The BLM would have fewer tools to improve vegetation conditions where this activity is restricted or closed.

Domestic cattle, goat, and sheep grazing would be allowed on all or portions of most potential ACECs, depending on the location and alternative. Livestock grazing and grazing infrastructure could damage the relevant and important values of a potential ACEC through damaging vegetation and weed spread. This would also degrade habitats and scenic values. Livestock grazing could also damage special status plants by consuming or damaging them. Relevant and important values associated with desert bighorn sheep could be threatened by disease transmission from domestic goats and sheep where domestic goat or sheep grazing occurs within or near potential ACECs with a desert bighorn sheep value. Intensive management would be used to adjust grazing to reduce impacts. Prohibiting or restricting domestic goat and sheep trailing close to desert bighorn sheep habitat would reduce the risk of disease transmission within potential ACECs with a desert bighorn sheep value.

Energy and minerals development could impact ACEC values by flattening, destroying, or removing vegetation, desired plant communities, and special status plant species; changing the visual landscape; degrading and fragmenting habitat; disturbing wildlife; causing erosion that could degrade aquatic habitats; spreading weeds; damaging cultural or geologic resources during road and facility construction; and contaminating surface water from wastewater spills and runoff containing drilling fluids. An NSO stipulation within an ACEC would eliminate these impacts by prohibiting surface occupancy or surface-disturbing activities associated with fluid mineral development. A CSU stipulation would allow mineral leasing with certain operational or locational constraints imposed by the BLM to protect an identified resource or value. This stipulation would reduce impacts on ACEC values associated with fluid mineral leasing. Closures to leasing of fluid minerals, coal, and nonenergy solid minerals, and closure to mineral materials disposal within potential ACECs would help protect ACEC values by eliminating surface-disturbance associated with energy and minerals development.

Recommending withdrawal of areas from locatable mineral entry within potential ACECs could help protect ACEC values if they are formally withdrawn. Withdrawal would eliminate the impacts of locatable minerals development on ACEC values within the portions of ACECs that were withdrawn. Specific impacts of locatable minerals development on ACEC values are of the same nature and type as impacts of general energy and minerals development.

Closing an area to casual use mining would protect stream bottoms, stream banks, riparian areas and floodplains from degradation impacts, including dredging, undercutting banks, and removing excess material.

A TL stipulation would close an area to fluid mineral development, as well as all surface-disturbing activities for a specific period, which could exceed 60 days. It does not generally apply to operation and basic maintenance, including associated vehicle travel. Intensive operations and maintenance would not be allowed. This stipulation would reduce impacts of the same nature and type as those described for mineral leasing when the period specified overlaps with a time when a biological ACEC value is particularly sensitive (e.g., when desert bighorn sheep are concentrating in their winter habitat).

An NGD restriction would prohibit other surface-disturbing activities, as defined in **Appendix B** and the glossary. This stipulation would greatly reduce impacts from surface disturbance on ACEC values. Specific impacts that could be reduced are flattening, destroying, or removing vegetation, desired plant communities, and special status plant species; degrading and fragmenting habitat; causing erosion that could degrade aquatic habitats; spreading weeds; and damaging cultural resources.

An SSR restriction would allow some surface-disturbing activities subject to special operational or locational constraints that could be applied by the BLM to protect a specified resource or value. This

BLM_0163463

stipulation would apply to the same types of activities as an NGD restriction and would also reduce impacts from those activities of the same nature and type described in the paragraph above. This restriction relies on project design, siting, and implementation of appropriate mitigation measures and monitoring protocols to ensure that the resource for which the restriction was designed to protect is adequately safeguarded.

Recreation, including travel, within potential ACECs could impact ACEC values by flattening, destroying, or removing vegetation, desired plant communities, and special status plant species; changing the visual landscape from construction of facilities; degrading and fragmenting habitat; disturbing wildlife; spreading weeds; and damaging cultural or geologic resources. Impacts would be reduced where camping and target shooting are restricted or prohibited and where travel is permanently or seasonally closed. Damage to geologic features or rock art would be reduced where rock climbing on those features is prohibited. Closure to rock climbing during bird breeding seasons would reduce degradation impacts on those birds from human disturbance and nest damage.

Recreation impacts are more likely to occur in ERMAs because ERMAs would attract more concentrated recreation focused on targeted recreation activities without focusing on recreational outcomes or experiences. Therefore, fewer restrictions on other resource uses would be implemented solely to protect recreational outcomes or experiences. Where they overlap, SRMAs could attract concentrated recreation to potential ACECs but would also allow the BLM to restrict land uses to enhance recreation opportunities and protect the resources supporting them. Impacts would be reduced where recreation was restricted to meet cultural and biological resource objectives or where educational facilities are constructed in a way that minimizes impacts on resources. Additionally, concentrating recreation in ERMAs and SRMAs could reduce recreation levels outside of the RMA areas and diminish impacts across an entire ACEC from dispersed recreation.

Identifying ACECs as ROW exclusion or avoidance areas would protect relevant and important values by reducing (for avoidance areas) or eliminating (for exclusion areas) impacts from development requiring a ROW permit including utilities, access roads, and renewable energy excluding geothermal. Designating utility corridors within potential ACECs could increase and concentrate impacts of utility development on those areas.

Acquisition of lands within designated ACECs could help protect relevant and important values by bringing additional acres under BLM control and managing those acres according to special protections for the resources they contain.

Stream segments eligible (Alternative A) or suitable (Alternatives B and D) for inclusion in the National Wild and Scenic Rivers System or lands managed to protect wilderness characteristics that overlap potential ACECs could also protect ACEC values due to complementary management objectives. Managing these areas would limit surface-disturbing activities and changes to the visual landscape and would protect existing resources.

### Effects Common to All Alternatives

Under all alternatives, management to protect and enhance riparian vegetation would protectively impact riparian ACEC values in the Roubideau-Potter-Monitor, Roubideau Corridors, San Miguel River, and San Miguel River Extension potential ACECs in the manner described above under **Nature and Type of Effects**.

Under all alternatives, emergency stabilization and response techniques would be applied to minimize impacts of wildfires. These techniques would protectively impact potential ACECs in the manner described under **Nature and Type of Effects**.

BLM_0163464

Under all alternatives, impacts from motorized and mechanized travel would be maintained or reduced because motorized and mechanized travel would be limited to existing (Alternative A) or designated (Alternatives B, C, D, and E) routes, at a minimum.

Under all alternatives, the Tabeguache Area would be managed as VRM Class I and ROW exclusion and would be withdrawn from locatable mineral entry. It would be closed to motorized and mechanized travel, wood cutting, coal leasing, fluid mineral leasing and geophysical exploration, nonenergy solid mineral leasing, and mineral materials disposal, in accordance with the Colorado Wilderness Act of 1993 (PL 103-77, August 13, 1993). Cultural values in the 5,290 acres of the Tabeguache Pueblo and Tabeguache Caves ACEC overlapping this area would be protected from surface disturbing activities that could damage the resources or the historical setting. Cultural and riparian values in the Tabeguache Creek ACEC within the Tabeguache Area would be protected from surface-disturbing activities that could damage the resources or historical setting.

All of the Adobe Badlands, Coyote Wash, Dolores River Slickrock Canyon, and Needle Rock potential ACECs overlap with WSAs, as do portions of the Dolores Slickrock Canyon (9,820 acres), La Sal Creek (3,420 acres), Lower Uncompahgre Plateau Cultural (1,300 acres), Roubideau Corridors (4,480 acres), Roubideau-Potter-Monitor (10,670 acres), and Salt Desert Shrub Ecosystem (3,940 acres) potential ACECs. Managing the WSAs to maintain their eligibility for consideration for wilderness would protect the relevant and important values by requiring new activities within WSAs to meet the nonimpairment criteria requiring new facilities or uses must be temporary and not create new surface disturbance (BLM 2012b). In addition, WSAs are closed to fluid mineral leasing, coal leasing, mineral material disposal, and ROWs. While not explicitly closed to nonenergy solid mineral leasing, development would likely create a new surface disturbance and thus not meet the nonimpairment criteria. These actions would protect ACEC values within overlapping portions of ACECs by prohibiting new surface-disturbing activities and the subsequent impacts of those activities in the manner described under *Nature and Type of Effects*.

The area of development potential for locatable minerals is generally considered to be the portion of the Planning Area west of the Uncompahgre Plateau. As such, impacts from locatable mineral exploration and development in potential ACECs east of the Uncompahgre Plateau is considered negligible. Acres currently withdrawn and recommended for withdrawal are still presented in the tables in this section but impacts in these areas will not be discussed further.

Implementing management for the following resources and resource uses would have negligible or no impact on ACECs' relevant and important values and are therefore not discussed in detail: air quality, climate change, wild horses, national trails and byways, and public health and safety.

### Alternatives

This section is structured by ACEC, then by alternative within the ACEC. The ACECs are organized in the order they appear in **Chapter 2**. Summary tables show overlapping land use allocations that could impact the relevant and important values for the ACEC proposed for designation under each alternative. For potential ACECs or portions of potential ACECs not proposed for designation under Alternatives A, C, D, and E, a summary of overlapping land use allocations that could impact the relevant and important values are shown in **Table 4-69** (Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative A), **Table 4-70** (Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative C), **Table 4-71** (Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative D), and **Table 4-72**, Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative E, at the end of this section. Because Alternative B proposes for designation all but 770 acres within the potential Biological Soil Crust and Roubideau Corridors ACECs, there is no summary table for ACECs not proposed for designation under Alternative B. Instead, those impacts are discussed in

BLM_0163465

text under the sections Alternative E East Paradox ACEC and Biological Soil Crust ACEC and Alternative E Roubideau Corridors ACEC and Roubideau-Potter-Monitor ACEC below.

*Adobe Badlands ACEC and Salt Desert Shrub ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-54** (Summary of Protections for Designated Adobe Badlands ACEC (Alternatives A, C, D, and E) and Salt Desert Shrub ACEC (Alternative B)). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

**Table 4-54**
**Summary of Protections for Designated Adobe Badlands ACEC (Alternatives A, C, D, and E) and Salt Desert Shrub ACEC (Alternative B)**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 6,370 | 34,510 | 6,370 | 6,370 | 6,370 |
| NL | 6,370 | 11,900 | 6,370 | 6,370 | 6,370 |
| NSO[1] | | 22,610 | | | 6,370 |
| CSU[1] | | 22,610 | | | 4,880 |
| TL[1] | 1,360 | 22,610 | | 6,370 | |
| Closed to mineral materials disposal | 6,370 | 34,510 | 6,370 | 6,370 | 6,370 |
| Within coal potential area | | 660 | | | |
| Closed to coal leasing | | 660 | | | |
| Within locatable mineral potential area | | | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | 6,370 | 34,510 | | | |
| NGD[1] | 6,370 | 34,510 | 6,370 | 6,370 | 6,370 |
| SSR[1] | | 34,510 | 6,370 | 6,370 | 10 |
| VRM Class I | 6,370 | 10,320 | 6,370 | 6,370 | 6,370 |
| VRM Class II | | 1,580 | | | |
| VRM Class III | | 22,600 | | | |
| VRM Class IV | | 10 | | | |
| Unavailable to livestock grazing | | 18,920 | | | |
| ROW avoidance | | 3,940 | | | |
| ROW exclusion | 6,370 | 30,540 | 6,370 | 6,370 | 6,370 |
| SRMA | | | | | |
| ERMA | | | 6,360 | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | 6,370 | 11,900 | 6,370 | 6,370 | 6,370 |

Source: BLM 2012a, 2018a, 2019
[1]Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect. Hatching indicates 0 acres or not applicable under this alternative.

Alternative A
The Adobe Badlands ACEC is designated. The ACEC overlaps with the Adobe Badlands WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Special status plant and animal species, scenic values and highly erodible soils would be protected.

BLM_0163046

The potential Salt Desert Shrub ACEC is not designated. A portion (30 percent) of the potential ACEC is within the Adobe Badlands WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under **Effects Common to All Alternatives**. Outside of the WSA, surface use restrictions would be applied minimally in the area and, as a result, the relevant and important values could be degraded as described above under **Nature and Type of Effects** where surface-disturbing activities occur. Application of TL stipulations on portions of the potential ACEC could mitigate these impacts to some extent, but the stipulations would not be targeted to protect ACEC values.

Alternative B

The Salt Desert Shrub ACEC would be designated; the entire Adobe Badlands ACEC is within the Salt Desert Shrub ACEC. The portion of the ACEC in the Adobe Badlands WSA (30 percent) would receive the same protective management described under **Effects Common to All Alternatives**. An additional 1,580 acres overlap the Adobe Badlands WSA Adjacent lands with wilderness characteristics unit, which also provides strict protections such as closed to fluid mineral leasing, closed to coal leasing, management according to VRM Class II objectives, and closed to motorized and mechanized travel. Outside of these areas, management protections would be greater than under Alternative A. For example, the entire area outside of the WSA and lands with wilderness characteristics unit would have an NSO stipulation for fluid mineral leasing, most of the ACEC would be managed as ROW exclusion and the remainder would be managed as ROW avoidance, and the entire ACEC would be closed to mineral material disposal. Management prescriptions are adequate to protect special status plant and animal species, as well as scenic values and highly erodible soils in the Adobe Badlands portion.

Alternative C

The Adobe Badlands ACEC would be designated. The ACEC overlaps with the Adobe Badlands WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Special status plant and animal species, scenic values, and highly erodible soils would be protected in a similar manner as Alternative A.

The potential Salt Desert Shrub ACEC would not be designated. The portion of the potential ACEC that is within the Adobe Badlands WSA (30 percent) would continue to receive the same protective management described under **Effects Common to All Alternatives**.

Overall, the management prescriptions identified in **Table T-1** would provide some protection for the special status plant and animal species within the potential Salt Desert Shrub ACEC. Outside of the WSA, nearly all of the area would be subject to CSU, or TL stipulations for fluid mineral development, and would be ROW avoidance. Because the stipulations would not be targeted at protecting the relevant and important values, impacts could be experienced if the stipulations were excepted, modified, or waived by the BLM Authorized Officer.

Other than the stipulations for fluid minerals and an SSR restriction for other surface-disturbing activities that would protect the relevant and important values on approximately 16,590 acres of the potential Salt Desert Shrub ACEC, few surface use restrictions would be in place. Where surface-disturbing activities occur, the special status plant and animal species could be impacted as described under **Nature and Type of Effects**.

Alternative D

The Adobe Badlands ACEC would be designated. The ACEC overlaps with the Adobe Badlands WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Special status plant and animal species, scenic values and highly erodible soils would be protected in a similar manner as Alternative A.

BLM_0163467

The potential Salt Desert Shrub ACEC would not be designated. Of the 34,540 acres comprising the potential ACEC, 6,380 acres are within the Adobe Badlands ACEC and would receive the same protections described above. Of the remaining 28,130 acres, 3,940 acres are within the Adobe Badlands WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Management prescriptions identified in **Table T-1** would help protect the special status species values within the potential Salt Desert Shrub ACEC. Outside of the WSA, nearly all of the area would be subject to CSU and TL stipulations for fluid mineral development, and about one-half would be ROW avoidance. Most of the area would also have an SSR restriction. Because the stipulations would not be targeted at protecting the relevant and important values, impacts could be experienced if the stipulations were excepted, modified, or waived by the BLM Authorized Officer.

About one-half of the potential Salt Desert Shrub ACEC would overlap the Adobe Ecological Emphasis Area, which would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would also provide protection to the special status species identified as relevant and important values. Surface use restrictions (same as those identified above) associated with the ecological emphasis area would apply throughout the potential ACEC providing some protection to the relevant and important values from surface-disturbing activities as described under **Nature and Type of Effects**.

Alternative E

The Adobe Badlands ACEC would continue to be designated. The ACEC overlaps with the Adobe Badlands WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Special status plant and animal species, scenic values, and highly erodible soils would be protected in a similar manner as Alternative A. The ACEC is not within a coal or locatable mineral potential area. The potential Salt Desert Shrub ACEC would not be designated. Of the 34,510 acres comprising the potential ACEC, 6,370 acres are within the Adobe Badlands ACEC and would receive the same protections described above. Of the remaining 28,140 acres, 3,940 acres are within the Adobe Badlands WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Management prescriptions identified in **Table T-1** would help protect the special status species values within the potential Salt Desert Shrub ACEC. Outside of the WSA, nearly all of the area would be subject to CSU stipulations for fluid mineral development, and about 40 percent would be ROW avoidance or exclusion. Most of the area would also have an SSR or NGD restriction. Because stipulations would not be targeted at protecting the relevant and important values, impacts could be experienced if the stipulations were excepted, modified, or waived by the BLM Authorized Officer.

*Fairview South ACEC, Fairview South (CNHP Expansion) ACEC, and Fairview South (BLM Expansion) ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-55** (Summary of Protections for Designated Fairview South ACEC (Alternatives A and C) Fairview South (CNHP Expansion) ACEC (Alternative B), and Fairview South (BLM Expansion) ACEC (Alternatives D and E)). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

BLM_0163468

**Table 4-55**
**Summary of Protections for**
**Designated Fairview South ACEC (Alternatives A and C)**
**Fairview South (CNHP Expansion) ACEC (Alternative B), and**
**Fairview South (BLM Expansion) ACEC (Alternatives D and E)**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 210 | 4,250 | 210 | 610 | 610 |
| NL | | | | | |
| NSO[1] | 210 | 4,250 | | 610 | 610 |
| CSU[1] | | 4,250 | 210 | 610 | 610 |
| TL[1] | 170 | 4,250 | 110 | 610 | 460 |
| Closed to mineral materials disposal | 210 | 4,250 | 210 | 610 | 610 |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | | | | |
| Withdrawn from locatable mineral entry | 50 | 1,480 | 50 | 220 | 220 |
| Recommend for withdrawal from locatable mineral entry | 210 | 4,250 | | | |
| NGD[1] | 210 | 4,250 | | | |
| SSR[1] | | 4,160 | 210 | 610 | 610 |
| VRM Class I | | | | | |
| VRM Class II | | 510 | | | |
| VRM Class III | 210 | 3,740 | 210 | 610 | 610 |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 4,250 | | 610 | 610 |
| ROW avoidance | | 110 | 210 | | |
| ROW exclusion | 210 | 4,140 | | 610 | 610 |
| SRMA | | 1,630 | | | |
| ERMA | | | | | |
| Closed to motorized travel | 210 | 980 | | | |
| Closed to motorized and mechanized travel | | 500 | | 610 | 610 |

Source: BLM 2012a, 2018a, 2019
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect. Hatching indicates 0 acres or not applicable under this alternative.

Alternative A

The Fairview South ACEC is designated. Management prescriptions which include NGD, NSO, closed to OHV use and closed to mineral material disposal provide protection for the special status plants within this ACEC. Impacts from livestock grazing can occur from trampling or grazing of the plants, and from alteration of the plant community, as described under **Nature and Type of Effects**. Because a larger portion of clay-loving wild buckwheat are located within the potential Fairview South (BLM Expansion) area outside of the existing ACEC, not designating this area as an ACEC results in a loss of focused protection for the plant species afforded by ACEC designation. However, the area receives some incidental protection from managing other resources as further described.

The potential Fairview South (BLM Expansion) and the Fairview South (CNHP Expansion) ACECs are not designated. Of the 610 acres comprising the potential Fairview South (BLM Expansion) ACEC and the 4,250 acres comprising the potential Fairview South (CNHP Expansion) ACEC, 210 acres of each are within the existing Fairview South ACEC and receive the same protections described above.

BLM_0163469

Outside of the overlap, the management prescriptions identified in **Table T-1** provide minimal protection for the special status plant and animal species and botanical values within the potential ACECs.

Fluid mineral development could cause surface disturbance that could damage or destroy plants and habitat as described under **Nature and Type of Effects**. Application of TL stipulations would provide some incidental protections across the potential ACEC and would provide incidental protection to the values during the timeframe specified in the stipulation. Because the potential ACECs would be available for mineral materials disposal and ROW location, the relevant and important values could be degraded as described above under **Nature and Type of Effects** if these activities were to occur in the area. Both motorized and mechanized travel would be limited to existing routes in the potential ACECs, which would prevent damage of plants and disruption of wildlife in most cases. Finally, impacts from livestock grazing can occur, as described for the Fairview South ACEC and under **Nature and Type of Effects**

Alternative B
The Fairview South (CNHP Expansion) ACEC would be designated. This ACEC includes the entire area of the potential Fairview South and Fairview South (BLM Expansion) ACECs. Management prescriptions summarized in **Table T-1** would provide protection for the special status plants and wildlife within this ACEC. This ACEC would provide similar management protections for the values as Alternative A, but over a larger area (20 times larger). The largest density of clay-loving wild buckwheat individuals would be within a designated ACEC under this alternative providing the most protection in the form of focused management of any of the alternatives.

Alternative C
The Fairview South ACEC would be designated. This is the same boundary as the existing ACEC. Management prescriptions would provide more protection for the special status plants within this ACEC than under Alternative A. A CSU stipulation would be applied to fluid mineral leasing and an SSR restriction placed on other surface-disturbing activities. These stipulations and restriction rely on project design, siting, and implementation of appropriate mitigation measures and monitoring protocols to ensure that the special status plants are adequately safeguarded. Similarly, the ACEC would be managed as a ROW avoidance area under Alternative C instead of as a ROW exclusion area as under Alternative A. This could allow land use authorizations in the ACEC but they would be required to be mitigated so as not to impair the special status plants.

The potential Fairview South (BLM Expansion) and the potential Fairview South (CNHP Expansion) would not be designated. Of the 610 acres comprising the potential Fairview South BLM Expansion ACEC and the 4,250 acres comprising the potential Fairview South (CNHP Expansion) ACEC, 210 acres would be within the Fairview South ACEC and would receive the same protections describe above. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the special status plant and animal species and botanical values within the potential ACECs. Because a larger portion of clay-loving wild buckwheat are located within the potential Fairview South (BLM Expansion) area outside of the existing ACEC, not designating this area as an ACEC would result in a loss of focused protection for the plant species afforded by ACEC designation. However, the area may receive some incidental protection from managing other resources as further described.

Overall, protection would increase over Alternative A. Application of CSU and SSR stipulations across the potential Fairview South (BLM and CNHP Expansion) ACECs would mitigate impacts from fluid mineral development and other surface-disturbing activities, but these stipulations would not be targeted to protect ACEC values. If the restrictions were excepted, modified, or waived by the BLM Authorized Officer, impacts on these values could occur as described under **Nature and Type of Effects**.

BLM_0163470

While more of the potential Fairview South (BLM and CNHP Expansion) ACECs would be closed to mineral materials disposal compared with Alternative A, this activity could still impact ACEC values on the remainder of the ACEC as described under **Nature and Type of Effects**.

Managing all of the potential Fairview South (BLM and CNHP Expansion) ACECs as ROW avoidance would decrease the risk of land use authorizations within the areas compared with Alternative A. Impacts of the ACEC being open for livestock grazing would be the same as under Alternative A.

Overlap of portions of the potential Fairview South (CNHP Expansion) ACEC with the Kinikin Hills ERMA (1,630 acres), a portion of which would be open to cross-country motorized and mechanized travel (1,120 acres), could increase impacts from recreation compared with Alternative A. Impacts of recreation on special status plants and wildlife are described under **Nature and Type of Effects**.

Alternative D

The Fairview South (BLM Expansion) ACEC would be designated. This ACEC includes the entire area of the existing Fairview South ACEC. Surface uses would be heavily restricted in the area as summarized in **Table T-1** providing protection for the special status plants and wildlife within this ACEC. This ACEC would provide similar management protections for the values as Alternative A, but over a larger area (about 3 times larger). The ACEC would be unavailable to livestock grazing, which would provide greater protection for the special status plants than would Alternative A. The ACEC would have an SSR restriction, which would be less protective than Alternative A, which is NGD. The SSR restriction would rely on project design, siting, and implementation of appropriate mitigation measures to ensure that the special status plants are adequately safeguarded.

The potential Fairview South (CNHP Expansion) would not be designated. Of the 4,250 acres comprising the potential ACEC, 610 acres are within the Fairview South (BLM Expansion) ACEC and would receive the same protections described above. Outside of the overlap, management prescriptions identified in **Table T-1** would help protect the special status plant and animal species and botanical values within the potential ACEC.

While portions of the potential Fairview South (CNHP Expansion) ACEC would be protected from the impacts of fluid mineral development by an NSO stipulation, fluid mineral activity could impact ACEC values on the remainder of the area. In the remaining area, impacts would be mitigated through application of CSU stipulations targeted at protecting the potential biological soil crusts and BLM sensitive plant species. Impacts of fluid mineral leasing would be increased compared with Alternative A and are described under **Nature and Type of Effects**. The potential ACEC would also be protected by an SSR restriction for surface-disturbing activities aimed directly at protecting the BLM sensitive plant species.

A portion of the potential Fairview South (CNHP Expansion) ACEC would be unavailable to livestock grazing, which would reduce the risk of impacts from grazing on vegetation as described under **Nature and Type of Effects**. Overlap of a portion of the potential ACEC with the Kinikin Hills ERMA could increase recreation impacts compared with Alternative A. Impacts of recreation are described under **Nature and Type of Effects**. Allowing motorized and mechanized travel within the area would have the same impacts as under Alternative A.

Alternative E
Impacts for the designated Fairview South (BLM Expansion) ACEC would be the same as described under Alternative D. The ACEC is not within the coal or locatable mineral potential area and has very low potential for oil and gas. Approximately 90 percent of the estimated global population of clay-loving wild buckwheat would be protected within the ACEC boundary.

BLM_0163471

The potential Fairview South (CNHP Expansion) would not be designated. Impacts would be the same as described under Alternative D.

*Needle Rock ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-56** (Summary of Protections for Designated Needle Rock ACEC).

**Table 4-56**
**Summary of Protections for Designated Needle Rock ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 80 | 80 | 80 | 80 | 80 |
| NL | 80 | 80 | 80 | 80 | 80 |
| NSO[1] | | | | | 80 |
| CSU[1] | | | | | 60 |
| TL[1] | 80 | 80 | 80 | 80 | 80 |
| Closed to mineral materials disposal | 80 | 80 | 80 | 80 | 80 |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | 80 | 80 | | 80 | 80 |
| NGD[1] | 80 | 80 | 80 | 80 | 80 |
| SSR[1] | | 40 | 70 | 80 | 80 |
| VRM Class I | 80 | 80 | 80 | 80 | 80 |
| VRM Class II | | | | | |
| VRM Class III | | | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | 80 | 80 | 80 | 80 | 80 |
| ROW avoidance | | | | | |
| ROW exclusion | 80 | 80 | 80 | 80 | 80 |
| SRMA | | | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | | | | |

Source: BLM 2012a, 2018a, 2019
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Alternatives A, B, C, D, and E
The Needle Rock ACEC would be designated in all alternatives. The ACEC overlaps the Needle Rock Instant Study Area (ISA) and would continue to receive the same protective management described under ***Effects Common to All Alternatives***. The ACEC is not within the coal or locatable mineral potential area and has very low potential for oil and gas.

While the action alternatives propose the area for management according to VRM Class II objectives, because it is an ISA, it is automatically managed according to VRM Class I objectives per BLM policy. Alternative B.1 also would close the area to fluid mineral leasing. This would prohibit surface-disturbing activities associated with fluid minerals development and protect the relevant and important values in

the same way as an NSO stipulation proposed under the other action alternatives; therefore, impacts are the same from fluid minerals development under all alternatives.

*San Miguel River ACEC and San Miguel River Expansion ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-57** (Summary of Protections for Designated San Miguel River ACEC (Alternatives A, C, D, and E) and San Miguel River Expansion ACEC (Alternative B)). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

**Table 4-57**
**Summary of Protections for Designated San Miguel River ACEC (Alternatives A, C, D, and E) and San Miguel River Expansion ACEC (Alternative B)**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 22,780 | 35,480 | 22,780 | 22,780 | 21,660 |
| NL | | 35,480 | | | |
| NSO[1] | 160 | | 380 | 22,780 | 21,660 |
| CSU[1] | 15,460 | | 22,780 | 21,310 | 19,660 |
| TL[1] | 19,890 | 35,480 | 18,890 | 22,780 | 21,340 |
| Closed to mineral materials disposal | 22,780 | 35,480 | | 22,780 | 21,660 |
| Within coal potential area | | 4,210 | 3,720 | 3,710 | 3,040 |
| Closed to coal leasing | | 4,210 | | 3,710 | 3,040 |
| Within locatable mineral potential area | 22,780 | 35,480 | 22,780 | 22,780 | 21,660 |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | | 35,480 | | | 2,440 |
| NGD[1] | | 32,830 | | | |
| SSR[1] | | 35,430 | 17,750 | 21,580 | 19,510 |
| VRM Class I | | 2,560 | | 1,100 | 1,100 |
| VRM Class II | 21,890 | 10,170 | 30 | 7,160 | 5,700 |
| VRM Class III | | 22,750 | 22,750 | 14,520 | 14,860 |
| VRM Class IV | 850 | | | | |
| Unavailable to livestock grazing | 16,250 | 35,480 | 16,250 | 18,670 | 18,000 |
| ROW avoidance | | 340 | 18,650 | 19,300 | 850 |
| ROW exclusion | 22,780 | 35,140 | | 2,430 | 2,810 |
| SRMA | 22,780 | 35,090 | | 22,780 | 18,340 |
| ERMA | | | 22,780 | | |
| Closed to motorized travel | 11,530 | | | | |
| Closed to motorized and mechanized travel | | 11,180 | | 5,400 | 3,820 |

Source: BLM 2012a, 2018a, 2019
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect. Hatching indicates 0 acres or not applicable under this alternative.

Alternative A

The San Miguel River ACEC is designated. Management prescriptions summarized in **Table 4-57** provide protection for the scenic and riparian values and special status species within this ACEC but they are vulnerable to damage caused by continued recreational mining and locatable mineral entry. Impacts would be as described above under ***Nature and Type of Effects***.

BLM_0163473

The potential San Miguel River Expansion ACEC is not designated. Of the 35,420 acres comprising the potential ACEC, 22,710 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the scenic and riparian values and special status species values within the potential ACEC.

While over half of the potential San Miguel River Expansion ACEC would continue to be protected from fluid mineral development by application of CSU stipulations, development in the remainder of the area could cause surface disturbance that could degrade relevant and important values as described under **Nature and Type of Effects**. Because all of the potential ACEC would be available for locatable mineral entry and ROW location, the relevant and important values could be degraded as described above under **Nature and Type of Effects** if these activities were to occur in the area.

Livestock grazing in the potential ACEC could damage riparian areas as described under **Nature and Type of Effects**. It should be noted that the area available to livestock grazing is currently ungrazed.

There is no VRM class objective in the area so development could be allowed that would diminish the scenic value.

Portions of Beaver Creek, Saltado Creek, and the San Miguel River have been determined eligible for inclusion in the NWSRS and flow through the potential San Miguel River Expansion ACEC. Management of the segments to protect their free-flowing condition, tentative classification, and ORVs (including vegetation, scenic, and wildlife) would provide protection to the riparian vegetation, scenic values, and wildlife species within the potential ACEC where they overlap the WSR study corridors. Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian ecosystems by ensuring sufficient flows to maintain the habitat.

Alternative B
The San Miguel River Expansion ACEC would be designated. This ACEC would offer management protections for the scenic and riparian values and special status species over a greater area than would Alternative A. Management prescriptions summarized in **Table 4-57** would provide more management protections than Alternative A: rather than NSO, the ACEC would not be open to leasing fluid minerals; it would have an NGD restriction; it would be unavailable to livestock grazing; and would be recommended for withdrawal for locatable mineral entry. Impacts of each would be as described above under **Nature and Type of Effects**. Approximately 36 percent of the ACEC would be managed according to VRM Class I or II objectives, in contrast with 62 percent that would be managed according to VRM Class II objectives under Alternative A. However, the remainder of the ACEC under Alternative B would be managed according to VRM Class III objectives while 36 percent of the ACEC would not have a VRM Class under Alternative A. Overall, Alternative B provides less protection for the scenic value than Alternative A.

Alternative C
The San Miguel River ACEC would be designated. The management prescriptions summarized in **Table 4-57** would provide protection for the scenic and riparian values and special status species within this ACEC. However, the types of restrictions would be less protective than under Alternative A and would rely on project design, siting, and implementation of appropriate mitigation measures and monitoring protocols to ensure that the values for which the restrictions were designed to protect are adequately safeguarded. The most notable difference between Alternative A and Alternative C is that the San Miguel River RMA under Alternative A would be managed as an ERMA under this alternative. As a result, use restrictions could decrease because the BLM would not be managing the area to maintain

BLM_0163474

user experiences. Therefore, ACEC values would not receive the same level of incidental protections from recreation management as under Alternative A.

The potential San Miguel River Expansion ACEC would not be designated. Of the 35,420 acres comprising the potential ACEC, 22,710 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the scenic and riparian values and special status species values within the ACEC.

The potential for impacts from fluid mineral development would decrease compared with Alternative A because most of the area would be subject to CSU stipulations in addition to TL stipulations. Because the stipulations would not be targeted at protecting the relevant and important values, impacts could be experienced if the stipulations were excepted, modified, or waived by the BLM Authorized Officer.

Just over half of the potential San Miguel River Expansion ACEC would be managed as VRM Class II, which would help protect the scenic relevant and important values and provide incidental protection to the special status wildlife in the area by requiring that development be constructed in a manner that maintains the existing character of the landscape.

Other surface use restrictions over most of the potential San Miguel River Expansion ACEC including an SSR restriction for other surface-disturbing activities and ROW avoidance would help protect the relevant and important values as described under **Nature and Type of Effects**.

Unlike under Alternative A, a portion of the potential San Miguel River Expansion ACEC is within the coal potential area under Alternative C. Coal exploration and development within this area would impact ACEC values as described under **Nature and Type of Effects**.

The entire potential San Miguel River Expansion ACEC would be available for locatable mineral entry and development; impacts would be the same as described under Alternative A.

The potential San Miguel River Expansion ACEC would be within the San Miguel River ERMA; impacts would be similar to those described for the San Miguel River ACEC designated under this alternative.

Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian ecosystems to maintain habitat.

Alternative D

The San Miguel River ACEC would be designated. The management prescriptions summarized in **Table 4-57** would provide protection for the scenic and riparian values and special status species within this ACEC and the type of restrictions would afford similar protections as under Alternative A. The most notable differences between Alternative A and Alternative D are that more acres would be managed as VRM Class III and fewer acres would be managed as ROW exclusion under Alternative D.

The potential San Miguel River Expansion ACEC would not be designated. Of the 35,420 acres comprising the potential ACEC, 22,780 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the scenic and riparian values and special status species within the ACEC.

Most of the potential San Miguel River Expansion ACEC would be managed according to VRM Class III objectives which would allow modifications to the landscape that attract the attention of the casual observer. This could impair the scenic value and allow surface-disturbing activities that could impair the other relevant and important values in the potential ACEC.

BLM_0163475

Management would be more protective than that under Alternative A. An increase in acres subject to CSU and TL stipulations compared with Alternative A would add some protections to complement NSO stipulations. In some cases, these stipulations would be targeted to protect ACEC values.

An SSR restriction for other surface-disturbing activities on nearly 90 percent of the potential San Miguel River Expansion ACEC would provide some incidental protection for the relevant and important values. This restriction would rely on project design, proper siting, and implementation of appropriate mitigation to ensure that the resource for which the restriction was designed to protect is adequately safeguarded.

While some of the potential San Miguel River Expansion ACEC would be closed to mineral material disposal, mineral material development, locatable mineral entry, and coal development could all impact relevant and important values as described under **Nature and Type of Effects**.

Approximately 84 percent of the potential San Miguel River Expansion ACEC would be managed as ROW avoidance, which would reduce the risk of impacts from land use authorizations on relevant and important values.

The overlap of most of the potential San Miguel River Expansion ACEC with the San Miguel River SRMA could increase concentration of recreation in the area but would also give the BLM additional tools to manage that recreation to protect the activities and the setting.

Portions of San Miguel River Segments 1 and 3 would be determined suitable for inclusion in the NWSRS and flow through the potential San Miguel River Expansion ACEC outside of the existing San Miguel River ACEC. Management of the segments to protect their free-flowing condition, tentative classification, and ORVs (including vegetation, scenic, and wildlife) would provide protection to the riparian vegetation, scenic values, and wildlife species within the potential ACEC where they overlap the WSR study corridors. Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian ecosystems by ensuring sufficient flows to maintain the habitat. Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian ecosystems to maintain habitat.

Alternative E
The San Miguel River ACEC would be designated. The size of the ACEC would be adjusted to 21,660 acres in Alternative E to further align the ACEC boundary to the relevant and important values. This was completed based on the topography of the area and facilitated by improvements in GIS mapping from when the ACEC report (**Appendix O**) was first drafted. The management prescriptions summarized in **Table 4-57** would provide protection for the scenic and riparian values and special status species within this ACEC, and the type of restrictions would afford similar protections as under Alternative A. Approximately 3,040 acres (14 percent) are within the coal potential area and would be closed for further consideration of coal leasing. The whole ACEC is within a locatable mineral potential area but is not recommended for withdrawal from locatable mineral entry. Finally, the ACEC has moderate potential for oil and gas development and would be subject to NSO stipulations. The most notable differences between Alternative A and Alternative E are more acres would be managed as VRM Class III, and fewer acres would be managed as ROW exclusion under Alternative E.

The potential San Miguel River Expansion ACEC would not be designated. Of the 35,420 acres comprising the potential ACEC, 21,660 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the scenic and riparian values and special status species within the ACEC.

BLM_0163476

Most of the potential San Miguel River Expansion ACEC would be managed according to VRM Class III objectives, which would allow modifications to the landscape that attract the attention of the casual observer. This could impair the scenic value and allow surface-disturbing activities that could impair the other relevant and important values in the potential ACEC.

Management would be more protective than under Alternative A. An increase in acres subject to CSU and TL stipulations compared with Alternative A would add some protections to complement NSO stipulations. In some cases, these stipulations would be targeted to protect ACEC values.

An SSR restriction for other surface-disturbing activities on nearly 90 percent of the potential San Miguel River Expansion ACEC would provide some incidental protection of the relevant and important values. This restriction would rely on project design, proper siting, and implementation of appropriate mitigation to ensure that the resource for which the restriction was designed to protect is adequately safeguarded.

While some of the potential San Miguel River Expansion ACEC would be closed to mineral material disposal, mineral material development, locatable mineral entry, and coal development could all impact relevant and important values, as described under **Nature and Type of Effects**.

Approximately 87 percent of the potential San Miguel River Expansion ACEC would be managed as ROW avoidance, which would reduce the risk of impacts from land use authorizations on relevant and important values.

The overlap between the potential San Miguel River Expansion ACEC and the San Miguel River SRMA could increase the concentration of recreation in the area, but would also give the BLM additional tools to manage that recreation to protect the activities and the setting.

Portions of San Miguel River Segments 1 and 3 would be determined suitable for inclusion in the NWSRS and flow through the potential San Miguel River Expansion ACEC outside of the existing San Miguel River ACEC. Management of the segments to protect their free-flowing condition, tentative classification, and ORVs (including vegetation, scenic, and wildlife) would provide protection to the riparian vegetation, scenic values, and wildlife species within the potential ACEC where they overlap the WSR study corridors. Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian ecosystems by ensuring sufficient flows to maintain the habitat. Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian ecosystems to maintain habitat.

*Tabeguache Creek ACEC*

The potential for impacts on the relevant and important values of the ACEC proposed for designation is summarized in **Table 4-58** (Summary of Protections for Designated Tabeguache Creek ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69** and **Table 4-70** at the end of this section.

Alternative A

The Tabeguache Creek ACEC would be designated. The ACEC is within the Tabeguache Area and would continue to receive the same protective management described under **Effects Common to All Alternatives** and **Assumptions**. Cultural and aquatic/riparian values would be protected.

BLM_0163477

**Table 4-58**
**Summary of Protections for Designated Tabeguache Creek ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | **560** | **0** | **0** | **0** | **0** |
| NL | 560 | | | | |
| NSO[1] | | | | | |
| CSU[1] | | | | | |
| TL[1] | | | | | |
| Closed to mineral materials disposal | 560 | | | | |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | 560 | | | | |
| Withdrawn from locatable mineral entry | 560 | | | | |
| Recommend for withdrawal from locatable mineral entry | | Not Designated | Not Designated | Not Designated | Not Designated |
| NGD[1] | | | | | |
| SSR[1] | | | | | |
| VRM Class I | 560 | | | | |
| VRM Class II | | | | | |
| VRM Class III | | | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | | | | |
| ROW avoidance | | | | | |
| ROW exclusion | 560 | | | | |
| SRMA | | | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | 560 | | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the authorized officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or stipulation, restriction, or protection is not applicable under this alternative.

<u>Alternatives B, C, D, and E</u>
The Tabeguache Creek ACEC would not be designated. However, because the ACEC is within the Tabeguache Area, it would continue to receive the same protective management described under ***Effects Common to All Alternatives*** and ***Assumptions***. Cultural and aquatic/riparian values would be protected in the same manner as under Alternative A.

*Dolores Slickrock Canyon ACEC, Dolores River Slickrock Canyon ACEC, Coyote Wash ACEC*
The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-59** (Summary of Protections for Designated Dolores Slickrock Canyon ACEC and Coyote Wash ACEC (Alternative B) and Dolores River Slickrock Canyon ACEC (Alternative D)). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

BLM_0163478

4. Environmental Consequences (Areas of Critical Environmental Concern)

**Table 4-59**
**Summary of Protections for Designated Dolores Slickrock Canyon ACEC and Coyote Wash ACEC (Alternative B)[1] and Dolores River Slickrock Canyon ACEC (Alternative D)**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 10,670 | 0 | 9,780 | 0 |
| NL | | 10,670 | | 9,780 | |
| NSO[2] | | | | | |
| CSU[2] | | | | | |
| TL[2] | | 10,670 | | 9,780 | |
| Closed to mineral materials disposal | | 10,670 | | 9,780 | |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | 10,670 | | 9,780 | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | | 10,670 | | 9,780 | |
| NGD[2] | | 10,670 | | 9,780 | |
| SSR[2] | | 10,670 | | 9,780 | |
| VRM Class I | Not Designated | 9,830 | Not Designated | 9,780 | Not Designated |
| VRM Class II | | 840 | | | |
| VRM Class III | | | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 4,380 | | 2,380 | |
| ROW avoidance | | | | | |
| ROW exclusion | | 10,670 | | 9,780 | |
| SRMA | | 9,790 | | 9,780 | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | 9,880 | | 9,780 | |

Source: BLM 2012a, 2018a
[1] Coyote Wash is within Dolores Slickrock Canyon, so acres are not shown separately
[2] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Alternative A
The Dolores Slickrock Canyon, Dolores River Slickrock Canyon and Coyote Wash ACECs would not be designated. The Dolores River Slickrock Canyon and Coyote Wash ACECs are entirely within the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. The potential ACECs are available for domestic goat and sheep grazing which increases the risk of disease transmission from domestic goats and sheep to desert bighorn sheep, one of the relevant and important values. It should be noted that there is currently no sheep grazing in Dolores Canyon, so risks are low. However, if any cattle allotments were converted to goat or sheep allotments, the risk of disease transmission would increase.

Portions of the Dolores River and La Sal Creek have been determined eligible for inclusion in the NWSRS and flow through the three potential ACECs. Management of the segments to protect the free-flowing condition, tentative classification, and ORVs (including scenic, fish, wildlife, ecologic, and vegetation) would provide protection to the scenic, special status fish species, rare plants, and wildlife within the ACECs where they overlap the WSR study corridor.

BLM_0163479

Most of the potential Dolores Slickrock Canyon ACEC (92 percent) is within the Dolores River Canyon WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. A TL stipulation for fluid minerals would also apply on part of the area to protect peregrine falcon nests and crucial big game (desert bighorn sheep) winter habitat. Other surface-disturbing activities would not be restricted resulting in the potential for impacts described under *Nature and Type of Effects*. There is no VRM class objective in the potential Dolores Slickrock Canyon ACEC outside of the WSA so development could be allowed that would diminish the scenic value.

Alternative B

The Dolores Slickrock Canyon and Coyote Wash ACECs would be designated. The potential Dolores River Slickrock Canyon ACEC (which would not be designated under this alternative) and the Coyote Wash ACEC are entirely within the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. The management prescriptions summarized in **Table 4-59** would provide the most protection of all alternatives for the riparian communities, BLM sensitive species, and scenic values within the ACECs.

Over half of the Dolores Slickrock Canyon ACEC would be closed to domestic goat and sheep grazing which would reduce the risk of disease transmission from domestic goats and sheep to desert bighorn sheep, one of the relevant and important values in the Dolores Slickrock Canyon ACEC and potential Dolores River Slickrock Canyon ACEC. However the risk would persist in the remaining area, although it is currently not grazed by domestic goats or sheep.

Portions of the Dolores River and La Sal Creek have been determined suitable for inclusion in the NWSRS and flow through the Dolores Slickrock Canyon ACEC. Management of the segments to protect the free-flowing condition, tentative classification, and ORVs would provide protection to the values within the ACEC where they overlap the WSR study corridor.

Outside of the Dolores River Canyon WSA, the Dolores Slickrock Canyon ACEC would be managed as VRM Class II which would provide protection to the scenic value as described under Nature and Type of Effects.

Alternative C

The potential Dolores Slickrock Canyon, Dolores River Slickrock Canyon and Coyote Wash ACECs would not be designated.

The potential Dolores River Slickrock Canyon and Coyote Wash ACECs are entirely within the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Most of the potential Dolores Slickrock Canyon ACEC (92 percent) is within the Dolores River Canyon WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*.

The three potential ACECs would be closed to domestic goat grazing, while domestic sheep grazing would be managed to minimize contact with desert bighorn sheep. Compared with Alternative A, this would minimize the risk of disease transmission between domestic sheep and desert bighorn sheep, one of the relevant and important values, from disease transmission.

Outside of the Dolores River Canyon WSA, there would be surface use restrictions (CSU and SSR on most of the area) to protect the rare vegetation communities and special status wildlife. Managing nearly all of the area as VRM Class II would provide protection to the scenic value by minimizing landscape modifications. In addition, nearly all of the potential ACECs would overlap the La Sal Ecological Emphasis

BLM_0163480

Area, which would provide some incidental protection to the special status species identified as relevant and important values as described under *Nature and Type of Effects*.

<u>Alternative D</u>
The Dolores River Slickrock Canyon ACEC would be designated. The Dolores River Slickrock Canyon ACEC overlaps the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Surface uses would be as summarized in **Table 4-59**. Because the potential Coyote Wash ACEC is completely within the Dolores River Slickrock Canyon ACEC, its values would be protected.

The potential Dolores Slickrock Canyon ACEC would not be designated; however, about 92 percent (9,780 acres) is within the Dolores River Slickrock Canyon ACEC and would receive the same protections. Of the remaining 890 acres not proposed for designation under this alternative, 80 acres are within the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the special status species and scenic values within the potential ACECs.

While there is no sheep grazing in the potential ACECs currently, under Alternative D cattle allotments could not be converted to sheep allotments in high probability for interaction areas unless it was determined that sheep grazing could be accomplished below high probability levels. Domestic goat grazing would be excluded on 4,190 acres of the potential Dolores Slickrock Canyon ACEC (39 percent), also accounting for 43 percent of the Dolores River Slickrock Canyon ACEC. This would help protect desert bighorn sheep, one of the relevant and important values, from disease transmission.

Portions of the Dolores River and La Sal Creek would be determined suitable for inclusion in the NWSRS and flow through the Dolores River Slickrock Canyon ACEC and potential Dolores Slickrock Canyon ACEC. Management of the segments to protect the free-flowing condition, tentative classification, and ORVs (including scenic, fish, wildlife, ecologic, and vegetation) would provide protection to the scenic, special status fish species, rare plants, and wildlife within the ACEC or potential ACEC where they overlap the WSR study corridor.

The potential Dolores Slickrock Canyon ACEC would overlap the La Sal Ecological Emphasis Area, which would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would also provide some protection to the special status species identified as relevant and important values.

Because the majority of the potential Dolores Slickrock Canyon ACEC would be managed as VRM Class I (within the WSA) or II (880 acres, 99 percent), impacts of which are described under *Nature and Type of Effects*, the scenic values would be protected. In addition, managing to meet VRM Class I or II objectives could preclude surface-disturbing activities such as mineral development, ROW location, and recreation facilities if they are not able to meet the visual resource objectives. Where these types of activities are able to be mitigated in order to meet VRM objectives, it is likely that the associated mitigation, such as surface reclamation, revegetation techniques, and minimizing cuts and fills, would also minimize impacts on the riparian and special status plant and wildlife species over the long-term.

<u>Alternative E</u>
The potential Dolores Slickrock Canyon ACEC and Coyote Wash ACEC would not be designated; however, approximately 92 percent (9,820 acres) is within the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the special status species and scenic values within the potential ACECs. Surface uses would be

as summarized in **Table 4-59**. Because the potential Coyote Wash ACEC is completely within the Dolores River Canyon WSA, its values would be protected.

While there is no sheep grazing in the potential ACECs currently, under Alternative E, cattle allotments could not be converted to sheep allotments in high probability for interaction areas, unless it is determined that sheep grazing could be accomplished below high probability levels. Domestic goat grazing would be excluded on 2,390 acres (22 percent) of the potential Dolores Slickrock Canyon ACEC. This would help protect desert bighorn sheep, one of the relevant and important values, from disease transmission.

Portions of the Dolores River and La Sal Creek are determined suitable for inclusion in the NWSRS and flow through the Dolores River Slickrock Canyon ACEC and potential Dolores Slickrock Canyon ACEC. Management of the segments to protect the free-flowing condition, tentative classification, and ORVs (including scenic, fish, wildlife, ecologic, and vegetation) would provide protection to the scenic, special status fish species, rare plants, and wildlife within the ACEC or potential ACEC where they overlap the WSR study corridor.

Because the majority of the potential Dolores Slickrock Canyon ACEC would be managed as VRM Class I (within the WSA) or II (780 acres, 99 percent), impacts of which are described under **Nature and Type of Effects**, the scenic values would be protected. In addition, managing to meet VRM Class I or II objectives could preclude surface-disturbing activities such as mineral development, ROW location, and recreation facilities if they are not able to meet the visual resource objectives. Where these types of activities are able to be mitigated in order to meet VRM objectives, it is likely that the associated mitigation, such as surface reclamation, revegetation techniques, and minimizing cuts and fills, would also minimize impacts on the riparian and special status plant and wildlife species over the long term.

*East Paradox ACEC and Biological Soil Crust ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-60** (Summary of Protections for Designated East Paradox ACEC (Alternative B) and Biological Soil Crust ACEC (Alternatives D and E)). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

Alternative A

The potential East Paradox and Biological Soil Crust ACECs would not be designated. Minimal surface use restrictions would be applied.

The potential Biological Soil Crust ACEC is partially protected by a CSU stipulation for fluid minerals on 1,120 acres, but the stipulation is not targeted at protecting rare biological soil crusts, the relevant and important value identified for this area. If the CSU were to be excepted, modified, or waived by the BLM Authorized Officer, surface disturbance associated with fluid mineral development could damage the biological soil crust. Other types of mineral development or uses of the land would not be restricted and could damage the soils. While livestock and recreational use of the area has impacted biological soil crust, the level of impact and season of use has allowed for moderate annual recovery. These activities have the potential to impair the biological soil crust if use deviates from current levels or season of use changes.

BLM_0163482

**Table 4-60**
**Summary of Protections for Designated East Paradox ACEC (Alternative B) and Biological Soil Crust ACEC (Alternatives D and E)**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 7,360 | 0 | 1,900 | 390 |
| NL | | 1,220 | | | |
| NSO[1] | | 6,140 | | 1,900 | 390 |
| CSU[1] | | 6,960 | | 1,880 | 370 |
| TL[1] | | 7,360 | | 1,900 | 390 |
| Closed to mineral materials disposal | | 7,360 | | 1,900 | 390 |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | 7,360 | | 1,900 | 390 |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | | 7,360 | | 1,900 | 390 |
| NGD[1] | | 7,360 | | 1,900 | |
| SSR[1] | | 6,960 | | 1,900 | 390 |
| VRM Class I | | | | | |
| VRM Class II | | 640 | | 1,900 | 390 |
| VRM Class III | | 6,720 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 1,390 | | | |
| ROW avoidance | | 70 | | 40 | 390 |
| ROW exclusion | | 7,290 | | 1,860 | |
| SRMA | | 7,360 | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | | | | |

*(Columns A and C are labeled "Not Designated")*

Source: BLM 2012a, 2018a, 2019
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

The potential East Paradox ACEC would be partially protected from fluid mineral development by NSO (1,130 acres) and CSU (3,960 acres) stipulations which would help protect the relevant and important values where there is overlap. There are no NGD or SSR restrictions; development in the remainder of the area could cause surface disturbance that could damage or destroy plants or their habitat, fish habitat, or the unique soils as described under ***Nature and Type of Effects***. Motorized and mechanized travel would be limited to existing routes in the ACECs which would prevent the trampling of plants and biological soils in most cases. However, erosion and runoff caused by vehicle travel on routes near streams containing special status fish could degrade the species' habitat and thus impact the relevant and important fish value. While livestock grazing within the ACEC has not yet damaged the soil crusts beyond repair, continued grazing risks damage to these crusts.

A TL stipulation would be applied to fluid mineral leases throughout both potential ACECs and would provide incidental protection to the values during the timeframe specified in the stipulation.

Most of both potential ACECs would be available for mineral materials disposal, locatable mineral entry, and ROW location. The potential ACECs are also within the area of locatable mineral development

BLM_0163483

potential. The relevant and important values could be degraded as described under **Nature and Type of Effects** if these activities were to occur.

A portion of the Dolores River has been determined eligible for inclusion in the NWSRS and flows through the potential East Paradox ACEC. Management of the segment to protect the free-flowing condition, tentative classification, and ORVs (including vegetation) would provide protection to the special status plants and rare biological soil crusts where they overlap the WSR study corridor.

Alternative B
The East Paradox ACEC would be designated. The potential Biological Soil Crust ACEC would not be designated; however, 1,800 acres are within the East Paradox ACEC and would receive management protections.

The management prescriptions summarized in **Table 4-60** would provide the most protection of all alternatives for the unique vegetation communities, rare species of biological soil crusts, and BLM sensitive plant and wildlife species in the East Paradox ACEC. The ACEC would be closed to oil and gas leasing over 17 percent of the area and would have an NSO stipulation across the remainder. There would also be an NGD restriction and ROW exclusion or avoidance across the entire ACEC.

On the 100 acres of the potential Biological Soil Crust ACEC outside of the East Paradox ACEC, surface use restrictions would be in place throughout the entire area, including NSO stipulations for fluid mineral leasing, closure to mineral material disposal, recommend for withdrawal from locatable mineral entry, NGD or SSR restrictions for other surface-disturbing activities, and management as ROW avoidance or exclusion areas.

Livestock grazing would continue on 560 of the 1,900 acres within the potential Biological Soil Crust ACEC. While livestock and recreational use of the area is not currently damaging the soils, these activities have the potential to impair the soils if use deviates from current levels or nature of use.

Alternative C
Neither the potential Biological Soil Crust nor the East Paradox ACECs would be designated. Minimal surface use restrictions would be applied.

Within the potential Biological Soil Crust ACEC, CSU and SSR restrictions targeted at protecting biological soil crusts, which is the relevant and important value identified, would be applied on 82 percent of the area, providing some level of protection from these activities. While livestock and recreational use of the area has impacted biological soil crust, the level of impact and season of use has allowed for moderate annual recovery. These activities have the potential to impair the biological soil crust if use deviates from current levels or season of use changes.

Within the potential East Paradox ACEC, protections would be similar to those described under Alternative A but would occur over more of the potential ACEC. Nearly all of the potential ACEC would be subject to either an NSO or CSU stipulation and a TL on all of the potential ACEC would protect the relevant and important values from surface disturbance associated with fluid mineral development and other surface-disturbing activities during the timeframe specified.

Closure of portions of the potential East Paradox ACEC to mineral materials disposal would prevent that activity from impacting ACEC values, but mineral materials disposal could still occur across the remainder of both areas. Furthermore, the potential ACECs would be open for locatable mineral entry. Impacts would be the same as described under Alternative A.

BLM_0163484

An SSR restriction for other surface-disturbing activities on over half of the potential East Paradox ACEC would provide protection to the relevant and important values as described under **Nature and Type of Effects**. Less than half of the potential ACEC would be managed as either ROW exclusion or avoidance. Where permitted, the relevant and important values could be impaired by surface disturbances associated with land use authorizations as described under **Nature and Type of Effects**.

Overlap of most of the potential East Paradox ACEC with the Paradox Valley ERMA could increase recreation impacts on special status plants within the potential ACEC as described under **Nature and Type of Effects.**

Impacts of livestock grazing, locatable mineral development, and motorized and mechanized travel within the potential East Paradox ACEC would be the same as under Alternative A.

Alternative D

The Biological Soil Crust ACEC would be designated; the potential East Paradox ACEC would not be designated. Within the Biological Soil Crust ACEC, surface uses would be heavily restricted as summarized in **Table 4-60**. Additionally, all forms of travel, including equestrian and foot travel, would be limited to designated routes, providing the most protection to the biological soil crust of any of the alternatives. The ACEC would be available to livestock grazing. While livestock and recreational use of the area has impacted biological soil crust, the level of impact and season of use has allowed for moderate annual recovery. These activities have the potential to impair the biological soil crust if use deviates from current levels or season of use changes.

Of the 7,360 acres comprising the potential East Paradox ACEC, 1,800 acres are within the Biological Soil Crust ACEC and would receive the same protections. Outside of the overlap, management prescriptions from other resources would help protect the special status plant and fish species and biological soils within the potential ACEC.

Approximately half of the potential East Paradox ACEC would be subject to an NSO stipulation for fluid minerals, protecting the relevant and important values from associated impacts as described under **Nature and Type of Effects**. The remaining portion of the ACEC would be protected by CSU stipulations for fluid minerals and SSR restrictions for other surface-disturbing activities, though they would not be specifically targeted at all ACEC values. Because of these stipulations, potential impacts from surface-disturbing activities would be reduced compared with Alternative A.

Managing 99 percent of the potential East Paradox ACEC according to VRM Class II objectives could reduce surface-disturbing activities such as mineral material development, ROW location, and recreation facilities that would not be able to meet the visual resource objectives. Where these types of activities are able to be mitigated in order to meet VRM objectives, it is likely that the associated mitigation, such as surface reclamation, revegetation techniques, and minimizing cuts and fills, would also minimize impacts on the special status plant and fish species and potential biological soils over the long-term.

Impacts of livestock grazing, locatable mineral development, and motorized and mechanized would be the same as under Alternative A.

Additionally, almost all of the potential East Paradox ACEC would overlap with the Paradox Valley ERMA, which could increase impacts from recreation compared with Alternative A. Impacts from recreation are described under **Nature and Type of Effects**.

Alternative E

Under Alternative E, 390 acres of the Biological Soil Crust ACEC would be designated. Not designated under Alternative E would be 1,510 acres of the Biological Soil Crust ACEC and the potential East

BLM_0163485

Paradox ACEC. Within the designated Biological Soil Crust ACEC, impacts would be the same as under Alternative D, but would occur over the smaller area. Impacts of livestock grazing would be the same as those described under Alternative A. The ACEC is not within the coal potential area but has moderate potential for oil and gas and would be subject to NSO stipulations. The area is also within the locatable mineral potential area and would not be recommended for withdrawal from locatable mineral entry. The area not designated as an ACEC has locatable mineral potential and includes one mining claim. Development of locatable minerals in this area would remove biological soil crust and impact the relevant and important value by making it no longer present where mining occurs. Outside of the designated area, there would be few surface use restrictions to protect potential biological soil crust. A CSU and SSR would cover 1,120 acres of the area, but any development on the surface could impact biological soil crust. The potential ACEC would be managed as VRM Class II, which would protect the area from surface disturbance that could not be mitigated to meet VRM Class objectives. However, surface-disturbing activities could still be authorized and could disturb biological soil crust.

Of the 7,360 acres comprising the potential East Paradox ACEC, 390 acres are within the Biological Soil Crust ACEC and would receive the same protections. Outside of the overlap, management prescriptions from other resources would help protect the special status plant and fish species and biological soils within the potential ACEC.

Approximately 40 percent of the potential East Paradox ACEC would be subject to an NSO stipulation for fluid minerals, protecting the relevant and important values from associated impacts as described under *Nature and Type of Effects*. 95 percent of the potential ACEC would be protected by CSU stipulations for fluid minerals and 84 percent of the potential ACEC would be protected by SSR restrictions for other surface-disturbing activities, though they would not be specifically targeted at all ACEC values. Because of these stipulations, potential impacts from surface-disturbing activities would be reduced compared with Alternative A.

Managing 38 percent of the potential East Paradox ACEC according to VRM Class II objectives could reduce surface-disturbing activities, such as mineral material development, ROW location, and recreation facilities that would not be able to meet the visual resource objectives. The impacts in this area would be the same as under Alternative D, but over a smaller area. The remaining potential ACEC would be managed as VRM Class III or IV, which would allow for landscape modifications. Fewer mitigation measures would be needed to meet visual resource objectives, compared with VRM Class II. However, compared with Alternative A, there are more incidental protections under Alternative E.

Additionally, 16 percent of the potential East Paradox ACEC would overlap with the Paradox Valley ERMA, which could increase impacts from recreation compared with Alternative A. Impacts from recreation are described under *Nature and Type of Effects*.

*La Sal Creek ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-61** (Summary of Protections for Designated La Sal Creek ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

BLM_0163486

**Table 4-61**
**Summary of Protections for Designated La Sal Creek ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 10,490 | 0 | 0 | 0 |
| NL | | 4,210 | | | |
| NSO[1] | | 6,280 | | | |
| CSU[1] | | 6,900 | | | |
| TL[1] | | 10,490 | | | |
| Closed to mineral materials disposal | | 10,490 | | | |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | 10,490 | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | Not Designated | 10,490 | Not Designated | Not Designated | Not Designated |
| NGD[1] | | 10,490 | | | |
| SSR[1] | | 10,380 | | | |
| VRM Class I | | 3,430 | | | |
| VRM Class II | | 6,660 | | | |
| VRM Class III | | 400 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 6,690 | | | |
| ROW avoidance | | | | | |
| ROW exclusion | | 10,490 | | | |
| SRMA | | 3,420 | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | 3,460 | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect. Hatching indicates 0 acres or not applicable under this alternative.

Alternative A
The La Sal Creek ACEC would not be designated. One-third of the potential ACEC is entirely within the Dolores River Canyon WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. A TL stipulation for fluid minerals would also apply on part of the area to protect peregrine falcon nests and crucial big game (desert bighorn sheep) winter habitat. Other surface-disturbing activities would not generally be restricted resulting in the potential for impacts described under *Nature and Type of Effects*.

The potential ACEC is available for domestic goat and sheep grazing which increases the risk of disease transmission from domestic goats and sheep to desert bighorn sheep, one of the relevant and important values.

Portions of the Dolores River, La Sal Creek, and Spring Creek have been determined eligible for inclusion in the NWSRS and flow through the potential ACEC. Management of the segment to protect the free-flowing condition, tentative classification, and ORVs (including fish, ecologic, and vegetation) would provide protection to the special status plants and fish and unique vegetation communities within the potential ACEC where they overlap the WSR study corridors.

BLM_0163487

Alternative B
The La Sal Creek ACEC would be designated. This ACEC would offer management protections for the unique vegetation communities and BLM sensitive plant and wildlife species. One-third of the ACEC is entirely within the Dolores River Canyon WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*.

Management prescriptions summarized in **Table 4-61** would provide more management protections than Alternative A: 11 percent of the ACEC would be closed to fluid mineral leasing, and the remainder would have an NSO stipulation, there would be an NGD restriction and ROW exclusion over the entire area. Impacts would be as described under *Nature and Type of Effects*. Also, about two-thirds the ACEC would be closed to all livestock grazing, and the remainder would be closed to domestic sheep and goats, which would help protect the unique vegetation communities.

Alternative C
The La Sal Creek ACEC would not be designated. One-third of the potential ACEC is entirely within the Dolores River Canyon WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA, a portion of the potential ACEC would overlap the La Sal Ecological Emphasis Area, which would provide some incidental protection to the special status species identified as relevant and important values as described under *Nature and Type of Effects*. Surface use restrictions, including CSU stipulations for fluid minerals, SSR restrictions for other surface-disturbing activities would offer some protection to the relevant and important values.

The potential ACEC is within the area of locatable mineral development potential, but would not be recommended for withdrawal from locatable mineral entry. As such, the impacts described under *Nature and Type of Effects* would be experienced if locatable mineral development were to occur. Just over half of the potential ACEC outside of the Dolores River Canyon WSA would be managed as ROW avoidance. Land use authorizations, if not properly mitigated, have the potential to impact the relevant and important values as described under *Nature and Type of Effects*.

Alternative D
The La Sal Creek ACEC would not be designated. Of the 10,490 acres comprising the La Sal Creek ACEC, 3,290 acres are within the Dolores River Slickrock Canyon ACEC and would receive the same protections summarized in **Table 4-59**. Of the remaining 7,200 acres not proposed for designation under this alternative, 120 acres are within the Dolores River Canyon WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*.

Outside of the overlap, there would be a CSU stipulation, SSR restriction and ROW avoidance over 95 percent of the potential ACEC. Impacts would be as described under *Nature and Type of Effects*.

The area would overlap the La Sal Ecological Emphasis Area, which would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would also provide protection to the special status species identified as relevant and important values. Surface use restrictions associated with the ecological emphasis area would apply throughout most of the potential ACEC providing some protection to the relevant and important values from surface-disturbing activities as described under *Nature and Type of Effects*.

The potential ACEC is within the area of locatable mineral development potential and would not be recommended for withdrawal from locatable mineral entry. If locatable mineral development were to occur, impacts could impair the relevant and important plant associations, rare plants, and special status fish species as described under *Nature and Type of Effects*

BLM_0163488

Under Alternative D cattle allotments could not be converted to sheep allotments in high probability for interaction areas unless it was determined that sheep grazing could be accomplished below high probability levels. Domestic goat grazing would be excluded on 2,400 acres of the potential La Sal Creek ACEC. This would help protect desert bighorn sheep, one of the relevant and important values, from disease transmission.

Portions of the Dolores River and La Sal Creek determined suitable for inclusion in the NWSRS also flow through the potential ACEC. Management of the segments to protect the free-flowing condition, tentative classification, and ORVs (including scenic, fish, wildlife, ecologic, and vegetation) would provide protection to the special status fish species and rare plants within the potential ACEC where they overlap the WSR study corridor.

Alternative E
The La Sal Creek ACEC would not be designated. One-third of the potential ACEC is entirely within the Dolores River Canyon WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA, impacts would be the same as under Alternative C, except that the whole area would be managed as ROW avoidance, further minimizing the effects of land use authorizations.

*Lower Uncompahgre Plateau ACEC*
The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-62** (Summary of Protections for Designated Lower Uncompahgre Plateau ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

Alternative A
The Lower Uncompahgre Plateau ACEC is not designated. A portion of the potential Lower Uncompahgre Plateau ACEC overlaps the Camel Back WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA, application of TL stipulations would provide some incidental protections across the ACEC, but they would not be specifically targeted to protect the cultural values. Though standard protections would apply to cultural resources uncovered during permitted activities, the lack of restrictions on surface-disturbing activities could result in damage to rock art and other cultural resources as described above under *Nature and Type of Effects* if these activities were to occur in the area.

Managing most of the potential ACEC as VRM Class III, in addition to the lack of restrictions on surface-disturbing activities, could lead to impacts on the sacred or historic setting of the cultural resources within the potential ACEC. Impacts are described above under *Nature and Type of Effects*.

A portion of Roubideau Creek has been determined eligible for inclusion in the NWSRS and flows through the potential ACEC. Management of the segment to protect the free-flowing condition, tentative classification, and ORVs (including cultural) would provide protection to the cultural resources within the potential ACEC where they overlap the WSR study corridors.

Alternative B
The Lower Uncompahgre Plateau ACEC would be designated. A portion of the Lower Uncompahgre Plateau ACEC overlaps the Camel Back WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Approximately 1,040 acres of the ACEC overlap the Roubideau-Potter-Monitor ACEC, also proposed for designation under this alternative. Where overlap occurs, the stricter of the management prescriptions would be applied.

BLM_0163489

**Table 4-62**
**Summary of Protections for Designated Lower Uncompahgre Plateau ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 31,810 | 0 | 0 | 0 |
| NL | | 4,480 | | | |
| NSO[1] | | 27,330 | | | |
| CSU[1] | | 30,620 | | | |
| TL[1] | | 31,810 | | | |
| Closed to mineral materials disposal | | 31,810 | | | |
| Within coal potential area | | 22,660 | | | |
| Closed to coal leasing | | 9,050 | | | |
| Within locatable mineral potential area | | | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | Not Designated | 31,810 | Not Designated | Not Designated | Not Designated |
| NGD[1] | | 31,810 | | | |
| SSR[1] | | 31,030 | | | |
| VRM Class I | | 1,300 | | | |
| VRM Class II | | 2,140 | | | |
| VRM Class III | | 28,370 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 390 | | | |
| ROW avoidance | | 3,080 | | | |
| ROW exclusion | | 27,570 | | | |
| SRMA | | 16,060 | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | 2,410 | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the **BLM** Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Outside of the WSA, the relevant and important values would be protected from surface-disturbing activities associated with fluid mineral leasing by an NSO stipulation. An NGD restriction would also apply throughout the ACEC for other surface-disturbing activities, and the area would be predominately managed as a ROW exclusion area, thereby protecting the cultural resource values from most surface-disturbing activities.

Of the 22,660 acres within the area of coal potential, only 9,050 acres (40 percent) would be closed to coal leasing. In the remainder of the area open to coal leasing, the relevant and important values could be impaired where coal development occurs. The greatest threat would be from surface-mining, but localized effects from underground mining could be experienced where surface vents are needed.

<u>Alternative C</u>
The Lower Uncompahgre Plateau ACEC would not be designated. A portion of the potential Lower Uncompahgre Plateau ACEC overlaps the Camel Back WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Surface use restrictions would be applied minimally in the area outside of the WSA. Where the potential ACEC would not be subject to surface use restrictions, cultural resources would be at risk of accidental damage.

BLM_0163490

Management of the entire Lower Uncompahgre Plateau ACEC as an area of archaeological significance, including emphasis on alternative mitigation for development, would increase protection for cultural resources over Alternative A in the manner described under **Nature and Type of Effects**.

<u>Alternative D</u>
The Lower Uncompahgre Plateau ACEC would not be designated. Of the 31,870 acres comprising the potential Lower Uncompahgre Plateau ACEC, 1,040 acres are within the Roubideau Corridors ACEC and would receive the same protections summarized in
**Table 4-64**. Of the remaining 30,770 acres not proposed for designation under this alternative, 260 acres are within the Camel Back WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the cultural values within the potential ACEC.

Managing the Lower Uncompahgre Plateau as an area of archaeological significance would specifically target protection of cultural values in the potential Lower Uncompahgre Plateau ACEC. Surface use restrictions, including a CSU and SSR restriction, would be in place to provide direct protection to the archaeological resources in the area. Other surface use restrictions would apply on portions of the potential ACEC but would not be targeted at protecting the relevant and important values. Where surface-disturbing activities occurred, cultural resources could be damaged as described under **Nature and Type of Effects**.

A portion of the potential ACEC would overlap the Dry Creek Basin Lands with Wilderness Characteristics unit, which would be managed to maintain those characteristics. Managing to maintain the size, naturalness, and opportunities for primitive or unconfined recreation would provide incidental protection to the portion of the potential ACEC where there is overlap by precluding activities that would impair the wilderness characteristics.

<u>Alternative E</u>
The Lower Uncompahgre Plateau ACEC would not be designated. A portion of the potential Lower Uncompahgre Plateau ACEC overlaps the Camel Back WSA and would continue to receive the same protective management described under **Effects Common to All Alternatives**. Surface use restrictions would be applied minimally in the area outside of the WSA. Where the potential ACEC would not be subject to surface use restrictions, cultural resources would be at risk of accidental damage.

*Paradox Rock Art ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-63** (Summary of Protections for Designated Paradox Rock Art ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69** and **Table 4-70**.

<u>Alternative A</u>
The Paradox Rock Art ACEC is not designated. The ACEC would remain open to rock climbing resulting in the potential for impacts described above under **Nature and Type of Effects**. Application of CSU and TL stipulations would provide some incidental protections across most of the areas, but they would not be specifically targeted to protect the cultural values. Though standard protections would apply to cultural resources uncovered during permitted activities, the lack of restrictions on surface-disturbing activities could result in damage to rock art and other cultural resources as described under **Nature and Type of Effects** if these activities were to occur in the areas. Locatable mineral exploration and development within the ACEC could also impact these resources as described under **Nature and Type of Effects**.

BLM_0163491

**Table 4-63**
**Summary of Protections for Designated Paradox Rock Art ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 1,080 | 0 | 1,080 | 1,080 |
| NL | | | | | |
| NSO[1] | | 1,080 | | 1,080 | 1,080 |
| CSU[1] | | 550 | | 1,080 | 1,080 |
| TL[1] | | 1,080 | | 1,080 | |
| Closed to mineral materials disposal | | 1,080 | | 1,080 | 1,080 |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | 1,080 | | 1,080 | 1,080 |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | | 1,080 | | 1,080 | 1,080 |
| NGD[1] | | 1,080 | | | |
| SSR[1] | | 550 | | 1,080 | 1,080 |
| VRM Class I | | | | | |
| VRM Class II | | 1,080 | | 1,080 | 1,080 |
| VRM Class III | | | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | | | | |
| ROW avoidance | | 20 | | 1,080 | 1,080 |
| ROW exclusion | | 1,080 | | | |
| SRMA | | 1,080 | | | |
| ERMA | | | | 1,080 | 1,080 |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | | | | |

(Columns A and C: Not Designated)

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Alternative B
The Paradox Rock Art ACEC would be designated. Stringent surface use restrictions would be applied throughout the entire ACEC, protecting cultural resource values as described under *Nature and Type of Effects*. In addition, the ACEC is within the area of locatable mineral potential and, unlike Alternative A, would be proposed for withdrawal from locatable mineral entry. If withdrawn, cultural resources would be protected from damage associated with locatable mineral development.

Alternative C
The Paradox Rock Art ACEC would not be designated. The potential ACEC would be managed as a National Register District to focus protection on the cultural ACEC values. Because the entire area would be subject to an NSO stipulation for the protection of this area, the cultural resources there would be protected from damage during fluid mineral development as described above under *Nature and Type of Effects*. If it is determined that the rock art values need additional protection, individual sites could be nominated for National or State Registers of Historic Places. If sites are listed on a National or State Register, they would experience additional protection over Alternative A, as described under *Nature and Type of Effects*.

BLM_0163492

Except for NSO stipulation, few surface use restrictions would be in place and cultural resources without surface use restrictions could be damaged. Most of the potential ACEC (84 percent) would be closed to motorized and mechanized travel. This would protect the archaeological sites from damage caused by motorized and mechanized travel.

<u>Alternative D</u>
The Paradox Rock Art ACEC would be designated. Surface uses would be heavily restricted in the area as summarized in **Table 4-63**, providing protection for the cultural resources within this ACEC similar to Alternative B. However, under Alternative D, fewer acres would be managed as NGD and ROW exclusion, with additional areas that would be managed as ROW avoidance and with CSU and SSR restrictions.

<u>Alternative E</u>
The Paradox Rock Art ACEC would be designated. Impacts would largely be the same as under Alternative D. The ACEC is not within the coal potential area. It has moderate potential for oil and gas and would be subject to NSO stipulations.

*Roubideau Corridors ACEC and Roubideau-Potter-Monitor ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-64** (Summary of Protections for Designated Roubideau-Potter-Monitor ACEC (Alternative B) and Roubideau Corridors ACEC (Alternative D)). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

<u>Alternative A</u>
Neither the Roubideau Corridors ACEC nor the Roubideau-Potter-Monitor ACEC is designated. Just over half of each potential ACEC is within the Camel Back WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under ***Effects Common to All Alternatives***. Outside of the WSA, surface use restrictions would be applied minimally in the areas and, as a result, the relevant and important values could be degraded as described above under ***Nature and Type of Effects*** where surface-disturbing activities occur. These impacts would be mitigated to some extent by closure to mineral materials disposal in riparian zones and application of TL stipulations to protect big game (desert bighorn) crucial winter habitat and lambing areas.

The potential Roubideau Corridors and Roubideau-Potter-Monitor ACECs are available for domestic goat and sheep grazing and some sheep grazing currently occurs in the area. This increases the risk of disease transmission from domestic goats and sheep to desert bighorn sheep, one of the relevant and important values.

Portions of Monitor, Potter, and Roubideau Creeks have been determined eligible for inclusion in the NWSRS and flow through the potential ACECs. Management of the segments to protect their free-flowing condition, tentative classification, and ORVs (including wildlife, vegetation, and cultural) would provide protection to the special status plants and fish, riparian vegetation, and cultural resources within the potential ACECs where they overlap the WSR study corridors. Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian vegetation and special status fish by ensuring sufficient flows to maintain their habitat.

BLM_0163493

**Table 4-64**
**Summary of Protections for Designated Roubideau-Potter-Monitor ACEC (Alternative B) and Roubideau Corridors ACEC (Alternative D)**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 20,430 | 0 | 8,720 | 0 |
| NL | | 20,430 | | 4,480 | |
| NSO[1] | | | | 4,240 | |
| CSU[1] | | | | 4,240 | |
| TL[1] | | 20,430 | | 8,720 | |
| Closed to mineral materials disposal | | 20,430 | | 8,720 | |
| Within coal potential area | | 5,930 | | 210 | |
| Closed to coal leasing | | 5,930 | | 190 | |
| Within locatable mineral potential area | | | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | | 20,430 | | 8,720 | |
| NGD[1] | | 20,430 | | 4,480 | |
| SSR[1] | | 20,430 | | 8,720 | |
| VRM Class I | | 14,930 | | 5,220 | |
| VRM Class II | | 5,490 | | 2,860 | |
| VRM Class III | | 10 | | 640 | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 1,100 | | | |
| ROW avoidance | | | | 930 | |
| ROW exclusion | | 20,430 | | 7,790 | |
| SRMA | | 20,430 | | 8,440 | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | 18,090 | | 7,850 | |

Columns A, C, and E: Not Designated

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Alternative B
The Roubideau-Potter-Monitor ACEC would be designated. Just over half of the ACEC is within the Camel Back WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA, stringent surface use restrictions would be applied throughout the entire ACEC, protecting cultural resource values as described under *Nature and Type of Effects*.

The potential Roubideau Corridors ACEC would not be designated. Of the 8,720 acres comprising the potential Roubideau Corridors ACEC, 8,050 acres are within the Roubideau-Potter-Monitor ACEC proposed for designation under this alternative and would receive the same protections summarized in **Table 4-64**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the riparian vegetation, special status species, and historical relevant and important values within the potential ACEC.

The portion of the potential Roubideau Corridors ACEC that lies outside the Roubideau-Potter-Monitor ACEC would be protected by application of NSO stipulations, management as ROW exclusion, and closure to mineral materials disposal. Nearly all of the undesignated portion of the potential ACEC

BLM_0163494

would also be subject to NGD restrictions. Any areas not subject to NGD restrictions would be subject to SSR restrictions. These management prescriptions would greatly reduce impacts of surface-disturbing activities on the cultural, special status species, riparian, and hydrologic values within the potential ACEC.

Domestic goat and sheep grazing and trailing would be prohibited within 9 miles of occupied desert bighorn sheep habitat, providing increased protection to the desert bighorn sheep value in the potential ACEC compared with Alternative A.

Alternative C
Neither the Roubideau Corridors ACEC nor the Roubideau-Potter-Monitor ACEC would be designated. The management prescriptions identified in **Table T-1** would help protect the cultural, riparian, hydrologic, and special status species ACEC values within these areas. Just over half of each potential ACEC is within the Camel Back WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA, surface use restrictions would be similar to Alternative A, though more acres would be protected with CSU and TL stipulations for fluid minerals, SSR restrictions for other surface-disturbing activities, and ROW avoidance areas.

Nearly all of the potential Roubideau Corridors ACEC would overlap the Monitor-Potter-Roubideau Ecological Emphasis Area, as would almost 40 percent of the potential Roubideau-Potter-Monitor ACEC, which would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would also provide some protection to the riparian vegetation and special status species identified as relevant and important values. The overlapping protections can be attributed to management of the Monitor-Potter-Roubideau Ecological Emphasis  Area and would also provide some incidental protection to the historical resource value.

Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian vegetation and special status fish by ensuring sufficient flows to maintain their habitat in both potential ACECs.

Portions of the potential Roubideau Corridors and Roubideau-Potter-Monitor ACECs are within the coal potential area under Alternative C (210 acres and 6,000 acres, respectively). While about half of each area would be closed to coal leasing, coal exploration and development could impact the remainder of the areas with coal potential as described under **Nature and Type of Effects**.

All of both potential ACECs would be closed to domestic goat grazing and domestic sheep grazing would be managed to minimize contact with desert bighorn sheep. This would help protect desert bighorn sheep, one of the relevant and important values, from disease transmission.

The potential Roubideau Corridors and Roubideau-Potter-Monitor ACECs would overlap the Roubideau ERMA. Increased recreation in the area without restrictions on surface-disturbing activities could lead to impacts on the relevant and important values as described under **Nature and Type of Effects**.

Alternative D
The Roubideau Corridors ACEC would be designated. Just over half of the ACEC is within the Camel Back WSA; relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. The entire ACEC would overlap the Monitor-Potter-Roubideau Ecological Emphasis Area, which would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would also provide some protection to the riparian vegetation and special status species identified as relevant and important

BLM_0163495

values. The management of these areas would be complementary and provide reinforced protection to the relevant and important values.

The potential Roubideau-Potter-Monitor ACEC would not be designated. Of the 20,470 acres comprising the potential ACEC, 8,090 acres are within the Roubideau Corridors ACEC and would receive the same protections summarized in **Table 4-64**. Of the remaining 12,380 acres not proposed for designation under this alternative, 5,940 acres are within the Camel Back WSA and would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA overlap, the management prescriptions identified in **Table T-1** would help protect the cultural, riparian, hydrologic, and special status species values within the ACEC.

Under Alternative D cattle allotments could not be converted to sheep allotments in high probability for interaction areas unless it was determined that sheep grazing could be accomplished below high probability levels. Domestic goat grazing would be excluded on 8,120 acres of the Roubideau Corridors ACEC (93 percent) and 19,360 acres of the potential Roubideau-Potter-Monitor ACEC (95 percent). This would help protect desert bighorn sheep, one of the relevant and important values, from disease transmission.

The potential Roubideau-Potter-Monitor ACEC would overlap the Monitor-Potter-Roubideau Ecological Emphasis Area, which would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would also provide some protection to the special status species identified as relevant and important values, though not as much as ACEC designation. Surface use restrictions associated with the ecological emphasis area would apply throughout most of the potential ACEC providing some protection to the relevant and important values from surface-disturbing activities as described under *Nature and Type of Effects*.

A portion of the potential Roubideau-Potter-Monitor ACEC would overlap the Camel Back WSA Adjacent lands with wilderness characteristics unit, which would be managed to maintain those characteristics. Managing to maintain the size, naturalness, and opportunities for primitive or unconfined recreation would provide incidental protection to the portion of the potential ACEC where there is overlap by precluding activities that would impair the wilderness characteristics.

Because of the surface use restrictions in place for the Camel Back WSA Adjacent and Monitor-Potter-Roubideau Ecological Emphasis Area, as well as restrictions to preserve the recreational activities and associated settings within the Roubideau SRMA, which also overlaps the potential Roubideau-Potter-Monitor ACEC, the relevant and important values would be protected.

Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian vegetation and special status fish by ensuring sufficient flows to maintain their habitat.

Alternative E
Neither the Roubideau Corridors ACEC nor the Roubideau-Potter-Monitor ACEC would be designated. The management prescriptions identified in **Table T-1** would help protect the cultural, riparian, hydrologic, and special status species ACEC values within these areas. Just over half of each potential ACEC is within the Camel Back WSA. Relevant and important values overlapping the WSA would continue to receive the same protective management described under *Effects Common to All Alternatives*. Outside of the WSA, surface use restrictions would be similar to Alternative A, though more acres would be protected with CSU and TL stipulations for fluid minerals, SSR restrictions for other surface-disturbing activities, and ROW avoidance areas.

BLM_0163496

Maintenance of instream flow rights to ensure sufficient instream flow would help protect riparian vegetation and special status fish by ensuring sufficient flows to maintain their habitat in both potential ACECs.

Portions of the potential Roubideau Corridors and Roubideau-Potter-Monitor ACECs are within the coal potential area under Alternative E (210 acres and 5,930 acres, respectively). Nearly all of the areas, except for 20 acres in the potential Roubideau Corridors ACEC, would be closed to coal leasing, protecting the relevant and important values from the impacts described under **Nature and Type of Effects**.

All of both potential ACECs would be closed to domestic goat grazing, and domestic sheep grazing would be managed to minimize contact with desert bighorn sheep. This would help protect desert bighorn sheep, one of the relevant and important values, from disease transmission.

The potential Roubideau Corridors and Roubideau-Potter-Monitor ACECs would overlap the Roubideau ERMA. Increased recreation in the area without restrictions on surface-disturbing activities could lead to impacts on the relevant and important values, as described under **Nature and Type of Effects**.

*San Miguel Gunnison Sage-grouse ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-65** (Summary of Protections for Designated San Miguel Gunnison Sage-grouse ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

Alternative A

The San Miguel Gunnison Sage-grouse ACEC is not designated. Of the 470 acres comprising the San Miguel Gunnison Sage-grouse ACEC, 160 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, surface use restrictions would be applied minimally in the area and, as a result, the relevant and important values could be degraded as described above under **Nature and Type of Effects** where surface-disturbing activities occur. The potential ACEC is available to livestock grazing and could experience the impacts described under **Nature and Type of Effects**.

Alternative B

The San Miguel Gunnison Sage-grouse ACEC would be designated. Of the 470 acres comprising the San Miguel Gunnison Sage-grouse ACEC, 160 acres are within the San Miguel River Expansion ACEC, also proposed for designation under this alternative and would receive the same protections summarized in **Table 4-57**. Where there is overlap, the stricter management would apply, including closing the area of overlap to fluid mineral leasing and motorized and mechanized travel. Outside of the area of overlap, stringent surface use restrictions would be in place that would protect the sage-grouse and their habitats, as described under **Nature and Type of Effects**. About half of the ACEC would be unavailable to livestock grazing, protecting the species' habitat from damage by livestock, preventing impacts described under **Nature and Type of Effects**. These impacts could be experienced on the remaining 240 acres.

BLM_0163497

**Table 4-65**
**Summary of Protections for Designated San Miguel Gunnison Sage-grouse ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 470 | 0 | 0 | 0 |
| NL | | 160 | | | |
| NSO[1] | | 310 | | | |
| CSU[1] | | | | | |
| TL[1] | | 470 | | | |
| Closed to mineral materials disposal | | 470 | | | |
| Within coal potential area | | 120 | | | |
| Closed to coal leasing | | 110 | | | |
| Within locatable mineral potential area | | 470 | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | Not Designated | 470 | Not Designated | Not Designated | Not Designated |
| NGD[1] | | 470 | | | |
| SSR[1] | | 260 | | | |
| VRM Class I | | | | | |
| VRM Class II | | 160 | | | |
| VRM Class III | | 310 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 230 | | | |
| ROW avoidance | | | | | |
| ROW exclusion | | 470 | | | |
| SRMA | | 160 | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | 160 | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Alternative C
The San Miguel Gunnison Sage-grouse ACEC would not be designated. Of the 470 acres comprising the potential ACEC, 160 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the Gunnison sage-grouse individuals and habitat within the potential ACEC.

Surface use restrictions would be applied on approximately half of the area that overlaps the San Miguel Ecological Emphasis Area. The ecological emphasis area would be managed to preserve the continuity of habitats, vegetation communities, and native wildlife within, which would provide some protection to the riparian vegetation and special status species identified as relevant and important values. In areas without surface use restrictions, Gunnison sage-grouse individuals and habitat would be subject to impacts associated with surface-disturbing activities described under *Nature and Type of Effects*. Potential impacts from livestock grazing would be the same as under Alternative A.

Alternative D
The San Miguel Gunnison Sage-grouse ACEC would not be designated. Of the 470 acres comprising the potential ACEC, 160 acres (34 percent) are within the San Miguel River ACEC and would receive the

BLM_0163498

same protections summarized in **Table 4-57**. It should be noted that the San Miguel River ACEC would not manage for Gunnison sage-grouse as a relevant and important value, so all protections provided by the San Miguel River ACEC would be incidental and not directed towards Gunnison sage-grouse. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the Gunnison sage-grouse populations and habitat within the potential ACEC. Impacts would be similar to those described under Alternative C except that the entire potential ACEC would be protected by a TL for fluid mineral leasing and other surface-disturbing activities aimed directly at protecting Gunnison sage-grouse winter and breeding habitats which would provide incidental protection to the relevant and important value. Approximately 70 acres of the potential ACEC would be unavailable to livestock grazing, preventing impacts described under **Nature and Type of Effects**. The potential for impacts would persist in the remaining area open for livestock grazing.

Alternative E

The San Miguel Gunnison Sage-grouse ACEC would not be designated. Of the 470 acres comprising the potential ACEC, 160 acres are within the San Miguel River ACEC and would receive the same protections summarized in **Table 4-57**. Outside of the overlap, the management prescriptions identified in **Table T-1** would help protect the Gunnison sage-grouse individuals and habitat within the potential ACEC. The entire potential ACEC would be subject to NSO, CSU, and TL stipulations for Gunnison sage-grouse, which would provide direct protection to the species from fluid mineral development. The ACEC would be subject to an SSR restriction, which would provide some degree of protection for land use authorizations, as described under **Nature and Type of Effects**.

*Sims-Cerro Gunnison Sage-grouse ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-66** (Summary of Protections for Designated Sims-Cerro Gunnison Sage-grouse ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

Alternative A

This Sims-Cerro Gunnison Sage-grouse ACEC is not designated. Surface use restrictions would be applied minimally in the area and, as a result, the relevant and important values could be impaired as described above under **Nature and Type of Effects** where surface-disturbing activities occur. Application of TL stipulations would mitigate impacts of surface-disturbing activities associated with fluid mineral development during the time specified by the stipulation, but these stipulations would not be specifically targeted to protect Gunnison sage-grouse. All of the potential ACEC would remain available to livestock grazing, potential impacts of which are described under **Nature and Type of Effects**.

Alternative B

This Sims-Cerro Gunnison Sage-grouse ACEC would be designated. Stringent surface use restrictions would be applied throughout the entire ACEC, providing protection to sage-grouse and their habitat from most surface-disturbing activities. Of the 21,260 acres within the area of coal potential, only 2,340 acres (11 percent) would be closed to coal leasing. In the remainder of the area open to coal leasing, the relevant and important values could be impaired where coal development occurs. The greatest threat would be from surface-mining, but localized effects from underground mining could be experienced where surface vents are needed. Potential impacts from livestock grazing would be similar to Alternative A, though 1,630 acres (6 percent) would be unavailable to grazing.

BLM_0163499

**Table 4-66**
**Summary of Protections for Designated Sims-Cerro Gunnison Sage-grouse ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| *Acres Designated as an ACEC:* | 0 | 25,620 | 0 | 0 | 0 |
| NL | | 3,120 | | | |
| NSO[1] | | 22,500 | | | |
| CSU[1] | | 20,010 | | | |
| TL[1] | | 25,620 | | | |
| Closed to mineral materials disposal | | 25,620 | | | |
| Within coal potential area | | 21,260 | | | |
| Closed to coal leasing | | 2,340 | | | |
| Within locatable mineral potential area | | | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | Not Designated | 25,620 | Not Designated | Not Designated | Not Designated |
| NGD[1] | | 25,620 | | | |
| SSR[1] | | 24,280 | | | |
| VRM Class I | | | | | |
| VRM Class II | | 910 | | | |
| VRM Class III | | 24,710 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 1,630 | | | |
| ROW avoidance | | 1,660 | | | |
| ROW exclusion | | 23,490 | | | |
| SRMA | | 3,120 | | | |
| ERMA | | | | | |
| Closed to motorized travel | | 1,770 | | | |
| Closed to motorized and mechanized travel | | | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

Alternative C
This Sims-Cerro Gunnison Sage-grouse ACEC would not be designated. The management prescriptions identified in **Table T-1** would provide some protection for the Gunnison sage-grouse populations and habitat within the potential ACEC. While application of an NSO stipulation to a small portion of the Sims-Cerro Gunnison Sage-grouse ACEC (920 acres) would increase protection compared with Alternative A, other areas open to fluid mineral leasing could still be impacted as described under **Nature and Type of Effects**. Over 60 percent of the potential ACEC would have CSU or TL stipulations attached to fluid mineral leases.

Except for an SSR restriction on less than half of the potential ACEC and the stipulations for fluid minerals previously mentioned, few other surface use restrictions would be applied. Surface-disturbing activities have the potential to damage sage-grouse habitat and disrupt individuals in a manner described under **Nature and Type of Effects**.

While some acres would be unavailable to livestock grazing, grazing could impact sage-grouse throughout most of the potential ACECs as described under **Nature and Type of Effects**.

BLM_0163500

Overlap of a portion of the potential Sims-Cerro Gunnison Sage-grouse ACEC with the Spring Creek ERMA could increase impacts from recreation on sage-grouse compared with Alternative A. Impacts of recreation are described under **Nature and Type of Effects**.

<u>Alternative D</u>
This Sims-Cerro Gunnison Sage-grouse ACEC would not be designated. The management prescriptions identified in **Table T-1** would help protect the Gunnison sage-grouse populations and habitat within the potential ACEC. Land use restrictions would be in place throughout most of the potential ACEC, including a TL stipulation for fluid minerals and other surface-disturbing activities aimed directly at protecting Gunnison sage-grouse winter and breeding habitats which would provide incidental protection to the relevant and important value. A small portion of the potential ACEC (6 percent) would be unavailable to livestock grazing. Impacts would be similar to those described under Alternative B.

<u>Alternative E</u>
This Sims-Cerro Gunnison Sage-grouse ACEC would not be designated. The management prescriptions identified in **Table T-1** would help protect the Gunnison sage-grouse populations and habitat within the potential ACEC. Land use restrictions would be in place throughout most of the potential ACEC, including a TL stipulation for fluid minerals and other surface-disturbing activities, aimed directly at protecting Gunnison sage-grouse winter and breeding habitats. This would provide incidental protection of the relevant and important value. A small portion of the potential ACEC (8 percent) would be unavailable to livestock grazing. Impacts would be similar to those described under Alternative B.

*Tabeguache Pueblo and Tabeguache Caves ACEC*

The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-67** (Summary of Protections for Designated Tabeguache Pueblo and Tabeguache Caves ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

<u>Alternative A</u>
Of the 26,400 acres comprising the Tabeguache Pueblo and Tabeguache Caves ACEC, 5,290 acres are within the Tabeguache Area and would continue to receive the same protective management under all alternatives described under **Effects Common to All Alternatives**.

Outside of the Tabeguache Area, surface use restrictions are applied minimally, standard protections apply to cultural resources uncovered during permitted activities though development could cause surface disturbance that could damage or destroy rock art as described under **Nature and Type of Effects**. All of the of the Tabeguache Pueblo and Tabeguache Caves ACEC outside the Tabeguache Area are covered by an NSO stipulation (21,030 acres), and TL restrictions also overlap approximately 60 percent of the area (12,470 acres) Application of NSO and TL stipulations would provide some incidental protections across most of the areas, but they would not be specifically targeted to protect the potential ACEC values. Because most of the ACECs would be available for mineral materials disposal and ROW location, the rock art could be degraded as described above under **Nature and Type of Effects** if these activities were to occur in the areas. Locatable mineral exploration and development within the ACEC could also impact these resources as described under **Nature and Type of Effects**.

BLM_0163501

**Table 4-67**
**Summary of Protections for Designated Tabeguache Pueblo and Tabeguache Caves ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| Acres Designated as an ACEC: | 0 | 26,400 | 0 | 0 | 0 |
| NL | | 20,150 | | | |
| NSO[1] | | 6,150 | | | |
| CSU[1] | | 6,150 | | | |
| TL[1] | | 6,150 | | | |
| Closed to mineral materials disposal | | 26,400 | | | |
| Within coal potential area | | 15,930 | | | |
| Closed to coal leasing | | 11,600 | | | |
| Within locatable mineral potential area | | 26,400 | | | |
| Withdrawn from locatable mineral entry | | 5,290 | | | |
| Recommend for withdrawal from locatable mineral entry | Not Designated | 21,010 | Not Designated | Not Designated | Not Designated |
| NGD[1] | | 26,400 | | | |
| SSR[1] | | 26,400 | | | |
| VRM Class I | | 5,290 | | | |
| VRM Class II | | 20,000 | | | |
| VRM Class III | | 1,010 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 760 | | | |
| ROW avoidance | | | | | |
| ROW exclusion | | 26,400 | | | |
| SRMA | | | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | 20,030 | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

A portion of Tabeguache Creek, which is within the Tabeguache Area, has been determined eligible for inclusion in the NWSRS and flows through the ACEC. Management of the segments to protect their free-flowing condition, tentative classification, and ORVs (including cultural) would provide protection to the cultural values within the potential ACEC where they overlap the WSR study corridors.

<u>Alternative B</u>
The Tabeguache Pueblo and Tabeguache Caves ACEC would be designated. Of the 26,400 acres comprising the Tabeguache Pueblo and Tabeguache Caves ACEC, 5,290 acres are within the Tabeguache Area and would continue to receive the same protective management under all alternatives described under **Effects Common to All Alternatives**. An additional 10,150 acres overlap the Lower Tabeguache/Campbell Creek lands with wilderness characteristics unit, which also provides strict protections such as closed to fluid mineral leasing, closed to coal leasing, management according to VRM Class II objectives, and closed to motorized and mechanized travel. Outside of these areas, stringent surface use restrictions would be applied throughout the ACEC providing protection to cultural resources from damage due to surface-disturbing activities. Of the 15,930 acres within the area of coal potential, 11,600 acres (73 percent) would be closed to coal leasing. In the remainder of the area open to coal leasing, the relevant and important values could be impaired where coal development occurs.

BLM_0163502

The greatest threat would be from surface-mining, but localized effects from underground mining could be experienced where surface vents are needed.

Alternative C
The Tabeguache Pueblo and Tabeguache Caves ACEC would not be designated. Of the 26,400 acres comprising the potential ACEC, 5,290 acres are within the Tabeguache Area and would continue to receive the same protective management under all alternatives described under *Effects Common to All Alternatives*. Outside of the Tabeguache Area, surface use restrictions would be applied minimally. Where surface uses are not restricted, there is potential for surface-disturbing activities to damage the cultural resources as described under *Nature and Type of Effects*.

Alternative D
The Tabeguache Pueblo and Tabeguache Caves ACEC would not be designated. Of the 26,400 acres comprising the potential ACEC, 5,290 acres are within the Tabeguache Area and would continue to receive the same protective management under all alternatives described under *Effects Common to All Alternatives*. Outside of the Tabeguache Area, the management prescriptions identified in **Table T-1** would help protect the cultural resources within the potential ACEC. An NSO stipulation for known eligible cultural resources, traditional cultural properties, sites/districts listed on the National Register of Historic Places, outstanding cultural resources to be nominated to the National Register of Historic Places, interpreted and/or public use sites, and experimental-use sites would be in place to directly protect the cultural resources from surface disturbance associated with fluid mineral development. In addition, an SSR restriction throughout the whole potential ACEC would protect the area from other surface-disturbing activities.

The ACEC is within the area of locatable mineral development potential and, aside from the Tabeguache Area which is withdrawn from locatable mineral entry, the area could experience impacts as described under *Nature and Type of Effects* if locatable mineral development were to occur in the area.

Alternative E
The Tabeguache Pueblo and Tabeguache Caves ACEC would not be designated. Of the 26,400 acres comprising the potential ACEC, 5,290 acres are within the Tabeguache Area and would continue to receive the same protective management under all alternatives described under *Effects Common to All Alternatives*. Outside of the Tabeguache Area, the management prescriptions identified in **Table T-1** would help protect the cultural resources within the potential ACEC. A CSU stipulation for cultural resources would be in place to directly protect cultural resources from surface disturbance associated with fluid mineral development. An SSR restriction throughout more than two-thirds of the potential ACEC would protect the area from surface-disturbing activities.

The ACEC is within the locatable mineral development potential area and, aside from the Tabeguache Area, which is withdrawn from locatable mineral entry, the area could experience impacts as described under *Nature and Type of Effects* if locatable mineral development were to occur in the area.

*West Paradox ACEC*
The potential for impacts on the relevant and important values for the ACEC proposed for designation under each alternative is summarized in **Table 4-68** (Summary of Protections for Designated West Paradox ACEC). The potential for impacts on the relevant and important values for the entire potential ACEC area, not just that area proposed for designation, under each alternative is summarized in **Table 4-69**, **Table 4-70**, **Table 4-71**, and **Table 4-72** at the end of this section.

BLM_0163503

**Table 4-68**
**Summary of Protections for Designated West Paradox ACEC**

| Stipulation, Restriction, or Protection | A | B | C | D | E |
|---|---|---|---|---|---|
| Acres Designated as an ACEC: | 0 | 5,190 | 0 | 0 | 0 |
| NL | | 20 | | | |
| NSO[1] | | 5,170 | | | |
| CSU[1] | | 4,260 | | | |
| TL[1] | | | | | |
| Closed to mineral materials disposal | | 5,190 | | | |
| Within coal potential area | | | | | |
| Closed to coal leasing | | | | | |
| Within locatable mineral potential area | | 5,190 | | | |
| Withdrawn from locatable mineral entry | | | | | |
| Recommend for withdrawal from locatable mineral entry | Not Designated | 5,190 | Not Designated | Not Designated | Not Designated |
| NGD[1] | | 5,190 | | | |
| SSR[1] | | 4,250 | | | |
| VRM Class I | | | | | |
| VRM Class II | | 270 | | | |
| VRM Class III | | 4,920 | | | |
| VRM Class IV | | | | | |
| Unavailable to livestock grazing | | 2,310 | | | |
| ROW avoidance | | 80 | | | |
| ROW exclusion | | 5,110 | | | |
| SRMA | | 5,190 | | | |
| ERMA | | | | | |
| Closed to motorized travel | | | | | |
| Closed to motorized and mechanized travel | | | | | |

Source: BLM 2012a, 2018a
[1] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
Hatching indicates 0 acres or not applicable under this alternative.

BLM_0163504

**Table 4-69**
**Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative A**

| Stipulation, Restriction, or Protection | Biological Soil Crust[1] | Coyote Wash[2] | Dolores River Slickrock Canyon[2] | Dolores Slickrock Canyon[3] | East Paradox[4] | Fairview South (BLM Expansion)[5] | Fairview South (CNHP Expansion)[6] | La Sal Creek[7] | Lower Uncompahgre Plateau[8] | Paradox Rock Art | Roubideau Corridors[9] | Roubideau-Potter-Monitor[9] | Salt Desert Shrub Ecosystem[10] | San Miguel Gunnison Sage-grouse[11] | San Miguel River Expansion[12] | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Acres Not Designated as an ACEC:* | 1,900 | 2,100 | 9,780 | 10,670 | 7,360 | 400 | 4,040 | 10,490 | 31,810 | 1,080 | 8,720 | 20,430 | 28,110 | 310 | 12,700 | 25,620 | 26,400 | 5,190 |
| NL[13] | 0 | ✓ | ✓ | 9,820 | 0 | 0 | 0 | 3,420 | 1,300 | 0 | 4,480 | 10,670 | 3,950 | 0 | 0 | 0 | 5,310 | 0 |
| NSO[13] | 150 | 2,090 | 9,710 | 9,800 | 1,130 | 0 | 0 | 3,430 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21,030 | 590 |
| CSU[13] | 1,120 | 0 | 0 | 720 | 3,960 | 0 | 0 | 2,760 | 0 | 450 | 0 | 0 | 0 | 0 | 7,420 | 0 | 9,690 | 2,400 |
| TL[13] | ✓ | 330 | 3,300 | 3,370 | ✓ | ✓ | 3,760 | 2,880 | 31,420 | ✓ | 5,960 | 15,730 | 16,780 | 0 | 10,180 | 15,770 | 14,080 | 4,840 |
| Closed to Mineral Materials Disposal | 0 | 560 | 1,910 | 2,460 | 780 | 0 | 270 | 1,400 | 1,980 | 0 | 5,340 | 5,080 | 330 | 0 | 12,430 | 2,980 | 8,190 | 0 |
| Within Coal Potential Area | | | | | | | | | | | | | | | | | | |
| Closed to Coal Leasing | | | | | | | | | | | | | | | | | | |
| Within Locatable Mineral Potential Area | ✓ | ✓ | ✓ | ✓ | ✓ | | | ✓ | | ✓ | | | | ✓ | ✓ | | ✓ | ✓ |
| Withdrawn from Locatable Mineral Entry | 0 | 0 | 0 | 0 | 0 | 170 | 1,430 | 0 | | 0 | | | | 0 | 0 | | 5,290 | 0 |
| Recommend for Withdrawal from Locatable Mineral Entry | 0 | 0 | 0 | 0 | 0 | | | 0 | | 0 | | | | 0 | 0 | | 0 | 0 |
| NGD[13] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SSR[13] | | | | | | | | | | | | | | | | | | |
| VRM Class I | 0 | ✓ | 9,780 | 9,830 | 0 | 0 | 0 | 3,410 | 1,300 | 0 | 4,480 | 10,670 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |
| VRM Class II | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VRM Class III | 0 | 0 | 0 | 0 | ✓ | ✓ | | 0 | 30,510 | 0 | 4,230 | 9,740 | 24,140 | 0 | 0 | ✓ | 0 | 0 |
| VRM Class IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VRM Undesignated | ✓ | 0 | 0 | 840 | ✓ | 0 | 0 | 7,080 | 0 | ✓ | 10 | 20 | 50 | ✓ | ✓ | 0 | 21,010 | ✓ |

BLM_0163505

| Stipulation, Restriction, or Protection | Biological Soil Crust[1] | Coyote Wash[2] | Dolores River Slickrock Canyon[2] | Dolores Slickrock Canyon[3] | East Paradox[4] | Fairview South (BLM Expansion)[5] | Fairview South (CNHP Expansion)[6] | La Sal Creek[7] | Lower Uncompahgre Plateau[8] | Paradox Rock Art | Roubideau Corridors[9] | Roubideau-Potter-Monitor[9] | Salt Desert Shrub Ecosystem[10] | San Miguel Gunnison Sage-grouse[11] | San Miguel River Expansion[12] | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unavailable to Livestock Grazing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ROW Avoidance | | | | | | | | | | | | | | | | | | |
| ROW Exclusion | 0 | ✓ | ✓ | 9,820 | 0 | 0 | 0 | 3,420 | 1,300 | 0 | 4,480 | 10,670 | 3,940 | 0 | 0 | 0 | 5,410 | 0 |
| SRMA | 0 | ✓ | 9,710 | 9,800 | 0 | 0 | 0 | 3,420 | 0 | 0 | 0 | 0 | 0 | 0 | 12,240 | 0 | 0 | 0 |
| ERMA | | | | | | | | | | | | | | | | | | |
| Closed to Motorized Travel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 160 | 170 | 0 | 0 | 0 | 0 | 0 | 0 |
| Closed to Motorized and Mechanized Travel | 0 | ✓ | ✓ | 9,820 | 0 | 0 | 0 | 3,420 | 1,300 | 0 | 4,480 | 10,680 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |

Source: BLM 2012a

[1] Biological Soil Crust ACEC is almost entirely within the East Paradox ACEC.
[2] Coyote Wash and Dolores River Slickrock Canyon ACECs are entirely within the Dolores Slickrock Canyon ACEC.
[3] Includes all of the Coyote Wash and Dolores River Slickrock Canyon ACECs, and approximately one-third of the La Sal Creek ACEC.
[4] Includes almost all of the Biological Soil Crust ACEC.
[5] Fairview South (BLM Expansion) ACEC is entirely with the Fairview South (CNHP Expansion) ACEC. Fairview South (BLM Expansion) ACEC contains the entire Fairview South ACEC, which is proposed for designation under Alternative A.
[6] Includes Fairview South (BLM Expansion) ACEC and the Fairview South ACEC (proposed for designation under Alternative A).
[7] Approximately one-third of the La Sal Creek ACEC overlaps with the Dolores River Slickrock Canyon and Dolores Slickrock Canyon ACECs.
[8] A total of 1,040 acres of the Lower Uncompahgre Plateau ACEC overlaps with the Roubideau Corridors and Roubideau-Potter-Monitor ACECs.
[9] A portion of the Roubideau Corridors ACEC overlaps with the Roubideau-Potter-Monitor ACEC.
[10] Includes the Adobe Badlands ACEC, which is proposed for designation under Alternative A.
[11] Approximately one-third of the San Miguel Gunnison Sage-grouse ACEC overlaps with the San Miguel River ACEC, which is designated under this Alternative. This portion also overlaps the San Miguel River Expansion ACEC.
[12] Includes the San Miguel River ACEC, which is proposed for designation under Alternative A.
[13] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
✓- Indicates stipulation, restriction, or protection covers the entire ACEC.
Hatching indicates not applicable under this alternative.

BLM_0163506

**Table 4-70**
**Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative C**

| Stipulation, Restriction, or Protection | Biological Soil Crust[1] | Coyote Wash[2] | Dolores River Slickrock Canyon[2] | Dolores Slickrock Canyon[3] | East Paradox[4] | Fairview South (BLM Expansion)[5] | Fairview South (CNHP Expansion)[6] | La Sal Creek[7] | Lower Uncompahgre Plateau[8] | Paradox Rock Art | Roubideau Corridors[9] | Roubideau-Potter-Monitor[8] | Salt Desert Shrub Ecosystem[10] | San Miguel Gunnison Sage-grouse[11] | San Miguel River Expansion[12] | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Acres Not Designated as an ACEC:* | 1,900 | 2,100 | 9,780 | 10,670 | 7,360 | 400 | 4,040 | 10,490 | 31,810 | 1,080 | 8,720 | 20,430 | 28,120 | 310 | 12,710 | 25,620 | 26,400 | 5,190 |
| NL[13] | 0 | ✓ | ✓ | 9,820 | 0 | 0 | 0 | 3,420 | 1,300 | 0 | 4,480 | 10,670 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |
| NSO[13] | 0 | 0 | 0 | 840 | 0 | 0 | 70 | 0 | 1,080 | ✓ | 0 | 0 | 2,990 | 0 | 50 | 920 | 1,330 | 360 |
| CSU[13] | 1,550 | ✓ | 9,760 | 10,640 | 7,040 | ✓ | ✓ | 7,300 | 18,440 | ✓ | ✓ | ✓ | 27,490 | 150 | 12,670 | 16,290 | 4,260 | 2,020 |
| TL[13] | ✓ | ✓ | 7,500 | 7,900 | ✓ | 350 | 3,450 | 2,350 | ✓ | ✓ | 8,660 | 20,350 | 1,220 | 100 | 11,600 | 16,080 | 23,030 | 4,450 |
| Closed to Mineral Materials Disposal | 0 | ✓ | ✓ | 9,820 | 1,290 | 320 | 1,020 | 3,420 | 1,550 | 0 | 4,870 | 10,990 | 6,710 | 0 | 50 | 1,330 | 5,680 | 310 |
| Within Coal Potential Area | | | | | | | | | 22,660 | | 210 | 6,000 | 660 | 10 | 490 | 21,260 | 15,920 | |
| Closed to Coal Leasing | | | | | | | | | 280 | | 130 | 3,110 | 660 | 0 | 0 | 0 | 680 | |
| Within Locatable Mineral Potential Area | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | ✓ | | | | ✓ | | | ✓ | ✓ |
| Withdrawn from Locatable Mineral Entry | 0 | 0 | 0 | 0 | 0 | 170 | 1,430 | 0 | | 0 | | | | 0 | 0 | | 5,290 | 0 |
| Recommend for Withdrawal from Locatable Mineral Entry | 0 | 0 | 0 | 0 | 0 | | 0 | | 0 | 0 | | | | 0 | 50 | | 0 | 0 |
| NGD[13] | 0 | ✓ | ✓ | 9,820 | 0 | 0 | 0 | 3,420 | 1,500 | 0 | 3,440 | 9,380 | 0 | 0 | 0 | 0 | 0 | 0 |
| SSR[13] | 1,540 | ✓ | 9,750 | 10,620 | 4,040 | ✓ | 4,010 | 7,250 | 4,260 | 340 | 8,380 | 10,720 | 16,590 | 150 | 9,590 | 12,070 | 8,430 | 1,690 |
| Class I | 0 | ✓ | 9,750 | 9,820 | 0 | 0 | 0 | 3,420 | 1,300 | 0 | 4,480 | 10,680 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |
| Class II | 0 | 0 | 30 | 770 | 0 | 0 | 0 | 1,430 | 10 | 0 | 410 | 0 | 0 | 0 | 6,620 | 1,430 | 1,140 | 800 |
| Class III | ✓ | 0 | 0 | 80 | ✓ | ✓ | 1,820 | 5,140 | 22,110 | ✓ | 3,570 | 9,750 | 4,010 | 140 | 5,820 | 24,190 | 18,630 | ✓ |
| Class IV | 0 | 0 | 0 | 0 | 0 | 0 | 2,220 | 500 | 8,400 | 0 | 260 | 0 | 20,170 | 170 | 270 | 0 | 1,580 | 0 |

BLM_0163507

| Stipulation, Restriction, or Protection | Biological Soil Crust[1] | Coyote Wash[2] | Dolores River Slickrock Canyon[2] | Dolores Slickrock Canyon[3] | East Paradox[4] | Fairview South (BLM Expansion)[5] | Fairview South (CNHP Expansion)[6] | La Sal Creek[7] | Lower Uncompahgre Plateau[8] | Paradox Rock Art | Roubideau Corridors[9] | Roubideau-Potter-Monitor[8] | Salt Desert Shrub Ecosystem[10] | San Miguel Gunnison Sage-grouse[11] | San Miguel River Expansion[12] | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unavailable to Livestock Grazing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 680 | 0 | 0 |
| ROW Avoidance | 1,050 | 0 | 10 | 770 | 3,230 | ✓ | 4,010 | 3,840 | 4,010 | 340 | 4,240 | 4,940 | 13,750 | 110 | 8,060 | 2,680 | 2,630 | 1,740 |
| ROW Exclusion | 330 | ✓ | 9,770 | 9,820 | 310 | 0 | 0 | 3,420 | 1,300 | 0 | 4,480 | 10,680 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |
| SRMA | *hatching — not applicable* | | | | | | | | | | | | | | | | | |
| ERMA | 0 | ✓ | 9,720 | 9,800 | 5,550 | 0 | 1,630 | 3,420 | 16,060 | ✓ | 8,440 | ✓ | 0 | 0 | 12,310 | 3,130 | 0 | 290 |
| Closed to Motorized Travel | *hatching — not applicable* | | | | | | | | | | | | | | | | | |
| Closed to Motorized and Mechanized Travel | 0 | ✓ | ✓ | 9,830 | 0 | 0 | 0 | 3,450 | 1,300 | 910 | 4,470 | 10,680 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |

Source: BLM 2012a

[1] Biological Soil Crust ACEC is almost entirely within the East Paradox ACEC.

[2] Coyote Wash and Dolores River Slickrock Canyon ACECs are entirely within the Dolores Slickrock Canyon ACEC.

[3] Includes all of the Coyote Wash and Dolores River Slickrock Canyon ACECs, and approximately one-third of the La Sal Creek ACEC.

[4] Includes almost all of the Biological Soil Crust ACEC.

[5] Fairview South (BLM Expansion) ACEC is entirely with the Fairview South (CNHP Expansion) ACEC. Fairview South (BLM Expansion) ACEC contains the entire Fairview South ACEC, which is proposed for designation under Alternative A.

[6] Includes Fairview South (BLM Expansion) ACEC and the Fairview South ACEC (proposed for designation under Alternative A).

[7] Approximately one-third of the La Sal Creek ACEC is partially within the Dolores River Slickrock Canyon and Dolores Slickrock Canyon ACECs.

[8] A total of 1,040 acres of the Lower Uncompahgre Plateau ACEC overlaps with the Roubideau Corridors and Roubideau-Potter-Monitor ACECs.

[9] A portion of the Roubideau Corridors ACEC overlaps with the Roubideau-Potter-Monitor ACEC.

[10] Includes the Adobe Badlands ACEC, which is proposed for designation under Alternative A.

[11] Approximately one-third of the San Miguel Gunnison Sage-grouse ACEC overlaps with the San Miguel River ACEC, which is proposed for designation under Alternative C. This portion also overlaps with the San Miguel River Expansion ACEC.

[12] Includes the San Miguel River ACEC, which is proposed for designation under Alternative A.

[13] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.

✓- Indicates stipulation, restriction, or protection covers the entire ACEC.

Hatching indicates stipulation, restriction, or protection is not applicable under this alternative.

BLM_0163508

**Table 4-71**
**Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative D**

| Stipulation, Restriction, or Protection | Coyote Wash[1] | Dolores Slickrock Canyon[2] | East Paradox[3] | Fairview South (CNHP Expansion)[4] | Fairview South[5] | La Sal Creek[6] | Lower Uncompahgre Plateau[7] | Roubideau-Potter-Monitor[8] | Salt Desert Shrub Ecosystem[9] | San Miguel Gunnison Sage-grouse[10] | San Miguel River Expansion[11] | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Acres Not Designated as an ACEC:** | 0 | 890 | 5,560 | 3,640 | 0 | 7,200 | 30,770 | 12,380 | 28,130 | 310 | 12,710 | 25,620 | 26,400 | 5,190 |
| NL[12] | | 80 | | | | 120 | 260 | 5,940 | 3,940 | 0 | 50 | 0 | 5,290 | |
| NSO[12] | | 640 | 2,870 | 1,430 | | 2,370 | 5,710 | ✓ | 7,510 | 0 | 11,510 | 6,870 | 5,800 | 2,530 |
| CSU[12] | | 870 | ✓ | ✓ | | 6,880 | ✓ | ✓ | 28,100 | 150 | 10,170 | 24,810 | ✓ | 4,040 |
| TL[12] | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Closed to Mineral Material Disposal | | 670 | 1,190 | 720 | | 980 | 3,370 | ✓ | 6,730 | 0 | 5,700 | 2,300 | 6,250 | 340 |
| Within Coal Potential Area | | | | | | | 22,630 | 5,560 | 660 | 10 | 490 | 21,260 | 15,920 | |
| Closed to Coal Leasing | | | | | | | 9,030 | 5,640 | 660 | 0 | 480 | 2,340 | 680 | |
| Within Locatable Mineral Potential Area | | ✓ | ✓ | | | ✓ | | | | ✓ | ✓ | | ✓ | ✓ |
| Withdrawn from Locatable Mineral Entry | | 0 | 0 | 1,260 | | 0 | | | | 0 | 0 | | 5,290 | 0 |
| Recommend for Withdrawal from Locatable Mineral Entry | | 0 | 0 | | | 0 | | | | 0 | 70 | | 0 | 0 |
| NGD[12] | | 80 | 0 | 0 | | 120 | 0 | 5,940 | 3,940 | 0 | 0 | 0 | 0 | 0 |
| SSR[12] | | ✓ | ✓ | ✓ | | 6,960 | ✓ | 12,360 | 27,490 | 150 | 11,290 | 24,580 | ✓ | 4,730 |
| Class I | | 80 | 0 | 0 | | 120 | 260 | 6,470 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |
| Class II | | 800 | 5,500 | 0 | | 4,040 | 1,110 | 3,750 | 0 | 0 | 2,530 | 3,170 | 7,670 | 4,510 |
| Class III | | 10 | 60 | 2,100 | | 3,040 | 25,780 | 2,160 | 290 | 140 | 10,180 | 22,450 | 11,770 | 680 |
| Class IV | | 0 | 0 | 1,540 | | 0 | 3,620 | 0 | 23,900 | 170 | 0 | 0 | 1,570 | 0 |
| Unavailable to Livestock Grazing | | 210 | 0 | 350 | | 2,920 | 10 | 0 | 40 | 70 | 10,010 | 1,440 | 150 | 0 |
| ROW Avoidance | | 790 | 2,550 | 1,080 | | 6,750 | 7,730 | 5,190 | 13,830 | 150 | 10,650 | 22,540 | 21,010 | 2,120 |
| ROW Exclusion | | 80 | 0 | 0 | | 150 | 260 | 7,190 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |

BLM_0163509

| Stipulation, Restriction, or Protection | Coyote Wash [1] | Dolores Slickrock Canyon [2] | East Paradox [3] | Fairview South (CNHP Expansion) [4] | Fairview South [5] | La Sal Creek [6] | Lower Uncompahgre Plateau [7] | Roubideau-Potter-Monitor [8] | Salt Desert Shrub Ecosystem [9] | San Miguel Gunnison Sage-grouse [10] | San Miguel River Expansion [11] | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SRMA | ▨ | 80 | 0 | 0 | ▨ | 150 | 15,020 | 12,120 | 0 | 0 | 12,310 | 3,120 | 0 | 0 |
| ERMA | ▨ | 0 | 5,550 | 1,120 | ▨ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 290 |
| Closed to Motorized Travel | ▨ | 0 | 0 | 0 | ▨ | 0 | 0 | 0 | 0 | 0 | 0 | 850 | 0 | 0 |
| Closed to Motorized and Mechanized Travel | ▨ | 80 | 0 | 0 | ▨ | 150 | 260 | 9,410 | 3,940 | 0 | 0 | 0 | 5,290 | 0 |

Source: BLM 2012a

[1] The Coyote Wash ACEC is entirely within the Dolores River Slickrock Canyon ACEC, which is proposed for designation under Alternative D. Coyote Wash would therefore be protected by the special management applicable to that ACEC.

[2] Contains the entire Dolores River Slickrock Canyon ACEC, which is proposed for designation under Alternative D.

[3] Contains all but 100 acres of the Biological Soil Crust ACEC, which is proposed for designation under Alternative D.

[4] Includes the Fairview South ACEC. Also contains the entire Fairview South (BLM Expansion) ACEC, which is proposed for designation under Alternative D.

[5] Fairview South ACEC is entirely within the Fairview South (BLM Expansion) ACEC, which is proposed for designation under Alternative D. Fairview South would therefore be protected by the special management applicable to that ACEC.

[6] Approximately one third of the La Sal Creek ACEC overlaps with the Dolores River Slickrock Canyon ACEC, which is proposed for designation under Alternative D. This portion of La Sal Creek also overlaps with the Dolores Slickrock Canyon ACEC.

[7] A total of 1,040 acres of the Lower Uncompahgre Plateau overlaps with the Roubideau Corridors ACEC, which is proposed for designation under Alternative D. This portion also overlaps with the Roubideau-Potter-Monitor ACEC.

[8] A portion of the Roubideau-Potter-Monitor ACEC overlaps with the Roubideau Corridors ACEC, which is proposed for designation under Alternative D.

[9] Contains the entire Adobe Badlands ACEC, which is proposed for designation under Alternative D.

[10] Approximately one-third of the San Miguel Gunnison Sage-grouse ACEC overlaps the San Miguel River ACEC, which is proposed for designation under Alternative D. This portion also overlaps the San Miguel River Expansion ACEC.

[11] Contains the entire San Miguel River ACEC, which is proposed for designation under Alternative D.

[12] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.

✓- Indicates stipulation, restriction, or protection covers the entire ACEC.

Hatching indicates not applicable under this alternative.

BLM_0163510

**Table 4-72**
**Summary of Protections for ACECs or Portions of ACECs Not Proposed for Designation, Alternative E**

| Stipulation, Restriction, or Protection | Biological Soil Crust | Coyote Wash | Dolores Slickrock Canyon | Dolores River Slickrock Canyon | East Paradox[2] | Fairview South (CNHP Expansion) | La Sal Creek | Lower Uncompahgre Plateau | Roubideau-Potter-Monitor | Roubideau Corridors | Salt Desert Shrub Ecosystem | San Miguel Gunnison Sage-grouse | San Miguel River Expansion | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Acres Not Designated as an ACEC:* | 1,510 | 2,100 | 10,670 | 9,780 | 7,020 | 3,640 | 10,490 | 31,810 | 20,430 | 8,720 | 28,130 | 430 | 12,700 | 25,620 | 26,400 | 5,190 |
| NL[3] | | 2,090 | 9,850 | 9,770 | | | 3,420 | 1,300 | 10,680 | 4,480 | 3,950 | | | | 5,290 | |
| NSO[3] | 20 | ✓ | 9,820 | 9,720 | 340 | 340 | 3,840 | 780 | 7,860 | 6,470 | 4,160 | ✓ | 11,100 | 4,770 | 1,010 | 1,170 |
| CSU[3] | 1,110 | 1,630 | 9,600 | 8,760 | 3,620 | 3,620 | 6,350 | 18,110 | ✓ | ✓ | 19,930 | 250 | 11,710 | 15,200 | 10,010 | 3,820 |
| TL[3] | ✓ | 10 | 110 | 0 | 3,380 | 3,380 | 1,080 | 30,510 | 9,630 | 4,140 | 4,960 | ✓ | 12,540 | 17,500 | 19,330 | 4,830 |
| Closed to Mineral Material Disposal | 0 | ✓ | 10,440 | ✓ | 310 | 310 | 4,250 | 4,060 | ✓ | 8,170 | 7,330 | 80 | 4,480 | 1,810 | 5,750 | 130 |
| Within Coal Potential Area | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22,660 | 5,930 | 210 | 660 | 90 | 1,170 | 21,260 | 15,920 | 0 |
| Closed to Coal Leasing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,060 | 5,930 | 190 | 660 | 0 | 370 | 2,340 | 680 | 0 |
| Within Locatable Mineral Potential Area | 0 | ✓ | ✓ | ✓ | ✓ | 0 | ✓ | 0 | 0 | 0 | 0 | ✓ | ✓ | 0 | ✓ | ✓ |
| Withdrawn from Locatable Mineral Entry | 0 | 0 | 0 | 0 | 0 | 1,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,290 | 0 |
| Recommend for Withdrawal from Locatable Mineral Entry | 0 | 740 | 2,760 | 2,760 | 0 | 0 | 1,160 | 690 | 7,860 | 6,400 | 0 | 10 | 0 | 0 | 1,010 | 0 |
| NGD[3] | 0 | 2,090 | 9,850 | ✓ | 0 | 0 | 3,420 | 1,300 | 10,680 | 4,480 | 3,950 | 0 | 0 | 0 | 0 | 0 |
| SSR[3] | 1,120 | 1,640 | 9,710 | 8,860 | 5,910 | 3,610 | 6,430 | 7,360 | 17,070 | 8,610 | 20,160 | 420 | 11,170 | 14,600 | 9,660 | 3,790 |
| Class I | | ✓ | 9,850 | ✓ | 0 | 0 | 3,420 | 1,300 | 11,670 | 5,220 | 3,950 | 0 | 0 | 0 | 5,290 | 0 |

BLM_0163511

4. Environmental Consequences (Areas of Critical Environmental Concern)

| Stipulation, Restriction, or Protection | Biological Soil Crust[1] | Coyote Wash | Dolores Slickrock Canyon | Dolores River Slickrock Canyon | East Paradox[2] | Fairview South (CNHP Expansion) | La Sal Creek | Lower Uncompahgre Plateau | Roubideau-Potter-Monitor | Roubideau Corridors | Salt Desert Shrub Ecosystem | San Miguel Gunnison Sage-grouse | San Miguel River Expansion | Sims-Cerro Gunnison Sage-grouse | Tabeguache Pueblo and Tabeguache Caves | West Paradox |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class II | ✓ | 0 | 780 | 0 | 2,640 | 0 | 4,050 | 900 | 6,050 | 2,910 | 0 | 0 | 4,560 | 3,170 | 7,670 | 4,240 |
| Class III | 0 | 0 | 30 | 0 | 4380 | 2,100 | 2,540 | 25,990 | 2,710 | 380 | 4010 | 260 | 8,830 | 22,450 | 11,770 | 950 |
| Class IV | 0 | 0 | 0 | 0 | 0 | 1,540 | 490 | 3,620 | 0 | 210 | 20,170 | 170 | 430 | 0 | 1,580 | 0 |
| Unavailable to Livestock Grazing | 0 | 260 | 860 | 710 | 0 | 0 | 1,280 | 0 | 430 | 360 | 40 | 70 | 10,130 | 1,690 | 20 | 0 |
| ROW Avoidance | 100 | 0 | 0 | 0 | 480 | 480 | 100 | 1,600 | 5,480 | 400 | 3,850 | ✓ | 1,530 | 7,170 | 590 | 110 |
| ROW Exclusion | 0 | ✓ | 9,850 | ✓ | 0 | 0 | 3,420 | 1,300 | 14,940 | 7,800 | 3,950 | 0 | 10 | 920 | 5,290 | 0 |
| SRMA | 0 | ✓ | 9,820 | 9,720 | 0 | 0 | 3,440 | 16,060 | 20,430 | 8,440 | 0 | 120 | 10,920 | 3,120 | 0 | 0 |
| ERMA | 0 | 0 | 0 | 0 | 5,550 | 1,120 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 290 |
| Closed to Motorized Travel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 860 | 0 | 0 |
| Closed to Motorized and Mechanized Travel | 0 | ✓ | 9,860 | ✓ | 0 | 0 | 3,450 | 1,300 | 17,500 | 7,850 | 3,950 | 0 | 70 | 0 | 5,290 | 0 |

Source: BLM 2018a, 2019
[1] Biological Soil Crust ACEC is almost entirely within the East Paradox ACEC.
[2] Includes almost all of the Biological Soil Crust ACEC.
[3] Total acreage for stipulations may be greater than the total acreage of an ACEC because stipulations could overlap. If a stipulation were excepted, modified, or waived by the BLM Authorized Officer, underlying stipulations could still be in effect.
✓ - Indicates stipulation, restriction, or protection covers the entire ACEC.
Hatching indicates not applicable under this alternative.

BLM_0163512

Alternative A

The West Paradox ACEC is not designated. While portions of the ACEC would continue to be protected from surface-disturbance related to fluid mineral development by application of NSO, CSU, and TL stipulations, these stipulations are not targeted at protecting the relevant and important ACEC values. If they are excepted, modified, or waived by the BLM Authorized Officer, impacts described under **Nature and Type of Effects** could be experienced if development occurs. Because all of the potential ACEC would be available for mineral materials disposal, locatable mineral entry, and ROW location, the relevant and important values could be impaired as described under **Nature and Type of Effects** if these activities were to occur in the area. Continued livestock grazing could damage vegetation communities and special status plants as described under **Nature and Type of Effects**.

Alternative B

The West Paradox ACEC would be designated. Stringent surface use restrictions would be applied throughout the ACEC, as summarized in **Table 4-68**, providing the most protection to cultural resources of any alternative from most surface-disturbing activities.

Alternative C

The West Paradox ACEC would not be designated. The management prescriptions identified in **Table T-1** would provide some protection for the special status plant and bird species and vegetation communities within this potential ACEC. Impacts on ACEC values from fluid mineral development could increase compared with Alternative A due to a decrease in the number of acres subject to NSO and TL stipulations.

While more acres would be closed to mineral materials disposal and managed as ROW avoidance than under Alternative A, these activities could still impact ACEC values across the remainder of the area as described under **Nature and Type of Effects**. Application of SSR restrictions on portions of the potential ACEC would mitigate impacts of mineral materials disposal and ROW location, but these stipulations would not be targeted to protect all ACEC values.

A small portion of the potential ACEC would overlap with the Paradox Valley ERMA, which could increase recreation impacts over Alternative A as described under **Nature and Type of Effects**.

Impacts of livestock grazing would be the same as under Alternative A.

Alternative D

The West Paradox ACEC would not be designated. The management prescriptions identified in **Table T-1** would help protect the special status plant and animal species and unique vegetation communities within the potential ACEC. While application of NSO stipulations would increase protection of ACEC values from impacts of fluid mineral development, this development would be allowed on the remainder of the area. Application of CSU and TL stipulations would mitigate impacts of this development.

Managing more of the area as closed to mineral materials disposal and ROW avoidance would reduce impacts of mineral materials disposal and ROW location compared with Alternative A, but these activities could still impact ACEC values on the remainder of the potential ACEC. Impacts of these activities are described under **Nature and Type of Effects**. Application of SSR restrictions across most of the potential ACEC would mitigate these impacts.

Management of most of the area as VRM Class II would also help mitigate impacts of surface-disturbing activities that would not satisfy the criteria of that VRM Class.

BLM_0163513

Impacts of livestock grazing, locatable mineral entry, and motorized and mechanized travel on the special status plants and unique vegetation within the potential ACEC would be the same as those under Alternative A.

The overlap of a portion of the potential ACEC with the Paradox Valley ERMA could increase impacts of recreation on ACEC values compared with Alternative A as described under **Nature and Type of Effects**.

Alternative E

The West Paradox ACEC would not be designated. The management prescriptions identified in **Table T-1** would help protect the special status plant and animal species and unique vegetation communities within the potential ACEC. While application of NSO stipulations in almost half of the ACEC would increase protection of ACEC values from impacts of fluid mineral development, this development would be allowed on the remainder of the area. Application of CSU and TL stipulations would mitigate impacts of this development.

Managing more of the area as ROW avoidance would reduce impacts of ROW location compared with Alternative A, but these activities could still impact ACEC values on the remainder of the potential ACEC. Impacts of these activities are described under **Nature and Type of Effects**. Application of SSR restrictions across most of the potential ACEC would mitigate these impacts. The potential ACEC would be open for mineral material disposal, and relevant and important values could be impacted by such activities, as described under **Nature and Type of Effects**.

Management of most of the area as VRM Class II would also help mitigate impacts of surface-disturbing activities that would not satisfy the criteria of that VRM Class.

Impacts of livestock grazing, locatable mineral entry, and motorized and mechanized travel on the special status plants and unique vegetation within the potential ACEC would be the same as those under Alternative A.

The overlap of a small portion of the potential ACEC with the Paradox Valley ERMA could increase impacts of recreation on ACEC values, compared with Alternative A, as described under **Nature and Type of Effects**.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on ACECs is the Uncompahgre RMP Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect ACECs are mineral exploration and development, unauthorized travel, forestry, livestock grazing, recreation, road construction, ROWs, water diversions, weed invasion and spread, weed control, prescribed fire and wildfire, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought.

Cumulative impacts on potential ACECs under the proposed plan and alternatives could result from non-BLM actions and decisions on lands next to ACECs. While protections exist within potential ACECs, population growth, development, and recreation throughout the Planning Area could, over time, encroach on these areas, causing potential degradation of the ACEC values, such as unauthorized off-route travel and trash dumping and increased noise, air pollution, and light pollution. Other impacts include displacement of species, habitat fragmentation, and changes to the visual landscape that could affect resources within ACECs. Impacts would be greater where recreation areas, such as SRMAs or ERMAs, or development were next to an ACEC. The BLM would adaptively manage to protect ACEC values and minimize impacts where applicable and feasible.

BLM_0163514

## 4.5.2  Wilderness and Wilderness Study Areas

Within the Decision Area there are two types of congressionally established wilderness resources: WSAs, including the Adobe Badlands, Camel Back, Dolores River Canyon, and Sewemup Mesa WSAs, and the Needle Rock ISA; and the Tabeguache Area, a special congressional designation managed similarly to wilderness. This chapter discusses the impacts from proposed management actions of other resources and resource uses on these two wilderness categories. Existing conditions are described in **Section 3.3.2** (Wilderness and Wilderness Study Areas). The size of the Tabeguache Area and each of the five WSAs is the same under all alternatives and is described in **Table T-1**. Since the authority to establish or release WSAs lies solely with Congress, no new WSAs will be established under any alternative; nor will any WSA be released under any alternative.

Wilderness character and WSA wilderness characteristics are primarily subject to impacts from recreational use, livestock grazing and management, fire suppression, and wildlife/vegetation management projects.

### Wilderness Study Areas

#### Methods and Assumptions

##### Indicators
Indicators of impacts on WSAs are impacts on their wilderness characteristics of natural appearance, outstanding opportunities for solitude or primitive and unconfined recreation, and unique or supplemental values.

All of the alternatives would continue to manage five WSAs according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), until such time as Congress either designates them as wilderness or releases them for other uses.

##### Assumptions
In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The five WSAs in the Planning Area, Adobe Badlands, Camel Back, Dolores River Canyon, Sewemup, and Needle Rock ISA, would continue to be managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), until Congress either designates or releases all or portions of the WSAs from further consideration.
- Managing the WSAs according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), will protect their wilderness characteristics in a manner that will not "impair the suitability of WSAs for preservation as wilderness" (FLPMA Section 603[c]). This is the "nonimpairment standard."
- Management of the WSAs is subject to valid existing rights and grandfathered uses under all alternatives, consistent with BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b).
- Established grazing in the WSAs is determined by the active AUMs permitted at the time of designation for any allotment that is wholly or partly within the WSAs. Maintenance of existing facilities and construction of new facilities necessary to manage and use permitted AUMs would be conducted in accordance with the nonimpairment standard of BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b).
- Livestock grazing managed in accordance with BLM regulations does not impact naturalness in the WSAs. The assumption is that grazing is part of wilderness, and the WSAs exist in the context of grazing, although livestock developments could impact the natural appearance of the WSAs.

BLM_0163515

- Actions that would "impair the suitability of WSAs for preservation as wilderness" would not be permitted unless they were to meet one of the following exception criteria described in BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b):
  - Emergencies such as suppression activities associated with wildfire or search and rescue operations
  - Reclamation activities designed to minimize impacts on wilderness values created by violations of and emergencies to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b)
  - Uses and facilities that are considered grandfathered or valid existing rights under BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b),
  - Uses and facilities that clearly protect or enhance the land's wilderness values or that are the minimum necessary for public health and safety in the use and enjoyment of the wilderness values
  - Reclamation of pre-FLPMA impacts
- All activities approved in the WSAs would be closely managed to ensure that they would not impair the areas' wilderness characteristics. Preservation of wilderness characteristics within the WSAs is paramount and is the primary consideration when evaluating any proposed action or use.
- Impacts on the WSAs from implementing management actions for other resources, resource uses, and special designations would be considered only if impacts would be negligible. Allowable uses in the WSAs are permitted if they meet the nonimpairment standard.
- The WSAs, if released by Congress, could still possess wilderness characteristics (with the exception of Needle Rock ISA, due to size and existing road), and post-release BLM management could impact those characteristics. As a result, preservation of wilderness characteristics within the released areas (former WSAs) should be considered during the evaluation of proposed actions or uses, should Congress release any of the WSAs from further wilderness review.

*Nature and Type of Effects*

In the WSAs, direct impacts normally come from recreational use, vegetation treatments, and the installation, maintenance, and use of range/wildlife improvements allowed under BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b). There could also be indirect impacts from management of other resources that would enhance wilderness characteristics in the WSAs.

Managing the WSAs to protect their wilderness characteristics would protect wilderness values through application of the minimum requirements analysis for all surface-disturbing activities. Because the BLM cannot and would not permit any actions that would impair the WSAs' wilderness characteristics, such impacts would occur only from activities associated with valid existing rights or grandfathered uses. Grazing is the only grandfathered use allowed in the WSAs, which may be managed in a manner and to the degree it was when the areas were designated.

BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), states that mining and mineral leasing uses can continue in the manner and to the degree that they were being conducted at the time the FLPMA was passed, as long as they do not cause unnecessary or undue degradation of the lands. While this clause allows for a natural progression of development, new impacts cannot be of a significantly different type than the impacts involved with the pre-FLPMA activity. There are no existing mineral leases within the WSAs. If mineral development occurred next to the WSAs, associated activities could impact visitors' perceptions if they were visible from within the WSA, particularly opportunities for solitude, as well as air quality and scenic and ecological values.

BLM_0163516

Livestock grazing is considered a valid existing right in the WSAs. Impacts are possible from livestock grazing, particularly from fencing and water developments, which could impact naturalness and opportunities for unconfined recreation. Cattle grazing could impact recreation by the presence of livestock in a wilderness setting. Impacts on areas frequented by livestock, such as springs or water developments, could diminish the naturalness in the vicinity of the developments. Existing range improvements used for grazing, such as fences, stock trails, springs, and stock ponds, constitute a valid existing right and would continue to be maintained. Structures and maintenance of range improvements could result in short-term impacts on solitude and naturalness. Changes in grazing could be allowed in number, kind, or season of use following the preparation of an environmental assessment (if not adequately addressed in an existing NEPA document).

Stipulations associated with cultural resources, water, soils, and special status species could indirectly improve the naturalness of the WSAs. If any of the WSAs were released by Congress from further wilderness review, these measures would help protect wilderness characteristics.

Lands managed to protect wilderness characteristics, where they are next to WSAs, could create additional protection for the WSAs, as the management for the areas would be similar. A wider expanse of contiguous land containing the WSAs and lands managed to protect wilderness characteristics could therefore heighten protection of wilderness characteristics found within the WSAs.

Where WSAs overlap or are next to stream segments eligible or suitable for inclusion in the NWSRS or other special management areas, such as ACECs or SRMAs, management of these other areas could also indirectly protect wilderness characteristics of the WSAs due to their protective measures, as they often include complementary management objectives.

Similarly, management for ecological emphasis areas could afford some protection for wilderness characteristics by management direction to preserve the continuity of habitats, vegetation communities, and native wildlife within, thus offering indirect protection of the naturalness wilderness characteristic.

<u>Effects of Management if Congress Releases WSAs from Wilderness Consideration</u>
In the event that one or more WSA is released by Congress from wilderness consideration, management of an area in accordance with WSR, SRMA, ecological emphasis area, or ACEC principles could offer some indirect protection of wilderness characteristics. Conversely, if congressionally released WSAs were managed as open to leasing, mineral entry and development, or mineral material sales, wilderness characteristics could be diminished or eliminated from surface disturbance caused by well pads and roads created for mineral exploration and development. The degree of impact would depend on the size of surface disturbance and related activity required for development.

*Effects Common to All Alternatives*
Because the BLM would not permit any new actions that would impair WSAs, such impacts would occur only from activities associated with valid existing rights or grandfathered uses. There could be indirect impacts from management of other resources that would enhance wilderness characteristics; however, such impacts are generally negligible, as protections are not as strict as those afforded to WSAs by BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b). Additional impacts on wilderness characteristics of affected WSAs could occur if Congress were to release one or more from further wilderness consideration.

Under all alternatives, WSAs are closed to coal leasing and nonenergy solid mineral leasing. In addition, all would have an NGD restriction, be closed to fluid mineral leasing and exploration, and prohibit associated surface-disturbing activities. These restrictions would protect all wilderness characteristics from development, but there is potential for impacts should the WSAs be released from wilderness

BLM_0163517

consideration by Congress, as well as potential for impacts from leasing or development in adjacent areas. Although active coal leasing does not occur near any of the WSAs, coal potential has been identified in and around the Camel Back WSA and, to a lesser extent, the Adobe Badlands WSA; therefore, there is some potential for coal development in some adjacent areas. Leasable mineral development potential is low in and around existing WSAs and is not likely to impact WSA management. Potential impacts on wilderness characteristics from mineral development are discussed under **Nature and Type of Effects**.

Managing all WSAs as VRM Class I contributes to the protection of the wilderness characteristics of natural appearance. All WSAs would be managed as ROW exclusion areas, which would help preserve wilderness characteristics. The BLM would consider the acquisition of lands in or next to WSAs in order to enhance wilderness characteristics.

All WSAs would also be closed to wood cutting and wood product sales and harvest to preserve all wilderness characteristics, in particular, naturalness.

Implementing management for the following resources would have negligible or no impact on WSAs and are therefore not discussed in detail: air quality, lands and realty, national trails and byways, and watchable wildlife viewing sites.

<u>Effects of Management if Congress Releases WSAs from Wilderness Consideration</u>

As discussed under **Nature and Type of Effects**, wilderness characteristics could be protected if areas are released from study by Congress in cases where other special designations overlap the WSA. The Needle Rock ISA, though managed to the same standards as WSAs, is only 80 acres and is bisected by a county road. It does not meet any of the size criteria for wilderness characteristics, and therefore would not possess wilderness characteristics if released by Congress. Under all alternatives, the entirety of the Needle Rock ISA would continue to be designated as the Needle Rock ACEC/Outstanding Natural Area if released by Congress from wilderness consideration (see **Section 4.5.1**). Limiting travel to designated routes would provide some protection similar to WSA management. Management as VRM Class I would limit surface-disturbing activities and related impacts on wilderness characteristics. However, the former WSA lands would be open to fluid minerals leasing, mineral entry and development, and mineral material sales; impacts would be as those described under **Nature and Type of Effects**.

*Alternative A*

Alternative A allows resource uses in the WSAs that maintain each area's suitability for preservation as wilderness and protects the viability of current wilderness characteristics. In addition to the management prescriptions discussed under **Effects Common to All Alternatives**, additional protection for wilderness characteristics under Alternative A is provided by closing Needle Rock ISA and a portion of the Adobe Badlands WSA to mineral materials disposal. This limits surface disturbance and vehicular access to mineral material sites, preserving naturalness of setting.

Under Alternative A, impacts from travel management on WSAs are minimal, because all WSAs, with the exception of Needle Rock ISA, are closed to motorized and mechanized travel, except for administrative use, including routes associated with grandfathered uses and valid existing rights. Motorized and mechanized travel in Needle Rock ISA is limited to the one existing way (BLM 2010b). Ways are closed in Dolores River Canyon WSA and in Sewemup Mesa WSA; special permits are required for vehicle use for administration of livestock grazing allotments. Closing WSAs to motorized travel continues to protect the wilderness characteristics in these areas by restricting activities that could impact roadlessness, natural appearance, and opportunities for solitude and primitive/unconfined recreation. Prohibition of motorized river activities in Dolores River Canyon further protects opportunities for solitude and primitive and unconfined recreation.

BLM_0163518

In addition, under Alternative A, segments eligible for inclusion in the NWSRS overlap with portions of the Dolores River Canyon WSA (La Sal Creek Segment 3 and Dolores River Canyon Segment 1a) and Camel Back WSA (Roubideau Creek Segment 1). Management of eligible segments must preserve the tentative classification and ORVs, including protection of the level of development in the river study corridors, their free-flowing condition, and adequate water quality to support the ORVs. This would result in limitations on surface-disturbing activities that would indirectly preserve or enhance wilderness characteristics (refer to **Section 4.5.3** [Wild and Scenic Rivers]).

Effects of Management if Congress Releases WSAs from Wilderness Consideration
If Congress were to release WSAs from wilderness consideration, some protection would be afforded for wilderness characteristics due to overlapping special designations, as described under **Nature and Type of Effects**. Under Alternative A, a portion of the Abode Badlands WSA (6,370 acres) would be encompassed in the Adobe Badlands ACEC. Management of the Adobe Badlands ACEC as VRM Class I would protect wilderness characteristics, as described in **Nature and Type of Effects**, should the Adobe Badlands WSA be released from further wilderness consideration.

*Alternative B*

Alternative B would provide the maximum level of protection for wilderness characteristics of all WSAs. Under this alternative, protective management of ACECs, SRMAs, ecological emphasis areas, suitable WSR segments, and lands with wilderness characteristics would provide both adjacent and overlapping designations. Adjacent protection of wilderness characteristics would provide complementary management for many characteristics, and a wider expanse of contiguous land could therefore heighten protection within WSAs and further ensure the integrity of wilderness characteristics.

Stream segments determined to be suitable for inclusion in the NWSRS could provide indirect protection of WSAs. Segments would overlap Dolores River Canyon and Camel Back WSAs, as described under Alternative A. Management of suitable segments tentatively classified as wild requires limitation on surface disturbance similar to a WSA including VRM Class I, ROW exclusion, and closure to mineral leasing and development, thereby preserving wilderness characteristics of naturalness and opportunities for solitude or primitive and unconfined recreation.

Under Alternative B, the Camel Back WSA would be contiguous with the Camel Back WSA Adjacent lands with wilderness characteristics unit. Similarly, Dolores River Canyon WSA would be adjacent to the Dolores River Canyon WSA Adjacent lands with wilderness characteristics unit. Impacts are as described under **Nature and Type of Effects**.

All WSAs under Alternative B would be closed to mineral material disposal, providing protection from surface disturbance of all wilderness characteristics.

Recreational impacts on wilderness characteristics under Alternative B would be reduced by prohibiting competitive events and target shooting in all WSAs, preserving opportunities for solitude, and preserving naturalness. Travel management impacts are the same as those described for Alternative A.

Effects of Management if Congress Releases WSAs from Wilderness Consideration
Alternative B would provide additional protection for wilderness characteristics should any WSAs be released by Congress from further wilderness consideration. It would do this by requiring an update to the wilderness characteristics inventory for lands that were formerly WSAs (FLPMA Section 201) and by specifying that, on release, those lands would be managed consistent with underlying land use designations. Overlapping designations would provide indirect protection for wilderness characteristics if the WSA were released by Congress, as discussed in further detail for each WSA, as follows.

BLM_0163519

*Sewemup Mesa WSA*. Management for Sewemup Mesa WSA, if released, would be similar in prescription to management for WSAs under Alternative B in that the area would remain closed to nonenergy solid mineral leasing, mineral materials disposal, and fluid minerals leasing; retain the NGD restriction; and be closed to motorized travel, competitive SRP permits, and wood cutting. The area would remain a ROW exclusion area. Significant differences that could impact wilderness characteristics include the allowance of mechanized travel, which could impact naturalness of setting and opportunities for solitude and primitive/unconfined recreation. Because the former WSA would be managed as VRM Class II, the naturalness characteristic would largely be protected.

*Dolores River Canyon WSA*. Management consistent with Dolores Slickrock Canyon ACEC and Dolores River Canyon SRMA would provide some indirect protection of wilderness characteristics, but management prescriptions would not be as protective as WSA management. Dolores River Canyon SRMA and 9,800 acres of Dolores Slickrock Canyon ACEC would be closed to motorized and mechanized travel. In the remaining portion of the ACEC (870 acres), motorized and mechanized travel would be limited to existing routes. Management as VRM Class II, closure to fluid minerals leasing, and an NGD restriction would limit surface-disturbing activities and related impacts on wilderness characteristics. However, the former WSA lands would be open to mineral entry and development and mineral material sales; impacts would be as those described under *Nature and Type of Effects*.

*Camel Back WSA*. If released, lands would be managed consistent with Roubideau-Potter-Monitor ACEC and Roubideau SRMA, providing direct protection of wilderness characteristics. Impacts from recreation on opportunities for solitude and primitive and unconfined recreation would be limited due to restrictions on SRP permits and prohibition of target shooting. However, the former WSA lands would be open to fluid minerals leasing, mineral entry and development, and mineral material sales; impacts would be as those described under *Nature and Type of Effects*. Management of the adjacent Roubideau Area on National Forest System lands would continue to provide a protective buffer on the southern border of the unit.

*Adobe Badlands WSA*. If released, these lands would be managed consistent with Salt Desert Shrub Ecosystem ACEC, which would provide direct protection of wilderness characteristics, particularly through management that would limit surface disturbance, including the NSO/NGD stipulation and ROW exclusion. Because there are no designated vehicle routes in the WSA, and because the Salt Desert Shrub Ecosystem ACEC prohibits OHVs and surface disturbance, the limited to designated routes travel management designation for the area would provide adequate protection of wilderness characteristics. However, the former WSA lands would be open to fluid minerals leasing, mineral entry and development, and mineral material sales; impacts would be as those described under *Nature and Type of Effects*.

*Needle Rock ISA*. If Congress releases Needle Rock ISA from wilderness consideration, the BLM would manage those lands consistent with Needle Rock ACEC. Some protection would be afforded for wilderness characteristics due to the overlapping special designation.

### Alternative C

Alternative C would provide the fewest adjacent or overlapping special designation areas, so the indirect impacts of special designation areas on WSAs would be minimized. Under Alternative C, there are no lands managed to protect wilderness characteristics contiguous or overlapping with WSAs.

All WSAs would be closed to mineral materials disposal; impacts are described under Alternative B.

BLM_0163520

<u>Effects of Management if Congress Releases WSAs from Wilderness Consideration</u>
Alternative C would provide the fewest adjacent or overlapping special designation areas, and surface disturbance could be more likely to occur in areas released by Congress from wilderness consideration.

If any WSAs were released by Congress from wilderness consideration, the lands could still receive indirect protection by being managed according to management prescriptions in the RMP. However, a focus on multiple use management under this alternative is not likely to be consistent with management for wilderness characteristics. Management of Sewemup Mesa WSA (if released) would be consistent with Grand Junction RMP prescriptions for Sewemup Mesa WSA, most of which is in the BLM's Grand Junction Field Office. Likewise, Dolores River Canyon WSA lands (if released) would be managed consistent with the San Juan Public Lands RMP, most of which is under the San Juan Public Lands Planning Area. Similarly, management of the Camel Back WSA lands (if released) would be consistent with management goals and objectives in this RMP, which would not specifically provide protection of wilderness characteristics. Prescriptions of adjacent BLM-administered lands would provide limited protection of wilderness characteristics and could lead to a loss in those characteristics. If released from wilderness consideration, management of Adobe Badlands consistent with the Adobe Badlands ACEC would provide some indirect protection for the area, as described under Alternative A.

Impacts from mineral development, if areas were released from consideration, could occur as described under **Nature and Type of Effects** and Alternative B.

*Alternative D*
Under Alternative D, WSAs would be closed to motorized and mechanized use, and the same management prescriptions and impacts from comprehensive travel and transportation management would apply, as described under Alternative B. Wilderness characteristics of solitude and primitive and unconfined recreation would be enhanced by the prohibition of competitive events.

As described under Alternative B, management for areas with wilderness characteristics would provide protection of wilderness characteristics in areas next to current WSAs. This is only applicable to the Camel Back WSA Adjacent (6,950 acres) under Alternative D.

All WSAs under Alternative D would be closed to mineral material disposal; impacts are described under Alternative B.

Stream segments determined to be suitable for inclusion in the NWSRS could provide indirect protection of WSAs. Segments would overlap Dolores River Canyon and Camel Back WSAs, as described under Alternative A. Impacts of interim management of these segments would be the same as those described under Alternative B.

<u>Effects of Management if Congress Releases WSAs from Wilderness Consideration</u>
*Sewemup Mesa WSA.* Management and impacts are as described for Alternative B, with the exception that the area would be managed as a ROW avoidance area. If ROWs were located on these lands, there would be impacts on roadlessness, naturalness, and primitive and unconfined recreation. Depending on the extent of the ROWs, wilderness characteristics could be eliminated.

*Dolores River Canyon WSA.* Management consistent with the Dolores River Slickrock Canyon ACEC would provide some indirect protection of wilderness characteristics, similar to that describe under Alternative B. Under Alternative D, additional protection would be provided by the closure to mineral material disposal, nonenergy solid mineral leasing, and NSO/SSR restrictions. These would limit the potential for surface disturbance and related impacts on naturalness from mineral development.

BLM_0163521

*Camel Back WSA*. Management consistent with Roubideau SRMA and Roubideau Corridors ACEC would provide some indirect protection of wilderness characteristics if released by Congress. Because it allows for projects that create visual impacts that attract the attention of a casual observer, management as VRM Class III could diminish the naturalness characteristic. While there are designated routes in the area, the overlapping SRMA management allows only nonmotorized/nonmechanized use; therefore, no new impacts on wilderness characteristics would occur. Management as a ROW avoidance area, as well as NSO/NGD stipulations, closure to mineral materials disposal, and closure to nonenergy solid mineral leasing, would limit the potential for surface disturbance and related impacts on naturalness. If ROWs were located on these lands, there would be impacts on roadlessness, naturalness, and primitive and unconfined recreation. Depending on the extent of the ROWs, wilderness characteristics could be eliminated.

*Adobe Badlands WSA*. Management and impacts would be the same as those described for Alternative C.

*Needle Rock ISA*. The effects would be the same as those under Alternative B.

Alternative E
Comprehensive Travel and Transportation Management
Under Alternative E, WSAs would be closed to motorized and mechanized use, resulting in impacts on WSAs that are the same as those under Alternative A.

Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals
All WSAs under Alternative E would be closed to mineral material disposal; impacts are described under Alternative B.

Wild and Scenic Rivers
Stream segments suitable for inclusion in the NWSRS could provide indirect protection of WSAs. Segments would overlap Dolores River Canyon and Camel Back WSAs, as described under Alternative A. Impacts of interim management of these segments would be the same as those described under Alternative B.

Effects of Management if Congress Releases WSAs from Wilderness Consideration
*Sewemup Mesa WSA*. Management and impacts are as described for Alternative D, with the exception that the BLM would manage the UFO portion to be consistent with the Grand Junction Field Office portion of the WSA. Also, instead of being closed to fluid minerals, there would be an NSO stipulation. This would ensure consistent management of the WSA and would preserve the roadlessness, naturalness, and primitive and unconfined recreation.

*Dolores River Canyon WSA*. The effects would be the same as those under Alternative D.

*Camel Back WSA*. The effects would be the same as those under Alternative D.

*Adobe Badlands WSA*. The effects would be the same as those under Alternative D.

*Needle Rock ISA*. The effects would be the same as those under Alternative B.

*Cumulative*
The cumulative impact analysis area used to analyze cumulative impacts on WSAs encompasses the Uncompahgre RMP Planning Area. Continued management of all WSAs to the nonimpairment standard prescribed by BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), will maintain the areas' suitability for preservation as wilderness. Trends described in **Chapter 3**, including increasing visitation and recreation in the area, continue to have potential to impact wilderness characteristics of

BLM_0163522

all WSAs. Management of the Sewemup Mesa WSA in the Grand Junction Field Office would enhance protection of wilderness characteristics of the WSA in both Planning Areas, as would management of the Dolores River Canyon WSA in the Tres Rios Field Office. In addition, the Colorado Roadless Rule (77 *Federal Register* 39576-39612, 3 July 2012) provides management direction for conserving and managing Roadless Areas on National Forest System lands. One of the Upper Tier areas, Roc Creek, is west of Sewemup Mesa WSA. The management under the Roadless Rule would protect additional lands in a compatible manner to WSAs and would enhance wilderness characteristics of the Sewemup Mesa WSA over a larger area.

### Tabeguache Area

As stated in **Chapter 3**, the Colorado Wilderness Act (HR 631), passed by Congress in 1993, designated the Tabeguache area as a special area, the management for which is similar to that of a wilderness area. This section will discuss potential impacts from other resources and resources to the Tabeguache Area and WSAs in the Planning Area.

*Methods and Assumptions*

Indicators

Indicators of impacts on the Tabeguache Area are the following:

- Potential changes in wilderness character (untrammeled, natural, and undeveloped; opportunities for solitude or primitive and unconfined recreation; and unique or supplemental values) within the area. Definitions of each quality of wilderness character are detailed in the Keeping It Wild Interagency Wilderness Monitoring Protocol (Landres et al. 2008):
  - Untrammeled—Number of authorized actions and persistent structures designed to manipulate plants, animals, pathogens, soil, water, or fire; percent of natural fire starts that are manipulated within the boundaries of the area; number of unauthorized actions by agencies, citizen groups, or individuals that manipulate plants, animals, pathogens, soil, water, or fire
  - Natural—Abundance, distribution, or number of indigenous species and special status species; abundance and distribution of nonindigenous species; AUMs of livestock use inside the area; extent and magnitude of changes to water, air quality, and human-caused stream bank erosion; departure from natural fire regimes; area and magnitude of loss of connectivity with the surrounding landscape
  - Undeveloped—Index of physical development for authorized or predesignation structures and developments (e.g., buildings, fences, and livestock water developments); existing or potential impact of inholdings; type and amount of administrative use of motor vehicles
  - Opportunities for solitude or primitive and unconfined recreation—Amount of visitor use; area of wilderness affected from travel routes; type and number of agency provided and user-created recreation facilities; type and extent of management restrictions
  - Unique and Supplemental Values—Severity of disturbances to cultural resources, and status of indigenous species that are listed, or are candidates for listing, as threatened or endangered

Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The Tabeguache Area was designated by the Colorado Wilderness Act (HR 631), passed by Congress in 1993, as a special area, the management for which is similar to that of a wilderness area. The Tabeguache Area must be managed to maintain the area's "presently existing

BLM_0163523

wilderness character and potential for inclusion in the National Wilderness Preservation System."

- Management of the Tabeguache Area is subject to valid existing rights and special provisions under all alternatives, as consistent with the Colorado Wilderness Act (HR 631).
- Established grazing in the Tabeguache Area is determined by the active AUMs permitted at the time of designation for any allotment that is wholly or partly within the area. Maintenance of existing facilities and construction of new facilities necessary to manage and use permitted AUMs would be conducted to maintain "presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System."
- Because livestock grazing levels at the time of wilderness designation were in accordance with BLM grazing regulations, and future grazing would conform to BLM grazing regulations, existing permitted AUM levels would not impact naturalness. However, livestock developments and authorized motorized use by permittees impact the undeveloped nature of the wilderness; livestock grazing operations can impact outstanding opportunities for primitive recreation, as visitors may have to camp in the presence of livestock or in areas with evidence of livestock (e.g., manure); and livestock grazing operations can impact solitude by increasing the potential of encounters between Tabeguache Area visitors and grazing permittees during authorized grazing dates.
- All activities approved in the Tabeguache Area would be closely managed to ensure that they would not impair the area's wilderness character.

*Nature and Type of Effects*

In the Tabeguache Area, protection of wilderness character (the combination of all the wilderness qualities) can involve trade-offs between different qualities of its wilderness character. For example, protecting or enhancing a biological community could require a vegetation treatment. In this case, the "natural" (ecological naturalness) quality of its wilderness character would be enhanced in the long term, but the treatment would negatively impact its untrammeled quality.

Stipulations associated with cultural resources, water, soils, and special status species could indirectly improve the untrammeled and undeveloped qualities of the Tabeguache Area.

There could be impacts on the wilderness character of the Tabeguache Area from fire management. Impacts could result from fire suppression, prescribed fire (intentionally ignited for resource or management objectives), and managed fire (naturally ignited fires that are not suppressed in order to achieve management objectives).

Because it would constrain natural processes, fire suppression in itself would reduce the untrammeled quality of the Tabeguache Area. However, if the fuels in the area were unnaturally dense as a result of past fire suppression, this condition could lead to unnaturally hot wildfires that could essentially sterilize the area, reducing its natural quality. Wildfire suppression is considered an emergency action and is not subject to a "minimum requirements analysis." Agency (e.g., BLM and Forest Service) resource advisors would normally be assigned to help mitigate impacts on wilderness character from fire-suppression activities.

Prescribed fire is used as a tool to restore natural fire ecology to an area. As such, it would act to enhance the natural quality of the area's wilderness character, while reducing the untrammeled quality. Fire use would enhance the natural quality of the Tabeguache Area without impairing any other qualities of wilderness character.

BLM_0163524

The designation of the Tabeguache Area as VRM Class I would contribute to the protection of its undeveloped character. Closing the Tabeguache Area to wood cutting and wood product sales and harvest also would preserve wilderness character.

Livestock grazing is considered a valid existing right in the Tabeguache Area. Livestock grazing could impact the untrammeled and natural qualities of its character. Existing range improvements used for grazing, such as fences, stock trails, springs, and stock ponds, constitute a valid existing right under the Colorado Wilderness Act (HR 631) and would continue to be maintained. Structures could diminish the undeveloped quality of the Tabeguache Area. Maintenance of range improvements could result in short-term impacts on the area's undeveloped quality and opportunities for solitude. Changes in grazing could be allowed in number, kind, or season of use following the preparation of an environmental assessment (if not adequately addressed in an existing NEPA document).

There are no existing mineral leases in the Tabeguache Area, and Congress has closed it to mineral development. If mineral development were to occur next to the Tabeguache Area, associated activities could impact visitors' perceptions. If they were visible from within the Tabeguache Area, impacts could occur on perceived opportunities for solitude, as well as untrammeled and undeveloped qualities.

Managing the Tabeguache Area as ROW exclusion would help preserve its wilderness character.

Continuing to prohibit motorized and mechanized use in the Tabeguache Area would protect its wilderness character by restricting activities that could impact opportunities for solitude and primitive/unconfined recreation. Motorized and mechanized use on authorized routes would be allowed for administrative and permitted access (i.e., livestock grazing) and could impact opportunities for solitude and the untrammeled character of the area. However, this use was present at the time of designation and should therefore not significantly alter wilderness character.

Special designation areas, such as protected lands with wilderness characteristics, ACECs, and managing stream segments as eligible or suitable for inclusion in the NWSRS, where next to the Tabeguache Area, would complement management for wilderness character and could therefore heighten protection within the Tabeguache Area, further ensuring the integrity of wilderness character. In addition, special management lands near, but not immediately adjacent to, the Tabeguache Area could also provide some additional protection, in particular by reducing development and related impacts on noise, light, and air pollution.

Similarly, management of ecological emphasis areas to preserve continuity of habitats, vegetation communities, and native wildlife would offer indirect protection of the Tabeguache Area's wilderness character.

*Effects Common to All Alternatives*

The BLM would not permit any actions that would impair the wilderness character of the Tabeguache Area. Such impacts would only occur from activities associated with valid existing rights or special provisions.

Under all alternatives the BLM would manage the Tabeguache Area as VRM Class I, contributing to the protection of its undeveloped quality, as described under **Nature and Type of Effects**.

Under all alternatives the Tabeguache Area would be closed to wood cutting and wood product sales and harvest; impacts are as described under **Nature and Type of Effects**.

Under all alternatives, 7,930 acres (98 percent) of the Tabeguache Area would remain available to livestock grazing. Impacts are described under **Nature and Type of Effects**

BLM_0163525

Under all alternatives, impacts from energy and mineral development would be minimal. The Tabeguache Area would continue to be withdrawn from mineral entry, and would be closed to fluid minerals leasing, coal leasing, nonenergy solid mineral leasing, and mineral material disposal. Active coal leasing does not occur near the Tabeguache Area, but coal potential has been identified in and around the area and could have impacts should adjacent areas be developed. Impacts are described under **Nature and Type of Effects**.

All alternatives would close the Tabeguache Area to motorized and mechanized travel; impacts are as described under **Nature and Type of Effects**.

All alternatives would manage the Tabeguache Area as ROW exclusion; impacts are as described under **Nature and Type of Effects**.

Implementing management for the following resources would have negligible or no impact on the Tabeguache Area and are therefore not discussed in detail: air quality, lands and realty, national trails and byways, and watchable wildlife viewing sites.

*Alternative A*

Under Alternative A, there are no ecological emphasis areas or protected lands with wilderness characteristics units, and there are no ACECs adjacent to or near the Tabeguache Area, so no indirect protections of the Tabeguache Area would occur. Approximately 1,240 acres of stream segments managed as eligible for inclusion in the NWSRS are contiguous to or overlapping with the Tabeguache Area. Impacts are as described under **Nature and Type of Effects**.

*Alternative B*

Alternative B would provide the most protection of wilderness character in the Tabeguache Area. Management to protect lands with wilderness characteristics units, ACECs (5,310 acres, or 66 percent of the Tabeguache Area), and ecological emphasis areas (8,060 acres, the entire Tabeguache Area), as well as managing stream segments as suitable for inclusion in the NWSRS (1,240 acres, the same as under Alternative A), would provide adjacent and overlapping protective management. Management of the Shavano Creek lands with wilderness characteristics units, near the Tabeguache Area, could provide additional protection for such resources as air and noise due to limitation on development in this unit. Additional impacts are as described under **Nature and Type of Effects**.

In addition to the restrictions on development described under **Effects Common to All Alternatives**, under Alternative B, an SSR restriction would limit surface disturbance from all activities, thereby preserving wilderness character.

Recreational impacts on wilderness character under Alternative B would be reduced by the prohibition of competitive events and target shooting in the Tabeguache Area, preserving opportunities for solitude, naturalness, and undeveloped character.

*Alternative C*

Alternative C would provide the fewest special designation areas, so the indirect impacts from special designation areas next to or near the Tabeguache Area would be minimized. Under Alternative C, there are no protected lands with wilderness characteristics units. No stream segments would be managed as eligible or suitable for inclusion in the NWSRS. Impacts are as described under **Nature and Type of Effects**.

BLM_0163526

*Alternative D*

Under Alternative D, there are no protected lands with wilderness characteristics units near or overlapping with the Tabeguache Area, so no indirect protections would occur. Management to protect ecological emphasis areas (8,060 acres, the entire Tabeguache Area), as well as managing stream segments as suitable for inclusion in the NWSRS (1,010 acres, less than under Alternative A), would provide adjacent and overlapping protective management. Impacts are as described under **Nature and Type of Effects**. Under Alternative D, SSR restrictions would be applied, with impacts as described under Alternative B.

*Alternative E*

The impacts would be the same as those described under Alternative D.

*Cumulative*

The cumulative impact analysis area used to analyze cumulative impacts on the Tabeguache Area is the Uncompahgre RMP Planning Area. Trends described in **Chapter 3**, including increasing visitation and recreation in the area, continue to have the potential to impact wilderness character if visitation to the Tabeguache Area or adjacent lands were to increase. In addition, development of coal or other energy and mineral resources next to the Tabeguache Area could impact perceived wilderness character. Of note is potential for coal development on private lands in the Nucla-Naturita coal field.

## 4.5.3   Wild and Scenic Rivers

This section discusses the impacts on Wild and Scenic Rivers (WSRs) from the proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.3.3** (Wild and Scenic Rivers).

**Methods and Assumptions**

*Indicators*

The indicator of impacts on WSRs is any potential change to the ORVs, tentative classification (i.e., wild, scenic, or recreational), or free-flowing condition of the river segment or corridor area from its current state, or a reduction in water quality to the extent that it would no longer support the ORVs, as described in **Section 3.3.3** and Appendix B of the Wild and Scenic River Suitability report (**Appendix P**). The preliminary classification and identified ORVs for each segment are summarized below in **Table 4-73** (Summary of Wild and Scenic River Study Segments). The length and acreage of the study corridor for each segment can be found in **Table 2-4** (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) and **Table 2-5** (Summary of Wild and Scenic River Study Segments (Alternatives D and E) in **Chapter 2**.

Documentation of the process used to determine suitability can be found in Appendix B of the draft Wild and Scenic River Suitability report (**Appendix P**).

### Table 4-73
### Summary of Wild and Scenic River Study Segments

| River or Creek | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|
| Gunnison River Segment 2[AB] | Recreational | Fish |
| Monitor Creek | Wild | Vegetation |
| Potter Creek | Wild | Vegetation |

BLM_0163527

| River or Creek | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|
| Roubideau Creek Segment 1 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Roubideau Creek Segment 2[AB] | Scenic | Wildlife, Vegetation |
| Deep Creek[AB] | Scenic | Fish |
| West Fork Terror Creek[AB] | Scenic | Fish |
| Beaver Creek | *Alternatives A and B*: Scenic *Alternative D*: Recreational | Vegetation |
| Dry Creek[AB] | Wild | Scenic, Geologic |
| Naturita Creek[AB] | Scenic | Fish |
| Saltado Creek | Wild | Vegetation |
| San Miguel River Segment 1 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | *Alternatives A and B*: Scenic *Alternative D*: Recreational | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River Segment 6 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | Wild | Vegetation |
| Tabeguache Creek Segment 2[AB] | Recreational | Cultural, Vegetation |
| Lower Dolores River | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| North Fork Mesa Creek[AB] | Scenic | Vegetation |
| Dolores River Segment 1a *(portion within the Dolores River Canyon WSA)* | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 1b[AB] *(portion from the Dolores River Canyon WSA to Bedrock)* | Recreational | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| Ice Lake Creek Segment 2[AB] | Scenic | Scenic |
| La Sal Creek Segment 1[AB] | Recreational | Fish, Vegetation |
| La Sal Creek Segment 2 | *Alternatives A and B*: Scenic *Alternative D*: Recreational | Fish, Vegetation |
| La Sal Creek Segment 3 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |
| Lion Creek Segment 2[AB] | Scenic | Vegetation |
| Spring Creek[AB] | Recreational | Vegetation |

[AB] This segment is identified as eligible or suitable only under Alternatives A and B, respectively.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- All suitable stream segments under consideration for WSR designation will be managed under interim protective measures required by the WSR Act and BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management

BLM_0163528

(BLM 2012h) until the ROD for this RMP is adopted. At that time, any stream segment not found suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS) would lose its interim protection. This procedure and the interim protective measures would ensure that the values for which these river segments were found eligible and suitable are not compromised until Congress makes a decision regarding WSR designation. The interim management policy requires the BLM to protect the identified ORVs, the water quality that supports those values, the free-flowing condition of the stream segment, and the classification of the segment (current level of stream corridor development).

- If WSR designation is not provided (i.e., if segments are found not suitable and released from further study under the WSR Act), provisions could still remain to protect these river corridors under a combination of existing plans and policies and actions proposed under the action alternatives of this RMP. These provisions protect streamside and riparian habitats, riparian and aquatic wildlife, water quality, and cultural and visual resources. The major difference between designation and nondesignation is the legislative and, thus, lasting protection afforded designated streams. Decisions in this RMP, however, affect suitability only. Once a segment is determined suitable, only Congress can formally designate it as part of the NWSRS.

- The BLM recognizes the collaborative partnership with the State of Colorado to maintain ORVs. The BLM intends to work with the State to identify collaborative approaches to maintain water supplies for human use while meeting the BLM's legal obligation to maintain free-flowing condition, ORVs and adequate water quality to support those ORVs, and tentative classification of suitable stream segments. However, even though this partnership works to protect flows that support ORVs, the BLM could potentially authorize surface-disturbing activities in some stream segments. Recognizing that, the analysis of impacts on eligible and suitable WSR stream segments includes an evaluation of where management actions might be inconsistent with the tentative classification given to each suitable segment, as well as potential impacts on its ORVs or free-flowing condition. For Alternatives C and D, in which some segments are found not suitable and, thus, lose their interim protection, the impacts from other management prescriptions on the ORVs are analyzed because the values for which the segments were found eligible would still be present.

- A withdrawal is an administrative designation made by the BLM that prohibits certain activities on the identified federal lands to protect the identified value. The BLM's determination of whether a stream segment is suitable or not suitable could affect some of these withdrawals, especially withdrawals that are designed to protect potential water storage and potential hydropower generation sites. If the BLM determines that a stream segment is suitable, the final management plan could recommend revocation of water storage or hydropower related withdrawals. In addition, Congress could require revocation of certain withdrawals if it were to designate a river segment. A WSR management plan created in accordance with designation could also include a recommendation for revocation of withdrawals.

## Nature and Type of Effects

The potential impact on each stream segment depends on the ORVs identified for the segment and the tentative classification of the segment. Segments classified as recreational would allow for the greatest level of development in the study corridor, while segments classified as wild must remain relatively undeveloped. Segments classified as scenic fall between recreational and wild segments, allowing a moderate amount of development within the study corridor. In the Planning Area, impacts on the tentative classification would come mostly from trail and road development, developed campsites, mineral and energy development, timber harvest, and, along segments classified as wild, heavy use by livestock.

BLM_0163529

Management actions that prohibit surface-disturbing activities, including ROW exclusion areas, in the WSR study corridor would provide some amount of protection for a number of ORVs, including cultural, vegetation, fish, scenic, wildlife, and geological, by keeping the ORVs intact from human disturbance. This would also ensure that the tentative classification of the area remains intact.

Properly functioning riparian/wetland vegetation communities provide soil stabilization, soil filtration, and diverse vegetation species. In turn, properly functioning riparian/wetland vegetation communities can provide protection for vegetation, fish, and wildlife ORVs. Uses in riparian/wetland vegetation, which include camping, livestock grazing, livestock trailing, and trail development, can indirectly diminish vegetation, fish, and wildlife ORVs. These activities can also cause soil erosion and degrade water quality, potentially impacting the fish ORV.

Managing the segments according to VRM Class I or II objectives would provide direct protection to segments with a scenic ORV by requiring that alterations to the landscape be done so as not to dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted. Because most large-scale developments cannot meet VRM Class I or II objectives, managing to protect the scenic values of the Planning Area would generally preclude most large-scale developments. In turn, this would provide indirect protection to segments with a cultural or historical ORV where a relatively unmodified landscape is part of the setting, vegetation ORVs, and wildlife and geological ORVs.

### Effects Common to All Alternatives

Under all alternatives, Roubideau Creek Segment 1 is within the Camel Back WSA, and Dolores River Segment 1a and La Sal Creek Segment 3 are within the Dolores River Canyon WSA. Typically, management of WSAs to meet the nonimpairment standard (described in BLM Manual 6330, Management of Wilderness Study Areas [BLM 2012b]) and specific management prescriptions provide protection for both the tentative classification of segments within WSAs by prohibiting or otherwise precluding the type of development that would change the free-flowing condition or result in a change in classification of wild segments to a scenic classification. Management of WSAs includes management as VRM Class I, minimal allowances for surface-disturbing activities, closure to fluid, coal, and nonenergy solid mineral leasing, ROW exclusion, and closure to wood cutting and wood product sales and harvest; impacts would be as discussed under **Nature and Type of Effects**. Management of WSAs also provides protection of ORVs, except for those that depend on a specific water flow, such as vegetation (Roubideau Creek Segment 1, La Sal Creek Segment 3), fish (La Sal Creek Segment 3), and ecology (Dolores River Segment 1a). This is because WSAs do not carry an instream flow water right, so water appropriated upstream could impact the vegetation and fish ORVs.

Similar to WSAs, the segment within the Tabeguache Area, Tabeguache Creek Segment 1, would receive indirect protection for the free-flowing condition and tentative classification, as discussed for WSAs, from management of the Tabeguache Area. This includes management as VRM Class I, closure to motorized and mechanized travel, minimal allowances for surface-disturbing activities, ROW exclusion, closure to wood cutting and wood product sales and harvest, withdrawal from locatable mineral entry, closure to fluid, coal, nonenergy solid mineral leasing, and closure to mineral material disposal. While the Tabeguache Area does not have an instream flow water right provided in the congressional designation of the area, a state-based flow water right provides protection for the vegetation ORV.

A portion of Roubideau Creek Segment 1 is not allotted for livestock grazing, including sheep, under Alternative A. While the remaining portion of the segment isn't closed to domestic sheep grazing, domestic sheep grazing does not currently occur in the study corridor. Under Alternatives B, C, and D, the study corridor would be closed to domestic sheep grazing. The absence of domestic sheep in this

BLM_0163530

portion of the study corridor would ensure the protection of desert bighorn sheep by minimizing the risk of disease transmission from domestic sheep to desert bighorn sheep in the surrounding area.

Impacts from implementing management for water resources, fish and wildlife, vegetation, special status species, and cultural resources would provide protection to segments that have those ORVs. As such, impacts from the management of these resources are not discussed further. In addition, implementing management for the following resources would not impact wild and scenic rivers and are therefore not discussed in detail: air quality, climate, soils, wild horses, wildland fire ecology and management, paleontological resources, lands with wilderness characteristics, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

### Alternative A

Because segments were found eligible based on current management and existing conditions, and because the BLM must manage all eligible segments to protect the tentative classification, free-flowing condition, ORVs, and adequate water quality to support those ORVs, continuation of current management would not diminish the aforementioned qualities. ORVs could be indirectly enhanced by management for other resources.

Under this alternative, there are few restrictions on surface-disturbing activities or stipulations in place for fluid mineral leasing. For example, only 29.2 miles (19 percent) of eligible segments are closed to fluid mineral leasing. Approximately 22.6 miles (15 percent) of eligible segments are open to fluid mineral leasing with no stipulations (i.e., NSO, CSU, and TL), including 20.4 miles (32 percent) of segments classified as wild. Without specific restrictions in the RMP, the BLM must implement or require design features, mitigation measures, and monitoring systems to ensure the continued eligibility of the segments. Regarding locatable minerals, where activity presently exists within the quarter-mile study corridor, the current levels of activity are compatible with protection of the segment. Future developments would require a mine plan that includes measures to mitigate impacts on the segment for its continued eligibility for inclusion in the NWSRS.

All or portions of San Miguel River Segments 1, 2, and 3 are within the San Miguel River SRMA. Management of the SRMA, which targets floatboating and camping, would enhance the recreational ORV along these segments. At the same time, a portion of this area, which includes San Miguel River Segment 2, a portion of San Miguel River Segment 1, Beaver Creek, and Saltado Creek, is also managed as an ACEC for the protection of riparian resources, bird habitat, and scenic values. These values overlap the ORVs of the segments, providing complementary management to enhance the ORVs.

### Alternative B

Under Alternative B, all eligible segments would be determined suitable for inclusion in the NWSRS. Because segments were found eligible based on current management and existing conditions, and because the BLM would manage all suitable segments to protect the tentative classification, free-flowing condition, ORVs, and adequate water quality to support those ORVs, management proposed under Alternative B would not diminish the aforementioned qualities.

The BLM would implement specific measures that would help ensure protection to the free-flowing condition, tentative classification, and ORVs of the segments. Restrictions for wild segments, including management as VRM Class I and ROW exclusion; closure to mineral material disposal, nonenergy solid mineral leasing, and coal leasing; recommendation to the Secretary of the Interior for withdrawal from locatable mineral entry;, and prohibition of other surface-disturbing activities would ensure that the wild classification of the segments and ORVs are maintained. In addition, an NSO stipulation would be attached to fluid mineral leases within the quarter-mile study corridor, so any fluid mineral development would occur outside of the corridor.

BLM_0163531

While scenic and recreational segments would not have the same level of restrictions as wild segments, management prescriptions would allow more activities consistent with the scenic and recreational classification. In these areas, the BLM might need to implement or require design features, mitigation measures, and monitoring systems to ensure the continued suitability of the segments.

ORVs could be indirectly enhanced by management for other resources.

Monitor and Potter Creeks are within the Camel Back WSA Adjacent, and would be managed to protect wilderness characteristics under this alternative. Managing for wilderness characteristics, including naturalness, could enhance the vegetation ORV by managing these lands and surrounding areas to maintain the natural qualities of the unit.

All or portions of San Miguel River Segments 1, 2, and 3 are within the San Miguel River SRMA. Management of the SRMA, which targets floatboating and camping, would enhance the recreational ORV along these segments. At the same time, a portion of this area, which includes San Miguel River Segment 2, a portion of San Miguel River Segment 1, Beaver Creek, and Saltado Creek, is also managed as an ACEC for the protection of riparian resources, bird habitat, and scenic values. These values overlap the ORVs of the segments, providing complementary management to enhance the ORVs.

### Alternative C

Under Alternative C, no segments would be determined suitable for inclusion in the NWSRS, and all segments would be released from interim management protection afforded to eligible segments (described under Alternative A). However, management prescriptions for other resources could overlap the study area and provide indirect protection to the ORVs and free-flowing condition.

During the suitability review of the eligible segments, new information became available for the ORVs along Roubideau Creek Segment 2 and North Fork Mesa Creek. It was determined that the ORVs for these two segments no longer rise to the level of outstandingly remarkable. Because these segments no longer contain ORVs, there would be no impacts from a WSR perspective.

Under Alternative C, the BLM would not pursue recommendations to the Colorado Water Conservation Board for protection or enlargements of in-stream flows on appropriate stream segments. Some segments, particularly those with water-based ORVs, such as fish, wildlife, vegetation, recreation, and scenic, rely on certain water levels for their existence. Should water levels drop, these ORVs could be diminished.

Managing the segments according to visual resource management (VRM) Class I or II objectives would provide direct protection to segments with a scenic ORV (i.e., Dry Creek; San Miguel River Segments 1 and 2; Lower Dolores River; Dolores River Segments 1a, 1b, and 2; Ice Lake Creek Segment 2; and La Sal Creek Segment 3) by requiring alterations to the landscape be conducted to not dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted. In turn, this would provide incidental protection to vegetation, wildlife, and geological ORVs that could be threatened by surface-disturbing activities. Of the segments with a scenic ORV, 13.0 miles (23 percent), would be managed as either VRM Class I or II, providing direct protection to the scenic ORV and incidental protection to other ORVs. The remaining segments or portions of segments would be managed as VRM Class III which allows modifications to the landscape that could diminish the scenic ORV.

Under Alternative C, approximately 29.1 miles (19 percent) of segments would be closed to wood product sales and harvest, providing some protection to the ORVs, including fish, wildlife, vegetation, and ecological, within the corridor that might be impacted by habitat destruction, erosion, and runoff caused by wood clearing. Scenic values would also be protected by prohibiting this type of landscape

BLM_0163532

modification. The remaining 126.4 miles (81 percent) of segments would be open to wood product sales and harvest, and the ORVs mentioned could experience impacts.

Approximately 29.1 miles (19 percent) of segments would be managed as ROW exclusion, which would protect all ORVs by precluding activities associated with utility and access road development that might cause habitat degradation, erosion, runoff, and modifications to the landscape affecting scenic quality and settings for cultural and historical ORVs. An additional 82.7 miles (53 percent) of segments would be managed as ROW avoidance. If the areas could be avoided, the same protections as under ROW exclusion would be experienced. If the areas could not be avoided, activities would minimize impacts through design features or mitigation measures. Finally, 31.8 miles (21 percent) of segments are within designated energy corridors. Where these corridors overlap ROW avoidance areas within the segment corridor, impacts would be minimized. Elsewhere, the location of ROWs could cause surface-disturbance that could impact any of the ORVs.

Approximately 29.1 miles (19 percent) of segments would be closed to fluid mineral leasing, which would protect all ORVs by precluding activities associated with mineral development that might cause habitat degradation, erosion, runoff, and modifications to the landscape affecting scenic quality and settings for cultural and historical ORVs. Approximately 8.8 miles (6 percent) of segments would be protected by an NSO stipulation for fluid minerals, which would generally provide the same level of protection as closing the area to leasing because, while the mineral would still be available for extraction beneath the surface, facilities would be located outside of the study corridor. If NSO stipulations are excepted or waived, 125.1 miles (81 percent) would be protected by a CSU stipulation. While surface occupancy could still occur, mitigation measures would be implemented to minimize impacts on the resource for which the stipulation was designed to protect.

In addition to the current withdrawal from locatable mineral entry for Tabeguache Creek Segment 1, 0.1-mile (less than 1 percent) of segments would be recommended for withdrawal from locatable mineral entry. The remaining segments would be available for locatable mineral entry. Along segments east of the Uncompahgre Plateau, there has been no exploration or development for these minerals, and resource potential is thought to be low. For all other segments, facilities and surface-disturbance associated with locatable mineral exploration and development could impact any of the ORVs.

Approximately 29.3 miles (19 percent) of segments would be closed to mineral material disposal, and the remaining areas would be open. If development of these minerals occurred within the study corridor, it is possible the fish could be impacted by erosion or runoff caused by associated surface-disturbing activities.

Approximately 37.5 miles (24 percent) would be closed to nonenergy solid mineral leasing, and the remaining areas would be open. Along segments outside of the Paradox Valley, the potential is thought to be low, so impacts from nonenergy solid mineral development would not be expected. Within the Paradox Valley, resource occurrence potential is high, so potential impacts could be possible. However, because development potential is low, the likelihood of potential impacts is limited.

Approximately 10 miles of seven study segments determined not suitable for inclusion in the NWSRS are within the area of coal potential (Beaver Creek, West Fork Terror Creek, Deep Creek, North Fork Mesa Creek, Dry Creek, Naturita Creek, and Tabeguache Creek Segment 2). Under Alternative C, only 0.2 miles of Tabeguache Creek Segment 2 would be closed to coal leasing. If coal development were to occur within the study corridor of the segments available for coal leasing, it could impair riparian vegetation impacting riparian ORVs and fish habitat, as well as impair scenic values.

Where segments with a recreational ORV are within ERMAs, managing for targeted recreation would enhance the recreational ORV of the segments. This includes Roubideau Creek Segment 1, San Miguel

BLM_0163533

River Segment 5 and 6, Dolores River Segment 2, Dolores River Segment 1a, San Miguel River Segments 1, 2, and 3, Saltado Creek, and a portion of Beaver Creek. On the other hand, an increased number of users could impact the biological ORVs by trampling or contaminating the area. This includes Naturita Creek, Monitor Creek, and Potter Creek.

San Miguel River Segments 1, 2, and 3, Saltado Creek, and a portion of Beaver Creek are within the San Miguel River ACEC for the protection of riparian resources, bird habitat, and scenic values, which overlap the ORVs of the segments, providing complementary management to enhance the ORVs.

### Alternative D

Under Alternative D, all or portions of 16 segments would be determined suitable for inclusion in the NWSRS. Because segments were found eligible based on current management and existing conditions, and because the BLM would manage all suitable segments to protect the tentative classification, free-flowing condition, ORVs, and adequate water quality to support those ORVs, management proposed under Alternative D would not diminish the aforementioned qualities of suitable segments. Specific measures could be implemented to ensure the continued suitability, described in **Chapter 2**. Qualities could be indirectly enhanced by management for other resources.

Under Alternative D, 13 stream segments would be determined not suitable for inclusion in the NWSRS. In addition, portions of eight segments in which only a portion of the eligible stream was determined suitable for inclusion in the NWSRS would be determined not suitable and released from further study under the WSR Act. During the suitability review of the eligible segments, new information became available for the ORVs along Roubideau Creek Segment 2 and North Fork Mesa Creek. It was determined that the ORVs for these two segments no longer rise to the level of outstandingly remarkable. Because these segments no longer contain ORVs, there would be no impacts from a WSR perspective. Impacts on the remaining segments determined not suitable are discussed below.

The BLM would continue to make recommendations to the Colorado Water Conservation Board for protection or enlargements of in-stream flows on appropriate stream segments. If granted along any of the segments determined not suitable for inclusion in the NWSRS, water-based ORVs, including fish, wildlife, vegetation, recreation, and scenic, would be protected.

Site-specific relocation restrictions for other surface-disturbing activities would be applied to all segments determined not suitable for inclusion in the NWSRS. This would provide some protection to all ORVs by relocating activities or designing or siting them in a manner to minimize impacts.

Managing the segments according to visual resource management (VRM) Class I or II objectives would provide direct protection to segments with a scenic ORV (i.e., Dry Creek; San Miguel River Segments 1 and 2; Lower Dolores River; Dolores River Segments 1a, 1b, and 2; Ice Lake Creek Segment 2; and La Sal Creek Segment 3) by requiring that alterations to the landscape be done in such a way so as not to dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted. In turn, this would provide incidental protection to vegetation, wildlife, and geological ORVs that could be threatened by surface-disturbing activities.

Under Alternative D, all segments determined not suitable for inclusion in the NWSRS would be closed to wood product sales and harvest, providing some protection to the ORVs, including fish, wildlife, vegetation, and ecological, within the corridor that might be impacted by habitat destruction, erosion, and runoff caused by wood clearing. Scenic values would also be protected by prohibiting this type of landscape modification.

Fewer than 2 percent of segments would be managed as ROW exclusion, which would protect all ORVs by precluding activities associated with utility and access road development that might cause habitat

BLM_0163534

degradation, erosion, runoff, and modifications to the landscape affecting scenic quality and settings for cultural and historical ORVs. The remaining segments (98 percent) would be managed as ROW avoidance. If the areas could be avoided, the same protections as under ROW exclusion would be experienced. If the areas could not be avoided, activities would minimize impacts through design features or mitigation measures. Finally, 6 miles of segments are within designated energy corridors. However, because these corridors overlap either ROW avoidance areas within the segment corridor, impacts would be minimized.

Approximately 1 percent of segments would be closed to fluid mineral leasing, which would protect all ORVs by precluding activities associated with mineral development that might cause habitat degradation, erosion, runoff, and modifications to the landscape affecting scenic quality and degradation for cultural and historical ORVs. All of the segments not closed to fluid mineral leasing would be protected by an NSO stipulation for fluid minerals, which would generally provide the same level of protection as closing the area to leasing because, while the mineral would still be available for extraction beneath the surface, facilities would be located outside of the study corridor. If an NSO stipulation were excepted, modified, or waived, 37.4 miles (81 percent of segments not closed) would still be protected by a CSU stipulation for fluid minerals. While surface occupancy could still occur, mitigation measures would be implemented to minimize impacts on the resource for which the stipulation was designed to protect.

In addition to the current withdrawal from locatable mineral entry for Tabeguache Creek Segment 1, 77.1 miles (51 percent) of segments would be recommended for withdrawal from locatable mineral entry. The remaining segments would be available for locatable mineral entry. Along segments east of the Uncompahgre Plateau, there has been no exploration or development for these minerals, and resource potential is thought to be low. For all other segments, facilities and surface-disturbance associated with locatable mineral exploration and development could impact any of the ORVs.

All suitable segments would be closed to mineral material disposal, so the ORVs would be protected from disturbances associated with mineral material development.

Approximately 4.6 miles (10 percent) would be closed to nonenergy solid mineral leasing, and the remaining areas would be open. Along segments outside of the Paradox Valley, the potential is thought to be low, so impacts from nonenergy solid mineral development are not expected. Within the Paradox Valley, resource occurrence potential is high, so potential impacts could be possible. However, because development potential is low, the likelihood of potential impacts is limited.

Approximately 9.5 miles of 6 study segments determined not suitable for inclusion in the NWSRS are within the area of coal potential (West Fork Terror Creek, Deep Creek, North Fork Mesa Creek, Dry Creek, Naturita Creek, and Tabeguache Creek Segment 2). Under Alternative D, only 0.2 miles of Tabeguache Creek Segment 2 would be closed to coal leasing. Impacts would be the same as described for Alternative C.

### *Alternative E*

Impacts from wild and scenic river management actions would be the same as those described under Alternative D.

The BLM would continue to make recommendations to the Colorado Water Conservation Board for protection or enlargements of instream flows on appropriate stream segments. If granted along any of the segments determined not suitable for inclusion in the NWSRS, water-based ORVs, including fish, wildlife, vegetation, recreation, and scenic, would be protected.

BLM_0163535

Site-specific relocation restrictions for surface-disturbing activities would be applied to all segments determined not suitable for inclusion in the NWSRS. This would provide some protection of all ORVs by relocating activities or designing or siting them in a manner to minimize impacts.

### Visual Resources

Managing the segments according to VRM Class I or II objectives would provide direct protection to segments with a scenic ORV (i.e., Dry Creek; San Miguel River Segments 1 and 2; Lower Dolores River; Dolores River Segments 1a, 1b, and 2; Ice Lake Creek Segment 2; and La Sal Creek Segment 3) by requiring that alterations to the landscape be conducted to not dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted. In turn, this would provide incidental protection of vegetation, wildlife, and geological ORVs that could be threatened by surface-disturbing activities.

### Forestry and Woodland Products

Under Alternative E, all segments (except Lion Creek Segment 2) determined not suitable for inclusion in the NWSRS would be closed to wood product sales and harvest, providing some protection of the ORVs, including fish, wildlife, vegetation, and ecological, within the corridor that might be impacted by habitat destruction, erosion, and runoff caused by wood clearing. Scenic values would also be protected by prohibiting this type of landscape modification.

### Lands and Realty—Rights-of-Way

Wild river segments (23.2 miles; 22 percent of suitable segments) would be managed as ROW exclusion, which would protect all ORVs by precluding activities associated with utility and access road development that could cause habitat degradation, erosion, runoff, and modifications to the landscape affecting scenic quality and settings for cultural and historical ORVs. The remaining segments (78 percent) would be managed as ROW avoidance. If the areas could be avoided, the same protections as under ROW exclusion would be experienced. If the areas could not be avoided, activities would minimize impacts through design features or mitigation measures. Finally, 25.8 miles of segments are within designated energy corridors. Where these corridors overlap ROW avoidance areas within the segment corridor, impacts would be minimized. Elsewhere, the location of ROWs could cause surface disturbance that could impact any of the ORVs.

### Fluid Leasable Minerals—Oil and Gas

Approximately 27 percent of segments would be closed to fluid mineral leasing, which would protect all ORVs by precluding activities associated with mineral development that could cause habitat degradation, erosion, runoff, and modifications to the landscape affecting scenic quality and degradation for cultural and historical ORVs. All of the segments not closed to fluid mineral leasing would be protected by an NSO stipulation for fluid minerals, which would generally provide the same level of protection as closing the area to leasing because, while the mineral would still be available for extraction beneath the surface, facilities would be located outside of the study corridor. If an NSO stipulation were excepted, modified, or waived, 73.5 miles (92 percent of segments not closed) would still be protected by a CSU stipulation for fluid minerals. While surface occupancy could still occur, mitigation measures would be implemented to minimize impacts on the resource for which the stipulation was designed to protect.

### Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals

In addition to the current withdrawal from locatable mineral entry for Tabeguache Creek Segment 1, 52.2 miles (50 percent) of suitable segments would be recommended for withdrawal from locatable mineral entry. The remaining segments would be available for locatable mineral entry. Along segments east of the Uncompahgre Plateau, there has been no exploration or development for these minerals, and

BLM_0163536

resource potential is thought to be low. For all other segments, facilities and surface-disturbance associated with locatable mineral exploration and development could impact any of the ORVs.

All suitable segments would be closed to mineral material disposal, so the ORVs would be protected from disturbances associated with mineral material development.

Approximately 105 miles (100 percent) would be closed to nonenergy solid mineral leasing, and the remaining areas would be open. Along segments outside of the Paradox Valley, the potential is thought to be low, so impacts from nonenergy solid mineral development are not expected. Within the Paradox Valley, resource occurrence potential is high, so impacts are possible. However, because development potential is low, the likelihood of potential impacts is limited.

*Solid Minerals—Coal*

Approximately 9.5 miles of six study segments determined not suitable for inclusion in the NWSRS (West Fork Terror Creek, Deep Creek, North Fork Mesa Creek, Dry Creek, Naturita Creek, and Tabeguache Creek Segment 2) are within the coal potential area. Under Alternative E, only 0.2-mile of Tabeguache Creek Segment 2 would be closed to coal leasing. If coal development were to occur within the study corridor of the segments available for coal leasing, it could impair riparian vegetation, impacting riparian ORVs and fish habitat, as well as impair scenic values.

## Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on WSRs includes all land, regardless of ownership, within the Uncompahgre RMP Planning Area and surrounding BLM field offices. Under Alternatives A, B, D, and E where stream segments would be found eligible or suitable, management of the segments would be consistent with neighboring BLM field offices where portions of those rivers are also suitable for inclusion in the NWSRS. This includes the Lower Dolores River, which continues onto the Grand Junction Field Office and was found suitable for inclusion in the NWSRS (tentative recreational classification) in the Grand Junction RMP (BLM 2015). The Gunnison River continues onto the Grand Junction Field Office but was found not suitable for inclusion in the NWSRS in the Grand Junction RMP (BLM 2015). Similarly, La Sal Creek flows onto the UFO from the Moab Field Office but was found not suitable in the Moab RMP (BLM 2008e).

There are no reasonably foreseeable future projects at this time that would impact the segments. However, if major projects were proposed and there were no systematic analysis of impacts on river-related values, in accordance with the WSR Act, there could be significant cumulative impacts on river-related values.

Other federal agencies considering permit applications (not under BLM authority) that could affect the free-flowing condition, ORVs, or tentative classification of any of the eligible or suitable segments would need to seek formal comments from the BLM, and the BLM would discourage projects with such impacts or suggest terms and conditions to eliminate, avoid, or mitigate impacts. Other agencies would not be required to act on the BLM's comments, so the effect on eligible and suitable segments would depend on the decisions outside of BLM authority. For stream segments determined not suitable under Alternatives C, D, and E, the BLM would not make recommendations based solely on the need to protect WSR values when it is asked for comments on projects authorized by other agencies. Rather, if asked to comment, the BLM would focus on impacts on documented multiple use values, rather than focusing on compliance with the WSR Act standards for protection of ORVs, free flowing condition, and classification.

BLM_0163537

## 4.5.4 National Trails and Byways

This section discusses impacts on national trails and byways from proposed management actions of other resources, resource uses, and special designations. Existing conditions are described in **Section 3.3.4** (National Trails and Byways).

### Methods and Assumptions

#### Indicators

##### National Trails

Indicators of impacts on national trails are as follows:

- Alterations to the level of public recreation or changes to the scenic, natural, and cultural resources of the Old Spanish National Historic Trail
- Alterations to the level of public recreation or changes to the scenic, natural, and cultural resources of the Tabeguache Trail and Paradox Trail

##### Byways

Indicators of impacts on byways and skyways are as follows:

- Alterations to the level of public access
- Alterations to the archaeological, cultural, historic, natural, recreational, and scenic qualities the byways and skyways are managed for

#### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- National trails and related sites are protected in accordance with federal laws and BLM regulations and agreements.
- Federal trail administrators will be consulted for undertakings on National Historic Trails.
- The BLM looks favorably at opportunities to cooperate with private landowners to minimize or eliminate disturbance to national trails.
- Recognizing that national trails often comprise numerous routes rather than a single trace, all protective zones begin at the outer edges of trails rather than at a centerline, which is difficult to define.
- Certain projects, due to their size or topography of the land, could require consideration of visual intrusions into the setting beyond the foreground or middle ground zones to comply with Section 106 of the NHPA.
- The BLM would work with local, state, and federal partners to manage state and federal byways.
- Management prescribed for national and state byways and skyways would provide opportunities for motor touring, while enhancing the understanding of the multiple uses of BLM-administered lands.

### Nature and Type of Effects

#### National Trails

Direct impacts on national trails typically result from actions that disturb the soil or alter the surrounding environment's characteristics that contribute to trail significance and introduce visual elements out of character with the property or that alter its setting, or result in neglect of the resource to the extent that it is impaired or destroyed. For example, surface-disturbing activities that destroy or alter trail ruts for historic trails are considered a direct impact. Direct impacts also include proactive trail management, such as the preservation of buffer zones.

BLM_0163538

Indirect impacts on national trails result from project-induced increases or decreases in activity in the Planning Area. The construction of a recreation facility could increase visitor use, which could result in indirect impacts on previously undisturbed trail segments, particularly along national historic trails. Construction in an area some distance from a trail also can result in erosion or deposition at a trail location.

Management for other resources (vegetation, wildlife, cultural and paleontological resources, and special designations) along the lands next to national trails could impact features of trails and the visitor experience. Wildlife habitat improvement projects could indirectly provide some enhancement or preservation of national trail qualities. Timing limitations for wildlife and special status species could impact national trails indirectly by closing these trails seasonally to protect wildlife or special status species. Closure of these national trails would make them unavailable for public use or recreation. Protection of cultural and paleontological resources could indirectly impact national trails by preserving the cultural and paleontological resource values in the area.

Management of soils and water quality could limit surface-disturbing activities on steep slopes, sensitive soils, or critical watersheds, making them unavailable for public use or recreation. Stipulations on surface-disturbing activities (e.g., NSO, CSU, or TL for fluid minerals development, or NGD, SSR, and TL for other surface-disturbing activities) could locally impact national trails indirectly by restricting or minimizing surface disturbance, thus preserving the scenic, natural, and cultural resource values in the area.

Impacts on national trails from livestock grazing include trampling, conflicts with unsocialized sheep guard dogs, as well as manure impacts. The intensity of the impact would vary with the visitor's experience of recreating in areas where livestock graze. In addition, development of livestock grazing facilities impacts the naturalness attribute of the physical setting. Stock ponds and catchments contrast with the natural landscape.

Future comprehensive travel and transportation management implementation decisions for the Old Spanish, Tabeguache, and Paradox Trails could directly impact trail usage. Travel restrictions would impact the types of experiences available along these trails. Opening the trails to more types of uses would likely increase use levels but could increase conflicts.

Development of pipelines and electricity transmission and distribution facilities next to trails could directly impact the trail during construction. Indirect impacts from development in this corridor could include changes to scenic resources over the long term due to the presence of transmission lines and other facilities. The West-wide Energy Corridor is exempt from ROW exclusion areas.

Management actions (VRM Class I; ROW exclusion; closed to wood cutting and wood product sales and harvest; closed to fluid minerals, coal, and nonenergy solid mineral leasing; and NGD restrictions) for the Adobe Badlands WSA could indirectly impact the Old Spanish Trail by restricting or minimizing surface disturbance, thus preserving the historic, natural, and scenic qualities of lands next to the trail.

### Byways

Byways and skyways are used frequently and are susceptible to direct and indirect impacts. Direct impacts on byways and skyways are any action that substantially limits or prevents the use of the byway or skyway. Indirect impacts are actions that alter the scenic or historic values associated with the byway or skyway.

Management for other resources (e.g., vegetation, wildlife, and cultural resources) along the lands next to byways could impact the visitor experience of traveling the byway. Wildlife habitat improvement projects could indirectly provide some enhancement or preservation of qualities of byways over the

BLM_0163539

long term. Restoring unhealthy vegetation communities and reducing infestations of noxious weeds could indirectly affect byways by enhancing the natural diversity of the native landscape in areas next to the byways over the long term. Short-term disturbance could occur due to the use of machinery for vegetation manipulation, but these effects would be temporary. Weed treatments would provide localized benefit where applied. Protection of cultural resources could indirectly impact byways by preserving the cultural resource values in the area of the byway.

Management of soils and water quality could limit surface-disturbing activities in specific areas (e.g., steep slopes, sensitive soils, and critical watersheds) along byways. Stipulations on surface-disturbing activities (e.g., NSO, CSU, and TL for fluid minerals development or NGD and SSR for other surface-disturbing activities) could locally impact byways indirectly by restricting or minimizing surface disturbance, thus preserving the scenic, natural, and cultural resource values in the area of the byway.

Development of pipelines and electricity transmission and distribution facilities in utility corridors that cross the byway or are next to the byway could directly impact byways during construction. Indirect impacts from development in these corridors could include changes to scenic resources.

### Effects Common to All Alternatives

#### National Trails

The 50 miles of the Old Spanish National Historic Trail on BLM-administered lands in the Decision Area is minimal; approximately 9 miles of the trail are under BLM jurisdiction. An Old Spanish Trail Comprehensive Administrative Strategy completed by the National Park Service and BLM, in cooperation with the Old Spanish Trail Association, was published in 2017. The portion of the trail on BLM-administered lands would be managed accordingly to minimize impacts on the trail. In the interim, BLM management actions would have minimal impact on the congressionally-designated Old Spanish Trail corridor under any alternative. However, impacts on the surrounding environment's characteristics that contribute to trail significance and introduce visual elements out of character with designated corridor, or that alter its setting could occur. These types of impacts are discussed below by alternative.

Under all alternatives, portions of the West-wide Energy Corridor are next to the Old Spanish Trail. Impacts are described under **Nature and Type of Effects**.

Implementing management for the following resources would have negligible or no impact on national trails and are therefore not discussed in detail: air quality, climate change, land health, wild horses, wildland fire management, lands with wilderness characteristics, forestry and woodland products, wilderness, wild and scenic rivers, byways, and watchable wildlife viewing sites.

#### Byways

For all alternatives, the BLM would support the management of designated national and Colorado byways within the Planning Area consistent with other resources. Designated All-American Roads include the San Juan Skyway; National byways include the Grand Mesa Scenic and Historic Byway, and any additional byways or All-American Roads designated by the US Secretary of Transportation during the life of the RMP. Designated Colorado byways include the Unaweep/Tabeguache Scenic Byway and the West Elk Loop.

All of the byways have sections of utility corridors (designated or proposed corridors) that cross the byway or are next to the byway. Impacts are described under **Nature and Type of Effects**.

Implementing management for the following resources would have negligible or no impact on byways and are therefore not discussed in detail: air quality, climate change, land health, wild horses, wildland fire ecology and management, paleontological resources, lands with wilderness characteristics, forestry

BLM_0163540

and woodland products, livestock grazing, comprehensive travel and transportation management, wilderness and WSAs, and national trails.

## Alternative A

### National Trails

Under Alternative A, the BLM would continue to work with the National Park Service and local nonfederal partners to manage the Old Spanish Trail. The Tabeguache and Paradox Trails would not be proposed for listing as national recreational trails.

Because the area around the Paradox Trail is an undesignated VRM area, indirect impacts on national trails could result in long-term changes to the scenic quality from major modifications to the landscape. The Old Spanish and Tabeguache Trails are in or next to areas managed as VRM Class III. These areas would be managed to partially retain the existing character of the landscape. Management activities in these areas could attract the attention of the observers, which could indirectly alter the scenic quality or setting of these trails.

The Old Spanish, Tabeguache, and Paradox Trails are all within areas not managed as RMAs (based on current BLM recreation guidance). Under Alternative A, the BLM would not make a commitment to the quality or quantity of recreation opportunities. Since recreation would be managed consistently with other resources and uses, recreation settings and opportunities would be impacted by those other uses, and current opportunities and recreation settings could change over the long term as a result of those impacts.

Under Alternative A, the Old Spanish Trail, Tabeguache, and Paradox Trails are not in areas managed as ROW avoidance or exclusion areas. This could result in surface disturbance and development related to ROW activities that could indirectly alter the scenic, natural, and cultural values associated with these trails during construction and in the long term during operation of facilities.

All congressionally designated trails would be closed to coal leasing, so there would be no impacts on the Old Spanish Trail from mining coal. Portions of the Paradox Trail near Nucla are in areas acceptable to coal leasing. Because this trail is not congressionally designated under Alternative A, sections of the trail in areas potentially leased for coal would be directly impacted by activities related to mining (such as surface disturbance) over the long term. Indirect impacts are visual resource impacts from mining that could alter the scenic values of the trail.

Under Alternative A, most of the Old Spanish, Tabeguache, and Paradox Trails on BLM-administered lands are in areas open to fluid mineral leasing with no stipulations (NSO or CSU). Because these restrictions would not be in place, potential fluid mineral development would not be compatible with preservation of trail values and could alter trail users' expected outcomes. A small section of the Old Spanish Trail east of Montrose is in an area withdrawn from mineral entry, eliminating impacts from mineral development in that area. Portions of the Paradox Trail are in an area recommended for withdrawal from locatable mineral entry, thereby reducing the potential for direct and indirect impacts on this trail from mineral development (e.g., surface disturbance and visual intrusions) in the short and long term. Most of the Old Spanish, Tabeguache, and Paradox Trails are in areas open to mineral material disposal. Indirect long-term impacts from potential mineral disposal include changes to the scenic quality of these trails.

Under Alternative A, the Old Spanish, Tabeguache, and Paradox Trails would not be in any ACECs and would not be impacted by management actions related to ACEC management.

BLM_0163541

*Byways*

By not establishing any BLM byways, resources along BLM roads would not receive the level of public recognition, and traffic would not increase at levels commensurate with an official byway.

Because the BLM-administered lands around the San Juan Skyway are an undesignated VRM area, indirect impacts on this byway could include changes to scenic quality from major modifications to the landscape. Sections of the Unaweep-Tabeguache Byway are in or next to areas managed as VRM Class II. These areas would be managed to retain the existing character of the landscape. Management activities in these areas should not attract the attention of the observers; however, indirect impacts could result if an observer were to focus on the management activity. Sections of the West Elk Loop Byway are in or next to areas managed as VRM Class III. These areas would be managed to partially retain the existing character of the landscape. Management activities in these areas could attract the attention of the observers, which could indirectly alter the scenic quality of the byway.

A portion of the Unaweep-Tabeguache Byway and San Juan Skyway runs through the San Miguel SRMA, and driving for pleasure combined with SRMA visitation could lead to increased use. Increased recreation management in these SRMAs could provide additional opportunities for activities and experiences for byway users in the long term. Enhanced awareness and appreciation can result in increased protective actions but may also strain resources. In addition, noticeable increases in traffic may be perceived as a negative impact by local residents who value remote settings or depend on the byways for transportation.

Under Alternative A, portions of the Unaweep-Tabeguache Byway and West Elk Loop are in ROW exclusion areas. This would reduce surface disturbance and development related to ROW activities that could indirectly alter the scenic, natural, and cultural values associated with these trails.

A small area east of Naturita near the Unaweep-Tabeguache Byway is acceptable to coal leasing. Indirect impacts could alter the scenic values of the byway if coal mining were to occur in areas visible to travelers. Sections of the West Elk Loop Byway east of Paonia travel through the active Somerset Coal Field. Any future coal mining in this area could contribute to visual impacts for travelers on this section of the byway already occurring from coal mining.

Under Alternative A, the Grand Mesa Byway and West Elk Loop on BLM-administered lands are in areas open to fluid mineral leasing with no stipulations (e.g., NSO or CSU). Portions (east of Norwood) of the Unaweep-Tabeguache Byway are in areas with NSO stipulations. Most of the Unaweep-Tabeguache Byway (west of Norwood), and sections of the San Juan Skyway are in areas open to fluid mineral leasing with CSU stipulations. Because these restrictions would not be in place, potential fluid mineral development would not be compatible with preservation of scenic values. Under Alternative A, none of the byways are in areas withdrawn from mineral entry. Similar to fluid mineral development, potential mineral exploration and development next to the byways could alter the scenic character of the byways. Portions of the Unaweep-Tabeguache Byway and San Juan Skyway are in areas open to mineral material disposal. Disposal of material in these areas could also impact the scenic resources of the byway indirectly if visible from the roadway.

A portion of the Unaweep-Tabeguache Byway passes through the San Miguel River ACEC. Under Alternative A, efforts to protect scenic and recreational ORVs along eligible WSR segments along the Unaweep-Tabeguache Byway would benefit scenic values of the byways by prohibiting or limiting most surface-disturbing activities and would promote recreation along the byways.

Under Alternative A, no byways would be within any watchable wildlife viewing sites. No formal opportunities would be provided to view wildlife along the byways.

BLM_0163542

### Alternative B

*National Trails*

Under Alternative B, management of the Old Spanish Trail would continue as described under Alternative A. However, the Tabeguache and Paradox Trails would be proposed for listing as national recreational trails. Should the proposal succeed, recreational use of these trails is likely to increase, thus providing the potential for greater opportunities for interpretation and education regarding the natural, cultural, and historical resources associated with these trails. This would also increase pressure on trail resources, including cultural and historic resources within the trail corridor and next to the trail.

An NSO stipulation for fluid minerals would prohibit surface occupancy within a half-mile buffer around the Old Spanish Trail. In addition, a CSU stipulation for fluid minerals restricting surface use within 0.5 to 5.0 miles on either side if the Old Spanish Trail would be in place. These stipulations would provide more protection from surface-disturbing activities than under Alternative A, reducing the potential for direct impacts on the trails from development and indirect impacts on scenic qualities and trail experience over the long term. In areas of NGD and SSR, national trails would also be less impacted in the short and long term by controlling surface-disturbing activities. If the Tabeguache and Paradox Trails were designated, an NSO stipulation would be in place that prohibits surface occupancy within a half-mile of the trail. Potential protections of the scenic qualities of these trails are similar to the Old Spanish Trail from this stipulation.

Similar to Alternative A, the Tabeguache Trail is in or next to areas managed as VRM Class III. Indirect impacts on this trail from visual resource management are the same as Alternative A. The Old Spanish Trail would be managed as VRM Class II within 0.5-mile of either side of the center line, providing additional protection from visual intrusions as compared to Alternative A. The Paradox Trail would be in areas managed as VRM Class II, III, and IV. Users of this trail could experience varying levels of surface disturbance or alterations to the landscape in the short and long term based on the VRM classification. VRM Class II areas would be managed to retain the existing character of the landscape, while areas of VRM Class III and IV would partially retain the landscape character or be changed dramatically due to development. Impacts would vary based on the restrictions and type of development. However, since VRM Class II objectives also limit the type and visibility of development that can occur, this management could preclude some development necessary to support recreation along the trail.

The portion of the Old Spanish Trail (1.0 mile) located within Kinikin SRMA, the portion of the Tabeguache Trail (13.3 miles) located in the Dry Creek SRMA, and the portion of the Paradox Trail (16.3 miles) located in the Paradox Valley SRMA would be managed according to the management actions of those SRMAs. Increased recreation management in these SRMAs could provide additional opportunities for activities and experiences for national trail users in the long term. Evidence of a management presence would provide a safe setting for users and fosters appropriate behavior that protects natural and cultural resources and the recreation setting. Where facilities are minimized, undeveloped settings would be maintained. However, developing new facilities would diminish undeveloped settings and opportunities for experiences, such as adventure, exploration, solitude, and escape from noise and crowds. Increased recreation management could also result in greater use of the trails, which could degrade the quality of the trail if overused and additional use of the trail could alter the number of encounters visitors would have with other trail users.

Unlike Alternative A, most of the Old Spanish, Tabeguache, and Paradox Trails would be in ROW exclusion and avoidance areas. This would limit the impacts from new development related to ROW activities in the short and long term, including transmission and roadway development.

BLM_0163543

Similar to Alternative A, all congressionally designated trails would be closed to coal leasing, so there would be no impacts on the Old Spanish Trail from mining coal. In addition, all congressionally designated trails would be closed to mineral materials disposal and nonenergy solid mineral leasing within a half-mile buffer; therefore, the Old Spanish Trail would not be impacted by these activities under Alternative B. The Tabeguache Trail is also in an area unacceptable to coal leasing. Portions of the Paradox Trail near Nucla are within areas acceptable to coal leasing. Like Alternative A, because this trail is not congressionally designated under Alternative B, sections of the trail in areas potentially leased for coal would be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts would include visual resource impacts that could alter the scenic values of the trail in the long term.

Under Alternative B, most of the Old Spanish, Tabeguache, and Paradox Trails on BLM-administered lands are in areas closed to fluid mineral leasing. Closing these areas would provide more protection of trail values than would Alternative A by limiting surface-disturbing activities and development. Under Alternative B, most of the Old Spanish Trail, Tabeguache, and Paradox Trails are in areas recommended for withdrawal from locatable mineral entry, eliminating impacts (e.g., surface disturbance and visual intrusions) in the short and long term from this type of mineral development in these areas. Portions of the Paradox Trail are in an area recommended for withdrawal from locatable mineral entry; therefore reducing the potential for impacts on this trail from mineral development. Unlike Alternative A, most of the Old Spanish, Tabeguache, and Paradox Trails would be in areas closed to mineral material disposal. This would eliminate potential indirect impacts on visual resources and recreation settings from material disposal in the long term.

Portions of the Old Spanish Trail pass through the proposed Fairview South (CNHP Expansion) ACEC (1.8 miles) and Salt Desert Shrub Ecosystem ACEC (8.0 miles); portions of the Tabeguache Trail pass through the Lower Uncompahgre ACEC (6.3 miles); and portions of the Paradox Trail pass through the East Paradox ACEC (5.8 miles), Tabeguache Pueblo and Tabeguache Caves ACEC (7.4 miles), and West Paradox ACEC (3.0 miles). Management activities tailored for what these ACECs were designated could indirectly preserve the scenic (habitat enhancements) and cultural values along these trails in the long term.

*Byways*

As under Alternative A, no BLM byways would be established under this alternative. The number of visitors traveling on BLM roads would not increase as a result of byway designations.

Under Alternative B, all national and BLM byways would be managed as VRM Class II within a half-mile of either side of the centerline. Alternative B.1 would extend that buffer to 1 mile of either side of centerline for the West Elk Scenic Byway. Maintaining the existing character of the landscape within this area would indirectly protect the scenic qualities associated with the byway. Management activities in these areas should not attract the attention of the observers; however, indirect impacts could result if an observer were to focus on the management activity. By designating the area around byways as VRM Class II, opportunities to protect viewsheds would be greater than under Alternative A. In addition, an NSO stipulation would apply to fluid mineral leasing within a half-mile of scenic byways. Alternative B.1 would extend that buffer to 1 mile of either side of centerline for the West Elk Scenic Byway. Restricting surface use within this area would indirectly protect the scenic qualities associated with the byway. Finally, a CSU stipulation would be applied under Alternative B.1 beyond 1 mile of either side of centerline of the West Elk Scenic Byway to lands visible from the byway. This would further ensure that the scenic driving experience is protected from visual intrusions associated with fluid mineral development. Potential impacts from these uses would be less than under Alternative A because of the stipulations.

BLM_0163544

A portion of the Unaweep-Tabeguache Byway and San Juan Skyway would run through the San Miguel SRMA, and a portion of the Unaweep-Tabeguache Byway would run through the Paradox Valley SRMA. Scenic touring would be a targeted activity in these SRMAs. Potential impacts are the same as Alternative A.

Under Alternative B, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop are in areas that would be managed as ROW exclusion and avoidance areas. These designations could provide more opportunities to preserve the historic, natural, and scenic qualities of lands next to these byways than under Alternative A by reducing ROW activities.

Under Alternative B, most of the lands surrounding the Unaweep-Tabeguache Byway, east of Highway 90, and the San Juan Skyway are in areas acceptable to coal leasing. Indirect visual resource impacts could occur in more areas along this byway than under Alternative A if coal mining was to occur in areas visible to travelers on the byway. Impacts on the West Elk Loop Byway east of Paonia are similar to those under Alternative A. Any future coal mining in this area could contribute to visual impacts for travelers on this section of the byway.

Like Alternative A, no byways are in areas withdrawn from mineral entry. Under Alternative B, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop Byway would be in areas recommended for withdrawal from locatable mineral entry, thereby reducing the potential for impacts on these byways from mineral development. In addition, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop Byway are in areas closed to mineral material disposal.

Portions of the Unaweep-Tabeguache Byway and San Juan Skyway would pass through the San Miguel River Expansion ACEC. Management activities tailored to values for which the ACEC was designated could indirectly preserve the scenic values along these byways. The effects could be perceived over a larger area than under Alternative A due to the expanded ACEC. Under Alternative B, efforts to protect ORVs along suitable WSR segments along the Unaweep-Tabeguache Byway would benefit scenic values of the byways by prohibiting or limiting most surface-disturbing activities, and it would promote recreation along the byways. Overall, additional stipulations (NSO and CSU for fluid minerals, and NGD and SSR for other surface-disturbing activities) under Alternative B would provide greater protection of ORVs than under Alternative A.

Portions of the Unaweep-Tabeguache Byway would pass through the San Miguel Watchable Wildlife Viewing Site. Management activities associated with this area could provide travelers with more opportunities to view wildlife in this area.

### Alternative C

#### National Trails

Under Alternative C, management of the Old Spanish Trail would continue as described under Alternative A. The Tabeguache and Paradox Trails would also be proposed for listing as national recreational trails as under Alternative B. Potential impacts from listing are the same as under Alternative B.

Under Alternative C, an NSO stipulation prohibiting fluid minerals surface occupancy within a 164-foot buffer around the Old Spanish Trail would be in place. In addition, a CSU stipulation restricting surface use from 164 feet to 5 miles on either side if the Old Spanish Trail would be in place. These stipulations would provide more protection to the trail from surface-disturbing activities than under Alternative A. Impacts are similar to those under Alternative B; however, the reduced buffer areas for these stipulations may not provide adequate protection of the values giving the Old Spanish Trail its significance. Potential impacts from fluid minerals development could be closer to the trail. Under

BLM_0163545

Alternative C, if the Tabeguache and Paradox Trails are designated, an NSO stipulation would be in place for these trails that prohibits fluid mineral surface occupancy within 656 feet of the trail. Potential impacts on scenic qualities of these trails from development are similar to those under Alternative B; however, the reduced buffer area under Alternative C would result in these impacts being closer to the trails.

Under Alternative C, portions of the Tabeguache Trails are in or next to areas managed as VRM Class IV; however, most of the Tabeguache Trail would be in VRM Class III areas. Impacts in the VRM Class III and IV areas are similar to the types of impacts described under Alternative B. The Old Spanish Trail would be managed as VRM Class III, resulting in the same impacts as described under Alternative A. Under Alternative C, the Paradox Trail would be in areas managed as VRM Class II, III, and IV. However, there are fewer areas of VRM Class II, so most of the trail is in areas that could partially retain the landscape character or be changed dramatically due to development.

The portion of the Old Spanish Trail (1.0 mile) located within Kinikin ERMA, the portion of the Tabeguache Trail (13.3 miles) located in the Dry Creek ERMA, and portion of Paradox Trail (10.4 miles) located in the Paradox Valley ERMA would be managed according to the management actions of those ERMAs. Impacts on these trails from recreation management are similar to those under Alternative A.

Like Alternative A, most of the Tabeguache and Paradox Trails would not be in ROW exclusion or avoidance areas. Impacts on these trails from new development related to ROW activities in the short and long term, including transmission and roadway development, are the same as under Alternative A. The Old Spanish Trail would be in a ROW avoidance area. Indirect impacts on trail values from development would be reduced due to this avoidance area.

Similar to Alternative A, all congressionally designated trails would be closed to coal leasing; therefore, there would be no impacts on the Old Spanish Trail from mining coal. In addition, all congressionally designated trails would be closed to mineral materials disposal and nonenergy solid mineral leasing within a 164-feet buffer. Potential impacts on scenic qualities of these trails from mineral activities are similar to those under Alternative B; however, the reduced buffer area under Alternative C would result in these impacts being closer to the trails. Under Alternative C, the Tabeguache and Paradox Trails are in areas acceptable to coal leasing. Because these trails are not congressionally designated under Alternative C, sections of these trails located in areas potentially leased for coal could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts include visual resource impacts that could alter the scenic values of the trail in the long term.

Under Alternative C, most of the Tabeguache and Paradox Trails on BLM-administered lands are in areas open to fluid mineral leasing. Impacts on these trails from fluid minerals development are similar to Alternative A. Like Alternative B, the Old Spanish Trail would be near areas closed to fluid minerals leasing. Closing areas to fluid minerals development would result in the same impacts as under Alternative B. Under Alternative C, most of the Old Spanish, Tabeguache, and Paradox Trails are in areas not recommended for withdrawal from locatable mineral entry, resulting in greater opportunities for direct and indirect impacts from mineral development (e.g., surface disturbance and visual intrusions) in the short and long term. Impacts from mineral material disposal are the same as under Alternative A because the Old Spanish, Tabeguache, and Paradox Trails would be in areas open to mineral material disposal.

Like Alternative A, the Old Spanish, Tabeguache, and Paradox Trails would not be within any ACECs. These trails would not be impacted by management actions related to ACEC management.

BLM_0163546

*Byways*

As under Alternative A, no BLM byways would be established under this alternative. As a result, the number of visitors traveling on BLM roads would not increase as a result of byway designations.

Under Alternative C, all national and BLM byways would be managed as VRM Class III within a quarter-mile of either side of centerline. This designation would partially retain the landscape character around the byways. Indirect impacts on byway travelers could result in greater changes to the landscape, and the changes would be closer to the byways due to the smaller buffer area. In addition, a CSU stipulation would apply to fluid minerals within a quarter-mile of scenic byways. Like Alternative B, potential impacts from these uses would be less than under Alternative A because of the stipulations; however, the less restrictive stipulation and smaller buffer area would not provide as much protection to viewsheds.

A portion of the Unaweep-Tabeguache Byway and San Juan Skyway would run through the San Miguel ERMA, and a portion of the Unaweep-Tabeguache Byway would run through the Paradox Valley ERMA. Scenic touring would be a protected activity in these ERMAs. Potential impacts are the same as impacts on SRMAs under Alternative A.

Under Alternative C, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop are in areas that would be managed as ROW avoidance areas. Like Alternative B, these designations could provide more opportunities to preserve the historic, natural, and scenic qualities of lands next to these byways than under Alternative A; however, the less restrictive designation would not provide as much protection from impacts related to ROW activities.

Under Alternative C, most of the lands surrounding the Unaweep-Tabeguache Byway and San Juan Skyway are in areas acceptable to coal leasing. Like Alternative B, indirect visual resource impacts could occur in more areas along this byway than under Alternative A if coal mining activities were to occur in areas visible to travelers on the byway. However, Alternative C has more areas along the Unaweep-Tabeguache Byway west of Highway 90 acceptable to coal leasing. Impacts on the West Elk Loop Byway east of Paonia are similar to those under Alternative A.

Like Alternative A, no byways are in areas withdrawn from mineral entry. Under Alternative C, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop Byway would not be in areas recommended for withdrawal from locatable mineral entry, resulting in greater opportunities for direct and indirect impacts from mineral development (e.g., surface disturbance and visual intrusions) in the short and long term. Impacts from mineral material disposal would be similar to those under Alternative A. In addition, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop Byway are in areas open to mineral material disposal, resulting in greater impacts on scenic values if any byways are near these activities.

Portions of the Unaweep-Tabeguache Byway would pass through the San Miguel River ACEC. Management activities tailored to what the ACEC was designated for could indirectly preserve the scenic values along these byways. The impacts on travelers on this byway are the same as Alternative B. Under Alternative C, all eligible stream segments would be found not suitable for inclusion in the NWSRS, and the BLM would release them from interim management protection. Therefore, opportunities to protect scenic values associated with the eligible segments along this byway would be less than under Alternative A.

BLM_0163547

### Alternative D

*National Trails*

Under Alternative D, management of the Old Spanish Trail would continue as described under Alternative A. The Tabeguache and Paradox Trails would also be proposed for listing as national recreational trails, as under Alternative B. Potential impacts from listing are the same as Alternative B.

Under Alternative D, an NSO stipulation prohibiting fluid minerals surface occupancy within a half-mile buffer around the Old Spanish Trail would be in place. In addition, a CSU stipulation restricting surface use within 0.5 to 5.0 miles on either side if the Old Spanish Trail would be in place. Impacts related to these stipulations are the same as under Alternative B. Like Alternative C, if the Tabeguache and Paradox Trails are designated, an NSO stipulation would be in place for these trails that prohibits surface occupancy within 656 feet of the trail. Potential impacts on scenic qualities of these trails are the same as under Alternative C.

Under Alternative D, 0.5-mile from the centerline of the Old Spanish Trail would be managed as VRM Class III and impacts would be similar to those described under Alternative A. Similarly, the Tabeguache Trail would be in VRM Class III areas. Impacts on the Tabeguache Trail would be similar to the types of impacts described under Alternative B. Like Alternative C, the Paradox Trail would be in areas managed as VRM Class II, III, and IV. Impacts are similar to Alternative C.

Like Alternative C, the portion of the Old Spanish Trail located within Kinikin ERMA (1.0 mile) and Paradox Trail located within the Paradox Valley ERMA (10.4 miles) would be managed according to the management actions of the ERMA. Impacts on these trails from managing these ERMA are the same as Alternative C. Like Alternative B, the portion of the Tabeguache Trail located in the Dry Creek SRMA (13.3 miles) would be managed according to the management actions of that SRMA. Impacts on this trail from recreation management are the same as under Alternative B.

Under Alternative D, portions of the Tabeguache and Paradox Trails would be in ROW avoidance areas. Impacts on these trails from new development in the short and long term, including transmission and roadway development, are similar to Alternative B. Like Alternative C, the Old Spanish Trail would be in a ROW avoidance area, resulting in reduced indirect impacts on trail values from development.

Similar to Alternative A, all congressionally designated trails would be closed to coal leasing; therefore, there would be no impacts on the Old Spanish Trail from mining coal. In addition, all congressionally designated trails would be closed to mineral materials disposal and nonenergy solid mineral leasing within a 164-foot buffer. Potential impacts on scenic qualities of these trails from mineral activities are the same as under Alternative C. Like Alternative B, the Tabeguache Trail is in an area unacceptable to coal leasing. Portions of the Paradox Trail are within areas acceptable to coal leasing. Like Alternative A, because this trail is not congressionally designated under Alternative D, sections of the trail located in areas potentially leased for coal would be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts would include visual resource impacts that could alter the scenic values of the trail in the long term.

Under Alternative D, the Old Spanish, Tabeguache, and Paradox Trails on BLM-administered lands would be in areas open to fluid mineral leasing. The Old Spanish Trail would have a CSU stipulation, and the Tabeguache and Paradox Trails would have an NSO stipulation. This would result in fewer impacts on trail values from fluid minerals development than under Alternative A.

Like Alternative A, the Old Spanish, Tabeguache, and Paradox Trails would not be within any ACECs. These trails would not be impacted by management actions related to ACEC management.

BLM_0163548

*Byways*

As under Alternative A, no BLM byways would be established under this alternative. As a result, the number of visitors traveling on BLM roads would not increase as a result of byway designations.

Under Alternative D, the Grand Mesa Scenic Byway and the West Elk Byway from the northeast Uncompahgre RMP Planning Area boundary to Gunnison County Road 12 would be managed as VRM Class II. Impacts on scenic resources along these sections of byways are the same as under Alternative B. The remaining portion of the West Elk Byway, San Juan Skyway, and Unaweep-Tabeguache Byway would be managed as VRM Class III. Impacts on scenic resources along these byways are the same as under Alternative C. These designations would provide more opportunities to protect scenic resources than Alternative A; however, the varying levels of protection under this alternative would result in scenic resource impacts similar to Alternative A in some areas of byways managed as VRM Class III. In addition, a CSU stipulation would apply to fluid minerals within a half-mile of scenic byways. Like Alternative C, potential impacts from these uses would be less than under Alternative A because of the stipulations; however, the larger buffer area would provide protection to viewsheds in more areas along byways.

A portion of the Unaweep-Tabeguache Byway and San Juan Skyway would run through the San Miguel SRMA, and a portion of the Unaweep-Tabeguache Byway would run through the Paradox Valley ERMA. Scenic touring would be a targeted activity in the SRMA and would be a protected activity in the ERMA. Potential impacts are the same as impacts on SRMAs under Alternative A.

Like Alternative C, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop are in areas that would be managed as ROW avoidance areas. Potential impacts on byways related to ROW activities are similar to Alternative C; however, expanded areas of avoidance could provide more opportunities to preserve the historic, natural, and scenic qualities of lands next to these byways.

Like Alternative C, most of the lands surrounding the Unaweep-Tabeguache Byway and San Juan Skyway are in areas acceptable to coal leasing. Impacts on scenic resources along these byways from potential coal development are similar to Alternative C. Impacts on the West Elk Loop Byway east of Paonia are similar to Alternative A.

Like Alternative A, no byways are in areas withdrawn from mineral entry. Under Alternative D, most of the Unaweep-Tabeguache Byway east of Norwood and near the northwest UFO boundary would be in areas recommended for withdrawal from locatable mineral entry, thereby reducing the potential for impacts on scenic resources from mineral development along this section of the byway. In addition, most of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop Byway are in areas closed to mineral material disposal.

Under Alternative D, most of the byways are in areas not recommended for withdrawal from locatable mineral entry, resulting in greater opportunities for direct and indirect impacts from mineral development (e.g., surface disturbance and visual intrusions) in the short and long term. Most of the byways are in areas open to mineral material disposal; however, a portion of the Unaweep-Tabeguache Byway east of Norwood is in areas closed to disposal. Impacts on scenic resources from mineral material disposal are similar to those under Alternative C in those areas open to disposal.

Under Alternative D, portions of the Unaweep-Tabeguache Byway would pass through the San Miguel River ACEC. The impacts on travelers on the byway through this ACEC are the same as Alternative B. In addition, the Unaweep-Tabeguache Byway would also be next to the Biological Soil Crust ACEC. Management related to this ACEC could provide additional opportunities to protect the scenic values along this section of the byway.

BLM_0163549

Under Alternative D, efforts to protect ORVs along suitable WSR segments along the Unaweep-Tabeguache Byway are similar to those under Alternative B; however the Naturita Creek segment would be determined to be not suitable, so ORV protective measures would not apply to this segment along the byway. Like Alternative B, additional stipulations (NSO and CSU for fluid minerals and NGD and SSR for other surface-disturbing activities) would provide greater protection of ORVs than under Alternative A.

### *Alternative E*

#### *National Trails*

Under Alternative E, management of the Old Spanish Trail would continue as described under Alternative A. The Tabeguache and Paradox Trails would also be proposed for listing as national recreational trails, as under Alternative B. Potential impacts from listing are the same as Alternative B.

Under Alternative E, a CSU stipulation restricting surface use up to 0.5-mile on either side of the Old Spanish Trail would apply. Impacts related to this stipulation are similar to those under Alternative B, but would occur over a smaller area. If the Tabeguache and Paradox Trails are designated, a CSU stipulation would apply that restricts surface occupancy or use within 656 feet of the trail. Potential impacts on scenic qualities of these trails are similar to, but less restrictive than, those under Alternative C.

#### Visual Resources

Under Alternative E, lands within 0.5-mile from the centerline of the Old Spanish Trail would be managed as VRM Class III; impacts would be similar to those described under Alternative A. Similarly, the Tabeguache Trail would be in VRM Class III areas; impacts would be similar to the types of impacts described under Alternative B. The Paradox Trail would be in areas managed as VRM Class II and III; impacts would be similar to those described under Alternatives B and C, respectively.

#### Recreation and Visitor Services

Like Alternative C, the portion of the Old Spanish Trail located within Kinikin ERMA (1.6 miles) and Paradox Trail located within the Paradox Valley ERMA (10.4 miles) would be managed according to the management actions of the ERMA. Impacts on these trails from managing these ERMAs are the same as Alternative C. Like Alternative B, the portion of the Tabeguache Trail located in the Dry Creek SRMA (13.3 miles) would be managed according to the management actions of that SRMA. Impacts on this trail from recreation management are the same as under Alternative B.

#### Lands and Realty—Rights-of-Way

Under Alternative E, the impacts from ROW avoidance areas on the Old Spanish, Tabeguache, and Paradox Trails would be the same as those under Alternative D.

#### Solid Leasable Minerals—Coal and Locatable Minerals, Mineral Materials, & Nonenergy Leasable Minerals

Under Alternative E, the impacts from coal leasing, mineral materials disposal, and nonenergy solid mineral leasing would be the same as those under Alternative D.

#### Fluid Leasable Minerals—Oil and Gas

Under Alternative E, the Old Spanish, Tabeguache, and Paradox Trails on BLM-administered lands would be in areas open to fluid mineral leasing. Each trail would have NSO and CSU stipulations. This would result in fewer impacts on trail values from fluid minerals development than under Alternative A.

BLM_0163550

Areas of Critical Environmental Concern

There would be 9.5 miles of national trails within ACECs. However, these trails would not be impacted by actions related to ACEC management.

*Byways*

As under Alternative A, no BLM byways would be established under this alternative. As a result, the number of visitors traveling on BLM roads would not increase as a result of byway designations.

Visual Resources

Under Alternative E, the Grand Mesa Scenic Byway and the West Elk Byway from the northeast Uncompahgre RMP Planning Area boundary to Gunnison County Road 12 would be managed as VRM Class II within 0.5-mile of either side of the centerline. Impacts on scenic resources along these sections of byways are the same as under Alternative B. The remaining portion of the West Elk Byway, San Juan Skyway, and Unaweep-Tabeguache Byway would be managed as VRM Class III. Impacts on scenic resources along these byways are the same as under Alternative C, but over a 0.50-mile buffer instead of a 0.25-mile buffer. These designations would provide more opportunities to protect scenic resources than Alternative A. In addition, a CSU stipulation would apply to fluid minerals within 0.50-mile of scenic byways. Like Alternative C, potential impacts from these uses would be less than under Alternative A because of the stipulations; however, the larger buffer area would provide protection to viewsheds in more areas along byways.

Recreation and Visitor Services

A portion of the Unaweep-Tabeguache Byway (9.5 miles) and San Juan Skyway (8.3 miles) would run through the San Miguel SRMA. Scenic touring would be a targeted activity in the area. Potential impacts are the same as impacts on SRMAs under Alternative A.

Lands and Realty—Rights-of-Way

A total of 25 miles of the Unaweep-Tabeguache Byway, San Juan Skyway, and West Elk Loop are in areas that would be managed as ROW avoidance areas. Potential impacts on byways related to ROW activities are similar to Alternative C; however, expanded areas of avoidance could provide more opportunities to preserve the historic, natural, and scenic qualities of lands next to these byways.

Solid Leasable Minerals—Coal

Most of the lands surrounding the West Elk Loop and Grand Mesa Byway are in areas acceptable to coal leasing. Indirect impacts could alter the scenic values of the byway if coal mining were to occur in areas visible to travelers. This would also occur under Alternative A for West Elk Loop Byway.

Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals

West Elk Loop and Unaweep-Tabeguache Byway are in areas withdrawn from locatable mineral entry. Under Alternative E, the Unaweep-Tabeguache Byway would be in areas recommended for withdrawal from locatable mineral entry, thereby reducing the potential for impacts on scenic resources from mineral development along this section of the byway. Under Alternative A, none of the byways are in areas withdrawn from mineral entry. Under Alternative E, byways that are in areas not recommended for withdrawal from locatable mineral entry would experience greater opportunities for direct and indirect impacts from mineral development (e.g., surface disturbance and visual intrusions) in the short and long term. In addition, the Unaweep-Tabeguache Byway, San Juan Skyway, West Elk Loop Byway, and Grand Mesa Byway are in areas closed to mineral material disposal. Impacts on scenic resources from mineral material disposal are similar to those under Alternative C in those areas open to disposal.

BLM_0163551

Areas of Critical Environmental Concern

Under Alternative E, portions of the Unaweep-Tabeguache Byway would pass through the San Miguel River ACEC. The impacts on travelers on the byway through this ACEC are the same as Alternative B. In addition, the Unaweep-Tabeguache Byway would also be next to the potential Biological Soil Crust ACEC. The impacts on travelers on the byway through this ACEC are the same as Alternative D.

Wild and Scenic Rivers

Under Alternative E, efforts to protect ORVs for suitable WSR segments (Lower Dolores and San Miguel Segments 1, 2, and 5) along the Unaweep-Tabeguache Byway could indirectly preserve the scenic values along the byway by prohibiting or limiting surface-disturbing activities. It would promote recreation along the byways.

### Cumulative

#### National Trails

The cumulative impact analysis area used to analyze cumulative impacts on national trails includes the Uncompahgre RMP Planning Area, as well as adjacent BLM field offices in which the Old Spanish National Historic Trail, Tabeguache Trail, or Paradox Trail occurs. The Old Spanish Trail is the only national historic trail next to or within the Planning Area boundary. It also occurs within the Grand Junction Field Office to the north and the Moab Field Office to the west. Management of the Old Spanish Trail in those field offices is similar to the management prescribed in this RMP. The BLM, in the Grand Junction RMP, proposed the designation of the Tabeguache Trail as a National Recreation Trail, which would enhance the values and manageability of the trail.

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect national trails include continued oil and gas development, ROW location, and, most important, increasing recreation and visitor use in the region putting additional pressure on trails. As discussed, management of the Old Spanish Trail is coordinated with the National Park Service and local nonfederal partners. Management plan development for this trail, as well as management direction provided for the Tabeguache Trail and Paradox Trail from adjacent BLM field offices or federal land managers, could decrease the potential for degradation and assist in the preservation of natural, cultural, and historic trail resources.

The actions and activities considered in this analysis would not result in the inability of the BLM to provide public access to national trails. However, these actions and activities would alter scenic, natural, and cultural features of the national trails. The degree of alteration would be greatest under Alternative A because of fewer land use restrictions for the protection of sensitive resources next to national trails. Conversely, the implementation of increased restrictions to protect sensitive resources under Alternative B would result in the fewest impacts on national trails. Alternatives C, D, and E would have slightly less restriction and therefore slightly greater impact than Alternative B.

#### Byways

The cumulative impact analysis area used to analyze cumulative impacts on byways includes the Uncompahgre RMP Planning Area and the San Juan Skyway, Grand Mesa Scenic and Historic Byway, Unaweep/Tabeguache Scenic Byway, and West Elk Loop, the byways on lands in and next to the Planning Area boundary.

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect byways in the Planning Area are activities associated with energy and minerals development, land use, visitor use, and vegetation management. Energy and minerals development could impact byways by altering visual landscapes through the addition

BLM_0163552

of pipelines or transmission lines, scarring of surrounding landscapes, and increased truck traffic on roadways. Certain land uses that surround BLM-administered lands, such as continued growth and development, also could affect byways by leading to increased visitor use of byways and increased demand for such resources as housing, energy, and utilities. Developing these resources could impact naturalness of lands surrounding byways by converting lands from their natural setting. Restoring unhealthy vegetation communities and reducing infestations of noxious weeds along the byway corridors would enhance the natural diversity of the native landscape.

The actions and activities considered in this analysis would not result in the inability of the BLM to provide public access to byways. However, these actions and activities would alter scenic, natural, and cultural features of the byways. The degree of alteration would be greatest under Alternative A because of fewer land use restrictions for the protection of sensitive resources next to byways. Conversely, the implementation of increased restrictions to protect sensitive resources under Alternative B would result in the least impact on byways. Alternatives C, D, and E would have slightly less restriction and therefore slightly greater impact than Alternative B.

## 4.5.5 Watchable Wildlife Viewing Sites

This section discusses impacts on watchable wildlife viewing sites that would occur from actions associated with the management of other resources. Existing conditions are described in **Section 3.3.5** (Watchable Wildlife Viewing Sites).

### Methods and Assumptions

This analysis focuses on management actions with disturbance potential to reduce the success of potential watchable wildlife viewing sites or the potential to increase opportunities for wildlife viewing within the potential watchable wildlife viewing sites. Impacts on the potential watchable wildlife viewing sites are discussed for alternatives that would not designate watchable wildlife viewing sites (Alternatives A, C, and D) in the same manner as alternatives that do designate the areas (Alternative B and E).

### Indicators

Indicators of impacts on watchable wildlife viewing sites are the following:

- The ability to identify and create opportunities for interpretation and education related to wildlife
- The ability to complete wildlife habitat improvements to enhance fish/wildlife viewing opportunities, while maintaining protection of fish/wildlife species and their habitats

### Assumptions

Assumptions are described in **Section 4.1.1**.

### Nature and Type of Effects

Actions that would impact watchable wildlife viewing sites are those that enhance wildlife viewing opportunities by improving habitat and wildlife health, actions that enhance wildlife viewing opportunities by restricting disturbance, and actions that reduce opportunities to view wildlife by creating disturbances.

Actions that enhance wildlife viewing opportunities through habitat improvement include management to promote and conserve native species as well as ecosystem diversity and the use of vegetation treatments (e.g., mechanical treatments, chemical treatments, prescribed fire, and reseeding) to improve plant composition and structure and overall wildlife habitat. Additionally, the management of ecological emphasis areas, if they were to overlap with the watchable wildlife viewing sites, would preserve the

BLM_0163553

continuity of habitats and encourage native wildlife persistence, also enhancing wildlife viewing opportunities.

Management of scenic values would create opportunities to view wildlife by protecting open spaces, including scenic vistas. Increased opportunities to view wildlife would also exist in areas where ACECs overlap watchable wildlife viewing sites due to restrictions on disturbances. Restrictions on camping, firewood harvest, and travel routes would minimize disturbances within the watchable wildlife viewing site, thereby enhancing wildlife viewing opportunities. Similarly, seasonally prohibiting disruptive activities in mapped big game crucial winter range would protect those animals and improve opportunities to view wildlife.

Actions that enhance educational values, opportunities, and awareness of wildlife viewing opportunities would complement the watchable wildlife viewing site through increased visitor awareness and understanding of wildlife, their habitats, and their importance. This would lead to increased stewardship of the wildlife and their habitat. Actions that develop recreation facilities and promote recreation could attract more visitors and encourage more people to view wildlife. However, increased visitation could also result in greater disturbance to wildlife, reducing viewing opportunities.

Designating roads and trails for public access would improve access within the watchable wildlife viewing site, but resulting habitat fragmentation could encourage wildlife to move elsewhere and degrade the watchable wildlife viewing experience.

Reducing human induced stressors if big game herds were determined by CPW to be highly stressed during crucial winter periods would temporarily reduce opportunities for wildlife viewing. However, this would protect herd populations over the long term and provide long-term benefits to wildlife viewing opportunities.

Mineral exploration and development on or next to watchable wildlife viewing sites would cause disturbance and reduce opportunities for wildlife viewing.

### Effects Common to All Alternatives

Under all alternatives, management actions that tended to restrict disturbance and focus on improving habitat and wildlife health would increase opportunities to view wildlife, while actions that tended to allow disturbances would decrease opportunities to view wildlife. The largest impacts under all alternatives would come from management actions related to recreation, mineral exploration and development, and travel management.

All alternatives manage a portion of the land within the San Miguel Watchable Wildlife Viewing Site boundary as the San Miguel River ACEC. This provides for protections that would restrict disturbances and promote opportunities for wildlife viewing.

While implementing management for some of the following resources could have impacts on the quality of the watchable wildlife experience, they would be negligible overall and are therefore not discussed in detail: air quality, climate change, soils and water, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, lands and realty, wilderness and WSAs, WSRs, national trails and byways, Native American tribal uses, and public health and safety.

### Alternative A

There would be no watchable wildlife viewing sites under Alternative A. Visitors would have to create their own opportunities to view wildlife and the associated interpretation and education would be lacking. Visitors would also not be directed to these areas for the purpose of viewing wildlife, so visitors

BLM_0163554

may not know that they are good locations. Wildlife viewing would take place across the Decision Area as opportunities arise, but would be lower quality.

Some of the land within the potential San Miguel Watchable Wildlife Viewing Site boundary would be managed as VRM Class II, limiting the types of development detrimental to wildlife habitat, but potentially restricting the construction of infrastructure to facilitate wildlife viewing.

The potential San Miguel Watchable Wildlife Viewing Site is entirely within the San Miguel River SRMA and ACEC. While the SRMA status attracts visitors to experience specific recreation not directly associated with wildlife viewing, the San Miguel River ACEC, also in this area, provides protection for the riparian resources and bird habitat needed to support wildlife viewing. Managing recreation in the SRMA in a manner that also protects the ACEC values provides an opportunity to encourage wildlife viewing and a sense of stewardship in visitors. There is no overlap between SRMAs and the other two potential watchable wildlife viewing sites (Billy Creek and Uncompahgre Riverway); dispersed recreation in the areas would not likely rise to a level that would disturb the species' habitat.

Under Alternative A, 160 acres within the potential San Miguel Watchable Wildlife Viewing Site has an NSO stipulations attached to fluid mineral leases, 15,500 acres (68 percent) has CSU stipulations attached to fluid mineral leases, and timing limitation stipulations are attached to fluid mineral leases on 19,920 acres (87 percent). Where these stipulations overlap, if one of them is excepted, modified, or waived by the BLM Authorized Officer, the underlying stipulation may still be in place. Portions are also closed to mineral material disposal. Additionally, 2,170 acres of the potential Billy Creek Watchable Wildlife Viewing Site (73 percent) are subject to timing limitations for fluid mineral development. These restrictions reduce disturbances to wildlife and promote wildlife viewing opportunities, but not target opportunities for wildlife interpretation and education that enhance public wildlife viewing experiences.

### Alternative B

Under Alternative B, three watchable wildlife viewing sites (Uncompahgre Riverway, the San Miguel River ACEC, and Billy Creek) would provide targeted opportunities for wildlife interpretation and education, enhancing public wildlife viewing experiences as a result. The watchable wildlife viewing sites would also direct resources for watching wildlife to areas most suitable for this activity, thereby improving the chances of viewing wildlife. In addition, wildlife habitat improvements in the watchable wildlife viewing sites would encourage more wildlife to frequent the area.

Watchable wildlife viewing site management under Alternative B would prohibit many disturbing activities that could cause wildlife to be less visible (i.e., move to areas of greater cover or outside the watchable wildlife viewing sites). For example, surface-disturbing activities would be prohibited within the Uncompahgre Riverway Watchable Wildlife Viewing Site and in most of the Billy Creek and San Miguel Watchable Wildlife Viewing Sites (totaling 23,970 acres, 93 percent). If exceptions were granted for surface-disturbing activities, site-specific relocation restrictions would apply within all of the watchable wildlife viewing sites. In addition, Alternative B proposes more actions aimed at maintaining existing landscapes in order to increase opportunities for viewing wildlife than under Alternative A. Furthermore, promoting the public's ability to view wildlife within the watchable wildlife viewing sites could increase visitors' feelings of stewardship and result in reduced impacts on other resources in the area.

Under Alternative B, the majority of the San Miguel Watchable Wildlife Viewing Site would be managed as VRM Class III (11,620 acres), potentially allowing the types of development detrimental to wildlife habitat but potentially allowing the construction of infrastructure to facilitate wildlife viewing opportunities.

BLM_0163555

Unlike Alternative A, some recreation under Alternative B would be restricted, such as motorized competitive events, all recreational mining, and some dispersed camping. These restrictions would impact watchable wildlife viewing sites by limiting disturbances that could scare away wildlife. The San Miguel Watchable Wildlife Viewing Site would be within the San Miguel River SRMA and ACEC. Targeted activities of the SRMA include educational programs and nonmotorized trail use and targeted benefits include several outcomes that would instill a sense of stewardship in visitors. This would enhance the watchable wildlife viewing experience in the area, particularly if educational programs were aimed at wildlife and their habitat. Management of the ACEC would provide protection for the riparian resources and bird habitat needed to support the wildlife viewing. Managing recreation in the SRMA in a manner that also protects the ACEC values provides an opportunity to encourage wildlife viewing.

The Uncompahgre Riverway Watchable Wildlife Viewing Site would be within the Ridgway Trails SRMA. Targeted activities in the SRMA include outdoor classroom and targeted experiences and benefits include several outcomes that would instill a sense of stewardship in visitors. This would enhance the watchable wildlife viewing experience in the area, particularly if educational programs were aimed at wildlife and their habitat. The Billy Creek Watchable Wildlife Viewing Site is not within an SRMA; dispersed recreation in the area would not likely rise to a level that would disturb the species' habitat. The Billy Creek Watchable Wildlife Viewing Site is within the CPW Billy Creek Wildlife Area and could provide for joint CPW/BLM educational programs and habitat improvement opportunities.

Under Alternative B, the San Miguel Watchable Wildlife Viewing Site would be closed to fluid mineral leasing, nonenergy solid mineral leasing, and mineral material disposal. It would also be recommended for withdrawal from locatable mineral entry, as would a portion of the Billy Creek Watchable Wildlife Viewing Site. In addition, the Uncompahgre Riverway and 190 acres of the Billy Creek Watchable Wildlife Viewing Site (6 percent) would be closed to fluid mineral leasing. On the remaining portion of Billy Creek, NSO, CSU, or TL stipulations would be attached to fluid mineral leases. Where these stipulations overlap, if one of them is excepted, modified, or waived by the BLM Authorized Officer, the underlying stipulation may still be in place. These restrictions would reduce disturbances to wildlife and promote wildlife viewing opportunities. The restrictions placed on mineral exploration and development on watchable wildlife viewing sites under this alternative are more stringent than under Alternative A, and as such, would contribute more to wildlife viewing opportunities than the other alternatives.

### Alternative C

There would be no watchable wildlife viewing sites under Alternative C, and visitors would have to create their own opportunities to view wildlife. Effects would be similar to Alternative A, except as described below.

Because there are no watchable wildlife viewing sites designated under this alternative, fewer precautions would be taken to encourage wildlife to inhabit lands within the potential watchable wildlife viewing site boundaries. Under Alternative C, only a very small area within potential watchable wildlife viewing sites proposed under Alternative B would be managed as VRM Class I or II (20 acres), resulting in fewer limitations on development that could be detrimental to wildlife habitat than under the other alternatives. Site-specific relocation restrictions would be imposed within all of the potential Uncompahgre Riverway Watchable Wildlife Viewing Site and portions of the potential Billy Creek and San Miguel Watchable Wildlife Viewing Sites (totaling 20,210 acres, 78 percent). While SSR restrictions could provide some level of protection from habitat fragmentation or loss, the restriction relies on site design and mitigation measures, which may or may not be adequate to protect the area for watchable wildlife viewing.

BLM_0163556

This alternative places the fewest restrictions on recreation of all the action alternatives. As a result, disturbance could be expected to be greater under this alternative, which could lead to decreased opportunities to view wildlife in the land within the potential watchable wildlife viewing site boundaries.

The potential San Miguel and Uncompahgre Riverway Watchable Wildlife Viewing Sites would be within the San Miguel River and Ridgway Trails ERMAs, respectively. Because ERMAs would not target activities or outcomes associated with wildlife viewing or stewardship, the potential for disturbances to wildlife from visitor use would be present. On the other hand, the potential San Miguel River Watchable Wildlife Viewing Site would overlap the San Miguel River ACEC, which would provide some restrictions to protect riparian resources and bird habitat, maintaining an opportunity for wildlife viewing.

Under Alternative C, CSU stipulations would be attached to fluid mineral leases in all of the potential watchable wildlife viewing sites. Timing limitation restrictions would also apply on all of the potential Uncompahgre Riverway Watchable Wildlife Viewing Site and portions of the potential San Miguel and Billy Creek Watchable Wildlife Viewing Sites. The restrictions placed on mineral exploration and development within the potential watchable wildlife viewing sites are more than those under Alternative A, and they allow for fewer disturbances which would reduce opportunities for wildlife viewing in the potential watchable wildlife viewing sites' boundaries.

### Alternative D

There would be no watchable wildlife viewing sites under Alternative D, and visitors would have to create their own opportunities to view wildlife. Effects would be similar to Alternative A, except as described below.

Under Alternative D, 1,100 acres of the land within the potential San Miguel Watchable Wildlife Viewing Site boundary would be managed as VRM Class I, and 7,160 acres would be managed as VRM Class II, limiting the types of development detrimental to wildlife habitat but potentially restricting the construction of infrastructure to facilitate wildlife viewing. Site-specific relocation restrictions would be imposed within all of the potential Uncompahgre Riverway and Billy Creek Watchable Wildlife Viewing Sites and portions of the potential San Miguel Watchable Wildlife Viewing Site (totaling 20,210 acres, 95 percent). While SSR restrictions could provide some level of protection from habitat fragmentation or loss, the restriction relies on site design and mitigation measures, which may or may not be adequate to protect the area for watchable wildlife viewing.

The potential San Miguel and Uncompahgre Riverway Watchable Wildlife Viewing Sites would be within the San Miguel River and Ridgway Trails SRMAs, respectively; impacts would be the same as described under Alternative B.

Under Alternative D, NSO stipulations would be attached to fluid mineral leases within all of the potential San Miguel and Uncompahgre Riverway Watchable Wildlife Viewing Sites and a portion of the potential Billy Creek Watchable Wildlife Viewing Site (totaling 23,890 acres, 93 percent). In addition, CSU stipulations would be attached to fluid mineral leases within all of the potential Billy Creek and Uncompahgre Riverway Watchable Wildlife Viewing Sites and a portion of the potential San Miguel Watchable Wildlife Viewing Site (totaling 24,320 acres, 94 percent). Finally, all of the potential watchable wildlife viewing sites would be TL restrictions on all surface-disturbing activities. Where these stipulations overlap, if one of them is excepted, modified, or waived by the BLM Authorized Officer, the underlying stipulation may still be in place. Impacts from these restrictions are similar to those described under Alternative B, but the magnitude of protection to the areas for watchable wildlife viewing would be less.

BLM_0163557

The potential San Miguel and a portion of the potential Billy Creek Watchable Wildlife Viewing Sites would be recommended for withdrawal from locatable mineral entry. The San Miguel and a portion of the potential Uncompahgre Riverway Watchable Wildlife Viewing Sites would be closed to mineral material disposal. Finally, The San Miguel River, Uncompahgre Riverway, and a portion of the potential Billy Creek Watchable Wildlife Viewing Sites would be closed to nonenergy solid mineral leasing. These restrictions would reduce disturbances to wildlife and would promote wildlife viewing opportunities. These restrictions are similar to those in place under Alternative A.

### Alternative E

Under Alternative E, three watchable wildlife viewing sites (Uncompahgre Riverway, San Miguel River ACEC, and Billy Creek) would provide targeted opportunities for wildlife interpretation and education, enhancing public wildlife viewing experiences as a result. The watchable wildlife viewing sites would also direct resources for watching wildlife to areas most suitable for this activity, thereby improving the chances of viewing wildlife. In addition, wildlife habitat improvements in the watchable wildlife viewing sites would encourage more wildlife to frequent the area.

Watchable wildlife viewing site management under Alternative E would prohibit many disturbing activities that could cause wildlife to be less visible (i.e., move to areas of greater cover or outside the watchable wildlife viewing sites). However, although watchable wildlife viewing sites management actions are similar under Alternatives B and E, Alternative E would not prohibit surface-disturbing activities within the Uncompahgre Riverway, Billy Creek, and San Miguel Watchable Wildlife Viewing Sites. Alternative E proposes more actions aimed at maintaining existing landscapes in order to increase opportunities for viewing wildlife than under Alternative A. Furthermore, promoting the public's ability to view wildlife within the watchable wildlife viewing sites could increase visitors' feelings of stewardship and result in reduced impacts on other resources in the area.

#### Visual Resources

Under Alternative E, 18,490 acres (72 percent of watchable wildlife viewing sites) would be managed as VRM Class III or IV, mostly in the San Miguel Watchable Wildlife Viewing Site. This would potentially allow development detrimental to wildlife habitat but potentially allowing the construction of infrastructure to facilitate wildlife viewing opportunities.

#### Recreation and Visitor Services

Unlike Alternative A, some recreation under Alternative E would be restricted, such as motorized competitive events, mining within 100 feet of developed recreation sites, and some dispersed camping. These restrictions would impact watchable wildlife viewing sites by limiting disturbances that could scare away wildlife. The San Miguel Watchable Wildlife Viewing Site would be within the San Miguel River SRMA and ACEC. Targeted activities of the SRMA include educational programs and nonmotorized trail use, and targeted benefits include several outcomes that would instill a sense of stewardship in visitors. This would enhance the watchable wildlife viewing experience in the area, particularly if educational programs were aimed at wildlife and their habitat. Management of the ACEC would provide protection for the riparian resources and bird habitat needed to support the wildlife viewing. Managing recreation in the SRMA in a manner that also protects the ACEC values provides an opportunity to encourage wildlife viewing.

The Uncompahgre Riverway Watchable Wildlife Viewing Site would be within the Ridgway Trails SRMA. Targeted activities in the SRMA include outdoor classroom, and targeted experiences and benefits include several outcomes that would instill a sense of stewardship in visitors. This would enhance the watchable wildlife viewing experience in the area, particularly if educational programs were aimed at wildlife and their habitat. The Billy Creek Watchable Wildlife Viewing Site is not within an SRMA but is

BLM_0163558

within the CPW Billy Creek Wildlife Area; dispersed recreation in the area would not likely rise to a level that would disturb the species' habitat.

*Fluid Leasable Minerals—Oil and Gas and Locatable Minerals, Mineral Materials, & Nonenergy Leasable Minerals*

Under Alternative E, the San Miguel and Uncompahgre Riverway Watchable Wildlife Viewing Sites would be closed to nonenergy solid mineral leasing and mineral material disposal. The Billy Creek Watchable Wildlife Viewing Site would not be closed to mineral material disposal. Uncompahgre Riverway and 11 percent of San Miguel Watchable Wildlife Viewing Sites would be recommended for withdrawal from locatable mineral entry. All of the watchable wildlife viewing sites would have NSO and TL stipulations. Billy Creek and San Miguel Watchable Wildlife Viewing Sites would also have CSU stipulations. Where these stipulations overlap, if one of them is excepted, modified, or waived by the BLM Authorized Officer, the underlying stipulation may still be in place. These restrictions would reduce disturbances to wildlife and promote wildlife viewing opportunities. The restrictions placed on mineral exploration and development on watchable wildlife viewing sites under this alternative are more stringent than under Alternative A and, as such, would contribute more to wildlife viewing opportunities.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on watchable wildlife viewing sites is the Uncompahgre RMP Planning Area. Cumulative impacts on watchable wildlife viewing sites are related to those described for fish and wildlife and vegetation, since vegetative communities provide the habitat for wildlife species and can affect habitat for fish species (e.g., riparian vegetation). Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect watchable wildlife viewing sites are energy and minerals development, forestry, livestock grazing, recreation and visitor use, road development, water diversion and withdrawals, weed invasion and spread, prescribed and wildland fires, land planning efforts, vegetation management, habitat improvement projects, insects and disease, and drought. Many of these activities change habitat conditions, which then cause or favor other habitat changes. For example, wildland fire removes habitat, and affected areas are more susceptible to weed invasion, soil erosion, and sedimentation of waterways, all of which degrade habitats. In general, resource use activities have cumulatively caused habitat removal, fragmentation, noise, increased human presence, and weed spread, whereas land planning efforts and vegetation, habitat, and weed treatments have countered these effects by improving habitat connectivity, productivity, diversity, and health.

## 4.6 SOCIAL AND ECONOMIC CONDITIONS

This section is a description of the support conditions in the Planning Area and follows the order of topics addressed in **Chapter 3**:

- Native American tribal interests
- Public health and safety
- Socioeconomics
- Environmental justice

### 4.6.1 Native American Tribal Interests

This section addresses potential effects from management actions on Native American tribal interests, specifically Indian Trust Assets, treaty-based rights, and reservation lands. Indian Trust Assets are legal interests in property, physical assets, or intangible property rights held in trust by the US Government

BLM_0163559

for Indian tribes or individual Indians. This includes treaty rights such as those described in the Brunot Agreement of 1878. As described in Chapter 3 in **Section 3.4.1** (Native American Tribal Interests) the Brunot Agreement allowed the Utes to retain the hunting rights on reservation lands relinquished by them; in other words, the tribes retained such rights as part of their status as prior and continuing sovereigns. These hunting rights currently apply only to the Ute Mountain Ute Indian Tribe. Within the Planning Area, there are approximately 54,060 acres of BLM-administered land that fall under the Brunot Agreement.

## Methods and Assumptions

The BLM conducted government-to-government tribal consultations with affected federally recognized Native American tribes to identify tribal interests and treaty rights (including Brunot Agreement issues) in the Planning Area, and these consultations are continuing. All laws, regulations, and policies pertinent to determining effects on tribal interests were considered and included in impacts criteria. This known information was overlain with the actions found under each alternative in **Chapter 2** and conclusions were drawn based on an understanding of how these types of actions could affect tribal interests, agreements, and trust assets.

### Indicators

The use of indicators in NEPA analysis should provide information on determining whether the action would have a significant adverse impact on the resource (43 CFR 1508.27). For tribal interests, treaty-based rights, and trust assets, a significant adverse impact would be the permanent loss of those interests, rights, and/or assets. When assessing whether the actions would have significant impact, the indicators are the same as the qualitative level-of-effect indicators as those described in **Section 4.3.9**, Cultural Resources (magnitude, severity, duration, rate of change, etc.).

### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The BLM will continue to consult with tribes regarding Brunot Agreement issues.
- If other Indian Trust Assets or treaty-based rights are revealed during the RMP process or RMP implementation, the BLM will conduct consultation and fulfill its obligations under applicable treaties, the tribal trust relationship, various federal laws, DOI and BLM regulations, and guidance and executive orders. The BLM, as a federal agency, will continue to maintain government-to-government relationships with federally recognized Native American tribes and will consult with tribes during resource management actions affecting tribal lands and resources.
- Short of the permanent loss of treaty rights and/or trust assets, the types of effects, and an impact's magnitude, severity, and duration upon tribal interests are best determined through tribal consultation. There may also be unidentified conflicts with existing tribal treaty rights or claims of ownership related to traditional use areas or heritage resources that can be determined through ongoing tribal consultation.

## Nature and Type of Effects

There would be no immediate impacts from the goals, objectives, and allocations noted in the alternatives, though there may be direct impacts associated with some future management actions. Indirect impacts are those that would result from implementing the planning decisions at a later time and those that are cumulative. Most impacts are difficult to quantify because the locations of sacred sites in the Planning Area are unknown, and planning-level alternatives typically do not identify specific areas for surface-disturbing activities.

Types of impacts that could occur from the planning actions include:

BLM_0163560

- Conflicts with the land uses, management, and economic wellbeing of nearby reservations, trust lands, restricted Indian allotments, and federally dependent Indian communities
- Conflicts with the exercise of off-reservation treaty and reserved rights including Brunot Agreement access and hunting and fishing rights
- Conflicts with federal trust responsibilities to tribes and individual Indians regarding real property, physical assets, or intangible property rights
- Conflict with existing court decisions, laws, policies, executive orders, and agency agreements with tribes regarding land and resource use

***Effects Common to All Alternatives***

An adverse effect is any action that disturbs the integrity of an Indian Trust Asset or treaty-based right or responsibility of the BLM in the Planning Area. Those actions can be caused by development (e.g., road construction or logging) or conservation (e.g., habitat improvement or landscape reclamation) alternatives. The BLM will continue to maintain government-to-government consultation with federally recognized Native American tribes and will consult with tribes during future resource management actions to assess case-by-case or project-by-project impacts.

Under all alternatives, the BLM would continue to manage BLM-administered lands in a manner that accommodates Native American access to Brunot Agreement lands. All alternatives allow for the appropriate tribal governments to consult on a case-by-case basis on undertakings on BLM-administered lands that could affect Native American concerns.

Implementing management for the following resources would have negligible or no impacts on Native American tribal interests and are therefore not discussed in detail: air quality, wild horses, paleontological resources, WSRs, national trails and byways, and public health and safety.

***Cumulative***

The cumulative impact analysis area used to analyze cumulative impacts on Native American tribal interests is the Uncompahgre RMP Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that could affect Native American tribal interests include increases in mining, fluid mineral leasing, leasable minerals, renewable energy development, personal and commercial harvesting of forest products, and wildland fire. There is little likelihood of any one of these actions causing the absolute loss of or restrictions on treaty rights or Indian trust assets due to the requirements within existing agreements to preserve access to the Brunot lands. However, only with information provided by the tribes through consultation is it possible to describe the less-than-total scope and scale of effects these actions may have. Ongoing consultation on a case-by-case basis will further define the impacts these actions may have on tribal interests.

All undertakings that could affect tribal interests on federal land or actions that are funded, licensed, or permitted by the federal government are subject to numerous directives in various federal regulations. Consideration of the future cumulative effects of undertakings would be required, and adverse effects would be resolved on a case-by-case or project-by-project basis. Adhering to appropriate legal measures would reduce cumulative effects to an insignificant level. Implementing the proposed RMP is not anticipated to contribute to cumulative effects on Indian Trust Assets or treaty-based rights.

## 4.6.2  Public Health and Safety

This section discusses impacts on public health and safety from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.4.2** (Public Health and Safety).

BLM_0163561

## Methods and Assumptions

### Indicators

The change in exposure to hazards resulting from management actions is used as an indicator of impacts on public health and safety.

### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Public health and safety issues would receive priority consideration in the management of BLM-administered lands.
- Potential for risk to visitor safety would increase with increasing numbers of BLM-administered land users.
- Activities and resources available in and around the Planning Area would continue to be important to the health and safety of current and future residents.
- Most abandoned mine sites in the Planning Area are identified and characterized.
- The BLM would set as its highest priority for abandoned mines the physical safety action of cleaning up of those abandoned mine sites at locations (a) where a death or injury has occurred and the site has not already been addressed or (b) on or in immediate access to areas with high visitor use (BLM Instruction Memorandum 2000-182, Mitigating and Remediating Physical Safety Hazards at Abandoned Mine Land Sites; BLM 2000).
- All new hazardous materials and waste sites would be identified and characterized.
- Resource development activities would identify any possible generation of hazardous waste.
- No substantial new hazardous materials uses and waste generating would occur within the Planning Area.
- The BLM's Hazard Management and Resource Restoration Program would respond to all hazardous material releases on BLM-administered surface lands. Emergency cleanup actions would be implemented on sites posing a substantial threat to the public and the environment.

## Nature and Type of Effects

Impacts on public health and safety include management actions that reduce or eliminate or reduce exposure to risk.

Health and safety hazards occurring on BLM-administered lands typically include the presence of hazardous materials, including the potential for air or water contamination.

Federally established National Ambient Air Quality Standards have been established to protect public health. Separate emissions standards have also been established for hazardous air pollutants that may cause an increase in fatalities or in serious, irreversible, or incapacitating illness. Management actions that maintain or move towards compliance with standards by limiting emissions from BLM managed or permitted activities would improve public health while those that allow for increased emissions and result in non-compliance with standards could impact public health.

Abandoned mine lands represent a risk to public safety due to the potential for injury by falling in open pits or excavations, encountering unsafe structures, and being exposed to contaminants remaining on site. Potential indirect impacts on public health occur from management actions that permit activities that result in soil or water contamination.

Mass movement poses a potential hazard to public health and safety in areas where there are steep, unstable hillsides and cliffs in which large amounts of soil, rock, and debris may become dislodged. Mass movement is a dynamic process and can be caused by long-term erosion of weaker rock strata, or can be initiated by natural events, such as an earthquake, rainstorm, or wildfire, or by man-made events such

BLM_0163562

as vehicular traffic over unstable surfaces. Management actions that contribute to mass movement may indirectly human injury or death and property damage. Energy and mineral development in the Planning Area includes inherent risks for workers and the public related to safety during construction and operation, as well as the potential introduction of hazardous materials that could impact human health should exposure occur. Introduction of hazardous materials could indirectly affect health due local air, soil, or water contamination. The potential for water contamination associated with hydraulic fracturing depends on many factors, including, but not limited to, the chemicals utilized in fracturing fluid, distance from the gas well to ground and surface water, and methods of transport and disposal of wastewaters (Jackson et al. 2011; Vidic et al. 2013).

As discussed in **Chapter 3**, exposure to hazardous materials produced from oil and gas development, and unconventional natural gas development in particular, has been correlated with human health concerns in some studies, including, but not limited to, respiratory problems, cancer, and endocrine system disorders. Studies have not been conclusive as to the level of impacts; however, distance from the site of development has been identified as one key factor in determining the potential for impacts (Qingmin 2015). Potential for impacts may also be higher for sensitive populations, including pregnant women and children. McKenzie and others (2014), for example, observed an association between density and proximity of natural gas wells and maternal residence with prevalence of specific birth defects. The specific level of impacts from development would be impacted by proximity of residents and sensitive populations to development, and specific methods employed in drilling and production.

Smoldering or burning coal seams are a risk to public health and safety through effects of exposure to airborne toxic chemicals. Burning coal seams may also trigger wildfire should the smoldering or burning seam come in contact with nearby plant communities.

Surface waters can be indirectly impacted over the long term from development activities in the same watershed and from livestock grazing, which can introduce both chemical and biological (e.g., fecal coliform and nitrogen) contamination into waters. Contaminated surface waters pose health risks to recreational users who may come into contact with those waters. Development activities in the vicinity of drinking water aquifers (groundwater) pose a risk of contaminating those aquifers and causing health impacts on groundwater consumers.

Risks to public health and safety from BLM-administered land use are potential for injury from recreation, including use of motorized and mechanized vehicles and target shooting. In general, risks to public health and safety are elevated with increased use intensity and public accessibility. Risks to BLM-administered land users also include exposure to naturally occurring hazards.

Additional risks to public safety occur from potential for wildfire to spread to communities next to BLM-administered lands. In addition, BLM-administered land users may become trapped, injured, or killed during a wildfire.

The BLM is responsible for maintaining facilities and infrastructure, for reducing health and safety risks to employees and the public, and for protecting BLM-administered lands from illegal waste dumping, theft, public property destruction, and resource misuse. Where hazards are known and public exposure to these risks can be minimized or prevented, land use planning decisions can help protect public health and safety.

### Effects Common to All Alternatives

As discussed in **Section 4.3.1**, Air Quality and Climate, emissions of pollutants from prescribed fire and other vegetation management activities were predicted to remain similar for all alternatives. Emissions from prescribed fire have the potential to result in impacts on visibility, ozone formation, and human and

BLM_0163563

wildlife health under all alternatives. BMPs for prescribed burns would be applied to minimize air quality impacts.

Lands available for use in the North Delta unexploded ordnance area have the potential for future health and safety risks related to exposure to undetonated explosive materials. The potential for long-term direct and indirect impacts is considered to be proportional to the number of acres in the North Delta unexploded ordnance area authorized for project development. Impacts would be minimized under all alternatives, with the requirements to identify and clear affected areas before development.

Hazardous materials threaten public health and safety through potential exposure to a hazardous substance and through potential contamination of water, soil, and air. The reduction in hazardous material sites through response to, and reclamation of, hazardous materials sites, in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR 300) and the Comprehensive Environmental Response, Compensation, and Liability Act would occur under every alternative. As more acres and sites are reclaimed, the risks of hazardous material exposure to public health and safety are reduced in proportion to the reclaimed acreage amount.

Hazardous fuels treatments, including prescribed fire and mechanical treatment, would improve public safety by reducing fire hazard. Many of these fuels treatments occur in locations to reduce the chance of a wildfire burning from BLM-administered lands onto adjacent private lands. Treatments to reduce hazardous fuels also reduce risk to BLM-administered land users from wildfires. Under all alternatives, protection of public safety would be emphasized by the Wildfire Management Program.

Use of BLM-administered lands for recreation presents a potential risk to public safety under all alternatives. Risks are assumed to increase as recreational use increases. However, within SRMAs, the risk to public health and safety would be reduced by providing recreational separation, signs, and facilities where applicable.

The designation of no shooting areas and areas with shooting restrictions improves public health and safety by limiting the risk of the public being injured by gunfire. The potential for long-term impacts is considered to be inversely proportional to the acreages that are closed or have restrictions for shooting under each alternative, so the level of risk varies by alternative along with these acreages.

Livestock grazing has the potential for human interaction and injury, in particular if conflicts between recreation and grazing land uses were to occur. An associated risk is the potential for injury when public interaction occurs with guard dogs associated with some livestock grazing. The potential for long-term impacts is considered to be in direct proportion to the acreages that are open for livestock grazing under each alternative, with an increased potential for areas that are also emphasized for recreation. Therefore, the level of risk varies by alternative along with these acreages.

Lands that are open for consideration for mineral material sales or fluid minerals leasing have the potential for health and safety risks related to mining activities and oil, gas, or geothermal exploration, development, operation, and decommissioning. Such risk includes potential injury or death from working with large machinery and equipment or in faulty development infrastructure throughout each phase of mine or plant production. It also includes potential exposure to toxic or poisonous substances during exploration and development phases. The number of acres open to mineral material sales or open for leasing is considered to be proportional to the potential for long-term, health and safety risks.

Similarly, lands that are acceptable for further coal leasing and development have the potential for future health and safety risks related to coal mining. The acres acceptable for further leasing and development are considered to be proportional to the potential for long-term health and safety impacts. Under all

BLM_0163564

alternatives, lease stipulations and BMPs would limit impacts on human health and safety from development.

Contamination of public water supply is a potential risk associated with development related to mining and oil, gas, and geothermal exploration. All alternatives notices, or stipulations to protect municipal watersheds and source water protection areas, but the level of protection varies among alternatives.

The implementation of BMPs for mineral development would minimize exposure risks and reduce potential for environmental contamination of air, water, and soil from energy and mineral development under all alternatives. As noted in *Nature and Type of Effects*, distance from development activities is one key factor in determining the level of impacts. Because the site-specific location of development cannot be determined in the planning process, the exact location and level of impacts for area communities and residents cannot be quantified in this analysis.

Under all alternatives, potential for illegal dumping in the Planning Area remains. Illegal waste may result in soil contamination and damage to surface water and ground water on BLM-administered land, causing harm to public health and the environment.

Under all alternatives, law enforcement demands are projected to increase as area population and public land use increases. Focus of law enforcement and challenges would vary by alternative.

Implementing management for the following resources would have negligible or no impact on public health and safety and are therefore not discussed in detail: soils, vegetation, special status species, fish and wildlife, cultural resources, paleontological resources, visual resources, lands with wilderness characteristics, forestry and woodland products, ACECs, WSAs, and national trails and byways.

### Alternative A

Under Alternative A, risks to public health and safety would be as described in **Chapter 3** and all current conditions and trends would continue. As a result, impacts under this alternative are similar to those described under *Effects Common to all Alternatives*.

Target shooting under Alternative A would continue to be prohibited in developed recreational sites (340 acres), providing a minimal level of protection for the public from injury by gunfire.

Mineral development would continue under Alternative A, with potential for exposure to hazardous materials used in development and production, as discussed under *Nature and Type of Effects*.

There is potential for continued release of some volatile organic compounds and hazardous air pollutant emissions over the life of the RMP, with related potential for impacts on human health.

Specific protection measures for municipal water supplies are limited to the water supply for the town of Norwood, so there is some potential for contamination of water supplies by development. As noted in *Nature and Type of Effects*, the level of impacts would be determined by specific development techniques and distance from water sources.

Law enforcement demands would remain similar to current conditions but are anticipated to increase as area population increases.

### Alternative B

Target shooting would be prohibited in 248,170 acres under Alternative B, including all developed recreation areas and other areas with high visitor use, such as SRMAs, and in the direction of roads and other routes. Target shooting would also be prohibited in WSAs, the Tabeguache Area, lands managed to protect wilderness characteristics, and in prairie dog colonies that have burrowing owls. This

BLM_0163565

alternative would provide the maximum level of protection from injury and damage to facilities from gunfire across all alternatives.

Mineral development would continue under Alternative B, with potential for exposure to hazardous materials used in development and production, as discussed under *Nature and Type of Effects*. Application of additional stipulations would reduce development in areas with sensitive resources and could reduce the potential for contamination. In addition, a NSO within 500 feet of occupied dwellings and 1,000 feet of other high-occupancy buildings would reduce risk of exposures and related health impacts for area residents. Under Alternative B.1, this NSO stipulation is extended to specific sites with sensitive populations in the North Fork Valley (i.e., 0.25-mile from schools and community centers). As a result, risks of exposure and related health impacts for sensitive populations may be decreased.

Alternative B emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year, having the lowest potential for impacts on public health due to air quality.

Under Alternative B, all municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, would be protected from contamination with an NL (fluid minerals) restriction, as well as an NGD restriction for other activities, providing enhanced protection, as compared with Alternative A.

Under Alternative B.1, all municipal water supplies classified by the State of Colorado, as well as domestic water wells and private water systems, would be protected from contamination with an NL (oil and gas) restriction. The area closed to leasing surrounding these sites is smaller than under Alternative B but would still provide enhanced protection compared with Alternative A.

Alternative B prohibits surface occupancy and surface-disturbing activities on a 20-acre site near Uravan under the Uranium Mill Tailings Remedial Action Area DOE stipulation. This would reduce risk to public health and safety from exposure to uranium and vanadium caused by ground-disturbing activities.

Management of new and abandoned mine lands to include road closure and soil stabilization would also occur under Alternative B. Road closure to abandoned mines would reduce the risk to public health and safety by reducing exposure to these areas through inhibiting access, with the number of roads closed proportional to the decrease in risk to public health and safety. Closure of roads near and next to active and abandoned mine sites that are closer to widely used roads, recreational areas, or places of dense human populations would result in a larger increase in public health and safety from mine sites than the closure of roads around active and abandoned mines in remote or hard-to-access areas. This is due to the difference in the expected frequency of visitors to mines in highly used areas versus remote areas. Also, the rehabilitation of soil around active and abandoned mine sites reduces active erosion, which reduces the risk of contaminated sediment impacting public health and safety. As actively eroding soil is stabilized, the potential introduction of toxic chemicals and sediment particles to municipal water supply decreases, leading to a decrease in water contamination and an increase in water quality. This alternative has a greater capacity to reduce the impact on public health and safety over Alternative A, which does not provide for the management of mine site soil rehabilitation or road closure.

Alternative B provides for the protection of public health and safety in the event of a smoldering or burning coal seam. Impacts are described under *Nature and Type of Effects*.

Under Alternative B, grazing allotments or portions of grazing allotments would be periodically evaluated to identify grazing issues and their impact on public health and safety. In cases where public health and safety is preferential to grazing on an allotment or portion of an allotment, grazing could be reduced or closed. Public health and safety would be improved.

BLM_0163566

Under Alternative B, law enforcement demands would likely be concentrated in the 12 SRMAs where recreation is more likely to be concentrated. Elimination of open cross-country travel and open designation areas could result in increased law enforcement demands.

### Alternative C

Under Alternative C, target shooting would be prohibited within developed recreation sites (340 acres, the same as Alternative A), providing a similar level of protection from injury by gunfire as would Alternative A.

Alternative C would have the fewest restrictions on mineral development of any alternative, with highest potential for exposure to hazardous materials used in development and production, and a related potential for human health impacts, as discussed under *Nature and Type of Effects*.

Alternative C emission estimates result in the greatest magnitude of and increases in total air pollutant emissions due to the least restrictions on solid mineral development and on oil and gas development. This alternative would have the greatest potential to contribute to volatile organic compounds and local increases in hazardous air pollutants and associated risks to human health, as discussed under *Nature and Type of Effects*.

Under Alternative C, all municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, would be protected from contamination during development by a NSO stipulation for the first 1,000 feet from the water supply. Once development is complete, a CSU stipulation and additional protective measures between 1,000 and 2,640 feet from the water would be maintained, providing enhanced protection, when compared with Alternative A.

Alternative C would also prohibit surface occupancy and surface-disturbing activities on a 20-acre site near the Uravan area, the impacts of which are similar to those described under Alternative B.

Under Alternative C, the management of active and abandoned mine lands to reduce active soil erosion through rehabilitation would occur. The impacts are similar to the results of soil rehabilitation that would occur under Alternative B. Alternative C provides for more management of mine sites than Alternative A through soil rehabilitation.

Alternative C would also provide for the protection of public health and safety in the event of a smoldering or burning coal seam, the impacts of which are described under *Nature and Type of Effects*.

Under Alternative C, law enforcement demands from recreation are likely to occur in the 11 ERMAs, where more recreation could occur. Maintenance of open areas would not increase law enforcement demands.

### Alternative D

Target shooting would be prohibited on 49,370 acres under Alternative D, including within 150 yards of any developed recreation site and in specific SRMAs and ACECs. Some limitations would be in place, including shooting toward a target located across a designated route, and shooting towards a site or facility if it is within the range of the firearm. This alternative would provide more protection from injury and damage to facilities by gunfire than would Alternative A.

Mineral development would continue under Alternative D, with potential for exposure to hazardous materials used in development and production, as discussed under *Nature and Type of Effects*. NSO

BLM_0163567

stipulations within 500 feet of occupied dwellings and 1,000 feet of other high-occupancy buildings would apply as under Alternative B, reducing risk of exposure and related health impacts for area residents.

Alternative D would contribute to emissions levels above that in Alternative A due to increased potential for mineral development. Impacts on human health from emission would be present as described under Alternative A and *Nature and Type of Effects*.

Alternative D would protect municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, from contamination with an NL restriction for the first 1,000 feet from the water supply, and then a CSU stipulation and additional protective measures between 1,000 and 2,640 feet, providing enhanced protection as compared with Alternative A.

Alternative D would also prohibit surface occupancy and surface-disturbing activities on a 20-acre site near Uravan, the impacts of which are similar to those described under Alternative B.

In addition, Alternative D would provide for the management of active and abandoned mine lands to reduce active soil erosion through rehabilitation. The impacts are similar to the results of soil rehabilitation that would occur under Alternative B. In addition to soil rehabilitation, Alternative D provides for possible route closure as a part of a comprehensive travel management plan. The impacts of route closure would depend on the outcome of travel management planning; however, Alternative D would have a greater capacity to reduce the risk of active and abandoned mine sites on public health and safety than Alternative A due to the review and possible closure of routes to those mine sites.

Alternative D would also provide for the protection of public health and safety in the event of a smoldering or burning coal seam, the impacts of which are described under *Nature and Type of Effects*.

Under Alternative D, grazing allotments or portions of grazing allotments would be periodically evaluated to identify grazing issues and their impact on public health and safety, as with Alternative B. The impacts of such are similar to those described under Alternative B.

Under Alternative D, law enforcement demands from recreation are likely to occur in the seven SRMAs and, to some extent, in the four ERMAs where recreation is most likely to occur. As discussed under Alternative B, travel management decisions prohibiting areas open to cross-county travel could result in increased law enforcement demands.

### Alternative E

*Recreation and Visitor Services*

Target shooting would be prohibited on 310 acres under Alternative E, including within 150 yards of any developed recreation site (30 acres fewer than Alternative A). Specific requirements for backstops for target shooting would provide some additional protection from injury and damage to facilities by gunfire beyond Alternative A.

*Fluid and Solid Leasable Minerals*

Mineral development would continue under Alternative E, with potential for exposure to hazardous materials used in development and production, as discussed under *Nature and Type of Effects*. Under Alternative E, NSO stipulations for occupied dwellings and other high-occupancy buildings would be extended to 1,000 feet, reducing risk of exposures and related health impacts for area residents.

Alternative E would also prohibit surface occupancy and surface-disturbing activities on a 20-acre site near Uravan, the impacts of which are similar to those described under Alternative B.

BLM_0163568

Management and closure of abandoned mine lands would occur as described under Alternative D, resulting in a greater capacity to reduce the risk of active and abandoned mine sites on public health and safety than Alternative A.

As in other action alternatives, Alternative E would also provide for the protection of public health and safety in the event of a smoldering or burning coal seam, the impacts of which are described under *Nature and Type of Effects*.

*Air Quality*

Under Alternative E, predicted energy and mineral development and related levels of air pollutant emissions would be similar to Alternative D and above that in Alternative A. The potential for impacts to human health would be present from local increases of volatile organic compounds (including hazardous air pollutants) and criteria pollutants. Under Alternative E, additional measures would be in place for air quality monitoring than in Alternative A. Over the life of the RMP, conducting future monitor siting analyses to determine potential monitoring locations would improve the ability to collect and assess information on the impacts of BLM development on air quality and related human health concerns; these monitoring efforts are needed to support future air quality assessments and regional modeling analysis. Under Alternative E, impacts from development on air quality and human health issues would also be reduced from Alternative A due to the potential addition of mitigation requirements as part of the adaptive management strategy that will be implemented over the life of the RMP.

*Water Resources*

Alternative E would provide measures to protect municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, from contamination during mineral development. Restrictions would include a NSO stipulations in a 1,000 buffer around surface water supply stream segments, NSO stipulations in a 0.5-mile buffer around ground water supplies, and further prohibitions on directional drilling limitations within 1,500 vertical feet below ground for ground and surface water supplies. In addition, CSU stipulations would be imposed in a 1,000-foot buffer for 5 miles upstream public water supply intakes. These measures would reduce potential for contamination of public water supplies from conventional and nonconventional drilling practices, compared with Alternative A, and thereby reduce the potential for associated risks to human health as discussed under *Nature and Type of Effects*. Similarly, CSU stipulations that impose limitations within 1,000 feet of domestic water wells and prohibit directional drilling with 1,500 vertical feet below ground of wells would result in a reduced potential for contamination from drilling, compared with Alternative A.

*Livestock Grazing*

Under Alternative E, grazing allotments or portions of grazing allotments would be periodically evaluated to identify grazing issues and their impact on public health and safety, as with Alternative B. The impacts of such are similar to those described under Alternative B.

*Recreation and Visitor Services*

Under Alternative D, law enforcement demands from recreation are likely to occur in the eight SRMAs and, to some extent, in the three ERMAs, where recreation is most likely to occur. Travel management decisions closing some areas open to cross-county motorized/mechanized travel could result in increased law enforcement demands over that in Alternative A. Alternative E would retain some open area (3,950 acres, approximately 45 percent that of Alternative A), which could reduce the level of unapproved use and law enforcement required.

BLM_0163569

*Cumulative*

The cumulative impact analysis area used to analyze cumulative impacts on public health and safety is the Uncompahgre RMP Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect public health and safety are potential exposure to unexploded ordnance in the North Delta unexploded ordnance area, exposure to hazardous materials from contaminated sites, dispersed or unmanaged target shooting, injury from recreational or conflicting land uses, risk from abandoned mine openings, risks associated with sites that are being used or were used for resource extraction, as well as potential for air, surface and ground water, and soil contamination from development.

Over the life of the RMP, these actions and risks are expected to continue to grow in proportion to the increasing use of BLM-administered lands by a regional and national audience. A larger population of visitors could result in a greater risk for human exposure to hazardous wastes, unexploded ordnance, and abandoned mine openings; a greater risk of injury from recreational or conflicting activities; and a greater strain on law enforcement.

Risks associated with mineral development, extractive infrastructure, and transmission lines would be expected to rise with renewable or traditional energy or mineral development increases. Development of oil and natural gas includes potential for exposure to contaminants at the site or drilling or extraction, as discussed in *Nature and Type of Effects*. Impacts from storage and use of hazardous substances would increase with the density of wells and well pads in the Planning Area. Development also results in sources of pollutants across different stages of the development cycle (i.e., from truck emissions, operations of drill rigs, separators, dehydrators, and other equipment, and from storage and pipeline transportation). Specific concerns associated with transportation pipelines include the potential for spills, leaks, or explosions and additional contamination.

The contribution to cumulative impacts from the alternatives would follow that discussed by for each alternative above. Potential for contamination of hazardous materials from oil and gas development would increase with increased levels of proposed development, with the highest contribution to cumulative impacts under Alternative C and the lowest under Alternative B.1. Pollutants emitted with common timing and/or common geography may create additional health impacts. Because the specific timing and location of development cannot be determined for the Planning Area, cumulative impacts cannot be quantified here. Further discussion of the potential impacts from development on community health and safety are included in **Section 4.6.3**, Socioeconomics.

As discussed under *Nature and Type of Effects*, BLM BMPs and standard operating procedures (**Appendix G**) would be applied as appropriate to implementation activities to reduce the risks of development, such as those associated with oil and gas development. Use of BMPs would reduce the contribution to cumulative impact under all alternatives.

## 4.6.3   Socioeconomics

Socioeconomic impacts would occur with the implementation of any of the alternatives. Potential impacts include changes in employment and income, in tax revenue for local, state, and federal government entities, and in demand for housing and government services. In addition, management actions could alter the attitudes and opinions concerning use of BLM-administered lands. This section describes potential impacts on socioeconomics from management actions. Existing conditions are described in **Section 3.4.3** (Socioeconomics).

BLM_0163570

Under all alternatives, the BLM continues to consider socioeconomic impacts of site-specific actions and incorporates socioeconomic issues into analyses of environmental, social, and economic impacts, such as the NEPA-required analyses for site-specific actions.

**Methods and Assumptions**

The study area is broken down using a tiered approach:

1. The six-county area of Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties. Mesa County was excluded from quantitative analysis in the Draft RMP/EIS. The analysis in the Draft RMP/EIS has been amended in this Proposed RMP/Final EIS to include Mesa County, because it is recognized as a regional economic center and influences economic activity in the Uncompahgre RMP Planning Area.

2. The five socioeconomic units, as defined in the Community Assessment of the Uncompahgre Planning Area (BLM 2009e), and as modified based on input received on the Draft RMP/EIS. This is also discussed in **Chapter 3**, as appropriate, to demonstrate differences between social or economic impacts in different portions of the Planning Area. Community-level data is provided if available and if they add meaning to the analysis.

The primary form of economic analysis in this assessment is economic impact analysis, which examines the changes in economic activity as a result of the proposed management (Watson et al. 2007). Economic impact analysis in this assessment takes one of two forms depending on the available data: qualitative or quantitative assessment. For those activities that directly generate measurable spending, the analysis estimates economic impact in terms of output (total spending) jobs, and income in the regional economy. For example, spending to drill gas wells and produce gas, produce coal, raise cattle, and recreate on BLM-administered land fits this type of analysis. Through the use of a regional input-output model (IMPLAN), an assessment of impacts on selected industrial sectors of the economy has been evaluated, including natural gas and coal production, livestock grazing, and recreation. IMPLAN is a regional economic impact model that provides a mathematical account of the flow of dollars and commodities through a region's economy. This model provides estimates of how a given amount of an economic activity translates into jobs and income in the region. These multipliers were applied to changes in final demand resulting from the differing BLM management alternatives in the RMP. The results measure the change in the level of output, jobs, and income for those industrial sectors impacted by each action.

Economic impacts based on IMPLAN modeling are described in terms of direct, indirect, and induced impacts. Direct impacts, such as income and employment, are directly affected by activity on BLM-administered land, such as employment to drill a natural gas well. Indirect impacts occur when related industries gain from purchases by the directly impacted businesses, such as the oil and gas company buying supplies from local firms. Induced impacts are the results of spending by employees hired due to the business activity just described (e.g., the natural gas employee spending money in a local restaurant). Together, these are reported as the total impact of the different management alternatives.

Employment opportunities related to activities on BLM-administered land and mineral estate include jobs in exploration, development, and production of minerals, including oil and gas, solid leasable minerals, such as coal, and locatable and mineral materials; jobs in livestock production; and jobs in various recreation activities. The quantified economic analysis using the IMPLAN model provides estimates of employment in the Planning Area from coal extraction, natural gas development and production, livestock grazing, and recreation on BLM-administered lands and mineral estate.

BLM_0163571

For all economic modeling presented here, data presented are estimates, based on best available data. Actual impacts would also vary based on site-specific differences and changes in market demand for mineral resources, policy regulating mineral extraction or livestock grazing, population change in the Planning Area, or various other factors that could alter the economic impact of BLM-administered land use. Narratives included discuss the specific limitations of data and modeling for each specific resource use.

For some resources, it was determined that the level of economic influence in the region from activities on BLM-administered lands would remain low under all alternatives, and would therefore be inconsistent with performing quantified economic impact analysis. Specific components of recreation, including recreational use permits, forest and woodland material sales, and ROW rents, are included in this category. For these types of resources, detailed qualitative discussion of impacts by alternative is included. Expert opinions were solicited from BLM UFO specialists regarding current conditions for specific resources and anticipated outcomes, and they were incorporated into the evaluation.

In the Draft RMP/EIS, a quantitative economic impact analysis of oil and gas development and production was not included due to the uncertainty related to timing, location, and level of development and production. Based on comments received on the Draft RMP/EIS, it was determined that a quantitative economic impact analysis of fluid mineral development would be included in the Proposed RMP/Final EIS to examine differences in effects of proposed management decisions by alternative. Due to low levels predicted for future oil development, this analysis includes only natural gas development and production. The values provided below are estimated based on the assumptions for development and production as outlined in this section, and further detailed in **Appendix S**, Socioeconomics Technical Methodology. Assumptions were informed by the UFO Reasonably Foreseeable Development Scenario (BLM 2012d) estimates and BLM UFO minerals resource specialists. The actual pace and timing of development and economic impacts would be impacted by various factors, including national and international energy demand and prices, production factors within the Planning Area, and drilling techniques. Site-specific NEPA analysis would be completed prior to any development and would include additional evaluation of the socioeconomic effects of the proposed action.

Mineral exploration and locatable mineral deposit development are allowed under the General Mining Law of 1872 on all BLM-administered lands unless withdrawn by Secretarial Public Land Order or an act of Congress. Level of locatable mineral extraction would be highly variable based on market conditions and other factors. As such, it was determined that quantitative economic analysis would not result in meaningful output.

In addition, not all economic values can be measured by market transactions. Open space, access to recreation, and other factors enhance quality of life for residents and could attract individuals or business to an area. This analysis examines values for nonmarket factors based on previous research on a qualitative and quantitative basis. See further discussion of nonmarket values in **Section 3.4.3**, Socioeconomics.

Results from the quantitative and qualitative economic analysis also are applied in measuring the social impacts. The level and type of economic activity predicted is examined in the context of the social setting. For example, the potential impacts of increased economic activity from resource extraction is examined to determine potential impacts to local community quality of life. Narrative discussion of the impacts on communities and groups is included for each of the five socioeconomic units. This discussion examines the impacts from proposed management on social conditions compared with baseline conditions.

BLM_0163572

*Indicators*

Key indicators that are used in the socioeconomic impact analysis are as follows:

BLM-Administered Land Indicators
- Recreation use in visits
- Livestock grazing AUMs
- Energy development and production:
  - Gas production (millions of cubic feet)
  - Coal production (millions of tons)
  - Other minerals (mineral materials, other leasables, and locatables)
- Ecosystem services

Social and Economic Indicators
- Population (growth projections)
- Changing demographics (selected indicators)
- Employment
- Income (personal income)
- Tax revenue
- Ethnic and racial characteristics of the region
- Open space (land enhancement value and attracting nonlabor income)

*Assumptions*

Assumptions are summarized below. Detailed methods of analysis are included in **Appendix S**, Socioeconomics Technical Methodology. All assumptions from the Draft RMP/EIS were reviewed and reconfirmed as appropriate for use in the Proposed RMP/Final EIS.

In addition to the assumptions in **Section 4.1.1**, the analysis is based on the following general assumptions:

- Values are presented in $2017, unless otherwise noted, for consistency with baseline data.
- Jobs are presented based on IMPLAN output and represent the annual average of monthly jobs. Thus, one job may represent one job lasting 12 months or two jobs lasting six months each, for example. Because jobs occurring over multiple years may not represent additional new employment opportunities (e.g., one employee working for two years represents two jobs), results are presented in the form of annual averages. Total jobs represent direct, indirect, and induced jobs supported.
- Labor Income (earnings) represent all forms of employment income, including employee compensation (wages and benefits) and proprietor income. Total labor earnings include direct, indirect, and induced employment.
- Economic output (gross regional economic output) represents the value of industry production. Total economic output includes direct, indirect, and induced value.
- All analyses utilize a 20-year timeframe, except for coal, which utilizes a 10-year timeframe due to anticipated depletion of coal resources in the 10-year period.

In addition to the assumptions in **Section 4.1.1**, the analysis is based on the following assumptions for livestock grazing:

- Ability of permittees/leasees to utilize permitted levels of forage would be impacted by factors such as weather, market conditions, and timing- and location-specific restrictions imposed to improve rangeland health. As a result, a high and low level of AUM use was examined to determine a range of economic impacts for each alternative. The high value is represented by

BLM_0163573

maximum permitted AUMs, and the low value by the rate of average of billed AUMs in the UFO for the past 10 fiscal years (2006 to 2016), approximately 60.3 percent of permitted AUMs.

- The actual AUMs used would vary by alternative but is assumed to be the same in each of the 20 years of the planning period
- A change in permitted AUMs will represent a corresponding change in the level of cattle or sheep grazing
- The ratio of livestock class (i.e., cattle or sheep) for each alternative is assumed to remain consistent across the 20-year planning period. The ratio for each alternative was determined based on current type of livestock and allotment-specific restrictions on livestock class and varies by alternative.
- The economic value of forage is estimated based on the value of production associated with forage and differs based on livestock class (i.e., cattle or sheep). Estimated gross production value per cattle is $871 in $2017 based on averaged data from 2008 to 2015 from Colorado State University Livestock Enterprise Budgets. Estimated production value per sheep is $260.42 in $2017 based on averaged data from 2010 to 2015 (Colorado State University 2015).
- Production for cattle and sheep result in local spending in various economic sectors. Production costs are input into IMPLAN based on percentage of spending per category, utilizing Colorado State University Livestock Enterprise Budgets for cattle and sheep (Colorado State University 2015).
- Approximately 16 AUMs are required to produce a marketable cow, and 3.2 AUMs to produce a marketable ewe (Workman 1986). Applying this number to the value per cattle or per sheep estimates provides an estimate value of production per AUM. Total value per cattle AUM is estimated at $54.45, and $81.25 for sheep AUMs, in $2017. Values for cattle are further adjusted by a factor of 1.2 per cattle to account for the fact that the majority of cattle in the Planning Area represent cow-calf pairs.
- Economic impact analysis is calculated for the six-county socioeconomic study area. Actual impacts would not be equally dispersed throughout the Planning Area, but would vary based on local economic dependence on livestock grazing, and the location and number of permittees/leasees impacted by proposed management decisions.

In addition to the assumptions in **Section 4.1.1**, the analysis is based the following assumptions for coal development:

- The coal resources in the Tongue Mesa coal field are heavily faulted with no rail access to the area, making it economically unviable to mine in the next 20 years (BLM 2010h). Since this is the current status of this resource area, it will have no impact on the socioeconomics of the area, and no further analysis was performed.
- The mining operations in the Somerset coal field produce high-quality coal and use subsurface mining techniques, specifically longwall mining. The output from the one active mine on BLM-administered land within this coal field is estimated to average approximately 5.5 million tons per year over the next 10 years. After 10 years of production at this rate, the resource would be depleted. For the purpose of analysis, the rate of production is assumed to remain fairly constant over this period due to constraints from demand and expressed interest.
- The coal resources in the Grand Mesa coal field have limited potential and are less economically viable than coal resources in Somerset due to low coal quality and transportation constraints. The Grand Mesa area would most likely be mined only when the resources at Somerset are exhausted, which is not forecasted to happen in the next 10 to 20 years. As such, it was assumed that Grand Mesa would not be mined in the next 10 to 20 years. Since this represents the current status of this resource area, it would have no impact on the socioeconomics of the area, and no further analysis was performed.

BLM_0163574

- The surface mining operation in the Nucla-Naturita coal field is on private land extracting private minerals. It ceased production after March 2017 when it produced its final 8,773 tons and entered into the reclamation phase (Tri-State 2017). It is assumed that no future production would occur at this mine during the planning period.

In addition to the assumptions in **Section 4.1.1**, the analysis includes the following assumptions for oil and gas development:

- Due to minimal current production levels in the Planning Area for oil, it is assumed that all future development represents natural gas wells.
- The analysis includes wells on BLM-administered mineral estate that is underneath BLM surface, state, or privately owned land within the Planning Area. While the BLM administers federal mineral estate beneath National Forest System lands where the Forest Service administers the surface, the BLM does not establish overall management direction of such mineral estate, such as determining which lands may be open to leasing and what stipulations may be applied to open lands. Therefore, this analysis excludes wells on National Forest System lands. This analysis refers to included wells as wells on BLM-administered mineral estate.
- The analysis addresses only new oil and gas wells, not current active wells.
- Approximately 64 percent of annual wells drilled represent conventional/shale gas, and the remaining 36 percent of wells represent coalbed natural gas wells. Of the conventional/shale gas wells, approximately 10 percent represent vertical wells, and 90 percent represent horizontal wells. Of the coalbed natural gas wells, approximately 50 percent would be drilled vertically and 50 percent horizontally.
- The number of new annual wells developed on BLM-administered mineral estate in the Decision Area would vary by alternative and would range from approximately 10 to 19 wells per year for each year of the planning period.
- Cost of well drilling and completion vary by well type (conventional/shale gas and coalbed natural gas) and well depth. Average full well costs are determined based on the UFO Reasonably Foreseeable Development Scenario (BLM 2012d) and BLM UFO minerals specialist input and are converted to $2017 utilizing the Bureau of Labor Statistics' consumer price index calculator.
- Costs of drilling and completion phases are analyzed separately based on spending in relevant economic sectors. Spending profiles for drilling and completion phases are based on estimates provided in the UFO Reasonably Foreseeable Development Scenario (BLM 2012d) for conventional and coalbed natural gas wells (BLM 2012d), and are converted to $2017 utilizing the US Bureau of Labor Statistics' consumer price index calculator.
- Approximately 50 percent of employment for drilling and completion was assumed to come from outside the six-county socioeconomic study area. The induced effects of gas development estimated by the IMPLAN model is adjusted downward to account for reduced spending from nonresidential workers. This is to account for the fact that nonresidential workers would not contribute to additional induced spending in the local economy, as the majority of their incomes would be spent in their locations of residence.
- Well success ratio is assumed to be 84 percent for all well types, as determined by BLM UFO minerals specialists.
- Natural gas price for production economic impacts is based on the Energy Information Administration's 2018 Annual Energy Outlook average natural gas price for the Dakotas/Rocky Mountain Region. Average supply gas price for 2018 to 2038 was $3.83 per thousand cubic feet in $2017 (US Energy Information Administration 2018).
- Well production is estimated at 188,304 thousand cubic feet per new well during the first year of production for all well types, with declining production levels for each subsequent year of

BLM_0163575

production. Rates of production decline for conventional/shale wells are based on decline curves for western Colorado conventional wells from 2015 production. Rates of decline for coalbed natural gas wells are based on decline curve ratios for the Tres Rios Filed Office from 2015 production data (IHS Enerdeq 2016).

In addition to the assumptions in **Section 4.1.1**, the analysis includes the following assumptions for recreation:

- The average of Recreation Management Information System data over the past 5 years is assumed to provide an accurate representation of visits on BLM-administered lands within the Planning Area for the past year. The 5-year average from fiscal year 2013 to 2017 was 571,655 total visits.
- Recreation use will continue to increase over the 20-year planning period. Exact numbers are not available for Uncompahgre RMP Planning Area visitor increase, so a linear progression was used to predict future increases in recreation visits based on state population forecasts. Based on this projection, recreation use can be assumed to continue to increase between 1.1 to 1.7 percent per year. Given this increase, annual regional economic impacts were examined for three levels of visitors: 1) recent average use (571,655 visits); 2) estimated visitor levels in 10 years (678,100 visits); and 3) estimated visitor levels in 20 years (769,370 visits). Actual increases in visitation could vary, based on regional and national economics and other factors.
- Recreational spending differs based on the type of visit (day trip or overnight) and the location of the visitor's residence (local or nonlocal). For this analysis, user groups are defined based on the Forest Service's Visitor Use Monitoring Survey categories, as follows:
  - local visitors on day trips
  - local visitors staying overnight on BLM-administered lands
  - local visitors staying overnight off BLM-administered lands
  - nonlocal visitors on day trips
  - nonlocal visitors staying overnight on BLM-administered lands
  - nonlocal visitors staying overnight off BLM-administered lands

Local visitors are defined as those living within 50 miles of the recreation site.

- Spending profiles for recreational users in the Planning Area are similar to those determined for other federal lands in Colorado. In the Draft RMP/EIS, data from the Grand Junction Field Office was determined to be the best available data. Due to proximity to the Planning Area, and the availability of recent surveys, the best available data at the time of preparation of the Proposed RMP/Final EIS were determined to be that from the Grand Mesa-Uncompahgre National Forest Visitor Use Monitoring Survey (White 2017). Total spending varies by visitor type but is averaged to $278.75 per visit in $2017.
- BLM data are collected in visits, and available spending data are collected by party. Party size varies by visit type (i.e., day or overnight). Recreation data are modified from visits to number of parties based on a party size of 2.3 to 2.5, specific to visit type. Party size is based on Grand Mesa-Uncompahgre National Forest Visitor Use Monitoring Survey data (White 2017).
- Spending by recreation activity (e.g., off-highway vehicle use and hiking) would vary. In the Draft RMP/EIS, data from the Grand Junction Field Office, developed by Mesa State University, was determined to be the best available data. Spending profiles for motorized and nonmotorized use were utilized to provide quantitative analysis of motorized and nonmotorized recreation. Current spending profiles for BLM recreational activity types by motorized and nonmotorized use categories were not are not available in the updated recreation data utilized in White 2017. In addition, White (2017) states that variations in type of visitation (i.e., day or overnight) are

BLM_0163576

likely to be larger than changes based on activity type. As a result, spending differences by recreational activity are discussed qualitatively in the Proposed RMP/Final EIS.

Projected resource outputs are based on the best available information and professional judgment. The purpose of the quantitative economic impact analysis is to compare the relative effects of the alternatives and should not be viewed as absolute values.

## Nature and Type of Effects

### Planning Area

The focus of this analysis is the resource activities that land management decisions would most likely impact, including energy development, livestock grazing, and recreation. Actions from resource programs or constraints (as described for each alternative) that impact energy development, livestock grazing, and recreation (e.g., surface-disturbing activities that impact the amount of land available for grazing) are included by implication. Also included are actions that impact social values and sense of place.

Changes in recreation levels and activity types could occur as a result of planning actions; for example, providing increased access for off-highway vehicle open areas could increase off-highway vehicle use and related spending, while emphasizing nonmotorized recreational activities could result in increased visitation and spending by hikers and mechanized bikers. It is anticipated that overall recreation in the local economy will continue to increase as population increases. Additionally, it should be recognized that jobs and income associated with recreation management do not capture the entire value of the experience held by recreation users within the Planning Area. For example, boating or motorized use within the Planning Area could change as management actions are implemented; therefore, the value of these recreation experiences could change as visitor use changes. Impacts resulting from increased visitation to the quality of the recreation experience would depend on the type and location of the recreation activity taking place, as well as the behavior of the individual recreationist.

Impacts could occur as a result of proposed management on specific groups of users related to recreation, including permitted outfitters and those interested in hunting and fishing. The type of social and economic impacts associated with hunting and fishing and recreational shooting are discussed in **Chapter 3.** Actions that impact the habitat quantity or quality for big game species or other species of economic value could impact the quantity of game and fish available for hunting and fishing, as well as the quality of the recreation experience.

Based on input received in community assessment workshops in the Planning Area (BLM 2009e), permitted outfitters represent economic contributions tied to BLM-administered lands by providing recreation services, such as big-game hunting and float trips, rock-climbing excursions, and mountain biking trips. Guided recreation trips with outfitters on the San Miguel River are of particular importance. Impacts on permitted outfitters would depend upon the recreational activity emphasized in the activity offered.

BLM management could impact the level of energy development of BLM-administered minerals. The BLM would continue to provide leasable, locatable, and mineral materials in the Planning Area. Management under the approved RMP will play one role in determining the extent of future energy and mineral resource activity in the Planning Area. For example, withdrawal from mineral entry would be recommended and could occur for portions of ACECs with mineral potential.

Most of the hydrocarbon production in the Planning Area is natural gas. As such, only natural gas production is discussed in the remainder of this section. Natural gas development and production can contribute to local, county, and state revenues, through spending on supplies and labor costs for well drilling, completion, operations, and maintenance. In addition, development and production would result

BLM_0163577

in contributions to federal royalty revenue, and various forms of state and local tax revenue, as described in **Chapter 3**.

The pace of development could differ from the rate assumed in the analysis. The BLM has limited control over the pace of development. An abrupt shift in development pace could result in short-term impacts on the demand for housing and community services. It also could have short-term impacts on the tax revenues from residences or businesses to support community services due to short-term changes in job opportunities and the resulting change in in-migration or out-migration trends. Any such impacts would likely be more severe for smaller communities, which are less likely to be able to absorb a sudden influx of new residents, or to continue to support existing infrastructure if out-migration were to suddenly increase. Planning Area-specific impacts from BLM-administered minerals in the Decision Area are included in the sections describing impacts by alternative, below.

The regional economic impact of gas production on Planning Area land results primarily from expenditures to drill wells and to extract gas from completed wells. Changes to local economic activity would occur based on differing levels of drilling or extraction or changes in cost of development or extraction. Fluctuations in natural gas price, level of production, and related economic contributions in Colorado have followed national trends in recent years (Leeds School of Business 2013). Variation in economic contributions is likely to continue, with local prices and production levels impacted by the cost of development relative to the market price.

Potential social issues related to gas development are a concern, particularly for nonconventional methods of extraction. Based on public comments received on the Draft RMP/EIS, local community residents are also concerned about water quality changes, exposure to hazardous material and potential impacts to human health, and changes to population and area social character as a result of development. Concerns also included the potential for development to impact the local agricultural and tourism industries, as well as property values.

Impacts on private lands adjacent to Decision Area lands could occur due to the sights and sounds of resource development. These impacts could include increased traffic, fugitive dust, noise, loss of privacy that results from increased human activity (e.g., crews and equipment), and visual or aesthetic impacts that could devalue private property. The level of impacts would vary depending on the specific nature and location of development. The impact on property values from gas drilling is uncertain. On the one hand, increased property valuations of large tracts could be expected due to potential income from gas drilling, and an influx of transient workers would likely increase the demand for and value of rental properties (Bennet 2013). In contrast, real or perceived concerns about local water quality, air quality, and/or visual setting could decrease residential property values or impact the ability to sell properties. A wide range of potential reduction of value, from 3 to 26 percent, has been found in studies examining impacts from oil and gas development and related groundwater contamination on residential property (see, for example, Throupe et al. 2013 and Muehlenbachs et al. 2012). The exact level of impacts is variable and dissipates with distance from the drilling site. Based on literature reviewed (Throupe et al. 2013; Muehlenbachs et al. 2012; Muehlenbachs et al. 2015; Bennett 2013; Boxall et al. 2005; and Integra Realty Resources 2010), the greatest level of impacts could occur within 0.5-mile of active wells, but some impacts have occurred within 1 mile or greater of active wells.

Based on proposed development, truck traffic could increase in the Planning Area. Impacts would be localized to areas with active drilling and completion and would be limited to the drilling period. Truck traffic could result in additional road repair maintenance costs for local municipalities, particularly for secondary roads (Raimi and Newell 2016). Taxes collected from oil and gas operations are intended to offset the costs of maintenance but may not fully compensate for costs. In a 2014 Pennsylvania study, the estimated road-reconstruction costs associated with a single horizontal well range from $13,000 to

BLM_0163578

$23,000, or $5,000 to $10,000 per well if state roads with the lowest traffic volumes are excluded (Abramzon et al. 2014). In Rio Blanco County, Colorado, a $17,700 per well fee was suggested to offset the costs of road infrastructure maintenance (RPI Consulting 2008). Increased taxes (severance and property) could mitigate these cost pressures for public roads. The level of unmitigated impacts would depend on the location and timing of development and would be further examined in site-specific analysis prior to development.

Stipulations on oil and gas development, including, but not limited to, surface disturbance limitations, development siting, and development timing would generally increase development costs; however, such stipulations would provide increased protection of the visual landscape, water quality, air quality, and the related quality of life factors for area residents and visitors.

Since the publication of the Draft RMP/EIS, the coal extraction in western Colorado has dramatically decreased. The only remaining active mine in the Planning Area is the West Elk Mine in the Somerset coal field. Coal development economic impacts would be determined by the tons of coal produced and the expenditures for mining at this mine.

Major commercially mined minerals are uranium, vanadium, and gypsum. Economic effects from mineral development, principally uranium mining, could be influenced by RMP actions to withdraw minerals and to establish permitting requirements. The completion of the proposed Piñon Ridge uranium mill near Naturita would likely increase the demand for uranium development, should development be completed. Permitting issues for the Piñon Ridge mine were resolved in in 2013; however, construction is currently on hold, and the timeline for future development is uncertain. Delays in construction are likely due to the drop in uranium spot prices, which have been reduced from a high of $88.25 per pound in 2006 to $29.62 per pound annual average in 2016 (US Energy Information Administration 2017b). The potential for uranium development and related economic impacts are, therefore, more likely to be impacted by the market prices for uranium than by proposed management actions. BLM mineral material management could impact local municipalities should changes occur to the ability to access free use permits. Crushed stone and sand and gravel removal by county and state governments is authorized under free use permits, such that the BLM receives no revenues or lease fees, so no payments are made to counties. If management actions result in closure of an area to mineral material extraction, this could result in additional costs to local governments, who may have to pay for a private mineral source or pay for increased cost of transport of materials from a different location.

Leasing of oil, gas, and geothermal fluid minerals, as well as coal solid mineral leasing, would result in federal royalty contributions to the local economies. As discussed in **Chapter 3**, standard distribution of federal royalties includes 49 percent of net funds to states of origin. Of this amount, approximately 41.7 percent is distributed to local cities, counties, and school districts, either by direct disbursement or grants. Because taxes are based on the value of produced gas, impacts would depend on level of resource extraction, as well as sales price, and would vary, as discussed by alternative, below.

Additional taxes from gas production that would be collected and distributed include severance tax and ad valorem tax. Both severance tax and ad valorum tax would depend on resource extraction level and sales price and would vary by alternative. As discussed in **Chapter 3**, severance tax is collected on a variable rate and includes deductions from gross value for production costs and property tax. Ad valorum tax varies depending on local tax rates. Because of these variables, and because the specific location of development has not been determined, property taxes and severance taxes collected are likely to vary from those included in model output for tax impacts, below.

Prescriptions and restrictions developed under each alternative for surface resource management and protection would impact the rate of exploration, development, and extraction of leasable mineral

BLM_0163579

resources. These prescriptions and restrictions would also increase the cost to both the producer and end product user for exploring for, developing, and extracting those mineral resources.

Right-of-way regulations, including ROW avoidance and exclusion, can impact the siting of utility corridors. Should siting of electricity or internet utilities be impacted, this could affect the cost and availability of affordable electricity, and high-speed broadband internet for local communities.

State-wide, livestock grazing represents an important economic sector. Total economic contributions (direct, indirect, and induced) from livestock grazing on BLM-administered lands in Colorado were estimated at $147.2 million in 2017 (BLM 2017f). Exports of beef from Colorado represented approximately $588 million in 2016, and fresh and frozen beef combined was the number one item exported from the state in terms of value (US Census Bureau 2016c). Even though not all beef exported from Colorado started out within the state, almost all local Colorado-grown beef is fed and exported from Colorado feed yards. In turn, this has allowed Colorado ranchers to transport their beef a shorter distance, allowing more money to stay within local communities. In 2018, Colorado was the second-largest sheep and lamb producer in the US, bringing approximately 220,000 sheep and lambs to market (US Department of Agriculture 2018).

BLM-administered land livestock grazing represents an important component of the grazing for local ranchers. Economic contributions of livestock grazing in the socioeconomic study area can be calculated by examining the production value of livestock and determining the value per AUM based on the level of forage needed to bring livestock to sale. The level of BLM forage offered to area operators by alternative can then be used to determine potential changes in projected employment and income based on this value. The quantitative economic impact analysis included in this assessment is based on BLM-administered forge only. Details of methodology used in this assessment are included in **Appendix S**, Socioeconomics Technical Methodology. In addition to economic contributions from production of livestock, counties receive a portion of BLM grazing permit fees collected. These payments to counties under the Taylor Grazing Act would continue under all of the alternatives and would vary by alternative, as described below. Fifty percent of revenues from Section 15 grazing fees on public domain lands are distributed to the state and counties; 12.5 percent of grazing fees from Section 3 leases are distributed to the state and counties (Congressional Research Service 2012).

Permitted AUM levels might not be an accurate portrayal of actual impacts. Factors such as drought, financial limitations on operators, market conditions, and the implementation of grazing practices designed to improve range conditions could result in changes to levels of actual use and are important to consider. Also, impacts may not be evenly distributed across all portions of the Planning Area. Should permitted AUMs be reduced in allotments that were not billing at full capacity, then economic impacts for that particular allotment and permittee could be minimal.

It is also important to recognize that changes in availability of forage on BLM-administered lands may not represent the full level of impacts on local livestock ranchers. On average, BLM-administered lands represent approximately 83 percent of the total lands in allotments in the Planning Area. Permittees and lessees often depend on forage from BLM-administered lands during a specific season. For example, many operators graze BLM-administered land in the spring through fall and winter their livestock on base property. If a ranch is seasonally dependent on federal forage, a reduction in federal AUMs can create forage imbalances and produce a greater reduction in grazing capacity than just the loss of federal AUMs (Torell et al. 2002).

With mounting economic pressures on the livestock sector, some ranch owners have raised money for retirement or other purposes by subdividing portions of their land into "ranchettes" and selling them to individuals. The sale of these ranchettes provides financial liquidity to ranchers who frequently have

BLM_0163580

most of their assets in land, but it generally results in increased building of fences, houses, and sometimes other structures (e.g., barns), changing the visual landscape. Under all alternatives, this trend would be likely to continue because it is fundamentally related to the nature of the ranching business (principally, the facts that most ranchers' assets are in land, and that profit margins are generally low and can turn negative in drought or other adverse conditions). Also, state laws govern property subdivision, under which county zoning laws cannot regulate subdivisions of 35 acres and larger. However, alternatives that could lead to increased costs for area ranchers could serve to increase this trend.

The organic farming and agritourism industry could be impacted by real or perceived effects from development. Potential impacts include changes to water quality or quantity, soil quality, or other factors that result in a decrease in quantity or quality of the product produced, impacts due to a perceived degradation of the area's quality of product that resulted in decreased sales and/or visitation (Ong 2014; Hitaj et al. 2014). Rumbach (2010) analyzed the potential impact of shale gas drilling on the New York tourism industry. He questioned whether drilling would permanently damage the brand of a region as a pristine and picturesque destination, as well as the brand image for agricultural products from a shale drilling area. While quantitative analysis is lacking, there is some indication that increased truck traffic and visual impacts of drilling rigs may impact visitor experience. Local organic farmers and wineries express similar concerns, as noted in local media (for example, Jaffee 2012). Public comments on the Draft RMP/EIS were also received noting the importance of the organic farming industry in the North Fork Valley in particular, and stating concern for the potential impacts from nonconventional natural gas development on the organic farming and agritourism industry.

All revenues described above are collected and disbursed at the federal, state, and local government levels. Taxes represent revenue that is diverted from private to public spending. When the taxes collected are spent locally, they can have the same multiplier effects as other spending does. Local taxes are the most likely to remain and be spent in the region. State taxes are likely to initially leave the area but might return in some proportion in the form of state spending in the region. Federal taxes also are likely to initially leave the area but might generate regional multiplier effects if they return as federal spending in the area. Similarly, as discussed in **Chapter 3,** for all area counties, payment in lieu of taxes (PILT) would be distributed to area counties in accordance with a formula that includes population, the amount of federal land within the county, and offsets for certain federal payments to counties, such as timber, mineral leasing, and grazing receipts. Impacts would vary by alternative, depending on mineral leasing and grazing receipts, and would follow trends discussed for these resources.

In addition to market values described above, nonmarket values are important to the wellbeing of visitors, residents, and others outside the Planning Area. These values include natural amenities, quality-of-life factors (such as view and open space), recreation opportunities, and ecosystem services. Nonmarket values relate to things that people value but are not generally bought or sold in a marketplace. Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions. However, the fact that no monetary value is assigned to these values does not lessen their importance in the decision-making process.

Some of the value associated with open space and other features can be captured in markets. For example, the price of a house that overlooks a pristine mountain range might be higher than the price of a house identical in almost every respect but overlooking a cement factory. However, the ability to see an open landscape while driving along a highway is not likely to be captured in the market.

A related concept is that some changes in management could affect both market and nonmarket values. For example, industrial development that substantially alters the visual characteristics of the landscape might, over time, result in fewer tourists visiting the area from afar and spending money in local hotels, restaurants, and shops. This decline in tourism would result in adverse impacts on employment and

BLM_0163581

income. Such industrial development also could reduce the satisfaction of residents who value open space and, therefore, would result in adverse impacts on nonmarket values. Conversely, new industrial development also would generate jobs and income.

As discussed in Chapter 3, models have been created to assess the economic contributions of ecosystem services so that these economic values can be incorporated into the planning process. The BLM-administered biophysical resources within the UFO are important and contribute to human well-being directly and indirectly. The UFO sustains ecosystems on which plant and animal habitat depends. For example, soil formation, nutrient cycling, production of oxygen, water quantity/quality, and evapotranspiration are factors that influence and shape characteristics of the ecosystems. Processes support the diversity and abundance of plants and animals provided by these habitats and ecosystems. Processes such as reforestation, natural succession, genetic variability, migration, and species interaction are shaped by ecosystem characteristics and through UFO management actions. Accordingly, ecosystem services have been discussed throughout the other resource, resource use, and special designation sections, even if they did not use the language of 'ecosystem services.'

As a result, the discussion for socioeconomic units below emphasizes the various nonmarket values or benefits derived from the "components of nature, directly enjoyed, consumed, or used to yield human well-being" (Boyd and Banzhaf 2007) associated with the resources in the UFO. The BLM recognizes that changes in nonmarket values would be likely as a result of management actions, and the severity of impacts would depend on the level of resource protection and development under each alternative. In general, alternatives that emphasize resource development over conservation likely would result in more impacts on nonmarket values and how Planning Area individuals perceive their own quality of life.

*Socioeconomic Units*

Recreation plays a vital role in all five socioeconomic units (see **Chapter 3** for a complete description and map of these units). Many people in the study area not only value their own proximity to recreation areas but see their towns as gateways to these areas, enabling them to attract tourists. This is particularly pronounced in socioeconomic unit 4, where the resort town of Telluride and major access points to the San Miguel River are located.

Impacts on the economy from leasable, locatable, and salable minerals are the most pronounced in socioeconomic units 1, 2, and 5, where major coal fields and minor oil and gas extraction have historically been located. Unit 5 is the most historically dependent on mineral extraction from BLM-administered lands, with major coal and uranium mines previously located near Nucla and Naturita. These towns are also economically dependent on these industries, as witnessed by their sensitivity to the "boom and bust" nature of mineral extraction.

Livestock grazing is an important economic and cultural resource to socioeconomic units 2, 3, 4, and 5. Many communities within these units have a long agricultural history, which not only contributes to the local economies, but also contributes to the area's history and sense of place. Units 3 and 5 contain the most grazing allotment acres and are more likely to be affected by future land use decisions than units 2 and 4. As discussed under Planning Area **Nature and Type of Effects**, agricultural operations are of particular importance to residents of the North Fork Valley communities within socioeconomic unit 1, with a growing importance of organic farming and agritourism.

Residents in all five socioeconomic units cited the scenic beauty of the landscapes and sense of community as strong factors in their decision to live and work in the area. While the BLM has not attempted to provide a monetary value on these factors, they do play an important role for both retaining residents and attracting new visitors. These factors could be impacted in all socioeconomic units by future land use decisions and development in the area.

BLM_0163582

*Effects Common to All Alternatives*

Implementing management actions under all alternatives for the following resources would have negligible or no impact on socioeconomics and are therefore not discussed in detail: wild horses, paleontological resources, Native American Tribal Uses, and public health and safety.

Across all alternatives, BLM management actions are not likely to change the Planning Area economic diversity (the number of economic sectors) or to change economic dependency, which occurs when the local economy is dominated by a limited number of industries. Shifts in emphasis could occur but would not likely result as a consequence of planning actions analyzed in this EIS. However, changes could be more important for smaller Planning Area communities. In addition, impacts could occur on social components of communities and other unquantifiable factors, such as sense of place.

For all alternatives, population in the area is expected to increase over the life of the RMP. As detailed in **Chapter 3**, population projections for 2040 call for a population increase ranging from lows of 8 percent and 22 percent in Ouray and Gunnison counties, to highs of 46 percent in Delta and San Miguel counties and 43 percent in Montrose County, with potential impacts on housing, employment, and social values as new people enter communities. While BLM management actions could result in some level of changes to population, as described below, the overall trends would not be impacted.

*Fluid and Solid Leasable Minerals*

Across all alternatives, certain factors impacting energy and mineral development would remain consistent. For coal development, 580 acres of areas with congressional mandates would remain closed to coal leasing and WSAs have been identified as unacceptable for further coal exploration and leasing consideration. This could have impacts on the level of extraction and associated economic impacts. In addition, according to the Coal Resource and Development Potential report (BLM 2010h), future levels of extraction in the area will be limited by coal sources that are economically feasible to extract and by limited transportation routes for extracted coal. Specifically, Tongue Mesa, Grand Mesa, and Uncompahgre Plateau coal have been determined to have low potential for development and will not likely be impacted by RMP decisions. The socioeconomic discussion focuses on the Somerset coal field, where underground mining occurs. BLM UFO minerals specialists predict that anticipated coal production from BLM-administered federal minerals in the Somerset coal field would not change across alternatives. This is because production is expected to come from one existing mine, and those acres of federal coal are currently leased. As noted in **Nature and Type of Effects**, estimated coal production levels and related economic impacts have been reduced from that projected in the Draft RMP/EIS due to local mine closures. It is estimated that an average of approximately 5.5 million tons of coal each year would be produced from federal minerals for the next 10 years. After approximately 10 years production at this rate, the Somerset coal field coal resources would be depleted. Coal contributions to employment and income from extraction would annually support approximately 35 direct and 112 total jobs, $6.35 million total labor income, and $38.7 million total economic output. Over the RMP lifespan, these figures increase to $63.5 million in labor income and $387.5 million in total economic output (**Table 4-74** [Regional Economic Impacts for Coal (All Alternatives)[1]). Under all alternatives, fluctuation in future coal markets could result in changes to the value of the resource, timing of production, and the related economic impacts. After depletion of the coal resource in the Planning Area, contributions would likely be reduced to a minimal level to support reclamation activities, as seen in other local area mines after production has ceased.

As discussed previously, current contributions from oil and gas development in the Planning Area represent a small fraction of jobs and income (see **Chapter 3**). While BLM management decisions could result in changes in acres available for exploration, development, and leasing, the relative economic impact of oil and gas leasing on BLM-administered mineral estate is expected to remain low across alternatives.

BLM_0163583

**Table 4-74**
**Regional Economic Impacts for Coal (All Alternatives)[1]**

| | Annually[2] | 10-year total[2] |
|---|---|---|
| Total Jobs (annual average) | 112 | 112 |
| Total Labor Income | $6,350,326 | $63,503,262 |
| Direct Economic Output | $27,232,671 | $272,326,713 |
| Total Economic Output | $38,748,502 | $387,485,018 |

Source: IMPLAN calculations from BLM data
[1] Somerset coal field only
[2] Based on approximately 55 million tons of coal resource, extracted at a rate of 5.5 million tons per year for 10 years

Likewise, under all alternatives, the change in population that would result from changes in energy and mineral sector employment is not anticipated to result in a significant overall population change. Current housing vacancies (15.7 percent for the Planning Area overall), and those currently employed in the industry from within and outside of the Planning Area, would likely result in minimal impacts to housing demand resulting from population changes due to energy development. However, concentrated development could impact community economy or social structure at the local level.

These impacts are based on current conditions and available technology in the energy market. Actual activity in oil, gas, or coal markets cannot be projected, so these estimates may not be an accurate portrayal of actual impacts. In addition, changes in population, housing markets, or other community factors could alter impacts on housing availability and affordability at the local level.

Economic impacts from solid nonenergy leasable mineral development, phosphate and sodium, would be limited under all alternatives, due to lack of foreseeable development, and are not quantified with the IMPLAN analysis.

Among renewable energy sources, solar has moderate to high potential in the Planning Area, while wind, geothermal, and biomass energy have low potential, due to the lack of commercial interest and existing infrastructure. The primary drivers of the pace of development will be market forces and policy variables outside the scope of this RMP. BLM decisions regarding management of BLM-administered land would result in some impacts on economic opportunities related to development, but the influence of BLM RMP decisions would be small in relation to the influence of market conditions and policies. As a result, no further discussion of renewable energy is included in the impacts by alternative discussion here. Renewable energy development is discussed in the Renewable Energy Potential Report (BLM 2010g) and **Section 4.4.6**, Lands and Realty – Renewable Energy.

*Forestry and Woodland Products*

Although management across alternatives varies in terms of acres of forest and woodland available for harvest for commercial or personal use, impacts on local economies are likely to be minimal. Commercial harvest, while permitted under the current RMP, is limited by lack of suitable timber and access. Levels of harvest of woodland product for personal use are not anticipated to be limited by management for any alternatives.

*Livestock Grazing*

Dependency on BLM forage would not change under any of the alternatives. The permitted use would provide varying degrees of total forage. As described in **Chapter 3**, the percentage of jobs in the overall area associated with farming and ranching are not likely to change as a result of BLM management action; it would continue to account for between 2 and 9 percent of area totals for area counties. Under all alternatives, forage on BLM-administered land would continue to provide a low-cost

BLM_0163584

and important complement to some livestock producers' forage supply. For smaller communities, dependency on grazing on BLM-administered lands could be more important, and jobs could be impacted.

If monitoring data indicate livestock grazing is negatively impacting other resources, appropriate adjustments would be made to AUMs, seasons of use, or use levels. Adjusting AUMs could impact the permittee negatively or positively, depending on the situation. Adjusting grazing management could impact livestock permittees by limiting flexibility for season of use and reducing the amount of available forage in the short term. Livestock removal during times of drought and critical growth could limit where permittees can put their livestock. These changes could have a more pronounced effect in communities where livestock production is a primary income source for operators and where livestock operations are more dependent upon BLM-administered land for forage. Payments to counties under the Taylor Grazing Act would continue under all alternatives.

*Recreation and Visitor Services and Comprehensive Travel and Transportation Management*

Under all of the alternatives, recreation visits are expected to increase. Employment and income related to recreation, on BLM-administered lands, would, at a minimum, continue to support opportunities important to the area economy and well-being. Localized changes in access could occur, but recreation opportunities would be maintained and enhanced, thereby accommodating existing recreation uses and expected increases in recreation uses. Across all of the alternatives, it is important to recognize that the difference in special management area designations (such as SRMAs and areas open, closed, or limited to motorized uses) represents a change in management focus and may not change the public's ability to access or use BLM-administered lands. The current planning effort will not include route designation in areas limited to designated routes, so the exact impacts on motorized and mechanized use levels are difficult to predict and are discussed at a qualitative level. Recreation opportunities would be maintained and enhanced with these designations, thereby accommodating existing recreation uses and expected increases in recreation. If visitors were to use other local lands in lieu of the Planning Area (i.e., other state or federal lands within the six-county socioeconomic study area) due to constraints applied, economic impacts could be limited. However, if visitors decided to recreate outside the socioeconomic study area, economic impacts on local communities and counties could occur. Due to the uncertainty related to the impacts of proposed management on the type of recreational future use, and the degree to which recreational visitors may seek out recreational opportunities outside of the region, quantitative analysis for recreation focuses on baseline condition at three time points over the planning period (current, 10 years, and 20 years). In general, recreation use can be assumed to continue to increase between 1.1 and 1.7 percent per year, using the method discussed under **Assumptions**. Given this increase, regional economic impacts were examined for three levels of visitors: 1) current conditions; 2) estimated use in 10 years; and 3) estimated visitor levels in 20 years. Economic output is elevated from that estimated in the Draft RMP/EIS due to three main adjustments to the analysis: 1) updated visitation estimates; 2) inclusion of local visitor spending; and 3) per party spending updates.

As noted in **Assumptions**, based on Recreation Management Information System data over the past 5 years, the UFO had an estimated 571,655 total visits per year. The Draft RMP/EIS reported baseline estimate of 297,700 visitor days. Due to reporting of visits as compared to visitor days, the numbers are not directly comparable.

Economic analysis of recreation in the Draft RMP/EIS focused on economic impacts from recreation, in terms of new income coming into the study area from nonlocal residents. In the case of recreation, unlike oil and gas development or livestock grazing, residents make considerable recreation-related expenditures (e.g., gas and food) during local trips. As a result, it was determined that it is appropriate to include those expenditures in an analysis of the economic role of recreation in the Planning Area.

BLM_0163585

Analysis in this Proposed RMP/Final EIS has, therefore, been revised to include total economic contributions, including residents' and nonlocal residents' spending on local recreation. As a result, economic impacts are significantly elevated above that reported in the Draft RMP/EIS.

In addition, economic impacts as reported in this Proposed RMP/Final EIS are affected by the per party spending estimates utilized. In the Draft RMP/EIS, spending for motorized and nonmotorized uses was estimated based on data from the BLM Grand Junction Field Office Planning Area. As noted in *Assumptions*, for this Proposed RMP/Final EIS, it was determined that the best available data for recreational spending were data collected from the Forest Service's Visitor Use Monitoring Survey (White 2017). Because these levels of spending are higher than those included in the Draft RMP/EIS, the related economic output is increased.

Expenditures of local and nonlocal visitors are estimated to support approximately 410 total jobs, $4.3 million annually in direct economic output, and $31.7 million total economic output in the regional economy for 2018. This is predicted to increase to 478 total jobs, $5.3 million annually in direct output, and $42.3 million total economic output in 2038 (**Table 4-75** [Economic Contributions from Recreation Activities: 2018, 2028, and 2038 (Thousands of 2017 Dollars)).

**Table 4-75**
**Economic Contributions from Recreation Activities: 2018, 2028, and 2038 (Thousands of 2017 Dollars)**

|  | Visitor Type | Total Jobs (average annual) | Total Labor Income | Direct Economic Output | Total Economic Output |
|---|---|---|---|---|---|
| 2018 (Year 1) | Local | 61 | $1,570 | $2,607 | $4,279 |
|  | Nonlocal | 347 | $9,150 | $17,043 | $27,378 |
|  | Total | 410 | $10,813 | $19,810 | $31,916 |
| 2028 (Year 10) | Local | 71 | $1,763 | $2,971 | $4,862 |
|  | Nonlocal | 389 | $9,836 | $18,421 | $29,561 |
|  | Total | 478 | $12,626 | $23,129 | $37,263 |
| 2038 (Year 20) | Local | 80 | $1,882 | $3,256 | $5,301 |
|  | Nonlocal | 447 | $10,729 | $20,204 | $32,400 |
|  | Total | 542 | $14,327 | $26,243 | $42,280 |
| Total (Years 1-20) | Local | 78 | $40,890 | $67,618 | $111,023 |
|  | Nonlocal | 440 | $234,289 | $436,404 | $701,008 |
|  | Total | 477 | $276,939 | $500,599 | $808,554 |

Source: IMPLAN calculations from BLM recreation data; White 2017 visitor spending data
Note: Assumes annual rate of increase of recreation visitors of based on rate of increase of Colorado population. Baseline visitation is based on BLM Recreation Management Information System data from 2012 to 2016. Party size and spending per visitor type are based on White 2017.

It is difficult to quantify all sectors of the economy influenced by recreation and tourism. It is likely that additional jobs in the retail and tourism sector would be influence by changes that affect Planning Area visitor numbers. For example, BLM management could influence the level, location, and type of visitor use. Lack of adequate facilities and opportunities for specific recreation opportunities can result in visitors choosing to recreate elsewhere in the area. Impacts of proposed management on the level and type of recreational use are discussed qualitatively by alternative.

Under all alternatives, impacts specific to hunting and fishing would be as described under *Nature and Type of Effects*. Recreation would continue to represent an important factor in quality of life for residents, with the potential to attract visitors, retirees, and others as nonlabor sources of income.

BLM_0163586