

## 26 ~ NORTH FORK MESA CREEK

### ~ N O T  S U I T A B L E ~

*Classification:* **Scenic**

*ORV:* **Vegetation** (not supported following review)

*Eligible Length:* **8.5 miles**

*BLM-Administered:* **5.8 miles**

*Key Considerations:*

- There is little water development in the headwaters of the North Fork Mesa Creek, which produces a flow regime mimicking natural conditions.

- The majority of the source water area upstream of the segment is managed by the BLM or USFS and existing authorities provide for ample management actions to protect stream flow needed to sustain the Vegetation ORV.

- Several ROWs occur within the corridor.

- There is a significant amount of private land in the lower reach of the segment.

**LOWER DOLORES HYDROLOGIC UNIT**

## SUMMARY OF RATIONALE FOR BLM DETERMINATION

Tabeguache Creek, Segment 2 was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A review by the CNHP lowered the rarity ranking of the Narrowleaf cottonwood/strapleaf willow/silver buffaloberry plant community to G3. The segment no longer possesses a Vegetation ORV and is no longer eligible for WSR designation. If a segment is not eligible for designation, it cannot be determined to be suitable for designation.

## SEGMENT ASSESSMENT

### WATER RIGHTS AND USES

The North Fork of Mesa Creek contributes flow to Mesa Creek and the Lower Dolores River, which provide habitat for native warm water fish.

WSR designation would be consistent with actions in the Range-wide Conservation Agreement and Strategy for the Roundtail Chub *(Gila robusta)*, Bluehead Sucker *(Catostomus discobolus)*, and Flannelmouth Sucker *(Catostomus latipinnis)*.

The CWCB holds instream flow water rights along the entire segment. The instream flow water rights provides partial protection of the Vegetation ORV. From the lower terminus to 3.90 miles upstream to the Cedar Tree Ditch Diversion, the instream flow water right is 2.1 cfs for the period from April 1 to May 31. This water right holds a 2006 priority. From Cedar Tree Ditch to the upper terminus, the CWCB holds an instream flow water right with a 2002 priority date. The water right is decreed for 2.75 cfs (April 1 to May 31), 0.5 cfs between (June 1 to February 29), and 1.9 cfs (March 1 to March 31).

There are three water diversions in the lower reach, but only the Patterson Ditch has a decreed water right for 14.12 cfs. The Patterson ditch diversion is located on public land. This water right is senior to the existing instream flow water right and any federal water right

BLM_0164705

associated with WSR designation. An instream flow right associated with WSR designation could restrict the ability to change points of diversion for existing water rights within the segment.

A number of stock watering facilities in headwater tributaries constitute the only water use above the upper terminus.

There are no conditional water rights within or upstream of the segment.

Any additional water right filings or changes to existing diversions would be junior to the instream flow water right.

## LAND OWNERSHIP AND USES

Approximately 17.2% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

### ROWs and Withdrawals

ROWs include telephone and power lines. A county road runs along the creek, dominating the setting for much of the segment. Unsurfaced roads cross the stream in a couple of locations. In the Uncompahgre Proposed RMP, any future ROW would be subject to stipulation SSR-13, which is 325 foot ROW avoidance area on both sides of the creek.

There is a bat maternity roost withdrawal along the creek.

While portions of the segment are within an area classified as having Waterpower and Reservoir Resources, the Powersite Classification does not preclude WSR designation.

### Energy and Mineral Leasing

There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, any future leases would be subject to stipulation NSO-11, which would prohibit surface occupancy within 325 feet on either side of the creek. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation, while private land at the lower portion of the corridor could create challenges for managing the area.

### Potential Costs Associated with WSR Designation

Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary

BLM_0164706

depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

### Alternative Protective Measures Considered

Because the BLM and USFS manage the headwaters of the North Fork of Mesa Creek, it is unlikely that any new diversions would be proposed or approved that would substantially decrease flows in the creek.

The creek does not qualify for ACEC designation, but substantial protection would be provided by proposed BLM land use prescriptions and stipulations.

BLM_0164707



**FIGURE 27 - (28) ICE LAKE CREEK, SEGMENT 2**

BLM_0164708

*Final Wild and Scenic River Suitability*

## SUMMARY OF RATIONALE FOR BLM DETERMINATION

Ice Lake Creek, Segment 2 was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to the segment difficult.

- The Scenic ORV would be adequately protected through the BLM's proposed Visual Resource Management Classifications and through stipulations on surface occupancy.

## SEGMENT ASSESSMENT

### WATER RIGHTS AND USES

Water yield through the segment contributes to the proper hydrologic function of La Sal Creek downstream.

One absolute water right near the lower terminus would be senior to any water right associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment. Flow through the segment could be further reduced if diversion amounts are enlarged or diversion points are changed.

There is no instream flow water right protection on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek, to which Ice Lake Creek is a tributary. The instream flow water right on La Sal Creek provides indirect protection of Ice Lake Creek,

### 28 ~ ICE LAKE CREEK, SEGMENT 2



~**N O T  S U I T A B L E**~

*Classification:* **Scenic**

*ORV:* **Scenic**

*Eligible Length:* **0.58 miles**

*BLM-Administered:* **0.31 miles**

*Key Considerations:*

- Landowners in the lower reach of the segment oppose WSR designation.

- The segment length is short and there are access issues involving private land within the segment.

- The BLM manages the source water areas that produce baseflow for the creek, providing protection for flow-dependent values.



**UPPER DOLORES HYDROLOGIC UNIT**

BLM_0164709

because during low flow conditions the La Sal Creek instream flow water right could call for water from tributaries to La Sal Creek.

A federal water right associated with WSR designation could restrict changing the points of diversion for existing water rights within the segment.

### LAND OWNERSHIP AND USES

Approximately 42% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act. The private property is a contiguous parcel located just upstream of the lower terminus.

#### ROWs
A BLM road traverses the canyon just east of the creek. In the Uncompahgre Proposed RMP, SSR-13 would apply to Naturita Creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek.

#### Energy and Mineral Resources
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to stipulation NSO-11, which would prohibit surface occupancy with 325 feet of perennial stream segments. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

There are no active mining claims in or adjacent to the creek corridor.

#### Visual Resource Management

In the Uncompahgre Proposed RMP, the creek would be managed under VRM Class IV.

### ADMINISTRATION

Ice lake Creek contributes flow to La Sal Creek, providing spring spawning habitat for native warm water fish consistent with the Range-wide Conservation Agreement and Strategy for Roundtail Chub (Gila robusta), Bluehead Sucker (Catostomus discobolus), and Flannelmouth Sucker (Catostomus latipinnis).

A large amount of private land hinders access to public land within the segment and a number of private landowners have expressed opposition to WSR designation.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

#### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for

BLM_0164710

**Final Wild and Scenic River Suitability**

signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Administering and managing this segment for the Scenic ORV would increase costs moderately above current levels. The public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV. The lower reach of this segment is private land within which the Ice Lake Creek Corridor is bisected by Colorado State Highway 90.

Private land currently limits access to the public land portion of the corridor from the highway. Acquiring portions of private land from willing sellers would enhance management of ORVs and provide public access, if this segment is designated. If designated, additional facilities would not likely be needed.

*Alternative Protective Measures Considered*

The BLM determined that the creek corridor would not qualify for any special designations. For example, the very low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. In addition, the BLM determined that the creek is not a good candidate for an instream flow water right, because the creek lacks a fish population, and the riparian community is not of unusually high quality. Based on these factors, the BLM concluded that proposed BLM land use prescriptions would provide the best protection of the ORVs.

BLM_0164711



**FIGURE 28 - (29) LA SAL CREEK, SEGMENT 1**

BLM_0164712

*Final Wild and Scenic River Suitability*

## 29 ~ LA SAL CREEK, SEGMENT 1



### ~NOT SUITABLE~

*Classification:* **Recreational**

*ORV:* **Fish, Vegetation**

*Eligible Length:* **4.82 miles**

*BLM-Administered:* **0.62 miles**

*Key Considerations:*

- There is a significant amount of private land within the segment, along with significant opposition to WSR designation from private landowners.

- Land use zoning for private land within the segment is relatively non-restrictive.

- This segment has no instream flow protection.



**UPPER DOLORES HYDROLOGIC UNIT**

### SUMMARY OF RATIONALE FOR BLM DETERMINATION

La Sal Creek, Segment 1 was found to be ***not suitable*** for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to some portions of the segment difficult.

- Given the large percentage of private land ownership, the optimal approach for managing the ORVs is to rely on BLM land use prescriptions and the downstream instream flow water right that acts to pull water through this segment.

### SEGMENT ASSESSMENT

#### WATER RIGHTS AND USES

The upstream terminus of this segment is along the Colorado-Utah state line. The headwaters of La Sal Creek are in Utah.

Water yield through the segment contributes substantially to the proper hydrologic function of the lower reaches of La Sal Creek. There is no instream flow water right protection on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek downstream, starting at the confluence of La Sal Creek and Sharp Canyon. The instream flow water right on downstream portions of La Sal Creek provides indirect

BLM_0164713

protection of this segment, because during low flow conditions, the La Sal Creek instream flow water right could call for water from upstream locations.

Four absolute water right diversions totaling 8.9 cfs within private portions of the segment are senior to any instream flow water right. A water right associated with WSR designation could restrict changing the points of diversion on existing water rights within the segment.

No conditional water rights or impoundments occur within the segment.

## LAND OWNERSHIP AND USES

Approximately 47% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the allowable and special uses are not related to agriculture and have the potential to conflict with the intent of the WSR Act.

### ROWs and Withdrawals
ROWs within the segment include a CDOT highway and county roads. Telephone and power lines cross and run adjacent to La Sal Creek.

In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek to protect values associated with perennial streams.

### Energy and Mineral Leasing
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to stipulation NSO-11, which would prohibit surface disturbance with 325 feet on each side of the creek. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

WSR designation would complement BLM Colorado Public Land Health standards for riparian vegetation and special status species.

A large amount and configuration of private land with non-restrictive zoning occurs within the segment. Large portions of private land have been converted to agricultural crops, making it difficult to manage for native riparian vegetation.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for

BLM_0164714

**Final Wild and Scenic River Suitability**

signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Fish and Vegetation ORVs would be substantially higher than current funding levels. Some management actions to sustain the target fish species would continue with or without designation, per the Range-Wide Conservation Agreement and strategy for Flannelmouth Sucker (*Catostomus latipinnis*), Bluehead Sucker (*Catostomus discobolus*), and Roundtail Chub (*Gila robusta*).

Private land acquisition would not be pursued, as more than 87% of the stream segment is privately owned, making it difficult for the BLM to acquire enough land to benefit management of the ORV. Some stream channel modification projects may be needed to facilitate fish propagation.

*Alternative Protective Measures Considered*

The BLM determined that the creek corridor would not qualify for any special designations. For example, the low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. In addition, the BLM determined that the creek is not a good candidate for instream flow protection, because most of the segment is in private ownership and those owners have expressed concern that an instream flow water right could restrict future irrigation activities on private lands. With these factors in mind, the BLM concluded that proposed BLM land use prescriptions, combined with relying upon the downstream instream flow water right to pull water through this segment, would provide the best protection of the ORVs.

BLM_0164715



**FIGURE 29 - (32) LION CREEK, SEGMENT 2**

*Final Wild and Scenic River Suitability*

## 32 ~ LION CREEK, SEGMENT 2



### ~NOT SUITABLE~

*Classification:* **Scenic**

*ORV:* **Vegetation**

*Eligible Length:* **1.57 miles**

*BLM-Administered:* **1.26 miles**

*Key Considerations:*

- There are many private land parcels and landowner opposition to WSR designation in the lower reaches of the segment.

- BLM manages the source water areas that produce baseflow for the creek. The BLM is unlikely to approve permits for projects that would reduce flows.

- Proposed BLM land use prescriptions would provide adequate protection of the Vegetation ORV.



### UPPER DOLORES HYDROLOGIC UNIT

## SUMMARY OF RATIONALE FOR BLM DETERMINATION

Lion Creek, Segment 2 was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to the entire segment difficult.

- The Vegetation ORV would be adequately protected through proposed stipulations on surface occupancy.

## SEGMENT ASSESSMENT

### WATER RIGHTS AND USES

Water yield through the segment contributes to the proper hydrologic function of La Sal Creek downstream.

The Manning Ditch is an absolute water right (of 0.6 cfs) near the lower terminus that would be senior to any instream flow associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment.

Changing points of diversion on existing water rights within the segment could be limited in the future by water rights associated with WSR designation.

There is no instream flow water right on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek, to which Lion Creek is a tributary. The instream flow water right on La Sal Creek provides indirect protection of Lion Creek, because during low flow conditions, the La Sal Creek instream flow water right could call for water from tributaries to La Sal Creek.

BLM_0164717

The BLM does have option of recommending an instream flow water right to the CWCB, based upon protecting riparian values.

## LAND OWNERSHIP AND USES

Approximately 17.4% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. The property is a contiguous parcel located just upstream of the lower terminus, limiting the potential for impacts on the ORV.

### ROWs

In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek.

### Energy and Mineral Resources

There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to NSO-11, which would prohibit surface occupancy within 325 feet on each side of the creek to protect values associated with perennial streams. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

## ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health Standard for riparian vegetation.

There are many private land parcels and landowner opposition to WSR designation in the lower reaches.

### Potential Costs Associated with WSR Designation

Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV would increase moderately above current funding levels. The public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV. The lower reach of this segment is private land within which the Lion Creek Corridor is bisected by Colorado State Highway 90.

The private land presently limits access to the public land portion of the corridor from the highway. Thus, acquiring portions of the private land from willing sellers would assist with managing and providing public access to this segment if designated. A small amount of additional funding would be

BLM_0164718

**Final Wild and Scenic River Suitability**

needed for signage, public education, ranger patrolling, and maintenance. Additional facilities would not be needed if designated. No detailed cost analysis or estimate was prepared as part of this study.

*Alternative Protective Measures Considered*

The BLM determined that the Lion Creek corridor would not qualify for any special designations. For example, the very low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. The creek may qualify for instream flow protection based upon riparian values, but given limited BLM resources, the BLM will likely focus on making instream flow recommendations on other creeks that have more BLM ownership along the creek. With these factors in mind, the BLM concluded that proposed BLM land use prescriptions would provide the best protection of the ORV.

BLM_0164719



**FIGURE 30 - (33) SPRING CREEK**

*Final Wild and Scenic River Suitability*

## 33 ~ SPRING CREEK



### ~NOT SUITABLE~

*Classification:* **Recreational**

*ORV:* **Vegetation**

*Eligible Length:* **2.65 miles**

*BLM-Administered:* **1.49 miles**

*Key Considerations:*

- The segment is short and non-contiguous, with private land parcels near the lower terminus and along much of the middle portion.

- The BLM manages the source water areas that produce baseflow for Spring Creek, allowing for protection of flow-dependent values through existing ROW authorities.

- There is currently no instream flow protection on the creek.



### UPPER DOLORES HYDROLOGIC UNIT

## SUMMARY OF RATIONALE FOR BLM DETERMINATION

Spring Creek was found to be *not suitable* for WSR designation. The BLM made this determination because:

- A subgroup of the Southwest RAC, which was comprised of a broad range of stakeholders, recommended that this segment be found not suitable for designation. In addition, private landowners along the segment are not supportive of designation.

- The BLM ownership pattern would make it very challenging to manage the segment as a designated river. Land uses inconsistent with protecting and enhancing the ORVs may occur on private lands, and private land ownership would make access to the entire segment difficult.

- The Vegetation ORV would be adequately protected through proposed stipulations on surface occupancy.

## SEGMENT ASSESSMENT

### WATER RIGHTS AND USES

Water yield from Spring Creek contributes to the proper hydrologic functioning of La Sal Creek, located downstream.

The BLM manages the springs that provide base flow for Spring Creek. The BLM has authority to deny ROW applications to protect this flow, or the BLM can place terms and conditions on ROW grants to protect flows.

An absolute ditch diversion water right within the segment is senior to any water right associated with WSR designation. There are no conditional water rights or impoundments within or upstream of the segment.

There is no instream flow water right on the segment. However, there is an existing CWCB instream flow water right on La Sal Creek, to which Spring Creek is a tributary. The instream flow water right on La Sal Creek provides indirect protection of Spring Creek, because

BLM_0164721

during low flow conditions, the La Sal Creek instream flow water right could call for water from tributaries to La Sal Creek.

The BLM has the option of recommending an instream flow water right to the CWCB, based upon protecting riparian values.

### LAND OWNERSHIP AND USES

Approximately 24.1% of the corridor consists of private lands zoned as General Agriculture in the Montrose County Master Plan. As presently defined in the Montrose County Zoning Resolution, the zone is relatively non-restrictive regarding allowable uses-by-right and uses requiring a special use permit. Many of the uses are not related to agriculture. Private parcels cover much of the middle portion and lower terminus of the segment.

#### ROWs
ROWs within the segment include Highway 90, a county road, a powerline, and a telephone line that parallels a portion of the creek. In the Uncompahgre Proposed RMP, SSR-13 would apply to the creek. This stipulation would implement a ROW avoidance area for 325 feet on each side of the creek.

#### Energy and Mineral Resources
There are existing oil and gas leases within the segment. Per the Uncompahgre Proposed RMP, future oil and gas leases would be subject to NSO-11, which would prohibit surface occupancy with 325 feet from the creek. In addition, CSU-12 would allow the BLM to require special operation constraints, including relocation of operations beyond 656 feet of the creek.

Active mining claims occur within the corridor and have a prior existing right to mineral deposits.

### ADMINISTRATION

WSR designation would complement the BLM Colorado Public Land Health standard for riparian vegetation.

State and local governments have not indicated an interest in sharing administration or funding of a designated WSR.

#### Potential Costs Associated with WSR Designation
Upon finding a segment suitable, the stream and corridor would be managed to protect the ORV, with little additional funding needed. Formal WSR designation would require additional funding for signage, public education, ranger patrols, and maintenance, the amount of which would vary depending upon projected increases in visitor use, as well as the segment's size, location, and other attributes.

Costs for administering and managing this segment for the Vegetation ORV would increase slightly above current funding levels. The headwater, public land portion of this segment is remote and has no developed access, both factors that would assist in the protection of the ORV.

The middle and lower portions of this segment contain private land within which the Spring Creek corridor is bisected by Colorado State Highway 90. The private land currently limits highway access

BLM_0164722

to public land portions of the segment. Thus, acquiring portions of private land from willing sellers would assist in managing and providing public access to this segment if designated. A small amount of additional funding would be necessary for signage, public education, ranger patrolling, and maintenance. Additional facilities would not be needed if designated.

### Alternative Protective Measures Considered

The BLM determined that the creek corridor would not qualify for any special designations. For example, the very low amount of recreation use would not qualify for SRMA designation, and the resources along the creek do not meet the relevance and importance criteria for ACEC designation. The creek may qualify for instream flow protection based upon riparian values, but given limited BLM resources, the BLM will likely focus on making instream flow recommendations on other creeks that have more BLM ownership along the creek. With these factors in mind, the BLM concluded that proposed BLM land use prescriptions and use of existing BLM ROW authority would provide the best protection of the ORV.

BLM_0164723

# E. DOLORES-SAN MIGUEL STAKEHOLDER ANALYSIS & RECOMMENDATIONS

## SOUTHWEST RESOURCE ADVISORY COUNCIL

The Southwest Resource Advisory Council is appointed by the Secretary of the Interior to represent a variety of interests across the Southwest District. The Southwest Resource Advisory Council meets two to four times annually to develop recommendations for the BLM regarding the preparation, amendment, and implementation of land use plans for public lands and resources and to provide representative citizen counsel and advice to the Secretary of the Interior concerning the planning and management of public land resources within the BLM Southwest District.

Between November 2010 and January 2011, a subgroup of the Southwest Resource Advisory Council conducted a series of public meetings in various towns throughout the western portion of the planning area to inform and solicit comment regarding segments within the Dolores and San Miguel river basins. The Southwest Resource Advisory Council Subgroup presented their suitability recommendations to the full Southwest Resource Advisory Council at the Statewide Resource Advisory Council Meeting on February 25. The Southwest Resource Advisory Council adopted the recommendations and forwarded them to the UFO for consideration.

BLM_0164724

TABLE 7 - SUMMARY OF SOUTHWEST RESOURCE ADVISORY COUNCIL SUITABILITY RECOMMENDATIONS

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| 14 - Beaver Creek Page 57 | Scenic | Suitable for Recreational classification | While mining is not a significant factor within the segment, the Southwest Resource Advisory Council determined that the following issues render the segment better suited to classification as *Recreational*:<br>• Recreational classification would allow for a healthy balance of competing interests: protection of the ORV, while providing reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty<br>• The Norwood Water Commission has requested future rights to develop a pump station at Goat Creek (a significant project) and development of the Naturita Canal is moving forward<br>• Overall, there was a great deal of public support for suitability. The Recreational Classification would allow for development of water rights if the Vegetation ORV continues to be protected. |

BLM_0164725

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **15 - Dry Creek** Page 59 | Wild | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found *not suitable* based upon the following discussion:<br>• The area does not receive significant visitation and the terrain protects the canyon to some extent<br>• The biggest threats to the segment are oil and gas development (but there has not been much exploration to date)<br>• Because the creek flows intermittently, the contribution of the segment to the NWSRS is questionable<br>• Five miles of private land at the upper end of the segment and three miles of private land between the segment and the San Miguel River, as well as accompanying senior private water rights, could make managing the segment difficult<br>• A rough 4WD road runs through the segment, making it unsuitable for classification as *Wild*. |
| **16 - Naturita Creek** Page 62 | Scenic | Not Suitable | • Fish species for which the Fish ORV was assigned are found primarily within private property at the lower end of the segment and landowners in that portion do not support WSR suitability.<br>• While a private landowner (Foley) with property at the upper end of the segment expressed strong support for suitability, an onsite review conducted by BLM staff could not substantiate a Vegetation ORV within the stretch. Another landowner (Lockhart) within the segment has a conservation easement on their property.<br>**NOTE:** *BLM staff conducted an on-site review of the stretch and could not recommend a Vegetation ORV.* |

BLM_0164726

**Final Wild and Scenic River Suitability**

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **17 - Saltado Creek** Page 64 | Wild | Suitable | • The Southwest Resource Advisory Council acknowledged and concurred with the strong support for a finding of *suitable* that the segment has received from private land owners. |
| **18 - San Miguel River, Segment 1** Page 66 | Recreational | Suitable | • The Southwest Resource Advisory Council found significant overall support for a finding of *Suitable* for the segment.<br>• While there are concerns regarding uranium and recreational placer mining within the segment, the Southwest Resource Advisory Council believes that the Recreational Classification would allow for the continuation of these activities. |
| **19 - San Miguel River, Segment 2** Page 70 | Wild | Suitable with modifications | • The Southwest Resource Advisory Council found significant support for a finding of *Suitable*.<br>• The natural geography of the segment led the Southwest Resource Advisory Council to recommend that the segment be shortened to end at the Bennett property in order to protect the landowner's interests at Horsefly Creek, and the corridor extend only to the canyon rims and end at the confluence with Horsefly Creek.<br>• The Southwest Resource Advisory Council considered the overall land health to be of great concern for the segment. While the impact of grazing on the Vegetation ORV is addressed to some extent through the current ACEC and Special Recreation Management Area designations, WSR designation would provide longer lasting protections. |

BLM_0164727

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| 20 - San Miguel River, Segment 3 Page 73 | Scenic | Suitable for Recreational classification | The Southwest Resource Advisory Council recommended that the segment be reclassified as Recreational due to:<br>• The CC Ditch and a dirt road that runs parallel to the river<br>• Two BLM campgrounds along the stretch<br>• A significant number of mining claims in the area<br>• The popularity of the segment for recreational gold mining.<br>The Southwest Resource Advisory Council also recommended that the Bennett property, as well as private land at the lower end of the segment, be excluded from the suitability recommendation. |
| 21 - San Miguel River, Segment 5 Page 76 | Recreational | Suitable with modifications | The Southwest Resource Advisory Council recommended that:<br>• The segment length be significantly reduced, beginning downstream from the Richards' property, running the length of The Nature Conservancy property, and terminating at the confluence with Tabeguache Creek.<br>• The boundaries of the protective corridor extend rim to rim and should be delineated by existing developments and natural barriers (such as the state highway). |
| 22 - San Miguel River, Segment 6 Page 79 | Recreational | Suitable with modifications | • The Southwest Resource Advisory Council recommended that the segment begin downstream of Umetco Minerals Corporation property and terminate at the confluence with the Dolores River. |

BLM_0164728

**Final Wild and Scenic River Suitability**

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **23 - Tabeguache Creek, Segment 1** Page 82 | Wild | Suitable | The Southwest Resource Advisory Council: <br>• Recommended that the segment begin at the USFS boundary and end one-quarter mile from private property. <br>• Noted that a *Wild* Classification would complement existing protections in the area (including designation as a specially managed "Area") and provides a good management tool for the BLM. |
| **24 - Tabeguache Creek, Segment 2** Page 84 | Recreational | Not Suitable | The Southwest Resource Advisory Council recommended a finding of *Not Suitable* due to: <br>• The ability to manage the segment being compromised by significant portions of private land. <br>• Lack of support from private landowners for finding the segment *Suitable*. |
| **25 - Lower Dolores River** Page 88 | Scenic | Suitable with modifications | The Southwest Resource Advisory Council recommended that: <br>• The segment be shortened to exclude private property (ending at the Weimer property). <br>• The corridor boundary be modified to protect mining claims and delineated on the east side by the highway and on the west side by a geographic marker such as the canyon rim or other natural feature. |
| **26 - North Fork Mesa Creek** Page 91 | Scenic | Not Suitable | Following a review by the Colorado Natural Heritage Program that lowered the rarity ranking of the Narrowleaf cottonwood/strapleaf willow/silver buffaloberry plant community to G3, the segment no longer possesses an ORV to support eligibility. |

BLM_0164729

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **27 - Dolores River, Segment 2** Page 94 | Recreational | Suitable with modifications | The Southwest Resource Advisory Council recommended: <br>• Suitability for the public land portion of the segment (5.3 miles), but not for private land portions (6.2 miles). <br>• Aligning the protective corridor to exclude the Buck Shot Mine and associated ROW. The segment boundary would follow the cliff line if less than one-quarter mile from the river center. |
| **28 - Ice Lake Creek, Segment 2** Page 98 | Scenic | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found Not Suitable based upon the following issues: <br>• Mining occurs on the mesa along the northern end of the segment <br>• The segment length is extremely short <br>• The segment terminates on private land, which could make the area more difficult to manage. |
| **29 - La Sal Creek, Segment 1** Page 100 | Recreational | Not Suitable | The Southwest Resource Advisory Council recommended finding the segment Not Suitable because: <br>• Extensive private land would make the segment difficult to manage. <br>• A significant number of private landowners do not support finding the segment Suitable. |
| **30 - La Sal Creek, Segment 2** Page 102 | Scenic | Suitable for Recreational classification with modifications | The Southwest Resource Advisory Council recommended that the segment be found Suitable with the following modifications: <br>• Change the Classification from Scenic to Recreational in order to accommodate potential future mining activities and road improvements <br>• Shorten the segment to end at and exclude the Cashin Mine. |

BLM_0164730

**Final Wild and Scenic River Suitability**

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| 31 - La Sal Creek, Segment 3 Page 104 | Wild | Suitable | The Southwest Resource Advisory Council recommended that the segment be classified as Wild due to:<br>• The pristine, wild, and remote character of the area.<br>• The critical habitat for native warm water fish provided by the segment. |
| 32 - Lion Creek, Segment 2 Page 107 | Scenic | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found Not Suitable due to:<br>• The short length<br>• A measure of self-protection afforded by the steep slopes of the corridor<br>• Restricted access from private land<br>• Lack of landowner support for finding the segment Suitable. |
| 33 - Spring Creek Page 109 | Recreational | Not Suitable | The Southwest Resource Advisory Council recommended that the segment be found Not Suitable due to:<br>• The short length<br>• An extensive amount of interspersed private land that could make the segment difficult to manage<br>• A measure of self-protection already afforded by the steep slopes of the corridor. |

BLM_0164731

| SEGMENT/ Eligibility Report Page Number | BLM ELIGIBILITY CLASSIFICATION | SOUTHWEST RESOURCE ADVISORY COUNCIL RECOMMENDATION | COMMENTS/BASIS FOR RECOMMENDATION |
|---|---|---|---|
| **34 - Dolores River, Segment 1** SJPLC Draft Land Management Plan, Page D-14 | Wild/ Recreational | Wild portion Suitable with modifications | The Southwest Resource Advisory Council believes that a recommendation of Suitable: <br> • Complements the WSA designation <br> • Is consistent with other WSR designations for portions of the Dolores River outside of the planning area. <br> In order to avoid interference with mining operations, the Southwest Resource Advisory Council recommended that the segment begin at the UFO boundary and terminate at the private land boundary (T47N/R18W/Section 31) south of Bedrock, and that the corridor extend from rim to rim or one-quarter mile from the high water mark (whichever measure is less). |

BLM_0164732

## F. GUNNISON BASIN STAKEHOLDER ANALYSIS & RECOMMENDATIONS

The Gunnison Basin stakeholder process was initiated by the Colorado River Water Conservation District. The stakeholder group contracted with a team of co-facilitators and held a series of public meetings to formulate recommendations regarding WSR suitability for eligible river segments in the Gunnison River Basin, including within the Dominguez-Escalante NCA. Nine meetings pertained to segments within the planning area outside of the NCA.

The stakeholder group was unable to reach a consensus and two sets of recommendations were forwarded to the BLM for consideration. Following are the meeting notes submitted by each group.

BLM_0164733

## STAKEHOLDER GROUP ONE RECOMMENDATIONS

February 16, 2011


Barbara Sharrow
Field Manager, Uncompahgre Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Wild & Scenic River Suitability Evaluation – Gunnison Basin Segments outside of Dominguez-Escalante National Conservation Area

Dear Ms. Sharrow:

The Gunnison Basin Wild and Scenic Rivers Stakeholder Group is a group of diverse stakeholders that has held ten meetings with 25 – 60 people in attendance at each since October 2010 to develop management plans to guide the Bureau of Land Management's suitability determinations for segments in the Gunnison Basin that BLM has found eligible to become part of the National Wild & Scenic Rivers System.

After careful deliberation, the stakeholder group has come to consensus that Deep Creek, the West Fork of Terror Creek, Gunnison River Segment 2 and Roubideau Creek Segment 2 should be found "Not Suitable" for inclusion in the National Wild & Scenic Rivers System. There was no dissent from this final recommendation by participants in the stakeholder group.

Key factors leading to this conclusion for each of these stream segments are listed below; additional information generated by the group's discussion can be found in the attached charts.

Deep Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Existing management actions by area landowners are protective of the Outstandingly Remarkable Value (ORV).
- The stream segment is frequently dry.
- Sole-source power lines and access roads currently exist that must be used for year-round operations and maintenance. Future development will likely require future upgrades and/or replacement of this infrastructure.

West Fork of Terror Creek:
- The small portion of the creek that is managed by the BLM raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- The stream segment is frequently dry. Water is diverted from upstream reservoirs to water right holders of the Leroux Creek Water Users Association. Water is only in the stream segment in the

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 1 of 5*

BLM_0164734

**Final Wild and Scenic River Suitability**

summer when Terror Ditch and Reservoir Company diverts water through it.
- The stream corridor contains extensive infrastructure related to power lines. A 230 KV transmission line crosses BLM land within the eligible corridor and requires year-round motorized access for operation, maintenance, and repair.
- Potential coal reserves exist in the area, and leases for their development have been issued.

Gunnison River Segment 2:
- The ORV for Gunnison River Segment #2 was endangered fish in the eligibility report; however, this is in error. Therefore there are no ORVs for this segment. Gunnison River Segment #2 is upstream of the Recovery Implementation Program's (for the four endangered fish species of the Upper Colorado River) designated "Critical Habitat" for all of the listed species. Analysis on planned re-operation of the Aspinall Unit is nearing completion with a primary goal of providing adequate flows for recovery of the listed species. The Draft Environmental Impact Statement for the Operation of the Aspinall Unit requires that the Unit be operated to avoid jeopardizing the continued existence of, and assist in the recovery of, the endangered fishes. To avoid jeopardizing means adequate water must continue to flow from the Aspinall Unit through Gunnison River Segment #2 and beyond. Even delisting of all four species would require continued flows deemed adequate for continued self-sustaining populations.
- The small portion of the river corridor that is managed by the BLM raised concerns about the impact on private lands from suitability finding.
- Potential for the river channel to change course exacerbated concerns about impacts to private property and reduced the viability of narrowing the corridor to mitigate concerns (one option discussed).

Roubideau Creek Segment 2:
- The large amount of private land in the corridor raised concerns about the BLM's ability to manage it as a Wild & Scenic River.
- Concerns about the potential impact of a Wild & Scenic suitability finding on grazing permittees' ability to use the area for grazing and transit (critical transit corridor for cattle grazing).
- Utility corridor crossing BLM with power lines and gas pipelines as well as electric distribution service to 10 meters within the corridor.

The stakeholder group held more in-depth discussions on Monitor Creek, Potter Creek and Roubideau Creek Segment 1, including two subcommittee meetings. The group came to unanimous agreement on what conditions need to be maintained in these stream corridors, but did not come to full consensus on what management tools should be applied to maintain these conditions. Additional information collected on each segment by the group can be found in the attached charts.

Conditions to be maintained on Monitor Creek, Potter Creek and Roubideau Creek Segment 1:
- Existing grazing rights, including continued access to important livestock transit corridors to both BLM and Forest Service lands.
- Existing water rights.
- Equipment access for pond maintenance.
- Healthy range and well-managed grazing.
- Healthy vegetation: both vegetation types identified by the BLM as ORV's and other vegetation types, which have improved because of current grazing management practices.
- Diverse and healthy wildlife: both wildlife identified by the BLM as ORV's and other species.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 2 of 5*

BLM_0164735

- A sense of wildness, remoteness and naturalness.
- Existing quiet recreation opportunities:
  - Hiking.
  - Horseback riding.
  - Hunting.
- Protection from over-use for recreation and damaging forms of recreation, including effective means to limit access by motorized vehicles.
- Existing healthy stream flows, which include return flows from irrigation and water facilities.

Management tools:
The group agreed that current management has maintained the values listed above and should be continued. However, there was no consensus on what classifications or management tools should be applied to the areas to ensure that this continues. Management tools discussed included Wild & Scenic Suitability, incorporating the corridors into an area classified as "Lands with Wilderness Characteristics (LWC)," a "Special Recreation Management Area (SRMA)," or "Area of Critical Environmental Concern (ACEC)." Group members expressed a preference for management tools that the local BLM office can reconsider with resource management plan revisions over tools that require the maintenance of particular protections until Congress acts (such as Wilderness Study Areas and Wild and Scenic suitability determinations).

*Wild & Scenic Suitability*
On Wild & Scenic Suitability, the majority of the group (24) indicated that the segments should be found Not Suitable, with two in opposition. Those opposed, which represent environmental advocacy organizations, will submit a separate report detailing why they believe the segments should instead be found Suitable. Key factors in the majority's opinion that the segments should be found Not Suitable include:
- The ORV's are already protected by a combination of current management strategies and the topography of the area. The current management is adequate as evidenced by the ORV's BLM identified in finding the segments eligible
- Concern about potential impacts on water rights.
- Concern about potential impacts on grazing rights.
- On Potter Creek, updated information showed that the vegetation identified by BLM as the segment's sole ORV in the original eligibility report was too common for the vegetation to qualify as an ORV, making the segment ineligible for Wild and Scenic status.
- Roubideau Creek Segment 1 is already contained within the Camelback Wilderness Study Area and therefore already managed to protect its wilderness qualities.

*Alternative Management Tools*
The group did not find consensus on whether classifying the stream segments as part of a LWC, SRMA, or ACEC would be an acceptable alternative to Wild & Scenic Suitability. Concerns raised with all of these management options included:
- The area is already sufficiently protected through current BLM management.
- These tools could affect a broader area than the stream corridors the group has been discussing.
- The full implications of these classifications are not yet sufficiently understood by the group.
- The group has not had time to flesh out what use stipulations they would want to recommend along with any of these classifications.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 3 of 5*

BLM_0164736

**Final Wild and Scenic River Suitability**

Please review the attached individual segment sheets for detailed information collected from the stakeholders.

The stakeholder group participants appreciate the support provided by BLM staff to help the participants understand the Wild & Scenic Rivers evaluation process.

Sincerely,
Gunnison Basin Wild & Scenic Rivers Stakeholder Group

| | |
|---|---|
| **Billy L. Pease\*** <br> Western Slope Gold Prospectors Association of America chapter from Olathe | **Constantine Hirschfeld\*** <br> President, Thunder Mountain Wheelers <br> North Fork Snowmobile Club |
| **Larry R. and Wanda K. Boyd\*** <br> Landowners in Roubideau Segment 1 and grazing permittees in Roubideau Segment 1 and 2, and Potter Creek, and Monitor Creek | Kenyon E. McGuire <br> Terror Ditch and Reservoir Company <br><br> Eugene M. McGuire <br> Terror Ditch & Reservoir Company |
| **Mike Wilson\*** <br> Thunder Mountain Wheelers | |
| **Olen Lund\*** <br> Delta County Commissioner District #3 <br> *Delta County endorses this letter.* | **Steven R. Lewis\*** <br> Concerned citizen, Western Colorado Chapter <br> Gold Prospectors Association of America |
| **Betty Oglesby\*** | **Shelby Bear\*** <br> SCRAC Subgroup |
| **Thomas M Alvey\*** <br> North Fork Water Conservancy District <br> Delta County Director CRWCD | **Charles McMurdy\*** <br> President, Montrose Ouray and San Miguel Farm Bureau <br> Olathe property owner and farmer. |
| **Chris Treese** <br> Colorado River Water Conservation District | **Dick Steele, DVM\*** <br> Western Colorado Chapter of the Gold Prospectors Association of America <br> Colorado Mule Deer Association <br> Colorado Sportsmens Wildlife Fund <br> Western Colorado Sportsmens Council |
| **Eric Trommer\*** <br> Landowner/farmer on the lower Gunnison and owner of New Leaf Fruit | **Art Etter, Engineer\*** <br> Bowie Resources, LLC |

\*Permission to list as signatory provided via email or phone.

Signatures continued on following page.

*Gunnison Basin Wild & Scenic Stakeholder Group Report, Page 4 of 5*

BLM_0164737

| James Graziano*<br>Monitor Mesa Ranch | Max, Julie & Gina Ungerer*<br>Landowners and water rights owners |
| --- | --- |
| <br>**Mike Berry**<br>Tri-County Water Conservancy District | <br>**Dick Miller**<br>My signature represents that of myself, Scott<br>Miller, John and Beth Wool, Kent Davis, Alan |
| **Mike Clarke***<br>Grazing permittee | Malcolm and Dave Abbott who are all in<br>association with the Escalante Ranch. |
| **Robert Gill***<br>Ranch Manager for Bear Ranch, LLC | **C. Douglas Atchley***<br>Landowner |
| **Richard Connell***<br>Colorado Farm Bureau | **Roger Bentley***<br>Landowner |
| **Chann Fogg***<br>Vice President, Delta County Farm & Livestock<br>Bureau *Delta County Farm & Livestock Bureau*<br>*endorses this letter.* | **Anna M. Hutchins***<br>Landowner |

*Permission to list as signatory provided via email or phone.

BLM_0164738

**Final Wild and Scenic River Suitability**

## STAKEHOLDER GROUP ONE MEETING NOTES

### 5 - GUNNISON RIVER SEGMENT 2

*Eligibility Report Information:*
- Classification:  Recreational
- ORV:  Endangered warm water fish
- Segment Length:  .41

*Stakeholder comments & questions on BLM information:*
- Is this a critical habitat reach for the fish, and are they in that segment?
  - DOW response:  this segment does not fall in the critical habitat designated by the USFWS.
- Is there spawning habitat or some other special feature for the endangered fish in this segment?
  - None noted
- Is this a natural channel (river splits around an island at this point)?
  - BLM response:  Yes
- Arial photos show water in this segment, with the south channel drier.
- Why no recreation ORV – valuable for canoeing & boating.
  - BLM response:  not "best of best," usual take-out is above segment because of downstream dam.
- How wide is the island?
  - BLM response:  Approx. ¼ mile

### TABLE 8 - GUNNISON RIVER, SEGMENT 2 STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Fish – flows | Heartland diversion dam downstream. | | Being rebuilt to allow fish passage. | Endangered Species Act already provides protections for the endangered fish. |
| 2 | Fish – other threats | Fishing | | Northern Pike coming will cause problems through predation. | |
| 3 | General | * Electrical services & access roads on south side within ¼ mile. Utility service requires year-round access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. * Hunting waterfowl | Replacement, upgrade or expansion of utilities within corridor. | | |

BLM_0164739

## 7 - MONITOR CREEK

### Eligibility Report Information

- Classification:  Wild
- ORV: Vegetation: ~~riparian narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest forests, Fremont cottonwood/skunkbush sumac riparian woodland and~~ coyote willow riparian shrublands
- Segment Length – 9.42; 100% BLM-managed

### Stakeholder comments & questions on BLM information

- Some stakeholders would like to see Recreation and Wildlife added as ORV's. BLM requested scientific data to support these ORVs.
- Question how the segment can be "Wild" if an upstream diversion is key to creating its character.
- No current Coal or Oil & Gas leases
- Vegetation ORVs narrowleaf cottonwood/strapleaf willow/silver buffaloberry and Fremont cottonwood/skunkbush sumac were removed through BLM updated information.
- A-ranking occurrence of Sandbar willow (aka Coyote Willow) remains.
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

BLM_0164740

**Final Wild and Scenic River Suitability**

### TABLE 9 - MONITOR CREEK STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Wildness | • Hunting<br>• Hiking | Potential for trail | • Deep canyon separates creek from private land. | • Adjacent landowner is in the process of establishing a conservation easement.<br>• Both sides of creek in Citizen-proposed Wilderness area.<br>• Trail compatible with "Wild"<br>• Colorado Natural Heritage Program – Potential Conservation Area |
| 2 | Flows | Upstream flows diverted to reservoir (100 yrs old). | Same as now | Reservoir/ irrigation impact:<br>• May benefit ORV by regulating flows, preventing scouring.<br>• Not clear what impact would be if diversion was stopped. | |
| 3 | | Grazing – there is a permit | Same as now | | • Suitability would only affect grazing if it was shown to degrade ORV.<br>• Would affect range improvements – increasing evidence of human activity could have an impact on the "Wild" classification.<br>• Related trails would be unaffected by suitability with "Wild" classification. |
| 4 | Habitat quality | | | Russian knapweed problem (least severe of Monitor, Potter, Roubideau). | BLM sprays to control. |
| 5 | General | Water rights? | | | If ORV depends on management of adjacent ranch, that puts BLM in a box. |

BLM_0164741

## 8 - POTTER CREEK

### Eligibility Report Information
- Classification:  Wild
- ORV:  ~~Vegetation: narrowleaf cottonwood/strapleaf willow-silver buffaloberry riparian forest~~
- Segment Length – 9.82; 100% BLM-managed

### Stakeholder comments & questions on BLM information
- Some stakeholders would like to see Recreation and Wildlife added as ORV's. BLM requested scientific data to support these ORVs.
- Does the creek cross private land near the confluence?
  *No – BLM verified after the meeting.*
- Grazing permittees utilize the watering ponds in this area and they must have access to maintain the ponds with equipment
- Details on mineral leases – No current leases
- How close is the jeep/ all-terrain vehicle (ATV) trail?
  *From Edd Franz (BLM) after the meeting:  The jeep trail between 7N Mesa and Potter Creek gets within 0.24 mile of Potter Creek. This should not be an issue because the "buffer" lands do not have to be exactly 0.25 mile on each side of the stream. The land just must average to 320 acres per mile.*
- Vegetation ORV removed from eligibility by BLM update.
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

### TABLE 10 - POTTER CREEK STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Wildness/ habitat | | | Used to be a jeep/log road; closed 25 years ago at DOW recommendation. | Citizen-proposed wilderness on both sides. Colorado Natural Heritage Program - Roubideau Creek Potential Conservation Area |
| 2 | Flows | Water rights? | | No diversions or impoundments | One individual suggested dividing Potter Creek into two segments because there doesn't appear to be water rights above Monitor Creek. |
| 3 | Habitat quality | | | Russian knapweed problem | BLM sprays to control. |
| 4 | | Grazing | | | |
| 5 | | Hunting | | | |
| 6 | | Hiking/ Recreation | | Jeep/ATV trail | ATV Club has adoption the trail for maintenance |

BLM_0164742

**Final Wild and Scenic River Suitability**

### 10 - ROUBIDEAU CREEK, SEGMENT 1

*Eligibility Report Information*
- Classification: Wild
- ORV: Recreational (non-mechanized), Wildlife (leopard frog, bighorn sheep), Cultural (inscription panel, rock art), Vegetation (~~Fremont cottonwood/skunkbush sumac~~ riparian woodland; skunkbush sumac/sandbar willow riparian shrubland)
- Segment length: 10.74 miles; 93% BLM

*Stakeholder comments & questions on BLM information*
- How do those landowners feel about the potential for their part of the stream to be determined "suitable" for Wild & Scenic status?
- *Wanda Boyd requests her land be removed from any Wild and Scenic consideration.*
- Is there a chunk of private land in the middle of the segment as well?
- *No – BLM verifies*
- Would BLM seek to swap or acquire private land on a segment if it was determined suitable? Yes per BLM
- Vegetation ORV Fremont Cottonwood/skunkbush removed per BLM update
- Subgroup agreed on the conditions needed to be maintained in the stream corridor, but did not come to agreement on what management tools should be applied to maintain these conditions.

### TABLE 11 - ROUBIDEAU CREEK, SEGMENT ONE STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Wildness | • Hunting<br>• Fishing<br>• Hiking | | | Within Camelback WSA:<br>• Provides surface disturbance protection.<br>• Does not provide protection specifically for ORV's.<br>• BLM found "not suitable" for designation as Wilderness; no process for revising. |
| 2 | Flows | Large diversion upstream. | | Sometimes stream goes dry in places. | |
| | Habitat quality | | | Russian knapweed problem (most severe among Monitor, Potter & Roubideau). | BLM spraying done on horseback because of WSA restrictions. |
| 3 | Cultural preservation | | | | Nominated for National Register of Historic Places (*would require that any federal or federally funded project take into account potential impacts on places deemed eligible to be on the National Register of Historic Places & give opportunity to comment by the Advisory Council on Historic Preservation*). |

BLM_0164743

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 4 | | Access Roads | | Main road up Roubideau terminates for public use just up from the confluence; good condition. | |
| 5 | | Grazing | | | |

### 11 - ROUBIDEAU CREEK SEGMENT 2

*Eligibility Report Information:*
- Classification: Scenic
- ORV: Wildlife (leopard frog, bighorn sheep). ~~Vegetation (Fremont cottonwood/ skunkbush sumac riparian woodland)~~
- Segment Length:  7.59 miles, 45.5% BLM managed

*Stakeholder comments & questions on BLM information:*
- Less than 50% BLM – potential management problems.
- Why does segment go so much on private land?
  - BLM response: ORV there.
- Frogs may not be so rare – noisy + lots of tadpoles seen locally.
- Bighorn sheep re-introduced; desert bighorn – not mountain; presumed native b/c rock art, but Fremont rock art sometimes depicts game species that weren't local to the area where they were drawn.
- Riparian vegetation not unusual
  - Vegetation ORV dropped by BLM after information update

**Final Wild and Scenic River Suitability**

TABLE 12 - ROUBIDEAU CREEK, SEGMENT TWO STAKEHOLDER ASSESSMENT

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Scenic classification | Utility corridor crossing BLM (345kV & 115kV power lines, and Trans-Colorado Natural Gas pipeline). Also, electric distribution service to 10 meters within corridor. All utilities require year-round access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. | Replacement, upgrade or expansion of utilities within corridor. | | |
| | | Gas line | Replacement, upgrade or expansion of utilities within corridor. | | |
| 2 | Wildlife/ Vegetation Habitat | | | WSA upstream from segment. | |
| | | Irrigation diversion upstream | | Often no flow in late summer, fall. | |
| | | | | Buttermilk Cr near Roubideau – water for bighorns to drink. | |
| | | | | Springs and runoff provide moisture that supports frogs, vegetation. | |
| | | | | predation – if controlled herons & raccoons, would help. | |

BLM_0164745

| | ORV NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 3 | General | Cattle grazing in canyon: 1 day spring, 1 day fall; 900 transit canyon to access other grazing areas – vital for access; started 1882. | | Not pleasant for recreation while cattle are going through. Cattle don't stay on road; drift through whole canyon. | BLM: Scenic classification was made with road considered; suitability with this classification wouldn't close the road. |
| | | Sheep on top, South + East, in winter. | | | |

## 12 - Deep Creek

*Information:*

- Classification - Scenic
- ORV - Green-back cutthroat trout
- Segment Length – 2.55 mi.;  BLM Admin Length - .58 mi.
- DOW recommended any stream with pure cutthroat be an ORV. Technique to differentiate greenback cutthroat from Colorado cutthroat… are genetic differences, only recently figured out… Original paper may have miss-labeled as greenback.
- Viable population upstream on USFS land

### Table 13 - Deep Creek Stakeholder Assessment

| | KEY CONDITIONS TO MAINTAIN ORV | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Fish are there | Limited fishing | | • Only places fish survive is in isolated pools on BLM stretch. <br>• Only occasional hitchhikers make it down to BLM <br>• More viable population upstream. | • If it's not broke, why fix it? |
| 2 | Limit other species detrimental to Cutthroat | | | • Competition from brook trout | • Consider going downstream to prevent brook trout from going upstream. |

BLM_0164746

**Final Wild and Scenic River Suitability**

| | KEY CONDITIONS TO MAINTAIN ORV | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 3 | Water Quantity – running water for longer period of time | • Irrigation Diversion up-stream <br> • Ranch has 1933 decree | Irrigation Diversion changes | • Creek is dried up 3 months of the year. <br> • Water is the limiting factor | • Cost-share a project to build a new, fish-friendly diversion. <br> • A public / private partnership for storage upstream could provide water for irrigation + fish. <br> • Bear Ranch cost-share program with USFS; can BLM participate <br> • BLM & water user agreements <br> • In Stream Flow (ISF) appropriation <br> • WSR Suitability - Permanency is important – uncertainty about future management decisions. <br> • With Suitability, BLM would manage to protect the fish & keep it from slipping from "Scenic" classification but can't do much without water. <br> • With Suitability, BLM management may not be very different but would force agencies to look at any actions that may harm the ORV |
| 4 | | Any pure cutthroat regardless of what kind, DOW considers important to conserve | | Question about if it is greenback cutthroat, and if so, if planted | • FWS "threatened" <br> • Protected under ESA <br> • Broad USFS guidance <br> • Angling regulations <br> • Ranch and water use of local water users are key factors in protection <br> • DOW to summarize regulations and for group |

BLM_0164747

| | KEY CONDITIONS TO MAINTAIN ORV | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 5 | | • Currently leased for Oil & Gas – per BLM<br>• No current coal leases – per BLM | | | • "No surface occupancy" would be easy to directionally drill.<br>• Suitability - would require a buffer around the stream in the case of oil & gas leasing – Potential for litigation? |
| 6 | | Sole-source power line crosses creek within 200-250' of BLM river segment, and uses an existing access road on BLM for year-round operation, maintenance & repair. Vegetation trimming and/or road repair (approx. I mile) may be needed to maintain the t-line and access ROW's. | Additional houses possible that would require more service.<br><br>Future replacement or upgrade of utilities within corridor may be necessary to accommodate load growth. | | |
| 7 | | Road crossing Deep Creek/ approx. I mile of access on BLM | Road maintenance if required to maintain access | | |
| 8 | | Livestock Grazing | | | |

BLM_0164748

**Final Wild and Scenic River Suitability**

## 13 - WEST FORK OF TERROR CREEK

*Eligibility Report Information:*
- Classification: Scenic
- ORV: Native Colorado Trout (may be threatened Greenback Cutthroats)
- Segment Length: 1.21 miles, 39.2% managed by BLM

*Stakeholder comments & questions on BLM information:*
- Request for details on when and where trout were found in the creek
  - DOW Response: Sampling records confirm the presence of cutthroat trout as early as 1978 & as recent as 2010
- Fish may be a non-threatened species of Colorado Cutthroat Trout. Most sampling has occurred on USFS land.
- If BLM only manages a broken 39.2% of the segment, could it manage that? Suggest not considering it b/c of this issue.
- Grand Mesa Canal Headgate #4, mentioned in eligibility report, has never been built – it is a conditional decree.
- Two small impoundments Rex and Holy Terror Reservoirs, are upstream from the reach; their stored water is not released through the West Fork of Terror Creek, but instead the water is diverted into the Leroux Creek drainage for irrigation use by the Leroux Creek Water Users Association.

### TABLE 14 - WEST FORK TERROR CREEK STAKEHOLDER ASSESSMENT

| | ORV + CLASSIFICATION CONDITION & NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 1 | Fish ORV: Flows | Senior water rights:<br>• Above segment: Overland Ditch, Leroux Creek Water Users Association<br>• Below segment: Terror Ditch, Holy Bee, Fawcett | | Several years the creek is dry at the confluence with the East Fork of Terror Creek. Bowie Resources has data back to 1983 showing flows ranging from spring flood (220 cfs) to 0 in the fall. | Endangered Species Act already provides protections for the endangered fish.<br>**Noted at 1/10 mtg**: ESA is not valid for these fish that are not threatened or endangered. |

BLM_0164749

| | ORV + CLASSIFICATION CONDITION & NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 2 | Scenic Classification | Roads: 1.15 miles unsurfaced, 0.90 single-lane county rd | | Segment can be easily accessed by road. There is currently no public access to adjacent road system. | 1/10/11 Mtg: Water is diverted to West Fork Terror Creek that is not a natural drainage. |
| | | 230 KV transmission line crosses creek on BLM and requires year-round motorized access for operation, maintenance & repair. Vegetation trimming and/or road repair may be required to maintain t-line and access ROW's. | Replacement, upgrade or expansion of utilities within corridor. | More industrial infrastructure in corridor than indicated in eligibility report. | |
| | | Dilapidated cabin and several small outbuildings located within corridor. | Future permanent and/or seasonal residence within corridor | Existing structures not noted in eligibility report. | |
| | | Roads cross the stream at two locations within the corridor. The county road crosses the stream over a culvert and the unsurfaced road crosses the steam with an unimproved 'at-grade' ford. | | Stream crossing not noted in eligibility report. | |
| | | Coal exploration drill hole and water quality monitoring wells currently permitted and scheduled to be installed in 2011 | Use of water quality monitoring wells will be required for 10-15 years | Additional industrial use in the corridor not noted in eligibility report. | |

BLM_0164750

**Final Wild and Scenic River Suitability**

| | ORV + CLASSIFICATION CONDITION & NEEDS | CURRENT USES & VALUES | POTENTIAL FUTURE USES | CURRENT PROBLEMS/ ASSETS | POLICY/MANAGEMENT TOOLS – OPTIONS AND IMPACT |
|---|---|---|---|---|---|
| 3 | General | Cattle grazing | | | All species whether listed as endangered, threatened, or sensitive species are protected under mine permitting processes. |
| | | Fishing | | Stream is narrow and brushy limiting fishing opportunity. | |
| | | Mining – coal exploration drill holes. | Potential coal reserves in corridor; leased. | Significant economic impact on local economy if coal reserves are unable to be mined. | |
| | | Oil & gas leases. | Oil & gas devel. | | |

BLM_0164751

## STAKEHOLDER GROUP TWO RECOMMENDATIONS

**Audubon Colorado • Center for Native Ecosystems
Colorado Environmental Coalition • Colorado Mountain Club • Colorado Wild
San Juan Citizens Alliance • Sheep Mountain Alliance • The Wilderness Society
Western Colorado Congress • NWWSERC/NFRIA/WSERC Conservation Center**

c/o The Wilderness Society
1660 Wynkoop #850
Denver, Colorado 80202                                          February 22, 2011

Barbara Sharrow, Manager
Uncompahgre Field Office
Bureau of Land Management
Montrose, Colorado

Dear Ms. Sharrow,

The ten undersigned organizations participated in the recently concluded ad hoc stakeholders process reviewing management recommendations and potential suitability of seven stream segments for possible inclusion in the National Wild and Scenic Rivers System (stream segments previously listed by the BLM as eligible for consideration for such protection—*Final Wild and Scenic River Eligibility Report for the BLM Uncompahgre Planning Area, June 2010*). These organizations either participated directly in the stakeholders process or were represented by participants, consulting with and advising those representatives throughout the process.

Our organizations joined this effort in good faith that open and fair consideration would be given, by all participants, to the option of a wild & scenic suitability finding for at least some of the stream segments. While that openness was not broadly forthcoming among the participating stakeholders, our representatives did present detailed information on the values of, and need for protection for, select streams. We hope that information and our perspectives contributed positively to the discussion. We also appreciate very much the efforts of a few stakeholders, outside our delegation, in their pursuit of a greater level of agreement on at least some streams.

In large part because of the refusal of other stakeholders to even consider the possibility of a suitability finding for any stream, the group reached no consensus agreement on recommendations to the Bureau of Land Management (BLM). While a letter signed by some of the stakeholders, opposing any suitability findings, has been sent to the BLM as the so-called majority recommendations, that letter does not represent the full group of stakeholders. **There was no consensus.**

Correspondingly, we respectfully offer our collective recommendations regarding potential suitability findings, and protective management, for the seven stream segments. These recommendations build on suitability comments our organizations submitted to the BLM in August 2010. They are supplemented with additional, updated, information and with new perspectives arising from the recent stakeholders discussions.

We thank you for carefully considering the details of these recommendations as you develop the range of alternatives for the pending resource management plan and, ultimately, as you settle on a final management plan.

BLM_0164752

The BLM's eligibility report was a very helpful starting point in the preparation of our original suitability comments and for our continued discussions of these streams with the BLM and with others. The level of detail provided, the careful research, and the professional presentation of that eligibility report have contributed to thoughtful review and discussion of these important streams.

Meanwhile, it is significant to note that Colorado has only one stream included in the National Wild and Scenic Rivers System. We trust that it is obvious that this is not because of a lack of outstanding streams in this state. Indeed, the BLM's eligibility report confirms that a long list of remarkable streams and stream corridors warrant special consideration and strong protection, whether under provisions of the Wild and Scenic Rivers Act or otherwise.

**Stream segments**

Gunnison River Segment 2
*.41 mile; Recreational; Fish*
This regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled, primarily because of loss of habitat or changes in river flows. (All these values are documented in the BLM's eligibility report.)

Federal ownership of the river segment is 100%. While only 66.5% of lands in the river corridor are federally owned, all those lands are on one side of the river, simplifying the implementation of protective management for those lands.

The primary need for the identified outstandingly remarkable values—particularly for the native fish—are reliable and seasonally natural flows of water in the Gunnison River. Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation of the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, *so long as* those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

Monitor Creek
*9.42 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0164753

In addition to the outstandingly remarkable values identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) WSA, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

<u>We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.</u>

<u>Potter Creek</u>
*9.82 miles; Wild; Vegetation (cottonwood/riparian)*
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0164754

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (*vegetation*), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (*desert bighorn sheep*). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) WSA, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded. Glibly stated, rare is rare, and vulnerable is vulnerable.

Stated a bit more thoughtfully, a plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of eligibility, and accompanying protective management, is an appropriate and timely tool for this plant community.

In any case, a finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

<u>We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.</u>

Roubideau Creek Segment 1
*10.71 miles; Wild; Recreational, Wildlife, Cultural, Vegetation*
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) WSA and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest

BLM_0164755

lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's eligibility report's preliminary classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (*narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest*); wildlife (*northern leopard frog, desert bighorn sheep*); cultural; and recreational (*primitive and non-mechanical exploration and exercise*).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

<u>We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.</u>

<u>Roubideau Creek Segment 2</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

<u>Deep Creek</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

<u>West Fork Terror Creek</u>
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

BLM_0164756

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, *so long as* those other methods continue to successfully protect the trout and its habitat.

**Summary**

The undersigned organizations recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:

- Monitor Creek
- Potter Creek
- Roubideau Creek Segment 1

The undersigned organizations recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability for:

- Gunnison River Segment 2
- Roubideu Creek Segment 2
- Deep Creek
- West Fork Terror Creek

Thank you again for your careful consideration of these comments and recommendations, as complement to the thorough research and review the BLM has already applied to these important streams and corridors.

Please let us know any way in which we can clarify these recommendations, expand on them, or assist with securing their implementation in the BLM's protective management of these streams.

Sincerely,

Steve Smith, Assistant Regional Director
The Wilderness Society
for

Ken Strom, Director
Audubon Colorado

Megan Mueller, Senior Staff Biologist
Center for Native Ecosystems

Becky Long, Water Caucus Coordinator
Colorado Environmental Coalition

Jay Heeter, Campaigns Coordinator
Colorado Mountain Club

Paul Joyce, Conservation Associate
Colorado Wild

Meghan Maloney, River Program Director
San Juan Citizens Alliance

Hilary White, Director
Sheep Mountain Alliance

Gretchen Nicholoff, President
Western Colorado Congress

Rob Peters, Executive Director
Andrea Robinson, Conservation Chair
NFRIA/WSERC Conservation Center

BLM_0164757

## G. SUITABILITY STUDY PARTICIPANTS

| NAME | DISCIPLINE | RESPONSIBILITY |
|---|---|---|
| Bruce Krickbaum | Planning & Environmental Coordinator | Report Oversight |
| Pauline Adams | Hydrologist | Hydrology & Public Outreach |
| Joe Cain | Geographical Information Systems Specialist | Mapping & Spatial Analysis |
| Amanda Clements | Ecologist | Vegetation & Land Health |
| Desty Dyer | Mining Engineer | Coal Resources |
| Robert Ernst | Geologist | Mineral Resources |
| Edd Franz | GGNCA Outdoor Recreation Planner | Recreation, Wilderness & Public Outreach |
| Tom Fresques | Colorado River Valley Fisheries Biologist | Fish |
| Glade Hadden | Archaeologist | Cultural & Historic Resources |
| Julie Jackson | Outdoor Recreation Planner | Recreation & Travel Management |
| Dave Kauffman | Associate Field Manager | Interdisciplinary Team |
| Jeff Litteral | Hydrologist | Hydrology & Public Outreach |
| D. Maggie Magee | Technical Writer/Editor | Report Writing & Editing |
| Jana Moe | Administrative Support Assistant | Administrative Support |
| Amanda Moore | Geographical Information Systems Specialist | Mapping & Spatial Analysis |
| Dennis Murphy | UFO/Contract Hydrologist | Report Writing & Hydrology |
| Teresa Pfifer | Lands & Minerals Staff Supervisor | Interdisciplinary Team |
| Linda Reed | Realty Specialist | Lands & Realty |
| Charles Sharp | Wildlife Biologist | Wildlife & TES Species |
| Barbara Sharrow | Field Manager | Interdisciplinary Team |
| Melissa Siders | Biology Staff Supervisor | Interdisciplinary Team |
| David Sinton | Geographical Information Systems Lead | Mapping & Spatial Analysis |
| Roy Smith | BLM Colorado Water Rights Specialist | Water Rights & Report Oversight |
| Jedd Sondergard | Hydrologist | Hydrology & Public Outreach |
| Thane Stranathan | Natural Resource Specialist | Oil & Gas Resources |
| Karen Tucker | GGNCA Manager | Interdisciplinary Team |

*All participants are BLM UFO Staff unless otherwise noted

BLM_0164758

*Final Wild and Scenic River Suitability*

## H. BIBLIOGRAPHY

**American Whitewater**
2017    *Assessing Instream Flows that Support Whitewater Recreation in the San Miguel River Basin.*
        Accessed online at: https://www.americanwhitewater.org/resources/repository/
        SanMiguelReport2016_FINALweb.pdf

**Bureau of Land Management**
1982    *Archaeological Resources of Southwestern Colorado: Uncompahgre and Gunnison Resource Areas,
        San Miguel Resource Area.* Colorado State Office. Denver.

1992    *Wild and Scenic Rivers-Policy and Program Direction for Identification, Evaluation, and
        Management.* BLM Manual 8351. Rel. 8-61. Washington D.C.

2000    *Colorado BLM State Director's Sensitive Species List (Animals and Plants).*
        Webpage: http://www.blm.gov/co/st/en/BLM_Programs/botany/Sensitive_Species_List_.html

2007    *San Juan Public Lands Center Draft Land Management Plan and Draft Environmental Impact
        Statement, Volume 3 - Appendices.* BLM/USFS San Juan Public Lands Center. Durango, CO.

2008    *Moab Field Office Record of Decision and Approved Resource Management Plan.* BLM Moab Field
        Office. Moab, UT.

2008b   *Preparation Plan for the Uncompahgre Resource Management Plan.* BLM Uncompahgre Field
        Office. Montrose, CO.

2009    *Wild and Scenic River Eligibility Report for Bureau of Land Management Grand Junction Field
        Office.* BLM Grand Junction Field Office. Grand Junction, CO.

2010    *Final Wild and Scenic River Eligibility Report for the Uncompahgre Planning Area.* BLM
        Uncompahgre Field Office. Montrose, CO. Available online at:
        http://www.blm.gov/co/st/en/fo/ufo/wild_and_scenic_river.html

2012    *Wild and Scenic Rivers-Policy and Program Direction for Identification, Evaluation, and
        Management.* BLM Manual 6400. Rel. 6-136. Washington, D.C.

**BOR (US Department of the Interior, Bureau of Reclamation)**
2009    Colorado River Basin Salinity Control Project. *Paradox Valley Unit, Title II.* Webpage:
        http://www.usbr.gov/projects/Project.jsp?proj_Name=CRBSCP+-+Paradox+Valley+Unit+-
        +Title+II

**Colorado Department of Public Health and Environment**
2010    Water Quality Control Commission. *Section 303(d) List of Water Quality-limited Segments
        Requiring Total Maximum Daily Loads. 5CCR 1002-93, Regulation #93.* Denver.

2010b   Water Quality Control Commission Regulations. *Regulation Number 35: Classifications and
        Numeric Standards for Gunnison and Lower Dolores River Basins, as amended 8 February 2010.*
        Accessed online at:  http://www.cdphe.state.co.us/regulations/wqccregs/

**Colorado River Water Conservation District**
2009    Water Glossary. *Colorado River Terms.* Webpage:  http://www.crwcd.org/page_100

BLM_0164759

## Colorado Water Conservation Board

2015 *Colorado Water Plan.* Accessed online at: https://www.colorado.gov/pacific/cowaterplan/plan

2015 *Gunnison Basin Implementation Plan.* Accessed online at: https://www.colorado.gov/pacific/cowaterplan/gunnison-river-basin

2015 *Southwest Basin Implementation Plan* Accessed online at: https://www.colorado.gov/pacific/cowaterplan/southwest-basin

2011 Instream Flow Program. *2011 Contested Appropriations.* Webpage: http://cwcb.state.co.us/environment/instream-flow-program/Pages/2011ContestedAppropriations.aspx

2010 *Statewide Water Supply Initiative.* Accessed online at: http://cwcb.state.co.us/water-management/water-supply-planning/pages/swsi2010.aspx

2004 *Statewide Water Supply Initiative.* Accessed online at: http://cwcb.state.co.us/public-information/publications/Pages/StudiesReports.aspx

## U.S. Geological Survey

2018 U.S. Geological Survey, 2018, National Water Information System data available on the World Wide Web (USGS Water Data for the Nation), accessed [March 22, 2018], at URL [http://waterdata.usgs.gov/nwis/].

2009 Capesius, J.P., and Stephens, V.C., 2009, Regional regression equations for estimation of natural streamflow statistics in Colorado: U.S. Geological Survey Scientific Investigations Report 2009–5136, 46 p.

2009 Ries, K.G., III, Steeves, P.A., Guthrie, J.D., Rea, A.H., and Stewart, D.W., 2009, Stream_network Navigation in the U.S. Geological Survey StreamStats Web Application, pp. 80-84.

## Colorado Wilderness Network

2006 *Colorado's Canyon Country Wilderness Proposal.* Website:  http://www.canyoncountrywilderness.org/home.htm

## Dolores Water Conservancy District

2018 *Draft Dolores Project Drought Contingency Plan.* Accessed online at: http://doloreswater.com/wp-content/uploads/2018/01/CLEAN-Final-Draft-DPDCP-with-Reclamation-Comments-Addressed.pdf

2014 *Water Management and Conservation Plan.* Accessed online at: http://doloreswater.com

## Environmental Protection Agency

2008 *Final Closeout Report: Uravan Mill and Adjacent Areas, Montrose County, Colorado.* Accessed online at:  www.epa.gov/region8/superfund/co/uravan/

2005 *Five Year Review:  Umetco Minerals Corporation Uravan Superfund Site.* Accessed online at: http://cumulis.epa.gov/fiveyear/index.cfm?fuseaction=fyrsearch.showSitePage&id=0800076

## Interagency Wild and Scenic Rivers Coordinating Council

1999 *National Wild and Scenic Rivers.* Website:  http://www.rivers.gov

BLM_0164760

**National Audubon Society**
2010   *Important Bird Areas Program.* Webpage:  http://www.audubon.org/bird/iba

**Orr, John, Editor**
2011   Coyote Gulch. Weblog:  http://coyotegulch.wordpress.com/category/colorado-water/wild-and-scenic/

**U.S. Forest Service**
2007   *Proposed Land Management Plan Grand Mesa, Uncompahgre, and Gunnison National Forests.* Delta, CO.

2007b  *Wild and Scenic Rivers Suitability Study for National Forest System Lands in Utah.* PowerPoint. Accessed online at:  http://www.fs.fed.us/r4/rivers/documents/suitability_presentation_052407.pdf

**U.S. Geological Service**
2010   National Water Information System. *Real-time data for Colorado:  Streamflow.* Webpage:  http://waterdata.usgs.gov/co/nwis/current/?type=flow&group_key=huc_cd

**Watershed Management Council**
1994   *Recommended Watershed Terminology.* Webpage:  http://watershed.org/news/fall_94/terminology.html

**Wild and Scenic Rivers Act**
1968   Public Law 90-542, 16 U.S.C. 1271 et seq., as amended. Accessed online at: http://www.rivers.gov/publications.html#wsract

**Willits, Patrick**
2001   The Trust for Land Restoration. *San Miguel River Restoration Assessment Summary.* Accessed online at:  www.restorationtrust.org/Rest-Assess_summ.pdf

BLM_0164761

TABLE 15 - SUITABLE SEGMENTS IN THE **UFO** PLANNING AREA

| SUITABLE SEGMENT | TOTAL SEGMENT MILES | TOTAL BLM MILES | TOTAL CORRIDOR ACRES | BLM LAND ACRES | RECOMMENDED CLASSIFICATION | OUTSTANDINGLY REMARKABLE VALUES |
|---|---|---|---|---|---|---|
| Monitor Creek | 9.4 | 9.4 | 2,540 | 2,540 | Wild | Vegetation |
| Potter Creek | 9.8 | 9.8 | 2,810 | 2,810 | Wild | Fish, Vegetation |
| Roubideau Creek, Segment 1 | 10.0 | 10.0 | 2,680 | 2,680 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Beaver Creek | 14.3 | 14.2 | 4,170 | 3,640 | Recreational | Vegetation |
| Saltado Creek | 5.6 | 4.1 | 1,640 | 1,340 | Wild | Vegetation |
| San Miguel River, Segment 1 | 27.2 | 17.3 | 8,360 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River, Segment 2 | 4.0 | 4.0 | 1,100 | 1,100 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River, Segment 3 | 4.5 | 4.5 | 1,350 | 1,350 | Recreational | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River, Segment 5 | 7.5 | 1.3 | 2,340 | 1,740 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River, Segment 6 | 2.1 | 2.1 | 390 | 390 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek, Segment 1 | 3.4 | 3.4 | 1,010 | 1,010 | Wild | Vegetation |
| Lower Dolores River | 4.2 | 4.2 | 630 | 630 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| Dolores River, Segment 1 | 8.7 | 8.7 | 1,950 | 1,950 | Wild | Recreational, Scenery, Fish, Wildlife, Geology, Ecology, Archaeology |
| Dolores River, Segment 2 | 5.3 | 5.3 | 1,230 | 1,230 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| La Sal Creek, Segment 2 | 3.3 | 3.3 | 790 | 790 | Recreational | Fish, Vegetation |
| La Sal Creek, Segment 3 | 3.4 | 3.4 | 800 | 800 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |

BLM_0164762

**Final Wild and Scenic River Suitability**

This page intentionally left blank.

BLM_0164763

BLM_0164764

**Draft Wild and Scenic River Suitability**

*It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations. The Congress declares that the established national policy of dams and other construction at appropriate sections of the rivers of the United States needs to be complemented by a policy that would preserve other selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes.*

Wild & Scenic Rivers Act, October 2, 1968



BLM_0164765

# Appendix Q
## Air Emission Inventory
## Technical Support Document
## (Revised; March 2019)

BLM_0164766

BLM_0164767

# TABLE OF CONTENTS

Section                                                                           Page

**Q.**    **AIR EMISSION INVENTORY TECHNICAL SUPPORT DOCUMENT (REVISED MARCH 2019)** ................................................................................................. Q-1

     Q.1     Introduction ............................................................................................ Q-1
                Q.1.1    Scope and Goals....................................................................... Q-1
                Q.1.2    Study Area................................................................................. Q-1
                Q.1.3    Relationships to Existing Plans and Documents ................. Q-2
                Q.1.4    Emission Inventory Overview................................................. Q-2
     Q.2     Emission Inventory Development........................................................ Q-5
                Q.2.1    Alternatives............................................................................... Q-5
                Q.2.2    Emission Calculations ............................................................. Q-8
     Q.3     Emission Inventory Results.................................................................. Q-40
                Q.3.1    BLM Action Emissions Summary........................................... Q-40
                Q.3.2    BLM Action Emissions Details and Comparison across Alternatives .......... Q-41
     Q.4. References............................................................................................... Q-52

# FIGURES
                                                                          Page

Q-1       Uncompahgre Field Office Planning Area ............................................................ Q-3

# TABLES
                                                                          Page

Q.2-1    Annual Oil and Gas Well Development Rates by Alternative....................................... Q-6
Q.2-2    Activity by Alternative for Non-oil and Gas Sources (Year 10) ................................ Q-9
Q.2-3    Emission Controls Summary Table for Non-oil and Gas Source Categories (note all controls listed in this table apply to each management alternative)...................... Q-10
Q.2-4    Oil and Gas Emission Controls Description and Percentage by Planning Year 10 ............. Q-11
Q.2-5    Construction Source Categories and Scaling Surrogates ......................................... Q-12
Q.2-6    Vehicle Fleets used during Drilling and Completion .................................................. Q-15
Q.2-7    Empirical Constants by Pollutant to Estimate Road Dust Emissions Factor ..................... Q-17
Q.2-8    Relationship of Vehicle Group to Fugitive Road Dust Emissions in Well Construction and Development ................................................................................... Q-17
Q.2-9    Vehicle Fleets Comprising Production Traffic ............................................................ Q-21
Q.2-10   Empirical Constants by Pollutant to Estimate Road Dust Emissions Factor ..................... Q-22
Q.2-11   Schedule of Uranium Mines in Production ............................................................... Q-34
Q.3-1    Estimated Annual Emissions Summary BLM Actions within the Planning Area.................. Q-41
Q.3-2    Estimated Annual Emissions by Activity – Base Year (tons/year)................................... Q-41
Q.3-3    Estimated Annual Emissions by Activity, Alternative A – Planning Year 10 ...................... Q-42
Q.3-4    Estimated Annual Emissions by Activity, Alternative B – Planning Year 10 ...................... Q-45
Q.3-5    Estimated Annual Emissions by Activity, Alternative B.I – Planning Year 10..................... Q-47
Q.3-6    Estimated Annual Emissions by Activity, Alternative C – Planning Year 10 ...................... Q-48
Q.3-7    Estimated Annual Emissions by Activity, Alternative D – Planning Year 10....................... Q-50
Q.3-8    Estimated Annual Emissions by Activity, Alternative E – Planning Year 10....................... Q-51

BLM_0164768

This page intentionally left blank.

BLM_0164769

# APPENDIX Q
# AIR EMISSION INVENTORY
# TECHNICAL SUPPORT DOCUMENT
# (REVISED MARCH 2019)

## Q.1   INTRODUCTION

### Q.1.1  Scope and Goals

This Emission Inventory Technical Support Document explains the data and methodologies used to estimate emissions associated with future development in the UFO planning area. For this effort, an emission inventory was developed for emission sources affected by BLM management decisions for the UFO planning area.

### Q.1.2  Study Area

The emission inventory was developed for the UFO planning area. The UFO planning area is located in western Colorado sharing a small section of the border with Utah ( **Figure Q-1**) and incorporates all or part of Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties.

The UFO manages more than 900,000 surface acres in southwestern Colorado, including the Gunnison Gorge National Conservation Area and Wilderness, as well as portions of the Dominguez-Escalante National Conservation Area, Dominguez Canyon Wilderness Area, and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre Rivers). The varied topography within the UFO ranges from lowland riparian along the Dolores River (4,706 feet) to red rock desert to pinion-juniper woodland to subalpine forest up on Storm King Mountain (11,449 feet). These lands offer a wealth of resources and opportunities for public use and enjoyment. The UFO is revising the UFO Resource Management Plan (RMP). The UFO RMP planning area encompasses approximately 675,677 surface acres within the UFO boundary. It does not include the Gunnison Gorge National Conservation Area or the Dominguez-Escalante National Conservation Area, which are managed under separate RMPs. Major activities occurring in the UFO planning area that have the potential to affect air quality include oil and gas development, off-highway vehicle (OHV) activity, solid minerals mining, locatable minerals mining, and prescribed fires and vegetation management.

BLM_0164770

## Q.1.3 Relationships to Existing Plans and Documents

The most recent documents describing the potential for resource development in the UFO planning area are the Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (BLM 2012a), the Mineral Potential Report for the Uncompahgre Planning Area (BLM 2011), and the Coal Resource and Development Potential Report (BLM 2010). The Mineral and Coal Potential Reports indicates relatively stable coal production and potential significant increases in uranium and vanadium mining in the UFO planning area. The Reasonable Foreseeable Development Scenario for oil and gas also indicates potential significant increases in oil and gas activity in the UFO planning area. Memos and information provided directly by UFO personnel (BLM 2018a, 2019a, 2019b) were also used to develop air pollutant emissions inventories in accordance with methodologies and information outlined in this technical support document.

## Q.1.4 Emission Inventory Overview

### Q.1.4.1 Emission Generating Activities

The following list of emission generating activities were identified as those management actions and activities authorized, permitted, allowed or performed under this RMP that could potentially emit regulated air pollutants and could potentially cause impacts to air quality within the planning area and Class I and sensitive Class II areas within 100 kilometers of the planning area:

- Fluid Leasable Minerals – Conventional Oil and Gas
- Fluid Leasable Minerals – Coal Bed Natural Gas
- Solid Leasable Minerals – Coal
- Locatable Minerals – Uranium and Vanadium
- Salable Minerals – Sand and Gravel
- Lands and Realty – Rights-of-Way
- Livestock Grazing
- Comprehensive Travel and Transportation Management
- Vegetation – Prescribed Fire and Mechanical Treatment

### Q.1.4.2 Pollutants

The emission inventory includes estimation of emissions of criteria air pollutants (CAPs), greenhouse gases (GHGs), and hazardous air pollutants (HAPs) as follows:

- Criteria Pollutants:

  – Carbon monoxide (CO)
  – Nitrogen oxides (NOX)
  – Particulate matter less than or equal to 10 microns in diameter ($PM_{10}$)
  – Particulate matter less than or equal to 2.5 microns in diameter ($PM_{2.5}$)
  – Sulfur dioxide ($SO_2$)
  – Volatile Organic Compounds (VOCs)
  – Greenhouse Gases
  – Carbon dioxide ($CO_2$)
  – Methane ($CH_4$)
  – Nitrous oxide ($N_2O$)

- Hazardous Air Pollutants (HAPs)

BLM_0164771



**Figure Q-1.   Uncompahgre Field Office Planning Area**

BLM_0164772

This page intentionally left blank.

BLM_0164773

While lead (pb) is a criteria pollutant, emissions of lead in the planning area are expected to be extremely low and are therefore not included in this analysis.

HAP emissions were estimated for each emissions source. For oil and gas emissions sources, HAP emissions from venting and combustion source categories were estimated for formaldehyde, n-hexane, benzene, toluene, ethylbenzene, and xylenes (BTEX).

Anthropogenic greenhouse gas emission inventories typically include carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and fluorinated gases. Fluorinated gases are not expected to be emitted in appreciable quantities by any category considered in this emission inventory and were therefore not included in this analysis.

### Q.1.4.3   Temporal

The analysis focused on estimating annual emissions associated with peak construction, production, and operation activities associated with the identified emission generating management actions. The base year 2015 was chosen as the base year for estimating actual emissions as this was the most recent year that reliable production and emissions data was available for existing sources within the planning area and this base year is consistent with the base year emission inventory developed for the Colorado Air Resource Management Modeling Study (CARMMS). Future year estimated emissions were calculated for 2016 through 2025. Potential peak construction and operation years for projected oil and gas development occur in Year 10 (i.e., 2025); therefore, Year 10 was selected to evaluate future air quality impacts.

## Q.2   EMISSION INVENTORY DEVELOPMENT

The UFO emission inventory was developed based on activity data for emission generating activities obtained from UFO staff, the Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (BLM 2012a), the Mineral Potential Report (BLM 2011), the Coal Resource and Development Potential Report (BLM 2010), and from NEPA analyses currently being conducted for BLM actions within the planning area. A large portion of the future oil and gas development for the planning area would be within the Bull Mountain Unit and developed under the Master Development Plan for the Unit. A Record of Decision was issued for the Bull Mountain Unit Master Development Plan in October 2017 (BLM 2017). *The Decision Record, Finding of No Significant Impact, and Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project* (BLM 2008) was used as a reference to identify the level of emissions associated with uranium mining. New coal mining projections information was provided in a memo by UFO personnel for revising the socioeconomic and air resource analyses (BLM 2018a). UFO personnel also provided updated projected oil and gas development rate values for developing emission inventories for the RMP alternatives (BLM 2018b).

### Q.2.1   Alternatives

For the UFO RMP, the BLM developed five alternatives to prepare different combinations of resource uses to address the identified major planning issues, enhance or expand resources or resource uses, and resolve conflicts among resources and resource uses.

- Alternative A is the No Action alternative; a continuance of current management practices.
- Alternative B emphasizes non-consumptive use and management of resources through protective, restorative, and enhancement measures, while also providing for multiple uses, such as livestock grazing, recreational opportunities and settings, and mineral development.

BLM_0164774

- Alternative B.I is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. While future oil and gas planning differs from Alternative B for Alternative B.I, future planning for non-oil and gas resources is equivalent to Alternative B for Alternative B.I.
- Alternative C emphasizes intensive management of natural resources, commodity production, and public use opportunities.
- Alternative D emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat.
- Alternative E is the agency's Proposed RMP, which is a reasonable combination of objectives and actions from the four alternatives (A, B, C, and D) presented in the Draft RMP/EIS.

Estimates of future activity for each emissions source category were made specific to each alternative for activities expected to be affected by the chosen management alternative.

### Q.2.1.1   Activity by Alternative

*Q.2.1.1.1   Oil and Gas Sources*

Future oil and gas activity estimates were developed by BLM staff. **Table Q.2-1** shows estimates of well, rig, and compressor station counts for each alternative Year 10 development. Included in **Table Q.2-1** is oil and gas activity on BLM-administered lands and cumulative development on BLM- and non BLM-administered lands in the UFO area.

For the emission inventory analysis, conventional well emissions were developed separately from coalbed natural gas (CBNG, also called coalbed methane) emissions based on the assumption that they differ significantly due to differences in drilling, completion, and production practices used in the development and operation. Additionally, midstream emissions were developed separately from well site emissions based on Colorado Department of Public Health and Environment Air Pollutant Emission Notices (APENs) emission data for the year 2011 and forecasts to future years based on total annual UFO area-wide gas production.

**Table Q.2-1   Annual Oil and Gas Well Development Rates by Alternative**

| Description | Federal | Non-federal |
|---|---|---|
| **Alternative A** | | |
| Annual Number of Wells Drilled (Conventional) | 15.9 | 6.0 |
| Annual Number of Wells Drilled (CBNG) | 25.8 | 1.2 |
| Number of Drill Rigs Operating | 2 | 1 |
| Number of Operating Compressor Stations | 3 | 1 |
| **Alternative B** | | |
| Annual Number of Wells Drilled (Conventional) | 17.4 | 10.0 |
| Annual Number of Wells Drilled (CBNG) | 25.4 | 6.3 |
| Number of Drill Rigs Operating | 2 | 1 |
| Number of Operating Compressor Stations | 3 | 1 |

BLM_0164775

| Description | Federal | Non-federal |
|---|---|---|
| **Alternative B.1** | | |
| Annual Number of Wells Drilled (Conventional) | 16.1 | 10.1 |
| Annual Number of Wells Drilled (CBNG) | 23.0 | 7.6 |
| Number of Drill Rigs Operating | 2 | 1 |
| Number of Operating Compressor Stations | 3 | 1 |
| **Alternative C** | | |
| Annual Number of Wells Drilled (Conventional) | 19.3 | 10.4 |
| Annual Number of Wells Drilled (CBNG) | 30.9 | 8.1 |
| Number of Drill Rigs Operating | 2 | 1 |
| Number of Operating Compressor Stations | 3 | 1 |
| **Alternative D** | | |
| Annual Number of Wells Drilled (Conventional) | 19.1 | 10.4 |
| Annual Number of Wells Drilled (CBNG) | 28.3 | 8.1 |
| Number of Drill Rigs Operating | 2 | 1 |
| Number of Operating Compressor Stations | 3 | 1 |
| **Alternative E (Proposed RMP)** | | |
| Annual Number of Wells Drilled (Conventional) | 18.3 | 5.2 |
| Annual Number of Wells Drilled (CBNG) | 30.2 | 8.0 |
| Number of Drill Rigs Operating | 2 | 1 |
| Number of Operating Compressor Stations | 3 | 1 |

For each year, the suite of existing and newly spudded wells along with individual well production estimates are used to estimate total annual gas production; total annual gas production is used to make future projections of certain oil and gas emissions sources including midstream sector gathering and treating facilities. For conventional and CBNG wells, CARMMS estimates of annual gas production per well and each alternative's well development scenario were used to estimate future year gas production for each alternative. Midstream emissions were forecasted to future years based on the assumption that total UFO planning area-wide midstream emissions would scale linearly with increases in total gas production. As necessary, for accounting purposes, total midstream sector emissions are allocated to each well type (CBNG or conventional) and/or mineral designation (BLM or cumulative) based on the corresponding percentage of annual gas production by well type and/or annual gas production by mineral designation.

*Q.2.1.1.2 Non-Oil and Gas Sources*
Comparisons of activities by source category for non-oil and gas sources are presented in **Table Q.2-2** below.

### Q.2.1.2 Emission Controls

The UFO emission inventory accounted for all applicable emissions controls such as New Source Performance Standards (NSPS). **Table Q.2-3** shows the emissions control measures for each emissions source category (except oil and gas) that were modeled in this analysis. **Table Q.2-4** presents the

BLM_0164776

emission controls applied to oil and gas sources along with the associated numerical estimates of the level of control.

## Q.2.2 Emission Calculations

Emission calculations for all emission-generating activities were derived from Operator-supplied data whenever possible.

Methods used to estimate emissions from each source category are explained in Sections 2.2.1 and 2.2.2. For oil and gas sources, the estimation methods used for the conventional wells were the same as those used for CBNG wells unless noted otherwise. For each source category, emissions for the base year were estimated. Emissions were then forecasted to future years, accounting for activity growth and for applicable sources, emissions controls. More detailed information regarding input assumptions, emissions factors, and calculations by source category is available from the BLM UFO upon request.

### Q.2.2.1   Oil and Gas Sources

The methodologies implemented to estimate base year and future year emissions by alternative from oil and gas sources are explained in this section. Methodologies apply to conventional and CBNG oil and gas developments, unless noted otherwise.

Emissions are generated in three main phases of oil and gas systems:

- Emissions from Well Construction and Development
- Emissions from the Production Phase (occurring at-or-nearby the wellpad)
- Emissions from Midstream Sources (Central Gas Compression and Processing)

BLM_0164777

**Table Q.2-2      Activity by Alternative for Non-oil and Gas Sources (Year 10)**

| Key Assumption | Base Year | A | B | B.1 | C | D | E |
|---|---|---|---|---|---|---|---|
| **Coal Mining** | | | | | | | |
| **Tons Produced (MMt/yr)** | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 |
| Coal mining activity was estimated for the Somerset Coal Field which includes the West Elk Mine (the only planning area coal mine currently in operation). Emissions estimates were not developed for coal resources in the Tongue Mesa coal field because the resources are heavily faulted with no rail access, and not estimated for coal resources in the Grand Mesa coal field due to low quality coal and transportation constraints. For the Final EIS, UFO personnel provided updated coal mining projection information for the Somerset Coal Field consistent with information from the Coal Resource and Development Potential Report (BLM 2010) indicated that Somerset Field coal production is likely to remain stable at recent/current baseline levels into the future. While demand for the bituminous coal produced by the Somerset Coal Field is likely to increase, production is limited by the capacity of the rail line spur that transports coal away from the Somerset Coal Field. It was assumed that Somerset Coal Field production would remain at current baseline levels. | | | | | | | |
| **Uranium Mining** | | | | | | | |
| **Tons Produced (MMt/yr)** | 0 | 0.73 | 0.73 | 0.73 | 0.73 | 0.73 | 0.73 |
| The Mineral Potential Report (BLM 2011) stated that the development potential of the Morrison Formation in the Uravan Mineral Belt is high. Based on input from UFO BLM personnel, it was assumed that 20 mines would be developed under each alternative, each assumed to have construction and operational characteristics similar to the estimates for the Whirlwind Mine, presented in Whirlwind Mine Environmental Assessment (BLM 2008). | | | | | | | |
| **Sand and Gravel** | | | | | | | |
| **Production (tons processed)** | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Sand and gravel mining activities were assumed to remain unchanged from base year levels for all alternatives based on input from BLM UFO Personnel. | | | | | | | |
| **Fire** | | | | | | | |
| **Acres Burned** | 800 | 800 | 1,120 | 1,120 | 640 | 1,000 | 1,000 |
| BLM UFO Personnel estimated that prescribed burning activities would remain similar to the base year for Alternative A, increase by 40% from the base year for Alternatives B and B.1, decrease by 20% from the base year for Alternative C, and increase from the base year by 25% for Alternative D. Estimates of changes in prescribed burning activity are based on stated objectives by alternative in the draft RMP for wildlife species management, vegetation mosaic objectives, and Wildland Urban Interface. | | | | | | | |
| **Travel and Transportation Management** | | | | | | | |
| **1,000 Vehicle Miles Traveled Per Year** | 1,910 | 2,433 | 1,831 | 1,831 | 2,433 | 2,032 | 2,320 |
| For Alternatives A and C, growth rate estimates similar to those estimated for the BLM Grand Junction Field Office (ENVIRON, 2012) were used to estimate 27% increase in off-road recreational vehicle activity in Year 10. For Alternatives B and B.1, off-road recreational vehicle activity was assumed to decrease by 4% from the base year for Year 10. For Alternative D, off-road recreational vehicle activity was assumed to remain at 2012 levels. | | | | | | | |
| **Livestock Grazing** | | | | | | | |
| **AUMs** | 35,519 | 35,519 | 28,958 | 28,958 | 36,949 | 35,528 | 35,520 |
| BLM UFO Personnel confirmed (2019) animal unit months (AUMs) values for each alternative. | | | | | | | |
| **Lands - ROWs and Realty** | | | | | | | |
| **# of sites** | 28 | 28 | 28 | 28 | 28 | 28 | 28 |
| BLM UFO Personnel indicated no change in activity for this emissions source from the base year for any alternative. | | | | | | | |

BLM_0164778

**Table Q.2-3    Emission Controls Summary Table for Non-oil and Gas Source Categories (note all controls listed in this table apply to each management alternative)**

| Applicable Pollutants | Control Description |
|---|---|
| **Coal Mining** | |
| $PM_{10}$, $PM_{2.5}$ | Emissions from coal mining and assumed emission controls were based on available NEPA documents for Somerset Coal Field development. Fugitive Dust Control: Mitigation measures would be implemented to reduce particulate matter/fugitive dust emissions during construction and production activities. Unpaved roads would be treated with water to control fugitive road dust emissions. Storage piles would be watered to limit wind erosion potential and reduce fugitive emissions. It is assumed that most coal transfer points and processing activities would be enclosed and would therefore reduce fugitive particulate emissions. |
| **Uranium Mining** | |
| $NO_X$, $PM_{10}$, $PM_{2.5}$ | Emissions from uranium mining and assumed emission controls were based on the Whirlwind Mine Environmental Assessment (BLM 2008) **Generators:** Generators would meet NSPS standards and incorporate best available control technology. **Particulate:** $PM_{10}$ emissions would be limited to Colorado Department of Public Health and Environment APEN permitted levels. The ore loading area would be treated with magnesium chloride and water would be used for dust suppression at the waste rock storage and other disturbed areas. |
| **Sand and Gravel** | |
| $PM_{10}$, $PM_{2.5}$ | **Fugitive Dust Control:** Fugitive road dust emissions would be controlled by watering and/or application of magnesium chloride. |
| **Fire** | |
| - No specific emission controls identified - | |
| **Travel and Transportation Management** | |
| - No specific emission controls identified - | |
| **Livestock Grazing** | |
| $PM_{10}$, $PM_{2.5}$ | **Fugitive Dust Control:** Fugitive road dust emissions would be controlled by watering. |
| **Land and Realty ROW** | |
| $PM_{10}$, $PM_{2.5}$ | **Fugitive Dust Control:** Fugitive road dust emissions would be controlled during land and realty right-or-way projects by watering and/or application of magnesium chloride. |

BLM_0164779

**Table Q.2-4    Oil and Gas Emission Controls Description and Percentage by Planning Year 10**

| Applicable Pollutant(s) | Description | Control / Equipment Change Percentage |
|---|---|---|
| **Dust Control** | | |
| PM$_{10}$, PM$_{2.5}$ | watering | 50% dust control |
| **Drill Rig Engines** | | |
| NO$_X$, PM | Cleaner non-road engines | 60% Tier II and 40% Tier IV |
| **Completion Engines** | | |
| NO$_X$, PM | Cleaner non-road engines | 60% Tier II and 40% Tier IV |
| **Green Completions** | | |
| VOC, HAPs | closed loop system and flaring control | 70% fraction green completion |
| **Liquids Removal System** | | |
| All | none | 0% |
| **Production Site Dehydrators** | | |
| VOC, HAPs | none | 0% |
| **Production Site Condensate Tanks** | | |
| VOC, HAPs | Fraction of condensate tanks controlled | 85% |
| **Production Site Pneumatic Devices** | | |
| VOC, HAPs | usage of low-bleed and no-bleed pneumatic devices | 100% no-bleed and 90% low-bleed |
| **Production Site Pneumatic Pumps** | | |
| VOC, HAPs | Fraction of pumps with controls | 85% |
| **Wellhead and Lateral Compressor Engines Electrification** | | |
| All | Fraction of stationary engines powered by on-site grid electricity | 0% |
| **Wellhead, Lateral, Centralized Compressor Engines** | | |
| VOC, CO, NO$_X$ | All engines required to meet Colorado RICE and Federal NSPS Standards | |

*Q.2.2.1.1    Emissions from Well pad Construction and Development*

Emissions from Well pad Construction and Development include those generated by equipment, vehicles and activities related to well pad construction, access roads construction, pipeline construction, wellbore drilling and well completions. **Table Q.2-5** includes the emission sources identified for the well pad construction and development phase. Pollutant emissions are initially estimated on a per surrogate basis and later scaled with the projected surrogate estimate to obtain area-wide annual emissions from each source.

BLM_0164780

Table Q.2-5    Construction Source Categories and Scaling Surrogates

| Equipment Source Category | Emissions Units per Event | Scaling Surrogate |
|---|---|---|
| | | |
| Well Pad, Access Road, and Pipeline Construction Equipment | tons/new pad | New pads per year |
| Well Pad, Access Road and Pipeline Construction Traffic | tons/new pad | New pads per year |
| Drilling Equipment and Completion Equipment | tons/spud | Spuds per year |
| Fracing Equipment | tons/spud | Spuds per year |
| Refracing Equipment | tons/well | Active wells per year |
| Drilling and Well Completion Traffic | tons/spud | Spuds per year |
| Rig Hauling and Rig Moving Traffic | tons/pad | New pads per year |
| Well Pad, Access Road and Pipeline Construction Wind Erosion | tons/new pad | New pads per year |
| Well Completion Venting | tons/spud | Spuds per year |

<u>Well Pad, Access Road, and Pipeline Construction Equipment</u>
This category refers to emissions associated with off-road engines used during construction of well pads, access roads and pipelines and is also inclusive of well pad reclamation activity. Detailed data for each engine type such as horsepower rating, hours of operation, fuel type, engine technology and load factors were derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors for each equipment type. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009). Engines were classified in three types as activity data and emissions factors vary by utility: well pad construction equipment, access road construction equipment and pipeline construction equipment.

Emissions on a per event (new well pads) basis for an engine type for which data was provided were estimated according to Equation 1:

$$E_{engine\,k,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$
Equation (1)

where:
$E_{engine}$ are emissions of pollutant $i$ from an engine type $k$ [ton/pad]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower of the engine $k$ [hp]
$LF$ is the load factor of the engine $k$
$t_{event}$ is the number of hours the engine is used [hr/pad]
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of type-k engines

BLM_0164781

_Area-Wide Annual Emissions from Source Category_

Annual emissions from well pad construction equipment by pollutant were estimated from the sum of engine emissions from each of the construction engine types ($E_{engineTOTAL,i} = \sum E_{engine\,k,i}$) according to Equation 2:

$$E_{well\,pad\,equip,i} = E_{engineTOTAL,i} \times S_{well\,pad} \qquad \text{Equation (2)}$$

where:

> $E_{well\,pad\,equip}$ are annual emissions of pollutant i from well pad construction and development equipment [ton/yr]
>
> $E_{engineTOTAL,i}$ is sum of all engine emissions per event [ton/pad]
>
> $S_{well\,pad}$ is the scaling surrogate for well pad construction [new pads/yr]

Well Pad, Access Road and Pipeline Construction Traffic

This category refers to the exhaust emissions from light-duty and heavy-duty vehicle traffic during well pad, access road and pipeline construction. Emission factors were developed using the MOVES2010a model (EPA 2010). For each field office, by project year representative county emissions factors were developed. The emission factors were prepared for two vehicle classes, heavy duty trucks (source type combination short-haul truck) and pick-up trucks (source type light commercial truck). MOVES2010a emissions factors were modeled to include exhaust running, idle and start, brake wear, tire wear, and evaporative processes. The $N_2O$ emission factor was obtained from 2012 Climate Registry Default Emission Factors (The Climate Registry 2012).

Emissions from two distinct fleet types were estimated in this source category dependent on the vehicle destination/use: (1) well pad and access road construction vehicles and (2) pipeline construction vehicles. Annual vehicle miles traveled (VMT) to well site were available for each vehicle class (light duty and heavy duty) within each fleet type (well pad and access road, and pipeline construction), thus exhaust emissions for each of four vehicle groups were calculated using the MOVES2010a emission factors on a grams per mile basis, as shown in Equation 3.

$$E_{traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185} \qquad \text{Equation (3)}$$

where:

> $E_{traffic,i}$ is traffic exhaust emissions for pollutant i per well pad [ton/pad]
>
> $EF_i$ is the average emission factor of pollutant i [g/mile]
>
> $N_{trips}$ is the annual number of round trips per activity [trips/pad]
>
> $D$ is the round trip distance [miles/trip]
>
> $907185$ is the mass conversion [g/ton]

BLM_0164782

*Area-Wide Annual Emissions from Source Category*

Annual emissions for well pad, pipeline and access road construction traffic by pollutant were propagated with the appropriate scaling surrogate according to Equation 4:

$$E_{well\ pad\ traffic,i} = E_{traffic,i} \times S_{well\ pad}$$   Equation (4)

where:

$E_{well\ pad\ traffic,\ i}$ is the annual exhaust emissions of pollutant i from well pad, pipeline and access road construction traffic [ton/yr]

$E_{traffic,i}$ are the emissions of pollutant i per new well pad [ton/wellpad]

$S_{well\ pad}$ is the scaling surrogate for well pad and access road construction traffic [new pads/yr]

Drilling, Completion and Hydraulic Fracturing Equipment

This section refers to emissions associated with off-road engines used during drilling and completion activities. Detailed data for each engine type per source category such as horsepower rating, hours of operation, fuel type, engine technology and load factors was derived from the literature. Emissions for four distinct engine groups were estimated: (1) drilling equipment, (2) completion equipment, (3) fracing equipment, and (4) refracing equipment. Emissions were estimated separately by engine type as inputs and surrogates (see **Table Q.2-5**) varied by type; however the same methodology delineated by Equations 5 and 6 was used in all calculations.

For drilling, completion and hydraulic fracturing equipment, the EPA Tier 2 Federal Diesel Engine Standard emission rates were applied for $NO_X$, VOC, CO, $PM_{10}$ and $PM_{2.5}$ emissions. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009). Emissions on a per event (spuds or active wells) basis for an engine type were estimated according to Equation 5:

$$E_{engine\ k,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$   Equation (5)

where:

$E_{engine}$ are exhaust emissions of pollutant *i* from an engine type k [ton/event]
$EF_i$ is the emissions factor of pollutant *i* [g/hp-hr]
$HP$ is the horsepower of the engine k [hp]
$LF$ is the load factor of the engine k
$t_{event}$ is the number of hours engine k is used [hr/event]
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of type-k engines

*Area-Wide Annual Emissions from Source Category*

Annual equipment emissions by pollutant were estimated separately for each of the four engine groups and scaled with the appropriate scaling surrogate according to Equation 6:

$$E_{D\&C\ equipment,i} = E_{engineTOTAL,i} \times S_{event}$$   Equation (6)

where:

$E_{D\&C\ equipment,i}$ is annual emissions of pollutant i from completion/drilling equipment [ton/yr]
$E_{engineTOTAL,i}$ is sum of all engine emissions per event [ton/event]
$S_{event}$ is the scaling surrogate for completion/drilling operations [event/yr] according to **Table Q.2-5**.

BLM_0164783

### Q.2.2.1.2    Drilling and Well Completion Traffic

This section refers to on-road emissions from light-duty and heavy-duty vehicle traffic during drilling and completion operations. Methodology to estimate traffic emissions from these source categories was similar to that of source category *Well Pad, Access Road and Pipeline Construction Traffic.* However, emissions for *Drilling Traffic* and *Completion Traffic* were calculated separately since activity inputs and surrogates varied by source category. Input data to estimate the annual vehicle miles traveled (VMT) per activity was derived from the literature for each vehicle class (light duty and heavy duty) within each fleet. Fleets were defined by the vehicle destination or utility. These are shown in **Table Q.2-6** below. Annual average emission factors from EPA's MOVES2010a model as described in Section 2.2.1.2 were applied.

**Table Q.2-6    Vehicle Fleets used during Drilling and Completion**

| Vehicle Use/Destination | Vehicle Class | | Fleet Group ID |
|---|---|---|---|
| | Type | Class | |
| Drilling Traffic | Semi Trucks | Heavy Duty Truck | 1 |
| | Pickup Trucks | Light Duty Truck | 2 |
| Rig Move Drilling Traffic | Semi Trucks | Heavy Duty Truck | 3 |
| Rig Hauling | Semi Trucks | Heavy Duty Truck | 4 |
| Well Completion & Testing | Semi Trucks | Heavy Duty Truck | 5 |
| | Pickup Trucks | Light Duty Truck | 6 |

Exhaust emissions for each of the fleet groups were calculated using the appropriate MOVES2010a emission factors on a grams per mile basis, as shown in Equation 7:

$$E_{traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185} \qquad \text{Equation (7)}$$

where:

$E_{traffic,i}$ is the traffic emissions for pollutant i per spud [tons/spud]

$EF_i$ is the average emission factor of pollutant i [g/mile]

$N_{trips}$ is the annual number of round trips per activity [trips/spud]

$D$ is the round trip distance [miles/trip]

*907185* is the mass unit conversion [g/ton]

Given that emissions from the vehicle fleets are based on the same surrogate (spuds), total emissions from drilling and completion traffic will be the sum of emissions per spud from each fleet (calculated with Equation 7), as shown in Equation 8:

$$E_{traffic,D\&C,i} = \sum_{fleet=1}^{7}\left(E_{traffic,i}\right)_{fleet} \qquad \text{Equation (8)}$$

where:

$E_{traffic,D\&C,i}$ is the total drilling and completions emissions of pollutant i per spud [ton/spud]

$E_{traffic,i}$ is the traffic emissions for pollutant i per spud for a vehicle fleet [tons/spud]

<u>Area-Wide Annual Emissions from Source Category</u>

Annual emissions for drilling/completion traffic by pollutant were propagated with the appropriate scaling surrogate (spuds per year) according to Equation 9:

BLM_0164784

$$E_{traffic,i} = E_{traffic,D\&C,i} \times S_{spud}$$

**Equation (9)**

where:

$E_{category\ traffic,\ i}$ are annual emissions of pollutant i from drilling/completion traffic [ton/yr]

$E_{traffic,D\&C,i}$ is the total drilling and completions emissions of pollutant i per spud [ton/spud]

$S_{spud}$ is the scaling surrogate for drilling/completion traffic [spuds/yr]

### Q.2.2.1.3    Construction Equipment Fugitive Dust

Fugitive dust emissions from disturbed land by well pad construction and reclamation equipment were estimated based on AP-42 Chapter 13 Section 13.2.3 guidance for estimating emissions from Heavy Construction Operations (EPA 1995a). A construction fugitive dust emission factor for total suspended particles (TSP) is available in the AP-42 guidance (1.2 tons-TSP/acre/month of activity).

Total suspended particle emissions from wellpad construction equipment on a per wellpad basis are estimated based on Equation 10:

$$E_{equip.dust,TSP} = EF \times A \times t \times \frac{(1-C)}{30}$$

**Equation (10)**

where:

$E_{equip,dust,TSP}$ is the TSP emissions from construction equipment fugitive dust [tons/wellpad]

$A$ is the average number of acres disturbed per wellpad [acres/wellpad]

$t$ is the number of construction days per wellpad [days]

$C$ is the control efficiency

$30$ is the conversion factor for days/month

Conversion factors for TSP to particulate matter $PM_{10}$ (EPA 2006b) and from $PM_{10}$ to $PM_{2.5}$ (Midwest Research Institute, 2006) were used to estimate other fugitive dust pollutant emissions ($PM_{10}$ and $PM_{2.5}$). A control efficiency of 50% was assumed for well pad construction watering control.

<u>Area-Wide Annual Emissions from Source Category</u>

Annual emissions for construction equipment fugitive dust, by pollutant i, were propagated with the appropriate scaling surrogate (wellpads per year) according to Equation 11:

$$E_{equip,dust,i_{TOTAL}} = E_{equip.dust,i} \times S_{new\ pads}$$

**Equation (11)**

where:

$E_{equip,dust,i_{TOTAL}}$ is the annual dust emissions of pollutant i from construction equipment [ton/yr]

$E_{equip.dust,i}$ is the fugitive dust emissions of pollutant i from construction equipment per pad [tons/wellpad]

$S_{new\ pads}$ is the scaling surrogate for construction equipment fugitive dust [new pads/yr]

### Q.2.2.1.4    Fugitive Dust Emissions from Construction, Drilling and Completion Support Vehicles

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance in Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 12.

$$EF_i = k \left(\frac{s}{12}\right)^a \left(\frac{W}{3}\right)^b$$

**Equation (12)**

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)

BLM_0164785

*s* is the surface material silt content (%)
*W* is the mean vehicle weight (tons)
*k, a, b* are empirical constants according to **Table Q.2-7.**

**Table Q.2-7    Empirical Constants by Pollutant to Estimate Road Dust Emissions Factor**

| Parameter | $PM_{10}$ | $PM_{2.5}$ |
|-----------|-----------|-----------|
| k | 1.5 | 0.15 |
| a | 0.9 | 0.9 |
| b | 0.45 | 0.45 |

Because the emissions factor is a function of vehicle weight, individual emissions factor for heavy duty vehicles and light duty vehicles were derived with Equation 12. To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 13 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100} \qquad \text{Equation (13)}$$

where:

$EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
$EF_i$ is the size-specific emission factor [lb/mile]
*P* is number of precipitation days (>0.01" rainfall) at the site
*CE* is the control efficiency for watering in unpaved roads; CE =50%

Emissions were estimated for all types of vehicles involved in construction, drilling and completion activities. The vehicle groups were classified according to their vehicle class and utility, and literature data was collected to estimate annual vehicle miles traveled per activity (or event), which varied by vehicle groups and by the type of oil and gas development (conventional gas and CBNG). The vehicle fleets used in each type of development are shown in **Table Q.2-8.**

**Table Q.2-8    Relationship of Vehicle Group to Fugitive Road Dust Emissions in Well Construction and Development**

| Vehicle Group ID | Utility/Destination | Vehicle Class | Event (Surrogate) |
|-----------------|--------------------|--------------|------------------|
| 1 | Well Pad Access Road Construction | Heavy Duty Truck | New pads |
| 2 | Well Pad Access Road Construction | Light Duty Truck | New pads |
| 3 | Pipeline Construction | Heavy Duty Truck | New pads |
| 4 | Pipeline Construction | Light Duty Truck | New pads |
| 5 | Drilling Traffic | Heavy Duty Truck | Spuds |
| 6 | Drilling Traffic | Light Duty Truck | Spuds |
| 7 | Rig Move Drilling Traffic | Heavy Duty Truck | New pads |
| 8 | Rig Move Drilling Traffic | Light Duty Truck | New pads |
| 9 | Rig Hauling | Heavy Duty Truck | New pads |
| 10 | Well Completion & Testing | Heavy Duty Truck | Spuds |
| 11 | Well Completion & Testing | Light Duty Truck | Spuds |
| 12 | Fuel Haul Truck | Heavy Duty Truck | Spuds |

BLM_0164786

Fugitive dust road emissions were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 13, along with the vehicle miles traveled for each vehicle group as shown in Equation 14.

$$E_{traffic,i} = \frac{EF_{mitigated} \times N_{trips} \times D}{2000}$$

**Equation (14)**

where:

$E_{traffic,i}$ is the traffic fugitive dust emissions for pollutant i per event [ton/event]

$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]

$N_{trips}$ is the annual number of round trips per activity [trips/event]
$D$ is the round trip distance [miles/trip]
*2000* is the mass conversion [lb/ton]

<u>Area-Wide Annual Emissions from Source Category</u>
Annual emissions for road fugitive dust from construction/drilling/completion traffic were propagated with the appropriate scaling surrogate according to Equation 15:

$$E_{dust,traffic,i} = E_{traffic,i} \times S_{event}$$

**Equation (15)**

where:

$E_{dust,traffic,i}$ are annual emissions of pollutant i for road fugitive dust from construction/drilling/completion traffic [ton/yr]
$E_{traffic,i}$ are the emissions of pollutant i per event (spuds or new pads) [ton/event]
$S_{event}$ is the scaling surrogate for the vehicle group [event/yr]

### Q.2.2.1.5    *Construction Wind Erosion*
Wind erosion dust emissions associated with well pad construction, and road, pipeline construction operations, and well pad reclamation activity were estimated based on AP-42 guidance for the estimation of emissions from industrial wind erosion (EPA 2006b). Wind erosion emissions per well pad were estimated based on Equation 16:

$$E_{dust,i} = \frac{P \times A \times r}{907,185}$$

**Equation (16)**

where:

$E_{dust,i}$ are dust emissions for pollutant i from construction wind erosion [ton/pad]
$P$ is the erosion potential [g/m²]
$A$ is the well pad construction area [m²/pad]
$r$ is the particle size multiplier for $PM_{10}$ or $PM_{2.5}$
*907,185* is a mass unit conversion [g/ton]

The erosions potential is a function of the wind friction velocity, as shown in equation 17 and 18:

$$P = 58 \times (u* - u_t)^2 + 25(u* - u_t)$$

**Equation (17)**

where:

$u*$ is the friction velocity (m/s)
$u_t$ is the threshold friction velocity (m/s)

$$P = 0 \qquad for \qquad (u* \leq u_t)$$

**Equation (18)**

BLM_0164787

Friction velocity estimates ($u*$) were made by multiplying the average annual fastest wind speed by 0.053 per AP-42 guidance (EPA 2006b). Particle size multipliers of 0.5 and 0.075 were assumed for $PM_{10}$ and $PM_{2.5}$ respectively per AP-42 guidance.

<u>Area-Wide Annual Emissions from Source Category</u>
The annual construction dust wind erosion emissions were scaled by multiplying per well pad emissions by the scaling surrogate (new pads) according to Equation 19:

$$E_{wind\ erosion\ total,i} = E_{dust,i} \times S_{well\ pad}$$   **Equation (19)**

where:

> $E_{dust\ erosion\ total,i}$ are the annual emissions of pollutant $i$ from construction dust wind erosion [ton/yr]
> $E_{dust,\ i}$ are the dust emissions of pollutant i per well pad [ton/pad]
> $S_{well\ pad}$ is the scaling surrogate for construction dust wind erosion [pad/yr]

### Q.2.2.1.6   Well Completion Venting
This section describes emissions from well completion venting. The calculation methodology for estimating venting emissions from a single completion event is shown below in Equation 20:

$$E_{completion,i} = \left[\frac{P \times Q_{completion}}{\frac{R}{MW_{gas}} \times T \times 3.5 \times 10^{-5}}\right] \times \frac{f_i}{907185} \times (1 - 0.95F_{flare} - F_{green})$$   **Equation (20)**

where:

> $E_{completion,i}$ is the uncontrolled emissions of pollutant $i$ from a single completion event [ton/event]
> $P$ is atmospheric pressure [1 atm]
> $Q_{completion}$ is the volume of gas generated per completion [MCF/event]
> $R$ is the universal gas constant [0.082 L-atm/mol-K]
> $MW_{gas}$ is the molecular weight of the gas [g/mol]
> $T$ is the atmospheric temperature [298 K]
> $f_i$ is the mass fraction of pollutant $i$ in the completion venting gas
> $F_{green}$ is the fraction of completions that were controlled by green completion techniques
> $F_{flare}$ is the fraction of completions controlled by flare
> $0.95$ is the control efficiency of the flare

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual emissions are obtained by scaling-up emissions per event by the number of spuds for a particular year. The total emissions from completion venting are estimated following Equation 21:

$$E_{completion,TOTAL,i} = E_{completion,i} \times S_{spuds}$$   **Equation (21)**

where:

> $E_{completion,TOTAL}$ are the annual emissions for pollutant i from completion venting [tons/year]
> $E_{completion,i}$ are the completion emissions from a single completion event [tons/event], event=spuds
> $S_{spuds}$ is the scaling surrogate for completion venting in a particular year [spuds/year]

### Q.2.2.1.7   Well Completion Flaring
This section describes the methodology for estimating flaring emissions from completion venting as described in Equation 22. It was assumed the efficiency of the flare was 95 percent.

BLM_0164788

$$E_{flare,completion} = \left( \frac{EF_i \times Q_{completion} \times F_{flared} \times HV}{1000} \right) \Big/ 2000$$

**Equation (22)**

where:

> $E_{flare,completion}$ is the area-wide flaring emissions of pollutant i for well completions [ton/event]
> $EF_i$ is the flaring emissions factor for pollutant $i$ [lb/MMBtu]
> $Q_{completion}$ is the volume of gas generated per completion [MCF/event]
> $HV$ is the local heating value of the gas [BTU/SCF]
> $F_{flared}$ is the fraction of well completions with flares

## Extrapolation to Area-Wide Annual Emissions

Annual area-wide flaring emissions for well completions are scaled-up using the total number of spuds per year as shown in Equation 23:

$$E_{heater,TOTAL,i} = E_{heater,i} \times S_{TOTAL}$$

**Equation (23)**

where:

> $E_{heater,TOTAL}$ is the annual emissions from well completion flaring for pollutant i [ [ton/yr]
> $E_{heater}$ is the emissions from well completion flaring for pollutant i per event [ton/event]
> $S_{TOTAL}$ is the total number of spuds for a particular year [spuds]. The number of well completions is assumed equal to the spuds count for the year.

### Q.2.2.1.8    Emissions from the Production Phase

Emissions from the Production phase include those generated by equipment, vehicles and activities related to oil and gas production at well sites after a well has been completed. Pollutant emissions are initially estimated on a per event basis and later scaled with the projected number of events per year (scaling surrogate) to obtain UFO planning area-wide annual emissions from each source.

## Well Workovers Equipment

This category refers to emissions associated with off-road engines used during well workovers. Detailed data for a typical workover engine such as horsepower rating, hours of operation, fuel type, engine technology and load factor was derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors for 'other oil field equipment' representative of workover engines. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on a per well basis for a workover engine were estimated according to Equation 24:

$$E_{engine,i} = f \times \frac{EF_i \times HP \times LF \times t \times n}{907,185}$$

**Equation (24)**

where:

> $E_{engine}$ are emissions of pollutant $i$ from a workover engine [ton/well]
> $EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
> $HP$ is the horsepower of the engine [hp]
> $LF$ is the load factor of the engine
> $t$ is the number of hours of use per day [hr/day]
> $907,185$ is the mass unit conversion [g/ton]
> $n$ is the number of operating days per well [days/well]

BLM_0164789

$f$ is the well workover frequency per year

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual emissions from well workover equipment by pollutant were estimated according to Equation 25:

$$E_{WO-equip,i} = E_{engine\ i} \times S_{wells}$$  Equation (25)

where:

$E_{WO-\ equip,\ i}$ are annual emissions of pollutant i from workover equipment [ton/yr]
$E_{engine,i}$ is emissions of pollutant i from workover equipment per well [ton/well]
$S_{well\ pad}$ is the scaling surrogate for workovers [active wells/yr]

*Q.2.2.1.9    Production Traffic (Well workovers, Road Maintenance, Well Pad Reclamation and Production)*
This section describes the estimation of exhaust emissions from light-duty and heavy-duty vehicle traffic used for Well Workovers, Maintenance, Well Pad Reclamation and Production. This excludes traffic from tank loading and compressor stations maintenance. Vehicle classes within the four source categories are shown in **Table Q.2-9**. Emissions from these vehicle fleets were first estimated on a per well basis and later on scaled to annual Area-wide emissions with the scaling surrogate, active wells per year.

**Table Q.2-9     Vehicle Fleets Comprising Production Traffic**

| Vehicle Fleets ID | Utility (Source Category) | Vehicle Class | Event (Surrogate) |
|---|---|---|---|
| 1 | Well Workover Commuting Vehicles | Light Duty Truck | Active Wells |
| 2 | | Heavy Duty Truck | |
| 3 | Road Maintenance | Light Duty Truck | |
| 4 | Road and Well Pad Reclamation | Light Duty Truck | |

Emission factors were developed using the MOVES2010a model as described in Section 2.2.1.2 above.

Exhaust emissions for the five vehicle groups were estimated as shown in Equation 26.

$$E_{fleet,traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$  Equation (26)

where:

$E_{fleet,traffic,i}$ is the fleet's traffic emissions for pollutant i per well [tons/well]
$EF_i$ is the average emission factor of pollutant i [g/mile]
$N_{trips}$ is the annual number of round trips per activity [trips/well]
$D$ is the round trip distance [miles/trip]
*907185* is the mass unit conversion [g/ton]

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual emissions for each category (fleet) of production traffic were propagated with the appropriate scaling surrogate (active wells per year) according to Equation 27:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{wells}$$  Equation (27)

where:

$E_{fleet,TOTAL,\ i}$ are annual emissions of pollutant i from a production fleet [ton/yr]

BLM_0164790

$E_{fleet,traffic,i}$ is the emissions of pollutant i per well for a production traffic fleet [ton/well]
$S_{wells}$ is the scaling surrogate for the source category [active wells/yr]

### Q.2.2.1.10  Fugitive Dust Emissions from Production Traffic (Well Workovers, Road Maintenance, Well Pad Reclamation and Other Production)

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 28.

$$EF_i = k \left(\frac{s}{12}\right)^a \left(\frac{W}{3}\right)^b \qquad \text{Equation (28)}$$

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
$s$ is the surface material silt content (%)
$W$ is the mean vehicle weight (tons)
$k, a, b$ are empirical constants according to **Table Q.2-10**.

**Table Q.2-10   Empirical Constants by Pollutant to Estimate Road Dust Emissions Factor**

| Parameter | PM$_{10}$ | PM$_{2.5}$ |
|---|---|---|
| k | 1.5 | 0.15 |
| a | 0.9 | 0.9 |
| b | 0.45 | 0.45 |

Because the emissions factor is a function of vehicle weight, individual emissions factor for heavy duty vehicles and light duty vehicles were calculated with Equation 28. To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 29 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100} \qquad \text{Equation (29)}$$

where:

$EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
$EF_i$ is the size-specific emission factor [lb/mile]
$P$ is number of precipitation days (>0.01" rainfall) at the site
$CE$ is the control efficiency for watering in unpaved roads

Vehicle fleets comprising production traffic are shown in **Table Q.2-9**. Fugitive dust emissions from these vehicle fleets were first estimated on a per well basis and later scaled to annual Area-wide emissions with the scaling surrogate, active wells per year.

Fugitive dust road emissions per well were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 29, along with the vehicle miles traveled for each vehicle group. This is shown in Equation 30.

$$E_{fleet,traffic,i} = \frac{EF_{mitigated} \times N_{trips} \times D}{2000} \qquad \text{Equation (30)}$$

where:

$E_{fleet,traffic,i}$ is the traffic fugitive dust emissions for pollutant i per well [ton/well]

BLM_0164791

$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
$N_{trips}$ is the annual number of round trips per activity [trips/well]
$D$ is the round trip distance [miles/trip]
$2000$ is the mass conversion [lb/ton]

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual fugitive dust emissions for each category (fleet) of Production traffic were propagated with the appropriate scaling surrogate (active wells per year) according to Equation 31:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{wells} \qquad \textbf{Equation (31)}$$

where:

$E_{fleet,TOTAL,i}$ are annual fugitive dust emissions of pollutant i from a production fleet [ton/yr]
$E_{fleet,traffic,i}$ is the fugitive dust emissions of pollutant i per well for a production traffic fleet [ton/well]
$S_{wells}$ is the scaling surrogate for the source category [active wells/yr]

### Q.2.2.1.11    Blowdown Venting
This section refers to the estimation of emissions from venting during well blowdowns. The calculation methodology for estimating emissions from a single blowdown event is shown below in Equation 32:

$$E_{blowdown,i} = \left( \frac{P \times \left( V_{vented} \right)}{\left( \frac{R}{MW_{gas}} \right) \times T \times 3.5 \times 10^{-5}} \right) \times \frac{f_i}{907185} \qquad \textbf{Equation (32)}$$

where:

$E_{blowdown,i}$ is the emissions of pollutant i from a single blowdown event [ton/event]
$P$ is atmospheric pressure [1 atm]
$V_{vented}$ is the volume of vented gas per blowdown (uncontrolled) [MCF/event]
$R$ is the universal gas constant [0.082 L-atm/mol-K]
$MW_{gas}$ is the molecular weight of the gas [g/mol]
$T$ is the atmospheric temperature [298 K]
$f_i$ is the mass fraction of pollutant i in the vented gas

<u>Extrapolation to Area-Wide Annual Emissions</u>
The total emissions from all annual blowdowns events occurring are estimated with Equation 33:

$$E_{blowdown,TOTAL} = E_{blowdown,i} \times N_{blowdown} \times S_{wells} \qquad \textbf{Equation (33)}$$

where:

$E_{blowdown,TOTAL}$ are the total annual emissions from blowdowns [tons/yr]
$E_{blowdown,i}$ are the blowdown emissions from a single blowdown event [tons/event]
$N_{blowdown}$ is the frequency of blowdowns per well per year [events/yr-well]
$S_{wells}$ is the total number of active wells for a particular year [wells]

### Q.2.2.1.12    Well Recompletion Venting
This section describes emissions from well recompletion venting. The calculation methodology for estimating venting emissions from a single recompletion event is shown below in Equation 34:

BLM_0164792

$$E_{recompletion,i} = \left[ \frac{P \times Q_{recompletion}}{\frac{R}{MW_{gas}} \times T \times 3.5 \times 10^{-5}} \right] \times \frac{f_i}{907185} \qquad \text{Equation (34)}$$

where:

$E_{recompletion,i}$ is the uncontrolled emissions of pollutant $i$ from a single recompletion event [ton/event]
$P$ is atmospheric pressure [1 atm]
$Q_{recompletion}$ is the volume of gas generated per recompletion [MCF/event]
$R$ is the universal gas constant [0.082 L-atm/mol-K]
$MW_{gas}$ is the molecular weight of the gas [g/mol]
$T$ is the atmospheric temperature [298 K]
$f_i$ is the mass fraction of pollutant $i$ in the recompletion venting gas

Extrapolation to Area-Wide Annual Emissions
Annual emissions are obtained by scaling-up emissions per event with the total number of recompletion events in a particular year. The total emissions from recompletion venting are estimated following Equation 35:

$$E_{recompletion,TOTAL,i} = E_{recompletion,i} \times f \times S_{well\ count} \qquad \text{Equation (35)}$$

where:

$E_{completion,TOTAL}$ are the annual emissions for pollutant i from recompletion venting [tons/year]
$E_{completion,i}$ are the venting emissions from a single recompletion event [tons/event]
$f$ is the frequency of recompletion events per well per year [events/yr-well]
$S_{well\ count}$ is the scaling surrogate for recompletion venting in a particular year [active wells]

## Q.2.2.1.13    Wellhead Fugitives

This source category refers to fugitive emissions or *leaks* from well equipment such as pump seals, valves, connectors, flanges, etc. Fugitive emissions were estimated for three main streams identified: gas service stream, liquids service stream and high oil stream. VOC, $CO_2$ and $CH_4$ emissions per stream were estimated using device-specific TOC emission factors for oil and gas production (EPA 1995b) and equipment counts. Input data was obtained from the literature on total device counts per well by type of equipment and by the type of service to which the equipment applies – gas, liquids and high oil.

Fugitive VOC emissions for an individual device in a given stream (gas, liquids, and high oil) were estimated according to Equation 36:

$$E_{fugitive\ VOC,k} = EF_{TOC} \times N \times t_{annual} \times Y \qquad \text{Equation (36)}$$

where:

$E_{fugitive\ VOC,\ k}$ is the fugitive VOC emissions for a given device k [ton/yr-well]
$EF_{TOC}$ is the emission factor of TOC [kg/hr/device]
$N$ is the total number of devices type-k for a given stream per well [devices/well]
$Y$ is the ratio of VOC to TOC in the vented gas

Total VOC fugitive emissions for a given stream are equal to the sum of all fugitive emissions from devices in that stream per Equation 37:

$$E_{fugitive\ VOC,stream} = \sum E_{fugitive\ VOC,k} \qquad \text{Equation (37)}$$

BLM_0164793

where:

$E_{fugitive\ VOC,stream}$ is the total fugitive VOC emissions in a given stream per well [ton/yr-well]

$CO_2$ and $CH_4$ fugitive emissions per stream were estimated according to Equations 38 and 39:

$$E_{fugitiveCH4,stream} = E_{fugitiveVOC,stream} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}}$$ **Equation (38)**

$$E_{fugitiveCO2,stream} = E_{fugitiveVOC,stream} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$ **Equation (39)**

where:

$E_{fugitive\ CO2,stream}$ is the total fugitive $CO_2$ emissions in a given stream per well [ton/yr-well]
$E_{fugitive\ CH4,stream}$ is the total fugitive $CH_4$ emissions in a given stream per well [ton/yr-well]
*Weight fractions* per pollutant were based on gas compositions. For gas and well streams, sales gas composition was used. For condensate stream, fugitive-post flash compositions were used.

Extrapolation to Area-Wide Annual Emissions
Fugitive emissions were propagated annually according to Equation 40 using the scaling surrogate, active well counts:

$$E_{fugitive,i} = E_{fugitive\ i,stream} \times S_{well\ count}$$ **Equation (40)**

where:

$E_{fugitive,\ i}$ are the annual fugitive emissions for pollutant i in a given stream [ton/yr]
$E_{fugitive\ l,\ stream}$ are fugitive emissions of pollutant i in a stream per well [ton/yr-well]
$S_{well\ count}$ is the number of active wells for a particular year [active wells]

### Q.2.2.1.14    Pneumatic Devices
Emissions for pneumatic devices will vary by the bleed rate of the device. The methodology for estimating the emissions from a mix of pneumatic devices i (liquid level controllers, pressure controllers, etc.) for a single typical well is shown in Equation 41:

$$E_{pneumatic,j} = \frac{f_j}{907185}\left(\sum_i \dot{V}_i \times N_i \times t_{annual}\right) \times \frac{P}{\left(\left(R/MW_{gas}\right) \times T \times 3.5 \times 10^{-5}\right)}$$ **Equation (41)**

where:

$E_{pneumatic,j}$ is the total emissions of pollutant j from all pneumatic devices for a typical well [ton/year/well]
$\dot{V}_i$ is the volumetric bleed rate from device i [MCF/hr/device]
$N_i$ is the average number of devices *i* found in a well [devices/well]
$t_{annual}$ is the number of hours per year that devices were operating [8760 hr/yr]
$P$ is the atmospheric pressure [1 atm]
$R$ is the universal gas constant [0.082 L-atm/mol-K]
$MW_{gas}$ is the molecular weight of the gas [g/mol]
$T$ is the atmospheric temperature [298 K]
$f_j$ is the mass fraction of pollutant j in the vented gas

Extrapolation to Area-Wide Annual Emissions
Annual emissions from pneumatic devices were estimated according to Equation 42:

BLM_0164794

$$E_{pneumatic,TOTAL,j} = E_{pneumatic,j} \times N_{well}$$

**Equation (42)**

where:

> $E_{pneumatic,TOTAL,j}$ is the total annual emissions of pollutant $j$ from pneumatic devices [ton/yr]
> $E_{pneumatic,j}$ is the pneumatic device emissions of pollutant $j$ for a single typical well [ton/yr/well]
> $N_{well}$ is the total number of active wells in the basin [wells]

### Q.2.2.1.15   Pneumatic Pumps

To estimate emissions from pneumatic pumps, literature data indicating the average rate of gas consumption per gallon of chemical injected and the annual chemical throughput for a single pump was applied. Emissions per well from pneumatic pumps were estimated as shown in Equation 43:

$$E_{pump,i} = \frac{N_{CIP} \times V_{vented,gas} \times t_{pump} \times MW_i \times R \times Y_i}{2000}$$

**Equation (43)**

where:

> $E_{pump,i}$ is the pneumatic pump emissions for pollutant $i$ per well [ton/yr-well]
> $V_{vented,TOTAL}$ is the average gas venting rate per pump [SCF/pump/hr]
> $N_{CIP}$ is the number of gas-actuated pneumatic pumps per well [pump/well]
> $t_{pump}$ is the annual hours of operation of a pump [hrs/yr]
> $MW_i$ is the molecular weight of pollutant $i$ [lb/lb-mol]
> $R$ is the universal gas constant [lb-mol/391.9scf]
> $Y_i$ is the molar fraction of pollutant $i$ in pneumatic pump vented gas
> $2000$ is the mass unit conversion [lb/ton]

<u>Extrapolation to Area-Wide Annual Emissions</u>

To estimate area-wide annual emissions from pneumatic pumps the scaling surrogate, active wells, was used according to Equation 44

$$E_{pneumaticpumps,i} = E_{pump,i} \times S_{well\ count}$$

**Equation (44)**

where:

> $E_{pneumaticpumps,i}$ are the annual emissions for pollutant $i$ from pneumatic pumps [ton/yr]
> $E_{pump,i}$ is the emissions from all pneumatic pumps per well [ton/yr-well]
> $S_{well\ count}$ is the number of active wells for a particular year [wells]

### Q.2.2.1.16   Water Injection Pumps

This category refers to exhaust emissions associated with diesel combustion in water injection pump engines. Detailed data for each engine type such as horsepower rating, hours of operation, fuel type, engine technology and load factors was derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on a per well basis for a water injection pump were estimated according to Equation 45:

$$E_{engine,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$

**Equation (45)**

BLM_0164795

where:

$E_{engine}$ are per-well emissions of pollutant $i$ from water injection pumps [ton/well]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower of the pump [hp]
$LF$ is the load factor of the pump
$t_{event}$ is the number of hours the engine is used annually [hrs/unit]
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of water injection pumps per well [units/well]

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual emissions from water injection pumps for pollutant i were estimated according to Equation 46:

$$E_{water\ pumps,i} = E_{engine,i} \times S_{well}$$   **Equation (46)**

where:

$E_{well\ pad\ equip}$ are annual emissions of pollutant i from water injection pumps [ton/yr]
$E_{engine,i}$ is engine emissions per well [ton/well]
$S_{well}$ is the scaling surrogate for water injection pumps [active wells/yr]

### Q.2.2.1.17   Miscellaneous Engines

This category refers to exhaust emissions associated with miscellaneous engines at well sites. Detailed data for miscellaneous engines such as horsepower rating, hours of operation, fuel type, engine technology and load factors was derived from the literature. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on a per well basis for miscellaneous engines were estimated according to Equation 47:

$$E_{engine,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185} \times f$$   **Equation (47)**

where:

$E_{engine}$ are per-well emissions of pollutant $i$ from miscellaneous engines [ton/well]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower of the pump [hp]
$LF$ is the load factor of the pump
$t_{event}$ is the number of hours the engine is used [hrs/unit]
$f$ is the fraction of wells served by a miscellaneous engine
$907,185$ is the mass unit conversion [g/ton]
$n$ is the number of engines per well [units/well]

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual emissions from miscellaneous engines for pollutant i were estimated according to Equation 48:

$$E_{water\ pumps,i} = E_{engine,i} \times S_{well}$$   **Equation (48)**

where:

$E_{well\ pad\ equip}$ are annual emissions of pollutant i from miscellaneous engines [ton/yr]
$E_{engine,i}$ is engine emissions per well [ton/well]
$S_{well}$ is the scaling surrogate for miscellaneous engines [active wells/yr]

BLM_0164796

### Q.2.2.1.18   Compressor Station Maintenance Traffic Exhaust

This section describes the estimation of exhaust emissions from light-duty vehicles (pickup trucks) used for compressor maintenance at compressor stations. Emission factors were developed using the MOVES2010a model (EPA 2010) as described in Section 2.2.1.2. The total vehicle miles travelled annually from maintenance visits to a single compressor station were obtained from the literature.

Exhaust emissions for this fleet were estimated as shown in Equation 49.

$$E_{fleet,traffic,i} = \frac{EF_i \times VMT_{CS}}{907185} \qquad \textbf{Equation (49)}$$

where:

$E_{fleet,traffic,i}$ is the fleet's traffic emissions for pollutant i per well [tons/station]
$EF_i$ is the average emission factor for light duty vehicles of pollutant i [g/mile]
$VMT_{CS}$ is the annual miles travelled for maintenance compressor station [miles/station]
907185 is the mass unit conversion [g/ton]

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual emissions for the compressor maintenance fleet were propagated with the scaling surrogate "total count of active compressor stations" according to Equation 50:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{CS} \qquad \textbf{Equation (50)}$$

where:

$E_{fleet,TOTAL,i}$ are annual emissions of pollutant i from compressor station maintenance traffic [ton/yr]
$E_{fleet,traffic,i}$ is the emissions of pollutant i per station for the fleet [ton/station]
$S_{CS}$ is the scaling surrogate for the source category [number of active compressor stations per year]

### Q.2.2.1.19   Fugitive Dust Emissions from Compressor Station Maintenance Traffic

Road dust emission factors for light duty vehicles traveling on unpaved surfaces to and from compressor stations were estimated with the same methodology as in Section 2.2.1.2.6 using Equations 28 and 29. Fugitive dust road emissions per station (visited) were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 29, along with the annual vehicle miles traveled per compressor station. This is shown in Equation 51.

$$E_{fleet,traffic,i} = \frac{EF_{mitigated} \times VMT}{2000} \qquad \textbf{Equation (51)}$$

where:

$E_{fleet,traffic,i}$ is the traffic fugitive dust emissions for pollutant i per station [ton/station]
$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
$VMT$ is the annual miles travelled for maintenance compressor station [miles/station]
2000 is the mass conversion [lb/ton]

<u>Extrapolation to Area-Wide Annual Emissions</u>
Annual fugitive dust emissions for compressor station maintenance traffic were propagated with the "total number of compressor stations" according to Equation 52:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{CS} \qquad \textbf{Equation (52)}$$

where:

BLM_0164797

$E_{fleet,TOTAL, i}$ are annual fugitive dust emissions of pollutant i from compressor station maintenance traffic [ton/yr]

$E_{fleet,traffic,i}$ is the emissions of pollutant i per station for the fleet [ton/station]

$S_{CS}$ is the scaling surrogate for the source category [number of active compressor stations per year]

### Q.2.2.1.20   Condensate Tanks Flashing

An uncontrolled VOC emissions factor applicable to Garfield, Mesa, Rio Blanco, and Moffat Counties (Colorado Department of Public Health and Environment 2006) was used to estimate emissions for condensate tanks in conventional gas and coalbed natural gas developments on a per barrel basis. The published emissions factor was 10 lbs VOC/bbl [0.005 tons/bbl]; for planning areas outside of those counties the emission factor of 11.8 lbs VOC/bbl [0.0059 tons/bbl] was used (Colorado Department of Public Health and Environment 2006). The VOC emissions factor was multiplied by the annual condensate production from each type of well to propagate VOC emissions to the planning area level for each year. $CO_2$ and $CH_4$ total emissions were then calculated using the weight fraction ratios from local flash gas composition analyses using Equations 53 and 54.

$$E_{tanks,CH4} = E_{tanks,VOC} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}} \qquad \textbf{Equation (53)}$$

$$E_{tanks,CO2} = E_{tanks,VOC} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}} \qquad \textbf{Equation (54)}$$

where:

$E_{tanks,VOC}$ is the total annual condensate tanks emissions from APENS database [tons/yr]
$E_{tanks,CO2}$ is the total condensate tank $CO_2$ emissions [tons/yr]
$E_{tanks,CH4}$ is the total condensate $CH_4$ emissions [tons/yr]
*Weight fractions* of each pollutant in flash gas

### Q.2.2.1.21   Loading Emissions from Condensate or Oil Tanks

This section describes emissions from truck loading of condensate tanks. The loading loss rate is estimated following Equation 55:

$$L = 12.46 \times \left( \frac{S \times V \times M}{T} \right) \qquad \textbf{Equation (55)}$$

where:

$L$ is the loading loss rate [lb/1000gal]
$S$ is the saturation factor taken from AP-42 default values based on operating mode. The operating mode for loading assumed was submerged loading: dedicated normal service.
$V$ is the true vapor pressure of the liquid loaded [psia]
$M$ is the molecular weight of the vapor [lb/lb-mole]
$T$ is the temperature of the bulk liquid [°R], T=540 R

VOC tank loading emissions are then estimated by Equation 56:

$$E_{loading,VOC} = L \times Y_{voc} \times \frac{42}{2000} \qquad \textbf{Equation (56)}$$

where:

$E_{loading}$ are the VOC tank loading emissions [ton/bbl]
$L$ is the loading loss rate [lb/1000gal]

BLM_0164798

$Y_{VOC}$ is the weight fraction of VOC in the vapor in the liquid loaded
*42* is a unit conversion [gal/bbl]
*2000* is a unit conversion [lbs/ton]

$CO_2$ and $CH_4$ emissions are calculated based on Equations 57-58:

$$E_{loading,CH4} = E_{loading,VOC} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}}$$   **Equation (57)**

$$E_{loading,CO2} = E_{loading,VOC} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$   **Equation (58)**

where:

$E_{loading,CO2}$ is the total loading $CO_2$ emissions per barrel of liquid [ton/bbl]
$E_{loading,CH4}$ is the total loading $CH_4$ emissions per barrel of liquid [ton/bbl]
*Weight fractions* of each pollutant in the vapor losses from the liquid loaded

<u>Area-Wide Annual Emissions from Source Category</u>
Annual emissions per pollutant i from condensate loading were scaled by annual condensate production per Equation 59:

$$E_{tank\ loadout,i} = E_{loading,i} \times S_{bbl\ condensate}$$   **Equation (59)**

where:

$E_{tank\ loadout,\ i}$ is the total condensate loading emissions for pollutant i from tank load-out [ton/yr]
$E_{loading,\ i}$ is the condensate loading emissions for pollutant i from per barrel [ton/bbl]
$S_{bbl\ condensate}$ is the total annual of barrels condensate [bbl/yr]

### Q.2.2.1.22   *Condensate, and Produced Water Hauling Traffic Exhaust*

This section describes the estimation of exhaust emissions from heavy-duty vehicles (haul trucks) used for produced condensate hauling from the well site. Emission factors were developed using the MOVES2010a model (EPA 2010) as described in Section 2.2.1.2. The total round trip distance for each hauling trip was derived from the literature. A hauling volume of per truck of 200 barrels of condensate, hence the number of round trips per barrel was estimated (1/200).

Exhaust emissions for condensate hauling fleet were estimated as shown in Equation 60a.

$$E_{fleet,traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$   **Equation (60a)**

where:

$E_{fleet,traffic,i}$ is the hauling traffic exhaust emissions for pollutant i per barrel [ton/bbl]
$EF_i$ is the average emission factor of pollutant i for heavy duty vehicles [g/mile]
$N_{trips}$ is the annual number of round trips per barrel [trips/bbl]. N=1/200
*D* is the round trip distance [miles/trip]
*907185* is the mass conversion [g/ton]

<u>Area-Wide Annual Emissions from Condensate Hauling</u>
Annual emissions for the condensate hauling fleet were propagated with the annual condensate production according to Equation 61a:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,,i} \times S_{bbl,condensate}$$   **Equation (61a)**

BLM_0164799

where:

$E_{fleet,TOTAL,i}$ are annual emissions of pollutant i from condensate hauling traffic [ton/yr]

$E_{fleet,traffic,i}$ is the emissions of pollutant i per barrel for the hauling fleet [ton/bbl]

$S_{bbl,condensate}$ is the scaling surrogate for the source category [barrels of condensate produced per year]

<u>Produced Water Hauling Exhaust Emissions</u>

Produced water refers to the water produced with the gas once the well has been completed and is under operation. This water is typically hauled from the well site storage tanks with water trucks or sent via pipeline to injection wells. Annual produced water rates will vary by the type of well. It was assumed that the annual rate of water production for conventional gas and CBNG wells was 33,632 and 1,671 barrels per year, respectively based on IHS Enerdeq Database estimates of 2011 water production by well type. It was assumed that produced water truck capacity is 130 bbl and that 50 percent of the water is hauled out.

Exhaust emissions for produced water hauling fleet were estimated as shown in Equation 60b:

$$E_{fleet,traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$
   **Equation (60b)**

where:

$E_{fleet,traffic,i}$ is the produced water hauling exhaust emissions for pollutant i per well [ton/well]

$EF_i$ is the average emission factor of pollutant i for heavy duty vehicles [g/mile]

$N_{trips}$ is the annual number of round trips per well [trips/well]

$D$ is the round trip distance [miles/trip]

$907185$ is the mass conversion [g/ton]

<u>*Area-Wide Annual Emissions from Produced Water Hauling*</u>

Annual emissions for the produced water hauling fleet were propagated to the planning area according to Equation 61b:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{active\ wells}$$
   **Equation (61b)**

where:

$E_{fleet,TOTAL,i}$ are annual emissions of pollutant i from produced water hauling traffic [ton/yr]

$E_{fleet,traffic,i}$ is the emissions of pollutant i per well for the hauling fleet [ton/well]

$S_{active\ wells}$ is the scaling surrogate for the source category, active wells per year [wells/yr]

<u>Fugitive Dust Emissions from Condensate and Produced Water Hauling Traffic</u>

Road dust emission factors for heavy duty vehicles traveling on unpaved surfaces for condensate hauling and produced water hauling were estimated with the same methodology as in Section 2.2.1.2.6 using Equations 28 and 29. Because the number of trips for both of these activities is based on different surrogates - per barrel for condensate hauling and per well for produced water hauling - as shown in Section 2.2.1.2.15, fugitive dust road emissions of each fleet were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 29. This is shown in Equation 62.

$$E_{fleet,traffic,i} = \frac{EF_{mitigated} \times D \times N_{trips}}{2000}$$
   **Equation (62)**

BLM_0164800

where:

$E_{fleet,traffic,i}$ is the traffic fugitive dust emissions for pollutant i per (1) barrel of condensate [ton/bbl] for condensate hauling or (2) well [ton/well] for produced water hauling

$EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]

$N_{trips}$ is the annual number of round trips per (1) barrel of condensate hauled [trips/bbl] for condensate hauling or (2) well [trips/well] for produced water hauling

$D$ is the round trip distance per hauling trip [miles/trip]

$2000$ is the mass conversion [lb/ton]

<u>*Area-Wide Annual Emissions from Condensate and Produced Water Hauling Traffic*</u>

Annual fugitive dust emissions for condensate hauling were propagated with the annual condensate production according to Equation 63:

$$E_{fleet,TOTAL,i} = E_{fleet,traffic,i} \times S_{bbl,condensate\ or\ active\ wells}$$   **Equation (63)**

where:

$E_{fleet,TOTAL\ i}$ are annual fugitive dust emissions of pollutant i from condensate hauling traffic [ton/yr]

$E_{fleet,traffic,i}$ is the dust emissions of pollutant i per barrel for the hauling fleet [ton/surrogate]

$S_{bbl,condensate\ or\ active\ wells}$ is the scaling surrogate for the source category: (1) [barrels of condensate produced per year] for condensate hauling or (2) [active wells per year] for produced water hauling

### Q.2.2.1.23   Heaters

This section describes the methodology for estimating emissions from heaters and reboilers. Heater emissions are a function of the properties of the local produced gas used as a fuel. Emissions factors for external combustion of natural gas were obtained from AP-42 Section 1.4 Natural Gas Combustion (EPA 1995a). Emissions per well from heaters and reboilers can be estimated individually using Equation 64.

$$E_{heater,i} = N_{heaters} \times \frac{EF_i \times Q_{heater} \times t_{annual}}{\left(HV_{local} \times 2000\right)}$$   **Equation (64)**

where:

$E_{heater,i}$ is the per well emissions for pollutant from a given heater [ton/well-yr]

$EF_i$ is the heater emission factor for a given pollutant i [lb/MM SCF]

$Q_{heater}$ is the heater MMBTU/hr rating [MMBTU$_{rated}$/hr]

$HV_{local}$ is the local natural gas heating value [BTU$_{local}$/SCF]

$t_{annual}$ is the annual hours of operation [hr/yr]

$N_{heaters}$ is the number of heaters per well

<u>*Area-Wide Annual Emissions from heaters*</u>

Annual emissions for heaters and reboilers are estimated with Equation 65 using the scaling surrogate active wells.

$$E_{heater,TOTAL,i} = E_{heater,i} \times W_{TOTAL}$$   **Equation (65)**

where:

$E_{heater,TOTAL}$ is the total emissions of pollutant i for a given heater type in the Project [ton/yr]

BLM_0164801

$E_{heater}$ is the per well annual emissions from a given heater type for pollutant i [ton/well-yr]
$W_{TOTAL}$ is the total number of wells for a particular year [wells]

### Q.2.2.1.24    Dehydrator Emissions

This section describes the methodology to estimate emissions from dehydrator still vents. Uncontrolled emission factors per unit of gas production for emissions of VOC, $CH_4$ and $CO_2$ were derived from the literature for the various well types. Total emissions were propagated using the gas production by well type, assuming 100 percent of the gas undergoes well site dehydration. This was done applying Equation 66.

$$E_{dehyTOTAL,i,j} = EF_{dehy,i} \times S_{gas\ production,j}$$    **Equation (66)**

where:

$E_{dehy,TOTAL,i,j}$ are the total area-wide emissions from dehydrators still vents for pollutant i in year j [tons/yr]

$EF_{dehy,i}$ is the dehydrator still vent emissions rate [tons/MCF]

$S_{gas\ production}$ is the annual gas production in year j [MCF/yr]

## Q.2.2.2  Midstream Sources

Midstream sources include gathering and treating emissions associated with facilities such as compressor stations and gas plants. Base year midstream emissions are taken from the 2011 APEN (Air Pollutant Emission Notice) emissions database provided by Colorado Department of Public Health and Environment (2013). Colorado Department of Public Health and Environment provided APEN emissions for all oil and gas related emission sources covered by the following SCC and SIC codes:

- All of the SCCs 202002*, 310*, 404003* (where * indicates all sub-SCCs for the SCC)
- And only those with the following SICs: 13*, 492*, 4612

Planning area sources were identified based on whether the latitude and longitude of each source was within the UFO planning area. The APEN oil and gas emissions database includes both well site and midstream sources. Midstream sources were identified for inclusion in the calculator based on the facility name and the suite of equipment included at a given facility. More detailed information regarding the emissions inventory for midstream sources is available from the BLM UFO upon request.

Emissions were available in the APEN emissions database for the pollutants VOCs, CO, $NO_X$, $PM_{10}$ and $SO_2$ in tons per year. Emissions for $CH_4$ and $CO_2$ were calculated using the vented gas speciation according to Equations 67 and 68 for the following sources.

- Glycol Dehydrator
- Natural Gas Processing Facilities, Gas Sweeting: Amine Process
- Condensate Tanks
- Natural Gas Processing Facilities, Flanges and Connections

$$E_{source,CH4} = E_{tanks,VOC} \times \frac{weight\ fraction_{CH4}}{weight\ fraction_{VOC}}$$    **Equation (67)**

$$E_{sourceCO2} = E_{tanks,VOC} \times \frac{weight\ fraction_{CO2}}{weight\ fraction_{VOC}}$$    **Equation (68)**

where:

$E_{source,VOC}$ is the total annual emissions from APENS database *a source* [tons/yr]

$E_{source,CO2}$ is the total $CO_2$ emissions from *a source* [tons/yr]

BLM_0164802

$E_{source,CH4}$ is the total $CH_4$ emissions from *a source* [tons/yr]
*Weight fractions* of each pollutant in the vented gas

For combustion sources such as compressor engines, process heaters and flares, emissions for $CH_4$, $N_2O$ and $CO_2$ were estimated using the ratios of each greenhouse gas to NOx of emissions factors from AP-42.

Emissions in future years were estimated by multiplying 2011 emissions by the ratio of gas production in a given future year to gas production in 2011. As necessary, for accounting purposes, total midstream sector emissions are allocated to each well type (CBNG or conventional) and/or mineral designation (BLM or cumulative) based on the corresponding percentage of annual gas production by well type and/or annual gas production by mineral designation.

### Q.2.2.3   Non-Oil and Gas Sources

The methodologies implemented to estimate base year and future year emissions by alternative from non-oil and gas sources are explained in this section. More detailed information regarding input assumptions, emissions factors and calculations by source category is available from the BLM UFO upon request.

#### Q.2.2.1.25   Coal Mining

Annual base year emissions from coal mining were estimated for the Somerset Coal Fields based on existing emission estimates for the operation of the producing mine, West Elk (BLM 2012d), and information provided by UFO mining specialists. Based on the *Coal Resource and Development Potential Report* (BLM 2010) and information from UFO personnel, which indicated that Somerset Coal Field production is likely to remain stable at recent levels into the future, emissions for all future years for all scenarios were set equal to base year emissions.

#### Q.2.2.1.26   Uranium Mining

Annual emissions from uranium mining were estimated according to the number of mines constructed and/or producing in a given year combined with estimates of emissions per mine from discrete emission producing activities: wind erosion, fugitive dust, heavy equipment, and on-road vehicles. Activity inputs such as the equipment and vehicle operations, tons of material processed, and disturbed area were taken primarily from the Whirlwind Mine EA (BLM 2008). The estimated number of uranium mines in operation is shown in **Table Q.2-11**.

Table Q.2-11   Schedule of Uranium Mines in Production

| Year | Uranium Mining Facilities All Alternatives |
|------|:--:|
| 2008-2012 | 0 |
| 2013 | 1 |
| 2014 | 3 |
| 2015 | 5 |
| 2016 | 7 |
| 2017 | 9 |
| 2018 | 10 |
| 2019 | 11 |
| 2020 | 12 |
| 2021 | 13 |

BLM_0164803

| Year | Uranium Mining Facilities All Alternatives |
|------|--------------------------------------------|
| 2022 | 14 |
| 2023 | 15 |
| 2024 | 16 |
| 2025 | 17 |
| 2026 | 18 |
| 2027 | 19 |
| 2028 | 20 |
| 2029 | 20 |
| 2030 | 20 |

Wind Erosion

Wind erosion dust emissions were estimated based on AP-42 guidance for the estimation of emissions from industrial wind erosion (EPA 2006b) based on Equation 71:

$$E_{dust,i} = \frac{k \times P \times M \times N}{907,185}$$   **Equation (71)**

where:

$E_{dust,\ i}$ are dust emissions for pollutant i from construction wind erosion [ton/mine]
$k$ is the particle size multiplies [0.5 for PM$_{10}$ and 0.075 from PM$_{2.5}$]
$P$ is the erosion potential [g/m$^2$]
$M$ is the number of disturbed acres [m$^2$/pad]
$N$ is the number of disturbances
$907,185$ is a mass unit conversion [g/ton]

The erosions potential is a function of the wind friction velocity, as shown in Equation 72 and 73:

$$P = 58 \times (u^* - u_t)^2 + 25(u^* - u_t)$$   **Equation (72)**

where:

$u^*$ is the friction velocity (m/s)
$u_t$ is the threshold friction velocity (m/s)

$$P = 0 \qquad for \qquad (u^* \le u_t)$$   Equation (73)

Friction velocity estimates ($u^*$) were made by multiplying the average annual fastest wind speed from Uncompahgre, Colorado from 1947 to 1979 by 0.053 per AP-42 guidance (EPA 2006b).

Fugitive Dust

Fugitive dust emissions from ventilation and surface facilities were taken from Whirlwind Mine Environmental Assessment (BLM 2008) permit not-to-exceed values.

Heavy Equipment

This category refers to emissions associated with off-road equipment used in uranium mining. The EPA NONROAD2008a model (EPA 2009b) was used to compile emission factors for each equipment type included in surveys. The N$_2$O emissions factor was obtained from the 2009 American Petroleum Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions on per piece of equipment were estimated according to Equation 74:

$$E_{engine,i} = \frac{EF_i \times HP \times LF \times t_{event} \times n}{907,185}$$

Equation (74)

where:

$E_{engine}$ are emissions of pollutant $i$ [ton/equipment]
$EF_i$ is the emissions factor of pollutant $i$ [g/hp-hr]
$HP$ is the horsepower [hp]
$LF$ is the load factor
$t_{event}$ is the number of hours the engine is used [hr/pad]
$907,185$ is the mass unit conversion [g/ton]

<u>On-road Vehicles – Exhaust</u>
This category refers to the exhaust and road dust emissions from light-duty and heavy-duty vehicle traffic used in uranium mining.

Emission factors were developed using the MOVES2010a model (EPA 2010). The emission factors were prepared for two vehicle classes, Semi-Trucks (Heavy Duty) and Pick-up Trucks (Light Duty), and represent annual average per-mile emissions in 2008 for Mesa County, Colorado. MOVES2010a emissions factors were modeled to include exhaust running, idle and start, brake wear, and tire wear, and evaporative processes. The $N_2O$ emission factor was obtained from 2012 Climate Registry Default Emission Factors (The Climate Registry 2012).

Emissions were calculated using the MOVES2010a emission factors on a grams per mile basis, as shown in Equation 75.

$$E_{traffic,i} = \frac{EF_i \times N_{trips} \times D}{907185}$$

Equation (75)

where:

$E_{traffic,i}$ is traffic exhaust emissions for pollutant i per well pad [ton/pad]
$EF_i$ is the average emission factor of pollutant i [g/mile]. For exhaust emissions, $EF_i$ = MOVES emission factors.
$N_{trips}$ is the annual number of round trips per activity [trips/pad]
$D$ is the round trip distance [miles/trip]
$907185$ is the mass conversion [g/ton]

<u>On-road Vehicles – Road Dust</u>
Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 76.

$$EF_i = k \left(\frac{s}{12}\right)^a \left(\frac{W}{3}\right)^b$$

Equation (76)

where:

$EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
$s$ is the surface material silt content (%)
$W$ is the mean vehicle weight (tons)
$k, a, b$ are empirical constants according to **Table Q.2-10**.

BLM_0164805

Because the emissions factor is a function of vehicle weight, individual emissions factors for heavy duty vehicles and light duty vehicles were derived with Equation 76. To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 77 was applied:

$$EF_{mitigated} = EF_i \times \frac{365-P}{365} \times \frac{100-CE}{100}$$   Equation (77)

where:

> $EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
> $EF_i$ is the size-specific emission factor [lb/mile]
> $P$ is number of precipitation days (>0.01" rainfall) at the site (Precipitation days at Uncompahgre Walker, CO; from Western Regional Climate Center. Mean data 1990-2010)
> $CE$ is the control efficiency for watering in unpaved roads

Fugitive dust road emissions were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 77, along with the vehicle miles traveled for each vehicle group as shown in Equation 78.

$$E_{traffic,i} = \frac{EF_{mitigated} \times N_{trips} \times D}{2000}$$   Equation (78)

where:

> $E_{traffic,i}$ is the traffic fugitive dust emissions for pollutant i per event [ton]
> $EF_{mitigated}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
> $N_{trips}$ is the annual number of round trips per activity [trips]
> $D$ is the round trip distance [miles/trip]
> $2000$ is the mass conversion [lb/ton]

### Q.2.2.1.27   Sand and Gravel
Annual emissions from sand and gravel extraction were estimated based on the data provided by BLM UFO personnel on the quantity of sand and gravel material extracted, equipment operation, and vehicle use for sand and gravel extraction.

Wind erosion, heavy equipment, and on-road vehicle exhaust and road dust emissions were estimated with sand and gravel source category activity inputs using the similar methodology to uranium mining as described above.

<u>Extraction and Processing Fugitive Dust</u>
Fugitive dust emissions associated with sand and gravel extraction were estimated based on AP-42 methodology. Extraction emissions were estimated using AP-42, Chapter 11.9 methodology and include estimates of emissions from the following processes: scraping, removal of overburden, grading, scraper unloading, batch drop, and truck loading. AP-42 methodology for estimating emissions from rock crushing (Chapter 11.19) and concrete batching (11.12) were used to estimate processing emissions for the following processes: tertiary crushing, fines crushing, screening, fines screening, conveyor transfer point, truck drop unloading, and batch plant crushed rock transfer. For all processes except removal of overburden, grading, and batch drop, AP-42 particulate matter emission rates were applied directly to UFO sand and gravel activity. For removal of overburden, grading, and batch drop standard AP-42 equations were used to estimate particulate matter emissions.

### Q.2.2.1.28   Vegetation – Prescribed Fire and Mechanical Treatment
Annual emissions from prescribed fires and mechanical treatments were estimated based on the data provided by BLM UFO personnel on the heavy equipment operation and vehicle use during prescribed fires and mechanical treatments as well as recent estimates of prescribed fire acreage burned. BLM UFO

BLM_0164806

Personnel estimated that prescribed burning activities would remain similar to the base year for Alternative A, increase by 40% from the base year for Alternatives B and B.I, decrease by 20% from the base year for Alternative C, and increase from the base year by 25% for Alternative D. BLM UFO Personnel estimated that mechanical treatment activities would remain similar to the base year for Alternative A, decrease by 20% from the base year for Alternatives B and B.I, increase by 50% from the base year for Alternative C, and increase from the base year by 20% for Alternative D. Estimates of changes in prescribed burning and mechanical treatment activity are based on stated objectives by alternative in the draft RMP for wildlife species management, vegetation mosaic objectives, and Wildland Urban Interface.

Heavy equipment and on-road vehicle exhaust emissions were estimated with prescribed fire and mechanical treatment source category activity inputs using the similar methodology to uranium mining as described above.

Smoke

Smoke emissions from prescribed fires were estimated by applying the annual estimate of acreage burned to a tons/acre burned emission factor. The tons/acre burned emission factor was derived estimated based on average emission rates from prescribed fires in the Western Governors' Association, Western Regional Air Partnership 2002 Fire Emission Inventory (Western Governors' Association, Western Regional Air Partnership 2005).

Fugitive Dust from Heavy Equipment

Fugitive dust emissions from heavy equipment were estimated based on AP-42 Chapter 13 Section 13.2.3 guidance for estimating emissions from Heavy Construction Operations (EPA 1995a). A construction fugitive dust emission factor for total suspended particles (TSP) is available in the AP-42 guidance (1.2 tons-TSP/acre/month of activity).

Total suspended particle emissions from wellpad construction equipment on a per wellpad basis are estimated based on Equation 79:

$$E_{equip.dust,TSP} = EF \times A \times t \times \frac{(1-C)}{30}$$

Equation (79)

where:

$E_{equip,dust,TSP}$ is the TSP emissions from construction equipment fugitive dust [tons]
$EF$ is the construction fugitive dust emission factor [tons/acre/month]
$A$ is the average number of acres disturbed annually [acres]
$t$ is the number of days to completion[days]
$C$ is the control efficiency for watering
$30$ is the conversion factor for days/month

Conversion factors for TSP to particulate matter $PM_{10}$ (EPA, 2006b) and from $PM_{10}$ to $PM_{2.5}$ (Midwest Research Institute, 2006) were used to estimate other fugitive dust pollutants emissions ($PM_{10}$ and $PM_{2.5}$).

On-road Vehicle Road Dust

Fugitive dust emissions from vehicle travel on unpaved roads were estimated based on the AP-42 technical guidance Section 13.2.2.1 Unpaved Roads (EPA 2006a). Road dust emission factors for vehicles traveling on unpaved surfaces at industrial sites can be estimated with Equation 80.

$$EF_i = \frac{k\left(\frac{s}{12}\right)^a \left(\frac{S}{30}\right)^b}{\left(\frac{M}{0.5}\right)^c} - C$$

Equation (80)

BLM_0164807

where:

> $EF$ is the size-specific particulate emissions factor for pollutant i (lb/mile)
> $s$ is the surface material silt content (%)
> $S$ is the mean vehicle speed (mi/hr)
> $M$ is the surface material moisture content (%)
> $k$, $a$, $b$ are empirical constants
> $C$ is the emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT)

To account for natural mitigation of road dust emissions due to annual precipitation and from watering control, Equation 81 was applied:

$$EF_{mitigated} = EF_i \times \frac{365 - P}{365} \times \frac{100 - CE}{100} \qquad \text{Equation (81)}$$

where:

> $EF_{mitigated}$ is the annual average emission factor for uncontrolled conditions including natural mitigation [lb/mile]
> $EF_i$ is the size-specific emission factor [lb/mile]
> $P$ is number of precipitation days (>0.01" rainfall) at the site (Precipitation days at Uncompahgre Walker, CO; from Western Regional Climate Center. Mean data 1990-2010)
> $CE$ is the control efficiency for watering in unpaved roads

Fugitive dust road emissions were calculated using the mitigated emissions factor ($EF_{mitigated}$) from Equation 81, along with the vehicle miles traveled for each vehicle group as shown in Equation 82:

$$E_{traffic,i} = \frac{EF_{mitigated,i} \times N_{trips} \times D}{2000} \qquad \text{Equation (82)}$$

where:

> $E_{traffic,i}$ is the traffic fugitive dust emissions for pollutant i per event [ton]
> $EF_{mitigated,i}$ is the average emission factor of pollutant i for fugitive dust emissions [lb/mile]
> $N_{trips}$ is the annual number of round trips per activity [trips]
> $D$ is the round trip distance [miles/trip]
> $2000$ is the mass conversion [lb/ton]

### Q.2.2.1.29   Comprehensive Travel and Transportation Management

Annual emissions from Travel and Transportation Management were estimated for off-road recreational vehicles based on annual estimates of activity by recreational equipment type (ATV, motorcycle, or snowmobile). Annual activity estimates were calculated based on the number of annual visitors per year using each recreational equipment type combined with estimates of activity per visit (14 miles per visit for ATVs and motorcycles and 4 hours per visit for snowmobiles). BLM UFO personnel also provided estimates of activity for heavy equipment used in road maintenance operations.

Heavy equipment emissions were estimated with Travel and Transportation Management activity using the similar methodology to uranium mining as described above. Recreational vehicle road dust emissions were estimated using methodology similar to road dust from Prescribed Fire and Mechanical Treatment activities.

Recreational Vehicles

This category refers to emissions associated with off-road motorcycles and all-terrain vehicles (ATVs). The EPA NONROAD2008a model (EPA 2009b) was used to estimate emission rates on a grams per mile basis for motorcycle and ATV use and on a grams per hour basis for snowmobile use within the UFO planning area. The $N_2O$ emissions factor was obtained from the 2009 American Petroleum

BLM_0164808

Institute O&G GHG Methodologies Compendium, Tables 4-13 and 4-17 (American Petroleum Institute 2009).

Emissions were estimated according to Equation 83:

$$E_{vehicle\ type,i} = \frac{EF_i \times A}{907,185}$$

Equation (83)

where:

$E_{vehicle\ type}$ are emissions of pollutant $i$ for motorcycles or ATVs [ton]
$EF_i$ is the emissions factor of pollutant $i$ [g/mi or g/hr]
$A$ is the number of miles travelled annually by motorcycles or ATVs [mi] or the number of hours of annual use for snowmobiles [hr]
907,185 is the mass unit conversion [g/ton]

### Q.2.2.1.30   Livestock Grazing

Annual emissions from livestock grazing and associated activities were estimated based on the data provided by BLM UFO personnel on the number of animals in the UFO planning area for the base year and for the future year for each alternative as well as information about the annual frequency, type, and duration of livestock associated construction projects.

Wind erosion, heavy equipment, and on-road vehicle exhaust emissions were estimated with livestock grazing associated activity using the similar methodology to uranium mining as described above. Road dust emissions were estimated using methodology similar to road dust from Prescribed Fire and Mechanical Treatment described above.

<u>Enteric Fermentation</u>

Enteric fermentation emissions were estimated by applying the Intergovernmental Panel on Climate Change (2006) $CH_4$ emission rate per animal to the number of animals in the UFO planning area.

### Q.2.2.1.31   Lands and Realty – Rights-of-Way

Annual emissions from land and realty – right-of-way activities were estimated based on the data provided by BLM UFO personnel on the annual frequency and type of projects.

Wind erosion, heavy equipment, and on-road vehicle exhaust emissions were estimated with land and realty – right-of-way source category activity inputs using the similar methodology to uranium mining as described above. Road dust emissions were estimated using methodology similar to road dust from Prescribed Fire and Mechanical Treatment described above.

## Q.3   EMISSION INVENTORY RESULTS

This section presents emissions inventories information tables summarizing the planning area baseline and future projected emissions. Emissions comparisons relative to baseline conditions and across all Alternatives are also provided. More detailed information regarding input assumptions, emissions factors, and calculations by source category is available from the BLM UFO upon request.

## Q.3.1  BLM Action Emissions Summary

**Table Q.3-1** shows BLM action total emissions across all source categories for the base year and for each alternative. Notably, Alternative B.I has the lowest emissions except for $SO_2$, while Alternative C

has the highest emissions across all pollutants and Alternative E has the second-highest projected emissions of the alternatives.

**Table Q.3-1    Estimated Annual Emissions Summary BLM Actions within the Planning Area**

| Scenario | Emissions (tons per year) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | CO | NOX | PM$_{10}$ | PM$_{2.5}$ | SO$_2$ | HAPs | CO$_2$ | CH$_4$ | N$_2$O | CO$_2$e |
| **Base Year** | 204 | 731 | 256 | 620 | 165 | 6 | 23 | 53,257 | 56,677 | 6 | 1,982,199 |
| **Year 10** | | | | | | | | | | | |
| Alternative A | 555 | 1,561 | 1,187 | 1,290 | 417 | 16 | 62 | 283,988 | 63,374 | 10 | 2,441,879 |
| Alternative B | 545 | 1,542 | 1,193 | 1,186 | 411 | 17 | 62 | 295,458 | 63,147 | 13 | 2,446,351 |
| Alternative B.1 | 518 | 1,493 | 1,152 | 1,177 | 408 | 17 | 58 | 280,175 | 62,535 | 12 | 2,410,207 |
| Alternative C | 653 | 1,801 | 1,322 | 1,336 | 429 | 17 | 73 | 318,375 | 64,758 | 10 | 2,523,144 |
| Alternative D | 610 | 1,716 | 1,276 | 1,250 | 422 | 17 | 69 | 313,313 | 64,122 | 12 | 2,497,194 |
| Alternative E | 614 | 1,742 | 1,282 | 1,297 | 428 | 17 | 69 | 314,717 | 64,532 | 12 | 2,512,570 |

## Q.3.2 BLM Action Emissions Details and Comparison across Alternatives

**Table Q.3-2** (Estimated Annual Emissions by Activity – Base Year (tons/year)) shows the estimated emissions for each pollutant from each emissions-generating activity analyzed for the base year. The estimated emissions for each of the alternatives are compared to these base year emissions and are included in the discussion of each alternative.

**Table Q.3-2    Estimated Annual Emissions by Activity – Base Year (tons/year)**

| Emissions Generating Activity | VOC | CO | NO$_X$ | PM10 | PM2.5 | SO2 | HAPs |
|---|---|---|---|---|---|---|---|
| Well-Site Oil and Gas | 38.2 | 23.2 | 22.7 | 9.0 | 2.2 | 0.0 | 6.7 |
| Mid-Stream Oil and Gas | 10.3 | 37.4 | 30.3 | 0.7 | 0.7 | 0.1 | 1.1 |
| **Fluid Minerals Total** | **48.5** | **60.6** | **53.0** | **9.8** | **2.9** | **0.1** | **7.9** |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Sand and Gravel | 0.0 | 0.1 | 0.0 | 3.4 | 0.6 | 0.0 | 0.0 |
| **Solid Minerals Total** | **21.1** | **82.6** | **112.5** | **103.3** | **77.6** | **1.6** | **2.1** |
| Livestock Grazing | 0.0 | 0.3 | 0.1 | 0.5 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 82.7 | 480.7 | 88.3 | 156.2 | 47.1 | 4.7 | 8.3 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 51.1 | 105.9 | 0.9 | 329.6 | 34.1 | 0.0 | 5.1 |
| **Other Activities Total** | **133.9** | **587.4** | **90.6** | **507.4** | **84.1** | **4.7** | **13.4** |
| **TOTAL BASELINE** | **203.5** | **730.7** | **256.1** | **620.5** | **164.6** | **6.4** | **23.4** |

Source: Appendix Q (Air Emission Inventory Technical Support Document)
[1]CBNG = coalbed natural gas; VOC = volatile organic compounds; [1]CO = carbon monoxide; NO$_X$ = nitrogen oxides; PM$_{10}$ = particulate matter smaller than 10 microns in effective diameter; PM$_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; SO$_2$ = sulfur dioxide; HAPs = Hazardous Air Pollutants

BLM_0164810

### Alternative A

Total estimated emissions for Alternative A are the third-lowest of the alternatives for volatile organic compounds and second-lowest for nitrogen oxides, and the annual emissions rates are closer to Alternatives B and B.I rates than annual emissions rates for Alternatives C, D, and E. This is due primarily to the reasonably foreseeable development rate predicted for oil and gas activities, which is similar to Alternative B and higher than Alternative B.I, but lower than Alternatives C, D, and E. Estimated emissions for Alternative A increase compared with the base year for all pollutants. Nitrogen oxide and carbon monoxide increases can be attributed to engine combustion emissions at both oil and gas development and uranium mining operations. $PM_{10}$ and $PM_{2.5}$ increases are due primarily to fugitive dust and fuel combustion emissions from increased uranium mining operations and travel and transportation management. Volatile organic compounds, sulfur dioxide, and hazardous air pollutant emission increases can be attributed to increased oil and gas activities. Table Q.3-3 (Estimated Annual Emissions by Activity, Alternative A – Planning Year 10) shows the estimated emissions for each pollutant from each emission- generating activity analyzed for Alternative A.

**Table Q.3-3    Estimated Annual Emissions by Activity, Alternative A – Planning Year 10**

| Emissions Generating Activity | VOC | CO | NOx | PM10 | PM2.5 | SO2 | HAPs |
|---|---|---|---|---|---|---|---|
| Well-Site Oil and Gas - CBNG | 58.2 | 174.9 | 123.2 | 48.1 | 11.6 | 0.4 | 5.8 |
| Well-Site Oil and Gas - Conventional | 221.4 | 177.2 | 188.2 | 64.5 | 15.5 | 0.2 | 28.1 |
| Mid-Stream Oil and Gas | 67.8 | 245.6 | 199.1 | 4.8 | 4.8 | 0.7 | 7.5 |
| *Fluid Minerals Total* | 347.5 | 597.8 | 510.5 | 117.3 | 31.9 | 1.2 | 41.4 |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 37.8 | 263.8 | 472.7 | 469.5 | 213.7 | 8.7 | 3.8 |
| Sand and Gravel | 0.0 | 0.1 | 0.2 | 3.4 | 0.6 | 0.0 | 0.0 |
| *Solid Minerals Total* | 58.9 | 346.4 | 585.4 | 572.8 | 291.3 | 10.4 | 5.9 |
| Livestock Grazing | 0.0 | 0.3 | 0.1 | 0.5 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 82.7 | 480.7 | 88.3 | 156.2 | 47.1 | 4.7 | 8.3 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 65.5 | 135.7 | 1.2 | 422.5 | 43.7 | 0.0 | 6.6 |
| *Other Activities Total* | 148.3 | 617.3 | 90.8 | 600.4 | 93.7 | 4.7 | 14.8 |
| **TOTAL** | 554.7 | 1,561.4 | 1,186.7 | 1,290.5 | 416.9 | 16.2 | 62.1 |
| *Change over Base Year* | 173% | 114% | 363% | 108% | 153% | 153% | 166% |

[1] CBNG = coalbed natural gas; CO = carbon monoxide; HAPs = hazardous air pollutants; $NO_X$ = nitrogen oxides; $PM_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; $PM_{10}$ = particulate matter smaller than 10 microns in effective diameter; $SO_2$ = sulfur dioxide; VOC = volatile organic compounds

### Fluid Leasable Minerals – Oil and Gas

Estimated emissions from oil and gas development for Alternative A were calculated using a reasonably foreseeable development rate based on a development level equivalent to 417 new federal wells (including Forest Service wells) added between the base year and planning Year 10, and associated drilling, completion, gas treatment, and compression activities over the life of the RMP. Estimated emissions from a small number of existing base year federal wells and associated decline over a 10-year period were also included in the estimated emissions calculations.

While the levels of oil and gas development differ by alternative, emissions controls were assumed to be the same for all alternatives for planning Year 10, as follows:

BLM_0164811

R. Drill rig and completion engines that meet or exceed Tier II engine emission standards as defined in 40 CFR Part 89, the emissions calculations assume 60 percent Tier II and 40 percent Tier IV engines by planning Year 10.
S. Fugitive dust control from pad, road, and pipeline construction using frequent watering and speed control with an assumed control efficiency of 50 percent
T. Control of waste gas from well stimulation and completion assuming 100 percent capture of all vented emissions, then 70 percent sent to flare and 70 percent sent to "green completion"
U. 100 percent of drilling/completion fluids are delivered and disposed of by truck
V. 85 percent well pad tank emissions are captured and flared at conventional gas wells; no well pad tank control is assumed for coalbed natural gas wells
W. 100 percent disposal of produced water and condensate is by truck
X. 10 percent of pneumatic devices would be no-bleed, while the remaining 90 percent would be low-bleed devices

Estimated emissions from oil and gas development would increase for all pollutants over the base year for this alternative due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter have the potential to impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions have the potential to contribute to regional ozone formation.

Hazardous air pollutants emissions could increase the risk of localized human health impacts.

*Solid Minerals – Coal, Uranium, Sand, and Gravel*

Estimated emissions for solid mineral development activities for Alternative A include underground coal mining, uranium and vanadium surface mining, and sand and gravel sales. Development and production rates for this alternative are based on the Mineral Potential Report (BLM 2011), recent permitting, historical production data for the planning area, and surface use restrictions included in this alternative. Solid mineral development and emissions estimates over the life of the RMP for this alternative include the following assumptions:

Y. Coal mine production remains unchanged from base year rates with any drop off in existing mine (West Elk) production replaced by production from future mine development in the area. In December 2017, the BLM formally adopted the Supplemental Final EIS and the Forest Service decision for Federal Coal Lease Modifications COC-1362 and COC-67232 (Forest Service 2017a, 2017b; BLM 2017b).
Z. Development of up to 20 small uranium/vanadium mines over the life of the plan
AA. Continuous sales of sand and gravel equivalent to the base year
BB. Fugitive dust control from construction activities using frequent watering and speed control with an assumed control efficiency of 50 percent

Emissions from solid mineral mining are expected to increase for all pollutants over the base year in Year 10 due to expected increases in mining activities (primarily new uranium mine developments). Fugitive dust ($PM_{10}/PM_{2.5}$) emissions from surface disturbing activities associated with uranium/vanadium mining are the most notable increase. These emissions have the potential to contribute to localized increases in particulate matter concentrations and impacts on visibility. Nitrogen oxide emissions from mining equipment associated with uranium mining are also expected to increase substantially. This increase has the potential to contribute to increased ozone formation and impacts on visibility and atmospheric deposition.

The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities. The rate of mineral development predicted for the emissions

BLM_0164812

inventory is based on mineral potential and may result in overestimating of emissions for this category. For example, the rate of uranium mining development predicted for the emissions calculations is independent of the availability of local processing facilities. The actual permitting and construction of a local uranium processing facility could have a significant effect on actual uranium mineral development over the life of the RMP.

*Lands and Realty – Rights-of-Way*

Emissions-generating activities associated with this category include construction activities for communication sites, transmission lines, and non-oil and gas pipelines. The UFO predicts very little activity over the life of the RMP for these activities. A total of 28 projects with an average of 4 acres of disturbance per project were assumed as the level of development for this category. This level of development is not expected to vary by alternative or increase over the life of the RMP. Estimated emissions would be very low for all alternatives and are not expected to contribute to significant air quality impacts. During normal operations, BMPs will be observed to minimize air quality impacts associated with applying or storing pesticides and herbicides, during lawn servicing, and during other routine activities associated with this activity.

*Livestock Grazing*

Emissions-generating activities associated with this category include primarily construction activities in support of grazing operations. Construction and maintenance of reservoirs, springs, wells, pipelines, and fences generate fugitive dust emissions and combustion emissions from construction equipment. Estimated emissions are based on AUMs from cattle grazing permits. Grazing activities are expected to stay the same as the base year over the life of the RMP for this alternative. Livestock grazing activities would decrease slightly for Alternatives B and B.I, increase slightly for Alternatives C and D, and remain about the same for Alternative E. Estimated emissions from this category would be very low for all alternatives and are not expected to contribute to significant air quality impacts.

*Comprehensive Travel and Transportation Management*

Emissions-generating activities associated with this category include fugitive dust from recreational road construction and maintenance, fugitive dust from OHV use, and combustion emissions from OHV use. Estimated emissions from these activities were calculated based on vehicle miles traveled and associated miles of road for recreational vehicles including all-terrain vehicles, dirt motorcycles, and snowmobiles. The UFO has estimated the counts of visitors using each type of OHV. Projected growth in OHV use over the life of the RMP was estimated to be 27 percent.). The magnitude of estimated volatile organic compound emissions predicted for this category has the potential to contribute to ozone formation. Estimated fugitive dust emissions could result in increased ambient concentrations of particulate matter and impacts on visibility.

*Vegetation – Prescribed Fire and Mechanical Treatment*

Emissions-generating activities associated with the category included smoke from prescribed fires and combustion emissions from mechanical equipment used to manage vegetation and wildlife habitat. Estimated emissions were calculated based on historical acres burned and treated in the planning area. Moderate growth was assumed for each alternative in accordance with the management goals for that alternative. Emissions of all pollutants from this category were predicted to remain equivalent to the base year over the life of the RMP due to the assumption of equivalent activity in future years under Alternative A vegetation management actions. However, the magnitude of emissions from prescribed fire has the potential to result in impacts on visibility, ozone formation, and human and wildlife health.

BLM_0164813

### Alternative B

Total estimated emissions for Alternative B would be the second-lowest of the alternatives for volatile organic compounds and particulate matter, and be the third-lowest for nitrogen oxides. This is due primarily to the lower reasonably foreseeable development rate for oil and gas development compared to Alternatives C, D, and E. Estimated emissions for Alternative B increase compared to the base year for all pollutants. Nitrogen oxide and carbon monoxide increases can be attributed to engine combustion emissions at both increased oil and gas developments and increased uranium mining operations. $PM_{10}$ and $PM_{2.5}$ increases are due primarily to fugitive dust and fuel combustion emissions from increased oil and gas developments and uranium mining operations. Volatile organic compounds, sulfur dioxide, and hazardous air pollutant emission increases can be attributed to increased oil and gas activities. **Table Q.3-4** (Estimated Annual Emissions by Activity, Alternative B – Planning Year 10) shows the estimated emissions for each pollutant from each emission-generating activity analyzed for Alternative B.

**Table Q.3-4     Estimated Annual Emissions by Activity, Alternative B – Planning Year 10**

| Estimated Emissions (tons/yr) - Alternative B - Planning Year 10 | | | | | | |
|---|---|---|---|---|---|---|
| Emissions Generating Activity | VOC | CO | NOx | PM10 | PM2.5 | SO2 | HAPs |
| Well-Site Oil and Gas - CBNG | 57.3 | 172.3 | 121.3 | 47.3 | 11.5 | 0.4 | 5.7 |
| Well-Site Oil and Gas - Conventional | 239.7 | 192.2 | 204.2 | 70.0 | 16.8 | 0.2 | 30.4 |
| Mid-Stream Oil and Gas | 69.5 | 251.7 | 204.0 | 4.9 | 4.9 | 0.7 | 7.7 |
| *Fluid Minerals Total* | 366.5 | 616.1 | 529.5 | 122.2 | 33.1 | 1.2 | 43.8 |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 37.8 | 263.8 | 472.7 | 469.5 | 213.7 | 8.7 | 3.8 |
| Sand and Gravel | 0.0 | 0.1 | 0.2 | 3.4 | 0.6 | 0.0 | 0.0 |
| *Solid Minerals Total* | 58.9 | 346.4 | 585.4 | 572.8 | 291.3 | 10.4 | 5.9 |
| Livestock Grazing | 0.0 | 0.2 | 0.1 | 0.4 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 73.2 | 483.1 | 76.4 | 172.5 | 52.8 | 5.3 | 7.3 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 46.1 | 95.4 | 0.8 | 297.0 | 30.7 | 0.0 | 4.6 |
| *Other Activities Total* | 119.4 | 579.3 | 78.5 | 491.1 | 86.5 | 5.3 | 11.9 |
| **TOTAL** | 544.8 | 1,541.8 | 1,193.4 | 1,186.1 | 410.9 | 16.9 | 61.6 |
| *Change over Base Year* | 168% | 111% | 366% | 91% | 150% | 163% | 163% |

[1] CBNG = coalbed natural gas; CO = carbon monoxide; HAPs = hazardous air pollutants; $NO_X$ = nitrogen oxides; $PM_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; $PM_{10}$ = particulate matter smaller than 10 microns in effective diameter; $SO_2$ = sulfur dioxide; VOC = volatile organic compounds

### Fluid Leasable Minerals – Oil and Gas

Oil and gas development predicted for Alternative B is based on a development level equivalent to 428 new federal wells (including Forest Service wells) added between the base year and Year 10, and associated drilling, completion, gas treatment, and compression activities. Estimated emissions from a small number of existing base-year federal wells and associated decline over a 10-year period were also included in the estimated emissions calculations. Assumptions for developing Alternative B emissions are the same as those used for Alternative A.

Estimated emissions from oil and gas development would increase for all pollutants over the base year for this alternative due to increased development.

Similar to Alternative A, estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air

BLM_0164814

quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions have the potential to contribute to regional ozone formation.

Hazardous air pollutants emissions could increase the risk of localized human health impacts.

*Solid Minerals – Coal, Uranium, Sand, and Gravel*

Estimated emissions and impacts on air quality would be the same as Alternative A for this category. Future coal mining rates in the UFO (from West Elk Mine) are expected to remain almost static from base year to future years, meaning not much change would occur in annual emissions for coal mining in the planning area. West Elk Mine is allowed to continue producing coal at current rates (BLM 2017b).

*Lands and Realty – Rights-of-Way*

Estimated emissions and impacts on air quality would be the same as Alternative A for this category.

*Livestock Grazing*

Estimated emissions and the potential for associated impacts on air quality are expected to decrease from the base year and be lower for this alternative than for Alternative A due to lower permitted AUMs and other livestock grazing management actions included for this alternative.

*Comprehensive Travel and Transportation Management*

Estimated emissions and impacts on air quality would be lower for this alternative than for Alternative A due to road closures and other travel management actions included for this alternative.

*Vegetation – Prescribed Fire and Mechanical Treatment*

Estimated emissions and impacts on air quality from this category are expected to be similar to the base year and Alternative A due to decreased use of mechanical treatments and increased use of prescribed fire under the management actions for this alternative.

**Alternative B.I**

Total estimated emissions for Alternative B.I would be the lowest of the alternatives for all pollutants except sulfur dioxide. This is due primarily to the lower reasonably foreseeable development rate of oil and gas development compared to Alternatives A, B, C, D, and E. All pollutants' estimated emissions for Alternative B.I would increase compared to the base year. Nitrogen oxide and carbon monoxide increases can be attributed to engine combustion emissions at both increased oil and gas developments and increased uranium mining operations. $PM_{10}$ and $PM_{2.5}$ increases would be due primarily to fugitive dust and fuel combustion emissions from increased uranium mining operations and vegetation management activities (e.g., prescribed fire). Volatile organic compounds, sulfur dioxide, and hazardous air pollutant emission increases can be attributed to increased oil and gas activities. **Table Q.3-5** (Estimated Annual Emissions by Activity, Alternative B.I – Planning Year 10) shows the estimated emissions for each pollutant from each emission-generating activity analyzed for Alternative B.I.

BLM_0164815

**Table Q.3-5    Estimated Annual Emissions by Activity, Alternative B.I – Planning Year 10**

| Estimated Emissions (tons/yr) - Alternative B.I - Planning Year 10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Emissions Generating Activity | VOC | CO | NOx | PM10 | PM2.5 | SO2 | HAPs |
| Well-Site Oil and Gas - CBNG | 52.1 | 156.5 | 110.2 | 42.9 | 10.4 | 0.3 | 5.2 |
| Well-Site Oil and Gas - Conventional | 223.9 | 179.2 | 190.3 | 65.2 | 15.7 | 0.2 | 28.4 |
| Mid-Stream Oil and Gas | 63.9 | 231.4 | 187.6 | 4.5 | 4.5 | 0.6 | 7.0 |
| *Fluid Minerals Total* | *339.8* | *567.1* | *488.1* | *112.6* | *30.5* | *1.1* | *40.6* |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 37.8 | 263.8 | 472.7 | 469.5 | 213.7 | 8.7 | 3.8 |
| Sand and Gravel | 0.0 | 0.1 | 0.2 | 3.4 | 0.6 | 0.0 | 0.0 |
| *Solid Minerals Total* | *58.9* | *346.4* | *585.4* | *572.8* | *291.3* | *10.4* | *5.9* |
| Livestock Grazing | 0.0 | 0.2 | 0.1 | 0.4 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 73.2 | 483.1 | 76.4 | 172.5 | 52.8 | 5.3 | 7.3 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 46.1 | 95.4 | 0.8 | 297.0 | 30.7 | 0.0 | 4.6 |
| *Other Activities Total* | *119.4* | *579.3* | *78.5* | *491.1* | *86.5* | *5.3* | *11.9* |
| **TOTAL** | 518.1 | 1,492.7 | 1,151.9 | 1,176.5 | 408.3 | 16.8 | 58.5 |
| *Change over Base Year* | *155%* | *104%* | *350%* | *90%* | *148%* | *161%* | *150%* |

¹ CBNG = coalbed natural gas; CO = carbon monoxide; HAPs = hazardous air pollutants; NO$_X$ = nitrogen oxides; PM$_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; PM$_{10}$ = particulate matter smaller than 10 microns in effective diameter; SO$_2$ = sulfur dioxide; VOC = volatile organic compounds

*Fluid Leasable Minerals – Oil and Gas*

Oil and gas development predicted for Alternative B.I is based on a development level equivalent to 391 new federal wells (including Forest Service wells) added between the base year and Year 10, and associated drilling, completion, gas treatment, and compression activities. Estimated emissions from a small number of existing base year federal wells and associated decline over a 10-year period were also included in the estimated emissions calculations.. Assumptions for developing Alternative B.I emissions are the same as those used for Alternative A.

Similar to Alternative A, estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. Emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation.

Hazardous air pollutants emissions could increase the risk of localized human health impacts.

*Solid Minerals – Coal, Uranium, Sand, and Gravel*

Estimated emissions and air quality impacts would be the same as Alternative A. Future coal mining rates in the UFO would be the same as those described for Alternative B.

*Lands and Realty – Rights-of-Way*

Estimated emissions and air quality impacts would be the same as Alternative A.

*Livestock Grazing*

Estimated emissions and associated air quality impacts would decrease from the base year and be lower for Alternative B than Alternative A due to lower permitted AUMs and other livestock grazing management actions included in Alternative B.

BLM_0164816

*Comprehensive Travel and Transportation Management*

Estimated emissions and air quality impacts would be lower for Alternative B.1 than Alternative A due to road closures and other travel management actions included in Alternative B.1.

*Vegetation – Prescribed Fire and Mechanical Treatments*

Estimated emissions and air quality impacts would be similar to the base year and Alternative A due to decreased use of mechanical treatments and increased use of prescribed fire in Alternative B.1.

## Alternative C

Total estimated emissions for Alternative C would be the highest of the alternatives for all pollutants. This is due primarily to the highest reasonably foreseeable development rate predicted for oil and gas activities of any of the alternatives. Estimated emissions for Alternative C increase significantly from the base year for all analyzed pollutants. Increases in emissions are similar to those for Alternative A for all source categories, except oil and gas development. **Table Q.3-6** (Estimated Annual Emissions by Activity, Alternative C – Planning Year 10) shows the estimated emissions for each pollutant from each emission-generating activity.

*Fluid Leasable Minerals – Oil and Gas*

Estimated emissions from oil and gas development for Alternative C were calculated using a reasonably foreseeable development rate based on a development level equivalent to 502 new federal wells added between the base year and Year 10, and associated drilling, completion, gas treatment and compression activities. Estimated emissions from a small number of existing base- year federal wells and associated decline over a 10-year period were also included in the estimated emissions calculations. Assumptions for developing Alternative C emissions are the same as those used for Alternative A.

**Table Q.3-6      Estimated Annual Emissions by Activity, Alternative C – Planning Year 10**

| Estimated Emissions (tons/yr) - Alternative C - Planning Year 10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Emissions Generating Activity** | **VOC** | **CO** | **NOx** | **PM10** | **PM2.5** | **SO2** | **HAPs** |
| Well-Site Oil and Gas - CBNG | 69.4 | 208.6 | 146.9 | 57.5 | 13.9 | 0.4 | 6.9 |
| Well-Site Oil and Gas - Conventional | 262.8 | 211.1 | 224.4 | 76.9 | 18.4 | 0.2 | 33.3 |
| Mid-Stream Oil and Gas | 80.7 | 292.2 | 236.8 | 5.7 | 5.7 | 0.8 | 8.9 |
| *Fluid Minerals Total* | 412.9 | 711.9 | 608.1 | 140.0 | 38.0 | 1.4 | 49.2 |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 37.8 | 263.8 | 472.7 | 469.5 | 213.7 | 8.7 | 3.8 |
| Sand and Gravel | 0.0 | 0.1 | 0.2 | 3.4 | 0.6 | 0.0 | 0.0 |
| *Solid Minerals Total* | 58.9 | 346.4 | 585.4 | 572.8 | 291.3 | 10.4 | 5.9 |
| Livestock Grazing | 0.0 | 0.3 | 0.1 | 0.6 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 115.7 | 606.2 | 125.8 | 178.7 | 52.9 | 5.2 | 11.6 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 65.5 | 135.7 | 1.2 | 422.5 | 43.7 | 0.0 | 6.6 |
| *Other Activities Total* | 181.3 | 742.8 | 128.4 | 623.0 | 99.6 | 5.2 | 18.1 |
| **TOTAL** | 653.1 | 1,801.0 | 1,321.9 | 1,335.8 | 428.9 | 17.0 | 73.2 |
| *Change over Base Year* | 221% | 146% | 416% | 115% | 161% | 164% | 213% |

[1] CBNG = coalbed natural gas; CO = carbon monoxide; HAPs = hazardous air pollutants; NO$_X$ = nitrogen oxides; PM$_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; PM$_{10}$ = particulate matter smaller than 10 microns in effective diameter; SO$_2$ = sulfur dioxide; VOC = volatile organic compounds

Estimated emissions from oil and gas development would increase for all pollutants over the base year for this alternative due to increased development.

BLM_0164817

Similar to Alternative A, estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation.

Hazardous air pollutants emissions could increase the risk of localized human health impacts.

*Solid Minerals – Coal, Uranium, Sand, and Gravel*

Estimated emissions and impacts on air quality would be the same as Alternative A for this category. Future coal mining rates in the UFO would be the same as those described for Alternative B.

*Lands and Realty – Rights-of-Way*

Estimated emissions and air quality impacts would be the same as Alternative A for this category.

*Livestock Grazing*

Estimated emissions and the potential for associated impacts on air quality are expected to be the largest under Alternative C due to higher permitted AUMs and other livestock grazing management actions.

*Comprehensive Travel and Transportation Management*

Estimated emissions and associated impacts on air quality are expected to be the same as Alternative A due to the assumption of equivalent activity for Alternatives A and C.

*Vegetation – Prescribed Fire and Mechanical Treatment*

Estimated emissions and impacts on air quality from this category are expected to increase from base year and be higher than for Alternative A due to decreased use of prescribed fire but increased use of mechanical treatments.

### Alternative D

Total emissions for Alternative D are estimated to be greater than Alternatives A, B, and B.1, and lower than Alternatives C and E. This is due primarily to the higher reasonably foreseeable development rate predicted for oil and gas activities than for Alternatives A, B, and B.1, but lower rate than Alternative C (oil and gas development projections for Alternative C are similar to those for Alternative E). Similar to the other alternatives, estimated emissions for Alternative D increase over the base year for all pollutants. **Table Q.3-7** (Estimated Annual Emissions by Activity, Alternative D – Planning Year 10) shows the estimated emissions for each pollutant from each emission-generating activity analyzed for Alternative D.

*Fluid Leasable Minerals – Oil and Gas*

Estimated emissions from oil and gas development for Alternative D were calculated using a reasonably foreseeable development rate based on a development level equivalent to 474 new federal wells (including Forest Service wells) added between the base year and planning Year 10, and associated drilling, completion, gas treatment and compression activities. Estimated emissions from a small number of existing base-year federal wells and associated decline over a 10-year period were also included in the estimated emissions calculations. Assumptions for developing Alternative D emissions are the same as those used for Alternative A.

BLM_0164818

**Table Q.3-7     Estimated Annual Emissions by Activity, Alternative D – Planning Year 10**

| Estimated Emissions (tons/yr) - Alternative D - Planning Year 10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Emissions Generating Activity | VOC | CO | NOx | PM10 | PM2.5 | SO2 | HAPs |
| Well-Site Oil and Gas - CBNG | 63.7 | 191.4 | 134.8 | 52.7 | 12.7 | 0.4 | 6.4 |
| Well-Site Oil and Gas - Conventional | 260.4 | 209.1 | 222.3 | 76.1 | 18.2 | 0.2 | 33.0 |
| Mid-Stream Oil and Gas | 76.4 | 276.8 | 224.4 | 5.4 | 5.4 | 0.7 | 8.4 |
| *Fluid Minerals Total* | *400.5* | *677.4* | *581.5* | *134.2* | *36.4* | *1.3* | *47.8* |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 37.8 | 263.8 | 472.7 | 469.5 | 213.7 | 8.7 | 3.8 |
| Sand and Gravel | 0.0 | 0.1 | 0.2 | 3.4 | 0.6 | 0.0 | 0.0 |
| *Solid Minerals Total* | *58.9* | *346.4* | *585.4* | *572.8* | *291.3* | *10.4* | *5.9* |
| Livestock Grazing | 0.0 | 0.3 | 0.1 | 0.5 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 99.8 | 585.1 | 106.5 | 191.4 | 57.7 | 5.7 | 10.0 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 51.1 | 105.9 | 0.9 | 329.6 | 34.1 | 0.0 | 5.1 |
| *Other Activities Total* | *151.0* | *691.8* | *108.7* | *542.6* | *94.8* | *5.8* | *15.1* |
| **TOTAL** | 610.5 | 1,715.6 | 1,275.6 | 1,249.6 | 422.5 | 17.4 | 68.8 |
| *Change over Base Year* | 200% | 135% | 398% | 101% | 157% | 171% | 194% |

[1] CBNG = coalbed natural gas; CO = carbon monoxide; HAPs = hazardous air pollutants; $NO_X$ = nitrogen oxides; $PM_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; $PM_{10}$ = particulate matter smaller than 10 microns in effective diameter; $SO_2$ = sulfur dioxide; VOC = volatile organic compounds

Similar to Alternative A, estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. Hazardous air pollutants emissions could increase the risk of localized human health impacts.

*Solid Minerals – Coal, Uranium, Sand, and Gravel*

Estimated emissions and impacts on air quality would be the same as Alternative A for this category. Future coal mining rates in the UFO would be the same as those described for Alternative B.

*Lands and Realty – Rights-of-Way*

Estimated emissions and impacts on air quality would be the same as Alternative A for this category.

*Livestock Grazing*

Estimated emissions and impacts on air quality would be similar to Alternatives C and E for this category.

*Comprehensive Travel and Transportation Management*

Estimated emissions and impacts on air quality would be slightly lower for this alternative than for Alternative A due to road closures and other travel management actions included for this alternative.

*Vegetation – Prescribed Fire and Mechanical Treatment*

Estimated emissions from this category would increase slightly from the base year due to management actions that increase the use of mechanical treatments and prescribed fire. Potential impacts on air quality would be slightly higher than those for Alternatives B and B.1.

BLM_0164819

### Alternative E

Total emissions for Alternative E are estimated to be greater than all other alternatives, except Alternative C. This is due primarily to the higher reasonably foreseeable development rate predicted for oil and gas activities than for Alternatives A, B, and B.1, but lower than Alternative C (projected oil and gas development is similar to Alternative D). Similar to the other alternatives, estimated emissions for Alternative E would increase over the base year for all pollutants. **Table Q.3-8** (Estimated Annual Emissions by Activity, Alternative E – Planning Year 10) shows the estimated emissions for each pollutant from each emission-generating activity analyzed for Alternative E.

**Table Q.3-8     Estimated Annual Emissions by Activity, Alternative E – Planning Year 10**

| Estimated Emissions (tons/yr) -  Alternative E - Planning Year 10 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Emissions Generating Activity | VOC | CO | NOx | PM10 | PM2.5 | SO2 | HAPs |
| Well-Site Oil and Gas - CBNG | 67.9 | 204.0 | 143.7 | 56.2 | 13.6 | 0.4 | 6.8 |
| Well-Site Oil and Gas - Conventional | 251.1 | 201.6 | 214.2 | 73.4 | 17.6 | 0.2 | 31.9 |
| Mid-Stream Oil and Gas | 78.2 | 283.1 | 229.4 | 5.5 | 5.5 | 0.8 | 8.6 |
| *Fluid Minerals Total* | *397.2* | *688.6* | *587.3* | *135.1* | *36.7* | *1.4* | *47.2* |
| Coal | 21.1 | 82.5 | 112.5 | 99.9 | 77.0 | 1.6 | 2.1 |
| Uranium | 37.8 | 263.8 | 472.7 | 469.5 | 213.7 | 8.7 | 3.8 |
| Sand and Gravel | 0.0 | 0.1 | 0.2 | 3.4 | 0.6 | 0.0 | 0.0 |
| *Solid Minerals Total* | *58.9* | *346.4* | *585.4* | *572.8* | *291.3* | *10.4* | *5.9* |
| Livestock Grazing | 0.0 | 0.3 | 0.1 | 0.6 | 0.1 | 0.0 | 0.0 |
| Vegetation Management | 99.8 | 585.1 | 106.5 | 191.4 | 57.7 | 5.7 | 10.0 |
| Lands and Realty | 0.1 | 0.6 | 1.2 | 21.2 | 2.9 | 0.0 | 0.0 |
| Comprehensive Travel and Transportation Management | 58.4 | 120.9 | 1.1 | 376.3 | 38.9 | 0.0 | 5.8 |
| *Other Activities Total* | *158.3* | *706.8* | *108.8* | *589.3* | *99.6* | *5.8* | *15.8* |
| TOTAL | 614.3 | 1,741.7 | 1,281.5 | 1,297.2 | 427.6 | 17.5 | 69.0 |
| *Change over Base Year* | *202%* | *138%* | *400%* | *109%* | *160%* | *172%* | *195%* |

[1] CBNG = coalbed natural gas; CO = carbon monoxide; HAPs = hazardous air pollutants; $NO_x$ = nitrogen oxides; $PM_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; $PM_{10}$ = particulate matter smaller than 10 microns in effective diameter; $SO_2$ = sulfur dioxide; VOC = volatile organic compounds

### Fluid Leasable Minerals – Oil and Gas

Estimated emissions from oil and gas development under Alternative E were calculated using a reasonably foreseeable development rate based on a development level equivalent to 485 new federal wells (including Forest Service wells) added between the base year and planning Year 10, and associated drilling, completion, gas treatment, and compression activities. Estimated emissions from a small number of existing base-year federal wells and associated decline over a 10-year period were also included in the estimated emissions calculations. Assumptions for developing Alternative E emissions are the same as those used for Alternative A.

Similar to the other alternatives, estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. Hazardous air pollutants emissions could increase the risk of localized human health impacts.

BLM_0164820

*Solid Minerals – Coal, Uranium, Sand, and Gravel*

Estimated emissions and impacts on air quality would be the same as Alternative A for this category. Future coal mining rates in the UFO would be the same as those described for Alternative B.

*Lands and Realty – Rights-of-Way*

Estimated emissions and impacts on air quality would be the same as Alternative A.

*Livestock Grazing*

Estimated emissions and impacts on air quality would be similar to Alternatives A, C, and D.

*Comprehensive Travel and Transportation Management*

Estimated emissions and associated impacts on air quality would be similar to Alternatives A and C, due to the assumption of equivalent activity for these alternatives.

*Vegetation – Prescribed Fire and Mechanical Treatment*

Estimated emissions from this category would increase slightly from the base year due to management actions that increase the use of mechanical treatments and prescribed fire. Potential impacts on air quality would be similar to those for Alternative D.

# Q.4. REFERENCES

American Petroleum Institute. 2009. American Petroleum Institute Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Natural Gas Industry. Prepared for American Petroleum Institute by URS Corporation: Austin, TX. August 2009.

BLM (United States Department of the Interior, Bureau of Land Management). 2008. Decision Record, Finding of No Significant Impact, and Final Environmental Assessment for the Whirlwind Mine Uranium Mining Project. BLM, Grand Junction Field Office, Grand Junction, CO, and Moab Field Office, Moab, UT. September 2008.

_____. 2010. Coal Resource and Development Potential Report. Prepared by Buckhorn Geotech for BLM, Uncompahgre Field Office, Montrose, CO. April 2010.

_____. 2011. Mineral Potential Report for the Uncompahgre Planning Area, Uncompahgre Field Office. Prepared by Rob Ernst, Geologist. BLM, Uncompahgre Field Office, Montrose, CO. March 2011. 61 p.

_____. 2012a. Reasonable Foreseeable Development Scenario for Oil and Gas, Uncompahgre Field Office, Colorado. Prepared by BLM Wyoming State Office, Reservoir Management Group for BLM, Uncompahgre Field Office, Montrose, CO. February 2012.

_____. 2017. Bull Mountain Unit Master Development Plan Record of Decision. BLM, Uncompahgre Field Office, Montrose, CO. October.

_____. 2017b. BLM Record of Decision, US Forest Service Supplemental Final Environmental Impact Statement for Federal Coal Lease Modifications COC-1362 and COC-67232 (including on-lease exploration plan), Grand Mesa, Uncompahgre, and Gunnison National Forests, Paonia Ranger District. BLM, Colorado State Office, Lakewood, CO. December. Internet Web site: https://eplanning.blm.gov/epl-front-office/projects/nepa/94746/127905/155605/West_Elk_ROD_-_Signed_by_ASLM_12.15.2017.pdf.

BLM_0164821

_____. 2018a. UFO RMP Coal Data Request for Revised Socioeconomic Analysis for the Final EIS. Memo with information provided by UFO mining specialist. March 2018.

_____. 2019a. Potential_gas_wells_analysis_PRMP_20190226.xls; Microsoft Excel workbook with projected oil and gas development information for Alternative E provided by UFO resource specialist. March 2019.

_____. 2019b. UFO RMP Alternative E data request and clarification for non- oil and gas values. Google Docs "UFO PRMP Ch4 GIS Calculations" spreadsheet with updated non-oil and gas values for Alternative E provided by UFO resource specialist. March 2019.

Colorado Department of Public Health and Environment. 2006. Oil and Gas Exploration and Production Condensate Tanks: An Overview of Air Quality Regulations. Colorado Department of Public Health and Environment, Air Pollution Control Division, Denver, CO. March 2006.

_____. 2013. 2011 APEN Emissions for Select Sources. Personal communication between David Thayer, Public Health Engineer, Colorado Department of Public Health and Environment, Air Pollution Control Division / Stationary Sources Program, and John Grant, Manager, ENVIRON International Corporation. March 22, 2013.

ENVIRON International Corporation. 2009. Final Report: Development of 2012 Oil and Gas Emissions Projections for the Piceance Basin. ENVIRON International Corporation, Novato, CA; Buys & Associates, Littleton, CO; and Independent Petroleum Association of Mountain States, Denver, CO. January 2009.

_____. 2012. Air Resources Technical Support Document: Grand Junction Field Office. Prepared by ENVIRON International Corporation for BLM, Grand Junction Field Office, Grant Junction, CO. December 2012.

EPA (US Environmental Protection Agency). 1995a. AP-42, Compilation of Air Pollutant Emission Factors, Fifth Edition, Volume I: Stationary Point and Area Sources. EPA Office of Air Quality Planning and Standards, Office of Air and Radiation, Research Triangle Park, NC. January 1995 with supplements. Internet Web site: http://www.epa.gov/ttn/chief/ap42/. Accessed on November 22, 2013.

_____. 1995b. Protocol for Emission Leak Emission Estimates. EPA Office of Air Quality Planning and Standards, Research Triangle Park, NC. November 1995.

_____. 2006a. AP-42, Compilation of Air Pollutant Emission Factors, Fifth Edition, Volume I: Stationary Point and Area Sources. Chapter 13.2.2 Unpaved Roads. EPA Office of Air Quality Planning and Standards, Office of Air and Radiation, Research Triangle Park, NC. November 2006.

_____. 2006b. AP-42, Compilation of Air Pollutant Emission Factors, Fifth Edition, Volume I: Stationary Point and Area Sources. Chapter 13.2.5 Industrial Wind Erosion. EPA Office of Air Quality Planning and Standards, Office of Air and Radiation, Research Triangle Park, NC. November 2006.

_____. 2009. Office of Transportation and Air Quality, Modeling and Inventories, NONROAD Model (nonroad engines, equipment, and vehicles). Internet Web site: http://www.epa.gov/otaq/nonrdmdl.htm. Accessed on November 22, 2013.

BLM_0164822

_____. 2010. Office of Transportation and Air Quality, Modeling and Inventories, MOVES (Motor Vehicle Emission Simulator). Internet Web site: http://www.epa.gov/otaq/models/moves/index.htm. Accessed on August 2, 2010.

Forest Service (US Department of Agriculture, National Forest Service). 2017a. Supplemental Final Environmental Impact Statement for Federal Coal Lease Modifications COC-1362 and COC-67232 (including on-lease exploration plan) US Department of Agriculture, Forest Service, Grand Mesa, Uncompahgre, and Gunnison National Forests, Paonia Ranger District. August. Internet Web site: https://www.fs.usda.gov/nfs/11558/www/nepa/68608_FSPLT3_4051445.pdf.

_____. 2017b. Final Record of Decision, Coal Lease Modifications COC-1362 and COC-67232, Gunnison County, Colorado. US Department of Agriculture, Forest Service, Grand Mesa, Uncompahgre, and Gunnison National Forests, Paonia Ranger District. November. Internet Web site: https://www.fs.usda.gov/nfs/11558/www/nepa/68608_FSPLT3_4111330.pdf.

Intergovernmental Panel on Climate Change. 2006. 2006 Intergovernmental Panel on Climate Change Guidelines for National Greenhouse Gas Inventories. Prepared by the National Greenhouse Gas Inventories Programme, H. S. Eggleston, L. Buendia, K. Miwa, T. Ngara, and K. Tanabe (eds.). Institute for Global Environmental Strategies, Hayama, Kanagawa, Japan.

Midwest Research Institute. 2006. Background Document for Revisions to Fine Fraction Ratios Used for AP-42 Fugitive Dust Emission Factors. Prepared by Midwest Research Institute for Western Governors' Association, Western Regional Air Partnership, Denver, CO. November 2006.

The Climate Registry. 2012. 2012 Climate Registry Default Emission Factors. January 2012.

URS. 2012a. Final Colorado River Valley Field Office Resource Management Plan Revision Air Resources Technical Support Document. Prepared by URS Group, Inc. for BLM, Colorado River Valley Field Office, Silt, CO, and BLM, Colorado State Office, Lakewood, CO. Revised August 2011.

Western Governors' Association, Western Regional Air Partnership. 2005. 2002 Fire Emission Inventory for the Western Regional Air Partnership Region – Phase II. July 2005. Internet Web site: http://www.wrapair.org/forums/fejf/documents/task7/PhaseIIEI/Wild_RX_20050701.zip. Accessed on November 22, 2013.

BLM_0164823

U.S. Department of the Interior
Bureau of Land Management

**Volume IV: Appendices R–T**

June 2019

# Uncompahgre Field Office
Proposed Resource Management Plan and Final Environmental Impact Statement



BLM_0164824

BLM MISSION

It is the mission of the Bureau of Land Management to sustain the
health, diversity, and productivity of the public lands for the use
and enjoyment of present and future generations.

BLM/CO/PL-19/001

# Appendix R
## Comment Summary and Response Report

BLM_0164826

BLM_0164827

# TABLE OF CONTENTS

Section                                                                                          Page

**R.     COMMENT SUMMARY AND RESPONSE REPORT ............................................................ R-1**

    1.    Introduction ................................................................................................. R-1
        Definitions .................................................................................................... R-1
            Comment ............................................................................................... R-1
            CommentWorks ..................................................................................... R-2
            Commenter ............................................................................................ R-2
            Comment Issue Category ...................................................................... R-2
            Form Letter ........................................................................................... R-2
            Submission ............................................................................................. R-2
            Substantive Comment ........................................................................... R-2
                *Summary Statement* .........................................................................*R-2*
                *Summary Response* ...........................................................................*R-2*
        Draft EIS Availability and Public Outreach ................................................... R-2
    2.    Comment Processes .................................................................................... R-3
        Comment Collection .................................................................................... R-3
            Unique Submissions ............................................................................... R-4
            Form Letters ......................................................................................... R-5
        Comment Analysis ....................................................................................... R-6
    3.    Comment Categories, Summaries, and Responses ...................................... R-11
        Section 1 – Extension Request .................................................................. R-12
               *Summary* ..........................................................................................*R-12*
               *Response* ..........................................................................................*R-12*
        Section 2 – Out of Scope ........................................................................... R-12
        Section 3 – Edits ........................................................................................ R-12
        Section 4 – Planning Issues and Criteria .................................................... R-13
        Section 5 – NEPA ...................................................................................... R-13
               *Summary* ..........................................................................................*R-16*
               *Response* ..........................................................................................*R-17*
           Section 5.1 – NEPA: Public notification ................................................ R-18
                  *Summary* ..................................................................................*R-20*
                  *Response* ..................................................................................*R-20*
           Section 5.2 – NEPA: Cooperating Agency relationships ......................... R-21
                  *Summary* ..................................................................................*R-22*
                  *Response* ..................................................................................*R-23*
           Section 5.3 – NEPA: Range of alternatives/purpose and need ............. R-23
                  *Summary* ..................................................................................*R-30*
                  *Response* ..................................................................................*R-31*
           Section 5.4 – NEPA: Best available information—baseline data ............ R-34
                  *Summary* ..................................................................................*R-38*
                  *Response* ..................................................................................*R-38*
           Section 5.5 – NEPA: GIS data and analysis ............................................ R-39
           Section 5.6 – NEPA: Direct/indirect impacts ......................................... R-39
                  *Summary* ..................................................................................*R-44*
                  *Response* ..................................................................................*R-45*

BLM_0164828

Section 5.7 – NEPA: Cumulative impacts .................................................................... R-46
    *Summary* ................................................................................................................ *R-47*
    *Response* ............................................................................................................... *R-47*
Section 5.8 – NEPA: Residual effects/unavoidable impacts .................................... R-47
Section 5.9 – NEPA: Mitigation measures ................................................................. R-48
    *Summary* ................................................................................................................ *R-52*
    *Response* ............................................................................................................... *R-52*
Section 6 – FLPMA ........................................................................................................ R-53
    *Summary* ................................................................................................................ *R-58*
    *Response* ............................................................................................................... *R-58*
Section 6.1 – FLPMA: Inventories ............................................................................... R-59
    *Summary* ................................................................................................................ *R-61*
    *Response* ............................................................................................................... *R-61*
Section 6.2 – FLPMA: Consistency with other state, county, or local plans ....... R-62
    *Summary* ................................................................................................................ *R-63*
    *Response* ............................................................................................................... *R-63*
Section 7 – Other laws, policy, and guidance .......................................................... R-63
    *Summary* ................................................................................................................ *R-67*
    *Response* ............................................................................................................... *R-68*
Section 8 – Gunnison Sage-grouse Range-Wide RMP Amendment/EIS ..................... R-68
    *Summary* ................................................................................................................ *R-72*
    *Response* ............................................................................................................... *R-73*
Section 9 – ACECs ......................................................................................................... R-74
Section 9.1 – ACECs: Range of alternatives ............................................................. R-74
    *Summary* ................................................................................................................ *R-98*
    *Response* ............................................................................................................... *R-100*
Section 9.2 – ACECs: Best available information—baseline data ......................... R-102
Section 9.3 – ACECs: Impact analysis ........................................................................ R-102
Section 9.4 – ACECs: Cumulative impact analysis ................................................... R-102
Section 9.5 – ACECs: Mitigation measures ............................................................... R-102
Section 10 – Air Resources .......................................................................................... R-103
Section 10.1 – Air Resources: Range of alternatives ............................................... R-103
    *Summary* ................................................................................................................ *R-103*
    *Response* ............................................................................................................... *R-103*
Section 10.2 – Air Resoruces: Best available information—baseline data .......... R-105
    *Summary* ................................................................................................................ *R-105*
    *Response* ............................................................................................................... *R-105*
Section 10.3 – Air Resources: Impact analysis ......................................................... R-106
    *Summary* ................................................................................................................ *R-115*
    *Response* ............................................................................................................... *R-116*
Section 10.4 – Air Resources: Cumulative impact analysis .................................... R-119
    *Summary* ................................................................................................................ *R-121*
    *Response* ............................................................................................................... *R-122*
Section 10.5 – Air Resources: Mitigation measures ................................................ R-123
    *Summary* ................................................................................................................ *R-125*
    *Response* ............................................................................................................... *R-126*
Section 11 – Climate/Climate Change ........................................................................ R-127
Section 11.1 – Climate/Climate Change: Range of alternatives ............................ R-127
    *Summary* ................................................................................................................ *R-140*
    *Response* ............................................................................................................... *R-141*

BLM_0164829

Section 11.2 – Climate/Climate Change: Best available information—
baseline data..........................................................................................R-142
*Summary*.................................................................................................R-148
*Response*................................................................................................R-149
Section 11.3 – Climate/Climate Change: Impact analysis .......................R-149
*Summary*.................................................................................................R-179
*Response*................................................................................................R-180
Section 11.4 – Climate/Climate Change: Cumulative impact analysis................R-183
*Summary*.................................................................................................R-185
*Response*................................................................................................R-185
Section 11.5 – Climate/Climate Change: Mitigation measures...........................R-185
*Summary*.................................................................................................R-195
*Response*................................................................................................R-195
Section 12 – Cultural Resources ...................................................................R-196
*Summary*.................................................................................................R-196
*Response*................................................................................................R-196
Section 13 – Wildland Fire Ecology and Management....................................R-197
*Summary*.................................................................................................R-199
*Response*................................................................................................R-199
Section 14 – General Fish and Wildlife .........................................................R-201
Section 14.1 – General Fish and Wildlife: Range of alternatives.........................R-201
*Summary*.................................................................................................R-217
*Response*................................................................................................R-221
Section 14.2 – General Fish and Wildlife: Best available information—
baseline data..........................................................................................R-224
*Summary*.................................................................................................R-227
*Response*................................................................................................R-227
Section 14.3 – General Fish and Wildlife: Impact analysis...................................R-227
*Summary*.................................................................................................R-237
*Response*................................................................................................R-238
Section 14.4 – General Fish and Wildlife: Cumulative impact analysis...............R-238
Section 14.5 – General Fish and Wildlife: Mitigation measures ...........................R-238
*Summary*.................................................................................................R-238
*Response*................................................................................................R-239
Section 15 – Endangered Species...................................................................R-239
Section 15.1 – Endangered Species: Endangered Species Act Consultation......R-239
*Summary*.................................................................................................R-242
*Response*................................................................................................R-242
Section 15.2 – Endangered Species: Range of alternatives (including
conservation measures) .........................................................................R-242
*Summary*.................................................................................................R-250
*Response*................................................................................................R-251
Section 15.3 – Endangered Species: Best available information—baseline
data.........................................................................................................R-252
*Summary*.................................................................................................R-253
*Response*................................................................................................R-253
Section 15.4 – Endangered Species: Impact analysis ...............................R-254
*Summary*.................................................................................................R-259
*Response*................................................................................................R-259
Section 15.5 – Endangered Species: Cumulative impact analysis.........................R-260

BLM_0164830

Section 15.6 – Endangered Species: Mitigation measures ......................................R-260
    *Summary* ........................................................................................................*R-262*
    *Response* .........................................................................................................*R-262*
Section 16 – Special Status Species (not including Threatened and
Endangered species).................................................................................................R-262
    Section 16.1 – Special Status Species: Range of alternatives (including
        conservation measures) ............................................................................R-262
        *Summary* ....................................................................................................*R-273*
        *Response* .....................................................................................................*R-274*
    Section 16.2 – Special Status Species: Best available information—
        baseline data...............................................................................................R-276
        *Summary* ....................................................................................................*R-276*
        *Response* .....................................................................................................*R-276*
    Section 16.3 – Special Status Species: Impact analysis............................................R-277
        *Summary* ....................................................................................................*R-279*
        *Response* .....................................................................................................*R-279*
    Section 16.4 – Special Status Species: Cumulative impact analysis.....................R-280
    Section 16.5 – Special Status Species: Mitigation measures ...............................R-280
Section 17 – Forestry ..............................................................................................R-280
    *Summary* ........................................................................................................*R-282*
    *Response* .........................................................................................................*R-283*
Section 18 – Health and Safety................................................................................R-284
    Section 18.1 – Health and Safety: Range of alternatives .........................................R-284
    Section 18.2 – Health and Safety: Best available information—baseline
        data...............................................................................................................R-284
        *Summary* ....................................................................................................*R-289*
        *Response* .....................................................................................................*R-290*
    Section 18.3 – Health and Safety: Impact analysis .................................................R-290
        *Summary* ....................................................................................................*R-328*
        *Response* .....................................................................................................*R-329*
    Section 18.4 – Health and Safety: Cumulative impact analysis ..........................R-329
        *Summary* ....................................................................................................*R-331*
        *Response* .....................................................................................................*R-331*
    Section 18.5 – Health and Safety: Mitigation measures..........................................R-331
Section 19 – Lands and Realty .................................................................................R-331
    Section 19.1 – Lands and Realty: Range of alternatives .........................................R-331
        *Summary* ....................................................................................................*R-340*
        *Response* .....................................................................................................*R-341*
    Section 19.2 – Lands and Realty: Best available information—baseline data.....R-344
        *Summary* ....................................................................................................*R-351*
        *Response* .....................................................................................................*R-351*
    Section 19.3 – Lands and Realty: Impact analysis .................................................R-351
        *Summary* ....................................................................................................*R-353*
        *Response* .....................................................................................................*R-354*
    Section 19.4 – Lands and Realty: Cumulative impact analysis ...........................R-355
        *Summary* ....................................................................................................*R-355*
        *Response* .....................................................................................................*R-355*
    Section 19.5 – Lands and Realty: Mitigation measures..........................................R-355
        *Summary* ....................................................................................................*R-355*
        *Response* .....................................................................................................*R-355*

BLM_0164831

Section 20 – Lands with Wilderness Characteristics......................................................R-355
    Section 20.1 – Lands with Wilderness Characteristics: Range of
        alternatives....................................................................................................R-355
        *Summary*.......................................................................................................*R-393*
        *Response*.......................................................................................................*R-395*
    Section 20.2 – Lands with Wilderness Characteristics: Best available
        information—baseline data...........................................................................R-399
        *Summary*.......................................................................................................*R-404*
        *Response*.......................................................................................................*R-404*
    Section 20.3 – Lands with Wilderness Characteristics: Impact Analysis............R-405
    Section 20.4 – Lands with Wilderness Characteristics: Cumulative
        impact analysis...............................................................................................R-405
    Section 20.5 – Lands with Wilderness Characteristics: Mitigation
        measures.........................................................................................................R-405
Section 21 – Leasable Minerals – Fluid......................................................................R-405
    Section 21.1 – Leasable Minerals – Fluid: Range of alternatives........................R-405
        *Summary*.......................................................................................................*R-451*
        *Response*.......................................................................................................*R-453*
    Section 21.2 – Leasable Minerals – Fluid: Best available information—
        baseline data...................................................................................................R-457
        *Summary*.......................................................................................................*R-464*
        *Response*.......................................................................................................*R-464*
    Section 21.3 – Leasable Minerals – Fluid: Impact analysis.................................R-464
        *Summary*.......................................................................................................*R-466*
        *Response*.......................................................................................................*R-466*
    Section 21.4 – Leasable Minerals – Fluid: Cumulative impact analysis...............R-466
    Section 21.5 – Leasable Minerals – Fluid: Mitigation measures..........................R-466
        *Summary*.......................................................................................................*R-483*
        *Response*.......................................................................................................*R-483*
Section 22 – Leasable Minerals – Solid.....................................................................R-485
    Section 22.1 – Leasable Minerals – Solid: Range of alternatives........................R-485
        *Summary*.......................................................................................................*R-494*
        *Response*.......................................................................................................*R-495*
    Section 22.2 – Leasable Minerals – Solid: Best available information—
        baseline data...................................................................................................R-496
        *Summary*.......................................................................................................*R-502*
        *Response*.......................................................................................................*R-502*
    Section 22.3 – Leasable Minerals – Solid: Impact analysis.................................R-502
        *Summary*.......................................................................................................*R-502*
        *Response*.......................................................................................................*R-503*
    Section 22.4 – Leasable Minerals – Solid: Cumulative impact analysis...............R-503
    Section 22.5 – Leasable Minerals – Solid: Mitigation measures..........................R-503
        *Summary*.......................................................................................................*R-504*
        *Response*.......................................................................................................*R-504*
Section 23 – Livestock Grazing.................................................................................R-505
    Section 23.1 – Livestock Grazing: Range of alternatives....................................R-505
        *Summary*.......................................................................................................*R-519*
        *Response*.......................................................................................................*R-520*

BLM_0164832

Section 23.2 – Livestock Grazing: Best available information—baseline data...................................................................................................R-522
    *Summary*.................................................................................*R-526*
    *Response*.................................................................................*R-526*
Section 23.3 – Livestock Grazing: Impact analysis.......................................R-527
    *Summary*.................................................................................*R-529*
    *Response*.................................................................................*R-529*
Section 23.4 – Livestock Grazing: Cumulative impact analysis .....................R-530
Section 23.5 – Livestock Grazing: Mitigation measures................................R-530
    *Summary*.................................................................................*R-532*
    *Response*.................................................................................*R-532*
Section 24 – Locatable Minerals....................................................................R-533
  Section 24.1 – Locatable Minerals: Range of alternatives....................R-533
    *Summary*.................................................................................*R-534*
    *Response*.................................................................................*R-535*
  Section 24.2 – Locatable Minerals: Best available information—baseline data...................................................................................................R-536
    *Summary*.................................................................................*R-540*
    *Response*.................................................................................*R-541*
  Section 24.3 – Locatable Minerals: Impact analysis ...................................R-542
  Section 24.4 – Locatable Minerals: Cumulative impact analysis..........R-542
  Section 24.5 – Locatable Minerals: Mitigation measures .....................R-542
    *Summary*.................................................................................*R-543*
    *Response*.................................................................................*R-543*
Section 25 – National Trails and Byways.......................................................R-543
    *Summary*.................................................................................*R-545*
    *Response*.................................................................................*R-546*
Section 26 – Paleontological Resources........................................................R-547
Section 27 – Recreation...............................................................................R-547
  Section 27.1 – Recreation: Range of alternatives ...............................R-547
    *Summary*.................................................................................*R-606*
    *Response*.................................................................................*R-608*
  Section 27.2 – Recreation: Best available information—baseline data...............R-611
    *Summary*.................................................................................*R-615*
    *Response*.................................................................................*R-616*
  Section 27.3 – Recreation: Impact analysis ........................................R-616
    *Summary*.................................................................................*R-619*
    *Response*.................................................................................*R-619*
  Section 27.4 – Recreation: Cumulative impact analysis .......................R-620
    *Summary*.................................................................................*R-621*
    *Response*.................................................................................*R-621*
  Section 27.5 – Recreation: Mitigation measures..................................R-621
Section 28 – Renewable Energy....................................................................R-621
    *Summary*.................................................................................*R-625*
    *Response*.................................................................................*R-626*
Section 29 – Saleable Minerals (Mineral Materials) ......................................R-626
Section 30 – Socioeconomics and Environmental Justice ..............................R-627
    *Summary*.................................................................................*R-636*
    *Response*.................................................................................*R-636*

BLM_0164833

Section 30.1 – Socioeconomics and Environmental Justice: Range of alternatives ................................................................................. R-637
    *Summary* ............................................................................ *R-639*
    *Response* ............................................................................ *R-639*
Section 30.2 – Socioeconomics and Environmental Justice: Best available information—baseline data ........................................... R-640
    *Summary* ............................................................................ *R-655*
    *Response* ............................................................................ *R-656*
Section 30.3 – Socioeconomics and Environmental Justice: Impact analysis ...... R-657
    *Summary* ............................................................................ *R-712*
    *Response* ............................................................................ *R-714*
Section 30.4 – Socioeconomics and Environmental Justice: Cumulative impact analysis ...................................................................... R-717
Section 30.5 – Socioeconomics and Environmental Justice: Mitigation measures ......................................................................... R-717
    *Summary* ............................................................................ *R-718*
    *Response* ............................................................................ *R-718*
Section 31 – Soil and Geology ................................................................ R-718
    *Summary* ............................................................................ *R-726*
    *Response* ............................................................................ *R-726*
Section 32 – Travel Management ............................................................. R-727
Section 32.1 – Travel Management: Range of alternatives .................................... R-727
    *Summary* ............................................................................ *R-755*
    *Response* ............................................................................ *R-756*
Section 32.2 – Travel Management: Best available information—baseline data ................................................................................. R-758
    *Summary* ............................................................................ *R-762*
    *Response* ............................................................................ *R-763*
Section 32.3 – Travel Management: Impact analysis ................................. R-764
    *Summary* ............................................................................ *R-766*
    *Response* ............................................................................ *R-766*
Section 32.4 – Travel Management: Cumulative impact analysis ......................... R-766
Section 32.5 – Travel Management: Mitigation measures ..................................... R-766
    *Summary* ............................................................................ *R-768*
    *Response* ............................................................................ *R-769*
Section 33 – Tribal Interests .................................................................. R-770
Section 34 – Vegetation ....................................................................... R-770
    *Summary* ............................................................................ *R-770*
    *Response* ............................................................................ *R-770*
Section 34.1 – Vegetation: Range of alternatives ...................................... R-770
    *Summary* ............................................................................ *R-773*
    *Response* ............................................................................ *R-774*
Section 34.2 – Vegetation: Best available information—baseline data ............... R-775
    *Summary* ............................................................................ *R-775*
    *Response* ............................................................................ *R-776*
Section 34.3 – Vegetation: Impact analysis ............................................. R-776
    *Summary* ............................................................................ *R-777*
    *Response* ............................................................................ *R-777*
Section 34.4 – Vegetation: Cumulative impact analysis ......................... R-777

BLM_0164834

Section 34.5 – Vegetation: Mitigation measures .......................................................... R-777
    *Summary* .......................................................................................................................... *R-778*
    *Response* ......................................................................................................................... *R-779*
Section 35 – Visual Resources ............................................................................................ R-779
  Section 35.1 – Visual Resources: Range of alternatives ........................................... R-779
    *Summary* .......................................................................................................................... *R-786*
    *Response* ......................................................................................................................... *R-787*
  Section 35.2 – Visual Resources: Best available information—baseline data ..... R-788
  Section 35.3 – Visual Resources: Impact analysis ..................................................... R-788
    *Summary* .......................................................................................................................... *R-789*
    *Response* ......................................................................................................................... *R-789*
  Section 35.4 – Visual Resources: Cumulative impact analysis ............................... R-789
    *Summary* .......................................................................................................................... *R-790*
    *Response* ......................................................................................................................... *R-790*
  Section 35.5 – Visual Resources: Mitigation measures ............................................ R-790
Section 36 – Watchable Wildlife Viewing Areas ............................................................ R-790
    *Summary* .......................................................................................................................... *R-791*
    *Response* ......................................................................................................................... *R-791*
Section 37 – Water ............................................................................................................... R-791
    *Summary* .......................................................................................................................... *R-792*
    *Response* ......................................................................................................................... *R-793*
  Section 37.1 – Water: Range of alternatives .............................................................. R-793
    *Summary* .......................................................................................................................... *R-820*
    *Response* ......................................................................................................................... *R-821*
  Section 37.2 – Water: Best available information—baseline data ......................... R-822
    *Summary* .......................................................................................................................... *R-831*
    *Response* ......................................................................................................................... *R-831*
  Section 37.3 – Water: Impact analysis ......................................................................... R-832
    *Summary* .......................................................................................................................... *R-860*
    *Response* ......................................................................................................................... *R-860*
  Section 37.4 – Water: Cumulative impact analysis ................................................... R-862
    *Summary* .......................................................................................................................... *R-864*
    *Response* ......................................................................................................................... *R-865*
  Section 37.5 – Water: Mitigation measures ................................................................ R-865
    *Summary* .......................................................................................................................... *R-872*
    *Response* ......................................................................................................................... *R-872*
Section 38 – Wild Horses ................................................................................................... R-873
Section 39 – Wild and Scenic Rivers ............................................................................... R-873
  Section 39.1 – Wild and Scenic Rivers: Range of alternatives .............................. R-873
    *Summary* .......................................................................................................................... *R-913*
    *Response* ......................................................................................................................... *R-916*
  Section 39.2 – Wild and Scenic Rivers: Best available information—
    baseline data .................................................................................................................. R-918
    *Summary* .......................................................................................................................... *R-919*
    *Response* ......................................................................................................................... *R-919*
  Section 39.3 – Wild and Scenic Rivers: Impact analysis ......................................... R-920
  Section 39.4 – Wild and Scenic Rivers: Cumulative impact analysis ................... R-920
  Section 39.5 – Wild and Scenic Rivers: Mitigation Measures ............................... R-920

BLM_0164835

Section 40 – Wilderness Areas/Wilderness Study Areas..............................................R-920
    Section 40.1 – Wilderness Areas/Wilderness Study Areas: Range of
        alternatives....................................................................................................R-920
        Summary.....................................................................................................R-925
        Response.....................................................................................................R-926
    Section 40.2 – Wilderness Areas/Wilderness Study Areas: Best available
        information—baseline data............................................................................R-927
    Section 40.3 – Wilderness Areas/Wilderness Study Areas: Impact analysis .....R-927
        Summary.....................................................................................................R-927
        Response.....................................................................................................R-927
    Section 40.4 – Wilderness Areas/Wilderness Study Areas: Cumulative
        impact analysis..............................................................................................R-928
    Section 40.5 – Wilderness Areas/Wilderness Study Areas: Mitigation
        measures........................................................................................................R-928
Section 41 – Other....................................................................................................R-928
    Section 41.1 – Other – Pipelines.......................................................................R-928
        Summary.....................................................................................................R-943
        Response.....................................................................................................R-943
    Section 41.2 – Other – Hydraulic Fracturing ....................................................R-944
        Summary.....................................................................................................R-987
        Response.....................................................................................................R-988
    Section 41.3 – Other – Soundscapes .................................................................R-990
        Summary.....................................................................................................R-994
        Response.....................................................................................................R-994
Section 42 – Ecological Emphasis Areas....................................................................R-994
    Section 42.1 – Ecological Emphasis Areas: Range of alternatives.....................R-994
        Summary.....................................................................................................R-1011
        Response.....................................................................................................R-1012
    Section 42.2 – Ecological Emphasis Areas: Best available information—
        baseline data................................................................................................ R-1013
        Summary.....................................................................................................R-1015
        Response.....................................................................................................R-1015
    Section 42.3 – Ecological Emphasis Areas: Impact analysis ................................ R-1016
    Section 42.4 – Ecological Emphasis Areas: Cumulative impact analysis.......... R-1016
    Section 42.5 – Ecological Emphasis Areas: Mitigation measures ...................... R-1016
Section 43 – Sheep .................................................................................................. R-1016
    Section 43.1 – Sheep: Range of alternatives ......................................................... R-1016
        Summary.....................................................................................................R-1018
        Response.....................................................................................................R-1018
    Section 43.2 – Sheep: Best available information—baseline data..................... R-1019
        Summary.....................................................................................................R-1025
        Response.....................................................................................................R-1025
    Section 43.3 – Sheep: Impact analysis................................................................... R-1026
        Summary.....................................................................................................R-1026
        Response.....................................................................................................R-1026
    Section 43.4 – Sheep: Cumulative impact analysis .............................................. R-1026
    Section 43.5 – Sheep: Mitigation measures........................................................... R-1026
        Summary.....................................................................................................R-1027
        Response.....................................................................................................R-1027

BLM_0164836

Section 44 – Gunnison Sage-Grouse ........................................................................... R-1027
  Section 44.1 – Gunnison Sage-Grouse: Range of alternatives.......................... R-1027
    *Summary* ...................................................................................................*R-1038*
    *Response* ....................................................................................................*R-1040*
  Section 44.2 – Gunnison Sage-Grouse: Best available information—
    baseline data....................................................................................... R-1041
    *Summary* ...................................................................................................*R-1043*
    *Response* ....................................................................................................*R-1043*
  Section 44.3 – Gunnison Sage-Grouse: Impact Analysis.................................... R-1044
    *Summary* ...................................................................................................*R-1045*
    *Response* ....................................................................................................*R-1045*
  Section 44.4 – Gunnison Sage-Grouse: Cumulative impact analysis................. R-1046
  Section 44.5 – Gunnison Sage-Grouse: Mitigation measures ........................... R-1046
Attachment A – Commenter Lists.................................................................................. R-1047

# TABLES

R-1    Draft RMP/EIS Public Meetings........................................................................... R-3
R-2    Submissions by Commenter Affiliation................................................................. R-5
R-3    Comments by Comment Issue Category .............................................................. R-8

BLM_0164837

| ACRONYMS AND ABBREVIATIONS | Full Phrase |
|---|---|
| ACEC | area of critical environmental concern |
| ATV | all-terrain vehicle |
| AUM | animal unit month |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| CARMMS | Colorado Air Resources Management Modeling Study |
| CFR | Code of Federal Regulations |
| CNHP | Colorado Natural Heritage Program |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| decision area | public lands and federal mineral estate managed by the United States Department of the Interior, Bureau of Land Management |
| DOE | United States Department of Energy |
| DOI | United States Department of the Interior |
| EIS | environmental impact statement |
| EPA | United States Environmental Protection Agency |
| ERMA | extensive recreation management area |
| ESA | Endangered Species Act of 1973 |
| federal mineral estate | subsurface mineral estate administered by the United States Department of the Interior, Bureau of Land Management |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | fire management plan |
| Forest Service | United States Department of Agriculture, Forest Service |
| FWFMP | Federal Wildland Fire Management Policy |
| GIS | Geographic Information Systems |
| IMPLAN | impact analysis for planning (model) |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| ISA | instant study area |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NGD | no ground disturbance |
| NHPA | National Historic Preservation Act of 1966 |
| NL | no leasing |
| North Fork area | North Fork Alternative Plan area (63,400 acres of BLM-administered surface estate and 137,600 acres of federal mineral estate) (Figure 2-1) |
| NPS | United States Department of the Interior, National Park Service |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NWSRS | National Wild and Scenic Rivers System |

BLM_0164838

| | |
|---|---|
| OHV | off-highway vehicle |
| ORV | outstandingly remarkable value |
| | |
| PFC | proper functioning condition |
| PFYC | Potential Fossil Yield Classification |
| PILT | payment in lieu of taxes |
| planning area | Uncompahgre Field Office boundary, including all lands, regardless of land ownership, except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA |
| PM$_{2.5}$ | particulate matter smaller than 2.5 microns in effective diameter |
| PM$_{10}$ | particulate matter smaller than 10 microns in effective diameter |
| | |
| RMA | recreation management area |
| RMP | resource management plan |
| ROD | record of decision |
| ROW | right-of-way |
| | |
| SRMA | special recreation management area |
| SRP | special recreation permit |
| SSR | site-specific relocation |
| | |
| TL | timing limitation |
| | |
| UFO | Uncompahgre Field Office |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| | |
| VRI | visual resource inventory |
| VRM | visual resource management |
| | |
| WSA | wilderness study area |
| WSR | wild and scenic river |
| WUI | wildland urban interface |

BLM_0164839

# APPENDIX R
# COMMENT SUMMARY AND RESPONSE REPORT

This entire appendix is new since publication of the Draft RMP/EIS.

## 1. INTRODUCTION

This report describes the public comment and response process to finalize the environmental impact statement (EIS) for the United States (US) Department of Interior, Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) Resource Management Plan (RMP). The appendix is divided into three main parts. **Section 1** defines terms useful in understanding this document and summarizes public involvement related to release of the Draft EIS. **Section 2** describes how public comments were acquired, categorized, addressed, and documented. **Section 3** presents substantive comments organized by specific comment issue category that relate to an aspect of the National Environmental Policy Act of 1969 (NEPA), the BLM planning process, or specific resources and resource uses. Each topic or subtopic contains excerpted substantive comments from individual letters/emails, a summary statement, and the BLM's response to the summary statement.

**Attachment 1** to this appendix is a comprehensive list of all commenters by affiliation. Commenters are listed alphabetically by the organization name or commenter's last name. This section also includes form letter submission details.

**Definitions**

The terms listed and defined in this section are provided to assist commenters find their substantive comments and understand the responses.

***Comment***

A distinct statement or question about a particular topic, such as:

- Purpose and need for action
- The BLM's use of facts, methods, or analyses in the EIS
- Matters outside the scope of the EIS

---

BLM_0164840

**CommentWorks**
The BLM's online comment tracking system. All unique submissions and applicable commenter information was entered into CommentWorks. All substantive comments were then parsed from submissions and classified within the CommentWorks system.

**Commenter**
This term includes any and all potentially interested or affected parties, whether private citizens, state, local or tribal governments, environmental groups, water users or irrigation districts, civic and community organizations, businesses, or others.

**Comment Issue Category**
The resource topic or issue to which a substantive comment is addressed. This may include the NEPA process, including alternatives, the affected environment section of the EIS, or a specific resource category, such as water quality.

**Form Letter**
A comment or comment document that is the same in wording or so similar as to be virtually identical to another comment or comment document. Examples are an online petition organized to encourage people to comment on the Draft EIS.

**Submission**
A written version of comments submitted by a commenter. This may be a letter or email. A submission may contain any number of comments.

**Substantive Comment**
A comment relevant to the scope of the EIS, environmental analysis, or NEPA process that merits a response. Comments that offer support or opposition to an alternative are not substantive comments. Additional details related to the definition of substantive comments are included in **Section 2**, Comment Analysis, of this report.

**Summary Statement**
A summary capturing the essence of similar substantive comments for a given comment issue category. For each comment issue category, one or more summary statements were created to capture all concerns brought forward in substantive comments in that category.

**Summary Response**
A response prepared for each summary statement that states relevant policy or guidance related to the concern, notes document locations where issues of concern are addressed, explains agency rationale for decisions, and/or notes how the Draft RMP/EIS was updated based on the comment, as appropriate.

**Draft EIS Availability and Public Outreach**
A notice of availability announcing the release of the draft RMP and draft EIS was published in the *Federal Register* on June 3, 2016, initiating the formal 90-day public comment period. In response to public requests, the comment period was extended for an additional 60 days, to November 1, 2016. The extension of the comment period was announced via a press release on

BLM_0164841

July 21, 2016. The BLM has continued to accept comments beyond this date, but they are not included in this report.

The BLM maintains a project mailing list. All contacts on the mailing list at the time of the Draft RMP/EIS received a newsletter announcing its availability. The newsletter also notified the public of upcoming Draft RMP/EIS meetings and announced the Draft RMP/EIS public review period. In addition to being available for download on the project website, paper copies of the Draft RMP/EIS were made available for public review at libraries in the planning area and at the BLM Colorado State Office in Lakewood and UFO in Montrose, Colorado. All documents were available via the project website, https://go.usa.gov/xnpgD.

During the comment period, the BLM held a series of public open house meetings across the planning area. At these meetings, the BLM provided attendees a brief overview of the plan, tips on Draft RMP/EIS navigation, and helpful information about making effective comments. A total of 294 people attended. See **Table R-1**, Draft RMP/EIS Public Meetings, for meeting dates and attendance details.

**Table R-1**
**Draft RMP/EIS Public Meetings**

| Location (Colorado) | Date (2016) | Address | Number of Attendees |
|---|---|---|---|
| Ridgway | Monday, June 20 | Ouray County 4-H Events Center, 22739 Highway 550 | 18 |
| Naturita | Tuesday, June 21 | Naturita Public Library Conference Room, 107 West 1st Avenue | 13 |
| Hotchkiss | Wednesday, June 22 | Hotchkiss High School Commons Area, 438 Bulldog Street | 148 |
| Delta | Tuesday, June 28 | Delta Center for the Performing Arts Community Room, 822 Grand Avenue | 34 |
| Montrose | Wednesday, June 29 | Montrose County Fairgrounds Friendship Hall, 1001 North Second Street | 66 |
| Telluride | Thursday, June 30 | Wilkinson Library Program Room, 100 West Pacific Avenue | 15 |

Refer to **Chapter 5** of the Final EIS for additional information on public coordination.

## 2. COMMENT PROCESSES

### Comment Collection

The BLM recognizes that commenters invested considerable time and effort to submit comments on the Draft RMP/EIS. A systematic process for cataloging comments, as described in detail below, was developed to ensure that all substantive comments were tracked and considered.

BLM_0164842

***Unique Submissions***

All written or verbal submissions received during the public comment period were evaluated and are documented in this report. A total of 783 unique written submissions were received during the comment period. Of these, 565 (72 percent) were received via email, 218 (28 percent) were submitted via the US Postal Service, and one (less than 1 percent) was received via fax.

The public comment form available at the public open houses on the Draft RMP/EIS (**Section 1**, above) provided instructions for requesting confidentiality and for withholding individual names or addresses from public review or from disclosure under the Freedom of Information Act.

To ensure that public comments were properly registered and that none were overlooked, a multi-phase management and tracking system was used. First, written submissions were logged and assigned a unique identifying number. The identifying number followed a standard convention and included identification of the project, submitter's last name, unique number, date received, and organization (if applicable). For example, a unique identifying number could be "UFORMP_Smith_000001_20161030. Each comment document was also assigned a commenter affiliation from the following:

- Anonymous
- Government—Federal
- Government—State
- Government—Local
- Government—Tribal
- Private Industry
- Elected Official
- Individual
- Organization (nonprofit/citizens group)

Submissions were associated with an organization, industry, or government when they were on official letterhead of that group and/or when signed by a representative in an official capacity using their title. People who noted an affiliation with a group (e.g., member of an organization) were counted as individuals.

The largest number of unique submissions (over 88 percent, 692 submissions) were received from individuals. Organizations represented approximately 5 percent (40 submissions), local government represented 2.5 percent (20 submissions), and private industry represented 2.2 percent (17 submissions). All other affiliation groups represented less than 2 percent of total submissions. See **Table R-2**, Submissions by Commenter Affiliation.

During the comment period, another comment period was occurring at the UFO for the Bull Mountain Master Leasing Plan Draft EIS. As a result, submissions that were directed to the Bull Mountain Master Leasing Plan Draft EIS but also included comments on the Uncompahgre Draft RMP/EIS were included in this report.

BLM_0164843

**Table R-2**
**Submissions by Commenter Affiliation**

| Affiliation | Number of Unique Submissions (portion of total) |
|---|---|
| Anonymous | 2 (0.3%) |
| Federal Government | 7 (0.9%) |
| State Government | 4 (0.5%) |
| Local Government | 20 (2.5%) |
| Private Industry | 17 (2.2%) |
| Elected Officials | 1 (0.1%) |
| Individuals | 692 (88.4%) |
| Organizations | 40 (5.1%) |

Note: no comments were received from tribal governments

A list of submissions by commenter affiliation is provided in **Attachment A**, Commenter Lists.

All unique submissions, including relevant affiliation and commenter(s) contact information were entered into the BLM's comment analysis database, CommentWorks. Submissions were organized by unique identifier.

### *Form Letters*

Multiple local and national organizations and groups held standardized letter campaigns, through which their constituents could submit the standard letter or a modified version of the letter indicating support for the group's position on the Draft RMP.

During the comment period, 90 different form letters (i.e., 2 or more letters with identical or nearly identical text) were identified. In total, 51,300 copies of form letters were submitted. A breakdown of all form letters received is included in **Attachment A**, Commenter Lists. For the majority (77 out of 90) of the form letters, fewer than 100 copies of each letter were received. However, internet-based letter campaigns initiated by local and national organizations generated more than 1,000 submissions each. These included, but are not limited to, EarthJustice (more than 24,000 submissions), Pew Charitable Trust (more than 9,700 submissions), Wild Earth Guardians (more than 6,100 submissions), Citizens for a Healthy Community (more than 1,700 submissions), and the Sierra Club (more than 1,400 submissions).

Some form letters were likely generated at letter-writing workshops held by organizations. However, the specific letters from these workshops cannot be definitively identified.

A representative copy of each form letter was entered into CommentWorks for further review, and the number of additional copies was noted. Individuals who submitted a modified standard letter generally added new comments or information to the letter or edited it to reflect their main concern(s). Modified submissions with additional unique substantive comments were given their own submission number and coded appropriately. Letters with additional nonsubstantive text were treated as standard form letter submissions.

BLM_0164844

## Comment Analysis

Once all comment submissions were received and catalogued through the process described above, the BLM reviewed each submission to understand the overall intent and perspective of the commenter. Within each comment document, all substantive comments were numbered and assigned a comment code appropriate to their content. During this analysis, the BLM relied on the Council on Environmental Quality's regulations to determine what constituted a substantive comment. A substantive comment does one or more of the following:

- Questions, with a reasonable basis, the accuracy of the information and/or analysis in the RMP/EIS;
- Questions, with a reasonable basis, the adequacy of the information and/or analysis in the RMP/EIS;
- Presents reasonable alternatives other than those presented in the Draft EIS that meet the purpose of and need for the proposed action and addresses significant issues;
- Questions, with a reasonable basis, the merits of an alternative or alternatives;
- Causes changes in or revisions to the preferred alternative; and
- Questions, with a reasonable basis, the adequacy of the planning process itself.

Additionally, the BLM NEPA Handbook (H-1601-1) identifies the following types of substantive comments:

- <u>Comments on the Adequacy of the Analysis</u>: Comments that express a professional disagreement with the conclusions of the analysis or assert that the analysis is inadequate are substantive in nature but may or may not lead to changes in the Proposed RMP/Final EIS. Interpretations of analyses should be based on professional expertise. Where there is disagreement within a professional discipline, a careful review of the various interpretations is warranted. In some cases, public comments may necessitate a reevaluation of analytical conclusions. If, after reevaluation, the manager responsible for preparing the EIS (BLM authorized officer) does not think that a change is warranted, the response should provide the rationale for that conclusion.
- <u>Comments That Identify New Impacts, Alternatives, or Mitigation Measures</u>: Public comments on a draft EIS that identify impacts, alternatives, or mitigation measures that were not addressed in the draft are substantive. This type of comment requires the BLM authorized officer to determine whether it warrants further consideration. If it does, the AO must determine whether the new impacts, new alternatives, or new mitigation measures should be analyzed in the Proposed RMP/Final EIS, a supplement to the Draft RMP/EIS, or a completely revised and recirculated Draft RMP/EIS.
- <u>Disagreements with Significance Determinations</u>: Comments that directly or indirectly question, with a reasonable basis, determinations regarding the significance or severity of impacts are substantive. A reevaluation of these determinations may

BLM_0164845

be warranted and may lead to changes in the Proposed RMP/Final EIS. If, after reevaluation, the BLM authorized officer does not think that a change is warranted, the response should provide the rationale for that conclusion.

Comments that failed to meet the above description were considered nonsubstantive. Many comments received throughout the process expressed personal opinions or preferences, had little relevance to the adequacy or accuracy of the Draft RMP/EIS, represented commentary regarding resource management and/or impacts without any real connection to the document being reviewed, or were considered out of scope because they dealt with existing law, rule, regulation, or policy. These comments did not provide specific information to assist the BLM in making changes to the alternatives or impact analysis in the Draft EIS and are not addressed further.

Opinions, feelings, and preferences for one element or one alternative over another, and comments of a personal and/or philosophical nature, were all read, analyzed, and considered, but because such comments are not substantive in nature, the BLM did not include them in this report or respond to them. It is also important to note that while all comments were reviewed and considered, comments were not counted as "votes." The NEPA public comment period is neither considered an election, nor does it result in a representative sampling of the population. Therefore, public comments are not appropriate to be used as a democratic decision-making tool or as a scientific sampling mechanism.

Of the 783 unique letters received, 378 contained substantive comments. Of the 90 master form letters analyzed, 73 contained substantive content. A total of 2,566 unique substantive comments were contained within all comment submissions. Copies of all submissions received on the Draft RMP/EIS are available by request on from the BLM UFO in Montrose, Colorado.

Within each submission in CommentWorks, substantive comments were identified and categorized into one or more comment categories. These codes were queried and tallied to provide information on comment categories, as summarized in **Table R-3**, Comments by Comment Issue Category[1]. Comment categories generally follow the sections presented in the Draft RMP/EIS, though some relate to the planning process. For each comment category, comments are subdivided into comments related to alternatives, best available information/baseline data, impacts analysis, cumulative impacts, and mitigation measures, as appropriate. For comment issue categories where only a handful of comments were received, no comment subcategories were created.

Comments that relate to the impacts from management of one resource upon another are coded under the impacted resource, following the structure of the impacts analysis in Draft EIS Chapter 4 (e.g., comments on the impacts of oil and gas development on water resources are coded under water resources). The exception is comments concerned with the general impacts of hydraulic fracturing and pipelines on resources and communities in and around the planning area, soundscapes, ecological emphasis areas, sheep, and Gunnison sage-grouse. Comments received for these specific topics are included in separate comment topic titled as such.

Many written submissions included more than one comment, so the submissions yielded approximately 2,566 individual comments within all submissions.

BLM_0164846

**Table R-3**
**Comments by Comment Issue Category[1]**

| Comment Issue Category | | Comment Issue Category Description | Portion of Total Comments |
|---|---|---|---|
| 1 | | **Comment period extension request** | <0.1% |
| 2 | | **Out of scope comment** (no summary or response) | 1.4% |
| 3 | | **Editorial comment** (tracked for revising the Proposed RMP/Final EIS; no summary or response provided) | 8.6% |
| 5 | | **NEPA** | 0.4% |
| | 5.1 | Public notification | 0.3% |
| | 5.2 | Cooperating agency relationships | 0.2% |
| | 5.3 | Alternatives/purpose and need | 0.8% |
| | 5.4 | Best available information—baseline data | 0.6% |
| | 5.6 | Impacts analysis | 0.5% |
| | 5.7 | Cumulative impacts analysis | 0.1% |
| | 5.9 | Mitigation measures | 0.4% |
| 6 | | **FLPMA** | 0.4% |
| | 6.1 | Inventories | 0.1% |
| | 6.2 | Consistency with other state, county, or local plans | 0.1% |
| 7 | | **Other Laws** | 0.3% |
| 8 | | **Gunnison Sage-grouse Range Wide RMP Amendment/EIS** | 0.5% |
| 9 | | **Areas of Critical Environmental Concern (ACECs)** | |
| | 9.1 | Alternatives | 2.3% |
| 10 | | **Air Resources** | |
| | 10.1 | Alternatives | 0.1% |
| | 10.2 | Best available information—baseline data | <0.1% |
| | 10.3 | Impacts analysis | 1.2% |
| | 10.4 | Cumulative impacts analysis | 0.1% |
| | 10.5 | Mitigation measures | 0.4% |
| 11 | | **Climate/Climate Change** | |
| | 11.1 | Alternatives | 1.1% |
| | 11.2 | Best available information—baseline data | 0.5% |
| | 11.3 | Impacts analysis | 2.7% |
| | 11.4 | Cumulative impacts analysis | 0.2% |
| | 11.5 | Mitigation measures | 0.9% |
| 12 | | **Cultural Resources** | 0.1% |
| 13 | | **Wildland Fire Ecology and Management** | 0.2% |
| 14 | | **General Fish and Wildlife** | |
| | 14.1 | Alternatives | 1.8% |
| | 14.2 | Best available information—baseline data | 0.2% |
| | 14.3 | Impacts analysis | 1.0% |
| | 14.5 | Mitigation Measures | <0.1% |
| 15 | | **Threatened and Endangered Species** | |
| | 15.1 | Endangered Species Act consultation | 0.3% |
| | 15.2 | Alternatives | 0.7% |
| | 15.3 | Best available information—baseline data | 0.1% |
| | 15.4 | Impacts analysis | 0.5% |

BLM_0164847

| Comment Issue Category | Comment Issue Category Description | Portion of Total Comments |
|---|---|---|
| 15.6 | Mitigation Measures | 0.1% |
| 16 | **Special Status Species (not including Threatened and Endangered Species)** | |
| 16.1 | Alternatives | 1.2% |
| 16.2 | Best available information—baseline data | <0.1% |
| 16.3 | Impacts analysis | 0.2% |
| 17 | **Forestry** | 0.2% |
| 18 | **Public Health and Safety** | |
| 18.2 | Best available information—baseline data | 0.5% |
| 18.3 | Impacts analysis | 4.3% |
| 18.4 | Cumulative impacts analysis | 0.2% |
| 19 | **Lands and Realty** | |
| 19.1 | Alternatives | 1.4% |
| 19.2 | Best available information—baseline data | 0.5% |
| 19.3 | Impacts analysis | 0.3% |
| 19.4 | Cumulative impacts analysis | <0.1% |
| 19.5 | Mitigation measures | <0.1% |
| 20 | **Lands with Wilderness Characteristics** | |
| 20.1 | Alternatives | 4.1% |
| 20.2 | Best available information—baseline data | 0.5% |
| 21 | **Leasable Minerals – Fluid** | |
| 21.1 | Alternatives | 5.7% |
| 21.2 | Best available information—baseline data | 0.7% |
| 21.3 | Impacts analysis | 0.2% |
| 21.5 | Mitigation Measures | 1.5% |
| 22 | **Leasable Minerals – Solid** | |
| 22.1 | Alternatives | 0.9% |
| 22.2 | Best available information—baseline data | 0.5% |
| 22.3 | Impacts analysis | <0.1% |
| 22.5 | Mitigation Measures | 0.1% |
| 23 | **Livestock Grazing** | |
| 23.1 | Alternatives | 2.3% |
| 23.2 | Best available information—baseline data | 0.5% |
| 23.3 | Impacts analysis | 0.1% |
| 23.5 | Mitigation Measures | 0.3% |
| 24 | **Locatable Minerals** | |
| 24.1 | Alternatives | 0.2% |
| 24.2 | Best available information—baseline data | 0.4% |
| 24.5 | Mitigation Measures | <0.1% |
| 25 | **National Trails and Byways** | 0.3% |
| 27 | **Recreation** | |
| 27.1 | Alternatives | 7.3% |
| 27.2 | Best available information—baseline data | 0.2% |
| 27.3 | Impacts analysis | 0.4% |
| 27.4 | Cumulative impacts | 0.1% |

BLM_0164848

| Comment Issue Category | Comment Issue Category Description | Portion of Total Comments |
|---|---|---|
| 28 | **Renewable Energy** | 0.4% |
| 30 | **Socioeconomics and Environmental Justice** | 1.2% |
| 30.1 | Alternatives | 0.3% |
| 30.2 | Best available information—baseline data | 1.4% |
| 30.3 | Impacts analysis | 6.3% |
| 30.5 | Mitigation Measures | 0.1% |
| 31 | **Soil and Geology** | 0.7% |
| 32 | **Travel Management** | |
| 32.1 | Alternatives | 2.7% |
| 32.2 | Best available information—baseline data | 0.2% |
| 32.3 | Impacts analysis | 0.1% |
| 32.5 | Mitigation Measures | 0.2% |
| 34 | **Vegetation** | <0.1% |
| 34.1 | Alternatives | 0.5% |
| 34.2 | Best available information—baseline data | 0.1% |
| 34.3 | Impacts analysis | 0.1% |
| 34.5 | Mitigation Measures | 0.1% |
| 35 | **Visual Resources** | |
| 35.1 | Alternatives | 0.7% |
| 35.3 | Impacts Analysis | 0.2% |
| 35.4 | Cumultitve Impacts | <0.1% |
| 36 | **Watchable Wildlife** | 0.1% |
| 37 | **Water Resoruces** | 0.1% |
| 37.1 | Alternatives | 3.1% |
| 37.2 | Best available information—baseline data | 0.9% |
| 37.3 | Impacts analysis | 3.1% |
| 37.4 | Cumulative Impacts | 1.1% |
| 37.5 | Mitigation Measures | 0.8% |
| 39 | **Wild and Scenic Rivers** | |
| 39.1 | Alternatives | 4.6% |
| 39.2 | Best available information—baseline data | 0.2% |
| 40 | **Wilderness Areas / Wilderness Study Areas** | |
| 40.1 | Alternatives | 0.7% |
| 40.3 | Impacts Analysis | 0.1% |
| 41 | **Other** | |
| 41.1 | Pipelines | 1.9% |
| 41.2 | Hydraulic Fracturing | 6.0% |
| 41.3 | Natural Soundscapes | 0.1% |
| 42 | **Ecological Emphasis Areas** | |
| 42.1 | Alternatives | 1.9% |
| 42.2 | Best available information—baseline data | 0.2% |
| 43 | **Bighorn Sheep** | |
| 43.1 | Alternatives | 0.1% |
| 43.2 | Best available information—baseline data | 0.5% |
| 43.3 | Impacts analysis | <0.1% |

| Comment Issue Category | Comment Issue Category Description | Portion of Total Comments |
|---|---|---|
| 43.4 | Mitigation Measures | <0.1% |
| **44** | **Gunnison Sage-Grouse** | |
| 44.1 | Alternatives | 1.1% |
| 44.2 | Best available information—baseline data | 0.2% |
| 44.3 | Impacts Analysis | 0.2% |

[1]Comment issue category codes are not included for codes that received no comments. Additional categories were added after review of comments; as a result, some comment issue numbering is not sequential.
Note: Totals may not add up to 100% due to some comments being included in more than one issue category.

### 3. COMMENT CATEGORIES, SUMMARIES, AND RESPONSES

For each of the identified comment issue categories in which comments were received, the BLM reviewed substantive comments, provided one or more comment summaries capturing the main concerns, and provided a response. Assigning a category allowed the BLM to properly group similar comments or comment topics for summary responses, as applicable.

For each comment issue category, summary statement(s) were created to capture the issues brought forward by commenters. Issues within each comment summary are organized by letter and number, as appropriate, in outline fashion.

Comment responses were then prepared following the issues identified in the comment summaries. For each issue raised within a comment issue category, the relevant response can be identified under the same outline level as the summary (e.g., the response to ACECs comment issue C.1 is located under response C.1 for that comment issue category).

Comment responses note one or more of the following, as applicable:

- Relevant laws, standards, or criteria that defined the BLM's approach

- Information from the EIS as it relates to the comment(s)

- Whether the comment(s) resulted in changes to the document

- Rationale for why changes were warranted or not

Comments citing editorial changes to the document (e.g., spelling and grammatical changes) were coded in the "Edit" category and reviewed and incorporated as appropriate into the Proposed RMP/Final EIS. These editorial comments did not receive a summary or response in this report.

In the sections below, comments are provided for each comment issue category. Individual substantive comments are followed by summaries and responses in each section. Each substantive comment retains the unique identifier code for the submission, as well as information on the commenter and commenter affiliation (as applicable). Some comments were determined to be relevant to more than one comment issue category. In these cases, the additional comment categories(s) are indicated by comment issue category number under the "other sections" information.

BLM_0164850

### Section 1 – Extension Request

Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000034_JohnsonA_20160630-1
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
On behalf of our respective organizations, we request that the Bureau of Land Management (BLM) issue a 90-day extension to the public comment period for the draft Uncompahgre Field Office Draft Resource Management Plan (UFO Draft RMP). It is clear that the original 90 days allotted for this comment period will not be sufficient for our organizations to fully review the over 2,000-page three-volume UFO Draft RMP document. In order to contribute substantive comments on every aspect of this very complex Draft RMP, our members, staff, and board will need an additional 90 days for public comment.

Furthermore, a number of other relevant regional and national NEPA processes are currently or soon will be underway, most notably the BLM Coal Lease Programmatic EIS, BLM Planning 2.0, Dominguez-Escalante final EIS and proposed RMP, Bull Mountain EIS, and the Grand Mesa Uncompahgre and Gunnison (GMUG) Forest Plan Revision among others. In order to meaningfully engage in the BLM UFO Draft RMP public comment period, we need an additional 90 days to review the document and submit substantive and specific comment.

*Summary*
One organization submitted a request for comment period extension in order to contribute substantive comments.

*Response*
The original NEPA-mandated 90-day comment period was initiated on June 3, 2016 and was scheduled to end on September 1, 2016. Based on public feedback, and to provide for additional public review, the original comment period was extended for an additional 60 days and ended on November 1, 2016.

### Section 2 – Out of Scope

Total Number of Submissions: 31
Total Number of Comments: 38
*Comments not included*

These comments did not result in any EIS changes because they are beyond the scope of the RMP revision.

### Section 3 – Edits

Total Number of Submissions: 42
Total Number of Comments: 221
*Comments not included*

The BLM reviewed recommended editorial changes and incorporated them in the Proposed RMP/Final EIS, as appropriate.

BLM_0164851

**Section 4 – Planning Issues and Criteria**

No comments are associated with this topic.

**Section 5 – NEPA**

Total Number of Submissions: 5
Total Number of Comments: 10

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-1
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-1 - Plan Maintenance: Revisions to maps including habitat have the potential to significantly impact land use, management actions and the environment. Accordingly, revisions to habitat maps should not be considered to be Plan Maintenance. Revisions to maps included in the RMP should be subject to a NEPA review and the associated notice and participation requirements. This action is necessary to assure that habitat map revisions do not result in adverse impact via the maps nexus to management actions.

Comment Number: 000219_AndersonK_20160930-1
Organization1:
Commenter1:Kevin Anderson
Commenter Type: Individual
Comment Excerpt Text:
First, as you know your Draft is massive. Most likely took a few years to prepare. My opportunity to comment being extended is appreciated. The document is like three metropolitan phone books and deceive the reader. I was looking at the maps in the index portion, then referencing the map on the next page only to have Alternative B. Not A, C, and D. I'm not sure if this was on purpose, however deceiving. This document is more than most individuals could comprehend.

Comment Number: 000273_BrownB_20161031-1
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
In closing, we would like to reiterate the negative impact that regulatory overburden is having on our members. It's egregious that the government keeps expanding at the administrative level, and every document that comes out is larger than the last. It's incredibly difficult for individuals or small organizations to be able to effectively evaluate and comment on these documents due to the sheer size, sometimes in excess of a thousand pages, not including the dozens of reference documents that should be closely scrutinized for their accuracy. It is imperative that the federal government start streamlining its management processes, in order to effectively focus on on-the-ground management of our public lands.

Comment Number: 000402_RatnerJ_20161028-4
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0164852

Objectives identify specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate). A sample objective is: "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species." When quantified, the indicators associated with Land Health Standards are one possible source of objectives.

While the DEIS has goals, the objectives as defined above are noticeably missing.

Comment Number: 000402_RatnerJ_20161028-49
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The EIS and RMP must analyze the successes and failures of the current RMP and analyze the validity of the assumptions and accuracy of the analysis of the EIS conducted to develop the current RMP. Such analyses are critical to learning from the mistakes of the past as well as to comply with NEPA

Comment Number: 000402_RatnerJ_20161028-5
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
2. Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)
After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.
a. Allowable uses. Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values. If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.
The land use plan must set the stage for identifying site-specific resource use levels. Site specific use levels are normally identified during subsequent implementation planning or the permit authorization process. At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions. These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.
b. Management actions. Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-today activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System). While protection and restoration opportunities and priorities are often related to managing specific land uses (such as

BLM_0164853

commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

Again, the 'direction' contained in the DEIS utterly fails to meet the above requirements.

Comment Number: 000402_RatnerJ_20161028-6
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Section E states, in part:
(2) Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.
(3) Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.
Subsection 1.19 Methodology and Scientific Accuracy (40 CFR 1502.24).
Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public. Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).
The DEIS failed to comply with this requirement.

Comment Number: 000402_RatnerJ_20161028-63
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In order to comply with NEPA and the APA, the BLM must conduct a thorough review of the performance and accomplishments of the current RMP as well as the validity and accuracy of the current RMP's NEPA documents. Further, the BLM must analyze how effectively the RMP and ROD have been implemented, what goals and objective have been met and why aspects of the RMP and ROD were not implemented or not implemented effectively. Such analyses must form the foundation for any RMP revision. Such analyses are fundamental not only compliance with the law by basic management principles.

Comment Number: 000402_RatnerJ_20161028-9
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 7 3
Comment Excerpt Text:
We also provide as highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit D. Of critical importance are:

BLM_0164854

.04J Manager responsibilities
.06 BLM Policy
.11 and .12 Inventory requirements
.13B (p9) RMP requirements
.16 (p11) RMP requirements
These requirements were not implemented in the DEIS.

Comment Number: 000410_BolandB_20161027-1
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
Initially, it cannot be ignored that the Draft RMP is incomprehensible. It is incomprehensible in its volume, totaling more than 1,985 pages. [Footnote 1: The Draft RMP includes an Executive Summary and Chapters 1-3, totaling 673 pages; Chapters 4-5, totaling 496 pages; Appendix A (on a CD-ROM), totaling 254 pages; and Appendices B-Q, totaling 562 pages.]
It is incomprehensible in its massive use of cross-references. See, e.g., Draft RMP at Table 2-2. It is incomprehensible in its content. See, e.g., id. at Appendix Q (Equations 1-83). And it is incomprehensible in its adoption of a Preferred Alternative without any meaningful explanation, analysis, or justification. See id. at §2.5.1 (concluding without explanation that "[t]he Field Manager recommends Alternative D as the preferred alternative" which "consists of components (objectives and actions) of the other alternatives considered. . .").

*Summary*
Commenters discussed several different aspects of NEPA as follows.

A. Commenters stated that the RMP did not fully comply with NEPA requirements in the following ways:

1. Objectives were not quantifiable and measurable.
2. Actions were not identified that would be anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health.
3. Performance and accomplishments of the current RMP should have been reviewed and analyzed to determine the effectiveness of implementation of the existing RMP.
4. Reasonable development scenarios were not identified for all allowable uses, such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing, to enable the orderly implementation of future actions.
5. Information obtained in the NEPA process should have been used to identify reasonable alternatives.

B. One commenter requested that map revision not be considered RMP maintenance and instead require additional NEPA review, particularly as related to habitat changes.

C. Commenters noted that the length of document and document organization made review and commenting difficult for the public, and recommend that the government streamline the process.

BLM_0164855

*Response*

A. The Draft RMP/EIS complies with NEPA requirements, including those referenced by the commenters:

1-2. The requisite level of information necessary to make an informed choice among the alternatives in an EIS is based on the scope and nature of the action or, in the case of a Draft RMP, the potential decisions, or alternatives. The Draft RMP/EIS includes broad goal statements, and corresponding objectives and management actions, for relevant resources and resource uses in the decision area, as stated in Table 2-2. As described in BLM Land Use Planning Handbook H-1601-1 and presented in Draft RMP/EIS Section 2.6.1 (page 2-20), objectives may be quantifiable and measurable and may have established timeframes for achievement, as appropriate. For example, BLM Colorado Public Land Health Standards are one possible source of quantifiable objectives, whereas objectives that do not lend themselves to achieving the goal are not typically quantifiable. BLM Land Use Planning Handbook H-1601-1 goes on to state that actions are defined as measures or criteria to achieve desired outcomes (i.e., objectives), including actions to maintain, restore, or improve land health. However, the RMP is intended to be strategic in nature, and while it provides an overarching vision for managing resources in the Uncompahgre RMP decision area, it must allow flexibility for changing conditions, priorities, and information over the approximately 20-year RMP life span. As a result, objectives and management actions are crafted to provide direction for subsequent implementation, but to allow flexibility for site-specific conditions, as appropriate. However, the BLM revised some objectives and management actions for the Proposed RMP, Alternative E, including measurable objectives consistent with assessmennt, inventory, and monitoring (AIM) protocol.

3. As a foundation of the Uncompahgre RMP revision, the BLM UFO conducted and completed the Analysis of the Management Situation (AMS, June 2010) for the Uncompahgre decision area. For the AMS, the BLM analyzed available inventory data, including the 1985 San Juan/San Miguel RMP and 1989 Uncompahgre Basin RMP, and other relevant information to characterize the resource area profile, portray the existing management situation, and identify management opportunities to respond to identified issues. The analysis provides the basis for formulating reasonable alternatives consistent with multiple use principles, including the types of resources for development or protection (43 CFR 1610.4-4). The AMS describes the current conditions and trends of the resources and the uses/activities in the decision area. This information was used in the affected environment discussion, provided the basis for the no action/present management alternative, and created a framework from which to resolve the planning issues through the development of alternatives. The AMS describes the status, or present characteristics and condition of, BLM-administered land; the status of physical and biological processes that affect ecosystem function; the condition of individual components such as soil, water, vegetation, and wildlife habitat; and the relative value and scarcity of the resources. The AMS also addresses social and economic conditions that influence how people, communities, and economies interact with the ecosystem.

4. The Draft RMP/EIS (Section 2.2.2) included an RFD for oil and gas development, and the BLM made an assumption about the overall magnitude of development that could occur based on known oil and gas resources and current technologies and economic trends.

BLM_0164856

However, due to shifting market conditions and associated demand and drilling applications, it is not possible to estimate specific locations, times, and pattern of oil and gas development for a 20-year period when developing an RMP/EIS. Assumptions regarding these factors would be too speculative and not contribute to a meaningful NEPA analysis.

For other activities occurring in the decision area, Draft RMP/EIS Chapter 3 provides a description of current conditions and characterization for each resource. This includes an analysis of resource trends representing the direction of change (either in use or occurrence) in each resource since the 1985 San Juan/San Miguel RMP and 1989 Uncompahgre Basin RMP. Although an RFD for each activity is neither required nor applicable to every resource, the Analysis of the Management Situation contains a trend and forecast analysis for each resource, where appropriate.

5.   Refer to Section 5.3 – NEPA: Range of alternatives/purpose and need, of this report.

B. The BLM Land Use Planning Handbook (H-1601.5.4) explains that maintenance actions are limited to minor changes further refining or documenting a previously approved decision. The BLM UFO follows plan maintenance guidance provided in the Colorado Supplement to H-1601, which specifies that maintenance changes include new inventory or monitoring data related to species distribution and habitat (see Appendix A, Examples of Maintenance Changes by Program).

C. The BLM recognizes the difficulty of review of lengthy documents and strives to increase efficiency when possible. To accommodate this, the original 90-day public comment period was extended by 60 days to provide more time for review and comment.

### Section 5.1 – NEPA: Public notification

Total Number of Submissions: 5
Total Number of Comments: 7

Comment Number: 000030_StanleyA_20160623-1
Organization1:
Commenter1:Alice Stanley
Commenter Type: Individual
Comment Excerpt Text:
The meeting that the BLM had in Hotchkiss, the people that attended that meeting were not even allowed to have a question and answer session. The public should have been able to have their input as what they thought about the whole situation. The meeting did not last long enough for any of that.

Comment Number: 000487_WeltK_20161101_MCC-7
Organization1:Mountain Coal Company, LLC
Commenter1:Kathy Welt
Commenter Type: Private Industry
Comment Excerpt Text:
We remain concerned, however, that this public process will be politicized by publishing the number of comments submitted "for" and/or "against" one or more alternatives analyzed, as in a vote. NEPA was never intended to be a "vote" and as such we ask that the number of comments received not be published and instead focus on each individual substantive comment.

BLM_0164857

Comment Number: 000509_WolcottE_20161102-20
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
Hard copies of the draft should have been made readily available directly to any individuals requesting them.

Comment Number: 000509_WolcottE_20161102-22
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
We were unable to speak with or ask questions at the oil and gas related table because there were not enough staff present to speak with all of the people concerned with the oil and gas topic, and though we patiently waited long for our turn for an a BLM staff member to be free, just before our turn came the staff at the oil and gas table packed up early before the designated time and exited refusing to speak with us. We asked the BLM host at the front door about this and they informed us there were no further public meetings scheduled in our local area and that "it had already been a long night" even though the official meeting closing time had not yet passed.

Comment Number: 500147_BradfordD_20161008-1
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
I find it very difficult to impossible to review this document in an electronic format. It is worse than cumbersome. This is a large, complex document that needs to be provided in physical form.

Comment Number: 500147_BradfordD_20161008-4
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
Finally, I do not believe any comments that are submitted should be allowed to have personal identifiable information withheld. People need to be accountable for their comments and if their names and contact information are not part of the public record, they should not be included in this public process.

Comment Number: 500164_PitkinMesaPipelineCo_20161024-3
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
We request early notification from the BLM of any and all dates for further comment or stakeholder action on the UFO RMP, subsequent lease sales or any unitization plans or formal filings for unitization on any and all lands in proximity to our source waters and request that the agency consider Cooperating Agency status for our organization.
We further request a written reply to this communication addressing our concerns in detail.

BLM_0164858

*Summary*

A. Commenters had concerns with the Draft RMP/EIS public involvement process, including the following:

1. Public meetings were too short and should have allowed time for public comment and input
2. BLM staff was not sufficiently available to discuss oil and gas issues at the public meetings
3. The number of comments received "for" or "against" alternatives should not be publicized to avoid politicization, and the focus should be on the content of individual substantive comments.
4. Hard copies of the draft should have been made available to any individuals requesting them as the electronic copy is difficult to review
5. Commenters should not be allowed to have personal identification information withheld when submitting a comment.

B. One industry group specifically requested early notification from the BLM of any and all dates for further comment or stakeholder action on the Uncompahgre RMP.

*Response*

A. Regarding the Draft RMP/EIS public involvement process:

1-2. The BLM followed the public involvement procedures outlined in 40 CFR 1500-1508. During the Draft RMP/EIS comment period, the BLM created a RMP-specific website to record and disseminate project information, mailed a newsletter to more than 390 individuals, and hosted six public meetings, each including an overview presentation by the BLM UFO Field Manager, followed by an open house where members of the public could discuss concerns with available BLM staff and provide written comments. Almost 300 people attended these meetings, and the BLM staff who attended the meetings attempted to discuss concerns raised by the attendees. An average of 49 people (ranging from 13 to 148 people) attended 6 the meetings. The evening timeframe and the number of BLM personnel at these meetings allowed the BLM to address the attendees' questions. More than 140 citizens attended the meeting in Hotchkiss, Colorado, which made it challenging for BLM staff to engage in discussion with each and every interested attendee. The BLM recognized this and attempted to address every attendee's question to the best of their ability.
3. Substantive public comments are reviewed for their content and are not classified as "for" or "against" particular management options. Specifically, substantive comments are classified by relevant issue topic, as shown by the sections of this report. More than 53,000 comment letter submissions were received on the Draft RMP/EIS. The BLM implemented a detailed process by which each submission was reviewed, filed, and tracked. During that process, each substantive comment within each submission was assigned to the appropriate issue topic(s) (e.g., resource category/subcategory) to promote organized review and response.
4. The BLM provided opportunities to obtain a hard (paper) copy of the Draft RMP/EIS and provided them to people who requested them. At each of the meetings, the BLM announced that paper copies were also available at all local libraries in the planning area.

BLM_0164859

5. The Dear Reader letter in the Draft RMP/EIS states that, "Before including your address, phone number, email address, or other personal identifying information in your comment, be advised that your entire comment – including your personal identifying information – may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so." A member of the public who wishes to obtain specific information associated with public comments may submit a request pursuant to the Freedom of Information Act. If the information has not already been released to the public, the BLM will conduct an appropriate review, consistent with the Freedom of Information Act, to determine whether it should be released.

B. Individuals and groups who submitted unique (non-form letter) substantive comments on the Draft RMP/EIS or who requested addition to the mailing list will be informed about future public involvement opportunities. Information about public involvement is also available on the project website: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86003.

### Section 5.2 – NEPA: Cooperating Agency relationships
Total Number of Submissions: 4
Total Number of Comments: 6

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-24
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW). The RMP will recognize the State's responsibility and authority to manage wildlife." At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.

Comment Number: 000492_RandallR_20161101-18
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes.

Comment Number: 000492_RandallR_20161101-2
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government

BLM_0164860

Comment Excerpt Text:
Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes.

Comment Number: 000492_RandallR_20161101-3
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.
Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.
The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law.

Comment Number: 500164_PitkinMesaPipelineCo_20161024-6
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
4) The Board requests that the BLM consider Cooperating Agency status for PMPLC.

*Summary*
Comments noted the following concerns with Cooperating Agency communication or issues:

BLM_0164861

A. Input from Colorado Parks and Wildlife (CPW), a cooperating agency, was not adequately solicited as related to wildlife issues. Comments and wildlife-related information, such as those provided by the CPW were not adequately incorporated into the Draft RMP.

B. The BLM should consider Cooperating Agency status for Pitkin Mesa Pipeline Company.

*Response*
A. The BLM reviewed the CPW's recommended edits and confirmed the accuracy of their comments. Additionally, CPW reviewed the Proposed RMP Alternative, and the BLM met with CPW several times to discuss their comments and incorporated them in the Proposed RMP/Final EIS, as appropriate.

B. Per BLM Land Use Planning Handbook (H-1601), cooperating agency status provides a formal framework for governmental units—local, state, tribal, or federal—to engage in active collaboration with a lead federal agency to implement NEPA requirements. The Pitkin Mesa Pipeline Company is not a government unit and, therefore, is ineligible for formal cooperating agency status. Thirty-eight potential cooperating agencies were identified and contacted at the outset of the planning effort in February 2010; of these, 19 agreed to participate. The BLM's relationship with and reliance on the extensive contributions of these government and interagency partners is highly valued. While not authorized to participate as cooperating agencies, private companies and individuals can make important contributions to BLM land use planning efforts through their comments.

### Section 5.3 – NEPA: Range of alternatives/purpose and need
Total Number of Submissions: 13
Total Number of Comments: 20
Comment Number: 000563_King_WELC_HasAttach-16
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Under these authorities, BLM is required not only to evaluate the impacts of federal coal leasing to public lands, water, and wildlife resources, but to avoid harm to those resources whenever possible. Accordingly, the MLA and FLPMA provide BLM the legal authority to either decide not to lease particular lands, or to withdraw large tracts from leasing.73
[Footnote 73: Even if BLM concludes that the agency lacks authority to bar new oil, gas, and coal leasing throughout the planning area, it should still consider such an alternative because it is otherwise reasonable. Federal courts hold that agencies have the duty to consider reasonable alternatives that are outside the jurisdiction of the agency or that require a change of law to implement. See 40 C.F.R. $ 1502.14(c) (an EIS "shall" "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); Council on Envilomnental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations,46 Fed. Reg. 18,026-01 at 18,027 (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable"); Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 814 (9th Cir. 1999) (setting aside EIS for failure to address alternative requiring Congressional action).]

BLM_0164862

Comment Number: 000270_HarperS_20161023-2
Organization1:
Commenter1:Steven Harper
Commenter Type: Individual
Comment Excerpt Text:
Some want no leasing in the North Fork Valley; others are in favor of Alternative B-1 (or the North Fork Alternative Plan). Either would work for me, but I'm struck mostly by how these alternatives have been rejected outright in the draft RMP with little or no explanation. You went to the trouble of incorporating Alternative B-1 into the draft; but surprisingly, you haven't adopted it as the Preferred Alternative for the North Fork Valley. Was the inclusion of Alternative B-1 just a placating gesture? Certainly, the FLPMA does not require that virtually all BLM parcels must be open to industrial development, especially when there is overwhelming evidence now that liquid fuel development employing hydraulic fracturing technologies can lead to permanent resource damage. Why take these risks in an area so unique and so fragile to the possible consequences?
The draft RMP is long on describing and comparing the alternatives; but it seems to me, quite short in providing explanations for the selection of the preferred alternative. As just one example, refer to Goal #331 involving fluid mineral development. It is clear from Table 2-2 that Alternative D proposes far fewer No Leasing acres and smaller buffer zones and other restrictions than does Alternative B-1 (Lines 333-339); however, I find inadequate explanation of how and/or why the BLM rejected the Alternative B-1 proposals in favor of Alternative D. Why not keep oil and gas development a half mile (2,640 feet) from public water sources rather than just 1000 feet? What's the explanation? For a more specific example, in Chapter 4, you state: "Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area." Page 4-90. Alternative D offers less. Why not adopt planning criteria that offers the most protection of our water supplies in favor of criteria that is more lax or risky?

Comment Number: 000298_AndersonT_20161025-2
Organization1:Telluride Mountain Club
Commenter1:Tor Anderson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM's final plan needs to encompass and fully consider ecological emphasis areas, special recreation management areas, areas of critical environmental concern, lands with wilderness characteristics, and wild and scenic suitability designations.

Comment Number: 000376_WegnerB_20161030-6
Organization1:
Commenter1:Bruce Wegner
Commenter Type: Individual
Comment Excerpt Text:
Three broad strategic objectives should have been the basis/overall guide for development of the UFO Draft RMP. These objectives/policies are: (1) National Energy Policy, (2) Oil & Gas Fracking Safety, and (3) Global Climate Change Policy

Comment Number: 000383_HellecksonB_20161031-10
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Comment Excerpt Text:

BLM_0164863

The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management. In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations. It will result in neither multiple use nor sustained yield. It will force the costs of energy extraction onto the residents of the North Fork in multiple ways, supporting the profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

Further, the DRMP preferred alternative makes the existence of our vineyard and winery untenable and squanders the time and investment made by a family over the course of more than 2 decades. The adoption of a "no leasing in the North Fork watershed" alternative conversely, fulfills the BLM's mission and preserves and enhances the existing enterprises in the Valley. It also allows us to continue to grow grapes and produce wine sustainably indefinitely, while continuing to enjoy the clean air and water, the safe areas and the dark night skies we came here for.

Comment Number: 000402_RatnerJ_20161028-1
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix C of the Handbook states:
The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:
I. Natural, Biological, and Cultural Resources: Decisions identified must be made during the land use planning process if the resource exists in the planning area.
II. Resource Uses: Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use. If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.
Again, take livestock grazing as an example, the DEIS 'direction' fails to implement requirements and limitations needed to meet goals.

Comment Number: 000410_BolandB_20161027-3
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
The Draft RMP generally fails to compare the North Fork Alternative Plan (Alternative B.1) to the BLM's preferred alternative (Alternative D), but in the few instances where a comparison is made it is apparent that Alternative B.1 presents the more sensible alternative.

Comment Number: 000433_FielderA_20161029-1
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
As presented, none of the alternatives offer the level of protection these lands [the North Fork Valley] warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

BLM_0164864

Comment Number: 000433_FielderA_20161029-11
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
Require the application of the Precautionary Principle in making agency decisions, and hence the establishment of incontrovertible proof of the safety of any proposed activity on these lands before the approval of such activity.

Comment Number: 000433_FielderA_20161029-8
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
There is no consideration of how this RMP complies with the Public Trust Doctrine and thus how it measures up to the moral and legal obligations of the federal government to the citizens of the United States.

Comment Number: 000487_WeltK_20161101_MCC-1
Organization1:Mountain Coal Company, LLC
Commenter1:Kathy Welt
Commenter Type: Private Industry
Comment Excerpt Text:
Although we believe that sustainability ecological resources must be addressed, we do not believe that the intent of the Multiple Use Sustained Yield Act can be fulfilled if ecological resources are given priority as presented in Alternative B. Similarly, to exclude/prohibit uses, such as potential future oil and gas development as presented in Alternative B1 of the RMP EIS, seems to conflict with the BLM's mission of Maximum Economic Recovery of mineral resources. Mineral resource extraction, whether coal, oil and gas, or other resources, has improved dramatically over the past several decades and will continue to improve while protecting and even enhancing the environment.

Comment Number: 000508_DrakeM_20161101-6
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
The UFO draft Resource Management Plan (RMP) does not contain an alternative that offers the level of protection these lands warrant. The current draft RMP appears to have ignored:
-What the communities and the public in your planning area have specifically suggested/requested
-The economic development plans that Gunnison and Delta Counties are implementing
-What federal law requires.

Comment Number: 000545_SlivkaJ_20161101-190
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. Several significant problems stemming from this practice are detailed in The Wilderness Society's 2016 report, No Exit: [Footnote 75 See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf)

BLM_0164865

and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf). ]

It precludes lands from being managed for multiple values.

It impedes meaningful conservation from taking place on sensitive lands.

Other resources are endangered by oil and gas leases that do not include sufficient protections.

It undermines the public's engagement in the land planning process.

It causes poor fiscal stewardship of taxpayer-owned resources.

It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities to enhance the management of those other resources, particularly in areas with low or no development potential.

The TWS report No Exit (included as Attachment 4) argues that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development. [Footnote 76 See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment"). ] By taking a proactive approach to managing oil and gas development as just one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife. We are including with these comments a proposed approach to making oil and gas allocations consistent with development potential in the Uncompahgre RMP. (See Attachment 5.) Our recommended approach is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development.

BLM_0164866

Comment Number: 000545_SlivkaJ_20161101-196
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14), which extends to considering more environmentally protective alternatives and mitigation measures. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein). For this RMP, the consideration of more environmentally protective alternatives, including alternatives to severely limit oil and gas leasing availability, is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a).

Comment Number: 000545_SlivkaJ_20161101-197
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing. A draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives, including closing areas currently open to leasing in order to protect wildlife, wilderness and other important resource values, especially those areas with low potential for oil and gas development.

Comment Number: 000545_SlivkaJ_20161101-198
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM's obligation to manage these public lands for a variety of resources, of which oil and gas is only one, requires consideration of alternatives to close substantial areas to oil and gas leasing and a preferred alternative that better balances energy development with other multiple uses of the public lands.

Comment Number: 000548_D'Alessandro_20161101-1
Organization1:
Commenter1:Ralph D'Alessandro
Commenter Type: Individual
Comment Excerpt Text:
I do not feel any of the alternatives adequately address all of the issues, especially not Alternative A, the no action alternative. Nor does Alternative D, the preferred alternative, adequately protect the resources and economy of the Uncompahgre Field Office (UFO) area. The inclusion of Alternative B1 in the options signifies its validity as a conservation based plan and suggest, with the below comments, that it be incorporated into Alternative D. Alternative C also largely emphasizes mineral extraction without the needed protections for water sources and consideration of the impact of such extraction on the local economies that would be affected. Selected comments relating to issues important to agriculture

touched on in Alternative C are identified individually and presented for incorporation also into Alternative D.

Comment Number: 000563_King_WELC_HasAttach-59
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
Here, the UFO is required to ensure that these objectives and duties are adhered to through the completion of the RMP, which must, inter alia, "use and observe the principles of multiple use and sustained yield" and "weigh long-term benefits to the public against short-term benefits." See 43 U.S.C. § 1712(c)(1), (7). Thus, the UFO has a substantive duty to consider the enduring legacy of oil and gas development in land management decision-making, which is to be balanced against other critical multiple use resource values.

Comment Number: 000594_MorrisL_20161028-4
Organization1:
Commenter1:Leah Morris
Commenter Type: Individual
Comment Excerpt Text:
The final Resource Management Plan should:
-Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
-Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
-Focus on quality of life and the recreation potential of such areas without leasing.
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

Comment Number: 000603_SmithP_20161024-2
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Comment Excerpt Text:
The numerous local governmental entities, private citizens and business leaders in the North Fork Valley that supported the NFAP is unprecedented nationally and to neglect to include this in the scoping section ignores the most basic of NEPA policy and has created a situation where this area has not be adequately identified or described as a part of the human environment. Therefore, the NEPA process has not been appropriately used to identify and assess the reasonable alternatives to proposed actions to avoid or minimize adverse effects of these actions upon the quality of the human environment," as required by CEQ regulation 1500.2(e)). In addition, by not appropriately describing the North Fork Valley and potential negative environmental effects to it as a "planning issue," this RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues," (Table 1-2, Step 7).

Comment Number: 000593_MorrisS_20161028-1
Organization1:
Commenter1:Steve Morris
Commenter Type: Individual
Comment Excerpt Text:
the final Resource Management Plan should:
-Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.

BLM_0164868

-Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

Comment Number: 000384_CastleS_20161029-1
Organization1:
Commenter1:Shannon Castle
Commenter Type: Individual
Comment Excerpt Text:
Specifically, the Final Resource Management Plan should:
Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
Protect the water and soil quality that our local farmers and ranchers depend on.
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to full its duty to consider the full range of reasonable management possibilities.

Comment Number: 500192_SchulzJ_20161027-9
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
The RMP must protect the current and long term productivity of public lands emphasizing resource extraction to the detriment of all other resources is a violation of BLM's mandate.

*Summary*
Commenters discussed several different aspects of the range of alternatives, including the following:

A. Commenters stated that the BLM did not sufficiently consider the North Fork Alternative and should therefore consider how the North Fork Alternative Plan (B.1) would be carried out if included in the BLM's preferred alternative (Alternative D). Some commenters stated that a sub-alternative should be included for each alternative, as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated in each alternative.

B. Commenters requested that additional lands be closed to fluid mineral development in order to fulfill the multiple-use mandate and in light of new information, science, and national policy related to climate change. Some commenters more specifically stated that only closing the North Fork Valley to fluid mineral leasing or implementing Alternative B.1 would provide sufficient protection of sensitive resources and communities in the North Fork Valley. Another commenter requested that the BLM consider not leasing on low and no-potential lands.

C. Other commenters stated that the BLM failed to consider use of BMPs and/or mitigation measures, or provide sufficient explanation for selecting the preferred alternative (Alternative D), which some commenters believe leans heavily towards resource extraction.

D. Other commentators state that the range of alternatives is insufficient and imbalanced because, while the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development or in

BLM_0164869

greenhouse gas rates across alternatives. They state that the Draft RMP fails to analyze in any alternative a requirement to mitigate climate impacts by capturing or flaring methane emissions.

E. Commenters stated that the development inherent in the BLM's preferred alternative (Alternative D) is incompatible with the existing mandate of the BLM and existing uses of the lands. In contrast, some commenters stated that the Multiple Use Sustained Yield Act cannot be fulfilled if ecological resources are given priority, as presented in Alternative B, and that to exclude/prohibit uses, such as potential future oil and gas development as presented in Alternative B.1, seems to conflict with the BLM's mission of Maximum Economic Recovery of mineral resources. One comment noted that the Draft RMP fails to evaluate energy needs as stated in the Draft RMP's goals statement. One commentor also stated that the RMP should be broad enough to allow for site-specific applications, not eliminate/restrict them at the planning stage.

F. One commenter stated that there is no consideration of how this Draft RMP complies with the Public Trust Doctrine and thus how it measures up to the moral and legal obligations of the federal government to US citizens.

G. One commenter noted that three broad strategic objectives should have been the basis/overall guide for development of the Draft RMP: (1) national energy policy, (2) oil and gas hydraulic fracturing safety, and (3) global climate change policy.

*Response*
A. The North Fork Alternative Plan was not included as a sub-alternative to Alternative A, No Action, because Alternative A represents current management according to the existing RMPs, and implementation decisions.

Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group (Citizens for a Healthy Community 2013). This partial alternative is a subset of Alternative B because Alternative B.1 focuses primarily on oil and gas development in the North Fork Valley only. However, management goals, objectives, and actions for other resources are most closely related to Alternative B. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area. In the analysis, impacts of Alternative B and Alternative B.1 are compared with Alternatives A, C, and D. Inclusion of management in Alternative B.1 and analysis of the impact of these actions is part of the range of alternatives.

B. The BLM's planning decision will include the identification of lands as open or closed to oil and gas leasing, and the restrictions that will apply to lands that are open to leasing. The Mineral Leasing Act (30 US Code 226) gives BLM the authority to lease and manage federal fluid mineral estate. Policy and directives from Executive Order 13783 (Promoting Energy Independence and Economic Growth) and Secretarial Order 3354 help guide BLM lands management decisions. The range of alternatives is consistent with the current administration's directives. As discussed in Section 21.1 - Range of alternatives (Leasable Minerals – Fluid) of this appendix, on lands that are subsequently leased, future site-specific analysis will assess those specific areas for which an

BLM_0164870

applicant has submitted an application for permit to drill. See also response in Section 21.1, Fluid minerals.

C. Draft RMP/EIS Table 2-2, line 5, management common to all alternatives, stated that best management practices (BMPs), other site-specific mitigation, and/or off-site mitigation measures would be applied. BMPs were included in Draft RMP/EIS Appendix G. Other management actions within Table 2-2 also refer to the implementation of BMPs. Secretarial Order 3360 rescinded BLM Mitigation Manual (MS-1794) and Mitigation Handbook (H-1794-1). Regional mitigation strategies described in the last paragraph of Draft RMP/EIS Section 2.3.1, Management Common to All Alternatives (page 2-6), was deleted. Landscape (not regional) mitigation objectives are identified in the RMP for each resource, resource use, and special designation.

The BLM's planning regulations direct that the BLM should identify its preferred alternative in a Draft RMP/EIS. See 43 CFR 46.425. Draft RMP/EIS Section 2.5 (page 2-18) provided the BLM's rationale for selecting the agency-preferred alternative (Alternative D). Justification for the agency's identification of the Proposed RMP is provided in the Proposed RMP/Final EIS. Also see Draft RMP/EIS Sections ES.6.5 (page ES-8), 2.3.6 (page 2-8), 2.5 (page 2-18–2-19), 4.1 (page 4-1), and 4.2 (page 4-7). Furthermore, The BLM Land Use Planning Handbook H-1601-1, Section III A (7), Select a Preferred Alternative, requires the BLM to identify a preferred alternative in the Draft RMP/EIS: "By evaluating the alternatives in the EIS, the BLM must determine which combination of potential planning decisions contained in the alternatives best meets multiple use and sustained yield mandates of Section 103(c) of FLPMA (43 US Code Section 1702(c)). If any one alternative contains the desired combination of potential planning decisions, then that alternative should be identified as the preferred alternative." Draft RMP/EIS Section 2.5 (page 2-18) provided the BLM's rationale for selecting the agency-preferred alternative (Alternative D). The term "preferred alternative" was defined in Draft RMP/EIS Section 2.3.6 (page 2-8) as the agency's (BLM) preferred alternative. Because Alternative D was determined to be the BLM's preferred alternative, "Alternative D" and "preferred alternative" were used interchangeably.

D. The BLM developed and analyzed a reasonable range of alternatives in the Draft RMP/EIS, including alternatives relating to the management of fluid minerals and coal, pursuant to the requirements of NEPA and 43 CFR 1610.4. As discussed in the Draft RMP/EIS, the BLM developed the alternatives based on the Analysis of the Management Situation; planning issues; tribal, federal, state, local, and other governmental agency input and consultation; and public scoping. The acreage open or closed to fluid mineral leasing and coal development (summarized in Table 2-1, pages 2-9–2-11) is similar for most alternatives; however, the level of constraints placed on new leases varies among the alternatives (summarized in Table 2-1, pages 2-10–2-11). Explanation of the acreages open to fluid mineral leasing in each of the alternatives was provided in Appendix B. Explanation of the acreages open or closed to coal development in each alternative was provided in Draft RMP/EIS Section 4.4.3 (pages 4-257–4-260) and Appendix L, which define acceptable and unacceptable areas discussed in Table 2-1, page 2-9. The management strategies considered range from an alternative providing greater conservation and protection of natural, recreation, and cultural values and intensive management of surface-disturbing activities, to an alternative focused on energy and commodity development with the least protective management actions for physical, biological, and heritage resources. A detailed rationale was provided in Draft RMP/EIS Section 2.4 (page 2-15) for the alternatives and

BLM_0164871

management options considered but eliminated from detailed analysis. Ann alternative closing the decision area to all fluid mineral leasing was not considered in detail; see responses in Section 21.1, Leasable Minerals – Fluid: Range of Alternatives and Section 22.1, Leasable Minerals – Solid: Range of Alternatives

E. The BLM's identification of Alternative D as the agency-preferred alternative is discussed in Part C of this response, above.

FLPMA (Section 103(c)) defines "multiple use" as the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. Accordingly, the BLM is responsible for the complicated task of striking a balance among the many competing uses of the public lands. The BLM's multiple-use mandate does not require that all uses be allowed on all areas of the public lands. Instead, the BLM must evaluate and choose an appropriate balance of resource uses, which involves tradeoffs between competing uses.

The concept of "maximum economic recovery" relates to the evaluation of federal coal resources prior to leasing. See 43 CFR 3422.1, 3425.4, and 3480.0-5(a)(21). Maximum economic recovery determinations are not made as part of the land use planning process. All alternatives allow for continued fluid mineral development; therefore, the proposed management in the Draft RMP/EIS is consistent with the goal to "provide opportunities to develop fluid minerals consistent with other resource goals and uses to support local and national energy needs" (Draft RMP/EIS Section 2.6, page 2-187, line 331). The purpose of fluid mineral planning decisions in an RMP is to identify lands available for fluid mineral leasing and any necessary restrictions to protect sensitive resources. Subsequent implementation decisions, including leasing, approval of applications for development, and requirement of BMPs, provide management flexibility.

F. No settled law guides whether, and how, the public trust doctrine may apply to federal land and resource management. However, FLPMA directs that management of BLM-administered lands should be "on the basis of multiple use and sustained yield unless otherwise specified by law" (43 USC 1701(a)(7)). "Multiple use" incorporates the concept of the public interest, as FLPMA defines it to mean "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; . . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including . . . recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values . . . " (43 USC 1702(c)). Consistent with FLPMA, the Proposed RMP reflects the BLM's judgment about the optimal balance of resource protection and uses, in furtherance of FLPMA's goals.

G. Management objectives presented in the Uncompahgre RMP accord with the principles of multiple use and sustained yield set forth in, the FLPMA, and were developed in accordance with information received in internal and public scoping.

BLM_0164872

### Section 5.4 – NEPA: Best available information—baseline data

Total Number of Submissions: 8
Total Number of Comments: 15

Comment Number: 000402_RatnerJ_20161028-69
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Attached we provide a range of information we request the BLM to review and provide analysis of in the EIS and move into management direction in the RMP. If the BLM feels that any of the information supplied is not applicable to the RMP planning process, we request the BLM to supply rationale in the EIS to justify that decision. Without such justification the BLM will not be complying with NEPA and the 'APA. [see 14 attachements included with PDF]

Comment Number: 000451_BishopB_20161031_HasAttach-1
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
To put it succinctly, NEPA requires decisions on the use of public lands to be based on the most current, available scientific data and information. As best we can determine, BLM ceased collecting information for this RMP in 2010. While there are a few references from later dates, e.g., the closure of the Elk Creek Mine in 2013, they are indeed, few. BLM had an enormous amount of data and information available to it, at least for the North Fork Valley, in the North Fork Citizens Alternative, which it seems not to have taken into account. The entire process of drafting this RMP has taken eight years so far. It is unconscionable to think that nothing of significance has changed in the RMP planning area during that period of time. There have been huge upheavals in the energy industry and in the understanding of its impact on human health and the environment. These changes and others cannot be ignored. To rely on Adaptive Management and Regional Mitigation Strategies as described in 2.3.1 to make RMP implementation adjustments is way beyond BLM's authority in light of such major changes in public information and public policy. (See also comments in the fourth section below.) The RMP may indeed be fatally flawed.

Comment Number: 000451_BishopB_20161031_HasAttach-5
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
We believe the information the RMP is based on is so out of date as to be in violation of NEPA requirements

Comment Number: 000508_DrakeM_20161101-4
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
The majority of your reference materials were not generated within the last five years.
This situation is totally unacceptable because of the rapid advancements in technology and studies in the O&G area. I am confident that multiple organizations are providing you with recommendations on how

BLM_0164873

to update your reference material, which would greatly affect some of the conclusions in the RMP and any Risk Management Plan.

Comment Number: 000530_PlattA_20161101_EPA-1
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Based on the EPA's review of the Draft RMP/EIS, .an overarching observation is that much of the existing conditions information is dated. For example, some of the discussion under the Affected Environment sections for air, water, and energy resources rely on data that are 5-9 years old. An accurate representation of existing conditions is prerequisite to the ability to assess future impacts. We recommend updating the existing conditions information, including the maps, for the Final RMP/EIS and providing an explanation for any older data that the BLM considers representative of current conditions.

Comment Number: 000545_SlivkaJ_20161101-224
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Draft RMP Relies on Stale Data
NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale. See Northern Plains Resource Council v. Surface Transportation Bd. 668 F.3d 1067, 1085---87 (9th Cir. 2011). To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ." Portland Audubon Soc'y v. Babbitt, 998 F.2d 705, 708 (9th Cir. 2000). An "agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions." Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000). Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).
Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

Comment Number: 000545_SlivkaJ_20161101-225
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.2

BLM_0164874

Comment Excerpt Text:
Stale Climate Change Data
The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008. Uncompahgre Draft RMP at 3-14 – 3-16. The RMP's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27; 3-57. To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report. Id. at 3-93. The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008. Id. at 4-38 – 4-40. In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010. Id. at 4-125.
The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2). [Footnote 107 Intergovernmental Panel on Climate Change, Second Assessment Report (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4), [Footnote 108 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21. Uncompahgre Draft RMP at 4-38. Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25. [Footnote 109 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016)]
The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather "baseline data" during the NEPA process. Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011). The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." Id. at 1086. Like the agency in Northern Plains, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data.

Comment Number: 000563_King_WELC_HasAttach-3
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0164875

BLM must address new scientific and economic information, including regarding (1) the impacts of climate change on the Uncompahgre planning area; (2) the social burden, or cost, of carbon and methane waste that would be authorized by the RMP; and (3) fossil fuel production and employment.

Comment Number: 000563_King_WELC_HasAttach-33
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Yet, in several important respects that relate to climate and socioeconomic impacts, the draft EIS uses stale, outdated evidence. BLM must rely on the latest information on climate change, coal mining, and economics in any subsequently prepared NEPA document.

Comment Number: 000563_King_WELC_HasAttach-34
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS appears to rely largely on data concerning climate change from 2010 or earlier, ignoring the wealth of new policies meant to guide BLM, and new studies and data emphasizing the worsening nature of the climate threat. Such ignorance is impermissible.
For example, the description of climate change in draft EIS Chapter Three relies on three studies: an EPA study published in 2007, and two state studies published in 2008. Draft EIS at 3- 14 – 3-16. The EIS's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27, 3-57. To affirm that impacts from climate change are already occurring, the EIS relies on a 2009 report. Id. at 3-93.
The information in Chapter Four of the EIS is also outdated. It describes potential greenhouse gas emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008—drafted during waning days of the climate-denying Bush administration. Id. at 4-38 – 4-40. To discuss the cumulative impacts of climate change in the project area, BLM relies on studies published between 1996 and 2010. Id. at 4-125.
As detailed above, there is abundant new data concerning the nature of climate change, the contribution of anthropogenic sources to that change, the impacts of that change, and the need for urgent action to address the climate crisis.149 [149 See supra at Section I.] No new information since 2012 is included in or cited by the draft EIS. Any subsequently prepared NEPA document must include and refer to this data.

Comment Number: 000563_King_WELC_HasAttach-82
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In this context, and to accurately account for and integrate climate change impacts into the affected environment, hard look, alternatives, and mitigation analysis, BLM should evaluate the relevant resources, ecosystems, or communities for key vulnerabilities as part of the baseline assessment. The vulnerability of ecosystems and communities, as well as the species and physical elements they comprise, depends on their inherent qualities and their ability to change or adapt to address new climatic conditions. For example, the vulnerability of certain species can be affected by the tolerance of individual organisms to the direct effects of climate change, the ability of populations to adapt to those conditions

BLM_0164876

through the expression of genetic variability, and the ability to adjust behaviorally to changes in the ecosystem, such as prey shifts. A vulnerability assessment would examine the species and physical elements of existing ecosystems and determine which elements are sensitive, which are resilient, which have the ability to adapt, and what the likely consequences would be of anticipated changes in climate. Human infrastructure—bridges, roads, buildings, etc.—should be assessed similarly.

Comment Number: 000563_King_WELC_HasAttach-83
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Because ecosystems (including the human communities that rest within such ecosystems) are so complex, it is impossible to evaluate the vulnerabilities of every population, species, community, or other element of the system in question. Instead, risk assessment must focus on particular, high-priority elements or "key vulnerabilities." In its 5th Assessment Report, the IPCC suggested the following criteria for identifying key vulnerabilities:

- Exposure of society, community or social-ecological system to climate stressors.
- Importance of vulnerable system(s).
- Limited ability of society, community, or social-ecological systems to cope with and build adaptive capacities or limit the adverse consequences of climate related hazard. Persistence of vulnerable conditions and degree of irreversibility of consequences.
- Presence of conditions that make societies highly susceptible to cumulative stressors in complex and multiple-interacting systems.

In other words, key vulnerabilities are likely to occur where the effects of climate change are large and intense, imminent, long lasting, highly probable, irreversible, and likely to limit the distribution of highly valued systems or system elements. BLM should clarify that understanding and assessing these vulnerabilities, based on existing information and tools,271 [271 Where there is scientific uncertainty, agencies must satisfy the requirements of 40 C.F.R. § 1502.22.] is a key component of the affected environment, hard look at impacts, and the design and consideration of alternatives and mitigation measures.

*Summary*
A. Comments stated that the RMP does not include the most currently available scientific data, as required by NEPA, because the baseline information uses data that is 5 to 10 years old. Commenters suggest that baseline data fails to accurately portray current conditions for multiple resource topics, including climate change, air quality, water resources, energy, methane emissions, fossil fuel production, and socioeconomics.

B. One organization provided data for BLM review and requested that the BLM include rationale in the Proposed RMP/Final EIS to justify the exclusion of any of this information.

C. In addition, commenters requested that the BLM evaluate the relevant resources, ecosystems, or communities for key vulnerabilities to climate change as part of the baseline assessment.

*Response*
A. The Draft RMP/EIS utilized the best available data at the time of preparation. Due to the dynamic nature of the fluid mineral industry, production and employment data have changed in

BLM_0164877

the timeframe during which the Draft RMP/EIS was drafted. Similarly, more recent data about climate change are available. The BLM updated data in the Proposed RMP/Final EIS, as appropriate.

B. The BLM reviewed the data provided and relevant analysis for specific issues and resources for which comments noted inadequacies. In cases where it was determined that data updates are necessary, or analysis is insufficient based on specific comments, the Proposed RMP/Final EIS was amended to include the necessary information.

C. The following were added to the Proposed RMP/Final EIS: a table showing controlled greenhouse gas emissions estimates for each alternative, new information from the BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol[1], information from the 2017 Greenhouse Gas and Climate Change Report[2], and information regarding the BLM's adaptive management strategy.

### Section 5.5 – NEPA: GIS data and analysis
No comments are associated with this topic.

### Section 5.6 – NEPA: Direct/indirect impacts
Total Number of Submissions: 12
Total Number of Comments: 13

Comment Number: 000165_KelsoJ_20160913-1
Organization1:
Commenter1:Jane Kelso
Commenter Type: Individual
Comment Excerpt Text:
I don't think the BLM has fully considered the impact of drilling for oil and gas on the usage of water, in the maintaining the roads, the impact on our air quality, and light pollution.
Drilling for oil and gas is an inappropriate use of our public lands, the land people who live here and vacation here use for hunting, fishing and recreation; the land ranchers use to graze their livestock, the land that supplies the water to our towns and organic farms. This desert climate is a delicate environment that needs to be treated as such!

Comment Number: 000194_AndersonS_20161002-1
Organization1:
Commenter1:Sandy Anderson
Commenter Type: Individual
Comment Excerpt Text:
From what I understand, BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies, the impact of unregulated gas gathering pipelines, extreme weather effects on pipelines, removing water from the hydrologic cycle, injection wells and the potential for earthquakes and contamination of aquifers, ozone levels, community source water protection, the impact of the pollution

---

[1] BLM (US Department of the Interior, Bureau of Land Management). 2015. BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol. BLM, Colorado State Office, Lakewood, CO. May 2015. Internet Web site: https://www.co.blm.gov/nepa/airreports/AR2015.html#a_meth. Accessed on September 15, 2017.
[2] Golder Associates. 2017. Greenhouse Gas and Climate Change Report. February.

BLM_0164878

on wildlife, the human health impact, the impact on local real estate or the organic agricultural economy, or many other crucial aspects.

Comment Number: 000638_PopeS_20161031-3
Organization1:
Commenter1:Sarah Pope
Commenter Type: Individual
Comment Excerpt Text:
Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed.

Comment Number: 000459_HardyR_20161027-14
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed.

Comment Number: 000225_LilienE_20161003-1
Organization1:
Commenter1:Elizabeth Lilien
Commenter Type: Individual
Comment Excerpt Text:
I also need to emphasize the poor and inadequate analysis preformed by the BLM. This analysis did not consider the uniqueness of the North Fork Valley housing the highest concentration of organic farms in Colorado (including vineyards, packing of organic fruit, vegetable growing operations) which will be negatively effected by the plans to drill and multiple risks to this agricultural area. Ignoring the impact of hydraulic fracturing, unregulated gas gathering pipelines, extreme weather causing flooding, mudslides and geological instability. Adding to these is the damage to human health, high ozone levels, water contamination, loss of recreation, and the overall impact on children, animals and all inhabitants due to these plans is just plain wrong . I do not want to forget the climate change impact that this development would effect contributing to greenhouse gas emissions among other threats to climate change.

Comment Number: 000401_ShoemakerS_20161028-4
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Other Sections: 5.7
Comment Excerpt Text:
The BLM has an important legal mandate:
Sustain the health, diversity, and productivity of America's public lands and resources through balanced stewardship to enhance the quality of life for all citizens, meeting their needs today without compromising their ability to meet those needs in the future.
Unfortunately the Draft RMP is fatally flawed as it is and cannot possibly accomplish this mandate. It takes a very reductionist and micro view of the situation, ignoring the "elephants" in the room, ignoring

BLM_0164879

significant near term as well as long term cumulative and permanent impacts. A systems perspective is required and totally lacking.

Comment Number: 000480_SmithR_20161028-3
Organization1:
Commenter1:Robin Smith
Commenter Type: Individual
Comment Excerpt Text:
It is a bold-faced lie for BLM to state that oil and gas development occurring on the federal mineral estate property adjacent to ours will not have any direct or indirect impacts on our non-decision lands—our private property. The negative impacts of oil and gas drilling next to our property will result in us being forced to:
• Breathe contaminated air;
• Risk drinking contaminated water;
• Risk irrigating our organically cultivated garden and orchard with contaminated water;
• Listen to constant fracking noise;
• Feel the ground vibrate from fracking;
• Endure endless truck traffic breaking the peace and tranquility of our rural property;
• Lose our dark skies due to light pollution;
• Have our beautiful mountain views obscured by oil and gas wells; and
• No longer see dozens of migrating deer, elk, and other wildlife on our property.
Because we do not want to live next to an oil and gas patch, the direct and indirect negative impact of oil and gas drilling next to our property will result in us having to sell our property and move out of the area. That assumes, of course, that we will be able to find someone to buy our property—after-all, who would buy his dream home next to an oil and gas well? Additionally, our reduced property values will cause financial hardship on our family.

Comment Number: 000508_DrakeM_20161101-7
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
Although this detailed process covers many of the requirements for a management plan, it is missing the key management element required for successful implementation of any management plan. That key element is a Risk Management Plan.
A risk is defined as "an uncertain event or condition that, if it occurs, has a positive or negative effect on a project's objectives." Risk is inherent with any project, and project managers should assess risks continually and develop plans to address them. The risk management plan contains an analysis of likely risks with both high and low impact, as well as mitigation strategies to help the project avoid being derailed should common problems arise. Risk management plans should be periodically reviewed by the project team to avoid having the analysis become stale and not reflective of actual potential project risks.
A Risk Management Plan is a document prepared by a project manager to foresee/define risks, to estimate both the probability of the occurrence and the details of the impact for the risks defined (the risk assessment matrix), rank the identified risks by the level of impact, to create mitigation plans to reduce the probability of occurrence of the risks, and to create recovery plans for the most critical impact risks.

BLM_0164880

Comment Number: 000519_LegerN_20161102-1
Organization1:
Commenter1:Natasha Leger
Commenter Type: Individual
Comment Excerpt Text:
I want to bring to your attention the omission of risk management, and BLM's human capital challenges and lack of resources from BLM's risk analysis in the draft RMP. The BLM remains on the GAO's list of high- risk programs as of its February 2015 High Risk Series Update.

The BLM's ability to manage the Federal Government's oil and gas resources and ensure environmental and public safety is considered at high risk because the BLM does not offer a competitive salary to recruit or retain experienced staff, BLM experiences high turnover rates in key oil and gas inspection and engineering positions, and some field offices have only a few employees in any given position, which results in a and a single separation having significant impact on operations. "According to Interior officials, these challenges made it more difficult to carry out oversight activities, including conducting production facility inspections, in some field offices. As a result, Interior faces challenges meeting its oil and gas oversight responsibilities, potentially placing both the environment and royalties at risk." GAO, High Risk Series Update, February 2015. I understand that the FY2017 budget proposes a 35% salary increase to address the human capital program. However, how does that impact the UFO? In addition, it was just brought to my attention that the BLM has lost thirty percent of its staff in Colorado in the last year. Please explain how BLM plans to meet its oversight, monitoring, and inspection obligations to ensure public safety and prevent irreparable harm under resource constraints.

Comment Number: 000545_SlivkaJ_20161101-240
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.3
Comment Excerpt Text:
BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape.

BLM_0164881

Comment Number: 000545_SlivkaJ_20161101-246
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.1
Comment Excerpt Text:
Recommended Approach to Managing Climate Change in RMPs
Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.
Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning" (included as Attachment 6), we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.
Summary of Comments: BLM should utilize the attached management framework to address and manage climate change in the RMP

Comment Number: FormLetterJ-12
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
Chapter 4, Section 4.1.1 Analytical Assumption, fifth bullet: This bullet asserts that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption because many of the direct and indirect impacts of implementing the RMP on lands underlain by federal fluid mineral estate have the potential to seriously impact the people (and their livelihoods) living in the North Fork Valley.
"Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, regardless of land ownership (emphasis added), except the Gunnison Gorge NCA Planning Area and the Dominguez-Escalante NCA" and is depicted on Figure 1-1 provided in the draft RMP. Whereas "decision area lands" are limited to public lands and federal mineral estate managed by the USDOI, Bureau of Land Management. The federal mineral estate managed by the BLM is depicted on Figure 1- 2, also provided in the draft RMP.
The North Fork Valley's traditional and organic farming, fruit and grape growing areas occur less than one mile in many places from the BLM decision area boundary (but within the Uncompahgre planning area). This proximity is especially true for the thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals leasing according to the BLM's preferred alternative. Obviously, these agricultural lands are at risk of being either directly or indirectly impacted by gas activity occurring on the adjacent or contiguous decision area land.

BLM_0164882

Comment Number: FormLetterJ-2
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
Additionally, this draft RMP has been written using the standard BLM RMP boilerplate/template language. There is nothing boilerplate about the North Fork Valley. Its presence in the Uncompahgre planning area requires that effects to it from actions occurring in the BLM decision area must be thoroughly considered. This has not been done.
The potential environmental consequences presented in this draft RMP do not in any way address the depth and breadth of potential effects to the valley from fluid mineral exploration and production. This is in direct conflict with BLM regulation 40 CFR 1610.4-6: Estimation of effects of alternatives, which requires that the Field Manager "will estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." Without acknowledging and describing the North Fork Valley in detail, this requirement cannot and has not been achieved.

*Summary*
Commenters claim that the BLM did not include adequate analysis of the following:

1.  Impacts of mineral development on local real estate
2.  Impacts of lands with wilderness characteristics on other resources
3.  Impacts from unregulated gas gathering pipelines, including potential for spills
4.  Impacts of hydraulic fracturing and multi-drilling technologies
5.  Impacts of removing water from the hydrologic cycle for mineral development
6.  Contamination of aquifers from mineral development
7.  Impacts of mineral development on community source water protection
8.  Injection wells and the potential for earthquakes geologic instability
9.  Impacts of mineral development and pollution on wildlife
10. Impacts of unconventional oil and gas development on wildlife, including threatened and endangered species and other sensitive species
11. Impacts of mineral development on the organic agricultural economy, especially in the North Fork Valley
12. Impacts of mineral development on the human health
13. Impacts on private lands in the North Fork Valley as it relates to oil and gas development in this area
14. Impacts of climate change and the potential increase in vulnerability to the project area from climate change

Comments state that the RMP should include a risk management plan and address risks associated with budget and staffing constraints.

One commenter asserts that the BLM did not follow NEPA requirements to sufficiently (1)explain why essential information is incomplete or unavailable; (2) explain its relevance to reasonably foreseeable impacts; (3) summarize of existing science on the topic; and (4) evaluate based on generally accepted theoretical approaches. This is specifically noted as related to climate and market impacts.

BLM_0164883

*Response*

The BLM reviewed analysis for specific issues and resources for which comments noted inadequacies. In cases where it was determined that data updates are necessary, or analysis is insufficient based on specific comments, the Proposed RMP/Final EIS was amended to include the necessary information.

More detailed responses are provided in resource-specific issue statements elsewhere in this report.

1. Impacts of mineral development on local real estate are discussed in response to Section 30.3 - Impacts Analysis (Socioeconomics and Environmental Justice) of this report.
2. BLM may grant rights-of-way for gas gathering pipelines across public lands, but does not regulate pipeline operation. For purposes of this analysis, BLM assumes that pipelines are operated in accordance with regulations. BLM has considered the potential impacts associated with pipeline leaks.  See sections 21 and 41.
5-12. Draft RMP/EIS Chapter 4 discusses mineral development impacts. As discussed in Section 21.1 – Range of alternatives (Leasable Minerals – Fluid) of this report, future site-specific analysis will assess those specific areas for which an applicant has submitted an application for permit to drill. Such site-specific analysis will assess the mineral development impacts. Impacts related to risks from pipelines are discussed in Section 21.1 – Range of alternatives (Leasable Minerals – Fluid) of this report. Impacts related to human health are discussed in Section 18.3 – Impact Analysis (Health and Safety) of this report.
13. BLM does not manage the development of nonfederal fluid minerals. Impacts on private lands from *nonfederal* fluid leasable minerals development are outside the BLM's jurisdiction and therefore outside the scope of BLM decision-making authority. Impacts on private lands from adjacent *federal and nonfederal* fluid leasable minerals development were considered in the cumulative impacts sections in the Draft RMP/EIS for resources including, but not limited to, air, water, wildlife, and socioeconomics.

A risk management plan is not required by NEPA analysis. The Final EIS will disclose to the decision-maker the impacts and risks for consideration in making a choice among alternatives.

Overall, the BLM gathered the necessary data essential to make a reasoned choice of the preferred alternative among the alternatives analyzed in detail in the Draft RMP/EIS, and provided an adequate analysis that led to disclosure of the potential environmental consequences of the alternatives (see Chapter 4, Environmental Consequences). As a result, the BLM has taken a "hard look," as required by the NEPA (see 40 CFR 1502.16) at the environmental consequences of the alternatives in the Draft RMP/EIS to enable the decision maker to make an informed decision.

BLM_0164884

### *Section 5.7 – NEPA: Cumulative impacts*
Total Number of Submissions: 2
Total Number of Comments: 3

Comment Number: 000509_WolcottE_20161102-15
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final decision needs to address the cumulative impacts of oil and gas development on BLM, Forest Service, private and other lands, not only the BLM lands in isolation.

Comment Number: 000563_King_WELC_HasAttach-143
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Revised analysis must take a hard look at these issues, including whether the potential cumulative impacts associated with all projected oil and gas development could result in unnecessary and undue degradation under FLMPA.

Comment Number: 000563_King_WELC_HasAttach-197
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.1
Comment Excerpt Text:
Additionally, the UFO RMP DEIS must analyze cumulative impacts from oil and gas projects moving forward in the Uncompahgre planning area, namely the Bull Mountain Unit Master Development Plan. The Bull Mountain plan's Final Environmental Impact Statement (FEIS) anticipates the development of 146 new gas wells, half of which are assumed shale wells including horizontal drilling in the northwest portion of Gunnison County, within the UFO. [Bull Mountain Unit Master Development Plan Final Environmental Impact Statement (FEIS) (January, 2015), DOI -BLM-CO-S050-201 3-0022-EIS, at ES-1, available at http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (attached as Exhibit 222).] The preferred alternative's water use in the Bull Mountain FEIS would exceed levels contemplated in the PBO. The FEIS estimates that construction, drilling, dust abatement, and completion of the 146 gas wells for the preferred alternative would require 2,480.2 acre-feet of water, of which 744.1 acre-feet would be fresh water.
[Bull Mountain FEIS, at ES-8 Table ES-1, ES-10-11.] Per well fresh water use, then, would amount to just over five acre-feet, nearly five times greater than the PBO's projections for vertical well depletions in the Gunnison River sub-basin. [Id.] The anticipated life of the project is six years, with an average of 27 wells drilled per year. [Compare id. at ES-7 with Exhibits 212-218 (water depletion logs).] Total fresh water depletions divided by the six year duration of the project amounts to 124 acre feet of fresh water depleted annually. As noted above, the PBO estimated total annual water depletions from the Gunnison sub-basin at 16 acre-feet—given the preferred alternative's proximity to tributaries of the Gunnison River, water would likely be taken from the Gunnison River sub-basin, although the Bull Mountain FEIS fails to clearly state the project's water source. [FEIS at 3-31, Figure 3-4.] The preferred alternative, then, would likely lead to annual water depletions from the Gunnison River sub-basin of over seven times greater than projected in the PBO. Even if water were drawn from the Colorado River sub-basin,

BLM_0164885

the 124 acre-feet required annually by the preferred alternative alone would amount to nearly one third of all allowable annual depletions for the Colorado River sub-basin under the 2008 PBO. The Uncompahgre DEIS does not contemplate or analyze water depletions from the Bull Mountain project, nor does it address projected future water depletions, in clear violation of NEPA's cumulative impacts analysis requirements. Additionally, to the extent that approval of the Uncompahgre draft RMP would rely on the PBO, such reliance is arbitrary and cannot constitute BLM's section 7 compliance. BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS.

*Summary*
A. Commenters stated that the BLM did not sufficiently analyze cumulative impacts and requested additional analysis of the oil and gas development on BLM, Forest Service, private, and other lands. This includes potential water depletions from the Bull Mountain project.

B. Commenters specifically requested that the cumulative analysis account for other reasonably foreseeable oil and gas development, including the Bull Mountain Unit Master Development Plan.

*Response*
A. The scope and nature of the specific proposed action, or, in the case of an RMP, an alternative drives what level of analysis must be done to comply with the requirements of the NEPA. Environmental analyses of RMP alternatives evaluate broad policies and provide an analytical foundation for subsequent project-specific NEPA review. The cumulative analysis in the Draft RMP/EIS considered the present effects of past actions, to the extent that they are relevant, and present and reasonably foreseeable (not highly speculative) federal and nonfederal actions, taking into account the relationship between the alternatives and these reasonably foreseeable actions. Cumulative impacts in the Draft RMP/EIS were assessed based on the projects and activities identified as likely to generate potential cumulative impacts, when added to the RMP alternatives, as defined in Table 4-1 (Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario).

The PBO is designed to tabulate al water depletions in the Gunnison Basin, which includes the Bull Mountain EIS and UFO RMP. It is important to note that the Bull Mountain Final EIS contained incorrect data regarding acre-feet. An errata sheet was issued in October 2017 containing the corrected acres. The projected annual water depletions for the Bull Mountain project are below the allowable PBO depletions. Information to address the impacts of these water depletions and hydraulic fracturing was added to Uncompahgre Proposed RMP/Final EIS Chapter 4.

B. Impacts from proposed actions, including the recently approved Bull Mountain Master Development Plan, are discussed under the relevant resource sections. The BLM reviewed the list of Reasonably Foreseeable Projects, Plans, or Actions and updated it with any significant additional projects identified since the preparation of the Draft RMP/EIS, and included associated analysis in the Proposed RMP/Final EIS, as appropriate. Therefore, the BLM has complied with 40 CFR Part 1508.7 in preparing a cumulative analysis based on the broad nature and scope of the proposed management options under consideration for the RMP.

### Section 5.8 – NEPA: Residual effects/unavoidable impacts
No comments are associated with this topic.

BLM_0164886

### Section 5.9 – NEPA: Mitigation measures

Total Number of Submissions: 6
Total Number of Comments: 10

Comment Number: 000441_HellecksonB_20161101-8
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Comment Excerpt Text:
In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the shareholders of TDRC in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative.

Comment Number: 000441_HellecksonB_20161101-3
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Other Sections: 5.3
Comment Excerpt Text:
The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option.

Comment Number: 000489_JohnsonA_20161101-101
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
L. Mitigation robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (2013);[101] the follow-up report entitled A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior (2014);[102] the Department of the Interior's Landscape-Scape Mitigation Manual (2015);[103] and BLM's Draft Regional Mitigation Manual (2013).[104]
[Footnote 101] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf
[Footnote 102] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf
[Footnote 103] https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf
[Footnote 104]
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File. dat/IM2013-142_att1.pdfSecretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in

BLM_0164887

project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014[105]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

[Footnote 105] Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203.It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794[106], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142.[107] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

[Footnote 106] Available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachm ents/2013.Par.57631.F ile.dat/IM2013-142_att1.pdf.

[Footnote 107] Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/20 13/IM_2013-142.html.BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;

b. Establish and prioritize regional mitigation objectives for the planning area;

c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and

d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

Ibid. Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts. Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to

BLM_0164888

ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred. Summary of Comments: BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP.

Comment Number: 000402_RatnerJ_20161028-35
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix C contains various BMP's but the RMP does not implement these. For instance in the livestock section we see rest and not doing repeated spring grazing yet the RMP fails to implement these BMP's despite the fact that repeated spring grazing is one of the major grazing problems on the FO.

Comment Number: 000509_WolcottE_20161102-19
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
Unfortunately, public comment is further hampered by incomplete information, as the draft falls woefully short on analysis and recommendations for mitigation of oil and gas development impacts. This should have been addressed with a no lease alternative, alternative B1 analysis and protections considered for the entire RMP area, and a myriad of other analyses and study presented in this letter and others.

Comment Number: 000545_SlivkaJ_20161101-242
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.5
Comment Excerpt Text:
Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.
BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"
In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation. [Footnote 130 Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.] This approach contained the following steps:

BLM_0164889

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
2. Developing landscape-scale goals and strategies;
3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

Comment Number: 000545_SlivkaJ_20161101-248
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:
a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.
Ibid. Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.
Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred.

Comment Number: 000545_SlivkaJ_20161101-249
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP.

BLM_0164890

Comment Number: 000563_King_WELC_HasAttach-84
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance.

Comment Number: 000563_King_WELC_HasAttach-85
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts.

*Summary*
A. Commenters stated that the BLM did not include adequate mitigation measures and recommendations. Specifically, they requested the following:

- Mitigation for oil and gas development
- Mitigation for climate change-related impacts

B. Commenters stated that the RMP does not include adequate measures for implementation of BMPs.

C. Commenters described the following strategy be employed for mitigation measures, as established in the Draft MS-1794:

1. Describe regional baseline conditions against which unavoidable impacts are assessed;
2. Establish and prioritize regional mitigation objectives for the planning area;
3. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives; and
4. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

*Response*
A – B. BMPs are those land and resource management techniques determined to be the most effective and practical means of maximizing beneficial results and minimizing conflicts and negative environmental impacts from management actions. Stipulations such as NSO, CSU, and TLs are mitigation for impacts on resources. The best practices and mitigation measures for a particular site are evaluated through the project-specific NEPA process and vary to accommodate unique, site-specific conditions and local resource conditions. BMPs are selected and implemented as necessary, based on site-specific conditions, to meet resource objectives for specific management actions. While BMPs can be RMP decisions, they often contain a level of specificity that is best made or analyzed on a site-specific basis. Implementation and effectiveness of BMPs need to be monitored to determine whether they are achieving RMP goals and objectives. Adjustments to BMPs can be made as necessary to ensure that RMP goals and objectives are being met, as well as to conform to changes in BLM regulations, policy, and

BLM_0164891

direction or new scientific information. The BLM seeks to develop and apply BMPs to mitigate impacts from mineral development, as well as other uses. In addition to the BMPs identified in the Draft RMP/EIS, the BLM would consider implementation of other BMPs to address specific issues identified at the implementation level.

C. The BLM appreciates the comments.

1. Baseline conditions for each resource analyzed in the Draft RMP/EIS are presented in Chapter 3 – Affected Environment. Each resource is analyzed for the landscape of the UFO planning area. This landscape level analysis is appropriate for an RMP and consistent with BLM Handbook 1601-1.

2-3. The final BLM Mitigation Manual (MS-1794) and Mitigation Handbook (H-1794-1) were rescinded by Secretarial Order 3360. The landscape (not regional) mitigation objectives are the objectives identified in the RMP for each resource, resource use, and special designation. The BLM uses terms in the Draft RMP/EIS such as "limit," "reduce," "minimize," "meet land health," "maintain," and "improve," which management and mitigation can help to achieve identified objectives. Additionally, the RMP also includes appropriate land-use allocations to achieve objectives (e.g., CSU, NSO, TLs, ROW exclusion or avoidance, and closures) and identifies BMPs to reduce impacts.

4. Identification of monitoring and adaptive management will be consistent with provisions already addressed in the preferred alternative, assessment, inventory, and monitory (AIM) protocols, and BLM and Department of the Interior policy and guidance.

### Section 6 – FLPMA
Total Number of Submissions: 6
Total Number of Comments: 10

Comment Number: 000402_RatnerJ_20161028-3
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The first and foremost consideration must be the legal and regulatory framework within which the BLM operates. The overarching law is FLPMA.

Compliance with Section 201a is the prerequisite of all planning and must be completed prior to initiation of the RMP revision process. Note also that the next Section B mentions funding. This indicates Section B is discretionary, whereas Section A is mandatory.
The regulations implementing the FLPMA planning requirements are at 43 CFR 1600.
43 CFR 1601.0-2 Objective.
The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation by the public, state and local governments, Indian tribes and appropriate Federal agencies. Resource management plans are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses. (emphasis added)
It is clear from the above that RMP's are required to provide specific requirements, standards and limitations that are overarching for the Field Office and that guide the site specific decisions later. The DEIS RMP direction are little more than aspirational with no requirements. This violates FLPMA.

BLM_0164892

Comment Number: 000342_WolcottS_20161031-4
Organization1:Roberts-Stucker Ditch Association
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
FLPMA requires that "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard.
For these reasons, the Roberts-Stucker Ditch Association requests that your preferred Alternative, D, be removed from the RMP from further consideration and that you put forth Alternative B1 as your preferred alternative or simply remove all possible future liquid mineral extraction via hydraulic fracturing from the BLM lands in the North Fork Valley

Comment Number: 000563_King_WELC_HasAttach-241
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
These UUD requirements are distinct from requirements under NEPA. "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." Ctr. for Biological Diversity, 623 F.3d at 645 (quoting Kendall's Concerned Area Residents, 129 I.B.L.A. 130, 140 (1994)). In the instant case, the UFO's failure to specifically account for UUD in the RMP and EIS – which is distinct from its compliance under NEPA – is also actionable on procedural grounds and must occur before the proposed RMP is approved

Comment Number: 000410_BolandB_20161027-11
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
The BLM misapprehends the FLPMA's multiple use mandate, and its conclusion that ecological damage is an "unavoidable adverse impact" of multiple use is wrong. To the contrary, as the Tenth Circuit Court of Appeals ruled in New Mexico ex rel. Richardson v. Bureau of Land Mgmt, 565 F.3d 683, 710 (10th Cir. 2009):
The Act does not mandate that every use be accommodated on every piece of land; rather, a delicate balancing is required. "Multiple use" requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage. It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses. As we have reasoned in the past, if all the competing demands . . . were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined. Accordingly, BLM's obligation to manage for multiple use does not mean that development must be allowed. . . . Development is a possible use, which BLM must weigh against other possible uses-- including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, and alternative that closes [an area] to development does not necessarily violate the principle of multiple use. . . .

BLM_0164893

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-4
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
FLPMA's incorporation of "the principles of multiple use and sustained yield", 43 U.S.C. 1712(c)(1), does not preclude BLM from closing the Uncompahgre decision area, or any other land management unit, to further fossil fuel leasing. The Tenth Circuit has squarely rejected the argument that FLPMA's multiple use provisions permit BLM to exclude no lease alternatives from review in the RMP context. BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 710 (10th Cir. 2009).The keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources;" closing the planning area to future fossil fuel leasing is essential to, rather than inconsistent with, that purpose. 43 U.S.C. § 1702(3). In addition, substantial portions of the planning area will be open to fossil fuel development even if BLM closes the area to further leasing. Twenty-five percent of the fluid mineral estate is already leased. DEIS 4-12. Insofar as FLPMA requires some accommodation of fossil fuel extraction on federal lands, that accommodation has already been provided, as the Uncompahgre and other planning areas have been open to such extraction throughout their history, substantial portions are already leased, and development of those leases will likely continue even if areas are entirely closed to further leasing. FLPMA's principle of "multiple use" must be understood in light of the FLPMA obligation to prevent "unnecessary or undue degradation," 43 U.S.C. § 1732(b). Because BLM has not shown any need for additional fossil fuel leasing and development, and degradation caused by such development would be unnecessary and undue.

Comment Number: 000489_JohnsonA_20161101-85
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1
Comment Excerpt Text:
3. Areas of Critical Environmental ConcernUnder FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well. See, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200. An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the

BLM_0164894

relevant and important values.For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.

Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area.

Comment Number: 000489_JohnsonA_20161101-94
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.1
Comment Excerpt Text:
b. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c) (emphasis added).Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long- term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-

the-ground implementation of climate change policies.In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16.The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives."

Comment Number: 000563_King_WELC_HasAttach-9
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Accordingly, the RMP revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with industry pressure to lease and develop public lands for fossil fuel resources. It is incumbent on the UFO to re-evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition.

Comment Number: 000563_King_WELC_HasAttach-95
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Furthermore, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq., directs that "the public lands be managed in a manner that will protect the quality of [critical resource] values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). This substantive mandate requires that the agency not elevate the development of oil and gas resources above other critical resource values in the planning area, as the UFO has done, here. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, that conservation of these resources should be the preeminent goal.

Comment Number: 000587_WolcottS_20161031-6
Organization1:
Commenter1:Steve Wolcott
Commenter Type: IndividualComment Excerpt Text:
The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., imposes a duty on BLM to identify, protect and monitor the many natural resources found on public lands governed by RMPs. Further, FLPMA requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard.

BLM_0164896

See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10 th Cir. 1988) (the UUD standards provides the "law to apply" and "imposes a definite standard on the BLM").

*Summary*
A. Commenters stated that the BLM misinterpreted the FLPMA's multiple use mandate, and the conclusion that ecological damage is an "unavoidable adverse impact" of multiple use is wrong. Commenters state that FLPMA's incorporation of "the principles of multiple use and sustained yield", 43 US Code Section 1712(c)(1), does not preclude BLM from closing the decision area to further fossil fuel leasing and cite the Tenth Circuit decisions as support. Further, they state that BLM must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition per 43 US Code Section 1701(a)(8), and that BLM's must, at a minimum, demonstrate compliance with the unnecessary or undue degradation standard, which is a distinct requirement from NEPA. As such, the Draft RMP/EIS should include a No Leasing Alternative.

B. Another commenter states that the Draft RMP/EIS fails to provide specific requirements, standards and limitations and thus is in violation of FLPMA.

*Response*
A. Section 102(a)(7) of the FLPMA declares that it is the policy of the United States that management of the public lands be on the basis of "multiple use" and "sustained yield." Section 103(c) defines "multiple use" as the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. Accordingly, the BLM is responsible for the complicated task of striking a balance among the many competing uses of public land. The BLM's multiple-use mandate does not require that all uses be allowed on all areas of the public lands. Through the land use planning process, the BLM evaluates and chooses an appropriate balance of resource uses which involves tradeoffs between competing uses.

While the FLPMA does identify mineral exploration and development as a "principal or major use," FLPMA Section 102(8) also states that BLM "where appropriate, will preserve and protect certain public lands in their natural condition." The range of alternatives complies with this FLPMA mandate and achieves a range of uses; refer to Section 5.3 – Range of alternatives/purpose and need of this report.

It is acknowledged that FLPMA (302b) requires that "in managing the public lands the secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 CFR Part 3809 defines prevention of unnecessary or undue degradation by: (a) complying with the terms and conditions of your notice or approved plan of operations; and other federal and state laws related to environmental protection and protection of cultural resources; (b) assuring that your operations are "reasonably incident" to operations and uses; and (c) attaining the stated level of protection or reclamation required by any applicable laws (e.g., the Wild and Scenic Rivers Act). The BLM's tiered approach to environmental review is calculated to provide the most informed decision making. The RMP represents the first stage of this process; further analysis of site-specific actions would ensure that operations are in compliance with applicable law, regulation, and policy and include

BLM_0164897

appropriate mitigation measures and/or BMPs to prevent unnecessary and undue degradation to public lands.

Further information related to BLM's consideration of a no leasing alternative is included in response to Section 21.1(Fluid Minerals – Range of Alternatives).

B. Land use planning-level decisions by their nature are broad in scope. The requisite level of data and information is more generalized in order to apply to a wide-ranging landscape perspective. More specific requirements and limitations would be provided during site-specific NEPA analysis of subsequent actions.

### Section 6.1 – FLPMA: Inventories
Total Number of Submissions: 2
Total Number of Comments: 3

Comment Number: 000402_RatnerJ_20161028-66
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM must base its management decisions upon inventories of the resources that occur on the public lands. The BLM must structure a comprehensive inventory program to inform the RMP process. This is a crucial and frequently overlooked aspect of the planning process.

Comment Number: 000489_JohnsonA_20161101-52
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 20.1
Comment Excerpt Text:
D. Lands with Wilderness Characteristics
We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. Specifically, we are particularly concerned with the Adobe Badlands WSA Adjacent and Camel Backs WSA Adjacent units, both of which have been partially included within Alternative B to be Lands Managed to Protect Wilderness Characteristics (LWCs). We strongly support all acres of these units to be included as LWCs within the final plan.
We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the draft RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA, to achieve a more balanced land use plan that embodies multiple use and sustained yield.
FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); see also Ore. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[58] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified

BLM_0164898

lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a continuing basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

[Footnote 58] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.

Comment Number: 000489_JohnsonA_20161101-56
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 20.2
Comment Excerpt Text:
3. Managementi. An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.
Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." See 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." Ore. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d at 1119. Therefore, BLM is required to consider "whether, and to what extent, wilderness values are present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143.Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct

BLM_0164899

the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

Summary of Comments: In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.

*Summary*

Commenters stated that the BLM must structure a comprehensive inventory program to inform the RMP process. They specifically noted that an accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis, and decision making. One commenter claimed that units are only partially included in Alternative B, and requested that all units are included in the Proposed RMP to achieve a more balanced land use plan that embodies multiple use and sustained yield.

*Response*

The BLM conducted an inventory of all decision area lands and their resources, including wilderness characteristics, per FLPMA Sections 102 and 201. In accordance with BLM policy outlined in BLM Manual Section 6310, the BLM assessment team:

- Analyzed GIS data to identify blocks of BLM land: (1) greater than 5,000 acres or adjacent to a WSA, designated wilderness, or the Tabeguache Area; and (2) that does not contain improved and maintained BLM roads, county roads, or highways (wilderness inventory roads).
- Assessed BLM 2013 one-meter aerial imagery and DigitalGlobe World Imagery (30 cm) to eliminate blocks of land that clearly lack wilderness characteristics of naturalness.
- Consulted with field staff familiar with assessment areas to elicit additional information and substantiate findings regarding areas eliminated from consideration.
- Conducted field visits in order to verify preliminary findings and complete inventories for qualifying areas. A summary of the 2015 inventory process for lands with wilderness characteristics was included in Volume III, Appendices, of the Draft RMP/EIS as Appendix F, Summary of the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update. The full 51-page 2015 inventory report can be found at: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86004.

  All acres determined to have wilderness characteristics are included in Alternative B. For all units, the acres with wilderness characteristics are less than the inventoried acreage, as shown in the inventory report and Appendix F.

### Section 6.2 – FLPMA: Consistency with other state, county, or local plans

Total Number of Submissions: 3
Total Number of Comments: 3

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-47
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 32.1
Comment Excerpt Text:
Line 484 Page 2-309: Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the counties to prepare an accurate inventory of roads that are known county jurisdiction. Montrose County will assist BLM in identifying such roads within the county based on road petitions, HUTF maps and other evidence readily available to the county. Recent communication between BLM and county staff on such information has been beneficial to both sides and we look forward to continuing this productive dialogue and exchange of information.

Comment Number: 000397_WolcottS_20161031-1
Organization1:Gunnison County Board of County Commissioners
Commenter1:Paula Swenson
Commenter Type: Local Government Comment Excerpt Text:
" • Decisions in the RMP will strive to be compatible with existing plans and policies of adjacent local, state and federal agencies, as long as the decisions are consistent with the purposes, policies and programs of federal law, and regulations applicable to public lands." RMP EIS, at 1-11.
Gunnison County is concerned that the use of the word "adjacent"—when used to describe local government—suggests that BLM land somehow is separate from—and only neighboring to—private land in Colorado counties, and that local government regulation of uses on BLM lands is impliedly preempted. Neither statute nor case law supports this implication.
As Gunnison County noted in its correspondence dated May 16, 2016, to Mr. Neil Kornze,Director, BLM, regarding Resource Management Planning, Proposed Rules, Notice Federal Register,February 25, 2016, 81 FR 9674: "The proposal ignores that local governments have relevant police- power authority significantly more expansive than 'land use.' These authorities include protection of public health, safety and welfare, and environmental and wildlife protection considerations..." The RMP EIS terminology of "plans and polices...of local agencies" fails to take notice of the legal authorities of local governments.
As the Court of Appeals noted in Board of County Commissioners of Gunnison County v. BDS International, LLC, 159 P.3d 773,783 (Colo. App. 2006):
" Relying on the Property Clause of the United States Constitution, a panoply of federal laws concerning the use and disposition of federal lands, and case law from other jurisdictions, (Cross-Appellant) argues that the County may not implement any regulations concerning oil and gas operations on federal lands. We are not persuaded...(W)e conclude that neither the federal statutory scheme nor the case law relied upon by (Cross-Appellant) supports the conclusion that Congress intended to preempt all local regulation in the area of oil and gas operations (on federal lands).

Comment Number: 000456_ColeK_20161031-11
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government Comment Excerpt Text:

BLM_0164901

The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic drivers for the entire region. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdiction and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the affected counties to prepare an accurate inventory of roads that are known county jurisdiction.

*Summary*
One commentator was concerned that the use of the word "adjacent," when used to describe local government, suggests that BLM-administered land somehow is separate from and only neighboring to private land in Colorado counties, and that local government regulation of uses on BLM lands is impliedly preempted. They state that neither statute nor case law supports this implication.

Another commentator recommended that the BLM consult with the affected counties to prepare an accurate inventory of roads that are known county jurisdiction.

*Response*
The Secretary has authority to manage the public lands in accordance with FLPMA, and has delegated much of that responsibility to BLM. The regulations and law enforcement activities of the BLM are focused on actions to protect the public lands and the property and resources located on or coming from those lands. In connection with the administration and regulation of the use and occupancy of the public lands, the BLM cooperates with the regulatory and law enforcement officials of any state or political subdivision thereof. Regulatory authorities of the BLM are therefore intended to be complementary to and in conjunction with that of local and state authorities. The BLM reviewed language and edited Proposed RMP/Final EIS to clarify this point.

Cooperating agencies were actively involved in the RMP planning process leading up to publication of the Draft RMP/EIS. Prior to site-specific travel management planning, the BLM will consult with local counties concerning inventory and information relevant to roads with county jurisdiction.

### Section 7 – Other laws, policy, and guidance
Total Number of Submissions: 2
Total Number of Comments: 8

Comment Number: 000402_RatnerJ_20161028-10
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
We also provide as highlighted version of BLM Manual 7200 Water Resource Management as Exhibit E.
Of critical importance are:
Objectives (p3)
.06C RMP requirements

BLM_0164902

.21 Planning and RMP requirements
These requirements were not implemented in the DEIS.

Comment Number: 000402_RatnerJ_20161028-11
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
We also provide as highlighted version of BLM Manual 6840 Sensitive Species Management as Exhibit F.
Of critical importance are:.04E5 (p5) State director responsibilities
.06 (p7) ESA and Sensitive Species requirements
Section D on p9
.12 (p14) Sensitive Species RMP requirements
.2 (p15)
.22 (p36 and on) Section A
.22D4C (p41) RMP requirements
These requirements were not implemented in the DEIS.

Comment Number: 000402_RatnerJ_20161028-23
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We also request the BLM to review its own analyses, management and monitoring direction contained in:
BLM Application of Environmental Laws, September 1995
BLM TR 1734-6 Interpreting Indicators of Rangeland Health
BLM TR 1737-20 Grazing Management Processes and Strategies for Riparian-Wetland Areas
BLM TR 1737-17 A Guide to Managing, Restoring and Conserving Springs in the Western United States
USDA FS RMRS-GTR-160 Survey Responses From the Intermountain West: Are we Achieving the Public's Objectives for Forests and Rangelands
US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993
USDA FS Research Paper INT-RP-492 Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996
USDA FS Research Paper INT-425 Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990
Montana BLM Riparian Technical Bulletin #3 Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review
Montana BLM Riparian Technical Bulletin #4 Successful Strategies for Grazing Cattle in Riparian Zones, 1998
BLM TR 1737-14 Grazing Management for Riparian Wetland Areas, 1997
BLM TR 1730-2 Biological Soil Crusts: Ecology and Management, 2001
BLM TR 1737-3 Inventory and Monitoring of Riparian Areas, 1989
USDA FS PNW-GTR-361 Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996
USDA FS RMRS-GTR-47 Monitoring the Vegetation Resources in Riparian Areas
USDA FS RMRS-GTR-121 Guide to Effective Monitoring of Aquatic and Riparian Resources
USDA FS RMRS-RP-40 Counter Misinformation Concerning Big Sagebrush, 2003
USDA FS RMRS-GTR-141 Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005

BLM_0164903

Case No. 1:20-cv-02484-MSK   Document 77-9   filed 04/29/21   USDC Colorado   pg 200 of 238

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 7 – Other Laws, Policy, and Guidance)

We incorporate by reference all of the above and request that the BLM analyze each of them and add these to the administrative record.

Comment Number: 000402_RatnerJ_20161028-24
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The DEIS stated that it was in compliance with WO IM 2012-169 but this is not the case.
Clearly, just looking at the bighorn sheep issue, the IM was not implemented.
Let's look at Action #19 as an example of the failure to provide appropriate limitations and requirements. This "action" states: Action: Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values. But this is a broad goal that lacks any specificity that would allow it to be implemented. As discussed in the earlier section on RMP requirements, this type of general,, 'apple pie' type statement does not drive or direct action. Appropriate actions would be such things as limitations on forage utilization, requirements for biological soil crust coverage by soil type with timeframes and repercussions if BSC recovery is not attained. This type of specificity, which the BLM's planning requirements mandate is totally absent from the DEIS.
In Action #25 we see that the BLM proposes to manage most of its lands to allow <50% of the areas to fail Rangeland Health Standards as long as the failing areas are "stable". This clearly does not comply with the 43 CFR 4180 mandate:
Manage the remaining lands, streams, and wetlands to fully meet the BLM Colorado Public Land Health Standards or to meet with problems where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards.

Comment Number: 000402_RatnerJ_20161028-7
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
The Department of the Interior Departmental Manual 520 DM1 provides important guidance for the development of RMP. We provide a highlighted version of this in full as Exhibit B.
We particularly draw your attention to the Policy statement, Section 1.7 C 4, 5 and 10 as well as 1.8. These requirements were not implemented in the DEIS.

Comment Number: 000402_RatnerJ_20161028-8
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
We also provide a highlighted version of BLM Manual 1737 Riparian-Wetland Area Management as Exhibit C. Of critical importance are:
.06 Department of the Interior and BLM Policy (p9)
.11 C 1 through 6 (p12) which define RMP minimum requirements
.41 A (p19) grazing related RMP requirements for the protection of riparian areas
.41 B (20) Wetland management requirements for RMP's

.42A 1, 2 and 3 RMP requirements for soil and water
.45A and D - RMP requirements for fish and wildlife habitat
Page 30 Salinity Control Act requirements
These requirements were not implemented in the DEIS.

Comment Number: 000402_RatnerJ_20161028-9
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5 3
Comment Excerpt Text:
We also provide a highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit
D. Of critical importance are:
.04J Manager responsibilities
.06 BLM Policy
.11 and .12 Inventory requirements
.13B (p9) RMP requirements
.16 (p11) RMP requirements
These requirements were not implemented in the DEIS.
Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-5
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.1
Comment Excerpt Text:
Nor does the Mineral Leasing Act preclude no-lease alternatives.9 Contrary to the draft RMP/EIS's
assertion, nothing in the MLA "directs field offices to apply the least restrictive management constraints
necessary to achieve resource goals and objectives for principal uses of public lands" in any way that
would preclude adopting an RMP that prohibits further leasing. DEIS at 2-16. Courts have consistently
held that section 226 of the MLA provides BLM with the discretion to decline to issue leases. See, e.g.,
Udall v. Tallman, 30 U.S. 1, 4 (1965), Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988).
See also Ash Creek Min. Co. v. Lujan, 969 F.2d 868, (10th Cir. 1992) (affirming that federal courts lack
authority to order federal lands to be leased and "the decision to offer the lands in question for
competitive leasing would be in the sole discretion of the Secretary. MLA § 2(a), [30] U.S.C. § 201").
The language quoted above from the Draft Plan does not appear in the MLA or the implementing
regulations. BLM's Land Use Planning Handbook states that "When applying leasing restrictions, the least
restrictive constraint to meet the resource protection objective should be used."10 Even on its own
terms, however, this non-binding policy statement does not apply to the threshold question of whether
BLM can adopt a goal of reducing contribution to climate change, or objectives of eliminating
greenhouse gas emissions. BLM can and should adopt such a goal, and leasing restrictions are the only
means of achieving it guaranteed to be effective.[9 Although not relied upon by BLM, we also note that
neither the Federal Coal Leasing Act Amendments nor the Federal Onshore Oil and Gas Leasing
Reform Act limit BLM's authority to close some or all areas to further coal, oil, or gas leasing in the
RMP process. See WildEarth Guardians v. Salazar, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) , 43 C.F.R. §
3425.1-8(a)(3), Western Energy Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013).][10 BLM, Land
Use Planning Handbook, H-1601-1 (March 11, 2005), (emphasis added)
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.P
ar.38665.File.dat/h1601-1.pdf.]

BLM_0164905

Case No. 1:20-cv-02484-MSK   Document 77-9   filed 04/29/21   USDC Colorado   pg 202 of 238

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 7 – Other Laws, Policy, and Guidance)

*Summary*

Commenters stated that the BLM was not in compliance with the following regulations and guidance:

- Washington Office Instruction Memorandum 2012-169
- BLM Manual 6840, Sensitive Species Management
- BLM Manual 7200, Water Resource Management
- Interior Departmental Manual 520 DM1

Commenters also requested that the BLM review the following laws, regulations, and guidance:

- BLM Application of Environmental Laws, September 1995
- BLM Technical Reference 1734-6, Interpreting Indicators of Rangeland Health
- BLM Technical Reference 1737-20, Grazing Management Processes and Strategies for Riparian-Wetland Areas
- BLM Technical Reference 1737-17, A Guide to Managing, Restoring and Conserving Springs in the Western United States
- US Department of Agriculture Forest Service RMRS-GTR-160, Survey Responses From the Intermountain West: Are We Achieving the Public's Objectives for Forests and Rangelands
- US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993
- US Department of Agriculture Forest Service Research Paper INT-RP-492, Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996
- US Department of Agriculture Forest Service Research Paper INT-425, Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990
- Montana BLM Riparian Technical Bulletin #3, Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review
- Montana BLM Riparian Technical Bulletin #4, Successful Strategies for Grazing Cattle in Riparian Zones, 1998
- BLM Technical Reference 1737-14, Grazing Management for Riparian Wetland Areas, 1997
- BLM Technical Reference 1730-2, Biological Soil Crusts: Ecology and Management, 2001
- BLM Technical Reference 1737-3, Inventory and Monitoring of Riparian Areas, 1989
- US Department of Agriculture Forest Service PNW-GTR-361, Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996
- US Department of Agriculture Forest Service RMRS-GTR-47, Monitoring the Vegetation Resources in Riparian Areas
- US Department of Agriculture Forest Service RMRS-GTR-121, Guide to Effective Monitoring of Aquatic and Riparian Resources
- US Department of Agriculture Forest Service RMRS-RP-40, Counter Misinformation Concerning Big Sagebrush, 2003
- US Department of Agriculture Forest Service RMRS-GTR-141, Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005

BLM_0164906

- 43 CFR Part 4180, Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration
- BLM Colorado Public Land Health Standards
- BLM Manual 6720, Aquatic Resource Management
- Mineral Leasing Act of 1920, 30 US Code Section 181 et seq.

*Response*

Only guidance relevant to the State of Colorado and BLM UFO Field Office, including federal, state, county and local guidance were carefully consulted, considered and applied to the RMP. Therefore, US Department of Agriculture, Forest Service guidance and BLM state-specific guidance outside of Colorado are not applicable to the UFO decision area. The BLM reviewed applicable recommended guidance and regulations to ensure compliance in the Proposed RMP/Final EIS.

Additionally, under the authority of the Mineral Leasing Act of 1920, the Energy Policy Act of 2005 (Public Law 109-58) was passed enabling the BLM to enter into a memorandum of understanding with the US Department of Agriculture concerning oil and gas leasing and operations. This established joint BLM and US Department of Agriculture (and Forest Service) policies and procedures for managing oil and gas leasing and operational activities on Forest Service lands where BLM holds subsurface rights. The memorandum of understanding satisfies requirements of Section 343 of the 2005 Energy Policy Act. This memorandum of understanding ensure[s] that lease stipulations are: (A) applied consistently; (B) coordinated between agencies; and (C) only as restrictive as necessary to protect the resource for which the stipulations are applied (42 US Code 15922(b)(3)). This policy is also reflected in the BLM NEPA handbook (H-1790-1).

**Section 8 – Gunnison Sage-grouse Range-Wide RMP Amendment/EIS**
Total Number of Submissions: 8
Total Number of Comments: 13

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-26
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Table 2-2 All Management Actions Specific to Gunnison Sage Grouse Habitat: We request that all management actions in Table 2-2 which are specific to Gunnison Sage Grouse habitat be amended to defer to the Rangewide RMP Amendment.

Comment Number: 000420_HovdeC_20161101-20
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is currently in draft form.

BLM_0164907

Comment Number: 000447_LeValleyM_20161101-10
Organization1:LeValley Ranch
Commenter1:Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the
BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental
Impact Statement, which is currently in draft form.

Comment Number: 000456_ColeK_20161031-12
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the
BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental
Impact Statement, which is also currently in "draft" form with public comment due in January, 2017.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-2
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010
and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not
incorporated into this UFO DRMP/EIS. The UFO Gunnison Sage-grouse ACEC analysis was not
informed by the latest information, nor the oil and gas stipulations, travel management and several other
sections of this UFO DRMP/EIS.
Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the
BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately
protect Gunnison Sage-grouse and incorporate the latest science and best management practices. All
leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease
is allowed a 20-year period with out-of-date stipulations and practices. While the GuSG DRMPa goes
much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and
habitat enhancement and connectivity measures, it still needs additional work and we plan on providing
comments for the GuSG DRMPa separately.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-13
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status
of the species or critical habitat as listed in the federal register in 2014, does not contemplate surface
disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-
managed federal mineral estate, and does not contemplate guidelines within numerous plans and the
latest best management practices for stipulations and buffers from leks. The UFO DRMP/EIS does not
take into consideration that Occupied GuSG Habitat includes specific properties (and split estate) that
the USFWS excluded from the critical habitat designation. The political removal of surface lands
coinciding within these specific private properties under conservation easements from listed critical

BLM_0164908

habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.A. In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in Alternative B of this UFO DRMP/EIS. The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available. The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-14
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-15
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-16
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Other Sections: 44.1
Comment Excerpt Text:
San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population. There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population. The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG.

BLM_0164909

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-25
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement. However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse48 that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not." In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions. San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

Comment Number: 000492_RandallR_20161101-17
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments.

Comment Number: 000562_RandallR_20161101_DNR_CWCB-1
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species.

BLM_0164910

Comment Number: 000563_King_WELC_HasAttach-235
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Fish and Wildlife Service found, in considering the adequacy or inadequacy of existing regulatory mechanisms to safeguard Gunnison sage-grouse, that existing BLM RMPs, including the current Uncompahgre RMP, are inadequate as regulatory mechanisms. Existing "RMPs provide only partial protection for Gunnison sage-grouse in terms of land use allocation decisions specific to the species and its habitat and, therefore, are considered inadequate to protect the species." In particular, with regard to fluid mineral development, "Given the already small and fragmented nature of the populations where future oil and gas leases are likely to occur, additional development within occupied habitat would negatively impact those populations by contributing to further habitat decline." [Gunnison Sage-Grouse Listing Rule at 69,284.]
In part in response to this finding of inadequate regulatory mechanisms for BLM lands and minerals, the Colorado and Utah BLM have undertaken a range-wide RMP Amendment process for Gunnison Sage-Grouse habitat, encompassing the UFO, with a draft RMP Amendment and EIS released in August 2016. This amendment process overlaps the UFO RMP Revision: "If the GUSG RMP Amendment is issued prior to the revised Uncompahgre RMP, then it would amend the existing Uncompahgre Basin RMP (as well as the San Juan/San Miguel RMP) for lands in the Uncompahgre RMP planning area. Analysis from the GUSG EIS would be incorporated by reference into the Uncompahgre Proposed RMP/Final EIS, and decisions made in the GUSG Approved RMP Amendment/ROD would be carried forward to the Uncompahgre Approved RMP/Record of Decision. However, if the revised Uncompahgre RMP is issued first, then the GUSG RMP Amendment could require amendment of the Uncompahgre RMP." [BLM, Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment Draft Environmental Impact Statement 1-14 (attached as Exhibit 298)]Yet the UFO DEIS fails to acknowledge or take into account substantial scientific information available in both the Listing Rule and the Gunnison Sage-Grouse Rangewide DEIS.

Summary
A. Commenters stated concern that the Draft RMP/EIS contained no commitment either to amend the final Uncompahgre RMP with the provisions of the final Gunnison Sage-grouse Rangewide RMP Amendments (should the Uncompahgre RMP be finalized before the Gunnison Sage-grouse RMP Amendments) or to incorporate the provisions of the final Gunnison Sage-grouse RMP Amendments into the Uncompahgre RMP (should the Gunnison Sage-grouse RMP Amendments be finalized first).

B. In addition, commenters stated that the Draft RMP/EIS fails to acknowledge or take into account substantial scientific information available in both the Listing Rule and the Gunnison Sage-grouse RMP Amendments Draft RMP/EIS and contains stipulations and restrictions on surface disturbance, including on split-estate, that are inconsistent with the stipulations and restrictions described in the Draft Gunnison Sage-grouse Rangewide RMP Amendments. Commenters further stated that the use of ACECs for Gunnison sage-grouse as the sole land designation and source of management emphasis for Gunnison sage-grouse in the preferred alternative is not consistent with the approach in administrative Draft Rangewide RMP Amendments, and is inadequate for Gunnison sage-grouse conservation and recovery efforts.

C. Multiple commenters requested that all management actions in Table 2-2 that are specific to Gunnison sage-grouse habitat be amended to defer to the Draft Gunnison Sage-grouse

BLM_0164911

Rangewide RMP Amendments. One commenter stated that all leases within the UFO should be deferred until the Record of Decision is signed for the Gunnison Sage-grouse RMP Amendments so that no lease is allowed a 20-year period with out-of-date stipulations and practices.

*Response*
A. Draft RMP/EIS Section 2.2.4, Gunnison Sage-Grouse Rangewide RMP Amendment (page 2-5), acknowledges that the planning process for the Gunnison Sage-Grouse Rangewide RMP Amendment is concurrent with the planning process for the Uncompahgre RMP. The Draft RMP/EIS states: "If the Uncompahgre RMP is approved before the Gunnison Sage-grouse Rangewide RMP Amendment is approved, the Gunnison Sage-grouse RMP Amendment may amend the Uncompahgre RMP. If the Gunnison sage-grouse RMP Amendment is approved prior to the Uncompahgre RMP completion, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a). The Uncompahgre Proposed RMP/Final EIS likely would incorporate by reference the analysis in the Gunnison sage-grouse EIS, and the Uncompahgre approved RMP/ Record of Decision likely would include the decisions from the Gunnison sage-grouse RMP Amendment."

B. In the development of the Proposed RMP, Alternative E, management actions were modified to be applied to "USFWS Gunnison sage-grouse occupied critical habitat and nondesignated occupied breeding habitat." This would provide protections to those lands with split-estate that were excluded from critical habitat designation. Furthermore, as stated above in response to part A, the Uncompahgre Proposed RMP/Final EIS incorporates by reference the analysis in the Gunnison sage-grouse EIS. As stated in Draft RMP/EIS Section 2.2.4 (page 2-5), the Uncompahgre approved RMP/Record of Decision likely will include the decisions from the Gunnison sage-grouse RMP Amendments. However, until completion of the Gunnison Sage-grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat is managed consistent with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). Draft RMP/EIS Section 2.2.4 on page 2-5 was edited to reflect this information. Refer to Section 44 of this report for more information.

C. Because the Uncompahgre Draft RMP/EIS was prepared in advance of the availability of the November 2014 Gunnison sage-grouse Listing Rule and the Gunnison sage-grouse Draft RMP/EIS publication, these documents were not incorporated into the Uncompahgre Draft RMP/EIS. Gunnison sage-grouse management and analysis was reviewed and revised as necessary in the Proposed RMP/Final EIS for consistency with both documents.

BLM_0164912

## Section 9 – ACECs

### Section 9.1 – ACECs: Range of alternatives

Total Number of Submissions: 37
Total Number of Comments: 60

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-55
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 543 Page 2-341: We request that Alternative D not require withdrawal from locatable mineral entry and remain open to mineral entry and surface occupancy subject to valid and existing rights.

Comment Number: 000213_PearsonM_20161025-11
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Other Sections: 39.1
Comment Excerpt Text:
The San Miguel River is uncommon in Colorado as one of the few substantial rivers without a major impoundment. The river has been the focus of extensive ongoing conservation efforts demonstrated by the Nature Conservancy's several preserves. I am pleased to support BLM's findings of various segments as suitable for designation under the Wild and Scenic Rivers Act. I also endorse BLM's proposed designation of the San Miguel River ACEC.

Comment Number: 000213_PearsonM_20161025-3
Organization1:
Commenter1:Mark Pearson
Commenter Type: IndividualComment Excerpt Text:
BLM has proposed La Sal Creek as an Ecological Emphasis Area, which is a useful first step. However, I urge the BLM to also designate the proposed La Sal Creek ACEC. An ACEC designation provides stronger protective management than that envisioned under the Ecological Emphasis Area. Particularly, all of the Ecological Emphasis Area and /or ACEC should be designatied NSO for oil and gas leasing. The proposed conditional surface use stipulations are inadequate to protect all of the values present.

Comment Number: 000213_PearsonM_20161025-4
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
I would like to highlight Nyswonger Mesa as an area in need of increased management attention. The La Sal Creek ACEC would incorporate Nyswonger Mesa, another rationale for designating the ACEC. Nyswonger Mesa is an integral part of the Dolores River Canyon landscape, is inaccessible to motorized use, and is recovering from past uranium exploration activities. It should be off-limits to new surface disturbing activities and should be designated NSO in the plan. I also encourage BLM to look more carefully at Nyswonger Mesa for its wilderness character adjacent to the existing proposed wilderness.

BLM_0164913

Comment Number: 000244_HendersonS_20161024-2
Organization1:
Commenter1:Susan Henderson
Commenter Type: Individual
Comment Excerpt Text:
I was also disappointed to read that the RMP preferred alternative for areas of critical environmental concern is so limited. As members of the Chipeta Chapter of the Colorado Archeological Society, we strongly support special management attention to the important historic, cultural and scenic values included in the 15 areas identified. Please include all ecological emphasis areas and restore them to their full acreage in the final RMP.

Comment Number: 000245_ElsnerD_20160929-1
Organization1:
Commenter1:Dan Elsner
Commenter Type: Individual
Comment Excerpt Text:
Include the greater salt brush area of critical environmental concern in the field plan. Isolated wildlife are a disaster for healthy populations. Wildlife know no boundaries. Healthy predator populations that can roam large areas enhance all the other communities - (plant, arthropod, prey).

Comment Number: 000269_CascadeR_20161028-14
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I applaud your proposal to protect the Paradox Rock Art ACEC which I visited recently. Numerous significant cultural sites exist within this ACEC. One in particular is extraordinary – a large panel covered in diverse pictographs that indicate use over an extended period of time. Protection of this panel alone is justification for including the Paradox Rock Art ACEC in your final RMP. We also visited other petroglyph sites which warrant protection. Some show signs of vandalism. To prevent further degradation of this critical resource, I urge you to protect this region through designation as an ACEC and plan for the monitoring of these cultural sites (utilizing volunteer stewards if needed.)

Comment Number: 000269_CascadeR_20161028-6
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:

I strongly urge the UFO to include many more acres of ACEC units and ecological emphasis areas in the final RMP than are currently proposed in the preferred alternative. Of the 215,840 acres (within 15 units) identified as eligible for ACEC less than one-fourth of that acreage is proposed in Alternative D and only 8 of the 15 units. Many of these units overlap or are adjacent to currently designated or proposed areas for protection. The draft RMP states on page 4-217 that this overlap and proximity is advantageous: "Where lands managed to protect wilderness characteristics overlap or are next to eligible or suitable WSR segments or ACECs, management of these other areas could also indirectly protect wilderness characteristics due to protective measures proposed for other areas." Of course the protective advantage works in both directions, so it makes logical sense to protect so many of the ACEC units omitted from Alternative D (and included in Alternative B) such as Salt Desert Shrub Ecosystem; Roubideau-Potter-Monitor; Lower Uncompahgre Plateau; San Miguel River Extension; Tabeguache Pueblo and Tabeguache Caves - to name a few – due to their proximity or overlap with

already or proposed protected areas and of course based upon their identified values – geological, cultural, scenic, riparian habitat, rare or endangered species, etc.

Comment Number: 000281_SirJesseU_20161031-1
Organization1:
Commenter1:Ulli Sir Jesse
Commenter Type: Individual
Comment Excerpt Text:
Please manage the Paradox Rock Art unit as an Area of Critical Environmental Concern in the Final RMP to protect the rare and irreplaceable petroglyphs of the area. I visited them a week ago and was blown away how beautiful they are.

Comment Number: 000332_RaitK_20161031_PewTrust-4
Organization1:The Pew Charitable Trusts
Commenter1:Ken Rait
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO evaluated 23 existing and proposed ACECs within the planning area and found 21 of them to meet to Relevant and Important criteria. We appreciate that the preferred alternative includes the Roubideau Corridors, San Miguel River, Dolores River Slick Rock Canyon, Biological Soil Crust, and Paradox Rock Art ACECs as well as an expansion of the Fairview South ACEC/Research Natural Area. However, overall, only eight of the 21 ACECs found to meet the relevance and importance criteria are proposed in the preferred alternative. While some of the ACEC proposals overlap with other special designations such as WSAs and EEAs, we encourage BLM to consider including additional ACECs that meet the R & I criteria as part of their overall management strategy.
Recommendation: Considering the cultural, scenic, wildlife and other resource values present in the Uncompahgre planning area, we recommend that BLM include additional ACEC designations that meet the R & I criteria in the final plan. Furthermore, BLM should require each ACEC designation to include specific management prescriptions to protect values for which the ACEC is designated.

Comment Number: 000363_RogersM_20161031-3
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Comment Excerpt Text:
Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert and Tabeguache especially should be brought forward to the preferred alt. Any of the ACECs from B that aren't in the preferred alt as ACECs should be given at least EEA status, especially Salt Desert in its entirety, much of Lower Uncompahgre, and the two Gunnison Sage-grouse ACECs. There must be reason to designate them as Areas of Critical Environmental Concern.

Comment Number: 000363_RogersM_20161031-6
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Other Sections: 16.1 20.1
Comment Excerpt Text:
Both B and D are good alternatives for protecting migratory birds from disturbances during breeding. But Burrowing owls and Sage-grouse need protected areas where they can be sustained as in the Abobe badlands LWC adj. and ACECs Areas of Critical Environmental Concern (ACECs).

BLM_0164915

Comment Number: 000378_FrankR_20161031-1
Organization1:
Commenter1:Roberta Frank
Commenter Type: Individual
Comment Excerpt Text:
If any proposed ACECs from Alternative B are not included in the final preferred alternative, they should at least be managed as EEAs with NSO and No Ground Disturbance stipulations

Comment Number: 000402_RatnerJ_20161028-54
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Therefore, BLM must give priority to ACECs and the inventory must be current and reflect changes in conditions and identify new and emerging resources and other values. The revised RMP and the DEIS must show that the BLM identified the emerging issues of the public's increasing desire for wilderness values, unspoiled wildlife habitat, protected resources, and the value of public lands.

Comment Number: 000409_DayB_20161031-16
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 524. Areas of Critical Environmental Concern (ACEC). Again, we prefer Alternative B. Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert, and Tabeguache should be included in the final preferred alternative. Some of the others, including the Gunnison Sage-grouse ACECs, should get at least EEA or similar status.

Comment Number: 000438_GoldmanA_20161031-4
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
Finally, a general comment about ACECs in the proposed Alt. D. I urge the BLM to restore the 7 eliminated ACECS with their enhance protection status to the agency's preferred alternative. Allowing a mere 25% of the eligible acreage to be managed as ACECs represents a mere 5000 out 675,000 acres of public lands subject to additionally equivalent landscape protection over already existing same or more restrictive management practices. The limited number and reduced acreage in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. I contend that this decision would be contrary to the BLM's mandate to maintain a balanced multi use approach to public lands management, specifically preserving lands with the high degrees cultural, ecological and/or environmental significance that the eliminated ACECs possess.

Comment Number: 000444_JackinoR_20161029-5
Organization1:Uncompahgre Valley Trail Riders
Commenter1:Rich Jackino
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
There is concern regarding the expansion within the Draft RMP of areas proposed as ACEC's. Our concern is based on the proposal to limit or close acreage to motorized travel when an area is designated as ACEC. In Alternative D there are 21,560 acres of NEW ACEC's recommended. The total

BLM_0164916

acreage becomes 51,320 acres within Alternative D, a 42 % increase. In our estimate, some ACEC areas merit closure to ATV/UTV use. Others can accommodate the designated trails approach. Again, our club's objective is to establish a few, high quality, designated trails for ATV/UTV use.

Throughout the eight ACEC's noted in ITEM 526 Alternative D, which we support, we would ask BLM, through the future travel plan development, to create some number of designated trails. An exception is in ITEM 541, Alternative D, that closure to motorized should be changed to limited to designated trails within these 9780 acres.

We also request that in the remaining 34,560 ACEC acres which are recommended for designated trails, in Alternative D, that a number of high quality looped trails be created. This can be a part of the travel management process in the future but nothing should be decided at this point in time that would restrict this trail development from happening.

Comment Number: 000446_KlingspornK_20161101-4
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Comment Excerpt Text:
Similarly, only 51,320 acres of the 215,840 acres of recommended ACECs in Alternative B were recommended in the Preferred Alternative. Significant omissions include the East and West Paradox ACECs, as well as the Coyote Wash ACEC, the La Sal Creek ACEC, and the Tabeguache Pueblo and Tabeguache Cave ACECs. Both East and West Paradox ACECs, (as well as the Paradox Rock Art ACEC, which is included) have irreplaceable cultural resources that could easily be degraded through mineral development or improper management. Specifically, these ACECs have "rare northern extent Anasazi rock art" and signs of occupation that show a relationship between the Fremont and Anasazi cultures. They are significant at local, regional and national levels, holding importance for Native American people and our larger national story and identity

Comment Number: 000471_NoeD_20161101-19
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Adobe Badlands. This area is just to the north of the town of Delta. The agency-preferred Area of Critical Ecological Concern (ACEC) (listed as the agency-preferred Alternative D in the RMP) is a rather small area of very pristine Adobes badland landscape that contains various ice-aged, mesa-top gravels and shale peaks to the west of Petrie Mesa. Although lacking certain wilderness characteristics, in my geologic-mapping ramblings I have found it to contain stunning scenery; the sense of solitude there is almost unbelievable!

I much prefer Alternative B, with its provisions for a much larger ACEC that includes the root area near Petrie Mesa but extends far to the north, south, and west, as far as the U.S. Highway 50 corridor. Though broken by some large "island" parcels of private land, this large ACEC contains a rather complete complex of Adobes landscape types. In addition to many more gravel mesas and shale peaks, it also contains extensive mud-fan complexes (which are not present in the smaller, Alternative D area). The result is that the expanded ACEC would contain a greater biodiversity and greater protection for the specialized types of plants that occupy all of the Adobes ecological niches. In particular, the mud-fan complexes house a large population of prairie dogs, which in turn are an important food source for many species of raptors. The mud-fans and shale slopes in this area are often encrusted with biotic soil crusts that favor the clayey soils. (And, interestingly, include the Delta Range Munitions Response Site for unexploded ordnance!) The northward extensions extend into the mid-slope area of Grand Mesa,

BLM_0164917

and into pinon-juniper forests and shrublands. I urge you to adopt the alternative (Alternative B) thaallows for the opportunity to manage an entire interconnected ecosystem, and not just parts of it.

Comment Number: 000475_PierceC_20161030-3
Organization1:
Commenter1:Carol Pierce
Commenter Type: Individual
Comment Excerpt Text:
Regarding Areas of Critical Environmental Concern (ACEC). Fifteen areas fit your criteria to be considered ACEC's. As seen in appendices O and A this was established after a very in depth evaluation to qualify as such. Of these fifteen identified areas the BLM is proposing only eight as ACEC. The following seem especially deserving of protection at this level: La Sal Creek, Salt Desert Shrub, and Tabeguache Pueblo and Tabeguache Caves. Please protect most if not all of the fifteen areas in your final plan!

Comment Number: 000478_ShannonL_20161031-2
Organization1:
Commenter1:Laurie Shannon
Commenter Type: Individual
Comment Excerpt Text:
I would also encourage you to include more Areas of Critical Environmental Concern (ACEC) into the final preferred alternative.

Comment Number: 000478_ShannonL_20161031-4
Organization1:
Commenter1:Laurie Shannon
Commenter Type: Individual
Comment Excerpt Text:
I also think the mesa between Monitor and Potter Creeks should be included as an ACEC in alternative D, as it is a key linkage between the two areas.

Comment Number: 000482_MeyersK_20161101_Tri-State_HasAttach-1
Organization1:Tri-State Generation and Transmission Association
Commenter1:Diana Leiker
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
It is not clear if major maintenance activities, rebuilds, upgrades (which may require a ROW expansion) or major structure replacement/line re-conductoring would be permitted in a designated ACEC, even if the line is an existing authorized use. The ACEC designation under all proposed alternatives should either 1.) Allow for use of existing access and allow for development of new access when necessary for existing infrastructure within ACEC boundaries and allow for upgrade and replacement within authorized and expanded ROWs or 2.) Tri-State would request that the BLM exclude all existing utility ROWs and associated access roads from incorporation into the ACEC.

BLM_0164918

Comment Number: 000486_ClaytonJ_20161101-16
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-329
Line: 531
Comment: Alternative B: The Service supports the CNHP expansion to Fairview South, in particular the areas that are occupied by clay-loving wild buckwheat. Also, we support this area being closed to sheep and cattle grazing.

Comment Number: 000486_ClaytonJ_20161101-19
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-348
Line: 554
Comment: The Service supports the proposal of the Salt Desert Shrub Ecosystem ACEC/Research Natural Area and the inclusion of the Adobe Badlands into this ACEC, in particular the areas that are occupied by Colorado hookless cactus.

Comment Number: 000489_JohnsonA_20161101-81
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes.

Comment Number: 000489_JohnsonA_20161101-85
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6
Comment Excerpt Text:
3. Areas of Critical Environmental Concern
Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM_0164919

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well. See, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200. An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the relevant and important values.
For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.
Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area.

Comment Number: 000489_JohnsonA_20161101-86
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. Roubideau – Potter – Monitor
In BLMs ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as an ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance.
The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rational for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them.
The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area.
After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. If BLM is not going to manage the mesa tops as

BLM_0164920

part of the LWC unit, an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

We recommend that the BLM include the full Roubideau ACEC as identified in Alternative B in the Final RMP.

Comment Number: 000489_JohnsonA_20161101-87
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. Adobe Badlands and Salt Desert Shrub Ecosystem ACECs
i. The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.
ii. The greater adobes area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the final RMP with the full acreage as identified in Alternative. This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.
iii. The proposed ACEC meets BLM's ACEC criteria and should be designated as such:
a. The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program.
b. Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants
c. More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area.
d. Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change. Without added management protection, the area could be damaged for decades to come.

Comment Number: 000501_Bockus_20161101_NPS-6
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Comment Excerpt Text:
PAGE/PARAGRAPH: 3-154
COMMENT: The Needle Rock ACEC is a perfect example of the kind of resource which might benefit from interpretive planning mentioned above. A greater analysis of existing services may lead to a determination to increase the level of services, leave the existing conditions as is, or lower the level. Opening a great conversation on a desired condition, though would help clarify the level of priority the place should have in overall UFO management and then steer BLM to sustainable services which also protect the site.

BLM_0164921

Similar, a strategy to evaluate existing interpretive signage and services might be helpful. Planning to identify all of the sites on Scenic Byway sections within the UFO, the San Miguel river corridor, and other locations should be considered before moving forward. In some cases coordination with other field offices might be appropriate. As mentioned above, this would be instrumental in preventing BLM from becoming over-extended in its ability to manage resources.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-10
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix O - Areas of Critical Environmental Concern
The Draft RMP/EIS includes analysis of several potential ACEC's that demonstrate the exceptional biological and environmental resource values of several areas within the UFO (Appendix O). We at Backcountry Hunters and Anglers support the designation of ACEC's for the Roubideau-Potter-Monitor, San Miguel River Expansion, and Dolores River-Slickrock Canyon areas of the UFO. The Draft RMP/EIS does not appear to contain integrated resource management direction under any alternative that would fully protect these resource values. Designation of these ACEC's does not preclude livestock grazing, mining, energy development, utility corridors, or recreation emphasis designations such as SMRA or ERMA. The designation of these ACEC's should provide further emphasis in the RMP to manage these areas for their unique character and biological resources and substantially reduce and limit impacts to these values from recreation, livestock grazing, and energy development.

The Roubideau-Potter-Monitor and Dolores-Slickrock Canyon ACEC's provide crucial habitat for existing populations of desert bighorn sheep. It is essential that the RMP include clear direction for both wildlife and livestock grazing resources to emphasize the perpetuation of healthy populations of desert bighorn sheep within these ACEC's and any other occupied habitat areas within the UFO through active vegetation management and the elimination of any potential contact between wild and domestic sheep. The BLM must utilize the most current science- based information and nationally accepted analysis methods to determine potential contact between wild and domestic sheep on these landscapes, and implement permit actions to resolve the issues associated with disease transmission to these populations. The RMP should include specific direction to subsequently develop an implementation plan to resolve the conflicts identified in the EIS through permit actions and/or updated allotment management plans within a five year time period.

Both of these ACEC's also provide critical big game winter range and security areas for elk and mule deer. The RMP should include clear direction for wildlife, vegetation, and livestock grazing resources to manage vegetation to provide habitat conditions favorable to big game, and to manage livestock grazing use in these areas to provide abundant residual forage for wildlife. The management prescriptions for recreation included in Appendix J do not adequately address mitigation of the potential impacts of current and future OHV and bicycle use or development within big game winter ranges. As I stated previously, attempts have been made locally by the BLM and Forest Service to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public and the impacts from these activities continue to degrade habitat quality and displace big game from preferred wintering areas. If the conditions on the ground are favorable, people use the roads and trails regardless of a seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place. Recreation strategies within Appendix J also need to include no motorized or mechanized use in these important wildlife areas. If there are user-developed routes already in place within these areas, the RMP should

BLM_0164922

also include direction to actively decommission those routes to prevent continued disturbance to wildlife and restore habitat effectiveness.

We also support designation of the San Miguel River ACEC. It would expand the current ACEC to a total of 35,480 acres, and include the entire river corridor as well as the major tributaries. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. As previously stated, we are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons. These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-1
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 20.1 14.1 42.1
Comment Excerpt Text:
Lower Tabeguache
As per my scoping letter, and based on my knowledge of this unique, lower elevation extension of the Tabeguache Special Management Area, I recommend combining all three protective designations in the RMP to do justice to this outstanding backcountry primitive area. This means including the entire LWC, the EEA to preserve wildlife values, and including the full cultural ACEC boundaries---all wrapped into one large protected area----20,000 + acres in all including the ACEC.
While the overall area has some low use roads and ranching activity, these uses do not disturb wildlife in the way recreational trails do. Tabeguache is one of the last areas in the Paradox Valley with high quality, undisturbed habitat that has not been heavily impacted by motorized and mechanized trails or uranium roads; it needs to be kept that way to insure continued health and viability of resident big game herds. However, as with Potter-Monitor and other large UFO primitive areas addressed below, protective designations for Tabeguache will be ineffective without greatly strengthened management prescriptions for each category, LWC, ACEC and EEA. The management prescriptions should include NSO and prohibit motorized and mechanized trails. Without these protections, these lands could be taken over by the same homogeneous gridwork of trails and uranium roads that dominates the surrounding the Paradox Valley.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-11
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
ACECS
It is disappointing to see that BLM has identified 15 ACECs totaling 215,840 acres but has included only eight of these areas preferred alt D, while reducing the acreage to only a small fraction of the total, 51,320 acres. Each ACEC in the RMP has been carefully documented as to its qualifications, by Rocky Mountain Wild as well as by the BLM, and has been found to have outstanding historic, cultural, and scenic values or fish, wildlife and other natural systems.

BLM_0164923

The reasons for dropping so much acreage are insufficient. We strongly recommend Alt B with that all identified ACECs being included in RMP and being restored to their originally identified acreage.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-3
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Paradox Valley
Again, as per my scoping letter, I recommend a primitive nonmechanized, non motorized type of management for this area so as to retain its uncrowded sense of space, solitude and vast vistas. This would mean a SRMA zoned for the most primitive recreation settings, combined with the full suite of proposed ACECs in Alternative B that would be managed for no human disturbance, to complement the primitive settings prescribed in the SRMA portions of the area.
The following 6 Paradox Valley ACECs contain unmatched and irreplaceable cultural, archeological, geological and biological values: West Paradox ACEC, Paradox Rock Art, East Paradox, La Sal Creek, Dolores Slick Rock Canyon and Coyote Wash---also the Biological Soil Crust ACEC. These ACECs should all be carried into the preferred alternative in the final RMP, with strong restrictions on human encroachment and disturbance, since the BLM does not have the resources to handle intensive management of future crowds of visitors.
I also recommend minimizing trail build-up in the following relatively unroaded areas:
* Sawtooth Ridge (has 5000 acres of unroaded land)
* Nyswonger Mesa
* Saucer Basin
Also the following areas have some uranium roads, but have only recently seen motorized trail encroachment and could still be protected as less crowded, more remote, nonmechanized lands:
* Roc Creek
* Hamilton Creek
* Hamilton Mesa,
* Callan Draw,
* McKee Draw,
* Bramiers Draw,
* Wickson Draw,
* Mailbox Draw
As with Tabeguache and other primitive areas in the field office, protective designations for Paradox Valley will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by the gridwork of trails, that now dominates the rest of the Paradox Valley.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-6
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 20.1
Comment Excerpt Text:
Potter-Monitor-Roubideaux
As with Tabeguache above, this is a large, primitive extension of the Camel Back WSA, forming a continuous ecosystem spanning higher elevation ponderosa/fir down to lower elevation red rock

BLM_0164924

canyons-----a stunning and dramatic landscape worthy of the full battery of protections. Equally important the area provides habitat security to big game including vulnerable the Desert Big Horn sheep species.

Recommendations - For Roubideau-Potter Creek, please combine the full array of protections, the almost 7000 acres of LWC-quality lands, the larger Alt B ACEC boundaries, and the full extent of EEA protection.

As with Tabeguache and other primitive areas in the field office, Potter-Roubideau designations will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by a gridwork of trails.

I would question locating a SRMA in a more remote and primitive area like Potter Monitor (unless SRMA status is the only way to prevent mineral leasing) as it is next to impossible to maintain uncrowded, primitive backcountry settings once an area has been designated for a recreation emphasis.

Comment Number: 000545_SlivkaJ_20161101-178
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.2
Comment Excerpt Text:
Clay-loving Wild Buckwheat
The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed action in Alternative B:
Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations. Uncompahgre Draft RMP at 2-394. Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.

Comment Number: 000545_SlivkaJ_20161101-186
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
All lands managed for conservation values should be closed to oil and gas leasing, including all Areas of Critical Environmental Concern and lands with wilderness characteristics. This is consistent with multiple-use management and ensuring conservation management is appropriately carried out. For example, the White River National Forest in its recent oil and gas amendment acknowledged that in some places conservation values outweigh the benefits derived from fluid mineral development and closed areas of high development potential. The ROD states:
There are a total of 198,513 acres of 'high oil and gas potential' on the White River National Forest... I chose to close through management direction approximately 61,000 acres of high potential lands on the Forest in order to maintain the natural character of the landscape and continue to protect the outstanding wildlife and recreation values of these lands. WRNF ROD on Oil and Gas Leasing at 6. [Footnote 67 http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/61875_FS PLT3_2595815.pdf]

BLM_0164925

This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter.

Comment Number: 000545_SlivkaJ_20161101-63
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1 42.1
Comment Excerpt Text:
We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.
We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0. Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes.

Comment Number: 000545_SlivkaJ_20161101-64
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1 42.1
Comment Excerpt Text:
The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes.

BLM_0164926

Comment Number: 000545_SlivkaJ_20161101-74
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP.
The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently
updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the
agency's landscape-level strategy for land use planning and the unique position that ACECs will have in
the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that
would be designated in the preferred alternative is inadequate to support a connected landscape and
maintain its ecological integrity.

Comment Number: 000545_SlivkaJ_20161101-75
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with
potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We
encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA
and agency policy, and also maximizes the ability of these designations to create a connected network of
protected areas across the Uncompahgre Field Office.

Comment Number: 000545_SlivkaJ_20161101-76
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs where
lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive
ACEC framework that designates adequate new ACECs, applies robust management prescriptions to
protect relevant and important criteria, and creates an integrated network with EEAs and other
conservation allocations and designations in the planning area.
Comment Number: 000545_SlivkaJ_20161101-77
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Comments on Specific Areas of Critical Environmental Concern Adobe Badlands and Salt Desert Shrub
Ecosystem ACECs
The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system
based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The
Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally
vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain
an intact ecosystem as they have a high difficulty in recovery from disturbance.
The greater Adobe area has two different proposed ACECs that overlap. One is the existing Adobe
Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC
which is much larger in size and would go further in protecting these fragile systems. Uncompahgre
Draft RMP at 2-137—138. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into

BLM_0164927

the Final RMP with the full acreage as identified in Alternative B. This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.

The Salt Desert Shrub Ecosystem ACEC meets BLM's ACEC criteria and should be designated as such: - The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program. - Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants - More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area. - Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change.

Without added management protection, the area could be damaged for decades to come.

Comment Number: 000545_SlivkaJ_20161101-78
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau-Potter-Monitor ACEC

In BLM's ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as a potential ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance. The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rationale for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them. See, e.g., Uncompahgre Draft RMP at 4-320. The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. Uncompahgre Draft RMP at 2-345—347. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area. The montane forest is not rare, nor is it pristine.

However, wildlife including desert bighorn sheep are known to move back and forth between the zones in search of forage and water, and need the full ecosystem. After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. Note that the Wickiup site with 13 wickiups on Monitor Mesa is on the Mesa top, not in the canyon. It is likely that other archaeological sites exist that have not been identified, since that particular site was found essentially by accident. Therefore, additional protection for the cultural resources on the mesa top is warranted.

We recommend that the BLM include the full Roubideau-Potter-Monitor ACEC as identified in Alternative B in the Final RMP. This is especially important if BLM does not manage the mesa tops as part of the LWC unit, in which case an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

BLM_0164928

Comment Number: 000545_SlivkaJ_20161101-79
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
La Sal Creek ACEC
BLM should designate the 10,490-acre La Sal Creek ACEC as proposed in Alternative B to protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Uncompahgre Draft RMP at 2-341. The La Sal Creek ACEC would provide enhanced protections for wilderness-quality lands adjacent to the Dolores River Canyon WSA, including the important species and scenic values associated with those lands that merit ACEC designation.

Comment Number: 000549_DayB_20161101-3
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Comment Excerpt Text:
Most of the ACECs from alt B and should be in the final preferred alt. It is disappointing to see the acres of ACECs cut from 216k down to 51k in alt D. I realize some of these may still receive lesser protection as EEAs or various SRMA zones, but this leaves too many important areas with little protection. La Sal and Tabeguache deserve strict protections under some designation.
Adobe needs some level of protection over its entire area.

Comment Number: 000609_AdamN_20161101-2
Organization1:Delta County Livestock Association
Commenter1:Nate Adam
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
No new areas should be designated as ACEC, so Alternative C is preferred. As the area available for recreation decreases, the pressure on the remaining area increases, intensifying stress on that particular area.
Please do not designate the Adobe Badlands or any other area as ACEC.

Comment Number: 500074_GoldmanA_20161101-1
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
The Ruch art panels we saw were amazingly undisturbed for being so close to passing highway traffic. Some of the best and extensive examples of prehistoric petroglyphs I've seen in Colorado. There is a primitive trail and interpretive BLM sign at one of them buyt the sign needs replaced as it is hardly legible.
This area definitely needs serious protective management as an ACEC and it is baffling that it was not mentioned in the final draft preferred Alt D. Common native grasses such as snakeweed and indian rice grass were observed as well as the rare (vulnerable) "Long Leaf Cat's Eye" (Oreocarya Longiflora)

BLM_0164929

Comment Number: 500116_ChamberlinJ_20161101-1
Organization1:
Commenter1:Judith Chamberlin
Commenter Type: Individual
Comment Excerpt Text:
I hiked in the Roubideau area- Potter-Monitor Canyon in Spring, May 2014 and like the quiet, opportunity for solitude and wildlife viewing (rare animal viewing due to the riparian area) bird watching, and rare plant species that I saw during my hike. I saw no other persons during my hike, including no ATV's, heard no traffic or airplane noise. The Fremont cottonwood/ skunk sumac riparian woodland should be protected as a habitat connectivity area- connecting lower elevation scrub lands with mesa tops as well as connecting this area with conservation areas to the north and to camel back wilderness study area to the south. This area seems to meet BLM's ACEC designation and should be protected as such.

Comment Number: 500117_VanWestR_20161101-1
Organization1:
Commenter1:Rein van West
Commenter Type: Individual
Comment Excerpt Text:
In hiking through the Robideau/Potter/Monitor ACEC I have been amazed by the diversity of the plant and arboreal life! I had no idea there was such an active wetlands and riparian streambed in this area. Granted, it was May, when one could expect some runoff from the plateau, but the volume was astonishing and wonderful. I was particularly pleased with the solitude and silence of the area, too. There were no other groups that I came across – which would have been fine – no problem – but nice to know that solitude was available. The richness of the emerging flowers was marvelous too.

I would strongly recommend that the Robideaux/ Potter/ Monitor ACEC be protected all the way up from the canyon bottom to the top of the rim. I believe this is an exceptional area encompassing the resource values needing protection.

Comment Number: 500118_DayB_20161101-3
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Comment Excerpt Text:
Monitor Mesa, between Potter+Monitor should be designated ACEC or Ecological Emphasis Area to minimize future development of the mesa top. Development on rims is detremental to wildlife + unmotorized travelers below. The natural veg with few weeds is a great migratory bird habitat + bighorn habitat.

Comment Number: 500120_RandallT_20161101-1
Organization1:
Commenter1:Terry Randall
Commenter Type: Individual
Other Sections: 20.1
Comment Excerpt Text:
have hiked and ridden horseback several times into the Robideau-Potter Creek area, including the tops of the Winter and Monitor mesas. In the spring there are wildflowers I don't get to see in the mountain areas. In the fall this area is close enough to home to see fall colors when I don't have to drive far.
I would like to see this area designated as LWC for the creek beds but also the Mesas as ACEC to protect and buffer the creek areas. This buffer would prevent civilization from destroying the wilderness

BLM_0164930

experience and driving off wildlife. At lease part of the Monitor Mesa should be preserved to provide a wildlife corridor without inroads of vegetation control and fencing by grazing cows and sheep owners.

Comment Number: 500122_HaefnerJ_20161101-1
Organization1:
Commenter1:Jane Haefner
Commenter Type: Individual
Other Sections: 20.1
Comment Excerpt Text:
We are surrounded by such unique landscape that can only and truly appreciated by foot. I realize land may be used for multi purpose reasons, but the Camelback WSA addition is a prime pristine area from the creeks up to the mesa rims. Wildlife, plants, birds, solitude and lack of civilization is an experience that should remain available to all.
We would like to see this area managed for its wilderness characteristics and support and LWC and ACEC designation.

Comment Number: 500123_VanWestJ_20161101-1
Organization1:
Commenter1:Jan van West
Commenter Type: Individual
Comment Excerpt Text:
The Roubideau - monitor - potter ACEC is necessary to protect this area by expanding the canyon's rims and up onto Monitor Mesa. The plant community is incredible – all kinds of relationships between the plants are in place from the Cottonwood communities up into the Pinion/Juniper and the Mesa Tops as well. Riparian too! Great opportunities here for solitude – for habitat to be protected! I had such a beautiful time in this exquisite (and rare) area!
Please keep it as it is by implementing the ACEC for this area!

Comment Number: 500250_HeuscherP_20161028-1
Organization1:
Commenter1:Pauline Heuscher
Commenter Type: Individual
Comment Excerpt Text:
The most impressive petroglyph panel that I have ever viewed in Colorado is in the W. Paradox Valley ACEC just north of HWY 90. There are other petroglyphs in this same area. The large petroglyph is as impressive as the famous petroglyphs and pictographs of the "Great Gallery in Horseshoe Canyon" or the "Hunting Scene" both of Utah. They must be protected under ACECs for several reasons: they have outstanding cultural values and I noticed bullet holes above the large panel – protection is vital

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-13
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
16. Gunnison Sage Grouse habitats established by the USFWS are not accurately reflected in the creation of ACEC.
The Organizations are very concerned with the impact that the potential listing of the Gunnison Sage Grouse had on development of ACEC proposal in 2013. As the Gunnison Sage Grouse has been listed and was provided designated habitat areas in 2014, the Organizations believe this overly cautious planning process for ACEC for grouse habitat can be significantly tightened to avoid unintended consequences in subsequent planning. The Organizations submit that the ACEC designations in the RMP

BLM_0164931

bear little to no relationship to the critical habitat that was subsequently designated. These are the types of conflicts that can result when there are concurrent planning efforts being conducted with multiple agencies that are not reconciled.

An example of the overly broad designation of proposed ACEC areas to protect the Gunnison Sage Grouse in comparison to the designated critical habitat found in the recent USFWS listing would be the West Montrose County ACEC. This ACEC would designate 22, 930 acres of ACEC to protect 290 acres of critical habitat. 59 Sims Cerro Gunnison Sage Grouse ACEC proposal would create an ACEC of 25,620 acres to protect 6,970 acres of critical habitat identified by the USFWS. As these ACEC areas more than IOx the size of the designated habitat, the Organizations must question the basis for this designation. The basis for these designations is brought into further concern as these ACEC encompass areas that were specifically found NOT to be habitat areas by the UWFWS. Designation of modeled but unoccupied habitat has become an issue of huge controversy in both the Gunnison and Greater sage grouse listing efforts. No more acceptable here than in designation of critical habitat as SERIOUSLY undermines partnership efforts.

See, UFO ACEC Report at pg 51.

ACEC designations would Significantly larger geographic areas would be protected as ACEC than were ever analyzed under related Gunnison Sage Grouse planning efforts. Gunnison Sage Grouse listing decisions provide the following outline of identified habitat as follows:

[See attachment for Figure]

See, DEPARTMENT OF THE INTERIOR Fish and Wildlife Service SO CFR Part I7 Threatened Wildlife and Plants; Designation of Critical Habitat for Gunnison Sage-Grouse; Federal Register /Vol. 79, No. 224/Thursday, November 20, 2014 /Rules and Regulations at pg 69357

Clearly the proposed boundaries for these ACEC to protect gunnison sage grouse habitat simply do not relate in any manner to the analysis area for habitat or decisions that have been made in associated USFWS planning efforts since the ACEC report was published. This simply is improper and must be updated to avoid a myriad of issues including unintended management consequences.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-3
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Organizations are very concerned with the expansions of Areas of Critical Environmental concern that is proposed in the DRMP have not been fully reviewed as management standards for these areas are not identified and recreational usage has been badly undervalued.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-8
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
12a(1). ACEC analysis must be strictly reviewed and related planning decisions must be addressed.
The Organizations are very concerned regarding the size and number of ACEC that are proposed in the DRMP, especially when these designations are balancing recreational usage of the same area that has been estimated at a level that is one-sixth its actual value. It has been the Organizations experience that any routes that fall within an ACEC designation are at risk of closure in subsequent travel management efforts simply because of the ACEC designation. As a result, the Organizations submit that the overly broad designation of ACEC areas poses a serious threat to recreational access being provided on the UFO.

BLM_0164932

The Organizations are intimately familiar with the inventory work provided by Rocky Mountain Wild in the recommendation of ACEC areas in planning and submit these inventory are a wish list of management by environmental organizations rather than a peer reviewed scientific analysis of the planning area. Often standards for the management of species are badly out of date in these inventory and rely on the most restrictive management standards ever proposed rather than the consensus management position on a species that has been reached by experts on the species and adopted by the USFWS as best available science.

The Organizations are very concerned that the ACEC analysis appears to make the determination that any sensitive or possibly threatened or endangered species is in this status due to a lack of habitat and that planning restrictions will help the species recover. As a result of this conclusion, any habitat in a proposed ACEC appears to make that ACEC important. The Organizations are very concerned that no basis is provided for this determination and after a review of the sensitive species and potential threatened or endangered species that many species decline is rarely related to a lack of habitat. This is a serious concern moving forward.

In addition to our concerns regarding the assumption that species are declining due to a lack of habitat a review of the Rocky Mountain Wild Proposal for ACEC on the UFO operates with a critical flaw when reviewing species importance, mainly that all threatened species are treated the same for protection. This simply is not the case as it is well established that plant species simply do not receive similar levels of protection under the ESA and other planning requirements. As the Ninth Circuit recently vigorously reaffirmed:

"Section 9(a)(2) contains separate protections for plants, but does not use the term "take." See 16 U.S.C. § 1538(a)(2). Section 9 thus demonstrates that when Congress uses the word "take," it means to describe an adverse action against animals, not plants. And, as the district court noted, unlike the section 9(a)(I) protections for "fish or wildlife," the section 9(a)(2) prohibitions relating to plants require "deliberate or malicious conduct."32

See, Center for Biological Diversity vs. BLM & USFWS et al; Case: 14-15836, 08/15/2016, 10: 10086302 at page 12.

Planning for habitat when habitat is not the problem diverts critically needed resources away from other issues where significant benefit could be achieved with those limited resources.

12a(2). "Potentially BLM Sensitive species" is not defined and is irrelevant to ACEC analysis.

The Organizations have been forced to addressed Rocky Mountain Wild ACEC inventory with all too much frequency and address the fact that often terms are used in the inventory that completely lack legal basis and offend any logical review of the analysis. These terms are frequently applied to artificially create an importance and urgency, that simply does not exist, in the designation of ACEC. Land managers simply feel compelled to do something to address these issues. The usage of these wildly artificial terms creating overvaluation of the resource also make lesser management decisions proposed seem more reasonable. Again the Organizations submit that this terms is simply not relevant for ACEC analysis but several ACEC analysis take this term into account when reviewing an area. While a BLM sensitive species can be the basis for listing, the Organizations are unable to identify any basis for protection of a potentially sensitive species or factors that would be relied on by managers to make such a determination. This must be strictly reviewed in the RMP development.

12a(3). Too many "globally significant riparian areas" a relied on for the analysis of ACEC areas.

The Organizations would be remiss if specific concern was not raised regarding the frequent usage of the term "globally significant riparian areas" as the basis for designation of several ACEC (ROUBIDEAU-POITER-MONITOR ACEC & ROUBIDEAU CORRIDORS ACEC). The Organizations are unsure what this term even means and submit that asserting there are several globally significant riparian areas on the UFO simply lacks any basis in fact or law. Are there locally relevant riparian areas on the UFO? That

BLM_0164933

answer is clearly yes but these are not to the level of importance that warrants the creation of an ACEC.

A Google search seeking further information on the basis or origin of the term "globally significant riparian areas" reveals no responses, which the Organizations submit speaks volumes to the validity of this term in ACEC analysis. The Organizations vigorously assert there is no generally accepted scientific basis for such a term being relied on for the management of areas, and that these areas simply do not exist on the UFO. While there certainly could be an area that would fit such a term, it would be located at the mouth of major rivers, such as the Mississippi, Nile, Amazon or other major waterway.

12b. Abuse of the USFWS listing process should not provide the basis for ACEC designations.
The Organizations submit that the Rocky Mountain Wild, and related entities, behavior in the ESA petitioning process for the several species of Beardtongue and Penstemon should not be rewarded with the designation of any ACEC areas. Designation of any ACEC area for these species would provide the management decisions that the USFWS has specifically and clearly failed to provide despite decades of efforts to list these species on the ESA list.
Such a decision would be directly contrary to efforts currently in place within the DOI to address these ongoing systemic abuses of the ESA listing process by several environmental organizations. The Organizations submit that the abuse of the listing process cannot create the basis for creation of any special management areas in associated RMP amendments as such a special designation outside the ESA petition process would completely undermine the value and ongoing refinement of the ESA process and render the expertise of the USFWS valueless on these species. The Organizations must also question why land managers would ever rely on these inventory for management as Rocky Mountain Wild and their partners have chosen to abuse the ESA petitioning process for decades and to a level that has been universally condemned by all parties, including President Obama. Creating ACEC areas in management simply invites this unacceptable behavior to be brought into the management of local field offices.

After a review of the 25 filings/documents with the USFWS that have resulted from The Penstemon and Beardtongue species over the last 33 years, this course of action is clearly the abuse of the ESA petitioning process that the USFWS has chosen to address with heightened citizen petitioning requirements under the ESA33 and UWFWS efforts to prioritize species based on the necessity of listing. 34 It must be noted that the clearly identified basis for not listing these plant species, mainly unclear threats and challenges to the species, would have resulted in these species being identified as a low priority for listing. As a low priority for listing resources would be targeted to scientific research to determine why the species is declining in order to insure that management actions being taken were actually benefitting the species.
See, DEPARTMENT OF THE INTERIOR Fish and Wildlife Endangered and Threatened Wildlife and Plants; Revisions to the Regulations for Petitions Federal Register I Vol. 80, No. 98 I Thursday, May 21, 2015 I pg 29286

See, DEPARTMENT OF THE INTERIOR, Fish and Wildlife Service Draft Methodology for Prioritizing Status Reviews and Accompanying 12- Month Findings on Petitions for Listing Under the Endangered Species Act, Federal Register /Vol. 81, No. 10 I Friday, January 15, 2016 I pg 2229.

The Organizations vigorously submit that many departments within the DOI have looked at many of the factors identified for the creation of these ACEC areas and have previously determined that these factors do not warrant management action under the ESA. many of these decisions are highly relevant to the factors addressed in the creation of an ACEC. The Organizations vigorously assert that these previous management decisions must be honored, rather than avoided by designation of ACEC areas.
12c. Cold desert shrubland Commuities are not special or important and do not warrant ACEC designation.

BLM_0164934

The Organizations again must oppose the weight that is given to terms such as "cold desert shrubland" communities in ACEC analysis. The Organizations are aware of extensive research and analysis that remains ongoing on these areas from a variety of sources, including novel discussions around the ability of these areas to possibly off-set global warming, but at no point is this term, or related areas, even proposed to be the basis for any management. The Organizations are entirely unable to identify a total amount of acreage on the continent or any site specific review of the UFO to address this factor. Given that no special management for these areas is proposed, the Organizations submit this is again a term relied on to attempt to create importance where there simply is no importance to the area.

12d. There is simply no analysis of management actions that need to be taken once an ACEC designation has been made.

The Organizations are vigorously opposed to the increased designation of 22 ACEC areas, which is a 4x expansion of the existing number of ACEC currently managed. Our concerns on this designation are compounded by the fact that at no point in the ACEC appendix is there any discussion of the special management attention that is to be undertaken in these new ACEC areas. The ACEC report clearly identifies BLM and statutory requirements for the need for special management as follows:

"2.2 Special Management Attention

Special management attention refers to management prescriptions developed during RMP preparation expressly to protect the important and relevant values of an area from the potential effects of proposed actions deemed to be in conformance with the terms, conditions, and decisions of the RMP (BLM Manual 1613.12). These management measures would not be necessary or prescribed if the critical and important features were not present."35

See, UFO ACEC report at pg 1

The Organizations submit that NEPA analysis simply cannot occur on the impacts of designation of 4x more ACEC areas when basic information such as management to be undertaken is not clearly identified.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-10
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1
Comment Excerpt Text:
13b. Other aquatic issues are managed under ACEC standards that has little to do with the threats to the species.

Two additional aquatic species sought to be managed with ACEC designations (Dolores River Slick Rock Canyon; LaSal; Roubideau Corridor and Robideau Porter Monitor) encompassing more than 60,000 acres to be managed in a manner that does not relate to the threat the species are the Bluehead and Flannelmouth Sucker. The Organizations vigorously assert that the management of 60,000 acres will in no way relate to the threats to the species that are entirely occurring in the waterways where they are living. The threats to these species is shockingly similar to the threats to various genetically pure species of trout.

The Rangewide Conservation Assessment and Strategy for the Bluehead and Flannelmouth Sucker outlines the primary threats to these species as follows:

" 6) Enhance and maintain habitat for roundtail chub, bluehead sucker, and flannelmouth sucker.
- Enhance and/or restore connectedness and opportunities for migration of the subject species to disjunct populations where possible.
- Restore altered channel and habitat features to conditions suitable for the three species.
- Provide flows needed for all life stages of the subject species.

BLM_0164935

- Maintain and evaluate fish habitat improvements throughout the range.
- Install regulatory mechanisms for the long-term protection of habitat (e.g., conservation easements, water rights, etc.).
7) Control (as feasible and where possible) threats posed by nonnative species that compete with, prey upon, or hybridize with roundtail chub, bluehead sucker, and flannelmouth sucker.
- Determine where detrimental actions occur between the subject species and sympatric nonnative species.
-Control detrimental nonnative fish where necessary and feasible.
- Evaluate effectiveness of nonnative control efforts.
- Develop multi-state nonnative stocking procedure agreements that protect all three species and potential reestablishment sites.
8) Expand roundtail chub, bluehead sucker, and flannelmouth sucker population distributions through transplant, augmentation (i.e., use of artificially propagated stock), or reintroduction activities as warranted using a genetically based augmentation/reestablishment plan."42
[42 See, RANGE-WIDE CONSERVATION AGREEMENT AND STRATEGY FOR ROUNDTAIL CHUB Gila rabusta, BLUEHEAD SUCKER Catostomus discobo/us, AND FLANNELMOUTH SUCKER Catostomus /atipinnis Prepared for Colorado River Fish and Wildlife Council; Publication Number 06-18 September 2006 at pg 48.]
The state of Wyoming recently updated their Sucker analysis and succinctly outlined the threats to the species as follows:
"Problems:
- Hybridization between native flannelmouth and bluehead sucker, and nonnative white sucker Catostomus commersoni, longnose sucker Catostomus catostomus, and Utah sucker Catostomus ardens is occurring. Some combinations are fertile and will lead to introgression.
- The effects of water development and reservoir construction exacerbated by drought have cut off this species' migratory corridors, degraded its habitat, and encouraged the spread of nonnatives. Competition with and predation by nonnative species (i.e., Catostomus sp., creek chub Semotilus atromaculatus, redside shiner Richardsonius balteatus, burbot Lota lota, brown trout Salmo trutta, and lake trout Salvelinus namaycush) further limit three species populations.
Conservation actions:
-Chemically treat Big Sandy River, Little Sandy and Muddy Creeks to remove nonnative species and reduce the risk of hybridization.
- Continue mechanical removal of nonnative species from Big Sandy River, and Little Sandy and Muddy (tributary to Little Snake River) Creeks.
- Develop methods for salvage, transport, holding, and repatriation of native species during chemical treatments.
-Construct a barrier upstream of Big Sandy reservoir to prevent recolonization of treated stream reaches by nonnative fish.
- Continue to partner with other agencies and conservation organizations (e.g., BLM, Little Snake River Conservation District, and Trout Unlimited) to address conservation needs for this species."43
[43 See, Wyoming State Wildlife Action Plan- 2010; Species Accounts; Wyoming Game and Fish Department Fish at pg 1-V 3-4.]
The Organizations note that none of the challenges or proposed management address issues that might occur on the shore of a creek that is habitat, but rather all management is directed towards minimizing contact between genetically pure fish and hybrid fish. Again designation of an ACEC of more than 60,000 acres to manage this issue creates the perception that a lack of non-aquatic habitat is causing the decline of the species. This could not be further from the truth.
The Organizations would be remiss if the close relationship of some of the proposed Bluehead and Flannelmouth sucker management standards to recent management of the Zuni Bluehead sucker was

BLM_0164936

not raised. This is important as the USFS recently listed critical habitat for the Zuni and none of the habitat areas were in Colorado.

*Summary*

A. Some commenters recommended that additional areas be designed for ACEC protection in the Proposed RMP/Final EIS, and stated that the number (8) of ACECs in the Draft RMP/EIS preferred alternative is inadequate. Others requested that the BLM restore the ACECs that were previously eliminated from consideration.

B. Commenters stated that ACECs can be utilized to manage ecologically valuable resources, particularly in the face of climate and land use changes, and recommended that they be integrated with ecological emphasis areas to create a network of connected landscape.

C. Commenters recommended that the following previously considered areas be designated as ACECs in the agency's preferred alternative (Alternative D):

1. All 21 areas (of the 23 analyzed) that meet ACEC relevance and importance criteria
2. All 15 areas proposed for ACEC designation in Alternative B (Coyote Wash, Dolores Slickrock Canyon, East Paradox, Fairview South [Colorado Natural Heritage Program Expansion], La Sal Creek, Lower Uncompahgre Plateau, Needle Rock, Paradox Rock Art, Roubideau-Potter-Monitor, Salt Desert Shrub Ecosystem, San Miguel Gunnison Sage-Grouse, San Miguel River Expansion, Sims-Cerro Gunnison Sage-Grouse, Tabeguache Pueblo and Tabeguache Caves, and West Paradox)
3. La Sal Creek, including Nyswonger Mesa
4. Camelback WSA
5. The full Roubideau-Potter and Monitor Mesa complex, due to high biodiversity rating and biodiversity
6. Fairview South expansion, due to occupation of clay-loving buckwheat
7. Salt Desert Shrub Ecosystem and Adobe Badlands, due to occupation of Colorado hookless cactus and vulnerable ecosystem
8. Lower Tabequache
9. East and West Paradox ACEC and Paradox Rock Art ACEC, due to the presence of irreplaceable cultural resources
10. The area between Monitor and Potter Creeks to provide linkage between ACECs
11. USFWS supports the Colorado Natural Heritage Program expansion of Fairview South and the Salt Desert Shrub ACEC, neither of which are included in Draft RMP/EIS Alternative D
12. The full Roubideau-Potter-Monitor ACEC (20,502 acres up to mesa top), as described in Alternative B, and not just the 8,720 (canyon floor), as described in Alternative D, for desert bighorn sheep habitat and plant diversity and solitude; also the full La Sal Creek ACEC (10,490 acres) for BLM sensitive plant, fish, and wildlife species

D. In contrast, some commenters stated that the BLM should not designate any new ACECs in the RMP because a decrease in available recreation area would put pressure on other areas.

E. Commenters requested that the BLM consider the following when managing ACECs:

BLM_0164937

1. Do not require withdrawal from locatable mineral entry in East Paradox/Biological Soil Crust ACEC, and remain open to mineral entry and surface occupancy subject to valid existing rights
2. Consider protection of any ACECs not included in the Proposed RMP as ecological emphasis areas with NSO and NGD stipulations
3. Show that the BLM identified the emerging issues of the public's increasing desire for wilderness values, unspoiled wildlife habitat, protected resources, and the value of public lands
4. Implement a future travel plan to create some future trail development and limit impacts on recreation in ACECs
5. Allow existing access regarding infrastructure upgrades and replacement or exclude all existing utility ROWs and associated access roads from designation
6. Avoid using the USFWS' ESA listing process as the basis for ACEC designations, as several organizations abuse of the ESA petitioning process. Creating any special management areas in associated RMP amendments is inappropriate because a special designation outside the ESA petition process would undermine ongoing refinement of the ESA process and render the expertise of the USFWS valueless on these species.

F. Some commenters noted potential flaws in the ACEC proposed management and analysis, including:

1. At 25,620 acres under Alternative B, Gunnison sage-grouse habitats established by USFWS in 2013 and 2014 are not accurately reflected in the creation of Sims-Cerro Gunnison Sage-Grouse ACEC. Along with the West Montrose County ACEC (22,930 acres in the *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* report [2011]), this is 10 times larger than the 6,970 acres designated by USFWS.
2. No alternative contains integrated management direction that would protect the relevant and important values of the Roubideau-Potter-Monitor, San Miguel River Expansion, and Dolores River Slickrock Canyon proposed ACECs. Management of these ACECs should preclude livestock grazing, mining, energy development, utility corridors, and recreation emphasis designations (e.g., SMRAs and ERMAs).
3. Conflicting resource management is apparent within ACECs. For example, Appendix J does not adequately address mitigation of potential impacts from OHV and bicycle trail use within big game winter ranges.
4. Recreational usage has been undervalued in the Draft RMP/EIS with regards to the expansion and broad definition of ACECs due to subsequent travel management efforts likely closing recreational use due to an ACEC designation.
5. The ACEC analysis appears to assume that declining species are protected in the same way and all threatened by declining habitat.
6. The term "globally significant riparian areas" lack any basis in fact or law and seems like an invalid term or factor in an ACEC designation.
7. Adobe Hills beardtongue, adobe penstemon, and cold desert shrubland communities are not special or important and do not warrant ACEC designation.

G. A commenter provided information regarding bluehead and flannelmouth sucker and ACECs.

BLM_0164938

*Response*

A, C, and D. 43 CFR Part 1610.7-2 requires the BLM to identify and assess potential ACECs in a Field Office's decision area during the RMP planning process. BLM Manual 1613 provides guidance on how to conduct an ACEC assessment. The BLM describes its process and rationale for considering and potentially proposing areas as ACECs in the report "Areas of Critical Environmental Concern (ACEC) — Final Report" (2013), which is available on the BLM's ePlanning website. This report is not a decision document, but rather is a tool to identify and assess areas containing relevant and important values as outlined in 43 CFR Part 1610.7-2 and BLM Manual 1613, which may lead to potential nomination for ACEC designation. According to these directions, all areas were reviewed by the BLM to determine if the relevance and importance criteria were met. Per BLM Manual 1613, areas having relevant and important values are "potential ACECs" and must be considered in at least one alternative in the RMP; however, the management prescriptions and boundaries can vary by alternative. Per this direction, the BLM fully analyzed each potential ACEC identified in the *Areas of Critical Environmental Concern (ACEC) — Final Report* and in the range of alternatives provided in the Draft RMP. ACECs brought forward in the agency-preferred alternative (Alternative D) were the result of multiple BLM personnel site visits to a nominated ACEC to fully understand the values present and logistical probabilities of successfully managing an area to retain identified relevant and important criteria and values. These values are considered in a comprehensive analysis, and determinations were made on the likelihood of success to maintain and manage these areas, as well as balance resource use and resource protection. This analysis identified areas that posed significant challenges to the BLM to manage successfully, which were subsequently not brought forward to the agency-preferred alternative. Significant challenges include, but are not limited to, site-specific significant private land interface; travel management challenges; monitoring challenges due to size and scattered locations of important values; adequate protection of values under existing federal, state, or local regulations; current duplicative ACEC protection for expansion areas what is deemed sufficient to protect values; and the potential for unintended impacts from increased attention to an area from an ACEC designation.

B. As described in Draft RMP/EIS Appendix D, Ecological Emphasis Areas, "…ecological emphasis areas supplement the other protected areas proposed for the RMP revision. These include rivers, streams, and adjoining riparian areas; pristine, unique, and ancient plant communities; WSAs; Wilderness Areas; lands with wilderness characteristics outside WSAs and Wilderness; ACECs; and protected areas of occupied habitat for threatened and endangered species. Together these form a network of largely interconnected habitat patches, both small and large, that span the UFO and links mountain areas with the valley bottoms" (page D-2). Table D-1 presents proposed ecological emphasis areas and connecting habitat type and benefiting species. These were chosen by the BLM because it was determined that they provide the most beneficial habitat type connections for a targeted species.

E. The BLM developed proposed prescriptions in the Draft RMP/EIS in an effort to reflect the public's desire to protect resources specific to each potential ACEC, while simultaneously recognizing valid existing rights and the FLPMA multiple-use and sustained yield mandate. Managing multiple and competing values of BLM-administered lands is directed by relevant prescriptions and regulations based on all recognized public land values. Valid existing rights (which would not be affected by an ACEC designation), resource values, and relevant

BLM_0164939

management prescriptions were considered and incorporated, where appropriate, into the range of alternatives. This includes all land use allowances and restrictions.

The Proposed RMP/Final EIS will carry forward ACECs that necessitate additional management prescriptions to protect unique values, as prescribed in 43 CFR 1610.7-2 and BLM Manual 1613. Although the ESA can be a factor for ACEC designations, it is not the basis. For the Uncompahgre RMP decision area, only two ACECs (San Miguel Gunnison Sage-Grouse and Sims-Cerro Gunnison Sage-Grouse, presented in Alternative B) have ESA connotations; the literature and listing clearly document that habitat is a limiting factor in terms of both suitable size and quality. Furthermore, the intent of ecological emphasis areas is to potentially reduce habitat fragmentation through habitat connectivity, which some ACECs may not provide. However, many ACECs not brought forward in the Proposed RMP/Final EIS have other management prescriptions identified to protect some, if not all, relevant and important values.

Travel management planning, including access to ROWs would be performed after the completion of the Proposed RMP/Final EIS and Approved RMP/Record of Decision is issued. This is necessary to direct the travel management planning effort.

F. The BLM appreciates the comments.

1. As stated on Draft RMP/EIS page O-19 of Appendix O, Summary of ACEC Report (which summarized the 2011 *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* report), the West Montrose County Gunnison Sage-Grouse Sites ACEC, which was externally nominated, was analyzed and found to not meet the relevance criteria. As such, the West Montrose County Gunnison Sage-Grouse Sites ACEC was not carried forward as a proposed ACEC in any of the Draft RMP/EIS alternatives. Similarly, Appendix O, page O-20 states that the Sims-Cerro Gunnison Sage-Grouse ACEC contains historic, potential, and occupied Gunnison sage-grouse habitat, as defined by CPW. Therefore, the Sims-Cerro Gunnison Sage-Grouse ACEC was reviewed based on the information provided by CPW in the Gunnison sage-grouse habitats established in the USFWS listing decision, and the proposed ACEC is completely covered by historic habitat as provided by CPW.

2. The level of management direction proposed for ACECs is appropriate for the RMP's planning-level analysis, as prescribed by BLM Land Use Planning Handbook H-1601-1, Appendix C, III.B.3 (page C-28) and BLM Manual 1613. Proposed ACEC management in Draft RMP/EIS Chapter 2, Alternatives, would protect the relevant and important values of each ACEC. Impacts of ACEC designations and management were analyzed under the associated resources and uses in Draft RMP/EIS Chapter 4. The BLM reviewed the analysis considering the recommended edits and incorporated them in the Proposed RMP/Final EIS, as appropriate.

3. Specific cases of conflicting analysis and management were reviewed and clarified in the Proposed RMP/Final EIS, as appropriate.

4. Impacts of ACEC designations were analyzed under the associated resources and uses in Draft RMP/EIS Chapter 4. The Draft RMP/EIS cannot analyze potential impacts on recreation that may or may not occur as a result of future travel management planning.

BLM_0164940

Impacts of that future travel management planning will be assessed during the NEPA analysis associated with those plans.

5. The three federally (ESA) protected species identified for ACEC management, Gunnison sage-grouse, Colorado hookless cactus, and clay-loving wild buckwheat, all have federal status due in part from the lack of suitable habitat either from a quality or quantity standpoint. These facts are well documented in both the listing and recovery documents and in many literature citations. Maintaining existing high-quality habitat is paramount for the conservation and recovery of these three species. The sensitive species resources contemplated for management in the other ACECs is an effort to meet the goals and objectives of BLM's Manual 6840 (Special Status Species Management), which is to manage these species such that a need for protection under the ESA is not needed. By placing management emphasis on the conservation of viable populations of these rare species, upon which functional habitat in sufficient quantity and quality is paramount, is a proactive approach to precluding the need for protections under the ESA.

6. The globally significant term is applicable as related to Colorado Natural Heritage Program habitat classification; use of this term was reviewed and corrected in the Proposed RMP/Final EIS, as appropriate. Some ecosystems considered globally vulnerable and/or locally imperiled by Colorado Natural Heritage Program (e.g., salt desert shrubland) do not in themselves have federal, state, or BLM status, but do provide habitat for special status species and, thus, were determined to warrant special protection under one or more alternatives.

7. Any ACEC contemplated for the management of native functioning salt desert plant communities where Adobe Hills beardtongue (*Penstemon retrorsus*) is present would indirectly receive the same level of protection as would the federally protected plants species that are present within those designated boundaries. While the BLM recognizes the Adobe Hills beardtongue's state status, it is no longer considered a BLM sensitive species and, thus, receives only indirect management where coincident with other sensitive species and habitats. In the Proposed RMP/Final EIS, the last bullet of Table 3-41 (Wilderness Study Areas) on Draft RMP/EIS page 3-160 was changed to "Contains occupied habitat for the threatened Colorado hookless cactus, ~~sensitive~~ Adobe Hills beardtongue (*Penstemon retrorsus*)…"

G. Refer to Section 14.1, Fish and Wildlife – Range of Alternatives, of this report regarding bluehead and flannelmouth sucker.

### Section 9.2 – ACECs: Best available information—baseline data
No comments are associated with this topic.

### Section 9.3 – ACECs: Impact analysis
No comments are associated with this topic.

### Section 9.4 – ACECs: Cumulative impact analysis
No comments are associated with this topic.

### Section 9.5 – ACECs: Mitigation measures
No comments are associated with this topic.

BLM_0164941

## Section 10 – Air Resources

### Section 10.1 – Air Resources: Range of alternatives
Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-12
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM also should have considered an alternative that would have imposed planning measures to reduce the air pollution emitted from oil and gas production by, for example:
1. Controlling the timing, pace, and location of development to maximize economies of scale in oil and gas fields;
2. Aligning oil and gas production with construction of gas capture infrastructure on the lease, unit, or communitization area so that oil production does not outpace gas capture; and
3. Synchronizing upstream production operations with midstream gas pipeline and processing capacity to ensure that gas is transported to market for sale and use by consumers.
We previously recommended these measures in comments regarding BLM's anticipated methane venting and flaring rule.23 BLM responded by explaining that it was "considering the integrated approach suggested by the commenters" and that BLM recognized that "[p]art of the solution to flaring, ... is to align the timing of well development with that of capture and processing infrastructure development, and to create incentives for operators to capture rather than flare." 81 Fed. Reg. 6616, 6662 (Feb. 8, 2016). However, neither the proposed methane rule nor the proposed RMP adopt measures to achieve this effect. Thus, at this stage, it is entirely unclear precisely how in fact BLM "is considering the integrated approach" we have recommended.
[23 See Comments submitted to the U.S. Bureau of Land Management by Western Environmental Law Center et al. on April 22, 2016, pp. 30-41 (https://www.regulations.gov/#!documentDetail;D=BLM2016-0001-9084).]
Comment Number: 000587_WolcottS_20161031-8
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley is affected by daily up and down valley winds and any oil and gas activities occurring in higher elevations could have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health.
The air quality in Garfield county has gotten a failing grade from the American Lung Association because of pollution from gas development. The BLM is required by law to prevent this kind of degradation.

### Summary
Commenters stated that the BLM should include an alternative that includes planning measures to reduce air pollution emitted from oil and gas production and consider effects from unique characteristics such as up and down valley winds.

### Response
Activities on BLM-administered lands are managed in recognition of the standards and requirements of the Clean Air Act, as amended, and would be in compliance with all other applicable federal, state, and local air regulations. In Colorado, the State of Colorado,

BLM_0164942