Department of Public Health and Environment sets regulations and requirements for the oil and gas industry aimed at controlling emissions in order to create and maintain a healthy environment below the Clean Air Act-established standards.

The current Colorado and federal regulations are relatively strict in regards to the oil and gas industry, and there are not many measures/practices above and beyond the current regulations that could be implemented to afford for high-efficiency emissions controls (emissions controls that are relatively effective and feasible for industry). As part of the approval of proposed oil and gas projects, the BLM requires operators to comply with current regulations and may require additional BMPs to reduce emissions. The commenter suggested approaches to minimize emissions might not be feasible/possible for all future UFO oil and gas projects given infrastructure set-ups, for example. However, the BLM would consider these practices to determine their feasibility when projects are proposed. The CARMMS modeled various levels of emissions for projected oil and gas development in the region, and shows the sensitivity of the atmosphere with more/less emissions loading into the region. The CARMMS-predicted source apportionment impacts for UFO future federal oil and gas development are generally small given the level of projected foreseeable oil and gas for the planning area, and they show that the additional mitigation controls (e.g., cleaner drill rig engines and no-bleed devices) applied for the CARMMS "medium" scenario might not afford for a large level of air quality impact reductions for future UFO federal oil and gas development. As described, refined project-level assessments will be completed by the BLM when actual proposed projects are submitted to the BLM and the BLM may require appropriate measures to reduce emissions, consistent with its analysis.

Site-specific activities, impacts on air quality related to oil and gas emissions, and measures to reduce impacts on air quality will be further addressed during implementation-level and project-level review, which will be guided by the Colorado BLM Comprehensive Air Resource Protection Protocol, included as Appendix H in the Draft RMP/EIS and Proposed RMP/Final EIS. As described in Draft RMP/EIS Section 4.3.1 (page 4-19), "The Colorado Air Resource Protection Protocol (Appendix H) provides details of the processes and the approach to protecting air quality and permitting/authorizing activities. It also includes a description of the comprehensive Colorado Air Resources Management Modeling Study (CARMMS) (BLM 2014b) that the BLM will use to better understand regional air quality for future permitting at the time of project proposal." Total estimated emissions, as well as predicted increases in emissions, were analyzed to develop air resource management goals, objectives, and actions that would be effective in minimizing future impacts on air quality under all alternatives. The resulting adaptive management strategy is described in detail in Appendix H. See response to Section 10.5, Mitigation, for additional details of monitoring and mitigation. BLM Colorado air quality modeling analyses for project-level assessments and CARMMS take into consideration complex terrain and meandering wind flows, as well as meteorology specific to the project area/region. Project-level assessments for actual future proposed oil and gas development projects would take into consideration fine-scale near-field drainage flows that could impact the North Fork Valley; additional monitoring efforts in the North Fork Valley would be used to verify analyses and afford additional protection.

BLM_0164943

### Section 10.2 – Air Resorces: Best available information—baseline data

Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000537_SchultzK_20161101_TEDX-8
Organization1: The Endocrine Disruption Exchange
Commenter1: Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM needs to establish background air quality in the 139,540 acres in the North Fork area open for leasing under Alternative D. =Multiple tests should be carried out in several locations throughout the proposed lease areas. These need to include analysis for volatile organic compounds (VOCs), nitrous oxides, polycyclic aromatic hydrocarbons, aldehydes, and sulfides.

*Summary*
One commenter stated that the BLM needs to establish baseline air quality tests in the North Fork Valley area, including analysis for volatile organic compounds, nitrous oxides, polycyclic aromatic hydrocarbons, aldehydes, and sulfides.

*Response*
Air quality conditions in the planning area are described in Draft RMP/EIS Section 3.1.1 (page 3-2), which includes representative volatile organic compound and hazardous air pollutant concentration data for the planning area using concentrations monitored in nearby areas of concentrated fluid minerals development (Table 3-1, page 3-3).

Appendix H contains the Colorado BLM Comprehensive Air Resource Protection Protocol. This protocol outlines the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality in Colorado. It also outlines specific measures that may be taken to address BLM-approved activities with the potential to cause significant adverse impacts to air resources. As discussed in Appendix H, project-level analysis may include baseline data collection to assess cumulative concentrations of volatile organic compounds and hazardous air pollutants. Section III.A describes the monitoring portion of this protocol. Areas where monitoring may be necessary for analysis will be determined at the implementation level or project level. Draft RMP/EIS Section 4.3.1 on page 4-20 describes the Colorado BLM Comprehensive Air Resource Protection Protocol and how protection will be afforded per its strategy. Future hazardous air pollutants monitoring may be conducted near the North Fork Valley to evaluate changes to baseline conditions. For example, the BLM Colorado and Delta County recently entered into an agreement to monitor air quality in the North Fork Valley near Paonia High School. Several air pollutants will be monitored, including ozone, NO2 / NOx, PM10 and PM2.5, and will be also collecting meteorological data for the Valley.

BLM_0164944

### Section 10.3 – Air Resources: Impact analysis

Total Number of Submissions: 20
Total Number of Comments: 32

Comment Number: 000563_King_WELC_HasAttach-243
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
For the reasons described above, we urge BLM to prepare a supplemental EIS that: …( (2) fully considers the problem of methane waste, and takes steps to control methane waste;

Comment Number: 000121_GannettA_20160826-1
Organization1:
Commenter1:Alison Gannett
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
Attached in a PDF is a new study from Pennsylvania. I would like to contend that the BLM has not done sufficient studies on the human air impacts and cumulative air impacts of Natural Gas Development. The studies have mostly just started in the last few years, and in no way can say conclusively that our health will NOT be impacted in any way shape or form. As a person with brain cancer and severe asthma, myself and many others with health issues will be unusually sensitive to air pollution. You have not proven that it will not affect our health. Our farm participated in the CHC air quality monitoring testing a few years ago, and we work closely with TEDx and know of the data that they have shown. Their testing has shown numerous toxic chemicals in the air around well pads. They have also done baseline data in the North Fork. and from CHC we have baseline data all over the North Fork Valley regarding air quality.

Comment Number: 000130_WassellP_20160903-14
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
-BLM did not consider that, by their own modeling, ozone levels already exceed the EPA threshold of 70ppb in certain areas.

Comment Number: 000142_ShishimM_20160911-1
Organization1:
Commenter1:Margaret Shishim
Commenter Type: Individual
Comment Excerpt Text:
Air quality – studies have been made and documented showing that even low-dose exposure to chemicals and the release of methane in oil and gas development have detrimental health effects including birth defects, respiratory problems, malignancies, rashes, etc. Just recently the EPA has identified the 4 Corners area as a "methane hot spot" due to the number of wells in the area. The BLM has failed in its Draft RMP to conduct a human health impact assessment.

BLM_0164945

Comment Number: 000184_BrettJ_20161017-8
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Air Quality
The final plan must protect the health of the airshed. The North Fork Valley is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone and other particulates and gases hazardous to agriculture and public health.
In Garfield, Mesa, Gunnison and Delta counties, there are 11,825 oil and gas facilities. Within a half mile radius of these facilities, there are over 6,100 people. The American Lung Association gave Mesa County an F Air Quality rating and Gunnison a C rating. Even more disturbing is that Delta county does not monitor air quality.
The BLM does not have the adequate information to assess airshed impacts of oil and gas activities and did not consider that their own modeling of ozone levels in the Bull Mountain area that exceed EPA thresholds of 70 ppb.
The North Fork Valley producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy clean, organic food. The potential for air contamination as a result of oil and gas development could destroy Slow Food and VOGA member farms' ability to market their products as organic and safe.

Comment Number: 000304_CarreD_20161023-2
Organization1:
Commenter1:Danielle Carre
Commenter Type: Individual
Comment Excerpt Text:
The BLM inadequately addresses the ozone levels and how we are already facing ozone levels that exceeds the EPA limits of 70ppb. In winter, when snow blankets the area and we have our typical inversions, the ozone levels have been measured to be above limits and the addition of VOC's from the drilling operations will only exacerbate the problem. Increased ozone levels will not only present a health issue, but will also diminish the view shed as the mountains will disappear behind a blueish haze of ozone and other pollutants. The nearby Black Canyon National Park will be affected by the increase in air pollution. While there is a national effort to improve the air quality of our National Parks, the lack of foresight and thorough research of the impacts of industrial oil and gas on air quality in our national parks by local public land agencies, negates any effort for improvement.

Comment Number: 000373_ThompsonG_20161030-4
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
Significant oil and gas development up valley would bring polluted air into our air shed, potentially harming not only our crops but also our health. We leave our windows open during summer nights to cool the house because we do not have air conditioning. We would be breathing polluted air while we sleep should oil and gas activity be allowed to increase up valley. BLM did not consider that their own modeling of ozone levels in the Bull Mountain Area exceed EPA thresholds of 70ppb. I am also concerned about the deleterious impacts from an increase in airborne volatile organic compounds, silicates and diesel exhaust from transportation, well and compressor sites. I feel that the draft plan did not take into account the difference in impact that new horizontal fracking technologies have compared

BLM_0164946

to conventional drilling, which include a 333% increase in air pollutant emissions involving 12 more tons of VOCs and 1 additional ton of HAPs per well.

Comment Number: 000400_InouyeD_20161028-4
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
One of the consequences of oil and gas development is impacts on air quality. For 17 years, the American Lung Association has analyzed data from official air quality monitors to compile the State of the Air report. Although most residents and visitors probably think the air is clean in Montrose County, neighboring Mesa County gets an F for the number of high ozone days, and Gunnison County gets a C grade in the ALA report card (http://www.lung.org/our-initiatives/healthy-air/sota/city-rankings/states/colorado/). Some of that ozone likely comes from oil and gas production in those counties, and some from nearby parts of Utah. On the Front Range, where many counties get an F rating, a study found that oil and gas production accounts for about 17 percent of overall ozone contribution. These results suggest that air quality in the study area for the RMP is at risk from future oil and gas development, and the only way to avoid these consequences is to not drill new wells.

Comment Number: 000427_WalshOeinckP_20161031-5
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
Atmospheric inversion incidents, especially in winter, aggravate the health risk of increased air pollution.

Comment Number: 000459_HardyR_20161027-10
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not consider that, by their own modeling, ozone levels already exceed the EPA threshold of 70ppb in certain areas.

Comment Number: 000509_WolcottE_20161102-12
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The BLM needs to consider the expected increase in respiratory illness that would result from fracking pollutants and truck traffic. What can be done to mitigate that?

Comment Number: 000530_PlattA_20161101_EPA-2
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that the analysis be amended to include results from the low and medium CARMMS scenarios, and to the extent possible, the analysis explain how those impacts could be interpreted with regard to each of the Draft · RMP/EIS alternatives. We recommend that comparisons of impacts be made between the alternatives and not between base-year and future-year model results alone.

BLM_0164947

We also recommend considering whether the selected future year of 2021 is still representative or needs to be updated given that it is only 5 years from the date of this Draft EIS. For NEPA purposes, we recommend that the analysis of the cumulative impacts be based on the maximum emission year during the RMP planning horizon of about 15-20 years. The appendices to the June 2011 MOU for Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through NEPA (AQ MOU) include an example that could be adapted for use with a reusable modeling framework such as CARMMS. This example emphasizes the importance of designing future year projections "to examine the potential for maximum growth in the planning area." At a minimum, we recommend that the Final RMP/EIS update current conditions with the most recently available information for the planning area counties, and then update the analysis to highlight any significant differences in air quality impacts between the alternatives.

Comment Number: 000536_SchottJ_20161031-7
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
Air quality: The plan does not take into consideration the cumulative impact of oil and gas exploration. There is proven release of methane gas from drilling and fracking operations and there are multiple proven cases of leaks from pipelines. In addition the massive increase in truck traffic will contribute to polluting the air we, as well as the plants and animals breath. Currently the BLM does not have adequate information to evaluate air quality impacts from the activities connected with oil and gas exploration and exploitation

Comment Number: 000537_SchultzK_20161101_TEDX-10
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3
Comment Excerpt Text:
The BLM needs to test for secondary pollutant VOCs in areas near oil and gas development.
Multiple ozone precursors are released during well development and production, and Table 3-2 shows existing ozone concentrations are out of compliance under the National Ambient Air Quality Standards. The BLM acknowledges that ozone concentrations will increase under all Alternatives both near oil and gas activities and downwind of the Planning Area (4-20). Reliable data should be collected from the Planning Area rather than modeled using measurements taken outside of the Planning Area that is not impacted by UOG.
Ozone has historically been considered a summertime problem, but research from the last 10 years has shown that winter ozone levels near oil and gas production can exceed summer levels when snow cover and weather inversions are present. Even low levels of ozone can cause short term respiratory effects like coughing, wheezing, and shortness of breath. and exacerbates existing conditions such as asthma and emphysema. Children are particularly vulnerable because their lungs are still developing until about age 18. Children get a higher "dose" of the ozone because they breathe in more air per pound of body weight and spend more time being active outdoors. Women exposed to ozone during pregnancy deliver low birth weight babies with compromised lung function (American Lung Association 2016).
[References: American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.]

BLM_0164948

Comment Number: 000537_SchultzK_20161101_TEDX-5
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Fracking requires millions of gallons of water to mix with thousands of pounds of chemicals per well, increasing the impact with additional truck trips to bring this water to the well site. Chemical products used for fracking include biocides, solvents, corrosion and scale inhibitors, friction reducers, and surfactants. Among the most common chemicals used during fracking are crystalline silica (respiratory toxicant, carcinogen), methanol (endocrine, cardiovascular, neurologic, and respiratory system toxicant), and 2- butoxyethanol (endocrine, immune, cardiovascular, neurologic, and respiratory system toxicant) (Colborn et al 2011). In addition, an estimated 30% to 70% of the fracking fluid will resurface as flowback, which, along with produced wastewater, will need to be trucked offsite for disposal. Recent studies by Colorado State University have found flowback to be the largest contributor to air pollution of any phase of well development (Colorado State University 2016a,b).
[References:
Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.
Colorado State University. 2016a. Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, CO. Available at http://www.garfield- county.com/air-quality/air-emissions-study.aspx.
Colorado State University. 2016b. North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study. Available at
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwj7pb Hb5vjPAhUIx2MKHfLdDj0QFggcMAA&url=http%3A%2F%2Fsource.colostate.edu%2Fwp-content%2Fuploads%2F2016%2F09%2FCSU_NFR_Report_Final_20160908.pdf&usg=AFQjC NFlmddRt3awfZVMah4QJVl4yJ3npQ&cad=rja.]


Comment Number: 000537_SchultzK_20161101_TEDX-6
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM must begin testing air quality immediately throughout the Planning Area beginning with the EPA Criteria Pollutants list rather than estimating averages and relying on models.
Table 3-1 reports Average Annual Air Pollutant Emissions using data from 2008, when there was limited oil and gas development. Also, potential emissions from Criteria Pollutants were estimated for reasonably foreseeable activities until 2021, but the RMP may be in place as long as 30 years if following the current RMP timeframe. These emission levels significantly underestimate potential impacts to air quality. Due to varied characteristics such as elevation and topography, locations where the existing measurements are taken should be representative of the Planning Area.
Comment Number: 000537_SchultzK_20161101_TEDX-9
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM needs to test for Hazardous Air Pollutants (HAPs).
Increased emissions of HAPs from oil and gas extraction are predicted for all Alternatives (4-21). HAPs are toxic compounds recognized as causing adverse impacts on health and the environment. Health effects associated with exposure to HAPs include endocrine effects such as increases in reproductive

BLM_0164949

and developmental disorders, impacts on the cardiovascular and immune systems, and increased rates of cancer among many others.

Comment Number: 000544_ThompsonK_20161101-6
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
The NFV is a Valley, and it is a small. It isn't a flat region where toxic chemicals may only penetrate the surface. The NFV is a small funnel-like environment in which toxicity, if present, will be concentrated in the lower regions of the Valley, where we all live. Thus, because of the size and structure of our Valley, our water sheds and air quality have a significant chance of being negatively impacted by heavy concentrated amounts of toxicity that would unequivocally impair the health of the citizens, causing respiratory and cancer related problems, and cause the demise of our magnificent wildlife (birds, eagles, elk, deer, mountain lions, bobcats) and their natural ecological habitats.

Comment Number: 000545_SlivkaJ_20161101-143
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Uncompahgre Draft RMP at 4-208. Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68). [Footnote 48 If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.] B1 reduces these threats, from poor air quality. Alternative B.1 emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality.

Comment Number: 000545_SlivkaJ_20161101-157
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.3
Comment Excerpt Text:
The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

BLM_0164950

Comment Number: 000560_KelloggV_20161016-1
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
BLM failed to produce a balanced plan that took into consideration new horizontal drilling and multi-stage fracking
technologies. This relatively new drilling technology invoices a far greater magnitude of impacts, including: double the
surface impacts of conventional drilling; up to a 333% increase in air pollutant emissions involving 12 more tons of VOCs and 1 additional ton of HAPs per well; 5-10 times more water; as well as increased noise, larger waste volumes, habitat fragmentation and loss, and thousands of additional round trips of truck traffic per well.

Comment Number: 000563_King_WELC_HasAttach-104
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM may not avoid including winter ozone modeling, even if information about winter ozone levels is incomplete. According to NEPA regulation, if an estimation of reasonably foreseeable significant adverse impacts cannot be obtained because, among other things, the means to obtain it are "not known," BLM has an obligation to include an evaluation "based upon theoretical approaches or research methods generally accepted in the scientific community," provided that "the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22. These methods of dealing with incomplete information are required under NEPA and must be thoroughly exercised before drawing the conclusion that a wintertime ozone analysis cannot be included in the RMP/EIS. See id.

Comment Number: 000563_King_WELC_HasAttach-105
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM has, in fact, modeled winter ozone concentrations for other recent NEPA actions.
Even though BLM did not perform a winter ozone modeling analysis of the proposed development, modeling results for wintertime ozone concentrations were included as part of the base case modeling performance evaluation for the Continental Divide-Creston (CD-C) DEIS in Wyoming. [See BLM Continental Divide-Creston (CD-C) AQTSD Appendix A.]
The DEIS included model performance evaluations for the 2005 and 2006 base case scenarios based on CD-C project modeling and on previously-conducted modeling for the Hiawatha Regional Energy Development Project EIS (Hiawatha). The results of the base case modeling evaluations suggest it is not unreasonable or inappropriate to include wintertime modeling results in BLM's analysis. Specifically, model results are presented in the CD-C DEIS and compared with year-round monitoring data at several sites.
[BLM CD-C AQTSD Appendix A at 68] In general, the modeling results appear to underestimate winter ozone concentrations, but not in all cases. [See, e.g., BLM CD-C AQTSD Appendix A at 68 (Close to the project area, the performance of the CD-C and Hiawatha modeling appears to be reasonably good "with the exception of a few days, the two base case simulations reproduce the observed ozone at [the

BLM_0164951

OCI monitor] reasonably well.").] Generally, the results of the CD-C DEIS performance evaluation indicate that there is a tendency towards underestimation, especially at observed maximum concentrations in winter. Even so, if modeled wintertime ozone concentrations are shown to be a problem and the performance evaluation for the modeling indicates that modeled results likely underestimate impacts in winter then, at a minimum, the BLM would have an obligation under NEPA to reduce emissions from the proposed development in order to ensure there will be no significant impacts to wintertime ozone levels based on the modeling, as evaluated (with an underestimation bias). BLM should have considered a similar approach for the RMP/EIS, but failed to do so. As shown by the high wintertime ozone levels nearby in Rangely, in the Uinta Basin in Utah, as well as in Wyoming's Sublette County, wintertime ozone near concentrated oil and gas development has simply become far too big of an issue, of tremendous public interest and concern, to be ignored in this long-term planning action. BLM should use the CARPP process to improve upon the analysis and monitoring methods used to evaluate impacts in the area but should not delay any further in completing a winter ozone analysis for the UFO planning area using the best available methods.

Comment Number: 000563_King_WELC_HasAttach-106
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Venting from methane drainage wells from coal mines in the North Fork Valley may release significant amounts of volatile organic compounds (VOCs). As described in comments on a recent proposal to expand the West Elk mine, VOC emissions at Arch's West Elk mine are in violation of Colorado air quality regulations, according to data obtained by state regulators. [Letter of E. Zukoski, Earthjustice to S. Armentrout, Supervisor, GMUG National Forest (Apr. 12, 2016) at 63-68 (exhibit omitted) (attached as Exhibit 239).] BLM must disclose these VOC emissions, address them in any air quality analysis, and acknowledge that any planning decision that permits these mines to continue mining will result in violations of the Clean Air Act due to the mines' continue refusal to obtain required permits.

Comment Number: 000563_King_WELC_HasAttach-107
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3
Comment Excerpt Text:
The UFO should look at additional hazardous air pollutant impacts from the proposed development, including the impacts from 1,3-butadiene and secondary formaldehyde that will result from the proposed development. The BLM has completed a more comprehensive analysis of HAPs in other recent NEPA actions which resulted in significant impacts from HAPs. Specifically, the Gasco EIS in Utah evaluated short-term and long-term impacts from numerous HAPs, including methanol, chlorinated solvents and acrolein. [See BLM Gasco Energy Project FEIS, Table 4-12, Table 4-19 and Appendix H. April 2010.] The Gasco EIS analysis found elevated cancer risks for acetaldehyde, 1,3-butadiene, and ethylene dibromide, none of which are included in the RMP/EIS for the UFO.
[BLM Gasco FEIS Table 4-19] DEIS, Appendix Q at Q-4 (identifying the HAP emissions that were estimated in the UFO RMP/EIS). The Gasco EIS also reported acrolein emissions that exceeded the acute Reference Exposure Level (REL) and the Reference Concentration for Chronic Inhalation (RfC) [BLM Gasco FEIS Appendix H, at H-45] Acrolein is also not included in the RMP/EIS assessment.

BLM_0164952

Comment Number: 000563_King_WELC_HasAttach-108
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3
Comment Excerpt Text:
BLM must include a more comprehensive analysis of HAP impacts and, in addition to the HAPs identified above, the BLM should also assess any HAP impacts associated with volatile emissions from hydraulic fracturing fluids. It is important to continue to improve upon the HAP analyses conducted under NEPA in order to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. See 40 C.F.R. §1508.27(b)(2).

Comment Number: 000563_King_WELC_HasAttach-109
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 35.3
Comment Excerpt Text:
The UFO provides visibility modeling based on the "projected federal and nonfederal oil and gas emissions throughout the 2.5 mile (4-kilometer) CARMMS domain plus mining on federal lands in Colorado," but provides no information about the contribution of the specific development contemplated by the UFO RMP/EIS. Yet the BLM acknowledges: "For all of the alternatives, the magnitude of emissions from oil and gas and coal and uranium mining development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas." DEIS at 4-25. The nature and extent of these impacts must be considered and specifically analyzed in the UFO RMP/EIS.

Comment Number: 000563_King_WELC_HasAttach-110
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3
Comment Excerpt Text:
Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations.

Comment Number: 000563_King_WELC_HasAttach-111
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3
Comment Excerpt Text:
Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide emissions in the United States. Nevertheless, the agency's preferred Alternative D leaves available approximately 865,970 surface acres within the planning area for oil and gas leasing and development, accounting for the development of approximately 330 federal wells. DEIS at 2-10, 4-36. The relationship between air quality and human health must be analyzed in the RMP/EIS. The failure of the UFO to do so, here,

BLM_0164953

represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs., 463 U.S. at 43 (1983).

Comment Number: 500003_TwittyE_20161014-1
Organization1:
Commenter1:Eric Twitty
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
Oil, gas, and fracking pollute air with toxic, carcinogenic chemicals. Releases from purge-tanks, valves, pipelines, and well-casings are UNREGULATED. We have seen first-hand the atmosphere in Weld, Larimer, and Boulder counties turn
brown.

Comment Number: FormLetterL_CHC WSCC-4
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Air
The final plan must protect the health of the airshed. The North Fork Valley is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health. The BLM does not have the adequate information to assess airshed impacts of oil and gas activities.

Comment Number: 500213_JonesB_20161101-5
Organization1:
Commenter1:Buck Jones
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
The BLM did not take a hard look at direct, indirect, and cumulative impacts as required by NEPA, including:
• BLM did not properly analyze methane and other air pollutants, or consider mitigation measures to reduce these impacts

   *Summary*
   Commenters stated that the BLM did not sufficiently analyze impacts of mineral management decisions on air quality, specifically stating that more information should be provided about the following:

   1. Current data; the Draft RMP/EIS utilizes outdated information from 2008 when there was limited oil and gas development
   2. Revised future year 2021; consider whether 2021 is still appropriate given it is 5 years from Draft RMP/EIS publication
   3. Relationship between air quality and human health
   4. Visibility modeling from projected oil and gas emissions
   5. Air quality impacts (direct, indirect, and cumulative) from natural gas development

BLM_0164954

6.   Potential air contamination effects on organic farms
7.   Differences in impacts from new horizontal hydraulic fracturing technologies as compared to conventional drilling
8.   Air quality impacts from increased truck traffic
9.   Impact of hydraulic fracturing fluid flowback and required vehicular off-site disposal on air pollution
10.  Analysis of hazardous air pollutants
11.  More comprehensive analysis of hazardous air pollutants impacts
12.  The need to test for secondary pollutant volatile organic compounds in areas near oil and gas development
13.  Ozone, as levels already exceed the EPA threshold in certain areas
14.  Social and environmental cost of coal mine methane venting, especially in the North Fork Valley.
15.  Effects of atmospheric inversions coupled with air pollution
16.  Better scientific modeling of impacts where information cannot be obtained, specifically the winter ozone modeling where the BLM did not perform this analysis in the Draft RMP/EIS for the proposed development

*Response*

In accordance with the FLPMA, BLM authorizations should provide for compliance with substantive environmental laws, including the Clean Air Act. There are no direct impacts on air quality through the administrative action of designating areas as open or closed to leasing in the RMP. Should leases be developed in the future, when specific projects are put forth by potential proponents, additional impacts will be analyzed through site-specific NEPA analysis, when more precise information about timing and location are known.

The BLM is implementing the Comprehensive Air Resource Protection Protocol to consistently and effectively address air quality analysis at each stage of NEPA analysis. As part of that process, the BLM will evaluate proposals to develop federal minerals based on a project's potential impacts on air quality considering project-specific emission levels and locations. The BLM would also consider the cumulative impacts analyzed in the RMP and any future modeling available at the time. The BLM may also consider air monitoring before, during, and after approved projects. One of the purposes of air monitoring is to measure impacts potentially attributed to development over time and determine the effectiveness of emissions control measures. As stated above, monitoring the air quality in the North Fork Valley near Paonia High School would help achieve this goal.

When oil and gas development activity is proposed, BLM air resources staff will review the proposed action, location, lease data, available infrastructure, and current production data and determine how those factors will affect air quality.

BLM air resources staff determine air quality effects based on an emissions inventory, monitoring data, and other information requested from the applicant as part of the application for permit to drill review process. If the applicant does not submit an emissions inventory or does not have complete information, the BLM will estimate those emissions based on similar development in the area and the CARMMS modeling emissions inventory.

BLM_0164955

BLM tracks estimated emissions throughout the life of approved operations.

1. The Draft RMP/EIS fully considered the best available scientific information related to air quality and climate change available at the time it was prepared. Climate change data were updated in the FEIS. The FEIS was updated to include a table showing controlled greenhouse gas emissions estimates for each alternative, new information from the BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol, the 2017 Greenhouse Gas and Climate Change Report, and information regarding the BLM's adaptive management strategy. The Forest Service modeling was reviewed and considered for inclusion in the Proposed RMP/Final EIS if appropriate; no additional modeling will be completed by the BLM. The current UFO oil and gas development rate based on the last few years of oil and gas development data is tracking at or below the CARMMS low oil and gas development rate for UFO. The CARMMS predicted air quality impacts contributions for new federal UFO oil and gas for the CARMMS low oil and gas development scenario are "insignificant": federal oil and gas development in the UFO therefore is not expected to contribute to regional air quality concerns. The Western Regional Air Partnership's West-wide jumpstart Air Quality Modeling Study year 2008 modeling platform was used for the potential air quality impacts assessment (CARMMS). Air quality concentrations/emissions sources for year 2008 serve as a baseline where CARMMS predicts the changes in air quality from year 2008 to year 2021. Comprehensive photo-chemical modeling studies require comprehensive emissions inventories, monitored concentrations, and meteorology for a historical year in order to model the future year and determine the changes that could occur from the base year to future year for increases/decreases in emissions for a region.

2. It is adequate for NEPA air quality assessments being conducted for new actual proposed oil and gas development to use CARMMS future predictions, as long as the proposed project is expected to be developed within the timeframe of the CARMMS analysis window (i.e., before year 2022 for CARMMS 1.0 and before year 2026 for CARMMS 2.0), as CARMMS predictions would include impacts associated with the proposed development.
BLM Colorado has conducted CARMMS 2.0 modeling that predicts impacts through year 2025 using a year 2011 modeling platform, and likewise, any project developed from year 2015 through year 2025 is expected to be accounted for in the CARMMS 2.0 2025 predictions. The Proposed RMP/Final EIS was updated to incorporate CARMMS 2.0 results; see Proposed RMP/Final EIS Section 4.3.1, Air Quality and Climate. As described in the Draft RMP/EIS, Appendix H, BLM uses an adaptive management approach  that provides for new analysis once it is determined that existing models are no longer adequate to support NEPA.

3. Draft RMP/EIS Section 4.6.2 (page 4-444) discusses the relationship between air quality and human health. The BLM incorporated additional information regarding how air quality pollutants could affect human health in the Proposed RMP/Final EIS, as appropriate.

4-12. Draft RMP/EIS emission inventories for development and production activities within the planning area are summarized in Appendix Q, Summary of Air Emission Inventory Technical Support Document, and include total nitrogen oxides ($NO_x$), sulfur dioxide

BLM_0164956

($SO_2$), carbon monoxide (CO), carbon dioxide ($CO_2$), particulate matter less than or equal to 10 microns in size ($PM_{10}$), particulate matter less than or equal to 2.5 microns in size ($PM_{2.5}$), volatile organic compounds, and hazardous air pollutants. Flaring emissions and control have been included in the analysis, along with road dust emissions resulting from oil and gas development. In addition, methane ($CH_4$), nitrous oxide ($N_2O$) and carbon dioxide ($CO_2$) emissions were included in the inventory for purposes of quantifying greenhouse gas emissions. Lead emissions are negligible and were not calculated in the inventory. The emissions inventories for the analyses (e.g., CARMMS) are developed based on operator-provided information that includes various levels of technologies and oil and gas development methods (e.g., directional and horizontal) and account for these source types. Impacts are discussed for air quality in terms of the potential impacts based on the emission inventory estimates. A full air quality modeling study is needed to estimate actual air quality impacts resulting from development under different alternatives. The CARMMS is intended to provide an estimate of air quality impacts associated with different management actions across multiple field offices. CARMMS also provides visibility modeling from projected oil and gas emissions, air quality impacts (direct, indirect, and cumulative) from natural gas development, and impacts on all areas (Class I and Class II) in the region.

Comprehensive emissions inventories and hazardous air pollutant analysis based on the latest science (e.g., factors and calculation methodologies) are developed at the project-level stage, and an impact analysis is then conducted using these representative data. As discussed in Draft RMP/EIS Appendix H, CARMMS regional modeling takes into account up-to-date emissions inventory, development methods, regulations, and industry practices and, therefore, does not require on-site emissions factor testing.

13. For Colorado, the State of Colorado, Department of Public Health and Environment sets regulations and requirements for the oil and gas industry aimed at controlling emissions in order to create and maintain a healthy environment below the Clean Air Act-established standards.

The Draft RMP/EIS analyses (CARMMS, etc.) include these existing condition air pollutant concentrations information, and the BLM considers existing conditions when authorizing future oil and gas development. The BLM is working with other agencies (e.g., Colorado Department of Public Health and Environment and US EPA) to determine significance thresholds for BLM-authorized activities, and the BLM uses CARMMS, annual reporting, and other tools to better understand potential air quality impact contribution and to determine how effective additional mitigation would be.

A comprehensive ozone analysis was also completed as part of CARMMS. It predicts ozone concentration changes from the baseline year to future modeled years at regional monitors (that existed during baseline year) and at rural locations throughout the region. The ozone standard is calculated as the 3-year average of the fourth-highest 8-hour ozone concentration, and although there have been monitored exceedances above the ozone National Ambient Air Quality Standard over recent years for the region, there have not been values calculated in the form of the Standard (3-year averages of fourth maximum 8-hour average) above the Standard and, therefore, the area is currently in attainment for ozone. Overall, CARMMS modeling shows that regional ozone air quality is predicted to improve.

BLM_0164957

14. Methane and methane capture were addressed in the Draft RMP/EIS Appendix Q for methane emissions calculations. Methane control and capture are also among the BMPs available for consideration as conditions of approval of development, as described in Appendix H. Specifically, emission inventories for development and production activities within the planning area were compiled and included criteria air pollutants, hazardous air pollutants, and greenhouse gas emissions, including methane.

Coal mine methane venting is included in Appendix Q of the Draft RMP/EIS in the CH4 emissions estimates totals shown in Table Q-3-2, and as shown in Figure Q-4 and described in the last paragraph on page Q-44, "Non-oil and gas minerals are the dominate source of base year CO2e emissions, accounting for 98% of base year CO2e emissions."…over 90% of the CH4 totals are related to CH4 venting. (CO2e stands for Carbon dioxide equivalent which is a term for describing different greenhouse gases in a common unit, including methane.)

Page Q-i shows the list of Appendices (sub-appendices) for Appendix Q, and Appendix E (of Appendix Q) presents the "Air Emissions Inventory Tables and Figures". These show that methane venting was accounted for in the air quality analysis for the Draft RMP/EIS, and the description for those "sub"-Appendices reads that they are available at UFO.

The March 28, 2017, Executive Order on Promoting Energy Independence and Economic Growth disbanded the Interagency Working Group on Social Cost of Greenhouse Gas Emissions and withdrew all the associated guidance. The BLM management will follow all active guidance.

15-16. Winter-time ozone formation in oil and gas development areas in the Rocky Mountain Region is a phenomena that occurs in areas of very high oil and gas development where temperature inversions setup for a prolonged period of time where pollutants are trapped in a bowl- or basin-like geographic setting. This phenomena is not as likely to occur in the Uncompahgre planning area because it not likely that all of the key conditions would occur at the same time for the North Fork Valley area because the area is subject to differential daytime temperature swings which disrupts the establishment of long-term inversions

### Section 10.4 – Air Resources: Cumulative impact analysis

Total Number of Submissions: 3
Total Number of Comments: 3

Comment Number: 000489_JohnsonA_20161101-41
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
B. Air Quality
1. Cumulative Air Quality Impacts
Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the Glenwood Springs Post-Independent ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).

BLM_0164958

These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan,[54] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.

[Footnote 54] BLM Bull Mountain MDP FEIS 2016. 4.2.1

http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing. This has happened elsewhere as well, like at Otero Mesa in New Mexico. The final RMP revision that properly considers this activity in relation to the area's air quality.

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:

Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies. (DEIS 4-25)

It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health: estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

Hazardous air pollutants emissions could increase the risk of localized human health impacts. (DEIS 4-37)

The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area.

BLM_0164959

Comment Number: 000537_SchultzK_20161101_TEDX-7
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM needs to address the cumulative air pollution contribution from multiple sources.
The BLM cannot assume that rural air is cleaner than towns and cities as it can already be impacted from industrial activities associated with natural resource extraction (3-4). In addition to oil and gas development, air pollution comes from coal mine methane vents, diesel exhaust, and mineral extraction among other sources. Increases of emissions from these sources are predicted to increase levels of particulate matter and encourage ozone formation in the Planning Area (4-21).

Comment Number: 000545_SlivkaJ_20161101-154
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Air Quality
i. Cumulative Air Quality Impacts
Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the Glenwood Springs Post-Independent ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).
These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.
The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan, [Footnote 60 BLM Bull Mountain MDP FEIS 2016. 4.2.1 http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.
BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).
The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing. This has happened elsewhere as well, like at Otero Mesa in New Mexico. The final RMP revision that properly considers this activity in relation to the area's air quality.

*Summary*
Commenters stated that the cumulative air quality analysis carried out by the BLM is inadequate due to lack of consideration for other oil and gas development in the region, such as the Bull

Mountain Master Development Plan, and that the BLM should not use the assumption that rural air is cleaner than urban air.

*Response*

The cumulative effects of regional oil and gas development are described in Draft RMP/EIS Section 4.3.1 under Cumulative Air Quality and Air Quality-Related Values Analyses (page 4-48). As described in this section, the CARMMS modeled regional ozone and $PM_{2.5}$ concentrations and visibility and deposition impacts from projected oil and gas development on federal lands in the Uncompahgre planning area and from existing and new oil and gas and mining-related activity occurring within the 13 Colorado BLM planning areas. CARMMS cumulative emissions inventories are comprehensive and account for existing and future oil and gas development for all areas of Colorado, Utah, Wyoming, New Mexico, and other nearby states. The CARMMS cumulative future year emissions inventories account for emissions sources for all categories, including oil and gas, for the entire United States.

CARMMS modeled three scenarios: low, medium, and high. The high scenario modeled an upper-bounds of potential oil and gas development for UFO that included all foreseeable projected Bull Mountain Unit oil and gas development (as proposed for the Master Development Plan), and future oil and gas development on lands surrounding the Bull Mountain Unit (e.g., Forest Service, private, BLM) and other areas of UFO and nearby planning areas. The medium scenario included additional control measures applied to the CARMMS high scenario level of oil and gas development. The low scenario for UFO simply removed the projected Bull Mountain Unit future oil and gas development (proposed for the Master Development Plan); as such, the difference in CARMMS-predicted air quality impacts between the high and low scenarios would be the predicted air quality impact contributions associated with future Bull Mountain Unit oil and gas development (proposed for the Master Development Plan).

The cumulative impact analysis presented in the Draft RMP/EIS and Proposed RMP/Final EIS is appropriate for a planning-level RMP, which uses baseline emissions information for federal, state, and private emissions sources and projections of future emissions to model pollutant concentrations for future years. Further, the Draft RMP/EIS laid out a process for evaluating the impacts of future specific oil and gas development proposals, as described in Appendix H of the EIS. As described under Section III.C of Appendix H: "Air dispersion and photochemical grid models are useful tools for predicting project-specific impacts on air quality, predicting the potential effectiveness of control measures and strategies, and forecasting trends in regional concentrations of air pollutants. The BLM will use regional air modeling and project-specific modeling, in conjunction with other air analysis tools, to develop air resource protection strategies consistent with our responsibilities under FLPMA. Further, the BLM will provide appropriate disclosure for any modeling of direct, indirect, and cumulative impacts of proposed actions during the required NEPA analysis."

The language in the Proposed RMP/Final EIS was modified to exclude the assumption that rural air is cleaner than urban air.

BLM_0164961

***Section 10.5 – Air Resources: Mitigation measures***
Total Number of Submissions: 3
Total Number of Comments: 10

Comment Number: 000400_InouyeD_20161028-10
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Other Sections: 10.3
Comment Excerpt Text:
Would there be any volatile chemicals released from waste storage ponds?
How would that air pollution be monitored and mitigated?

Comment Number: 000509_WolcottE_20161102-11
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
mitigation of air quality from oil and gas development has not been addressed under the preferred
alternative and cannot be fully mitigated except under a no lease alternative.

Comment Number: 000563_King_WELC_HasAttach-100
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
For the BLM's Greater Natural Buttes adaptive management plan, the National Park Service advocated
for the establishment of specific monitored ozone "trigger points" set at levels below the NAAQS and
tied to immediate implementation of enhanced mitigation measures, including phased development.281 [
281 See BLM Greater Natural Buttes FEIS at P-68.] Similarly, for the Gasco adaptive management plan,
EPA provided the following input to BLM to ensure the adaptive management strategy would help
prevent significant adverse impacts to air quality:

First, the draft EIS does not make clear what would constitute a "significant increase" in the emissions
inventory, triggering the need for a new modeling analysis. Second, the strategy should include
monitoring that conforms to 40 CFR Parts 50 and 58, with an emphasis on obtaining measurements that
contribute to the formation of secondarily formed pollutants such as PM2.5 and ozone. The EIS should
identify how monitoring results may trigger a need for additional modeling. Finally, the adaptive
management strategy should address how BLM and Gasco will address the proposed lowering of the
ozone standard.282 [282 Letter from EPA to BLM, Re: Comments on the Gasco Uinta Basin Natural
Gas Development Project Draft EIS CEQ # 20100386 (January 7, 2011) [hereinafter "EPA 2011 Letter"]
(attached as Exhibit 194).]
BLM must establish specific triggers, as outlined by NPS and EPA. Without these specific triggers for
further specific action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are
appropriate to prevent significant impacts to air quality.

Comment Number: 000563_King_WELC_HasAttach-101
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)

BLM_0164962

Comment Excerpt Text:
More generally, BLM must establish more definitive requirements for monitoring, modeling, permitting and mitigations in Section III of the CARPP. As written, this section of the CARPP only offers analysis and protection of air resources through discretionary means and therefore cannot be relied on to ensure adequate air resource protection. The CARMMS predictions for all alternatives forecast a two- or three-fold increase in criteria pollutants. There is little chance that these significant increases won't cause or contribute to exceedances of the NAAQS. BLM must address this and plan restrictions in this RMP to avoid these almost certain violations.

Comment Number: 000563_King_WELC_HasAttach-102
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should clearly define what it would consider to be "a reasonable correlation" and must specify what would trigger the need for a new modeling analysis. In the provision for evaluating projected future development BLM says it will, "use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses." CARPP Section IV.E. Again, BLM must establish a threshold that defines what specific measure of difference in the inventory data would trigger a subsequent analysis. Without these specific thresholds that trigger further action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality.

Comment Number: 000563_King_WELC_HasAttach-103
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Air Resource Mitigation Measures
In addition to the CARPP, BLM should commit to implementation of specific and enforceable management actions that ensure no significant impacts to air quality and air quality related values—as determined by air quality modeling—in the RMP/EIS. The CARPP should only be used as a tool to improve upon and adapt these management actions as more andimproved data become available. Specifically, BLM must consider Best Management Practices (BMPs) to ensure that human health and the environment are protected from oil and gas drilling over the life of the new RMP—as detailed below in Section IV.B.10.

Comment Number: 000563_King_WELC_HasAttach-96
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The discretionary nature of the CARPP is very concerning, especially if it is relied upon in the draft RMP/EIS as a primary means for protecting air resources and used by BLM to justify not proposing additional management actions to address significant impacts shown in the impact analysis. BLM must establish a comprehensive set of mitigation measures for the RMP/EIS that ensures no significant air quality impacts from the proposed development would occur based on the best currently-available analysis tools, and should then use the CARPP as a means to improve upon and update those measures, as needed, based on periodic and specific monitoring and modeling commitments that the agency agrees to implement.

BLM_0164963

Comment Number: 000563_King_WELC_HasAttach-97
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Evaluation of the overarching purpose, scope and responsibilities under the CARPP (Section I) requires analysis of how the CARPP relates to the RMP/EIS and the BLM's authority under NEPA, which the UFO failed to provide. Of concern is the fact that the CARPP can be modified "without maintaining or amending any specific Field Office RMP". CARPP Section I.A. Any modifications to the CARPP should include adequate public participation opportunities. Important public notification and participation provisions of the CARPP include: (1) the commitment to make the Colorado Air Resources Management Modeling Study (CARMMS) results and analysis available to the public (Section III.C.3); and (2) the commitment to complete an annual summary report that is made available to public (Section V). The periodic review of the reasonably foreseeable development projections to be conducted every three to five years must also be made available to the public (Section IV.E).

Comment Number: 000563_King_WELC_HasAttach-98
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
It is important to ensure that monitoring data collected as part of the CARPP is also made available to the public. Under the Monitoring Data Transparency provision of the CARPP, BLM states that, "the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol". CARPP Section III.A.4. BLM must work with the State of Colorado and EPA to establish a more comprehensive monitoring network in the planning area and it is vitally important that the data collected from monitoring efforts throughout the planning area are quality assured and made publicly available through the State and/or EPA websites.

Comment Number: 000563_King_WELC_HasAttach-99
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The CARPP states that BLM will participate in a cooperative effort to establish a comprehensive monitoring network in the planning area and share collected data with other agencies and the public, "as appropriate" and "contingent upon available funding" (Section III.A.1). This is an important provision of the CARPP and BLM should work with the State and EPA to expand monitoring in the area. Establishment of a more comprehensive monitoring network will help serve as a backstop to track and ensure air quality protection throughout the planning area and to help identify areas of concern with regard to air impacts. But the adaptive management process must require frequent and specific actions are taken in order to prevent significant impacts throughout the planning area – as opposed to taking corrective action after a significant impact is identified, as the current management plan proposes.

*Summary*

Commenters stated that mitigation of air quality impacts from oil and gas development is not adequately analyzed in the Draft RMP/EIS, because it does not include a definition of a "significant increase" in emissions, measurable triggers for new analysis as outlined by the National Park Service and EPA, or definitive requirements for monitoring and modeling.

BLM_0164964

Commenters also had concerns regarding the Draft RMP's use of the Colorado Air Resource Protection Protocol (Appendix H) and stated that its use to justify not proposing additional management actions to address significant impacts is inadequate. They stated that the Colorado Air Resource Protection Protocol analysis, as currently written, cannot be relied on to ensure adequate air resource protection because it only provides for discretionary measures. Commenters added that the RMP/EIS needs to include a set of mitigation measures that ensures that no significant air quality impacts from proposed development would occur based on currently available analysis tools; the Colorado Air Resource Protection Protocol is then used as a means to improve upon and update this set of mitigation measures.

*Response*
Emissions levels and level of impacts from development activities have a high degree of variability due to site-specific differences in baseline air quality, timing, and location of development, and differences in weather and atmospheric conditions. As a result, it is not feasible to apply strict mitigation at the planning level. The Comprehensive Air Resource Protection Protocol presented in Appendix H lays out the process by which development proposals will be evaluated, in collaboration with federal, state, and local agencies, to determine appropriate mitigation through subsequent NEPA and permitting processes. While this is a strategy and not a decision document, analysis of development proposals is mandated in existing law, including the Clean Air Act and NEPA.

As discussed in the response to Section 10, Air Resources, Section 10.4, Cumulative Impact Analysis, of this report, the CARMMS modeled three scenarios (low, medium, and high). The medium scenario includes additional mitigation measures beyond state and federal regulations and requirements. These additional mitigation measures are considered, but as shown in the CARMMS analysis/report and as discussed in the response to Section 10, Air Resources, Section 10.3, Impact Analysis, of this report, these additional mitigation measures are not shown to be universally effective in reducing potential impacts to air quality, due to the small contribution of the federal development relative to other cumulative sources outside the BLM's authority. The predicted air quality impact contributions (according to CARMMS) for UFO are small for all CARMMS modeling scenarios, and very low for the CARMMS low oil and gas development scenario. As discussed in the response to Section 10, Air Resources, Section 10.3, Impact Analysis, Section 10.3 – Air Resources: Impact the current UFO oil and gas development rate based on the last few years of oil and gas development data is tracking at or below the CARMMS low oil and gas development rate for UFO. The CARMMS predicted air quality impacts contributions for new federal UFO oil and gas for the CARMMS low oil and gas development scenario are "insignificant": federal oil and gas development in the UFO therefore is not expected to contribute to regional air quality concerns.

As described for the BLM Colorado adaptive management air quality strategy, the BLM will continue to evaluate levels of oil and gas development with modeling analyses (CARMMS 1.0 and CARMMS 2.0; see response to Section 10, Air Resources, Section 10.3, Impact Analysis, of this report) to determine if oil and gas development in the Uncompahgre RMP planning area is reaching levels where additional mitigation would be effective and feasible. The BLM is working with the National Park Service, EPA, and other federal agencies to establish significance criteria for assessing impacts for new federal oil and gas development that do not trigger cumulative

BLM_0164965

threshold, to adequately determine whether future development would have a significant impact at a local or regional level and should be mitigated.

## Section 11 – Climate/Climate Change

### *Section 11.1 – Climate/Climate Change: Range of alternatives*
Total Number of Submissions: 14
Total Number of Comments: 27

Comment Number: 000031_SparJ_20160624-2
Organization1:WildEarth Guardians
Commenter1:Jon Spar
Commenter Type: Individual
Comment Excerpt Text:
All mining and drilling should be abandoned as again, there will be a few who would gladly destroy our public lands and make them unlivable for the native inhabitants for their unquenchable greed. The President recently signed onto the Paris agreement and allowing more fossil fuel extraction is exactly counter to that aim. Mining as well uses enormous amounts of energy and destroys habitat especially surface mining that is so often used for coal.

Comment Number: 000036_Datsko_20160702-2
Organization1:
Commenter1:Kathy Datsko
Commenter Type: Individual
Comment Excerpt Text:
I do not feel Alternative D moves us in a sustainable way towards meeting our nation's climate commitments. Expanding fossil fuel extraction does not move us in the long term direction that is needed to meet our goals.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-6
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 21 Page 2-25: The management actions presented across this row (line 21) do not represent an appropriately broad range of alternatives. The No Action Alternative and Preferred Alternative are the only alternatives presented. The management actions described by these alternatives are extremely different. We request that BLM develop an additional management action as Alternative D. This action should attempt to balance multiple use and protection of ecological emphasis areas.

Comment Number: 000363_RogersM_20161031-4
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Comment Excerpt Text:
There are issues that are not manageable at this level. Climate change and its affects on the human population, wildlife and flora. But BLM can do much to support the necessary adaptations that will be required by users, flora and fauna. Including all the suitable ACEC's, Wilderness Characteristic lands and

BLM_0164966

Wild and Scenic river corridors would be in the right direction. The UFO has already inventoried these as suitable and should therefore be included in any chosen alternative

Comment Number: 000433_FielderA_20161029-5
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
In light of the well-established scientific principles of climate science, and in recognition of our country's commitment to the Paris Climate Agreement, the carbon contained in these public assets must be left in the ground in order to maintain their highest possible worth and to preserve the habitability of Earth for human civilization. Far from opening new areas to exploration and exploitation, you should be forbidding access to the remaining carbon reserves in the ground. Secure the legacy our grandchildren will expect of us by protecting those carbon reserves on BLM lands.

Comment Number: 000446_KlingspornK_20161101-7
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Other Sections: 22.1
Comment Excerpt Text:
The fact that the BLM Alternative D continues to outline extensive areas for potential coal leasing highlights the fact that much of the information it is working off is out of date. Current climate change directives, enacted at the federal level, require that public agencies such as the BLM account for climate change mitigation and adaptation in their planning, policy, and operations.
Unfortunately, this Draft RMP does not incorporate current science or policy in any of its alternatives. Even Alternative B would open up 494,580 acres to fluid mineral leasing. Alternative D would leave 627,290 acres, or 95% of the mineral estate open to fluid mineral leasing, an insignificant reduction from the current plan, which leaves 631,580 open.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-9
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must consider and analyze alternative that requires all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by capturing or flaring the mine's methane emissions. Technologies to capture or flare methane are readily available, both flaring and capture have been studied or used at coal mines in the planning area, and BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands. Moreover, doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-1
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Prevention, rather than merely adaptation to, climate change is required by the Federal Land Management Policy Act ("FLPMA") and federal policy. FLPMA requires that "[i]n managing the public

BLM_0164967

lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b) (emphasis added). The recent Presidential Memorandum, Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment, affirms that "It shall be the policy of the Department[] of ... the Interior, ... to avoid and then minimize harmful effects to land, water, wildlife, and other ecological resources (natural resources) caused by land- or water-disturbing activities."5 BLM's recently-proposed "Planning 2.0" rule recognizes that this policy should apply to land use planning, adopting "avoiding impacts" as the first and most important step in the "mitigation hierarchy," 81 Fed. Reg. at 9686, id. at 9725 (proposed 40 C.F.R. § 1601.0-5). President Obama has specifically instructed BLM, in its management of fossil fuel extraction on federal lands, to reduce the greenhouse gas emissions that contribute to climate change.6[5 https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural-resourcesdevelopment-and-encouraging-related (emphasis added).][6 See, e.g., White House, Fact Sheet: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to Cut Methane Emissions (Jan. 14, 2015) https://www.whitehouse.gov/the-pressoffice/2015/01/14/fact-sheet-administration-takes-steps-forward-climate-action-plan-anno-1.]These policies and concerns must be integrated into land use planning; they cannot be postponed to the lease or later stage. Climate change presents the quintessential situation in which BLM must "weigh long-term benefits to the public against short-term benefits," 43 U.S.C. § 1712(c)(7), and BLM's development and adoption of land use plans must consider the available scientific evidence, id. § 1712(c)(2), including the evidence regarding climate change, the impact of fossil fuel extraction and use in general, and the effects of federal fossil fuel leasing in particular.7 The proposed RMP's failure to adopt goals and objectives regarding limiting greenhouse gas emissions from activities in the decision area was arbitrary and capricious. BLM adopted precisely such goals in the recent amendment to plan for the adjacent Tres Rios field office, and BLM has not provided -- and cannot provide – a rational basis for failing to do so here.[7 See, e.g., Peter Erickson and Michael Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals? 1, 31-32, Stockholm Environment Institute Working Paper 2016-02 (May 2016), available at https://www.seiinternational.org/mediamanager/documents/Publications/Climate/SEI-WP-2016-US-fossilfuel-leasesclimate.pdf.]

Comment Number: 000489_JohnsonA_20161101-100
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
3. Adapting to Climate Change
In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:
* use the best available science of climate change risks, impacts and vulnerabilities,
* use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,
* use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,
* promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,
* Manage linked human and natural systems that help mitigate climate change impacts, such as:
o protect diversity of habitat, communities and species,
o protect and restore core, unfragmented habitat areas and key habitat linkages,
o maintain key ecosystem services,
o monitor, prevent and slow the spread of invasive species,

BLM_0164968

o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.)[100] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

* Restoration Zones: areas that are devoted to forestalling change through the process of ecological restoration;

* Innovation Zones: areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and

* Observation Zones: areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.

[Footnote 100] These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014).

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of restoration zones is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, innovation zones are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing observation zones is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

Summary of Comments: BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing."

BLM_0164969

Comment Number: 000489_JohnsonA_20161101-94
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6
Comment Excerpt Text:
b. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.
FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c)...
Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long-term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16.
The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives."

Comment Number: 000489_JohnsonA_20161101-97
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.
The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

BLM_0164970

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands.[90]

[Footnote 90] Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016).

Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions. The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord[91] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming.[92] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project.[93]

[Footnote 91] Copenhagen Accord ¶ 1, agreed Dec. 18, 2009, FCCC/CP/2009/11/Add.1, available at http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); id. at ¶ 2(agreeing that "deep cuts in global emissions are required according to science" to meet this goal).

[Footnote 92] The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre- industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art.2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[Footnote 93] The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g., Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016).

BLM_0164971

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius.[94] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically- specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2- degree Celsius limit in the most cost-efficient manner.[95] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays.

[Footnote 94] McGlade, Christophe and Paul Ekins, The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C, 517 Nature (187) (2015).

[Footnote 95] See id. at 187-90.

The United States has set national commitments to reduce GHG emissions. The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million CO2-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C."[96]

[Footnote 96] See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and- environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership).

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in CO2 emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things.[97] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

[Footnote 97] See also Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions.

Comment Number: 000545_SlivkaJ_20161101-2
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0164972

Summary of Comments: The Uncompahgre Draft RMP has laid out a management framework that could protect and enhance natural resources as directed by FLPMA through conservation management of valuable public lands such as lands with wilderness characteristics, Ecological Emphasis Areas, ACECs and quiet recreation management areas. However, BLM's approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy and reflects an antiquated bias that the agency is proactively seeking to overcome. BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy development and meaningfully address climate change, including adaptation strategies and consistency with national climate goals.

Comment Number: 000545_SlivkaJ_20161101-238
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives."

Comment Number: 000545_SlivkaJ_20161101-246
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.6
Comment Excerpt Text:
Recommended Approach to Managing Climate Change in RMPs
Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.
Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning" (included as Attachment 6), we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.
Summary of Comments: BLM should utilize the attached management framework to address and manage climate change in the RMP

Comment Number: 000545_SlivkaJ_20161101-247
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Adapting to Climate Change

BLM_0164973

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:

? use the best available science of climate change risks, impacts and vulnerabilities,

? use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,

? use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,

? promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,

? Manage linked human and natural systems that help mitigate climate change impacts, such as:

o protect diversity of habitat, communities and species,

o protect and restore core, unfragmented habitat areas and key habitat linkages,

o maintain key ecosystem services,

o monitor, prevent and slow the spread of invasive species,

o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.) [Footnote 132 These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014)] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

- Restoration Zones: areas that are devoted to forestalling change through the process of ecological restoration;

- Innovation Zones: areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and

- Observation Zones: areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of restoration zones is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, innovation zones are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This

BLM_0164974

strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing observation zones is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

Summary of Comments: BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing."

Comment Number: 000563_King_WELC_HasAttach-15
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.3
Comment Excerpt Text:

Climate change has fundamentally altered the paradigm of public lands management—a reality reflected in new national policy as well as international commitments—but ignored by the Uncompahgre draft EIS. The business-as-usual approach reflected by BLM fails to meet the needs of present and future generations—the agency's core mandate in managing public lands and minerals. 43 C.F.R. § 1702(c). Both science and common sense dictate that perpetuating a management approach which has substantially contributed to climate change is no longer sufficient. The agency must consider alternatives that are responsive to this reality, including not leasing fossil fuel minerals. Every ton of carbon dioxide added to the atmosphere worsens climate change. So any additional oil and gas or coal production permitted on BLM land managed by the Uncompahgre field office and the combustion of those fossil fuels will worsen climate change. Due to the urgent need to protect mankind and federal public lands from the potentially devastating impacts of catastrophic global warming, BLM must consider and analyze an alternative that reduces or eliminates the number of new fossil fuel leases in the Uncompahgre area.

Comment Number: 000563_King_WELC_HasAttach-25
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

However, despite these acknowledgments, the UFO fails to adequately address climate change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable alternatives, mitigation measures and standards in the plan. The UFO could take action to reduce GHG impacts from the UFO planning below the level of significance, e.g., by further limiting development and/or requiring further emission controls. Instead, the UFO provides a long list of excuses in the RMP/EIS as to why action is either not possible or not meaningful, such as:

• Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity (albedo). DEIS at 4-39.

• Projected changes are likely to occur over several decades to a century and may not be "measurably discernable within the reasonably foreseeable future." Id. at 4-40.

• Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of the EIS/RMP analysis. Id.
• It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. Id.
• It is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area. Id.
This type of dismissive approach fails to satisfy the guidance outlined in Department of Interior Secretarial Order 3226, discussed below, or the requirements of NEPA. "Reasonable forecasting and speculation is … implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

Comment Number: 000563_King_WELC_HasAttach-32
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS does not appear to acknowledge the existence of the Clean Power Plan or the Paris Agreement—hardly surprising given that the climate analysis appears to have been completed in 2010. The Draft EIS therefore fails to acknowledge any conflict between the alternative plans and the CPP or the nation's commitments under the Paris accord. However, it is clear that each alternative, which projects up to 27 million tons of CO2 emissions from coal mined in the plan area for the foreseeable future, totaling up to half a billion tons over 20 years, may conflict with the CPP, which intends to limit pollution from power plants that is predicted and cut coal combustion in the U.S. by nearly a quarter by 2030. The potential conflict with the Paris Agreement, which pledges the U.S. to reduce GHG emissions by 26-28% from 2005 levels by 2025, on a path to reduce those emissions by 80% by 2050, is also readily apparent. BLM's failure to acknowledge this conflict is arbitrary and capricious, in violation of NEPA and Executive Order 12,866.

Comment Number: 000563_King_WELC_HasAttach-38
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
All of the alternatives considered in the draft EIS would increase emissions over a baseline year and would continue "business-as-usual" indirect climate emissions from coal produced in the Somerset coal field and burned. The draft EIS must disclose the potential for a megadrought, and disclose that BLM's alternatives will only increase the chances of such an event. Further, BLM must consider planning standards and goals that address the potential for a megadrought and measures that can be taken to reduce the impacts of such a drought on fish, wildlife, ecosystems, soils, etc. See also Section IV.C.2., discussing the impact of climate change on stream flows in the Upper Colorado River Basin.
Comment Number: 000563_King_WELC_HasAttach-5
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
NEPA requires BLM to consider national policy in its decisionmaking process—a fact expressly recognized by the agency's purpose and need, DEIS 1-2—yet the DEIS fails to do so with regard to climate change, as detailed above.

BLM_0164976

Comment Number: 000563_King_WELC_HasAttach-7
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Perhaps more importantly, the UFO failed to consider any alternatives that would meaningfully address greenhouse gas emissions and climate change impacts in the planning area—including a no-leasing alternative—and that are reflective of current science and national policy.

Comment Number: 000563_King_WELC_HasAttach-8
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Simply put, the timeframe to avoid catastrophic climate change is short, and the management of our federal minerals is dangerously out of step with this reality. As noted above, the UFO failed to consider any alternative that would meaningfully reduce the projected 3.11 MMTCO2e of annual emissions from the planning area. Draft EIS at 4-39.

Comment Number: 000563_King_WELC_HasAttach-12
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM's alternatives fail to account for current resource conditions, changes in circumstances, and new or revised national-level policy, in particular with regard to climate change. Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, as detailed below, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14.

Comment Number: 000588_WitherillD_20161101-5
Organization1:
Commenter1: Deirdre Witherell
Commenter Type: Individual
Comment Excerpt Text:
This assumption of unrestricted fossil fuel consumption is reflective of a fundamental disconnect between how our public lands are managed for energy production and national policies and expectations to limit GHG emissions. Importantly, the Draft RMP fails to consider any alternatives that would meaningfully address GHG emissions and climate change impacts in the planning area and that are reflective of current science and national policy.
Comment Number: 000590_DascaluJoffeD_20161101-1
Organization1:
Commenter1: Diana Dascalu-Joffe
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Unfortunately, every option BLM is considering in its draft plan for that area will worsen, not reduce, climate pollution. In fact, over the 20-year life of the plan, BLM predicts that fossil fuel development and combustion could result in over a half a billion tons of additional climate pollution—about the equivalent of running the state's five largest coal-fired power plants. BLM should be part of the climate solution, not

BLM_0164977

part of the problem. BLM's failure to even consider options that reduce the agency's contribution to climate pollution is contrary to your administration's policy and common sense.

We therefore urge you to ensure that BLM gives meaningful consideration to alternatives that end new fossil fuel leasing of lands and minerals managed by the Uncompahgre Field Office. BLM's new plan for the Uncompahgre region presents an important opportunity for the Department of Interior to avoid substantial greenhouse gas emissions while protecting important natural resources at stake in Colorado's North Fork Valley.

Comment Number: 000590_DascaluJoffeD_20161101-3
Organization1:
Commenter1:Diana Dascalu-Joffe
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We commend the Department of Interior on its initiatives to begin addressing the role of federal fossil fuel leasing and production in the climate crisis, including its historic programmatic review of the federal coal leasing program and its efforts to address methane emissions from oil and gas production on federal lands.

The plan for the Uncompahgre Planning Area offers the Department an exceptional opportunity to begin integrating the United States' climate goals into its local plans for managing public lands and mineral estates. In particular, the combination of already-declining coal production and the lack of substantial existing oil and gas infrastructure in the region present an opportunity for significant emissions savings without a major stranding of investments or loss of employment.

BLM's draft plan for the Uncompahgre area, however, proposes expanding fossil fuel leasing and development above historic levels, and the agency fails to address options that limit climate pollution in any meaningful way. BLM rejects any consideration of alternatives that would close the planning area to either coal or oil and gas leasing. Every one of its alternatives contemplates levels of fossil fuel leasing and production that would result in increased greenhouse gas emissions over current levels.

Comment Number: 000590_DascaluJoffeD_20161101-6
Organization1:
Commenter1:Diana Dascalu-Joffe
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM has an incredible opportunity to develop a "gold standard" in resource management that helps combat the climate crisis while providing a path to sustainable development in a region of Colorado that is eager to transform its economic base. Therefore, we urge you to direct BLM to prepare a revised plan and environmental analysis—one that incorporates U.S. Paris Agreement climate goals by adding emissions reduction to its purpose and need, analyzes an alternative that would prohibit new fossil fuel leases, and that recommends the area for long-term withdrawal from availability for mineral leasing.

Comment Number: 000605_BushnellH_20161021-1
Organization1:
Commenter1:Helen Bushnell
Commenter Type: Individual
Comment Excerpt Text:
It also appears to be in violation of the our international agreements to limit climate change.
Every single alternative analyzed in the environmental impact statement would increase climate pollution over baseline levels, and none would limit any fossil fuel production from moving forward

BLM_0164978

Comment Number: FormLetterD_CBD-1
Organization1:Center for Biological Diversity
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft management plan for the Uncompahgre Field Office fails to seriously address climate change, which is the most significant threat to Colorado's public lands and the planet.
Every alternative analyzed in the plan would allow coal mining to continue at current levels for the next 10-20 years, a decision that your own environmental impact statement admits could result in more than half a billion tons of climate pollution. In fact, every single alternative analyzed in the environmental impact statement would increase climate pollution over baseline levels, and none would limit any fossil fuel production from moving forward, regardless of the impact to the community and environment. Every alternative would allow more leasing, fracking and drilling for oil and gas.
Federal public lands must be part of the climate solution, not the problem. I therefore urge you to:
--adopt goals for the planning area that include significantly reducing climate pollution from BLM-approved actions on these lands;- analyze and select an alternative that prohibits new leases for climate-polluting fossil fuels, including coal, oil and natural gas;
--honestly disclose the direct and indirect climate emissions of fossil fuel leasing, including the costs of climate pollution (the "social cost of carbon"); and help communities in the area transition to cleaner economies rather than continuing to promote reliance on dirty fuels.

Comment Number: FormLetterF_EarthJustice-1
Organization1:EarthJustice
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
I am deeply concerned that the draft management plan for the Uncompahgre Field Office fails to seriously address climate change, the most significant threat to Colorado's public lands and the planet. Every alternative the BLM is considering would allow coal mining to continue at current levels for the next 10 to 20 years, a decision that your own environmental impact statement (EIS) admits could result in more than half a billion tons of climate pollution. In fact, every single alternative the EIS analyzes would increase climate pollution over baseline levels, and none would result in any reduction of coal production. Every alternative would allow more leasing, more fracking and more drilling for oil and gas.
Federal public lands must be part of the climate solution, not continue to make the problem worse. I therefore urge the BLM to:
- Adopt goals for the planning area that include significantly reducing the climate pollution from BLM-approved actions on these lands
- Seriously consider alternatives that prohibit new leases for climate-polluting fossil fuels, including coal, oil and natural gas
- Honestly disclose the direct and indirect climate emissions of fossil fuel leasing, including the costs of climate pollution (the "social cost of carbon")
- Take a hard look at how to work with communities in the area to transition from fossil fuels to cleaner economies

*Summary*

Commenters stated that the BLM fails to adequately address climate change in the draft RMP due to lack of robust consideration of reasonable alternatives, lack of range of alternatives to mitigate climate change, lack of meaningful mitigation measures and standards, and failure to include an alternative that significantly reduces greenhouse gas emissions. They noted that the BLM fails to acknowledge the existence and established targets of the Clean Power Plan or the

BLM_0164979

Paris Agreement, and none of the alternatives presented offer an approach to meet the Nation's climate commitments or address options that limit climate pollution in a meaningful way. They recommend that a no leasing alternative be utilized in order to meet these commitments. One commenter rejected the Draft RMP's approach to addressing climate change and stated this analysis is required by NEPA and US Department of the Interior Secretarial Order.

Commenters also specifically stated that prevention, rather than merely adaptation to, climate change is required by FLPMA. They recommended that the BLM craft long-term management prescriptions to avoid permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. They state that failure to adopt goals and objectives limiting greenhouse gases in the decision area is arbitrary and capricious. In addition, they stated that the final RMP should plan for uncertainty and risk in the light of variations to weather, vegetation, and other factors as a result of climate change. They also requested that an adaptive portfolio approach to land management be utilized by the BLM to best protect against climate change. In addition, management providing connectivity through Ecological Emphasis Areas is recommended to provide increased resilience against climate change.

*Response*
As discussed in in Appendix H, an adaptive management strategy has been included in the Colorado Air Resource Protection Protocol to allow the BLM to comply with NEPA and complete an appropriate analysis to ensure that activities approved by the BLM minimize adverse impacts to air quality and climate change, while allowing for development of important domestic energy resources.

Unfortunately, no analysis tools currently exist to describe the planning area's incremental contributions to the global phenomenon of climate change in terms of potential warming, drought, sea level rise, or other common environmental metrics associated with increasing concentrations of atmospheric greenhouse gases. The problem is, by nature, a cumulative issue, and any downscaling of the projected global climate changes effects to project/planning area scales (based on emissions scaling) does not provide meaningful analysis due to the fact that no studies have identified the precise relationship between specific levels of emissions from a particular source, and measurable differences in climate-change-related impacts. Nor has EPA or any other regulatory body adopted standards based on such impacts. Without specific thresholds with which to compare expected emissions, a quantitative analysis of potential differences in climate change impacts and mitigation among alternatives is not possible. As identified in the emissions inventories for all alternatives, the projected emissions sources will emit greenhouses gases, and will thus contribute to the accumulation of atmospheric greenhouse gases, and potential climate change effects if future year global emissions and the associated impacts are consistent with any of the scenarios analyzed by Intergovernmental Panel on Climate Change contributing scientists. As described above, climate change is a global issue, and several recent studies, including Stockholm Environment Institute's Study on "How would phasing out US federal leases for fossil fuel extraction affect [carbon dioxide] emissions and 2°C goals?[3]," focuses on how this global phenomena could be impacted by reducing federal oil and gas development. The study describes that US fossil fuel production will likely "require a drop in

---

[3] Erickson, P., and M. Lazarus. 2016. How would phasing out US federal leases for fossil fuel extraction affect $CO_2$ emissions and 2°C goals? Stockholm Environment Institute. May 1.

BLM_0164980

production far exceeding what is expected from federal lands" to achieve the 2C goal as nonfederal oil and gas is far greater than federal mineral production, and the authors therefore recommend adopting a strategy aimed at oil and gas as a whole (federal and nonfederal), and not just federal oil and gas to achieve climate goals. Other statements in the Study include "reduced leasing of federal natural gas resources may have little effect on global carbon dioxide emissions over the next two decades" and "restricting leasing would not have a substantial net greenhouse gas emissions impact."

Oil and gas operations in Colorado are subject to existing Federal and state regulations that restrict emissions. Other effective and feasible emission controls are not presently available. As part of its approval of oil and gas projects, the BLM requires operators to comply with current regulations and encourages or requires the operator to follow additional BMPs to further reduce emissions. When the BLM considers a project proposal, it examines whether additional control measures and BMPs are warranted, effective, and feasible.

Action to limit climate change is also expressed through management actions and allowable uses in other resource sections, such as ecological emphasis areas, ACECs, soils, and others. Site-specific mitigation and monitoring measures would be included, as appropriate, when authorizing specific development.

The BLM will continue to review the latest climate change science, trends, and emissions inventories, and federal, state, and local policies when analyzing site-specific development. The Clean Power Plan and the Paris Agreement are not active policies of the current administration. As such, current policy does not include specific identified targets for reducing greenhouse gases.

### Section 11.2 – Climate/Climate Change: Best available information—baseline data
Total Number of Submissions: 8
Total Number of Comments: 12

Comment Number: 000563_King_WELC_HasAttach-244
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
For the reasons described above, we urge BLM to prepare a supplemental EIS that: (3) fully considers current scientific and economic information, especially regarding climate change;

Comment Number: 000383_HellecksonB_20161031-9
Organization1: Helleckson Vineyards and Stone Cottage Cellars
Commenter1: Brent Helleckson
Commenter Type: Individual
Comment Excerpt Text:
Climate Change
The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15). The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18). The effects of climate change are already being felt at the individual farm as lower than typical snow pack,

warmer and earlier spring thaws, earlier bud break, warmer summertime highs, warmer falls, etc. As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible. When finding oneself in a hole and wishing to get out, the first step is to stop digging. When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises. The North Fork watershed is certainly one of those places and should be protected with a no leasing alternative.

Comment Number: 000440_ReedM_20161101_HCCA-4
Organization1:High Country Conservation Advocates
Commenter1:Matt Reed
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008.91 The RMP's description of projected climate change in Colorado relies on a single study from 2008.92 To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report.93 The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008.94 In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010.95
[91 Draft RMP at 3-14 – 3-16.]
[92 Id. at 3-26 – 3-27; 3-57.]
[93 Id. at 3-93.]
[94 Id. at 4-38 – 4-40.]
[95 Id. at 4-125.]

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-15
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
the draft RMP/EIS errs by using long-outdated estimates of the "global warming potential," or "GWP," of greenhouse gases other than carbon dioxide. GWP expresses warming caused by a greenhouse gas relative to the warming caused by an equivalent mass of carbon dioxide. GWP allows emissions of non-$CO_2$ pollutants to be expressed in terms of $CO_2$-equivalent. The draft RMP/EIS uses estimates provided by the Intergovernmental Panel on Climate Change more than twenty years ago. DEIS 4-38. These estimates have twice been superseded by updated IPCC reports, most recently, in September 2013, when the IPCC released its Fifth Assessment Report.30 For example, this report estimates, on the basis of more recent and thorough science, that methane from fossil sources has 36 times the global warming potential of carbon dioxide over a 100 year time frame and at least 87 times the global warming potential of carbon dioxide over a 20-year time frame.31 Both the EPA and the Department of Energy have recognized that the newer estimates represent the best available science regarding the impact of non-$CO_2$ GHGs. Specifically, although EPA uses the older IPCC values in compiling EPA's GHG Inventory, EPA has explained that EPA believes more recent estimates to be more accurate and better reflect scientific consensus; EPA uses the old values for the narrow purpose of compiling the inventory

BLM_0164982

because the convention establishing the inventory has specified old values and has not been updated.32 The Department of Energy has similarly recognized that the Fifth Assessment Report values using climate feedbacks (e.g., 36 and 87 for methane) reflect the current scientific consensus.33

[30 IPCC, Climate Change 2013: The Physical Science Basis: Chapter 8, page 714, Table 8.7.]
[31 Id.]
[32 https://www3.epa.gov/climatechange/ghgemissions/gwps.html]
[33 Department of Energy, Opinion and Order 3357-C, DOE/FE Dkt. 11-161-LNG, at 30 (Dec. 4, 2015) ("We agree with Sierra Club that using 20- and 100-year methane GWPs of 87 and 36 is more appropriate for use today and that climate carbon feedbacks should be captured in the GWP values for methane."), available at
www.fossil.energy.gov/programs/gasregulation/authorizations/2011_applications/ord3357c.pdf.]

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-16
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
the draft RMP/EIS understates the volume of greenhouse gases likely to be emitted by oil and gas development. BLM estimates emissions using a "bottom up" methodology that principally functions by multiplying "emission factor" estimates of emissions from individual activities, such as venting associated with completion of a single well, by "activity factors," estimates of those events' frequency. See Garvin Heath, et al., National Renewable Energy Laboratory, Estimating U.S. Methane Emissions from the Natural Gas Supply Chain at iv (August 2015) (describing these terms and methodology)34, Air Emission Inventory Technical Support Document at 10-37 (explaining analysis conducted here).
[34 http://www.nrel.gov/docs/fy16osti/62820.pdf; but see
https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf at 2 ("For natural gas systems, calculations are commonly more complex than simply multiplying an emission factor by an activity factor.").]
Here, the draft RMP/EIS relies on long-outdated inputs in applying this method of assessment. Many of the emission factor estimates used in the Air Emission Inventory TSD are taken from a 1995 EPA document. However, as EPA has recognized, those estimates were developed "when the industry practices were much different from now. In some cases, the emissions factors were developed using limited sample data and knowledge about the industry's operations (e.g., wells, compressors)."35 More recent and accurate is available, and should have been used here. There have been numerous published, peer-reviewed studies providing more recent measurements of emissions, which BLM should have used.36 For example, EPA, in preparing its most recent nationwide inventory of greenhouse gas emissions, "used multiple recently published studies as well as [greenhouse gas reporting program] Subpart W data to revise the [1990s era] emission factors and activity data for majority of the natural gas systems emission sources and many petroleum systems production segment emission sources."37 Reflecting this improved data, EPA's estimate of methane emissions from the oil and gas sector rose by 34%, relative to the prior estimate.38
[35 EPA, Greenhouse Gas Emissions Reporting from the Petroleum and Natural Gas Industry: Background Technical Support Document at 47 (Apr. 12, 2010), available at
https://www.epa.gov/sites/production/files/2015-05/documents/subpart-w_tsd.pdf.]
[36 See, e.g., See Allen, et al., Measurements of methane emissions at natural gas production sites in the United States, Proceedings of the National Academy of Sciences 110:44 (Oct. 29, 2013) at 17,768-17,773, available at http://www.pnas.org/content/110/44/17768.full.pdf+html (supplemental appendices and tables available at http://www.pnas.org/content/suppl/2013/09/11/1304880110.DCSupplemental/

BLM_0164983

sapp.pdf); Prasino Group, Final Report For Determining Bleed Rates for Pneumatic Devices in British Columbia (Dec. 18, 2013), at 15, available at http://scek.ca/sites/default/files/ei-2014-01-finalreport20140131.pdf.]

[37 EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: Revisions under Consideration for Natural Gas and Petroleum Systems Uncertainty Estimates at 7, (April 2016), https://www.epa.gov/sites/production/files/2016--08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf]

[38 See, e.g., Envt'l Def. Fund, New EPA Stats Confirm: Oil & Gas Methane Emissions Far Exceed Prior Estimates (Apr. 15, 2017), https://www.edf.org/media/new-epa-stats-confirm-oilgas-methaneemissions-far-exceed-prior-estimates; Gina McCarthy, Remarks on Climate Action at CERA in Houston, Texas (Feb. 24, 2016), available at https://yosemite.epa.gov/opa/admpress.nsf/8d49f7ad4bbcf4ef852573590040b7f6/5c432a7068e191e98525 7f630054fea8!OpenDocument (acknowledging that "methane emissions from existing sources in the oil and gas sector are substantially higher than we previously understood").]


Comment Number: 000530_PlattA_20161101_EPA-3
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Given this RMP covers the same North Fork Area recently analyzed under the USFS's Colorado Roadless Rule EIS, [1] we recommend the BLM consider this analysis and incorporate relevant information regarding a range of potential future coal production scenarios and their associated direct and indirect GHG emissions into the Final RMP/EIS.
[footnote 1] Colorado Roadless Rule Website:
http://www.fs.usda.gov/wps/portal/fsinternet/!ut/p/c4/04SB8K8xLLM9MSSzPy8xBz9CPOos3gDfxMDT8M wRydLA1ci72BTFzMTAwiQL8h2VAQAJp-nEg!!/?ss=119930&navtype=BROWSEBYSUBJECT&cid=null&navid=111OOOOOOOOOOOO&pnavid= null&position=BROWSEBYSUBJECT&ttype=roadmain&pname=Roadless-%2520Colorado%2520Roadless %2520Rule


Comment Number: 000545_SlivkaJ_20161101-225
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.4
Comment Excerpt Text:
Stale Climate Change Data
The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008. Uncompahgre Draft RMP at 3-14 – 3-16. The RMP's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27; 3-57. To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report. Id. at 3-93. The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008. Id. at 4-38 – 4-40. In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010. Id. at 4-125.

BLM_0164984

The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2). [Footnote 107 Intergovernmental Panel on Climate Change, Second Assessment Report (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4), [Footnote 108 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21. Uncompahgre Draft RMP at 4-38. Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25. [Footnote 109 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016)]

The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather "baseline data" during the NEPA process. Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011). The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." Id. at 1086. Like the agency in Northern Plains, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data.

Comment Number: 000545_SlivkaJ_20161101-235
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty

BLM_0164985

to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22. Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. at 350); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52 (1983). Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change.

Comment Number: 000560_KelloggV_20161016-2
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 18.2
Comment Excerpt Text:
The RMP contains no mention of greenhouse gas or climate change effects. It also contains no mention of earthquakes.

Comment Number: 000563_King_WELC_HasAttach-31
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As part of its analysis, BLM should disclose to the public the clearly competing interests at stake: one the one hand, meeting these national and international climate emission reduction targets set by EPA, the President, or agreed upon by 195 nations; and on the other, the fact that the plan alternatives will likely benefit only one or two coal companies and a handful of oil and gas operators.

Comment Number: 000563_King_WELC_HasAttach-35
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The loss of wildlife, water, and recreation that these adjacent and nearby forests protect on National Forest lands will have cross-boundary and downstream impacts on BLM lands in the Uncompahgre field office. Aspen and spruce on BLM lands in the area will also likely be similarly impacted.158 [158 See Uncompahgre Draft EIS at 3-111; 3-20; 3-90 (describing forest type in BLM fire management units).] Forest loss will have economic and fiscal impacts on local communities and the state. Yet the

BLM_0164986

Uncompahgre draft EIS mentions aspen and spruce decline only in passing, without addressing the cascading impacts to natural resources in the Uncompahgre field office (other than lamenting the potential impacts to the logging industry).159 [159 Id. at 4-232 (acknowledging that aspen decline and spruce beetle epidemics may impact the timber industry); id. at 4-480 (same).]

Further, the draft EIS fails to use the same models and information that the Forest Service relied on earlier this year to attempt to understand the potential impacts of the climate crisis on forests and other ecosystems on BLM land in the same area. BLM must address these deficiencies in any subsequently prepared NEPA document.

Comment Number: 000590_DascaluJoffeD_20161101-2
Organization1:
Commenter1:Diana Dascalu-Joffe
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
According to a large body of scientific research, holding temperature rise to "well below 2°C" requires that the vast majority of global and U.S. fossil fuels stay in the ground. The global carbon budget—the remaining amount of carbon that can be released into the atmosphere before we lose any reasonable chance of holding global temperature increases well below 2°C—is extremely limited and rapidly being consumed by continued fossil fuel use. Over the past decade, the burning of fossil fuels from federal leases has resulted in nearly a quarter of all U.S. energy-related emissions and nearly four percent of global emissions. Ending new leases for federally-managed fossil fuels would have a significant effect on U.S. emissions, and would signal a serious commitment to meeting emissions targets by controlling not only fossil fuel consumption but also production and infrastructure. Moreover, a recent study by Oil Change International entitled The Sky's Limit, shows that meeting the Paris climate goals requires a managed decline in currently operating fossil fuel production activities, such as coal, oil and gas extraction, transport and combustion. Specifically:
The potential carbon emissions from the oil, gas, and coal in the world's currently operating fields and mines would take us beyond 2°C of warming. The reserves in currently operating oil and gas fields alone, even with no coal, would take the world beyond 1.5°C.

*Summary*
Commenters identified the following concerns with baseline data:

- The Draft RMP relies on outdated climate change data from 2010 or earlier, instead of new science that emphasizes the growing impacts from climate change.
- The Draft RMP underestimates the volume of greenhouse gases likely to be emitted by oil and gas development.
- The final RMP should incorporate analysis from the Forest Service's Colorado Roadless Rule EIS.
- Impacts of climate change on resources should utilize the data in the BLM's Rapid Ecoregional Assessment for the Colorado Plateau.
- The BLM fails to implement modeling to understand climate impacts on forests; the BLM should use the same modeling as the Forest Service used in 2016 to understand impacts of climate change.

Conversely, some commenters stated that the BLM baseline data on climate change is sufficient to permit analysis of impacts under NEPA.

BLM_0164987

*Response*

The Draft RMP/EIS fully considered the best available scientific and economic information related to climate change available at the time it was prepared. Climate change data were updated in the Proposed RMP/Final EIS. The Proposed RMP/Final EIS was updated to include a table showing controlled greenhouse gas emissions estimates for each alternative, new information from the BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol[4], the 2017 Greenhouse Gas and Climate Change Report[5], and information regarding the BLM's adaptive management strategy. The Forest Service modeling was reviewed and considered for inclusion in the Proposed RMP/Final EIS if appropriate; no additional modeling will be completed by the BLM.

### Section 11.3 – Climate/Climate Change: Impact analysis

Total Number of Submissions: 39
Total Number of Comments: 71
Comment Number: 000618_WoodallK_20161101-1
Organization1:
Commenter1:Kristina Woodall
Commenter Type: Individual
Comment Excerpt Text:
Climate change must be addressed in all public land documents; it would be a violation of the NEPA to not consider long-term consequences/impacts.

Comment Number: 000373_ThompsonG_20161030-7
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Other Sections: 5.7
Comment Excerpt Text:
BLM did not take a hard look at direct, indirect, and cumulative impacts, as required by NEPA, including meaningfully analyzing greenhouse gas emissions and the impacts of climate change, including the severity of these impacts and the social cost of carbon.

Comment Number: 500213_JonesB_20161101-1
Organization1:
Commenter1:Buck Jones
Commenter Type: Individual
Other Sections:
Comment Excerpt Text:
The BLM did not take a hard look at direct, indirect, and cumulative impacts as required by NEPA, including:
• BLM failed to meaningfully analyze greenhouse gas emissions and the impacts of climate change, including the severity of these impacts and social cost of carbon;

---

[4] BLM (US Department of the Interior, Bureau of Land Management). 2015. BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol. BLM, Colorado State Office, Lakewood, CO. May. Internet Web site: https://www.co.blm.gov/nepa/airreports/AR2015.html#a_meth. Accessed on September 15, 2017.

[5] Golder Associates. 2017. Greenhouse Gas and Climate Change Report. February.

BLM_0164988

Comment Number: 000152_GentryR_20161014-1
Organization1:
Commenter1:Rosie Gentry
Commenter Type: Individual
Comment Excerpt Text:
The plan does not even consider the impacts of horizontal fracking or coal extraction on climate change. A recent study published in the Proceedings of the National Academy of Sciences showed that methane emissions as a result of fracking in southwestern Pennsylvania were up to 1000 times higher than those estimated by the EPA. From the EPA website they state, "methane is the second most prevalent greenhouse gas emitted in the United States from human activities", and that "pound for pound the comparative impact of methane on climate change is over 20 times greater than carbon dioxide over a one hundred year period." How can the BLM be adhering to its mission to sustain health and diversity on our public lands for future generations when it ignores the effects of methane emissions from oil and gas wells on climate change. The impacts from climate change threaten the very existence of future generations.

Comment Number: 000169_WentzelR_20160906-3
Organization1:
Commenter1:Ruth Wentzel
Commenter Type: Individual
Comment Excerpt Text:
Ozone levels already exceed the EPA threshold, in some areas. Predicted climate change has not been included in analysis. Potential risks from greenhouse gas emissions have not been quantified.

Comment Number: 000236_DavisP_20161016-1
Organization1:
Commenter1:Philip Davis
Commenter Type: Individual
Comment Excerpt Text:
The BLM, in its environmental analysis, for the draft Resource Management Plan (RMP) failed to consider the impact of energy development on the Nation's commitment to fight climate change. The analysis is therefore fatally flawed and the RMP derived from it is invalid.
A new report by Oil Change International shows that in order to keep the commitments made at the Paris climate talks the US cannot initiate ANY new fossil fuel projects. There is already enough carbon in existing oil fields and coal mines to exceed the targets world leaders agreed to last year. Fossil fuels must be kept in the ground, we must devote ourselves to creating a carbon neutral future, and the BLM must not entertain new leases of public land for the purpose of fossil fuel extraction, particularly not natural gas wells in the air- and watersheds of the North Fork Valley of Colorado. We urge adoption of Alternative B1 of the Draft Resource Management Plan.

Comment Number: 000237_VaughtK_20161004-4
Organization1:Dancing Dog Farm
Commenter1:Kenneth Vaught
Commenter Type: Individual
Comment Excerpt Text:
I would also ask that the BLM consider the climate change impacts and overall environmental impacts from the greenhouse gas emissions associated with gas development. With huge advances being made recently to address climate change, such as the Paris Agreement, the federal Clean Power Plan and the Colorado Climate Plan, reducing the number and location of gas leases in the North Fork Valley would seem to be in step with taking some meaningful action to reduce the impacts from climate change. The

BLM_0164989

BLM's Preferred Alternative Plan does not adequately address the climate change issues or the environmental issues.

Comment Number: 000347_GleasonB_20161028-2
Organization1:Boot Doctors
Commenter1:Bob Gleason
Commenter Type: Individual
Comment Excerpt Text:
Climate Change is the biggest challenge we as a race and the planet face. Recent studies have shown a concentration of greenhouse gasses in our region. Fracking produces dramatic amounts of greenhouse gas. The Resource Plan must acknowledge this fact and retard the development of fracking as a step towards climate health.

Comment Number: 000357_CaskeyC_20161031-1
Organization1:
Commenter1:Christopher Caskey
Commenter Type: Individual
Comment Excerpt Text:
In Section 4-37, Greenhouse Gasses and Climate Change, I found your analysis lacking urgency. The RMP states, "Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area." This is false. Many regional predictions are available and the consensus is warmer and drier in the Colorado River basin. See for example "Effects of Climate Change and Land Use on Water Resources in the Upper Colorado River Basin" published by the USGS in 2011. The RMP further states, "Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area." While this is true, it is misleading. Every gallon of gasoline burned adds 400 gallons of ice melt to the oceans. See "Carbon choices determine US cities committed to futures below sea level" PNAS 2015. The fact that we cannot measure which greenhouse gasses causes what ice to melt is immaterial. We have a responsibility as Americans to lead by example and rigorously evaluate our emissions.

Comment Number: 000399_Hockenbery_20161028-2
Organization1:
Commenter1:Mary Hockenbery
Commenter Type: Individual
Comment Excerpt Text:
Also, this Draft RMP needs to assess in depth the impact of local gas leasing on Global Climate Change.

Comment Number: 000400_InouyeD_20161028-6
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future."
Note that this text is largely copied from a 2008 BLM report from Oregon that stated "It may be difficult to discern whether global climate change is already affecting resources, let alone the Planning or

BLM_0164990

Decision Areas for the RMP. In most cases there is more information about potential or projected effects of global climate change on resources. It is important to note that projected changes are likely to occur over several decades to a century. Therefore many of the projected changes associated with climate change described below may not be measurably discernible within the reasonably foreseeable future." - Environmental Assessment OR-030-08-006 (Copying unattributed text like that would be considered plagiarism in the scientific literature.)

This statement was mostly incorrect in 2008, and the RMP statement is definitely incorrect now. Global climate change is already affecting the ecology of the analysis area. I have conducted research on this topic (at the Rocky Mountain Biological Laboratory) since 1971. The growing season is significantly longer than it used to be a few decades ago, the timing of hibernation by marmots and other mammals has been changing, plants and animals are moving up in elevation and disappearing from some lower elevations, the timing of runoff in streams has changed, the timing of bird migration has changed, and the frequency of "false springs" has increased (a warm spell in early spring followed by a late frost), resulting in increased frost damage to both wildflowers and agriculture (for example, last year's disastrous frost that wiped out almost all fruit production in the North Fork Valley). Some of my publications about these changes in Gunnison County include:

Inouye, D. W., W. A. Calder and N. M. Waser. 1991. The effect of floral abundance on feeder censuses of hummingbird populations. Condor 93:279-285.

Inouye, D. W. and A. D. McGuire. 1991. Effects of snowpack on the timing and abundance of flowering in Delphinium nelsonii: implications for climate change. American Journal of Botany 78(7):997-1001.

Inouye, D. W., W. A. Barr, K. B. Armitage, and B. D. Inouye. 2000. Climate change is affecting altitudinal migrants and hibernating species. Proceedings of the National Academy of Sciences 97(4): 1630-1633.

Inouye, D. W. 2000. The ecological and evolutionary significance of frost in the context of climate change. Ecology Letters 3(5):457-463.

Inouye, D. W., M. A. Morales, and G. J. Dodge. 2002. Variation in timing and abundance of flowering by Delphinium barbeyi Huth (Ranunculaceae): the roles of snowpack, frost, and La Niña, in the context of climate change. Oecologia 130: 543-550.

Inouye, D. W., F. Saavedra, and W. Lee-Yang. 2003. Environmental influences on the phenology and abundance of flowering by Androsace septentrionalis L. (Primulaceae). American Journal of Botany 90(6):905-910.

Saavedra, F., D. W. Inouye, M. V. Price and J. Harte. 2003. Changes in flowering and abundance of Delphinium nuttallianum (Ranunculaceae) in response to a subalpine climate warming experiment. Global Change Biology 9: 885-894.

Inouye, D. W. 2007. Impacts of global warming on pollinators. Wings 30(2): 24-27.

Inouye, D. W. 2008. Effects of climate change on phenology, frost damage, and floral abundance of montane wildflowers. Ecology 89(2): 353-362. [Rated "Recommended" by Faculty of 1000]

Miller-Rushing, A. J., D. W. Inouye, and R. B. Primack. 2008. How well do first flowering dates measure plant responses to climate change? The effects of population size and sampling frequency. Journal of Ecology 96: 1289-1296.

Miller-Rushing, A. J. and D. W. Inouye. 2009. Variation in the impact of climate change on flowering phenology and abundance: An examination of two pairs of closely related wildflower species. American Journal of Botany 96:1821-1829.

Forrest, J., D. W. Inouye, and J. D. Thomson. 2010. Flowering phenology in subalpine communities: Does climate variation reshuffle species assemblages? Ecology 91(2):431-440.

Lambert, A., A. J. Miller-Rushing, and D. W. Inouye. 2010. Changes in snowmelt date and summer precipitation affect the flowering phenology of Erythronium grandiflorum Pursh (glacier lily, Liliaceae). American Journal of Botany 97(9): 1431–1437.

Aldridge, G., D. W. Inouye, J. R. K. Forrest, W. A. Barr, and A. J. Miller-Rushing. 2011. Emergence of a mid-season period of low floral resources in a montane meadow ecosystem associated with climate change. Journal of Ecology 99(4): 905-913.

BLM_0164991

Boggs, C. L., and D. W. Inouye. 2012. A single climate driver has direct and indirect effects on pollinator numbers. Ecology Letters 15(5):502-508. [Rated "must read" by Faculty of 1000]

Anderson, J. T., D. W. Inouye, A. McKinney, and T. Mitchell-Olds. 2012. Phenotypic plasticity and adaptive evolution contribute to advancing flowering phenology in response to climate change. Philosophical Transactions of the Royal Society 279(1743): 3843-3852. [Rated "must read" by Faculty of 1000]

McKinney, A. M., P. J. CaraDonna, D. W. Inouye, b. barr, D. Bertelson, and N. M. Waser. 2012. Asynchronous changes in phenology of migrating Broad-tailed Hummingbirds and their early-season nectar resources. Ecology 93(9):1987-1993.

Iler, A. M., and D. W. Inouye. 2013. Effects of climate change on mast-flowering cues in a clonal montane herb, Veratrum tenuipetalum (Melanthiaceae). Amer. J. Bot. 100:1-7.

Iler, A. M., T. T. Høye, D. W. Inouye, and N. M. Schmidt. 2013. Nonlinear flowering responses to climate: Are species approaching their limits of phenological change? Philosophical Transactions of the Royal Society, themed issue 368: 20120489

Iler, A. M., D. W. Inouye, T. T. Høye, A. J. Miller-Rushing, L. A. Burkle, and E. Johnston. 2013. Maintenance of temporal synchrony between syrphid flies and their floral resources despite differential phenological responses to climate. Global Change Biology 19(8):2348–2359.

CaraDonna, P. J., A. M. Iler, and D. W. Inouye. 2014. Shifts in flowering phenology reshape a subalpine plant community. Proc. Nat. Acad. Sci. (USA) 111(13): 4916-4921. [Recommended by Faculty of 1000]

Wright, Karen W., K. L. Vanderbilt, D. W. Inouye, C. D. Bertelsen, and T. M. Crimmins. 2015. Turnover and reliability of flower communities in extreme environments: Insights from long-term phenology data sets. Journal of Arid Environments 115:27-34.

Pyke, G. H., J. D. Thomson, D. W. Inouye and T. J. Miller. 2016. Effects of climate change on phenologies and distributions of bumble bees and the plants they visit. Ecosphere 7(3): DOI 10.1002/ecs2.1267

Petry, W. K., J. D. Soule, A. M. Iler, A. Chicas-Mosier, D. W. Inouye, T. E. X. Miller, K. A. Mooney. 2016. Sex-specific responses to climate change drive rapid shifts in population sex ratio. Science 353: 69-71.

Compagnoni, A., A. J. Bibian, B. M. Ochocki, H. S. Rogers, E. L. Schultz, M. E. Sneck, B. D. Elderd, A. M. Iler, D. W. Inouye, H. Jacquemyn, and T. E. X. Miller. The effect of demographic correlations on the stochastic population dynamics of perennial plants. Ecological Monographs, in press.

These changes, with potential negative consequences for the flora and fauna of the study area, are already well documented and would be exacerbated by the greenhouse gases that would be produced by oil and gas development. As would the effects of climate change on the orchards and vineyards of the North Fork Valley.

Less than a mile from my house there was a major forest fire about 15 years ago, and the vegetation has still not recovered. A paper out this fall reports: "Increased forest fire activity across the western United States in recent decades has contributed to widespread forest mortality, carbon emissions, periods of degraded air quality, and substantial fire suppression expenditures.

Although numerous factors aided the recent rise in fire activity, observed warming and drying have significantly increased fire-season fuel aridity, fostering a more favorable fire environment across forested systems. We demonstrate that human-caused climate change caused over half of the documented increases in fuel aridity since the 1970s and doubled the cumulative forest fire area since 1984. This analysis suggests that anthropogenic climate change will continue to chronically enhance the potential for western US forest fire activity while fuels are not limiting."

http://www.pnas.org/content/early/2016/10/05/1607171113.abstract

In summary, I don't think it is "difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP.". We don't have to wait several decades to a century to see the effects of continued/increasing fossil fuel use.

BLM_0164992

Comment Number: 000401_ShoemakerS_20161028-7
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must address the impact of massive losses of methane and flaring during drilling and operations and the use of that methane that is finally produced on climate change. Natural gas is extracted by fracking is not the clean transition fuel that has been advertised, it is worse than coal.

Comment Number: 000403_HamnerM_20161031-3
Organization1:Colorado House of Representatives
Commenter1:Millie Hamner
Commenter Type: State Government
Other Sections: 18.3 41.1 41.2
Comment Excerpt Text:
To my knowledge, BLM has not conducted a human health impact assessment, analyzed new hydraulic fracturing and multi-stage drilling technologies, taken a hard look at the implications of climate change on the region, the local economy and other resources BLM is obligated to manage, nor considered the impact of the rural gas gathering lines exemption from Federal pipeline integrity regulations.

Comment Number: 000408_BattenD_20161027-2
Organization1:
Commenter1:Dave Batten
Commenter Type: Individual
Comment Excerpt Text:
I noticed in the air quality section of the draft RMP that you are planning for a threefold increase in $CO_2$ emissions in the next ten years (or perhaps that is over the 2008 values), and I have a question. Aren't we bound by the Paris accords to reduce emissions of all greenhouse gases? I wonder if it shouldn't be a part of the RMP to make every effort to help get those greenhouse gases down in every aspect of government, which presumably includes considering the $CO_2$ emissions of users of our public lands.

Comment Number: 000427_WalshOeinckP_20161031-4
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
Climate change needs to be considered in light of the Paris Climate Agreement.

Comment Number: 000433_FielderA_20161029-10
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
Include an in-depth analysis of the Social Cost of Carbon associated with fossil fuel extraction in these locations, so that the operators wishing to develop these lands are liable for the true costs of their activities. Without such analysis, the costs of the health and environmental impacts of those operators' activities will be paid for primarily by people and communities who are not in favor of oil and gas development on these lands, including current residents of the region, future generations, the plant and

BLM_0164993

animal communities that depend on clean air and water, and people around the world affected by
anthropogenic climate change.

Comment Number: 000433_FielderA_20161029-7
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
There is no Social Cost of Carbon (SCC) analysis of any of the alternatives, despite the fact that
respected scientists within your agency have attempted to conduct such analysis and have advocated for
the inclusion of such analysis in the RMPs and EISs conducted by your agency.

Comment Number: 000440_ReedM_20161101_HCCA-3
Organization1:High Country Conservation Advocates
Commenter1:Matt Reed
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
[A] statement that emissions from a proposed Federal action represent only a small fraction of global
emissions is essentially a statement about the nature of the climate change challenge, and is not an
appropriate basis for deciding whether or to what extent to consider climate change impacts under
NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the
potential impacts associated with a proposed action and its alternatives and mitigations because this
approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that
diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG
concentrations that collectively have a large impact. When considering GHG emissions and their
significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions
and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to
calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in
deciding whether or to what extent to consider climate change impacts under NEPA.81

Comment Number: 000441_HellecksonB_20161101-9
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Comment Excerpt Text:
The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15). The effects of climate
change will likely increase the amount of land in the North Fork that fails to fully meet the land health
standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18). The
effects of climate change are already being felt at the individual farm as lower than typical snow pack,
warmer and earlier spring thaws, earlier bud break, warmer summertime highs, warmer falls, etc. As
mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its
actions to climate change and, by extension, to avoid them where possible.

Comment Number: 000451_BishopB_20161031_HasAttach-13
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
While there is some discussion of climate change, there is no analysis of the RMP's proposed land use
on it. BLM claims management of climate would have no impact on energy and minerals (4-260). The

BLM_0164994

RMP should discuss just the opposite concern, that of the impact of oil and gas extraction on the climate. The world's understanding of climate change, its causes and impacts, has changed dramatically since 2007. The U.S. just signed the Paris Agreement on Climate Change, which will have a dramatic effect on public policy especially concerning emissions of greenhouse gases. BLM states that Alt. D would have the second highest emissions level of all the proposed alternatives. While the draft RMP cannot be expected to reflect the instructions of the Paris Agreement, BLM must now take them into account as it adjusts its preferred alternative. We believe the changes dictated by new public policy regarding climate change to be so great as to require a second round of public comment on a revised RMP before the final version is published.

Comment Number: 000451_BishopB_20161031_HasAttach-8
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
Two current and significant concerns are not addressed in the RMP - Hydraulic Fracturing and Climate Change.

Comment Number: 000453_CarpenterN_20161031_partial DUP of 000412-3
Organization1:
Commenter1:Nicole Carpenter
Commenter Type: Individual
Comment Excerpt Text:
- The draft RMP does not mention climate change and the extent that fluid mineral development would contribute to atmospheric $CO_2$. This is now required under NEPA. The final RMP needs to include this analysis.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-17
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Even EPA's revised inventory likely likely underestimates the total amount of methane that is emitted by the oil and gas sector, because "bottom-up" analyses, such as the one BLM used here and EPA's inventory, consistently produce estimates far lower than those indicated by "top-down" studies that measure atmospheric concentrations of methane in areas with heavy oil and gas development, and estimate the oil and gas sector's contribution to those levels using isotopic analysis. One top-down analysis of emissions of Colorado's Denver-Julesberg Basin estimates an emission rate of 2.6% to 5.6%.39 Another study of Utah's Uinta Basin indicated an emission rate of 6% to 12%.40 Peer-reviewed studies that have compared bottom-up and top-down studies have recognized that top-down studies consistently produce higher estimates, and indicate likely underestimates in bottom-up studies.41
[39 Gabrielle Pétron et al., A New Look at Methane & Non-Methane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin, 119 J. Geophysical Research 6836, 6850 (2014), available at http://onlinelibrary.wiley.com/doi/10.1002/2013JD021272/epdf.]
[40 Anna Karion et al., Methane Emissions Estimate from Airborne Measurements Over a Western United States Natural Gas Field, 40, Geophysical Research Letters 4393, 4393 (2013), available at http://onlinelibrary.wiley.com/doi/10.1002/grl.50811/full.]
[41 A.R. Brandt et al., Methane Leaks from North American Natural Gas Systems, 343 Science 733 (2014), available at http://www.novim.org/images/pdf/ScienceMethane.02.14.14.pdf (comaring top-down

BLM_0164995

and bottom-up estimates); see also Clean Air Task Force, NRDC, and Sierra Club, Waste Not: Common Sense Ways to Reduce Methane Pollution from the Oil and Natural Gas Industry at 9-11 (Jan. 2015), http://catf.us/resources/publications/files/WasteNot.pdf]

Here, BLM must recalculate its emission estimates using more recent data, and BLM must address whether the resulting estimates are consistent with the emissions estimates provided by these top-down studies. Because the draft RMP/EIS and air emission inventory TSD do not identify methane emissions from gas production specifically, Sierra Club, decision makers, and the public cannot readily provide this comparison.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-18
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
By expanding or contracting the supply of coal, oil, and natural gas, BLM's decisions here will alter not only how much of the planning area's resources are used, but also the prices at which they are available in the market. Those price shifts will most certainly be significant enough to alter demand for both fossil fuels and renewable resources such as wind and solar, and those changes in the market could lead to stark differences in greenhouse gas emissions that must be quantified here. Admittedly, if each of the alternatives BLM evaluates are identical in the amount of fossil fuels produced -- as is the currently the case for coal and nearly so for oil and gas -- then the market impacts of those alternatives will be identical. However, this analysis would be particularly useful comparing BLM's action alternatives with a "no leasing" conservation alternative that limits supply of coal, oil, and natural gas. BLM's failure to even acknowledge this issue flies in the face of decades of Department of Interior precedent, ignores relevant modeling already conducted on the market and climate impacts of expanding coal production in the Uncompahgre planning area, and fails to use readily available tools that would allow BLM to analyze and disclose the climate impacts of its proposal.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-22
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition to correcting BLM's flawed assessment of the amount and potency of greenhouse gas emissions, BLM must provide discussion and context for assessing the severity or significance of those emissions. One way to do so is by using the social cost of carbon dioxide and other greenhouse gases, as discussed in the separate comments submitted by Western Environmental Law Center et al., p. 62-68. Another tool BLM must use is to address the impact of BLM's management plan for the Uncompahgre planning area -- which anticipates adding more than half a billion tons of CO2-e to the atmosphere over the next twenty years -- on the numerous federal policies and international agreements that call for steep reductions in U.S. greenhouse gas emissions by 2025 and 2030.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-23
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In order to take the hard look NEPA requires, BLM must provide the public and decision-makers with an up to date review of the Obama Administration's climate objectives and international climate agreements and assess whether its Draft Plan is consistent with those goals and commitments.

BLM_0164996

NEPA regulations direct federal agencies, "to discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)," 40 C.F.R. § 1506.2(d), and require agencies to address "possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). CEQ's NEPA Climate Guidance interprets these regulations to encompass the requirement to address "approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."46
[46 CEQ NEPA Climate Guidance at 28-29.]
BLM has made no attempt to comply with this mandate.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-24
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Decisions that purport to merely extend the status quo for greenhouse gas emissions would in reality drive us dangerously close to expensive and destructive global temperature increases. BLM must acknowledge this reality in order to give the public and decision-makers the appropriate context in which to view the competing alternatives here. As proposed, BLM's Draft plan predicts that the coal, oil, and natural gas generated in the Uncompahgre planning area over the twenty years would release more than half a billion tons of $CO_2$-e into our atmosphere. BLM's plan is thus in direct conflict with our international climate commitments and domestic greenhouse gas reduction targets, but BLM fails to reconcile or even acknowledge this conflict.
More fossil fuel leasing, or even a continuation of the status quo, is totally out of step both with our Administration's priorities and the latest science on the urgent need to reduce greenhouse gas emissions. At a minimum, NEPA requires BLM to address these inconsistencies and explain the extent of the conflict so that both the public and decision-makers have an accurate understanding of the climate impacts of BLM's proposal.

Comment Number: 000483_HanksG_20161101-6
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3 14
Comment Excerpt Text:
4.3.1 Air Quality and Climate
The DRMP fails to adequately address the impacts of climate change on fish and wildlife habitat. Impacts of climate change are particularly threatening in the western U.S. where warmer water, changes in the timing of spring snowmelt, and increased droughts, floods, and wildfires are attributed to changes in ecological processes brought on by a warmer planet. The health of the landscape has a direct influence on the ability of natural systems to rebound after a catastrophic event and adapt to a changing climate. Coldwater species such as trout are, by definition, especially vulnerable to climate change because of their dependence on clean, cold water. Cutthroat trout are exceptionally vulnerable. Existing stressors from reduced populations, loss of life history forms, degraded and fragmented habitat and non-native species have already pushed many native trout populations to the edge of extinction. The added effects of climate change may take these populations over the edge.
The first and most important component of TU's conservation strategies is to protect remaining critical habitat areas. Protecting the strongholds is more cost-effective and has a higher likelihood of success than trying to restore an area that has already been substantially degraded. These fish cannot afford any

BLM_0164997

further reduction in available habitat across their range. They have already been extirpated or severely reduced from the lower elevation edges of their historic range so it is critical that the remaining headwater strongholds remain intact.

Removal of vegetation, road construction, and other surface disturbing activities all pose a risk for increased sedimentation and degradation of native trout habitat in the project area. Since the UFO contains locations holding GBCT and CRCT, TU contends the DRMP must develop a more comprehensive analysis of the impacts climate change will potentially have on native trout and other native fish species in the UFO DRMP footprint. Such discussion and analysis should include:

* Analyze the latest innovative technologies that will contribute to minimizing impacts to trout streams that are important spawning and rearing areas.

* Evaluate the potential for removal or elimination of any stream barriers within the UFO boundaries that may impact instream flows.

* Develop a science-based protection plan of streamside habitats that may be impacted by oil and gas development in the UFO.

* Identify the most important reaches of these streams which contain pure conservation populations of cutthroat and develop protection measures.

* Provide an annual monitoring program that establishes goals and objectives for improving stream habitat and minimizes contamination from drilling and production.

* Implement conservation strategies for water management required for all operators that helps minimize water decreases during low water periods.

Comment Number: 000489_JohnsonA_20161101-90
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

1. BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20-year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that must be managed so as to maximize their ability to adapt and endure in the face of climate change.

We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. See, e.g., Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time.

Comment Number: 000489_JohnsonA_20161101-91
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0164998

a. BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment.[84]

[Footnote 84] Available at http://nca2014.globalchange.gov/

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau.[85] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands.

Colorado Plateau REA Final Report II-3-c at viii.

[Footnote 85] Information on the REA is available at: http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html.

Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying

BLM_0164999

opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP.

Comment Number: 000489_JohnsonA_20161101-96
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
c. BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape.

Comment Number: 000499_BacigalupiL_20161101-2
Organization1:
Commenter1:Linda Bacigalupi
Commenter Type: Individual
Comment Excerpt Text:
On Line 17 of Table 2.2 (Description of Alternatives), the RMP states a goal of managing resources "in response to stresses induced by climate change". I do not find an analysis of climate change IMPACTS CAUSED BY VARIOUS ALTERNATIVES. Specifically, I do not find that the net energy and net CO2 effects of a massive oil and gas leasing in this area of Western Colorado have been adequately analyzed.(nor have they been adequately analyzed nationally). However, as responsible land managers, I believe we have control in our local area to consider this important impact before leasing is permitted. I am cognizant that stipulations can to a certain extent limit environmental impacts of energy

BLM_0165000

development, but also that the act of leasing conveys a property right…and rightly so since companies invest a good deal of resources in just the initial act of acquiring these leases. I think it is incumbent upon the BLM, for both public and private interests, to have adequately considered ALL IMPACTS of development, and the societal costs thereof, before putting forward a mineral leasing green light in their RMP.

Comment Number: 000509_WolcottE_20161102-16
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final decision needs to fully study and address the impacts on climate change posed by oil and gas development in the RMP, individually and cumulatively.

Comment Number: 000530_PlattA_20161101_EPA-4
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
EPA recommends that BLM follow the approach outlined by the CEQ's GHG Guidance regarding the analysis of GHG emissions and climate change.
[footnote 2] CEQ Guidance, p.11.
The Draft RMP/EIS incorrectly states that "the tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available." In addition, BLM inappropriately references conclusions from a 2008 modeled source to determine that activities under the UFO planning area would have no measurable impact on the climate. We recommend removing these statements and instead refer to CEQ's GHG Guidance for how to analyze climate change impacts.

Comment Number: 000545_SlivkaJ_20161101-240
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.6
Comment Excerpt Text:
BLM must estimate the potential increase in vulnerability to climate change impacts.
As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:
The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

BLM_0165001

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape.

Comment Number: 000545_SlivkaJ_20161101-157
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

Comment Number: 000545_SlivkaJ_20161101-230
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. See, e.g., Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time.

Comment Number: 000545_SlivkaJ_20161101-231
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.
Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment. [Footnote 120 Available at http://nca2014.globalchange.gov/]
An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau. [Footnote 121 Information on the REA is available at: http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological

BLM_0165002

Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands.

Comment Number: 000545_SlivkaJ_20161101-232
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.
This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that
"[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.
The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management

BLM_0165003

actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP.

Comment Number: 000545_SlivkaJ_20161101-233
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172, 1217 (9th Cir. 2008). In CBD v. NHTSA, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.

Comment Number: 000545_SlivkaJ_20161101-234
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as:
Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).

Comment Number: 000545_SlivkaJ_20161101-236
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects.

Comment Number: 000545_SlivkaJ_20161101-241
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165004

BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands. [Footnote 122 Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016)]

Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions. The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord [Footnote 123 Copenhagen Accord ¶ 1, agreed Dec. 18, 2009, FCCC/CP/2009/11/Add.1, available at http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); id. at ¶ 2 (agreeing that "deep cuts in global emissions are required according to science" to meet this goal)] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming. [Footnote 124 The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project. [Footnote 124 The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at

BLM_0165005

http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regulations.gov and it should be included in the administrative record for this decision. [Footnote 125 The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g., Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016)]

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius. [Footnote 126 McGlade, Christophe and Paul Ekins, The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C, 517 Nature (187) (2015)] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically-specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2-degree Celsius limit in the most cost-efficient manner. [Footnote 127 See id. at 187-90] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays. The United States has set national commitments to reduce GHG emissions.

The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million $CO_2$-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C." [Footnote 128 See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership)]

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in $CO_2$ emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things. [Footnote 129 See also Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action

BLM_0165006

to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions.

Comment Number: 000545_SlivkaJ_20161101-245
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.5
Comment Excerpt Text:
Summary of Comments: The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

Comment Number: 000548_D'Alessandro_20161101-7
Organization1:
Commenter1: Ralph D'Alessandro
Commenter Type: Individual
Comment Excerpt Text:
The analysis of climate change impacts caused by the different alternatives does not appear to be included in the draft. Specifically there does not appear to be any analysis of the $CO_2$, methane and ozone effects from oil and gas leasing. An area such as the North Fork Valley bounded by the West Elk Mountains on the east and the Grand Mesa on the west already has high ozone concentration. The topography of the alley will trap and hold gaseous emissions so the analysis of at least the above identified gases should be made to better understand the impact on air quality. This has recently been identified as an air quality issue especially with respect to ozone for oil and gas exploration and extraction on BLM lands in Utah near the Colorado border (see Grand Junction Daily Sentinel Monday, October 3, 2016).

Comment Number: 000563_King_WELC_HasAttach-26
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons CO2e, and maximum indirect (combustion) emissions from BLM actions under the Uncompahgre RMP of 27,366,562 tons CO2. See DEIS at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11). Such emissions would make a significant contribution to total emissions from federal lands, and

BLM_0165007

contribute significantly to total U.S. emissions.125 [125 The Wilderness Society, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters, February 2012, available at: http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf (attached as Exhibit 24).]

Comment Number: 000563_King_WELC_HasAttach-27
Organization1:Western Environmental Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO should be commended for attempting to quantify indirect emissions, as well as for including methane emissions from drilling and completion in its quantification of direct emissions. However, the BLM continues to take a dismissive approach to climate change
impacts. In an effort to shrug off the significance of the GHG impacts of the BLM's actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. DEIS at 4-39. Such comparisons are unhelpful and misleading. First, in making these comparisons, the BLM omits the substantial indirect emissions elsewhere identified by the agency. Moreover, as explained by the CEQ, these comparisons do not reveal anything beyond "the nature of the climate change challenge itself"; i.e., the fact that many individual sources together make a big impact on the climate:

Comment Number: 000563_King_WELC_HasAttach-28
Organization1:Western Environmental Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Meaningful consideration of GHGs is clearly within the scope of required NEPA review. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008). As the Ninth Circuit has held, in the context of fuel economy standard rules:
The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time" Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1216 (9th Cir. 2008)(quoting 40 C.F.R. § 1508.7).
The courts have ruled that federal agencies should consider indirect GHG emissions resulting from agency policy, regulatory, planning and leasing decisions.

Comment Number: 000563_King_WELC_HasAttach-29
Organization1:Western Environmental Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The CEQ Final Climate Guidance is dispositive on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of the proposed action. 81 [81 Fed. Reg. 51,866 at 16 (Aug. 5, 2016)(citations omitted).] Fed. Reg. 51,866 (Aug. 5, 2016). The CEQ guidance provides clear direction for BLM to conduct a lifecycle greenhouse gas analysis because the modeling and tools to conduct this type of analysis are readily available to the agency:
If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed

action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.

CEQ's guidance even provides an example of where a lifecycle analysis is appropriate in a leasing context:
The indirect effects of such an action that are reasonably foreseeable at the time would vary with the circumstances of the proposed action. For actions such as a Federal lease sale of coal for energy production, the impacts associated with the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that coal.127 [127 Id. at 16, n. 42 (attached as Exhibit 4).]
The volume of potential coal, oil and gas from the new parcels available for lease in the UFO draft RMP and EIS is knowable, and the lifecycle GHG emissions impact from these new lease parcels is also quantifiable. Indeed, BLM attempts to quantify direct and indirect GHG emissions on pages 4-38 and 4-42 of the UFO RMP DEIS. However, the analysis falls short of an accurate depiction of actual climate change emissions impact for this planning area, in particular, for potential oil and gas leasing. We easily generated an accurate, site-specific impact analysis for each alternative by utilizing BLM's own Energy Policy and Conservation Act phase III Oil and Gas Inventory Model geodatabase and the Uncompahgre draft RMP DEIS alternative GIS shapefiles to establish future extractible oil and gas volume from the planning area.128 [128 Center for Biological Diversity, Maps and volume estimates of future extractible oil and gas volume in the Uncompahgre planning area based on GIS mapping of U.S. Bureau of Land Management's EPCA Phase III Inventory GIS Data, published May 2008, found at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III/EPCA_III_geodata.html; U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html; Emails and Dropbox files from David Sinton, Geographic Information Systems Specialist, BLM Uncompahgre Field Office, re: Uncompahgre draft RMP and EIS shapefiles supplemental data (October 7, 2016 2:14 PM MT). Methodology used: Intersect the leasable oil and gas areas for each alternative provided in the Dropbox files and on the planning website for the Uncompahgre field office's draft RMP and EIS with the model layer from BLM's Oil and Gas Inventory Model Geodatabase. Then calculate new acreage for each polygon and multiply the "Total Oil Density" and "Total Gas Density" layers by this acreage to create volume data. The resultant maps are attached as Exhibits 79-83.] Then, we generated potential lifecycle greenhouse gas emissions for resultant oil and gas volumes using a peer-reviewed carbon calculator and lifecycle greenhouse gas emissions model developed by EcoShift consulting.129 [129 See Mulvaney (attached as Exhibit 23).] This model is not novel in its development or methodology. Numerous greenhouse gas calculation tools exist to develop lifecycle analyses, particularly for fossil fuel extraction, operations, transport and end-user emissions.130 [130 See Council on Environmental Quality, Revised draft guidance for greenhouse gas emissions and climate change impacts (2014), https://ceq.doe.gov/current_developments/GHG-accountingtools.html.]
For purposes of this comment letter, we have provided a complete and accurate GHG lifecycle emissions analysis for the potential volume of new leasable parcels of oil and gas for each alternative in the UFO draft RMP:131 [131 See supra note 128, Center for Biological Diversity, Maps and volume estimates.]
SEE PDF FOR TABLE
Exhibits 79, 80, 81, 82, and 83 provide a visual representation of the potential leasable areas in each alternative for oil and gas that were used to quantify the above emissions totals.132 [132 See supra note 128, Center for Biological Diversity Maps and volume estimates.] For coal, the only volume information

BLM_0165009

provided in the draft RMP is in the supporting document entitled the Uncompahgre Field Office's Colorado Resource Management Plan Revision and Environmental Impact Statement Coal Resource and Development Potential Report. BLM estimates that coal development in the Uncompahgre planning area would occur in an area encompassing about 45,280 acres and containing an estimated 829 million tons of recoverable coal reserves.133 [133 U.S. Bureau of Land Management, Uncompahgre Resource Management Plan Revision and Environmental Impact Statement Final Coal Resource and Development Potential Report at 67 (April 2010) available at http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.93 060.File.dat/UFO-FinalCoalRpt_04-15-10_508.pdf (attached as Exhibit 88).] 829 million tons of recoverable coal reserves translates into 2.21 GtCO2e, using the same Ecoshift lifecycle emissions calculation tool referenced above. A visual representation of the potential coal leasing acreage for each alternative is provided in exhibits 84, 85, 86, and 87.134 [ 134 Center for Biological Diversity, Maps and volume estimates of future extractible coal mining acreage in the Uncompahgre planning area based on U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. See also id. at 67.]

It is starkly evident that if BLM were to actually undertake an accurate assessment of potential lifecycle greenhouse gas emissions from each alternative, like we have demonstrated here, the significance of the greenhouse gas emissions impact from future fossil fuel development proposed in the UFO RMP would be undeniable.

Comment Number: 000563_King_WELC_HasAttach-37
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The EIS must also disclose, and the RMP should address the fact that a new study predicts that climate change is likely to worsen drought across the Uncompahgre Field Office. A peer-reviewed article in Science Advances published in October estimates that the chance of a "megadrought" – a period of "aridity as severe as the worst multiyear droughts of the 20th century [that] persist[s] for decades" – in the American Southwest before the end of the century is between 70% and 99%, in large part due to human-caused climate change.169 [169 T. Ault et al., Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances (Oct. 5, 2016) at 1 (attached as Exhibit 193).] The study projects that: business-as-usual emissions of greenhouse gases will drive regional warming and drying, regardless of large precipitation uncertainties. We find that regional temperature increases alone push megadrought risk above 70, 90, or 99% by the end of the century, even if precipitation increases moderately, does not change, or decreases, respectively. Although each possibility is supported by some climate model simulations, the latter [99% risk] is the most common outcome [of the models used]. An aggressive reduction in global greenhouse gas emissions cuts megadrought risks nearly in half.170

Local effects of climate change are already being felt by farmers, including lowerthan-typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, and warmer falls.171 [171 Interview with Brent Helleckson, Owner of Helleckson Vineyards and Stone Cottage Cellars.] Agriculture in the North Fork Valley relies exclusively on the timely availability of clean irrigation water, which depends on a healthy, vegetated watershed.172 [172 Id.] Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways.173 [173 Id.] Sudden Aspen Decline, a drought- and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid- to late spring.174 [174 Id.] The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate.175 {175 Id.] The reservoirs fill as

BLM_0165010

they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it.176 [176 Id.] Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff.177 [177 Id.] The level of fossil fuel development contemplated by the RMP/EIS alternatives would further exacerbate the degradation of the watershed by road construction, well pad development, pipeline construction, and dust.178 [178 Id.]

Comment Number: 000563_King_WELC_HasAttach-49
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions. See High Country Conservation Advocates, 52 F.Supp.3d at 1190. By failing to consider the costs of GHG emissions from the Proposed Action, the agency's analysis effectively assumes a price of carbon that is $0. See id. at 21 (holding that although there is a "wide range of estimates about the social cost of GHG emissions[,] neither the BLM's economist nor anyone else in the record appears to suggest the cost is as low as $0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis."). The agency's failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866.

Comment Number: 000563_King_WELC_HasAttach-50
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Further, BLM's failure to undertake a social cost of carbon analysis here is also arbitrary because the Forest Service in November 2015 undertook an initial social cost of carbon analysis for coal to be made available by the Colorado Roadless Rule coal mine exception. That analysis– in which BLM is a cooperating agency – involves coal from the very same coal field (the Somerset) and some of the very same mines (including the West Elk mine) that are at issue in the Uncompahgre Field Office RMP.218 [218 Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (Nov. 2015) at 98-101, available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last viewed Nov. 1, 2016).] While the Colorado Roadless Rule's social cost of carbon analysis has many flaws,219 [219 See, e.g., letter of Environmental Defense Fund et al. to Forest Service et al. (Jan. 15, 2016) (attached as Exhibit 234); T.M. Power et al., Comments on the Rulemaking for the Colorado Roadless Areas Supplemental Draft Environmental Impact Statement (Jan. 14, 2016) (attached as Exhibit 235).] it is evidence that this metric can be, and is being, used by BLM and other agencies to address the climate impacts of some of the same coal from the same mines at issue in the Uncompahgre draft RMP.

Comment Number: 000563_King_WELC_HasAttach-51
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Moreover, BLM measures the planning area's GHG emissions against a baseline of national and/or global GHG emissions—thereby marginalizing the Proposed Actions contribution to our climate crisis while concluding the agency is powerless to avoid or mitigate such impacts. CEQ warns against such a comparison, providing:

BLM_0165011

Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with ta proposed action and its alternatives and mitigation. CEQ Guidance at 9. CEQ also provides that "[i]t is essential … that Federal agencies not rely on boilerplate text to avoid meaningful analysis, including consideration of alternatives or mitigation." Id. at 5-6 (citing 40 C.F.R. §§ 1500.2, 1502.2). Indeed, the EPA has also cautioned "against comparing GHG emissions associated with a single project to global GHG emission levels" because it erroneously leads to a conclusion that "on a global scale, emissions are not likely to change" as a result of the project.220 [220 See Light, 87 Tul. L. Rev. 511, 546.]

Applying the SCC, as provided above, takes these abstract emissions and places them in concrete, economic terms. It also allows the agency to easily perform the cost-benefit analysis enforced by EO 12866, as well as BLM's own policy. Specifically, Instruction Memorandum No. 2013-131 (Sept. 18, 2013) is reflective of the BLM's attempt to internalize the costs of such emissions:

All BLM managers and staff are directed to utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making where relevant and feasible, in accordance with the attached guidance. At least a qualitative description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in NEPA analyses….

Nonmarket environmental values reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices. Examples include the perceived benefits from hiking in a wilderness or fishing for subsistence rather than commercial purposes. The economic methods described in this guidance provide monetary estimates of nonmarket values. Several non-economic, primarily qualitative methods can also be used to characterize the values attributed to places, landscapes, and other environmental features. Guidance on qualitative methods for assessing environmental values, including ethnography, interviews, and surveys, is in preparation.

Ideally, economic analysis for resource management should consider all relevant values, not merely those that are easy to quantify. Utilizing nonmarket values provides a more complete picture of the consequences of a proposed activity than market data alone would allow. The BLM's Land Use Planning Handbook, Appendix D encourages inclusion of information on nonmarket values, but does not provide detail. The agency simply cannot continue to ignore its obligation to consider the costs of GHG emissions in its decisionmaking, as it has done here.


Comment Number: 000563_King_WELC_HasAttach-53
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Given its recent endorsement by the IWG, BLM should use the social cost of methane to quantify the expected climate damage caused by the extraction and combustion of coal, oil, and natural gas extracted under BLM's draft plan for the Uncompahgre planning area.
Similar to the social cost of carbon, the social cost of methane provides a standard methodology that allows state and federal agencies to quantify the social benefits of reducing methane emissions through actions that have comparatively small impacts on cumulative global emission levels. The social cost of methane is intended to "offer a method for improving the analyses of regulatory actions that are projected to influence [methane or nitrogen oxide] emissions in a manner consistent with how [carbon dioxide] emission changes are valued."223 [223 Id. at 3.] Like the social cost of carbon, the social cost of

BLM_0165012

methane is presented as a range of figures across four discount rates; it is based on results from three integrated assessment models; displayed in dollars per metric ton of emissions; and increases over time because emissions become more damaging as their atmospheric concentrations increase.224 [224 Id. at 7.]

Like the social cost of carbon, the social cost of methane has been subject to peer review and will be updated by the IWG to ensure it reflects the best available scientific information.225 [225 Id. at 3.] The IWG estimates that each additional ton of methane emitted in 2020 will cause between $540 and $3,200 dollars (measured in $2007).226 [226 226 Id. at 7. For comparison purposes, the current social cost of carbon values for CO2 emissions in 2020 range from $120 to $123 per ton.]

Comment Number: 000563_King_WELC_HasAttach-54
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should use the best tools available to it in order to fully analyze and disclose the climate impacts of its proposal. Given that both the social cost of carbon and social cost of methane have been adopted by the IWG, which includes a dozen federal offices and agencies including the Department of Interior, BLM should use these tools to evaluate the climate impacts of its draft plan for the Uncompahgre planning area, which, as noted, anticipates generating more than half a billion tons of CO2-e over the next two decades.

Comment Number: 000563_King_WELC_HasAttach-55
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM discloses estimated annual methane emissions from the proposed action to be 135,083 metric tons. See DEIS (Table 4-9). However, BLM does not disclose what leak rate this calculation represents. Furthermore, the BLM underestimates the climate impact of these emissions. Specifically, BLM uses a global warming potential (GWP) of 21 over a 100-year time horizon (meaning that methane is assumed to be 21 times as potent as CO2 over a 100-year time horizon). DEIS at 4-38. This assumption is derived from a 1996 report from the Intergovernmental Panel on Climate Change ("IPCC"). However, the 100-year GWP for methane was updated by the IPCC in a 2013 Report to reflect that methane is 36 times as potent as CO2. Additionally, the IPCC's new research has calculated that methane is 84 times as potent as CO2 over a 20-year time horizon.232 Furthermore, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent as CO2 over a twenty-year time period. These values should be used—or at the very least acknowledged—in the DEIS, but are instead ignored.

Comment Number: 000563_King_WELC_HasAttach-6
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The agency not only fails to take informed action to address climate change, as required by Order 3226 and Order 3289, but signals a deep misunderstanding of basic climate science as well as the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios." See Final Guidance at 11.10 [10 See also, Final Climate Guidance at 12 n. 28 (linking to

quantification tools that "are widely available, and are already in broad use in the Federal and private sectors").]

As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of fossil fuel leasing and development on public lands in the planning area, as required by NEPA and underscored by the CEQ, as detailed below.

Comment Number: 000563_King_WELC_HasAttach-60
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, the BLM, as an agency within the U.S. Department of Interior, is subject to Secretarial Order 3289 (Dept. Int. Sept. 14, 2009). As noted above, Secretarial Order 3289, in section 3(a), provides that BLM "must consider and analyze climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." Section 3(a) of Secretarial Order 3289 also reinstated Secretarial Order 3226 (January 19, 2001). Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decisionmaking processes. As the Order explains: "climate change is impacting natural resources that the Department of the Interior (Department) has the responsibility to manage and protect." Sec. Or. 3226, § 1. The Order, therefore, "ensures that climate change impacts are taken into account in connection with Department planning and decision making." Id. The Order obligates BLM to "consider and analyze potential climate change impacts" in four situations: (1) "when undertaking long-range planning exercises"; (2) "when setting priorities for scientific research and investigations"; (3) "when developing multi-year management plans, and/or" (4) "when making major decisions regarding the potential utilization of resources under the Department's purview." Id. § 3. The Order specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "planning and management activities associated with oil, gas and mineral development on public lands." Id.(emphasis added). BLM's oil and gas decisions, including UFO's RMP/EIS, are thus contemplated by and subject to section 3 of the Order.

Comment Number: 000563_King_WELC_HasAttach-77
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Despite this variability in methane pollution data, what remains clear is that inefficiencies and leakage in oil and gas production results in a huge amount of avoidable waste and emissions, and, conversely, a great opportunity for the UFO to reduce GHG emissions on our public lands. Many of these uncertainties and underestimates, as EPA has explained, are a result of the fact that emissions factors were "developed prior to the boom in unconventional well drilling (1992) and in the absence of any field data and does not capture the diversity of well completion and workover operations or the variance in emissions that can be expected from different hydrocarbon reservoirs in the country." Mandatory GHG Reporting Rule, 75 Fed. Reg. 18608, 18621 (April 12, 2010). These underestimates are also caused by the dispersed nature of oil and gas equipment – rather than a single, discrete source, such as a coal-fired power plant, oil and gas production consists of large numbers of wells, tanks, compressor stations,

BLM_0165014

pipelines, and other equipment that, individually, may appear insignificant but, cumulatively, may very well be quite significant. While dispersed, oil and gas development is nonetheless a massive, landscape-scale industrial operation – one that just happens to not have a single roof. BLM, as the agency charged with oversight of onshore oil and gas development, therefore has an opportunity to improve our knowledge base regarding GHG emissions from oil and gas production, providing some measure of clarity to this important issue by taking the requisite "hard look" NEPA analysis as part of its land use decision-making for the Uncompahgre RMP and EIS.264 [264 In this context, the 2010 SIR, while providing a basic literature review of GHG emissions sources, is merely a starting point for BLM's responsibility to take a hard look at GHG emissions in the context of foreseeable drilling operations in the geologic formations proposed for leasing.]

Comment Number: 000563_King_WELC_HasAttach-81
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Excluding climate change effects from the environmental baseline ignores the reality that the impacts of proposed actions must be evaluated based on the already deteriorating, climateimpacted state of the resources, ecosystems, human communities, and structures that will be affected. Accordingly, BLM must clarify that existing and reasonably foreseeable climate change impacts as part of the affected environment in the planning area, which then must be assessed as part of the agency's hard look at impacts, and integrated into each of the alternatives, including the no action alternative. Put differently, simply acknowledging climate impacts as part of the affected environment is insufficient. BLM must incorporate that information into their hard look at impacts (e.g., the cumulative impact of climate change, the proposed action, and other past, present, and reasonably foreseeable impacts), in particular to help inform the design and consideration of alternatives and mitigation measures.

Comment Number: 000583_PattersonC_20161009-1
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Comment Excerpt Text:
Oil and gas extraction contributes to increased greenhouse gas emissions. Drilling, transporting and storing natural gas releases methane. According to the EPA, methane is estimated to have a Greenhouse Warming Potential 28–36 times greater than CO2 over 100 years. Methane is a precursor to ozone, another greenhouse gas.
To deliver a 50% probability of no more than 2C of warming this century, the world must leave two-thirds of its fossil fuel reserves in the ground.

Comment Number: 000585_WentzelR_20160906-3
Organization1:
Commenter1:Ruth Wentzel
Commenter Type: Individual
Comment Excerpt Text:
Predicted climate change has not been included in analysis. Potential risks from greenhouse gas emissions have not been quantified.

Comment Number: 000587_WolcottS_20161031-9
Organization1:
Commenter1:Steve Wolcott

BLM_0165015

Commenter Type: Individua
Comment Excerpt Text
The BLM does not have the adequate information to assess airshed impacts of oil and gas activities. The impact of oil & gas development on climate change must be realistically assessed, using recent actual measurements of methane and other VOC leakage rates in active oil & gas fields. The BLM should study and determine the real rate of methane release from gas development from existing gas wells and well development in the UFO area, including the leakage from this gas as it is transported to market. Then assess and prevent pollution and climate impacts using real local data.

Comment Number: 000619_DavisP_20161101-1
Organization1:
Commenter1:Philip Davis
Commenter Type: Individual
Comment Excerpt Text:
The BLM, in its environmental analysis, for the draft Resource Management Plan (RMP) failed to consider the impact of energy development on the Nation's commitment to fight climate change. The analysis is therefore fatally flawed and the RMP derived from it is invalid.

Comment Number: 000632_CarrollL_20161031-1
Organization1:
Commenter1:Lynn Carroll
Commenter Type: Individual
Comment Excerpt Text:
BLM is mandated to consider all uses of the land. But Oil and Gas leasing compromises all other uses by rendering the environment unfit for man or beast. I want to see the no-leasing alternative considered - and not just in financial terms. The contribution of local oil & gas development to global warming cannot be ignored and already extreme measures are needed to be taken by everyone.
BLM's long-term RMP covers a mere 20 years, but the most adverse and deadly effects may be further in the future than that: as wells are rapidly depleted and abandoned, their infrastructure disintegrates, and fugitive greenhouse gas emissions such as methane increase. This phenomenon is poorly understood and should not be casually dismissed (Boothroyd et al 2016 Sci Total Environ 547:461-9; Alvarez et al 2012 Proc Natl Acad Sci 109:6435-40; Kang et al 2014: Proc Natl Acad Sci 111:18173-7). As global warming continues, runaway methane emissions from all sources may result in collapse of conditions necessary to sustain life as we know it. The Permian-Triassic extinction event apparently had similar climatic disruptions from greenhouse gases; dominant life forms became extinct, and biodiversity did not recover for 50 million years.

Comment Number: 000637_PattersonC_20161031-3
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Comment Excerpt Text:
I don't want the North Fork Valley to be despoiled by oil and gas development. However, my biggest concern is global. Scientific evidence indicates gas production, from drill pad to market is more polluting than originally believed. The biggest risk is intentionally and accidentally releasing methane. Methane escapes in every stage of natural gas production: development, transportation and consumption. The Intergovernmental Panel on Climate Change concludes the global warming potential of methane is 34 times that of carbon dioxide over a one-hundred-year time span.
To deliver a 50% probability of no more than 1.5C of warming this century, the world must keep two-thirds of its fossil fuel reserves in the ground.

Comment Number: 500145_FrankC_20160808-1
Organization1:
Commenter1:Christine Frank
Commenter Type: Individual
Comment Excerpt Text:
There is nothing in the Draft BLM RMP on the climate impacts of expanding fossil fuel extraction if it were allowed in the North Fork Valley in the next 30 years.

Comment Number: 500145_FrankC_20160808-2
Organization1:
Commenter1:Christine Frank
Commenter Type: Individual
Comment Excerpt Text:
There is no data in the plan on subsequent greenhouse gas emissions from oil and gas development and how they will contribute to continued global warming.

Comment Number: 500192_SchulzJ_20161027-3
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
The RMP must address the impact of massive losses of methane and flaring during drilling and operations and the use of that methane that is finally produced on climate change. Natural gas is extracted by fracking is not the clean transition fuel that has been advertised, it is worse than coal.

Comment Number: 500203_McCainJ_20161025-8
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• The draft RMP does not mention climate change and the extent that fluid mineral development would contribute to atmospheric C02. This is now required under NEPA. The final RMP needs to include this analysis.

Comment Number: 500267_PetersonS_20161101-1
Organization1:
Commenter1:Sarah Peterson
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
fracking releases methane and will contribute to global climate change

Comment Number: FormLetterTTT-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I don't believe that the BLM took a comprehensive or hard look analysis of direct, indirect, and cumulative impacts, as required by NEPA.

BLM_0165017

The BLM failed to meaningfully analyze greenhouse gas emissions and the impacts of climate change, including the severity of these impacts and social cost of carbon and the BLM failed to consider various drilling technologies, including horizontal drilling and multi-stage fracking in its analysis.

The BLM did not properly analyze methane and other air pollutants or consider mitigation measures to reduce these impacts. The BLM has not completed a thorough analysis of the aforementioned areas. And the additional demands of fracking would overwhelm our area and deplete our limited water supply.

*Summary*

A. Commenters stated that the Draft RMP/EIS impacts analysis related to climate change:

1. Fails to include impacts of horizontal hydraulic fracturing or coal extraction on climate change
2. Does not provide full analysis and quantified impacts to climate change and greenhouse gases from proposed management actions
3. Fails to address impacts of methane production on climate change
4. Does not consider the Paris Agreement, the Federal Clean Power Plan, or the Colorado Climate Plan and related climate commitments to reduce climate change
5. Uses outdated data to calculate emissions
6. Does not assess impacts and increased vulnerability to the ecosystem from climate change, including increased frequency of drought and wildfire
7. Does not consider the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions
8. Underestimated global warming potential and greenhouse gas emissions
9. Fails to use Council on Environmental Quality's guidance for how to analyze climate change impacts
10. Limits climate change calculations to a percentage of sector, nationwide, or global emissions, and meaningful consideration of greenhouse gases is within the scope of NEPA review. They suggest that the BLM should address the impact of oil and gas development on climate change using recent actual measurements of methane and other volatile organic compound leakage from local active oil and gas fields.

In addition, commenters stated that the BLM incorrectly states that it is difficult to discern whether global climate change is already affecting the resources in the analysis area when the BLM has access to significant data and useful tools to assist with climate change analysis.

B. Comments stated that the BLM should include a social cost of carbon/social cost of greenhouse gas estimate as a way to analyze climate impacts, and indicated that the court in *High Country Conservation Advocates, et al. v. United States Forest Service* recognized that this estimate provides a tool to quantify the costs of greenhouse gas emissions. Commenters stated that social cost of carbon/greenhouse gas estimate must be included when a cost-benefit analysis is conducted. Some comments claimed that the Interagency Working Group on the social cost of carbon/greenhouse gas protocol that monetizes climate impacts associated with carbon and other greenhouse gas emissions provides a common metric for analysis across alternatives and reflects best available information for evaluating climate impacts.

BLM_0165018

*Response*

A. The BLM appreciates the comments.

1. Coal extraction was included in greenhouse gas estimates, as noted in Draft RMP/EIS Appendix Q on page Q-3. Table Q-7 presents tons produced (MMt/year) for coal mining. Horizontal hydraulic fracturing equipment was also included in greenhouse gas estimates, as noted in Draft RMP/EIS Appendix Q, page page Q-12.

2. Relevant information from the BLM's 2015 Annual Report[6] and the 2017 Greenhouse Gas and Climate Change Report[7] were added to the Proposed RMP/Final EIS and relevant quantitative analysis has been added to appendix H and Q, as appropriate.

3. Methane emissions were included in greenhouse gas estimates as presented in Appendix Q, page Q-4 of the Draft RMP/EIS and has been updated in Section 4.3.1 of the PRMP/FEIS.

   Relevant information from BLM's 2015 Annual Report[11] and the 2017 Greenhouse Gas and Climate Change Report[12] were added to the Proposed RMP/Final EIS, as appropriate. Additionally, the March 28, 2017, Executive Order on Promoting Energy Independence and Economic Growth disbanded the Interagency Working Group on Social Cost of Greenhouse Gas Emissions and withdrew all the associated guidance. The BLM management will follow all active guidance.

4. The Proposed RMP/Final EIS includes updated values as appropriate. The Colorado Climate Plan for limiting VOC and methane from oil and gas operations and requiring green completions was considered in the updated CARMMS analysis in the FEIS.

5. Relevant information from the BLM's 2015 Annual Report[11] and the 2017 Greenhouse Gas and Climate Change Report[12] were added to the Proposed RMP/Final EIS, as appropriate.

6. Greenhouse gases and climate change as they relate to drought and wildfire are considered and included in the analysis.

7& 8. BLM has described and evaluated greenhouse gas emissions and potential climate change impacts in a manner commensurate with available information and analytical tools. The Proposed RMP/Final EIS was updated as appropriate, including using CARMMS 2.0 projected greenhouse gas emissions (including downstream), a discussion about current rules and regulations that affect natural resource extraction such as those issued by the EPA, Colorado Department of Public Health and Environment, and BLM.

9. The CEQ guidance was withdrawn in April 2017. As noted above, BLM has described and evaluated greenhouse gas emissions and potential climate change impacts in a manner commensurate with available information and analytical tools.

---

[6] BLM (US Department of the Interior, Bureau of Land Management). 2015. BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol. BLM, Colorado State Office, Lakewood, CO. May. Internet Web site: https://www.co.blm.gov/nepa/airreports/AR2015.html#a_meth. Accessed on September 15, 2017.

[7] Golder Associates. 2017. Greenhouse Gas and Climate Change Report. February.

BLM_0165019

10.  Relevant information from the BLM's 2015 Annual Report[8] and the 2017 Greenhouse Gas and Climate Change Report[9] were added to the Proposed RMP/Final EIS and relevant quantitative analysis has been added to appendix H and Q, as appropriate.

B.  The court in *High Country Conservation Advocates, et al. v. United States Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014) held that the agency did not offer adequate reasons why the quantification of coal lease modifications' contribution to the social cost of carbon was abandoned in the FEIS after the social cost of carbon protocol had been included in the DEIS.

A protocol to estimate what is referenced as the "social cost of carbon" (SCC) associated with GHG emissions was developed by a federal Interagency Working Group (IWG), to assist agencies in addressing Executive Order (EO) 12866, which requires federal agencies to assess the cost and the benefits of proposed regulations as part of their regulatory impact analyses.  The SCC is an estimate of the economic damages associated with an increase in carbon dioxide emissions and is intended to be used as part of a cost-benefit analysis for proposed rules. As explained in the Executive Summary of the 2010 SCC Technical Support Document "the purpose of the [SCC] estimates…is to allow agencies to incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that have small, or 'marginal,' impacts on cumulative global emissions." Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 February 2010 (withdrawn by EO13783).  While the SCC protocol was created to meet the requirements for regulatory impact analyses during rulemakings, there have been requests by public commenters or project applicants to expand the use of SCC estimates to project-level NEPA analyses.

The decision was made not to expand the use of the SCC protocol for this RMP for a number of reasons. Most notably, this action is not a rulemaking for which the SCC protocol was originally developed.  Second, on March 28, 2017, the President issued Executive Order 13783 which, among other actions, withdrew the Technical Support Documents upon which the protocol was based and disbanded the earlier Interagency Working Group on Social Cost of Greenhouse Gases.  The Order further directed agencies to ensure that estimates of the social cost of greenhouse gases used in regulatory analyses "are based on the best available science and economics" and are consistent with the guidance contained in OMB Circular A-4, "including with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates" (E.O. 13783, Section 5(c)).  In compliance with OMB Circular A-4, interim protocols have been developed for use in the rulemaking context.  However, the Circular does not apply to project decisions, so there is no Executive Order requirement to apply the SCC protocol to project decisions.

Further, the National Environmental Policy Act (NEPA) does not require a cost-benefit analysis (40 C.F.R. § 1502.23), although NEPA does require consideration of "effects" that include

---

[8] BLM (US Department of the Interior, Bureau of Land Management). 2015. BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol. BLM, Colorado State Office, Lakewood, CO. May. Internet Web site: https://www.co.blm.gov/nepa/airreports/AR2015.html#a_meth. Accessed on September 15, 2017.
[9] Golder Associates. 2017. Greenhouse Gas and Climate Change Report. February.

BLM_0165020

"economic" and "social" effects.  40 C.F.R. 1508.8(b). Without a complete monetary cost-benefit analysis, which would include the social benefits of the proposed action to society as a whole and other potential positive benefits, inclusion solely of an SCC cost analysis would be unbalanced, potentially inaccurate, and not useful in facilitating an authorized officer's decision. Any increased economic activity, in terms of revenue, employment, labor income, total value added, and output, that is expected to occur with the proposed action is simply an economic impact, rather than an economic benefit, inasmuch as such impacts might be viewed by another person as negative or undesirable impacts due to potential increase in local population, competition for jobs, and concerns that changes in population will change the quality of the local community. Economic impact is distinct from "economic benefit" as defined in economic theory and methodology, and the socioeconomic impact analysis required under NEPA is distinct from cost-benefit analysis, which is not required.

The fact that climate impacts associated with GHG emissions were not quantified in terms of monetary costs does not mean that climate impacts were ignored. Climate change and potential climate impacts, in and of themselves, are often not well understood by the general public (Etkin and Ho 2007, National Research Council 2009).  This is in part due to the challenges associated with communicating about climate change and climate impacts, stemming in part from the fact that most causes are invisible factors (such as greenhouse gases) and there is a long lag time and geographic scale between causes and effects (National Research Council 2010). Research indicates that for difficult environmental issues such as climate change, most people more readily understand if the issue is brought to a scale that is relatable to their everyday life (Dietz 2013); when the science and technical aspects are presented in an engaging way such as narratives about the potential implications of the climate impacts (Corner, Lewandowsky, Phillips, and Roberts 2015); use examples and make information relevant to the audience while also linking the local and global scales (National Research Council 2010).  In order to more effectively convey the potential climate impacts, the BLM qualitatively discussed potential climate change trends at several scales as well as referencing the "Climate Statistics and Change Analysis" section of the BLM Colorado's Annual Report on the Colorado Air Resource Protection Protocol.  This approach presents the data and information in a manner that follows many of the guidelines for effective climate change communication developed by the National Academy of Sciences (National Research Council 2010) by making the information more readily understood and relatable to the decision-maker and the general public. The BLM also specifically estimates greenhouse gas emissions across alternatives (Table 4-10).  Together the climate trends and projections as discussed in referenced materials and quantified greenhouse gas emissions provide a meaningful and engaging way to connect the reader to more relevant impacts that then allow them to make the connections to the state, regional and global impacts. This approach effectively informs the decision-maker and the public of future climate effects at a variety of scales, whereas the social cost of carbon metric would only provide a monetary value at the global scale.

Finally, the SCC, protocol does not measure the actual incremental impacts of a project on the environment and does not include all damages or benefits from carbon emissions. The SCC protocol estimates economic damages associated with an increase in carbon dioxide emissions - typically expressed as a one metric ton increase in a single year - and includes, but is not limited to, potential changes in net agricultural productivity, human health, and property damages from

BLM_0165021

increased flood risk over hundreds of years. The dollar cost figure arrived at based on the SCC calculation represents the value of damages avoided if, ultimately, there is no increase in carbon emissions. But the dollar cost figure is generated in a range and provides little benefit in assisting the authorized officer's decision for project level analyses.

To summarize, this RMP FEIS does not undertake an analysis of SCC because 1) it is not engaged in a rulemaking for which the protocol was originally developed;  2) the IWG, technical supporting documents, and associated guidance have been withdrawn; 3) NEPA does not require cost-benefit analysis ; and 4) the full social benefits of energy production have not been monetized, and quantifying only the costs of GHG emissions but not the benefits would yield information that is both potentially inaccurate and not useful.

### Section 11.4 – Climate/Climate Change: Cumulative impact analysis
Total Number of Submissions: 2
Total Number of Comments: 4

Comment Number: 000489_JohnsonA_20161101-92
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP.[86] In CBD v. NHTSA, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.
[Footnote 86] Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172, 1217 (9th Cir. 2008).
Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as:
Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).
BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22. Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information."[87]

[Footnote 87] Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. at 350); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions."[88] Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive."[89]

[Footnote 88] Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52 (1983).

[Footnote 89] Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change.

Comment Number: 000563_King_WELC_HasAttach-30
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Therefore, even though climate change emissions from the Alternatives may look minor when viewed in isolation, when considered cumulatively with all of the other GHG emissions from BLM-managed land, they become significant and cannot be ignored.

Comment Number: 000563_King_WELC_HasAttach-80
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
It is crucial for the BLM to close the gap in their decisionmaking regarding the cumulative contribution of coal, oil and gas development made available in the planning area, particularly given the conflict between such authorization and the agency's responsibility to manage for healthy,resilient ecosystems. Although the BLM has recognized the threat of climate change, the agency's decisionmaking is not reflective of this harm and the agency fails to take the many necessary and meaningful steps to ameliorate the impacts to communities, landscapes, and species.

BLM_0165023

Comment Number: 000563_King_WELC_HasAttach-94
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area.

### Summary
Commenters stated that the BLM failed to take the required "hard look" at the cumulative impacts of fossil fuel development on climate change in the decision area.

### Response
The BLM must discuss the cumulative effects of the proposed action and the alternatives when preparing an EIS (BLM Handbook H-1790-1, Section 6.8.3). The Council on Environmental Quality regulations define cumulative effects as "…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or nonfederal) or person undertakes such actions" (40 CFR Part 1508.7). It is neither practical nor required to exhaustively analyze all possible cumulative impacts. Instead, the cumulative impact analysis should focus on meaningful impacts. The BLM identified key planning issues (see Chapter 1) to focus the analysis of environmental consequences in Chapter 4 on meaningful impacts.

The BLM has complied with the requirements of 40 CFR Part 1508.7 and prepared a cumulative impact analysis based on the broad nature and scope of the proposed management options under consideration at the land use planning level. The cumulative impact analysis considered the effects of the planning effort when added to other past present and reasonably foreseeable (not highly speculative) federal and nonfederal actions. The cumulative impacts section (in Chapter 4) identifies all actions that were considered in the cumulative impacts analysis, and provides a basis for the cumulative impacts analysis for each affected resource.

A greenhouse gas and climate change assessment was completed and included in the Draft RMP/EIS (page 4-37 – 4-42). Climate change impacts are cumulative in nature. Additional information was added to the Proposed RMP/Final EIS, as appropriate.

### Section 11.5 – Climate/Climate Change: Mitigation measures
Total Number of Submissions: 7
Total Number of Comments: 23

Comment Number: 000126_Kavanaugh_20160831-1
Organization1: Town of Telluride
Commenter1: Sean Murphy
Commenter Type: Local Government
Comment Excerpt Text:
We request that the BLM include actions to reduce climate change in any adopted plan. As a mountain community, we are directly impacted by climate change. We see these effects in our snowpack levels, in the health of our forests, the distribution of our wildlife and water resources, and our susceptibility to drought and wildfire.

BLM_0165024

Comment Number: 000400_InouyeD_20161028-11
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
If any new wells are permitted, they should be required to capture methane released by drilling and development of oil and gas. Not only is methane a potent greenhouse gas that contributes to global climate change, but it is also a potentially valuable resource.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-10
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As noted, NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." Id. at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R. §§ 1502.14(f), 1502.16(h). According to CEQ's recent NEPA Climate Guidance, when analyzing the climate impacts under NEPA, "an agency should compare the anticipated levels of GHG emissions from each alternative – including the no-action alternative – and mitigation actions to provide information to the public and enable the decision maker to make an informed choice."16 Both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instruct agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action."17 The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane."18

[16 CEQ Guidance at 11.]
[17 Id. at 19.]
[18 Id.]
BLM's draft plan, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other way to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives considered, coal mines in the planning area will emit more than 3 million tons of $CO_2$-e every year in direct emissions from operation of the mines, "primarily from fugitive methane emissions." DEIS at 4-39; see DEIS Tables 4-9 and 4-10, pp. 4-38, 4-39.
Although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review, (40 C.F.R. 1502.14(c)), BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts. In 2014, as part of BLM's "advanced notice of proposed rulemaking" on coal mine methane capture, BLM spelled out this authority in clear terms both as to new and existing mines: Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize and require lessees to capture otherwise vented [waste mine methane] to use or sell. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases.19
[19 79 Fed. Reg. 23,923 (Apr. 29, 2014) (emphasis added).]

BLM_0165025

Comment Number: 000489_JohnsonA_20161101-42
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.5
Comment Excerpt Text:
2. Methane Capture in the North Fork Valley
The Western Slope Conservation Center believes the final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.
One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[55] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3- megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non- profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years.[56]
[Footnote 55] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.
[Footnote 56] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.
On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[57] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.
[Footnote 57] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting
In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.
The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversify our economy, create new jobs and realize the mass potential for renewable energies.
The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest,

BLM_0165026

the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, the Western Slope Conservation Center believes coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

Comment Number: 000489_JohnsonA_20161101-95
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation. Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

Comment Number: 000489_JohnsonA_20161101-98
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

e. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[98] This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;

2. Developing landscape-scale goals and strategies;

3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and

4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM_0165027

[Footnote 98] Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[99] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

[Footnote 99] See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta- Saldivar, Joaquin; McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016).

Comment Number: 000545_SlivkaJ_20161101-237
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16.

Comment Number: 000545_SlivkaJ_20161101-239
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165028

Comment Excerpt Text:
Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation. Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change.

Comment Number: 000545_SlivkaJ_20161101-242
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.9
Comment Excerpt Text:
Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation. [Footnote 130 Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.] This approach contained the following steps:
1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
2. Developing landscape-scale goals and strategies;
3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

Comment Number: 000545_SlivkaJ_20161101-243
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring

BLM_0165029

creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Comment Number: 000545_SlivkaJ_20161101-244
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.
It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario. [Footnote 131 See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016)] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

Comment Number: 000545_SlivkaJ_20161101-245
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.3
Comment Excerpt Text:
Summary of Comments: The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM_0165030

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 89 of 652

Comment Number: 000563_King_WELC_HasAttach-78
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Convincing evidence also exists to support the consideration of alternatives that would attach meaningful stipulations to areas open to oil and gas leasing, above and beyond the steps taken by the agency, here. As a prime contributor to short-term climate change over the next few decades, methane is a prime target for near-term GHG reductions. In fact, there are many proven technologies and practices already available to reduce significantly the methane emissions from oil and gas operations, further detailed below. These technologies also offer opportunities for significant cost-savings from recovered methane gas. Moreover, new research indicates that tropospheric ozone and black carbon ("BC") contribute to both degraded air quality and global warming, and that emission control measures can reduce these pollutants using current technology and experience.265 [265 Drew Shindell, et al., Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security, SCIENCE 2012 335, at 183 (attached as Exhibit 143).] Employment of these strategies will annually avoid a substantial number of premature deaths from outdoor air pollution, as well as increase annual crop yields by millions of metric tons due to ozone reductions. Indeed, reducing methane emissions is important not only to better protect the climate, but also to prevent waste of the oil and gas resource itself and the potential loss of economic value, including royalties. BLM should evaluate these technologies, analyzing the benefits of technological implementation versus current agency requirements.

Comment Number: 000563_King_WELC_HasAttach-79
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Although the UFO has taken steps in requiring some mitigation measures, additional emission reduction strategies, as detailed herein, can both strengthen the UFO's existing requirements, as well as satisfy the requirements of SO 3226, FLPMA, and the MLA.

Comment Number: 000563_King_WELC_HasAttach-86
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology).275 [275 Final Climate Guidance at 13, 16 (attached as Exhibit 4).]BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

Comment Number: 000563_King_WELC_HasAttach-87
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165031

The Uncompahgre draft RMP alternatives presently contain no mitigation measures aimed at reducing GHG emissions attributable to the plan. The RMP's failure to contain any GHG mitigation measures (despite the demonstrated harm that continued emissions will have to the Uncompahgre area, BLM lands generally, and across the globe), or to even consider any such mitigation measures violates NEPA.

Comment Number: 000563_King_WELC_HasAttach-88
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
To comply with NEPA's mandates, and BLM policy, concerning mitigation, BLM should require compensatory mitigation to offset the unavoidable direct and indirect climate change impacts of the Uncompahgre RMP.

Comment Number: 000563_King_WELC_HasAttach-89
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should quantify and offset emissions through specific compensatory mitigation actions Quantifying climate change impacts is becoming increasingly more practical, and the science connecting impacts to temperature changes increasingly more precise. Compensatory mitigation actions can be directed at enhancing the adaptive capacity of human and natural communities in the affected landscape to improve their health and resilience in the face of expected change. Offsetting actions should include investments in land protection to ensure that the UFO's ecological systems have the space and conditions to adapt. Significant opportunity exists to offset GHG emissions. EPA has repeatedly urged land management agencies to assess carbon offsets in Environmental Assessments and EISs as a way to reduce the climate change impacts of agency actions. For example, EPA specifically recommended that the Forest Service's Lease Modifications EIS for the West Elk Mine (on which the Uncompahgre Field Office was a cooperating agency) "acknowledge that revenues for carbon credits are available via several existing markets."277 [277 EPA July 2012 Comment Letter at 5 (attached as Exhibit 148) (identifying four U.S. carbon exchanges creating a market for carbon credits).]
Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project "discuss reasonable alternatives and/or potential means to mitigate or offset the GHG emissions from the action."278 [278 Letter of L. Svoboda, EPA, to T. Malecek, USFS, at 8 (Oct. 27, 2010) (attached as Exhibit 149).]
Numerous state agencies already use offsets to control GHG emissions.279 [279 See, e.g., Settlement Agreement, ConocoPhillips and California (Sept. 10, 2007) (California agency requiring offsets as a condition of approving a project) (attached as Exhibit 150); Minn. Stat. § 216H.03 subd. 4(b) (Minnesota law requiring offsets for certain new coal-fired power plants); Me. Rev. Stat. Ann. tit. 38, § 580-B(4)(c) (Maine law establishing greenhouse gas initiative that includes the use of carbon offsets).] Offsets can include participation in third-party offset markets or renewable energy credits.

Comment Number: 000563_King_WELC_HasAttach-90
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In any subsequently prepared NEPA document, the BLM should consider mitigation measures that offset the direct and indirect carbon emissions attributable to the draft plan alternatives – 27 million tons.

BLM_0165032

Specifically, BLM should consider requiring that purchasers of fossil fuel leases be required to purchase offsets from reputable carbon markets that offset the direct and indirect greenhouse gas emissions from the mining and combustion of fossil fuels from their leases.

Comment Number: 000563_King_WELC_HasAttach-91
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should address the full scope of lifecycle emissions through avoidance, minimization, and compensatory mitigation for fossil fuel production, transport and combustion. The premise of compensatory mitigation is to address unavoidable harm. In the case of fossil fuel production, the harm from GHG emissions is primarily attributable to end-use combustion. Nevertheless, BLM should at least address the direct emissions that could be avoided or minimized by, for example, requiring the capture or combustion of methane from coal mines, adopting enforceable mitigation requirements to minimize methane emissions and waste from oil and gas production, etc.

Comment Number: 000563_King_WELC_HasAttach-92
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should specify whether compensatory mitigation should be paid on an annual basis or paid up front. Fees collected for compensatory mitigation are often paid in a lump sum at the beginning of a project's operational life. In the case of climate impacts, however, it may make more sense to consider an annual payment on the basis of production, or an annualized payment schedule based on expected production with corrections on a semi-annual basis. By spreading payments over the life of the project (and tying them to when the impacts actually occur), the system should be both fairer to producers and more true to the spirit of mitigation.

Comment Number: 000563_King_WELC_HasAttach-93
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must ensure that compensatory mitigation actions are additional and durable, and last for the duration of impacts.
This is an established principle for the Department's approach to mitigation, but it is particularly important with regard to climate impacts. For example, the Australian Government's Climate Change Authority found that, "Assessing additionality is a key feature of all baseline and credit schemes. An additionality test assesses whether a project or activity creates 'additional' emissions reduction that would not have occurred in the absence of the incentive. The baseline for the project assesses how much emissions have been reduced. Additionality is important to ensure that a baseline and credit scheme does not pay for emissions reductions that would have occurred anyway."280 [280 See Australian Government Climate Change Authority, Additionality,http://www.climatechangeauthority.gov.au/reviews/carbon-farming-initiative-study/additionality.]

BLM_0165033

Comment Number: 000590_DascaluJoffeD_20161101-5
Organization1:
Commenter1:Diana Dascalu-Joffe
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Further, despite administration policies that require both quantitative and qualitative disclosure of climate emissions and consideration of alternatives and mitigation measures that would reduce climate impacts, the Uncompahgre draft environmental impact statement fails to disclose or consider available mitigation measures to reduce the climate impacts of additional coal, oil and gas development.

*Summary*
A. Commenters stated that the BLM should include measures to reduce direct and indirect impacts on climate change in the EIS. Some considerations include requiring methane capture, methane flaring, or any other way to mitigate the climate impact of methane emissions from coal mines in the planning area, as well as enhanced energy efficiency, carbon sequestration, lower greenhouse gas-emitting technology. The BLM should also design compensatory mitigation actions that are additional and durable, and last for the duration of impacts.

Commenters also claimed that the BLM's general statements that it will conduct monitoring are not an appropriate form of mitigation. Instead, a vigilant science-based monitoring system should be established in the RMP in order to address unforeseeable shifts in the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations. Commenters stated that the BLM must avoid, minimize, and offset climate change-related impacts.

*Response*
A. The following were added to the Proposed RMP/Final EIS: a table showing controlled greenhouse gas emissions estimates for each alternative, new information from the BLM's 2015 Annual Report[10], the 2017 Greenhouse Gas and Climate Change Report[11], and information regarding the BLM's adaptive management strategy. The BLM's 2015 Annual Report[14] was prepared in accordance with Section V of the BLM's Colorado BLM Comprehensive Air Resource Protection Protocol, which requires the BLM to assess whether or not the strategies defined within the protocol and implemented for project-level authorizations for oil and gas-related projects are effective in meeting the stated goals and objectives outlined within the RMP. The Greenhouse Gas and Climate Change Report[15], published in February 2017 and commissioned by the BLM, contains a tool that was developed to generate a baseline data set for greenhouse gas emissions associated with production and consumption activities, separated by federal and nonfederal lands for coal, oil, natural gas, and natural gas liquids. The purpose of the tool is to allow the BLM to quantify the greenhouse gas emissions from a proposed project developed on BLM-administered lands and to allow the BLM to compare project emissions to national emissions estimated by the tool and evaluate if any mitigation is feasible. Relevant information from these reports was included in the Proposed RMP/Final EIS, as appropriate.

---

[10] BLM (US Department of the Interior, Bureau of Land Management). 2015. BLM Colorado State Office's 2015 Annual Report on the Colorado Air Resource Protection Protocol. BLM, Colorado State Office, Lakewood, CO. May 2015. Internet Web site: https://www.co.blm.gov/nepa/airreports/AR2015.html#a_meth. Accessed on September 15, 2017.
[11] Golder Associates. 2017. Greenhouse Gas and Climate Change Report. February.

As stated in Draft RMP/EIS Section 4.3.1, the BLM will adopt an adaptive management strategy for protecting air resources. This strategy is provided in Draft RMP/EIS Appendix H (Colorado BLM Comprehensive Air Resource Protection Protocol). Specifically, Draft RMP/EIS Appendix H, Section III presents actions the BLM would take to analyze and protect air quality. Furthermore, methane and methane capture were addressed in the Draft RMP/EIS Appendix Q for methane emissions calculations. Methane control and capture are also among the BMPs available for consideration as conditions of approval of development, as described in Appendix H. Specifically, emission inventories for development and production activities within the planning area were compiled and included criteria air pollutants, hazardous air pollutants, and greenhouse gas emissions, including methane.

### Section 12 – Cultural Resources
Total Number of Submissions: 2
Total Number of Comments:2

Comment Number: 000247_ArntzenK_20161020_CO_State_Historical-1
Organization1:History Colorado
Commenter1:Katie Arntzen
Commenter Type: State Government
Comment Excerpt Text:
We offer comment on Addendum M statement: "Addendum I to the Colorado Protocol: Section 106 Requirements for Comprehensive Travel and Transportation Management Planning allows the BLM to complete consultation per Section 106 of the National Historic Preservation Act after route designation (M-4)."
As of October 29, 2016, Addendum I of the 1998 Colorado State Protocol, carried forward as Attachment F of the 2014 Colorado State Protocol, will expire by its terms and cannot be used for fulfilling your Section 106 requirements for travel and transportation management program as currently proposed by the Draft RMP/ EIS.

Comment Number: 000420_HovdeC_20161101-8
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-126-135, Line 216-238, (need to review application buffers)

*Summary*
One commenter provided a suggestion to update the text in the Draft RMP/EIS, stating that Addendum I to the Colorado State Protocol will expire and cannot be used to fulfill Section 106 of the National Historic Preservation Act requirements for the travel and transportation management program.

Another commenter recommended that surface use restriction buffers around cultural sites be reviewed.

*Response*
The Proposed RMP/Final EIS was updated to reflect the newest protocol agreement.

BLM_0165035

Surface use restrictions with buffers of varying sizes were developed in the Draft RMP/EIS (pages 2-124 to 2-135) to provide a range of alternatives as related to restrictions on surface uses for cultural resource protection. BLM reviewed these restrictions and buffers in development of the Proposed RMP/Final EIS.

### Section 13 – Wildland Fire Ecology and Management
Total Number of Submissions: 4
Total Number of Comments: 5

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-29
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 204 Page 2-122: We request amending Alternative D to expressly allow for unrestricted suppression tactics when human life or property is at risk. As a local government charged with protection of public safety and welfare, it is unacceptable to prioritize avoidance of fire lines and soil disturbance over public safety.

Comment Number: 000509_WolcottE_20161102-9
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
This increased risk of wildfire must be addressed and fully mitigated in the final plan through largely limiting surface occupancy as described in alternative B1 in the NFV and further throughout the RMP region, requiring road closures/locked gates on any new roads related to oil and gas development, banning smoking and the use of open flame by oil and gas development and support service employees, and other effective methods. Or surface occupancy should be precluded from all areas until these potential impacts are fully addressed.

Comment Number: 000604_WienerJ_20161031-1
Organization1:Western Colorado Congress
Commenter1:John Wiener
Commenter Type: Individual
Comment Excerpt Text:
(2) Similarly, we must have access for fire prevention, as the conditions worsen with increasingly varied and extreme weather events. The critical change that must be respected and is not well-enough considered is the increase in high-intensity precipitation. Every square inch of ground cover will be needed, and that requires forest management that reduces the extreme intensity high-fuel fires. So, keep the wild as wild, but manage the modified to prevent catastrophic fires and then flooding that further worsens water quality.

Comment Number: 000499_BacigalupiL_20161101-1
Organization1:
Commenter1:Linda Bacigalupi
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165036

On Line 191-206 Wildland Fire Ecology and Management, it was interesting to see the detailed commitment the BLM has/will have for managing the fuels on public land to minimize wildfire issues. I am particularly sensitive to this issue because my property was affected by the 1994 Wake Fire of 3,500+ acres. That was a lightening- caused fire; and I applaud the BLM and other local agencies for their public education and incentive programs to protect private property since that fire. However, I do not find an analysis of the potential fire-creating impacts of various activities on the public lands, specifically the concentrated oil and gas development of BLM and other private surface lands in fire-prone PinonJuniper and Sagebrush habitats. I believe these risks and their accompanying costs should be considered in your analysis

Comment Number: 000563_King_WELC_HasAttach-36
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP and EIS also fails to address adequately the fact that wildfire in the western
U.S., including within the Uncompahgre Field Office, is becoming more frequent and damaging larger landscapes. For example, the New York Times published a story on its front page on April 13 reporting that fire season in the United States and elsewhere is starting earlier and lasting longer; that fires are burning with more intensity; and that firefighting is eating up an ever-increasing amount of the Forest Service's budget.160 [[160 M. Richtel and F. Santos, The New York Times, "Wildfires, Once Confined to a Season, Burn Earlier and Longer" (Apr. 13, 2016) (attached as Exhibit 191).]

Comment Number: 500268_BearS_21060930_DMEA-4
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
• Line 196 - Wildland Fire and Ecology Management: The objective states that fire-protection and fuels-management activities would be utilized to prevent or reduce negative impacts on power transmission lines. Within the industry, there is a distinction between transmission and distribution lines. DMEA asks that this objective be clarified to include electric distribution lines as well as communication lines throughout the document.

Comment Number: 500268_BearS_21060930_DMEA-26
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
• Figure 3-14, Wildland Urban Interface (WUI)
The Lands section acknowledges that the local population is expanding faster than state averages and that the WUI is expanding. It is DMEA's experience that since Scoping was completed many of the people moving to the area are building residences in more rural areas. Given that the life of the plan is estimated to be 20 years and that it will probably be longer, the mapped WUI should be expanded farther onto BLM administered lands in the Uncompahgre valley and north Delta areas particularly. Figure 3-24, Right-of-Way Locations and Corridors, depicts areas where current ROW locations already cross or are very near public lands. (Please see other comments related to the need to address ROW's in the WUI.)

BLM_0165037

*Summary*

A. Commenters requested that the Proposed RMP consider:

1. Allowing for unrestricted fire suppression when human life or property is at risk
2. In order to reduce risk of wildfire, as described under Alternative B1, limiting surface occupancy and requiring road closures/locked gates on any new roads related to oil and gas development, limiting smoking, and limiting the use of open flame banned by oil and gas development and support service employees; alternatively, preclude surface occupancy from all areas until these potential impacts are fully addressed
3. Allowing management of modified landscapes to reduce incidence of high-intensity fire; this is important with changing weather patterns related to climate change

B. Commenters stated that the BLM failed to address the following in impacts analysis:

1. Impacts of potential fire-creating activities on or near lands with fire-prone habitat and potential cost associated with these activities.
2. Increased frequency and range of wildfires in the Western US

C. One commenter requested that the objective in Draft RMP/EIS Table 2-2, line 196 (page 2-120) be clarified to include transmission and distribution lines.

D. One commenter noted that the mapped wildland-urban interface in Draft RMP/EIS Figure 3-14 requires updating to reflect changes since RMP/EIS scoping was completed, particularly for BLM-administered lands in the Uncompahgre Valley and north Delta areas.

*Response*

A. The BLM appreciates the comments.

1. As stated in the Draft RMP/EIS (pages 3-86 – 3-87), the UFO follows federal guidance in the 2009 update to the Federal Wildland Fire Management Policy, which states that firefighter and public safety is the first priority in every fire management activity. Per management action 197 (page 2-121), under all alternatives, the BLM would respond to and suppress fires or portions of fires that are threatening social, economic, or resource values. As such, permitting unrestricted fire suppression would be inconsistent with this federal policy, which all federal agencies are required to follow. The Draft RMP/EIS analyzes the full range of suppression tactics as allowed by federal policy. Suppression tactics will be applied on an as-needed basis and determined at the time of the occurrence, taking values at risk into consideration during suppression operations.
2. Human ignition of wildfires, including oil and gas development, in the UFO is historically very low. However, lease stipulations and BMPs would be applied under all alternatives to limit the impacts of oil and gas development on fire risk. Determination and application of such measures would be completed during site-specific project application which would be subject to NEPA analysis at that time. (See Draft RMP/EIS Appendix G, Best Management Practices and Standard Operating Procedures.) Other methods to decrease ignition risk exist and are addressed in the Montrose Fire Danger Operating Plan, including increased communication with oil and gas companies, fire restriction considerations, and others.

BLM_0165038

3. The fire regime for the majority of the UFO decision area is Fire Regime Group IV, indicating that high-intensity and severity fires occur roughly every 100 to 300 years. Some localized impacts can certainly be expected from high-severity fires; however, without the certainty needed to address the increase of extreme precipitation events, those are likely still within the historical range of variability, given that the majority of precipitation in the area is from summer thunderstorms that generate high rainfall rates in localized areas. Additionally, all UFO landscapes are modified by either grazing, fire exclusion, fire history, insect and disease activity, or vegetation management treatments. All vegetation management treatments are designed to reduce fire intensity in an unplanned ignition scenario. Although the level of active treatment varies by alternative, all alternatives would allow for the modification of fuels/vegetation complexes to move towards more historic vegetative conditions and reduce the risk of high-intensity fire. The agency-preferred alternative (Alternative D) would allow for mechanical treatment, prescribed fire, and seeding in an ecologically appropriate manner.

B. The BLM appreciates the comments.

1. The impact of fire-prone activities and environmental conditions is discussed Chapter 4, Section 4.3.8 (Wildland Fire Ecology and Management) in the *Nature and Type of Effects* (Draft RMP/EIS pages 4-165–4-167) and for specific actions provided in the range of alternatives (pages 4-167–4-174) at a level commensurate with planning-level analysis. However, potential fire-creating activities are addressed through project-level NEPA for oil and gas activities, as well as Fire Danger Operating Plan. Any increase in oil and gas activities would not directly impact the BLM preparedness or fuels budget; only potential suppression costs would impact the BLM's budget if Fire Danger Operating Plan guidance was not effective. The referenced New York Times article discusses Forest Service, not BLM, budgeting. BLM suppression budgeting is more stable than Forest Service, without the need to "fire borrow." Fire Family Plus analysis has been performed extensively on UFO (see Fire Danger Operating Plan), and shows a stable trend line from 1994 to 2014 with regards to acres burned. Severity is largely driven by fire regime, as well as fuel loading, but UFO landscapes are largely within their historical range of variability with Fire Regime IV.

2. Addressing wildfires in the western US is outside the spatial scope of this analysis for the UFO planning area. However, historical wildfires in the UFO dating back to 1993 are discussed in Chapter 3, Section 3.1.9 – Fire History (page 3-88) and are noted in the Draft RMP/EIS cumulative impacts analysis, Chapter 4, Section 4.3.8 (pages 4-174 to 4-175).

C. Draft RMP/EIS Table 2-2, line 196 includes "power transmission lines" in the stated objective. The BLM updated the Proposed RMP/Final EIS to include "public utility" lines in Table 2-2 and throughout the Proposed RMP/Final EIS, as appropriate.

D. Wildland-urban interface data represented the best available information at the time of Draft RMP/EIS publication based on a collaboration between the BLM and community fire districts using human-constructed features, such as communities, some roads, utility corridors,

recreational facilities, and communication sites. Because the inputs to wildland-urban interface change through time, these data will be updated in the fire management plan, as appropriate.

### Section 14 – General Fish and Wildlife

#### Section 14.1 – General Fish and Wildlife: Range of alternatives
Total Number of Submissions: 24
Total Number of Comments: 45

Comment Number: 000587_WolcottS_20161031-19
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan must designate known habitats of rare and threatened fish species as Right of Way exclusion areas and prohibiting oil and gas surface activities. The same holds true for riparian zones and wetlands. Roads, pipelines, powerlines, and well pads will negatively impact water quality and reduce available habitat for local fish species.

Comment Number: FormLetterA-1
Organization1:The Pew Charitable Trusts
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, the BLM has identified more than 242,500 acres of potential Ecological Emphasis Areas—places that contain vulnerable networks of interconnected habitat and migration corridors—throughout the Uncompahgre Field Office.
While the identification of these lands is a great first step, many of them are not recommended for protection in the draft RMP. The BLM needs to safeguard the entirety of these vulnerable wild lands in the proposed RMP.
I urge you to maximize conservation for lands with wilderness character as well as Ecological Emphasis Areas in the Uncompahgre Field Office's proposed RMP in order to safeguard western Colorado's wild places for our future generations.

Comment Number: FormLetterAv2_PewCharitableTrusts-1
Organization1:The Pew Charitable Trusts
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 20.1
Comment Excerpt Text:
The Draft RMP has made a great first step in identifying and proposing to protect some of our most sensitive and unique areas, however thousands of acres are still being left without the protections they deserve.
I feel that the Draft Resource Management Plan (RMP) for the Uncompahgre Field Office should be strengthened to better safeguard lands with wilderness character as well as critical habitat for wildlife. Specifically, I urge the BLM to:
•Include more lands with wilderness characteristics in the final RMP, particularly the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit.
•Include all of the identified areas of critical environmental concern and restore them to their originally identified acreage in the Final RMP.

BLM_0165040

•Include all 242,500 acres of ecological emphasis areas and restore them to their full acreage in the final RMP.

I urge you to maximize conservation for lands with wilderness character as well as critical habitat in the Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and rugged landscapes we know and love in western Colorado.

Comment Number: 000557_OrtizK_20161101-2
Organization1:
Commenter1:Karen Ortiz
Commenter Type: Individual
Other Sections: 16.1
Comment Excerpt Text:
As such growing tourism in the valley is safeguarded as B.1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). 11 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22. favor of the Visual Resource Management classifications in Alternative B.1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; CSU-47 Vistas.2
Alternative B.1 not only benefits the tourist economies of the North Fork Valley, it protects the natural resources of the valley and surrounding areas, its abundance and diversity of wildlife, waterbodies and riparian areas, and migration routes and habitat areas. Nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the stronger protections than provided by the B.1. In regards to the valley's natural resources I support specific recommendations in both Alternative B.1 and No Leasing stipulation from Alternative B as follows: NL-4 Waterbodies; NL-3 Major river corridors; NL-NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Comment Number: 000573_PickettM_20161031-1
Organization1:
Commenter1:MJ Pickett
Commenter Type: Individual
Other Sections: 20.1
Comment Excerpt Text:
The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the road-less lands in the Grand Mesa National Forest.

Comment Number: 000548_D'Alessandro_20161101-3
Organization1:
Commenter1:Ralph D'Alessandro
Commenter Type: Individual
Comment Excerpt Text:
Land with deer and elk winter concentration areas, such as the areas above and on Sunshine Mesa in Hotchkiss, should be protected from oil and gas exploration and extraction to inflict minimal disruption on the wildlife (addressed in Page 2-111, line 114 B1). Additionally the parturition protective provisions in Page 2-111, line 114 B should be incorporated into Alternative D. This is especially important in those

BLM_0165041

prime hunting areas, such as exist in Delta County, where substantial revenue is derived from wildlife hunting.

Comment Number: 000409_DayB_20161031-4
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
L 71. Non-game wildlife. Alternative B is good. We do not agree with Alternative D's plan to manage all land primarily for resource production and big game, except for special designations and a few others. This prioritization needs to change and/or all of the proposed EEAs and Areas of Critical Environmental Concern (ACECs) from Alternative B need to be included in Alternative D.

Comment Number: 000117_SrebnikG_20160815-1
Organization1:
Commenter1:Gail Srebnik
Commenter Type: Individual
Other Sections: 35.1 37.1
Comment Excerpt Text:
We realize change is inevitable but this is our only planet and our first priority should be to keep it healthy. We would insist that all the proposed actions in the North Fork Alternative, B1, be included in the final RMP. This includes the communities of Hotchkiss, Paonia and Crawford and areas that supply municipal water, irrigation, and domestic water companies. These areas would be affected by your plan and would impact the scenic features of the Valley as well as effecting the high quality of wildlife lands. Together we need to ensure the strongest level of long-term protection for resources of particular concern included in Alternative B1, such as water supplies and riparian areas; scenic qualities of the valley and our 'million-dollar' viewsheds; undeveloped wildlife lands including winter range and migration corridors. We should also include all other conservation protections in Alternative B.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-16
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 27.1
Comment Excerpt Text:
Line 100 Page 2-66: We request that Alternative B be amended to read "Maintain or improve fisheries habitat where consistent with maintaining native species and sports fisheries" This amendment would provide a better balance in the management of fish habitat for multiple uses and recreational values.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-17
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 101 Page 2-67: We request that Alternative D be amended to include a provision for allowing work after approved site specific review. The current language would make completion of certain projects including impoundments impossible from a practical standpoint.

BLM_0165042

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-18
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 106 Page 2-72: We request that Alternative D be amended to include the language, "Design land treatment projects and other facilities to not degrade the quality and quantity of wildlife habitats" This amendment would provide a more reasonable and attainable action.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-20
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 124 Page 2-81: We request that BLM revisit the proposed Alternative B and include language that would allow project specific consideration of surface use activities. As currently written, Alternative B would totally restrict use of the identified lands regardless of the actual impact of a potential use.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-21
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 127 Page 2-81: We request that BLM revisit the proposed Alternative 8 and include language that would allow project specific consideration of surface use activities. As currently written, Alternative B would totally restrict use of the identified lands regardless of the actual impact of a potential use.

Comment Number: 000220_EdsonM_SimmonsJ_20161010-3
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Comment Excerpt Text:
Roeer State Wildlife Area, which is designated as a critical habitat area by the Division of Wildlife, is not far from our property. Deer from this area graze through our pasture in winter. Roeber SWA and any proposed areas open for leasing in the final RMP that are on or near critical wildlife habitat, should be protected from potential negative impacts from oil and gas development. This particular area is a calving area for elk and is closed in the winter, any human disturbance could affect the wildlife calving or migration.

Comment Number: 500176_StewartC_20161027_TownOfPaonia-6
Organization1:Town of Paonia
Commenter1:Charles Stewart
Commenter Type: Local Government
Comment Excerpt Text:

Any proposed areas that could become open for leasing in the final RMP that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area which is designated as a critical habitat area by

BLM_0165043

the Division of Wildlife, should be protected from any potential negative impacts from oil and gas development.

Comment Number: 000220_EdsonM_SimmonsJ_20161010-4
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Other Sections: 27.1
Comment Excerpt Text:
We enjoy hiking, snowshoeing and skiing with our friends and out-of-town visitors in Jumbo Mountain and Lone Cabin areas near Paonia. We strongly encourage the BLM to protect the landscape level recreational opportunities of these places, plus Elephant Hill, McDonald Creek, and "C" Hill, by designating these areas as Special Recreation Management Areas (SRMA) and manage them as such. The economic growth surrounding recreation activities in our valley is substantial, and is valuable to the community as it supports multiple businesses that provide lodging, food, services and goods to the growing numbers of people that are visiting this area in order to access the beautiful trails and wilderness around the North Fork Valley. The current management regime with Jumbo Mountain is not sustainable. In order to ensure that trails are well maintained and that the area is managed correctly for decades to come, we urge the BLM to designate and manage the full BLM Jumbo Mountain unit as an SRMA and provide for motorized and non-motorized uses. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Comment Number: 000260_HunterL_20161028-2
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Other Sections: 20.1
Comment Excerpt Text:
Wild and scenic rivers should be protected. The final RMP must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.

Comment Number: 000363_RogersM_20161031-5
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Other Sections: 37.1
Comment Excerpt Text:
The final plan should include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

Comment Number: 000400_InouyeD_20161028-9
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165044

If drilling/production waste water is stored in pounds, what efforts would be made to protect wildlife from coming into contact with contaminated water? Big and small game animals would potentially be attracted to storage ponds, and unless they are covered they pose a threat to waterfowl as well.

Comment Number: 000402_RatnerJ_20161028-55
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should define specifically what, if any, animal damage control or predator control activities will be allowed and in what manner. The WWP opposes all animal damage control, predator control and wildlife services proposals made to date. The majority, if not all, of these types of activities are not appropriate and should not be allowed on public lands.

Comment Number: 000466_McGavinR_20161031-1
Organization1:
Commenter1:Rick McGavin
Commenter Type: Individual
Comment Excerpt Text:
Any proposed areas open for leasing in the final RMP that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area, which is designated as a critical habitat area by the Division of Wildlife, should be protected from any potential negative impacts from oil and gas development. This particular area is a calving area for elk and is closed in the winter; any human disturbance could affect the wildlife calving or migration.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-12
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County recommended a standardized set of stipulations (pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-27
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County requests that the UFO examine carefully CPW recommended species-specific stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-28
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent

BLM_0165045

possible. Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-29
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities. CPW has strongly recommended the use of deer and elk winter range as defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado49 . CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates. 'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten. During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."
[49 Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.]
San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. 50,51,52,53,54

Comment Number: 000483_HanksG_20161101-12
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Timing Limitations
TU is concerned about the use of Timing Limitations (TL) in lieu of NSO in areas of big game winter range and strongly support NSO applications both during oil and gas exploration and development, and operations and maintenance. Timing limitations are temporary and do not account for loss of habitat once an area can be accessed and disturbed after the timing limitations expire. Current science supports the recommendation of NSO stipulations in critical winter range. Critical winter ranges contain the important cover, forage, and security that assure the survival of mule deer and elk herds, even in the worst of winters. Any direct habitat loss to these important lands compromises the ability of populations to survive when snowpack is at a maximum and temperatures are coldest. TU felt the DRMP failed to discuss the possibility of NSO in critical winter big game habitat under any alternative.

Comment Number: 000483_HanksG_20161101-22
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
p. 2- 67/68Wildlife Native and Sports Fish

BLM_0165046

Trout Unlimited encourages using TL-3 rather than TL-5 in the Final RMP based on disturbance of Brown Trout spawning dates. These fish, though non-native, are not typically not stocked fish, making them valuable wild fisheries. Their spawning cycles in the fall are arguably extremely valuable from an economic and ecologic standpoint. During this critical time of year, projects should at minimum need additional review and approval.

Comment Number: 000489_JohnsonA_20161101-24
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.2 21.1
Comment Excerpt Text:
Table 2-2, Actions 99, 139, and 147 endanger the health of fisheries by failing to protect aquatic habitat to the most prudent extent necessary to ensure a viable and healthy fish habitat into the future. The pursuit of "opportunities to enhance, protect, or restore native aquatic species habitats" (Action 99) does not guarantee that such goals will be met. Additionally, the preferred alternative fails to recognize priority habitats for special status fish and aquatic wildlife which include perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters. These failures have the potential to place undue stress on these species and threaten the community health of these organisms (Action 133). Threatened and endangered species are particularly under threat because the habitat they occupy will be managed under the proposed preferred alternative as right of way avoidance, rather than exclusion areas (Action 139). Finally, the proposed alternative fails to provide adequate protection for the Native Cutthroat Trout (Action 147). This federally listed fish species requires the maintenance of its habitat integrity and the promotion of their recovery, and the buffer zones and other restrictions threaten that integrity and recovery.

Comment Number: 000489_JohnsonA_20161101-32
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.2
Comment Excerpt Text:
D. Special Status Species, Wildlife & Vegetation (Aquatic and Riparian)
The draft RMP does not adequately protect fish from adverse surface activity. The WSCC is concerned the BLM has not taken sufficient measures within the draft RMP to protect and support and growth of fisheries within the UFO. Inadequate buffers zones described in the agency's preferred alternative D for ROW, surface use, and travel management are pervasive throughout the draft RMP. It is imperative that the BLM protect special status fish and aquatic wildlife by recognizing that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters as priority habitats (Action 133, Alt. B).
Furthermore, it is vitally important that the BLM protect federally listed fish species, maintain the integrity of habitat for federally listed species, and promote their recovery by prohibiting surface occupancy and restricting all ground disturbances within one mile of federally listed fish occupied habitat as described in Action 147, Alt. B; Appendix B, B-24.
The WSCC has found that throughout the draft RMP there are multiple areas where the agency preferred alternative leaves far too much uncertainty in its prescribed actions. For example, in Table 2-2, action 99, the preferred alternative dictates that the action "pursue opportunities to enhance, protect or restore native aquatic species habitat". The word "Pursue" allows for incompletion of the presented objective of the action. However, Alternative B dictates precise actions to enhance protect and restore native aquatic species habitat' The WSCC recommends the BLM adopt actions described in alternative B

BLM_0165047

to protect habitat for fisheries and aquatic animals by enhancing, protecting, and restoring at least 5 miles of aquatic habitat by doing things like modifying or removing fish migration barriers and improving stream vegetation and structure to benefit non-game native species (Action 99, Alt. B) and thereby achieve the intended objective.

Comment Number: 000489_JohnsonA_20161101-4
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.2
Comment Excerpt Text:
c. Wildlife habitat and migration routes.
The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.
In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Comment Number: 000492_RandallR_20161101-16
Organization1: Colorado Department of Natural Resources
Commenter1: Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.
In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.
In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this

BLM_0165048

document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc). CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts.

Comment Number: 000492_RandallR_20161101-19
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.

Comment Number: 000492_RandallR_20161101-4
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Other Sections: 5.4
Comment Excerpt Text:
The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.
The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan

BLM_0165049

(2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed.

Comment Number: 000492_RandallR_20161101-5
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area.

Comment Number: 000492_RandallR_20161101-6
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.
Desired Conditions
* Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
* Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
* Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., , springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
* Large predator species contribute to ecological diversity and ecosystem functioning.
* Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long term connectivity and integrity of habitats to facilitate effective wildlife movement.
* Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
* Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
* Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
* Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.

BLM_0165050

* Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
* Riparian and aquatic habitat, including springs and fens, support well distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
* Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
* Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
* Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
* Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
* Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

Comment Number: 000492_RandallR_20161101-9
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.
* Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
* The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long- term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
* Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.
* An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
* Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
* Macroinvertebrate diversity and abundance reflect high water quality.
* Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
* Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
* Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
* Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

BLM_0165051

Comment Number: 000492_RandallR_20161101-7
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Standards [to include in FEIS]
* Raptors: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)
* Ungulates: Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.
* Ungulates: In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.
* Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands: The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
* Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range. pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

Comment Number: 000545_SlivkaJ_20161101-140
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Wildlife habitat and migration routes
The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections. In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support

BLM_0165052

the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Comment Number: 000545_SlivkaJ_20161101-146
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas
Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.
B1 would be the most protective of wildlife habitat in the North Fork. [Footnote 52 DEIS Volume II 4-134] The DEIS notes:
Under Alternative B.1, an NSO would be applicable within 0.25 mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area.
Uncompahgre Draft RMP at 4-136. Alternative B1 best protects riparian corridors, which are critical components in the habitat systems in the valley: "These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B." Id at 4-116. The stronger management in B1 include more protection for the valley's special status species: "These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B." Id at 4-155. Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat: "Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B." Id at 4-154. Alternative B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout: "In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area." Id at 4-155.
And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection: "[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats." Id at 4-131.
In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1).
However, in addition to best protecting important features to the humans that occupy the North Fork— in nearly every case B1 provides the best protections for furred, finned and feathered residents as well.

Comment Number: 000545_SlivkaJ_20161101-182
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roeber and McCluskey State Wildlife Area

BLM_0165053

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.

Comment Number: 500250_HeuscherP_20161028-2
Organization1:
Commenter1:Pauline Heuscher
Commenter Type: Individual
Comment Excerpt Text:
The Hubbard Park area is one of few prime habitat areas for the purple martin birds. This species of birds is very sensitive to disruption of their habitat. There are few areas in western Colorado that have the habitat that the purple martins need other than this area proposed for drilling. BLM has an obligation to consider this issue and choose B1.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-10
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1
Comment Excerpt Text:
13b. Other aquatic issues are managed under ACEC standards that has little to do with the threats to the species.
Two additional aquatic species sought to be managed with ACEC designations(Dolores River Slick Rock Canyon; LaSal; Roubideau Corridor and Robideau Porter Monitor ) encompassing more than 60,000 acres to be managed in a manner that does not relate to the threat the species are the Bluehead and Flannelmouth Sucker. The Organizations vigorously assert that the management of 60,000 acres will in no way relate to the threats to the species that are entirely occurring in the waterways where they are living. The threats to these species is shockingly similar to the threats to various genetically pure species of trout.
The Rangewide Conservation Assessment and Strategy for the Bluehead and Flannelmouth Sucker outlines the primary threats to these species as follows:
" 6) Enhance and maintain habitat for roundtail chub, bluehead sucker, and flannelmouth sucker.
- Enhance and/or restore connectedness and opportunities for migration of the subject species to disjunct populations where possible.
- Restore altered channel and habitat features to conditions suitable for the three species.
- Provide flows needed for all life stages of the subject species.
- Maintain and evaluate fish habitat improvements throughout the range.
- Install regulatory mechanisms for the long-term protection of habitat (e.g., conservation easements, water rights, etc.).
7) Control (as feasible and where possible) threats posed by nonnative species that compete with, prey upon, or hybridize with roundtail chub, bluehead sucker, and flannelmouth sucker.
- Determine where detrimental actions occur between the subject species and sympatric nonnative species.
-Control detrimental nonnative fish where necessary and feasible.
- Evaluate effectiveness of nonnative control efforts.

BLM_0165054

- Develop multi-state nonnative stocking procedure agreements that protect all three species and potential reestablishment sites.

8) Expand roundtail chub, bluehead sucker, and flannelmouth sucker population distributions through transplant, augmentation (i.e., use of artificially propagated stock), or reintroduction activities as warranted using a genetically based augmentation/reestablishment plan."42

[42 See, RANGE-WIDE CONSERVATION AGREEMENT AND STRATEGY FOR ROUNDTAIL CHUB Gila rabusta, BLUEHEAD SUCKER Catostomus discobo/us, AND FLANNELMOUTH SUCKER Catostomus /atipinnis Prepared for Colorado River Fish and Wildlife Council; Publication Number 06-18 September 2006 at pg 48.]

The state of Wyoming recently updated their Sucker analysis and succinctly outlined the threats to the species as follows:

"Problems:

- Hybridization between native flannelmouth and bluehead sucker, and nonnative white sucker Catostomus commersoni, longnose sucker Catostomus catostomus, and Utah sucker Catostomus ardens is occurring. Some combinations are fertile and will lead to introgression.

- The effects of water development and reservoir construction exacerbated by drought have cut off this species' migratory corridors, degraded its habitat, and encouraged the spread of nonnatives.

Competition with and predation by nonnative species (i.e., Catostomus sp., creek chub Semotilus atromaculatus, redside shiner Richardsonius balteatus, burbot Lota lota, brown trout Salmo trutta, and lake trout Salvelinus namaycush) further limit three species populations.

Conservation actions:

-Chemically treat Big Sandy River, Little Sandy and Muddy Creeks to remove nonnative species and reduce the risk of hybridization.

- Continue mechanical removal of nonnative species from Big Sandy River, and Little Sandy and Muddy (tributary to Little Snake River) Creeks.

- Develop methods for salvage, transport, holding, and repatriation of native species during chemical treatments.

-Construct a barrier upstream of Big Sandy reservoir to prevent recolonization of treated stream reaches by nonnative fish.

- Continue to partner with other agencies and conservation organizations (e.g., BLM, Little Snake River Conservation District, and Trout Unlimited) to address conservation needs for this species."43

[43 See, Wyoming State Wildlife Action Plan- 2010; Species Accounts; Wyoming Game and Fish Department Fish at pg 1-V 3-4.]

The Organizations note that none of the challenges or proposed management address issues that might occur on the shore of a creek that is habitat, but rather all management is directed towards minimizing contact between genetically pure fish and hybrid fish. Again designation of an ACEC of more than 60,000 acres to manage this issue creates the perception that a lack of non-aquatic habitat is causing the decline of the species. This could not be further from the truth.

The Organizations would be remiss if the close relationship of some of the proposed Bluehead and Flannelmouth sucker management standards to recent management of the Zuni Bluehead sucker was not raised. This is important as the USFS recently listed critical habitat for the Zuni and none of the habitat areas were in Colorado.

Comment Number: 500268_BearS_21060930_DMEA-30
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B

BLM_0165055

• There are timing limitations that protect periods such as nesting, breading and calving periods. There are also SSR's that could force relocation or compliance with other unspecified constraints for the same purpose. This creates confusion and uncertainty as to what a proponent can expect. Many of the restrictions allow for exception, modification or waiver, but that does not alleviate the potential for significant time delay and cost impacts.

• Timing Limitations need to be the minimum timeframes biologically necessary. The constraints can add significantly to the overall duration and cost of the development. The impact of overlapping timing limitations can potentially make a project unbuildable due to the small open window available for development. DMEA requests that exceptions, modifications and waivers be reasonably available to reduce the negative impact on a project. This is especially necessary in the WUI where public health, safety and electrical/broadband service is critical.

*Summary*

A. The following general fish and wildlife recommendations were made:

1. Review species-specific stipulations provided by San Miguel County and CPW for incorporation.
2. Consider adding winter range to ungulate-protection strategies.
3. Vary wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically based stipulations in ways that may render their intended benefit to wildlife meaningless.
4. Add wildlife protective measures for drilling/production wastewater stored in ponds.
5. Define what animal damage-control or predator-control activities will be allowed and in what manner.
6. Regardless of key habitats or priority species designations, include descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the decision area.
7. Incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005); The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006); 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah, and Wyoming; 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah, and Wyoming; Gunnison and White-tailed prairie dog conservation strategy (2010); Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010); Uncompahgre Plateau Deer Management Plan D-19 (2005); Uncompahgre Plateau Elk Management Plan E-20 (2005); RBS-21 West San Juan bighorn sheep DAU Plan; Colorado Bighorn Sheep management Plan 2009-2019; and State Wildlife Action Plan (2015).
8. Describe the desired conditions of wildlife populations and wildlife habitat across the decision area per 43 CFR. Include descriptions of, and criteria for the management, preservation, and conservation of, fish and wildlife species and habitat within the decision area. Review recommended standards and desired conditions provided by CPW. CPW-recommended desired conditions include:
   i. Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable

BLM_0165056

forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.

ii. Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.

iii. Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).

iv. Large predator species contribute to ecological diversity and ecosystem functioning.

v. Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long term connectivity and integrity of habitats to facilitate effective wildlife movement.

vi. Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.

vii. Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.

viii. Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.

ix. Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.

x. Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.

xi. Riparian and aquatic habitat, including springs and fens, support well distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.

xii. Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.

xiii. Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.

xiv. Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.

xv. Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.

xvi. Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

xvii. Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.

BLM_0165057

xviii.   The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long- term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.

xix.   Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

xx.   An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.

xxi.   Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.

xxii.   Macroinvertebrate diversity and abundance reflect high water quality.

xxiii.   Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.

xxiv.   Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.

xxv.   Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.

xxvi.   Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

CPW-recommended standards include:

xxvii.   Raptors: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (Colorado Department of Wildlife 2008)

xxviii.   Ungulates: Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

xxix.   Ungulates: In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

xxx.   Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands: The intent is to ensure no net loss of existing habitat effectiveness within the areas

BLM_0165058

listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.

xxxi. Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range, pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

9. Include that standards and guidelines be developed for oil and gas activities in Gunnison sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, and lynx denning and winter foraging habitat to address impacts from oil and gas operations.

B. The following recommendations were made for terrestrial/big game species:

1. Areas on or near critical wildlife habitat, such as the McCluskey and Roeber State Wildlife Areas, should be protected from any potential negative impacts from oil and gas development. Furthermore, Draft RMP/EIS Appendix G contains BMPs and standard operating procedures for projects, including oil and gas activities, proposed to occur on BLM-administered lands.
2. In big game winter range, utilize NSO rather than TL stipulations.
3. Change Alternative D to read "design land treatment projects and other facilities to not degrade the quality and quantity of wildlife habitats," to provide a more reasonable and attainable action.
4. The BLM should acknowledge that TL stipulations are not adequate to protect big game species from oil and gas development.

C. The following recommendations were made for birds:

1. Provide protection from development in Hubbard Park area, one of few prime habitat areas for purple martin birds.
2. Include language that would allow project-specific consideration of surface use activities in bird habitat.

D. The following recommendations were provided for aquatic wildlife:

1. Change Draft RMP/EIS page 2-66, line 100 management language to read "Maintain or improve fisheries habitat where consistent with maintaining native species and sports fisheries."

BLM_0165059

2. At Draft RMP/EIS page 2-67, line 101, include a provision for allowing in-stream work in occupied fisheries habitat after approved site-specific review; the current language would make completion of certain projects including impoundments impractical.

3. Protect aquatic wildlife by recognizing that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters as priority habitats, and provide adequate buffers from development.

4. Reconsider ACEC designations; some ACEC designations have been applied to protect species (e.g., bluehead and flannelmouth sucker) when populations are impacted by factors other than habitat degradation.

E. One commenter noted that overlapping surface use and timing restrictions for wildlife create uncertainty for proponents and result in potential for significant delays and increased costs. They requested that TLs are the minimum biologically necessary, and that exceptions, modifications, and waivers be available for ROW development, particularly in the wildland-urban interface.

*Response*

A. The BLM appreciates the comments. The BLM reviewed recommended changes to management actions for general fish and wildlife and incorporated them in the Proposed RMP/Final EIS, as appropriate.

1. The BLM worked closely with CPW and USFWS while developing the stipulations in the Draft RMP/EIS and Proposed RMP/Final EIS. This resulted in a few changes to the application of some stipulations applied to USFWS-designated areas. These include applying TLs to USFWS-designated critical habitat and designated occupied critical habitat, NSO stipulations to USFWS occupied critical habitat and nondesignated occupied breeding habitat, and CSU stipulations to USFWS-designated and nondesignated critical habitat. These changes will provides an easy transition of the Uncompahgre RMP if the Proposed RMP is approved, as they closely comply with CPW or BLM Statewide Stipulations.

2. The BLM conferred with CPW to discuss recommended changes to management actions for general fish and wildlife. CPW mapped winter range for elk and mule deer covers a great majority of BLM-administered lands. By focusing protection on the combination of CPW mapped crucial and severe winter range, the BLM is providing TL protections to the most important winter habitats, which covers over 600,000 acres of BLM-administered lands and split-estate.

3. Stipulations were developed based on the best available data at the RMP planning level at the time. For big game species, use of stipulations on big game habitat types, as mapped by the CPW, allowed for geographic examination of stipulations and related impacts. A stipulation prohibiting surface use in big game winter range was included in the Draft RMP/EIS (page 2-76, line 112). The BLM reviewed stipulations in Draft RMP/EIS Appendix B and the preferred alternative. Where appropriate, stipulations were modified for consistency with the CPW's statewide stipulation letter (titled *Colorado Department of Wildlife Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales* and dated December 13, 2010). CPW recommendations were considered in the development of stipulations.

BLM_0165060

4. Best Management Practices and Standard Operating Procedure (Draft RMP/EIS Appendix G) include a prohibition on the use of evaporation ponds for disposing of produced water (Draft RMP/EIS page G-10). Impacts from wastewater ponds on special status and migratory birds are presented on Draft RMP/EIS page 4-130.

5. Predator control is not within the BLM's purview. Predator-control activities would be performed consistent with CPW regulations and Predator Control Plans. The BLM added a management action to the Proposed RMP/Final EIS stating that the BLM would work in consultation with CPW on managing native wildlife species populations and habitats.

6. The internal draft alternatives provided to Cooperating Agencies and RAC Subgroup members in January 2011 included priority species and habitats. The Draft RMP/EIS includes key/priority habitats and species related to listed species (Draft RMP/EIS page 2-82 et seq.). The Draft RMP/EIS also includes descriptions of and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the decision area, as outlined in Draft RMP/EIS Table 2-2, Fish and Wildlife, on pages 2-63–2-128.

7. The BLM reviewed the referenced plans and incorporated their objectives in the Proposed RMP/Final EIS, as appropriate.

8. The BLM reviewed the CPW-recommended desired conditions and standards and incorporated them in the Proposed RMP/Final EIS, as appropriate.

9. Draft RMP/EIS Appendix G contains BMPs and standard operating procedures for projects, including oil and gas activities, proposed to occur on BLM-administered lands. Although not exhaustive, Appendix G recommends BMPs, such as closed-loop drilling systems, tanks to store flowback fluids, and water quality testing and a prohibition on the use of evaporation ponds for disposing of produced water. These recommendations apply to the RMP and are, therefore, broad-scale measures appropriate to a planning-level analysis. The approved RMP will neither approve new oil and gas leases nor approve oil and gas development activities; these activities will require future site-specific analysis. Further measures, including new technologies, conditions of approval, or BMPs may be required by such site-specific analysis that will also include on-site visits and a discussion of the specific conditions of approval and BMPs needed to address potential impacts, including those to adjacent wildlife habitat.

B. The BLM appreciates the comments. The BLM reviewed recommended changes to management actions for terrestrial/big game wildlife and incorporated them in the Proposed RMP/Final EIS, as appropriate.

1. Site-specific review for individual well pads, roads, or pipelines will be addressed at the application for permit to drill stage, which will also include on-site visits and a discussion of the specific conditions of approval and BMPs needed to address potential impacts, including those to adjacent state wildlife areas.

2. The Draft RMP/EIS includes a TL stipulation on big game winter range during the specified time periods (as identified in TL-CO-9, TL-6, TL-7, and TL-8; see Draft RMP/EIS Appendix B pages B-79 to B-83) because a TL effectively closes these areas during the specified timeframes and is unnecessary year round. Information was added to the Proposed RMP/Final EIS effects analysis to indicate that TLs would be sufficient to

BLM_0165061

protect critical habitat. As stated in Draft RMP/EIS Appendix B, Section B.1.4 (page B-3), "areas identified for Timing Limitations (TL), a moderate constraint, are closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames…. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted…." The intent of a TL stipulation is to prevent unnecessary disturbance and energy utilization by animals during the winter months, a time when limited forage, snow pack, and cold weather renders animals more vulnerable to starvation and exposure.

3. The action is specifically to conduct habitat improvement projects and is designed to offset such actions that degrade habitat. When other projects are proposed that are not specifically for habitat improvement, other actions may apply.

4. The BLM defers to existing federal and state guidelines and policy, as well as agency expertise, such as CPW's and USFWS', to help craft effective land use stipulations and guidelines relevant to managing multiple-use lands consistent with FLPMA. To be more consistent with CPW, USFWS, and BLM statewide stipulations and policy, the BLM revised some objectives and management actions for the Proposed RMP, Alternative E. These include, but are not limited to: including measurable objectives consistent with AIM protocol; revising management actions to better define how stated goals and objectives would be achieved for fish and aquatic habitat; revising TLs for wildlife big game winter to be more consistent with CPW regulations; revising the objective for Special Status Species to better describe the desired conditions of wildlife populations and wildlife habitat across the planning area; and revising TLs where appropriate to be more consistent with statewide CPW stipulations. If not appropriate, the Proposed RMP, Alternative E,ensures TLs are consistent with BLM statewide stipulations, which are used on BLM-administered lands across Colorado.

C. The BLM appreciates the comments.

1. Hubbard Park within the Grand Mesa National Forest is not in the Uncompahgre RMP planning area; therefore, no management actions can be included for this area.

2. A range of management actions were considered for upland game and migratory bird habitat with a varying degree of flexibility for surface land uses (see Draft RMP/EIS pages 2-81 to 2-82, lines 124-128). Also see response to part A, #1-3, above, regarding CPW stipulations.

D. The BLM appreciates the comments.

1. The BLM explored a range of alternatives in the Draft RMP/EIS and selected an alternative where the BLM manages for native and/or desired nonnative species, which includes sports fisheries.

2. The relevant management action at Draft RMP/EIS page 2-67, line 101, is a TL (timing limitation). As such, the stipulation would only apply during the identified specific timeframes. Stipulations could be excepted, modified, or waived by the BLM Authorized Officer, as stated in Draft RMP/EISAppendix B, Section B.3 (page B-5). Exceptions,

BLM_0165062

modifications, and waivers provide a viable and effective means of applying adaptive
management techniques (see Draft RMP/EIS page B-5).

3.  Buffers from surface-disturbing activities are included in the Draft RMP/EIS for riparian
    areas (Draft RMP/EIS page 2-54 to 2-84), as well as perennial, intermittent, and
    ephemeral water sources (Draft RMP/EIS pages 2-194 to 2-201, line 336).

4.  Rationale for ACEC designation in general is discussed in the Draft RMP/EIS (page 3-
    153) and, for specific ACECs, in the ACEC Final Report (2013), prepared to support
    this planning process. ACECs analyzed and presented in the range of alternatives in the
    Draft RMP/EIS are the result of the BLM soliciting ACEC nominations from the public
    during the RMP scoping process, as well as internal BLM analysis, both of which comply
    with FLPMA Section 202 (43 US Code 1712[c][3]), 43 CFR 1610.7-2, and BLM Manual
    1613. Also see response in Section 9.1 of this report.

E. TLs were developed based on best available biological information in coordination with CPW.
As noted in Appendix B, (Draft RMP/EIS page B-5), right-of-way location authorizations are not
subject to the SSR restriction. The RMP analysis is intended to provide general guidelines for
future development; the permitting stage for individual ROW authorizations will determine
specific conditions of approval and relevant restrictions. Stipulations could be excepted,
modified, or waived by the BLM Authorized Officer, as stated in Draft RMP/EIS Appendix B,
Section B.3 (page B-5). Exceptions, modifications, and waivers provide a viable and effective
means of applying adaptive management techniques (see Draft RMP/EIS page B-5).

### Section 14.2 – General Fish and Wildlife: Best available information—baseline data

Total Number of Submissions: 3
Total Number of Comments: 6

Comment Number: 000545_SlivkaJ_20161101-181
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Big Game Winter Range
The final RMP must take into account significant new research demonstrating the effects of natural gas
development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for
designating Ecological Emphasis Areas and encourage their inclusion in the final plan.
Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the
North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the
local economy, and a key component of the landscape's ecosystem health.
We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat
from oil and gas development specifically. Development across BLM lands in the North Fork particularly
would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on
winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what
degree elk and mule deer populations would be impacted. Reduction in effective winter range size
caused by extensive oil and gas development in the North Fork cold increase deer density on remaining
winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality
of big game habitat within the proposed lease parcels and the social and economic importance of hunting
to the North Fork communities, it would be a travesty to rely on inadequate analysis.

BLM_0165063

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-5
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Other Sections: 5.2
Comment Excerpt Text:
Wildlife and Watchable Wildlife Viewing Areas
Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements.

Comment Number: 000483_HanksG_20161101-25
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Stipulation TL-6 Wildlife Big Game Winter Habitat:
Trout Unlimited would like to support Timing Limitations as detailed in Stipulation TL-6 with one exception. TU feels that excluding CPW data is unreasonable and irresponsible. As the managing agency of the wildlife itself, a partnership and collaboration between agencies would be greatly preferred to complete exclusion. BLM's reasoning that the area is too large and therefore "compromises a considerable proportion of the resource area" is not a valid reason to not implement protections. If the science indicates winter range, and that impacts to big game in winter range is significant (see previous comments) then BLM cannot ignore this issue. A better refined dataset of winter range may be beneficial, but that should be spelled out in the stipulation language rather than ignored. Otherwise, TU supports Timing Limitations for all big game species, not just elk and deer.

Comment Number: 000545_SlivkaJ_20161101-134
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Wildlife habitat and migration routes. Situated between the West Elk Mountains (and Wilderness Area) Grand and Black Mesas, and encompassing two significant river riparian areas, the North Fork (and Smith Fork) Valley is a wildlife haven. The West Elk Mountains and the flanks that lie on BLM lands are known as concertation areas for black bears, especially in the crucial late summer and early fall period when this species is preparing for winter hibernation. [Footnote 35 Oil and Gas Leasing and Development Final EIS, Grand Mesa Uncompahgre Gunnison National Forest 1993.] BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding the North Fork are home to threatened, endangered and sensitive species including the Gunnison Sage Grouse, and important hunting and migration routes for others including the Canada lynx. Yellow-billed cuckoos nest in the riparian vegetation along the North Fork River and tributaries.
Raptors frequent the area, including wintering bald eagles and nesting peregrine falcons. Streams and rivers that head on the Grand Mesa and West Elks contain important trout fisheries, and the Gunnison River just below the confluence is a Colorado Gold Medal trout stream. The Gunnison River is also home to three species of endangered fish that are known to be impacted by activity on the selenium

BLM_0165064

rich soils of the valley. Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public trust," is paramount. [Footnote 36 DEIS at Volume II 4-127.] Colorado Parks and Wildlife, in previous comments on the scuttled lease sale, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas.

Comment Number: 000545_SlivkaJ_20161101-67
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Mapping Wildland Values to Support Conservation Strategies Across the US
Overview: For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.
Ecological integrity and "wildness": The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes (Aplet 1999, Aplet et al. 2000). Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 1a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity (Theobald 2013) to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

Comment Number: 000545_SlivkaJ_20161101-68
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Connectivity: The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate (Rudnick et al. 2012). Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states (Belote et al. 2016). Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 1b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved. Ecosystem representation: Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types (Dietz et al. 2015). Unfortunately, our protected areas systems currently does not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our

BLM_0165065

entire natural heritage (Aycrigg et al. 2015). Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 1c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

Hotspots of endemic biodiversity: There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities (Jenkins et al. 2015). We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 1d, lower right).

Figure 1. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 2.

*Summary*

Commenters recommended the following in the Proposed RMP/Final EIS:

1. Include information on the importance of migration routes in the planning area.
2. Identify actions to sustain in-stream conditions, and identify desired future conditions for the aquatic environment.
3. Work with CPW to obtain information on species-specific buffers, TLs, BMPs, and other wildlife data.

*Response*

1. Commenters are correct that information on migration routes and is limited in the Draft RMP/EIS. That is because, while there may be migration routes within the planning area, CPW has not designated important migration routes in the area.
2. An overview of aquatic habitat is provided in Draft RMP/EIS Section 3.1.6, Fish and Wildlife (page 3-58). In-stream conditions and desired future conditions would vary based on site-specific location and would be addressed prior to any site-specific action in subsequent NEPA analysis.
3. Refer to the response to subsection 14.1, Range of Alternatives, part A, item #1-3, above.

### Section 14.3 – General Fish and Wildlife: Impact analysis

Total Number of Submissions: 18
Total Number of Comments: 26

Comment Number: 000581_PattersonC_20161016-1
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Other Sections: 21.3
Comment Excerpt Text:
The BLM did not adequately study the adverse impacts of oil and gas exploration and extraction, air pollution, water contamination, noise, traffic, inevitable habitat fragmentation on the health and

BLM_0165066

reproductive success of wildlife animals and plants. Disruption, noise, pollution will negatively impact the big game population and the hunters they attract.
Sedimentation and pollution ruins world famous trout streams.

Comment Number: 000555_NicholofR_20161101-5
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Other Sections: 21.3
Comment Excerpt Text:
The study found that deer populations declined "most drastically" in areas of gas well drilling:
Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel. Ongoing natural gas operations should mandate a well-planned and executed mitigation plan with UNOCAL that will measurably demonstrate re-vegetation and mule deer habitat restoration success.
Gas well drilling and pipe line construction each require road construction and high levels of truck traffic and heavy machinery operations that will disturb deer and elk. Such disturbance during calving and fawning would likely result in increased calf and fawn mortality. Disruption to migration patterns is another likely detriment. Chronic Wasting Disease may be exacerbated by the increased stress to herds from prolonged disturbance. Some wells would likely be drilled in deer and elk security areas which are a requirement for healthy populations.

Comment Number: 000555_NicholofR_20161101-6
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Other Sections: 21.3
Comment Excerpt Text:
The third major component of Delta County's wildlife-related economy is fishing. The potential damage to our fisheries resource would be mainly from contamination of streams by toxic hydro-fracturing compounds, produced water, fuel spills, sediment loading from soil erosion associated with well pad construction and pipe line installation, etc. [ In 2015 the oil and gas industry reported 615 spills, or nearly 2 per day. The number of unreported spills is unknown.]

Comment Number: 000555_NicholofR_20161101-4
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Comment Excerpt Text:
The negative effects on deer and elk from roads have been well- documented over the past four decades. For mule deer "Roads generally decrease the value of habitat for distances up to 1/2 mile from the road. If roads are to be left open in an area, the combined length of roads should be less than 1 mile per square mile of habitat." (Managing Forested Lands For Wildlife, Colorado Division of Wildlife and USDA Forest Service, 1984). Elk are sensitive to human activity and "should be afforded maximum protection from disturbance... It is important that elk be relatively free from human disturbances. This is particularly true during parturition, young -rearing, and in winter." (Ibid.) More recently, studies of deer populations around Pinedale Wyoming show a 45% decline in mule deer populations over the past 3 years thanks to intensive gas drilling and development.
Parachute Creek Mule Deer Monitoring Report -1982-2000, by Bio-Resources, Inc. is a major long -term study of deer populations near Parachute, Colorado commissioned by then energy giant

BLM_0165067

UNOCAL Corporation. It concludes that Natural gas drilling operations in the lower valley add another adverse impact that should require mitigation of negative influence on the health of the deer herd. At present, the mule deer herd should be managed with several years of deferred hunting, and sheep and cattle grazing should be managed to avoid the steep -slope xeric shrub habitat. Natural gas development operations need to initiate a concerted mitigation program with realistic, measurable, result- oriented habitat and herd management. ...land management in Parachute Creek needs to assist the recovery by decreasing human land use impacts. Human presence should be controlled while deer occupy winter range. (emphasis added)

In other words, not only the hunting economy would likely be damaged, but the livestock industry as well. In fact, restoration of deer herd health and numbers from the effects of gas well activity will require the radical measure of controlling mere human presence.

Comment Number: 000483_HanksG_20161101-6
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3 11.3
Comment Excerpt Text:
4.3.1 Air Quality and Climate

The DRMP fails to adequately address the impacts of climate change on fish and wildlife habitat. Impacts of climate change are particularly threatening in the western U.S. where warmer water, changes in the timing of spring snowmelt, and increased droughts, floods, and wildfires are attributed to changes in ecological processes brought on by a warmer planet. The health of the landscape has a direct influence on the ability of natural systems to rebound after a catastrophic event and adapt to a changing climate. Coldwater species such as trout are, by definition, especially vulnerable to climate change because of their dependence on clean, cold water. Cutthroat trout are exceptionally vulnerable. Existing stressors from reduced populations, loss of life history forms, degraded and fragmented habitat and non-native species have already pushed many native trout populations to the edge of extinction. The added effects of climate change may take these populations over the edge.

The first and most important component of TU's conservation strategies is to protect remaining critical habitat areas. Protecting the strongholds is more cost-effective and has a higher likelihood of success than trying to restore an area that has already been substantially degraded. These fish cannot afford any further reduction in available habitat across their range. They have already been extirpated or severely reduced from the lower elevation edges of their historic range so it is critical that the remaining headwater strongholds remain intact.

Removal of vegetation, road construction, and other surface disturbing activities all pose a risk for increased sedimentation and degradation of native trout habitat in the project area. Since the UFO contains locations holding GBCT and CRCT, TU contends the DRMP must develop a more comprehensive analysis of the impacts climate change will potentially have on native trout and other native fish species in the UFO DRMP footprint. Such discussion and analysis should include:

* Analyze the latest innovative technologies that will contribute to minimizing impacts to trout streams that are important spawning and rearing areas.
* Evaluate the potential for removal or elimination of any stream barriers within the UFO boundaries that may impact instream flows.
* Develop a science-based protection plan of streamside habitats that may be impacted by oil and gas development in the UFO.
* Identify the most important reaches of these streams which contain pure conservation populations of cutthroat and develop protection measures.
* Provide an annual monitoring program that establishes goals and objectives for improving stream habitat and minimizes contamination from drilling and production.

BLM_0165068

\* Implement conservation strategies for water management required for all operators that helps minimize water decreases during low water periods.

Comment Number: 000130_WassellP_20160903-15
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.

Comment Number: 000130_WassellP_20160903-7
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Other Sections: 30.3 21.3
Comment Excerpt Text:
-The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.

Comment Number: 000237_VaughtK_20161004-1
Organization1:Dancing Dog Farm
Commenter1:Kenneth Vaught
Commenter Type: Individual
Other Sections: 32.3
Comment Excerpt Text:
The area surrounding the Valley is rich in wildlife, with the draws and drainages used as wildlife corridors for movement. Each winter, there is an area elk herd that number 250 – 300 that overnight in Short Draw, along Coal Road about a mile north of the town of Hotchkiss and each morning between 5:30 am and 6:00 am, migrate in a northwesterly direction from the Draw, up into the south facing cedar areas on BLM land. It is quite a site to see from December until they move out in late February. This area that the elk occupy each winter is adjacent to several of the Valley parcels that the BLM is considering leasing for oil and gas development with Coal Road being direct access to the lease areas. There currently is no traffic to speak of on Coal Road with most of it's use coming from summer biking to BLM grounds or hikers and walkers. Any future heavy truck traffic on the Coal Road would certainly interrupt the seasonal migration in one of the area elk herd's winter habitats.

Comment Number: 000311_GallA_20161031-1
Organization1:Backcounty Hunters and Anglers
Commenter1:Adam Gall
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Taking a specific look at one location, Oak Mesa falls into the category of lands available to leasing. Oak Mesa is part of a major migration corridor for elk and mule deer that come off the Grand Mesa and down into their traditional winter ranges. The undisturbed habitat of this area allows for healthy big game herds and a robust hunting economy. There are no established roads, virtually no habitat fragmentation and very little human impact other than during hunting season.

BLM_0165069

Numerous studies exist indicating roads and/or habitat fragmentation as a leading cause of declining and/or unhealthy ungulate populations. Additional winter ranges that would be compromised by across-the-board leasing would be the entire Lone Cabin region east of Paonia, the lower Minnesota Creek area and the largely undeveloped sagebrush-dominated landscape between the towns of Hotchkiss and Crawford.

Comment Number: 000400_InouyeD_20161028-7
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Other Sections: 21.3
Comment Excerpt Text:
Last week, a Denver Post article about the declining deer population in Colorado reported that ".... state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover.". It seems likely that other big game populations are also in danger of declining if there is large-scale oil and gas development in the study area. Road-kills are a major source of mortality already (I see many on Highway 133) and any increase in the number of roads, or of traffic on existing roads, will undoubtedly result in more roadkills, and disrupt traditional migration routes. How would these negative effects be mitigated if additional development occurs? Or could they be mitigated?

Comment Number: 000401_ShoemakerS_20161028-13
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Other Sections: 30.3
Comment Excerpt Text:
The RMP must address the massive impacts to wildlife, wildlife habitat, and hunting, along with related economic issues.

Comment Number: 000401_ShoemakerS_20161028-9
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Other Sections: 18.3
Comment Excerpt Text:
The RMP must address the adverse impacts of oil and gas development on human, agricultural animal, and wildlife health.

Comment Number: 000409_DayB_20161031-18
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Page 3-66. Habitat fragmentation is understated. The part about damaging some species and benefiting others is misleading. Typically, fragmentation is detrimental to species (such as Sage-grouse) that can afford disturbance the least because they have already declined. Changes resulting in habitat fragmentation usually only benefit the few species (ravens, red fox) that are already increasing.

BLM_0165070

Comment Number: 000457_BlandC_20161031-3
Organization1:
Commenter1:Carter Bland
Commenter Type:
Comment Excerpt Text:
4. Risks to wildlife from habitat fragmentation, interference with mitigation, and damage to grazing and wintering grounds;
5. Risks of damage to valuable recreational, hunting, and fishing resources;

Comment Number: 000483_HanksG_20161101-7
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 31.3 37.3
Comment Excerpt Text:
4.3.2 Soils and Geology
Trout Unlimited originally requested that underlying soils be identified across the UFO DRMP footprint, specifically in CRCT watersheds. Native fish are especially susceptible to the ill-effects of sedimentation to their habitat. Though we recognize the included mapping efforts with soil classifications, nowhere was referenced the local soils and potential consequences to CRCT or any other coldwater fisheries. The DRMP failed to provide a review of the numerous impacts to critical and sensitive fish and wildlife habitat from act of massive soil movement and changes from oil and gas development and we request that such information be provided in the Final RMP.
The DRMP fails to adequately analyze the impacts of soil sedimentation and revegetation as it impacts fish and wildlife habitat. Exploration and extraction of oil and gas resources does create alterations to the subsurface and surface environment. Analysis of the gravel and soil regime and its behavior during spring thaw events, flooding events, impacts to wetlands, and streams was inadequate in the DEIS. TU feels that the DRMP presents inadequate discussion of the long term and short term impacts from exploration and drilling activities that can be damaging to the soils and geology and the aquatic ecology of the surrounding areas.

Comment Number: 000489_JohnsonA_20161101-50
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
B. Areas of High Conservation Value
Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.
1. Big Game Winter Range
The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.
Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.
We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on

BLM_0165071

winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis.

Comment Number: 000509_WolcottE_20161102-13
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
Impacts of road densities and proximity on habitat fragmentation and corridors is well documented in the scientific literature. This type of analysis is not represented at all in the preferred alternative which does very little to address or mitigate habitat fragmentation. BLM lands are very important in the region in this regard, and a full analysis and robust mitigation should be applied.

Comment Number: 000509_WolcottE_20161102-14
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
Historical changes over time of habitat fragmentation should also be analyzed, along with cumulative fragmentation and corridors impacts in conjunction with oil and gas and other development on Forest Service, private and other lands.
Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-1
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix G – Best Management Practices and Standard Operating Procedures
There have been several wildlife habitat improvement projects implemented on the UFO to enhance winter range for big game. Several of those projects were developed and implemented in cooperation with the US Forest Service and Colorado Parks and Wildlife. The primary objective of these projects was to enhance existing winter range conditions and encourage elk and mule deer to utilize traditional winter ranges on public lands by improving winter forage and browse condition and production. These projects in combination with wildfire rehab efforts were largely successful in meeting these objectives. During that time the Uncompahgre National Forest also developed and implemented a forest- wide travel management plan which includes specific direction and actions to further encourage big game use of these winter ranges through an active program of reducing open road and trail densities through route decommissioning and seasonally closing big game winter range areas to all forms of motorized and mechanized travel from December 1 through April 15. In combination, these efforts have had a significant effect on seasonal use patterns and distribution of big game.
While the BLM did implement the vegetation projects, there has not been an equal effort to reclaim or manage the existing roads, trails, or fire lines within these areas, or to control use by the public. This was largely due to the lack of direction in the current RMP, or a comprehensive travel management plan for the UFO. The effectiveness of the vegetation treatments for big game on BLM lands has been reduced by this lack of travel management. Over the years of implementing these projects and suppressing and rehabbing wildfires, there has been a steady progression and increase in open road and OHV trail densities which are having a significant impact upon big game habitat effectiveness.

BLM_0165072

The UFO has made the decision to approach travel management on a watershed or implementation-level scale. There is a lot of merit to this approach, but there needs to be stronger direction and guidance in the RMP to prevent cumulative effects to wildlife habitat and our remaining unroaded landscapes. As one recent example, a travel management plan was developed for the Burn Canyon area south of Norwood. The final decision intends to provide a mix of recreation opportunities for hiking/horseback, bicycle, and OHV recreation. The Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-9
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 32.3
Comment Excerpt Text:
Appendix M – Travel Management
The RMP will determine planning level decisions for the UFO, such as which areas are open, closed, or limited to OHV and bicycle use, and which types of uses will be emphasized within those broad allocations (Recreation Management Areas – Appendix J). We believe the BLM should strive to provide a balance in those allocations, and to recognize the values we place on providing large blocks of undisturbed habitat for fish and wildlife and the opportunity for traditional methods of hunting and fishing in the backcountry. That balance would include a priority for the retention and enhancement of lands with wilderness characteristics and/or lands with low densities of open routes, lands that currently provide seasonally important big game habitat and migration corridors, and lands adjacent to communities surrounding the UFO that will provide opportunities for quiet use and solitude.
Appendix M includes a description of the process and criteria that will be considered by the BLM when evaluating routes within area-specific travel management plans during implementation of the RMP. Within Appendix M we would like to see the BLM include additional management goals and objectives for big game habitat capability and effectiveness. We strongly fell there is a need for additional consideration and recognition of the impacts of motorized and mechanized recreation use upon big game distribution, productivity, vulnerability, and population structure, as well as hunter success in relation to open road/trail density on the landscape. There is a large and growing body of research available that needs to be recognized and implemented by the BLM. We have posted several of the most relevant research studies on our website at backcountryhunters.org:
Literature Reviews of OHV Impacts on Hunting, Fishing and Habitat:
1. ATV Impacts on the Landscape and Wildlife [] (2011). A white paper by BHA which provides a synthesis of OHV-related articles in three sections focused on the effects of ATV use on: 1) soils, water quality and vegetation 2) wildlife (primarily elk) 3) the habitat and environment that wildlife depend upon.
https://d3n8a8pro7vhmx.cloudfront.net/backcountryhunters/pages/2374/attachments/original/145591927 5/ORV_WHITE_PAPER.pdf?1455919275
2. Off Road Vehicle Impacts on Hunting and Fishing. An excellent illustrated literature review by the Isaac Walton League highlighting the impacts that off road vehicle use has on our sporting heritage.
http://www.recpro.org/assets/Library/Trails/collision_course_ohv_report_2007.pdf

BLM_0165073

3. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands (2007). A synthesis of literature compiled by the Department of Interior.
https://pubs.usgs.gov/of/2007/1353/report.pdf
4. The Effects of Off-Road Vehicles on Ecosystems. A research review by Texas Parks and Wildlife.
https://tpwd.texas.gov/publications/pwdpubs/media/pwd_rp_t3200_1081.pdf
5. Effects of Roads on Elk: Implication for Management in Forested Ecosystems (2005). Research which builds on a large body of research demonstrating the impacts of roads on elk behavior and habitat.
http://www.emwh.org/pdf/elk/Effects%20of%20Roads%20on%20Elk%20Implications%20for%20Manageme nt%20in%20Forested%20Ecosystems%202005.pdf
6. Behavioral Responses of North American Elk to Recreational Activity (2008). A study which found that "activities of elk can be substantially affected by off-road recreation. Mitigating these effects may be appropriate where elk are a management priority. Balancing management of species like elk with off-road recreation will become increasingly important as off-road recreational uses continue to increase on public lands in North America." http://www.bioone.org/doi/abs/10.2193/2008-102
7. Reproductive Success of Elk Following Disturbance Following Disturbance by Humans During Calving Season (2011). A study which shows that cow/calf ratios decease when disturbance increases and therefore "maintaining disturbance-free areas for elk during parturitional periods" is necessary.
https://www.jstor.org/stable/3803250?seq=1#page_scan_tab_contents
There are additional Goals and Objectives and the associated Actions that relate to open road/trail densities, the impacts of bicycle trails and use, and the conservation of our existing backcountry areas that I request the BLM to include in Appendix M to guide implementation of travel management on the UFO. These additional Goals, Objectives, and Actions will also enable the BLM to fully comply with 43CFR 8342.1 b) Areas and trails will be located to minimize harassment of wildlife or significant disruption of wildlife habitat, and c) Areas and trails will be located to minimize conflicts between OHV's and other uses.
Goal/Objective – Locate and manage OHV and mechanized routes and trails to minimize harassment of wildlife or significant disruption of wildlife habitat.
Action #1 – Limit and reduce motorized and mechanized routes and trails in areas managed for mixed uses. Implement road and trail density standards within these areas that are favorable to big game habitat requirements as defined in current scientific research.
Action #2 – Motorized and mechanized routes and trails will avoid lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas.
Action #3 – No motorized off-route down game retrieval will be allowed anywhere within the UFO.
Action #4 – Seasonal closures to protect big game winter range will include snowmobiles.
Action #5 – Routes designated for administrative use within all mixed use areas, lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas will be closed to public OHV and bicycle use yearlong.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-13
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.3 32.3
Comment Excerpt Text:
In Dry Creek, the final RMP needs to recognize that not all trails are created equal, but rather factor in the mileage-requirements of long distance trail uses such motorized and mechanized, along with the additional habitat fragmentation these additional miles create. The RMP needs to analyze projected fragmentation by trails in this and other high use areas, to assess the carrying capacity of the land and to establish an upper limit on the amount of trail fragmentation that will still maintain habitat connectivity and BLM Land Use Health Standards into the future.

BLM_0165074

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-5
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Burn Canyon
Burn Canyon is an example of an overlap between a high trail use area, and a critical winter concentration big game area ---an overlap of a type that occurs in at least seven other places in the field office. The kind of high quality habitat found in Burn Canyon is increasingly rare on this largely desert mesa landscape, and disturbance by trails is raising stress levels in herds due to human interaction and avoidance, with potential to cause displacement of animals to less productive habitat. This in turn creates the likelihood over time of diminished reproductive success and ultimately declines in herd health and populations.
The Burn Canyon SRMA designation is a mixed blessing. There is first the manageability problem of locating a high-use SRMA adjacent to incompatible protective designations such as EEAs, ACECs or LWCs. Also RMRI has concerns about downshifting the Recreation Zones in the Burn Canyon SRMA into the less primitive backcountry and middle country settings, as an endless downward slide.
NOTE: Statewide, it is to be noted that even though Colorado citizens prioritize wildlife slightly higher than trails in recent CPW policy docs, they are not informed of the connections between the two, nor are the properly apprised of how trails could be designed and located to mitigate these impacts.

Comment Number: 000536_SchottJ_20161031-8
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Other Sections: 21.3
Comment Excerpt Text:
Wildlife: Oil and gas drilling and especially the fracturing process are loud, brightly lighted and operates 24 hours a day 7 days a week. The RMP does not take into consideration the negative impact these operations will have upon the wildlife. Pipelines cut through wild areas and interrupt the natural migration of elk and deer. Increased traffic and new roads cut into the wild, disrupt animal wellbeing and disrupt natural behaviors and could result in diminished populations

Comment Number: 000544_ThompsonK_20161101-6
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual
Other Sections: 10.3
Comment Excerpt Text:
The NFV is a Valley, and it is a small. It isn't a flat region where toxic chemicals may only penetrate the surface. The NFV is a small funnel-like environment in which toxicity, if present, will be concentrated in the lower regions of the Valley, where we all live. Thus, because of the size and structure of our Valley, our water sheds and air quality have a significant chance of being negatively impacted by heavy concentrated amounts of toxicity that would unequivocally impair the health of the citizens, causing respiratory and cancer related problems, and cause the demise of our magnificent wildlife (birds, eagles, elk, deer, mountain lions, bobcats) and their natural ecological habitats.

BLM_0165075

Comment Number: 500046_TrumbleM_20160923-1
Organization1:
Commenter1:Mary Trumble
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
You have done no studies or analysis in our specific area [North Fork Valley]. You did not identify the human health impact that hydraulic fracking would have in our area or the impact that it would have on our wildlife and hunting and fishing.

Comment Number: 000216_GibbG_20161026-1
Organization1:
Commenter1:
Commenter Type: Individual
Comment Excerpt Text:
Regarding the wildlife, if a high percentage of leasing occurs the wildlife migration patterns will be fragmented. It is my understanding that mule deer populations are declining. Several research articles indicate that this is due to an increase in development, especially from the oil and gas industry. In addition, many other species will suffer. It will affect hunting and wildlife viewing as well. The BLM also needs to consider wildlife, not just oil and gas. Wells, pads, ponds, pipe and roads will fragment the habitat.

*Summary*
Commenters noted that impacts to wildlife and wildlife habitat can occur from proposed development activities.

A. Commenters stated that the Proposed RMP should address the potential for wildlife habitat fragmentation from development, and recognize that if a high percentage of leasing occurs the wildlife migration patterns would be fragmented, such as in the Oak Mesa area. Commenters noted that fragmentation and other changes to wildlife habitat could impact hunting and wildlife viewing. Commenters recommended that the RMP management be revised to state that land treatment projects and other facilities would be constructed in a manner that would not degrade the quality and quantity of wildlife habitats. It is also recommended that wildlife habitat fragmentation be mitigated by assuring connectivity between Grand Mesa and West Elk Wilderness through the designation of Ecological Emphasis Areas and Special Recreation Management Areas. The text in the Draft RMP/EIS related to habitat fragmentation was found to be understated; a commenter noted that changes resulting in habitat fragmentation usually only benefit the few species (e.g., ravens and red fox) that are already increasing.

B. Commenters stated that the BLM needs to address the following additional issues in impacts analysis:

1. Impacts of soil sedimentation, revegetation, and climate change on fish and wildlife habitat
2. Impact of industrial oil and gas development and operations and related air, light, and water pollution on the health of wildlife animals, and on the hunting and fishing economy

BLM_0165076

3. Update Appendix M, Travel Management, to include additional management goals and objectives addressing conflicts between recreation, including motorized and mechanized uses, and wildlife

*Response*
A. The BLM appreciates the comments. The BLM revised the Proposed RMP/Final EIS to provide additional analysis related to the potential for habitat fragmentation from development, including additional discussion about ecological emphasis areas as a mechanism to reduce fragmentation at a landscape level (Draft RMP/EIS page 4-132). Ecological emphasis areas are discussed in the Draft RMP/EIS at pages 2-68 et seq. and 4-132 et seq., and in Appendix D. Also refer to the response to Section 42.1, Ecological Emphasis Areas, Range of Alternatives, of this report.

B. The BLM appreciates the comments.

1-2. The RMP analysis is intended to provide sufficient detail to inform the decision maker of the reasonable effects anticipated from planning for future development. The site-specific review of individual well pads, roads, pipelines, or other surface activities will be addressed at the permitting stage, which will also include on-site visits and a discussion of the specific conditions of approval and BMPs needed to address potential impacts.
3. Draft RMP/EIS Table 2-2, lines 472 through 489 present management actions designed to minimize potential conflict with wildlife and special status species. The BLM reviewed Appendix M, Travel Management, and added information as appropriate.

### Section 14.4 – General Fish and Wildlife: Cumulative impact analysis
No comments are associated with this topic.

### Section 14.5 – General Fish and Wildlife: Mitigation measures
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-23
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." With species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010.

*Summary*
Commenters recommended that the BLM further consult and consider the CPW's detailed list of BMPs for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources."

BLM_0165077

*Response*
Where appropriate, stipulations were modified for consistency with the CPW's statewide stipulation letter (*Colorado Department of Wildlife Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales*, December 13, 2010). CPW recommendations were considered in the development of stipulations and were updated in the Proposed RMP/Final EIS, where appropriate.

## Section 15 – Endangered Species

### Section 15.1 – Endangered Species: Endangered Species Act Consultation

Total Number of Submissions: 2
Total Number of Comments: 8

Comment Number: 000530_PlattA_20161101_EPA-27
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Documentation of the USFWS's consultation and recommendations for mitigation and monitoring will be a valuable addition to the Proposed RMP/Final EIS.
In addition, given that water consumption and produced water disposal considerations identified in our Comment #6 above could impact four Colorado River endangered fish species, we recommend the Proposed RMP/Final EIS describe how the BLM will ensure that future projects will comply with the recovery goals of the Upper Colorado River Endangered Fish Recovery Program.

Comment Number: 000563_King_WELC_HasAttach-195
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3 15.4
Comment Excerpt Text:
While the Uncompahgre Field Office has not published a Biological Assessment (BA) as a part of the DEIS process yet, any potential reliance in the UFO BA on the 2008 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 311), is improper. The PBO does not take into account the enormous water depletion effects of horizontal drilling. The PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to meet recommended stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

BLM_0165078

Comment Number: 000563_King_WELC_HasAttach-196
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.4 37.3 15.2
Comment Excerpt Text:
While the 2008 PBO is designed to address any depletions resulting from oil and gas development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices. [BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").]

Comment Number: 000563_King_WELC_HasAttach-197
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.7
Comment Excerpt Text:
Additionally, the UFO RMP DEIS must analyze cumulative impacts from oil and gas projects moving forward in the Uncompahgre planning area, namely the Bull Mountain Unit Master Development Plan. The Bull Mountain plan's Final Environmental Impact Statement (FEIS) anticipates the development of 146 new gas wells, half of which are assumed shale wells including horizontal drilling in the northwest portion of Gunnison County, within the UFO. [Bull Mountain Unit Master Development Plan Final Environmental Impact Statement (FEIS) (January, 2015), DOI -BLM-CO-S050-201 3-0022-EIS, at ES-1, available at
http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (attached as Exhibit 222).] The preferred alternative's water use in the Bull Mountain FEIS would exceed levels contemplated in the PBO. The FEIS estimates that construction, drilling, dust abatement, and completion of the 146 gas wells for the preferred alternative would require 2,480.2 acre-feet of water, of which 744.1 acre-feet would be fresh water.
[Bull Mountain FEIS, at ES-8 Table ES-1, ES-10-11.] Per well fresh water use, then, would amount to just over five acre-feet, nearly five times greater than the PBO's projections for vertical well depletions in the Gunnison River sub-basin. [Id.] The anticipated life of the project is six years, with an average of 27 wells drilled per year. [Compare id. at ES-7 with Exhibits 212-218 (water depletion logs).] Total fresh water depletions divided by the six year duration of the project amounts to 124 acre feet of fresh water depleted annually. As noted above, the PBO estimated total annual water depletions from the Gunnison sub-basin at 16 acre-feet—given the preferred alternative's proximity to tributaries of the Gunnison River, water would likely be taken from the Gunnison River sub-basin, although the Bull Mountain FEIS fails to clearly state the project's water source. [FEIS at 3-31, Figure 3-4.] The preferred alternative, then, would likely lead to annual water depletions from the Gunnison River sub-basin of over seven times greater than projected in the PBO. Even if water were drawn from the Colorado River sub-basin, the 124 acre-feet required annually by the preferred alternative alone would amount to nearly one third of all allowable annual depletions for the Colorado River sub-basin under the 2008 PBO. The Uncompahgre DEIS does not contemplate or analyze water depletions from the Bull Mountain project, nor does it address projected future water depletions, in clear violation of NEPA's cumulative impacts

BLM_0165079

analysis requirements. Additionally, to the extent that approval of the Uncompahgre draft RMP would rely on the PBO, such reliance is arbitrary and cannot constitute BLM's section 7 compliance. BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS.

Comment Number: 000563_King_WELC_HasAttach-199
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Ample evidence, including empirical research, demonstrates that climate change is already reducing stream flows in the Colorado River Basin and that flows will continue to dwindle as Colorado Basin temperatures rise. Accordingly, BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS.

Comment Number: 000563_King_WELC_HasAttach-200
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Compounding this threat to the endangered fish are persistent drought conditions that have diminished natural flows in the Colorado River Basin and reduced water storage that is needed to supplement Upper Basin flows. The period from 2000 to 2015 was the lowest 16-year period for natural flow in the last century, and one of the lowest 16-year periods for natural flow in the past 1,200 years, according to paleorecords. [Bureau of Reclamation, Managing Water in the West: SECURE Water Act Section 9503(c) Report to Congress, Chapter 3, Colorado River Basin at 3-64 (2016) (Chapter 3 attached as Exhibit 241).] As a result, water storage in the Colorado River system reservoirs have declined "from nearly full to about half of capacity," and led to local shortages in the Upper Colorado's sub-basins. [Id.] Further, population growth will increase water demand for agriculture and municipal uses, making it increasingly difficult to ensure sufficient water availability for the endangered fish, which rely on the release of stored water, especially in dry years. [See id. at 3-7, 3-8.] An ever widening gap between water supply and water demand is weakening the Colorado River water supply system's reliability and ability to buffer the system in dry years. [Id. at 3-10, 3-12.] According to the U.S. Geological Survey, "increased water demand and declining water availability make the restoration of endangered fish habitat extremely challenging." This growing gap between supply and demand in the Upper Colorado River Basin must be taken into account in a reinitiated consultation.

Comment Number: 000563_King_WELC_HasAttach-203
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A consistent pattern of failing to meet recommended flows in the Colorado River's 15- Mile Reach requires BLM and the Service to reinitiate consultation over the Fluid Mineral Program.

Comment Number: 000563_King_WELC_HasAttach-204
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

The Recovery Program's continuing pattern of failing to meet recommended flows is new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an extent that was not considered in the PBO or in the Uncompahgre RMP DEIS, and requires reinitiation of consultation over the Fluid Mineral Program or more specifically to the Uncompahgre RMP DEIS.

*Summary*

One commenter stated that the Proposed RMP/Final EIS should include documentation of USFWS's consultation and recommendations for mitigation and monitoring, and discussion about how future projects will comply with the recovery goals and associated recommended flows of the Upper Colorado River Endangered Fish Recovery Program.

A commenter also stated that the BLM cannot rely on 2008 Programmatic Biological Opinion to fulfill Endangered Species Act Section 7 consultation, as it does not consider new water intensive development activities in the area, population growth, or the pattern of consistent failure to meet recommended flows, and the BLM must reinitiate consultation on the PBO or initiate Section 7 consultation for the Draft RMP. A commenter also stated that the RMP cumulative impacts analysis of endangered species needs to include the Bull Mountain Unit Master Development Plan in relation to the Programmatic Biological Opinion limits.

*Response*

The Draft RMP/EIS states that "The BLM will consult with US Fish and Wildlife Service to develop the draft Biological Assessment, which will be prepared after public comments are received on the draft RMP/EIS" (Section 5.2.3). The draft Biological Assessment was prepared after the Proposed RMP was developed based on public comments on the Draft RMP/EIS, and consultation was complete prior to publishing the Proposed RMP/Final EIS. The Proposed RMP/Final EIS includes documentation of findings from the Biological Assessment and USFWS consultation. The Proposed RMP/Final EIS includes USFWS's recommendations for mitigation and monitoring, as appropriate. The Proposed RMP/Final EIS contains discussion about how future projects will comply with the recovery goals and associated recommended flows of the Upper Colorado River Endangered Fish Recovery Program.

The Proposed RMP/Final EIS contains additional text describing the 2017 Programmatic Biological Opinion for Water Depletions associated with BLM's Fluid Minerals Program within the Upper Colorado River Basin in Colorado.

### Section 15.2 – Endangered Species: Range of alternatives (including conservation measures)

Total Number of Submissions: 10
Total Number of Comments: 19

Comment Number: 000489_JohnsonA_20161101-44
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. Canada Lynx
The Canada lynx (Lynx canadensis) is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which

BLM_0165081

also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.

Comment Number: 000492_RandallR_20161101-8
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Other Sections: 15.3
Comment Excerpt Text:
Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout.

Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g., sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.

Comment Number: 000129_BlackburnW_20160901-3
Organization1:Thunder Mountain Wheelers ATV Club
Commenter1:Walt Blackburn
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 32.1
Comment Excerpt Text:
The Hookless Cactus having been identified specifically on the northern part of the "open area." TMW suggest that the total "open area" be reduced by approximately 2 thousand acres by eliminating "open riding" on the norther 1/3 of the area and re-designate that area to designated trails only.

BLM_0165082

Comment Number: 000345_ReeseC_20161027-17
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
The final plan must designate known habitats of rare and threatened fish species as Right of Way exclusion areas and prohibiting oil and gas surface activities. The same holds true for riparian zones and wetlands. Roads, pipelines, powerlines, and well pads will negatively impact water quality and reduce available habitat for local fish species

Comment Number: 000402_RatnerJ_20161028-50
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP must provide clear management direction for the protection of ESA listed and BLM Sensitive Species

Comment Number: 000402_RatnerJ_20161028-56
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM should establish goals, objectives, standards and limitations to ensure the protection of and recovery of threatened, endangered, sensitive and special status species. BLM should designate critical habitat for every endangered, sensitive, threatened and special status species. These habitat areas should be managed with the species survival and recovery as the highest and most valuable use. The BLM should look at all options for protecting activity centers through special status land designations, including, but not limited to, Areas of Critical Environmental Concern, Research Natural Areas, Outstanding Natural Areas, Wilderness Study Areas, Suitable Wild, Scenic and Recreational River miles, or other administrative designations.

Comment Number: 000486_ClaytonJ_20161101-14
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Page: B-87
Line: TL-14
Comment: We recommend extending the Timing Limitation (TL) through August 31 to protect nesting cuckoos that have not yet finished nesting and might still have un-fledged young. We also recommend extending the TL buffer out to 800 m instead of 100 m (at least for major activities such as drilling, use of explosives, pile-driving, etc.). And we recommend that the TL not be restricted to riparian areas—noise and human disturbance outside of and adjacent to riparian habitats could indirectly disturb nesting cuckoos nearby. Exceptions could be appropriate within this area for minor disturbances meeting specified criteria.

BLM_0165083

Comment Number: 000486_ClaytonJ_20161101-4
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-89
Line: 143
Comment: Alternative D: We believe that an NSO (as in alternative B) would be more appropriate for areas where threatened and endangered plants are found than a CSU. The plan states that an inventory of habitat may be required before drilling. How will we know when inventory of habitat be required? What criteria will be used to determine when an inventory of habitat is required?
Also, is there an ACEC proposed for any Colorado hookless cactus populations to protect core areas? We recommend protection, such as an ACEC designation, for one or more large, dense, healthy hookless cactus populations to aid in the recovery of the species.

Comment Number: 000489_JohnsonA_20161101-24
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1
Comment Excerpt Text:
Table 2-2, Actions 99, 139, and 147 endanger the health of fisheries by failing to protect aquatic habitat to the most prudent extent necessary to ensure a viable and healthy fish habitat into the future. The pursuit of "opportunities to enhance, protect, or restore native aquatic species habitats" (Action 99) does not guarantee that such goals will be met. Additionally, the preferred alternative fails to recognize priority habitats for special status fish and aquatic wildlife which include perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters. These failures have the potential to place undue stress on these species and threaten the community health of these organisms (Action 133). Threatened and endangered species are particularly under threat because the habitat they occupy will be managed under the proposed preferred alternative as right of way avoidance, rather than exclusion areas (Action 139). Finally, the proposed alternative fails to provide adequate protection for the Native Cutthroat Trout (Action 147). This federally listed fish species requires the maintenance of its habitat integrity and the promotion of their recovery, and the buffer zones and other restrictions threaten that integrity and recovery.

Comment Number: 000489_JohnsonA_20161101-32
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1
Comment Excerpt Text:
D. Special Status Species, Wildlife & Vegetation (Aquatic and Riparian)
The draft RMP does not adequately protect fish from adverse surface activity. The WSCC is concerned the BLM has not taken sufficient measures within the draft RMP to protect and support and growth of fisheries within the UFO. Inadequate buffers zones described in the agency's preferred alternative D for ROW, surface use, and travel management are pervasive throughout the draft RMP. It is imperative that the BLM protect special status fish and aquatic wildlife by recognizing that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters as priority habitats (Action 133, Alt. B).

Furthermore, it is vitally important that the BLM protect federally listed fish species, maintain the integrity of habitat for federally listed species, and promote their recovery by prohibiting surface occupancy and restricting all ground disturbances within one mile of federally listed fish occupied habitat as described in Action 147, Alt. B; Appendix B, B-24.

The WSCC has found that throughout the draft RMP there are multiple areas where the agency preferred alternative leaves far too much uncertainty in its prescribed actions. For example, in Table 2-2, action 99, the preferred alternative dictates that the action "pursue opportunities to enhance, protect or restore native aquatic species habitat". The word "Pursue" allows for incompletion of the presented objective of the action. However, Alternative B dictates precise actions to enhance protect and restore native aquatic species habitat' The WSCC recommends the BLM adopt actions described in alternative B to protect habitat for fisheries and aquatic animals by enhancing, protecting, and restoring at least 5 miles of aquatic habitat by doing things like modifying or removing fish migration barriers and improving stream vegetation and structure to benefit non-game native species (Action 99, Alt. B) and thereby achieve the intended objective.

Comment Number: 000489_JohnsonA_20161101-4
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1
Comment Excerpt Text:
c. Wildlife habitat and migration routes.

The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections. In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Comment Number: 000489_JohnsonA_20161101-46
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4. Colorado Hookless Cactus

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the

BLM_0165085

BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.

Comment Number: 000489_JohnsonA_20161101-48
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
6. Clay-loving Wild Buckwheat
The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed Action 20. in Alternative B:
Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.
Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.

Comment Number: 000545_SlivkaJ_20161101-175
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.
In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.
In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.

Comment Number: 000545_SlivkaJ_20161101-177
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Colorado Hookless Cactus

BLM_0165086

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.

Comment Number: 000545_SlivkaJ_20161101-178
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1
Comment Excerpt Text:
Clay-loving Wild Buckwheat
The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed action in Alternative B:
Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations. Uncompahgre Draft RMP at 2-394. Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area

Comment Number: 000563_King_WELC_HasAttach-196
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.1 15.4 37.3
Comment Excerpt Text:
While the 2008 PBO is designed to address any depletions resulting from oil and gas development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices. [BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").]

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-11
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
14. Lynx management standards provided in the ACEC designations appear to address many issues excluded from management by best available science.
The Organizations again must express serious concern with the possible designation of the San Miguel ACEC expansion based on lynx habitat possibly being in the area. As the Organizations have been involved in years of discussions with national experts on the lynx, the Organizations can vigorously state

BLM_0165087

that the population issues with the lynx are the result of overhunting and poisoning of the species around 1900 and that all national experts agree that there is no lack of habitat for a lynx in Colorado. Additionally, CPW reintroduced the lynx around 2000 in Colorado and the species has flourished. CPW now estimates that the population is above carrying capacity for the state. The only reason the species has not been delisted is the lynx was listed at the landscape level and only Colorado has undertaken a reintroduction, which was plagued by many management challenges, and now the lynx cannot be removed from listing on any level other than by a landscape level delisting.

The Organizations were active participants in stakeholder meetings leading to the issuance of the 3rd edition of the Lynx Conservation Assessment and Strategy in 2013, which document was specifically adopted by the BLM and USFWS. The Organizations are very concerned that this document is simply never mentioned in relevant parts of the RMP and lynx issues have been relied for many management changes. The Organizations wanted to highlight some of the more significant changes in lynx management standards in the 2013 LCAS including:

• Recreational usage of lynx habitat is a second level threat and not likely to have substantial effects on the lynx or its habitat. Previous theory and management analysis had placed a much higher level of concern on recreational usage of lynx habitat; 44

44 See, Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy. 3rd edition. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp. at pg 94. (Hereinafter referred to as the "2013 LCAS")

• Lynx have been known to incorporate smaller ski resorts within their home ranges, but may not utilize the large resorts. Dispersed motorized recreational usage certainly does not create impacts that can be equated to even a small ski area; 45

45 2013 LCAS at pg 83.

• Road and trail density does not impact the quality of an area as lynx habitat;46

46 2013 LCAS at pg 95.

• There is no information to suggest that trails have a negative impact on lynx; 47

47 2013 LCAS at pg 84.

• Snow compaction from winter recreational activity is not likely to change the competitive advantage of the lynx and other predators;48

48 2013 LCAS at pg 83.

• Snow compaction in the Southern Rocky Mountain region is frequently a result of natural process and not recreational usage; 49

49 2013 LCAS at pg 26.

• Winter recreational usage of lynx habitat should only be "considered" in planning and should not be precluded given the minimal threat this usage poses to the lynx; and 50

50 2013 LCAS at pg 94.

• Failing to manage habitat areas to mitigate impacts of poor forest health issues, such as the spruce and mtn pine beetle, is a major concern in lynx habitat for a long duration.51

51 2013 LCAS at pg 91.

The Organizations are aware that the 2013 LCAS represents a significant change in management standards for a wide range of issues from the 2000 LCAS and Southern Rockies Lynx Amendment. It is our intent in providing a copy of the 2013 LCAS at this time that complete incorporation of this best available science, which reflects the minimal impacts of recreational usage of lynx habitat will streamline any site specific planning issues in the future. The RMP standards must be brought into consistency with best available science that has been clearly stated on this issue and submit that lynx habitat in Colorado is simply not a factor to be addressed in the creation of ACEC areas.

BLM_0165088

Comment Number: FormLetterL_CHC WSCC-12
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Federally listed and threatened aquatic species - The final plan must designate known habitats of rare and threatened fish species as Right of Way exclusion areas and prohibiting oil and gas surface activities. The same holds true for riparian zones and wetlands. Roads, pipelines, powerlines, and well pads will negatively impact water quality and reduce available habitat for local fish species.

*Summary*
A. Commenters requested that the BLM designate critical habitat for every endangered, sensitive, threatened, and special status species and manage this habitat with the species survival and recovery as the highest and most valuable use. Commenters recommended that the BLM look at all options for protecting habitat through special status land designations, including, but not limited to, ACECs, Research Natural Areas, Outstanding Natural Areas, WSAs, suitable wild, scenic, and recreational river miles, or other administrative designations.

B. Commenters recommend the following measures to protect Canada lynx:

1. Include protective provisions from Alternative B (i.e., non-waivable NSO stipulations) in the Proposed RMP to prevent violation of the ESA.
2. Review Canada lynx management standards provided in the ACEC designations, as they appear to address many issues excluded from management by best available science.

C. Additional recommendations were provided to provide adequate protection for other federally listed species, including:

1. Designate known habitats of rare and threatened fish species as ROW exclusion areas, prohibit oil and gas surface activities, and restrict all ground disturbances within 1 mile of federally listed fish occupied habitat.
2. Include the Adobe Badlands lands with wilderness characteristics unit, Adobe Ecological Emphasis Area, and Salt Desert Shrub Ecosystem ACEC in the Proposed RMP for protection of Colorado hookless cactus.
3. Provide protection of the clay-loving buckwheat through ACEC designations and by limiting OHVs to designated trails in the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.
4. Protect core areas of Colorado hookless cactus populations with a designation such as an ACEC.
5. Reduce the North Delta OHV open area by approximately 2,000 acres by closing its northern third to protect Colorado hookless cactus.
6. Identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g., sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.
7. To protect nesting yellow-billed cuckoos that have not yet finished nesting and might still have un-fledged young, extend TL-14 through August 31. Extend the TL buffer to

800 meters instead of 100 meters (at least for major activities such as drilling, use of explosives, and pile-driving). Do not restrict the TL to riparian areas.

8.  In Alternative D, apply an NSO instead of a CSU for areas where threatened and endangered plants are found. Specify under which criteria a habitat inventory will be required before drilling.

9.  Consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete water to develop the Mancos/Mowry and Niobrara shale plays and consider the use of these water-intensive practices throughout the rest of the programmatic action area.

*Response*

A. Formal Endangered Species Act consultation and requirements of Section 7(a) as they pertain to federal action agencies under the Endangered Species Act are addressed in the Biological Assessment prepared in association with the Proposed RMP/Final EIS. While the Proposed RMP/Final EIS analysis was used in developing the Biological Assessment, the Biological Assessment contained the formal impacts determinations for each listed species. The US Fish and Wildlife Service issued their Biological Opinion on December 17, 2018.

Designation of critical habitat falls under the purview of USFWS and is not a BLM land use planning action. The BLM surveys suitable habitat for all sensitive species during site-specific project planning and addresses impacts accordingly at the site-specific scale.

The Draft RMP/EIS contains a variety of management actions to support habitat for Endangered Species Act listed species, including, but not limited to, ACECs, other special designations, and stipulations to prevent ground-disturbing activities.

B. The BLM appreciates the comments.

1.  The BLM reviewed the the recommended changes for Canada lynx, including the Canada Lynx Conservation Assessment and Strategy, 3rd edition[12], and updated the Proposed RMP/Final EIS to reflect the additions/modifications, which includes not bringing forward the proposed San Miguel Expansion ACEC to the Proposed RMP.

2.  No Canada lynx management standards are provided in the proposed ACECs, and no proposed ACECs would manage for lynx; refer to Draft RMP/EIS Appendix O, Summary of Areas of Critical Environmental Concern Report, and the more-detailed report, *Evaluation of Existing and Proposed Areas of Critical Environmental Concern for the Uncompahgre Planning Area* (BLM 2011f).

C. The BLM reviewed the recommended changes for other listed species and updated the Proposed RMP/Final EIS, as appropriate. This includes making the existing 8,560 North Delta Open OHV Area into a 3,950 SRMA with a target use of open OHV use. The surface land

---

[12] Interagency Lynx Biology Team. 2013. Canada lynx conservation assessment and strategy, 3rd edition. US Department of Agriculture, Forest Service; US Department of the Interior, Fish and Wildlife Service, Bureau of Land Management, and National Park Service. Forest Service Publication R1-13-19, Missoula, MT. 128 pp. Internet Web site: https://www.fs.fed.us/biology/resources/pubs/wildlife/LCAS_revisedAugust2013.pdf.

BLM_0165090

reduction includes closing part of the northern portion of the area to protect the Colorado Hookless cactus.

### Section 15.3 – Endangered Species: Best available information—baseline data

Total Number of Submissions: 2
Total Number of Comments: 3

Comment Number: 000402_RatnerJ_20161028-20
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP must provide scientifically defensible and clear direction for the recovery and management ESA listed and BLM Sensitive Species. The DEIS fails to accomplish this.
BLM must ensure full compliance with BLM Manual MS-6840.06.E (Special Status Species Management). BLM Manual MS-6840.06.E requires that "protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species"—that is:
Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed. BLM Manual MS-6840.06.C & .06.E. See BLM Manual MS-6840.06.C (1&3) (discussing BLM's responsibility to confer with U.S. Fish & Wildlife Service regarding individual species' needs).

Comment Number: 000402_RatnerJ_20161028-41
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 34.2
Comment Excerpt Text:
Additionally, the EIS should document how domestic grazing activities on allotments has affected habitat for threatened, endangered, and sensitive species in the project area. How has vegetation changed as a result of a century of livestock grazing?

Comment Number: 000563_King_WELC_HasAttach-201
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Uncompahgre DEIS and Fluid Mineral PBO's discussion of the environmental baseline for, and threats to, the Colorado pikeminnow and razorback sucker contains no discussion whatsoever of environmental and tissue mercury contamination or the resulting toxicity and reproductive impairment to the endangered fish. Significant new research since the Uncompahgre DEIS and the 2008 PBO has demonstrated that elevated levels of mercury in Colorado pikeminnow muscle tissue, including within the Upper Colorado River Basin, are at concentrations likely to cause reproductive and behavioral impairment to the fish. [USFWS, Upper Colorado River Endangered Fish Recovery Program, Colorado pikeminnow (Ptychocheilus lucius), 5-Year Review: Summary and Evaluation 21 (2011) ("[T]he recovery goal revision needs to consider the impacts of mercury. . . the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure.") (attached as Exhibit 309) ("Colorado Pikeminnow 5-year Review"); USFWS, Biological Opinion for the Four Corners Power

BLM_0165091

Plant and Navajo Mine Energy Project at 76 & Table 3 (April 8, 2015) ("Four Corners Biological Opinion") (attached as Exhibit 243).

*Summary*

One commenter stated that the draft RMP fails to provide scientifically defensive and clear direction for the recovery and management of Endangered Species Act-listed and BLM sensitive species.

1. Revise text to fully comply with BLM Manual 6840 and discuss how historic domestic grazing activities on allotments have impacted habitat for threatened, endangered, and sensitive species.
2. Provide background information on tissue mercury contamination and resulting toxicity and reproductive impairment to endangered fish (including the Colorado pikeminnow and razorback sucker).
3. Include an adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries, as well as the Colorado River cutthroat trout.

*Response*

The Draft RMP/EIS utilized the best available science for an RMP-level planning document for all special status species. The BLM is a multi-use agency, and management actions balance the protection of special status species and resource uses.

The BLM appreciates the comments.

1. This information was added to the Proposed RMP/Final EIS.
2. The baseline conditions discussion in Draft RMP/EIS Section 3.1.7, Special Status Species – Trends – Special Status Fish and Wildlife, beginning on Draft RMP/EIS page 3-85, is intended to provide a brief overview of the factors that have impacted current population levels. As noted on Draft RMP/EIS page 3-85, habitat degradation and loss are caused by, or exacerbated by, historic overgrazing, oil and gas development, mining, water diversions, recreation, agriculture, residential development, and other human activities. Coal development (of which mercury is a byproduct) was added to the list of factors impacting special status fish species trends in the Proposed RMP/Final EIS. As noted in the Draft RMP/EIS (page 4-257), the site-specific review of individual coal development and detailed analysis of impacts on special status species, as applicable, will be addressed at the permitting stage.
3. Draft RMP/EIS Section 3.1.7, Special Status Species – Current Conditions – Special Status Fish and Wildlife, beginning on Draft RMP/EIS page 3-75, contains information about distribution and status of these species. For Colorado pikeminnow, razorback sucker, and bonytail chub, distribution information is contained in the text write-ups for these species beginning on Draft RMP/EIS page 3-75, their federal status is contained in Draft RMP/EIS Table 3-23 (page 3-76), and trends are discussed on Draft RMP/EIS page 3-85. Additional information regarding baseline habitat conditions for these three federally listed species (Colorado pikeminnow, razorback sucker, and bonytail chub) was added to the Proposed RMP/Final EIS. Additional details of these species will be included in the Biological Assessment prepared in association with the Proposed RMP/Final EIS.

BLM_0165092

For the BLM sensitive species of roundtail chub, bluehead sucker, flannelmouth sucker, and Colorado River cutthroat trout, distribution information and baseline habitat conditions are contained in the text write-ups for these species beginning on Draft RMP/EIS page 3-78, their federal status is contained in Draft RMP/EIS Table 3-24 (page 3-79), and trends are discussed on Draft RMP/EIS page 3-85.

### Section 15.4 – Endangered Species: Impact analysis
Total Number of Submissions: 6
Total Number of Comments: 12

Comment Number: 000356_AdamK_20161031-15
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Please include language that addresses the issue of predation on endangered species prior to AUM decreases.

Comment Number: 000489_JohnsonA_20161101-43
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.4 16.3 44.3
Comment Excerpt Text:
C. Wildlife
1. Imperiled Species
Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

Comment Number: 000483_HanksG_20161101-9
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 16.3 16.1
Comment Excerpt Text:
4.3.5 Fish and Wildlife
The DRMP identifies CRCT as species of specific concern, and GBCT as federally threatened and though not expressly listed, identifies populations of these fish in waterways of the UFO. Given the level of oil and gas development along with other factors affecting water quality and quantity, TU remains

BLM_0165093

particularly concerned with the management of these streams and the overall watershed condition. Most of these populations are isolated from one another and without implementing stringent protection measures; a single damaging event could exterminate any one of these populations. TU believes that these high value water bodies deserve full protective measures from oil and gas development, should be identified and mapped, and be assigned strict stipulations that include strong buffers (as defined below), NGD language, and ongoing defined water quality monitoring.

The BLM is within its regulatory and management jurisdiction to prioritize the protection of all of these streams. Such measures will ensure the retention and proliferation of these populations in both the short- and long-term including restoration efforts that expand the ranges in and around these streams. We strongly disagree that buffer recommendations of less than 500 feet would protect all fish-bearing streams. Riparian and stream setbacks, or buffers, must be expanded to provide better protection from accidents and spills. Current stipulation proposals are inadequate and insufficient to protect the fisheries and riparian components should a spill occur. Strong buffers provide significant protections. We support the quarter-mile buffer required on major rivers; however, many sensitive populations of native trout (CRCT and GBCT) exist outside of those major rivers and are located in more isolated first order streams. Any other buffer size, such as proposed 325 foot, from a multi-well pad oil and gas rig will offer little protection. Instead, we recommend one-quarter mile buffer for all perennial waters, similar to that which the Little Snake River Field Office has implemented (October 2011). For sensitive fish species, such as CRCT, we recommend minimum one-half mile buffer.

It is TU's assertion, supported by science (see discussion on buffers below) that the larger a buffer area, the better protection measures are allowed. Oil and gas activities involve extreme disturbances to surface and subsurface lands. We are advocating for stronger buffer stipulation requirements in the DRMP, reasoning that it is easier to modify larger buffer protections to lesser buffer protections through negotiated conditional use approvals and agreements, science-backed exemptions, and increased monitoring.

Potential impacts to surface and groundwater sources include increased sedimentation, turbidity of surface water, erosion, wetland loss, effects on water quality from contamination with drilling fluids, petroleum, hydraulic fracturing chemicals, other industrial chemicals used during drilling practices, and the disruption of historic and normal flow patterns of surface water due to the increased number of roads, well pads, permanent surface facilities, and traffic. The DRMP fails to adequately address these significant impacts.

Comment Number: 000545_SlivkaJ_20161101-173
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 44.3
Comment Excerpt Text:
Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

Comment Number: 000545_Slivka|_20161101-174
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Canada Lynx
The Canada lynx (Lynx canadensis) is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

Comment Number: 000563_King_WELC_HasAttach-193
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA.

Comment Number: 000563_King_WELC_HasAttach-194
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2 37.4
Comment Excerpt Text:
BLM must analyze the effects of the massive water demand resulting from relatively new horizontal drilling techniques in the Upper Colorado River Basin (the "Upper Basin") which would impact watersheds in the Uncompahgre planning area, including (1) the significant cumulative impacts on local water supplies and the Colorado River endangered fish under NEPA and (2) the cumulative impacts of water depletion effects on the Colorado River endangered fish under Section 7 of the Endangered Species Act. The loss of adequate flows in the endangered fishes' habitat within the Upper Colorado River Basin is so serious that the Service has determined that any depletion of Upper Basin stream flows adversely affects and jeopardizes the endangered fish. [U.S. Bureau of Land Management, White River FEIS at 3-71 (2015) ("The FWS has determined that any federally authorized depletion from the Upper Colorado River Basin has an adverse effect on listed Colorado River fishes.") (Chapter 3 attached as Exhibit 310); Biological Opinion for BLM Resource Management Plan (RMP), Price Field Office (PFO), 138 (Oct. 27, 2008), available at:
http://www.blm.gov/style/medialib/blm/ut/price_fo/Planning/rod_approved_rmp.Par.2742.File.dat/Price%2 0Biological%20Opinion.pdf (attached as Exhibit 209) ("The USFWS determined that any depletion will jeopardize their continued existence and will likely contribute to the destruction or adverse modification of their critical habitat") (citing USDI, Fish and Wildlife Service, Region 6 Memorandum, dated July 8, 1997); Biological Opinion for BLM Resource Management Plan (RMP), Vernal Field Office (VFO), 113 (Oct. 23, 2008), available at:
http://www.blm.gov/style/medialib/blm/ut/vernal_fo/planning/rod_approved_rmp.Par.4719.File.dat/Vernal BiologicalOpinion.pdf (attached as Exhibit 210) (same).] The UFO draft RMP and EIS identifies critical habitat of at least two endangered fish populations within the planning area, namely the Colorado

BLM_0165095

Pikeminnow and the Razorback Sucker in the Gunnison and Uncompahgre Rivers. UFO RMP DEIS at 3-75. Therefore, any depletion is subject to Section 7 consultation and review under NEPA.

Comment Number: 000563_King_WELC_HasAttach-195
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.1 37.3
Comment Excerpt Text:
While the Uncompahgre Field Office has not published a Biological Assessment (BA) as a part of the DEIS process yet, any potential reliance in the UFO BA on the 2008 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 311), is improper. The PBO does not take into account the enormous water depletion effects of horizontal drilling. The PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to meet recommended stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

Comment Number: 000563_King_WELC_HasAttach-196
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.1 37.3 15.2
Comment Excerpt Text:
While the 2008 PBO is designed to address any depletions resulting from oil and gas development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices. [BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").]

Comment Number: 000563_King_WELC_HasAttach-198
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165096

The Uncompahgre RMP DEIS and the PBO entirely fails to acknowledge climate change effects on Upper Colorado River Basin stream flows, and related effects on the endangered fish. [In contrast, the Biological Assessment for the Bull Mountain MDP acknowledges that climate change "could impact listed fish species and their habitats by reducing suitable habitat, changing distributions, and altering food webs and water quality, including temperatures. Additional effects of climate change may include severity and frequency of droughts, floods, and wildfires, as well as changes in the timing of snowmelt and peak flows (Isaak et al. 2012; Haak et al. 2010; Rieman and Isaak 2010; Wenger et al. 2011), all of which may impact listed fish species in the analysis area." BLM, Biological Assessment, Uncompahgre Field Office, Bull Mountain Unit Master Development Plan and EIS, 4-9 (2015) (attached as Exhibit 223).] Anthropogenic climate change is profoundly impacting the Colorado River in ways that are altering temperature, streamflow, and the hydrologic cycle. As detailed below, changes observed to date include rising temperatures, earlier snowmelt and streamflow, decreasing snowpack, and declining runoff and streamflow. Modeling studies project that these changes will only worsen, including continued declines in streamflow and intensification of drought. Climate change is likely to have significant effects on the endangered fish species in the Colorado River basin and the Colorado River ecosystem.

Comment Number: 000563_King_WELC_HasAttach-202
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Uncompahgre DEIS acknowledges, without detail or quantitative analysis, that "selenium is a particularly important issue in the Gunnison River Basin, as elevated levels are the suspected cause of reproductive failure of select species of warm water fishes in the Lower Gunnison River. The most widespread impairment to area water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds and are suspected to be the cause of reproductive failures in select species in the Lower Gunnison River." UFO RMP DEIS at 3-31. While the UFO RMP does reference its participation in the Gunnison River Basin Selenium Management Program (SMP) as part of a 2009 programmatic Biological Opinion for selenium in the Gunnison River, the UFO RMP does not address how they are monitoring or minimizing selenium loadings from non-agricultural nonpoint sources in this RMP, especially for potential fossil fuel development. In fact, in the 2011 "Program Formulation Document" for the SMP, as well as its latest (2014) Annual Progress Report, it stated that BLM will "address selenium in new [Uncompahgre] Resource Management Plan." [U.S. Bureau of Reclamation, Selenium Management Program: Program Formulation Document Gunnison River Basin, Colorado, Prepared by Selenium Management Program Workgroup at 69 (December 2011), available at http://www.usbr.gov/uc/wcao/progact/smp/docs/Final-SMP-ProgForm.pdf (attached as Exhibit 250); U.S. Bureau of Reclamation, Selenium Management Program Annual Report at 23 (2014) available at http://www.usbr.gov/uc/wcao/progact/smp/docs/SMP-2014AnnualRep.pdf (attached as Exhibit 251).] There is no substantive review of the SMP or requirements within the SMP referenced anywhere in the draft UFO RMP DEIS. The effects of selenium on endangered fish species in the UFO are extensively documented in the below comments.

Comment Number: 000402_RatnerJ_20161028-34
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 34.3 23.1
Comment Excerpt Text:
3-46 states:

BLM_0165097

Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:

Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

### Summary

Commenters requested inclusion of analysis of the following:

1. Additional analysis on the impacts of fluid mineral leasing, including analysis of unconventional drilling technologies, on Canada lynx, Gunnison sage-grouse, greenback cutthroat trout, and Colorado hookless cactus
2. Impacts of water depletion from horizontal drilling technologies and potential effects on aquatic threatened and endangered species
3. Impacts of increased selenium load on endangered fish species
4. Potential of endangered birds drinking from wastewater pools
5. Impacts of development on water quality and the resultant effects on greenback cutthroat trout
6. Impacts of climate change on threatened and endangered species habitat
7. For oil and gas development, consideration of a larger buffer, more than 500 feet, from perennial waters for better protection of fish-bearing streams from accidents and spills
8. Potential impacts of livestock grazing on Colorado hookless cactus

### Response

The RMP analysis is intended to provide sufficient detail to inform the decision maker of the reasonable effects anticipated from planning for future development; the site-specific review of individual well pads, roads, pipelines, or other surface activities will be addressed at the permitting stage, which will also include on-site visits and a discussion of the specific conditions of approval and BMPs needed to address potential impacts.

The BLM appreciates the comments. Analysis of the noted topics was included in the Draft RMP/EIS as follows. The BLM reviewed recommended edits and incorporated them in the Proposed RMP/Final EIS, as appropriate.

1. Impacts on Canada lynx are discussed on Draft RMP/EIS pages 4-155, 4-159, and 4-163. Impacts specific to greenback cutthroat trout are not discussed, as impacts on this

BLM_0165098

species are considered in the Colorado River cutthroat trout discussion (Draft RMP/EIS pages 4-149-150, 4-155, 4-159, and 4-162-163) because the two species are closely related. Impacts on Colorado hookless cactus are discussed on Draft RMP/EIS pages 4-146, 4-147, 4-149, and 4-162. Refer to Section 44 of this report for Gunnison sage-grouse. Analysis of unconventional drilling technologies on Canada lynx, Gunnison sage-grouse, greenback cutthroat trout, and Colorado hookless cactus was added to the Proposed RMP/Final EIS.

2. Horizontal drilling effects on water resources are discussed in Draft RMP/EIS Section 4.3.3, Water Resources, on page 4-83. The results of the re-initiation programmatic biological assessment for water depletions for oil and gas activities were incorporated in the Proposed RMP/Final EIS.

3. Impacts of increased selenium load on endangered fish species was analyzed in the 2017 *Programmatic Biological Assessment Management of the Federal Fluid Minerals Program in Western Colorado Water Depletion Effects on the Four Endangered Big River Fishes: Bonytail (Gila elegans), Colorado Pikeminnow (Ptychocheilus lucius), Humpback Chub (Gila cypha), and Razorback Sucker (Xyrauchen texanus) in the Upper Colorado River Basin* which is incorporated by reference in the Final EIS.

4. Impacts of birds in general drinking from wastewater pools are discussed on Draft RMP/EIS pages 4-130.

5. Impacts specific to greenback cutthroat trout are not discussed, as impacts on this species are considered in the native cutthroat trout discussion (Draft RMP/EIS pages 4-149-150, 4-155, 4-159, and 4-162-163) because the two species are closely related. This was clarified in the Proposed RMP/Final EIS.

6. Impacts on climate change on special status species are discussed on Draft RMP/EIS pages 4-151. The Proposed RMP/Final EIS was updated to include new climate change data including information from the 2017 *Programmatic Biological Assessment Management of the Federal Fluid Minerals Program in Western Colorado Water Depletion Effects on the Four Endangered Big River Fishes: Bonytail (Gila elegans), Colorado Pikeminnow (Ptychocheilus lucius), Humpback Chub (Gila cypha), and Razorback Sucker (Xyrauchen texanus) in the Upper Colorado River Basin,* which is incorporated by reference in the Final EIS.

7. Larger (greater than 500 feet) buffers are considered for various alternatives in Draft RMP/EIS Table 2-2, line 44 (NL-2, NL-3, NSO-7, and NSO-9; page 2-36) and line 47 (NL-4 and NL-5; page 2-38).

8. The BLM has made an "adverse effect" determination regarding federally listed plants and its livestock grazing program and has consulted USFWS in accordance with ESA Section 7. Furthermore, the BLM intends to follow the conservation measures presented in the Biological Opinion.

### Section 15.5 – Endangered Species: Cumulative impact analysis
No comments are associated with this topic.

### Section 15.6 – Endangered Species: Mitigation measures
Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-26
Organization1:San Miguel County Board of Commissioners

BLM_0165099

Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW).

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-5
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
11. Accurate implementation of endangered species listing decisions is critical to any long term recoveries.
Prior to addressing the specific concerns on particular species, the Organizations must provide a brief summary of our participation in endangered species issues as the basis for why accurate representation of current best available science is such an issue for the Organizations. This is a major concern as almost all public lands in Colorado are possible habitat for some form of wildlife. The Organizations believe the summary is necessary in order to develop a complete understanding of the level of frustration that has been experienced in review of the ACEC portions of the DRMP. The Organizations have been active partners with Colorado Parks and Wildlife and the US Fish and Wildlife Service in the management of several endangered species, including the lynx and wolverine. The Organizations have been actively involved in multiple year stakeholder meetings regarding the Wolverine in the hope of developing sufficient management clarity to allow the wolverine to be reintroduced and avoid many of the issues that have plagued the lynx reintroduction. The Organizations will note that failing to properly review up to date management standards for the species often result in much of the conflict that plagues ESA issues. Clarifying management standards to avoid this type of management for endangered species has been a primary goal of these efforts. The Organizations believe the DRMP is a perfect example of management for endangered species that must be avoided. Once an ACEC area is created based on a possible listing this immediately creates a situation where the ACEC management and boundary areas could, and often do, conflict with subsequent decisions from the USFWS as science on many species is often rapidly changing and advancing.
The issues that plagued the lynx include many of the issues that are now proposed to be relied on in the DRMP, such as attempting to manage issues and uses that simply do not impact the species and the failure to properly address economics in the habitat designation process. The Organizations are deeply troubled that proposed DRMP management of endangered species void any efforts of user group/agency partnerships. While the Organizations have only been directly involved in the lynx and wolverine issues, the Organizations are aware there are numerous partnership groups addressing many endangered species such as the Greater and Gunnison Sage grouse and many of the fish species living in the Colorado River. This will directly undermine the efforts of these partner groups and result in the wasting of the significant resources that have been devoted by both agency and partner groups to address the true threats to these species.
In addition to the lynx, the Organizations believe the examples of the genetically pure trout species and various amphibians in Colorado are relevant to explaining our concerns on this issue, even if these species are not of major concern on the UFO. While the concerns with Trout management are discussed at length subsequently, the Organizations will note that designation of an ACEC will never remove hybrid fish from the waterways occupied by the genetically pure fish, but the ACEC designation

does create the perception that habitat areas adjacent to these waterways are contributing to the decline of the species. It has been the Organizations experience that once shorelines are drawn into question, these areas are immediately highlighted for loss of route in the area under the assumption that this benefits the species. That simply is not true and not scientifically based.

The Organizations experience with the Boreal toad raises similar concerns, as the decline of almost all amphibian species in Colorado is the result of respiratory virus that most experts believe is transported by birds. The designation of an ACEC area will not stop birds from transporting the virus, but again conveys the message that a lack of habitat is contributing to the decline of the Boreal Toad.

The Organizations are deeply concerned regarding the lack of review that has occurred on ESA species and the integration of this into the ACEC designation process. While brief reviews and erring on the side of closure may be acceptable in the short term, history has taught us that this management has been ineffective in benefitting the species and resulted in significant unintended economic impacts to the Colorado economy.

### Summary

One commenter stated that the BLM should implement compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW). Another commenter noted that the Draft RMP must rely on current scientific information when managing endangered species and the BLM should consider strategic partnerships with relevant organizations concerning endangered species management.

### Response

As stated on Draft RMP/EIS Section 1.8 (page 1-19), the Approved RMP will undergo review per the BLM's Land Use Planning Handbook H-1601-1, at least every 5 years, to determine the need to update based on current inventories and most recent science. New BLM mitigation guidance per Secretarial Order 3349 (which revokes Secretarial Order 3330) was incorporated in the Proposed RMP/Final EIS in accordance with its procedures. Specific mitigation to address well pad density was not added due to the general nature of the comment that does not identify specific areas or species. However, this would be addressed during site-specific analysis, as appropriate.

The Draft RMP includes partnerships with other agencies and interested parties to implement the RMP (Table 2-2, page 2-23, row 6) and partnerships with state and federal agencies to manage special status fish species (Table 2-2, page 2-92, row 146).

## Section 16 – Special Status Species (not including Threatened and Endangered species)

### Section 16.1 – Special Status Species: Range of alternatives (including conservation measures)

Total Number of Submissions: 15
Total Number of Comments: 32

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-22
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3

BLM_0165101

Comment Excerpt Text:
Line 146 Page 2-92: We request that Alternative D be made the same as Alternative C in order to maintain sport fisheries in the UFO.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-23
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 147 Page 2-92: We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This change will provide for flexibility in future land management decisions.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-24
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 148 Page 2-93: We request that Alternative D be amended to match Alternative C in order to allow for flexibility in future decision making.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-25
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 152 Page 2-95: We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This change will provide for flexibility in future land management decisions.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-27
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 170 Page 2- 105: We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This will allow for site specific review and flexibility in future decision making.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-28
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Table 2-2 All Management Actions Related to Wildlife Habitat Excluding GuSG: We request that all management actions related to wildlife habitat (excluding GuSG) allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making. Regulatory certainty and habitat

protection can be assured by prohibiting or restricting proposed activities ininstances where such activities would adversely impact habitat.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-1
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Special Status Terrestrial Wild Life
o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

Comment Number: 000356_AdamK_20161031-1
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Special Status Terrestrial Wild Life
o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

Comment Number: 000363_RogersM_20161031-6
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Other Sections: 9.1  20.1
Comment Excerpt Text:
Both B and D are good alternatives for protecting migratory birds from disturbances during breeding. But Burrowing owls and Sage-grouse need protected areas where they can be sustained as in the Abobe badlands LWC adj. and ACECs Areas of Critical Environmental Concern (ACECs).

Comment Number: 000402_RatnerJ_20161028-27
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
#126 is another example of meaningless direction that looks good on paper but does nothing:
Action:
Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern.
The action needs to properly define adaptive management triggers and response actions. As currently written it provides no management direction.
#128 is similar in its worthlessness:

Comment Number: 000402_RatnerJ_20161028-28
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165103

Action:

Apply appropriate restrictions and mitigation to minimize impacts on migratory birds.

It is the RMP that is required to define what those "appropriate restrictions and mitigation" measures are and when they are to be applied.

#136 is the same rubbish:

Comment Number: 000402_RatnerJ_20161028-29
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Action:
Promote BLM-sensitive species conservation to reduce the likelihood and need for species to be listed
This is a general goal not an action.
#543 is just pure corruption. The BLM is so spineless that it allows the only significant impact to BSC to continue in the postage stamp sized ACEC to protect BSC.
It is quite similar to the bighorn sheep section that prohibits goat grazing that impacts bighorn sheep, because goat grazing does not exist, very much like prohibiting Martian landing sites, but leaves domestic sheep, which is very much a threat to bighorn sheep essentially unaddressed.

Comment Number: 000409_DayB_20161031-23
Organization1: Black Canyon Audubon Society
Commenter1: Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Page 4-142. Special Status Species. The bullets on NGD and especially on roads are good. Road density and distance of roads from Special Status Species is as important as anything in this plan. This is why we need more EEAs, LWCs, and ACECs in Alternative D.

Comment Number: 000409_DayB_20161031-24
Organization1: Black Canyon Audubon Society
Commenter1: Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Page 4-153. BLM discusses the much lessened impacts to Special Status Species under Alternative B, due largely to the larger area of EEAs and ACECs. This summarizes what we think is the most important part of the RMP and why we want to see all of these protected areas put into the final preferred alternative.

Comment Number: 000409_DayB_20161031-7
Organization1: Black Canyon Audubon Society
Commenter1: Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 133. Special Status and Sensitive Species (SSS). Maybe some combination of Alternatives B and D would be better. Preserving habitat is usually best, but Alternative D doesn't include enough habitat protections. Apparently no Pinyon-Juniper species are included in Alternative D.

Comment Number: 000409_DayB_20161031-8
Organization1: Black Canyon Audubon Society
Commenter1: Bill Day

BLM_0165104

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 177. NGD in prairie dog towns. Alternative B is better because of the slightly earlier closure, but NGD should apply all year, because of the status of the two prairie dog species and other SSS that rely on them.

Comment Number: 000409_DayB_20161031-9
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 178. No shooting in prairie dog towns. Hunting could be allowed, but not target shooting, which could be done elsewhere. It is hard to say that BLM is trying to preserve the Special Status Species otherwise.

Comment Number: 000420_HovdeC_20161101-7
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive. Habitats at site specific locations would be addressed during the application for a specific activity.
Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.
Page 2-102-105, Line 161-167, Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.
Page 2-113, Lines 176-179, prairie dog restrictions (need to review applications). Site specifics do not belong in a RMP
Page 2-119,Line 187, Water Fowl and Shore Birds, river corridor buffers Resources

Comment Number: 000483_HanksG_20161101-23
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Cutthroat Trout Specific Stipulations
Trout Unlimited strongly supports Stipulation NSO-25: Occupied Native Cutthroat Trout Habitat, to prohibit surface occupancy within 0.50-mile of stream segments occupied by native cutthroat trout. We also feel that Stipulation NSO-26/ SSR-25 of the Preferred Alternative is absolutely unacceptable. As discussed frequently in this document, cutthroat trout are a highly sensitive species, and already face numerous threats on the DRMP footprint. Allowing such development so close to our native coldwater trout strongholds seems not only irresponsible, but outright hostile. Furthermore, conservation populations deserve NL/NGD stipulations rather than CSU/SSR language. These places might be the last remaining stock of these fish left in their name stake state. Failure to adequately address this issue in planning likely cause for future failures on the ground.

Comment Number: 000483_HanksG_20161101-9
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165105

Other Sections: 16.3 15.4
Comment Excerpt Text:
4.3.5 Fish and Wildlife
The DRMP identifies CRCT as species of specific concern, and GBCT as federally threatened and though
not expressly listed, identifies populations of these fish in waterways of the UFO. Given the level of oil
and gas development along with other factors affecting water quality and quantity, TU remains
particularly concerned with the management of these streams and the overall watershed condition.
Most of these populations are isolated from one another and without implementing stringent protection
measures; a single damaging event could exterminate any one of these populations. TU believes that
these high value water bodies deserve full protective measures from oil and gas development, should be
identified and mapped, and be assigned strict stipulations that include strong buffers (as defined below),
NGD language, and ongoing defined water quality monitoring.
The BLM is within its regulatory and management jurisdiction to prioritize the protection of all of these
streams. Such measures will ensure the retention and proliferation of these populations in both the
short- and long-term including restoration efforts that expand the ranges in and around these streams.
We strongly disagree that buffer recommendations of less than 500 feet would protect all fish-bearing
streams. Riparian and stream setbacks, or buffers, must be expanded to provide better protection from
accidents and spills. Current stipulation proposals are inadequate and insufficient to protect the fisheries
and riparian components should a spill occur. Strong buffers provide significant protections. We support
the quarter-mile buffer required on major rivers; however, many sensitive populations of native trout
(CRCT and GBCT) exist outside of those major rivers and are located in more isolated first order
streams. Any other buffer size, such as proposed 325 foot, from a multi-well pad oil and gas rig will offer
little protection. Instead, we recommend one-quarter mile buffer for all perennial waters, similar to that
which the Little Snake River Field Office has implemented (October 2011). For sensitive fish species,
such as CRCT, we recommend minimum one-half mile buffer.
It is TU's assertion, supported by science (see discussion on buffers below) that the larger a buffer area,
the better protection measures are allowed. Oil and gas activities involve extreme disturbances to
surface and subsurface lands. We are advocating for stronger buffer stipulation requirements in the
DRMP, reasoning that it is easier to modify larger buffer protections to lesser buffer protections
through negotiated conditional use approvals and agreements, science-backed exemptions, and
increased monitoring.
Potential impacts to surface and groundwater sources include increased sedimentation, turbidity of
surface water, erosion, wetland loss, effects on water quality from contamination with drilling fluids,
petroleum, hydraulic fracturing chemicals, other industrial chemicals used during drilling practices, and
the disruption of historic and normal flow patterns of surface water due to the increased number of
roads, well pads, permanent surface facilities, and traffic. The DRMP fails to adequately address these
significant impacts.

Comment Number: 000489_JohnsonA_20161101-47
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
5. White-tailed Prairie Dog
Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred
Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive
Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy
and No Leasing within close proximity to active prairie dog colonies.

BLM_0165106

Comment Number: 000489_JohnsonA_20161101-49
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
8. Debeque Milkvetch
The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.

Comment Number: 000545_SlivkaJ_20161101-179
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
White-tailed Prairie Dog
Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies.

Comment Number: 000545_SlivkaJ_20161101-180
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Debeque Milkvetch
The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.
Comment Number: 000557_OrtizK_20161101-2
Organization1:
Commenter1:Karen Ortiz
Commenter Type: Individual
Other Sections: 14
Comment Excerpt Text:
As such growing tourism in the valley is safeguarded as B.1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). I
1 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22. favor of the Visual Resource Management classifications in Alternative B.1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; CSU-47 Vistas.2 Alternative B.1 not only benefits the tourist economies of the North Fork Valley, it protects the natural resources of the valley and surrounding areas, its abundance and diversity of wildlife, waterbodies and riparian areas, and migration routes and habitat areas. Nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the stronger protections than provided by the B.1. In regards to the valley's natural resources I support specific recommendations in both Alternative B.1 and No Leasing stipulation from Alternative B as follows: NL-4

BLM_0165107

Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

Comment Number: 500143_RewL_20161017-1
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-14
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
17. Prairie Dog management standards must be balanced with multiple use impacts from lack of clarity in standards.
Organizations are deeply concerned with proposed management of white Tailed Prairie dog habitat in the DRMP and related ACEC areas proposed for the protection of these species, such as the Salt Desert Shrublands, Roubideau and Fairview South ACEC covering almost SOk acres. The Organizations are aware the prairie dog remains a sensitive species for BLM management purposes, but submit that the DRMP management simply cannot be reconciled with relevant management decisions from other managers. The DRMP proposes to manage the species as follows:
"Allowable Use: STIPULATION TL-25: Gunnison and White-Tailed Prairie Dog. Prohibit surface use and surface-disturbing and disruptive activities within 300 feet of active prairie dog colonies from April 1 to July 15 to protect reproduction. "61
61 See, UFO DRMP at pg 2-114.
Again recreational usage is frequently a factor important in development and related implementation of ACEC and now clearly identified in the RMP. Such management would result in major closures for minimal risks that have been identified by relevant experts who have concluded:
"Indirect effects of energy development on prairie dogs and their ecosystem may include (1) increased exposure to shooters and OHV users because of improved road access into remote areas - Gordon et al. (2003) found that shooting pressure was greatest at colonies with easy road access, as compared to more remote colonies; and (2) invasion of habitats by invasive and noxious weeds."62
62 See, Seglund, A.E. and P.M Schnurr. 2010. Colorado Gunnison's and white-tailed prairie dog conservation strategy. Colorado Division of Wildlife, Denver, Colorado, USA. at pg 126.
Additionally, this management fails to address the primary threat to the species identified when USFWS determined listing was not necessary in 2010. In this document recreational concerns for the species were entirely centered on recreational shooting, as the USFWS clearly states:
"We conclude that the best scientific and commercial information available indicates that the white-tailed prairie dog is not now, or in the foreseeable future, significantly threatened by the overutilization for commercial, recreational, scientific, or educational purposes."63
63 See, Dept of Interior; Endangered and Threatened Wildlife and Plants; 12-month Finding on a Petition to List the White-tailed Prairie Dog as Endangered or Threatened Federal Register I Vol. 75, No. 104 I Tuesday, June 1, 2010 I at 30354
The Organizations vigorously assert that any management actions that are proposed or ACEC management standards that are proposed MUST be narrowly tailored to avoid impacts to recreational

usage of roads and trails in these areas as these have been consistently and vigorously determined to NOT be a priority threat to the species.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-15
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
18. Kit fox threats are often outside land manager ability to address as many threats are on private lands or under state management.
The Organizations are aware that the kit fox is a BLM sensitive species, but the Organizations vigorously opposed to any assertion that the protection of possible habitat areas will contribute to any recovery of the species. The Organizations will note that the kit fox is not a major species in Colorado and has often been managed with the swift fox in Colorado, which has a much larger range and historical presence in the state and is also able to breed with the kit fox and generate a swift fox offspring. Given the large scale designations proposed in the ACEC/RMP the Organizations are forced to assume that the term kit fox and swift fox have been used interchangeably. The Organizations are vigorously opposed to any management that would be based on the San Joaquin Kit Fox, a species in southern California, as this species is geographically unrelated to the kit fox in Colorado.
The Organizations are aware that at one point OHV recreation was the basis for a highly theoretical concern for kit fox habitat and was specifically identified as an area where research was needed in 2006 Conservation Assessment and Strategy for the kit fox. This research was conducted and the 2011 Conservation assessment and strategy for the kit fox clearly found:
"While swift foxes continue to be used for commercial, recreational, scientific, or educational purposes, populations appear to be stable throughout the range. It is the SFCT's view this factor has not risen to the level of a threat."64
64 See, Dowd Stukel, E., ed. 2011. Conservation assessment and conservation strategy for swift fox in the United States - 2011 Update. South Dakota Department of Game, Fish and Parks, Pierre, South Dakota. Conservation assessment and strategy at pg 52 (Hereinafter referred to as the Swift fox Conservation assessment and Strategy")
In the 2011 Conservation Assessment and Strategy high speed arterial type roadways were specifically and extensively reviewed and found to not to be a threat to the species.65 Given these conclusions the Organizations must question the relevance of an ACEC that addresses kit fox habitat as these ACEC areas and management standards are addressing issues that clearly pose far less of a threat than a high speed arterial road. In the 2011 Conservation Assessment and Strategy there is simply no mention of OHV recreation as a possible threat, which clearly relates to the fact this activity most commonly occurs on low speed low volume forest roads where risks are greatly reduced..
65 See, Swift Fox Conservation assessment and strategy at pg 58.
North Dakota Fish and Wildlife provides a very neat summary of the primary threats to the kit fox, which are outlined as follows:
"Reasons for Decline: The swift fox has declined as a consequence of the increase in agriculture and the disappearance of the native prairies. Widespread shooting, trapping, and poisoning campaigns aimed at wolves, coyote, and red fox also reduced swift fox populations. Swift fox are very easy to trap and very susceptible to poisoned bait. They also get hit by cars when foraging along the sides of roads."66
66 https://www.fws.gov/northdakotafieldoffice/endspecies/species/swift_fox.htm
The Organizations vigorously assert that protecting habitat areas in a resource management plan simply bears no relationship to reducing these threats to the species as hunting and baiting of the fox are not habitat issues and are clearly within the management authority of state wildlife managers. Again the presence of kit fox habitat does not create importance in the area to warrant the designation as an ACEC.

BLM_0165109

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-9
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
13a. Cutthroat trout habitat management appears to conflict with the primary threat to the species. Cutthroat trout management is clearly an area where previous management activities by agencies left significant room for improvement, which has resulted in a high degree of public sensitivity to this issue. Understanding this relationship and threats will be exceptionally relevant to avoiding future conflicts between users and the agency. The failure to properly identify the threats to cutthroat trout in the planning area directly allows management standards to be applied that fail to address true threats to the species, including the fact that many cutthroat trout in Colorado are actually hybrid fish, that were recently found to be the primary threat to the native species.

USFWS decisions specifically addressing cutthroat trout management are simply never accurately addressed in the DRMP and creation of ACEC areas. The specter of arbitrary management decisions immediately becomes a concern with this type of management history and clearly expand the possibility of conflict on an issue the public is already exceptionally sensitive too. The Organizations believe a brief summary of the management history of management and threats to cutthroat trout will help to understand why management of this species is such a sensitive issue for the public. Researchers have uniformly found the primary threat to the species to be:

"At the time of Recovery Plan development, the main reasons cited for the subspecies' decline were hybridization, competition with nonnative salmonids, and overharvest (USFWS 1998). "37

37 See, US Fish and Wildlife Service; Greenback Cutthroat Trout; 5 year summary and evaluation; May 2009 at pg 4. See also pg 39

The hybridization of the cutthroat was the result of management activities that occurred at an unprecedented level in Colorado. The scale of previous management activity does provide a significant amount of context to the levels of frustration. Research has concluded:

"Between 1885 and 1953 there were 41,014 documented fish stocking events in Colorado by state or federal agencies. The vast majority of these involved brook trout (Salvelinus fontinalis), rainbow trout (Oncorhynchus mykiss) and cutthroat trout (O. clarkii) (Fig. 3, supporting information). Remarkably, over 750 million fish of these three species were stocked from hatcheries into streams and lakes in Colorado over this period of time. Introductions of brook trout and rainbow trout probably had devastating effects on native cutthroat trout populations because brook trout are superior competitors and rainbow trout hybridize with cutthroat trout (Young & Harig 2001)." 38

38 Metcalf et al; Historical stocking data and 19th century DNA reveal human-induced changes to native diversity and distribution of cutthroat; Molecular Ecology (2012) 21,5194-5207.

These concerns regarding hybrid fish are not new. The June 2006 Conservation strategy and agreement between FWS and the Forest Service provides 7 objectives and 11 strategies for the Colorado Cutthroat trout, all of which seek to address the impacts of stocking 750 million threats to the cutthroat trout.39 Again no mention of motorized recreation impacts to the trout habitat are mentioned or could just designations of large land areas for the benefit of the species.

39 CRCT Conservation Team. 2006. Conservation agreement for Colorado River cutthroat trout (Oncorhynchus clarkii pleuriticus) in the States of Colorado, Utah, and Wyoming. Colorado Division of Wildlife, Fort Collins. at pg 3-4.

It should be noted that the 2006 Conservation Strategy does provide a rather lengthy discussion of habitat issues involved in the management of the trout. 40 This discussion immediately centers around removal of non-native fish in Colorado waterways used by the cutthroat to avoid predation, hybridization and effects of superior competition of non-native fish. None of these standards are cited here due to their length and lack of relevance to travel management. The 2006 Conservation Agreement does not even arguably imply any travel management issues, as all habitat discussions are all

BLM_0165110

related to preserving cutthroat trout from non-native species. If there were trail related habitat issues, the Organizations have to believe they would have been discussed in this section. The lack of discussion on this issue is a clear indication of the truly low levels of concern that surround routes adjacent to water bodies.

40 See 2006 Conservation Strategy at pg 9.

The 2006 Conservation Agreement provides a general management standard for motorized access in habitat areas as follows:

"by implementing conservation measures to avoid streamside habitat degradation while approving new grazing, logging, and road and trail construction proposals; by moving existing roads and trails away from streamside habitats and rehabilitating disturbed riparian habitats; All of these positive activities are ongoing throughout the subspecies' range and are implemented based on agency priorities and funding levels on an annual basis." 41

41 See, USFWS 5 year listing decision at pg 35.

Given the unprecedented level of impact from previous stocking of 750 million threats to the Colorado cutthroat trout in Colorado waterways, the Organizations believe the low level of any threat from a trail possibly adjacent to the waterway would be readily apparent. Given the scale and type of threat from the 750 million threats to the cutthroat trout, the Organizations believe closing every trail in the state would result in no benefit to the cutthroat trout.

Throughout the reintroduction of the cutthroat trout, significant effort and resources have been allocated to maintaining fishing access to the waterways where the cutthroat trout has been reintroduced. While this commitment to maintaining fishing access to these waterways is commendable, it clearly will contribute significantly to user conflicts when areas in the vicinity of these water bodies are closed for other uses. If there was a genuine concern for the cutthroat trout, a closure of the body water to fishing would be the most direct way to minimize a primary threat to the fish, mainly the possible incidental taking of the fish. Application of management standards that allow active pursuits to take a fish will appear significantly arbitrary, when use of OHV by the fisherman to access the chosen fishing location is deemed a larger threat to the fish than the active fishing pursued once there. There is simply no rational argument to be made that an OHV being ridden near a body of water presents a higher level of threat to the fish than active fishing activity, even if fishing is catch and release. This type of arbitrary management also allows a primary threat to the species to continue while prohibiting a low risk secondary factor. This simply makes no sense but clearly could be the result of designation of ACEC areas of large size for this factor.

A history of the cutthroat trout in Colorado reveals the primary, and overwhelming, threat to the cutthroat trout is previous management attempts to stock or reintroduce the trout, which experts have summarized the as DEVESTATING to the cutthroat trout. The scale of mismanagement of the trout is an issue that is widely known to the public in Colorado and an issue where there is an exceptionally high level of sensitivity to new management decisions. Clearly, land managers asserting a trail closure is necessary to address prior mismanagement of a species is a questionable decision. Such decisions are made even more questionable and volatile as listing decisions have consistently concluded OHV recreation is a low risk to the trout and should be done only on an "as needed" basis. This falls well short of the management of any area as an ACEC to benefit the species.

Comment Number: 000565_TothK_20161102_DCD-1
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

Comment Number: 500268_BearS_21060930_DMEA-33
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B
• TL24 and TL25 prohibit surface use and surface disturbing or disruptive activities within 300 feet of active prairie dog colonies from March 1/ April 1 to July 15. CPW has seasons established for prairie dogs that are June 15 through the end of February on public lands and year round on private lands with unlimited bag and possession limits. It is incongruous to protect prairie dogs from development that recreationists can shoot.
On private lands, landowners tend to view prairie dogs as vermin due to the property damage they cause and the threat (real or perceived) to contract and transmit disease. Expansion of prairie dog populations from public lands to private lands would be considered a negative offsite impact. This timing limitation should be reconsidered for its practicality and should especially not be applied in the Wildland Urban Interface zone.

Comment Number: 500268_BearS_21060930_DMEA-35
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix G: BMP's and SOP's
• The provisions encourage underground electric transmission lines over overhead lines through non-wooded and non-forested habitat. DMEA is very strongly opposed. Especially for the higher voltage transmission lines, this would result in significantly greater surface disturbance during construction, would increase the cost of construction by approximately 10 times, maintenance costs would skyrocket, and DMEA's ability to quickly respond to emergency outages would be affected. Also, the landowner's right of use of land within an underground right-of-way is greatly diminished.

*Summary*
A. One commenter requested that all management actions related to wildlife habitat (excluding Gunnison sage-grouse) allow for surface occupancy and surface-disturbing activities subject to site-specific review with the ability to apply site-specific restrictions, stating that this approach would allow for site-specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat. In contrast, other commenters requested that the maximum level of NSO restrictions analyzed be included in the preferred alternative, and requested that additional acres of special species habitat be protected as ecological emphasis areas, lands with wilderness characteristics units, and ACECs.

B. A commenter stated that adaptive management actions, including mitigation efforts on migratory bird impacts, that fail to define specific triggers and response actions and general nonspecific goals are meaningless. However, another commenter noted that site-specific restriction/implementation measures are not appropriate for an RMP.

C. Commenters requested the following changes:

BLM_0165112

1. Apply NL/NGD rather than CSU/SSR stipulations for Colorado River cutthroat trout to protect this species' habitat
2. Review Colorado River cutthroat trout habitat management in coordination with primary threats to the species
3. Include adequate buffers to protect all stream-bearing trout from oil and gas activity
4. Commit to a holistic approach to monitoring populations of each of the native fish species along the Dolores River
5. Designate defined habitats as species-occupied habitats to avoid unnecessary restrictions
6. Prohibit target shooting near prairie dog towns; apply nonwaivable stipulations in close proximity to active prairie dog colonies
7. Balance prairie dog management standards with multiple uses
8. Add substantive protections for the Debeque milkvetch; no protection is currently included for this special status species
9. Recognize that kit fox threats are often outside land manager ability to address, as many threats are on private lands or under state management and habitat does not warrant ACEC designation

D. Some commenters requested that Alternative D be modified to be the same as another alternative, or to be another combination of other alternatives. Commenters also requested edits to specific proposed management actions to clarify intent and to provide additional management flexibility.

E. One commenter stated that the TLs proposed around prairie dog colonies (TL-24 and TL-25) do not take into account CPW-established timing limitations, are not practical, and should be reconsidered, particularly for the wildland-urban interface.

F. One commenter stated that the provisions in Appendix G, Best Management Practices and Standard Operating Procedures, that encourage underground transmission lines would result in increased costs of construction and maintenance, as well as diminished landowners' right of land use.

*Response*
A. Stipulations are based on the best available science and applicable laws, policies, and regulations. The justification for each stipulation can be found in Draft RMP/EIS Appendix B under the specific stipulation. In addition, the Draft RMP/EIS analyzed the impact of these stipulations on special status species in Section 4.3.6.

There are exception, modification, and waiver criteria that allow the BLM to work with proponents on a case-by-case basis. Exception criteria for all stipulations help the BLM and applicants understand the best protections on a site-specific basis.

B. As stated on Draft RMP/EIS age 2-6, "Adaptive management would be guided by Adaptive Management, the US Department of the Interior Technical Guide (Williams et al. 2007)." New BLM mitigation guidance per Secretarial Order 3349 (which revokes Secretarial Order 3330) was incorporated in the Proposed RMP/Final EIS in accordance with its procedures.

BLM_0165113

C. The BLM appreciates the comments. The BLM reviewed the recommended changes and edits to proposed management actions and updated the Proposed RMP/Final EIS, as appropriate, while maintaining a balanced approach to resource management.

1-2. The BLM reviewed Colorado cutthroat trout management relative to primary threats and revised the Proposed RMP/Final EIS, as appropriate.

3. A range of buffers were included for streams containing sensitive status species, as defined in Draft RMP/EIS page 2-92 to 2-93, lines 147-148.

4. Monitoring of aquatic habitat, including that for sensitive status fish, would be conducted based on Public Land Health Standard 4 which specifically addresses special status wildlife and plant species and their habitats, as discussed in Draft RMP/EIS Section 4.3.6, page 4-142.

5. Use of occupied habitat for management stipulations in the Draft RMP/EIS provides flexibility for implementation of stipulations as appropriate on a site-specific basis.

6. Management actions related to target shooting areas will comply with BLM Instruction Memorandum 2008-074 and 2015-157. The Proposed RMP/Final EIS was updated to reflect this, as appropriate.

7. A range of alternatives concerning prairie dogs was analyzed, as defined in Draft RMP/EIS page 2-113 – 2-115, lines 176–178.

8. The BLM and Colorado Natural Heritage program have no records of this species occurring within the decision area. Should it be detected in the future, the species would be subject to stipulations found in Draft RMP/EIS Table 2-2.

9. Management actions for kit fox are focused on actions for which the BLM has authority to address, as specified in the Draft RMP/EIS page 2-115, line 181. Kit fox is just one resource provided protection by the proposed Salt Desert Shrub Ecosystem ACEC, as defined on Draft RMP/EIS page 2-347, line 553.

D. Regarding the actions where commenters requested that Alternative D be modified to be the same as another alternative, or to be another combination of other alternatives, a range of alternatives was analyzed in the Draft RMP/EIS. During Proposed RMP development, the BLM considered the comments requesting edits to proposed management actions and included them in the Proposed RMP/Final EIS, as appropriate.

E. Gunnison and white-tailed prairie dog are considered key species in the planning area due to high interest in the species, species decline, and listing petitions (see Draft RMP/EIS Table 3-19 on page 3-59). As a result, protective measures were determined appropriately for these species. TL dates were based on the best available science for the Gunnison and white-tailed prairie dog species in the UFO planning area.

F. The provision noted (Draft RMP/EIS Appendix G, page G-16) is a recommended BMP for the protection of migratory bird habitat. As stated on Draft RMP/EIS page G-1, BMPs would be applied on a site-specific basis at the permitting stage to avoid, minimize, reduce, rectify, or compensate for adverse environmental impacts. Impacts from BMPs would be evaluated through the environmental review process at the permitting stage.

BLM_0165114

### Section 16.2 – Special Status Species: Best available information—baseline data

Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000483_HanksG_20161101-1
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Cutthroat Trout
Colorado River cutthroat trout (CRCT) historically occupied numerous tributary systems of the Upper Colorado and Green River systems. Today the CRCT is found in only 16% of historically occupied subwatersheds, even less in the Gunnison Basin. Habitat alterations and non-native trout have pushed remaining populations into isolated tributaries where the habitat quality continues to remain high and risk from non-native introductions is reduced. Many of these small populations, however, do not meet minimum habitat and abundance requirements for long-term persistence[1].
[Footnote 1] Williams, J.E., A.L. Haak, N.G.Gillespie, and W.T.Colyer. 2007b. The Conservation Success Index: synthesizing and communicating salmonid condition and management needs. Fisheries 32:477-492
As identified on page 1-12, it was indicated by BLM that "Additional planning criteria received in public scoping comments included incorporation of the Conservation Agreement or Strategy for Colorado River Cutthroat Trout." Neither of these documents were referenced in the DRMP or used to evaluate potential threats or opportunities within the DRMP footprints for conservation of native cutthroat trout. Furthermore the 1998 Greenback Recovery plan that is cited is dated, and even without a new recovery plan in place, Trout Unlimited would like to see more and updated references guiding the current and future managements on the Uncompahgre Field Office.
The failure to obtain and incorporate identified sources of information specific to native trout is a concern, and potentially a cause for further revision to the RMP. The Cutthroat trout Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests[2] clearly identifies populations of conservation status for both CRCT and GBCT, as well as threats, habitat types, and management suggestions.
[Footnote 2] Dare, M., M. Carrillo, and C. Speas. 2011. Cutthroat trout (Oncorhynchus clarkii) Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Grand Mesa, Uncompahgre, and Gunnison National Forests, Delta, Colorado.
As this study shows CRCT are not only isolated to high elevations, as is claimed on page 3-78 of the DRMP. Presented in Trout Unlimited's original comments for the scoping of this DRMP was a map and information regarding suitable waters for CRCT reintroduction. CRCT area BLM identified Sensitive Species, there should be more consideration put on these resources during the planning process.
Trout Unlimited does support the directives of some alternatives to prioritize native trout fisheries by removing barriers and competitive non-native species. These are all tactics towards a successful future for our native fish, but more needs to be done on this front to ensure the longterm viability of the cutthroat legacy.

### Summary
Commenters stated that the BLM should review information sources specific to native trout; failure to obtain and incorporate this information is concerning and potentially cause for further RMP revision.

### Response
The BLM appreciates the comment. The BLM reviewed the baseline data for native trout and updated the Proposed RMP/Final EIS, as appropriate. The Proposed RMP/Final EIS includes

BLM_0165115

updated genetic understanding of trout in Colorado and identifies stream locations of trout subspecies. The Proposed RMP/Final EIS also includes goals and objectives to maintain segregation and/or restore connectivity for conservation populations, as well as restoration opportunities, for trout.

### Section 16.3 – Special Status Species: Impact analysis

Total Number of Submissions: 5
Total Number of Comments: 6

Comment Number: 000218_RecceS_20160929-2
Organization1:National Rifle Association
Commenter1:Susan Recce
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Alternative B would also close lands to recreational shooting where there are prairie dog colonies that have burrowing owls. No supporting data is provided to justify such closures as necessary for the protection of burrowing owls. Closing lands to public activities that have been a historic use requires supporting data to make the case for the loss of public access. That case is not made in the DRMP for Alternative B.
Recommendation: In areas where prairie dog colonies and burrowing owl populations are present as noted in Alternative B, provide analysis and or evidence of existing or predicted impacts to species populations as a result of the presence of recreational shooting prior to restricting the activity.

Comment Number: 000489_JohnsonA_20161101-43
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 16.3 15.4
Comment Excerpt Text:
C. Wildlife
1. Imperiled Species
Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

Comment Number: 000402_RatnerJ_20161028-22
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

The RMP/EIS must review the habitat requirements for migrant birds, the effects of livestock grazing at the permitted numbers in combination with all other habitat altering management proposed and provide prescriptions that will assure migrant birds and their habitat improve.

Comment Number: 000483_HanksG_20161101-9
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 16.1 15.4
Comment Excerpt Text:
4.3.5 Fish and Wildlife
The DRMP identifies CRCT as species of specific concern, and GBCT as federally threatened and though not expressly listed, identifies populations of these fish in waterways of the UFO. Given the level of oil and gas development along with other factors affecting water quality and quantity, TU remains particularly concerned with the management of these streams and the overall watershed condition. Most of these populations are isolated from one another and without implementing stringent protection measures; a single damaging event could exterminate any one of these populations. TU believes that these high value water bodies deserve full protective measures from oil and gas development, should be identified and mapped, and be assigned strict stipulations that include strong buffers (as defined below), NGD language, and ongoing defined water quality monitoring.
The BLM is within its regulatory and management jurisdiction to prioritize the protection of all of these streams. Such measures will ensure the retention and proliferation of these populations in both the short- and long-term including restoration efforts that expand the ranges in and around these streams. We strongly disagree that buffer recommendations of less than 500 feet would protect all fish-bearing streams. Riparian and stream setbacks, or buffers, must be expanded to provide better protection from accidents and spills. Current stipulation proposals are inadequate and insufficient to protect the fisheries and riparian components should a spill occur. Strong buffers provide significant protections. We support the quarter-mile buffer required on major rivers; however, many sensitive populations of native trout (CRCT and GBCT) exist outside of those major rivers and are located in more isolated first order streams. Any other buffer size, such as proposed 325 foot, from a multi-well pad oil and gas rig will offer little protection. Instead, we recommend one-quarter mile buffer for all perennial waters, similar to that which the Little Snake River Field Office has implemented (October 2011). For sensitive fish species, such as CRCT, we recommend minimum one-half mile buffer.
It is TU's assertion, supported by science (see discussion on buffers below) that the larger a buffer area, the better protection measures are allowed. Oil and gas activities involve extreme disturbances to surface and subsurface lands. We are advocating for stronger buffer stipulation requirements in the DRMP, reasoning that it is easier to modify larger buffer protections to lesser buffer protections through negotiated conditional use approvals and agreements, science-backed exemptions, and increased monitoring.
Potential impacts to surface and groundwater sources include increased sedimentation, turbidity of surface water, erosion, wetland loss, effects on water quality from contamination with drilling fluids, petroleum, hydraulic fracturing chemicals, other industrial chemicals used during drilling practices, and the disruption of historic and normal flow patterns of surface water due to the increased number of roads, well pads, permanent surface facilities, and traffic. The DRMP fails to adequately address these significant impacts.

Comment Number: 000489_JohnsonA_20161101-43
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165117

Other Sections: 5.6 15.4
Comment Excerpt Text:
C. Wildlife
1. Imperiled Species
Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

Comment Number: 500009_HemsellA_20161101-2
Organization1:
Commenter1:Ambalila Hemsell
Commenter Type: Individual
Other Sections: 41.2 15.4
Comment Excerpt Text:
One concern I have is for the birds that will drink from the open waste water pools at the sites, as there are many undisclosed chemicals in the hydraulic fracturing fluids. We don't if them drinking this water will give them a disease or outright kill them. I know it's the BLM's duty to help protect sensitive species, which in this region we have the Bald eagle, Golden Eagle, among many other birds on your sensitive species list

*Summary*
   A.  Commenters noted that there is not enough supporting data to close recreational shooting areas where prairie dogs and burrowing owls are found, and that the BLM should provide analysis and/or evidence of existing or predicted impacts to species populations as a result of the presence of recreational shooting prior to restricting the activity.
   B.  Commenters also requested additional analysis of the following:
       1.  Habitat requirements for migrant birds and the effects of livestock grazing
       2.  Impacts on water quality from development and the resultant effects on native trout species
       3.  Impacts on sensitive status birds from drinking out of wastewater ponds left during oil and gas development

*Response*
The BLM appreciates the comments. The BLM revised the Proposed RMP/Final EIS to include additional information for the following analyses:

   A.  Management actions related to target shooting areas will comply with BLM Instruction Memorandum 2008-074 and 2015-157. The Proposed RMP/Final EIS was updated to reflect this, as appropriate.

BLM_0165118

B. The BLM appreciates the comments.

1. Draft RMP/EIS page 4-131 states, "Livestock grazing removes herbaceous vegetation, which can reduce wildlife food and cover, thermal protection, and nest sites." This broadly reflects the impacts on migratory birds (i.e., food, cover, thermal protection, and nesting sites), which is appropriate for an RMP-level analysis. Specific habitat requirements for specific migratory birds, particularly birds of conservation concern, will be addressed in site-specific analysis for livestock grazing renewal.

2. A range of buffers was included for streams containing sensitive status, as defined on Draft RMP/EIS page 2-92–2-93, lines 147–148. In addition, Draft RMP/EIS page 2-30, line 34 presents measures to reduce impacts on water quality through land use stipulations.

3. BMPs and standard operating procedure (Draft RMP/EIS Appendix G) include a prohibition on the use of evaporation ponds for disposing of produced water (Draft RMP/EIS page G-10).

### Section 16.4 – Special Status Species: Cumulative impact analysis
No comments are associated with this topic.

### Section 16.5 – Special Status Species: Mitigation measures
No comments are associated with this topic.

### Section 17 – Forestry
Total Number of Submissions: 5
Total Number of Comments: 5

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-32
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 289 Page 2-162 Alternative B: Non-commercial woodland products should not have to be purchased by an operator when the creation of such products is ancillary to their operation. Woodland byproducts would be better addressed through permit and operational conditions specific to the permitted activity (mining, O&G production, etc.). We request that Alternative B be amended to address this comment.

Comment Number: 000420_HovdeC_20161101-10
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-154, Line 275, Manage as non-commercial. Do not put acreage limits on harvestable acres given the length of the RMP and the uncertainty of what treatments may be needed in the future.
o Page 2-158, Line 280, Use Alternative D action which also includes biomass for insect and disease control.

BLM_0165119

o Page 2-155 Line 278; do not restrict harvest in ACECs, SRMAs and other designations due to treatments that may be needed to maintain the original characteristics.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-9
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Top of the Pines.
Ouray County has specific comments or requested revisions as follows:
The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2- 156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that the BLM has eliminated timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to the BLM.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-17
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
19b. Udall Forest Health Report.
The Organizations believe there is significant research prepared at the request of Senator Udall that must be addressed as part of any Wilderness or similar designation process as best available science. The Organizations are aware that Senator Udall's request was directed toward pine beetle impacts, but believe these findings are exceptionally relevant to the management of public lands in general. General management of public lands was also within the scope of the Senator's request.68 The Organizations are aware that the UFO planning area has been spared much of the pine beetle impact but many of these same issues are present on the UFO but involve juniper incursions and other invasive species that need to be actively managed.
68 Id at pg 25.
The conclusions of this report specifically identify that designated Wilderness and improperly managed Roadless areas were a contributing factor to the pine beetle outbreak69 and a limiting factor in the FS response70. Given the stark nature of these conclusions and the large scope of the request from Senator Udall, the Organizations vigorously assert these concerns must be addressed in the designation of any further WSA/WCA or similar designations.
69 USFS; A review of the Forest Service Response: The Bark Beetle outbreak in Northern Colorado and Southern Wyoming; A report by the USFS at the request of Senator Mark Udall; September 2011; Executive Summary at pg i.
70 Id at pg 12.

BLM_0165120

19c. State Forest Service reports identify Wilderness as a significant Impairment to Forest Health. The state of Colorado has also developed planning documents addressing forest health that must be addressed in the DRMP. The Colorado State Forest Service conducted its annual forest health analysis in 2010, which outlined the numerous insect and disease threats that face Colorado's forests. This is an annually published report which consistently finds that active forest management was critical in addressing these threats to Colorado forests. This plan specifically outlined the significant areas that are impacted by the mountain pine beetle epidemic and addressed the significant impacts to safety and enjoyment of recreational usage in these areas as a result of the beetle epidemic.

The 2010 report also provided specific insect impacts maps for the State71. A comparison of the high impact areas for beetles to designated Wilderness areas reveals an exceptionally high correlation between designated Wilderness and areas that are hardest hit by the beetle epidemic. These maps were exceptionally similar to the forest health and fire risk maps that were provided in the Colorado SCORP. The Organizations concerns regarding the failure to address the SCORP are addressed in other portions of these comments.

71 Colorado State Forest Service; 2010 Report on the health of Colorado Forests; January 2011: maps included as unpagenated introduction to the report.

The 2011 State Forest Service Forest Health report addressed the concerns between forest health and the spruce beetle outbreak in and around the Wolf Creek pass area, which the State Forest Service directly attributes to the inability of land managers to address blow down areas in the Weminuche Wilderness area.72 The 2011 report provides a historical analysis of many other blow down areas that could have been managed but were not due to land management restrictions. The inability to mitigate these blow down specifically resulted in massive spruce beetle outbreaks in the area. 73 The Organizations will note at the time of preparation of these comments the West Fork Complex fire is currently burning completely out of control in this area and has forced the complete evacuation of the town of South Fork, providing concrete proof of many of the negative impacts of failing to actively manage these areas. Clearly the massive superheated burn area will not improve wildlife habitat or any recreational usage of these areas for a significant period of time going forward.

72 Id at pg 9.

73 Id at pg 10.

Again the Organizations believe these reports are clearly best available science that has clearly found there is a critical need for the active management of public lands in order to maintain basic health and sustainable. The Organizations believe cost effective and easy access is a key component of the active management of these areas. The Organizations believe these analysis and conclusions must be addressed in any WSA/WCA review and balanced in any expansion of such management in the UFO DRMP.

### Summary

A. Commenters stated that the BLM should consider the following changes to forestry alternatives in the Proposed RMP:

1. Clarify the intent in regard to reserved timber resource in Ouray County, known as the Top of the Pines property
2. Address woodland byproducts through permit and operational conditions specific to the permitted activity (e.g., mining and oil and gas production)
3. Includes biomass for insect and disease control, as under Alternative D
4. Do not put acreage limits on harvestable acres given the longevity of the RMP and the uncertainly of what treatments may be needed in the future
5. Do not restrict harvest in ACECs, SRMAs, and other designations, as treatments may be needed to maintain the original characteristics

BLM_0165121

B. One commenter requested that the BLM consider other forestry health planning documents, including the *Forest Service Response: The Bark Beetle outbreak in Northern Colorado and Southern Wyoming* and the Colorado Forest Service's *2010 Report on the Health of Colorado's Forests*.

*Response*
A. The BLM appreciates the comments. The BLM reviewed recommended edits and incorporated them in the Proposed RMP/Final EIS, as appropriate.

1. The BLM intends to comply with the 2002 warranty deed agreement between the BLM and Ouray County whereas the BLM approved a transfer of title and change in use for the property to Ouray County for a public recreational and educational camp that offers hiking, nature study, camping, wildlife habitat, and sustainability education to the public. Table 2-2, pages 2-155 to 2-157, states that the management of the reserved federal timber on 168 acres of land deeded to Ouray County under the preferred alternative (Alternative D), would be the same as managed under the current RMP (Alternative A). As such, the 128 acres of existing timber resource would continue to be managed by the BLM and closed to product sales and/or harvest. However, Table 2-2 includes an exemption to this closure to improve forest and land health conditions, or to achieve a vegetation mosaic objectives, which are actions to be taken by the BLM or by Ouray County with approval by the BLM.

2. As stated in Table 2-2, page 2-162, line 289, byproducts of other permitted activities would be appraised and managed as a condition of the operational permit. BLM Policy 5000-1 forest management of the public domain, states the BLM receive fair market value for the sale of forest products. Free use is permissible if it is in the best interest of the Government, and is permitted by regulation.

3. The potential for biomass production and use, where appropriate, is included in the range of alternatives in Table 2-2, page 2-158, line 280 in Alternatives B and D. This was based on the 2010 *Renewable Energy Potential Report,* which is available on the BLM's eplanning website.

4-5. Forestry under all alternatives would be undertaken with a goal of improving forest health and managing for sustained yield. As stated in Draft RMP/EIS Section 4.4.1, Forestry and Woodland Products, page 4-226, "The quality and quantity of forest and woodland products available for harvest in the long term is directly tied to forest health and vegetation management. As discussed in Chapter 3, such factors as insect and disease outbreaks, age class structure diversity, and forest succession rate can impact forest products available for harvest." Therefore, forest product harvest would be managed through making specific portions of the decision area closed or open to harvest based on other resource objectives and current conditions. Flexibility is provided, including for management in ACECs and other designations, by allowing exceptions for wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives (Draft RMP/EIS page 2-157). Should conditions in the decision area change over the course of the RMP and necessitate a full-scale review of areas open or closed to harvest, an RMP amendment could be conducted to revise management direction.

BLM_0165122

B. The BLM appreciates the comments. The BLM has reviewed *the Forest Service Response: The Bark Beetle outbreak in Northern Colorado and Southern Wyoming* and the Colorado Forest Service's *2010 Report on the Health of Colorado's Forests* and incorporated them into the Proposed RMP/Final EIS, as appropriate.

## Section 18 – Health and Safety

### Section 18.1 – Health and Safety: Range of alternatives
No comments are associated with this topic.

### Section 18.2 – Health and Safety: Best available information—baseline data
Total Number of Submissions: 8
Total Number of Comments: 12

Comment Number: 000200_KenosianM_20161014-1
Organization1:
Commenter1:Mary Kenosian
Commenter Type: Individual
Comment Excerpt Text:
See the Reuters article about this PA court case:
http://www.reuters.com/article/us-pennsylvania-frackingidUSKCN0WC2I8 . The headline for that article: "Pennsylvania Families Win 4.2 Million in Fracking Lawsuit." You don't want to go fishing near Dimock, either, from experience.
-A health concern: Please see the study from Johns Hopkins that shows a 40% increase in http://hub.jhu.edu/2015/10/12/fracking-pregnancy-risks/
-Another health impact-Asthma Exacerbations. Here is a study from Sept. 1st, 2016 from the National Institutes of Health: https://www.ncbi.nlm.nih.gov/pubmed/27428612
-Another health concern, "This study provides evidence that UNGD is associated with nasal and sinus, migraine headache, and fatigue symptoms in a general population representative sample." Abstract from the NIH, full article in Journal of the American Medical Assn., Internal Med. Link: https://www.ncbi.nlm.nih.gov/pubmed/27561132
-In addition, there are many other concerns. How much GHG emission will come from drilling 30,000 acres? As the United States has signed the Paris Treaty, clearly it is incumbent upon the BLM to ascertain the effects of this drilling on CO2 and methane emissions. The Jet Propulsion Laboratory and NASA have already documented large GHG emissions in the 4 corners area: http://www.jpl.nasa.gov/news/news.php?feature=6591

Comment Number: 000545_SlivkaJ_20161101-155
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area.

Comment Number: 000276_GannettA_20161031-1
Organization1:
Commenter1:Alison Gannett

BLM_0165123

Commenter Type: Individual
Comment Excerpt Text:
The RMP says that not only is drilling for fluid minerals safe, and that they have studied the cumulative effects and that they are acceptable. I do not believe it is possible to make those statements, considering that studies on the internet have no way to determine these claims. How can one determine that working with carcinogenic chemicals can ever be safe? and how would we ever be able to study their synergistic cumulative effects if we do not know which combinations are being used at each well pad on any given day? This would be the same as looking at any given human in 2016 and saying they will never get cancer. How do you know? how do you study this? we do not have the technology. The BLM did not consider a human health impact report in its draft management plan.
Therefore, a moratorium should occur until this is done, or support the North Fork Alternative B1
Case in point, the AmericanLungAssociation.org
(also formerly pristine air in Uintah County, UT received an "F" rating for ozone in the american lung association 2013 State of the Air Report)

Comment Number: 000293_MilvenanE_20161022-7
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
Here is an August 2014 list indicating instances of national groups in government, academia and industry calling for more research on health effects of hydraulic fracturing: http://mdehn.org/wp-content/uploads/2014/12/calls_for_moreresearch.pdf
There are many locations in the United States with hydraulic fracturing in place and ongoing research on health effects on both those living in close proximity to these wells and on the workers. While these investigations continue collecting and analyzing data, the best practice would be to avoid mineral rights leasing on public lands in the North Fork Valley until there is more definitive information about the effects of hydraulic fracturing on the health of the people living here.

Comment Number: 000360_GannetA_20161031-1
Organization1:Holy Terror Farm
Commenter1:Alison Gannett
Commenter Type: Individual
Comment Excerpt Text:
A study recently tested ORGANIC vegetables for heavy metals and traced them back to petrochemical production - from air and water. http://craftsmanship.net/the-vegetable-detective/
"In September of 2014, Hubbard was getting reports back showing heavy metals in virtually every kale sample he sent in. There were also traces of nickel, lead, cadmium, cesium, aluminum, and arsenic. These levels were then showing 7 times higher that what the 2009 CDC report in humans that ate those veggies. "
"July of 2014, he stumbled on a 2006 study out of the Czech Republic showing how the "cruciferous" family of vegetables behave as "hyperaccumulators" of thallium. Crucifers
include many of our more intense green vegetables such as kale, cabbage, broccoli, cauliflower, mustard and collard greens. These are also the vegetables often touted—and consumed—most heavily these days, supposedly for their outsized health benefits."
"We now know that heavy metals are additive and synergistic," he said. "If you get a little thallium, and a little lead, and a little cadmium in your system, you've got one plus one plus one equals five or six, not just three." The reason, he said, is that metals and chemicals might each have different effects by themselves, but they "share similar sites of action where they disrupt metabolism."

BLM_0165124

Please support a moratorium on fluid mineral extraction for this RMP until these issues can be studied. At least, support the North Fork Alternative B1, so that we can provide clean food and water for our foodsheds.

Comment Number: 000484_GoldsteinE_20161030_HasAttach-1
Organization1:
Commenter1:Elena Goldstein
Commenter Type: Individual
Comment Excerpt Text:
McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, Science of the Total Environment,424:79-87.
Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living > ½ mile from wells and (2) residents living = ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.

Comment Number: 000484_GoldsteinE_20161030_HasAttach-2
Organization1:
Commenter1:Elena Goldstein
Commenter Type: Individual
Comment Excerpt Text:
Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology
DOI: http://dx.doi.org/10.1210/en.2013-1697
This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling- dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activities, suggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.
Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134):
DOI: 10.1126/science.1235009
Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.
Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke University, Durham, NC.

BLM_0165125

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground.

Comment Number: 000537_SchultzK_20161101_TEDX-1
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 2
Comment Excerpt Text:
While we are pleased that the BLM is updating the outdated Resource Management Plan (RMP), TEDX would like to see Alternative D, the BLM's Preferred Alternative, strengthened to better protect human and environmental health. Specifically, the BLM did not adequately take into account risks to human health from increased oil and natural gas development when drafting the Alternatives. For example, Alternative D has the second highest estimated total emissions level yet remains the Preferred Alternative. Coloradans already live with degraded air quality from oil and gas activity (Colborn et al 2014, McDuffie et al 2016). Nearly 16,000 people live within one-half mile of an oil or gas well drilled on public land in Colorado and new well development will further degrade our air quality, increasing the risk of health impacts in exposed populations (Oil and Gas Threat Map 2016). Further, under Alternative D total acreage available for leasing for fluid mineral development decreased by only 1% throughout the Planning Area.
[References:
Colborn T, Schultz K, Herrick L, Kwiatkowski C. 2014. An exploratory study of air quality near natural gas operations. Hum Ecol Risk Assess 20(1):86-105, doi:10.1080/10807039.2012.749447.
McDuffie EE, Edwards PM, Gilman JB, Lerner BM, Dubé WP, Trainer M, Wolfe DE, Angevine WM, deGouw J, Williams EJ, et al. 2016. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. J Geophys Res Atmos 121, doi:10.1002/2016JD025265.]
Alternative B1, the North Fork Alternative Plan (NFAP), still allows fluid mineral leasing, but potential development estimates and associated emissions are much lower due to the increased buffer area between oil and gas development and population centers (4-32). The NFAP requires the strongest protections for air, groundwater, and surface water. While the BLM was required to consider the NFAP, none of the recommendations were included in Alternative D.

Comment Number: 000537_SchultzK_20161101_TEDX-2
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Public Health Risks from Oil and Natural Gas Development
Three hundred articles have been published in peer-reviewed journals since the NFAP was submitted in 2013. Articles documenting air and water pollution have expanded beyond chemical detections to include pollutant exposure pathways, and these articles indicate an increased potential public health risk from exposure to chemicals found near oil and gas development. Sensitive populations, including pregnant women, children, and the elderly residents, are more susceptible to adverse impacts from chemical exposure.
Six articles were published on endocrine disruption and unconventional oil and gas development (UOG). Three of these studies target prenatal exposure from populations impacted by UOG in Colorado and

BLM_0165126

Pennsylvania. Associated developmental outcomes include congenital heart defects (McKenzie 2014), babies born with low birth weight and small for gestational age (Stacy et al 2015), and preterm birth (Casey et al 2015). Endocrine effects from environmentally relevant exposure levels to fracking fluids in laboratory mice include altered organ weights (testes, thymus, uterus, ovary), disrupted hormone activity, and potential impacts on fertility (Kassotis et al 2016a,b).

[References:

Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS. 2015. Unconventional natural gas development and birth outcomes in Pennsylvania, USA. Epidemiology 27(2):163-172, doi: 10.1097/ede.0000000000000387.

Kassotis CD, Bromfield JJ, Klemp KC, Meng CX, Wolfe A, Zoeller RT, Balise VD, Isiguzo CJ, Tillitt DE, Nagel SC. 2016. Adverse reproductive and developmental health outcomes following prenatal exposure to a hydraulic fracturing chemical mixture in female C57Bl/6 Mice. Endocrinology 157(9):3469-3481, doi: 10.1210/en.2016-1242.

Kassotis CD, Klemp KC, Vu DC, Lin C-H, Meng C-X, Besch-Williford CL, Pinatti L, Zoeller RT, Drobnis EZ, Balise VD, et al. 2016b. Endocrine-disrupting activity of hydraulic fracturing chemicals and adverse health outcomes after prenatal exposure in male mice. Endocrinology 156(12):4458-4473, doi: 10.1210/en.2015-1375.

McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect: 122(4):412-417, doi: 10.1289/ehp.1306722.

Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. 2015. Perinatal outcomes and unconventional natural gas operations in southwest Pennsylvania. PLoS ONE 10(6):e0126425, doi: 10.1371/journal.pone.0126425.]


Comment Number: 000537_SchultzK_20161101_TEDX-3
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3
Comment Excerpt Text:

UOG emissions can also impact the respiratory system. New research has found an association between proximity to UOG activity and an increase in asthma exacerbations (Rasmussen et al 2016). Inhalation of silica, a proppant used during fracking, and diesel exhaust from increased truck traffic and on-site equipment, can increase respiratory disease (McCawley 2015). Pride et al found that short-term exposure to rising ozone levels near UOG was associated with increased visits to a health clinic for respiratory effects in an impacted community in Wyoming (2015).

[References:

McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.

Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi:10.1016/j.envres.2014.10.033.

Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi:10.1001/jamainternmed.2016.2436.]

Exposure to chemicals detected near UOG have led to other adverse health outcomes as well. A health symptom survey from a densely drilled area in Pennsylvania found that residents living within 1 km of a natural gas well more frequently reported respiratory as well as dermal symptoms compared to

BLM_0165127

residents living 2 km or more from a well (Rabinowitz et al 2015). Another Pennsylvania study found a relationship between well density and hospitalization rates for cardiac, neurologic, and dermal effects among others (Jemielita et al 2015). Tustin et al found a relationship between residents living near UOG in Pennsylvania and nasal, sinus, migraine, and fatigue symptoms (2016). Like Colorado, Pennsylvania is heavily impacted by UOG. Due to concerns over health effects, the Pennsylvania Medical Association recently called for a moratorium on new drilling and hydraulic fracturing until the health risks are more thoroughly understood.

[References:
Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.
Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.
Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281.]

Comment Number: 000542_SwackhamerP_20161101-1
Organization1:
Commenter1:Phyllis Swackhamer
Commenter Type: Individual
Comment Excerpt Text:
The New York State Department of Health (NYSDOH) released A Public Health Review Of High Volume Hydraulic Fracturing For Shale Gas Development in December 2014. This review found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This led to their recommendation that fracking should be banned in New York State. Following that review another publication, The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Please refer to the Compendium.

Comment Number: 000542_SwackhamerP_20161101-2
Organization1:
Commenter1:Phyllis Swackhamer
Commenter Type: Individual
Comment Excerpt Text:
Data from a recent study suggest that natural gas drilling operations may result in elevated endocrine disrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling--dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697)

*Summary*
Commenters provided information and recommended review of references related to human health impacts from exposure to chemicals and emissions from fluid mineral development,

BLM_0165128

including, but not limited to, cancer risk from exposure to hydrocarbons, endocrine disruption potential, and respiratory system effects.

Commenters recommended that mineral leasing should be avoided and a moratorium imposed until more research has been conducted on the health effects of those living in close proximity. It was also recommended that Alternative D be strengthened to protect human health from adverse impacts related to oil and gas development based on the information provided and North Fork Alternative Plan (Alternative B1) recommendations.

*Response*
The BLM appreciates the comments. The BLM reviewed the recommended references and incorporated them into the Proposed RMP/Final EIS, as appropriate.

A moratorium on development is not required for the protection of human health. All fluid mineral development continues to be managed under the current (1989) RMP, which provides stipulations and other conditions for leasing. In addition, all site-specific leasing and development is subject to NEPA analysis, including human health impacts analysis.

At the time of a site-specific development proposal consideration, analysis will require continued compliance with federal and state regulatory requirements, as well as design features related to the proposed action to prevent drilling and production failures and contamination by and exposure to hazardous materials, aiming to reduce the risk of impacts on human health from natural gas drilling. Additionally, these measures would aim to reduce the risk that soil or surface water contamination, groundwater contamination, and direct exposure of workers to hydraulic fracturing chemicals.

The Colorado Oil and Gas Conservation Commission's regulations address the saftey of oil and gas operations and the BLM would require all operators to comply with Colorado Oil and Gas Consevation Commission standards and regulations.

### Section 18.3 – Health and Safety: Impact analysis
Total Number of Submissions: 65
Total Number of Comments: 110

Comment Number: 500213_JonesB_20161101-2
Organization1:
Commenter1:Buck Jones
Commenter Type: Individual
Comment Excerpt Text:
The BLM did not take a hard look at direct, indirect, and cumulative impacts as required by NEPA, including:
• BLM failed to consider impacts on human health and should have performed a comprehensive health impact assessment ("HIA");

Comment Number: 000563_King_WELC_HasAttach-245
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165129

Comment Excerpt Text:
For the reasons described above, we urge BLM to prepare a supplemental EIS that:… (4) strengthens its "hard look" at impacts to air, water, and human health, including by conducting a Health Impact Assessment.

Comment Number: 000441_HellecksonB_20161101-1
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Comment Excerpt Text:
The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed, including the Terror Creek watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3-176.

Comment Number: 000108_StraightD_20160803-1
Organization1:
Commenter1:Daniel Stright
Commenter Type: Individual
Comment Excerpt Text:
Comments relating to an unremarkable =10 sw mi area of BLM SW of Beaver Hill Subdivision bounded by Spring Canyon (SE), 90 RD(NW) and private property on the NE and SW.
Comments on BLM's findings:
1. In the RMP, this area is identified as a target shooting area. There is a residence about 140 ft to the east of the BLM boundary. There is a potential safety issue if target shooting is allowed by the RMP in this area.

Comment Number: 000121_GannettA_20160826-1
Organization1:
Commenter1:Alison Gannett
Commenter Type: Individual
Other Sections: 10.3
Comment Excerpt Text:
Attached in a PDF is a new study from Pennsylvania. I would like to contend that the BLM has not done sufficient studies on the human air impacts and cumulative air impacts of Natural Gas Development. The studies have mostly just started in the last few years, and in no way can say conclusively that our health will NOT be impacted in any way shape or form. As a person with brain cancer and severe asthma, myself and many others with health issues will be unusually sensitive to air pollution. You have not proven that it will not affect our health. Our farm participated in the CHC air quality monitoring testing a few years ago, and we work closely with TEDx and know of the data that they have shown. Their testing has shown numerous toxic chemicals in the air around well pads. They have also done baseline

data in the North Fork. and from CHC we have baseline data all over the North Fork Valley regarding air quality.

Comment Number: 000125_ThorupR_20160902-1
Organization1:
Commenter1:Janice Thorup
Commenter Type: Individual
Comment Excerpt Text:
Concerns about health of humans and our land have not been adequately addressed.

Comment Number: 000130_WassellP_20160903-13
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
BLM did not conduct a human health impact assessment.

Comment Number: 000184_BrettJ_20161017-5
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Also, naturally occurring radioactive material comes up with wastewater produced from oil and gas extraction. The waste can remain radioactive for millennia. Excessive radiation exposure can increase cancer risks; radon gas, for example, has been tied to lung cancer. BLM did not analyze the risks of exposure to radioactive waste, and Colorado does not have regulations in place to manage radioactive waste from oil and gas operations.

Comment Number: 000184_BrettJ_20161017-9
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Health Impacts
The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan. Hundreds of peer reviewed scientific articles exist on all aspects of toxins related to unconventional oil and gas production. The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying low-dose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, malignancy as well as all the problems listed below.
The New York State Department of Health (NYSDOH) released A Public Health Review Of High Volume Hydraulic Fracturing For Shale Gas Development in December 2014. In this study, it found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This study led to their recommendation that fracking should be banned in New York State.
The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Below

are some studies published in 2015 or 2014. The citing after each will read PSR-C then the page number.
Uncertainty.
• California Council on Science and Technology studied the impacts of well stimulation on human health from the exposure to fracking-related air pollution. The unknown number and toxicity of chemicals mixed in these fluids make it difficult to quantify risk but the paper identifies the potential health risks. One conclusion: that "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in California's oil operations." (PSR-C p.72)
Birth defects, birth weight, and infant mortality.
• In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. (PSC-C p.76)
• University of Pittsburgh study of three heavily drilled PA counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller-than-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. (PSR-C p.72, 73)
• Health professionals in Vernal, Utah reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one health professional. (PSR-C p.76)
• Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5-kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The chances of a low APGAR score, a summary measure of the health of newborn children, roughly doubled, to more than 5 percent. (PSR-C p.77)
• Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. (PSR-C p.77; 72-73)
Rashes and upper respiratory problems.
• A Pennsylvania, Yale-led study found that health symptoms reported by residents increased in frequency as distance between residence and gas wells decreased. Those living less that one kilometer from drilling activities had increased reports of rashes and upper respiratory problems. (PSR-C p.73)
Urgent Care & Hospitalization.
• Hospitals in the Bakken Shale region reported a sharp rise in ambulance and emergency room visits since the boom in drilling and fracking. Drug overdoses and oil field related injuries accounted for 50% of the cases in one emergency room. (PSR-C p.76)
• University of Pennsylvania's Center of Excellence in Environmental Toxicology found the increasing number of gas wells in Pennsylvania is significantly correlated with inpatient rates of hospitalization. (PSR-C p.75)

Comment Number: 000186_ScotJ_MilvenanE_20161024-4
Organization1:
Commenter1:J. Scot Milvenan
Commenter Type: Individual
Comment Excerpt Text:
Safety

In addition to the lack of consideration for and understanding of the water supplies in our area, there is an alarming lack of attention paid to safety inspections once fracking is underway and to topographical damage due to fracking and fracking accidents.

-BLM did not consider lack of pipeline safety inspections. BLM failed to consult with the Pipeline Hazardous Materials and Safety Administration and failed to consider the potential impacts that an exemption from safety rules would have on human health, the environment, and wildlife. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration"

With a lack of provisions for necessary pipeline safety inspections comes the added risk of fires, contaminations, and other dangers to the area. To that end:

--BLM did not consider forest fire risks from pipeline explosions.

--Our planning area is often subject to drought conditions, in which fires can quickly get out control. The RMP states that "mineral resource development....would introduce additional ignition sources into the planning area, which...could increase the potential for high -- intensity wildland fires." (4-482) That is the extent of their mention of the issue, in their "unavoidable adverse impacts" section. We can avoid this dangerous risk by designating places where wildfires are a risk as unsuitable for fluid mineral extraction.

-The draft RMP did not address possible environmental disasters caused by or affecting fluid mineral development. It is now known that wastewater injection wells cause seismic activity. There is no mention of this in the RMP. Even mild earthquakes can destabilize the infrastructure enough to cause an accident. BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers. Seismic activity could also increase potential for rockslides, which are already common in the area and can block the highway for days, causing significant financial losses both in cleanup and loss of business due to road closures. It is also possible that naturally occurring mudslides and avalanches could affect the safety and integrity of extraction infrastructure. The West Elk Mountains are geologically unstable and these issues should be mentioned in the RMP to provide a basis for future environmental impact statements to address these risks.

Comment Number: 000186_ScotJ_MilvenanE_20161024-5
Organization1:
Commenter1:J. Scot Milvenan
Commenter Type: Individual
Comment Excerpt Text:
Human Health
While researching hydraulic fracturing and what we currently know about the health impacts of living in an area where these activities are present, we want to point out that there is no indication that fracking and its associated processes can be done with a minimum risk to human health. Here is an August 2014 list indicating instances of national groups in government, academia and industry calling for more research on health effects of hydraulic fracturing:

http://mdehn.org/wpcontent/uploads/2014/12/calls_for_moreresearch.pdf

BLM failed to consider impacts of human health, and should have performed a comprehensive health impact assessment. Not only that, but BLM has not accepted new information in the past four years on the negative health impacts of proximity to fracking processes. There are many locations in the United States with hydraulic fracturing in place and ongoing research on health effects on both those living in close proximity to these wells and on the workers. While these investigations continue collecting and analyzing data, the best practice would be to avoid mineral rights leasing on public lands in the North Fork Valley until there is more definitive information about the effects of hydraulic fracturing on the health of the people living here and proper consideration of those effects prior to formulating the RMP. A conservative approach is best when dealing with the irreplaceable.

BLM_0165133

Comment Number: 000226_HickamC_20161025-1
Organization1:
Commenter1:Carol Hickam
Commenter Type: Individual
Comment Excerpt Text:
I do not believe the BLM has done its due diligence in performing the required in depth risk analysis. If they have, I have not seen it. If for no other reason, pipelines should not be put in rural areas where they are unregulated. Pipeline safety was not considered. They break despite best efforts at building adequate ones. In addition, recent studies have shown radioactive waste water which only fuels climate change.

Comment Number: 000258_ReeseC_20161024-1
Organization1:
Commenter1:Heidi Reese
Commenter Type: Individual
Comment Excerpt Text:
Public health and safety
Traffic impacts - The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed.
Seismic activity - New data indicates deep injection wells and other oil and gas activities increases seismic activities. The final plan must assess and mitigate potential impacts of human-caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

Comment Number: 000293_MilvenanE_20161022-1
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan, and there has been inadequate risk analysis to date. It is my professional opinion that the health risks to newborns and pregnant mothers, and to children and adults are significant enough to warrant much more analysis. A moratorium pending further study is the only responsible way to protect the current and future generations in the North Fork Valley.

Comment Number: 000293_MilvenanE_20161022-3
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
There is growing concern about the potential health problems in children and adults living near gas drilling, and efforts to quantify these risks are underway. This type of research requires funding and time. Ongoing research results continue to be released, and must be evaluated before expanding the practice of hydraulic fracturing throughout the country. It is particularly important to bring attention to recent findings because the Bureau of Land Management stopped the clock on accepting new information four years ago, and as such, it did not take these findings into account when formulating the Draft Resource Management Plan for the North Fork Valley. The BLM did not conduct a human health impact assessment in its plan. There should be provisions for ongoing risk analysis, and regulations in place for rural gas gathering pipelines under the Pipeline Hazardous Materials and Safety Administration.

BLM_0165134

Comment Number: 000293_MilvenanE_20161022-4
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
Please see below scientific data from studies published in 2015 and 2016 regarding the significant impact on birth defects, birth weight, and infant mortality, collated by Citizens for a Healthy Community. These studies were cited in The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility.

• In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine, or spinal cord) were associated with the density and proximity of natural gas wells within a 10- mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. PSC-C p.76 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3984231/

• A University of Pittsburgh study of three heavily-drilled Pennsylvania counties found that the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller-than-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. PSR-C p72,73

• Health professionals in Vernal, UT reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Uintah Basin has 11,200 oil and gas wells. PSR-C p76. Pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists.

• Preliminary data from researchers at Princeton University, Columbia, and MIT used Pennsylvania birth records from 2004-2011 to assess the health of infants born within a 2.5 kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6% to more than 9%. The chances of a low APGAR score (a summary measure of the health of newborns at birth) roughly doubled, to more than 5%. PSR-C p.77

• Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. PSR-C p77; 72-73

We must analyze thoroughly the evidence of the impact of gas drilling on developing children, including incidence of asthma and respiratory problems. The California Council on Science and Technology studied the impacts of exposure to fracking-related air pollution and asserted "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in California's oil operations." PSR-C p.72

I cannot emphasize this one enough. Jerome Paulson, MD; Medical Director for National & Global Affairs; Director of the Mid-Atlantic Center for Children's
Health & The Environment; Child Health Advocacy Institute, Children's National Health System and Professor of Pediatrics and of Environmental & Occupational Health George Washington University states in a public letter to the Secretary of Pennsylvania Department of Environmental Protection on June 30, 2014:

• "In protecting children from environmental health hazards, it is essential to recognize that for many reasons children may be more exposed to environmental health hazards than adults in the same location. Moreover, children may have different outcomes than adults similarly exposed. For example, children breathe more air and drink more water per unit of body weight than adults do. Therefore, if the air or water are contaminated, the children will receive a higher dose than the adults. Children also live longer than adults. While that may seem selfevident, it is important in the environmental context because many outcomes of environmental exposures occur years after the exposure. If the delay between exposure and outcome is, for example, 40 years or more, as it may well be in terms of some of

BLM_0165135

the chronic lung diseases of adulthood, if a 60 year old adult is exposed, s/he may not live long enough to develop the adverse outcome. A child, however, will, in all likelihood, live long enough to experience that adverse outcome."

• "As a physician with significant expertise in environmental health, I want to point out that there is no information in the medical or public health literature to indicate that [Unconventional Gas Exploitation] can be implemented with a minimum of risk to human health."

http://citizenshale.org/2014/07/physicianwarns-pa-dep-to-protect-children-and-pregnant-moms/#_edn1 Please also note the following additional sources that I found useful and informative. I have pulled and emphasized particularly relevant information below

the links, but the overarching takeaway is that there are indications of increased health risks surrounding hydraulic fracturing and more research is needed in order to determine how to proceed safely:

From a December 2014 government (NIH) informational article summarizing hydraulic fracturing and what it means for communities:

https://www.niehs.nih.gov/health/materials/hydraulic_fracturing_and_health_508.pdf

• The National Institute of Environmental Health Sciences (NIEHS) is a branch of the National Institutes of Health. This agency is involved in funding for research to investigate potential health impacts related to hydraulic fracturing. Some reseearch activities include the following:

· Examining patterns of pregnancy and asthma near the Marcellus Shale (Geisinger Clinic, Danville, PA – led by Brian Schwartz)

· Investigation of pregnancy risks near the Barnett Shale hydraulic fracturing sites (UTHSC – Houston, led by Kristina Whitworth)

· Assessing markers of stress inflammation, cardiovascular health and quality of life (U of C, Denver – John Adgate.) p.2

Comment Number: 000293_MilvenanE_20161022-5
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
From an April 2014 reference article associating increase in birth defects and maternal proximity to gas drilling: http://ehp.niehs.nih.gov/1306722/

• This study suggests a positive association between greater density and proximity of natural gas wells within a 10-mile radius of maternal residence and greater prevalence of CHDs [congenital heart defects] and possibly NTDs [Neural Tube Defects], but not oral clefts, preterm birth, or reduced fetal growth. Further studies incorporating information on specific activities and production levels near homes over the course of pregnancy would improve exposure assessments and provide more refined effect estimates. Recent data indicate that exposure to NGD [development and production of natural gas] activities is increasingly common... Taken together, our results and current trends in NGD underscore the importance of conducting more comprehensive and rigorous research on the potential health effects of NGD

Comment Number: 000293_MilvenanE_20161022-6
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
From a June 2013 article describing a Health Impact Assessment process in Battlement Mesa/Parachute, Colorado: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3698738/

• To fully understand the health impacts associated with natural gas development, extensive research in environmental emissions, community impacts, and health outcomes should be conducted. Regulators,

BLM_0165136

legislators, and planners, however, must make real-time decisions and are often unable to wait for science to catch up. In the absence of good data on the effects of natural gas development on their citizenry, concerned community governments have been invoking temporary moratoriums that may impede even potentially safe natural gas development. In such circumstances, when definitive scientific data are incomplete, HIA methods can provide guidance to community leaders for the inclusion of health in the decision-making process.

Comment Number: 000314_HixL_20161022-4
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
The following areas have not been addressed or were inadequately addressed in the Draft Resource Plan and studies should be performed before any RMP Alternative is adopted:
o Infrastructure and Economic Impacts & Costs
o Environmental Impacts – Water/Air/Natural Disasters
o Seismic Study
o Human Health Impact Study
o Wildlife Impact
o Pipeline Safety & Safety Inspections

Comment Number: 000342_WolcottS_20161031-3
Organization1:Roberts-Stucker Ditch Association
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The Roberts-Stucker Ditch is one and a half miles long and is located on a steep slope. This slope has suffered several land slides over the years. The Roberts-Stucker Ditch Association has spent many thousands of dollars repairing breaches over the years caused by the slides. Ultimately the ditch was piped at great expense to reduce this risk and increase water efficiency. This pipeline is susceptible to seismic activity, which may be triggered by hydrological fracturing activity. Such an event could interrupt water supplies causing significant crop losses. The cost to repair this kind of damage would be a significant. Waste water injection wells associated with fracking have caused earthquakes in several areas of the country. Deep well injection caused numerous earthquakes at the Rocky Mountain Arsenal near Denver in the 1960's.

Comment Number: 000355_SwackhamerP_20161031-1
Organization1:
Commenter1:Phyllis Swackhamer
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
I do not know how extensive the BLM does its own or investigates other hydrology reports in the UFO area, but this report to the Delta County Board of County Commissioners three years ago on the groundwater systems of the North Fork Valley and Terraces area (http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf) should be alarming to anyone who lives in this area. And it should signal that fracking in this area is not safe for our water.
Some conclusions are:

BLM_0165137

"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

I am a resident of the North Fork Valley who is dependent on the clean water we now have access to for drinking and irrigation. Given this hydrological situation, it appears that our water sources can NOT be guaranteed to remain safe if drilling for oil and gas takes place on a large scale in this area. This is a strong argument for adopting a no-lease option by the BLM in areas that could affect the water of the North Fork Valley. I hope you will support this option if you want to support the future of agriculture and the health of this Valley.

Comment Number: 000360_GannetA_20161031-2
Organization1:Holy Terror Farm
Commenter1:Alison Gannett
Commenter Type: Individual
Comment Excerpt Text:
How can the current BLM RMP conclude that current technology for fluid mineral extraction be "safe" and that "all" known cumulative effects can be known? With a list of over 600 known chemicals for injection, it is stated that most have never been studied for their synergistic health effects. And, since we have no idea what chemical combo is being used on any given well or any given day, how can it be concluded that ALL chemical combinations are "safe"? TEDx.org states that over 30% of fluid mineral injection chemicals are know human health hazards and carcinogens. The BLM must study this until all known chemical combinations are known and each combo is tested to make sure that does not affect human health (or wildlife or the climate, etc). This must be for air, water and soil.

Comment Number: 000373_ThompsonG_20161030-6
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
BLM must conduct a human health impact assessment (HIA) in its final UFO RMP. The CDC (Centers for Disease Control and Prevention) states, "In the United States, HIA is a rapidly emerging practice among local, state, and federal jurisdictions." Because there are now hundreds of peer reviewed scientific articles on all aspects of toxins related to unconventional oil and gas production, it is imperative that human health be protected.

BLM_0165138

Comment Number: 000387_HudekH_20161101-6
Organization1:The Hive Paonia
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
Please conduct a human health impact assessment before approving a Resource Management Plan

Comment Number: 000400_InouyeD_20161028-1
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
I don't think the Draft RMP pays sufficient attention to the adverse health effects that could result from large-scale oil and gas extraction activities, especially given the many recent research reports about such activities. I will highlight here some recent studies in Colorado. For example, a recent "study was designed to characterize and quantify emission rates and dispersion of air toxics, ozone precursors, and greenhouse gases from oil and gas operations in the Denver-Julesburg Basin on the northern Front Range of Colorado. Based on a review of critical knowledge gaps and input from a study Technical Advisory Panel, particular focus was placed on quantifying emissions of individual volatile organic compounds (VOCs), methane, and ethane from oil and gas production sites and from hydraulic fracturing ("fracking") and flowback, important steps in the completion of new wells." (http://www.colorado.gov/airquality/tech_doc_repository.aspx?action=open&file=CSU_NFR_Report_Final_20160908.pdf). Reported dated 15 September 2016, accessed 28 September 2016.
The chemicals released by fracking, flowback, and production included methane, ethane, propane, i-pentane, n-pentane, benzene, toluene, ethylbenzene, and m+p-xylene, at concentrations that can be predicted to have potential health impacts on humans for at least hundreds of meters from the release site. The consequences of the release of these chemicals for air quality and human health must be considered. They are likely to have impacts on local vegetation and wildlife as well. Such risks led the Governor of New York to ban fracking in that state in December 2014. The risks include both air and water pollution. A recent study (McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417) examined associations between maternal residential proximity to natural gas development and birth outcomes in a retrospective cohort study of 124,842 births between 1996 and 2009 in rural Colorado. They calculated inverse distance-weighted natural-gas well counts within a 10-mile radius of maternal residence to estimate maternal exposure, and found an association between density and proximity of natural gas wells and the prevalence of congenital heart defects and possibly neural tube defects. The chemicals responsible are probably the same cohort described in the study described above.
Additional information on the health consequences of gas drilling is available in these publications, which are not cited in the RMP, but should be considered in a revision:
Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health.
New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.
The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.
Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012.Natural Gas Operations from a Public Health Perspective, Human and Ecological Risk Assessment: an International Journal 17(5):1039-1056.
The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret

BLM_0165139

exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns–causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, Science of the Total Environment,424:79-87.

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living > ½ mile from wells and (2) residents living =n ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.

Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking-water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697

This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling-dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activitiessuggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.

Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009

Comment Number: 000400_InouyeD_20161028-3
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
Data from a recent study suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697)

BLM_0165140

Comment Number: 000400_InouyeD_20161028-5
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
This is a graph from Web of Science [SEE ATTACHMENT] (10/28/16), showing the number of scientific publications since 2012 that have the keywords "fracking" and "health". It documents how rapidly our knowledge of this intersection is growing. Would it be imprudent to make a decision now that would lock us into exposure to adverse effects of oil and gas development for decades to come? With the kinds of adverse effects already documented in the studies listed above? I think it would be. We need to confirm the science before deciding to proceed with oil and gas development that can threaten human health.

As a group, these studies raise serious concerns about the health and environmental impacts of development of natural gas wells. These impacts would have serious consequences for the economy of the North Fork valley, which depends on clean air and water for agriculture, recreation, tourism, and domestic consumption. These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no-fracking option. If these health effects are engendered by permitting oil and gas development in the study area, how will they be mitigated? I'm not sure they can be. Who will pay for the consequences to individuals exposed to these effects?

Comment Number: 000401_ShoemakerS_20161028-9
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Other Sections: 14.3
Comment Excerpt Text:
The RMP must address the adverse impacts of oil and gas development on human, agricultural animal, and wildlife health.

Comment Number: 000403_HamnerM_20161031-3
Organization1:Colorado House of Representatives
Commenter1:Millie Hamner
Commenter Type: State Government
Other Sections: 11.3 41.1 41.2
Comment Excerpt Text:
To my knowledge, BLM has not conducted a human health impact assessment, analyzed new hydraulic fracturing and multi-stage drilling technologies, taken a hard look at the implications of climate change on the region, the local economy and other resources BLM is obligated to manage, nor considered the impact of the rural gas gathering lines exemption from Federal pipeline integrity regulations.

Comment Number: 000427_WalshOeinckP_20161031-2
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
The possibility of mudslides and earthquakes due to fracking-related activities in delicate geological areas should be considered.

BLM_0165141

Comment Number: 000427_WalshOeinckP_20161031-3
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
New studies have shown a distinct link between adverse health outcomes and proximity to gas wells.

Comment Number: 000433_FielderA_20161029-2
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
A large portion of my family's diet consists of food grown in the North Fork Valley, and so our health would be directly and negatively impacted by the mining activity that would be allowed in Alternative D of the RMP. There is no denying that food security depends on clean air and water, and that unconventional fossil fuel extraction threatens air and water quality in many lasting ways. Unconventional reserves have only recently been made commercially viable and accessible through horizontal drilling and hydraulic fracturing, and yet a rich and voluminous body of peer-reviewed scholarly research already provides us with ample evidence of the dangers posed by the same types of development that Alternative D would allow.[1] Alternative D is therefore an assault on the basic human rights of my family and my community to drink water, breathe air and grow food that is uncontaminated by industrial pollution associated with fossil fuel extraction.
[1] As a start, please refer to the New York State Department of Health's study "A Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development" (Dec 2014) and "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)," 3rd edition (Oct 2015), by Concerned Health Professionals of New York and the Physicians for Social Responsibility.

Comment Number: 000441_HellecksonB_20161101-2
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Comment Excerpt Text:
The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies.

Comment Number: 000441_HellecksonB_20161101-5
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Other Sections: 41.2
Comment Excerpt Text:

BLM_0165142

The topology of the watershed introduces another risk not addressed either in the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata.

Comment Number: 000442_HickamC_20161028-1
Organization1:
Commenter1:Carol Hickam
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
I do not believe the BLM has done its due diligence in performing the required in depth risk analysis. If they have, I have not seen it. If for no other reason, pipelines should not be put in rural areas where they are unregulated. Pipeline safety was not considered. They break despite best efforts at building adequate ones. In addition, recent studies have shown radioactive waste water which only fuels climate change.

Comment Number: 000446_KlingspornK_20161101-8
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Comment Excerpt Text:
Furthermore, much of the fresh, organic food that is served in Telluride's top-notch restaurants come from the verdant fields and orchards of the North Fork Valley. An increase in oil and gas leasing in this area—particularly in fracking—would have direct impacts on the safety and reputation of our food sources.

Comment Number: 000453_CarpenterN_20161031_partial DUP of 000412-2
Organization1:
Commenter1:Nicole Carpenter
Commenter Type: Individual
Comment Excerpt Text:
- The draft RMP does not adequately address human health impacts. The only mention of potential health impacts in relation to fluid minerals is that "energy and mineral development...includes inherent risks for workers and the public related to safety during construction and operation, as well as the potential introduction of hazardous materials that could impact human health should exposure occur. Introduction of hazardous materials could indirectly affect health due local air, soil, or water contamination" and "Contaminated surface waters pose health risks to recreational users who may come into contact with those waters. Development activities in the vicinity of drinking water aquifers (groundwater) pose a risk of contaminating those aquifers and causing health impacts on groundwater consumers." (Page 4-445) The document makes no mention of the effects that water contaminated with mineral salts, chemical additives, dissolved hydrocarbons, toxic metal ions, and radioactive materials will have on human health, agriculture, livestock, or the economy. The document does not address

BLM_0165143

mitigation or protocols to manage incidents of air/water/soil contamination, nor does it mention any existing legislation that would regulate such potential risks.

Comment Number: 000457_BlandC_20161031-2
Organization1:
Commenter1:Carter Bland
Commenter Type:
Comment Excerpt Text:
1. Risks to air quality from volotile organic compounds, silicates, and other airborne contaminants;
2. Risks to potable drinking water supplies for the towns of Somerset, Paonia, Hotchkiss, Crawford, and Delta as well as for those individuals and families served by private water companies such as: Bone Mesa Water Company, Stucker Mesa Water Company, and Pitkin Mesa Pipeline Company;
3. Risks to irrigation and crops from water contamination and from damage to irrigation canal access and bridges;

Comment Number: 000459_HardyR_20161027-6
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions.

Comment Number: 000459_HardyR_20161027-9
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not conduct a human health impact assessment.

Comment Number: 000469_MilvenanE_20161025-2
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Other Sections: 2
Comment Excerpt Text:
Please see below scientific data from studies published in 2015 and 2016 regarding the significant impact on birth defects, birth weight, and infant mortality, collated by Citizens for a Healthy Community. These studies were cited in The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility.
• In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine, or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. PSC-C p.76
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3984231/
• A University of Pittsburgh study of three heavily-drilled Pennsylvania counties found that the more exposure a pregnant woman had to gas wells, the higher her risk for a smallerthan-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. PSR-C p72,73

BLM_0165144

• Health professionals in Vernal, UT reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Uintah Basin has 11,200 oil and gas wells. PSR-C p76. Pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists.

• Preliminary data from researchers at Princeton University, Columbia, and MIT used Pennsylvania birth records from 2004-2011 to assess the health of infants born within a 2.5 kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6% to more than 9%. The chances of a low APGAR score (a summary measure of the health of newborns at birth) roughly doubled, to more than 5%. PSR-C p.77

• Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. PSRC p77; 72-73

We must analyze thoroughly the evidence of the impact of gas drilling on developing children, including incidence of asthma and respiratory problems. The California Council on Science and Technology studied the impacts of exposure to fracking-related air pollution and asserted "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in California's oil operations." PSR-C p.72

Comment Number: 000509_WolcottE_20161102-3
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
Radioactive materials and disposal have been problematic in the gas development in the Dakotas and elsewhere, and this needs to fully studied and addressed in the final decision.

Comment Number: 000536_SchottJ_20161031-10
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
Human Health: The RMP does not assess the impact of oil and gas exploration and activity on human health. Every increasing numbers of studies are revealing the negative impact of fracturing on the air, water, visual and auditory environment which in turn has had health consequences for people and animals living in areas with these activities. The RMP must take these into consideration.

Comment Number: 000537_SchultzK_20161101_TEDX-10
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
The BLM needs to test for secondary pollutant VOCs in areas near oil and gas development. Multiple ozone precursors are released during well development and production, and Table 3-2 shows existing ozone concentrations are out of compliance under the National Ambient Air Quality Standards. The BLM acknowledges that ozone concentrations will increase under all Alternatives both near oil and gas activities and downwind of the Planning Area (4-20). Reliable data should be collected from the Planning Area rather than modeled using measurements taken outside of the Planning Area that is not impacted by UOG.

BLM_0165145

Ozone has historically been considered a summertime problem, but research from the last 10 years has shown that winter ozone levels near oil and gas production can exceed summer levels when snow cover and weather inversions are present. Even low levels of ozone can cause short term respiratory effects like coughing, wheezing, and shortness of breath. and exacerbates existing conditions such as asthma and emphysema. Children are particularly vulnerable because their lungs are still developing until about age 18. Children get a higher "dose" of the ozone because they breathe in more air per pound of body weight and spend more time being active outdoors. Women exposed to ozone during pregnancy deliver low birth weight babies with compromised lung function (American Lung Association 2016).
[References: American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.]

Comment Number: 000537_SchultzK_20161101_TEDX-11
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Alternative D should not be the Preferred Alternative regarding fluid mineral leasing. There is a large body of evidence that the BLM has not considered showing that reduced air quality near UOG can impact human and environmental health. The large leasable acreage available for fluid mineral extraction places potential development close to rural populations. The BLM needs to address the shortcomings of the available air quality data and risk to public health before allowing oil and gas development to proceed. At the very minimum, the BLM should incorporate the NFAP into the Preferred Alternative. Thank you for accepting these comments.

Comment Number: 000537_SchultzK_20161101_TEDX-3
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.2
Comment Excerpt Text:
UOG emissions can also impact the respiratory system. New research has found an association between proximity to UOG activity and an increase in asthma exacerbations (Rasmussen et al 2016). Inhalation of silica, a proppant used during fracking, and diesel exhaust from increased truck traffic and on-site equipment, can increase respiratory disease (McCawley 2015). Pride et al found that short-term exposure to rising ozone levels near UOG was associated with increased visits to a health clinic for respiratory effects in an impacted community in Wyoming (2015).
[References:
McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.
Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi:10.1016/j.envres.2014.10.033.
Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi:10.1001/jamainternmed.2016.2436.]
Exposure to chemicals detected near UOG have led to other adverse health outcomes as well. A health symptom survey from a densely drilled area in Pennsylvania found that residents living within 1 km of a natural gas well more frequently reported respiratory as well as dermal symptoms compared to

BLM_0165146

residents living 2 km or more from a well (Rabinowitz et al 2015). Another Pennsylvania study found a relationship between well density and hospitalization rates for cardiac, neurologic, and dermal effects among others (Jemielita et al 2015). Tustin et al found a relationship between residents living near UOG in Pennsylvania and nasal, sinus, migraine, and fatigue symptoms (2016). Like Colorado, Pennsylvania is heavily impacted by UOG. Due to concerns over health effects, the Pennsylvania Medical Association recently called for a moratorium on new drilling and hydraulic fracturing until the health risks are more thoroughly understood.

[References:

Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.

Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.

Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281.]

Comment Number: 000537_SchultzK_20161101_TEDX-4
Organization1:The Endocrine Disruption Exchange
Commenter1:Kim Schultz
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Given that the BLM did not consider a No-Leasing Alternative and in light of the above research indicating significant adverse health impacts from UOG, the BLM should, at a minimum, adopt NFAP regarding fluid mineral leasing in the North Fork Valley, and the BLM should apply this conservation framework to cover leasing throughout the Planning Area. The BLM needs to consider the health risk to the populations living near leasable public lands.
BLM should be required to do the following:
* The BLM must begin with a realistic estimate of impact.
The BLM estimates 1,271 wells could be drilled in the Planning Area, 418 wells on land managed by the BLM, identifying impacts from only coalbed methane wells and conventional natural gas wells (3-121). Impacts from UOG including horizontal drilling and hydraulic fracturing were not analyzed.
* The BLM must take into account that UOG is more damaging to the health and the environment than conventional oil and gas extraction.
UOG wells are deeper and horizontal laterals can stretch up to a mile requiring larger amounts of toxic chemicals. Drilling muds containing weighting agents, emulsifiers, and lubricants are used to help move the drill bit down the well bore and can contain toxic chemicals; naphthalene (endocrine, immune, and neurologic system toxicant, mutagen, carcinogen), and petroleum distillates (gastrointestinal, respiratory, and neurologic system toxicants) are some of the most common ingredients found in drilling products (Colborn et al 2011).
[References:
Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.]

Comment Number: 000544_ThompsonK_20161101-1
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual

BLM_0165147

Comment Excerpt Text:
The draft RMP fails to adequately consider the fragile geology that surrounds the NFV. Highway 133, which runs from Carbondale to Hotchkiss over McClure Pass, is 2-lanes, curvy, mountainous, with lots of rocky terrain that hugs the Highway. McClure Pass, near the Paonia Reservoir, is often closed these days, due to rock slides. It is highly likely that the rock slides are caused by the rumbling vibration of heavy trucks, speeding down the narrow mountain road. If the heavy truck traffic increases exponentially, which will happen as it has in all regions where extraction activity occurs, McClure Pass may become impassable to the private citizen due to increased slides which I believe, if studied, could be proven to be directly caused by increased traffic of large, heavy, fast moving trucks which are typically carrying several tons of water or gravel, making them even heavier. Neither the nature of the roads, nor the geology itself, can withstand the impacts of the truck nor of the extraction activity anywhere near the NFV.
Related to this is the danger in there being so many trucks on the steep, rocky, narrow roads. The oil and gas trucks that I have witnessed are driven aggressively, which puts other drivers and their vehicles (cars and motorcycles) at risk of needless injury and damage. I am aware of personal instances in which trucks have hit rocks that have shot into the tires of passing vehicles, ruining tires and front end suspensions.

Comment Number: 000544_ThompsonK_20161101-3
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
2. Draft RMP Fails to Consider Recent Findings Associating Earthquakes with Fracking Activity. Recent studies have concluded that earthquake activity, especially in Oklahoma, is directly caused by [racking activity. Your failure to consider this recent information is irresponsible. Having lived in Washington, D.C., I recognize that the Federal government moves at snail 's pace sometimes. But, lives and livelihoods are at stake here. I applaud you for updating the obsolete RMP from 1989. The draft RMP, however, admits to not considering data from the last few years. The most recent data is some of the most important data to consider because it shows a direct correlation between fracking and injury to the land. You are not serving the people when you the oil and gas industry a blank check to frack when the recent studies are showing how dangerous it is.

Comment Number: 000545_SlivkaJ_20161101-199
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Health Impact Assessment
As we stated in our scoping comments for the Uncompahgre RMP, BLM should conduct a Health Impact Assessment to adequately evaluate potential impacts of fossil fuel development on public health and adopt management decisions to minimize or eliminate those impacts. NEPA intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "…it is the continuing responsibility of the Federal Government to use all practicable means…to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may….assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "…attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences…"[Footnote 85 42 USC § 4331] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects

BLM_0165148

public health or safety." [Footnote 86 40 CFR 1508.27(b)2] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." [Footnote 87 40 CFR 1500.2(f)]

Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations. We therefore recommend that BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS for the Uncompahgre RMP. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations. [Footnote 88 International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, A Guide to Health Impact Assessments in the Oil and Gas Industry, (London; 2005): http://www.ipieca.org/activities/health/health_publications.php]

Comment Number: 000545_SlivkaJ_20161101-200
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Two papers authored by environmental health experts at the University of Colorado's School of Public Health examined available information regarding the health effects of oil and gas drilling and production. Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals." [Footnote 89 Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.] They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties. [Footnote 90 Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf. ] Some of their conclusions that are specifically relevant to the RMP revision include:
? Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.
? Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.
? Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.
? There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.
? Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.
? It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.
? An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.
? A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

BLM_0165149

Summary of Comments: BLM should incorporate a Health Impact Assessment (HIA) into the EIS accompanying the Uncompahgre RMP.

Comment Number: 000560_KelloggV_20161016-4
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Comment Excerpt Text:
I am concerned about spills. There were 615 spills, 271 (44%) of which were from produced water, in 2015. That equates to nearly two spills every day in Colorado. These spills endanger ground, surface water, water wells, and livestock. I am concerned about radioactive material. BLM did not analyze the risks of exposure to radioactive waste and Colorado does not have regulations in place to manage radioactive waste from oil and gas operations.

Comment Number: 000560_KelloggV_20161016-5
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
Rural gas gathering lines are exempt from federal pipeline safety regulations. BM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. From 2003 to 2013, there were 85 reportable incidents in which storms or other severe natural force conditions damaged pipelines and resulted in their failure, for example Yellowstone River near Laurel, MT in 2011 and San Jacinto River in October 1994. BLM also did not consider the pipeline safety impacts on hikers, campers, hunters and anglers. BLM did not consider forest fire risks from pipeline explosions and we live in a forested state with high fire risk. BLM did not consider the lack of pipeline safety inspections.

Comment Number: 000563_King_WELC_HasAttach-4
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must take a hard look at impacts to air, water, and human health, which must include a detailed Health Impact Assessment.

Comment Number: 000563_King_WELC_HasAttach-107
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
The UFO should look at additional hazardous air pollutant impacts from the proposed development, including the impacts from 1,3-butadiene and secondary formaldehyde that will result from the proposed development. The BLM has completed a more comprehensive analysis of HAPs in other recent NEPA actions which resulted in significant impacts from HAPs. Specifically, the Gasco EIS in Utah evaluated short-term and long-term impacts from numerous HAPs, including methanol, chlorinated solvents and acrolein. [See BLM Gasco Energy Project FEIS, Table 4-12, Table 4-19 and Appendix H. April 2010.]

BLM_0165150

The Gasco EIS analysis found elevated cancer risks for acetaldehyde, 1,3-butadiene, and ethylene dibromide, none of which are included in the RMP/EIS for the UFO.
[BLM Gasco FEIS Table 4-19] DEIS, Appendix Q at Q-4 (identifying the HAP emissions that were estimated in the UFO RMP/EIS). The Gasco EIS also reported acrolein emissions that exceeded the acute Reference Exposure Level (REL) and the Reference Concentration for Chronic Inhalation (RfC) [BLM Gasco FEIS Appendix H, at H-45] Acrolein is also not included in the RMP/EIS assessment.

Comment Number: 000563_King_WELC_HasAttach-108
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
BLM must include a more comprehensive analysis of HAP impacts and, in addition to the HAPs identified above, the BLM should also assess any HAP impacts associated with volatile emissions from hydraulic fracturing fluids. It is important to continue to improve upon the HAP analyses conducted under NEPA in order to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. See 40 C.F.R. §1508.27(b)(2).

Comment Number: 000563_King_WELC_HasAttach-110
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations.

Comment Number: 000563_King_WELC_HasAttach-111
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide emissions in the United States. Nevertheless, the agency's preferred Alternative D leaves available approximately 865,970 surface acres within the planning area for oil and gas leasing and development, accounting for the development of approximately 330 federal wells. DEIS at 2-10, 4-36. The relationship between air quality and human health must be analyzed in the RMP/EIS. The failure of the UFO to do so, here, represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs., 463 U.S. at 43 (1983).

Comment Number: 000563_King_WELC_HasAttach-132
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel

BLM_0165151

Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2 21.2
Comment Excerpt Text:
Further, there is no discussion of the increased adverse impacts to human health or the environment. Thus, these statements, which implicitly recognize that the RFD may not account for the full extent of production, provide little in terms of analysis of fracking impacts. Such a void of analysis and consideration of a widely employed technology that not only has the potential, but, in all likelihood, will drastically alter the foreseeable development within the planning area, fails to satisfy the UFO's obligations under NEPA.

Comment Number: 000563_King_WELC_HasAttach-215
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As introduced above, emissions from oil and gas development are not limited only to the combustion stage but, rather, occur throughout the chain of production. These emissions not only impact the critical resource values of the UFO – as detailed throughout these Comments – but also can result in serious harm to human health. BLM must fully consider the potential human health impacts that may be caused by oil and gas operations approved under the UFO RMP, as required by NEPA. [See North Fork Resident Declarations (attached as Exhibit 300); Photos (attached as Exhibits 314-322).]

Comment Number: 000563_King_WELC_HasAttach-216
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The rapid development of high volume/horizontal drilling in conjunction with hydraulic fracturing has driven expansion of new sources resulting in increased emissions – a change that requires consideration in the UFO's RMP analysis.

Comment Number: 000563_King_WELC_HasAttach-217
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Unfortunately, impacts to human health are not limited only to natural shale gas emissions, but can result from exposure to chemicals necessary for gas extraction – namely, the hundreds of chemicals used in hydraulic fracturing. [See Theo Colborn, et. al., Comments to the Bureau of Land Management, Uncompahgre Field Office, THE ENDOCRINE DISRUPTION EXCHANGE, April 20, 2012 (attached as Exhibit 278); Theo Colborn, et. al., Natural Gas Operations from a Public Health Perspective, HUMAN AND ECOLOGICAL RISK ASSESSMENT, 17: 1039-1056 (2011) (attached as Exhibit 279). Indeed, "[b]etween 2005 and 2009, the 14 oil and gas service companies [analyzed by Congress] used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components. Overall, these companies used 780 million gallons of hydraulic fracturing products – not including water added at the well site – between 2005 and 2009." [U.S. CONGRESS, HOUSE OF REPRESENTATIVES (attached above as Exhibit 171).] Chemical components include BTEX compounds – benzene, toluene, xylene, and ethylbenzene – which are hazardous air pollutants and known human carcinogens. The UFO has failed to sufficiently consider the human health impacts associated with these extractive practices in the RMP and DEIS.

Comment Number: 000563_King_WELC_HasAttach-218
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The health problems and uncertainties that proliferate in communities where oil and gas development takes place warrants the further collection of data and research, as contemplated under NEPA, before such development can be made possible through the authorization of development through the UFO RMP. NEPA requires a hard look at these impacts.

Comment Number: 000563_King_WELC_HasAttach-219
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM did not conduct a health impact assessment, or equivalent analysis, and, as a result, the agency's RMP/EIS does not satisfy NEPA and its implementing regulations.

Comment Number: 000563_King_WELC_HasAttach-220
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
NEPA requires that the BLM employ at least the same level of effort to analyze human health impacts as it does to promote industry's interest in development when preparing the RFD and associated analyses regarding projected drilling levels.
A health impact assessment ("HIA") or equivalent analysis would fulfill the regulations governing NEPA, to examine human health impacts "to the fullest extent possible." A HIA would be forward-looking and attempt to identify all of the potential direct, indirect, and cumulative links between a proposed activity and the health and well-being of affected communities, and to develop mitigation measures to minimize harms and maximize benefits. The RMP does not does not include this type of analysis of human health impacts.

Comment Number: 000563_King_WELC_HasAttach-221
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The U.S. EPA has posted on its website an excellent document on the utility of an HIA as part of the NEPA analysis of federal agencies where public health impacts are at issue. [See EPA, Human Impact Partners, Frequently Asked Questions About Integrating Health Impact Assessment into Environmental Impact Statement, available at: http://www.epa.gov/region9/nepa/PortsHIA/pdfs/FAQIntegratingHIA-EIA.pdf (attached as Exhibit 281).] HIA "provides a systematic process and methodology to anticipate and proactively address the potential health consequences of a program or policy in order to maximize the potential benefits and minimize adverse outcomes." [See Aaron Wernham, Inupiat Health and Proposed Alaskan Oil Development: Results of the First Integrated Health Impact Assessment/Environmental Impact Statement for Proposed Oil Development on Alaska's North Slope, ECOHEALTH, 2007 (attached as Exhibit 282).] Steps in the HIA process include:
1. Screening: Determines whether an HIA is necessary, and whether it is likely to be useful.

BLM_0165153

2. Scoping: Establish the population to which the HIA applies, the scope of health problems to be analyzed, the HIA team, methods to be used in the assessment, and data sources.

3. Assessment: describe the baseline health status and determinants of health in the population and assess likely impacts through a literature review and qualitative or quantitative analysis.

4. Decision and recommendations to minimize adverse impacts and maximize benefits.

5. Monitoring and reassessment plan: select a set of outcomes likely to be sensitive/accurate indicators of the changes predicted, such as health outcomes and develop a plan to monitor and then reassess if needed.

The BLM did not conduct these steps, and did not analyze the impacts to the population within the planning area, considering how many people might be exposed to health impacts, analyze where development would take place relative to water sources or residences, or assess the likely impacts to the actual population in the area, including particularly vulnerable populations. It also omitted significant potential impacts. For example, the agency did not include any potential impacts from vehicle accidents or other safety issues, or the illness caused by the stress and mental anguish associated with living near intensive oil and gas development.


Comment Number: 000563_King_WELC_HasAttach-222
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM's section examining health effects, EIS at 4-444 to -451, is cursory, states the obvious, provides only comparative assessments between alternatives, and does not quantify harms. For example, the brief discussion of Alternative D (the agency preferred alternative) states, regarding air quality, that impacts will be the same as under Alternative C, but at a slightly reduced level. EIS at 4-450. In turn, Alternative C merely provides that "[t]his alternative would have the greatest potential to contribute to volatile organic compounds and local increases in hazardous air pollutants and associated risks to human health." Id. at 4-449. Regarding air quality, BLM's only other generic observation, unconnected to any analysis of the specific alternatives at issue, is that "[m]anagement actions that maintain or move towards compliance with standards by limiting emissions from BLM managed or permitted activities would improve public health while those that allow for increased emissions and result in non-compliance with standards could impact public health." EIS at 4-445.


Comment Number: 000563_King_WELC_HasAttach-223
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Further, no impacts to water resources from fracking are identified by BLM in its examination of health effects, which is unacceptable. Any later, site-specific analysis and application of mitigation measures is no substitute for analysis of impacts and development of alternatives and mitigation measures at the RMP/EIS level. Waiting for the approval of site-specific projects forecloses not only analysis of the true impacts of the agency action that is actually being proposed, but in so doing, forecloses the ability of BLM, other agencies, and the public to identify at an early stage the significant environmental issues that are deserving of study in this EIS. This RMP is a major point in the leasing decision-making process, requiring analysis of all of the impacts at this stage.


Comment Number: 000563_King_WELC_HasAttach-224
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel

BLM_0165154

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
These and additional recent studies that were not considered by BLM include:
1. Lisa M. McKenzie et al., Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado, Environmental Health Perspectives (April 2014) (attached above as Exhibit 157).
2. Jessica Gilman, et al., Source signature of volatile organic compounds (VOCs) from oil and natural gas operations in northeastern Colorado, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 286).
3. John L. Adgate, et al., Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 295).
4. Seth Shonkoff, et al., Environmental Public Health Dimensions of Shale and Tight Gas Development, ENVIRONMENTAL HEALTH PERSPECTIVES (2014) (attached as Exhibit 287).
5. Christopher W. Moore, et al., Air Impacts of Increased Natural Gas Acquisition, Processing, and Use: A Critical Review, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 288).
6. Avner Vengosh, et al., The effects of shale gas exploration and hydraulic fracturing on the quality of water resources in the United States, PROCEDIA EARTH AND PLANETARY SCIENCE (2014) (attached as Exhibit 289).
7. Christopher D. Kassotis, et al., Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region, Endocrinolgy (2014) (attached as Exhibit 176). (attached above as Exhibit 176).
8. Brian E. Fontenot, et al., An Evaluation of Water Quality in Private Drinking Water Wells Near Natural Gas Extraction Sites in the Barnett Shale Formation, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 290).
9. Sherilyn A. Gross, et al., Analysis of BTEX Groundwater Concentrations from Surface Spills Associated with Hydraulic Fracturing Operations, JOURNAL OF THE AIR & WASTE MANAGEMENT ASSOCIATION (2013) (attached as Exhibit 291).
10. K.D. Retzer, et al., Motor vehicle fatalities among oil and gas extraction workers, ACCIDENT ANALYSIS & PREVENTION (2013) (attached as Exhibit 292).
11. Eric J. Esswein, et al, Occupational exposures to respirable crystalline silica during hydraulic fracturing, JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HYGIENE (2013) (attached as Exhibit 293).
12. R.Z. Witter, et al., Occupational exposures in the oil and gas extraction industry: state of the science and research recommendations, AMERICAN JOURNAL OF INDUSTRIAL MEDICINE (2014) (attached as Exhibit 294).
13. Physicians for Social Responsibility, Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Oil and Gas Extraction), Third Edition (October 14, 2015), available at: http://www.psr.org/assets/pdfs/fracking-compendium.pdf (attached as Exhibit 326).
14. Gayathri Vaidyanathan, Fracking Can Contaminate Drinking Water, Climate Wire (April 4, 2016), available at: https://www.scientificamerican.com/article/fracking-cancontaminate-drinking-water/ (last visited November 1, 2016).
15. A. Austin, et al., Associations Between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania, Environmental Health Perspectives (July 31, 2016), available at: http://ehp.niehs.nih.gov/wp-content/uploads/advpub/2016/8/EHP281.acco.pdf (attached as Exhibit 327).

BLM_0165155

Comment Number: 000563_King_WELC_HasAttach-225
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
EPA is also currently investigating the potential impacts of hydraulic fracturing on drinking water
resources due to concerns about its potential environmental and human health impacts. Until such
research is completed, there is insufficient information to fully understand the potential impacts on
human health, an uncertainty that the BLM failed to take into consideration. The EPA is still in the
process of completing this study. Nevertheless, the BLM ignored the uncertainty of the impacts of
hydraulic fracturing on drinking water. BLM must consider these studies in any subsequently prepared
NEPA document to ensure that it took the required hard look at health impacts.

Comment Number: 000563_King_WELC_HasAttach-229
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Processes used to produce oil and gas often generate radioactive waste containing concentrations of
naturally occurring radioactive materials (NORM). Radioactive wastes from oil and gas production can
be found in produced water, flowback water from hydraulic fracturing, drilling waste including cuttings
and mud, and/or sludge. This material can concentrate in pipes, storage tanks and facilities, and on other
extraction equipment, and may be left on site or be emitted into the environment. Some of these
materials can penetrate the skin and raise the risk of cancer. The RMP includes no discussion on
potential health impacts associated with NORM that may be released into the environment due to oil
and gas extraction activities.

Comment Number: 000584_PattersonC_20161005-2
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Other Sections: 41.1 41.2
Comment Excerpt Text:
BLM did not consider current information on earthquakes, human health impact, climate change impact,
and environmental damage caused by hydraulic fracturing, injection wells, and oil and gas operations.

Comment Number: 000587_WolcottS_20161031-13
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Other Sections: 18.5
Comment Excerpt Text:
New data indicates deep injection wells and other oil and gas activities increases seismic activities. This
will threaten a lot of water infrastructure, such as the 6 miles of pipeline that delivers Stucker Mesa
Domestic Water and the 11/2 miles of 18" irrigation pipeline that delivers irrigation water to Stucker
Mesa. Both of these pipelines are largely on steep and unstable slopes on BLM lands that are vulnerable
to land slips. Damage to this infrastructure would interrupt irreplaceable water deliveries that would
cause significant economic losses. Repairs could take weeks, cause significant crop losses and cost tens
of thousands of dollars to repair. There are hundreds of water conveyance systems in the area that are

BLM_0165156

vulnerable to seismic activity. The final plan must assess and mitigate potential impacts of human caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

Comment Number: 000471_NoeD_20161101-12
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Induced earthquakes seismic activity. In my work at the state geological survey of Colorado, we were well aware of the effect of deep, waste-fluid disposal injection wells in causing seismic instability and earthquakes. Colorado contains some famous and well-documented examples (including the Rocky Mountain Arsenal near Denver, the Rangely oil field, the Raton Basin coal gas play near Trinidad, and the U.S. Bureau of Reclamation's brine injection well near Bedrock. In addition to general concerns to the public, induced-earthquake hazards are a potential threat to coal mine operations and the Paonia Reservoir dam. Many of the hillsides in the North Fork area are comprised of metastable to active landslides and sandstone cliffs that regularly produce rockfalls. These hazards are recognized by the Colorado Geological Survey, which names the North Fork Gunnison River corridor and the 2nd - highest landslide hazard area in Colorado (Rogers, 2003). The additional occurrence of induced earthquakes in this area could potentially increase the frequency and magnitude of damaging landslides and rockfalls

Comment Number: FormLetterL_CHC WSCC-7
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Seismic activity - New data indicates deep injection wells and other oil and gas activities increases seismic activities. The final plan must assess and mitigate potential impacts of human-caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

Comment Number: 000617_CromptonW_20161101-1
Organization1:
Commenter1:William Crompton
Commenter Type: Individual
Comment Excerpt Text:
the BLM has proposed a land use plan that does not take into consideration the known health effects of fracking on the human and non-human residents of this valley and the greater southwest.

Comment Number: 500010_MasciocchiM_20161101-1
Organization1:
Commenter1:Matt Masciocchi
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
Hydraulic Fracturing has been scientifically linked to a wide variety of human health issues. Some of these health concerns include:
• Birth defects
• Endocrine disruption
• Respiratory ailments

BLM_0165157

• Cardio vascular disease
• Immune system function

Comment Number: 5000162_OvertonL_20161018-2
Organization1:
Commenter1:Lee Overton
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
Air quality is another consideration. Communities subject to pollution from hydraulic fracking have frequently had severe reactions. A review by the New York State Department of Health released a "Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development," in December 2014, which found problems with skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation, all of which led to the recommendation that New York should ban tracking in that state.
Studies pertaining to birth defects, birth weight and infant mortality show negative results as stated below:
* in rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects.
* University of Pittsburgh study of three heavily drilled Pennsylvania counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller than normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality.
* Health professionals in Vernal, Utah reported a six-fold increase in infant death rates over a three year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one professional.
* Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5 kilometer radius of natural gas tracking sites. They found that proximity to tracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The North Fork Valley cannot afford the risk of contamination.

Comment Number: 500031_DanuffS_20161024-1
Organization1:
Commenter1:Steve Danuff
Commenter Type: Individual
Comment Excerpt Text:
While the detrimental effects on human health of oil and gas development and associated tracking are being documented and proven scientifically, both nationally and locally with landslides and flammable water, why has the BLM neglected to conduct a human health impact assessment as part of this Draft RMP

Comment Number: 500034_HannahK_20161022-1
Organization1:
Commenter1:Kay Hannah
Commenter Type: Individual

BLM_0165158

Comment Excerpt Text:
While the detrimental effects on human health of oil and gas development and associated fracking are being documented nationwide as well as locally the BLM neglected to conduct a human health impact assessment as part of this Draft RMP.

Comment Number: 500046_TrumbleM_20160923-1
Organization1:
Commenter1:Mary Trumble
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
You have done no studies or analysis in our specific area. You did not identify the human health impact that hydraulic fracking would have in our area or the impact that it would have on our wildlife and hunting and fishing.

Comment Number: 500176_StewartC_20161027_TownOfPaonia-3
Organization1:Town of Paonia
Commenter1:Charles Stewart
Commenter Type: Local Government
Comment Excerpt Text:
The Town is very concerned about potential health risks associated with natural gas development and is concerned that the BLM has not adequately addressed the potential for lasting negative impacts on the citizens of the North Fork Valley if the quality of the air and water in this area were to be compromised due to increased pollutants that come from the drilling process. In the words of a lead researcher from Johns Hopkins Bloomberg School of Public Health, Brian Schwartz "The first few studies have all shown health impacts," he says. "Policymakers need to consider findings like these in thinking about how they allow this industry to go forward."1

Comment Number: 500203_McCainJ_20161025-6
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• The draft RMP does not adequately address human health impacts. The only mention of potential health impacts in relation to fluid minerals is that "energy and mineral development...includes inherent risks for workers and the public related to safety during construction and operation, as well as the potential introduction of hazardous materials that could impact human health should exposure occur. Introduction of hazardous materials could indirectly affect health due local air, soil, or water contamination" and "Contaminated surface waters pose health risks to recreational users who may come into contact with those waters. Development activities in the vicinity of drinking water aquifers (groundwater) pose a risk of contaminating those aquifers and causing health impacts on groundwater consumers." (Page 4-445) The document makes no mention of the effects that water contaminated with mineral salts, chemical additives, dissolved hydrocarbons, toxic metal ions, and radioactive materials will have on human health, agriculture, livestock, or the economy. The document does not address mitigation or protocols to manage incidents of air/water/soil contamination, nor does it mention any existing legislation that would regulate such potential risks.

Comment Number: 500203_McCainJ_20161025-7
Organization1:
Commenter1:James McCain

BLM_0165159

Commenter Type: Individual
Comment Excerpt Text:
• The draft RMP did not address possible environmental disasters caused by or affecting fluid mineral development. It is possible that wastewater injection wells can cause seismic activity. There is no mention of this in the RMP. It is also possible that naturally occurring mudslides and avalanches could affect the safety and integrity of extraction infrastructure. There was a close call on May 25, 2014, when a mudslide came within feet of burying a drilling pad near Colbran, Co. and killed three people. The West Elk Mountains are geologically unstable and these issues need to be mentioned in the RMP to provide a basis for future EIS's to address these risks.
• The draft RMP does not adequately address the possibility of explosions, or lightning strikes, and the risk that these events can pose to nearby residences, structures, property and other natural resources when natural gas and other flammable/explosive materials are involved. The planning area is often subject to drought conditions, in which fires can quickly get out control. The RMP states that "mineral resource development .... would introduce additional ignition sources into the planning area, which ... could increase the potential for high-intensity wildland fires." (4-482) That is the extent of the content of this issue, briefly mentioned in the "Unavoidable Adverse Impacts" section. We can avoid this "adverse impact" by designating places where wildfires are a risk as unsuitable for fluid mineral extraction.
• The draft RMP does not address how fluid mineral development would strain local emergency services such as volunteer fire, ems and rescue groups. In the fall of 2015, there was a report of flames in the forest alongside Hwy 133. Paonia Volunteer Fire Dept was dispatched to the scene, over an hour's drive from their station. It turned out that one of the wells was flaring gasses and hadn't notified the local authorities as they were required, by law. This had the effect of wasting volunteers' time and could have been detrimental if there had been a real emergency during the time the fire department's limited resources were tied up investigating this false alarm. If there were a true emergency in this remote location, where is the nearest HAZMAT team that is qualified to deal with oil and gas spills? What is the response time? The specifics should be determined in project EIS's but the issue needs to be mentioned in the RMP that guides future EIS's.

Comment Number: 500226_CareyH_20161101-1
Organization1:
Commenter1:Hugh Carey
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
I am concerned that the BLM didn't consider the damage of fracking or do a human health impact study on fracking operations before drafting the RMP. A recent study released by John Hopkins indicates that an increase of health problems in areas near hydraulic fracturing is directly related:
"New research suggests that Pennsylvania residents with the highest exposure to active natural gas wells operated by the hydraulic fracturing ('fracking') industry are nearly twice as likely to suffer from a combination of migraine headaches, chronic nasal and sinus symptoms and severe fatigue.
Researchers from the Johns Hopkins Bloomberg School of Public Health, reporting online Aug. 25 in the journal Environmental Health Perspectives, say their findings add to a growing body of evidence linking the fracking industry to health problems. 'These three health conditions can have debilitating impacts on people's lives,' says first author Aaron W. Tustin, MD, MPH, a resident physician in the Department of Environmental Health Sciences at the Bloomberg School. 'In addition, they cost the health care system a lot of money. Our data suggest these symptoms are associated with proximity to the fracking industry.' "
Why is the BLM not acknowledging the people whose health has been damaged or those who have died near fracking operations?

Comment Number: 500255_StoneM_20161101-1
Organization1:
Commenter1:Marilyn Stone
Commenter Type: Individual
Comment Excerpt Text:
Risks have been identified but not impacts on human health. There is a wealth of emerging research on negative health impacts.
The RMP does not identify the action plan implemented should the risks to air, water, wildlife and human health occur.

Comment Number: FormLetterAAA-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In addressing the Draft RMP, I have many concerns and in particular note that the BLM doesn't address the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems of people. Has the BLM completed studies on the impact of the chemicals used in the fracking fluids and how they affect human health? A thorough analysis of gas and oil opeartions needs to be completed before any options can be considered.

Comment Number: FormLetterCCC-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, pipeline leakages, and their impact on people's health. The BLM did not take into consideration the potential damage to respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems from:
1. truck transportation of water, fluids and sand and the impact of VOCs and particulate matter
2. casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter
3. flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter

Comment Number: FormLetterDDD-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In The Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on people's health.
Comment Number: FormLetterDDD-2
Organization1:
Commenter1:

BLM_0165161

Commenter Type:
Comment Excerpt Text:
BLM did not analyze or consider:
1. truck transportation of water, fluids and sand and the impact_of VOCs and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
2. casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
3. flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

Comment Number: FormLetterEEE-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, pipeline leakages, and their impact on people's health. The BLM did not take into consideration the potential damage to respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems from:
. truck transportation of water, fluids and sand and the impact of VOCs and particulate matter
. casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter
. flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter

Comment Number: FormLetterFFF-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the environment and people's health.
In particular, the BLM did not take into consideration the following:
1. truck transportation of water, fluids and sand
2. casing, drilling and hydraulic fracturing
3. flaring and condensate tank flaring

Comment Number: FormLetterGGG-3
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
the possibility of explosions, or lightning strikes and the risk that these events can pose to nearby residences, structures, property and other natural resources when natural gas and other explosive materials are involved. The planning area is often subject to drought conditions in which fires can quickly get out control.

BLM_0165162

Comment Number: FormLetterGGG-4
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
potential toxic emissions such as the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked or spilled as a result of drilling, continuous operations or accidents, and their impact on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems of people.

Comment Number: FormLetterHH-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Also among my concerns is the fact that the BLM has not included a human health analysis. A strict standard should be set with regular testing if any development occurs to ensure that the quality we have is not lessened. I see too many gaps which have not been supplied to make me feel that the proper safety nets will be in place or proper monitoring.

Comment Number: FormLetterHHH-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In The Draft RMP the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on people's health.
BLM did not analyze or consider:
1. truck transportation of water, fluids and sand and the impact of VOCs and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
2. casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
3. flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
4. the use of waste ponds for the storage of flow back fluids, drilling muds, and other chemicals and water used in the hydraulic fracturing process and the impact of the VOCs and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
5. glycol dehydration to separate wet oil or water out of the natural gas stream and the impact of VOCs, particulate matter, methane and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

Comment Number: FormLetterII-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In addition, the Draft RMP also does not address the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of

drilling, continuous operations or accidents, and their impact on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems of people.

Comment Number: FormLetterL_CHC WSCC-6
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Public health and safety
Traffic impacts - The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed. Local residents rely on a handful of narrow state highways for daily transportation and emergency access. Oil and gas activities would significantly increase the number and frequency of oversized trucks and machinery transported on our highways, increasing the risk of accident and emergency vehicle blockage.

Comment Number: FormLetterLLL-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Nowhere in the Draft RMP does the BLM address the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the respiratory, nervous, digestive, immune, reproductive, cardiovascular systems of people.
The BLM did not analyze or consider:
1. gas pipelines and the impact of VOCs, methane, hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
2. compressor stations and the consequent venting of methane and the impact of VOCs and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
3. natural gas processing plants and the impact of VOCs, particulate matter, methane, and nitrogen oxide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
4. the venting of VOCs and gases from metering stations to monitor gas transmission in pipeline and the impact on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
5. pipeline maintenance operations that release VOCs, methane, and hydrogen sulfide and impact the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

Comment Number: FormLetterMMM-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
BLM did not analyze or consider:
1. truck transportation of water, fluids and sand and the impact of VOCs and particulate-matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
2. casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
3. flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

BLM_0165164

4. the use of waste ponds for the storage of flow back fluids, drilling muds, and other chemicals and water used in the hydraulic fracturing process and the impact of the VOCs and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

5. glycol dehydration to separate wet oil or water out of the natural gas steam and the impact of VOCs, particulate matter, methane and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

Comment Number: FormLetterMMM-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In The Draft RMP the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked' or spilled as a result of drilling, continuous operations or accidents, and their impact on people's health.

Comment Number: FormLetterOOO-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In the Draft Resource Management Plan, the BLM does not address the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling, continuous operations or accidents, and their impact on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems of people.

Comment Number: FormLetterOOO-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM did not consider any of the following:
- truck transportation of water, fluids and sand and the impact of VOCs and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- casing, drilling and hydraulic fracturing and the impact of methane, nitrogen oxide, hydrogen sulfide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- flaring and condensate tank flaring and the impact of VOCs, methane, nitrogen oxide and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- the use of waste ponds for the storage of flowback fluids, drilling muds, and other chemicals and water used in the hydraulic fracturing process and the impact of the VOCs and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- glycol dehydration to separate wet oil or water out of the natural gas stream and the impact of VOCs, particulate matter, methane and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- gas pipelines and the impact of VOCs, methane, hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- compressor stations and the consequent venting of methane and the impact of VOCs and particulate matter on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

BLM_0165165

- natural gas processing plants and the impact of VOCs, particulate matter, methane, and nitrogen oxide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- the venting of VOCs and gases from metering stations to monitor gas transmission in pipelines and the impact on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
- pipeline maintenance operations that release VOCs, methane and hydrogen sulfide and impact the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems

Comment Number: FormLetterP-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Hydraulic Fracturing has been scientifically linked to a wide variety of human health issues. Some of these health concerns include:
. Birth defects
. Endocrine disruption
. Respiratory ailments
. Cardio vascular disease
. Immune system function
These are serious ailments that can be prevented by the use of renewable alternative energy use rather then the polluting gas and oil industry.
I urge you to please take the public health and the environmental health into consideration and BAN hydraulic fracturing in Colorado.

Comment Number: FormLetterPPP-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
A couple of my many concerns which need to be addressed and analyzed follow:
1. The use of waste ponds for the storage of flow back fluids, drilling muds and other chemicals and water used in the fracking process and the impact of VOCs and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive and cardiovascular systems.
2. Glycol dehydration to separate wet oil or water out of the natural gas stream and the impact of VOCs, particulate matter, methane and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive and cardiovascular systems.

Comment Number: FormLetterZ-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In the Draft RMP, the BLM never addresses the volatile organic compounds (VOCs), particulate matter, methane, nitrogen oxide, and hydrogen sulfide that are released, leaked, or spilled as a result of drilling continuous operations or accidents, and their impact on people's health.

Comment Number: FormLetterZ-2
Organization1:
Commenter1:
Commenter Type:

BLM_0165166

Comment Excerpt Text:
I question the BLM considering additional oil and gas development and fracking when you have not analyzed oil and gas operations and their impact on human health. I would also like to know why the BLM ignores the articles on thousands of people who either lost their lives or had their health compromised from living near oil and gas development?

*Summary*
Commenters stated that the BLM should analyze threats to human safety, including the following:

- Lack of pipeline safety inspections and threat of forest fires and harm from pipeline explosions
- Strain on emergency services
- Impacts from potential spills and leaks
- Increased truck traffic and risk of accident and emergency vehicle blockage
- Possible environmental disasters caused by or affecting fluid mineral development, such as seismic activity, flooding, and rockslides

Commenters noted that the BLM has not sufficiently analyzed human health impacts from energy development. They recommended that a human health impact assessment be conducted and the following be considered:

- Potential for hazardous air pollutant impacts and impacts associated with volatile emissions and volatile organic compounds
- Potential for contamination of ground and surface water
- Radioactive waste material
- Low-dose endocrine-disrupting chemicals
- Uncertainty of impacts due to the unknown mixture and toxicity of chemicals in hydraulic fracturing operations
- Links to birth defects and infant mortality
- Respiratory problems
- Cardiovascular disease
- Immune system problems
- New information on health impacts from hydraulic fracturing and potential for higher risk of adverse human health impacts from hydraulic fracturing operations than from conventional oil and gas operations
- Impacts to children and other sensitive groups
- Quantifiable impacts to human health and analysis beyond comparative assessments between alternatives
- Impacts from associated energy development activity (including truck transportation, compressor stations, natural gas processing plants, metering stations, pipeline maintenance operations, waste ponds, glycol dehydration, flaring, and condensate tank flaring)
- EPA's Human Impact Assessment methodology

BLM_0165167

*Response*

RMP-level impact analyses are broad and qualitative rather than quantitative or focused on site-specific actions. The BLM adequately analyzed impacts to public health and safety at the RMP level, in accordance with the significance criteria outlined in 40 CFR 1508.27(b). As noted in the Draft RMP/EIS (page 4-447), under all alternatives, lease stipulations and BMPs would limit impacts on human health and safety from development. Lease stipulations and BMPs would be applied as determined appropriate at subsequent site-specific NEPA analysis at the application for permit to drill stage. Also refer to the response to Section 18.2 – Health and Safety of this report.

Draft RMP/EIS Section 4.6.2 analyzes general impacts of the various alternatives, including specific impacts from decisions directly and indirectly related to oil and gas leasing activities, on public health and safety. Specifically, potential for exposure to chemicals during fluid mineral development (e.g., from spills and leaks) is discussed on page 4-447 and potential geological hazards on page 4-445. Likewise, although the Draft RMP/EIS recognizes the potential for impacts to public safety from pipeline spills, increased vehicular traffic, and a strain on emergency services, related quantitative impacts would be addressed in a site-specific analysis and not at the broader RMP-level analysis. Further, the Colorado Oil and Gas Consevation Commission is the primary agency charged with fostering the responsible development of Colorado's oil and gas natural resources in a manner consistent with the protection of public health, safety, and welfare, including the environment and wildlife resources. Although the BLM does have standards and regulations for mineral extraction and development, the BLM requires that all operators be in full compliance with standards and measures set by the Colorado Oil and Gas Consevation Commission when conducting operations on public lands.

While a Human Impact Assessment can inform a NEPA analysis, it is not required by NEPA statute, implementing regulation, or policy. The BLM reviewed the specific human health concerns noted in the comments and added additional information to the Proposed RMP/Final EIS impacts analysis as appropriate to addresses these issues.

### Section 18.4 – Health and Safety: Cumulative impact analysis
Total Number of Submissions: 4
Total Number of Comments: 6

Comment Number: 000401_ShoemakerS_20161028-10
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must address the cumulative system impacts of oil and gas development on community health and function (things like physical infrastructure, health services, crime, community safety, and policing).

Comment Number: 000563_King_WELC_HasAttach-226
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165168

BLM must fully consider cumulative health impacts of different alternatives. Because the BLM will be leasing minerals located directly beneath and adjacent to private property, and because thousands of people live in close proximity to the industrial activity that will be permitted by the agency, BLM has the responsibility to consider potential impacts on human health from all development, and look at them cumulatively. For example, an individual exposed to both air and water pollution will have different health impacts than an individual exposed only to air pollution.

Comment Number: 000563_King_WELC_HasAttach-227
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The assessment of cumulative impacts in NEPA documents is required by Council on Environmental Quality (CEQ) regulations. See 40 C.F.R. §1508.25 (Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act). Oil and gas development involves multiple sources of pollutants and disturbance caused by connected actions, including the operations of wellpads, trucks, wells, compressors, pipelines, tanks, pits, separators, dehydrators, rigs and more. Oil and gas development also includes hundreds of potential pollutants, both man-made and naturally occurring. When considered together, pollutants emitted with common timing and/or common geography may create additional health impacts that should be assessed. Also, oil and gas development may create health impacts from air pollution, water contamination, soil contamination, or a combination of all three. Due to the multiple variables and factors involved in oil and gas development, it is essential that the BLM ensure a health impact assessment that fully considers all cumulative impacts to comply with federal regulations and to appropriately assess health impacts and inform the public.

Comment Number: 000563_King_WELC_HasAttach-228
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
If the full cumulative health impacts are not considered by BLM at this stage it is unlikely that BLM would consider them adequately in connection with individual lease sales, or in project-level and site-specific EAs. This type of shell game, whereby the agency avoids an analysis of the cumulative impacts of the entire project (in this case, 15,000 plus wells) is in contravention of NEPA. See e.g., Blue Mountains Biodiversity Project v. U.S. Forest Service, 161 F.3d 1208, 1215 (9th Cir. 2008)

Comment Number: 000642_SwackhamerP_20161101-1
Organization1:
Commenter1:Phyllis Swackhamer
Commenter Type: Individual
Comment Excerpt Text:
146 wells in the ~19,000 A. area will have health effects on animals and people. These effects of these wells have to be combined with wells already existing or proposed and with future proposed wells in the new Draft RMP for the UFO.

Comment Number: 500192_SchulzJ_20161027-6
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165169

The RMP must address the cumulative system impacts of oil and gas development on community health and function (things like physical infrastructure, health services, crime, community safety, and policing).

*Summary*
Commenters stated that the BLM must assess the cumulative effects of oil and gas development on community health across different alternatives. The analysis should consider that pollutants are introduced from all stages of the development process (e.g., truck emissions, well pad operations, trucks, wells, compressors, pipelines, tanks, pits, separators, dehydrators, and rigs) and may occur in multiple forms of exposure (i.e., air and water pollution). A commenter stated that if the full cumulative health impacts are not considered by the BLM at this stage, it is unlikely that BLM would consider them adequately in connection with individual lease sales or in project-level and site-specific environmental assessments.

*Response*
The cumulative analysis in Draft RMP/EIS Section 4.6.2, Public Health and Safety, considered the present effects of past actions, to the extent that they are relevant, and present and reasonably foreseeable (not highly speculative) federal and nonfederal actions, at the broad level appropriate for analysis at the RMP scale, per 40 CFR 1508.7.

The BLM appreciates the comments. Additional information was added to the Proposed RMP/Final EIS related to cumulative impacts of energy development, including all stages of the development process.

### Section 18.5 – Health and Safety: Mitigation measures
No comments are associated with this topic.

## Section 19 – Lands and Realty

### Section 19.1 – Lands and Realty: Range of alternatives
Total Number of Submissions: 9
Total Number of Comments: 35

Comment Number: 500268_BearS_21060930_DMEA-2
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Land use decisions must recognize the need for safe passage of equipment and personnel performing routine maintenance and repair. Especially the immediate passage of equipment and personnel responding to emergency situations such as electrical outages. It should also be noted that reasonable access may not always be down line within the line ROW due to restrains such as topography, other resource values and the need to access the main road system.

Comment Number: 500268_BearS_21060930_DMEA-6
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Line 493 - ROW Exclusion Areas: Exceptions that would apply to exclusion areas:

BLM_0165170

100-foot buffer from the center line of county roads and highways (these areas would be managed as ROW avoidance). This exception should be modified for linear ROW's such as overhead power and communication lines. It is not always advantageous to overlap the line and road ROW. Placing the structures far enough from the road to ensure vehicle safety and meet design criteria is necessary. Overlapping ROW's can result in less new surface disturbance during construction but increase traffic hazards to both the public and utility workers as they perform maintenance and repair activities.

Comment Number: 500268_BearS_21060930_DMEA-7
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Line 494 - ROW Avoidance Areas: DMEA is very concerned over the nature, scope and application of restrictions. Concerns are commented on under the appropriate sections. It is noted that there are no exceptions listed for Avoidance Areas as there are for Exclusion Areas. Additional exceptions and allowances should be made for proposed ROW's in the WUI zone to meet public needs.

Comment Number: 500268_BearS_21060930_DMEA-8
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Line 500 - Utility Corridors: Manage the designated West-wide Energy Corridor (26,880 acres) according to existing policy plus designate and manage an additional 14 corridors (37,420 acres) for public utilities and facilities (Figure 2-57, Appendix A):
Figure 2-57 shows almost all of the public lands in the DMEA service area. From the description, it appears Figure 2-57 is suited to Line 501 and Figure 3-24 is suited to the described utility corridors. Please clarify. (See other comments associated with Figure 2-57)

Comment Number: 500268_BearS_21060930_DMEA-9
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Table 2-3 Renewable Energy Exclusion and Avoidance Areas: The objective states that future hydro projects proposed "within 325 feet of all perennial and intermittent waters and naturally occurring wetlands, springs, and seeps" would be in an avoidance area but would be considered. If in an avoidance area, project would involve extra time, design, process, restrictions and cost. It would be impossible to cost-effectively develop a small hydro project without being in this zone. The National Energy Policy is encouraging a shift from fossil fuels to renewable energy. This objective is contrary to that Policy and should be reconsidered. It is also contrary to the objective in Table 2-2, Line 496. (See DMEA's other comments related to restrictions.)

Comment Number: 500268_BearS_21060930_DMEA-10
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
DMEA and Tri-State provided digital mapping of their systems during Scoping. It is not readily apparent from the description in Chapter 3 or Figures 2-56 through 2-58, Designated Utility Corridors, that the

BLM_0165171

information was used. It is noted that major ROW's are depicted on Figure 3-24, ROW Locations, but there is just a reference in Chapter 3 and analysis in Chapter 4 only addresses the 'Designated Utility Corridors' and not the existing infrastructure. Although the existing electric corridors does not appear to be 'Designated', the ROW's do exist. Existing ROW's have special relevance by their Valid Existing Rights to the description of the Existing Environment. Consequently, they will have an important bearing on future management decisions and the analysis of possible environmental consequences should reflect existing infrastructure.

Comment Number: 500268_BearS_21060930_DMEA-22
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Any land tenure adjustments such as disposals need to be subject to existing ROW's and facilities as valid existing rights.

Comment Number: 500268_BearS_21060930_DMEA-23
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
DMEA requests that any area closed or restricted to motorized or mechanized travel allows the utility administrative access for the inspection, operation, maintenance, repair and upgrade of the electric infrastructure.

Comment Number: 500268_BearS_21060930_DMEA-24
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Figures 2-52 - 55: ROW Exclusion and Avoidance.
Alternative D, the Preferred Alternative, would be very limiting. If restrictions similar to NGD's and SSR's are applied to ROW's, there would be significant direct adverse impacts to DMEA's operations and maintenance activities. Those restrictions would indirectly affect our rural communities through a decrease in available services and cost increases. The exceptions noted in Table 2-2 for ROW's is of little help. Please provide DMEA and other utilities with the proposed restrictions and how those restrictions would be applied in the Exclusion and Avoidance areas in order that we provide meaningful review and comment.

Comment Number: 500268_BearS_21060930_DMEA-25
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Figures 2-56 - 58: Designated Utility Corridors:
The muddy green color in Figure 2-56 (Alternative A) is defined in the legend as 'Utility Corridors' and in Figure 2-57 (Alternatives B and D) as 'Open to Development of Major Utility Corridors'. No explanatory information is provided for the distinction of 'Major'. DM EA notes that the titles of the figures only refer to 'Utility Corridors'. In addition to transmission lines, DMEA's distribution lines are

BLM_0165172

critical to providing electric service to its customers. Land use decisions in the plan need to accommodate this need.

In comparing Alternative D Figure 2-55, ROW Exclusion and Avoidance Areas, and Figure 2-57, Designated Utility Corridors, it is incongruous that so much of DMEA's service area can at the same time be in Exclusion and Avoidance Areas and open to development. This again underscores the need for BLM to provide DMEA and other utilities clarification on what land use decisions are proposed and how and when any restrictions will be applied. As noted elsewhere, the exceptions described in Table 2-2 for ROW's is of little help.

Please see comments and issues associated with the identification of existing 'Designated' corridors. Factoring the existing transmission lines and distribution lines into the analysis would provide a better baseline for analyzing potential impacts and proposing practical future land use decisions.

Comment Number: 500268_BearS_21060930_DMEA-27
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B: Restrictions
Section 2.2.1 states that NGD restrictions do not apply to ROW's, SSR restrictions may apply to ROW's and Timing Limitations (TL) do apply to ROW's. Section 2.2.2 states that NGD and SSR do not apply and TL's do apply. Based on other narrative in the document, DMEA assumes that NGD and SSR restrictions do not apply to ROW's.

The application of unnecessary and overly onerous restrictions can create a situation where the BLM can give its 'approval' for a project and then negate the project by administrative fiat. We urge the BLM be judicious in the design and application of the various restrictions.

Comment Number: 500268_BearS_21060930_DMEA-28
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B: Restrictions
In the event of an emergency, the standard exception needs to allow for immediate utility response without prior BLM approval to protect public safety and health, welfare and property.

Comment Number: 500268_BearS_21060930_DMEA-29
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B: Restrictions
While there may be some flexibility to site a substation or communication site, transmission and distribution lines are linear. DMEA must be able to build a power line from Point A to Point B with limited angles and deviations, and have reasonable access to the power line corridor. Expansive areas of Exclusion or Avoidance in the middle of a proposed line will be extremely detrimental in the design and cost effectiveness of public projects.

Comment Number: 000482_MeyersK_20161101_Tri-State_HasAttach-2
Organization1: Tri-State Generation and Transmission Association
Commenter1: Diana Leiker

BLM_0165173

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Draft RMP and DEIS does not appear to specifically acknowledge Tri-State facilities in the planning area, nor was Tri-State contacted as requested to specifically discuss ROW avoidance and exclusion area designations. As a major stakeholder in the RMP revisions, we feel that Tri-State's electrical facilities should be considered for planning purposes when discussing ROW avoidance and exclusion designations.

Comment Number: 000482_MeyersK_20161101_Tri-State_HasAttach-4
Organization1: Tri-State Generation and Transmission Association
Commenter1: Diana Leiker
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 19.1
Comment Excerpt Text:
Tri-State would again request the Final RMP acknowledges these existing facilities and the right to continue to maintain, access, and improve authorized infrastructure.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-49
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 39.1 3
Comment Excerpt Text:
Line 493 Page 2-312: We request that Alternative D be amended to include WSR segments as ROW Exclusion Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-50
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 39.1
Comment Excerpt Text:
Line 494 Page 2-315: We request that Alternative D be amended to include WSR segments as ROW Avoidance Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-56
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 514 Page 2-323: We request amending Alternative B to include language that specifies that acquisitions will only be made on a voluntary basis from willing landowners. This amendment would protect the property rights of landowners in the identified areas.

BLM_0165174

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-57
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 511 Page 2-322: We request that Alternative D be amended to remove the criteria "Lands that provide public or administrative access" There are other means of assuring that public and administrative access is protected after disposal or transfer of lands which makes this criterion unnecessary and potentially onerous.

Comment Number: 000310_SokolovichB_20161027_DOE-1
Organization1:Department of Energy
Commenter1:Bud Sokolovich
Commenter Type: Federal Government
Comment Excerpt Text:
We reviewed the resource management plan and had a question for clarification and possible consideration. On the attached map from the plan, there are areas depicted in a yellow shading that are former UMETCO claim areas. They total approximately 377 acres. In the management plan, these areas do not appear to have restrictions placed on them like the supplemental standards areas do. In anticipation of these areas being withdrawn in the future for reclamation and monitoring purposes, the DOE would propose that these former mill site claim areas have restrictions similar to the supplemental standards area placed on them. This would alleviate future issues associated with new mining claims being granted in an area that may be withdrawn by DOE.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-1
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses. Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014 (9) and the map that comprises Exhibit A (10) for an inventory of designated public rights-of-way. There may be others, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A.
9http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229
10http://ouraycountyco.gov/documentcenter/view/2476

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-10
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones. A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on

BLM_0165175

the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-11
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-12
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-13
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-14
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions. The three isolated approximately 35-40 acre

BLM_0165176

parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner. County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning. This should be able to be accomplished with this parcel.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-19
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County does not desire any parcels to be disposed of that would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches or other easements. Any parcels disposed of should conform with the criteria and standards set forth in the San Miguel County Comprehensive Plan. Parcels that contain critical habitat for sensitive or listed species or that provide connectivity between other public lands should not be disposed of. If the BLM doesn't want to manage such parcels, then the adjacent federal or state agency should be given an opportunity for management or ownership.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-22
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision. This parcel is entirely surrounded by private land. It was recommended for disposal in Alternatives A-C. However, no reason is given why it is not included for disposal in the agency preferred Alternative D. It is close to the Alder Creek riparian area. We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D. San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners.

Comment Number: 000482_MeyersK_20161101_Tri-State_HasAttach-3
Organization1:Tri-State Generation and Transmission Association
Commenter1:Diana Leiker
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Tri-State formally requests that these existing ROWs and substation are excluded from the ROW exclusion categories for all Draft RMP and DEIS alternatives to permit lawful and authorized maintenance and operation activities including access roads use and improvement to continue.

Comment Number: 000482_MeyersK_20161101_Tri-State_HasAttach-4
Organization1:Tri-State Generation and Transmission Association
Commenter1:Diana Leiker
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 4
Comment Excerpt Text:
Tri-State would again request the Final RMP acknowledges these existing facilities and the right to continue to maintain, access, and improve authorized infrastructure.

BLM_0165177

Comment Number: 000511_FitzhughR_20161101_COPMOBA-RAT-1
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Rodney Fitzhugh
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
RAT prefers that BLM not dispose of any public lands that either (a) would increase the amount of private land intersected by public rights-of-way, especially trails, or (b) are located adjacent to USFS or other public lands which may be suitable for further development of recreation opportunities.

Comment Number: 000565_TothK_20161102_DCD-17
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
The board should not support any language that infringes on privately owned surface property that is situated above a federally owned mineral estate.

Comment Number: 000502_SchroederA_20161101_BOR-13
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Pg 2-11, Table 2-1, Private, State, or BOR Project Lands Surface/Federal Minerals: Withdrawn from locatable mineral entry
Comment: The table shows no BOR acreage withdrawn from locatable minerals. There should be approximately 11,764 acres [to be verified] of BOR withdrawn lands in this category within the planning area.
Recommendation: The table should be revised to show the acreages of BOR 5A withdrawn lands within the planning area; they are withdrawn from locatable mineral entry. Acreages for this category should include the following constructed and active projects or portions thereof within the planning area: Paonia Project; Dallas Creek Project; Bostwick Park Project; Aspinall (formerly Curecanti) Unit, CRSP; Fruitgrowers Dam Project; Smith Fork Project; and Uncompahgre Project. Actual acres within the planning area should be determined through GIS applications, if necessary.
Rationale: The table does not show any acreages for BOR project lands withdrawn from locatable mineral entry. We presume this category consists of BOR 5A withdrawn lands pursuant to the '83 IA. All current BOR withdrawn lands are withdrawn from locatable mineral entry.

Comment Number: 000502_SchroederA_20161101_BOR-14
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Pg 2-208: Table 2-2, Line 347 - maintain following areas as WD from locatable minerals: BOR 9,010 acres.
Comment: How was this acreage derived? BOR records indicate about 11,764 acres of BOR 5A withdrawn lands within the UFO planning area, plus another undetermined acreage of 5B lands. A 2,754 acre difference in 5A lands is substantial.
Recommendation: Verify the acreage, and revise as necessary.

Rationale: This document is going to be cited by various entities throughout its life; it needs to be accurate.

Comment Number: 000502_SchroederA_20161101_BOR-15
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Figs 2-32, 2-33, 2-34, 2-35 (Alts A, B, C, D, respectively), - Lands withdrawn and to be Recommended for withdrawal from Locatable Mineral Entry; and Fig 2-82 Land Withdrawals and Powersite Classifications
Comment: These figures do not show all current BOR withdrawals within the planning area. They are missing portions of the withdrawals for the Uncompahgre and Bostwick Park (USFS lands) Projects and Whitewater and Aspinall Units, CRSP; and all of the withdrawals for the Dallas Creek, Smith Fork, Paonia, and Fruitgrowers Projects.
Recommendation: Revise these figures to show all current BOR withdrawn lands (approximately 14,000 acres).
Rationale: All of the lands currently under BOR withdrawals are withdrawn from locatable mineral entry.

*Summary*
A. Commenters state that the BLM should consider specific changes to the lands and realty alternatives, including:

1. Manage WSR segments as ROW exclusion only when such segments have been added to the National Wild and Scenic Rivers System by Congress.
2. Clarify that acquisitions would only be made on a voluntary basis from willing landowners.
3. Remove the criteria "lands that provide public or administrative access" from the requirements for land for disposal or transfer.
4. Consider not disposing lands that are nonconforming to county land use codes; would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches, or other easements; contain critical habitat for sensitive or listed species; or provide connectivity between other public lands.
5. Provide notice to local counties related to lands slated for disposal. There are currently several parcels considered for disposal in the alternatives where County consultation would be appropriate.
6. Former mill site claim areas should have restrictions placed on them to alleviate future issues with new mining claims in anticipation of areas being withdrawn for the Department of Energy.
7. For linear ROWs, such as overhead power and communication lines, modify the ROW exclusion exception area to a 100-foot buffer from the center line of county roads and highways, because placing the structures far enough from the road is needed to ensure vehicle safety and meet design criteria.
8. Delta-Montrose Electric Association requests that the BLM include additional exceptions and allowances for proposed ROWs in the wildland-urban interface to meet public needs, including exceptions in avoidance and exclusion areas.

BLM_0165179

9. Clarify how surface use restrictions (i.e., timing limitations (TL), no ground disturbance (NGD), and site-specific relocation (SSR)) would apply to ROW development.

10. Recognize the need for safe passage of equipment and personnel performing routine maintenance and repair. Provide standard exception to allow for immediate utility response without prior BLM approval to protect public safety and health, welfare, and property.

11. Review the avoidance area for hydropower "within 325 feet of all perennial and intermittent waters and naturally occurring wetlands, springs, and seeps," as this would make it impossible to cost-effectively develop a small hydropower project and is contrary to the National Energy Policy, which encourages a shift to renewable energy, and is contrary to objective in Table 2-2, Line 496.

12. Consider adopting a BMP or standard operating procedure that any operator on BLM-administered lands conduct surface-disturbing actions (e.g., pipelines and access roads) should notify other ROW holders if they may be impacted.

B. Commenters also recommended that the BLM conduct additional review of some specific land parcels recommended for disposal and provided information on these parcels for review and consideration.

1. A parcel of approximately 22 acres in T45N R8W Section 9.

2. Two parcels east of US 550 within T44N R8W Section 13 adjacent to Forest Service lands, in the general vicinity of Lake Lenore.

3. Two parcels west of US 550, south of Portland. The northern of these two is within T44N R8W Section 13; the southern parcel is within T44N R9W Section 14.

4. A parcel consisting of approximately 129 acres within T44N R8W Section 11

5. Three isolated approximately 35-40 acre parcels on Log Hill Mesa.

6. Isolated BLM parcel on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision.

C. Tri-State generation and Delta-Montrose Electric Association requested that the Proposed RMP acknowledges the companies' existing facilities and the right to continue to maintain, access, and improve authorized infrastructure.

D. Delta-Montrose Electric Association requested that that the BLM provide them and other utilities clarification on what land use decisions are proposed and how and when any restrictions would be applied, particularly as they relate to the data in Draft RMP/EIS Figures 2-55, 2-57, and 3-34. In addition, Delta-Montrose Electric Association asked that the BLM clarify how existing utilities were incorporated into designated utility corridors.

E. Commenters requested that the BLM consider specific changes to locatable minerals withdrawals, including revising text and figures to show all current US Bureau of Reclamation withdrawals, including US Bureau of Reclamation 5A lands, within the planning area (approximately 14,000 acres).

*Response*
A. The BLM appreciates the comments. The BLM reviewed recommended changes and incorporated them in the Proposed RMP/Final EIS, as appropriate, as follows:

BLM_0165180

1. According to BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management, "the BLM's policy goal for eligible and suitable rivers is to manage their free-flowing condition, water quality, tentative classification, and any outstandingly remarkable values to assure a decision on suitability can be made for eligible rivers; or in the case of suitable rivers, until Congress designates the river or releases it for other uses. To that end, the BLM has broad discretionary authority, on a case-by-case basis through project-level decision-making and the NEPA process, not to impact river values or make decisions that might lead to a determination of ineligibility or nonsuitability" (page 3-8). BLM policy in Manual 6400 also states; "for BLM-identified eligible and suitable rivers, the BLM should consider exercising its discretion to deny applications for right-of-way grants if the BLM determines through appropriate environmental analysis that the right-of-way proposal is not compatible with the river's classification and the protection and enhancement of river values" (page 3-10). The BLM has determined that it is necessary for suitable wild segments to be managed as ROW exclusion areas (see page. 2-362, row 587 of the Draft RMP/EIS) to maintain their classification as wild, which is defined as essentially primitive, with little or no evidence of human activity (Manual 6400, page 1-3). Upon designation of any segment, the BLM would evaluate management needs of the individual segment and develop a river management plan.

2. The BLM Acquisition Handbook (H-2100-1) states:

    "Section 205 of the Federal Land Policy and Management Act of 1976, as amended, (FLPMA) authorizes BLM to acquire land or interests in land for all purposes related to its mission as long as these acquisitions are consistent with "applicable land use plans." The BLM has a variety of acquisition methods which may be utilized to acquire land or interests in land needed to facilitate and enhance its management objectives. These methods include negotiated purchase, donation, exchange, and condemnation…. The array of available acquisition alternatives provides the Authorized Officer considerable flexibility in selecting which alternative will safeguard BLM investment and facilitate sound resource management action on public lands. Various methods of acquisition may be utilized to acquire multiple parcels within a given project area. These alternatives may be either permanent or temporary and include the outright (fee) purchase of land (surface estate)."

    All acquisitions would follow the regulations as established in the Uniform Relocation Assistance and Real Property Acquisition Policies Act of January 2, 1971.

3. "Lands that do not provide administrative or public access" are only included as a criterion for disposal under one alternative (Alternative C). A range of management alternatives for this action was analyzed in the Draft RMP/EIS.

4-5. The BLM would evaluate any future disposal actions on a case-by-case basis under project-specific NEPA and appropriate regulations. By regulation, a Notice of Realty Action or Notice of Exchange Proposal must be published in the Federal Register for all tenure actions. Lands must be identified as available for disposal in the RMP in order to consider a land tenure action. Identification of available for disposal does not inherently indicate that any action would take place.

6. The BLM has reviewed the land status designated in the specific areas noted by the commenter and made corrections as appropriate. For the Department of Energy Uranium Mill Tailings Remedial Action Area, NSO-66/NGD-30 would apply.

BLM_0165181

As noted in Draft RMP/EIS Table 2-2, line 520, applying supplemental standards may be utilized in lieu of withdrawing the affected lands; therefore, this management was considered and analyzed under the range of alternatives in the Draft RMP/EIS.

7. The ROW exception area noted from the center line of county roads and highways would apply only within the 53,700-acre exclusion area identified in the Draft RMP/EIS. In this area, protection of special areas (i.e., specific identified ACECs, WSAs, and SRMAs as noted in Draft RMP/EIS Table 2-2, line 493) is prioritized. Exceptions would be provided to allow for some flexibility, but preferred locations for development are next to existing facilities and routes outside of exclusion and avoidance areas (see Table 2-2, line 501 of the Draft RMP/EIS). No change was made to the Proposed RMP/Final EIS.

8. A range of restrictions on ROW development was included in the Draft RMP/EIS (see Draft RMP/EIS Table 2-2, lines 500-501, pages 2-317 to 2-319) and analyzed (see Draft RMP/EIS Section 4.4.6, pages 4-329 to 4-336). Areas classified as avoidance areas are not excluded from development; site-specific criteria for development would be determined in subsequent project-specific NEPA analysis.

9. As noted in Draft RMP/EIS Section 2.6, page 2-19 and Appendix B, pages B-4 and B-5, NSO, CSU, and TL are stipulation decisions and would apply to fluid mineral leasing and development of federal mineral estate underlying BLM-administered lands, privately owned lands, and state-owned lands, but not National Forest System lands. NGD, SSR, and TL are restriction decisions and would apply to other surface-disturbing activities on BLM-administered surface lands. The BLM would apply ROW exclusion and ROW avoidance and TL designations as applicable to any future ROW development.

10. In terms of OHV access, as defined in 43 CFR 8340.0-5(a) and noted on Draft RMP/EIS page 3-138, OHV regulations exclude OHV operation for emergency purposes, and any vehicle whose use is expressly authorized by the authorized officer or otherwise officially approved. This includes vehicles used for administrative access, which is defined on Draft RMP/EIS page Glossary-2, as "administrative access pertains to travel on routes that are limited to authorized users (typically motorized access). These are existing routes that lead to developments that have an administrative purpose, where the BLM or a permitted user must have access for regular maintenance or operation."

11. The area identified for hydropower is an avoidance area, and not exclusion area. As noted in Table 2-3 (Draft RMP/EIS page 2-379), an avoidance area allows some use and occupancy of BLM-administered lands, while protecting identified resources or values. These areas are potentially open to renewable energy projects, but the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value. All applications for hydropower within the decision area would be reviewed on a site-specific basis when/if the BLM receives an application.

12. The BLM would evaluate any future land-disturbing activities on a case-by-case basis under project-specific NEPA. Public notification of actions is typically posted on the NEPA register.

B. The BLM appreciates the comments. Comments related to specific land parcels were reviewed and addressed as appropriate in the Proposed RMP/Final EIS. Appendix N was revised to correct land status as appropriate and make it more user friendly. No parcel designations

BLM_0165182

were changed; however, any future actions would be evaluated on a case-by-case basis under project-specific NEPA and appropriate regulations. Lands must be identified as available for disposal in the RMP in order to be considered for disposal.

C. The Draft RMP/EIS includes as its planning criteria the recognition of valid existing rights (page 1-12). It is further acknowledged on pages 1-13; 2-23, row 4; and 4-2.

D. The BLM reviewed Figures 2-56, 2-57, and 2-58 and updated these figures as appropriate based on management actions described in Table 2-2, lines 500 and 501.

As noted on Draft RMP/EIS page 3-147, Figure 3-24 shows existing ROW and the West-wide Energy Corridor. The proposed utility corridors took into account existing ROWs to the extent practical and appropriate. The West-wide Energy Corridors were incorporated into the Proposed RMP/ Proposed RMP/Final EIS per the West-wide Energy Corridor Programmatic EIS and Record of Decision.

In January 2009, the US DOI approved amendments to 92 BLM land management plans to designate energy corridors on the public lands governed to be compliant with Section 368 of the Energy Policy Act of 2005 (42 US Code Section 15926). This directed the Secretaries of the Interior, Agriculture, Commerce, Defense, and Energy to: (1) designate corridors for oil, gas, and hydrogen pipelines and electricity transmission and distribution facilities on federal land in the 11 western States; (2) perform any environmental reviews that may be required; and (3) incorporate the designated corridors into the relevant agency land use and resource management plans or equivalent plans. To carry out this direction, the BLM, US Department of Energy, and Forest Service prepared a programmatic EIS to support the designation of energy corridors. The DOI was sued challenging the Programmatic EIS and associated energy corridor designations. As part of 2009 Settlement Agreement, the BLM reviews West-wide Energy Corridors on an annual basis and conducted a similar review for the Uncompahgre RMP planning effort. Per the terms of this agreement, preferred corridors have been identified, and processing for applications to construct newly proposed facilities within these corridors would be expedited. The agreement also states that facilities proposed outside of the preferred corridors would be considered upon application, which would be subject to site-specific review. Therefore, the data presented in the Draft RMP/EIS is accurate. The existing corridors per the terms of the Settlement Agreement are accurately represented in the Draft RMP/EIS, and any new corridors would be analyzed via a site-specific review.

E. The BLM appreciates the comments. The BLM reviewed recommended edits, including those related to Bureau of Reclamation 5A lands, and incorporated updates in the Proposed RMP/Final EIS, as appropriate.

### Section 19.2 – Lands and Realty: Best available information—baseline data

Total Number of Submissions: 4
Total Number of Comments: 12

Comment Number: 500268_BearS_21060930_DMEA-12
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear

BLM_0165183

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The DRMP correctly notes that demand for utility services and renewable energy will increase and that over time existing corridors will become saturated and new corridors will need to be identified. The document states that Adaptive Management will be used to update the plan. The comment above gives cause for concern. The pressure on corridors will increase quicker in the WUI. It is important for the document to start from a current and more accurate baseline and then analyze the management of ROW's, especially in the WUI.

Comment Number: 500268_BearS_21060930_DMEA-11
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition, the problems associated with corridors designated in the West Wide Energy Corridor EIS were brought to BLM's attention in Tri-State's Scoping input. DMEA refers BLM to that letter. Basing the analysis and proposed land use decisions on dated, faulty and/or inaccurate information leads to poor management decisions. It appears that BLM failed to use its Adaptive Management process to update the baseline data with pertinent and available information to correct this problem.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-18
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
We recommend that it would be very helpful for the reviewing public and agencies if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO RMP GIS web page, and also if the name of the county were provided in Appendix N. We were able to obtain from UFO GIS staff the land tenure shapefile via email. While actual reasons for recommending individual parcels for disposal or nondisposal in the four alternatives were not located in the DRMP/EIS, there were some cryptic rationales present within the land tenure shapefile attribute table for a few but not all parcels.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-21
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:
Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.
Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the Approved RMP/ROD.

BLM_0165184

Comment Number: 000502_SchroederA_20161101_BOR-1
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
BOR has approximately 16,270 acres of acquired or withdrawn lands associated with constructed and active projects (i.e., 5A lands), plus another undetermined acres of land associated with non-authorized or non-constructed projects (i.e., 5B lands). These lands and land interests generally are not identified separately in Tables and Figures. Rather, they are included under other federal, private, state, or BLM lands. It is often unclear which BOR lands, if any, are included within a given land category. BOR lands (both acquired/withdrawn) associated with constructed and active projects (i.e., 5A BOR lands) , include the following: Aspinall Unit, CRSP-7200 A; Bostwick Park- 236 A; Dallas Creek- 3448 A; Fruitgrowers- 575 A; Paonia- 1943 A; Paradox Valley Unit, CRBSCP- 458 A; SF- 741 A; Uncompahgre- 1671 (withdrawn only; acquired- not calculated). BOR lands (withdrawn) associated with non-constructed projects (i.e., 5B BOR lands), include the following: Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa; GIS acreage determinations are needed for the portions of these 2 withdrawals within the planning area.

Comment Number: 000502_SchroederA_20161101_BOR-2
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Comment Excerpt Text:
BOR facilities (canals, laterals, etc.) on public domain are valid existing rights, whether or not there is a formal BLM authorization identified. They were generally authorized by Reclamation or other applicable law, but may not have been formally reserved by Reclamation previously. BOR will work with BLM to formalize necessary rights-of-way for undocumented BOR facilities on public domain lands.

Comment Number: 000502_SchroederA_20161101_BOR-3
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Comment Excerpt Text:
All of BOR's current withdrawn lands are reserved for reclamation purposes (i.e., project/irrigation works) and are closed to location under the mining laws, but not to leasing under the mineral leasing acts.

Comment Number: 000502_SchroederA_20161101_BOR-4
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Comment Excerpt Text:
The Curecanti National Recreation Area (CNRA) is a special management area. BOR withdrew or acquired most of the lands currently within CNRA for reclamation purposes. The Aspinall Unit, CRSP, is the constructed Reclamation project associated with the CNRA lands. BOR and NPS jointly manage the CNRA under their respective and applicable laws, policies, regulations, and management agreements.

BLM_0165185

Comment Number: 000502_SchroederA_20161101_BOR-5
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
There appear to be inaccuracies or discrepancies in BOR withdrawn acreages throughout the document. BOR and BLM should confirm these acreages and BLM should revise the RMP/EIS accordingly.

Comment Number: 000502_SchroederA_20161101_BOR-6
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
BOR is attempting to get its withdrawals revoked on certain lands within the UFO planning area. This effort includes the entire Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa Project, and an isolated 40-acre parcel associated with the Dallas Creek Project. The withdrawals associated with the Whitewater Unit and the Fruitland Mesa Project are included within the 28,060 acres which BLM repeatedly identifies as continuing the withdrawal from location under the mining laws. We would appreciate BLM's full cooperation and assistance in expediting BOR's recommended revocations of its withdrawals. Any subsequent BLM decision to withdraw those lands from location under the mining laws should be based on its needs; BOR no longer needs to retain these withdrawal to protect its interests. The document should be revised throughout, as necessary, to show this difference.

Comment Number: 000502_SchroederA_20161101_BOR-9
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Comment Excerpt Text:
BLM decisions which create general surface use restrictions (e.g., no ground disturbance, row exclusion/avoidance, site-specific relocation etc.) on BLM lands adjacent to or in close proximity to BOR facilities may limit BOR's options to expand project facilities outside of current footprints if necessary. This is of particular concern for BOR's efforts to reduce salt loading in the Colorado River basin (e.g., CRBSCP and associated salinity reduction programs such as lining/piping of irrigation ditches/canals and the Paradox brine disposal (injection, evaporation). The following table lists the constructed and active BOR projects, or portions thereof, within the UFO planning area and lists the general surface use restrictions of concern by project.
TABLE: BOR Constructed Projects/Facilities within the UFO Planning Area
Project: Aspinall Unit (portion only)
Location: Along Gunnison River between the Black Canyon of the Gunnison NP and Gunnison, CO.
Managers:
* Project O&M-BOR
* Recreation (CNRA; Sec. 8, CRSPA)- NPS
* Land Use (CNRA)- Joint BOR and NPS
* Recreation and Land Use (Non- CNRA)- BOR
Major Facilities:
* Crystal Dam and Reservoir
* Crystal Dam Access Road

BLM Decision Areas of Concern:
* Sims-Cerro Gunnison Sage-Grouse ACEC
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail, West Elk Loop Scenic Byway

Project: Bostwick Park
Location: From Silver Jack Reservoir between the Cimarron River and Cimarron Ridge, over Cerro Summit to Bostwick Park, east of Montrose, CO
Managers:
* Project O&M-Bostwick Park WCD
* Recreation (Silver Jack Reservoir)- USFS
* Land Use (Silver Jack Reservoir)- joint, BOR, USFS, BPWCD
Major Facilities:
* Silver Jack Dam and Reservoir
* Cimarron Canal System (BPWCD)
BLM Decision Areas of Concern:
* Sims-Cerro Gunnison Sage Grouse ACEC
* ROW avoidance and exclusion areas
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail

Project: Dallas Creek
Location: Along Uncompahgre River between Ridgway, CO and Colona, CO
Managers:
* Project O&M Tri-County Water Conservancy District (TCWCD)
* Recreation (Ridgway Reservoir)- CP&W
* Land Use- Joint, BOR, TCWCD, CP&W
Major Facilities:
* Ridgway Dam and Reservoir
BLM Decision Areas of Concern:
* SRMAs/ERMAs: Ridgway Trails
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Ecological Emphasis Area- Ridgway
* Surface Disturbing Activity Restrictions- NGD and SSR

Project: Fruitgrowers Project
Location: Along Alfalfa Run between Eckert, CO, and Corey, CO and Austin, CO
Managers:
* Project O&M-Orchard City Irrigation District
* Recreation- BOR
* Land Use- Joint, BOR, OCID
Major Facilities:
* Fruitgrowers Dam and Reservoir
* Diversion dam and feeder canal
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Surface Disturbing Activity Restrictions- NGD and SSR

---

BLM_0165187

Project: Paradox Valley Unit, CRBSCP
Location: Along Dolores River in Paradox Valley near Bedrock, CO
Managers:
* Project O&M- BOR
* Land Use- BOR
Major Facilities:
* Brine Collection wells and pumping station
* Brine injection well
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* ACECs: La Sal Creek, West Paradox, East Paradox, Coyote Wash, Dolores Slick Rock Canyon, and Biological Soil Crust.
* Dolores River Canyon WSA
* Wilderness Characteristics Protection: Dolores River Canyon WSA adjacent
* Travel Management: use of existing or designated trails or roads that adjoin or provide access to BOR lands or facilities
* Wild/Scenic Rivers- Dolores River Seg. 1a, Dolores River Seg. 1B, Dolores River Seg. 2, La Sal Creek Seg. 1, La Sal Creek Seg 2, La Sal Creek Seg. 3, Ice Creek Seg. 2, Lion Creek, Seg. 2, and Spring Creek
* SRMAs/ERMAs: Dolores River Canyon, Paradox Valley
* Ecological Emphasis Area- La Sal
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Paradox Trail

Project: Paonia Project
Location: Along Muddy Creek and the north side of the North Fork of the Gunnison River from Paonia Reservoir to Hotchkiss, CO
Managers:
* Project O&M- North Fork Water Conservancy District and Fire Mountain Reservoir & Canal Co.
* Recreation (Paonia Reservoir)- CP&W
* Land Use (Paonia Reservoir)- joint, BOR, NFWCD, FMCR&CC, CP&W
* Land Use (FMC)- joint, BOR, NFWCD, FMCR&CC
Major Facilities:
* Paonia Dam and Reservoir
* Fire Mountain Canal
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* W/SRs: Deep Creek?
* Coal Leasing; Adjacent to and underlying Paonia Reservoir
* Oil/Gas Leasing; Adjacent to and underlying Paonia Reservoir?
* Ecological Emphasis Area- Terror Creek
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- West Elk Loop Scenic Byway

Project: Smith Fork Project
Location: Area surrounding Crawford, CO
Managers:
* Project O&M- Crawford Water Conservancy District
* Recreation (Crawford Reservoir)- CP&W
* Land Use (Crawford Reservoir)- joint, BOR, CWCD, CP&W

BLM_0165188

Major Facilities:
* Crawford Dam and Reservoir
* Aspen Canal
BLM Decision Areas of Concern:
ROW avoidance and exclusion areas
Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
ACECs: Needle Rock
WSAs: Needle Rock
Surface Disturbing Activity Restrictions- NGD and SSR
National Trails and Scenic Byways- West Elk Loop Scenic Byway

Project: Uncompahgre Project (portion only)
Location: From the East Portal Area on the Gunnison River along the Gunnison Tunnel alignment and within the Uncompahgre Valley from about Colona to Delta
Managers:
* Project O&M- Uncompahgre Valley Water Users Association
* Recreation (East Portal area)- NPS
* Recreation (elsewhere)- joint, BOR, UVWUA
* Land Use (East Portal area - joint, BOR, UVWUA, NPS
* Land Use (elsewhere)- joint, BOR, UVWUA
Major Facilities:
* Gunnison Diversion Dam and Tunnel
* South Canal system
* Loutzenhiser Canal system
* Selig Canal system
* Delta/Montrose Canal system
* West Canal system
* Others?
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* ACECs: Sims-Cerro Gunnison Sage Grouse, Lower Uncompahgre Plateau, Fairview South/Expansions
* W/SRs: Robideau Creek Seg. 2
* SRMAs/ ERMAs: Kinikin Hills, Spring Creek, Dry Creek
* Ecological Emphasis Areas- Sims Mesa, Ridgway, Spring Canyon, Dry Creek, Monitor- Potter-Robideau
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail

Comment Number: 000540_SkokoM_20161102-1
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Please see the image below regarding the land ownership discrepancy shown in your Draft RMP maps in the Kinikin Hills SRMA (RMZ 2) area. I have compared BLM Ownership Data (7/25/2016) with cross hatched areas are the area where there are problem. The labels below are showing the Name or the parcel owner along with the assessor s Account Number.
This may need to be updated before the Final UFO RMP goes out?

BLM_0165189

"Inholding" area in 48N, 8W, Sec. 32 is currently show as Private is indeed BLM (Acct Number R0010083)

Piece of land that crosses 47N, 8W, Sec. 5 and 6 is currently shown as BLM is indeed private (Acct Number R0023063)

Piece of land in 47N, 8W, Sec. 5 is currently shown as BLM is indeed private (Acct Number R0023064)

[see pdf for map]

*Summary*
A. Commenters requested that the GIS files for land tenure and disposal be made publicly available online. They also noted that some tables and figures in the draft RMP do not match the GIS files.

B. Commenters recommended that the BLM work the US Bureau of Reclamation to clarify withdrawn lands and ROWs because there seems to be inaccuracies or discrepancies throughout the Draft RMP/EIS. Another commenter noted that there may inaccuracies in baseline data, including West-wide Energy Corridor data that should be reviewed to ensure that baseline data are correct, especially with regards to the wildland-urban interface.

C. One commenter also noted that BLM decisions that create general surface use restrictions (e.g., NGD, ROW exclusion/avoidance, and SSR) on BLM-administered lands adjacent to or in close proximity to US Bureau of Reclamation facilities may limit US Bureau of Reclamation's options to expand project facilities outside of current footprints if necessary.

*Response*
A. The BLM offers GIS data online on its ePlanning website. Any GIS data not included on this website is available upon request.

B. The BLM reviewed the recommended edits to land tenure, disposal, and ROWs and edited the Proposed RMP/Final EIS, as appropriate. The BLM also reviewed existing corridor data for accuracy and determined the data are accurate. West-wide Energy Corridors data are based on the corridors as mapped in the West-wide Energy Corridor EIS. Per the 2009 Settlement Agreement, corridors are periodically reviewed. Any future actions, including parcel designations and new corridor or facility proposals, would be evaluated on a case-by-case basis under project-specific NEPA and appropriate regulations, taking into account site-specific baseline data.

C. The BLM reviewed the general surface use restrictions, including those near existing US Bureau of Reclamation facilities. The BLM manages public lands for multiple use and sustained yield, not for speculative future needs. Any future use of public lands would be evaluated on a case-by case basis through project-specific NEPA.

### Section 19.3 – Lands and Realty: Impact analysis
Total Number of Submissions: 2
Total Number of Comments: 8

Comment Number: 500268_BearS_21060930_DMEA-3
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear

BLM_0165190

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM correctly acknowledges that the demand for energy ROW's and the Wildland Urban Interface (WUI) is expanding. Even though the demand and the expansion are identified as planning issues, only the Wildland Fire Management section addresses in any meaningful way the land use management implications and intentions. Although briefly addressed in the Recreation section, that section only addresses the public's demand for recreation. None of the other resource uses address the issue. DMEAs services provide a critically important need to the public. We request the BLM consider and address the issue in relation to ROW's especially in the WUI, resource uses such as utility ROW's need to be permitted without restrictions that would lead to unnecessary and increased costs to DMEAs consumers.

Comment Number: 500268_BearS_21060930_DMEA-14
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In the Lands and Renewable Energy Section Effects Common to All Alternatives, the effects are accurately described but DMEA has shown that the 'designated corridors' are inaccurate. This leads to a flawed analysis and problematical management decisions. (See other comments related to designated corridors.)

Comment Number: 500268_BearS_21060930_DMEA-15
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Working with DMEA on both the Delta County Transmission Improvement Project and the East Montrose Project, BLM is aware that the public strongly desires public utilities serving the public good be constructed on public lands. The public has been strongly opposed to providing private property ROW for a public improvement project. This obviously puts increasing demand on public lands within the WUI. Exceptions, modifications, waivers and reasonable restrictions need to be incorporated for ROW and renewable energy developments. The analysis in Chapter 4 and proposed land use management decisions should reflect the need.

Comment Number: 500268_BearS_21060930_DMEA-16
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Proposed restrictions related to NGD/NSO and SSR/CSU are presented for the other resource uses. Although Chapter 4 is unclear, it appears from Appendix B that NGD/NSO and SSR/CSU will not apply to ROW Exclusion and Avoidance Areas. The potential negative impact to DMEA's operations and maintenance under Alternative B is alarming. DMEA believes that the utility companies deserve to review and comment on the Exclusion and Avoidance restrictions in the same manner as other proponents. (Also see comments on Appendix B and Appendix G.)

Comment Number: 500268_BearS_21060930_DMEA-17
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear

BLM_0165191

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The DRMP should address the potential impact of overlapping restrictions, whether they are restrictions and/or timing limitations, since they can negate a project administratively or by making a project uneconomically feasible.

Comment Number: 500268_BearS_21060930_DMEA-20
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
DMEA notes that there is no table in the Lands section similar to Renewal Energy Table 4-62, page 4-338 (referenced as Table 4-61 in the Table of Contents). A similar table would be helpful.

Comment Number: 500268_BearS_21060930_DMEA-21
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As noted in the Chapter 3 comments for the Renewable Energy section, any new renewable energy site development will need to be connected to the grid via a ROW. As a connected action, this needs to at least be acknowledged in Chapter 4.

Comment Number: 000502_SchroederA_20161101_BOR-18
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Pg 4-330; Bullet 2:
Comment: This bullet implies a level of withdrawal that may not exist under current withdrawals. Recommendation: Revise this bullet along the following lines: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws." Also, some of the terms used, should be defined in the glossary (See comments under "Glossary").
Rationale: There is no universal withdrawal wording for current withdrawals, as implied by this bullet; a withdrawal does not necessarily withdraw lands from all of the actions described in this bullet. Each withdrawal order is specifically worded based on legislation or intent. For example, a BOR withdrawal of land under the first form of withdrawal pursuant to Sec. 3 of the Reclamation Act of 1902, withdraws land from public entry and reserves it for Reclamation irrigation works contemplated under the provisions of that act. Based on subsequent rulings as noted in the USDI book, Federal Reclamation and Related Laws Annotated, Reclamation's first form withdrawal apparently withdrew lands from entry under the various disposal or appropriation acts, such as the mining laws and homestead acts, but not from the mineral or other leasing acts.

### Summary
A. One commenter requested that the impact analysis be updated to reflect the following:

BLM_0165192

- Impacts of restricting ROW development in light of increased future demand, particularly in the wildland-urban interface
- The need for exceptions, modifications, and waivers
- Clarification of impacts from stipulations and surface use restrictions, as well as overlapping restrictions
- Inaccurate baseline data for West-wide Energy corridor and other "designated corridors"
- The connected action of grid connection for renewable energy development

This commenter also requested that the BLM include a table similar to Draft RMP/EIS Table 4-62 (Lands Managed as ROW Exclusion and Avoidance Areas for Renewable Energy) for the lands and realty section.

B. Another commenter recommended that the BLM change the lands and realty impact analysis by revising bullet 2 on page Draft RMP/EIS 4-330 to state: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws."

*Response*
A-B. The BLM appreciates the comments. The BLM reviewed impacts of restrictions on ROW development and included additional discussion in Section 4.4.6, lands and realty impacts, and Section 4.6.3, socioeconomic impacts, as appropriate for an RMP-level analysis. As stated on Draft RMP/EIS page 4-5, where varying levels of management from different resource programs overlap, the stricter management prescriptions would generally apply. As noted in this report's response to Section 19.1 – Range of alternatives (above), ROW development would be classified as a surface-disturbing activity; therefore, NDG, SSR, and TL restrictions would apply as applicable to future ROW development. ROW development would be permitted on any lands not classified as ROW exclusion areas in the RMP. Specific restrictions for a given development, as well as applicable exceptions, modifications, or waivers, would be determined at the ROW permitting stage, and the BLM would evaluate the actions on a case-by-case basis under project-specific NEPA and appropriate regulations.

As noted in this report's response to Section 19.2 – Best available information—baseline data (above), corridor data were reviewed. West-wide Energy Corridor data are included based on decisions in the West-wide Energy Corridor EIS.

Information equivalent to Draft RMP/EIS Table 4-62 (Lands Managed as ROW Exclusion and Avoidance Areas for Renewable Energy) is included in Draft RMP/EIS Table ES-3 Comparative Summary of Alternatives (Draft RMP/EIS page ES-14).

Regarding the connected action of grid connection for renewable energy development, refer to part D of the response to Section 19.1 – Lands and Realty: Range of alternatives (above).

B. The BLM reviewed the recommended change and updated the Proposed RMP/Final EIS per the comment in bullet 2.

BLM_0165193

### Section 19.4 – Lands and Realty: Cumulative impact analysis

Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 500268_BearS_21060930_DMEA-19
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Table 4.1 refers to three other plans where decisions were expected in 2013 or 2014. Were these decisions made and if so, were the decisions incorporated into the DRMP?

*Summary*
One commenter requested that data in Draft RMP/EIS Table 4.1, Reasonably Foreseeable Future Actions, be updated to reflect current status of lands and realty decisions.

*Response*
The BLM updated the table as appropriate to note current status.

### Section 19.5 – Lands and Realty: Mitigation measures

Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 500268_BearS_21060930_DMEA-1
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The life of the BLM land use plan is estimated to be 20 years. Current land use plans have been in effect for much longer and it can be anticipated that this one will too. Flexibility will be needed. DMEA encourages BLM to use an adaptive management process to ensure that DMEAs concerns are incorporated into the decision-making process.

*Summary*
A commenter requested that the BLM use an adaptive management process for lands and realty management decisions.

*Response*
As noted in Draft RMP/EIS Section 2.3.1 (page 2-6), adaptive management would be guided by Adaptive Management, the US Department of the Interior Technical Guide (Williams et al. 2007). Under the concept of adaptive management, new information or changing conditions would be evaluated and a decision would be made as to whether to make implementation adjustments or changes.

## Section 20 – Lands with Wilderness Characteristics

### Section 20.1 – Lands with Wilderness Characteristics: Range of alternatives

Total Number of Submissions: 64
Total Number of Comments: 106

BLM_0165194

Comment Number: 000489_JohnsonA_20161101-55
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Comment Number: 000126_Kavanaugh_20160831-3
Organization1:Town of Telluride
Commenter1:Sean Murphy
Commenter Type: Local Government
Comment Excerpt Text:
The Town supports Alternative B's focus on managing lands to protect Wilderness Characteristics. A higher level of protection of these lands within the UFO boundaries would be consistent with our community's values.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-3
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Table 2-1 Page 2-9: The Prefered Alternative (Alt D) of the Draft RMP proposes to manage 6,950 acres to the east of the Camel Back WSA as "Lands Managed to Protect Wilderness Characteristics. The Record of Decision for BLM's Wilderness Study Report published in 1991 expressly analyzed Camel Back WSA and the surrounding area. This analysis included adjacent lands which are now proposed for management as lands with wilderness characteristics. BLM's Record of Decision found a total of zero (0) acres in Camel Back WSA as being "Recommended for Wilderness". Conversely, a total of 10,402 acres were " Recommended for Non Wilderness" (p. 311). The analysis in this ROD described the acreage now proposed as having wilderness characteristics as follows: "The eastern boundary is defined by a variety of noticeable human imprints, including approximately 4 miles of unimproved jeep trail, extensive areas of contour furrowing, and a large chain area ... (p.311). Even the acreage within the WSA was not recommended for Wilderness Designation. Per the ROD: "The limited extent of wilderness qualities within the WSA, and the BLM's preference for other options for managing the area, are the primary reasons for recommending that it be released for uses other than wilderness" (p.311). "Although the WSA does have some rugged terrain and outstanding natural features, the majority of its featu res are very common to lands throughout southern Colorado, and there is nothing to really set the area apart." (p.311).
The current proposal in the Draft RMP contradicts BLM's previous findings with regard to the wilderness characteristics of the Camel Back WSA and surrounding area. It is neither true nor reasonable to suggest that these lands have gained in wilderness characteristics since the 1991 Record of Decision. With it so clearly stated by BLM that the even the Camel Back WSA should not be managed as wilderness, it does not appear rationale to now conclude that adjoining lands should be managed as such.
We respectfully request that BLM apply another management standard to lands adjacent to the existing Camel Back WSA. We offer BLM's own Record o f Decision and the included findings as evidence that these lands do not possess characteristics sufficient to warrant management as lands with wilderness characteristics. We ask that these comments be considered with regard to all sections of the RMP which pertain to lands adjoining the Camel Back WSA.

BLM_0165195

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-30
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 265 Page 2-148: Lands adjoining the Camelback WSA do not contain adequate wilderness characteristics to justify ma nagement as "Lands with Wilderness Characteristics" BLM's prior analyses have demonstrated that these lands do not contain such characteristics. There is no basis for a management action in this RMP that would designate 6,950 acres adjoin ing the WSA as "Lands with Wilderness Characteristics" and this proposed management action should be removed from consideration and replaced with a designation that is supported by factual landscape level conditions. Additionally, we request that Dry Creek and Roc Creek not be managed as lands with wilderness characteristics due to inadequate evidence to support such a designation.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-31
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 268 Page 2-151: We suggest that BLM not rely on "adjacent lands" to make a determination of wilderness characteristics. Wilderness inventory and assessment should be applied only to the lands being ana lyzed. If BLM makes determinations of wilderness characteristic based on characteristics of adjo ining lands, there is no site specific validity to those determinations. Through this flawed practice, any lands adjoining lands determined to have wilderness characteristics would also be considered to have wilderness characteristics by mere association. There would be no end to this process.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-4
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Table 2-1 Page 2-9: The preferred Alternative (A lt D) of the Draft RMP proposes to manage 7,030 acres in the Dry Creek Basin and 4,340 acres in the vicinity of Roc Creek as "Lands Managed to Protect Wilderness Characteristics '. It is worth noting that the post FLPMA analyses conducted by BLM did not identify these lands as containing wilderness characteristics nor was any recommendation made to recommend these lands for wilderness study or designation. U.S. Department of Interior. (October, 1991). Wilderness Study Report (Volume Two) Montrose District Study Areas. Bureau of Land Management: Colorado State Office. While we understand BLM's obligation to continually inventory lands, we disagree with the premise that over 18,000 acres of land with true wilderness characteristics has gone undiscovered in Montrose County until 2016. We respectfully request that BLM propose a different management approach for lands in Dry Creek Basin and Roc Creek which are proposed to be managed as land with wilderness characteristics in Alternative D of the Draft RMP.

Comment Number: 000202_FosterM_20160926-1
Organization1:
Commenter1:Mike Foster
Commenter Type: Individual

BLM_0165196

Comment Excerpt Text:
Specifically, I urge the BLM to:
•Reduce the area with wilderness characteristics in the final RMP, particularly excluding the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit.

Comment Number: 000213_PearsonM_20161025-1
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
While the RMP proposes some additional management recognition and attention to the Tabeguache region, it is not nearly as complete or as protective as that proposed for Roubideau. Specifically:
-There is an expansive area analyzed for its wilderness character adjacent to Tabeguache, and proposed for identification in Alternative B. I encourage BLM to reconsider its decision not to manage these units (Lower Tabeguache and Chavano Creek) for maintaining their wilderness character.
-BLM's preferred management approach to the area surrounding Tabeguache is only to designate it as an Ecological Emphasis Area, apparently in lieu of managing for wilderness character. While this might be an appropriate alternative, it falls short in terms of protective management. The RMP proposes that the Tabeguache Ecological Emphasis Area be left available for surface disturbing oil and gas development, as contrasted with the strict NSO proposed for the Roubideau Ecological Emphasis Area. I strongly encourage BLM to institute NSO stipulations for the Tabeguache Ecological Emphasis Area in recognition of its wilderness character as well as to ensure protection of habitat continuity.

Comment Number: 000213_PearsonM_20161025-5
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
I concur with the BLM's identification of the lands adjacent to Camel Back WSA as possessing wilderness character. These tributary canyons of Monitor Creek and Potter Creek are an inseparable component of the wilderness character of the larger Roubideau watershed

Comment Number: 000213_PearsonM_20161025-9
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
I am pleased to see BLM's recognition of Roc Creek's outstanding character through proposed management to protect its wilderness character. Roc Creek is one of those geographic circumstances where fragmented administration could easily result in its wild character being overlooked. But in this case, BLM and the Forest Service have separately recognized the wilderness character of this impressive, majestic deep canyon draining the east slope of the La Sals. The Forest Service has identified its upper section of Roc Creek as an Upper Tier Colorado Roadless Area, and adjacent BLM lands are managed as the Sewemup Mesa WSA by the Grand Junction Field Office, so it is fitting that the Uncompahgre Field Office identify its segment for compatible management to protect wilderness character.

Comment Number: 000222_RazianoR_20161026_COPMOBA-5
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Renata Raziano
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165197

Comment Excerpt Text:
Finally, we are concerned that the Lands with Wilderness Characteristics designation in Dry Creek includes the Coyote Ridge and Coyote Cutoff trails. In the preferred Alternative D, these trails would no longer be open to mountain bikes. These trails are valuable to the mountain bike community and should stay open to mechanized use. They are two of the trails in the Dry Creek area that are most enjoyable for mountain bikers due to their grades and trail design. They provide a challenge to intermediate and advanced riders and allow them to create longer rides in the Dry Creek area.

Comment Number: 000244_HendersonS_20161024-1
Organization1:
Commenter1:Susan Henderson
Commenter Type: Individual
Comment Excerpt Text:
I was surprised, startled, and dismayed to read that although the RMP identifies over 42,000 acres of Lands with Wilderness Character, the preferred alternative protects only 18,000 acres. My husband and I hike in many of the identified areas and value the quality of life they afford us. Additionally, we are also site stewards of a threatened biological species in the adobe badlands and value the unique biological resources in that area. Please include more lands with wilderness characteristics in the final preferred alternative.

Comment Number: 000257_GoldmanA_20161026-3
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
In reference to Apendix A Figure 2-21
The Adobe Badlands Adjacent proposed LWC should be restored to Alt D with the full protection of No leasing and NSO as outlined in Alternative B1. to protect the non extractive resource values of this land adjoining the WSA. I have hiked this land and believe it still is suitable as an LWC despite its proximity to oil leasing and OHV recreation. Active management (e.g., adequate signage) would do alot to prevent further degradation of the area

Comment Number: 000265_VanWestR_20161019-3
Organization1:
Commenter1:Rein van West
Commenter Type: Individual
Comment Excerpt Text:
- Dry Creek
- Camel Back
- Roc Creek
- Shavano Creek
- Lower Tabeguache
- Adobe Badlands
All of these units have 'wilderness characteristics', so I was disappointed units 4, 5, and 6 hadn't been included in the preferred alternative, D. In my mind, without question, each of these areas has compelling wilderness attributes of some sort: great bird life, perennial streams with riparian habitat, wildlife corridors, quiet trails, scenic views, unusual geology, and most have relatively few signs of disturbance.
I would like to see ALL six of these named areas as part of the final RMP, whatever that winds up being.

BLM_0165198

Comment Number: 000269_CascadeR_20161028-11
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I realize the Adobe Badland WSA sees regular violations to its non-motorized status. I personally have witnessed these infractions during my visits to this WSA, but I have also experienced the solitude, vastness, beauty, naturalness, recreational opportunities and sightings of Eriogonum inflatum, the federally endangered Eriogonum pelinophilum and the rare/threatened Hookless cactus (Schlerocatus glaucus.) The presence of cryptobiotic soil/biological crust is noteworthy as well. Combined with the proposed Adobe area of critical environmental concern (ACEC) and the ecological emphasis area included in the preferred alternative, the inclusion of the adjacent Adobe Badlands addition in the final RMP will augment the significance of protecting this larger unique and fragile ecosystem which is home to Ferruginous hawks, Burrowing owls, White-tailed prairie dogs, pronghorn and possibly kit fox. I urge you to include all acreage in this region suitable for ACEC and ecological emphasis in the final RMP – not the reduced area currently proposed in the preferred alternative. This lower elevation environment coupled with spectacular geology makes this area worthy of protection. As a large contiguous unit, it will also provide an expanded landscape for wildlife, a span of ecological zones across elevation, and opportunities for recreation.

Comment Number: 000269_CascadeR_20161028-12
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I had the great fortune recently to visit the Lower Tabeguache/Campbell Creek and Shavano Creek units. Given their remote location, untrammeled qualities and your findings of suitability for LWC, I strongly recommend that these two units be included in your final RMP as LWCs and that they be managed as wilderness. Lower Tabeguache/Campbell Creek includes many cultural sites that warrant protection and preservation and the unit's sheer size of 11,060 roadless acres is cause for protection. Together with the Shavano Creek unit (which contains valuable riparian habitat, naturalness, and opportunities for solitude) and the nearby (already protected) Tabeguache SMA, these combined units provide a large track of landscape that affords a critical wildlife corridor from lower elevations up to the forested Uncompahgre Plateau

Comment Number: 000269_CascadeR_20161028-4
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
The draft RMP determined seven areas totaling 42,150 acres qualify as suitable Lands with Wilderness Characteristics (LWC), however the preferred alternative proposes to designate only three of those seven units as LWC encompassing 18,320 acres to be managed as wilderness. I have visited the majority of these LWCs and consider them most worthy of protection. Please include all seven units in your final RMP.

Comment Number: 000269_CascadeR_20161028-5
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual

Other Sections: 40.1
Comment Excerpt Text:
also strongly recommend that, if Congress releases any WSAs from wilderness consideration, the UFO continue to manage these units as wilderness to protect their wilderness characteristics into the future

Comment Number: 000320_LarmerP_20161101-1
Organization1:
Commenter1:Paul Larmer
Commenter Type: Individual
Comment Excerpt Text:
I am writing to urge you to maintain all lands with wilderness qualities in their within the RMP, and expand the Adobe Badlands WSA to the west, as outlined in the citizen's alternative

Comment Number: 000332_RaitK_20161031_PewTrust-2
Organization1:The Pew Charitable Trusts
Commenter1:Ken Rait
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We commend the BLM for completing a LWC survey for the planning area and refining their findings over time to better comply with BLM manual 6310. Both Alternative B and the preferred alternative include LWCs. Unfortunately less than half the acreage BLM found to contain wilderness characteristics is included in the preferred alternative – only 18,320 of the 42,150 acres. Notably, a number of areas adjacent to WSAs were found to have wilderness characteristics but were not included in the preferred alternative.
We believe that the LWC findings in the preferred alternative contain inconsistencies with Manual 6310 guidance in several specific areas: Adobe Badlands WSA adjacent, Camel Back WSA adjacent, Dolores River Canyon WSA adjacent, Dry Creek Basin, Shavano Creek, and Atkinson Breaks. We would like to incorporate by reference the comments of The Wilderness Society regarding this issue, and request that BLM revisit these potential LWCs.
Recommendation: The BLM's LWC inventory for the Uncompahgre field office is inconsistent with Manual 6310 guidance in several specific areas. We recommend that BLM reevaluate the above listed areas for lands with wilderness characteristics.

Comment Number: 000332_RaitK_20161031_PewTrust-3
Organization1:The Pew Charitable Trusts
Commenter1:Ken Rait
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Protection of Lands with Wilderness Characteristics
Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating a range of alternatives that would protect those values.
Examples of management prescriptions that will most effectively protect lands with wilderness characteristics in the Uncompahgre RMP planning area include, but are not limited to, the following:
- Recommend withdrawal from mineral entry;
- Close to leasing or allow leasing only with no surface occupancy with no exceptions, waivers, or modifications;
- Designate as right-of-way exclusion areas;
- Close to construction of new roads;

BLM_0165200

- Designate as closed to motor vehicle use, as limited to motor vehicle use on designated routes, or as limited to mechanized use on designated routes;
- Close to mineral material sales;
- Designate as Visual Resource Management Class I or II;
- Restrict construction of new structures and facilities unrelated to the preservation or enhancement of wilderness characteristics or necessary for the management of uses allowed under the land use plan; and/or
- Retain public lands in federal ownership.

The preferred alternative includes some but not all of these management prescriptions for LWCs. Recommendation: For lands the BLM identifies to manage to maintain wilderness characteristics in the Uncompahgre RMP, we urge the agency to apply appropriately strong management prescriptions that will, in fact, ensure that wilderness characteristics on identified units are maintained over the lifespan of this planning decision. Specifically, we recommend applying substantive protections to conserve the wilderness characteristics of deserving areas. This will most effectively preserve the naturalness and outstanding opportunities for solitude and/or primitive recreation of those lands.

Comment Number: 000345_ReeseC_20161027-16
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Stevens Gulch - The final plan must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy

Comment Number: 000345_ReeseC_20161027-7
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest.

Comment Number: 000363_RogersM_20161031-1
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Comment Excerpt Text:
The BLM has inventoried Lands with Wilderness Characteristics (LWCs). Alternative B is very good and all the remaining LWC's should be managed to protect those wilderness qualities. Alt D is not a good substitute as they drop LWCs .The RMP states that these are core areas regarding wildlife and should be protected as such and indeed there is no reason that they should not be. All LWC's protection should be added in to the preferred alternative.

BLM_0165201

Comment Number: 000363_RogersM_20161031-6
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Other Sections: 16.1 9.1
Comment Excerpt Text:
Both B and D are good alternatives for protecting migratory birds from disturbances during breeding. But Burrowing owls and Sage-grouse need protected areas where they can be sustained as in the Abobe badlands LWC adj. and ACECs Areas of Critical Environmental Concern (ACECs).

Comment Number: 000377_SkokoM_20161019-3
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual
Comment Excerpt Text:
I am opposed to the Dry Creek LWC as it could potentially restrict access to recreation opportunities to motorized and non-motorized (bikes) users which have been well established in the area for some time.
The BLM currently has signage for several of the trails in the proposed LWC (rock crawling, moto trails). I believe that these trails should be taken into account when drawing the LWC boundary. The proposed LWC would eliminate bicycle/moto use of Coyote Cutoff and Coyote Ridge trails that are crucial connectors to the already established network of trails NW of Dry Creek Rd. Restricting use of these trails would essentially deem the entire trail network a very undesirable place to ride a mountain bike.
Please consider the existing trails/roads and their current uses as recreation asset before essentially closing off access to this unique area for mountain biking.

Comment Number: 000389_KittelsonK_20161030-2
Organization1:Cycling Western Colorado
Commenter1:Kristina Kittelson
Commenter Type: Individual
Comment Excerpt Text:
I am also concerned that the Lands with Wilderness Characteristics designation in Dry Creek includes the Coyote Ridge and Coyote Cutoff trails. In the preferred Alternative D, these trails would no longer be open to mountain bikes. These trails are valuable to the mountain bike community and should stay open to mechanized use. They are two of the trails in the Dry Creek area that are most enjoyable for mountain bikers due to their grades and trail design. They provide a challenge to intermediate and advanced riders and allow them to create longer rides in the Dry Creek area.

Comment Number: 000409_DayB_20161031-13
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 265. Lands with Wilderness Characteristics (LWCs). We agree with this document, which calls LWCs core areas regarding wildlife on page 4-154. All of the few remaining eligible areas should be managed to protect their wilderness characteristics.

Comment Number: 000430_ElliotA_20161027-1
Organization1:
Commenter1:Allison Elliott
Commenter Type: Individual
Comment Excerpt Text:
The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the EEAs. I believe that both Roatcap and Hubbard Creeks should be included in the listed EEAs. The upper reaches of these areas have a large, mature aspen stand, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest and The West Elk Wilderness.

Comment Number: 000438_GoldmanA_20161031-1
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
I am writing to support the BLM's inclusion of the Roc Creek LWC in the agency's preferred Alternative D of the draft RMP. It has opportunities for primitive and unconfined recreation, is natural in appearance and offers the perception of solitude due to its remoteness in the West End of Montrose County. Its location adjacent to Roc Creek Roadless Area as well as Sewemup Mesa further adds to the suitability for a LWC management prescription.

Comment Number: 000438_GoldmanA_20161031-2
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
I would also strongly urge the BLM to restore the Tabaguache and Shavano Creek LWCs as proposed in Alt. B to the final RMP. As required for inclusion as an LWC both areas are large enough (11,060 and 6060 acres respectively). Tabaguache Creek , with the exception of some human activity at its edges, and two areas of the unit excluded for livestock purposes, retains its natural appearance and lack of influence by human activity, There is also the opportunities for solitude and primitive unconfined recreation since the area is accessible only by non motorized means.
A similar argument can be made for Shavano Creek with regard to primitive and unconfined recreation, naturalness, and opportunities for solitude since there is limited road access to the area. It also possesses supplemental values including important wildlife habitat connectivity between the Tabaguache WSA, forest lands on the Uncompahgre Plateau and adjacent lower elevation lands.

Comment Number: 000446_KlingspornK_20161101-3
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Comment Excerpt Text:
However, out of the 42,150 acres found in the Conservation Alternative to have wilderness characteristics, only 18,320 are included in the BLM Preferred Alternative. Areas like Shavano Creek, Atkinson Breaks, and the Dolores Canyon WSA-adjacent area should all be included with the other LWCs in Alternative D, as they each possess qualities of solitude, outstanding views, or other attributes that would not be sufficiently protected by lower levels of protection. Lands that are managed for their wilderness characteristics have a host of other benefits, including air, water, and soil protection, wildlife habitat, and reduction in sound and light pollution.

BLM_0165203

Comment Number: 000450_BagleyJ_20161024-1
Organization1:
Commenter1:Jay Bagley
Commenter Type: Individual
Comment Excerpt Text:
I would also like to see the final plan protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. While I am personally not a hunter, hunting in this area is an important part of both our culture and our economy.

Comment Number: 000452_MayJ_20160912-2
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Comment Excerpt Text:
The proposed Dry Creek Lands with Wilderness Characteristics includes existing, signed, BLM-sanctioned trails (Coyote Cutoff, Coyote Ridge, Fenceline). The boundary of lands with Wilderness Characteristics should exclude these trails. In particular, Fenceline Trail is a spectacular trail that explores Dry Creek Canyon. Fenceline should be designated non-motorized open to bicycles in the RMP, with the option to reroute portions of the trail to make it ridable on a mountain bike. It could be an epic trail.

Comment Number: 000456_ColeK_20161031-1
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
We do not support the de facto creation of additional wilderness areas by managing any areas outside of WSAs to protect wilderness characteristics. We assert such management is outside of BLM jurisdiction and legislatively prohibited by Congress. Also, to manage LWC for solitude given the increase in recreation and directive to allow for increased use, is not feasible.

Comment Number: 000460_BakerG_20161028-4
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
The proposed Dry Creek Lands with Wilderness Characteristics includes existing, signed, BLM-sanctioned trails (Coyote Cutoff, Coyote Ridge, Fenceline). The boundary of lands with Wilderness Characteristics should exclude these trails. In particular, Fenceline Trail is a spectacular trail that explores Dry Creek Canyon. Fenceline should be designated non-motorized open to bicycles in the RMP, with the option to reroute portions of the trail to make it ridable on a mountain bike. It could be an epic trail.

Comment Number: 000471_NoeD_20161101-20
Organization1:
Commenter1:David Noe

Commenter Type: Individual
Comment Excerpt Text:
Alternative B also contains the provision of designating an area of Lands With Wilderness Characteristics (LWC) ("Adobe Badlands Adjacent") along the middle slopes at the southern tip of Grand Mesa. This is to the north of the proposed ACEC, and it borders USFS lands that are on the higher slopes of the mesa. I have been near this area a few times while doing my geologic mapping. But mainly, I found it to be largely inaccessible due to lack of roads, as well as landslide terrain that supports heavy pinon-juniper forest and shrubland growth. In other words, it contains many things that are earmarks of wilderness characteristics! I would imagine that this type of terrain is under-represented in the LWC realm, and so I would encourage you to adopt this area as a LWC.

Comment Number: 000474_SgammaK_20161031_WEA-2
Organization1:Western Energy Alliance
Commenter1:Kathleen Sgamma
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Lands with Wilderness Characteristics
The preferred alternative would designate more than 18,320 acres as new Lands with Wilderness Characteristics (LWCs) areas. Designation of these areas would result in burdensome restrictions on development of substantial portions of the Planning Area, including NSO, CSU, and TL stipulations. Under Section 102 of FLPMA, Congress directed BLM to manage lands on a multiple-use basis to "…best meet the present and future needs of the American people" in a "combination of balanced and diverse resource uses," including minerals development. Importantly, in Section 103(c) of FLPMA, Congress listed resources that BLM should take into account in allocating management, and "wilderness characteristics" is not included as such a resource. On the other hand, mineral development is a "principal or major use" of public lands under FLPMA. Congress further emphasized the importance of minerals development by, as noted above, declaring that public lands be managed "in a manner which recognizes the Nation's need for domestic sources of minerals." 43 U.S.C. § 1701(a)(12).
In addition, designation of LWCs conflicts with a Congressional prohibition. Congress has explicitly denied funding for the implementation of Secretarial Order 3310 concerning the designation of "Wild Lands." LWCs are "wild lands" in all but name. It is therefore a violation of law to designate LWCs through the RMP process. BLM designation of LWCs violates FLMPA's multiple-use directive, and as such we oppose their inclusion in the preferred alternative. Alternative C, which does not manage for lands with wilderness characteristics, takes the proper approach.

Comment Number: 000475_PierceC_20161030-1
Organization1:
Commenter1:Carol Pierce
Commenter Type: Individual
Comment Excerpt Text:
Regarding Lands with Wilderness Characteristics (LWC) in the plan; I see you believe that seven areas totaling 42,000 acres deserve to be managed in a way to protect their wilderness characteristics in Alternative plan B. BUT you only propose to manage three of the seven totaling only 18,000 acres under the preferred alternative plan. It makes no sense to qualify them as deserving and then disregard that discovery in your preferred proposal. Please qualify the full 7 areas.

Comment Number: 000478_ShannonL_20161031-1
Organization1:
Commenter1:Laurie Shannon
Commenter Type: Individual

BLM_0165205

Comment Excerpt Text:
I would urge you to include more of the lands that have wilderness characteristics that are identified alternative B into alternative D.

Comment Number: 000478_ShannonL_20161031-3
Organization1:
Commenter1:Laurie Shannon
Commenter Type: Individual
Comment Excerpt Text:
Under alternative B, you found about 41,780 acres that have wilderness characteristics, so it is splitting hairs to only carry forward about 18,320 acres into alternative D. With a huge planning area of nearly 700,000 acres, when you divide up the 41,780 acres into all the different geographic areas you identified, it's pretty small stuff, so why not go ahead and protect most if not all the lands that contain wilderness characteristics in the preferred alternative?

Comment Number: 000489_JohnsonA_20161101-52
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6.1
Comment Excerpt Text:
D. Lands with Wilderness Characteristics
We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. Specifically, we are particularly concerned with the Adobe Badlands WSA Adjacent and Camel Backs WSA Adjacent units, both of which have been partially included within Alternative B to be Lands Managed to Protect Wilderness Characteristics (LWCs). We strongly support all acres of these units to be included as LWCs within the final plan.
We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the draft RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA, to achieve a more balanced land use plan that embodies multiple use and sustained yield.
FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); see also Ore. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[58] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a continuing basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

BLM_0165206

[Footnote 58] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.

Comment Number: 000489_JohnsonA_20161101-57
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6
Comment Excerpt Text:
ii. BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.
Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management.
FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. FLPMA further requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b) (emphasis added). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with this standard. See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10th Cir. 1988). As the court found in Mineral Policy Center v. Norton, "in enacting FLPMA, Congress's intent was clear: Interior is to prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive." 292 F.Supp.2d 30 (D.D.C. 2003) (emphasis added). Further: "FLPMA, by its plain terms, vests the Secretary of the Interior with the authority—and indeed the obligation—to disapprove of an otherwise permissible mining operation because the operation though necessary for mining, would unduly harm or degrade the public land." Id. at 20.
Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is arguably appropriate to prevent unnecessary and/or undue degradation to wilderness resources on the public lands. BLM has not shown that such a decision is infeasible. Accordingly, BLM is under a statutory obligation to demonstrate compliance with FLPMA's requirement to not cause undue or unnecessary degradation to important resources. See e.g., Kendall's Concerned Area Residents, 129 IBLA 130, 138 (1994). In fact, declining to manage the reasonable amount of land BLM has found to possess wilderness characteristics could be a choice not to avoid unnecessary or undue degradation. BLM should discuss a variety of options to protect this important resource, including through explicitly managing to protect wilderness characteristics.

Comment Number: 000489_JohnsonA_20161101-58
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson

BLM_0165207

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:
* to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;
* to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and
* outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.
These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.

Comment Number: 000489_JohnsonA_20161101-59
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas.
In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way:
"Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to

BLM_0165208

determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

Summary of Comments: BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.

Comment Number: 000489_JohnsonA_20161101-60
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

iii. Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320.

BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics

BLM_0165209

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 268 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics (Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment 1). All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment A.1. All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment A.2.


Comment Number: 000489_JohnsonA_20161101-61
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4. High quality LWC meriting the strongest levels of protection
Management prescriptions for Camel Back WSA-adjacent should include:
* VRM I
* Closed to oil and gas leasing
* Closed to renewable energy development
* Closed to new rights-of-way (ROW exclusion)
* Closed to motorized and mechanized use
* Construction of new permanent and temporary roads is prohibited
* Close to mineral material disposal and non-energy solid leasable mineral exploration and development
* Recommend withdrawal from locatable mineral entry
* Closed to commercial timber harvest
* Vegetation treatments must utilize the minimum tool necessary
* Seek opportunities to acquire and incorporate non-federal inholdings
* Retain lands in federal ownership
* Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.
This area is proposed for management to protect its wilderness characteristics in the Draft RMP preferred alternative.

BLM_0165210

Comment Number: 000489_JohnsonA_20161101-62
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
(1) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses
Management prescriptions for Adobe Badlands WSA Adjacent should include:
* VRM II
* NSO stipulation for fluid minerals without exception, modification, or waiver.[61]
* Closed to renewable energy development
* Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors
* Motorized and mechanized use limited to designated routes
* Construction of new permanent and temporary roads is prohibited
* Close to mineral material disposal and non-energy solid leasable mineral exploration and development
* Recommend withdrawal from locatable mineral entry
* Closed to commercial timber harvest
* Vegetation treatments must not have long-term impacts on wilderness characteristics
* Seek opportunities to acquire and incorporate non-federal inholdings
* Retain lands in federal ownership
[Footnote 61] By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.
This area is evaluated for management to protect its wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing it in a second category of LWC management in the proposed plan is as follows:

Comment Number: 000489_JohnsonA_20161101-63
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Adobes LWC
The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." (Fram Whitewater Unit MDP EA at 1.1). Therefore, BLM should not preclude protection of highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing Whitewater Unit leases.
The Adobe Badlands WSA adjacent unit also provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation.
Solitude: After hosting multiple hikes into the area over a three-year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.

BLM_0165211

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 270 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

Unconfined recreation: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord. Naturalness: Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area.

In summary, the BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through a LWC designation in the final RMP. The surrounding adobe areas that do not meet LWC qualifications should then be protected as ACECS and EEA, as described later.

Comment Number: 000501_Bockus_20161101_NPS-10
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Comment Excerpt Text:
PAGE/PARAGRAPH: Table 2-1, 2-9
COMMENT: The Preferred Alternative D should include all areas with wilderness characteristics to be protected and managed as such. If not protected, the wilderness character of these lands could become degraded and eventually lost. 42,150 acres is a very small percentage of the total land area covered in this plan, so why not protect these areas?

Comment Number: 000501_Bockus_20161101_NPS-9
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Other Sections: 40.1
Comment Excerpt Text:
PAGE/PARAGRAPH: Vol III, Appendix F Wilderness Characteristics Inventory
COMMENT: The 2008 publication of "Keeping It Wild: An Interagency Strategy for Monitoring Wilderness Character Across the National Wilderness Preservation System" (Landres and others 2008) provided the first nationally consistent interagency strategy to assess whether wilderness character is being preserved. This strategy was recently updated by the 2015 publication of "Keeping It Wild 2: An Updated Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System". Will the BLM UFO be adopting this interagency strategy to monitor for wilderness character in WSAs, proposed or designated wilderness that have wilderness characteristics? The adoption of this monitoring strategy may assist with future wilderness planning and management.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-6
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix F - Lands with wilderness characteristics

BLM_0165212

The Draft RMP/EIS identifies a total of eight areas that meet the qualifications for lands with wilderness characteristics. Lands that qualify for this designation are of primary interest to Backcountry Hunters and Anglers. They can provide essential habitat and security for wildlife and fish as well as high quality backcountry hunting and fishing opportunities. In reviewing the analysis and management alternatives for these areas in the Draft RMP/EIS, it is apparent that the BLM recognizes that several of these areas have been severely impacted by roads and trails used for past mining and energy development, utilities, livestock grazing, and OHV use. We are adamant that the remaining areas that retain their wilderness character be protected from further energy and recreation development and emphasized for the improvement of land health objectives and habitat for terrestrial wildlife.

The Camel Back WSA Adjacent area includes a total of 8,700 acres of BLM lands that include Monitor and Potter Canyons as well as most of the Monitor Mesa area in between. According to the BLM's analysis, at least 6,950 acres still retain their wilderness character. In combination with the Camel Back WSA and adjacent National Forest lands, this area represents some of the best remaining roadless and backcountry habitat on this portion of the Uncompahgre Plateau. It provides high quality habitat for a population of desert bighorn sheep as well as winter range for elk and mule deer. Management of the Camel Back area should emphasize the retention and enhancement of its roadless character and wildlife habitat. The RMP should acknowledge the resource values of this landscape for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game. The RMP should also specify that domestic sheep grazing will only be authorized and managed to achieve no contact between domestic sheep and desert bighorn to prevent disease transmission.

The Lower Tabeguache/Campbell Creek area includes 11,060 acres of BLM lands that include Long Mesa, Burro Creek Mesa, Wild Cow Mesa, and Spring Creek Mesa. This area represents another large block of unroaded backcountry habitat that has escaped the development associated with past uranium mining on this portion of the Uncompahgre Plateau. This portion of the Uncompahgre Plateau also contains high quality big game winter range and important security from the disturbance of roads and OHV trails. In order to retain and improve habitat for elk and mule deer, and encourage them to remain on public lands during the winter months, the RMP should include specific direction for this area that will prohibit any development of motorized and mechanized trails. Some attempts by the BLM and Forest Service have been made to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public. If the conditions on the ground are favorable, people use the roads and trails regardless of the seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place.

Shavano Creek includes 6,090 acres of BLM lands in the upper Campbell Creek and West Campbell Creek adjacent to the north side of the Tabeguache SMA. In combination with the adjacent National Forest lands, this area provides a significant roadless area on this portion of the Uncompahgre Plateau. The Upper Campbell Creek drainage of the BLM would increase the size of this area if it were not for a county road (U472) going to a stock pond development, presumably for maintenance of this pond. Other user-developed OHV trails have been created off county road 226 in to Shavano Creek. Much of this area burned in the Campbell Creek wildfire of 2004 which significantly enhanced habitat conditions on big game winter range, creating a large winter concentration area. The RMP should acknowledge the resource values of this area for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area, and implement an aggressive decommissioning program to eliminate the user-developed OHV trails. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve

BLM_0165213

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 272 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

land health objectives while providing residual forage for big game. Implementing these management standards would encourage elk and mule deer to remain on preferred habitats on public lands and reduce game damage occurring to adjacent private lands in and around Nucla.

Norwood Canyon contains 5,600 acres of BLM lands along the San Miguel River between Norwood Bridge and Pinyon Bridge. This part of the San Miguel River canyon provides river rafting, kayaking, and fishing opportunities that are not adjacent to the noise and activities of highway 145 or 141. River recreation and fishing activities are far less than the section above Norwood Bridge so the area provides opportunities for more solitude and quiet use. There are currently at least two ways to legally hike into the Norwood Canyon to gain fishing access. Both access routes are not official "government" trails which further limits activity in this area and provides a high quality backcountry fishing experience. This situation needs to be maintained by the BLM and the RMP should specify that there will not be any trail development or OHV/bicycle use into or within the Norwood Canyon. Access on the BLM would continue to be provided by boat and/or hiking the old road on the north side of the river which goes around the Cascabel Ranch private land.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-1
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1 14.1 42.1
Comment Excerpt Text:
Lower Tabeguache
As per my scoping letter, and based on my knowledge of this unique, lower elevation extension of the Tabeguache Special Management Area, I recommend combining all three protective designations in the RMP to do justice to this outstanding backcountry primitive area. This means including the entire LWC, the EEA to preserve wildlife values, and including the full cultural ACEC boundaries---all wrapped into one large protected area----20,000 + acres in all including the ACEC.

While the overall area has some low use roads and ranching activity, these uses do not disturb wildlife in the way recreational trails do. Tabeguache is one of the last areas in the Paradox Valley with high quality, undisturbed habitat that has not been heavily impacted by motorized and mechanized trails or uranium roads; it needs to be kept that way to insure continued health and viability of resident big game herds. However, as with Potter-Monitor and other large UFO primitive areas addressed below, protective designations for Tabeguache will be ineffective without greatly strengthened management prescriptions for each category, LWC, ACEC and EEA. The management prescriptions should include NSO and prohibit motorized and mechanized trails. Without these protections, these lands could be taken over by the same homogeneous gridwork of trails and uranium roads that dominates the surrounding the Paradox Valley.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-10
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Lands with Wilderness Characteristics (LWCs)
While I understand that the wilderness characteristics of some UFO LWCs have degraded over time, it is unjustified to drop over half--- 24,000 acres---of the original 42,150 acres of identified LWCs, as does Alternative D.
Instead, I recommend that all seven of the Alt B LWCs be carried into the final decision, (Line 265, Alt B) including the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit, all of

BLM_0165214

which can be managed easily for their outstanding opportunities for solitude, primitive recreation opportunities and naturalness.

These areas would benefit as well by being considered core areas for wildlife (4-154).

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-2
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Shavano Creek
Same story for the Shavano Creek/Campbell Creek area: The area provides a concentration of high quality forage for big game and outstanding roadless and primitive values. It provides an extension of the Tabauache primitive area to the south and similarly needs a full range of protections, including LWC designation for the full 6,090 acres of LWC qualifying lands . User created motorized trails in the area need prompt and effective closures to stop further incursions, and a management prescription banning future motorized and mechanized trails.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-6
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1
Comment Excerpt Text:
Potter-Monitor-Roubideaux
As with Tabeguache above, this is a large, primitive extension of the Camel Back WSA, forming a continuous ecosystem spanning higher elevation ponderosa/fir down to lower elevation red rock canyons-----a stunning and dramatic landscape worthy of the full battery of protections. Equally important the area provides habitat security to big game including vulnerable the Desert Big Horn sheep species.
Recommendations - For Roubideau-Potter Creek, please combine the full array of protections, the almost 7000 acres of LWC-quality lands, the larger Alt B ACEC boundaries, and the full extent of EEA protection.
As with Tabeguache and other primitive areas in the field office, Potter-Roubideau designations will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by a gridwork of trails.
I would question locating a SRMA in a more remote and primitive area like Potter Monitor (unless SRMA status is the only way to prevent mineral leasing) as it is next to impossible to maintain uncrowded, primitive backcountry settings once an area has been designated for a recreation emphasis.

Comment Number: 000525_RutledgeT_20161101_MountainTripInternational-4
Organization1:Mountain Trip
Commenter1:Todd Rutledge
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Also, please support the Lands with Wilderness Characteristics (LWCs), and Areas of Critical Environmental Concern (ACECs) identified in Alternative B, ensuring that this land does not default to mineral leasing. The landscape itself is a natural resource, and one of the highlights for our guests is to capture wild spaces that are free from the blight of mineral development and its associated infrastructure. The areas of concern also contain numerous archaeological sites and unique plant species

BLM_0165215

Comment Number: 000531_RazianoR_20161028-2
Organization1:
Commenter1:Renata Raziano
Commenter Type: Individual
Comment Excerpt Text:
In addition, I am concerned that the Lands with Wilderness Characteristics designation in Dry Creek includes the Coyote Ridge and Coyote Cutoff trails. These trails are two of the most suitable trails for mountain biking in that Dry Creek area and should not be closed to mechanized use.

Comment Number: 000536_SchottJ_20161031-11
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
Terror Creek and Stevens Gulch area: The RMP must protect all lands with wilderness characteristics, including Terror Creek, one of the "Ecological emphasis areas". The area is home to the Purple Martin that are not found in other areas. It is also home to one of the largest mature aspen stands in the world, providing prime habitat for elk and deer and provides important connectivity between the valley bottom and the roadless lands on the Grand Mesa. Hunting in the area is an important part of our culture and our economy.

Comment Number: 000545_SlivkaJ_20161101-10
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. See, e.g., Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Comment Number: 000545_SlivkaJ_20161101-13
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management. FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is appropriate to achieve BLM's multiple use and sustained yield mandate.

BLM_0165216

Comment Number: 000545_SlivkaJ_20161101-14
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:

- to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;
- to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and
- outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.

Comment Number: 000545_SlivkaJ_20161101-15
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas. In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way: "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or

BLM_0165217

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 276 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

Summary of Comments: BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.

Comment Number: 000545_SlivkaJ_20161101-16
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

iii. Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320. BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

BLM_0165218

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38— 40; excerpt included as Attachment 1. All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment 2.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

(1) High quality LWC meriting the strongest levels of protection This management category should include Camel Back WSA-adjacent, Dry Creek Basin, Roc Creek, Lower Tabeguache and Shavano Creek. Management prescriptions should include: ? VRM I ? Closed to oil and gas leasing ? Closed to renewable energy development ? Closed to new rights-of-way (ROW exclusion) ? Closed to motorized and mechanized use ? Construction of new permanent and temporary roads is prohibited ? Close to mineral material disposal and non-energy solid leasable mineral exploration and development ? Recommend withdrawal from locatable mineral entry ? Closed to commercial timber harvest ? Vegetation treatments must utilize the minimum tool necessary ? Seek opportunities to acquire and incorporate non-federal inholdings ? Retain lands in federal ownership ? Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.

Comment Number: 000545_SlivkaJ_20161101-17
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

These areas are proposed for management to protect their wilderness characteristics in the Draft RMP preferred alternative, with the addition of Lower Tabeguache and Shavano Creek. Our rationale for those additions is as follows:

- The Lower Tabeguache LWC unit is adjacent to the specially managed Tabeguache Area and Shavano Creek, and would therefore create an important protected core area. - The Lower Tabeguache and Shavano Creek units also encompasses the Tabeguache Pueblo and Tabeguache Caves area considered but rejected for ACEC designation to protect cultural resource values. In addition, the stream segment through Lower Tabeguache was found eligible but rejected as suitable under WSR designation. Those values can be effectively protected with enhanced LWC management if not WSR and ACEC. - LWC management would offer better protections to the habitat values and species in the overlapping Ecological Emphasis Area, detailed in Table D-1. BLM recognizes these areas as important wildlife habitat

BLM_0165219

because they are part of a large undisturbed area that connects directly to the USFS land on the Uncompahgre Plateau, and thus is an important migration corridor for species moving between the high and low lands of the Plateau. - Shavano Creek is adjacent to the Windy Gap Colorado Roadless Area, further extending this protected core area into the adjacent forest land. The Draft RMP acknowledges that this adjacent management would enhance the qualities of naturalness and solitude of the areas by extending them over a larger area. Uncompahgre Draft RMP at 4-225.

Comment Number: 000545_SlivkaJ_20161101-18
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We furthermore reiterate our support for the protective management of the Camel Back WSA-adjacent LWC unit. The Potter/Monitor addition to the Camelback WSA has been in the Colorado Wilderness Network's Brown Book of proposed Wilderness Areas for 30 years and is clearly and area considered to have "wilderness characteristics." Indeed, the wild quality of the area has improved rather than degraded since the BLM's original inventory - less dispersed travel, fewer illegal motorized and mechanized uses in closed areas and "administrative use only" areas, less vandalism of signage, regrowth on the mesa tops from vegetative treatments like chaining and roller-chopping, less impact of livestock due to improved range management. The area also provides a unique recreational experience. The sense of isolation and solitude is unparalleled within 50 miles, in spite of nearly 200,000 people living within that radius, and yet access is relatively quick and easy year-round. Because of the close connection between Potter and Monitor Canyons and the Camelback WSA in Roubideau Canyon, the opportunities for unconfined recreation, outstanding solitude, and naturalness is greatly enhanced by having all three canyon and stream segments protected as fully as possible for their wild characteristics.

Comment Number: 000545_SlivkaJ_20161101-19
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
(2) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses This management category should include Adobe Badlands WSA-adjacent and Dolores River Canyon WSA-adjacent. Management prescriptions should include:
? VRM II ? NSO stipulation for fluid minerals without exception, modification, or waiver. [Footnote 4: By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.] ? Closed to renewable energy development ? Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors ? Motorized and mechanized use limited to designated routes ? Construction of new permanent and temporary roads is prohibited ? Close to mineral material disposal and non-energy solid leasable mineral exploration and development ? Recommend withdrawal from locatable mineral entry ? Closed to commercial timber harvest ? Vegetation treatments must not have long-term impacts on wilderness characteristics By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42. ? Seek opportunities to acquire and incorporate non-federal inholdings ? Retain lands in federal ownership

Comment Number: 000545_SlivkaJ_20161101-20
Organization1:The Wilderness Society
Commenter1:Juli Slivka

BLM_0165220

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
These areas are evaluated for management to protect their wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing them in a second category of LWC management in the proposed plan is as follows:
- The Dolores River Canyon WSA-adjacent areas have some impacts, but still meet the criteria for LWC and therefore provide important roadless areas adjacent to the WSA that are valuable for backcountry recreation opportunities and wildlife habitat. Additional impacts to these areas should be minimized. Nyswonger Mesa in particular offers spectacular vistas into the canyon and is readily accessible on long-since closed routes from the Bedrock store. [Footnote 5: We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.]
- LWC management for the Dolores River Canyon WSA-adjacent units would offer better protections to the habitat values and species in the overlapping La Sal Ecological Emphasis Area, detailed in Table D-1. - The Adobe Badlands WSA-adjacent unit provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation:
o Solitude: After hosting multiple hikes into the area over a three year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.
o Unconfined recreation: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.
o Naturalness: Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area.

Comment Number: 000545_SlivkaJ_20161101-21
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
(We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.) BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through LWC management in the final RMP.

BLM_0165221

Comment Number: 000545_SlivkaJ_20161101-22
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should manage the Adobe LWC unit in the Final RMP in order to fulfill the agency's mandate to
protect the Adobe Badlands WSA. A larger area managed for wilderness characteristics adjacent to the
WSA will only help protect and enhance the Wilderness that has already been designated.

Comment Number: 000545_SlivkaJ_20161101-23
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater
Unit. However, the Master Development Plan for the Whitewater Unit that is currently under
evaluation only proposes development in the northern portion of the unit and explicitly states that
"development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram
Whitewater Unit MDP EA at 1.1. Therefore, BLM should not preclude management to protect the
highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the
existing leases. [Footnote 6: According to the unitization agreement, the Whitewater Unit was supposed
to contract, and lands outside the "participating area" (PA) of the unit were supposed to be
automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the
unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the
unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the
presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the
unit will contract to exclude the Adobe LWC prior to the RMP being finalized.]
Summary of Comments: BLM must adopt robust management prescriptions for lands managed to
protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should
consider a variety of management regimes for lands identified as possessing wilderness characteristics to
allow for management of other multiple uses in conjunction with maintaining wilderness characteristics.
BLM should manage specific LWC units in the Uncompahgre Field Office as described above.

Comment Number: 000545_SlivkaJ_20161101-3
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and
that the Draft RMP considers multiple alternatives to protectively manage those lands. We recognize
that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the
updated inventory requirements, as the field office publicly posted inventory information in a timely
fashion when the new policy was released and refined that information in 2015 to better align with BLM
Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision.
However, BLM should make some adjustments in the Proposed RMP to better comply with agency
policy, and the agency's obligations under FLPMA and NEPA that policy is rooted in, and to achieve a
morebalanced land use plan that embodies multiple use and sustained yield.
In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and
the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain
that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based

BLM_0165222

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 281 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.

Comment Number: 000545_SlivkaJ_20161101-7
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dry Creek Basin
Similar to the Camel Back LWC unit, BLM eliminated areas with past vegetation treatments that should actually qualify as LWC, as they now appear largely natural to the average visitor. BLM also eliminates small parcels within the larger unit for lack of outstanding opportunities, contrary to guidance which states: "The area does not have to possess outstanding opportunities…on every acre." BLM Manual 6310 at .06(C)(2)(c). BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

Comment Number: 000545_SlivkaJ_20161101-8
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Shavano Creek
Again, BLM inappropriately cuts out areas due to past vegetation treatments that do not appear unnatural to the average visitor.

Comment Number: 000545_SlivkaJ_20161101-9
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Atkinson Breaks It appears BLM has not inventoried Atkinson Breaks area. BLM should inventory the area north of the Lower Tabeguache/Campbell Creek LWC unit, including the numerous canyons known as the Atkinson Breaks, as well as the steeper slopes abutting USFS lands of the Uncompahgre Plateau. In particular, the BLM lands below Campbell Point and around South Fork Mesa Creek and Blue Basin are likely to meet the criteria for lands with wilderness characteristics.

Comment Number: 000549_DayB_20161101-4
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Comment Excerpt Text:
I can't see why the UFO would not to manage all of the remaining LWCs to protect their wilderness character. If there is a reason to downgrade any areas, they should at least be managed as ACECs or similar management with another name.

BLM_0165223

Comment Number: 000573_PickettM_20161031-1
Organization1:
Commenter1:MJ Pickett
Commenter Type: Individual
Other Sections: 14
Comment Excerpt Text:
The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the road-less lands in the Grand Mesa National Forest.

Comment Number: 000586_WilseyS_20160902-1
Organization1:
Commenter1:Shirley Wilsey
Commenter Type: Individual
Comment Excerpt Text:
The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest.

Comment Number: 000587_WolcottS_20161031-18
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest. The final plan must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest.

Comment Number: 500097_Rudowsky_20161101-1
Organization1:
Commenter1:Greg Rudowsky
Commenter Type: Individual
Comment Excerpt Text:
We hiked Dry Creek Basin on 7/23/2016 and enjoyed no only the hike but the solitude and beauty of the area. Enjoyed seeing petroglyphs as well. Please protect as a lands with wilderness characteristics.

Comment Number: 500099_GoldmanA_20161101-1
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165224

I have hike in the Dry Creek Basin for the pas 25 years mainly in the spring, fall and early winter. Also have brought horses down there 10 times or more. Rarely have I encountered others when hiking.

2) This area is less than 5 miles from my home on Spring Creek and is quickly and easily accessible including short trips at sunset. The cliffs along dry creek with their unusual mud flows are a spectacular setting to enjoy a quick hike in a desert like canyon. The canyon rivals favorably some of the red rocks country in Utah.

3) The area provides a natural unspoiled feeling to the hiker. The riparian area with its lack of developed trails enables a sense of solitude in spite of the presence of a singletrack motorized trail parallel to the creek. The mud flows cascading off the cliff face, petroglyphs, numerous varieties of native cacti, Narrow Leaf Cottonwood, Wild Rose and diverse plant species including Bahia and native orases are all waiting to be discovered by the observant hiker. It is a wild enough area that protecting it as a LWC should not be that difficult since motorized accessibility is limited the primitive nature of this section of Dry Creek acts as a wildlife corridor between upper elevations of the plateau

Comment Number: 500100_TerryN_20161101-1
Organization1:
Commenter1:Naolani Terry
Commenter Type: Individual
Comment Excerpt Text:
I have hiked in this area many times. Today I became more intimately acquainted with "Dry" Creek full of water. This area should be protected – it is not even easily accessible to motorized traffic and should not become so. This riparian area is filled with several varieties of native species and equally free from invasive plants that are rife where I live only about 8 miles away. It certainly offers opportunities for solitude, wandering alone or in small groups when the creek is running, other sounds such as motorized traffic are not obvious but when the creek is dry, hikers and horseback riders might be impacted by disturbing noise. There are petroglyphs and swallow nests in this area, and I'm sure so many other varieties of wildlife. Please preserve this one of 4 areas meeting wilderness criteria in the UFO management area.

Comment Number: 500101_BaldwinS_20161101-1
Organization1:
Commenter1:Susan Sky Baldwin
Commenter Type: Individual
Comment Excerpt Text:
I have ridden my horse in this area and hike up the east side of Dry Creek 3 times this spring and am amazed how much I appreciate this area and do agree that are special wilderness characteristics. That because of the following characteristics I will continue to recreate in this area. I noticed solitude along the creek riparian areas, cliff swallows, + canyon wrens were abundant. I did not encounter other users on my trips into the basin. I noticed the area was completely devoid of invasive weed species! Rare indeed. It was obvious that the area provides a sanctuary for animals. I did encounter motorized single track that bisects this area. I did not see or hear any motorcycles but it was an excellent trail for horses and hikers. I would hope that this trail remains unmaintained if it must be motorized. There was a lovely petroglyph panel on the cliff along the east side of the stream was and extra bonus. I am strongly in support of the area being classified as a LWC. If possible the single track trail that bisects this area would best serve this area by being unmaintained

Comment Number: 500102_HaefnerJ_20161101-1
Organization1:
Commenter1:Jane Haefner
Commenter Type: Individual

BLM_0165225

Comment Excerpt Text:
On 07 June 2014 my hike in the Dry Creek Basin Land area the solitude, naturalness and primitive unconfined recreation this area has to offer is phenomenal. The riparian community is, in what appears to be, intact without invasive plant species. The availability of the creek at the time of year allows for sounds of water to penetrate the canyon instead of vehicular traffic.
Also found more what appeared to be authentic petroglyphs on the canyon wall along with unique formations on the cliff walls.
Since the BLM wilderness inventory findings meet all wilderness criteria, the Dry Creek Basin Lands has much to offer for all.

Comment Number: 500103_RandallT_20161101-1
Organization1:
Commenter1:Terry Randall
Commenter Type: Individual
Comment Excerpt Text:
I hike and horseback ride in this area in spring and early winter. It is close to home. It is open when snow closes the high country. There are places in the creek area where I can hear the creek, see some petroglyphs. It is a place I can hike without getting lost.
I feel this area definitely has wilderness characteristics due to solitude. There are generally only 1-2 cars at the trailhead but I rarely see anyone. I was amazed to find petroglyphs in this area. It also seems to be an important corridor for the Uncompahgre Plateau wildlife into the lower stream areas.
I use this area frequently as a place where my dog can be off leash without people all around that I have to worry about.

Comment Number: 500104_SchwartzJ_20161101-1
Organization1:
Commenter1:Jim Schwartz
Commenter Type: Individual
Comment Excerpt Text:
I thoroughly enjoyed my hike into Dry Creek Basin. Its primitive nature allowed for a special time in this wonderful riparian environment. The petroglyphs, cliff walls with swallow nests and cottonwoods along with spring flowers (cactus still blooming) all added to the experience. I didn't realize this gem was so close to Montrose and already want to go back. I found out there is an unmaintained motor route thru the area – it's limited we didn't conflict with my experience though I wouldn't want to see it turned into a major motor route. And I highly recommend to others to see it on foot or horseback as there is an intimacy here with nature that is best seen that way.

Comment Number: 500105_HeuscherE_20161101-1
Organization1:
Commenter1:Enno Heuscher
Commenter Type: Individual
Comment Excerpt Text:
I love the wilderness characteristics of the dry creek area+ support non-maintenance of the trails in this area, as it provides solitude, peace, wildlife seen and enjoyed, and the riparian area is natural. Heard no human motorized noise, no invasive plants seen, which is rare. Also no trash, no grazing effects, probably due to the rougher terrain.
Please consider mapping this as you already have done to keep it as a wilderness character area, and also do at least provide directions to the area so more people can appreciate this area.

BLM_0165226

Comment Number: 500118_DayB_20161101-1
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Comment Excerpt Text:
Monitor, Potter, Roubideau Creeks I support the LWC designation for the creek bottoms. All the canyons have very good natural veg + wildlife habitat.

Comment Number: 500120_RandallT_20161101-1
Organization1:
Commenter1:Terry Randall
Commenter Type: Individual
Other Sections: 9.1
Comment Excerpt Text:
have hiked and ridden horseback several times into the Robideau-Potter Creek area, including the tops of the Winter and Monitor mesas. In the spring there are wildflowers I don't get to see in the mountain areas. In the fall this area is close enough to home to see fall colors when I don't have to drive far.
I would like to see this area designated as LWC for the creek beds but also the Mesas as ACEC to protect and buffer the creek areas. This buffer would prevent civilization from destroying the wilderness experience and driving off wildlife. At lease part of the Monitor Mesa should be preserved to provide a wildlife corridor without inroads of vegetation control and fencing by grazing cows and sheep owners.

Comment Number: 500122_HaefnerJ_20161101-1
Organization1:
Commenter1:Jane Haefner
Commenter Type: Individual
Other Sections: 9.1
Comment Excerpt Text:
We are surrounded by such unique landscape that can only and truly appreciated by foot. I realize land may be used for multi purpose reasons, but the Camelback WSA addition is a prime pristine area from the creeks up to the mesa rims. Wildlife, plants, birds, solitude and lack of civilization is an experience that should remain available to all.
We would like to see this area managed for its wilderness characteristics and support and LWC and ACEC designation.

Comment Number: 500125_SchwartzJ_20161101-1
Organization1:
Commenter1:Jim Schwartz
Commenter Type: Individual
Comment Excerpt Text:
After hiking in Potter and Monitor canyons for the first time – what an incredible place. I can see the addition of it as Lands With Wilderness characteristics as something worthy. If felt primitive and remote yet accessible from nearby towns. The riparian areas provide important habitat plus adding this will provide connectivity to the existing Camelback WSA. Some proposals for further protection could further ensure this great place stays special.

Comment Number: 500185_WilliamsS_20161027-1
Organization1:
Commenter1:Sheelagh Williams
Commenter Type: Individual

BLM_0165227

Comment Excerpt Text:
The RMP identifies seven areas as Lands with Wilderness Characteristics, totaling 42,150 acres. However, only three areas totaling 18,320 acres are included in the Preferred Alternative. This is inadequate.

The Roc Creek Area meets ALL the requirements of Wilderness Characteristics. It is of sufficient size. It meets the criteria for naturalness, outstanding solitude, outstanding primitive and unconfined recreation and has supplemental values. How can an area which includes OUTSTANDING characteristics be excluded? Perhaps it was considered in isolation. However, it is directly adjacent to the USFS's 9500 acre Roc Creek Roadless Area which is directly adjacent to the Sewemup Mesa Wilderness Study Area. It is vital to protect large areas so as to avoid the "island" impact where edges of areas are degraded.

The Dry Creek Basin Lands Area also meets ALL the requirements of Wilderness Characteristics. Public access to perennial creeks in the desert areas is rare and wonderful!

Yet another area which meets ALL the requirements of Wilderness Characteristics is the Camel Back WSA. This area includes Monitor Creek which contains areas of Fremont cottonwood/skunkbush sumac riparian woodland which is classified as globally imperiled by the Colorado Natural Heritage Program and an A ranked area of common coyote willow riparian shrubland. This area is significant in that it provides improved connectivity across lower elevation scrub lands.

The final area which clearly merits inclusion is the 6180 acre parcel north of the Adobe Badlands. Next to the current Wilderness Study Area is an Area of Critical Environmental Concern which IS included but drastically reduced in size and does not include the surrounding salt brush ecosystem. This ecosystem is critical as it includes the Federally threatened Colorado Hookless Cactus (Schlerocactus glaucus) and the Federally endangered Clay-loving wild buckwheat (Eriognum pelinophilum) found only in Montrose and Delta counties. It also includes Ferruginous Hawks, Burrowing Owls, White-tailed Prairie Dogs, pronghorns and possibly kit foxes. Further, the biological soil crusts and lichens are so sensitive to disturbance.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-16
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
19a. The Organizations are vigorously opposed to Wilderness type designations as these significantly impair forest health.

As previously noted the Organizations have significant concerns regarding the lack of NEPA analysis of many issues surrounding management changes proposed for ACEC areas and these concerns would extend to areas proposed to be Wilderness characteristics areas as well. The Organizations are also aware of a significant amount of research that is clearly best available science on Wilderness issues that weighs heavily against designation of additional areas as WCA as the restrictive management impacts a variety of resources. The Organizations can simply find no reference to any of these works on the DRMP but believe them to be highly relevant management issues to be reviewed if designations are expanded.

The scope of these threats and of the impact to public access is outlined in the Forest Service Report, prepared at the request of Senator Udall and discussed in other sections of these comments. A copy of the Udall report is submitted in conjunction with these comments. The Organizations would note that many of the Forest health issues raised in the report mirror factors to be balanced in WCA management in BLM guidance. Management of forest health and fires are issues that are specifically addressed in the new BLM WSA manual as follows:

BLM_0165228

"2. Fire a. General. This section of the manual cannot be used without incorporating standard agency fire management policies and techniques found in other BLM documents, such as the Guidance for Implementation of Federal Wildland Fire Management Policy, but not repeated here.

i. Managing fire. The overall goal of managing fire in WSAs is to allow the frequency and intensity of the natural fire regime to play its inherent role in the ecosystem. This means both allowing fire where ecosystems evolved in the presence of fire, and preventing unnatural spread of fire in ecosystems that evolved without broad-scale fires.

ii. Biological constraints. The overall goal may be affected by past human actions. These may include fire suppression leading to fuel buildup creating the possibility of unnaturally severe fires, or the invasion of non-native annual grasses leading to the unnatural spread of fire in ecosystems that evolved without broad-scale fires.

iii. Management constraints. The overall goal may be affected by budgets, national fire management demands, suppression of fire on adjacent land before it moves into the WSA, or undesired consequences of wildfire moving out of the WSA (such as wildfires that may pose a danger to human life and/or property)."67

67 See, BLM manual 6330 at pg 1-13.

The Organizations vigorously assert that these factors weigh heavily against the expansion of any WCA areas in management. Colorado needs to learn from the negative forest health impacts that have resulted from existing Wilderness areas and not allow additionally management restrictions to be brought into place that can limit land manager responses in the future.

Comment Number: FormLetterAv2_PewCharitableTrusts-1
Organization1:The Pew Charitable Trusts
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14 42.1
Comment Excerpt Text:
The Draft RMP has made a great first step in identifying and proposing to protect some of our most sensitive and unique areas, however thousands of acres are still being left without the protections they deserve.

I feel that the Draft Resource Management Plan (RMP) for the Uncompahgre Field Office should be strengthened to better safeguard lands with wilderness character as well as critical habitat for wildlife. Specifically, I urge the BLM to:

•Include more lands with wilderness characteristics in the final RMP, particularly the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit.

•Include all of the identified areas of critical environmental concern and restore them to their originally identified acreage in the Final RMP.

•Include all 242,500 acres of ecological emphasis areas and restore them to their full acreage in the final RMP.

I urge you to maximize conservation for lands with wilderness character as well as critical habitat in the Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and rugged landscapes we know and love in western Colorado.

Comment Number: FormLetterK_TWS-1
Organization1:The Wilderness Society
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for

BLM_0165229

elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.

Comment Number: FormLetterL_CHC WSCC-11
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Wildlife
Adobe Badlands -
The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest.
Stevens Gulch - The final plan must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.
Comment Number: 000260_HunterL_20161028-2
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Other Sections: 14.1
Comment Excerpt Text:
Wild and scenic rivers should be protected. The final RMP must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.

Comment Number: 000545_SlivkaJ_20161101-6
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dolores River Canyon WSA Adjacent
Similar to BLM's inventory of the Adobe Badlands LWC unit, the portions of the Dolores River LWC unit that are contiguous with the WSA should inherit the outstanding opportunities for solitude or primitive and unconfined recreation already found to exist in the Dolores River Canyon WSA.

Comment Number: 500107_PriceJ_20161101-1
Organization1:
Commenter1:David Price
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165230

Potter and Monitor Hiked canyon bottoms 7/17/16, a Sunday morning/afternoon. Fortunate to find solitude w/in easy access of Delta. Quiet areas, mostly free from the sounds and sights of civilization becoming increasingly rare.

I was also impressed with the diversity of the riparian area from understory shrubs to canopy of narrow-leaf cottonwood, juniper, oak, ponderosa pine and pinyon pine. Quality riparian habitat, especially on the Colorado Plateau are important for wildlife and birds. Even at midday in the extreme heat of summer, I was able to identify 18 bird species in a couple of hours.

I support BLM policies that emphasize protection of non-extractive uses and protection of resources habitat diversity, water quality, archeological places, wildlife, views and soundscape.

Comment Number: 500109_HeuscherE_20161101-1
Organization1:
Commenter1:Enno Heuscher
Commenter Type: Individual
Comment Excerpt Text:
Potter and Monitor Canyons Hike in August 2016, loved the riparian isolation and varied vegetation (small-leaf cottonwood, oakbrush, ponderosa pine, blue gamma grass, other grasses. Nobody had hike this area for 2-3 weeks based on no fresh tracks, suggesting good for WSA or wilderness designation. No evidence of coal seams or historic mining activity. No power lines or pipelines in this area, and no evidence of motor vehicle use, even by the ranchers. Numerous transient floods have kept the "wilderness" in this area, and would prevent any potential development for housing etc. Also passed some dinosaur tracks in the Potter canyon area.

Comment Number: 500110_TrowbridgeD_20161101-1
Organization1:
Commenter1:Debora Trowbridge
Commenter Type: Individual
Comment Excerpt Text:
Potter/Monitor Canyon July 17, 2016 Hiking trip. I love the fact that it is so close to Delta. I am newer to the area and have been looking for places close by. It has lots of options with trails following the rivers and up on the mesas. I've been excited to see a variety of birds, such as kestrels, and trees – small leaf cotton. The rock formations are very interesting, too, with the sighting of dinosaur prints, who would have thought that they existed so close to Delta?!

This area is great. It's quiet, peaceful, and the breeze is great. It's interesting to see how high the water levels have got in the rivers. I've found several large rocks that have obviously been water/weather worn. It would be wonderful to protect and preserve this area for more folks to enjoy. It's nice to have a place close to home without roads, power poles, and other signs of civilization. Great place to spend the day.

Comment Number: 500111_MebarryJ_20161101-1
Organization1:
Commenter1:Jane McGarry
Commenter Type: Individual
Comment Excerpt Text:
Camelback Addition – Monitor, Potter & Roubideau
I enjoy mtn. biking and hiking in this area. It is quiet and peaceful – I never see other recreationists once I leave the parking lot. Bird watching is ver good, both canyon birds and riparian birds along two creeks. Lush stands of narrow-leaf cottonwood and skunkbush. Good birds on the mesa tops also – and pronghorn. These mesa-top environments should be protected in their own right as wildlife corridors. In the canyon bottoms the riparian zones are healthy and beautiful. A few remnant Ponderosa pines in the bottom are unique.

BLM_0165321

All in all this area deserves wildness- level protection, especially as it is contiguous with the Camelback WSA.

Comment Number: 500113_OlivierH_20161101-1
Organization1:
Commenter1:Helen Olivier
Commenter Type: Individual
Comment Excerpt Text:
Camelback Addition Winter and spring great hiking and backpacking – wonderful riparian walk along the creeks with wide variety of plants and trees – freemont cottonwood, skunkbrush. One sees plenty of habitat connectivity places for the animals to get down to permanent streams and the riparian areas around them. There are plenty of opportunities to explore off the main trail to experience wildlife evidence, photos, old trails and their history. Going out with WCC in spring 2014 let me know a lot more about the area. Lots of interesting geology.
I would like to see the Camelback addition coming into existence with the canyon walls included up to the top and hopefully some resource protection on the mesas.
All in all it is a beautiful area deserving long term protection. Setting ½ way up a mesa writing this with no roads in sight or other people sums this up.

Comment Number: 500114_MeadeD_20161101-1
Organization1:
Commenter1:David Meade
Commenter Type: Individual
Comment Excerpt Text:
Camelback Addition I am fortunate to have visited this area.
The scenery, plant diversity, and historic significance I believe warrants this area be protected.
One gets the impression that they are in a secluded wilderness, when in fact they area only a few mile from densely populated areas.

Comment Number: 500114_MeadeD_20161101-2
Organization1:
Commenter1:David Meade
Commenter Type: Individual
Comment Excerpt Text:
I would like to see the top of Monitor Mesa fully protected and managed well.

*Summary*
A. Multiple commenters suggested that the BLM manage for wilderness characteristics on all lands found to contain wilderness characteristics in the inventory, as this would support the BLM's multiple-use and sustained-yield mandate. Specifically, commenters requested that the following areas be managed for wilderness characteristics:

1. Lower Tabeguache: this area is home to high-quality, undisturbed habitat and unroaded backcountry, and protective designations should be combined to manage this area
2. Atkinson Breaks: It appears that the BLM has not inventoried the Atkinson Breaks area. The BLM should inventory the area north of the Lower Tabeguache/Campbell Creek lands with wilderness characteristics unit, including the numerous canyons known as the Atkinson Breaks, as well as the steeper slopes abutting National Forest System lands of the Uncompahgre Plateau. In particular, the BLM lands below Campbell Point and

BLM_0165232

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 291 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

around South Fork Mesa Creek and Blue Basin are likely to meet lands with wilderness characteristics criteria.

3. Shavano Creek: this area provides high-quality forage, roadless areas, primitive values, and untrammeled qualities

4. Camel Back and lands adjacent to Camel Back WSA: this area should be designated to protect resources in the Camel Back WSA and for high-quality recreational opportunities

5. Dry Creek: areas of past vegetation treatment have been restored, and there are solitude opportunities

6. Roc Creek: this area is an Upper Tier Colorado Roadless Area and provides opportunities for primitive and unconfined recreation

7. Adobe Badlands: this would help protect the Adobe Badlands WSA and solitude, naturalness, vastness, and recreational opportunities

8. Terror Creek: this area provides habitat connectivity

9. Norwood Canyon: this area provides river recreation opportunities, along with opportunities for solitude and quiet use

10. Potter-Monitor-Roubideaux: protective designations should be combined for the management of this area and its unique recreational experience

11. Stevens Gulch: This area provides habitat to unique wildlife and vegetation

12. Manage the top of Monitor Mesa for wilderness characteristics

In contrast, another commenter stated that the BLM's management of lands with wilderness characteristics violates FLMPA's multiple-use directive and that management of lands with wilderness characteristics outside of WSAs or Wilderness Areas should be deleted from the Proposed RMP.

B. Commenters also requested that the BLM consider the following specific comments related to proposed management:

1. Avoid relying on adjacent lands to determine appropriate management; lands adjacent to the Camel Back WSA, Roc Creek, and Dry Creek do not possess qualities to be managed as lands with wilderness characteristics, as described in BLM's 1991 analysis, *Lands Managed to Protect Wilderness Characteristics.*

2. Consider impacts on recreation due to managing for wilderness characteristics; for example, managing Dry Creek (specifically the popular Coyote Ridge and Coyote Cutoff trails) for wilderness characteristics would limit mountain biking opportunities and trails and should not be managed as such.

3. Consider layering management to maximize protections of wilderness characteristics. Utilize alternative designations (e.g., ACECs) for lands not managed for wilderness characteristics.

4. Consider use of two categories for managing lands with wilderness characteristics: high-quality lands with wilderness characteristics, and additional areas managed to protect wilderness characteristics while providing multiple uses.

5. Apply appropriately strong protections on lands managed for wilderness characteristics to protect these characteristics (e.g., closed to leasing or NSO with no exceptions, waivers, or modifications). Commenters provided specific protections to be included.

BLM_0165233

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 292 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

a. Recommend withdrawal from mineral entry;
b. Close to leasing or allow leasing only with no surface occupancy with no exceptions, waivers, or modifications;
c. Closed to mineral material disposal and nonenergy solid leasable mineral exploration and development
d. Closed to commercial timber harvest
e. Designate as right-of-way exclusion areas or right-of-way exclusion outside of designated utility corridors
f. Vegetation treatments must utilize the minimum tool necessary or vegetation treatments must not have long-term impacts on wilderness characteristics
g. Designate as closed to motorized and mechanized vehicle use, as limited to motorized and mechanized vehicle use on designated routes, or as limited to mechanized use on designated routes;
h. Construction of new permanent and temporary roads is prohibited
i. Designate as Visual Resource Management Class I or II;
j. Restrict construction of new structures and facilities unrelated to the preservation or enhancement of wilderness characteristics or necessary for the management of uses allowed under the land use plan; and/or
k. Retain public lands in federal ownership
l. Seek opportunities to acquire and incorporate non-federal inholdings
m. Close area to military training activities, including landings associated with High Altitude Mountain Environment Training
n. Closed to renewable energy development

*Response*

A. The BLM appreciates the comments.

1-11. Consistent with 43 US Code, Section 1782; Utah 535 F.3d at 1186-87; and after passage of FLPMA in 1976, all BLM-administered lands in the US were required to be inventoried by the BLM to assess their suitability for wilderness preservation. Additionally, the BLM Land Use Planning Handbook (H-1601-1) directs the BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation)" and to "include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics."

While conducting the inventory, the BLM considered all BLM-administered lands within the Uncompahgre RMP planning area (i.e., the decision area). Atkinson Breaks, Terror Creek, Stevens Gulch, and Norwood Canyon were found not to meet the wilderness characteristics criteria for size and were dropped from further consideration.

The areas that were found to have wilderness characteristics are presented in Draft RMP/EIS Appendix F and include Lower Tabeguache Creek/Campbell Creek, Shavano Creek, Camel Back WSA Adjacent, Dry Creek Basin, Roc Creek, Adobe Badlands WSA Adjacent, and Dolores River Canyon WSA Adjacent. These areas are all considered in

BLM_0165234

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 293 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

Draft RMP/EIS Alterative B in Table 2-2 starting on page 2-148. As a result, consideration of these areas is within the range of alternatives.

Potter Canyon was inventoried as part of the Camel Back WSA and Camel Back WSA Adjacent. Therefore, the Draft RMP/EIS range of alternatives considers Potter Canyon; the Camel Back WSA is included in all Draft RMP/EIS alternatives, as well as the Camel Back WSA Adjacent, which is included in Draft RMP/EIS Alternatives B and D. Refer to Section 20 – Lands with Wilderness Characteristics, Section 20.2 – Best available information—baseline data, response part A.3, below, regarding Monitor Mesa.

BLM Manual Section 6310, Conducting Wilderness Characteristics Inventory on BLM Lands, establishes BLM policy. It states, "Section 201 of FLPMA requires the BLM to maintain on a continuing basis an inventory of all public lands and their resources and other values, which includes wilderness characteristics. It also provides that the preparation and maintenance of the inventory shall not, of itself, change or prevent change of the management or use of public lands. Regardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands. In some circumstances conditions relating to wilderness characteristics may have changed over time, and an area that was once determined to lack wilderness characteristics may now possess them." The fact that BLM found that certain lands did not possess wilderness characteristics in 1991 does not mean that those lands can never possess wilderness characteristics. In the time that has passed since 1991, management actions and natural processes have led some lands to become roadless and natural-appearing to the point that today they do possess wilderness characteristics. In Adobe Badlands WSA Adjacent and Camel Back WSA Adjacent units, roads existed in 1991 that separated those units from their respective WSAs. Today, they no longer meet the definition of "roads" for the purposes of wilderness characteristics inventory (MS-1610, page 11). Therefore, today those units are adjacent to their respective WSAs. By definition they now meet the size criteria, and they share the same outstanding opportunities for solitude and primitive and unconfined recreation as their respective WSAs. The current wilderness characteristics inventory determined that they meet the "naturalness" criteria as well.

The BLM Land Use Planning Handbook (H-1601-1) directs the BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation)" and to "include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." In addition, the BLM policy concerning considerations of lands with wilderness characteristics in a Draft RMP/EIS is outlined in BLM Manual 6320, Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process. BLM Manual 6320 directs the BLM to: "…examine options for managing [lands with wilderness characteristics] and determine the most appropriate land use allocations for them. Considering wilderness characteristics in the land use planning process may result in several outcomes, including, but not limited to: (1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; (2) emphasizing other multiple uses while applying management restrictions (conditions of use, mitigation

BLM_0165235

measures) to reduce impacts to wilderness characteristics; (3) the protection of wilderness characteristics as a priority over other multiple uses" (BLM Manual 6320.06(A)).

Lands containing wilderness characteristics were determined based on an extensive inventory process, as detailed in the Draft RMP/EIS Section 3.1.13, and the *Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update* report (Draft RMP/EIS Appendix F). Also refer to response in Section 6.1 – FLMPA – Inventories of this report. While 5,000 acres or more of roadless lands is generally the minimum size criterion for wilderness characteristics, lands less than 5,000 acres may be considered if they are contiguous to lands formally protected for wilderness values, such as designated wilderness or wilderness study areas (Draft RMP/EIS page 3-108).

As presented in Table 2-1 (page 2-9), the BLM considered a range of alternatives for managing lands with wilderness characteristics in the Draft RMP/EIS. In the analysis, the BLM considered the trade-offs of managing lands with wilderness characteristics to maintain those characteristics versus the resource use potential of the lands. Management varies by alternative and includes varying acres managed for wilderness characteristics, variation in the permitted activities on these lands, and use of alternative designations for lands by alternative. Characterizations, consideration, and rationale related to each area analyzed for lands with wilderness characteristics are provided in Appendix F of the Draft RMP/EIS.

The BLM conducted an inventory of lands with wilderness characteristics based on BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands. Findings of the inventory are documented in Draft RMP/EIS Appendix F.

Since publication of the Draft RMP/EIS, revised policy guidance was issued by the US Department of the Interior regarding the inventory of lands with wilderness characteristics. The revised policy implements a tiered approach to these lands and allows for:

(1) Emphasizing other multiple uses as a priority over protecting wilderness characteristics;

(2) Emphasizing other multiple uses while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics;

(3) The protection of wilderness characteristics as a priority over other multiple uses (BLM Manual 6320.06(A)).

Using the revised policy as guidance, the Proposed RMP brings forward managing three inventoried units as applying management restrictions to reduce impacts on wilderness characteristics, while managing for other uses, and three units for the minimization of impacts on wilderness characteristics, while managing for other uses.

12. Refer to Section 20 – Lands with Wilderness Characteristics, Section 20.2 – best available information—baseline data, response part A.3, below, regarding Monitor Mesa.

B. The BLM appreciates the comments. The BLM reviewed the suggested edits to the areas managed for wilderness characteristics and proposed management and edited the Proposed RMP/Final EIS, as appropriate.

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 295 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

1. Per BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands, an area meets the size requirement for potentially having lands with wilderness characteristics if it is "contiguous with lands which have been formally determined to have wilderness or potential wilderness values, or any federal lands managed for wilderness characteristics." This includes WSAs, regardless of their recommendation to Congress as suitable or unsuitable for wilderness designation. The BLM determined that three areas contiguous with WSAs contain wilderness characteristics and have described an array of management actions for the areas. Descriptions for these areas are contained in Draft RMP/EIS Appendix F.

2. Impacts on recreational opportunities from managing for lands with wilderness characteristics is discussed on Draft RMP/EIS pages 4-300, 4-302, 4-307, and 4-316. Furthermore, on Draft RMP/EIS pages 4-224 to 4-225, the Draft RMP/EIS notes that routes present during the inventory process were considered. As such, motorized and mechanized travel on existing routes would be limited to designated routes in lands with wilderness characteristic, including those existing routes in the Dry Creek Basin Unit. Lands managed for wilderness characteristics and formally designated Wilderness have very different management standards. While motorized and mechanized use is prohibited in designated Wilderness, it is not necessarily incompatible within lands managed for the protection of wilderness characteristics. For example, the inventory process for Dry Creek Basin determined that the unit possess wilderness characteristics, even though there are a few motorized and mechanized trails within the unit. Those characteristics can be maintained, while continuing to allow some motorized and mechanized travel within the unit.

3. While layering of management areas is permitted, for an area to be considered as an ACEC, it must meet one or more relevance criteria and one or more importance criteria described in 43 CFR 1610.7-2. The range of alternatives does include analysis of lands with wilderness characteristics that overlap SRMAs, ERMAs, ACECs, and river segments determined to be suitable for inclusion in the NWSRS. The BLM may select any combination of these in the Proposed RMP.

4. The BLM appreciates the suggestion. However, BLM planning guidance for conducting an inventory allows for: "(1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; (2) emphasizing other multiple uses while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics; (3) the protection of wilderness characteristics as a priority over other multiple uses" (BLM Manual 6320.06(A)). The BLM has the authority to choose a range of management options, and not every option needs to be presented in the RMP, only considered. Alternatives were developed considering the BLM's ability to effectively manage areas to protect their wilderness characteristics (BLM Manual 6320, pp 3-4).

5. Potential management measures presented in the range of alternatives in Draft RMP/EIS Table 2-2, page 2-148 include measures that would protect the wilderness characteristics of those areas. Suggested measures not already analyzed were considered in the Proposed RMP/Final EIS.

### Section 20.2 – Lands with Wilderness Characteristics: Best available information— baseline data

Total Number of Submissions: 8
Total Number of Comments: 12

Comment Number: 000230_HarrisB_20161019-1
Organization1:
Commenter1:Bill Harris
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
One concern I do have in regards to the Dry Creek Lands with Wilderness Characteristics is the inclusion of land that has the Coyote Cutoff and Coyote Ridge trails. Both trails are motorized, so are they recommended for closure, or is there some sort of mistake on the map.

Comment Number: 000489_JohnsonA_20161101-53
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Adobe Badlands WSA Adjacent BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while partner assessments, submitted in their comments on this draft RMP show the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the power lines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation. However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g., WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore, they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

Comment Number: 000489_JohnsonA_20161101-54
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Camel Back WSA Adjacent BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer.

BLM_0165238

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole. Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation.

Comment Number: 000545_SlivkaJ_20161101-5
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Camel Back WSA Adjacent
BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer. (Emphasis added).
However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.
Image 4634 (above) shows the main route traversing Monitor Mesa from the southwest to the northeast. This route is clearly constructed and maintained. However, because this route is bordered on both sides by large vegetation including juniper trees exceeding 10 feet in height as well as dense stands of mature sagebrush, this route has little impact on the naturalness of the mesa top as a whole. Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation. A visit to the area clearly shows that the areas of former vegetative treatments are largely recovered, as seen in the following photos, all of which were taken amidst the vegetative treatment areas cited in BLM's report. These photos are representative of the entirety of Monitor Mesa as of May 2014:
The photo below looks generally west and southwest along BLM's proposed boundary for this unit. To the left of the photo is an area BLM found to be natural in appearance, to the right is an area removed from the unit because of "substantial evidence of human modification" that would be "obvious" to the average visitor:
BLM Manual 6310 is clear that "apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems". The above photos show, and any visit to the area would confirm, that Monitor Mesa "looks natural to the average visitor". BLM must revise its inventory of the Camel Back WSA Addition unit to incorporate the areas of removed because of former vegetative treatments, such as Upper Long Gulch, which BLM removed from the unit and which is shown below:

BLM_0165239

Comment Number: 000489_JohnsonA_20161101-56
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6.1
Comment Excerpt Text:
3. Management
i. An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.
Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." See 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."
The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." Ore. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d at 1119. Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143. Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.
Summary of Comments: In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.

Comment Number: 000545_SlivkaJ_20161101-12
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.

Comment Number: 000438_GoldmanA_20161031-3
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual

BLM_0165240

Comment Excerpt Text:
With regard to the proposed Camel Back WSA adjacent LWC, I urge the BLM to restore the 1750 acres removed from the top of Monitor Mesa. The small portion of the mesa top that has constructed and maintained routes can be cherry stemmed out of the LWC. Having hiked in the area, it retains its "natural" feeling having recovered from past vegetative treatments and represents an ecologically important addition to the proposed LWC between the canyon rims below. The eliminated acreage possesses the required opportunity for primitive and unconfined recreation, the feeling of solitude and retains its natural appearance to both myself as well as the "casual observer".

Comment Number: 000545_SlivkaJ_20161101-4
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Adobe Badlands WSA Adjacent BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while our assessment shows the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the powerlines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation.
However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g., WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.

Comment Number: 500107_PriceJ_20161101-1
Organization1:
Commenter1: David Price
Commenter Type: Individual
Comment Excerpt Text:
Potter and Monitor Hiked canyon bottoms 7/17/16, a Sunday morning/afternoon. Fortunate to find solitude w/in easy access of Delta. Quiet areas, mostly free from the sounds and sights of civilization becoming increasingly rare.
I was also impressed with the diversity of the riparian area from understory shrubs to canopy of narrow-leaf cottonwood, juniper, oak, ponderosa pine and pinyon pine. Quality riparian habitat, especially on the Colorado Plateau are important for wildlife and birds. Even at midday in the extreme heat of summer, I was able to identify 18 bird species in a couple of hours.
I support BLM policies that emphasize protection of non-extractive uses and protection of resources habitat diversity, water quality, archeological places, wildlife, views and soundscape.

BLM_0165241

Comment Number: 500109_HeuscherE_20161101-1
Organization1:
Commenter1:Enno Heuscher
Commenter Type: Individual
Comment Excerpt Text:
Potter and Monitor Canyons Hike in August 2016, loved the riparian isolation and varied vegetation (small-leaf cottonwood, oakbrush, ponderosa pine, blue gamma grass, other grasses. Nobody had hike this area for 2-3 weeks based on no fresh tracks, suggesting good for WSA or wilderness designation. No evidence of coal seams or historic mining activity. No power lines or pipelines in this area, and no evidence of motor vehicle use, even by the ranchers. Numerous transient floods have kept the "wilderness" in this area, and would prevent any potential development for housing etc. Also passed some dinosaur tracks in the Potter canyon area.

Comment Number: 500110_TrowbridgeD_20161101-1
Organization1:
Commenter1:Debora Trowbridge
Commenter Type: Individual
Comment Excerpt Text:
Potter/Monitor Canyon July 17, 2016 Hiking trip. I love the fact that it is so close to Delta. I am newer to the area and have been looking for places close by. It has lots of options with trails following the rivers and up on the mesas. I've been excited to see a variety of birds, such as kestrels, and trees – small leaf cotton. The rock formations are very interesting, too, with the sighting of dinosaur prints, who would have thought that they existed so close to Delta?!
This area is great. It's quiet, peaceful, and the breeze is great. It's interesting to see how high the water levels have got in the rivers. I've found several large rocks that have obviously been water/weather worn. It would be wonderful to protect and preserve this area for more folks to enjoy. It's nice to have a place close to home without roads, power poles, and other signs of civilization. Great place to spend the day.

Comment Number: 500126_GoldmanA_20161101-1
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
Have visited the confluence of Poltes and Monitor Canyons in the spring of 2014. Hiking in the area approximately 4 miles in. It is easily accessible to the trailhead via 4wd. It is a beautiful unspoiled Canyon/Mesa system with incredible rock formations and canyon vistas from the mesa top. When hiking with our party we saw no other individuals so the opportunity for solitude is likely there. This area shows little evidence of human disturbance except for the impact of cattle grazing (trail erosion, fencing). There was no sound of airplanes or offroad vehicles. Lots of wildflowers were in bloom at the time of our visit. Hiking to the top of monitor mesa provided opportunity for a more primitive trail, bushwhacking experience. It is one of the nicest riparian woodland areas I have hiked in this part of Colorado, and it is accessible enough that an older person like myself can experience its remoteness without much difficulty. I would like to see the WSA managed as a LWC or at least an ACEC from the top of Monitor Mesa as this represents a larger and natural contiguous land boundary and is contiguous with Camelback WSA. The areas connectivity to both the Roubideau WSA and the Camelback WSA makes it ripe for repeated and varied exploration on foot or horseback. Its suitability as a bird sanctuary was evident.

BLM_0165242

*Summary*

A. Commenters stated that the following should be clarified:

1. The future of motorized trails and the inclusion of Coyote Cutoff and Coyote Ridge trails in the Dry Creek Lands with Wilderness Characteristics unit
2. The size of the Adobe Badlands Lands with Wilderness Characteristics unit
3. The reasoning for eliminating Monitor Mesa from consideration

B. Commenters also stated that in order to establish a true set of baseline conditions, the BLM must refine its lands with wilderness characteristics inventory to fully comply with BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands.

*Response*

A. The BLM appreciates the comments.

1. Draft RMP/EIS Section 4.3.12 (pages 4-224 and 4-225) addresses existing travel routes in lands inventoried for wilderness characteristics. It states: "In the remaining lands with wilderness characteristics, motorized and mechanized travel would be limited to designated routes. Except for the Dry Creek Basin unit, public use of routes is currently infrequent and is generally limited to hunting. In these areas, when motorized or mechanized travel does occur, the perceived impact on naturalness, solitude, and opportunities for primitive recreation could be diminished during the time of use. Use in the Dry Creek Basin unit is slightly more frequent, given its proximity to Montrose." Lands managed for wilderness characteristics and formally designated Wilderness have very different management standards. While motorized and mechanized use is prohibited in designated Wilderness, it is not necessarily incompatible within lands managed for the protection of wilderness characteristics. For example, the inventory process for Dry Creek Basin determined that the unit possess wilderness characteristics, even though there are a few motorized and mechanized trails within the unit. Those characteristics can be maintained, while continuing to allow some motorized and mechanized travel within the unit. As such, motorized and mechanized travel on the existing Coyote Cutoff and Coyote Ridge trails would remain.

2. As presented on Draft RMP/EIS pages 2-9 and 2-149, the Adobe Badlands WSA Addition unit is 6,180 acres. While conducting the decision area lands with wilderness characteristics inventory, nine subunits (A-I) of the Adobe Badlands WSA Adjacent were intensively analyzed, comprising approximately 16,520 acres. Based on this analysis, the total acreage of lands found to possess wilderness characteristics within the unit is 6,180. The remaining 9,050 acres within the nine subunits, in whole or in part, were either found to lack naturalness, solitude, size, and/or outstanding opportunities for primitive and unconfined recreation. If a subunit was found to lack these criteria, either solely or combined, based on BLM Manual 6310, it was not deemed to possess lands with wilderness characteristics and was therefore eliminated from further consideration. This method was applied to the south and southwest portion of subunit A due to existing human-made structures or alterations, including, but not limited to, powerlines that detract from the naturally appearing landscape. The analysis found that the southern half of the subunit has an unnatural appearance. From the vicinity of Wells

BLM_0165243

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 302 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 20 – Lands with Wilderness Characteristics)

Gulch Road sound of the road's switchbacks, and south and east of Alkali Basin Road, the area shows significant alternations from natural conditions. Evidence of lack of naturalness includes ponds, contour furrows, water catchments, constructed and maintained roads, other vehicle round, canals, and altered contouring of natural drainages.

3. As presented in Draft RMP/EIS Appendix F, most of Monitor Mesa shows substantial evidence of human modification. In addition to constructed and maintained routes that run the length of the mesa top, nearly all of the mesa top has undergone mechanical vegetative treatments (e.g., chaining, roller-chopping) that are obvious to a casual observer. For this reason, 1,750 acres of Monitor Mesa has been excluded from the unit.

B. The *Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update* report used best available information using a combination of GIS, maps, and interviews with knowledgeable staff consistent with BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands. Inventories are used to guide the decision maker and are updated as information becomes available. If, as inventories are updated through the life of the RMP, new areas are found to have wilderness characteristics, including WSA adjacent units, the decision maker will have that information available to them at that time and can choose a new course of action. The BLM is considering options for continuing to update this inventory and provide a mechanism for future decision making. See also response in Section 6.1 – FLPMA inventories, in this report.

### Section 20.3 – Lands with Wilderness Characteristics: Impact Analysis
No comments are associated with this topic.

### Section 20.4 – Lands with Wilderness Characteristics: Cumulative impact analysis
No comments are associated with this topic.

### Section 20.5 – Lands with Wilderness Characteristics: Mitigation measures
No comments are associated with this topic.

### Section 21 – Leasable Minerals – Fluid

### Section 21.1 – Leasable Minerals – Fluid: Range of alternatives
Total Number of Submissions: 103
Total Number of Comments: 146

Comment Number: 000593_MorrisS_20161028-2
Organization1:
Commenter1:Steve Morris
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

BLM_0165244

Comment Number: 000415_BaxterE_20161028-1
Organization1:
Commenter1:Ed Baxter
Commenter Type: Individual
Comment Excerpt Text:
Specifically, the final Resource Management Plan should include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans. Without having considered a no-leasing alternative the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

Comment Number: 000559_KelloggV_20161030-1
Organization1:
Commenter1:Viva Kellogg
Commenter Type: IndividualComment Excerpt Text:
BLM did not consider all reasonable alternatives, including the possibility of not leasing our public lands at all. Oil and gas activity has the potential to negatively impact the North Fork Valley's healthy food shed, clean water, clean air and public health. BLM failed to mention that the North Fork Valley is a special use area tied to the economics of this area.

Comment Number: 000563_King_WELC_HasAttach-1
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must consider and analyze a "no-leasing" alternative that would bar new fossil fuel leases in the Uncompahgre planning area.

Comment Number: 000563_King_WELC_HasAttach-10
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
By these measures, BLM's range of alternatives fails to satisfy its statutory obligation under FLPMA, as well as the purpose and need of the RMP. All of the draft EIS alternatives propose to leave available extensive lands for fossil fuel leasing and development. See Summary of Alternatives, below. Critically, although acreage may reflect subtle differences between alternatives, there is virtually no change in the foreseeable range of coal, oil and gas leasing and development, or in greenhouse gas emission rates across alternatives. In fact, each alternative shows an increase in direct greenhouse gas emissions over base year emissions of between 10 and 12 percent, ranging from 3.08 to 3.13 MMTCO2e annually.

Comment Number: 000563_King_WELC_HasAttach-13
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
The UFO draft RMP and EIS dismisses a number of no-leasing alternatives, citing BLM's mandate under the Mineral Leasing Act of 1920 ("MLA") to use the least restrictive management constraints to reach principle use and resource development goals. Draft EIS at 2-15. Courts have interpreted BLM's authority under the MLA as discretionary and not as an absolute mandate to lease. In fact, the Ninth Circuit held that the MLA "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract . . . we affirm the

BLM_0165245

district court's holding that the agencies failed to give the no action alternative meaningful consideration and thereby violated NEPA." Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988) (internal citations omitted).BLM's rejection of no-leasing alternatives in this RMP is unsubstantiated and relies on a very narrow and outdated interpretation of BLM's leasing and planning authority, particularly in an EIS development context.

Comment Number: 000563_King_WELC_HasAttach-14
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As is the case here, BLM has provided no basis in law or fact to dismiss outright the no-leasing alternatives outlined in the draft UFO EIS. And because BLM is conducting an EIS review for this RMP, the requirement for analyzing or dismissing no action or no-leasing alternatives is heightened. See W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1274-75 (10th Cir. 2013) ("Regulations require both documents to incorporate a range of reasonable alternatives, but the depth of discussion and analysis required is different depending on whether the document is an EIS or an EA. For example, section 40 C.F.R. §1502.14 provides that an EIS should '[r]igorously explore . . . all reasonable alternatives,' and '[d]evote substantial treatment to each alternative' with 'detail.' Id. at (a)-(b).")
Thus, not only is BLM's consideration of a no-leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives. This is particularly true of the agency's preferred Alternative D, which leaves 371,400 acres open to coal leasing, 865,970 acres open to oil and gas leasing (draft EIS at 2-10), projects 1,271 wells will be drilled in the planning area over the planning period (draft EIS at 4- 457), and commits the planning area to 3.11 MMTCO2e emissions, every year, for the foreseeable future (draft EIS at 4-39).

Comment Number: 000563_King_WELC_HasAttach-17
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
Barring new leases to achieve national, regional and local greenhouse gas reduction goals would constitute "broad-scale direction" for the planning area. A desired outcome for a reasonable alternative could be reducing the planning area's contribution to climate pollution. It would establish that certain uses—oil, gas, and coal production—would be allowable only on current leases, and it would enable BLM to achieve a desired outcome of reducing the chance of catastrophic climate change and increasing the chance for the U.S. to reach its greenhouse gas reduction goals set by the Paris Agreement. As discussed above, such management direction would adhere to the law and BLM's multiple use mandate. As such, a no or limited fossil fuel leasing alternative would meet the purpose and need for the RMP.

Comment Number: 000563_King_WELC_HasAttach-18
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS explicitly rejects providing full consideration to alternatives that would "Prohibit Fluid Mineral Leasing throughout Decision Area" and "Prohibit Coal Leasing throughout Decision Area,"74 [74 Draft EIS at 2-16.] but the three grounds on which it does so lack legal or factual basis.
First, in rejecting both alternatives, the draft EIS asserts that all fully-analyzed alternatives propose closing some areas to fossil fuel leasing, and that "[r]esource values that can only be protected by

BLM_0165246

prohibiting all fluid mineral leasing throughout the decision area have not been identified."75 [75 Id.] This is both irrelevant and untrue. It is irrelevant because BLM need not identify some other resource value that "can only be protected" by barring fossil fuel leasing. It need only determine that leasing may not be in the public interest. It is untrue because virtually every resource value in the decision area— water, recreation, human health, wildlife, theeconomy, air quality, etc.—are threatened by climate change, as the draft EIS itself recognizes, and as a wealth of scientific literature demonstrates.76 [76 See, e.g., Draft EIS at 3-16 (listing impacts of climate change in the Rocky Mountain West to snowpack, drought, wildfire, insect epidemics, human health, river flows, agriculture, groundwater, vegetation and wildlife, and forests).]

In an order issued more than seven years ago, the Secretary of Interior warned that "dramatic effects of climate change … are already occurring," and that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage … we oversee."77 [77 Secretarial Order 3289, Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009) (attached as Exhibit 26).] The draft RMP itself includes as one of its objectives: "Reduce impacts from climate change on soil and water resources, native vegetation and wildlife species and communities, and wildlife habitats," recognizing that climate change threatens all of those resources.78 [78 Draft EIS at 2-24.]

Second, the draft EIS claims neither alternative would meet the purpose and need for the RMP because part of the RMP's purpose is to adopt "management direction in accordance with principles of multiple use and sustained yield."79 [79 Id. at 2-16.] As discussed above, the principle of multiple use explicitly anticipates that some use would be prohibited on public lands. Further, the keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(3). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated by the multiple use mandate. Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

New Mexico ex rel. Richardson, 565 F.3d at 710 (emphasis in original).Third, BLM alleges that for coal as well as oil and gas, the authority for leasing derives from the MLA, and that that law "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands."80 [80 Id.]

We have scoured the MLA and found no such provision. If BLM believes that such a provision exists, we request that it provide a citation for the public to review as soon as possible. BLM may have been alluding to a provision of the Energy Policy Act of 2005 (Section 363) that bears resemblance to the draft EIS's language, but that provision is inapplicable for numerous reasons. The Energy Policy Act provision directs the Secretaries of Agriculture and Interior to "enter into a memorandum of understanding [MOU] regarding oil and gas leasing" on BLM and Forest Service lands, and states that the MOU "shall include provisions that … ensure that lease stipulations are …only as restrictive as necessary to protect the resource for which the stipulations are applied."81 [81 42 U.S.C. § 15922(b)(3)(C).] This provision, on its face, is inapplicable to coal leasing. Further, it relates to "lease stipulations," which assumes, first, that the land has been open to leasing under the applicable land management plan. And the MOU itself appears to be aimed at ensuring consistency of stipulations where leased lands cross BLM and Forest Service boundaries. Thus even if the draft EIS meant to invoke this

BLM_0165247

provision, it is not a basis for failing to provide full consideration to the no-leasing alternative(s) in a
resource management plan revision.

In sum, none of the justifications BLM provides for rejecting consideration of the noleasing alternative is
supported by fact or law. BLM therefore must consider in detail alternatives that bar new leasing in the
Uncompahgre area.

Comment Number: 000563_King_WELC_HasAttach-239
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Therefore, drilling activities may only go forward as long as unnecessary and undue environmental
degradation does not occur. This is a substantive requirement, and one that the UFO must define and
apply in the context of oil and gas development authorized in the planning area. In other words, the
UFO must define and apply the substantive unnecessary and undue degradation ("UUD") requirements
in the context of the specific resource values at stake.

Comment Number: 000536_SchottJ_20161031-4
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
The RMP did not take the NFAP seriously and therefor did not compare it with all the alternative plans.
It was treated as an add--on to alternative B only. A complete analysis of the NFAP is necessary.

Comment Number: 000545_SlivkaJ_20161101-130
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM can and should close the North Fork area to oil and gas leasing in the
proposed RMP. This can be accomplished without requiring supplemental NEPA under the CEQ
regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not
"substantial." There is ample precedent for BLM making similar changes between draft and final EISs
without supplemental NEPA.

Comment Number: 000480_SmithR_20161028-1
Organization1:
Commenter1:Robin Smith
Commenter Type: Individual
Comment Excerpt Text:
BLM has failed to consider all reasonable alternatives in the Draft RMP. Paragraph (a) of §1502.14 of the
Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to:
Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were
eliminated from detailed study, briefly discuss the reasons for their having been eliminated. (Emphasis
added.)
Section 2.4.1 of the Draft RMP provides the following additional information on how BLM formulates its
alternatives:
…the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of
Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives

BLM_0165248

that promote exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration. (Emphasis added.)

Consistent with these guidelines, Section 2.4.3 of the draft RMP dismisses a no oil and gas leasing alternative by stating:

An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP.

Further, Section 2.4.4 states:

An alternative that prohibits coal leasing throughout the decision area would not meet the purpose of and need for the RMP.

However, an analysis of Alternative D, the Agency's Preferred Alternative, reveals BLM is proposing to make approximately 870,000 acres, or 95%, of the 916,000 acres in the planning area available for oil and gas leasing. Apparently, BLM considers making 95% of the acreage available for oil and gas leasing a reasonable alternative and not an exclusive use or maximum development alternative.

To remain consistent with BLM's proposed Preferred Alternative, I propose inserting language in Alternative B, the Conservation Alternative, prohibiting fossil fuel (coal, oil and gas) leasing on 95% of the lands within the planning area throughout the life of the RMP.


Comment Number: FormLetterJ-3
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
The inadequacy of the draft RMP is further exemplified by the following:

1) Chapter 1, Section 1.4 and Table 1.3: This section and table fail to appropriately and adequately acknowledge and discuss the North Fork Alternative Plan (NFAP) presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley.

The NFAP was submitted in order to provide the BLM with information about the uniqueness and renowned agricultural productivity of the valley and supported the request to remove the BLM land surrounding this valley from any future leasing. However, the section summarizing the scoping comments received does not include this important scoping submittal and has consequently resulted in the lack of any meaningful reference to this agriculturally important and productive area throughout the remainder of the draft RMP. This violates the Council on Environmental Quality (CEQ) regulation at 40 CFR 1501.7(a)(2) which requires the lead agency to determine the significant issues to be analyzed in depth in an Environmental Impact Statement.

This absence of acknowledgment of the North Fork Valley's unique qualities is also in direct conflict with Section 1500.1(b) of the CEQ regulations which states that "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."


Comment Number: FormLetterJ-4
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Chapter 1, Table 1-2, Step 7: By not appropriately including the North Fork Valley and the potential negative environmental effects to it by the various proposed alternatives as a "planning issue," this draft RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues."

BLM_0165249

Comment Number: 500203_McCainJ_20161025-5
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• In the draft RMP, the NFAP is tacked onto the 'conservation' Alternative B, as a sub-alternative B1. All parts of the planning area not covered in the NFAP are overlaid with alternative B. This makes it appear that the NFAP and alternative B1 are much more restrictive than the public intended, since the public only proposed to protect the North Fork Valley. By tacking the NFAP onto alternative B, it appears that the public proposed to remove 95% of the entire planning area from being available for leasing, which is not an accurate representation. If overlaying the NFAP onto another alternative is their way of analyzing the plan, they should overlay the NFAP over each alternative, so it's effect on each proposed plan can be accurately evaluated. Otherwise, it appears that the BLM tacked the NFAP onto the conservation alternative as a matter of protocol. without giving it serious consideration.

Comment Number: 500150_AlderdiceD_20161101-1
Organization1:
Commenter1:David Alderdice
Commenter Type: Individual
Comment Excerpt Text:
the final Resource Management Plan should include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans; include a sub-alternative for each alternative (A1, C1, 01) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

Comment Number: 500029_HuschS_20161020-2
Organization1:
Commenter1:Susan Husch
Commenter Type: IndividualComment Excerpt Text:
I request that the final Resource Management Plan should:
• Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
• Include a sub-alternative for each alternative (A 1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

Comment Number: 500203_McCainJ_20161025-10
Organization1:
Commenter1:James McCain
Commenter Type: IndividualComment Excerpt Text:
Specifically, the draft Resource Management Plan needs to:
• Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
• Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

Comment Number: 000587_WolcottS_20161031-3
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . .

BLM_0165250

. Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will
avoid or minimize adverse effects of these actions upon the quality of the human environment." 40
C.F.R. § 1500.2(e) (emphasis added). The BLM must adopt a final plan that makes important wildlife
habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development.

Comment Number: 000563_King_WELC_HasAttach-231
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
The Uncompahgre RMP revision will replace the existing 1985 San Juan/San Miguel Resource
Management Plan and the 1989 Uncompahgre Basin Resource Management Plan. These 1985 and 1989
RMPs are completely out-of-date and can no longer serve their intended land use planning function with
regard to oil and gas development in the UFO. Due to the insufficiency of BLM's existing management
framework, all oil and gas leasing and development decisions, at all stages of BLM's administrative
processes, should be suspended until the Uncompahgre RMP revision is complete and these deficiencies
can be addressed. An oil and gas moratorium is not only a logical approach to BLM's minerals
management responsibilities; it is also required under NEPA and its implementing regulations.

Comment Number: 000545_SlivkaJ_20161101-195
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)Comment Excerpt Text:
As discussed above, BLM has a wide range of authority under FLPMA's multiple use mandate to specify
that not all uses are appropriate in all places. The many other natural resources present in the planning
area (such as wilderness characteristics, scenic values, cultural resources, recreation, and fish and wildlife
habitat) can and should be protected for public enjoyment. By limiting the options for closing areas to oil
and gas development, BLM is improperly constraining the range of management alternatives in
contravention of NEPA. Although many acres are open to oil and gas development subject to various
lease stipulations, BLM often offers companies exceptions, modifications or waivers from the application
of "no surface occupancy" (NSO) stipulations. Appendix B to the Draft RMP sets out a wide variety of
"criteria" that could support a request for exceptions, modifications or waivers

Comment Number: 000433_FielderA_20161029-6
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
There is no alternative being considered that would prohibit the leasing of these lands [the North Fork
Valley] for mining operations, and as such, it fails to evaluate the full range of reasonable management
plans.

Comment Number: 000545_SlivkaJ_20161101-184
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6
Comment Excerpt Text:
The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil
and gas development.

BLM_0165251

FLPMA obligates BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process. Specifically, multiple-use is defined as:

…the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c). The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return. The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit. It is well within the realm of BLM's multiple-use mandate to not have a significant portion of the planning area open to oil and gas leasing. In fact, the U.S. Court of Appeals for the 10th Circuit has reiterated in relation to this planning area: "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." New Mexico v. Bureau of Land Management, 563 F.3d 683, 710 (10th Cir. 2009).

IM 2010-117 plainly states that "under applicable laws and policies, there is no presumed preference for oil and gas development over other uses." It recognizes that oil and gas leasing is sometimes inconsistent with protecting other important resources and values. BLM must consider the range of resource values being managed on the public lands and close lands to oil and gas leasing where other resources are more important.

Comment Number: 000545_SlivkaJ_20161101-194
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Inadequate range of alternatives
Under the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 50,060 mineral acres that would be closed to leasing in Alternative D, nearly 90% (44,220 acres) are statutorily closed areas. In other words, BLM is using its discretionary authority provided in this RMP to close a mere 5,840 additional acres to oil and gas leasing over the no action alternative. Furthermore, the other two action alternatives only contemplate closing 219,580 acres and 306,670 acres. Ibid. This means that the full range of alternatives only contemplates closing 5%-33% of the planning area to oil and gas leasing. This does not represent a true range of alternatives.

Comment Number: 000545_SlivkaJ_20161101-183
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Oil and Gas Management
a. BLM should close additional lands to oil and gas leasing to conserve important resources and meet the agency's multiple use and sustained yield mandate.

BLM_0165252

The preferred alternative would make available 865,970 acres to oil and gas leasing, including lands with wilderness characteristics, areas of critical environmental concern, and important wildlife habitat. The acreage left open to leasing is 95% of the planning area, and is practically unchanged from the no action alternative. This is inappropriate management of resources BLM is charged with stewarding, does not balance conservation with development, and is unsupportable in an area with low potential for oil and gas development. BLM should close lands with conservation values to oil and gas leasing in the RMP. BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation measures; and 3) the potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.

Comment Number: 000200_KenosianM_20161014-3
Organization1:
Commenter1:Mary Kenosian
Commenter Type: Individual
Comment Excerpt Text:
Specifically, the final Resource Management Plan should:
-Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
-Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

Comment Number: 500009_HemsellA_20161101-1
Organization1:
Commenter1:Ambalila Hemsell
Commenter Type: Individual
Comment Excerpt Text:
I don't believe the BLM has explored all alternative option, as I did not see a no leasing option in the RMP plans.

Comment Number: 500053_BristowD_20161101-1
Organization1:
Commenter1:Dave Bristow
Commenter Type: Individual
Comment Excerpt Text:
The BLM did not consider a no-leasing alternative. A no-leasing alternative is not only reasonable, but given what wwe now know about the impacts of oil and gas to human health, our enviroment, and climate change, it represents the best way to protect the North Fork Valley and ensure our community can continue to thrive in the future.

Comment Number: 000441_HelleksonB_20161101-3
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Other Sections: 18.5
Comment Excerpt Text:
The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for

BLM_0165253

multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option.

Comment Number: 000443_InouyeK_20161031-1
Organization1:
Commenter1:Kevin Inouye
Commenter Type: Individual
Comment Excerpt Text:
We in Wyoming gave up far too much to attack the temporary jobs and income that coal and natural gas (and uranium and gas previously) offered, and now we're suffering from a broken state economy, cleanup costs the businesses can't cover (in part because we let them waive their deposits), and the environmental and economic fallout of having let ourselves essentially be used then thrown away by these corporate interests as the markets shift. The consequences will far outlast the benefits for you too, I fear.
I request that you adopt a no-leasing alternative as the logical conclusion for management in the study area. The economics of fossil fuel extraction are changing rapidly; witness the decline of coal mining in the North Fork Valley in the past few years, and the rapid increase in renewable energy development.

Comment Number: 000184_BrettJ_20161017-14
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

Comment Number: 000120_McGillJ_20160820-1
Organization1:
Commenter1:Joseph McGill
Commenter Type: Individual
Comment Excerpt Text:
Oil & Gas: Between carbon fuels contribution to climate warming, the methane leaks documented at wells in the Four Corners area, the glut of natural gas on the market, the sketchy record of drillers dealing with waste fluids, I cannot believe any of these alternatives are so incredibly generous for leasing. The water on the Grand Mesa is my drinking water as well as the water supply for the numerous orchards, farms and ranches in the area. The North Fork similarly supplies Paonia, Hotchkiss and Somerset. People fish and boat in these waters, some even swim in the lower lakes. Your own analysis says recreation is the single largest use of these lands. Considering we have a glut of these fuels being produced, producing more does not produce significant job counts (compared to the existing agriculture and growing renewables industry - see the Solar Energy Institute and DMEA renewable activities), and not least that those fuels only aggravate Climate Warming, I believe your RMP alternatives fail to recognize the greater community and global concerns.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-30
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:

BLM_0165254

San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117.

Comment Number: 000545_SlivkaJ_20161101-128
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. BLM can and should close the North Fork area to oil and gas leasing in the final RMP.
The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA.

Comment Number: 000545_SlivkaJ_20161101-1
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
However, the Draft RMP ultimately fails to consider or implement reasonable management alternatives for oil and gas resources that would adequately protect local communities from oil and gas development or meaningfully analyze and respond to climate change. The prioritization of oil and gas development above all other multiple uses at the expense of healthy communities and climate solutions must be remedied before BLM finalizes the Uncompahgre RMP. Additionally, the Draft RMP misses other opportunities to appropriately balance multiple uses on Colorado's public lands and meet BLM's obligations under relevant laws and policies. Our comments demonstrate where and how BLM can create a lasting vision for conserving natural resources and balancing multiple uses through the RMP revision.

Comment Number: 000509_WolcottE_20161102-23
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
Decisions to lease or not to lease legally available lands must be made in accordance with planning regulations and appropriate NEPA analysis. The BLM should have included a no lease alternative, and must immediately rectify this oversight by reissuing the draft with a no lease alternative for public comment.

Comment Number: 000508_DrakeM_20161101-11
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
[The Final Resource Management Plan must:]
- Include a no-leasing alternative to adequately evaluate the full range of reasonable management plans. There is little doubt that multiple areas with the UFO, like the NFV and all of Delta County, need the no-leasing alternative to be incorporated in the final "Preferred Alternative"

BLM_0165255

Comment Number: 000563_King_WELC_HasAttach-242
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
For the reasons described above, we urge BLM to prepare a supplemental EIS that: (1) fully considers a range of alternatives, including a "no-leasing" alternative;

Comment Number: 000285_WutchiettC_20161027-1
Organization1:
Commenter1:Cynthia Wutchiett
Commenter Type: Individual
Comment Excerpt Text:
Paragraph (a) of §1502.14 of the Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to: 'Rigorously explore and objectively evaluate all reasonable alternatives.
Yet section 2.4 of your Draft RMP titled, Alternatives Considered but Eliminated from Detailed Analysis, states alternatives that propose exclusive resource prohibition were eliminated from detailed study. It states that a no-lease alternative would be too extreme. Really? Then how is leasing 95% not just as extreme?
Further, Section 2.4.1. states: '…the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives that promote exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration. ' If you believe that leasing 95% is an acceptable alternative, then NOT leasing 95% is just as acceptable.

Comment Number: 000409_DayB_20161031-1
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, we urge the BLM to take a serious look at "No Exit: Fixing the BLM's Indiscriminate Energy Leasing," published by The wilderness Society https https://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web.pdf.
This report's veracity is born out by the RMP's preference to lease roughly 95% of the acreage within the UFO analysis area. Given that the US is now producing much more oil and gas domestically than it is using while damaging more habitat and non-mineral resources than at any time in the past century, it hardly makes sense for BLM to continue down the path of indiscriminate wholesale leasing. The glut of oil and gas is expected to continue for the near future while the extinction of flora and fauna species is expected to accelerate. It seems that the BLM is continuing the abandonment of its multiple use mandate in favor of leasing to multinational corporations for speculative purposes. This leasing obsession also flies in the face of the recent Paris Agreement on Climate Change. It is hypocritical to promise the rest of the world that we will reduce greenhouse gases as soon as possible while simultaneously encouraging domestic fossil fuel extraction via the BLM's leasing program. The BLM should adopt a policy of carefully analyzing its energy leasing program as well as site specific projects as it relates to the Paris Agreement and the quantities of greenhouse gases either generated or prevented from entering the atmosphere.

BLM_0165256

Comment Number: 000616_TaylorS_20161031-1
Organization1:
Commenter1:Samara Taylor
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

Comment Number: 000200_KenosianM_20161014-2
Organization1:
Commenter1:Mary Kenosian
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

Comment Number: 000039_WarnerV_20160912-1
Organization1:
Commenter1:Virginia Warner
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

Comment Number: 000242_HuberT_20161011-1
Organization1:
Commenter1:Tom Huber
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

Comment Number: 500005_BarretoR_20161017-3
Organization1:
Commenter1:Ruth Barreto
Commenter Type: Individual
Comment Excerpt Text:
Without having considered a no-leasing alternative, nor assessed how the North Fork Alternative Plan (Bl) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities

Comment Number: 000376_WegnerB_20161030-1
Organization1:
Commenter1:Bruce Wegner
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165257

If national strategies such as energy policy and climate change were used as the principles for developing the UFO Draft RMP, and the development of alternatives reflected these underlying principles, it would mandate not only that a "no leasing" alternative be considered, but that it would have been BLM's preferred alternative for not just the North Fork Valley, but the entire UFO region. I request the BLM include a "no leasing" alternative in its UFO Draft RMP, and that the subsequent analyses of all alternatives be based upon sound national energy and environmental policies that reflect long term goals and desired outcomes for generations to come.

Comment Number: 000342_WolcottS_20161031-1
Organization1:Roberts-Stucker Ditch Association
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
You should include a "no drilling" alternative, as NEPA requires you to consider all reasonable alternatives.

Comment Number: 000459_HardyR_20161027-13
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. A no-leasing alternative is the only reasonable alternative to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come.

Comment Number: 000246_YoderC_20161024-1
Organization1:
Commenter1:Chris Yoder
Commenter Type: Individual
Comment Excerpt Text:
BLM's multiple use mandate argues against oil and gas leasing in the North Fork Valley, at least until BLM has completed a thorough analysis of the risks that large-scale oil and gas development would create for human and animal health, the environment, and the economy of the North Fork Valley. A no leasing alternative would protect non- resource-exploitive values and land uses ... while at the same time preserving for possible future use the option of oil and gas leasing. The reverse is not true.
That is why, at this time, I believe that a no-leasing alternative is the best way to honor BLM's multiple use mandate. On the other hand, the draft RMP is a roadmap to industrializing the Uncompahgre Field Office area with the resulting contamination of the air, water, soil, and agricultural lands of the very special North Fork Valley. That is to say, as it now stands, the draft RMP repudiates multiple use in favor of a single use --- oil and gas.
The only way to prevent irreparable harm to this special area is to close off all BLM lands and minerals in the area to oil and gas leasing. At a minimum it BLM must impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations.

Comment Number: 000638_PopeS_20161031-2
Organization1:
Commenter1:Sarah Pope
Commenter Type: Individual

BLM_0165258

Comment Excerpt Text:
A no-leasing alternative is the only reasonable alternative to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come.

Comment Number: 000184_BrettJ_20161017-2
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing, injection wells and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. If the BLM will not consider a no-leasing alternative, then by all means it must make Alternative B1 as the preferred alternative.
In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

Comment Number: 000035_BronfmanJ_20160630-1
Organization1:
Commenter1:Joanie Bronfman
Commenter Type: Individual
Comment Excerpt Text:
I am very opposed to oil and gas development and fracking activities. I don't think they should be permitted when the public health risks are great, such as:
- Activities on public lands that have the potential to poison foodsheds and threaten to wipe out food security for people on the Western Slope and the Front Range.
- The destruction/pollution of clean air, abundant fresh water, and foodsheds (including Colorado's largest concentration of organic farms).
- Significant harm to human health and a local economy based on agriculture and organic farms, recreation, hunting, and tourism.
- Loss of unique biodiversity in the State of Colorado.
Given what we know about the risks of oil and gas chemicals, and radioactive wastewater to human health, I believe a no leasing alternative for the North Fork Valley is the best way to protect our community and preserve the quality of life North Fork Valley residents have come to treasure and cherish.

Comment Number: 000130_WassellP_20160903-2
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
BLM did not consider a reasonable no-leasing alternative for the North Fork Valley

BLM_0165259

Comment Number: 000475_PierceC_20161030-2
Organization1:
Commenter1:Carol Pierce
Commenter Type: Individual
Comment Excerpt Text:
The preamble to NEPA reads:
"To declare national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.
The plan's allocation of so much land for possible gas production is so off target from NEPA or the BLM's mission statements. I find myself in ABSOLUTE DISBELIEF you took a good hard look and came up with the plan you "preferred." For you to propose that 94.5 % of the land mass as suitable for gas development. I am sorry to sound disrespectful but this is how I see it. Please decrease the amount of land you propose to be open to fracking.

Comment Number: 000133_EP_20160831-1
Organization1:
Commenter1:E Peeeel
Commenter Type: Individual
Comment Excerpt Text:
I cannot support any increase in natural gas wells in the sensitive watershed of the upper North Fork Area totaling an estimated 30,000 acres without any environmental oversight, public input, and is subject to a dubious valuation process. This is irresponsible due to undisclosed chemicals which are in the fracking fluid. Therefore, a no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals.
It is imperative that the BLM should offer a no lease option which permits no increase in hydraulic fracturing.

Comment Number: 000145_DickmanB_20161013-1
Organization1:
Commenter1:Betty Dickman
Commenter Type: Individual
Comment Excerpt Text:
A no-leasing alternative is the only reasonable conclusion to a rigorous analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization.
3. a moratorium on oil and gas leasing shoud be imposed until rural gas gathering pipelines are regulated by Pipeline Hazardous Materials and Safety Administration.

Comment Number: 000158_BrettE_20161018-1
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
Oil and gas development not be considered as appropriate use for the area, particularly for the North Fork Valley. The draft RMP should include a "no leasing" alternative.

BLM_0165260

Comment Number: 000158_BrettE_20161018-4
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
I urge you to incorporate into the UFO RMP plans that prohibit or severely limit oil and gas development. The BLM should include a "no leasing" alternative. However, reality dictates that the market continues to demand fossil fuels, therefore, I urge you to accept Alternatives B and B1 which limit development and maintain special places for all of us to enjoy for years to come.

Comment Number: 000163_DeeringE_20161013-1
Organization1:
Commenter1:Eunice Deering
Commenter Type: Individual
Comment Excerpt Text:
A no-leasing alternative is the only reasonable conclusion to a rigorous analysis of the risksposed by oil and gas operations including fracking technologies and large-scale industrialization.
3. a moratorium on oil and gas leasing shoud be imposed until rural gas gathering pipelines areregulated by Pipeline Hazardous Materials and Safety Administration.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-36
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 336 Page 2-196: We request that Alternative D be amended to allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will a llow for site specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-37
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 39.1
Comment Excerpt Text:
Line 336 Page 2- 199: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.
As a general comment with regard to WSR designations, we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations.

BLM_0165261

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-38
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 39.1
Comment Excerpt Text:
Line 337 Page 2-204: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-39
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 338 Page 2-205: We request that Alternative D be amended to allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will a llow for site specific review and flexibility in future decision making.
Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-5
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Table 2-1 Page 2-10: With regard to Fluid Mineral Leasing, this table includes a 162,670 acre increase in lands ··open to leasing subject to No Surface Occupancy (NSO)-B LM surface/federal minerals. If the intent of the RMP is to continue to allow for productive leases on these acres as shown in Figure 2-23, it would be more practical to apply CSU restrictions. Although horizontal drilling capabilities have improved in recent years, total elimination of surface occupancy on leased ground would render much of this acreage infeasible for production due to accessibility issues. We believe CSUs would provide the necessary resource protection while a lso maintaining the potential for future resource development.

Comment Number: 000178_GannettA_20161016-1
Organization1:
Commenter1:Alison Gannett
Commenter Type: Individual
Comment Excerpt Text:
http://srl.geoscienceworld.org/content/early/2016/09/08/0220160100
Scientific abstract study links earthquake in Kansas to fluid injection. [see attached]
A moratorium on drilling should be in place until safe disposal for wastewater is available. Open pits have multiple problems leaking, overflowing w/sudden storms, transportation spills, etc and deep water injection has now been proven to cause earthquakes. In our unstable soil geology, neither disposal option is viable. It can certainly not be proven "SAFE" by the BLM.
None of the RMP options have considered these new scientific studies on disposal. Further more, the collection/gathering pipelines are currently EXEMPT from regulation. A moratorium on drilling should

BLM_0165262

also be put in place until this issue is resolved. The RMP failed to consider safety to our soil, water and air from this pipeline exemption. Furthermore, according to national sources and COGCC, larger pipelines, even when regulated and inspected, regularly leak and break, contaminating soil, air and water.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-6
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Other Sections: 36.1
Comment Excerpt Text:
Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.
Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

Comment Number: 000474_SgammaK_20161031_WEA-1
Organization1:Western Energy Alliance
Commenter1:Kathleen Sgamma
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Private Property Rights and Negotiated Surface Use Agreements
Placing stipulations on private lands above federally-owned minerals is an infringement of private property rights and conflicts with existing BLM policy. Restrictions in the plan should only apply to federal lands.
BLM's 2007 "Split Estate Rights, Responsibilities, and Opportunities" brochure states that BLM's policy is to "offer the surface owner the same level of resource protection provided on federally owned surface." It does not say that BLM will mandate the surface use terms for private surface estate. The 2007 brochure states that the operator must consult in good faith with the surface owner and that the surface owner "will have [his or her] views on protection standards and construction and operation issues carefully considered by the BLM as the BLM determines appropriate mitigation measures." How is BLM supposed to "carefully consider" the surface owner's views when BLM has bound itself to apply all RMP management direction to split estate land regardless of the surface owner's views?
Under the procedure contemplated in Onshore Order Number 1, an operator must engage in good-faith negotiations with the private surface owner to reach an agreement for the protection of surface resources and reclamation of the disturbed areas. BLM should respect this process. The RMP should expressly state that surface use issues on private surface will be resolved primarily between the surface owner and the operator and that BLM will not apply management direction that conflicts with the agreement reached between the surface owner and operator.

Comment Number: 000189_RaleighC_20161010-1
Organization1:
Commenter1:Cameron Raleigh
Commenter Type: Individual
Comment Excerpt Text:
A no leasing alternative is the only reasonable conclusion. A moratorium on oil and gas leasing should be imposed until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.

BLM_0165263

Comment Number: 000198_RaleighC_20161010-1
Organization1:
Commenter1:Chuck Raleigh
Commenter Type: Individual
Comment Excerpt Text:
There must be no lease alternatives for oil and gas operations including fracking technologies and large scale industrialization.
A moratorium on oil and gas leasing should be imposed until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.

Comment Number: 000237_VaughtK_20161004-3
Organization1:Dancing Dog Farm
Commenter1:Kenneth Vaught
Commenter Type: Individual
Other Sections: 30.3
Comment Excerpt Text:
I would respectfully ask that the BLM reconsider it's plan to lease all of the Valley areas specified in the recently released Draft Resource Management Plan. Due to the geology of the Valley, it does not appear that there is a source of gas that is economical to develop in the Valley area, with past test drilling data all showing the same results of no retrievable gas present. With ground potentially leased that has no gas reserves, it is the perception of gas development that deters people from relocating to or visiting the Valley and harms the overall economy of the area. The oil and gas leasing in the Valley area would kill off the thriving small businesses that are dependent on having clean water supplies that meet organic standards, clean air and an overall healthy environment. The gas industry should not be allowed to adversely impact the established organic agricultural businesses and the growing ag tourism businesses that are here.

Comment Number: 000257_GoldmanA_20161026-2
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
In reference to p 4-284 Table 4-45
Similarly, NSO stipulations need to be increased from 238,140 acres, especially in the EEAs, ACECs and LWCs, as management of these areas would be undermined with any allowable surface drilling.
Excluding 50.050 out of 916,020 acres (5.4%) from fluid mineral leasing in the planning area is an unbalanced proportional emphasis on mineral extraction to the detriment of other resource values such as fish and wildlife, recreation and tourism, scenic viewsheds, vegetative, water and air quality and other non extractive economic interests. By your own reckoning 416,600 acres left open to drilling have low development potential anyway.

Comment Number: 000269_CascadeR_20161028-1
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
It is disturbing that the draft RMP's preferred alternative makes nearly 90% of the UFO's planning area available to oil and gas leasing and 95% of the area rated as low potential for gas development open to gas leasing. I recognize that every lease must go through NEPA and is site specific, however I ask that the final RMP reflect the realistic potential for oil and gas development in the region and that further

BLM_0165264

consideration be given to effects of development on water and air quality, wildlife, soils, climate change, agriculture, recreation, and human health. I also urge you to consider the economic and health benefits of keeping fossil fuels in the ground particularly in our region where agriculture, ranching, recreation and tourism are significant economic drivers.

Comment Number: 000269_CascadeR_20161028-17
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I ask that you consider a no-leasing alternative on all public lands in the UFO as it seems all 4 alternatives have significant/excessive potential for lease sales. I grow much of my own food and purchase local foods for my family's consumption I consider extractive industries incompatible with sustainable agriculture

Comment Number: 000270_HarperS_20161023-3
Organization1:
Commenter1:Steven Harper
Commenter Type: Individual
Comment Excerpt Text:
When comparing the maps of Alternatives D and B-1 for the North Fork Valley, I see that the major difference is that the vast majority of the North Fork parcels in Alternative D are allowed to be leased, but are subject to "Controlled Surface Use." While Controlled Surface Use (CSU), No Surface Occupancy (NSO) and/or Timing Limitations (TL) stipulations imposed upon leases are comforting to some extent, these surface restrictions are limited – they don't address the subsurface risks and cumulative impacts of liquid fuel development using hydraulic fracturing technologies, risks that can realistically include permanently polluted aquifers, degraded irrigation water sources, air pollution releases from drilling and even earthquakes from injection wells. I'll spare you the URL citations. Because surface stipulations do not protect our resources as well as NSO designations and/or no leasing, Alternative D, it seems to me, cannot conceivably be considered as a reasonable alternative for the BLM parcels in the North Fork Valley. Your 2012 report entitled "REASONABLE FORESEEABLE DEVELOPMENT SCENARIO FOR OIL AND GAS FOR THE UNCOMPAHGRE FIELD OFFICE, COLORADO" states that the projected drilling densities for the North Fork Valley Parcels through the year 2030 are "very low." This must mean low interest and/or low potential. In any event, given this assessment, in combination with the risks posed by oil and gas development, it would seem that there is little reason not to withhold most of the North Fork Valley parcels from liquid fuel development at least for the duration of this new RMP.

Comment Number: 000283_BrillH_20161031-1
Organization1:High Wire Hops
Commenter1:Hal Brill
Commenter Type: Individual
Comment Excerpt Text:
We grow high quality hops for many microbreweries around the regions. Our livelihood depends upon clean water and air, as well as a perception that the North Fork Valley is a healthy place for sustainable agriculture. Our hops have been in many award winning beers due to their high quality. So although I am not opposed to some extraction of fossil fuels, I want to see a significant buffer zone that separates the agricultural North Fork Valley from drilling activities.

BLM_0165265

Comment Number: 000383_HellecksonB_20161031-7
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Other Sections: 31
Comment Excerpt Text:
Seismicity
Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e., an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRM identifies 683 movement features (e.g., rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRM at 3-178).
The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features.
Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.
The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity and again argues for a "no leasing in the North Fork watershed" alternative.

Comment Number: 000383_HellecksonB_20161031-8
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
Degradation of Watershed
As mentioned previously, agriculture in the North Fork relies exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed. Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways. Sudden Aspen Decline, a drought and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff. The level of development inherent in the DRMP preferred alternative further exacerbates the degradation of the watershed by road construction, well pad development, pipeline construction and dust. In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the residents of the North Fork in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.

Comment Number: 000401_ShoemakerS_20161028-6
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker

BLM_0165266

Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must address the question of whether or not this oil and gas development is really needed as well as the appropriate scale and timing of leasing and proposed development. At best natural gas is a short-term transition fuel eventually to be replaced by other energy sources

Comment Number: 000410_BolandB_20161027-2
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
As you know, the North Fork Valley recently confronted many of the issues raised in the Draft RMP in connection with the BLM's Preliminary Environmental Assessment and proposed Finding of No Significant Impact concerning the August 2012 proposed lease sale of approximately 30,000 acres of public lands (the "2012 Proposed Lease Sale"). The BLM reported that, in response to the 2012 Proposed Lease Sale, it received 2,982 comment letters during the public scoping period, including letters from 2,904 individuals and 61 organizations. Final Environmental Assessment, dated 11/16/2012. The 2012 Proposed Lease Sale received an "overwhelmingly negative response . . . from ranchers, coalmen, farmers, anglers and hunters," Mitchell Gershten, North Fork oil/gas lease sales are still a bad idea, DELTA COUNTY INDEPENDENT, December 14, 2012, and the BLM ultimately withdrew the parcels. The public's strong reaction to the 2012 Proposed Lease Sale demonstrated the North Fork community's overwhelming opposition to oil and gas development.
In the face of that recent experience, Citizens for a Healthy Community proposed the North Fork Alternative Plan, characterized as Alternative B.1 by the BLM, which reflects the community's sentiments. But once again, in connection with the Draft RMP, the BLM has ignored those concerns and proposes a pro-development plan.

Comment Number: 000420_HovdeC_20161101-13
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Delta County prefers site specific management of the fluid mineral leasing which takes into consideration all of the federal, state and local regulations, and technical advancements at the time of application. Delta County supports landscape management that incorporates a balanced level of economic viability, protection, restoration, enhancement and use of resources. Delta County has been consistent in their priority of multiple uses across all public lands and protection of private property rights associated with split estates.
o Delta County prefers a balanced approach to the fluid mineral leasing with the intent that the foundation, information, analysis and site specific conditions identified at the site level is brought forward to supplement and advise future oil and gas lease sale nominations.
o Delta County supports all forms of energy as they feel strongly that a diverse energy grid is critical to our homeland security and economy.

Comment Number: 000420_HovdeC_20161101-14
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:

BLM_0165267

Page 2494, Line 336, Remove the NSO restriction on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.
o Page 2-201, Line 337, Remove the CSU restriction on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.
o Page 2-205, Line 338, Remove the NSO and Surface Disturbance restrictions on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.

Comment Number: 000424_DoolingP_20161030-1
Organization1:
Commenter1:Peter Dooling
Commenter Type: Individual
Comment Excerpt Text:
No alternatives in the RMP provide enough specific regulations or stipulations regarding SWD injection. A more detailed study on the risks associated with SWD must be considered before allowing any injection in the UFO.

Comment Number: 000427_WalshOeinckP_20161031-8
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
The leasing of parcels which are unlikely to be productive should not even be considered.

Comment Number: 000431_EllisonP_20161031-1
Organization1:
Commenter1:Pamela Ellison
Commenter Type: Individual
Comment Excerpt Text:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.
The potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities, which, in turn, could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal."
I'm curious if the BLM took this information into account when determining which areas are suitable for drilling, and treated all the stakeholders with equal weight.

Comment Number: 000451_BishopB_20161031_HasAttach-15
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual

BLM_0165268

Comment Excerpt Text:
BLM recognizes that the economic contributions of natural gas development represent a small fraction of jobs and income (4-462). Why would a public land agency even consider the North Fork Valley a suitable place for drilling with all its potential negative impacts for such an insignificant positive result? A responsible public land agency would not do so. In 2011 BLM proposed an oil and gas lease sale of some 30,000 acres in the North Fork Valley. After receiving approximately 3000 negative comments, BLM revised its proposal to include a bit more than 20,000 acres. It appears that all 30,000 acres are now back under consideration for leasing. In our lengthy comment letter (excerpts of which are attached and are included here as part of this response to the draft RMP) we noted all the reasons why leasing was inappropriate for parcels 6195 and 6191 [T14S/R92W sections 3 and 4; T13S/R92W section 33 and 34], which surround our property. BLM removed them from further consideration. Nothing has changed on those lands, so why are they back under consideration for leasing, stipulations not withstanding?

Comment Number: 000451_BishopB_20161031_HasAttach-3
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Other Sections: 5.3
Comment Excerpt Text:
BLM states in ES.6.5: "Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, . . ." If balance implies compromise, this is surely a noble goal. However, Alternative D falls way short of both balance and compromise. Table 4-31 shows the Quantitative Impacts on Fluid Mineral Resources for the five RMP Alternatives under consideration. The first entry shows acres of land proposed for closure to fluid mineral leasing among the Alternatives. Alt. B, the "resource protection" alternative shows 186,700 acres closed; Alt. C, the "resource extraction" alternative shows 44,200 acres closed; Alt. D shows 50,060 acres closed. How is this balanced? It is certainly not a compromise! The entry that shows acres of land open to fluid mineral leasing subject to standard terms and conditions is hugely out of balance. The entries that show acres of land under NSO and CSU stipulations show a better balance between resource use and protection. However, Alternative D leans heavily on stipulations that do little to change the character of the use of the land in the RMP planning area. Indeed, "Alternative D would have the second highest [of the Alternatives] estimated emissions levels, with impacts above Alternative A [the current RMP]." (4 - 450) Under Alt. D mineral extraction would be permitted along with all the negative impacts the involved industry would bring to the area. (See comments in the fifth section below.) Stipulations simply do not change the overall impact of oil and gas leasing, at least not in the North Fork Valley.

Comment Number: 000456_ColeK_20161031-3
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
The DRMP proposes a 162,670 acre increase in lands "Open to leasing subject to NSO-BLM surface/federal minerals". If the intent of the DRMP is to continue to allow for productive leases on these acres as shown in Figure 2-23, it would be more practical to apply Controlled Surface Use (CSU) restrictions.

BLM_0165269

Comment Number: 000456_ColeK_20161031-4
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
Although directional/horizontal drilling capabilities have improved in recent years, total elimination of surface occupancy on leased ground would render much of the subject acreage inaccessible to drilling. We believe CSU restrictions are a fair compromise and would provide the necessary resource protection while also maintaining the potential for future resource development.

Comment Number: 000456_ColeK_20161031-5
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
Although areas with existing leases would not be subject to the stipulations in the DRMP, we are not supportive of applying new conditions of approval (COA) based on the new DRMP. The unpredictability of changing and unknown COAs will deter the industry from developing the resources to their fullest extent while using best management practices and result in a reduction of economic activity locally and regionally.

Comment Number: 000471_NoeD_20161101-10
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Please note that the Cozzette and Cameo Sandstone Members of the Mesaverde Group, which are listed as potential conventional drilling targets in the RMP document (page 3-120), do not exist in the North Fork area. My mapping shows that these zones pinch out to the west, near North Delta/Cedaredge. This lack of conventional targets in the North Fork area further justifies the limiting of leases in the North Fork area, as provided in Alternative B.1.

Comment Number: 000471_NoeD_20161101-11
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
In the paragraphs above, I have outlined many reasons why the Niobrara-equivalent strata of the Mancos Shale constitute a very poor to non-existent oil & gas play, based on geologic mapping and the distribution and character of the formation. I believe that there is a mistaken assumption – that all potentially leasable parcels on BLM lands are also potentially productive. If all of the parcels were potentially equally productive, then removing parcels from leasing would constitute a serious loss of oil & gas production and income. However, this assumption is most definitively untrue, for the reasons noted in the previous paragraphs. Removing a large number of low-quality or outwardly unproductive parcels will not have a large effect on the oil & gas production potential of BLM lands.
"The North Fork Alternative" plan (Alternative B.1) removes most of these parcels from leasing, and rightfully so. All of the other alternatives introduce leasing into these areas of very poor production potential, and are therefore inappropriate, impractical, and economically unsound. Lease restrictions would be of little use if the resource is not there! The remaining parcels that are leasable under

Alternative B.1, particularly in the Oak Mesa area, probably have low economic potential. After the failure of the Oak Mesa well, I would be surprised if those parcels are actually drilled in the future.
Comment Number: 000471_NoeD_20161101-3
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
My mapping in the North Delta, Orchard City, Lazear, Hotchkiss, Paonia, and Crawford quadrangles shows that Niobrara-equivalent strata and older strata in the Mancos Shale are found in extensive outcrops to the north and south of the Gunnison and North Fork Gunnison Rivers in the Delta to Hotchkiss areas, and along Cottonwood Creek, the Smith Fork River, and other tributary drainages in the Crawford area. In these areas, the Niobrara target zone either exists at the ground surface or has been eroded away. In short, the target zone no longer exists and no oil & gas production is possible. These areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

Comment Number: 000471_NoeD_20161101-4
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
To the north of the Niobrara outcrops, there is a topographic escarpment that forms the southern edge of the traditional Piceance Basin. It becomes several thousand feet higher than the adjacent North Fork Gunnison River valley. The Niobrara-equivalent strata are covered progressively, as one goes northward, by overlying formations, including younger members of the Mancos Shale, the Mesaverde Formation, and the Wasatch and Green River Formations. As a consequence of higher-elevation topography and bedrock that dips (tilts) and deepens into the basin northward, a significant amount of overburden strata become present atop the Niobrara zone. For safe oil & gas drilling using horizontal drilling and hydro-fracturing, there needs to be enough overburden to separate the deep "frac'ing" or production zone from overlying, nearsurface aquifers. (I do not know how much overburden is "safe." However, oil & gas promotional literature appears to state that the production depth needs to be 5,000-7,000 feet below the ground surface. I assume that this requisite amount of overburden exists in the central Piceance Basin in order to make for a viable Niobrara play there.) From these relationships, it can be easily inferred that, at the southern edge of the Piceance Basin, there will be a broad area to the north of the Niobrara where there is insufficient overburden to safely and practically develop and produce from the subsurface Niobrara zone. The northern edge of this area (i.e., the boundary between "non-sufficient" and "sufficient" overburden is not known, and is probably highly dependent upon the surface topography, which can vary markedly in the presence of deep tributary canyons. In the most general terms, these areas of insufficient overburden would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

Comment Number: 000471_NoeD_20161101-6
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
The NFA removes parcels that are coincident or proximal to a number of drinking water springs, both along the North Fork Gunnison River valley between Hotchkiss and Paonia, and on the western flanks of Mt. Lamborn and Landsend Peak. This is an appropriate and necessary protection. It should be noted, however, that some of the allowed leases in the upper Roatcap Creek drainage basin are upstream and

BLM_0165271

up (ground-water) gradient from four drinking water springs. I would urge you to withdraw those parcels as part of your final RMP.

Comment Number: 000471_NoeD_20161101-7
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:

In the northern Piceance Basin, and in northwestern Colorado and the Denver Basin as well, the productive zones in the Niobrara consist of closely stacked layers of limestone, ranging up to 20-40 feet thick and sandwiched between expanses of claystone. The limestone layers are an ideal medium for horizontal drilling, as they are brittle yet soft, and they can yield much oil & gas. The bounding claystones cannot be drilled or developed so efficiently and are not regarded as production targets. My mapping has found that limestones along the Delta-to-Paonia outcrop corridor are present as widely separated, individual beds that are each a foot thick or less. Most of the Niobrara-equivalent outcrops are comprised of claystone. Interpolating, this means that there is a major facies change somewhere in the subsurface Piceance Basin, between the limestone-rich New Castle outcrops and productive oil & gas fields in the north and the limestone-poor outcrops along the southern margin of the Basin. Thin, individual limestone beds cannot be drilled horizontally, and they cannot possibly yield oil & gas in commercially viable quantities. I have taken groups of oil & gas geologists to Niobrara-equivalent outcrops near Delta and Paonia, and they cannot believe they are seeing the same formation that they are drilling to the north! But the difference is real. There is some yet-unknown place beneath the Piceance Basin where the reservoir rock undergoes a facies change and the limestone all but disappears to the south. While it is not up to BLM to delineate that boundary, it is clear that the Mancos strata in the southern part of the Basin do not contain enough limestone to constitute a viable reservoir rock. (As a point of reference, Gunnison Energy's recent Oak Mesa exploratory well was drilled into this limestone-poor Niobrara zone. It was a very costly dry hole.) In a general way, these Limestone-poor areas along the Piceance Basin escarpment areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

Comment Number: 000471_NoeD_20161101-9
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:

Horizontal drilling and hydro-fracturing cannot be done in hard, brittle, silica-rich formations, including the Dakota Sandstone, Morrison Formation, and Entrada Sandstone that underlie the Mancos Shale. All of these formations were drilled and tested during the early to mid 20th century, using conventional vertical drilling, throughout the BLM-UFO planning area. With the exception of a minor oil-production well near Crawford, these wildcat wells were all dry holes. Unlike horizontal drilling, which can exploit target formations in a variety of structural configurations, vertical drilling requires that there must be some type of structural closure or facies change to trap oil & gas in order for production to occur. The previous drilling has already tested those traps, mostly without success. From this, I conclude that a deeper, sub-Mancos oil & gas resource does not exist in the North Fork and nearby areas.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-5
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 7
Comment Excerpt Text:

BLM_0165272

Nor does the Mineral Leasing Act preclude no-lease alternatives.9 Contrary to the draft RMP/EIS's assertion, nothing in the MLA "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands" in any way that would preclude adopting an RMP that prohibits further leasing. DEIS at 2-16. Courts have consistently held that section 226 of the MLA provides BLM with the discretion to decline to issue leases. See, e.g., Udall v. Tallman, 30 U.S. 1, 4 (1965), Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988). See also Ash Creek Min. Co. v. Lujan, 969 F.2d 868, (10th Cir. 1992) (affirming that federal courts lack authority to order federal lands to be leased and "the decision to offer the lands in question for competitive leasing would be in the sole discretion of the Secretary. MLA § 2(a), [30] U.S.C. § 201"). The language quoted above from the Draft Plan does not appear in the MLA or the implementing regulations. BLM's Land Use Planning Handbook states that "When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used."10 Even on its own terms, however, this non-binding policy statement does not apply to the threshold question of whether BLM can adopt a goal of reducing contribution to climate change, or objectives of eliminating greenhouse gas emissions. BLM can and should adopt such a goal, and leasing restrictions are the only means of achieving it guaranteed to be effective.

[9 Although not relied upon by BLM, we also note that neither the Federal Coal Leasing Act Amendments nor the Federal Onshore Oil and Gas Leasing Reform Act limit BLM's authority to close some or all areas to further coal, oil, or gas leasing in the RMP process. See WildEarth Guardians v. Salazar, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) , 43 C.F.R. § 3425.1-8(a)(3), Western Energy Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013).]

[10 BLM, Land Use Planning Handbook, H-1601-1 (March 11, 2005), (emphasis added) http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.P ar.38665.File.dat/h1601-1.pdf.]

Comment Number: 000480_SmithR_20161028-2
Organization1:
Commenter1:Robin Smith
Commenter Type: Individual
Comment Excerpt Text:
When deciding where to locate the 5% of lands, or approximately 46,000 acres, that will be open to fossil fuel leasing in Alternative B, BLM must take into account where there is opposition to oil and gas development and where there is support. Due to the overwhelming opposition to leasing anywhere near the North Fork Valley, this area should be included in the 870,000 acres that will remain closed to leasing. Similarly, the 46,000 acres available for fossil fuel leasing should be located in those communities within the UFO that support oil and gas development.

Comment Number: 000486_ClaytonJ_20161101-7
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3 8 21.1 44.1
Comment Excerpt Text:
Page: 2-187 to 2-191
Line: 333-334
Comment: Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks. We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse.

BLM_0165273

Comment Number: 000489_JohnsonA_20161101-103
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. B1 is highly protective of North Fork yet represents only a small impact to oil and gas resource
Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork.
It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D. (DEIS II 4-476)
Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[111]
[Footnote 111] 111 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512
B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.
The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted.[112]
The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states...
[Footnote 112] "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin.[113] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil.[114]
Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact.
[Footnote 113] "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf
[Footnote 114] "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance
These lands in the Piceance Basin provide decades of suitable sites for drilling.[115]
The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of

proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play.

[Footnote 115] "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Resource Management Plan. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and willing lessees, owners and operators—it is the market and industry's willingness alone that will determine how may rigs employ how many people.

Comment Number: 000489_JohnsonA_20161101-51
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.3
Comment Excerpt Text:
3. Roeber and McCluskey State Wildlife Area
The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.

Comment Number: 000508_DrakeM_20161101-2
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
There is no doubt that if the UFO had completed a Risk Management Plan that there
would be multiple areas within the UFO region what would have been identified as appropriate for a "No Lease for O&G" option. Considering the O&G risk impacts and the current worldwide surplus with O&G, it is obvious that delaying O&G development for the next 20 years is reasonable. There is little doubt that the extraction technologies will greatly improve in the next 20 years and the risks associated with the O&G development will drop.

Comment Number: 000515_RobinsonB_20161101_GunnisonEnergy-1
Organization1:Gunnison Energy
Commenter1:Brad Robinson
Commenter Type: Private Industry
Comment Excerpt Text:
Gunnison asks that the Preferred Alternative be rejected . Specifically, this alternative lacks flexibility and attempts to make vast areas closed to all minerals extraction and oil and gas development. The over use of no surface occupancy and other onerous stipulations is a not so vailed attempt to merely ban all future oil and gas activity in the area.

BLM_0165275

The area in question has been the site of oil and gas development for more than fifty years. During this time, there has never been a significant adverse event or impact to the area. The current oil and gas operators in the area have demonstrated a responsible approach to development. This responsible development can continue in harmony with land other uses.

Comment Number: 000525_RutledgeT_20161101_MountainTripInternational-3
Organization1:Mountain Trip
Commenter1:Todd Rutledge
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We ask that you include no surface occupancy on any of the EEAs identified in Alternative B in order to protect wildlife habitat and migration corridors. In the "Preferred Alternative," Alternative D --- over 90% of land would be open for oil and gas leasing. This is the default, yet many of these lands have low potential for oil and gas, or possess other outstanding values and should be protected for recreation, wildlife, or other conservation values. We ask that the BLM set reasonable limits to mineral extraction on our public land.

Comment Number: 000536_SchottJ_20161031-1
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
The BLM has the authority to use a little used tool called "No Leasing". The BLM should use this tool to close 75% of the of the North Fork Area to oil and gas leasing for the life of the RMP. Based upon a complete and accurate assessment of the specific resource concerns of the area this designation is called for.

Comment Number: 000536_SchottJ_20161031-2
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
20% of the North Fork should be designated for "No Surface Occupancy"

Comment Number: 000536_SchottJ_20161031-3
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
Less than 5% of the North Fork area would not be closed but be managed with stipulations to protect areas with moderate geologic hazard and vistas.

Comment Number: 000545_SlivkaJ_20161101-131
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.3
Comment Excerpt Text:
If BLM does not close the North Fork area to leasing, it must adopt Alternative B/B1 to protect the public lands resources and communities in the North Fork Valley.

BLM_0165276

Comment Number: 000545_SlivkaJ_20161101-185
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation measures.
BLM has an opportunity in this RMP to make great strides in conservation and recreation management, as well as other multiple uses. However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development. Oil and gas development is known to cause a variety of problems that are detrimental to natural resource conservation, and by leaving a large amount of the planning area open to leasing, BLM may undermine any conservation efforts or goals it identifies in the RMP. Making areas available to oil and gas leasing also allows for speculative leasing, which can preclude conservation management of those areas. Even leases in areas with low potential for development or where leaseholders have no plans for development tie up the land for the duration of the lease due to the lease being a valid existing right. For example, BLM could not commit to mitigation efforts in leased areas due to the possibility of the lease(s) eventually being developed.
Therefore, BLM should limit lands available to leasing to ensure the viability and durability of conservation efforts.

Comment Number: 000545_SlivkaJ_20161101-188
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.
In the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 865,970 acres open to leasing, 433,230 acres are considered low potential for conventional oil and gas and 449,330 acres are considered no potential for coal bed methane. Out of the 433,230 total acres of low potential oil and gas BLM has kept 410,600 acres open (95%). Out of the 449,330 acres of no potential coal bed methane, BLM has kept 413,650 acres open (92%). Despite being classified as low or no potential and a severe lack of operator interest (only 5 leases have been issues in the field office since 2009 [Footnote 68 LR2000 Report]), BLM has chosen to keep a large amount of land open to leasing. This comes at the expense of protecting other resource values like wildlife, recreation and wilderness.

Comment Number: 000545_SlivkaJ_20161101-189
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Clearly, BLM's analysis of development potential and reasonable foreseeable development in the planning area is not informing management alternatives in the Draft RMP. BLM should instead utilize this analysis to implement a management decision that reflects the likely development in the planning area during the life of the RMP. All areas identified as having "low" oil and gas potential should be removed from consideration for leasing. BLM can (and frequently does) amend land use plans to accommodate new interest in leasing and developing a resource when that interest transpires. Without such interest, it is irresponsible to allow for speculative leases to tie up public land that should instead be managed for multiple uses.

BLM_0165277

Making low development potential areas available for leasing compromises protections for wildlife, recreation and other resources while encouraging speculative leasing. An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing. [Footnote 69 See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.16%29.pdf).] Fundamental flaws in BLM's guidance have led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development. [Footnote 70 www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil____gas_ statistics/data_sets.Par.69959.File.dat/summary.pdf ] And a Congressional Budget Office report recently found that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued noncompetitively actually entered production. [Footnote 71 https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf]

Comment Number: 000545_SlivkaJ_20161101-191
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should close all areas identified as having low or very low potential for oil and gas development to leasing to ensure speculative or unexpected leasing does not undermine conservation efforts. BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate. BLM should utilize the proposal included as Attachment 5 to reevaluate oil and gas allocations in the Uncompahgre RMP.

Comment Number: 000545_SlivkaJ_20161101-204
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Phased leasing and development and surface disturbance caps
Phased leasing is the concept of limiting the number of parcels offered for sale in a given time period or otherwise leasing parcels in a strategic manner. BLM includes phased leasing as a "Resource Protection Measure" in its formal guidance on MLPs. Handbook H-1624-1, Section V.C.2. Phased development is used to manage the timing and location of oil and gas development in a given area. As stated by the BLM, phased development "refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while restricting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed." Phased development can be applied in a variety of ways. It can be based on timing - developing one area, then completing reclamation before moving to another area. It can be based on location - delaying development in wildlife corridors. Phased development can also be used to limit the amount of surface disturbance on a lease at any given time (applying surface disturbance caps – as a percent of a lease or unit or using an acreage figure) and requiring successful restoration before permitting additional disturbance. This concept allows development to proceed in a controlled manner and gives BLM the

BLM_0165278

flexibility and time necessary to address any problems that may arise and develop a solution before the same issue arises somewhere else.

Phased leasing and development have been used effectively in a number of land-use planning decisions. We have seen phased leasing successfully incorporated into both the Dinosaur Trail MLP and Beaver Rim MLP. In Dinosaur Trail, BLM includes phased leasing as an approach to achieve the overall RMP objective:

Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology.

White River Field Office Approved RMPA at 1-4. Within the Dinosaur Trail MLP, BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology. Under the phased approach, leasing will first proceed in that portion of the Dinosaur Trail planning area with the most accessible oil and gas resources and fewest potential resource conflicts, and later proceed to areas with lower development potential.

Phased development was also incorporated into the Beaver Rim MLP which utilizes a surface disturbance cap approach to phased development and provides that the BLM will:

Allow no more than 5 percent surface disturbance in the township in which the parcel is located until interim reclamation goals are achieved. Require co-location of new disturbance if technically feasible. If new disturbances cannot be co-located, they must be at least 1.2 miles from existing disturbance. Lander Record of Decision and Approved RMP, Record No. 2028.

In the Uncompahgre RMP, BLM could apply a similar phased approach as described in Dinosaur Trail, by first providing for leasing and development in that portion of the planning area where industry interest is most heavily focused, where development potential is medium to high, where infrastructure already exists, and where resource conflicts are minimal. Once high and medium potential lands have been fully leased and there is expressed interest from industry, the agency would then consider leasing parcels in low potential areas, pending additional planning. This framework is essential to ensuring the adequate protection of other resources in undesirable oil and gas areas. The Uncompahgre RMP could also incorporate phased development by establishing a surface disturbance cap as done was done in the Beaver Rim MLP to incentive successful final reclamation prior to approving new APDs.


Comment Number: 000545_SlivkaJ_20161101-205
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Clustered leasing and development
Clustered development based upon best available technology can minimize surface area development and impacts as well as reduce noise and dust caused by traffic to and from drill sites. In the Uncompahgre Field Office, BLM should focus development in places where there are active wells or where there is existing infrastructure like piping and roads. This is a viable way of reducing habitat fragmentation and protecting sensitive species while allowing development activities to proceed responsibly.

We encourage BLM to create mechanisms and make land use allocations that results in clustered development for oil and gas. There are at least 17 wells in the planning area, but the RFD estimates that during the planning cycle of 2010 through 2030, as many as 1,271 wells could be drilled in the planning

BLM_0165279

area with 418 under BLM management. Uncompahgre Draft RMP at 3-120. While this number is speculative and contingent upon stipulations and authorizations made in the RMP, it points to future opportunities to concentrate development in a way that limits the extent of lateral development and the overall impact of oil and gas activities.

Comment Number: 000545_SlivkaJ_20161101-206
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Master Development Plans
A critical drawback to the BLM's reliance upon stipulations and COAs on an individual lease and permit basis is that is does not allow for comprehensive and holistic management or effective cumulative impact analysis. The best way to promote those positive management strategies is for BLM to require comprehensive development plans through Master Development Plans (MDPs). By requiring the submission of multi-well plans that include details on proposed locations, access points and ancillary facilities, the agency can gain a clearer picture of the scope and scale of not just the development, but the potential impacts to surrounding resources and visual values. Although MDPs have been used in this field office - most recently with Whitewater and Bull Mountain - BLM fails to identify MDPs as a tool for minimizing impacts associated with fluid mineral development in the Draft RMP. In fact, there is no reference to MDPs anywhere in the draft alternatives.
Other field offices have encouraged the use of MDPs by including specific stipulations in planning documents. This approach was adopted in the White River Field Office's Dinosaur Trail MLP, which directs that "Master Development Plans would be required for all oil and gas activities, including exploratory drilling, within the Dinosaur Trail MLP." White River Field Office Approved RMPA at 2-45. Notably, within the Dinosaur Trail MLP, "specific resource protection measures would be evaluated when an operator submits a Master Development Plan"; and those measures can include unitization, phased development, limitations on surface disturbance, multi-well pads, protections for scenic values and placing all linear disturbances (e.g., power lines, pipelines, roads) in common corridors and interim reclamation. Id. at 2-46. The Grand Junction Field Office utilizes this approach in the recently revised RMP as well. Fluid mineral Stipulation MIN-MA-05 states:
In areas being actively developed, the operator will be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.
GJFO Approved RMP at 181.
MDPs can also be a useful tool in managing oil and gas units. Requiring MDPs can help BLM manage how development occurs across a unit and protect important public lands resources while providing for development of the unit.
MDPs are an effective tool for minimizing impacts from oil and gas development and help incentivize smart and systematic development. They are an efficient way for BLM to manage oil and gas resources in the planning area. We encourage BLM to require MDPs for all fluid mineral development in the planning area.

Comment Number: 000565_TothK_20161102_DCD-18
Organization1: Delta Conservation District
Commenter1:

BLM_0165280

Commenter Type: Local Government
Comment Excerpt Text:
The BLM is disingenuous when it promotes drilling on private agricultural land to provide access to federal minerals. Instead, the BLM should develop a "corridor rule" that allows for easier access to federal land that border prime farm land, provided that the adjacent land owner supports mineral activity in BLM land that is adjacent to his or her land.

Comment Number: 000545_SlivkaJ_20161101-207
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
New drilling techniques
Relatively recent drilling approaches such as stacked and biplanar horizontal drilling or a "wine rack" approach are reducing surface infrastructure and overall impacts, while making monitoring, inspection and enforcement more efficient for the agency. For instance, stacked horizontal or lateral drilling can allow numerous wells to be drilled from a pad that can access different depths and conditions; as discussed in a recent article on drilling in shale formations, "Pioneer can drill 30 to 40 wells from the same pad site to different depths before turning them horizontally through six different strata, each with its own characteristics." [Footnote 99 Online at http://www.bizjournals.com/dallas/blog/2013/05/pioneer-using-stacked-laterals-in.html] This technique can limit surface disturbance and infrastructure, while also providing access to fluid mineral resources.
The Dinosaur Trail Master Leasing Plan, in the White River Field Office, includes taking advantage of the best available technology in its overall vision for the WRFO Oil and Gas Development Amendment: Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology.
White River Field Office Approved RMPA at 1-4. Recognizing that technology already exists and is rapidly evolving to minimize impacts and maximize efficiencies should be an integral component of oil and gas planning on public lands, and BLM should incorporate stipulations encouraging the use new technologies in the Uncompahgre RMP.
As noted above, BLM can incorporate requirements such as surface disturbance limitations and placing multiple wells on a pad in COAs and/or MDPs. In addition to including a stipulation incentivizing the use of new technologies, BLM should also require advanced drilling techniques as COAs within the planning area at the APD level to minimize impacts and increase efficiencies as part of fulfilling the overall goals of the RMP.

Comment Number: 000545_SlivkaJ_20161101-208
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Suspensions
Pursuant to 43 CFR 3103.4-4 and 43 CFR 3165.1, operators are allowed to apply for and BLM may approve a request for suspension of an existing lease. A suspension effectively puts a lease on hold, stopping the clock and ensuring the lease will not expire. While in suspension, operators are exempt from making rental payments on that lease and have no obligation to diligently develop those resources that would otherwise be subject to royalty payments. Nationally, 10% (3.25 million acres) of currently

BLM_0165281

leased federal minerals are held in suspension, often without appropriate justification. This deprives American taxpayers of the royalty and rental payment revenues they are owed while allowing industry to pad their books for investors. A study conducted by The Wilderness Society found that approximately $82 million have been lost on rental payments not made due to suspensions. [Footnote 100 Online at: https://wilderness.org/sites/default/files/TWS%20Hoarders%20Report-web.pdf] Additionally, suspensions tie up land and keep BLM from protecting other resource values like wildlife, wilderness and recreation.

Compounding this problem is inadequate monitoring and review of suspended leases by the agency. Often, suspension orders expire or the stated justification for the suspension is resolved, but the suspension is not lifted by the BLM. This results in leases remaining in suspension well beyond the timeframe specified in the order and in some instances allows suspensions to remain even when a suspension is no longer permissible under the agency's own rules and regulations.

The revision to the Uncompahgre RMP provides BLM with an opportunity to address this issue across the entire planning area to ensure suspensions are issued and rescinded appropriately. We encourage BLM to pursue the following actions:

? Include a management action that commits the agency to a review of all suspensions within the planning area. The BLM should lift suspensions on all leases where there are no valid reasons to continue suspension and cancel all those that have expired. The BLM should take immediate action to address problematic lease suspensions by cleaning up records, lifting unnecessary and expired suspensions and issuing expiration notices on leases that should have expired by the terms of applicable suspension agreements.

? The BLM should increase transparency and opportunities for public involvement in lease suspensions and monitoring. The BLM should post documentation of lease suspension requests and decisions, including on its NEPA log, but also in a dashboard available via state office websites. Information on suspended leases, including status and reason for suspension, should be made public to provide for public oversight and accountability on the length of suspensions in annual oil and gas program reports. A summary of lease suspensions should be included in the BLM's annual reporting of oil and gas statistics, as well.

? The field office should develop and issue guidance for considering suspension requests that includes clear criteria for when the authorized official does and does not have discretion to grant a suspension request and provides the authorized official with parameters on issuing suspensions. This guidance should also clarify when the agency should exercise its discretion to approve or deny a suspension request and establish a monitoring and tracking system for suspensions.


Comment Number: 000563_King_WELC_HasAttach-2
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.1
Comment Excerpt Text:
BLM must take steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions.


Comment Number: 000563_King_WELC_HasAttach-240
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)

---

BLM_0165282

Comment Excerpt Text:
In fact, the UFO has expressly recognized this mandate in the context of Wilderness Study Areas. See DEIS at 3-158 and 4-397. However, the obligation to implement a management regime that sufficiently protects the air, water, lands, and health goes beyond Wilderness Study Areas to encompass the entire planning area. Of critical importance in regard to oil and gas development is the agency's failure to require mitigation measures and best management practices on all future development within the planning area.

Comment Number: 000579_HigginbothamN_20160606-1
Organization1:
Commenter1:Nelly Higginbotham
Commenter Type: Individual
Comment Excerpt Text:
Oil and gas development and fracking on public lands in or around our area should not be permitted when there's a risk to our overall health and well-being, could potentially disrupt and poison our watersheds, creating an issue for the food we so proudly grow, pollute the air we breathe and destroy the views we hold so dear. Given what we now know about the negative impact of oil and gas chemicals, and radioactive wastewater to human health, a no-leasing alternative for the North Fork Valley is the-only way to protect our community and preserve the quality of life we, North Fork residents, have come to highly value and cherish.

Comment Number: 000620_FarnyC_20161101-1
Organization1:
Commenter1:Cindy Farny
Commenter Type: Individual
Comment Excerpt Text:
There needs to be a new plan where you designate certain areas that could be leased if need be, but NOT 98% of the land in the draft plan for the Uncompahgre Field Office.

Comment Number: 000639_RobertsJ_20161027-1
Organization1:
Commenter1:Josh Roberts
Commenter Type: Individual
Comment Excerpt Text:
The citizen of the north fork valley and surrounding areas have consistently responded to the blm's efforts to lease public lands to private corporations with dismay and requests for no development. I am an organic farmer and am developing and organic raw milk dairy. I live just outside of Paonia and have chosen to live and work in this region because of the quiet, dark nights, minimal truck traffic, relatively clean air and water. Any choice to increase oil and gas development threatens my livelihood and represents an arbitrary and cupreous choice by the BLM that I am in full opposition to.

Comment Number: 000640_SibleyB_20161015-1
Organization1:
Commenter1:Bert Sibley
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
I feel that the BLM needs to impose a moratorium on oil and gas leasing until they do a complete assessment of safety risks for the pipeline and unregulated rural transmission lines and also needs to have baseline samples of air quality.

BLM_0165283

Comment Number: 000643_WegnerB_20161101_BullMtn-1
Organization1:
Commenter1:Brian Wegner
Commenter Type: Individual
Comment Excerpt Text:
BLM has proposed a revised Resource Management Plan for the UFO, and is required to issue a moratorium on oil and gas development until the new RMP is issued.

Comment Number: 500016_GoldsberryS_20161101-2
Organization1:
Commenter1:
Commenter Type:
Other Sections: 41.1
Comment Excerpt Text:
For both moral and liability reasons,
it is necessary that the BLM issue a moratorium on oil and gas leasing.The risks associated with the pipelines span from endangering campsites and campers,forest fires, water pollution, animal fatalities, human fatalities, as well as many other social and economic risks. Until a thorough risk assessment is completed on the pipelines, there needs to be a moratorium on all leasing. Without a moratorium, the BLM could be held responsible for any and all injuries, deaths, environmental degradation, and economic repercussions because this risk assessment was not conducted.

Comment Number: 500027_LavertyD_20161026-3
Organization1:
Commenter1:Densie Laverty
Commenter Type: Individual
Comment Excerpt Text:
Although I appreciate the inclusion of the North Fork Alternative: B1, in the draft regional management plan; I am asking the BLM to include a NO LEASING ALTERNATIVE in the RMP. Avoidance (not allowing a harmful activity) is the first step of proper mitigation, and one that the BLM must consider and adopt if appropriate.

Comment Number: 500040_EllisonK_20160914-2
Organization1:
Commenter1:Keith Ellison
Commenter Type: Individual
Comment Excerpt Text:
I encourage you to pursue a no-leasing alternative as a way
to preserve our fishing heritage and the quality of fishing
in the North Fork Valley.

Comment Number: 500041_GroomeP_20160920-1
Organization1:
Commenter1:Patricia Lewis Groome
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
I became aware of the RMP recently. It is my belief that the BLM did not complete a proper risk analysis. The BLM did not consider earthquake, hydraulic fracing, human health impacts or pipeline safety. The

BLM_0165284

BLM did not consider risks of unregulated pipelines in rural areas and have put us at even more risk for that reason, I ask for a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated.

Comment Number: 500131_HeidemanB_20161027-2
Organization1:
Commenter1:Bernie Heideman
Commenter Type: Individual
Comment Excerpt Text:
The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impact on the environment, the BLM may restrict or prohibit some land uses in specific areas."
Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, the leasing of any federal fluid minerals within the borders of the NF AP should be prohibited and this prohibition on further leasing incorporated into the alternative chosen for the revised RMP or at the very least, those in Alternative B1. This is the only way to preserve and protect the integrity of this unique and renowned part of Colorado.

Comment Number: 500147_BradfordD_20161008-7
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
The elimination of gas and oil leases in the upper North Fork Valley is unreasonable and unnecessary. These resources could and should be developed

Comment Number: 500147_BradfordD_20161008-8
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
However, I do not support the sale of leases in the Paonia area, especially south of the North Fork of the Gunnison River. These areas have very low potential and should not be put up for bid unless there is documented evidence that there are developable gas and oil resources in this area.

Comment Number: 500161_PellandE_20160803-1
Organization1:
Commenter1:Erica Pelland
Commenter Type: Individual
Comment Excerpt Text:
It is imperative that the BLM should offer a no lease option which permits no increase in hydraulic fracturing.

Comment Number: 500186_BrettE_20161001-1
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
Allowing oil and gas leases adjacent to communities like the North Fork Valley is the equivalent to genocide. You would be killing those people, lifestyles and lands that make America great. I urge you to

BLM_0165285

incorperate into the UFO RMP plans that prohibit or severely limit oil and gas development. The BLM should include a "no leasing" alternative. However, reality dictates that the market continues to demand fossil fuels, therefore, I urge you to accept Alternatives B and B1 which limit development and maintain special places for all of us to enjoy for years to come.

Comment Number: 500188_HillC_20161101-1
Organization1:
Commenter1:Celeste Hill
Commenter Type: Individual
Comment Excerpt Text:
A no-leasing alternative is the only reasonable conclusion to a rigorous analysis of the risks posed by oil and gas operations, including tracking technologies and large scale industrialization. Please place a moratorium on oil and gas leasing and impose a ban on these activities until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.

Comment Number: 500201_WitherC_20160808-1
Organization1:
Commenter1:Candy Wither
Commenter Type: Individual
Comment Excerpt Text:
As a part time resident of Paonia I would like to encourage you to consider a no leasing Alternative.

Comment Number: 500262_RehfeldtM_20160808-1
Organization1:
Commenter1:Melissa Rehfeldt
Commenter Type: Individual
Comment Excerpt Text:
I ask you to deeply consider a no fracking alternative to be written up and accepted

Comment Number: FormLetterB_CHC-1
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

Comment Number: FormLetterCCCC-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Please consider the option of not leasing.

BLM_0165286

Comment Number: FormLetterEEEE-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Therefore, a no leasing option should be considered, as we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals. The no lease option is the best way to protect the North Fork Valley and ensure our community can continue to thrive in the future. While that is the only option I feel is valid, if you won't consider a no-lease option, then Plan B1 would be the next least damaging option.

Comment Number: FormLetterGG-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Due to the undisclosed chemicals in the fracking fluid, it would be irresponsible to proceed without further study. Therefore, a no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals.

Comment Number: FormLetterH_CHC-1
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
I urge BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale oil and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado, and adopt a no-leasing alternative.
The draft RMP is a roadmap to industrializing the UFO region, and in particular, contaminating the air, water, soil, and agricultural lands of the very special North Fork Valley.
It is unacceptable and unconscionable to not only risk destroying this vital ecosystem, but to sanction additional greenhouse gas emissions, which increase disastrous climate change impacts. The only way to prevent irreparable harm to this special area is to close off all BLM lands and minerals in the area to oil and gas leasing.
At a minimum it BLM must impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable.

Comment Number: FormLetterHHHH-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
This is why I am asking you to please choose the North Fork Alternative, B1, and all other reasonable conservation protections in Alternative B. This is only secondary to my first choice, which would be to have zero hydraulic fracturing. How did you not consider this as a reasonable alternative?

BLM_0165287

Comment Number: FormLetterI_WildEarthGuardians-1
Organization1:WildEarth Guardians
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.1
Comment Excerpt Text:
I urge the Bureau of Land Management to exercise its absolute discretion over whether to lease oil, gas, and coal leasing and undertake the following actions:
1. Make all publicly owned oil, gas, and coal in the Uncompahgre Field Office unavailable for leasing;
2. Prohibit any and all future leasing of fossil fuels within the Field Office; and
3. Require that existing fossil fuel leases be canceled as expeditiously as possible after production ends.

Comment Number: FormLetterII-3
Organization1:
Commenter1:
Commenter Type:
Other Sections: 41.1
Comment Excerpt Text:
However, because rural gas gathering lines are exempt from the federal pipeline safety regulations, the moratorium is needed to protect the North Fork Valley until rural pipelines are regulated. At this point, the BLM should not move forward with any options laid out in the Draft RMP.

Comment Number: FormLetterNN-1
Organization1:
Commenter1:
Commenter Type:
Other Sections: 41.1
Comment Excerpt Text:
The fact that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety is enough to call for a moratorium on all oil and gas leasing in the
North Fork area. For both moral and liability reasons, it is necessary that the BLM issue this moratorium. The risks associated with the pipelines are too great to move forward at this point.
I demand that BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give we the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

Comment Number: FormLetterNNNN-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I sincerely recommend that you do not allow any of the options mentioned in the RMP. There should be a NO LEASE option! While I recommend that you don't do anything, if you must select an option, then the only one to consider is Alternative Plan B1.

Comment Number: FormLetterOO-1
Organization1:
Commenter1:

BLM_0165288

Commenter Type:
Other Sections: 41.1
Comment Excerpt Text:
The fact that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety is enough to call for a moratorium on all oil and gas leasing in the North Fork area. For both moral and liability reasons, it is necessary that the BLM issue this moratorium.
The risks associated with the pipelines are too great to move forward at this point.
I demand that BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give we the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

Comment Number: FormLetterPP-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
A no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially/spilled or consumed by animals. If that is not possible, then the only option I would consider is Plan B1.

Comment Number: FormLetterQ-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
How can the BLM consider more drilling sites for fracking when you have not analyzed oil and gas operations and their impact on human health and the environment? How can BLM prove that no harm to human health will result from these operations?
A thorough analysis of the human and environmental impact needs to be completed before any leasing options should be considered. The BLM should strongly consider a no-leasing alternative, as that is the only reasonable option at this point in time.

Comment Number: FormLetterRRR-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I don't feel that the BLM explored all reasonable options and did not consider a no-leasing alternative. That is the only reasonable option. Knowing what we do about the impacts of oil and gas on human health, the environment and climate change, a no-leasing option is the best way to protect the North Fork Valley and ensure our community can continue to thrive in the future.
While that is the only option I feel is valid, if you won't consider a no-lease option, then Plan B1 would be the next

Comment Number: FormLetterUU-1
Organization1:
Commenter1:
Commenter Type:

BLM_0165289

Comment Excerpt Text:
Due to the undisclosed chemicals in the fracking fluid, it would be irresponsible to proceed without further study. Therefore, a no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals.

Comment Number: FormLetterVVV-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM has not considered all options. Where is the No Lease option? That must be included as an alternative plan.

Comment Number: FormLetterX-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I am unwilling to consider any of the options in the BLM's Draft RMP due to continuing negative impact of fracking on the environment and everyone living, working or vacationing in areas near fracking. I demand that the BLM issue a moratorium on oil and gas leasing and hydraulic fracturing.

Comment Number: FormLetterXX-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I urge the BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, and risk human and animal life.

Comment Number: FormLetterY-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM has not considered all options. Where is the No Lease option? That must be included as an alternative plan.

*Summary*
A. Commenters stated that the BLM did not consider a full range of alternatives due to the failure to include a no leasing alternative, and that the rationale the BLM used to dismiss the no leasing alternative without analysis has no basis in law or fact and does not consider new information, science, and national policy related to climate change. Similarly, some commenters stated that closing 5 to 33 percent of the decision area to oil and gas leasing does not represent a true range of alternatives. Other commenters stated that there is ample precedent for the BLM to add additional areas closed to leasing between draft and final EISs without requiring supplemental NEPA. Commenters also noted specific locations that should be withdrawn from

BLM_0165290

oil and gas leasing for resource protection (i.e., land adjacent to drinking water springs, both along the North Fork Gunnison River valley between Hotchkiss and Paonia and on the western flanks of Mt. Lamborn and Landsend Peak, and critical wildlife habitat, such as the Roeber State Wildlife Area).

Commenters recommended removing NSO and CSU and other restrictions on private surface, as this infringes on private property rights of the surface owner. Commenters also requested review of conservation easement data and NSO stipulations on private conserved lands with split estate.

B. Some commenters requested a moratorium on oil and gas leasing while the planning process is ongoing. Others requested that the moratorium occur until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration, and until safe disposal for wastewater (including saltwater) is available, and/or until an environmental risk assessment has been completed.

C. Commenters also stated that the potential for development of oil and gas resources should inform oil and gas allocations in the RMP, and that the RMP must address the question of whether or not this oil and gas development is necessary, as well as the appropriate scale and timing of leasing and proposed development. The BLM's *Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado* (Draft RMP/EIS reference BLM 2012d) should be referenced and used when determining when lands have a high, medium, low, and very low potential for oil and gas development.

D. Other commenters noted that drilling in the North Fork Valley would not substantially alter the amount of gas available for development over the life of the RMP, the number of jobs available in the oil and gas industry regionally, or the amount of energy being produced.

E. One commenter questioned why 30,000 acres are being considered for development when a proposal in 2011 reduced this acreage to 20,000.

F. One commenter noted that the BLM should verify if the Cozzette and Cameo Sandstone of the Mesa Verde Group are located in the North Fork Valley and if the Niobrara Zone and sub-Mancos oil and gas resource currently exist.

G. Commenters suggested alternative methods of leasing. One commenter encouraged the BLM to require master development plans for all fluid mineral development in the decision area and to add this requirement in the Proposed RMP. By requiring the submission of multi-well plans that include details on proposed locations, access points, and ancillary facilities, the BLM could gain a clearer picture of the scope and scale of not just the development, but also of the potential impacts to surrounding resources and values. Another commenter recommended phased leasing, with priority given to areas with the highest level of mineral potential, or clustered leasing to limit overall area of disturbance.

H. Commenters stated that the use of Controlled Surface Use (CSU), No Surface Occupancy (NSO), and/or Timing Limitations (TL) stipulations do not provide the same level of protection as no leasing, particularly related to the subsurface risks and cumulative impacts of liquid fuel

BLM_0165291

development using hydraulic fracturing technologies, and these should not be seen as reasonable alternatives to no leasing.

I. In contrast, some commenters requested reduced limitations on oil and gas leasing, including:

1. Amend Alternative D to allow for surface occupancy and surface-disturbing activities subject to site-specific review with the ability to apply site-specific restrictions to allow flexibility.
2. Include a preference for site-specific management of fluid mineral leasing, which takes into consideration all of the federal, state, and local regulations and technical advancements at the time of application.
3. Limit fluid mineral leasing in suitable WSR segments only when such segments have been added to the National Wild and Scenic Rivers System by Congress.

J. Commenters stated that the BLM should incorporate stipulations related to the use of new technologies for fluid mineral development in the RMP. Commenters recommended specific edits of management actions for fluid mineral development, including modification of the type of stipulations applied in specific areas (e.g., CSU versus NSO). Commenters requested that the Proposed RMP include stipulations that allow for coal mine methane drilling, while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development.

K. One commenter noted that lack of analysis on well bore failures and their effects in the Draft RMP/EIS, and noted that the agency's preferred alternative (Alternative D) is incompatible with the North Fork Valley's economy.

*Response*
A. The BLM explained its rationale for not including a fluid mineral no leasing alternative in Draft RMP/EIS Section 2.4.3 (page 2-16). As noted in the Draft RMP/EIS (Section 2.4.1), "[a]lternatives that promote exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resources uses were eliminated from further consideration." As noted in the Draft RMP/EIS, the BLM identified no resource values that could only be protected by prohibiting all such leasing throughout the decision area, and no such resources values have been identified since completion of the Draft RMP/EIS. Although an alternative prohibiting leasing throughout 100 percent of the decision area was not analyzed in detail, which does not mean that the entire decision area would be leased under any of the alternatives.

In addition to the closed to leasing alternative allocations, the Draft RMP includes other less-restrictive alternative allocations, such as NSO, CSU, and TL stipulations and BMPs (see Appendix B of the Draft RMP/EIS for a consolidated list of stipulations considered and Appendix G of the Draft RMP/EIS for a consolidated list of BMPs). The BLM developed a reasonable range of alternatives that meet the BLM's purpose of and need for the RMP (Draft RMP/EIS Chapter 1). The BLM's range of alternatives is neither too permissive nor too restrictive.

The list of drinking water springs was updated in the Proposed RMP/Final EIS. However, regulations mandate that new springs discovered over the life of the Uncompahgre RMP would also be protected by the State of Colorado. On split-estate lands, the BLM coordinates with

BLM_0165292

both the operator and surface owner, in accordance with the requirements of Onshore Oil and Gas Order No. 1 (Approval of Operations on Onshore Federal and Indian Oil and Gas Leases), and generally provides the surface owner the same level of resource protection as would be required on BLM-administered surface. The BLM does not regulate the surface owners' use of surface estate; the BLM regulates the activities of federal mineral leases. Further detail regarding the BLM's regulation of surface operations necessary to accommodate development of the federal fluid mineral estate can be found by reviewing the preamble to federal Onshore Oil and Gas Order No. 1, particularly pages 10308 and 10312 of the preamble. Because the surface estate is subservient to the dominant mineral ownership of the US, in order to comply with the NEPA, ESA, National Historic Preservation Act, and other federal regulations, the BLM adds lease stipulations to the split-estate for federal oil and gas leases to ensure that the leasing and surface development decisions conform to the approved RMP.

B. The UFO RMP is a planning-level document that does not make site-specific decisions on mineral leasing, including moratoriums. However, the 1989 RMP is the current land use plan, and its decisions remain in effect until the RMP revision is approved. The 1989 RMP states:

> "Oil, Gas, and Geothermal Resources. Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms: Other conditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands. Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities."

Because the 1989 RMP is supported by an EIS, a moratorium on oil and gas leasing is unnecessary until such time the RMP revision is approved. During the RMP process, oil and gas parcels nominated for leasing, submission of master development plans, or applications for permit to drill may require further NEPA analysis that assesses hydraulic fracturing, climate change, and habitat loss, among other topics.

Information on risks from pipelines was added to Chapter 4, Public Health and Safety. The US Department of Transportation, Pipeline and Hazardous Materials Safety Administration issued a final rule, Pipeline Safety: Operator Qualification, Cost Recovery, Accident and Incident Notification, and Other Pipeline Safety Changes, including revisions to rules covering rural gathering lines (82 Federal Register 7972, January 23, 2017). This rule was scheduled to go into effect March 24, 2017, but has been delayed while the new administration reviews the final rule. Until such time that the new rule is in effect, operators will comply with the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011. If and when the new rule goes into effect, operators constructing or operating pipelines on oil and gas leases within the UFO will be required to adhere to the new rule. Draft RMP/EIS Appendix G, Best Management Practices and Standard Operating Procedures, includes BMPs for fluid minerals throughout the oil and gas process (see Draft RMP/EIS page 2-23 line 5, and Appendix G, page G-1). Further specific measures (conditions of approval) may be required of oil and gas operators by the BLM at the application for permit to drill level (see Draft RMP/EIS, Appendix B, page B-3). Also see Section 41, Other – Pipelines of this report.

BLM_0165293

C. Analysis regarding the Reasonably Foreseeable Development Scenario fluid minerals potential (conventional oil and gas potential and coalbed methane potential) and the oil and gas alternatives allocations is included in Draft RMP/EIS Chapter 4, Energy and Minerals (see Draft RMP/EIS page 4-255). It is also important to understand the Reasonably Foreseeable Development Scenario's distinction between the BLM and the Forest Service as surface management agencies and the decisions addressed in this RMP. The BLM's alternatives do not address mineral potential on lands managed by the Forest Service because the Forest Service makes the allocation decisions for those lands in separate plans.  The BLM's fluid minerals alternatives contain varying options for protection of resources, resulting in varying impacts that can be compared among all alternatives analyzed in the EIS. This includes direct and indirect impacts on sensitive resources, such as wildlife habitat, recreation areas, and sensitive water resources, as well as the analysis contained in the Reasonably Foreseeable Development Scenario regarding potential development on UFO-administered lands, including the cumulative impacts of fluid mineral lease development in the UFO. Future technologies could change the fluid minerals development potential assumptions, making areas viable in the future; therefore, current development potential alone was not used to allocate closures to fluid minerals.

D. Refer to the response to Section 30 regarding socioeconomic impacts comments.

E. In 2011, the BLM identified 30,000 acres, which were proposed for consideration for leasing in the May 2012 BLM Colorado quarterly oil and gas lease sale. After initial BLM review of the parcels, the acreage was reduced to 20,000. Due to an extended public comment process and additional time necessary for the BLM to complete the environmental analysis of the parcels, the parcels forwarded to the sale after analysis were moved to the February 2013 BLM Colorado quarterly lease sale. In August 2013, the BLM deferred the oil and gas lease sale and stated that these parcels would be addressed through ongoing dialog and the ongoing planning efforts (the Uncompahgre Draft RMP). The Draft RMP/EIS addresses a range of alternatives for fluid minerals, including Alternative B.1, which would close most of the North Fork area to fluid mineral leasing. The BLM's preferred alternative, Alternative D, in the Draft RMP/EIS allocates fluid minerals based on a variety of reasons, including water resources.

F. The North Fork Valley does contain Cozzette and Cameo Coal formations. The North Fork Valley also contains the Niobrara Zone a sub-Mancos oil and gas resource layer.

G. When applicable, the BLM does use the master development plan approach in the UFO; current plans include the Bull Mountain Unit Master Development Plan and the North Fork Mancos Master Development Plan. Although not applicable in every situation, per federal Onshore Oil and Gas Order No. 1, an oil and gas operator *may* (emphasis added) use master development plans for field development of multiple wells to facilitate early planning, orderly development, and the cumulative effects analysis for all the applications for permits to drill expected to be drilled by an operator in a developing field. In addition, per federal Onshore Oil and Gas Order No. 1, a master development plan may consist of as few as two similar applications for permit to drill as long as they are consistent with each other in terms of a drill plan and surface use plan. A master development plan was not completed for the entire decision area because, outside the Bull Mountain Unit Master Development Plan area and the North Fork Mancos Master Development Plan area, the development potential is low. Also, the wide

BLM_0165294

variety of unique surface conditions and well types that could be proposed would limit the use of a single-wide coverage master development plan in many cases.

BLM Washington Office Instruction Memorandum 2018-034, Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, issued on January 31, 2018, states:

> "The BLM conducted the review required by Executive Order 13783 and Secretarial Order 3354 and determined that Master Leasing Plans have created duplicative layers of NEPA review. This policy, therefore, eliminates the use of Master Leasing Plans. The Master Leasing Plan procedures in Chapter V of BLM Handbook H-1624-1, Planning for Fluid Minerals Resources, are hereby rescinded. The BLM will not initiate any new Master Leasing Plans or complete ongoing Master Leasing Plans under consideration as land use plan amendments."

H. Draft RMP/EIS Chapter 4 analyzes the effects of hydraulic fracturing on resources (see Draft RMP/EIS pages 4-83, 4-87, and 4-130). As stated in Section 2.4.3, page 2-16, of the Draft RMP/EIS, resource values that can only be protected by prohibiting all fluid mineral leasing throughout the entire decision area have not been identified. An alternative that prohibits fluid mineral leasing throughout the entire decision area would not meet the purpose of and need for the RMP (detailed in Section 1.1), part of which is management direction in accordance with principles of multiple use and sustained yield. Leasing of public lands for fluid mineral exploration and production is authorized and directed by the FLPMA, BLM Land Use Planning Handbook (H-1790-1), Mineral Leasing Act of 1920 (as amended), and the Energy Policy Act of 2005 (Public Law 109-58).

H-I. Assigning decision area-wide surface use and timing stipulations on BLM-administered lands during the RMP planning-level analysis is appropriate in order to provide general direction for potential site-specific applications for resource use. The stipulations identified with the alternatives in Draft RMP/EIS Appendix B would be used to guide implementation-level analysis to make an informed decision on an application at that time. All relevant federal, state, and local regulations are considered at the implementation-level analysis.

J. Draft RMP/EIS Appendix G recommends BMPs, such as closed-loop drilling systems, tanks to store flowback fluids, and water quality testing (see Draft RMP/EIS page G-9). These recommendations apply to the Draft RMP and are, therefore, broad-scale measures appropriate to a planning-level analysis. The approved RMP will neither approve new oil and gas leases nor approve oil and gas development activities; these activities will require further review and decisions (see Draft RMP/EIS page 1-5). Further measures, including new technologies, conditions of approval, or BMPs may be required by such site-specific analysis.

K. Draft RMP/EIS Section 4.3.3, Water Resources, Assumptions (page 4-80), mentions the vulnerability to casing failure of groundwater at greater depths to casing failure. The BLM requires that operators comply with all federal and state requirements, including those of the Colorado Oil and Gas Conservation Commission (Draft RMP/EIS Table 2-2, line 2, page 2-23). The Proposed RMP/Final EIS was edited to clarify that operators must comply with the Colorado Oil and Gas Conservation Commission's requirements for well bore integrity.

BLM_0165295

Impacts on local economies and a comparative analysis of each alternative is one of many factors considered in the identification of the preferred alternative in the Draft RMP/EIS and the Proposed RMP, Alternative E, in the Proposed RMP/Final EIS. The BLM conducted a comprehensive analysis of the socioeconomic factors and compared the impacts of each alternative. Development of lands in open areas would require site-specific analysis. As discussed in Section 21.1 - Range of alternatives (Leasable Minerals – Fluid) of this report, future site-specific analysis will assess those specific areas for which an applicant has submitted an application for permit to drill and subsequently through the NEPA review process, where applicable. These future site-specific analyses would use project-specific information and therefore could provide more precise consideration of impacts to the North Fork Valley's economy than is possible in an RMP EIS.

### Section 21.2 – Leasable Minerals – Fluid: Best available information—baseline data

Total Number of Submissions: 11
Total Number of Comments: 19

Comment Number: 000130_WassellP_20160903-3
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
-BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an analysis of conventional oil and gas development from 2004.

Comment Number: 000302_DavolD_20161031-1
Organization1:
Commenter1:Donald Davol
Commenter Type: Individual
Other Sections: 22.2
Comment Excerpt Text:
I am disappointed that the current draft plan still facilitates the expansion of coal mining and natural gas development, while relying on data that dates back to 2010 or older.

Comment Number: 000451_BishopB_20161031_HasAttach-4
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
It strains credulity that there is no mention of hydraulic fracturing (fracking) in this RMP. If there is one issue of greatest concern to the residents of the North Fork Valley, it is the fracking of gas wells and all the attendant public health and environmental impacts and risks. BLM simply cannot ignore the "gorilla in the room". BLM cannot hide behind its policy of adaptive management and regional mitigation strategies as described in 2.3.1. Its claim that "the RMP revision is based on current scientific knowledge and best available data" is specious. If it can cite coal production figures for the Somerset area mines from 2013 and 2014, it must do better than rely on information available only as late as 2007 or 2008 concerning industry practices in oil and gas extraction. Considering the massive potential impact on the North Fork Valley of oil and gas leasing, this is a huge and unacceptable lack of effort to deal with an

BLM_0165296

issue of such overwhelming concern. BLM simply must take into account the new technologies that the
oil and gas industry are employing and their associated risks.

Comment Number: 000457_BlandC_20161031-1
Organization1:
Commenter1:Carter Bland
Commenter Type:
Comment Excerpt Text:
4. BLM does not consider hydraulic fracturing and multi-stage drilling technologies, and therefore it's
development and impact projections are probably inaccurate. The number of wells, laterals, and
supporting infrastructure is likely to be much higher than reflected in the draft RMP.

Comment Number: 000459_HardyR_20161027-3
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an
analysis of conventional oil and gas development from 2004.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-13
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft RMP/EIS fails to consider the full scope of reasonably foreseeable future oil and gas
development, and associated environmental impacts, by failing to adequately address likely growth in
Mancos Shale oil and gas development. The draft relies on outdated estimates of the amount of gas
available, and fails to account for the possibility of future boom in development of this gas. By
underestimating reasonably foreseeable future oil and gas development, BLM impermissibly understated
the likely greenhouse gas and other air emissions from those activities.
The Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office
(Feb. 16, 2012) ("RFD") acknowledges that "[s]hale gas production could become important in the part
of the Piceance Basin that lays in the northeast part of the Study Area ... if Mancos Shale exploration
occurring there is determined to be economically successful." RFD at 57. However, the RFD and draft
RMP/EIS do not appear to have included such development in their predictions of future activity. Id.;
DEIS at 3-120 to 3-121.
Although shale gas production in the decision area has not reached levels seen in some other regions,
future growth beyond that predicted in the RFD is reasonably foreseeable. As BLM recently recognized
in the foreseeable development scenario for the Farmington, New Mexico office, unfavorable economics
may delay "significant activity … for the Mancos gas play" for several years, but "once the economics
become favorable, the activity is anticipated to rapidly increase."24 Here, however, the forecasts of
foreseeable future development do not appear to have accounted for such an increase. More broadly,
the draft RMP/EIS and RFD do not appear to have followed BLM's instruction, in BLM's Fluid Mineral
Leasing Handbook, to "Always assume at least one boom and bust cycle over the life of the plan."25
[24 BLM, RFD for Farmington, NM, Executive Summary (Oct. 2014),
http://www.blm.gov/style/medialib/blm/nm/field_offices/farmington/farmington_planning/ffo_pla
nning_docs/rmpa_mancos.Par.52727.File.dat/SJB%20Mancos%20RFD%20final%20report-10.27.pdf]
[25 Fluid Mineral Leasing Handbook at III-8,

http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.44374.File.dat/H_1624_1.pdf]

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-14
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While an increase in Mancos Shale production could be foreseen even on the basis of material cited in the RFD, the RFD and draft RMP/EIS also fail to account for recent information demonstrating that far higher levels of development are possible. The RFD relies on a 2003 assessment of the amount of gas available in the broader Uinta-Piceance Basin. RFD at 82 (citing U.S. Geological Survey Uinta-Piceance Assessment Team, 2002[26]). The USGS has recently explained that its prior assessments sorely understated technically recoverable oil and gas volumes. As USGS explained, "The previous USGS assessment of the Mancos Shale in the Piceance Basin ... estimated 1.6 trillion cubic feet of shale natural gas."27 USGS now believes that this understates recoverable gas by a factor of 40, and that "The Mancos Shale in the Piceance Basin of Colorado contains an estimated mean of 66 trillion cubic feet of shale natural gas, 74 million barrels of shale oil and 45 million barrels of natural gas liquids."28 These revised USGS estimates must be incorporated into the NEPA and planning process.29
[26 https://pubs.usgs.gov/dds/dds-069/dds-069-b/]
[27 https://www.usgs.gov/news/usgs-estimates-66-trillion-cubic-feet-natural-gas-colorado-s-mancosshale-formation]
[28 Id.]
[29 Fluid Mineral Leasing Handbook at III-4.]

Comment Number: 000502_SchroederA_20161101_BOR-12
Organization1:Bureau of Reclamation
Commenter1:Alan Schroeder
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Pg 2-11 (Table 2-1)- BLM Surface/Federal Minerals [superscript] 6.
Comment: It is unclear which BOR withdrawn lands, if any, are included in this category; we presume it is only BOR's 5B withdrawn lands. The [superscript] 6 table note on page 2-15 should be revised to be more specific as to the BOR withdrawn lands included in this category.
Recommendation: Replace the current [superscript] 6 table note wording on page 2-15 with, "Includes BOR withdrawn lands for the Whitewater Unit, CRSP and the Fruitland Mesa Project."
Rationale: BOR has no withdrawn "non-project" lands. We presume only the 5B lands for which BLM has full administrative responsibility pursuant to the 1983 BOR/BLM Interagency Agreement are included in these acreages. Those lands include those portions of the Whitewater Unit, CRSP (aka, Dominguez Project) and Fruitland Mesa Project withdrawals within the planning area.

Comment Number: 000530_PlattA_20161101_EPA-26
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We suggest that the Final RMP/EIS include a discussion regarding how or if the updated development potential of the Mancos Shale in the Piceance Basin, as recently determined by the U.S. Geological Survey, affects reasonably foreseeable development for the planning area. Based on this discussion, it

BLM_0165298

may be necessary to update related sections of the Environmental Consequences chapter. (See Assessment of continuous (unconventional) oil and gas resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016: https://pubs.er.usgs.gov/publication/fs20163030.)

Comment Number: 000543_TarbellM_20161101-1
Organization1:
Commenter1:Michael K. Tarbell
Commenter Type: Individual
Comment Excerpt Text:
Moreover, your estimates for greenhouse gas emissions (Tables 4-2, 4-9, etc) associated with these extractive activities must be revised in light of recent results indicating that rogue methane emissions have been profoundly underestimated (e.g., Howard, T., "University of Texas Study Underestimates National Methane Emissions at Natural Gas Production Sites due to Instrument Sensor Failure", Energy Science & Engineering, 23 Jun 2015; Schwietzke, S., "Upward Revision of Global Fossil Fuel Methane Emissions Based on Isotope Database", Nature, Vol 538, pp 88-91, 06 Oct 2016).

Comment Number: 000545_SlivkaJ_20161101-192
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Reasonable Foreseeable Development Scenario
An updated and accurate Reasonable Foreseeable Development Scenario (RFD) for oil and gas is critical to the RMP planning process. The RFD analysis plays an important role the development of an adequate range of alternatives and provides key assumptions used to assess the cumulative impacts and environmental consequences of each alternative on the affected environment. The draft RMP relies heavily on RFD data and ultimately factors into the selection of the preferred alternative and Approved RMP. Clearly, the RFD has severe implications for fluid mineral management decisions made on BLM lands. Due to the importance of this analysis we believe BLM should take the opportunity to update the UFO RFD itself to address the shortcomings detailed below.
The UFO RFD was completed in July 2012 and as a result relies on severely outdated information. Since 2012 we have seen the bottom fall out of both the domestic and international oil and gas markets. Henry Hub spot prices for natural gas have fallen from a high of $12 per million Btu in 2008 to $2 per million Btu today and crude futures on the West Texas Intermediate (WTI) are trading at $44 per barrel compared to $134 per barrel in 2008 [Footnote 77 http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rclc1&f=m]. As a result, the planning area has seen a significant decline in exploration and production activities. According to data from the Colorado Oil and Gas Conservation Commission, in 2015 only 4 wells were started and 2 wells spudded between the five counties of Delta, Gunnison, Ouray and San Miguel [Footnote 78 http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf]. Statewide, the number of drilling permits issued has decline 50% since 2010 and the number of active rigs has fallen from 73 in January 2012 to just 22 in January of 2015 [Footnote 79 http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf]. In fact, there are currently only 4 active rigs in the entire Piceance basin [Footnote 80 http://www.naturalgasintel.com/topics/395] .
According to recent projections from the Energy Information Administration (EIA), the oil and gas markets will not be recovering to the near historic levels of production experienced from 2008 to 2014 any time soon. EIA predicts that domestic crude oil and condensate production will grow 0.9% by 2040 and natural gas consumption will grow by only 0.5% [Footnote 81

BLM_0165299

http://www.eia.gov/forecasts/aeo/data/browser/#/?id=1-AEO2015] . This corresponds with much slower growth in terms of price as well. Henry Hub spot prices are projected to average around $6/MMBtu in 2035 while WTI spot prices for crude and condensate are estimated to reach around $110 per barrel; significantly lower figures than those assumed by the 2012 RFD. And even those estimates are likely overly optimistic. The dramatically different and unforeseen change in market conditions necessitate a reevaluation of the RFD scenario and in particular the development potential estimates in the planning area.

Comment Number: 000545_SlivkaJ_20161101-193
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels." [Footnote 82 2012 UFO RFD, p. 57-58 ] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative [Footnote 83 BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in Chapter 3, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."] .
The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. We argue that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for selecting a more balanced alternative that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel extraction. We know the importance of wildlife, agriculture and wilderness as an economic driver in the region. [Footnote 84 According to a PEW study, in 2014 there were 4.9 million visits to BLM lands in CO, $372 million in overall spending ($275 million on quiet recreation), $113 million generated in personal income specifically tied to quiet recreation on BLM lands and 3,412 jobs supported quiet recreation on BLM lands. See http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/03/31/the-economic-value-of-quiet-recreation-on-blm-lands] More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in this RMP.

Comment Number: 000563_King_WELC_HasAttach-128
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165300

Other Sections: 41.2
Comment Excerpt Text:
The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and
Gas Development Due to Fracking.

Comment Number: 000563_King_WELC_HasAttach-129
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
There are significant flaws with the UFO's Reasonable Foreseeable Development
Scenario for Oil and Gas ("RFD") which undermine validity of the agency's analysis of resource impacts,
and here, impacts due to fracking. The RMP/EIS fails to consider the full potential of recent hydraulic
fracturing techniques and vastly underestimates the extent of oil and gas development and its impacts on
the environment. For example, BLM estimates that—as projected by the RFD—1,271 wells would be
developed under the RMP on all federal minerals and private minerals within the planning area. DEIS at
4-3. However, this estimate does not allow for the likely scenario that advances in hydraulic fracturing
technology will increase the number of drilled wells.

Comment Number: 000563_King_WELC_HasAttach-130
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The RFD is outdated and underestimates the number of potential wells. Since the RFD is
four years old, and based on older data, it fails to consider the full extent of current and future
development. The RMP/EIS fails to take into account the most recent trends in well development, which
are the most crucial in predicting the extent of development and its likely impacts. All evidence points to
increased drilling in relation to historic trends. Many reports have highlighted the recent nationwide
growth in hydraulic fracturing and natural gas development, as identified below.

Comment Number: 000563_King_WELC_HasAttach-131
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Of particular note is the agency's failure to provide any information or analysis of
substance on the critical issue of hydraulic fracturing. For the most part, the RFD mentions fracking as a
technology that is currently used in some areas and may allow for future development of additional
plays. For example, the agency provides:
Only one horizontal well has been drilled to date in the Study Area. New types of horizontal fracturing
technology will likely be used to stimulate these types of wells in the future. Development could be
similar to that used to stimulate the Bakken Formation Middle Member in North Dakota. For horizontal
boreholes, multi-stage fracture stimulations could be used. RFD at 35.
The combination of horizontal drilling and hydraulic fracturing technologies has made it possible to
produce shale gas and tight gas economically. Much of the Study Area oil and gas supply growth is
expected to come from production from existing known reservoirs, with most new reservoir

BLM_0165301

discoveries potentially coming from exploration for nonconventional plays in the continuous assessment units (including shale gas and coalbed natural gas) identified by the U.S. Geological Survey in Appendix 1. RFD at 58.

While these statements acknowledge that increased production may "potentially" come from exploration due to fracking and additional horizontal fracturing technology "will likely" be used in the future, there is no quantification of the increase in the number of wells, acres impacted, or required infrastructure.

Comment Number: 000563_King_WELC_HasAttach-132
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3 41.2
Comment Excerpt Text:
Further, there is no discussion of the increased adverse impacts to human health or the environment. Thus, these statements, which implicitly recognize that the RFD may not account for the full extent of production, provide little in terms of analysis of fracking impacts. Such a void of analysis and consideration of a widely employed technology that not only has the potential, but, in all likelihood, will drastically alter the foreseeable development within the planning area, fails to satisfy the UFO's obligations under NEPA.

Comment Number: 000563_King_WELC_HasAttach-133
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Notably, BLM also fails to consider analysis from a recent USGS report concerning the development of Mancos Shale in the Piceance Basin—which may significantly affect development projections in the Uncompahgre planning area—wherein USGS concluded: "Using a geology-based assessment methodology, the U.S. Geological Survey assessed technically recoverable mean resources of 74 million barrels of shale oil, 66.3 trillion cubic feet of gas, and 45 million barrels of natural gas liquids in the Mancos Shale of the Piceance Basin in Colorado and Utah." [USGS, Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).]

Comment Number: 000563_King_WELC_HasAttach-134
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
In sum, while fracking has been around for decades, the magnitude of the modern technique is new. Modern fracking calls for much more water and chemicals than older wells, and enables the drilling of far more wells in new areas than in the past. Conservation Groups request that the BLM update the RFD to account for this reality.

BLM_0165302

*Summary*

Commenters stated that the Draft RMP/EIS relies on outdated data for the planning area. For example, the 2012 Reasonably Foreseeable Development Scenario report utilizes data from 2004. The old assessments underestimated the amount of natural gas available for development in Mancos Shale in the Piceance Basin and should be revised to include updated data. In addition, the amount of greenhouse gas emissions that would be released have been underestimated. An updated Reasonably Foreseeable Development Scenario is needed for the planning process, as the assumptions used to develop potential projections and the Reasonably Foreseeable Development Scenario have changed.

Commenters noted the lack of discussion concerning hydraulic fracturing. It was also stated that the BLM should consider new drilling and hydraulic fracturing technologies and the impacts of these technologies, which may differ from existing technologies discussed, and the BLM should address likely growth in oil and gas development.

*Response*

The Reasonably Foreseeable Development Scenario and Draft RMP/EIS fully considered the best available scientific and economic information at the time of writing. The Reasonably Foreseeable Development Scenario addresses both the possible resources and development potential of those resources. Those assumptions are still valid today, as they were in 2010. An exception may be that the US Geological Survey concluded that the previous assessment of the Mancos Shale resource was low. There has been no physical increase in development in the UFO since 2010. See responses in Section 11, above, related to climate change data and updates.

The Draft RMP/EIS addressed potential impacts from hydraulic fracturing in Chapter 4, Section 4.3.3, Water Resources, and Section 4.3.5, Fish and Wildlife. Chapter 4, Section 4.6.3, Socioeconomics, addressed public health and safety, including risks from exposure to hazardous materials. Revised socioeconomic data has been included in the FEIS. However, because the Draft RMP/EIS is a broad-scale plan, proposed placement of infrastructure, such as well pads, pipelines, compressor stations, and access roads, would be reviewed at the site-specific level via an environmental analysis for an application for permit to drill or master development plan. Such a proposal would likely include the use of the technology proposed and, thus, impacts from drilling, completions, production, and reclamation would be disclosed and mitigated if necessary.

### Section 21.3 – Leasable Minerals – Fluid: Impact analysis

Total Number of Submissions: 5
Total Number of Comments: 6

Comment Number: 000581_PattersonC_20161016-1
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
The BLM did not adequately study the adverse impacts of oil and gas exploration and extraction, air pollution, water contamination, noise, traffic, inevitable habitat fragmentation on the health and reproductive success of wildlife animals and plants. Disruption, noise, pollution will negatively impact the big game population and the hunters they attract.

BLM_0165303

Sedimentation and pollution ruins world famous trout streams.

Comment Number: 000555_NicholofR_20161101-5
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
The study found that deer populations declined "most drastically" in areas of gas well drilling:
Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel. Ongoing natural gas operations should mandate a well-planned and executed mitigation plan with UNOCAL that will measurably demonstrate re-vegetation and mule deer habitat restoration success.
Gas well drilling and pipe line construction each require road construction and high levels of truck traffic and heavy machinery operations that will disturb deer and elk. Such disturbance during calving and fawning would likely result in increased calf and fawn mortality. Disruption to migration patterns is another likely detriment. Chronic Wasting Disease may be exacerbated by the increased stress to herds from prolonged disturbance. Some wells would likely be drilled in deer and elk security areas which are a requirement for healthy populations.

Comment Number: 000555_NicholofR_20161101-6
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
The third major component of Delta County's wildlife-related economy is fishing. The potential damage to our fisheries resource would be mainly from contamination of streams by toxic hydro-fracturing compounds, produced water, fuel spills, sediment loading from soil erosion associated with well pad construction and pipe line installation, etc. [ In 2015 the oil and gas industry reported 615 spills, or nearly 2 per day. The number of unreported spills is unknown.]

Comment Number: 000130_WassellP_20160903-7
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Other Sections: 30.3 14.3
Comment Excerpt Text:
-The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.

Comment Number: 000400_InouyeD_20161028-7
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:

BLM_0165304

Last week, a Denver Post article about the declining deer population in Colorado reported that "…. state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover.". It seems likely that other big game populations are also in danger of declining if there is large-scale oil and gas development in the study area. Road-kills are a major source of mortality already (I see many on Highway 133) and any increase in the number of roads, or of traffic on existing roads, will undoubtedly result in more roadkills, and disrupt traditional migration routes. How would these negative effects be mitigated if additional development occurs? Or could they be mitigated?

Comment Number: 000536_SchottJ_20161031-8
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
Wildlife: Oil and gas drilling and especially the fracturing process are loud, brightly lighted and operates 24 hours a day 7 days a week. The RMP does not take into consideration the negative impact these operations will have upon the wildlife. Pipelines cut through wild areas and interrupt the natural migration of elk and deer. Increased traffic and new roads cut into the wild, disrupt animal wellbeing and disrupt natural behaviors and could result in diminished populations

> *Summary*
> Refer to the summary in Section 14.3, Fish and Wildlife – Impact Analysis, of this report.

> *Response*
> Refer to the response in Section 14.3, Fish and Wildlife – Impact Analysis, of this report.

### Section 21.4 – Leasable Minerals – Fluid: Cumulative impact analysis
No comments are associated with this topic.

### Section 21.5 – Leasable Minerals – Fluid: Mitigation measures
Total Number of Submissions: 3
Total Number of Comments: 38

Comment Number: 000489_JohnsonA_20161101-11
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 31.1
Comment Excerpt Text:
a. Final plan should exclude oil and gas activities on slopes steeper than 30%
Best Management Practices as outlined in the agency preferred alternative do not sufficiently protect slopes steeper than 30%, listing them as avoidance areas rather than exclusion areas (table 2-2, actions 39 and 40). Furthermore, a stipulation is made in Alternative D for slopes between 30-39% to allow occupancy and use along with special designs, construction, and implementation measures (including the possibility of an operator submitted engineering report) to maintain soil stability. Based on decades of local knowledge, along with a long record of local surface instability within the region, we recommend that the agency adopts surface use stipulations included in alternatives B and B1 for slopes over 30% rather than the stipulations outlined in action 40, alternative D. Unstable geology in the North Fork of the Gunnison watershed lead to broad destabilization resulting in high sediment loads within waterways as well as landslides.[29]

BLM_0165305

[Footnote 29] Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6

Comment Number: 000489_JohnsonA_20161101-12
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. Abandoned and non-viable wells
The BLM's Preferred Alternative does not address best management practices or standard operating procedures for the processes involved with plugging and abandoning wells that are no longer viable. The final RMP must include mitigation and protection from impacts to water resources from abandoned, plugged, and non-viable wells.

Comment Number: 000545_SlivkaJ_20161101-138
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.1
Comment Excerpt Text:
Character of place
The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [43 Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.
The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors;
NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards. [Footnote 44 NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted. ]

Comment Number: 000545_SlivkaJ_20161101-139
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.1
Comment Excerpt Text:

BLM_0165306

Water supply

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Oil and gas development is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas. [Footnote 45 "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/ ] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL- 6 stipulation (from Alternative B) and NL- 7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

Comment Number: 000545_SlivkaJ_20161101-140
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.1
Comment Excerpt Text:
Wildlife habitat and migration routes
The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections. In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

BLM_0165307

Comment Number: 000545_SlivkaJ_20161101-141
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Recreational access and opportunities
Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process.

Comment Number: 000545_SlivkaJ_20161101-201
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Reclamation
BLM's current approach to well site reclamation is inadequate. We propose a change in the way reclamation is currently managed by moving away from relying on site-specific BMPs and COAs (which is accompanied by an increased level of inconsistency across the planning area) and instead implement a performance-based standards approach. Under such a system BLM would no longer dictate exactly how to proceed with reclamation. Instead, BLM would include reclamation goals in a reclamation plan or other planning document and allow companies to utilize their intellectual and financial resources to find the best way to achieve those goals. We recommend that BLM consider using this approach to well site reclamation in the Uncompahgre RMP.

Comment Number: 000545_SlivkaJ_20161101-202
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Draft RMP relies on this outdated approach to reclamation. Under the "Management Common to all Alternatives" BLM states it will:
Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in Appendix G), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion.
Uncompahgre Draft RMP at 2-23. In other words, reclamation will be dealt with on a case-by-case basis through the inclusion of COAs and BMPs at the APD stage. This concept of addressing reclamation is the same as it has always been as illustrated by the general statement included as an action common to all alternatives (including the no action alternative) under the fluid mineral stipulations in Chapter 2:

BLM_0165308

Require operators to meet the current BLM Goldbook standards for soil and water protection and plans for surface reclamation, plus other BMPs (Appendix G), as applicable, for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

Id. at 2-207. The only other explicit reference reclamation in the context of fluid mineral development comes in the form of a very broad objective statement, "Lease federal fluid mineral and geothermal resources to facilitate economically and environmentally responsible exploration, development, and reclamation using the best available technology." Id. at 2-187. Otherwise, reclamation-centric stipulations tend to focus only on soil issues. The proposed alternative includes CSU-3/SSR-3, CSU-6/SSR-6 and NSO-6/SSR-8 state that an operator may be required to submit a reclamation plan if the proposed action will impact saline or selenium soils, biological soil crust or is located on a slope greater than 40%. Id. at 2-30, 2-32 and 2-34.

The current way in which reclamation is regulated has led to ongoing issues with unreclaimed, orphaned or abandoned sites as well as improperly reclaimed sites. This is not a new issue. According to a 2005 Government Accountability Office (GAO) study, seven of eight field offices reviewed had a backlog of reclamation inspections. [Footnote 94 GAO-05-418]

Additionally, the review revealed that 1,975 wells in the eight field offices had been abandoned over 4 years ago and did not have an approved Final Abandonment Notice. [Footnote 95 GAO-05-418] While funding and personnel deficiencies certainly play a role in these issues, it can also be argued that an inefficient and burdensome reclamation program makes it harder for both operators to reclaim sites and for BLM officials to approve final reclamation. A new reclamation program can help to streamline the process for both operators and the agency.

Comment Number: 000545_SlivkaJ_20161101-203
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We propose BLM establish a new performance standard based reclamation program for interim and final reclamation using some of the principles from Colorado's coal mine program and the White River Field Office RMPA. Several key elements would need to be developed in order to move forward with this including defining the reclamation standards, creating a reporting framework and establishing a monitoring and review system. While that level of detail may be beyond the scope of the RMP, BLM could lay the groundwork for the establishment of such a program at the implementation stage by including specific fluid mineral objectives that commit the agency to creating and implementing a comprehensive fluid mineral reclamation program for the planning area. Alternatively, BLM could develop a reclamation plan and include it as an appendix to the RMP similar to the approach taken by the WRFO.

Comment Number: 000563_King_WELC_HasAttach-145
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Application of proposed site-specific requirements is not outside the scope of the RMP planning process. For example, in the proposed Land and Resource Management Plan and Final Environmental Impact Statement ("LRMP/FEIS") for BLM public lands in the San Juan Public Lands Planning Area/Tres Rios Field Office ("TRFO"), BLM required the use of BMPs through stipulations, standards, and guidance. Furthermore, it is not necessary for many BMPs to be sitespecific; rather they can be applied broadly to all oil and gas operations in the UFO area. For example, near public water supply intakes, the TRFO-

BLM_0165309

LRMP requires the use of pitless drilling systems, tanks to store stimulation and flowback fluids, and non-toxic hydraulic fracturing fluids only, among other requirements.

Comment Number: 000563_King_WELC_HasAttach-146
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix G contains many important provisions to reduce the risks to the environment and human health from oil and gas operations and the UFO RMP can and should require the use of these BMPs through stipulations, standards, and guidance. However, additional protections are needed, including but not limited to: improved site characterization to look for pathways by which contaminants may reach groundwater; stronger well design and construction standards; stimulation operation monitoring and reporting requirements; and improved waste water handling planning and practices.

Comment Number: 000563_King_WELC_HasAttach-147
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
NEPA was enacted to promote efforts that will prevent or eliminate damage to the human environment. BMPs help "mitigate" environmental impacts. "Mitigation" is defined in CEQ regulations as measures to help, avoid, reduce or compensate for environmental impacts. 40 CFR 1508.20. BLM's failure to analyze the potential benefits of requiring these BMPs in alternatives does not satisfy NEPA's hard look mandate and frustrates the purpose of preparing an EIS (40 CFR 1502.1 states that the purpose of preparing an EIS is to "…provide full and fair discussion of significant environmental impacts and [ ] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."). By failing to implement these BMPs in the RMP, BLM has failed to take adequate measures to minimize and mitigate the adverse impacts that will result from the RMP. The following BMPs should be required for all oil and gas operations in the UFO area.

Comment Number: 000563_King_WELC_HasAttach-148
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Geologic Suitability
Operators of wells that will be hydraulically fractured must demonstrate to the satisfaction of the regulator that the wells will be sited in a location that is geologically suitable.
In order to allow the regulator to determine suitability, the owner or operator must provide:
1. A detailed analysis of regional and local geologic stratigraphy and structure including, at a minimum, lithology, geologic facies, faults, fractures, stress regimes, seismicity, and rock mechanical properties;
2. A detailed analysis of regional and local hydrology including, at a minimum, hydrologic flow and transport data and modeling and aquifer hydrodynamics; properties of the producing and confining zone(s); groundwater levels for relevant formations; discharge points, including springs, seeps, streams, and wetlands; recharge rates and primary zones, and; water balance for the area including estimates of recharge, discharge, and pumping;
3. A detailed analysis of the cumulative impacts of hydraulic fracturing on the geology of producing and confining zone(s) over the life of the project. This must include, but is not limited to, analyses of changes

BLM_0165310

to conductivity, porosity, as well as permeability, geochemistry, rock mechanical properties, hydrologic flow, and fracture mechanics; and
4. A determination that the geology of the area can be described confidently and that the fate and transport of injected fluids and displaced formation fluids can be accurately predicted through the use of models.

Comment Number: 000563_King_WELC_HasAttach-149
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Wells that will be hydraulically fractured must be sited such that a suitable confining zone is present. The operator must demonstrate to the satisfaction of the regulator that the confining zone:
1. Is of sufficient areal extent to prevent the movement of fluids to USDWs, based on the projected lateral extent of hydraulically induced fractures, injected hydraulic fracturing fluids, and displaced formation fluids over the life of the project;
2. Is sufficiently impermeable to prevent the vertical migration of injected hydraulic fracturing fluids or displaced formation fluids over the life of the project;
3. Is free of transmissive faults or fractures that could allow the movement of injected hydraulic fracturing fluids or displaced formation fluids to USDWs;
4. Contains at least one formation of sufficient thickness and with lithologic and stress characteristics capable of preventing or arresting vertical propagation of fractures; and
5. The regulator may require operators of wells that will be hydraulically fractured to identify and characterize additional zones that will impede or contain vertical fluid movement.

Comment Number: 000563_King_WELC_HasAttach-150
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Area of Review
Operators must delineate an "area of review," which is the region around a well or group of wells that will be hydraulically fractured where USDWs may be endangered. It should be delineated based on 3D geologic and reservoir modeling that accounts for the physical and chemical extent of hydraulically induced fractures, injected hydraulic fracturing fluids and proppant, and displaced formation fluids and must be based on the life of the project. The physical extent would be defined by the modeled length and height of the fractures, horizontal and vertical penetration of hydraulic fracturing fluids and proppant, and horizontal and vertical extent of the displaced formation fluids. The chemical extent would be defined by that volume of rock in which chemical reactions between the formation, hydrocarbons, formation fluids, or injected fluids may occur, and should take into account potential migration of fluids over time.
The model must take into account all relevant geologic and engineering information including but not limited to:
1. Rock mechanical properties, geochemistry of the producing and confining zone, and anticipated hydraulic fracturing pressures, rates, and volumes;
2. Geologic and engineering heterogeneities;
3. Potential for migration of injected and formation fluids through faults, fractures, and manmade penetrations; and

BLM_0165311

4. Cumulative impacts over the life of the project.

As actual data and measurements become available, the model must be updated and history matched. Operators must develop, submit, and implement a plan to delineate the area of review. The plan should include the time frame under which the delineation will be reevaluated, including those operational or monitoring conditions that would trigger such a reevaluation. Within the area of review, operators must identify all wells that penetrate the producing and confining zones and provide:

1. A list of all such wells, including but not limited to wells permitted but not yet drilled, drilling, awaiting completion, active, inactive, shut-in, temporarily abandoned, plugged, and orphaned;

2. A description of each well's type, construction, date drilled, location, depth, record of plugging and/or completion, and any additional information the Division may require;

3. An assessment of the integrity of each well identified;

4. A plan for performing corrective action if any of the wells identified are improperly plugged, completed, or abandoned;

5. An assessment to determine the risk that the stimulation treatment will communicate with each well identified;

6. For each well identified as at-risk for communication, a plan for well control, including but not limited to:

a. A method to monitor for communication;

b. A determination of the maximum pressure which the at-risk well can withstand;

c. Actions to maintain well control;

d. If the at-risk well is not owned or operated by the owner/operator of the well to be stimulated, a plan for coordinating with the offset well operator to prevent loss of well control;

7. The location, orientation, and properties of known or suspected faults, fractures, and joint sets;

8. An evaluation of whether such features may act as migration pathways for injected fluids or displaced formation fluids to reach protected water or the surface;

9. An assessment to determine the risk that the stimulation treatment will communicate with such features; and

10. If such features may act as migration pathways and are at-risk for communication, the stimulation design must be revised to ensure that the treatment will not communicate with such features or the well must be re-sited.

This information should be provided with the stimulation permit application.


Comment Number: 000563_King_WELC_HasAttach-151
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The Alberta Energy Regulator ("AER"), the oil and gas regulator in Alberta, Canada, recognized that communication between wells during fracturing is a serious risk to well integrity and groundwater after a number of spills and blowouts resulted from communication between wells during fracturing. As a result, AER created requirements to address the risk of communication and reduce the likelihood of occurrence. [Alberta Energy Board, Directive 083: Hydraulic Fracturing – Subsurface Integrity (May 2013) at 15, available at: http://www.aer.ca/documents/directives/Directive083.pdf (attached as Exhibit 208).] Similarly, Enform, a Canadian oil and gas industry safety association, published recommended practices to manage the risk of communication. [Enform Canada, Interim IRP 24: Fracture Stimulation: Interwellbore Communication; An Industry Recommended Practice For The Canadian Oil And Gas Industry, Interim Volume 24, 1st Edition (Mar. 27, 2013).] We recommend that the BLM review these rules and incorporate similar requirements.

BLM_0165312

Comment Number: 000563_King_WELC_HasAttach-152
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Operators must submit to the regulator a statistically significant sample, as determined by the regulator, of existing and/or new geochemical analyses of each of the following, within the area of review:
1. Any and all sources of water that serve as underground sources of drinking water ("USDWs") in order to characterize baseline water quality. This data must be made publically available through an online, geographically-based reporting system. The sampling methodology must be based on local and regional hydrologic characteristics such as rates of precipitation and recharge and seasonal fluctuations. At a minimum, characterization must include:
a. Standard water quality and geochemistry; [Including: Turbidity, Specific Conductance, Total Solids, Total Dissolved Solids, pH, Dissolved Oxygen, Redox State, Alkalinity, Calcium, Magnesium, Sodium, Potassium, Sulfate,Chloride, Fluoride, Bromide, Silica, Nitrite, Nitrate + Nitrite, Ammonia, Phosphorous, Total Organic Carbon, Aluminum, Antimony, Arsenic, Barium, Beryllium, Boron, Bromide, Cadmium, Chromium, Cobalt, Copper, Cyanide, Iron, Lead, Manganese, Mercury, Molybdenum, Nickel, Selenium, Silver, Strontium, Thallium, Thorium, Uranium, Vanadium, Zinc, Cryptosporidium, Giardia, Plate Count, Legionella, Total Coliforms, and Organic Chemicals including Volatile Organic Compounds (VOCs).]
b. Stable isotopes;
c. Dissolved gases;
d. Hydrocarbon concentration and composition. If hydrocarbons are present in sufficient quantities for analysis, isotopic composition must be determined;
e. Chemical compounds or constituents thereof, or reaction products that may be introduced by the drilling or hydraulic fracturing process. The use of appropriate marker chemicals is permissible provided that the operator can show scientific justification for the choice of marker(s);


Comment Number: 000563_King_WELC_HasAttach-153
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Operators should also consider testing for environmental tracers to determine groundwater age;
2. Any hydrocarbons that may be encountered both vertically and really throughout the area of review;
3. The producing zone(s) and confining zone(s) and any other intervening zones as determined by the regulator. At a minimum, characterization must include:
a. Mineralogy;
b. Petrology; and
c. Major and trace element bulk geochemistry.
The site characterization and planning data listed above does not have to be submitted with each individual well application as long as such data is kept on file with the appropriate regulator and the well for which a permit is being sought falls within the designated area of review.


Comment Number: 000563_King_WELC_HasAttach-56
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165313

In many respects, we think that BLM's current rules can be tightened. Regardless, it is clear that BLM's expansive authority, responsibility, and opportunity to prevent waste must permeate the UFO's full planning and decision-making processes for oil and gas. This ensures that the UFO take advantage of not only proven, often economical technologies and practices to prevent methane waste, but, further, the agency's tools to ensure the orderly and efficient exploration, development, and production of oil and gas through controls placed on the very scale, pace, and nature of development. Moreover, it is clear that BLM's authority, responsibility, and opportunity extends to both existing and future oil and gas development. BLM, ultimately, manages the federal, publicly owned, onshore oil and gas resource in trust for the American people.

Comment Number: 000563_King_WELC_HasAttach-57
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Waste Prevention, Production Subject to Royalties, and Resource Conservation: Proposed Rule, 81 Fed. Reg. 6616, 6616 (February 8, 2016). The BLM must consider federal rulemaking on Order No. 9, and the implications that this rule would have on action in its planning level decision-making, such as the establishment of mandatory requirements to prevent methane venting, flaring, and leaks.

Comment Number: 000563_King_WELC_HasAttach-58
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Western Environmental Law Center and our partners also recently submitted comments on this proposed rule. These comments are incorporated herein, attached hereto as Exhibit 123, and must also be considered by the UFO when undertaking the Uncompahgre RMP/EIS planning process. See 40 C.F.R. § 1502.9(c)(1)(ii).

Comment Number: 000563_King_WELC_HasAttach-61
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
If the BLM does not adopt a no-leasing alternative, it must strengthen its approach to methane mitigation. While the draft RMP/EIS recognizes methane as a source of GHG emissions from the proposed action and acknowledges the significant impact of methane on climate, the BLM fails to provide a detailed analysis of measures that could be employed to mitigate these emissions. The CEQ has identified "lower GHG-emitting technology" and "capturing or beneficially using GHG emissions such as methane" as two broad categories of mitigation measures that "should" be considered in NEPA reviews. CEQ Final Climate Guidance at 19.
At the RMP stage, it is appropriate and advisable for the agency to identify required methane mitigation measures that must be included either (1) as stipulations in future lease sales, or (2) as conditions of approval ("COAs") for all future APD or MLP approvals or other authorizations for implementation when activities are conducted or equipment is installed. Colorado's Comprehensive Air Resource Protection Protocol ("CARPP"), provided in Appendix H to the RMP/EIS, is a tool that can provide an important state-of-the-art resource to guide the agency's analysis of GHG mitigation measures applicable to the Uncompahgre RMP. In particular, Table V-1 identifies Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development, which displays some emission

BLM_0165314

reduction measures, their potential environmental benefits and liabilities, and feasibility. These methane measures are applicable to all new oil and gas development and are not dependent on conditions in leasing areas or site-specific conditions for individual APDs or MDPs, so they may and should be identified and required at the RMP stage.

Comment Number: 000563_King_WELC_HasAttach-62
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A key area of concern to Conservation Groups is the effectiveness of the mitigation measures adopted to ensure that methane is captured and able to make it to market for sale and not be vented or flared. Such considerations must be included in the agency's NEPA analysis. This includes, inter alia, how the agency will assess whether the gathering and processing investments proposed are adequate. That is, the agency is obligated to identify and describe how the infrastructure investments identified in the EIS (i.e., gathering pipelines, compressor stations and processing facilities) will be located and adequately sized to accommodate estimated levels of production of natural gas for the duration of the proposed project.

Comment Number: 000563_King_WELC_HasAttach-63
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Notably, at least one BLM Field Office has already taken pioneering steps to address methane emissions and waste through mandatory mitigation measures at the RMP stage. Specifically, in a joint Land and Resource Management Plan ("LRMP"), BLM: 1610 (CO-933), adopted by BLM Colorado's Tres Rios Field Office ("TRFO") and the San Juan National Forest ("SJNF"), the agencies broke new and essential ground in both acknowledging that significant GHG pollution would result from oil and gas development on TRFO lands, and then establishing required methane mitigation standards at the planning stage that will bind future leases and permits to drill to comply with these measures. Given that the TRFO is directly adjacent to the UFO, including shared geologic formations and mineral resources, it is arbitrary and capricious for BLM here to ignore or not adopt mitigation measures consistent with those included by the TRFO. At the very least, BLM has an obligation to explain why such measures are not applied in the Uncompahgre planning area, which it has failed to do. As provided in the Final EIS for the TRFO LRMP:
NEPA analysis is typically conducted for oil and gas leasing and when permits are issued. This FEIS is the first NEPA analysis where lands that could be made available for lease are identified and stipulated. In a subsequent analysis stage, when there is a site-specific proposal for development, additional air quality impact analysis would occur. This typically occurs when an application for a permit to drill is submitted. Based on the analysis results, additional mitigation or other equally effective options could be considered to reduce air pollution.

Comment Number: 000563_King_WELC_HasAttach-64
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Tye: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The TRFO set a new standard by recognizing that the climate change impacts from oil and gas industry activities are cumulative and that methane losses from business-as-usual industry practices at the field office level contribute significantly to climate change and must be mitigated. In the Final EIS, the TRFO

BLM_0165315

also recognized that methane emissions represent waste of a key natural resource that belongs to all U.S. citizens, and the failure to control such waste robs the U.S. and state treasuries of royalty revenues. Accordingly, the TRFO adopted six important methane mitigation measures, which include:
• Centralized Liquid Gathering Systems and Liquid Transport Pipelines
• Reduced Emission Completions/Recompletions (green completions)
• Replacement of High-bleed Pneumatics with Low-Bleed/No-Bleed or Air-Driven Pneumatic Devices on all Existing Wells
• Installation of Low Bleed/No Bleed Pneumatic Devices on all New Wells
• Dehydrator Emissions Controls; and
• Electric Compression
Id. at 376.
As the BLM proceeds in the Uncompahgre planning process, it is essential to consider the pioneering action taken by the TRFO. See 40 C.F.R. § 1502.9(c)(1)(ii). The BLM's dismissive approach to climate change reflected in the Uncompahgre draft RMP/EIS, and its failure to adequately address methane emissions, is plainly incompatible with the climate impacts of oil and gas development. It is incumbent upon the UFO to confront the issues of climate change and methane emissions head-on, which must be accomplished through field office level planning and decisionmaking that is reflective of the challenges we face.

Comment Number: 000563_King_WELC_HasAttach-65
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Beyond these methane mitigation measures, additional, widely recognized emissions reduction technologies, best management practices ("BMPs"), and planning tools for mitigating methane emissions and waste are available to the UFO that must be given a hard look in its analysis of the proposed action. Wide ranges of technologies and BMPs have been identified in numerous sources, including the BLM itself.234 [234 See BLM, Best Management Practices for Fluid Minerals, available at: http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECT ION_/bmps.Par.60203.File.dat/WO1_Air%20Resource_BMP_Slideshow%2005-09-2011.pdf (attached as Exhibit 124); BLM, Montana/Dakotas, 2010 Oil and Gas Leasing EAs, available at: http://www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html; CARPP at Appendix L; EPA, Natural Gas STAR Program, available at: http://www.epa.gov/gasstar/; and Susan Harvey, et al., Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste (attached as Exhibit 125).]
We believe that these additional measures must receive a hard look, and be adopted in the UFO RMP/EIS because: (1) they can reduce methane emissions to help protect the climate; (2) can minimize methane waste; (3) can have paybacks for industry from the sale of captured methane, even at today's low gas prices; and (4) because failure to adopt them as mandatory methane emissions and waste mitigation measures in the RMP/EIS may well jeopardize the ability of the UFO to require them in critical later stages of development, such as lease sales and APDs after lease rights are conveyed.

Comment Number: 000563_King_WELC_HasAttach-66
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165316

Conservation Groups also believe that the UFO should require gas capture planning by lessees and planning and timely development of gas gathering, boosting and processing infrastructure to ensure that GHG emissions are reduced, that revenues from gas sales are maximized for royalty payments for the federal and state governments, and that waste of this important resource is minimized.

Comment Number: 000563_King_WELC_HasAttach-67
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Moreover, the EPA, in a recently released white paper,235 [235 EPA, Office of Air Quality Planning and Standards, Oil and Natural Gas Sector Hydraulically Fractured Oil Well Completions and Associated Gas during Ongoing Production (April 2014), available at: https://www.epa.gov/controlling-air-pollution-oil-and-natural-gasindustry (attached as Exhibit 126).] also identifies additional field use measures that reduce flaring and waste:
• Compression of natural gas for transport;
• Methane re-injection;
• Electric power generation for on-site use or connection to the grid.

Comment Number: 000563_King_WELC_HasAttach-68
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Critically, another approach—outlined below and promoted by industry—has been advanced to successfully reduce methane venting, flaring, and waste, and the UFO should require production and midstream companies to conduct front-end planning employing these techniques and provide the results of the plans to the UFO. In January 2014, the 500-member North Dakota Petroleum Council (www.ndoil.org) recommended that the state oil and gas regulator ("NDIC") require the following:
• Gas Capture Plan[s] (GCP):
o Forces gas capture planning prior to drilling
o GCP may include at the discretion of NDIC:
  • Location map gathering system connection, processing plant(s) identified
  • Flowback strategy (rate, duration, plan for multi-well start up)
  • Current system capacity and utilization
  • Time period for connection

o At the discretion of NDIC, penalty for failure to comply
  • Failure to submit GCP

• New wells – suspension or denial of permit
• Existing wells – curtail production where no detriment to well or reservoir
  • Failure to comply with GCP

• Curtail production
• Not meeting flowback strategy
• Mitigating circumstances may allow extension (i.e., economic evaluation, operator's overall capture rate, ROW, safety, weather, work crews, etc.)
• Midstream Planning and Tracking

BLM_0165317

o Midstream companies meet with NDIC on a regular basis (i.e., annual, bi-annual) to status operations and updates

o Suggested reporting to include:

- Percent gas captured by gathering system
- Gathering forecast by gathering system
- Status plant processing capacity and gathering capacity with
- future obligations and capture targets
- Utilization and downtime/interruptions of service
- Field compression downtime / Plant downtime/maintenance

Comment Number: 000563_King_WELC_HasAttach-69
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Based on these alternatives, Conservation Groups believe that capturing methane emissions is just the first of the UFO's duties in regards to GHG emissions and waste.
The UFO must also ensure that methane will be used beneficially in the field or enter a sales gas line and make it to market, as opposed to simply being vented or flared and wasted. As an alternative to venting, flaring, and waste, UFO must take a hard look at these planning tools, which are alternatives available to ensure either field use of the resource or that gathering, boosting and processing infrastructure is in place prior to development activities. Further, we believe that public disclosure of the results of such planning should be required.

Comment Number: 000563_King_WELC_HasAttach-70
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, Conservation Groups also take issue with the notion that "adaptive management" is a viable approach to addressing methane emissions and waste. According to the draft RMP/EIS, at 4-20: Total estimated emissions as well as predicted increases in emissions were analyzed to develop air resource management goals, objectives, and actions that would be effective in minimizing future impacts on air quality. The resulting adaptive management strategy is described in detail in Appendix H (Colorado BLM Comprehensive Air Resource Protection Protocol).

Comment Number: 000563_King_WELC_HasAttach-71
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO seems to ignore the fact that methane emissions and waste are not monitored in the same manner and to the same degree as criteria and hazardous air pollutants. According to the EPA, reporting is only required of:
… sources that in general emit 25,000 metric tons or more of carbon dioxide equivalent per year in the United States. Smaller sources … are not included in the Greenhouse Gas Reporting Program.236 [236 EPA, Fact Sheet: Greenhouse Gas Reporting Program Implementation, available at: https://www.epa.gov/sites/production/files/2014-09/documents/ghgrp-overview-factsheet.pdf (attached as Exhibit 127).]

BLM_0165318

EPA has identified many small sources that are encompassed by the RMP/EIS but that would not exceed the reporting threshold and would, in the absence of additional monitoring and reporting requirements established in the RMP/EIS, go unmeasured. These include: venting from workovers, pneumatic devices, liquids unloading, and small compressors, and equipment leak throughout natural gas systems.237 [237 EPA, Petroleum and Natural Gas Systems (Feb. 2013), available at: http://www.epa.gov/ghgreporting/documents/pdf/infosheets/OnshorePetroleumNaturalGasSystems.pdf (attached as Exhibit 128).]

Comment Number: 000563_King_WELC_HasAttach-72
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Therefore, by its own admission, UFO's reliance on adaptive management to address methane emissions and waste are "not possible" because the agency has failed to require monitoring of smaller—but cumulatively significant—sources of such waste in the oil and gas production process. The UFO must do more than cite the CARPP as a tool for future adaptive management. Rather, the agency must adopt the methane mitigation technologies, BMPs and planning tools identified above to address all future development authorized under the RMP/EIS, and to apply these tools, practices, and technologies not just to development on new leases but as RMP authorized stipulations on all new oil and gas development in the planning area.

Comment Number: 000563_King_WELC_HasAttach-73
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As discussed in Section II.D.2., above, in the context of coal mine methane, it is critically important to reduce methane waste from fossil fuel production in order to limit climate damages. Ensuring compliance with the agency's methane waste obligations through proper analysis and documentation in the NEPA process is important: technologies and practices change, and the UFO's duty to prevent degradation and waste cannot be excused just because the agency apparently lags behind the technological curve. The GAO's 2010 report noted that BLM's existing waste prevention guidance—Notice to Lessees and Operators ("NTL") 4a—was developed in 1980, well before many methane reduction technologies and practices were developed and understood. GAO also found that NTL 4a does not "enumerate the sources that should be reported or specify how they should be estimated."238 [238 See GAO-11-34 (2010) at 11, 27 (attached as Exhibit 121).] Problematically, GAO noted "that [BLM] thought the industry would use venting and flaring technologies if they made economic sense," a perspective which assumes – wrongly – that markets work perfectly in the absence of necessary regulatory signals and is belied by the lack of information about the magnitude of methane waste and the documented, if still poorly understood, barriers to the deployment of GHG reduction technologies and practices. Id. at 20-33. Compounding the problem, GAO also "found a lack of consistency across BLM field offices regarding their understanding of which intermittent volumes of lost gas should be reported to [the Oil and Gas Operations Report]." Id. at 11. BLM, to its credit, conceded: "existing guidance was outdated given current technologies and said that they were planning to update it by the second quarter of 2012." Id. at 27.
Indeed, a Report released by NRDC identified that "[c]apturing currently wasted methane for sale could reduce pollution, enhance air quality, improve human health, conserve energy resources, and bring in more than $2 billion of additional revenue each year."239 [239 Susan Harvey, et al., Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing

BLM_0165319

Methane Waste (March 2012) (attached as Exhibit 125).] Moreover, the Report further identified ten technically proven, commercially available, and profitable methane emission control technologies that together can capture more than 80 percent of the methane currently going to waste. Id. Such technologies must also be considered in BLM's alternatives analysis.

Comment Number: 000563_King_WELC_HasAttach-74
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While the UFO has identified the issue of fugitive emissions and waste, Conservation Groups urge the agency to strengthen this path through additional hard look analysis and enforceable mitigation requirements.

Comment Number: 000563_King_WELC_HasAttach-75
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Oil and natural gas systems are the biggest contributor to methane emissions in the United States, accounting for over one quarter of all methane emissions.242 [242 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011 (attached as Exhibit 122).] Moreover, methane emissions in the planning area are further compounded by massive contributions from area coal mines—in particular the West Elk Mine—as well as significant oil and gas production and emissions in the Piceance Basin and Uintah Basin, both of which impact planning area air quality. In light of serious controversy and uncertainties regarding GHG pollution from oil and gas development, as noted above, the agency's quantitative assessment should account for methane's long-term (100-year) global warming impact and, also, methane's short-term (20-year) warming impact using the latest peer-reviewed science to ensure that potentially significant impacts are not underestimated or ignored. See 40 C.F.R. § 1508.27(a) (requiring consideration of "[b]oth short- and long-term effects").

Comment Number: 000563_King_WELC_HasAttach-76
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Again, the UFO assumes that methane is 21 times as potent as carbon dioxide ("CO2") over a 100-year time horizon,243 [243 See 78 Fed.Reg. 19802, April 2, 2013 (EPA proposal to increase methane's GWP to 25 times CO2).] a global warming potential ("GWP") based on the Intergovernmental Panel on Climate Change's ("IPCC") Second Assessment Report from 1996.244 [244 INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Second Assessment Report (1996) (attached as Exhibit 132); see also U.S. Environmental Protection Agency, Methane, available at: http://www.epa.gov/outreach/scientific.html.] However, the IPCC recently updated their 100-year GWP for methane, substantially increasing the heat-trapping effect to 36.245 [245 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis, at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).] A Supplementary Information Report ("SIR"), prepared for BLM's oil and gas leasing program in Montana and the Dakotas, further explains that GWP "provides a method to quantify the cumulative effect of multiple GHGs released into the atmosphere by calculating carbon dioxide equivalent (CO2e) for the GHGs." SIR at 1-2.246 [246 BLM, Climate Change,

BLM_0165320

Supplementary Information Report, Montana, North Dakota and South Dakota (2010) available at: www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html (attached as Exhibit 133).] However, substantial questions arise when you calibrate methane's GWP over the 20-year planning and environmental review horizon used in the SIR and, typically, by BLM, including the UFO. See SIR at 4-1 thru 4-45 (discussing BLM-derived reasonably foreseeable development potential in each planning area). Over this 20-year time period, the IPCC's new research has calculated that methane's GWP is 87 247 [247 See IPCC Physical Science Report (attached as Exhibit 113).] – yet another substantial increase from its earlier estimate of 72, which was still over three times as potent as otherwise assumed by the SIR.248 [248 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Fourth Assessment Report, Working Group 1, Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Ch. 2, p. 212, Table 2.14, available at: www.ipcc.ch/publications_and_data/ar4/wg1/en/ch2s2-10-2.html (attached as Exhibit 134).] However, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent over a twenty-year time period.249 [249 Drew Shindell et al., Improved Attribution of Climate Forcing to Emissions, SCIENCE 2009 326 (5953), p. 716, available at: www.sciencemag.org/cgi/content/abstract/326/5953/716 (attached as Exhibit 135).] This information suggests that the near-term impacts of methane emissions have been significantly underestimated. See 40 C.F.R. § 1508.27(a) (requiring consideration of short and long term effects). Further, by extension, BLM has also significantly underestimated the near-term benefits of keeping methane emissions out of the atmosphere. 40 C.F.R. §§ 1502.16(e), (f); id. at 1508.27. These estimates are important given the noted importance of near term action to ameliorate climate change – near term action that scientists say should focus, inter alia, on preventing the emission of short-lived but potent GHGs like methane while, at the same time, stemming the ongoing increase in the concentration of carbon dioxide.250 [250 See, e.g., Limiting Global Warming: Variety of Efforts Needed Ranging from 'Herculean' to the Readily Actionable, Scientists Say, SCIENCE DAILY (May 4, 2010), available at: http://www.sciencedaily.com/releases/2010/05/100503161328.htm; see also, Ramanathan, et. al., (attached above as Exhibit 54).]
These uncertainties – which, here, the agency does not address – necessitate analysis in the RMP and EIS. 40 C.F.R. §§ 1508.27(a), (b)(4)-(5).

Comment Number: 000563_King_WELC_HasAttach-77
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.3
Comment Excerpt Text:
Despite this variability in methane pollution data, what remains clear is that inefficiencies and leakage in oil and gas production results in a huge amount of avoidable waste and emissions, and, conversely, a great opportunity for the UFO to reduce GHG emissions on our public lands. Many of these uncertainties and underestimates, as EPA has explained, are a result of the fact that emissions factors were "developed prior to the boom in unconventional well drilling (1992) and in the absence of any field data and does not capture the diversity of well completion and workover operations or the variance in emissions that can be expected from different hydrocarbon reservoirs in the country." Mandatory GHG Reporting Rule, 75 Fed. Reg. 18608, 18621 (April 12, 2010). These underestimates are also caused by the dispersed nature of oil and gas equipment – rather than a single, discrete source, such as a coal-fired power plant, oil and gas production consists of large numbers of wells, tanks, compressor stations, pipelines, and other equipment that, individually, may appear insignificant but, cumulatively, may very well be quite significant. While dispersed, oil and gas development is nonetheless a massive, landscape-scale industrial operation – one that just happens to not have a single roof. BLM, as the agency charged with oversight of onshore oil and gas development, therefore has an opportunity to improve our knowledge

BLM_0165321

base regarding GHG emissions from oil and gas production, providing some measure of clarity to this important issue by taking the requisite "hard look" NEPA analysis as part of its land use decision-making for the Uncompahgre RMP and EIS.264 [264 In this context, the 2010 SIR, while providing a basic literature review of GHG emissions sources, is merely a starting point for BLM's responsibility to take a hard look at GHG emissions in the context of foreseeable drilling operations in the geologic formations proposed for leasing.]

*Summary*

A. Commenters stated that the BLM's approach to site reclamation is inadequate and outdated. These commenters proposed that the BLM move away from relying on site-specific BMPs and conditions of approval (which is accompanied by an increased level of inconsistency across the planning area) and instead implement a performance-based standards approach. They recommended use of the some of the principles from Colorado's coal mine program and the BLM White River Field Office RMP Amendment.

B. Commenters provided additional suggestions, including the following:

1. Establish mandatory requirements to prevent methane venting, flaring, and leaks to minimize greenhouse gas emissions. Methane mitigation measures that must be included either (1) as stipulations in future lease sales, or (2) as COAs for all future applications for permit to drill or master leasing plan approvals or other authorizations for implementation when activities are conducted or equipment is installed. Consider inclusion of additional measures to reduce waste, such as compression of natural gas for transport, methane reinjection, and electric power generation for on-site use or connection to the grid. Commenters requested that methane waste be examined at all stages of the process and that production and midstream companies conduct front-end planning and employ techniques to minimize waste. Commenters also stated that literature related to the impacts of methane emissions and capture techniques be further examined, and that adaptive management is not appropriate to deal with methane waste.
2. Describe how the infrastructure investments identified in the EIS (i.e., gathering pipelines, compressor stations, and processing facilities) will be located and adequately sized to accommodate estimated levels of production of natural gas for the duration of the proposed project.
3. Include other mitigation measures, including:
   a. Plugging and abandoning wells that are no longer viable;
   b. How the BLM would protect water resources from oil and gas development and incorporate the BLM's Gold Book Standard for soil and water protection;
   c. Surface use stipulations for Gunnison sage-grouse in the North Fork Valley as it relates to oil and gas development; and
   d. Surface use stipulations concerning recreation in the North Fork Valley.

*Response*

A. Reclamation of well sites is defined in the Draft RMP/EIS glossary as "returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan." Both the current 1989 RMP and this Draft RMP/EIS

BLM_0165322

identify that successful reclamation is a cornerstone to authorizing federally managed development.

The approach to well site reclamation in the Draft RMP/EIS, regardless of alternative, incorporates the appropriate federal regulations, guidance, and understanding of industry BMPs, and considers state regulations and, in many cases, the potential that individual landowner input may be required.

Rather than set predetermined success rates or detail every circumstance or technical process available to achieve reclamation success in a land use plan, the BLM utilizes Standard Terms and Conditions of a federal lease, 43 CFR 3160, federal Onshore Oil and Gas Order No. 1 (Approval of Operations on Onshore Federal and Indian Oil and Gas Leases), and the BLM's "Gold Book" to provide the necessary guidance to for each site-specific surface-disturbance proposal. Information in the BLM "Gold Book" in particular encourages the proponent and BLM to select and apply technically feasible and appropriate reclamation practices based on an understanding of the site-specific reclamation concerns. Although the commenter suggests modifying the approach across the UFO as a whole, the concept of performance-based reclamation success is already a tool available to the BLM which, based on need resulting from site-specific analysis, w be an eventual requirement to approve the proposal.

B. The BLM reviewed the recommended edits:

1.  If and when the BLM's Methane and Waste Prevention Rule goes into effect, oil and gas operators will be required to follow it. Otherwise, oil and gas operators would still be required to follow the guidance in Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases (NTL-4A) and applicable EPA Quad-O (40 CFR Part 60, Subpart OOOO) requirements. In addition, oil and gas locations within the State of Colorado are also required to comply with state regulation of Colorado Oil and Gas Consevation Commission Rule 912.

2.  Proposed placement of infrastructure, such as well pads, pipelines, compressor stations, and access roads, will be reviewed at the site-specific analysis through an environmental assessment or other NEPA review associated with an application for permit to drill or master development plan. A statement to this effect was added to the Proposed RMP/Final EIS.

3.  The BLM reviewed the recommendations:

    a.  Rules and regulations for plugging and abandoning wells that are no longer viable are outlined in 43 CFR 3162.3-4 and Colorado Oil and Gas Consevation Commission Rule 319.

    b.  The BLM's Gold Book Standard is discussed in Draft RMP/EIS in Appendix G, page G-36. Additional references to the BLM's Gold Book Standard were added to the Proposed RMP/Final EIS. Also see Section 37, Water, of this report.

    c.  Refer to the response to comments in Section 16.1 of this report for Gunnison sage-grouse stipulations.

    d.  Draft RMP/EIS Appendix B lists restrictions on fluid mineral leasing, including NL-10 (closed to leasing), Gunnison Sage-grouse Critical Habitat and Breeding (Lek) Habitat. Appendix B also contains restrictions with the purpose of

BLM_0165323

protecting recreation, including consideration of No Leasing in Jumbo Mountain SRMA, RMZ-1 (NL-15) and NSO elsewhere (NSO-56) and NSO for the North Fork Gunnison River (NSO-9); a specific stipulation for the North Fork Valley is unnecessary.

### Section 22 – Leasable Minerals – Solid

No comments are associated with this topic.

#### Section 22.1 – Leasable Minerals – Solid: Range of alternatives

Total Number of Submissions: 13
Total Number of Comments: 23

Comment Number: 000487_WeltK_20161101_MCC-2
Organization1:Mountain Coal Company, LLC
Commenter1:Kathy Welt
Commenter Type: Private Industry
Comment Excerpt Text:
Additionally, the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application. The purpose of the RMP is to provide balanced management of all of the resources in the area including wildlife habitat, ranching, recreation, conservation and mineral development." The RMP should be broad enough to allow for these site-specific applications, not eliminate/restrict them at the Planning stage.

Comment Number: 000545_SlivkaJ_20161101-223
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.1
Comment Excerpt Text:
Summary of Comments: BLM must evaluate a robust range of alternatives for coal management in the Uncompahgre RMP. This includes considering alternatives that balance uses and impacts within areas known to have coal resources rather than prioritizing coal leasing and development over other multiple uses across all alternatives. BLM should develop a truer range of alternatives that considers, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal.

Comment Number: 000545_SlivkaJ_20161101-220
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6 22.1
Comment Excerpt Text:
An examination of the RMP finds no evidence that BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. See 43 U.S.C. § 1701(a)(8)

BLM_0165324

Comment Number: 000545_SlivkaJ_20161101-221
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.
Uncompahgre Draft RMP at I-2.This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.
As further explained in BLM's NEPA Handbook:
The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.
BLM NEPA Handbook at 6.2.1. To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.
By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.

Comment Number: 000440_ReedM_20161101_HCCA-2
Organization1:High Country Conservation Advocates
Commenter1:Matt Reed
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.Comment Number: 000588_WitherillD_20161101-4
Organization1:
Commenter1:Deirdre Witherell
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165325

To comply with NEPA's requirements for a reasonable range of alternatives, the BLM should consider a "no leasing" alternative for coal resources in the planning area. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing. The agency notes that "[a]ll of the alternatives outlined above provide for continued coal, oil, and gas exploration and development within the UFO. As such, the BLM understands that the majority, if not all, of any developed resources will eventually be consumed to produce energy."7 [7 Draft RMP at 4-41.]

Comment Number: 000369_GibsonA_20161030-2
Organization1:
Commenter1:Ann Gibson
Commenter Type: Individual
Comment Excerpt Text:
I urge you to analyze and adopt a "no leasing" alternative for coal. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing, and is the only effective way to realistically minimize climate impacts.

Comment Number: 000393_LudlowM_20161101-1
Organization1:Oxbow Mining LLC, Elk Creek Mine
Commenter1:Michael Ludlow
Commenter Type: Private Industry
Comment Excerpt Text:
The extraction of coal mine methane should be considered separately from coal bed methane and natural gas extraction in the RMP. As drafted the RMP does not distinguish any differences in Appendix B, Restrictions to Fluid Mineral Leasing. Millions of cubic feet of methane are contained in active and abandoned mines in the North Fork Valley. This methane is escaping to the atmosphere through the ground strata. The leasing of this coal mine methane should be treated differently for development purposes on public lands. This coal mine methane is located in the valley and should not be subjected to the same restrictions as other gas deposits. The restrictions are written to protect people and public lands from drilling and hydraulic fracturing impacts. Leasing and extraction of this coal mine methane would allow for beneficial use of this resource rather than allowing it to escape to the atmosphere as a greenhouse gas that has the potential to increase climate change.

Comment Number: 000420_HovdeC_20161101-12
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Delta County feels very strongly that converting methane to electricity will be part of the diverse energy grid going forward within Delta County. Delta County feels that the current alternatives do not allow for expansion of this energy source and request that the draft final RMP EIS expand the area available for Fluid Mineral leasing in the coal areas around coal mines so that they could provide additional useable product for any methane to electricity project. Specifically, Delta County requests an area generally an east-west band in the Paonia-Somerset Known Recoverable Coal Resource Area bounded by the southern surface outcropping of the coal interval and the norther boundary determined by those points where the overburden exceeds 3500 feet above the B seam of the Mesa Verde coal interval be left open for leasing so that expansion could occur in these areas.

Comment Number: 000446_KlingspornK_20161101-7
Organization1:
Commenter1:Katie Klingsporn

BLM_0165326

Commenter Type: Individual
Other Sections: 5.3
Comment Excerpt Text:
The fact that the BLM Alternative D continues to outline extensive areas for potential coal leasing highlights the fact that much of the information it is working off is out of date. Current climate change directives, enacted at the federal level, require that public agencies such as the BLM account for climate change mitigation and adaptation in their planning, policy, and operations.
Unfortunately, this Draft RMP does not incorporate current science or policy in any of its alternatives. Even Alternative B would open up 494,580 acres to fluid mineral leasing. Alternative D would leave 627,290 acres, or 95% of the mineral estate open to fluid mineral leasing, an insignificant reduction from the current plan, which leaves 631,580 open.

Comment Number: 000448_LishC_20161101-2
Organization1:
Commenter1:Christopher Lish
Commenter Type: Individual
Comment Excerpt Text:
Every alternative the BLM is considering would allow coal mining to continue at current levels for the next 10 to 20 years, a decision that your own EIS admits could result in more than half a billion tons of climate pollution. In fact, every single alternative the EIS analyzes would increase climate pollution over baseline levels, and none would result in any reduction of coal production. Every alternative would allow more leasing, more fracking, and more drilling for oil and gas.
Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-11
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A recent report published by the state of Colorado confirms that both methane capture and flaring are feasible within the Uncompahgre planning area.20 As explained in that 2016 report, the Oxbow mine has been flaring methane since 2012, and the West Elk mine has the potential to generate more than 17 megawatts of electricity from the mine's ventilation air methane system.21 Moreover, EPA reported in 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology."22
[20 State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016), available at
https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Report%202016%20FINAL%203_2016.pdf (last viewed Oct. 21, 2016).]
[21 Id. at 18, 38.]
[22 EPA, Coal Mine Methane Flaring: Technology and Case Studies (Sep. 2014).]
BLM's failure to consider an alternative requiring methane flaring or capture as a condition of mining coal on public lands in the planning area violates NEPA and must be corrected by the agency.

Comment Number: 000487_WeltK_20161101_MCC-4
Organization1:Mountain Coal Company, LLC
Commenter1:Kathy Welt
Commenter Type: Private Industry
Comment Excerpt Text:
Reference L-2: 4) "Consult with the surface owner regarding private surface land overlying federal coal."
- Landowner considerations for coal operations are already addressed by SMCRA, and requiring consultation seems excessive.

BLM_0165327

Comment Number: 000523_MeltonA_20161101-1
Organization1:
Commenter1:Allison Melton
Commenter Type: Individual
Comment Excerpt Text:
It is necessary that BLM analyze and adopt a "no leasing" alternative for coal. Such an alternative is a required to counterbalance the current alternatives that skew heavily in favor of coal leasing. A "no leasing" alternative for coal is also the only effective way to realistically minimize climate impacts. It is irresponsible for the BLM to ignore the real and lasting impacts of its preferred alternative, especially when the neighboring and overlapping sister agency's (GMUG's) recent analysis in a forest-wide project (Spruce Beetle Aspen Decline Management Response DEIS) demonstrates that these public lands and surrounding lands are going to have substantial negative impacts as the result of climate change

Comment Number: 000530_PlattA_20161101_EPA-6
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Perhaps most importantly, the Draft RMP/EIS does not identify which coal fields have high levels of methane that would be vented prior to and during mining.

Comment Number: 000530_PlattA_20161101_EPA-8
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Further, the coal technical report [3] prepared for the Draft RMP/EIS identified areas with potential for coal development during the plan life. The conclusions of the report include no expectation of commercial mining for the Tongue Mesa or Grand Mesa coalfields over the next 20 years (p. 59). In addition, the Draft RMP/EIS alternatives propose a new area for coal leasing in the Dakota Formation west of Montrose even though, according to the report, this area appears to have poor prospects for commercial mining.
[footnote 3] Coal Resource and Development Potential Report, Uncompahgre Field Office, Colorado, April 2010
With the above issues in mind, we recommend that the Draft RMP/EIS alternatives be revised regarding acreage proposed for coal leasing in order to reflect the predicted potential for development and anticipated market conditions for the planning horizon of the RMP (i.e., 15-20 years). To reflect changes in coal demand, specifically, we recommend that the Preferred Alternative be revised as follows: reduce the acreage available for leasing in the Nucla-Naturita field to the amount of coal needed to continue operating the power plant until2022; delete available leasing for the Tongue Mesa and Grand Mesa coal fields due to the lack of commercial scale mining anticipated over the planning horizon of this analysis; and delete the proposed acreage acceptable for coal leasing in the area of the Dakota Formation west of Montrose due to poor prospects for commercial mining over the next 15-20 years. These changes to the Preferred Alternative would help to limit the potential for air and water resources impacts resulting from project-level development.

Comment Number: 000530_PlattA_20161101_EPA-9
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government

BLM_0165328

Other Sections: 22.5
Comment Excerpt Text:
We recommend that new leases in this area include stipulations that require the successful lessee to either use or combust a substantial portion of the methane vented from these mines. Given the magnitude of GHG emissions from these uncontrolled vents, if it is not economical to install methane mitigation measures then we recommend not issuing the leases until economic conditions improve sufficiently to make methane reduction feasible.

Comment Number: 000545_SlivkaJ_20161101-156
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example. [Footnote 61 Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3-megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non-profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years. [Footnote 62 Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.]

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power. [Footnote 63 Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses,

BLM_0165329

government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies.

Comment Number: 000545_SlivkaJ_20161101-158
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

Comment Number: 000545_SlivkaJ_20161101-220
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 6 5.3
Comment Excerpt Text:
An examination of the RMP finds no evidence that BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. See 43 U.S.C. § 1701(a)(8).

Comment Number: 000545_SlivkaJ_20161101-222
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.3
Comment Excerpt Text:
The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the Draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential. See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290. In other words, across the planning area the BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.
Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is identical. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is

BLM_0165330

estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years." Uncompahgre Draft RMP at 4-454 (emphasis added).

The similarity in available acreage and the identical emissions resulting from coal development conflicts with NEPA's requirement that an actual range of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and development in a manner unencumbered by other resource considerations, making its analysis only a "foreordained formality" in violation of NEPA. City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years." Uncompahgre Draft RMP at 4-289 – 4-290, 4-454. Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades. Id. at 4-289 – 4-290, 4-454 – 4-455. It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%). Uncompahgre Draft RMP at Table 2-3, 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%). Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

Comment Number: 000545_SlivkaJ_20161101-223
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 5.3
Comment Excerpt Text:
Summary of Comments: BLM must evaluate a robust range of alternatives for coal management in the Uncompahgre RMP. This includes considering alternatives that balance uses and impacts within areas known to have coal resources rather than prioritizing coal leasing and development over other multiple uses across all alternatives. BLM should develop a truer range of alternatives that considers, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal.

Comment Number: 000563_King_WELC_HasAttach-11
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165331

The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining—which BLM failed to do, in violation of NEPA. Conservation Groups therefore request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in the resource area over the 20-year life of the plan, and another that will eliminate new leasing. See infra at II.C.

Comment Number: 000563_King_WELC_HasAttach-19
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The fact that BLM may, someday, complete a federal coal program PEIS does not eliminate BLM's duty under law to fully analyze a range of reasonable alternative concerning coal leasing and coal production in the Uncompahgre RMP EIS. While the PEIS could result in BLM amending numerous RMPs to address changes to coal leasing, whether or how that would occur is unknown. The Uncompahgre Field Office cannot dodge its responsibility to address coal production and coal leasing in the hopes that the PEIS may do the job later.

Comment Number: 000563_King_WELC_HasAttach-2
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.1
Comment Excerpt Text:
BLM must take steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions.

Comment Number: 000563_King_WELC_HasAttach-20
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must consider and analyze alternatives that require all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by using capturing or flaring the mine's methane emissions. Several technologies to capture or flare methane are in use now, both flaring and capture have been studied or used at coal mines in the planning area, BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands, and doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades.
The draft EIS for the Uncompahgre RMP, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other approach to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives it considers, coal mines in the planning area will emit more than 3 million tons of $CO_2e$ every year in direct emissions from operation of the mines, and BLM confirms that the vast majority of these emissions are "primarily from fugitive methane emissions." DEIS at 4-39; see DEIS Tables 4-9 and 4-10 at 4-38, 4-39.

BLM_0165332

Comment Number: 000563_King_WELC_HasAttach-21
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Given the new science documenting the urgency of reducing methane emissions to combat climate change and the failure of voluntary incentive programs to encourage methane mitigation, here BLM must consider an alternative that requires companies to utilize technologies that capture and/or flare coal mine methane pollution as a condition for authorization to mine federally-owned coal in the Uncompahgre planning area.

Comment Number: 000588_WitherillD_20161101-3
Organization1:
Commenter1: Deirdre Witherell
Commenter Type: Individual
Comment Excerpt Text:
The RMP should include an alternative which places a significant portion of Somerset "off-limits" to coal development.
The Draft RMP indicates that almost all of the coal production in the resource area will come from the Somerset Coal Field. This 40,000 acre area is almost entirely open to leasing under every alternative.6 The most restrictive alternative closes only 12% of the Somerset field to leasing, while the Preferred Alternative leaves 98% open to leasing. However, GHG emissions are the same for each alternative, rendering the slight acreage difference irrelevant in terms of climate impacts. The only way to address a reasonable range of coal scenarios and outcomes would be to analyze alternatives that place significant portions of the Somerset coal field off-limits to coal mining, which the BLM has chosen not to do.
2 Draft RMP at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); id. at 4-454 (economically unviable).
3 Id. at 4-289 – 4-290 (90% or more of Grand Mesa coal field open to mining under all action alternatives); id. at 4- 454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).
4 See 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).
5 Draft RMP at 4-264.
6 Id. at 4-454 – 4-455.

Comment Number: FormLetter1_WildEarthGuardians-1
Organization1: WildEarth Guardians
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.1
Comment Excerpt Text:
I urge the Bureau of Land Management to exercise its absolute discretion over whether to lease oil, gas, and coal leasing and undertake the following actions:
1. Make all publicly owned oil, gas, and coal in the Uncompahgre Field Office unavailable for leasing;
2. Prohibit any and all future leasing of fossil fuels within the Field Office; and
3. Require that existing fossil fuel leases be canceled as expeditiously as possible after production ends.

*Summary*
A. Commenters stated the BLM should consider a reasonable range of alternatives, including at least one alternative that would result in: (1) at least a 50-percent reduction in coal production in the decision area (including the Somerset area) over the 20-year life of the RMP; and (2)

BLM_0165333

another that will eliminate new coal leasing. The commenters suggest these alternatives in response to their claim that the Draft RMP/EIS alternatives fail to consider reduced or heavily mitigated coal mining and favor coal mining over multiple-use management.

B. The following changes were also suggested:

1. Consider extraction of coal mine methane separately from coal bed methane and natural gas. Include stipulations in the Proposed RMP that allow for coal mine methane drilling, while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

2. Restrict activity around WSR segments only when such segments have been added to the National Wild and Scenic Rivers System by Congress.

3. Revise the acreage for coal leasing to reflect the predicted development potential and anticipated market conditions for the RMP planning horizon, as noted in the *Coal Resource and Development Potential Report, Uncompahgre Field Office, Colorado.*

4. Take into account possible changes related to the Coal Leasing Programmatic EIS.

5. Consider and analyze an alternative that requires all coal mines operating in the planning area to mitigate climate impacts by capturing or flaring the mine's methane emissions. This should subsequently be reflected in the greenhouse gas emissions by alternative. As currently written, greenhouse gas emissions are identical despite varying acreages in the alternatives.

6. Remove the mention of consultation with landowners in Appendix L, page L-2, because it is already covered by Surface Mining Control and Reclamation Act of 1977 consultation.

7. Identify which coal fields have high methane levels.

*Response*
A. The BLM developed and analyzed a reasonable range of alternatives in the Draft RMP/EIS as related to coal, pursuant to the requirements of NEPA and BLM's land use planning regulations at 43 CFR 1610.4. The BLM developed the alternatives based on the Analysis of the Management Situation; 2010 Coal Resource and Development Potential Report, planning issues; tribal, federal, state, local, and other governmental agency input and consultation; and public scoping. The acreage open or closed to coal development is similar for most alternatives; however, the level of constraints placed on new leases varies between the alternatives.

B. The BLM appreciates the comments.

1. BLM Washington Office Instruction Memorandum 2017-037, Waste Mine Methane Policy (January 20, 2017), is current guidance. Exclusion of other mineral leasing would abide by legal and regulatory processes already established.

2. Please refer to Section 39, Wild and Scenic Rivers, of this report.

3. Per FLPMA Section 102(a)(12), public lands should be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of

BLM_0165334

1970 (84 Stat. 1876, 30 US Code 21a) as it pertains to the public lands. Per FLPMA Section 103(c), "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. The FEIS has been updated to reflect the revised coal resources within the UFO planning given improved technology and mapping as well as currently active coal mines in the planning area since publication of the DEIS.

4. Per Secretarial Order 3348, Concerning the Federal Coal Moratorium, issued on March 29, 2017, the US Department of the Interior determined that "a [Programmatic EIS] is not required to consider potential improvements to the [coal] program." All activities associated with the preparation of the Federal Coal Program Programmatic EIS have therefore ceased.

5. BLM does not have the authority to require capture or flaring of waste mine methane, but BLM will foster voluntary activities by operators to flare or capture waste mine methane pursuant to BLM Washington Office Instruction Memorandum 2017-037.

6. Appendix L is required Coal Screening (43 CFR 3461). The consultation with landowner takes place upon submission of a coal lease application regarding leasing, while the consultation with landowner under the Surface Mining Control and Reclamation Act of 1977 is regarding mine plan permitting. They are not redundant.

7. The coal fields with high methane levels are addressed under Fluid Minerals. Draft RMP/EIS Chapter 3, Section 3.2.3, Trends (Draft RMP/EIS page 3-121, Trends) states that, "Much of the planning area gas supply growth is expected to come from development of the coalbed natural gas resource and new reservoir discoveries potentially coming from exploration for nonconventional plays." Also, coalbed natural gas is referenced in Draft RMP/EIS Chapter 4, page 4-23, and on page Glossary-13 as being associated with fluid minerals.

### Section 22.2 – Leasable Minerals – Solid: Best available information—baseline data

Total Number of Submissions: 7
Total Number of Comments: 12

Comment Number: 000302_DavolD_20161031-1
Organization1:
Commenter1:Donald Davol
Commenter Type: Individual
Other Sections: 21.2

BLM_0165335

Comment Excerpt Text:
I am disappointed that the current draft plan still facilitates the expansion of coal mining and natural gas development, while relying on data that dates back to 2010 or older.

Comment Number: 000369_GibsonA_20161030-1
Organization1:
Commenter1:Ann Gibson
Commenter Type: Individual
Other Sections: 30.2
Comment Excerpt Text:
The Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment.

Comment Number: 000440_ReedM_20161101_HCCA-5
Organization1:High Country Conservation Advocates
Commenter1:Matt Reed
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:
-the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;
-the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;
-layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets; and
-the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.

Comment Number: 000440_ReedM_20161101_HCCA-7
Organization1:High Country Conservation Advocates
Commenter1:Matt Reed
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Any subsequent "hard look" at impacts from coal leasing and development should include a range of alternatives with varying degrees of environmental protections. These alternatives should be consistent with comments provided herein, and include a "no lease" alternative that would leave coal in the ground. HCCA requests that the agency specifically consider an alternative that would withdraw the planning area's coal from operation of the public lands laws, including the Mineral Leasing Act, and that would remove these resources from their availability for lease or other extractive activity.

Comment Number: 000487_WeltK_20161101_MCC-3
Organization1:Mountain Coal Company, LLC
Commenter1:Kathy Welt
Commenter Type: Private Industry
Comment Excerpt Text:
Reference L-2: "Somerset Coal Field contains three active mines on federal leases."
This needs to be updated as one mine has been permanently sealed and is in final reclamation, and another mine is in cessation of operations

BLM_0165336

Comment Number: 000487_WeltK_20161101_MCC-6
Organization1:Mountain Coal Company, LLC
Commenter1:Kathy Welt
Commenter Type: Private Industry
Comment Excerpt Text:
Pages 3-125 & 126: The coal operations data and trends need to be updated to reflect more current information and potential in the coming decades. Mines and reserves in the Somerset and Nucla/Naturita area have or are planned to experience significant changes.

Comment Number: 000512_FurimskyB_20161031-1
Organization1:
Commenter1:Ben Furimsky
Commenter Type: Individual
Other Sections: 30.2
Comment Excerpt Text:
The Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment.

Comment Number: 000545_SlivkaJ_20161101-226
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.2
Comment Excerpt Text:
Stale Coal Production and Employment Data
To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.
Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:
? the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees; [Footnote 110 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016)]
? the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees; [Footnote 111 Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016)]
? layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets; [Footnote 112 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016)]
and
? the announcement that the Nucla coal mine, and the power station it serves, will close in 2022. [Footnote 113 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand

BLM_0165337

Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016)]

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future. [Footnote 114 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016). ]

As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates [see pdf for table]

Comment Number: 000545_SlivkaJ_20161101-227
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.2
Comment Excerpt Text:
The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Uncompahgre Draft RMP at 4-13. Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future. Id. at 3-178.

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

Comment Number: 000545_SlivkaJ_20161101-228
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.2
Comment Excerpt Text:
The following data and conclusions are stale given the changes in the local coal industry:

- The Draft RMP uses production averages from June 2014 and June 2015, though an additional 13 months of data exist demonstrating a steep drop in production since last year. Id. at 3-126.
- The Draft RMP assumes a coal production rate of "9 to 11 million tons per year," which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area. Id. at 4-255; See also id. at 4-289 – 4-290.
- The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. Id. at 3-126 – 3-127. Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015. [Footnote 115 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016).

BLM_0165338

Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016)] The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015. [Footnote 116 Id.] Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015. [Footnote 117 Id.]

- The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

- The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP." Id. at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate: the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012; [Footnote 118 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016)] today that number is less than 250.

- The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production. Uncompahgre Draft RMP at 3-125. See also id. at 4-11 – 4-12; id. at 4-258 – 4-259. But Bowie #2 is idle, and Elk Creek is permanently closed.

- The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, although its operator agreed to close it in 2022. [Footnote 119 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 26, 2016)] Id. at 4-289 – 4-290.

- The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels.

- To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011, Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely

BLM_0165339

output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false. See id. at 4-20.

The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

Comment Number: 000545_SlivkaJ_20161101-229
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.2
Comment Excerpt Text:
Summary of Comments: BLM must utilize current, high quality information to analyze coal management alternatives in the Uncompahgre RMP, including updated climate and production and employment data. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

Comment Number: 000563_King_WELC_HasAttach-39
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Falling coal production and employment in the Somerset coal fields demonstrates that draft EIS's data—most of it from 2010 or before—is stale, and that its assumptions and conclusions are misplaced. For example, much of the draft EIS's coal data derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Draft EIS at 4-13 (citing the report to reach conclusions about predicted coal production). That document in turn bases its production estimates in part on 2010 projections from the Energy Information Administration (EIA) which then predicted, among other things, that demand for coal from the Rocky Mountain Region would increase and that "coal will remain the dominant energy source for electricity generation."198 [198 BLM, Coal Resource and Development Potential Report (April 2010) at 65 (attached as Exhibit 88).] That prediction has already proven wrong, as natural gas is likely to overtake coal as the dominant source this year.199 [199 Energy Information Administration, Natural gas expected to surpass coal in mix of fuel used in U.S. power generation in 2016 (Mar. 16, 2016), and available at: http://www.eia.gov/todayinenergy/detail.php?id=25392# (attached as Exhibit 105).]

EIA's 2016 report now projects continued coal plant retirements with or without implementation of the Clean Power Plan, and about a 35% decline in coal consumption by 2040 if the CPP is implemented.200 [200 Energy Information Administration, Annual Energy Outlook 2016 with projections to 2040 (2016) at MT-17 – MT-18; MT-22, available at:http://www.eia.gov/forecasts/aeo/pdf/0383(2016).pdf.] The sharpest declines in coal production under the CPP, will occur in the Western coal region, and EIA estimates coal production in the West will fall even without the CPP.201 [201 Id. at MT-31.] While EIA's Annual Energy Outlook may not be the most reliable predictor of coal production—after all, U.S. coal production this year is already down 20% from 2015 levels—BLM cannot rely on a document that has been revised each year since 2010 and that in 2016 reaches significantly different conclusions than the 2010 report.

BLM_0165340

Comment Number: 000563_King_WELC_HasAttach-41
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS uses production averages from June 2014 and June 2015, Draft EIS at 3-126, although an additional 13 months of data exist demonstrating a steep drop in production since last year (due to Bowie #2's idling and West Elk's production drop).
The draft also assumes a coal production rate of "9 to 11 million tons per year," id. at 4-255, which is well above the permitted level, let alone the current production rate, of the West Elk mine, the only remaining operating mine in the area. See also id. at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same").

Summary
Commenters stated that the Draft RMP/EIS relies on outdated coal market information and still assumes an expansion of coal mining, when some of the mines described as active in the Draft RMP are now closed (such as the Elk Creek Mine), idle (such as the Bowie #2 Mine), or pending closure (such as the Nucla Mine in 2022). Commenters noted that the Proposed RMP/Final EIS must use current and high-quality information to reflect these changes to accurately analyze coal management alternatives. The commenters suggested the Proposed RMP/Final EIS include updated market condition, trends, operations, climate, production, and employment data.

Response
The BLM is committed to using the most recent data available for its analysis and reviewed the Draft RMP/EIS to ensure the Proposed RMP/Final EIS reflects relevant changes in the decision area. For information related to coal, the BLM reviewed coal-producing facilities and corresponding coal production rates and reflected these in the Proposed RMP/Final EIS, as appropriate.

### Section 22.3 – Leasable Minerals – Solid: Impact analysis
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000530_PlattA_20161101_EPA-7
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Accordingly, we recommend that the Final RMP/EIS assess whether coal demand in the Nucla-Naturita coal field will be short term and whether the amount of coal needed through 2022 may already be covered by existing leases.

Summary
One commenter stated that the Proposed RMP should assess whether coal demand in the Nucla-Naturita coal field would be short term and whether the amount of existing leases would cover the amount of coal needed through 2022.

BLM_0165341

*Response*
The BLM reviewed changes in the coal industry since the Draft RMP/EIS was written and edited the Proposed RMP/Final EIS, as appropriate. The announced closure of the Nucla power station and, hence, the termination of coal mining in the Nucla-Naturita coal field implies that no foreseen demand for federal coal from that coal field exists. The existing coal leases are fee, not federal. The Proposed RMP/Final EIS was updated accordingly.

### Section 22.4 – Leasable Minerals – Solid: Cumulative impact analysis
No comments are associated with this topic.

### Section 22.5 – Leasable Minerals – Solid: Mitigation measures
Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000489_JohnsonA_20161101-42
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 11.5
Comment Excerpt Text:
2. Methane Capture in the North Fork Valley
The Western Slope Conservation Center believes the final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.
One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[55] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3- megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non- profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of CO2 a year, with a projected life of at least 15 years.[56]
[Footnote 55] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.
[Footnote 56] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.
On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[57] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.
[Footnote 57] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting
In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this

BLM_0165342

wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies.

The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, the Western Slope Conservation Center believes coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.

Comment Number: 000530_PlattA_20161101_EPA-9
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 22.1
Comment Excerpt Text:
We recommend that new leases in this area include stipulations that require the successful lessee to either use or combust a substantial portion of the methane vented from these mines. Given the magnitude of GHG emissions from these uncontrolled vents, if it is not economical to install methane mitigation measures then we recommend not issuing the leases until economic conditions improve sufficiently to make methane reduction feasible.

*Summary*
A. Commenters stated that the BLM should incentivize the capture of coal mine methane and that new leases should require that the successful lessee either use or combust a substantial portion of the methane vented from the mines.

B. One commenter recommended that the Proposed RMP/Final EIS take into account changes related to the forthcoming Coal Leasing Programmatic EIS.

*Response*
A. The Uncompahgre RMP will comply with current guidance related to methane flaring. BLM Washington Office Instruction Memorandum 2017-037, Waste Mine Methane Policy (January 20, 2017), is current guidance. The RMP will foster voluntary activities by operators to capture waste mine methane from underground coal mines, will allow waste mine methane to be put to productive use, where economical, and will reduce environmental impacts, while ensuring continued safe underground mining operations on federal lands.

BLM_0165343

B. Per Secretarial Order 3348, Concerning the Federal Coal Moratorium, issued on March 29, 2017, the US Department of the Interior determined that "a [Programmatic EIS] is not required to consider potential improvements to the [coal] program." All activities associated with the preparation of the Federal Coal Program Programmatic EIS have therefore ceased.

## Section 23 – Livestock Grazing

### Section 23.1 – Livestock Grazing: Range of alternatives
Total Number of Submissions: 16
Total Number of Comments: 58

Comment Number: 000031_SparJ_20160624-1
Organization1:WildEarth Guardians
Commenter1:Jon Spar
Commenter Type: Individual
Comment Excerpt Text:
Discussion of not allowing any cattle grazing should be part of the stipulation as it is well known the damage done particularly in stream and riparian areas by freely grazing cattle.
As climate change becomes an ever increasing stressor on our forests and lands it will be a greater disaster to have cattle adding to that effect.
Only a few people will benefit from allowing their animals to graze on our public lands but all of us (taxpayers/citizens) will pay the bill and suffer the long term consequences of this action as will all the animals and plants that will continue to try and live under ever more trying conditions as the climate heats up. I would advise you take a serious look at the consequences of your actions should you allow further grazing.

Comment Number: 500176_StewartC_20161027_TownOfPaonia-7
Organization1:Town of Paonia
Commenter1:Charles Stewart
Commenter Type: Local Government
Comment Excerpt Text:
The elimination of livestock grazing or reduction in use could affect the viability of these ranches. Any proposed elimination or reduction in use must be based on documented trends in rangeland conditions. If range resource conditions have been identified to be unsatisfactory, strategies for improved management should be considered before livestock grazing reductions are considered. If reductions in livestock grazing are considered the analysis must also evaluate the economic impacts of these reductions on the individual ranch operations and on the county. The Town of Paonia does not support any alternative that eliminates or reduces livestock grazing unless there is a documented problem in rangeland conditions that cannot be resolved with improved management.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-33
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 297 Page 2-165: We request that Alternative D be amended to analyze acreages that may be unsuitable for grazing and apply site specific data to defined criteria as a means of determining what acreage may be withdrawn from grazing availability.

BLM_0165344

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-10
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
o Page 2-169, Line 303, add Colorado Resource Monitoring Initative to the list of plans to base decisions on. In addition, include the Memorandum of Understanding with Colorado Cattlemens, Colorado Wool Growers, BLM, and the Colorado Department of Ag.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-11
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
o Page 2-167, Line 300, there is no mention of using livestock as a tool for vegetation treatments. Targeted grazing is an economical and viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-12
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
o Page 2-167, Line 301, No permits or allotments should be closed.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-13
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-14
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
o Page 2-172, Line 307, alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-7
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3

BLM_0165345

Comment Excerpt Text:
oPage 2-164, Line 295, maintain the ability to increase AUMs.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-8
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-9
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.

Comment Number: 000356_AdamK_20161031-10
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Page 2-167, Line 301, No permits or allotments should be closed.

Comment Number: 000356_AdamK_20161031-5
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Page 2-164, Line 295, maintain the ability to increase AUMs when the resource reflects improved carrying capacity over the long term.

Comment Number: 000356_AdamK_20161031-6
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management at the range level.

Comment Number: 000356_AdamK_20161031-7
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual

BLM_0165346

Other Sections: 3
Comment Excerpt Text:
Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.
Comment Number: 000356_AdamK_20161031-8
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Page 2-169, Line 303, add Colorado Resource Monitoring Initiative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, Department of Ag.

Comment Number: 000356_AdamK_20161031-9
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

Comment Number: 000402_RatnerJ_20161028-14
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP must address how it will handle the buy-out of grazing permits by conservation and other organizations, and should identify how it will retire such permits through the planning process. BLM should work with permittees to identify those who are interested in retiring their permits or being relocated to prevent resource damage.

Comment Number: 000402_RatnerJ_20161028-15
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Drought – The RMP must lay out a clear and effective drought policy

Comment Number: 000402_RatnerJ_20161028-31
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We see on 3-21 the statements:
The most recent salinity management efforts in the UFO have concentrated on nonstructural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields.

BLM_0165347

Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management.

Yet the primary surface disturbing activity across the FO, livestock grazing, has no requirements or limitations put in place to reduce salinity or selenium.

Comment Number: 000402_RatnerJ_20161028-34
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 34.3 15.4
Comment Excerpt Text:
3-46 states:
Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.
Yet the RMP puts in place no requirements or limitations to recover cool season bunch
grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.
3-72 states:
Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.
But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

Comment Number: 000402_RatnerJ_20161028-42
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Grazing permits should require public access easements across private land. If permittees refuse to grant access to public lands, then all permits should be cancelled.

Comment Number: 000402_RatnerJ_20161028-43
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.2
Comment Excerpt Text:
It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view. Not all areas should be grazed by livestock. This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land. In addition, sensitive soils must be protected. This

BLM_0165348

includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts. It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery. Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections. Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation.

Comment Number: 000402_RatnerJ_20161028-46
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.5
Comment Excerpt Text:
? Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as 1 Category allotments first

Comment Number: 000402_RatnerJ_20161028-51
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP must include timelines and priorities for the completion and review of progress of the Fundamentals of Rangeland Health Standards and Guidelines assessments and determinations as required under the 4180 regulations.
For further details on the implementation of the 4180 regulations, we request that the BLM review its 1/19/01 Manual Transmittal Sheet for H-4180-1 Rangeland Health Standards. We specifically bring the BLM's attention to its duties to make "significant progress" towards meeting Standards and Guidelines. The RMP must provide direction to achieve the Fundamentals of Rangeland Health and the Standards and Guidelines, and in those situations, of which there are many, where these are not being met, the RMP must provide sufficient direction that results in the required "significant progress".

Comment Number: 000402_RatnerJ_20161028-60
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP/EIS can not present livestock grazing as a given with little difference in AUM's between alternatives. This would not be a reasonable range of alternatives.

Comment Number: 000402_RatnerJ_20161028-74
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.

BLM_0165349

Yet the RMP puts in place NO requirements or limitations to achieve this.

The livestock grazing section of Appendix G is another example of where the RMP fails to implement basic protections.

Comment Number: 000420_HovdeC_20161101-28
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:

The BLM Instruction Memorandum and Handbook provides clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental settings and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure.

Comment Number: 000420_HovdeC_20161101-29
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:

Page 2-175, Line 316, given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) represents 11,267 head of sheep in our county and we see similar pressures to reduce sheep grazing in numerous BLM and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what would be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape. The experiments mentioned in the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompahgre Resource Area.

o Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep. This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings.

o This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder

supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation.

Comment Number: 000447_LeValleyM_20161101-5
Organization1:LeValley Ranch
Commenter1:Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
The BLM Instruction Memorandum and Handbook provides clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental influences and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure.

Comment Number: 000447_LeValleyM_20161101-7
Organization1:LeValley Ranch
Commenter1:Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep. This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings. o This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation.

Comment Number: 000456_ColeK_20161031-10
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
The status of all allotments needs to be determined on a case-by-case basis in concert with the permittees at the implementation stage of planning

BLM_0165351

Comment Number: 000483_HanksG_20161101-17
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix C. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado
Trout Unlimited has been partners to federal agencies and grazing permittees on past projects in many places. Partnerships like these can lead to mutually beneficial relationships that are good for the land, the recreational users of the land, water users, the grazing operations, and the overseeing agency. Through these types of partnerships appropriate monitoring can done and standards upheld or exceeded. We would like to see the prioritization of partnerships and mutually beneficial projects added to the grazing management section of the Final RMP.

Comment Number: 000486_ClaytonJ_20161101-6
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-170
Line: 304
Comment: There is no mention of vegetation criteria for wildlife, including listed species such as GUSG, in any of these alternatives. For example, the GUSG Rangewide Conservation Plan's Structural Habitat Guidelines are not referenced. We recommend including this criterion in the development of these grazing systems.

Comment Number: 000492_RandallR_20161101-15
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.

Comment Number: 000504_BrownD_20161101_CDA-1
Organization1:Colorado Department of Agriculture
Commenter1:Les Owen
Commenter Type: State Government
Comment Excerpt Text:
The range of alternatives provided in the RMP for levels of livestock grazing is inconsistent with guidance provided in the Forty Most Asked Questions Concerning the Council on Environmental Quality's National Environmental Policy Act Regulations [1] (CEQ40). CEQ40 states in 1b that, "…a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." Alternatives in the RMP allow only for livestock grazing to decrease from current levels; none of the alternatives provide for an increase in domestic livestock grazing.
[footnote 1] https://ceq.doe.gov/nepa/regs/40/40p3.htm

BLM_0165352

Comment Number: 000504_BrownD_20161101_CDA-2
Organization1:Colorado Department of Agriculture
Commenter1:Les Owen
Commenter Type: State Government
Comment Excerpt Text:
The Federal Land Policy and Management Act of 1976 [2] (FLPMA) defines domestic livestock grazing as one of the principal or major uses of federal land. A reasonable range of alternatives that covers the full spectrum should include management options that allow for an increase in domestic livestock grazing provided that land health requirements are met as described in the BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (Standards and Guidelines).
[footnote 2] 43 USC §1701 et seq.

Comment Number: 000504_BrownD_20161101_CDA-3
Organization1:Colorado Department of Agriculture
Commenter1:Les Owen
Commenter Type: State Government
Comment Excerpt Text:
The preferred alternative objective for livestock grazing, Table 2-2 Line 295, provides the needed management direction to ensure that watershed, wildlife, and other resource needs are met. Adherence to the Standards and Guidelines ensures that livestock grazing would not be the causal factor in compromising other resources. Proposed restrictions or changes to livestock grazing management beyond those described in the Standards and Guidelines should be removed from the RMP. Decisions to reduce or increase livestock grazing use on federal lands should be baed on data from site-specific, scientifically defensible resource monitoring techniques.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-3
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Wildlife – Terrestrial
Retain the following direction to improve habitat effectiveness:
* In all habitat improvements and manipulations, and maintenance of those areas, including projects designed to improve livestock grazing, reduce fuel loading, or otherwise, consider the habitat requirements of native wildlife communities, game and non-game alike, and acknowledge the ecological tradeoffs.
* During severe or extreme drought years, to the extent possible, assure that some pastures retain the maximum herb cover (even standing dead material) possible for ground-nesting birds.
Modify or add the following direction to improve habitat effectiveness:
* "Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game." Modify this direction to include seasonal closures on public recreation use to avoid impacts to wintering big game, and change the dates to December 1 through March 1. These dates encompass the winter season for big game animals, and would be more consistent with seasonal closures on adjacent National Forest lands.
* Manage big game winter ranges to provide habitat conditions and seclusion that will encourage use of public lands by elk and mule deer.

BLM_0165353

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-4
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Livestock Grazing
Retain the following direction to meet landscape objectives and enhance success of treatments:
* Grazing will be deferred on new vegetation treatments and rehabilitated burned areas to the extent necessary to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).
* Seasonal utilization levels on palatable forage species should not exceed 50 percent unless required to meet specific range management objectives as identified in an allotment management plan or other activity plan.
* During any time of the year, livestock use shall not exceed an average of 30 percent on native woody vegetation in riparian areas unless required to meet specific range or riparian management objectives as identified in an allotment management plan or other activity plan.
* Develop rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods to improve rangeland health. All developed strategies that are not during dormant periods should ensure livestock grazing does not occur in the same location during the same time period in any two consecutive years.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-8
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.5 14.1 43.1 43.5
Comment Excerpt Text:
Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling
Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA. We are extremely concerned about the health and productivity of our limited bighorn sheep herds. There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep. To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.
We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO. Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model. When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep. Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep. Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.
The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc. We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS. In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have

BLM_0165354

potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.

Implementation of the decisions within the final RMP would occur through subsequent updates and revisions of allotment management plans. Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public. This could be achieved through the development of an implementation plan for allotment management plans and permit actions.

Comment Number: 500137_EtchartE_20161031_HasAttach-1
Organization1:
Commenter1:Ernie Etchart
Commenter Type: Individual
Comment Excerpt Text:
Livestock grazing allotments should be managed on an allotment-by-allotment basis for optimum resource conditions and upward trends.

Comment Number: 500143_RewL_20161017-10
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-164, Line 295, maintain the ability to increase AUMs

Comment Number: 500143_RewL_20161017-11
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.

Comment Number: 500143_RewL_20161017-12
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-166, Une 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.

Comment Number: 500143_RewL_20161017-13
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-169, Line 303, add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. In , include the MOU with CCA, CWGA, BLM, Department of Ag.

Comment Number: 500143_RewL_20161017-14
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry

BLM_0165355

Comment Excerpt Text:
Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

Comment Number: 500143_RewL_20161017-4
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-172, Line 307, alternative c is more feasible and allows for the sustain ability of multi-generational use of working landscapes

Comment Number: 500143_RewL_20161017-5
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements

Comment Number: 500143_RewL_20161017-6
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-167, Line 301, No permits or allotments should be closed.

Comment Number: 500147_BradfordD_20161008-5
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
Any proposed elimination or reduction in use must be based on documented trends in rangeland conditions. If range resource conditions have been identified to be unsatisfactory, strategies for improved management should be considered before livestock grazing reductions are considered.

Comment Number: 000565_TothK_20161102_DCD-10
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local GovernmentOther Sections: 3
Comment Excerpt Text:
Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.

Comment Number: 000565_TothK_20161102_DCD-11
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local GovernmentOther Sections: 3
Comment Excerpt Text:

BLM_0165356

Page 2-169, Line 303, add Colorado Resource Monitoring Initiative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, Department of Ag.

Comment Number: 000565_TothK_20161102_DCD-12
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local GovernmentOther Sections: 3
Comment Excerpt Text:
Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

Comment Number: 000565_TothK_20161102_DCD-12
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-167, Line 301, No permits or allotments should be closed.

Comment Number: 000565_TothK_20161102_DCD-8
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-164, Line 295, maintain the ability to increase AUMs

Comment Number: 000565_TothK_20161102_DCD-9
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.

Comment Number: 000492_RandallR_20161101-22
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.

BLM_0165357

*Summary*

A. Commenters stated the following:

1. One commenter stated that a no grazing alternative should be analyzed.
2. Another commenter stated that the RMP must address how to handle the buy-out of grazing permits by conservation groups, and that the BLM should work with permittees to retire or relocate permits to prevent resource damage.
3. Another commenter requested that the selected management include a voluntary waiver and retirement provision for all grazing permits.
4. Some commenters felt that the range of alternatives for livestock grazing is not reasonable because there is little variation in AUMs.
5. Commenters noted that the RMP must implement a schedule of regular feedback loops required under BLM Manual H-4180, Rangeland Health Standards, and that the RMP should include language stating that the best available science will be used to design grazing systems that allow land health standards to be achieved, and to describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.
6. However, another commenter noted that variation in the landscape makes use of a single standard inappropriate, and that the BLM Instruction Memorandum and Handbook provide clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend, with livestock grazing as the causal factor. A commenter requested that proposed restrictions or changes to livestock grazing management beyond those described in the Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado (BLM 1997) be removed from the RMP, and that decisions to reduce or increase livestock grazing use on federal lands be based on data from site-specific, scientifically defensible resource monitoring techniques. Other comments requested that no allotments be unavailable to grazing.

B. Commenters stated that the RMP should include grazing management actions to address known issues with vegetation, including reduced cool season grasses and forb cover, salinity, and selenium, and should include vegetation criteria for wildlife, such as Gunnison sage-grouse, when developing grazing systems. Commenters recommended that the RMP develop a drought plan to assure that sufficient forage remains for wildlife use. Another commenter requested that protective measures, such as rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods, be retained to improve rangeland health.

C. One commenter requested that the BLM discontinue using the presence of Rocky Mountain bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the decision area, because an existing memorandum of understanding (BLM-MOU-CO-482) with Colorado Cattlemen, Colorado Wool Growers, BLM, and Colorado Department of Agriculture, already accomplishes the required separation, but this memorandum is not mentioned in the RMP. Another commenter requested that the BLM use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing.

D. Commenters requested specific changes be made to proposed management actions, including the following:

BLM_0165358

1. Add Colorado Resource Monitoring Initiative to the list of plans and include the Memorandum of Understanding with Colorado Cattlemen, Colorado Wool Growers, BLM, and Colorado Department of Agriculture
2. Maintain the ability to increase AUMs when resource reflects improved carry capacity over the long term
3. Allow changes in management in ACECs before making areas unavailable to livestock grazing
4. Consider targeted grazing as a tool for vegetation management
5. Define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture, and clarify overnight trailing in sensitive areas
6. Require grazing permits to require public access easements to BLM-administered land
7. Reactivate the Winter-Monitor allotment
8. Add input from counties to reasons for adjustment to grazing management
9. When developing grazing strategies, add forage quantity to consideration
10. Use the results presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. Clarify potential impacts on converting cattle allotment to sheep allotments in the context of domestic/wild sheep interaction.

*Response*
A. The alternatives were drafted based on consideration of resource use and resource protection, with different emphases and goals across the alternatives. The BLM also considered a reasonable range of alternatives in regards to closing allotments, consistent with 40 CFR 1501(c).

1. BLM Instruction Memorandum 2012-169, Resource Management Plan Alternative Development for Livestock Grazing, provides the parameters for what constitutes a reasonable range of alternatives for an RMP/EIS. A no grazing alternative was considered but eliminated from detailed consideration, as discussed in Draft RMP/EIS Section 2.4.7 (page 2-17 to 2-18).
2. The BLM does not allow lease buyouts. The specific guidelines for holding a grazing permit are outlined in 43 CFR Part 4100, subpart 4110. For example, one mandatory qualification for grazing use is that an applicant must own or control land or water base property (43 CFR 4110.1).
3. Voluntary relinquishment of a grazing allotment by a permittee is allowed under existing BLM regulations, but this does not retire the allotment. Any potential retirement of an existing grazing allotment would continue to be subject to site-specific analysis and will not be addressed at this RMP-level planning effort.
4. The BLM would continue to adjust livestock AUMs by allotment on a case-by-case basis to ensure all grazing permits are meeting or making significant progress towards meeting rangeland health standards as presented in Appendix C of the Draft RMP/EIS. Therefore, a range of alternatives showing potential increases or decreases of AUMs that are not supported by monitoring data or achievement of standards for rangeland health was not considered. See Draft RMP/EIS Chapter 2, Table 2-2, line 302 (page 2-168).
5. A statement about use of best available science to design grazing systems that allow the Standards for Public Land Health to be achieved was added to the Proposed RMP/Final

EIS. Monitoring occurs on an allotment basis at permit renewal, as required on a 10-year basis by 43 US Code 1752.

6. Through the land use planning process, the BLM may designate lands as "available" or "unavailable" for livestock grazing, as well as impose grazing use restrictions, limitations, or other grazing management-related actions intended to achieve goals and objectives (BLM Handbook H-1601-01, Land Use Planning Handbook, Appendix C); therefore, it is appropriate to include limitations beyond those in the Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado (BLM 1997).

B. Vegetation management measures are included in Draft RMP/EIS Appendix G. BMPs specific to livestock grazing are included on page G-5 and reference drought planning and sediment salinity/selenium yields. Implementation-level decisions will be made through the appropriate site-specific NEPA process. These decisions will address issues such as rotational grazing strategies, incorporating rest, deferment, and restoration actions (measures that may also be implemented if necessary to attain land health standards); removal of range improvements; and utilization levels being set at a specific percentage. The Proposed RMP/Final EIS provides guidelines, processes, and protocols, but does not make implementation-level decisions or analyze the impacts from such decisions.

C. The BLM acknowledges BLM-MOU-CO-482 (March 2009) and will continue to honor it. The stated purpose of the memorandum of understanding is as follows: "The purpose of this [memorandum of understanding] is to provide general guidance for cooperation in reducing contact between domestic and bighorn sheep in order to minimize potential interspecies disease transmission and to ensure healthy bighorn sheep populations while sustaining an economically viable domestic sheep industry in Colorado." To achieve this purpose, understanding the historic, current, and changing habitats of bighorn sheep is vital, and the BLM, in conjunction with the CPW, will continue to monitory and use this data to achieve the agreed-upon purpose of the memorandum of understanding. As stated in the memorandum of understanding, this may include recommending active and/or vacant domestic sheep allotments for closure or modification via a NEPA analysis to resolve documented resource conflicts. Furthermore, BLM Manual Section 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (March 2, 2016), requires the BLM to achieve effective separation of BLM-authorized domestic sheep or goats from wild sheep on BLM-administered lands. Effective separation is defined as the spatial or temporal separation between domestic sheep and goats and wild sheep. The directive contains several criteria from which to create effective separation management practices, including, but not limited to, habitat distribution, connectivity, and wild sheep occurrence. Therefore, the BLM is required to understand bighorn sheep habitat as a means to achieve effective separation and will take appropriate actions, via a site-specific NEPA analysis, to comply with this directive. Management of domestic sheep and goats to sustain wild sheep is integrated into RMPs as appropriate, and the Uncompahgre Proposed RMP/Final EIS was updated to include management actions to comply with BLM Manual Section 1730.

D. The BLM reviewed recommended edits and incorporated them in the Proposed RMP/Final EIS, as appropriate.

BLM_0165360

1. These were added to the same action (Draft RMP/EIS Table 2-2, line 303) in Proposed RMP/Final EIS Chapter 2.

2. Draft RMP/EIS Chapter 2, Table 2-2, lines 295 and 302 address this.

3. Changing ACEC management is an option for ensuring that an ACEC's relevant and important values are protected. ACECs would only be made unavailable to livestock grazing if required in order to protect the relevant and important values.

4. Targeted grazing as a restoration tool, including noxious weed management, was addressed in the Proposed RMP/Final EIS, as appropriate.

5. Definitions of "trailing" and "active movement" were added to the Proposed RMP/Final EIS.

6. Access to public lands under a grazing permit is allowed subject to any relevant stipulation(s) for the allotment.

7. The Winter-Monitor allotment is open. There is a portion of it in the Camel Back pasture that is closed. Draft RMP/EIS Chapter 2, Table 2-2, line 298, Alternative D, would open that pasture to trailing.

8. Engaging and soliciting input from relevant counties for reasons related to potential grazing management adjustments is already mandated through regulation under 43 CFR 4120.5-1.

9. In the Proposed RMP/Final EIS, the word "quantity" was added to Draft RMP/EIS Chapter 2, Table 2-2, line 304, Alternative D.

10. Potential suitability of existing allotments for domestic sheep grazing is addressed in Draft RMP/EIS Chapter 2, Table 2-2, line 316, Alternative D. Draft RMP/EIS Alternative D considers the results of the risk of contact model (Draft RMP/EIS Appendix K) for suitability of domestic sheep grazing (Table 2-2, lines 316–318, on pages 2-175–2-177). Draft RMP/EIS Alternatives B and C prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 9- or 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat, and Alternative D prohibits conversion of cattle grazing allotments to domestic sheep/goat grazing where the Probability of Interaction assessment depicts allotments as having a high likelihood for disease transmission (see Draft RMP/EIS Table 2-2, line 317, p. 2-177). Proposed RMP/Final EIS Chapter 4, Section 4.3.6, Special Status Species, was updated to clarify that converting grazing allotments from cattle to domestic sheep would increase the risk of contact between domestic and wild sheep, but that conversion would only be allowed in areas with lower risk of contact and likelihood of disease transmission. Additionally, site-specific NEPA analysis would be conducted prior to authorizing a conversion. As stated in Draft RMP/EIS Alternative D, at permit renewal, the Probability of Interaction assessment will be reviewed with more detailed on-the-ground data to assess the probability of interaction for each individual allotment; results will direct management for permit renewal (Draft RMP/EIS Table 2-2, line 317, page 2-177).

### Section 23.2 – Livestock Grazing: Best available information—baseline data

Total Number of Submissions: 4
Total Number of Comments: 13

Comment Number: 000402_RatnerJ_20161028-17
Organization1: Western Watersheds Project

BLM_0165361

Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM can not just assume that an AUM is 800 lbs of forage consumption per month. The RMP/EIS must analyze the current and potentially available forage to satisfy the forage consumption by the number of livestock it currently permits or proposes to permit. It can not assume that the forage capacity determined 20-40 years ago is applicable today.

Comment Number: 000402_RatnerJ_20161028-53
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The current RMP authorizes a certain number of AUM's. However, that is based on an AUM equivalent to 800 lbs of forage per month. The most current information, reviewed above shows that number to be 1368 lbs/month per AUM. Therefore, if sufficient forage were available to satisfy all needs, the numbers of livestock grazed should be reduced to account for the increases in weight and correct the erroneous assumption that 800 lbs/month is an accurate consumption figure. Using the ratio between the current RMP's forage amount per AUM divided by the correct figure above, gives a needed reduction in permitted numbers and/or seasons of use of 42% to account for the RMP's understated forage consumption, without accounting for wildlife, plant and watershed needs.

Comment Number: 000402_RatnerJ_20161028-38
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addressing range management in the revision the BLM should use and reference the quantitative data (including the methodologies used to collect them and the time they were collected) pertaining to the current and expected acreages which meet, or fail to meet, desired vegetative condition, and trends in vegetative condition. Using out-dated data or using methodologies which are no longer accepted, would be inappropriate. As we previously cited, the BLM's own planning handbook requires the use of the best available information. For example, the critical values of riparian areas were not well known even twenty years ago, so that most analyses at the time did not apply to riparian areas

Comment Number: 000402_RatnerJ_20161028-40
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The EIS must disclose the type, location, and number of the various "range improvements" (fencing, water developments, water pipelines, access roads, and so forth) that currently exist on the public lands that will be managed under the direction of the RMP revision. What cumulative impacts have these "improvements" had on vegetation, wildlife habitat, water quality, riparian areas, soils, and habitat fragmentation? What changes/impacts to upland vegetation, water quality, habitat values, and other resources near these developments have occurred as a result of these "improvements?" Have these management activities been successful at accomplishing the goals for which they were implemented? These questions must be answered

BLM_0165362

Comment Number: 000402_RatnerJ_20161028-43
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.1
Comment Excerpt Text:
It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view. Not all areas should be grazed by livestock. This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land.In addition, sensitive soils must be protected. This includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts. It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery. Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections. Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation.

Comment Number: 000402_RatnerJ_20161028-44
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In areas to be grazed by livestock, the amount of forage produced must be determined and allocations of forage to watershed protection (50%), wildlife (25%) and livestock (25%) be made as recommended by Holechek et al (1998)1. [1 Holechek, Jerry L., Rex D. Piper and Carlton H. Herbel. 1998. Range Management Principles and Practices. 542 pp. Prentice-Hall, New Jersey.]
Field data collection will be necessary to accomplish this.

Comment Number: 000402_RatnerJ_20161028-47
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The EIS and RMP must address the fact that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined. Failure to address this critical issue will lead to legal vulnerability under NEPA, APA and the False Claims Act.

Comment Number: 000402_RatnerJ_20161028-48
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
To comply with FLMPA, TGA, PRIA, NEPA and the APA, the EIS and RMP must only approve livestock grazing within the limits of current productivity and suitability, not capacities determined many decades ago. Current data shows that productivity on BLM lands has declined significantly over the last 20-40 years.

Comment Number: 000402_RatnerJ_20161028-61
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner

BLM_0165363

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
With current GIS technology, availability of soil surveys, and vegetation type information, developing a capability analysis is a relatively simple task. Without balancing the currently available livestock AUM's with the physical and biological limitation of the land, the BLM avoids the most basic scientific principles which are aimed at providing for sustainable use without impairment. As a result of having no capability determination, combined with a realistic forage capacity determination, BLM cannot assure that sufficient forage exists to support the proposed livestock numbers and ignores the forage and habitat needs of wildlife and the need for nutrient cycling and soil protection provided by retaining plant matter to hold the soil and add nutrients.

Comment Number: 000402_RatnerJ_20161028-62
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A failure by the BLM in its RMP to analyze utilization, stocking rates and precipitation is a failure to meet NEPA requirements for analysis. The failure to provide sustainable utilization rates for upland and riparian area herbaceous vegetation, aspen suckers and riparian shrubs and incorporate those into grazing permits as terms and conditions leaves management uncontrolled and subject to bias, violating FLPMA.
We provide in C_Grazing Capacity Info Proposed Outline, a scientifically and legally defensible methodology for determining capability and suitability of BLM lands for livestock grazing. We request the BLM incorporate this process into the RMP as well as the EIS alternatives.

Comment Number: 000420_HovdeC_20161101-27
Organization1: Delta County
Commenter1: Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect.

Comment Number: 000447_LeValleyM_20161101-4
Organization1: LeValley Ranch
Commenter1: Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub
community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect.

BLM_0165364

Comment Number: 000501_Bockus_20161101_NPS-8
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Comment Excerpt Text:
PAGE/PARAGRAPH: Vol III, Appendix E Grazing Allotments
COMMENT: There are grazing allotments listed in this table that include NPS and/or private lands that are not accounted for under "other acres". These allotments are: Dead Horse Common, Spring Gulch and Rawhide-Coffeepot. NPS would like re- initiate the update of the 1993 Grazing MOU between our agencies to increase the level of communication and coordination of grazing management activities in these and other allotments that include NPS lands.

*Summary*
A. Commenters requested that the BLM review baseline data and assumptions used to determine livestock forage availability in the planning area, including the following issues:

1. Address that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined, and examine monthly forage utilization levels used to determine stocking rate.
2. Use current data to determine current productivity and suitability.
3. Create suitability maps and determination of forage availability; map unsuitable areas and phase out allotments in those areas to provide necessary protections.
4. Define acreages that do or do not meet desired vegetative condition.
5. Define trends in vegetative condition.
6. Allocate forage be to watershed protection (50 percent), wildlife (25 percent), and livestock (25 percent).

B. One commenter stated that the BLM has the information available to develop a capability analysis, and the lack of analysis for utilization, stocking rates, and precipitation is a failure to meet NEPA requirements.

C. A commenter requested that the BLM disclose the type and location of all range improvements in the decision area.

D. Another commenter stated that enforcing an annual stubble height on the basis that grazing is the only factor influencing grass height is inaccurate.

E. One commenter requested that the BLM review the acres in Appendix E, Grazing Allotments, for specific allotments (Dead Horse Common, Spring Gulch, and Rawhide-Coffeepot), and reinitiate the 1993 memorandum of understanding between the BLM and the NPS for livestock grazing.

*Response*
A. Prior to beginning the Draft RMP/EIS and throughout the planning effort, the BLM has considered data availability from all sources, existing data adequacy, data gaps, and data types necessary to support informed management decisions at the land use plan level.

BLM_0165365

Per BLM Land Use Planning Handbook H-1601-1, the RMP determines forage available within the decision area (area-wide basis). It also provides guidelines for future allotment-specific adjustments. Later, during implementation, vegetation condition in relation to land heath is assessed at the allotment level in the permit renewal process and is inappropriate at the RMP-level analysis. These conditions would be analyzed at the site-specific planning level because conditions can vary throughout the Uncompahgre RMP decision area.

B. Capability analysis is inappropriate at an RMP-level analysis. The inventory and monitoring process for rangeland conditions is dynamic and occurs on an ongoing basis at the allotment-specific level to determine achievement of or progress towards meeting land health standards. This analysis would consider factors such as utilization, stocking rates, and precipitation, and make adjustments to grazing management as appropriate.

C. Broad landscape-level analysis in an RMP does not necessitate mapping of all range improvements. Additional information on range improvement locations would be available in allotment-level management plans and subsequent NEPA analysis.

D. The Draft RMP/EIS does not specify annual stubble height. This would be analyzed during site-specific analysis.

E. Acres in the Appendix E were revised due to GIS review. The grazing memorandum of understanding is outside the scope of this planning process but would be coordinated independently.

### Section 23.3 – Livestock Grazing: Impact analysis
Total Number of Submissions: 3
Total Number of Comments: 3

Comment Number: 000273_BrownB_20161d031-2
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:s
Despite the voluminous size of this document, it fails to demonstrate the need to reduce aums, or the impacts to the permit renewal process when the RMP is finalized. BLM's single-minded approach of always reducing aums, often times ignores actual forage conditions and utilization, by failing to increase aums when range conditions warrant increased utilization. The BLM increasingly relies upon inaccurate computer modeling (bighorn sheep), and artificially created matrices (bighorns and forage manage) to create a pre-determined outcome of reducing/eliminating livestock grazing. We find it egregious for a land management agency to spend more time on administration, modeling, and matrices, than it does meeting monitoring requirements in the field, where the real data exists. For a number of years, the BLM has been severely deficient in fulfilling its role to accurately and fairly monitor range conditions. Determinations regarding forage utilization need to be done in conjunction with the permittee, and monitoring sites need to be indicative of the overall allotment. Additionally, inadequately trained staff (seasonal and/or inexperienced) often times make causal observations that are incorrect, but end up in EAs, EISs, and RMPs. The RMP lacks specificity at a number of levels, and indicates that meeting numerous dubious parameters will be addressed during the permit renewal process, without disclosing the effects on the permittee during the permit renewal process.

BLM_0165366

Placing restrictions on sheep grazing favors recreation, single-species management (bighorn sheep), and environmental extremism over multiple-use and adaptive range management; and it will only serve to advance a radical agenda to permanently end livestock grazing on our western rangelands. Instead of unilaterally adopting strict policies without permittee input, we urge the BLM to support adaptive management by working actively with the permittees. We strongly urge the BLM to comply with its mandate to manage for multiple-use.

Comment Number: 000402_RatnerJ_20161028-71
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The analysis also fails to address disease transmission from cattle.
From a recent RMP revision:
https://eplanning.blm.gov/epl-frontoffice/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=36859&dctmId=0b0003e88040d6d4
2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs).
However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species.
Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats.
Appendix C contains a more detailed review of the effectiveness of BMPs.
The Partridge Creek allotment overlaps with bighorn sheep CHHR and the Marshall Mountain Allotment is in close proximity to CHHR. The Hard Creek allotment overlaps with the Little Salmon area of concern. The terrain on all three of these allotments is interspersed with dense vegetation and forested areas, with additional areas that are steep, rocky, and rugged. Therefore, application of the specified terms and conditions on these allotments would likely be ineffective at significantly reducing the potential for contact between bighorn sheep and domestic sheep.
Hence, for the Partridge Creek, Hard Creek, and Marshall Mountain Allotments, this alternative would be effectively the same as Alternative A under which all four allotments would be available for domestic sheep grazing but without specified terms and conditions. Differing from the other three allotments, the Big Creek Allotment is not in or near bighorn sheep CHHR or the Little Salmon area of concern and has more open and moderately sloped rangeland. However, for this allotment, this alternative would be essentially the same as Alternatives B, which also makes Big Creek available for domestic sheep or goat grazing with application of the terms and conditions. Therefore this alternative was not analyzed in detail.

BLM_0165367

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO
IM for bighorn sheep which requires effective separation.

Comment Number: 000504_BrownD_20161101_CDA-5
Organization1:Colorado Department of Agriculture
Commenter1:Les Owen
Commenter Type: State Government
Comment Excerpt Text:
The preferred alternative states that restrictions on domestic sheep allotments due to bighorn sheep
would be based on the probability of interaction assessment. The Probability of Interaction and Risk of
Contact models used for the assessment are based on limited data, numerous uncertainties, and
unjustified assumptions. Further, the assessment does not take into account the significant role that
domestic sheep management plays in reducing the risk of interaction between domestic and bighorn
sheep. Implementation of restrictions based on the flawed assessment methodology would likely result
in domestic sheep operations going out of business with little benefit for bighorn sheep.

*Summary*
One commenter noted that the Draft RMP/EIS fails to analyze disease transmission from cattle
and does not look at the role that domestic sheep management plays in reducing risk of
interaction between domestic and bighorn sheep. Further, the commenter requested that data
used in the PoI and RoC models be reassessed for accuracy and justification. One commenter
stated that, in Appendix K, the reliance on BMPs to keep domestic and bighorn sheep separate
is incorrect because BMPs have been shown to be ineffective. A commenter requested that the
Proposed RMP include a BLM Washington Office Instruction Memorandum for bighorn sheep
that requires effective separation; the BLM believes the commenter meant to cite BLM Manual
1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep, regarding effective
separation.

Another commenter referenced the Partridge Creek, Big Creek, Hard Creek, and Marshall
Mountain Allotments.

Another commenter stated that the Draft RMP fails to demonstrate the need to reduce AUMs,
and the BLM should embrace adaptive management and work with permittees rather than adopt
strict policies for grazing permit renewal.

*Response*
The BLM appreciates the comments. The BLM re-ran the RoC model and incorporated the
updated results into the Proposed RMP/Final EIS, as appropriate. Reference to BLM Manual
1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep, regarding effective
separation, was added to the Proposed RMP/Final EIS.

The Partridge Creek, Hard Creek, and Marshall Mountain Allotments are not in the
Uncompahgre RMP decision area. These allotments are in the state of Idaho and discussed in
the BLM's Cottonwood RMP. Therefore, these allotments are not relevant to the Uncompahgre
RMP.

The livestock grazing alternatives were created based on consideration for resource use and
resource protection, with different emphases and goals across the alternatives. Under some

BLM_0165368

alternatives, a reduction in AUMs was determined appropriate to achieve resource objectives. As stated in Draft RMP/EIS Chapter 2, Table 2-2, line 302 (page 2-168), AUMs would be adjusted at a site-specific level using an interdisciplinary process when certain data indicate a change is needed. As stated in line 302 and codified in 43 CFR 4130.2(b), the BLM would consult, cooperate, and coordinate with affected permittees and lessees before issuing or renewing grazing permits or leases.

### Section 23.4 – Livestock Grazing: Cumulative impact analysis
No comments are associated with this topic.

### Section 23.5 – Livestock Grazing: Mitigation measures
Total Number of Submissions: 2
Total Number of Comments: 7

Comment Number: 000402_RatnerJ_20161028-12
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP revision should include standards/requirements for a range management monitoring protocol for both upland and riparian areas. Details of the stream stability monitoring protocol, including the frequency and intensity with which it will be utilized, and so forth, should be provided in the RMP revision.

Comment Number: 000402_RatnerJ_20161028-2
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM must include in each RMP alternative and in the final selected alternative a voluntary waiver and retirement provision for all grazing permits.
The RMP must include measurable (i.e., quantifiable) standards for livestock grazing including maximum upland and riparian utilization of 30% on any herbaceous graminoids; maximum bank or wetland trampling annually not to exceed 10% of hydric and mesic soils areas; maximum use of woody browse by all sources not to exceed 15% of new leader growth annually.

Comment Number: 000402_RatnerJ_20161028-39
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In many areas, winter use by wildlife follows the end of the livestock grazing period. It would be worthwhile to establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. In some areas, it is likely that combined use would be greater than expected for both riparian and upland total utilization and stricter standards may be necessary for livestock utilization.

Comment Number: 000402_RatnerJ_20161028-46
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner

BLM_0165369

Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.1
Comment Excerpt Text:
Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as I Category allotments first

Comment Number: 000402_RatnerJ_20161028-52
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP must also provide feedback loops so that once Standards and Guidelines (S&G) evaluations are completed, that the BLM requires regular reviews to insure "significant progress" is being made.

Comment Number: 000530_PlattA_20161101_EPA-17
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that the Final RMP/EIS include an expanded list of BMPs with consideration of the following:
* Management to limit deposition of animal waste in and adjacent to waterbodies, including protecting or repairing any existing exclusions, providing upland water developments, and development of new range improvements to discourage congregation near waterbodies.
* Enhanced monitoring of resource conditions adjacent to high value water resources.
* Monitoring to assess effectiveness of range improvements in protecting aquatic resources.

Comment Number: 000530_PlattA_20161101_EPA-18
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that the Final RMP/EIS clarify whether adaptive management techniques would be applied under all alternatives since it currently appears to be discussed only under Alternative B. If adaptive management is included, we recommend that the Final RMP/EIS also identify the features of an effective adaptive management plan that would be utilized at the project level, including the following:
* Achievable and measurable objectives to provide accountability and guide future decisions;
* Specific decision thresholds with identified indicators for each impacted resource;
* Targets that specify a desired future condition;
* Commitment to implement a monitoring plan with protocols to assess whether thresholds are being met;
* Commitment to use monitoring results to modify management strategies as necessary; and
* Designated timeframes for completion of necessary management modifications.

BLM_0165370

*Summary*

A. A commenter requested that the RMP include standards/requirements for a range management monitoring protocol for both upland and riparian areas, and establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. They also stated that the BLM must prioritize reviews based on the need for change, such as Category I allotments first.

B. The following additional BMPs were recommended:

1.  Add management to limit deposition of animal waste in and adjacent to waterbodies, including protecting or repairing any existing exclusions, providing upland water developments, and developing new range improvements to discourage congregation near waterbodies.
2.  Add enhanced monitoring of resource conditions adjacent to high-value water resources.
3.  Add monitoring to assess effectiveness of range improvements in protecting aquatic resources.

C. One commenter requested a voluntary waiver and retirement provision, and quantifiable standards for livestock grazing, including maximum utilization rates.

D. A commenter also requested clarification regarding whether adaptive management techniques would be applied under any alternative selected, stating that it appears to be discussed only under Alternative B. If adaptive management is included, they recommended that the Proposed RMP/Final EIS also identify the features of an effective adaptive management plan that would be utilized at the project level.

*Response*

A. Livestock grazing allotment monitoring and permit modification would be in accordance with the Rangeland Management Grazing Administration Regulations found in 43 CFR 4100. Future changes to livestock grazing permits would occur at the project-specific (allotment) level after the appropriate monitoring, rangeland health assessments, site-specific NEPA, and compliance with the 43 CFR 4100 grazing regulations and 43 CFR 4180 (Fundamentals of Rangeland Health), occurs. At that time, permits would be developed to ensure the allotment(s) meets all applicable standards and would strive to meet all applicable habitat objectives.

B. The BLM appreciates the comments. The riparian BMPs would minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality (Draft RMP/EIS Appendix G, page G-13). The BLM reviewed recommended BMPs and incorporated them in the Proposed RMP/Final EIS as appropriate.

C. A Voluntary waiver and retirement provision would follow methods outlined in BLM Washington Office Instruction Memorandum 2013-184, Relinquishment of Grazing Permitted Use on BLM-administered Lands. Establishing utilization rates for livestock grazing would be determined at an implementation level, site-specific analysis. This is due to the variable environmental conditions within the UFO BLM decision area that characterizes specific grazing

BLM_0165371

allotments. These variables include but are not limited to precipitation, elevation, and soils conditions. As such, prescribing utilization rates is not appropriate at the broader RMP-level planning effort.

D. Adaptive management would be applied under any alternative, as described in Draft RMP/EIS Chapter 2, Section 2.3.1 on page 2-6. Specific to grazing, see Draft RMP/EIS page 4-248: Under Alternative C, "grazing management practices would be adjusted the same as described under Alternative B, with similar impacts. Under Alternative C, however, management strategies would emphasize increasing available forage and stocking rates where appropriate, while maintaining BLM Colorado Public Land Health Standards (BLM 1997). Additional forage under this alternative could be allocated to domestic livestock, and AUMs could be increased; therefore, this alternative is more likely to increase flexibility for livestock management in the long term." Also refer to Draft RMP/EIS page 4-250: Under Alternative C, "grazing management practices could be adjusted as described under Alternative B, with similar impacts. Under Alternative D, management strategies would emphasize improving rangeland health and forage quality; as a result, short-term impacts on permittees could increase if additional management actions are needed to implement an improved grazing strategy."

## Section 24 – Locatable Minerals

### Section 24.1 – Locatable Minerals: Range of alternatives
Total Number of Submissions: 3
Total Number of Comments: 5

Comment Number: 000032_WitmanR_20160627-2
Organization1:
Commenter1:Randy Witham
Commenter Type: Individual
Comment Excerpt Text:
Do NOT withdraw any land from mineral entry/claiming.
Again, a favorite tactic that supports only one user group's desires -- extreme environmentalists. Nothing's broken that needs fixing. Nothing. Boaters boat, fishermen fish, hikers hike and claim owners mine on their claims. Withdrawing lands from mineral entry arbitrarily sets up winners & losers. BLM should not be out supporting just one special interest group at the expense of another.
FYI: We already have 123 National Monuments for 100s of millions of acres and 759 Wilderness Areas for almost 110 million acres that the public can do little more than just look at.....like a postcard. Enough has been "saved for future generations" as it is. What we the public need is the federal government and BLM to manage OUR public lands for all user groups....and take down gates, remove boulders, open up our lands, not close them off further.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-52
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Appendix J Paradox Valley SRMA Page J-45 through J-53: We request that none of the lands within this SRMA be recommended for withdrawal from locatable mineral entry. This area is part of the Uravan Mineral Belt which is a well known formation for uranium and vanadium production. The recreational

BLM_0165372

activities identified in this area can easily coexist with future resource extraction through permit conditions and other administrative controls.

Comment Number: 000176_Waschbusch]_20161013_MontroseCounty-58
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Comment Excerpt Text:
As noted in our previous comments, BLM has previously recommended this area [Robideau SRMA] as being unsuitable for wilderness. This recommendation was in part based upon, "a variety of noticeable human imprints". (1991 BLM Wilderness Study Report Volume 2 p.311). Man's presence on this landscape has not diminished since this report. This is an area that can and does support multiple use. We request that all lands within this SRMA remain open to locatable mineral entry. Future resource development can occur in harmony with BLMs intended development of recreational uses in this area.
Comment Number: 000545_Slivka]_20161101-218
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft RMP lacks information to support reasoned decisions involving "[c]hanges in restrictions that can be placed on mineral claiming, leasing, or development activities." Uncompahgre Draft RMP at 4-254. None of the alternatives consider the past costs, current impacts, and future costs of deferred reclamation. Taken together, the historical and current lack of viability supports analysis, and selection, of an alternative withdrawing all uranium from mineral entry. Id. at 4-290.

Comment Number: 000545_Slivka]_20161101-219
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Plan conformance allows specific mining-related proposals to be conditioned or restricted based on the specifics in the land use plan. BLM should revise the draft RMP to consider alternatives that ensure that all mining-related proposals are conducted only in a manner to protect public health, water quality, and wildlife. This includes such concepts as restricting the placement of wastes or ores in riparian areas, requiring radiometric surveys as part of baseline and reclamation plan analyses, and seasonal closures for wildlife as appropriate. Such provisions are well within BLM's authority. BLM regulations state that: "All future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). Further, "Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment." 43 C.F.R. § 1601.0-5(b). The draft RMP does not conform with the actual conditions on the ground.

*Summary*
A. Commenters stated that the BLM should not withdraw any land from mineral entry. These commenters requested that the BLM revise the Draft RMP/EIS to consider alternatives that ensure that all mining-related proposals are conducted only in a manner to protect public health, water quality, and wildlife.

BLM_0165373

B. Commenters also stated that none of the alternatives consider the costs of deferred reclamation, and that an alternative withdrawing all uranium from mineral entry should be analyzed.

C. One commenter requested that the BLM not withdraw any land from mineral entry in the Paradox Valley SRMA because it is located within the Uravan Mineral Belt. The commenter also requested that the Roubideau SRMA remain open to locatable mineral entry.

*Response*

A. As stated in Draft RMP/EIS Section 4.4.1 on page 2-15, the FLPMA is the principal law governing how the BLM manages public lands. It guides the BLM in management, protection, development, and enhancement of public lands. The FLPMA specifically requires the BLM to manage for the multiple use and sustained yield of public land resources for both present and future generations. Section 102(a)(12) recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands, including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 USC 21a) as it pertains to the public lands. Section 103(c) defines the term "multiple use" to manage the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. However, it also recognizes the need for harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment, with consideration given to the relative resource values and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. Therefore, keeping all lands open and not withdrawn from mineral entry would be inconsistent with the FLPMA. In addition, the withdrawal process is a separate process above and beyond the RMP analysis and follows the requirements outlined in FLPMA Section 204, including a separate series of analyses. For withdrawal proposals that are 5,000 acres or more, notification to both Houses of Congress is also required. Refer to the Draft RMP/EIS, Section 2.4.

Per the Hardrock Mining Law of 1872, as amended, federal lands open to mineral entry are available to explore for, discover, and purchase certain valuable mineral deposits. All mining-related proposals would comply with 43 CFR 3809 and 3802, which requires that anyone intending to develop resources on BLM-administered lands prevent unnecessary and undue degradation from mining operations, reducing impacts to public health, water quality, and wildlife. Additionally, per 43 CFR 3809, a plan of operations must be submitted for any operations causing disturbance greater than casual use in some special status areas, such as designated ACECs. Notice level operations do not apply in these special status areas and, therefore, operations greater than casual use require BLM approval, as well as trigger the NEPA process. This requirement would be addressed at the site-specific notice or plan of operations proposal stage, and not at the RMP level. Therefore, the reasonable range of alternatives presented in the Draft RMP/EIS reflects this policy.

B. In accordance with 43 CFR 3809 regulations, reclamation bonds are required for both plans of operations and notices. 43 CFR 3809.420 requires that reclamation is concurrent. It must be initiated and completed at the earliest economically and technically feasible time on the portions of the disturbed area that will not be disturbed further. As such, the BLM does not allow for

BLM_0165374

deferred reclamation. The BLM regulations were first established in 1981 and most recently revised in 2001. These regulations require that any operations greater than casual use must provide and maintain an adequate financial guarantee.

C. The BLM understands that overlapping management actions may lead to conflicts in resource uses and protection. The Paradox Valley SRMA is identified only in Alternative B at 86,990 acres, and falls entirely within the Uravan Mineral Belt. The Uncompahgre RMP decision area portion of the Uravan Mineral belt is 267,584 acres. Of this 267,584 acres, the Sewemup and Dolores Canyons WSAs, as well as the Tabeguache area (13,340 acres, 1,740 acres, and 1,691 acres, respectively), overlap the Uravan Mineral Belt. These acres would be recommended for withdrawal, as the Draft RMP/EIS states in Chapter 4 on page 4-5, that the stricter management prescription would apply where varying levels of management from different resource programs overlap. Likewise, the Roubideau SRMA is proposed in Draft RMP/EIS Alternatives B and D at 25,350 acres. This potential SRMA overlaps the 10,680-acre Camelback WSA, which, under all alternatives, would be closed to coal leasing and nonenergy solid mineral leasing. In addition, all WSAs would have an NGD restriction, be closed to fluid mineral leasing and exploration, and prohibit associated surface-disturbing activities. This means that withdrawing minerals in the Roubideau SRMA would remove 14,660 acres from locatable mineral entry. As noted on Draft RMP/EIS pages J-63 through J-69, these overlapping acres would be recommended for withdrawal from mineral entry in Alternative B, and not recommended for withdrawal from mineral entry under Alternative D. Alternative A (No Action) includes areas previously recommended for withdrawal. This provides a reasonable range of alternatives and management actions in the RMP to meet the stated objectives.

### Section 24.2 – Locatable Minerals: Best available information—baseline data
Total Number of Submissions: 1
Total Number of Comments: 9

Comment Number: 000545_SlivkaJ_20161101-209
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Uranium
The Draft RMP presents an unrealistic expectation of the viability of future uranium mining based on an unsupported assertion that "because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region remains strong." Uncompahgre Draft RMP at 3-128.
Unfortunately, the draft RMP is based on an outdated 2011 Mineral Potential Report ("MPR") that only identified the potential occurrence of uranium and vanadium deposits, and speculated on future mining viability based on an artificially inflated 2011 spot price. If accepted mining economic analysis were applied to the plan-level NEPA analysis, which includes social and environmental costs, it is likely that the MPR would confirm that there is very low potential for viable claims on BLM-managed uranium deposits in the plan area. The uranium mines are of such low viability, that a properly conducted socio-economic analysis would likely support an area-wide uranium withdrawal to protect other resource values and improve the regional economy.
The MPR is silent as to the effect of the high production costs on the economic and commercial viability of these deposits. It is well established that the validity of a federal mining claim on BLM lands is

BLM_0165375

dependent on a consideration of all costs. "Claim validity is determined by the ability of the claimant to show that a profit can be made after accounting for the costs of compliance with all applicable laws . . ." Great Basin Mine Watch, 146 IBLA 248, 256 (1999) (emphasis added). In addition to production costs, environmental compliance costs must also be factored in the claimant's economic analysis in order to prove the existence of a valuable mineral deposit. Since a profitable mining operation must be proven for any mining claim to be considered valuable, determining the costs of environmental compliance is a necessary precursor towards validating a discovery. Great Basin Mine Watch, 146 IBLA 248, 256 (1999); U.S. v. Pittsburgh Pacific Company, 30 IBLA 388,405 (1977), citing U.S. v. Kosanke Sands, 12 IBLA 282, 298-99 (1973). As the Board in Pittsburgh Pacific recognized, environmental cost factors may be significant enough to "stand in the way of a profitable mining operation" and therefore, must be factored in by the BLM. Id. at 393.

Comment Number: 000545_SlivkaJ_20161101-210
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft RMP's use of the term "mineral resources" is misleading, and ignores the financial viability parameters that must be addressed in "mining claim validity exams." If this analysis is carried out at the RMP level, which NEPA reasonably requires, it is foreseeable that there would be no valid mineral claims due to the prohibitively high cost to conventionally mine and mill yellowcake from the ores located in the sandstone deposits. Uncompahgre Draft RMP at 2-413. Historically, uranium mines have not made enough money to carry out necessary reclamation and decontamination of the mine sites. The draft RMP conclusion that price exceeds cost of production is supported by the mere recognition that "over 400 documented abandoned uranium mines in the planning area." Id. at 3-175. Focus should be placed on the undisclosed number of inactive federally owned mines in the planning area. Ideally, the federal taxpayers should not pay for the clean-up costs at claims that the claimants have failed to reclaim, due in part to deficiencies in the 1872 Mining Law and the 43 C.F.R.§ 3809 regulations. However, at many of the inactive federal mines, the operators are long gone and the responsibility falls on the federal government to carry out clean up.

Comment Number: 000545_SlivkaJ_20161101-211
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The MPR analysis is based on an unrealistic "price of uranium (U3O8) at $72 per pound and the price of ferro-vanadium at $31 per kilogram as of February 14, 2011." The $72 level is simply not supportable. This price may be indicative of the hedge fund bubble of 2007 that drove the price into the $140 range, but bears no relation to current market conditions or production costs. The $72 spot price ignores the post-Fukushima realities as they apply to nuclear energy and the ongoing disposal of Department of Energy uranium stockpiles.
The plan-level NEPA analysis must be based on a current analysis that recognizes $20.00 per pound price reported by TradeTech as of Oct. 21, 2016. The $20 per pound spot price is more reflective of the supply/demand and production costs for this global commodity. Because in situ leach uranium mining and mining richer deposits involves dramatically lower production costs, it is likely that the Uravan Mineral Belt deposits will never be economically viable.

BLM_0165376

Comment Number: 000545_SlivkaJ_20161101-212
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Mineral Potential Report provides an unsupportable account of the history of uranium mining that is brought into the draft RMP. Uncompahgre Draft RMP at 4-477, MPR at 30. The uranium deposits in the Uravan Mineral Belt have never supported a viable uranium industry. Reported opinions from the lawsuits brought against the federal government provide details of federal buying programs and price supports in the 1950s that created a non-market boom. Cotter Corp. v. Seaborg, 370 F.2d 686, 690 (10th Cir. 1966)(describing Atomic Energy Commission buying program). Due to new discoveries, such as the "uranium-bearing ore deposits on the Spokane Reservation, located near Ford, Washington," the Atomic
Energy Commission curtailed its price support programs. Gay v. United States, 174 Ct. Cl. 420, 460, 356 F.2d 516, 525 (1966). Early controversies over mining included "court orders that [Bureau of Land Management] must be given the opportunity to expeditiously review Cotter's reclamation plan." Utah v. Andrus, 486 F. Supp. 995, 1009 (D. Utah 1979). The Uravan Mineral Belt crashed shortly after federal price support program ended in 1958, with area uranium mills staying open and only sporadically operating under various agreements with the United States Atomic Energy Commission." Duman v. Commissioner, 1967 Tax Ct. Memo LEXI S 99, at *4 (U.S. T.C. Aug. 3, 1967). The history of the industry between 1958 and 1970 is thus misstated.
After 1958, the largely bankrupt uranium industry did not, and was not required to reclaim or clean up the impacts of mines and mills. The federal government spent an undisclosed billions of tax dollars under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), to remedy the damage caused by a patchwork of ineffective state regulatory programs. Dep't of Health v. Mill, 887 P.2d 993, 1004 (Colo. 1994) citing 42 U.S.C. § 7901.3. The MPR also misstates the status of the Uravan Mill. MPR at 31. Uravan has still not achieved full clean-up and closure, and remains subject to Colorado-issued UMTRCA license and EPA CERCLA actions. W. Colo. Cong. v. Umetco Minerals Corp., 919 P.2d 887, 890 (Colo. App. 1996). The passage of modern pollution and mining laws intended to ensure the pollution prevention and clean-up costs fall on the mining company, not the federal fisc are not addressed in the draft RMP and MPR. Preliminary comparisons suggest that billions of dollars spent on disposal and maintenance of uranium mill tailings has eclipsed the income generated from the mining and milling activity in the Uravan Mineral Belt.

Comment Number: 000545_SlivkaJ_20161101-213
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The MPR is based on outdated information. The Cotter mill in Cañon City has been demolished, and Denison Mines has abandoned its United States holdings. The status of the mills in the region is also outdated. The Piñon Ridge Mill license has been twice rejected by the Colorado Courts and is now being held in abeyance during remand. The future tailings disposal capacity of the White Mesa Mill is highly questionable, and it is not clear whether the mill will accept any new sources of mined uranium ore. Rather, a new business model is emerging at White Mesa that focuses exclusively on charging disposal fees and processing "alternate feed materials" from commercial, industrial, and military clean-ups. [Footnote 101 See: http://www.energyfuels.com/news-pr/energy-fuels-secures-new-processing-contract/ (last visited 10/31/2016)] In short, the existing infrastructure to support Uravan Mineral Belt

BLM_0165377

uranium mining has either been demolished, is nearing the end of its serviceable life, or has been shelved.

Comment Number: 000545_SlivkaJ_20161101-214
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM's analysis must include data on the full economic and financial cost of producing uranium into yellowcake, rather than reliance on anecdotal "communication with industry experts and government officials." MPR at 40. Reliance on a 2004 report to suggest that $15 prices over the next 20 years would support a uranium industry is not supportable. MPR at 42 citing (Spanski et al 2004). To the contrary, industry reports establish costs of at least $80/lb to mine and mill uranium into yellowcake. "The simple fact is that the World is currently oversupplied with uranium. Utilities appear to be well-covered for now." [Footnote 102 http://www.energyfuels.com/news-pr/energy-fuels-issues-letter-shareholders. (last visited 10/31/2016)]
The DOE-leased mines in the plan area remain subject to a permanent injunction that invalidated the underlying NEPA analysis relied upon in the MPR. MPR at 42. Colorado Environmental Coalition v. Office of Legacy Management, 819 F. Supp. 2d 1193, 1217 (D. Colo. 2001) amended by 2012 U.S. Dist. LEXIS 24126, 2012 WL 628547 (D. Colo. Feb. 27, 2012). DOE has not properly asked the District Court to lift the permanent injunction. The 2014 Final Environmental Impact Statement contains many of the same deficiencies identified by the 2011 District Court opinion, especially the failure of the programmatic NEPA analysis to address site-specific impacts to inform the cumulative impacts analysis. Reliance on the DOE approach and analysis has infused BLM's DEIS analysis with the same legal deficiencies.

Comment Number: 000545_SlivkaJ_20161101-215
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The prospects of mines reopening are also based on unreasonable and inapplicable assumptions about price. MPR at 45. In reality, these mines are opened sporadically due to Colorado mining laws applicable to five year "temporary cessation" periods. There is a financial incentive to avoid reclamation and clean-up by keeping these mines in an "active" status under Colorado mining law. The assumed relationship between price and activity in the MPR is disproven by a mining industry that has not re-opened any mine since 2009, even though the price has remained above the assumed $15 threshold. At no place in the analysis does BLM reveal the production costs that are publicly reported by Energy Fuels and other publicly traded companies. This data is available, but was not included in the MPR analysis. The draft RMP does contain a correct conclusion that high energy costs and high transportation costs have resulted in mine and mill closures. Uncompahgre Draft RMP at 4-10.

Comment Number: 000545_SlivkaJ_20161101-216
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
The socioeconomic analysis ignores the data generated during the Colorado licensing of the Piñon Ridge mill. Of key importance is the report generated by Dr. Tom Powers. (See Attachment 5.) In short,

BLM_0165378

uranium mining is simply not economically viable, and the RMP and DEIS repeat demonstrably false myths that perpetuate "false hopes" of a uranium revival and create a negative economic impact on viable sources of economic development. [Footnote 103 http://www.durangoherald.com/article/20140507/OPINION01/140509617/ (last visited 10/31/2016)] The draft RMP assumes an active uranium mining and milling economy, yet there are zero active mines and mills in the plan area. The draft RMP asserts "[a]ctivities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions." Uncompahgre Draft RMP at 4-20. No data is provided to support the conclusion that major contributions from an active uranium mining industry would remain consistent with the emissions from the currently inactive industry. The lack of analysis must be addressed because emissions from current and potential uranium production is expected to have serious impacts on "Class I airsheds and sensitive Class II areas." Id. at 4-25. The draft RMP confirms the importance of mine validity exams on the RMP and site-specific scale: "The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities." Id. at 4-29.

Comment Number: 000545_SlivkaJ_20161101-217
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Informed planning decisions cannot be made without informing the public and the decisionmakers that uranium mining has never been economically viable in the Uravan Mineral Belt without direct (ore buying) or indirect (reclamation and clean-up) subsidies. If equipped with this information, planning can couple mineral withdrawal with terms that protect the BLM and federal taxpayers from the predictable impacts left behind a half-century of uranium mine speculation that has left BLM with more than 4000 federal mines that lack easily identifiable operators to pay for reclamation costs. At this stage, most operators are insolvent and short of a region-wide Superfund designation, BLM will be stuck with these stranded land management costs.

*Summary*
Commenters stated the Draft RMP presents an unrealistic expectation of the viability of future uranium mining and is based on an outdated Mineral Potential Report from 2011, which is inaccurate for the following reasons:

1. The analysis is based on an unrealistic and outdated price of uranium.
2. The report only identified the potential occurrence of uranium and vanadium deposits and is silent about the effect of high-production costs on the economic and commercial viability of these deposits, and does not employ mining claim validity exams.
3. The report does not mention the number of inactive federally owned mines in the planning area.
4. The report provides an unsupportable account of the history of uranium mining.
5. The report is based on outdated information and contains inaccurate status of uranium mills, such as the Cotter Mill, Pinon Ridge Mill, and White Mesa Mill.
6. The report utilizes communication with agency representatives instead of data on the full economic and financial cost.

BLM_0165379

7. The analysis inaccurately assumes an active uranium mining and milling economy and does not accurately reflect current market conditions, such as per pound price or production costs.

8. The report does not inform the public and decision maker that uranium mining has never been economically viable in the Uravan Mineral Belt without subsidies.

*Response*

1. 43 US Code 1701 Sec. 102 (a) states that: "The Congress declares that it is the policy of the United States that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 US Code 21a) as it pertains to the public lands." Based on these regulations, the BLM is to make public lands available for orderly and efficient development of these resources under the principles of Multiple Use Management.
BLM Manual Section 3031, Energy and Mineral Resource Assessment, sets standards for assessing, classifying, and reporting on the potential for the occurrence of mineral resources on lands managed by the BLM in the Mineral Potential Report. The purpose of report is to identify geologic likelihood of mineral potential in a particular area, not the economic feasibility of developing a resource. Following this direction, the Mineral Potential Report identified the presence and occurrence of locatable minerals in the decision area. The determination was made that minerals occur in quantities and qualities that make their potential for development greater than nominal. The methodology and conclusions in this report are still valid even though current demand is down.

2. Specific procedures, mineral appraisals, and evaluations requiring determinations or estimations of monetary value or market potential are beyond the scope of the Mineral Potential Report, as outlined in BLM Manual Section 3031, Energy and Mineral Resource Assessment. Economic viability of production is analyzed at the site-specific notice or plan of operations stage.

3 and 5. Data in Draft RMP/EIS Section 3.2.3, Energy and Mineral Resources was updated to reflect the current conditions and trends of uranium mining in the planning area. Draft RMP/EIS Table 4.1, Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that comprise the Cumulative Impact Scenario, was updated to reflect updated uranium mine information in the cumulative impacts analysis area.

4. The purpose of the Mineral Potential Report is to identify the occurrence of mineral resources in the planning area. The 2011 Mineral Potential Report was developed utilizing the standards and processes established by BLM policy. Specifically, BLM Manual Section 3031, Energy and Mineral Resource Assessment, sets standards for gathering and analyzing information on energy and mineral resources for BLM land use decisions. The Mineral Potential Report is the best available data and identified the presence and occurrence of locatable minerals in the decision area.

6. BLM Manual Section 3031, Energy and Mineral Resource Assessment, sets standards for gathering and analyzing information on energy and mineral resources for BLM land use decisions. BLM Manual Section 3031 also sets standards for assessing, classifying, and reporting on the potential for the occurrence of mineral resources on BLM-administered lands. The 2011 Mineral Potential Report was developed utilizing the

BLM_0165380

standards and processes established by BLM policy. The Mineral Potential Report is the best available data and identified the presence and occurrence of locatable minerals in the decision area. The determination was made that minerals occur in quantities and qualities that make their potential for development greater than nominal. The price of commodities fluctuate up or down depending on market conditions. Fluctuations in the commodity markets do not change the fact the minerals occur in these areas. Recommended data were reviewed and incorporated as appropriate into Proposed RMP/Final EIS Section 3.2.3, Energy and Mineral Resources, to reflect current conditions and trends of uranium mining in the planning area. Economic viability of production is beyond the scope of the RMP analysis and the 2011 Mineral Potential Report. Specific procedures, mineral appraisals, and evaluations requiring determinations or estimations of monetary value or market potential are beyond the scope of Manual Section 3031, which was utilized to develop the Mineral Potential Report. Financial analysis would be examined at the site-specific notice or plan of operations stage.

7.  The Mineral Potential Report utilized the best available data and identified the presence and occurrence of locatable minerals in the planning area. The determination was made that minerals occur in quantities and qualities that make their potential for development greater than nominal. The price of commodities fluctuates up or down depending on market conditions. Fluctuations in the commodity markets does not impact the presence of minerals in the area. Data in Proposed RMP/Final EIS Section 3.2.3, Energy and Mineral Resources, were updated to reflect the current conditions and trends of uranium mining in the planning area. Discussion in Proposed RMP/Final EIS Section 4.6.3, Socioeconomics, was updated to reflect the current status and projections for planning area uranium mining.

8.  The BLM recognizes BLM-administered lands as an important source of the Nation's energy and mineral resources and is required to identify lands available for orderly and efficient development of these resources under the principles of Multiple Use Management. Economic viability of production would be analyzed at the site-specific notice or plan of operations stage. See also the response to subpart 1 of this section, above.

### Section 24.3 – Locatable Minerals: Impact analysis
No comments are associated with this topic.

### Section 24.4 – Locatable Minerals: Cumulative impact analysis
No comments are associated with this topic.

### Section 24.5 – Locatable Minerals: Mitigation measures
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000530_PlattA_20161101_EPA-16
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:

BLM_0165381

The Draft RMP/EIS notes that there is a high occurrence potential for uranium in the planning area and predicts an increase in uranium extraction and processing over the planning horizon. It is unclear from the Draft RMP/EIS discussion (p. 4-287) which BMPs will be required for uranium exploration and reclamation. We recommend using existing roads to the fullest extent possible and following strict standards for any necessary road construction, stockpiling of topsoil, and sediment basins, similar to those identified in Appendix G., BMPs and SOPs, under the categories of Water, Riparian, Forestry, and Fluid Minerals practices and procedures for protection of water resources. We also recommend including a discussion of requirements for the adequate bonding of exploration activities to restore the mining site and repair any road damage that may occur from high runoff events. In addition, we recommend including a discussion and/or map to specify the areas more likely to experience heavy exploration in the future or to be the sites of new mines (we note that Figure 3-22 identifies current active exploration sites). We encourage higher reclamation and bonding standards for exploration and mining in areas that have not been previously mined. Conversely, if the exploration and mining will be in an area with previous mining and incomplete reclamation, we recommend encouraging the proponent to improve reclamation for historic mining activities as part of the permitting process.

*Summary*

One commenter requested additional information about the following, as related to uranium mining:

1. Requirements for the adequate bonding of exploration activities to restore the mining site and repair any road damage that may occur from high runoff events
2. Discussion and/or map to specify the areas more likely to experience heavy future exploration or to be new mine sites

*Response*

1. Bonding requirements are enacted at the notice or plan of operations stage of permitting before starting operations. The BLM's general bond requirements described in its regulations would apply and would govern the amount of bond and any bond increase (43 CFR Part 3809). The BLM must require financial guarantees that are based on the costing to construct, operate, and maintain treatment facilities, including the periodic replacement of facilities, as they may wear out, for as long as the treatment and facilities are needed after mine closure. In addition, operators must conduct operations in a way that will not cause unnecessary or undue degradation in accordance with the Surface Management regulations, which include the 43 CFR Part 3809 performance standards. Specific applicable BMPs would be determined at the permitting stage.
2. Uranium potential in the planning area is discussed based on the Mineral Potential Report (BLM 2011), a supporting study prepared in advance of the Draft RMP/EIS. As noted in this report, development location and potential is related to mineral potential and commodity market prices. Areas for development would, therefore, vary based on current market price and conditions.

### Section 25 – National Trails and Byways

Total Number of Submissions: 5
Total Number of Comments: 8

Comment Number: 000420_HovdeC_20161101-25
Organization1: Delta County

BLM_0165382

Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
The Old Spanish Trail was in part created and maintained as a livestock driveway. The RMP should reflect that trailing and using the Old Spanish Trail by livestock is authorized.

Comment Number: 000472_JensenJ_20161101_NPS-2
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Comment Excerpt Text:
We would prefer to see a more flexible, viewshed based avoidance area approach for National Historic Trails.

Comment Number: 000472_JensenJ_20161101_NPS-1
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
We would like to see a section clearly describing how the requirements of BLM Manual 6280 were (or will be) met in the land use planning process.

Comment Number: 000472_JensenJ_20161101_NPS-10
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Chapter 4, page 4-422: As discussed in previous comments, the Comprehensive Administrative Strategy (CAS) will not provide the type of guidance you are referring to here. We suggest that you cite BLM Manual 6280 instead of the CAS.

Comment Number: 000472_JensenJ_20161101_NPS-3
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Table 2-2, Line 595: Please explain why all National Historic Trails except the Old Spanish National Historic Trail will be managed as VRM Class II. This appears to be an arbitrary decision with a bias against preserving existing viewshed along the Old Spanish National Historic Trail.

Comment Number: 000472_JensenJ_20161101_NPS-9
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:

BLM_0165383

Chapter 4, page 4-420 (assumptions): We couldn't agree more heartily with the following statement made in this section: "Recognizing that national trails often comprise numerous routes rather than a single trace, all protective zones begin at the outer edges of trails rather than at a centerline, which is difficult to define." However, all of the protective measures for the Old Spanish National Historic Trail outlined in this draft RMP are based on a somewhat arbitrary centerline. BLM Manual 6280 directs the development of a National Historic Trail Management Corridor in the land use planning process, it does not appear that these directions have been carried out with respect to the Old Spanish National Historic Trail.

Comment Number: 000472_JensenJ_20161101_NPS-6
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Comment Excerpt Text:
Chapter 3, page 3-168: The Comprehensive Management Plan referred to in this section (and elsewhere) is now a Comprehensive Administrative Strategy (CAS). Unfortunately, the CAS will not provide the type of management guidance you seem to be referring to here. While it does identify high potential sites and segments, as well as provide some very general high-level administrative goals, it does not identify the National Trail Right-of-Way nor does it provide management suggestions.

Comment Number: 000472_JensenJ_20161101_NPS-7
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Other Sections: 5.2
Comment Excerpt Text:
Chapter 3, page 170: The local office needs to work with the federal trail administrators (in the case of the Old Spanish Trail, this would be National Park Service and the Utah State office of the BLM) as first point of contact, in addition to including the Old Spanish Trail Association as a consulting party.

Comment Number: 000472_JensenJ_20161101_NPS-8
Organization1:National Park Service
Commenter1:Jill Jensen
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Chapter 4, page 4-420 (consultation): This section seems to imply that the field office will only consult with the SHPO for undertakings on the National Historic Trails. With respect to the Old Spanish National Historic Trail, the National Park Service, the Old Spanish Trail Association and any other interested party are also consulting parties under section 106 of the National Historic Preservation Act. Unless other arrangements are made (e.g., Programmatic Agreement, Memorandum of Understanding) the federal trail administrators are to be consulted for all actions on the National Historic Trails, as all such actions are subject to compliance with the National Trails System Act.

*Summary*
Commenters requested the following changes to National Trails and Byways proposed management:

1.  Reflect that livestock use, including trailing on the Old Spanish National Historic Trail, is an authorized use.

BLM_0165384

2. Provide a more flexible, viewshed-based avoidance area approach for National Historic Trails.

3. Explain why the Old Spanish National Historic Trail is not proposed for VRM Class II management like all other historic trails.

4. The Comprehensive Management Plan referred to is a Comprehensive Administrative Strategy; it does not provide the same type of management guidance at a Comprehensive Management Plan. The BLM should cite BLM Manual 6280, Management of National Scenic and Historic Trails and Trails under Study or Recommended as Suitable for Congressional Designation, instead of the Comprehensive Administrative Strategy. The BLM should also discuss how the requirements of BLM Manual 6280 were (or will be) met in the land use planning process.

5. Develop a national trail corridor, including for the Old Spanish National Historic Trail, per BLM Manual 6280, rather than utilize an arbitrary centerline for management actions.

6. Note that federal trail administrators will be consulted for undertakings on National Historic Trails.

*Response*

1. The Old Spanish National Historic Trail has historically been used for trailing and is still open to trailing.

2. Per BLM Manual 6280, the BLM designates VRM classes based on the National Trail visual resource inventory and the desired future condition of National Trail resources, qualities, values, and associated settings and the primary use or uses of the areas through which such trails may pass.

3. Approximately 9 miles of the Old Spanish Trail are on BLM-administered lands. In cooperation with the Old Spanish Trail Association, the National Park Service and BLM are currently working on the Old Spanish Trail Comprehensive Management Strategy. Once completed, the portion of the trail on BLM-administered lands would be managed according to decisions made within the Old Spanish Trail Comprehensive Management Strategy. However, in the interim, under Alternatives C and D, the Old Spanish Trail would be managed as VRM Class III partially due to existing infrastructure in and around the area, but also due to several proposed management actions contained in Alternatives C and D that would make it difficult to manage the Old Spanish Trail as VRM Class II. These management actions include, but are not limited to potential nearby ROW authorizations, energy wide corridor, and recreation uses. As stated in Section 2.3.5 on page 2-8, Alternative C is managed for maximum utilization and managing certain areas in the UFO decision area given corresponding management actions provides a full range of alternatives as required by NEPA at the RMP planning level.

4. The BLM appreciates the comment. The Proposed RMP/Final EIS was edited to cite BLM Manual 6280. Requirements of BLM Manual 6280 were (or will be) met in the land use planning process.

5. Management actions for the Old Spanish National Historic Trail were based on its location per the Class III cultural resources inventory. As stated on Draft RMP/EIS page 2-365, "The Class III inventory has identified the Old Spanish Trail corridor in the UFO as roughly centered along US Highway 50." Establishing the National Trail Management Corridor for the Old Spanish National Historic Trail is included as an action item in the

Draft RMP/EIS (page 2-365, line 593). Draft RMP/EIS management direction provides for modification of management areas based on the results of additional inventories, stating that, "The congressionally designated Old Spanish Trail route is based on completed field inventories; however, location(s) and may be modified to better address the inventory findings" (page 2-365, line 593).

6.  The BLM appreciates the comment. Draft RMP/EIS page 4-423 states that, "the BLM would continue to work with the National Park Service … to manage the Old Spanish Trail." Text was added to the Proposed RMP/Final EIS, stating that federal trail administrators will be consulted for undertakings on National Historic Trails.

## Section 26 – Paleontological Resources

No comments are associated with this topic.

## Section 27 – Recreation

### Section 27.1 – Recreation: Range of alternatives

Total Number of Submissions: 88
Total Number of Comments: 187

Comment Number: 000008_StillmanC_20160606-1
Organization1:
Commenter1:Chris Stillman
Commenter Type: Individual
Comment Excerpt Text:
Please keep portions of Colorado's BLM Public Land open to Recreational/Target shooting for responsible and safe shooters.
These lands are precious to me and other Colorado shooters and hunters I know. Public lands are the only places available to people like me in a lower economic status, can afford to sight in our firearms before hunting season. I can not afford membership to belong to expensive shooting clubs or ranges. Public lands give me and my friends an opportunity to enjoy Colorado's beautiful outdoor spaces.

Comment Number: 000022_CroasdaleD_20160607-1
Organization1:
Commenter1:Don Croasdale
Commenter Type: Individual
Comment Excerpt Text:
Reading the 4 plans under consideration, I would strongly urge the BLM to adopt Plan A. The other plans, as I understand them, are far too restrictive when it comes to recreational shooting.

Comment Number: 000023_ColyerM_20160608-1
Organization1:
Commenter1:Marilyn Colyer
Commenter Type: Individual
Comment Excerpt Text:
I would suggest maybe three safely boundered areas where hill prevent straying bullets and where there is visibility and these would be signed as Target Shooting areas.
The way things are now with people shooting willy nilly into woods just about any where has made much of the public lands very unsafe for all other people apart from shooter, for livestock and for wildlife. It surely is time to bring about a change and stop target shooters using land at random. Until

BLM_0165386

new areas are established and well known and also signing at many roads and also information in newspapers random target shooters should be warned one time and there after fined.

Comment Number: 000027_GarberJ_20160615-1
Organization1:
Commenter1:Jim Garber
Commenter Type: Individual
Comment Excerpt Text:
Please register my strongest disagreement to any changes in the current regulations regarding target shooting on BLM Lands. Plan A is, and has been, well thought out and practical for the serious public use for many years. Any expanded restrictions needlessly punish the respectful, law-abiding and appreciative citizens – now and in the future – who relish great enjoyment and satisfaction with the heritage of target shooting on public lands. Additional restrictions will more than likely result in the unintended consequence of fewer responsible eyes and ears on the public land that would witness and report any wrong doing or other violations.

Comment Number: 000052_EthertonJ_20160727-1
Organization1:
Commenter1:James Etherton
Commenter Type: Individual
Comment Excerpt Text:
Local commercial ranges are limited in number, loaded with rules to limit liability, and are expensive (like $20/hr per person; $40 for a parent (trainer) and child). Designated shooting areas safely removed from the camping area would be highly desirable.

Comment Number: 000058_CraftonJ_20160727-1
Organization1:
Commenter1:James Crafton
Commenter Type: Individual
Comment Excerpt Text:
It is my personal and professional opinion that the BLM is stepping beyond a wise use of OUR resources. These belong to the whole of the American public. Therefore, the use thereof for recreational, energy and any other reasonable purpose should conform to the desires of those utilizing those areas. Thus, several of the plans that have been promulgated by the BLM for land and use management in the Uncompahgre area are clearly contradictory to the desires of the principal users. There are two excellent examples of failure to maximize value. One is recreational shooting in areas where there is no one or nothing that will be disturbed, such as the proposal to ban "target shooting" (whatever that is, because a deer is a "target") on 70,000 to 250,000 acres of public (I'm part owner) land.

Comment Number: 000073_McIntireS_20160727-1
Organization1:
Commenter1:Scott McIntire
Commenter Type: Individual
Comment Excerpt Text:
Please keep all BLM lands open for activities, including informal target shooting. As a resident of Colorado, these lands need to remain open to legal and lawful activities of the general public, which includes shooting sports. While I personally do not engage in either hunting or other shooting sports, I believe these lands must stay available to those who do.

BLM_0165387

My request to keep these lands available for target shooting (Alternative A) does not include bona fide and established recreational areas, which should remain closed to shooting and hunting. But these represent a small number of acres in comparison to the amount of land in Alternatives B, C, and D.

Comment Number: 000074_DannS_20160727-1
Organization1:
Commenter1:Steve Dann
Commenter Type: Individual
Comment Excerpt Text:
I would like to express my support for maintaining the maximum available use for Public Target Shooting and Hunting uses for the affected areas. I support Alternative A, the no-action or status-quo management strategy, that would continue to prohibit target shooting at developed recreational sites, while making the maximum available area available for target shooting and hunting related activities. If continuation of Alternative A, is not the public consensus use option, I would support also support Alternative C as a compromise use option.
As Public Funds, particularly those from the Pittman Robertson Act have funded significant recreational opportunities, it seems only fair to ensure that Sportsmen who have provided these funds are allowed to maintain and maximize use of the affected areas.

Comment Number: 000092_Beldohr_20160727-1
Organization1:
Commenter1:
Commenter Type: Individual
Comment Excerpt Text:
As a concerned citizen I am sending you my comments on your plan to restrict target shooting on Public Land in Southwest Colorado. The last ten years have seen a steady decline on the places where an average citizen can go to legally shoot, not for hunting, but just for practice and recreational shooting. Most of the gun ranges have been shut down by subdivisions that build right next to an existing gun range and then complain about the shooting. Now you are removing one of the last places where we can go. You say you are still leaving some places for recreational shooting but all of these places require driving for hours and hours to get to them. We NEED some places left where we can go NEAR our city centers. This is where most people live, not 50 miles into the back woods. Also these places need to have LONG range shooting, up to 500 yards or more, not just 25 yard pistol ranges and 100 yard rifle ranges. If you give us some place to go legally most of us will, but if there is NO places left to go legally we will still go shooting anyway.

Comment Number: 000102_BaldwinD_20160801-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Please use Plan "A" for the future of Southern Colorado. Add no more acreage that is prohibited from target shooting. I use this area regularly and own property in Costilla County. We have more than enough regulation already. Please let us use the area that we pay for, in ways that we can enjoy it responsibly. In fact, I request that areas be constructed to encourage responsible target shooting, (similar to the range at the Pawnee Recreational Area in Northern Colorado). in the BLM areas in Southern Colorado (In the Blanca/ San Luis area would be excellent!).

Comment Number: 000104_LilienE_20160802-1
Organization1:
Commenter1:Elizabeth Lilien

BLM_0165388

Commenter Type: Individual
Other Sections: 27.1 42.1
Comment Excerpt Text:
I urge the BLM's Resource management plan to designate Jumbo Mountain and surrounding lands as an Ecological Emphasis Area, as a Special Recreation Management Area, and to recognize the Jumbo Mountain trail network as a sanctuary for hiking, running, biking, horseback riding, or just sitting and enjoying the remarkable scenery

Comment Number: 000111_HanelT_20160805-1
Organization1:
Commenter1:Tom Hanel
Commenter Type: Individual
Comment Excerpt Text:
It is time these [Jumbo Mtn] trails be recognized by the BLM and be protected to the max as a recreation area; and the single paths be preserved.

Comment Number: 000112_LeslieE_20160809-1
Organization1:
Commenter1:Ethel Leslie
Commenter Type: Individual
Comment Excerpt Text:
With reference to section 2.3 and 2.3.4 on page 2-7 of the DRMP, alternatives B and B1 protect the areas where I fish north of Hotchkiss and hike in the North Fork Valley close to our area of residence. I routinely hike Jumbo Mountain and support Jumbo Mountain for the designation of Special Recreation Management Area. This area also attracts tourism which is part of the local economy. Alternative B also provides protections for the areas in Ridgway where I hike and camp during the summer and autumn.

Comment Number: 000127_LiebtrauL_20160902-1
Organization1:
Commenter1:Lloyd Liebetrau
Commenter Type: Individual
Comment Excerpt Text:
I'm requesting that the Interdisciplinary Team considers making the "open area" a SRMA.
The North Delta OHV Open Area consists of 8,560 acres and is a very important and often used riding and training area for the OHV community. This area is not only used by the local OHV community but it is also utilized and provides open area opportunities to many people specifically traveling to the Delta area to enjoy the opportunity to ride off trail along with the ability to train new and upcoming riders in the art of OHV recreation.
Our past experience tells us that changing the entire open area to designated trails would be an enforcement and signage nightmare. The motorized community has recreated and enjoyed the area for decades and policing such a major change would be next to impossible. I would also like to note that according to the BLM, they do not have a budget to support additional management.

Comment Number: 000129_BlackburnW_20160901-1
Organization1:Thunder Mountain Wheelers ATV Club
Commenter1:Walt Blackburn
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The North Delta OHV Open Area consisting of 8560 acres and is a very important and often used riding and training area for the OHV community. This area is not only used by the local OHV community it is utilized and provides open area opportunities to many people specifically traveling to the

BLM_0165389

Delta area to enjoy the opportunity to ride off trail along with the ability to train new and upcoming riders the art of OHV recreation.
Our past experience tells us that changing the entire open area to designated trails would be an enforcement and signage nightmare. The motorized community has recreated and enjoyed the area for decades and policing such a major change would be next to impossible.

Comment Number: 000129_BlackburnW_20160901-2
Organization1:Thunder Mountain Wheelers ATV Club
Commenter1:Walt Blackburn
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Interdisciplinary Team considers making the "open area" a SRMA. This would allow the authorizing officer to determine that the resources require special management and control measures to meet the management objectives.

Comment Number: 000142_ShishimM_20160911-6
Organization1:
Commenter1:Margaret Shishim
Commenter Type: Individual
Comment Excerpt Text:
The BLM, in its final RMP, must designate all BLM lands on and surrounding Jumbo Mountain, lephant Hill, Lone Cabin Rd, McDonald Creek and "C" Hill as a Special Recreation Management Area and remove all oil and gas leasing in these areas.

Comment Number: 000153_MosherR_20160928-1
Organization1:
Commenter1:Rossann Mosher
Commenter Type: Individual
Comment Excerpt Text:
We would like to comment specifically on the Ridgway Trails Special Recreation Management Area – RMZ 2.
We are private land owners in the area and are in favor of Alternative B because it would prohibit competitive events in the area, as Alternative D could allow. We feel this is the better alternative for wildlife and near-by residents. The trail access areas are quite small and a large competitive event would have a negative impact on the local traffic flow, noise levels, particulate pollution levels (dust), roadside trash levels and wildlife movement through the area.

Comment Number: 000157_BrettE_20161018-3
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
America's Great Outdoors Initiative in the UFO RMP would look like maximizing outdoor recreation and increasing the Special Recreation Management Areas like Jumbo Mountain. We could make America healthier by dedicating our lands and resources to encouraging outdoor activities.

Comment Number: 000158_BrettE_20161018-2
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual

BLM_0165390

Comment Excerpt Text:
In addition, I urge you to designate the Jumbo Mountain area as a Special Recreation Management Area.

Comment Number: 000174_BlackwellD_20160927-1
Organization1:
Commenter1:Dan Blackwell
Commenter Type: Individual
Comment Excerpt Text:
I would like to see legislation to detour the use & destruction of public lands for personal financial gains or reckless shooters. Example, permits to shoot on public lands with mandatory hunter education or forestry classes would create a source of income to help manage our resources. Similar to the registration of OHV vehicles. Let those that use our lands for responsible recreation pay to play. Those that do not comply can be ticketed, another source of income, or assigned to work/cleanup detail. The Pikes Peak Forest Service can provide further insight into the inappropriate use of lands surrounding Gold Camp Road.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-42
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 368 Page 2-219: It is not necessary to recommend withdrawal from mineral entry around recreational sites by the Secretary of the Interior. These sites could be adequately protected via alternative administrative action which would provide the same level of resource protection without the permanent rigidity of a withdrawal.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-43
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 475 Page 2-301: The elimination of the open areas as proposed in Alternative D will have a detrimental impact to local communities by reducing available recreational opportunities. Tourism and visitation related to the open areas will be adversely impacted. At this point, BLM has invested heavily in the infrastructure serving the open areas and through those efforts, local open areas are well known attractions. We strongly urge BLM to amend Alternative D to include the acreage currently designated as open as well as the opportunity to designate additional open areas.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-51
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 32.1
Comment Excerpt Text:
Appendix J Roubideau SRMA Page J-61 through J-69: We request that all travel management actions for this SRMA allow for motorized and mechanized travel. This area is well known to 4WD and OHV enthusiast and also has excellent potential for development of mountain biking opportunities.

BLM_0165391

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-53
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 32.1 3
Comment Excerpt Text:
Appendix J Kinikin Hills SRMA Page J -33: We request that the travel management action for Zone I of this SRMA be amended to a llow for mechanized travel. There are many areas that are accessible only to non-mechanized use (horseback riding, hiking), but there are very few that allow for non-motorized mechanized use (mountain biking). This change would provide much needed opportunities for development of mountain bike trails in the Montrose area.

Comment Number: 000183_ShishimT_20161026-1
Organization1:
Commenter1:Teresa Shishim
Commenter Type:
Comment Excerpt Text:
Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

Comment Number: 000184_BrettJ_20161017-11
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Recreation
In conjunction with the visitor's agri-tourism experience of the North Fork Valley, recreation definitely plays a significant role.
Jumbo Mountain Trails - The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents and visitors. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.
Plus, Jumbo Mountain must be open to hiking, mountain biking (including pedal-assisted electric bikes) and horseback riding - no motorized vehicles are allowed.

Comment Number: 000184_BrettJ_20161017-13
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Future Recreation Development - Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and waterbased recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the

BLM_0165392

North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte and Robideau Canyon.

Comment Number: 000206_Kleinman_20161025-3
Organization1:
Commenter1:Amber Kleinman
Commenter Type: Individual
Comment Excerpt Text:
Stevens Gulch is a winter recreation retreat for this area. Many cross country skiers use the powerline road and Steven Gulch Road to get out on the snow and get some exercise in the clean air. Its close proximity town encourages winter recreation for snow shoeing and snowmobiles as well. Stevens Gulch Road should remain clear of Drilling operations.

Comment Number: 000217_RubanowM_20161026-2
Organization1:
Commenter1:Morgan Rubanow
Commenter Type: Individual
Comment Excerpt Text:
I would also like the BLM to designate all BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area. I personally live at the top of Pan American Avenue in Paonia by the base of the mountain and believe that this area needs to be fully protected to secure the entire viewshed and its use as a recreational area. I can attest that this area is used by a large number of recreational users from bike enthusiasts, hikers, dog walkers, runners, and horseback riders based on my location to the 'trail head' that everyone uses. Additionally, I use these trails nearly every day of the week and want to ensure this area is properly protected so I can continue to enjoy 'my backyard'. This area needs to be set aside for recreational use rather than industrial activity such as oil and gas and I would like to see all oil and gas leases removed from land on and surrounding Jumbo. It is an important area that draws in economic benefits to the town as out-of-towners visit our area to hike or bike and provides spectacular views that make Paonia unique to other nearby towns. It would also prevent possible contamination issues of irrigation water and surrounding lands.

Comment Number: 000218_RecceS_20160929-1
Organization1:National Rifle Association
Commenter1:Susan Recce
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Alterative B would close nearly 250,000 acres or 37% of the planning area to recreational shooting. We oppose this alternative as being excessive in meeting the BLM's multiple use mandates under the Federal Land Policy and Management Act. While this Alternative would close certain ACECs and SRMAs to recreational shooting, as does Alternative D (the BLM's preferred alternative), it would also close lands in Wilderness Study Areas and lands managed to protect wilderness characteristics. Since the Wilderness Act does not prohibit recreational shooting or hunting, there is no basis for the BLM to preemptively close lands to recreational shooting that are designated as wilderness or are protected for the future possibility of being designated as wilderness, any more than there is a basis to close these lands to hunting.
Recommendation: Remove any and all references to recreational shooting closure proposals that are inconsistent with existing BLM regulations (43 CFR Sec. 8365).

Comment Number: 000218_RecceS_20160929-2
Organization1:National Rifle Association
Commenter1:Susan Recce

BLM_0165393

Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 16.3
Comment Excerpt Text:
Alternative B would also close lands to recreational shooting where there are prairie dog colonies that have burrowing owls. No supporting data is provided to justify such closures as necessary for the protection of burrowing owls. Closing lands to public activities that have been a historic use requires supporting data to make the case for the loss of public access. That case is not made in the DRMP for Alternative B.
Recommendation: In areas where prairie dog colonies and burrowing owl populations are present as noted in Alternative B, provide analysis and or evidence of existing or predicted impacts to species populations as a result of the presence of recreational shooting prior to restricting the activity.

Comment Number: 000218_RecceS_20160929-5
Organization1:National Rifle Association
Commenter1:Susan Recce
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
On page 4-311, under Alternative C, the DRMP states that "Designated target shooting areas and ranges would be allowed, which could increase recreational opportunities by providing managed, accessible and designated areas for shooting." A similar statement appears on page 4-316 under Alternative D. We question whether these are valid statements in light of BLM's established policy of not allowing ranges to be built on public lands, including the addition of small improvements such as berms and target holders, as well as a separate policy that terminated the leasing of public lands for range development.
With rare exception, the BLM has steadfastly refused to identify or designate areas for recreational shooting, even if such designations would reduce user conflicts and increase public safety. The "disturbed areas" that the DRMP speaks of seem ideal sites to study for their potential to accommodate more concentrated recreational use as shooting participation increases, as well as their potential to mitigate the proposed closures, reduce user conflicts and positively respond to adjacent homeowner concerns. But we question whether this is a realistic expectation that the DRMP offers the public, when it appears to be diametrically opposed to agency policy.
Needless to say, we would very much support a reversal of these policies which would allow field offices such as the Uncompahgre to pursue these options in a quest to enhance recreational opportunities for all visitors, and to be proactive in addressing the projected increase of those who are looking to these public lands for recreational shooting opportunities. The DRMP would have provided the ideal opportunity to address proactive management of recreational shooting especially if, as noted, pressure for more places to shoot is likely to increase. At the very least, the closures proposed in both Alternatives B and D would exacerbate a set of condition that the BLM has described for the future, a future that the DRMP is supposed to address throughout the next 15 years. Therefore, we strongly encourage the BLM to incorporate the following recommendation.
Recommendation: Incorporate language in the final RMP that would allow the BLM to determine the feasibility of establishing "unofficial shooting areas" (noted above) as managed or unmanaged designated target shooting areas and/or ranges as an implementation level activity. In addition, retain language in the final RMP stating that "designated target shooting areas and ranges would be allowed, which could increase recreational opportunities by providing managed, accessible and designated areas for shooting."

Comment Number: 000220_EdsonM_SimmonsJ_20161010-4
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Other Sections: 14.1

BLM_0165394

Comment Excerpt Text:
We enjoy hiking, snowshoeing and skiing with our friends and out-of-town visitors in Jumbo Mountain and Lone Cabin areas near Paonia. We strongly encourage the BLM to protect the landscape level recreational opportunities of these places, plus Elephant Hill, McDonald Creek, and "C" Hill, by designating these areas as Special Recreation Management Areas (SRMA) and manage them as such. The economic growth surrounding recreation activities in our valley is substantial, and is valuable to the community as it supports multiple businesses that provide lodging, food, services and goods to the growing numbers of people that are visiting this area in order to access the beautiful trails and wilderness around the North Fork Valley. The current management regime with Jumbo Mountain is not sustainable. In order to ensure that trails are well maintained and that the area is managed correctly for decades to come, we urge the BLM to designate and manage the full BLM Jumbo Mountain unit as an SRMA and provide for motorized and non-motorized uses. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Comment Number: 000222_RazianoR_20161026_COPMOBA-1
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Renata Raziano
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Kinikin Hills ERMA: we would prefer that the Kinikin Hills parcel be designated an SRMA and RMZ2 be designated for nonmotorized trail development. It has terrain that is suitable for mountain bike trails and a multi-loop system here would provide trails for all levels of riders. It is particularly valuable given its quick access from the town of Montrose as well as from Highway 550. Ideally, a nonmotorized trail system here could be accessed from a trailhead off of Uncompahgre Road. With a long riding season, easy access from town and a major highway, a nonmotorized trail system here would serve Montrose residents and visitors alike.

Comment Number: 000222_RazianoR_20161026_COPMOBA-2
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Renata Raziano
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In the proposed Dry Creek SRMA we support the preferred alternative D for RMZ4 (Linscott Canyon/Hwy 90) which designates it as an area for priority development of nonmotorized singletrack. A trailhead with substantial parking, restrooms and camping is currently being proposed by Montrose County as part of the Rim Rocker Trail project. In addition to serving OHVs setting out on the Rim Rocker trail, the trailhead facilities will provide a staging area for mountain bike races and events. A ~10 mile trail system with a long loop suitable for racing will provide a unique venue for mountain bike events that currently does not exist in Montrose, Delta or Ouray County. Mountain bike races and events held at this site would provide an economic benefit to Montrose County and bring visitors from Colorado and surrounding states. A race venue here would also benefit the local high school mountain bike race team and could host state-wide high school races that would bring racers and their families to Montrose for several days.

Comment Number: 000222_RazianoR_20161026_COPMOBA-4
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Renata Raziano
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 32.1
Comment Excerpt Text:

BLM_0165395

Also in the Spring Creek SRMA, we support the designation of the Buzzard Gulch trail system as a nonmotorized RMZ (RMZ1 Alternative D). The current Buzzard Gulch provides beginner and intermediate mountain bikers, hikers and equestrians with a quality singletrack experience close to town. Further development of the trail system with a small loop suitable for young children with parents and a more challenging trail for advanced riders would provide riding for all ability levels and families.

Comment Number: 000230_HarrisB_20161019-2
Organization1:
Commenter1:Bill Harris
Commenter Type: Individual
Comment Excerpt Text:
I support the Spring Creek SRMA. Spring Creek Canyon which includes Buzzard Gulch is a popular trail venue for hikers, mountain biker, runners and equestrians. Continued development of this trail system will provide added options for local residents and visitors alike. Would recommend that non-motorized trails be added to the RMZ3 designation.

Comment Number: 000230_HarrisB_20161019-3
Organization1:
Commenter1:Bill Harris
Commenter Type: Individual
Comment Excerpt Text:
) I support the EMRA designation for Kinnikin Hills. The RMZ2 area is well-suited for non-motorized trail development. The Kinnikin Hills area south of Kinnikin Road has a problem with illegal dumping, unsafe firearms use and off-trail Motorized use. Development of formal recreation facilities will discourage these abuses

Comment Number: 000234_HammondD_20161029-1
Organization1:
Commenter1:Darell Hammond
Commenter Type: Individual
Comment Excerpt Text:
Instead of shutting off the land too target shooters (that pay taxes and have rights too) some basic problem solving should come into play. I would think about making some designated areas for shooters to use.
This way you can control where shooting accrues and their unfortunate mess. No one wants to see a shot-up refrigerator in the middle of the woods. I understand & see there are too many people hiking thru the woods to have random shooters shooting up the trees and not paying attention to their backstops. Designated shooting areas would help control dangers, keep the trash in the areas it was created, save some trees from being shoot up and would be easier to monitor target shooters. Could even make some revenue as a non-monitored Fee Area like some wilderness campgrounds.

Comment Number: 000260_HunterL_20161028-1
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
Specifically with regard to recreation: The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final RMP should include the entire Jumbo Mountain unit as a Special Recreation Management Area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter

BLM_0165396

mule deer and elk habitat. Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat, are critical components that help sustain the multi-million-dollar hunting industry in the area. The final RMP should include ecological emphasis areas for all critical winter habitats within the North Fork Valley. The final plan should also include the protections of the B1 alternative, which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies. Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final RMP should include Special Recreation Management Areas and Extensive Recreation Management Areas for all lands identified as of high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking, among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: 000269_CascadeR_20161028-16
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I also support the inclusion of all 11 Special Recreation Management Areas totaling 244,050 acres in your final RMP

Comment Number: 000280_KnutsonD_20161029-2
Organization1:
Commenter1:David Knutson
Commenter Type: Individual
Comment Excerpt Text:
Our home is on the east side of Paonia right near the [Jumbo] trail system, primarily so that I can go out the door to access our trails. I am pleased to see that your draft plan recognizes the recreation value of this area and I urge you to place protections and resources to improve this fantastic trail system. I anticipate that as the years go by, your office will see multiple requests for Special Use Recreation Event Permits. The area is well known to trail runners and mountain bikers.

Comment Number: 000282_LightfootA_20161029-3
Organization1:
Commenter1:Ali Lightfoot
Commenter Type:
Comment Excerpt Text:
I would also like the BLM to designate all BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area. As I said, I live at the top of Pan American Avenue in Paonia by the base of the mountain and believe that this area needs to be fully protected to secure the entire viewshed and its use as a recreational area. I can attest that this area is used by a large number of recreational users from cyclists, hikers, dog walkers, runners, and horseback riders based on my location to the 'trail head' that everyone uses. Additionally, I use these trails nearly every day of the week and want to ensure this area is properly protected so I can continue to enjoy 'my backyard'. This area needs to be set aside for recreational use rather than industrial activity such as oil and gas and I would like to see all oil and gas leases removed from land on and surrounding Jumbo. It is an important area that draws in economic benefits to the town as out-of-towners visit our area to hike or bike and provides spectacular views that

BLM_0165397

make Paonia unique to other nearby towns. It would also prevent possible contamination issues of irrigation water and surrounding lands.

Comment Number: 000303_ChapinJ_20161027-1
Organization1:
Commenter1:Jenny Chapin
Commenter Type: Individual
Comment Excerpt Text:
I strongly encourage the BLM to protect the landscape level recreational opportunities of these places, plus Elephant Hill, McDonald Creek, and "C" Hill, by designating these areas as Special Recreation Management Areas (SRMA) and manage them as such. The economic growth surrounding recreation activities in our valley is substantial, and is valuable to the community as it supports multiple businesses that provide lodging, food, services and goods to the growing numbers of people that are visiting this area in order to access the beautiful trails and wilderness around the North Fork Valley. The current management regime with Jumbo Mountain is not sustainable. In order to ensure that trails are well maintained and that the area is managed correctly for decades to come, we urge the BLM to designate and manage the full BLM Jumbo Mountain unit as an SRMA and provide for motorized and non-motorized uses

Comment Number: 000325_SwansonR_20161027_CityofMontrose-1
Organization1:City of Montrose
Commenter1:Rex Swanson
Commenter Type: Local Government
Comment Excerpt Text:
Visitor opportunities like hiking, horseback riding, biking, and numerous off highway motorized trails have contributed directly to the area's economic growth. Montrose intends to continue the growth of tourism. That said, it is disconcerting to read the Draft RMP/EIS and see alternatives which potentially work counter to fostering economic growth.
The City is mindful of the complexities the BLM faces in managing 675,800 acres of land. However, the City requests that consideration be given to selecting an alternative which has the least impact on the public's recreational opportunities.

Comment Number: 000345_ReeseC_20161027-5
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists.

Comment Number: 000345_ReeseC_20161027-6
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking,

BLM_0165398

horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: 000348_EdstromS_20161101-10
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
South Oak Mesa ERMA, Hotchkiss – Developing recreational trails on Oak Mesa would allow the community of Hotchkiss close to town access of trails possessing all skill levels, very similar to what is being built in the Ridgeway Area Trails. This location would be ideal for residents to explore the outdoors, and enjoy the fresh air and beautiful views into the North Fork Valley and beyond.

Comment Number: 000348_EdstromS_20161101-11
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
McDonald Mesa ERMA– McDonald Mesa possesses a small amount of existing multi-use trails that could be developed into a much greater mountain bike trail network if designated as an ERMA. This country provides users great access to front, middle and backcountry, with its proximity to Forest Service land. An ERMA would coincide nicely with the proposed development of SRMA on Youngs Peak just to the south. This area would be developed with the more adventurous mountain biker and trail user in mind, with its diversity of slope aspect and geography.

Comment Number: 000348_EdstromS_20161101-12
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
Stevens Gulch ERMA, Paonia–Developing a trail network in Stevens Gulch would greatly benefit the community of Paonia due to its proximity and access to varied natural terrain, and would present an opportunity to use old mining territory as the backbone of recreational trail development reaching into the National Forest.

Comment Number: 000348_EdstromS_20161101-13
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
DAMB prefers "not allowing livestock grazing in areas that conflict with recreation sites would generally improve recreation opportunities by eliminating (or reducing) animals and their waste from these areas over the long term" chapter 4-301.

Comment Number: 000348_EdstromS_20161101-15
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual

BLM_0165399

Comment Excerpt Text:
DAMB and COPMOBA support the development of recreational areas because sustainably designed and built trail systems are a major economic driver for local and regional communities. In reference to any proposed SRMA/ERMAs in the North Fork region, DAMB requests for regulations to allow for non-motorized competitive events at the discretion of the Authorized BLM Officer.

Comment Number: 000348_EdstromS_20161101-2
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Other Sections: 30.3
Comment Excerpt Text:
DAMB supports the development of any Special Recreation Management Areas (SRMA) and Extensive Recreation Management Areas (ERMA) in the managed area of the UFO. We believe creating these environments for local communities will result in unlimited numbers of positive experiences and benefits. These will develop in all shapes and forms no matter the location of the SRMA/ERMAs. The experiences include, but are not limited to: developing skills and abilities specific to mountain biking, enjoying having access to natural landscapes, being able to frequently participate in desired activities and natural environments, getting much needed physical exercise, releasing and reducing built-up mental tensions, increasing and maintaining quality of life, perceived value of the community due to quality of life, and community building for those who use and enjoy it. Potential general benefits include improved mental well-being, increased skills for outdoor enjoyment, a greater understanding of the importance of recreation and tourism to our communities, a more outdoor oriented lifestyle, improved physical fitness and health maintenance, and an enhanced lifestyle and quality of life. With the epidemic of declining health in America, we feel that the physical and mental benefits listed above are crucial to developing healthy communities in Delta County.

Comment Number: 000348_EdstromS_20161101-4
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
Jumbo Mountain SRMA – DAMB believes Jumbo Mountain is unique and could be the keystone recreational hub for the North Fork Valley. As a whole, we believe Jumbo Mountain provides a great location for recreation and visitor service management to be the predominant land use planning focus, as defined by a SRMA. Jumbo Mountain is geographically oriented in a prime location for users to enjoy high scenic values, low altitude trail networks that allow for longer riding season, and close to amenities and higher density population.
Specific experiences and benefits obtained by this management area would be ease of access for local and regional outdoor enthusiasts to a variety of front, middle, and backcountry terrain, diversity within trail system for all skill levels and abilities on non-motorized routes to be used daily by residents, promoting a quiet environment that would enhance the quality of life and health for residents and visitors locally and regionally, and lastly, provide a resource supporting recreation as an economic driver for Delta County.
By designating the entire Jumbo Unit as a SRMA, as outlined in Alternative B, diversification for multi-use opportunities would be possible. These could be delineated by specific Recreation Management Zones (RMZ). Specifically, we suggest expanding RMZ-1 and its proposed characteristics as listed on page J-27 and J-28 in appendix J, to encompass proposed area of RMZ-2. Furthermore, we suggest expanding

BLM_0165400

RMZ-2 and its proposed characteristics to encompass the hatched area as shown on Figure J-4, appendix J.

Comment Number: 000348_EdstromS_20161101-5
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
North Delta SRMA - DAMB requests the development of non-motorized singletrack trails in North Delta for mountain biking. Currently cyclists are not considered in the SRMA plan for North Delta. With consideration of our user group, cyclists could access Grand Mesa from Delta city limits on backcountry routes. A mountain bike trail created in this area would mimic the 'Palisade Plunge' trail being developed in Mesa County, a potential destination trail taking cycling enthusiasts from high altitude of Grand Mesa down through multiple geographic regions to the town of Palisade. This trail concept partially has been adapted from 'The Whole Enchilada' in Moab, UT. This in part has proven to be effective in solidifying Moab as a world-class mountain bike destination.

Comment Number: 000348_EdstromS_20161101-6
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
Hotchkiss High School Area ERMA – Recently DAMB has been working with the Nature Connection to create a master plan of trail networks adjacent to the Hotchkiss High School. This network will include youth oriented bike skill courses and singletrack on Parks and Rec land, and also development of a mountain bike course on Delta County School District property. With BLM property adjoining this location, this would be a great opportunity to expand trail networks to the south, creating a diversified trail network for all types of recreationalists. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turn key access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands. DAMB asks that you protect this area for current and future use, with an emphasis on recreation, and designate these lands as an ERMA.

Comment Number: 000348_EdstromS_20161101-7
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
Youngs Peak SRMA, Crawford – DAMB members and local residents recognize the great potential for the development of recreational non-motorized trails on Youngs Peak. It has great proximity to the community of Crawford, and its K-6 school where it would provide an optimal environment for kids, families, and residents to enjoy the fresh air and beautiful views of the West Elk Mountains. By designating this area as a SRMA, Delta County residents could quickly access the natural environment by means of a trail network that would have them engaging with nature within minutes of downtown Crawford. A well-designed trail network would provide an opportunity for this community to attract recreationalists from around the region, thus stimulating the economy by increased use of developed public lands in the area.

BLM_0165401

Comment Number: 000348_EdstromS_20161101-8
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
Elephant Hill/Lone Cabin SRMA - Elephant Hill and Lone Cabin is a great location for the development of a SRMA, with close proximity to the town of Paonia and the Jumbo Mountain trail network. This area would provide citizens with a more remote backcountry experience, and create corridors which would allow access to the high country thru non-motorized trail networks extending into the National Forest. Being this area is so close to town and adjoining neighborhoods, trails on Elephant Hill and Lone Cabin area would quickly provide local residents the splendor of quiet and solitude of the outdoor environment.

Comment Number: 000348_EdstromS_20161101-9
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
Paonia State Park/Paonia Reservoir SRMA- Members of DAMB and the North Fork Trail Advocacy Group (NFTAG) have been considering development of trails in Paonia State Park to provide a regional attraction and a destination for the mountain bike community. With the cooperation of the Colorado Parks and Wildlife, this area has great potential to provide a high country experience unmatched by any others in Western Colrado at this time. By creating an SRMA in this area, the BLM along with partners of CPW, USFS, DAMB and NFTAG, could tap into territory that is unique and would provide recreational opprotunities that would stand alone in in this region.

Comment Number: 000377_SkokoM_20161019-1
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual
Other Sections: 32.1
Comment Excerpt Text:
The lack of non-motorized trails and recreation opportunities on BLM lands in the Uncompahgre Field Office (UFO) is astounding, as compared to the surrounding field offices (Grand Junction, Gunnison and Tres Rios. Take the area surrounding Montrose for instance, in a 20-mile radius there is a total of 11 miles of BLM non-motorized trails (Buzzard Gulch, which has its own issues [shooting range]). If you take that out further (1 hour drive), the only additional non-motorized area on BLM lands is the Ridgway Area Trails (RAT) which totals approximately 20 miles.
The heavy use by all non-motorized users, namely mountain bikers, of the RAT system is evidence that the Uncompahgre Valley has been devoid of quality non-motorized spaces and trails. I think the UFO can do a better job to address this obvious lack of non-motorized recreation resources. The BLM lands surrounding Montrose and the Uncompahgre Valley is absolutely dominated by motorized-use areas that is not conducive to a "silent" recreation setting. My comments are centered on the increased access to mountain biking and hiking in a setting that is devoted to a "silent-sport" setting in the Uncompahgre Valley.

Comment Number: 000377_SkokoM_20161019-2
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual

BLM_0165402

Comment Excerpt Text:
I am very much in favor of the Alternative B for the Kinikin Hills SRMA. This area has exceptional terrain in a beautiful setting with quick access to population centers. All of these factors make for the ideal recreational area. RMZ 2 being non-motorized is a perfect alternative as it allows foot and bike traffic to access a natural setting quickly and it would push the motorized users and shooting (noise) away from the residences to an isolated area further up the mountain (RMZ 3). The RMZ 2 area could serve the communities of Montrose/Delta and Ridgway/Ouray with fantastic hiking and biking opportunities that are currently in very short supply. I believe when "silent sport" areas are made available they are a great boon the surrounding communities and businesses.
The terrain (adobes, mesas, P&J hillsides) in the area of RMZ 2 is very unique from a mountain biking perspective and has the potential for some very fun/fast trails, potentially on the level of Fruita. There currently exists a number of moto trails in the area which could easily be adopted/retrofitted to cater to hikers, mountain bikers and horseback riders. These existing trails would be a fantastic start to establishing this area as premier non-motorized recreation area.

Comment Number: 000377_SkokoM_20161019-4
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual
Comment Excerpt Text:
The recreation opportunities on BLM lands within and surrounding the Uncompahgre Valley has been very biased in the direction of motorized users. This may have made sense 25 years ago but the cultural landscape and recreational styles have evolved. I feel that it is the BLM's responsibility to address these changes and create specific areas where non-motorized users can recreate. The fact is, riding a mountain bike or hiking on a motorized trail is not an ideal recreational experience. In some instances user groups should be segregated. My hope is that the UFO will look at what some of the surrounding field offices have done to tailor access to certain groups (mountain bikes/hikers) and the resulting benefits to the citizens and communities.

Comment Number: 000377_SkokoM_20161019-5
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual
Comment Excerpt Text:
A Trailhead(s) independent from the current user group (motos and target shooters) would be important to welcoming potential hikers/bikers [In Kininkin Hills SRMA]. The ideal location for this would be on the west side of RMZ 2 where it intersects with Uncompahgre Rd (38.3601, -107.7890). There is an existing road serving irrigation ditch and a large, relatively flat area that could serve as a parking area. The setting is ideal and would be an incredible introduction to a beautiful and unique area with easy access for the user base. An alternative trailhead location would be somewhere off of the road the divides RMZ 2 and RMZ 3.
Please see the attached KMZ as a reference for this area's existing trails, potential trails/trailheads. The attached photo shot looking east from the potential trailhead location off Uncompahgre Rd.

Comment Number: 000379_HudekH_20161101_MountainHarvestFestival-1
Organization1:Mountain Harvest Creative
Commenter1:Heidi Hudek
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165403

The North Fork community has put great effort and our souls into developing a trail system for hiking, trail running, and mountain biking on Jumbo Mountain. The trails were used for several years as a 5k race during Mountain Harvest Festival, and this special event brought trail running enthusiasts from far and wide. Please designate BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area, and include Elephant Hill, Lone Cabin Rd, McDonald Creek, and "C" hill.

Comment Number: 000382_Oeserl_20161024-1
Organization1:
Commenter1:Ian Oeser
Commenter Type: Individual
Comment Excerpt Text:
I use and appreciate the Jumbo Mountain BLM area for its diverse recreational trails and natural habitat. I mountain bike weekly in this area, and moved here in large part because of the non-motorized bike trails. I value the quiet and undisturbed landscape and would be very disappointed to have the scenic views and quiet connection to nature disturbed by oil and gas development. I would very much like to see the BLM adopt Jumbo Mountain area as a Special Recreation Management Area, so they could, with the help of so many eager volunteers in our community, provide better access and signage on the existing trails. The number of hikers and mountain bikers coming to this area for recreation is growing exponentially each year, bringing commerce to our local businesses and municipality. Recreation is a huge economic boon for our area, and I would like to see it continue to grow with the BLM support. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.
River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan. The final plan must include protections for these recreation resources and lands. Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million- dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.
Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: 000389_KittelsonK_20161030-3
Organization1:Cycling Western Colorado
Commenter1:Kristina Kittelson
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165404

Specifically, in regards to the Paonia area, I encourage you to make the BLM land that includes Jumbo Mountain a Special Recreation Management Area (SRMA) due to the unique value, importance, and distinctiveness of this tremendous recreational resource. I support the inclusion of the North Fork Alternative B1 in the final plan, which will protect most of the North Fork Valley from oil& gas leasing on BLM lands and surrounding Jumbo Mountain due to the negative effects on recreation, air quality, views, access, traffic, water quality, habitat impacts and other concerns. I support the designation of BLM lands on and surrounding Jumbo Mountain as an Ecological Emphasis Area due to unique winter habitat it provides for mule deer and other wildlife.

Comment Number: 000389_KittelsonK_20161030-4
Organization1:Cycling Western Colorado
Commenter1:Kristina Kittelson
Commenter Type: Individual
Comment Excerpt Text:
In the Montrose area, non-motorized recreation is currently underrepresented in BLM lands surrounding this community, and I support the designation of more non-motorized SRMAs to prioritize the development of non-motorized trail systems. In particular, the following:
Kinikin Hills ERMA: I prefer that the Kinikin Hills parcel be designated an SRMA and RMZ2 be designated for non-motorized trail development. It has terrain that is suitable for mountain bike trails and would provide trails for all levels of riders. It has easy access from the town of Montrose as well as from Highway 550. Ideally, a non-motorized trail system here could be accessed from a trailhead off of Uncompahgre Road. With a long riding season, easy access from town and a major highway, a non-motorized trail system here would serve Montrose residents and visitors alike.
In the proposed Dry Creek SRMA, I support the preferred alternative D for RMZ4 (Linscott Canyon/Hwy 90), which designates it as an area for priority development of non-motorized singletrack. A trailhead with substantial parking, restrooms and camping is currently being proposed by Montrose County as part of the Rim Rocker Trail project. In addition to serving OHVs setting out on the Rim Rocker trail, the trailhead facilities will provide a staging area for mountain bike races and events. A ~10 mile trail system with a long loop suitable for racing will provide a unique venue for mountain bike events that currently does not exist in Montrose, Delta or Ouray County. Mountain bike races and events held at this site would provide an economic benefit to Montrose County and bring visitors from Colorado and surrounding states. A race venue here would also benefit the local high school mountain bike race team and could host statewide high school races that would bring racers and their families to Montrose for several days.
In the Spring Creek SRMA, I would prefer that RMZ3 include non-motorized singletrack as an additional focus. Non-motorized trail development in this parcel could connect the Buzzard Gulch trail system with the newly constructed Spring Canyon Connectors and Spring Canyon trail. This would create a challenging, non-motorized, loop ride for more adventurous riders. Currently, mountain bikers most frequently access the trails in Spring Canyon by driving or riding on Dave Wood Road; replacing road use with a singletrack trail would greatly enhance the experience for non-motorized users.
Also in the Spring Creek SRMA, I support the designation of the Buzzard Gulch trail system as a non-motorized RMZ RMZ1 Alternative D). The current Buzzard Gulch provides beginner and intermediate mountain bikers, hikers and equestrians with a quality singletrack experience close to town. Further development of the trail system with a small loop suitable for young children with parents and a more challenging trail for advanced riders would provide riding for all ability levels and families.

Comment Number: 000401_ShoemakerS_20161028-3
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry

Comment Excerpt Text:
Also, please seriously consider designating the BLM lands on and around Jumbo Mountain as a Special
Recreation and Ecological Emphasis Management Area because of their unique value, importance, and
distinctiveness of the recreational area and criticality of the area as winter habitat for mule deer and
other wildlife.

Comment Number: 000409_DayB_20161031-14
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 380. Special Recreation Management Areas (SRMAs). We favor SRMAs in general and support BLM's
effort to manage these areas through zones. We are concerned about the possibility of causing too
much human activity to be drawn towards some of the most important wildlife habitat, which is
discussed well on page 4-135. Recreation, especially motorized recreation, has to be planned carefully in
or near the EEAs and other important wildlife areas. Most of these areas, such as Jumbo Mountain (in its
Alternative B full size), are probably fine. It is pretty hard for commenters to tell how the areas overlap,
with which uses and zones in different alternatives. BLM has to plan this very carefully, regardless of
what general comments say. Dry Creek, Spring Canyon, and Ridgway/Kinikin Hills might be especially
important ones to look at closely.

Comment Number: 000420_HovdeC_20161101-16
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-220, Line 371, Provide for the same requirements as for Alternative D to control competitive
events in ERMA's. Page 2-220, Line 372, (need to consider maximum number of group size) Page 2-221,
Line 374, (Consider target shooting buffer restriction as in Alternative D) Page 2-243, Line 395, the
mental benefits section does not belong in a RMP. This language opens the BLM up to additional
litigation and undoes process. Who determines what creates the well-being and happiness of an
individual.
Extensive Recreation Management Area:
o Pages 2-289-299, Lines 431-468, (review inclusion of areas and applications) Important for the BLM to
work with adjoining counties when designating ERMAs.

Comment Number: 000420_HovdeC_20161101-34
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-243, Line 395, not sure the benefits section belongs in a RMP. Leaves it subject to interpretation
and increased conflict. Restored mind from unwanted stress; improved mental well-being are very
subjective terms and will only add to the long list of factors that the BLM could potentially be sued over.
In addition, these emphasis factors clearly will create special use categories for landscapes and will
reduce the multiple use mandates for BLM. In addition, this language will be used against the livestock
industry. Delta County views this language that is used throughout the recreation section as another
example of where the RMP is too prescriptive and site specific.

Comment Number: 000420_HovdeC_20161101-35
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-239, Line 394, Delta BoCC would prefer Jumbo Mountain was designated as an ERMA to ensure flexibility and multiple use in that area where private land is intermingled with BLM.

Comment Number: 000425_DoolingP_20161030-1
Organization1:
Commenter1:Patrick Dooling
Commenter Type: Individual
Comment Excerpt Text:
I am glad the BLM is considering Special Recreation Management Area status for Jumbo Mountain. I support the SRMA status as outlined in Alternative B, providing the most comprehensive protections for this gem of our community.
Unlike most people that are probably commenting in support of the expanded SRMA status as outlined in Alt B, I am not a mountain biker. However, I believe one key to advancing the economy of the North Fork Valley beyond the coal industry lies in tourism. It is no secret that the North Fork Valley is looking for an industry to provide income as the coal industry is collapsing. Adventure tourism can achieve this while protecting and enhancing our lands. Jumbo Mountain can provide a hotspot for mountain bikers across Colorado to enjoy world-class trails in an incredibly scenic location. An increase in tourism will support almost every local industry, including hospitality, restaurants, and retail, including places such as The Cirque Cyclery in Paonia. Expanded SRMA status for Jumbo Mountain will not only give local mountain bikers an opportunity to enjoy their land, but also bring bikers from around the country to enjoy the beauty of the North Fork Valley.

Comment Number: 000435_GallegosT_20161031-1
Organization1:
Commenter1:Tim Gallegos
Commenter Type: Individual
Comment Excerpt Text:
As an outdoor recreationalist, I am primarily concerned with preserving and enhancing specific areas within the Uncompahgre Field Office district within Delta County, for present use, and for use in the future, by outdoor lover types, including myself, my family, and my friends. I would like specific areas to be set aside for recreational non-motorized trails.

Comment Number: 000435_GallegosT_20161031-2
Organization1:
Commenter1:Tim Gallegos
Commenter Type: Individual
Comment Excerpt Text:
I would specifically support the designation of Jumbo Mountain as an SRMA and as part of economic development and tourism concerns, would ask that any prohibition on competitive events be removed from consideration, as it is important, for economic development concepts, that competitive events be allowed.

Comment Number: 000435_GallegosT_20161031-3
Organization1:
Commenter1:Tim Gallegos
Commenter Type: Individual

BLM_0165407

Comment Excerpt Text:
In addition to the trails on Jumbo, I would ask that other areas in the UFO be considered for the designation and development of non-motorized single track trails, trailheads, and trailhead facilities, such as parking areas, restrooms, signage for tourism, and possibly picnic and camping area development. I would ask that areas in North Delta, particularly around the Adobe Badlands Wilderness Study Area, and over to the present Devil's Thumb Golf Course, owned by the City of Delta, be considered and studied, for an epic trail to be developed from the existing Drop Off Trail on Forest Service lands on the Grand Mesa, through BLM land, possibly across Delta County land, and down to the City of Delta. This could be a great economic boost for the city. Specifically, in the North Fork, areas on Young's Peak north of Crawford, Elephant Hill/Lone Cabin south of Jumbo Mountain, should be considered for non-motorized trail development, and possible recreational designation.

Comment Number: 000439_GravesB_20161101-1
Organization1:
Commenter1:Ben Graves
Commenter Type: Individual
Comment Excerpt Text:
In order to prevent use-conflict, the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and expand hunting access in the areas east of Jumbo Mountain.

Comment Number: 000446_KlingspornK_20161101-5
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Comment Excerpt Text:
I commend the BLM for creating Special Recreation Management Areas as an important tool for protecting the many places throughout this field office where recreation abounds. Unfortunately, the Paradox Extensive Recreation Management Area included in Alternative D does not contain sufficient protections for the conservation and recreational values contained in this section of land. Only the Paradox Special Recreation Management Area outlined in Alternative B (for the purposes of rock climbing, hiking, biking, and camping) would provide for some of the protections (such as withdrawal from or limitation to oil and gas, coal, and mineral leasing of all types) that this area is worthy of. This is an area that receives consistent use by recreationalists. Many young people have learned to climb on the short pitches and excellent rock of what is locally known as "Atomic Energy Crag." In addition, an SRMA in this area would help protect the outstanding scenic and historical values of the confluence of the Dolores and the San Miguel, the "Hanging Flume," relics of uranium mining, and fantastic views of the San Juans and La Lals.
In general, the mere 3% of lands in Alternative D that are currently to be managed as "quiet use" should be expanded—the majority of recreation in this area is non-motorized, and an expansion of these areas through careful travel management planning would help to protect recreational and habitat values, and reduce user conflict.

Comment Number: 000450_BagleyJ_20161024-2
Organization1:
Commenter1:Jay Bagley
Commenter Type: Individual
Comment Excerpt Text:
As someone who visits the Jumbo Mountain area near Paonia about five days per week, I would also like to see all of this area designated as an SRMA. There are so many more recreational opportunities that can be experienced in this area with valuable BLM planning here.

BLM_0165408

Comment Number: 000452_BrandtL_20161101-1
Organization1:
Commenter1:Laurie Brandt
Commenter Type: Individual
Comment Excerpt Text:
I feel that none of the alternatives offered adequately provide for the needs of non--motorized, quiet users, especially mountain bikers. In other words, none of the alternatives offer a balance between motorized and non--motorized use. I would like to see the BLM come up with an alternative that includes a focus on setting aside more non--motorized areas, especially areas where bicycles are welcome and encouraged.
Hikers and horseback riders can use wilderness areas and "Areas with Wilderness Characteristics," but mountain bikers are pushed into motorized areas. Except for a few SRMA's that focus on mountain biking such as the RAT trails, Buzzard Gulch and Jumbo Mountain, there are relatively few miles where we can ride in peace and quiet when compared with the many hundreds of miles of motorized trails in our region. The immense popularity of the RAT and Buzzard Gulch trails speak to the demand for trails designed for mountain biking. These areas are becoming destination trails for locals and visitors and this helps drive our economy and promotes a healthy lifestyle. If you look at the BLM model in the Grand Junction and Fruita areas, they have successfully designated separate areas for motorized and non--motorized use. They have achieved more of a balance of these two user groups and it has made for world--class recreation for both groups.

Comment Number: 000452_BrandtL_20161101-2
Organization1:
Commenter1:Laurie Brandt
Commenter Type: Individual
Comment Excerpt Text:
We need to have multiple non--motorized areas in all portions of the region that are easily accessible to Montrose, Olathe, Delta, Paonia, Norwood and other towns within the UFO's region. We as mountain bikers like the proposed Kinikin Hills area and expanding Buzzard Gulch/Spring Creek, but there can be more areas in Dry Creek, for example, that can be designated as non--motorized or mountain biking areas.

Comment Number: 000452_BrandtL_20161101-3
Organization1:
Commenter1:Laurie Brandt
Commenter Type: Individual
Comment Excerpt Text:
To create more of a balance of motorized and non--motorized use, I request that you come up with an alternative that provides for more quiet user areas, some of which are designated for mountain biking. With your areas with wilderness characteristics, where bikes presumably wouldn't be allowed, this will ensure that there are more opportunities for mountain biking in the UFO planning area. We have world- class terrain on vast areas of BLM land managed by the UFO, so let's have a more equal designation for low impact, environmentally -friendly activities like mountain biking.

Comment Number: 000452_MayJ_20160912-3
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165409

In general the RMP reserves over 90% of the land area to motorized travel. More land should be reserved for nonmotorized quiet users (e.g., mountain bikes, hiking)

Comment Number: 000452_MayJ_20160912-4
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Comment Excerpt Text:
Appendix J, p. J-33: Kinikin Hills SRMA:
I fully support the Alternative B to designate this area as a SRMA, for non-motorized singletrack stacked loop systems. Please also include the option to construct a BLM trailhead accessed off of Uncompahgre Rd.

Comment Number: 000452_MayJ_20160912-5
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Comment Excerpt Text:
2. Appendix J, p. J-85, Spring Creek SRMA, RMZ 2:
I support Alternative B, which would allow non-motorized trails. Competitive events should also be allowed, although this was not included in the alternatives.

Comment Number: 000454_OchsD_20161101_CBMBA-1
Organization1:Crested Butte Mountain Bike Association
Commenter1:David Ochs
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
CBMBA would ultimately like to see a backcountry connection with Paonia and the North Fork Valley, and feels the connection between Gunnison, Paonia, and Crested Butte would be a destination amenity for the future. Jumbo Mountain would be a large piece of that puzzle, and provides a responsible and sustainable network of trails and connectivity.

Comment Number: 000454_OchsD_20161101_CBMBA-2
Organization1:Crested Butte Mountain Bike Association
Commenter1:David Ochs
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
The Crested Butte Mountain Bike Association (CBMBA) supports the creation of an SRMA on Jumbo Mountain east of Paonia as outlined in Alternative B (lines 377-428) of Resource Management Plan 1610(COSO50). The North Fork area has no established mountain biking network and the creation of an SRMA on Jumbo Mountain will provide this area with a recreation amenity that will serve the local and surrounding communities with an economic driver and healthy lifestyle opportunities.

Comment Number: 000460_BakerG_20161028-1
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Appendix J, p. J-85, Spring Creek SRMA, RMZ 2:

BLM_0165410

I support Alternative B, which would allow non-motorized trails. Competitive events should also be allowed, although this was not included in the alternatives.

Comment Number: 000460_BakerG_20161028-2
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Appendix J, p. J-33: Kinikin Hills SRMA:
I fully support the Alternative B to designate this area as a SRMA, for non-motorized singletrack stacked loop systems. Please also include the option to construct a BLM trailhead accessed off of Uncompahgre Rd.

Comment Number: 000460_BakerG_20161028-3
Organization1:
Commenter1:Garry Baker
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
In general the RMP reserves over 90% of the land area to motorized travel. More land should be reserved for nonmotorized quiet users (e.g., mountain bikes, hiking)

Comment Number: 000466_McGavinR_20161031-2
Organization1:
Commenter1:Rick McGavin
Commenter Type: Individual
Comment Excerpt Text:
We strongly encourage the BLM to designate Elephant Hill and Jumbo Mountain as a Special Recreation Management Area (SRMA) and manage it as such. This designation would allow an area that is already being predominantly used for recreation, such as hiking, biking, hunting, equestrian and ATV use to be managed and maintained for the quality of these uses. We use the area for daily recreation and exercise, one of the great things about being residents of this valley. Management of this area should benefit from BLM resources that will ensure that the trails remain safe and that residents and visitors will enjoy a high-quality experience.

Comment Number: 000471_NoeD_20161101-16
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
North Delta. I am quite familiar with the lands contained within the North Delta off-road area, as a consequence of my geologic mapping fieldwork studies. I support designating it a Special Recreation Management Area (SRMA) (Alternative B), rather than an Extensive Recreation Management Area (ERMA) (Alternative D). The call for a more comprehensive management plan is warranted, in my mind, because of the geologic character of the Mancos Shale. This is one of the few areas of the Adobes where ice-age streams did not flow; it is a bypass area. As a result, there are few gravel-capped mesas. Instead, there is an abundance of shale peaks, cuestas, and rounded summits, forming an extensive badlands terrain that is quite susceptible to erosion. This high erodibility of the landscape is a cause for a more comprehensive scrutiny and long-term management of off-road land uses here

BLM_0165411

Comment Number: 000471_NoeD_20161101-17
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Jumbo Mountain. Again, I am quite familiar with this area because of my geologic mapping fieldwork studies, and also because I mountain bike and hike in the area. The BLM is aware of the numerous, "citizen-built" trails that have been constructed in this area. At present, this trail systems represents a minor draw for out-of-town tourists, and a source of revenue for businesses in the town of Paonia. I applaud the BLM for recognizing this, and for proposing two variants of Special Recreation Management Area (SRMA) status that would bring the trail system under federal management. The preferred alternative (Alternative D) is limited to the present extent of trails, on the western flank of Jumbo Mountain. A potential problem here is that motorized travel is not represented. The SRMA under this scenario is OK for biking and hiking, by motorized vehicle use would be incompatible. I prefer Alternative B, which features a much-expanded SRMA that encompasses most of Jumbo Mountain. This larger area holds promise for future, managed recreational uses, including a possible minor expansion of the mountain bike trail system, plus the possibility of locating motorized off-road vehicle and dirt-bike trails around the bulk of Jumbo Mountain, in its central and eastern parts. I feel that this is an opportunity to account for numerous recreation uses for Jumbo Mountain, while giving incompatible or conflicting uses their own territories. With the opportunity for increased future recreational uses comes an opportunity for the town of Paonia to capitalize and prosper from those uses. This is the time to seize that opportunity and manage it properly. Thank you for proposing these areas!

Comment Number: 000471_NoeD_20161101-18
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Kinikin Hills. Similar to the Adobe Badlands and McDonald Creek, this is an area of Mancos Shale and gravel-capped hills near Montrose. I am quite familiar with this area as a result of my geologic mapping. Among other things, it contains some notable geologic features, including (a) upland gravel deposits of a prehistoric river system (termed "the Bostwick River") that existed prior to the development of the modern Uncompahgre River valley, and (b) a deposit of the Lava Creek B tephra, an ashfall deposit that came from an enormous volcanic eruption in Wyoming's Yellowstone region, about 640,000 years ago (see Noe and others, 2007 for discussions). I support Alternative B for this area, which calls for a Special Recreation Management Area (SRMA) and non-motorized day use. I feel that this is an appropriate plan for managing the full range of Adobes-type terrains here.

Comment Number: 000471_NoeD_20161101-21
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
McDonald Creek. I know this little-visited area well as a result of my geologic mapping. It contains some varied, upland and Adobes-type terrains. The bedrock is Mancos Shale and many of the mesas are gravel capped. This area is somewhat similar to the Adobe Badlands/Devils Thumb area near North Delta and the Kinikin Hills area near Montrose. I could not find in the RMP document a specific listing of potential use alternatives or designations for this area, except for being named as an Ecological Emphasis Area, grouped along with Jumbo Mountain (RMP Appendix A, Figure 2-2). It possibly contains the Lone Cabin, Elephant Hill, and Youngs Peak ('C' Hill) areas, as well. Because of the geologic and ecological similarities

BLM_0165412

of this area with the Adobes Hills and Kinikin Hills, I would support a use alternative (such as an Extensive Recreation Management Area, or ERMA designation) for McDonald Creek and the other nearby areas that is in line with the Alternative B designation for that area.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-15
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities…"; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"17 [17Pages 2-281 to 2-287; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.317 26.File.dat/2 _UFODRMP 2016_508.pdf]
Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other. Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. 18 [18http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0. Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf]

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-17
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel. It will be important to refine any stipulations for this Core Zone 1, to ensure that this possibility can be realized in the next few years. The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located: [see pdf for parcel map]. Figure 5.a. Showing parcels of the proposed Ridgway EEA. Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-3
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
Special Recreation Management Areas (SRMAs).
Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway. This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado. Local families with children are also enjoying the highly scenic trail system. These trails also leverage other trails along the Uncompahgre

BLM_0165413

Riverway and Ridgway State Park. We support RAT and COPMOBA in their comments and requests to enhance our trail systems. The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.

Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"16 We are curious if "single-track" should have been included in the objective for Zone 2?

[16Pages 2-258 to 2-262; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.317 26.File.dat/2_UFO-DRMP-2016_508.pdf]

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-4
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
Enhanced Ecological Areas (EEAs).
The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County. It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte. The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-6
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.
According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA. On the BLM UFO Recreation Management Area web page, the BLM states: "Within ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities. This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."19 Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit. Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-9
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B beapproved and incorporated into the final RMP. We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area.

BLM_0165414

Comment Number: 000482_MeyersK_20161101_Tri-State_HasAttach-6
Organization1:Tri-State Generation and Transmission Association
Commenter1:Diana Leiker
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.5
Comment Excerpt Text:
Tri-State is formally requesting that the BLM incorporate a no shooting policy around electric infrastructure similar to what has been implemented for trails and roads into the Final RMP and EIS. We would also request that all existing distribution and transmission ROWs are formally designated as no target shooting areas under Alternatives A through D.

Comment Number: 000489_JohnsonA_20161101-1
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, the final RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley.
Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.
Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.
Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.[14]
[Footnote 14] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non- metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp- content/uploads/ProtectedPublicLands_Manuscript_2012.pdf

Comment Number: 000489_JohnsonA_20161101-5
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. Recreational access and opportunities
Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57

BLM_0165415

Recreation-Jumbo Mountain SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process. See below (WSCC RMP Comments III.E) for additional comments on recreation management not specific to the North Fork Alternative.

Comment Number: 000489_JohnsonA_20161101-64
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
E. Recreation
1. Specific RMA Recommendations for the North Fork and Lower Gunnison Watersheds
The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.
We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II).
Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use.
Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Comment Number: 000489_JohnsonA_20161101-65
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
a. Jumbo Mountain
All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.
The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alt B (DEIS J-4). Our members attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alt B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft plan

BLM_0165416

(DEIS NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking.[62] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita.[63] The trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.

[Footnote 62] See https://www.Mountainbproject.com/
[Footnote 63] http://www.gjsentinel.com/sports/articles/a-good-change

In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Please see the Figure 2a for mapped current and proposed trails within the Jumbo Mountain area.

[SEE PDF FOR Figure 2a. Map of existing and proposed recreation routes on Jumbo Mountain. All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.]

The draft RMP includes closure of the SRMA to competitive events (DEIS Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community.

We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below (WSCC RMP Comments Part III.G).


Comment Number: 000489_JohnsonA_20161101-66
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. Elephant Hill
We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain.

BLM_0165417

These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2b for mapped current and proposed trails on Elephant Hill.

[SEE PDF FOR Figure 2b. Map of existing routes and proposed recreation routes on Elephant Hill. All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.]

Comment Number: 000489_JohnsonA_20161101-67
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
c. Youngs Peak
We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2c for mapped current and proposed trails on Youngs Peak.

[SEE PDF FOR Figure 2c. Map of existing routes and proposed recreation routes on Youngs Peak. All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.]

Comment Number: 000489_JohnsonA_20161101-68
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. North Delta SRMA - WSCC supports the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.

Comment Number: 000489_JohnsonA_20161101-69
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
e. Hotchkiss High School Area – WSCC supports ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve

BLM_0165418

outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.

Comment Number: 000489_JohnsonA_20161101-70
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
f. Roubideau SRMA
We support designation, as proposed in Alternative B and the Preferred Alternative, of all 25,350 acres of Roubideau as a SRMA. This designation, however, should not supersede protections for wildlife management. We:
* Support motorized being limited to RMZ 4 and to designated trails within that Zone. Understand desire to leave routes in RMZ 3 open for hunting purposes however recommend that it include seasonal closures for off-season use.
* Support RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.
* Support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.
Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of NO LEASING for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1.
Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.
In summary, the Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas- and manage for future recreational use- a layered management decision utilizing all of these designations is warranted.
As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area.

Comment Number: 000489_JohnsonA_20161101-72
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
3. Designating Recreation Management Areas for Non-Motorized Recreation
In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014. The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special

BLM_0165419

recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." Ibid.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

Summary of Comments: BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management.

BLM_0165420

Comment Number: 000489_JohnsonA_20161101-73
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4. Special Recreation Permits
The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. See, e.g., Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.
The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications. The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process. The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits.
Summary of Comments: In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications.

Comment Number: 000489_JohnsonA_20161101-74
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
5. Game Retrieval
We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.
Summary of Comments: BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative.

Comment Number: 000489_JohnsonA_20161101-83
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1 42.1
Comment Excerpt Text:
2. Comments on Specific Ecological Emphasis Areas
a. Jumbo Mountain/McDonald Creek
We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B (DEIS Table 2-2, 103; DEIS Figure 2-2, Appendix A) As the BLM outlines in the draft RMP (DEIS Appendix D-2), these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear.
The draft RMP describes the ecological value of these areas as follows:

Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage. (DEIS Table D-1)

Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We would also like to express our strong support for overlapping designations of both the Jumbo Mountain / McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see WSCC and DAMB/COPMOBA Comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others (DAMB/COPMOBA), that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

Comment Number: 000501_Bockus_20161101_NPS-3
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Comment Excerpt Text:
PAGE/PARAGRAPH: Table 2 Alternatives, 2-259, 2-263, 2-271, 2-281
COMMENT: Although the analysis shows some recreation areas would be developed, and some would not, it's important to note that not every location needs recreational facilities developed. Sustainability in relationship to cost, upkeep, and the staff to manage far-flung recreational facilities should be recognized. Too often, facilities are put in place, often through partner or community financing, but no plan exists to maintain them after they are vandalized, wear out or just fall apart. And sometimes there isn't necessarily a need. A few locations show 2 or more trails are built in the very close proximity which have greater impacts on the landscape than necessary

Comment Number: 000501_Bockus_20161101_NPS-4
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Comment Excerpt Text:
PAGE/PARAGRAPH: 3-202/203
COMMENT: 3.5.2 – Interpretation and Environmental Education. We strongly suggest that the RMP calls for a separately developed strategy for interpretation which would help guide the development of interpretive services. Current use of partners to disseminate travel information & brochures is sound and reduces impact on the land. Yet, not every place or location needs to be interpreted, and many partners see "Interpretation" only as tourism development. It might be helpful to realize how the interpretive function can address management "issues in a way that relates those issues to the visitors' experiences" as already mentioned in the plan. A range of interpretation could be considered which would provide services at important or unique locations, but others would be open for self-discovery by those who arrive at those resources, and should be addressed in such a strategy.

BLM_0165422

The idea of working through various digital media, where available and appropriate is also sound. This helps to reduce on-site impacts, and may target specific messages and stories relevant to particular resources.

Comment Number: 000501_Bockus_20161101_NPS-7
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Comment Excerpt Text:
REVIEWER: ZAENGER
PAGE/PARAGRAPH: 4-292
COMMENT: The bullet statement, "Development of improved facilities especially recreation trails, would result in increased use," suggests that sustainability of facilities should be considered when in facility development is contemplated.

Comment Number: 000509_WolcottE_20161102-18
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The BLM would need to present a strong documented case to support leaving any areas out of a special recreation area or extending the protections of a special recreation area from oil and gas development

Comment Number: 000511_FitzhughR_20161101_COPMOBA-RAT-3
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Rodney Fitzhugh
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
RAT essentially endorses the Ridgway SRMA objectives stated in Alternatives B and D of the DRMP. Rat generally agrees with the stipulations for both zones of the Ridgway SRMA, as described in Appendix J. RAT also generally supports DRMP comments submitted by the Montrose, Delta and West End Chapters of COPMOBA concerning various other RMP's designated in the DRMP. We believe careful and consistent management of the Burn Canyon, Dry Creek, Kinikin Hills, Jumbo Mountain and Ridgway RMP's will have a synergistic effect to enhance social, recreational and economic benefits in the adjacent communities

Comment Number: 000516_HukekH_20161101-5
Organization1:
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
Please designate BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area, and include Elephant Hill, Lone Cabin Rd, McDonald Creek, and C hill

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-3
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1
Comment Excerpt Text:
Paradox Valley

BLM_0165423

Again, as per my scoping letter, I recommend a primitive nonmechanized, non motorized type of management for this area so as to retain its uncrowded sense of space, solitude and vast vistas. This would mean a SRMA zoned for the most primitive recreation settings, combined with the full suite of proposed ACECs in Alternative B that would be managed for no human disturbance, to complement the primitive settings prescribed in the SRMA portions of the area.

The following 6 Paradox Valley ACECs contain unmatched and irreplaceable cultural, archeological, geological and biological values: West Paradox ACEC, Paradox Rock Art, East Paradox, La Sal Creek, Dolores Slick Rock Canyon and Coyote Wash---also the Biological Soil Crust ACEC. These ACECs should all be carried into the preferred alternative in the final RMP, with strong restrictions on human encroachment and disturbance, since the BLM does not have the resources to handle intensive management of future crowds of visitors.

I also recommend minimizing trail build-up in the following relatively unroaded areas:

* Sawtooth Ridge (has 5000 acres of unroaded land)
* Nyswonger Mesa
* Saucer Basin

Also the following areas have some uranium roads, but have only recently seen motorized trail encroachment and could still be protected as less crowded, more remote, nonmechanized lands:

* Roc Creek
* Hamilton Creek
* Hamilton Mesa,
* Callan Draw,
* McKee Draw,
* Bramiers Draw,
* Wickson Draw,
* Mailbox Draw

As with Tabeguache and other primitive areas in the field office, protective designations for Paradox Valley will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by the gridwork of trails, that now dominates the rest of the Paradox Valley.


Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-4
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1 42.1
Comment Excerpt Text:
Dry Creek
RMRI commented on the Dry Creek TMP back in 2008, which was commendable for its numerous route closures that reduced the route fragmentation characterizing the area at that time.

Pressures for habitat fragmentation by trails continue in Dry Creek due to new mountain bike proposals, etc. Nonetheless, the Dry Creek LWC should be managed for its existing and potential wilderness characteristics and should remain free of mechanized trails in order to maintain its less crowded, more primitive, more wilderness-like character.

Once trails are built it's difficult for the BLM to limit use levels; by definition motorized and especially mt bike trails, become high-traffic thoroughfares leading to continued off-trail use and other problems.

Dry Creek should also have the additional protection of the overlapping EEA as defined in Alt B. A SRMA designation might be desirable if the area has O & G potential. Otherwise an ERMA would be preferable as attracting less use and impacts. Even a full SRMA might remain manageable if it were

BLM_0165424

limited to the nonmechanized, primitive backcountry setting found in the BLM's Recreation Settings Matrix.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-5
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.3
Comment Excerpt Text:
Burn Canyon
Burn Canyon is an example of an overlap between a high trail use area, and a critical winter concentration big game area ---an overlap of a type that occurs in at least seven other places in the field office. The kind of high quality habitat found in Burn Canyon is increasingly rare on this largely desert mesa landscape, and disturbance by trails is raising stress levels in herds due to human interaction and avoidance, with potential to cause displacement of animals to less productive habitat. This in turn creates the likelihood over time of diminished reproductive success and ultimately declines in herd health and populations.
The Burn Canyon SRMA designation is a mixed blessing. There is first the manageability problem of locating a high-use SRMA adjacent to incompatible protective designations such as EEAs, ACECs or LWCs. Also RMRI has concerns about downshifting the Recreation Zones in the Burn Canyon SRMA into the less primitive backcountry and middle country settings, as an endless downward slide.
NOTE: Statewide, it is to be noted that even though Colorado citizens prioritize wildlife slightly higher than trails in recent CPW policy docs, they are not informed of the connections between the two, nor are the properly apprised of how trails could be designed and located to mitigate these impacts.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-9
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Special Recreation Management Areas SRMAs
It is difficult to manage levels of trail use on SRMA trails once designated. The draft RMP should acknowledge that while SRMA status in some cases may protect from the bigger threat of mineral leasing, in fact SRMAs tend to attract volumes of use that themselves become problematic.
Burn Canyon: Enforcement, mountain bikes and wildlife impacts
As one example, Burn Canyon shows how SRMAs can impact wildlife by attracting higher levels of unmanageable trail use. Bicyclists are violating seasonal bike closures in McKee Draw and throughout Burn Canyon, bringing in new use and disturbance to previously less disturbed wildlife areas.
This kind of conflict between critical habitat and high human use areas should have been avoided in Burn Canyon by proactively channeling trail use elsewhere. Avoiding such conflicts should be a strong priority in the RMP and future management.

Comment Number: 000531_RazianoR_20161028-1
Organization1:
Commenter1:Renata Raziano
Commenter Type: Individual
Comment Excerpt Text:
I support the designation of nonmotorized SRMAs in Dry Creek and Spring Creek, but also would like to see the Kinikin Hills ERMA be designated an SRMA. This area is easily accessed from town and has terrain that is very promising for mountain biking.

BLM_0165425

Comment Number: 000532_PritchardM_20161101_RFMBA-2
Organization1:Roaring Fork Mountain Bike Association
Commenter1:Mike Pritchard
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition, we recommend designation of SRMA's and/or ERMA's for:
-North Delta (to connect the Grand Mesa to Delta City limits with mechanized routes).
-Hotchkiss High School Area (transformative educational pursuits on public lands).
-The Youngs Peak area near Crawford (community benefits: health, wellness, destination tourism).
-Elephant Hill / Lone Cabin (remote non-motorized backcountry experiences near Paonia).
-Paonia State Park & Reservoir (increased public access and amenity to existing state assets).
-Powell Mesa / Oak Mesa near Hotchkiss (community benefits: health, wellness, destination tourism).
-McDonald Mesa (remote non-motorized backcountry experiences near Crawford).
-Stevens Gulch (reclamation of mining impacted lands for recreation near Paonia).

Comment Number: 000532_PritchardM_20161101_RFMBA-3
Organization1:Roaring Fork Mountain Bike Association
Commenter1:Mike Pritchard
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In consultation with our mountain bike and trail advocacy contacts at the Delta Area Mountain Bikers, we support the creation of an SRMA for the Jumbo Mountain area (as outlined in Alt. B1). Maximizing the size of this SRMA will ensure a diversity of recreation uses will be possible throughout the life of this Resource Management Plan.

Comment Number: 000532_PritchardM_20161101_RFMBA-4
Organization1:Roaring Fork Mountain Bike Association
Commenter1:Mike Pritchard
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Roaring Fork Valley, managed by the BLM's Colorado River Valley Field Office, benefits from two Special Recreation Management Areas (SRMA's) as well as additional Extensive Recreation Management Areas (ERMA's). These designations allow for BLM land managers and community partners to agree on the areas where specific investment in developing high quality recreation amenities, especially non-motorized trail systems, will serve the greatest needs of local populations. RFMBA wholeheartedly recommends that SRMA's and ERMA's be designated within UFO's final RMP.
While our board members, and members at large, are focused on maintaining and evolving the trail systems within the Roaring Fork Valley, many of us often travel to neighboring regions to explore public lands and high quality trail systems. We stay in local hotels and B&B's with our families, and search out new restaurants while enjoying time away from work. The economic benefit story of high quality trails is one that has been grasped by communities throughout Colorado, and we hope that towns like Delta and Paonia will benefit similarly based upon decisions that will be made within this RMP.

Comment Number: 000545_SlivkaJ_20161101-136
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, the revised RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a

BLM_0165426

Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.

[Footnote 40 Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf]

Comment Number: 000545_SlivkaJ_20161101-141
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Recreational access and opportunities
Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process.

Comment Number: 000545_SlivkaJ_20161101-147
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA
Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

BLM_0165427

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes: "Development could also add to the changes in the scenic values and other non-market commodities." Uncompahgre Draft RMP at 4-479.

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities. Uncompahgre Draft RMP at 4-301. The DEIS notes that recreation and tourism related activity is likely to increase across the resource area: "Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state." Id at 4-479.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B. Uncompahgre Draft RMP at 4-306.

Comment Number: 000545_SlivkaJ_20161101-148
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily nonmotorized recreational area only makes sense. However, and although the draft RMP/EIS notes that pubic use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors.

Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

Uncompahgre Draft RMP at 4-208. These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

Comment Number: 000545_SlivkaJ_20161101-149
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas

BLM_0165428

(ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality.

Comment Number: 000545_SlivkaJ_20161101-159
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Recreation
The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.
We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II).

Comment Number: 000545_SlivkaJ_20161101-160
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Comment Number: 000545_SlivkaJ_20161101-161
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Jumbo Mountain
All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.
The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alternative B. Uncompahgre Draft RMP at J-4. Members of the community attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alternative B, allows for trail connectivity with other current and future

BLM_0165429

recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft RMP (NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

Comment Number: 000545_SlivkaJ_20161101-162
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

Comment Number: 000545_SlivkaJ_20161101-163
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking. [Footnote 64 See https://www.mtbproject.com/] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita. [Footnote 65 http://www.gjsentinel.com/sports/articles/a-good-change] We the trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.

Comment Number: 000545_SlivkaJ_20161101-164
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly, the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Figure 1. Map of existing and proposed recreation routes on Jumbo Mountain.

BLM_0165430

All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

Comment Number: 000545_SlivkaJ_20161101-165
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft RMP includes closure of the SRMA to competitive events (Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community.

Comment Number: 000545_SlivkaJ_20161101-166
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below on the proposed EEA.

Comment Number: 000545_SlivkaJ_20161101-167
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Elephant Hill
We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.
Figure 2. Map of existing routes and proposed recreation routes on Elephant Hill.
All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.

Comment Number: 000545_SlivkaJ_20161101-168
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Youngs Peak
We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would

BLM_0165431

provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.
Figure 3. Map of existing routes and proposed recreation routes on Elephant Hill.
All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.

Comment Number: 000545_SlivkaJ_20161101-169
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
North Delta SRMA
We support the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.

Comment Number: 000545_SlivkaJ_20161101-170
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Hotchkiss High School Area
We support ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.

Comment Number: 000545_SlivkaJ_20161101-172
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We also strongly support overlapping designations of both the Jumbo Mountain/McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see above comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

Comment Number: 000545_SlivkaJ_20161101-25
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 20.1

BLM_0165432

Comment Excerpt Text:

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." Ibid.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

Summary of Comments: BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management.

Comment Number: 000545_SlivkaJ_20161101-26
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
c. Comments on specific RMAs Paradox Valley

We recommend that the BLM carry forward the Paradox Valley SRMA as proposed in Alternative B into the Final RMP rather than the ERMA that is currently proposed in Alternative D. An SRMA is a more appropriate designation as it would provide better and more focused guidance for the management of the varied recreational activities the Paradox Valley has to offer visitors and residents alike. Most notably, there is increased interest in river-based recreation as well as the history of the area---including its uranium mining and role in U.S. nuclear history as well as pre-European settlement history. In

BLM_0165433

particular, the historic mining flume, with the restored section near the confluence of the Dolores and San Miguel rivers, is a unique draw. Mountain bike trails are beginning to crop up in the area, and rock climbing is popular along the EE22 Road on Sawtooth Ridge, and this part of the SRMA would be appropriate for more intensive human-powered recreation development because of the extensive existing surface disturbance from mining.

With the seeming over-saturation of tourists in places like Moab, people are looking elsewhere for similar red rock recreation experiences, and the Paradox Valley and Dolores/San Miguel confluence area offer similarly spectacular landscapes and recreation experiences. People will discover this area, whether or not BLM plans for it. It will be better for both the resources and land to get ahead on management. Local communities are struggling with economic change. Low prices for uranium and the announcement of the closure of the Nucla power plant and its coal mine have people on the West End of Montrose County facing an uncertain future. Recreation on public lands is one of the best options for helping to revive local economies and could be a real chance for turnaround for struggling communities like Nucla, Naturita and Bedrock. The BLM has an opportunity to lay the groundwork for well-managed recreational opportunities in this area before the demand rises, and to do it in a way that protects the land and benefits local communities.

Comment Number: 000545_SlivkaJ_20161101-27
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Paradox Valley SRMA: Management for VRM Class II would also protect the stunning views of the red rock cliff walls, canyons and the La Sals that make the Paradox Valley such a unique a beautiful place to live and visit. Stronger and more focused recreation management as provided in the SRMA would also better protect the many other values recognized in this area in the various ACECs proposed. We are strongly supportive the NSO stipulations that are proposed for RMZ 1,2 and 3 in Alternative B and having RMZ 4 closed to leasing.
Again, we believe the BLM has recognized many other highly valued resources in this area that should be prioritized over oil and gas leasing.

Comment Number: 000545_SlivkaJ_20161101-28
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Paradox Valley SRMA: RMZ 4 should be expanded to include all identified Lands with Wilderness Characteristics on Carpenter Mesa, and managed in a way that will continue to provide a recreational experience of solitude and primitive recreation experiences. Combined with the large, scenic Roc Creek drainage, and contiguous roadless lands on the Manti-La Sal National Forest, and Sewemup Mesa WSA, this area creates a larger complex of undeveloped lands to support more extensive wilderness recreational opportunities.
Therefore, we recommend that RMZ 4 be expanded to capture all of the LWC lands.

Comment Number: 000545_SlivkaJ_20161101-29
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau

BLM_0165434

This SRMA provides additional recreational opportunities to provide a quiet alternative to the busier Dominguez-Escalante NCA to the north. The management prescriptions for Roubideau could help enhance the wilderness experiences available in the Camel Back WSA and the adjacent congressionally-designated Roubideau Area on the Uncompahgre National Forest. These existing designations provide protections to the whole of Roubideau Creek, from the top of the Uncompahgre Plateau down to the valley floor. Additionally, the Camel Back WSA is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015), so BLM should take care to ensure that the wilderness characteristics are unimpaired given the high level of interest in eventual wilderness designation as a companion to the Roubideou Area.

The management objectives are good though we are concerned that an emphasis to move majority of the zones closer to "front country" management. BLM should make sure that the WSA areas are adequately protected to ensure that solitude and primitive recreation remain as a recreational opportunity.

We support motorized being limited to RMZ 4 and to designated trails within that zone. However, motorized uses in RMZ4 should be minimized to preserve the highly rare wild qualities of the other RMZs.

Competitive and large-group motorized events belong elsewhere, not in the Roubideau SRMA.

Also, wherever practicable, motorized roads/trails/routes within RMZ4 should be routed a minimum of 100 feet away from the canyon rims.

Users can park and walk to the rim, thus improving the quality of the visual and auditory experience for all users, including the motorized users. While we understand and generally support BLM's desire to leave routes in RMZ 3 open for hunting purposes, we recommend that BLM include seasonal closures for off-season use. We also recommend RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.

We support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.

Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of no mineral leasing for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1. Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for mineral leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

Portions of the SRMA within the Camel Back WSA should be managed to VRM I. Manual 6330 stipulates that all WSAs should be managed to VRM I.


Comment Number: 000545_SlivkaJ_20161101-30
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dolores River Canyon

The SRMA overlaps with a portion of the Dolores River Canyon WSA in UFO. Because of this fact, the management prescriptions for the Dolores River Canyon SRMA should align with BLM WSA Manual 6330. For instance, draft RMP appendix J recommends VRM II management for this SRMA, however Manual 6330 stipulates that all WSAs should be managed to VRM I.

BLM_0165435

Comment Number: 000545_SlivkaJ_20161101-31
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, the Dolores River Canyon WSA is recommended by BLM for wilderness designation by Congress, and is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as well as subject to inclusion in the legislative proposal of the Dolores River Stakeholders Group, which is developing stakeholder-driven recommendations for public lands below McPhee Reservoir to Bedrock as a substitution for wild and scenic river suitability. The Dolores River Canyon SRMA, like the Paradox Valley SRMA, has the potential to help benefit the economies of nearby communities by providing well-managed recreational opportunities. Unlike the Paradox Valley SRMA, the Dolores River Canyons SRMA is a wilderness setting and the WSA management and care for wilderness values necessitate a much lower level of recreational development. This makes it all the more sensible to designate the Paradox Valley SRMA as a companion, to help provide a spectrum of recreational opportunities in the region.

Comment Number: 000545_SlivkaJ_20161101-32
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. RMZ 1 is entirely within the WSA, so appropriately limits recreation to types appropriate to a wilderness setting, with a focus on boating, water-based activities. However, hiking is also a popular activity to gain access up the river corridor starting from the Y9 Road in Bedrock below the BLM boat ramp and picnic facility. Also, the plan and BLM's travel management should reflect that motorized access is blocked about ¼ miles below the boat ramp and picnic facility on Bureau of Reclamation land (exactly at coord. 38.30116, - 108.89630). 2. RMZ 2 is also entirely within the WSA and as such also appropriately focuses on wilderness setting activities like hiking and backpacking in high-walled Wingate sandstone canyons such as La Sal Creek, Big Steer Canyon and Coyote Wash.

Comment Number: 000545_SlivkaJ_20161101-33
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River
This SRMA is an extremely popular river corridor, and BLM has made major improvements to the recreational facilities over the last decade. Tourism and outdoor recreation are the largest economic drivers in San Miguel County, and this river corridor is key infrastructure providing great opportunities for boating, fishing, camping and other activities. Additionally, the canyon and its tributaries support bighorn sheep and other wildlife cherished for hunting and wildlife viewing. BLM should set management prescriptions to protect and safeguard this river and the recreation it supports. BLM should adopt the recommended mineral withdrawal proposed in Alternative B to protec the corridor and provide for a level of reasonable certainty regarding the management of the SRMA for the life of the RMP. BLM has conducted administrative withdrawals elsewhere, such as along popular recreational stretches of the Arkansas River as well as for wildlands such as Vermillion Basin. Water quality is essential to this stretch, and rivers in Southwest Colorado already have to contend with a legacy of pollution from the mines of yesteryear, so any additional mining or fluid mineral development in the SRMA is an unacceptable risk.

BLM_0165436

Finally, portions of this SRMA are being considered for designation in legislation pending before
Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as the proposed Norwood Canyon
Wilderness. BLM should take care to make sure that lands proposed for wilderness not be impaired in
the interim.

Comment Number: 000545_SlivkaJ_20161101-34
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. Special Recreation Permits
The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the
Draft RMP offers guidance and limitations for the issuance of SRPs. See, e.g., Uncompahgre Draft RMP at
2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the
Draft RMP on guiding the authorization of special recreation permits.
The BLM Handbook on Recreation Permit Administration states that field offices can and should
develop guidelines for issuing SRPs, including thresholds for when permits are required for organized
groups and events for specific types of recreation activities, land areas, or resource settings. BLM
Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis is best accomplished in
the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP
applications.
The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process (See
Grand Junction SRP guidance, included as Attachment 3). The standards set out in these RMPs are very
specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate
cumulative impacts from such permits. Summary of Comments: In the Uncompahgre RMP, BLM should
provide specific criteria for evaluating special recreation permits to guide agency staff on processing
applications.

Comment Number: 000549_DayB_20161101-2
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Other Sections: 42
Comment Excerpt Text:
Motorized recreation should be planned to avoid the EEAs, which the draft RMP mentions regarding
placement of SRMAs over EEAs at p 4-135.

Comment Number: 000553_LoveL_20161101-1
Organization1:
Commenter1:Jason Love
Commenter Type: Individual
Comment Excerpt Text:
I am in favor of quiet use trails (non motorized) as well as lifting any ban on competitive events as I
believe this could be a significant financial boon for Delta County in the future.
To close I believe that outdoor recreation and the development of sustainable trail systems and
supporting infrastructure is the road map to the health and economic recovery of Delta County.

Comment Number: 000553_LoveL_20161101-2
Organization1:
Commenter1:Jason Love
Commenter Type: Individual

BLM_0165437

Comment Excerpt Text:
I support alternative B and B.1 of the RMP proposal and would especially like to see the Jumbo Mountain area designated as SRMA as well as several well designed none motorized trails from the top of the Grand Mesa down into the city of Delta.

Comment Number: 000557_OrtizK_20161101-1
Organization1:
Commenter1:Karen Ortiz
Commenter Type: Individual
Comment Excerpt Text:
Furthermore, I would like to see Jumbo Mountain designated a Special Recreation Management Area (SRMA) as a strategy to develop and protect the special recreational opportunities in that locale for residents and visitors alike. I plan to build a home in the Creek Vista subdivision adjacent to Jumbo Mountain. My friends and I have personally enjoyed mountain bike riding and hiking since the mid-1980s. Alternative B.1 offers protective management to safeguard the natural features adjacent to my future home and the outstanding recreational opportunities at the mountain. The Jumbo Mountain area is also important to the Town of Paonia. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with Alternative B.1 acreage and stipulations. Under B.1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306). Should Jumbo Mountain be designated a SRMA in the final plan, I am confident the aforementioned groups supporting the classification would work with the BLM to develop and implement the specifics of a plan and rally around maintaining the area.

Comment Number: 000571_GravesB_20161101-1
Organization1:
Commenter1:Ben Graves
Commenter Type: Individual
Comment Excerpt Text:
I especially support Alternative B and the protections for Jumbo Mountain as a SRMA because I see firsthand. The growth in the trail system over the last 5 years and the increased use of the trails and want to make sure the resource is managed responsibly for recreation. I am an avid trail user and I mountain bike or trail run almost every day. I live about 3 blocks from Jumbo trails and a major reason for my family moving to Paonia was this trail access. The ability for children, the elderly and tourists to have access to a scenic wildlife viewing and high quality singletrack recreation experience from downtown Paonia is a unique feature of our community and is a draw for people around the state. The Mancos shale geology, steep, rugged trails and fragile desert vegetation are not compatible with heavily motorized, industrial oil and gas development or offtrail use. Some existing user-created trails are not sustainable. SRMA status for the Jumbo Mountain area and the 4000 acreas east of Jumbo Mountain would enable the BLM to improve the current management of this fragile landscape and help put Paonia on the map as an outdoor recreation destination.

Comment Number: 000571_GravesB_20161101-2
Organization1:
Commenter1:Ben Graves
Commenter Type: Individual
Comment Excerpt Text:
In Alternative B, the added room for growth of the existing trail system into the areas east of Jumbo Mountain towards the Sunset Roadless Area and the National Forest, would be a way for the Paonia community to continue to attract mountain bike and singletrack recreation users from around the state. Motorized use in the close to town trails is just not compatible with the high amount of nonmotorized

use. In order to prevent use conflict, the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and expand hunting access in the areas east of Jumbo Mountain.

Comment Number: 000571_GravesB_20161101-3
Organization1:
Commenter1:Ben Graves
Commenter Type: Individual
Comment Excerpt Text:
I would like to see provisions for the local community to host small competitive events. From the mid2000s until 2014, local groups hosted charity runs on the Jumbo Trails for Cherry Days and Harvest Festival. These events drew competitors from around the Western Slope to Paonia. In 2013 Paonia High School hosted a regional cross-country meet on the Jumbo trails. Our local businesses would benefit greatly from community groups hosting nonmotorized, small scale events like trail runs and mountain bike competitions. This would further allow our community to redefine itself as a recreation destination. River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative B1 provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan.

Comment Number: 000571_GravesB_20161101-4
Organization1:
Commenter1:Ben Graves
Commenter Type: Individual
Comment Excerpt Text:
Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land and water based recreation. The final plan should include Special Recreation Management Areas identified in Alternative B. Recreation activities in these areas include mountain biking, horseback riding, motor biking, OHV use, trail running, snowmobile use, hunting, fishing, crosscountry skiing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, Lone Cabin, the North Fork of the Gunnison River corridor in the Paonia area and the Smith Fork river corridor, McDonald Creek, Elephant Hill, Adobe Butte, and Roubideau Canyon in the rest of Delta County.

Comment Number: 000572_McCurdy_20161101-1
Organization1:
Commenter1:Tracy McCurdy
Commenter Type: Individual
Comment Excerpt Text:
I specifically support designating Jumbo Mountain as a Special Recreation Management Area (SRMA), which is needed to properly manage and capitalize on our unique recreational opportunities here in the North Fork Valley.

Comment Number: 000576_Ruppert_20161015-7
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final RMP should include the entire Jumbo Mountain unit as a Special

BLM_0165439

Recreation Management Area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists.

Comment Number: 000576_Ruppert_20161015-9
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The final RMP should include Special Recreation Management Areas and Extensive Recreation Management Areas for all lands identified as of high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking, among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: 000581_PattersonC_20161016-4
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Comment Excerpt Text:
Critical recreation areas include: Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.
These wild areas are more valuable as wild, clean recreation areas than their value as short-term sources of dirty, polluting fossil fuels.

Comment Number: 000587_WolcottS_20161031-1
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Other Sections: 35.1
Comment Excerpt Text:
I collect trespass fees from hunters to hunt on my land and to access BLM lands surrounding my land on Stucker Mesa. This is a vital part of my livelihood. This activity will be destroyed if the agricultural/pristine nature of the area has oil & gas infrastructure added to the viewscape. I regularly raft the North Fork from above Somerset to Delta. Enjoyment of this activity is also dependent on preventing more industrialization of the viewscape and contamination of the waters of the North Fork of the Gunnison. The final plan must include protections for these recreation resources and lands.

Comment Number: 000587_WolcottS_20161031-14
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists

Comment Number: 000587_WolcottS_20161031-17
Organization1:
Commenter1:Steve Wolcott

BLM_0165440

Commenter Type: Individual
Comment Excerpt Text:
The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: 000592_WhippleL_20161101-2
Organization1:
Commenter1:Lynn Whipple
Commenter Type: Individual
Comment Excerpt Text:
Hikers and horseback riders can use wilderness areas and "Areas with Wilderness Characteristics," but mountain bikers are pushed into motorized areas. Except for a few SRMA's that focus on mountain biking such as the RAT trails, Buzzard Gulch and Jumbo Mountain, there are relatively few miles where we can ride in peace and quiet when compared with the many hundreds of miles of motorized trails in our region. The immense popularity of the RAT and Buzzard Gulch trails speak to the demand for trails designed for mountain biking. These areas are becoming destination trails for locals and visitors and this helps drive our economy and promotes a healthy lifestyle. If you look at the BLM model in the Grand Junction and Fruita areas, they have successfully designated separate areas for motorized and non-motorized use. They have achieved more of a balance of these two user groups and it has made for world-class recreation for both groups.
We need to have multiple non-motorized areas in all portions of the region that are easily accessible to Montrose, Olathe, Delta, Paonia, Norwood and other towns. We like the proposed Kinikin Hills area and expanding Buzzard Gulch/Spring Creek, but there can be more areas in Dry Creek, for example, that can be designated as non-motorized or mountain biking areas. As mountain bikers, we like the quiet and peaceful nature of non-motorized trails. We ride our bicycles to enjoy the outdoor experience and environment we live in. We love the skills and challenges that singletrack trails provide. We don't prefer dirt roads or two-track; singletrack trails are what we seek and love to ride on sustainable trails. Motorized trails are also often too steep and rutted, which can be difficult or impossible to ride on a bicycle. We are looking for a different experience and we are more compatible with hikers and other non-motorized users because of our slower speed, quietness, and desire to be self-propelled and are a low impact on the environment. To create more of a balance of motorized and non-motorized use, I request that you come up with an alternative that provides for more quiet user areas, some of which are designated for mountain biking. With your areas with wilderness characteristics, where bikes presumably wouldn't be allowed, this will ensure that there are more opportunities for mountain biking in the UFO. We have world-class terrain on vast areas of BLM land managed by the UFO, so let's have a more equal designation for low impact, environmentally-friendly activities like mountain biking.

Comment Number: 000602_SchwietermanN_20161024-1
Organization1:
Commenter1:Neal Schwieterman
Commenter Type: Individual
Comment Excerpt Text:
The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North

BLM_0165441

Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: 000609_AdamN_20161101-3
Organization1:Delta County Livestock Association
Commenter1:Nate Adam
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
No areas should be designated as SRMA or ERMA. BLM is meant to be for multiple use and these designations go directly against that purpose.

Comment Number: 500052_WestC_20160930-1
Organization1:
Commenter1:Callie West
Commenter Type: Individual
Comment Excerpt Text:
Finally and specifically I urge the BLM to designate Jumbo Mountain as a Special Resource Management Area, assuring that local residents and visitors alike will continue to have access to outdoor recreation that enhances our community's health and well being, and scenic vistas that show off the unique beauty and agricultural heritage of the North Fork Valley.

Comment Number: 500071_GibsonB_20161101-1
Organization1:
Commenter1:Beth Gibson
Commenter Type: Individual
Comment Excerpt Text:
Looking at your preferred alternative plan I want to applaud your inclusion of new areas of Lands with Wilderness Characteristics, Wild and Scenic Rivers, and SMPAs. But I want to strongly encourage you to include more of these. There are so many identified in Alternative B… and also to not limit each area to a smaller acreage. (For example, the Tabeguacke areas, more of the Dry Creek region and Shavano Creek.) Within these designations I feel creating more SMRAs that ERMAs is important to maintain and uphold this special resource we have here: physical outdoor beauty coupled with a chance for solitude. I am very concerned that 95% of the entire area will be left open for gas drilling. Much of the area in the Montrose area has been shown to not have much potential for extractive industry. Because of this we should place these areas under protection and promote recreational activities. More and more people are moving to this area to be able to hike, kayak, and bike.

Comment Number: 500114_MeadeD_20161101-3
Organization1:
Commenter1:David Meade
Commenter Type: Individual
Comment Excerpt Text:
ATV use is widespread on the Uncompahgre. It would be fortunate if this are could be protected from this invasive and damaging activity.

Comment Number: 500147_BradfordD_20161008-3
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165442

I do not support the listing of Jumbo Mountain/McDonald Creek as a Special Emphasis Area. The description of the reasoning seems extremely weak. Fragmentation in the North Fork Valley is more problematic than fragmentation of the public lands in the Jumbo Mountain/McDonald Creek area. The loss of large, open space ranches to increased residential development is causing more fragmentation of habitat in the North Fork Valley

Comment Number: 500176_StewartC_20161027_TownOfPaonia-4
Organization1:Town of Paonia
Commenter1:Charles Stewart
Commenter Type: Local Government
Comment Excerpt Text:
Finally, the Town of Paonia strongly encourages the BLM to designate Jumbo Mountain as a Special Recreation Management Area (SRMA) and manage it as such.

Comment Number: 500186_BrettE_20161001-2
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
In addition I urge you to designate the Jumbo Mountain area as a Special Recreation Management Area per Alternative B and to remove oil and gas leasing from the Jumbo area.

Comment Number: 500192_SchulzJ_20161027-1
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
Also, please seriously consider designating the BLM lands on and around Jumbo Mountain as a Special Recreation and Ecological Emphasis Management Area because of their unique value, importance, and distinctiveness of the recreational area and criticality of the area as winter habitat for mule deer and other wildlife.

Comment Number: 500201_WitherC_20160808-2
Organization1:
Commenter1:Candy Wither
Commenter Type: Individual
Comment Excerpt Text:
I do applaud your plan to create a special recreation management area for Jumbo Mountain Plan B. I really hope that you include this in your final plan.

Comment Number: 500268_BearS_21060930_DMEA-2
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Line 374 - Target shooting limits: Proposed limits on target shooting ask people to not target facilities such as "recreation site, communication site, and power substations". Please note that targeting power line insulators and fiber optic lines can also cause significant damage and should be included in the proposed limitations.

BLM_0165443

Comment Number: FormLetterL_CHC WSCC-10
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Future Recreation Development -
Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: FormLetterL_CHC WSCC-8
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Recreation
Jumbo Mountain Trails - The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-16
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 14.1
Comment Excerpt Text:
Line 100 Page 2-66: We request that Alternative B be amended to read "Maintain or improve fisheries habitat where consistent with maintaining native species and sports fisheries" This amendment would provide a better balance in the management of fish habitat for multiple uses and recreational values.

Comment Number: 500268_BearS_21060930_DMEA-5
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
• Line 374 - Target shooting limits: Proposed limits on target shooting ask people to not target facilities such as "recreation site, communication site, and power substations". Please note that targeting power line insulators and fiber optic lines can also cause significant damage and should be included in the proposed limitations.

BLM_0165444

*Summary*

A. Numerous commenters stated that target shooting areas should be left open as described under Alternative A, and areas to encourage responsible shooting (i.e., unofficial shooting areas) should be created as an implementation-level activity following RMP finalization. They note that the local economy is dependent on recreational opportunities and supporting a growing recreation industry. In addition, one commenter requested that the BLM retain language in the final RMP stating that "designated target shooting areas and ranges would be allowed, which could increase recreational opportunities by providing managed, accessible, and designated areas for shooting." Another commenter requested a no-shooting policy around electric infrastructure, as well as managing all existing distribution and transmission ROWs as no target shooting areas. Specific to areas with prairie dogs and burrowing owl populations, commenters noted that the BLM should provide analysis and or evidence of existing or predicted impacts to species populations as a result of the presence of recreational shooting prior to restricting the activity. One commenter also noted recreational shooting should be permitted in WSAs.

B. Commenters provided input on Special Recreation Management Areas (SRMAs) and Extensive Recreational Management Areas (ERMAs)

1. One commenter recommended that the BLM consider locations of sensitive wildlife habitat when designating SRMAs, as associated human activity could impact wildlife.
2. Commenters recommended that BLM should designate the following areas as a SRMAs, and provided rational and specific management recommendations:
   - Jumbo Mountain for the diverse recreational trails and natural habitat and competitive events
   - North Delta OHV open area and the inclusion of mountain bike designation
   - Elephant Hill due to a likely increase of recreational use and prime location for mountain biking, hiking, and other day use activities
   - Lone Cabin Road
   - McDonald Creek
   - "C" Hill
   - Stevens Gulch for winter recreation
   - The North Fork and Gunnison River corridor
   - Smith Fork river corridor
   - Adobe Butte
   - Roubideau Canyon with adequate protections for wildlife management
   - Kinikin Hills for nonmotorized trail opportunities
   - Spring Creek
   - Youngs Peak due to a likely increase of recreational use and prime location for mountain biking, hiking, and other day use activities
   - Paonia State Park/Paonia Reservoir
   - Burn Canyon
   - Dry Creek for nonmotorized trail opportunities
   - Paradox Valley
3. In addition, some commenters recommended that the following areas be designated as Extensive Recreational Management Areas (ERMAs) due to increased use:
   - South Oak Mesa – Multi-use trails

BLM_0165445

- McDonald Mesa – Mountain bike trails
- Stephens Gulch – Multi-use trails
- Hotchkiss High School Area due to the prime location for a local trail network
- Jumbo Mountain to ensure flexibility and multiple use
- Elephant Hill due to a likely increase of recreational use and prime location for mountain biking, hiking, and other day use activities
- C Hill
- Lone Cabin
- Youngs Peak near Crawford due to a likely increase of recreational use and prime location for mountain biking, hiking, and other day use activities

4. In contrast, one commenter noted that no areas should be designated as SRMAs or ERMAs because of the BLM's multiple use purpose, and these designations oppose that purpose.

5. Other commenters supported the idea of creating recreation opportunities in the Mckenzie Butte area just outside of Ridgway.

C. Some commenters noted that the alternatives do not adequately provide for the needs of nonmotorized, quiet users, especially mountain bikers, stating that the alternatives do not offer a balance between motorized and nonmotorized use. They requested that the BLM a focus on setting aside more nonmotorized areas, especially areas where bicycles are welcome and encouraged.

D. Commenters stated that the BLM should consider the following management recommendations:

1. Limit livestock grazing in areas that conflict with recreational use
2. Review specific locations provided in comments for consideration for designating and developing trailheads, trailhead facilities, and recreational trails
3. Define specific criteria for evaluating special recreation permits
4. Acknowledge that not every recreational area requires facilities and consideration for sustainability of facilities
5. Do not recommend withdrawal from mineral entry around recreational sites by the Secretary of the Interior. These sites could be adequately protected via alternative administrative action which would provide the same level of resource protection without the permanent rigidity of a withdrawal.
6. Provide strategy for interpretation and environmental education.

E. Some commenters suggested edits to specific areas within the decision area in order to to clarify management actions. Suggested considerations include the following:

1. Keep Stevens Gulch Road clear of drilling operations.
2. Manage the Dolores River Canyon SRMA as VRM Class I because it overlaps with a portion of the Dolores River Canyon WSA, and WSAs are managed as VRM Class I per BLM Manual 6330.
3. In the Jumbo Mountain SRMA, expand RMZ I to encompass the proposed area of RMZ-2, and expand RMZ 2 and its proposed characteristics to encompass the hatched area on Draft RMP/EIS Appendix J, Figure J-4.

BLM_0165446

4. In the Jumbo Mountain SRMA, consider the possibility for limited competitive events.
5. In the Kinikin Hills ERMA, manage RMZ 2 for nonmotorized trail development.
6. In the North Delta SRMA, consider development of nonmotorized single-track trails in RMZ 1 and RMZ 2.
7. In the Paradox Valley SRMA, expand RMZ 4 to include all identified lands with wilderness characteristics on Carpenter Mesa, and manage it in a way that will continue to provide a recreational experience of solitude and primitive recreation experiences.
8. In the Ridgway Trails SRMA, include single-track as an objective for RMZ 2.
9. In the San Miguel River SRMA, include an additional 76 acres just southwest of the confluence of Willow Creek and the San Miguel River. The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area. Manage as VRM Class II to be consistent with the ACEC and the two state-designated scenic byways.
10. In the Spring Creek SRMA, add nonmotorized trails to RMZ 3.
11. In the Spring Creek SRMA RMZ 2, allow competitive events.

F. Commenters also requested that the BLM conduct public workshops so the public can understand the complex network of potential Recreation Management Areas in the decision area.

G. One commenter recommended that benefits of recreation areas not be included in the RMP, as these are subjective.

*Response*
A. Public safety concerns related to recreational shooting were identified in public scoping as a concern to be addressed in the RMP revision. All management actions related to authorizing shooting range areas on BLM-administered lands will be consistent with BLM Instruction Memorandum 2008-074, which directs the BLM to authorize shooting sports areas, such as target ranges on BLM-administered lands via one of two ways: 1) Section 203 FLPMA Direct Sale, or 2) Recreation and Public Purposes Act Patents. Accordingly, all management actions related to recreational shooting, hunting, and fishing area closures will be consistent with BLM Instruction Memorandum 2015-157, which provides the procedures and steps that BLM must follow in order to comply with congressional direction contained in the Consolidated and Further Continuing Appropriations Act 2015 (Public Law 113-235) related to reporting proposed closures of BLM-administered lands to recreational shooting, hunting, or fishing on a nonemergency basis for more than 30 days. The Proposed RMP/Final EIS was updated to reflect management actions consistent with BLM Instruction Memoranda 2008-074 and 2015-157, as appropriate. See response in Section 30, Socioeconomics, of this report, which is related to economic contributions of recreational shooting. Furthermore, additional information was added to Chapter 3 of the Proposed RMP/Final EIS related to current dispersed recreational shooting, as well as current resource conflicts with recreational shooting in the decision area. Analysis was added on dispersed recreational target shooting. However, note that the BLM does not condone creating undesignated target shooting areas on BLM-administered lands. Taking an accurate inventory of user-created and, therefore, undesignated target shooting areas is difficult to conduct within the RMP planning area due to their dispersed nature and irregularity of when and where they are created. Regarding recreational shooting in WSAs, the BLM must take or

BLM_0165447

allow no action which precludes Congress's authority of designation of WSAs. In these areas, therefore, the resource takes precedence over recreational activities (see BLM Manual 6330, Management of BLM Wilderness Study Areas).

B. The BLM appreciates the comments.

1-4. As noted in the Draft RMP/EIS (Section 3.2.4, Recreation and Visitor Services, page 3-131), current BLM guidance (BLM Handbook H-8320-1, Planning for Recreation and Visitor Services) identifies SRMAs as administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation.

Potential conflicts between SRMAs and ERMAs and sensitive species are discussed in Section 4.3.6, Special Status Species (pages 4-140–4-164), specifically pages 4-152, 4-1254, 4-157, 4-158, 4-161, and 4-162.

SRMAs are designated to be the dominant resource within a specific area. The SRMAs presented in the Draft RMP/EIS are the result of scoping comments, field observations, and prior knowledge of areas where people tend to recreate. The SRMAs presented in the range of alternatives reflect these efforts.

As directed within BLM Handbook H-8320-1 (on page 1-37), the BLM considered overlapping designations within the Proposed RMP/Final EIS to determine if the SRMA can facilitate the visitor's ability to participate in outdoor recreation activities and protect the area's associated qualities and conditions.

ERMAs are identified as administrative units that require specific management consideration in order to address recreation use, demand, or recreation and visitor service program investments. Management of ERMAs is commensurate with the management of other resources and resource uses (Draft RMP/EIS page 3-132).

SRMAs and ERMAs in the decision area were proposed based on scoping comments, six focus group meetings in 2010, and specialists' knowledge of the recreation areas within the RMP decision area, in combination with guidance outlined in BLM Handbook H-8320-1, Planning for Recreation and Visitor Services, BLM Manual 8320, Planning for Recreation and Visitor Services, and related program guidance in BLM Handbook H-1601-1 Land Use Planning. Detailed description of each recreation management area, including prescribed setting character conditions, are included in Draft RMP/EIS Appendix J, Descriptions of Recreation Management Areas.

5. Thank you for your comment. Additional opportunities for recreation, including those in Ouray County, were analyzed throughout the Draft RMP/EIS. Specific trail designations will be determined in implementation-level travel management planning after the RMP is complete.

C. The Draft RMP/EIS alternatives presented and analyzed a range of recreational opportunities, including motorized and nonmotorized use. SRMAs and ERMAs vary by alternative, as do management actions and allowable uses in these areas (see Chapter 2, Table 2-1, Comparative Summary of Alternatives, on page 2-12 and Table 2-2, Description of Alternatives, on pages 2-216–2-300). Targeted Activities, experiences, benefits, and recreational character settings, as

BLM_0165448

well as management actions and allowable uses, are also included in Draft RMP/EIS, Appendix J, Descriptions of Recreation Management Areas. There are multiple areas where travel is limited to nonmotorized, as noted in detail in Draft RMP/EIS Table 2-2, page 2-302, line 477; page 2-303, line 478; and page 2-304 – 2-306, line 480 such as the nonmotorized trails designated off Highway 90 in the Lindsey Canyon Area within Dry Creek and some trails along the San Miguel River. Additional areas where travel is addressed are located in Goals for specific recreation areas, are detailed in Draft RMP/EIS Appendix J, Description of Recreation Management Areas, and the travel implementation process in Draft RMP/EIS Appendix M, Travel Management.

D. The BLM appreciates the comments.

1. Draft RMP/EIS page 3-136 presents the UFO's monitoring protocol. As stated: "The UFO recreation staff and law enforcement officers monitor all forms of recreation activities and public use for user conflicts, recreation effects on natural and cultural resources, visitor health and safety issues, and conflicts with adjacent private landowners. In addition, recreation staff monitors implementation of recreation management actions and the attainment of management objectives." The Draft RMP/EIS also states on page 1-19: "Implementation of the RMP would be monitored and periodically evaluated based on guidance in the BLM's Land Use Planning Handbook, H-1601-1 (BLM 2005a), as amended. Monitoring is the process of tracking and documenting the implementation (or the progress of implementation) of land use plan decisions." Finally, direction in BLM Handbook H-8320-1, Planning for Recreation and Visitor Services, on pages IV-14 – IV-17, states that if conflicts occur in high-use recreation areas, adjustments to management may be made based on results of monitoring.

2. Designation and development of trailheads, trailhead facilities, and recreational trails, including potential opportunities to connect trails, will be determined during implementation-level travel planning. In Draft RMP/EIS Chapter 2, Table 2-2, Description of Alternatives, pages 2-216–2-300, and in Appendix J, Description of Recreation Management Areas, facility development is addressed under each SRMA in the Management Actions and Allowable Use Decisions section and within each ERMA. Language was added to Appendix M, Travel Management, of the Proposed RMP/Final EIS, under the Route-by-route Designation Guidelines section that includes the consideration of travel and recreational facilities as needed during route-by-route travel planning.

3. Per BLM Handbook H-8320-1, Planning for Recreation and Visitor Services, and BLM Handbook H-1601-1, Land Use Planning, recreation administration, including special recreation permits, is an implementation-level decision. Implementation decisions allow site-specific actions to achieve land use planning decisions. Implementation decisions may be made in the land use plan (i.e., RMP) or subsequent planning efforts. Areas where permits would or would not be allowed are land use plan-level decisions, which were included in Draft RMP/EIS (see Chapter 2, Table 2-2, Description of Alternatives, on pages 2-219–2-221). The criteria used for issuing special recreation permits are not land use plan-level decisions. The BLM has the discretionary authority to deny an individual permit (see H-8320-1, page IV-9).

BLM_0165449

4. Facility development will be determined during implementation-level travel planning. In Draft RMP/EIS Chapter 2, Table 2-2, Description of Alternatives, on pages 2-216–2-300, and in Appendix J, Description of Recreation Management Areas, facility development is addressed under each SRMA in the Management Actions and Allowable Use Decisions section and within each ERMA, as well as during route-by-route travel planning.

5. As noted in the Draft RMP/EIS Chapter 2, line 528, where applicable, issue ROWs, leases, other authorizations, or agreements in lieu of withdrawals.

6. Specific interpretation and education management would be determined at the implementation stage and is not addressed in the Proposed RMP/Final EIS.

E. The BLM appreciates the comments. The BLM reviewed recommended edits and incorporated them in the Proposed RMP/Final EIS, as appropriate.

F. The BLM conducted several community assessment meetings in October and November 2008, recreational focus groups in February 2010, and public meetings for the Draft RMP/EIS in 2016, including the following:

- Monday, June 20, 2016 – Ouray County 4-H Events Center, Ridgway
- Tuesday, June 21, 2016 – Naturita Public Library Conference Room
- Wednesday, June 22, 2016 – Hotchkiss High School Commons Area
- Tuesday, June 28, 2016 – Delta Center for the Performing Arts
- Wednesday, June 29, 2016 – Montrose County Fairgrounds
- Thursday, June 30, 2016 – Wilkinson Library Program Room, Telluride

G. SRMA designation is based on a Targeted Recreational Opportunities and Outcomes approach. This approach incudes review of potential benefits from recreational areas. The approach is further described in Appendix J.

### Section 27.2 – Recreation: Best available information—baseline data

Total Number of Submissions: 5
Total Number of Comments: 6

Comment Number: 000218_RecceS_20160929-4
Organization1:National Rifle Association
Commenter1:Susan Recce
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.3 27.1
Comment Excerpt Text:
The DRMP notes on page 3-178 that requests for dispersed shooting areas are expected to increase and with that, concerns from adjacent landowners are also expected to increase. However, nothing in the DRMP indicates how the BLM will address the expected increase in recreational shooting and resolve anticipated conflicts with landowners. Neither does the DRMP address how the ability of the BLM to respond to the expected shooting demand will be affected by closing additional public lands as proposed in Alternatives B and D.
On page 3-176, the DRMP states that there are no designated target shooting areas within the planning area, and that the "planning area has several unofficial shooting areas in old borrow pits, gravel pits and other disturbed areas where there is a history of such use." These popular shooting sites are not

BLM_0165450

identified in the DRMP as being within or outside the areas being proposed for closure in Alternatives B and D.

Recommendation: Identify existing "unofficial shooting areas in old borrow pits, gravel pits and other disturbed areas where there is a history of such use" in the DRMP and provide further explanation as to how these individual areas would be impacted by the various alternatives proposed in the DRMP.

Comment Number: 000394_KoskiP_20161030-1
Organization1: West End Trails Alliance
Commenter1: Paul Koski
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
West End communities currently face an impending economic disaster with the scheduled closing of the Nucla Station power plant and supplying coal mine by 2022. The State of Colorado, Montrose County, Region 10 and the Department of Local Affairs among others have already begun the discussion about diversification of these local economies. One of the most promising is the development of outdoor recreation. We are currently involved with an initiative called Blueprint 2.0 which will create a plan to develop an outdoor recreation industry
here in the West End based on successful trail models implemented in other Colorado communities. We believe a working relationship with the BLM-UFO is necessary in order to develop recreational features such as camp sites, trail signage, kiosks, trail connectors and stacked loop trail systems which will enhance current efforts to identify existing trails for area residents and visitors. The resource Management Plan should address these efforts that local communities, impacted by surrounding Public Lands, are currently undertaking.

Comment Number: 000489_JohnsonA_20161101-71
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
2. Planning for Recreation and Visitor Services
In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).
In general, we support the extensive and special Recreation Management Areas that are evaluated in the range of alternatives targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." Id. at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data.

BLM_0165451

Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM)[64] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

[Footnote 64]

http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

Summary of Comments: In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.


Comment Number: 000501_Bockus_20161101_NPS-5
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
PAGE/PARAGRAPH: 3-203
COMMENT: Trends section. The western Colorado landscape is littered with "interpretation," usually wayside panels, created decades ago, which are now terribly outdated. The information contained on them is sometimes incorrect, and the materials, often fiberglass embedded, are so weather- worn they are difficult to read and present an embarrassing condition. The plan seems to foreshadow many places to be "interpreted," but doesn't suggest how the places will be monitored to determine if the interpretation has encouraged visitor impacts to the point that the resources are damaged or destroyed. It also suggests that many partners will likely provide the financial resources to install them (often through grant money, for which there are seldom replacement dollars), without a plan to update or replace dilapidated or vandalized materials. As mentioned above, a separate strategy to identify the most worthwhile places, which can also be protected, would be a worthy consideration. Sometimes government offices embrace opportunities because "interpretation" buys agency good will. While this is a valid goal, it often creates unsustainable conditions and unintended resource impacts which become impossible to reverse. Coupled with all of the trails and recreational facilities identified in this plan, it's possible that BLM could become overextended. Good advance planning helps to interface with

communities and partners so understanding can be realized with them, while also providing for sustainable conditions and good resource stewardship.

Comment Number: 000545_SlivkaJ_20161101-135
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Recreational opportunities and access. The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed by the Forest Service, National Park Service, BLM and the State of Colorado. [Footnote 37 DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.
...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist. [Footnote 38 Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.] Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties. [Footnote 39 Ibid.] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels. And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a more settled visit. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Among area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors.

Comment Number: 000545_SlivkaJ_20161101-24
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
III. Recreation a. Planning for Recreation and Visitor Services
In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).
In general, we support the extensive Recreation Management Areas that are evaluated in the range of alternatives, including in the preferred alternative, targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the

BLM_0165453

["participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.]

primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." Id. at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data. Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) [Footnote 7: http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

Summary of Comments: In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP.

*Summary*

A. Commenters stated the BLM did not utilize sufficient background data or studies to inform recreation analysis and alternatives development. Commenters stated the importance of monitoring methods, such as social surveys and visitation rates.

B. Specifically, commenters requested that the BLM include information on current unofficial shooting areas and how the BLM plans to accommodate the anticipated increase in this recreation activity in the planning area.

C. In addition, commenters noted that the RMP should include information on the efforts that local communities, impacted by surrounding public lands, are currently undertaking to develop recreation facilities.

BLM_0165454

*Response*
A. Multiple efforts were taken during the scoping phase of the RMP planning process;' these included six recreational focus group meetings throughout the planning area, community assessment meetings, and scoping meetings to gather data. The BLM has continually monitored and collected data to estimate visitation and use numbers through the BLM Recreational Management Information System (RMiS) (see Draft RMP/EIS Section 3.2.4, Recreation, on pages 3-130–3-137). The Recreational Management Information System is the BLM's internal application that aggregates information pertaining to BLM-administered land used for public recreation purposes. Since 1984, Recreational Management Information System has been the official record for outdoor recreation information on BLM-administered lands. It is the best available information and appropriate for use in a landscape-level analysis, along with the reports from the community assessment, recreation focus groups, and scoping comments. Traffic counter data collected throughout the UFO is adjusted using area-specific formulas to help to estimate use. Additionally, results from site-specific user surveys, as available, are used to determine visitor demographics and recreation preferences. Many visitation areas in the decision area lack direct visitation facilities and are multi-use areas, limiting collection of site-specific data. The BLM acknowledges the trends towards an increased demand for recreation (Draft RMP/EIS Section 3-130, page 3-137).

B. It is noted in Draft RMP/EIS Section 3.4.2 that requests for target shooting areas are likely to increase. Draft RMP/EIS Section 2.6, Table 2-2 (pages 2-221–2-223), presents the alternatives to limit target shooting to protect natural resources and/or where public safety is at risk. Refer to response part A of Section 27.1 – Range of alternatives (Section 27 – Recreation), above.

C. The BLM relies heavily on its partnerships with local governments, communities, organizations, and clubs, as stated throughout the Draft RMP/EIS (for example, see Section 3.2.4, Recreation Visitor Services, on pages 3-130 – 3-137; Section 3.3.4, National Trails and Byways, on pages 3-167 – 3-170; and Section 3.5.2, Interpretation and Education, on pages 3-202–3-203). The BLM also conducted community assessment meetings in October and November 2008 and recreational focus groups in February 2010, all of which were taken into consideration during Draft RMP/EIS formation. As noted in Section 1.2, Description of the Planning Area (page 1-4), management direction and actions outlined in the RMP apply only to the decision area, which is comprised of planning area BLM-administered lands. Therefore, baseline recreation information focuses on BLM-administered lands. Information for actions occurring on non-BLM-administered lands in the planning area are discussed under the cumulative impacts analyses in Chapter 4. The BLM appreciates the comments. Efforts being undertaken by local communities to develop recreation on surrounding lands were added to cumulative impacts analyses in the Proposed RMP/Final EIS.

### Section 27.3 – Recreation: Impact analysis
Total Number of Submissions: 8
Total Number of Comments: 9

Comment Number: 000130_WassellP_20160903-9
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual

BLM_0165455

Comment Excerpt Text:
-BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities.

Comment Number: 000218_RecceS_20160929-3
Organization1:National Rifle Association
Commenter1:Susan Recce
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Alternative D proposes to close 49,370 acres to recreational shooting. It would maintain closure of lands around recreational facilities and, like Alternative B, it would close certain ACECs and SRMAs to recreational shooting. The DRMP explains that the ACEC and SRMA closures are designed to "increase the quality of other recreation opportunities", or provide for "quiet trail or water-based activities," or for those "users seeking opportunities for primitive and unconfined recreation." We appreciate the need to provide well-balanced opportunities for a variety of recreation experiences; however, it is impossible to determine if the BLM will achieve the appropriate balance without data on the impacts, individual and cumulative, that these closures will have on shooters who are the only group of recreationists facing the entire loss of access under Alternative D and Alternative B that is currently open to them. All the DRMP states is that "prohibiting target shooting in certain areas would reduce opportunities for this activity." To understand the true impact, one needs to know how many shooters will likely be affected, where the alternative locations to recreate are that have similar or better access, and what the effect will be on crowding and safety of driving displaced recreationists to areas used by other shooters.
For example, a person who recreationally shoots in the North Delta SRMA contacted a member of the Roundtable to say that the area would be well suited for target shooting and does not understand why it is proposed for closure. Under Alternative D on page 2-415 it is called the North Delta OHV area, implying that it will be closed to recreational shooting to accommodate off-highway vehicle (OHV) use. He explains that the area is remote and virtually unused except for target shooting and some OHV use. We share his concern because the DRMP does not lend understanding as to why both activities could not be accommodated if the recreational use is sparse and demand for places to shoot is expected to increase (as described below).
Recommendation: Under Alternative D on page 2-415, the BLM should provide further analysis and explanation regarding the inability of the North Delta OHV area to accommodate recreational shooting. Such analysis should provide the public with a description of how the area is currently used and an explanation as to the types of user conflicts that have been observed and what is predicted in the future. The analysis should also include the number and types of recreational users who would be impacted by the restrictions proposed in Alternative D.

Comment Number: 000363_RogersM_20161031-2
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Comment Excerpt Text:
The info on Special Recreation Management Areas (SRMAs) makes it difficult to untangle from other designations. SRMA's are a good thing unless they degrade the resources that they are overlapping. Big game corridors and EEA's are both impacted by the proposed SRMA's. This needs to be looked at carefully before proceeding.

BLM_0165456

Comment Number: 000483_HanksG_20161101-3
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Although some language pertaining to fish and wildlife in general was found within the DRMP, there was no reference to the overall fisheries aspect on the DRMP footprint. Like hunting, recreational fishing requires a different type of relationship with the wildlife we pursue as sportsmen and women. Overall, year round, health of the total population is important, not just singular instances or point impacts. With recreational travel management, recreational shooting, and wildlife viewing areas requiring complete analyses and sections within the DRMP, we ask for similar level of consideration for the traditional sporting recreation of hunting and fishing. Our chosen form of recreation may not come with some of the larger impacts of others, but it is certainly affected by management decisions within the DRMP and, not free from serious cumulative implications.

Comment Number: 000489_JohnsonA_20161101-51
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.1
Comment Excerpt Text:
3. Roeber and McCluskey State Wildlife Area
The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.

Comment Number: 000594_MorrisL_20161028-3
Organization1:
Commenter1:Leah Morris
Commenter Type: Individual
Comment Excerpt Text:
Hunting, hiking, fishing, biking, camping, and other recreation will be threatened as wildlife corridors, trails, scenic beauty, and water sources are ruined by roads and pollution.

Comment Number: 000605_BushnellH_20161021-2
Organization1:
Commenter1:Helen Bushnell
Commenter Type: Individual
Comment Excerpt Text:
The Uncompahgre Plan is does not take into account the needs of the agricultural and recreation industries

Comment Number: 000637_PattersonC_20161031-2
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual

BLM_0165457

Comment Excerpt Text:
As long as the destination is desirable, the outdoor recreation industry is stable and dependable. Pristine, wild, clean public lands will attract visitors indefinitely.
Oil and gas development in the NFV will destroy the wild, unspoiled landscape, which is critical attracting visitors, sportsmen. Wastewater ponds, condensate tanks, storage tanks, gas wells, sand trucks, flaring wells, dust, noise, lights, foul orders, polluted air and water are not compatible with an outdoor experience.
BLM did not consider how industrial oil and gas activities decrease recreational value of BLM lands, which are public and belong to all citizens.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-13
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.3 27.3 32.3
Comment Excerpt Text:
In Dry Creek, the final RMP needs to recognize that not all trails are created equal, but rather factor in the mileage-requirements of long distance trail uses such motorized and mechanized, along with the additional habitat fragmentation these additional miles create. The RMP needs to analyze projected fragmentation by trails in this and other high use areas, to assess the carrying capacity of the land and to establish an upper limit on the amount of trail fragmentation that will still maintain habitat connectivity and BLM Land Use Health Standards into the future.

*Summary*
Commenters requested that the BLM provide additional analysis of the following:

1. Decreased recreational value of BLM-administered lands from oil and gas activity
2. Further analysis and explanation regarding the inability of the North Delta OHV area to accommodate recreational shooting
3. How SRMAs would be impacted by other overlapping designations
4. Traditional hunting and fisheries aspects of the planning area
5. Increased recreation and trail development and the impacts on wildlife habitat, particularly for big game winter range in the lower-elevation valleys and foothills
6. Regarding trails in Dry Creek, refer to Section 14.3, Fish and Wildlife – Impact Analysis, of this report.

*Response*
The BLM appreciates the comments. The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action (BLM Handbook H-1790-1, Section 6.8.1.2). The RMP/EIS analysis is intended to provide sufficient detail to inform the decision maker of the reasonable effects anticipated from planning for future development; the site-specific review of individual well pads, roads, pipelines, or other surface activities will be addressed at the permitting stage. Analysis of the noted topics was included in the Draft RMP/EIS at a level commiserate with RMP planning analysis, as follows:

1. General impacts on recreational areas from oil and gas development, including the application of stipulations, are discussed in Draft RMP/EIS Chapter 4, Section 4.4.4, Recreation and Visitor Services (page 4-294).

BLM_0165458

2. As noted in the Draft RMP/EIS (see Table 2-6 on page 2-415), prohibiting target shooting in certain areas, including the North Delta OHV area, would reduce opportunities for this activity but would increase public safety in many parts of the decision area by focusing target shooting in appropriate locations. The North Delta OHV area is a very popular recreational area where dispersed target shooting can pose a public safety risk. In past years there have been complaints issued by the Town of Delta and other individuals about the concern for their and other's safety within the area due to target shooting. There has also been at least one report of a vehicle receiving a bullet hole after being parked in the North Delta OHV area.

3. Impacts on SRMAs from overlapping designations are discussed in Draft RMP/EIS Chapter 4, Section 4.4.4, Recreation and Visitor Services (pages 4-291–4-315). The BLM reviewed specific management in overlapping areas to determine if clarification is required and incorporated them in the Proposed RMP/Final EIS, as appropriate. As directed within BLM Handbook H-8320-1 (on page I-37), the BLM considered overlapping designations within the Proposed RMP/Final EIS to determine if the SRMA can facilitate the visitor's ability to participate in outdoor recreation activities and protect the area's associated qualities and conditions. As noted in Draft RMP/EIS Section 4.1.2, General Methodology for Analyzing Impacts (page 4-5), in instances where varying management levels overlap, the stricter management prescriptions would apply.

4. Proposed RMP/Final EIS Chapter 3 was updated to better reflect existing hunting and fishing opportunities within the decision area. Although some impacts on hunting and fishing activities are discussed in Draft RMP/EIS Chapter 4, Section 4.4.4, Recreation and Visitor Services (pages 4-291–4-315) under each alternative, these impact analyses were updated in the Proposed RMP/Final EIS to correspond to potential impacts presented in the Chapter 4 Fish and Wildlife and Water analyses, as appropriate.

5. Impacts of recreation on wildlife, including big-game habitat, is addressed in Draft RMP/EIS Chapter 4, Section 4.3.5, Fish and Wildlife; for example, see page 4-129.

6. Refer to the response in Section 14.3, Fish and Wildlife – Impact Analysis, of this report.

### Section 27.4 – Recreation: Cumulative impact analysis
Total Number of Submissions: 1
Total Number of Comments: 2

Comment Number: 000420_HovdeC_20161101-21
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
The UFO RMP does not address the cumulative impact of continued decrease in areas for recreation and what that continual narrowing of where the public can go on the remaining open areas. The USFS and BLM have been given directives to get more people outdoors and with that mean an increased usage. More and more recreationists are discovering this area and the continual narrowing of choices will have a major impact on the landscapes that are open. This is not discussed in this document.

Comment Number: 000420_HovdeC_20161101-23
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government

BLM_0165459

Other Sections: 35.4
Comment Excerpt Text:
The view shed in Delta County that is often prioritized and wildlife habitat that is highlighted is due to large landscapes of habitat that are not fragmented but are highly productive because they are a working landscape. That working landscape is tied to the ability to utilize BLM lands and the two are connected and dependent on each other. The large landscapes contribute to the recreationist's satisfaction and the view shed adds to a tourist's willingness to provide a favorable review of the area. Single species management of BLM lands or continued restricted use of our public lands will have unintended consequences that will not be undone with the next plan or NEPA document. Delta County Board of Commissioners urges the multiple use mandate of the BLM to continue and to not be marginalized as is documented in the Uncompahgre Field Office Draft Resource Management Plan.

*Summary*
Commenters stated that the Draft RMP/EIS fails to consider the impact that increases in overall recreation, coupled with decrease in recreational areas, would have on the remaining areas, and the impact that the decrease in viewshed would have in the recreationalist's satisfaction with the area.

*Response*
The Draft RMP/EIS recognizes the growth in demand for recreation areas in Section 3.2.4 (page 3-137), which notes that effective management is necessary to mitigate impacts and states that additional SRMAs may be prescribed in the future. Section 4.3.11 and page 4-199 note that "many people live and recreate in the planning area because of its remoteness and visual qualities," and impacts on visual resources, including viewshed, are further discussed in that section until page 4-212.

### Section 27.5 – Recreation: Mitigation measures
No comments are associated with this topic.

### Section 28 – Renewable Energy
Total Number of Submissions: 4
Total Number of Comments: 10

Comment Number: 000157_BrettE_20161018-2
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
The New Energy Frontier would promote and expand the efforts of groups like Solar Energy International (SEI) and use our public lands for solar energy generation. The UFO region has plenty of sunny days. Weather data indicates this as a prime region for solar power generation. My personal experience with PV Solar is that conscientious construction that includes consideration for passive solar, PV solar and Thermal solar is more than adequate for our energy needs. The Solarize Delta County program (by SEI) is expanding PV solar usage.
Areas such as the "dobies" between Crawford and Paonia and between Hotchkiss and Delta are prime targets for solar energy production.

BLM_0165460

Comment Number: 000420_HovdeC_20161101-30
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Page 2-377, Line 640, Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located.

Comment Number: 000447_LeValleyM_20161101-8
Organization1:LeValley Ranch
Commenter1:Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
o Page2-377, Line 640, Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located.

Comment Number: 000588_WitherillD_20161101-1
Organization1:
Commenter1:Deirdre Witherell
Commenter Type: Individual
Comment Excerpt Text:
. The Draft RMP should include alternatives which put renewables on equal footing with coal development.
The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development. However, the RMP is skewed in favor of coal development over renewables. The draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing.
But the alternatives leave between 76% and 99.3% of all lands with coal development potential open to leasing. This prioritizes coal develop on these lands over the myriad other potential uses and values. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%).1
Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).
1 See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).

Comment Number: 000590_DascaluJoffeD_20161101-4
Organization1:
Commenter1:Diana Dascalu-Joffe
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165461

BLM's failure to analyze alternatives that would restrict fossil fuel development is all the more arbitrary given that BLM considers prohibiting renewable energy development—including wind and solar—on 95% of the resource area.

Comment Number: 500145_FrankC_20160808-3
Organization1:
Commenter1:Christine Frank
Commenter Type: Individual
Comment Excerpt Text:
There is also nothing in the RMP calling for the development of renewable wind and solar power, which would allow us to keep the dirty hydrocarbons in the ground and drastically reduce greenhouse gas emissions.

Comment Number: 000563_King_WELC_HasAttach-22
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
None of the alternatives considered look specifically at renewable energy. However, a transition to clean energy is critical to achieving the national climate goals discussed in Section 1 of these comments. Several statements of national policy in regulations and executive orders create an obligation for BLM to look more closely at renewable energy as a resource in the Uncompahgre Field Office planning area. As of 2010, these include:
• The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of non-hydropower renewable energy on public lands by 2015. The President has requested that BLM produce an additional 10,000 megawatts beyond that mandated in the Energy Policy Act of 2005.
• Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production.
• Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing solar energy systems on BLM administrative facilities and projects.
• Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands.
• Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.
• Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the Federal Register revised the authority of 48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-19
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews

BLM_0165462

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As the Secretary of Interior has recognized, opening up more federal lands for fossil fuel production could not only affect the amount of coal produced, but also the amount of wind and solar generation in our energy grid. That is why, in ordering a comprehensive study of the climate impacts of the federal coal program, the Secretary directed the Department of Interior to evaluate "how the administration, availability, and pricing of Federal coal affect regional and national economies (including job impacts), and energy markets in general, including the pricing and viability of other coal resources... and other energy sources."42 The Secretary further directed the Department to study, "[t]he impact of possible program alternatives on the projected fuel mix and cost of electricity in the United States."43
[42 Secretarial Order 3338 at 8 (Jan. 15, 2016) available at
http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_rele
ase_attachments.Par.4909.File.dat/FINAL%20SO%203338%20Coal.pdf (last visited July 1, 2016).]
[43 Id.]
BLM makes no attempt to analyze market changes and instead ignores the issue altogether. Nor can BLM simply punt on market effects until it finishes that programmatic review. Simply because BLM might complete a discretionary review, untethered from any particular proposal, at some point in the future does not mean that BLM can dodge meaningful consideration of its proposals here. The Draft Plan prepared by BLM, if not vastly improved, would constitute an unlawful dodge – preventing both the public and decision makers from fully understanding the environmental impacts of the choice BLM is making.

Comment Number: 000563_King_WELC_HasAttach-23
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that "the demand for renewable energy ROWs would increase over the life of this RMP." DEIS 4-336. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in the planning area, stating that: "Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential." DEIS 3-151. The DEIS further states that "the demand for renewable energy-related ROWs should increase nationally, although within the planning area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM." DEIS 3-152. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy.

Comment Number: 000563_King_WELC_HasAttach-24
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Importantly, the BLM also fails to consider the impacts of coal and oil and gasdevelopment on renewable energy resources and the potential incompatibility of these resource uses. The DEIS identifies the impacts of protections for ecological, scenic and recreational resources on wind and solar development, including exclusion and avoidance areas. DEIS 2-376. But the DEIS does not examine in depth the impact of oil and gas development on high renewable energy potential areas, simply stating generally that:

Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail: air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses,
wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, energy and minerals, comprehensive trails and travel management, lands and realty,
renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety. DEIS 4-338 (emphasis added).
Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted: Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development. DEIS 4-341.
Given the urgent need to transition away from fossil fuels and toward renewable energy to meet our nation's commitment to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development. Further, the BLM is required to include a renewable energy alternative or include renewable energy as a priority element in each alternative to ensure that a thorough analysis of this important public lands resource is conducted.

Comment Number: 500268_BearS_21060930_DMEA-5
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
500268_BearS_21060930_DMEA-13
• The Renewable Energy section [Chapter 3] does not address hydropower. (Hydropower is addressed in Chapter 4.) DMEA has been very proactive in developing this type of renewable energy source (e.g.; the South Canal hydropower facilities) and continues to receive numerous requests from its consumers about small scale hydropower projects. Opportunities for low head hydro should be addressed.
• It is also worth noting that developing a renewable energy facility also requires it to be connected to the grid via a ROW (e.g.; a connected action) for it to be feasible.

*Summary*
A. Comments requested that the BLM include alternatives further considering renewable energy.

B. Commenters stated that the planning area is a prime candidate for solar energy development, and there is a need for flexibility of where renewable infrastructure can be located.

C. Commenters stated that the BLM did not adequately analyze the potential for renewable energy in the planning area, and did not attempt to analyze market changes in regards to renewable energy development, which prevents both the public and decision makers from fully understanding the impacts.

D. Commenters were concerned that allowing fossil fuel development would preclude potential renewable energy development and stated that the BLM failed to consider the impact that oil

BLM_0165464

and gas development will have on area renewable energy potential, and did not put renewables on equal footing with coal development. They further stated that the BLM's failure to analyze alternatives that would restrict fossil fuel development is arbitrary given the restrictions that would occur due to the allowed level of fossil fuel development.

E. One commenter requested that Chapter 3 be updated to include information on current conditions and demand for hydropower and to note that developing a renewable energy facility also requires it to be connected to the grid via a ROW for it to be feasible.

*Response*

A. The Draft RMP/EIS considers alternatives addressing renewable energy. See Table 2.3, and the Renewable Energy Potential Study Report (BLM 2010) that was prepared in support of the RMP.

B. The UFO is managed as an exclusion area for utility-scale solar (greater than 20 megawatts) based on the direction in the Solar Programmatic EIS (BLM 2012c). This direction would not be impacted by the RMP decisions and would limit utility-scale solar development under all alternatives. However, future proposed projects for less than utility scale would be evaluated on a case-by-case basis under the ROW regulations at 43 CFR 2800.

C. Renewable energy potential for the decision area was assessed based on best available data and is addressed in the Renewable Energy Potential Study Report (BLM 2010) that was prepared in support of the RMP. Analysis of renewable energy is addressed at a broad scale appropriate for an RMP; see Draft RMP/EIS Section 4.4.7 (pages 4-335 to 4-341). Proposed future projects for less than utility scale would be evaluated on a case-by-case basis under the ROW regulations at 43 CFR 2800.

D. As stated in Draft RMP/EIS Section 4.4.3 starting on page 4-253, minerals and renewable energy are based on their resource potential, and development potential is based on its economic feasibility to develop such resources. As further stated, mineral development would have negligible or no impact on renewal energy development, as it is reasonable to assume that either the mineral projects or the renewable energy projects could be sited such that they could be compatibly developed. For example, each resource would be likely to have some level of flexibility such that projects could be sited in close proximity and not necessarily in the exact same locations.

E. Although most hydropower in the UFO is located on BOR-administered lands, such as the South Canal Hydropower Facility, the Proposed RMP/Final EIS was updated to include an overview of hydropower in Chapter 3 as appropriate and to note that renewable energy facilities would require connection to the grid via ROW.

## Section 29 – Saleable Minerals (Mineral Materials)

No comments are associated with this topic.

BLM_0165465

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 524 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

## Section 30 – Socioeconomics and Environmental Justice

Total Number of Submissions: 27
Total Number of Comments: 31

Comment Number: 000274_MattelianoM_20161031-2
Organization1:
Commenter1:Melanie Matteliano
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley is important to Colorado. This place is critical habitat for wildlife, and a key supplier of local produce and agricultural products to Colorado markets. This place is a destination for foodies and agro-tourists, hunters, fishers, and outdoor enthusiasts. This place is home to local communities comprised of families who have been here for generations, and for enthusiastic newcomers who want to foster the local way of life for generations to come. The best assets of the North Fork Valley are the pristine areas of wilderness, and the unique ecology and climate that foster the highest concentration of organic farms in the state. If the valley is industrialized, all of that will change. Local organic farmers will lose their livelihoods to soil and water contamination, and to decreased demand for North Fork Valley produce. Tourists will be turned off by the loss of wilderness areas and the concern over contaminated air, water, and local food products. Hunters will be forced to follow their displaced game to other areas in Colorado. The health of the families who live here will be put at risk, people will suffer from increased rates of respiratory and cardiovascular disease. The entire identity of the region will be transformed, slowly and surely, by the onslaught of trucks, drilling pads, gas wells, container ponds, storage tanks, wastewater pits, and pipelines, by the noise and the air pollution.
This proposal is an irresponsible and inappropriate use of public lands, and the potential for human, animal, and environmental damage is simply too high. I implore the BLM to reconsider the proposal, in light of the unique value of the North Fork Valley as a recreational haven, an important wilderness and agricultural area, and a crucial supplier of organic food to Colorado.

Comment Number: 000277_BackusD_20161031-1
Organization1:
Commenter1:Dolores Backhus
Commenter Type: Individual
Comment Excerpt Text:
Development of the leases would negatively impact and impede local investments and resources required in transitioning and maintaining the economy to one based on agri-tourism, recreation, renewable energy, agriculture, and organic food. Development would contribute to increased greenhouse gas emissions, and climate change impacts on community resources (agriculture & wildlife).

Comment Number: 000314_HixL_20161022-2
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
The potential for adverse economic impact to our farms, ranches, orchards, wineries and tourism/outdoor recreation is too great a risk for widespread fracking. A reasonable approach might be to determine, along with the community, where adverse impact is minimal and will not affect or destroy the economies already in place or endanger water & food sheds.

BLM_0165466

Comment Number: 000387_HudekH_20161101-1
Organization1:The Hive Paonia
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
our business relies on entrepreneurs, people who come to this area with new ideas and build businesses which are beneficial. They are vital to the economy of Delta County, and they bring economic stability. They come here to live a life with an abundance of fresh food and outdoor recreation. Maintaining water safety, space for exploration, scenic views, and a healthy environment are integral to attracting and keeping these families here. Oil and Gas development threatens these needs.
The more new residents we attract, the more success is possible for small businesses, consultants, and artists. Creative people are attracted to the inspiration provided by the area's beauty and people who live here. Internet speed upgrades in Paonia will attract more tele-commuters and entrepreneurs. These people are looking for a quieter life, where they can breath fresh air, grow and purchase fresh food, and have quick access to public lands and recreation – all leading to longer, healthier life. We must retain this quality of life and protect the area from over-development, loud trucks, and polluted water. Real Estate agents market the healthy setting, organic farms, and wineries. A group of area realtors filed a joint protest stating that oil and gas development "would result in the Federal Government willfully vandalizing a local economy." We need families to build a stable economy. Many people who consider moving here for the quality of life we have, will no longer consider the move if there is oil and gas development – for the safety of their families.

Comment Number: 000403_HamnerM_20161031-2
Organization1:Colorado House of Representatives
Commenter1:Millie Hamner
Commenter Type: State Government
Comment Excerpt Text:
Activities on public lands should not have the potential to destroy clean air, abundant fresh water and foodsheds, which the public depends on. The North Fork economy, the recreational opportunities it provides, and the hundreds of thousands of people who depend on the food produced here rely on clean air and water. Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines could be seriously impacted by air pollution or surface, ground, and/or water contamination that have been linked with oil and gas extraction

Comment Number: 000420_HovdeC_20161101-19
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 32.2
Comment Excerpt Text:
The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic drivers for the entire regions. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Delta County urges the BLM to consult with the affected counties to prepare an accurate inventory of roads.

Comment Number: 000420_HovdeC_20161101-22
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government

BLM_0165467

Comment Excerpt Text:
Delta Board of County Commissioners urges the BLM to seriously consider the local economies when planning for the next 20-30 years. Delta County is 57% federally owned and the decisions made in these planning documents have real consequences as noted in the last three years with the decline of our coal industry. Delta County is diversifying its economy; however the base of the economic engine is still related to dependency on federal lands. It is easy for those that are not near the ground to make decisions because it is the politically correct or it looks good on a map but these are real jobs and people that need to able to count on the dependability and sustained yield of the BLM lands.

Comment Number: 000429_ElaS_20161101-1
Organization1:Ela Family Farms
Commenter1:Steve Ela
Commenter Type: Individual
Comment Excerpt Text:
Additionally, our organic certification is dependent on demonstrating that no contamination on non-allowable substances occurs. We have to test the water we use for contaminants and if they were to appear, we would potentially lose our certification and one of our main marketing attributes. Since we annually generate over a million dollars of revenue from our marketing, this would have a dramatic impact on our income and livelihood.
In addition to water, our orchards depend on the clean air of the valley. While the main wind direction during the day is from the southwest, at night we experience a wind shift and the main flow is from the north east as the downslope winds kick in. This means that there is the potential for any air contaminants from anywhere to the east or west of us to be distributed over our area. Again, our organic certification depends on documenting no outside contaminants and we are obligated to maintain buffer strips around our orchards to prevent contamination. However, any air contaminant would be very difficult to mitigate and could again jeopardize our certification.

Comment Number: 000433_FielderA_20161029-4
Organization1:
Commenter1:Adrian Fielder
Commenter Type: Individual
Comment Excerpt Text:
Worst of all, the operators who wish to conduct mining activity on these lands are not required by your RMP to prove the safety of their proposed activity, as would be the case if this agency were applying the Precautionary Principle to its decisions. In the absence of proof that industrial activity on these public lands would cause no harm to the communities living here, it is not acceptable, or even permissible, for your agency to allow forms of development that could undermine the economic vitality of our region, as fossil fuel extraction would most likely do.

Comment Number: 000437_GentryC_20161028-1
Organization1:
Commenter1:Chris Gentry
Commenter Type: Individual
Comment Excerpt Text:
This valley possesses unquantifiable value in fruit and vegetable production and boasts more organic farms per square mile than any other location in Colorado. We are becoming a national model for biodynamic farming, permaculture practices and self-sustenance. Organic farms, vineyards, wineries, and a host of other local businesses make this valley truly special. This goes without mentioning the multitude of outdoor recreation opportunities also available here that would be adversely affected by gas/oil/coal development.

BLM_0165468

Comment Number: 000437_GentryC_20161028-2
Organization1:
Commenter1:Chris Gentry
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
Regarding the agricultural base and related businesses in the North Fork Valley, there is no way they can operate in tandem with gas and oil development when their lifeblood is this watershed which will be at risk if these lands are opened to leasing. Multi-stage fracking and horizontal drilling have definite risks and it seems these were not considered within this new RMP.

Comment Number: 000437_GentryC_20161028-3
Organization1:
Commenter1:Chris Gentry
Commenter Type: Individual
Comment Excerpt Text:
I cannot understate how vital, undisturbed natural resources are to local economies and the tax revenues generated through outdoor recreation and tourism. As Colorado continues to attract new residents, people are looking more and more to the western slope for both residence and recreation. Implementing oil, gas and coal development in the North Fork Valley would absolutely stifle the progress and vitality that many have worked so hard to achieve.

Comment Number: 000442_HickamC_20161028-2
Organization1:
Commenter1:Carol Hickam
Commenter Type: Individual
Comment Excerpt Text:
We are not just an isolated group of people. Tourists are flocking here to escape into the pristine valley where we live. Restaurants and farmer's markets in the front range relying on local, organic foods get much of it from our farmers and ranchers. Our economy does not need fracking to survive. In fact, our local economies are in jeopardy if we have fracking. As the coal mines have shut down, there have been dire predictions for the schools, etc. The Delta County Schools student count is only down by 80. We are absorbing the loss of the coal industry due to our economy which is enhanced by non-industrialized public lands. Yes, we should do everything possible to support coal miners who have lost jobs along with helping them stay in this community if they choose. But, fracking jobs are not long term employment opportunities. It is the devastation of land and natural resources for short term employment and gain.

Comment Number: 000445_JanusJ_20161031-1
Organization1:
Commenter1:John Janus
Commenter Type: Individual
Comment Excerpt Text:
Yes it has a positive effect on our local economy in the short run though will leave our economy and land in ruins in a decade or so. Is this the kind of economy and environment you want to leave to your children and grandchildren. Yes it is easy to brush it off as everything will be fine and the gas and oil companies will make it all right. Historically this is not true. And the damage will be done forever. Significantly harming our sustainable and strong agricultural heritage. Real estate values will go down, and our tourist numbers will decrease.

BLM_0165469

Comment Number: 000483_HanksG_20161101-2
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The fisheries of the DRMP footprint play a huge part in the local economy. Indeed they are managed as a resource by the state wildlife agency, and revered for their recreational and business opportunities by locals and tourists. The socioeconomic impacts of these waters are elaborated on later in this document, but as of a 2013 report, an economic output from fishing alone in the South West region of Colorado, totaled $110 million[3]. The monies raised through state fishing license sales and the nationwide, Dingell-Johnson excise tax, earmarked for the conservation of these resources should be added to the total value of habitat based economy. Angler dollars are being spent on BLM land and will continue to be into the future so long as these fisheries remain healthy and productive.
[Footnote 3] "The Economic Contributions of Outdoor Recreation: A regional and county-level analysis." Southwick Associates study conducted for Colorado Parks and Wildlife, http://c.ymcdn.com/sites/www.cpra-web.org/resource/resmgr/imported/Colorado%20SCORP%20Econ%20Report%2011-27-13.pdf

Comment Number: 000544_ThompsonK_20161101-5
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual
Comment Excerpt Text:
The RMP does not adequately address the unique qualities of the NFV, most notably the bowl shape of the Valley and the post coal mining prolific organic farming and related businesses.

Comment Number: 000554_MommaertsM_20161101-2
Organization1:
Commenter1:Marissa Mommaerts
Commenter Type: Individual
Comment Excerpt Text:
At the same time, organic farming and ecotourism have the potential to create widespread economic benefit for our communities, if our natural resources are managed responsibly. These industries will actually build ecological and economic resilience in our region, rather than making our communities more vulnerable. And in an era of increasing economic and ecological instability, building community resilience is absolutely vital.

Comment Number: 000555_NicholofR_20161101-3
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Other Sections: 30.2
Comment Excerpt Text:
The following is from a study I conducted in 2002 and updated in 2012 on the potential impacts from oil and gas development to the wildlife-based economy of Delta County.
Wildlife and related resources are a major contributor to the economy of Delta County, both in direct and indirect expenditures as well as the unquantifiable "quality of life" and aesthetic values. The largest wildlife-related economic contributions are from hunting and fishing, which would be negatively impacted by natural gas drilling and development. The Colorado Division of Wildlife's latest report "The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" (BBC Research & Consulting,

BLM_0165470

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 529 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 –
Socioeconomics and Environmental Justice)

2008) determined that direct expenditures in Delta County from fishing, deer and elk and small game hunting in 2008 (based on data collected from 2006 to 2008) was $16,300,000. When the secondary economic impacts and CDOW direct expenditures are added, the total impact was $27,840,000. The state-wide Total Impact amounts to $1,843,300,000. These figures do not include the economic benefits of wildlife watching which totals $1,218,200,000 state-wide. While county-by-county amounts were not available in the report for wildlife watching, if we use the same ratio of Delta County/State of Colorado hunting and fishing applied to wildlife watching we get a figure of $18,394,800 of total economic impact for Delta County. In other words, according to this report the wildlife resources of Delta County are responsible for over 46 million dollars of economic activity in Delta County ANNUALLY.

Comment Number: 000559_KelloggV_20161030-2
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Comment Excerpt Text:
The economy of the North Fork Valley has traditionally been dependent on mostly farming, ranching and the coal mines. With the decline in the coal industry, many forces have come together to recreate our economy around the unique attributes of this area, growing our economy in the areas of ecotourism, recreational activities and the arts. This new direction is not compatible with oil and gas activities. Tourists do not spend their vacations and holidays in an area surrounded by industrialized oil and gas drilling activities!

Comment Number: 000571_GravesB_20161101-5
Organization1:
Commenter1:Ben Graves
Commenter Type: Individual
Comment Excerpt Text:
With the decline in the coal industry, the North Fork Valley needs to redefine and continue to diversify the economy. As a classroom teacher, I see firsthand what the loss of jobs and steady incomes does to the fabric of a community. I believe the BLM should do everything in its power to help the North Fork maintain the potential for a diversified economy through embracing public lands access, wildlife protection, scenic viewsheds and recreation with a balanced approach toward oil and gas development. Such a balanced approach recognizes that some locations are not appropriate for such development, when the development would compromise higher valued amenities.

Comment Number: 000572_McCurdy_20161101-2
Organization1:
Commenter1:Tracy McCurdy
Commenter Type: Individual
Comment Excerpt Text:
Our trails have important potential to bring significant economic benefits for the North Fork Valley that cannot be ignored. This past October 22, Paonia had our 7th annual "Gears and Beers" festival, which has its basis in mountain biking and road riding throughout our clean, scenic area, followed by enjoying local foods and refreshments. This year, the event was very successful and had high attendance from both locals and visitors, and I met several groups of riders who had travelled from neighboring areas, such as Grand Junction and Aspen. Mountain biking and other forms of outdoor recreation provide a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. We are just beginning to realize the economic benefits that mountain biking can bring to our valley, and DAMB/NFTAG as part of the greater organization of COPMOBA seek the

BLM_0165471

support of the BLM to realize this potential, as the BLM has done successfully for other areas on the Western Slope of Colorado.

With the involvement and support of the BLM, cycling-related revenue has grown to contribute approximately $1.5 million annually to the once-depressed economy of Fruita, Colorado, with significant increases in sales tax revenue, particularly coming from restaurants. For more on this success story, please see http://www.steamboattoday.com/news/2013/may/19/biking-series-part-2-how-fruita-did-it. More supporting evidence of the benefits of cycling on boosting economic growth can be found at: http://www.americantrails.org/resources/economics/economic-benefits-trails-macdonald.html http://www.pinkbike.com/news/economic-impacts-of-mountain-biking-tourism-2014.html, http://www.pinkbike.com/news/economic-impacts-of-mountain-bike-tourism-2016-update.html http://headwaterseconomics.org/trail/13-coldwater-mountain-bike-trail

While oil and gas development may benefit a small number of people in our community on a short-term basis, recreationally based tourism is sustainable and will benefit nearly everyone in the North Fork Valley either directly or indirectly: farmers, restaurants, shops, and those they employ. In the past several years, I've seen our tourism growing rapidly, as people from across the Western Slope and the Front Range of Colorado and from neighboring states learn of the beauty and healthy lifestyle our valley has to offer.

For example, an annual Cider Fest event at Delicious Orchards in Paonia has been more than doubling in popularity for the past 4 years, attracting hundreds of people, with many coming from other areas of Colorado and out of state. I've seen Delicious Orchards' overall success as an organic farm and store grow immensely over the past few years. Since opening 8 years ago, Revolution Brewing, Paonia's microbrewery, has regularly had to increase its brewing and tasting room capacity to meet the growing demand from locals and visitors. The brewery's tasting room is literally overflowing during high tourism months.

There are many interrelated reasons people visit and live in the North Fork Valley, all adversely affected by oil and gas development. We have a different type of development that is working for us and must be developed further for our economy to grow and thrive: we have developed a solid reputation for our high-quality organic foods, clean air and water, and pristine, scenic lands. The North Fork Valley is a place where people go to relax on vacation and a place where people relocate based on the high quality of life that our natural resources allow us.

Those views from Jumbo Mountain of family farms, orchards, and vineyards are not only pretty. These agricultural lands sustain and contribute to local wineries, produce sheds, farm-to-table restaurants, local organic groceries, and many other businesses. Our businesses and resulting jobs are benefitting from a growing demand for organic and local foods and agricultural tourism. This trickles down to the rest of our community that relies on that healthy food, and expands to consumers outside of the Western Slope, such as Glenwood Springs, Aspen, Denver, and beyond. Businesses and jobs will suffer from any development of the North Fork Valley lands that threatens even the perception of the quality of our water and air, because this perception is directly tied to the perception of quality of our agricultural products.


Comment Number: 000576_Ruppert_20161015-2
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
From an economic standpoint, rather than relying on the limited and temporary income and tax revenue from oil and gas development, we should focus on more diverse and sustainable practices such as agriculture and tourism (as well as attracting young professionals that telecommute and contribute to the economic health of the area).

BLM_0165472

The final RMP must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches.

Comment Number: 000576_Ruppert_20161015-6
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Comment Number: 000581_PattersonC_20161016-2
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Comment Excerpt Text:
The pristine, quiet North Fork Valley attracts thousands of hunters and fishers, pouring millions of dollars into local communities. Intact, clean and healthy habitat are critical to sustain hunting and fishing industry in the area.

Comment Number: 000582_PattersonC_20161014-1
Organization1:
Commenter1:Cynthia Purchase
Commenter Type: Individual
Comment Excerpt Text:
The pristine, quiet North Fork Valley is a recreation paradise. River and trail recreation are a multimillion dollar economic engine for local communities. I live in Atlanta and I vacation in Delta County.
Streams and river corridors, trails, slopes of the West Elk Mountains, and the Jumbo Mountain BLM lands are more valuable as wild, clean recreation areas than their value as short term sources of dirty, polluting fossil fuels.

Comment Number: 000585_WentzelR_20160906-1
Organization1:
Commenter1:Ruth Wentzel
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley now contains the highest concentration of organically grown agriculture in the state of Colorado. These farms and businesses continue to grow, thanks in part to our clean air and water. Given all the new information and scientific evidence of the last 5 years, we now know fluids used in hydraulic fracking have and will continue to contaminate ground and surface water. Clean air and water are the lifeblood of our community! This "plan" is heavily weighted toward Industrial growth, which is incompatible with organic agriculture. Allowing gas drilling would have a negative impact on our local economy.

Comment Number: 000587_WolcottS_20161031-11
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual

BLM_0165473

Comment Excerpt Text:
Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, nonindustrial,and agricultural lifestyle. The final plan must protect the investments locals, including myself, have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Comment Number: 000594_MorrisL_20161028-2
Organization1:
Commenter1:Leah Morris
Commenter Type: Individual
Comment Excerpt Text:
Additionally, this valley is finally beginning to collaborate on high quality agriculture projects that focus on organic farming. If we can no longer guarantee the quality of our water, we will lose farmers, tourism, food production, and other businesses that provide the tax dollars that maintain our schools, libraries, and other vital organizations. Many families, possibly including our own, will not choose to live in such a place and will move away. The community will then lose our tax dollars, our professional skills, our school participation, and our values.

Comment Number: 500003_TwittyE_20161014-3
Organization1:
Commenter1:Eric Twitty
Commenter Type: Individual
Comment Excerpt Text:
We came here for the quiet, environment, organic agriculture, wineries, culture, lack of traffic, and especially lack of oil and gas. Industrialization will have the following negative impacts:
• Wreck the economy. The North Fork depends on the industry-free qualities it currently has for agriculture, tourism, and entrepreneurship. Industrialization will change the region's character and impair the above.
• Threaten organic agriculture, and force organic farms to close. If pollutants are released, land will no longer qualify as organic.

Comment Number: 500007_ClevelandB_20161101-1
Organization1:
Commenter1:Britten Cleveland
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
The North Fork Valley is a hub of agriculture in Colorado, shipping produce throughout the state. The threats posed by fracking in The North Fork include damaging local economy by potentially harming our watershed and polluting our beautiful farms. The benefits of fracking will not impact our local community, as the revenue raised will not stay in the North Fork. Agriculture in the North Fork is an economic driver. It benefits the environment, the community, and our economy.

Comment Number: 500129_KoontzW_20161018-2
Organization1:Town of Hotchkiss
Commenter1:Wendella Koontz
Commenter Type: Local Government
Comment Excerpt Text:

BLM_0165474

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 533 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

Management of BLM mineral resources for responsible development will continue to be an important part of the Hotchkiss economy. Many large cattle ranching operations and numerous small acreage, traditional and organic farms and orchards exist in the North Fork Valley around Hotchkiss. These agricultural businesses depend on BLM and USFS grazing leases, clean water for irrigation and domestic use, and maintaining productive lands. The Hotchkiss community depends on the effective management of public lands and resources to sustain these agricultural entities.

*Summary*
A. Commenters stated that oil and gas development in the North Fork Valley and decision area is based on a boom and bust economy that would not likely result in long-term employment or economic growth. Further, these commenters noted that, given the decline in the coal industry, the North Fork Valley can no longer rely on extractive industries for its economic base. They stated that the North Fork Valley has been heavily investing in diversifying its economy through organic agriculture, recreation, and tourism, which currently contribute millions of dollars to the local economy. These commenters felt that additional oil and gas development would adversely impact the area's appeal to tourists and the growing economy based on agri-tourism, organic farming, recreation, real estate values, fisheries, hunting, renewable energy, agriculture, and organic food, all of which are more sustainable than the boom and bust nature of oil and gas development. As such, residents stated concern that development would undermine the efforts and progress that have been made to diversify the local economic base.

B. Commenters also believed that the Draft RMP/EIS analysis underestimates the importance of livestock and multiple uses of roads and routes to the local economy.

*Response*
A. The BLM considered a range of alternatives related to oil and gas development in the decision area, including an alternative with increased protective measures and decreased development for the North Fork Valley, which incorporated specific recommendations provided by a community group (Citizens for a Healthy Community 2013) (see description of Alternative B.1 at Draft RMP/EIS page 2-7). The potential impacts on the local economy are discussed by alternative in Draft RMP/EIS Section 4.6.1, Socioeconomics (pages 4-451–4-477). Per the BLM Land Use Planning Handbook (H-1601-1), the role of the RMP is to identify areas as available or not available for leasing and areas subject to restraints. In all cases, areas identified as available to leasing would require additional site-specific analysis prior to project implementation. As discussed in Section 21 (Leasable Minerals – Fluid) of this report, future site-specific analysis will assess those specific areas for which an applicant has submitted an application for permit to drill. Such analysis will assess economic impacts, among other things. Also see the response to Section 5 (NEPA), Section 5.6 (Direct/Indirect Impacts), of this report for additional details related to the range of fluid mineral leasing alternatives.

B. An overview of the importance of livestock to the local economy is discussed in Draft RMP/EIS Section 4.6.1, Socioeconomics (pages 4-458–4-460). This includes a discussion about direct, indirect, and induced economic contributions and employment, as well as the importance of agri-tourism operations in the North Fork Valley. Additional information was added to the Proposed RMP/Final EIS to note the importance of federal grazing lands in the seasonal grazing rotation, with impacts beyond the amount of federal AUMs. The importance of multiple forms

BLM_0165475

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 534 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

of recreation to the economy is discussed in Draft RMP/EIS Section 4.6.1, Socioeconomics (pages 4-455–4-456).

### Section 30.1 – Socioeconomics and Environmental Justice: Range of alternatives

Total Number of Submissions: 9
Total Number of Comments: 8

Comment Number: 000110_DavisE_20160804-1
Organization1:
Commenter1:Ellen Davis
Commenter Type: Individual
Comment Excerpt Text:
A few of these businesses and people that have come here include multiple shooting ranges, gun stores, gun smith shops, gun safety and training courses, and hunting. All of which have been a great contribution to the community in ways that not only include the utilization of the Second Amendment by American Citizens, but also a great way of stimulating the economy, and building a more connected and equally knowledgeable community. These staples for our community show the importance of outdoor shooting ranges. The acreage that the BLM is considering closing that is normally used for target shooting is essential to the state of Colorado.

Comment Number: 000112_LeslieE_20160809-2
Organization1:
Commenter1:Ethel Leslie
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley is an agricultural and ranching community that has organic farms, wineries and ranchlands. Drilling and horizontal hydraulic fracturing have negative impacts to the water, air and land in this area. This area does not have the infrastructure to support the increases in industrialization that are part of drilling and hydraulic fracturing. Our community is developing agriculture, recreation and tourism as the economic base at this time. The ability to sustain and protect the viewsheds, watersheds and wildlife areas is important to the future of this area.I respectfully request that you find Plan B and B1 as the RMP that will be the plan for the future for the Uncompahgre Field Office area.

Comment Number: 000149_CordellD_20161013-1
Organization1:
Commenter1:David Cordell
Commenter Type: Individual
Comment Excerpt Text:
I urge you to provide further evidence that any activity proposed for the North Fork Valley of Colorado will have no impact on the economic well-being of the citizens of that area and will not be harmful to the environment, including superficial issues like odors and visual distractions. Any drilling activity must include liability requirements to indemnify those who may be harmed by the drilling activity.

Comment Number: 000229_ZieglerC_20161008-2
Organization1:
Commenter1:Cynthia Ziegler
Commenter Type: Individual
Comment Excerpt Text:
The BLM should ensure that management of the North Fork Valley's public lands enhance rather than harm the economic opportunities that exist in the North Fork Valley. We currently are most fortunate

BLM_0165476

to enjoy clean air and water, non-industrialized public lands and recreational trails and access, and scenic beauty. Alternative B1 goes the furthest to provide protections for our growing non-industrialized economy.

Comment Number: 000229_ZieglerC_20161008-3
Organization1:
Commenter1:Cynthia Ziegler
Commenter Type: Individual
Comment Excerpt Text:
Recreation on our trails and rivers contributes millions of dollars into local economies. The North Fork Alternative provides protection from oil and gas development for stream and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area.
Hunting, fishing, and camping in our area is also a multi-million dollar industry. We must protect the public's access to these places, as well as ensure that these places remain healthy habitats for wildlife. Alternative B1 would prohibit any surface occupancy in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian area, and water bodies.

Comment Number: 000260_HunterL_20161028-5
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be jeopardized by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.

Comment Number: 000298_AndersonT_20161025-3
Organization1:Telluride Mountain Club
Commenter1:Tor Anderson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The economic future of our region will depend upon the health and quality of our land and environment, and the diverse opportunities and economies this offers. The BLM's final plan should limit available oil and gas leasing on lands west of Naturita, on public lands in the Paradox Valley, and anywhere else that energy development encroaches on recreational areas.

Comment Number: 000545_SlivkaJ_20161101-138
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Character of place
The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [43 Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease

BLM_0165477

areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.

The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors;

NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards. [Footnote 44 NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted. ]

Comment Number: 000580_BlairL_20161101-2
Organization1:
Commenter1:Lauren Blair
Commenter Type: Individual
Comment Excerpt Text:
The final plan must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be jeopardized by oil and gas activity.

*Summary*
A. Commenters stated that the target shooting areas that are considered for closure are vital to the community and are contributors to the local economy.

B. Many commentators believed that protective measures proposed under Alternative B.1 would best protect the North Fork Valley's agricultural, recreational, and ranching industries and the associated economic contributions. Commenters also stated that the RMP should limit oil and gas leasing in places where development encroaches on recreational areas.

*Response*
A. A range of alternatives for target shooting is included and analyzed in the Draft RMP/EIS (see Section 2.6, Table 2-2, pages 2-221–2-223). Also see the response to Section 27 (Recreation), Section 27.1 (Range of Alternatives), of this report. The Proposed RMP/Final EIS was modified to include information on general economic contributions from recreational target shooting in Section 3.4.3, Socioeconomics.

B. The Draft RMP/EIS includes and analyzes measures limiting development in the North Fork Valley area and in recreation areas (see Draft RMP/EIS Section 2.6, Table 2-2 on pages 2-187–2-203 and corresponding analysis in Section 4.6.3 on pages 4-466–4-475). The effects of Alternative B.1 on the North Fork Valley's agricultural, recreational, and ranching industries are discussed in Draft RMP/EIS Section 4.6.3, Socioeconomics (pages 4-469–4-473). For example, Draft RMP/EIS page 4-472 states, "Alternative B.1 would be the most restrictive of fluid mineral

BLM_0165048

development in the North Fork area and is therefore likely to have the greatest impact on economic contributions from the oil and gas industry in the planning area and in the North Fork area in particular." Per the BLM Land Use Planning Handbook (H-1601-1), the role of the RMP is to identify areas as available or not available for leasing and areas subject to restraints. In all cases, areas identified as available to leasing would require additional site-specific analysis prior to project implementation. As discussed in Section 21 (Leasable Minerals – Fluid) of this report, future site-specific analysis will assess those specific areas for which an applicant has submitted an application for permit to drill. Such analysis will assess recreational area impacts, among other things. Also see the response to Section 5 (NEPA), Section 5.6 (Direct/Indirect Impacts), of this report for additional details related to the range of fluid mineral leasing alternatives.

### Section 30.2 – Socioeconomics and Environmental Justice: Best available information—baseline data

Total Number of Submissions: 16
Total Number of Comments: 37

Comment Number: 000157_BrettE_20161018-1
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
In 2012-2015, I was Program Advisor to the North Fork Heart and Soul Community planning process http://www.northforkheartsoul.com. In that project, we had the opportunity to look closely at the demographics and socioeconomic impacts of the North Fork Valley. Our team interviewed thousands of local residents and collected stories and data for over two years. We compared the local present situation with census data and other national and state studies. The culmination of the project is reflected in the statements of community values that define "what matters most" to the residents of our community. A comprehensive White Paper can be found on the website. Very few comments from residents favored oil and gas development. While local economy was deemed very important, people did not consider jeopardizing our land, our water and our food a worthwhile alternative. To the best of my knowledge, the BLM has not considered this study in its RMP.

Comment Number: 000440_ReedM_20161101_HCCA-6
Organization1:High Country Conservation Advocates
Commenter1:Matt Reed
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
-The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data.112 Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015.113 The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015.114 Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015.115
-The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region.116 In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

BLM_0165479

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 538 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

-The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP."117 Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report.118 These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;119 today that number is less than 250.
[110 Id. at 4-255.]
[111 See also id. at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same).]
[112 Id. at 3-126 – 3-127]
[113 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production2016-down-42-percent/ (last viewed October 26, 2016).]
[114 Id.]
[115 Id.]
[116 Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions).]
[117 Id. at 4-468.]
[118 See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17.]
[119 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016).]
-The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production.120 But Bowie #2 is idle, and Elk Creek is permanently closed.
-The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely,121 although its operator agreed to close it in 2022.122
-The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction."123 While some mineral extraction may be increasing, coal is falling compared to historic levels.
-To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area."124 In the base year of 2011,125 Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false.

Comment Number: 000160_BrettE_20161018_HasAttach-1
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:

1. Data from the BLM report is old data and does not reflect current migration patterns and the changes in demographics that are occurring.

Comment Number: 000160_BrettE_20161018_HasAttach-2
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
2. The grouping of "Socioeconomic Units" is flawed by placing Paonia in with the underpopulated areas of Somerset and Bowie and by not applying the traditional regions of the North Fork Valley, Surface Creek watershed and areas surrounding the city of Delta.
a. Paonia historically and traditionally is regarded as part of the North Fork Valley.
b. The town and the surrounding area is a part of Delta County District 3 which includes Paonia, Hotchkiss and Crawford.
c. Any assumptions about industry trends and linking Paonia to the defunct town of Bowie and the Gunnison County town of Somerset are inaccurate.
d. Currently Paonia has earned the reputation for being "Colorado's Farm-to-Table Capital" and is the anchor of the North Fork Creative District. Value-add food and beverage products and creative industries are dominating the local economy.
e. Due to mine closures, fewer and fewer households are dependent on local mining jobs.

Comment Number: 000160_BrettE_20161018_HasAttach-3
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
4. The BLM report does not reflect current economic drivers that are changing the industries and lifestyles of current and future residents.
a. In 2015 and 2016, the coal mining industry saw a severe reduction due to global demand and consumer trends. Two of the three mines in Bowie and Somerset closed and the third, West Elk mine, whose corporation has filed bankruptcy, is expected to continue to reduce services and ultimately close as well.
b. The historic coalmine-driven economy is quickly changing and sentiment to continue to expect mining jobs to bolster the local economy is waning.
c. New small businesses including internet-based business are bolstering the local economy. Current installation of broadband internet is making these businesses viable alternatives to the "old" ways of conventional farming and mining.

Comment Number: 000160_BrettE_20161018_HasAttach-4
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
The BLM's assessment for Socioeconomic Unit 1 that "Recreational use of land is important for local area residents" is correct. However, the statement "The key issues are providing the continued access to public lands for traditional agricultural and extractive resource uses while preserving the quality of life for local residents" would not be supported by most Paonians in that while there is an acceptance of coal extraction, the presence of other extractive industries is viewed as a detriment to the quality of life of the area.

BLM_0165481

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 540 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 –
Socioeconomics and Environmental Justice)

Comment Number: 000160_BrettE_20161018_HasAttach-5
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
In spite of the BLM's thorough study, I suggest that the SOCIOECONOMIC BASELINE ASSESSMENT
REPORT is flawed in its assumptions and conclusions for the North Fork Valley. It is extremely
important that the BLM make their judgments and conclusions based on an accurate assessment of the
local population

Comment Number: 000160_BrettE_20161018_HasAttach-6
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
a. References for population, industries and other demographic parameters are from 2010 and earlier
and based on Census data that is even older.

Comment Number: 000160_BrettE_20161018_HasAttach-7
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
b. Currently, in the North Fork Valley, we are witnessing an influx of "boomer" generation retirees and
near-retirees along with representative millennials and Generation Z who seeking a small town, rural
quality of life. This dynamic is creating a trending toward volunteerism and mentoring by one group and
the rise entrepreneurial businesses by the latter.
c. These patterns are affecting the socioeconomic make up of age, education, consumer behaviors and
social equity now and for the future.

Comment Number: 000160_BrettE_20161018_HasAttach-8
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
County or State cumulative data does not reflect the microcosm of the small towns of Paonia,
Hotchkiss and Crawford.
a. Local studies have demonstrated that because of the sharp distinctions of the three regions in Delta
County, the county or state rollup of census data does not adequately describe the reality of the towns
and their surrounding areas.

Comment Number: 000160_BrettE_20161018_HasAttach-9
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
The statement for Socioeconomic Unit 2 "Utilization of public land and enhancing environmental values
while preserving open space is also important. The key issue is finding the balance that allows residents
to retain a lifestyle that meets their needs and provides recreational opportunities for visitors to the
area" is accurate for the North Fork Valley.

BLM_0165482

Comment Number: 000284_HessJ_20161028-1
Organization1:
Commenter1:John Hess
Commenter Type: Individual
Comment Excerpt Text:
the Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment.

Comment Number: 000296_HickamJ_20161028-1
Organization1:
Commenter1:Jon Hickam
Commenter Type: Individual
Comment Excerpt Text:
I feel that it did not adequately address the unique environmental and economic situation of the north fork valley.
Right now the economy of the north fork is changing. The coal mines are shutting down but the real estate market and economic activity of the region is actually growing. The new economy that is developing in the North Fork is based on a combination of organic farming, outdoor recreation, hunting and fishing, and folks like me that are moving to the area and bring their jobs with them. I overheard the postmaster in Paonia say that he had processed 5 change of address forms in one week for people coming from Boulder alone. We are drawn to the safe small town feel, the fantastic local agricultural products and the relatively pristine natural environment. This is what the basis of a longterm, stable North Fork economy will be in the 21st century.
This developing economy is fundamentally not compatible with today's hydraulic fracking technologies. The implications of fracking technology here would be a couple of outside companies making some money, a short term boom of temporary labor, followed by longterm degradation of our watershed and view shed and by extension or local economic sustainability. Having this area become known as a fracking area will decrease the appeal of our agricultural products, the appeal our outdoor recreation, and appeal as a home community for people that are coming into the area with new economic opportunities.

Comment Number: 000302_DavolD_20161031-2
Organization1:
Commenter1:Donald Davol
Commenter Type: Individual
Comment Excerpt Text:
For the final draft of the RMP, I hope that the BLM will include up to date data concerning coal markets and coal employment in the area.

Comment Number: 000369_GibsonA_20161030-1
Organization1:
Commenter1:Ann GIbson
Commenter Type: Individual
Other Sections: 22.2
Comment Excerpt Text:
The Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment.

BLM_0165483

Comment Number: 000432_EspinosaG_20161029-1
Organization1:
Commenter1:Gerald Espinosa
Commenter Type: Individual
Comment Excerpt Text:
The greater Delta County recognizes the need to diversify from boom and bust extraction industry, dating back to their 1996 Master Plan, where today's initiatives to promote recreation and value-added agriculture were first articulated as a community. Jumbo Mountain is a premiere mountain biking spot, where locals are willing to share their track (try finding that elsewhere in Colorado). Before the trains were laid for coal, our fruit was carried to acclaim at the 1893 Chicago World Fair. Today's Mountain Harvest Fest and Cherry Days are a gathering in celebration of our bumper-crops but more so our community.
Today the Delta County Commissioners and economic development agencies like REGION 10 and DCED are working on a broad range of regional initiatives from commercial kitchens, co-branding of tourism, riverfront development and urban revitalization as strategies of economic and community resilience. DMEA, the largest equity-holder in the two counties, is advancing high-speed fiber and local energy as a means of economic injection to our community. These share broad communal support, unlike fracking and the selloff of our shared public lands.

Comment Number: 000451_BishopB_20161031_HasAttach-10
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
The RMP is laughably out of date in regards to coal mining in the North Fork. Not one, but two coal mines are shut down, and the third employs little more than 200 people and produced only 5.1 million tons of coal in 2015. Coal mining in this country is waning as other sources of energy become more attractive both economically and environmentally. Clean though the North Fork Valley coal may be, its future as an energy source is dim. The only other mineral extraction of any note are the gas wells in the Bull Mountain Unit, northeast of Paonia Reservoir in Gunnison County. This is a long way from Paonia and has modest, if any impact on the community and its surrounds, except for the negative aspects noted in the last section of this comment letter.

Comment Number: 000451_BishopB_20161031_HasAttach-11
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
Paonia's recent past, current and future economic engine is not resource extraction dependent. Residents of the town and surrounding area are building a robust and multifaceted economy that is based on both conventional and organic agriculture; art, music, and an abundance of other creative endeavors; agricultural and recreational tourism; entrepreneurs; retirees; and others. Paonia is part of the North Fork Valley Creative District. Paonia's Mountain Harvest Festival just won the 2016 Governor's Award for the best small town festival. Life style may be a cliché to some, but it is a, if not the, feature that attracts new residents and causes those living here to celebrate every day the choice to live here.

Comment Number: 000451_BishopB_20161031_HasAttach-2
Organization1:
Commenter1:Sarah Bishop

BLM_0165484

Commenter Type: Individual
Comment Excerpt Text:
The RMP divides the UFO into socioeconomic units. It places Paonia, Bowie and Somerset in Unit 1, which it characterizes as dependent on resource extraction (3 - 182 and 4 - 472). If one is to place Paonia anywhere, it fits in socioeconomic Unit 2:"Issues in this unit relate to growing the economy in concert with the natural landscape. Utilization of public land and enhancing environmental values, while preserving open space, are also important. The key issue is finding the balance that allows residents to retain a lifestyle that meets their needs and provides recreational opportunities for visitors to the area." That describes our mindset perfectly. Agriculture, retirees and self-proprietors also make a significant contribution to the local economy. The North Fork Valley is the Farm to Table capital of Colorado.

Comment Number: 000451_BishopB_20161031_HasAttach-6
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
The characterization of Paonia and surrounding lands as being dependent on resource extraction is totally inaccurate

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-18
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa. Currently, outside of the southern portion of Log Hill Mesa, where infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure.

Comment Number: 000489_JohnsonA_20161101-40
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. Economic sectors to be included in full socio-economic analysis.
The final RMP should provide protections that enhance the following inputs into the economies of the Uncompahgre planning area:
Trails-based and River Recreation
Colorado is emerging as a leader in the recreation economy, and both nonmotorized (i.e., hiking, trail running, mountain biking, etc.) and motorized (snowmobiling, OHV, etc.) trail-based recreation on Colorado's public lands contribute millions of dollars into local economies. River recreation is a growing opportunity in the North Fork, one being increasingly prioritized by area communities and stakeholders.

BLM_0165485

The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area.[45]
[Footnote 45] "Colorado emerging as a national leader in developing a recreational-based economy," Denver Post June 5, 2016 "The Economic Value of Quiet Recreation on BLM Lands: Colorado," Pew Charitable Trust fact sheet, www.pewtrusts.org/~/media/assets/2016/03/wli_co_quietrec_final.pdf?la=en.
Hunting and Angling
Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The North Fork Alternative would prohibit any surface occupancy in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.[46]
[Footnote 46] "Big game hunting pours massive money into state, regional economy," Glenwood Springs Post Independent, October 25, 2015 www.postindependent.com/news/local/big-game-hunting-pours-massive-money-into-state-regional-economy/. "Colorado Parks & Wildlife 2016 Fact Sheet," at http://cpw.state.co.us/Documents/About/Reports/StatewideFactSheet.pdf
North Fork Valley Festivals and Events
Festivals and events, including agritourism-related activities like the West Elk Wine Trail, farm-to-field dining, car, bike and motorcycle rallies, races, and groups rides, community festivals (like Cherry Days, the Harvest Festival, Pioneer Days, Sheep Camp Stock Dog Trials in Hotchkiss) rely in part on the characteristics provided by the small town atmosphere and undeveloped public lands in and around our valley. The North Fork Alternative prohibits leasing and development on the edges of towns and away from farms and residences, schools, parks, and community facilities.[47]
[Footnote 47] "Annual Festivals & Events," North Fork Visitors Guide, at www.northforkvisitorguide.com/annual-festivals--events.html. Behind the Vines: Stone Cottage Cellars, 5280 Magazine, June 30 2016 at www.5280.com/digital/2016/06/behind-vines-stone- cottage-cellars
Windshield Tourism
The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character, called "the closest you can come to a wilderness experience in a passenger car." Oil and gas development could jeopardize the scenic qualities of the area. The North Fork Alternative includes the strongest protections for the Valley's scenic features.[48]
[Footnote 48] "Scenic Byways of Colorado: West Elk Scenic and Historic Byway," GrandCircle.org at http://www.grandcircle.org/scenic- byways/scenic-byways-of-colorado/324-west-elk-scenic-and-historic-byway
Agritourism
Agritourism relies on a character inherent in the place, the North Fork Valley in this case, which is home to the West Elk Wine region and has been called America's Provenance, Colorado's Farm-to-Table Capital, and other laudatory titles. That character would be jeopardized by industrialization that accompanies oil and gas development. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.[49]
[Footnote 49] "Agritourism in the North Fork Valley Is Blooming," Slow Food Western Slope, July 18 2014 at http://slowfoodwesternslope.org/agritourism-in-the-north-fork-valley-is-blooming/.
"Agritourism," Delta County Tourism Cabinet, at http://www.deltacountycolorado.com/about/agritourism.aspx
Farming, Ranching and Food-based Enterprise
Agriculture remains the dominant force in the valley, known for its concentration of organic and sustainable farms, orchards, and ranches. The brand that food-based enterprise already in the North Fork Valley relies on is its reputation for high quality, organic or natural products. This North Fork brand has been acknowledged widely throughout the state and region, including in a recent federally funded economic study for Delta County completed by Better Cities. [50] Impacts to agriculture from the management of nearby and adjacent public lands, which include water conveyances for, lie upslope,

BLM_0165486

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 545 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

and otherwise directly impact farms and private lands from oil and gas development poses a legitimate concern and potential, if uncertain, threat.

[Footnote 50] "Shale Development and Agriculture, Agricultural and Applied Economics Association," 2014 at http://www.choicesmagazine.org/choices-magazine/theme-articles/is-the-natural-gas-revolution-all-its-fracked-up-to-be-for- local-economies/shale-development-and-agriculture. "Economic opportunities lie in ag, tourism and manufacturing," Delta County Independent, August 25, 2015.

Creative Industries

The North Fork Valley is an emerging hotspot for the creative industries—from musicians and poets, founders, sculptures and glassblowers, to authors, playwrights, photographers and painters—and is Colorado's only rural state-designated Creative District. The agricultural roots and bucolic character of the valley are primary components of what makes the North Fork a uniquely inspirational base for a growing creative community.[51]

[Footnote 51]"Supporting the Creative Industries of Colorado's North Fork Valley," North Fork Valley Creative Coalition at http://northforkcreative.org/

Footloose Economy

Economic activity that follows quality-of-life cannot not be understated in quantifying value of nearby public lands. This is especially true for the North Fork, due to the outstanding opportunities to access top quality public lands and the spectacular backdrop these lands provide our community, paired with the other initiatives happening in the valley. This includes current efforts to bring a food enterprise hub, new educational facilities, and gigabyte speed broadband. Combined these efforts at economic development can continue to attract consultants, start-up entrepreneurs, educators and students, creative industries such as photography, art, design, and music, tele-commuters, and many other of the self-employed—all drawn to the area's high quality of life, rural and healthy environment, and adjacent non-industrialized public lands. The North Fork Alternative goes furthest in protecting and maintaining these features.[52]

[Footnote 52] "Understanding the Recreation Economy on Nearby Public Lands," Headwaters Economic white paper, November 2014 at http://headwaterseconomics.org/public-lands/insights-understanding-the-recreation-economy/. "Colorado: Assessing the Economic Value of Public Lands," OurPublicInds.org at www.ourpubliclands.org/public-lands-report-co. "Western Public Lands," Wilburforce Foundation, September 2014 at www.wilburforce.org/files/western-lands-messaging-report/at_download/file

Real Estate

Real estate sales in the North Fork Valley continue to be driven be those seeking a rural, non-industrial, and agricultural lifestyle. "The argument repeated many times was that gas development on public lands this close to organic farms and wineries who are marketing the healthy setting and perceived purity of their production as well as the product itself, is incompatible and would result in the federal government willfully vandalizing a local economy. A group of area realtors filed a joint protest that echoed this thought." [53]

[Footnote 53] "BLM Deadline Passes – The Valley Waits to See Results of Protests," Merchant Herald, December 2012 at www.merchantherald.com/blm-deadline-passes-the-valley-waits-to-see-results-of-protests/

2. The RMP does not adequately take into account economic trends such as the decline of local coal production

The BLM has not completed the necessary research needed to develop an accurate economic impact study. It is recommended the BLM reconsider their assumption for mineral development with regards to coal extraction. Specifically, in the Somerset coal field in order to take into account market forces that have caused coal mines to close. This will change the results of the economic impact study in regards to anticipated economies and population growth in the next 20 years. (Vol II, paragraph 2, 4-458, Paragraph 2, 4-457)

BLM_0165487

Comment Number: 000504_BrownD_20161101_CDA-6
Organization1:Colorado Department of Agriculture
Commenter1:Les Owen
Commenter Type: State Government
Comment Excerpt Text:
The EIS estimates the value of BLM forage to livestock producers to be the difference between private land grazing fees and the BLM grazing fee. This represents a major flaw in the analysis. Extensive cost of grazing studies have shown that ranchers, on average, spend as much per unit of forage on public lands (current fees plus additional costs of use) as is paid for private land grazing leases.[4] The estimated value of BLM forage provided in the EIS actually represents additional costs of use incurred by permitted ranching operations compared to grazing on private land.
[footnote 4] Whittlesey, N. K., R. G. Huffaker, and W. R. Butcher. 1993. Grazing Policy on public lands. Choices 3rd Quarter: 15-19
An animal unit month (AUM) of forage is the quantified amount of forage necessary to maintain an animal unit (I cow or 5 sheep) for one month. The value of this forage to a livestock producer is the gross revenue from livestock production made possible by having access to the forage. Revenue from livestock production is the same regardless of land ownership.
Colorado State University produces Colorado Livestock Enterprise Budgets [5] that provide an estimate of total gross revenues from production for rangeland sheep and cattle operations. The 2014-2015 rangeland sheep estimate of the gross revenue from production per ewe is $204.54. This can be converted to an annual gross revenue from production per AUM of forage by multiplying $204. 54 by 5 ewes/animal unit and dividing by 12 months resulting in an annual gross revenue from production per sheep AUM of $84.39. The 201 4-2015 cow-calf estimate of the gross revenue from production per cow is $1,256.80. This can be converted to an annual gross revenue from production per AUM of forage by dividing by 12 months resulting in an annual gross revenue from production per cattle AUM of $104.73.
AUM values provide a metric to compare alternatives and can be used to analyze the magnitude of impacts that changes to authorized livestock use under each alternative would have on individual allotments and communities within the planning area. For example, the preferred alternative would reduce maximum permitted cattle AUMs by 1,940. This reduction represents an estimated decrease of $202,176.40 per year in gross revenue from cattle production.
[footnote 5] Available at: http://www.coopext.colostate.edu/ABM/livestock.shtml

Comment Number: 000512_FurimskyB_20161031-1
Organization1:
Commenter1:Ben Furimsky
Commenter Type: Individual
Other Sections: 22.2
Comment Excerpt Text:
The Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment.

Comment Number: 000545_SlivkaJ_20161101-226
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.2
Comment Excerpt Text:
Stale Coal Production and Employment Data

BLM_0165488

To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.

Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:

- the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees; [Footnote 110 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016)]

- the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees; [Footnote 111 Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016)]

- layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets; [Footnote 112 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016)]

and

- the announcement that the Nucla coal mine, and the power station it serves, will close in 2022. [Footnote 113 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016)]

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future. [Footnote 114 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016). ]

As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates

Comment Number: 000545_SlivkaJ_20161101-227
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.2
Comment Excerpt Text:
The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document

BLM_0165489

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 548 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Uncompahgre Draft RMP at 4-13. Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future. Id. at 3-178.

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

Comment Number: 000545_SlivkaJ_20161101-228
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.2
Comment Excerpt Text:
The following data and conclusions are stale given the changes in the local coal industry:

- The Draft RMP uses production averages from June 2014 and June 2015, though an additional 13 months of data exist demonstrating a steep drop in production since last year. Id. at 3-126.
- The Draft RMP assumes a coal production rate of "9 to 11 million tons per year," which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area. Id. at 4-255; See also id. at 4-289 – 4-290.
- The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. Id. at 3-126 – 3-127. Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015. [Footnote 115 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016)] The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015. [Footnote 116 Id.] Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015. [Footnote 117 Id.]
- The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.
- The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP." Id. at 4-468. Similarly optimistic assumptions are contained in the BLM's

BLM_0165490

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 549 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 –
Socioeconomics and Environmental Justice)

2010 Socioeconomic Baseline report. See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012; [Footnote 118 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016)] today that number is less than 250.

- The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production. Uncompahgre Draft RMP at 3-125. See also id. at 4-11 – 4-12; id. at 4-258 – 4-259. But Bowie #2 is idle, and Elk Creek is permanently closed.
- The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, although its operator agreed to close it in 2022. [Footnote 119 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 26, 2016)] Id. at 4-289 – 4-290.
- The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels.
- To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011, Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false. See id. at 4-20.

The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

Comment Number: 000545_SlivkaJ_20161101-229
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 22.2
Comment Excerpt Text:
Summary of Comments: BLM must utilize current, high quality information to analyze coal management alternatives in the Uncompahgre RMP, including updated climate and production and employment data. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

Comment Number: 000555_NicholofR_20161101-3
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Other Sections: 30
Comment Excerpt Text:
The following is from a study I conducted in 2002 and updated in 2012 on the potential impacts from oil and gas development to the wildlife-based economy of Delta County.
Wildlife and related resources are a major contributor to the economy of Delta County, both in direct and indirect expenditures as well as the unquantifiable "quality of life" and aesthetic values. The largest wildlife-related economic contributions are from hunting and fishing, which would be negatively impacted by natural gas drilling and development. The Colorado Division of Wildlife's latest report "The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" (BBC Research & Consulting, 2008) determined that direct expenditures in Delta County from fishing, deer and elk and small game hunting in 2008 (based on data collected from 2006 to 2008) was $16,300,000. When the secondary economic impacts and CDOW direct expenditures are added, the total impact was $27,840,000. The state-wide Total Impact amounts to $1,843,300,000. These figures do not include the economic benefits of wildlife watching which totals $1,218,200,000 state-wide. While county-by-county amounts were not available in the report for wildlife watching, if we use the same ratio of Delta County/State of Colorado hunting and fishing applied to wildlife watching we get a figure of $18,394,800 of total economic impact for Delta County. In other words, according to this report the wildlife resources of Delta County are responsible for over 46 million dollars of economic activity in Delta County ANNUALLY.

Comment Number: 500027_LavertyD_20161026-1
Organization1:
Commenter1:Densie Laverty
Commenter Type: Individual
Comment Excerpt Text:
The draft management plan does not take into account the existing economic conditions of the region that would be strongly effected by leasing the public lands surrounding our communities of Paonia, Hotchkiss, Crawford and Cedaredge.

Comment Number: 500143_RewL_20161017-3
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

Comment Number: 000563_King_WELC_HasAttach-40
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Similarly, the draft EIS relies on BLM's July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated information (coal data from 2009 and before) that paints an overly rosy picture of the predicted importance and value of coal to the local economy. See Draft EIS at 3-178. Nearly every data point and prediction in this report as it relates to coal production and

BLM_0165492

employment is obsolete given the additional six-plus years of data available to the agency in a time of turmoil for the coal industry in general and for North Fork mines in particular. Any subsequently-prepared NEPA document must include up-to-date data concerning coal markets, and coal production and coal employment in the area.

Comment Number: 000563_King_WELC_HasAttach-42
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing
2010 data. Id. at 3-126 – 3-127. The draft also cites EIA data indicating coal production economic contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a third of Colorado's coal, and production has fallen by two-thirds. Coal's "economic contribution" as well as taxes and royalties have thus likely dramatically fallen as well.

Comment Number: 000563_King_WELC_HasAttach-45
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS describes the Bowie #2 mine as "actively producing" although the mine is now idle, and further suggests that the Elk Creek mine may someday resume production. Draft EIS at 3-125. See also id. at 4-11 to 4-12 (making similar statements); id. at 4-258 to 4-259 (same). But Bowie #2 is idle, and Elk Creek is permanently closed.

Comment Number: 000563_King_WELC_HasAttach-46
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, id. at 4-289 – 4-290, although its operator agreed to close it in 2022, six years or fewer into the plan's life.

Comment Number: 000563_King_WELC_HasAttach-47
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft EIS makes assumptions about coal mining rates to address potential impacts to natural resources. For example, the draft EIS predicts an upswing in impacts to some resources because coal mining, among other activities is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels. Similarly, to address air quality impacts, the draft EIS assumes that "Coal mine production remains unchanged from

BLM_0165493

base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011 (see id. at 4-20), Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about three times their likely output this year. The draft EIS's assumption that coal production rates are "unchanged" from 2011 is false.

Comment Number: 000563_King_WELC_HasAttach-48
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The fact that the draft EIS relies on stale data is not a mere flyspeck. It is significant because it skews BLM's analyses of economic values and climate pollution, among many others. Assuming an inflated value for coal production and employment gives a false impression of the relative importance and staying power of this industry as it enters a decline from which there is no foreseeable recovery, given not only competition from cheaper energy sources but the need for the nation – and the world – to end coal combustion if we are to avoid the worst impacts of climate change and comply with international and national climate commitments. It also prevents BLM from considering how to prepare for and transition from fossil fuel production in the region.

*Summary*
A. Commenters stated that the BLM did not consider the preference of the local community (specifically in the North Fork Valley) to protect the local economy over oil and gas development.

B. Commenters stated that the Draft RMP/EIS baseline conditions for socioeconomics were inaccurate due to the following:

1. Data used in the Draft RMP/EIS, based on the Socioeconomic Baseline Report, are outdated and do not reflect the changing demographics and lifestyles in the North Fork Valley area.
2. Baseline data utilize outdated coal market information; the Proposed RMP/Final EIS must portray this accurately.
3. Baseline data fail to adequately include the economic sectors of trails-based and river recreation, hunting and angling, events, windshield tourism, agri-tourism, food-based enterprise, creative industries, footloose economy, and real estate.
4. Paonia should be grouped with the North Fork Valley Socioeconomic Unit (Unit 2) in the Socioeconomic Baseline Report, as it relates to an economy based on the natural landscape and not resource extraction.
5. County or State cumulative data do not reflect the microcosm of the small towns of Paonia, Hotchkiss, and Crawford.
6. The analysis fails to include the economic contribution of any agricultural crops in the North Fork Valley.
7. The value of BLM forage to livestock producers and AUM values represents a flaw in the analysis.

BLM_0165494

*Response*
A. The preferences of the North Fork Valley communities, as detailed in the recommendations provided by a community group (Citizens for a Healthy Community 2013), are considered and analyzed in detail as Draft RMP/EIS Alternative B.1, a partial alternative of Alternative B.

B.

1-2. Baseline socioeconomic data for the RMP was collected and published in 2010 in the Socioeconomic Baseline Report prepared in support of the RMP during the planning process (BLM 2010; UFO RMP and EIS Final Socioeconomic Baseline Report, BLM, UFO, Montrose, CO, July 2010). Due to the dynamic nature of the fluid mineral industry, production and employment data have changed in the timeframe during which the Draft RMP/EIS was drafted. The BLM recognizes that some of the baseline data is now outdated, and this information was updated in the Proposed RMP/Final EIS, as appropriate.

3. An overview of socioeconomic impacts at the RMP analysis level was based on best available data and provided for tourism and recreation, including hunting and angling (for example, see Section 4.6.3 Socioeconomics, Nature and Type of Effects, on pages 4-455–4-457). Agritourism and food-based enterprises in the North Fork Valley are discussed (for example, see page 4-459). Other examples include Draft RMP/EIS Table 4-87, Economic Impacts from Recreation Activities: 2013, 2022, and 2032 (2012 Dollars) (Draft RMP/EIS page 4-468), Table 4-84, Sales Tax Impacts from Recreation Activities: 2013, 2022, and 2032 (2012 Dollars) (page 4-466), and Table 4-81, Hunting and Fishing Economic Impacts from Nonresidents in Planning Area Counties, 2007 (page 4-457). Baseline information and impacts analysis were updated in the Proposed RMP/Final EIS to include additional information on property values.

4. The BLM appreciates the comments. The socioeconomic unit for Paonia was reclassified as Unit 2 in the Proposed RMP/Final EIS. The Socioeconomic Baseline Report is a static report representing baseline information collected in 2013 and will not be updated as a result of comments collected in on the Draft RMP/EIS.

5. As noted in the Draft RMP/EIS Section 3.4.3, Socioeconomics (pages 3-178–3-179), economic and demographic statistics are primarily reported by county. For these reasons, demographic, economic, and social data are presented for the socioeconomic study area, which was defined in the Draft RMP/EIS as all lands within the five counties that primarily comprise the planning area (Delta, Gunnison, Montrose, Ouray, and San Miguel). Mesa County was added to the socioeconomic study area in the Proposed RMP/Final EIS. Additional details at the community level, as gathered in socioeconomic workshops, are included in the Socioeconomic Baseline Report prepared in support of this planning effort (BLM 2010; UFO RMP and EIS Final Socioeconomic Baseline Report, BLM, Uncompahgre Field Office, Montrose, CO, July 2010).
The BLM recognizes that small towns may include unique characteristics not captured in county-level analysis. Additional review of the impacts at the site-specific level, including economic impacts, will be included in subsequent NEPA prior to any implementation-level activities.

6. The general contribution of agriculture in planning area counties, as well as the importance of the North Fork Valley organic farming industry and agri-tourism, is

BLM_0165495

broadly discussed in Draft RMP/EIS Section 4.6.3, Socioeconomics (page 4-459). Additional agricultural data from the US Department of Agriculture National Agricultural Statistical Service 2012 Agricultural Survey was added to the Proposed RMP/Final EIS in Section 3.4.3, Socioeconomics, under the Agriculture and Livestock Grazing discussion. Agricultural data is available at the county level; therefore, information for Delta County is utilized in the discussion of North Fork Valley contributions.

7.  Although the value of forage based on public grazing fees as compared to replacement forage costs is included in the Draft RMP/EIS, the quantitative analysis of livestock grazing contributions by alternative, as displayed in Draft RMP/EIS Section 4.6.3 (page 4-467) and Table 4-87, Regional Economic Impacts for Livestock Grazing by Alternative (page 4-468), utilizes Colorado State University Colorado Livestock Enterprise Budgets, which provide an estimate of total gross revenues from production for rangeland sheep and cattle operations. Detailed information on methods utilized for socioeconomic analysis are available in the UFO socioeconomic methods document, included in the project record and available at the BLM UFO in Montrose, Colorado. The Proposed RMP/Final EIS was modified to clarify methods utilized in analysis.

### Section 30.3 – Socioeconomics and Environmental Justice: Impact analysis

Total Number of Submissions: 100
Total Number of Comments: 161

Comment Number: 000489_JohnsonA_20161101-55
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area. Their protection enables the customs and culture of this community to continue.
(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas. 43 U.S.C. § 1712. Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.
(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in Colorado.[59] In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

BLM_0165496

[Footnote 59] USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf

Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." Ibid. The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning.[60] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

[Footnote 60] IM 2013-131, available at:
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131Ch1.print.html.

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

In framing information for management decisions, focus on the difference in changes to nonmarket values between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may increase the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may decrease the benefits of subsistence hunting and watershed protection in this area. The difference between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives. IM 2013-131, Attachment 1-5.

The guidance also directs that quantitative analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and non-extractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

Summary of Comments: BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP.

Comment Number: 000115_ReileyK_20160811-2
Organization1:
Commenter1:Katie Reily
Commenter Type: Individual

BLM_0165497

Comment Excerpt Text:
It is trying to survive by rebuilding itself as a place for agri-tourism. Down from my house there is a new community commercial kitchen going in for local farmers to process their fruit and vegetables so they can sell to folks in larger cities. Even if the environmental impact turns out to be small the perceived threat will NEVER go away. Please reconsider our request for the no leasing alternative for the North Fork of the Gunnison.

Comment Number: 000126_Kavanaugh_20160831-2
Organization1:Town of Telluride
Commenter1:Sean Murphy
Commenter Type: Local Government
Comment Excerpt Text:
Although grazing, oil and gas leasing, and other forms of resource development are significant and historic uses on lands in the UFO, we ask you to please also consider that protecting the unspoiled beauty and ecological integrity of BLM lands is directly beneficial to our local economy and central to our community values. Draft RMP Alternative B's emphasis on improving and rehabilitating resources aligns with the efforts we continue to implement in our community to preserve and enhance our natural environment.

Comment Number: 000129_BlackburnW_20160901-4
Organization1:Thunder Mountain Wheelers ATV Club
Commenter1:Walt Blackburn
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 32.1
Comment Excerpt Text:
Reducing the "open area" and changing to designated trails only on the norther part of the area would have a positive effect on the salinity and erosion concerns.
TMW would suggest the team give full consideration to leaving the "Open Area", intact at least in part for the OHV community that has lost over 75% of their trails and riding opportunities over the past two decades. We also would like to remind the Interdisciplinary Team that the "Open Area" has a very positive impact on the socio-economic impact on the City and Delta County with the many out of town visitors that use the area.

Comment Number: 000130_WasselIP_20160903-1
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
-BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines can all be harmed by air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.

Comment Number: 000130_WasselIP_20160903-10
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique, and unrivaled agricultural area containing numerous vineyards, orchards and vegetable

BLM_0165498

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 557 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

growing operations. Analyzing the effects of drilling and all the associated risks to this agricultural area must be addressed in detail.

Comment Number: 000130_WassellP_20160903-7
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
-The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.

Comment Number: 000140_Shishim_20160911-1
Organization1:
Commenter1:Dave Shishim
Commenter Type: Individual
Comment Excerpt Text:
In reading your proposal, you have given scant attention to the impact that these activities would have on the existing economy of the North Fork Valley. The fact is, that oil and gas leasing and exploration would have a tremendously negative impact on the businesses that already exist on the North Fork. We in the North Fork are finally emerging from a number of very dark economic years and the economy that has grown up is one that is based on many small businesses with much small-scale agriculture targeted to a diverse base of residents and non-resident customers. We have successfully marketed the North Fork as "America's Provence" and these many small businesses that have bet their futures on this economy continuing to grow and prosper would be put out of business by the large scale petrochemical extraction that you seek to promote. Whereas the extraction business would be at best very temporary and would not provide meaningful local hiring, the economy that we have built is not only sustainable, but growing.

Comment Number: 000142_ShishimM_20160911-3
Organization1:
Commenter1:Margaret Shishim
Commenter Type: Individual

Comment Excerpt Text:
Traffic – my home is located above Highway 133 off of Fire Mountain Rd. There is only one way to get in and out of my residential area—and that is to pull out onto or cross Hwy. 133. The intersection of Fire Mountain Rd. and Hwy. 133 is already hazardous, with limited visibility. Heavy oil and gas truck traffic would make this (and the rest of Hwy. 133 - which is only one lane either way) a very dangerous situation and deadly accidents much more likely.

Comment Number: 500176_StewartC_20161027_TownOfPaonia-5
Organization1:Town of Paonia
Commenter1:Charles Stewart
Commenter Type: Local Government
Comment Excerpt Text:

Furthermore, areas that are in close proximity to town limits which are used for recreation must be protected from potential damage due to oil and gas development. In addition to the concerns about the

BLM_0165499

impacts on the local recreation areas, any potential development that would be accessed by Town of Paonia streets would severely impact our already degrading roads. Heavy truck traffic is cause for concern at the municipal level.

Comment Number: 000142_ShishimM_20160911-5
Organization1:
Commenter1:Margaret Shishim
Commenter Type: Individual
Comment Excerpt Text:
Property values – there are statistics showing a decrease in property values for homes/properties located near drilling/well activity. I've worked hard on improving my home for 14 years and don't want to see my property value, nor other properties in the NFV, decrease.
6.Recreation – my family and I are cyclists, both road and mountain bike. We also love camping, floating on the river, and hiking. Jumbo Mountain and trails on BLM and Forest Service land are very important to us personally and to many others who live here or come here as visitors. Trail-based recreation, also hunting and fishing, puts millions of dollars into Colorado's economy and also local economies.

Comment Number: 000152_GentryR_20161014-2
Organization1:
Commenter1:Rosie Gentry
Commenter Type: Individual
Comment Excerpt Text:
Delta County has made great strides in creating and encouraging an alternative economy to a boom-or-bust one based on fossil fuel extraction. Out of necessity due to the closing of the local coal mines, many dedicated individuals and governmental and non-governmental groups have encouraged this budding economy along with supporting our long standing agricultural economy. This sustainable economy consists of the highest concentration of organic farms in Colorado, all types of agriculture including livestock and orchards, many local vineyards/wineries, and various tourism and agritourism-based businesses. This budding and long standing agriculture economy is reliant on our current clean water and air, abundant water resources, a rural and quiet setting, beautiful vistas and open spaces, outdoor recreation opportunities, healthy wildlife ecosystems and farmland free from threat of toxic contamination. BLM's plan to lease out 95% of the valley for mineral exploration would industrialize our valley and quash this current budding economy. Just the threat of this industrialization is hampering investment in our budding economy. I so reject the BLM's power to force this industrialization on our community and to thwart our community's efforts to grow a sustainable economy.

Comment Number: 000158_BrettE_20161018-3
Organization1:
Commenter1:Elaine Brett
Commenter Type: Individual
Comment Excerpt Text:
Industrial development is not compatible with a trail-centered tourism economy. These trails attract visitors from throughout Colorado and support local hospitality and retail businesses.

Comment Number: 000169_WentzelR_20160906-1
Organization1:
Commenter1:Ruth Wentzel
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165500

The North Fork Valley now contains the highest concentration of organically grown agriculture in the state of Colorado. These farms and businesses continue to grow, thanks in part to our clean air and water. Given all the new information and scientific evidence of the last 5 years, we now know fluids used in hydraulic fracking have and will continue to contaminate ground and surface water. Clean air and water are the lifeblood of our community! This "plan" is heavily weighted toward Industrial growth, which is incompatible with organic agriculture. Allowing gas drilling would have a negative impact on our local economy.

Comment Number: 000180_RoseH_20160921-1
Organization1:
Commenter1:Lori Ann
Commenter Type: Individual
Comment Excerpt Text:
There is a thriving organic community in the valley that will only become more attractive and lucrative in the future. Our clients are regularly asking for advice and ways to forego the "traditional" chemicals they have been using for years. There is a growing consciousness in the nation around the production of are food and it's relation to our personal health and well-being. As I am sure you are aware, there is a huge industry developing around "whole foods". The valley is attracting this population, they are buying homes, choosing to relocate and participate in the local economy.
The oil and gas industry does not support the development of this community nor the local economy, in fact given what we know about the risks of oil and gas chemicals, and radioactive wastewater to human health and environment and the industries previous impacts on local economies, it is certain this industry will deter these people from relocating here and cause current residents to relocate elsewhere. A no-leasing alternative would allow The North Fork Valley to sustain and develop a healthy local agricultural community and economy that has the potential to contribute to the state of Colorado in developing healthy local agricultural areas that allow the State of Colorado to become a healthy, self-sustaining community in and of itself.

Comment Number: 000184_BrettJ_20161017-1
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley has a forcefully developing market for agri-tourism, farm-stays and agriculture-based education. Products from area farms supply markets and top restaurants in towns around western Colorado, including Aspen, Telluride and Crested Butte and serve many Front Range communities, including Colorado Springs, Golden, Denver, Boulder, Longmont and Fort Collins. The farms' customers have created relationships with the growers and forged a unique community that is the North Fork Valley. These relationships develop as our farmers have been able to furnish organic, high-quality fruits, vegetables, meat, dairy, wine and specialty products.
An October 5, 2016 Aspen Sojourner article (http://www.aspensojo.com/articles/2016/10/5/beyond-the-roundabout-autumn-perfection-in-paonia) highlights the items mentioned above providing credence the North Fork Valley is a destination that must be protected:
"Nestled in the North Fork Valley in Delta County, Paonia is home to the state's largest concentration of organic farmers thanks to its richly fertile land, which yields ample fruit (peaches, apples, cherries, pears, and plums) and veggies while supporting some of the country's best livestock. Incorporated in 1881 and named by founder Samuel Wade after the peony root stock he brought in a covered wagon all the way from Ohio, the town has now grown into a haven for aging flower children, new-agers, liberal activists, and environmentalists…The town of just under 2,000 residents prides itself on its vibrant off-

BLM_0165501

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 560 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

beat culture filled with farm-to table restaurants, progressive media outlets, art galleries, boutiques, and wineries.
"It doesn't get more scenic then driving from Aspen to Paonia in the fall, with expansive views of the western Elk Mountains from McClure Pass. It's a direct route from the Roaring Fork Valley to the North Fork Valley via State Highway 133; the road takes you through Carbondale and Redstone, and is open year-round. The top of the pass is a prime spot for leaf-peeping. The drive then traces Muddy Creek down to Paonia State Park—worth a stop on your way there or back to take in the stunning sight of the Ragged Mountains.
"One of the few regions in Colorado to successfully cultivate and bottle pinot noir, the North Fork Valley is a hotbed for high-altitude grape growing, with plenty of vineyards to explore.
"Continue down the road to the home of Big B's juices and hard ciders, where you can pick apples, along with plenty of other produce, depending on the season. It's the quintessential autumn adventure…
"Founded in 2008 by husband and wife Mike and Gretchen King, [Revolution Brewing] uses locally grown hops with water directly from the springs on nearby Mount Lamborn for beer that's hand stirred and brewed on a six-barrel system."
Our producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy good and clean food. The potential for soil, air and water contamination as a result of oil and gas development could destroy our Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.

Comment Number: 000186_ScotJ_MilvenanE_20161024-3
Organization1:
Commenter1:J. Scot Milvenan
Commenter Type: Individual
Comment Excerpt Text:
RMP acknowledges the fact that "Delta County is home to the highest concentration of organic farms of any Colorado county" (4-459) but what of the risk of contamination to irrigation water and crops from:
-fracking chemical contamination of ground and surface waters
-damage to irrigation canal access and bridges
-airborne volatile organic compounds
-airborne silicates
-silting in of rivers and irrigation ditches
-increases in diesel exhaust from transportation, well, and compressor sites
What kind of damage will that cause to the organic agricultural products in this region? It would be devastating. Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence and importance of this rare, unique and unrivaled agricultural area. Analyzing the effects of drilling and all the associated risks to our vineyards and organic farming operations must be addressed in detail.

Comment Number: 000197_HinesC_20161018-1
Organization1:
Commenter1:Cynthia Hines
Commenter Type: Individual
Comment Excerpt Text:
I am opposed to oil and gas leasing on public lands in the North Fork Valley because of the devastating effects the industrialization of this area will have on our efforts to build a sustainable economy based on:
Agriculture - the NFV has the highest concentration of organic farms and orchards in Colorado, is a designated American Viticulture Area, is home to ranches that produce heritage beef, pork, lamb and poultry, as well as goat milk and cheese products.

BLM_0165502

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 561 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

Tourism and Recreation - The NFV has unparreled beauty and clean soil, water and air that attract thousands of visitors each year, contributing significantly to the local economy. Our open space and lack of traffic congestion will be severely compromised by well pads and the light, deafening noise and large vehicle traffic associated with fracking.

Hunting and Fishing - The NFV is home to numerous gold medal fishing streams and extensive big game hunting. Generations have visited the NFV year after year to pursue these activities, generating a significant portion of the local economy. Many ranches are dependent upon the revenues generated by these activities and could not remain in existence without them.

THE BLM did not consider the significant financial contributions to the local economy from the above activities. Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledged the existence of these crucial sources of revenue and therefore did not analyze the effects drilling would have on them. This is a total abdication of the BLM's responsibility to protect the public from the negative effects of oil and gas activities.

The NFV economy is an unique combination of the perpetuation of multi-generation, homesteaded ranches, hunting and fishing and more recent heritage and organic farming and eco-tourism. Not only are these activities generating a sustainable economy for the NFV, they perpetuate our highly valued way of life. A hard-look analysis at the risks posed by oil and gas operations can only lead to the conclusion that a no-leasing alternative is the only alternative that serves the economic interests of the North Fork Valley.

Comment Number: 000200_KenosianM_20161014-4
Organization1:
Commenter1:Mary Kenosian
Commenter Type: Individual
Comment Excerpt Text:
In addition to the environmental impacts, there is insufficient consideration of the long-term economic impact to the region.

Comment Number: 000200_KenosianM_20161014-5
Organization1:
Commenter1:Mary Kenosian
Commenter Type: Individual
Comment Excerpt Text:
-I expect a full exploration of health issues, including the latest peer-reviewed studies. I expect consideration of the Dimock judicial award for water pollution damages and ruling. I expect a study of GHG emissions with regard to Paris Treaty impact, which the US has now signed. And I expect a thorough exploration of the economic impacts on farming, organic farming, tourism, and other money-generating recreational activities.
-I expect a study of the socio-economic impact on the communities of the region.

Comment Number: 000206_Kleinman_20161025-8
Organization1:
Commenter1:Amber Kleinman
Commenter Type: Individual
Comment Excerpt Text:
The management of the public land around us should enhance the opportunities that exist in the North Fork Valley by maintaining the current visual and scenic resources,the clean air and water, and the non industrialized viewscape. Looking at the mountains around our town gives me peace. To see them lit up with drill rigs would feel polluted and ruin the appeal of our little town. When people see drilling operations they assume our environment is polluted. This does not have to be true to negatively effect

BLM_0165503

the price of property, the sale of organic food, or the boom of agritourism in our valley. The presence of hydraulic fracturing allows one industry to unfairly endanger all others. Presently we have an active real estate market in our valley. Home sales and prices increased after the last BLM lease deferral. Many people moved here because they saw a strong community willing to stand up to the oil and gas industry. I am grateful every day for this pristine environment with clean water, clean air, and incredible scenic beauty. The industrialization of this valley would destroy the economy currently based on healthy farming, ranching, ecotourism, recreation, hunting, fishing and all related small businesses.

The North Fork Valley is in the heart of the West Elk Scenic Byway. The West Elk Wine trail relies on the undeveloped public land in and around our valley. The Garvin Mesa wine loop should be removed from oil and gas leasing. This is a popular tourist attraction which would lose value with drill rigs to look at. The roads in this area are steep and primitive. Increased truck traffic up and down the mesa would be dangerous and deter tourism to the many established wineries in the area. No surface occuancy should be allowed in this area to preserve the already established businesses and the viewscape. This includes Farmers Mine Road, Garvin Mesa Road, and 4175 Drive.

Comment Number: 000219_AndersonK_20160930-3
Organization1:
Commenter1:Kevin Anderson
Commenter Type: Individual
Comment Excerpt Text:
One of my largest concerns is the adverse effect of our local economy. Multiple use of public lands has long been Delta County's cornerstone. In the last three years Delta County has lost over 1000 coal mining jobs alone! That equates 31,000 lost jobs if this was in the Denver area. This forces me to believe the economic outcome portion of the Draft is flawed

Comment Number: 000220_EdsonM_SimmonsJ_20161010-1
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Comment Excerpt Text:
'Non-labor' sources make up over 46% of the income of Delta County according to the U.S. Department of Commerce and Bureau of Economic Analysis released in 2012. Dividends, retirement benefits, interest, and transfer payments are examples of non-labor income. So retirees like us make up a major part of the economy of Delta County, and particularly of the North Fork Valley. Realtors in the North Fork Valley have made it clear in published articles that the perception of potential oil and gas development in the valley reduces property values and makes prospective home buyers hesitant to invest here. The North Fork Alternative Plan B1 outlines a reasonable development plan that would reassure current owners that their home will maintain its value, encourage investment in the area by new potential property buyers, and maintain a major source of income for our area.

Comment Number: 000220_EdsonM_SimmonsJ_20161010-2
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Other Sections: 37.1
Comment Excerpt Text:
Agricultural irrigation water is a major concern in the North Fork Valley. Irrigation water is used for livestock, and by farms and orchards that are highly regarded throughout the state for providing high quality products. Many of these farms and orchards are certified organic and any contamination would jeopardize this certification. The North Fork Valley's economic diversity relies upon the ranching and

BLM_0165504

agricultural industry. Unforeseen contamination could significantly impact the land and subsequently the industries that are so vital to the economic stability of this area. Mineral leasing and severance tax funds will not compensate for the loss of agricultural endeavors and its attributed labor force. The North Fork Alternative B1 would ensure that all agricultural irrigation waters would be protected through the buffer that is stipulated in the the plan.

Comment Number: 000224_O'ReillyE_20161019-2
Organization1:
Commenter1:Elizabeth O'Reilly
Commenter Type: Individual
Comment Excerpt Text:
Please, initiate Alternative B1 to help decrease the above issues I personally think will detract if any other initiative is chosen. If the water is contaminated, if the air is more polluted, if the wildlife are restricted in their habitual patterns and harmed, if the organic industry that resides within Delta County & is making a strong demonstration of an industry worth backing & providing a living is thwarted it will cause me personally to move and many others, if they have the resources to do so. It will stop the growth of our changing Delta County at a critical transitional time and the burgeoning creative district will succumb to wasteland. Not a long term vision I imagine anyone wishes to observe.

Comment Number: 000224_O'ReillyE_20161019-3
Organization1:
Commenter1:Elizabeth O'Reilly
Commenter Type: Individual
Comment Excerpt Text:
I moved to this area in 2011, specifically for the organic food being produced throughout the area. Which since 1980's has seen a huge growth nationwide. The wildlife sightings during migration times or hiking about, the accessibility to clean air, and the lifestyle characteristics that go along with these practices of "healthy" living. My concern for the area is that if Alternative B1 is not chosen, the risk goes higher in affecting the long time ranchers, organic farms/orchards and vineyards along with myself as a resident, drinking the city water in negative ways that challenge the reasons many choose to live here.

Comment Number: 000227_JanusJ_20161019-1
Organization1:
Commenter1:John Janus
Commenter Type: Individual
Comment Excerpt Text:
I would like to point out There has not been adequate research and study into the environmental impacts of oil and gas development on the Western Slope of Colorado. Fracking wastewater is radioactive and contains many chemicals injurious to all forms of life. The history of the gas and oil companies is not good. It is common for a substantial amount of this toxic brew released into the environment. There are the pipeline concerns also a heavy impact on the environment. This type of commercial activity is at odds with the current economic base of the area, Agriculture, Tourism and Real Estate. Agriculture which has been a profound economic driver in the region since the beginning would suffer significantly. Please choose B1 alternative as this is the only plan that is sustainable for the benefit of all citizen on the Western Slope of Colorado.

Comment Number: 000229_ZieglerC_20161008-1
Organization1:
Commenter1:Cynthia Ziegler
Commenter Type: Individual

BLM_0165505

Comment Excerpt Text:
Farming, ranching, and food-based enterprise are probably the dominant force in the valley. We are known for our concentration of organic and sustainable farms, orchard, and ranches, and much of it relies on its reputation for high quality, organic or natural products. Agritourism is also a growing aspect of our community, and relies on the character inherent in the North Fork Valley. The Wesk Elk region is making a name for itself as a destination wine touring region as well as Farm to Table capital. The impacts from oil and gas development on nearby public lands pose a threat to these important aspects of our community. The North Fork Alternative requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the rural character of the valley.

Speaking of tourism, the North Fork Valley is at the heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character. It is just about the closest you can come to experiencing the wilderness from your car. Oil and gas development would most likely jeopardize the scenic qualities of the area. Alternative B1 offers the strongest protections for the Valley's scenic features.

The threat of oil and gas development in the North Fork Valley has been seen to have a negative impact on real estate sales. Most people looking to move here are seeking a rural, non-industrial, and agricultural lifestyle. A group of local realtors filed a protest saying that gas development on public lands this close to organic farms and wineries who are marketing the healthy setting and purity of the production and their products is incompatible and would result in the federal government willfully vandalizing a local economy.

Comment Number: 000237_VaughtK_20161004-3
Organization1:Dancing Dog Farm
Commenter1:Kenneth Vaught
Commenter Type: Individual
Other Sections: 21.1
Comment Excerpt Text:
I would respectfully ask that the BLM reconsider it's plan to lease all of the Valley areas specified in the recently released Draft Resource Management Plan. Due to the geology of the Valley, it does not appear that there is a source of gas that is economical to develop in the Valley area, with past test drilling data all showing the same results of no retrievable gas present. With ground potentially leased that has no gas reserves, it is the perception of gas development that deters people from relocating to or visiting the Valley and harms the overall economy of the area. The oil and gas leasing in the Valley area would kill off the thriving small businesses that are dependent on having clean water supplies that meet organic standards, clean air and an overall healthy environment. The gas industry should not be allowed to adversely impact the established organic agricultural businesses and the growing ag tourism businesses that are here.

Comment Number: 000257_GoldmanA_20161026-4
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
Finally Alternative B1 recommends no leasing in much of the Hotchkiss Paonia area, Preferred Alt D does little to incorporate any of that input with the exception of some NSO stipulations. Gas drilling of any kind in the North Fork adjacent to water sources, agricultural areas, scenic view sheds and tourism dominated businesses will forever negatively impact the health and economic wellbeing of those communities.

BLM_0165506

Comment Number: 000260_HunterL_20161028-4
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final RMP. Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, non-industrial, and agricultural lifestyle.
The final RMP must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Comment Number: 000266_SouleM_20161025-2
Organization1:
Commenter1:Michael Soule
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley is also fortunate in being situated between two major hubs of recreational and cultural activity, namely the Aspen region in the Roaring Fork Valley, and Telluride/ Montrose to the south, both of which have excellent airports and highway access that serve it unique economy. I would be forced to move elsewhere if these resources were compromised by unhealthy industrial, polluting forms of development such as natural gas extraction.
My question is whether this area will retain these qualities. In the past, episodes of destructive mineral extraction have lead to devastating, boom or bust cycles that ultimately benefitted only corporate interests in other states. Our region will either succumb to fossil fuel industrialization or it remain on its current trajectory – one that encourages a steadily growing economy based on artisanal farming, fruit orchards, ranching, hunting, fishing, and tourism (including eco-tourism).
The valley will either succumb to fossil fuel industrialization or it will remain on its current, thriving trajectory based on ecotourism, artisanal farming, ranching, and hunting and fishing.

Comment Number: 000280_KnutsonD_20161029-3
Organization1:
Commenter1:David Knutson
Commenter Type: Individual
Comment Excerpt Text:
1. I urge your team to seriously consider and incorporate the "North Fork Alternative Plan, B1" in the final RMP. My wife and I have lived in the North Fork valley since 2003 and are homeowners there. We deeply appreciate the access we have to clean water, clear air, and local organic food sources. I am concerned that if the North Fork alternative is not incorporated, we could experience a deterioration in water quality and air quality due to increased industrial hydraulic fracturing as allowed in other alternatives of your draft plan. We would be personally impacted by loss of real estate value and concerns for our health - we are both in our 60's and our respiratory systems would not tolerate poor air quality

Comment Number: 000285_WutchiettC_20161027-4
Organization1:
Commenter1:Cynthia Wutchiett

BLM_0165507

Commenter Type: Individual
Comment Excerpt Text:
You have also not considered:
1. The decline in property values for residents adjacent to the planning area. My residence, which is the culmination of my life's work and savings, would be only 400 yards from an area that has the potential for a gas well. I will secure an MAI appraisal of my residence and, if the adjacent land is leased, will again have an MAI appraisal and will take legal action to obtain reimbursement for the decline in value.

Comment Number: 000286_HellecksonB_20161031-1
Organization1:The West Elks Winery Association
Commenter1:Brent Helleckson
Commenter Type: Private Industry
Comment Excerpt Text:
The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3. This
is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3--176.

Comment Number: 000286_HellecksonB_20161031-2
Organization1:The West Elks Winery Association
Commenter1:Brent Helleckson
Commenter Type: Private Industry
Comment Excerpt Text:
The level of development implied by the preferred alternative will certainly impair our ability to attract visitors to our tasting rooms. It is difficult and expensive to convince travelers to make the 5 hour journey from the Front Range to the North Fork Valley. Placing a large gas and oil field development between the North Fork and the Front Range will make that much more difficult and expensive. Further, all of us growing grapes in the Valley, rely on readily available, clean irrigation water. The development implied by the DRMP preferred alternative would severely impact our watershed, snowpack, spring runoff and, consequently, the timely availability of irrigation water. Also, the likelihood of surface and ground water contamination from oil and gas activity inhibits our ability to produce quality grapes of unique characteristics, thereby eroding our competitive advantage in the marketplace.

Comment Number: 000303_ChapinJ_20161027-3
Organization1:
Commenter1:Jenny Chapin
Commenter Type: Individual
Comment Excerpt Text:
The North Fork Valley's economic diversity relies upon the ranching and agricultural industry. Unforeseen contamination could significantly impact the land and subsequently the industries that are so vital to the economic stability of this area. Mineral leasing and severance tax funds will not compensate

BLM_0165508

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 567 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

for the loss of agricultural endeavors and its attributed labor force. The North Fork Alternative B1 would ensure that all agricultural irrigation waters would be protected through the buffer that is stipulated in the plan.

Comment Number: 000304_CarreD_20161023-3
Organization1:
Commenter1:Danielle Carre
Commenter Type: Individual
Comment Excerpt Text:
Finally, I want to comment on the economy. We are an area that suffers from a poor economy and in the past we have relied on the extractive industries for a significant portion of our economy. I think that our commissioners have been of the mind set to " put all their eggs in one basket" ....the extractive industries basket. The oil and gas industry provides a" boom and bust economy" a few segments of our economy benefit for a short while and the rest of us suffer the consequences of the pollution, increased traffic and the resulting road damage, and more. The problem is that the economy that is taking root here, one of organic production and tourism, the development of remote workers coming here for IT work, campuses like Solar Energy International and the increase of solar jobs ( we own a solar installation company) is one that is susceptible to the effects of the gas and oil industry. Tourists are not going to fish in what are now "Gold Medal" waters once they are polluted (or even perceived to be polluted) nor will they come if a haze of ozone pollution obliterates the views. The reputation of our organic produce will not hold when people know that we are surrounded by gas wells. People will not want to relocate here to work remotely when they feel that their health and welfare will be threatened by the gas and oil industry.
Developing is an economy of the long haul. I think that this economy and those of us who work in it ought to be given due consideration when looking at actions on our adjacent public lands. The proposed alternative does not give us this consideration.

Comment Number: 000311_GallA_20161031-2
Organization1:Backcounty Hunters and Anglers
Commenter1:Adam Gall
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Along with disrupting historical winter range, numerous watersheds that feed the North Fork of the Gunnison and the Smith Fork of the Gunnison would be literally surrounded by leases. These are both major tributaries of the main Gunnison River, which is world famous for it's Gold Medal trout waters that bring in fishermen, women and children from every state in the lower 48. The hunting and fishing opportunities one can experience in the North Fork Valley are world-class. These industries are robust, well-managed and, perhaps most importantly, reliable, year after year, decade after decade. There is no boom and bust component to the hunting and fishing industries. The concept of sacrificing the stability and reliability of well established economies revolving around clean water and healthy habitat for fish and big game for yet another boom and bust stab at resource extraction is unacceptable. It flies in the face of the BLM's own initiative of Connecting with Communities that they have proposed in their own outreach programs.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-4
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165509

o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta, Montrose, Gunnison, San Miguel and Ouray Counties. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-5
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of all West Central Colorado Counties. This is a more accurate way to reflect livestock grazing in the RMP.

Comment Number: 000345_ReeseC_20161027-12
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Recreation, Agri-tourism, Scenic Viewsheds and Real Estate – Would be negatively impacted by the Preferred Alternative plan. he final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Comment Number: 000346_BurnsK_20161030-2
Organization1:Burns Ranch
Commenter1:Karl Burns
Commenter Type: Individual
Comment Excerpt Text:
Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County and other counties. This is a more accurate way to reflect livestock grazing in the RMP. IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. if livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

Comment Number: 000347_GleasonB_20161028-1
Organization1:Boot Doctors
Commenter1:Bob Gleason
Commenter Type: Individual
Comment Excerpt Text:
As a permitted outfitter, my business provides recreational experiences to visitors and local citizens on the Resource Area. I believe mineral resource development would severely degrade the experience our clients have. Recreation is the key economic driver in our region and is a far more sustainable and environmentally much friendlier than extractive industries. Our business provides direct employment to

BLM_0165510

60 persons in San Miguel county and through our purchasing of supplies and services we provide economic benefit to many more. We feel mineral resource development in the area would be devastating to our enterprise.

Comment Number: 000348_EdstromS_20161101-3
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
The members of DAMB are not just focused on the advocacy of mountain bike trails for our own leisure. Our group is comprised of people from all walks of life with differing jobs and careers, and participate in a variety of community improvement organizations. We are experiencing the economic challenges that come with the decline of coal mining operations in Delta County.
A recent economic study funded by Delta County Economic Development (DCED) concluded that the fastest and most attainable route to economic growth in Delta County would be through tourism, primarily agricultural and recreational tourism. While the Delta Tourism Council is working to promote our rich organic agricultural farms, and vinyards, we feel that the establishment of SMRA/ERMAs in conjunction with sustainably designed trail systems will fast track the popularity of all types of tourism in the area.
Recognizing that families are multidimensional when it comes to travel needs, we believe the more variety of tourism opportunities we can supply for all age levels, the greater opportunity for economic growth through family and baby boomer friendly tourism experiences. We see the building of mountain biking trail systems throughout the county as an integral component of economic growth through tourism.
For example, the town of Fruita, Colorado, receives $1.5 million from mountain biking annually; has had a 51% increase in sales tax revenue, including 80% sales tax revenues from restaurants. According to americantrails.org over 50% of bicyclist earn $100,000 or more per year and over 80% of bicyclist earn $50,000 or more per year. More supporting evidence of economics of cycling can be found at this link: http://www.americantrails.org/resources/economics/economic-benefits-trails-macdonald.html
The economics of recreational development directly related to mountain biking is further exemplified in the following articles. This piece follows the history of user data and economic benefits that Fruita and the Grand Valley have enjoyed due to mountain biking:
http://www.steamboattoday.com/news/2013/may/19/biking-series-part-2-how-fruita-did-it/This is an article giving an overview of economic impacts found from mountain biking world wide:
http://www.pinkbike.com/news/economic-impacts-of-mountain-biking-tourism-2014.html,
http://www.pinkbike.com/news/economic-impacts-of-mountain-bike-tourism-2016-update.html .
Lastly, here is an economic and impact analysis study of mountain biking trail development in Alabama that shows influences of mountain bike tourism. http://headwaterseconomics.org/trail/13-coldwater-mountain-bike-trail/ . The potential for trails in varying terrain and scenic beauty, would add Delta County to the list of major mountain biking destinations in Colorado, and enhance the Western Slope as a world class mountain biking destination, rivaling or surpassing Moab.

Comment Number: 000350_GulickS_20161031-1
Organization1:
Commenter1:Steve Gulick
Commenter Type: Individual
Comment Excerpt Text:
The North Fork has long been known for its scenery and its recreational opportunities, and tourism is booming. The valley is also developing a national reputation for its organic agriculture, for its leadership in solar energy (Solar Energy International is headquartered in Paonia), and now for its revolutionary

BLM_0165511

high speed fiber optic communications. All of these have made the North Fork a magnet for progressive and high-tech companies. Note that the Hive in Paonia provides office space for new, small, and transitional businesses. Unfortunately, the cultural values of high-tech and fossil fuel development tend to be in severe opposition, and it would not take long for a North Fork full of drill rigs and tankers to lose its charm and allure.

Ranching and agriculture are key to the North Fork economy. Organically grown fruit, vegetables and livestock have provided the North Fork with an enviable reputation for quality organic produce. Such a reputation is highly fragile; the intrusion of oil and gas operations into the area could tarnish that reputation even if they were at some distance from the nearest organic farm. And any petrochemical spills in the North Fork area could have drastic impact if they got publicized. Even if the organic produce itself was not affected, public trust would be eroded.

Comment Number: 000350_GulickS_20161031-2
Organization1:
Commenter1:Steve Gulick
Commenter Type: Individual
Comment Excerpt Text:
In addition, oil and gas development would result vastly increased highway traffic in the North Fork. A 2014 report by AP found that fracking requires 2,300 to 4,000 truck trips per well to deliver fracking fluids. The increased truck traffic causes more accidents, and census data in six American drilling states shows that traffic deaths have more than quadrupled since 2004 in some fracking regions. Drilling near Paonia would necessitate such traffic to pass through the town center, passing a couple blocks from my home. It would ruin the serene character of the town for the worse - in fact, we moved to Paonia in part because the main highway (133)bypassed it completely.

Comment Number: 000356_AdamK_20161031-13
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Comment Excerpt Text:
Data indicates that grazing, as a land use in the UFO, is not strictly for traditional and cultual importance; it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

Comment Number: 000356_AdamK_20161031-14
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Comment Excerpt Text:
IMPLAN calculates economic impact based on forage used in the UFO; however, additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, operating costs increase for livestock operators and thus increases the likelihood of producers scaling back and reducing their numbers.

Comment Number: 000356_AdamK_20161031-16
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165512

All economic impacts need to be taken into consideration before classifying an area as SRMA, EMRA or Wilderness.

Comment Number: 000361_MacMillanM_20161101-1
Organization1:
Commenter1:Megan MacMillan
Commenter Type: Individual
Comment Excerpt Text:
We bought our house in July of 2015 and have witnessed an increased demand for real estate in this valley as people choose to move and invest here due to the lifestyle allowed. The final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities

Comment Number: 000370_ChamberlinJ_20161029-1
Organization1:
Commenter1:Judith Chamberlin
Commenter Type: Individual
Comment Excerpt Text:
I feel the BLM did not consider the unique nature of the North Fork Valley in its draft RMP for the area. The current plan did not consider, and is incompatible with, the community's plans for a diversified, resilient economy. The North Fork Valley is and should be kept as protected area for agriculture and recreation, and it's biodiversity must be protected.

Comment Number: 000373_ThompsonG_20161030-10
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
In addition there needs to be strategic analysis done on resource utilization (energy versus agricultural development) as it relates to national security and food independence (food security). From a strategic viewpoint it is my contention that we, as a nation, need to do everything possible to preserve and protect the productivity of our agricultural lands.

Comment Number: 000373_ThompsonG_20161030-3
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
Recreation and Agri-tourism are significant drivers of economic growth for the North Fork Valley. The phenomenal beauty and pristine nature of the landscape are bringing growing numbers of tourists and recreationalists to the valley. Hunters continue to come to lands around the valley due to its prime location and excellent animal habitat. Cycling tours are growing in popularity with participants coming from all over the world. These bicyclists typically ride a loop that includes Aspen, Crested Butte and Paonia. Should Highway 133 become congested with heavy trucks and should the view shed become littered with oil and gas tanks, well pads, etc. these cyclists would likely go elsewhere. These economic drivers would then be lost due to increased oil and gas activity in the North Fork Valley area. The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley.

BLM_0165513

Comment Number: 000373_ThompsonG_20161030-8
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
Traffic from increased oil and gas activity will mean more noise and pollution along Highway 133. I live less than a mile from Hwy 133 and want BLM in the final plan to establish adequate mitigation measures for traffic. Those measures should include provisions that would reduce noise and exhaust levels from heavy trucks.

Comment Number: 000383_HellecksonB_20161031-3
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Comment Excerpt Text:
Impacts to Economic Viability of Existing Enterprises
Much of the recent improvement in economic outlook for the North Fork Valley rests upon the desirability of the natural and man-made features of the area. Personal communications with local realtors indicate that both retirees and young families are relocating to the area for precisely the same reasons our family did in 1994. Further, the rapidly developing agritourism sector relies on attracting tourists from the Front Range, and from out of state, to enjoy the amenities offered in the Valley. Our family winery relies heavily on our ability to attract out-of-area customers to our tasting room, vineyard, and guest cottage. Fully 80% of our income is derived from these sources and we spend significant resources each year attracting these visitors. While the Valley is currently enjoying a blossoming of businesses such as our own (e.g., wineries, organic farms, traditional farms, farm-to-table venues, farmstays, lavender farms, etc.) the robust growth we are experiencing would be brought to a halt should the watershed develop as the BLM proposes. It is already difficult and expensive to convince visitors to make the 5 hour trip from the Front Range. It would become exponentially more so if they were asked to traverse a gas field of multiple thousands of wells, with its attendant truck traffic, flares, pipelines, etc. The destruction of the visual amenities, the clear air, dark skies, and pastoral/agricultural character of the Valley would foster the destruction of those entities dependent upon these values. In making our decisions, we have relied on the BLM to manage the lands under its jurisdiction so as to maintain these values. Failure of the BLM to do so represents and existential threat to our livelihood. Nowhere, either in the DRMP, in associated presentations made by the BLM-UFO, in communications made by the interested energy companies, by the State of Colorado, the COGCC, or by the Delta County Commissioners has anyone articulated a method by which oil and gas development can be made compatible with the entities described above. Lip service is often paid to the minimization of impacts, the use of "Best Management Practices," and mitigation. However, no analysis of the expected impacts to existing enterprises is offered. There is no mention of restrictions on the pace or scale of development, no mention of liquidated damages for unmitigated impacts, no mention of resolving conflict of use in favor of existing entities, etc. In essence, those of us who live in the Valley are tacitly asked to shoulder these costs of energy extraction in order to facilitate the profitability of the oil and gas industry, and the tax, royalty and severance streams that accrue to various governmental agencies.

Comment Number: 000388_CerianiJ_20161023-7
Organization1:Stucker Mesa Domestic Water Company
Commenter1:Jean Ceriani
Commenter Type: Local Government
Comment Excerpt Text:
There are several farms and ranches on Stucker and Wakefield Mesas that depend on SMDWC for stock water and water for food production. These farms and ranches are managed free of chemicals.

BLM_0165514

Any threats to the health of the land and livestock that might arise from oil and gas drilling pose severe economic repercussions and would be totally unacceptable.

Comment Number: 000388_CerianiJ_20161023-9
Organization1:Stucker Mesa Domestic Water Company
Commenter1:Jean Ceriani
Commenter Type: Local Government
Comment Excerpt Text:
There is also the negative economic impact on the SMDWC shareholders should their domestic water source suffer damage. A water tap would probably currently sell for $15,000. Several years ago, one sold for $10,000. At 21 taps, the value of the company, not counting infrastructure, may be as high as $315,000.

Comment Number: 000389_KittelsonK_20161030-1
Organization1:Cycling Western Colorado
Commenter1:Kristina Kittelson
Commenter Type: Individual
Other Sections: 32.1
Comment Excerpt Text:
Finally in the Gateway area, many communities are facing enormous economic impacts due to the declining coalmine industry. I encourage you to take into consideration that creating a travel management plan supporting mountain biking trails will help these ailing towns diversify their economies through outdoor recreation

Comment Number: 000395_WinneR_20161031-1
Organization1:The Rose
Commenter1:Roberta Winne
Commenter Type: Individual
Comment Excerpt Text:
In the last ten years we have seen a steady growth of sustainable agricultural businesses: wineries, fruit orchards, cider production, organic vegetable farms, hops field (not to mention the still-problematic and hence undeveloped cultivation of legal marijuana). We are also anticipating a nascent mountain bike trail system with its attendant economic benefits. All of these businesses provide realized and potential tax bases, employment opportunities, and a positive regional brand that attracts visitors and investors. To overlook the multitude of rare scenic and regional attractions and risk undermining them, as the full implementation of extractive mining threatens to do, impacts our water sources, air quality, wildlife, recreational advantages, and biologic equilibrium. This, in turn, threatens our livelihoods, our collective health, and our enviable qualities of life.
The effects of extractive oil and gas leasing in communities have been observed and documented. The impact of highly paid, transient work forces changes the economic and social structures of the communities that host the activity. A boom economy creates a rampant inflation of services and property. Businesses benefit in the short run from a boom, but social cohesion and long-term viability of these communities are deleteriously affected. The short-term gains in grocery, liquor, gasoline sales, for example, must be weighed against the loss of a more diverse economy that attracts businesses like tourism, recreation, and farming. Not incidentally, these businesses are all thriving and in various stages of development in the North Fork Valley. The costs to the infrastructure of a "boom town" are high. Higher costs for road maintenance, public safety, and health and education services come with an industry that, after inhabiting a community, may leave it changed, denuded, unrecognizable.

BLM_0165515

Comment Number: 000399_Hockenbery_20161028-1
Organization1:
Commenter1:Mary Hockenbery
Commenter Type: Individual
Comment Excerpt Text:
I am writing this letter to question why this Draft RMP allows for gas leasing in the lower and central NFV - when many years of exploratory drilling have shown little in the way of commercially viable resources in these areas. Allowing leasing in these areas creates conflict with our economic recovery and will economically harm many residents in our valley while providing very little local economic benefit in the way of permanent jobs. The losses far outweigh the benefits. Having a lease sale go forward in the future would be devastating to our communities and our efforts to create a sustainable long term economy based on our diverse assets.

Comment Number: 000401_ShoemakerS_20161028-13
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Other Sections: 14.3
Comment Excerpt Text:
The RMP must address the massive impacts to wildlife, wildlife habitat, and hunting, along with related economic issues.

Comment Number: 000401_ShoemakerS_20161028-14
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must deal with the impacts to regional and state food security.

Comment Number: 000402_RatnerJ_20161028-64
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP/EIS must adequately and honestly analyze the economic impacts of livestock grazing on BLM lands. The BLM has pandered to "lifestyles" for ranchers while ignoring the actual contribution of the livestock grazed to the local and regional economy or the economic impacts of the land degradation that takes place from livestock grazing. The Fish and Wildlife Service publishes reports on the value of wildlife-associated recreation that shows values of hundreds of millions of dollars to billions of dollars of revenue related to hunting, fishing and wildlife watching in each western state23. [23 U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.] In addition, the cost of polluted water, loss of watershed storage due to soil compaction and loss of herbaceous cover are not counted in the costs of livestock grazing. As the reference below shows, in actuality, rural communities as well as livestock permittees depend on other sources of income. Laws require that public lands be administered in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.
Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies. Their numbers and contribution pale in comparison to the natural values of our public lands.

BLM_0165516

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 575 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002)24 points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West. [24 Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west. Island Press.] That reference can be found on-line at: http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf

Comment Number: 000402_RatnerJ_20161028-65
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP Economic analyses should include consideration of this information and the following:
- costs of administration
- costs of installation and maintenance of range improvements borne by the BLM and/or funded by county range improvement funds
- grazing fees collected and their distribution to various entities
- grazing fees collected and net return to the Forest Service and the American people, and separate out the dollars returned to grazing permittees and local counties.
- value of livestock grazing gross revenue to the permittee at current market rates
- value of wildlife-associated recreation (DOI 2002)
- loss in value of wildlife associated recreation to livestock grazing by using equivalent AUMS consumed by livestock as applied to wildlife needs (AUMs) and economic benefits
- cost of soil erosion and loss of groundwater recharge and streamflow
- cost of water pollution
- the net contribution of the individual livestock operations under consideration to the county and regional economy
- compare the individual livestock operation in dollars and jobs to the local, state and regional economy and report what percentage this allotment comprises of this total
- compare these various economic values with other economic and employment sectors at those local, state and regional levels.

Comment Number: 000402_RatnerJ_20161028-68
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Revised RMP should also contain a complete and unbiased economic analysis of livestock grazing, including the income to the federal government and counties of permitting grazing on allotments within the planning area and an accurate and thorough breakdown of costs of administering livestock grazing in the planning area. Costs should include restoration of habitats, monitoring, fence maintenance, and administrative and planning expenses. The costs of livestock grazing in terms of loss in ecological services should be analyzed. Ecological services compromised by livestock grazing include watershed function as a result of reduced ground cover, soil compaction and loss of infiltration capacity and water storage, soil erosion, loss of forage and habitat for native species. The forage consumed by livestock must be valued in terms of the value of deer and other wildlife species displaced, the loss of hunting and wildlife watching opportunities Further, in terms of the value of livestock grazing itself, Dr. Thomas Power (Power 2002) has developed questions that allow a determination of the significance of forage used on public lands to the economy as a whole. These are:
5. "What portion of the value produced by cattle and sheep operations is associated with feed used?

BLM_0165517

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 576 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 –
Socioeconomics and Environmental Justice)

6. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

7. What portion of the total agricultural activity involves raising cattle and sheep?

8. What part of the total economy is represented by agriculture."

The following references provide insight into non-market or ecosystem service valuations of natural resources: (1) Daily, Gretchen C and Katherine Ellison. 2002. The New Economy of Nature; (2) Committee on Assessing and Valuing the Services of Aquatic and Related Terrestrial Ecosystems, National Research Council. 2004.Valuing Ecosystem Services: Toward Better Environmental Decisionmaking. Washington DC: National Academies Press; (3) Loomis, John., Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results from a Contingent Valuation Survey. Ecological Economics. 33, pp. 103-117. 2000. (4) Loomis, John. Environmental Valuation Techniques in Water Resource Decision Making. Journal of Water Resources Planning and Management, Vol. 126, No. 6, pp. 339-344. November/December 2000.

Comment Number: 000409_DayB_20161031-25
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Pages 4-460 and 461. We agree with BLM that special designations, including wilderness, increase nonmarket values, property values, and economic activity. Actions that emphasize resource development have greater negative impacts on nonmarket values and quality of life. This applies to oil and gas development in particular.

Comment Number: 000410_BolandB_20161027-10
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
Meanwhile, the Draft RMP establishes that the economy of the planning area is driven by recreation, agriculture, and tourism. In particular, the Draft RMP states that "[r]ecreation plays an important role in the planning area's economy, contributing directly through the purchase or access fees, special use permits, fishing and hunting licenses, and the services of local guides and outfitters, and indirectly through the purchase of commodities, such as gasoline, accommodations, and food and beverages." Id. at 4-456. The economic impact from hunting and fishing licenses and CPW fees in Delta County in 2007 is reported to be $27,840,000.00. Id. at Table 4-82.

With respect to the impact of agriculture on the planning area economy, the Draft RMP reports: Locally, agriculture represents approximately 3.6 percent of jobs in the planning area counties, based on 2010 numbers. . . . Impacts on local communities might be greater, as agriculture represents a traditional livelihood and plays an important role in the sense of place and history of these communities. For example, the North Fork Valley represents a region where traditional agriculture uses have maintained importance due to the presence of organic and conventional small-scale farms, orchard, and wineries. Delta County is home to the highest concentration of organic farms in any Colorado county and supports the West Elk American Viniculture Area. Additionally, the area supports agritourism, visits to farms and orchards to pick produce or view operations. Based on the 2012 agricultural census, Delta County had contributions of $2,827,000 from farm-related sources, including $293,000 from agritourism operations. Id. at 4-459.

BLM_0165518

Finally, with respect to tourism, the Draft RMP states that "industrial development that substantially alters the visual characteristics of the landscape might, over time, result in fewer tourists visiting the area from afar and spending money in local hotels, restaurants, and shops." Id. at 4-460.

Looking beyond the area's economy, the Draft RMP found that "[a]ll five socioeconomic units cited the scenic beauty of the landscapes and sense of community as strong factors in their decision to live and work in the area. While no monetary value can be placed on these, they do play an important role for both retaining residents and attracting new visitors. These factors could be impacted in all socioeconomic units by future land use decisions and development in the area."

Comment Number: 000410_BolandB_20161027-8
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
Impacts on Socioeconomics. It is difficult to understand why the BLM would prefer an alternative with so many adverse impacts on the planning area. The explanation appears to lie in connection with the BLM's socioeconomic analysis. In this regard, the Draft RMP states that the BLM's preferred alternative (Alternative D) "would aim to balance resource uses, such as energy development, with resource conservation, resulting in economic opportunities associated with resource development and preserving scenic and environmental values." Id. at 4-475. A closer look at the Draft RMP demonstrates that the BLM's conclusion is fatally flawed.

First, the BLM does not even attempt to quantify the economic impact of oil and gas production on the resource area, admitting that "[f]or some resources, it was determined that the level of uncertainty for production or use did not allow for meaningful economic modeling output. Oil and gas production falls into this category. . . ." Id. at 4-452. Due to the speculative nature of oil and gas production, "economic modeling would not result in meaningful output." Id. [Footnote: Consequently, the BLM's principal justification for adopting Alternative D as its preferred alternative--to allow for the "economic opportunities associated with resource development"--lacks any factual support.]

Because the BLM has not attempted to quantify the value of oil and gas production, it similarly does not attempt to quantify the economic impact of federal royalties on the community's economy, stating that "impacts would depend on level of resource extraction and would vary. . . ." Id. at 4-463.

As a result of the BLM's inability to quantify the economic impact of oil and gas production in the planning area, the Draft RMP contains no evidence that oil and gas development would produce any economic benefit whatsoever. The only evidence contained in the Draft RMP is to the contrary--that oil and gas development is "historically not a major presence within the planning area." Id. at 4-478. The Draft RMP notes further that "[w]ithin the North Fork Valley, currently 116 gas wells have been drilled on federally managed oil and gas leases, including split-estate lands. Of these wells, 15 are presently producing natural gas, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged." Id. Consequently, the Draft RMP fails to provide any evidence that oil and gas production provides any economic benefit to the planning area or has any meaningful impact on meeting the nation's oil and gas needs.

Comment Number: 000410_BolandB_20161027-9
Organization1:
Commenter1:Boyd Boland
Commenter Type: Individual
Comment Excerpt Text:
Moreover, the BLM acknowledges the adverse impacts that the boom and bust economies created by oil and gas drilling can have on small communities like those of the North Fork Valley, stating: The BLM has limited control over the pace of development because it authorizes only economic activities but does

BLM_0165519

not perform these activities. An abrupt shift in the pace of development could result in short-term impacts on the demand for housing and community services. It also could have short-term impacts on the supply of tax revenues from residences or businesses to support community services due to short-term changes in job opportunities and the resulting change in in-migration or out-migration trends. Any such impacts would likely be more severe for smaller communities, which are less likely to be able to absorb a sudden influx of new residents, or to continue to support existing infrastructure if out-migration were to increase suddenly.

Comment Number: 000413_ChmielL_20161031-1
Organization1:
Commenter1:Leonard Chmiel
Commenter Type: Individual
Comment Excerpt Text:
I have witnessed a marked shift in the economy here in this short period of time. New full time residents have supplanted the traditional sources of income. Doesn't seem the draft Preferred Alternative RMP recognizes that fact, and it is an important fact.
The Uncompahgre Field Office planning area in the preferred alternative RMP hasn't taken into account that the Valley community has become the creative and entrepreneurial locus of a for all of Western Colorado, for many in Utah and the Front Range.
The draft RMP only briefly mentions current direction of agriculture in the North Fork Valley. This is a gross omission. Organic farming, ranching, orchard culture, and vineyards including my own are having a pronounced economic effect and will become even greater in the future. The advent of High Speed Internet provided by DMEA in the near future will provide high tech entrepreneurs with the incentive to move here. This addition to the Valley's community will broaden the economic base for all of Delta County. These folks will be moving here for the benefits of the Valley as it is now, not for minimal opportunities for employment from leasing of it's surrounding BLM lands, To imagine this influx of people moving here to enjoy the "benefits" of industrialization of the valley is a bit of a stretch.
40 CFR 1502.15 in my understanding, requires a succinct description of the environment of the area that is under consideration. Seems to me this has not been done in the BLM Preferred Alternative and is a glaring omission of this requirement.

Comment Number: 000420_HovdeC_20161101-18
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
2012 Colorado Agriculture Statistics data indicates that Livestock sales for Delta County are $35,966,700 annually. This is direct sales information and does not include a multiplier. When a conservative multiplier of 2.4 is used, the impact to Delta County is $86,320,080 strictly from the livestock industry. Attached to our comments, is a fact sheet from Colorado State University Extension. Colorado Agriculture Statistics shows 11,267 head of sheep in Delta County and 17,000 cattle.
o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.
o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

BLM_0165520

Comment Number: 000427_WalshOeinckP_20161031-1
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
The impact of industrial traffic on fragile rural roads will be devastating, not just the damage to the structure of the roads themselves but the impact on the mobility of residents and visitors. My husband works in the Roaring Fork Valley and relies on Hwy.133. A recent rock slide added over one hour to his commute and it could have been much worse if the slide occurred in a different location. The danger of very many large trucks to the safety of commuters needs to be studied. There is also the diminished quality of life in the Town of Paonia and outskirts caused by the constant parade of heavy, loud trucks spewing carbon monoxide, running over pets and making leisurely strolls with the family a thing of the past. My frequent walks up Minnesota Creek Road with my dog will become unpleasant and too dangerous.The bucolic nature of the community which drives the economy in so many ways will be destroyed.

Comment Number: 000427_WalshOeinckP_20161031-10
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
Even if highway views can be preserved through site regulations, the existence of well sites back country would diminish the pleasure of hikers and hunters and they will stay away and take their money elsewhere.

Comment Number: 000427_WalshOeinckP_20161031-11
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
Despite coal mine closures and the loss of jobs for hundreds of local families, real estate values are currently strong. That will end with even the suggestion that gas wells could become part of the landscape

Comment Number: 000427_WalshOeinckP_20161031-12
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
. The few and temporary jobs involved in oil and gas development will surplant many existing long term jobs in agriculture, arts and culture, and tourism.

Comment Number: 000427_WalshOeinckP_20161031-13
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
In the decades since we moved here, we have watched the North Fork Valley become a mecca for artists of many different disciplines. Many festivals and music events have cropped up, luring out-of-towners who spend money at local businesses. Without the threat of extractive industries and

BLM_0165521

the destruction they bring, the self- determined trajectory of this state -designated Creative District is to expand on this cultural richness.

Comment Number: 000427_WalshOeinckP_20161031-7
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
The negative impact to the existing economy which depends on scenic beauty, clean water and air and low traffic ingress and egress. The branding of the North Fork cannot survive even the perception of the loss of any of the above qualities.

Comment Number: 000427_WalshOeinckP_20161031-9
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
The fragmentation of wildlife habitat impacts not only the wildlife but the hunting industry. Hunting is a way of life here.

Comment Number: 000446_KlingspornK_20161101-1
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Comment Excerpt Text:
At the same time, with nearly 500,00 visitors per year coming to these public lands, they are a critical resource that drive the dominant economy of our region, tourism. My quality of life and my identity, but also my livelihood depends on maintaining the beauty, integrity, and diversity of these unique landscapes. Despite a long history of extractive use, Telluride has been able to successfully transition to a tourism-driven economy based on sustainable use of these lands that surround us. The income our visitors have brought in has even enabled us to start cleaning up the legacy of scarred land and toxic drainage that mining left behind. We do not want to move backward in time.
While grazing, oil and gas leasing, and other forms of resource development are also significant and historic uses on lands in the UFO, I ask you to consider as well the much more significant revenue generated in tourism every year in Telluride.
Conversely, protection of terrestrial and riparian habitats through means such as the Ecological Emphasis Areas, Special Recreation Management Areas, Areas of Critical Environmental Concern, Lands with Wilderness Characteristics identified in Alternative B will serve to strengthen our economy, improve our resilience, and provide our visitors and residents with high-quality outdoor experiences.

Comment Number: 000451_BishopB_20161031_HasAttach-12
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
The valley has a reputation of being a place just short of Shangri-la. Whether it is deserved or not, whether it is hyperbole or not, is not the issue. It is what people who live here, visit here, have heard about here, think and believe. That reputation is gold. It provides a huge base to our economy. While it is strong, it is also fragile. Any change in the use of land that impacts the valley either enhances or detracts from that reputation. Alternative D would fatally damage that reputation. BLM's defense of Alt.

BLM_0165522

D in 4 - 477 may be appropriate for lands outside of the North Fork Valley, but stating that "continued development of energy and mineral resources would allow for economic contributions from resource extraction, while preserving values that impact quality of life nonmarket values . . ." is patently false.

Comment Number: 000451_BishopB_20161031_HasAttach-14
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Comment Excerpt Text:
BLM must take ownership of the impacts of the management of its lands on the private properties and residents of the RMP planning area. BLM claims of lack of control over public perception and concerns, transportation, and other matters regarding mineral extraction are disingenuous. While it may lack control, BLM must recognize these concerns and include discussion in the RMP of how the allowed use of its lands will impact others. BLM recognizes the value of agriculture, open lands and view scape in the North Fork Valley (4-459, 460). The RMP also states that public health and safety is a priority (4-444). BLM has utterly failed to advance this priority by not acknowledging the potential impact on roads and other infrastructure of oil and gas extraction in the North Fork Valley.
The roads in the valley are not built to handle the heavy truck traffic required by oil and gas well drilling and will need constant and costly repair. If all the proposed areas in the RMP are open for drilling, the low key ambiance of a small town - Paonia - will be destroyed by the large trucks traveling through the middle of downtown. Public safety will be severely impacted everywhere throughout the North Fork Valley by the presence of so many large vehicles.

Comment Number: 000454_OchsD_20161101_CBMBA-2
Organization1:Crested Butte Mountain Bike Association
Commenter1:David Ochs
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
The Crested Butte Mountain Bike Association (CBMBA) supports the creation of an SRMA on Jumbo Mountain east of Paonia as outlined in Alternative B (lines 377-428) of Resource Management Plan 1610(COSO50). The North Fork area has no established mountain biking network and the creation of an SRMA on Jumbo Mountain will provide this area with a recreation amenity that will serve the local and surrounding communities with an economic driver and healthy lifestyle opportunities.

Comment Number: 000456_ColeK_20161031-8
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
Accurate portrayal and analysis of the social and economic impacts of multiple use of BLM lands is lacking in the DRMP. It appears that parts of the DRMP rely on old, outdated, or non-applicable and inconsistent socio-economic data and analyses, resulting in underestimated impacts of multiple uses of the BLM to the local and regional economy.

Comment Number: 000456_ColeK_20161031-9
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:

BLM_0165523

Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of the region. IMPLAN calculates economic impact based on forage used in the UFO; however, additional analysis needs to include the value of the livestock for the entire year. This is a more accurate way to reflect livestock grazing in the RMP. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus the region. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers

Comment Number: 000459_HardyR_20161027-1
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines can all be harmed by air
pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.
• The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations. Analyzing the effects of drilling and all the associated risks to this agricultural area must be addressed in detail.

Comment Number: 000459_HardyR_20161027-12
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
The BLM did not adequately consider the impact of industrial oil and gas operations, air
pollution and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.
• BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.
• BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities.

Comment Number: 000471_NoeD_20161101-15
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Economic impacts. Oil & gas development would have an adverse effect on recreation, agritourism, scenic viewsheds, and real estate in the North Fork area. This part of Colorado is gaining renown for it idyllic character, organic farming, recreation lifestyles, and for its clean air and water. Compared to long-cycle employment opportunities that exist here from coal mining, boom-and-bust oilfield economics offer little in the way of long-term economic solutions.

BLM_0165524

Comment Number: 000475_PierceC_20161030-6
Organization1:
Commenter1:Carol Pierce
Commenter Type: Individual
Comment Excerpt Text:
In your preferred proposal choice; Chapters 2 (Affected Environment), and 4 (Environmental
Consequences) did not even acknowledge the scope of the rarity and uniqueness of the North Fork
area. The area is unrivaled in this state for organically raised vegetables, fruit, hay, livestock, and
vineyards. The BLM needs to fully analyze the effects of water contamination and air pollution, which are
inevitable, for the entire area.
The effect of impacts on the present local resources and economical endeavors will be thwarted and the
investments would be shifted from what is presently in place regarding agro-tourism, recreation,
renewable energy, agriculture and organically grown foods. It is likely we'd never regain that foothold
again.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-20
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM's failure to study the market effects of its plan is particularly egregious because BLM was a
cooperating agency on the U.S. Forest Service's preparation of a supplemental Draft EIS that looked at
the market effects of a proposal to open up additional lands for coal production in much of the
Uncompahgre planning area. The U.S. Forest Service's 2015 analysis, though flawed in significant
respects, nonetheless used a robust energy-economy model to predict impacts to wind and solar
generation from a proposal that would open up approximately 170 million tons of coal on otherwise
protected lands in Colorado. After using ICF's Integrated Planning Model to study the market and
climate impacts of its proposal, the Forest Service concluded:
Changes in gross production and consumption of coal from the North Fork Coal Mining Area are
expected to have an effect on production and consumption of other fuel sources, including alternative
supplies of coal, natural gas, and other energy supplies such as renewables.44
[44 U.S. Forest Service, Rulemaking for Colorado Roadless Areas Supplemental Draft Environmental
Impact Statement, p. 80 (November 2015), available at
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last visited Nov. 1, 2016).]
The Forest Service explained that opening up 170 million tons of coal for mining would cause "the
mixture of fuels [to] shift[], including increases in production and consumption of underground coal, and
decreases in production and consumption of substitute fuel sources such as surface coal, natural gas, and
renewable energy," with the result being a net 131 million ton increase in greenhouse gas emissions.45
As a cooperating agency to that analysis, BLM cannot now pretend that it does not exist. If the BLM no
longer stands by that analysis, it should say so. If it somehow does not think the analysis is relevant to
BLM's decision here, it should say so. But ignoring recent analysis looking at the same resources studied
here, prepared with input from the same agency, is arbitrary and capricious.
[45 Id. at 81.]
In addition to the recent Forest Service analysis, ICF International's Integrated Planning Model has been
used to evaluate these types of market responses to numerous state and federal proposals in recent
years. A recent, but by no means exhaustive list, of examples include the following projects and analyses:
EPA, Clean Power Plan; State Department, Keystone XL Pipeline; Surface Transportation Board, Tongue
River Railroad; and Washington Department of Ecology, Millennium Bulk Export Terminal. There are
additional energy market models that could further inform BLM's evaluation here, particularly with
regard to oil and gas. We point to the recent use of the Integrated Planning Model not to suggest BLM

BLM_0165525

must use this particular model in revamping its analysis, but rather to note that this analysis can and has been done across a wide range of agencies studying the market and climate impacts of a variety of fossil fuel extraction and infrastructure proposals. BLM's refusal to study the market impacts of its decision here is thus not only out of touch with how energy markets work, it is out of step with the way in which other federal agencies review the market and climate impacts of their decisions under NEPA.

Comment Number: 000483_HanksG_20161101-13
Organization1: Trout Unlimited
Commenter1: Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Total economic output from hunting, fishing, and wildlife watching accounts for $405 million annually and provides approximately 6,600 jobs in the South West region (inclusive of Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties) of the state according to a 2013 Southwick and Associates report for Colorado Parks and Wildlife. Not only are sportsmen and women dependent on quality habitat and healthy wildlife, they are actively contributing to the conservation of these places and species. Traditional sporting values were not discussed in the consequences section of the DRMP. Trout Unlimited has highlighted many possible impacts to habitat, wildlife, and access throughout our comments, and ask the BLM to evaluate the costs and benefits in future management decisions made under the Final RMP to hunting, fishing, and wildlife watching.

Comment Number: 000489_JohnsonA_20161101-39
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A. Socio-economics
We have clearly state in Part I of these comments why the North Fork Alternative, B1, is the only alternative in the draft RMP that would adequately protect against the negative socio-economic impacts of oil and gas activities within the North Fork planning area.
This support notwithstanding, we strongly urge the BLM to include in the final RMP more robust analysis on socio-economic impacts from oil and gas development within the full Uncompahgre planning area.
The U.S. Bureau of Land Management should ensure that management of public lands do not harm, but rather enhance, the economic opportunities that exist within the Uncompahgre planning area by working to maintain the area's current character, visual and scenic resources, clean air and water, non-industrialized public lands and recreational trails and access.

Comment Number: 000496_WiltanenW_20161031-1
Organization1:
Commenter1: Wayne Wiltanen
Commenter Type: Individual
Comment Excerpt Text:
The effect of leasing on local infrastructure. Local roads are not engineered to accommodate the kind of heavy traffic that leasing will cause. Medical and emergency services in the area are hardly sufficient to service the local populace much less the increase resulting from the sale of leases. Law enforcement will be challenged as will public safety generally by the influx of gas/oil field crews. There is considerable concern over increased drug infiltration into the area and the safety of our children generally. The tiny increase in local business is far offset by the societal costs of oil/gas development in the North Fork.

BLM_0165526

Comment Number: 000496_WiltanenW_20161031-3
Organization1:
Commenter1:Wayne Wiltanen
Commenter Type: Individual
Comment Excerpt Text:
3. Property values. Farmers, ranchers, orchardists and viticulturists have made a major investment in the
property that is relevant to their businesses. In my own case what I can leave to my posterity is the
value of the farm, not a stock portfolio. Local realtors report that when the BLM was planning initial
leasing in the North Fork, about 4 years ago, that existing contracts to buy property in the North Fork
were dropped like hot potatoes. There is no reason to assume that similar effects on property values
would not result from oil/gas leasing. Which in turn means that the value of my investment in my farm
would be decreased (and if recognized by the county assessor, property taxes would drop -- not
something any county wants to hear).

Comment Number: 000496_WiltanenW_20161031-4
Organization1:
Commenter1:Wayne Wiltanen
Commenter Type: Individual
Comment Excerpt Text:
Short term versus sustainable long term economics. Farms, ranches, orchards and vineyards in the
North Fork are long established sustainable enterprises that provide food, not just locally but state-wide
and some even nationally, and have done so for decades (a few for over a century). Leasing that has the
potential to destroy this long-term sustainable productive activity for short term returns that in no way
benefit the North Fork or Delta County is unconscionable. Not only are the ranches, farms, orchards
and vineyards productive but they also support agrotourism, which would be sharply curtailed with the
industrialization of Delta County. The economics of long-term sustainable enterprises versus short term
gains for corporations must be considered seriously.

Comment Number: 000500_BilchakR_20161031_Poss_Dup-1
Organization1:
Commenter1:Rosemary Bilchak
Commenter Type: Individual
Comment Excerpt Text:
Another significant economic driver for this valley is the hiking, fishing, hunting and other recreational
uses that will be threatened by drilling. The multi-faceted requirements of these activities such as clean
air, clean water, sustainable food supplies, and undisturbed migration corridors and birthing locations for
wildlife have been blatantly ignored.
The draft RMP fails to fulfill its duty to protect the lands under consideration and fails to address the
concerns of the affected communities.

Comment Number: 000500_BilchakR_20161031-1
Organization1:
Commenter1:Rosemary Bilchak
Commenter Type: Individual
Comment Excerpt Text:
Another significant economic driver for this valley is the hiking, fishing, hunting and other recreational
uses that will be threatened by drilling. The multi-faceted requirements of these activities such as clean
air, clean water, sustainable food supplies, and undisturbed migration corridors and birthing locations for
wildlife have been blatantly ignored.

BLM_0165527

The draft RMP fails to fulfill its duty to protect the lands under consideration and fails to address the concerns of the affected communities.

Comment Number: 000508_DrakeM_20161101-10
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
[The Final Resource Management Plan must:]
-Include the detailed evaluation of the impacts of O&G on the economic development effort underway in Delta and Gunnison counties.

Comment Number: 000508_DrakeM_20161101-8
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
Delta County and the Delta County Economics Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expanded the agricultural increase "value-added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections, you can rabidly see how O&G development poses a great risk to the plan that Delta County has started to implement.

Comment Number: 000509_WolcottE_20161102-5
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Other Sections: 30.5
Comment Excerpt Text:
These specific impacts including short term economic gain in exchange for sacrificing or detrimental impact to most of the long term sustainable economic drivers in the region and impacts on public roads and services need to be addressed in detail and the final plan must fully protect the area from these impacts. The economically externalized costs of oil and gas development must be fully studied, monetarily quantified and mitigated - impacts to property values, water values, tourism, hunting/fishing, photography, agriculture, renewable resources on BLM lands (firewood, wildcrafting, etc), costs to public roads and services, social impacts including crime and drug use amongst oil and gas workers, traffic and traffic accidents, loss and contamination of water, sedimentation, game damage, viewshed damage, night pollution, other impacts outlined in this letter and others. Only a no lease alternative would fully mitigate these impacts, and to a lesser degree B1 analysis and protections applied throughout the region.

Comment Number: 000509_WolcottE_20161102-7
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
A full economic analysis of the value of these viewsheds and the cost of their destruction over time should be conducted.

BLM_0165528

Comment Number: 000525_RutledgeT_20161101_MountainTripInternational-1
Organization1:Mountain Trip
Commenter1:Todd Rutledge
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM's final plan should limit available oil and gas leasing lands west of Naturita, on public lands in the Paradox Valley, and anywhere else that energy development encroaches on recreational areas. Please take into full consideration the negative impact that energy development would have to local tourism and the human---powered activities that many of us enjoy in those areas.

Comment Number: 000536_SchottJ_20161031-5
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
Agricultural concerns: Our farm is certified organic and biodynamic. Contamination of our water supply would not only be unhealthy to our products and animals it would ruin the economic value of our certifications. Our irrigation water comes from Turner Ditch with is fed from Minnesota Creek and Beaver Reservoir. This resource would be endangered by the known risks from the failure of pipelines, and the accidental release of pollutants into the streams, ditches, and watersheds from drilling operations. The RMP does not take into consideration these risks in its analysis. The RMP does not take into consideration the impact of flooding of oil and gas fields and pipelines which could cause contamination of irrigation water. There should be no oil or gas leasing near any of the major river and stream corridors of the North Fork of the Gunnison, the Gunnison and Smith Fork Rivers.

Comment Number: 000536_SchottJ_20161031-9
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
Economic impact: The RMP does not assess the economic impact of the industrialization of the valley that is currently famous for its wineries, organic agriculture, hunting and fishing, outdoor recreation, agri-tourism, scenic beauty and quality of life. There is a proven history in areas where oil and gas exploration take place that property values drop as much as 25%. In an area that is increasing attractive to retired persons the threat of oil and gas exploration has kept them away. Banks in areas with fracturing activity are reluctant to make mortgage loans on property. Even the threat of this kind of activity will have a negative impact upon the real estate business.
Damage done to the wildlife in the area will reduce the economic benefit the valley receives from hunting deer and elk. Outdoor recreation of all kinds from hiking, climbing to fishing would be impacted by the presence of oil and gas industrial installations.
The North Fork Valley is part of the West Elk Scenic By-Way. The RMP does not assess the impact of oil and gas exploration and activity on the rural character and the scenic beauty of the area that draws people from throughout the state and the country.

Comment Number: 000544_ThompsonK_20161101-7
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165529

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 588 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 –
Socioeconomics and Environmental Justice)

Draft RMP Fails to Consider the Negative Impacts to Burgeoning Economic Activity in the NFV. The NFV has cohabited with neighboring coal mines for over 100 years. The mines are closing, as you know. This has caused employment challenges for many whom the mines employed. Some of those people are pursuing alternative livelihoods with alternative energy industries, such as solar, wind, nuclear, geothermal, and others, or by joining other longtime farmers and ranchers as well as newcomers to the "organic farming revolution."

Our most important resource is FOOD, not oil and gas; we can't live if we don't eat. If we don't eat nutritional food, in a clean environment, our health suffers. Some of the best, and healthiest food in America is grown right here in the NFV because of the high quality of our water, our clean air, our unique climate, and the high standards of the farming practices employed by our farmers and ranchers. The NVF in fact was named the Garden Spot of Colorado at the turn of the 20th century. It is incumbent upon us, you and me, the current stewards of the land, to make sure this remains true.

In addition, the economy of the NFV is finally recovering from the slow-down in the coal industry because we have used our ingenuity and creativity to revive, reinvent and reinvigorate ourselves and our economy for the good of the Valley. We are engaged in all facets of healthy food production and, given the opportunity. could feed a much broader segment of society if even the mere threat of oil and gas, and especially fracking. completely disappeared from our horizon.

Comment Number: 000545_SlivkaJ_20161101-11
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." Ibid. The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning. [Footnote 3: IM 2013-131, available at: http://www.blm.gov/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."
USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM _2013-131__Ch1.print.html.
BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:
In framing information for management decisions, focus on the difference in changes to nonmarket values between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may increase the visitor days of use

BLM_0165530

– therefore the total nonmarket benefits – from motorized recreation, but may decrease the benefits of subsistence hunting and watershed protection in this area.

The difference between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives.

IM 2013-131, Attachment 1-5. The guidance also directs that quantitative analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and nonextractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

Comment Number: 000545_SlivkaJ_20161101-132
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages. Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated. [Footnote 31 Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management.

Comment Number: 000545_SlivkaJ_20161101-142
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 35.3
Comment Excerpt Text:
Character of place: visual resources, healthy communities, farms, landscapes, river corridors
The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether. [Footnote 46 DEIS II 4-91]
And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II. [Footnote 47 Acreages developed from analysis of GIS data downloaded from BLM. ] And B1 not only protects more acres than Alternative B, but it also applies stronger stipulations to do so.

BLM_0165531

Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation.

Comment Number: 000545_SlivkaJ_20161101-143
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
Uncompahgre Draft RMP at 4-208. Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68). [Footnote 48 If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.] B1 reduces these threats, from poor air quality.
Alternative B.1 emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality.

Comment Number: 000545_SlivkaJ_20161101-144
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries. The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy. [Footnote 50 "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/ ]
Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.
Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these." Uncompahgre Draft RMP at 4-69. Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

Comment Number: 000545_SlivkaJ_20161101-147
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA
Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided.

BLM_0165532

Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes: "Development could also add to the changes in the scenic values and other non-market commodities." Uncompahgre Draft RMP at 4-479.

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities. Uncompahgre Draft RMP at 4-301. The DEIS notes that recreation and tourism related activity is likely to increase across the resource area: "Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state." Id at 4-479.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B. Uncompahgre Draft RMP at 4-306.

Comment Number: 000545_SlivkaJ_20161101-148
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily nonmotorized recreational area only makes sense. However, and although the draft RMP/EIS notes that pubic use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors.

Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

Uncompahgre Draft RMP at 4-208. These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

Comment Number: 000545_SlivkaJ_20161101-150
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Alternative B1 would have minimal impacts on oil and gas resources
Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource

BLM_0165533

area under Alternative D, which would allow a higher level of development in the North Fork: "It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D." Uncompahgre Draft RMP at 4-476.

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan. [Footnote 54 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512 ] B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted: The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states... [Footnote 55 "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds]

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin. [Footnote 56 "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Prese ntation%20to%20RAC_6.4.15a.pdf] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil:

Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact. [Footnote 57 "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance]

These lands in the Piceance Basin provide decades of suitable sites for drilling:

The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play. [Footnote 58 "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html]

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Uncompahgre RMP. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and eager lessees, owners and operators—it is the market and industry's willingness alone that will determine how many rigs employ how many people.

BLM_0165534

Comment Number: 000545_SlivkaJ_20161101-216
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 24.2
Comment Excerpt Text:
The socioeconomic analysis ignores the data generated during the Colorado licensing of the Piñon Ridge mill. Of key importance is the report generated by Dr. Tom Powers. (See Attachment 5.) In short, uranium mining is simply not economically viable, and the RMP and DEIS repeat demonstrably false myths that perpetuate "false hopes" of a uranium revival and create a negative economic impact on viable sources of economic development. [Footnote 103 http://www.durangoherald.com/article/20140507/OPINION01/140509617/ (last visited 10/31/2016)] The draft RMP assumes an active uranium mining and milling economy, yet there are zero active mines and mills in the plan area. The draft RMP asserts "[a]ctivities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions." Uncompahgre Draft RMP at 4-20. No data is provided to support the conclusion that major contributions from an active uranium mining industry would remain consistent with the emissions from the currently inactive industry. The lack of analysis must be addressed because emissions from current and potential uranium production is expected to have serious impacts on "Class I airsheds and sensitive Class II areas." Id. at 4-25. The draft RMP confirms the importance of mine validity exams on the RMP and site-specific scale: "The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities." Id. at 4-29.

Comment Number: 000554_MommaertsM_20161101-1
Organization1:
Commenter1:Marissa Mommaerts
Commenter Type: Individual
Comment Excerpt Text:
Unconventional (shale) oil extraction has a low energy return on energy invested, and studies show most fracking wells decline rapidly and are not a wise longterm investment (see Post Carbon Institute's report "Drilling Deeper: A Reality Check on U.S. Government Forecasts for a Lasting Tight Oil& Shale Gas Boom.")

Comment Number: 000555_NicholofR_20161101-2
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Comment Excerpt Text:
I find Alternative D to be unacceptable for the many reasons contained in the above-mentioned comments, but particularly for the potential negative impacts to wildlife and to the hunting, fishing, and wildlife viewing that comprise a significant component of the economy of western Colorado and Delta County in particular.

Comment Number: 000555_NicholofR_20161101-7
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165535

In summary, the wildlife resources of Delta County contribute significantly to the economic health of the county and should be protected. Hundreds of gas wells with their attendant thousands of miles of roads and pipelines, high -decibel compressors, vastly increased truck traffic, unavoidable soil erosion, and use of toxic chemicals will result in increased stress to the wildlife resources and could significantly impact the economic benefits derived from those resources.

Comment Number: 000560_KelloggV_20161016-6
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Comment Excerpt Text:
I have great concerns about the heavy truck traffic that would result from oil and gas activity in this area. We have two lane roads and rural emergency response with a long drive to hospital/medical facilities. We are not equipped to accept the risks associated with increased heavy truck traffic and the accompanying accidents.

Comment Number: 000563_King_WELC_HasAttach-205
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development.

Comment Number: 000563_King_WELC_HasAttach-206
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO's NEPA analyses must include analysis of impacts from increases in vehicle traffic that development authorized under the RMP/EIS would induce. For example, cases have required NEPA analyses of proposed casino projects to include impacts of increases in vehicle traffic the projects would induce. See Michigan Gambling Opposition v. Kempthorne, 525 F.3d 23, 29 (D.C. Cir. 2008); Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852, 863
(D.C. Cir. 2006).

Comment Number: 000563_King_WELC_HasAttach-207
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
As noted above, fracking requires huge amounts of water, and consequently a great number of tanker truck trips to transport this water and chemicals to the site and to transport waste from the site. See EIS at 4-28 (noting that all alternatives assume that 100 percent of drilling/completion fluids are delivered and disposed of by truck, and 100 percent of produced water and condensate is disposed of by truck). Given that fracking can require thousands of round trips by heavy trucks when developing each well – the impacts of which are compounded exponentially for development of an entire oil and gas field – it is clear that this heavy industrial transport activity will result in dramatic

BLM_0165536

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 595 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

impacts. However, the RMP/EIS underestimates truck traffic and provides an understated and cursory analysis of its impacts, which fails to satisfy the agency's NEPA obligations.

Comment Number: 000563_King_WELC_HasAttach-208
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Specifically, the RMP/EIS fails to undertake a substantive analysis of the impacts from oil and gas related traffic. The RMP/EIS acknowledges that oil and gas development will result in increased traffic, see e.g., EIS at 3-206, 4-478. However, the RMP/EIS makes no effort to take a meaningful look at the effects from this significant rise in traffic, merely mentioning generalized impacts from delays, dust, road degradation, and increased vehicle safety concerns as potential negative impacts to the area. Id. This type of cursory analysis fails to satisfy the UFO's hard look obligations.

Comment Number: 000563_King_WELC_HasAttach-209
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Absent from the RMP/EIS, for example, is any attempt by the agency to estimate increased maintenance demands, consider safety costs for increased roadway use, increased traffic accidents and associated medical impacts and burdens on local hospitals, burdens on first responders and the criminal justice system, or to even project where or how many miles of access roads will be constructed. Moreover, while the RMP/EIS calculates projected emissions caused by oil and gas related traffic, see Emission Inventory Technical Support Document Appendix A at A-5, the RMP/EIS underestimates the number of truck trips needed per well associated with the more water-intensive techniques necessary for hydraulic fracturing.

Comment Number: 000563_King_WELC_HasAttach-210
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
A recent and comprehensive 2013 study by Boulder County, Colorado of the impacts of fracking-related truck traffic (hereafter "Boulder Study"), concluded that the hydraulic fracturing process for a single well would require an average of 1,400 one-way truck trips just to haul water to and from the site. See Boulder Study at 8. Using national data, the study also finds that taking into account the full development process (construction, drilling, and completion), the average fracked well requires 2,206 one-way truck trips. Id. at 10. This figure does not include production phase trips, which could add an additional 730 truck trips per year depending on various factors including the success of the well and whether it is re-fracked. Id.
The Boulder Study serves as an example of what BLM should analyze in its EIS. The Study uses this trip generation data to analyze the impacts of oil and gas development on the county's roadway system and, ultimately, to quantify these impacts in terms of maintenance and safety costs. Id. at 4. To establish a baseline, the Study inventoried current roadways including surface conditions, traffic volumes, and shoulder widths. In addition to the number of truck trips, the Study also examined the vehicle classification, load, origin, and destination of the trips. Finally, road deterioration and safety costs are

BLM_0165537

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 596 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

calculated under three development scenarios, resulting in an average cost of $36,800 per well over 16 years. Id. at 55. The Boulder Study is just one example of the type of quantitative analysis of oil and gas related traffic that can be completed with currently available information.

Comment Number: 000563_King_WELC_HasAttach-52
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Nor can the agency tout the benefits of coal, oil and gas development without similarly disclosing the costs. See 40 C.F.R. § 1502.23. For example, BLM identifies "tax impact from coal extraction in the planning area" as a benefit, with revenues "associated with the sales and income earned from extraction and transportation of coal." DEIS at 4-465. Although not quantified in the same way, BLM also assumes that "increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities." Id. Accordingly, BLM relies on figures in Table 4-90 (Baseline Regional Economic Impacts for Coal), to suggest a substantial net economic benefit, including $556 million in annual output and $175 million in labor income. DEIS at 4-469. Setting aside that this economic data is based on wildly optimistic assumptions on future coal production and employment for 2,518 people—with a current reality of coal mines being shut down and present employment of around 250 people—this type of misleading and one-sided analysis is expressly forbidden under NEPA. See Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446-47 (4th Cir. 1996) ("it is essential that the EIS not be based on misleading economic assumptions); Sierra Club v. Sigler, 695 F.2d 957, 979 (5th Cir. 1983) (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs). Moreover, even assuming BLM's optimistic economic benefits, it still pales when compared to the social costs of planning area greenhouse gas emissions, totaling $1,654,582,566 per year.

Comment Number: 000587_WolcottS_20161031-12
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed. Local residents rely on a handful of narrow state highways and county roads for daily transportation and emergency access. Oil and gas activities would significantly increase the number and frequency of oversized trucks and machinery transported on our highways, increasing the risk of accident and emergency vehicle blockage. This traffic would also cause damage to the roads, increasing our tax burden.

Comment Number: 000594_MorrisL_20161028-1
Organization1:
Commenter1:Leah Morris
Commenter Type: Individual
Comment Excerpt Text:
This is a small town, and any leases which allow oil and gas companies to develop roads, pollute water sources, and increase traffic to sites will have a direct impact on every person who lives in this area. For instance, increased truck traffic through town on 2nd Avenue to oil and gas developments will pass within feet of my house where my son plays outside.

BLM_0165538

The cost to the Town of Paonia to maintain those roads is one consideration, and the safety of my child is another. Any increase in traffic on roads not equipped to handle such traffic means a higher likelihood of accidents, road damage, congestion, noise pollution, impact on local wildlife, and more.

Comment Number: 000603_SmithP_20161024-1
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Comment Excerpt Text:
An example of how this draft RMP has completely omitted any meaningful discussion about the "affected environment" is demonstrated by the fact that there is absolutely no reference to "organic farm" or "organic agriculture" in Chapters 1 or 3. A reference to "organic farm" is found on Pages 2-31 and 2-199 in Chapter 2, but both references are specifically limited to a reiteration of some of the provision of the North Fork Alternative Plan (NFAP)/Alternative B.1. Chapter 4 only contains two references to "organic farm." The first is found on page 4-69 and again is only presented to reiterate a provision in Alternative B.1. The second reference to "organic farming" is the only meaningful reference in the entire RMP. This is found on page 4-84 where the threat to an organic operation's designation as "organic" could be in jeopardy if water being used to irrigate the crops on that operation are contaminated by a gas field spill; a serious potential consequence that should never be allowed to occur.

Comment Number: 000603_SmithP_20161024-4
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Comment Excerpt Text:
This entry in Table 2-6 should include a discussion within Alternatives A, C and D as to the effect on the economic contributions and quality of life associated with local agricultural operations (North Fork Valley) that would be attributable to each of these three alternatives.

Comment Number: 000630_Frann_20151005-1
Organization1:
Commenter1:
Commenter Type: Individual
Comment Excerpt Text:
According to the agency's own estimates, 500,000 visitors recreate annually on BLM lands managed by the Uncompahgre Field Office in southwestern Colorado. These visits are an integral piece of Colorado's economy; according to a study commissioned by The Pew Charitable Trusts, a total of $275 million a year is spent in communities within 50 miles of recreation sites by visitors engaging in quiet (nonmotorized) recreation activities on BLM lands.
Places like Shavano Creek and Camel Back are wild and remote landscapes deserving of management that keeps them as they are: accessible to hikers, backpackers, sportsmen, and others who enjoy these places in low-impact ways. Local residents have asked the BLM to preserve outstanding opportunities for solitude and adventure—an economic driver for the region, as well as vital wildlife corridors that safeguard healthy populations of deer and elk that attract hunters from across the nation. However, the current recommendations in the draft resource management plan do not go far enough to fully protect these important areas.

Comment Number: 000633_ClagettR_20161025-1
Organization1:
Commenter1:Rita Clagett

BLM_0165539

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 598 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

Commenter Type: Individual
Comment Excerpt Text:
Fracking and other extractive industries are simply not compatible with the main and growing economic drivers of this valley and its various overlapping communities: organic agriculture, clean meat, wineries, agritourism; hunting, biking, and other recreation, and the arts. As a state-certified creative district the valley is recognized as a remarkable and special place, where industrial development is incompatible.

Comment Number: 000636_OBrianC_20151101-1
Organization1:
Commenter1:Colin OBrien
Commenter Type: Individual
Comment Excerpt Text:
The economics of oil and gas is a boom bust economy. Home prices crashed in these oil and gas communities and have not recovered. Oil and gas leasing will not create jobs. Skilled employees will be imported in from other places, such as Louisiana and Texas.
Our public lands are a very important resource that can pay dividends long into the future if managed appropriately.
Leasing public lands in this area for a short term gain and sacrificing everything that makes the North Fork Valley special for a few years of cheap oil and gas is a mistake that should be avoided at all costs. Oil and gas is a finite resource that will not support the long term viability of this area. Investing in recreation, agriculture and tourism will create a strong foundation for the future. Oil and gas leasing is diametrically opposed to a long term foundation of the use of public lands.

Comment Number: 000637_PattersonC_20161031-1
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Comment Excerpt Text:
The draft RMP repeatedly states oil and gas development would not have
a significant impact on regional employment or the local economy. "Across all alternatives, for natural gas development, the economic contributions to the planning area represent a small fraction of jobs and income." (Page 4-462)
"Agriculture represents 3.6% of jobs in the planning area… traditional agricultural uses have maintained importance due to the presence of organic and conventional small-scale farms, orchards, and wineries." (Page 4-459)
The largest concentration of organic farms in Colorado is in the North Fork Valley. The organic produce and spin off products are shipped across the country.
The NFV is an agri-tourism destination, nicknamed Colorado's "farm-to-table capital." Air, water and soil pollution, noise, vibration, dust, lights, transient workers that result from drilling and the associated infrastructure and traffic will contaminate the pristine North Fork. Gas drilling and fracking are incompatible with the area.
Ruining the rural lifestyle of the North Fork Valley will decrease quality of life for residents and visitors and decrease residential, farm, and ranch property values.
The North Fork Valley is a recreational paradise. Consumers spend $674B on outdoor recreation. Outdoor recreation employs 3 times as many people as the oil and gas industry.

Comment Number: 5000162_OvertonL_20161018-4
Organization1:
Commenter1:Lee Overton
Commenter Type: Individual

BLM_0165540

Comment Excerpt Text:
Impacts on real estate values is a factor to be examined. Initially, if a drilling area appears to be very active, more employees are needed, real estate values can be higher and housing can be in great demand. That means that values increase accordingly. The demand for additional support facilities increases, as well, such as grocery stores, schools. laundromats, restaurants, etc. After the initial construction is complete and the wells are operating, employment lessens, workers leave and the demand for housing and additional facilities cease. The euphoria slumps, the area starts into a downward spin. It is a negative cycle. And when the oil and gas is gone, except for the pollution, what is left of the valley? Additionally, the North Fork Valley has had in recent years an impressive development in organic agriculture that has brought national attention. People are drawn to this valley because of the exposure. They like what they see and the word spreads. Farming like this is important and people are impressed. But such results are threatened by the possibility of oil and gas development which could cause air and water contamination of their growing sites and ultimately their products. It would be a devastating end of an important, positive success.

Comment Number: 500030_FugateT_20160302-1
Organization1:Roaring Fork Mountain Bike Association
Commenter1:Todd Fugate
Commenter Type: Individual
Comment Excerpt Text:
Within 5 miles of Carbondale are 2 separate BLM parcels designated as an SRMA. One such parcel has a 50,000+ users annually. As a byproduct of the recreation offered on these parcels, in the last 10 years Carbondale has seen a second bike shop open, a new running store open, restaurants and hotels thriving, and folks moving to the community for the recreational opportunities.
Typically twice yearly I'll make the trek over to Paonia for a mountain bike excursion on the jumbo Mountain trail system. This area is ideal for the Paonia community in that it's close to town so locals do not need to drive to recreate, and brings the out of towners right into Paonia for spending opportunities post or prior to a ride.
Paonia deserves to economically diversify through recreation, and community members deserve the opportunity to recreate on public lands, thus please consider choosing the B1 alternative for the North Fork

Comment Number: 500043_FerrellJ_20161101-1
Organization1:
Commenter1:Jack Ferrell
Commenter Type: Individual
Comment Excerpt Text:
I work and maintain a relationship, and attend events and recreate all over Western Colorado, Among my greatest concerns of all the alternatives besides B1 is the traffic that would necessarily result from even minimal increases in oil and gas development. I request and urge you to support safe and less congested roadways. The large vehicle traffic is emotionally and psychologically intense, disturbing, impactful, and negative and I'm sure the extra presence of toxic dust from roadway and the vehicles has physical impacts of and extreme negative nature on our ecological support systems, the vast and developing and precious agriculture here including organic agriculture, as well as wildlife, people, and domestic animals.

Comment Number: 500047_ReichB_20161101-1
Organization1:
Commenter1:Belinda Reich
Commenter Type: Individual

BLM_0165541

Comment Excerpt Text:
The North Fork Valley is a hub of agriculture in Colorado, shipping produce throughout the state. The threats posed by fracking in The North Fork include damaging local economy by potentially harming our watershed and polluting our beautiful farms. The benefits of fracking will not impact our local community, as the revenue raised will not stay in the North Fork. Agriculture in the North Fork is an economic driver. It benefits the environment, the community, and our economy. Agriculture is an industry that is essential for life.

Comment Number: 500136_YorkS_20161101-1
Organization1:
Commenter1:Sandy York
Commenter Type: Individual
Comment Excerpt Text:
Your reports do not consider many factors one being the fact that this is now an agriculture organic farm area and no longer a coal town, plus the outfitters for elk in this area exceed 54 million per year, and if fracking begins, the elk will leave.

Comment Number: 500143_RewL_20161017-2
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

Comment Number: 500145_FrankC_20160808-4
Organization1:
Commenter1:Christine Frank
Commenter Type: Individual
Comment Excerpt Text:
There is nothing the RMP about the impacts of Oil and Gas leasing on land values.

Comment Number: 500145_FrankC_20160808-5
Organization1:
Commenter1:Christine Frank
Commenter Type: Individual
Comment Excerpt Text:
There is nothing in the BLM's RMP that even suggests such a just transition on the data to clean energy developments let alone how it could benefit the North Fork Valley and other communities on the Western Slope while ensuring job security and protection of the earth's climate

Comment Number: 500147_BradfordD_20161008-6
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
If reductions in livestock grazing are considered the analysis must also evaluate the economic impacts of these reductions on the individual ranch operation and on the county. The base ranch operations for

BLM_0165542

ranches holding public land grazing permits are providing significant amounts of open space and wildlife habitat. If ranches are forced to graze the private lands more heavily or to sell out due to livestock reductions, what impacts will this have on conditions on these private lands? I do not support any alternative that eliminates or reduces livestock grazing unless there is a documented problem in rangeland conditions that cannot be resolved with improved management.

Comment Number: 500158_CoyleJ_20161020-1
Organization1:
Commenter1:Judy Coyle
Commenter Type: Individual
Comment Excerpt Text:
Please don't make the North Fork Valley a Petri dish for another energy extraction enterprise that will crash our economy again when the final "transition" to clean renewable energy happens. What would remain of our quiet, vibrant community, that lives close to and respects nature and its gifts, would be devastated, the ground and water poisoned. Please don't allow this to happen. Don't buy into the "transition"; let's go straight for the renewable energy sources NOW. Don't put the people and the land through a damaging middle stage.

Comment Number: 500187_KampeA_20161018-2
Organization1:
Commenter1:Anastacia Kampe
Commenter Type: Individual
Comment Excerpt Text:
Third, it is a fact that the mere potential of oil and gas leasing and subsequent exploration/drilling decreases property values. Our home and land is a major financial investment for us. Oak Mesa is predominantly managed by the BLM and sits directly adjacent to the north end of our personal property. Drilling here would, without a doubt, negatively impact the market value of our home and property.

Comment Number: 500187_KampeA_20161018-3
Organization1:
Commenter1:Anastacia Kampe
Commenter Type: Individual
Comment Excerpt Text:
Fourth, the BLM ground north of us (Oak Mesa) as well as throughout the entire North Fork Valley is world class hunting for elk and mule deer. Every fall, for decades, resident and non-resident hunters alike, venture out onto their public lands with hopes of filling their freezers with some of the finest meat on the planet...and pump millions of dollars into local economies. The herd health in the North Fork area is robust and a reliable economic driver. This is due largely to the fact that the BLM lands these herds use year round are intact and minimally developed. Oil and gas leasing will undo that quickly as road development and major truck traffic will be necessary. Numerous studies show declining heard numbers with increased roads and fragmentation. Why sacrifice a proven long-term revenue generator benefitting many for the sake of a short-term generator that benefits very few?

Comment Number: 500250_HeuscherP_20161028-3
Organization1:
Commenter1:Pauline Heuscher
Commenter Type: Individual
Comment Excerpt Text:
Agriculture is this areas' main business-ranching and in particular organic farming. This North Fork area is in the watershed of the proposed drilling and that will affect water quality and water quantity which is

BLM_0165543

of prime importance to growers and ranchers. Paonia area is famous state wide as a great resource for organic food not only for the West Slope but also for the entire state of Colorado.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-2
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
9. The UFO recreational jobs analysis is directly conflicting with research from other organizations.
As previously noted, the Organizations are deeply concerned with the inconsistency of UFO economic contribution analysis with state level and regional analysis from a wide range of sources on both total spending and per day recreational spending amounts. The Organizations assert that a hard look at a priority management issue would not have been concluded by a mere comparison of spending, but must also include analysis of factors that are directly tied to the recreational community and its spending. Accurate analysis of employment profiles in the UFO planning area and the total employment in the recreational field would be factors that are related to the total recreational spending. When the conclusions that are reached regarding employment in the UFO planning process and those from other sources are compared, these calculations are equally inconsistent.
The UFO RMP asserts 36 jobs as a result of recreation on the UFO planning area.29 By comparison previously cited documents identify exponentially larger numbers of persons employed in recreational activities in the planning areas, which are more specifically calculated as follows:
• COHVCO found that 1,564 persons are employed in positions related to motorizedrecreation in the UFO planning area;30
• CPW found that 1,170 persons are employed in Montrose, Ouray, Gunnison and Delta County areas in positions that are directly related to hunting and fishing activities;31
• Colorado Tourism found that 3,150 persons are employed in positions related to tourism and travel in Montrose, Ouray, Gunnison and Delta County counties;
• The Paiute Trail in Utah concludes that 146 jobs directly result from their 600 miles of trails;
29 DRMP at pg 4-468.
30 COHVCO study at pg 17.
31 CPW study Section IV page 16&17.
The Organizations are deeply concerned that comparison of recreational employment research conducted by the UFO and the conclusions that are reached by State and local partners and user groups analysis. The Organizations vigorously assert the inconsistencies in employment calculations are direct evidence that UFO conclusions are incorrect. The Organizations vigorously assert these conclusions must be corrected and multiple use rebalanced after accurate economic contribution conclusions have been reached.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-4
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4b. Economic contributions are the sole means of integrating recreation in a multiple use planning process.
The Organizations are intimately familiar with the interdisciplinary team process used for balancing of multiple uses at the field office level of planning that occur before the NEPA review process has really started. Often interdisciplinary team meetings are long and difficult meetings that divert significant office resources away from other more short term management issues, making the need for quality work and materials critical to successful team meetings. The intense nature of these meetings mandates that every

BLM_0165544

member of the team have a complete toolbox full of quality information for these meetings and that all toolboxes have been subjected to stringent review to insure that some issues or concerns are not artificially overvalued in the balancing process. If only certain members have a full toolbox others have a toolbox that has been artificially over valued , these members have the highest probability of prevailing on particular issues in the planning process which will result in a proposal that does not accurately reflect a range of alternatives for multiple use. This situation will merely reflect which parties in the interdisciplinary team meetings had the best resources. This situation must be avoided at all costs. Economics and recreational access have been identified as management issues in the DRMP. NEPA regulations clearly state how management issues are to be addressed in NEPA analysis as follows: "The CEQ regulations require NEPA documents to be "concise, clear, and to the point" (40 CFR 1500.2(b), 1502.4). Analyses must "focus on significant environmental issues and alternatives" and be useful to the decision-maker and the public (40 CFR 1500.1). Discussions of impacts are to be proportionate to their significance (40 CFR 1502.2(b))." 7

6 See, Hughes River, Supra note 4 at pg 12

7 BLM Manual H-1790-1- NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK - pg 4.

A toolbox for the recreational planner will include mapping and inventory of resources and quality economic information regarding demand for particular usages based on visitor use information and economic benefits for particular usages. The recreational planner does not have the Wilderness Act, Wild and Scenic River inventory or Endangered Species Act to rely on in the planning process, they only have economic benefits to the local community to rely on. Given that the economic benefit from an average recreational usage is 6x higher than that estimated in the UFO, the Organizations assert that protecting lands will look far more valuable than utilization for recreational activity. The impact of proposed ACEC will be totally disproportionate to any benefits that could accrue from these designations.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-6
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4c. Proper integration of economic information in the planning process is an ongoing issue in federal planning.
The proper integration of accurate economic information is often a weakness of the public lands planning process in Colorado, which has resulted in the creation of many other longer term problems when decisions reflecting an imbalanced multiple uses are implemented. This concern was recently identified as a major planning issue that is not just limited to Colorado. The Western Governors' Association released its Get Out West report in conjunction with its economic impact study of recreation on public lands in the Western United States which specifically identified that proper valuation is a significant management concern as follows:
"Several managers stated that one of the biggest challenges they face is "the undervaluation of outdoor recreation" relative to other land uses."8

8 Western Governors Association; Get out West Report; Managing the Regions Recreational Assets; June 2012 at pg

The Get Out West report from the Western Governors' Association also highlighted how critical proper valuation of recreation is to the development of good management plans based on multiple use principals. The Get Out West report specifically found:
"Good planning not only results in better recreation opportunities, it also helps address and avoid major management challenges - such as limited funding, changing recreation types, user conflicts, and degradation of the assets. Managers with the most successfully managed recreation assets emphasized

BLM_0165545

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 604 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

that they planned early and often. They assessed their opportunities and constraints, prioritized their assets, and defined visions."9

9 Get Out West Report at pg 5.

The Organizations believe our concerns regarding the UFO DRMP and those expressed in the Western Governor's Get Out West report virtually mirror each other. This concern must be addressed prior to finalization of the UFO RMP in order to avoid increases to many other management issues that were sought to be minimized with the creation of the DRMP. There can simply be no factual argument made that recreation has not been significantly undervalued in the UFO and this has directed the range of alternatives provided for multiple use recreation on the UFO when other restrictions are more fully applied in the future. The Organizations believe that the failure to proportionally analyze economics has lead to erroneous conclusions and an imbalance of multiple usage of the GJFO.

5a. Extensive research from a wide range of sources reaches conclusions that are irreconcilable with UFO conclusions regarding recreational spending.

The Organizations devote a significant portion of these comments discussing spending profiles of users developed from a wide range of sources ranging from partner agencies of the BLM to state and local government agencies and user groups. These analysis provide research that can be generally grouped into conclusions on three broad categories:

1. Total recreational spending of a user group at regional, state or local levels;
2. Average per day spending of user groups and recreational users in general; and
3. Jobs that result from this recreational spending.

The general use of the three broad categories for presentation of recreational spending information would provide numerous manners to cross check and double check the consistency of any office level planning initiatives with the conclusions of this research. As more specifically addressed in the following sections of these comments, the UFO conclusions are wholly inconsistent with these research conclusions on all three broad categories.

The Organizations must note the findings are basically consistent with each other regarding the average spend of particular user groups regardless of the entity that performed the research. The Organizations believe the variables that would be more applicable to establishing variations in total recreational spending at the planning office level would be the result of comparative opportunity and suitability of resources and opportunities that are provided on the planning office. These variables would directly impact the comparative totals for user groups and the total visitor days to the planning office. At no point in these analysis documents is there an arguable basis provided for the per day spending profiles that have been developed in the UFO planning process. The UFO conclusions are simply inconsistent with all other research and directly impacted the preferred alternative and the range of alternatives presented.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-7
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
8a. The total spending attributed to all recreational activities in the RMP is facially incorrect.

The Organizations are deeply concerned regarding the lack of analysis of the existing resources from Federal, State and local communities in addition to information provided from user groups. The failure to develop accurate analysis methodology in the UFO planning process has resulted in economic analysis calculations as part of the DRMP that are simply irreconcilable with any other calculations regarding recreational total spending in the planning areas. RMP summarizes the total recreational economic contributions to the UFO planning area as follows:

[See Attachment for Table 4-88: Economic Impacts from Recreation Activities: 2013, 2022, and 2032 (2012 Dollars)]

BLM_0165546

A brief summary of the conclusions regarding total spending on recreational activities in the Montrose, Ouray, Gunnison and Delta County areas will immediate result in one conclusion. GJFO research has reached conclusions that are entirely inconsistent with the conclusions of all other analysis.

1. Colorado Parks and Wildlife has concluded that hunting and fishing in the Montrose, Ouray, Gunnison and Delta County areas, which encompass the UFO planning area, results in over $112.4 million in annual spending to these counties.12

12 Colorado Division of Wildlife; Final Report: The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado; Sept 26, 2008 prepared by BBC Research and Consulting; at Section 3 pg 16.

2. Colorado Department of Tourism recently concluded that travel to Montrose, Ouray, Gunnison and Delta County resulted in over $292 million in spending in 2011. 13

13 Colorado Tourism Office- Office of Economic Development and International Trade; The Economic Impact of Travel in Colorado 1996-2011; prepared by Dean Runyan Associates at pgs 40 &43.

3. The Colorado Off-Highway Vehicle Coalition has concluded that over $129 million is spent in the UFO planning from the use of registered off highway vehicles, not including four wheel drive vehicles registered for road usage. 14

14 Colorado Off Highway Vehicle Coalition; Economic Contribution of Off-Highway Vehicle Recreation in Colorado; Executive Summary; July 2009 prepared by The Louis Berger Group; at pg ES-6.

These are spending amounts that are entirely consistent with the Western Governors' summary of outdoor recreation as a significant economic driver of western communities. As these current spending profiles are more than 20x the projected spending on the UFO, the Organizations vigorously assert the UFO projections are incorrect and insufficient for NEPA or the analysis required for management issues. The Organizations believe the total spending amount is simply incorrect as it cannot be reconciled with the research provided by any federal or state agencies or user groups which have analyzed the spending of particular user groups. The variations in total spending between the GJFO and all other user groups is far in excess of the 32% the Hughes River Court found sufficient to strike down the NEPA analysis in that matter on. These analysis simply must be corrected and multiple uses rebalanced on more accurate analysis of recreational spending and the public must be provided the opportunity to meaningfully comment on the revised proposal.

8b. UFO conclusions regarding per day recreational spending analysis is facially incorrect.

There are three categories that economic information is frequently provided in and the Organizations clearly have issues with total spending conclusions in the UFO plan. The UFO conclusions are also wholly inconsistent with conclusions regarding per day spending as well. The Organizations believe that reducing the total recreational spending found in the DRMP to a per day per user total allows for more meaningful analysis of the undervaluation of all recreation in the DRMP. The development of a least common denominator of recreational spending permits more meaningful analysis and comparison of the wide range of resources that are currently available as many analysis do not provide a total planning office spend.

As previously noted, the DRMP projects that total recreational spending on the UFO is only $3.9 million per year as follows:

[See Attachment for Table 4-88: Economic Impacts from Recreation Activities: 2013, 2022, and 2032 (2012 Dollars)] 15

15 DRMP at pg 4-468

The UFO socio-economic study estimates visitation for recreational activity as follows:

[See Attachment for Table 2-2: Trends in Visitation (2008-2009*]

As the DRMP provides both a total recreational spend and a total number of recreational visitor days, the average recreational daily spend relied on for development ofthe DRMP is able to be developed by dividing the total spend by the total days as follows:

$3.9 million/396,340 = $10.01 per day per user average recreational spending

The Organizations believe any assertion that the average recreational user spends $10.01 is ever more incorrect as this amount is merely an average. For this conclusion to be correct, it would mean there

BLM_0165547

are large recreational groups that are able to recreate for significantly less than $10 per day to offset
those user groups directly addressed in these comments, who on average spend l0x this amount per
day. The Organizations believe this facially incorrect conclusion is the direct result of the failure to
meaningfully analyze economics has lead to conclusions in the DRMP.

6d. Western Governors Association research directly conflicts with UFO conclusions on average daily
recreational spending.

The Organizations note that while the Western Governors Study cited above did not provide specific
calculations regarding average spending of recreational users, the study was issued with a large number
of companion site specific case studies.16 Many of these case studies did provide a total visitor days
number and a total spending amount as part of their analysis.

16 See, Western Governors' Association; The West; A Wealth of Recreational Opportunities Report.
After calculating the average daily spend for a wide range of recreational activities in locations
throughout the west, the Organizations are forced to conclude that these case studies are entirely
consistent with the Forest Service NVUM data as these case studies had a total spending range of low
$20 per day to a high of $190 per day and the bulk of areas finding an average spend in the $45 to $70
per day range. Again these conclusions simply cannot be reconciled with the spending amounts
determined in the UFO planning process.


Comment Number: FormLetterJ-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The RMP currently in effect was approved at least 26 years ago (1989/scoping began in 1983) and it in
no way accounts for the socioeconomic benefits being derived from the agricultural operations that now
exist in the North Fork Valley. Unfortunately, this draft RMP is no better. It contains only cursory
acknowledgement of the existence of this valley within the Uncompahgre Field Office planning area and
has not adequately or appropriately described what makes it of such unique agricultural, artistic and
entrepreneurial importance to all of Colorado, the resort towns surrounding the valley
(Aspen, Telluride and Crested Butte) and surrounding states. This omission of fully describing this valley
does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to
be affected by the alternatives under consideration" as required by 40 CFR 1502.15.
This valley has been formally identified through multiple means as a truly unique place:
a) It has been described as "An American Provence" in the book by the same name written by
University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its
vineyards to the famous wine growing region of southern France.
http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/
b) This valley was designated by the state of Colorado as a Colorado Certified Creative District in 2013.
Information on the significance of this designation can be viewed at
http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts
c) Delta County was recently awarded three Blueprint 2.0 Initiatives by the Colorado Office of
Economic Development and International Trade. The Initiatives include Strengthening Local Business
Brand, Adaptive Reuse Workshop and Tourism Promotion. http://choosecolorado.com/lt-gov-donna-
lynne-announces-colorado-blueprint-2-0-initiative-recipients/
d) The North Fork Valley has also been designated as an American Viticulture Area by the U.S.
government. This designation was officially adopted in 2001 and codified at 27 CFR
https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf An
American Viticulture Area is a delineated grape-growing region having distinguishing features as
established in Federal regulation and a name and delineated boundary. This is only one of two such
designated areas in Colorado.

BLM_0165548

These accolades, awards and designations are presented here to make a point - - this valley is recognized for its unique agriculture (it contains the highest concentration of organic farms, orchards and vineyards in Colorado), local business, art, agribusiness, agritourism, and recreation industries and deserves protection from any threat of environmental degradation. Gas exploration and development is not compatible with the economic culture of this valley and in fact, its very presence would threaten its highly regarded reputation as an organic agricultural area.

Comment Number: FormLetterJ-11
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
Chapter 4, Section 4.3.3 Water Resources: The following statement is made on page 4-84, "The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations." This is the only mention of organic farming in the entire draft RMP. Such a serious threat to the North Fork Valley cannot be allowed to ever occur. And the only way to prevent it is to close the entire area within the NFAP area to any new oil and gas leasing. Oil and gas drilling is absolutely incompatible with the existing land uses currently occurring in this valley.

Comment Number: FormLetterL_CHC WSCC-10
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Future Recreation Development -
Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

Comment Number: FormLetterL_CHC WSCC-5
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Real Estate - Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, non-industrial, and agricultural lifestyle. The final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.

Comment Number: FormLetterL_CHC WSCC-9
Organization1:Citizens for a Healthy Community
Commenter1:

BLM_0165549

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Hunting and Fishing -
Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

Comment Number: 000565_TothK_20161102_DCD-13
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

Comment Number: 000565_TothK_20161102_DCD-12
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year.
Livestock grazing within the UFO fills a critical winter and spring niche that is vital to theoverall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

Comment Number: FormLetterSSS-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The uniqueness of this valley-as home to the largest concentration of organic farms in the State of Colorado, Gold Medal fishing, prized big-game hunting aware winning fruits and wines-should have been considered by the BLM and was not. Tens of thousands of people from outside the valley depend on the clean food this valley provides to farmers markets, grocery stores, community supported agriculture programs, and restaurants.
Clean water and.clean air are the lifeblood of this community and the foundation for agriculture, and all the recreational activities that have made outdoor recreation a multibillion dollar industry that employs 6 times more people than the oil and gas industry and results in over 600 billion dollars of consumer spending--hunting, fishing, hiking, camping, mountain biking.

Comment Number: FormLetterWWW-1
Organization1:
Commenter1:
Commenter Type:

BLM_0165550

Comment Excerpt Text:
The uniqueness of this valley-as home to the largest concentration of organic farms in the State of Colorado, Gold Medal fishing, prized big-game hunting aware winning fruits and wines-should have been considered by the BLM and was not. Tens of thousands of people from outside the valley depend on the clean food this valley provides to farmers markets, grocery stores, community supported agriculture programs, and restaurants.
Clean water and clean air are the lifeblood of this community and the foundation for agriculture, and all the recreational activities that have made outdoor recreation a multibillion dollar industry that employs 6 times more people than the oil and gas industry and results in over 600 billion dollars of consumer spending--hunting, fishing, hiking, camping, mountain biking.

Comment Number: 500268_BearS_21060930_DMEA-18
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Recreationists and others who are described as being negatively impacted by utility ROW's but are the same people requesting more electric and communication services for heat, A/C, power appliances, lights, broadband, etc. Modern society considers the benefit of affordable electricity and high speed broadband critical for the safety, health, and job growth of our rural communities. A great deal is said about the negative impacts to other resources, but the positive impacts these services bring to our communities should also be discussed in the DRMP.

*Summary*
A. Commenters stated that the importance of the following issues and noted that were not adequately addressed in the impacts analysis:

1. Quantitative economic impacts of oil and gas development to support lands available for oil and gas leasing under Alternative D, and that it would have any meaningful impact on meeting the nation's oil and gas needs
2. The lack of economic viability of local uranium mining
3. The unique character of the North Fork Valley. Several commenters stated that the Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines could all be harmed by air pollution or surface or ground water contamination that are associated with oil and gas extraction. Commenters noted that short-term gains from oil and gas development should be compared to long-term gains from long-term sustainable industries based on the above values. One commenter noted that the relative contribution to jobs from oil and gas drilling in the North Fork would be minor compared to public lands already under lease in other areas in the state.
4. Real and perceived environmental effects of development on the agri-tourism and organic farming industries. Some commenters stated that the analysis failed to recognize the importance of the organic farming industry in the area, particularly in the North Fork Valley, and the role that this sector plays in providing a sustainable economy. Others noted that the agricultural and agri-tourism industry is reliant on clean water and air, abundant water resources, a rural and quiet setting, vistas and open spaces, outdoor recreation opportunities, and healthy wildlife ecosystems, and that development would impact these qualities. A few commenters noted that the analysis should address local and regional food security. Some stated that a no-leasing alternative

BLM_0165551

is the only compatible option with this economic sector. Others felt that Alternative B.1 would provide protection of these resources and associated economic impacts. Others stated that even if the environmental impact turns out to be small, the perceived threat and impacts to the marketing and perception of the area would still be present.

5. Impacts of drilling/well activity on property values and the desirability of the local housing market as retirement homes and investment properties. One commenter stated that the final RMP needs to include a comprehensive economic study on real estate values and analysis of how wealth destruction from declines in property values would impact the local North Fork Valley economy.

6. Impacts of development on agricultural and municipal water supplies and associated impacts on local communities

7. Impacts of oil and gas development on infrastructure, such as medical services and traffic; commenters stated that increased truck traffic from development would impact social settings and tourism, and that local roads are not engineered to deal with heavy truck traffic

8. Impacts of industrial oil and gas operations and associated air pollution and water contamination on the health of wildlife animals, and the associated impact on the hunting and fishing economy

9. Impacts of development on scenic viewsheds and related tourism impacts; commenters also noted the importance of protecting the unspoiled beauty and ecological integrity of BLM-administered lands, which is directly beneficial to the local economy and central to community values

10. Impacts of development on recreation and tourism. One commentator noted that there is a conflict with the recreational employment impacts analysis and the conclusions that are reached by state and local partners and user groups analysis. Some commenters felt that the trail-centered tourism economy is incompatible with mineral development. They noted that trails attract visitors from throughout Colorado and support local hospitality and retail businesses. The economic contribution of recreational development related to mountain biking was specifically mentioned. One commenter noted that economic importance of mountain biking in the Gateway area is important due to the declining coal industry. Other commenters noted the socioeconomic contributions of the "open" recreational areas, Special Recreation Management Areas (SRMAs), and Extensive Recreation Management Areas (ERMAs).

11. The North Fork Valley community being the creative and entrepreneurial locus for western Colorado, and how extractive industries could affect that

12. Impacts of managing for lands with wilderness characteristics on market and nonmarket values

B. Specific areas noted for restrictions on oil and gas development on BLM-administered lands to protect economic interests include the following:

- West Elk wine trail
- Gavin Mesa wine loop
- Hotchkiss and Paonia area
- Jumbo Mountain area
- Trailhead areas

BLM_0165552

- Lands west of Naturita
- BLM-administered lands in the Paradox Valley

C. Some commenters stated that the IMPLAN analysis calculates economic contributions from livestock grazing of BLM forage only, and the broader impacts on livestock operators who use BLM-administered lands as seasonal forage should be addressed. Commenters also noted that grazing contributions to overall, year-round economic well-being of all west-central Colorado, as well as contributions of traditional and cultural importance, should be discussed. Other commentators noted that the total costs of grazing should include factors, including, but not limited to, cost of administration of grazing permits, cost of related maintenance, cost of impacts to other resources from grazing, and other impacts to ecosystem services.

D. One commenter noted the importance of multiple use and extraction industries for some portions of the planning area. They felt that the recent losses of jobs in the coal industry were not adequately addressed.

E. Some commenters noted the importance of considering market and nonmarket impacts of special designation areas, and one stated that a more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics, needs to be included.

F. One commenter requested that the contributions of affordable electricity and high-speed broadband internet to local communities be discussed in the Proposed RMP/Final EIS. They also noted that the impacts on increasing demand for communication services should be discussed.

G. One commenter cited the November 2015 Rulemaking for Colorado Roadless Areas Draft RMP/EIS that stated changes in gross production and consumption of coal from the North Fork Coal Mining Area are expected to affect production and consumption of other fuel sources.

*Response*
A. The BLM appreciates the comments.

1. Quantitative impacts analysis for fluid mineral development was added to the Proposed RMP/Final EIS (see Chapter 4, Socioeconomics), based on general assumptions related to the level of anticipated development under each alternative. Changes to economic contributions would occur, however, based on differing levels of drilling or extraction or changes in cost of development or extraction. The BLM will conduct subsequent project-specific NEPA analyses for projects proposed for implementation under the RMP. The subsequent NEPA analyses for project-specific actions will tier to the land-use planning analysis and evaluate project impacts at the appropriate site-specific level (40 CFR 1502.20 and 1508.28). As required by NEPA, the public will have the opportunity to participate in the NEPA process for site-specific actions.

2. Development and production rates for uranium were based on best available information and historical production data for the planning area, as detailed in the Mineral Potential Report (BLM 2011; Mineral Potential Report for the Uncompahgre Planning Area; prepared by Rob Ernst, Geologist, BLM UFO, Montrose, CO, March 2011, 61 p.).

BLM_0165553

3. Impacts on the North Fork Valley are discussed in Draft RMP/EIS Section 4.6.3, Socioeconomics, Nature and Type of Effects, as well as by alternative through Section 4.6.3 (pages 4-451 to 4-475). Impacts on wildlife, air, and water quality are covered under the respective Chapter 4 resource sections, and are also discussed in terms of the connection with socioeconomic impacts in Section 4.6.3. The relatively minor contribution to the regional economy for all federal fluid mineral development in the decision area is also noted in the Draft RMP/EIS (page 4-462).

4. The BLM appreciates the comments. Additional information on the general types of impacts from development on the agri-tourism and organic farming industry and the qualitative impacts by alternative was added to the Proposed RMP/Final EIS. As noted in the response to Section 5 (NEPA), Section 5.3 (Range of Alternatives/Purpose and Need), of this report, prior to development, further site-specific analysis of impacts would be required, including potential impacts on the local agri-tourism and organic farming industry.

5. The BLM appreciates the comments. Information on the general types of impacts from development on local property values was added to the Proposed RMP/Final EIS. Quantitative analysis is not appropriate at the RMP planning level due to a lack of site-specific development locations. As noted in the response to Section 5 (NEPA), Section 5.3 (Range of Alternatives/Purpose and Need), of this report, prior to development, further site-specific analysis of impacts would be required, including potential impacts on the local agri-tourism and organic farming industry.

6. Impacts of development on local water supplies are discussed in Draft RMP/EIS Section 4.3.3, Water Resources (pages 4-80–4-96) and Section 4.6.2, Public Health and Safety (pages 4-444–4-450).

7. Impacts of oil and gas development on infrastructure and public services are discussed broadly in Draft RMP/EIS Section 4.6.3, Socioeconomics, Nature and Type of Effects (pages 4-455–4-458). The Draft RMP/EIS discusses traffic on page 2-208, management action 342, in the context of fluid minerals development; in Section 3.5.3 (pages 3-203–3-207), and on pages 4-25, 4-26, 4-43, 4-129, 4-130, 4-425, 4-435, 4-445, and 4-478. The Draft RMP/EIS states, "Development could also result in increased truck traffic, emissions, and impacts on local wildlife and scenic values, which could all impact social setting of local communities" (page 4-478). Draft RMP/EIS Appendix Q (Summary of Air Emission Inventory Technical Support Document) discusses well pad, access road, and pipeline construction traffic (page Q-11) and explains how air emission calculations were done, presenting the results in Draft RMP/EIS Appendix Q, Tables Q-3-1 and Q-3-2, and Figures Q-2, Q-3, Q-4, Q-5, Q-6, and Q-7. Exact quantification of potential impacts of oil and gas development on truck traffic would require a site-specific analysis that depends on the actual number and location of wells drilled, for example, which, at the RMP planning-level stage, would be speculative. As noted in the response to Section 5 (NEPA), Section 5.3 (Range of Alternatives/Purpose and Need), of this report, prior to development, further site-specific analysis of impacts would be required, including potential impacts on roads and other infrastructure. Additional information was added relative to qualitative impacts of development on increased truck traffic.

8. Several management actions related to the Gunnison River in particular are included in Draft RMP/EIS Chapter 2, including, but not limited to, Table 2-2, pages 2-36–2-39. Impacts of fluid mineral development on wildlife are discussed in Draft RMP/EIS Section

BLM_0165554

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 613 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 –
Socioeconomics and Environmental Justice)

4.3.5, Fish and Wildlife (pages 4-126–4-138), both under the Nature and Type of Effects and by alternative. Potential impacts of development on hunting and fishing are discussed in Draft RMP/EIS Section 4.4.4, Recreation and Visitor Services and Section 4.6.3, Socioeconomics (pages 4-456–4-457).

9. Draft RMP/EIS Section 4.6.3, Socioeconomics, discusses nonmarket environmental values and impacts, including quality of life values such as scenic viewsheds or views (Draft RMP/EIS pages 4-458 and 4-460 et seq.). Impacts of development on scenic viewsheds and related tourism impacts are discussed in Draft RMP/EIS Section 4.6.3, Socioeconomics, on page 4-460, and by alternative throughout that section on pages 4-466–4-477. Refer to Section 35, Visual Resources, Section 35.1, Range of alternatives, of this report regarding effects on visual amenities, such as dark/night skies.

10. The contributions from various recreational activities and settings, including trail use, mountain biking, and "open" areas, are broadly discussed in the Draft RMP/EIS (for example, see page 4-465, Section 4.6.3, Socioeconomics). The BLM reviewed the recommended studies related to economic contributions from recreation and modified the Proposed RMP/Final EIS, as appropriate.

11. The BLM reviewed information related to the assertion that the North Fork Valley community is the creative and entrepreneurial locus for western Colorado and modified the Proposed RMP/Final EIS, as appropriate. The Proposed RMP/Final EIS was also updated to reflect that Paonia, Hotchkiss, and Crawford are a state-designated Creative District.

12. The nonmarket value of wilderness and other protected areas is discussed in Draft RMP/EIS Section 4.2.3 (page 4-460). BLM Washington Office Instruction Memorandum 2013-131, Guidance on Estimating Nonmarket Environmental Values, does not specifically require monetary or quantitative analysis of nonmarket values of protecting lands with wilderness characteristics in an RMP analysis.

B. The determination for which areas should have restrictions on oil and gas development was made based on fluid mineral potential and the RFD (BLM 2012; Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, prepared by BLM Wyoming State Office, Reservoir Management Group for BLM, UFO, Montrose, CO, February 2012) balanced with the needs of sensitive resources and other land uses. See response to Section 5 (NEPA), Section 5.3 (Range of Alternatives/Purpose and Need), of this report for additional details. The BLM reviewed the areas recommended for additional closures or restrictions on oil and gas development and edited the Proposed RMP/Final EIS, as appropriate.

C. The BLM appreciates the comments. The socioeconomic analysis was modified to note that livestock grazing on BLM-administered lands in the decision area contributes to year-round grazing operations on public/private lands and may have broader economic impacts than that captured in IMPLAN analysis utilizing federal AUMs as a result. In addition, text has been added to clarify that additional factors, such as cost of administration of grazing permits, cost of related maintenance, cost of impacts to other resources from grazing, and other impacts to ecosystem services, are not captured in the quantitative analysis.

BLM_0165555

D. The BLM is committed to using the most recent data available for its analysis and reviewed the Draft RMP/EIS to reflect relevant changes in the decision area. Coal production and employment data have changed in the timeframe during which the Draft RMP/EIS was drafted. The BLM recognizes that some of the baseline data is now outdated, and the BLM reviewed coal-producing facilities, as well as corresponding coal production rates and employment, which are reflected in the Proposed RMP/Final EIS, as appropriate.

E. Draft RMP/EIS Section 3.4.3, Socioeconomics, discusses baseline information related to nonmarket environmental values. The nonmarket value of wilderness and other protected areas is discussed in Section 4.2.3 (page 4-460). BLM Washington Office Instruction Memorandum 2013-131, Guidance on Estimating Nonmarket Environmental Values, does not specifically require analysis of the economic and nonmarket benefits and values of protecting lands with wilderness characteristics in an RMP analysis.

F. The Proposed RMP/Final EIS was updated to note contributions of ROWs in supporting affordable electricity and high-speed broadband internet to local communities.

G. The cited analysis was part of the social cost of carbon analysis, which is a cost-benefit analysis (and not required by NEPA).

### Section 30.4 – Socioeconomics and Environmental Justice: Cumulative impact analysis
No comments are associated with this topic.

### Section 30.5 – Socioeconomics and Environmental Justice: Mitigation measures
Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000345_ReeseC_20161027-13
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Traffic impacts - The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed.

Comment Number: 000509_WolcottE_20161102-5
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Other Sections: 30.3
Comment Excerpt Text:
These specific impacts including short term economic gain in exchange for sacrificing or detrimental impact to most of the long term sustainable economic drivers in the region and impacts on public roads and services need to be addressed in detail and the final plan must fully protect the area from these impacts. The economically externalized costs of oil and gas development must be fully studied, monetarily quantified and mitigated - impacts to property values, water values, tourism, hunting/fishing, photography, agriculture, renewable resources on BLM lands (firewood, wildcrafting, etc), costs to public roads and services, social impacts including crime and drug use amongst oil and gas workers, traffic and traffic accidents, loss and contamination of water, sedimentation, game damage, viewshed

BLM_0165556

Case No. 1:20-cv-02484-MSK   Document 77-10   filed 04/29/21   USDC Colorado   pg 615 of 652

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 30 – Socioeconomics and Environmental Justice)

damage, night pollution, other impacts outlined in this letter and others. Only a no lease alternative would fully mitigate these impacts, and to a lesser degree B1 analysis and protections applied throughout the region.

*Summary*

Commenters stated that the economically externalized costs of oil and gas development must be fully studied, quantified, and mitigated. They stated that permits for development should be suspended until fees and royalties are raised to a fair price, and measures are taken to ensure a genuine restoration occurs after development.

*Response*

The BLM recognizes that activities that result in resource development and use can impose costs on those users who prefer more-pristine settings. Such effects were stated qualitatively in DEIS Chapter 4 (for example, see Section 4.3.5, Fish and Wildlife, on page 4-130, which states "Oil and gas development … generally occurs over wide areas and results in networks of new roads, pipelines, and other facilities"). The BLM did not have available and was not required to prepare an analysis of externalities to quantify these potential effects on the human experience of a relatively undeveloped environment. Analysis of such values and associated impacts is considerably more speculative than the analysis of "hard" effects, such as those that would result from development and extractive activities. For these reasons, the disclosure of anticipated externalities or nonmarket costs is appropriately stated in qualitative terms. The level of information in the Draft RMP/EIS is adequate for BLM decision makers to make an informed decision.

Onshore royalty rates are set at the national level; any change requires a formal rulemaking process. Royalty rates are not a RMP-level planning decision. Bonding requirements are enacted at the application for permit to drill stage of permitting before any applications for permit to drill are approved and before any drilling of federal mineral estate. The BLM's general bond requirements described in its regulations would govern the amount of bond and any bond increase (43 CFR Part 3104).

**Section 31 – Soil and Geology**
Total Number of Submissions: 18
Total Number of Comments: 18

Comment Number: 000459_HardyR_20161027-8
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-7
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:

BLM_0165557

Slopes

Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B.

Comment Number: 000400_InouyeD_20161028-12
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:

Potential earthquake risk from underground disposal of fracking wastes Is enough known about the geology of the study area to provide certainty that injection of fracking wastes would not cause an increased potential for earthquakes? "Oklahoma's three largest earthquakes since 2011 have accounted for approximately two-thirds of the energy unleashed during the state's spate of induced seismicity. Potential remains for another magnitude 5.0 or greater temblor — and there still has not been a sizable aftershock from the state-record Pawnee quake last month — but indications are that man-made earthquakes have returned to a downward trend [following a reduction in underground disposal of fracking wastes]. Jeremy Boak, director of the Oklahoma Geological Survey, presented that information this month during an hourlong talk at the Oklahoma Corporation Commission's annual Oil and Gas Institute on OU-Tulsa's campus. Boak discussed his concern that an underground "pressure pulse" could trigger another large quake."http://www.tulsaworld.com/homepagelatest/three-quakes-since-make-up-two-thirds-of-oklahoma-s/article_ec758a9f-2944-5fc0-8150-1658da9c22fb.html

Comment Number: 000489_JohnsonA_20161101-11
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:

a. Final plan should exclude oil and gas activities on slopes steeper than 30%

Best Management Practices as outlined in the agency preferred alternative do not sufficiently protect slopes steeper than 30%, listing them as avoidance areas rather than exclusion areas (table 2-2, actions 39 and 40). Furthermore, a stipulation is made in Alternative D for slopes between 30-39% to allow occupancy and use along with special designs, construction, and implementation measures (including the possibility of an operator submitted engineering report) to maintain soil stability. Based on decades of local knowledge, along with a long record of local surface instability within the region, we recommend that the agency adopts surface use stipulations included in alternatives B and B1 for slopes over 30% rather than the stipulations outlined in action 40, alternative D. Unstable geology in the North Fork of the Gunnison watershed lead to broad destabilization resulting in high sediment loads within waterways as well as landslides.[29]

[Footnote 29] Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6

Comment Number: 000383_HellecksonB_20161031-7
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Other Sections: 21.1
Comment Excerpt Text:

Seismicity

BLM_0165558

Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e., an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRM identifies 683 movement features (e.g., rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRM at 3-178).

The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features.

Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity and again argues for a "no leasing in the North Fork watershed" alternative.

Comment Number: 000509_WolcottE_20161102-1
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The preferred alternative does not entirely remove those steep slopes from oil and gas development, surface occupancy or oil and gas development. Alternative B1 does. It is critical that the BLM go much further in removing the steep slopes on the north side of the North Fork Valley and throughout the RMP region from surface occupancy and gas development, as well as protecting ditches, homes and other resources from seismic activity throughout the RMP region.

Comment Number: 000548_D'Alessandro_20161101-5
Organization1:
Commenter1:Ralph D'Alessandro
Commenter Type: Individual
Other Sections: 37.1 31.3
Comment Excerpt Text:
Selenium control is an area that appears to save received too little consideration in areas where there are steep slopes of 30% or greater. The Selenium Task Force and those individuals and organizations working on the Selenium Management Plan in the UFO area have worked hard to reduce the addition of selenium into the rivers and tributaries that feed the Colorado River. In accordance with the existing agreement with the BLM and other federal agencies (ex. BOR), I believe Controlled Surface Use is appropriate for areas adjacent high selenium soils and No Surface Occupancy is appropriate for areas with steep slopes in selenium soils addressed as a stipulation in Page 2-28, line 40 B1 and should be incorporated into Alternative D. I also advocate the incorporation into Alternative D the provisions in Page 2-28, line 34 B1 to address the selenium soil issue comprehensively.

Comment Number: 000402_RatnerJ_20161028-30
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:

BLM_0165559

On p. 317 we see the statement: "The "meeting the standard with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard."

We could find no support, either in the 4180 regulations or elsewhere to support the policy that 49% of a land area failing Rangeland Health Standards meets Rangeland Health Standards.

Please provide the regulatory basis for this approach in the revised EIS.

Comment Number: 000603_SmithP_20161024-5
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Comment Excerpt Text:
Section 3.1.3 Geology and Soils:

On page 3-22 of this Section, the BLM has included a discussion titled - Prime or Unique Farmlands and Residential Development. This subsection states that "Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) Prime farmlands, (2) Unique farmlands, (3) Farmlands of statewide importance, and (4) Farmlands of local importance. Impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS."

The last sentence shown directly above indicates that if federal actions occurring on BLM administered lands impact farmlands identified as prime or unique, these impacts must be analyzed and disclosed to the public during the development of this very document under review.

However, the next paragraph in this section states that "There are no farmlands of national or statewide importance on BLM-administered lands within the planning area. However, according to a report by the Soil Conservation Service, irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins (Soil Conservation Service1980)." The sentence regarding the requirement to analyze and disclose impacts to farmland identified as prime or unique does not limit this analysis to those prime or unique farmlands that exist on BLMadministered lands. Instead, it is indicated that this analysis is required for impacts to prime or unique farmlands resulting from federal actions taking place on BLM-administered lands. Therefore, the impacts to identified irrigated and prime irrigated lands occurring in the drainage basins listed in the next sentence (occurring within the Uncompahgre Field Office planning area) of Section 3.1.3 must be analyzed and disclosed in Chapter 4 and they are not. Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands.

Comment Number: FormLetterJ-7
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:

Chapter 3, Section 3.1.3 Geology and Soils: The following statement is included in this section; "There are no farmlands of national or statewide importance on BLM-administered lands within the planning area (emphasis added). However, according to a report by the Soil Conservation Service, "irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre, North Fork, Surface Creek, and Smith Fork drainage basins" (Soil Conservation Service 1980).

Comment Number: 000345_ReeseC_20161027-4
Organization1:
Commenter1:Cory Reese

BLM_0165560

Commenter Type: Individual
Comment Excerpt Text:
New data indicates deep injection wells and other oil and gas activities increases seismic activities. The final plan must assess and mitigate potential impacts of human-caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

Comment Number: 000401_ShoemakerS_20161028-16
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must address the very real risks that will be created by deep well wastewater injection in the area, one of the most geologically unstable areas of Colorado. Earthquakes and mudslides damage to infrastructure critical to the economic function of the region. Impacts to oil and gas infrastructure must be assessed as well.

Comment Number: 000548_D'Alessandro_20161101-5
Organization1:
Commenter1:Ralph D'Alessandro
Commenter Type: Individual
Other Sections: 31.1 37.1
Comment Excerpt Text:
Selenium control is an area that appears to save received too little consideration in areas where there are steep slopes of 30% or greater. The Selenium Task Force and those individuals and organizations working on the Selenium Management Plan in the UFO area have worked hard to reduce the addition of selenium into the rivers and tributaries that feed the Colorado River. In accordance with the existing agreement with the BLM and other federal agencies (ex. BOR), I believe Controlled Surface Use is appropriate for areas adjacent high selenium soils and No Surface Occupancy is appropriate for areas with steep slopes in selenium soils addressed as a stipulation in Page 2-28, line 40 B1 and should be incorporated into Alternative D. I also advocate the incorporation into Alternative D the provisions in Page 2-28, line 34 B1 to address the selenium soil issue comprehensively.

Comment Number: 000563_King_WELC_HasAttach-135
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Induced Seismicity from Hydraulic Fracturing Remain Unaddressed.

Comment Number: 000563_King_WELC_HasAttach-136
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The UFO must take a hard look at the issues of subsidence and the possibility of seismic activity that could result from expanded oil and gas development, wastewater disposal, and coal mining. The Draft RMP/EIS does not consider these issues at all.

BLM_0165561

Comment Number: 000563_King_WELC_HasAttach-137
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The threat of seismic activity induced from oil and gas development practices as well as coal mining must be analyzed by the UFO. As noted above, Ohio officials placed a five-mile buffer around waste injection wells. Given the recognized correlation between oil and gas development practices and the inducement of earthquakes, taking such a precautionary approach, here, through required stipulations that would attach to all future oil and gas development in the planning area is prudent and would help stem potential future impacts. At the very least, however, BLM must take a hard look at possible seismicity impacts from the proposed action, which the RMP/EIS has failed to do at all.

Comment Number: FormLetterJ-10
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
Chapter 4, Section 4.3.2 Soils and Geology: Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated and prime irrigated lands occurring within the planning area, this Section is completely silent on the environmental consequences of federal actions on these agriculturally significant lands. This is a serious omission which only further reinforces the fact that the BLM did not take the environment actually in existence in the planning area into consideration which violates 40 CFR 1502.15 of the CEQ regulations.

Comment Number: FormLetterJ-8
Organization1:
Commenter1:
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
Analysis of potential impacts to irrigated and prime irrigated lands existing within the Uncompahgre planning area (North Fork Valley) resulting from federal actions taking place on BLM-administered lands must be analyzed and disclosed in Chapter 4 and they are not. Chapter 4 is completely silent on the impacts to irrigated and prime irrigated lands occurring within the valley floors in the planning area which violates 40 CFR 1508.14.

Comment Number: 000441_HellecksonB_20161101-7
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Other Sections: 41.2
Comment Excerpt Text:
Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e., an activation of faults beneath Denver and the Front range.

The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRMP identifies 683 movement features (e.g., rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRMP at 3-178). The increased ismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features. TDRC expends significant money each year to clear our conveyance system of rockfall and slides. We also monitor a slide above our reservoir yearly to assure that no motion is occurring. The dam retaining our reservoir water has recently been reclassified to reflect the increased risk of damage to new downstream development, should a dam failure occur. Increased seismicity presents an immediate increase in risk and likely increase in direct cost to TDRC for insurance, monitoring and compliance. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity

Comment Number: 000402_RatnerJ_20161028-37
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
• Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to protect or restore the functions of springs.
• Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.
• Implement BMPs from the BLM/USGS Mancos shale research findings (Murphy 2011) applicable to livestock management, recreation management (e.g., location and limitations of OHV use areas), rights-of-way, and other surface disturbing activities.
• Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.
Yet the RMP fails to implement any of these nor does the RMP require the implementation of these. So again it looks good on paper but is designed to be worthless from a resource protection perspective.

Comment Number: 000587_WolcottS_20161031-13
Organization1:
Commenter1: Steve Wolcott
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
New data indicates deep injection wells and other oil and gas activities increases seismic activities. This will threaten a lot of water infrastructure, such as the 6 miles of pipeline that delivers Stucker Mesa Domestic Water and the 11/2 miles of 18" irrigation pipeline that delivers irrigation water to Stucker Mesa. Both of these pipelines are largely on steep and unstable slopes on BLM lands that are vulnerable to land slips. Damage to this infrastructure would interrupt irreplaceable water deliveries that would cause significant economic losses. Repairs could take weeks, cause significant crop losses and cost tens of thousands of dollars to repair. There are hundreds of water conveyance systems in the area that are vulnerable to seismic activity. The final plan must assess and mitigate potential impacts of human caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides.

Comment Number: 000560_KelloggV_20161016-2
Organization1:
Commenter1: Viva Kellogg

BLM_0165563

Commenter Type: Individual
Other Sections: 11.2
Comment Excerpt Text:
The RMP contains no mention of greenhouse gas or climate change effects. It also contains no mention of earthquakes.

Comment Number: 000402_RatnerJ_20161028-73
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Maintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures Again the RMP fails to put in place any requirements or limitations to achieve this. This is particularly obvious from the perspective of livestock which is the primary impact to soil surface conditions.

Comment Number: 000483_HanksG_20161101-7
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3 14.3
Comment Excerpt Text:
4.3.2 Soils and Geology
Trout Unlimited originally requested that underlying soils be identified across the UFO DRMP footprint, specifically in CRCT watersheds. Native fish are especially susceptible to the ill-effects of sedimentation to their habitat. Though we recognize the included mapping efforts with soil classifications, nowhere was referenced the local soils and potential consequences to CRCT or any other coldwater fisheries. The DRMP failed to provide a review of the numerous impacts to critical and sensitive fish and wildlife habitat from act of massive soil movement and changes from oil and gas development and we request that such information be provided in the Final RMP.
The DRMP fails to adequately analyze the impacts of soil sedimentation and revegetation as it impacts fish and wildlife habitat. Exploration and extraction of oil and gas resources does create alterations to the subsurface and surface environment. Analysis of the gravel and soil regime and its behavior during spring thaw events, flooding events, impacts to wetlands, and streams was inadequate in the DEIS. TU feels that the DRMP presents inadequate discussion of the long term and short term impacts from exploration and drilling activities that can be damaging to the soils and geology and the aquatic ecology of the surrounding areas.

Comment Number: 500268_BearS_21060930_DMEA-31
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B
• TLI has a rutting threshold of 2" in Alternative B and TL2 has a rutting 3" threshold in Alternative D for the same reason. What is the justification for an even more restrictive requirement in the Preferred Alternative than what is proposed in Alternative B, the environmental emphasis alternative? DMEA requests that the 3" rut rule continue to be included in the Preferred Alternative as it currently exists.

BLM_0165564

*Summary*

A. Commenters had the following input on alternatives:

- Removal of steep slopes from surface occupancy during oil and gas development, as under Alternative B.1, is critical.
- Stipulation measures for steep slopes should remain at 30 percent, in order to protect highly saline and easily erodible soils.
- In order to reduce the addition of selenium to waterways, CSU should be allowed in areas adjacent to high selenium soils, and NSO is appropriate for areas with steep slopes in selenium soils.

B. One commenter stated that language referring to irrigated and prime irrigated lands in the North Fork, Surface Creek, and Smith Fork drainage basins should be added to the Chapter 3 affected environment discussion.

C. Another commenter stated that the BLM must provide the regulatory basis to support the assessment that soil polygons with half of assessment sites not meeting soil Rangeland Health Standards are still classified as meets Rangeland Health Standards.

D. Commenters requested that the BLM analyze the following:

1. impacts on prime and irrigated farmlands
2. induced seismology from hydraulic fracturing

E. One commenter stated that the specific standards and goals described in the Draft RMP/EIS for soil resources are not tied to implementation actions and, therefore, would not protect the resource.

F. One commenter requested that the TL-1 stipulation for the preferred alternative (3 inch rutting threshold) be modified to be less restrictive and similar to that in Alternative B (2 inch rutting threshold).

*Response*

A. The Draft RMP/EIS includes management actions restricting surface use on steep slopes, including restrictions on slopes greater than 30 percent (see Draft RMP/EIS Chapter 2, Alternatives, pages 2-34–2-35), as well as areas with high selenium (page 2-30).

B. Baseline information on prime and irrigated farmlands, including those in North Fork, Surface Creek, and Smith Fork drainage basins, is presented on Draft RMP/EIS page 3-22 (Section 3.1.3, Soils and Geology). The Proposed RMP/Final EIS was updated to reflect prime and unique soils.

C. Rangeland health standards for soil are defined in the Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado (Draft RMP/EIS Appendix C). Per BLM Washington Office Instruction Memorandum 2012-124, Implementation of Land Health Reporting Data Standard, and BLM Manual 4180, Land Health, acres of land meeting/not meeting standards are reported for each standard. This determination is not an RMP planning decision,

BLM_0165565

and baseline information reflects current monitoring practices. The Proposed RMP/Final EIS was updated to reflect these policies.

D.

1. Impacts on prime and irrigated farmlands are discussed in Draft RMP/EIS Section 4.3.2 on page 4-69 for Alternative B.1. The BLM appreciates the comments. Additional impacts analysis was added to the Proposed RMP/Final EIS for the other alternatives.
2. Although no studies exist on the impacts of hydraulic fracturing on induced seismology relative to the UFO decision area, the BLM reviewed and considered other relevant scientific studies and incorporated this information in the Proposed RMP/Final EIS.

E. Objectives and management actions for soil are written to provide direction for implementation and to allow flexibility for site-specific conditions as appropriate. Also see the response to Section 5 – NEPA of this report.

F. The Draft RMP/EIS analyzed a range of alternatives that are philosophically distinct and represent a range of management approaches for responding to planning issues and resolving user conflict. To be consistent with each alternative's distinction, the rutting threshold in Draft RMP/EIS Alternative B is more restrictive to development than that proposed in Alternative D (prohibiting surface disturbance for activities in areas with rutting of 2 inches or more is more restrictive than prohibiting activities in areas with rutting of 3 inches or more) to represent a range of management actions in each alternative.

## Section 32 – Travel Management

### Section 32.1 – Travel Management: Range of alternatives
Total Number of Submissions: 29
Total Number of Comments: 70
Comment Number: 000592_WhippleL_20161101-1
Organization1:
Commenter1:Lynn Whipple
Commenter Type: Individual
Comment Excerpt Text:
would like to see the BLM offer alternatives that includes a focus on setting aside more non-motorized areas, for quiet users and lower impact on natural resources and wildlife.

Comment Number: 000032_WitmanR_20160627-3
Organization1:
Commenter1:Randy Witham
Commenter Type: Individual
Comment Excerpt Text:
Under Public Health & Safety, Line 84, keep all current trails, roads & routes open to the public.
A favorite tactic of the extreme environmentalists is to use revised Travel Mgt Plans to do just one thing..........further limit the public's access to THEIR public lands. We're sick and tired of every new Travel Mgt Plan doing one thing..........putting up more gates, more fencing, more boulders, decommissioning primitive & disbursed camp sites. We are sick of being herded into fee campgrounds, being required to look for and fight for and even make reservations to get a campsite in a campground

BLM_0165566

where we have to endure everyone else's campfire smoke, barking dogs, noise and such. There's nothing wrong with getting away from others, camping out in the wild.

So, no to your consideration to close any routes in the UFO area of responsibility. We need to open the land up more, repair some of the damage done in past plans.

Comment Number: 000045_TankaD_20160714-1
Organization1:
Commenter1:Dale Tanaka
Commenter Type: Individual
Comment Excerpt Text:
I would like the travel plan to increase the amount of OHV trails in this area, most importantly single track access. Outdoor recreation brings stimulates local economy with minimal environmental impacts

Comment Number: 000108_StraightD_20160803-3
Organization1:
Commenter1:Daniel Stright
Commenter Type: Individual
Comment Excerpt Text:
In the RMP draft there are no seasonal closures in the subject 10 sq mi area. In June 2016, Montrose County reached agreement with affected Beaver Hill landowners to open Old Paradox Road as an unmaintained trail for ATVs and high clearance OHVs. The trail connects with Old Paradox Road on BLM in SE ¼ Sec 21-48N-10W, parallels the canyons, travels in deep soils in the bottom of some major drainages, and aligns with the dip of the surface topography. The trail will erode with use (soil disturbance) and heavy rains. In addition, this area is identified by CPW (on private and public lands) as critical mule deer wintering range and as a major mule deer
migration pathway. As a result, the BOCC agreed to impose gated seasonal closures of this trail where it crosses the Beaver Hill Subdivision (at the BLM boundary and at the intersection with Paradox Trail. The dates of the closures are to be determined. The trail has been surveyed and constructed, and a recorded easement has been dedicated to Montrose County. A shape file from MC GIS of this survey is attached to this email.

Comment Number: 000129_BlackburnW_20160901-3
Organization1:Thunder Mountain Wheelers ATV Club
Commenter1:Walt Blackburn
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.2
Comment Excerpt Text:
The Hookless Cactus having been identified specifically on the northern part of the "open area." TMW suggest that the total "open area" be reduced by approximately 2 thousand acres by eliminating "open riding" on the norther 1/3 of the area and re-designate that area to designated trails only.

Comment Number: 000129_BlackburnW_20160901-4
Organization1:Thunder Mountain Wheelers ATV Club
Commenter1:Walt Blackburn
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Reducing the "open area" and changing to designated trails only on the norther part of the area would have a positive effect on the salinity and erosion concerns.

BLM_0165567

TMW would suggest the team give full consideration to leaving the "Open Area", intact at least in part for the OHV community that has lost over 75% of their trails and riding opportunities over the past two decades. We also would like to remind the Interdisciplinary Team that the "Open Area" has a very positive impact on the socio-economic impact on the City and Delta County with the many out of town visitors that use the area.

Comment Number: 000151_HeppM_20161011-2
Organization1:
Commenter1:Matt Hepp
Commenter Type: Individual
Comment Excerpt Text:
I am highly supportive of more purpose-built singletrack for both motorized and non-motorized uses.
I do NOT support installation of more ATV and other 2-track routes as there are many many existing miles of passable 2-tracks in the Uncompahgre BLM lands.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-44
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 476 Page 2-302: We request that BLM keep the North Delta OHV area open in order to provide for OHV related recreational opportunities. These opportunities are important to attracting touri sts and visitors to the a rea.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-45
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 480 Page 2-304: The management action proposed in Alternative D would be better addressed through site specific travel management planning. We recommend that BLM remove this management action from the proposed RMP and address the identified areas through site specific, comprehensive travel management planning at a later date. More precisely targeted planning efforts will provide a better balance of resource protection and travel opportunities.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-46
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 481 Page 2-307: We request that Alternative D be amended to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This limited allowance will preserve hunting opportunities for hunters with differing physical abilities.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-47
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government

BLM_0165568

Other Sections: 3 6.2
Comment Excerpt Text:
Line 484 Page 2-309: Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the counties to prepare an accurate inventory of roads that are known county jurisdiction. Montrose County will assist BLM in identifying such roads within the county based on road petitions, HUTF maps and other evidence readily available to the county. Recent communication between BLM and county staff on such information has been beneficial to both sides and we look forward to continuing this productive dialogue and exchange of information.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-48
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 488 Page 2-310: It is not practical to require "prior notification" for off route use of emergency vehicles. We suggest this language be removed from the proposed action.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-51
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 27.1
Comment Excerpt Text:
Appendix J Roubideau SRMA Page J-61 through J-69: We request that all travel management actions for this SRMA allow for motorized and mechanized travel. This area is well known to 4WD and OHV enthus iast and also has excellent potential for development of mountain biking opportunities.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-53
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 27.1
Comment Excerpt Text:
Appendix J Kinikin Hills SRMA Page J -33: We request that the travel management action for Zone I of this SRMA be amended to a llow for mechanized travel. There are many areas that are accessible only to non-mechanized use (horseback riding, hiking), but there are very few that allow for non-motorized mechanized use (mountain biking). This change would provide much needed opportunities for development of mountain bike trails in the Montrose area.

Comment Number: 000177_JohnsonP_20160930-3
Organization1:
Commenter1:Philip Johnson
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165569

I also believe that more restrictions or blockages should be made on unauthorized roads created by off road vehicles. I oppose additional trails created for quad tracs and dirt bikes, since there are thousands of miles of 4WD and back roads for them to use within the area.

Comment Number: 000196_RodriguezJ_20160831-1
Organization1:
Commenter1:Joyce Rodriguez
Commenter Type: Individual
Comment Excerpt Text:
The open riding area just north of the Trap Club in North Delta needs to be kept open. This area is used to train riders close to home and it needs to keep an open area

Comment Number: 000217_RubanowM_20161026-3
Organization1:
Commenter1:Morgan Rubanow
Commenter Type: Individual
Comment Excerpt Text:
Lastly, I would like the BLM to manage Jumbo Mountain for multiple uses to ensure user and resident safety and I ask that the BLM please perform future travel management planning for motorized and non-motorized uses. The BLM should keep in mind that these trails are in a residential area and that the concerns of the residents should be listened to.

Comment Number: 000219_AndersonK_20160930-2
Organization1:
Commenter1:Kevin Anderson
Commenter Type: Individual
Comment Excerpt Text:
That said, Delta has the largest open OHV use area left in Colorado. "North Delta Adobes" This area has historical motorized use. The Draft notes. "In the past, visitors drove jeeps, trucks and motorcycles. Today the BLM has seen an increase in use of OHV's of all types and sizes." The Draft goes on to say these vehicles have contributed to the widening, deepening, braiding and eroding of some existing routes and increasing the number of hill climb, play and camping areas. The OHV increased use must be ATV and Side by Sides? These vehicles are limited by design. Four wheels do not climb steep adobes without rolling.
I would like to see the North Delta Adobes retain their historical use and be left as an open OHV area. This would be a good attribute for Delta's economy in the future. The OHV community has lost over 75 percent of their trails and riding opportunities over the past twenty years. Delta is the center of other commonly visited OHV areas. The passing of House Bill16-1030 will give municipalities the jurisdiction to allow OHV's on their roads to access recreation areas. This could allow access from Delta to public lands without having to trailer. This should also help boost tourism dollars in town at gas stations, restaurants, motels, and campgrounds.
Another concern, the Draft does not have route by route designations. I was told that would come after the gavel drops on the Draft RMP/EIS. I'm concerned the OHV community and public land access will lose again on the next round!

Comment Number: 000222_RazianoR_20161026_COPMOBA-3
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Renata Raziano
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165570

In the Spring Creek SRMA we would prefer that RMZ3 include nonmotorized singletrack as an additional focus. Nonmotorized trail development in this parcel could connect the Buzzard Gulch trail system with the newly constructed Spring Canyon Connectors and Spring Canyon trail. This would create a challenging, completely nonmotorized, loop ride for more adventurous riders. Currently, mountain bikers most frequently access the trails in Spring Canyon by driving or riding on Dave Wood Road; replacing road use with a singletrack trail would greatly enhance the experience for nonmotorized users.

Comment Number: 000222_RazianoR_20161026_COPMOBA-4
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Renata Raziano
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1
Comment Excerpt Text:
Also in the Spring Creek SRMA, we support the designation of the Buzzard Gulch trail system as a nonmotorized RMZ (RMZ1 Alternative D). The current Buzzard Gulch provides beginner and intermediate mountain bikers, hikers and equestrians with a quality singletrack experience close to town. Further development of the trail system with a small loop suitable for young children with parents and a more challenging trail for advanced riders would provide riding for all ability levels and families.

Comment Number: 000269_CascadeR_20161028-2
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I celebrate the UFO's preferred alternative proposal to close the entire planning/management area to open motorized travel. This decision is a critical component of protecting natural resources while still allowing motorized travel on designated routes. As a quiet user who values wildlife viewing, tranquility and the sounds and smells of nature, I ask (or more accurately implore) you to close the 114,970 acres to motorized travel as defined in Alternative B. This acreage constitutes a mere 17% of the UFO jurisdiction. This component of Alternative B does not yet balance motorized and human powered use in my opinion, but it is a move in the right direction – not just for quiet users but also for wildlife, botanical species, soils, water, and air quality.

Comment Number: 000282_LightfootA_20161029-4
Organization1:
Commenter1:Ali Lightfoot
Commenter Type:
Comment Excerpt Text:
I would like the BLM to manage Jumbo Mountain for multiple uses to ensure user and resident safety and I ask that theBLM please perform future travel management planning for motorized and non-motorized uses.

Comment Number: 000288_Monhollandt_20161031-1
Organization1:Over the Edge Sports
Commenter1:Landon Monholland
Commenter Type: Private Industry
Comment Excerpt Text:
The Uncompahgre Plateau is the perfect spot to build singletrack trails that connect and make loops that are popular with cyclists and offroad motorcyclists. The trails of the Unc unfortunately tend to dive

BLM_0165571

down into canyons and valleys with no way back out but to hike or turn around. Some creative thought about reroutes and new trails to increase connectivity should be considered in the RMP.

Comment Number: 000288_Monhollandt_20161031-2
Organization1:Over the Edge Sports
Commenter1:Landon Monholland
Commenter Type: Private Industry
Comment Excerpt Text:
I would like to see provisions in the RMP for future motorized single track construction. And more thought put into connectivity so that big loops can be strung together without getting on miles of roads. A gigantic single track motorized loop of the entire Unc Plateau would be the gem of Colorado and would boost the economies of all the towns below.

Comment Number: 000329_HodgeJ_20161031-1
Organization1:
Commenter1:James Hodge
Commenter Type: Individual
Comment Excerpt Text:
With the addition of a few more trails, Delta could become a serious destination for tourists looking for a high quality outdoor experience, particularly those who enjoy mountain biking. What's more, additional trails would create a more livable environment in the City of Delta and surrounding areas, thus attracting more businesses to the area.
Regarding the type of mountain bike trails: I would encourage the UFO to emphasize easy and intermediate single track trails. I live in the Grand Junction area, and while this area is well known for advanced/expert mountain bike trails, the development of trails here has often neglected the casual or beginning rider. By avoiding this omission, the Delta area would have yet one more reason to attract visitors from around the region.

Comment Number: 000377_SkokoM_20161019-1
Organization1:
Commenter1:Michael Skoko
Commenter Type: Individual
Other Sections: 27.1
Comment Excerpt Text:
The lack of non-motorized trails and recreation opportunities on BLM lands in the Uncompahgre Field Office (UFO) is astounding, as compared to the surrounding field offices (Grand Junction, Gunnison and Tres Rios. Take the area surrounding Montrose for instance, in a 20-mile radius there is a total of 11 miles of BLM non-motorized trails (Buzzard Gulch, which has its own issues [shooting range]). If you take that out further (1 hour drive), the only additional non-motorized area on BLM lands is the Ridgway Area Trails (RAT) which totals approximately 20 miles.
The heavy use by all non-motorized users, namely mountain bikers, of the RAT system is evidence that the Uncompahgre Valley has been devoid of quality non-motorized spaces and trails. I think the UFO can do a better job to address this obvious lack of non-motorized recreation resources. The BLM lands surrounding Montrose and the Uncompahgre Valley is absolutely dominated by motorized-use areas that is not conducive to a "silent" recreation setting. My comments are centered on the increased access to mountain biking and hiking in a setting that is devoted to a "silent-sport" setting in the Uncompahgre Valley.

BLM_0165572

Comment Number: 000389_KittelsonK_20161030-1
Organization1:Cycling Western Colorado
Commenter1:Kristina Kittelson
Commenter Type: Individual
Other Sections: 30.3
Comment Excerpt Text:
Finally in the Gateway area, many communities are facing enormous economic impacts due to the declining coalmine industry. I encourage you to take into consideration that creating a travel management plan supporting mountain biking trails will help these ailing towns diversify their economies through outdoor recreation

Comment Number: 000391_KennyM_20161028-1
Organization1:
Commenter1:Marc Kenny
Commenter Type: Individual
Comment Excerpt Text:
I would strongly encourage the BLM work with the Bookcliff Rattlers and MTRA to design and layout dirt bike single track trails using as much of existing as possible to create various loops options on the north end. Further these trails would make great mountain biking trails too. I'm thinking of Butterknife, Sarlacc, Sidewinder, West Bench, and other shared single track moto and dirt bike trails.

Comment Number: 000409_DayB_20161031-15
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 478 and 480. Travel closures. Alternative B is better because it has more ACECs and EEAs and includes elk calving areas.

Comment Number: 000420_HovdeC_20161101-17
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-302, Line 476, The North Delta Off Highway Vehicle (OHV) area totals 8,560 acres. The difference between the acres designated open (5,250) in Alternative C and the total acres is 3,310 acres. Those 3,310 acres in the northern portion of the North Delta OHV area should be designated as restricted to designated routes and not removed from the overall area. Although there are concerns about threatened and endangered species in the northern area, there are many existing routes currently and historically used in the present open OHV designation. The North Delta OHV area should be managed as an ERMA Page 2-307, Line 481, amend Alternative D to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This consideration allows for additional hunting opportunities for hunters with differing physical abilities.
o Both Alternatives B and D would eliminate open area designations and not allow cross-country travel. While this is portrayed in Table 4-61, this report mentions the elimination of the North Delta OHV area of cross-country travel under Alternative B, but omits from mentioning the same elimination in Alternative D. Alternative C would expand the open area designation by including Kinikin Hills in addition to the North Delta OHV area. Alternative A would maintain the status quo; at least until a designated route system is potentially implemented (within 5 years of completing the RMP).

BLM_0165573

Comment Number: 000420_HovdeC_20161101-36
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-307, Line 481 Alternative D is amended to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This limited allowance will preserve hunting opportunities for hunters with differing physical abilities.

Comment Number: 000444_JackinoR_20161029-1
Organization1:Uncompahgre Valley Trail Riders
Commenter1:Rich Jackino
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
An exception to the designated trails approach are the "open" areas in Peach Valley and north of Delta which are viewed as small discreet special use areas for a small segment of the motorized crowd. Those should remain in their current condition as there are few of them available anywhere in Colorado. The users of these areas have special needs which should not/cannot be met in any other areas managed by BLM. In fact, we recommend that BLM designate one additional open area in the West End of Montrose County comprised of a few thousand acres. Doing so would accommodate these special need users in that part of the county. Hopefully by providing these approved open areas motorized users needs will be met in these confined areas and they will refrain from violating other BLM lands. It would be much more effective to manage all lands if BLM permitted these users to use specified areas, otherwise they will infringe on lands where they are not welcome by BLM. In summary, we support Alternative A in ITEM 476 with one exception and that is the creation of one additional open area in the West End.

Comment Number: 000444_JackinoR_20161029-2
Organization1:Uncompahgre Valley Trail Riders
Commenter1:Rich Jackino
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The user of designated trails will travel to the trailhead in a vehicle with a trailer hauling their machine. Therefore a parking area is required for loading and unloading, and parking during the day while the user is out on the trail. An area large enough for twenty vehicles with trailers will accommodate most trail users. These trailheads will be served by county roads and therefore it will be important for the BLM to work with the county to establish trailhead locations. Where none exist today the trailhead will need to be created with land clearing, gravel surface, signage, etc. As a part of this Draft RMP we respectfully submit that trailhead locations be anticipated when determining management plans. No management plan should be enacted which would prevent the establishment of these trailheads in the future. With these thoughts in mind we support ITEM 485 as written.

Comment Number: 000444_JackinoR_20161029-3
Organization1:Uncompahgre Valley Trail Riders
Commenter1:Rich Jackino
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While the current RMP does not specify individual ATV/UTV trails, it is important that selection of alternatives throughout the RMP today does not close the door to the establishment of trails in the future. Therefore, we recommend that Alternative A (ITEM 475) be selected at this time. This NO

BLM_0165574

ACTION Alternative will then permit the BLM much latitude when it embarks on a UFO-wide travel management plan in the future. Please remember that the overall objective from our viewpoint is the creation of 30 to 40 designated trails, looped, several miles long each throughout the whole UFO.

Comment Number: 000483_HanksG_20161101-14
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Minimum road system: In order to protect fish and wildlife resources, allow for management, provide quality motorized access and develop a financially maintainable system of roads, the plan set forth should be the minimum road system capable of fulfilling these goals. Furthermore, TU strongly supports the decommissioning of unused, unnecessary and illegal routes. Numerous studies show the benefits, both fiscally and ecologically, of road and route decommissioning and the consequent positive effects on the general quality of public lands.
Road density: To preserve the backcountry experience, we believe that the route density outside of Wilderness and areas without roads should be less than 1 mile per square mile. One mile of road for every square mile of area is still a high road density and this should be the bare minimum for all districts – outside of designated motorized recreation areas – in order to protect road and traffic sensitive animals such as elk, mule deer, bighorn sheep, and cutthroat trout.
Water resources: In accordance with riparian area BMPs, we recommend that new motorized routes be located a minimum of 500 feet from all streams, springs, wetlands, lakes, and rivers. Routes that cannot be relocated in order to protect streams and riparian areas should be closed or have appropriate sediment reduction materials installed.
Protection of wild and native fish: Coldwater fish and native CRCT in particular are sensitive to runoff and streambed degradation that can occur when motorized use is inadequately managed or poorly planned. Route management planning is inherently good for fish as it tends to eliminate redundant routes and limit motorized use in riparian areas and areas of sensitive soils. CRCT are designated as a species of special concern in Colorado and we fully expect BLM will protect the watersheds containing CRCT by limiting route density, eliminating routes in riparian corridors and carefully considering how motorized travel will impact sediment loads in these valuable watersheds. Sportsmen also place a high value on wild, non-native trout that exist in other watersheds inside the planning area and we are confident that the BLM will seek reasonable protections for the watersheds while still providing sportsmen access.

Comment Number: 000486_ClaytonJ_20161101-11
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3
Comment Excerpt Text:
Page: 2-304
Line: 480
Comment: Alternative B: GUSG closure to vehicles in San Miguel/CSCSM population areas should be from March 1- July 15.
No alternatives appear to specify a closure period for GUSG in the Crawford population—this should be added. The lekking and nesting periods should be protected. The closure should also be timed to address and minimize the effects of high-intensity elk use on vegetation in the Crawford CH unit.
Alternative D: no specific reference to GUSG closure needs. We recommend specifying GUSG closures for this alternative as was done in Alternative B.

BLM_0165575

Comment Number: 000489_JohnsonA_20161101-34
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Also, the draft RMP does not sufficiently explain how the BLM will prevent "using roads during wet periods if use will damage the road drainage features?" (DEIS G-10). WSCC members have observed that historically the BLM continually fails to close roads during wet periods, and BLM roads are substantially damaged by heavy rutting caused by use during said wet periods.

Comment Number: 000489_JohnsonA_20161101-76
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
F. Travel Management
1. Area allocations for off-road vehicles
i. Providing and protecting quiet recreation opportunities
The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. Ibid. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below.
Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences.
As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's 2011 Travel and Transportation Management (TTM) Manual generally recognizes that:
The recreation program has a specific need to recognize and manage motorized recreational use of off-highway vehicles (OHVs) and non-motorized travel, such as foot, equestrian, and non- motorized mechanical travel. The planning process should consider and address the full range of various modes of travel on public lands, not only motorized access needs.
BLM Manual 1626 at .06(A)(1) (emphasis added).
BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use. Ensuring opportunities for a full range of non-motorized travel is crucial for creating a comprehensive transportation and travel plan. In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.
ii. Applying the minimization criteria to area allocations
In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and 1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and

BLM_0165576

other recreational uses.[67] When designating areas or trails available for ORV use, agencies must locate them to:

* minimize damage to soil, watershed, vegetation, or other resources of the public lands; (2) minimize harassment of wildlife or significant disruption of wildlife habitats; and

* minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands.[68]

[Footnote 67] Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).

[Footnote 68] Exec. Order No. 11644, § 3(a).

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide: The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses.[69] Collectively, these cases confirm the agencies' substantive obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so.[70] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts."[71] BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations (Manual 1626.06(A)) and route designations (Manual 1626.06(B)).

[Footnote 69] See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgment of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures and elimination of cross-country travel minimized impacts); Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); Central Sierra Environmental

BLM_0165577

Resource Center v. U.S. Forest Service, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1071-74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria); Center for Biological Diversity v. BLM, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria).

[Footnote 70] See, e.g., CBD v. BLM, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); Idaho Conservation League, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process").

[Footnote 71] WildEarth Guardians, 790 F.3d at 931.

As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its substantive duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to each area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.[72] Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.[73] That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644."[74]

[Footnote 72] See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); SUWA, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").

[Footnote 73] See 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); Idaho Conservation League, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).

[Footnote 74] WildEarth Guardians, 790 F.3d at 931.

Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources.[75] In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands.[76] The BMPs provide guidelines, based on peer- reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.[77]

[Footnote 75] See Friends of the Clearwater, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk

BLM_0165578

habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources).

[Footnote 76] T. Adam Switalski and Allison Jones, Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers, 8 Journal of Conservation Planning 12-24 (2012), available at http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf and attached. Development of a BLM-specific literature review and set of BMPs is in progress.

[Footnote 77] The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. See Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSPLT3_2541294.pd f.

Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts.[78] For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.

[Footnote 78] See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes).

Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system.[79] BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary.[80] To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

[Footnote 79] See Sierra Club v. U.S. Forest Serv., 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative).

[Footnote 80] Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3.

Finally, attempts to mitigate impacts associated with an existing OHV system are insufficient to fully satisfy the duty to minimize impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be located to minimize" impacts and conflicts.[81] 43 C.F.R. § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach.[82] As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

[Footnote 81] Exec. Order 11644, § 3(a); see also Center for Biological Diversity, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the effects of route designations, i.e., the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)).

[Footnote 82] See Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring).

iii. ORV "open" areas

BLM_0165579

We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2-301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

Summary of Comments: BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to minimize resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.

Comment Number: 000489_JohnsonA_20161101-77
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
2. Comprehensive Travel and Transportation Management Planning
The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:
If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. The following tasks should be completed in the RMP for each planning area or TMA:
a. Produce a map of the known network of transportation linear features, including modes of travel;
b. Define the long term management goals for the transportation system;
c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.
d. Identify any incomplete travel and transportation tasks:
i. Outline additional data needs and a strategy to collect needed information;
ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;

BLM_0165580

iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and

iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." Id. at .06(B)(3).

The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. Id. at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:

Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):

1. North Fork (71,020 acres)
2. South Montrose (66,180 acres)
3. North Delta (61,270 acres)
4. San Miguel (74,960 acres)
5. West End (289,960 acres)

Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." Id. at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. Id. at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation

BLM_0165581

network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

Summary of Comments: The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool.

Comment Number: 000489_JohnsonA_20161101-78
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
3. Non-motorized trail networks
BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non-motorized trail systems.

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities.

The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; specifically, for a long-term, non-motorized trail system. BLM H- 8342 at 18.

In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:

* Define the long term management goals for the transportation system;
* Define interim management objectives for areas or sub-areas where route designations are not being completed
* Identify any incomplete travel and transportation tasks:
o Outline additional data needs and a strategy to collect needed information;
o Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;

BLM_0165582

o Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process BLM Manual 1626 at .06(B)(2). As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-impacts places on the landscape. In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:

a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers;
b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions;
c) Results in sustainable systems;
d) Provides high quality experiences;
e) Serves the abilities of non-motorized recreational users;
f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources.
g) Minimizes user conflicts by separating user groups whenever feasible;
h) Limits the desire to venture off-trail.

Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP. As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non- motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

Summary of Comments: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.

Comment Number: 000489_JohnsonA_20161101-79
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4. Temporary Closures

BLM_0165583

BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:

Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

Summary of Comments: The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

Comment Number: 000489_JohnsonA_20161101-80
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
5. Revised Statute 2477
The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:
Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider adjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort.
Uncompahgre Draft RMP at ES-6, I-13; see also 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process.
Summary of Comments: BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process.

Comment Number: 000498_AntonelliD_20161101-1
Organization1:
Commenter1:Daniel Antonelli
Commenter Type: Individual
Comment Excerpt Text:
Singletrack trail is what most mountain bike users seek out and have the best experience riding. There are some trails in this area that qualify for some of the best experiences I have had. I would highly recommend that the single track trails in this area be inventoried and protected. I would be willing to work with your office in identifying areas and trails that would be of benefit to all concerned. There are several that come to mind and are listed below:

1) Single track trail leading down the Atkinson Creek drainage from the Paradox trail intersection downstream to an intersection with a 4x4 road near Hog Point. A good return route uses a trail on the east ridge above the same Atkinson Creek drainage.

2) The Beehive Canyon trail from the water tank near Biscuit rock to the intersection with a 4x4 road on Carpenter Flats is a very cool ride. There are several mine buildings along the way to explore.

3) And a big favorite, Y11 trail leaving from the lower portion of the Uravan site leading down the south side of the San Miguel River and then still high on the cliff following the Dolores River upstream to a fork. One fork leads down to the river road and the other is a trail leading higher up and to the south east to connect with 4x4 roads in the Saucer Basin. A return on theses roads then a short switchback trail returns to the start of the Y11 trail.

4) A trail on the west side of the Dolores River starting just downstream from the bridge at Biscuit rock and then eventually climbing up on top of the mesa at the northernmost point of Carpenter Flats to an intersection with a 4x4 drive road is a challenge but rewarding adventure.

5) Another favorite is an old road almost single track trail starting above and east of the Tabaguache Creek and San Miguel River confluence. It travels upstream on the north side of the San Miguel River for 6-8 miles and the forks. One fork leads up Coal Creek with and exit up Box Canyon. The other fork in the trail crosses Coal Creek and stays next to the San Miguel River and heads upstream to a shallow ford and one can access Highway 141 or other trails for a return trip. This trail is always good as an out and back also.

6) A trail leading up the South Fork of Mesa Creek and connecting with trails on Forest Service lands

7) Farther west and up onto Carpenter Ridge there are two different trails that are located on a bench just below the rim that overlook the Paradox valley in spectacular fashion. One takes off of 6 Road coming out of Paradox Valley and heads to the southeast. The other is a few miles west and is near the Forest Boundary. The views off of the bench these trails are on is also spectacular.

8) There a several trails starting on south side of Highway 141 near the the San Miguel River and Coal Creek confluence. These trails make very interesting loops up to the rim of Sawtooth Ridge and back. There is some mining history, slick rock formations, small canyons and interesting vegetation in this area.

9) One of the trails on Sawtooth Ridge follows the very edge of the rim for several miles making for spectacular views of the Paradox Valley and the La Sal mountains.

10) There are several other old or abandoned 4x4 roads that make for wonderful experiences on a bike in the Atkinson Breaks and Martin Mesa Areas. Many of these trails have a bunch of mining ruins, great views and challenging terrain. I can elaborate on these if you would like.

There are several trails in the Burro Creek area that are near or in the area proposed as Lands with Wilderness Characteristics. I would like to protect the area but recommend another form of protection that does not exclude mountain bike access. I would be willing to look at adjusting the boundary of the LWC with BLM personnel if that is the only option.

I would like to see these trails be accessible to mountain bike users for years to come. I would be willing to help GPS the routes or meet with BLM personnel to perform tasks to make this happen

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-12
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
TRAVEL MANAGEMENT AND WILDLIFE
For maximum protection for wildlife, we recommend the proposed route closures in Alt B, including Alt B seasonal closures, See Lines 478 and 480, travel closures. pages 4-128 and 4-132. through 4-130, also citations pp. 4-129.

BLM_0165585

Comment Number: 000545_SlivkaJ_20161101-35
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
e. Game Retrieval We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.
Summary of Comments: BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative.

Comment Number: 000545_SlivkaJ_20161101-38
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Travel Management a. Area allocations for off-road vehicles i. Providing and protecting quiet recreation opportunities The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. Ibid. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below. Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences. As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's Travel andTransportation Management (TTM) Manual generally recognizes that:
TTM's comprehensive approach is driven by the need to provide access to and across public lands for a wide variety of users (including authorized, administrative, commercial, recreational, traditional, and other travel purposes), while also addressing the equally wide variety of uses, including all forms of motorized, non-motorized, mechanized, and non-mechanized travel.
BLM Manual 1626 at 1.6 (emphasis added). BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use.
Ensuring opportunities for a full range of non-motorized travel is crucial for creating a comprehensive transportation and travel plan.
In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.

BLM_0165586

Comment Number: 000545_SlivkaJ_20161101-39
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its substantive duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to each area being considered for designation. That methodology must include several key elements:
First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.
[See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); SUWA, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").]
Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.
[See 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); Idaho Conservation League, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).]
That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644." [WildEarth Guardians, 790 F.3d at 931.]

Comment Number: 000545_SlivkaJ_20161101-40
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources. 18 In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands. 19 The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.

Comment Number: 000545_SlivkaJ_20161101-41
Organization1:The Wilderness Society
Commenter1:Juli Slivka

BLM_0165587

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system. 22 BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary. 23 To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

Comment Number: 000545_SlivkaJ_20161101-43
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to minimize resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.

Comment Number: 000545_SlivkaJ_20161101-44
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The following tasks should be completed in the RMP for each planning area or TMA:
a. Produce a map of the known network of transportation linear features, including modes of travel; b. Define the long term management goals for the transportation system; c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.

Comment Number: 000545_SlivkaJ_20161101-45
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. Identify any incomplete travel and transportation tasks:
i. Outline additional data needs and a strategy to collect needed information; ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints; iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process;

BLM_0165588

and iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.
BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." Id. at .06(B)(3).

Comment Number: 000545_SlivkaJ_20161101-46
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped.

Comment Number: 000545_SlivkaJ_20161101-47
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. Id. at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

Comment Number: 000545_SlivkaJ_20161101-48
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:
Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):
1. North Fork (71,020 acres) 2. South Montrose (66,180 acres) 3. North Delta (61,270 acres) 4. San Miguel (74,960 acres) 5. West End (289,960 acres)
Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." Id. at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

BLM_0165589

Comment Number: 000545_SlivkaJ_20161101-49
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. Id. at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.
Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

Comment Number: 000545_SlivkaJ_20161101-50
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool.

Comment Number: 000545_SlivkaJ_20161101-51
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Non-motorized trail networks BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non-motorized trail systems.

Comment Number: 000545_SlivkaJ_20161101-52
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165590

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

Comment Number: 000545_SlivkaJ_20161101-53
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities.
The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; specifically for a long-term, non-motorized trail system. BLM H- 8342 at 18.

Comment Number: 000545_SlivkaJ_20161101-54
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:
? Define the long term management goals for the transportation system; ? Define interim management objectives for areas or sub-areas where route designations are not being completed ? Identify any incomplete travel and transportation tasks:
o Outline additional data needs and a strategy to collect needed information; o Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints; o Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process

Comment Number: 000545_SlivkaJ_20161101-55
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165591

As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

Comment Number: 000545_SlivkaJ_20161101-56
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-impacts places on the landscape.

Comment Number: 000545_SlivkaJ_20161101-57
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

Comment Number: 000545_SlivkaJ_20161101-58
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:
a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers; b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions; c) Results in sustainable systems; d) Provides high quality experiences; e) Serves the abilities of non-motorized recreational users; f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources. g) Minimizes user conflicts by separating user groups whenever feasible; h) Limits the desire to venture off-trail.
Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP.

Comment Number: 000545_SlivkaJ_20161101-59
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non-motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby

area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

Comment Number: 000545_SlivkaJ_20161101-60
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.

Comment Number: 000545_SlivkaJ_20161101-61
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Temporary Closures BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:
Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.
IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.
Summary of Comments: The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

Comment Number: 000545_SlivkaJ_20161101-62
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Revised Statute 2477 The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

BLM_0165593

Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider unadjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort. Uncompahgre Draft RMP at ES-6, I-13; see also 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process. Summary of Comments: BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process.

Comment Number: 500106_JesseU_20161101-2
Organization1:
Commenter1:Ulli Lir Jesse
Commenter Type: Individual
Comment Excerpt Text:
I applaud your decision to discontinue open OHV use across the field office.

*Summary*
A. Some commenters stated that the BLM should uphold its assertion that Revised Statute 2477 claims are not addressed in the agency's planning process. Commenters recommended that the BLM work with Montrose County to get an accurate inventory of existing roads in the decision area. They recommended that the BLM not close any existing routes and increase the amount of available OHV routes. Some commenters also noted a preference for purpose-built single-track routes over two-track routes.

B. Some commenters provided support of eliminating or reducing the North Delta OHV open area, while others recommended keeping it open for flexible recreational opportunities and requested an additional open area in the West End of Montrose County.

C. One commenter recommended that the RMP incorporate a minimum road system to limit the number of roads needed to manage BLM-administered lands, which may reduce impacts to resources. Suggested road density is less than 1 mile per square mile, routes a minimum of 500 feet from all water resources, and limited motorized use in riparian and sensitive soil areas. Route density targets should be clearly defined.

D. Others stated that the BLM should produce a map of the known network of transportation linear features, define the long-term management goals for the transportation system, define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP for each travel management area, and identify any incomplete travel and transportation tasks. Existing linear features that are low in conflict should be prioritized when considering new trails.

E. Commenters request that the BLM include additional consideration for recreation opportunities for quiet and non-motorized recreation, especially in areas intended to provide a semi-primitive and/or primitive recreation experience. They request that additional areas have discretionary closure to motorized use.

BLM_0165594