F. Commenters suggested the following regarding specific and travel management actions:

1. Permit cross-county travel to allow for motorized big game retrieval to facilitate hunting or, conversely, prohibit all cross-country travel for motorized vehicles, including for game retrieval.
2. Remove language requiring "prior notification" for off-route emergency use
3. Block unauthorized trails
4. Implement temporary closures as needed to protect public lands and resources
5. Consider road management measures during wet periods
6. Consider trail connectively and construction of loops
7. Apply minimization criteria per Executive Orders 11644 and 11989 and BLM Manual 1626
8. Specify the criteria that BLM will use to designate a nonmotorized trail network in future route management planning

G. Commenters provided specific recommended modifications to BLM management actions, including the following:

- Jumbo Mountain – manage for multiple uses
- Roubideux SRMA – allow for motorized and mechanized travel
- Kinikin Hills, Zone 1 – allow for mechanized travel
- Spring Creek SRMA RMZ 3 – include nonmotorized singletrack
- Buzzards Gulch trail system – support for nonmotorized designation
- Uncompahgre Plateau – creatively designed singletrack
- Gateway Area – Travel Management Plan supporting mountain biking
- Consider trailhead location when determining management plans
- No alternative contains a closure period for Gunnison sage-grouse Crawford population

*Response*
A. Site-specific route designations will be addressed in implementation-level travel management planning (see Draft RMP/EIS Appendix M, Travel Management, for details). As noted in the Draft RMP/EIS Executive Summary on page ES-6, the BLM does not consider claims under Revised Statute 2477 in the land use planning process.

B. The BLM identified and analyzed a full range of alternatives concerning the North Delta OHV Area in the Draft RMP/EIS. Table 2-2, page 2-302, line 476 provides the range of management actions for all alternatives analyzed in the Draft RMP/EIS. Impacts of these alternatives are presented in Chapter 4 in the Recreation and Visitor Services analysis starting on page 4-291 and the Comprehensive Travel and Transportation Management analysis starting on page 4-323. An open area was not analyzed in the alternatives for the West End of Montrose County because the demand or need was not identified during public scoping.

C. Route density will be used as an analysis tool in implementation-level travel management planning, as noted in Draft RMP/EIS Appendix M, page M-9 under the Route-by-route Designation Guidelines heading.

BLM_0165595

D. The current transportation network in the UFO will be confirmed during site-specific travel management planning. A map of existing routes in the "Limited to Existing Routes" category was added to the Proposed RMP/Final EIS. Until site-specific travel management planning, interim travel management actions are provided in Draft RMP/EIS Table 2-2, pages 2-306–2-308, line 481. Long-term goals for the decision area are identified in Table 2-2, page 2-300, line 473. Goals for specific recreation areas are detailed in Draft RMP/EIS Appendix J, Description of Recreation Management Areas.

E. A wide range of alternatives was analyzed in the Draft RMP/EIS. There are multiple areas where travel is limited to nonmotorized, as noted in Table 2-2, page 2-302, line 477; page 2-303, line 478; and pages. 2-304 – 2-306, line 480. Additional areas where travel is addressed are located in Goals for specific recreation areas detailed in Appendix J, Description of Recreation Management Areas, and the travel implementation process in Appendix M, Travel Management.

F. The BLM appreciates the comments.

1. As noted in Draft RMP/EIS Table 2-2, line 481 on page 2-307, Alternative D would prohibit cross-country motorized/mechanized travel for big-game retrieval. However, this alternative would allow hand-held, wheeled, game retrieval carts to go off routes only during CPW-authorized big game and mountain lion hunting seasons, as well as allowing cross-country travel for foot and horse travel.

2. In the Proposed RMP/Final EIS, language was changed to clarify the difference between "emergency" travel and "administration" travel. However, the following is stated in Draft RMP/EIS Table 2-2, line 481 for Alternatives A, B, and C: "…Should prior notification not be possible, require contact with a BLM Authorized Officer within 72 hours following emergency entry."

3 and 6. Management and trail planning for specific routes, including unauthorized routes and potential opportunities to connect trails, will be determined during implementation-level travel planning.

4-5. Management actions as detailed in Table 2-2, pages 2-300–2-310 provide for flexibility when using temporary closures, including restrictions during wet conditions to protect sensitive resources.

7. As stated in Draft RMP/EIS Appendix M on page M-1, "The ultimate goal of the travel management process is to propose a management framework that supports BLM's mission, achieves resource management objectives and provides appropriate, sustainable public and administrative access." In addition, Draft RMP/EIS Chapter 2 on pages 2-7 – 2-8 address the goals and objectives for each alternative, and Table 2-2, pages 2-300 – 2-310 addresses further goals, objectives, and actions for comprehensive travel and transportation management. Draft RMP/EIS Chapter 4 on page 4-323 and Appendix M on page M-5 also address how OHV designations were determined within each alternative. Implementation-level travel management planning will follow all relevant regulations, including minimization criteria per Executive Orders 11644 and 11989 and BLM Manual 1626, as stated in Draft RMP/EIS Appendix M, Travel Management, page M-4.

8. Criteria to be used in future travel management planning are included in Draft RMP/EIS Appendix M, Travel Management.

BLM_0165596

G. As presented in Draft RMP/EIS Appendix J, the Draft RMP/EIS identifies SRMAs and ERMAs within the decision area that provide targeted activities. Within SRMAs, targeted experiences and benefits drive the appropriate activities, which were based on public feedback, field observations, and previous travel planning efforts. Targeted activities can be adjusted at the implementation level as long as they reflect the targeted experience and targeted benefits identified in Draft RMP/EIS Appendix J. Provided recommendations related to site-specific travel management designations will be considered at implementation-level travel management planning.

### Section 32.2 – Travel Management: Best available information—baseline data

Total Number of Submissions: 4
Total Number of Comments: 5

Comment Number: 000108_StraightD_20160803-2
Organization1:
Commenter1:Daniel Stright
Commenter Type: Individual
Comment Excerpt Text:
In the NW ¼ of sec 28-48N-10W there is a public road on private property shown on the RMP maps. This road is also shown on MC road maps. In the Dry creek travel plan this section of road is shown as closed and on-the-ground signage states that the trail is closed at the private property boundary. My understanding is that this trail was created during earlier chaining and is, in fact, not legal public access. The trail is currently blocked and signed no trespassing. I believe that the Dry Creek Travel Plan recommended the rerouting of this access to the west of the private property.

Comment Number: 000153_MosherR_20160928-2
Organization1:
Commenter1:Rossann Mosher
Commenter Type: Individual
Comment Excerpt Text:
We do however have one concern about Alternative B, under the item of travel management. This item does not specify closing the trails from November through April. This seems like an important omission in terms of the health of local wildlife populations (deer and some birds) who winter throughout this area and then birth their young in the spring in this area.

Comment Number: 000394_KoskiP_20161030-3
Organization1:West End Trails Alliance
Commenter1:Paul Koski
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP's travel management sections allows for identification of trails to be considered. We have listed many trails currently being used and to be proposed with our comments. We would like to see these routes recognized and considered in the future for their unique historic and recreational values. This is not a complete list however, as more are being considered, explored and mapped on a ongoing basis.!

Comment Number: 000394_KoskiP_20161030-4
Organization1:West End Trails Alliance
Commenter1:Paul Koski
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165597

Comment Excerpt Text:
West End Trails for consideration in the UFO- Resource Management Plan
Note: Not a complete list
Trail
Name
!Y-11 or Shamrock Trail!
! Historic cow trail has become a popular mountain bike single track with easy access from Hwy 141 near Uravan. Offers access into Saucer Basin on the north side of the Basin. One of the few single track trails in the West End with unique views of the confluence area downstream from Uravan.!
!Paradox Trail with Spradlin Park Bypass (under construction)!
! Established in 1995, this epic 118 mile Paradox Trail connects the Tabeguache Trail on the Uncompahgre Plateau with the Kokopelli Trail in Utah.!
!Blue Mesa Loop!
! Utilizes an old jeep road just below the rim of Blue Mesa on the west side then climbs up to Blue Mesa and joins the existing two track system there to complete the loop. Great views of Sew em Up Mesa WSA, the Narrows section of Hwy 141 south of Gateway high above the Dolores River.!
!North Bench Trail (Out and back)!
! An existing grazing access road running along a scenic bench high above the San Miguel River from near Tabeguache Creek heading SE towards Coal Canyon and beyond almost to Tuttle Draw before the two track enters private lands.!
Saucer Basin Loop!
! The old two track begins at CR EE22 near the NE corner of Saucer Basin and finds its way down into this scenic valley containing unusual fin and cliff formations. Existing two track and trails eventually bring hikers and riders to the south rim of Saucer Basin overlooking the Paradox Valley over 1,500 ft. below. Trail users can complete the loop by following the rim SE until it hooks back up to an old two track and EE22.!
!Sawtooth Ridge Loop!
! This area lies between Hwy 141 on the north and Hwy 90 on the east and south. The area contains one of the largest expanses of continuous slick rock in the WestEnd. Shallow canyons also cut through the area with large pines in the canyon bottoms. There is existing access from both Highways on old two track. Visually a real treat with challenging yet fun terrain for bikers and hikers.!
Nyswonger Mesa Loop!
! This ride uses two parallel old two track roads beginning off Hwy 90 just before it leaves the Paradox Valley to the SW. The upper road ends at the west buttress cliffs of Nyswonger Mesa where remnants of an old ladder mark the way up onto the mesa top. The old two track trail system there will lead mountain bikers off the north side on a steep switchbacked trail. Nice views off in each direction and directly above the Paradox Valley, Dolores River WSA and Bedrock. !
Catch Em Up Trail (Bedrock)!
! Historic cow trail which allows users a quick but steep access to the west end of Davis Mesa and the existing two track trail system. Beautiful views of the Paradox Valley and a challenging hike.!
!Dry Creek Trail!
! Access is available off an existing BLM road east of Dry Creek after leaving the county road at the Coke Oven Ranch. Once in the creek bottom hikers follow an abandoned two track up the canyon. Very quiet and isolated as the creek winds its way through massive cliffs towards Dry Creek Basin. Evidence of flash flooding is apparent.! ! !
North Spradlin Park Boundary Trail (hiking only- to be proposed)!
! Although denied for a possible solution for mountain bikers, this trail will be proposed to allow public access along the southern boundary of the Tabeguache SMA. About 800 ft of new trail would be created to link up existing two track trail on both sides. Allows access for hikers and equestrians.!
!Naturita Public Lands Access (south)!

BLM_0165598

! Exiting two track climbs from Hwy 141 near Ferrell Gas on the west side of town. Allows public access onto the flats and existing trail system just south and above the town of Naturita.!
!Martin Mesa Canyon (hiking only)!
! Short out and back up an existing trail into the main drainage arms of Martin Mesa. Quiet and scenic.!
!Horse Collar Arch Trail (hiking only!
! Historic trail constructed with the purpose of allowing hikers down into the Martin Mesa drainage and to view the unusual Horse Collar Arch which the water has etched out over time to create a large hole and a drop of over 150 feet. Easy access off Hwy 141 near the Hanging Flume.!
!Beehive Canyon Trail!
! Small tight canyon near Hwy 141 and Biscuit Rock with access off CR Q13. Old two track / single track trail leads mountain bikers and hikers up the small canyon eventually connecting with CR P12 above to make a loop.!
!Naturita to Nucla Trail (multi use - to be proposed)!
! This long talked about trail would utilize existing two track on BLM lands which lie just south of the Hopkins Field County Airport. New trail sections would need to be constructed in order to enter the town of Naturita on public lands.!
!East and North Nucla trail System (stacked loop systems to be proposed)!
! With the upcoming completion of the Paradox Trail Reroute in 2017, WETA is already looking at proposing two stacked loop trail systems to the north and east of the town of Nucla. These areas holds much potential for recreational use including mountain biking and hiking.!
Sew Em Up Mesa Trail (County Line)!
! Unmarked trail leading up to the rim of Sew Em Up Mesa WSA. A unique and easy access off Hwy 141 at the boundary of Montrose and Mesa Counties. Large boulders, towering cliffs and a quiet canyon await hikers into this pristine area.!
Sew Em Up Mesa Trail ( Roc Creek and the HWY 141 Narrows Spring)!
! Petroglyphs await hikers wishing to get off Hwy 141 and experience the quiet of Sew Em Up Mesa WSA near Roc Creek and just past the Narrows Spring Box north on Hwy 141.!
!Long Park Trail- West End!
! Just off CR EE22, hikers can find their way to the high rim of the Paradox Valley on a gentle loop. There is also an old two track access to the east rim of Saucer Basin with fantastic vistas into Basin with its unusual sandstone fins.
Burn Canyon Trail System (under construction)
! This large area is currently proposed as a SRMA which WETA supports. Over 30 miles of multi use trails will be featured here when completed.!
!Thunder Trails to Burn Canyon System connector (to be proposed)
! Two popular trail systems in close proximity need to be connected and to provide access across Naturita Canyon. !
!MailBox Park Trails - Norwood to Nucla (to be proposed)!
! This is another long talked about trail which would connect the communities of Norwood to Nucla and Naturita via Mailbox Park. There are enough existing two track trails that could be connected with new single track trails which will avoid private lands and complete the Norwood to Nucla Trail.

Comment Number: 000420_HovdeC_20161101-19
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 30
Comment Excerpt Text:
The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic

BLM_0165599

drivers for the entire regions. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Delta County urges the BLM to consult with the affected counties to prepare an accurate inventory of roads.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-7
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix J – Recreation Management Areas
Appendix J provides a series of tables that outlines goals and objectives for various Recreation Management Areas on BLM lands under various alternatives. Some of the RMA's include the entire range of alternatives in the Draft EIS, while others do not. Presumably the areas that do not include a range of alternatives already have a recently approved travel management plan in place (such as Burn Canyon, Ridgway, Dry Creek).
One of the primary concerns we have with increased trail development for OHV's and bicycles on BLM lands is where this development is occurring, and the level to which it is being developed. Most big game winter range occurs in the lower elevation valleys and foothills, and extends upward in elevation on the drier south and west facing slopes. Much of the habitat for big game and other species that occurs in the valleys is now developed for our towns and housing in the rural areas surrounding these towns, or for agricultural production. As a result, extensive areas of winter habitat have been lost to this development and its associated roads, traffic, and other human activities. This has generally displaced big game to higher elevation winter ranges on the foothills and mesas of the adjacent public lands. With our increase in human population there is also a tremendous increase in recreation on the adjacent public lands and pressure on the BLM to build and/or authorize more and more OHV and bicycle trails to accommodate this use. Once a few trails are established, other user-developed trails appear and additional proposals from user-groups come to the BLM for even more trails that reach farther and farther into areas that have provided big game winter range. The result has been a dramatic increase in the displacement of wildlife off their limited winter range areas and a subsequent decline in the health and productivity of our big game herds.
This RMP provides an opportunity for the BLM to define which areas are critical for wildlife and should not be developed for recreational use, and which areas can be developed for recreation while still protecting other resource values. We strongly feel that the BLM should provide this direction in the RMP instead of continuing to react to proposals from user-groups that are only focused on their own goals and activities.
In general, we support the efforts to manage use of the most popular destinations by providing good maps, access to the trailheads, and education for the users of those areas. However, we are very concerned that there are no Management Actions or Allowable Use Decisions for fish or wildlife in any proposed RMA's, and request that the BLM include this direction in the Final RMP. The following are some specific comments on a few of the proposed RMA's.
Burn Canyon SRMA. A travel management plan was recently developed for this SRMA and projects are currently being implemented within the planning area. As previously stated, the Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

BLM_0165600

The BLM promised in its decision to monitor use of the area and apply adaptive management to further actions. The main lessons that should be learned from here is that 1) seasonal restrictions to protect big game winter range are ineffective when the BLM has no jurisdiction over primary access roads managed by the county, 2) overall use of the area increases substantially after becoming a designated RMA, 3) people do not comply with allowable trail use designations, 4) the UFO does not have the resources to monitor and enforce compliance with established regulations for recreational use.

Dolores River Canyon SRMA. We agree entirely with the management goals and objectives for this SRMA. We are also aware of several user-developed OHV trails in the area that access the south rim of the Dolores River canyon, as well as go all the way into the bottom of the Dolores River canyon from Sylvia's Pocket. Appendix J should also include direction to obliterate these trails to restore the primitive nature of this Canyon.

Dry Creek SRMA. Management emphasis within this area is primarily for a variety of motorized and mechanized recreation, both trail based and off-trail rock crawling. The matrix in Appendix J does not have any mitigation measures for wildlife. There are substantial areas of big game winter range within this SRMA and there is currently a proposal to construct another 50 miles of mountain bike trails. As stated above, we are concerned with the continued loss of big game winter range to recreation development and the additional trail development proposed in this area would result in an extreme density of trails and associated disturbance. The BLM needs to develop and include a standard for open route density to alleviate these impacts. Similar to Burn Canyon, we believe that the presence of county roads and the ineffectiveness of a seasonal closure (if there is one) would not adequately minimize harassment of wildlife or significant disruption of wildlife habitat.

Paradox Valley SRMA. Zone 3 of this SRMA includes a substantial amount of area that should be included in the Zone 4 management strategy. Any plans to provide OHV and bicycle trail riding in this area should be limited to existing roads that are managed by the county or that are roads that remain from previous mining activity that are somewhat used and maintained, and would create a logical and safe trail system. Much of the area near the rim of the Paradox Valley and Dolores River canyon is very primitive in nature, and should be left available for dispersed hiking, hunting, and exploring. Appendix J only includes one alternative, and the BLM should at least consider and analyze an alternative that retains and enhances the primitive nature of this area for wildlife habitat and undeveloped, dispersed uses.

San Miguel River SRMA. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. We are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons, which is compatible with the recreation strategy for zone 2. These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.

*Summary*

A. Commenters stated that the BLM should work closely with various user groups and counties when designating trails and uses, and identified the following trails for consideration:

- Shamrock Trail
- Historic Cow Trail
- Paradox Trail
- Blue Mesa Loop
- North Bench Trail

BLM_0165601

- Saucer Basin Loop
- Sawtooth Ridge Loop
- Nyswonger Mesa Loop
- Catch Em Up Trail
- Dry Creek Trail
- North Spradlin Park Boundary Trail
- Naturita Public Lands Access
- Martin Mesa Canyon
- Horse Collar Arch Trail
- Beehive Canyon Trail
- Naturita to Nucla Trail
- East and North Nucla trail System
- Sew Em Up Mesa Trail
- Long Park Trail- West End
- Burn Canyon Trail System
- Thunder Trails to Burn Canyon System connector
- MailBox Park Trails – Norwood to Nucla

B. Comments included several suggestions on how to manage SRMAs, as described in Draft RMP/EIS Appendix J. Comments included opposition to any new trail development in certain areas, including Norwood Canyon below the Cascabel Ranch in the San Miguel SRMA, and general concerns about increased users in other SRMAs due to existing county roads and new trail development. Comments also expressed concern for wildlife displacement due to establishing SRMAs that consequently attract more people to an area. Commenters requested that the BLM establish a standard for open route density to alleviate impacts to big game winter range in the Dry Creek SRMA and that the BLM enforce rules established in the Burn Canyon SRMA regarding appropriate trail users on specific trails.

C. Commenters provided data and request that the BLM review specific timing limitations to ensure that correct timeline are in place for resource protection.

D. One commenter noted public and private property access in the Dry Creek Area and its relation to the Dry Creek Travel Management Plan.

*Response*
A–B. The BLM appreciates these recommendations. The BLM currently maintains excellent working relationships with county and local governments related to BLM-administered lands within and surrounding the UFO. The BLM plans to maintain these working relationships through consistent communication and working groups for appropriate projects, including road inventories and trail development. Specific trail development and management will not be addressed at the RMP planning level. This can be addressed at the implementation-level planning process if the BLM receives a trail development proposal in a specific portion of the UFO on BLM-administered lands.

As discussed in the Draft RMP/EIS page 2-308, line 484, comprehensive travel management planning, including route designation, will be conducted following the RMP planning process (see

BLM_0165602

also Draft RMP/EIS, Appendix M, Travel Management, for information and guidance on comprehensive travel management planning). New routes in the decision area would adhere to guidance and mitigation in BLM Manual 1626, Travel and Transportation Management Manual. Route density will be used as an analysis tool in implementation-level travel management planning, as noted in Draft RMP/EIS Appendix M, page M-9, under the Route-by-route Designation Guidelines heading.

C. Data provided related to timing and seasonal limitations are included in Draft RMP/EIS Table 2-2, line 475, which contains "Seasonal Limitations" for acreages allocated to each alternative. Further, Draft RMP/EIS Table 2-2, line 480 also contains the specific months for these seasonal closures.

D. Draft RMP/EIS Table 2-2, line 483 contains the following action: "Bring forward the decisions from the Dry Creek Travel Management Plan (BLM 2009a) in the Dry Creek Travel Management Area and the Ridgway Travel Management Plan (BLM 2013a) (Figure 2-80, Appendix A)." As such, trail designations and boundaries will follow the Dry Creek Travel Management Plan.

### Section 32.3 – Travel Management: Impact analysis
Total Number of Submissions: 3
Total Number of Comments: 3

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-13
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.3 14.3
Comment Excerpt Text:
In Dry Creek, the final RMP needs to recognize that not all trails are created equal, but rather factor in the mileage-requirements of long distance trail uses such motorized and mechanized, along with the additional habitat fragmentation these additional miles create. The RMP needs to analyze projected fragmentation by trails in this and other high use areas, to assess the carrying capacity of the land and to establish an upper limit on the amount of trail fragmentation that will still maintain habitat connectivity and BLM Land Use Health Standards into the future.

Comment Number: 000237_VaughtK_20161004-1
Organization1:Dancing Dog Farm
Commenter1:Kenneth Vaught
Commenter Type: Individual
Other Sections: 14.3
Comment Excerpt Text:
The area surrounding the Valley is rich in wildlife, with the draws and drainages used as wildlife corridors for movement. Each winter, there is an area elk herd that number 250 – 300 that overnight in Short Draw, along Coal Road about a mile north of the town of Hotchkiss and each morning between 5:30 am and 6:00 am, migrate in a northwesterly direction from the Draw, up into the south facing cedar areas on BLM land. It is quite a site to see from December until they move out in late February. This area that the elk occupy each winter is adjacent to several of the Valley parcels that the BLM is considering leasing for oil and gas development with Coal Road being direct access to the lease areas. There currently is no traffic to speak of on Coal Road with most of it's use coming from summer biking

BLM_0165603

to BLM grounds or hikers and walkers. Any future heavy truck traffic on the Coal Road would certainly interrupt the seasonal migration in one of the area elk herd's winter habitats.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-9
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 14.3
Comment Excerpt Text:
Appendix M – Travel Management
The RMP will determine planning level decisions for the UFO, such as which areas are open, closed, or limited to OHV and bicycle use, and which types of uses will be emphasized within those broad allocations (Recreation Management Areas – Appendix J). We believe the BLM should strive to provide a balance in those allocations, and to recognize the values we place on providing large blocks of undisturbed habitat for fish and wildlife and the opportunity for traditional methods of hunting and fishing in the backcountry. That balance would include a priority for the retention and enhancement of lands with wilderness characteristics and/or lands with low densities of open routes, lands that currently provide seasonally important big game habitat and migration corridors, and lands adjacent to communities surrounding the UFO that will provide opportunities for quiet use and solitude.
Appendix M includes a description of the process and criteria that will be considered by the BLM when evaluating routes within area-specific travel management plans during implementation of the RMP. Within Appendix M we would like to see the BLM include additional management goals and objectives for big game habitat capability and effectiveness. We strongly fell there is a need for additional consideration and recognition of the impacts of motorized and mechanized recreation use upon big game distribution, productivity, vulnerability, and population structure, as well as hunter success in relation to open road/trail density on the landscape. There is a large and growing body of research available that needs to be recognized and implemented by the BLM. We have posted several of the most relevant research studies on our website at backcountryhunters.org:
Literature Reviews of OHV Impacts on Hunting, Fishing and Habitat:
1. ATV Impacts on the Landscape and Wildlife [] (2011). A white paper by BHA which provides a synthesis of OHV-related articles in three sections focused on the effects of ATV use on: 1) soils, water quality and vegetation 2) wildlife (primarily elk) 3) the habitat and environment that wildlife depend upon.
https://d3n8a8pro7vhmx.cloudfront.net/backcountryhunters/pages/2374/attachments/original/145591927
5/ORV_WHITE_PAPER.pdf?1455919275
2. Off Road Vehicle Impacts on Hunting and Fishing. An excellent illustrated literature review by the Isaac Walton League highlighting the impacts that off road vehicle use has on our sporting heritage.
http://www.recpro.org/assets/Library/Trails/collision_course_ohv_report_2007.pdf
3. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands (2007). A synthesis of literature compiled by the Department of Interior.
https://pubs.usgs.gov/of/2007/1353/report.pdf
4. The Effects of Off-Road Vehicles on Ecosystems. A research review by Texas Parks and Wildlife.
https://tpwd.texas.gov/publications/pwdpubs/media/pwd_rp_t3200_1081.pdf
5. Effects of Roads on Elk: Implication for Management in Forested Ecosystems (2005). Research which builds on a large body of research demonstrating the impacts of roads on elk behavior and habitat.
http://www.emwh.org/pdf/elk/Effects%20of%20Roads%20on%20Elk%20Implications%20for%20Manageme
nt%20in%20Forested%20Ecosystems%202005.pdf
6. Behavioral Responses of North American Elk to Recreational Activity (2008). A study which found that "activities of elk can be substantially affected by off-road recreation. Mitigating these effects may be appropriate where elk are a management priority. Balancing management of species like elk with off-

BLM_0165604

road recreation will become increasingly important as off-road recreational uses continue to increase on public lands in North America." http://www.bioone.org/doi/abs/10.2193/2008-102

7. Reproductive Success of Elk Following Disturbance Following Disturbance by Humans During Calving Season (2011). A study which shows that cow/calf ratios decease when disturbance increases and therefore "maintaining disturbance-free areas for elk during parturitional periods" is necessary. https://www.jstor.org/stable/3803250?seq=1#page_scan_tab_contents

There are additional Goals and Objectives and the associated Actions that relate to open road/trail densities, the impacts of bicycle trails and use, and the conservation of our existing backcountry areas that I request the BLM to include in Appendix M to guide implementation of travel management on the UFO. These additional Goals, Objectives, and Actions will also enable the BLM to fully comply with 43CFR 8342.1 b) Areas and trails will be located to minimize harassment of wildlife or significant disruption of wildlife habitat, and c) Areas and trails will be located to minimize conflicts between OHV's and other uses.

Goal/Objective – Locate and manage OHV and mechanized routes and trails to minimize harassment of wildlife or significant disruption of wildlife habitat.

Action #1 – Limit and reduce motorized and mechanized routes and trails in areas managed for mixed uses. Implement road and trail density standards within these areas that are favorable to big game habitat requirements as defined in current scientific research.

Action #2 – Motorized and mechanized routes and trails will avoid lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas.

Action #3 – No motorized off-route down game retrieval will be allowed anywhere within the UFO.

Action #4 – Seasonal closures to protect big game winter range will include snowmobiles.

Action #5 – Routes designated for administrative use within all mixed use areas, lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas will be closed to public OHV and bicycle use yearlong.

*Summary*
Refer to the summary in Section 14.3, Fish and Wildlife – Impact Analysis, of this report.

*Response*
Refer to the response in Section 14.3, Fish and Wildlife – Impact Analysis, of this report.

**Section 32.4 – Travel Management: Cumulative impact analysis**
No comments are associated with this topic.

**Section 32.5 – Travel Management: Mitigation measures**
Total Number of Submissions: 4
Total Number of Comments: 4

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-5
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Comprehensive Trails and Travel Management
Appendix G currently lacks any direction specific to wildlife. The following direction should be added to improve habitat effectiveness:
* Recreational trail systems will not be developed in areas identified as big game winter concentration areas, severe winter range, or critical winter range.

BLM_0165605

* All proposals for the establishment, modification, and funding of recreational trails will be reviewed by local District Wildlife Managers and Biologists with Colorado Parks and Wildlife prior to BLM proceeding with implementation.
* Where effective, the use of seasonal route and/or area restrictions will be in effect from December 1 through March 1 regardless of current weather and snow conditions.
* The analysis of OHV and bicycle trail system proposals will include identification of open road and trail densities and the potential impacts of the alternatives on habitat effectiveness.
* The implementation of travel management plans will include corresponding measures and funding to decommission roads and user-developed routes concurrently with trail development.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-17
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
However challenging, incentives for compliance with seasonal closures should be instituted in Burn Canyon, to maintain habitat security as intended.
Such incentives for effective trail closures need to be featured in the final RMP as well. This letter strongly recommends Adaptive Management, whereby trails are closed until the ingredients for compliance, enforcement, signs, using cooperation, etc. are in place.
This kind of resolve in instituting Adaptive Management needs to permeate all the recreation sections in the RMP, with creative incentives such as trail closures used, so the onus and expense of compliance is shifted to the trail user community. This could avoid the serious wildlife impacts from noncompliance we are seeing in Burn Canyon.
NOTE: Human society has the ingenuity the adapt to wildlife. Wildlife does not have a similar ability to adapt to humans.

Comment Number: 000545_SlivkaJ_20161101-42
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, attempts to mitigate impacts associated with an existing OHV system are insufficient to fully satisfy the duty to minimize impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be located to minimize" impacts and conflicts. 24 43 C.F.R. 18 See Friends of the Clearwater, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources). 19 T. Adam Switalski and Allison Jones, Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers, 8 Journal of Conservation Planning 12-24 (2012), available at http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf. Development of a BLM-specific literature review and set of BMPs is in progress. 20 The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. See Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSP LT3_2541294.pdf. 21 See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes). 22 See Sierra Club v. U.S. Forest

BLM_0165606

Serv., 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative). 23 Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3. 24 Exec. Order 11644, § 3(a); see also Center for Biological Diversity, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the effects of route designations, i.e., the BLM is required to place routes § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach. 25 As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

iii. ORV "open" areas We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2- 301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1. BLM Manual 1626 reiterates that "open area designation must address the designation criteria (43 CFR 8342.1)." BLM Manual 1626 at 3.1(A).

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-1
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
10. Restricting travel to designated routes has been highly effective in mitigating many management concerns.
The Organizations are intimately familiar with management of motorized recreation in areas with sensitive, threatened or endangered plants and have found that moving from an open riding area to a designated route system has been highly effective in dealing with possible impacts to plants in the area from recreational usage. As the UFO has taken this step only in 2009, the Organizations are unclear if the benefits have been reviewed and properly taken into account in the planning process. There is simply no analysis of how proposed management standards relate to the relevant and importance criteria that are identified for the ACEC areas as these management standards simply have not been provided as part of the draft RMP.
The Organizations are also concerned that similar management standards are employed for plant species regardless of the category of the Endangered Species Act, if the species is present on the ESA list at all. Given the fact that many species do not appear to be on the Endangered species list, economic concerns and multiple usage must be meaningfully addressed in the planning process. The significant benefits of moving to a designated trail system clearly would benefit plants in the area, and the Organizations believe a meaningful discussion of why this management alternative is insufficient must be provided.

*Summary*
Commenters provided BMP suggestions related to recreation, travel management, and wildlife. Commenters also stated that the RMP should include incentives for compliance with seasonal

BLM_0165607

trail closures to maintain habitat security, as well as implementing an adaptive management strategy for trail use. Another commenter noted that attempts to mitigate impacts from the existing OHV system are currently insufficient to satisfy existing Executive Orders. Finally, commenters stated that moving from an open OHV area to a designated route system has been highly effective in areas with sensitive, threatened, or endangered plants, but are concerned that the ESA is not considered during the planning process.

*Response*

BMPs related to wildlife are contained in Draft RMP/EIS Appendix G on pages G-14–G-19 and in Table 2-2 on pages 2-63–2-68 and 2-82–2-94. At the RMP planning level, these BMPs provide sufficient direction to understand the natural environment at a landscape perspective, while considering any proposal that may entail surface disturbance or potential impacts in the UFO. Specific recommendations, including appropriate timing stipulations, would be made at the implementation-level planning process.

As noted in Draft RMP/EIS Section 4.4.5, Comprehensive Travel and Transportation Management (page 4-325), implementation-level travel management planning would include increased enforcement, public education, signing, and resource monitoring to protect habitat security and encourage responsible trail use. These management practices would be implemented as appropriate within the decision area and as resources allow.

As stated in Draft RMP/EIS Appendix M on page M-1, "The ultimate goal of the travel management process is to propose a management framework that supports BLM's mission, achieves resource management objectives and provides appropriate, sustainable public and administrative access." In addition, Draft RMP/EIS Chapter 2, pages 2-7 – 2-8 address the goals and objectives for each alternative, as do Table 2-2, pages 2-300 – 2-310, which address further goals, objectives, and actions for comprehensive travel and transportation management. Draft RMP/EIS Chapter 4 on page 4-323 and Appendix M on page M-5 also address how OHV designations were determined within each alternative. Implementation-level travel management planning will follow all relevant regulations, including minimization criteria per Executive Orders 11644 and 11989 and BLM Manual 1626, as stated in Appendix M.

Travel management route designations in the Uncompahgre RMP decision area (i.e., BLM-administered lands in the planning area) are implementation-level decisions that must adhere to guidance and mitigation in BLM Manual 1626, Travel and Transportation Management Manual (September 27, 2016). Draft RMP/EIS Appendix M includes evaluation criteria that will be used during implementation-level travel management planning. Draft RMP/EIS Appendix G includes BMPs for travel management, including road design and construction. Additionally, minimization criteria, as defined in 43 CFR 8342, are also applied during implementation-level route designation planning. Impacts of travel management planning on sensitive status species requires the BLM to consult with the Fish and Wildlife Service per Section 7 of the Endangered Species Act. Consultation would include area designations, and if appropriate, specific route designations. This is discussed in Draft RMP/EIS Section 4.3.6, Sensitive Status Species, pages 4-140–4-160.

BLM_0165608

### Section 33 – Tribal Interests
No comments are associated with this topic.

### Section 34 – Vegetation
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: FormLetterJ-9
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Chapter 3, Section 3.1.5, Vegetation & Chapter 4, Section 4.3.4 Vegetation: Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these existing and important resources in Chapter 3 has resulted in the complete omission of possible effects to these resources in Chapter 4, Environmental Consequences. This violates CEQ regulations at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.

*Summary*
One commenter stated that the Draft RMP/EIS fails to discuss agricultural lands in the Chapters 3 or 4 vegetation sections and, therefore, violates Council on Environmental Quality regulations at 40 CFR Part 1502.15, Affected Environment, and Part 1508.8, Effects.

*Response*
Prime and unique farmlands are discussed in Draft RMP/EIS Section 3.1.3, Soils and Geology (page 3-22) and in Section 4.3.2, Soils and Geology (pages 4-61–4-75). The BLM has limited authority over other agricultural operations in the Uncompahgre RMP planning area, as these generally occur on private rather than BLM-administered lands. However, the Proposed RMP/Final EIS was updated to reflect prime and unique farmlands.

### Section 34.1 – Vegetation: Range of alternatives
Total Number of Submissions: 6
Total Number of Comments: 12

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-12
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 75 Page 2-54: We request that Alternative D be amended to include the 100ft buffer identified in Alternative B as this will provide greater flexibility for future decision making.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-13
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3

Comment Excerpt Text:
Line 79 Page 2-57: We request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valid existing rights and uses within the targeted area".

Comment Number: 000402_RatnerJ_20161028-70
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Objective:
Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions
But this is another typical way for the BLM to eliminate requirements. These kinds of statements must be changes to maintain areas exceeding objectives/standards and improve area not exceeding.
Another frequently abused weasely words rendering direction meaningless is the use of words such as "pursue" and "analyze" and "prioritize". All these modifiers render the subsequent direction utterly meaningless.
The primary impact to vegetation and the spread of weeds is livestock grazing yet the DEIS fails to address this primary issue.
Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-14
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 81 Page 2-58: We request that Alternative D be made the same as Alternative C in order to allow for flexibility in future decision making. NSO and SSR restrictions could be selectively applied under this action whereas the current Alternative D contains an arbitrary mandate for application of NSO and SSR restrictions that could be onerous for future land management decisions.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-3
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Land Health
o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health.

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-6
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
Page 2-27, Line 26, add recreation to actions that can cause land health problems.

Comment Number: 000486_ClaytonJ_20161101-2
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government

BLM_0165610

Other Sections: 3
Comment Excerpt Text:
Page: 2-50
Line: 64
Comment: Alternative B: Does this include all areas that have degraded vegetation, including all of the areas mentioned in alternative D? What criteria will be used to determine if restoration in an area will have a high probability of success? How long will the test plots be monitored for success? Why is offsite mitigation added in alternative D and not alternative B?

Comment Number: 000489_JohnsonA_20161101-20
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
* Table 2-2, Actions 63 & 64 outline methods and actions for maximizing native vegetation throughout BLM lands. The maximization of native vegetation is essential for the health of riparian areas, wetlands, and other sensitive habitats. The BLM has taken great effort to promote the success of native vegetation in this section. The agency preferred alternative D is a reasonable option, but when allowing for the use of non-native revegetation, the agency should add the words "as a last and final option" or "when all other native re-vegetation options have been exhausted."

Comment Number: 000489_JohnsonA_20161101-21
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
Table 2-2, Action 75 fails to protect valuable riparian and wetland areas by managing a 325-foot buffer zone as a right of way avoidance area. Avoidance areas do not guarantee that these valuable habitat resources will receive the levels of protection that they deserve.
* Table 2-2, Action 76 does not provide an adequate buffer to protect the valuable riparian habitat within the UFO. It is recommended that the BLM modify their preferred Alternative D to include a 500-foot buffer (rather than the 100ft buffer currently drafted), in addition to requiring stipulations for commercial special recreation permits.
* Table 2-2, Action 79 does not ensure that wetlands and riparian areas impacted by historic land use and flow regime modification will be enhanced and restored. It is suggested that the words "Pursue opportunities to" are removed from Alternative D to ensure that wetlands and riparian areas impacted by historic land use and flow regime modification are enhanced and restored.

Comment Number: 000489_JohnsonA_20161101-23
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Table 2-2, Action 88 fails to manage lands under Integrated Weed Management strategies to support BLM Colorado Public Land Health Standards. Invasive species negatively impact riparian and wetland health. Suppressing and eradicating noxious and invasive species is essential for the health of these habitats.

BLM_0165611

Comment Number: 000530_PlattA_20161101_EPA-25
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 37.1
Comment Excerpt Text:
We also recommend that the Preferred Alternative include special protections from livestock grazing, such as buffer zones for high quality riparian and wetland resources including springs and fens. In addition, we note that 11 grazing allotments were identified as "having problems meeting," or "not meeting," the BLM Colorado Public Land Health Standard 2 (riparian/water quality standard). We support including the full acreage of these affected 11 allotments in the "Improve" management category under the Preferred Alternative D.

Comment Number: 500143_RewL_20161017-8
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

Comment Number: 500143_RewL_20161017-9
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-27, Line 26, add recreation to actions that can cause land health problems

*Summary*
Commenters provided specific changes to and suggestions for management actions in order to clarify proposed management:

1.  Regarding areas with degraded vegetation, include additional details on criteria used to determine if restoration in an area will have a high probability of success, and test plot methods.
2.  Manage land health for an upward trend, and consider recreation as a factor that can contribute to land health problems.
3.  Manage lands under Integrated Weed Management Strategies to support BLM Colorado Public Land Health Standards.
4.  Include buffer zones from livestock grazing for riparian and wetland areas and review buffer distances and language under the preferred alternative to ensure that adequate protection is in place for sensitive riparian areas.
5.  Allow application of NSO and SSR restrictions selectively, as appropriate.
6.  When allowing for the use of nonnative revegetation, add the words "as a last and final option" or "when all other native revegetation options have been exhausted."
7.  Add language that clarifies that maintenance/restoration of wetland and riparian habitat is allowed if pursuit of such opportunities does not impact valid existing rights and uses within the targeted area.
8.  Reconsider whether ROW avoidance protects valuable riparian and wetland areas.

BLM_0165612

9. Reconsider buffer zones identified in the agency's preferred alternative to maximize flexibility, compared with Alternative B.

*Response*

1-3. Under all alternatives, the UFO would be managed according to BLM Colorado Public Land Health Standards (see Draft RMP/EIS Appendix C). Restoration criteria and monitoring details would vary on a site-specific basis as determined by ecological conditions. Specific details on restoration criteria and monitoring protocol would be further detailed in the implementation plan as well.

4. While the BLM recognizes and appreciates the impact that improperly managed livestock grazing has on riparian areas, the buffer distances presented Draft RMP/EIS Table 2-2, line 81 are intended to mitigate "surface-disturbing" activities. BLM regulations do not require a buffer zone around riparian/wetland areas specifically from livestock grazing activities. Furthermore, according to the BLM's definition found in Draft RMP/EIS Glossary page Glossary-37, livestock use is not considered a surface-disturbing use. Regarding livestock grazing buffers for riparian and wetland areas, Draft RMP/EIS Chapter 2, Table 2-2, line 299 (page 2-166) includes a range of alternatives regarding trailing livestock overnighting or bedding in sensitive areas, such as riparian zones. Draft RMP/EIS Chapter 2, Table 2-2, line 296 (page 2-164) makes lands available for livestock grazing commensurate with BLM Colorado Public Land Health Standards (Draft RMP/EIS Appendix C), and states to "periodically evaluate acres available and active grazing permitted use...and adjust as needed based on monitoring and land health conditions." Draft RMP/EIS Chapter 2, Table 2-2, line 301 (page 2-167) further describes how allotments or portions of allotments would be periodically evaluated to identify grazing issues; potential closures to livestock grazing would be based on several criteria. In addition, Draft RMP/EIS Chapter 2, Table 2-2, line 302 (page 2-168) states: "Adjust grazing management (e.g. distribution) using an interdisciplinary process when the following data indicate that change is needed: utilization levels or patterns of use in uplands and riparian areas and/or apparent trend data; long-term trend data; Land Health Assessment data…" These mechanisms could result in implementing changes in management of livestock grazing in riparian and wetland areas.

5. As defined in Draft RMP/EIS Appendix B (Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities), Section B.3 (page B-5), stipulations could be excepted, modified, or waived by the BLM Authorized Officer. The standard exception, modification, and waiver are defined in Draft RMP/EIS Appendix B, Section B.3 (page B-5 et seq.). For some NSO and SSR stipulations, the standard exception, modification, and/or waiver would apply, while for other NSO and SSR stipulations, exceptions, modifications, and/or waivers would not be allowed. Refer to the stipulation description of each specific NSO and SSR in Draft RMP/EIS Appendix B, Tables B-2 and B-7, respectively.

6. The BLM appreciates the comment. The recommended edit was made to the Proposed RMP/Final EIS. The revised text states: "Use locally derived native species for revegetation. If locally derived native species are not available, are cost prohibitive, or are not likely to succeed, allow use of native species from outside the area or nonnative species that are not invasive when all other native revegetation options have been determined to be ineffective."

BLM_0165613

7. As stated in Draft RMP/EIS Section 4.1.1, Analytical Assumptions (page 4-2), all actions, including maintenance/restoration of wetland and riparian habitat, would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements.

8. ROW avoidance is defined at Draft RMP/EIS page Glossary-33 as "an area identified through resource management planning to be avoided but may be available for ROW location with special stipulations. A ROW avoidance area is comparable to the SSR restriction applied to other resources." SSR is defined at Draft RMP/EIS page Glossary-34: "…it allows some use and occupancy of public land while protecting identified resources or values… the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value." Such specified resource or value could include riparian and wetland areas.

9. The 325-foot buffer from the edge of naturally occurring riparian and wetland areas, seeps, and springs as ROW avoidance is more flexible that Alternative B, because the 100-foot buffer in Alternative B would be managed as ROW exclusion, which has greater limitations than ROW avoidance.

### Section 34.2 – Vegetation: Best available information—baseline data
Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000402_RatnerJ_20161028-41
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.3
Comment Excerpt Text:
Additionally, the EIS should document how domestic grazing activities on allotments has affected habitat for threatened, endangered, and sensitive species in the project area. How has vegetation changed as a result of a century of livestock grazing?

Comment Number: 500147_BradfordD_20161008-2
Organization1:
Commenter1:David Bradford
Commenter Type: Individual
Comment Excerpt Text:
I am enclosing a topo map showing the trails I have
mapped using a GPS unit. In addition there are numerous populations of noxious weeds that are on the increase in the Jumbo Area, primarily hoary cress and Russian knapweed. These are issues than need to be addressed in the RMP, not just designating the Jumbo Mountain/McDonald Creek as a Special Emphasis Area.

*Summary*
One commenter stated that the Proposed RMP/Final EIS should document how historic livestock grazing has affected vegetation. A commenter also provided information on noxious weed infections in the Jumbo Mountain area for review and incorporation.

BLM_0165614

*Response*
Current conditions of vegetation in the decision area, including those resulting from livestock grazing activities, are discussed in Draft RMP/EIS Section 3.1.5, Vegetation, on pages 3-42–3-57. The BLM reviewed and considered the provided information on noxious weeds and incorporated it into the Proposed RMP/Final EIS, as appropriate.

### Section 34.3 – Vegetation: Impact analysis
Total Number of Submissions: 2
Total Number of Comments: 3

Comment Number: 000402_RatnerJ_20161028-19
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Grazing and rest requirements for key species of grass can be critical. Native cool-season perennial bunchgrasses can be very sensitive to defoliation and growing season use. For example, Anderson (1991)14 stated in regards to bluebunch wheatgrass, "Effects of growing season defoliation injury are well documented: basal area, stem numbers and both root and forage yields are reduced and mortality can be high. ... Defoliation to very short stubble heights during the boot stage has been reported to essentially eliminate plants within as few as three years. ... Vigor recovery has been found to require most of a decade, even with complete protection from grazing." The author went on to describe experiments in which a single clipping of the grass during the growing season produced 43% less herbage and 95% fewer flower stalks the following year than unclipped plants. Under a deferred system in eastern Oregon, it was reported that bluebunch wheatgrass could not be 14 Anderson, Loren D. 1991. [14 Anderson, Loren D. 1991. Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office.]
Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office. maintained at 30 – 40% use in the boot stage (early June). A one time removal of 50% of the shoot system during active growth may require six years' rest even in an area with 17" precipitation.15 Anderson (1991) [15 Mueggler, W.F. 1975. Rate and pattern of vigor recovery in Idaho fescue and Bluebunch wheatgrass. Journal of Range Management 28(3):198-204.] also makes the point regarding bluebunch wheatgrass that, "The belief that range improvement will occur after one or two years of rest following a single season of more than 'light' use during the growing season is erroneous." Mueggler (1975) also determined that Idaho fescue of moderately low vigor required 3 years of rest for recovery and that plants of bluebunch wheatgrass and Idaho fescue in very low vigor may require 8 years and 6 years of rest, respectively for recovery. BLM failed to consider the recovery, growth and maintenance requirements for these sensitive native grasses.

Comment Number: 000402_RatnerJ_20161028-34
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.1 15.4
Comment Excerpt Text:
3-46 states:
Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to

BLM_0165615

move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident. Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:

Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing.

Comment Number: 000504_BrownD_20161101_CDA-4
Organization1:Colorado Department of Agriculture
Commenter1:Les Owen
Commenter Type: State Government
Comment Excerpt Text:

The analysis of livestock grazing impacts fails to consider relevant science regarding the positive impacts that properly managed livestock grazing has on vegetative communities. Research has shown that in arid and semiarid areas, grazing at use levels below 40 percent can have positive impacts to forage plants compared to exclusion of grazing.[3] Additionally, the analysis understates the importance of water systems developed on federal land as part of a livestock grazing operation to wildlife habitat.

[footnote 3] Holechek, J .L., T.T. Baker, J. C. Boren, and D. Galt. 2006. Grazing Impacts on Rangeland Vegetation: What We Have Learned. Rangelands 28:7- 13.

*Summary*

Commenters stated that the BLM failed to consider the following:

1.  The recovery, growth, and maintenance requirements for sensitive native grasses
2.  Requirements or limitations to recover cool season bunch grasses
3.  Positive impacts that properly managed livestock grazing can have on vegetative communities

*Response*

1-2. Past and current actions that have contributed to current vegetative conditions, including loss of native grasses, are discussed in Draft RMP/EIS Section 3.1.5, Vegetation, on pages 3-47–3-51. This information was updated in the Proposed RMP/Final EIS, as appropriate.

3.  Impacts from properly managed grazing areas are discussed in Draft RMP/EIS Section 4.3.4, Vegetation, on page 4-109.

### Section 34.4 – Vegetation: Cumulative impact analysis

No comments are associated with this topic.

### Section 34.5 – Vegetation: Mitigation measures

Total Number of Submissions: 3
Total Number of Comments: 3

BLM_0165616

Comment Number: 000489_JohnsonA_20161101-36
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
3. Vegetation – Riparian
Please describe the methods to be used by BLM or land users to minimize livestock grazing and trailing impacts in riparian areas (DEIS G-13).

Comment Number: 000509_WolcottE_20161102-10
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan needs to address this by largely limiting surface occupancy as described in alternative B1 in the NFV and further throughout the RMP region, requiring road closures/locked gates on any new roads related to oil and gas development, and requiring trucks to be washed, mechanical non-chemical requirements for weed removal or other effective measures to prevent to spread of noxious weeds and invasive species.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-2
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Vegetation – General and Upland
Retain the following direction to meet landscape objectives and enhance success of treatments:
* Limit authorized use levels and activities where needed to allow vegetation to recover from fire, drought, disease and insect outbreaks
* Incorporate strategies in grazing plans which manage fuel build up to enhance natural fire use.
* Defer vegetation disturbing activities during severe or extreme drought to allow for vegetation recovery.
* On a landscape scale, maintain a diversity of age classes. Any 100 square mile patch of pinyon-juniper should encompass the full range of seral stages. Preferentially achieve diversity by actions in younger age classes rather than reductions of older stands.
* To benefit species sensitive to habitat fragmentation, maintain unroaded stands or patches no less than 1.2 square miles in size.
* Maintain connectivity between stands of pinyon-juniper, sagebrush, and ponderosa pine by preserving corridors of similar vegetation.
* Reclaim unused or undesired roadbeds in pinyon-juniper woodland, salt desert shrub, and ponderosa pine.
* Place high requirements for justifying creation or retention of roads (or other linear features that fragment the habitat) in sagebrush. Reclaim unused or undesired roadbeds in sagebrush land cover type

Summary
Commenters stated that the Proposed RMP/Final EIS should clarify what methods are being used to minimize livestock grazing and trailing impacts, limit surface occupancy to prevent the spread of noxious weeds and invasive species, and maintain treatments and directions to meet landscape objectives. Methods could include limiting authorized use levels to an area after a

BLM_0165617

disturbance, deferring disturbing activities during severe drought, maintaining a diversity of age classes throughout the decision area, and maintaining vegetation connectivity.

*Response*
Management actions for vegetation are outlined in Draft RMP/EIS Section 2.6, Management Guidance for Alternatives, Table 2-2, pages 2-163–2-178. Under all alternatives, vegetation conditions would meet the BLM Colorado Public Land Health Standards at a minimum. Specific methods utilized to minimize livestock grazing impacts, limit invasive species, and maintain Land Health Standards may vary at the site-specific level within the bounds of the management selected in the Proposed RMP. Specific treatment methods and grazing managed would be analyzed in site-specific NEPA (i.e., at the grazing permit renewal phase).

## Section 35 – Visual Resources

### Section 35.1 – Visual Resources: Range of alternatives
Total Number of Submissions: 11
Total Number of Comments: 19

Comment Number: 000117_SrebnikG_20160815-1
Organization1:
Commenter1:Gail Srebnik
Commenter Type: Individual
Other Sections: 37.1 14.1
Comment Excerpt Text:
We realize change is inevitable but this is our only planet and our first priority should be to keep it healthy. We would insist that all the proposed actions in the North Fork Alternative, B1, be included in the final RMP. This includes the communities of Hotchkiss, Paonia and Crawford and areas that supply municipal water, irrigation, and domestic water companies. These areas would be affected by your plan and would impact the scenic features of the Valley as well as effecting the high quality of wildlife lands. Together we need to ensure the strongest level of long-term protection for resources of particular concern included in Alternative B1, such as water supplies and riparian areas; scenic qualities of the valley and our 'million-dollar' viewsheds; undeveloped wildlife lands including winter range and migration corridors. We should also include all other conservation protections in Alternative B.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-2
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Table 2-1 Page 2-9: Application of VRM to lands where surface ownership is private or held by the State equates to application of a management action to the surface estate. The RMP defines visual resource management as: The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives: Glossary-40.
Applying a management action such as a VRM designation is by BLMs stated definition an attempt to manage land. As the visual resource of land is certainly on the surface estate, applying such an action on privately held land is beyond BLMs scope of authority within the RMP. We respectfully request that BLM not apply VRM to lands upon which BLM does not administer the surface estate.

BLM_0165618

Comment Number: 000220_EdsonM_SimmonsJ_20161010-6
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Comment Excerpt Text:
Mount Lamborn and Landsend Peak are icons in the North Fork Valley. They dominate the valley and are seen as you drive up highways 92 and 133 from Delta. Mt. Lamborn is commonly in the background of photos that realtors use to sell homes and property in the valley. Houses around the valley, including ours, are situated to emphasize views of these peaks. We have a clear view of BLM property at the base of Mount Lamborn from our living room windows. The land tilts down from Mt Lamborn such that drilling operations would be highly visible throughout the valley even as far away as Hotchkiss. One area which is potentially leasable in Alternates C and D is less than a mile from our house. Our home value would certainly decline if the view is of prominent drilling rigs rather than the current natural oak, pinyon and juniper vegetation. We therefore support Alternative B1 which does not include this area for oil and gas leasing.

Comment Number: 000409_DayB_20161031-10
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L251. Visual Resources. Alternatives B and B1 are much better for wildlife and recreation. We agree with this RMP in Volume 2, page 4-132 that Visual Resource Management (VRM) Classes I and II are important.

Comment Number: 000420_HovdeC_20161101-1
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Table 2-1 Page 2-9, Application of VRM to lands where surface ownership is private or held by the State equates to application of a management action to the surface estate. The RMP defines visual resource management as:
o "The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives." Glossary-40.
o Applying a management action such as a VRM designation is by BLMs stated definition an attempt to manage land. As the visual resource of land is certainly on the surface estate, applying such an action on privately held land is beyond BLMs scope

Comment Number: 000420_HovdeC_20161101-9
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-138-9, Line 251, Seems to restrict use of private property.
Page 2-140, Line 253, designating Adobe Badlands as VRM Class II is restricting recreational value and potential.

BLM_0165619

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-8
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
Visual Resources and Dark Skies.
Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.

Comment Number: 000489_JohnsonA_20161101-2
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.[18]
[Footnote 18] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.

Comment Number: 000489_JohnsonA_20161101-89
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
J. Night Sky Resources
We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. Id at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.
BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. See, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "…the public lands be managed in a manner that will protect the quality of the…scenic…[and] air and atmospheric…values…"); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "…assure for all Americans…esthetically pleasing surroundings…"); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts

on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

* Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

* Any facilities authorized will use the best technology available to minimize light emissions.

Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

Summary of Comments: BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:

* Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review.

* Any facilities authorized will use the best technology available to minimize light emissions.

Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.


Comment Number: 000509_WolcottE_20161102-8
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan must study and protect the region from nighttime light pollution, especially in the case of oil and gas development.


Comment Number: 000545_SlivkaJ_20161101-123
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Night Sky Resources

BLM_0165621

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. Id at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.

Comment Number: 000545_SlivkaJ_20161101-124
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

Comment Number: 000545_SlivkaJ_20161101-125
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

- Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.
- Any facilities authorized will use the best technology available to minimize light emissions.

Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Comment Number: 000545_SlivkaJ_20161101-126
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

BLM_0165622

Comment Number: 000545_SlivkaJ_20161101-127
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:
Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. ? Any facilities authorized will use the best technology available to minimize light emissions.
Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.

Comment Number: 000587_WolcottS_20161031-1
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Other Sections: 27.1
Comment Excerpt Text:
I collect trespass fees from hunters to hunt on my land and to access BLM lands surrounding my land on Stucker Mesa. This is a vital part of my livelihood. This activity will be destroyed if the agricultural/pristine nature of the area has oil & gas infrastructure added to the viewscape. I regularly raft the North Fork from above Somerset to Delta. Enjoyment of this activity is also dependent on preventing more industrialization of the viewscape and contamination of the waters of the North Fork of the Gunnison. The final plan must include protections for these recreation resources and lands.

Comment Number: 000587_WolcottS_20161031-10
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The West Elk Loop Scenic Byway, world famous for its scenery and rural charm, brings tourists to our valley. People live here in large part because of the viewshed. This is one of the natural resources that the BLM is charges with protecting. Oil and gas development as allowed in your preferred alternative will destroy the scenic qualities of the area.

Comment Number: 000565_TothK_20161102_DCD-21
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Visual Resource Management (VRM):
The Board recommends all applications of VRM that apply to privately held land are removed from the document. This has the potential of usurping private land owner rights.

BLM_0165623

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-4
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
Due to the scenic and recreational ORVs, the fact that this segment [San Miguel River Segment 1] is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management. This is consistent with the San Juan Scenic Byway Management Plan11 , the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan12 , and the San Miguel County Comprehensive Development Plan13 . While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"14 , the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement. If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations. Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-5
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
First, the San Miguel River corridor along with tributaries Saltado and Beaver Creeks was analyzed by San Miguel County staff holistically. These areas have several existing and proposed designations within either Alternative A, Alternative B, and/or Alternative D. However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not match the language within the RMP, and added quite literally, layers of complexity to understand which stipulation (generally the most protective or stringent) would apply to which portion of land within this area.
To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that showed the stated stipulations for each designation category, for the San Miguel River mainstem and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and surrounding canyon/ACEC lands. As one example of the inconsistencies of stipulations in this area, a single place within the San Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with Specie Creek -- was within:
-the Alternative D WSR segment proposed as Suitable, Recreation;
-the Alternative D San Miguel River Special Recreation Management Area (SRMA);
-the Alternative A and D existing San Miguel River Area of Critical Environmental Concern (ACEC) designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation community exists "mainly due to the undammed San Miguel River and its intact hydrology." The report when on to state, "Such communities are becoming increasingly rare in Colorado." 18 The report also states that the Visual Resource Index (VRI) should be V-2 for the existing San Miguel River ACEC.)
[18Page 41;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52 182.File.dat/ACEC%20Report%20Final%2001152013.pdf]

BLM_0165624

-the Alternative D San Miguel Ecological Emphasis Area;
-the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)
-the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)
-the Alternative B fluid minerals stipulation: No Lease (NL);
-the Alternative A lands shown as not having Coal potential.
What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA. This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways. The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D. The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.
Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-6
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D. There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River. San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C. The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways. The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II.

*Summary*
Commenters stated that:

1. The BLM should carry forward the most protective management actions from Alternative B.1 in order to best protect the iconic viewshed and character of place, such as Mt. Lamborn and West Elk Loop Scenic Byway.
2. Applying management action such as VRM designation is beyond the BLM's scope when applicable to surface estate on privately owned land.
3. There is general support of preserving dark skies in the planning area. The BLM should identify areas unaffected by humanmade light sources and develop minimum management prescriptions to be included in the RMP that give due consideration to the night sky resource. Specific management was recommended for incorporation.

4. One commenter recommended no less than VRM Class II management for the San Miguel River Segment 1 that is eligible for inclusion in the National Wild and Scenic Rivers System and provided three management plans related to this.

5. For some specific locations along the San Miguel River, there are inconsistent overlapping stipulations (e.g., one location on the San Miguel River is simultaneously classified as a WSR suitable segment, SRMA, and ACEC).

6. One commenter stated that management action line 251 on Draft RMP/EIS page 2-138 seems to restrict use of private property.

7. One commenter stated that designating the Adobe Badlands as VRM Class II (Draft RMP/EIS page 2-140, line 253) would restrict recreational value and potential.

*Response*

1. Draft RMP/EIS Section 2.6, Table 2-2, Description of Alternatives, on pages 2-140–2-241 provides a range of protective measures for viewsheds, including measures to protect viewsheds of Mt. Lamborn and from the West Elk Byway.

2. Onshore Order 1 (43 CFR 4160) addresses BLM responsibilities on federal leases overlain by private surface (split-estate). It states that NEPA requires the BLM to regulate exploration, development, and abandonment on federal leases on split-estate lands in essentially the same manner as a lease overlain by federal surface. As noted in Draft RMP/EIS Section 2.3, Alternatives Considered for Detailed Analysis, on page 2-15, VRM classes on split-estate lands are a recommendation and would be used as a tool for designing and siting development of energy projects.

3. The BLM appreciates the comments. Information on dark skies and light pollution was added to the visual impacts section of the Proposed RMP/Final EIS.

4. The BLM appreciates the comments. The BLM reviewed the management plans provided and incorporated them in the Proposed RMP/Final EIS, as appropriate.

5. The BLM appreciates the comments. The BLM reviewed overlapping stipulations and adjusted management as appropriate in the Proposed RMP/Final EIS to clarify intent. As noted in Draft RMP/EIS Section 4.1.2, General Methodology for Analyzing Impacts, page 4-5, in instances where varying management levels overlap, the stricter management prescriptions would apply.

6. The BLM appreciates the comments. As noted in the Draft RMP/EIS pages 2-138–2-139, line 251, management classes (VRM) are established through the RMP process for BLM-administered lands. See BLM Handbooks H-8410-1, Visual Resource Inventory, and H-8440 for Visual Resource Management. The BLM also **recommends** VRM classes in the decision area on private/state surface with federal mineral estate. Recommending VRM classes is just that—a recommendation—and does not actually apply any VRM classes to those private/state surface lands. It would be up to the private/state surface owner to determine whether or not they would manage their lands according to the general principles of VRM classes.

7. Draft RMP/EIS Alternative C would designate the Adobe Badlands as VRM Class II (page 2-140, line 253). Draft RMP/EIS Chapter 4, Section 4.4.4, Recreation and Visitor Services, Nature and Type of Effects (page 4-293) states: "In VRM Class I and II areas, recreation objectives would be protected by maintaining the scenic quality of those lands. VRM Class I and II designations could restrict development of recreation facilities, such as campgrounds and trails, which could alter the opportunity to enhance

BLM_0165626

recreation in these areas. However, VRM Class I and II designations would protect the naturalness of the physical setting, thereby enhancing opportunities to participate in recreation in less-developed settings."

### Section 35.2 – Visual Resources: Best available information—baseline data

No comments are associated with this topic.

### Section 35.3 – Visual Resources: Impact analysis

Total Number of Submissions: 5
Total Number of Comments: 5

Comment Number: 000142_ShishimM_20160911-4
Organization1:
Commenter1:Margaret Shishim
Commenter Type: Individual
Comment Excerpt Text:
Viewsheds -- the views from my home and in the NFV are spectacular, with dark sky nights, millions of stars and views of the Milky Way. Air and light pollution from drilling activity would have a negative impact on the views, both day and night.

Comment Number: 000509_WolcottE_20161102-6
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The preferred alternative does not adequately address viewshed impacts.

Comment Number: 000545_SlivkaJ_20161101-142
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Character of place: visual resources, healthy communities, farms, landscapes, river corridors
The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether. [Footnote 46 DEIS II 4-91]
And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II. [Footnote 47 Acreages developed from analysis of GIS data downloaded from BLM. ] And B1 not only protects more acres than Alternative B, but it also applies stronger stipulations to do so.
Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation.

BLM_0165627

Comment Number: 000563_King_WELC_HasAttach-109
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 10.3
Comment Excerpt Text:
The UFO provides visibility modeling based on the "projected federal and nonfederal oil and gas emissions throughout the 2.5 mile (4-kilometer) CARMMS domain plus mining on federal lands in Colorado," but provides no information about the contribution of the specific development contemplated by the UFO RMP/EIS. Yet the BLM acknowledges: "For all of the alternatives, the magnitude of emissions from oil and gas and coal and uranium mining development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas." DEIS at 4-25. The nature and extent of these impacts must be considered and specifically analyzed in the UFO RMP/EIS.

Comment Number: 000576_Ruppert_20161015-1
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
drill pads are unsightly. I enjoy scenic drives and hikes on the Grand Mesa and often take out-of-town guests there to show off the natural beauty of this area.
This use would be drastically / negatively impacted by oil and gas development.

*Summary*
Commenters stated that development, equipment, and light pollution from oil and gas activity and equipment would negatively impact viewsheds and dark skies, and the preferred alternative does not adequately address impacts.

*Response*
Impacts from oil and gas development under the agency-preferred alternative are discussed in Draft RMP/EIS Section 4.3.11, Visual Resources, on page 4-211. The BLM appreciates the comments. Additional information was added to the Nature and Type of Effects discussion of this section to support the analysis by alternative.

### Section 35.4 – Visual Resources: Cumulative impact analysis
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000420_HovdeC_20161101-23
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 27.4
Comment Excerpt Text:
The view shed in Delta County that is often prioritized and wildlife habitat that is highlighted is due to large landscapes of habitat that are not fragmented but are highly productive because they are a working landscape. That working landscape is tied to the ability to utilize BLM lands and the two are connected and dependent on each other. The large landscapes contribute to the recreationist's satisfaction and the view shed adds to a tourist's willingness to provide a favorable review of the area. Single species

BLM_0165628

management of BLM lands or continued restricted use of our public lands will have unintended consequences that will not be undone with the next plan or NEPA document. Delta County Board of Commissioners urges the multiple use mandate of the BLM to continue and to not be marginalized as is documented in the Uncompahgre Field Office Draft Resource Management Plan.

*Summary*
A commenter stated that large landscapes of unfragmented, productive habitat contribute to recreationalists' satisfaction and that viewshed adds to a tourist's favorable review of the area. The Proposed RMP/Final EIS should consider the impacts of cumulative projects on viewsheds from the recreationalist's perspective.

*Response*
Cumulative impacts of development on recreational setting and experience are discussed in Draft RMP/EIS Section 4.4.4, Recreation and Visitor Services, on pages 4-322–4-323.

### Section 35.5 – Visual Resources: Mitigation measures
No comments are associated with this topic.

### Section 36 – Watchable Wildlife Viewing Areas
Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-6
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Other Sections: 19.1
Comment Excerpt Text:
Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife. Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.
Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-31
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. 55 San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas. We believe this will actually help with future mitigation of threats such as invasive

BLM_0165629

plants, non-native species, feral cats, and other disturbances. The scenic qualities of this area also further enhance the potential high-quality viewing experience.

*Summary*
Commenters voiced support of creating watchable wildlife viewing areas, specifically near the San Miguel River, Billy Creek State Wildlife Area, and the Uncompahgre Riverway. Commenters requested that the BLM obtain County and other source GIS files showing conservation easement locations, and that an NSO stipulation be placed on all private conserved lands with split estate.

*Response*
Watchable wildlife areas are considered and analyzed under Draft RMP/EIS Alternative B on pages 4-435–4-441. The BLM appreciates the comments. The BLM reviewed recommended NSO edits and incorporated them in the Proposed RMP/Final EIS, as appropriate.

### Section 37 – Water
Total Number of Submissions: 3
Total Number of Comments: 3

Comment Number: 000402_RatnerJ_20161028-67
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The EIS and RMP must also address CWA compliance, including monitoring, antidegradation and Class I waters issues. We are attaching a letter by Raymond Corning discussing some of these issues.

Comment Number: 000635_LawhornT_20161028-1
Organization1:
Commenter1:Tamara Lawhorn
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Characteristics of landslides in western Colorado, USA:Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6
GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO: NORTH FORK VALLEY AND TERRACES AREA
GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models
Full article located at:
http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf
Quote from conclusion:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. "

BLM_0165630

Comment Number: 000565_TothK_20161102_DCD-5
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Comment Excerpt Text:
Another water issue that should be addressed is, under no circumstance should the Federal government
be allowed to appropriate waters that impact the beneficial use of the people of Colorado.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-10
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 52 Page 2-46: We take issue with water owned by the people of the State of Colorado being
appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream
flow rights amounts to a federal appropriation of water that will adversely impact the people of
Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative
would be preferable to this proposed action.

Comment Number: 500268_BearS_21060930_DMEA-37
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix I: Drought Management
• Under Extreme (03) and Exceptional (04) drought, new surface disturbing activities in areas with
sensitive soils would be prohibited. The description of how drought management would be implemented
is vague and raises numerous questions. For example, the appendix provides a table of varying drought
conditions and says management would be focused on "droughty soils". Figure 3-6 depicts droughty soils
with a rating of High to Low. DMEA didn't find any description in the document as to how the drought
provisions would be applied to soils of the various ratings. Most of the soils in the planning area are
rated High to Moderate. Drought management could have a significantly negative impact on DMEA and
its consumers. DMEA requests that the concept of drought management be better defined, explained
and considered before moving forward.

Comment Number: 500268_BearS_21060930_DMEA-38
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The public demand for electrical and broadband services is independent of drought conditions. Demand
will continue to increase especially in the WUI. BLM management prescriptions need provide consider
the public's health and safety, and efforts should be made to mitigate negative impacts the public.

*Summary*
A. Commenters stated that the RMP must address Clean Water Act compliance and that
federal water appropriation should not impact beneficial use.

BLM_0165631

B. One commenter requested clarification of drought management measure (Draft RMP/EIS Appendix I) implementation, particularly related to soils management changes. They also requested that drought management prescripts account for demand for communication services and potential public health and safety impacts.

*Response*

A. Management actions under all alternatives would support compliance with the Clean Water Act. As noted in Draft RMP/EIS Section 2.6, Management Guidance for Alternatives, Table 2-2, page 2-37, management actions would call for the BLM to "manage lands to improve water quality and promote the delisting of state impaired water bodies (303[d]-listed water bodies only) in areas where BLM management actions are contributing to impaired water quality." The State of Colorado specifically established its instream flow protection to encourage federal agencies to utilize state processes to address instream flow protection needs. The Colorado Water Conservation Board weighs each instream flow recommendation made by federal agencies against the needs of local citizens to develop water for future beneficial uses. The BLM is not aware of any instream flow appropriations in Montrose County that have left no water available for future water development. The State and water courts, not the BLM, implement the water rights program for Colorado. All BLM water rights would be granted pursuant to the McCarran Amendment and Public Water Reserves regulations, as discussed in Draft RMP/EIS Section 3.1.4, Water Resources, pages 3-34–3-37. Further, decisions at the RMP level would not directly create any water rights or result in any appropriations. Existing water instream flow water rights held by the Colorado Water Conservation Board are not monitored by Colorado Water Conservation Board. The BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist.

B. Measures in Draft RMP/EIS Appendix I, Drought Management, are intended as general management guidelines based on Table I-1, Drought Severity Classification. Details of site-specific drought management would be determined based on local conditions monitoring and soil data collection.

### Section 37.1 – Water: Range of alternatives

Total Number of Submissions: 38
Total Number of Comments: 80

Comment Number: 000117_SrebnikG_20160815-1
Organization1:
Commenter1:Gail Srebnik
Commenter Type: Individual
Other Sections: 35.1 14.1
Comment Excerpt Text:
We realize change is inevitable but this is our only planet and our first priority should be to keep it healthy. We would insist that all the proposed actions in the North Fork Alternative, B1, be included in the final RMP. This includes the communities of Hotchkiss, Paonia and Crawford and areas that supply municipal water, irrigation, and domestic water companies. These areas would be affected by your plan and would impact the scenic features of the Valley as well as effecting the high quality of wildlife lands. Together we need to ensure the strongest level of long-term protection for resources of particular concern included in Alternative B1, such as water supplies and riparian areas; scenic qualities of the

BLM_0165632

valley and our 'million-dollar' viewsheds; undeveloped wildlife lands including winter range and migration corridors. We should also include all other conservation protections in Alternative B.

Comment Number: 000170_GannettA_20161005-1
Organization1:
Commenter1:Alison Gannett
Commenter Type: Individual
Comment Excerpt Text:
Until the BLM figures out a way to prevent fracking wastewater chemicals from getting into our irrigation farm water or our drinking water, we should place a moratorium on leasing and the management plan. Clearly "management" has not figured out how to prevent spills or leaks, or guarantee us farmers a business future. While the Colorado BLM might not be allowing produced water to be sprayed on our crops, the COGCC website leak and spill list does not leave our water protected (drinking or food irrigation water). We have hundreds of reservoirs and irrigation canals, if not thousands, in this RMP that could get accidentally poisoned, and we farmers would not get notified or compensated. Please support the North Fork Alternative Plan B1, so we have time to figure out how to protect our food, air and water.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-11
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 53 Page 2-46: The management action presented across Alternatives B, C and D does not represent an appropriately broad range of alternatives Water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to these proposed actions. Alternatively, we recommend that BLM deve lop an Alternative D that would not involve filing on add itional water rights.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-35
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Additionally, Montrose County requests that the following language be included in the RMP: Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative detem1ination of WSR suitability, shall be construed as a limitation or prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 1OCW164, 1OCW165, 1OCW166 and 1OCW169.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-54
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:

BLM_0165633

Appendix I Drought Management Page 1-2: We recommend that CWCB conduct monitoring of in-stream flow rights held by that agency. It is not an appropriate use of BLM resources to dedicate federal staff to management of state administered water and water use.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-7
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 31 Page 2-29: We request that Alternative D be amended to be the same as Alternative C in order to avoid setting unattainable standards for water quality which may be inaccurately attributed to specific land use activities (grazing, recreation, travel).

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-8
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 38 Page 2-33: We request that Alternative D be made the same as Alternative C. We have two reasons for this request. First, BLM is understaffed to manage the lands that are already under the agency's jurisdiction and addition of more lands would only exacerbate this problem. The second reason is that federal acquisition of the limited private lands available in the west end would further erode the local tax base and depress the economy of Montrose County and the West End. Line 44 Page 2-36: We request that Alternative D be amended to match Alternative C to allow for adaptive management and flexibility in project specific decision making.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-9
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 47 Page 2-38: We request that Alternative D be amended to match the language used in Alternative C to allow for adaptive management and flexibility in project specific decision making.

Comment Number: 000184_BrettJ_20161017-3
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Water Resources
Needless to say, water quality is important for good, clean, sustainable agriculture. Clean water is the lifeblood of the North Fork Valley. The BLM proposes to lease practically every acre of the North Fork to oil and gas, which would threaten our drinking and irrigation water.
Extracting fuel from shale formations requires pumping hundreds of thousands of gallons of water, sand and chemicals into the ground to break apart rock and free the gas. Some of that water, along with large quantities of existing underground water, returns to the surface, and it can contain high levels of salt, drilling chemicals, heavy metals and naturally occurring radioactive material. Drinking and irrigation water sources have been contaminated by oil and gas chemicals released through leaks and spills,

BLM_0165634

naturally occurring gases and radioactive materials from disturbance of the geologic formation, and air-borne contaminants.

The oil and gas industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Therefore, there is a lack of meaningful regulation.

Comment Number: 000184_BrettJ_20161017-6
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
The BLM is required to honor community source water protection plans, which are developed to protect a community's drinking water source from contamination. The towns of Crawford, Hotchkiss, and Paonia secured source water plans, which were not taken into consideration by the BLM in its preferred alternative.

Comment Number: 000206_Kleinman_20161025-1
Organization1:
Commenter1:Amber Kleinman
Commenter Type: Individual
Comment Excerpt Text:
BLM land surrounds the springs that supply our drinking water and the land between Paonia and our water source. This land should be removed from consideration for oil and gas leasing. I was on town council for 4 years and have come to understand how these springs collect water and the fragile nature of the pipes that convey that water to our town. Bell Creek area and L 30 Dr should be off limits to drillling as it is too close to the town water supply. This steep and unstable area is not appropriate for drilling. Any activity of this nature would increase chances that our domestic water would be contaminated during exploration or in the future. We aren't assured by the federal government regulations since hydraulic fracturing has been exempt from the clean air and clean water act. In addition, rural pipelines are exempt from federal regulation as well. With no local control and no federal regulation, our safety is in the hands of the oil companies and the handful of inspectors that cover this half of the state. In order to protect our drinking water the final RMP must include all buffers and oil and gas restriction recommendations in the Source Water Protection Plan and the North Fork Alternative B1.

Comment Number: 000206_Kleinman_20161025-7
Organization1:
Commenter1:Amber Kleinman
Commenter Type: Individual
Comment Excerpt Text:
The irrigation water that supplies so many farmers in this agricultural area should be protected from drilling as well. The irrigation watershed includes the corridor that runs down from McClure Pass, Jumbo Mountain, Elephant hill, Stevens Gulch, Garvin Mesa, Pitkin Mesa, Stewart Mesa, Bone Mesa, Terror Creek Reservoir, Bell creek, Elephant hill, and Lone Cabin reservoir. There should also be a set back from Lone Cabin Ditch and reservoir. Our water resources should be at least 1/2 mile from oil and gas exploration to remain untainted. Also surface occupancy should be prohibited within the 100 year flood plain. Any contamination that spills over from drilling operations would jeopardize the organic certification of many of our farms. Paonia has the highest concentration of organic farm in the state.

BLM_0165635

Comment Number: 000213_PearsonM_20161025-10
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
I encourage BLM and the Colorado Water Conservation Board to continue to partner in identifying and protecting instream flow related values through additional appropriations of flows for fish, wildlife, vegetation, recreation, and scenic values.

Comment Number: 000220_EdsonM_SimmonsJ_20161010-2
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Other Sections: 30.3
Comment Excerpt Text:
Agricultural irrigation water is a major concern in the North Fork Valley. Irrigation water is used for livestock, and by farms and orchards that are highly regarded throughout the state for providing high quality products. Many of these farms and orchards are certified organic and any contamination would jeopardize this certification. The North Fork Valley's economic diversity relies upon the ranching and agricultural industry. Unforeseen contamination could significantly impact the land and subsequently the industries that are so vital to the economic stability of this area. Mineral leasing and severance tax funds will not compensate for the loss of agricultural endeavors and its attributed labor force. The North Fork Alternative B1 would ensure that all agricultural irrigation waters would be protected through the buffer that is stipulated in the the plan.

Comment Number: 000220_EdsonM_SimmonsJ_20161010-5
Organization1:
Commenter1:Michael Edson
Commenter Type: Individual
Comment Excerpt Text:
We are members of the South Lamborn Mesa Water Association (SLMWA). The SLMWA purchases water from the Town of Paonia. The Town of Paonia gets its water from 38 springs around the base of Mount Lamborn. The North Fork Alternative B1 stipulates a buffer of oil and gas surface activities within a half of a mile from all source water supplies. We ask that, in order to protect the quality and quantity of our domestic water, the final UFO RMP include all buffers and oil and gas restriction recommendations in the Town of Paonia's Source Water Protection Plan and North Fork Alternative Plan B1.

Comment Number: 000260_HunterL_20161028-3
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
With respect to agricultural water rights: I would like to see further education for our farmers and ranchers to alleviate the 'use it or lose it' mentality; ranchers/farmers should be able to maintain their water rights regardless of use in order to encourage conservation and to keep the water in the river as much as possible.

Comment Number: 000260_HunterL_20161028-6
Organization1:
Commenter1:Lucy Hunter

BLM_0165636

Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground
domestic water sources, including municipal waters supplies, that risk being impacted by surface spills and well failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan.

Comment Number: 000260_HunterL_20161028-7
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

Comment Number: 000260_HunterL_20161028-8
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities

Comment Number: 000272_MitasH_20161027-1
Organization1:Bone Mesa Domestic Water District
Commenter1:Andrea Wang
Commenter Type: Regulatory Agency
Comment Excerpt Text:
Specific Source Water Concerns:
During the community process of developing the Source Water Protection Plan, the stakeholders identified potential contaminant sources that may impact the [Bone Mesa Domestic Water District] BMDWD's springs. Potential Natural Resource Development, including but not limited to oil and gas development, was identified and ranked as the number one priority risk to BMDWD's drinking water sources.
BMDWD does not believe that any oil and gas drilling should occur in areas where there are municipal watersheds, aquifers, or recharge zones for aquifers, which are identified as Zones 1, 2, and 3 on the attached BMDWD Source Water Protection Area map. Therefore, in order to preserve the pristine conditions of their source waters, we request that the source water protection area be recognized as a public water supply, and be excluded from oil and gas leasing, geophysical exploration, and any surface occupancy or disturbance. We urge you to include language in your Resource Management Plan that protects this valuable resource.

BLM_0165637

Comment Number: 000303_ChapinJ_20161027-2
Organization1:
Commenter1:Jenny Chapin
Commenter Type: Individual
Comment Excerpt Text:
I ask that, in order to protect the quality and quantity of our domestic water, the final UFO RMP include all buffers and oil and gas restriction recommendations in the Town of Paonia's Source Water Protection Plan and North Fork Alternative Plan B1.

Comment Number: 000345_ReeseC_20161027-10
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Irrigation water and agriculture - The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This directly impacts our food supply.

Comment Number: 000345_ReeseC_20161027-11
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Streams and surface water quality - The final plan must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing.

Comment Number: 000345_ReeseC_20161027-9
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Domestic Water Sources - The final plan must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources

Comment Number: 000363_RogersM_20161031-5
Organization1:
Commenter1:Malinda Rogers
Commenter Type: Individual
Other Sections: 14.1
Comment Excerpt Text:
The final plan should include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

Comment Number: 000402_RatnerJ_20161028-16
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner

BLM_0165638

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The RMP must address this poor performance and lay out an action plan to achieve the goals laid out in the BLM's "Riparian-Wetland Initiative for the 1990's".
We would like the reader to note that attaining PFC is only the lowest acceptable level. PFC is not a goal but the basis on which other resource goals are met. We request the BLM review its own manual, TR 1737-15, for a more complete description of what PFC is and is not. We especially direct the BLM's attention to page 16 of this manual for a very clear description of the fact that PFC is only the lowest basis on which all other values are built upon. As such, the RMP must delineate management objects that go far beyond PCF to include watershed health values, fisheries values, water quality values and wildlife values.

Comment Number: 000402_RatnerJ_20161028-45
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.5
Comment Excerpt Text:
? PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC

Comment Number: 000402_RatnerJ_20161028-57
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.5
Comment Excerpt Text:
No BLM action or plan would be complete without considering TMDL listing, status, and planning. Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded. Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments. The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs). The RMP must also require water quality monitoring to determine the impacts of its authorized activities.

Comment Number: 000409_DayB_20161031-3
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
L 45-50, and L55. Municipal water setbacks. No Surface Occupancy stipulations as described for Alts C and D do not allow for as much protection of this critically important resource as No Lease. Under C and D horizontal drilling could occur sub-surface under a flood plain, irrigation canal, reservoir, and water course, introducing the possibility of major water pollution and degradation. The rationale for larger setbacks and/or No Lease stipulations can be found by examining how far toxic chemical plumes

have travelled at various locations around the state, such as at Leaking Underground Storage Tanks and chemical use facilities at Commerce City and Denver. For example, the underground VOC plume and Superfund clean-up at Chemical Sales Co. covered 5 square miles.L 69. Exemplary, ancient, rare, and relict vegetation. Only Alternative B has NGD and NSO stipulations. These should be in the final preferred alternative.

Comment Number: 000420_HovdeC_20161101-4
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-46, Line 52, Delta County does not believe that water owned by the people of the State of Colorado being appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream flow rights amounts to a federal appropriation of water that will adversely impact the people of Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to this proposed action.

Comment Number: 000420_HovdeC_20161101-5
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-46 Line 53, The management action presented across Alternatives B, C and D does not represent an appropriately broad range of alternatives Water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to these proposed actions. Alternatively, we recommend that BLM develop an Alternative D that would not involve filing on additional water rights.

Comment Number: 000441_HellecksonB_20161101-6
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Comment Excerpt Text:
The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork and the shareholders of TDRC are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield.

Comment Number: 000459_HardyR_20161027-11
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual

BLM_0165640

Comment Excerpt Text:
BLM did not consider community source water protection plans.

Comment Number: 000483_HanksG_20161101-10
Organization1: Trout Unlimited
Commenter1: Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Intermittent Stream Buffers
We applaud the BLM for implementing a buffer on intermittent and ephemeral streams across alternatives. However, the protection of intermittent and ephemeral streams merits further consideration in the DRMP. In most mountain regions during runoff or sudden event storms, ephemeral drainages can become perennial mountain streams in a matter of hours and can run for a period of weeks or often months (Elmore, 2008). Trout may enter these drainages and may be spawning or have spawned and are at an early life stage. A thorough inventory of the streams and drainages in the planning area would potentially reveal those areas containing new flow systems or potential flow systems and would be subject to stronger buffering protections. Again, as we have mentioned above, by implementing a planning wide buffer requirement at the RMP level (such as that recently completed in the Little Snake FO RMP; October 2011), it will be easier to mitigate specific project cases to a more reasonable buffer based on case by case project applications and review.

Comment Number: 000483_HanksG_20161101-11
Organization1: Trout Unlimited
Commenter1: Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Riparian Buffers
Because of the chances for accidents and contamination through surface runoff from well pads, TU strongly advocates for the implementation of stronger, more effective buffers along perennial streams. Riparian setbacks, or buffers, are valuable in a variety of ways. From headwaters to downstream municipal communities, protection of our nation's water systems remains a top priority. Protecting water systems provide a healthy benefit for more than just fish; terrestrial wildlife including big game, large and small mammals, birds, insects, amphibians and reptiles all benefit by having clean water. Additionally, livestock and agricultural operations benefit from managed riparian areas. Scientific literature for management states that a stream buffer, a riparian setback, or forested buffer should be viewed as not only a parcel-specific best management practice, such as a stormwater management pond or a bioretention structure, but also as a watershed-scale management system[5].
[Footnote 5] Chagrin River Watershed Partners, Inc. 2006. "Riparian Setbacks: Technical Information for Decision Makers.
TU's concerns center on the harms done to riparian and stream areas when an oil or gas pad is situated too close to a water body. Surface runoff from rain and/snow events provides both benefits and damage. On well pads where industrial contaminants including oil, diesel, chemicals and an assorted variety of other equipment lubricants, transporting of these harmful materials becomes a problem when a pad is situation too close to water. Surface runoff is a conduit for sediment and particulate pollutants, particularly in areas that have little vegetative material (or buffers) or on steep slopes with erodible soils. We now understand the greater role of water quality on the physical association between streams and their riparian corridor. Moreover, small first order streams that generate more of the runoff in watersheds and are home to Colorado's cutthroat trout species appear to play a significant role in intercepting runoff that reaches the downstream system. These small streams provide important water quality filtration services that extend far downstream and enhance water quality throughout the

watershed. When these systems become contaminated with pollutants, large acreage distribution of these pollutants becomes a significant impact, affecting more than just the localized surface area, it affects the entire watershed[6].

[Footnote 6] Burkhart, M.R., D.E. James, and M.D. Tomer. 2004. "Hydrologic and terrain variables to aid strategic location of riparian buffers" Journal of Soil and Water Conservation. 59(5): p.216-223

By implementing half-mile buffers on sensitive fish bearing streams and one-quarter mile buffer on all perennial waters provides an effective barrier to intercept any potential spill or subsurface contamination event, and potentially minimizing costly remediation efforts.

Precedent Setting for Increased Buffers

The BLM and the Forest Service are tending to increase buffer setbacks, as recently witnessed in multiple examples:

* Establishment of a half-mile stream buffer for occupied and potential cutthroat trout habitat (Montana's Butte BLM RMP, 2009);

* Establishment of up to one-quarter mile stream buffer for all perennial streams (Colorado's Little Snake BLM RMP, 2011); and

* Implementation of one-quarter mile buffer for all native Yellowstone cutthroat trout habitat (Wyoming's Lander BLM Final RMP, ROD soon to be released, 2014).

* Implementation of a 500-foot stream buffer for native trout habitat (Utah's Dixie National Forest LUP, 2011).

TU suggests that the Final RMP implement a one-half mile NSO buffer stipulation as a progressive management strategy in providing the needed attention to cutthroat trout management in the UFO resource planning area. Implementing stronger setbacks assists in meeting the conservation objectives of the CRCT Conservation Agreement, of which the BLM is a signature to. These suggested and agency supported buffer stipulation recommendations will help in the co-existence of native trout protection and restoration, and oil and gas development, potentially lessening the impacts to quality fish habitat.


Comment Number: 000483_HanksG_20161101-20
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
p. 2 -36/37 – Stipulations for Hydrologic setbacks on major rivers
Trout Unlimited supports NL-2/NGD-3: Hydrology River across all major rivers in the DRMP footprint. The Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers make up the bulk of recreational trout fishing in the DRMP. These places are all amazing fisheries in their own right, some holding or qualifying for Gold Medal designation. As discussed elsewhere in this document, with new technology available to make NDG possible in these corridors, and the potential negative impacts to financially and ecologically rich these resources, TU hopes to see more NL-2/NGD-3 adopted in the Final RMP.


Comment Number: 000483_HanksG_20161101-21
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
p. 2 – 38/39 - ROW exclusions (Alt B) in riparian 0.25 mi for riparian, 325 ft for perennial
Road and sediment impacts to fish and fisheries can be as deadly as any other form of water quality degradation. This does not only apply to small waterways, and the 0.25 mile ROW on major rivers

BLM_0165642

should be upheld in the Agency Preferred Alternative and Final RMP. Although TU applauds BLM for consideration of perennial streams and the Preferred Alternative's 325 foot ROW avoidance buffer, TU urges BLM to consider potential cumulative impacts to overall watershed health and increase protections on perennial streams with a wider buffer or ROW exclusion on these systems.

Comment Number: 000483_HanksG_20161101-24
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Stipulation CSU-16 Hydrology Features:
Protections of perennial streams is more important than the DRMP has made it out to be. Trout Unlimited feels the cumulative downstream, watershed wide, effects are worthy of analysis and evaluated for best possibilities of mitigating any potentially negative impacts. Also problematic is the BLM definition of perennial streams, which can vary from year to year based on hydrology and water balance. As such, Trout Unlimited asks for minimum of 500 feet CSU on wetlands, springs and seeps, and perennial streams in the Final DRMP.

Comment Number: 000489_JohnsonA_20161101-17
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
c. Final plan must include adequate buffers for domestic and irrigation water sources
The North Fork Valley and Colorado's Western Slope have been defined for over one hundred years by their idyllic, agricultural landscapes. In a water scarce landscape, the hard work of farming families over the course of generations to channel and beneficially use the water that is available is nothing less than extraordinary. Some of the ditches that provide these farms were built by hand with mule teams. Now, those ditches provide water for people who are keeping the agricultural tradition of the region alive. The agricultural products and value-added goods are sold nationally, statewide, and locally. Neighboring resort communities like Aspen, Telluride, and Crested Butte particularly benefit from the North Fork Valley's agricultural production because they attract tourists who are interested in human powered lifestyles like hiking and skiing that heavily emphasize the consumption of local foods. Locally, it is universally known that Paonia peaches are the best in the country.
The value of agriculture is "often understated because some of its most valuable attributes are intrinsic and qualitative. It is valuable because it is an iconic part of the culture and heritage, its expansive landscape provides value to residents and visitors, it has a strong and complementary relationship to visitor enjoyment, return flows from irrigation sustain late season stream flows for fisheries and recreation and replenish underground aquifers needed for some rural residential real estate."[37] [Footnote 37] Coley/Forrest, Inc. "Water and Its Relationship to the Economies of Headwater Counties." Http://nwccog.org/wp- content/uploads/2015/03/QQStudy_Report_Jan-2012.pdf. The Northwest Colorado Council of Governments Foundation, Inc, Dec. 2011. Web. 19 Oct. 2016. 10.
The final plan must include adequate buffers for irrigation and domestic water sources in order to protect the livelihoods, foodshed, and residents of the North Fork Valley. Fruit, hay, corn, vegetables, and more depend on clean water that is free of highly toxic chemicals, components, and condensates. In the North Fork Valley, many people raise their crops organically, but even if someone uses agricultural aids to maximize their production, those crops will still be negatively impacted by poor water quality. While the North Fork's quintessential way of life is shaped by fields and orchards, many local residents also nurture gardens that help feed their families throughout the year. Those gardens depend on clean domestic and municipal water, as do the people who tend them.

The preferred Alternative does not give this legacy of agriculture the protections that the farmers deserve. The BLM's preferred alternative in Table 2-2, does not stipulate surface occupancy protections with regards to agricultural water conveyance systems. Ditches that were dug by hand and fields and orchards that have been tended by generations will not be protected from the potential inadvertent accidents and releases associated with surface occupancy.

In addition to failing to protect local farms, the BLM's proposed RMP does not provide adequate protection for domestic water supplies and does not fulfill the BLM's objective to "manage lands within municipal watersheds and public water supply areas to provide clean drinking water to local communities."

Some of the proposed actions include the following:

* Applying inadequate restrictions and closures on lands to activities such as fluid mineral leasing and geophysical exploration, mineral materials disposal, etc. (Action 50).
* Manage land within 1,000 feet of a surface water supply-stream as a right of way avoidance area.
* Allow well bores to be drilled within 1,000 feet of a domestic water well (Action 55).
* Allow fluid mineral drilling leasing and geophysical exploration on 36,810 acres more than Alternative B by only prohibiting leasing and exploration on land that is within 1,000 feet of public water supply water (Action 334).
* Allowing surface occupancy on 214,790 acres more than Alternative B by stipulating only minimal protections for rivers and streams (Action 336)
* Allowing controlled surface occupancy on 333,330 acres by stipulating only minimal protections for rivers and streams (Action 337)

None of these actions give public water supplies the protection they deserve because of the highly consequential impacts of development. Currently, no comprehensive, population-based study of the public health effects of unconventional natural gas operations exists.[38] As such, the proposed alternative's actions that impact public water supplies and subsequently public health are a highly inappropriate and arbitrary attempt at minimizing the impacts from surface occupancy, leasing, and exploration associated with oil and gas development in addition to other minerals.

[Footnote 38] (Adgate et al).

Furthermore, the protection amount of 1,000 feet is applied widely throughout the draft RMP, under the agency preferred alternative D, as a buffer to streams, wetlands, domestic water sources (including wells and springs), as well as irrigation ditches and other water conveyance systems. Clarification supported by the best available science is needed to clarify the otherwise arbitrary distances proposed in the preferred Alternative. In its absence, it is recommended that the BLM adopt the protections described in alternative B and B.1 for buffer zones as they are more specific to the needs of each particular use.

For all actions that address public water supply, it is recommended that the BLM adopt Alternatives B and B1 in order to meet the RMP's objectives related to water supply.

Comment Number: 000489_JohnsonA_20161101-19
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
* Table 2-2, Action 44 fails to protect the Gunnison, North Fork Gunnison, Smith Fork, San Miguel, Uncompahgre, and Dolores Rivers from oil and gas leasing, geophysical exploration, surface occupancy, and its subsequent impacts. These rivers provide invaluable economic, environmental, and public health resources, and the proposed action has the potential to negatively impact all of these resources indefinitely. Only Alternatives B and B.1 adequately provide protections for these riverine resources while still allowing for surface occupancy, exploration, and development in more appropriate areas.

BLM_0165644

Comment Number: 000489_JohnsonA_20161101-22
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
Table 2-2, Action 81 fails to protect the ecological values, water quality, aquatic value, recreational attractions, water storage, and flood control services provided by lakes, ponds, naturally occurring wetlands and impounding reservoirs from the impacts of surface occupancy and use. The proposed action of the preferred alternative does not give ample protections to these water bodies, subsequently endangering the viability of the species, farms and irrigated acreage, public health, and environmental health dependent on them. Only alternatives B and B.1 offer a minimum level of protection for these invaluable resources.

Comment Number: 000489_JohnsonA_20161101-26
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
c. Stream health standards in RMP do not equate to healthy ecosystems, but instead are inadequate minimum-level protections
Stream health is a vital component for functioning land and water-based ecosystems. Should the quality of rivers, streams, and their riparian and wetland areas falter, the entire system and the economies dependent on it will falter as well. Because the health of streams and sensitive areas such as riparian and wetland areas play an important role in not just a functioning ecosystem but also a functioning economy, it is critical to afford them maximum protections. However, the stream health standards in the RMP outline measures that do not meet even minimum needs for protection.
The preferred alternative, as stated in Table 2-2, Action 43, will promote the delisting of state impaired water bodies for 303[d]-listed water bodies only, and that it will "develop a water and aquatic monitoring plan, if necessary, to determine areas where adaptive management is needed." Alternative B will promote the delisting of state impaired 303[d]-listed and Monitoring and Evaluation list water bodies. It is recommended that the final RMP include water bodies which are on the Monitoring and Evaluation List in order to address issues on less impaired streams before they become more impaired and more expensive to improve. The final RMP must also define what requirements necessitate adaptive management plans and the process required to develop a water and aquatic monitoring plan. The final RMP should include all other available water quality data and reports for the planning area, including the Western Slope Conservation Center's newly released "VOLUNTEER WATER QUALITY MONITORING NETWORK, April 2001 – April 2014 Data Report." (WSCC Comments, Appendix II) Though the draft RMP makes an effort at protecting sensitive areas (DEIS Table 2-2, Actions 23-24), there are many objectives and actions that need to be modified to better reach the goals outlined for land health (Table 2-2, Goal 22). The preferred alternative, Objective 24 partitions some of BLM lands (those specially designated as sensitive areas) to be managed and protected to "fully meet Colorado Public Land Health Standards", but leaves the remaining lands to be managed "with problems" as long as they are trending in the general direction of meeting Colorado Public Land Health Standards. We ask that the BLM manage all lands to fully meet Colorado Public Land Health Standards, thereby closing loopholes that could allow ambiguous protections for sensitive areas left undesignated.

Comment Number: 000489_JohnsonA_20161101-27
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson

BLM_0165645

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
d. RMP standards and Best Management Practices do not adequately protect water bodies
The WSCC is extremely concerned that the standards and Best Management Practices outlined in the RMP are inadequate to meet the goals and objectives listed for Water Resources (Table 2-2, Action 29). Table 2-2, Action 32 describes methods to protect water bodies in areas with high levels of salt and selenium. While Alternatives B and B1 mandate inventory assessments for activities completed within these hazardous areas (and also outlines specific geographic hazards), the agency preferred alternative leaves site assessments/evaluation as an option to be completed or ignored "when feasible." The preferred alternative here falls far short of outlining the protections necessary to meet aforementioned goals.
In regard to riparian areas, the preferred alternative states: "Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions and to improve or exceed proper functioning conditions" (Table 2-2, Objective 74). However, the supporting agency preferred actions fail to adequately meet that objective. It is our concern that by managing buffer zones as "avoidance areas" rather than "exclusion areas" (Action 75) these sensitive areas are open to all manner of disturbance which would result in irreversible ecological damage.
The WSCC is also concerned that the preferred alternative actions outlined to meet Objective 74 are too ambiguous in their management of sensitive areas such as water bodies. For example, Action 79, alternative B mandates that the agency "create, enhance, and restore wetland and riparian areas impacted by historic land use and flow regime modification" however, the agency preferred alternative dictates the action to only "pursue" such measures and in effect gives this action very little in the way of requirements to complete restoration measures. It is of great concern to the WSCC that these types of vague measures as outlined in the agency's preferred alternative will result in vague management and therefore negatively impact sensitive ecological areas.
The WSCC also recommends that the BLM adopt the measures described in alternatives B and B1 for allowable use and surface occupancy (Table 2-2, Action 81). While the preferred alternative describes stipulations that would allow for various types of use and occupancy (including oil and gas leasing), the stipulations described are inadequate for the protection of these water bodies. For example, the preferred alternative prohibits use and occupancy within 325'-500' of the water bodies listed and briefly describes how to determine the mapped extent of such water bodies according to observed vegetation. However, such boundaries such as riparian and wetland margins can be difficult to determine and are not necessarily dictated by the vegetation observed in the field. Hydrologic conditions must be taken into account as well as the connectivity of source water for such impounded ponds, perennial, intermittent /ephemeral streams, wetland, fens, springs, seeps, and riparian areas. At times, the source water for such sensitive ecological areas is not easily observable and can originate from a myriad of locations, many of them much further than the 500' buffer. We highly recommend that the BLM adopt the measures described in Alternatives B and B1 for allowable use and surface occupancy when it comes to these important water bodies.

Comment Number: 000489_JohnsonA_20161101-3
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. Water supply.
Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

BLM_0165646

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas.[19] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

[Footnote 19] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL- 6 stipulation (from Alternative B) and NL- 7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

Comment Number: 000489_JohnsonA_20161101-30
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
4. Drought Management
Under severe drought conditions (D2), Appendix I (DEIS) of the draft RMP states that drought letters would be sent to grazing permittees and other land users. Please provide information in Appendix I on what these letters would say, and what follow up in management would occur with these letters, including actions by the land users, if required.
Similarly, Appendix I (DEIS) states that under severe drought conditions (D2), the BLM will "prepare local seasonal precipitation graphs." Please explain how "local" are these graphs, how many of these are prepared within the planning area, how the data are collected that are used in these graphs, and what is done with the graphs after they are prepared.
Also, Appendix I (DEIS) states that under extreme drought conditions (D3), OHV Open Areas and designated routes would be temporarily closed. Please explain what conditions would allow these areas to be re-opened, and what a reasonable timeline for that reopening would look like.

Comment Number: 000489_JohnsonA_20161101-31
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
C. Right Of Way (ROW) Concerns - The draft RMP does not adequately protect surface water quality from development impacts including increased sedimentation, pollutants, etc.
The WSCC is concerned that the preferred alternative does not protect surface water quality from surface activities as determined by Right of Way. ROW buffers outlined under the agency's preferred alternative D fall far short of the protections needed to meet goals and objectives for surface water quality throughout the draft RMP. The WSCC recommends that the BLM adopt the guidelines

BLM_0165647

expressed in alternative B and B1 for ROW buffers. The following actions are examples of inadequate protections as outlined in the agency preferred alternative D and recommendations for modification.

* (Table 2-2, Action 45) Alternative B designates a ROW avoidance area within 0.25 miles along major river corridors. However, the agency preferred alternative D is "no action". Though ROW exclusion of major river corridors is infeasible, it is recommended that the BLM adopt ROW avoidance areas outlined in Alternative B to meet the agency objectives.

* (Table 2-2, Action 46) The agency preferred alternative would manage a 325-foot buffer along perennial streams as ROW avoidance areas as the preferred alternative. Alternative B would manage a 325-foot buffer along perennial streams as ROW exclusion areas. The WSCC is concerned that perennial streams will be impacted by the construction and use of roads, pipelines, etc. While these areas would be operated with stipulation, by managing the areas as avoidance areas some perennial streams would ultimately be adversely impacted by the construction and development of roads, pipelines, and utility lines, etc. It is recommended that these impacts be avoided by managing the area according to Alternative B as an exclusion area. (Vol. I, Table 2-2: Action 45, 46, 49, 493, 494); (Vol. II: 4-90, 4-93, 4-97, 4-99, 4-100)

* (Table 2-2, Action 75-84) The ROW protections in the agency's preferred alternative D for Riparian and Wetland areas as described in Table 2-2, are not adequate to meet the corresponding Objective 74. For example: In addition to the action proposed in alternative D, there needs to be a ROW "exclusion" in the naturally occurring riparian and wetland areas, seeps, and springs instead of an ROW "avoidance" buffer.

* (Table 2-2, Action 49) Alternative D manages lands within 1,000 feet of a surface water supply- stream segment as ROW avoidance areas. Alternative B manages lands within 2,640 (.5 mile) of a supply stream segment as ROW exclusion areas. As listed above in section II.3, until clarification supported by the best available science is given for the otherwise arbitrary buffer distance of "1,000ft," the WSCC recommends that the BLM adopt the ROW buffers outlined in alternatives B and B.1 as they are specific to the needs of each particular use

* (Table 2-2, Action 26) The overall goal for land health as stated in Table 2-2 is to "Manage soils, riparian- wetland areas, native plant and animal communities, special status species, and water quality to meet land health standards". However, the corresponding actions do not support the objectives outlined to meet that goal. For example: It is stated in Action 26 "Limit, modify, or manage the cause..." It is suggested that the BLM should add "Close" to these management actions in Alternative D in order to fully meet the goal for land health as described in Table 2-2.

Comment Number: 000489_JohnsonA_20161101-8
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. Surface Occupancy, No Surface Occupancy, and No Leasing stipulations
Surface occupancy can produce highly consequential impacts to water resources, particularly with regards to the application, handling, and transport of liquids and chemicals associated with oil and gas activities. Surface occupancy can result in the following:

* Increased risk for surface and groundwater contamination as "current scientific consensus is that accidents and malfunctions, such as well blowouts, leaking casings, and spills of drilling fluids or wastewater, are more likely to contaminate surface and groundwater supplies than the process of high-volume hydraulic fracturing itself"[27]

* The development and maintenance of new roads and/or increased traffic on existing roads, and the corresponding negative impacts to surface and groundwater contamination.

* Increased air and water pollution due to "(1) direct and fugitive emissions of methane and non-methane hydrocarbons from the well and associated infrastructure (e.g., production tanks, valves,

BLM_0165648

pipelines, and collection and processing facilities); (2) diesel engines that power equipment, trucks, and generators; (3) drilling muds, fracturing fluids, and flowback water; and (4) deliberate venting and flaring of gas and related petroleum products"[28]

* Negative impacts on federally protected fish habitats and the native cutthroat trout and other species of concern.

[Footnote 27] Adgate, John L., Bernard D. Goldstein, and Lisa M. Mckenzie. "Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development." Environmental Science & Technology Environ. Sci. Technol. 48.15 (2014): 8307-320. Web. 19 Oct. 2016.

[Footnote 28] (8310 Adgate et al)

The Preferred Alternative does not include adequate limitations to surface occupancy through the No Surface Occupancy and No Leasing management prescriptions. NSO and No Leasing buffer zones for domestic and irrigation water sources, stream bodies, and other sensitive ecological and agricultural resources as identified in Alternative B and B1 are supported by all referenced documentation in the NFAP as previously submitted to the BLM, as well as in these comments. These prescriptions are absolutely necessary to provide a minimum degree of protection for the water resources within the North Fork and Lower Gunnison watersheds, and similar buffers and protections should be extended to the full planning area.

Comment Number: 000489_JohnsonA_20161101-9
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
2. Controlled Surface Use Stipulations in Preferred Alternative not adequate for protection of water resources in the North Fork Valley
It is clear that the Preferred Alternative attempts to address many of the impacts of oil and gas leasing and development on water resources in the planning area through the use of non-binding, waivable controlled surface use (CSU) stipulations. Nearly across the board, these CSUs do not provide adequate protections for water resources compared to the management prescriptions in Alternatives B1 and B. (See Table 2 in Appendix)
There is a 73%-96% difference in No Leasing prescription acreage between Alternatives B and D, with Alternative D drastically limiting the use of No Leasing, and therefore minimizing protections for water resources. Alternative D does not include B1 protections within .50 mile of Paonia, Hotchkiss, and Crawford. Alternative D also fails to include 76%-86% of acreage closure/withdrawal from locatable mineral entry as compared to Alternatives B (DEIA VI, Table 2-2: action 333,334,336, 348,352)(DEIS Vol II 4-92,4-99, 4-98)

Comment Number: 000530_PlattA_20161101_EPA-15
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Some of the BLM's proposed lease stipulations are not completely consistent with the EPA's general recommendations. For example, we generally recommend a minimum 100 foot NSO setback buffer from slopes greater than 30%; a minimum 500 foot NSO setback for flowing waters (rivers and streams) or 100-year floodplain, whichever is greater; a minimum 500 foot NSO setback for lakes, ponds and reservoirs, wetland and riparian areas and springs; and a minimum 750 foot NSO setback for 303(d) impaired waters. With this in mind, we recommend that the BLM's Preferred Alternative incorporate either these EPA recommendations or the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water resources). In addition, we recommend clarifying

BLM_0165649

Appendix B stipulation CSU-12 regarding protection of hydrology features under Alternative D. The stipulation description notes that CSU restrictions would apply from 325-500 feet of perennial streams, but it does not provide the related distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments.

Comment Number: 000530_PlattA_20161101_EPA-19
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 37.5
Comment Excerpt Text:
Note that for groundwater and groundwater under the direct influence of surface water (GWUDI) public drinking water supply sources, we generally recommend a minimum one-half mile (2,640 feet) NSO or CSU concentric buffer. This recommendation is based on the professional judgment of the CDPHE Source Water Protection Program (SWPP). For additional information, please contact the CDPHE SWPP Coordinator, John Duggan, at 303-692-3534.
To further strengthen the BLM's efforts to protect public drinking water supply sources, we recommend that the Final RMP/EIS Preferred Alternative's Public Water Supply leasing stipulations incorporate either the above EPA recommendation for protection of groundwater and GWUDI public drinking water supply sources or the related stipulations described for Alternatives B/B.1 and noted by the BLM as being more protective of water resources.

Comment Number: 000530_PlattA_20161101_EPA-24
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
With this in mind, we recommend that the Final RMP1 EIS describe how the BLM intends "to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands" as described in EO 11990, including how wetlands will be identified and avoided, and how unavoidable impacts would be mitigated. Methods to protect wetlands, riparian areas and floodplains, include the following:
* Application of minimum setback requirements through leasing stipulations such as NSO for wetlands and riparian areas. The EPA recommends NSO within the footprint of wetland and riparian areas, as well as a 500 foot NSO setback from wetland and riparian areas (described in the Surface Water Mitigation section of Comment #4 above);
* Leasing stipulations to protect floodplains, such as NSO within the 100-year floodplain (described in the Surface Water Mitigation section of Comment #4 above); and
* Delineation and marking of perennial seeps, springs and wetlands on maps and on the ground prior to project level development to ensure identification of these resources to facilitate their protection.

Comment Number: 000530_PlattA_20161101_EPA-25
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 34.1
Comment Excerpt Text:
We also recommend that the Preferred Alternative include special protections from livestock grazing, such as buffer zones for high quality riparian and wetland resources including springs and fens. In addition, we note that 11 grazing allotments were identified as "having problems meeting," or "not

meeting," the BLM Colorado Public Land Health Standard 2 (riparian/water quality standard). We support including the full acreage of these affected 11 allotments in the "Improve" management category under the Preferred Alternative D.

Comment Number: 000545_SlivkaJ_20161101-139
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Water supply
Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.
The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Oil and gas development is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas. [Footnote 45 "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/ ] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.
We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL- 6 stipulation (from Alternative B) and NL- 7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

Comment Number: 000545_SlivkaJ_20161101-145
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities
The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors. In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.

BLM_0165651

Uncompahgre Draft RMP at 4-117. B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90:

Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger. [Footnote 51 DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B.] We have recommended (in Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species.

Comment Number: 000548_D'Alessandro_20161101-2
Organization1:
Commenter1:Ralph D'Alessandro
Commenter Type: Individual
Comment Excerpt Text:
Specifically, there is inadequate protection in Alternative D for the springs that provide domestic water companies their water to serve their customers, especially in areas where oil and gas exploration and extraction would be permitted on lands lying above such source springs to protect those down slope springs whose water flow could be affected by drilling and hydraulic fracturing, potentially altering the water flow path to such springs. Those immediately overlying areas should be designated as No Leasing (addressed on Page 2-28, line 55 in B1). Additionally, passage through such overlying areas to areas where leasing is permitted should be via Controlled Surface Access.

Comment Number: 000548_D'Alessandro_20161101-5
Organization1:
Commenter1:Ralph D'Alessandro
Commenter Type: Individual
Other Sections: 31.1 31.3
Comment Excerpt Text:
Selenium control is an area that appears to save received too little consideration in areas where there are steep slopes of 30% or greater. The Selenium Task Force and those individuals and organizations working on the Selenium Management Plan in the UFO area have worked hard to reduce the addition of selenium into the rivers and tributaries that feed the Colorado River. In accordance with the existing agreement with the BLM and other federal agencies (ex. BOR), I believe Controlled Surface Use is appropriate for areas adjacent high selenium soils and No Surface Occupancy is appropriate for areas with steep slopes in selenium soils addressed as a stipulation in Page 2-28, line 40 B1 and should be incorporated into Alternative D. I also advocate the incorporation into Alternative D the provisions in Page 2-28, line 34 B1 to address the selenium soil issue comprehensively.

BLM_0165652

Comment Number: 000555_NicholofR_20161101-1
Organization1:
Commenter1:Robin Nicholoff
Commenter Type: Individual
Comment Excerpt Text:
I am extremely concerned that the Preferred Alternative of the DRMP does not go far enough in protecting the water rights enumerated above nor the values that enticed my construction clients to move to this valley.

Comment Number: 000561_BeyerK_20161101-2
Organization1:
Commenter1:Krista Beyer
Commenter Type: Individual
Comment Excerpt Text:
I support the Colorado Water Conservation Board's request to manage flows through the Colorado State Instream Flow Program (ISF). However, I recognize the difficulty attempting to please too many and reach a compromise that pleases none. It is my hope that the ISF will actively manage flows in a way that will allow for sufficient flows to protect ecology of the rivers along with whitewater and angling recreation. If the ISF's protections fall short, I expect the BLM and the Secretary of the Interior pursue alternative flow protections.

Comment Number: 000576_Ruppert_20161015-3
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies, that risk being impacted by surface spills and well failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan.

Comment Number: 000576_Ruppert_20161015-4
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

Comment Number: 000576_Ruppert_20161015-5
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The final RMP must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

BLM_0165653

Comment Number: 000577_RehnM_20161023-1
Organization1:
Commenter1:Maddie Rehn
Commenter Type: Individual
Comment Excerpt Text:
Water quality is not only imperative to human and ecosystem health, but also the local agriculture community. According to the U.S. Department of Agriculture's 2007 census, direct sales of farm products (via farm stands, farm-to-home cooperatives, etc.) in Delta county, with over 90 percent coming from the North Fork Valley, are some of the highest in the rural U.S.. The valley produces 77 percent of the state's apples, 71 percent of its peaches. Agriculture relies on clean water.
Therefore, the final plan must consider protections for our rivers, landscapes & wildlife to ensure protection of key natural resources including riparian areas, river corridors, sensitive species, air and water quality, and the valley's scenic qualities and visual resources.

Comment Number: 000580_BlairL_20161101-1
Organization1:
Commenter1:Lauren Blair
Commenter Type: Individual
Comment Excerpt Text:
The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

Comment Number: 000584_PattersonC_20161005-1
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Comment Excerpt Text:
It is impossible to prevent spills and seepage, which contaminate soil and ground water. Across Colorado, there is an average of almost two spills from the oil and gas industry each day. Colorado oil and gas companies reported 615 oil and other chemical spills in 2015. Denver based Center for Western Priorities, also found 15% of the spills contaminated groundwater. In 2014, there were 712 spills. Many spills are obscured by running a bulldozer over the contaminated soil and are never reported.
Most of the domestic water sources in the North Fork Valley are surface springs and streams. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies.
The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals.

Comment Number: 000587_WolcottS_20161031-4
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
The final plan must protect the health of the watershed. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. There are no alternative sources of water if these springs and water sheds be contaminated. Spills from

BLM_0165654

fracking are inevitable, as experience in Colorado and across the country has demonstrated. The final plan must exclude all oil and gas activities within a halfmile of all surface and ground domestic water sources, streams and ditches and the watersheds that feed into them. These are all at risk from surface spills.

Comment Number: 000587_WolcottS_20161031-5
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan should protect local agriculture by excluding oil and gas activities within half a mile of ditches, streams, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity. Agriculture in the SMP area is unlike agriculture in other parts of the country. We cannot depend on water falling directly from the sky. We depend totally on precipitation that is collected, stored, and transported on and across BLM lands and adjacent private lands that are susceptible to contamination from spills and leaks from oil & gas developments allowed in the preferred alternative.

Comment Number: 000587_WolcottS_20161031-7
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

Comment Number: 000603_SmithP_20161024-3
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Table 2-2, page 2-28 Soils and Water Resources:
The water goal under this section presents generic references to streams, water quality, watershed function and public uses. This description should include the use of water for irrigation purposes and that public use is not limited to the standard uses of human (public and private water supply) and livestock consumption, fishing and recreation and should acknowledge and describe the water's use for agricultural production. This omission results in the comparison of alternatives on this topic to completely ignore the effects of each alternative on the existing land uses within the North Fork Valley that would be variably impacted/protected by the provisions in each alternative. A token reference on page 2-31 to Agricultural operations as identified in the NFAP does not constitute the "hard look" required by NEPA.

Comment Number: 500005_BarretoR_20161017-2
Organization1:
Commenter1:Ruth Barreto
Commenter Type: Individual
Other Sections: 5.3

BLM_0165655

Comment Excerpt Text:
Specifically, the final RMP must:
• Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
• Exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies, as these could be contaminated by surface spills and well failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or adjacent to BLM lands directly affected by this plan.
• To protect irrigation water, the final plan must exclude oil and gas activities within a quarter mile of all ditches, domestic water decrees, dams, irrigation intakes, or canals.

Comment Number: 500013_MorreC_20161027-1
Organization1:
Commenter1:Claire Moore
Commenter Type: Individual
Comment Excerpt Text:
Protection of irrigation water:
Our irrigation water comes from and via Roatcap Creek drainage . In the event of oil and gas development in the area, our water could be seriously impacted.
The distance limits required as listed on page 2-190 are necessary for continued safety of our water supplies.

Comment Number: 500027_LavertyD_20161026-2
Organization1:
Commenter1:Densie Laverty
Commenter Type: Individual
Comment Excerpt Text:
I, as well as all the other farmers and ranchers in the North Fork Valley, depend on a well developed irrigation system, consisting of a series of ditches distributing gravity fed water from the North Fork of the Gunnison River as well as her tributaries (Minnesota Cr.),and also the Smith Fork, to the.entire valley. We are all extremely concerned about the impact of this industry to our irrigation water, and thus our livelihoods. The oil and gas industry does not have a good track record concerning spillage of waste water, tracking fluid, as well as oil. The resource management plan does not address these concerns. I would ask for set backs from all water sources, including all river corridors, irrigation ditches, municipal water supplies (groundwater wells & springs), private water systems (domestic water wells, and all water decrees), riparian areas and wetlands, as well as any perennial water sources, intermittent streams and ponds that are habitat for aquatic wildlife.

Comment Number: 500164_PitkinMesaPipelineCo_20161024-4
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
As such, the board expects the BLM to implement a no-lease/no surface occupancy management regime in an as yet to be determined radius surrounding our source waters. We request this closure and stipulation be placed into the revised UFO RMP as implemented.

Comment Number: 500164_PitkinMesaPipelineCo_20161024-5
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Other Sections: 37.3

BLM_0165656

Comment Excerpt Text:
2) The Board requests that in its final Environmental Impact Statement, the BLM include a full, detailed description and analysis of potential impacts to groundwater across the UFO resource area with particular attention given to the North Fork Valley and its environs.
3) The Board requests inclusion in the BLMs designation of 'Public Water Sources with Zones of Potential Influence.'

Comment Number: 500176_StewartC_20161027_TownOfPaonia-2
Organization1:Town of Paonia
Commenter1:Charles Stewart
Commenter Type: Local Government
Other Sections: 37.5
Comment Excerpt Text:
Paonia's water is acquired via 38 springs and the Town passed Watershed Ordinance 2003-02 on February 25, 2003. There is established by the Town of Paonia, Colorado a Watershed Designation ("Watershed") pursuant to Colorado Revised Statutes (C.R.S) 31-15-707(1 )(b). The Watershed is that area in which the Town shall exercise its powers to maintain and protect the Town's waterworks from injury and the Town's water supply from pollution. This Watershed is created under the authority granted in C.R.S 31-15-707(1)(b ), as amended. The Watershed and these regulations are created only for the purpose of protecting the Town's waterworks and water supply. Furthermore, Paonia has also created a Source Water Protection Plan which the BLM needs to consider in the determination of the final RMP. The planning team for the source water protection plan recommended "Source Water Protection Best Management Practices" be considered for implementation by several agencies, including the BLM. The North Fork Alternative stipulates a buffer of oil and gas surface activities within a half of a mile from all source water supplies. The Town of Paonia is voluntarily committed to applying source water assessment and protection principles to finding and protecting new water sources in the future. This is part of the larger ongoing commitment to providing the highest quality drinking water to local residents. The Town of Paonia asks that, in order to protect the quality and quantity of our domestic water, the final UFO RMP include all buffers and oil and gas restriction recommendations in the Source Water Protection Plan and Alternative Bl.

Comment Number: 500190_GofforthW_20161014-1
Organization1:Town of Crawford
Commenter1:Wanda Goffworth
Commenter Type: Local Government
Comment Excerpt Text:
Of the highest importance to the town is our ability to provide clean and safe drinking water to Town Residents. As we have stated to the BLM in the past, with respect to previously proposed lease sales, Public lands managed by the BLM are near and intertwined with our drinking water supply and delivery system. Protection of this critical resource for the Town of Crawford was recently addressed with the implementation of our Towns' Source Water Protection Plan. This plan, adopted in 2013, came to fruition as a result of a year of meetings with identified stakeholders for the Towns groundwater source, Wiley Springs. Stakeholders included the Town of Crawford and its' citizens, the BLM and USFS, West Elk Cattle Pool, adjacent landowners, and the Colorado Dept. of Health. The Town of Crawford requests that the BLM honor our Source Water Protection Plan in its new Resource Management Plan. For obvious reasons, the Town's drinking water supply must be protected from an industrial activity that has the potential for pollution by spills, releases, equipment failure, human error and other potentially unknown and unintended consequences related to gas and oil drilling and the use of high volume hydraulic fracturing. Contamination of the Town's drinking water supply or damage to its delivery system cannot be allowed to occur.

In addition, the Town would like to underscore the importance of maintaining and operating its waste water system. Crawford utilizes a BLM right of way that provides access to its wastewater treatment plant. The Town of Crawford also has a wastewater collection main that borders BLM-managed lands. It is vitally important to the future of the town that our ability to maintain and continue wastewater treatment at this facility is not impeded by oil and gas activity. The town is supportive of BLM's multiple use mandate. A perfect example of this mandate in action can be found in Young's Peak. The BLM lands that border the town on the north include Young's Peak. This peak provides the scenic backdrop for our town, a hiking trail that provides recreation for town residents, and these lands are right next to the Crawford School. Surely this is an area where the BLM can agree that it would be inappropriate to lease for the industrial practice of oil and gas drilling and hydraulic fracturing.

Comment Number: 500197_SteckelC_20130807_TownOfCrawford-1
Organization1:Town of Crawford
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
Of the highest importance to the town is our ability to provide clean and safe drinking water to town residents. As we have stated to the BLM in the past, with respect to previously proposed lease sales, public lands managed by the BLM are near and intertwined with our drinking water supply and delivery system. For obvious reasons, the town's drinking water supply must be protected from an industrial activity that has the potential for pollution by spills, releases, equipment failure, human error and other potentially unknown and unintended consequences related to gas and oil drilling and the use of high volume hydraulic fracturing. Contamination of the Town's drinking water supply or damage to its delivery system cannot be allowed to occur.

Comment Number: FormLetterL_CHC WSCC-1
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Water
Domestic Water Sources -
The final plan must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies, that risk being impacted by surface spills and well failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan.

Comment Number: FormLetterL_CHC WSCC-2
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Irrigation water and agriculture - The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.

BLM_0165658

Comment Number: FormLetterL_CHC WSCC-3
Organization1:Citizens for a Healthy Community
Commenter1:
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Streams and surface water quality - The final plan must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

*Summary*
A. Some commenters stated that current measures in the Draft RMP are insufficient to protect planning area water. Commenters recommend that the BLM consider including protective measures, including:

1. Appropriate buffers and setbacks between energy development and water resources, including a half-mile buffer from surface and ground domestic water sources and a quarter-mile buffer from all ditches, domestic water decrees, dams, irrigation intakes, or canals
2. Stronger protective measures for intermittent, ephemeral, and perennial streams
3. Restrictions on energy development in areas susceptible to contamination and near springs that feed into domestic water sources
4. Measures that go beyond proper functioning condition water quality objectives and standards beyond the minimum inadequate protections
5. Objectives to meet Total Maximum Daily Load goals
6. Specific mechanisms to regulate and monitor impacts on water quality and quantity from drilling operations, including:
   a. Requiring developers to submit a plan for cumulative water use over the life of a project; details of the desired plan's elements were recommended in comments
   b. Requiring developers to delineate and monitor an area of review for wells with hydraulic fracturing

B. Commenters also recommended inclusion of the strongest level of protections for municipal and agricultural irrigation waters, as detailed in Alternative B.1, stating that this is required to comply with community source water protection plans, such as those for Hotchkiss, Crawford, and Paonia, and to protect the organic farming industry in the North Fork Valley. Commenters recommended that source water protection BMPs be considered for implementation. Commenters noted specific protective measures for incorporation into the RMP.

C. In addition, some commenters were concerned about the potential impacts of proposed actions on water appropriations and water rights. Commenters requested that the BLM monitor instream flow rights held by the BLM and not propose an action that would result in a federal appropriation of water, and would not impose limits or prohibitions on existing water rights.

BLM_0165659

D. Commenters also recommended edits to specific management actions for clarification, such as clarifying CSU restrictions for intermittent and ephemeral streams. Other commenters suggested increasing NSO setbacks for rivers, streams, wetlands, floodplains, and riparian areas.

E. Commenters stated that the drought management plan in Draft RMP/EIS Appendix I should clarify the content of disseminated drought letters to public land users, content of local seasonal precipitation graphs, and the conditions under which OHV Open Areas temporarily closed due to drought would be reopened.

*Response*
A. To meet the multiple use mandate of the BLM while minimizing risk to water/aquatic resources, the Draft RMP/EIS includes a range of NSO and CSU stipulations to minimize risk to the various types of water resources, including public water supplies that use a groundwater well or spring (see Draft RMP/EIS Table 2-2, pages 2-28–2-49; note that total maximum daily loads are presented on page 2-35, line 44). In addition, BMPs and project design features would be required for site-specific projects. The list of standard operating procedures and BMPs as related to water protection in Draft RMP/EIS Appendix G is not comprehensive. The BLM will work with project applicants to determine appropriate standard operating procedures and BMPs at the project level. These specific mechanisms to regulate and monitor impacts on water quality and quantity from drilling operations will be determined at the site-specific planning level prior to project implementation.

B. A range of management actions related to source water protection, including stipulations preventing or limiting surface-disturbing activities near designated municipal watersheds and source water protection areas and domestic wells, were included and examined in the Draft RMP/EIS. Potential impacts on municipal water are examined in Draft RMP/EIS Section 4.3.3, Water Resources (pages 4-80–4-100) and Section 4.6.2, Public Health and Safety (pages 4-444–4-451). BMPs, as included in Draft RMP/EIS Appendix G, would be implemented as appropriate at the site-specific planning level.

C. Decisions at the RMP level would not directly create any water rights or result in any appropriations. Existing water instream flow water rights held by the Colorado Water Conservation Board are not monitored by the Colorado Water Conservation Board. BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist.

D. The BLM appreciates the comments. Stipulations, including CSU and NSO, for rivers, streams, wetlands, floodplains, and riparian areas were examined and edited to incorporate new and relevant information as appropriate in the Proposed RMP/Final EIS.

E. Existing water instream flow water rights held by the Colorado Water Conservation Board are not monitored by the Colorado Water Conservation Board. The BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist. However, a more recent drought monitoring plan was developed and incorporated into the Proposed RMP/Final EIS, as appropriate.

BLM_0165660

### *Section 37.2 – Water: Best available information—baseline data*

Total Number of Submissions: 13
Total Number of Comments: 23

Comment Number: 000186_ScotJ_MilvenanE_20161024-6
Organization1:
Commenter1:J. Scot Milvenan
Commenter Type: Individual
Comment Excerpt Text:
Per the UFO, BLM did not map the area's hydrology, which makes it difficult for future project environmental impact statements to predict the impact of fracking processes on private and commercial water sources. The BLM has not determined how our springs and aquifers are fed and thus cannot predict how fluid mineral development and disposal will affect them. This lack of information poses too high a risk to our water, potentially affecting 30,000+ people in the valley.

Comment Number: 000387_HudekH_20161101-3
Organization1:The Hive Paonia
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
While developing a RMP, the BLM is required to honor Source Water Protection Plans, as were developed by the Towns of Paonia, Crawford and Hotchkiss. These Protection Plans were not taken in consideration by the BLM for its Preferred Alternative. Please consider these plans.

Comment Number: 000388_CerianiJ_20161023-1
Organization1:Stucker Mesa Domestic Water Company
Commenter1:Jean Ceriani
Commenter Type: Local Government
Comment Excerpt Text:
1) Stucker Mesa Domestic Water Company receives water from four springs, one of which, known as Vought Springs, is located in T14S/R92W Section 34 at Lat: 38 degrees 52.661' Long: W107 degrees 39.328' Elevation 6825'. This spring is due west of Stucker Mesa Road in Sections 34 and 35. Drilling for petroleum in this area could negatively and permanently affect the quality and quantity of water from this spring.
2) The pipeline that carries water from the Vought Springs to the company cistern lies under a corner of Section 34 just below Stucker Mesa Rd. A drilling caused rupture of this line would leave all households below this point without water. SMDWC brings water to 21 taps and 28 permanent and 6 part time residents on Wakefield and Stucker Mesas along Stucker Mesa Rd, above and to the northwest of Paonia. The company has existed since 1940, supplying domestic and stock water to its shareholders and contractors. Its decree on springs above Vought Springs was confirmed by The Water Court in 1951. The springs and pipeline have been providing water since 1906.
While the water supply has been mostly sufficient throughout the years, drought and dry conditions have caused shortages. In 2007, SMDWC received a decree on the Vought Springs, which it developed and added to its water supply. Since that time, the quantity of water available to shareholders has been sufficient to meet their needs. SMDWC cannot adequately serve its families in the future should that water supply be permanently disrupted in any way.
We are concerned that access to the area in Sections 34 and 35 (as noted in 1 above) would require construction of a road up a very steep gully, probably on top of our pipeline (only 18 inches below the surface) and through a part of the Vought Springs aquifer. This action would be unacceptable.

BLM_0165661

The mere act of drilling into the Vought Springs aquifer is unacceptable. Surface spills of fluids or those emanating from the well, whether fracking fluid or those associated with the oil or gas, could have a devastating impact on our water supply.

We are concerned that airborne dispersal of VOCs and particulates could be absorbed into the ground water that feeds Vought Springs, as we believe these springs are under surface water influence as well. Waiting until the damage is done is unacceptable.

Comment Number: 000388_CerianiJ_20161023-5
Organization1:Stucker Mesa Domestic Water Company
Commenter1:Jean Ceriani
Commenter Type: Local Government
Comment Excerpt Text:
In 2012 we strongly objected to BLM offering drilling leases in any area that might impact the source of water to the Vought Springs. We believe the area in Sections 34 and 35 (as noted in 1 above) is directly adjacent to the source of that water. Drilling there would be much too close for comfort. We do not believe there can be adequate assurance of no impact or mitigation for this threat to our water supply. After review of comments received in 2012, BLM removed the parcel – 6191-- of our concern from its revised lease proposals. Our concerns have not diminished, and in fact have increased. In light of the large body of research concerning current practices in oil and gas extraction that has been conducted in just the last few years, we fail to understand on what basis BLM wishes to open up the area around Vought Springs to drilling, even with stipulations. We further believe that BLM has utterly failed to take current research results into consideration in its support of Alternative D as its preference. This is an outright violation of NEPA.

Comment Number: 000398_GershtenM_20161031-1
Organization1:
Commenter1:Mitchell Gershten
Commenter Type: Individual
Comment Excerpt Text:
The BLM must complete more extensive analyses of the hydrology of the entire region but specifically of the North Fork Valley. These data must be included in the final EIS prior to any consideration of leasing for oil and gas development.

Comment Number: 000402_RatnerJ_20161028-18
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
One of the thorniest issues that the BLM has to consider is water quality of streams flowing through the lands it manages. The revision should provide a comprehensive plan for watershed analysis, restoration, monitoring, and adaptive management; particularly where livestock impact water quality; and to inventory, monitor and develop site-specific plans for riparian management, tailored to watershed needs as identified through these processes.

The DEIS does not accomplish this.

Comment Number: 000402_RatnerJ_20161028-32
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.5
Comment Excerpt Text:

BLM_0165662

3-29 states:
Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium.
This statement implies that the BLM actually monitors the water quality impacts of its authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of them do this. Is the UFO actually monitoring water quality impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it administers or is the above statement stretching the truth?
In the FEIS please clarify what data is being collected, where and how often and what percent of the FO the data collection efforts cover.
The DEIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.
3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing.

Comment Number: 000402_RatnerJ_20161028-33
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
3-33 states:
As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and Escherichia coliform bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria.
Please provide information as to the dates when this sampling occurred and when livestock were present on the applicable allotment. WWP and the Forest Service have collected thousands of e. coli samples and exceedances of standards only occur when livestock are present. Natural background levels of e. coli are rarely above 25 CFU. So if your data was not collected when livestock were present on the allotment, the results are meaningless to conclude there are no exceedances.
3-37 states:
However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher.
Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.
Certainly, if the BLM were serious about salinity, erosion and selenium control it would have inventoried these for the AMS and then put in specific actions in the RMP to deal with this problem.

Comment Number: 000471_NoeD_20161101-5
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
-My mapping, and previous geological studies by the USGS in the area show that ground-water from certain formations migrates from deeper in the Piceance Basin to outcrops along the Gunnison and

North Fork Gunnison Rivers, forming naturally occurring mineral springs. Many of these springs form along Dakota Sandstone outcrops. However, in the LeRoux Creek valley, I have found and mapped mineral springs that align with the outcrops of limestone-bearing members of the Mancos Shale, including the Juana Lopez and the Fort Hays and Smoky Hill Members. This out-of-basin migration and surface discharge of Niobrara-equivalent formation waters onto the landscape is a potential red flag for oil & gas development, in that it would be potentially risky to perform hydro-fracturing and pump millions of gallons of toxic "frac'ing" fluids into a formational zone that conveys water to and is in contact with surface aquifers and surface streams. The risk, and the velocity at which the ground-water moves through these zones is unknown and unstudied. It should be mentioned ground-water flow and temperature modeling studies done by Lazear (2006; 2009) found that infiltrating surface waters on the southern flanks of Grand Mesa most likely flow downward into the underlying formations before coming to the surface as formation-water seeps and springs. He postulated that vertical fractures with depths of up to 1 km (3,280 feet) influence the apparently deep flow paths of the ground-water. With regard to oil & gas production and potential contamination of aquifers, the problem is that, because of the geometry of the sedimentary rocks, both formation and downward circulating meteoric ground-waters flow along certain bedrock layers toward the outcrops at the southern edge of the basin, bringing those waters into contact with shallow aquifers and with surface waters. As a result, there is an area of unknown width that extends northward from the springs into the Piceance Basin where "frac'ing" fluids should not be mixed with migrating formation waters on account of transport (of unknown duration) and potential contamination of the surface and near-surface water aquifers and streams. And also very generally, this area (roughly coincident with insufficient overburden area) would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.

Comment Number: 000489_JohnsonA_20161101-13
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
4. Not enough data exists to make decisions about processing produced water.
Throughout the BLM's draft RMP, actions in the Preferred Alternative lack informed data to make informed decisions. This is particularly evident with regard to the best management plans (and lack thereof) for produced water associated with hydraulic fracturing for oil and gas development. The relationship between the injection of produced water and its impacts to the environment is still too new and too dynamic for the best available science to make prudent decisions that will protect our natural resources for future generations. From the initial diversion from the natural water system to disposal and processing post processing, produced water has the potential to negatively impact natural resources such as surface and groundwater, riparian and stream health, and geologic functions. For example, some have alleged that the storage of produced water in Oklahoma has caused an increase in the quantity and intensity of earthquakes in the area.[30] However, in the past year, the number of earthquakes has decreased since their peak.[31] Because of the consumptive nature of this water use and the potentially toxic chemicals and components that are present in produced water, this is highly concerning for what it indicates about possible impacts to the North Fork Valley of future oil and gas drilling. The potential impacts that produced water could incur on the environment and communities are too great, and too little data exists to make scientifically sound decisions that allow for safe development of oil and gas while protecting the communities that will be impacted by the BLM's final RMP.
[Footnote 30] Ellsworth, W. L. "Injection-Induced Earthquakes." Science 341.6142 (2013): 1225942. Web. 19 Oct. 2016.
[Footnote 31] Regan, Michael D. "Why Is Oklahoma Seeing Fewer Earthquakes? Scientists Point to New Oil & Gas Rules." PBS. PBS, 28 Aug. 2016. Web. 19 Oct. 2016.

BLM_0165664

Comment Number: 000489_JohnsonA_20161101-18
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
2. Salinity and selenium
The watersheds within the UFO have been the subject of much attention because of the high levels of salinity and selenium that have negative downstream impacts when they are released into rivers and streams. Indeed, "[t]he Lower Gunnison Basin represents the largest contribution of salinity to the Colorado River system, with a total annual loading of 1,440,000 tons."[39] "The Mancos Shale is a major source of dissolved solids and selenium in the study area. The Mancos Shale is the lateral equivalent to the Niobrara Shale, Cody Shale, and Pierre Shale in Colorado, Montana, Nebraska, South Dakota, and Wyoming (Tweto, 1979; Green, 1992; Wright and Butler, 1993)".[40]
[Footnote 39] URS, and US Department of the Interior / Bureau of Reclamation. Final Findings and Strategies: Comprehensive Planning Studies for Salinity Control Measures in the Upper Colorado River Basin. Rep. N.p.: n.p., 2013. Print.
[Footnote 40] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." Scientific Investigations Report 2013–5015 (2013): Iii-300. Web. 19 Oct. 2016, 4.
Salinity control efforts in the Gunnison River Basin dates back to the 1970s with the creation of the Colorado River Basin Salinity Control Forum. "The Bureau of Reclamation (2011a) estimated that 47 percent of the salinity load in the entire Colorado River Basin is derived from natural sources, including geological formations, saline springs, and surface runoff; 37 percent results from irrigation; and the remaining 16 percent results from reservoir-storage effects and municipal and industrial activities".[41]
In response, the "Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system" (RMP Volume II, 4-17). The effect of these efforts has resulted in the reduction of "227,100 tons per year by both on-farm and off- farm measures through combined efforts from Reclamation, USDA/NRCS, and the BLM."[42]
[Footnote 41] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." Scientific Investigations Report 2013–5015 (2013): Iii-300. Web. 19 Oct. 2016. 12.
[Footnote 42] (URS, 1-5).
The Western Slope Conservation Center is concerned that the agency preferred alternative in the proposed RMP will exacerbate the concentrations of salinity and selenium in the Lower Gunnison River and Colorado River Basins through run-off and erosion due to the deterioration of aging, existing agricultural infrastructure and surface disturbing activities (such as fluid mineral exploration and development, off- trail recreation, and road and infrastructure construction and maintenance) coupled with wind and water erosion, the effects of drought, and the unpredictability and extreme weather events and trends associated with global climate change. Additionally, as stated in the proposed RMP (Volume I, 3-32): "Management actions in the planning area that could result in accelerated selenium yields from deep water percolation include ROWs involving open water sources (such as irrigation ditches and canals), and land sales or exchanges that involve lands dominated by Mancos Shale."
Already, millions of dollars have been invested in the watershed to minimize salinity and selenium leaching. The Western Slope Conservation Center is concerned that the preferred alternative will negate that investment of time and money and will increase salinity and selenium loading in the Lower Gunnison River. This will result in a failure to protect domestic and agricultural water within the UFO and downstream in the Colorado River Basin. It is recommended that the BLM adopt Alternative B in

BLM_0165665

order to meet Objective 30 in Table 2-2 to "manage the activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources."

As referenced in Vol. II, page 4-84, motorized travel has detrimental effects on erosion, soil health, water quality, and watershed health. It is suggested that to minimize the detrimental effects of motorized travel on saline/selenium soils and to minimize saline/ selenium loading in this watershed and the greater Colorado River watershed, that soils with high concentrations for saline/selenium be managed as ROW exclusion areas. Table 2-2, Action 33 outlines management of saline/selenium soils with relation to ROW travel. It is recommended that the BLM adopt the actions outlined in alternative B rather than the preferred alternative D which is "no action".

Table 2-2, Action 31: The agency preferred alternative D supports activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources as outlined in Objective 30.

Comment Number: 000489_JohnsonA_20161101-28
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
e. BLM has not completed research or accrued necessary information to make an informed or accurate management plan for water bodies
The Western Slope Conservation Center is disappointed with the extent to which the draft RMP addresses the cumulative impacts of the preferred alternative's proposed actions to water resources. As it stands, the actions included in the preferred alternative are deficient in addressing water resource concerns. The lack of baseline monitoring and evaluation current conditions will make it impossible to understand and address changes in water quality and stream health which in turn will impact public health and the economy.
While Alternative B and B1 do provide more support for water resources, they too fail to address the impacts of the potential consumptive water use of fluid minerals development on watershed, stream, riparian, and wetland health.
The final RMP must include additional baseline data (see Appendix II) and a more thorough analysis of cumulative impacts to water bodies, including from all consumptive water uses.

Comment Number: 000489_JohnsonA_20161101-7
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The final RMP must also include all best available data regarding impacts of oil and gas development on water quality as well as water resources within the planning area, which includes a number of studies and reports references in these comments as well as other concerned parties. Part of this data includes a newly released Western Slope Conservation Center report on the Water Quality of the North Fork Watershed based on water quality monitoring conducted monthly between April 2001 and April 2014. (WSCC Comments, Appendix II) All of the following comments should be read in reference to this newly released report.

Comment Number: 000509_WolcottE_20161102-2
Organization1:
Commenter1: Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165666

These BLM lands are also only in some cases several hundred feet upstream from domestic and other water sources which have not been identified on your maps. This is the case with our ranch on Stucker Mesa, which includes springs on our ranch which are only hundreds of feet downstream of normally dry draws - springs which are used for domestic, stock, irrigation, grape/wine production, wildlife and other uses. In the case of landslide, erosion from road building, contaminating spills from vehicles/hauled fluids/oil and gas activities (which are documented to happen all too often and cannot be mitigated) these springs would be contaminated or silted in or both, destroying the source of water for many households. These types of springs as well as shallow water wells also exist on property to the west and east of our ranch up and down the valley. These springs must be protected, and should have been fully inventoried by the BLM (DNR and other state water agency maps and data showing points of diversion for water sources, wetlands, ditches and canals, streams, rivers, irrigated fields and wells should be included in RMP along with large buffers which not only take into account lateral distance BUT ALSO elevation, drainages including dry drainages and watershed models which demonstrate where spills, landslides and sedimentation would travel to, both in general and in relation to the water features listed above) and no surface occupancy should be allowed for gas development in watersheds upstream of water sources until new practices, financial bonding or new technology can guarantee no spills, erosion or other adverse effects on water sources.

Comment Number: 000516_HukekH_20161101-1
Organization1:
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
The current clean water we have is necessary for the organic foods I choose to buy locally. While developing a Resource Management Plan, the BLM is required to honor Source Water Protection Plans, as were developed by the Towns of Paonia, Crawford, and Hotchkiss. These Protection Plans were not taken in consideration by the BLM for its Preferred Alternative. Please consider these plans.

Comment Number: 000516_HukekH_20161101-3
Organization1:
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
Drinking and irrigation water sources have been contaminated by naturally occurring gasses and radioactive materials released by geologic disturbance, processing chemicals, leaks, spills, and airborne contaminants. According to the Center for Western Priorities, 2015 Colorado Oil and Gas Toxic Release Tracker, there were 615 spills in Colorado in 2015! Colorado does not have regulations in place to manage radioactive waste from oil and gas operations, and these operations are exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Please take the time to analyze the risks of exposure to these chemicals and radioactive waste.

Comment Number: 000530_PlattA_20161101_EPA-10
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
It is important to characterize both the existing and potential groundwater and drinking water resources in the planning area. We recommend that the Final EIS identify and describe the quality of all groundwater sources that meet both the BLM definition of usable water under Onshore Order No.2,

BLM_0165667

and those considered underground sources of drinking water (USDW) under the Safe Drinking Water Act (SDWA). Useable waters are "those waters containing up to 10,000 ppm of total dissolved solids" which must be reported, protected and/or isolated under BLM Onshore Order No.2; these aquifers are also considered Underground Sources of Drinking Water (USDW) if their total dissolved solids (TDS) concentrations are< 10,000 mg/L. As such, these USDWs are subject to protection under the SDWA unless an aquifer exemption has been granted.

One option to address this recommendation is to provide a set of stratigraphic column diagrams representative of the planning area that includes those formations containing mineral resources and all aquifers and water-bearing intervals. We recommend including additional information regarding water quality (TDS) and whether or not the groundwater may be considered useable or USDW. It would also be informative to describe what (if any) current use exists for those water bearing zones.

We note that Figure 3-8, displaying the major geologic structures, is helpful. We recommend that the Final RMP/EIS map include all known geologic structures (i.e., faults and fractures) to further inform well placement at the project level and to avoid structures that are more likely to act as conduits for deeper fluid flow into shallower aquifers. Please also include the outline of the Piceance Basin Province, not just the structural boundary.

Comment Number: 000530_PlattA_20161101_EPA-12
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Draft RMP/EIS Figure 3-10, Hydrologic Units, does not provide the level of detail necessary to understand the existing water resources of the planning area. The EPA recommends the Final RMP/EIS include maps with the following information:
* Water bodies in the planning area, including perennial, intermittent and ephemeral water bodies;
* Using the most recent EPA-approved CWA Section 303(d) list (which is 2016), water body segments classified by the CDPHE as water quality impaired or threatened under the Clean Water Act (CWA) Section 303(d); water bodies considered not impaired by CDPHE, and water bodies that have not yet been assessed by the CDPHE for impairment status. We also recommend that a table be provided to identify the designated uses of water bodies and the specific pollutants of concern, where applicable.
In addition, Tables 3-9 through 3-11 present data from the 2007-2008 timeframe, including some sampling data from 1998-2007. To ensure an adequate representation of existing conditions, we recommend that this information be updated for the Final EIS with the most recent available data. We recommend comparing existing conditions to existing water quality standards or other reference conditions and presenting associated water quality status and trends.

Comment Number: 000530_PlattA_20161101_EPA-21
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 37.5
Comment Excerpt Text:
The EPA recommends that the Final RMP/EIS address how water quality monitoring in the planning area will occur at the project level prior to, during, and after anticipated development to detect impacts to both surface water and groundwater resources, including private well monitoring. The EPA notes that for groundwater, operators will at a minimum need to conform to the COGCC requirements for pre-development and post-development groundwater monitoring described in Rule 609. As Colorado has no present requirements for surface water pre- and post-development monitoring, the EPA recommends the Final RMP/EIS describe how project-level monitoring will occur to identify any impacts

BLM_0165668

to surface water resources resulting from oil & gas exploration and production. A recent example of a surface and groundwater quality monitoring plan is the "Water Quality Monitoring Plan" developed by the BLM for the Monument Butte Oil and Gas Development Project Final EIS.[4]
[footnote 4] Under "Documents" please see Final EIS, Appendix H: http://go.usa.gov/xgjTJ

Comment Number: 000530_PlattA_20161101_EPA-23
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that the Final RMP/EIS present inventories and maps of existing wetlands and waters of the U.S. within the planning area, including waters that are regulated under Section 404 of the CWA and wetlands and waters that are protected under Executive Order 11990 - Protection of Wetlands (May 24, 1977). Providing information on existing acreage and functional health of these areas will be a valuable addition to the Final RMP/EIS in order to understand baseline conditions.

Comment Number: 000545_SlivkaJ_20161101-133
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Water supply. Colorado agriculture depends on irrigation, along with area residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.
The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and which are exacerbated by development on the highly erodible Mancos soils that comprise much of the region.
Irrigation in the valley relies on an interconnected series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly though the irrigation systems that water the valley. [Footnote 32 "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/ ] In addition, impacts in source areas carry real risk of groundwater harm. Recharge areas for aquifers are both broad and shallow, as noted in a comment from one local domestic water company.
These springs are primarily fed by subsurface collection of precipitation percolating through talus and glacial deposits into a larger sub-surface groundwater storage in the till deposits. These springs are dependent entirely upon precipitation and surface runoff for their supply and recharge of the underground well system (Wright Engineering Study of 1977, extracting data from U.S. Geological Survey's Professional Paper No. 617 entitled "Quaternary Geology of the Grand and Battlement Mesas Area, Colorado") and do so from an area of greater than 1 sq. mi. [Footnote 33 Pitkin Mesa Pipeline Company draft RMP/EIS comments.] Finally, the North Fork and Smith Fork rivers sit in the Gunnison Basin, a major headwaters area for the Colorado River System. The Gunnison Basin is identified as a "water bank" to ensure adequate flows remain in the Colorado River to meet Colorado River Compact requirements. Adequate flows in the Gunnison are also needed to maintain water quality considerations due to selenium and salinity loads, and to avoid irrigators being forced to cut back on water use under the Endangered Species Act. [Footnote 34 "Program Overview," Gunnison Basin Selenium Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html ]

BLM_0165669

Comment Number: 500164_PitkinMesaPipelineCo_20161024-1
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Other Sections: 3
Comment Excerpt Text:
Further, as a party of interest with a valuable resource we request inclusion in the BLM designation of 'Public Water Sources with Zones of Potential Influence-Table 3-14 in the Draft RMP.

Comment Number: 500203_McCainJ_20161025-4
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• The BLM admittedly does not have mapping of the planning area's groundwater hydrology, which makes it difficult for future project EIS's to predict the impact of fluid mineral development on private and commercial water sources.

*Summary*
A. Commenters noted that:

1.  The BLM did not map the area's hydrology or inventoried area water bodies, which makes future planning difficult. Commenters stated that extensive analyses and data collection of the region's hydrology should be conducted before oil and gas leasing is permitted, because the BLM does not currently have enough data or baseline monitoring to make decisions.
2.  The Draft RMP/EIS does not include discussion of induced seismicity.
3.  Additional areas should be included in the NL area due to the upwelling of groundwater along the southern margin of the Grand Mesa.
4.  Baseline water quality is inadequate to determine if bacterial water quality exceedances are present.

B. Commenters also requested that the BLM further review data for specific areas (e.g., the area around Vought Springs, Pitkin Mesa, and Stucker Mesa) prior to making it available to leasing.

*Response*
A. The BLM appreciates the comments.

1–3. The BLM used the best data available at the time of the Draft RMP/EIS. The BLM revisited existing data related to groundwater drinking sources and existing water bodies/wetlands in the decision area and updated the Proposed RMP/Final EIS, as appropriate. The Proposed RMP/Final EIS was also updated to include relevant information for induced seismicity, as appropriate.

4.  Collection of bacterial water quality is done with every effort of getting representative samples. The nature of sampling acknowledges that exceedances could be missed during times other than when samples are collected. Additionally, the State of Colorado measures attainment of the E.coli standard using the geometric mean of representative stream samples. Using the geometric mean normalizes measurements that individually

BLM_0165670

may have exceeded the standard to ensure a single exceedance does not constitute listing on the Colorado 303(d) List of Impaired Waters.

B. The BLM considered and incorporated the groundwater study provided by Delta County in the Proposed RMP/Final EIS, as appropriate. However, site-specific data related to hydrology will be examined in subsequent NEPA analysis prior to permitting and development. Detailed examination of hydrology at the planning area scale is not necessary to determine planning-level decisions.

### Section 37.3 – Water: Impact analysis
Total Number of Submissions: 53
Total Number of Comments: 79
Comment Number: 000530_PlattA_20161101_EPA-12
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
Lastly, please update the reference to the EPA's hydraulic fracturing study (p. 4-83). While the original draft concluded that no "widespread" contamination related to oil and gas exploration was evident, there are scientific studies of groundwater impacts directly related to oil and gas operations in the Piceance Basin, Colorado, and elsewhere. We can provide a list of references if so desired. Please discuss these impacts in the Piceance Basin and what well construction practices will be required to prevent similar groundwater contamination within the planning area.

Comment Number: 000130_WassellP_20160903-11
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
BLM did not analyze the impact of permanently removing water from the hydrologic cycle.

Comment Number: 000142_ShishimM_20160911-2
Organization1:
Commenter1:Margaret Shishim
Commenter Type: Individual
Comment Excerpt Text:
Water quality and quantity– my domestic water source(Pitkin Mesa Pipeline) originates from springs that could be contaminated by fracking chemicals or spills. In the year 2015 there were 615 spills, nearly 2 spills every day in Colorado. Also, the irrigation water used for our many organic farms, ranches and vineyards must be clean water. Polluted irrigation water would put farms and ranches out of business and have a huge negative economic impact. Water is our lifeblood. Fracking uses an enormous amount of water and permanently removes that water from the hydrologic cycle. We can't afford to sacrifice our water supply for the benefit of the oil and gas industry.

Comment Number: 000184_BrettJ_20161017-7
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165671

In addition, the BLM also did not consider the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Comment Number: 000186_ScotJ_MilvenanE_20161024-1
Organization1:
Commenter1:J. Scot Milvenan
Commenter Type: Individual
Comment Excerpt Text:
Water
Living in a place where people are so mindful of their water needs and careful about preserving the quality and quantity of their water makes it particularly tragic to introduce something like hydraulic fracturing that will endanger the water supply. The oil and gas industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. That, combined with inadequate analysis of the impact on our water supply, render the draft RMP and its alternatives untrustworthy as viable options.

Comment Number: 000285_WutchiettC_20161027-5
Organization1:
Commenter1:Cynthia Wutchiett
Commenter Type: Individual
Comment Excerpt Text:
2. [you have not considered] The potential contamination of the entire region's water supply. In addition to having my government regulated, domestic water at risk, you are also risking the contamination of my residential water well.

Comment Number: 000300_HinesT_20161031-1
Organization1:
Commenter1:Todd and Cynthia Hines
Commenter Type: Individual
Comment Excerpt Text:
We are opposed to hydraulic fracturing in the North Fork Valley as recommended by the BLM RMP because it fails to address threats created by fracking to our water sheds. A report prepared for the Delta County Commissioners clearly addresses what should be significant concerns. That report can be found here: http://www.heathhydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf

Comment Number: 000304_CarreD_20161023-1
Organization1:
Commenter1:Danielle Carre
Commenter Type: Individual
Comment Excerpt Text:
The BLM does not adequately address the importance of protecting our water in its preferred alternative. The stock answer that fracking is safe ignores the reality of the number of contaminated water resources that have occurred throughout the US. In Colorado, there were 615 spills, 271 (44%) of which were from produced water in 2015. That equates to nearly two spills every day in Colorado. 15% of the spills resulted in water contamination, with: 44% within 50 feet of ground water, 31% within 1000 feet of surface water, 39% within 1500 feet of a water well, and 9% within 500 feet of cows, pigs, sheep, or other livestock. The protection of our VERY limited water resources is paramount in a document that will impact this area for 30 years. The major river corridors need to be protected from water contamination as well as for their scenic and recreational values. Although I prefer no leasing, I ask that at a minimum the lands within ½ a mile of the North Fork and Gunnison Rivers and the Smith

BLM_0165672

Fork, our major water sources, not be open to leasing. And that surface occupancy within the 100 year flood plain of any stream by prohibited. As stated in action 44 in Alt. B-1. As our clean water is essential for the quality food production of this area, the ditches and irrigation intakes and dams need to have identical protections. Municipal water resources require protections and the Source Water Protection plans of towns that are affected in the RMP must be honored. The plans developed by the towns of Crawford, Hotchkiss, and Paonia were not taken into consideration by the BLM in its preferred alternative. Finally, the BLM does not address the impacts of removing large amounts of water that are needed for fracking on the hydrological cycle. In total, I feel that the preferred plan put forward by the BLM is not one that considers water as a limited and precious resource of our desert lands and is therefore an incomplete aspect of the draft RMP.

Comment Number: 000314_HixL_20161022-1
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
The amount of water used in the fracking process alone, in the face of serious aquifer depletion throughout the US and the long running drought conditions in others, is sufficient testament to our lack of foresight. Water is life, without it all life dies; there are alternative sources for energy, there are none for water. I have seen no address to this vital issue - What are the plans for providing the millions/billions of gallons of water needed to frack this area? Some fracking communities have run out of water completely or soon will. Related articles:
a) https://www.theguardian.com/environment/2014/feb/05/fracking-water-america-drought-oil-gas
b)http://voices.nationalgeographic.com/2014/02/06/fracking-in-water-stressed-zones-increases-risks-to-communities-and-energy-producers/

Comment Number: 000342_WolcottS_20161031-2
Organization1:Roberts-Stucker Ditch Association
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The water conveyed by the the Roberts-Stucker Ditch comes from snowmelt in Roatcap Creek, and from The Overland Reservoir which delivers water to Roatcap Creek. So any contamination of the Roatcap Creek drainage or drainages above the Overland Canal could result in contaminated water being delivered to the 8 family farms and 6 rural residences on Stucker Mesa. This is not acceptable. Records gathered by the Colorado COGCC show that spills from oil & gas development often results in contamination of surface water. This is regular occurance in the oil & gas industry. Contamination of our irrigation & stock water would have a devastating impact on the livelihood, quality of life, and property values of the residents and farms on Stucker Mesa. There are numerous irrigation systems in the North Fork Valley similar to ours that would be similarly threatened by oil & gas development.

Comment Number: 000355_SwackhamerP_20161031-1
Organization1:
Commenter1:Phyllis Swackhamer
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
I do not know how extensive the BLM does its own or investigates other hydrology reports in the UFO area, but this report to the Delta County Board of County Commissioners three years ago on the

BLM_0165673

groundwater systems of the North Fork Valley and Terraces area (http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf) should be alarming to anyone who lives in this area. And it should signal that fracking in this area is not safe for our water.

Some conclusions are:

"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. ....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

I am a resident of the North Fork Valley who is dependent on the clean water we now have access to for drinking and irrigation. Given this hydrological situation, it appears that our water sources can NOT be guaranteed to remain safe if drilling for oil and gas takes place on a large scale in this area. This is a strong argument for adopting a no-lease option by the BLM in areas that could affect the water of the North Fork Valley. I hope you will support this option if you want to support the future of agriculture and the health of this Valley.

Comment Number: 000373_ThompsonG_20161030-5
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Comment Number: 000383_HellecksonB_20161031-1
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Comment Excerpt Text:
Likely Development Scenario
The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource.

BLM_0165674

Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3-176.

Comment Number: 000383_HellecksonB_20161031-4
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Comment Excerpt Text:
Impacts to Water Resources
The agriculture in the North Fork Valley relies on the reliable availability of clean irrigation water. The population of the Valley relies on a combination of clean surface and ground water for domestic use. Further, many of the existing enterprises in the Valley depend upon the image, and actuality, of purity for their business model. Examples include organically and bio-dynamically certified agriculture and those enterprises devoted to healing. Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.
Surface spills
The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies. The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option.

Comment Number: 000383_HellecksonB_20161031-6
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Other Sections: 5.3
Comment Excerpt Text:
The topology of the North Fork introduces another risk not addressed either in the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower

BLM_0165675

elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata.

The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine. The latter requires a million dollar per year treatment plant to be operated indefinitely.

The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term

monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield. It also argues for a "no leasing in the North Fork watershed" alternative.

Comment Number: 000383_HellecksonB_20161031-8
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter1:Brent Helleckson
Commenter Type: Individual
Other Sections: 21.1
Comment Excerpt Text:
Degradation of Watershed
As mentioned previously, agriculture in the North Fork relies exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed. Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways. Sudden Aspen Decline, a drought and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff. The level of development inherent in the DRMP preferred alternative further exacerbates the degradation of the watershed by road construction, well pad development, pipeline construction and dust. In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the residents of the North Fork in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.

Comment Number: 000386_GershtenM_20161031-1
Organization1:
Commenter1:Mitchell Gershten
Commenter Type:
Other Sections: 3
Comment Excerpt Text:
I have recently made aware of this important paper which describes risks to water systems in the North Fork Valley with development of oil and gas wells. The BLM must take these risks into account when devising its final RMP and strategies for O and G leasing and development in this region. The risks of permanent damage to ground water and aquifer systems is too great to permit any leasing in the North

BLM_0165676

Fork Valley and its environs.. I urge your team to review this paper carefully and to note its findings in any final documents on this matter. For this and other reasons already noted, I once again wish to express my support for Alternative B.1. I do not, in any manner, support implementation of Alternative D.

GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO: NORTH FORK VALLEY AND TERRACES AREA

GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models

Full article located at: http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf

Quote from conclusion:

"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. "

Kolm, K. E., and P.K.M. van der Heijde. 2012. Groundwater Systems of Delta County, Colorado: Oak Mesa Area -- GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models (With Addendum). Report prepared for Delta County Board of County Commissioners, Integral Consulting, Louisville, Colorado.


Comment Number: 000387_HudekH_20161101-4
Organization1:The Hive Paonia
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
Please also consider the permanent removal of water required to support the drilling process. Our hydrologic cycle and the water needs down the flow would be greatly damaged if the amount of water required for the potential development of the Preferred Alternative were taken from our environment – an environment which is more often troubled by drought.

Drinking and irrigation water sources have been contaminated by naturally occurring gasses and radioactive materials released by geologic disturbance, processing chemicals, leaks, spills, and airborne contaminants. According to the Center for Western Priorities, 2015 Colorado Oil and Gas Toxic Release Tracker, there were 615 spills in Colorado in 2015! Colorado does not have regulations in place to manage radioactive waste from oil and gas operations, and these operations are exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Please take the time to analyze the risks of exposure to these chemicals and radioactive waste.


Comment Number: 000388_CerianiJ_20161023-8
Organization1:Stucker Mesa Domestic Water Company
Commenter1:Jean Ceriani
Commenter Type: Local Government
Comment Excerpt Text:
If drilling, road building, fracking, heavy traffic, and soil disturbance causes seismic activity or landslides, it could have disastrous impacts on the SMDWC. Sections of our pipeline could be destroyed. The Vought Springs could be destroyed. Our collection system could be destroyed. The destruction might be reparable, at great expense, or not.

BLM_0165677

Comment Number: 000398_GershtenM_20161031-5
Organization1:
Commenter1:Mitchell Gershten
Commenter Type: Individual
Comment Excerpt Text:
the BLM appears to have inadequately addressed the hydrology of the Uncompahgre region in general
and the North Fork Valley in particular. Until this is done, it appears premature to approve any activities
with potentially adverse effects on water resources in our region. As such, we request here that prior
to full implementation of the RMP, that the BLM complete and include a full and detailed description of
and analysis of potential impacts to groundwater across the UFO resource area, and in particular in the
North Fork region in its final Environmental Impact Statement.

Comment Number: 000400_InouyeD_20161028-2
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Other Sections: 3
Comment Excerpt Text:
Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale
formations economically feasible. These technologies are not free from environmental risks, however,
especially those related to regional water quality, such as gas migration, contaminant transport through
induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on
the current understanding of these environmental issues.
Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy
recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke
University, Durham, NC.
The potential for contamination from wastewaters associated with hydraulic fracturing depends on many
factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and
fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite
precautions by industry, contamination may sometimes occur through corroded well casings, spilled
fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of
methane or water upwards from deep underground. During the first month of drilling and production
alone, a single well can produce a million or more gallons of waste water that can contain pollutants in
concentrations far exceeding those considered safe for drinking water and for release into the
environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid,
and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another
potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals
found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the
well to the surface along with the shale gas.

Comment Number: 000400_InouyeD_20161028-8
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
The experience from the 2015 Gold King Mine waste water accident in Colorado shows that there can
be a significant economic and environmental cost from such accidents. Oil and gas development will
threaten both water quality and the volume of in-stream flows that support this economic and
recreational activity. There are already too many spills from oil and gas drilling and production in
Colorado. 615 in 2015 alone (http://www.denverpost.com/2016/03/17/oil-and-gas-companies-in-

BLM_0165078

colorado-reported-615-spills-in-2015/), of which 90 contaminated groundwater. There were 777 spills the previous year. An unavoidable conclusion is that increased oil and gas development in the study area will result in groundwater contamination.

Comment Number: 000401_ShoemakerS_20161028-8
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must address the massive destructive use of water in the fracking process in a region where water supplies are already overdrawn and pervasive long term drought is the most likely reality for the foreseeable future. It must also address potential impacts to city and private water system watersheds, and irrigation systems including their watersheds.

Comment Number: 000402_RatnerJ_20161028-13
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Claims based on the absence of streams from 303d lists or absence of monitoring data are not sufficient to document that water quality is not impaired. Research has shown that when livestock are present, fecal coliform bacteria increase, temperature increases due to removal of shading vegetation and streams become silt-laden, destroying their native aquatic life. Other factors such as eroding stream banks, cattle defecating in streams, etc. are violations of Narrative or Anti-degradation Standards. The altering of stream flows by degraded watershed conditions that allow greater runoff and siltation as well as late season dewatering of streams must all be considered.

Comment Number: 000420_HovdeC_20161101-11
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Delta County has received significant input from constituents regarding fluid mineral resources in the North Fork. Delta County has a long history of collaboration with all sides of this issue. Delta County was one of the first counties in the state to add additional stipulations to the oil and gas industry through its Specific Development Regulation (SDR) process.
o The above mentioned Specific Development Regulations are used in combination with federal and state requirements to address site specific concerns.
o Delta County is submitting the attached Hydrology reports that were researched for the County. There are four distinct reports that cover the entire county. These studies outline pathways of potential impacts to groundwater from development of any kind.

Comment Number: 000427_WalshOeinckP_20161031-6
Organization1:
Commenter1:Patricia WalshOenick
Commenter Type: Individual
Comment Excerpt Text:
The risk of contamination of municipal and irrigation water sources through casing failure, pipeline breaks and truck spills can cause permanent damage. Also permanent will be the water loss from the hydrologic cycle in an area where water is already scarce.

BLM_0165679

Comment Number: 000429_ElaS_20161101-2
Organization1:Ela Family Farms
Commenter1:Steve Ela
Commenter Type: Individual
Comment Excerpt Text:
We are located on Rogers Mesa, an alluvial fan of Leroux Creek. The United States Geological Survey of the groundwater resources of Rogers Mesa noted that most of the groundwater that is currently being accessed for domestic and irrigation purposes comes from the infiltration of surface water into the aquifer. Any degradation or pollution of the water flowing down Leroux Creek would find its way into our agricultural ditch systems and ultimately into the aquifer through this direct link of surface water recharging our aquifer. The same would be true for any contamination finding its way into the Fire Mountain Ditch system which also flows across Rogers Mesa.

Comment Number: 000441_HellecksonB_20161101-4
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Comment Excerpt Text:
Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern. Although there is little or no data specific to Colorado or specific to the Terror Creek drainage, Ingraffea et. al., prominent researchers on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well. Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence." Should such scientific evidence be supported under North Fork conditions, the extremely conservative estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades.
These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane. For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor.

Comment Number: 000453_CarpenterN_20161031_partial DUP of 000412-4
Organization1:
Commenter1:Nicole Carpenter
Commenter Type: Individual
Comment Excerpt Text:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydro-structures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

Comment Number: 000459_HardyR_20161027-7
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not analyze the impact of permanently removing water from the hydrologic cycle.

Comment Number: 000459_HardyR_20161027-8
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Other Sections: 31.1
Comment Excerpt Text:
BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.

Comment Number: 000471_NoeD_20161101-14
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Water supply. The North Fork Gunnison River is already mostly allocated to supporting organic agriculture. The river has a short annual period of snowmelt runoff. During the summer months, when water is shunted into numerous irrigation canals, the stream flows at a trickle. It would appear that the additional water needed to support extensive oil & gas drilling and disposal operations is not available from the North Fork drainage basin.

Comment Number: 000471_NoeD_20161101-8
Organization1:
Commenter1:David Noe
Commenter Type: Individual
Comment Excerpt Text:
Much of the terrain in the RMP planning area is underlain by Mancos Shale. The Mancos is a prolific contributor to salt and salinity levels in the lower Gunnison River drainage basin. From my work with the interagency Salinity Task Force in recent years, I am aware of efforts that have been done to understand how human actions can increase salt and selenium concentrations in streams, and also of the mitigative activities that have been funded for purposes of lowering salt and selenium levels. Oil & gas drilling and associated activities, such as road and drilling pad building, emplacement of drainage pits, and erosion of the emplaced infrastructure, would undoubtedly increase the transport of salt and selenium into the local streams. I am concerned that, with the exception of Alternative B.1 in the North Fork (and Alternative B elsewhere), none of the other alternatives offers a means of keeping salt and selenium concentrations at manageable levels.

BLM_0165681

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-25
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM has recognized, as it must, that fluid mineral leasing, exploration, and development impact water resources. "Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts." DEIS 4-83. Waters can also be affected by activities other than fluid spills, such as sedimentation or mobilization of underground contaminants. "Hydraulic fracturing," in particular, "could disturb surface water and groundwater hydrology and impact water quality." DEIS 4-130. However, BLM failed to take a hard look at these impacts.

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-26
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM cannot provide a "hard look" at the impacts of spills without discussing the contaminants that might be present in spilled fluid. BLM recognizes that fracturing fluid contains numerous "chemical additives," and that hydraulic fracturing presents a risk of spill of these chemicals, or of fracturing fluid or wastewater that contains them. DEIS 4-83; see also id. at 4-61, 4-80,[53] 4-445. But BLM provides no discussion of what these additives might be, the amounts used, or the consequences of a spill of any particular additive, chemical, or other hazardous material.
[53 The DEIS identifies "spills of hazardous materials in water bodies" as an "indicator" of impacts on water resources. DEIS at 4-80 (emphasis added). BLM must recognize that spills are likely to impact water resources even when the spill is not directly into a water body; for example, material spilled on soil can be mobilized by rain and then reach surface or groundwater.]

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-28
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM must take a hard look at the broader efficacy of the BLM's Onshore Orders, the Colorado Oil and Gas Conservation Commission's requirements for well completions, and the "stipulations and site-specific condition of approvals for drilling, completions, and fluids management" that BLM asserts will protect water resources. DEIS at 4-83. As explained by BLM's Handbook on Planning for Fluid Mineral Resources, it is not enough for BLM to identify mitigation measures: BLM must take a hard look at "The residual impacts that would remain following the application of the mitigation measures ... i.e., effectiveness of mitigation measures in ameliorating potential impacts."54 See New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 481 (D.C. Cir. 2012) ("merely pointing to [a] compliance program is in no way sufficient to support a scientific finding" of no "significant environment[al] impact."). BLM has not provided such an analysis. For example, although BLM argues that effects would be minimized by adherence to BLM's onshore orders, DEIS 4-83, in formulating Onshore Order #8, "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands," BLM's NEPA analysis was "not intended to analyze the effects that may result from actual hydraulic fracturing activities," and instead only considered the incremental effects of the "procedures" the rule would require "prior to, during, and subsequent to hydraulically fracturing an oil and gas well," such as performing a cement evaluation log.55
[54 Planning for Fluid Mineral Resources at III-8.]

BLM_0165682

[55 BLM, Environmental Assessment: Proposed Hydraulic Fracturing Rule, at 4,https://www.regulations.gov/contentStreamer?documentId=BLM-2013-0002-0003.]

Comment Number: 000483_HanksG_20161101-19
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix I. Drought Management
Drought is not only a term reserved to the natural input of a water balance, it needs to be evaluated by water uses too. By defining drought conditions using only the Palmer index, it does not take into consideration human use or influence. If these considerations were factored, including traditional, municipal, and proposed development use, an extreme classification as baseline would be likely. As such, according to Appendix I, prohibition of surface disturbing activities, closure of open OHV areas, and additional BMP's for erosion control would be implemented. In this light, rather than being retroactive, Trout Unlimited is asking the UFO to use thoughtful planning when it comes to development scenarios and water resources. TU would like to point out that the strategy of monitoring existing CWCB instream flow rights would prove inadequate to protect valuable fisheries. Few of the instream flow rights have adequate measurement and monitoring that can provide real time information about flows and administrative processes would likely not completed in time to prevent tributaries from running dry or below the established minimum flow necessary to protect the riparian resources.

Comment Number: 000483_HanksG_20161101-8
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 3
Comment Excerpt Text:
4.3.3 Water Resources
Water resources, water quantity specifically, are of concern in the part of the state underlying the UFO. In this region water resources are already taxed, and where those implications are felt locally every day, increased water development would add additional stresses to an over appropriated system.. Increased water demand would advance conflicts between users, interest groups, and fish and wildlife habitat. Currently, existing instream flow rights, which only protect minimum flow necessary to maintain native environment, go unmet on normal years on many streams in the UFO. These rights are typically not monitored in real time and are junior to existing senior irrigation rights some of which place calls on upstream junior users thereby curtailing existing users. Increased water use in this area will increase structural deficits on the Colorado mainstem further jeopardizing existing water users.
A good example of water resource issues that should be considered is the North Fork of the Gunnison watershed. In this area water users often are curtailed to provide water to downstream seniors, tributaries are disconnected from the mainstem, CWCB instream flow rights go unmet, and trout habitat and populations have been diminished as a result of diversions for irrigation and other uses. Trout Unlimited is concerned that further water development would stress water resources and currently healthy portions of the basin and drive continued conflict amongst users.
Currently, groups like Trout Unlimited are working to promote mutually beneficial water partnerships just to keep enough water in its natural banks to support fish. Unlike other water uses, there can be no break in supply for trout and other aquatic wildlife. We would like to work with BLM on this issue so that any impacts to water resources are not a battle but instead a partnership with positive outcomes for all.

Water resources to Trout Unlimited have similar meaning as outlined in section 4.3.3 of the DRMP. Page 4-80 states the impacts on water resources as:
"Every management action that directly or indirectly has the potential to alter aquifer properties and water quality and quantity and the natural hydrograph can have accompanying temporary or permanent impacts on water resources. The discussion of impacts on water resources includes the effects of surface- and subsurface-disturbing actions on water quality, water quantity, and cumulative watershed health."
And implications to water resources as:
* Alteration of the physical characteristics of streams, springs/seeps/fens, wetlands, riparian areas, and groundwater aquifers that affect the properly functioning condition and sustainability of these resources
* Ability to maintain sustainable yield of groundwater resources
* Number of state and federal water quality standard exceedances for surface and groundwater
* Changes in water quality that affect the survival rate of downstream aquatic or riparian species
* Number of spills of hazardous materials in water bodies
* Acre-feet of water depleted
Trout Unlimited certainly agrees with all of these impacts. Yet, the remainder of section 4.3.3 does not explicitly quantify the potential impacts to any of these bullet points in terms of water quantity. Furthermore, the BLM focuses on different alternative's mitigations rather than direct impacts of development. What is lacking are the numbers on streamflows, groundwater use, and strain on water rights for agriculture and municipalities, all caused from potential energy development scenarios. Without this imperative information and analysis, we are hard pressed to support any alternative as believers in responsible energy development on our public lands. Also missing from the evaluation is cumulative impacts to overall watershed health. In fact, the DRMP does not provide information pertinent to expected withdrawals.
Trout Unlimited urges the UFO to seriously consider reevaluating the environmental consequences to water resources before the Final RMP is complete. A revision of this section would be necessary to compile the information necessary to make a responsible decision on any proposed alternative.

Comment Number: 000489_JohnsonA_20161101-14
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.5
Comment Excerpt Text:
5. The RMP does not address concerns to groundwater health, potential seismic activity, and surface water impacts associated with produced water
Not only does too little data exist to make informed decisions, but no action in the RMP addresses the potential environmental impacts of any part of the process that involves produced water. It is highly concerning that the preferred alternative opens 865,970 acres to oil and gas development but does not address the impacts and corresponding best management practices associated with management of produced water.
The local impacts of withdrawing significant quantities of water for hydraulic fracturing on stream and riparian health, local industry other than oil and gas development, and community health have also not been addressed by the draft RMP. A conservative estimate of water needed for hydraulic fracturing is 500,000 gallons per well.[32] While this totals into a relatively small percentage compared to total water use compared to agricultural and municipal water use statewide and nationally, the amount of water required locally can be comparatively significant within the immediate water system's supply and use. This dynamic can have serious repercussions on local river health, especially when the North Fork of the Gunnison River already experience flows of under 20 cubic feet per second (cfs) during summer

BLM_0165684

months. For example, in the Marcellus Shale of Pennsylvania, the early shale gas boom led to water withdrawal problems that had to be rectified by the state due to withdrawing too much water.[33] [Footnote 32] Jackson, Robert B., Avner Vengosh, J. William Carey, Richard J. Davies, Thomas H. Darrah, Francis O'sullivan, and Gabrielle Pétron. "The Environmental Costs and Benefits of Fracking." Annual Review of Environment and Resources Annu. Rev. Environ. Resour. 39.1 (2014): 327-62. Web. 19 Oct. 2016.
[Footnote 33] (Jackson et al 335).
The final RMP must include adequate best management practices to mitigate impacts of storing, transporting, or disposing produced water.
On-site storage of produced water (and flowback water) typically occurs in surface pits or sealed tanks prior to reuse and/or disposal.[34] While current evidence "suggests that wastewater is more effectively treated onsite because effluents discharged to publicly owned treatment plants may not be able to be sufficiently treated by such treatment plants for this waste stream," the proposed RMP lacks any actions to address protocol for this potentially toxic fluid.[35]
[Footnote 34] (8313, Adgate et al).
[Footnote 35] (8313, Adgate et al).
Should 100 percent of the produced water and condensate from oil and gas development be transported by truck, the transport will exhibit significant risks to the environmental and population. On-site release incidents from leaks, faulty equipment, and inadvertent human error can have significant and permanent impacts.
The transport of produced water and condensates will also produce negative impacts such as: increased local traffic along small, rural highways; increased emissions from heavy truck travel (thus contributing to greenhouse gases that exacerbate climate change); poor air quality due to increased particulate in the air due to dirt-road travel; and the negative impacts to the North Fork Valley and Western Slope way of life.
These persistent impacts would have little consequence compared to the high-impact potential of an accident of a vehicle that is transporting produced water and condensate. Any release that might occur along local highways and roads would contaminate local rivers and streams, negatively impacting water quality in a water system that is part of the Colorado River's headwaters. Additionally, we are concerned that the transport of produced water from the Uncompahgre region to be injected at another site would induce undue negative impacts on other communities and environments.
Should less than 100 percent of the produced water and condensate from oil and gas development not be transported by truck, the remaining produced water and condensate would likely be injected into earth or recycled.
The final RMP must address best management practices for these activities, and include management actions that mitigate possible impacts on other resources as detailed in these comments.

Comment Number: 000489_JohnsonA_20161101-15
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. Water Quality Impacts to Domestic and Agricultural Water Use
Residents within the North Fork Valley and Uncompahgre planning area are fully dependent on the quality of their domestic and agricultural water supply for their health, happiness, and livelihoods. The Preferred Alternative in the draft RMP does not provide adequate protections for these essential water resources
a. RMP does not adequately describe protections for groundwater
Domestic groundwater sources vary greatly throughout the planning area. The protections outlined in the agency's preferred alternative are not sufficient for protecting groundwater aquifers. Objective 54 in

BLM_0165685

Table 2-2, states "Protect groundwater resources and recharge areas to maintain functioning condition of all parameters within the hydrologic cycle, including groundwater quantity and quality." However, the agency's actions do not meet this proposed objective.

Action 55 allows an unlimited surface occupancy distance (no prohibition or setbacks) and only vaguely describes the required mechanisms for sealing the interface of casing and substrate. The interconnected nature of groundwater aquifers (some of them quite shallow), and the potential loss of drilling fluid into aquifers during exploration poses too high a risk for permanent contamination. It is recommended that the BLM adopt the protections outlined in Alternative B and B1 to meet the objective outlined in line 54.

Fluid mineral exploration and development often produces significant amounts of saltwater/ produced water containing oil, sand, polymers, chemicals, and dissolved solids. As this water is no longer usable, it is recycled or disposed of in underground reservoirs, which produces significant surface disturbance in addition to the surface disturbance of the oil and gas producing wells. If these disposal wells are permitted by the BLM, they should be subject to at least the same surface restrictions as oil/gas wells. The draft RMP does not address regulatory specifics associated with fluid mineral exploration and development.

Comment Number: 000489_JohnsonA_20161101-29
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
f. Ecological Impacts from motorized use
The WSCC is concerned about the impacts from motorized use particularly near sensitive areas such as intermittent streams, wetlands, fens, seeps, springs, water bodies, and other ACEC's.
The draft RMP describes (in acres) the amount of area impacted by motorized use according to each alternative (Volume II, Tables 4-21, 4-22, 4-23). In all tables, the agency preferred alternative D opens more land to motorized use than any of the other alternatives, barring Alternative C. Table 4-22 shows the amount of lands closed to motorized use for slopes greater than 30%. The preferred alternative closes only 40 acres of this highly erodible topography (compared with the alternative B, 2,440acres). Alternative C, in this case, opens all lands over 30% slope for motorized use. The agency's preferred alternative D and alternative C are unacceptable options for sensitive areas and will lead to harmful ecological impacts for streams and waterbodies throughout the UFO.

Comment Number: 000489_JohnsonA_20161101-33
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. Road construction and management
Please address the management of the construction of permanent and semi-permanent roads as related to Forestry and Woodland Products. It is noted that in Table 2-2, Action 270, that there doesn't seem to be any action under Forestry and Woodland Products that addresses the construction of permanent or semi- permanent roads, and the corresponding impacts to surface water and stream bodies. (DEIS 2.4.91 and 2.4.97)

Comment Number: 000489_JohnsonA_20161101-6
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165686

Comment Excerpt Text:
The draft RMP (DEIS 4.3.3) provides only a general outline for impacts to water resources within the planning area. There is no discussion of impacts or mitigations to water resources due to specific management actions in particular locations. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts.

Comment Number: 000496_WiltanenW_20161031-2
Organization1:
Commenter1:Wayne Wiltanen
Commenter Type: Individual
Comment Excerpt Text:
Water. For farmers, ranchers, orchardists and viticulturists clean water is the life-blood of their work. Contamination of surface water by oil/gas operations compromises the value of their products. Of equal concern is the contamination of domestic water supplies, which in the North Fork rely heavily on sub-surface sources (e.g., springs and wells). The social and economic effects of bad domestic water should be obvious. An additional factor not generally addressed is that the Bureau of Reclamation has recently invested millions in projects to put irrigation canal systems into a pipes. This is part of a project to reduce downstream pollution, primarily by selenium. I cannot imagine that the Bureau of Reclamation would be pleased if their investment is compromised because in place of selenium pollution, surface water pollution is being passed downstream. A simple solution is to not lease in a surface water catchment area that has an existing water collection system for irrigation water. Similarly for domestic drinking water catchment areas. The BLM is not required by law to lease land, it is permitted to do so and may so decide to withhold lease blocks at its discretion.

Comment Number: 000508_DrakeM_20161101-12
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
[The Final Resource Management Plan must:]
- Include the detailed evaluation of the reduction in Colorado water supply in future years based on the fact that the water used in O&G development is removed from the earth's water cycle.

Comment Number: 000508_DrakeM_20161101-3
Organization1:
Commenter1:Michael Drake
Commenter Type: Individual
Comment Excerpt Text:
The RMP does not consider the O&G water use impact on the Colorado Water Conservation Board's (CWCB) studies indicating that the Colorado will have a water deficit as early as 2030. The O&G development uses about 0.5% of the total water usage in Colorado in a year. That means that every decade the total amount of water available in Colorado drops by 5% because the water used by O&G development is removed from the earth's water cycle. The earth isn't generating any new water, just reusing what has been here for millennials. CWCB's website is
http://cwcb.state.co.us/watermanagement/ Pages/WaterManagementHome.aspx

Comment Number: 000516_HukekH_20161101-2
Organization1:
Commenter1:Heidi Hudek
Commenter Type: Individual

BLM_0165687

Comment Excerpt Text:
Please also consider the permanent removal of water required to support the drilling process. Our hydrologic cycle and the water needs down the flow would be greatly damaged if the amount of water needed for the potential development of the Preferred Alternative were taken from our environment - an environment which is more often troubled by drought.

Comment Number: 000530_PlattA_20161101_EPA-13
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that the Final RMP/EIS address potential impacts to impaired water bodies within and/or downstream of the planning area based on the most recent EPA-approved CWA Section 303(d) list (which is 2016). The BLM should coordinate with CDPHE if there are identified potential impacts to impaired water bodies (in order to avoid causing or contributing to the exceedance of water quality standards). Where a Total Maximum Daily Load (TMDL) exists for impaired waters in the area of potential impacts, we recommend that pollutant loads from activities on BLM lands comply with the TMDL allocations for point and nonpoint sources. Where new loads or changes in the relationships between point and nonpoint source loads are created, we recommend that the BLM work with CDPHE to revise TMDL documents and develop new allocation scenarios that ensure attainment of water quality standards. Where TMDL analyses for impaired water bodies within, or downstream of, the planning area still need to be developed, we recommend that proposed activities in the drainages of CWA impaired or threatened water bodies be either carefully limited to prevent any worsening of the impairment or avoided where such impacts cannot be prevented.

Comment Number: 000530_PlattA_20161101_EPA-14
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
To fully disclose and, if necessary, mitigate the potential impacts of soil disturbance, we recommend that the Final RMP/EIS include an estimate of erosion rates and resulting impacts to water quality for each alternative. For example, the Wyoming BLM's Bighorn Basin Draft RMP/EIS estimated erosion rates based on projected amount of surface disturbance, types of surface disturbance and general characteristics of the basin (erodible soils, slopes, etc.). Erosion rates were calculated using the Water Erosion Prediction Project model (WEPP), a web-based interface developed by the U.S. Department of Agriculture, Agricultural Research Service, which can be accessed at http://www.ars.usda.gov/Research/_docs.htm?docid=18084&pf=l. We recommend that the BLM consider using this model or another appropriate model that would be applicable to this planning area.

Comment Number: 000530_PlattA_20161101_EPA-20
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that the Final RMP/EIS include a general discussion of the following:
* A range of water demand per well developed in the planning area (based on predicted well depths, formation characteristics, and well designs, as well as hydraulic fracturing operations, if used);
* Possible sources of water needed for oil and gas development; and

BLM_0165688

* Potential impacts of the water withdrawals (e.g., drawdown of aquifer water levels, reductions in stream flow, impacts on aquatic life, wetlands, and other aquatic resources).

In addition, the EPA recommends the Final RMP/EIS include a general discussion of how flow back and produced water will be managed including:

* Estimated volume of produced water per well;
* Options and potential locations for managing the produced water (i.e., .UIC wells, evaporation ponds, and surface discharges);
* Possible target injection formations, formation characteristics and depth of any UIC wells; and
* Potential impacts of produced water management.

The EPA also recommends the BLM encourage operators to consider recycling produced water for use in well drilling and stimulation, thereby decreasing the need for water withdrawals and for produced water management/disposal facilities and minimizing the associated impacts.

Comment Number: 000536_SchottJ_20161031-5
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Other Sections: 30.3
Comment Excerpt Text:
Agricultural concerns: Our farm is certified organic and biodynamic. Contamination of our water supply would not only be unhealthy to our products and animals it would ruin the economic value of our certifications. Our irrigation water comes from Turner Ditch with is fed from Minnesota Creek and Beaver Reservoir. This resource would be endangered by the known risks from the failure of pipelines, and the accidental release of pollutants into the streams, ditches, and watersheds from drilling operations. The RMP does not take into consideration these risks in its analysis. The RMP does not take into consideration the impact of flooding of oil and gas fields and pipelines which could cause contamination of irrigation water. There should be no oil or gas leasing near any of the major river and stream corridors of the North Fork of the Gunnison, the Gunnison and Smith Fork Rivers.

Comment Number: 000536_SchottJ_20161031-6
Organization1:
Commenter1:James Schott
Commenter Type: Individual
Comment Excerpt Text:
Domestic water supply: The "preferred plan" removed only 1% of the total area proposed for leasing in the old RMP that was 30 years old. The current plan does not take into consideration the danger that the known risks from oil and gas operation produce in the form of contaminated streams, underground water sources including wells and springs. Our water originates from several springs on the lower slopes of Lamborn Mountain and Lands End. German Creek and Bell Creek are both put at risk. The RMP does nothing to protect those resources from known and proven risks from accidental spills and flooding.

Comment Number: 000545_SlivkaJ_20161101-153
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Water Resources
The Draft RMP, and particularly the agency's preferred alternative, fail to put necessary measures in place to protect the valuable water resources of the North Fork Valley and Lower Gunnison Watershed.

BLM_0165689

As documented in the comments submitted by the West Slope Conservation Center, the Draft RMP and preferred alternative fail to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts. The final RMP must also adopt robust management decisions to protect this vital resource.

We herein reference and support West Slope Conservation Center's comments to BLM on the Uncompahgre Draft RMP regarding water resources.

Comment Number: 000551_JursinovicM_20161031-1
Organization1:
Commenter1:Mary Jursinovic
Commenter Type: Individual
Comment Excerpt Text:
Three years ago today a report (prepared for the Delta County Board of County Commissioners) was issued on the groundwater systems of the North Fork Valley and Terraces area. Some conclusions from it that should be cause for alarm by anyone who uses drinking or irrigation water in the Valley are: "The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29).

The full report is available at www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf

Comment Number: 000560_KelloggV_20161016-3
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
I am concerned about the lack of regulation over the oil and gas industry. This industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. The North Fork Valley water sources include hundreds of domestic wells and over 25 drinking water

springs. The North Fork Valley watershed cannot afford the risk of contamination. In addition, BLM did not consider the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Comment Number: 000563_King_WELC_HasAttach-115
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Historically, BLM has been dismissive of possible impacts to water quality from hydraulic fracturing. However, given the weight of both new and old evidence documenting the risk of water contamination from gas drilling across the country and within the planning area, BLM's approach is becoming increasingly untenable. Indeed, even an industry report prepared for Gunnison Energy Corporation – a major oil and gas developer with leases just south of the UFO – has acknowledged the potential for significant impacts to water resources from fracking. [See Gunnison Energy Corporation, Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources of the South Flank of the Grand Mesa, Delta County, Colorado (March 2003) at 42, 56 (attached as Exhibit 181).]
The simple fact of the matter is that natural gas development has the potential for poisoning our water with toxic, hazardous, and carcinogenic chemicals as well as naturally occurring radioactive radium, and BLM has failed to provide a thorough hard look analysis of these potentially significant impacts in its analysis for UFO RMP.

Comment Number: 000563_King_WELC_HasAttach-116
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The UFO failed to sufficiently consider issues of water supply related to fracking.

Comment Number: 000563_King_WELC_HasAttach-117
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
Here, in its NEPA analysis BLM must closely assess the direct, indirect, and cumulative impacts of lease development on water supplies. 40 C.F.R. §§ 1508.7, 1508.8. This analysis must consider the potential sources of water in the UFO that would be used for oil and gas development, and the impacts of these water withdrawals on water availability for drinking, agriculture, and wildlife. The analysis must further address the impacts to water quantity at different annual, seasonal, monthly, and daily time scales because the impacts of such water withdrawals could be more acute during times, months, and seasons of scarcity. For example, increased withdrawal and irretrievable contamination of waters will be particularly harmful during times – like the present – when much of the state is experiencing drought conditions. [See id. at 8.]
Based on the estimated 1,271 wells to be drilled over the life of the RMP, this will result in 2.5-10.1 billion gallons of water that will be removed from the hydrologic system. Nowhere does BLM disclose or analyze the impact of this withdrawal on the planning area or resource values.

BLM_0165691

Comment Number: 000563_King_WELC_HasAttach-118
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The UFO failed to sufficiently consider impacts to surface water related to fracking.

Comment Number: 000563_King_WELC_HasAttach-119
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:
The BLM briefly considers the potential for hydraulic fracturing fluid spills, recognizing that "[h]ydraulic fracturing could disturb surface water and groundwater hydrology and impact water quality." EIS at 4-130. Although Appendix G does contain some best management practices directed at reducing the potential for contaminating water resources with hydraulic fracturing spills, EIS at G-9 to G-10, the UFO has failed to address several fundamental questions that are central to fulfilling the agency's hard look mandate. It is undisputed that millions of gallons of water are needed to frack a single well. This raises several issues which the UFO has failed to fully address in the RMP/EIS. See State of New Mexico v. BLM, 656 F.3d 963, 714-15 (10th Cir. 2009) (providing that the EIS failed to take hard look at water quality impacts from proposed oil and gas lease sale where wells would generated significant amounts of waste water). For example:
• What source waters will be used for well development, and what are the direct, indirect, and cumulative impacts of extracting high volumes of these waters from surface or groundwater sources in this area?
• How would the produced water be disposed of? If produced water is returned to the surface as toxic waste for evaporation, where will such wastewater ponds be located?
And, if produced water is re-injected in wastewater wells, where will such wells be located?
• What kind of treatment, if any, will be required of the producer for treating fracking wastewater?
• What is the potential footprint and location of the necessary treatment facilities, and what is the direct, indirect, and cumulative impact of such facilities?
• What mitigation measures and best management practices will BLM require, or at least recommend, to ensure that wastewater does not contaminate surface or groundwater resources, or impact threatened and endangered populations and designated critical habitat in the planning area?
The EIS does not adequately address or analyze the risks of water quality contamination from surface storage of fracking fluid and other oil and gas wastes, including produced and flowback water from wells. Surface pits, in particular, are a major source of water pollution. For instance, New Mexico data, as summarized by the Oil and Gas Accountability Project, shows 743 instances of groundwater contamination, almost all of it occurring over the last three decades. Over half of these incidents, totaling 398 instances of contamination, are linked to faulty pits. [Earthworks, Oil and Gas Accountability Project, Closed-Loop Drilling Systems: A Cost-Effective Alternative to Pits, at 5 (attached as Exhibit 195).]
Comment Number: 000563_King_WELC_HasAttach-120
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 41.2
Comment Excerpt Text:

Likewise, the BLM does not quantify, nor fully address, the risk of potentially catastrophic spills and blowouts at well sites. This is a serious error because such major spills are not uncommon in natural gas drilling. For instance, a major well blowout in Pennsylvania recently sent thousands of gallons of contaminated fluid coursing into a stream feeding the Susquehanna River. [Associated Press, Crews Stop Flow of Drilling Fluid from PA Well (Apr. 22, 2011) (attached as Exhibit 198).]

In February of 2013, a major spill occurred in Windsor, Colorado where at least 84,000 gallons of water contaminated with oil and chemicals used in hydraulic fracturing spilled from a broken wellhead and into a field. [Bruce Finely, Water fouled with fracking chemicals spews near Windsor, THE DENVER POST (Feb. 14, 2013), available at: http://www.denverpost.com/ci_22586154/water-fouled-frackingchemicals-spews-near-windsor#ixzz2zpeQUnhK (attached as Exhibit 199).] The BLM has failed to demonstrate that such incidents could not occur on the leases that will be approved under this RMP. In 2015, there were 615 spills related to oil and gas activities in Colorado, with 90 spills resulting in water contamination. 268 spills occurred fewer than 50 feet from groundwater. [Center for Western Priorities, Colorado Toxic Release Tracker 2015 Summary, available at: http://westernpriorities.org/colorado-toxic-release-tracker/]

Comment Number: 000563_King_WELC_HasAttach-195
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.1 15.4
Comment Excerpt Text:
While the Uncompahgre Field Office has not published a Biological Assessment (BA) as a part of the DEIS process yet, any potential reliance in the UFO BA on the 2008 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 311), is improper. The PBO does not take into account the enormous water depletion effects of horizontal drilling. The PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to meet recommended stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

Comment Number: 000563_King_WELC_HasAttach-196
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.1 15.4 15.2
Comment Excerpt Text:
While the 2008 PBO is designed to address any depletions resulting from oil and gas development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in

BLM_0165693

horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices. [BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").]

Comment Number: 000604_WienerJ_20161031-2
Organization1:Western Colorado Congress
Commenter1:John Wiener
Commenter Type: Individual
Comment Excerpt Text:
a great deal of riparian zone vegetation is reliant on return-flows from irrigation, which in many places re-times flows and makes the wildlife much better off; no matter what a purist might like, we started changing the hydrology when we took out the beaver and then predators... now we Must manage.

Comment Number: 000634_ClagettR_20161101-1
Organization1:
Commenter1:Rita Clagett
Commenter Type: Individual
Comment Excerpt Text:
It is appalling to me that the Delta County Board of County Commissioners would support fracking in the North Fork Valley in light of this hydrology report they received three years ago, clearly delineating the potential danger to the very life blood of the valley's citizens and economy. Water is Life. Excerpts from the report make it clear that fracking in this area is entirely inappropriate. let the BLM do the right thing and proclaim that this valley is simply not the right place to cater to corporate profit motive and lease our public lands for industrial development, no matter how slim the chance of success in drilling. We know that you know, and the BOCC knows, this danger is real and present:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. ....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

Comment Number: 000638_PopeS_20161031-1
Organization1:
Commenter1:Sarah Pope

BLM_0165694

Commenter Type: Individual
Comment Excerpt Text:
As an organic farmer and citizen of the North Fork Valley the purity and quality of our water and public lands is of the utmost importance. Marketing our products rely on the quality of soil and water that we depend upon. Allowing our public minerals to be harvested in a manner that is so polluting and wasteful is irresponsible and unacceptable when farmers and ranchers are paying expensive dues for water rights. I urge the BLM to look at more water-conscious means of extracting precious minerals from public lands.

Comment Number: 500003_TwittyE_20161014-2
Organization1:
Commenter1:Eric Twitty
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
No one wants an accident, but they certainly happen. Wellhead and pipeline spills and pollution could ruin the creek, our property, and property values.

Comment Number: 500015_HineyD_20161027-1
Organization1:
Commenter1:David Hiney
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:
I supervised stimulation jobs and commonly injected 10,000 gallons each of hydrofluoric and hydrochloric acid, 5,000 gallons of diesel fuel, hundreds of gallons each of biocide, scale inhibitor, demulsifier, surfactant, and others. Horizontal wells now use much larger amounts.
The risk of chemicals being forced from a stim or frack job into ground water may be low, but is certainly not impossible and cannot be known until it occurs. In fact hydraulic fracturing is the process of pumping chemicals under high pressure to crack the formation forcing them into other areas. A common problem in drilling is loss of circulation in which the drilling fluid required for the process migrates to other areas, under relatively low pressure, while trying to prevent it.
Migration of the above chemicals into a ground water zone would be catastrophic since the entire population of the North Fork Valley depends on pristine ground water with no other supply. Potential ground water contamination is reason enough that these areas should be permanently removed from consideration of leasing for oil or gas exploration.

Comment Number: 5000162_OvertonL_20161018-1
Organization1:
Commenter1:Lee Overton
Commenter Type: Individual
Comment Excerpt Text:
And, further, what will be the impacts on the integrity of the water for wildlife, soils, streams and municipalities dependent on that water? Clean water is the lifeblood of the North Fork Valley. With the BLM proposing to lease practically every acre of the Valley to oil and gas, our drinking water and irrigation water are threatened. The BLM has not considered the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support tracking and other drilling operations, particularly in periods of draught. The oil and gas industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources.

BLM_0165695

Comment Number: 500044_StrongfellowP_20161025-1
Organization1:
Commenter1:Perry Strongfellow
Commenter Type: Individual
Comment Excerpt Text:
In 2014 over 700 spills were reported at oil and gas operations in Colorado alone. Not only is there an increased risk of water contamination, but also a higher risk of toxic wastes being released due to seismic activity, flooding or other phenomena. Such incidents have been documented throughout the US for many years, and I do not want the wildlife, our lifestyles and or livelihoods to be endangered by increased fracking in our area.

Comment Number: 500164_PitkinMesaPipelineCo_20161024-2
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Despite the tremendous importance of this resource to our members, our Board, and the entire North Fork community, we note that the BLM has not included adequate analysis of groundwater resources in the planning area, or in the North Fork Valley specifically. Given the shallow nature of our resources, this lack of analysis is troubling and potentially problematic from source water protection standpoint. As such, we request here that prior to full implementation of the RMP, that the BLM complete and include a full and detailed description of and analysis of potential impacts to groundwater across the UFO resource area, and in particular in the North Fork region in its final Environmental Impact Statement.

Comment Number: 500164_PitkinMesaPipelineCo_20161024-5
Organization1:Pitkin Mesa Pipeline Company
Commenter1:
Commenter Type: Private Industry
Other Sections: 37.1
Comment Excerpt Text:
2) The Board requests that in its final Environmental Impact Statement, the BLM include a full, detailed description and analysis of potential impacts to groundwater across the UFO resource area with particular attention given to the North Fork Valley and its environs.
3) The Board requests inclusion in the BLMs designation of 'Public Water Sources with Zones of Potential Influence.'

Comment Number: 500187_KampeA_20161018-1
Organization1:
Commenter1:Anastacia Kampe
Commenter Type: Individual
Comment Excerpt Text:
First, for our family, our domestic water source is Love Gulch. Love Gulch is directly adjacent to and drains BLM land that would be made available for oil and gas development. The roll of the dice that drilling and hydraulic fracturing can be poses a serious threat to our most vital resource: clean drinking water. Second, our irrigation water comes from Paonia Reservoir and Fire Mountain Canal. There is already a lot of drilling taking place in the Muddy Creek drainages above Paonia Reservoir. Increased drilling above the entire length of the Fire Mountain Canal poses a huge threat to our valuable irrigation water resource. We grow hay, maintain a fruit orchard, grow cut flowers for commercial sale as well as our own vegetable garden with the irrigation water from Fire Mountain ... and we are just a few of the hundreds of people and crops reliant on this canal.

BLM_0165696

Comment Number: 500192_SchulzJ_20161027-4
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
The RMP must address the massive destructive use of water in the fracking process in a region where water supplies are already overdrawn and pervasive long term drought is the most likely reality for the foreseeable future. It must also address potential impacts to city and private water system watersheds, and irrigation systems including their watersheds.

Comment Number: 500203_McCainJ_20161025-3
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• The draft RMP makes no mention of wastewater disposal for fluid mineral development. Drilling uses a lot of water in the process of extracting natural gas. What is acceptable in terms of wastewater disposal on our public lands? The only time wastewater is mentioned is in the ACEC's portion of the Environmental Impacts section: "Energy and minerals development could impact ACEC values by .... contaminating surface water from wastewater spills and runoff containing drilling fluids." (4-346) These same negative impacts would occur anywhere fluid mineral development is allowed to take place, why is it not mentioned anywhere else?

Comment Number: FormLetterBB-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
There are so many concerns which have not been addressed in the Draft RMP. In communities where hydraulic fracturing is occurring, toxic compounds have found their way into water while some have leaked at drilling sites or while transporting fluids and water. Their damage to various human organs has been documented.
A couple of more concerns which need to be addressed and analyzed follow:
1. The use of waste ponds for the storage of flow back fluids, drilling muds, and other chemicals and water used in the hydraulic fracturing process and the impact of the VOCs and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
2. Glycol dehydration to separate wet oil or water out of the natural gas stream and the impact of VOCs, particulate matter, methane and hydrogen sulfide on the respiratory, nervous, digestive, immune, reproductive, and cardiovascular systems
Farmers, ranchers and residents in the North Fork Valley do not have extra water for hydraulic fracturing.
And after the proposed drilling, the remaining water would be filled with toxins and is not anything we would feel safe drinking, giving to our livestock or using on plants or fruit trees. Fracking will drive away our growing agro-tourism business and our quality conscious customers will not want to purchase food grown in unhealthy soils, poor quality air and poisoned water.

Comment Number: FormLetterGGG-1
Organization1:
Commenter1:
Commenter Type:

BLM_0165697

Comment Excerpt Text:
leaks or spills of toxic chemicals as well as spills of water, fluids and sands when transported from the drilling sites.

Comment Number: FormLetterIII-1
Organization1:
Commenter1:
Commenter Type:
Other Sections: 41.2
Comment Excerpt Text:
The BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought. These concerns were not addressed in the Draft RMP
- Risk of contamination to irrigation water and crops from:
- Fracking chemical contamination of ground and surface waters
- Damage to irrigation canal access and bridges o Airborne volatile organic compounds
- Airborne silicates
- Silting in of rivers and irrigation ditches
- Increases in diesel exhaust from transportation, well and compressor sites 5 Risk of loss to irrigation shares for multiple irrigation ditches in the North Fork.
- Drinking Water 5 Risk to drinking water supplies for North Fork communities, potentially affecting 30,000 + people

Comment Number: 000565_TothK_20161102_DCD-19
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Comment Excerpt Text:
The BLM should take a more active interest in the dewatering of coal seam wells for natural gas exploitation on the federal estate. They should ensure that studies (during the dewatering process) are undertaken to verify that ground and surface water is not expropriated by fresh water coal seam dewatering operations.

Comment Number: 000483_HanksG_20161101-7
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 31.3 14.3
Comment Excerpt Text:
4.3.2 Soils and Geology
Trout Unlimited originally requested that underlying soils be identified across the UFO DRMP footprint, specifically in CRCT watersheds. Native fish are especially susceptible to the ill-effects of sedimentation to their habitat. Though we recognize the included mapping efforts with soil classifications, nowhere was referenced the local soils and potential consequences to CRCT or any other coldwater fisheries. The DRMP failed to provide a review of the numerous impacts to critical and sensitive fish and wildlife habitat from act of massive soil movement and changes from oil and gas development and we request that such information be provided in the Final RMP.
The DRMP fails to adequately analyze the impacts of soil sedimentation and revegetation as it impacts fish and wildlife habitat. Exploration and extraction of oil and gas resources does create alterations to the subsurface and surface environment. Analysis of the gravel and soil regime and its behavior during

BLM_0165698

spring thaw events, flooding events, impacts to wetlands, and streams was inadequate in the DEIS. TU feels that the DRMP presents inadequate discussion of the long term and short term impacts from exploration and drilling activities that can be damaging to the soils and geology and the aquatic ecology of the surrounding areas.

*Summary*
A. Commenters stated that the BLM did not sufficiently consider and analyze all impacts on water resources, including the following:

1.  quantifiable and site-specific analysis
2.  residual impacts that would remain after application of mitigation measures
3.  impacts on water quality from hydraulic fracturing, including the incorporation of new studies
4.  the potential for permanent removal of water from the hydrologic cycle due to drilling and fresh water coal seam dewatering operations, and the related removal of irrigation water
5.  analysis of well-bore failures and potential for spills and blowouts
6.  information on groundwater flow and lack of groundwater protections and the potential for alteration to the natural groundwater hydrologic system by the construction and operation of proposed oil and gas wells
7.  analysis of flow-back or produced water and wastewater impacts
8.  impacts on domestic drinking water supplies, including existing underground water pipelines
9.  analysis regarding salt and selenium loads
10. human influence of drought conditions
11. impacts from road construction associated with development
12. impacts from soil erosion from ground-disturbing activities (include an estimation of erosion rate by alternative)
13. rivers and streams on the Colorado 303(d) List of Impaired Waters

B. Commenters suggested reference material be reviewed and incorporated in the Proposed RMP/Final EIS and stated that a lack of data about stream water quality is insufficient to draw the conclusion that water quality is not impaired. A commenter requested that the BLM take a harder look at the level of protection provided by the BLM's Onshore Orders, the Colorado Oil and Gas Conservation Commission's requirements for well completions, and the stipulations and site-specific conditions of approval for drilling, completions, and fluids management.

C. One commenter recommended that the BLM update the reference to EPA's hydraulic fracturing study on Draft RMP/EIS page 4-83 as related to hydraulic fracturing impacts, and noted that the EPA generally recommends a minimum half-mile NSO or CSU concentric buffer for groundwater and groundwater under direct influence of surface water.

*Response*
A. The BLM appreciates the comments.

1-2. The RMP analysis is intended to provide sufficient detail to inform the decision maker of the reasonable effects anticipated from planning for future development; the site-specific

BLM_0165699

review of individual well pads, roads, pipelines, or other surface activities will be addressed at the permitting stage, which will also include on-site visits and a discussion and analysis of the specific conditions of approval and BMPs needed to address potential impacts. Similarly, residual impacts after mitigation would be determined in site-specific NEPA analysis.

3-7. Draft RMP/EIS Chapter 4 analyzes the effects of hydraulic fracturing on water resources (see pages 4-83 and 4-87). As stated in Draft RMP/EIS Section 2.4.3, Prohibit Fluid Mineral Leasing throughout Decision Area, on page 2-16, "resource values that can only be protected by prohibiting all fluid mineral leasing throughout the decision area have not been identified. An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP (detailed in Section 1.1), part of which is management direction in accordance with principles of multiple use and sustained yield. Leasing of BLM-administered lands for fluid mineral exploration and production is authorized and directed by the FLPMA, BLM Land Use Planning Handbook (H-1790-1), Mineral Leasing Act of 1920 (as amended), and Energy Policy Act of 2005 (Public Law 109-58).

Groundwater is managed by the State through Water Quality Control Commission regulations 41, 42, and 43. Groundwater information was added based on the RFD and the new programmatic biological opinion. Draft RMP/EIS Chapter 3, Affected Environment, outlines sensitive areas for groundwater that are limited and primarily unconfined in the decision area.

Allowable uses and stipulations outlined in Draft RMP/EIS Chapter 2, Alternatives, were developed to protect surface and groundwater quality and quantity; the BMPs and standard operating procedures in Draft RMP/EIS Appendix G also outline protective measures.

It is noted that oil and gas development could impact ground water quality. Draft RMP/EIS Section 4.3.3, Water Resources, page 4-84, states that, if contamination of aquifers from oil and gas development occurs, changes in groundwater quality could impact downstream users diverting water from groundwater sources, such as municipal and public wells, domestic wells, springs, and surface water diversions that communicate with groundwater. Impacts of water contamination are further discussed in Section 4.6.2, Public Health and Safety, on pages 4-444–4-450. The extent of potential contamination would depend on the point of contamination and volume of the contaminant. Similarly, the Draft RMP/EIS notes that reductions in water flow can have adverse impacts on the ecology of a watershed, its recreational potential, the availability of drinking water and water for other uses, and groundwater quality and quantity (Section 4.3.3, Water Resources, page 4-83).

Site-specific NEPA analysis would consider potential impacts on water quality and quantity at a more detailed level based on specific proposed activities.

8. Draft RMP/EIS Section 4.6.2, Public Health and Safety, analyzes impacts from decisions directly and indirectly related to oil and gas leasing activities, on public health and safety. Specifically, potential for exposure to chemicals during fluid mineral development (e.g., from spills and leaks) is discussed on Draft RMP/EIS page 4-447.

9. The Draft RMP/EIS discusses impacts on water resources from salts and selenium loads throughout Section 4.3.3 Water Resources (pages 4-80–4-102).

BLM_0165700

10. The Draft RMP/EIS drought management appendix (Appendix I) details management of drought from all causes. However, the BLM UFO updated its drought management plan, which is included in the Proposed RMP/Final EIS, as appropriate.

11. The Draft RMP/EIS discusses impacts on water resources from road construction at a general level throughout Section 4.3.3, Water Resources (pages 4-80–4-102).

12. Based on existing soil surveys, Draft RMP/EIS Table 3-5 on page 3-20 identifies soils with specific characteristics and quantifies acres related to the potential for soil erosion based on soil attribute. This soil survey is accurate and identifies fragile soils and places specific stipulations on those soil types. The Draft RMP/EIS also discusses impacts on water resources from soil erosion throughout Section 4.3.3, Water Resources (pages 4-80–4-102).

13. Effects on impaired water bodies (i.e., rivers and streams on the Colorado 303(d) List of Impaired Waters) are discussed in Draft RMP/EIS Chapter 4, Section 4.3.3, Water Resources, on pages 4-85 (Alternative A), 4-89 (Alternative B), 4-94 (Alternative C), and 4-96 (Alternative D).

B–C. The BLM appreciates the comments. The BLM reviewed the recommended studies and incorporated new and relevant information into the Proposed RMP/Final EIS, as appropriate. The EPA reference was revised per the commenter's recommendation.

### Section 37.4 – Water: Cumulative impact analysis
Total Number of Submissions: 7
Total Number of Comments: 7

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-34
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Montrose County Conditionally Decreed Water Rights: Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 1OCW164, 1OCW165, 1OCW166 and 1OCW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past. Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

Comment Number: 000186_ScotJ_MilvenanE_20161024-2
Organization1:
Commenter1:J. Scot Milvenan
Commenter Type: Individual
Comment Excerpt Text:
-The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonably Foreseeable Development Scenario will have on existing domestic and commercial water supplies, including springs, wells or surface irrigation water.
-BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

BLM_0165701

Because the BLM does not know the impact fracking will have on the quantity of our limited water, we risk loss to irrigation shares for the multiple irrigation ditches in the North Fork Valley. It is not right that leasing oil and gas companies might get the water they need while local landowners do not.

Comment Number: 000453_CarpenterN_20161031_partial DUP of 000412-1
Organization1:
Commenter1:Nicole Carpenter
Commenter Type: Individual
Comment Excerpt Text:
- The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonably Forseeable Development Scenario will have on existing domestic and commercial water supplies, including springs, wells or surface water. The BLM has the means to estimate this figure and yet it does not.
- The draft RMP makes no mention of wastewater disposal for fluid mineral development. Drilling uses a lot of water in the process of extracting natural gas. What is acceptable in terms of wastewater disposal on our public lands? The only time wastewater is mentioned is in the ACEC's portion of the Environmental Impacts section: "Energy and minerals development could impact ACEC values by …. contaminating surface water from wastewater spills and runoff containing drilling fluids." (4-346) These same negative impacts would occur anywhere fluid mineral development is allowed to take place, why is it not mentioned anywhere else?
- The BLM admittedly does not have mapping of the planning area's groundwater hydrology, which makes it difficult for future project EIS's to predict the impact of fluid mineral development on private and commercial water sources.

Comment Number: 000457_BlandC_20161031-6
Organization1:
Commenter1:Carter Bland
Commenter Type:
Comment Excerpt Text:
Include a more extensive analysis of regional hydrology and specifically that of the North Fork Valley to fully assess risks to drinking water, agriculture, wildlife, and recreation.

Comment Number: 000483_HanksG_20161101-4
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Watershed approach to management
Trout Unlimited's mission, more than anything, revolves around watershed health. We believe that impacts, negative or beneficial, are cumulative and compounding moving down a watershed. Rather than using site specific impacts, often times a bigger picture is a better perspective. Water quality, temperature, sediment, grazing, and water resources, all are addressed in the DRMP in terms of site specific impacts, but not addressed cumulatively. A better scale of analysis would be more appropriate in many cases when examining environmental consequences specifically.
Water resources, for example, throughout the DRMP footprint are heavily taxed by existing water uses resulting in water shortages, water quality impacts, and conflict amongst water users locally and in the greater Colorado River Basin. By looking at both scales now, the DRMP would be strengthened well into the plan's lifespan.
An example of more watershed based management can be found by looking to the Beaverhead-Deerlodge National Forest implementation of a protection approach where they applied NSO

BLM_0165702

stipulations to entire drainages for the protection of cutthroat trout in key watersheds (Beaverhead-Deerlodge Final Forest's Management Plan, 2009). Outside of designated key watersheds, there is a drainage-wide controlled surface use (CSU) that requires no net increase in sediment loading. These kind of federal land use plans represent proactive efforts addressing oil and gas drilling on public lands where there is potential to degrade or permanently impact important riparian and trout habitat.

Comment Number: 000563_King_WELC_HasAttach-194
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.4 41.2
Comment Excerpt Text:
BLM must analyze the effects of the massive water demand resulting from relatively new horizontal drilling techniques in the Upper Colorado River Basin (the "Upper Basin") which would impact watersheds in the Uncompahgre planning area, including (1) the significant cumulative impacts on local water supplies and the Colorado River endangered fish under NEPA and (2) the cumulative impacts of water depletion effects on the
Colorado River endangered fish under Section 7 of the Endangered Species Act. The loss of adequate flows in the endangered fishes' habitat within the Upper Colorado River Basin is so serious that the Service has determined that any depletion of Upper Basin stream flows adversely affects and jeopardizes the endangered fish. [U.S. Bureau of Land Management, White River FEIS at 3-71 (2015) ("The FWS has determined that any federally authorized depletion from the Upper Colorado River Basin has an adverse effect on listed Colorado River fishes.") (Chapter 3 attached as Exhibit 310); Biological Opinion for BLM Resource Management Plan (RMP), Price Field Office (PFO), 138 (Oct. 27, 2008), available at: http://www.blm.gov/style/medialib/blm/ut/price_fo/Planning/rod_approved_rmp.Par.2742.File.dat/Price%20Biological%20Opinion.pdf (attached as Exhibit 209) ("The USFWS determined that any depletion will jeopardize their continued existence and will likely contribute to the destruction or adverse modification of their critical habitat") (citing USDI, Fish and Wildlife Service, Region 6 Memorandum, dated July 8, 1997); Biological Opinion for BLM Resource Management Plan (RMP), Vernal Field Office (VFO), 113 (Oct. 23, 2008), available at: http://www.blm.gov/style/medialib/blm/ut/vernal_fo/planning/rod_approved_rmp.Par.4719.File.dat/Vernal BiologicalOpinion.pdf (attached as Exhibit 210) (same).] The UFO draft RMP and EIS identifies critical habitat of at least two endangered fish populations within the planning area, namely the Colorado Pikeminnow and the Razorback Sucker in the Gunnison and Uncompahgre Rivers. UFO RMP DEIS at 3-75. Therefore, any depletion is subject to Section 7 consultation and review under NEPA.

Comment Number: 500203_McCainJ_20161025-2
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonably Foreseeable Development Scenario will have on existing domestic and commercial water supplies, including springs, wells or surface water. The BLM has the means to estimate this figure and yet it does not.

*Summary*
Commenters stated that the following should be considered in the cumulative impact analysis:

BLM_0165703

1. Montrose County Conditionally Decreed Water Rights; the development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area.
2. Existing water use allocations and demand at the local and greater Colorado River Basin level to assess potential future water shortages and conflict.
3. Potential impacts on existing domestic and commercial water supplies, including springs, wells and surface water, from fluid mineral extraction as outlined in the Reasonably Foreseeable Development Scenario. Commenters recommend that cumulative impacts analysis should include impacts from fluid development on private and commercial water sources and that wastewater disposal from fluid mineral development should also be considered.
4. Regional hydrology, including groundwater hydrology in the North Fork Valley, as well as downstream and watershed-wide impacts

*Response*

1-2. Existing water diversions are included in Draft RMP/EIS Table 4-1, Reasonably Foreseeable Future Actions, and addressed in Draft RMP/EIS Section 4.3.3, Water Resources, pages 4-100–4-102.
3. Fluid mineral development in the cumulative impacts analysis area was included in Draft RMP/EIS Table 4-1, Reasonably Foreseeable Future Actions and discussed in Section 4.3.3, Water Resources, pages 4-100–4-102.
4. As noted in Draft RMP/EIS Section 4.3.3, Water Resources, page 4-100, the cumulative impact analysis area used to analyze cumulative impacts on water quality and watershed resources extends outside of the planning area, following fourth order watershed boundaries. The cumulative impact analysis area also includes the Colorado River downstream to the US/Mexico border.

### Section 37.5 – Water: Mitigation measures

Total Number of Submissions: 7
Total Number of Comments: 20

Comment Number: 000130_WasseIlP_20160903-8
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
-BLM did not consider community source water protection plans.

Comment Number: 000373_ThompsonG_20161030-11
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
Because fracking is exempt from important sections of the Clean Water Act and the Safe Drinking Act it is imperative that BLM include in the final plan measures that will absolutely protect the North Fork Valley's watershed from the risk of contamination. As part of this effort BLM needs to analyze the risks of exposure to radioactive waste in the wastewater coming from extraction. Clean water is the lifeblood of the North Fork Valley and must be protected.

BLM_0165704

Comment Number: 000402_RatnerJ_20161028-32
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.2
Comment Excerpt Text:
3-29 states:
Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium.
This statement implies that the BLM actually monitors the water quality impacts of its authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of them do this. Is the UFO actually monitoring water quality impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it administers or is the above statement stretching the truth?
In the FEIS please clarify what data is being collected, where and how often and what percent of the FO the data collection efforts cover.
The DEIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.
3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing.

Comment Number: 000402_RatnerJ_20161028-36
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.
But again these are not only undefined but not implemented.

Comment Number: 000402_RatnerJ_20161028-45
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.1
Comment Excerpt Text:
? PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC
Comment Number: 000402_RatnerJ_20161028-57
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.1
Comment Excerpt Text:

BLM_0165705

No BLM action or plan would be complete without considering TMDL listing, status, and planning. Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded. Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments. The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs). The RMP must also require water quality monitoring to determine the impacts of its authorized activities.

Comment Number: 000402_RatnerJ_20161028-58
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The BLM should also develop an expanded monitoring plan. Many activities on BLM lands degrade water quality but the BLM may not have a clear grasp on its waters' quality. This RMP revision and EIS must expand on other agencies' and individuals' monitoring efforts, to insure that no data-gaps exist on BLM lands.

Comment Number: 000402_RatnerJ_20161028-59
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Overall, the BLM must comply with the Clean Water Act. To this end, the BLM should look to required CWA reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high quality waters can be protected and how degraded waters can be improved. Additionally, the BLM should specially insure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP.

Comment Number: 000455_ClearyM_20161101_4CRanch,LLC-3
Organization1:
Commenter1:Michael P. Cleary
Commenter Type: Individual
Comment Excerpt Text:
o Irrigation ditches have a perpetual ROW. Currently the BLM will not allow a ditch company to straighten a piped ditch outside of its existing perpetual right without losing that right and trading it for a 30 year term ROW. The BLM needs to be more flexible here as that would save the government money, clean up erosion issues in existing ditches and reduce pipeline operating costs.
o 5% of construction cost is allocated to mitigate the environmental impact of drying up ditches. It would be wise for the BLM to adopt a policy that focuses the location of the mitigation near the proposed piping project, and that the a priority of the allocated funds be directed to providing access to water for wildlife in arid areas.

Comment Number: Form M
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
o Irrigation ditches have a perpetual ROW. Currently the BLM will not allow a ditch company to straighten a piped ditch outside of its existing perpetual right without losing that right and trading it for a

BLM_0165706

30 year term ROW. The BLM needs to be more flexible here as that would save the government money, clean up erosion issues in existing ditches and reduce pipeline operating costs.

5% of construction cost is allocated to mitigate the environmental impact of drying up ditches. It would be wise for the BLM to adopt a policy that focuses the location of the mitigation near the proposed piping project, and that the a priority of the allocated funds be directed to providing access to water for wildlife in arid areas.

Comment Number: 000489_JohnsonA_20161101-10
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
3. Best Management Practices for Fluid Mineral Management
The Best Management Practices outlined in the draft RMP are inadequate for providing minimum degrees of protection for water resources within the planning area.

Comment Number: 000489_JohnsonA_20161101-14
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3
Comment Excerpt Text:
5. The RMP does not address concerns to groundwater health, potential seismic activity, and surface water impacts associated with produced water
Not only does too little data exist to make informed decisions, but no action in the RMP addresses the potential environmental impacts of any part of the process that involves produced water. It is highly concerning that the preferred alternative opens 865,970 acres to oil and gas development but does not address the impacts and corresponding best management practices associated with management of produced water.

The local impacts of withdrawing significant quantities of water for hydraulic fracturing on stream and riparian health, local industry other than oil and gas development, and community health have also not been addressed by the draft RMP. A conservative estimate of water needed for hydraulic fracturing is 500,000 gallons per well.[32] While this totals into a relatively small percentage compared to total water use compared to agricultural and municipal water use statewide and nationally, the amount of water required locally can be comparatively significant within the immediate water system's supply and use. This dynamic can have serious repercussions on local river health, especially when the North Fork of the Gunnison River already experience flows of under 20 cubic feet per second (cfs) during summer months. For example, in the Marcellus Shale of Pennsylvania, the early shale gas boom led to water withdrawal problems that had to be rectified by the state due to withdrawing too much water.[33]

[Footnote 32] Jackson, Robert B., Avner Vengosh, J. William Carey, Richard J. Davies, Thomas H. Darrah, Francis O'sullivan, and Gabrielle Pétron. "The Environmental Costs and Benefits of Fracking." Annual Review of Environment and Resources Annu. Rev. Environ. Resour. 39.1 (2014): 327-62. Web. 19 Oct. 2016.

[Footnote 33] (Jackson et al 335).

The final RMP must include adequate best management practices to mitigate impacts of storing, transporting, or disposing produced water.

On-site storage of produced water (and flowback water) typically occurs in surface pits or sealed tanks prior to reuse and/or disposal.[34] While current evidence "suggests that wastewater is more effectively treated onsite because effluents discharged to publicly owned treatment plants may not be able to be

BLM_0165707

sufficiently treated by such treatment plants for this waste stream," the proposed RMP lacks any actions to address protocol for this potentially toxic fluid.[35]

[Footnote 34] (8313, Adgate et al).

[Footnote 35] (8313, Adgate et al).

Should 100 percent of the produced water and condensate from oil and gas development be transported by truck, the transport will exhibit significant risks to the environmental and population. On-site release incidents from leaks, faulty equipment, and inadvertent human error can have significant and permanent impacts.

The transport of produced water and condensates will also produce negative impacts such as: increased local traffic along small, rural highways; increased emissions from heavy truck travel (thus contributing to greenhouse gases that exacerbate climate change); poor air quality due to increased particulate in the air due to dirt-road travel; and the negative impacts to the North Fork Valley and Western Slope way of life.

These persistent impacts would have little consequence compared to the high-impact potential of an accident of a vehicle that is transporting produced water and condensate. Any release that might occur along local highways and roads would contaminate local rivers and streams, negatively impacting water quality in a water system that is part of the Colorado River's headwaters. Additionally, we are concerned that the transport of produced water from the Uncompahgre region to be injected at another site would induce undue negative impacts on other communities and environments.

Should less than 100 percent of the produced water and condensate from oil and gas development not be transported by truck, the remaining produced water and condensate would likely be injected into earth or recycled.

The final RMP must address best management practices for these activities, and include management actions that mitigate possible impacts on other resources as detailed in these comments.

Comment Number: 000489_JohnsonA_20161101-16
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. Water Rights

While the BLM supports existing water rights through quantitative protections, it does not protect the quality of the water associated with those rights. Current uses of the water rights depend on a historical standard of water quality.

The WSCC supports Objective 51 and the agency preferred alternatives 52 and 53 to provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian and aquatic ecosystems. Healthy instream flows are vital for fisheries, wetlands, and riparian areas. Action 52 will help keep those ecosystems that depend on instream flows viable and healthy. Additionally, maintaining historical water quality standards is critical for human and economic health.

The Preferred Alternative, however, would allow oil and gas development (fluid mineral exploration and development, non-fluid mineral exploration and development, construction and maintenance of roads, and other surface disturbing activities including recreation) which would negatively impact the quality of the water within the watershed, through the inadvertent release of potentially and proven toxic chemicals, increased particulate matter in air and watersheds due to increased surface activity, etc. Historical water use, primarily associated with farming, depends on the continuation of the high standards of water quality that have persisted in the area for generations.

The final RMP must include specific stipulations, actions, and best management practices for maintaining the historical water quality standards and mitigating potential negative impacts to water quality. This should include publicly available monitoring for conductivity, total and dissolved metals including selenium, nutrients, and field parameters to evaluate conditions. The final RMP must also include

BLM_0165708

enforceable action plans should water quality conditions exceed state and national water quality standards or shift substantially from historical records. The Western Slope Conservation Center has gathered water quality on the North Fork of the Gunnison River for 15 years and has used this data to establish a water quality baseline (WSCC, See Appendix). Management thresholds should be based on the site specific water quality classifications determined by the state of Colorado.[36]
[Footnote 36] https://www.colorado.gov/pacific/sites/default/files/42_2014%2807%29withmaps.pdf

Comment Number: 000489_JohnsonA_20161101-25
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. RMP does not put in place adequate monitoring metrics including macro-invertebrates
The preferred alternative proposes actions that have the potential to negatively impact stream health and water quality. However, the RMP does not put into place adequate monitoring metrics for parameters for evaluating stream health and water quality, nor does it establish best management practices for entities that might engage in resource development on the landscapes addressed by the RMP. This is unacceptable because it fails to provide metrics to evaluate the impacts of activity on the landscape. In order to understand the impacts of activity, it is recommended that a baseline for parameters including but not limited to conductivity, dissolved metals, and macroinvertebrates be established where surface activity occurs and monitoring continues during and after such activity.

Comment Number: 000489_JohnsonA_20161101-93
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects.

Comment Number: 000530_PlattA_20161101_EPA-11
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
In addition, the EPA recommends that the Final RMP/EIS include the following:
* A mitigation plan for remediating future unanticipated impacts to drinking water wells, such as requiring the operator to remedy those impacts through treatment, replacement or other appropriate means.
* A general production wellbore diagram and discussion to demonstrate how near-surface and deeper useable waters will be isolated and protected from fluid migration that may occur during oil and gas development activities. At a minimum, current Colorado Oil and Gas Conservation Commission (COGCC) protections for groundwater resources should be implemented. Specifically, we recommend that a discussion of the requirements of COGCC Rule 317, most recently updated on March 16, 2016, be included in the Final RMP/EIS. These requirements apply wherever "freshwater" groundwater sources exist (as described by COGCC Rule 317). In addition, we suggest requiring disclosure of all chemicals

introduced to the wellbore (including maintenance chemicals) used at well pads to inform response decisions in the event of a spill or other impact.
* Abandonment procedures for sealing wells no longer in use in order to reduce the potential for inactive wells to serve as the conduits for fluid movement between production zone(s) and aquifer(s). This is particularly important where existing wells do not have surface casing set into the base of USDWs and lack sufficient production casing cement.

Comment Number: 000530_PlattA_20161101_EPA-19
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 37.1
Comment Excerpt Text:
Note that for groundwater and groundwater under the direct influence of surface water (GWUDI) public drinking water supply sources, we generally recommend a minimum one-half mile (2,640 feet) NSO or CSU concentric buffer. This recommendation is based on the professional judgment of the CDPHE Source Water Protection Program (SWPP). For additional information, please contact the CDPHE SWPP Coordinator, John Duggan, at 303-692-3534.
To further strengthen the BLM's efforts to protect public drinking water supply sources, we recommend that the Final RMP/EIS Preferred Alternative's Public Water Supply leasing stipulations incorporate either the above EPA recommendation for protection of groundwater and GWUDI public drinking water supply sources or the related stipulations described for Alternatives B/B.1 and noted by the BLM as being more protective of water resources.

Comment Number: 000530_PlattA_20161101_EPA-21
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Other Sections: 37.2
Comment Excerpt Text:
The EPA recommends that the Final RMP/EIS address how water quality monitoring in the planning area will occur at the project level prior to, during, and after anticipated development to detect impacts to both surface water and groundwater resources, including private well monitoring. The EPA notes that for groundwater, operators will at a minimum need to conform to the COGCC requirements for pre-development and post-development groundwater monitoring described in Rule 609. As Colorado has no present requirements for surface water pre- and post-development monitoring, the EPA recommends the Final RMP/EIS describe how project-level monitoring will occur to identify any impacts to surface water resources resulting from oil & gas exploration and production. A recent example of a surface and groundwater quality monitoring plan is the "Water Quality Monitoring Plan" developed by the BLM for the Monument Butte Oil and Gas Development Project Final EIS.[4]
[footnote 4] Under "Documents" please see Final EIS, Appendix H: http://go.usa.gov/xgjT]

Comment Number: 000530_PlattA_20161101_EPA-22
Organization1:Environmental Protection Agency
Commenter1:Amelia A. Platt
Commenter Type: Federal Government
Comment Excerpt Text:
We recommend that Section 4.4.2, Livestock Grazing, include a discussion of how monitoring requirements will be applied at the project level to ensure that the BLM Colorado Public Land Health Standards are met. An explanation regarding how the Annual Operating Instructions will ensure

BLM_0165710

compliance with project level monitoring requirements for parameters such as water quality would be helpful. To evaluate and adjust grazing management strategies, we recommend a monitoring section that describes how monitoring will be implemented on an allotment level and watershed or sub-watershed level to determine rangeland conditions including water quality status and trends. A wide array of monitoring options exist, and we are available to discuss the options if desired.

*Summary*

A. Commenters stated that the Proposed RMP/Final EIS should include details on how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards, Colorado Oil and Gas Conservation Commission Rules 317 (General Drilling Rules) and 609 (Statewide Groundwater Baseline Sampling and Monitoring), Total Maximum Daily Loads goals, and the FLPMA.

B. Commenters stated that the RMP should include the following mitigation measures:

- Implementation of Colorado BMPs
- Measures for protecting unanticipated impacts to drinking water wells
- Location-focused mitigation
- Mitigation for the transport, storage, or disposal of produced water
- Prioritize mitigation funding received in construction to focus the mitigation near the proposed project, prioritize allocated funds to ensure water access for wildlife
- Specific stipulations for maintaining historical water quality standards, include publicly available monitoring for conductivity; total and dissolved metals, including selenium; nutrients; and field parameters to evaluate conditions
- Management items in the instance of drought, as included in BLM Washington Office Instruction Memorandum 2013-094, Resource Management during Drought
- Abandonment procedures for sealing wells no longer in use
- Measures to ensure that monitoring is conducted
- Adequate monitoring metrics, including macro-invertebrates

C. Commenters stated that an expanded monitoring plan should be used and should include other agencies to ensure no data gaps. The BLM should consider requiring Clean Water Act reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high-quality waters can be protected and how degraded waters can be improved. One commenter requested an explanation regarding how the BLM will monitor water quality at the project level to ensure BLM Colorado Public Land Health Standards are met, especially as it relates to monitoring livestock grazing activities. Additionally, a commenter stated that the BLM should ensure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP.

*Response*

A. The BLM's authority to regulate for water quality on BLM-administered lands derives from FLPMA Section 102(a)(8), which directs the BLM to manage the public lands in a way that protects water quality. The BLM does not set water quality standards, which are established by the individual states and the EPA. However, the BLM is authorized to enforce water quality standards as part of its permit process. Before the BLM grants any permits or leases, the applicant is required to ensure that the terms of the proposed use comply with applicable

BLM_0165711

federal and state water quality regulations. Specific measures to meet state and federal standards, as well as monitoring protocol, would be established at the permitting stage.

Draft RMP/EIS Section 2.6, Management Guidance for Alternatives A, B/B.1, C, and D, Table 2-2, Management Common to All Alternatives, page 2-23, line 2 states that all alternatives would comply with state and federal laws, regulations, policies, and standards, including FLPMA multiple use mandates. This includes Colorado Oil and Gas Conservation Commission rules, among others. Additionally, Draft RMP/EIS Section 3.1.4 on pages 3-31 – 3-32 contain a discussion of selenium TMDL drafted by the Colorado Water Quality Control Division that identifies point and nonpoint sources of selenium loading and established safe levels of selenium for the Gunnison River Basin. Draft RMP/EIS Table 2-2, line 43 describes the action to prepare a water and aquatic monitoring plan.

B. The BLM's role is to fulfill mandates expressed in federal laws for resource maintenance and protection. This responsibility is fulfilled by imposing terms and conditions on the land use authorization. If actions the BLM analyzes and authorizes through NEPA are shown to have significant impacts on the resource, appropriate and reasonable mitigation should be applied to address those resource concerns. The BLM believes that the appropriate mitigation can only be applied once the location and nature of the proposed project is known. Appropriate mitigation measures would be developed and analyzed at the project-specific level. Draft RMP/EIS Section 1-3, Planning Process, page 1-5, states that implementation planning can include identification of specific mitigation needs and development and implementation of other similar plans and actions. The Draft RMP/EIS further states that the RMP would furthermore be implemented using regional mitigation strategies per BLM Instruction Memorandum 2013-142, Interim Policy, Draft Regional Mitigation Manual Section 1794 (Draft RMP/EIS Section 2.3.1, Management Common to All Alternatives, page 2-6). However, the final BLM Mitigation Manual (MS-1794) and Mitigation Handbook (H-1794-1) were rescinded by Secretarial Order 3360. This reference to BLM Instruction Memorandum 2013-142, Interim Policy, Draft Regional Mitigation Manual Section 1794 was changed to reflect the current guidance, which changed between Draft RMP/EIS and Proposed RMP/Final EIS. The BLM uses terms in the Draft RMP/EIS such as "limit," "reduce," "minimize," "meet land health," "maintain," and "improve," which management and mitigation can help to achieve identified objectives.

C. Monitoring and evaluation efforts are considered implementation-level efforts. Site-specific plans and actions would be developed at the permitting stage. Draft RMP/EIS Table 2-2, line 43 describes the action to prepare a water and aquatic monitoring plan across the range of alternatives. The BLM would continue existing monitoring efforts during land health assessments at established surface water locations as funding and staffing allows.

## Section 38 – Wild Horses
No comments are associated with this topic.

## Section 39 – Wild and Scenic Rivers

### Section 39.1 – Wild and Scenic Rivers: Range of alternatives
Total Number of Submissions: 30
Total Number of Comments: 117

BLM_0165712

Comment Number: 000032_WitmanR_20160627-1
Organization1:
Commenter1:Randy Witham
Commenter Type: Individual
Comment Excerpt Text:
Do NOT implement any Wild and/or Scenic designations on any gold bearing creeks, streams or rivers. In particular, the San Miguel & Dolores Rivers have some of the best and largest gold in the State of Colorado and suction dredging is one of the best methods of recovering that gold without any damage to the environment. High Bankers and other powered operations, by gas, solar or battery power, are effective as well.
This is nothing but a tactic used by the extreme environmentalists, as we have seen in Oregon as just one example, to effectively end all suction dredging and all powered equipment/operations in the state on all federal mining claims in that state. They designate the majority of all streams & rivers as wild and/or scenic and BINGO, closed to all motorized mining operations.
All our rivers, creeks & streams are wild & scenic naturally, and are fine as they are......serving the many needs of a diverse universe of user groups. Designating them as "Wild and/or Scenic" can and will ONLY serve to allow BLM to serve just one user group -- extreme environmentalists -- and implement prohibitions, restrictions and limitations that will deny all others access, use and enjoyment of their public lands.
It will also drive withdrawal from mineral entry/claiming and put at risk all the current claimants as to access, use and enjoyment of THEIR federally recognized mining claims. Wrong as can be.

Comment Number: 000126_Kavanaugh_20160831-4
Organization1:Town of Telluride
Commenter1:Sean Murphy
Commenter Type: Local Government
Comment Excerpt Text:
Alternative D proposes Suitable Wild and Scenic River segments that, while not as extensive as those presented in Alternative B, represent the results of an inclusive multi-stakeholder compromise. We support these findings and recognize Wild and Scenic suitability as an important tool for protecting our water resources for drinking water, ecological function, recreation, and many other uses.

Comment Number: 000492_RandallR_20161101-26
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.

Comment Number: 000151_HeppM_20161011-1
Organization1:
Commenter1:Matt Hepp
Commenter Type: Individual
Comment Excerpt Text:
I feel any free-flowing rivers should be designated Wild and Scenic to the extent possible, as these are a valuable resource in the dry West.

BLM_0165713

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-37
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 21.1
Comment Excerpt Text:
Line 336 Page 2- 199: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.
As a general comment with regard to WSR designations, we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-38
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 21.1
Comment Excerpt Text:
Line 337 Page 2-204: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-40
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Line 348 Page 2-209: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-41
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 22.1
Comment Excerpt Text:
Line 358 Page 2-214: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of"suitability"" in-lieu of Congressional action as intended by the WSR Act.

BLM_0165714

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-49
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 19.1
Comment Excerpt Text:
Line 493 Page 2-312: We request that Alternative D be amended to include WSR segments as ROW Exclusion Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of"suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000176_WaschbuschJ_20161013_MontroseCounty-50
Organization1:Montrose County
Commenter1:Jon Waschbusch
Commenter Type: Local Government
Other Sections: 3 19.1
Comment Excerpt Text:
Line 494 Page 2-315: We request that Alternative D be amended to include WSR segments as ROW Avoidance Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

Comment Number: 000177_JohnsonP_20160930-2
Organization1:
Commenter1:Philip Johnson
Commenter Type: Individual
Comment Excerpt Text:
I have floated the Dolores River between Slick Rock and Bedrock and have been amazed by the canyons winding continuously around cliffs overhanging the river. This is one area that needs wilderness protection. Dominguez Canyon of the Gunnison, and the Dolores should be recommended for Wild and Scenic River Status.

Comment Number: 000213_PearsonM_20161025-11
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Other Sections: 9.1
Comment Excerpt Text:
The San Miguel River is uncommon in Colorado as one of the few substantial rivers without a major impoundment. The river has been the focus of extensive ongoing conservation efforts demonstrated by the Nature Conservancy's several preserves. I am pleased to support BLM's findings of various segments as suitable for designation under the Wild and Scenic Rivers Act. I also endorse BLM's proposed designation of the San Miguel River ACEC.

Comment Number: 000213_PearsonM_20161025-2
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165715

The RMP's preferred alternative proposes a portion of Tabeguache Creek as suitable for designation under the Wild and Scenic Rivers Act. I heartedly agree that the few miles within the special management area qualify as a wild segment, but I would add recreation to the list of outstandingly remarkable values. The informal trail along the creek provides an uncommon opportunity to experience a lower elevation, undeveloped riparian corridor as it transitions from cottonwood/will ecosystem to a riparian forest with abundant, large ponderosa pines. BLM has previously characterized the primitive recreation opportunities along Tabeguache Creek as outstanding in its original identification of the area as a WSA in 1980, and when recommending it for wilderness designation in its 1991 wilderness study report.

-I urge BLM to reconsider its determination not to recommend the lower segment of Tabeguache Creek as suitable for wild and scenic designation. This segment possesses outstanding remarkable cultural as well as vegetative values, and even with a minority of the stream segment in private ownership, BLM can still manage its majority share of the stream corridor to maintain the wild and scenic values.

Comment Number: 000213_PearsonM_20161025-7
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
I strongly support the recommendation as suitable for wild and scenic designation of various segments of the Dolores River and La Sal Creek. The Dolores River segments include the last portion within the WSA, and as well as the scenic canyon at the confluence with the San Miguel. These are indisputably spectacular segments with outstanding scenery and recreation values, as well as providing habitat for sensitive native fish species.

Comment Number: 000213_PearsonM_20161025-8
Organization1:
Commenter1:Mark Pearson
Commenter Type: Individual
Comment Excerpt Text:
-I am pleased to support BLM's recommendation as suibable for Wild and Scenic River designation of Roubideau Creek, Monitor Creek, and Potter Creek. As the RMP notes, these creeks possess outstandingly remarkable values in the form of riparian vegetation communities, recreation, wildlife, and cultural values. Roubideau Creek offers one of the most unusual recreation experiences in Colorado owing to it's extraordinary ecological transition from barren desert to lush montane forest, and its large, perennial flows amidst cottonwoods and willows.

Comment Number: 000249_FrishmanA_20161013-1
Organization1:
Commenter1:Andrew Frishman
Commenter Type: Individual
Comment Excerpt Text:
I strongly believe that that the Dolores and San Miguel River segments meet suitability requirements for Wild & Scenic designation and that the BLM should maintain their suitability as part of their Resource Management Plan. Anyone who has visited these rivers knows that their scenic and recreational values are exceptional. While I support the Colorado Water Conservation Board's request to manage flows through the Colorado State Instream Flow Program (ISF), I would urge the BLM and the Secretary of the Interior to pursue other flow protections if the ISF's are not sufficient to protect whitewater recreation and ecological values. The Dolores in particular is a world class river, whose recreational

BLM_0165716

potential and ecological values are unfortunately impaired by inadequate flows. Please maintain the suitability of these wonderful river segments in the forthcoming plan!

Comment Number: 000265_VanWestR_20161019-1
Organization1:
Commenter1:Rein van West
Commenter Type: Individual
Comment Excerpt Text:
Another addition I'd like to see added to the final RMP, are all the river segments as identified as 'wild and scenic'. Water is the number one important resource in the American West for not only us humans but for our wildlife, too. Protection of this resource to the nth degree only makes sense. So my plea is to give full protection to all free-flowing rivers and streams identified in our watersheds….free-flowing rivers can't be protected without also protecting the watersheds where they're found. This is a reasonable request given the increasing demands and stress placed on our watersheds from a number of factors. Once a watershed is compromised it is near impossible to bring it back to a level where it provides the sustenance for native plants and wildlife.

Comment Number: 000268_Russell_20161030-1
Organization1:
Commenter1:James Russell
Commenter Type: Individual
Comment Excerpt Text:
I sincerely hope that the BLM can include the Dolores in their Wild and Scenic plan and that something can be done to protect the water flows into the lower Dolores.

Comment Number: 000269_CascadeR_20161028-10
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
Finally, please add Roc Creek to the UFO eligibility report and deem it suitable for protection as well. You are no doubt aware that Colorado has only one congressionally designated WSR – the Poudre – and currently two being considered by Congress – the Crystal near Marble and Deep Creek in the southern Flat Tops. BLM's inclusion of all 154.1 miles of suitable WSR affords the opportunity that we might one day have a WSR designation in the UFO region. More importantly their inclusion in the final RMP protects these rivers' pristine qualities into the future for wildlife, habitat preservation, biological diversity, and future human generations

Comment Number: 000269_CascadeR_20161028-3
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I applaud your inclusion of 104.6 miles of suitable Wild and Scenic River (WSR) segments in the preferred alternative D and request you retain all these segments in your final draft. I also urge you to include the other 50 (actually 49.5) miles of river that you found eligible in your survey in your final RMP. All these segments are free flowing and have values worthy of protection. There are so few free-flowing rivers in the UFO jurisdiction that it is incumbent on the UFO to conserve these stretches of river in the most natural condition possible. Including them in your final RMP will do just that.

BLM_0165717

Comment Number: 000269_CascadeR_20161028-7
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
I support including Tabaguache Creek segment 2 in addition to Tabaguache Creek segment 1 to further protect the length of this waterway. Although segment 2 is not within the already protected Tabequache Area, segment 2 is very close to and adjacent to this area managed as wilderness

Comment Number: 000269_CascadeR_20161028-8
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
Similarly, including Roubideau Creek segment 2 in addition to the already suitable Monitor, Potter and Roubideau segment 1 enhances the protection of the riparian habitats in this area. I have hiked this area and can attest to the scenic value of this segment. Even the shorter isolated segments included in Alternative B such as the Deep Creek and West Fork Terror Creek warrant protection as this region has so few remaining free flowing rivers.

Comment Number: 000269_CascadeR_20161028-9
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Comment Excerpt Text:
All segments should be managed with protection equal to or stronger than adjacent federal land planning areas surrounding these UFO segments.

Comment Number: 000341_GleasonB_20161028-1
Organization1:Boot Doctors
Commenter1:Bob Gleason
Commenter Type: Individual
Comment Excerpt Text:
In travelling through all the navigable sections of the San Miguel and Dolores rivers, I have found these rivers to have tremendous wild and scenic characteristics on par with the prime rivers currently protected by Wild and Scenic status. The San Miguel is a freestone river without artificial alteration of the natural flow variations through the seasons. This has preserved a rich display of plant and wildlife that is rare among our river systems. The seasonal ebb and flow of water levels provides unique recreational opportunities. The gush of high water in the spring is a delight to the river runner, and opens the entire river corridor to exploration by the whitewater enthusiast. The low water of the late summer and fall creates a fine experience for the walk and wade angler. This seasonal variation has supported native and rare plant life and animal habitat that has been lost on other rivers. These natural characteristics of this upper reach of the Colorado River system would greatly benefit from the protections assured by the Wild and Scenic Rivers Act.

Comment Number: 000371_VanVurstB_20161031-3
Organization1:Southwestern Water Conservation District
Commenter1:Beth Van Vurst
Commenter Type: Local Government
Comment Excerpt Text:

BLM_0165718

Finally, SWCD encourages the BLM to continue to explore whether, by virtue of pulling water through an identified river segment, existing decreed water rights already provide sufficient protection for any flow-related ORVs. Where that isn't the case, the BLM should work cooperatively with the State and local governments, including SWCD, to determine whether those entities can appropriate or acquire additional water rights as an alternative to: (1) imposing flow-related conditions in federal permits; or, (2) relying on federal reserved rights if a wild and scenic designation were to occur.

Comment Number: 000375_HawkinsC_20161031-2
Organization1:The Nature Conservancy
Commenter1:Celene Hawkins
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Through the community outreach, Sub-RAC, and RAC processes, consensus was reached on suitability designations for the 13 segments of river that the BLM has recommended in Alternative D. The Nature Conservancy supports the community and RAC-based process, and the consensus outcome of that process, as an accurate reflection of community values and opinions in those river basins to support BLM's proposed Alternative D.

Comment Number: 000375_HawkinsC_20161031-3
Organization1:The Nature Conservancy
Commenter1:Celene Hawkins
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Nature Conservancy is also working with water users and stakeholders on upstream segments of the Dolores River below McPhee Dam to explore opportunities, build support for, and take action to improve the ecological conditions downstream of McPhee Reservoir while honoring water rights, protecting agricultural and municipal water supplies, and the continued enjoyment of rafting and fishing. The Nature Conservancy supports a proactive and collaborative approach on those segments of the Dolores River to managing tight water supplies and habitat for sensitive, warm water native fish species. Because of potential water user concerns about how the BLM's recommendations for suitability for the five segments of river in the Dolores River Basin could affect the operation of the Dolores Project and McPhee Dam, The Nature Conservancy supports the Colorado Water Conservation Board's (CWCB) request that the BLM work with the CWCB to clarify the relationship between the recommendations for inclusion of the Dolores River segments in the NWSRS and the operation of the Dolores Project.

Comment Number: 000406_RiceM_20161101_AmericanRivers-1
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Correspondingly, we appreciate the position recently taken by the Colorado Water Conservation Board (CWCB) (which manages the state stream protection program), acknowledging the potential value of wild & scenic suitability findings in both watersheds and requesting several specific accommodations from the BLM.
Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting w&s-suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d)

incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that w&s suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that w&s suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

Comment Number: 000406_RiceM_20161101_AmericanRivers-10
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Beaver Creek
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.
Federal land ownership of nearly 100% will simplify effective implementation of protective management. We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-11
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We concur with the SWRAC recommendation that the Dry Creek segment may besufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.

Comment Number: 000406_RiceM_20161101_AmericanRivers-12
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Naturita Creek
This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.
While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections—including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation.

Comment Number: 000406_RiceM_20161101_AmericanRivers-13
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Saltado Creek

BLM_0165720

Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River. The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River.

100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-14
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 1
This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence. With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.

This segment includes unparalleled scenery and attendant natural and cultural features. The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features.

We recommend that all of San Miguel River Segment 1 be found suitable.

Comment Number: 000406_RiceM_20161101_AmericanRivers-15
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 2
This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

We recommend that San Miguel River Segment 2 be found suitable with modificationsrecommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-16
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 3

BLM_0165721

This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows. While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.

We recommend that San Miguel River Segment 3 be found suitable with modificationsrecommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-17
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 5
In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.

We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-18
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River, segment 6
This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.

While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management.

We recommend that San Miguel River segment 6—or at least the federal portion—be found suitable with modifications recommended the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-19
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Tabeguache Creek Segment 1
This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream.

BLM_0165722

Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management. We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-2
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Specific stream segments
We strongly endorse all the w&s suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge you to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge the BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be w&s eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups andacknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, the BLM should promptly reconsider, through RMP amendment, eligibility and suitability for those segments.

Comment Number: 000406_RiceM_20161101_AmericanRivers-20
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Tabeguache Creek Segment 2
This segment contributes reliable and significant volume of streamflow to the San Miguel River, and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced.

Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability.

Comment Number: 000406_RiceM_20161101_AmericanRivers-21
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)

Comment Excerpt Text:
Lower Dolores River
Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection.
The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.
In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.
While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants— cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.
We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-22
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
North Fork Mesa Creek
This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.
A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.
While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management, and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.
We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability.

Comment Number: 000406_RiceM_20161101_AmericanRivers-23
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dolores River, segment 1

Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection.

Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.

Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.

We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-24
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dolores River Segment 2
Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures.

The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment.

We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-25
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Ice Lake Creek Segment 2
This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values. We concur with the SWRAC recommendation that, because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.

Comment Number: 000406_RiceM_20161101_AmericanRivers-26
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165725

Comment Excerpt Text:
La Sal Creek Segment 1
We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability.

Comment Number: 000406_RiceM_20161101_AmericanRivers-27
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
La Sal Creek Segment 2
This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area.
The presence of healthy populations of regionally imperiled native fish, and the presence ofglobally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.
Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal. We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000406_RiceM_20161101_AmericanRivers-28
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
La Sal Creek, segment 3
If ever a stream segment were suitable under that definition of the Wild and Scenic Rivers Act, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.
In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.
Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management. We recommend that the full length of La Sal Creek segment 3 be found suitable.

Comment Number: 000406_RiceM_20161101_AmericanRivers-29
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Lion Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

BLM_0165726

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

Comment Number: 000406_RiceM_20161101_AmericanRivers-3
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Gunnison River Basin
Gunnison River Segment 2
As documented the BLM's w&s eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.
Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream— contribute, or will contribute, to the reliability of those critical-habitat flows.
It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes

Comment Number: 000406_RiceM_20161101_AmericanRivers-30
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Spring Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.
While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

Comment Number: 000406_RiceM_20161101_AmericanRivers-31
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additional river segment
Roc Creek
Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

BLM_0165727

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).
This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination that it is suitable.

Comment Number: 000406_RiceM_20161101_AmericanRivers-32
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We believe that the w&s suitability findings included in the BLM's Wild and Scenic River
Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the draft RMP preferred Alternative D

Comment Number: 000406_RiceM_20161101_AmericanRivers-33
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation.

Comment Number: 000406_RiceM_20161101_AmericanRivers-34
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

Comment Number: 000406_RiceM_20161101_AmericanRivers-35
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report [for Potter creek] is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.
A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the

future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.

Comment Number: 000406_RiceM_20161101_AmericanRivers-37
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:
• Gunnison River Segment 2
• Roubideau Creek Segment 2
• Deep Creek
• West Fork Terror Creek
• Dry Creek
• Naturita Creek
• Tabeguache Creek Segment 2
• North Fork Mesa Creek
• Ice Lake Creek Segment 2
• La Sal Creek Segment 1
• Lion Creek Segment 2
• Spring Creek

Comment Number: 000406_RiceM_20161101_AmericanRivers-4
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Monitor Creek
This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0165729

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

Comment Number: 000406_RiceM_20161101_AmericanRivers-5
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Potter Creek
This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.
The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.
Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.
In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

Comment Number: 000406_RiceM_20161101_AmericanRivers-6
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau Creek Segment 1
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.
The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor. Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.
A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise).
Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management. We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

BLM_0165730

Comment Number: 000406_RiceM_20161101_AmericanRivers-7
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there. The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

Comment Number: 000406_RiceM_20161101_AmericanRivers-8
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Deep Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.
In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.
The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, so long as those other methods continue to successfully protect the trout and its habitat.

Comment Number: 000406_RiceM_20161101_AmericanRivers-9
Organization1:American Rivers
Commenter1:Matt Rice
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
West Fork Terror Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.
The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, so long as those other methods continue to successfully protect the trout and its habitat.

Comment Number: 000408_BattenD_20161027-1
Organization1:
Commenter1:Dave Batten
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165731

Starting with the Wild and Scenic Rivers designation, I appreciate your including the sixteen segments in Alternative D, and I believe it is very important to include all these segments in the final version of your RMP. I strongly support protecting these segments for their outstanding values and their free-flowing streams. I do question the wisdom of excluding some segments of continuous streams with wild and scenic characteristics. I would encourage you to include most of the segments that are included in Part B but currently are not included in Part D. I especially encourage you to give all of the Dolores segments the strongest protections that you can, in order to help rectify the mistakes made by the Grand Junction and Tres Rios districts in the past.

Comment Number: 000408_BattenD_20161027-3
Organization1:
Commenter1:Dave Batten
Commenter Type: Individual
Comment Excerpt Text:
On the other hand, I also see no point in giving wild and scenic status to tiny and isolated sections of streams, such as the Gunnison River segment 2, Deep Creek, and Terror Creek, though I support maintaining other kinds of protections on these segments. I feel that the protections provided for these segments by Alternative D are sufficient, even if those segments are not suitable for inclusion in the WSR designation.

Comment Number: 000409_DayB_20161031-17
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 586. Wild and Scenic Rivers. It is hard to see why any of the segments that are really suitable would not be included. If any have to be left out, maybe segments too small to manage could be. Alternative B makes more sense.

Comment Number: 000420_HovdeC_20161101-31
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Other Sections: 3
Comment Excerpt Text:
Page 2-359, Line 586, within the full array of management tools that BLM utilizes is the ability to protect the free-flowing nature and Outstanding Recreational Values for the stretches of waterways identified as eligible for designation. Delta County does not support any recommendation of these waterways as suitable for Wild and Scenic designation. o BLM should not use an administrative determination (WSR suitability) as the basis for imposing land use restrictions on adjoining land.

Comment Number: 000446_KlingspornK_20161101-6
Organization1:
Commenter1:Katie Klingsporn
Commenter Type: Individual
Comment Excerpt Text:
I support the Wild and Scenic suitability findings of the Draft RMP, and ask the BLM to protect the 104.6 miles of these sections as wild and free-flowing rivers. The SW Resource Advisory Council, which helped to come up with these suitable reaches on the San Miguel and the Dolores Rivers, facilitated an extremely inclusive, collaborative process, that brought together user groups from across the board.

BLM_0165732

Wild and Scenic suitability is an important tool for protecting our water resources for drinking water, ecological function, and many other uses. As a headwater community, these values are no less important for us; we recognize that every deficiency in downstream water quality and quantity also affects us.

Comment Number: 000456_ColeK_20161031-6
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
We strongly support utilizing available and recommended management tools to protect the free-flowing nature and Outstanding Recreational Values for the stretches of waterways identified as eligible for designation. We do not support any recommendation of these waterways as suitable for wild or scenic designation.

Comment Number: 000456_ColeK_20161031-7
Organization1:Board of County Commissioners for Mesa County
Commenter1:Kristen Cole
Commenter Type: Local Government
Comment Excerpt Text:
we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations. As written, this management action substitutes as administrative determination of "suitability" in lieu of Congressional action as intended by the WSR Act.

Comment Number: 000461_multiplenames_20160912_MontroseCtyBOCC-1
Organization1:Montrose County Commissioners
Commenter1:Ron Henderson
Commenter Type: Local Government
Comment Excerpt Text:
On behalf of the citizens of Montrose County, the Board of County Commissioners for Montrose County stand in opposition to the Department of Interior Bureau of Land Management ("BLM") inclusion for designation of portions of the San Miguel and Dolores Rivers, and some of their tributaries located in Montrose County under the Federal Wild and Scenic Rivers Act, 16 USC 1271-1287 as amended (the "Act"). On August 11, 2010, the County, acting through its Commissioners adopted Resolution #45-2010 opposing these designations. A copy of the Resolution is included.
These waterways flow through private land holdings, as well as those of the BLM, and land in the unincorporated areas of Montrose County. Many of the private land owners have owned and protected their land for many years. The waterways, and adjacent land, are already being used for recreational purposes where appropriate. The adjacent land that is a part of the BLM holdings, as well and the County land, is also being used for recreational purposes, where and when appropriate. As is obvious, there is no need to designate them for recreational purposes, since they are being used as such.

Comment Number: 000461_multiplenames_20160912_MontroseCtyBOCC-2
Organization1:Montrose County Commissioners
Commenter1:Ron Henderson
Commenter Type: Local Government
Comment Excerpt Text:

BLM_0165733

In addition to those already mentioned, there are multiple other reasons for not placing these waterways [San Miguel and Dolores Rivers] under the Act. These rivers and their tributaries are in the FEMA flood plain. To designate them under the Act would be to compromise needed health, safety and welfare protections for control of water flow to prevent flooding. It would also compromise the ability to control wildfires in the area and to properly route county traffic flow. The designation could also have a negative economic impact on the County. It stands to limit private landowners from utilizing their land to their determination of highest and best potential. In this time of economic hardship for many, to compromise the economic health of Montrose County by imposing limitations on the agricultural community, as well as land use ability, would create additional economic burdens.

These rivers and their tributaries have adequate protection under the current system of state and federal laws, including BLM regulations, as well as Montrose County land use regulations. To add another layer of government regulation and barriers would create a very fragmented system of regulations.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-1
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-3
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-4
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
Due to the scenic and recreational ORVs, the fact that this segment is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management. This is consistent with the San Juan Scenic Byway Management Plan11 , the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan12 , and the San Miguel County Comprehensive Development Plan13 . While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"14 , the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement. If this is indeed a fact, then stronger stipulations are needed to

replace those in Alternative D and/or in addition to the Alternative D stipulations. Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-8
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Other Sections: 27.1 3
Comment Excerpt Text:
San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments). The stipulations for these lands collectively should include:
-"7" = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.
o SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).
-"AVOID" = ROW Avoidance.
o SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.
-"CAMPFIRE" = No Campfires for dispersed camping.
o SMC Note: San Miguel County is ok with campfires in existing campgrounds -- Fall Creek, Caddis Flats and Lower Beaver if already allowed.
-"COAL" = Closed to coal mineral leasing.
o SMC Note: BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit. This entire area is given a classification of no coal potential in Alternative A.
-"CWOD" = Closed to commercial wood cutting.
-"DES" = Limited to designated routes / Limited to existing routes.
-"DR_Timing" = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).
-*"HYDROE" = Exclusion area for hydropower.
o SMC Note: This is consistent with the importance of this segment for fishing and recreational boating.
-"LOCATE" = Petition Secretary of Interior to withdrawal for locatable minerals.
-"NL" = No lease.
o SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC. According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments. This well was a wildcat well near Placerville, drilled in 1960 and was "DA: dry and abandoned."
o SMC Note: SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area. According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile23 , the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative. However, this stipulation seems to missing from the WSR Alt D shapefile attribute table24 . Alternative B gives all these areas the stipulation of

"NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.
[23http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.202 91.File.dat/fluid_minerals_alt_d.zip]
[24http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.286 98.File.dat/WSR_ALT_D_FINAL.zip]
-"RANGE" = Closed to livestock grazing.
o SMC Note: essentially already recommended in Alternatives B and D. This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.
-"RECMINE" = No recreational mining.
o SMC Note: SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor. Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining. San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.
-"SALABLE" = Closed to salable mineral disposal.
o SMC Note: Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.
-"SEED" = Area closed to seed collection.
-"SHEEP" = Grazing of sheep and goats not permitted
o SMC Note: essentially already recommended in Alternatives B and D. SMC Note: This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.
-*"SOLARE" = Exclusion area for solar.
o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here. The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations. PV arrays for off-site uses need to be proximal to substations. 25
[25http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Pa r.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]
-"SOLID"= Closed to non-energy solid mineral leasing.
o SMC Note: Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.
-"SSR" = Site-Specific Relocation.
-"TAR"=Prohibit target shooting.
o SMC Note: Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.
-"V-2"=VRM II
o SMC Note: WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted…In turn, this would provide indirect protection to segments

BLM_0165736

with a cultural or historical ORV." 26 As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.

[26Page 4-412;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.129 39.File.dat/4_UFO-DRMP2016_508.pdf]

o SMC Note: Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile. WSR should have a VRM II.

-*"WINDE"=Exclusion area for the wind.

o SMC Note: The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). 27

[27http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Pa r.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]

-"WOOD"=Closed to wood cutting.

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.28

[28http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.873 78.File.dat/WSR_ALT_D_FINAL.html]


Comment Number: 000483_HanksG_20161101-16
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Deep Creek
The suitability study for Deep Creek (segment 12) recommends that BLM manage to prevent any more degradation to flows, but says reason for recommendation of non-suitable is because of lack of instream flow in the future. If BLM is committed to managing for a beneficial outcome in regards to flow, what justification is left for not suggesting suitability? Trout Unlimited would like to add to the conversation that in Deep Creek are Greenback lineage native trout with less than 1% non-native genes. This classification of a conservation population is the cornerstone of recovery for a successful recovery of the entire species. This information was not mentioned or considered in the suitability study, and should be re-evaluated as an Outstanding Remarkable Value. The classification of a conservation population would give incentive to pursue some of the identified possibilities to secure necessary water sources in order to meet suitability standards on Deep Creek.


Comment Number: 000525_RutledgeT_20161101_MountainTripInternational-2
Organization1:Mountain Trip
Commenter1:Todd Rutledge
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We ask the BLM to fully protect all river and stream segments identified in the BLM Uncompahgre Wild & Scenic eligibility report as being suitable for Wild and Scenic designation. These river and stream segments have been recognized for their free---flowing condition and for their outstanding and remarkable values, including providing critical habitat for fish and excellent places to fly fish, raft and recreate. Having boated and explored many stretches threatened by potential development, we plead you to embrace the necessity of keeping such wild places in their natural condition. We therefore urge you to strongly support the suitability finding for the 104.6 miles that have been identified in the agency's

BLM_0165737

"Preferred Alternative," and urge you to retain all those stretches in the final RMP. Please include the 154 miles of streams and rivers found suitable in Alternative B to be included in your final plan.

Comment Number: 000535_RussellC_20161101-1
Organization1:
Commenter1:Chason Russell
Commenter Type: Individual
Comment Excerpt Text:
Please consider both the Dolores and San Miguel for Wild and Scenic designation

Comment Number: 000545_SlivkaJ_20161101-100
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 2
This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem. Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.
We recommend that San Miguel River Segment 2 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-101
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 3
This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows. While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.
We recommend that San Miguel River Segment 3 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-102
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 5
In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should

BLM_0165738

be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.
We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-103
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River, segment 6
This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.
While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management. We recommend that San Miguel River segment 6—or at least the federal portion—be found suitable with modifications recommended the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-104
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Tabeguache Creek Segment 1
This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream. Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report. Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.
We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-105
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Tabeguache Creek Segment 2
This segment contributes reliable and significant volume of streamflow to the San Miguel River, and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.
The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced. Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

BLM_0165739

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability.

Comment Number: 000545_SlivkaJ_20161101-106
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Lower Dolores River
Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection. The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.
In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.
While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants—cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.
We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-107
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
North Fork Mesa Creek
This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.
A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.
While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management, and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.
We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability.

BLM_0165740

Comment Number: 000545_SlivkaJ_20161101-108
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dolores River, segment 1
Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection. Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.
Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.
We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-109
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dolores River Segment 2
Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.
With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures. The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.
Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment. We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-110
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Ice Lake Creek Segment 2
This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values.
We concur with the SWRAC recommendation that, because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.

BLM_0165741

La Sal Creek Segment 1 We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability.

Comment Number: 000545_SlivkaJ_20161101-111
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
La Sal Creek Segment 2
This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area.
The presence of healthy populations of regionally imperiled native fish, and the presence of globally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.
Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal. We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-112
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
La Sal Creek, segment 3
If ever a stream segment were suitable under that definition of the Wild and Scenic Rivers Act, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.
In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.
Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management.
We recommend that the full length of La Sal Creek segment 3 be found suitable.

Comment Number: 000545_SlivkaJ_20161101-113
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Lion Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.
While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

BLM_0165742

Comment Number: 000545_SlivkaJ_20161101-114
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Spring Creek
This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.
While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

Comment Number: 000545_SlivkaJ_20161101-115
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additional river segments Roc Creek
Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.
The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).
This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination that it is suitable.

Comment Number: 000545_SlivkaJ_20161101-116
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: We recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:
• Monitor Creek • Potter Creek • Roubideau Creek Segment 1 • Beaver Creek • Saltado Creek • San Miguel River Segment 1 • San Miguel River Segment 2 • San Miguel River Segment 3 • San Miguel River Segment 5 • San Miguel River Segment 6 • Tabeguache Creek Segment 1 • Lower Dolores River • Dolores River Segment 1 • Dolores River Segment 2 • La Sal Creek Segment 2 • La Sal Creek Segment 3 • Roc Creek

Comment Number: 000545_SlivkaJ_20161101-117
Organization1: The Wilderness Society
Commenter1: Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165743

We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:
• Gunnison River Segment 2 • Roubideau Creek Segment 2 • Deep Creek • West Fork Terror Creek • Dry Creek • Naturita Creek • Tabeguache Creek Segment 2 • North Fork Mesa Creek • Ice Lake Creek Segment 2 • La Sal Creek Segment 1 • Lion Creek Segment 2 • Spring Creek

Comment Number: 000545_SlivkaJ_20161101-80
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We believe that the W&S suitability findings included in the BLM's Wild and Scenic River Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP.

Comment Number: 000545_SlivkaJ_20161101-81
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Critique of working groups One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.
The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.
As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

Comment Number: 000545_SlivkaJ_20161101-82
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Watershed approach to rivers management and protection The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests. Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office. That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

BLM_0165744

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

Comment Number: 000545_SlivkaJ_20161101-83
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

Comment Number: 000545_SlivkaJ_20161101-84
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights.

Comment Number: 000545_SlivkaJ_20161101-85
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation.

Comment Number: 000545_SlivkaJ_20161101-86
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

We strongly endorse all the W&S suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Comment Number: 000545_SlivkaJ_20161101-87
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments.

Comment Number: 000545_SlivkaJ_20161101-88
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Gunnison River Basin Gunnison River Segment 2
As documented the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.
Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation of the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.
It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

Comment Number: 000545_SlivkaJ_20161101-89
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Monitor Creek This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.
BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.
Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0165746

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (desert bighorn sheep). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.


Comment Number: 000545_SlivkaJ_20161101-90
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

Potter Creek This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream. The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (desert bighorn sheep). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

BLM_0165747

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation.

While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands. We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.

Comment Number: 000545_SlivkaJ_20161101-91
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau Creek Segment 1
This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard

BLM_0165748

frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise). Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

Comment Number: 000545_SlivkaJ_20161101-92
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

Comment Number: 000545_SlivkaJ_20161101-93
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Deep Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows. The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, so long as those other methods continue to successfully protect the trout and its habitat.

Comment Number: 000545_SlivkaJ_20161101-94
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
West Fork Terror Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there. The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, so long as those other methods continue to successfully protect the trout and its habitat.

BLM_0165749

Comment Number: 000545_SlivkaJ_20161101-95
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Beaver Creek
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.
Federal land ownership of nearly 100% will simplify effective implementation of protective management. We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-96
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dry Creek
This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.
The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor. Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effective implementation of protective management.
We concur with the SWRAC recommendation that the Dry Creek segment may be sufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.

Comment Number: 000545_SlivkaJ_20161101-97
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Naturita Creek
This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.
While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections—including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation.

Comment Number: 000545_SlivkaJ_20161101-98
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Saltado Creek

BLM_0165750

Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River. The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River. 100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC.

Comment Number: 000545_SlivkaJ_20161101-99
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
San Miguel River Segment 1
This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence. With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.
This segment includes unparalleled scenery and attendant natural and cultural features. The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features. We recommend that all of San Miguel River Segment 1 be found suitable.

Comment Number: 000561_BeyerK_20161101-1
Organization1:
Commenter1:Krista Beyer
Commenter Type: Individual
Comment Excerpt Text:
I have been fortunate enough to have seen both the Dolores as well as the San Miguel Rivers and believe both meet the suitability requirements for Wild and Scenic designations. Both rivers are situated in incredible scenic as well as historical locations important to the past, present, and future culture of the Four Corners area. Both rivers contain a rich history of Native American presence as well as explorers, pioneer settlers, miners, homesteaders, and/or outlaws. This history along with the priceless value of water in the Colorado River Basin, wilderness in the west, and new found recreational boating and angling value make these river segments ideal for a Wild and Scenic suitability designation that should be maintained as a part of the Resource Management Plan.

Comment Number: 500073_GoldmanA_20161101-1
Organization1:
Commenter1:Andrew Goldman
Commenter Type: Individual
Comment Excerpt Text:
In addition to the river segments listed for suitable in the draft RMP preferred Alternative D for "Wild and Scenic" designation, all free flowing rivers and streams included as suitable in the original analysis should also be included, specifically:

BLM_0165751

* Gunnison River segment 2
* Tabaguche Creek segment 1
* Robideau Creek segment 2
* North Fork Mesa Creek
* Deep Creek
* Dolores River segment 1b
* Dry Creek Segment 1
* Lion Creek Segment 2
* Naturita Creek
* Spring Creek
Spring Creek and its adjacent canyon is a favorite hiking spot for me and provides beautiful opportunities for solitude and quiet recreation. It's an important wildlife corridor as well off the Uncompaghre Plateau.

.Comment Number: 500185_WilliamsS_20161027-2
Organization1:
Commenter1:Sheelagh Williams
Commenter Type: Individual
Comment Excerpt Text:
Another aspect of protecting unique and ecologically important areas is the Wild and Scenic River designation. The BLM is to be applauded for including 104.6 miles of the 154 miles of rivers and streams in the Preferred Alternative. I urge you to be strong and include the 104.6 miles in the final RMP. The final RMP should provide river and stream protection equal to or stronger than that provided in adjacent federal land planning areas to the north and south of these watersheds. I personally would like to see the following added: Gunnison River segment 2, Deep Creek, Naturita Creek, Ice Lake Creek segment 1 and Spring Creek.

Comment Number: FormLetterC-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I ask you to include all of these segments in the final plan.
Specifically, I urge the BLM to:
• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic eligibility report for their free-flowing condition and for all outstandingly remarkable values.
•Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include the following segments found suitable in Alternative B in the preferred Alternative.
• Add Roc Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild & Scenic protection.
• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning areas to the North and South of these watersheds.
I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

*Summary*
A. Commenters had varying opinions on the extent to which decision area rivers should be found suitable for inclusion in the National Wild and Scenic Rivers System. One commenter stated that any free-flowing river should be found suitable. Other commenters felt that the balanced approach determined by consensus and proposed in Alternative D was appropriate.

BLM_0165752

B. Specifically, some commenters recommended that the following eligible segments be found suitable for inclusion in the National Wild and Scenic Rivers System:

- Beaver Creek – important tributary to the San Miguel River
- Dolores River – outstanding scenic and recreation values
- Dominguez Canyon – outstanding scenic and recreation values
- La Sal Creek Segments 1,2, 3 – extensive private land ownership in segment 1, unroaded geography, including distinctive canyon features, in segment 2, and regionally rare riparian and scenic values in segment 3
- Ice Lake Creek Segment 2 – free-flowing condition, water quality, and stream corridor values
- Monitor Creek – outstandingly remarkable values for riparian vegetation communities, recreation, wildlife, and cultural values
- Naturita Creek – endangered native fish and/or fish species of concern
- North Fork Mesa Creek – presence of imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands, and important contributor to high-quality streamflows to Mesa Creek and eventually the Dolores River
- Potter Creek – outstandingly remarkable values for riparian vegetation communities, recreation, wildlife, and cultural values
- Lion Creek – unroaded geography, including distinctive canyon features
- Spring Creek – unroaded geography, including distinctive canyon features
- Gunnison River Segment 2 – important recreational values, habitat for at least two endangered species of native fish, along with three other species of ancient native fish
- Gunnison River within Dominguez-Escalante National Conservation Area
- Roc Creek (add to eligibility – included as eligible in the Manti-La Sal National Forest Land and Resource Management Plan)
- Roubideau Creek, segments 1 and 2 – outstandingly remarkable values for riparian vegetation communities, recreation, wildlife, and cultural values
- Saltado Creek – important streamflow-contributing tributary to the San Miguel River
- San Miguel River, Segment 1 – important streamflow contribution to the Dolores River, scenery, natural and cultural resources, and four globally vulnerable (G3) riparian communities
- San Miguel River, Segment 2 – undisturbed stream and corridor features, including geological and landform scenery
- San Miguel River, Segment 3 – recreation experiences
- San Miguel River, Segment 5 – important habitat for imperiled native fish noted in the BLM's Final Eligibility Report
- San Miguel River, Segment 6 – important habitat for imperiled native fish and healthy, native riparian vegetation along this segment
- Tabeguache Creek, Segment 1 – important wildlife support
- Tabeguache Creek, Segment 2 – significant volume of streamflow to the San Miguel River
- Deep Creek – greenback cutthroat trout

BLM_0165753

- West Fork Terror Creek – outstanding wildlife and vegetation values and relatively low percentage of federal land ownership along the stream

C. Other commenters recommended and provided rationale for finding the following segments not suitable for inclusion in the National Wild and Scenic Rivers System:

- Deep Creek
- Dolores River
- Dry Creek (protected by ACEC designation and NSO stipulation)
- Ice Lake Creek Segment 2
- La Sal Creek Segment 1
- Lion Creek, Gunnison River Segment 2
- Naturita Creek
- North Fork Mesa Creek
- Roubideau Creek Segment 2
- San Miguel River
- Spring Creek
- Tabeguache Creek Segment 2
- West Fork Terror Creek

D. Some commenters noted that the above segments already have protection or do not warrant protection, while others recommended that these segments are protected by other designation and measures that are monitored for effectiveness.

E. Other commenters noted that it is an overreach for the BLM to use administrative designations as a basis for imposing NSO and other land use restrictions. The BLM should restrict activity only when designation in the National Wild and Scenic Rivers System is granted through Congress. For example, Montrose County Commissioners drafted Resolution #45-2010 opposing the designation of the San Miguel and Dolores Rivers as eligible for inclusion in the National Wild and Scenic Rivers System. They are in a Federal Emergency Management Act floodplain, which would compromise the County's ability to manage flood control, and would limit private landowners from using their lands to their fullest potential. They are adequately protected under the current system of state and federal laws.

F. Commenters requested that BLM consider these specific recommendations related to management actions:

1. Do not adjust RMP suitability findings for stream segments being discussed for possible federal legislation (e.g., upper Dolores River and La Sal Creek) and leave final or adjusted determinations to Congress or to future BLM administrative processes. For example, Upper Dolores River Segment 1A and La Sal Creek segments 2 and 3 are currently being considered for a National Conservation Area. If designated, Congress will determine that none of these segments are suitable.
2. Consider if federal reserved instream flow water rights are the best method for protecting flow-related outstandingly remarkable values in river corridors, and provide alternatives.

BLM_0165754

3. Manage all segments with protection equal to or stronger than adjacent federal land planning areas surrounding these UFO segments.

4. For San Miguel River Segment 1, one commenter recommended stronger stipulations in Alternative D and VRM Class II or better management.

*Response*

A–C. WSR eligibility and suitability is a multi-step process involving evaluation and input from potentially affected parties per Section 5(d)(1) of the Wild and Scenic Rivers Act and BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Mitigation. Documentation of the process used to determine suitability is summarized in Draft RMP/EIS Appendix P and detailed in the 2013 UFO Draft Wild and Scenic River Suitability report. The 13 suitability criteria defined in BLM Manual 6400 together help inform the suitability determination. One of the suitability criteria directs the BLM to consider existing support of or opposition to designation. Expressions of support of or opposition to designation in comment letters were considered by the BLM under this factor. Suitability determinations were reviewed based on additional information provided in comments, and final determination of suitability will be issued in the RMP Record of Decision.

Finding a stream not suitable does not remove the BLM's authority to manage for the values identified during the eligibility stage. While the current RMP may lack management protections for these values, the Draft RMP/EIS was designed to specifically incorporate measures to manage for river-related values. These measures are based upon multiple legal authorities that the BLM relies upon outside of the Wild and Scenic Rivers Act.

Dominguez Canyon and the Gunnison River within Dominguez-Escalante National Conservation Area are outside of the UFO RMP decision area. Other comments suggested that there are additional outstandingly remarkable values that should have been included for certain segments. The BLM considered all of those values during the study process and found that, while those values exist in many segments, they are not unique, rare, or exemplary within the region and do not rise to the level of "outstandingly remarkable values," as defined by the BLM.

D. The BLM acknowledges that other measures may provide protection of outstandingly remarkable values in eligible segments regardless of the ultimate suitability determination in the BLM RMP. The BLM's Manual direction for the suitability analysis process squarely focuses on other potential protection measures by requiring the BLM to answer the following questions: Will the river's free-flowing character, water quality, and outstandingly remarkable values be protected through designation? Is designation the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered (see Draft RMP/EIS Appendix P). To evaluate the effectiveness and impacts associated with alternative protection measures, the Draft RMP/EIS includes an alternative (Alternative B) in which all of these stream segments are found suitable, and it also included an alternative determining that all of the segments are not suitable (Alternative C).

E. The BLM's Wild and Scenic Rivers Manual 6400, Section 3.6 requires the BLM to implement interim management protection when a stream is determined to be eligible or suitable.

BLM_0165755

Protective interim management is required to preserve the option of the US Congress to designate a stream segment into the NWSRS by preventing the river-related values from being degraded while the stream is in interim status. Protective interim management applies only on BLM-administered segments and does not apply management restrictions to privately owned lands.

F. The BLM appreciates the comments.

1.  The BLM Wild and Scenic Rivers Manual 6400 requires the BLM to consider management approaches that might serve as an alternative to a suitability determination and potential inclusion in the National Wild and Scenic Rivers System. The objective is to identify the optimal management approach for the river corridor. The suitability analysis requires the BLM to assess the current status of the river corridor, the likelihood of various types of development, and management issues that could arise within the river corridor. As such, the Draft RMP/EIS includes analysis of a range of suitability determinations, as noted in Section 2.3, Alternatives Considered for Detailed Analysis, Table 2-1, page 2-14. National Conservation Areas are often highly effective tools for managing outstandingly remarkable values. However, new National Conservation Areas are created only by Congress are not an administrative management tool that the BLM can unilaterally implement by making a planning decision. The BLM cannot consider potential federal legislation during the suitability analysis or land use planning process. Accordingly, the BLM will not adjust its analysis based upon potential federal legislation.

2.  Formal Congressional designation under the Wild and Scenic River Act automatically incorporates a federal instream flow water right, unless Congress includes a legislative exception for the river being designated. However, the BLM's decision does not comprise any sort formal designation into the National Wild and Scenic Rivers System, and does not create a federal water right for the segment. The Draft RMP/EIS includes analysis of a range of suitability determinations, as noted in Section 2.3, Alternatives Considered for Detailed Analysis, Table 2-1, page 2-14. Analysis includes examination of alternative methods for outstandingly remarkable values protection. The BLM's suitability reports documents segments with existing instream flow water rights established by the Colorado Water Conservation Board, and identifies segments where it may be possible to rely upon Colorado Water Conservation Board instream flow rates if new or enlarged instream flow are established to fully protect the water-dependent outstandingly remarkable values.

3.  Management prescriptions and stipulations that apply to eligible or suitable stream corridors would be equally or more protective than any prescriptions and stipulations that apply to adjacent lands. Special designations on adjacent land can provide protection of a segment's tentative classification by prohibiting or otherwise precluding the type of development that would change the free-flowing condition, degrade the outstandingly remarkable values, or degrade water quality. If a stream segment is determined to be not suitable and the wild and scenic rivers prescriptions and stipulations are removed, then management of the stream corridor is governed by prescriptions and stipulations that apply to the underlying and adjacent lands. The Draft RMP/EIS includes analysis of a

BLM_0165756

range of suitability determinations, as noted in Section 2.3, Alternatives Considered for Detailed Analysis, Table 2-1, page 2-14.

4. The BLM appreciates the comments. The BLM reviewed recommended management and incorporated it in the Proposed RMP/Final EIS, as appropriate.

**Section 39.2 – Wild and Scenic Rivers: Best available information—baseline data**

Total Number of Submissions: 4
Total Number of Comments: 5

Comment Number: 000371_VanVurstB_20161031-1
Organization1:Southwestern Water Conservation District
Commenter1:Beth Van Vurst
Commenter Type: Local Government
Comment Excerpt Text:
The Bureau of Land Management ("BLM") proposes, under the preferred Alternative D, to find eight river segments in the San Miguel Basin and five river segments in the Dolores Basin suitable for inclusion in the National Wild and Scenic Rivers System. SWCD is aware that the BLM's preliminary suitability findings on these specific river segments may be consistent with the recommendations previously made by the Southwest Resource Advisory Council. However, the BLM's suitability findings must also be based on the most up-to-date and accurate information possible since such a finding may have immediate and far-reaching consequences on water users within the San Miguel and Dolores river basins. The Draft RMP-EIS does not appear to take into account the efforts of local stakeholders to establish the Dolores River National Conservation Area which, if successful, would obviate the need for a suitability determination onone or more segments within what the BLM has identified as the "Upper Dolores River" hydrologic unit.

Comment Number: 000371_VanVurstB_20161031-2
Organization1:Southwestern Water Conservation District
Commenter1:Beth Van Vurst
Commenter Type: Local Government
Comment Excerpt Text:
On a broader level, the BLM's suitability analysis for the San Miguel and Dolores Basin river segments appears to rely on information that was collected many years ago. The suitability analysis should be updated to take into account the Colorado Water Plan, the Southwest Basin Roundtable's Basin Implementation Plan and the Statewide Water Supply Initiative (SWSI). Both of these plans were released in 2015 and the SWSI report was last updated in 2010. All of these documents contain important information regarding Colorado's anticipated water demands and planned water development projects. The BLM should also review information available on the Colorado Decision Support System to make sure that its suitability analysis, and the Draft RMP-EIS as a whole, takes into account all decreed absolute and conditional water rights including, but not limited to, those decreed by Montrose County in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-2
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values.

BLM_0165757

San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin.5

Comment Number: 000483_HanksG_20161101-15
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
West Fork Terror Creek
Preventing the listing of suitability in this RMP is the lack of information on Greenback Cutthroat trout. Instead of dropping the suitability of the segment, Trout Unlimited would prefer a directive to gather more information and retain management as if found suitable until presence of GBCT is researched.

Comment Number: 000509_WolcottE_20161102-17
Organization1:
Commenter1:Eli Wolcott
Commenter Type: Individual
Comment Excerpt Text:
This includes waterways on BLM lands and downstream. Many of these waterways have been inventoried for their unique and important characteristics, and yet these inventories have not been included in the analysis and should be.

*Summary*
A. Commenters stated that the BLM must consider other plans, new information, and anticipated water demands when making suitability determinations. Plans/data recommended for review include the following:

- Colorado Water Plan
- Southwest Basin Roundtable's Basin Implementation Plan
- San Miguel Flow Survey
- Dolores Water Conservancy District Drought Contingency Plan
- Colorado Decision Support System
- Statewide Water Supply Initiative
- Colorado Parks and Wildlife fish values data
- Greenback cutthroat trout data

B. Other commenters stated that the Draft RMP/EIS does not take into account the efforts of local stakeholders to establish the Dolores River National Conservation Area, which would obviate the need for a suitability determination in the Upper Dolores River.

C. One commenter felt that the BLM should consider gathering more current information on segments before dropping the suitability consideration.

*Response*
A. The BLM appreciates the comments. The BLM reviewed the data provided and incorporated it in the Proposed RMP/Final EIS, as appropriate.

BLM_0165758

B. National Conservation Areas are often highly effective tools for managing outstandingly remarkable values. However, new National Conservation Areas are created only by Congress and are not an administrative management tool that the BLM can unilaterally implement by making a planning decision. The BLM cannot consider potential federal legislation during the suitability analysis or land use planning process. Accordingly, the BLM will not adjust its analysis based upon potential federal legislation.

C. Draft suitability determinations were made based on the best available data at the time of writing. The BLM reviewed additional data as recommended in comments and will utilize that information in developing the final determinations.

### Section 39.3 – Wild and Scenic Rivers: Impact analysis
No comments are associated with this topic.

### Section 39.4 – Wild and Scenic Rivers: Cumulative impact analysis
No comments are associated with this topic.

### Section 39.5 – Wild and Scenic Rivers: Mitigation Measures
No comments are associated with this topic.

## Section 40 – Wilderness Areas/Wilderness Study Areas

### Section 40.1 – Wilderness Areas/Wilderness Study Areas: Range of alternatives
Total Number of Submissions: 12
Total Number of Comments: 17

Comment Number: 000040_WadeJ_20160712-1
Organization1:
Commenter1:Jon Wade
Commenter Type: Individual
Comment Excerpt Text:
I am also opposed to establishment of any additional wilderness areas or designation of other protected areas unless the local residents request that designation. The unintended consequences of living adjacent to areas with special management are unacceptable, and the impacts on residents are seldom mitigated. I request that the wilderness study area designations be removed from these lands because they also bring uncompensated impacts to area residents, and those designations are seldom removed once imposed, even after all study has ended.

Comment Number: 000269_CascadeR_20161028-5
Organization1:
Commenter1:Robyn Cascade
Commenter Type: Individual
Other Sections: 20.1
Comment Excerpt Text:
also strongly recommend that, if Congress releases any WSAs from wilderness consideration, the UFO continue to manage these units as wilderness to protect their wilderness characteristics into the future

BLM_0165759

Comment Number: 000420_HovdeC_20161101-38
Organization1: Delta County
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
Continue to push for Congress to release the Adobe Badlands WSA and manage it for an ERMA. The Adobe Badlands Area should be managed for recreation and allow for the cross country travel of this area to reduce the burden on adjoining areas.

Comment Number: 000444_JackinoR_20161029-6
Organization1:Uncompahgre Valley Trail Riders
Commenter1:Rich Jackino
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Over thirty years ago these areas were designated, restrictions were put in place and they have languished in a "hold" state for all this time. FEW STUDIES have been performed even though that was the stated intent. These areas do NOT include any special wilderness characteristics, with maybe a couple of exceptions. Few, if any, inventories have been completed documenting special characteristics. These 36,160 acres have been locked up while we all wait for congressional action to return these areas to BLM management. We request that one of these areas (Camel Back – 10,680 acres) be immediately managed with the creation of a few designated ATV trails. This area is located in close proximity to the population centers of Delta and Montrose and will serve the recreational needs of these communities. The designated trails approach does not create harm to other fauna and flora attributes of these areas if any exist.

Comment Number: 000489_JohnsonA_20161101-88
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
I. Wilderness Study Areas
We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress.
The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA. Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter- Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.

Comment Number: 000501_Bockus_20161101_NPS-9
Organization1:National Park Service
Commenter1:Danguole Bockus
Commenter Type: Federal Government
Other Sections: 20.1
Comment Excerpt Text:

BLM_0165760

PAGE/PARAGRAPH: Vol III, Appendix F Wilderness Characteristics Inventory
COMMENT: The 2008 publication of "Keeping It Wild: An Interagency Strategy for Monitoring Wilderness Character Across the National Wilderness Preservation System" (Landres and others 2008) provided the first nationally consistent interagency strategy to assess whether wilderness character is being preserved. This strategy was recently updated by the 2015 publication of "Keeping It Wild 2: An Updated Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System". Will the BLM UFO be adopting this interagency strategy to monitor for wilderness character in WSAs, proposed or designated wilderness that have wilderness characteristics? The adoption of this monitoring strategy may assist with future wilderness planning and management.

Comment Number: 000534_HenningB_20161028_RockyMtnElkFdn-1
Organization1:Rocky Mountain Elk Foundation
Commenter1:Blake Henning
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The only part of Alternative D that we do not support is the recommendation for Wilderness designation of 13, 350 acres of the Dolores River Canyon and 1,800 acres of the Sewemup Mesa. We are pleased that the Camel Back (10,400 acres), Adobe Badlands (10,430 acres), and Needle Rock (80 acres) Wilderness Study Areas were not recommended for Wilderness designation by Congress. With the identified shortage of early succession habitat within the planning area, active management is needed on a large scale and classification as Wilderness would prohibit active management for wildlife habitat. In the Colorado Plateau ecoregion's mid-elevation forest type the analysis points out that only 5% is in grass-forb type, while more than 71% is in Pinyon-Juniper type. While in the Southern Rockies ecoregion there is nothing identified in the grass-forb type, we suspect that it may be contained in the mountain shrub type.

Comment Number: 000545_SlivkaJ_20161101-118
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress. Uncompahgre Draft RMP at 2-357—358. Particularly, we support the robust management actions for Sewemup Mesa WSA in Alternatives B and D, and encourage BLM to carry those management actions through to the Proposed RMP. BLM should manage Sewemup Mesa as ROW exclusion rather than ROW avoidance, as contemplated in Alternative B. Ibid.

Comment Number: 000545_SlivkaJ_20161101-119
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Additionally, the commitment to managing the Adobe Badlands and Dolores River Canyon WSAs consistent with overlapping ACEC designations is appropriate to ensure the relevant and important values of these areas continue to be proactively managed in the event the WSAs are released from wilderness study by Congress.

BLM_0165761

Comment Number: 000545_SlivkaJ_20161101-120
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA.
Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter- Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.

Comment Number: 000545_SlivkaJ_20161101-121
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We also note that Special Recreation Management Areas overlapping with Wilderness Study Areas apply Visual Resource Management classes that are inconsistent with WSA policy, and how BLM states WSAs will be managed in the Draft RMP. BLM Manual 6330 states: "All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses." BLM Manual 6330 at 1.6(D)(9). Indeed, the Draft RMP states that all WSAs will be managed as VRM I across the range of alternatives. Uncompahgre Draft RMP at 2-355. The Dolores River Canyon SRMA overlaps with the Dolores River Canyon WSA, but the SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Uncompahgre Draft RMP at J-11, J-13.
Similarly, the Roubideau SRMA overlaps with the Camel Back WSA. The Roubideau SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Id. at J-63. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP.

Comment Number: 000545_SlivkaJ_20161101-122
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should carry forward the management actions for Sewemup Mesa WSA from Alternative B. BLM should carry forward the commitment to manage released WSAs consistent with overlapping ACEC and SRMA designations, as stated in Alternatives B and D. Particularly for Camel Back WSA, if BLM does not designate the Roubideau-Potter-Monitor ACEC or Roubideau SRMA as outlined in Alternative B, BLM should identify specific management actions in the final RMP to protect the area similar to Sewemup Mesa. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP.

BLM_0165762

Comment Number: 500013_MorreC_20161027-2
Organization1:
Commenter1:Claire Moore
Commenter Type: Individual
Comment Excerpt Text:
WSAs: I have been through the Dolores River Canyon WSA several times. The plant species and the bird species of that area need continued protection, especially with the low flows of the river since the McPhee Dam impounds most of the water.

Comment Number: 500106_JesseU_20161101-1
Organization1:
Commenter1:Ulli Lir Jesse
Commenter Type: Individual
Comment Excerpt Text:
I love to hike, birdwatch and find solitude in the wilderness area. I hiked into the Camelback Wilderness this spring and loved the rock formations, bird species and solitude.
Please do not develop for oil and gas and please use the recommendation under Alternative B.
Preserving this area for future generations is important to allow many more people to enjoy this area.
If more tire tracks were to destroy the soil there it would take away from the senic and quiet use of this area.
Also Robideau Creek is a haven for wildlife and fish.

Comment Number: 500112_BallantyerM_20161101-1
Organization1:
Commenter1:Mary Ballantyer
Commenter Type: Individual
Comment Excerpt Text:
Roubideau
1) I have been here in the last winter and early summer, hiking + photographing
2) I like the area because it is close to home (Montrose) and can be visited in the winter. Views are spectacular and walking next to a creek is always fun. I have not seen bighorns although I understand they are often there. Also I have not seen Indian artifacts though they are known to be there. Having to cross the stream (wade through) is thrilling + somewhat challenging, and permits more solitude for anyone wanting to get their feet wet. I plan ahead. I know some of the descents of early pioneers who trailed cattle through here while makes it more interesting. Some day I would like to go all the way up through the forest to the road and shuttle back down. I would like this area to have protection and management of wilderness so that I can be enjoyed perpetually.

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-18
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
19d. Watershed health managements standards identify the critical need for active management of these areas.
The Organizations must note that the designations and management of WCA/WSA areas fails to analyze the need for active management in protecting watershed health in these areas. The need for management to address priority watershed management issues is specifically identified in regional management documents prepared under FSM 2520. The Organizations must again note the USFS is a science partner with the BLM and the Organizations believe these issues and management standards are

BLM_0165763

clearly based on best available science. The regional priorities identify forest thinning as the priority management issue in watershed areas to protect against wildfire risks and this need is are simply never addressed in the designation of WSA/WCA in the DRMP. Forest Service research identifies a wide variety of adverse impacts to watershed health from a lack of ability to actively manage a watershed. The Organizations believe these management priorities are accurately addressed in USFS regional watershed guidelines and the reasoning for the variance between the DRMP and regional guidelines must be addressed.

Region 2 mangers have completed this requirement under FSM 2520 in partnership with the Colorado Forest Service and the Denver Water Department. These guidelines have been adopted by all 11 front range counties for management of Watershed areas. The regional guidelines for protection and management of watersheds outlines significantly different management objectives and requirements for watersheds as these guidelines identify the need for thinning and removal of trees as the management priority, of which motorized access and routes is a key tool. Issues such as stream bank stabilization and fisheries habitat enhancement are simply never addressed in regional watershed management guidelines. The project appears to directly contradicts the concerns and direction for management provided in the management guidelines. Clearly this issue must be resolved prior to moving forward with any expansion of WCA type management.

*Summary*

A. Commenters stated that the BLM should manage the following areas as wilderness:

- Camel Back WSA unit and lands with wilderness characteristics unit, including Monitor Mesa
- Dolores River Canyon WSA unit and lands with wilderness characteristics unit
- Adobe Badlands WSA unit and lands with wilderness characteristics unit
- Sewemup Mesa
- Roubideau WSA

B. Commenters noted that the BLM release the following WSAs:

- Adobe Badlands
- Camel Back
- Dolores River Canyon
- Sewemup Mesa

C. Commenters provided the following additional comments on WSA/Wilderness management actions:

1. The BLM should adopt the strategy outlined in Keeping It Wild 2: An Updated Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System to manage Wilderness Study Areas
2. SRMAs overlapping the WSAs apply VRM classes that are inconsistent with WSA policy
3. Designation of WSA/lands with wilderness characteristics areas fail to analyze the need for protecting watersheds in the area per US Forest Service Manual FSM 2520, as the Forest Service is a science partner of the BLM
4. Wilderness/WSA designations should only be established if local landowners support the process

BLM_0165764

Case No. 1:20-cv-02484-MSK   Document 77-11   filed 04/29/21   USDC Colorado   pg 171 of 423

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 40 – Wilderness Areas/Wilderness Study Areas)

5. If Congress releases any WSAs from consideration, the UFO should continue to manage these units as wilderness to protect their wilderness characteristics

*Response*

A-B. Only Congress holds the authority to designate Wilderness, or designate or release WSAs from consideration. It is no longer the policy of the BLM to designate additional WSAs through the RMP process, or to manage any lands other than existing WSAs in accordance with BLM Manual 6330, Management of Wilderness Study Areas (Draft RMP/EIS Section 1.5, Planning Criteria and Legislative Constraints, page 1-12), as affirmed in the settlement agreement from Utah v. Norton. Under all Draft RMP/EIS alternatives, the BLM would continue to manage the five existing WSAs according to BLM Manual 6330, Management of Wilderness Study Areas, until such time as Congress either designates them as wilderness or releases them for other uses (Draft RMP/EIS Section 4.5.2, Wilderness and Wilderness Study Areas, page 4-395). Current guidance in BLM Manual 6330, Management of Wilderness Study Areas (which derives its authority from FLPMA Section 603(c)), directs the BLM to manage WSAs "…so as not to impair the suitability of such areas for preservation as wilderness." This would include restrictions on the allowance of new discretionary uses or the development of new trails or other recreational infrastructure that may establish an expectation of continued use that would be incompatible with future wilderness designation.

C.

1. WSAs are managed according to BLM Manual 6330, Management of Wilderness Study Areas; guidance for monitoring WSAs is also provided in this manual. Keeping It Wild 2 is a monitoring and reporting mechanism for designated Wilderness Areas, of which there are none in the Uncompahgre RMP planning area.

2. As noted in Draft RMP/EIS Section 4.1.2, General Methodology for Analyzing Impacts, page 4-5, in instances where varying management levels overlap, the stricter management prescriptions would apply. Therefore, the VRM guidance from the WSA would apply when the WSA and SRMA overlap. Should the WSA in question be released from consideration by Congress, SRMA management prescriptions would apply.

3. "WCA" is not a known term for any BLM-administered lands; however, it can be inferred that the commenter meant "lands with wilderness characteristics." Management of BLM-administrated lands is not required to comply with Forest Service direction, such as that in Forest Service Manual FSM 2520.

4. As noted above, under the A-B response above, WSA designation is determined by Congress and is not a decision made in the land use planning process.

5. The potential for impacts on wilderness characteristics should current WSAs be released from consideration by Congress is discussed for each alternative in Draft RMP/EIS Section 4.5.2, Wilderness and Wilderness Study Areas, pages 4-308–4-407. In the event that one or more WSA is released by Congress from wilderness consideration, management of an area in accordance with WSR, SRMA, ecological emphasis area, or ACEC principles could offer some indirect protection of wilderness characteristics. Management by alternative, as detailed in the Draft RMP/EIS, offers a varying level of overlapping protection and is analyzed in Section 4.5.2, Wilderness and

BLM_0165765

Case No. 1:20-cv-02484-MSK   Document 77-11   filed 04/29/21   USDC Colorado   pg 172 of
423

R. Comment Summary and Response Report (3. Comment Summaries and Responses, Section 40 – Wilderness
Areas/Wilderness Study Areas)

Wilderness Study Areas. In addition, Alternative B would provide additional protection of wilderness characteristics should any WSAs be released by Congress from further wilderness consideration. It would do this by requiring an update to the wilderness characteristics inventory for lands that were formerly WSAs (FLPMA Section 201) and by specifying that, on release, those lands would be managed consistent with underlying land use designations (Draft RMP/EIS page 4-401).

### Section 40.2 – Wilderness Areas/Wilderness Study Areas: Best available information—baseline data

No comments are associated with this topic.

### Section 40.3 – Wilderness Areas/Wilderness Study Areas: Impact analysis

Total Number of Submissions: 2
Total Number of Comments: 2

Comment Number: 000224_O'ReillyE_20161019-1
Organization1:
Commenter1:Elizabeth O'Reilly
Commenter Type: Individual
Comment Excerpt Text:
I often travel on road 133 to access the Wilderness. This road is always slumping, shifting and moving due to unstable conditions. I can't imagine what an increase in traffic, specifically any related to fracking needs with heavy & numerous vehicles crossing the already stressed pavement will do? Cost CDOT in damages and upkeep ? As designated the "West Elk Scenic Drive" with an increase in truck traffic, gas pads and such will cheapen the Scenic part of the drive for many. Any other alternative choice shows lack of support for the value of these lands beyond just a mineral extraction exchange, i.e., financial and thus the value of "Scenic" is redefined in a manner not consistent with Wilderness.

Comment Number: 500203_McCainJ_20161025-9
Organization1:
Commenter1:James McCain
Commenter Type: Individual
Comment Excerpt Text:
• The draft RMP does not consider proximity to designated wilderness areas such as the West Elk Wilderness and Raggeds Wilderness, which are protected with Class 1 Airshed classifications. What would be the air quality impacts caused by adjacent development. There is currently a proposed well pad within 1 mile of the Wilderness Area border.

#### Summary

Commenters stated that the Draft RMP/EIS did not analyze how increased truck traffic would impact access to Wilderness, and it did not analyze proximity of Wilderness to development in an airshed context.

#### Response

It is unknown where truck traffic would occur with respect to Wilderness Areas and WSAs, so a discussion to this specific impact would be difficult to conduct. However, general impacts of truck traffic on recreation and tourism were added to the discussion of socioeconomic impacts in the Proposed RMP/Final EIS. Also see response to Section 30 – Socioeconomics and Environmental Justice, Section 30.3 – Impact Analysis, of this report).

BLM_0165766

As noted in the response to Section 10 – Air Resources, Section 10.3 – Impact Analysis, of this report, Draft RMP/EIS Appendix H contains the Colorado BLM Comprehensive Air Resource Protection Protocol. This protocol outlines the process and strategies the BLM will use when authorizing activities that have the potential to adversely impact air quality in Colorado. As part of that process, the BLM will evaluate proposals to develop federal minerals based on a project's potential impacts on air quality considering project-specific emission levels and locations. The BLM will also consider project-specific air monitoring before, during, and after approved projects to ensure air quality standards are met. As such, impacts of development on adjacent Wilderness will be addressed on a site-specific basis.

### Section 40.4 – Wilderness Areas/Wilderness Study Areas: Cumulative impact analysis
No comments are associated with this topic.

### Section 40.5 – Wilderness Areas/Wilderness Study Areas: Mitigation measures
No comments are associated with this topic.

## Section 41 – Other

### Section 41.1 – Other – Pipelines
Total Number of Submissions: 44
Total Number of Comments: 50

Comment Number: 500213_JonesB_20161101-4
Organization1:
Commenter1:Buck Jones
Commenter Type: Individual
Comment Excerpt Text:
The BLM did not take a hard look at direct, indirect, and cumulative impacts as required by NEPA, including:
• BLM failed to consult with the Pipeline Hazardous Materials and Safety Administration and failed to consider the potential impacts that an exemption from safety rules would have on human health, the environment, and wildlife.

Comment Number: 000130_WassellP_20160903-4
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.

Comment Number: 000400_InouyeD_20161028-13
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter1:David Inouye
Commenter Type: Individual
Comment Excerpt Text:
The draft RMP does not address the fact that at present major gas pipelines in the study area are not regulated, by either the state or federal government. There have been some dramatic and fatal accidents in the past year from pipelines in other parts of the country, and I am concerned that there is already the potential for these kinds of accidents in the study area from existing transmission lines.

BLM_0165767

Comment Number: 000130_WassellP_20160903-6
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
-BLM did not consider the impact of extreme weather causing flooding, mudslides, and geological
instability, which can compromise the integrity of pipelines and result in leaks and potential explosions.

Comment Number: 000278_Abell_20161031-1
Organization1:
Commenter1:Laura Abel
Commenter Type: Individual
Comment Excerpt Text:
a moratorium on oil and gas leasing should be imposed until rural gas gathering pipelines are regulated
by the Pipeline Hazardous Materials and Safety Administration

Comment Number: 000314_HixL_20161022-4
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
The following areas have not been addressed or were inadequately addressed in the Draft Resource
Plan and studies should be performed before any RMP Alternative is adopted:
o Infrastructure and Economic Impacts & Costs
o Environmental Impacts – Water/Air/Natural Disasters
o Seismic Study
o Human Health Impact Study
o Wildlife Impact
o Pipeline Safety & Safety Inspections

Comment Number: 000373_ThompsonG_20161030-9
Organization1:
Commenter1:Greg Thompson
Commenter Type: Individual
Comment Excerpt Text:
Because rural gas gathering lines are exempt from federal pipeline safety regulations, the BLM must
implement in the plan measures that will address the issues referenced in the Pipeline Hazardous
Materials Safety Administration 2016 Proposed Rulemaking on Gas Pipelines. Measures to insure the
safety of hikers, campers, hunters and anglers must be included in the RMP. BLM did not consider; 1)
forest fire risks from pipeline explosions, 2) lack of pipeline safety inspections and 3) the impact of
extreme weather causing flooding, mudslides and geological instability.

Comment Number: 000387_HudekH_20161101-5
Organization1:The Hive Paonia
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
Please also consider pipeline safety. Rural gas gathering lines are exempt from Federal pipeline safety
regulations. Extreme weather causing flash floods, mudslides and geologic instability can cause damage to
pipelines that has yet to be considered in our safety. From 2003 to 2013 there were 85 incidences in

BLM_0165768

which storms or other natural conditions damaged pipelines resulting in failure. In 1994 flooding in the San Jacinto River led to the failure of eight hazardous liquid pipelines. The escaping liquid ignited, lead to injuries of 547 people. These are just some of many examples as to the importance of considering the safety of residents and our water.

Comment Number: 000403_HamnerM_20161031-3
Organization1:Colorado House of Representatives
Commenter1:Millie Hamner
Commenter Type: State Government
Other Sections: 18.3 11.3 41.2
Comment Excerpt Text:
To my knowledge, BLM has not conducted a human health impact assessment, analyzed new hydraulic fracturing and multi-stage drilling technologies, taken a hard look at the implications of climate change on the region, the local economy and other resources BLM is obligated to manage, nor considered the impact of the rural gas gathering lines exemption from Federal pipeline integrity regulations.

Comment Number: 000436_GatesJ_20161031-1
Organization1:
Commenter1:Jonathan Gates
Commenter Type: Individual
Comment Excerpt Text:
I request that the BLM impose a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety. Administration.

Comment Number: 000442_HickamC_20161028-1
Organization1:
Commenter1:Carol Hickam
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
I do not believe the BLM has done its due diligence in performing the required in depth risk analysis. If they have, I have not seen it. If for no other reason, pipelines should not be put in rural areas where they are unregulated. Pipeline safety was not considered. They break despite best efforts at building adequate ones. In addition, recent studies have shown radioactive waste water which only fuels climate change.

Comment Number: 000448_LishC_20161101-1
Organization1:
Commenter1:Christopher Lish
Commenter Type: Individual
Comment Excerpt Text:
It is unacceptable and unconscionable to not only risk destroying this vital ecosystem, but to sanction additional greenhouse gas emissions, which increase disastrous climate change impacts. The only way to prevent irreparable harm to this special area is to close off all BLM lands and minerals in the area to oil and gas leasing. At a minimum it BLM must impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable.

BLM_0165769

Comment Number: 000459_HardyR_20161027-5
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.

Comment Number: 000469_MilvenanE_20161025-1
Organization1:
Commenter1:Eileen Milvenan
Commenter Type: Individual
Comment Excerpt Text:
There is growing concern about the potential health problems in children and adults living near gas drilling, and efforts to quantify these risks are underway. This type of research requires funding and time. Ongoing research results continue to be released, and must be evaluated before expanding the practice of hydraulic fracturing throughout the country. It is particularly important to bring attention to recent findings because the Bureau of Land Management stopped the clock on accepting new information four years ago, and as such, it did not take these findings into account when formulating the Draft Resource Management Plan for the North Fork Valley. The BLM did not conduct a human health impact assessment in its plan. There should be provisions for ongoing risk analysis, and regulations in place for rural gas gathering pipelines under the Pipeline Hazardous Materials and Safety Administration.

Comment Number: 000516_HukekH_20161101-4
Organization1:
Commenter1:Heidi Hudek
Commenter Type: Individual
Comment Excerpt Text:
Please also consider pipeline safety. Rural gas gathering lines are exempt from Federal pipeline safety regulations. Extreme weather causing flash floods, mudslides and geologic instability can cause damage to pipelines that has yet to be considered in our safety. From 2003 to 2013 there were 85 incidences in which storms or other natural conditions damaged pipelines resulting in failure. In 1994 flooding in the San Jacinto River led to the failure of eight hazardous liquid pipelines. The escaping liquid ignited, lead to injuries of 547 people

Comment Number: 000560_KelloggV_20161016-5
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
Rural gas gathering lines are exempt from federal pipeline safety regulations. BM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. From 2003 to 2013, there were 85 reportable incidents in which storms or other severe natural force conditions damaged pipelines and resulted in their failure, for example Yellowstone River near Laurel, MT in 2011 and San Jacinto River in October 1994. BLM also did not consider the pipeline safety impacts on hikers, campers, hunters and anglers. BLM did not consider forest fire risks from pipeline explosions and we live in a forested state with high fire risk. BLM did not consider the lack of pipeline safety inspections.

BLM_0165770

Comment Number: 000563_King_WELC_HasAttach-211
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Furthermore, the BLM did not consult agencies with pipeline safety jurisdiction and did not consider the environmental, public safety, and human health impacts associated with a web of unregulated gas gathering pipelines. EIS 5-5. Rural gas gathering pipelines are exempt from federal pipeline safety regulations and therefore state regulation. 49 CFR § 192. Unregulated gas gathering pipelines are at higher risk of failure than regulated pipelines. See PHMSA Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).

Comment Number: 000563_King_WELC_HasAttach-212
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The lack of risk management regulations to ensure public safety when it comes to rural gas gathering pipelines.
a. Under current federal and state regulations, the BLM and oil and gas operators have no way of assuring the public that rural gas gathering pipelines will be properly constructed to prevent risks of failure. Regulatory agencies do not have specific knowledge of the construction of rural gas gathering pipelines because they are largely non-jurisdictional to federal and state oversight. [See Letter from Joe Molloy, Section Chief, COPUC Pipeline Safety Program, to Natasha Leger (October 17, 2016) (attached as Exhibit 305) ("Molloy Letter").]
b. Under current federal and state regulations, oil and gas operators do not have an obligation to disclose incremental failures that may occur or may have occurred on unregulated gas gathering pipelines. All oil and gas operators are only required to report gas leaks that necessitate evacuation of people or closure of a public road, or result in a defined incident. [Id.]
c. Non jurisdictional pipeline operators are not required to take all practicable measures to protect pipelines from "washouts, floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to sustain abnormal loads." [See id; 49 CFR 192.317.] While Colorado pipeline safety regulators expect "that an operator be able to demonstrate through appropriate documentation that it has addressed its obligations under §192.317… which would include addressing all potential geologic hazards," this is not guaranteed. BLM has not demonstrated that it has taken geologic hazards into consideration from a pipeline safety perspective.
d. The Pipeline Hazardous Materials and Safety Administration (PHMSA) has exclusive jurisdiction over pipeline safety. Interstate pipelines are delegated to the states via an interagency agreement with PHMSA called a "certification agreement."
[A Regulatory Review of Liquid and Natural Gas Pipelines in Colorado at 4 (December 2014) (attached as Exhibit 306).]
While BLM consulted the Colorado Oil and Gas Conservation Commission (COGCC) on this draft RMP, COGCC does not have jurisdiction over gas gathering pipelines.
e. In the current regulatory environment, state and federal pipeline safety inspectors do not specifically keep records on jurisdictional pipeline operator's contractors. Instead, it is expected that the operators themselves have records regarding work performed on the pipeline by contractors so that they have an adequate ability to trace and remedy any issues associated with the contractor's work. Therefore neither BLM, COGCC, nor the state and federal pipeline safety inspectors have visibility into the qualification of contractors or whether the actual work performed was adequate. [Molloy Letter at 6.]

BLM_0165771

In addition, existing federal pipeline safety rules do not address or require accurate mapping of gas gathering pipelines. "Due to the sheer mileage of active pipeline in the United States, regulatory agencies rarely keep detailed operator maps." [Molloy Letter at 7.]

Comment Number: 000563_King_WELC_HasAttach-213
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The risks to public safety from unregulated rural gas gathering pipelines.
a. The BLM did not consider the cumulative impact and environmental risk of a projected 1,271 miles of unregulated gas gathering pipelines based on their estimated 1271 wells for the planning area. [RMP/EIS 4-2; Reasonable Forseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, Final Report at 61 (February 16, 2012) ("UFO RFD") (attached as Exhibit 40).]
This estimate of gas gathering pipeline mileage assumes 1 mile of gathering pipeline per well, a conservative estimate compared to 1.65 miles of gathering pipeline in the Marcellus Shale region. [Nels Johnson, Tamara Gagnolet, Rachel Ralls, and Jessica Stevens, Natural Gas Pipelines:Excerpt from Report 2 of the Pennsylvania Energy Impacts Assessment at 3 (December 16, 2011) (attached as Exhibit 307).]
In addition, because the BLM's oil and gas assumptions are based on conventional, not unconventional oil and gas development through hydraulic fracturing and multiwell drilling technologies, these estimates may be significantly underestimated. [RMP/EIS 4-2; UFO RFD at 61 (attached as Exhibit 40).]
b. BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. The nation's pipeline system faces a greater risk from failure due to extreme weather events such as hurricanes, floods, mudslides, tornadoes, and earthquakes.
i. A 2011 crude oil spill into the Yellowstone River near Laurel, MT, was caused by channel migration and river bottom scour, leaving a large span of pipeline exposed to prolonged current forces and debris washing downstream in the river. Those external forces damaged the exposed pipeline.
ii. In October 1994, flooding along the San Jacinto River led to the failure of eight hazardous liquid pipelines and also undermined a number of other pipelines. The escaping products were ignited, leading to smoke inhalation and burn injuries of 547 people.
iii. From 2003 to 2013, there were 85 reportable incidents in which storms or other severe natural force conditions damaged pipelines and resulted in their failure. Operators reported total damages of over $104M from these incidents.
iv. PHMSA has issued several Advisory Bulletins to operators warning about extreme weather events and the consequences of flooding events, including river scour and river channel migration. [See Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines, 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).]
c. BLM did not consider the pipeline safety impacts on hikers, campers, hunters, and anglers utilizing the public lands for recreation purposes. On August 19, 2000, a 30-inch-diameter gas transmission pipeline ruptured adjacent to the Pecos River near Carlsbad, NM. The released gas ignited and burned for 55 minutes. Twelve persons who were camping under a concrete-decked steel bridge that supported the pipeline across the river were killed, and their vehicles were destroyed. Two nearby steel suspension bridges for gas pipelines crossing the river were damaged extensively. [Id. at 20730.]
d. BLM did not consider forest fire risks from pipeline explosions. On December 11, 2012, a 20-inch-diameter gas transmission line ruptured in a sparsely populated area about 106 feet west of Interstate 77 (I-77) in Sissonville, West Virginia. An area of fire damage about 820 feet wide extended nearly 1,100 feet along the pipeline right-of-way. Three houses were destroyed by the fire, and several other houses were damaged. Reported losses, repairs, and upgrades from this incident totaled over $8.5 million, and major transportation delays occurred. I-77 was closed in both directions because of the fire and

resulting damage to the road surface. The northbound lanes were closed for about 14 hours, and the southbound lanes were closed for about 19 hours while the road was resurfaced, causing delays to both travelers and commercial shipping. [Id. at 20728.]

e. BLM did not consider lack of pipeline safety inspections. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations showing that most states with delegated authority from PHMSA to conduct intrastate inspections do not have expanded regulations that cover increased oversight of gathering companies building gathering pipelines in rural areas are generally not subject to inspection and do not have to report the location and characteristics of much of the gathering pipelines being installed. [See GAO Report, Oil and Gas Transportation: Department of Transportation Is Taking Actions To Address Rail Safety, But Additional Actions Are Needed To Improve Pipeline Safety (August 2014) at 27 (attached as Exhibit 308).]

f. BLM did not consider the risks associated with undisclosed incremental pipeline failures on wildlife, ground water and surface water contamination, grazing cattle, human health, and uptake of oil and gas chemicals by crops.

Comment Number: 000563_King_WELC_HasAttach-214
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

In addition, the RMP/EIS is unclear on whether or what pipelines will be required, whether they would be limited in what they transport, how many barrels per day they would transport, and how much truck traffic this would displace (if any, since the pipelines ultimately are transferring product to trucks). There are no specific estimates of how many pipelines will be constructed, how many miles of pipe will be laid, what their diameter would be, how many water-bodies they would cross, or where they will be located. In this regard the BLM again has not taken a "hard look" at the subject, and if this information is not available it is incumbent upon BLM to explain what would be required to obtain it and why it cannot collect the information. 40 C.F.R. § 1502.22.

Reducing truck traffic through the installation of pipelines introduces different impacts to the environment, but the RMP/EIS provides no treatment of these impacts. Further, while the RMP/EIS acknowledges the potential for contamination of soils, surface water, and groundwater as a result of spills, see, e.g., DEIS at 4-83, there is no discussion of possible spill volumes or consideration of various spill scenarios.

Comment Number: 000584_PattersonC_20161005-2
Organization1:
Commenter1: Cynthia Patterson
Commenter Type: Individual
Other Sections: 41.2 18.3
Comment Excerpt Text:

BLM did not consider current information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and oil and gas operations.

Comment Number: 000585_WentzelR_20160906-2
Organization1:
Commenter1: Ruth Wentzel
Commenter Type: Individual
Other Sections: 41.2
Comment Excerpt Text:

In addition, the BLM has not analyzed the impacts of hydraulic fracturing and multi-drilling technologies, with regard to ecological damage. Analyzing the effects of drilling as well as rural gas gathering lines, which are exempt from regulation by the Federal Government, must be addressed.

Comment Number: 000603_SmithP_20161024-6
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Comment Excerpt Text:
Section 3.4.2 Public Health and Safety. This section fails to mention the potential threat from pipeline and compressor explosions or explosions that can occur at a well site.

Comment Number: 000640_SibleyB_20161015-1
Organization1:
Commenter1:Bert Sibley
Commenter Type: Individual
Other Sections: 21.1
Comment Excerpt Text:
I feel that the BLM needs to impose a moratorium on oil and gas leasing until they do a complete assessment of safety risks for the pipeline and unregulated rural transmission lines and also needs to have baseline samples of air quality.

Comment Number: 500003_TwittyE_20161014-2
Organization1:
Commenter1:Eric Twitty
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
No one wants an accident, but they certainly happen. Wellhead and pipeline spills and pollution could ruin the creek, our property, and property values.

Comment Number: 500016_GoldsberryS_20161101-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
After looking over the BLM's Draft Resource Management Plan, it is evident that a key piece is missing. The issue is that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety.

Comment Number: 500016_GoldsberryS_20161101-2
Organization1:
Commenter1:
Commenter Type:
Other Sections: 21.1
Comment Excerpt Text:
For both moral and liability reasons, it is necessary that the BLM issue a moratorium on oil and gas leasing.The risks associated with the pipelines span from endangering campsites and campers,forest fires, water pollution, animal fatalities, human fatalities, as well as many other social and economic risks. Until a thorough risk assessment is completed on the pipelines, there needs to be a moratorium on all leasing.

BLM_0165774

Without a moratorium, the BLM could be held responsible for any and all injuries, deaths, environmental degradation, and economic repercussions because this risk assessment was not conducted.

Comment Number: 500041_GroomeP_20160920-1
Organization1:
Commenter1:Patricia Lewis Groome
Commenter Type: Individual
Other Sections: 21.1
Comment Excerpt Text:
I became aware of the RMP recently. It is my belief that the BLM did not complete a proper risk analysis. The BLM did not consider earthquake, hydraulic fracing, human health impacts or pipeline safety. The BLM did not consider risks of unregulated pipelines in rural areas and have put us at even more risk for that reason, I ask for a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated.

Comment Number: 500046_TrumbleM_20160923-2
Organization1:
Commenter1:Mary Trumble
Commenter Type: Individual
Comment Excerpt Text:
Also very important is the fact that rural gas gathering lines are exempt from federal pipeline safety standard and we cannot take on the risk. There have not been any Environmental Impact Studies done on the proposed areas to lease.
Comment Number: 500242_WalshM_20161101-3
Organization1:
Commenter1:Mark Walsh
Commenter Type: Individual
Comment Excerpt Text:
Pipeline safety and integrity management was not mentioned in the draft RMP. The integrity of the pipeline can be compromised not only from faulty construction, but from .flooding, mudslides, earthquakes, and geological instability. Not only can leaks and spills occur along the pipeline, which contaminate soil and water, but ruptures and explosions occur from faulty construction or a compromised pipeline. ·
Rural gas gathering pipelines must be regulated to prevent leaks, spills and explosions and give the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

Comment Number: FormLetterAA-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The safety of these visitors is a concern in that the BLM proposed RMP does not address pipeline safety, pipeline maintenance or inspections. BLM did not consider how hunters, campers, and hikers could be impacted if there was extreme weather resulting in flooding, mudslides and geological instability, which could compromise the integrity of pipelines and result in leaks and potential explosions. Here is an example of somewhere this has already happened. Let's learn from history and avoid this happening in the North Fork Valley.

BLM_0165775

In October 1994, flooding along the San Jacinto River led to the failure of eight hazardous liquid pipelines and also undermined a number of other pipelines. The escaping products were ignited, leading to smoke inhalation and burn injuries of 547 people.

I bring this to your attention because the BLM does not consider pipeline safety and integrity management in the Draft Resource Management Plan. There have been so many leaks in gas and oil pipelines that I am shocked by the absence of this important consideration. Pipelines fail. The public knows this and the government knows this. That is why there are federal pipeline safety regulations to ensure proper construction of pipelines are reporting of pipelinā failures for proper oversight. However, rural gas gathering lines are exempt from federal pipeline safety regulations.

I am requesting that the BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spilts and explosions in order to ensure that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

Comment Number: FormLetterBBB-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Also a big concern is that rural gas gathering lines are exempt from federal pipeline safety regulations. The web of unregulated pipelines creates an increased risk to health and safety. BLM did not consider pipeline safety and integrity management in its Draft Resource Management Plan.

Comment Number: FormLetterCC-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I am also concerned that nowhere in the Draft RMP are pipeline safety, maintenance or inspections addressed. As rural gas gathering lines are exempt from federal pipeline safety regulations, the campers, anglers, hunters and hikers who come to the Western Slope each year would be at risk.

Comment Number: FormLetterCCC-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Pipeline safety or pipeline integrity management was not mentioned once in the document. How can the BLM have conducted a comprehensive environmental risk assessment if it did not consider Pipeline safety in the Draft RMP? Pipelines fail. The public knows it and the government knows it; that's why there are federal pipeline safety iegulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight. However, rural gas gathering lines are exempt from federal pipeline safety regulations. The integrity of the pipeline can be compromised not only from faulty construction, but from flooding, mudslides, earthquakes, and geologic instability. Not only can leaks and spills occur along the pipeline, which contaminate soil and water, but ruptures and explosions occur from faulty construction or a compromised pipeline.

Comment Number: FormLetterDD-1
Organization1:
Commenter1:
Commenter Type:

BLM_0165776

Comment Excerpt Text:
I am also concerned that nowhere in the Draft RMP are pipeline safety, maintenance or inspections addressed. As rural gas gathering lines are exempt from federal pipeline safety regulations, the campers, anglers, hunters and hikers who come to the Western Slope each year would be at risk.

In addition, BLM did not consider the lack of pipeline safety inspections in rural areas. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations showing that most states with delegated authority from PHMSA to conduct intrastate inspections do not have expanded regulations that cover increased oversight of gathering companies building pipelines

pipelines in rural areas are generally not subject to inspection and do not have to report the location and characteristics of much of the gathering pipelines being installed. It only makes sense that before a decision is made on leasing the lands, BLM would thoroughly conduct an assessment on the possible repercussions from unregulated rural gas gathering pipelines.

Comment Number: FormLetterEE-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The Draft RMP for the Uncompahgre Region is inadequate and must be revised. Until this is done, I request that the BLM issue a moratorium on oil and gas leasing. Currently, rural gas gathering pipelines are exempt from federal regulations. The moratorium is needed until iurat gas gathering pipelines are regulated to prevent leaks, spills, explosions and ensure that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage tne environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

How can the BLM have conducted a comprehensive environmental risk assessment if it did not include pipeline safety in its Draft Resource Management Plan? Both the government and the public know of many pipeline failures. That's why there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight. Nevertheless, rural gas gathering lines are exempt from federal pipeline safety regulations.

There are so many situations which demand that pipeline safety be a priority. Extreme weather can cause flooding, mudslides or geological instability resulting in damage to the pipelines and culminating in leaks, spills and potential explosions. With a number of gas pipelines on BLM leases, campsites could be in danger with the possibility of forest fires damaging the environment and r:isking human and animal lives. In addition, the integrity of the pipeline can be compromised from faulty construction. Why weren't pipeline safety inspections included in the draft RMP?

Comment Number: FormLetterEE-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Also, the Draft RMP did not consíder forest fire risks fr.om pipeline explosions. Our wilderness and wooded areas are far too valuable for tourism and local hunting to risk without doing a proper assessment of pipeline safety. Here is a real event that took place, showing how things can easily go wrong. On December 11, 20t2, a 2O-inch-diameter gas transmission line ruptured in a sparsely populated area about 106 feet west of Interstate 77 (I-77) in Sissonville, WV. An area of fire damage about 820 feet wide extended nearly 1,100 feet along the pipeline right-of-way. Three houses were destroyed by the fire, and several other houses were damaged. Reported losses, repairs, and upgrades from this incident totaled over $8.5 million, and major transportation delays occurred. I-77 was closed

BLM_0165777

in both directions because of the fire and resulting damage to the road surface. The northbound lanes were closed for about 14 hours, and the southbound lanes were closed for about 19 hours while the road was resurfaced, causing delays to both travelers and commercial shipping. http://www.ntsb.gov/investigations/AccidentReports/Reports/PAR1401.pdf

Comment Number: FormLetterEEE-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM has a responsibility to "sustain[ing] the health and diversity of the country's public lands." Pipeline safety or pipeline integrity management was not mentioned once in the document. How can the BLM have conducted a comprehensive environmental risk assessment if it did not consider pipeline safety in the Draft RMP? Pipelines fail. The public knows it and the government knows it; that's why there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight. However, rural gas gathering lines are exemPt from federal pipeline safety regulations.
The integrity of the pipeline can be compromised not only from faulty construcţion, but also from flooding, mudslides, earthquakes, and geologic instability. Not only can leaks and spills occur along the pipeline, which contaminate soil and water, but also ruptures and explosions occur from faulty construction or a compromised pipeline.

Comment Number: FormLetterFF-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment.

Comment Number: FormLetterII-3
Organization1:
Commenter1:
Commenter Type:
Other Sections: 21.1
Comment Excerpt Text:
However, because rural gas gathering lines are exempt from the federal pipeline safety regulations, the moratorium is needed to protect the North Fork Valley until rural pipelines are regulated. At this point, the BLM should not move forward with any options laid out in the Draft RMP.

Comment Number: FormLetterKK-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:

BLM_0165778

The Draft RMP failed to mention pipeline integrity management and pipeline safety. It is very plausible that the integrity of the pipeline could be compromised, not only from faulty construction, but also from flooding, mudslides, earthquakes, and geologic insability. Leaks and spills could occur along the pipeline, which could contaminate the soil and water. Faulty construction or a compromised pipeline from any geological incident could also result in a rupture or explosion. We have, already seen instances of this happening within the United States. What makes this problem even more uncertain is that right now rural gas gathering pipelines are not regulated. This is a danger. Rural gas pipelines need to be regulated to prevent leaks, spills, explosions and also to give the public confidence that these pipelines will not endanger campsites, start forest fires, damage the environment, or result in animal or human fatalities. How can the BLM have conducted a proper comprehensive environmental risk assessment if it did not consider pipeline safety in its Draft Resource Management Plan? Both the government and the public know of many pipeline failures. That's why there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight.

Comment Number: FormLetterMM-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
How can the BLM have conducted a comprehensive environmental risk assessment if it did not consider pipeline safety in its Draft Resource Management Plan? Pipelines fail. The public knows it and the government knows it; that's why there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight.
It is important to know that rural gas gathering lines are exempt from federal pipeline safety regulations. That is right, exempt from federal safety regulations. The fact that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety is enough to call for a moratorium on all oil and gas leasing in the North Fork area.

Comment Number: FormLetterNN-1
Organization1:
Commenter1:
Commenter Type:
Other Sections: 21.1
Comment Excerpt Text:
The fact that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety is enough to call for a moratorium on all oil and gas leasing in the North Fork area. For both moral and liability reasons, it is necessary that the BLM issue this moratorium. The risks associated with the pipelines are too great to move forward at this point.
I demand that BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give we the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

Comment Number: FormLetterOO-1
Organization1:
Commenter1:
Commenter Type:
Other Sections: 21.1
Comment Excerpt Text:

BLM_0165779

The fact that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety is enough to call for a moratorium on all oil and gas leasing in the North Fork area. For both moral and liability reasons, it is necessary that the BLM issue this moratorium.

The risks associated with the pipelines are too great to move forward at this point.

I demand that BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give we the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

Comment Number: FormLetterQQ-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
We question why the BLM did not consider include pipeline safety, management etc. in the Draft RMP. Here are four ways that pipeline integrity can be compromised: flooding, mudslides, earthquakes and geologic instability. In addition, leaks and spills occur at the drilling sites and along pipelines contaminating soil and water. And what about ruptures and explosions occuring from faulty construction or a compromised pipeline? These were not addressed in tñe Draft RMP.

Comment Number: FormLetterS-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The risks associated with the pipelines span from endangering campsites and campers, forest fires, water pollution, animal fatal-itj-es, human fatalities, as well as many other social and economic risks. Until a thorough risk assessment is completed on the pipelines, there needs to be a moratorium on all leasing. The BLM could be held responsible for any and all injuries, deaths, environmental degradation, and economic repercussions because thís risk assessment was not conducted.

We cannot risk the safety, health, and beauty of the North Fork area to the oil and gas industry. This valley is too special for you to simply neglect this important piece of information.

Comment Number: FormLetterV-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM not consider include pipeline integrity, safety, inspections or management in the Draft RMP. We know that Pipeline integrity can be compromised through flooding, mudslides, earthquakes and geologic instability.

In addition, leaks and spills occur at the drilling sites and along pipelines contaminating soil and water. And what about ruptures and explosions occurring from faulty construction or a compromised pipeline? None of these were addressed in the Draft RMP.

How can the BLM have conducted a comprehensive environmental risk assessment if it did not consider Pipeline safety in its Draft Resource Management Plan? Pipelines fail. Unfortunately, rural gas gathering pipelines do not fall under federal safety regulations.

This must be addressed.

BLM_0165780

Comment Number: FormLetterXXX-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I am also concerned that nowhere in the Draft RMP are pipeline safety, maintenance or inspections addressed. As rural gas gathering lines are exempt from federal pipeline safety regulations, the campers, anglers, hunters and hikers who come to the Western Slope each year would be at risk.
In addition, BLM did not consider the lack of pipeline safety inspections in rural areas. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations showing that most states with delegated authority from PHMSA to conduct intrastate inspections do not have expanded regulations that cover increased oversight of gathering companies building gathering pipelines in rural areas are generally not subject to inspection and do not have to report the location and characteristics of much of the gathering pipelines being installed. It only makes sense that before a decision is made on leasing the lands, BLM would thoroughly conduct an assessment on the possible repercussions from unregulated rural gas gathering pipelines.

Comment Number: FormLetterYY-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
I am also concerned that nowhere in the Draft RMP are pipeline safety, maintenance or inspections addressed. As rural gas gathering lines are exempt from federal pipeline safety regulations, the campers, anglers, hunters and hikers who come to the Western Slope each year would be at risk.

Comment Number: FormLetterZ-3
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Pipeline safety or pipeline integrity management was not mentioned once in the document. The integrity of the pipeline can be compromised not only from faulty construction, but also from flooding, mudslides, earthquakes, and geologic instability. Not only can leaks and spills occur along the pipeline, which contaminate soil and water, but also ruptures and explosions occur from faulty construction or a compromised pipeline.

Comment Number: FormLetterZZ-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
How can the BLM have conducted a comprehensive environmental risk assessment if it did not consider pipeline safety in its Draft Resource Management Plan? Both the government and the public know of many pipeline failures. That's why there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight. However, rural gas gathering lines are exempt from federal pipeline safety regulations.
The RMP draft document never mentions pipeline safety or pipeline integrity management. The integrity of the pipeline can be compromised not only from faulty construction, but also from flooding, mudslides,

BLM_0165781

earthquakes, and geologic instability. Not only can leaks and spills occur along the pipeline, which contaminate soil and water, but also ruptures and explosions occur from faulty construction or a compromised pipeline.

I request that the BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.

*Summary*
A. Commenters stated that pipeline safety is a concern due to regulatory agencies not having specific knowledge of the construction of rural gas gathering pipelines, a lack of requirements for oil and gas operators to disclose incremental failures, nonjurisdictional pipeline operators who are not required to take all practicable measures to protect pipelines from hazards, and safety inspectors who do not keep records on jurisdictional pipeline operator's contractors.

B. Commenters stated that the BLM did not fully analyze pipelines, including the following:

- Compromised integrity of pipelines due to floods, mudslides, and geologic instability resulting in leaks and explosions
- Forest fires from explosions
- Safety of hikers, campers, hunters, and anglers
- Wildlife impacts from leaks and spills

C. Commenters also noted that the BLM did not consider the cumulative impact of unregulated gas-gathering pipelines. They recommended a moratorium on oil and gas leasing be imposed until gas-gathering pipelines are regulated by the US Department of Transportation, Pipeline and Hazardous Materials and Safety Administration.

*Response*
A. In terms of pipeline safety regulations, federal regulations prescribe comprehensive minimum safety requirements for the transportation of gas and hazardous liquids by pipeline. See 49 CFR Parts 191 and 192 (gas) and Part 195 (hazardous liquids). In Colorado, state regulations prescribe comprehensive safety requirements for the upstream segment of pipeline for gas and liquids. See Colorado Oil and Gas Consevation Commission 1100 Rule Series, Flowline regulations, Rule 1101. In addition, BLM best management practices and standard operating procedures, as detailed in Draft RMP/EIS Appendix G, would be applied as appropriate to implementation activities to reduce the risks of development, such as those associated with oil and gas gathering and/or transportation pipelines. As noted in the response to Section 21 – Leasable Minerals – Fluids, Section 21.1 – Range of Alternatives, of this report, if and when the US Department of Transportation, Pipeline and Hazardous Materials Safety Administration's *Pipeline Safety: Operator Qualification, Cost Recovery, Accident and Incident Notification, and Other Pipeline Safety Changes* final rule goes into effect, the BLM will be required to comply with all components. Specific components of pipeline safety noted in the comment, including nonjurisdictional pipeline operators safety inspections, are outside the BLM's jurisdiction and, therefore, irrelevant to the planning effort.

BLM_0165782

B. The transportation infrastructure for oil and gas leasing and development, including pipelines, is proposed and analyzed at the project-specific level. It would be speculative to predict the actual distribution of pipelines (e.g., the location of pipelines) and the expected miles of pipeline anticipated in the planning or decision area, except to note that the large majority of these follow existing or new access roads or existing pipeline corridors. The BLM will work with the applicant on a case-by-case basis and through the NEPA process to identify and implement best practices to reduce impacts on sensitive resources and reduce risk to human health and safety. An overview of the risks from pipelines was added to Chapter 4, Public Health and Safety, of the Proposed RMP/Final EIS.

C. Cumulative impacts include consideration of reasonably foreseeable (not highly speculative) federal and nonfederal actions, taking into account the relationship between the proposed action and these reasonably foreseeable actions. Although the Reasonably Foreseeable Development Scenario report outlines an area in the northeastern portion of the UFO as high potential for oil and gas development, specific locations of oil and gas pipelines have not been identified at the RMP planning level. However, note that only a small portion of the high potential area would include oil or gas well permits where the BLM would be considered the surface management agency, because much of this area is split-estate. As such, for oil or gas to be transported out of the area via pipeline, it must meet Forest Service permitting and approval as well. Because the 1989 RMP is still in effect, site-specific analysis will be required, and a moratorium on oil and gas leasing is unnecessary until the RMP revision is approved.

### Section 41.2 – Other – Hydraulic Fracturing
Total Number of Submissions: 64
Total Number of Comments: 154

Comment Number: 500213_JonesB_20161101-3
Organization1:
Commenter1:Buck Jones
Commenter Type: Individual
Other Sections:
Comment Excerpt Text:
• BLM failed to consider various drilling technologies, including horizontal drilling and multi-stage fracking in its analysis;

Comment Number: 000459_HardyR_20161027-4
Organization1:
Commenter1:Robert Hardy
Commenter Type: Individual
Comment Excerpt Text:
BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies.

Comment Number: 000239_FinniganG_20161026-2
Organization1:
Commenter1:Georgia Finnigan
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165783

Your RMP does not adequately address the high risks of oil and gas development as required from the NEPA: National Environmental Quality Act especially fracking providing details on the horrific damage that industry causes to the environment, human and animal health and economies.

There is a lot of new scientific evidence of damage to health and the environment from various forms of oil and gas development, particularly fracking, that will endanger all life.

Comment Number: 000130_WassellP_20160903-12
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.

Comment Number: 000130_WassellP_20160903-5
Organization1:
Commenter1:Phil Wassell
Commenter Type: Individual
Comment Excerpt Text:
-BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies.

Comment Number: 000169_WentzelR_20160906-2
Organization1:
Commenter1:Ruth Wentzel
Commenter Type: Individual
Comment Excerpt Text:
In addition, the BLM has not analyzed the impacts of hydraulic fracturing and multi-drilling technologies, with regard to ecological damage. Analyzing the effects of drilling as well as rural gas gathering lines, which are exempt from regulation by the Federal Government, must be addressed.

Comment Number: 000261_CodaB_20161030-1
Organization1:
Commenter1:464145
Commenter Type:
Comment Excerpt Text:
Every week new scientific studies are released that expose the danger to health, even life, engendered by the oil and gas industry, particularly when using 'fracking.' The risk -potential is unacceptable.

Although there have been hundreds of studies published, analyzing and proving ill effects to people, wildlife, air and water quality, I will cite only a few.

The latest I've read is from Yale School of Public Health October 24, 2016. The researchers' analysis found ">80% of the chemicals lacked sufficient data on cancer-causing potential…Of the 119 compounds with sufficient data, 44% of the water pollutants and 60% of the air pollutants were either confirmed or possible carcinogens."

A thirteen-year study in rural Colorado ending 2013 found birth defects (congenital heart, brain, spine or spinal cord) were associated with both proximity and density of natural gas wells within ten miles of mothers' places of residence. Several chemicals used are known to increase birth defects risks. Health professionals in Vernal, Utah reported a 6-fold increase in infant death rates over a three- year period. [the above two citations are from The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility]

BLM_0165784

The BLM has a mandate to consider the best multi-use of public lands and all reasonable alternatives. The NFAP and a no -leasing alternative do that, continuing the history of the past century of being an agricultural center. It would also support continued farming and ranching, outdoor recreation and hunting, as a Colorado Creative District, the West Elks American Viticulture Area, and increased real estate sales by drawing people to relocate to the Planning Area because of the opportunities and values expressed in the NFAP.

Comment Number: 000277_BackusD_20161031-2
Organization1:
Commenter1:Dolores Backhus
Commenter Type: Individual
Comment Excerpt Text:
consider the new research and information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracking, injection wells, and on-going well operations

Comment Number: 000314_HixL_20161022-1
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
The amount of water used in the fracking process alone, in the face of serious aquifer depletion throughout the US and the long running drought conditions in others, is sufficient testament to our lack of foresight. Water is life, without it all life dies; there are alternative sources for energy, there are none for water. I have seen no address to this vital issue - What are the plans for providing the millions/billions of gallons of water needed to frack this area? Some fracking communities have run out of water completely or soon will. Related articles:
a) https://www.theguardian.com/environment/2014/feb/05/fracking-water-america-drought-oil-gas
b)http://voices.nationalgeographic.com/2014/02/06/fracking-in-water-stressed-zones-increases-risks-to-c ommunities-and-energy-producers/

Comment Number: 000314_HixL_20161022-2
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Other Sections: 30
Comment Excerpt Text:
The potential for adverse economic impact to our farms, ranches, orchards, wineries and tourism/outdoor recreation is too great a risk for widespread fracking. A reasonable approach might be to determine, along with the community, where adverse impact is minimal and will not affect or destroy the economies already in place or endanger water & food sheds.

Comment Number: 000314_HixL_20161022-3
Organization1:
Commenter1:Lasca Hix
Commenter Type: Individual
Comment Excerpt Text:
a) NRDCs Issue Brief @ https://www.nrdc.org/sites/default/files/fracking-air-pollution-IB.pdf
b)https://insideclimatenews.org/news/05062015/fracking-has-contaminated-drinking-water-epa-now-conc ludes

BLM_0165785

The assumptions under which the RMP was constructed are flawed and are based on conventional oil & gas drilling not hydraulic fracturing and multi-stage drilling technologies. Further, the reliance on a 2004 study for the 2013 Foreseeable Development scenarios does not take into account fracking and multi-stage drilling nor does it consider the cumulative effect on domestic and commercial water supplies.

Comment Number: 000401_ShoemakerS_20161028-11
Organization1:Paonia Chamber of Commerce
Commenter1:Susan Shoemaker
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP must deal with the actual impacts of modern fracking technology and not imply that it is equivalent to older less damaging technologies.

Comment Number: 000403_HamnerM_20161031-3
Organization1:Colorado House of Representatives
Commenter1:Millie Hamner
Commenter Type: State Government
Other Sections: 18.3 11.3 41.1
Comment Excerpt Text:
To my knowledge, BLM has not conducted a human health impact assessment, analyzed new hydraulic fracturing and multi-stage drilling technologies, taken a hard look at the implications of climate change on the region, the local economy and other resources BLM is obligated to manage, nor considered the impact of the rural gas gathering lines exemption from Federal pipeline integrity regulations.

Comment Number: 000437_GentryC_20161028-2
Organization1:
Commenter1:Chris Gentry
Commenter Type: Individual
Other Sections: 30
Comment Excerpt Text:
Regarding the agricultural base and related businesses in the North Fork Valley, there is no way they can operate in tandem with gas and oil development when their lifeblood is this watershed which will be at risk if these lands are opened to leasing. Multi-stage fracking and horizontal drilling have definite risks and it seems these were not considered within this new RMP.

Comment Number: 000441_HellecksonB_20161101-5
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Other Sections: 18.3
Comment Excerpt Text:
The topology of the watershed introduces another risk not addressed either in the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower

BLM_0165786

elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata.

Comment Number: 000441_HellecksonB_20161101-7
Organization1:Terror Ditch and Reservoir Company
Commenter1:Brent Helleckson
Commenter Type: Local Government
Other Sections: 31
Comment Excerpt Text:
Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e., an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRMP identifies 683 movement features (e.g., rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRMP at 3-178). The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features. TDRC expends significant money each year to clear our conveyance system of rockfall and slides. We also monitor a slide above our reservoir yearly to assure that no motion is occurring. The dam retaining our reservoir water has recently been reclassified to reflect the increased risk of damage to new downstream development, should a dam failure occur. Increased seismicity presents an immediate increase in risk and likely increase in direct cost to TDRC for insurance, monitoring and compliance. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.
The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity

Comment Number: 000451_BishopB_20161031_HasAttach-4
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual
Other Sections: 21.2
Comment Excerpt Text:
It strains credulity that there is no mention of hydraulic fracturing (fracking) in this RMP. If there is one issue of greatest concern to the residents of the North Fork Valley, it is the fracking of gas wells and all the attendant public health and environmental impacts and risks. BLM simply cannot ignore the "gorilla in the room". BLM cannot hide behind its policy of adaptive management and regional mitigation strategies as described in 2.3.1. Its claim that "the RMP revision is based on current scientific knowledge and best available data" is specious. If it can cite coal production figures for the Somerset area mines from 2013 and 2014, it must do better than rely on information available only as late as 2007 or 2008 concerning industry practices in oil and gas extraction. Considering the massive potential impact on the North Fork Valley of oil and gas leasing, this is a huge and unacceptable lack of effort to deal with an issue of such overwhelming concern. BLM simply must take into account the new technologies that the oil and gas industry are employing and their associated risks.

Comment Number: 000451_BishopB_20161031_HasAttach-8
Organization1:
Commenter1:Sarah Bishop
Commenter Type: Individual

BLM_0165787

Other Sections: 11.3
Comment Excerpt Text:
Two current and significant concerns are not addressed in the RMP - Hydraulic Fracturing and Climate Change.

Comment Number: 000475_PierceC_20161030-5
Organization1:
Commenter1:Carol Pierce
Commenter Type: Individual
Comment Excerpt Text:
I would like to list other negative impacts hydraulic fracturing extractions brings to communities and areas that the BLM did not give adequate analysis or consideration to:
*heavy truck traffic damage, dust pollutants along with the VOC's
*more crime in areas with man camps etc.,
*property value declines, an exodus of those that see fracking as a great negative rather than positive
* water contamination in an area with the most organic grower concentration in the state
* ozone levels in certain parts of the area are already reading 70ppb (levels exceeding EPA's threshold of acceptability
*fragmentation of wildlife habitat and impact on big game populations
* increased sedimentation in the fishing streams (some of which are gold medal fishing waters)
* negative impacts on these recreational aspects
* impacts on agri-tourism in the region; BLM did not analyze the impacts of unregulated gas gathering pipelines impact of weather related incidents compromising the integrity of those pipelines
*BLM did not analyze the impact of water removal from the water sources
* the potential for earthquakes where injections wells are placed and the effects on contamination of aquifers regarding those sites
*source water protection plans were not considered

Comment Number: 000479_MatthewsN_20161101_SierraClub_HasAttach-27
Organization1:Sierra Club Environmental Law Program
Commenter1:Nathan Matthews
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We agree that, insofar as hydraulic fracturing occurs at all, the chemicals used should be "biodegradable, non-toxic neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used," and we support BLM's identification of this as a "best management practice." DEIS at G-10. BLM must do more, however, and prohibit use of chemicals that fail to meet these criteria. The draft RMP/EIS does not clearly state that adherence to identified best management practices is mandatory. Even if BLM requires that additives meet this standard, a "hard look" requires BLM to identify chemicals that are likely to be used, and to assess the impacts of a spill of those particular chemicals.

Comment Number: 000544_ThompsonK_20161101-3
Organization1:
Commenter1:Kathy Thompson
Commenter Type: Individual
Other Sections: 31
Comment Excerpt Text:
2. Draft RMP Fails to Consider Recent Findings Associating Earthquakes with Fracking Activity. Recent studies have concluded that earthquake activity, especially in Oklahoma, is directly caused by [racking

BLM_0165788

activity. Your failure to consider this recent information is irresponsible. Having lived in Washington, D.C., I recognize that the Federal government moves at snail 's pace sometimes. But, lives and livelihoods are at stake here. I applaud you for updating the obsolete RMP from 1989. The draft RMP, however, admits to not considering data from the last few years. The most recent data is some of the most important data to consider because it shows a direct correlation between fracking and injury to the land. You are not serving the people when you the oil and gas industry a blank check to frack when the recent studies are showing how dangerous it is.

Comment Number: 000560_KelloggV_20161016-1
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 10.3
Comment Excerpt Text:
BLM failed to produce a balanced plan that took into consideration new horizontal drilling and multi-stage fracking technologies. This relatively new drilling technology invoices a far greater magnitude of impacts, including: double the surface impacts of conventional drilling; up to a 333% increase in air pollutant emissions involving 12 more tons of VOCs and 1 additional ton of HAPs per well; 5-10 times more water; as well as increased noise, larger waste volumes, habitat fragmentation and loss, and thousands of additional round trips of truck traffic per well.

Comment Number: 000560_KelloggV_20161016-3
Organization1:
Commenter1:Viva Kellogg
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
I am concerned about the lack of regulation over the oil and gas industry. This industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. The North Fork Valley water sources include hundreds of domestic wells and over 25 drinking water springs. The North Fork Valley watershed cannot afford the risk of contamination. In addition, BLM did not consider the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Comment Number: 000563_King_WELC_HasAttach-113
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
As described in detail below, there is a wealth of information and reports stressing the dangers of fracking that must be considered in the agency's subject NEPA analysis. Of course, given the national attention and debate that fracking is generating, significant sources of new information and research are being consistently published warning against the dangers and impacts that fracking can produce, which must also be considered by the agency.

Comment Number: 000563_King_WELC_HasAttach-114
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

Even in draft form, the Pavillion Report and its troubling findings as well as incidents described above and other evidence of fracking related contamination from around the country underscore the need for thorough analysis to be performed by the UFO, which the agency failed to provide in the RMP and EIS.

Comment Number: 000563_King_WELC_HasAttach-115
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3
Comment Excerpt Text:
Historically, BLM has been dismissive of possible impacts to water quality from
hydraulic fracturing. However, given the weight of both new and old evidence documenting the risk of water contamination from gas drilling across the country and within the planning area, BLM's approach is becoming increasingly untenable. Indeed, even an industry report prepared for Gunnison Energy Corporation – a major oil and gas developer with leases just south of the UFO – has acknowledged the potential for significant impacts to water resources from fracking. [See Gunnison Energy Corporation, Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources of the South Flank of the Grand Mesa, Delta County, Colorado (March 2003) at 42, 56 (attached as Exhibit 181).] The simple fact of the matter is that natural gas development has the potential for poisoning our water with toxic, hazardous, and carcinogenic chemicals as well as naturally occurring radioactive radium, and BLM has failed to provide a thorough hard look analysis of these potentially significant impacts in its analysis for UFO RMP.

Comment Number: 000563_King_WELC_HasAttach-116
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3
Comment Excerpt Text:
The UFO failed to sufficiently consider issues of water supply related to fracking.

Comment Number: 000563_King_WELC_HasAttach-118
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3
Comment Excerpt Text:
The UFO failed to sufficiently consider impacts to surface water related to fracking.

Comment Number: 000563_King_WELC_HasAttach-119
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3
Comment Excerpt Text:
The BLM briefly considers the potential for hydraulic fracturing fluid spills, recognizing that "[h]ydraulic fracturing could disturb surface water and groundwater hydrology and impact water quality." EIS at 4-130. Although Appendix G does contain some best management practices directed at reducing the potential for contaminating water resources with hydraulic fracturing spills, EIS at G-9 to G-10, the UFO has failed to address several fundamental questions that are central to fulfilling the agency's hard look mandate. It is undisputed that millions of gallons of water are needed to frack a single well. This raises

several issues which the UFO has failed to fully address in the RMP/EIS. See State of New Mexico v. BLM, 656 F.3d 963, 714-15 (10th Cir. 2009) (providing that the EIS failed to take hard look at water quality impacts from proposed oil and gas lease sale where wells would generated significant amounts of waste water). For example:
• What source waters will be used for well development, and what are the direct, indirect, and cumulative impacts of extracting high volumes of these waters from surface or groundwater sources in this area?
• How would the produced water be disposed of? If produced water is returned to the surface as toxic waste for evaporation, where will such wastewater ponds be located? And, if produced water is re-injected in wastewater wells, where will such wells be located?
• What kind of treatment, if any, will be required of the producer for treating fracking wastewater?
• What is the potential footprint and location of the necessary treatment facilities, and what is the direct, indirect, and cumulative impact of such facilities?
• What mitigation measures and best management practices will BLM require, or at least recommend, to ensure that wastewater does not contaminate surface or groundwater resources, or impact threatened and endangered populations and designated critical habitat in the planning area?
The EIS does not adequately address or analyze the risks of water quality contamination from surface storage of fracking fluid and other oil and gas wastes, including produced and flowback water from wells. Surface pits, in particular, are a major source of water pollution. For instance, New Mexico data, as summarized by the Oil and Gas Accountability Project, shows 743 instances of groundwater contamination, almost all of it occurring over the last three decades. Over half of these incidents, totaling 398 instances of contamination, are linked to faulty pits. [Earthworks, Oil and Gas Accountability Project, Closed-Loop Drilling Systems: A Cost-Effective Alternative to Pits, at 5 (attached as Exhibit 195).]

Comment Number: 000563_King_WELC_HasAttach-120
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 37.3
Comment Excerpt Text:
Likewise, the BLM does not quantify, nor fully address, the risk of potentially catastrophic spills and blowouts at well sites. This is a serious error because such major spills are not uncommon in natural gas drilling. For instance, a major well blowout in Pennsylvania recently sent thousands of gallons of contaminated fluid coursing into a stream feeding the Susquehanna River. [Associated Press, Crews Stop Flow of Drilling Fluid from PA Well (Apr. 22, 2011) (attached as Exhibit 198).]
In February of 2013, a major spill occurred in Windsor, Colorado where at least 84,000 gallons of water contaminated with oil and chemicals used in hydraulic fracturing spilled from a broken wellhead and into a field. [Bruce Finely, Water fouled with fracking chemicals spews near Windsor, THE DENVER POST (Feb. 14, 2013), available at: http://www.denverpost.com/ci_22586154/water-fouled-frackingchemicals-spews-near-windsor#ixzz2zpeQUnhK (attached as Exhibit 199).] The BLM has failed to demonstrate that such incidents could not occur on the leases that will be approved under this RMP. In 2015, there were 615 spills related to oil and gas activities in Colorado, with 90 spills resulting in water contamination. 268 spills occurred fewer than 50 feet from groundwater. [Center for Western Priorities, Colorado Toxic Release Tracker 2015 Summary, available at: http://westernpriorities.org/colorado-toxic-release-tracker/]

Comment Number: 000563_King_WELC_HasAttach-121
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel

BLM_0165791

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO failed to sufficiently consider impacts to groundwater related to fracking.

Comment Number: 000563_King_WELC_HasAttach-122
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM acknowledges that "[u]se, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts," and that "[i]f a groundwater source is contaminated, there are few cost-effective ways to reclaim that water; thus, the longterm impacts of groundwater contamination are considerable." DEIS 4-83. However, BLM says that "no scientific consensus has been reached" regarding the potential for hydraulic fracturing to contaminate shallow groundwater and notes that "[r]igorous well casing protocols can reduce the risk of such contamination." DEIS at 4-83 to -84. As identified above, there are many documented instances where groundwater contamination has, in fact, resulted from the fracking of oil and gas wells. The UFO's brief and dismissive response and analysis of the potential for contamination of groundwater as a result of fracking fails to satisfy the agency's obligation under
NEPA to take a hard look at these impacts.

Comment Number: 000563_King_WELC_HasAttach-123
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM's conclusion that the evidence of potential impacts to groundwater from fracking is inconclusive is challenged by existing models. For example, see T. Myers, Potential Contaminant Pathways from Hydraulically Fractured Shale to Aquifers, GROUND WATER (April 17, 2012) (attached as Exhibit 301): Fracking can release fluids and contaminants from the shale either by changing the shale and overburden hydrogeology or simply by the injected fluid forcing other fluids out of the shale. The complexities of contaminant transport from hydraulically fractured shale to near-surface aquifers render estimates uncertain, but a range of interpretative simulations suggest that transport times could be decreased from geologic time scales to as few as tens of years. Preferential flow through natural fractures fracking-induced fractures could further decrease the travel times to as little as just a few years. Id. at 9.
And see, N.R. Warner, Geochemical evidence for possible natural migration of Marcellus Formation brine to shallow aquifers in Pennsylvania, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 109, iss. 30. (July 9, 2012) (attached as Exhibit 302):
This study shows that some areas of elevated salinity with type D composition in NEPA were present prior to shale-gas development and most likely are unrelated to the most recent shale gas drilling; however, the coincidence of elevated salinity in shallow groundwater with a geochemical signature similar to produced water from the Marcellus Formation suggests that these areas could be at greater risk of contamination from shale gas development because of a preexisting network of cross-formational pathways that has enhanced hydraulic connectivity to deeper geological formations. Id. at 5.

Comment Number: 000563_King_WELC_HasAttach-124
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165792

Comment Excerpt Text:
BLM also overlooks the linkage between hydraulic fracturing and water wells. The BLM must recognize these and analyze this risk and impacts. In addition to the studies cited in the health section of this protest, see e.g., S.G. Osborn, et al., Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 108, iss. 20. (May 17, 2011) (attached as Exhibit 303):
Methane concentrations were detected generally in 51 of 60 drinking-water wells(85%) across the region, regardless of gas industry operations, but concentrations were substantially higher closer to natural-gas wells. Methane concentrations were 17-times higher on average in shallow wells from active drilling and extractionareas than in wells from non-active areas. Id. at 8173.
Although dissolved methane in drinking water is not currently classified as a health hazard for ingestion, it is an asphyxiant in enclosed spaces and an explosion and fire hazard. Id. at 8173.
More research is also needed on the mechanism of methane contamination, the potential health consequences of methane, and establishment of baseline methane data in other locations. Id. at 8176.
In addition, see also, U.S. EPA, Draft Report, Investigation of ground water contamination near Pavillion, Wyoming (December 2011) (attached as Exhibit 176):
The presence of synthetic compounds such as glycol ethers, along with enrichments in K, Cl, pH, and the assortment of other organic components is explained as the result of direct mixing of hydraulic fracturing fluids with ground water in the Pavillion gas field. Id. at 27. And, see also, U.S. EPA, Report to Congress, Management of wastes from the exploration, development, and production of crude oil, natural gas and geothermal energy. Vol.1. (December 1987) (attached as Exhibit 169):
During the fracturing process, fractures can be produced, allowing migration of native brine, fracturing fluid, and hydrocarbons from the oil or gas well to a nearby water well. When this happens, the water well can be permanently damaged and new well must be drilled or an alternative source of drinking water found. Id. at IV-22.
In 1982, Kaiser Gas Co. drilled a gas well on the property of Mr. James Parsons. The well was fractured using a typical fracturing fluid or gel. The residualfracturing fluid migrated into Mr. Parson's water well (which was drilled to a depth of 416 feet), according to an analysis by the West Virginia Environmental Health Services Lab of well water samples taken from the property. Dark and light gelatinous material (fracturing fluid) was found, along with white fibers.
(The gas well is located less than 1,000 feet from the water well.) The chief of the laboratory advised that the water well was contaminated and unfit for domestic use, and that an alternative source of domestic water had to be found. Id. at IV-22.

Comment Number: 000563_King_WELC_HasAttach-125
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO failed to sufficiently consider issues of wastewater disposal.

Comment Number: 000563_King_WELC_HasAttach-126
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should consider the possibility of using recycled water and decreasing the use of evaporation ponds, as well as address concerns about the safety of injection wells. The UFO has an obligation to take a hard look at wastewater disposal and provide a comparative analysis of the different alternatives for disposal. It is not appropriate to assume that treatment can and will be adequate to take care of the

problem. For example, see Brian D. Lutz, et al., Generation, Transport, and Disposal of Wastewater Associated with Marcellus Shale Gas Development, WATER RESOURCES RESEARCH (February 8, 2013) (attached as Exhibit 304).

Comment Number: 000563_King_WELC_HasAttach-127
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While the BLM should be applauded for making strides to prevent the contamination of water resources with this BMP, the BMP fails to address the fact that not all substances that will be used in the fracturing process are made public. Moreover, regardless of the "concentrations being used," BLM should categorize all substances as hazardous, toxic, carcinogenic, or benign.

Comment Number: 000563_King_WELC_HasAttach-128
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.2
Comment Excerpt Text:
The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking.

Comment Number: 000563_King_WELC_HasAttach-129
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.2
Comment Excerpt Text:
There are significant flaws with the UFO's Reasonable Foreseeable Development
Scenario for Oil and Gas ("RFD") which undermine validity of the agency's analysis of resource impacts, and here, impacts due to fracking. The RMP/EIS fails to consider the full potential of recent hydraulic fracturing techniques and vastly underestimates the extent of oil and gas development and its impacts on the environment. For example, BLM estimates that—as projected by the RFD—1,271 wells would be developed under the RMP on all federal minerals and private minerals within the planning area. DEIS at 4-3. However, this estimate does not allow for the likely scenario that advances in hydraulic fracturing technology will increase the number of drilled wells.

Comment Number: 000563_King_WELC_HasAttach-130
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.2
Comment Excerpt Text:
The RFD is outdated and underestimates the number of potential wells. Since the RFD is four years old, and based on older data, it fails to consider the full extent of current and future development. The RMP/EIS fails to take into account the most recent trends in well development, which are the most crucial in predicting the extent of development and its likely impacts. All evidence points to increased drilling in relation to historic trends. Many reports have highlighted the recent nationwide growth in hydraulic fracturing and natural gas development, as identified below.

BLM_0165794

Comment Number: 000563_King_WELC_HasAttach-131
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.2
Comment Excerpt Text:
Of particular note is the agency's failure to provide any information or analysis of
substance on the critical issue of hydraulic fracturing. For the most part, the RFD mentions fracking as a
technology that is currently used in some areas and may allow for future development of additional
plays. For example, the agency provides:
Only one horizontal well has been drilled to date in the Study Area. New types of horizontal fracturing
technology will likely be used to stimulate these types of wells in the future. Development could be
similar to that used to stimulate the Bakken Formation Middle Member in North Dakota. For horizontal
boreholes, multi-stage fracture stimulations could be used. RFD at 35.
The combination of horizontal drilling and hydraulic fracturing technologies has made it possible to
produce shale gas and tight gas economically. Much of the Study Area oil and gas supply growth is
expected to come from production from existing known reservoirs, with most new reservoir
discoveries potentially coming from exploration for nonconventional plays in the continuous assessment
units (including shale gas and coalbed natural gas) identified by the U.S. Geological Survey in Appendix 1.
RFD at 58.
While these statements acknowledge that increased production may "potentially" come from
exploration due to fracking and additional horizontal fracturing technology "will likely" be used in the
future, there is no quantification of the increase in the number of wells, acres impacted, or required
infrastructure.

Comment Number: 000563_King_WELC_HasAttach-132
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 18.3 21.2
Comment Excerpt Text:
Further, there is no discussion of the increased adverse impacts to human health or the environment.
Thus, these statements, which implicitly recognize that the RFD may not account for the full extent of
production, provide little in terms of analysis of fracking impacts. Such a void of analysis and
consideration of a widely employed technology that not only has the potential, but, in all likelihood, will
drastically alter the foreseeable development within the planning area, fails to satisfy the UFO's
obligations under NEPA.

Comment Number: 000563_King_WELC_HasAttach-133
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.2
Comment Excerpt Text:
Notably, BLM also fails to consider analysis from a recent USGS report concerning the development of
Mancos Shale in the Piceance Basin—which may significantly affect development projections in the
Uncompahgre planning area—wherein USGS concluded: "Using a geology-based assessment
methodology, the U.S. Geological Survey assessed technically recoverable mean resources of 74 million
barrels of shale oil, 66.3 trillion cubic feet of gas, and 45 million barrels of natural gas liquids in the
Mancos Shale of the Piceance Basin in Colorado and Utah." [USGS, Assessment of Continuous

BLM_0165795

(Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).]

Comment Number: 000563_King_WELC_HasAttach-134
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.2
Comment Excerpt Text:
In sum, while fracking has been around for decades, the magnitude of the modern technique is new. Modern fracking calls for much more water and chemicals than older wells, and enables the drilling of far more wells in new areas than in the past. Conservation Groups request that the BLM update the RFD to account for this reality.

Comment Number: 000563_King_WELC_HasAttach-135
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 31.3
Comment Excerpt Text:
Induced Seismicity from Hydraulic Fracturing Remain Unaddressed.

Comment Number: 000563_King_WELC_HasAttach-136
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 31.3
Comment Excerpt Text:
The UFO must take a hard look at the issues of subsidence and the possibility of seismic activity that could result from expanded oil and gas development, wastewater disposal, and coal mining. The Draft RMP/EIS does not consider these issues at all.

Comment Number: 000563_King_WELC_HasAttach-137
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 31.3
Comment Excerpt Text:
The threat of seismic activity induced from oil and gas development practices as well as coal mining must be analyzed by the UFO. As noted above, Ohio officials placed a five-mile buffer around waste injection wells. Given the recognized correlation between oil and gas development practices and the inducement of earthquakes, taking such a precautionary approach, here, through required stipulations that would attach to all future oil and gas development in the planning area is prudent and would help stem potential future impacts. At the very least, however, BLM must take a hard look at possible seismicity impacts from the proposed action, which the RMP/EIS has failed to do at all.

Comment Number: 000563_King_WELC_HasAttach-138
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165796

Comment Excerpt Text:
The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations.

Comment Number: 000563_King_WELC_HasAttach-139
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Wells are first fracked after they are initially drilled. Subsequently, re-fracking or restimulation operations are often conducted during the life of the well. Most or all of the impacts to air, water, habitat, wildlife, vegetation, and other resources are expected to be similar for refracking as for the original fracturing jobs. In some cases, there is little additional surface disturbance associated with re-fracking, but in other cases, additional stimulation activities increase the overall footprint of the development, undo the assumptions regarding temporary and long-term reclamation success, and further contribute to such issues as invasive weeds. The UFO's RMP/EIS and RFD focus on initial drilling operations and routine maintenance, while these documents remain silent on the frequency and impacts – direct, indirect, and cumulative-related to re-fracking operations.

Comment Number: 000563_King_WELC_HasAttach-140
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The re-fracking impacts analysis appears to be absent from the EIS and must be conducted for all wells in the field office: private and public, existing and future, existing target formations, and potential new plays. Absent such analysis, BLM has failed to take a hard look at the direct, indirect or cumulative impacts of ongoing and reasonably foreseeable oil and gas development in the UFO.

Comment Number: 000563_King_WELC_HasAttach-141
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Water requirements for re-fracking can be expected to be similar to those for the original fracking job, unless cleanout operations require additional water. If re-fracturing includes operations to clean out the wellbore prior to treatment, BLM needs to disclose the volumes of water and other impacts or resource uses associated with such operations. [BLM Wyoming State Office, Hydraulic Fracturing White Paper (July 2013), available at: http://www.blm.gov/pgdata/etc/medialib/blm/wy/information/NEPA/og/2014/02feb.Par.49324.File.dat/v1AppE.pdf (attached as Exhibit 207).] Emissions might be greater or less. Disturbance to wildlife can be highly significant, and re-stimulation activities should be treated like drilling for purposes of seasonal closures and other habitat protections in the RMP. If reclamation projections currently assume that pads will be reclaimed up to the direct footprint of the well, they must be re-calculated to take into account the potential for future operations utilizing a footprint closer to the original drilling pad area if needed for the truck traffic and other activities associated with re-stimulation. Current disturbance estimates and projections are found in the RFD at 75.

Comment Number: 000563_King_WELC_HasAttach-142
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165797

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM sundry notices should allow the agency to track and regulate surface disturbances associated with re-fracking. To the extent sundry notices have not covered these activities, BLM must consider and impose new requirements to allow it to regulate and assess the impacts of these operations. Although COGCC may not have required permits or compiled records for refracking jobs or re-stimulation operations when the RFD was prepared, COGCC commenced tracking such information on April 1 2012, the effective date of COGCC Rule 205A, regarding chemical disclosure for hydraulic fracturing treatments. If BLM currently lacks its own records, it can secure such information from COGCC to be incorporated into its analysis of oil and gas impacts. To the extent the UFO currently lacks a comprehensive database of re-fracking operations, it needs to rectify this omission in the new RMP.

Comment Number: 000563_King_WELC_HasAttach-149
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Wells that will be hydraulically fractured must be sited such that a suitable confining zone is present. The operator must demonstrate to the satisfaction of the regulator that the confining zone:
1. Is of sufficient areal extent to prevent the movement of fluids to USDWs, based on the projected lateral extent of hydraulically induced fractures, injected hydraulic fracturing fluids, and displaced formation fluids over the life of the project;
2. Is sufficiently impermeable to prevent the vertical migration of injected hydraulic fracturing fluids or displaced formation fluids over the life of the project;
3. Is free of transmissive faults or fractures that could allow the movement of injected hydraulic fracturing fluids or displaced formation fluids to USDWs;
4. Contains at least one formation of sufficient thickness and with lithologic and stress characteristics capable of preventing or arresting vertical propagation of fractures; and
5. The regulator may require operators of wells that will be hydraulically fractured to identify and characterize additional zones that will impede or contain vertical fluid movement.

Comment Number: 000563_King_WELC_HasAttach-150
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Area of Review
Operators must delineate an "area of review," which is the region around a well or group of wells that will be hydraulically fractured where USDWs may be endangered. It should be delineated based on 3D geologic and reservoir modeling that accounts for the physical and chemical extent of hydraulically induced fractures, injected hydraulic fracturing fluids and proppant, and displaced formation fluids and must be based on the life of the project. The physical extent would be defined by the modeled length and height of the fractures, horizontal and vertical penetration of hydraulic fracturing fluids and proppant, and horizontal and vertical extent of the displaced formation fluids. The chemical extent would be defined by that volume of rock in which chemical reactions between the formation, hydrocarbons, formation fluids, or injected fluids may occur, and should take into account potential migration of fluids over time.

BLM_0165798

The model must take into account all relevant geologic and engineering information including but not limited to:
1. Rock mechanical properties, geochemistry of the producing and confining zone, and anticipated hydraulic fracturing pressures, rates, and volumes;
2. Geologic and engineering heterogeneities;
3. Potential for migration of injected and formation fluids through faults, fractures, and manmade penetrations; and
4. Cumulative impacts over the life of the project.
As actual data and measurements become available, the model must be updated and history matched. Operators must develop, submit, and implement a plan to delineate the area of review. The plan should include the time frame under which the delineation will be reevaluated, including those operational or monitoring conditions that would trigger such a reevaluation. Within the area of review, operators must identify all wells that penetrate the producing and confining zones and provide:
1. A list of all such wells, including but not limited to wells permitted but not yet drilled, drilling, awaiting completion, active, inactive, shut-in, temporarily abandoned, plugged, and orphaned;
2. A description of each well's type, construction, date drilled, location, depth, record of plugging and/or completion, and any additional information the Division may require;
3. An assessment of the integrity of each well identified;
4. A plan for performing corrective action if any of the wells identified are improperly plugged, completed, or abandoned;
5. An assessment to determine the risk that the stimulation treatment will communicate with each well identified;
6. For each well identified as at-risk for communication, a plan for well control, including but not limited to:
a. A method to monitor for communication;
b. A determination of the maximum pressure which the at-risk well can withstand;
c. Actions to maintain well control;
d. If the at-risk well is not owned or operated by the owner/operator of the well to be stimulated, a plan for coordinating with the offset well operator to prevent loss of well control;
7. The location, orientation, and properties of known or suspected faults, fractures, and joint sets;
8. An evaluation of whether such features may act as migration pathways for injected fluids or displaced formation fluids to reach protected water or the surface;
9. An assessment to determine the risk that the stimulation treatment will communicate with such features; and
10. If such features may act as migration pathways and are at-risk for communication, the stimulation design must be revised to ensure that the treatment will not communicate with such features or the well must be re-sited.
This information should be provided with the stimulation permit application.

Comment Number: 000563_King_WELC_HasAttach-151
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
The Alberta Energy Regulator ("AER"), the oil and gas regulator in Alberta, Canada,recognized that communication between wells during fracturing is a serious risk to well integrity and groundwater after a number of spills and blowouts resulted from communication between wells during fracturing. As a result, AER created requirements to address the risk of communication and reduce the likelihood of occurrence. [Alberta Energy Board, Directive 083: Hydraulic Fracturing – Subsurface Integrity (May

2013) at 15, available at: http://www.aer.ca/documents/directives/Directive083.pdf (attached as Exhibit 208).] Similarly, Enform, a Canadian oil and gas industry safety association, published recommended practices to manage the risk of communication. [Enform Canada, Interim IRP 24: Fracture Stimulation: Interwellbore Communication; An Industry Recommended Practice For The Canadian Oil And Gas Industry, Interim Volume 24, 1st Edition (Mar. 27, 2013).] We recommend that the BLM review these rules and incorporate similar requirements.

Comment Number: 000563_King_WELC_HasAttach-152
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Operators must submit to the regulator a statistically significant sample, as determined by the regulator, of existing and/or new geochemical analyses of each of the following, within the area of review:
1. Any and all sources of water that serve as underground sources of drinking water ("USDWs") in order to characterize baseline water quality. This data must be made publically available through an online, geographically-based reporting system. The sampling methodology must be based on local and regional hydrologic characteristics such as rates of precipitation and recharge and seasonal fluctuations. At a minimum, characterization must include:
a. Standard water quality and geochemistry; [Including: Turbidity, Specific Conductance, Total Solids, Total Dissolved Solids, pH, Dissolved Oxygen, Redox State, Alkalinity, Calcium, Magnesium, Sodium, Potassium, Sulfate,Chloride, Fluoride, Bromide, Silica, Nitrite, Nitrate + Nitrite, Ammonia, Phosphorous, Total Organic Carbon, Aluminum, Antimony, Arsenic, Barium, Beryllium, Boron, Bromide, Cadmium, Chromium, Cobalt, Copper, Cyanide, Iron, Lead, Manganese, Mercury, Molybdenum, Nickel, Selenium, Silver, Strontium, Thallium, Thorium, Uranium, Vanadium, Zinc, Cryptosporidium, Giardia, Plate Count, Legionella, Total Coliforms, and Organic Chemicals including Volatile Organic Compounds (VOCs).]
b. Stable isotopes;
c. Dissolved gases;
d. Hydrocarbon concentration and composition. If hydrocarbons are present in sufficient quantities for analysis, isotopic composition must be determined;
e. Chemical compounds or constituents thereof, or reaction products that may be introduced by the drilling or hydraulic fracturing process. The use of appropriate marker chemicals is permissible provided that the operator can show scientific justification for the choice of marker(s);

Comment Number: 000563_King_WELC_HasAttach-153
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 21.5
Comment Excerpt Text:
Operators should also consider testing for environmental tracers to determine groundwater age;
2. Any hydrocarbons that may be encountered both vertically and really throughout the area of review;
3. The producing zone(s) and confining zone(s) and any other intervening zones as determined by the regulator. At a minimum, characterization must include:
a. Mineralogy;
b. Petrology; and
c. Major and trace element bulk geochemistry.

BLM_0165800

The site characterization and planning data listed above does not have to be submitted with each individual well application as long as such data is kept on file with the appropriate regulator and the well for which a permit is being sought falls within the designated area of review.

Comment Number: 000563_King_WELC_HasAttach-154
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Water Use and Disposal Planning
Operators must submit to the regulator a plan for cumulative water use over the life of the project. The plan should take into account other activities that will draw water from the same sources, such as agricultural or industrial activities; designated best use; seasonal and longer timescale variations in water availability; and historical drought information. Elements of the plan must include but are not limited to:
1. The anticipated source, timing, and volume of withdrawals and intended use;
2. Anticipated transport distances and methods (e.g., pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution;
3. Anticipated on-site storage methods;
4. A description of methods the operator will use to maximize the use of non-potable water sources including reuse and recycling of wastewater;
5. An evaluation of potential adverse impacts to aquatic species and habitat, wetlands, and aquifers, including the potential for the introduction of invasive species, and methods to minimize those impacts; and
6. Anticipated chemical additives and chemical composition of produced water, with particular attention to those chemicals that would hinder the reuse or recycling of wastewater or pose a challenge to wastewater treatment

Comment Number: 000563_King_WELC_HasAttach-155
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Operators must submit to the regulator a proposed plan for handling wastewater, such as flowback and produced fluids. Elements of the plan must include, but are not limited to:
1. Anticipated cumulative volumes of wastewater over the life of the project, reported in three categories: reuse, recycle, and disposal;
2. Anticipated on-site temporary storage methods;
3. Anticipated transport distances and methods (e.g., pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution; and
4. An assessment of currently available and anticipated disposal methods, e.g., disposal wells, wastewater treatment facilities, etc. This assessment must enumerate the disposal options available and evaluate the ability of those options to handle projected wastewater volumes. In the case of wastewater treatment facilities, the assessment must also evaluate the ability of those facilities to successfully treat the wastewater such that it would not pose a threat to water supplies into which it is discharged.

Comment Number: 000563_King_WELC_HasAttach-156
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

Well Design and Construction

Proper well construction is crucial to ensuring protection of USDWs. The first step to ensuring good well construction is ensuring proper well drilling techniques are used. This includes appropriate drilling fluid selection, to ensure that the wellbore will be properly conditioned and to minimize borehole breakouts and rugosity that may complicate casing and cementing operations. Geologic, engineering, and drilling data can provide indications of potential complications to achieving good well construction, such as highly porous or fractured intervals, lost circulation events, abnormally pressured zones, or drilling "kicks" or "shows." These must be accounted for in designing and implementing the casing and cementing program. Reviewing data from offset wellbores can be helpful in anticipating and mitigating potential drilling and construction problems. Additionally, proper wellbore cleaning and conditioning techniques must be used to remove drilling mud and ensure good cement placement. Hydraulic fracturing requires fluid to be injected into the well at high pressure and, therefore, wells must be appropriately designed and constructed to withstand this pressure. The casing and cementing program must:

• Properly control formation pressures and fluids;
• Prevent the direct or indirect release of fluids from any stratum to the surface;
• Prevent communication between separate hydrocarbon-bearing strata;
• Protect freshwater aquifers/useable water from contamination;
• Support unconsolidated sediments;
• Protect and/or isolate lost circulation zones, abnormally pressured zones, and any prospectively valuable mineral deposits.

Casing must be designed to withstand the anticipated stresses imposed by tensile, compressive, and buckling loads; burst and collapse pressures; thermal effects; corrosion; erosion; and hydraulic fracturing pressure. The casing design must include safety measures that ensure well control during drilling and completion and safe operations during the life of the well. The components of a well that ensure the protection and isolation of USDWs are steel casing and cement. Multiple strings of casing are used in the construction of oil and gas wells, including: conductor casing, surface casing, production casing, and potentially intermediate casing. For all casing strings, the design and construction should be based on Good Engineering Practices ("GEP"), Best Available Technology ("BAT"), and local and regional engineering and geologic data. All well construction materials must be compatible with fluids with which they may come into contact and be resistant to corrosion, erosion, swelling, or degradation that may result from such contact.

Comment Number: 000563_King_WELC_HasAttach-157
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Conductor Casing
Depending on local conditions, conductor casing can either be driven into the ground, or a hole drilled and the casing lowered into the hole. In the case where a hole is excavated, the space between the casing and the wellbore – the annulus – should be cemented to surface. A cement pad should also be constructed around the conductor casing to prevent the downward migration of fluids and contaminants.

Comment Number: 000563_King_WELC_HasAttach-158
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165802

Surface Casing
Surface casing setting depth must be based on relevant engineering and geologic factors, but be shallower than any hydrocarbon-bearing zones, and at least 100 feet but not more than 200 feet below the deepest protected water. If shallow hydrocarbon-bearing zones are encountered when drilling the surface casing portion of the hole, operators must notify regulators and take appropriate steps to ensure protection of protected water.
Surface casing must be fully cemented to surface by the pump and plug method. If cement returns are not observed at the surface, remedial cementing must be performed to cement the casing from the top of cement to the ground surface.

Comment Number: 000563_King_WELC_HasAttach-159
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Intermediate Casing
Depending on local geologic and engineering factors, one or more strings of intermediate casing may be required. This will depend on factors including, but not limited to: the depth of the well, the presence of hydrocarbon-or fluid-bearing formations, abnormally pressured zones, lost circulation zones, or other drilling hazards. Casing setting depth must be based on local engineering and geologic factors and be set at least 100 feet below the deepest protected water, anomalous pressure zones, lost circulation zones, and other drilling hazards. Intermediate casing must be set to protect groundwater if surface casing was set above the base of protected water, and/or if additional protected water was found below the surface casing shoe.
When intermediate casing is installed to protect groundwater, the operator shall set a full string of new intermediate casing to a minimum depth of at least 100 feet below the base of the deepest strata containing protected water and cement to the surface. The location and depths of any hydrocarbon strata or protected water strata that is open to the wellbore above the casing shoe must be confirmed by coring, electric logs, or testing, and shall be reported as part of the completion report.
When intermediate casing is set for a reason other than to protect strata that contain protected water, it must be fully cemented to surface unless doing so would result in lost circulation. Where this is not possible or practical, the cement must extend from the casing shoe to 600 feet above the top of the shallowest zone to be isolated (e.g., productive zone, abnormally pressured zone, etc). Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume.

Comment Number: 000563_King_WELC_HasAttach-160
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Production Casing
If both surface casing and intermediate casing are used as water protection casing, or if intermediate casing is not used, a full string of production casing is required. A production liner may be hung from the base of the intermediate casing and used as production casing as long as the surface casing is used as the water protecting casing, and intermediate casing is set for a reason other than isolation of protected water. When the production string does not extend to the surface, at least 200 feet of overlap between the production string and next larger casing string should be required. This overlap should be cemented

BLM_0165803

and tested by a fluid-entry test at a pressure that is at least 500 psi higher than the maximum anticipated pressure to be encountered by the wellbore during completion and production operations to determine whether there is a competent seal between the two casing strings.

Comment Number: 000563_King_WELC_HasAttach-161
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
When intermediate casing is not used, production casing must be fully cemented to surface unless doing so would result in lost circulation. If not cemented to the surface, production casing shall be cemented with sufficient cement to fill the annular space from the casing shoe to at least 600 feet above fluid-bearing formations, lost circulation zones, oil and gas zones, anomalous pressure intervals, or other drilling hazards. Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. Sufficient cement shall also be used to fill the annular space to at least 100 feet above the base of the freshwater zone, either by lifting cement around the casing shoe or cementing through perforations or a cementing device placed at or below the base of the freshwater zone.

Comment Number: 000563_King_WELC_HasAttach-162
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
For surface, intermediate, and production casing, at a minimum, centralizers are required at the top, shoe, above and below a stage collar or diverting tool (if used), and through all protected water zones. In non-deviated holes, a centralizer shall be placed every fourth joint from the cement shoe to the ground surface or to within one joint of casing from the bottom of the cellar, or casing shall be centralized by implementing an alternative centralization plan approved by the BLM. In deviated holes, the BLM may require the operator to provide additional centralization. All centralizers must meet API Spec 10D (Recommended Practice for Casing Centralizers – for bow string centralizers), or API Spec 10 TR4 (rigid and solid centralizers) and 10D-2 (Petroleum and Natural Gas Industries, Equipment for Well Cementing, Part 2, Centralizer Placement and Stop Collar Testing).

Comment Number: 000563_King_WELC_HasAttach-163
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
All cemented casing strings must have a uniformly concentric cement sheath of at least 1" (i.e. i.e., minimum difference of 2" between wellbore diameter and casing outside diameter). An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume.

Comment Number: 000563_King_WELC_HasAttach-164
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165804

For any section of the well drilled through fresh water-bearing formations, drilling fluids must be limited to air, fresh water, or fresh water based mud, and exclude the use of synthetic or oil-based mud or other chemicals.

Comment Number: 000563_King_WELC_HasAttach-165
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
In areas where the depth to the lowest protected water is not known, operators must estimate this depth and provide the estimate with the application for a permit to drill. This depth should then be verified by running petrophysical logs, such as resistivity logs, after drilling to the estimated depth. If the depth to the deepest protected water is deeper than estimated, an additional string of casing is required. Surface casing must be of sufficient diameter to allow the use of one or more strings of intermediate casing. All instances of protected water not anticipated on the permit application must be reported, including the formation depth and thickness and water flow rate, if known or estimated.

Comment Number: 000563_King_WELC_HasAttach-166
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
All cement must have a have a 72-hour compressive strength of at least 1200 psi and free water separation of no more than two milliliters per 250 milliliters of cement, tested in accordance with the current API RP 10B. Cement must conform to API Specification 10A and gas-blocking additives must be used. Cement mix water chemistry must be proper for the cement slurry designs. At a minimum, the water chemistry of the mix water must be tested for pH prior to use, and the cement must be mixed to manufacturer's recommendations. An operator's representative must be on site verifying that the cement mixing, testing, and quality control procedures used for the entire duration of the cement mixing and placement are consistent with the approved engineered design and meet the cement manufacturer recommendations, API standards, and the requirements of this section.

Comment Number: 000563_King_WELC_HasAttach-167
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Compressive strength tests of cement mixtures without published performance data must be performed in accordance with the current API RP 10B and the results of these tests must be provided to the regulator prior to the cementing operation. The test temperature must be within 10 degrees Fahrenheit of the formation equilibrium temperature at the top of cement. A better quality of cement may be required where local conditions make it necessary to prevent pollution or provide safer operating conditions.

Comment Number: 000563_King_WELC_HasAttach-168
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Prior to cementing, the hole must be prepared to ensure an adequate cement bond by circulating at least two hole volumes of drilling fluid and ensuring that the well is static and all gas flows are killed. Top

BLM_0165805

and bottom wiper plugs and spacer fluids must be used to separate drilling fluid from cement and prevent cement contamination. Casing must be rotated and reciprocated during cementing when possible and when doing so would not present a safety risk. Cement should be pumped at a rate and in a flow regime that inhibits channeling of the cement in the annulus. During placement of the cement, operator shall monitor pump rates to verify they are within design parameters to ensure proper displacement efficiency. Throughout the cementing process operator shall monitor cement mixing in accordance with cement design and cement densities during the mixing and pumping.

Comment Number: 000563_King_WELC_HasAttach-169
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
All surface, intermediate, and production casing strings must stand under pressure until a compressive strength of 500 psi is reached before drilling out, initiating testing, or disturbing the cement in any way. In no case should the wait-on-cement ("WOC") time be less than 8-hours. All surface, intermediate, and production casing strings must be pressure tested. Drilling may not be resumed until a satisfactory pressure test is obtained. Casing must be pressure tested to a minimum of 0.5 psi/foot of casing string length or 1500 psi, whichever is greater, but not to exceed 80% of the minimum internal yield. If the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak, corrective action must be taken.

Comment Number: 000563_King_WELC_HasAttach-170
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
A formation integrity test ("FIT") must be performed immediately after drilling out of all surface and intermediate casing. The test should demonstrate that the casing shoe will maintain integrity at the anticipated pressure to which it will be subjected while drilling the next section of the well, no flow path exists to formations above the casing shoe, and that the casing shoe is competent to handle an influx of formation fluid or gas without breaking down. If any FIT fails, the operator must contact the BLM and remedial action must be taken to ensure that no migrations pathways exist. The casing and cementing plan may need to be revised to include additional casing strings in order to properly manage pressure.

Comment Number: 000563_King_WELC_HasAttach-171
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Cement integrity and location must be verified using cement evaluation tools that can detect channeling in 360 degrees. If fluid returns, lift pressure, displacement and/or other operations indicate inadequate cement coverage, the operator must: (i) run a radial cement evaluation tool, a temperature survey, or other test approved by the Division to identify the top of cement; (ii) submit a plan for remedial cementing to the Division for approval; and (iii) implement such plan by performing additional cementing operations to remedy such inadequate coverage prior to continuing drilling operations. Cement evaluation logging must be performed on all strings of cemented casing that isolate protected water, potential flow zones, or through which stimulation will be performed.

BLM_0165806

Comment Number: 000563_King_WELC_HasAttach-172
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
When well construction is completed, the operator should certify, in writing, that the casing and cementing requirements were met for each casing string.

Comment Number: 000563_King_WELC_HasAttach-173
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Well Logs
After drilling the well but prior to casing and cementing operations, operators must obtain well logs to aid in the geologic, hydrologic, and engineer characterization of the subsurface. Open hole logs, i.e., logs run prior to installing casing and cement, should at a minimum include:
Gamma Ray Logs:
Gamma ray logs detect naturally occurring radiation. These logs are commonly used to determine generic lithology and to correlate subsurface formations. Shale formations have higher proportions of naturally radioactive isotopes than sandstone and carbonate formations. Thus, these formations can be distinguished in the subsurface using gamma ray logs.
Density/Porosity Logs:
Two types of density logs are commonly used: bulk density logs, which are in turn used to calculate density porosity, and neutron porosity logs. While not a direct measure of porosity, these logs can be used to calculate porosity when the formation lithology is known. These logs can be used to determine whether the pore space in the rock is filled with gas or with water.
Resistivity Logs:
These logs are used to measure the electric resistivity, or conversely conductivity, of the formation. Hydrocarbon and fresh water-bearing formations are resistive, i.e., they cannot carry an electric current. Brine-bearing formations have a low resistivity, i.e., they can carry an electric current. Resistivity logs can therefore be used to help distinguish brine-bearing from hydrocarbon-bearing formations. In combination with Darcy's Law, resistivity logs can be used to calculate water saturation.
Caliper Logs:
Caliper logs are used to determine the diameter and shape of the wellbore. These are crucial in determining the volume of cement that must be used to ensure proper cement placement.
These four logs, run in combination, make up one of the most commonly used logging suites. Additional logs may be desirable to further characterize the formation, including but not limited to Photoelectric Effect, Sonic, Temperature, Spontaneous Potential, Formation Micro-Imaging ("FMI"), Borehole Seismic, and Nuclear Magnetic Resonance ("NMR"). The use of these and other logs should be tailored to site-specific needs.

Comment Number: 000563_King_WELC_HasAttach-174
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Core and Fluid Sampling
Operators of wells that will be hydraulically fractured should also obtain whole or sidewall cores of the producing and confining zone(s) and formation fluid samples from the producing zone(s). At a minimum, routine core analysis should be performed on core samples representative of the range of lithology and

BLM_0165807

facies present in the producing and confining zone(s). Special Core Analysis ("SCAL") should also be considered, particularly for samples of the confining zone, where detailed knowledge of rock mechanical properties is necessary to determine whether the confining zone can prevent or arrest the propagation of fractures. Operators should also record the fluid temperature, pH, conductivity, reservoir pressure and static fluid level of the producing and confining zone(s). Operators should prepare and submit a detailed report on the physical and chemical characteristics of the producing and confining zone(s) and formation fluids that integrates data obtained from well logs, cores, and fluid samples. This must include the fracture pressure of both the producing and confining zone(s). This data does not need to be gathered for every well but operators should obtain a statistically significant number of samples.

Comment Number: 000563_King_WELC_HasAttach-175
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Operators must maintain mechanical integrity of wells at all times. Mechanical integrity should be periodically tested by means of a pressure test with liquid or gas, a tracer survey such as oxygen activation logging or radioactive tracers, a temperature or noise log, and a casing inspection log. The frequency of such testing should be based on-site, with operation specific requirements and be delineated in a testing and monitoring plan prepared, submitted, and implemented by the operator.

Comment Number: 000563_King_WELC_HasAttach-176
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Mechanical integrity and annular pressure should be monitored over the life of the well.
Instances of sustained casing pressure can indicate potential mechanical integrity issues. The annulus between the production casing and tubing (if used) should be continually monitored. Continuous monitoring allows problems to be identified quickly so repairs may be made in a timely manner, reducing the risk that a wellbore problem will result in contamination of USDWs.

Comment Number: 000563_King_WELC_HasAttach-177
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Each hydraulic fracturing treatment must be modeled using a 3D geologic and reservoir model, as described in the Area of Review requirements, prior to operation to ensure that the treatment will not endanger USDWs. Prior to performing a hydraulic fracturing treatment, operators should perform a pressure fall-off or pump test, injectivity tests, and/or a mini-frac. Data obtained from such tests can be used to refine the hydraulic fracture model, design, and implementation.

Comment Number: 000563_King_WELC_HasAttach-178
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Prior to well stimulation, all casing and tubing to be used by the operator to perform the stimulation treatment must be pressure tested. For cemented completions, the test pressure must be at least 500 psi greater than the anticipated maximum surface pressure to be experienced during the stimulation

BLM_0165808

operation or the life of the completion operation. For non-cemented completions, the test pressure must be a minimum of: (i) 70% of the lowest activating pressure for pressure actuated sleeve completions; or (ii) 70% of formation integrity for open-hole completions, as determined by a formation integrity test. A failed test is one in which the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak. In the event of a failed test, the operator must:

1. Orally notify the authorized officer as soon as practicable but no later than 24 hours following the failed test, and;

2. Perform remedial work to restore mechanical integrity.

Stimulation operations may not begin until a successful mechanical integrity test is performed and the results are submitted to the regulator. If mechanical integrity cannot be restored, the well must be plugged and abandoned.

Comment Number: 000563_King_WELC_HasAttach-179
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
During the well stimulation operation, the operator must continuously monitor and record the pressures in each well annuli, surface injection pressure, slurry rate, proppant concentration, fluid rate, and the identities, rates, and concentrations of all additives (including proppant).

If during any stimulation operation the annulus pressure:

1. increases by more than 500 pounds per square inch as compared to the pressure immediately preceding the stimulation; or

2. exceeds 80% of the API rated minimum internal yield on any casing string in communication with the stimulation treatment.

The operation must immediately cease, and the operator must take immediate corrective action and orally notify the authorized officer immediately following the incident.

Within one week after the stimulation operations are completed, the operator must submit a report containing all details pertaining to the incident, including corrective actions taken.

Comment Number: 000563_King_WELC_HasAttach-180
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
If at any point during the hydraulic fracturing operation the monitored parameters indicate a loss of mechanical integrity or if injection pressure exceeds the fracture pressure of the confining zone(s), the operation must immediately cease. If either occurs, the operator must notify the regulator within 24 hours and must take all necessary steps to determine the presence or absence of a leak or migration pathways to USDWs. Prior to any further operations, mechanical integrity must be restored and demonstrated to the satisfaction of the regulator and the operator must demonstrate that the ability of the confining zone(s) to prevent the movement of fluids to USDWs has not been compromised. If a loss of mechanical integrity is discovered or if the integrity of the confining zone has been compromised, operators must take all necessary steps to evaluate whether injected fluids or formation fluids may have contaminated or have the potential to contaminate any unauthorized zones. If such an assessment indicates that fluids may have been released into a USDW or any unauthorized zone, operators must notify the regulator within 24 hours, take all necessary steps to characterize the nature and extent of the release, and comply with and implement a remediation plan approved by the regulator. If such contamination occurs in a USDW that serves as a water supply, a notification must be placed in a

BLM_0165809

newspaper available to the potentially affected population and on a publically accessible website and all known users of the water supply must be individually notified immediately by mail and by phone.

Comment Number: 000563_King_WELC_HasAttach-181
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The use of diesel fuel and related products, BTEX compounds, and 2-BE in well stimulation fluids should be prohibited.

Comment Number: 000563_King_WELC_HasAttach-182
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Techniques to measure actual fracture growth should be used, including downhole tiltmeters and microseismic monitoring. These techniques can provide both real-time data and, after data processing and interpretation, can be used in post-fracture analysis to inform fracture models and refine hydraulic fracture design. Tiltmeters measure small changes in inclination and provide a measure of rock deformation. Microseismic monitoring uses highly sensitive seismic receivers to measure the very low energy seismic activity generated by hydraulic fracturing.

Comment Number: 000563_King_WELC_HasAttach-183
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Hydraulic fracturing fluid and proppant can sometimes be preferentially taken up by certain intervals or perforations. Tracer surveys and temperature logs can be used to help determine which intervals were treated. Tracers can be either chemical or radioactive and are injected during the hydraulic fracturing operation. After hydraulic fracturing is completed, tools are inserted into the well that can detect the tracer(s). Temperature logs record the differences in temperature between zones that received fracturing fluid, which is injected at ambient surface air temperature, and in-situ formation temperatures, which can be in the hundreds of degrees Fahrenheit.

Comment Number: 000563_King_WELC_HasAttach-184
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Operators should develop, submit, and implement a long-term groundwater quality monitoring program. Dedicated water quality monitoring wells should be used to help detect the presence of contaminants prior to their reaching domestic water wells. Placement of such wells should be based on detailed hydrologic flow models and the distribution and number of hydrocarbon wells. Baseline monitoring should begin at least a full year prior to any activity, with monthly or quarterly sampling to characterize seasonal variations in water chemistry. Monitoring should continue a minimum of 5 years prior to plugging and abandonment.

BLM_0165810

Comment Number: 000563_King_WELC_HasAttach-185
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
At a minimum, operators must report:
• All instances of hydraulic fracturing injection pressure exceeding operating parameters as specified in the permit;
• All instances of an indication of loss of mechanical integrity;
• Any failure to maintain mechanical integrity;
• The results of:
o Continuous monitoring during hydraulic fracturing operations;
o Techniques used to measure actual fracture growth; and
o Any mechanical integrity tests;
• The detection of the presence of contaminants pursuant to the groundwater quality monitoring program;
• Indications that injected fluids or displaced formation fluids may pose a danger to USDWs;
• All spills and leaks; and
• Any non-compliance with a permit condition.

Comment Number: 000563_King_WELC_HasAttach-186
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The following must be made publically available on a well-by-well basis through an online, geographically based reporting system, a maximum of 30 days subsequent to a hydraulic fracturing operation:
1. Actual source, volume, geochemistry and timing of withdrawal of all base fluids;
2. Actual chemical additives used, reported by their type, chemical compound or constituents, CAS number, and the actual concentration or rate and volume percentage of all additives; and
3. Geochemical analysis of flowback and produced water, with samples taken at appropriate intervals to determine changes in chemical composition with time and sampled until such time as chemical composition stabilizes.

Comment Number: 000563_King_WELC_HasAttach-187
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The following must be made publically available on a well-by-well basis through an online, geographically based reporting system, a minimum of 30 days prior to a hydraulic fracturing operation:
1. Baseline water quality analyses for all USDWs within the area of review;
2. Proposed source, volume, geochemistry, and timing of withdrawal of all base fluids; and
3. Proposed chemical additives (including proppant coating), reported by their type, chemical compound or constituents, and Chemical Abstracts Service ("CAS") number, and the proposed concentration or rate and volume percentage of all additives.

Comment Number: 000563_King_WELC_HasAttach-188
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel

BLM_0165811

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Operators must develop, submit, and implement an emergency response and remedial action plan. The plan must describe the actions the operator will take in response to any emergency that may endanger human life or the environment – including USDWs – such as blowouts, fires, explosions, or leaks and spills of toxic or hazardous chemicals. The plan must include an evaluation of the ability of local resources to respond to such emergencies and, if found insufficient, how emergency response personnel and equipment will be supplemented. Operators should detail what steps they will take to respond to cases of suspected or known water contamination, including notification of users of the water source. The plan must describe what actions will be taken to replace the water supplies of affected individuals in the case of the contamination of a USDW.

Comment Number: 000563_King_WELC_HasAttach-189
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Prior to plugging and abandoning a well, operators should determine bottom hole pressure and perform a mechanical integrity test to verify that no remedial action is required. Operators should develop and implement a well plugging plan. The plugging plan should be submitted with the permit application and should include the methods that will be used to: determine bottom hole pressure and mechanical integrity; the number and types of plugs that will be used; plug setting depths; the type, grade, and quantity of plugging material that will be used; the method for setting the plugs; and, a complete wellbore diagram showing all casing setting depths and the location of cement and any perforations.

Comment Number: 000563_King_WELC_HasAttach-190
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Plugging procedures must ensure that hydrocarbons and fluids will not migrate between zones, into USDWs, or to the surface. A cement plug should be placed at the surface casing shoe and extend at least 100 feet above and below the shoe. All hydrocarbon-bearing zones should be permanently sealed with a plug that extends at least 100 feet above and below the top and base of all hydrocarbon-bearing zones. Plugging of a well must include effective segregation of uncased and cased portions of the wellbore to prevent vertical movement of fluid within the wellbore. A continuous cement plug must be placed from at least 100 feet below to 100 feet above the casing shoe. In the case of an open hole completion, any hydrocarbon or fluid-bearing zones shall be isolated by cement plugs set at the top and bottom of such formations, and that extend at least 100 feet above the top and 100 feet below the bottom of the formation.

Comment Number: 000563_King_WELC_HasAttach-191
Organization1: Western Environmental Law Center
Commenter1: Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
At least 60-days prior to plugging, operators must submit a notice of intent to plug and abandon. If any changes have been made to the previously approved plugging plan the operator must also submit a revised plugging plan. No later than 60-days after a plugging operation has been completed, operators

must submit a plugging report, certified by the operator and person who performed the plugging operation.

Comment Number: 000563_King_WELC_HasAttach-192
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
After plugging and abandonment, operators must continue to conduct monitoring and provide financial assurance for an adequate time period, as determined by the regulator, that takes into account site-specific characteristics including but not limited to:
• The results of hydrologic and reservoir modeling that assess the potential for movement of contaminants into USDWs over long time scales; and
• Models and data that assess the potential degradation of well components (e.g., casing, cement) over time and implications for mechanical integrity and risks to USDWs.

Comment Number: 000563_King_WELC_HasAttach-193
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.4
Comment Excerpt Text:
The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA.

Comment Number: 000563_King_WELC_HasAttach-207
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
As noted above, fracking requires huge amounts of water, and consequently a great number of tanker truck trips to transport this water and chemicals to the site and to transport waste from the site. See EIS at 4-28 (noting that all alternatives assume that 100 percent of drilling/completion fluids are delivered and disposed of by truck, and 100 percent of produced water and condensate is disposed of by truck). Given that fracking can require thousands of round trips by heavy trucks when developing each well – the impacts of which are compounded exponentially for development of an entire oil and gas field – it is clear that this heavy industrial transport activity will result in dramatic impacts. However, the RMP/EIS underestimates truck traffic and provides an understated and cursory analysis of its impacts, which fails to satisfy the agency's NEPA obligations.

Comment Number: 000563_King_WELC_HasAttach-209
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
Absent from the RMP/EIS, for example, is any attempt by the agency to estimate increased maintenance demands, consider safety costs for increased roadway use, increased traffic accidents and associated medical impacts and burdens on local hospitals, burdens on first responders and the criminal justice

BLM_0165813

system, or to even project where or how many miles of access roads will be constructed. Moreover, while the RMP/EIS calculates projected emissions caused by oil and gas related traffic, see Emission Inventory Technical Support Document Appendix A at A-5, the RMP/EIS underestimates the number of truck trips needed per well associated with the more water-intensive techniques necessary for hydraulic fracturing.

Comment Number: 000563_King_WELC_HasAttach-210
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 30.3
Comment Excerpt Text:
A recent and comprehensive 2013 study by Boulder County, Colorado of the impacts of fracking-related truck traffic (hereafter "Boulder Study"), concluded that the hydraulic fracturing process for a single well would require an average of 1,400 one-way truck trips just to haul water to and from the site. See Boulder Study at 8. Using national data, the study also finds that taking into account the full development process (construction, drilling, and completion), the average fracked well requires 2,206 one-way truck trips. Id. at 10. This figure does not include production phase trips, which could add an additional 730 truck trips per year depending on various factors including the success of the well and whether it is re-fracked. Id.
The Boulder Study serves as an example of what BLM should analyze in its EIS. The Study uses this trip generation data to analyze the impacts of oil and gas development on the
county's roadway system and, ultimately, to quantify these impacts in terms of maintenance and safety costs. Id. at 4. To establish a baseline, the Study inventoried current roadways including surface conditions, traffic volumes, and shoulder widths. In addition to the number of truck trips, the Study also examined the vehicle classification, load, origin, and destination of the trips. Finally, road deterioration and safety costs are calculated under three development scenarios, resulting in an average cost of $36,800 per well over 16 years. Id. at 55. The Boulder Study is just one example of the type of quantitative analysis of oil and gas related traffic that can be completed with currently available information.

Comment Number: 000584_PattersonC_20161005-2
Organization1:
Commenter1:Cynthia Patterson
Commenter Type: Individual
Other Sections: 41.1 18.3
Comment Excerpt Text:
BLM did not consider current information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and oil and gas operations.

Comment Number: 000585_WentzelR_20160906-2
Organization1:
Commenter1:Ruth Wentzel
Commenter Type: Individual
Other Sections: 41.1
Comment Excerpt Text:
In addition, the BLM has not analyzed the impacts of hydraulic fracturing and multi-drilling technologies, with regard to ecological damage. Analyzing the effects of drilling as well as rural gas gathering lines, which are exempt from regulation by the Federal Government, must be addressed.

Comment Number: 000587_WolcottS_20161031-4
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Other Sections: 37.1
Comment Excerpt Text:
The final plan must protect the health of the watershed. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. There are no alternative sources of water if these springs and water sheds be contaminated. Spills from fracking are inevitable, as experience in Colorado and across the country has demonstrated. The final plan must exclude all oil and gas activities within a halfmile of all surface and ground domestic water sources, streams and ditches and the watersheds that feed into them. These are all at risk from surface spills.

Comment Number: 000603_SmithP_20161024-7
Organization1:
Commenter1:Paige Smith
Commenter Type: Individual
Comment Excerpt Text:
Chapter 4, Environmental Consequences
1. Section 4.1.1 Analytical Assumption, fourth bullet:
This discussion of reasonable foreseeable development and the number of wells that could be developed should be revised to indicate whether this analysis is assuming that these natural gas wells will be developed using directional drilling, hydraulic fracturing completion methodologies and multiple wells per pad. In addition, this section should include an estimate of how many well pads, miles of pipeline and amount of compression that is estimated to be required in order to support this level of drilling. Each of these factors can have a much higher environmental impact to air quality, water quality and water quantity as compared to conventional vertical drilling using a single well per pad.

Comment Number: 500001_SpencerD_20161013-1
Organization1:
Commenter1:Donna Spencer
Commenter Type: Individual
Comment Excerpt Text:
We are aware of the fact that hydraulic fracking requires an abundance of water – a great deal of water which we don't have to support the gas/oil drilling.

Comment Number: 500003_TwittyE_20161014-1
Organization1:
Commenter1:Eric Twitty
Commenter Type: Individual
Other Sections: 10.3
Comment Excerpt Text:
Oil, gas, and fracking pollute air with toxic, carcinogenic chemicals. Releases from purge-tanks, valves, pipelines, and well-casings are UNREGULATED. We have seen first-hand the atmosphere in Weld, Larimer, and Boulder counties turn brown.

Comment Number: 500007_ClevelandB_20161101-1
Organization1:
Commenter1:Britten Cleveland
Commenter Type: Individual

BLM_0165815

Other Sections: 30
Comment Excerpt Text:
The North Fork Valley is a hub of agriculture in Colorado, shipping produce throughout the state. The threats posed by fracking in The North Fork include damaging local economy by potentially harming our watershed and polluting our beautiful farms. The benefits of fracking will not impact our local community, as the revenue raised will not stay in the North Fork. Agriculture in the North Fork is an economic driver. It benefits the environment, the community, and our economy.

Comment Number: 500008_WardF_20161101-1
Organization1:
Commenter1:Fredrika Ward
Commenter Type: Individual
Other Sections: 2
Comment Excerpt Text:
my first choice, which would be to have zero hydraulic fracturing. How did you not consider this as a reasonable alternative?

Comment Number: 500008_WardF_20161101-2
Organization1:
Commenter1:Fredrika Ward
Commenter Type: Individual
Comment Excerpt Text:
Hydraulic Fracturing presents many dangers still unknown to us. Some that we have already seen come in the impact of transportation of hazardous materials, impact on water and air quality, road degradation, increased heavy truck traffic, and an impact on wildlife.

Comment Number: 500010_MasciocchiM_20161101-1
Organization1:
Commenter1:Matt Masciocchi
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
Hydraulic Fracturing has been scientifically linked to a wide variety of human health issues. Some of these health concerns include:
• Birth defects
• Endocrine disruption
• Respiratory ailments
• Cardio vascular disease
• Immune system function
Comment Number: 500015_HineyD_20161027-1
Organization1:
Commenter1:David Hiney
Commenter Type: Individual
Other Sections: 37.3
Comment Excerpt Text:
I supervised stimulation jobs and commonly injected 10,000 gallons each of hydrofluoric and hydrochloric acid, 5,000 gallons of diesel fuel, hundreds of gallons each of biocide, scale inhibitor, demulsifier, surfactant, and others. Horizontal wells now use much larger amounts.
The risk of chemicals being forced from a stim or frack job into ground water may be low, but is certainly not impossible and cannot be known until it occurs. In fact hydraulic fracturing is the

BLM_0165816

process of pumping chemicals under high pressure to crack the formation forcing them into other areas. A common problem in drilling is loss of circulation in which the drilling fluid required for the process migrates to other areas, under relatively low pressure, while trying to prevent it. Migration of the above chemicals into a ground water zone would be catastrophic since the entire population of the North Fork Valley depends on pristine ground water with no other supply. Potential ground water contamination is reason enough that these areas should be permanently removed from consideration of leasing for oil or gas exploration.

Comment Number: 5000162_OvertonL_20161018-2
Organization1:
Commenter1:Lee Overton
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
Air quality is another consideration. Communities subject to pollution from hydraulic tracking have frequently had severe reactions. A review by the New York State Department of Health released a "Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development," in December 2014, which found problems with skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation, all of which led to the recommendation that New York should ban tracking in that state.
Studies pertaining to birth defects, birth weight and infant mortality show negative results as stated below:
* in rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects.
* University of Pittsburgh study of three heavily drilled Pennsylvania counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller than normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality.
* Health professionals in Vernal, Utah reported a six-fold increase in infant death rates over a three year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one professional.
* Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5 kilometer radius of natural gas tracking sites. They found that proximity to tracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The North Fork Valley cannot afford the risk of contamination.

Comment Number: 500025_GreenR_20161101-1
Organization1:
Commenter1:Robert Green
Commenter Type: Individual
Comment Excerpt Text:
In addition to fracking, the hazard of storing chemicals as well as the presence of sludge ponds and the ensuring increased truck traffic, which always occurs, must be taken into consideration. Please eliminate this item from your plan.

BLM_0165817

Comment Number: 500029_HuschS_20161020-1
Organization1:
Commenter1:Susan Husch
Commenter Type: Individual
Comment Excerpt Text:
Include the most current data on drilling and fracking impacts- not data from years ago- in the decision-making process. These include data on land stability, human health, water air and soil impacts, economic impact and much more.

Comment Number: 500192_SchulzJ_20161027-2
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
Fix the Significant Deficiencies in the Draft RMP and Planning Process Based on FACTS emerging from areas already fracked, it is likely that the scale and nature of proposed gas and oil development in the Uncompahgre planning area will create massive negative systemic impacts across the entire region-damaging every resource the people of Western Colorado value - except resource extraction. The proposed action will damage not only current residents, agriculture and businesses of the present generation but future generations as well.

Comment Number: 500192_SchulzJ_20161027-5
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
The RMP must address the very real risks that will be created by deep well wastewater injection in the area, one of the most geologically unstable areas of Colorado. Earthquakes and mudslides damage to infrastructure critical to the economic function of the region. Impacts to oil and gas infrastructure must be assessed as well.

Comment Number: 500192_SchulzJ_20161027-7
Organization1:
Commenter1:Jon Schulz
Commenter Type: Individual
Comment Excerpt Text:
The RMP must deal with the actual impacts of modern fracking technology and not imply that it is equivalent to older less damaging technologies.
Comment Number: 500224_SullivanS_20161101-1
Organization1:
Commenter1:Sharon Sullivan
Commenter Type: Individual
Comment Excerpt Text:
Please consider that option that fracking is something that could seriously hurt Colorado. Right now the majority of our land is pristine, open, and healthy. That is how people envision Colorado. Imagine someone wanting to move here and coming to visit only to find unsightly hydraulic fracturing machines spread about. Imagine taking a hike in the mountains and then running across one of these eyesores. Worse yet, what if you already lived here and they put one near your home and one of the mystery chemicals in the fluid seeped into the ground water and affected the drinking water.

Comment Number: 500226_CareyH_20161101-1
Organization1:
Commenter1:Hugh Carey
Commenter Type: Individual
Other Sections: 18.3
Comment Excerpt Text:
I am concerned that the BLM didn't consider the damage of fracking or do a human health impact study on fracking operations before drafting the RMP. A recent study released by John Hopkins indicates that an increase of health problems in areas near hydraulic fracturing is directly related:
"New research suggests that Pennsylvania residents with the highest exposure to active natural gas wells operated by the hydraulic fracturing ('fracking') industry are nearly twice as likely to suffer from a combination of migraine headaches, chronic nasal and sinus symptoms and severe fatigue. Researchers from the Johns Hopkins Bloomberg School of Public Health, reporting online Aug. 25 in the journal Environmental Health Perspectives, say their findings add to a growing body of evidence linking the £racking industry to health problems.
'These three health conditions can have debilitating impacts on people's lives,' says first author Aaron W. Tustin, MD, MPH, a resident physician in the Department of Environmental Health Sciences at the Bloomberg School. 'In addition, they cost the health care system a lot of money. Our data suggest these symptoms are associated with proximity to the fracking industry.' "
Why is the BLM not acknowledging the people whose health has been damaged or those who have died near fracking operations?

Comment Number: 500230_RocessA_20161101-1
Organization1:
Commenter1:Amy Rocess
Commenter Type: Individual
Comment Excerpt Text:
it is fearsome that there are so many undisclosed chemicals in the hydraulic fracturing fluids. We have no idea what will happen if these chemicals got into our ground water or how they will affect the wildlife. These are questions that need to be answered.

Comment Number: 500233_BartahJ_20161101-1
Organization1:
Commenter1:JM Bartah
Commenter Type: Individual
Comment Excerpt Text:
Fracking harms the environment. The clean water in the North Fork Valley benefits many in the Roaring Fork who enjoy fresh organic produce form the North Fork.
• Fracking is a threat to the local economy. Local business that rely on tourism and visitors from out of town will be harmed by the pollution and traffic that fracking brings.
• Human health and wellness is not supported by fracking industries.
• The benefits of fracking do not stay in local communities, however, the responsibilities of clean up and reclamation do.

Comment Number: 500266_EleneL_20161101-1
Organization1:
Commenter1:Elene L
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165819

This is irresponsible due to undisclosed chemicals which are in the fracking fluid. Therefore, a no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals.

Comment Number: 500267_PetersonS_20161101-1
Organization1:
Commenter1:Sarah Peterson
Commenter Type: Individual
Other Sections: 11.3
Comment Excerpt Text:
fracking releases methane and will contribute to global climate change

Comment Number: FormLetterAAA-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Has the BLM taken into consideration new horizontal drilling and multi-stage hydraulic fracturing technologies? This relatively new drilling technology involves a far greater magnitude of impacts, including: double the surface impacts of conventional drilling; up to a 333% increase in air pollutant emissions involving 12 more tons of VOCs and one additional ton of HAPs per well; 5 to 10 times more water as well as increased noise, larger waste volumes, habitat fragmentation and loss, and thousands of additional round trips of truck traffic per well.

Comment Number: FormLetterBB-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
How can the BLM say that oil and gas development with hydraulic fracturing will not harm human health when you haven't carried out a thorough analysis of oil and gas operations and their impact on human health? Why are you ignoring the many stories of people whose lives have been lost or their health compromised from living near oil and gas development? (Refer to *) The BLM has a responsibility to prevent such documented damage.

Comment Number: FormLetterBBB-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
There are so many concerns that have not been addressed in The Draft RMP.In communities where hydraulic fracturing is occurring, toxic compounds have found their way into water while some have leaked at drilling sites or while transporting fluids and water. The damage to various human organs from these toxins has been documented.

Comment Number: FormLetterBBB-3
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:

BLM_0165820

How can the BLM say that oil and gas development with hydraulic fracturing will not harm human health when they haven't carried out a thorough analysis of oil and gas operations and its impact on human health? Why are you ignoring the many stories of people whose lives have been lost or their health compromised from living near oil and gas development? Please consider a no-leasing option or issue a moratorium on all leasing until more research has been completed.

Comment Number: FormLetterCC-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
As mentioned in the wilderness.org article, "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

Comment Number: FormLetterDD-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
It is irresponsible to locate oil and gas operations in a sensitive watershed that directly feeds thelargest concentration of organic farms in the state. Any increase in hydraulic fracturing would damage the unique biodiversity and pollute soil, water and air while increasing the risk to human health.

Comment Number: FormLetterFF-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see beiow fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health." Methane is also mentioned as a problem related to fracking.

Comment Number: FormLetterGGG-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
possible environmental disasters caused by or affecting fluid mineral development. It is possible that wastewater injection wells can cause seismic activity. There is no mention of this in the RMP.

BLM_0165821

Comment Number: FormLetterHH-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
It would be irresponsible to increase fracking due to undisclosed chemicals which are in the fracking fluid. Therefore, a no leasing option should be considered because we don't know the ramifications of those chemicals put into our ground water or potentially spilled or consumed by animals.

Comment Number: FormLetterII-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
At this point in time, it would be irresponsible for the BLM to move forward as the Draft RMP failed to mention pipeline integrity management and pipeline safety. It is very plausible that the integrity of the pipeline could be compromised, not only from faulty construction, but also from flooding, mudslides, earthquakes, and geologic instability. Leaks and spills could occur along the pipeline, which could contaminate the soil and water. Faulty construction or a compromised pipeline from any geological incident could also result in a rupture or explosion. We have already seen instances of this happening within the United States. What makes this problem even more uncertain is that right now rural gas gathering pipelines are not regulated. This is a danger. Rural gas pipelines need to be regulated to prevent leaks, spills, explosions and also to give the public confidence that these pipelines will not endanger campsites, start forest fires, damage the environment, or result in animal or human fatalities.

Comment Number: FormLetterIII-1
Organization1:
Commenter1:
Commenter Type:
Other Sections: 37.3
Comment Excerpt Text:
The BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought. These concerns were not addressed in the Draft RMP
- Risk of contamination to irrigation water and crops from:
- Fracking chemical contamination of ground and surface waters
- Damage to irrigation canal access and bridges o Airborne volatile organic compounds
- Airborne silicates
- Silting in of rivers and irrigation ditches
- Increases in diesel exhaust from transportation, well and compressor sites 5 Risk of loss to irrigation shares for multiple irrigation ditches in the North Fork.
- Drinking Water 5 Risk to drinking water supplies for North Fork communities, potentially affecting 30,000 + people

Comment Number: FormLetterJJ-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:

BLM_0165822

I find it unfair and irresponsible to lease federal land for oil and gas development without federal, state, and local environmental review. The numerous
impacts Hydraulic Fracturing will have on our land include, but are not limited to, chemical contamination of ground and surface waters, damage to irrigation canal access and bridges, airborne volatile organic compounds, airborne silicates, the silting of rivers and irrigation ditches, and an increase in diesel exhaust from transportation, well, and compressor sites.

Comment Number: FormLetterPP-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
What if with the increase of 146 natural gas wells, we, too start experiencing earthquakes,increased health risks, such as asthma and neurological diseases? As noted in the two articles below, the consequences of hydraulic fracturing are costing the communities unexpected expense and dollars and lives.
As mentioned in the wilderness.org article, "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three year study from the Colorado School of Public Health." Methane is also mentioned as a problem related to fracking.
I cannot condone any increase in natural gas wells In the sensitive watershed of the upper North Fork Area totaling an estimated 30,000 acres without any environmental oversight, public input, and is subject to a dubious valuation process. This is irresponslble due to undisclosed chemicals which are in the fracking fluid.

Comment Number: FormLetterQ-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
How does the Draft RMP address new horizontal drilling and multi-stage hydraulic fracturing technologies? This relatively new drilling technology involves afar greater magnitude of impacts, including: double the surface impacts of conventional drilling; up to a 333% increase in air pollutant emissions involving I2 more tons of VOCs and one additional ton of HAPs per well; 5 to I0 times more water as well as increased noise, larger waste volumes, habitat fragmentation and loss, and thousands of additional round trips of truck traffic per well. We are effectively killing our precious eco-system and putting an end to sustainablity in Western Colorado. A thorough study of the damage to all forms of life resulting from leakage and spills of toxic chemicals as well as spills of water, fluids and sands when transported from the drilling sites need to be reviewed and analyzed.

Comment Number: FormLetterR-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
How has the draft RMP addressed new horizontal drilling And multi-stage hydraulic fracturing technologies? This Relatively new drilling technology involves a far greater Magnitude of impacts, including: double the surface impacts Of conventional drilling; up to a 333% increase in air pollutant

BLM_0165823

emissions involving 12 more tons of VOCs and one Additional ton of haps per well; 5 to io times more water as

Well as increased noise, larger waste volumes, habitat fragmentation and loss, and thousands of additional round Trips of truck traffic per well. We are effectively killing our Precious eco-system and putting an end to sustainability in Western Colorado. A thorough study of the damage to all forms of life resulting from leakage and spills of toxic

Chemicals as well as spills of water, fluids and sands when transported from the drilling sites need to be reviewed and analyzed.

Comment Number: FormLetterRR-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Please do not allow hydraulic fracturing on our public lands. An ounce of prevention is worth a pound of cure ond the damage causes by the oil and gas industries is evident and left to communities and citizens to clean up. There is no benefit for our community in this risky business. Please take the health and wellbeing of the people, animals, environment, and water into consideration and at minimum support the North Fork Alternative Plan(B1), at most ban fracking in Colorodo like many other wise states and countries have done.

Comment Number: FormLetterRRR-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
From what I have read, I believe that the BLM has not considered many factors, the least of which is the new drilling technology which has much greater impact with 333% increase in air pollutant emissions, 5-10 times more water as well increased noise, an increase in waste, habitat fragmentation and damage to our roads from thousands of additional round trips of truck traffrc per single well! I am stunned that the BLM would consider a plan which opens up 95% of the Uncompahgre planning area to oil and gas leasing and development.

Comment Number: FormLetterT-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Then, there is the more personal aspect of the situation. Hydraulic fracturing has impacts on the physical and mental health of humans. How can we expect to live normally when we are paranoid of each bite of food-each sip of water? Hydraulic fracturing creates risk to drinking water supplies for North Fork communities, potentially affecting 30,000 plus people. In the Valley, there are insufficient water supplies necessary to support fracturing and other drilling operations, particularly in this period of persistent drought. Beyond this, hydraulic fracturing is a risk to public health from airborne contaminants, ozone and smog, as well as contamination of ground and surface waters.

Comment Number: FormLetterTT-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:

BLM_0165824

It is imperative that the BLM should offer a no lease option which permits no increase in hydraulic fracturing.

Comment Number: FormLetterU-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
In my opinion, The BLM has also failed to produce a balanced plan that took into consideration new horizontal drilling and multi-stage hydraulic fracturing technologies. This relatively new drilling technology involves a far greater magnitude of impacts, including: double the surface impacts of conventional drilllng; up to a 333% increase in air pollutant emissions involving 12 more tons of VOCs and 1 additional ton of HAPs per well; 5 to 10 times more water; as well as increased noise, larger waste volumes, habitat fragmentation and loss, and thousands of additional round trips of truck traffic per well.

Comment Number: FormLetterUUU-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Hydraulic Fracturing will leave a great impact on the wildlife inhabiting the North Fork Valley. It is clear that the BLM did not take a hard look at direct, indirect, and cumulative impacts, including the impact of human health, as well as consultation with the Pipeline Hazardous Materials and Safety Administration and failed to consider the potential impacts that an exemption from safety rules would have on human health, the environment, and wildlife.

Comment Number: FormLetterVVV-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM has failed to produce a balanced plan, which takes into consideration new drilling and fracking technologies. Which result in a 333% increase in air pollutant emissions involving 12 more tons of VOCs and one additional ton of HAPs per well plus 5-10 times more water, increased noise, larger volumes of waste, habitat disruption etc. Lastly, we have no idea, which chemicals are in the fracking fluid and have no idea of the impact they will have on wildlife or the environment.
Comment Number: FormLetterXX-2
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
A thorough analysis must be completed before any increase in hydraulic fracturing can be allowed. The price is too high for all of us. With a significant number of new natural gas wells, will we too have earthquakes and more health risks, such as asthma and neurological diseases? The article below addresses the consequences of hydraulic fracturing in terms of dollars and lives. We can't take that chance.
As mentioned in the wilderness.org article cited below, "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause

BLM_0165825

respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health." Methane is also mentioned as a problem related to fracking.

Comment Number: FormLetterY-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
The BLM has failed to produce a balanced plan, which takes into consideration new drilling and fracking technologies. Which result in a 333% increase in air pollutant emissions involving 12 more tons of VOCs and one additional ton of HAPs per well plus 5-10 times more water, increased noise, larger volumes of waste, habitat disruption etc. Lastly, we have no idea, which chemicals are in the fracking fluid and have no idea of the impact they will have on wildlife or the environment.

Comment Number: FormLetterYY-1
Organization1:
Commenter1:
Commenter Type:
Comment Excerpt Text:
Further studies and pipeline regulations must be completed before any increase in hydraulic fracturing can be allowed. The price is too high for all of us. With the increase in natural gas wells, will we also start experiencing earthquakes along with increased health risks, such as asthma and neurological diseases? Read the article below that discusses the definitive link between injection wells and earthquakes. As noted in the article, the consequences of hydraulic fracturing are costing communities unexpected expenses and also human lives. We can't take that chance.
As mentioned in the wilderness.org article, "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking. I stand with those who want to maintain a healthy environment for all, in which no one will be exposed to an increase of toxic chemicals from hydraulic fracturing.

*Summary*
A. Commenters stated that the BLM did not take a hard look at all impacts related to hydraulic fracturing, and overlooked studies that link impacts to hydraulic fracturing, including the following:

- Contamination of aquifers and toxic springs
- Water depletion, including Endangered Species Act Section 7 consultation
- Human health, including human health assessment
- Air quality
- Climate change
- Secondary impacts to local economic drivers, such as agriculture and outdoor recreation
- Increased truck traffic
- Impacts to local infrastructure
- Fragmentation of wildlife habitat

BLM_0165826

- Increased sedimentation
- Induced seismicity

B. Commenters stated that the BLM needs to analyze modern hydraulic fracturing technologies and not use older, less-damaging technologies assumptions when analyzing impacts.

The Reasonably Foreseeable Development Scenario report is outdated and underestimates the number of potential wells for future development. Therefore, the Draft RMP/EIS fails to consider the most recent trends in well development and does not include an estimate of how many well pads, miles of pipeline, and amount of compression would be required to support the level of drilling. No analysis was done for re-hydraulic fracturing or associated resources uses and, therefore, the BLM did not properly analyze direct, indirect, and cumulative impacts.

C. Commenters recommended that specific requirements and regulations be developed for hydraulic fracturing, including the following:

- Wells must be sited where a suitable confining zone is present, and operators must delineate an area of review that models the physical and chemical extent of hydraulically induced fractures
- Operators must submit data reports to regulators, including, but not limited to, water use and disposal planning
- Wells must be properly constructed with casings designed to withstand anticipated conditions
- Water-depth tests must be done before drilling
- Cement casing must be designed using specific standards, with varying requirements based on site-specific geologic and engineering factors
- Cement must meet compressive strength standards
- Formation and cement integrity tests must be conducted
- Well, gamma ray, density, and resistivity and caliper log testing must be conducted
- Core and fluid sampling must be conducted
- Testing of mechanical integrity, pressure, slurry rate, proppant concentrations, fluid rate, and groundwater must be conducted
- Requirements must be enacted to make developer reports publicly available
- Plugging procedures must be regulated

*Response*
A. The Draft RMP/EIS addresses potential impacts from fluid mineral development, including hydraulic fracturing, throughout Chapter 4, including, but not limited to, Section 4.3.1, Air Quality and Climate, Section 4.3.3, Water Resources, and Section 4.3.5, Fish and Wildlife. Draft RMP/EIS Section 4.6.3, Socioeconomics, addresses public health and safety, including risks from exposure to hazardous materials and secondary impacts to local quality of life and economics. Additional information was added to the Proposed RMP/Final EIS relative to the potential for induced seismicity and increased truck traffic.

A land use planning-level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative, rather than quantitative or focused on site-specific actions. The BLM need not speculate about all conceivable impacts, but it must evaluate the

BLM_0165827

reasonably foreseeable significant effects of the proposed action (BLM NEPA Handbook, H-1790-1, Section 6.8.1.2, Analyzing Effects). For example, determining the amount of freshwater that will be needed for new natural gas developments, as well as the local, site-specific impacts of such water withdrawal, would be speculative due to the variations associated from one project to another. However, this type of analysis would be conducted during site-specific NEPA for future projects.

B. The Reasonably Foreseeable Development Scenario report for oil and gas development included assumptions about the overall magnitude of development that could occur based on known oil and gas resources and current technologies and economic trends. Due to shifting market conditions, as well as technologies employed, it is not possible to estimate specific locations, times, and pattern of oil and gas development when writing the Draft RMP/EIS. Making assumptions regarding these factors would be speculative and not contribute to a meaningful NEPA analysis. Also see response to Section 5 – NEPA of this report.

C. The Colorado Oil and Gas Conservation Commission regulates hydraulic fracturing, and BLM requires operators to comply with applicable state regulations. For instance, Colorado Oil and Gas Consevation Commission Rule 205A requires operators in Colorado to disclose the chemical content of hydraulic fracturing fluids within 60 days of the conclusion of a hydraulic fracturing treatment in the FracFocus Chemical Disclosure Registry[13] database. For example:

- On December 13, 2011, the State of Colorado enacted Code of Colorado Regulations 404-1:205A, a new rule requiring vendors and providers of hydraulic fracturing services to provide the operator of a natural gas well with the identity of each additive and each chemical intentionally added to the hydraulic fracturing fluid, within 30 days following the conclusion of the hydraulic fracturing treatment (Nettles et al. 2012 CCR 404-01:205A). The operator must then complete a chemical disclosure registry form and post the form to a national public website, http://fracfocus.org, within 60 to 120 days. The operator must disclose the concentration of the chemical or additive but is not required to disclose the brand name of the product or additive to which the disclosed chemical or chemical concentration is a component. A vendor, service provider, or operator may claim that the specific identity and concentration of a chemical is entitled to trade secret protection and may withhold disclosure of this information on that basis. However, the identity and amount of any chemicals claimed to be a trade secret must be identified to any health professional who requests such information in writing (and who agrees to keep the information confidential) for the purpose of diagnosing or treating an individual who may have been exposed to such chemicals. Likewise, this information must be provided to the Colorado Oil and Gas Consevation Commission upon receipt of a letter stating that such information is necessary to respond to a spill or release, or a complaint from a person who may have been directly and "adversely affected or aggrieved" by a spill or release.

---

[13] Internet Web site: www.fracfocus.org

BLM_0165828

In addition to Colorado Oil and Gas Consevation Commission Rule 205A, other hydraulic fracturing rules within Colorado Oil and Gas Consevation Commission purview include:

- Rule 205, Inventory Chemicals
- Rule 305.c.(1), Landowner Notice of Intent to Hydraulic Fracture
- Rule 316C.a, 48-Hour Notice of Treatment to Local Governmental Designee
- Rule 317, General Drilling Rules, including Well casing and cementing; Cement bond logs
- Rule 317B, Public Water System Protection including setbacks and precautions near surface waters and tributaries that are sources of public drinking water
- Rule 341, Bradenhead Monitoring During Well Stimulation Operations
- Rule 608, Special requirements for CBM wells
- Rules 902, 903, and 904, pit permitting, lining, monitoring, and secondary containment

As discussed under part A of this response, above, a land use planning-level decision is broad in scope. The decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground decisions or actions (e.g., the BLM is not approving an application for permit to drill to start drilling). Site-specific requirements based on technology to be employed in operations will be determined and managed via conditions of approval at the leasing stage, or application of best management practices, as appropriate.

### Section 41.3 – Other – Soundscapes
Total Number of Submissions: 2
Total Number of Comments: 3

Comment Number: 000489_JohnsonA_20161101-75
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
6. Natural Soundscapes
Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife. BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.
For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."

BLM_0165829

We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest.

SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD- GIS because it is available by request from TWS.[65]

[Footnote 65] The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape.[66] This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors.

[Footnote 66] See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html.

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

* Class I Objective: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention.

* Class II Objective: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be heard on occasion, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape.

* Class III Objective: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

* Class IV Objective: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

BLM_0165830

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management.

Summary of Comments: BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.

Comment Number: 000545_SlivkaJ_20161101-36
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Natural Soundscapes Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife. BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

Comment Number: 000545_SlivkaJ_20161101-37
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has

BLM_0165831

developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest. SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS. [Footnote 8: The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.]

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape. This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors. [See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html. ]

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

? Class I Objective: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention. ? Class II Objective: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be heard on occasion, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape. ? Class III Objective: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

? Class IV Objective: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention.

However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into

BLM_0165832

baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management. Summary of Comments: BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.

### Summary

Commenters stated that the BLM should analyze natural soundscapes, as it is a resource that can impact other resources, and that soundscapes should be incorporated in the designation and management of backcountry recreation areas. Commenters also recommended that acoustic modeling be used to help analyze and preserve this resource.

### Response

Resources and resource uses to be analyzed in the RMP were determined based on internal and external scoping (see Draft RMP/EIS Section 1.4.3, Issues Considered but Not Further Analyzed); soundscapes were not identified as a resource for separate assessment in this process. There is no regulation or policy direction regarding analysis of soundscapes as a separate resource; however, impacts on sound in wilderness were analyzed in the context of lands with wilderness characteristics (Draft RMP/EIS Section 4.3.12, pages 4-212–4-225), and Wilderness and WSAs (Draft RMP/EIS Section 4.5.2, pages 4-388–4-404).

## Section 42 – Ecological Emphasis Areas

### Section 42.1 – Ecological Emphasis Areas: Range of alternatives

Total Number of Submissions: 26
Total Number of Comments: 50

Comment Number: 000409_DayB_20161031-2
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Lines (L) 17-19. The actions here are the same, but they all require preserving connectivity, which shows the necessity of incorporating all of the Ecological Emphasis Areas (EEAs) from Alternative B into the preferred alternative. BLM discusses this on page 4-151, and we agree. "These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other long-term changes that might require species or communities to move over time."

BLM_0165833

Comment Number: 000576_Ruppert_20161015-10
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
With respect to wilderness and wildlife protection: Wildlife habitat fragmentation should be mitigated by assuring connectivity between Grand Mesa and West Elk Wilderness through the designation of Ecological Emphasis Areas and Special Recreation Management Areas. Wild and scenic rivers should be protected. The final RMP must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest.

Comment Number: 000576_Ruppert_20161015-8
Organization1:ODISEA Consulting Engineers
Commenter1:Jeff Ruppert
Commenter Type: Individual
Comment Excerpt Text:
The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat. Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat, are critical components that help sustain the multi-million-dollar hunting industry in the area. The final RMP should include ecological emphasis areas for all critical winter habitats within the North Fork Valley.

Comment Number: 000578_WarrenD_20161101-1
Organization1:
Commenter1:David Warren
Commenter Type: Individual
Comment Excerpt Text:
The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest.

Comment Number: 000492_RandallR_20161101-10
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP.

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-10
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid minerals stipulations, should be applied by the final decision in this area. We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. 31

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-7
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Other Sections: 27.1 42.1
Comment Excerpt Text:
With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should not be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC. The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). 20
[20
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.60521.F ile.dat/ecological_emphasis_areas.zip]
The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D21 :
[21 Page D4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par. 39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf]
San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas. With the stipulations recommended below, these areas will be well served. All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below.

Comment Number: 000104_LilienE_20160802-1
Organization1:
Commenter1:Elizabeth Lilien
Commenter Type: Individual
Other Sections: 27.1 42.1
Comment Excerpt Text:
I urge the BLM's Resource management plan to designate Jumbo Mountain and surrounding lands as an Ecological Emphasis Area, as a Special Recreation Management Area, and to recognize the Jumbo Mountain trail network as a sanctuary for hiking, running, biking, horseback riding, or just sitting and enjoying the remarkable scenery

BLM_0165835

Comment Number: 000184_BrettJ_20161017-12
Organization1:Slow Food Western Slope
Commenter1:Jim Brett
Commenter Type: Individual
Comment Excerpt Text:
Hunting and Fishing - Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of a no-leasing alternative or at least B1 which prohibits surface activities in critical wildlife habitat, and includes both No-Leasing and No Surface Occupancy setbacks from streams, riparian areas and water bodies.

Comment Number: 000260_HunterL_20161028-2
Organization1:
Commenter1:Lucy Hunter
Commenter Type: Individual
Comment Excerpt Text:
With respect to wilderness and wildlife protection: Wildlife habitat fragmentation should be mitigated by assuring connectivity between Grand Mesa and West Elk Wilderness through the designation of Ecological Emphasis Areas and Special Recreation Management Areas.

Comment Number: 000332_RaitK_20161031_PewTrust-1
Organization1:The Pew Charitable Trusts
Commenter1:Ken Rait
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Ecological Emphasis Areas
We commend the BLM on the inclusion of Ecological Emphasis Areas (EEA) in the draft plan as a management tool to protect biodiversity and contribute to connectivity across the planning area and larger landscape. These areas are defined as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors." We agree with BLM's assessment that the strategy of conserving connected habitat patches across a landscape and elevation zones is well suited to BLM's often fragmented land ownership. Indeed, the UFO's planning area contains important habitat across multiple jurisdictions, including Forest Service, Park Service, and private lands. Despite the BLM's lands being sometimes interspersed among these other ownerships, there is ample potential to better manage for connectivity between protected areas.
While the identification of the EEAs is a great first step, many of the identified EEA lands are not recommended for protection in the draft RMP's preferred alternative. Alternative B includes 242,580 acres within 12 EEAs, but only 177,700 acres of EEAs are included in the preferred alternative. All twelve identified EEAs included in Alternative B are included in the preferred alternative, but more than half of them are significantly cut down in size. For example, in the case of Naturita Canyon, the EEA goes from 15,620 acres in Alternative B to only 1,510 acres in the preferred alternative. To provide true connectivity, the BLM should safeguard the entirety of these vulnerable wild lands in the proposed RMP. Additionally, strong management prescriptions for EEAs are important to ensuring that these lands fulfil the goal of biodiversity protection and habitat connectivity. As identified by the BLM in the draft plan, fragmentation is generally damaging to the habitat, watershed, and ecological values. While the management of EEAs under the preferred alternative allows for restrictions to surface occupancy, it is not required. We urge BLM to consider management decisions to best protect the biodiversity and connectivity.

BLM_0165836

Recommendation: In order to best serve the goal of protecting biodiversity and habitat connectivity, the BLM should maximize the number and acreage of Ecological Emphasis Areas in the final plan and strengthen the management prescriptions for all EEAs.

Comment Number: 000345_ReeseC_20161027-14
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
The final plan should also include an Ecological Emphasis Area [at Jumbo Mtn] to protect critical winter mule deer and elk habitat.

Comment Number: 000345_ReeseC_20161027-15
Organization1:
Commenter1:Cory Reese
Commenter Type: Individual
Comment Excerpt Text:
Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

Comment Number: 000348_EdstromS_20161101-14
Organization1:Delta Area Mountain Bikers
Commenter1:Sven Edstrom
Commenter Type: Individual
Comment Excerpt Text:
We also support the concept of creating Ecological Emphasis Areas (EEAs) for winter habitat for mule deer and other animals of concern, where deemed necessary and where EEAs coalesce with the objectives of our organization. Having ample wildlife in recreation management areas contributes to the experience of natural beauty, and distinction of these environments.

Comment Number: 000402_RatnerJ_20161028-75
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
#103 designates ecological emphasis areas but authorizes the same ecologically degrading activities, such as livestock grazing, in them. This renders the whole ecological emphasis area concept meaningless.

Comment Number: 000409_DayB_20161031-5
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
L 103-105. Ecological Emphasis Areas (EEAs). Numerous reasons, from page 4-129 and 130, and Volume 3 Appendix D introduction, from this RMP show that only Alternative B is sufficient. All of the EEAs in their full size and management from Alternative B should be incorporated into the final preferred alternative. Among these reasons are the previously mentioned need for more elevations for wildlife to

BLM_0165837

use in adapting to climate change; the loss of most migration routes in the past, which should be considered under cumulative impacts of past management; and the importance of big game on local economies.

The Naturita, Dry Creek, Tabeguache, and Adobe EEAs should be carried forward to the preferred alternative in their full Alternative B sizes. Adobe, as it is in Alternative D, is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests.

Comment Number: 000430_ElliotA_20161027-2
Organization1:
Commenter1:Allison Elliott
Commenter Type: Individual
Comment Excerpt Text:
I have read that the National Wildlife Federation, a hunting and conservation group, sights habitat loss and fragmentation as a primary cause of the decline of Colorado deer. And that state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover. The final plan must include EEAs all critical winter habitats within the North Fork Valley.

Comment Number: 000447_LeValleyM_20161101-2
Organization1:LeValley Ranch
Commenter1:Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has.

Comment Number: 000466_McGavinR_20161031-1
Organization1:
Commenter1:Rick McGavin
Commenter Type: Individual
Comment Excerpt Text:
The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Comment Number: 000473_PadgettL_20161101_OurayCtyBOCC-16
Organization1:Ouray County Board of Commissioners
Commenter1:Lynn Padgett
Commenter Type: Local Government
Comment Excerpt Text:
In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. Ouray County appreciates that the UFO is trying to incorporate connectivity

BLM_0165838

of core habitat for multiple species into the management plan. However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

Appendix D describes the proposed Ridgway EEA as:

"BlM land on Log hill Mesa and arounf Billy Creek State wildfe Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in cirtical big game wintering area. Divided into four zones"

Comment Number: 000475_PierceC_20161030-4
Organization1:
Commenter1:Carol Pierce
Commenter Type: Individual
Comment Excerpt Text:
Regarding Ecological Emphasis Areas (EEA) are shown in Appendix A and D. The BLM showed ample indicators discussing the importance of a number of areas in Appendix D qualifying for this status. I feel the importance of protection for these areas is critically important due to studies indicating they are some of the only remaining areas providing higher to lower elevation movement of wildlife. There is much literature available showing the effects of oil and gas drilling damaging the elk and deer herds. Many of these areas are identified in Alternative B but not in Alternative D. Please include all the EEA's shown in Alternative B as a preferred alternative. Please put No Surface Occupancy (NSO) regulations on each as well. Please include burrowing owls, kit fox, and prairie dogs habitat along Hwy. 50 in the Adobe EEA.

Comment Number: 000483_HanksG_20161101-18
Organization1:Trout Unlimited
Commenter1:Garrett Hanks
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix D. Ecological Emphasis Areas
The concept of Ecological Emphasis Areas is intriguing to Trout Unlimited since it is focused on landscape level connectivity and watershed health, two of TU's guiding principles in public lands management. We would like to suggest to BLM to include more than vegetation and terrestrial language in making these designations. Connectivity and landscape level analysis for coldwater fisheries is also important. Two examples of where this has played out on federal lands is the Beaverhead-Deerlodge National Forest mentioned previously and Flathead National Forest's creation of a Watershed Conservation Network for Native Fish[7]. Similar analysis and management directions could be applied in the case of an Ecological Emphasis Area on the UFO, and should be considered for the Final RMP and future planning.
[Footnote 7] http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd502201.pdf

Comment Number: 000489_JohnsonA_20161101-82
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
1. Ecological Emphasis Areas
The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to

BLM_0165839

"manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." Id. at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old. The only somewhat recent research is from 2001.[83] BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.

[Footnote 83] Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.)

Mapping Wildland Values to Support Conservation Strategies Across the US

Overview: For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

Ecological integrity and "wildness": The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes. Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 3a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity to serve as surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

Connectivity: The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate. Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states. Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 3b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved.

Ecosystem representation: Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types. Unfortunately, our protected areas systems currently do not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage. Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 3c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

BLM_0165840

Hotspots of endemic biodiversity: There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities. We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 3d, lower right).

Wildland conservation priorities: We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 4). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps in Figure 5 (WSCC Comment Appendix I), additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

Summary of Comments: BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.


Comment Number: 000489_JohnsonA_20161101-83
Organization1: Western Slope Conservation Center
Commenter1: Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1 42.1
Comment Excerpt Text:
2. Comments on Specific Ecological Emphasis Areas
a. Jumbo Mountain/McDonald Creek
We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B (DEIS Table 2-2, 103; DEIS Figure 2-2, Appendix A) As the BLM outlines in the draft RMP (DEIS Appendix D-2), these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear.
The draft RMP describes the ecological value of these areas as follows:
Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage. (DEIS Table D-1)

Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We would also like to express our strong support for overlapping designations of both the Jumbo Mountain / McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see WSCC and DAMB/COPMOBA Comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others (DAMB/COPMOBA), that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

Comment Number: 000489_JohnsonA_20161101-84
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
b. Adobe Ecological Emphasis Area
The BLM is also proposing to manage part of the greater Adobes area under an Ecological Emphasis area designation, which as described above, we support. However, the specific proposal for the Adobe area changes drastically from Alterative B to Alternative D as it is basically gutted through the center, leaving only portions of the area designated on the northwest and far eastern boundaries.
This would leave the center of the Adobes/Desert Salt Brush Ecosystem ACEC area completely without any special designation status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analysis. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the full acreage of the Adobes EEA must be restored in the final RMP.
Taken altogether, the LWC, ACEC and EEA designations will create a holistic management proposal that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.

Comment Number: 000492_RandallR_20161101-11
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Other Sections: 5.2 42.1
Comment Excerpt Text:
Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP.

BLM_0165842

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-1
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1 20.1 42.1
Comment Excerpt Text:
Lower Tabeguache
As per my scoping letter, and based on my knowledge of this unique, lower elevation extension of the Tabeguache Special Management Area, I recommend combining all three protective designations in the RMP to do justice to this outstanding backcountry primitive area. This means including the entire LWC, the EEA to preserve wildlife values, and including the full cultural ACEC boundaries---all wrapped into one large protected area----20,000 + acres in all including the ACEC.
While the overall area has some low use roads and ranching activity, these uses do not disturb wildlife in the way recreational trails do. Tabeguache is one of the last areas in the Paradox Valley with high quality, undisturbed habitat that has not been heavily impacted by motorized and mechanized trails or uranium roads; it needs to be kept that way to insure continued health and viability of resident big game herds. However, as with Potter-Monitor and other large UFO primitive areas addressed below, protective designations for Tabeguache will be ineffective without greatly strengthened management prescriptions for each category, LWC, ACEC and EEA. The management prescriptions should include NSO and prohibit motorized and mechanized trails. Without these protections, these lands could be taken over by the same homogeneous gridwork of trails and uranium roads that dominates the surrounding the Paradox Valley.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-14
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The full 242,580 acres of EEAs need to be carried into the final decision, in recognition of the fact that all lands in the field office play some role in landscape functioning, and even 200,000 + acres identified---much less the meager 177,700 acres recommended in Alt D-----fall short of the mark.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-15
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Second, EEA management prescriptions must be greatly strengthened to assure meaningful protection of the identified areas-----at the very least NSO restrictions and motorized/mechanized recreation closures. (for NSO rationale, see RMP EIS pages 4-129 and 130 for discussion of O&G impacts on deer and elk)

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-16
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Third, EEA management needs to proceed cautiously on mountain bike use considering it has become the new "unmanaged use" of the day, having overtaken OHV use in its ability to spread human disturbance rapidly across landscapes. Because mountain bike use is still largely unregulated and

BLM_0165843

unmanaged, any mechanized trail designations occurring in EEAs should ideally be put on hold until such time as the BLM is able to institute trail planning guidelines that accomplish the following:
a) protect unfragmented habitat,
b) halt user-created trail proliferation, and
c) bring about a culture of compliance in the mountain bike community----at least on a par with the compliance that has been achieved by the OHV community

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-4
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 27.1 42.1
Comment Excerpt Text:
Dry Creek
RMRI commented on the Dry Creek TMP back in 2008, which was commendable for its numerous route closures that reduced the route fragmentation characterizing the area at that time.
Pressures for habitat fragmentation by trails continue in Dry Creek due to new mountain bike proposals, etc. Nonetheless, the Dry Creek LWC should be managed for its existing and potential wilderness characteristics and should remain free of mechanized trails in order to maintain its less crowded, more primitive, more wilderness-like character.
Once trails are built it's difficult for the BLM to limit use levels; by definition motorized and especially mt bike trails, become high-traffic thoroughfares leading to continued off-trail use and other problems.
Dry Creek should also have the additional protection of the overlapping EEA as defined in Alt B. A SRMA designation might be desirable if the area has O & G potential. Otherwise an ERMA would be preferable as attracting less use and impacts. Even a full SRMA might remain manageable if it were limited to the nonmechanized, primitive backcountry setting found in the BLM's Recreation Settings Matrix.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-7
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Ecological Emphasis Areas
Overall RMP Recommendation - Include all 242,500 acres of ecological emphasis areas and restore them to their full acreage in the final RMP.
EEAs are an excellent addition to the tool kit of existing protections provided by LWCs and ACECs.
The EEA designation captures the landscape dimension not well protected by LWCs and ACECs and that conservationist comments have been pointing to for a number of years.
The EEA category fills in the gaps by identifying "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with EEAs being "managed to protect the large landscape over the long term." This is an exciting acknowledgement of landscape connectivity and how it relates to trail connectivity which has previously been the sole focus. We are grateful to the UFO Field Manager and staff for their foresight in including this critical but missing piece of holistic landscape protection.

Comment Number: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-8
Organization1:Rocky Mountain Recreation Initiative
Commenter1:Rosalind McClelland
Commenter Type: Organization (nonprofit/citizens group)

BLM_0165844

Other Sections: 11.1 42.1
Comment Excerpt Text:
Importance of EEAs to big game and nongame species
From a wildlife perspective, there are a number of reasons why all 12 EEAs---as well as all ACECs and LWCs in Alternative B---need to be carried forward together into the final preferred alternative. Also why Alt B EEAs need to be retained in their full boundaries, not have reduced boundaries as in Alt D – see [*] below.
[*]NOTE Naturita Canyon, Dry Creek, Tabeguache and Adobe EEAs should keep their original acreage from alt B. The Adobe EEA, which the EIS notes has white-tailed prairie dogs, burrowing owls and possibly kit foxes, has regrettably had the majority of the prairie dog habitat in Alt D.
Reason 1 - Inadequate protections
Lines 64 and 71. Only EEA's and special designations get consideration for restoration (line 64) and non game wildlife is secondary to resource production in all of the other areas (line 71) Similarly with Lines 103-105.
Reason 2 - Climate change - Landscape connectivity –
All the designations combined are necessary to give wildlife the range of elevation and corridors they need to be able to move in reaction to changes in climate and vegetation. The Vol 3, appendix D intro to EEAs commendably acknowledges some of this.
Climate advantages of EEAs - Line 17-19. EEAs in this way mitigate climate change for wildlife, allowing wildlife habitat to shift uphill, as well as provide connectivity, see p 4-132.
Reason 3 – Seasonal migrations
EEAs will facilitate seasonal migrations of deer and elk, as well; see discussion of EEAs in vol 2, pages 128, 134 and 135. Wildlife movement facilitated by EEAs will also help remedy the disruption of critical migration corridors in the past.

Comment Number: 000545_SlivkaJ_20161101-171
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Jumbo Mountain/McDonald Creek Ecological Emphasis Area
We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B. Uncompahgre Draft RMP at Table 2-2, 103; Figure 2-2. As BLM outlines in the draft RMP, these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear. Id. at D-2.

Comment Number: 000545_SlivkaJ_20161101-63
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1 42.1
Comment Excerpt Text:
We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

BLM_0165845

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0. Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes.

Comment Number: 000545_SlivkaJ_20161101-64
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 9.1 42.1
Comment Excerpt Text:
The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes.

Comment Number: 000545_SlivkaJ_20161101-65
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Ecological Emphasis Areas The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." Id. at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

Comment Number: 000545_SlivkaJ_20161101-71
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165846

Adobe Ecological Emphasis Area
Alternatives B and D would manage part of the greater Adobe area under an Ecological Emphasis area designation, which we support. Uncompahgre Draft RMP at 2-68. However, the specific proposal for the Adobe EEA changes drastically from Alterative B to Alternative D. Alternative D significantly guts the EEA through the center, leaving only portions of the area designated on the northwest and far eastern boundaries. This would leave the center of the Adobes/greater saltbrush area completely without any special management status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analyses.
As proposed in Alternative D, the Adobe EEA is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the final RMP should designate the larger Adobe EEA considered in Alternative B.
Taken altogether, the LWC, ACEC and EEA management for the greater Adobe area would create a holistic management approach that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.

Comment Number: 000545_SlivkaJ_20161101-72
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Roubideau Ecological Emphasis Area
We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both. As the Roubideau area is identified as a high value are for habitat, wilderness and recreation views, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. Closing the Roubideau EEA to oil and gas leasing is important to protect sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog which BLM has identified in the area. Uncompahgre Draft RMP at D-3.
The Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas - and manage for future recreational use - a layered management decision utilizing all of these designations and allocations is warranted.

Comment Number: 000545_SlivkaJ_20161101-73
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Dry Creek Ecological Emphasis Areas
We are supportive the Dry Creek EEA as it is proposed in Alternative B, as the area is significantly reduced in the Dry Creek EEA as proposed in Alternative D. We are also concerned about the overlap of the Dry Creek SRMA in the same area as the EEA.
BLM is proposing to manage the Dry Creek SRMA for front country management and for "operational recreation setting characteristics), allowing competitive events and choosing other "less restrictive actions" to manage the area, including a CSO stipulation for oil and gas leasing for parts of the SRMA rather than an NSO. Uncompahgre Draft RMP at 4-319. Although we understand this is a popular area with much motorized and mechanized activity, we are concerned that the SRMA proposal in Alternative

BLM_0165847

D is in conflict with BLM's proposed EEA in the same area. The EEA centers on three large drainages that link the Uncompahgre Valley to the Plateau and identified riparian, cliff and canyon pinon-juniper ecosystems as well as areas of sage brush and ponderosa. The area supports bear, mountain lion, mule deer and native warm water fish.

We believe the SRMA proposal as laid out in Alternative B, which would close the area to leasing, recommend ROW avoidance, and recommended the area for mineral withdraw, would help achieve the EEA objectives.

Comment Number: 000549_DayB_20161101-2
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Other Sections: 27.1
Comment Excerpt Text:
Motorized recreation should be planned to avoid the EEAs, which the draft RMP mentions regarding placement of SRMAs over EEAs at p 4-135.

Comment Number: 000511_FitzhughR_20161101_COPMOBA-RAT-2
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Rodney FitzhughThank you.

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
We believe that to the extent trail development may be considered in conflict with management of this proposed EEA [Ridgeway], that conflict can be minimized by well defined, publicized and enforced winter closures, and by development of a suitable travel management plan to elimate some of the multitude of motorized trails currently located in the area, and prevent their further proliferation.

Comment Number: 000511_FitzhughR_20161101_COPMOBA-RAT-4
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter1:Rodney Fitzhugh
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While we certainly appreciate that the UFO's efforts to preserve connectivity of core habitat for big game and other wildlife, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D. The parcel of most concern to RAT is depicted in Figure 2-4 of the DRMP (the westernmost parcel labeled "Ridgway"). RAT would support the designation of the western parcel (Core Zone 1) to be included in this EEA, only if only if its inclusion would not have a substantial negative impact on the development of enhanced single-track trail systems in the area. We note the proximity of this area to Log Hill Mesa, where about a third of all Ouray County citizens reside
Comment Number: FormLetterJ-6
Organization1:
Commenter1:
Commenter Type:
Other Sections: 5.3 3
Comment Excerpt Text:
Chapter 2, Table 2-1 and Appendix D, Ecologic Emphasis Areas: The North Fork Valley should have been included in this portion of the analysis. Although it does not fit the BLM's routine (boilerplate) areas of analysis - unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors – does not make this ecologically unique area any less worthy of consideration.

BLM_0165848

In fact, minimizing impacts to this culturally and agriculturally significant geographic area should be the core value addressed throughout the draft RMP and presented under each of the Alternatives in Tables 2-1 through 2-6.

Comment Number: 000587_WolcottS_20161031-15
Organization1:
Commenter1:Steve Wolcott
Commenter Type: Individual
Comment Excerpt Text:
The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Comment Number: 000549_DayB_20161101-1
Organization1:
Commenter1:Bill Day
Commenter Type: Individual
Comment Excerpt Text:
All of the EEAs (line 103) from alt B need to be in the final RMP. They need to maintain their size and management from B, also. These areas can preserve much of the remaining connectivity for wildlife, even with changes in climate. These areas should have NSO and NGD stips.

Comment Number: 000420_HovdeC_20161101-33
Organization1:
Commenter1:Robbie LeValley
Commenter Type: Local Government
Comment Excerpt Text:
The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA.
EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has.

Comment Number: 000609_AdamN_20161101-1
Organization1:Delta County Livestock Association
Commenter1:Nate Adam
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. There is no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto

BLM_0165849

Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given a EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has.

o No areas should be designated as wild and scenic rivers because it limits use on that BLM area, so this is another area where Alternative C is preferred.

Comment Number: 000492_RandallR_20161101-20
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:

The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

[Figure 1 CPW recommended big game winter range emphasis areas and BLM proposed ecological emphasis areas]

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

Summary

1.  Commenters provided input on the use of ecological emphasis areas. Some commenters supported the strategy of conserving connected habitat patches at a landscape scale with ecological emphasis areas as a new management tool to protect biodiversity, provide resiliency against climate change, and contribute to connectivity across the planning area and larger landscape. They recommended that the BLM maximize the number and acreage of ecological emphasis areas, as described in Alternative B, but use more recent research and modern science to achieve the stated goals of ecological emphasis areas. Another commenter noted that the BLM must not permit ecologically degrading activities, including livestock grazing, in ecological emphasis areas. Another commenter stated that motorized recreation should avoid ecological emphasis areas. Another

BLM_0165850

commenter was concerned about the ROW avoidance stipulations in ecological emphasis areas.

2. It was noted that the BLM should clarify the definition of ecological emphasis areas as an "area designation" rather than a "resource designation." Another commenter noted that there is no legal basis for the development of ecological emphasis areas and that protection of wildlife and plant habitat is already occurring based on existing BLM planning tools and designations.

3. Commenters recommended ecological emphasis areas for the following locations:
   - Jumbo Mountain/ McDonald Creek
   - Dry Creek
   - Roubideau
   - Terror Creek
   - Roeber State Wildlife Area
   - Greater Adobes area, as described in Alternative B
   - All critical winter habitat within the North Fork Valley
   - Winter habitat for mule deer and other animals of concern
   - Critical winter mule deer and elk habitat
   - North Fork Valley
   - Coldwater fisheries

4. One commenter expressed concern that by allowing competing uses that could impact the functionality of these areas for wildlife, the RMP would not achieve the purpose for which some ecological emphasis areas were selected; these uses include not placing density restrictions on development in certain wintering habitat, and overlapping ecological emphasis areas and SRMAs that have conflicting direction. The RMP needs to address how these conflicts would be managed. One commenter also requested that the BLM indicate how potential conflicts between ecological emphasis areas and overlapping resource allocations and land uses (e.g., trails) would be resolved.

5. One commenter requested that some ecological emphasis areas be defined using limiting habitat factors for ungulates, stating that priority species designations and key habitats were removed from the Administrative Draft RMP.

6. One commenter requested that, in the wildlife section, the BLM identify the specific opportunities the agency would pursue for individual species conservation and management, as well as how wildlife issues would be managed in association with competing resource values.

*Response*
1. The BLM appreciates the comments. The BLM considered the suggestions for ecological emphasis area management; however, ecological emphasis areas are not included in the Proposed RMP (Alternative E).

2. Ecological emphasis areas are described and explained in Draft RMP/EIS Appendix D (Ecological Emphasis Areas). Ecological emphasis areas are not BLM designations; rather, they would be a management mechanism specific to the UFO intended to help protect biodiversity across the UFO and larger landscape over the long term, as described in Draft RMP/EIS Appendix D, Concept and Identification of Ecological Emphasis Areas (page D-1). As stated on Draft RMP/EIS page D-2, resource management planning offers the opportunity to emphasize certain uses over others in different parts of the

BLM_0165851

landscape. BLM Land Use Planning Handbook (H-1601-1), Appendix C, part E, Fish and Wildlife (H-1601-1 Appendix C, page 6) includes the following under fish and wildlife land use plan decisions: "Designate priority species and habitats, in addition to special status species, for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." Ecological emphasis areas would be a tool by which the BLM UFO would identify such species in the Uncompahgre RMP. Ecological emphasis areas were discussed at Cooperating Agency and RAC Subgroup meetings during Draft RMP/EIS development, primarily in conjunction with draft alternatives development. The glossary (DEIS page Glossary-11) definition and Appendix D description were edited to clarify that ecological emphasis areas are a UFO-specific management tool.

3. The BLM appreciates the comments. The BLM considered the recommended ecological emphasis area locations; however, ecological emphasis areas are not included in the Proposed RMP (Alternative E).

4. The Proposed RMP (Alternative E) does not include ecological emphasis areas.

5. The BLM considered the use of limiting habitat factors for ungulates in the development of all ecological emphasis areas; see Table D-1 for species-specific information. See the response to item #2, above, for additional details regarding ecological emphasis area identification and management direction.

6. Draft RMP/EIS Chapter 2, Table 2-2 identifies species conservation and management measures and how wildlife issues would be managed in association with competing resource values. For example, the Terrestrial Wildlife section of Table 2-2 discusses measures to protect elk calving areas (page 2-79), as well as species-specific stipulations that are detailed in Draft RMP/EIS Appendix B.

### Section 42.2 – Ecological Emphasis Areas: Best available information—baseline data
Total Number of Submissions: 3
Total Number of Comments: 5

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-11
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B. The purple and red polygons (see figures below) make up the Naturita Canyon EEA. It would provide linkages between adjacent State land (blue) and National Forest land (green). The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS). The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit.

Comment Number: 000545_SlivkaJ_20161101-66
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation

BLM_0165852

and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old (Faaborg 1980; Samson 1983; Noss 1983; Kushlan 1979; Miller 1979.) The only somewhat recent research is from 2001 (Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.) BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.

Comment Number: 000545_SlivkaJ_20161101-69
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Wildland conservation priorities: We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 2). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.
Figure 2. Composite wildland values map based on criteria in Figure 1. The composite value was produced by setting each criterion to the same scale and summing. Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps below in Figure 3, additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.
Figure 3. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office. Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

Comment Number: 000545_SlivkaJ_20161101-70
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Summary of Comments: BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.

BLM_0165853

Comment Number: 000409_DayB_20161031-20
Organization1:Black Canyon Audubon Society
Commenter1:Bill Day
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
P 3-82. Burrowing owls. Burrowing owls have been observed for most of the last several years in the part of the Salt Desert ACEC that is not proposed as an EEA in Alternative D, according to reports on West Slope Birding Network.

*Summary*
1. One commenter stated that the RMP should list Gunnison sage-grouse as a species that the Naturita Canyon Ecological Emphasis Area would be managed to benefit.
2. Commenters requested that the BLM make greater use of available modern science to evaluate areas and manage to better achieve ecological emphasis area and general habitat management goals and objectives stated in the RMP. A commenter requested that the BLM review the connectivity model provided by the Wilderness Society.
3. A commenter requested that the BLM consider tailoring management prescriptions to individual ecological emphasis areas (or sets of ecological emphasis areas), depending on the fragility and management needs of resource values present.
4. One commenter noted that burrowing owls have been observed in the portion of the Salt Desert ACEC not proposed as an ecological emphasis area.

*Response*
1. The BLM appreciates the comment. The BLM considered the suggestion to identify Gunnison sage-grouse as a species that the Naturita Canyon Ecological Emphasis Area would be managed to benefit; however, ecological emphasis areas are not included in the Proposed RMP (Alternative E).
2. Ecological emphasis areas are explained in Draft RMP/EIS Appendix D (Ecological Emphasis Areas). Also refer to the response to part 2 of Section 42.1 of this report, above. Discussion regarding the adaptive management concept in Draft RMP/EIS Chapter 2, Section 2.3.1, Management Common to All Alternatives, Adaptive Management(Draft RMP/EIS page 2-6), indicated that the BLM would evaluate new information or changing conditions and make a determination as to whether implementation adjustments or changes are necessary. As science is modernized, the BLM could apply that new information to ecological emphasis area management. The BLM considered literature cited, and the connectivity model provided, by the Wilderness Society and information from CPW and Western Slope Conservation Center; however, ecological emphasis areas are not includedin the Proposed RMP (Alternative E).
3. The BLM appreciates the comment. The BLM considered tailoring management prescriptions to ecological emphasis areas (or sets of ecological emphasis areas); however, ecological emphasis areas are not included in the Proposed RMP (Alternative E).
4. The Salt Desert ACEC would provide for effective management of burrowing owls as a relevant and important value. Because ACEC designation would provide more restrictive management of the area, effective protections for the burrowing owl would exist despite not being within a proposed ecological emphasis area.

BLM_0165854

### Section 42.3 – Ecological Emphasis Areas: Impact analysis
No comments are associated with this topic.

### Section 42.4 – Ecological Emphasis Areas: Cumulative impact analysis
No comments are associated with this topic.

### Section 42.5 – Ecological Emphasis Areas: Mitigation measures
No comments are associated with this topic.

## Section 43 – Sheep

### Section 43.1 – Sheep: Range of alternatives
Total Number of Submissions: 2
Total Number of Comments: 3

Comment Number: 000492_RandallR_20161101-12
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species [2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, Special Status Species Management.
[Footnote 2] BLM Information Bulletin No. CO-2015-034

Comment Number: 000492_RandallR_20161101-24
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:
* Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
* Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
* Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
* In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder only if grazing period will be shorter than running a smaller band.
* Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
* Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.

BLM_0165855

* Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
* Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
* Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
* Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
* Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill.

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-8
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.1 43.1 43.5
Comment Excerpt Text:
Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling
Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA. We are extremely concerned about the health and productivity of our limited bighorn sheep herds. There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep. To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.
We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO. Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model. When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep. Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep. Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.
The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc. We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS. In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.
Implementation of the decisions within the final RMP would occur through subsequent updates and revisions of allotment management plans. Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public. This could be achieved through the development of an implementation plan for allotment management plans and permit actions.

BLM_0165856

*Summary*
Commenters stated the following:

1. The BLM should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. The risk of contact should preclude other suitability criteria such as historic/current use, terrain, and forage type. In addition to a suitability determination, the BLM should add specific direction to remove domestic sheep from, and not authorize conversion of class of livestock from cattle to domestic sheep on, any allotment where there is a potential for contact with bighorn sheep.

2. The BLM should clarify whether converting grazing allotments from cattle to domestic sheep would result in an increase in the potential for contact between domestic and wild sheep.

3. The BLM should ensure that language in the RMP conforms to BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016).

4. The BLM should recognize that the BLM Colorado State Office recently designated the Rocky Mountain Bighorn Sheep as a BLM Sensitive Species and include in the RMP desired conditions to promote the conservation of special status species.

5. The BLM should include 2012 WAFWA BMPs and CPW-recommended BMPs where there is overlap and/or a risk of contact between domestic and bighorn sheep.

*Response*
The BLM appreciates the comments.

1-2. Draft RMP/EIS Alternative D considers the results of the risk of contact model (Appendix K) for suitability of domestic sheep grazing (Table 2-2, lines 316–318, on pages 2-175–2-177). Draft RMP/EIS Alternatives B and C prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 9- or 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat, and Alternative D prohibits conversion of cattle grazing allotments to domestic sheep/goat grazing where the Probability of Interaction Assessment depicts allotments as having a high probability for disease transmission (see Draft RMP/EIS Table 2-2, line 317, page 2-177). Proposed RMP/Final EIS Chapter 4, Section 4.3.6, Special Status Species, was updated to clarify that converting grazing allotments from cattle to domestic sheep would increase the risk of contact between domestic and wild sheep, but that conversion would only be allowed in areas with lower risk of contact and likelihood of disease transmission. Additionally, site-specific NEPA analysis would be conducted prior to authorizing a conversion. As stated in Draft RMP/EIS Alternative D, at permit renewal, the Probability of Interaction Assessment will be reviewed with more detailed on-the-ground data to assess the probability of interaction for each individual allotment; results will direct management for permit renewal (Draft RMP/EIS Table 2-2, line 317, page 2-177).

3. The Proposed RMP/Final EIS was updated to include a reference to BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (March 2, 2016).

4. Draft RMP/EIS Table 2-2, line 111 (page 2-76) states that bighorn sheep include both Rocky Mountain and desert bighorn sheep subspecies. Both subspecies were assessed in the Draft RMP/EIS as part of the bighorn sheep management actions (Chapter 2) and

discussion (Chapters 2, 3, and 4). Draft RMP/EIS Chapter 4, Section 4.3.5, Fish and Wildlife, and Section 4.3.6, Special Status Species discuss both desert and Rocky Mountain bighorn sheep (generically referred to as bighorn sheep). The Proposed RMP/Final EIS was updated to indicate that the Rocky Mountain bighorn sheep is a BLM sensitive species. Proposed RMP/Final EIS Chapter 2, Table 2-2, line 156, was changed to "Special Status Terrestrial Wildlife – Desert and Rocky Mountain Bighorn Sheep." Proposed RMP/Final EIS Chapter 3, Section 3.1.7, Special Status Species was updated to include a paragraph about Rocky Mountain bighorn sheep in the BLM sensitive species subsection (Draft RMP/EIS page 3-78) and to include Rocky Mountain bighorn sheep in Table 3-24 (Draft RMP/EIS page 3-79).

5. Draft RMP/EIS Chapter 2. Table 2-2 includes alternative actions intended to reduce the probability of interaction between domestic and wild sheep, including consideration of specific Western Association of Fish and Wildlife Agencies buffer guidelines preventing the establishment of new sheep allotments in proximity to existing bighorn herd areas. The 2012 Western Association of Fish and Wildlife Agencies guidelines state that "Site-specific risk assessments should be completed to evaluate the efficacy of using natural barriers, defined buffer zones, or other actions to minimize risk of contact." Site-specific management decisions for grazing permits—incorporating specific BMPs to prevent domestic and bighorn sheep interaction—will be developed during the grazing permit renewal process (BML Manual 1730, Section 1.8).

### Section 43.2 – Sheep: Best available information—baseline data
Total Number of Submissions: 4
Total Number of Comments: 14

Comment Number: 000402_RatnerJ_20161028-21
Organization1: Western Watersheds Project
Commenter1: Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Take for instance, bighorn sheep, the DEIS fails to even mention let alone implement the BLM's bighorn sheep manual.

Comment Number: 000447_LeValleyM_20161101-6
Organization1: LeValley Ranch
Commenter1: Robbie LeValley
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-175, Line 316, given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) represents 17,000 head of sheep in our county and we see similar pressures to manage sheep grazing in numerous BLM and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what would be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape.

BLM_0165858

The experiments mentioned in the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompaghre Resource Area.

Comment Number: 000273_BrownB_20161031-7
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
Livestock protection dogs also guard the sheep. The livestock protection dogs keep intruders out of the sheep. An intruder is typically a coyote, bear, or lion, but can also be anything the guardian dog does not recognize such as a bighorn sheep. The livestock protection dogs position themselves between the intruder and the domestic sheep to prevent contact. To this end, the BLM has no reason, need, authority nor expertise to dictate the number of livestock dogs recommended by the RMP.

Comment Number: 000273_BrownB_20161031-8
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
However, one of the most disturbing aspects of the RMP is that it abandons land and forage management in favor of single species management by prioritizing bighorn sheep populations (despite lack of scientific evidence) over agriculture. In April 2014, the CWGA, Colorado Parks & Wildlife, Colorado Department of Agriculture, and the BLM and USFS renewed the aforementioned existing MOU. The purpose of the MOU is to provide general guidance for cooperation in reducing contact between domestic and bighorn sheep in order to minimize potential interspecies disease transmission and to ensure healthy bighorn sheep populations while sustaining an economically viable domestic sheep industry in Colorado. The RMP contravenes the cooperative intent of the MOU, and ignores research data from the USDA Agricultural Research Service ("ARS").
Flawed Information Regarding the Potential for Disease Transmission
The RMP clearly demonstrates a bias against domestic sheep, with leading statements such as, "Transmission of M haemolytica from domestic sheep to bighorn sheep was irrefutable, as demonstrated by Lawrence et al (2010)....(K1)" In particular, the Lawrence et al. 2010 study cited in the RMP was not conducted under conditions relevant to reality as it was a pen study which forced the animals to have fence line contact and ultimately to commingle. Additionally, the results of the Lawrence study are misinterpreted and deliberately misused. The Lawrence study simply showed that the domestic sheep and bighorns exchanged respiratory bacteria (just the same as humans would that were standing very close to each other).
It did not prove that the green-flourescent labeled M haemolytica bacteria exchanged from the domestic sheep to the bighorn sheep is what killed the bighorns. It is also important to point out that in order to cause the fluorescent tagged bacteria to show up in the culture dishes and on the slides, researchers had to use antibiotics to kill the other bacteria present in order to be able to photograph the fluorescent tagged bacteria. In other words, the bacteria of interest was selectively and biasedly grown; further evidence that is was likely at a very low level in the animals and not the cause of illness in the bighorn sheep in that study. Researchers also used a greater magnification in the photos within the publication in order to make the fluorescent tagged bacteria more noticeable vs. the other bacteria present. This not-so-subtle manipulation during the research phase, created yet another "study" with a predetermined outcome biased against domestic sheep. To understand the results and implications of the study, we request that the BLM contact Don Wage Knowles, DVM with the USDA Agricultural Research Service

BLM_0165859

(USDA — WSU — Pullman, WA) since he was one of the researchers involved in this project, and is not interested in perpetuating inaccurate information.

Thus far, all of the experiments related to disease transmission have been conducted under laboratory conditions--in pens with controlled conditions and using animals that have been acclimated to those conditions. Such studies are very different from what might actually happen as far as disease transmission on the open range, where herd management practices are designed to avoid domestic-bighorn contact. Available research cited in the RMP focuses on the potential for contact, without looking at a broad scope of what else is going on with the bighorn populations. None of the studies cited in the RMP have proven that bighorn sheep and domestic sheep currently have high risk of contact on the range, or that contact almost inevitably results in disease.

In fact, all captive studies and experiments that have tried to prove Mannheimia haemolytica to be the "bighorn killer," responsible for wild sheep die-offs, were clearly biased and many of the policy decisions that have been made are based on the biased and faulty science. This is obvious from the continued reference to Mannheimia haemolytica research in the Uncompahgre RMP.

Supporting this assertion of faulty research is the recent identification of a completely different bacterium (Mycoplasma ovipneumoniae - Movi) that is now identified as being the real cause of bighorn sheep pneumonia. What is clear is that bighorn pneumonia is a complex disease phenomenon and for decades has been, and quite honestly remains, incompletely understood.

What is understood, however, that respiratory pneumonia in both livestock and wildlife is stress induced. Most wildlife researchers continue to ignore devastating effects of capture myopathy on bighorns, and the stress creating by handling and putting bighorns in an unfamiliar environment. It's no wonder that bighorns died in the early pen "studies" that were done.

Comment Number: 000273_BrownB_20161031-9
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP further states that "no one form of evidence can conclusively demonstrate that bighorn sheep in the wild coming into contact with domestic sheep frequently leads to die-offs; however, taken together, the experiments and observations from the laboratory and the field do indicate that wild bighorn sheep coming into contact with domestic sheep does pose a risk of disease transmission and die-offs in free-ranging bighorn populations." This illogical premise betrays a continued lack of credibility, accountability, and a desire to misrepresent the available facts. As stated herein, the experiments and lab observations are not representative of the actual conditions on the range. They are forced simulations that require close contact in order to ensure transmission of pneumonia-causing bacteria.

Comment Number: 000273_BrownB_20161031-4
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
Appendix K Bighorn/Domestic Sheep Risk of Association Modeling
Exaggerated Risk of Contact
We are very concerned about the reliance upon and incorporation of the USFS flawed Payette modeling as a baseline to manage BLM domestic sheep allotments with the Uncompahgre RMP.
Both the Payette modeling and the Snow Mesa EA (K15) failed to follow scientific standards for risk assessment (see attached Comments on Snow Mesa Allotment Analysis: Assessment of Risk of Physical Contact between Rocky Mountain Bighorn Sheep and Domestic Sheep in the Snow Mesa Sheep Allotment Grazing Landscape — M Thurmond DVM, PhD — September 7 2015). The United States

Animal Health Association (USAHA) recently passed Resolution 43 — Ensuring Sound Science-Based
Animal Health Policies. The resolution (attached) states USAHA's concern regarding the USDA's need
to have "clear and sound evaluation criteria for scientific studies used to support federal animal health
policies..."
It is included with our comments because the BLM is almost exclusively relying upon the USFS's biased
"data" for the Uncompahgre RMP.

Comment Number: 000273_BrownB_20161031-5
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
The RMP is fundamentally flawed by using the Probability of Interaction (PoI) Model in its risk
assessment. This ill-conceived notion lies at the root of the inaccuracies produced by the Risk of
Contact ("RoC") Model utilized by the BLM. Even more inaccurately, contact is almost universally
equated with guaranteed disease transmission. While the RMP concedes a lack of confirming research, it
selectively cites certain literature to bolster its argument to reduce domestic sheep grazing.
Consequently, the RMP is crafted with an unfounded and faulty assumption—that contact between
bighorn sheep and domestic sheep automatically results in disease transmission and die-offs.
The deliberate bias and inaccuracies built into the RoC is staggering. "The RoC model estimates the
probability that foraying bighorn sheep will reach a domestic sheep allotment. However, within an
allotment it is not possible to determine where and when domestic sheep would consistently occur or
for how long. Use of some areas with an allotment may present less chance of contact with bighorn
sheep than others, while some areas may have higher probability of contact. Consequently, because of
this uncertainty, the RoC model predicts potential interspecies contact by using the assumption that
contact with an allotment results in interspecies contact (K-9)." This assumption is so far removed from
the reality of what actually takes place when grazing, that it would be laughable; if not for the fact that
the BLM and USFS are using the results from this flawed process to reduce or eliminate domestic sheep
grazing. Further compounding the issue, the BLM cites the unsubstantiated USFS claims in the Snow
Mesa EA (K-15), stating that "a disease occurring in a bighorn herd every 25 years or less would result in
a high risk to bighorn long term viability and low probability of population persistence."
However, both BLM and USFS documents fail to mention that in reality, there has not been any bighorn
die-offs or confirmed disease transmission in the Snow Mesa area caused by domestic sheep, despite the
fact that domestic and bighorn sheep have both been in the same area for a number of years.
The PoI model notes that in order for the model to be useful, the number of variables needs to be kept
small to retain enough predictive power to be useful (K3). Death in bighorns as a result of pneumonia-
causing bacteria is a multi-factorial issue including internal and external stressors such as lack of genetic
diversity (inbreeding), nutritional deficits, parasite loads, weather conditions, overall health of the
bighorn population, etc. So, combining the PoI model and the Risk of Contact (RoC) model is of no
value, as both models fail to include parameters that would shift the risk assessment results away from
the "high risk" category, and instead gives a predetermined and exaggerated risk of contact rating.

Comment Number: 000273_BrownB_20161031-6
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
The potential for contact is not only quite low but it is also further minimized by best management
practices already used by permittees. These measures accomplish the need to balance multiple-use

BLM_0165861

demands with the management practices to support viable populations of bighorn sheep and a healthy domestic sheep industry.

Currently used management practices include constant herder supervision, compliance monitoring, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks, reporting known contact, and cleaning up salting areas upon departure.

These guidelines already accomplish temporal and spatial separation.

Furthermore, the herding instinct of range sheep, guiding them to stay in a manageable bunch and not scatter, complements the above-listed practices. Domestic sheep that wander from the main band are much more likely to be killed by a predator than to encounter a bighorn sheep.

The bands of ewes have at least one herder with them or within close proximity to them throughout the day, and the sheep are bedded near camp at night to reduce the risk of predator attacks. Herders have been instructed to chase away any bighorn sheep, if they were to see any.

Comment Number: 000273_BrownB_20161031-10
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
Furthermore, there is a scarcity of reliable data available from the field; hence, the BLM's reliance on outdated records that have little if any bearing on current conditions. Determining a course of action based on these faulty sources of information would be both illogical and contrary to the Agency's statutory mandates.

The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings. Forced enclosure experiments ("pen studies") are not indicative of, and do not provide a direct correlation to, what happens in open range situations.

Comment Number: 000402_RatnerJ_20161028-72
Organization1:Western Watersheds Project
Commenter1:Jonathan Ratner
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science. We provide as an attachment a review of the use of this model in the North Delta process.

Comment Number: 000492_RandallR_20161101-21
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for

BLM_0165862

the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

* The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.

* The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.

* The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.

* The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.

* The local model assumes that slopes greater than or equal to 60% lower the probability of contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.

* The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams.


Comment Number: 000273_BrownB_20161031-11
Organization1:Colorado Wool Growers Association
Commenter1:Bonnie Brown
Commenter Type: Private Industry
Comment Excerpt Text:
The BLM is following suit with the U.S. Forest Service by using its flawed modeling process and inaccurate research references. A lack of objective scientific accuracy cripples support for the revocation or reduction of the grazing allotments. The mathematical modeling studies utilized by the U.S. Department of Agriculture Forest Service's Bighorn Sheep Working Group to determine potential contact are fundamentally flawed. By starting with set mathematical formulas using specific mathematical parameters, a conclusion to a possible scenario is generated based on inaccurate input. The obvious problem with this method is in how and what parameters are chosen. Input of inaccurate data will result in the output of inaccurate answers.

This modeling method allows the operator to tailor the data in order to fit a preordained conclusion. This same modeling method has been shown to be erroneous in comparisons of simulations to real outcomes. Such issues cause the proposal to fail the standards of quality, integrity, and utility of the Data Quality Act ("DQA") and the best available science standards of the Environmental Species Act ("ESA"). They also run afoul of Presidential orders on scientific integrity and transparency. The basic flaws of the RoC modeling process are clearly explicated in the RMP itself when it states that "much of the needed data was not available for individual Colorado bighorn populations. The BLM made the following assumptions.....". Key input factors such as bighorn range and suitable habitat are assumed, while failing to incorporate management practices that discourage or eliminate contact.

Not only does the method not qualify as the best available science, but the BLM intends to implement draconian, unfair policies due to these imbalanced and inaccurate predictions. At best, the results are guesswork alone and, by any standard of common sense, should therefore not become the basis of agency policy.

The entire Pol / RoC modeling is based on estimates, speculations, assumptions, and pre-determined parameters to arrive at a predetermined outcome of "high risk." There are simply too many facets to

BLM_0165863

this multi-factorial issue, too many assumptions, and too much of selectively omitted input information to make this modeling accurate or useful.

Comment Number: 000492_RandallR_20161101-13
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.
The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.
[Footnote 3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)

*Summary*
Commenters requested that the BLM review data utilized in domestic sheep management decisions and reexamine the RoC and PoI risk assessment models used to calculate the risk of contact for domestic and wild sheep in the planning area. Commenters stated that the EIS currently is relying on outdated data to determine risk of potential disease transmission from domestic to bighorn sheep and that the Payette modeling, the Snow Mesa EA, Risk of Contact, and Probability of Interaction Model use incorrect assumptions, are fundamentally flawed in their risk assessments, and overestimate the risk of contact between bighorn and domestic sheep and should be reconsidered. These models do not adequately consider best management practices and the protection dogs used by permittees to minimize contact. They further assert that bias against domestic sheep abandons land and forage management in favor of single species management.

*Response*
The BLM reviewed data utilized in domestic sheep management decisions to ensure that best available data are utilized. The Risk of Contact model (Draft RMP/EIS Appendix K) is currently the best available peer-reviewed model. As stated in Draft RMP/EIS Chapter 2, Table 2-2, line 316 (page 2-176), the Appendix K model is the preliminary assessment for RMP analysis. The BLM has determined that this model is adequate for a landscape-level analysis, such as that conducted for an RMP. During permit renewals, these assessments would be reviewed using more detailed on-the-ground data to assess the probability of interaction for each individual allotment, with the results directing management pertaining to the renewal (Draft RMP/EIS page 2-176). The site-specific analysis conducted at permit renewal would incorporate new data and

BLM_0165864

the currently accepted peer-reviewed model. The Proposed RMP/Final EIS was updated to include a reference to BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (March 2, 2016), which recommends use of the Risk of Contact model. The Probability of Interaction model was removed from the Proposed RMP/Final EIS. Also see the response to Section 43.1, above.

### Section 43.3 – Sheep: Impact analysis
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000492_RandallR_20161101-23
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area.

*Summary*
One commenter requested that the BLM discuss the potential for, and potential impacts from, disease transmission to bighorn sheep in Proposed RMP/Final EIS Chapter 4.

*Response*
The BLM reviewed the domestic/wild sheep disease transmission model (Draft RMP/EIS Appendix K) and revised the Proposed RMP/Final EIS Chapter 4 discussion of potential disease transmission and potential impacts on bighorn sheep. Also see the responses to Sections 43.1 and 43.2, above.

### Section 43.4 – Sheep: Cumulative impact analysis
No comments are associated with this topic.

### Section 43.5 – Sheep: Mitigation measures
Total Number of Submissions: 1
Total Number of Comments: 1

Comment Number: 000514_GrotherC_20161029_Backcountry Hunters and Anglers-8
Organization1:Backcountry Hunters and Anglers
Commenter1:Craig Gother
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 23.1 43.1 43.5
Comment Excerpt Text:
Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling
Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA. We are extremely concerned about the health and productivity of our limited bighorn sheep herds. There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep. To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.

BLM_0165865

We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO. Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model. When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep. Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep. Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.

The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc. We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS. In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.

Implementation of the decisions within the Proposed RMP would occur through subsequent updates and revisions of allotment management plans. Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public. This could be achieved through the development of an implementation plan for allotment management plans and permit actions.

*Summary*

Commenters recommended that the BLM provide timely (five-year) updates and revisions to the Proposed RMP based upon the suitability determinations in the RMP, with input from CPW and the public. They noted that the updates and revisions could be achieved through the development of an implementation plan for allotment management plans and permit actions.

*Response*

The Approved RMP will undergo review at least every 5 years, per the BLM Land Use Planning Handbook H-1601-1, in order to determine the need for updates based on current inventories and science. In addition, grazing permit renewals are completed every 10 years, which provides an opportunity to review and revise, eliminate, or incorporate site-specific management actions (including BMPs), with input from CPW, grazing permittees, and the public.

## Section 44 – Gunnison Sage-Grouse

### Section 44.1 – Gunnison Sage-Grouse: Range of alternatives

Total Number of Submissions: 16
Total Number of Comments: 29

Comment Number: 000037_BernhardtB_20160706-1
Organization1:
Commenter1:Barb Bernhardt
Commenter Type: Individual
Comment Excerpt Text:

BLM_0165866

In looking at the UFO-RMP I don't see anything on the Gunnisson Sage Grouse for areas outside of the current ACEC on the north side of the Black Canyon. This is of great concern because there is important habitat not in that area. With no specific protections in planned for the other habitat, the remaining populations and the habitat needed to support/increase both them as well as the entirety of the 5000 or so GuSG estimated to remain will be impossible, and will undermine the FWS goal to eventually remove GuSG from 'Threatened' status. In fact, failure to protect habitat outside of the current ACEC will doom to species to 'Endangered' status.

Comment Number: 000545_SlivkaJ_20161101-176
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Gunnison Sage-grouse
We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.
Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "[e]xpansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."
All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP.

Comment Number: 500143_RewL_20161017-7
Organization1:REW Land and Cattle LLLP
Commenter1:
Commenter Type: Private Industry
Comment Excerpt Text:
Page 2-102-105, Line 161-167, Gunnison Sage Grouse,. Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements

Comment Number: 000565_TothK_20161102_DCD-2
Organization1:Delta Conservation District
Commenter1:
Commenter Type: Local Government
Other Sections: 3, 44.1
Comment Excerpt Text:
o Page 2-102-105, Line 161-167, Gunnison Sage Grouse, Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements.

Comment Number: 000486_ClaytonJ_20161101-7
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government

BLM_0165867

Other Sections: 21.1 3 44.1
Comment Excerpt Text:
Page: 2-187 to 2-191
Line: 333-334
Comment: Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks. We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse.

Comment Number: 000486_ClaytonJ_20161101-8
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3 44.1
Comment Excerpt Text:
Page: 2-195
Line: 336
Comment: Alternative B: Where leasing is allowed, we recommend an NSO throughout all GUSG CH and within 4 miles of a lek.
Alternative D: A 0.6 mile buffer only offers protection for lekking and mating. A 4.0 mile buffer will include most nesting and brood-rearing protection. An NSO throughout all occupied habitat would protect all nesting and broodrearing habitat from direct impacts. See our related comment on NSO-32 below.

Comment Number: 000486_ClaytonJ_20161101-9
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3 44.1
Comment Excerpt Text:
Page: 2-201
Line: 337
Comment: Alternative B does not have specific protective CSU stipulations for GUSG or its CH. Furthermore, this action does not describe how CSUs can avoid or minimize effects to GUSG. A GUSG CSU needs to be included in the stipulations.

Comment Number: 000282_LightfootA_20161029-2
Organization1:
Commenter1:Ali Lightfoot
Commenter Type:
Comment Excerpt Text:
One concern with the proposed draft (Alternative D) involves the lack of protection for the Gunnison sage-grouse. Based on the best scientific evidence, it is suggested that the distance necessary between surfacedisturbance/exploration and an active lek is 4 miles and I ask that the BLM increases this radius from 0.6 miles to 4 miles and to further protect this species by making this area no surface occupancy

Comment Number: 000315_AllenR_20161031_SWBoardofGrazingAdvisors-2
Organization1:Southwest Board of Grazing Advisors
Commenter1:Ross Allen
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:

BLM_0165868

o Page 2-102-105, Line 161-167, Gunnison Sage Grouse: Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements.

Comment Number: 000356_AdamK_20161031-2
Organization1:
Commenter1:Nate Adam
Commenter Type: Individual
Other Sections: 3 44.1
Comment Excerpt Text:
Page 2-102-105, Line 161-167, Gunnison Sage Grouse. Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements. Some range improvements provide benefits to the species that inhabit the area.

Comment Number: 000455_ClearyM_20161101_4CRanch,LLC-1
Organization1:
Commenter1:Michael P. Cleary
Commenter Type: Individual
Comment Excerpt Text:
o Page 2-102-105, Line 161-167, Gunnison Sage Grouse. Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements.

Comment Number: 000476_RobertsonL_20161101-1
Organization1:
Commenter1:Leigh Robertson
Commenter Type: Individual
Other Sections: 3 44.1
Comment Excerpt Text:
Since the Gunnison Sage-grouse has been listed as a threatened species since this plan was started, I feel it's imperative that the RMP uses the recommendations in Alternative B in order to protect this rare bird and its habitat. Actually, in some cases I believe the science warrants even stricter protections, as I'll reference below.
If the BLM goes generally chooses the recommendations in Alternative D, I request that the following specific changes be made:
Change to recommendations in those in Alternative B (or larger buffers) at least on the following pages: 2-102,
2-377: Within GUSG designated critical habitat: exclude wind, solar and hydropower.
2-103, 2-195 ideally change the buffer to 6.2 miles, or 4 miles at a minimum.
References to support larger buffers:
Per BLM Instruction Memorandum No. 2014-100 Disturbance will be focused outside of a 4-mile buffer around leks.
A multiscale assessment of factors associated with lek abandonment between 1965 and 2007 found that the level of the human footprint within 5 km (3.1 mi) of the lek was negatively associated with lek persistence (Knick and Hanser, 2011).
Coates and others (2013) suggested that an 8 km (5 mi) protection area centered on an active lek location should encompass the seasonal movements and habitat use of 90-95% of sage-grosue associated with the lek.
The Colorado Plan [Colorado Greater Sage-grouse Steering Committee, 2008] recommended a 6.4 km [4 mi] circular buffer.

BLM_0165869

Holloran and Anderson (2005) reported 64% of monitored nests fell within 5 km (3.1 mi) of a lek, and response to industrial development (decreased nesting rates and success rates) was observable to distances between 5 and 10 km (3.1 – 6.2 mi) from a lek.

Gregory and Beck (2014) suggested significant immediate effects on lek attendance with one well pad within 2 km (1.2 mi) of a lek and time-lagged effects due to industrial development within 10 km (6.2 mi) of a lek. Direct impacts of energy development on sage-grouse habitats and populations, such as loss of sagebrush canopy or nest failure, have been estimated to occur within a 1.2-ha (3-acre) area of leks (radius: 62 m [68 yards]); indirect influences, such as habitat degradation or utilization displacement, have been estimated to extend out to 19 km (11.8 mi) from leks (Naugle and others, 2011).

Regional analyses of well-density and distance effects (Johnson and others, 2011) suggested negative trends in populations (lek counts) when distance was less than 4 km (2.5 mi) to the nearest producing well; whereas density effects were evident rangewide based on decreasing population trends when greater than eight active wells occurred within 5 km (3.1 mi) of leks, or when more than 200 active wells occurred within 18 km (11 mi) of leks.

p. 2-104: Would line 165, Alternative B prohibit brush-beating of a lek? If so, the wording should be changed to allow it.

p. 2-105 line 167 and 2-314 line 494 Need greater than a 0.6 mile radius around a lek for ROW exclusion, based on the following from:

Manier, D.J., Bowen, Z.H., Brooks, M.L., Casazza, M.L., Coates, P.S., Deibert, P.A., Hanser, S.E., and Johnson, D.H., 2014, Conservation buffer distance estimates for Greater Sage-Grouse—A review: U.S. Geological Survey Open-File Report 2014–1239, 14 p., http://dx.doi.org/10.3133/ofr20141239.

Recent research has added important information to previous speculations and estimations, specifying concentrated foraging behaviors by common ravens (a common predator of sage-grouse nests) at 2.2 km (1.4 mi) from electrical transmission towers with the observed foraging area extending out to 11 km (6.8 mi; Coates, and others, 2014a). According to estimates, the greatest potential impact on sage-grouse nests occurs within 570 m (0.35 mi) of structures (Howe and others, 2014). Negative trends in lek counts were associated with increasing number of communication towers within 18 km of leks range wide (Johnson and others 2011). Johnson and others (2011) also documented negative trends in lek counts for Great Plains populations within 20 km (12.4 mi) of a power transmission line or when the linear density of powerlines within 5 km (3.1 mi) of leks was greater than 10 km (6.2 mi)—notably, affected areas may be greater in these habitats (compared to other intermountain communities) because visibility is often greater in gentle terrain.

All: lek area avoidance should start March 15, not April 1, or customize it to the appropriate date for the subpopulation, e.g., page 2-350.

2-349 Alternative B: Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation Plan…ADD: with adjustments as needed to incorporate the latest science and/or findings from monitoring after management activities.

Pages 3-76, 3-77: changed GUSG to Threatened.


Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-16
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Other Sections: 8 44.1
Comment Excerpt Text:
San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population. There may be different lek buffers and needs

BLM_0165870

between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population. The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG

Comment Number: 000477_MayJ_20161101_SanMiguelCty_HasAttach-17
Organization1:San Miguel County Board of Commissioners
Commenter1:Joan May
Commenter Type: Local Government
Comment Excerpt Text:
The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No Surface Occupancy being applied to all BLM lands within 4-miles of a lek. These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area. Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks. The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

Comment Number: 000486_ClaytonJ_20161101-1
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3 44.1
Comment Excerpt Text:
In this proposed RMP revision, particularly in Alternative D, descriptors such as 'may be' or 'might be' are often used for management actions that could be taken to protect listed species such as GUSG or listed plant species. Instead, we recommend using terms such as 'will be' or 'shall be' taken. This more definitively addresses the requirements of section 7(a) as they pertain to Federal action agencies under the Endangered Species Act.

Comment Number: 000486_ClaytonJ_20161101-12
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-313
Line: 494
Comment: Alternative D: only specifies avoidance for occupied habitat, leks, and 0.6 mile buffer. If GUSG CH is not designated as an exclusion area (as in Alternative B line 493), we recommend ROW avoidance for all CH and within 4 miles of a lek to include the majority of GUSG nesting and brood-rearing habitat and to address indirect effects. If avoidance is selected, adaptive management that would address downward trends is recommended.

BLM_0165871

Comment Number: 000486_ClaytonJ_20161101-15
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-103
Line: 63
Comment: Surface use closure dates should be from March 1- July 15 (also change in Appendix A and B). These are our current guidelines to include the entire breeding season, including lekking, nesting and early brood-rearing (comparable to greater sage-grouse). Please change these dates elsewhere in the RMP when referencing GUSG reproductive/breeding season closures. It is also unclear why Alternative B applies to "Gunnison Sage-Grouse Breeding (Non-lek) Habitat" whereas Alternative D applies to "Gunnison Sage-Grouse Breeding (Lek and Non-lek) Habitat." Why would Alternative B not include lek habitat? We recommend that both lek and non-lek habitat be included in Stipulation 17 (Alternative B).

Comment Number: 000486_ClaytonJ_20161101-5
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Comment Excerpt Text:
Page: 2-104
Line: 66
Comment: Alternative B.1 describes restrictions that only apply within mapped GUSG nesting and early brood rearing habitat. This alternative should also describe the indirect effects of any activity occurring outside of mapped habitat that would impact GUSG (such as noise, tall structures, etc.) and what restrictions would be included to address these indirect effects. Indirect effects from activities occurring outside of mapped habitat should be included elsewhere in this RMP when describing activities within buffer distances or CH boundaries.

Comment Number: 000489_JohnsonA_20161101-45
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
2. Gunnison Sage-grouse
We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.
Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "expansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."
All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP.

Comment Number: 000492_RandallR_20161101-1
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse rangewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species

Comment Number: 000492_RandallR_20161101-14
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Comment Excerpt Text:
Gunnison Sage Grouse
The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

Comment Number: 000529_PaulsonD_20161101-1
Organization1:
Commenter1:Deborah Paulson
Commenter Type: Individual
Comment Excerpt Text:
It is especially important that species on the edge, like the Gunnison Sage--grouse, be given the strongest protections possible. As someone who has worked with the San Miguel Basin GSG Working

BLM_0165873

Group, I have watched the transformation of Dry Creek Basin with the development of the oil and gas over the last decade. The road traffic and noise have increased dramatically, almost certainly with negative impacts for the grouse. The plan to withdraw leases in GSG habitat as they expire is helpful, but not sufficient. Restrictions on surface activities should err on the side of protection, using the maximum buffer distances from the literature to protect nesting, resting and winter habitat, as well as leks. According to the USGS Open-File Report 2014-1239, the maximum effect of most types of disturbance on grouse behavior and survival is about 5 miles. Buffers should be at least that much, as we are not currently succeeding in stopping the decline of this species. The ACECs for Gunnison Sage-grouse should be implemented.

Comment Number: 000545_SlivkaJ_20161101-176
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 8 44.1
Comment Excerpt Text:
Gunnison Sage-grouse
We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.
Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "[e]xpansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."
All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP.

Comment Number: 000563_King_WELC_HasAttach-236
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Contrary to the DEIS's assertion, the UFO supports four, not three, of the remaining populations of Gunnison sage-grouse: "the Uncompahgre FO operates . . . provides habitat for four GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population (with the Sims Mesa sub-population entirely within the Uncompahgre FO), the Crawford Population, the Gunnison Basin Population, and the Piñon Mesa Population." [Gunnison Sage-Grouse Rangewide RMP DEIS at 1-13.] The Crawford population in particular has been classified by the BLM has having "medium potential" for oil and gas development. [Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,255.] Although it currently has only a single federal well, additional oil and gas development within the Crawford Population could adversely affect its persistence and chance of recovery.

Comment Number: 000563_King_WELC_HasAttach-237
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel

BLM_0165874

Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
On average, lek attendance was stable when no oil and gas development was present within 6,400m (Fig. 4). However, attendance declined as development increased. [Green et al. at 9.] Importantly, Green et al. confirmed that declines in sage-grouse populations may continue even within Wyoming's "core areas," where density of wells is limited to one pad per square mile. Yet the UFO DEIS fails to consider any alternative that either prohibits fluid mineral leasing or regulates the density of allowable oil and gas facilities. Althoug the DEIS does consider minimal buffers and seasonal operation restrictions around leks, the DEIS acknowledges that its preferred alternative would "fall short of accepted minimum protection standards to maintain sage-grouse viability:
For Gunnison sage-grouse, stipulations would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats. Breeding habitat would be protected with similar stipulations as Alternative C (NSO20/SSR-32), and would similarly fall short of accepted minimum protection standards to maintain sage-grouse viability (Knick and Connelly 2011). However, disturbance/disruption would be prohibited during the breeding season within four miles of active leks (CSU-28/SSR-34). [DEIS at 3-77.]

Comment Number: 500263_JonesS_20160924_COHVCO_HasAttach-12
Organization1:COHVCO/TPA/CSA
Commenter1:Scott Jones
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
15. Gunnison Sage Grouse ACEC designations must address the limited impacts of recreation on the species.
The Organizations are very concerned regarding the ambiguity of Grouse management standards proposed in the DRMP and how this will impact multiple use recreation as there is no clarity provided in the designation of the ACEC areas and this factor has been heavily relied on for the designation of ACEC areas. This concern is based on the fact that surface disturbing activities appear to have included trail usage in other areas of the DMRP and these usages have been specifically found to be of minimal concern with sage grouse habitat. This is an issue that has been extensively discussed in the multiple listing decisions addressing both the Gunnison and Greater Sage Grouse and with a wide range of partner groups and conservation committees for the management of the grouse. The necessity of a complete exclusion of surface occupancy and disturbance has been specifically addressed by the state of Colorado as follows:
"The new rules require that permittees and operators determine whether their proposed development location overlaps with "sensitive wildlife habitat," or is within restricted surface occupancy (RSO) Area. For greater sage grouse, areas within 1 km (0.6 mi) of an active lek are designated as RSOs, and surface area occupancy will be avoided except in cases of economic or technical infeasibility (CDOW, 2009, p. 12). Areas within approximately 6.4 km (4 mi) of an active lek are considered sensitive wildlife habitat (CDOW, 2009, p. 13) and the development proponent is required to consult with the CDOW ... "52 52 See, Endangered and Threatened Wildlife and Plants; 12-Month Findings for Petitions to List the Greater SageGrouse (Centrocercus urophasianus) as Threatened or Endangered 12 month finding; March 2010 at pg 64.
The Organizations are very aware there are a large number of issues involved with the decline of all Grouse species, including urbanization of habitat, grazing, oil and gas exploration and increased predation. While there are a large number of threats to the grouse, recreational usage of habitat areas has been a concern that has been consistently identified as a lower level threat. The low level threat of recreation to the Grouse is clearly identified in the listing decision issued in 2013 for the Gunnison Sage Grouse, which specifically states:

BLM_0165875

"Recreational activities as discussed above do not singularly pose a threat to Gunnison sage-grouse. However, there may be certain situations where recreational activities are impacting local concentrations of Gunnison sage grouse, especially in areas where habitat is already fragmented such as in the six small populations and in certain areas within the Gunnison Basin." 53

53 Endangered and Threatened Wildlife and Plants; Endangered Status for Gunnison Sage-Grouse; 78 Fed. Reg. 2486 (Jan. 11, 2013) at pg 2533. (hereinafter referred to as the "Grouse status proposal")

In the recently released listing decision for the Greater Sage Grouse, recreational activity was also identified as a low priority threat.54 Management of the impact of roads on Grouse in habitat areas is a key component in the habitat designation process as the listing decision notes that all grouse habitat is at least indirectly impacted by roads. 55 The Organizations are keenly aware that wildlife response to a high volume, high speed arterial road is consistently higher than the response to a low speed, low volume forest service type road. Research indicates that Grouse display a hierarchical response to levels of road use.56 Road access to recreational areas is a key component of most users recreational experience on public lands and this access is frequently only provided by low speed, low volume forest service roads. Frequently many of these routes see very minimal levels of usage during the week, which should be taken into account in management of these routes.

54 Endangered and Threatened Wildlife and Plants; 12-Month Findings for Petitions to List the Greater SageGrouse (Centrocercus urophasianus) as Threatened or Endangered, Fed. Reg. (March 5, 2010) at Pg 75.

55 See, Grouse Status proposal at pg 2499.

56 Aldridge et al; Crucial Nesting Habitat for Gunnison Sage Grouse; A Spatially Explicit Hierarchical Approach; Journal of Wildlife Management; Vol. 76(2); February 2012; 391-406 at pg 404.

FWS research also notes the adoption of a designated system for recreational purposes is of significant benefit to the sage grouse. The 2010 USFWS listing decision discussed changes to designated trails on USFS lands as follows:

"As part of the USFS Travel Management planning effort, both the Humboldt-Toiyabe National Forest and the Inyo National Forest are revising road designations in their jurisdictions. The Humboldt-Toiyabe National Forest released its Draft Environmental Impact Statement in July, 2009. The Inyo National Forest completed and released its Final Environmental Impact Statement and Record of Decision in August 2009 for Motorized Travel Management. The ROD calls for the permanent prohibition on cross country travel off designated authorized roads." 57

57 12-month findings for petition to list the Greater Sage Grouse(Centrocercus urophasianus) as threatened or endangered. Fed Reg. (March 5, 2010) at pg 92.

Clearly, if the designated route system that was being adopted by these Forests was insufficient for the protection of Sage Grouse habitat, such a position would have been clearly stated in this discussion given the large body of research that exists for the management of the Sage Grouse.

Research indicates that seasonal closures of a designated trail system for the protection of leks is a highly effective tool, which the status decision specifically notes as follows:

"The BLM and Gunnison County have 38 closure points to minimize impacts to Gunnison sage-grouse within the Basin from March 15 to May 15 each year (BLM 2009, p. 40). While road closures may be violated in a small number of situations, road closures are having a beneficial effect on Gunnison sage-grouse through avoidance or minimization of impacts during the breeding season."58

58 See, Grouse Status proposal at pg 2532 .

The Organizations believe that seasonal closures of routes will also only be effective if the nesting areas are seasonally closed to other uses as well. Clearly closing a route to address concerns regarding its proximity to leks and nesting areas will not be effective if grazing, lek viewing and other activities identified as similar or higher risk activities for the habitat areas are continued.

The Organizations again believe Grouse management is an issue that a range of alternatives for recreational trails usage could be provided for and simply has not been. As the FWS has specifically addressed the effectiveness of designated routes and seasonal closures on a significantly smaller scale

BLM_0165876

than those proposed in the DRMP, the Organizations believe this is a viable option for the management of these areas. The Organizations are vigorously opposed to any more restrictive standards in the DRMP as these standards would not be based on best available science and would directly contradict the ongoing and extensive efforts of partner groups and committees to determine appropriate management standards for the Grouse that preserve economic contributions of public lands. Given the lack of analysis provided for particular routes or areas to be closed in the DRMP, the Organizations are simply unable to provide more site specific comments on this issue.

Comment Number: 000486_ClaytonJ_20161101-18
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3 44.1
Comment Excerpt Text:
Page: B-27
Line: NSO-32/NGD-13
Comment: We recommend NSO/NGD protection throughout all GUSG CH, including unoccupied CH. For an exception, modification, or waiver, we recommend only allowing this if the action would not impair the function or utility of the site for current or subsequent GUSG use in any season (e.g., reproductive display, nesting, brood rearing, wintering, etc.) and would not adversely affect GUSG.

Comment Number: 500268_BearS_21060930_DMEA-34
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix G: BMP's and SOP's
• There are noise reduction provisions proposed within 4 miles of active leks. DMEA notes that Table 2-2 Line #494 and Table 2-3 refer to a 0.6 mile radius. DMEA suggests that this distance match the 0.5 mile protection distance discussed previously.

Comment Number: 500268_BearS_21060930_DMEA-32
Organization1: Delta-Montrose Electric Association
Commenter1: Shelby Bear
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Appendix B
• TL17 and TL18 prohibits surface use and surface disturbing and disruptive activities within 4.0 to 6.0 miles of Gunnison sage-grouse leks from March 1 to June 30. These distances are unreasonable compared to the 0.25 and 0.5 mile distances associated with other species such as nesting raptors. DMEA notes that Table 2-2 Line #494 refers to a 0.6 mile radius. DMEA requests that the avoidance distance match those of raptors of 0.5 mile of nesting raptors.

*Summary*
A. Commenters provided the following recommendations for the Gunnison sage-grouse:

1. The Gunnison sage-grouse was listed as a threatened species under the Endangered Species Act on November 20, 2014. The RMP needs to address this listing and include appropriate management actions consistent with this listing.

2. Use recommendations in Alternative B (i.e., non-waivable NSO and no leasing stipulations) or stricter protections per research studies provided by commenters.

3. Revise management action to allow for range improvements in Gunnison sage-grouse habitat.

4. Review to ensure that protections identified for Gunnison sage-grouse habitat from surface-disturbing activities/development are appropriate. Commenters recommend that buffers within the San Miguel Basin range from 4 miles to 6.2 miles (instead of the current 0.6-mile radius). Commenters state that restrictions should err on the side of protection, using the maximum buffer distances from literature to protect nesting, resting, and winter habitat, as well as leks.

5. Consider a no leasing alternative.

6. Amend surface closure dates to March 1 to July 15 per current guidance when citing Gunnison sage-grouse reproductive/breeding seasonal closures.

7. Provide protection for areas outside of the current ACEC on the north side of the Black Canyon.

8. Obtain San Miguel County's GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists. Apply NSO and other stipulations consistent with the primary conservation easement values on these properties for Gunnison sage-grouse protection.

9. Provide measures to protect from indirect effects of any activity occurring outside of mapped habitat that would impact Gunnison sage-grouse (e.g., noise and tall structures).

10. Gunnison sage-grouse ACEC designations must address the limited impacts of recreation on the species.

11. Incorporate, where appropriate, management direction contained in the Gunnison Sage-Grouse RMP Amendment/EIS currently in preparation and describe how this document will be incorporated into the Uncompahgre RMP.

12. Consider Gunnison sage-grouse management direction in the Tres Rios Field Office RMP to ensure consistent direction across the entire San Miguel Basin population.

13. Describe the criteria to be used to determine when an inventory of habitat would be required before drilling.

14. State that the UFO contains four, not three, remaining populations of Gunnison sage-grouse: Cerro Summit-Cimarron-Sims Mesa population, Crawford population, Gunnison Basin population, and Pinon Mesa population.

15. Recommend (on page B-27, NSO-32/NGD-13) NSO/NGD protection throughout all Gunnison sage-grouse critical habitat, including unoccupied critical habitat. Recommend to authorize exceptions, modifications, or waivers only if the action would not impair the function or utility of the site for current or subsequent Gunnison sage-grouse use in any season (e.g., reproductive display, nesting, brood rearing, or wintering) and would not adversely affect Gunnison sage-grouse.

B. One commenter stated that the surface use restrictions proposed for Gunnison sage-grouse leks are unreasonably restrictive compared with those for raptors, and requested that the restrictions be revised to match those of nesting raptors. They also noted that there is conflicting language regarding noise-reduction distances from active leks and requested that the less-restrictive measure be utilized.

BLM_0165878

*Response*

A. The BLM appreciates the comments.

1. Draft RMP/EIS Table 3-23 (Federally Listed Fish and Wildlife Species; page 3-76) and page 3-77 were updated in the Proposed RMP/Final EIS to reflect the listing of the Gunnison sage-grouse as threatened under the ESA. Draft RMP/EIS Table 2-2 (Description of Alternatives A, B/B.1, C, and D) includes appropriate management actions consistent with this listing (Draft RMP/EIS Table 2-2, rows 161–167 on pages 2-102–2-105).

2, 3, 4, 6, 8, 9, 10, 11, 12, 13, and 15. The BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS was published in August 2016. It applies to all land use plans in the Amendment planning area (including the Uncompahgre RMP). If approved, decisions would consist of identifying and defining goals and objectives (desired outcomes) for resources and resource uses, and allowable uses and management actions necessary for achieving the goals and objectives. These decisions would guide future land management actions and subsequent site-specific implementation actions to maintain or improve Gunnison sage-grouse habitat.

If the Uncompahgre RMP is approved before the Gunnison Sage-Grouse Rangewide RMP Amendment is completed and approved, then the Amendment could modify the revised Uncompahgre RMP as appropriate. If the Gunnison Sage-Grouse Rangewide RMP Amendment is approved prior to completion of the Uncompahgre RMP revision, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a), with corresponding updates to the Uncompahgre RMP upon completion. The Uncompahgre Proposed RMP/Final EIS incorporates the management measures and analysis in the Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS. Until completion of the Gunnison Sage-Grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat will continue to be managed in accordance with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). Draft RMP/EIS Section 2.2.4 on page 2-5 was edited to reflect this information.

5. Draft RMP/EIS Section 2.4.3 on page 2-16 describes the consideration and subsequent elimination of a no leasing alternative.

7. The areas outside of the current ACEC on the north side of the Black Canyon are within the Gunnison Gorge National Conservation Area, which is managed under a separate RMP.

14. The UFO contains portions of three remaining populations of Gunnison sage-grouse: San Miguel, Cerro/Cimarron/Sims, and Crawford. The Crawford occupied critical habitat is entirely within the Gunnison Gorge National Conservation Area RMP planning area and has a seasonal closure for motorized and mechanized vehicles (December 1 through May 15). There are small isolated pieces of BLM-administered land within potential (unoccupied) critical habitat within the Uncompahgre RMP decision area. The Piñon Mesa population is within the planning areas for the Grand Junction RMP and Dominguez-Escalante National Conservation Area RMP.

BLM_0165879

B. The Gunnison sage-grouse was listed as a threatened species under the ESA on November 20, 2014. The RMP addresses this listing and includes it in appropriate management actions consistent with it. Refer to the response to part A, numbers 2, 3, 4, 6, 8, 9, 10, 11, 12, 13, and 15, of this response regarding the Gunnison Sage-Grouse Rangewide RMP Amendment. In Draft RMP/EIS Table 2-2, line 494 (pages 2-313–2-315), restrictions on ROW development refer to ROW avoidance areas of 0.6 mile from a lek. Restrictions of 4 miles from a lek (as discussed in Draft RMP/EIS Table 2-2, line 166, pages 2-104–2-105) apply only to CSU/SSR and not to ROW authorizations (per Draft RMP/EIS page B-5, "Right-of-way location authorizations are not subject to the SSR restriction because it is constrained in other ways").

### Section 44.2 – Gunnison Sage-Grouse: Best available information—baseline data

Total Number of Submissions: 4
Total Number of Comments: 5

Comment Number: 000217_RubanowM_20161026-1
Organization1:
Commenter1:Morgan Rubanow
Commenter Type: Individual
Comment Excerpt Text:
One concern with the proposed draft (Alternative D) involves the lack of protection for the Gunnison sage-grouse. First, I would like to ask what scientific research was used to decide the 0.6 mile radius buffer from Gunnison sage-grouse (Centrocercus minimus) leks as an adequate distance to prevent surface disturbance/exploration (i.e., page 2-103)? Based on the best scientific evidence, it is suggested that the distance necessary between surface disturbance/exploration and an active lek is 4 miles and I ask that the BLM increases this radius from 0.6 miles to 4 miles and to further protect this species by making this area no surface occupancy. This is a standard that was proposed by scientists for the Greater sage-grouse (Centrocercus urophasianus), a very similar species of grouse, during the revamping of the 'Greater sage-grouse federal management plan'. I suggest this for a few reasons; first, females nest within 4 miles of the lek, therefore, the 0.6 mile distance will not provide adequate protection for nesting females (ref: Mark Salvo- Defenders of Wildlife at the Society of Conservation Biology 2016 North American Congress Conference in Madison, WI and Holloran et al. 2005). Holloran, M., Heath, B., Lyon, A., Slater, S., Kuipers, J., and Anderson, S. 2005. Greater sagegrouse nesting habitat selection and success in Wyoming. The Journal of Wildlife Management. Vol 60:2. Pp 628-649.
Additionally, there is high mortality of sage-grouse chicks (ref: Mark Salvo 2016), so a 4 mile buffer area would benefit this vulnerable species immensely. Lastly, surface disturbances increases the chance of cheatgrass (Bromus tectorum) and weeds to invade the area. This invasion can change the fire regime of the area and outcompete native plants, both of which would affect the sage-grouse negatively (ref: Mark Salvo 2016 and Miller et al. 2011). With climate change, the impact of fire and cheatgrass will increase, so the BLM needs to plan for the unavoidable changes we know that we will see in the future.
Miller, R., Knick, S., Pyke, D., Meinke, C., Hanser, S., Wisdom, M., and Hild, A. 2011. Characteristics of sagebrush habitats and limitations to long-term conservation In Knick, S.,Connelly, J., eds., Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats, Studies in Avian Biology No. 38: Berkeley, CA, Univ. of California Press, p.145-184.

Comment Number: 000282_LightfootA_20161029-1
Organization1:
Commenter1:Ali Lightfoot
Commenter Type:

BLM_0165880

Comment Excerpt Text:
Surface disturbances increases the chance of cheatgrass and weeds to invade the area. This invasion can change the fire regime of the area and outcompete native plants, both of which would affect the sage-grouse negatively. With climate change, the impact of fire and cheatgrass will increase, so the BLM needs to plan for the unavoidable changes we know that we will see in the future.

Comment Number: 000492_RandallR_20161101-25
Organization1:Colorado Department of Natural Resources
Commenter1:Amy Laughlin
Commenter Type: State Government
Other Sections: 3 44.1
Comment Excerpt Text:
[Footnote 4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23.

Comment Number: 000563_King_WELC_HasAttach-234
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Contrary to the DEIS's characterization of the Gunnison sage-grouse as a candidate species, DEIS at 3-76, the Gunnison sage-grouse was listed as a threatened species under the Endangered Species Act in November 2014. See U.S. Fish and Wildlife Service, Threatened Status for Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014).
Approximately 88 to 93 percent of the species's historical range has been lost since Euro- American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all the populations to extirpation." Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,228. The listing rule found that "the persistence of Gunnison sage-grouse is dependent on large and contiguous sagebrush habitats, that human development and disturbance contribute to the decline of this needed habitat, and that such impacts negatively affect the survival and persistence of Gunnison sage-grouse." Id. Numerous activities on BLM land and minerals contribute to loss of these sage-grouse habitats, including road-building, power lines, livestock grazing practices, invasive plants, fire, and leasable minerals (i.e., oil and gas development). Oil and gas development has numerous adverse effects on Gunnison sage-grouse habitat, behavior, and population not acknowledged in the DEIS.

Comment Number: 000563_King_WELC_HasAttach-238
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
Even with only one operating oil and gas well, the UFO's Crawford Population has been in dramatic decline from 2000 through 2012, and had to be supplemented with birds from the Gunnison Basin in 2011 through 2013. [See Gunnison Sage-Grouse Rangewide RMP DEIS at 3-14] BLM manages approximately 63% of the remaining occupied habitat for this population, as well as 13% of occupied habitat. Despite the precarious status of the Crawford Population in particular, the UFO DEIS fails either to take a hard look at the extensive science showing relationship between oil and gas density and

BLM_0165881

sage-grouse population decline, or to consider any alternative that would either limit density of development or exclude oil and gas entirely from Gunnison sage-grouse occupied and/or suitable habitat. Given that 63% of the Crawford Population's remaining habitat is on BLM land with "moderate" oil and gas decisions, BLM consideration of a no-leasing alternative for the area has the potential to eliminate a significant threat to the extirpation of one of the few remaining populations of Gunnison sage-grouse.

*Summary*

Commenters recommend the following:

1. The BLM should review the literature and provide a rationale for the determination that a 0.6-mile radius buffer around Gunnison sage-grouse leks would provide an adequate distance to prevent surface disturbance from activities.
2. The BLM should modify the RMP text to state that the UFO supports four, not three, of the remaining populations of Gunnison sage-grouse.
3. The BLM should update the RMP text and Table 3-23 to reflect the current listing statuses for the Gunnison sage-grouse and western yellow-billed cuckoo.
4. The BLM should work with CPW to obtain updated information relevant to the Gunnison sage-grouse.

*Response*

1. Buffering the lek polygons by 0.6 mile matches up with the disturbance guidelines in the Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005). This 0.6-mile buffer serves as a measure of protection to ensure that the entire lek polygon is captured within the buffer polygon and that potential direct or indirect impacts directly adjacent to a lek that could influence lekking behavior are evaluated (see BLM's Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS, August 2016, page 6-132). This rationale for the 0.6-mile lek buffer was added to the Uncompahgre Proposed RMP/Final EIS.
2. The UFO contains three remaining populations. The Crawford population is within the Gunnison Gorge National Conservation Area RMP planning area, not the Uncompahgre RMP decision area. The Pinyon Mesa population is within the Grand Junction RMP and Dominguez-Escalante National Conservation Area RMP planning area.
3. Draft RMP/EIS Table 3-23 (Federally Listed Fish and Wildlife Species; page 3-76) was updated in the Proposed RMP/Final EIS to reflect the current ESA listing of threatened status for the Gunnison sage-grouse and the western yellow-billed cuckoo. Draft RMP/EIS page 3-77 was updated in the Proposed RMP/Final EIS to reflect the current listing of threatened for the Gunnison sage-grouse. The western yellow-billed cuckoo was deleted from Draft RMP/EIS Table 3-24 (Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area; page 3-79). The discussion of the western yellow-billed cuckoo as a BLM Sensitive Species within the Fish and Wildlife subsection of Draft RMP/EIS page 3-82 was moved up to the Federally Listed Species section of the Proposed RMP/Final EIS. The Proposed RMP/Final EIS was searched globally to update the status of these two species.
4. The BLM added updated Gunnison sage-grouse information to the Proposed RMP/Final EIS.

BLM_0165882

### Section 44.3 – Gunnison Sage-Grouse: Impact Analysis

Total Number of Submissions: 4
Total Number of Comments: 4

Comment Number: 000486_ClaytonJ_20161101-9
Organization1:U.S. Fish and Wildlife Service
Commenter1:J Creed Clayton
Commenter Type: Federal Government
Other Sections: 3 44.1
Comment Excerpt Text:
Page: 2-201
Line: 337
In addition, oil and gas activities outside but adjacent to CH could still have indirect effects on GUSG inside CH (e.g., noise and tall structures which avian predators can use to nest or perch, allowing for an increase their hunting effectiveness within CH). Those effects should be considered and could be addressed via a CSU surrounding and between GUSG CH units.

Comment Number: 000489_JohnsonA_20161101-43
Organization1:Western Slope Conservation Center
Commenter1:Alex Johnson
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.4 16.3 44.3
Comment Excerpt Text:
C. Wildlife
1. Imperiled Species
Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

Comment Number: 000545_SlivkaJ_20161101-173
Organization1:The Wilderness Society
Commenter1:Juli Slivka
Commenter Type: Organization (nonprofit/citizens group)
Other Sections: 15.4 44.3
Comment Excerpt Text:
Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the

BLM_0165883

requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.

Comment Number: 000563_King_WELC_HasAttach-233
Organization1:Western Environmental Law Center
Commenter1:Kyle Tisdel
Commenter Type: Organization (nonprofit/citizens group)
Comment Excerpt Text:
The Uncompahgre DEIS Fails to Take a Hard Look at Reasonably Foreseeable Effects on the Threatened Gunnison Sage-Grouse.

*Summary*
Commenters requested inclusion of the following analysis:

1. Indirect effects of oil and gas activities outside but adjacent to Gunnison sage-grouse critical habitat.
2. Additional analysis on the impacts of fluid mineral leasing, including analysis of unconventional drilling technologies, on Canada lynx, Gunnison sage-grouse, greenback cutthroat trout, and Colorado hookless cactus.
3. Detailed examination of the potential impacts from development and land use activities on Gunnison sage-grouse.
4. Impacts of climate change on threatened and endangered species habitat.
5. Reasonably foreseeable effects on Gunnison sage-grouse.

*Response*
1. Direct and indirect impacts on Gunnison sage-grouse are discussed on Draft RMP/EIS pages 4-150, 4-155, 4-159, and 4-163. Additional analysis of the indirect effects of oil and gas activities outside but adjacent to Gunnison sage-grouse critical habitat were added to the Proposed RMP/Final EIS.
2. Impacts on Gunnison sage-grouse are discussed on Draft RMP/EIS pages 4-150, 4-155, 4-159, and 4-163. Refer to Section 15 of this report for other species cited in this comment. Analysis of unconventional drilling technologies on Canada lynx, Gunnison sage-grouse, greenback cutthroat trout, and Colorado hookless cactus was added to the Proposed RMP/Final EIS.
3. The analysis assumptions for the special status species impact analysis (Draft RMP/EIS Section 4.3.6) states that, "Impacts on Gunnison sage-grouse would be similar to those described from scientific literature on greater sage-grouse" (Draft RMP/EIS page 4-143). Impacts of development and land use activities on greater sage-grouse are discussed on Draft RMP/EIS pages 4-130. Impacts of development and land use activities on Gunnison sage-grouse specifically are discussed on Draft RMP/EIS pages 4-150, 4-155, 4-159, and 4-16. Additional analysis of the effects of proposed management actions was added to the Proposed RMP/Final EIS.

BLM_0165884

4. Potential impacts from climate change on special status species are discussed on Draft RMP/EIS page 4-151 for Alternative B and page 4-160 for Alternative D. The Proposed RMP/Final EIS was updated to include new climate change regulations since release of the Draft RMP/EIS.

5. Impacts on Gunnison sage-grouse are discussed on Draft RMP/EIS pages 4-150, 4-155, 4-159, and 4-163.

### Section 44.4 – Gunnison Sage-Grouse: Cumulative impact analysis

No comments are associated with this topic.

### Section 44.5 – Gunnison Sage-Grouse: Mitigation measures

No comments are associated with this topic.

BLM_0165885

## ATTACHMENT A – COMMENTER LISTS

### Table A-1
### Commenters by Affiliation

| Affiliation | Commenter Name(s) | Submission Number |
|---|---|---|
| **Elected Official** | | |
| Colorado House of Representatives | Millie Hamner | 000403_HamnerM_201610 31 |
| **Organization** | | |
| 350 Colorado | Micah Parkin | 000590_DascaluJoffeD_201 61101 |
| American Rivers | Matt Rice | 000406_RiceM_20161101_ AmericanRivers |
| Backcountry Hunters and Anglers | Craig Grother | 000514_GrotherC_201610 29_Backcountry Hunters and Anglers |
| Backcountry Hunters and Anglers | Adam Gall | 000311_GallA_20161031 |
| Black Canyon Audubon Society | Bill Day | 000409_DayB_20161031 |
| Colorado Plateau Mountain Bike Trail Association | Renata Raziano | 000222_RazianoR_2016102 6_COPMOBA |
| Colorado Plateau Mountain Bike Trail Association Ridgeway Areas Trails | Rodney Fitzhugh | 000511_FitzhughR_2016110 1_COPMOBA-RAT |
| Crested Butte Mountain Bike Association | David Ochs | 000454_OchsD_20161101_ CBMBA |
| Delta Area Mountain Bikers | Sven Edstrom | 000348_EdstromS_2016110 1 |
| Delta County Livestock Association | Nate Adam | 000609_AdamN_20161101 |
| Friends of the Paradise Theatre | Elaine M Brett | 500163_BrettE_20161020_ FOPT |
| High Country Conservation Advocates | Matt Reed | 000440_ReedM_20161101_ HCCA |
| Mountain Harvest Creative | Heidi Hudek | 000379_HudekH_20161101 _MountainHarvestFestival |
| Mountain Trip | Todd Rutledge | 000525_RutledgeT_201611 01_MountainTripInternation al |
| National Rifle Association | Susan Recce | 000218_RecceS_20160929 |
| North Fork Agriculture Operations | Mark Waltermire and Katie Dean- Thistle Whistle Farms Wendy Mitchell- Avalanch Cheese Co. Emily Hartnett- Terra Fata Farm Schyler Jelsma- Pristine Valley Farm | 500195_NorthForkAgOp_2 0140615 |

BLM_0165886

| Affiliation | Commenter Name(s) | Submission Number |
|---|---|---|
| | Monica and Wayne Wiitanen, Scott Horner- Small Potatoes Farm Eugenie McGuire- Desert Weyr Elena Goldstein- P Monkey Ranch | |
| Realtors of the North Fork Valley | Bob Lario Linda Lario Shari Davis Doris Danielsen Bert Sibley Martha Jackson Mike Jackson Myles Roberts Bob Pennatta Mark Schaffer Liz Heidrick Bernadette Stech Glenda Bailey David Mitchell Cathy Smith | 500196_RealtorsNorthFork Valley_20130401 |
| Roaring Fork Mountain Bike Association | Mike Pritchard | 000532_PritchardM_201611 01_RFMBA |
| Rocky Mountain Elk Foundation | Toni O'Hara | 000534_HenningB_201610 28_RockyMtnElkFdn |
| Rocky Mountain Recreation Initiative | Rosalind McClelland | 000522_McClellanR_20161 102_Rocky Mountain Recreation Initiative |
| Sierra Club Environmental Law Program | Nathan Matthews | 000479_MatthewsN_20161 101_SierraClub |
| Slow Food Western Slope Valley Organic Growers Association | Jim Brett | 000184_BrettJ_20161017 |
| Southwest Board of Grazing Advisors | Ross Allen Steve Stuckla Terri Lamers Pat Youmans Ernie Etchart | 000315_AllenR_20161031_ SWBoardofGrazingAdvisors |
| Telluride Mountain Club | Tor Anderson | 000298_AndersonT_20161 025 |
| The Endocrine Disruption Exchange | Kim Schultz | 000537_SchultzK_20161101 _TEDX |
| The Nature Conservancy | Celene Hawkins | 000375_HawkinsC_201610 31 |
| The Pew Charitable Trusts | Ken Rait | 000332_RaitK_20161031_P ewTrust |

BLM_0165887

| Affiliation | Commenter Name(s) | Submission Number |
|---|---|---|
| The Wilderness Society | Juli Slivka | 000545_SlivkaJ_20161101 |
| Western Colorado Congress | Steve Allerton | |
| Sheep Mountain Alliance | Karen Tuddenham | |
| San Juan Citizens Alliance | Jimbo Buickrood | |
| American Rivers | Matt Rice | |
| Dolores River Boating Advocates | Amber Clark | |
| Glenwood Springs | Steve Smith | |
| Conservation Colorado | Luke Schafer | |
| Great Old Broads for Wilderness | Shelley Silbert | |
| The Sierra Club | Alan Apt | |
| Rocky Mountain Wild | Megan Mueller | |
| San Luis Valley Ecosystem Council | Christine Canaly | |
| Wilderness Workshop | Peter Hart | |
| The Wineries of the West Elks American Viticultural Area | Rob Kimball- 5680 Vineyards Eames and Pam Peterson- Alfred Eames Cellars Ty and Helen Gillespie- Azura Cellars Lee and Kathy Bradley- Black Bridge Winery Jeff and Tracey Schwartz- Delicious Orchards Larry and Nina Parker- Fire Mountain Vineyard Yvon Gross and Joanna Reckert- Leroux Creek Vineyeards Scott and Lisa Fairbanks- Liliputian Winery Wink Davis and Max Eisle- Mesa Winds Winery Steve Rhodes- S.Rhodes Vineyard Brent and Karen Helleckson- Stone Cottage Cellars John and Joan Mathewson- Terror Creek Winery | 500198_WineriesOfWestElk_20161101 |
| Thunder Mountain Wheelers ATV Club | Walt Blackburn | 000129_BlackburnW_20160901 |

BLM_0165888

| Affiliation | Commenter Name(s) | Submission Number |
|---|---|---|
| Trout Unlimited | Garrett Hanks | 000483_HanksG_20161101 |
| Uncompahgre Valley Trail Riders | Rich Jackino | 000444_JackinoR_20161029 |
| West End Trails Alliance | Paul Koski | 000394_KoskiP_20161030_WETA |
| Western Colorado Congress | Rein Van West | 500193_VanWestR_201311 13_WesternColoradoCongress |
| Western Energy Alliance | Kathleen Sgamma | 000474_SgammaK_2016103 1_WEA |
| Western Environmental Law Center | Laura King | 000563_King_WELC |
| Earth Justice | Edward Sukoski | |
| Sierra Club Environmental Law Program | Nathan Matthews | |
| WildEarth Guardians | Jeremy Nichols | |
| Citizens for a Healthy Community | Natasha Leger | |
| Wilderness Workshop | Peter Hart | |
| Western Slope Conservation Center | Alex Johnson | 000034_JohnsonA_2016063 0 |
| Western Colorado Congress | Rien van West | |
| Citizens for a Healthy Community | Natasha Leger | |
| Northern San Juan Broadband | Robyn Cascade | |
| Sheep Mountain Alliance | Karen Tuddenham | |
| High County Conservation Advocates | Matt Reed | |
| Western Slope Conservation Center | Alex Johnson | 000489_JohnsonA_2016110 1 |
| Western Watersheds Project | Jonathan Ratner | 000402_RatnerJ_20161028 |
| **Private Industry** | | |
| Azura Cellars and Gallery | Maria Pena Ty Gillespie | 000334_PenaM_20161031 |
| Colorado Wool Growers Association | Bonnie Brown | 000273_BrownB_20161031 |
| Dancing Dog Farm | Kenneth Vaught | 000237_VaughtK_20161004 |
| Gunnison Energy | Brad Robinson | 000515_RobinsonB_201611 01_GunnisonEnergy |
| Helleckson Vineyards and Stone Cottage Cellars | Brent Helleckson | 000383_HellecksonB_20161 031 |
| LeValley Ranch | Robbie LeValley | 000447_LeValleyM_201611 01 |
| M4 Ranch Group | Dan Murphy | 000050_MurphyD_2016072 7 |
| Mountain Coal Company, LLC | Kathy Welt | 000487_WeltK_20161101_ MCC |
| Over the Edge Sports | Landon Monholland | 000288_Monhollandt_2016 1031 |
| Oxbow Mining LLC, Elk Creek Mine | Michael Ludlow | 000393_LudlowM_2016110 1 |

BLM_0165889

| Affiliation | Commenter Name(s) | Submission Number |
|---|---|---|
| Paonia Chamber of Commerce | Susan Shoemaker | 000401_ShoemakerS_2016I 028 |
| Pitkin Mesa Pipeline Company | | 500164_PitkinMesaPipeline Co_20161024 |
| REW Land and Cattle LLP | | 500143_RewL_20161017 |
| Roberts-Stucker Ditch Association | Steve Wolcott | 000342_WolcottS_2016103 1 |
| Stucker Mesa Domestic Water Company | Jean Ceriani | 000388_CerianiJ_20161023 |
| Terror Ditch and Reservoir Company | Brent Helleckson | 000441_HellecksonB_2016I 101 |
| The West Elks Winery Association | Brent Helleckson | 000286_HellecksonB_2016I 031 |
| Tri-State Generation and Transmission Association | Diana Leiker | 000482_MeyersK_2016110 I_Tri-State |
| **Government** | | |
| *Federal Government* | | |
| Bureau of Reclamation | Alan Schroeder | 000502_SchroederA_2016I 101_BOR |
| Department of Energy | Bud Sokolovich | 000310_SokolovichB_2016I 027_DOE |
| Department of Energy- Uranium Leasing Program | Deborah Steckley | 000161_SteckleyD_2016102 6 000308_SteckleyD_2016102 7_DOE |
| Environmental Protection Agency | Amilia A. Platt | 000530_PlattA_2016110I_E PA |
| Fish and Wildlife Service | J Creed Clayton | 000486_ClaytonJ_20161101 _FWS |
| National Park Service | Jill Jensen | 000472_JensenJ_20161101_ NPS |
| *State Government* | | |
| History Colorado | Katie Arntzen | 000247_ArntzenK_2016102 0_CO_State_Historical |
| Colorado Department of Natural Resource- Colorado Parks and Wildlife | Robert Randal | 000492_RandallR_20161101 _DNR |
| Colorado Department of Agriculture | Les Owen | 000504_BrownD_20161101 _CDA |
| Colorado Department of Natural Resources- Colorado Water Conservation Board | James Eckland | 000562_RandallR_20161101 _DNR_CWCB |
| *Local Government* | | |
| Bone Mesa Domestic Water District | Andrea Wang | 000272_MitasH_20161027 |
| City of Montrose | Rex Swanson | 000325_SwansonR_201610 27_CityofMontrose |
| Dolores Water Conservancy District | Michael Preston | 000428_PrestonM_2016102 8 |

BLM_0165890

| Affiliation | Commenter Name(s) | Submission Number |
|---|---|---|
| Gunnison County Board of County Commissioners | Paula Swenson | 000397_WolcottS_20161031 |
| Gunnison County | Paula Swenson | 000564_SwensonP_20161102 |
| Mesa County Board of County Commissioners | Kristen Cole | 000456_ColeK_20161031 |
| Montrose County Board of County Commissioners | Ron Henderson David White Gary Ellis | 000461_multiplenames_20160912_MontroseCtyBOCC |
| Montrose County | Jon Waschbusch | 000176_WaschbuschJ_20161013_MontroseCounty |
| Ouray County Board of County Commissioners | Lynn Padgett | 000473_PadgettL_20161101_OurayCtyBOCC |
| Delta Conservation District | Toth Kay | 000565_TothK_20161102_DCD-18 |
| Delta County Board of County Commissioners | Bruce Hovde C. Douglass Achley | 000420_HovdeC_20161101 |
| San Miguel County Board of County Commissioners | Joan May | 000462_SanMiguelCoBoardofCommissioners 000477_MayJ_20161101_SanMiguelCty |
| Southwestern Water Conservation District | Beth Van Vurst | 000371_VanVurstB_20161031 |
| Town of Crawford | Carolyn Steckel | 500197_SteckelC_20130807_TownOfCrawford |
| Town of Crawford | Wanda Goffworth | 500190_GofforthW_20161014 |
| Town of Hotchkiss | Wendella Koontz | 500129_KoontzW_20161018 |
| Town of Paonia | Charles Stewart | 500176_StewartC_20161027_TownOfPaonia |
| Town of Telluride | Sean Murphy | 000126_Kavanaugh_20160831 |

Note: Number of submissions differs from the number of commenters due to inclusion of more than one commenter on some submissions and more than one submission from some commenters.

BLM_0165891

**Table A-2**
**Submissions by Individuals**

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Laura | Abel | 000278_Abell_20161031 |
| Neshama | Abraham | 000405_AbrahamN_20161101 |
| Nate | Adam | 000356_AdamK_20161031 |
| David | Alderdice | 500150_AlderdiceD_20161101 |
| Coleen | Alloway | 000449_AllowayC_20161031 |
| Kevin | Anderson | 000219_AndersonK_20160930 |
| Sandy | Anderson | 000194_AndersonS_20161002 |
| Daniel | Antonelli | 000498_AntonelliD_20161101 |
| Boulos | Ayad | 000097_AyadB_20160729 |
| Mary | Bachran | 000407_BachranM_20161029 |
| Linda | Bacigalupi | 000499_BacigalupiL_20161101 |
| Dolores | Backhus | 000277_BackusD_20161031 |
| Tom | Backhus | 000309_BackhusT_20161030 |
| Daniel | Baer | 500108_BaerD_20161101 |
| Jay | Bagley | 000450_BagleyJ_20161024 |
| Danny | Bailey | 000547_BaileyD_20161031 |
| Matthew | Bainsmith | 000423_BainsmithM_20161031 |
| Garry | Baker | 000460_BakerG_20161028 |
| | Baldohr | 000092_Beldohr_20160727 |
| Kevin | Baldwin | 000103_BaldwinK_20160801 |
| Susan | Baldwin | 000209_BaldwinS_20161020 |
| | | 500101_BaldwinS_20161101 |
| | | 500245_BaldwinS_20161101 |
| Mary | Ballantyer | 500112_BallantyerM_20161101 |
| Marv | Ballantyne | 000287_BallantyneM_20161031 |
| Ruth | Barreto | 500005_BarretoR_20161017 |
| JM | Bartah | 500233_BartahJ_20161101 |
| Dave | Batten | 000408_BattenD_20161027 |
| Ed | Baxter | 000415_BaxterE_20161028 |
| R | Bergen | 500091_BergenR_20161101 |
| Leonard | Berilin | 500220_BerilinL_20161101 |
| Barb | Bernhardt | 000037_BernhardtB_20160706 |
| Krista | Beyer | 000561_BeyerK_20161101 |
| Rosemary | Bilchak | 000500_BilchakR_20161031 |
| | | 000500_BilchakR_20161031 |
| Michael | Bilicko | 000046_BilickoM_20160720 |
| Sarah | Bishop | 000451_BishopB_20161031 |
| Dan | Blackwell | 000174_BlackwellD_20160927 |
| Lauren | Blair | 000580_BlairL_20161101 |
| Boyd | Boland | 000410_BolandB_20161027 |

BLM_0165892

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Eugenia | Bone | 000124_BoneE_20160909 |
| Andrea | Borghi | 000086_BorghiB_20160727 |
| Jeanne | Bradbury | 000139_BradburyJ_20160911 |
| David | Bradford | 500147_BradfordD_20161008 |
| Laurie | Brandt | 000452_BrandtL_20161101 |
| Elaine | Brett | 000157_BrettE_20161018 |
| | | 000158_BrettE_20161018 |
| | | 000159_BrettE_20161018 |
| | | 000160_BrettE_20161018 |
| | | 500186_BrettE_20161001 |
| Jim | Brett | 000184_BrettJ_20161017 |
| H | Briggs | 500087_BriggsH_20161101 |
| Hal | Brill | 000283_BrillH_20161031 |
| Dave | Bristow | 500053_BristowD_20161101 |
| Joanie | Bronfman | 000035_BronfmanJ_20160630 |
| Alan | Brown | 000362_BrownA_20161029 |
| Sam | Brown | 000214_BrownS_20161011 |
| | | 000215_BrownS_20161011 |
| | | 000354_BrownS_20161031 |
| Ralph | Browning | 000068_BrowningR_20160727 |
| Ron | Bruce | 000019_BruceR_20160607 |
| | | 000100_BruceR_20160730 |
| Bill | Brueggeman | 500080_BrueggemanB_20161022 |
| Michael | Bryant | 000094_BryantM_20160728 |
| Joe | Bullock | 500264_BullockJ_20161101 |
| Karl | Burns | 000346_BurnsK_20161030 |
| Art | Burrows | 500036_BurrowsA_20161101 |
| Helen | Bushnell | 000605_BushnellH_20161021 |
| Kent | Campbell | 000150_CampbellK_20160930 |
| Randy | Campbell | 000503_Campbell_20161029 |
| | | 000503_Campbell_20161029 |
| Sharon | Campbell | 000503_Campbell_20161029 |
| Mike | Campo | 500019_CampoM_20161101 |
| Hugh | Carey | 500226_CareyH_20161101 |
| | Carlson | 000003_Carlson_20160604 |
| | | 000063_Carlson_20160727 |
| | | 000172_Carlson_20160929 |
| Nancy | Carlson | 500182_CarlsonN_20161020 |
| Jacquie | Carpenter | 000337_CarpenterJ_20161031 |
| John | Carpenter | 000248_CarpenterJ_20161005 |
| Nicole | Carpenter | 000453_CarpenterN_20161031 |
| Scott | Carpenter | 000162_CarpenterS_20161014 |

BLM_0165893

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Danielle | Carre | 000304_CarreD_20161023 |
| Lynn | Carroll | 000632_CarrollL_20161031 |
| Robyn | Cascade | 000269_CascadeR_20161028 |
| | | 500168_CascadeR_20161024 |
| Christopher | Caskey | 000357_CaskeyC_20161031 |
| Shannon | Castle | 000384_CastleS_20161029 |
| Sara | Castro | 500006_CastroS_20161101 |
| Andrew | Cesati | 000228_CesatiA_20161019 |
| Judith | Chamberlin | 000370_ChamberlinJ_20161029 |
| | | 500116_ChamberlinJ_20161101 |
| Julie | Chambers | 500020_ChambersJ_20160808 |
| Celeste Hill | Chambliss | 500188_HillC_20161101 |
| Jenny | Chapin | 000303_ChapinJ_20161027 |
| Janet | Chapman | 500172_ChapmanJ_20161022 |
| Giobbi | Charles | 000134_GiobbiC_20160910 |
| Jennifer | Chavez | 500170_ChavezJ_20161028 |
| Leonard | Chmiel | 000413_ChmielL_20161031 |
| Rita | Clagett | 000633_ClagettR_20161025 |
| | | 000634_ClagettR_20161101 |
| Eddie | Clement | 000491_ClementE_20161031 |
| Britten | Cleveland | 500007_ClevelandB_20161101 |
| B | Coda | 000261_CodaB_20161030 |
| James | Coffee | 000071_CoffeeJ_20160727 |
| Marilyn | Colyer | 000023_ColyerM_20160608 |
| David | Congour | 000241_CongourD_20161025 |
| | | 000417_ConjourD_20161031 |
| Peter | Cook | 000079_CookP_20160727 |
| Mike | Coombs | 000096_Coombs_20160729 |
| Matt | Cooper | 000015_CooperM_20160607 |
| David | Cordell | 000149_CordellD_20161013 |
| Carla | Cote | 000223_CoteC_20161025 |
| Tamara K | Cova | 000567_CovaT_20161031 |
| John | Cowell | 000569_CowellJ_20161031 |
| Judy | Coyle | 500158_CoyleJ_20161020 |
| James | Crafton | 000058_CraftonJ_20160727 |
| Anateya | Cranson | 500179_CransonA_20161028 |
| Jeff | Cristol | 000418_CristolJ_20161031 |
| Don | Croasdale | 000022_CroasdaleD_20160607 |
| Bill | Crompton | 000263_CromptonB_20161028 |
| William | Crompton | 000617_CromptonW_20161101 |
| Lindsay E | Cusack | 000568_CusackL_20161029 |
| Roy | Dakroub | 000047_DakroubR_20160727 |

BLM_0165894

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Chris | Dalbow | 500054_DalbowC_20161101 |
| Ralph | D'Alessandro | 000548_D'Alessandro_20161101 |
| Shari | Dangremond | 500237_DangremondS_20161101 |
| Steve | Dann | 000074_DannS_20160727 |
| Steve | Danuff | 500031_DanuffS_20161024 |
| Kathy | Datsko | 000036_Datsko_20160702 |
| Robert | Datsko | 500132_DatskoR_20160823 |
| Chris | Davies | 500092_DaviesC_20161101 |
| Ellen | Davis | 000110_DavisE_20160804 |
| Jeff | Davis | 000016_DavisJ_20160607 |
| Philip | Davis | 000236_DavisP_20161016 |
| | | 000619_DavisP_20161101 |
| Tom | Davis | 000048_DavisT_20160727 |
| Donald | Davol | 000302_DavolD_20161031 |
| Bill | Day | 000549_DayB_20161101 |
| | | 500118_DayB_20161101 |
| Durfee | Day | 000505_DayD_20161102 |
| Katie | Dean | 000419_DeanK_20161101 |
| Eunice | Deering | 000163_DeeringE_20161013 |
| Patricia | Del Tredici | 000338_TrediciP_20161028 |
| Rick | Dellenbach | 000143_DellenbachR_20160920 |
| Betty | Dickman | 000145_DickmanB_20161013 |
| Bryan | Diehl | 500258_DiehlB_20160808 |
| Rick | Dimick | 000507_DimickR_20161101 |
| Ronald | Dixon | 000089_DixonR_20160728 |
| Robert | Dobbs | 000076_DobbsR_20160727 |
| Dan | Dockray | 000044_DokrayD_20160713 |
| Melinda | Doden | 000385_DodenM_20161031 |
| Kayla | Dodson | 000182_DodsonK_20160927 |
| Patrick | Dooling | 000425_DoolingP_20161030 |
| Peter | Dooling | 000424_DoolingP_20161030 |
| Vince | Dougan | 000009_DouganV_20160606 |
| Gary | Douglass | 000025_DouglassG_20160609 |
| Michael | Drake | 000508_DrakeM_20161101 |
| Krista | Dudley | 500174_DudleyK_20161029 |
| Emma | Duke | 500049_DukeE_20161101 |
| Mark | Dutka | 000033_DutkaM_20160630 |
| C | Eastment | 000128_EastmentC_20160909 |
| Michael | Edson | 000220_EdsonM_SimmonsJ_20161010 |
| Jan | Simmons | |
| Sven | Edstrom | 000348_EdstromS_20161101 |
| Max | Eisele | 000426_EiseleM_20161028 |

BLM_0165895

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Steve | Ela | 000429_ElaS_20161101 |
| Susan | Ellinger | 000510_EllingerS_20161031 |
| Allison | Elliott | 000430_ElliotA_20161027 |
| Keith | Ellison | 500040_EllisonK_20160914 |
| Pamela | Ellison | 000431_EllisonP_20161031 |
| Dan | Elsner | 000245_ElsnerD_20160929 |
| Parker | Cushing | 500085_CushingP_20161101 |
| James | Eng | 000004_EngJ_20160606 |
| Mike | Erickson | 000088_EricksonM_20160727 |
| Gerald | Espinosa | 000432_EspinosaG_20161029 |
| Ernie | Etchart | 500137_EtchartE_20161031 |
| James | Etherton | 000052_EthertonJ_20160727 |
| Larry | Evans | 000141_EvansL_20160912 |
| Henry | Fair | 000256_WolfJ_20161030 |
| Cindy | Farny | 000620_FarnyC_20161101 |
| Jack | Ferrell | 500043_FerrellJ_20161101 |
| Adrian | Fielder | 000433_FielderA_20161029 |
| Kay | Findlay | 500157_FindlayK_20161002 |
| Georgia | Finnigan | 000239_FinniganG_20161026 |
| Dylan | Fixmer | 000113_FixmerD_20160809 |
| Daniel | Fonke | 000421_FonkeD_20161101 |
| | | 000422_FonkeD_20161101 |
| | | 000506_FonkeD_20161102 |
| Mike | Foster | 000202_FosterM_20160926 |
| Christine | Frank | 500145_FrankC_20160808 |
| Jim | Frank | 000026_FrankJ_20160614 |
| Roberta | Frank | 000378_FrankR_20161031 |
| Nancy | Franklin | 500189_FranklinN_20161025 |
| | Frann | 000630_Frann_20151005 |
| Paul | Frazier | 000195_FrazierP_20160923 |
| Andrew | Frishman | 000249_FrishmanA_20161013 |
| Todd | Fugate | 500030_FugateT_20160302 |
| Ben | Furimsky | 000512_FurimskyB_20161031 |
| Adam | Gall | 500155_GallA_20160914 |
| Tim | Gallegos | 000435_GallegosT_20161031 |
| Ryan | Gannaway | 500038_GannawayR_20161101 |
| | | 000042_GannawayR_20160713 |

BLM_0165896

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Alison | Gannett | 000121_GannettA_20160826 |
| | | 000164_GannettA_20160930 |
| | | 000170_GannettA_20161005 |
| | | 000178_GannettA_20161016 |
| | | 000276_GannettA_20161031 |
| | | 000349_GannettA_20161031 |
| | | 000360_GannetA_20161031 |
| | | 000367_GannettA_20161031 |
| | | 000494_GannettA_20161031 |
| Lisa | Ganora | 000193_GanoraL_20161008 |
| | | 000331_Ganoral_20161027 |
| Jim | Garber | 000027_GarberJ_20160615 |
| Jeremiah Paul | Garcia | 000513_GarciaJ_20161101 |
| | Garth | 000201_Garth_20160929 |
| Stan | Garvey | 500064_GarveyS_20160621 |
| Jonathan | Gates | 000436_GatesJ_20161031 |
| Kathleen | Gates | 000340_GatesK_20161030 |
| John | Gavan | 000380_GavanJ_20161031 |
| Paul J. | Gaydos | 500204_GaydosP_20161026 |
| Chris | Gentry | 000437_GentryC_20161028 |
| Rosie | Gentry | 000152_GentryR_20161014 |
| Elizabeth | Germain | 000083_GermainA_20160727 |
| Katherine | German | 000485_GermanK_20161030 |
| Mitchell | Gershten | 000398_GershtenM_20161031 |
| Gretta | Gibb | 000216_GibbG_20161026 |
| Ann | Gibson | 000369_GibsonA_20161030 |
| Beth | Gibson | 500071_GibsonB_20161101 |
| Helen | Gillespie | 000326_GillespieE_20161030 |
| Ty | Gillespie | 000327_GillespieT_20161030 |
| Maria | Pena | 000334_PenaM_20161031 |
| Ron | Gilley | 000085_GilleyR_20160727 |
| Bob | Gleason | 000341_GleasonB_20161028 |
| | | 000347_GleasonB_20161028 |
| Helen | Goldberg | 500056_GoldbergH_20161101 |
| Andrew | Goldman | 000257_GoldmanA_20161026 |
| | | 000438_GoldmanA_20161031 |
| | | 500073_GoldmanA_20161101 |
| | | 500074_GoldmanA_20161101 |
| | | 500093_GoldmanA_20161101 |
| | | 500099_GoldmanA_20161101 |
| | | 500126_GoldmanA_20161101 |
| Elena | Goldstein | 000484_GoldsteinE_20161030 |

BLM_0165897

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Ben | Graves | 000439_GravesB_20161101 |
| Ben | Graves | 000571_GravesB_20161101 |
| Eddie | Gray | 000041_GrayE_20160712 |
| Joan | Green | 500206_GreenJ_20161101 |
| Robert | Green | 500025_GreenR_20161101 |
| Patricia Lewis | Groome | 500041_GroomeP_20160920 |
| Jacqueline | Gulick | 000495_GulickJ_20161031 |
| Steve | Gulick | 000350_GulickS_20161031 |
| Russ | Gunnard | 000065_GunnardJ_20160727 |
| Brett | Guthrie | 000253_GuthrieB_20160929 |
| Jane | Haefner | 500102_HaefnerJ_20161101 |
| | | 500122_HaefnerJ_20161101 |
| Dennis D | Hais | 500057_HaisD_20161101 |
| Brian | Hall | 000146_HallB_20160929 |
| Tina | Hall | 500127_HallT_20161101 |
| Lesley | Hallenborg | 500072_HellenborgL_20161101 |
| Darell | Hammond | 000234_HammondD_20161029 |
| Tom | Hanel | 000111_HanelT_20160805 |
| Kay | Hannah | 500034_HannahK_20161022 |
| Chris | Hardy | 000039_HardyC_20160711 |
| Robert | Hardy | 000459_HardyR_20161027 |
| Greg | Harper | 000012_HarperG_20160606 |
| Steven | Harper | 000270_HarperS_20161023 |
| Bill | Harris | 000230_HarrisB_20161019 |
| Mark | Harris | 000190_HarrisM_20161024 |
| Mary Ellen | Harte | 000339_HarteM_20161028 |
| Charles | Hatten | 000051_HattenM_20160727 |
| Bernie | Heideman | 500131_HeidemanB_20161027 |
| Brent | Helleckson | 000383_HellecksonB_20161031 |
| Ambalila | Hemsell | 500009_HemsellA_20161101 |
| | | 500221_HemsellA_20161101 |
| Susan | Henderson | 000244_HendersonS_20161024 |
| Claudia | Henshall | 000550_HenshallC_20161101 |
| Matt | Hepp | 000151_HeppM_20161011 |
| John | Hess | 000284_HessJ_20161028 |
| Enno | Heuscher | 500105_HeuscherE_20161101 |
| | | 500109_HeuscherE_20161101 |
| Pauline | Heuscher | 500250_HeuscherP_20161028 |
| Carol | Hiatt | 000434_HiattC_20161028 |
| Nina | Hiatt | 500028_HiattN_20161028 |
| Carol | Hickam | 000226_HickamC_20161025 |
| | | 000442_HickamC_20161028 |

BLM_0165898

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Jon | Hickam | 000296_HickamJ_20161028 |
| Nelly | Higginbotham | 000579_HigginbothamN_20160606 |
| Cynthia | Hines | 000197_HinesC_20161018 |
| Todd and Cynthia | Hines | 000300_HinesT_20161031 |
| David | Hiney | 500015_HineyD_20161027 |
| Lasca | Hix | 000314_HixL_20161022 |
| Mary | Hockenbery | 000399_Hockenbery_20161028 |
| James | Hodge | 000329_HodgeJ_20161031 |
| Theodore | Hogan | 000056_HoganT_20160727 |
| Debroah | Holder | 500037_HolderD_20160915 |
| Stephen | Hornback | 000189_HornbackS_20161020 |
| Craig | Howell | 000255_HowellC_20161031 |
| Tom | Huber | 000242_HuberT_20161011 |
| Heidi | Hudek | 000387_HudekH_20161101 |
|  |  | 000516_HukekH_20161101 |
| Graeme | Hunt | 000211_HuntG_20161016 |
| Lucy | Hunter | 000260_HunterL_20161028 |
| Susan | Husch | 500029_HuschS_20161020 |
| Deb | Imlah | 500160_ImlahD_20160808 |
| Calvin | Inda | 500153_IndaEtAl_20161101 |
| Juan | Inda |  |
| Bonnie | Inouye | 000271_InouyeB_20161029 |
| Brian | Inouye | 000279_InouyeB_20161028 |
| David | Inouye | 000318_InouyeD_20161031 |
|  |  | 000400_InouyeD_20161028 |
| Kevin | Inouye | 000443_InouyeK_20161031 |
| Austin | Jackson | 000106_JacksonA_20160802 |
| Samantha | Jackson | 000107_JacksonS_20160803 |
| Scott | Jackson | 000105_JacksonG_20160802 |
|  | Jalop | 000631_Jalop_20161006 |
| Erin | Jameson | 000275_JamesonE_20161031 |
| John | Janus | 000227_JanusJ_20161019 |
|  |  | 000445_JanusJ_20161031 |
| Paul | Janzen | 000203_JanzenP_20160926 |
| Aaron | Jerad | 000615_JeradA_20161027 |
| Ulli Lir | Jesse | 500106_JesseU_20161101 |
| Ulli Sir | Jesse | 000281_SirJesseU_20161031 |
| Darynne | Jessler | 000109_JesslerD_20160804 |
| Marce | Jessop | 000014_JessopM_20160607 |
| Jennifer | Johnson | 500223_JohnsonJ_20161101 |
| Mick | Johnson | 000414_JohnsonM_20161031 |

BLM_0165899

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Philip | Johnson | 000177_JohnsonP_20160930 |
| Buck | Jones | 500213_JonesB_20161101 |
| David | Jones | 000517_JonesD_20161029 |
| David L. | Jones | 500115_JonesD_20161101 |
| Susan | Jones | 500058_JordanS_20160826 |
| Coby | Jordan | 500035_JordanC_20161022 |
| Lucor | Jordan | 000333_JordanL_20161030 |
| Brucc | Joss | 500002_JossB_20161016 |
| Mary | Jursinovic | 000336_JursinovicM_20161012 |
| | | 000551_JursinovicM_20161031 |
| Patti | Kaech | 500146_KaechP_20160809 |
| Anastacia | Kampe | 500187_KampeA_20161018 |
| Kristen | Keenan | 500202_KeenanK_20161013 |
| Susan | Keenan | 500063_KeenanS_20160622 |
| Zack | Kelley | 500084_KelleyZ_20161101 |
| Scott | Kellogg | 000154_KelloggS_20161016 |
| Viva | Kellogg | 000559_KelloggV_20161030 |
| | | 000560_KelloggV_20161016 |
| Jane | Kelso | 000165_KelsoJ_20160913 |
| April | Kennedy | 500149_KennedyA_20161028 |
| Cody | Kennedy | 000049_KennedyC_20160727 |
| Marc | Kenny | 000391_KennyM_20161028 |
| Mary | Kenosian | 000200_KenosianM_20161014 |
| Alison | Kerr | 500061_KerrA_20160921 |
| Daniel | Keuning | 000166_KeuningD_20160930 |
| Jim | Kilpatrick | 000175_KilpatrickJ_20160929 |
| Dale | Kinkade | 000090_KinkadeD_20160728 |
| Mark | Kirchhoefer | 000171_KirchhoeferM_20160930 |
| Kristina | Kittelson | 000389_KittelsonK_20161030 |
| John | Klausner | 000179_KlausnerJ_20160929 |
| Amber | Kleinman | 000206_Kleinman_20161025 |
| Katie | Klingsporn | 000446_KlingspornK_20161101 |
| Michael | Knox | 000101_KnoxM_20160801 |
| David | Knutson | 000280_KnutsonD_20161029 |
| Pete | Kolbenschlag | 000552_KolbenschlagP_20161101 |
| | | 500199_KolbenschlagP_20160622 |
| | | 500252_KolbenschlagP_20160811 |
| Stu | Krebs | 500070_KrebsS_20161101 |
| Corbett | Kroehler | 500205_KroehlerC_20161008 |
| Laura | Kunkel | 500032_KunkelL_20161021 |
| Elene | L | 500266_EleneL_20161101 |
| Shawn | LaBounty | 000518_LaBountyS_20161101 |

BLM_0165900

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Paul | Lamar | 000463_LamarP_20161101 |
| Dennis | Lane | 000392_LaneD_20161030 |
| Ulrich | Lange | 500184_LangeU_20161027 |
| Eliza | Large | 000168_LargeE_20161006 |
| Bob | Lario | 000306_LarioB_20161023 |
| Paul | Larmer | 000320_LarmerP_20161101 |
| Jackie | Larson | 000082_LarsonJ_20160727 |
| Densie | Laverty | 500027_LavertyD_20161026 |
| Tamara | Lawhorn | 000635_LawhornT_20161028 |
| Natasha | Leger | 000519_LegerN_20161102 |
| Justine | Lerkozyk | 500227_LerkozykL_20161101 |
| Ethel | Leslie | 000112_LeslieE_20160809 |
| Geoffrey | Levens | 000028_LevensG_20160618 |
| | | 000029_LevensG_20160618 |
| Sid | Lewis | 500014_LewisS_20161101 |
| Lloyd | Liebetrau | 000127_LiebtrauL_20160902 |
| Elizabeth | Lilien | 000104_LilienE_20160802 |
| Elizabeth | Lilien | 000225_LilienE_20161003 |
| Linda | Lindsey | 000520_LindseyL_20161031 |
| Dennis | Lineberry | 000067_LineberryD_20160727 |
| Christopher | Lish | 000448_LishC_20161101 |
| Matt | Livingston | 000167_LivingstonM_20160930 |
| Darin | Locke | 000005_LockeD_20160606 |
| Jason | Love | 000553_LoveL_20161101 |
| Jere | Lowe | 000521_LoweJ_20161101 |
| Kathie | Lower | 500076_LowerK_20161101 |
| Drew | Ludwig | 000064_Ludwid_20160727 |
| Peggy | Lyon | 500083_LyonP_20161101 |
| Kate | Mabry | 000204_MabryK_20161024 |
| Megan | MacMillan | 000361_MacMillanM_20161101 |
| Malinda | Magnum | 000080_Magnum_20160727 |
| Cynthia | Malleck | 000464_MalleckC_20161101 |
| Laurence | Mammoser | 000207_MammoserL_20161026 |
| Donna | Maniscalco | 000098_ManiscalcoD_20160730 |
| Ron | Mansour | 000087_MansourR_20160727 |
| Faith | Markell | 500023_MarkellF_20161101 |
| Jeffrey | Markewich | 000233_MarkewichJ_20160929 |
| Sarah | Marshall | 000262_MarshallS_20161027 |
| Betsy | Marston | 500024_MarstonB_20161011 |
| Ed | Marston | 000497_MarstonE_20161101 |
| Matt | Masciocchi | 500010_MasciocchiM_20161101 |
| Melanie | Matteliano | 000274_MattelianoM_20161031 |

BLM_0165901

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Annemarie | Maynard | 000018_MaynardA_20160607 |
| James | McCain | 500203_McCainJ_20161025 |
| Stacy | McCulloch | 000122_McCullochS_20160830 |
| Tracy | McCurdy | 000572_McCurdy_20161101 |
| Jane | McGarry | 000465_McGarryJ_20161101 |
| | | 500111_McGarryJ_20161101 |
| Rick | McGavin | 000466_McGavinR_20161031 |
| Joseph | McGill | 000120_McGillJ_20160820 |
| Eugenie | McGuire | 000467_McGuireO_20161031 |
| Scott | McIntire | 000073_McIntireS_20160727 |
| Gail | Srebnik | 000117_SrebnikG_20160815 |
| David | Meade | 500114_MeadeD_20161101 |
| Allison | Melton | 000523_MeltonA_20161101 |
| Prima | Merry | 500253_MerryP_20161101 |
| Laurie | Milford | 000524_MilfordL_20161101 |
| Linda | Miller | 000468_MillerL_20161031 |
| Rob | Miller | 500254_MillerR_20161027 |
| Sandy | Miller | 500159_MillerS_20161101 |
| Tara | Miller | 000372_MillerT_20161027 |
| Eileen | Milvenan | 000186_ScotJ_MilvenanE_20161024 |
| | | 000293_MilvenanE_20161022 |
| | | 000469_MilvenanE_20161025 |
| J. Scot | Milvenan | 500244_MilvenanJ_20160801 |
| Helen | Mitas | 000251_MitasH_20161022 |
| Marissa | Mommaerts | 000554_MommaertsM_20161101 |
| Claire | Moore | 500013_MorreC_20161027 |
| James | Moran | 000053_MoranJ_20160727 |
| Morgan | Morehart | 000077_MorehartM_20160727 |
| Leah | Morris | 000594_MorrisL_20161028 |
| Steve | Morris | 000593_MorrisS_20161028 |
| Geoff | Morton | 500167_MortonG_20161015 |
| | | 500210_MortonG_20161015 |
| Rossann | Mosher | 000153_MosherR_20160928 |
| Peter | Mueller | 000381_MuellerP_20161031 |
| Sue | Navy | 000526_NavyS_20161101 |
| Alexandra | Neil | 000135_NeilA_20160910 |
| Robin | Nicholoff | 000555_NicholofR_20161101 |
| Keith | Nichols | 500175_NicholsS_20161027 |
| Sydney | Nichols | 500175_NicholsS_20161027 |
| Jake | Niece | 000527_NieceJ_20161101 |
| David | Noe | 000471_NoeD_20161101 |
| Greg | Norris | 000528_NorrisG_20161101 |

BLM_0165902

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Colin | Obrien | 000636_OBrianC_20151101 |
| Ian | Oeser | 000382_OeserI_20161024 |
| Helen | Olivier | 500113_OlivierH_20161101 |
| Robert | Olivier | 500121_OlivierR_20161101 |
| Dennis | Olmstead | 000254_OlmsteadD_20161028 |
| Joe | Olszewski | 000060_OlszewskiJ_20160727 |
| Elizabeth | O'Reilly | 000224_O'ReillyE_20161019 |
| Karen | Ortiz | 000557_OrtizK_20161101 |
| Patrick | O'Shaughnessy | 000556_OShaughnessyP_20161031 |
| Lee | Overton | 5000162_OvertonL_20161018 |
| Lisa | Paris | 000055_ParisL_20160727 |
| James | Pasterz | 000024_PasterzJ_20160608 |
| | | 000144_PasterzJ_20160929 |
| Cynthia | Patterson | 000581_PattersonC_20161016 |
| | | 000583_PattersonC_20161009 |
| | | 000584_PattersonC_20161005 |
| | | 000637_PattersonC_20161031 |
| | | 000645_PattersonC_20160728 |
| | | 000582_PattersonC_20161014 |
| Nissa | Patterson | 000192_PattersonN_20161024 |
| Deborah | Paulson | 000529_PaulsonD_20161101 |
| Mark | Pearson | 000213_PearsonM_20161025 |
| Erica | Pelland | 500161_PellandE_20160803 |
| Bob | Pennetta | 000316_PennettaB_20161031 |
| Robert | Pennetta | 000470_PennettaR_20161026 |
| Petrika | Peters | 500069_PetersP_20161101 |
| Sarah | Peterson | 500267_PetersonS_20161101 |
| Jonathan B | Phipand | 500089_PhipandJ_20161101 |
| MJ | Pickett | 000573_PickettM_20161031 |
| Carol | Pierce | 000475_PierceC_20161030 |
| John | Pietsch | 000116_PietschJ_20160815 |
| Polci | Piottin | 500018_PiottinP_20161101 |
| Marlyn | Pitterle | 500178_PitterleM_20161028 |
| Thomas | Pitterle | 500139_PitterleT_20161028 |
| Neal | Platzer | 500154_PlatzerN_20161101 |
| | | 500078_PlatzerN_20161101 |
| Elizabeth | Plummer | 500060_PlummerE_20161101 |
| Hortense | Plummer | 500042_PlummerH_20161101 |
| Sarah | Pope | 000638_PopeS_20161031 |
| Tom | Powers | 000478_ShannonL_20161031 |
| David | Price | 500107_PriceJ_20161101 |
| Jon | Prince | 000148_PrinceJ_20160930 |

BLM_0165903

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Justin | Pritchard | 000252_PritchardJ_20161014 |
| Peter | Pruett | 000359_Pruett_20161027 |
| Jean | Public | 000001_PublicJ_20160604 |
| Dennis | Pungitore | 000002_PungitoreD_20160606 |
| Arron | Purlee | 500086_PurleeA_20161101 |
| Wayne | Quade | 500065_QuadeW_20161101 |
| | | 500066_QuadeW_20161101 |
| | | 500067_QuadeW_20161101 |
| Terence | Quinn | 000250_QuinnT_20160929 |
| Beth | Raboin | 000575_RaboinB_20161031 |
| Dawn | Rains | 500048_RainsD_20161101 |
| Cameron | Raleigh | 000189_RaleighC_20161010 |
| Chuck | Raleigh | 000198_RaleighC_20161010 |
| Terry | Randall | 500103_RandallT_20161101 |
| | | 500120_RandallT_20161101 |
| Renata | Raziano | 000531_RazianoR_20161028 |
| Cory | Reese | 000345_ReeseC_20161027 |
| Heidi | Reese | 000258_ReeseC_20161024 |
| Sam | Reeve | 000072_ReeveS_20160727 |
| Susan | Reeyes | 500098_ReeyesS_20161101 |
| Melissa | Rehfeldt | 500262_RehfeldtM_20160808 |
| Maddie | Rehn | 000577_RehnM_20161023 |
| Belinda | Reich | 500047_ReichB_20161101 |
| Katie | Reily | 000115_ReileyK_20160811 |
| George | Reinhardt | 000330_ReinhardtG_20161028 |
| Larry | Rerucha | 000093_ReruchaL_20160728 |
| Daniel | Reuter | 000013_ReuterD_20160607 |
| Tom | Reyburn | 000021_ReyburnT_20160607 |
| Jim | Richardson | 500059_RichardsonJ_20161101 |
| Jim | Riddell | 000533_RiddellJ_20161101 |
| Josh | Roberts | 000639_RobertsJ_20161027 |
| Leigh | Robertson | 000476_RobertsonL_20161101 |
| Amy | Rocess | 500230_RocessA_20161101 |
| Arnold | Rochlin | 000621_RochlinA_20161101 |
| Shelly | Rodgers | 500079_RodgersS_20161101 |
| Joyce | Rodriguez | 000132_RodriguezJ_20160831 |
| | | 000196_RodriguezJ_20160831 |
| Rudy | Rodriguez | 000196_RodriguezJ_20160831 |
| John | Rogan | 500212_RoganJ_20161101 |
| Mary | Rogen | 500219_RogenM_20161101 |
| M | Rogers | 000363_RogersM_20161031 |
| Jessica | Rohrig-Thrift | 500026_RohrigThriftJ_20161025 |

BLM_0165904

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Tom | Ropkoski | 000119_RipkoskiT_20160820 |
| Leah | Rorick | 000185_RorickL_20161019 |
| Lori Ann | Rose | 000180_RoseH_20160921 |
| | | 000181_RoseL_20160921 |
| Charles | Ross | 000062_RossC_20160727 |
| Morgan | Rubanow | 000217_RubanowM_20161026 |
| Greg | Rudowsky | 500097_Rudowsky_20161101 |
| Jeff | Ruppert | 000576_Ruppert_20161015 |
| Chason | Russell | 000535_RussellC_20161101 |
| James | Russell | 000268_RussellJ_20161030 |
| John | Rybon | 000006_RybonJ_20160606 |
| Robin | Sabatke | 000259_SabatkeR_20161026 |
| Jake | Sakson | 500140_SaksonJ_20161101 |
| Philip | Salembier | 500209_SalembierP_20161010 |
| Jen | Sanborn | 000264_SanbornJ_20161031 |
| | | 000416_SanbornJ_20161027 |
| Cody | Sanders | 000078_SandersC_20160727 |
| Shevy | Schenk | 500068_SchenkS_20161101 |
| Rachel | Schmitzer | 000365_SchmitzerR_20161031 |
| John | Schnaderbeck | 000095_SchnaderbeckJ_20160728 |
| James | Schott | 000536_SchottJ_20161031 |
| Mark | Schuler | 000084_SchulerM_20160727 |
| Jon | Schulz | 500192_SchulzJ_20161027 |
| Jim | Schwartz | 500104_SchwartzJ_20161101 |
| | | 500125_SchwartzJ_20161101 |
| | | 500095_SchwartzJ_20161101 |
| Neal | Schwieterman | |
| | | 000602_SchwietermanN_20161024 |
| Karl | Schwinn | 000243_SchwinnK_20160922 |
| Clee | Sealing | 000191_SealingC_20161024 |
| Jesse | Seelhoff | 000020_SeelhoffJ_20160607 |
| Faith | Sendecki | 500062_SendeckiR_20160706 |
| Laurie | Shannon | 000478_ShannonL_20161031 |
| | | 500081_ShannonL_20161101 |
| | Sheehan | 000254_SheehanW_20161019 |
| Randall | Shepard | 000368_ShepardR_20161026 |
| Luke | Shipley | 000147_ShipleyL_20160929 |
| Dave | Shishim | 000140_Shishim_20160911 |
| Margaret | Shishim | 000142_ShishimM_20160911 |
| Scott | Shishim | 000538_ShishimS_20161101 |
| Tim | Shortell | 000374_ShortellT_20161021 |
| | | 500232_ShortellT_20161101 |

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Bert | Sibley | 000640_SibleyB_20161015 |
| Jan | Simmons | 000220_EdsonM_SimmonsJ_20161010 |
| Fred | Simon | 500096_SImonF_20161101 |
| George | Sjaardema | 000066_Sjaardema_20160727 |
| Michael | Skoko | 000377_SkokoM_20161019 |
| | | 000540_SkokoM_20161102 |
| Frank | Smith | 000010_SmithF_20160606 |
| Jean | Smith | 000187_SmithJ_20161024 |
| Joe | Smith | 000061_SmithJ_20160621 |
| | | 000061_SmithJ_20160621 |
| Mary | Smith | 000294_SmithM_20161031 |
| | | 000335_SmithM_20161031 |
| Paige | Smith | 000603_SmithP_20161024 |
| | | 000641_SmithP_20161102 |
| Robin | Smith | 000480_SmithR_20161028 |
| Jamie | Sorensen | 000017_SorensenJ_20160607 |
| | | 000091_Sorenson J_20160728 |
| Michael | Soule | 000266_SouleM_20161025 |
| Regina | Sowell | 500075_SowellR_20161101 |
| Jon | Spar | 000031_SparJ_20160624 |
| Witt | Sparks | 000390_SparksW_20161027 |
| Donna | Spencer | 500001_SpencerD_20161013 |
| Nathan | Sponseller | 000541_SponsellerN_20161031 |
| Gail | Srebnik | 000117_SrebnikG_20160815 |
| Mary | Stahl | 500156_StahlM_20160729 |
| Alice | Stanley | 000030_StanleyA_20160623 |
| Deborah | Steckley | 000161_SteckleyD_20161026 |
| Bruce | Steffens | 000123_SteffensB_20160831 |
| Kris | Steffens | 000210_SteffensK_20161004 |
| Martin | Steitz | 500249_SteitzM_20160910 |
| Jim | Stephenson | 500119_StephensonJ_20161101 |
| Chris | Stillman | 000008_StillmanC_20160606 |
| Marilyn | Stone | 000301_StoneM_20161031 |
| | | 500255_StoneM_20161101 |
| Emma | Stopher-Griffin | 500173_StopherGriffinE_20161019 |
| Brian | Stratton | 000358_StrattonB_20161029 |
| Daniel | Stright | 000108_StraightD_20160803 |
| Perry | Strongfellow | 500044_StrongfellowP_20161025 |
| Jon | Strother | 000057_StrotherJ_20160727 |
| James | Sullivan | 000136_SullivanJ_20160910 |
| Sharon | Sullivan | 500224_SullivanS_20161101 |

BLM_0165906

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Phyllis | Swackhamer | 000355_SwackhamerP_20161031 |
| | | 000542_SwackhamerP_20161101 |
| | | 000642_SwackhamerP_20161101 |
| Kim | Sweitzer | 000481_SweitzerK_20161031 |
| Lance | Swigart | 500152_SwigartL_20161027 |
| Dale | Tanaka | 000045_TankaD_20160714 |
| Michael K. | Tarbell | 000543_TarbellM_20161101 |
| Carolyn | Taylor | 500256_TaylorC_20160808 |
| George | Taylor | 000007_TaylorG_20160606 |
| Ray | Taylor | 500128_TaylorR_20161101 |
| Samara | Taylor | 000616_TaylorS_20161031 |
| Sherrion | Taylor | 500165_TaylorS_20161004 |
| | | 500257_TaylorS_20160808 |
| Bill | Tembrock | 500124_TembrockB_20161101 |
| Luke R | Tembrock | 000404_TembrockL_20161031 |
| William | Tembrock | 500130_TembrockW_20160707 |
| Clinton | Terhune | 500022_TerhuneC_20160808 |
| Naolani | Terry | 500100_TerryN_20161101 |
| | | 500077_TerryN_20161101 |
| Fred | Thompson | 000011_ThompsonF_20160606 |
| Greg | Thompson | 000373_ThompsonG_20161030 |
| Kathy | Thompson | 000544_ThompsonK_20161101 |
| Janice | Thorup | 000125_ThorupR_20160902 |
| | | 000232_ThorupJ_20160902 |
| | | 500033_ThorupJ_20161003 |
| Billy | Traynor | 000173_TraynorB_20161010 |
| Debora | Trowbridge | 500110_TrowbridgeD_20161101 |
| | | 500088_TrowbridgeD |
| Mary | Trumble | 500046_TrumbleM_20160923 |
| Eric | Twitty | 500003_TwittyE_20161014 |
| Glenn | Van Oss | 000081_VanOss_20160727 |
| Jan | van West | 500123_VanWestJ_20161101 |
| | | 500090_VanWestJ_20161101 |
| Rein | van West | 000265_VanWestR_20161019 |
| | | 500117_VanWestR_20161101 |
| | | 500094_VanWestR_20161101 |
| Kenneth | Vaught | 000237_VaughtK_20161004 |
| Phil | Volckhausen | 000043_VolckhausenP_20160713 |
| Meis | von Jesse | 500082_JesseN_20161101 |
| L | Vorys | 500180_VorysL_20161101 |
| Jon | Wade | 000040_WadeJ_20160712 |
| Mark | Walsh | 500242_WalshM_20161101 |

BLM_0165907

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Patricia | WalshOenick | 000427_WalshOenickP_20161031 |
| Mark | Waltermire | 000546_WaltermireM_20161101 |
| Fredrika | Ward | 500008_WardF_20161101 |
| Virginia | Warner | 000039_WarnerV_20160912 |
| David | Warren | 000578_WarrenD_20161101 |
| Phil | Wassell | 000130_WassellP_20160903 |
| Michael | Webb | 500055_WebbM_20161101 |
| Brian | Wegner | 000643_WegnerB_20161101 |
| | | 500261_WegnerB_20161101 |
| Bruce | Wegner | 000376_WegnerB_20161030 |
| Doris | Wehrmacher | 000238_WehrmacherD_20161018 |
| | | 000305_WehrmacherD_20161027 |
| | | 000307_WehrmacherD_20161024 |
| | | 000343_WehrmacherD_20161028 |
| | | 000364_WehrmacherD_20161027 |
| William | Weinberger | 000156_WeinbergerW_20160920 |
| Trudy | Welty | 500171_WeltyT_20161028 |
| Ruth | Wentzel | 000169_WentzelR_20160906 |
| | | 000585_WentzelR_20160906 |
| Goris | Werhmacher | 500191_WehrmacherG_20161016 |
| Callie | West | 500052_WestC_20160930 |
| | | 500144_WestC_20161030 |
| Lynn | Whipple | 000592_WhippleL_20161101 |
| Laurie | White | 000188_WhiteL_20161020 |
| Roger | Wickham | 000118_WickhamR_20160815 |
| John | Wiener | 000604_WienerJ_20161031 |
| Cynthia | Wilcox | 000574_WilcoxC_20161031 |
| Wesley Duke | William | 000114_DukeW_20160811 |
| Gar | Williams | 000075_WilliamsG_20160727 |
| Sheelagh | Williams | 500185_WilliamsS_20161027 |
| Sandra | Williamson | 000321_WilliamsonS_20161031 |
| Shirley | Wilsey | 000586_WilseyS_20160902 |
| Wayne | Wiltanen | 000496_WiltanenW_20161031 |
| Roberta | Winne | 000395_WinneR_20161031 |
| Earle | Wise | 500039_WiseE_20161101 |
| Randy | Witham | 000032_WitmanR_20160627 |
| Candy | Wither | 500201_WitherC_20160808 |
| | | 500259_WitherC_20160808 |
| Deirdre | Witherell | 000588_WitherillD_20161101 |
| Ben | Wolcott | 000488_WolcottB_20161031_HasAttach |
| Eli | Wolcott | 000509_WolcottE_20161102 |

BLM_0165908

| First Name | Last Name | Submission Number(s) |
|---|---|---|
| Steve | Wolcott | 000342_WolcottS_20161031 |
| | | 000587_WolcottS_20161031 |
| Kristina | Woodall | 000618_WoodallK_20161101 |
| Sue | Woodruff-Morton | 500166_WoodruffMortonS_20160915 |
| Lonnie | Woods | 000070_WoodsL_20160727 |
| Robert | Wrght | 500141_WrghtR_20160808 |
| Cynthia | Wutchiett | 000285_WutchiettC_20161027 |
| Laura | Yale | 000458_YaleL_20161028 |
| Chris | Yoder | 000246_YoderC_20161024 |
| Sandy | York | 500135_YorkS_20161101 |
| | | 500136_YorkS_20161101 |
| Christie | Young | 500004_YoungC_20161027 |
| Coy | Young | 000069_YoungC_20160727 |
| Millicent | Young | 000344_YoungM_20161027 |
| | | 000558_YoungM_20161031 |
| Monica | Zarley | 000490_ZarleyM_20161101 |
| Cynthia | Ziegler | 000229_ZieglerC_20161008 |
| | | 000351_ZieglerC_20161031 |

Note: Submissions with no name provided are not included here. Number of submissions differs from the number of commenters due to inclusion of more than one commenter on some submissions and more than one submission from some commenters.

**Table A-3**
**Form Letter Summary**

| Form Letter Identification | Initiating Organization (If Applicable) | Number of Submission Copies Received |
|---|---|---|
| A (two versions) | Pew Charitable Trust | 9,702 |
| B | Citizens for a Healthy Community | 1,752 |
| C | | 90 |
| D | Center for Biological Diversity | 559 |
| E | | 630 |
| F | EarthJustice | 24,004 |
| G | Western Slope Conservation Center | 102 |
| H | | 5,019 |
| I | WildEarth Guardians | 6,143 |
| J | | 37 |
| K | The Sierra Club | 1,422 |
| L | | 48 |
| M | | 6 |
| O | | 4 |
| P | | 6 |
| Q | | 38 |
| R | | 38 |
| S | | 67 |

BLM_0165909

| Form Letter Identification | Initiating Organization (If Applicable) | Number of Submission Copies Received |
|---|---|---|
| T | | 7 |
| U | | 9 |
| V | | 8 |
| W | | 2 |
| X | | 7 |
| Y | | 5 |
| Z | | 45 |
| AA | | 27 |
| BB | | 121 |
| CC | | 10 |
| DD | | 17 |
| EE | | 26 |
| FF | | 24 |
| GG | | 13 |
| HH | | 19 |
| II | | 29 |
| JJ | | 7 |
| KK | | 28 |
| LL | | 13 |
| MM | | 26 |
| NN | | 24 |
| OO | | 29 |
| PP | | 44 |
| QQ | | 7 |
| RR | | 5 |
| SS | | 5 |
| TT | | 10 |
| UU | | 10 |
| VV | | 30 |
| WW | | 17 |
| XX | | 27 |
| YY | | 8 |
| ZZ | | 28 |
| AAA | | 85 |
| BBB | | 28 |
| CCC | | 24 |
| DDD | | 58 |
| EEE | | 27 |
| FFF | | 28 |
| GGG | | 16 |
| HHH | | 24 |
| III | | 7 |
| JJJ | | 8 |
| LLL | | 105 |
| MMM | | 42 |

BLM_0165910

| Form Letter Identification | Initiating Organization (If Applicable) | Number of Submission Copies Received |
|---|---|---|
| NNN | | 56 |
| OOO | | 112 |
| PPP | | 7 |
| RRR | | 13 |
| SSS | | 7 |
| TTT | | 18 |
| UUU | | 2 |
| VVV | | 9 |
| WWW | | 11 |
| XXX | | 9 |
| YYY | | 2 |
| ZZZ | | 3 |
| AAAA* | | 31 |
| BBBB* | | 69 |
| CCCC* | | 24 |
| DDDD* | | 5 |
| EEEE* | | 56 |
| FFFF* | | 23 |
| GGGG* | | 8 |
| HHHH* | | 2 |
| IIII* | | 8 |
| JJJJ* | | 6 |
| KKKK* | | 2 |
| LLLL* | | 2 |
| MMMM* | | 2 |
| NNNN* | | 4 |
| OOOO* | | 3 |

*Submissions received for the Bull Mountain Master Leasing Plan Draft EIS but containing comments for the Uncompahgre Draft RMP/EIS

BLM_0165911

# Appendix S
## Economic Impact Analysis Methodology

BLM_0165912

BLM_0165913

# APPENDIX S
# ECONOMIC IMPACT ANALYSIS METHODOLOGY

This entire appendix is new since publication of the Draft RMP/EIS.

## S.1   INTRODUCTION

This report is a description of the methods and data underlying the Uncompahgre Resource Management Plan (RMP) socioeconomic analysis. The information in this appendix is intended to support the analysis in **Chapter 4** of the Final Environmental Impact Statement (EIS), rather than act as a stand-alone documentation of methods and approach. Refer to **Section 4.6.3**, Socioeconomics, of the Proposed RMP/Final EIS for assumptions, analysis by alternative, and other details.

The first portion of the following information is a description of the general approach used in the analysis. The next portion is a discussion of the general aspects of the regional input-output model and how it was used to estimate quantitative economic impacts. The remaining sections provide additional detailed data used in the analysis for recreation, livestock grazing, coal, and natural gas.

## S.2   ECONOMIC IMPACT ANALYSIS METHODS AND ASSUMPTIONS

### S.2.1   Methods and Assumptions

The Study Area is examined based on a tiered approach. The first level of analysis is Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties. It is the Socioeconomic Study Area (Study Area) examined for baseline demographic data and quantitative analysis. This Study Area includes all counties overlapping the Decision Area in whole or in part. Mesa County was excluded from quantitative analysis in the Draft RMP/EIS due to the minimal number of acres in the Uncompahgre RMP Decision Area (Decision Area); however, Mesa County represents a regional economic center and influences economic activity in the Uncompahgre RMP Planning Area (Planning Area). Due to this, the analysis in the Draft RMP/EIS has been amended in this Proposed RMP/Final EIS to include Mesa County.

The second component of the analysis is based on the five socioeconomic units, as defined in the Community Assessment of the Uncompahgre Planning Area (BLM 2009).

BLM_0165914

A county-level analysis may not capture the specific issues relevant to communities and portions of the Planning Area, as drawn from the Community Assessment of the Uncompahgre Planning Area (BLM 2009) and results from the economic strategies workshops. As a result, a qualitative discussion of social and economic impacts was provided for the socioeconomic units.

The economic impact analysis in this assessment primarily examines the changes in economic activity as a result of the proposed management (Watson et al. 2007). Economic impact analysis in this assessment takes one of two forms, depending on the available data: qualitative or quantitative assessment. For those activities directly generating measurable spending, the analysis estimates economic impact in terms of output (total spending) and jobs and income in the regional economy. For example, spending to drill gas wells and produce gas, produce coal, raise cattle, and recreate on BLM-administered lands fits this type of analysis. Using a regional input-output model (Impact Analysis for Planning, IMPLAN), the impacts on selected industrial sectors of the economy have been evaluated, including natural gas and coal production, livestock grazing, and recreation.

IMPLAN is a regional economic impact model that provides a mathematical account of the flow of dollars and commodities through a region's economy. This model provides estimates of how a given amount of an economic activity translates into jobs and income in the region. These multipliers were applied to changes in final demand resulting from the differing BLM management alternatives in the Draft RMP/EIS. The results measure the change in the level of output, jobs, and income for those industrial sectors affected by each action.

Economic impacts based on IMPLAN modeling are described in terms of direct, indirect, and induced impacts. Direct impacts, such as income and employment, are directly affected by activity on BLM-administered lands, such as employing workers to drill a natural gas well. Indirect impacts occur when related industries gain from purchases by the directly affected businesses, such as the oil and gas company buying supplies from local firms. Induced impacts are the results of spending by employees hired due to the business activity just described, such as the natural gas employee spending money in a local restaurant. Together, these are reported as the total impact of the different management alternatives.

Employment opportunities related to activities on BLM-administered lands and mineral estate include jobs in exploration, development, and production of minerals, including oil and gas, solid leasable minerals, such as coal, and locatable and mineral materials. Also included are jobs in livestock production and in various recreation activities.

The quantified economic analysis using the IMPLAN model provides estimates of employment in the Planning Area from coal extraction, natural gas development and production, livestock grazing, and recreation on BLM-administered lands and mineral estate.

For all economic modeling presented here, data are estimates, based on best available information. Actual impacts would also vary, based on site-specific differences and changes in market demand for mineral resources, policy regulating mineral extraction or livestock grazing, population change in the Planning Area, or various other factors that could alter the economic impact of BLM-administered land use. The purpose of the quantitative economic impact analysis is to compare the relative effects of the alternatives and should not be viewed as absolute

BLM_0165915

values. Included narratives discuss the specific limitations of data and modeling for each specific resource use.

The analysis include the following general assumptions:

- Values are presented in $2017, unless otherwise noted, for consistency with baseline data.

- Jobs are based on IMPLAN output and represent the annual average of monthly jobs; thus, one job may represent one job lasting 12 months or two jobs lasting six months each, for example. Because jobs occurring over multiple years may not represent additional new employment opportunities (e.g., one employee working for two years represents two jobs), results are presented in the form of annual averages. Total jobs represent direct, indirect, and induced jobs.

- Labor Income (earnings) represent all forms of employment income, including employee compensation (wages and benefits) and proprietor income. Total labor earnings include direct, indirect, and induced employment.

- Economic output (gross regional economic output) represents the value of industry production. Total economic output includes direct, indirect, and induced value.

- All analyses use a 20-year time frame, except for coal, which uses a 10-year time frame due to anticipated depletion of coal resources over 10 years

For some resources, the level of economic influence in the region from activities on BLM-administered lands would remain low under all alternatives; therefore, it would be inconsistent with performing a quantified economic impact analysis. Specific components of recreation, including recreation use permits, forest and woodland material sales, and right-of-way rents, are included in this category. For these types of resources, a detailed qualitative discussion of impacts by alternative is included. BLM Uncompahgre Field Office (UFO) specialists' expert opinions informed the current conditions for specific resources and anticipated outcomes, and they were incorporated into the evaluation.

In addition, not all economic values can be measured by market transactions. Open space, access to recreation, and other factors enhance quality of life for residents and could attract individuals or business to an area.

This analysis examines values for nonmarket factors based on previous research on a qualitative basis. See further discussion of nonmarket values in **Section 3.4.3**, Socioeconomics.

Results from the quantitative and qualitative economic analysis also are applied in measuring the social impacts. The level and type of economic activity predicted is examined in the context of the social setting. For example, the potential impacts of increased economic activity from resource extraction is examined to determine the potential impacts to local community quality of life.

As discussed above, a narrative of the impacts on communities and groups is included for each of the five socioeconomic units in **Chapter 4** analysis. This discussion examines the impacts

BLM_0165916

from proposed management on social conditions, as compared to the baseline conditions. In addition, a discussion for socioeconomic units analyzes the potential for impacts on identified stakeholder groups. No additional information is provided in this appendix for the qualitative analysis (see **Chapters 3** and **4** of the Final EIS).

## S.3   THE IMPACT ANALYSIS FOR PLANNING (IMPLAN) MODEL

This analysis used IMPLAN 2016 data, which is the most current data at the time of this analysis. Before running the model, cost and price data were converted to a consistent dollar year (2017), using sector-specific adjustment factors from the IMPLAN model. The values in this report are expressed in year 2017 dollars.

The current IMPLAN model has 440 economic sectors, 302 of which are represented in the Study Area counties. This analysis involves direct changes in economic activity for IMPLAN economic sectors, as well as changes in all other related sectors due to the ripple effect.

The IMPLAN production coefficients were modified to reflect the interaction of producing sectors in the Study Area; as a result, the calibrated model does a better job of generating multipliers and the subsequent impacts that reflect the interaction between and among the sectors in the Study Area, compared with a model using unadjusted national coefficients. Key variables used in the IMPLAN model were filled in using data specific to the Study Area, including employment estimates, labor earnings, and total industry output.

The economic input for each model was a monetary value for a specific economic sector, and inputs for multiple sectors can be applied to each scenario. These scenarios are run against the model parameters to provide economic predictions of direct, indirect, and induced effects on employment, labor income, value added, and output; these effects on each sector were broken down. IMPLAN can also provide information on federal, state, and local taxes.

The analysis for the Uncompahgre RMP/EIS focused on major economic sectors in the Study Area: recreation, livestock grazing, oil and gas development, and coal production. While the IMPLAN model can produce meaningful results, they are only as accurate as the inputs provided. The process used and assumptions made to provide these inputs are discussed in detail below.

### S.3.1   Recreation

Recreation plays a large role on public lands in the UFO, and many recreationists rely on BLM-administered lands for their activities. While entry fees are a source of income for the BLM, recreationists also spend money in the area on food, lodging, supplies, fuel, and other commodities. This spending has an economic impact on the local economy, and many smaller communities rely on this source of income from outside visitors.

Traditionally, an economic impact analysis for recreation measures only the effects of "new" income in the Study Area, based on spending of visitors on local recreation. The premise assumes spending by local residents does not represent an additional source of economic activity in the area, and spending by local residents would continue, using local substitute recreation opportunities. The Draft RMP/EIS analysis was based on this approach and analyzed the economic impacts from visiting recreationalists.

Local residents, however, make considerable recreation-related expenditures, such as spending on gas and food, for example; therefore, the Proposed RMP/Final EIS includes an analysis of total economic contribution from recreation, based on spending by local residents and visitors.

The quantitative economic analyses in **Chapter 4** for recreation consist of one set of figures for all alternatives. The estimates do not address differences between the alternatives, because the differences in management actions affecting recreation cannot be quantified with a reasonable level of certainty. Differences in impacts between the alternatives are discussed qualitatively.

The two determining factors of economic input for recreation are 1) visitor numbers and 2) how much each visitor spends while in the area. Average visitor data from the BLM Recreation Management Information System for fiscal years 2012 through 2016 was used to estimate current visitor numbers (see **Table S-1**). Because visitors may visit more than one location on a trip, and specific location visiting is not consistently available, data were not modified to account for visits to portions of the UFO that are outside of the Decision Area.

Visitation is anticipated to increase over the planning period as a result of population growth. Population projections from the Colorado State Demography Office were used to project visitor numbers over the next 20 years. Changes in recreation use level were anticipated to follow population changes for the state level, which increased at a rate of 1.6 to 1.1 percent annually over the 20-year planning period. Projected visitation levels for three time points over the planning period, 2018, 2028, and 2038, are shown in **Table S-2**. Actual increases in visitation could vary, based on regional and national economics and other factors.

**Table S-1**
**Estimated UFO Annual Visitation Data**

| Past Annual Visitation | | | | | | Estimated Annual Visitation | | |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year 2013 | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 | Fiscal Year 2017 | 5-Year Average (Baseline Visitation Estimate) | 2018 Estimated Visitation | 2028 Estimated Visitation | 2038 Estimated Visitation |
| 467,451 | 524,284 | 585,772 | 583,589 | 697,180 | 571,655 | 580,808 | 678,100 | 769,370 |

Sources: BLM 2017; Colorado Department of Local Affairs 2018

**Table S-2**
**General Recreation Segment Shares by Party Type (percent)**

| Out-of-Town | | | Local | | | |
|---|---|---|---|---|---|---|
| Day | Overnight on BLM Lands | Overnight | Day, (including Non-primary Visitor) | Overnight on BLM Lands | Overnight | Total |
| 7% | 4% | 10% | 77% | 1% | 1% | **100%** |

Source: Adapted from White 2017 (Grand Mesa Uncompahgre National Forest visitor use monitoring trip type segment shares, excluding use at ski areas)

BLM_0165918

BLM data are collected in visits, and available spending data are collected by visitor parties. Party size varies by whether it is a day or night visit. Recreation data are modified, from the number of visits to the number of parties, based on a party size of 2.3 to 2.5 people, specific to visit type. Party size is based on Grand Mesa Uncompahgre National Forest visitor use monitoring data (White 2017).

Allocation of visits into recreation trip type market segments was be based on Grand Mesa Uncompahgre National Forest visitor use monitoring non-ski area allocations. The visitor use monitoring trip type segments help explain differences in spending of distinct subgroups of visitors and the "segmentation yields total spending averages for general recreation that are statistically and practically different for each trip segment" (White 2017 p.8).

User groups are defined based on the National Forest visitor use monitoring, as follows:

- Local visitors on day trips (L-Day)
- Local visitors staying overnight on BLM-administered lands (L-OVN-BLM)
- Local visitors staying overnight off BLM-administered lands (L-OVN)
- Out-of-town visitors on day trips (NL-Day)
- Out-of-town visitors staying overnight on BLM-administered lands (NL-OVN-BLM)
- Out-of-town visitors staying overnight off BLM-administered lands (NL-OVN)

White (2017) included an additional category, non-primary visitors. To conservatively estimate potential expenditures associated with activity on BLM-administered lands, these visitors are estimated to use the same expenditure data as local day use visitors. This are defined as those living within 50 miles of the recreation site.

Spending profiles for recreationists in the Planning Area are assumed to be similar to those determined for other federal lands in Colorado. In the Draft RMP/EIS, data from the Grand Junction Field Office was determined to be the best available source; however, due to its proximity to the Planning Area and the availability of more recent surveys, the best available data when this Proposed RMP/Final EIS was prepared is that from the Grand Mesa Uncompahgre National Forest visitor use monitoring surveys (White 2017).

In the Draft RMP/EIS, data from the Grand Junction Field Office, developed by Mesa State University, was the best available. Spending profiles were used to provide a quantitative analysis of spending for motorized and nonmotorized recreation users. Current spending profiles for BLM recreational activity types for those two categories were not available in the updated recreation data used in White (2017). In addition, White (2017) states that variations in type of visitation (i.e., day or overnight) are likely to be larger than changes based on activity type. As a result, spending differences by recreation activity are discussed qualitatively in the Proposed RMP/Final EIS. Refer to **Table S-3**, Spending by Trip Type Segment, in 2017 Dollars, per Party per Trip.

BLM_0165919

**Table S-3**
**Spending by Trip Type Segment, in 2017 Dollars, per Party per Trip**

| | Out-of-Town | | | Local | | | |
| | Day | Overnight on National Forest System Land | Overnight | Day | Overnight on National Forest System Land | Overnight | All Visits |
|---|---|---|---|---|---|---|---|
| Total spending per trip | $79.51 | $403.07 | $838.92 | $27.39 | $188.30 | $399.45 | $278.75 |

Source: White 2017 (above average spending level data)
Note: Adjusted to 2017 dollars, using US Bureau of Labor Statistics Consumer Price Index Inflation Calculator. Non-primary visits combined with local day visits are assumed to have the same average spending.

Spending was segmented into the following IMPLAN sectors based on percent expenditures from White (2017). All data were adjusted for inflation using the US Bureau of Labor Statistics Consumer Price Index Inflation Calculator.

- 499 Hotels and motels

- 500 Other accommodations

- 501 Restaurants

- 400 Retail, food and beverage

- 402 Retail, gas stores

- 442 Auto equipment rental and leasing

- 520 Other federal government

- 496 Other amusement and recreation industries

- 404 Retail, sporting goods, hobbies

- 406 Retail, miscellaneous

To determine the direct economic inputs from visitor types, the total part visits for a given year were divided based on relevant percent of the party visits. For each segment, recreation spending was multiplied by the corresponding spending profile for each of the economic sectors. Total direct spending across all segments was summed to yield the total direct economic contribution estimates. This value was entered into the region specific IMPLAN model to determine indirect and induced employment and expenditures. Based on this data, estimated economic impacts from recreation for three time points in the planning process were developed: current (2018), 10 years (2028), and 20 years (2038).

### S.3.2   Livestock Grazing

Many ranchers use BLM-administered lands to graze their livestock, either in conjunction with their private land or entirely on BLM-administered lands. Livestock grazing represents a large economic sector in many parts of the western US and drives the economy in many rural areas. Ranchers lease grazing allotments from the BLM using animal unit month (AUM), which is the

BLM_0165920

amount of forage that a particular type of livestock consumes in a month. The BLM determines a sustainable level of AUMs on each allotment based on plant communities and vegetation condition; it may lease up to this maximum number to local ranchers. Often, not all AUMs that are allotted are used.

The two determining factors for the economic impact of livestock grazing are AUMs used and the revenue from production for both cattle and sheep. Their revenue includes both the cost to raise the animal and the income provided to the proprietor. For this document, two scenarios were modeled: the maximum AUM scenario, where all of the permitted AUMs were used, and the average or billed AUM scenario, where only a certain portion of AUMs were used.

The maximum AUM scenario is based on the total permitted level by alternative. To determine the level of billed AUMs, the economic impact estimates for livestock grazing were based on the 10-year average (2006–2016) of billed AUMs of forage use for cattle and sheep in the Planning Area, or approximately 60.3 percent of permitted AUMs. Because billed use may exceed actual grazing use, the economic analyses may overstate the actual economic impacts of grazing to some degree. The analysis by alternative assumes that the level of grazing would be modified based on the total permitted AUMs. Because many operators do not currently use the permitted level of AUMs, actual changes in level of use and related economic impacts may be less than predicted.

In the Final RMP/EIS alternatives, some BLM-administered lands are identified as being unavailable to sheep grazing, creating lands that are available to cattle only. The ratio for each alternative was determined based on current type of livestock and allotment-specific restrictions on livestock class; it varies by alternative. The livestock class (i.e., cattle or sheep) for each alternative is assumed to remain consistent across the 20-year planning period. The ratio for each alternative was determined based on current type of livestock and allotment-specific restrictions on livestock class; it varies by alternative.

Estimated AUMs allocated to cattle and sheep for total permitted and billed AUM scenarios is shown in **Table S-4**.

**Table S-4**
**Livestock Grazing Level by Alternative**

|  | Alternative | | | | |
|---|---|---|---|---|---|
|  | **A** | **B** | **C** | **D** | **E** |
| Cattle permitted | 26,880 | 23,222 | 28,402 | 26,889 | 26,880 |
| Cattle billed | 16,208 | 14,003 | 17,126 | 16,214 | 16,208 |
| Sheep permitted | 8,639 | 5,736 | 8,547 | 8,639 | 8,639 |
| Sheep billed | 5,209 | 3,459 | 5,154 | 5,209 | 5,209 |

Estimated gross production value per cow/steer is $871 in 2017 dollars, based on averaged data from 2008 to 2015 from Colorado State University. The livestock enterprise budgets estimated production value per sheep is $260.42 (in 2017 dollars) based on averaged data from 2010 to 2015 (Colorado State University 2015).

The economic value of forage is estimated based on the value of production associated with forage; it differs based on livestock class (i.e., cattle or sheep). To determine economic value of forage, the number of AUMs for each animal class was converted into equivalent heads of livestock, using the conversion rate of an average of 1 cow-calf pair per 16 AUMs (following Workman [1986]); thus, the average value of an AUM can be estimated using data on the value of cattle production per bred cow and dividing by 16. A similar procedure can be used to estimate the value of an AUM used for sheep production, using 3.2 AUMs per sheep.

Values for cattle are further adjusted by a factor of 1.2 per cow/steer, to account for the fact that most cattle in the Planning Area represent cow-calf pairs. Applying this number to the value per cow/steer or per sheep provides an estimate value of production per AUM. Total value per cattle AUM is estimated at $54.45 and at $81.25 for sheep AUMs, in 2017 dollars (see **Table S-5**, below). Values were adjusted for inflation using the US Bureau of Labor Statistics Consumer Price Index Inflation Calculator, as applicable.

**Table S-5**
**AUM Value**

|  | Production Value | AUM/Animal | Value/AUM | Cow-Calf Adjustment | Adjusted Value of Production per AUM |
|---|---|---|---|---|---|
| Cattle | $871 | 16 | $54.45 | 1.2 | $65.34 |
| Sheep | $260 | 3.2 | $81.25 | N/A | $81.25 |

Sources: Colorado State University 2015; Workman 1986

The costs of production for cattle and sheep were separated then disaggregated across IMPLAN sectors based on Colorado State University Livestock Enterprise Budgets for cattle and sheep (Colorado State University 2015), as follows:

- 2 Grain farming

- 459 Veterinary services

- 319 Wholesale trade

- 19 Support activities for agriculture and forestry

- 417 Commercial and Industrial machinery and equipment repair

- 360 Real estate

- 354 Monetary authorities and depository credit intermediation

- 40 Maintenance and repair

- 14 Animal production, except cattle, poultry, and eggs (sheep only)

- 11 Cattle ranching and farming (cattle only)

- N/A Employee compensation

The number of AUMs per year were multiplied by total AUM values, disaggregated into the appropriate sectors to obtain direct input values for the IMPLAN model separately for sheep

and cattle. Direct, indirect, and induced impacts from sheep and cattle for a given alternative were then modeled. This procedure was repeated for each alternative.

While the six-county Study Area was used to model the economic analysis for livestock grazing, impacts would not be equally distributed across the Planning Area; instead, they would likely be concentrated in the area with a higher dependence on the agricultural industry, such as Delta and Gunnison counties, based on current employment data.

### S.3.3   Coal

Coal production represents a high-value commodity in the Planning Area; however, the levels of production have decreased in recent years, resulting in decreased economic contributions from this industry in the Planning Area. In the UFO, all of the coal mined on BLM-administered lands is subsurface mining in Delta and Gunnison counties, in the Somerset Coal Field in the northern portion of the Study Area.

Coal analysis includes only mining of federal minerals in the Planning Area. The only mine currently operational in the Planning Area is the West Elk Mine in the Somerset Coal Field. No additional mines are anticipated to be operational on federal mineral estate during the planning period, based on the following assumptions:

- The coal resources in the Tongue Mesa Coal Field are heavily faulted, with no rail access to the area, making it economically unviable to mine in the next 20 years (BLM 2010). Since this is the current status of this resource area, it will have no impact on the socioeconomics of the area, and no further analysis was performed.

- The coal resources in the Grand Mesa Coal Field have limited potential and are less economically viable than coal resources in Somerset, due to low coal quality and transportation constraints. The Grand Mesa area would most likely be mined only when the resources at Somerset are exhausted, which is not forecasted to happen within the next 10 to 20 years. Since this represents the current status of this resource area, it would have no impact on the socioeconomics of the area, and no further analysis was performed.

- The surface mining operation in the Nucla-Naturita Coal Field is on private land and extracting private minerals. It ceased production after March 2017 when it produced its final 8,773 tons and entered into the reclamation phase (Tri-State Generation and Transmission Association 2017). The assumption is that no future production would occur during the planning period.

The two determining factors for analyzing the economic impact from coal using IMPLAN are tons of coal mined per year and the revenues gained per ton of coal. Information provided by the BLM indicates that approximately 5.5 million tons of coal are mined annually. In total, the remaining coal reserves are estimated at 55 to 60 million tons. As a result, coal reserves could be tapped out in 10 years or fewer, depending on the rate of coal production.

Coal production would not change across alternatives even though there are differences in the number of acres. That is because production is expected to come from one mine, and those acres of federal coal are currently leased; however, factors external to the RMP management

BLM_0165923

decisions, such as market conditions, may result in fluctuations in future coal market and could affect the level of coal production in a given year.

Price per ton of coal was determined based on regionally specific mine mouth[1] price low sulfur (bituminous) coal. The average projected mine mouth price from 2015 to 2050 was $37.40 per ton (US Energy Information Administration 2017).

Operational costs per short-ton of coal (including all labor and operating costs) were determined based on the proprietary data in the 2017 Coal Cost Guide for underground longwall mining.

### S.3.4   Natural Gas

In the Draft RMP/EIS, a quantitative economic impact analysis of oil and gas development and production was not included. This was due to the uncertainty related to timing, location, and level of development and production. Based on comments received on the Draft RMP/EIS, the BLM determined that a quantitative economic impact analysis of fluid mineral development would be included in the Proposed RMP/Final EIS. Its purpose is to examine differences in effects of proposed management decisions by alternative. Due to low levels predicted for future oil development, analysis incudes only natural gas development and production.

The values provided below are estimated, based on the assumptions for development and production. Assumptions were informed by the UFO Reasonable Foreseeable Development Scenario (BLM 2012) estimates and BLM UFO minerals specialists. The actual pace and timing of development and economic impacts would be affected by various factors, including national and international energy demand and prices, production factors in the Planning Area, and drilling techniques. A site-specific NEPA analysis would be completed before any development, and it would include an additional evaluation of the socioeconomic effects of the proposed action. Due to minimal current production levels in the Planning Area for oil, the assumption is that all future development represents natural gas wells.

The analysis includes wells on BLM-administered mineral estate underneath the surface and state or privately owned land in the Decision Area. While the BLM administers federal mineral estate beneath National Forest System lands, and the Forest Service administers the surface, the BLM does not establish overall management direction of such mineral estate, such as determining which lands may be open to leasing and what stipulations may be applied to open lands. Therefore, this analysis excludes wells on National Forest System lands. It refers to included wells as those on BLM-administered mineral estate.

In addition, the analysis addresses only new oil and gas wells, not current active wells. As such, the economic impacts represent a subset of those of all oil and gas wells, new and existing, on federal mineral estate and nonfederal mineral estate in the Planning Area.

---

[1] A mine mouth electric plant is a coal-burning electricity-generating plant that is built close to a coal mine. In these plants, coal is excavated from the dig site, placed on a conveyor belt, and run directly into the plant where the coal is burned.

BLM_0165924

Quantitative economic impacts were assessed for two phases: well development (including drilling and completion) and production.

### Drilling and Completion

Drilling and completion economic quantitative impacts are assessed by examining the total level of drilling and completion and the cost per well, as based on the reasonably foreseeable development scenario and average costs for similar development.

Roughly 64 percent of annual wells drilled represent conventional/shale gas, and the remaining 36 percent represent coal bed natural gas wells. The specific number of estimated wells per year by well type (conventional versus coal bed natural gas, vertical or horizontal) was provided by BLM UFO minerals specialists, in coordination with the BLM UFO geographic information system specialist (**Table S-6**, Annual Wells Drilled on BLM-Administered Mineral Estate).

**Table S-6**
**Annual Wells Drilled on BLM-Administered Mineral Estate**

| Well Type | Alternative | | | | | |
|---|---|---|---|---|---|---|
| | **A** | **B** | **BI** | **C** | **D** | **E** |
| Conventional (10% vertical, 90% horizontal) | 5.2 | 6.7 | 5.4 | 8.6 | 8.4 | 9.2 |
| Coalbed natural gas (50% vertical, 50% horizontal) | 4.8 | 4.4 | 2 | 9.9 | 7.3 | 7.6 |
| Total of annual wells | 10 | 11.1 | 7.3 | 18.5 | 15.7 | 16.8 |

Sources: BLM UFO minerals specialist and BLM UFO geographic information system specialist professional judgement

Shale development is expected to continue to represent a small proportion of the wells in the Planning Area; therefore, no specific predicted amount of shale wells or costs specific to this well type were included in the quantitative analysis. The percent of wells completed was assumed to be 84 percent for all well types, as determined by BLM UFO minerals specialists.

The costs of well drilling and completion vary by well type (conventional/shale gas and coal bed natural gas) and well depth. Average full well costs are determined based on the UFO Reasonable Foreseeable Development Scenario (BLM 2012) and BLM UFO minerals specialist input. These data were converted to 2017 dollars, using the Bureau of Labor Statistics' consumer price index calculator.

Costs for drilling and completion phases were analyzed separately based on spending disaggregated across relevant economic sectors. Spending profiles are based on estimates provided in the UFO Reasonable Foreseeable Development Scenario (BLM 2012) for conventional and coal bed natural gas wells (BLM 2012). They were converted to 2017 dollars using the US Bureau of Labor Statistics' consumer price index calculator. See **Table S-7**, Total Well Drilling and Development Direct Costs.

BLM_0165925

**Table S-7**
**Total Well Drilling and Development Direct Costs**

| | Coalbed Natural Gas Vertical[1] | Coalbed Natural Gas Horizontal[2] | Conventional/ Shale Vertical[3] | Conventional/ Shale Horizontal[4] |
|---|---|---|---|---|
| Drilling | $394,000 | $1,820,000 | $1,097,000 | $3,298,000 |
| Completion | $368,000 | $1,680,000 | $1,171,000 | $3,935,000 |

Sources:
[1] Based on Uinta-Piceance Basin well depth 5,000–10,000 foot cost from BLM 2012
[2] Based on BLM UFO minerals specialist expertise
[3] Great Basin and Paradox Basin 10,000–15,000 feet cost from BLM 2012
[4] Great Basin and Paradox Basin 15,000–20,000 feet cost from BLM 2012

Sectors with spending for drilling and completion are the following:

- 58 Construction of other new nonresidential structures

- 37 Drilling oil and gas wells

- 38 Support activities for oil and gas operations

- 395 Wholesale trade

- 445 Commercial and industrial machinery and equipment rental and leasing

- 449 Architectural, engineering, and related services

- 411 Truck transportation

- 428 Wireless telecommunications

- 447 Legal services

- 470 Other support services

Once the economic impacts per each well type were estimated for drilling and for completion, those figures were multiplied by the total number of wells drilled and completed per year for each well type. Impacts for each type of well were summed to provide total annual economic impacts.

Approximately 50 percent of employment needs for drilling and completion are anticipated to be met by local residents. The IMPLAN model provided estimates of direct, indirect and induced output, employment, and labor earnings for drilling and completion. Induced impacts were reduced by 50 percent for sectors 37 and 38 to account for out-of-town workers involved with drilling and completing oil and gas wells. This was based on input from the BLM UFO minerals specialist and figures used for other oil and gas development projects in the UFO. This is to account for the fact that out-of-town workers would not contribute to additional induced spending in the local economy. This is because most of their incomes are assumed to be spent in the communities where they are staying.

BLM_0165926

*Production*

Production economic impacts were assessed using information on oil and gas production provided by the BLM UFO minerals specialist. For all well types, production levels were assumed to be 188,304 million cubic feet per new well first year. Rates of production decline for conventional/shale wells based on decline curves for western Colorado conventional wells from 2015 production (IHS Enerdeq 2016). Rates of decline for coalbed natural gas wells are based on decline curve ratios for the Tres Rios Field Office from 2015 production data (IHS Enerdeq 2016).

For each year, the number of wells completed was broken down into conventional and coalbed natural gas vertical and horizontal wells, based on assumptions. For each well type, the average first year production rate (volume) from the annual decline curves was then applied to determine the total production from first-year wells. In subsequent years, the appropriate average production rates from the decline curves were applied to the number of second year wells, third year wells, and so on. Total production was then summed across all the wells for each year in the analysis period to determine total impacts. Production estimates are provided in **Table S-8**, below.

**Table S-8**
**Total Production by Alternative (million cubic feet for 20-Year Planning Period)**

| A | B | B1 | C | D | E |
|---|---|---|---|---|---|
| 165,132,693 | 170,600,154 | 100,963,329 | 319,451,385 | 256,029,315 | 277,322,517 |

Source: BLM UFO well per year estimates and per well projections

The production volume data was then multiplied by price estimates to estimate total annual revenue for oil and gas production. The market prices for oil and gas were based on the Dakota-Rocky Mountain natural gas supply reference case average forecast price for 2018–2038 ($3.83), expressed in 2017 dollars (US Energy Information Administration 2018). These revenue streams were then entered into the IMPLAN models to estimate the total economic impacts from production.

The estimates for federal mineral royalties represents Colorado's 49 percent share of the federal government's 12.5 percent royalty rate, which amounts to 6 percent of the market value.

## S.4   REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 2009. Community Assessment of the Uncompahgre Planning Area. BLM, Uncompahgre Field Office, Montrose, CO.

_____. 2010. Coal Resource and Development Potential Report. Prepared by Buckhorn Geotech for BLM, Uncompahgre Field Office, Montrose, CO. April 2010.

_____. 2012. Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado. Prepared by BLM Wyoming State Office, Reservoir Management Group for BLM, Uncompahgre Field Office, Montrose, CO. February 2012.

_____. 2017. Recreation Management Information System. Report No. 19. BLM, Uncompahgre Field Office, Montrose, CO.

Colorado Department of Local Affairs. 2018. Population projections. Internet Web site: https://demography.dola.colorado.gov/population/population-totals-colorado-substate/#population-totals-for-colorado-and-sub-state-regions.

Colorado State University. 2015. Colorado livestock enterprise budgets for cow-calf (2014–2015, 2009–2010, 2008–2009) and sheep-range (2014–2015, 2011–2012, and 2009–2010). Internet Web site: http://www.wr.colostate.edu/ABM/livestock.shtml.

IHS Enerdeq. 2016. Well completion and energy production data. IHS Enerdeq Browser. Internet Web site: https://ihsmarkit.com/products/oil-gas-tools-enerdeq-browser.html.

Tri-State Generation and Transmission Association. 2017. New Horizon Mine reaches agreement with miners' union, will cease mining operations and begin reclamation activities. Internet Web site: https://www.tristategt.org/content/new-horizon-mine-reaches-agreement-miners'-union-will-cease-mining-operations-and-begin. June 8, 2017.

US Energy Information Administration. 2017. Annual Energy Outlook 2017—Coal Minemouth Prices by Region and Type – Coal Minemouth Prices: Rocky Mountain: Reference case. Internet Web site: https://www.eia.gov/outlooks/aeo/data/browser/#/?id=15-AEO2017&sourcekey=0.

_____. 2018. Lower 48 Natural Gas Production and Supply Prices by Supply Region. Internet Web site: https://www.eia.gov/outlooks/aeo/data/browser/#/?id=72-AEO2018&region=0-0&cases=ref2018&start=2016&end=2050&f=A&linechart=ref2018-d121317a.3-72-AEO2018&sid=ref2018-d121317a.125-72-AEO2018&sourcekey=0.

Watson, P., J. Wilson, D. Thilmany, and S. Winter. 2007. "Determining economic contributions and impacts: What is the difference and why do we care?" *The Journal of Regional Analysis and Policy* 37(2): 140–146.

White, E.M. 2017. Spending Patterns of Outdoor Recreation Visitors to National Forests. US Department of Agriculture, Forest Service, Pacific Northwest Research Station, Seattle, WA. October 2017.

Workman, J.P. 1986. *Range Economics*. Macmillan Publishing, Inc. New York, NY.

BLM_0165928

This page intentionally left blank.

# Appendix T

## Description of Alternatives

BLM_0165931

# APPENDIX T

# DESCRIPTION OF ALTERNATIVES

This appendix is new since publication of the Draft RMP/EIS; however, the contents were moved to this appendix from **Chapter 2**, Alternatives. Changes to that Chapter 2 content from the Draft RMP/EIS are shaded in gray.

## T.1 MANAGEMENT GUIDANCE FOR ALTERNATIVES A, B/B.1, C, D, AND E

**Table T-1** is a description of all decisions proposed for each alternative, including goals and objectives. Decisions in **Table T-1** are mostly land use plan-level decisions, with the exception of some decisions that are implementation-level decisions. Implementation-level decisions are identified in the Agency- Proposed RMP by an asterisk (*) following the management action. Most implementation-level decisions are management actions in the Recreation section, such as prohibiting overnight camping or campfires. Recreation management areas with complex implementation issues may require a subsequent implementation-level recreation area management plan tiered to decisions in this land use plan. Subsequent site-specific NEPA analysis would be required to implement some types of actions. Decisions that involve closures or use restrictions (e.g. camping restrictions, shooting restrictions, closed travel areas) would be implemented through supplemental rules which allow enforcement. Other actions that involve education, information, interpretation, and monitoring may not require site-specific NEPA analysis.

NSO, CSU, and TL are stipulation decisions and apply to fluid mineral leasing and development of federal mineral estate underlying BLM lands, privately owned lands, and state-owned lands, but not National Forest System lands. The Forest Service makes stipulation decisions in its own plan. NGD, SSR, and TL are restriction decisions and apply to other surface-disturbing activities on BLM-administered surface lands. Definitions of these stipulations are provided in **Appendix B** (Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities).

Acreages for alternatives in Chapter 2, **Table T-1**, and stipulations in **Appendix B** are calculated based on current information and may be adjusted in the future through RMP maintenance as conditions warrant.

BLM_0165932

### T.1.1   How to Read Table T-1

The following describes how **Table T-1** is written and organized to show the land use plan decisions proposed for each alternative. Refer to the diagram on the next page for an example of how to read **Table T-1**.

- Per Appendix C of BLM Land Use Planning Handbook H-1601-1, land use plan decisions are broad-scale decisions that guide future land management actions and subsequent site-specific implementation decisions. Land use plan decisions fall into two categories, which establish the base structure for **Table T-1: 1)** desired outcomes (**goals** and **objectives**), and **2) allowable uses** and **actions** to achieve outcomes.

  - *Goals* are broad statements of desired outcomes and management direction that usually are not quantifiable.

  - *Objectives* identify specific desired outcomes for resources. Objectives may be quantifiable and measurable and may have established timeframes for achievement, as appropriate.

  - *Actions* identify measures or criteria to achieve desired outcomes (i.e., objectives), including actions to maintain, restore, or improve land health.

  - *Allowable uses* identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate.

  - *Stipulations* (NSO, CSU, TL), which fall under the allowable uses category, are also applied to surface-disturbing activities to achieve desired outcomes (i.e., objectives).

- In general, only those resources and resource uses identified as planning issues have notable differences between the alternatives.
- Actions applicable to all alternatives are shown in one cell across a row. These particular objectives and actions would be implemented regardless of which alternative is ultimately selected.
- Actions applicable to more than one but not all alternatives are indicated by either combining cells for the same alternatives, or by denoting those objectives or actions as the "same as Alternative B," for example.
- Shaded text identifies changes between the Draft RMP/EIS and this Proposed RMP/Final EIS. Specific to Table T-1, where text is shaded in the Alternative E (Agency Proposed) column, it indicates a difference from Alternatives B, C, or D where those alternatives are largely similar to Alternative E.

BLM_0165933

## Diagram T-1
## How to Read Table T-1



| 29. | **SOILS AND GEOLOGY** | | | | |
|---|---|---|---|---|---|
| 30. | **GOAL:** Manage for soil stability and productivity to maintain overall watershed health. Manage erosion to minimize downstream impacts from soil-related issues (e.g., sediment runoff, selenium, and salinity). | | | | |
| 31. | **Objective:** Make management units available for erosion and salinity control objectives and projects that do not conflict with primary objectives of each unit. | **Objective:** Manage activities in the Colorado River Basin to minimize the yield of sediment, salt, and selenium contributions from BLM-administered lands to water resources. | | | |
| 32. | **Action:** Develop necessary erosion-control structures, vegetation improvements, or salinity/selenium-reduction measures to improve water quality (BLM 1985). Develop in-channel structures and land treatment projects designed to reduce runoff and soil erosion in places where it does not | **Action:** Improve water quality and overall watershed health by managing the soil for adequate watershed cover and a healthy soil surface on soils high in salinity/selenium. This could include the following: • Modifying livestock grazing practices to reduce sediment yield • Limiting recreational uses • Planning and implementing comprehensive travel management | **Action:** Manage activities to minimize soil erosion and sediment yields to water bodies. | **Action:** Same as Alternative B. | **Action:** Improve water quality and overall watershed health by managing the soil for adequate watershed cover and a healthy soil surface on soils high in salinity/selenium. This could include the following: • Modifying livestock grazing practices to reduce sediment yield • Managing recreational uses |
| | conflict with management of other resources (BLM 1989a). | | | | • Planning and implementing comprehensive travel management |
| 33. | **Action:** Locate and assess nonfunctional, eroding, earthen check dams in the Mancos Shale areas north of Delta. | **Action:** Inventory and assess stock ponds, check dams, and contour furrows and rehabilitate, repair, or remove those structures that are eroding soils with the highest salinity and selenium concentrations and containing severe weed infestations. Areas in need of improvements include, but are not limited to: • Mancos shale areas north of Delta • East side of the Uncompahgre Plateau, | **Action:** No similar action. (A similar activity is not required.) | **Action:** When feasible, inventory and assess stock ponds, check dams, and contour furrows and rehabilitate, repair, or remove those structures with severe/active erosion. Combine efforts with other projects (e.g., range water projects, road maintenance, and recreation projects) where feasible to increase efficiency. | |

Goals, objectives, or actions that are applicable to more than one alternative are indicated by combining cells for the same alternatives.

Actions that are the same as another alternative but whose cells cannot be combined are noted as, "Same as Alternative___."

Where an action in one or more alternatives does not apply to another, for example Alternative C in this diagram, it states, "No similar action."

BLM_0165934

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

Air Quality
Areas of Critical Environmental Concern
Climate
Comprehensive Travel and Transportation Management
Cultural Resources
Fish and Wildlife
Wildlife – General
    Fish and Aquatic
    Wildlife – Terrestrial
    Big Game
    Raptors
    Upland Game Birds
    Migratory Birds
    Bighorn Sheep
Fluid Leasable Minerals (Oil and Gas and Geothermal Resources)
Forestry and Woodland Products
Land Health
Lands with Wilderness Characteristics

Lands and Realty
    Communication Sites
    Utility Corridors
    Land Tenure Adjustments
        Disposal
        Retention
        Acquisition
    Withdrawals
    Renewable Energy
Livestock Grazing
Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals
    Locatable Minerals
    Mineral Materials
    Nonenergy Solid Leasable Minerals
National Trails and Byways
Native American Tribal Interests
Paleontological Resources
Public Health and Safety
Recreation and Visitor Services
    Special Recreation Management Areas
    Extensive Recreation Management Areas

Soils and Geology
Solid Leasable Minerals (Coal)
Special Status Species
    General
    Plants
    Fish and Aquatic
    Terrestrial
    Gunnison Sage-Grouse
Vegetation
    General
    Riparian
    Weeds
Visual Resources
Watchable Wildlife Viewing Sites
Water Resources
Wild and Scenic Rivers
Wild Horses
Wilderness and Wilderness Study Areas
Wildland Fire Ecology and Management

BLM_0165935

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| 1. | **Management Common to All Alternatives** | | | | |
| 2. | Comply with state and federal laws, regulations, policies, and standards, including FLPMA multiple use mandates. | | | | |
| 3. | Implement actions originating from laws, regulations, and policies and conform to day-to-day management, monitoring, and administrative functions not specifically addressed. | | | | |
| 4. | Preserve valid existing rights, which include any leases, claims, or other use authorizations established before a new or modified authorization, change in land designation, or new or modified regulation is approved. Existing fluid mineral leases are managed through conditions of approval outlined in the RMP. | | | | |
| 5. | Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in Appendix G), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion. | | | | |
| 6. | Seek to enhance collaborative opportunities, partnerships, and communications with other agencies and interested parties to implement the RMP, including education and outreach and project-specific activities (such as monitoring and trail development). | | | | |

\* Implementation-level decisions are identified in Alternative E, the Agency-Proposed RMP, by an asterisk (\*) following the decision.

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 7. | **Resources** | | | | |
| 8. | **AIR QUALITY** | | | | |
| 9. | **GOAL:** Protect air resources from significant adverse impacts associated with BLM-authorized/permitted actions in accordance with the methodology and provisions outlined in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H). | | | | **GOAL:** Protect air resources and related values, including visibility, from significant adverse impacts associated with BLM-authorized/ permitted actions in accordance with the methodology and provisions outlined in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H). |
| 10. | **Objective:** Limit air quality degradation from authorized activities on BLM-administered lands through appropriate analyses of impacts on air quality, with reference to applicable federal, state, and local air quality laws, rules, regulations, and implementation plans, and applicable federal land management guidance documents (e.g., Federal Land Managers' Air Quality Related Values Work Group Phase 1 Report—Revised [2010] [Forest Service et al. 2010]). | | | | **Objective:** Limit air quality and related values degradation from authorized activities on BLM-administered lands (or related to BLM subsurface mineral development) through appropriate analyses of impacts on air quality, with reference to applicable Colorado and |

BLM_0165937

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | | National Ambient Air Quality Standards, applicable federal, state, and local air quality laws, rules, regulations, and implementation plans, and applicable guidance documents (e.g., Federal Land Managers' Air Quality Related Values Work Group Phase I Report—Revised [2010] [Forest Service et al. 2010]). |
| 11. | **Action:** Participate in, conduct, or require air modeling analyses as described in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H) as part of a comprehensive strategy to minimize the potential for BLM-permitted activities to cause or contribute to conditions that exceed ambient air quality standards or cause significant adverse impacts on air quality-related values. | | | | |
| 12. | **Action:** Attach Lease Notice CO-56 to new oil and gas leasing agreements to provide notice to operators of air quality analysis and mitigation that may be required on a case-by-case basis at the permitting/development stage. | | | | |
| 13. | **Action:** Develop Conditions of Approval for project-specific surface-disturbing activities to minimize the potential for BLM-permitted activities to cause or contribute to conditions that exceed ambient standards or cause significant adverse impacts on air quality-related values (on both a project level and contemporaneous cumulative basis). | | | | **Action:** Same as Alternatives A–D, plus: Conditions of Approval will be developed using information from the BLM Air Resources Annual Report. |

BLM_0165938

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| 14. | **Action:**<br>Work cooperatively with local, state, federal, and tribal agencies to enhance air-monitoring efforts in order to provide a broader measure of spatially distributed air pollutant concentrations for the purposes of evaluating atmospheric conditions with respect to ambient air quality standards and air quality-related values. | | | | **Action:**<br>Same as Alternatives A–D, plus: Conduct air quality and meteorological monitoring siting analyses to determine locations needed to support future air quality assessments and regional modeling analysis. |
| 15. | **Action:**<br>Implement the adaptive management strategy for protecting air resources as described in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H). Provide an annual activity summary report of BLM-authorized actions (track project-specific emissions) for comparison against the most recent regional air quality model results to provide cumulative context for any analyzed contemporaneous development period. Produce the annual report as required in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H) to track progress toward meeting the defined goal and objectives. | | | | **Action:**<br>Same as Alternatives A–D, plus: Include mitigation requirements in project approval decisions if determined to be appropriate, based on updated analysis, using information in the BLM Colorado Air Resources Annual Report or other air quality and related values impacts analysis tools. |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165939

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| 16. | No similar action. | | | | **Action:** Conduct greenhouse gas and climate change analyses (e.g., quantify greenhouse gas emissions and assess potential impacts on climate for proposed actions) consistent with current policy/guidance, while following the overall BLM Colorado Air Resources adaptive management approach for protecting air resources and related values utilizing the most current data/information, trends, and climate modeling studies. |

BLM_0165940

Table T-1
Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 17. | **CLIMATE** | | | | |
| 18. | **GOAL:** No similar goal in current RMPs. | **GOAL:** Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change. | | | |
| 19. | **Objective:** No similar objective in current RMPs. | **Objective:** Reduce impacts from climate change on soil and water resources, native vegetation and wildlife species and communities, and wildlife habitats. | | | |
| 20. | **Action:** No similar action in current RMPs. | **Action:** Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values. Where feasible, coordinate with local or regional scientists and organizations in addressing climate change. | **Action:** No similar action. (There would not be any required actions to reduce impacts from climate change.) | **Action:** Same as Alternative B. | |
| 21. | **Action:** No similar action in current RMPs. | **Action:** Plant 1- to 2-year-old seedlings or seed local native species into new habitats where needed to improve restoration and revegetation success and to improve long-term survival of plant populations. Emphasize providing habitat for | **Action:** Seed local native species into new habitats where needed to improve restoration and revegetation success and to improve long-term survival of plant populations. | **Action:** Same as Alternative B. | |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165941

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | pollinators and butterflies, especially monarchs. | | | |
| 22. | **Action:** No similar action in current RMPs. | **Action:** Minimize unnatural (e.g., size and intensity) soil and vegetation disturbance in ecological emphasis areas to reduce barriers to plant migration. | **Action:** Same as Alternative A. | **Action:** Same as Alternative B. | **Action:** Same as Alternative A. |

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 23. | **LAND HEALTH** | | | | |
| 24. | **GOAL:** Manage soils, riparian-wetland areas, native plant and animal communities, special status species, and water quality to meet land health standards. | | | | |
| 25. | **Objective:** Manage public lands according to BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). | **Objective:** Manage lands, streams, and wetlands to *fully meet or exceed* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). | **Objective:** Manage lands, streams, and wetlands to, at a minimum, *meet with problems* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C), provided that lands meeting with problems are stable or trend toward achievement of | **Objective:** Manage ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, areas with exemplary, ancient, or rare vegetation, and Wild and Scenic River segments with a vegetation Outstandingly Remarkable Value (ORV) to *fully meet* or exceed the | **Objective:** Manage ACECs, WSAs, lands managed to minimize impacts on wilderness characteristics, areas with exemplary, ancient, or rare vegetation, and Wild and Scenic River segments to achieve BLM Colorado Public Land Health Standards (BLM 1997; Appendix C) on |

BLM_0165942

T. Description of Alternatives (Management Guidance for Alternatives A, B/B.1, C, D, and E [Land Health])

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency Preferred in Draft RMP | Alternative E Agency Proposed |
|---|---|---|---|---|---|
| | | | the BLM Colorado Public Land Health Standards. | BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). Manage the remaining lands, streams, and wetlands to *fully meet* the BLM Colorado Public Land Health Standards or to *meet with problems* where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards. | greater than 80 percent of upland and riparian vegetation communities with 80 percent confidence. On the remaining BLM-administered lands, manage to achieve BLM Colorado Public Land Health Standards on greater than 70 percent of upland and riparian vegetation communities with 80 percent confidence. Measure BLM Colorado Public Land Health Standards on uplands using foliar cover, species composition, canopy gap, soil stability, and other appropriate indicators, and use best available science to determine benchmarks for achieving standards. For aquatic and riparian systems, measure bank stability, floodplain connectivity, aquatic health, water |

BLM_0165943

T. Description of Alternatives (Management Guidance for Alternatives A, B/B.1, C, D, and E [Land Health])

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | | quality, and other appropriate indicators, and use best available science to determine benchmarks for achieving standards. |
| 26. | **Action:** No similar action in current RMPs. | **Action:** Apply land and stream health improvement projects in areas likely to be stabilized or improved to a higher health condition, regardless of land health status. | **Action:** Apply land and stream health improvements on lands, streams, and wetlands rated as *not meeting* BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). | **Action:** Apply land and stream health improvement projects in areas likely to be stabilized or improved to a higher health condition, regardless of land health status. This would apply to ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, areas with exemplary, ancient, or rare vegetation, and Wild and Scenic River segments with a vegetation ORV. In the remaining lands, streams, and wetlands, apply land and stream health improvement projects in areas rated as *not meeting* BLM Colorado Public | **Action:** Apply land and stream health improvement projects in areas likely to be stabilized or improved to a higher health condition, regardless of land health status. This would apply to ACECs, WSAs, lands managed to minimize impacts on wilderness characteristics, areas with exemplary, ancient, or rare vegetation, and Wild and Scenic River segments with a vegetation ORV. For remaining lands, streams, and wetlands, apply land and stream health improvement projects in areas rated as *not meeting* BLM Colorado |

BLM_0165944

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | Land Health Standards (BLM 1997; Appendix C). | Public Land Health Standards (BLM 1997; Appendix C). |
| 27. | **Action:** No similar action in current RMPs. | **Action:** Close, limit, or modify the causes, where an activity has been demonstrated to be causing land health problems, to improve the health of lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). Activities could include the following: <br>• Grazing <br>• Plant material and wood collection <br>• Noncommercial mineral material collection (e.g., moss rock collection and decorative stone collection) <br>• Travel <br>• Camping | **Action:** Limit or modify the cause, where an activity has been demonstrated to be causing land health problems, to improve health of lands, streams, and wetlands rated as *meeting* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C) *with problems* with a downward trend. Activities could include the following: <br>• Grazing <br>• Plant material and wood collection <br>• Noncommercial mineral material collection (e.g., moss rock collection and decorative stone collection) <br>• Travel <br>• Camping | **Action:** Limit, modify, or manage the cause, where an activity has been demonstrated to be causing land health problems, to improve land health of lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). Activities could include the following: <br>• Grazing <br>• Plant material and wood collection <br>• Noncommercial mineral material collection (e.g., moss rock collection and decorative stone collection) <br>• Travel <br>• Camping | **Action:** Limit, modify, or manage the cause, where an activity has been demonstrated to be causing land health problems, to improve land health of lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). Activities could include the following: <br>• Grazing <br>• Plant material and wood collection <br>• Noncommercial mineral material collection (e.g., moss rock collection and decorative stone collection) <br>• Travel <br>• Camping and other recreational activities |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165945

**Table T-1
Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 28. | **Action:** No similar action in current RMPs. | **Action:** Apply the following management, unless it can be demonstrated that new projects and land use authorizations do not reduce the opportunity to improve the health of lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C): <br>• ROW avoidance <br>• **STIPULATION** CSU-1/SSR-1: *Lands, Streams, and Wetlands "Not Meeting" BLM Colorado Public Land Health Standards*. Surface occupancy or use may be restricted or prohibited and SSR restrictions applied. (Refer to Appendix B; Figures 2-20 and 2-29) | **Action:** Same as Alternative A. | **Action:** Require that new projects and land use authorizations identify BMPs or conditions of approval that minimize conflicts with health-improvement measures for lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). | |

BLM_0165946

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 29. | **SOILS AND GEOLOGY** | | | | |
| 30. | **GOAL:** Manage for soil stability and productivity to maintain overall watershed health. Manage erosion to minimize downstream impacts from soil-related issues (e.g., sediment runoff, selenium, and salinity). | | | | |
| 31. | **Objective:** Make management units available for erosion and salinity control objectives and projects that do not conflict with primary objectives of each unit. | **Objective:** Manage activities in the Colorado River Basin to minimize the yield of sediment, salt, and selenium contributions from BLM-administered lands to water resources. | | | |
| 32. | **Action:** Develop necessary erosion-control structures, vegetation improvements, or salinity/selenium-reduction measures to improve water quality (BLM 1985). Develop in-channel structures and land treatment projects designed to reduce runoff and soil erosion in places where it does not | **Action:** Improve water quality and overall watershed health by managing the soil for adequate watershed cover and a healthy soil surface on soils high in salinity/selenium. This could include the following: • Modifying livestock grazing practices to reduce sediment yield • Limiting recreational uses • Planning and implementing comprehensive travel management | **Action:** Manage activities to minimize soil erosion and sediment yields to water bodies. | **Action:** Same as Alternative B. | **Action:** Improve water quality and overall watershed health by managing the soil for adequate watershed cover and a healthy soil surface on soils high in salinity/selenium. This could include the following: • Modifying livestock grazing practices to reduce sediment yield • Managing recreational uses |

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | conflict with management of other resources (BLM 1989a). | | | | • Planning and implementing comprehensive travel management |
| 33. | **Action:** Locate and assess nonfunctional, eroding, earthen check dams in the Mancos Shale areas north of Delta. | **Action:** Inventory and assess stock ponds, check dams, and contour furrows and rehabilitate, repair, or remove those structures that are eroding soils with the highest salinity and selenium concentrations and containing severe weed infestations. Areas in need of improvements include, but are not limited to: • Mancos shale areas north of Delta • East side of the Uncompahgre Plateau, from 25 Mesa Road to Dry Creek Canyon (contour furrow area) • Negro Creek/Dough Spoon Area | **Action:** No similar action. (A similar activity is not required.) | **Action:** When feasible, inventory and assess stock ponds, check dams, and contour furrows and rehabilitate, repair, or remove those structures with severe/active erosion. Combine efforts with other projects (e.g., range water projects, road maintenance, and recreation projects) where feasible to increase efficiency. | |
| 34. | **Action:** No similar action in current RMPs. | **Action:** Manage saline/selenium soils as ROW exclusion areas. | **Action:** Manage saline/selenium soils as ROW avoidance areas. | **Action:** No similar action. (Soils would be managed to meet the objective.) | |

BLM_0165948

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative B.1 (North Fork area only) | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| 35. | Allowable Use: **STIPULATION** TL-UB-1 (BLM 1989a): *Highly Erodible and/or Saline Soil Areas.* Prohibit surface-disturbing activities from March 1 to May 31 when saturated soils are most vulnerable to damage. (Refer to Appendix B; Figure 2-24, Appendix A.)<br><br>**Action:** Manage 24,180 acres of Mancos shale hills, commonly known as the "adobes," to reduce salinity loads in the Upper Colorado River Basin (BLM 1989a). | Alternative B: Allowable Use: **STIPULATION** NSO-1/NGD-1: *Geology Soil: Saline/ Selenium Soils.* Prohibit surface occupancy and use and apply NGD restrictions on lands with soils, as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, with the following | Allowable Use: **NO LEASING** (NL) NL-1: *Selenium Soils.* Close to oil and gas leasing and geophysical exploration soils with high and very high potential for selenium loading.<br><br>Allowable Use: **STIPULATION** NSO-2: *Selenium Soils.* Prohibit surface occupancy within 402 meters (0.25-mile) of soils with high and very high potential for | Allowable Use: **STIPULATION** CSU-2/ SSR-2: *Geology Soil: Saline/Selenium Soils.* Surface occupancy or use may be restricted and SSR restrictions applied on lands within mapped soils with the following special characteristics: saline/selenium soils. Special design, construction, and implementation measures, including relocation of operation by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/reclamation plan to avoid, minimize, and mitigate potential effects on soil productivity. | Allowable Use: **STIPULATION** CSU-3/ SSR-3: *Geology Soil: Saline/Selenium Soils.* Surface occupancy or use may be restricted and SSR restrictions applied on lands within mapped soils with the following special characteristics: saline/selenium soils. Special design, construction, and implementation measures, including relocation of operation by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/ reclamation plan to avoid and minimize potential effects on soil productivity. (Refer to Appendix B; Figures 2-23 and 2-31 [Alternative D] and 2-91 and 2-93 [Alternative E], Appendix A.) |

BLM_0165949

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A Current Management (No Action) | Alternative B | | Alternative C | Alternative D Agency Preferred in Draft RMP | Alternative E Agency Proposed |
|---|---|---|---|---|---|---|
| | | special character-istics: saline/seleniu m soils. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | selenium loading. (Refer to Appendix B; Figure 2-21, Appendix A.) | (Refer to Appendix B; Figures 2-22 and 2-30, Appendix A.) | | |
| 36. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: No similar allowable use. (There would not be a similar stipulation near agricultural operations.) | **Alternative B.1** (North Fork area only): Allowable Use: **STIPULA-TION** NSO-3: *Agricultural Operations.* Prohibit surface occupancy on, or within 0.25-mile of, any prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and | Allowable Use: No similar allowable use. (There would not be a similar stipulation near agricultural operations.) | | |

BLM_0165950

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | the West Elks American Viticultural area. (Refer to Appendix B; Figure 2-21, Appendix A.) | | | |
| 37. | **Action:** No similar action in current RMPs. | **Action:** Manage 7,360 acres of potential biological soil crust in the East Paradox ACEC as a ROW exclusion area. | **Action:** Manage 360 acres of rare biological soil crust (*Lecanora gypsicola* and *Gypsoplaca macrophylla*) in East Paradox as a ROW exclusion area. | **Action:** Manage 1,900 acres of rare biological soil crust (*Lecanora gypsicola* and *Gypsoplaca macrophylla*) in the Biological Soil Crust ACEC as a ROW exclusion area, with the following additional exception (manage these areas as ROW avoidance):<br>• Allow ROWs for private edge-holdings for reasonable access and utilities only if other access is not possible. | **Action:** Manage 390 acres of rare biological soil crust (*Lecanora gypsicola* and *Gypsoplaca macrophylla*) in the Biological Soil Crust ACEC as a ROW avoidance area. |
| 38. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** CSU-4/SSR-4: *Geology Soil; Potential Biological Soil Crust.* Surface occupancy or use | Allowable Use: **STIPULATION** CSU-5/SSR-5: *Geology Soil; East Paradox Biological Soil Crust.* Surface | Allowable Use: **STIPULATION** CSU-6/SSR-6: *Geology Soil; Potential Biological Soil Crust.* Surface occupancy or use may be restricted and SSR restrictions applied on lands within mapped soils with the following special | |

BLM_0165951

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | may be restricted and SSR restrictions applied on lands within mapped soils with the following special characteristics: potential biological soil crust. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/reclamation plan to mitigate potential effects on soil productivity. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | occupancy or use may be restricted and SSR restrictions applied on lands within mapped soils with the following special characteristics: East Paradox biological soil crust. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/ reclamation plan to mitigate potential effects on soil productivity. (Refer to Appendix B; Figures 2-22 and 2-30, Appendix A.) | characteristics: biological soil crust only when high levels of crust development are found. Determine the level of crust development using best available techniques. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/ reclamation plan to mitigate potential effects on soil productivity. (Refer to Appendix B; Figures 2-23 and 2-31 [Alternative D] and 2-91 and 2-93 [Alternative E], Appendix A.) | |
| 39. | **Action:** No similar action in current RMPs. | **Action:** Protect rare biological soil crust in the East Paradox area by pursuing acquisition of private parcels from | **Action:** Same as Alternative A. (Land acquisition would not be actively pursued.) | **Action:** Same as Alternative B. | **Action:** Same as Alternative A. (Land acquisition would not be actively pursued.) |

BLM_0165952

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | | willing sellers. (Also refer to *Lands and Realty* section.) | | | | |
| 40. | **Action:** No similar action in current RMPs. | **Action:** Manage slopes of 30 percent or greater (174,540 acres) as ROW exclusion areas. | | **Action:** Manage slopes of 40 percent or greater (115,080 acres) as ROW avoidance areas. | **Action:** Manage slopes of 30 percent or greater (174,540 acres) as ROW avoidance areas. | **Action:** Same as Alternative A. |
| 41. | Allowable Use: **STIPULATION** CSU-CO-27 (BLM 1991a): *Slopes of or Greater than 40 Percent.* Before disturbing the surface on slopes of 40 percent or greater, require a BLM Authorized Officer's approval of a professional engineering/reclamation plan. Require that such a plan demonstrate how the following will be accomplished: • Site productivity will be restored. | **Alternative B:** Allowable Use: **STIPULATION** NSO-4/NGD-2: *Geology: Slope Greater than 30 Percent.* Prohibit surface occupancy and use and apply NGD restrictions on lands with steep slopes greater than 30 percent. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | **Alternative B.1** (North Fork area only): Allowable Use: **STIPULATION** NSO-5: *High Geologic Hazard.* Prohibit surface occupancy on all areas with medium to high geologic hazard and on slopes greater than 30 percent. Allowable Use: **STIPULATION** CSU-7: *Moderate* | Allowable Use: **STIPULATION** CSU-8/ SSR-7: *Geology: Slope Greater than 40 Percent.* Surface occupancy or use may be restricted and SSR restrictions applied on steep slopes over 40 percent. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/ reclamation plan to mitigate potential effects on slope stability. (Refer | Allowable Use: **STIPULATION** NSO-6/ SSR-8: *Geology: Slope Greater than 40 Percent.* Prohibit surface occupancy and use and apply SSR restrictions on lands with steep slopes greater than 40 percent. (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) **STIPULATION** CSU-9/SSR-9: *Geology Slope, Slopes of 30 to 39 Percent.* Surface occupancy or use may be restricted and SSR restrictions applied on steep slopes of 30 to 39 percent. Special design, construction, and implementation measures, including | Allowable Use: **STIPULATION** CSU-8/SSR-7: *Geology: Slope Greater than 40 Percent and CSU-9/SSR-9: Geology: Slopes of 30 to 39 Percent.* Surface occupancy or use may be restricted and SSR restrictions applied on steep slopes above 40 percent and of 30 to 39 percent. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/ |

BLM_0165953

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | • Surface runoff will be adequately controlled.<br>• Off-site areas will be protected from accelerated erosion, such as rilling, gullying, piping, and mass wasting.<br>• Surface-disturbing activities will not be conducted during extended wet periods.<br>(Refer to Appendix B; Figure 2-19, Appendix A.) | *Geologic Hazard.* Surface occupancy or use may be restricted on all areas with moderate geologic hazards. Special design, construction, and implementa-tion measures, including relocation of operations by more than 200 meters (656 feet), may be required. (Refer to Appendix B; Figure 2-21, Appendix A.) | to Appendix B; Figures 2-22 and 2-30, Appendix A.) | relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit an engineering/ reclamation plan to mitigate potential effects on slope stability. (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) | reclamation plan to mitigate potential effects on slope stability. (Refer to Appendix B; Figures 2-91 and 2-93, Appendix A.) |
| 42. | Allowable Use: **STIPULATION** TL-UB-1 (BLM 1989a): *Highly Erodible and/or Saline Soil Areas.* Prohibit | Allowable Use: **STIPULATION** TL-1: *Saturated Soils.* Prohibit surface occupancy and surface-disturbing activities in areas where soils are | Allowable Use: No similar allowable use. (A TL for saturated soil would not exist.) | Allowable Use: **STIPULATION** TL-2: *Saturated Soils.* Prohibit surface occupancy and surface-disturbing activities in areas where | Allowable Use: Same as Alternative C. |

BLM_0165954

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | surface-disturbing activities from March 1 to May 31 when saturated soils are most vulnerable to damage. (Refer to Appendix B; Figure 2-24, Appendix A.) | saturated or that demonstrate rutting of 2 inches or more. The BLM Authorized Officer would determine when soil conditions are appropriate for activities to resume. (Refer to Appendix B; Figure 2-25, Appendix A.) | | soils are saturated or that demonstrate rutting of 3 inches or more. The BLM Authorized Officer would determine when soil conditions are appropriate for activities to resume. (Refer to Appendix B; Figure 2-27, Appendix A.) | |

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 43. | **WATER RESOURCES** | | | | |
| 44. | **GOAL:** Protect, restore, and enhance watershed function in the capture, retention, and release of water in quantity, quality, and timing, thereby ensuring aquatic and terrestrial ecosystem health and public uses. Maintain and restore the physical, chemical and biological integrity of the aquatic system, including stream banks and bottom configurations; maintain and restore the sediment regime under which aquatic ecosystems evolved; maintain and restore the timing, variability, and duration of floodplain inundation and water table elevation in wetlands, seeps and springs. | | | | |
| 43. | **Objective:** Maintain or improve water quality in accordance with state and federal laws and approved standards, including consultation with state agencies on | **Objective:** Maintain and improve water quality by ensuring streams are in compliance with the Clean Water Act for biological, chemical, and physical constituents. | | | **Objective:** Maintain and improve water quality by ensuring streams are in compliance with the Clean Water Act for greater than 80 percent of stream segments in ACECs, WSAs, suitable wild and |

BLM_0165955

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | proposed projects that could significantly affect water quality (BLM 1985). | | | | | scenic river segments, and lands managed to minimize impacts on wilderness characteristics, and greater than 70 percent of stream segments on the remaining BLM-administered lands, with 80 percent confidence. Where not meeting these water quality goals, work toward meeting them in accordance with Land Health Standards. |
| 44. | **Action:** No similar action in current RMPs. | **Action:** Manage lands to improve water quality and promote the delisting of state impaired water bodies (303[d]-listed and Monitoring and Evaluation list) in areas where BLM management actions are contributing to impaired water quality. | | **Action:** Manage lands to improve water quality and promote the delisting of state impaired water bodies (303[d]-listed water bodies only) in areas where BLM management actions are contributing to impaired water quality. Develop a water and aquatic monitoring plan using the BLM aquatic AIM protocol, if necessary, to determine areas where adaptive management is needed. | | |
| 45. | Allowable Use: **STIPULATION** NSO-CO-7 (BLM 1991a): *Waterfowl* | **Alternative B:** Allowable Use: | **Alternative B.1** (North Fork area only): | Allowable Use: **STIPULATION** CSU-10/SSR-10: *Hydrology River.* Surface occupancy | Allowable Use: **STIPULATION** NSO-9/SSR-11: *Hydrology River.* Prohibit surface | Allowable Use: **STIPULATION** CSU-10/SSR-10: *Hydrology River.* Surface occupancy |

BLM_0165956

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | *and Shorebird.* Prohibit surface occupancy and use on significant production areas; major areas are Waterfowl Ecological emphasis areas and rookeries. (Refer to Appendix B; Figure 2-19, Appendix A.) | **NO LEASING/ STIPULA- TION** NL-2/NGD-3: *Hydrology River.* Close to fluid mineral leasing and geophysical exploration and prohibit surface-disturbing activities within 402 meters (1,320 feet) (0.25-mile) the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the following major rivers: | Allowable Use: **NO LEASING** NL-3: *Major River Corridors.* Close to oil and gas leasing and geophysical exploration within 0.50-mile mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers.<br><br>Allowable Use: **STIPULA- TION** NSO-7: *Major River Corridors.* Prohibit surface occupancy within 0.50 to 1.0-mile of the North Fork of the | or use may be restricted and SSR restrictions may be applied within 402 meters (1,320 feet) (0.25-mile) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers: Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers. (Refer to Appendix B; Figures 2-22 and 2-30, Appendix A.) | occupancy and use and apply SSR restrictions within 400 meters (1,312 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers:<br>• Gunnison<br>• North Fork Gunnison<br>• San Miguel<br>• Uncompahgre<br>• Dolores Rivers (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) | or use may be restricted and SSR restrictions may be applied within 122 meters (400 feet) of the ordinary high-water mark (bank-full stage) or within 100 meters (328 feet) of the 100-year floodplain (whichever area is greatest) on the following major rivers: Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers. (Refer to Appendix B; Figures 2-91 and 2-93, Appendix A.) |

BLM_0165957

**Table T-I**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | | Gunnison, North Fork Gunnison, San Miguel, Uncom-pahgre, and Dolores Rivers. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | Gunnison and Smith Fork of the Gunnison Rivers.<br><br>Allowable Use: **STIPULA-TION** NSO-8: *Floodplains.* Prohibit surface occupancy within the 100-year floodplain of any stream or river system. (Refer to Appendix B; Figure 2-21, Appendix A.) | | | |
| 46. | **Action:** No similar action in current RMPs. | **Action:** Designate as ROW avoidance areas a 0.25-mile buffer along the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores river corridors. | | **Action:** No similar action. (The major river corridors would not be ROW avoidance or exclusion areas.) | **Action:** Same as Alternative B. | **Action:** Designate as ROW avoidance areas a 400-foot buffer along the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores River corridors. |

BLM_0165958

Table T-1
Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| 47. | **Action:** No similar action in current RMPs. | **Action:** Manage a 325-foot buffer along perennial streams as ROW exclusion areas. | | **Action:** No similar action. (Perennial streams would not be ROW avoidance or exclusion areas.) | **Action:** Manage a 325-foot buffer along perennial streams as ROW avoidance areas. | **Action:** Manage a 50-foot buffer along perennial streams as ROW avoidance areas. |
| 48. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: **STIPULA-TION** NSO-10/NGD-4: *Perennial Streams.* Prohibit surface occupancy and use and apply NGD restrictions within 152 meters (500 feet) of the edge of the ordinary high-water mark (bank-full stage) of perennial streams. (Refer to Appendix B; Figures 2-22 | **Alternative B.1** (North Fork area only): Allowable Use: **NO LEASING** NL-4: *Water Bodies.* Close to oil and gas leasing and geophysical exploration within 805 meters (2,640 feet) (0.50-mile) of lakes, ponds, naturally occurring wetlands and impounding reservoirs (not including stock ponds for livestock). | Allowable Use: **STIPULATION** CSU-11/SSR-12: *Perennial Streams.* Surface occupancy or use may be restricted and SSR restrictions may be applied on lands within 100 meters (325 feet) of the edge of the ordinary high-water mark (bank-full stage) of perennial streams. (Refer to Appendix B; Figures 2-22 and 2-30, Appendix A.) | Allowable Use: **STIPULATION** NSO-11/SSR-13: *Hydrology Features.* Prohibit surface occupancy and use and apply SSR restrictions within 100 meters (328 feet) from the mapped extent of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. For streams, measure the buffer from ordinary high-water mark (bank-full stage); for wetland features, measure the buffer from the edge of the mapped extent. (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) | Allowable Use: **STIPULATION** CSU-12/SSR-13: *Hydrology Features.* Surface occupancy or use may be restricted on lands within 50 feet of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. For perennial, intermittent, and ephemeral streams, measure the extent from the ordinary high-water mark (bank-full stage); for wetland features, measure the buffer from the edge of the mapped extent. For unmapped wetlands, determine the vegetation boundary (from which the buffer originates) in the field. Surface-disturbing |

BLM_0165959

Table T-1
Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | and 2-29, Appendix A.) | Allowable Use: **NO LEASING** NL-5: *Water Ways:* Close to oil and gas leasing and geophysical exploration within 805 meters (2,640 feet) (0.50-mile) of all streams, watercourses, and waterways. (Refer to Appendix B; Figure 2-21, Appendix A.) | | **STIPULATION** CSU-12: *Hydrology Features.* Surface occupancy or use may be restricted on lands adjacent to perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. For perennial, intermittent, and ephemeral streams, measure the extent from the ordinary high-water mark (bank-full stage); for wetland features, measure the buffer from the edge of the mapped extent. For unmapped wetlands, determine the vegetation boundary (from which the buffer originates) in the field. Surface-disturbing activities may require special engineering design, construction, and implementation measures, including | activities may require special engineering design, construction, and implementation measures, including relocation of operations beyond 200 meters (656 feet), from the extent of water impoundments, streams, riparian areas, and/or wetlands to protect water resources. Apply the CSU restrictions from 50 feet of the edge of the ordinary high-water mark (bank-full stage) of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. (Refer to Appendix B; Figure 2-91, Appendix A.) |

BLM_0165960

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | | | | | relocation of operations beyond 200 meters (656 feet), from the extent of water impoundments, streams, riparian areas, and/or wetlands to protect water resources. Apply CSU restrictions from 325 to 500 feet of the edge of the ordinary high-water mark (bank-full stage) of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. (Refer to Appendix B; Figure 2-23, Appendix A.) | |
| 49. | **Objective:** No similar objective in current RMPs. | **Objective:** Manage lands within municipal watersheds and public water supply areas to provide clean drinking water to local communities. | | | | |
| 50. | **Action:** No similar action in current RMPs. | **Action:** Manage as ROW exclusion areas those lands within 2,640 feet (0.50-mile) of either side of a classified surface water-supply stream segment (as | | **Action:** Manage as ROW avoidance areas those lands within 1,000 feet of either side of a classified surface water supply-stream segment (as measured from the average high-water mark of a water body) for a distance of 5 miles upstream of a public water supply intake. | | |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165961

T. Description of Alternatives (Management Guidance for Alternatives A, B/B.1, C, D, and E [Water Resources])

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | | measured from the average high-water mark of a water body) for a distance of 5 miles upstream of a public water supply intake. | | | | |
| 51. | Allowable Use: **LEASE NOTICE** LN-UB-1: *Municipal Water Supply.* If drilling is proposed, the operator is hereby notified that there are concerns about the municipal water source and water conveyance for the town of Norwood, Colorado. The lessee is hereby notified that special design, construction, and scheduling measures may be required in order to minimize the impacts of drilling and production. The overall goal of these measures is to protect Norwood's | **Alternative B: Action:** Apply the restrictions or closures specified below on the following lands: • Within 2,640 feet (0.50-mile) on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of | **Alternative B.1** (North Fork area only): Allowable Use: **NO LEASING** NL-7: *Public Water Supplies.* Close to oil and gas leasing and geophysical exploration within 1,320 feet of a municipal water supply (classified surface water-supply stream segment), including intakes, and within a | **Action:** Apply the restrictions or closures specified below on the following lands: • Within 1,000 feet on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake classified by the State as a "water supply." • Within a 1,000-foot buffer of all public water supplies that use a groundwater well or spring.  Apply the following restrictions or closures on these lands: | **Action:** Apply the restrictions or closures specified below on the following lands: • Within 1,000 feet on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake classified by the State as a "water supply." • Within a 1,000-foot buffer of all public water supplies that use a groundwater well or spring.  Apply the following restrictions or closures on these lands: | **Action:** Apply the restrictions or closures specified below on the following lands: • Within 1,000 feet on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake classified by the State as a "water supply." • Within a 2,640-foot (0.50-mile) buffer of all public water supplies that use a groundwater well and groundwater under the direct influence of surface water. |

BLM_0165962

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | municipal water source (refer to Appendix B). | 5 miles upstream of a public water supply intake classified by the State as a "water supply." <br>• Within a 2,640-foot (0.50-mile) buffer of all public water supplies that use a ground-water well or spring.<br><br>Apply the following restrictions or closures on these lands:<br>• Close to mineral materials disposal | 1,320-foot buffer of all public water supplies that use a groundwater well or spring.<br><br>Allowable Use:<br>**STIPULA-TION** NSO-12: *Public Water Supplies.* Prohibit surface occupancy from 1,320 feet (0.25-mile) to 2,640 feet (0.50-mile) of a municipal water supply (classified surface water-supply stream segment), including intakes, and | • Close to mineral materials disposal (e.g., sand and gravel).<br>• Close to nonenergy solid mineral leasing (e.g., potash, sodium, and phosphate).<br>• Close to coal leasing.<br>• Close to livestock grazing.<br>• Recommend to the Secretary of the Interior withdrawal from locatable minerals (e.g., gold, uranium, and other hard rock).<br>• **STIPULATION** NSO-13: *Hydrology Source.* Prohibit surface occupancy and use within 305 meters (1,000 feet) of a classified surface water supply stream segment (as measured from the average high water mark) for a distance of 8 kilometers (5 miles) upstream of a public water supply intake | • Close to mineral materials disposal (e.g., sand and gravel).<br>• Close to nonenergy solid mineral leasing (e.g., potash, sodium, and phosphate).<br>• Minimize impacts from livestock grazing on these lands.<br>• Recommend to the Secretary of the Interior withdrawal from locatable minerals (e.g., gold, uranium, and other hard rock).<br>• Allowable Use:<br>**NO LEASING** NL-8: *Public Water Supplies.* Close to fluid mineral leasing and geophysical exploration 1,000 feet on either side of a classified surface water-supply stream segment (as measured from the average high water) for a distance of 5 | Apply the following restrictions or closures on these lands:<br>• Close to mineral materials disposal (e.g., sand and gravel).<br>• Close to nonenergy solid mineral leasing (e.g., potash, sodium, and phosphate).<br>• Minimize impacts from livestock grazing on these lands.<br>• Require a mine plan for locatable mineral development.<br>• Allowable Use:<br>**STIPULATION** NSO-69: *Public Water Supplies.* Prohibit surface occupancy and use within 305 meters (1,000 feet) on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a |

BLM_0165963

T. Description of Alternatives (Management Guidance for Alternatives A, B/B.1, C, D, and E [Water Resources])

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | (e.g., sand and gravel).<br>• Close to nonenergy solid mineral leasing (e.g., potash, sodium, and phosphate).<br>• Close to coal leasing.<br>• Close to livestock grazing.<br>• Recommend to the Secretary of the Interior withdrawal from locatable minerals (e.g., gold, uranium, and other hard rock). | from 1,320 feet (0.25-mile) to 2,640 feet (0.50-mile) of all public water supplies that use a groundwater well or spring. (Refer to Appendix B; Figure 2-21, Appendix A.) | with the classification "*Water Supply*" by the State of Colorado.<br>• **STIPULATION** NSO-13b: *Hydrology Public Well.* Prohibit surface occupancy and use within 305 meters (1,000 feet) of groundwater public water supply wells.<br><br>If public water providers develop source water protection plans, apply this stipulation to cover the appropriate designated area in the protection plan and apply these protection measures. (Refer to Appendix B; Figure 2-22, Appendix A.) | miles upstream of a public water supply intake classified by the State as a "water supply," and within a 1,000-foot buffer of all public water supplies that use a groundwater well or spring.<br><br>If public water providers develop source water protection plans, apply this "No Leasing" to cover the appropriate designated area in the protection plan and apply these protection measures. (Refer to Appendix B; Figure 2-23, Appendix A.) | public water supply intake classified by the State of Colorado as a "water supply," and within a 2,640-foot (0.50-mile) buffer of all public water supplies that use a groundwater well or groundwater under the direct influence of surface water. Also prohibit directional drilling within 457 vertical meters (1,500 vertical feet) below a surface Public Water Supply or 457 vertical meters (1,500 vertical feet) below the depth of a Public Water Supply that use a groundwater well or groundwater under the direct influence of surface water. (Refer to Appendix B; Figure 2-91, Appendix A.)<br>• Allowable Use: **STIPULATION** CSU- |

BLM_0165964

T. Description of Alternatives (Management Guidance for Alternatives A, B/B.1, C, D, and E [Water Resources])

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Allowable Use: **NO LEASING** NL-6: *Public Water Supplies.* Close to fluid mineral leasing and geophysical exploration within 2,640 feet (0.50-mile) of either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance | | | | 13: *Hydrology Source.* Surface occupancy or use may be restricted on lands located greater than 305 meters (1,000 feet) but less than 805 meters (2,640 feet) (0.50-mile) of a classified surface water supply stream segment (as measured from the average high-water mark) for a distance of 8.05 kilometers (5 miles) miles upstream of a public water supply intake classified by the State as a "water supply," and all public water supplies that use a groundwater well or spring. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. |

BLM_0165965

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | of 5 miles upstream of a public water supply intake classified by the State as a "water supply," and within a 2,640-foot (0.50-mile) buffer of all public water supplies that use a ground-water well or spring.<br>• Allowable Use: **STIPU-LATION** NGD-5: *Public Water Supplies.* Prohibit surface- | | | Prior to authorizing activities in this area, the operator may be required to submit a coordinated water resources monitoring plan to mitigate potential effects on the source water protection areas of public water supply. (Refer to Appendix B; Figure 2-91, Appendix A.) |

BLM_0165966

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | disturbing activities on lands within 2,640 feet (0.50-mile) on either side of a classified surface water-supply stream segment (as measured from the average high water mark) for a distance of 5 miles upstream of a public water supply intake classified by the State as "water supply" and within 2,640 feet (0.50-mile) | | | | |

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | of all public water supplies that use a ground-water well or spring.<br><br>If public water providers develop source water protection plans, apply this "No Leasing" and NGD restriction to cover the appropriate designated area in the protection plan and apply these protection measures. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | | | |

BLM_0165968

## Table T-1
### Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 52. | **Objective:** No similar objective in current RMPs. | **Objective:** Provide sufficient water quantity on BLM-administered lands for multiple use management and functioning, healthy riparian, and aquatic ecosystems. | | | |
| 53. | **Action:** Work with Colorado Water Conservation Board to ensure a sufficient instream flow to benefit warm and cold water fish species on:<br>• 23 existing instream flow rights held by the Colorado Water Conservation Board and<br>• Streams where Colorado Water Conservation Board applications for instream flow water rights are pending, such as the Lower San Miguel River and Tabeguache Creek. | **Action:** Make recommendations to the Colorado Water Conservation Board for protection or enlargements of instream flows on appropriate stream segments. Assist the Conservation Board in instream flow assessments and monitoring of current BLM instream flow stream reaches for compliance. | **Action:** No similar action. (Recommendations to the Colorado Water Conservation Board would not be required.) | **Action:** Same as Alternative B. | |

BLM_0165969

## Table T-1
## Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency Preferred in Draft RMP | Alternative E Agency Proposed |
|---|---|---|---|---|---|
| 54. | **Action:** Maintain current water rights, including groundwater (e.g., wells and springs), to benefit wildlife and livestock, including: <br>• 54 surface water rights <br>• 2 ditches <br>• I well <br>• 15 reservoirs <br>• 121 springs/seeps | **Action:** Maintain current water rights to benefit wildlife and livestock. Object to proposals that could jeopardize existing rights. File for new surface water rights on perennial and seasonal streams and new water rights for groundwater sources (i.e., springs/seeps, wells, reservoirs, streams) in adequate quantities to protect Planning Area resource needs and sustainability. | | | |
| 55. | **Objective:** No similar objective in current RMPs. | **Objective:** Protect groundwater resources and recharge areas to maintain functioning condition of all parameters within the hydrologic cycle, including groundwater quantity and quality. | | | |
| 56. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: **STIPULA-TION** NSO–14: Domestic Water Wells. Prohibit surface occupancy within 305 meters (1,000 feet) of all | **Alternative B.1** (North Fork area only): Allowable Use: **NO LEASING** NL-9: *Domestic Water Wells and Private Water Systems.* Close to oil | Allowable Use: No similar allowable use or action. (There would not be a stipulation or requirement on well bores.) | **Action:** Apply the following requirements to oil and gas well bores that are within 305 meters (1,000 feet) of a domestic water well, beginning at the ground surface and extending through the freshwater aquifer: <br>• Extend surface casing through the freshwater aquifer. | Allowable Use: **STIPULATION** CSU-59: *Domestic Water Wells.* Surface occupancy or use may be restricted on lands located within 305 meters (1,000 feet) of all domestic water wells. Special engineering design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), |

BLM_0165970

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | domestic water wells. (Refer to Appendix B; Figure 2-20, Appendix A.) | and gas leasing and geophysical exploration within 1,320 feet of all domestic water wells and private water systems, including ditches and domestic water decrees. Allowable Use: **STIPULATION** NSO-15: *Domestic Water Wells and Private Water Systems.* Prohibit surface occupancy from 402 meters (1,320 feet) (0.25-mile) to 805 | | • Require freshwater mud for drilling the surface casing. | may be required. Also prohibit directional drilling within 457 vertical meters (1,500 vertical feet) below the depth of a domestic water well. (Refer to Appendix B; Figure 2-91, Appendix A.) |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165971

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|---|
| | | | meters (2,640 feet) (0.50-mile) of all domestic water wells and private water systems, including ditches and domestic water decrees.<br><br>(Refer to Appendix B; Figure 2-21, Appendix A.) | | | |
| 57. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: No similar allowable use. (There would not be a stipulation on water conveyance systems.) | **Alternative B.1** (North Fork area only): Allowable Use: **STIPULA-TION** NSO-16: *Water Conveyance Systems.* Prohibit surface occupancy within 1,320 | Allowable Use: Same as Alternative B. | | |

BLM_0165972

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | feet of any dam, ditch, irrigation intake, canal, or other water conveyance. (Refer to Appendix B; Figure 2-21, Appendix A.) | | | |
| 58. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Protect soil, water, and vegetation resources during periods of drought. | | | |
| 59. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Implement drought management guidelines, outlined in Appendix I, Drought Management, during drought to maintain or achieve long-term resource productivity. | | | |

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| 60. | **VEGETATION** | | | | |
| 61. | *VEGETATION – GENERAL* | | | | |
| 62. | **GOAL:**<br>Manage vegetation for a mix of productive and resilient plant and biological soil crust communities that sustain native plant and animal species, including pollinators and butterflies, especially monarchs, at viable population levels. Manage shrub and woodland communities within the Historic Range of Natural Variability, maintaining successional processes and sustaining all structural stages across the landscape. Manage riparian and wetland systems to function properly, have the ability to recover from disturbance, and sustain native species at viable population levels. | | | | |

BLM_0165973

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| 63. | **Objective:** No similar objective in current RMPs. | **Objective:** Maximize native vegetation. | **Objective:** Minimize loss of native vegetation. | **Objective:** Maximize native vegetation and natural processes. | **Objective:** Maximize native vegetation and natural processes by ensuring upland vegetation communities are within the range of natural variability, with an appropriate mix of plant functional groups, cover, and diversity, according to best available science on greater than 80 percent of vegetation communities in ACECs, WSAs, suitable wild and scenic river segments, and lands managed to minimize impacts on wilderness characteristics and on greater than 70 percent of vegetation communities on the remaining BLM-administered lands, over 10 years with 80 percent confidence. |

BLM_0165974

Table T-1
Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| 64. | **Action:**<br>Where reseeding is required, emphasize using native plant species. Consider seeding nonnative plant species based on local goals, native seed availability and cost, persistence of nonnative plants and annuals and noxious weeds on the site, and composition of nonnative species in the seed mix (BLM 1997). | **Action:**<br>Use locally derived native species for revegetation. If locally derived native species are not available or cost prohibitive, allow some use of sterile nonnative species. | **Action:**<br>Use native species for revegetation. If native species are not available or cost prohibitive, allow some use of nonnative species that are not invasive. | **Action:**<br>Use locally derived native species for revegetation. If locally derived native species are not available, are cost prohibitive, or are not likely to succeed, allow use of native species from outside the area or nonnative species that are not invasive. | **Action:**<br>Use locally derived native species for revegetation. If locally derived native species are not available, are cost prohibitive, or are not likely to succeed, allow use of native species from outside the area or nonnative species that are not invasive when all other native revegetation options have been determined to be ineffective. |
| 65. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Restore areas of degraded vegetation where there is a high probability of success. Use test plots first for more difficult areas.<br><br>Revegetate areas that are impacted by wildfire or resource use and development to basic levels of ecologic | **Action:**<br>As off-site mitigation for vegetation damaged by nearby resource use and development, restore areas of degraded vegetation where there is a high probability of success.<br><br>Revegetate areas that are impacted by wildfire or resource use and | **Action:**<br>On ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, and areas with rare vegetation, restore areas of degraded vegetation, including burned areas, where there is a high probability of success. Use test plots first for more difficult areas. | **Action:**<br>On ACECs, WSAs, lands managed to minimize impacts on wilderness characteristics, and areas with rare vegetation, restore areas of degraded vegetation, including burned areas, where there is a high probability of success. Use test plots first for more difficult areas. |

BLM_0165975

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | functionality as on-site mitigation. | development as on-site mitigation. | On other lands, revegetate areas that are impacted by wildfire or resource use and development to basic levels of ecologic functionality as on-site or off-site mitigation. | On other lands, revegetate areas that are impacted by wildfire or resource use and development to basic levels of ecologic functionality as on-site or off-site mitigation. |
| 66. | **Objective:** No similar objective in current RMPs. | **Objective:** Provide the public with commonly available and renewable native plant materials through the sale of native seed collecting permits, commercial and institutional seed-collecting permits, and permits for the collection of other plant products, while protecting other resources. | | | |
| 67. | **Action:** No similar action in current RMPs. | **Action:** Make 444,160 acres available for seed collection permits. Close the following areas to permits:<br>• WSAs<br>• ACECs<br>• Lands managed to protect wilderness characteristics<br>• Ecological emphasis areas<br>• Riparian areas, except for research and revegetation purposes | **Action:** Make 631,060 acres available for permits for seed collection, wildings, and other plant materials. Close the following areas to permits:<br>• WSAs<br>• Occupied threatened and endangered plant habitat<br>• Occupied special status plant species habitat | **Action:** Make 582,950 acres available for permits for seed collection, wildings, and other plant materials. Close the following areas to permits:<br>• WSAs<br>• ACECs, except for research and revegetation purposes<br>• Lands managed to protect wilderness characteristics<br>• Ecological emphasis areas | **Action:** Make 631,060 acres available for permits for seed collection, wildings, and other plant materials.<br><br>Except for research and revegetation purposes, close the following areas to permits:<br>• WSAs<br>• Occupied threatened and endangered plant habitat; collection of ESA-listed taxa will not be permitted |

BLM_0165976

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | • Exemplary, ancient, and rare vegetation communities<br>• Occupied threatened and endangered plant habitat<br>• Occupied special status plant species habitat | | • Riparian areas, except for research and revegetation purposes<br>• Exemplary, ancient, and rare vegetation communities<br>• Occupied threatened and endangered plant habitat<br>• Occupied special status plant species habitat | • Occupied special status plant species habitat |
| 68. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>Manage exemplary, ancient, and rare vegetation communities; and ecological emphasis areas to maintain their integrity and functionality. (Refer to Wildlife – Terrestrial for actions related to ecological emphasis areas.) | | | **Objective:**<br>Same as Alternative A. |
| 69. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage exemplary, ancient, and rare vegetation communities as ROW exclusion areas. | **Action:**<br>Manage exemplary, ancient, and rare vegetation communities as ROW avoidance areas. | | **Action:**<br>Same as Alternative A. |
| 70. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>**STIPULATION** NSO-17/NGD-6: *Plant Community.* Prohibit surface occupancy and use and apply NGD restrictions within occupied habitat for exemplary, ancient, rare, and relict vegetation | Allowable Use:<br>Same as Alternative A. (There would not be NSO, CSU, NGD, or SSR restrictions in exemplary, ancient, rare, or relict vegetation communities.) | Allowable Use:<br>**STIPULATION** CSU-14/SSR-14: *Plant Community.* Surface occupancy or use may be restricted and SSR restrictions applied within occupied habitat that meets BLM's criteria established in the RMP | Allowable Use:<br>Same as Alternative A. (There would not be NSO, CSU, NGD, or SSR restrictions in exemplary, ancient, rare, or relict vegetation communities.) |

BLM_0165977

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | communities. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | | for significant and/or relict plant communities (exemplary, ancient, and rare vegetation communities). Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Prior to authorizing activities in this area, the operator may be required to submit a plan of development that would demonstrate that habitat would be preserved to maintain the viability of significant or relict plant communities. (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) | |
| 71. | *VEGETATION – UPLANDS* | | | | |
| 72. | **Objective:** No similar action in current RMPs. | **Objective:** Manage vegetation structure for maximum naturalness, with secondary outcomes of sensitive species habitat, | **Objective:** Manage vegetation structure to emphasize resource production and fuels reduction as needed. | **Objective:** On ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, and areas with exemplary, | **Objective:** On ACECs, WSAs, lands managed to minimize impacts on wilderness characteristics, and areas with exemplary, ancient, |

BLM_0165978

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | resource production, and fuels reduction. | | ancient, or rare vegetation, manage vegetation structure to emphasize naturalness of vegetation age class distribution across the landscape and to support sensitive species habitat, with resource production, big game habitat, and fuels reduction as secondary outcomes.<br><br>On the remaining areas, manage vegetation structure to emphasize resource production and fuels reduction and to support big game species habitat, with naturalness and sensitive species habitat as secondary outcomes. | or rare vegetation, manage vegetation structure to emphasize naturalness of vegetation age class distribution across the landscape and to support sensitive species habitat, with resource production, big game habitat, and fuels reduction as secondary outcomes.<br><br>On the remaining areas, manage vegetation structure to emphasize resource production and fuels reduction and to support big game species habitat, with naturalness and sensitive species habitat as secondary outcomes. |
| 73. | **Action:** To maintain dispersed ecologic communities for wildlife, in all vegetation types, maintain as leave | **Action:** Update the vegetation mosaic objectives in the Fire Management Plan (FMP) to meet RMP objectives for upland | **Action:** No similar action. (The FMP would be updated to meet RMP objectives, without a specific design | **Action:** Same as Alternative B. | |

BLM_0165979

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | strips or islands interspersed throughout the project areas. 5 to 15 percent of the existing vegetation (emphasis area A; BLM 1985). | vegetation. Vegetation treatments must be consistent with these mosaic objectives and must meet multiple interdisciplinary objectives. | requirement for vegetation treatments.) | | |
| 74. | *VEGETATION – RIPARIAN* | | | | |
| 75. | **Objective:** No similar objective in current RMPs. | **Objective:** Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions. | **Objective:** Manage naturally occurring riparian and wetland areas for Proper Functioning Condition. | **Objective:** Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions and to meet or exceed Proper Functioning Condition. | **Objective:** Manage naturally occurring riparian and wetland areas to maintain or improve stream banks and floodplains to a stable and Proper Functioning Condition, similar to reference condition or expected condition for greater than 80 percent of stream segments in ACECs, WSAs, suitable wild and scenic river segments, and lands managed to minimize impacts on wilderness characteristics and greater than 70 percent of stream segments on remaining BLM- |

BLM_0165980

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | | administered lands, over 10 years with 80 percent confidence where not meeting these vegetation community goals, work toward meeting them in accordance with Land Health Standards. |
| 76. | **Action:** On 15,350 acres (management unit 7), protect riparian/aquatic zones up to 0.25-mile wide. Activities that disturb these areas could be approved on a site-specific basis after consultation with affected entities and development of mitigating measures (BLM 1989a). | **Action:** Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 100-foot buffer from their edge, as ROW exclusion areas, unless it can be determined that the project would not diminish site integrity. | **Action:** Require that new ROW authorizations in naturally occurring wetlands and riparian areas, seeps, and springs identify effective measures to maintain Proper Functioning Condition. | **Action:** Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 325-foot buffer from their edge, as ROW avoidance areas unless it can be determined that the project would not diminish hydrologic or vegetation conditions. | **Action:** Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 50-foot buffer from their edge, as ROW avoidance areas unless it can be determined that a project would maintain Proper Functioning Condition. |
| 77. | **Action:** On 6,480 acres (emphasis area J), coordinate forestry and woodland products management on a case-by-case basis | **Action:** Close riparian areas to mineral materials disposal (with a 500-foot buffer), wood products collection and harvest, and other plant products collection | **Action:** Limit mineral materials disposal, wood products collection and harvest, and other plant products collection within riparian areas to locations where | **Action:** Close riparian areas to mineral materials disposal, wood products collection and harvest, and other plant products collection, except for research, | **Action:** No similar action; this is addressed by other actions. |

BLM_0165981

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | to ensure riparian resources are protected and, in some cases, improved (BLM 1985; also refer to the *Forest and Woodland Products* section.) | (with a 100-foot buffer). Prohibit issuing permits for recreation activities or events. | they would have the least impact. | invasive species control, and revegetation (with a 100-foot buffer).<br><br>Require additional riparian stipulations for commercial special recreation permits (SRPs) and restrict use to designated routes in locations where they would have the least impact for organized group and event permits. | |
| 78. | **Action:**<br>No similar action in current RMPs | **Action:**<br>Limit vegetation treatments in riparian areas to weed treatment and managed wildland fire from natural ignition. | **Action:**<br>Allow vegetation treatments in riparian areas that do not impair riparian/wetland values. | **Action:**<br>Allow vegetation treatments in riparian areas that are compatible with and promote natural riparian/wetland function and improvement. | |
| 79. | **Action:**<br>Improve aquatic/riparian habitat on the following priority areas:<br>• Upper San Miguel River and its tributaries (44 miles) | **Action:**<br>No similar action; this is addressed by other actions. | | | |

BLM_0165982

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | • Upper Dolores River (30 miles)<br>• Lower San Miguel and its tributaries (20 miles) (BLM 1985)<br><br>Manage 680 acres in the Roubideau Creek and Potter Creek drainages for improvement of riparian habitat (BLM 1989a).<br><br>Manage 3,720 acres (management unit 9) to restore and enhance riparian vegetation along 40 miles of streams (BLM 1989a).<br><br>On 3,720 acres (management unit 9), incorporate into existing activity plans, or develop in new riparian/aquatic system management plans, | | | | |

BLM_0165983

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | objectives and projects designed to accelerate improvement of species diversity, stream bank cover and stability, and instream structure and to raise the water table (BLM 1989a).<br><br>On 5,200 acres (emphasis area B), invest wildlife funds for structural improvements and vegetation restoration projects to improve high-priority riparian habitat at the following drainages: Roc, North and South Mesa, and La Sal Creeks (BLM 1985; also refer to the *Terrestrial Wildlife* section). | | | | |

BLM_0165984

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| 80. | **Action:** At a minimum, maintain or preferably improve riparian vegetation and stream bank cover (BLM 1989a). <br><br> Maintain or improve vegetation conditions and stream bank cover (BLM 1989a). <br><br> Restore and enhance riparian vegetation along 40 miles of streams (management unit 9; BLM 1989a). | **Action:** Create, enhance, and restore wetland and riparian areas impacted by historic land use and flow regime modification. | | **Action:** No similar action. (There would not be a specific requirement to create, enhance, and restore wetland and riparian areas impacted by historic land use and flow regime modification.) | **Action:** Pursue opportunities to enhance and restore wetland and riparian areas impacted by historic land use and flow regime modification. | |
| 81. | **Action:** Limit vehicle use in the riparian zones associated with Bear and Roatcap Creeks to designated roads and trails yearlong (BLM 1989a). | **Action:** No similar action; travel management limits vehicles to designated roads and trails. | | | | |
| 82. | Allowable Use: **STIPULATION** CSU-CO-28 (BLM 1991a): *Riparian* | **Alternative B:** Allowable Use: | **Alternative B.1** (North Fork area only): Allowable Use: | Allowable Use: **STIPULATION** CSU-15/SSR-15: *Naturally Occurring Riparian and* | Allowable Use: **STIPULATION** NSO-19/SSR-16: *Hydrology Features.* Prohibit surface | Allowable Use: **STIPULATION** CSU-12/SSR-13: *Hydrology Features.* Surface |

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | *Vegetation Zone.* Restrict oil and gas exploration and development, including roads, transmission lines, and storage facilities, to an area beyond the riparian vegetation zone. (Refer to Appendix B; Figure 2-19, Appendix A.) | **STIPULA-TION** NSO-18/NGD-7: *Hydrology Features.* Prohibit surface occupancy and use and apply NGD restrictions within 201 meters (660 feet) from the mapped extent of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; springs and seeps; and water impound-ments. For streams, measure the buffer from | Allowable Use: **NO LEASING** NL-4: *Water Bodies.* Close to oil and gas leasing and geophysical exploration within 805 meters (2,640 feet) (0.50-mile) of lakes, ponds, naturally occurring wetlands, and impounding reservoirs (not including stock ponds for livestock). (Refer to Appendix B; Figure 2-21, Appendix A.) | *Wetland Areas, Water Bodies, Springs, and Seeps.* Surface occupancy or use may be restricted and SSR restrictions applied on lands within 30 meters (100 feet) of the edge of the riparian zone along perennial and intermittent waters and naturally occurring wetlands, springs, and seeps. Surface-disturbing activities may require special engineering design, construction, and implementation measures, including relocation of operations beyond 200 meters (656 feet), to protect water resources. (Refer to Appendix B; Figures 2-22 and 2-30, Appendix A.) | occupancy and use and apply SSR restrictions within 100 meters (325 feet) from the mapped extent of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. For streams, measure the buffer from the ordinary high-water mark (bank-full stage); for riparian and wetland features, measure the buffer from the edge of the mapped extent. (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) **STIPULATION** CSU-16: *Hydrology Features.* The CSU restrictions apply from 325 to 500 feet of the hydrology features shown below. Surface occupancy or use may be restricted on lands adjacent to | occupancy or use may be restricted and SSR restrictions applied on lands within 50 feet of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. For perennial, intermittent, and ephemeral streams, measure the extent from the ordinary high-water mark (bank-full stage); for wetland features, measure the buffer from the edge of the mapped extent. For unmapped wetlands, determine the vegetation boundary (from which the buffer originates) in the field. Surface-disturbing activities may require special engineering design, construction, and implementation measures, including relocation of operations |

BLM_0165986

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | the ordinary high-water mark (bank-full stage); for wetland features, measure the buffer from the edge of the mapped extent. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | | | perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. For perennial, intermittent, and ephemeral streams, measure the extent from the ordinary high-water mark (bank-full stage); for wetland features, measure the buffer from the edge of the mapped extent. For unmapped wetlands, determine the vegetation boundary (from which the buffer originates) in the field. Surface-disturbing activities may require special engineering design, construction, and implementation measures, including relocation of operations beyond 200 meters (656 feet), from the extent of water impoundments, streams, riparian areas, and/or wetlands to protect water resources. (Refer | beyond 200 meters (656 feet), from the extent of water impoundments, streams, riparian areas, and/or wetlands to protect water resources. Apply the CSU restrictions from 50 feet of the edge of the ordinary high-water mark (bank-full stage) of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. (Refer to Appendix B; Figure 2-91, Appendix A.) |

BLM_0165987

**Table T-I**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|---|
| | | | | | | to Appendix B; Figure 2-23, Appendix A.) | |
| 83. | **Action:** Incorporate into existing activity plans or develop in new riparian/aquatic system management plans objectives and projects designed to accelerate improvement of species diversity, stream bank cover and stability, and instream structure and to raise the water table. Prepare and design riparian improvement plans to accelerate the improvement of riparian vegetation. Incorporate into new management plans for riparian/aquatic systems wildlife habitat management objectives, projects, and mitigating measures that do not | **Action:** No similar action; this is addressed by other actions in this section that manage riparian and wetland areas. | | | | | |

BLM_0165988

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | conflict (management unit 9; BLM 1989a). | | | | |
| 84. | **Action:** On 3,890 acres (emphasis area F), protect riparian zones on springs associated with cultural sites (BLM 1985; also refer to the *Cultural Resources* section.) | **Action:** No similar action; this is addressed by other actions to protect riparian zones. | | | |
| 85. | **Action:** Maintain or improve riparian habitat to good or excellent ecological condition, using acceptable grazing systems and fencing where needed (BLM 1989a). | **Action:** No similar action; this is addressed by the objective and other actions in this section. | | | |
| 86. | *VEGETATION – WEEDS* | | | | |
| 87. | **GOAL:** Through Integrated Weed Management, suppress and eradicate, where possible, noxious and invasive species to support healthy native plant communities. | | | | |
| 88. | **Objective:** No similar objective in current RMPs. | **Objective:** Manage lands under Integrated Weed Management strategies to support BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). | | | |
| 89. | **Action:** Implement Integrated Weed Management | **Action:** Implement Integrated Weed Management using | **Action:** Implement Integrated Weed Management using | **Action:** Same as Alternative A. | **Action:** Implement Integrated Weed Management using |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0165989

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | using the UFO Weed Management Strategy, including Strategy by Species (BLM 2010c). Apply appropriate integrated noxious weed control methods (e.g., physical, mechanical, educational, biological, herbicide, and fire) to noxious/invasive weed infestations.<br><br>Continue to update the Strategy as needed to address issues as they arise. | the UFO Weed Management Strategy, including Strategy by Species (BLM 2010c). Apply appropriate integrated noxious weed control methods (e.g., physical, mechanical, educational, biological, herbicide, and fire) to noxious/invasive weed infestations of state-listed "A" noxious weed species and early detection rapid response species.<br>Continue to update the strategy as needed to address issues as they arise. | the UFO Weed Management Strategy, including Strategy by Species (BLM 2010c). Apply appropriate integrated noxious weed control methods (e.g., physical, mechanical, educational, biological, herbicide, and fire) to noxious/invasive weed infestations of state-listed "A" and "B" noxious weed species and early detection rapid response species.<br>Continue to update strategy as needed to address issues as they arise. | | the UFO Weed Management Strategy, including Strategy by Species (BLM 2010c). Apply appropriate integrated noxious weed control methods (e.g., targeted grazing, physical, mechanical, educational, biological, herbicide, and fire) to noxious/invasive weed infestations. |
| 90. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Prioritize streams supporting rare or exemplary vegetation for weed treatment. | **Action:**<br>Prioritize for weed treatment streams with recreational, livestock, or mineral developments and maintained routes. | **Action:**<br>Prioritize for weed treatment ACECs, WSAs, ecological emphasis areas, areas with exemplary, ancient, or rare vegetation, lands managed to protect wilderness characteristics, Wild and Scenic River segments | **Action:**<br>Prioritize for weed treatment ACECs, WSAs, , areas with exemplary, ancient, or rare vegetation, lands managed to minimize impacts on wilderness characteristics, Wild and Scenic River segments |

BLM_0165990

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | with a vegetation ORV, and high-use areas with recreational, livestock, or mineral developments and maintained routes. | with a vegetation ORV, and high-use areas with recreational, livestock, or mineral developments and maintained routes. |
| 91. | **Action:** No similar action in current RMPs. | **Action:** Maintain all quarry pits weed-free of all state-listed A, B, and C noxious weed species and for BLM weed species of concern. | **Action:** Maintain all quarry pits weed-free of all state-listed A and B noxious weed species. | **Action:** Maintain all quarry pits weed-free of all state-listed A, B, and C noxious weed species. | |
| 92. | **Action:** Require that all seed slated for BLM reclamation projects meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. Seed lots shall contain no more than 0.5 percent by weight of other weed seed (BLM 1997). | **Action:** Require that all seed used on BLM-administered lands meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. In addition to BLM policy of weed-free seed use, seed lots shall contain less than 250 seeds per pound of cheatgrass and/or Japanese brome (in combination). Other species determined to be noxious or invasive may be added to this list. All seed must be of certified quality or source identified. | **Action:** Same as Alternative A. | **Action:** Same as Alternative B. | |

BLM_0165991

**Table T-1**

**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 93. | **Action:** No similar action in current RMPs. | **Action:** Require all hay, straw, or mulch that is used or stored on BLM-administered lands be certified as weed free. | | | |

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 94. | **FISH AND WILDLIFE** | | | | |
| 95. | *WILDLIFE – GENERAL* | | | | |
| 96. | **GOAL:** Manage terrestrial and aquatic habitats and species to promote ecosystem diversity, productivity, viability, and natural processes. | | | | |
| 97. | **Objective:** Intensively manage for optimal aquatic wildlife habitat. Provide necessary investments to enhance wildlife habitat. Cooperate with the Colorado Parks and Wildlife (CPW) for funding of habitat improvement projects, and also cooperate with CPW on the reintroduction program (BLM 1985).\n\nComply with FLPMA to maintain, enhance, and protect fish | **Objective:** Restore, enhance, preserve, and promote aquatic and terrestrial ecosystem integrity and values. Emphasis is on native fish and cold-water sport fish, and native nongame species, while allowing for improvements to habitat for native game species.\n\nProtect breeding habitats of migratory birds by managing for ecosystem diversity, productivity, viability and natural processes through use of | **Objective:** Maintain aquatic and terrestrial ecosystem integrity and productivity. Emphasis is on sports fisheries and upland game species.\n\nProtect migratory birds to the extent required by the Migratory Bird Treaty Act of 1918. | **Objective:** Restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity and values. Emphasis is on native species (mammals, reptiles, amphibians, birds, fish, invertebrates and plants) management, including objectives and improvements for ensuring habitat diversity, productivity, viability, and natural processes throughout the ecosystem (s). | **Objective:** (See also Vegetation and Water Quality Objectives.) Restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity and values. Emphasis is on native species (mammals, reptiles, amphibians, birds, fish, invertebrates and plants) management, including objectives and improvements for ensuring habitat diversity, productivity, viability, and natural |

BLM_0165992

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | habitat on public lands. Continue to apply seasonal restrictions where they are needed to mitigate impacts of human activities on important seasonal wildlife habitat. | the vegetation mosaic objectives (refer to the *Vegetation* section). | | Protect endangered species and migratory birds to the extent required by the Endangered Species Act and the Migratory Bird Treaty Act of 1918.<br><br>Protect breeding habitats of migratory birds by managing for ecosystem diversity, productivity, viability and natural processes through use of the vegetation mosaic objectives (refer to the *Vegetation* section). | processes throughout the ecosystem, and striving for stable, sustainable wildlife populations.<br><br>Provide for effective wildlife and fish habitat throughout the Decision Area with abundance and distribution commensurate with the capability of the land to sustain wildlife and fish populations. Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats. Consider route densities in travel management to support CPW wildlife population objectives.<br><br>Utilize current conservation plans, agreements, and |

BLM_0165993

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | | strategies, including state habitat and species management and action plans, to direct management.<br><br>Protect endangered species and migratory birds to the extent required by the Endangered Species Act and the Migratory Bird Treaty Act of 1918.<br><br>Protect breeding habitats of migratory birds by managing for ecosystem diversity, productivity, viability and natural processes through use of the vegetation mosaic objectives (refer to the *Vegetation* section). |
| 98. | **Action:** The BLM District Manager may authorize supplemental releases and reintroduction of native or naturalized | **Action:** Allow augmentation and reintroduction to expand the current range of native species in response to partner or stakeholder proposals and requests | **Action:** Allow augmentation and reintroduction to expand the current range of desired game species and species of economic | **Action:** Allow augmentation and reintroduction to expand the current range of aquatic and terrestrial species or to expand population numbers to improve genetic viability of native terrestrial and aquatic species, in coordination with CPW. | |

BLM_0165994

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | wildlife species (excluding federal or state-listed endangered, threatened, or candidate species) following environmental analysis in management units 3, 5, 8, 9, 13-15 (BLM 1989a).<br><br>Allow CPW to introduce chukar. Allow other game species introduction if site-specific analysis indicates that significant conflicts with livestock will not occur (emphasis area A; BLM 1985).<br><br>Reestablish river otters in the Dolores River (emphasis areas B, C, and D; BLM 1985). | and in coordination with CPW. | importance, in coordination with CPW. | | |

**Table T-I**

**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | Allow introduction or reintroduction of bighorn sheep in the Dolores River Canyon WSA.<br><br>Expand pronghorn antelope herds (emphasis area A; BLM 1985). Manage for 300 head of pronghorn antelope. | | | | |
| 99. | *WILDLIFE – FISH and AQUATIC* | | | | |
| 100. | **Action:**<br>Give special management consideration to all perennial streams that could provide quality fisheries through the activity planning process and monitoring system to maintain, improve, or enhance resource conditions associated with aquatic/riparian habitat (emphasis area A; BLM 1985). | **Action:**<br>Annually enhance, protect, or restore at least 5 miles of aquatic habitat, including modification or removal of special status fish migration barriers, in consultation with the CPW, and structural and vegetation improvements to benefit primarily nongame native species. | **Action:**<br>Annually improve at least 2 miles of aquatic habitat, including structural and vegetation improvements to benefit primarily game species and popular fisheries. | **Action:**<br>Pursue opportunities to enhance, protect, or restore native aquatic species habitats, in consultation with the CPW, including modification or removal of special status fish migration barriers and structural and vegetation improvements commensurate with other resource objectives. | **Action:**<br>Pursue opportunities to enhance, protect, or restore native aquatic species habitat, in consultation with CPW, including modification or removal of special status fish migration barriers and structural and vegetation improvements commensurate with other resource objectives. |

BLM_0165996

Table T-1
Description of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | Manage the following riparian areas to improve aquatic habitat: Roc, North Mesa, South Mesa, La Sal and Dry Creeks, and the east and west forks of Dry Creek Canyon (BLM 1985).<br><br>Invest wildlife funds for structural improvements and vegetation restoration projects to improve high-priority riparian habitat at the following drainages: Roc, North and South Mesa, La Sal, and Dry Creeks (East and West Forks) (emphasis area B; BLM 1985). | | | | Quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired nonnative vertebrate species. |
| 101. | **Action:**<br>Monitor, maintain, or improve known active fisheries habitat. Focus initially on the San Miguel and Dolores | **Action:**<br>Maintain or improve fisheries habitat where consistent with maintaining native species populations. Prioritize | **Action:**<br>Maintain or improve sports fisheries habitat where compatible with adjoining surface uses. | **Action:**<br>Same as Alternative B. | |

BLM_0165997

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | Rivers and their major tributaries. Improve aquatic habitat on these areas, listed in priority order:<br>• The upper San Miguel River and its tributaries (44 miles)<br>• The upper Dolores River and its tributaries (30 miles)<br>• The lower San Miguel River and its tributaries (20 miles)<br><br>Develop aquatic/riparian habitat management plans for these priority areas, including intensive monitoring plans (emphasis area B; BLM 1985). | systems based on CPW conservation and management objectives. | | | |
| 102. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>**STIPULATION** TL-3: *Wildlife Native and Sport Fish.* Prohibit in-stream | Allowable Use:<br>**STIPULATION** TL-4: *Wildlife Coldwater Sport Fish.* Prohibit in-stream | Allowable Use:<br>**STIPULATION** TL-5: *Wildlife Native and Sport Fish.* Prohibit in-stream channel work within occupied fisheries as mapped in the RMP, BLM's GIS database, | |

BLM_0165998

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | channel work within occupied fisheries as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, during the following periods:<br><br>• Spring spawning period: April 1 to August 1 (rainbow trout, cutthroat trout, native warm water fish [flannelmouth sucker, bluehead sucker, and roundtail chub]), and Paiute and mottled sculpin<br>• Fall spawning period: October 1 to November 30 (brown and brook trout)<br><br>(Refer to Appendix B; Figure 2-25, Appendix A.) | channel work within occupied fisheries as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, during the following periods:<br><br>• Spring spawning period: April 1 to June 15 (rainbow and cutthroat trout)<br>• Fall spawning period: October 1 to November 30 (brown and brook trout)<br><br>(Refer to Appendix B; Figure 2-26, Appendix A.) | or other data provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM, during the following period:<br><br>• Spring spawning period: April 1 to July 15 (native cutthroat trout, rainbow trout, and native warm water fish [flannelmouth sucker, bluehead sucker, and roundtail chub])<br><br>(Refer to Appendix B; Figure 2-27 [Alternative D] and 2-92 [Alternative E], Appendix A.) | |

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 103. | *WILDLIFE – TERRESTRIAL* | | | | |
| 104. | **Action:** Key habitats include big game winter range, winter raptor concentration areas, bighorn sheep, pronghorn antelope, and aquatic/riparian habitats. Maintain and improve vegetation conditions.<br><br>Protect, maintain, and enhance the following:<br>• Critical habitats for big game, upland game birds, and waterfowl<br>• Crucial habitats for nongame species of special interest or concern to state and other federal agencies (BLM 1985)<br><br>Comply with the FLPMA to maintain, enhance, and protect | **Action:** Manage the following 242,580 acres as ecological emphasis areas (Figure 2-2, Appendix A) and manage to preserve the continuity of habitats, vegetation communities, and native wildlife within:<br>• Adobe Zones 1-4 (40,730 acres)<br>• Dry Creek Zones 1-5 (20,320 acres)<br>• Jumbo Mountain/McDonald Creek Zones 1-5 (17,220 acres)<br>• La Sal Zones 1-3 (22,350 acres)<br>• Monitor-Potter-Roubideau Zones 1-11 (27,320 acres)<br>• Naturita Canyon Zones 1- 4 (15,620 acres)<br>• Ridgway Zones 1-4 (16,700 acres)<br>• San Miguel Zones 1-7 (25,520 acres) | **Action:** Manage the following 24,150 acres as ecological emphasis areas (Figure 2-3, Appendix A) and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife within:<br>• La Sal Zones 1 and 3 (13,270 acres)<br>• Monitor-Potter-Roubideau Zones 5, 6, 7, 10, and 11 (10,880 acres)<br><br>(Refer to Appendix D, Ecological Emphasis areas, for an explanation of these areas.) | **Action:** Manage the following 177,700 acres as ecological emphasis areas (Figure 2-4, Appendix A) and manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives:<br>• Adobe Zones 1, 3, and 4 (24,170 acres)<br>• Dry Creek Zones 1-3 (10,790 acres)<br>• Jumbo Mountain/McDonald Creek Zones 1-4 (15,630 acres)<br>• La Sal Zones 1-3 (22,350 acres)<br>• Monitor-Potter-Roubideau Zones 1-11 (27,320 acres)<br>• Naturita Canyon Zone 1 (1,510 acres)<br>• Ridgway Zones 1 and 2 (9,070 acres) | **Action:** Same as Alternative A. |

BLM_0166000

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | fish habitat on public lands.<br><br>Manage 2,500 acres in CamelBack Ridge and Upper Roubideau Creek drainages along the southeastern portion of the Camel Back WSA to maintain the area's capability to support wintering deer, elk, and bighorn sheep. | • Sims Mesa (19,650 acres)<br>• Spring Canyon (3,380 acres)<br>• Tabeguache Zones 1-10 (31,540 acres)<br>• Terror Creek (2,230 acres)<br><br>(Refer to Appendix D, Ecological Emphasis Areas, for an explanation of these areas.) | | • San Miguel Zones 1, 2, 3, 5, and 7 (17,840 acres)<br>• Sims Mesa (19,650 acres)<br>• Spring Canyon (3,380 acres)<br>• Tabeguache Zones 1, 2, 4, 5, 6, 9, and 10 (23,760 acres)<br>• Terror Creek (2,230 acres)<br><br>(Refer to Appendix D, Ecological Emphasis Areas, for an explanation of these areas.) | |
| 105. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage portions of the following ecological emphasis areas, totaling 186,080 acres, as ROW exclusion areas:<br>• Adobe Zone 1 (11,480 acres)<br>• Dry Creek Zones 1-4 (14,310 acres)<br>• Jumbo Mountain/McDonald | **Action:**<br>Manage all ecological emphasis areas totaling 24,150 acres as ROW avoidance. | **Action:**<br>Manage all ecological emphasis areas totaling 177,700 acres as ROW avoidance areas. | **Action:**<br>Same as Alternative A. |

BLM_0166001

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | Creek Zones 1-4 (15,630 acres)<br>• La Sal Zones 1-3 (22,350 acres)<br>• Monitor-Potter-Roubideau Zones 1-11 (27,320 acres)<br>• Naturita Canyon Zones 1-4 (15,620 acres)<br>• Ridgway Zones 1-4 (16,700 acres)<br>• San Miguel Zones 1-7 (25,520 acres)<br>• Spring Canyon (3,380 acres)<br>• Tabeguache Zones 1-10 (31,540 acres)<br>• Terror Creek (2,230 acres)<br><br>Manage portions of the following ecological emphasis areas, totaling 56,500 acres, as ROW avoidance:<br>• Adobe Zones 2-4 (29,250 acres)<br>• Dry Creek Zone 5 (6,000 acres) | | | |

BLM_0166002

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Jumbo Mountain/McDonald Creek Zone 5 (1,600 acres)<br>• Sims Mesa (19,650 acres) | | | |
| 106. | Allowable Use: No similar allowable use in current RMPs, although this is partially addressed by other actions. | Allowable Use: **STIPULATION** NSO-20/SSR-17: *Ecological emphasis areas.* Prohibit surface occupancy and use and apply SSR restrictions within portions of *ecological emphasis areas* (207,320 acres):<br>• Adobe Zone 1 (11,480 acres)<br>• Dry Creek Zones 1-4 (14,310 acres)<br>• Jumbo Mountain/McDonald Creek Zones 1-5 (17,220 acres)<br>• La Sal Zones 1-3 (22,350 acres)<br>• Monitor-Potter-Roubideau Zones 1-11 (27,320 acres)<br>• Naturita Canyon Zones 1-4 (15,620 acres) | Allowable Use: **STIPULATION** CSU-17/ SSR-18: *Ecological emphasis areas.* Surface occupancy or use may be restricted and SSR restrictions applied within all ecological emphasis areas (24,150 acres). (Refer to Appendix B; Figures 2-22 and 2-30, Appendix A.) | Allowable Use: **STIPULATION** CSU-17/ SSR-18: *Ecological emphasis areas.* Surface occupancy or use may be restricted and SSR restrictions applied within all ecological emphasis areas (177,700 acres). (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) | Allowable Use: No similar allowable use. |

BLM_0166003

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Ridgway Zones 1-4 (16,700 acres)<br>• San Miguel Zones 1-7 (25,520 acres)<br>• Sims Mesa (19,650 acres)<br>• Spring Canyon (3,380 acres)<br>• Tabeguache Zones 1-10 (31,540 acres)<br>• Terror Creek (2,230 acres).<br>(Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.)<br><br>Allowable Use:<br>**STIPULATION** CSU-17/SSR-18: *Ecological emphasis areas.* Surface occupancy or use may be restricted and SSR restrictions applied within portions of ecological emphasis areas, (35,250 acres):<br>• Adobe Zones 2-4 (29,250 acres)<br>• Dry Creek Zone 5 (6,000 acres) | | | |

BLM_0166004

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | | | |
| 107. | **Action:** Implement habitat improvement projects where necessary to stabilize and/or improve unsatisfactory or declining habitat conditions. Identify such projects through habitat management plans or coordinated resource management plans. <br><br> On 51,680 acres (management unit 2), manage vegetation to improve the areas' capabilities to support wintering deer, elk, and bighorn sheep populations. <br><br> Develop habitat management plans and design land treatment projects and other | **Action:** Annually enhance or restore at least 500 acres of terrestrial habitat to benefit primarily native, nongame species, including birds, and to increase carrying capacity for native game species, emphasizing winter range and crucial habitat types. | **Action:** Annually treat at least 3,000 acres of terrestrial habitat to increase carrying capacity for game species, including game birds, emphasizing winter range and crucial habitat types. | **Action:** Restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity and values in consultation with CPW. Emphasize the management of native species (mammals, reptiles, amphibians, birds, fish, invertebrates, and plants), including objectives and improvements for ensuring habitat diversity, productivity, viability, and natural processes throughout the ecosystem, and striving for stable, sustainable wildlife populations. <br><br> Design land treatment projects and other facilities to improve the | **Action:** Restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity and values in coordination with CPW. Emphasize the management of native species (mammals, reptiles, amphibians, birds, fish, invertebrates, and plants), including objectives and improvements for ensuring habitat diversity, productivity, viability, and natural processes throughout the ecosystem, and striving for stable, sustainable wildlife populations. <br><br> Design land treatment projects and other facilities to improve the |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0166005

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | facilities to improve the quality and quantity of winter habitat (management unit 2; BLM 1989a).<br><br>Maintain, improve, and enhance crucial habitats for nongame species of special interest or concern to state and other federal agencies (BLM 1985).<br><br>Open the Planning Area to land treatments for wildlife and project facility development. Maintain existing wildlife facilities and land treatments (BLM 1989a). Maintain existing wildlife habitat projects on 121,710 acres (management unit 1; BLM 1989a).<br><br>On 83,630 acres (management units 3, | | | quality and quantity of wildlife habitats. | quality and quantity of wildlife habitats. |

BLM_0166006

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | 5, 8, 9, 13-15), maintain existing wildlife habitat projects and develop new projects if they will not decrease the woodland base (BLM 1989a).<br><br>In wildlife emphasis areas (22,410 acres) where livestock also graze, maintain an overall hiding cover-to-forage ratio of 40:60 for wildlife (BLM 1985). | | | | |
| 108. | **Action:** Incorporate objectives to protect or improve aquatic habitat into allotment management plans and habitat management plans. Develop and implement needed habitat management plans and improvements, including monitoring | **Action:** Coordinate with CPW during implementation to achieve desired habitat conditions for native species and to achieve BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). Review this strategy every 5 years. | | | |

BLM_0166007

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | plans. Habitat management plan development for aquatic species will be closely coordinated with CPW, the Forest Service, and, where appropriate, US DOI Fish and Wildlife Service (USFWS). Project development will require input from all resource programs to assess impacts through the environmental process (BLM 1985). Subject to the availability of manpower and funds to complete necessary wildlife habitat improvements on 23,100 acres (emphasis area B), manage the habitat for current levels of deer and elk (20,000 and 1,600, respectively). | | | | |

BLM_0166008

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | Consider wildlife reductions in localized areas if vegetation resource monitoring indicates the need to maintain use within the carrying capacity. Share the reductions with domestic livestock, depending on monitoring results (BLM 1985). | | | | |
| 109. | **Action:** On 51,680 acres (management unit 2), give wildlife priority for all additional forage made available as a result of BLM habitat improvement (BLM 1989a).<br><br>Maintain wildlife forage allocations at current levels until studies determine adjustments are needed to achieve management directives. Divide | **Action:** No similar action; this is addressed in the *Livestock Grazing* section. | | | |

BLM_0166009

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | additional forage allocations equally between wildlife and livestock grazing (management units 3, 5, 8, 9, 13-15; BLM 1989a). | | | | |
| 110. | **Action:** On crucial (now termed "severe and winter concentration areas") deer and elk winter range (17,370 acres), give wildlife priority for forage allocations (management unit 7; BLM 1989a). | **Action:** No similar action; this has been completed. | | | |
| 111. | **Action:** Provide investments to enhance wildlife species that will benefit from uneven-aged timber management (emphasis area J; BLM 1985). | **Action:** No similar action; other actions address timber management. | | | |

BLM_0166010

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 112. | *Terrestrial Wildlife – Big Game (Mule Deer, Elk, Pronghorn, Antelope, Bighorn Sheep, Moose, Black Bear, Mountain Lion)* Note: Bighorn sheep include both Rocky Mountain and desert subspecies, unless otherwise designated as one or the other. | | | | |
| 113. | Allowable Use: **STIPULATION** TL-CO-9 (BLM 1991a): *Big Game Species (Mule Deer, Elk, Pronghorn Antelope, and Bighorn Sheep).* Prohibit surface occupancy in big game crucial winter habitat (now termed "severe and winter concentration areas"), including severe big game winter range or other definable winter ranges as mapped by the CPW, from December 1 to April 30. (Refer to Appendix B; Figure 2-24, Appendix A.) | Allowable Use: **STIPULATION** TL-6: *Wildlife Big Game Winter.* Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game crucial winter habitat as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: crucial winter range, severe winter concentration areas. <br>• Elk, mule deer, and pronghorn antelope: December 1 to April 30 <br>• Moose: November 15 to May 30 <br>• Rocky Mountain and desert bighorn sheep: November 1 to April 30 | Allowable Use: **STIPULATION** TL-7: *Wildlife Big Game Winter.* Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game crucial winter habitat as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: crucial winter range, severe winter range, and winter concentration areas. <br>• Elk and mule deer: January 1 to March 31 <br><br>(Refer to Appendix B; Figure 2-26, Appendix A.) | Allowable Use: **STIPULATION** TL-8: *Wildlife Big Game Winter.* Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game crucial winter habitat as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: crucial winter range, severe winter range, and winter concentration areas. <br>• Elk, mule deer, pronghorn antelope, and moose: December 1 to April 30 <br>• Rocky Mountain and desert bighorn sheep: November 1 to April 30 (Refer to Appendix B; Figure 2-27, Appendix A.) | Allowable Use: **STIPULATION** TL-8: *Wildlife Big Game Winter.* Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game crucial winter habitat as mapped in the RMP, BLM's GIS database, or other data provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: crucial winter range, severe winter range, and winter concentration areas. <br>• Elk, mule deer, and moose: December 1 to April 15 <br>• Pronghorn: January 1 to March 31 <br>• Rocky Mountain and desert bighorn sheep: November 1 to April 15 |

BLM_0166011

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | Some travel closures and restrictions may also apply in specific geographic areas. (Refer to Appendix B; Figure 2-25, Appendix A.) | | | (Refer to Appendix B; Figure 2-92, Appendix A.) |
| 114. | Allowable Use: **STIPULATION** TL (BLM 1991a): *Big Game Birthing Areas (by Species)*. Restrict surface-disturbing activities in the following areas: <ul><li>Elk calving (now termed "production"): April 16 to June 30 (Stipulation: TL-CO-10 and TL-UB-05)</li><li>Pronghorn antelope fawning: May 1 to July 15 (Stipulation: TL-CO-11)</li><li>Rocky Mountain bighorn sheep lambing: May 1 to July 15 (Stipulation: TL-CO-12)</li></ul> | Allowable Use: **STIPULATION** TL-9: *Wildlife Big Game Production*. Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game production areas as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: <ul><li>Elk: May 15 to June 30</li><li>Pronghorn antelope: May 1 to July 15</li><li>Rocky Mountain bighorn sheep:<ul><li>May 1 to July 15 for lambing range</li><li>October 15 to December 15 for rutting grounds</li></ul></li></ul> | Allowable Use: **STIPULATION** TL-10: *Wildlife Big Game Production*. Prohibit surface use and surface-disturbing activities during the following time period in big game production areas as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: <ul><li>Elk: May 15 to June 15. (Refer to Appendix B; Figure 2-26, Appendix A.)</li></ul> | Allowable Use: **STIPULATION** TL-11: *Wildlife Big Game Production*. Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game production areas as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: <ul><li>Elk, pronghorn antelope, Rocky Mountain bighorn sheep, and moose: April 15 to June 30</li><li>Desert bighorn sheep: February 1 to May 1 (Refer to Appendix B; Figure 2-27, Appendix A.)</li></ul> | Allowable Use: **STIPULATION** TL-11: *Wildlife Big Game Production*. Prohibit surface use and surface-disturbing and disruptive activities during the following time period(s) in big game production areas as mapped in the RMP, BLM's GIS database, or other maps provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM: <ul><li>Elk and moose: May 15 to June 30</li><li>Desert bighorn sheep: February 1 to May 1</li><li>Rocky Mountain bighorn sheep: April 15 to June 30</li></ul> |

BLM_0166012

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | • Desert bighorn sheep lambing: March 16 to May 30 (Stipulation: TL-CO-14)<br><br>(Refer to Appendix B; Figure 2-24, Appendix A.) | • Desert bighorn sheep:<br>o March 15 to June 15 for lambing range<br>o August 1 to September 30 for rutting grounds<br>• Moose: May 15 to July 15<br><br>Some travel closures and restrictions may also apply in specific geographic areas. (Refer to Appendix B; Figure 2-25, Appendix A.) | | | | (Refer to Appendix B; Figure 2-92, Appendix A.) |
| 115. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: No similar allowable use. (There would not be a similar stipulation within mule deer and elk habitat). | **Alternative B.1** (North Fork area only): Allowable Use: **STIPULA-TION** NSO-21: *Mule Deer and Elk Habitat.* Prohibit surface occupancy in mule deer and elk crucial winter range, including severe winter | Allowable Use:<br>No similar allowable use. (There would not be a similar stipulation within mule deer and elk habitat). | | |

BLM_0166013

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | range and winter concentration areas, and in elk reproduction areas. Also prohibit surface occupancy in big game migration corridors. (Refer to Appendix B; Figure 2-21, Appendix A.) | | | |
| 116. | **Action:** To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 15 in the area. | **Action:** To protect elk calving areas, prohibit motorized and mechanized travel from April 15 to June 30 in elk production/calving areas.<br><br>Add other areas as appropriate through future site-specific travel management analyses.<br><br>Where needed, extend seasonal closures to | **Action:** To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 15 in elk production/calving areas.<br><br>Add other areas, as appropriate, through future site-specific travel management analyses.<br><br>Where needed, extend seasonal closures to | **Action:** No similar action (there would not be similar motorized or mechanized restrictions in elk calving areas). | **Action:** To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 30 in elk production/calving areas.<br><br>Add other areas as appropriate through future site-specific travel management analyses.<br><br>Where needed, extend seasonal closures to |

BLM_0166014

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | include pedestrian or equestrian traffic. | include pedestrian or equestrian traffic. | | include pedestrian or equestrian traffic. <br><br> The Field Manager may modify the size and timeframes upon consultation with CPW if monitoring information indicates that plant seasonal cycles or animal use patterns are inconsistent with dates established.* |
| 117. | **Action:** Transplant bighorn sheep into the Winter Mesa area if they will not conflict with livestock. The objective is to reestablish this species in historically occupied habitat, increase total population numbers, and ensure species viability in the region (management unit 1; BLM 1989a). | **Action:** Allow for restoring wild sheep populations in suitable and historic wild sheep habitat not currently stocked with domestic sheep and goats. | **Action:** No similar action. (Restoration of wild sheep would not be pursued.) | **Action:** Allow for restoring wild sheep populations in areas where 1) the Domestic/Bighorn Sheep Probability of Interaction Assessment depicts existing sheep allotments are not at a high or moderate risk for disease transmission and 2) in suitable and historic wild sheep habitat not currently stocked with domestic sheep and goats. | **Action:** Allow for restoring wild sheep populations 1) in areas where the Domestic/Bighorn Sheep Risk of Contact (RoC) model or currently accepted model indicates that existing sheep allotments are not at high or moderate risk for disease transmission and 2) in suitable and historic wild sheep habitat not currently stocked with domestic sheep and goats. |

BLM_0166015

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 118. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** CSU-18/SSR-19: *Desert and Rocky Mountain Bighorn Sheep Summer Range.* Surface occupancy or use may be restricted or prohibited and SSR restrictions applied to reduce impacts of surface-disturbing activities and operations on bighorn sheep summer range. (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A.) | Allowable Use: No similar allowable use. (There would not be a stipulation.) | Allowable Use: Same as Alternative B. (Refer to Appendix B; Figures 2-23 and 2-31, Appendix A.) | Allowable Use: Same as Alternative B, plus: Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet) from bighorn sheep, crucial bighorn sheep habitat, or specific habitat features may be required. Specific habitat features may include, but are not limited to, water areas, mineral licks, and lambing areas. (Refer to Appendix B; Figures 2-91 and 2-93, Appendix A.) |
| 119. | Refer to the *Livestock Grazing* section for information on domestic sheep grazing. | | | | |
| 120. | **Action:** Allow for introduction of bighorn sheep and river otters in Dolores River and the Dolores River Canyon WSA (emphasis areas C and D; BLM 1985). | **Action:** No similar action; this is addressed by other actions. | | | |

BLM_0166016

**Table T-1**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| 121. | **Action:** In big game winter range (emphasis area B), limit the width of vegetation openings to approximately 150 to 200 yards (BLM 1985). | **Action:** No similar action; this is addressed by other actions (a habitat management strategy and vegetation mosaic objectives would be developed from other actions). | | | |
| 122. | *Terrestrial Wildlife – Raptors* | | | | |
| 123. | Refer to the *Special Terrestrial Wildlife – Raptors* section | | | | |
| 124. | *Terrestrial Wildlife – Upland Game Birds (Wild Turkey)* | | | | |
| 125. | Allowable Use: No similar allowable use in current RMPs, although this is partially addressed for some species, areas, or situations. | Allowable Use: **STIPULATION** TL-12: *Wildlife Turkey.* Prohibit surface use and surface-disturbing and disruptive activities within wild turkey habitat (as mapped in the RMP, BLM's GIS database, or other data provided by local, state, federal, or tribal agencies that are analyzed and accepted by the BLM) during the following time period: • Wild turkey winter habitat from December 1 to April 1. (Refer to Appendix B; Figure 2-25, Appendix A.) | Allowable Use: No similar allowable use. (There would not be a TL stipulation.) | Allowable Use: Same as Alternative B. (Refer to Appendix B; Figure 2-27 [Alternative D] and Figure 2-92 [Alternative E], Appendix A.) | |

BLM_0166017