Figure WC1.8. Conservation easements protecting important wildlife habitats across the Bear's Ears and White River herds.

**Cost of current or needed habitat treatments; road crossings etc.:**

The landscape-scale need for habitat treatments, conservation easements, and highway crossing/fencing structures necessary to improve the Bear's Ears and White River network of migration corridors would be very costly and could reach several million dollars. CPW is conducting approximately 2000 acres of habitat enhancement with our federal and local partners annually within this priority area but there is a large backlog of identified projects for which funding has not been acquired. CPW could implement an additional 1500 to 2000 acres of habitat enhancement annually within this area, if sufficient funding was available. These enhancement projects cost approximately $250/acre, and two thousand additional acres of habitat enhancement would cost approximately $500,000 annually. CPW's Habitat Protection Program brings $11 million or more each year to the purchase of conservation easements that protect wildlife habitat values. Properties within this priority area consistently rank highly in each year's allocation. Easements are generally multi-million dollar expenditures, so the need for additional funding is essentially endless. Highway crossing structures can cost up to $1 million each. Currently, CDOT and CPW has $200,000 for the design of highway crossing structures along Highway 13. Detailed assessment of several key highway segments commenced in 2019, but neither agency has secured funds for construction of structures in key crossing areas.

**Other Issues for awareness:**

None

**#2 Colorado Migration Corridor Priority: San Juan Basin (Southwest Colorado)**

**Why the area selected as a priority**:

BLM_0166746

This corridor spans Game Management Units (GMUs) 75/77/78/751/771 in the San Juan Basin (elk herd E31 and deer herd D30, Figure WC2.1). Deer and elk movement patterns have been documented in the last 15 years through a combination of CPW, Southern Ute Tribe, and consultant studies (Figures WC2.2 and WC2.3). The area is home to about 27,000 deer and 19,000 elk using several significant migration routes. This area contains the second largest deer herd in Colorado, and the third largest elk herd. This area has the added benefit of being multi-jurisdictional, with the majority of lands managed by the USFS, BLM, and Southern Ute Tribe, interspersed with private lands, and it contributes to big game movements crossing into New Mexico. This corridor has been identified as a focal area for GOCO wildlife crossing structures with CDOT.

**Spatial Location**:

The San Juan Basin is located in southwest Colorado.  The southern boundary is the New Mexico state line, and the eastern and northern boundaries are the Continental Divide, with the Animas River being the western boundary.

21

BLM_0166747



Figure WC2.1. Location of the San Juan deer and elk herds in southwest Colorado.

**Habitat Types:**

The climate is a highland or mountain climate, characterized by cool springs and falls, warm summers and moderately cold winters.  Average precipitation and snowfall for Durango are 18 and 63 inches per year respectively. Snowfall increases dramatically moving to the east and toward the Continental Divide, approaching 250-300 inches per year.  Vegetative types include: alpine over 12,000 feet elevation, spruce/fir stands down to 10,000 feet, oakbrush, serviceberry, and ponderosa pine above 7,000 feet, and pinyon/juniper/sagebrush and agricultural fields below 7,000 feet.

22

BLM_0166748

The amount and quality of winter range is the limiting factor for these deer and elk herds. Winter range is primarily in private ownership, with the remainder located on the Southern Ute Tribe and public lands.  Available habitat on these lands is becoming more limited with human encroachment through development and expansion of recreational activities.

**Important Stopover areas within the corridor:**

Recent studies by CPW, the Southern Ute Tribe, and WEST,Inc utilizing GPS-collars have identified numerous discrete migration corridors, highway crossings, and stop-over areas for various segments of the San Juan deer and elk herds. Previous studies with VHF-collars demonstrate landscape scale connectivity.



Figure WC2.2. Composite map of recent deer studies by CPW, Southern Ute Tribe, and WEST,Inc using GPS collars. Map contains data shared by Aran Johnson (Southern Ute Tribe) and Hall Sawyer (WEST,Inc).

BLM_0166749



Figure WC2.3. Deer and elk movement data in the San Juan Basin, Colorado, 1998-2008.

**Landownership:**

Winter range is primarily privately owned (51%)(Table WC2.1). The Southern Ute Tribe owns an additional 20%, and the remaining 28% of winter range is publicly managed. Twenty-nine percent of the winter range and 15% of the severe winter range occur on public lands.

24

BLM_0166750

Table WC2.1. Land ownership in relation to deer and elk habitat use in the San Juan Basin, Colorado.

| | | Winter Range | Winter Concentration | Severe Winter Range | DAU |
|---|---|---|---|---|---|
| TOTAL | DAU Square miles | 1295 (46%) | 135 (5%) | 779 (28%) | 2795 (100%) |
| | BLM | 26 (2%) | 6 (4%) | 12 (1%) | 63 (2%) |
| | BOR | 2 (<1%) | 0 | 2 (<1%) | 8 (<1%) |
| | CPW | 1 (<1%) | 0 | 1 (<1%) | 2(<1%) |
| | USFS | 332 (26%) | 25 (19%) | 98 (13%) | 1545 (55%) |
| Public Access | | 361 (28%) | 31 (23%) | 113 (15%) | 1618 (58%) |
| | Southern Ute | 264 (20%) | 7 (5%) | 183 (23%) | 320 (12%) |
| | Private | 663 (51%) | 94 (70%) | 480 (62%) | 849 (30%) |
| | State of CO | 7 (<1%) | 3 (2%) | 3 (<1%) | 8 (<1%) |
| Private Access | | 934 (72%) | 104 (77%) | 666 (85%) | 1177 (42%) |

.

**Land Uses:**

The area has seen extensive exurban development in the previous 20 years, replacing a primarily agricultural setting with rural residential developments. Few large landowners remain. In addition, extensive natural gas extraction has occurred, with associated road and pipeline corridors. The exurban development and increased human population has stressed the local highway system with a high volume of high speed traffic. Numerous wildlife crossings have been identified with previous telemetry studies, as well as through review of wildlife-vehicle collision data (Western Slope Wildlife Prioritization Study, CDOT).

**Risk/Threats:**

*Development on Winter Range and Migration Corridors*

25

BLM_0166751

Exurban development is occurring on much of the winter range and migration corridors in the San Juan Basin.  Managers and the public are increasingly concerned over cumulative and prolonged impacts of this development disrupting big game migration and decreasing the quality and quantity of winter range.  Development influences both the carrying capacity of the big game habitat and affects harvest management programs.  Although development is a widespread issue, it is a considerably larger problem in the western portions of the San Juan Basin, around Pagosa Springs and Durango.

Winter range is already limited and it is the habitat type that is most at risk from development.  Deer and elk eat less and lose weight during the winter and to conserve energy they limit physical activity.  Any type of disturbance will cause a deer or elk to use more energy during this critical time. Such winter-time stress can lead to a higher risk of mortality, and may also negatively influence both reproduction and the survival of fawns or calves born later that same year.

Migration corridors are needed for deer and elk to access important summer and winter ranges.  The largest and most productive deer populations in the West are migratory.  Development and barriers that disrupt migration can have a direct bearing on an individual animal's health, survival and reproductive success.

As the primary land use in the San Juan area continues to transition from agricultural to rural residential, maintenance of connectivity between summer ranges and winter ranges located on public and tribal lands is a critical need. Strategic placement of highway crossing structures and land protection through conservation easements will be required, and the remaining winter and transition ranges must be maintained in the best condition possible.

**Are the Risk/Threats Immediate or Long-term:**

*Immediate:* Critical parcels of land continue to be developed, creating higher traffic volumes into Durango/Bayfield and Pagosa Springs. Opportunities for land protection are being replaced by subdivisions. *Long Term:* As development continues and highways are stressed, the highway corridors will be expanded in order to accommodate the volume of traffic.

26

**Actions necessary to reduce or eliminate risks/threats:**

CPW and partner organizations need to maintain connectivity between deer/elk summer and winter ranges, creating corridors for movement and for safe passage across Highways 160 and 84. To help identify these migration corridors, GPS-quality deer and elk data is needed in the central portion of the DAU's (called the HD Mountains, primarily on publicly owned lands).

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

CPW, CDOT, SUI Tribe, USFS, BLM are all partners in various efforts. The recently completed Western Slope Wildlife Prioritization Study (CPW, CDOT) has strategically mapped deer and elk high risk highway crossings across the western slope of Colorado, identifying significant wildlife crossing areas. This has already led to a partnership with the Southern Ute Tribe and Great Outdoors Colorado that will develop a major wildlife crossing structure on the east side of the HD Mountains.

**Cost of current or needed habitat treatments; road crossings etc.:**

The large scale habitat treatments and highway crossings structures and fencing necessary to maintain the San Juan Basin deer and elk herds' network of migration corridors will be very costly, and may require several million dollars to complete.

**Other Issues for awareness:** None known.

**#3 Colorado Migration Corridor Priority: Uncompahgre (West-Central Colorado)**

**Why the area selected as a priority:**

The Uncompahgre Plateau encompasses Colorado's D-19 and E-20 deer and elk herds. The elk herd is managed for a quality hunting experience in GMU 61 using limited allocations of licenses, and within GMU 62 the herd is managed for hunting opportunity, with more liberal license availability.

27

Deer numbers have seen a long, steady decline from approximately 50,000 in 1980, to 15,000 in 2019. Elk numbers peaked in 2003 at just over 14,000 and have since declined to around 9,000 in 2019. These declines are the result of poor fawn/calf recruitment rates which in turn are attributed largely to recurring drought, poor livestock management, disease, development of houses and golf courses, and increasing recreational impacts.

**Spatial Location:**

D19 and E20 are in west-central Colorado, south of Grand Junction, west of Montrose, and north of the San Miguel River. Because of the valued wildlife resources on the Uncompahgre Plateau, the area has been the focus of multiple research projects on deer, elk, mountain lions, and bears (Fig WC3.1).



Figure WC3.1- Location of Elk DAU E-20 and Deer DAU D-19 in west-central Colorado.

**Habitat Types:**

At elevations below approximately 6,500 ft near the Dolores, San Miguel, Uncompahgre and Gunnison Rivers, a high desert plant community is the

28

predominant vegetation type.  Important plant species of this community include four-wing saltbush, shadscale saltbush, black sagebrush, winterfat, broom snakeweed, rabbitbrush, greasewood, and, in the Gateway area, black brush.  Elevations between approximately 6,000-7,500 ft, are characterized by pinyon pine and Utah juniper woodlands and grassland/shrub (e.g., basin big sagebrush, black sagebrush, Wyoming/mountain big sagebrush, mountain mahogany, Indian ricegrass). The pinyon-juniper type covers approximately 40% of DAU D-19 and is the predominant plant community.  From approximately 7,500 to 8,500 ft, ponderosa pine/mountain shrub (e.g., Gambel oak, serviceberry, mountain mahogany, mountain big sagebrush, silver sagebrush, snowberry, manzanita) is the dominant vegetation type.  Elevations above 8,500 ft are generally characterized by aspen forests and a mixed spruce-fir complex (aspen, Douglas fir, sub-alpine fir and Engleman spruce).  Common plant species found in lowland riparian areas on the Uncompahgre Plateau include narrowleaf cottonwood, coyote willow, chokecherry, tamarisk, and boxelder.   In higher elevation riparian areas characteristic species include thinleaf alder, birches, willows, and blue spruce.

 Agricultural areas and cultivated croplands within the DAU occur primarily in the Uncompahgre Valley between Montrose and Delta and in the other major river valleys surrounding the Plateau.

**Important Stopover areas within the corridor:**

Migration on the Uncompahgre Plateau generally takes place over a day or two for most deer and elk. Spring migration may be slower if snow is persistent at higher elevations, but fall migration is usually quick. Some deer and elk that migrate to the south off of the Uncompahgre may take longer. The horsefly peak and the area around the Cornerstone subdivision is one of the few identified stopover areas and concentrated migration corridors. Fall migration stopover may occur in the oakbrush habitat if deer slow their movements to feed on acorns.

**Landownership:**

Land ownership in DAU D-19 is 24% private, 38% BLM, 37% US Forest Service, and 1% state.    Municipalities that border the DAU include Montrose, Delta, Olathe, Ridgway, Norwood, Nucla, Naturita, and Gateway.

29

**Land Uses:**

Agriculture is one of the primary land uses within D-19, with irrigated farmland primarily along the edges of the DAU and extensive cattle and sheep grazing across public and private lands. Recreational activities including hunting, hiking, horseback riding, fishing, wildlife viewing, photography, four-wheeling, OHV use, snowmobiling, and cross-country skiing and mountain biking have always been part of the landscape. However, over the last 15 years OHV use and mountain biking have seen the greatest growth, as local communities support the development of mountain biking and jeep/OHV trails on nearby public lands to create destinations for recreation and to increase local revenue at the expense of wildlife populations. Additional land uses include mining and timber harvest. Historically, the area supported extensive mining for uranium, vanadium and coal, but currently gravel is the primary material being mined. Timber harvest has ebbed and flowed over the years, but currently there has been more prescribed/stewardship cutting taking place to improve forest health. Montrose is home to one of the largest timber mills in Colorado taking trees from all over Colorado.

**Risk/Threats:**

 *Threats:*

Habitat loss to development- golf courses and houses in migration corridors, winter range, and production areas.

Decreasing habitat quality- drought impacts, poor shrub vigor, poor aspen health, poor Douglas-fir and Spruce communities with disease and insect impacts, increasing weed issues, shifts on winter ranges from cool season to warm season grasses, and competition from livestock for forage .

Increased recreational use- increasing mountain bike use, increasing OHV use, more recreational users checked at check stations over Labor Day weekend than hunters.

Fencing- Lots of old sheep fencing remains in the region,  inhibiting deer and elk movements on fawning/calving and summer range. Juvenile deer and elk can't jump sheep fences and become susceptible to predation, abandonment, and injury.

30

BLM_0166756

Disease- In general, diseases are a factor of mule deer juvenile survival. Recently, chronic wasting disease has been detected in the Uncompahgre Valley.  Hemorrhagic diseases also occur across the Uncompahgre Plateau.

 Highway Crossings- Deer and elk migrate across US Highway 550 and CO Highway 62. Exclusionary fencing has been in place on a portion of the highway for a long time and may have inhibited migration patterns. The West Slope Prioritization study has identified a segment of 550 as a top 5% project area to implement exclusionary fencing and crossing structures.

### Are the Risk/Threats Immediate or Long-term:

The threats on the Uncompahgre Plateau are immediate and long-term. Habitat loss to development has been occurring and will continue to occur on private lands across and around the Uncompahgre Plateau. Conservation easements have been used to protect private property, however, land values on the southern end of the Uncompahgre are very high so cost has been prohibitive for acquisition and for compensation for the sale of development rights.

Fencing can protect drivers and deer from collision but it can become a barrier that inhibits migration. As animals cross highways, the risk of wildlife-vehicle collisions presents both an immediate and long-term threat to short term survival and long term migration patterns.

As the human population in the area has increased, mule deer migration has been inhibited by traffic along US Highway 550 and CO Highway 62. Additional fencing has been placed along the 550 corridor but there are still stretches that CDOT has identified for more fencing. Habitat quality could improve with more consistent precipitation, however, long term trends have been much drier than in previous decades even with events like last winter's high snow pack. Additionally, while livestock numbers and big game numbers grazing and browsing across the Uncompahgre have decreased compared to historic high numbers, long term impacts on vegetation remain and are important browse plants are especially slow to respond following the drought conditions observed over the last 20 years.

Sheep fencing could be considered an immediate threat to be addressed, but some of the fences have been around for decades.

31

BLM_0166757

Diseases, both hemorrhagic and CWD, remain factors that suppress the growth potential of big game populations. These diseases can have lasting negative impacts on populations, and are expected to continue to be factors influencing mortality.

Recreational use within the Uncompahgre Plateau has both short term and long term impacts on the habitat and populations of wildlife as human populations continue to  grow.

**Actions necessary to reduce or eliminate risks/threats:**

 *Conservation actions:*

Conservation easements (~$3000/acre @ 1000 acres per year) to protect important winter ranges for connectivity and continuity are needed. Placing the Cornerstone elk ranch, located between Cornerstone golf course and subdivision and Horsefly peak, under a conservation easement would create significant protection for deer and elk migration corridors. There are many additional privately owned parcels to protect, but inflated land values make it difficult. CPW may partner with the Colorado West Land Trust to add focus to big game migration corridors and important winter ranges.

Wildlife friendly fencing program (~$7500/mile, cost share at 50%, 20 miles/year). Cooperate with landowners in summer ranges to replace or cost-share woven wire fence replacement to wildlife friendly fencing, and/or to put in gates or to drop stretches of fencing where woven wire must be used.

Travel Management ($2000/year for big game closure signs)- Assist USFS and BLM with closing roads and with developing educational materials for trail users about conflicts between wildlife and trails.

Habitat improvement ($150,000/year)- Continue to implement habitat treatments in or adjacent to key winter ranges as identified in CPW's West Slope Mule Deer Strategy.   Key outcomes from treatments will be improved sagebrush communities: decreased weeds, increased grass and forb diversity, decreased bare soils, and a possible shift warm season winter range communities back to cool season grasses.  NEPA is ready to go for the Dry Mesa area up to Escalante Canyon. In addition, CPW can plan projects to implement mule deer strategy area and habitat improvement projects on

32

BLM_0166758

winter ranges in GMU 61. Funding to assist with completion of NEPA compliance would be beneficial.

Highway crossings on Hwy 550 and 62 ($1,000,000)- The West Slope Prioritization study identified a segment of Highway 550 as a top 5% project area. CDOT is currently designing a project for fencing and an underpass near Billy Creek State Wildlife Area. The underpass would cost approximately $700,000 for the structure and another $250,000-$300,000 for construction.

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

Research is underway to identify causes of reduced elk recruitment plaguing southern Colorado. This work is being conducted by CPW's mammals research unit with funding support from the Rocky Mountain Elk Foundation, Habitat Partnership Program, and a local landowner.

CPW's West Slope Mule Deer Strategy projects are being conducted in cooperation with the BLM, USFS, and Mule Deer Foundation to improve habitat through pinyon-juniper thinning on winter ranges, seeding a recent large wildfire area, and improving pasture fencing on winter ranges.

West Slope Prioritization Study, developed jointly between CDOT and CPW, has identified conflict areas and a priority project area along the Highway 550 corridor on the southeast edge of the Uncompahgre Plateau.

**Cost of current or needed habitat treatments; road crossings etc.:**

*Funding to date:*

CPW's West Slope Mule Deer Strategy habitat improvement projects across the Uncompahgre Plateau have been taking place over the last few years. To date approximately $375,000 has already been spent by CPW, SCTF, and GOCO to implement seeding on the Bull Draw fire and on mastication projects.

*Funding needed:*

33

Conservation easements (~$3000/acre @ 1000 acres per year) to protect important winter ranges for connectivity and continuity are needed. Placing the Cornerstone elk ranch, located between Cornerstone golf course and subdivision and Horsefly peak, under a conservation easement would create significant protection for deer and elk migration corridors. There are many additional privately owned parcels to protect, but inflated land values make it difficult. CPW may partner with the Colorado West Land Trust to add focus to big game migration corridors and important winter ranges.

Wildlife friendly fencing program (~$7500/mile, cost share at 50%, 20 miles/year) (Figure WC3.2). Cooperate with landowners in summer ranges to replace or cost-share woven wire fence replacement to wildlife friendly fencing, and/or to put in gates or to drop stretches of fencing where woven wire must be used.

Travel Management ($2000/year for big game closure signs)- Assist USFS and BLM with closing roads and with developing educational materials for trail users about conflicts between wildlife and trails.

Habitat improvement ($150,000/year)- Continue to implement habitat treatments in or adjacent to key winter ranges as identified in CPW's West Slope Mule Deer Strategy (Figure WC3.2).   Key outcomes from treatments will be improved sagebrush communities: decreased weeds, increased grass and forb diversity, decreased bare soils, and a possible shift warm season winter range communities back to cool season grasses.  NEPA is ready to go for the Dry Mesa area up to Escalante Canyon. In addition, CPW can plan projects to implement mule deer strategy area and habitat improvement projects on winter ranges in GMU 61. Funding to assist with completion of NEPA compliance would be beneficial.

Highway crossings on Hwy 550 and 62 ($1,000,000)(Figure WC3.2)- The West Slope Prioritization study identified a segment of Highway 550 as a top 5% project area. CDOT is currently designing a project for fencing and an underpass near Billy Creek State Wildlife Area. The underpass would cost approximately $700,000 for the structure and another $250,000-$300,000 for construction.

34

BLM_0166760



Figure WC3.2. Location of current and proposed mule deer habitat projects on Uncompahgre plateau. Projects will protect big game winter ranges and migration corridors.

**Other Issues for awareness:** None

35

## #4 Colorado Migration Corridor Priority: Piney River/State Bridge (Northwest Colorado)

### Why the area selected as a priority:

The Piney River/State Bridge priority area includes most of the State Bridge deer herd (DAU D-8) and all of the Piney River elk herd (DAU E-12) and provides habitat for significant populations of both mule deer and elk. Specifically, the priority area includes Game Management Units 35, 36, and 361. At approximately 14,000 deer, the State Bridge deer herd is one of the ten largest herds on the western slope of Colorado.  The Piney River elk herd includes approximately 3,700 animals.  While both species are within CPW's long-term population objective for the herds, habitat carrying capacity has declined over recent decades, as both the quantity and quality of habitat have diminished due to land development, fragmentation by roads and trails, increased human activity on public lands, and suppression of large-scale wildfires.

### Spatial Location:

The Piney River/State Bridge priority area is located in north-central Colorado. The area occurs in Eagle and Garfield counties and lies north of the Eagle River and east of the Colorado River. It is bounded on the east by alpine habitats on the Gore Range divide. Interstate 70 runs along the southern edge of the priority area. The mountain ski town of Vail occurs in the eastern portion of the priority area, and several additional mountain towns, including Avon and Eagle, are located along the southern edge of the priority area (Figure WC4.1). The Piney River/State Bridge  priority area is approximately 620 square miles in size.

36



Figure WC4.1.  Piney River/State Bridge Priority Area.

Mule deer and elk winter range is concentrated in the central and western portions of the priority area.  The Piney River/State Bridge priority area occurs at relatively high elevation.  Snowfall is heavy and persistent for many months in most years.  Consequently, south facing slopes at lower elevations in the central and western portions of the area are of critical importance.  Approximately one third of the area provides suitable winter range for deer, and elk winter in about half of the priority area. Two thirds of the winter range is on public land, with the remaining third in private ownership. The highest density of wintering mule deer occurs along slopes lining the north side of the I-70 corridor and along Highway 131. Elk winter use is greatest in the north-central portion of the priority area, with lower levels of use along the I-70 corridor and the Colorado River.

37

BLM_0166763

The majority of deer and elk in the priority area migrate from higher elevations to these winter ranges in the fall and early winter and reverse the pattern in the spring.  Unfettered access to these winter range areas is of critical importance, as deer and elk seek wintering ranges where snow depths are lower and winter temperatures are higher.  Two key migration corridors are present in the unit.  The first, and most significant, runs east to west along the north side of I-70.  It is particularly important for deer. The second key area is associated with the Dowd Junction highway underpass at the eastern end of the priority area near Vail.  Maintenance of free movement to and from this underpass is of high importance for deer that summer south of I-70, but winter in the priority area to the north of the Interstate.  Mule deer and elk winter range concentrations are shown in figures WC4.2 and WC4.3, respectively.

BLM_0166764



Figure WC4.2.  Mule deer winter range density in the Piney River/State Bridge Priority Area.

BLM_0166765



Figure WC4.3.  Elk winter range density in the Piney River/State Bridge Priority Area.

## Habitat Types:

Vegetation types in this unit are largely determined by elevation and aspect. Topography in the priority area is highly varied.  The Gore Mountain Range, along the eastern boundary, has elevations in excess of 13,000 ft.  Low-lying regions are found adjacent to the Colorado River, with an average elevation of just over 6,000 ft.

Above approximately 12,500 ft, the mountain peaks in the Gore Range are comprised mostly of bare rock or alpine communities.  Spruce-fir forest occurs between the elevations of 8,000 and 12,500 ft.  Aspen and aspen-conifer mixes dominate the slopes from 7,000 to 8,500 feet.  Mountain shrub communities occur primarily on lower slopes near 7,000 feet.  In the

40

BLM_0166766

western two-thirds of the area, pinyon-juniper woodland covers the foothills, and sagebrush parks appear on more level sites as elevation drops. Aspen is found mostly on sites that have been burned or disturbed within the past 150 years.  Major vegetation categories are shown in Figure WC4.4.



Figure WC4.4.  Major vegetation communities within the Piney River/State Bridge Priority Area.

**Important Stopover areas within the corridor:**

Specific migration routes in the Piney River/State Bridge priority area have not been mapped to the degree of specificity necessary to identify stopover areas.  As noted in the Bears Ears/White River discussion above, detailed migration route mapping in northwestern Colorado suggests that migrating deer and elk don't utilize stopover areas to the degree documented in other states.

41

BLM_0166767

**Landownership:**

The Piney River/State Bridge priority area is 75% federal land and 23% private land, with the remainder owned by the State of Colorado and other entities.   The Eagle's Nest Wilderness makes up 13% of the priority area. The eastern half of the priority area is comprised of National Forest, with BLM ownership predominant in the western half (Figure WC4.5).



Figure WC4.5.  Land ownership in the Piney River/State Bridge Priority Area.

**Land Uses:**

 Land use is varied and diverse in the Piney River/State Bridge priority area. The main industries are tourism, outdoor recreation, ranching, construction, real estate and logging.

BLM_0166768

The local economy is strongly influenced by tourism.  Interstate 70, along the southern edge of the priority area, is the major east-west artery through Colorado's Rocky Mountains. The main tourist attractions in the vicinity are the Vail and Beaver Creek Ski areas, located just south of the priority area. These resorts have shifted recreational activity in recent years from winter-only ski areas to four-season resorts that draw visitors for a variety of outdoor recreational activities throughout the year.  Increased recreational activity at these resorts has led to increasing recreation on public lands within the priority area as well.  Over the past 10 years, the priority area has experienced rapid expansion of non-consumptive outdoor recreation activities, especially mountain biking and backcountry skiing, but also hiking, trail running, motorbiking, ATV/UTV riding, snowmobiling, and horseback riding.  The area also supports substantial wildlife-related recreation, including hunting and fishing.

Construction and real estate development and sales are also major industries in the area, and are fueled in part by the increase in recreational activity.  Unfortunately, many of the new developments are located in mule deer and elk winter range. Approximately 30% of the winter range in the priority area is privately owned, much of which has already been developed or may be subject to residential and commercial land development in the future.  Over the past 30 years, this development has been focused along the I-70 and Highway 131 corridors.  The density of residential development varies from suburban housing to larger exurban ranchettes.

Public land in the priority area is used for livestock grazing, although livestock grazing on private lands has declined with the general decline in agriculture as lands are converted to residential use. The BLM administers all or part of 34 active grazing allotments in the priority area. Livestock use occurs primarily in the spring, summer, and fall.  The Forest Service administers 8 active grazing allotments occurring totally or partially in the priority area.  The period of livestock use on the National Forest varies, but primarily occurs from late June through October. Grazing practices have changed greatly since the 1960s, such that impacts of livestock on the land are much less today than in the late 19th and early 20th centuries.

Other commercial land uses in the priority area include logging and mining. Commercial logging has occurred in several portions of the priority area in

BLM_0166769

the past.  The area's forests have experienced a significant bark beetle outbreak in recent years which has also contributed to a change in forest cover and has resulted in additional timber management activities. The Forest Service has several active or future timber sales planned in these areas.  Cinders are mined for making blocks and for road surfacing at the Dotsero volcanic site in the western portion of the priority area.  Gypsum is mined just north of the town of Gypsum for the local wallboard plant. There have been several oil and gas wells drilled in the priority area since 1940, but most of these were not productive.

**Risk/Threats:**

The most significant threats to deer and elk in this priority area are the rapid expansion in the intensity and duration of year-around recreational activity and the associated increase in residential and commercial development.  Both lead to reduction in the amount and quality of winter range, as well as the ability of deer and elk to migrate successfully to and from these winter ranges.  As noted above, the Piney River/State Bridge priority area occurs at relatively high elevation and receives considerable snowfall that persists through a long winter season.  Consistent access by deer and elk to south facing slopes within the priority area, particularly the ability of deer to reach and winter on the slopes within a few miles north of I-70, is critical to the conservation of these herds.

The incidence of wildlife-vehicle collisions along I-70 has been high in the past, leading to the installation of exclusionary fence along many miles of the Interstate in this priority area.  While adequate escape ramps have been constructed to allow animals to exit the fenced right of way, no wildlife crossing structures have been constructed in this area, with the exception of the Dowd Junction deer crossing under the Interstate near Vail.  There are several long bridges that provide some crossing areas under the Interstate, but they are not necessarily engineered to facilitate wildlife use or located within the most important crossing sites.  Highway 131 bisects high-density deer winter range north of the Interstate and also contributes to wildlife mortality.  Traffic volume along this highway is relatively low, but is likely to increase as the level of recreation and residential development increases.

**Are the Risk/Threats Immediate or Long-term:**

44

There are both long-term and immediate components to the threats facing wintering and migrating deer and elk in the Piney River/State Bridge priority area.  The intensity and duration of recreational activity is increasing rapidly year by year.  The White River National Forest is among the most heavily visited forests in the entire National Forest system. Rapidly developing mountain bike designs and increased prevalence of off-highway vehicles are expanding the ability of people to reach formerly remote and inaccessible wildlife habitats year-round.

Residential and commercial development associated with local ski areas has been occurring for more than 40 years and has accelerated in recent decades.  Much of this development has occurred on privately owned winter range.  Several large ranches, particularly in the eastern portions of the priority area, have been purchased by owners who intend to maintain the properties in an undeveloped state.  Few are protected by conservation easements, but they have served to conserve key habitats nonetheless.  This shift of private land away from production agriculture has moderated the effect of livestock grazing on large areas of private land, and on federal lands to a lesser degree, but winter range habitat condition in the priority area is still depressed through the persistent degradation caused by historic grazing practices and the successional effects of long-term fire suppression.

Much of the I-70 corridor has already been fenced to exclude wildlife, with some reduction in the ability of wildlife to move across the Interstate corridor.  Additional areas continue to be fenced annually.  No exclusionary fencing is in place along Highway 131, and there are no immediate plans to construct any.  This highway represents a potential future risk to deer and elk, as it bisects important and heavily used winter range.

**Actions necessary to reduce or eliminate risks/threats:**

Several actions may be successful in reducing or eliminating these threats. First and foremost, continued diligence from the BLM and the Forest Service in avoiding, minimizing, and mitigating the negative effects of land use developments, including recreation, on migrating and wintering deer and elk will be critically important. Counties, municipalities, and non-governmental organizations also have a role to play in properly designing and implementing land use practices within the priority area. Limitations on the timing and intensity of recreational activity on publicly and privately

BLM_0166771

owned winter range will be especially valuable in reducing impacts on big game.

Protection of privately owned migration areas and winter ranges through the implementation of conservation easements will also benefit conservation of  limited winter ranges in the priority area.  Unfortunately, land value in the priority area is high and rising, adding to the costs of conservation easements with each passing year.

Identification and construction of strategically designed and located highway crossing structures could conserve, and in some cases restore, permeability for migrating wildlife.  This will be particularly important should the need for exclusionary fencing along Highway 131 develop at some point in the future.

Habitat enhancement to counteract the lingering effect of historic grazing practices and to reset vegetative succession to improve forage quality for wintering deer and elk would benefit both species.  Potential treatment practices include prescribed fire, mechanical removal or thinning of pinyon-juniper woodland, timber and beetle-kill management, mechanical mastication or roller-chopping of mountain shrub communities, understory restoration, and management/restoration of the soil water table and wet meadow/seep areas.

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

CPW participates with the BLM, the Forest Service, and local governments, as appropriate, to evaluate and comment on land use proposals, including the application of timing limitations, identification of best management practices, and development of mitigation proposals.  CPW has also partnered with BLM and others to conduct habitat management projects in the priority area.  Most of these projects have involved the mechanical removal of pinyon-juniper woodland.  BLM has also begun to work on water table restoration projects in downcut ephemeral water courses.  CPW and the Colorado Department of Transportation (CDOT) have established a transportation alliance to coordinate efforts to reduce wildlife-vehicle collisions and to increase permeability across state highway corridors.  CPW and CDOT recently completed a western slope-wide assessment of collision

BLM_0166772

risk that will be used for prioritizing and planning wildlife crossing projects.  An interagency group has been established in Eagle County to assess highway safety and wildlife crossing needs in the county.

**Cost of current or needed habitat treatments; road crossings etc.:**

Protection of winter range and migration corridors on private lands through conservation easements would be an effective method of ensuring long-term conservation of non-federal habitat.  CPW has not completed any conservation easements in the priority area to date.  Due to the high cost of land in the area, purchased easements will be quite expensive.  A single easement of sufficient size to be meaningful will cost several million dollars, depending on location and easement terms.

Highway crossing structures are similarly expensive.  CPW experience with structures across nearby Highway 9 indicates that the per structure cost for a two-lane underpass or overpass structure is approximately $1 million.  The Highway 9 project spaced structures at 1-1.5 mile intervals.  Structures across I-70 would be more expensive due to their greater length to span multiple lanes of traffic.

Average cost for pinyon-juniper removal or understory restoration habitat treatments is approximately $250/acre.  Habitat enhancement of 5000 acres (approximately 4% of winter range in the priority area) would cost $1,250,000.

**Other Issues for awareness:**

None

**#5 Colorado Migration Corridor Priority: Bookcliffs (West-Central Colorado)**

**Why the area selected as a priority:**

The Bookcliffs priority area includes all of the Bookcliffs deer herd (DAU D-11) and western portions of the Yellow Creek elk herd (DAU E-10) within its 1,757 square miles.  The priority area provides habitat for approximately

47

7,500 mule deer and perhaps 5,000 elk.  Specifically, the priority area includes Game Management Units (GMUs) 21 and 30. Much of GMU 21 and northern portions of GMU 30 are public land managed by the BLM.  The Bookcliffs deer herd is below the long-term population objective established by CPW.  The elk population is above the current long-term objective, but elk populations on public land portions of the priority area are frequently lower than desired.  Both species migrate elevationally in the fall and spring.  BLM lands provide important winter range for both species, and portions of each herd also migrate relatively long distances annually, including movement into the state of Utah for the winter months. Habitat carrying capacity has declined over recent decades, as both quantity and quality of habitat have diminished due to extensive oil and gas development, fragmentation by roads and trails, increased human activity on public lands, and suppression of large-scale wildfires.

**Spatial Location**:

The Bookcliffs priority area is located in west-central Colorado.  It lies to the northwest of Grand Junction along the Colorado-Utah state line (Figure WC5.1). It is bounded on the north by the White River, on the south by the Colorado River, and on the east by the high ground of the Cathedral Rim. The priority area occurs in Mesa, Garfield, and Rio Blanco counties.

48

BLM_0166774



**Location of Mule Deer DAU D-11** (GMUs 21, 30), West-central Colorado

Figure WC5.1. Bookcliffs Priority Area.

The Bookcliffs priority area contains approximately 1,150 square miles of suitable winter range (Figure WC5.2).   Lower elevation lands across the priority area comprise the most important winter range for both deer and elk.  Favorable snow depths, slope and aspect, and winter temperatures create accessible forage and make these areas suitable for wintering big game.  Elk are generally found at higher elevations than deer due to their ability to forage in deeper snow conditions.  However, during severe winters, both deer and elk are forced to winter at the lower elevations.  The majority of deer and elk in the priority area winter on public lands, as

49

approximately 91% of the winter range occurs on public land.  The remaining 9% of the winter range is held by private landowners. Important private land wintering areas are found within the lower drainages.



**Location of Mule Deer DAU D-11** (GMUs 21, 30), West-central Colorado showing Deer Winter Range, Severe Winter Range, and Winter Concentration Areas.

Figure WC5.2.  Winter range in the Bookcliffs Priority Area.

BLM_0166776

Two principal migration patterns occur in the priority area. A portion of deer and elk move to the south side of the priority area and winter on the Bookcliff slopes above the valley floor, or drop into the valley, depending on winter conditions. This tends to be a relatively short-distance, elevational movement pattern. On the north side of the priority area, similar elevational movements between summer and winter range occur, but a portion of the deer and elk demonstrate longer-distance, directional seasonal migration. This movement pattern is to the west and northwest, with a significant proportion of both deer and elk wintering on adjacent areas in Utah.

**Habitat Types:**

Topography varies greatly in the Bookcliffs priority area. The highest elevations are at the center of the area at the top of the Bookcliffs. Elevations decrease to the north and south from there. The highest elevation in the priority area is approximately 9,300 ft. The lowest elevation is approximately 4,600 ft and occurs in the southwestern corner of the priority area, where the Colorado River meets the Utah state line. The Bookcliffs area is noted for canyon country in the south and rolling pinyon-juniper/sagebrush/mountain shrub steppe in the north.

Steep-sided sandstone and shale canyons are dominant geographic features of this priority area. The Bookcliffs are a generally continuous, uniformly high cliff formation with canyons and washes running north to south toward the Colorado River. In the upper reaches of GMU 30, large canyons bisect the topography at frequent intervals. The interior portions of the priority area are composed of mesas and rolling sagebrush hills. Terrain is less fragmented and more open in these interior areas.

Vegetation within the Bookcliff priority area varies across the wide range of elevations and aspects that occur. At lower elevations along drainages, irrigated lands composed primarily of grass/alfalfa meadows are common. At lower elevations away from the drainages, vegetation is typical of most semi-arid regions in western Colorado. Saltbush, sagebrush, and greasewood are common shrub species found in these open desert areas. Cheatgrass dominates the understory in many areas in the desert. Pinyon-juniper woodlands are common on the lower and intermediate slopes throughout the priority area. Oakbrush (Gambel's oak) is found mixed with

BLM_0166777

pinyon-juniper woodland at higher elevations.  A combination of sagebrush and snowberry are commonly found in open areas in the oakbrush zone at intermediate and higher elevations.  Higher elevations, which receive considerably more moisture, are dominated by stands of aspen and Douglas fir, sagebrush steppe, and serviceberry-dominated shrublands.  Often, the aspen and fir are found in pockets, rather than in large, continuous forested areas.  Vegetative communities grade into each other in response to slope, aspect, and moisture, forming a mosaic pattern across the landscape. Extensive crop production of corn, wheat, alfalfa, beans, and onions occurs in the Grand Valley.  These crop fields are used by deer and elk principally during the winter months, although some deer use the fields throughout the year.

**Important Stopover areas within the corridor:**

Specific migration routes in the Bookcliffs priority area have not been mapped to the degree of specificity necessary to identify stopover areas.  As noted in the Bears Ears/White River discussion above, detailed migration route mapping in northwestern Colorado suggests that migrating deer and elk don't utilize stopover areas to the degree documented in other states.

**Landownership:**

The Bookcliffs priority area contains a mixture of public and private lands. Approximately 81% of the priority area is in public ownership.  The vast majority of the priority area (80%) is managed by the BLM, 0.4% is managed by CPW, 0.2% is managed by the Colorado State Land Board and 19% is privately owned.  BLM lands in the priority area are managed by the Grand Junction and White River Field Offices, located in Grand Junction and Meeker, respectively.  The land managed by CPW falls within the Square S Summer Range tract of the Piceance State Wildlife Area.

**Land Uses:**

Livestock production is a predominant land use throughout the priority area.  Much of the private land is used to graze livestock throughout the year.  Cattle and sheep ranchers graze livestock on BLM lands during various seasons of the year.  Livestock are generally grazed on allotments during the summer and then moved to home ranches for the winter, but some grazing also occurs on BLM lands during the winter months.  Most

BLM_0166778

domestic grazing is by cattle.  Historically, domestic sheep were grazed in significant numbers, but are now limited to a few small flocks.

Crop production is limited to specific regions within southern portions of the priority area, but plays a significant role in wildlife management.  The Grand Valley area around Grand Junction and Fruita is extensively irrigated and farmed.

Significant oil and natural gas resources underlie portions of the Bookcliffs priority area, particularly in the northern half of the area.  Extensive development has occurred in the Douglas Creek drainage basin.  While the field remains in production, the pace of development has fallen sharply since 2009.  An increase in the price of natural gas could accelerate these activities.

The Bookcliffs priority area experienced a great deal of human population growth over the past 20 years, primarily in the Grand Valley and along Interstate 70.  The majority of new housing developments built outside city limits have occurred in deer winter range, fragmenting former sagebrush and agricultural lands.  The area north of Grand Junction is undergoing rapid conversion of agricultural lands to exurban and suburban housing developments.

Outdoor recreation is extensive across the priority area, which provides excellent backcountry hiking, biking, and off highway vehicle (OHV) opportunities.  Vehicular access varies across private and public lands.  A network of roads provides ample access to many areas that are open to multi-purpose land uses.  Big game hunting is a major recreational activity in the priority area in the fall.  Fishing is limited to some of the larger perennial streams and to several public and private reservoirs.

Commercial timber harvest is limited to small blocks and occurs primarily on private land.  Some Douglas fir has been harvested in recent years.  Most of this harvest occurs in rugged canyon areas in the northern part of the priority area.  Aspen has also been harvested, sometimes as part of other land management practices including habitat management for big game wildlife.   Some firewood is harvested, both commercially and privately.

**Risk/Threats:**

53

Livestock grazing is extensive across the Bookcliffs priority area.  The arid nature of the priority area requires careful management to ensure that livestock grazing is done in a manner consistent with maintaining land health standards.  Vegetation in the priority area, particularly within deer range, has been intensively managed to produce livestock forage, often to the detriment of shrubs important as deer winter forage.  Natural fire has been suppressed in the priority area for many decades, and pinyon-juniper encroachment into sagebrush communities is a significant concern in some areas.  Pinyon-juniper encroachment may be impacting wildlife populations by reducing palatable forage suitable for deer.

Intensity of outdoor recreation activity is increasing in the priority area. Fruita has become a destination mountain biking area where new trail complexes have been pioneered in recent years.  Off road vehicle activity on federal lands has also increased substantially.

Oil and gas production is currently at a relatively low level but could increase quickly with a change in the market price of natural gas.  Oil and gas developments can affect big game wildlife in several ways.  One is the direct disturbance on and immediately surrounding drill pads due to development and production activities on the drill pad, increased human activity, and habitat displacement.  Indirect disturbance effects also extend into adjacent undeveloped areas and can alter deer use patterns in these habitats.  Additionally, the necessary infrastructure to support oil and gas production, including roads and pipelines, fragment the landscape and contribute to an overall decline in habitat quality.  Elk and deer tend to avoid areas of higher human activity, and thus can lose access to affected habitat. Both summer and winter ranges have been affected by past and present oil and gas development and production.  Planned developments will likely be concentrated more heavily on winter ranges, increasing the impact of each development on wintering deer and elk.

Increasing suburban and exurban residential development has occurred in some of the most productive habitat (irrigated agricultural fields) in the priority area.  The resulting loss of deer and elk winter range is a significant and increasing concern.

Highway 139 bisects the priority area, but has not been identified as a major risk factor for wildlife-vehicle collisions.

54

BLM_0166780

**Are the Risk/Threats Immediate or Long-term:**

Increased recreation activities and suburban/exurban development are immediate threats in the Bookcliffs priority area.  Vegetative effects of livestock grazing and effects of oil and gas development and production are long-term threats, so long as current energy market conditions prevail.

**Actions necessary to reduce or eliminate risks/threats:**

Several actions may be successful in reducing or eliminating these threats. First and foremost, continued diligence from the BLM in avoiding, minimizing, and mitigating the negative effects of land use developments, including recreation, on migrating and wintering deer and elk will be of critical importance.  Counties, municipalities, and non-governmental organizations also have a role to play in properly designing and implementing land use practices within the priority area.  Limitation of the timing and intensity of recreational activity on publicly and privately owned winter range will be especially valuable.

Although private lands make up a small portion of the Bookcliffs priority area, they constitute some of the most productive habitat.  Protection of privately owned migration areas and winter ranges through conservation easements could benefit conservation of deer and elk in the priority area. Land value in the priority area is lower than in some of the mountain communities, and may help in leveraging conservation easement efforts.

Habitat enhancement to counteract the vegetative effects of domestic livestock grazing practices and to reset vegetative succession to improve forage quality for wintering deer and elk would benefit both species. Potential treatment practices include prescribed fire, mechanical removal or thinning of pinyon-juniper woodland, mechanical mastication or roller-chopping of mountain shrub communities, understory restoration, and management/restoration of the soil water table and wet meadow/seep areas.

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

CPW participates with the BLM and local governments, as appropriate, to evaluate and comment on land use proposals, including the application of

BLM_0166781

timing limitations, identification of best management practices and development of mitigation proposals. CPW has also partnered with BLM and others to conduct habitat management projects in the priority area, particularly in the higher elevations along the eastern edge of the area. Most of these projects have involved the mechanical removal of pinyon-juniper woodland. CPW and CDOT have established a transportation alliance to coordinate efforts to reduce wildlife-vehicle collisions and to increase permeability across state highway corridors. CPW and CDOT recently completed a western slope-wide assessment of collision risk that will be used for prioritizing and planning wildlife crossing projects.

**Cost of current or needed habitat treatments; road crossings etc.:**

Protection of winter range and migration corridors on private lands through conservation easements would be an effective method of ensuring long-term conservation of non-federal habitat. CPW has not completed any conservation easements in the priority area to date. Even with the relatively moderate cost of land in the area, purchased easements will be quite expensive. A single easement of sufficient size to be meaningful will cost several million dollars, depending on location and easement terms.

Average cost for pinyon-juniper removal or understory restoration habitat treatments is approximately $250/acre. Habitat enhancement of 5000 acres (approximately 0.7% of winter range in the priority area) would cost $1,250,000.

**Other Issues for awareness:**

None

**#1 Colorado Research Priority:  Upper Purgatoire Mule Deer and Elk Herds**

**Why the area selected as a priority**: The Upper Purgatoire watershed (GMUs 85, 851 and 140; DAUs E-33 and D-32) provides some of the most critical mule deer and elk winter habitat in the SE Region of Colorado and contains one of the top 5 elk herds in the state.  Three primary

56

opportunities exist in this area to better understand how deer and elk use this important landscape.  First, a better understanding of elk and deer movements in the northern portion (GMU 85) would help us better identify the migration corridors in this area.  Second, this area is bisected by Interstate 25 from the town of Trinidad to the Colorado State line at the top of Raton pass.  The importance of understanding how deer and elk interchange across Interstate 25 recently intensified with our recent knowledge that the New Mexico Department of Transportation is installing exclusionary fencing along Interstate 25 from the city of Raton to the top of Raton pass.  In this project, New Mexico has limited funds to provide crossing structures.  Therefore, with limited crossing structures and lack of fencing on the Colorado side of the pass, the incidence of vehicle collisions with bear, lion, deer and elk may intensify.  Lastly, CPW, The Nature Conservancy (TNC), and Trust for Public Lands (TPL) recently purchased a 19,000 acre ranch to the south of Trinidad; this property's western boundary is Interstate 25.  The property known as the Fishers Peak Ranch will be open to the public for a variety of uses, which could include, hunting, camping, hiking, mountain biking, rock climbing, and wildlife watching.  The development of recreation on this property provides a rare opportunity for CPW to examine impacts of recreation on deer and elk movements and distribution, in addition to investigating concerns about wildlife crossing Interstate 25.

**Spatial Location**:

This watershed includes GMUs 85, 851 and 140, which overlap with deer DAU D-32 (Figure R1.1). The watershed is bounded on the north by US highway 69, Interstate 25 and Colorado 160; on the east by Colorado 389; the south by the New Mexico and Colorado State line; and on the west by the Sangre de Cristo and Culebra Mountain Ranges (Figure R1.1).

BLM_0166783



Figure R1.1.  Upper Purgatoire watershed including GMUs 85, 851 and 140.

**Habitat Types:**  This area covers 2,044 square miles ranging in elevation from 14,047 feet at the summit of Culebra Peak to about 5,364 feet where San Francisco Creek flows under Colorado 160.  The range in elevation leads to diverse habitat types that includes; alpine tundra, subalpine conifer, montane mixed conifer, montane shrub, pinyon/juniper woodlands, oak brush, mountain meadow and plains grassland.

**Important Stopover areas within the corridor:**

These are unknown at this time due to the lack of telemetry data within this area.

**Landownership:**  The size of the watershed is 2,070 square miles.  Of that area, 71 mi² is owned by CPW (Spanish Peaks, Lake Dorothey, Bosque del Oso and James M. John State Wildlife Areas) which is approximately 3.4%

BLM_0166784

of the watershed, the U. S. Forest Service controls 109 mi² (5.2%), the BLM 46 mi² (2.2%), the State Land Board 66 mi² (3.1%), and 1,772 mi² is in private ownership (85.6%).

**Land Uses:** Agriculture is the predominant land use in the watershed with livestock grazing, primarily cattle and horses, occurring throughout the area on native rangeland. Irrigated hay and alfalfa occurs along many rivers with the majority of row crops confined to small farms. In addition, the Raton basin has been extensively developed for coalbed methane, with roads and well pads found throughout large portions of the watershed. Lastly, large ranches have been developed into 40 acre or smaller "ranchettes", which has fragmented portions of the watershed.

**Risk/Threats:** First, the extensive development of coalbed methane in the Raton Basin has fragmented this watershed in some of the key winter ranges for both deer and elk. Much of the development has already occurred in the southern portion of the watershed. However, development of gas resources to the northern portion of the watershed could further fragment this landscape. Second, over the last 30 years, a number of large ranches have been developed into 40 acre or smaller "ranchettes". These developments have fragmented the landscape through both the development of homes and also the proliferation of fences. Many of these developments are located in deer and elk winter range, which likely affects both distribution and movements of deer and elk in the watershed. Third, as described above, we are concerned about the fencing of Interstate 25 on Raton Pass in New Mexico and the potential impact that the lack of fencing and key crossing structure may have on the Colorado side. Lastly, the future impact of trail-based recreation on the movement of deer and elk on Fishers Peak Ranch is unknown at this time, but presents a a rare opportunity to be studied.

**Are the Risk/Threats Immediate or Long-term:** The risk of oil and gas development and ranchette development are long term. The risk of wildlife-vehicle collisions on Interstate 25 between Trinidad and Raton Pass is more immediate. New Mexico Department of Transportation plans to complete a fencing project from Raton to the top of Raton Pass in the summer of 2020. It is expected that trail-based recreation on the Fishers Peak property will be developed within the next few years. This presents a rare opportunity to

BLM_0166785

study the impacts and make contributions to other managers addressing the impacts of increased trail-based recreation on deer and elk movements and distribution.

**Actions necessary to reduce or eliminate risks/threats:**  First, protection and enhancement of winter range in this watershed is needed to reduce the threat of oil and gas development and housing development.  Additional information on deer and elk movements in this watershed could help define the best locations for these actions.  Another need is development and execution of a strategy to facilitate wildlife crossing Interstate 25 between Trinidad and Raton pass.  Lastly, thoughtful and well planned recreation development on the Fishers Peak Ranch is needed to reduce this threat.

**Current efforts (what is the activity; who is conducting the work; and partners involved):** In partnership with several large ranches, CPW researchers have been collaring and monitoring approximately 30 cow elk in the southwest portion of this watershed.  The study was initiated to examine the cause of low calf:cow ratios in this herd.  In addition to the cow capture, 60 neonate calves are captured each spring to monitor calf survival.  This information has provided information on elk movements in this area.  However, it only represents a small portion of the watershed. CPW has been communicating with CDOT staff to make them aware of the fencing project in New Mexico and the need to consider action to mitigate wildlife-vehicle collisions on the Colorado side.  CPW and TNC have been conducting a biological inventory of the wildlife on the Fishers Peak Ranch. In the summer of 2019, 45 remote cameras were deployed to estimate population abundance and distribution of deer and elk on the property.  This information will be utilized in developing a master plan for the property, which identifies areas for both protection and recreational development.

**Cost of current or needed habitat treatments; road crossings etc.:** Application of satellite transmitters to a minimum of 40 doe deer and 30 cow elk in the areas not included in the current elk study would provide a better assessment of habitat use and timing/pattern of migration.  This information would improve understanding of seasonal habitat use and migration patterns in these herds.  In particular, fine scale (i.e., GPS/satellite) telemetry information would allow greater understanding of the changes that have occurred in wintering distributions of deer and elk,

BLM_0166786

the specific corridors used by deer and elk during seasonal migrations, the timing of migration relative to hunting seasons, and the out-of-area winter ranges used by both big game species.  Costs to implement this action include $106,000 for capture efforts, satellite transmitter collars, and initial year of airtime for monitoring, followed by $15,000/year for an additional 2-3 years of monitoring and maintaining the samples of 40 transmitter-equipped deer and 30 transmitter-equipped elk. This information would support a refined management approach to both the deer and elk herds.

A rare opportunity exists for CPW to examine the impacts of trail-based recreation on the movements of deer and elk on the Fishers Peak Ranch. Due to the connectivity of the Ranch to Interstate 25, collared animals could be used to examine crossing locations.  Application of satellite transmitters to a minimum of 40 doe deer and 40 cow elk would be needed to assess impacts of recreation on deer and elk movements.  Costs to implement this action include $121,000 for capture efforts, satellite transmitter collars, and initial year of airtime for monitoring, followed by $20,000/year for an additional 2-3 years of monitoring and maintaining the samples of 40 transmitter-equipped deer and 40 transmitter-equipped elk. This information will support a better understanding of the impacts of recreation on deer and elk movements and distribution and also examine the potential interchange of animals across Interstate 25.

The highway crossing structures and fencing necessary to facilitate wildlife passage across Interstate 25 from Trinidad south to the New Mexico State line would be very costly and could reach several million dollars.

**Other Issues for awareness:** None


**#2 Colorado Research Priority:  South Park Elk  Herds**


**Why the area selected as a priority**:

The area referred to as South Park is located in Central Colorado and includes critical winter range habitat and important migration corridors for several elk herds.  The largest elk herd within South Park is E-18, the

61

Kenosha Pass Elk Herd, occupying GMUs 50, 500, and 501.  All seasonal movements of this elk herd occur within the geographic area of South Park. The southern portion of South Park, GMU 50, contains critical winter range for E-18 elk and 3 adjacent elk herds. Nearly all elk from E-18, an estimated population of 1,900 elk, winter in a just a few areas of South Park. Additionally, another 500-1,000 elk from elk herds that summer in GMUs 37, 46, 49, 57, 58, and 581 migrate to the same areas of GMU 50 each winter. In the winter of 2018, nearly 2,000 elk were counted in a single group on one property, the James Mark Jones State Wildlife Area.  The severity of the winter influences the timing and number of elk that migrate to South Park.  During winters with average to above average snowfall, elk winter survival depends on their ability to access wintering areas in South park.  Therefore, protection of wintering habitats and migration corridors in South Park is critical to the performance and viability of 4 different elk populations.

**Spatial Location**:

South Park is a grassland basin formed by the Mosquito and Park Mountain Ranges.  It encompasses the South Platte River headwaters in Park County; the town of  Fairplay is the largest population center. South Park is located approximately 60 miles southwest of Denver.

Elk migrate in the winter to South Park from adjacent herds located near the towns of  Breckenridge, Bailey, Lake George, Hartsel, Leadville and Salida (Figure R2.1). Elk migrate long distances to areas in South Park that are free of snow and provide necessary winter forage.

BLM_0166788



Figure R2.1: South Park Areas Elk Winter Concentration and Migration Patterns which is composed of part or all of GMUs 37, 46, 49, 50, 57, 58, 500, 501, and 581.

**Habitat Types:**

Vegetative types vary across South Park depending on elevation, climate, and aspect. For elevations over 11,500 feet, vegetation is alpine tundra which mainly consists of willows, grasses, forbs and sedges. As elevation drops (9,000-11,500), the ecosystem shifts to subalpine forest which consists of densely forested areas of lodgepole, bristlecone and limber pine, spruce/fir, rocky outcroppings, aspens and grass dominated meadows. The dominant life zone (6,500-9,000 feet) within South Park consists of ponderosa pine forest, Douglas-fir, and foothill shrub and grass species. Shrub species include mountain mahogany, chokecherries, currant, and shrubby cinquefoil. Elk are dependent on each of these various habitat types during different times of the year.  Elk winter in the lower elevations of South Park with habitat composed of foothills shrub and grass species.

63

BLM_0166789

Agricultural croplands occur along tributaries up to elevations of 9,500 feet and consist of native grass hay species.

**Important Stopover areas within the corridor:**

Stopover areas within the corridor are unknown, but investigation and identification of potential stopover areas will be a research objective.

**Landownership:**

Approximately half of South Park is in public, federal ownership and the other half is privately owned or in non-federal ownerships.

**Land Uses:**

Land use in South Park has changed significantly in the last 25 years. Private lands have been converted from ranch lands to residential uses. Significant portions of the most critical winter range for elk were impacted and private lands have been subdivided into residential properties. Much of the lower elevation, non-subdivided private land consists of large acreage ranches managed for cattle and hay production.

Recreational activity is high from hiking, fishing, hunting, off road vehicle use, and mountain biking. The proximity to Denver and Colorado Springs, along with access to public land, makes this area popular for recreationalists year round. The headwaters to the South Platte River basin and its associated tributaries support a major tourism industry and generate significant revenue for Park County.  Recreational activities have increased significantly over the last 10 years and are expected to continue to increase.

Several high speed and high volume highways bisect or border South Park. Highway 285 bisects the northern portion of South Park and Highway 9 borders the west side. Both highways contribute to elk mortality and have become a barrier to elk movement as traffic has increased over the last 10 years.

**Risk/Threats:**

Recreation is the dominant use on public lands and has increased commensurately with the population growth in the Denver metro area. Land

64

conversion from agriculture to exurban/suburban housing has been and continues to degrade elk habitat.  Recreation and human development displace elk, fragment habitat, and create barriers to movement.

**Are the Risk/Threats Immediate or Long-term:**

Threats to South Park winter range and migration corridors from recreational impacts are both immediate and long term. Conversion of agricultural lands to residential use is a long term threat.

**Actions necessary to reduce or eliminate risks/threats:**

Protection of winter range and migration corridors in South Park is needed to reduce the threat of recreational impacts and housing development. Additional information on elk movements in South Park will help define the best locations to facilitate wildlife movements through habitat protections and enhancements. Management strategies should be developed and prioritized to protect critical areas and manage important habitats. Location data from radio collars would inform land use, development proposals, recreational proposals, and other land management agency resource management plans.

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

Over the last 10 years, CPW staff has worked with the South Park Habitat Partnership Program (HPP) Committee to implement elk winter range improvement projects. Local CPW staff has collaborated with CDOT to install elk crossing signage where elk mortality has occurred along Highway 285.

65

**Cost of current or needed habitat treatments; road crossings etc.:**

A research project to monitor elk movements in the South Park area will initially require one-time funding of approximately $115,000 to deploy 40 GPS radio collars on elk. This will include costs of capture efforts, satellite transmitter collars, a temporary employee, field equipment, and 3 years of airtime/subscription fees (Figure R2.2).

Table R2.2: South Park area elk study budget for years 1-3.

| South Park Area Elk Study Budget (Year 1) | | | |
|---|---|---|---|
| **Description** | **Cost ($)** | **Quantity** | **Total ($)** |
| **Personnel** | | | |
| Intern/Temporary | $15.00-$16.00/hr pay | 1, 4-6 month term | 18600.12 |
| **Equipment and Supplies** | | | |
| GPS Collars | 800 | 40 | 32000.00 |
| Activation Fees | 45 | 40 | 1800.00 |
| Subscription Fees/annual | 200 | 40 | 8000.00 |
| Helicopter Capture | 900 | 40 | 36000.00 |
| Field Supplies | 1000 | | 1000.00 |
| | | | $97,400.12 |
| | | | |
| | | | |
| South Park Area Elk Study Budget (Year 2 &Year 3) | | | |
| **Description** | **Cost** | **Quantity** | **Total** |
| **Personnel** | | | |
| Intern/Temporary | $15.00-$16.00/hr pay | 1, 4-6 month term | 0.00 |
| **Equipment and Supplies** | | | |
| Subscription Fees | 200 | 40 | 8000.00 |
| Year 2 Total | | | $8,000.00 |
| Year 3 Total | | | $8,000.00 |
| **TOTAL** | | | $16,000.00 |

Multiple habitat treatments have occurred on winter range in South Park on the James Mark Jones State Wildlife Area (JMJ SWA)and over $250,000 has been spent on these projects.  These treatments have included clearing decadent overstory to stimulate grass growth on winter range.  Over 2,000

66

acres of winter range have been treated over the last 10 years.  Additional habitat treatment project sites have been identified on winter range in South Park.  The cost to complete this winter range habitat work includes $350/acre to treat 1,500 acres for a broadcast burns, $400/acre to treat 750 acres for conifer reduction, and $450/acre to treat 150 acres for aspen enhancement. Funding for habitat treatments in South Park could improve another approximately 2,000 acres of winter range in South Park.

**Other Issues for awareness:**

A telemetry project in South Park, conducted in the 1990s to better understand elk movements, identified several winter migration corridors in South Park.  Initiating another telemetry project on elk  in South Park offers an opportunity to compare current location and movement data to previous data. We also have the opportunity to interpret the impacts of land use change over the past 20 years on elk migration and habitat quality.

**#3 Colorado Research Priority:**  Front Range Mule Deer

**Why the area selected as a priority**:

Mule deer are a valued resource on the Front Range and provide watchable and hunting opportunities for the public along with economic benefits to local communities.  Mule deer hunting is the most significant big game hunting opportunity on the Front Range.

Management of mule deer on the Front Range is challenging because of the mixture of land ownership on the landscape, restricting traditional management tools and data collection. Many properties that provide deer habitat are small in size and within municipal boundaries, resulting in prohibitions on traditional hunting methods.  The Front Range is also experiencing rapid land use changes from human developments and demands for data to inform management actions is growing. Most of CPW's

67

BLM_0166793

mule deer research and management projects have been conducted in west slope deer herds. CPW's understanding of mule deer movements along the Front Range is limited.  Specific corridors and priority habitats used by mule deer still need to be identified.  Telemetry data from mule deer, gathered with GPS radio collars, would identify specific migration corridors, stopovers, summer and winter ranges, highway crossing locations, and other critical habitats.  This data will be useful for siting wildlife crossing structures in cooperation with CDOT.  The project would involve capture and radio-collaring a sample of  doe mule deer on winter range and then monitoring their movements over the 3-year lifetime of the transmitters.

**Spatial Location**:

Colorado's Front Range runs north and south on the east side of the Continental Divide in Northeastern Colorado and encompases the foothills. Major population areas include Denver, Fort Collins and Castle Rock. Major rivers include the Cache La Poudre, Big and Little Thompson, and the South Platte River. Mule deer range in habitat from an elevation of 5,000 feet up to 13,000 feet.  Mule deer occupy all areas and  for all seasons along the Front Range. In general mule deer summer at higher elevations and shift to lower elevations in the winter along the foothills of the Front Range (Figure R3.1).

BLM_0166794



Figure R3.1: Front Range Study Area with mule deer winter range identified in blue.

## Habitat Types:

Vegetation along the Front Range is diverse, varying with elevation and climate. The lowest elevation is comprised of short grass prairie. Shrubs, including mountain mahogany, juniper and currants, range from approximately 5,500 to 7,500 feet in elevation. Mountain riparian communities dominated by willows, chokecherries, alders and narrowleaf cottonwoods are found along various creeks.  Ponderosa pine dominated communities are found up to 8,500 feet with Douglas fir covering many north facing slopes in the foothills. The Front Range contains subalpine forests from 8,500 feet up to timberline at approximately 11,600 feet. The subalpine forest zone is dominated by lodgepole pine intermixed with aspen up through 10,500 feet in elevation. Spruce/fir subalpine forest interspersed with meadows is the dominant vegetation up to timberline. Stands of limber and bristlecone pine also occur at higher elevations. Alpine

69

tundra, alpine willows and rock dominate above timberline on the Front Range.

**Important Stopover areas within the corridor:**

Stopover areas along the Front Range have not been identified and determining these areas is a priority. Radio collar locations would identify these areas along with other important habitat.  Migration patterns have been coarsely identified based upon field staff observations, but the extent of migration is largely unknown (Figure R3.2).



Figure R3.2: Migration patterns (red arrows) of Front Range mule deer.

**Landownership:**

Within the foothills and lower elevations of the Front Range, lands are mostly privately owned;  the U.S. Forest Service owns most land at higher elevations.

**Land Uses:**

70

BLM_0166796

Outdoor recreation on public lands is substantial along the Front Range. Hiking, four wheeling, horseback riding, motorcycle riding, mountain bike riding, angling, hunting and wildlife viewing are primary uses. Hunting is not currently allowed on any city or county open space lands or parks, with the exception of a few county properties. Much of the private lands have the potential to be developed into residential subdivisions. Agriculture activities on private land consist of hay production and cattle and horse grazing. Grazing allotments do occur on federal lands in several areas along the Front Range, but this is not a significant land use.

**Risk/Threats:**

The Front Range contains Colorado's largest and densest human population centers and continues to experience annual population growth. Land conversion from agriculture/undeveloped lands to exurban/suburban housing continues to be significant.  Recreation is the dominant use on public lands and has increased commensurately with human population growth. Recreation and human development displace mule deer and fragment habitat.  Human development also creates management issues by restricting harvest and creating refuge areas.

**Are the Risk/Threats Immediate or Long-term:**

The rate of change on the landscape due to development, coupled with limited data on mule deer movements and habitat use, create immediate and long term threats.

**Actions necessary to reduce or eliminate risks/threats:**

A better understanding of critical mule deer habitats and migration corridors is needed to inform management strategies that focus on the protection of critical areas and management of important habitats. Location data from radio collars would inform land use, development proposals, recreational proposals, and other agency resource management plans.

71

BLM_0166797

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

CPW staff currently map mule activity and priority habitats based upon field observations.  This data is used to guide CPW recommendations on land use and development proposals.  CPW partners with federal, county and city agencies on mule deer management along the Front Range.

**Cost of current or needed habitat treatments; road crossings etc.:**

No specific habitat treatments or road crossings have been identified to date. A research project for Front Range mule deer will initially require one-time funding of approximately $150,000 to deploy 40 GPS radio collars on mule deer. This will include costs of capture efforts, satellite transmitter collars, a temporary employee, field equipment, and 3 years of airtime/subscription fees (Table 3.2).

Table R3.2.  Front Range mule deer study budget for years 1-3.

| Front Range Mule Deer Study Budget (Year 1) | | | |
|---|---|---|---|
| **Description** | **Cost ($)** | **Quantity** | **Total ($)** |
| **Personnel** | | | |
| Intern/Temporary | $15.00-$16.00/hr pay | 1, 4-6 month term | 18600.12 |
| **Equipment and Supplies** | | | |
| GPS Collars | 1500 | 40 | 60000.00 |
| Activation Fees | 45 | 0 | 0.00 |
| Subscription Fees | 300 | 0 | 0.00 |
| Helicopter Capture | 800 | 40 | 32000.00 |
| Field Supplies | 1000 | | 1000.00 |
| | | | **$111,600.12** |
| | | | |
| | | | |
| Front Range Mule Deer Study Budget (Year 2 & Year 3) | | | |
| **Description** | **Cost** | **Quantity** | **Total** |
| **Personnel** | | | |
| Intern/Temporary | $15.00-$16.00/hr pay | 1, 4-6 month term | 0.00 |
| **Equipment and Supplies** | | | |
| Subscription Fees | 300 | 40 | 12000.00 |
| Year 2 Total | | | $12,000.00 |
| Year 3 Total | | | $12,000.00 |
| **TOTAL** | | | **$24,000.00** |

BLM_0166798

**Other Issues for awareness:**

None.

**#4 Colorado Research Priority:  Guanella Pass**

**Why the area selected as a priority**:

Guanella Pass is composed of important wildlife habitats and movement corridors for many species including elk, mule deer, and moose.  This area is heavily impacted by recreation due to the close proximity to the Denver metro area. There is a lack of data to inform management strategies to conserve and manage wildlife habitat and migration corridors.  The U.S. Forest Service partnered with multiple stakeholders to develop the Guanella Pass Scenic and Historic Byway Corridor Management Strategy which outlines a vision for resource management in the Guanella Pass area.

**Spatial Location**:

Guanella Pass is located 40 miles southwest of Denver and is accessed by Interstate 70 at Georgetown and US Highway 285 at Grant (Figure R4.1). The Guanella Pass Byway runs north/south and traverses about 24 miles of forest, shrubland, and alpine tundra of the Rocky Mountains in north central Colorado. The northern portion of Guanella Pass lies in Clear Creek County within the Arapaho National Forest. The southern portion of the pass lies in Park County within the Pike National Forest. Mount Evans Wilderness is situated just east of Guanella Pass, and Square Top Mountain Inventoried Roadless Area can be found just west of the Guanella Pass Road summit. Wildlife migration occurs on both sides and over the top of Guanella Pass.

73



Figure R4.1. Guanella Pass Area.

## Habitat Types:

Elevation, temperature gradients, and precipitation patterns create diverse flora and fauna in the Guanella Pass area.  The lower elevations, starting at 9,500 feet, contain ponderosa pine and Douglas-fir tree species, with patches of aspen interspersed. Broad willow flats with sedges and riparian grasses dominate the moist meadows, while mountain mahogany shrublands can be found on drier slopes.

Subalpine habitat occurs at 11,500 feet dominated by engelmann spruce and subalpine fir  along with some limber pine and bristlecone pine. The area ranges up to 14,000 feet with higher elevations characterized by vegetation that includes elk sedge, low willow, hairgrass meadow, and contains many small fens and ponds, including one of the largest alpine willow carrs in Colorado.

## Important Stopover areas within the corridor:

Important stopover areas within the corridor have not been investigated to

74

date. Therefore, developing a greater understanding of the movements of deer and elk, and their potential use of and location of stopover areas will be a priority.

**Landownership:**

Land ownership is nearly all U.S. Forest Service lands.

**Land Uses:**

Recreation is the main land use in the Guanella Pass area. Recreational opportunities including backpacking, bicycling, wildlife watching, hiking, camping, fishing, four-wheeling, horseback riding, hunting, mountaineering, orienteering, picnicking, photography, rock hounding, sightseeing, nordic skiing, snowshoeing, snowmobiling, ATV riding, and auto touring.

**Risk/Threats:**

Recreational use has increased significantly over the last 10 years, but management actions and strategies to address the increased activity have not kept pace.  Data is needed to inform management actions to manage and protect wildlife habitats and corridors.

**Are the Risk/Threats Immediate or Long-term:**

Threats are immediate and long term.  The Denver metro area population is projected to increase in the near future and likely recreation will increase in the Guanella Pass area. Social capacity concerns currently exist regarding the amount of recreation in the area for both USFS and CPW.

**Actions necessary to reduce or eliminate risks/threats:**

Identifying wildlife movement corridors and habitat use with radio collar locations is the first priority. The second priority is using that data to inform management actions to conserve critical area and manage recreational use.

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

BLM_0166801

The U.S. Forest Service has partnered with numerous stakeholders to develop a plan to define a vision and management strategies for the Guanella Pass area. CPW collaborates with the U.S. Forest Service on land use management recommendations and strategies.

### Cost of current or needed habitat treatments; road crossings etc.:

This research proposal is for on-going (up to 10 years) funding to deploy approximately 10-15 GPS radio collars on mule deer and 10-15 radio collars on elk. Initially (the first 3 years), location data will be used to identify critical habitats and migration corridors to inform future study design objectives, the number/species of radio collared animals, and the study area for years 3-10. The first 3 years of this project is estimated at approximately $88,000. This project funding will include costs of capture efforts, satellite transmitter collars, a temporary employee, field equipment, and 3 years of airtime/subscription fees (Table R4.1).

Table R4.1: Guanella Pass area study budget for years 1-3.

| Guanella Pass Area Study Budget (Year 1) | | | |
|---|---|---|---|
| Description | Cost ($) | Quantity | Total ($) |
| Personnel | | | |
| Intern/Temporary | $15.00-$16.00/hr pay | 1, 4-6 month term | 0.00 |
| Equipment and Supplies | | | |
| GPS Collars | 1500 | 30 | 45000.00 |
| Activation Fees | 45 | 0 | 0.00 |
| Subscription Fees | 300 | 0 | 0.00 |
| Helicopter Capture | 800 | 30 | 24000.00 |
| Field Supplies | 1000 | | 1000.00 |
| | | | $70,000.00 |
| | | | |
| | | | |
| Guanella Pass Area Study Budget (Year 2 & Year 3) | | | |
| Description | Cost | Quantity | Total |
| Personnel | | | |
| Intern/Temporary | $15.00-$16.00/hr pay | 1, 4-6 month term | 0.00 |
| Equipment and Supplies | | | |
| Subscription Fees | 300 | 30 | 9000.00 |
| Total Year 2 | | | $9,000.00 |
| Total Year 3 | | | $9,000.00 |
| TOTAL | | | $18,000.00 |

76

**Other Issues for awareness:**

None.

**#5 Colorado Research Priority:** Dolores Mule Deer and Elk Herds

**Why the area selected as a priority**:

Mule deer and elk have long been an important resource to the local communities and economy.  The population of deer and elk in Disappointment Creek area have been performing poorly for several  years.

CPW's understanding of big game movements in this area is limited.  Specific corridors used by mule deer and elk have not been clearly identified.  Telemetry data from deer and elk, gathered with GPS radio collars, would identify specific migration corridors, stopovers, summer and winter ranges, and other critical habitat.  Highway crossings would also be identified and these locations used in cooperation with CDOT in identifying areas for wildlife crossing structures.  The project would capture doe deer and cow elk on winter range and fit them with radio collars.  Capture would be spread out in an attempt to get the best representation of deer and elk distribution on the landscape.

**Spatial Location**: Disappointment Creek is located in Southwest Colorado (Figure R5.1) with major population centers of Dolores, Dove Creek, Norwood, Telluride, and Mancos.  The main rivers in the area are the Mancos River, the Dolores River, San Miguel River and Disappointment Creek.  Mule deer and elk are found in a variety of habitats ranging from 4,700 ft elevation to above 13,000 ft elevation.  Deer and elk make long distance seasonal migration movements from lower elevation habitats in the winter to high elevation habitats in the summer (Figure R5.2).

These movements also take animals across several jurisdictional boundaries including private, State, BLM, US Forest Service (FS), National Park, and Tribal (Figure R5.3).  Several highways and major roads, including Hwy 62,

77

BLM_0166803

Hwy 84, Hwy 141, Hwy 145, and Hwy 491, intersect deer and elk movement corridors and habitat causing conflicts between big game and motorists.



Figure R5.1:  Location of the Disappointment Creek Area in southwest Colorado.

**Habitat Types:**

The lower elevations along the Dolores, San Juan, and San Miguel Rivers are high desert vegetation types and have dominant canyon-mesa geographic features, with some agricultural areas in the river flood-plain areas. As elevations increase, the vegetation changes to grassland/shrub, pinyon-juniper, ponderosa pine often with an oak understory, mountain shrub, aspen, and Douglas-fir. At the highest elevations, subalpine spruce fir and Engelmann spruce lead into alpine areas of willow or grass/sedge/forb communities above 12,000 feet.  Deer and elk depend on these habitat types at various times of the year and through different life phases.

**Important Stopover areas within the corridor:**

78

BLM_0166804

Stopover areas within the corridor have yet to be identified.  Determining where these are, along with other important habitat, is a priority.



Figure R5.2:  Rough migration patterns of deer and elk across vegetation types (lower elevation habitat in the southwest to higher elevation habitat to the northeast) in the Disappointment Creek Area.

79

BLM_0166805



Figure R5.3:  Rough migration patterns of deer and elk across jurisdictional boundaries in the Disappointment Creek Area.

**Landownership:**

Land ownership in the DAU is 34% U.S. Forest Service, 32% BLM, 30% private, and 2% CPW and State Land Board each

80

**Land Uses:**

The southwest portion of the area, south of the Dolores River and Hwy 85, dryland and irrigated farming is still prevalent.  The fields are bisected with canyons hosting native pinyon/juniper forest habitats.  Recreation use, specifically hiking and single track biking, is steadily growing. Trails to support these activities are expanding into the native habitats found in the canyons and other undisturbed habitats.  Residential growth is also occurring in this area, with large acre properties being subdivided into residential lots.  Road densities are increasing to access these new homes.  There is also some energy development.

The central and western edge of the area is predominantly US Forest Service (FS) lands.  Motorized recreation is very popular with high density of roads and trails.  Non-motorized recreation is also a favorite pastime and growing in popularity on FS lands.  The Telluride area attracts recreational users throughout the year resulting in extensive development of housing and lodging primarily in summer habitat deer and elk range.  Cattle grazing occurs on portions of the federal lands which are shared by deer and elk throughout the year. Logging has occurred with a desire by the Dolores Ranger District to increase intensities in an attempt to minimize tree mortality caused by beetles.

The northern and western portion of the unit historically has been associated with livestock grazing across public and private lands. The area around Norwood north to Naturita and west into Dry Creek Basin supports considerable irrigated agricultural hay production. Subdividing and development occurs in the Norwood area, but not to the extent of the Telluride area. Historically uranium mining occurred primarily across lower elevation winter ranges and hard rock precious mineral mining occurred at the higher elevations. Many of these patented claims are now being developed for recreational houses. Recreational activities are focused around skiing and snowmobiling in the high country with hiking and OHV use occuring in the summer months. Single track trails are being developed more in the high country as well as on winter ranges around Norwood and Naturita.

**Risk/Threats:**

BLM_0166807

The area has historically been agricultural based, with farming and ranching the primary land uses on private lands, and grazing/forest products the primary uses on public lands. In the last 20 years, significant portions of agricultural land has been converted to exurban/suburban housing, and public lands are increasingly used for recreation in addition to livestock grazing. These changes have shifted the seasonal use patterns of deer and elk and have altered their migration corridors. Increased recreational activity within critical habitats also present a threat by displacing deer and elk and decreasing the functionality of habitat.

**Are the Risk/Threats Immediate or Long-term:**

Threats are both immediate and long-term, as crucial habitat has been and continues to be lost to development and expanding recreational activity. Once development occurs, whether ex-urban or recreational, it is essentially permanent, with cumulative losses of crucial habitat.

**Actions necessary to reduce or eliminate risks/threats:**

To maintain robust mule deer and elk populations in the Disappointment Creek area, the following actions are necessary:

1) Identify migration corridors and critical habitat used by these animals,

2) Ensure that there is unobstructed connectivity between seasonal habitat and other critical habitats, and

3) Augment the amount and quality of critical habitat.

Identifying deer and elk migration corridors and use of habitat is the first priority in reducing threats in this area. With this information, resources can be prioritized where these crucial habitats are found.

The area around McPhee Reservoir northwest towards Dove Creek provides important migration corridors and winter range for mule deer and elk. Most of this is private ownership and converted to agriculture. Conservation easements would be valuable in protecting large tracts of property from future development. Restoration of native habitat, primarily sagebrush systems, would be valuable to big game during the winter when resources are limited.

 In addition, there are key corridors and critical winter habitat located on US Forest Service lands in the McPhee Reservoir area. Notably the Sage Hen

82

BLM_0166808

(west side of McPhee) and House Creek (northeast of McPhee) areas support high densities of wintering deer and elk (Figure R5.4). Deer and elk concentrate here in part due to the loss of winter habitat from construction of the McPhee Reservoir in the 1980's. There are opportunities for habitat improvement, protection from recreation development and use, and reduction of domestic grazing with FS cooperation. These actions would all have positive impacts on mule deer and elk populations. Habitat work may include controlled burns, chemical treatment of noxious weeks, thinning of shrubs and/or trees by hand crews, and hydro-axing. Other areas to use these management actions to improve habitat on FS land would be identified through deer and elk telemetry data.

Opportunity is also available on Lone Mesa State Park. The 11,000 acre park (currently closed to the public) offers transitional range for migrating deer and elk. The habitat improvement actions identified above would also be beneficial to deer and elk in the park.

In the northern portion of the area, deer and elk typically migrate from the northern and western low elevation sagebrush and pinyon-juniper shrublands to the higher elevation areas to the south and east through the mountain shrub communities up to the aspen, coniferous, and alpine habitats. The transition habitat in this area is primarily privately owned and if developed could hinder migration for large numbers of animals. These migration corridors are not clearly mapped, and the routes and potential stopover areas are not known. Telemetry studies using collared animals will help to identify sites for conservation easements and potentially for habitat improvement projects to maintain migration corridors for deer and elk across GMU 70.

83

BLM_0166809



Identified Habitat Enhancement
and Protection Areas

Figure R5.4. Habitat Enhancement and Protection Areas Identified in the Dolores River Area.

**Current efforts (what is the activity; who is conducting the work; and partners involved):  The** Western Slope Wildlife Prioritization Study (CPW, CDOT) was recently completed and assists in identifying sections of high risk highway crossings.

84

BLM_0166810

**Cost of current or needed habitat treatments; road crossings etc.:**

This research proposal is for one-time funding of $166,000 to deploy approximately 40 GPS collars on deer and elk each, that will acquire data for 3+ years (multiple seasons and annual intervals for each deer or elk). Costs to implement this action include $121,000 for capture efforts, satellite transmitter collars, and initial year of airtime for monitoring, followed by $15,000/year for an additional 3 years of monitoring and maintaining the samples of 40 transmitter-equipped deer and 40 transmitter-equipped elk. This information would support a refined management approach to both the deer and elk herds.

**Other Issues for awareness:**

**None**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**LITERATURE CITED**

Horne, J.S., E.O. Garton, S.M.Krone, and J.S. Lewis. 2007. Analyzing animal movements using Brownian bridges.  Ecology 88(9):2354-2363.

BLM_0166811

**APPENDICES**

BLM_0166812



## Appendix A Landownership

Legend

Colorado

Bureau of Land Management

Bureau of Reclamation

Colorado Division of Wildlife

City

Energy and Defense

Federal Aviation Administration

National Forest

Fish and Wildlife

Indian Reservation

Miscellaneous

National Recreation Area

National Park Service

BLM_0166813

<u>APPENDIX B:</u>  **Department of the Interior Secretarial Order 3362: Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors**

ORDER NO. 3362
Subject: Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors

Sec. 1 **Purpose**. This Order directs appropriate bureaus within the Department of the Interior (Department) to work in close partnership with the states of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming to enhance and improve the quality of big-game winter range and migration corridor habitat on Federal lands under the management jurisdiction of this Department in a way that recognizes state authority to conserve and manage big-game species and respects private property rights. Through scientific endeavors and land management actions, wildlife such as Rocky Mountain Elk (elk), Mule Deer (deer), Pronghorn Antelope (pronghorn), and a host of other species will benefit. Additionally, this Order seeks to expand opportunities for big-game hunting by improving priority habitats to assist states in their efforts to increase and maintain sustainable big game populations across western states.

Sec. 2 **Authorities**. This Order is issued under the authority of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, as well as the Department's land and resource management authorities, including the following:

a. Federal Land Policy and Management Act of 1976, as amended, 43 U.S.C. 1701, *et seq.*;
b. U.S. Geological Survey Organic Act, as amended, 43 U.S.C. 31, *et seq.*;
c. National Wildlife Refuge System Improvement Act of 1997, as amended, 16 U.S.C. 668dd *et seq.*; and
d. National Park Service Organic Act of 1916, as amended, 54 U.S.C. 100101, *et seq.*

Sec. 3 **Background**. The West was officially "settled" long ago, but land use changes continue to occur throughout the western landscape today. Human populations grow at increasing rates with population movements from east and west coast states into the interior West. In many areas, development to accommodate the expanding population has occurred in important winter habitat and migration corridors for elk, deer, and pronghorn. Additionally,

88

BLM_0166814

changes have occurred across large swaths of land not impacted by residential development. The habitat quality and value of these areas crucial to western big-game populations are often degraded or declining.

BLM_0166815

The Bureau of Land Management (BLM) is the largest land manager in the United States (U.S.) with more than 245 million acres of public land under its purview, much of which is found in Western States. The U.S. Fish and Wildlife Service (FWS) and National Park Service (NPS) also manage a considerable amount of public land on behalf of the American people in the West. Beyond land management responsibilities, the Department has strong scientific capabilities in the U.S. Geological Survey (USGS) that can be deployed to assist State wildlife agencies and Federal land managers. Collectively, the appropriate bureaus within the Department have an opportunity to serve in a leadership role and take the initiative to work closely with Western States on their priorities and objectives as they relate to big-game winter range and migration corridors on lands managed by the Department.

Consistent with the American conservation ethic, ultimately it is crucial that the Department take action to harmonize State fish and game management and Federal land management of big-game winter range and corridors. On lands within these important areas, if landowners are interested and willing, conservation may occur through voluntary agreements.

Robust and sustainable elk, deer, and pronghorn populations contribute greatly to the economy and well-being of communities across the West. In fact, hunters and tourists travel to Western States from across our Nation and beyond to pursue and enjoy this wildlife. In doing so, they spend billions of dollars at large and small businesses that are crucial to State and local economies. We have a responsibility as a Department with large landholdings to be a collaborative neighbor and steward of the resources held in trust.

Accordingly, the Department will work with our State partners and others to conserve and/or improve priority western big-game winter range and migration corridors in sagebrush ecosystems and in other ecotypes as necessary. This Order focuses on the Western States of: Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. These States generally have expansive public lands with established sagebrush landscapes along with robust big-game herds that are highly valued by hunters and tourists throughout the Nation.

The Department has broad responsibilities to manage Federal lands, waters, and resources for public benefit, including managing habitat to support fish, wildlife, and other resources.

Secretary's Order 3356, "Hunting, Fishing, Recreational Shooting, and Wildlife Conservation Opportunities and Coordination with States, Tribes, and Territories," (SO 3356) was issued on September 15, 2017. SO 3356

90

BLM_0166816

primarily focused on physical access to lands for recreational activities, particularly hunting and fishing. This Order is focused on providing access to big game animals by providing direction regarding land management actions to improve habitat quality for big-game populations that could help ensure robust big-game populations continue to exist. Further, SO 3356 includes a number of directives related to working with States and using the best available science to inform development of guidelines, including directing relevant bureaus to:

> a. Collaborate with State, tribal, and territorial fish and wildlife agencies to attain or sustain State, tribal, and territorial wildlife population goals during the Department's land management planning and implementation, including prioritizing active habitat management projects and funding that contributes to achieving wildlife population objectives, particularly for wildlife that is hunted or fished, and identifying additional ways to include or delegate to States habitat management work on Federal lands;
>
> b. Work cooperatively with State, tribal, and territorial wildlife agencies to enhance State, tribe, and territorial access to the Department's lands for wildlife management actions;
>
> c. Within 180 days, develop a proposed categorical exclusion for proposed projects that utilize common practices solely intended to enhance or restore habitat for species such as sage grouse and/or mule deer; and
>
> d. Review and use the best available science to inform development of specific guidelines for the Department's lands and waters related to planning and developing energy, transmission, or other relevant projects to avoid or minimize potential negative impacts on wildlife.

This Order follows the intent and purpose of SO 3356 and expands and enhances the specific directives therein.

Sec. 4 **Implementation**. Consistent with governing laws, regulations, and principles of responsible public stewardship, I direct the following actions:

> a. With respect to activities at the national level, I hereby direct the BLM, FWS, and NPS to:
>
> > (1) Within 30 days, identify an individual to serve as the "Coordinator" for the Department. The Coordinator will work closely with appropriate States, Federal agencies, nongovernmental organizations, and/or associations to identify active programs focused on big- game winter range and/or migration corridors. The programs are to be organized and cataloged by region and other geographic features (such as watersheds and principles of wildlife

91

BLM_0166817

management) as determined by the Deputy Secretary, including those principles identified in the Department's reorganization plan.

(2) Within 45 days, provide the Coordinator information regarding:
    (i) Past and current bureau conservation/restoration efforts on winter range and migration corridors;
    (ii) Whether consideration of winter range and corridors is included in appropriate bureau land (or site) management plans;
    (iii) Bureau management actions used to accomplish habitat objectives in these areas;
    (iv) The location of areas that have been identified as a priority for conservation and habitat treatments; and (v) Funding sources previously used and/or currently available to the bureau for winter range and migration corridor conservation/restoration efforts.

(3) Within 60 days, if sufficient land use plans are already established that are consistent with this Order, work with the Coordinator and each regional Liaison (see section 4b) to discuss implementation of the plans. If land use plans are not already established, work with the Coordinator and each regional Liaison to develop an Action Plan that summarizes information collected in section 4 (a) (1) and (2), establishes a clear direction forward with each State, and includes:
    (i) Habitat management goals and associated actions as they are associated with big game winter range and migration corridors;
    (ii) Measurable outcomes; and
    (iii) Budgets necessary to complete respective action(s).

b. With respect to activities at the State level, I hereby direct the BLM, FWS, and NPS to:

(1) Within 60 days, identify one person in each appropriate unified region (see section 4a) to serve as the Liaison for the Department for that unified region. The Liaison will coordinate at the State level with each State in their region, as well as with the Liaison for any other regions within the State. The Liaison will schedule a meeting with the respective State fish and wildlife agency to assess where and how the Department can work in close partnership with the State on priority winter range and migration corridor conservation.

92

(2) Within 60 days, if this focus is not already included in respective land management plans, evaluate how land under each bureau's management responsibility can contribute to State or other efforts to improve the quality and condition of priority big-game winter and migration corridor habitat.

(3) Provide a report on October 1, 2018, and at the end of each fiscal year thereafter, that details how respective bureau field offices, refuges, or parks cooperated and collaborated with the appropriate State wildlife agencies to further winter range and migration corridor habitat conservation.

(4) Assess State wildlife agency data regarding wildlife migrations early in the planning process for land use plans and significant project-level actions that bureaus develop; and

(5) Evaluate and appropriately apply site-specific management activities, as identified in State land use plans, site-specific plans, or the Action Plan (described above), that conserve or restore habitat necessary to sustain local and regional big-game populations through measures that may include one or more of the following: (i) restoring degraded winter range and migration corridors by removing encroaching trees from sagebrush ecosystems, rehabilitating areas damaged by fire, or treating exotic/invasive vegetation to improve the quality and value of these areas to big game and other wildlife;

(ii) revising wild horse and burro-appropriate management levels (AML) or removing horses and burros exceeding established AML from winter range or migration corridors if habitat is degraded as a result of their presence;

(iii) working cooperatively with private landowners and State highway departments to achieve permissive fencing measures, including potentially modifying (via smooth wire), removing (if no longer necessary), or seasonally adapting (seasonal lay down) fencing if proven to impede movement of big game through migration corridors;

(iv) avoiding development in the most crucial winter range or migration corridors during sensitive seasons;

(v) minimizing development that would fragment winter range and primary migration corridors;

(vi) limiting disturbance of big game on winter range; and

93

(vii) utilizing other proven actions necessary to conserve and/or restore the vital big-game winter range and migration corridors across the West.

c. With respect to science, I hereby direct the USGS to:

(1) Proceed in close cooperation with the States, in particular the Western Association of Fish and Wildlife Agencies and its program manager for the Crucial Habitat Assessment Tool, prior to developing maps or mapping tools related to elk, deer, or pronghorn movement or land use; and

(2) Prioritize evaluations of the effectiveness of habitat treatments in sagebrush communities, as requested by States or land management bureaus, and identified needs related to developing a greater understanding of locations used as winter range or migration corridors.

d. I further hereby direct the responsible bureaus and offices within the Department to:

(1) Within 180 days, to update all existing regulations, orders, guidance documents, policies, instructions, manuals, directives, notices, implementing actions, and any other similar actions to be consistent with the requirements in this Order;

(2) Within 30 days, provide direction at the state or other appropriate level to revise existing Federal-State memorandums of agreement to incorporate consultation with State agencies on the location and conservation needs of winter range and migration routes; and (3) Consult with State wildlife agencies and bureaus to ensure land use plans are consistent and complementary to one another along the entire wildlife corridor in common instances where winter range or migration corridors span jurisdictional boundaries.

e. Heads of relevant bureaus will ensure that appropriate members of the Senior Executive Service under their purview include a performance standard in their respective current or future performance plan that specifically implements the applicable actions identified in this Order.

94

Sec. 5 **Management**. I hereby direct the Deputy Secretary to take is responsible for taking all reasonably necessary steps to implement this Order.

Sec. 6 **Effect of Order**. This Order is intended to improve the internal management of the Department. This Order and any resulting reports or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. To the extent there is any inconsistency between the provision of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 7 **Expiration Date**. This Order is effective immediately. It will remain in effect until its provisions are implemented and completed, or until it is amended, superseded, or revoked.
Secretary of the Interior
Date:

95

BLM_0166821

**Appendix C. Funded Research Priorities from 2018-2019 Action Plan – implementation will occur during 2019-2020**

## RESEARCH NEEDS

### Colorado #1 Research Priority  North Park Mule Deer Herd

### Why the area selected as a priority:

The number of winter-resident deer in the North Park herd has declined in recent years.  Preliminary radio-telemetry information from Wyoming to the north and the Middle Park herd to the south suggest that a large number of the mule deer present in North Park in the summer months migrate to either Wyoming or Middle Park and spend much of the fall hunting season and all winter in these areas outside North Park.  Additional radio-telemetry data on mule deer would be of great value in understanding seasonal habitat use and migration patterns of this deer herd.  In particular, fine scale (i.e., GPS/satellite) telemetry information would allow greater understanding of the changes that have occurred in mule deer wintering distribution, the proportion of mule deer migrating out of the herd unit to Wyoming and Middle Park, the specific corridors used by mule deer during these migrations, the timing of the migration relative to hunting seasons, and the out-of-area winter ranges used by these deer.  This information would support a better-tuned management approach to this deer herd.

### Spatial Location:

The North Park mule deer herd is located in the headwaters basin of the North Platte River in north-central Colorado.  The northern boundary of the herd unit is the Wyoming-Colorado state line.  The Continental Divide lies along the western boundary of the herd unit, with Rocky Mountain National Park to the southeast.  The Middle Park Basin lies to the south of the North Park herd unit.

### Habitat Types:

The North Park herd occupies a high-mountain park that is surrounded on the east, south and west by mountain ranges.  The periphery of the Park is comprised of mountains ranging from alpine habitats at the highest elevations to coniferous timber with interspersed aspen stands.  Significant areas of coniferous timber have experienced heavy pine beetle mortality

BLM_0166822

over the past decade.  The base of North Park is at approximately 8000 feet in elevation.  It is characterized by extensive areas of sagebrush steppe uplands, separated by large willow-dominated riparian areas and extensive irrigated hay meadows.

**Important Stopover areas within the corridor:**

Unknown-only limited telemetry information is available for this herd unit.

**Landownership:**

Land ownership in the North Park herd unit is 36% private land, 12% state land and 52% federal land.  The Routt National Forest covers 32% of the herd unit and most of the mountainous areas that surround the park. The Bureau of Land Management (BLM) property, 18.2%, is primarily sagebrush habitat in the center of the park where a majority of the private land is also located. The Colorado State Forest, 6.8%, is found on the east side of the park.  The Arapaho National Wildlife Refuge, 1.7%, manages important waterfowl and big game habitat in the center of the park.  State Trust Lands, 4.9%, are primarily sagebrush habitat with some aspen and mixed conifer.

**Land Uses:**

North Park is one of the more remote and least developed areas in northwestern Colorado.  The principal land use in North Park is agriculture, principally irrigated hay production on private lands and domestic livestock grazing on all land ownerships.  The area receives significant recreational activity (fishing, hunting, off-highway vehicle use).  Oil and gas development has ramped up over the past five years, and shows the potentially to expand in the future.  The rate of residential development is relatively low.

**Risk/Threats:**

Anthropogenic threats to wildlife are relatively low in North Park.  Most current land uses appear to be consistent with long-term wildlife conservation.  The area of greatest concern is the increasing pace of oil and gas development on the valley floor.  Severe winter conditions are the greatest annual risk to big game in North Park.

97

BLM_0166823

**Are the Risk/Threats Immediate or Long-term:**

North Park is known for its winters-severe winter conditions are an every year possibility in North Park.  Oil and gas development is increasing year-by-year, but still remains relatively low compared to other areas within northwestern Colorado.

**Actions necessary to reduce or eliminate risks/threats:**

Few risks/threats are amenable to intervention (e.g., severe winter conditions) or are of a sufficient degree to require intervention at present. The principal current need in this population is better knowledge of how deer use North Park and surrounding areas through the year.

**Current efforts (what is the activity; who is conducting the work; and partners involved):**

Some radio-telemetered deer from Wyoming and Middle Park have been observed using North Park in the summer.  No Colorado-specific telemetry data is available for this herd.

**Cost of current or needed habitat treatments; road crossings etc.:**

Application of satellite transmitters to a minimum of 40 doe deer would provide a better assessment of habitat use and timing/pattern of migration. This information would improve understanding of seasonal habitat use and migration patterns in this deer herd.  In particular, fine scale (i.e., GPS/satellite) telemetry information would allow greater understanding of the changes that have occurred in mule deer wintering distribution, the proportion of mule deer migrating out of the herd unit to Wyoming and Middle Park, the specific corridors used by mule deer during these migrations, the timing of the migration relative to hunting seasons, and the out-of-area winter ranges used by these deer.  Costs to inplement this action include $60,500 for capture efforts, satellite transmitter collars, and initial year of airtime for monitoring, followed by $10,00/year for an additional 2-3 years of monitoring and maintaining the sample of 40 transmittered deer. This information would support a better-tuned management approach to this deer herd.

**Other Issues for awareness:**

98

BLM_0166824

None

**Colorado #2 Research Priority  San Juan Basin (Southwest Colorado)**

**Why the area selected as a priority**:

Deer and elk movement patterns in the San Juan Basin have been documented in the last 15 years through a combination of CPW, Southern Ute Tribe, and consultant studies. However, our understanding of the movements of big game in this area remains limited to several significant migration routes. Specific corridors used by deer and elk have not been clearly identified. This area has the added benefit of being multi-jurisdictional- USFS, BLM, and Southern Ute Tribe, as well as private, as well as interstate movements into New Mexico. This corridor has been identified as a focal area for GOCO wildlife crossing structure with CDOT. In particular, fine scale (i.e., GPS/satellite) telemetry information would allow greater understanding of the changes that have occurred in wintering distribution of mule deer and elk, the proportion of both species migrating out of the herd unit to New Mexico, the specific corridors used by big game during these migrations, the timing of the migration relative to hunting seasons, and the out-of-area winter ranges used.  This information would support a better-tuned management approach to both deer and elk herds.

**Spatial Location**:

The San Juan Basin is located in the southwest part of Colorado.  The southern boundary is the New Mexico state line, and the eastern and northern boundaries are the Continental Divide, with the Animas River being the western boundary.

**Habitat Types:**

The climate is a highland or mountain climate, characterized by cool springs and falls, warm summers and moderately cold winters.  Average precipitation and snowfall for Durango are 18 and 63 inches per year

99

BLM_0166825

respectively. Snowfall increases dramatically moving to the east and toward the Continental Divide, approaching 250-300 inches per year.  Vegetative types include: alpine over 12,000 feet elevation, spruce/fir stands down to 10,000 feet, oakbrush, serviceberry, and ponderosa pine above 7,000 feet, and pinyon/juniper/sagebrush and agricultural fields below 7,000 feet.

The amount and quality of winter range is the limiting factor for this deer and elk herd. Winter range is primarily on private land, with the remainder located on the Southern Ute Tribe and public lands.  These lands are becoming more limited with human encroachment.

**Important Stopover areas within the corridor:**

Recent studies by CPW, the Southern Ute Tribe, and WEST,Inc utilizing GPS-collars have identified numerous discrete migration corridors, highway crossings, and stop-over areas for various segments of the San Juan deer and elk herds. Previous studies with VHF-collars demonstrate landscape scale connectivity.

**Landownership:**

Winter range is primarily privately owned (51%), the Southern Ute Tribe owns 20%, and the remaining 28% of winter range is publicly managed. Twenty-nine percent of the winter range and 15% of the severe winter range occur on public lands.

**Land Uses:**

The area has seen extensive exurban development in the previous 20 years, replacing a primarily agricultural setting with rural residential. Few large landowners remain. In addition, extensive natural gas extraction has occurred, with associated road and pipeline corridors. In order to accommodate the exurban development, the highway system is stressed with high volume and high speed traffic. Numerous wildlife crossings have been identified with previous radio collar studies, as well as wildlife collisions (Western Slope Wildlife Prioritization Study, CDOT).

**Risk/Threats:**

*Development on Winter Range and Migration Corridors*

100

BLM_0166826

Exurban development is occurring on much of the winter range and migration corridors in the San Juan Basin.  Managers and the public are increasingly concerned over cumulative and prolonged impacts disrupting migration and decreasing quality and quantity of winter range. Development influences both carrying capacity and harvest management. Development is a wide spread issue, but it is a considerably larger problem in the western portions of the San Juan Basin and around Pagosa Springs.

Winter range is already limited and the habitat type that is most at risk by development.  Deer and elk eat less and lose weight during the winter and to conserve energy they limit physical activity.  Any type of disturbance will cause a deer or elk to use more energy during this critical time and lead to a higher chance of that animal dying.  It can also influence reproduction success and survival of fawns or calves born later that same year.

Migration corridors are needed for deer and elk to access important summer and winter ranges.  The largest and most productive deer populations in the West are migratory.  Development and barriers that disrupt migration can have a direct bearing on an individual animal's health, survival and reproductive success.

As the primary land use continues to transition from agricultural to rural residential, it is imperative to maintain connectivity between summer ranges and winter ranges located on public and tribal lands. This will involve strategic placement of highway crossing structures and land protection through conservation easements. Secondly, the remaining winter and transition ranges must be maintained in the best condition possible.

**Are the Risk/Threats Immediate or Long-term:**

*Immediate:* Critical parcels of land continue to be developed, creating higher traffic volumes into Durango/Bayfield and Pagosa Springs. Opportunities for land protection are being replaced by subdivisions. *Long Term:* As development continues and highways are stressed, the highway corridors will be expanded in order to accommodate the volume of traffic.

**Actions necessary to reduce or eliminate risks/threats:**

Primarily, the need is to maintain connectivity between deer/elk summer and winter ranges, creating corridors for movement and for safe passage

101

BLM_0166827

across Highways 160 and 84. To help identify these migration corridors, GPS-quality deer and elk data is needed in the central portion of the DAU's (called the HD Mountains, primarily publicly owned).

## Current efforts (what is the activity; who is conducting the work; and partners involved):

CPW, CDOT, SUI Tribe, USFS, BLM are all partners in various efforts. The Western Slope Wildlife Prioritization Study (CPW, CDOT) is nearing completion in strategically mapping deer and elk corridors across the western slope of Colorado in relation to highways, and will result in identifying significant wildlife crossing areas. This has already led to a partnership with the Southern Ute Tribe and Great Outdoors Colorado that will develop a major wildlife crossing structure on the east side of the HD Mountains.

## Cost of current or needed habitat treatments; road crossings etc.:

Application of satellite transmitters to a minimum of 40 doe deer and 40 cow elk would provide a better assessment of habitat use and timing/pattern of migration.  This information would improve understanding of seasonal habitat use and migration patterns in this deer herd.  In particular, fine scale (i.e., GPS/satellite) telemetry information would allow greater understanding of the changes that have occurred in wintering distributions of deer and elk, the proportion of these populations that migrate out of the herd unit to New Mexico, the specific corridors used by deer and elk during these migrations, the timing of the migration relative to hunting seasons, and the out-of-area winter ranges used by both big game species.  Costs to inplement this action include $121,000 for capture efforts, satellite transmitter collars, and initial year of airtime for monitoring, followed by $20,00/year for an additional 2-3 years of monitoring and maintaining the samples of 40 transmittered deer and 40 transmittered. This information would support a better-tuned management approach to both the deer and elk herds.

The large scale habitat treatments and highway crossings structures and fencing necessary to maintain the San Juan Basin deer and elk herds' network of migration corridors would be very costly and could reach several million dollars.

BLM_0166828

**Other Issues for awareness:**

None

**CURRENT ACTIVITIES** - catalog on-going corridor/winter range projects and/or research projects.

Colorado West Slope Mule Deer Strategy 2014 (link to web page: http://cpw.state.co.us/learn/Pages/CO-WestSlopeMuleDeerStrategySummit.aspx ) includes seven primary strategic priorities, of which 4 are directly linked to this SO:

1) Landscape-scale habitat management to improve habitat quality,
2) Predator management where predation may be limiting deer survival,
3) Protect habitat and mitigate development impacts to lesson rates of habitat loss,
4) Reduce the impacts of highways on mule deer survival, movements and migration,
5) Reduce the impacts of human recreation on mule deer,
6) Regulate doe harvest and provide youth opportunity,
7) Maintain a strong ungulate population and disease monitoring program and conduct applied research to improve management of deer populations

The Western Slope Wildlife Prioritization Study (CPW, CDOT) is nearing completion in strategically mapping deer and elk corridors across the western slope of Colorado in relation to highways, and will result in identifying significant wildlife crossing areas.

SAM species activity mapping which provides information on wildlife distributions to public and private agencies and individuals, for environmental assessment, land management resource planning and general scientific reference.

CPW has identified threats in their Wildlife Action Plan (SWAP)  that pertain to big game migration.  Oil and Gas, roads and railroads, habitat fragmentation specifically mentions elk and mule deer. (link to SWAP: http://cpw.state.co.us/aboutus/Pages/StateWildlifeActionPlan.aspx )

BLM_0166829



**COLORADO**
**Parks and Wildlife**
Department of Natural Resources

Montrose Service Center
2300 South Townsend Avenue
Montrose, CO 81401
Phone (970) 252-6000

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

**RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016**

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements[1], absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative

---

[1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Chris Castilian, Chair • Jeanne Horne, Vice-Chair
John Howard • Bill Kane • Dale Pizel • James Pribyl, Secretary • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp



record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law.

## Wildlife

The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed.

Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area.

2

Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

## Desired Conditions

- Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
- Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
- Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
- Large predator species contribute to ecological diversity and ecosystem functioning.
- Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.
- Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
- Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
- Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
- Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
- Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
- Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
- Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
- Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
- Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
- Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
- Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

## Standards

- **Raptors**: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (**CDOW 2008**)
- **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and

3

conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

- **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

- **Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands:** The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
  - o Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range, pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

## Aquatic Species

Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.

Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

- Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
- The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
- Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

4

BLM_0166833

- An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
- Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
- Macroinvertebrate diversity and abundance reflect high water quality.
- Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
- Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
- Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
- Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

## Ecological Emphasis Areas

BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP.

The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same

5

BLM_0166834

geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP.

### Big Horn Sheep

The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species[2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, *Special Status Species Management.*

The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

- The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
- The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
- The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
- The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
- The local model assumes that slopes greater than or equal to 60% lower the probability of

---

[2] BLM Information Bulletin No. CO-2015-034

BLM_0166835

contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.
- The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams.

The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.

The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

- Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
- Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
- Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
- In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder **only** if grazing period will be shorter than running a smaller band.
- Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
- Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.

---

[3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)

7

BLM_0166836

- Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
- Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
- Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill.

In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area.

**Gunnison Sage Grouse**
The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

**Land Health Standards**
The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that

---

[4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23.

allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.

## Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity

CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April 2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts.

Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments.

## Conclusion

The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final

9

RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes.

Sincerely,

Renzo DelPiccolo, Area Wildlife Manager- Montrose

xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenum, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

10

BLM_0166839

BLM_0166840

Figure 1: CPW recommened big game winter range emphasis areas and BLM proposed ecological emphasis areas.



**Legend**

- Winter range emphasis areas
- Elk Winter Range
- Mule Deer Winter Range
- Draft Proposed Ecological Emphasis Areas
- Uncomaphgre Field Office - BLM

Map developed by:
Brad Banulis
Wildlife Biologist
10.18.2016

Miles
0   4   8      16      24      32

BLM_0166841

**STATE OF COLORADO**

**Bill Ritter, Jr., Governor**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF WILDLIFE

AN EQUAL OPPORTUNITY EMPLOYER

Thomas E. Remington, Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192
*wildlife.state.co.us*



*For Wildlife-*
*For People*

December 13, 2010

Helen Hankins
State Director-BLM-Colorado State Office
BLM Colorado State Office
2850 Youngfield St.
Lakewood, CO 80215

Re:   **CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales**

Dear Helen,

The Colorado Division of Wildlife (CDOW) would like to thank you for meeting with us regarding quarterly lease sales and the leasing reform process.   We found these meetings to be highly productive.  We continue to appreciate your cooperation.  CDOW values the opportunity for us to work together on issues that will help link the common threads of our missions, including the protection and management of wildlife and wildlife habitat.

As you know, CDOW has statutory authority to protect, preserve, enhance and manage the wildlife of Colorado for the use, benefit, and enjoyment of the people of Colorado and its visitors.  We encourage BLM to develop a standardized approach that will protect wildlife and wildlife habitats across planning area boundaries.

The purpose of this letter is two-fold.  One is to make recommendations for Resource Management Plan (RMP) guidance that will allow appropriate oil and gas exploration and development while also providing for the long-term conservation of wildlife and wildlife habitats across the State of Colorado; the second is to provide our expectations for adequate wildlife stipulations in the quarterly oil and gas lease sale process to improve efficiency.

**Wildlife Protection Considerations in Resource Management Plans**

CDOW is actively participating in the RMP revision process across the State by attending regular meetings with BLM staff and submitting comments through the Department of Natural Resources' Cooperating Agency Agreement.  We appreciate the opportunity to engage with BLM on wildlife and land use issues, and to provide comment during the draft RMP and quarterly oil and gas lease sale processes.  We have also found that engaging early with BLM by attending Notices of Staking has been

DEPARTMENT OF NATURAL RESOURCES, Mike King, Executive Director
WILDLIFE COMMISSION, Tim Glenn, Chair • Robert Streeter, Vice Chair • Mark Smith, Secretary
Members, David R. Brougham • Dennis Buechler • Dorothea Farris • Allan Jones • John Singletary • Dean Wingfield
Ex Officio Members, Mike King and John Stulp

effective for exchanging information that results in benefits for operators and wildlife. CDOW also appreciates the opportunity to engage in BLM's new leasing reform process.

CDOW continues to be concerned that mitigating impacts on a site-by-site basis does not result in an effective conservation strategy over the long term. We recommend that the RMPs provide landscape-level analysis and guidance that, in addition to deciding which parcels are made available and under what stipulations, also addresses broader approaches such as phased or clustered development. CDOW requests that these comments be integrated, as appropriate, into relevant chapters and appendices within RMPs that are currently being revised.

As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources. We would like to see RMPs incorporate avenues to seek compensatory mitigation when surface density exceeds one well pad per section (within the habitats we've identified) or when other development parameters exceed the point where normal operational practices provide sufficient avoidance and minimization of impacts to wildlife. CDOW would also like to highlight the importance of implementing adaptive management and monitoring programs to assess oil and gas development with respect to resulting impacts on the landscape.

**Recommendations for Lease Stipulations**

As you are aware, CDOW has prepared a detailed list of Best Management Practices (BMPs) for oil and gas development, titled *"Actions to Minimize Adverse Impacts to Wildlife Resources."* The first part of the document contains general BMPs and the last part contains species-specific BMPs. The species-specific BMPs include recommendations on protective buffers (grouse, raptors, riparian, etc.), timing information (winter range, breeding periods, etc.), and recommendations on surface density caps (mule deer and grouse). While this document does not cover all wildlife species in Colorado, it does cover the majority of the species that CDOW is concerned about.

As a tool to assist you, we have summarized the information from the species-specific BMPs into a simplified matrix which is attached to this letter. The matrix includes those wildlife species and habitats that would be best protected through BLM's implementation of these recommendations as standard stipulations in RMPs and quarterly lease sales. The matrix lists wildlife species, habitat types, and area or buffer distance recommendations for No Surface Occupancy Stipulations, buffer distance and time periods associated with Timing Limitation Stipulations, and facility density, surface disturbance and noise limitations for Controlled Surface Use Stipulations.

**No Surface Occupancy Stipulations**

**No Surface Occupancy** is recommended at nest and breeding sites for certain species (see attached table for details) including: bighorn sheep, Brazilian free-tailed bat, Townsend's big-eared bat, fringed myotis, Columbian sharp-tailed grouse, cutthroat trout, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, least tern, lesser prairie chicken, mountain plover, northern leopard frog, piping plover, plains sharp-tailed grouse, Preble's and New Mexico meadow jumping mouse, various raptors, southwest willow flycatcher, western boreal toad, and certain aquatic habitats including 300 feet from the ordinary high water mark.

In addition, CDOW recommends **No Lease**, or at a minimum **No Surface Occupancy**, within some categories of wildlife habitat and other special management areas significant to wildlife and wildlife recreation in Colorado, including: State Wildlife Areas, greater sage-grouse core areas, Gunnison sage-grouse occupied habitat, gold medal waters, designated cutthroat trout habitat, roadless areas, and Wilderness Study Areas.

## Timing Limitation Stipulations

**Timing Limitation** stipulations recommendations are made for certain species (see attached table for details) including: bighorn sheep, black-footed ferret, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, kit fox, least tern, lesser prairie chicken, mountain plover, piping plover, plains sharp-tailed grouse, prairie dogs, pronghorn antelope, raptors, southwest willow flycatcher, swift fox, and various aquatic species.

Several species are recommended for **Lease Notices** to require habitat surveys, as appropriate including: bats, black bear, black footed ferret, kit fox, least tern, lynx, mountain plover, northern leopard frog, piping plover, prairie dogs, Preble's and New Mexico jumping mouse, raptors, river otter, southwest willow flycatcher, and swift fox.

## Controlled Surface Use Stipulations

A **Controlled Surface Use** Stipulation is recommended to restrict density of surface development to one well pad per section (above this level of disturbance, off site and/or on site mitigation is recommended, as appropriate) within select habitats for certain species, including: bighorn sheep, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, lesser prairie chicken, plains sharp-tailed grouse, southwest willow fly catcher, western boreal toad, and generally aquatic species.

As a minimum standard for sage grouse, CDOW recommends a **Controlled Surface Use** stipulation which caps disturbance at less than or equal to 1 percent of the total surface area of mapped sage grouse seasonal habitats (located within core areas), or if seasonal habitats are unmapped, within the core area boundary.  Note that for Gunnison sage-grouse, occupied habitat is considered the core area boundary.  For occupied greater sage-grouse habitat outside of core areas, CDOW recommends a 5 percent cap on surface disturbance within mapped seasonal habitats, or if seasonal habitats are unmapped, within the occupied habitat boundary.

CDOW also recommends a **Controlled Surface Use Stipulation** in all mapped sage grouse seasonal habitats and core areas to limit noise emissions from oil and gas facilities consistent with the recommendations in both the Colorado Greater Sage-grouse Conservation Plan and the Gunnison Sage-grouse Rangewide Conservation Plan.  Similar noise limitations within mapped seasonal habitats and core areas (where defined) are likely to benefit Columbian sharp-tailed grouse, plains sharp-tailed grouse, and lesser prairie chickens.

## Lease Notices

**Lease Notices** are also recommended for several species which may be threatened or endangered or candidates for listing including: black-footed ferret, cutthroat trout, Gunnison sage-grouse, least tern, lynx, piping plover, Preble's and New Mexico jumping mouse, southwest willow fly catcher, and western boreal toad.

CDOW also recommends that **Lease Notices** be applied to any lease issued in habitat where threatened and endangered species exist, within Gunnison and greater sage-grouse production areas, State of Colorado listed sensitive species, migration corridors (where surface density caps may provide the most effective protection), designated cutthroat trout habitat, and critical habitat areas where wildlife species are in decline, and within habitats that are irreplaceable and unique. These Lease Notices should notify lessees that additional restrictions may be applied to protect these key wildlife habitats. Other information contained within the BMPs document could be utilized to formulate Conditions of Approval attached with Applications for Permits to Drill, as BLM deems appropriate.

**Ongoing Coordination**

CDOW's recommendations are based on recent peer-reviewed research of the impacts of development on wildlife and wildlife habitats. Our recommendations are likely to evolve through time as new wildlife science becomes available. This is particularly true for some species, such as greater and Gunnison sage-grouse, where our understanding of development impacts on these species continues to improve. Change in status of species which are petitioned for inclusion as threatened or endangered under the Endangered Species Act may also influence future recommendations.

It is not CDOW's intent to create static recommendations regarding lease stipulations, as species and habitats and their priorities often change. We appreciate that recommendations must remain flexible and these recommendations must reflect current conditions as we know them. However, regular communication between the CDOW and BLM Geospatial Information Systems Departments' should help ensure that stipulations retain sufficient flexibility to be applied to the most appropriate places over time.

We look forward to continuing to work with you in the future and continuing productive dialog on this subject. Please let us know if we can provide any more information that BLM would find helpful.

Sincerely,

Thomas E. Remington
Director

CC:   Sherri Thompson-Denver BLM Office
      Steve Bennett, BLM NW District Office
      Lori Armstrong, BLM SW District Office
      Greg Shoop, BLM Front Range District Office
      Nancy Warren, CDOW
      Ron Velarde, CDOW
      Dan Prenzlow, CDOW
      Tom Speeze, CDOW
      Steve Yamashita, CDOW
      K. Kaal, CDOW
      D. Riggs, CDOW
      B. Petch, CDOW
      J. Holst, CDOW
      C. Greenman, CDOW
      A. Trujillo, CDOW

| CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado | | | | |
|---|---|---|---|---|
| *Wildlife* <br> *Species* | *Habitat* <br> *Types* | *No Surface Occupancy* <br> *Stipulation* <br><br> *(area or buffer distance)* | *Timing Limitation* <br> *Stipulation* <br><br> *(time period - may be greater than 60 days)* | *Controlled Surface Use* <br> *Stipulation* <br><br> *(potential facility relocate or other operational constraint)* |
| *Bats (Brazilian Free-tailed, Townsend's Big-eared, Fringed Myotis)* | *Roost Sites* | Within 0.25 Miles of Roost Site | N/A | A bat inventory may be required prior to approval of operations within historic mining complexes. These are areas where bats are suspected or the habitat is deemed suitable but no bats have been documented.  The inventory data will be used to apply conservation measures to reduce the impacts of surface disturbance on bat habitat |
| *Bighorn Sheep* | *Production Areas* <br> *Winter Range* | Entire Mapped Production Area <br> Entire Mapped Winter Range Area | (TL for human activities in these habitats including over flights) <br> April 15-June 30 (Rocky Mountain) February 1 -May 1 (Desert) <br> November 1-April 15 | N/A <br> N/A |
| *Black Footed Ferret* | *Release Areas* | N/A | Entire Area March 1-July 15 | N/A |
| *Columbian Sharp-tailed Grouse* | *Leks* | Within 0.4 Miles of Lek Sites | N/A | N/A |
|  | *Winter habitat* | N/A | Restrict development between Dec 1- March 15 | Limit noise not to exceed 49 dB measured 30 ft. from source. |
|  | *Production Areas (Breeding and Nesting habitat* | N/A | Within 1.25 Miles of Lek Sites March 15-July 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| *Cutthroat Trout* | *Designated Cutthroat Habitat* | 300-Feet from OHWM | SEE Aquatic Species stip | N/A |
|  | *Designated Cutthroat Habitat Watershed* | N/A | N/A | Surface Density Limitation of one pad per section |
| *Mule Deer* | *Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas)* | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation |
| *Elk* | *Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas)* | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation actions |
|  | *Production Areas* | N/A | May 15-June 30 | Surface Density Limitation of one pad per section or consider off site mitigation actions |

BLM_0166846

| | | | | |
|---|---|---|---|---|
| **Gunnison/Greater Sage-grouse** | | | | |
| | *Leks [1]* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Core Areas (Occupied Habitat = Core Area for Gunnison sage-grouse)* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Winter Range* | N/A | December 1-March 15 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting habitat* | N/A | Within 4 Miles of Lek Sites  March 1-June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Greater Prairie Chicken** | | | | |
| | *Leks* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Production Areas (Breeding and Nesting habitat* | N/A | Within 2.2 miles of Lek sites March 1-June 30 | Surface Density Limitation of one pad per section; Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| **Kit Fox** | | | | |
| | *Den Sites* | N/A | Within 0.25 mile of den sites February 1-May 1 | Pre-construction survey for den sites may be required |
| **Least Tern** | | | | |
| | *Production Areas (Breeding and Nesting habitat)* | Within 300 Feet OHWM | 0.5 Miles-No Human Encroachment-April 1-July 31 | N/A |
| **Lesser Prairie Chicken** | | | | |
| | *Leks [2]* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Core Areas* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting Habitat)* | | Within 2.2 Miles of Lek Sites March 15-June15 | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Lynx** | | Consult with DOW regarding Lynx use of the development area | | |
| **Mountain Plover** | *Active Nest Site* | Within 300 Feet of Active Nest | N/A | Pre-construction survey for nest sites may be required |
| **Piping Plover** | *Production Areas (Breeding and Nesting Habitat)* | Within 300 Feet OHWM | Within 0.5-No Human Encroachment-April 1-July 31 | N/A |

BLM_0166847

| | | | | |
|---|---|---|---|---|
| **Plains Sharp-Tailed Grouse** | | | | |
| | *Leks* | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | *Core Areas* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting Habitat)* | N/A | Within 1.25 Miles of Lek Sites-March 1- June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Prairie Dogs (White-tailed/Gunnison's)** | | | | |
| | *Colonies* | N/A | March 1-June 15 | Pre-construction survey for active colonies may be required; avoid direct disturbance to active colonies when possible |
| **Preble's and New Mexico Meadow Jumping Mouse** | | | | |
| | *Known and Potential Occupied Habitat* | Within 300 ft. of stream centerline | N/A | N/A |
| **Pronghorn Antelope** | | | | |
| | *Winter Concentration Areas* | N/A | January 1-March 31 | N/A |
| **Bald Eagle** | | | | |
| | *Active Nest Site [3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment October 15-July 31 | |
| | *Active Winter Night Roost Sites [4]* | Within 0.25 Miles of Roost Site | N/A | Pre-construction roost surveys may be required |
| | *Active Winter Night Roost Sites* | N/A | 0.5 Miles- No Human Encroachment November 15 - March 15 | |
| **Ferruginous Hawk** | | | | |
| | *Active Nest Site [3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment February 1-July 15 | |
| **Golden Eagle** | | | | |
| | *Active Nest Site [3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment December 15-July 15 | |
| **Mexican Spotted Owl** | | | | |
| | Protected Activity Centers (PAC) | Entire PAC | N/A | Pre-construction nest surveys may be required |
| | *Protected Activity Centers (PAC)* | N/A | Adjacent PAC Areas- No Human Encroachment March 1-August 31 | |
| **Northern Goshawk** | | | | |
| | *Active Nest Site [3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment March 1-September 15 | |
| **Osprey** | | | | |
| | *Active Nest Site [3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.25 Miles- No Human Encroachment April 1-August 31 | |
| **Peregrine Falcon** | | | | |
| | *Active Nest Site [3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment March 15-July 31 | |

BLM_0166848

| | | | | |
|---|---|---|---|---|
| **Prairie Falcon** | | | | |
| | *Active Nest Site* [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles-No Human Encroachment March 15-July 15 | |
| **Swainson's Hawk** | | | | |
| | *Active Nest Site* [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.25 Miles- No Human Encroachment April 1-July 15 | |
| **Other Raptors Not Listed Above** | | | | |
| | Nesting Habitat | N/A | No Human Encroachment January 1-July 15 | Pre-construction nest surveys may be required |
| | Roost Sites | N/A | No Human Encroachment November 15-April 1 | |
| **Burrowing Owl** | | | | |
| | Active Nest Site | N/A | 300 Foot March 1-August 15 | N/A |
| **River Otter** | | | | |
| | Occupied Habitat | N/A | N/A | Minimize disturbance of riparian vegetation and road development within 300 ft. of occupied habitat |
| **Southwest Willow Flycatcher** | | | | |
| | Active Nest Site | Within 300 Feet of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Suitable habitat (USFWS minimum patch size definition) | | Restrict activities between May 15-Aug 1 | Pre-construction nest surveys may be required |
| **Swift Fox** | | | | |
| | Den Sites | N/A | 0.25 Mile March 15-June 15 | Pre-construction survey for den sites may be required |
| **Northern Leopard Frog** | | | | |
| | Breeding Sites | Within 0.25 Miles of Breeding Site | N/A | N/A |
| **Western Boreal Toad** | | | | |
| | Breeding Sites | Within 0.5 Miles of Breeding Site | N/A | N/A |
| **Aquatic Species** | | | | |
| | Gold Medal Water | 300 Feet from OHWM | N/A | N/A |
| | Rainbow Trout | N/A | March 1-June 15 | N/A |
| | Brown Trout | N/A | October 1-May 1 | N/A |
| | Brook Trout | N/A | August 15-May 1 | N/A |
| | Cutthroat Trout | N/A | June 1-September 1 | N/A |
| | Bluehead Sucker | N/A | May 1-July 15 | N/A |
| | Flannelmouth Sucker | N/A | April 1-July 1 | N/A |
| | Roundtail Chub | N/A | May 15-July 15 | N/A |

[1] Greater and Gunnison sage-grouse lek = any lek active within last 10 years (core area); any lek active within last 5 years (outside core area)

[2] Lesser prairie chicken lek = any lek active within last 3 years

[3] Active Nest Site = any nest that is frequented or occupied by a raptor during the breeding season, or which has been frequented or occupied in any of the five previous breeding seasons

[4] Active Bald Eagle Winter Night Roost = Areas where bald eagles gather and perch overnight, and sometimes during the day in the event of inclement weather.

BLM_0166849



**COLORADO**
**Parks and Wildlife**

Department of Natural Resources

Montrose Service Center
2300 South Townsend Avenue
Montrose, CO 81401
Phone (970) 252-6000

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

**RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016**

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements[1], absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative

---

[1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Chris Castilian, Chair • Jeanne Horne, Vice-Chair
John Howard • Bill Kane • Dale Pizel • James Pribyl, Secretary • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp



record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law.

## Wildlife

The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed.

Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area.

2

Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

## Desired Conditions

- Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
- Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
- Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
- Large predator species contribute to ecological diversity and ecosystem functioning.
- Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.
- Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
- Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
- Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
- Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
- Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
- Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
- Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
- Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
- Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
- Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
- Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

## Standards

- **Raptors**: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)
- **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and

3

conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

- **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

- **Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands:** The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
    - o  Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range, pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

### Aquatic Species

Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.

Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

- Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
- The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
- Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

4

BLM_0166853

- An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
- Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
- Macroinvertebrate diversity and abundance reflect high water quality.
- Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
- Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
- Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
- Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

## Ecological Emphasis Areas

BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP.

The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same

5

geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP.

## Big Horn Sheep

The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species[2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, *Special Status Species Management*.

The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

- The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
- The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
- The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
- The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
- The local model assumes that slopes greater than or equal to 60% lower the probability of

---

[2] BLM Information Bulletin No. CO-2015-034

6

contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.
- The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams.

The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.

The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

- Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
- Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
- Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
- In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder **only** if grazing period will be shorter than running a smaller band.
- Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
- Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.

---

[3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)

7

- Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
- Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
- Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill.

In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area.

## Gunnison Sage Grouse
The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

## Land Health Standards
The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that

---

[4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23.

8

allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.

**Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity**
CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April 2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts.

Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments.

**Conclusion**
The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final

9

RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes.

Sincerely,

Renzo DelPiccolo, Area Wildlife Manager- Montrose

xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenum, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

10

BLM_0166859

BLM_0166860

Figure 1: CPW recommened big game winter range emphasis areas and BLM proposed ecological emphasis areas.



### Legend

- Winter range emphasis areas
- Elk Winter Range
- Mule Deer Winter Range
- Draft Proposed Ecological Emphasis Areas
- Uncomaphgre Field Office - BLM

Miles
0   4   8        16        24        32

Map developed by:
Brad Banulis
Wildlife Biologist
10.18.2016

BLM_0166861

**STATE OF COLORADO**

**Bill Ritter, Jr., Governor**
**DEPARTMENT OF NATURAL RESOURCES**

# DIVISION OF WILDLIFE
AN EQUAL OPPORTUNITY EMPLOYER

Thomas E. Remington, Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192
*wildlife.state.co.us*



*For Wildlife-*
*For People*

December 13, 2010

Helen Hankins
State Director-BLM-Colorado State Office
BLM Colorado State Office
2850 Youngfield St.
Lakewood, CO 80215

**Re:   CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales**

Dear Helen,

The Colorado Division of Wildlife (CDOW) would like to thank you for meeting with us regarding quarterly lease sales and the leasing reform process.  We found these meetings to be highly productive.  We continue to appreciate your cooperation.  CDOW values the opportunity for us to work together on issues that will help link the common threads of our missions, including the protection and management of wildlife and wildlife habitat.

As you know, CDOW has statutory authority to protect, preserve, enhance and manage the wildlife of Colorado for the use, benefit, and enjoyment of the people of Colorado and its visitors.  We encourage BLM to develop a standardized approach that will protect wildlife and wildlife habitats across planning area boundaries.

The purpose of this letter is two-fold.  One is to make recommendations for Resource Management Plan (RMP) guidance that will allow appropriate oil and gas exploration and development while also providing for the long-term conservation of wildlife and wildlife habitats across the State of Colorado; the second is to provide our expectations for adequate wildlife stipulations in the quarterly oil and gas lease sale process to improve efficiency.

**Wildlife Protection Considerations in Resource Management Plans**

CDOW is actively participating in the RMP revision process across the State by attending regular meetings with BLM staff and submitting comments through the Department of Natural Resources' Cooperating Agency Agreement.  We appreciate the opportunity to engage with BLM on wildlife and land use issues, and to provide comment during the draft RMP and quarterly oil and gas lease sale processes.  We have also found that engaging early with BLM by attending Notices of Staking has been

DEPARTMENT OF NATURAL RESOURCES, Mike King, Executive Director
WILDLIFE COMMISSION, Tim Glenn, Chair • Robert Streeter, Vice Chair • Mark Smith, Secretary
Members, David R. Brougham • Dennis Buechler • Dorothea Farris • Allan Jones • John Singletary • Dean Wingfield
Ex Officio Members, Mike King and John Stulp

BLM_0166862

effective for exchanging information that results in benefits for operators and wildlife. CDOW also appreciates the opportunity to engage in BLM's new leasing reform process.

CDOW continues to be concerned that mitigating impacts on a site-by-site basis does not result in an effective conservation strategy over the long term. We recommend that the RMPs provide landscape-level analysis and guidance that, in addition to deciding which parcels are made available and under what stipulations, also addresses broader approaches such as phased or clustered development. CDOW requests that these comments be integrated, as appropriate, into relevant chapters and appendices within RMPs that are currently being revised.

As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources. We would like to see RMPs incorporate avenues to seek compensatory mitigation when surface density exceeds one well pad per section (within the habitats we've identified) or when other development parameters exceed the point where normal operational practices provide sufficient avoidance and minimization of impacts to wildlife. CDOW would also like to highlight the importance of implementing adaptive management and monitoring programs to assess oil and gas development with respect to resulting impacts on the landscape.

**Recommendations for Lease Stipulations**

As you are aware, CDOW has prepared a detailed list of Best Management Practices (BMPs) for oil and gas development, titled *"Actions to Minimize Adverse Impacts to Wildlife Resources."* The first part of the document contains general BMPs and the last part contains species-specific BMPs. The species-specific BMPs include recommendations on protective buffers (grouse, raptors, riparian, etc.), timing information (winter range, breeding periods, etc.), and recommendations on surface density caps (mule deer and grouse). While this document does not cover all wildlife species in Colorado, it does cover the majority of the species that CDOW is concerned about.

As a tool to assist you, we have summarized the information from the species-specific BMPs into a simplified matrix which is attached to this letter. The matrix includes those wildlife species and habitats that would be best protected through BLM's implementation of these recommendations as standard stipulations in RMPs and quarterly lease sales. The matrix lists wildlife species, habitat types, and area or buffer distance recommendations for No Surface Occupancy Stipulations, buffer distance and time periods associated with Timing Limitation Stipulations, and facility density, surface disturbance and noise limitations for Controlled Surface Use Stipulations.

**No Surface Occupancy Stipulations**

**No Surface Occupancy** is recommended at nest and breeding sites for certain species (see attached table for details) including: bighorn sheep, Brazilian free-tailed bat, Townsend's big-eared bat, fringed myotis, Columbian sharp-tailed grouse, cutthroat trout, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, least tern, lesser prairie chicken, mountain plover, northern leopard frog, piping plover, plains sharp-tailed grouse, Preble's and New Mexico meadow jumping mouse, various raptors, southwest willow flycatcher, western boreal toad, and certain aquatic habitats including 300 feet from the ordinary high water mark.

In addition, CDOW recommends **No Lease**, or at a minimum **No Surface Occupancy**, within some categories of wildlife habitat and other special management areas significant to wildlife and wildlife recreation in Colorado, including: State Wildlife Areas, greater sage-grouse core areas, Gunnison sage-grouse occupied habitat, gold medal waters, designated cutthroat trout habitat, roadless areas, and Wilderness Study Areas.

**Timing Limitation Stipulations**

**Timing Limitation** stipulations recommendations are made for certain species (see attached table for details) including: bighorn sheep, black-footed ferret, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, kit fox, least tern, lesser prairie chicken, mountain plover, piping plover, plains sharp-tailed grouse, prairie dogs, pronghorn antelope, raptors, southwest willow flycatcher, swift fox, and various aquatic species.

Several species are recommended for **Lease Notices** to require habitat surveys, as appropriate including: bats, black bear, black footed ferret, kit fox, least tern, lynx, mountain plover, northern leopard frog, piping plover, prairie dogs, Preble's and New Mexico jumping mouse, raptors, river otter, southwest willow flycatcher, and swift fox.

**Controlled Surface Use Stipulations**

A **Controlled Surface Use** Stipulation is recommended to restrict density of surface development to one well pad per section (above this level of disturbance, off site and/or on site mitigation is recommended, as appropriate) within select habitats for certain species, including: bighorn sheep, Columbian sharp-tailed grouse, cutthroat trout, mule deer, elk, greater sage-grouse, greater prairie chicken, Gunnison sage-grouse, lesser prairie chicken, plains sharp-tailed grouse, southwest willow fly catcher, western boreal toad, and generally aquatic species.

As a minimum standard for sage grouse, CDOW recommends a **Controlled Surface Use** stipulation which caps disturbance at less than or equal to 1 percent of the total surface area of mapped sage grouse seasonal habitats (located within core areas), or if seasonal habitats are unmapped, within the core area boundary.  Note that for Gunnison sage-grouse, occupied habitat is considered the core area boundary.  For occupied greater sage-grouse habitat outside of core areas, CDOW recommends a 5 percent cap on surface disturbance within mapped seasonal habitats, or if seasonal habitats are unmapped, within the occupied habitat boundary.

CDOW also recommends a **Controlled Surface Use Stipulation** in all mapped sage grouse seasonal habitats and core areas to limit noise emissions from oil and gas facilities consistent with the recommendations in both the Colorado Greater Sage-grouse Conservation Plan and the Gunnison Sage-grouse Rangewide Conservation Plan.  Similar noise limitations within mapped seasonal habitats and core areas (where defined) are likely to benefit Columbian sharp-tailed grouse, plains sharp-tailed grouse, and lesser prairie chickens.

**Lease Notices**

**Lease Notices** are also recommended for several species which may be threatened or endangered or candidates for listing including: black-footed ferret, cutthroat trout, Gunnison sage-grouse, least tern, lynx, piping plover, Preble's and New Mexico jumping mouse, southwest willow fly catcher, and western boreal toad.

CDOW also recommends that **Lease Notices** be applied to any lease issued in habitat where threatened and endangered species exist, within Gunnison and greater sage-grouse production areas, State of Colorado listed sensitive species, migration corridors (where surface density caps may provide the most effective protection), designated cutthroat trout habitat, and critical habitat areas where wildlife species are in decline, and within habitats that are irreplaceable and unique. These Lease Notices should notify lessees that additional restrictions may be applied to protect these key wildlife habitats. Other information contained within the BMPs document could be utilized to formulate Conditions of Approval attached with Applications for Permits to Drill, as BLM deems appropriate.

**Ongoing Coordination**

CDOW's recommendations are based on recent peer-reviewed research of the impacts of development on wildlife and wildlife habitats. Our recommendations are likely to evolve through time as new wildlife science becomes available. This is particularly true for some species, such as greater and Gunnison sage-grouse, where our understanding of development impacts on these species continues to improve. Change in status of species which are petitioned for inclusion as threatened or endangered under the Endangered Species Act may also influence future recommendations.

It is not CDOW's intent to create static recommendations regarding lease stipulations, as species and habitats and their priorities often change. We appreciate that recommendations must remain flexible and these recommendations must reflect current conditions as we know them. However, regular communication between the CDOW and BLM Geospatial Information Systems Departments' should help ensure that stipulations retain sufficient flexibility to be applied to the most appropriate places over time.

We look forward to continuing to work with you in the future and continuing productive dialog on this subject. Please let us know if we can provide any more information that BLM would find helpful.

Sincerely,

Thomas E. Remington
Director

CC:   Sherri Thompson-Denver BLM Office
Steve Bennett, BLM NW District Office
Lori Armstrong, BLM SW District Office
Greg Shoop, BLM Front Range District Office
Nancy Warren, CDOW
Ron Velarde, CDOW
Dan Prenzlow, CDOW
Tom Speeze, CDOW
Steve Yamashita, CDOW
K. Kaal, CDOW
D. Riggs, CDOW
B. Petch, CDOW
J. Holst, CDOW
C. Greenman, CDOW
A. Trujillo, CDOW

| CDOW Recommended Stipulations for Oil and Gas Within the State of Colorado | | | | |
|---|---|---|---|---|
| **Wildlife** **Species** | **Habitat** **Types** | **No Surface Occupancy** **Stipulation** **(area or buffer distance)** | **Timing Limitation** **Stipulation** **(time period - may be greater than 60 days)** | **Controlled Surface Use** **Stipulation** **(potential facility relocate or other operational constraint)** |
| Bats (Brazilian Free-tailed, Townsend's Big-eared, Fringed Myotis) | Roost Sites | Within 0.25 Miles of Roost Site | N/A | A bat inventory may be required prior to approval of operations within historic mining complexes. These are areas where bats are suspected or the habitat is deemed suitable but no bats have been documented.  The inventory data will be used to apply conservation measures to reduce the impacts of surface disturbance on bat habitat |
| **Bighorn Sheep** | Production Areas Winter Range | Entire Mapped Production Area Entire Mapped Winter Range Area | (TL for human activities in these habitats including over flights) April 15-June 30 (Rocky Mountain) February 1 -May 1 (Desert) November 1-April 15 | N/A N/A |
| **Black Footed Ferret** | Release Areas | N/A | Entire Area March 1-July 15 | N/A |
| **Columbian Sharp-tailed Grouse** | Leks | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | Winter habitat | N/A | Restrict development between Dec 1- March 15 | Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| | Production Areas (Breeding and Nesting habitat | N/A | Within 1.25 Miles of Lek Sites March 15-July 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Cutthroat Trout** | Designated Cutthroat Habitat | 300-Feet from OHWM | SEE Aquatic Species stip | N/A |
| | Designated Cutthroat Habitat Watershed | N/A | N/A | Surface Density Limitation of one pad per section |
| **Mule Deer** | Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas) | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation |
| **Elk** | Crucial Winter Ranges (Severe Winter Range and Winter Concentration Areas) | N/A | December 1-April 15 | Surface Density Limitation of one pad per section or consider off site mitigation actions |
| | Production Areas | N/A | May 15-June 30 | Surface Density Limitation of one pad per section or consider off site mitigation actions |

BLM_0166866

| | | | | |
|---|---|---|---|---|
| **Gunnison/Greater Sage-grouse** | | | | |
| | *Leks [1]* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Core Areas (Occupied Habitat = Core Area for Gunnison sage-grouse)* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Winter Range* | N/A | December 1-March 15 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting habitat* | N/A | Within 4 Miles of Lek Sites  March 1-June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 4 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Greater Prairie Chicken** | | | | |
| | *Leks* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Production Areas (Breeding and Nesting habitat* | N/A | Within 2.2 miles of Lek sites March 1-June 30 | Surface Density Limitation of one pad per section; Limit noise not to exceed 49 dB  measured 30 ft. from source. |
| **Kit Fox** | | | | |
| | *Den Sites* | N/A | Within 0.25 mile of den sites February 1-May 1 | Pre-construction survey for den sites may be required |
| **Least Tern** | | | | |
| | *Production Areas (Breeding and Nesting habitat)* | Within 300 Feet OHWM | 0.5 Miles-No Human Encroachment-April 1-July 31 | N/A |
| **Lesser Prairie Chicken** | | | | |
| | *Leks [2]* | Within 0.6 Miles of Lek Sites | N/A | N/A |
| | *Core Areas* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting Habitat)* | | Within 2.2 Miles of Lek Sites March 15-June15 | Surface Density Limitation of one pad per section; Relocate compressors > 2.2 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Lynx** | | Consult with DOW regarding Lynx use of the development area | | |
| **Mountain Plover** | *Active Nest Site* | Within 300 Feet of Active Nest | N/A | Pre-construction survey for nest sites may be required |
| **Piping Plover** | *Production Areas (Breeding and Nesting Habitat)* | Within 300 Feet OHWM | Within 0.5-No Human Encroachment-April 1-July 31 | N/A |

BLM_0166867

| | | | | |
|---|---|---|---|---|
| **Plains Sharp-Tailed Grouse** | | | | |
| | *Leks* | Within 0.4 Miles of Lek Sites | N/A | N/A |
| | *Core Areas* | No Lease | N/A | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| | *Production Areas (Breeding and Nesting Habitat)* | N/A | Within 1.25 Miles of Lek Sites-March 1- June 30 | Surface Density Limitation of one pad per section; Relocate compressors > 1.25 miles from lek; Limit noise not to exceed 49 dB measured 30 ft. from source. |
| **Prairie Dogs (White-tailed/Gunnison's)** | | | | |
| | *Colonies* | N/A | March 1-June 15 | Pre-construction survey for active colonies may be required; avoid direct disturbance to active colonies when possible |
| **Preble's and New Mexico Meadow Jumping Mouse** | | | | |
| | *Known and Potential Occupied Habitat* | Within 300 ft. of stream centerline | N/A | N/A |
| **Pronghorn Antelope** | | | | |
| | *Winter Concentration Areas* | N/A | January 1-March 31 | N/A |
| **Bald Eagle** | | | | |
| | *Active Nest Site [3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment October 15-July 31 | |
| | *Active Winter Night Roost Sites [4]* | Within 0.25 Miles of Roost Site | N/A | Pre-construction roost surveys may be required |
| | *Active Winter Night Roost Sites* | N/A | 0.5 Miles- No Human Encroachment November 15 - March 15 | |
| **Ferruginous Hawk** | | | | |
| | *Active Nest Site [3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment February 1-July 15 | |
| **Golden Eagle** | | | | |
| | *Active Nest Site [3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment December 15-July 15 | |
| **Mexican Spotted Owl** | | | | |
| | Protected Activity Centers (PAC) | Entire PAC | N/A | Pre-construction nest surveys may be required |
| | *Protected Activity Centers (PAC)* | N/A | Adjacent PAC Areas- No Human Encroachment March 1-August 31 | |
| **Northern Goshawk** | | | | |
| | *Active Nest Site [3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment March 1-September 15 | |
| **Osprey** | | | | |
| | *Active Nest Site [3]* | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.25 Miles- No Human Encroachment April 1-August 31 | |
| **Peregrine Falcon** | | | | |
| | *Active Nest Site [3]* | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | *Active Nest Site* | N/A | 0.5 Miles- No Human Encroachment March 15-July 31 | |

BLM_0166868

| *Prairie Falcon* | | | | |
|---|---|---|---|---|
| | Active Nest Site [3] | Within 0.5 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.5 Miles-No Human Encroachment March 15-July 15 | |
| *Swainson's Hawk* | | | | |
| | Active Nest Site [3] | Within 0.25 Miles of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Active Nest Site | N/A | 0.25 Miles- No Human Encroachment April 1-July 15 | |
| *Other Raptors Not Listed Above* | | | | |
| | Nesting Habitat | N/A | No Human Encroachment January 1-July 15 | Pre-construction nest surveys may be required |
| | Roost Sites | N/A | No Human Encroachment November 15-April 1 | |
| *Burrowing Owl* | | | | |
| | Active Nest Site | N/A | 300 Foot March 1-August 15 | N/A |
| *River Otter* | | | | |
| | Occupied Habitat | N/A | N/A | Minimize disturbance of riparian vegetation and road development within 300 ft. of occupied habitat |
| *Southwest Willow Flycatcher* | | | | |
| | Active Nest Site | Within 300 Feet of Nest Site | N/A | Pre-construction nest surveys may be required |
| | Suitable habitat (USFWS minimum patch size definition) | | Restrict activities between May 15-Aug 1 | Pre-construction nest surveys may be required |
| *Swift Fox* | | | | |
| | Den Sites | N/A | 0.25 Mile March 15-June 15 | Pre-construction survey for den sites may be required |
| *Northern Leopard Frog* | | | | |
| | Breeding Sites | Within 0.25 Miles of Breeding Site | N/A | N/A |
| *Western Boreal Toad* | | | | |
| | Breeding Sites | Within 0.5 Miles of Breeding Site | N/A | N/A |
| *Aquatic Species* | | | | |
| | Gold Medal Water | 300 Feet from OHWM | N/A | N/A |
| | Rainbow Trout | N/A | March 1-June 15 | N/A |
| | Brown Trout | N/A | October 1-May 1 | N/A |
| | Brook Trout | N/A | August 15-May 1 | N/A |
| | Cutthroat Trout | N/A | June 1-September 1 | N/A |
| | Bluehead Sucker | N/A | May 1-July 15 | N/A |
| | Flannelmouth Sucker | N/A | April 1-July 1 | N/A |
| | Roundtail Chub | N/A | May 15-July 15 | N/A |

[1] Greater and Gunnison sage-grouse lek = any lek active within last 10 years (core area); any lek active within last 5 years (outside core area)

[2] Lesser prairie chicken lek = any lek active within last 3 years

[3] Active Nest Site = any nest that is frequented or occupied by a raptor during the breeding season, or which has been frequented or occupied in any of the five previous breeding seasons

[4] Active Bald Eagle Winter Night Roost = Areas where bald eagles gather and perch overnight, and sometimes during the day in the event of inclement weather.

BLM_0166869

**Controlled Surface Use (CSU)/Site-Specific Relocation (SSR) – Big Game Severe Winter Range, Winter Concentration Areas, Production Areas and Migration Corridors**

***Surface occupancy or use is subject to the following special operating constraints:*** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropogenic activity and permanently constructed facilities shall be designed to maintain habitat function, permeability, and landscape connectivity between seasonal habitats. This includes limiting the density of permanently constructed facilities requiring daily access (well pads, compressor stations, injection wells, equipment yards) to one facility per square mile (640 acres) or less, and limiting the density of open system routes, both motorize and nonmotorized, to one linear mile per square mile[1] (640 acres). Exception: these density standards do not apply to administrative routes. If the desired density limits cannot be achieved on a site-specific basis for newly permitted facilities, consult with Colorado Parks and Wildlife to implement on or offsite compensatory mitigation as needed to meet the objectives of a state plan, program or authorization.

***For the purposes of:*** Protecting and improving priority big game winter range and migratory habitats consistent with S.O. 3362, and in order to maintain reproductive success and recruitment necessary to sustain healthy big game populations capable of meeting state population objectives.

***Rationale:*** There is an established body of evidence that timing limitation stipulations on oil and gas and other development activities are not adequate to maintain the functionality of big game habitats. Managing the concentration and intensity of development is necessary to maintain big game populations in areas subject to landscape-scale anthropogenic development. This may include requiring collocation of facilities as needed to minimize traffic and road/trail densities.

---

[1] System route density at the point of interest as calculated using the Line Density Tool in ArcGIS with a 1 mile grid cell size and a 1.5 mile search radius from the center of the grid cell.

BLM_0166870

**Controlled Surface Use (CSU)/Site-Specific Relocation (SSR) – Big Game Severe Winter Range, Winter Concentration Areas, Production Areas and Migration Corridors**

***Surface occupancy or use is subject to the following special operating constraints:*** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropogenic activity and permanently constructed facilities shall be designed to maintain habitat function, permeability, and landscape connectivity between seasonal habitats. This includes limiting the density of permanently constructed facilities requiring daily access (well pads, compressor stations, injection wells, equipment yards) to one facility per square mile (640 acres) or less, and limiting the density of open system routes, both motorize and nonmotorized, to one linear mile per square mile[1] (640 acres). Exception: these density standards do not apply to administrative routes. If the desired density limits cannot be achieved on a site-specific basis for newly permitted facilities, consult with Colorado Parks and Wildlife to implement on or offsite compensatory mitigation as needed to meet the objectives of a state plan, program or authorization.

***For the purposes of:*** Protecting and improving priority big game winter range and migratory habitats consistent with S.O. 3362, and in order to maintain reproductive success and recruitment necessary to sustain healthy big game populations capable of meeting state population objectives.

***Rationale:*** There is an established body of evidence that timing limitation stipulations on oil and gas and other development activities are not adequate to maintain the functionality of big game habitats. Managing the concentration and intensity of development is necessary to maintain big game populations in areas subject to landscape-scale anthropogenic development. This may include requiring collocation of facilities as needed to minimize traffic and road/trail densities.

---

[1] System route density at the point of interest as calculated using the Line Density Tool in ArcGIS with a 1 mile grid cell size and a 1.5 mile search radius from the center of the grid cell.

**34-60-128. Habitat stewardship - rules.** (3) In order to minimize adverse impacts to wildlife resources, the commission shall:

(b) Provide for commission consultation and consent of the affected surface owner, or the surface owner's appointed tenant, on permit-specific conditions for wildlife habitat protection THAT DIRECTLY IMPACT THE AFFECTED SURFACE OWNER'S PROPERTY OR USE OF THAT PROPERTY. Such PERMIT-SPECIFIC conditions FOR WILDLIFE HABITAT PROTECTION shall be discontinued when final reclamation has occurred. PERMIT-SPECIFIC CONDITIONS FOR WILDLIFE HABITAT PROTECTION THAT DO NOT DIRECTLY IMPACT THE AFFECTED SURFACE OWNER'S PROPERTY OR USE OF THAT PROPERTY, SUCH AS OFF-SITE COMPENSATORY MITIGATION REQUIREMENTS, DO NOT REQUIRE THE CONSENT OF THE SURFACE OWNER OR THE SURFACE OWNER'S APPOINTED TENANT.

BLM_0166872

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Monday, September 23, 2019 11:15 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: BLM Uncompahgre Field Office Resource Management Plan |
| **Attachments:** | UFO RMP USFWS Update. 6843.9.20.19 (1).pdf |

Follow up letter to the USFWS on their BO.

---------- Forwarded message ---------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Fri, Sep 20, 2019 at 8:47 AM
Subject: BLM Uncompahgre Field Office Resource Management Plan
To: Timberman, Ann <ann_timberman@fws.gov>
Cc: Loscalzo, Matthew <mloscalzo@blm.gov>, Neil Perry <nperry@blm.gov>, Kenneth Holsinger <kholsing@blm.gov>,
Kurt Broderdorp <kurt_broderdorp@fws.gov>

Ann,

Please see attached memo regarding our ongoing Resource Management Plan revision. We've continued to coordinate with your staff on this project as we go through our process of moving toward a Record of Decision. Please let me know if you have any questions or would like to discuss further. Best regards,

Greg


--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
DOI Upper Colorado River Region 7
970.240.5338
970.596.1515 (c)



--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

1

BLM_0166873



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE FIELD OFFICE
2465 South Townsend Ave.
Montrose, CO 81401
**blm.gov/colorado**



**SEP 2 0 2019**

In Reply Refer To:
6843 (CO-S05)

Memorandum

To:         Western Colorado Supervisor
            Western Colorado Ecological Services Field Office, United States Fish and Wildlife
            Service

From:       Gregory Larson
            Bureau of Land Management, Uncompahgre Field Office Manager

Subject:    BLM Uncompahgre Field Office Resource Management Plan; TAILS 06E24100-2018-F-
            0248.

On July 31, 2018 the Bureau of Land Management Uncompahgre Field Office (BLM UFO) submitted a
biological assessment (BA) to the US Fish and Wildlife Service (Service) requesting formal Section 7
Consultation on the effect of the subject project on species and habitats listed under the Endangered
Species Act of 1973, as amended (16 U.S.C. § 1531 et seq.; [Act]). The BLM UFO received concurrence
from the Service on December 17, 2018. The BLM UFO and Service agreed with the determinations that
the submitted Proposed Resource Management Plan (PRMP) **"may affect, but is not likely to adversely
affect"** Mexican spotted owl, and western yellow-billed cuckoo; is **"likely to adversely affect"** Gunnison
sage-grouse (and critical habitat), bonytail chub, Colorado pikeminnow (and critical habitat), greenback
cutthroat trout, humpback chub, razorback sucker (and critical habitat), clay-loving wild buckwheat, and
Colorado hookless cactus.

On July 28, 2019 the BLM UFO released the PRMP and Final Environmental Impact Statement (FEIS).
The document and associated appendices can be downloaded from: https://go.usa.gov/xnpgD

The PRMP/FEIS released on July 28, 2019 included changes to the Agency-Proposed Alternative (E)
originally submitted to the USFWS for consultation. None of these changes directly addressed
management for the aforementioned species. These changes include:

- Removing the following concepts and management directives from the Agency-Proposed
  Alternative (E):
    - Habitat Management Areas
    - "Tier 1" Lands with Wilderness Characteristics – Managed to protect wilderness
      characteristics. (Will be managed as "Tier 2" – Managed to minimize impacts to
      wilderness characteristics while managing for other uses – 18,320 acres.)

BLM_0166874

- Changing the following stipulation from No Surface Occupancy (NSO) to Controlled Surface Use (CSU):
    - Steep slopes, over 40%.
    - Special Recreation Management Areas (SRMA), except the Dolores River Canyon and San Miguel River which would remain under the NSO stipulation.
    - National Recreation Trails
    - Hydrology Features (rivers and streams)
    - Bat Hibernacula (Wildlife Bat; Bat Roost Sites and Winter Hibernacula).
- Limiting NSO-26 (Occupied Native Cutthroat Trout) to only include green lineage ssp.
- Removing CSU stipulations from the following:
    - Relic Plant Communities
    - Extensive Recreation Management Areas (ERMA)
- Reducing the 5.0-mile CSU buffer for the Old Spanish Trail to ½ mile.
- Changing the Paleontological CSU stipulation to a lease notice.
- Removing the Right-of-Way (ROW) avoidance areas from the following areas:
    - Slopes over 30%
    - Relic & Rare Plant Communities.
- Reducing the Hydrologic River ROW avoidance buffer from 1,000 feet to 400 feet.
- Reducing the 325-foot NSO buffer around perennial streams, wetland, and riparian areas to a 50-foot CSU buffer.
- Removing the ROW exclusion from the Roubideau SRMA Recreation Management Zone 1.
- Reducing the San Miguel River Area of Critical Environmental Concern (ACEC) by 1,120 acres to a total of 21,660 acres to focus on the Relevant and Important Values of the proposed ACEC. This results in the total proposed ACEC designation increasing in the Agency-Proposed Alternative (E) by 190 acres over Alternative A (No Action).
- Reducing the boundary for the San Miguel River SRMA by 6,490 acres to better align with physical boundaries rather than jurisdictional boundaries.

Prior to release of the PRMP/FEIS, BLM UFO biological staff determined that these changes to the Agency-Proposed Alternative (E) do not affect the species or habitat which were consulted on via the above mentioned BA, and therefore the determinations therein remain unchanged and appropriate, which has been previously discussed between Ken Holsinger and Kurt Broderdorp. If the Service would like a more detailed assessment of the changes to the Agency-Proposed Alternative (E) or any specific elements of the associated BA, please contact BLM UFO staff to discuss any procedural preferences or Gregory Larson, UFO Manager by phone at 970-240-5311 or email at glarson@blm.gov.

BLM_0166875

# Label: "RMP/RMP Record 11.5.19/release"

**Created by:glarson@blm.gov**

Total Messages in label:21 (8 conversations)

Created: 11-05-2019 at 13:34 PM

# Conversation Contents

### UFO RMP followup

### Attachments:

/1. UFO RMP followup/1.1 UFO RMP USFWS Update. 6843.101519.pdf

## "Holsinger, Kenneth" <kholsing@blm.gov>

| | |
|---|---|
| **From:** | "Holsinger, Kenneth" <kholsing@blm.gov> |
| **Sent:** | Tue Oct 15 2019 10:04:14 GMT-0600 (MDT) |
| **To:** | "Timberman, Ann" <ann_timberman@fws.gov>, Kurt Broderdorp <Kurt_Broderdorp@fws.gov> |
| **CC:** | Gina Jones <gphillips@blm.gov>, Gregory Larson <glarson@blm.gov> |
| **Subject:** | UFO RMP followup |
| **Attachments:** | UFO RMP USFWS Update. 6843.101519.pdf |

Hi Ann and Kurt,

Our RMP lead noticed a few errors in the letter we sent to you dated 9/20/2019 with the following subject title: BLM Uncompahgre Field Office Resource Management Plan; TAILS 06E24100-2018-F-0248 please find attached a corrected version of the letter for replacement in the project file as it reflects accurate information. Apologies for the inconvenience please let me know if you have any questions.

Have a good day.

**Ken Holsinger**, Biologist
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
970-240-5389

## "Larson, Gregory" <glarson@blm.gov>

| | |
|---|---|
| **From:** | "Larson, Gregory" <glarson@blm.gov> |
| **Sent:** | Tue Oct 15 2019 10:07:15 GMT-0600 (MDT) |
| **To:** | "Holsinger, Kenneth" <kholsing@blm.gov> |
| **Subject:** | Re: UFO RMP followup |

Thanks Ken.

On Tue, Oct 15, 2019 at 10:04 AM Holsinger, Kenneth <kholsing@blm.gov> wrote:
    Hi Ann and Kurt,

Our RMP lead noticed a few errors in the letter we sent to you dated 9/20/2019 with the following subject title: BLM Uncompahgre Field Office Resource Management Plan; TAILS 06E24100-2018-F-0248 please find attached a corrected version of the letter for replacement in the project file as it reflects accurate information. Apologies for the inconvenience please let me know if you have any questions.

Have a good day.

**Ken Holsinger**, Biologist
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
970-240-5389

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
DOI Upper Colorado River Region 7
970.240.5338
970.596.1515 (c)

## "Broderdorp, Kurt" <kurt_broderdorp@fws.gov>

| | |
|---|---|
| **From:** | "Broderdorp, Kurt" <kurt_broderdorp@fws.gov> |
| **Sent:** | Tue Oct 15 2019 11:24:05 GMT-0600 (MDT) |
| **To:** | "Holsinger, Kenneth" <kholsing@blm.gov> |
| **CC:** | "Timberman, Ann" <ann_timberman@fws.gov>, Gina Jones <gphillips@blm.gov>, Gregory Larson <glarson@blm.gov> |
| **Subject:** | Re: UFO RMP followup |

Thanks Ken, we have updated our project file.

On Tue, Oct 15, 2019 at 10:04 AM Holsinger, Kenneth <kholsing@blm.gov> wrote:
Hi Ann and Kurt,

Our RMP lead noticed a few errors in the letter we sent to you dated 9/20/2019 with the following subject title: BLM Uncompahgre Field Office Resource Management Plan; TAILS 06E24100-2018-F-0248 please find attached a corrected version of the letter for replacement in the project file as it reflects accurate information. Apologies for the inconvenience please let me know if you have any questions.

Have a good day.

**Ken Holsinger**, Biologist
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
970-240-5389

BLM_0166878

--
Kurt Broderdorp
Fish and Wildlife Biologist
Western Colorado Office
US Fish and Wildlife Service
(970) 628-7186

BLM_0166879



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE FIELD OFFICE
2465 South Townsend Ave.
Montrose, CO 81401
**blm.gov/colorado**



In Reply Refer To:
6843 (CO-S05)

Memorandum

To:         Western Colorado Supervisor
            Western Colorado Ecological Services Field Office, United States Fish and Wildlife
            Service

From:       Gregory Larson
            Bureau of Land Management, Uncompahgre Field Office Manager

Subject:    BLM Uncompahgre Field Office Resource Management Plan; TAILS 06E24100-2018-F-
            0248.

On July 31, 2018 the Bureau of Land Management Uncompahgre Field Office (BLM UFO) submitted a
biological assessment (BA) to the US Fish and Wildlife Service (Service) requesting formal Section 7
Consultation on the effect of the subject project on species and habitats listed under the Endangered
Species Act of 1973, as amended (16 U.S.C. § 1531 et seq.; [Act]). The BLM UFO received concurrence
from the Service on December 17, 2018. The BLM UFO and Service agreed with the deteminations that
the submitted Proposed Resource Management Plan (PRMP) **"may affect, but is not likely to adversely
affect"** Greenback cutthroat trout, Mexican spotted owl, Western yellow-billed cuckoo, Colorado
pikeminnow (and critical habitat), Razorback sucker (and critical habitat), Bonytail chub (and critical
habitat), and Humpback chub (and critical habitat); is **"likely to adversely affect"** Gunnison sage-grouse
(and critical habitat), clay-loving wild buckwheat (and critical habitat), and Colorado hookless cactus.

On July 28, 2019 the BLM UFO released the PRMP and Final Environmental Impact Statement (FEIS).
The document and associated appendicies can be downloaded from: https://go.usa.gov/xnpgD

The PRMP/FEIS released on July 28, 2019 included changes to the Agency-Proposed Alternative (E)
originally submitted to the USFWS for consultation. None of these changes directly addressed
management for the aforementioned species. These changes include:

- Removing the following concepts and management directives from the Agency-Proposed
  Alternative (E):
    - Habitat Management Areas
    - "Tier 1" Lands with Wilderness Characteristics – Managed to protect wilderness
      characteristics. (Will be managed as "Tier 2" – Managed to minimize impacts to
      wilderness characteristics while managing for other uses – 18,320 acres.)
- Changing the following stipulation from No Surface Occupance (NSO) to Controlled Surface Use
  (CSU):
    - Steep slopes, over 40%.

- ○ Special Recreation Management Areas (SRMA), except the Dolores River Canyon and San Miguel River which would remain under the NSO stipulation.
  - ○ National Recreation Trails
  - ○ Hydrology Features (rivers and streams)
  - ○ Bat Hibernacula (Wildlife Bat; Bat Roost Sites and Winter Hibernacula).
- Limiting NSO-26 (Occupied Native Cutthroat Trout) to only include green lineage ssp.
- Removing CSU stipulations from the following:
  - ○ Relic Plant Communities
  - ○ Extensive Recreation Management Areas (ERMA)
- Reducing the 5.0-mile CSU buffer for the Old Spanish Trail to ½ mile.
- Changing the Paleontological CSU stipulation to a lease notice.
- Removing the Right-of-Way (ROW) avoidance areas from the following areas:
  - ○ Slopes over 30%
  - ○ Relic & Rare Plant Communities.
- Reducing the Hydrologic River ROW avoidance buffer from 1,000 feet to 400 feet.
- Reducing the 325-foot NSO buffer around perennial streams, wetland, and riparian areas to a 50-foot CSU buffer.
- Removing the ROW exclusion from the Roubideau SRMA Recreation Managment Zone 1.
- Reducing the San Miguel River Area of Critical Environmental Concern (ACEC) by 1,120 acres to a total of 21,660 acres to focus on the Relevant and Important Values of the proposed ACEC. This results in the total proposed ACEC designation increasing in the Agency-Proposed Alternative (E) by 190 acres over Alternative A (No Action).
- Reducing the boundary for the San Miguel River SRMA by 6,490 acres to better align with physical boundaries rather than jurisdictional boundaries.

Prior to release of the PRMP/FEIS, BLM UFO biological staff determined that these changes to the Agency-Proposed Alternative (E) do not affect the species or habitat which were consulted on via the above mentioned BA, and therefore the determinations therein remain unchanged and appropriate, which has been previously discussed between Ken Holsinger and Kurt Broderdorp. If the Service would like a more detailed assessment of the changes to the Agency-Proposed Alternative (E) or any specific elements of the associated BA, please contact BLM UFO staff to discuss any procedural preferences or Gregory Larson, UFO Manager by phone at 970-240-5311 or email at glarson@blm.gov.

| | |
|---|---|
| **From:** | Connell, Jamie E |
| **To:** | Shoop, Gregory P; Barangan, Jayson C; Gilbert, Megan A; Connolly, Stephanie A |
| **Subject:** | Fwd: [EXTERNAL] FW: Letter from Sen. Bennet re BLM Uncompahgre Field Office |
| **Date:** | Tuesday, October 22, 2019 10:56:21 AM |
| **Attachments:** | San Miguel BLM Protest comments 7.29.2019.Final.pdf |

FYI and followup as appropriate.

*Jamie*

Jamie E. Connell
Department of the Interior Upper Colorado Basin, Region (R7)
BLM Colorado State Director

office: 303-239-3700

---------- Forwarded message ---------
From: **Whitney, John (Bennet)** <John_Whitney@bennet.senate.gov>
Date: Mon, Oct 21, 2019 at 9:14 PM
Subject: [EXTERNAL] FW: Letter from Sen. Bennet re BLM Uncompahgre Field Office
To: jconnell@blm.gov <jconnell@blm.gov>

Jamie

One more attachment too large for first email.

John

BLM_0166882



# BOARD OF COMMISSIONERS

## HILARY COOPER   KRIS HOLSTROM   LANCE WARING

July 29, 2019

Director (210)
Attention: Protest Coordinator, WO-210
20 M St SE, Room 2134LM
Washington, D.C. 20003

Via electronic submission button ([https://eplanning.blm.gov/epl-front-office/eplanning/comments/commentSubmission.do?commentPeriodId=77137](https://eplanning.blm.gov/epl-front-office/eplanning/comments/commentSubmission.do?commentPeriodId=77137)) and overnight (non-USPS) delivery.

> RE: San Miguel County, Colorado Protest of the Proposed Resource Management Plan (PRMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO), June 2019

Dear Director,

Please accept this timely protest which is filed in accordance with 43 C.F.R. § 1610.5-2.

**Statement of Resource Management Plan Being Protested:**
We are protesting the Proposed Resource Management Plan (PRMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO) released to the public on June 28, 2019.

**This protest is submitted by the Board of County Commissioners (BOCC), San Miguel County, Colorado (SMC).**

> **Protester**
> **Name:**  Board of County Commissioners, San Miguel County, Colorado
> **Address:** Via U.S. Mail – PO Box 1170, Telluride, CO 81435
>     Via Delivery (non-USPS) – 333 West Colorado Avenue, 3rd Floor, Telluride, CO 81435
> **Phone:** 970-728-3844
> **Email:**  bocc@sanmiguelcountyco.gov

BLM_0166883

**Statement of Protester's Interest:**

The San Miguel County (SMC) Board of County Commissioners (BOCC) are responsible for ensuring health, safety and welfare—including environmental health—within the County. Watershed health, soil health and protection of wildlife habitat are essential elements of San Miguel County. SMC has collaborated, cooperated and coordinated with federal land agencies on federal land planning and projects. Sixty percent of the land in San Miguel County is federal public land with another 4 percent being owned by the State of Colorado. Only 36 percent of San Miguel County consists of private land. San Miguel County is 70.6 percent federal mineral estate.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, especially Gunnison sage grouse (GuSG) critical habitat, by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat. San Miguel County has financially contributed approximately $2 million for GuSG habitat conservation and improvements through the County's Land Heritage Program, co-funding of the Gunnison sage-grouse Working Group and funding of other actions intended to provide direct benefits to GuSG recovery and resilience. SMC continues to actively participate with the stakeholder group that developed the Gunnison sage-grouse Rangewide Conservation Plan and is currently participating in the U.S. Fish and Wildlife Service's 5-year species status review, Species Status Assessment, Recovery Plan and Collaborative Action Plan.

San Miguel County commissioned "A Natural Heritage Assessment San Miguel and Western Montrose Counties, Colorado," prepared by the Colorado Natural Heritage Program in 2000, which identified several areas having high biodiversity as Potential Conservation Areas (PCAs). [1] Citizens of San Miguel County have long recognized the need to plan for the conservation of plants and animals that are native to the San Miguel And Dolores River Basins and have demonstrated their desire to protect significant natural heritage and natural resources by organizing the San Miguel Watershed Coalition, San Miguel Conservation Foundation, San Miguel County Open Space Commission, San Miguel County Land Heritage Program and providing co-funding of collaborative groups such as the previously mentioned Gunnison sage-grouse Working Group and the Public Lands Partnership.

In addition, San Miguel County elected officials, staff and liaisons regularly and vigorously participate publicly and as a cooperating agency in federal public lands planning processes. We have participated throughout the BLM UFO RMP planning process as a cooperating agency and through official public comment periods. SMC has been a cooperating agency with BLM UFO for this RMP revision process since June 10, 2010 when an MOU was signed (attached). We are similarly a cooperating agency for the BLM Gunnison Sage-Grouse (GuSG) Resource Management Plan Amendment (RMPa) process (MOU attached) which was expected to amend or be inserted into the GuSG portion of this plan. We have a 2017 MOU with the UFO to emphasize continued SMC and UFO consultation, coordination, cooperation, collaboration and communication in land use actions and ratifying our partnership for the continued coordination and cooperation for implementation of the "Connecting with Communities" Recreation Strategy (attached). We

---

[1] http://www.cnhp.colostate.edu/download/documents/2000/San_Miguel_and_Western_Montrose.pdf

BLM_0166884

commented on the Section 368 Corridor Review (attached) which is reviewing an energy corridor that intersects San Miguel County and the UFO.

Additional recent and ongoing planning processes that SMC is actively participating in include the BLM Tres Rios Field Office (TRFO) RMP/FEIS; BLM TRFO Travel Area Planning (TAP) process; BLM TRFO Areas of Critical Concern (ACEC) RMP amendment process; Alpine Ranger coalition with the BLM, US Forest Service (USFS); the USFS Grand Mesa, Uncompahgre and Gunnison National Forests (GMUG) Forest Plan Revision process; USFS Spruce Beetle Epidemic and Aspen Decline (SBEADMR); Uncompahgre Collaborative Forest Restoration project and others.

Federal lands agency resource management plans and forest plans directly impact San Miguel County's mandate to provide health, safety and welfare services to our citizens and visitors. They impact our socio-economic opportunities, environmental quality and quality of life. We will continue to participate in the planning process for the BLM UFO RMP.

**Issues Being Protested:**

1. **Excessive delay between the Draft RMP/EIS (DRMP/DEIS) and Proposed RMP/Final EIS (PRMP/FEIS) and development of a substantially new agency alternative without providing a public comment period.**

2. **Inadequate Public Comment opportunity without all supporting data and files being made publicly available for the full Protest Period.**

3. **References to the Gunnison sage grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.**

4. **Inadequate NEPA analysis and protections for water bodies, aquatic, wetland, and hydrologic resources, source water protection areas, domestic water supplies and cultural resources for fluid mineral leasing and surface disturbing activities.**

5. **General Wildlife: Failure to follow Colorado Parks & Wildlife (CPW) recommendations and guidelines for wildlife species, including Gunnison sage grouse, aquatic species, desert bighorn sheep and big game migration corridors. Lack of consistency with CPW Best Management Practices (BMPs), species-specific stipulations and ungulate winter range protection. In all cases, BLM UFO RMP should require collaboration, coordination, cooperating and consulting with CPW on wildlife species and habitats.**

6. **San Miguel River: Inadequate visual resource management protection of the San Miguel River Corridor, adjacent Scenic Byways, and San Miguel River ACEC and inadequate management of lands within the proposed San Miguel River Expansion ACEC.**

3

*San Miguel County, Colorado*

7. **Burn Canyon: Failure to appropriately manage Burn Canyon as a Special Recreation Management Area (SRMA) vs. an Extensive Recreation Management Area (ERMA) or provide management direction for appropriate visual resource management protection and protection of sensitive riparian areas from motorized or mechanized uses or surface occupancies.**

8. **Dolores River: Inadequate management direction to protect the lands within the analyzed Dolores River Slickrock Canyon ACEC to protect and prevent degradation of the significant natural, biological, cultural, recreational and scenic resources and values.**

9. **San Miguel River Segment 1 and Beaver Creek Segment ORVs are incompatible with hydro, solar, wind, and mineral development.**

10. **Lands Identified for Disposal: San Miguel County opposes Lands Identified for Disposal within San Miguel County that are within 4-miles of a Gunnison sage grouse lek, adjacent to or intersecting Gunnison sage grouse Critical Habitat, contain Public Rights-Of-Way, contain Lone Cone Reservoir and are adjacent to private land conserved for Gunnison sage grouse Habitat.**

11. **The Proposed PRMP/FEIS does not adequately consider the consequences of climate change.**

12. **Underlying analysis of uranium and other locatable minerals is factually incorrect which renders the analysis of the direct, indirect and cumulative impacts arbitrary, capricious and factually incorrect.**

**Detailed Discussion of Issues with Identification of Parts of the Plan Being Protested:**
Our discussion of each of these issues below provides a statement of the part(s) of the plan being protested (including Chapter, Section, Page and/or Map) with a concise statement explaining why the State Director's decisions are believed to be wrong.

**Excessive delay between the Draft RMP/EIS (DRMP/DEIS) and Proposed RMP/Final EIS (PRMP/FEIS) and development of a substantially new agency alternative without providing a public comment period.**
The Draft RMP/DEIS was released in 2016 and the Proposed RMP/FEIS was released in June 2019 with an entirely new Agency Preferred Alternative. The 30-day protest period does not provide adequate time for a thorough analysis or comparison of the alternatives, especially the previous Agency Preferred Alternative D and the new Preferred Alternative E. The 30-day protest period does not allow for public comment and restricts the ability to protest to those that have commented in the past and restricts content to issues that have been raised in the past. In the three years since the Draft RMP was released, there may be new stakeholders who should have the ability to comment on a Resource Management Plan that is intended to guide land-use

4

BLM_0166886

*San Miguel County, Colorado*

decisions for at least the next decade. Also, the release of a new Alternative may raise new issues that were not commented on in the past. Without adequate time for review, adequate analysis is not possible by the public and cooperating agencies.

The DRMP/DEIS was released for review May 20, 2016. San Miguel County commented on the DRMP/DEIS in October 2016. We received UFO agency responses to our October 2016 comments in April of 2018. The BLM Southwest Resource Advisory Council (RAC) examined a range of alternatives presented by UFO in February of 2013 and a more timely review should be allowed.

Volume 1, Page I-9 of the Proposed RMP states that following the introduction of the agency preferred alternative in the DRMP/DEIS there was a 150-day comment period incorporating a 60-day extension and six open houses in six Planning Area communities. In contrast, following the PRMP/FEIS with a NEW Alternative there is no opportunity for comment, minimal public outreach and no open houses.

Given the 30-day Protest Period, SMC worked diligently to review the over 4000-page document provided and requested additional information to improve our ability to analyze in the short period of time. GIS other supporting data and documents were not provided on a timely basis for us to adequately understand the potential impacts of the new Alternative.

**Requested Remedy:**  BLM should rescind the Proposed RMP and release the new Alternative as a Draft RMP with a 60-day comment period.

**Inadequate Public Comment opportunity without all supporting data and files being made publicly available for the full Protest Period.**
Issue Reference Citations:
- Volume I, Executive Summary, Page ES-1
- Volume I, Chapter 2, Page 2-5 and Table 2-2
- Volume II, Appendix A, Figures (Pages A1-A267)
- https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86012
- https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86011

The 30-day Protest Period was initiated by the publication of the official Notice of Availability in the Federal Register on Friday, June 28, 2019. At that time there were no GIS files newer than June 2016 available on the e-planning website[2]. There were no GIS data files for the new

---

[2] https://eplanning.blm.gov/epl-front office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86004

BLM_0166887

proposed alternative. After SMC staff requested the current GIS files, they were made available on July 11, 2019. SMC staff identified at least one important supporting data file (Lands Identified for Disposal) still missing from the BLM's e-planning data web page[3]. This file was emailed to SMC staff on July 16, 2019, but as of July 21, 2019 is still not publicly available. Lands Identified for Disposal is a topic which was previously a SMC subject of concern and detailed comments from San Miguel County were provided for the agency preferred alternative to the DRMP/DEIS in 2016. The PRMP/FEIS maps in Volume II, Appendix A are at a scale that shows the entire UFO decision area across six counties. This scale is not conducive to reviewing a 40-acre proposed disposal parcel in context.

Additionally, this scale does not allow for examination of proposed actions and the proposed decision to inform comments and plan understanding. The BLM is required to consult with local governments and citizens regarding site-specific knowledge when making land-use decisions. GIS data files and interactive maps similar to the "Story Maps" made available online by the USFS as part of the Grand Mesa, Uncompahgre, and Gunnison National Forests Plan Revision are needed to examine how the proposed actions affect lands and resources and allow informed input to ensure the best land-use decisions.

Page ES-1 of the PRMP states, "This website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process."

This statement is not true and over half of the protest period has passed without the agency publicly posting relevant maps and GIS data to inform reviews of the new proposed alternative. All relevant supporting material upon which the agency's alternative has been based or which contains proposed management codes and administrative or designated area boundaries must be provided at the onset of the protest or public comment period.

There is a significant difference between the objective of Alternative D, the agency preferred alternative in the DRMP/DEIS which described incorporating a "balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses,"[4] and the new Proposed Alternative E, which is described by the BLM as a "reasonable combination of objectives and actions from A, B, C, and D"[5]. There is no rationale provided for this significant switch to determine if it is actually "reasonable." "Reasonable" is a subjective term that should not be used for an official Agency Preferred Alternative.

SMC would like the time to conduct a thorough GIS analysis of the Ecological Emphasis Areas, included in Alternative D and eliminated from Alternative E to determine any potential loss of protection of resources.

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86012

[4] PRMP/FEIS Page 2-5

[5] PRMP/FEIS Page 2-5

6

BLM_0166888

*San Miguel County, Colorado*

**Requested Remedy:**  BLM should rescind the Proposed RMP based on the numerous substantive changes made to the alternatives without public and cooperating agency access to complete supporting materials and GIS files at the initial time of publication. Further supplemental analysis is required. An adequate public comment period is warranted due to the introduction of a new Alternative and lack of supporting documentation for review. <u>All</u> supporting background and data should be publicly available at the beginning of the comment period or protest period.

**References to the Gunnison Sage Grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.**

Issue Reference Citations:

- Volume I, Pages 1-8, 1-9, 2-38, 2-113, 2-129, 2-130, 3-45, 3-48, 3-52, 3-59, 3-62, 4-13, 4-126, 4-128, 4-129, 4-133, 4-138, 4-141, 4-144, 4-148, 4-149, 4-176, 4-362, 4-363, 4-364, 4-365, 4-366, 4-370, 4-371, 4-372, 4-373, 4-374, 4-375, 4-376, and 4-474
- Volume I, Appendix A, Figure 2-92
- Volume I, Appendix B (all)
- Volume II, Chapter 5, Page 5-2
- Volume III, Appendix T, Pages T-113, T-114, T-115, T-116, T-117, T-235, T-239, T-244, T-245, T-251, T-255, T-256, T-259, T-408, T-409, T-412, T-464, T-465, and T-466

The Gunnison sage grouse (GuSG) was listed as a threatened species under the Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).

San Miguel County, a Cooperating Agency, and the general public are denied the opportunity to adequately review the new Proposed Alternative E in the PRMP/FEIS for GuSG and habitat impacts. It is unclear how the proposed actions in the PRMP/FEIS were contemplated by the BLM's referenced Biological Assessment, which has not been made available or contemplated by the USFWS's Biological Opinion (BO), referenced in the PRMP/FEIS as having been signed on December 17, 2018, and also not provided for review.[6] The PRMP/FEIS was published in the Federal Register on June 28, 2019. A Biological Opinion is a document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened or endangered species.

According to the PRMP/FEIS (page 5-2), the Biological Opinion was issued "concurring with the determinations that the Proposed RMP: 1) may affect, but is not likely to adversely affect, the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado

---

[6] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018.

BLM_0166889

pikeminnow, razorback sucker, bonytail, and humpback chub; and 2) may affect, and is likely to adversely affect, Colorado hookless cactus, clay-loving wild buckwheat (including designated critical habitat), and Gunnison sage grouse (including designated critical habitat) (USFWS 2018d)."

In 2016, San Miguel County provided substantial comments on the DRMP/DEIS treatment of the GuSG and critical habitat, which took into consideration that there was a more robust Gunnison Sage Grouse Rangewide RMP Amendment process underway which was considering making all GuSG critical habitat an Area of Critical Environmental Concern and was considering protective stipulations for not just BLM lands designated as habitat and/or within 4-miles of GuSG leks, but also split estate.

At the time of release of this PRMP/FEIS, the Gunnison Sage Grouse Rangewide RMP Amendment has been canceled and the process ended. This new situation changes the context and importance of comments and input into the need for necessary land protection, resource allocation and stipulations to protect and enhance GuSG populations and habitat within the UFO.

San Miguel County desired the GuSG Rangewide RMP Amendment[7] to modify and strengthen the UFO RMP measures after completion of this UFO RMP. Although we have not had adequate time to thoroughly review the PRMP/FEIS we do find that it allows for discretion to waive the protective stipulations that are present in the new Proposed Alternative E.

San Miguel County has been participating in the Section 368 West Wide Energy Corridor review process[8] since the DRMP/DEIS was released. SMC recommended relocation of the corridor going north-south through SMC because it would have significant negative impacts on GuSG. SMC provided these comments to responsible officials at the UFO and discussed them in-person in 2018.

We are attaching our comments on both the Section 368 West Wide Energy Corridor and the GuSG Rangewide RMP Amendment DRMP/DEIS.

**Requested Remedies:**

1.      Provide the BLM's Biological Assessment and the USFWS Biological Opinion for review and clarify whether the BO was based on the June 28, 2019 PRMP/FEIS or a different alternative.  UFO should incorporate any recommendations of the Biological Opinion into the PRMP/FEIS.  Cooperating Agencies and the public should be allowed to comment on the new Proposed Alternative E within the current context of no forthcoming GuSG

---

[7] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681
[8] http://corridoreis.anl.gov

BLM_0166890

*San Miguel County, Colorado*

Rangewide RMP Amendment. This PRMP/FEIS fails to adequately protect GuSG or address split estate.

2.  The UFO should fully follow and incorporate the recommendations of the Biological Opinion for GuSG[9] and the 2005 Rangewide Conservation Plan[10] which include:

    a.  *Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.*

    b.  *Coordinate with Colorado Parks & Wildlife in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e., unoccupied critical habitat).*

    c.  *Improve habitat within currently occupied and adjacent potential habitats.*

    d.  *Protect suitable unoccupied habitat areas from permanent loss.*

    e.  *Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.*

3.  The BLM should not allow stipulations intended to protect GuSG to be available for administrative waivers, exceptions and modifications without clear criteria and process. The UFO RMP Proposed Alternative should follow the following guidance of the Biological Opinion[11]:

***Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:***
*\*\*Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:*

1.  *Topography/areas of non-habitat create an effective barrier to impacts*
2.  *No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).*
3.  *The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to land ownership patterns).*

*\*\*In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above*

---

[9] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Pages 27-28
[10] https://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[11] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Page 28

BLM_0166891

*San Miguel County, Colorado*

*Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.*

*•Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).*

> 4. *Incorporate the management prescriptions and protective ACECs developed for the Gunnison sage grouse Rangewide RMP Amendment into the UFO RMP, since the Gunnison Sage-Grouse Rangewide RMP process is no longer active. BLM and Cooperating Agencies invested many years into researching and developing that RMP. See Attachment 3.*

> 5. *Un-designate or relocate the portion of the Section 368 West Wide Energy Corridor that goes through San Miguel County. There is no ROW on non-federal land that will not significantly impact GuSG habitat.  See Attachment 4.*

**Inadequate NEPA analysis and protections for waterbodies, aquatic, wetland, and hydrologic resources, source water protection areas, domestic water supplies and cultural resources for fluid mineral leasing and surface disturbing activities.**

Issue Reference Citations:

- Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Non-energy Solid Leasable Minerals
- Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative

The fluid mineral leasing acreage in the new Proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition. The current RMP predates the concerns for Canada lynx, Gunnison sage grouse and many new conditions that have developed, including new science and data regarding climate change. There is no explanation for the changes in the new Proposed Alternative E.  The acreage identified for NSO is significantly reduced in the new alternative. Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), ad CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

***Requested Remedy:***  The fluid mineral leasing acreage significantly changes from Alternative D to Alternative E and the BLM must allow for adequate public comment and re-consider Cooperating Agency input prior to a protest period for this new Proposed Alternative which significantly reduces protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural

BLM_0166892

and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

**General Wildlife: Failure to follow Colorado Parks & Wildlife recommendations and guidelines for wildlife species, including Gunnison sage grouse, aquatic species, desert bighorn sheep and big game migration corridors. Lack of consistency with CPW Best Management Practices (BMPs), species-specific stipulations and ungulate winter range protection. In all cases, BLM UFO RMP should require collaboration, coordination, cooperating and consulting with CPW on wildlife species and habitats.**

Issue Reference Citations:

- Volume I, Chapter 2
- Volume I, Table 2-2, especially, but not limited to Fish & Wildlife, Special Status Species, and Livestock Grazing
- Volume II, Chapters 4-5 and Appendix B
- Volume III, Appendix K
- Volume IV, Appendix T, Description of Alternatives

San Miguel County works closely with State of Colorado wildlife biologists and CPW staff to ensure the protection of wildlife and habitat in the county. The Final RMP should fully incorporate protective stipulations including NSO's, timing limitations and best management practices in collaboration and consultation with CPW. San Miguel County continues to support Alternative D's overall direction on Page 2-127: "Alternative D's overall management direction is similar to Alternative B, with additional direction to promote ecosystem integrity and protect and restore ecosystem processes. As a result, Alternative D would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats."  In contrast, Alternative E, through the seemingly less restrictive Controlled Surface Use stipulation reduces protections according to the overall management direction on Page 2-127: "The BLM's overall management direction and associated impacts would be similar to Alternative D, although across fewer acres and with less-protective stipulations (i.e., CSU versus NSO)."

***Requested Remedy:*** Incorporate the additional details for desired conditions, standards suggested by CPW and best management practices related to the management, preservation, and consideration of fish and wildlife species and habitat. Fully incorporate previous CPW requests offered during the DRMP/DEIS comment period on Alternative D, through their specific comments on GuSG, aquatic species, bighorn sheep, land health standards and stipulations for fluid mineral leasing and other surface disturbing activities.

**San Miguel River: Inadequate visual resource management protection of the San Miguel River Corridor, adjacent Scenic Byways, and San Miguel River ACEC and inadequate management of lands within the proposed San Miguel River Expansion ACEC.**

Issue Reference Citations:

- Volume I, Page 2-160 to 2-161

BLM_0166893

*San Miguel County, Colorado*

- Volume II, Appendix B
- Volume IV, Page T-490 and T-491
- Volume I, Appendix A: Figures 2-84 [Alternative B], 2-85 [Alternative C], 2-86 [Alternative D], and 2-103 [Alternative E]
- Index, Page I-1, Entire list of ACEC references as they apply to the San Miguel River and San Miguel River Expansion ACECs.

The lands within the existing San Miguel River ACEC currently have a visual resource management protection level of VRM-II (V-2). The Proposed Alternative will change that to VRM-III (V-3). The PRMP/FEIS will treat the San Juan Skyway as VRM Class III and Unaweep/Tabeguache Byway as VRM Class III within 0.5 mile of the road. Visual resources are extremely important to San Miguel County's economy, tourism, and quality of life (see Attachments 1 and 2). The San Miguel River Canyon should be given the greatest possible visual resource management level, no less than a VRM-II.

The BLM describes VRM-II class and objective as follows: "To retain the existing character of the landscape. Allowed Level of Change: The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape." VRM Class III Objective is described as follows: "To partially retain the existing character of the landscape. Allowed Level of Change: The level of change to the characteristic landscape should be moderate. Management activities may attract attention, but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape."[12]

Proposed Alternative E removes the stipulation presented in Alternative D for excluding wind, solar, and hydropower from the San Miguel River ACEC and changes it to avoidance. We have not had adequate time for review of these new and significantly changed stipulations and how they will be put into practice. Due to the strong support from our business, recreation and conservation communities, we continue to support the exclusion of any impacts that would alter the native character and scenic beauty of the San Miguel River corridor and its scenic, recreational, vegetation and wildlife values.

To provide cohesive management and avoid conflicts with recreation and ecological values of the San Miguel River Canyon, San Miguel County believes the final alternative and decision should include the San Miguel River Expansion ACEC and the protective management stipulations described in Alternative B of the DRMP/DEIS.

***Requested Remedy:*** Manage the San Miguel River ACEC and lands within the San Juan Skyway and Unaweep/Tabeguache Byway as VRM Class II. It is unacceptable to diminish the VRM Class and objective of these lands so that objective is to only "partially retain" the existing scenic

---

[12] http://blmwyomingvisual.anl.gov/vr-mgmt/blm/index.cfm

BLM_0166894

character. Incorporate the management prescriptions and designate the San Miguel River Expansion ACEC as described in Alternative B.

**Burn Canyon: Failure to appropriately manage Burn Canyon as a Special Recreation Management Area (SRMA) vs. an Extensive Recreation Management Area (ERMA) or provide management direction for appropriate visual resource management protection and protection of sensitive riparian areas from motorized or mechanized uses or surface occupancies.**

Issue Reference Citations:

- Volume I, Page 2-11, 2-84 to 2-91, 3-112, 3-113, 4-6, 4-212, 4-276, 4-283, 4-284, 4-291, 4-296, 4-298, 4-305
- Volume II, Appendix B
- Volume IV, Appendix T
- Index, Page I-3, I-4, and I-8, Entire lists of SMRA and ERMA references as they apply to the Burn Canyon SMRA or Burn Canyon ERMA

In our previous comments, San Miguel County requested to have Burn Canyon managed as an SRMA vs and ERMA, primarily to retain the sensitive riparian areas in the drainages as non-motorized areas. We requested that if the Burn Canyon is managed as an ERMA, it be given a clear NSO, with the riparian areas in the canyons closed to motorized and mechanized uses. We requested that these areas have VRM-II to further protect the scenic resources. The Proposed Alternative E significantly alters the previous Agency Alternative and removes stipulations for CSU. This is a major change of use in areas considered during the trail planning stages for Burn Canyon to be sensitive habitats which should be avoided.

Burn Canyon and Naturita Canyon were analyzed in Alternative B as Ecological Emphasis Areas. San Miguel County recommended in our 2016 comments (Attachment 2) that the full Naturita Canyon EEA as described in Alternative B and stipulations for the Burn Canyon EEA and the Naturita Canyon EEA presented in Alternative B be incorporated into the final alternative and decision.

*Requested Remedy:* Burn Canyon should be managed to limit recreational activities to non-motorized, non-mechanized, backcountry primitive types of recreation in the sensitive scenic and riparian areas within the canyon terrain. These areas should be VRM-II. See Attachments 1 and 2. SMC continues to support the management stipulations for the Naturita Canyon EEA and Burn Canyon EEA, as described in Alternative B of the DEIS/FEIS.

**Dolores River: Inadequate management direction to protect the lands within the analyzed Dolores River Slickrock Canyon ACEC to protect and prevent degradation of the significant natural, biological, cultural, recreational and scenic resources and values.**

Issue Reference Citations:

- Volume I, Chapter 2, Including Table 2-2
- Volume II, Chapter 4, Tables 4-69 through 4-72

13

- Volume IV, Appendix T
- All references to Dolores River Slickrock Canyon ACEC and SRMA in Volume II, Index Pages I-1 and I-8.

Management of the Dolores River Slickrock Canyon ACEC should  protect and prevent damage to the significant "scenic, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub and sensitive plant communities, including sensitive species Kachina daisy and Naturita milkvetch. Not including recognition or protection for these resources, plants and animals will likely result in the degradation of significant natural, biological, cultural, recreational and scenic values that are unique to the Dolores River Slickrock Canyon. SMC continues to support the Dolores River Slickrock Canyon ACEC considered in Alternative B of the DRMP/DEIS which was adequate to protect the unique landscape and ecosystems of this section of the Dolores River. SMC continues to support the following stipulations for this section of the Dolores River; ROW exclusion, No Lease, No Ground Disturbance, No Recreational Mining, No Commercial Seed Collection, No Commercial Wood Collection, No Campfires, Camping Only In Designated Sites, Petition Sec of Interior to withdrawal for locatable minerals and exclusion from hydro, solar, and wind energy developments.

***Requested Remedy:***  At a minimum, return to the management levels contained in Alternative D and summarized on Page T-49 and designate a Dolores River Slick Canyon ACEC, which provides a balance between the management levels warranted and other input:
"Manage 9,780 acres as the Dolores River Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:

- Close to motorized and mechanized travel.
- Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades and fences, as needed for resource protection.
- Allow dispersed camping unless otherwise posted.
- Prohibit open campfires: require use of fire pans, stoves, or grills.
- Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.
- Close to wood product sales and/or harvest.
- Require porta-potties for overnight use if restroom is not available.
- Manage as VRM Class II.
- Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC*. Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)
- Manage as ROW avoidance.
- Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.
- Allowable Use: Close to mineral materials disposal.
- Allowable Use: Close to non-energy solid mineral leasing.

BLM_0166896

The Dolores River SRMA offers some management protection for a lesser extent of the Dolores River Slickrock Canyon, however, stipulations for fluid mineral leasing and other surface disturbing activities are subject to administrative waiver or modification where they would be in effect and if allowed could severely degrade the unique and sensitive conditions of the Dolores River Slickrock Canyon area.

**San Miguel River Segment 1 and Beaver Creek Segment ORVs are incompatible with hydro, solar, wind, and mineral development.**
Issue Reference Citations:
- Wild and scenic river (WSR), 1-5, 2-124, 2-157, 3-118, 3-128, 3-129, 4-47, 4-60, 4-83, 4-104, 4-107, 4-148, 4-193, 4-209, 4-301, 4-313, 4-321, 4-396, 4-400, 4-405, T-25, T-43, T-49, T-163
- Volume II, Appendix A, Figures
- Appendix P

Similar to Alternative D of the DRMP/DEIS, new Proposed Alternative E finds the San Miguel River Segment 1 is Suitable and recommended for a Recreational classification with Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology Outstandingly Remarkable Values (ORVs). Beaver Creek is Suitable and recommended for a Recreational classification with Vegetation ORV.  Unlike Alternative D, the protective stipulations provided in the new Alternative E omit exclusion of hydro, solar, or wind energy. This will allow inappropriate and incompatible development of marginal renewable energy resources in these segments.

***Requested Remedy:*** Retain the stipulations that exclude wind, solar, and hydro from Beaver Creek and San Miguel River Segment 1. Review Attachment 1 and consider the list of stipulations that are warranted for these segments and the lands within the San Miguel River ACEC, San Miguel River Expansion ACEC and San Miguel River SRMA. These stipulations provide appropriate and warranted protection and management for these areas which provide irreplaceable scenic beauty, ecological services that protect watershed and forest health, habitat and recreation opportunities that are important to our environmental quality and economy.

**Lands Identified for Disposal: San Miguel County opposes Lands Identified for Disposal within San Miguel County that are within 4-miles of a Gunnison sage grouse lek, adjacent to or intersecting Gunnison sage grouse Critical Habitat, contain Public Rights-Of-Way, contain Lone Cone Reservoir and are adjacent to private land conserved for Gunnison sage grouse habitat.**
Issue Reference Citations:
- Volume III, Appendix N, Page N-6
- Volume II, Appendix A, Figure 2-62 and Table 2-2 (Page 2-12)

Three parcels are in the PRMP/FEIS proposed alternative as Lands Identified for Disposal within San Miguel County on Page N-6:

BLM_0166897

*San Miguel County, Colorado*

N. Legal Descriptions of Lands Identified for Disposal

| Township | Range | Section | Aliquot Lot Tract | Acres | Alt A | Alt B | Alt C | Alt D | Alt E BLM Proposed |
|----------|-------|---------|-------------------|-------|-------|-------|-------|-------|--------------------|
| 43 N | 13 W | 12 | NESW | 40 | No | Yes | No | Yes | Yes |
| 44 N | 13 W | 24 | NESE | 40 | Yes | Yes | Yes | Yes | Yes |
| 44 N | 13 W | 35 | NWSW | 40 | Yes | Yes | Yes | Yes | Yes |

The three parcels are within Lone Cone and Gurley Reservoir areas. The parcel within T43 N R13 W Section 12 intersects Lone Cone Reservoir and is surrounded by Gunnison sage grouse critical habitat (Figure VIII.a below). The parcel is within 0.25 miles of the active Lone Cone Lek complex. It is less than one mile from a historic lek. Due to the conflicts with existing uses, water rights, access and Gunnison sage grouse critical habitat, San Miguel County opposes this action.

The parcel within T44 N R13 W Section 35 intersects and is adjacent to Gunnison sage grouse critical habitat (Figure VIII.a below). The parcel is within 1.25-1.5 miles of the active Lone Cone Lek complex and an additional historic lek. It is surrounded by private land with a conservation easement in place to protect Gunnison sage grouse habitat. There is a BLM route (undesignated) on this parcel and aerial imagery shows tracks that connect to adjacent land. Due to the conflicts with existing uses, access, and Gunnison sage grouse critical habitat and lands conserved for Gunnison sage grouse, San Miguel County opposes this action.

The parcel within T44 N R13 W Section 24 is adjacent to private land with a conservation easement in place to protect Gunnison sage grouse habitat (Figure VIII.a below). The parcel is within 3-4 miles of the active Lone Cone and Beaver Mesa Lek complex and additional historic leks. There is a BLM route (undesignated) on this parcel and aerial imagery shows tracks that connect to adjacent land.  Due to the conflicts with existing uses, access, and Gunnison sage grouse critical habitat and lands conserved for Gunnison sage grouse, San Miguel County opposes this action.

San Miguel County is opposed to any land disposal that interferes with public or private land access, water rights and irrigation and the protection of Gunnison sage grouse habitat or populations. The GIS shapefile of the Lands Identified for Disposal was not made publicly available for the protest period or for the 2016 DRMP/DEIS, which should be considered to be a procedural error.

BLM_0166898

*San Miguel County, Colorado*



T44N R13W Section 24, NESE

T44N R13W Section 35, NWSW

T43N R13W Section 12, NESW

Figure VIII.a: Showing the locations of the three parcels identified for disposal in the new Proposed Alternative

*Requested Remedy:* BLM should not include the three parcels above within San Miguel County as "Lands Identified For Disposal" in the final decision due to conflicts with existing water rights and Lone Cone Reservoir, conflicts with existing access routes between public and private lands and conflicts with Gunnison sage grouse habitat conservation.

17

BLM_0166899

*San Miguel County, Colorado*

---

**The Proposed PRMP/FEIS does not adequately consider the consequences of climate change.**
Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.
***Requested Remedy***: An adequate PRMP/FEIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with the efforts of the State to meet the State's climate and carbon emission reduction goals.

**Underlying analysis of uranium and other locatable minerals is factually incorrect which renders the analysis of the direct, indirect and cumulative impacts arbitrary, capricious and factually incorrect.**

**Issue Reference Citations:**
- **Volume 1, Chapter 2, 3 & 4**

The current status of the public lands and the likelihood of uranium mining within the project area is set out in Federal District Court Judge Martinez's March 18, 2019 Order (see attachments A-D) dissolving the injunction on lease tracts within the UFO jurisdiction where Dpt of Energy (DOE) manages the minerals and BLM manages the surface. The PRMP/FEIS relies on outdated information and analysis based on the now-invalidated Pinon Ridge Mill license. As stated in the Martinez ruling (page 11): "[T]he supplemental BA [the US Fish and Wildlife Service prepared for the uranium lease tracts jointly managed by BLM and DOE] plausibly and adequately explains why the Piñon Ridge Mill will likely never be constructed, and why substantial uranium mining is not likely to occur anyway". The Pinon Ridge license was revoked by Colorado regulators on April 26, 2018, based on the April 17, 2018 findings entered by Hearing Officer Dana, pursuant to the September 3, 2014 remand order of the Colorado District Judge McGahey that held the license in abeyance. Federal Judge Martinez's Order further confirms that "the only potential location that ULMP-generated uranium ore could be milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox Valley." (page 11). Both of Judge Martinez's conclusions - uranium mining is not likely, and White Mesa is the only potential mill for ore mined from the project area -  must be applied to analysis of all uranium mines, whether part of the relocatable minerals BLM leads or the DOE lease program that BLM serves as the surface management agency.

The PRMP/FEIS - and particularly the decision to adopt the new Alternative E - is devoid of accurate direct, indirect and cumulative impacts analysis of the current legal status or actual conditions that have changed since the DRMP/DEIS was issued.

Due to the lack of time for an adequate review of Preferred Alternative E and the considerable time that has elapsed between the initiation of this RMP Revision and the delay between the DRMP and PRMP/FEIS, we assume there are additional errors of fact, due to lack of current information.

BLM_0166900

***Requested Remedy:*** Based on the considerably extended ten-year planning process for this RMP, we request that the BLM restart the planning process in order to allow for factually correct and current information used to conduct the thorough analysis needed to develop the ultimate preferred Alternative. We also continue to request that the public and cooperating agencies have adequate time to review and comment on all alternatives.

**List of attachments submitted to BLM UFO and DOI during the planning process by San Miguel County:**

1. April 23, 2018: Letter from San Miguel County to UFO.
2. October 31, 2016: Comments from San Miguel County to UFO on the DRMP/EIS.
3. January 9, 2017: Comments by San Miguel County, Colorado Board of County Commissioners regarding the Gunnison Sage Grouse Rangewide Draft Resource Management Amendment/Draft EIS ("GuSG DRMPa"); 81 Fed. Reg. 53503 (August 12, 2016)
4. February 28, 2018: Section 368 West-Wide Energy Corridors Region 2 Review Cooperating Agency Agreements demonstrating SMC is an interested and engaged party:
   a. June 10, 2010, MOU Between SMC and BLM UFO to be a Cooperating Agency for the RMP revision
   b. September 4, 2014, MOU Between SMC and Colorado BLM to be a Cooperating Agency for the Gunnison Sage Grouse EIS
   c. May 3, 2017, MOU Between SMC and BLM UFO establishing a mechanism for consultation, coordination, cooperation, collaboration and communication in land use actions and ratifying our partnership for the continued coordination and cooperation for implementation of the "Connecting with Communities" Recreation Strategy.

**List of additional attachments:**

A. A.Doc 166 Order Dissolving.pdf
B. B.12A1318b Findings Conclusions and Ruling on Remand
C. C.Radiation Management - State Licensing - Revocation - Colorado Radioactive Materials License Number CO 1170-01-1
D. D.Order RE_ Energy Fuels Resources Corporation's Motion to Remand to Hearing Officer

**In summary, the State Director's decision does not comply with NEPA, FLPMA or MOU's signed with San Miguel County, does not consider local land use jurisdiction and contains analysis lacking accurate direct, indirect and cumulative impacts.**

Ther agency preferred alternative introduced in the DRMP/DEIS was shaped through considerable public and cooperating agency input over a six-year period. Volume IV, Section 5.2, Page 5-2 states, "The BLM implemented an extensive collaborative outreach and public involvement process that has included conducting a community assessment (BLM 2009f), coordinating with cooperating agencies, and working closely with the Colorado Southwest Resource Advisory Council and a specially created and sanctioned subgroup of the resource

BLM_0166901

advisory council. ***The BLM will continue to meet with interested agencies and organizations throughout the planning process, as appropriate, and will continue coordinating closely with cooperating agencies and the resource advisory council subgroup.*** [Emphasis added].

Section 5.24, Pages 5-2 to 5-4 also state that, "The BLM invites agency cooperation early in the RMP process using the process outlined in 43 CFR 1501.6. A cooperating agency is any federal, state, or local government agency or Indian tribe that enters into a formal agreement with the lead federal agency to help develop an environmental analysis. More specifically, cooperating agencies "work with the BLM, sharing knowledge and resources, to achieve desired outcomes for public lands and communities within statutory and regulatory frameworks" (BLM Land Use Planning Handbook H-1601-1; BLM 2005a). ***The primary role of cooperating agencies during the planning process is to provide input on issues for which they have a special expertise or jurisdiction.*** [Emphasis added].

The UFO has not satisfied the stated Purpose of the MOU or followed through on certain stated Roles and Responsibilities listed in the Memorandum of Understanding Between San Miguel County and the Bureau of Land Management Uncompahgre Field Office (MOU). In the MOU signed in June 2010 (Attachment 5(a)), the BLM provided in the Purpose that, "...the BLM recognizes a compelling need to ensure that the interests of San Miguel County are accounted for, and that they are meaningfully engaged in...resource management planning effort and associated EIS."

The UFO Roles and Responsibilities are listed in Section V.A(i-iv) of the document:

## V.   ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.   To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide San Miguel County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which San Miguel County provided input due to its special expertise.

iii. To consider and incorporate information and comments provided by San Miguel County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

The San Miguel County Roles and Responsibilities are listed in Section V.B(i-vii) of the document:

BLM_0166902

## B. RESPONSIBILITIES OF SAN MIGUEL COUNTY

San Miguel County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i.  Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii.  To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii.  To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved San Miguel County programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which San Miguel County has special expertise,

- socio-economic data such as demographics, activities and values.

iv.  To review and provide comments during specified review periods on preliminary baseline and other technical reports for which San Miguel County has contributed data or other pertinent information.

v.  To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi.  During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii.  To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

In March 2018, San Miguel County and Cooperating Agencies were invited to meet with UFO and learned about their consideration of new concepts for the RMP. We offered comments on a draft revised Table 2-2 provided to us electronically on March 29, 2018 (see Attachment 1). There was no meaningful opportunity to help develop Alternative E. The public and cooperating agencies have never been given the opportunity to officially comment on this Alternative which introduces completely new concepts and direction. Supporting data including but not limited to, the Biological Assessment, Biological Opinion and GIS files were not made available for all or a significant part of this 30-day Protest Period. It is a procedural error and violation of FLPMA to deny the public an opportunity to comment on materials upon which the BLM bases its decisions. New situations have developed since 2016, such as the halting of the GuSG Rangewide RMP Amendment, which may significantly affect comments received that were contextual to concurrent planning processes and expectations, which have now changed. With the changed

BLM_0166903

condition of the stalled GuSG Rangewide RMP process, this RMP/EIS needs to reconsider GuSG management and protections and allow adequate public comment and cooperating agency collaboration. With the significantly changed status of the Pinon Ridge Uranium Mill, the BLM must revise the analysis of all potential impacts of related land use, environmental and socio-economic considerations.

**RESERVATION**:  Given the time constraints of filing this Protest, San Miguel County may not have addressed all issues. Therefore, San Miguel County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

CONTACT INFORMATION:  Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

Amy Markwell
San Miguel County Attorney
333 West Colorado Ave. 3rd Floor
PO Box 791
Telluride, CO 81435
Ph: (970)728-3879
amym@sanmiguelcountyco.gov

Sincerely,
San Miguel County, Colorado
Board of Commissioners

Kris Holstrom, Chair
Hilary Cooper
Lance Waring

BLM_0166904

Case No. 1:20-cv-02484-MSK   Document 78-1   filed 04/29/21   USDC Colorado   pg 160 of
191
Case 1:08-cv-01624-WJM-NRN   Document 166   Filed 03/18/19   USDC Colorado   Page 1 of 12

Attacment A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 08-cv-1624-WJM-NRN

COLORADO ENVIRONMENTAL COALITION,
INFORMATION NETWORK FOR RESPONSIBLE MINING,
CENTER FOR NATIVE ECOSYSTEMS,
CENTER FOR BIOLOGICAL DIVERSITY, and
SHEEP MOUNTAIN ALLIANCE,

        Plaintiffs,

v.

OFFICE OF LEGACY MANAGEMENT, and
UNITED STATES DEPARTMENT OF ENERGY,

        Defendants.

---

## ORDER GRANTING MOTION TO DISSOLVE INJUNCTION AND DIRECTING ENTRY OF FINAL JUDGMENT

---

        Plaintiffs bring this lawsuit under the Administrative Procedure Act ("APA"),

5 U.S.C. §§ 701 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§§ 4231 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*,

challenging certain decisions made by the United States Department of Energy's Office

of Legacy Management (for purposes of this order, "DOE") concerning a uranium

mining program in southwestern Colorado that DOE oversees.  That program was

known as the Uranium Lease Management Program ("ULMP").  At some point, the

program dropped "Management" from its title and now goes by "ULP," but the Court will

continue to refer to it as "ULMP" for consistency with prior orders.

        In an earlier phase of this lawsuit, the Court enjoined DOE from implementing its

BLM_0166905

most recent decisions regarding the ULMP.  Currently before the Court is DOE's Motion to the Dissolve Injunction ("Motion to Dissolve").  (ECF No. 160.)  For the reasons explained below, the Court will grant this motion, dissolve the injunction, and enter final judgment.

## I.  BACKGROUND

**A.     Early Stages and Original Injunction**

In 2007 and 2008, DOE approved new uranium mining under the ULMP, mostly on lands around Paradox Valley in southwestern Colorado.  Plaintiffs sued in July 2008, claiming that DOE had not satisfied its obligations under NEPA, ESA, and associated regulations when making this decision.  (ECF No. 1.)  Substantive proceedings moved slowly at first due to parallel litigation over collateral matters, and to limited discovery the Court permitted.  (ECF No. 41.)  The case was transferred to the undersigned upon his appointment in February 2011.  (ECF No. 71.)

In October 2011, having finally received full substantive briefing, the Court partially agreed with Plaintiffs' challenges.  *See Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193 (D. Colo. 2011) (ECF No. 94) ("*CEC I*").  Consequently, the Court vacated DOE's environmental review documents, stayed all existing ULMP leases, and enjoined DOE from approving additional leases or other ULMP-related activities on the lease tracts.  *Id.* at 1224.  The Court then invited DOE to "move . . . to dissolve this injunction" after it had "conduct[ed] an environmental analysis on remand that complies with NEPA, ESA, all other governing statutes and regulations, and this Order."  *Id.*

BLM_0166906

**B.      Previous Motion to Dissolve Injunction**

In April 2017, DOE moved to dissolve the injunction.  (ECF No. 147.)  The Court

resolved that motion in February 2018.  *See Colo. Envtl. Coal. v. Office of Legacy*

*Mgmt.*, 302 F. Supp. 3d 1251 (D. Colo. 2018) (ECF No. 151) ("*CEC II*").  The Court

agreed with DOE that it had corrected all previously noted errors, save for one.  The

ESA requires federal agencies to evaluate whether their actions might jeopardize the

habitat of an endangered or threatened species, and this evaluation process may

include consultation with the United States Fish & Wildlife Service ("FWS").  *See id*. at

1269–70.  In this case, the main question was whether reasonably foreseeable uses

and discharges of water in the course of mining and associated activities might

ultimately affect four endangered fish species living in the Colorado River.  *Id*. at 1270,

1273–74.  DOE requested FWS's opinion on the matter (a "Biological Opinion" or

"BiOp") by sending to FWS the DOE's Biological Assessment ("BA") that that water

usage would have at least *some* adverse effect on the endangered Colorado River fish.

*Id*. at 1270.  FWS's resulting BiOp concluded that there was no likelihood of

jeopardizing or threatening those fishes' habitat.  *Id*. at 1270–71.

However, when requesting the BiOp, DOE conveyed to FWS only the forecasted

annual water consumption of ULMP mines, and not water consumption for "other mining

operations expected to coincide with renewed mining on ULMP lease tracts."  *Id*. at

1273.  In particular, DOE's water consumption analysis did not address a uranium mill

planned for Paradox Valley, to be known as the Piñon Ridge Mill:

> Among the many things DOE says about this mill, DOE
> predicts "[a] surge in uranium exploration, mining, and
> permitting . . . if the mill is constructed," referring to mining
> on BLM land rather than ULMP lease tracts.  DOE notes that

3

> the Piñon Ridge Mill would require water as part of its milling
> operations.  DOE does not, however, estimate the mill's
> water requirements, nor the water requirements of the non-
> ULMP uranium mines it predicts will come into existence.

*Id.* (citations omitted; alterations in original).  "Notably," the Court added,

> DOE does not claim that it lacks information from which it
> can reasonably estimate the amount of water the Piñon
> Ridge Mill will likely consume, or the amount of water non-
> ULMP uranium mines will likely consume.  The Court is
> therefore compelled to presume that DOE possesses the
> necessary information.

*Id.* at 1274.

With the ability to predict all water consumption associated with renewed mining

on the ULMP tracts—whether caused by DOE's decision to resume mining there, or

simply coinciding with it and reasonably foreseeable to occur—the Court held that DOE

had acted arbitrarily and capriciously by relying on FWS's resulting BiOp, knowing that

the BiOp was formulated with materially incomplete information.  *Id.*; *see also id.* at

1272 ("An agency acts 'not in accordance with law,' 5 U.S.C. § 706(2)(A), when it fails

to convey material information in its possession to FWS, and the agency behaves

arbitrar[ily] and capriciously when it relies on a BiOp resulting from a materially defective

consultation.").  "Fortunately," the Court continued,

> the remedy in this circumstance does not require total
> vacatur . . . .  Instead, the Court will leave the existing
> injunction in place, for the time being, and order DOE to
> reinitiate consultation with FWS based on a supplemental
> BA.  The supplemental BA may be limited solely to the
> question of water depletion based on DOE's estimates of the
> likely combined annual water usage of ULMP mines, non-
> ULMP mines likely to become operational, and the Piñon
> Ridge Mill.  Upon receiving FWS's response (presumably an
> additional or supplemental BiOp), DOE may then issue an
> updated or supplemental ROD [*i.e.*, record of decision] and
> move once again to dissolve the injunction.  Such a motion

BLM_0166908

> need only address whether DOE fulfilled its ESA § 7
> consultation duties with respect to water depletion that may
> affect Colorado River endangered fish.

*Id.* (footnote omitted).

## C.   Current Motion to Dissolve

By letter dated May 2, 2018, DOE transmitted a supplemental BA to FWS.  (ECF

No. 160-1.)  The supplemental BA reports DOE's efforts to search for all relevant

current or reasonably foreseeable uranium mining and related activities in the area, and

to estimate annual water usage of all these activities.  (*Id.* at 4–7.)  The BA also

tabulates all of the estimated water usage.  (*Id.* at 7–10.)

The most notable development reported in the supplemental BA is that, not long

after this Court issued *CEC II*, a Colorado administrative law judge ruled that the

Colorado Department of Public Health and Environment ("CDPHE") should not have

issued the license under which the Piñon Ridge Mill was to be constructed and

operated.  (*Id.* at 5–6.)  The supplemental BA further reports that CDPHE elected not to

appeal the judge's decision, and "therefore the license [was] revoked as of April 26,

2018."  (*Id.* at 6.)  In this light, the supplemental BA announces that the Piñon Ridge Mill

is no longer a reasonably foreseeable action coinciding with renewed ULMP mining, so

DOE would not consider its potential water usage.  (*Id.*)  However, perhaps out of a

desire not to appear to be shirking the Court's instructions in *CEC II*, DOE included

within the supplemental BA the amount of water the Piñon Ridge Mill had been

expected to consume.  (*Id.*)  DOE also included a parting comment about the changing

uranium market and its potential relationship to the defunct Piñon Ridge proposal:

> Finally, in the [previous BA's] discussion regarding
> cumulative effects from the yet-to-be constructed Piñon

BLM_0166909

Case No. 1:20-cv-02484-MSK   Document 78-1   filed 04/29/21   USDC Colorado   pg 165 of 191

> Ridge Mill, whose licensed was revoked in April 2018, DOE
> cited the following text from that company's reports for the
> mill: "A surge in uranium exploration, mining, and permitting
> is anticipated if the mill is constructed, including permitting
> and development of uranium/vanadium deposits controlled
> by Energy Fuels Resources."  The cited reports were circa
> 2009 to 2012.  This statement may have been appropriate at
> that time; however, since then, various world events
> happened (e.g., Fukushima in 2011) that contributed to
> continued low uranium ore prices—lower than economically
> feasible for new mining or a surge in mining.

(*Id.* at 10–11.)

By letter dated June 19, 2018, FWS responded to DOE's supplemental BA. (ECF No. 160-2.)  As to Piñon Ridge, FWS agreed that it was no longer the sort of reasonably foreseeable action that must be considered.  (*Id.* at 3.)  As to all other data reported in the supplemental BA, FWS announced that its previous BiOp was still accurate in predicting no jeopardy to the Colorado River endangered fishes' habitat. (*Id.* at 2–4.)

Having received this information, DOE moved to dissolve the injunction in July 2018.  (ECF No. 160.)  Plaintiffs remain opposed to dissolving the injunction, except as to ULMP least tracts that will be reclaimed rather than newly mined.  (ECF No. 162 at 9–10.)

## II.  LEGAL STANDARD

In opposing the *first* motion to dissolve, Plaintiffs argued from case law that a party seeking to dissolve an injunction bears a heavy burden to show that circumstances have changed.  (*See* ECF No. 148 at 10–11.)  The Court rejected this argument: "Plaintiffs' cited case law relates to injunctions that were meant to last indefinitely.  Here, however, the Court specifically contemplated lifting its injunction after

6

BLM_0166910

DOE completed the necessary environmental review." *CEC II*, 302 F. Supp. 3d at 1255 (citing *CEC I*, 819 F. Supp. 2d at 1224).

In opposing DOE's *current* Motion to Dissolve, Plaintiffs once again argue that DOE bears a heavy burden of showing changed circumstances.  (ECF No. 162 at 4.) The Court again rejects this argument, for the reasons just stated.  Although DOE bears the burden in this procedural posture, it is simply a burden to show that it has materially complied with the Court's instructions.

### III.  ANALYSIS

### A.      Whether a New or Supplemental Administrative Record is Needed

DOE attached its supplemental BA and FWS's response to its Motion to Dissolve (ECF Nos. 160-1, 160-2), but has not submitted any other documents generated during the re-consultation process the Court ordered in *CEC II*.  Plaintiffs' primary challenge is that DOE cannot move to dissolve the injunction without first assembling and lodging a new or supplemental administrative record, comprising all documents related to the re-consultation.  (ECF No. 162 at 5–6.)

The parties have not cited, nor has the Court located, any authority establishing that a government agency must, in all instances, assemble and disclose a full administrative record before seeking a Court's approval of its administrative action.  The case law *assumes* that an administrative record will be assembled, but without discussing it as some sort of categorical or jurisdictional requirement.

Despite the paucity of case law on the topic, judicial review of administrative action will, by nature, nearly always require an administrative record.  Under the unique circumstances presented here, however, the Court finds that DOE committed no error,

BLM_0166911

or, if it did, the error is attributable to Plaintiffs as the equivalent of invited error.  These

outcomes are evident from the procedures that led up to the Motion to Dissolve.

To repeat, the Court's instructions in *CEC II* were as follows:

> Fortunately, the remedy in this circumstance does not
> require total vacatur . . . .  Instead, the Court will leave the
> existing injunction in place, for the time being, and order
> DOE to reinitiate consultation with FWS based on a
> supplemental BA.  The supplemental BA may be limited
> solely to the question of water depletion based on DOE's
> estimates of the likely combined annual water usage of
> ULMP mines, non-ULMP mines likely to become operational,
> and the Piñon Ridge Mill.  Upon receiving FWS's response
> (presumably an additional or supplemental BiOp), DOE may
> then issue an updated or supplemental ROD and move once
> again to dissolve the injunction.  Such a motion need only
> address whether DOE fulfilled its ESA § 7 consultation
> duties with respect to water depletion that may affect
> Colorado River endangered fish.

302 F. Supp. 3d at 1274 (footnote omitted).  A few months later, DOE submitted a

status report announcing that it had transmitted its supplemental BA to FWS and

"intend[ed] to file a motion to dissolve the injunction as soon as practicable after receipt

of [FWS's] final response to the [BA]."  (ECF No. 154 at 1–2.)  The Court then ordered

the parties to "confer and . . . file a joint status report explaining their views (including

their respective views, if they cannot agree) on: (1) what steps remain, if any, before

[DOE] may file a motion to dissolve the injunction, and (2) an appropriate briefing

schedule for such a motion."  (ECF No. 155.)  In the joint status report, "[t]he parties

agree[d] that the only step remaining before [DOE] may file a motion to dissolve the

injunction is for [DOE] and [FWS] to complete their consultation over [the supplemental

BA]."  (ECF No. 156 at 1.)  The parties also presented an agreed-upon briefing

schedule, with the motion to dissolve due "30 days after receipt of final response from

BLM_0166912

FWS to Supplemental BA." (*Id.* at 3.)  The Court adopted the proposed briefing

schedule, with the first deadline (*i.e.*, filing of the motion to dissolve) set for 30 days

after DOE received a final response from FWS regarding the supplemental BA.  (ECF

No. 157.)

This course of events reveals three things.  First, the Court charged DOE with a

limited, discrete task—in contrast to a reopening of the entire process that the Court

ordered in *CEC I*.  Second, the Court expressed its expectation of an updated or

supplemental ROD,[1] but the Court said nothing about a new or supplemental

administrative record—in contrast to proceedings before the original motion to dissolve

(ECF No. 147), where the Court specifically required a new administrative record (*see*

ECF No. 132).  Third, the Court asked the parties to describe "what steps remain, if any,

before [DOE] may file a motion to dissolve the injunction" (ECF No. 155), and Plaintiffs

did not at that time raise the need to produce a new or supplemental administrative

record.

Accordingly, because the Court did not require a new administrative record, DOE

did not err in failing to produce one.  Also, the situation is equivalent to "invited error"

because Plaintiffs had their opportunity to insist on an administrative record as part of

the scheduling order but did not.  *See, e.g.*, *United States v. Edward J.*, 224 F.3d 1216,

1222 (10th Cir. 2000).

Finally, assembling an administrative record would take more time and likely

more briefing.  The Court finds that it would not be in the interest of justice to delay

---

[1] No party has pointed the Court to an updated or supplemental ROD, unless the
supplemental BA (ECF No. 160-1) is deemed to be the same thing.  But Plaintiffs do not object
on this account, so the Court will not explore the matter further.

BLM_0166913

resolution of the matter any further.  This case is almost eleven years old, and the Court's injunction has been in place for more than seven years.

For all these reasons, the Court holds under the unusual circumstances presented here that DOE need not have assembled and disclosed a full administrative record before seeking review of its limited, Court-ordered re-consultation with FWS.

**B.      Whether DOE Properly Evaluated the Significance of the Piñon Ridge Mill Developments**

Plaintiffs' only other argument against dissolving the injunction is that DOE purportedly did not recognize the true significance of the Piñon Ridge Mill's demise. (ECF No. 162 at 6–8.)  Plaintiffs note that the Piñon Ridge Mill was expected to consume a substantial amount of water—substantial enough to exceed a numeric threshold that FWS finds significant, particularly when added to all other estimated water usage.  (*Id.* at 7.)  Plaintiffs argue that FWS therefore should have considered the Piñon Ridge estimate as a proxy for whatever mill will handle the uranium likely to be mined in the area: "the newly presented fact that [the] Piñon Ridge Mill license is no longer effective *and another mill must be used* does not allow [DOE] to arbitrarily exclude the water depletions needed to mill the oars from the [DOE] uranium lease tracts."  (*Id.* (emphasis added).)  Plaintiffs' argument fails for at least three reasons.

First, Plaintiffs fail to recognize the significance of the Piñon Ridge Mill in the Court's previous ruling.  The Court noted DOE's prediction that the Piñon Ridge Mill would prompt a uranium mining boom in the area, particularly on non-ULMP tracts. *CEC II*, 302 F. Supp. 3d at 1273.  The Court thus faulted DOE for failing to "estimate the mill's water requirements, [and] the water requirements of the non-ULMP uranium mines [DOE] predicts will come into existence."  *Id.*  And that is what the Court tasked

BLM_0166914

DOE with estimating and then transmitting to FWS.  *Id.* at 1274.  The Court never

faulted DOE's estimates for water usage associated with ULMP lease tracts.

Regardless, the supplemental BA plausibly and adequately explains why the Piñon

Ridge Mill will likely never be constructed, and why substantial uranium mining is not

likely to occur anyway.  There is no hint that the mining that likely *will* occur will require

anywhere near the fairly large amount of water predicted for the Piñon Ridge Mill.

Second, FWS in fact conveyed the Piñon Ridge Mill estimate to FWS.  It did so,

of course with a significant caveat, *i.e.*, that it no longer viewed the estimate as relevant

and it was not seeking FWS's opinion in light of the estimate.  (ECF No. 160-1 at 5–6.)

Nonetheless, FWS came to its own conclusion, in agreement with DOE, that the Piñon

Ridge estimate was not a matter it needed to consider.  (ECF No. 160-2 at 3.)  DOE

therefore did not fail to convey the relevant information to FWS—and conveying that

information is what the Court ordered in *CEC II*.

Third, the only potential location that ULMP-generated uranium ore could be

milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox

Valley.  DOE conveyed White Mesa's estimated water requirements to FWS.  (ECF No.

160-1 at 7.)  Plaintiffs fault DOE for relying on a 1979 figure for that estimate, stating

that "[c]urrent data is [*sic*] presumably available."  (ECF No. 162 at 8.)  But Plaintiffs

then go on to note that the previously-filed administrative record shows the White Mesa

Mill processes "only alternate feed" (nuclear waste generated through non-natural

processes, from which uranium may be extracted), not uranium ore.  (*Id.* (internal

quotation marks omitted).)  This strongly suggests that useful data for White Mesa Mill

are *not* available, given that the mill does not presently process what ULMP and other

BLM_0166915

uranium mines would produce—uranium ore.

For these reasons, the Court finds that DOE did not fail to convey adequate information to FWS during the re-consultation process.  Consequently, DOE has remedied the only lingering problem noted in *CEC II*, and is entitled to have the injunction dissolved.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Defendants' Motion to Dissolve the Injunction (ECF No. 160) is GRANTED;

2.   The Court's injunction entered October 18, 2011 (ECF No. 94, as modified by ECF No. 102) is DISSOLVED;

3.   The Clerk shall enter judgment in favor of Defendants and against Plaintiffs, and shall terminate this action; and

4.   The parties shall bear their own costs.

Dated this 18th day of March, 2019.

BY THE COURT:

William J. Martinez
United States District Judge

BLM_0166916

Attachment B

JAG No. 12 A 1318; Pursuant to § 24-4-105, C.R.S.

IN RE: THE APPLICATION OF ENERGY FUELS RESOURCES, INC. FOR A
RADIOACTIVE MATERIALS LICENSE FOR THE **PIÑON RIDGE URANIUM MILL**

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – APRIL 17, 2018**

## PROCEDURAL HISTORY

Beginning November 7, 2012 and concluding on November 13, 2012, the undersigned, acting as the hearing officer appointed by the director of the Colorado Department of Public Health and the Environment (hereafter CDPHE),  presided over a hearing in Nucla, Colorado to consider the application of Energy Fuels filed with CDPHE for issuance of a license to mill radioactive materials.  Sheep Mountain Alliance, Rocky Mountain Wild, Center for Biological Diversity, Colorado Environment Coalition and Dr. Robert L. Grossman (collectively hereafter referred to as Sheep Mountain Alliance, et al.) sought and were granted party status to resist the issuance of the license sought by Energy Fuels.

On January 14, 2013, the undersigned entered "Findings of Fact, Conclusions of Law and Ruling (hereafter January 14, 2013 Ruling)" following a public hearing.  As noted at pages one and five of the January 14, 2013 Ruling, the undersigned concluded as a matter of law that the hearing was an intermediate step in CDPHE's consideration of Energy Fuels application.  Sheep Mountain Alliance, et al. and Rocky Mountain Wild, the Plaintiffs in the current Judicial Proceeding, argued at the hearings held in 2012 and  reassert in the current Judicial Proceeding that the undersigned committed error in refusing to issue an "initial decision" and make findings and conclusions upon all material issues of fact, law or discretion.

An administrative appeal of the January 14, 2013 Ruling to the Executive Director of CDPHE was denied and on April 25, 2013 CDPHE issued the uranium milling license sought by Energy Fuels.  Plaintiffs thereafter filed a complaint in the Denver District Court (Action No. 13CV32397) seeking judicial review of the April 24, 2013 license, including adequacy of the 2012 hearing and the January 14, 2013 Ruling.  Plaintiffs' claims for relief include:

1. Failure of the January 14, 2013 Ruling to meet the requirements of an "initial decision" as required by the Administrative Procedure Act.   §24-4-105 (14)(a), C.R.S.
2. Failure of the January 14, 2013 Ruling to provide and adhere to an explicit and predetermined burden of proof.
3. Failure of the January 14, 2013 Ruling to make factual and legal determinations upon each of the procedural requirements and substantive issues enumerated in part 18 of the Rules and Regulations pertaining to Radiation Control promulgated by CDPHE.

1

BLM_0166917

    4.   Failure of the January 14, 2013 Ruling to conclude that the absence of competent localized economic data requires a conclusion that Energy Fuels failed to meet its burden of proof.

    5.   Inadequacy of the Environmental Impact Analysis upon which the April 24, 2013 license was based.

Plaintiffs' seek a declaration that the license issued is void.

On September 3, 2014, Judge Robert L. McGahey, Jr. of the Denver District Court issued an Order remanding Plaintiffs' action (1) for an "initial decision" as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203 and (2), C.R.S. for a *post hoc* determination of the burdens of proof in the hearing.  After limited discovery, the matter was referred to the undersigned as the original hearing officer.

The decision in this review is to be based upon the record made in the hearing held in Nucla, Colorado in 2012.  In requiring an "initial decision" upon the evidence previously presented the Court's Order requires a statement of findings and conclusions upon all the material issues of fact, law, or discretion presented by the record.  § 24-4-105 (14)a, C.R.S. The parties disagreed about the appropriateness of an additional hearing or briefing to address the application of the standard of an "initial decision" to the record.  Therefore the required review of the record and the evidence offered was undertaken without the assistance of counsel.

BURDEN OF PROOF

The parties do not significantly disagree about the applicable burden of proof, Energy Fuels, as the applicant and proponent of the license, bears the ultimate burden of proof to support the entry of an Order that the license should be issued. § 24-4-105 (7), C.R.S.;  6 C.C.R.1007-1 §18.7.6.5.  In the briefs filed by Energy Fuels and by Sheep Mountain Alliance, et al., the parties agree, and the undersigned now concludes, that Sheep Mountain Alliance, et al., as the party seeking an affirmative order, bears the burden of persuasion in challenging the sufficiency of the notice for the hearing held and the competence of the Environmental Impact Analysis prepared by CDPHE.  As noted in the Conclusions of Law below, § 25-11-203 (3) (c) (III), C.R.S. assigns the burden of proof upon the technical issues argued at the hearing to the Applicant, Energy Fuels.  The requirements of proof shall conform, to the extent practicable, with those in civil nonjury cases in the district courts. §24-4-105 (7), C.R.S..  To satisfy the burden of proof, a party must therefore prove its position by a preponderance of the evidence.

JANUARY 14, 2013 RULING

In that earlier ruling, the undersigned made a number of Findings of Fact and Conclusions of Law that are necessary to an "initial decision."  That Ruling is attached hereto (Attachment A) and made a part of this Ruling and the undersigned specifically again finds by a preponderance of the evidence that  Findings of Fact Number 2 & 3 and Conclusions of Law Number 1, 2 and 3 remain valid and should be repeated in this Ruling.

BLM_0166918

INITIAL DECISION

The initial decision as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203, C.R.S. as required by the District Court Order of September 3, 2014, shall include a statement of findings and conclusions upon all the material issues of fact, law or discretion presented by the record and the appropriate order, sanction, relief or denial thereof.  § 24-4-105 (14) (a), C.R.S.  That initial decision is then subject to appeal to CDPHE.

The conflicting perceptions of counsel and the undersigned about the purpose of the hearing held in Nucla, Colorado in the fall of 2012 caused Energy Fuels and CDPHE to limit the evidence they offered to the voluminous documents filed in support of and response to the application for a license together with an overview of that application process by the witnesses offered by those parties.  Sheep Mountain Alliance, et al. offered technical evidence addressing specific argued deficiencies in the application or CDPHE's evaluation of it.  In some instances, Energy Fuels and CDPHE offered technical evidence in response to those argued deficiencies. The written record prepared by CDPHE and presented at the hearing was submitted to the undersigned in electronic form without an index, making access to all of the material relating to a particular argument highly difficult.

FINDINGS OF FACT

Applying the burden of proof adopted above to the evidence offered, the undersigned now finds, by a preponderance of the evidence:

1. Energy Fuels and CDPHE substantially complied with the notice and process requirements governing the issuance of a license to mill radioactive materials.  § 25-11-201 et seq., C.R.S.; 6 C.C.R.1007-1 part 18.  Minor procedural defects, if any, in that process do not preclude issuance of a license.  As noted in Conclusion of Law #3 below, the hearing fully satisfied the requirements of § 24-4-105, C.R.S.

2. The Environmental Assessment prepared by Energy Fuels and Submitted to the CDPHE pursuant to § 25-11-203 (2) (b) (II), C.R.S.; § 25-11-203 (2) (c), C.R.S.; 6 C.C.R. 1007-1 §3.8.8; 6 C.C.R. 1007-1 §18.3.4; and 6 C.C.R. 1007-1 §28.3.5.4 substantially complies with the requirements of the statutes of the State of Colorado and the regulations adopted by CDPHE. A specific dispute with all or part of that Assessment does not make the document unlawful or insufficient.

3. The Environmental Impact Analysis prepared by CDPHE pursuant to C.C.R. 1007-1 §18.4.1 substantially complies with the requirements of the regulations adopted by CDPHE.  A specific dispute with all or part of that Analysis does not make the document unlawful or insufficient.

4. Counsel for Rocky Mountain Wild, Center for Biological Diversity and Colorado Environmental Coalition, (hereafter collectively referred to as the "Wildlife Coalition"), offered documentary evidence that the proposed mill site was a potential habitat area for a number of species of animals, birds and plants. They further argued that there has been an historical impact

3

upon aquatic life in the rivers in the region from the uranium mining and milling industry.  With the exception of one sighting of the Gunnison Sage Grouse several years ago, there was no evidence offered of the presence of an endangered or threatened species on or in the immediate proximity of the proposed mill site.  There are some references in the record reflecting consideration within the Environmental Assessment and the Environmental Impact Analysis of impacts upon animals, birds and plants in proximity to the proposed mill site. The undersigned now finds that Energy Fuels has failed to meet its burden to prove that those impacts have been fully considered.

5. Dr. Craig Little and Dr. Robert Grossman were qualified and testified as experts in the air modeling process and possible wind dispersion of radioactive dust from the tailings ponds and the materials storage piles at the proposed mill.  The conflicts in the expert testimony and the lack of clarity in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to minimize the impacts to the public and the environment of windborne radioactive dust have been met..

6. Ann Maest testified as an expert to address the qualities of the caffeinate to be discharged to the tailings ponds and its comparison with water quality standards for the ground water and surface water in the vicinity of the proposed mill, and the studies of and issues related to the designed pond liners and pond construction.  Kimberly F. Morrison testified as an expert to discuss the liner systems proposed for the tailings piles and netting to mitigate access of waterfowl.  The conflicts in the testimony and ambiguities in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to minimize the impacts of contaminated ground water to the public and the environment have been met..

7. Constance L Travers testified as an expert to address the sufficiency of the ground water supply plan and the ground water investigation and monitoring plan, and dispute the conclusion found in the Environmental Assessment and the Environmental Impact Assessment (EIA) that no pathways are present for ground water below the site.  Roman Popielak testified as an expert to address the ground water investigation and the possibility of perched ground water evidenced in the test wells.  The conflicts in the testimony and the lack of clarity in the documentary record leads the undersigned to find that Energy Fuels has failed to meet its burden to prove that the statutory and regulatory requirements to assure a sufficient water supply for operation of the proposed mill have been satisfied.

8. Dr. Thomas M. Power and Sandra L. Goodman testified as experts about the socioeconomic impacts of the proposed mill, each using the employment prediction of Energy Fuels for direct jobs to be created and different study areas for a calculation of indirect jobs that might be created.  Any cost-benefit analysis for this proposed site, as with any other site, is entirely dependent upon the physical area of impact to be studied.  The broader the area included in the study, the less statistically significant the possible benefit would be and the greater the impact of a possible or potential risk.  Considering the reports of each witness, and the absence of separate and distinct economic data for the west end of Montrose County, the conclusions reached by each of them seems highly speculative and without significant probative value.  The proposed mill site is intentionally located as far as possible from any population center.  The absence of precise economic data to support the opinions of experts does not, however, preclude

4

a thorough analysis of the environmental, social, technical and other benefits of the proposed application against environmental costs and social effects while considering available alternatives. The hundreds of individuals interviewed or offering comments at numerous public hearings, including the November 2012 hearing in Nucla, where more than two hundred individuals offered oral or written comments, provide a sufficient data base to support CDPHE's conclusions about the socio-economic impact of the proposed license. Energy Fuels has satisfied its burden of proof that is has fully considered the socio-economic impact of the proposed mill.

9. Many of the individuals offering public comments and counsel for Sheep Mountain Alliance, et al. challenge the adequacy of the bond amount set by CDPHE although each relate their objections to the cost of remediation at historic mills that were more loosely regulated or to the cost that might be realized if an upset condition existed. The statutory and regulatory requirements that the bond amount be regularly reviewed make a finding upon the bond amount set in 2012 unnecessary.

10. (2013 Finding #2) Energy Fuels has had internal discussions about the capacity of the proposed mill and the possibility of seeking an amendment or amendments to the license to allow for a greater capacity of production. Those discussions and related analysis and design documents do not mandate a modification of the application to reflect that greater capacity or require a modified Environmental Impact Assessment to reflect that increased capacity. The application seeks to process 500 tons per day and any application to enlarge that capacity would require another full review by CDPHE. There is no evidence offered supporting a conclusion that CDPHE would attempt to circumvent that full review.

11. (2013 Finding #3) Counsel for Sheep Mountain Alliance, et al., and a number of the individuals making public comments, complain that there were too many informal conversations between Energy Fuels and CDPHE, and that the informality of that relationship is evidence of a bias or at least a lack of objectivity on the part of CDPHE in favor of Energy Fuels. Informality in the relationship between a regulated party and the regulator may simply indicate civility. The evidence does not evidence a bias in the behavior of CDPHE or its employees.

CONCLUSIONS OF LAW

Considering the foregoing Findings of Fact, the undersigned now makes the following conclusions of law:

1. § 25-11-203 (3) (c) (II), C.R.S. provides that "the department (CDPHE) may order reasonable mitigation measures to address any substantial adverse impacts to public health or the environment or transportation infrastructure or transportation facilities within the county attributable solely to approval of the license…pertaining to the facility's receipt of the radioactive material." § 25-11-203 (3) (c) (III), C.R.S. provides, in part, "the applicant shall demonstrate that if the license . . . pertaining to the facility's receipt of the radioactive material is approved, then the receipt, storage, processing, and disposal of radioactive material will: (A) Be conducted such that the exposures to workers and the public are within the dose limits of part 4 of the department's rules pertaining to radiation control for workers and the public; (B) Not cause releases to the air, ground or surface or groundwater that exceed permitted limits; . . ."

5

2. 6 C.C.R.1007-1 §4.5.2 provides that "the licensee. . . shall use, to the extent practical, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as reasonably achievable (ALARA),"

3. (2013 Conclusion #1) The hearing conducted as described in the record of these proceedings fully satisfies the requirements of § 24-4-105, C.R.S., in that notice was properly issued; any entity or individual who sought party status was admitted as a party; the parties were offered the opportunity to call witnesses and offer exhibits and cross-examine the witnesses who testified without limitation; the rules of evidence were relaxed to allow the tender of documents as exhibits without foundation; each step of the proceedings were recorded by a reporter and transcripts of those proceedings were made available to the parties; and that oral and written comments were solicited from members of the public who had not sought party status, without limitation on the time they wished to speak or the content of their comments.

4. (2013 Conclusion #2) As discussed above the purpose and scope of this ruling is to render an "initial decision" as to whether Energy Fuels application met all criteria under state law for issuance of a license pursuant to § 25-11-203, C.R.S., and (2) for a *post hoc* determination of the burdens of proof in the hearing. As an initial issue the undersigned must address the purpose and scope of this hearing. Many of those offering public comments, either oral or written, exceeded the scope of the hearing and the broader issues they raised require some discussion of the role of CDPHE, and its appointed hearing officer, in the regulation of uranium milling. Those public comments offered in support of the application and the proposed license cited primarily the economic opportunities to be realized by bringing additional employment to the west end of Montrose County. Many of the public comments offered in opposition to the application and the proposed license discussed the general impact upon the environment of any energy development, the risk of nuclear power production as evidenced by incidents in the Ukraine and in Japan, the risk of nuclear power production compared to production from other energy sources, the adequacy of the regulatory process put in place to regulate uranium mining and milling, the inherent health and environmental risk from the processing and handling of radioactive materials, alternate possibilities for employment, the possible use of thorium as a safer nuclear fuel and the possible proliferation of nuclear weapons.

Decisions to allow the mining, milling and use of uranium have been made by the United States Congress through the Atomic Energy Act and the Uranium Mill Radiation Control Act and by the legislative process in Colorado through the Radiation Control Act. Through the agreement with the Nuclear Regulatory Commission and the provisions of the Radiation Control Act, the regulation of the nuclear industry has been delegated to CDPHE, which also receives its funding through the state budgetary process. Perhaps the more collegiate process suggested in the testimony of Dr. Grossman would produce a superior result but it is not the process provided by law. The statutory obligation of CDPHE to consider Energy Fuel's application may conflict with both its mission statement and its vision. Neither CDPHE nor its appointed hearing officer has the authority to simply ignore the statutory mandate to consider and act upon Energy Fuels Application. Consideration of the broader questions raised during the public comments must be addressed to the Congress of the United States or the Legislature of the State of Colorado.

BLM_0166922

5. (2013 Conclusion #3) Arguments and a number of public comments urge the possibility that the market price of the minerals produced will be inadequate to support construction and operation of the proposed mill.  Economic consequences of that nature are highly speculative and are typically left to the market for resolution.

Applying the Conclusions of Law above to the Findings of Fact above the undersigned now finds that Energy Fuels has failed to meet its burden of proof upon the following issues:

1. Impacts upon animals, birds and plants in proximity to the proposed mill site;
2. Limiting, so far as reasonably achievable, wind dispersion of radioactive materials;
3. Limiting, so far as reasonably achievable, contamination of ground water at the proposed mill site; and
4. Provision of an adequate water supply for operation of the proposed mill.

Application of Energy Fuels for a license to mill radioactive materials should, absent an additional hearing, be denied.

Entered in Denver, Colorado this 17th day of April, 2018.


_____
Richard W. Dana
Appointed Hearing Officer

7

BLM_0166923

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2018, a true and correct copy of the foregoing FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – APRIL 17, 2018, was served via electronic filing (E-Mail), addressed to the following:

Jerry W. Goad, Esq.
Ralph Carr Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Jerry.goad@coag.gov

John D. Fognani, Esq.
Haynes and Boone, LLP
1050 Seventeenth Street, Suite 1800
Denver, Colorado 80265
John.fognani@haynesboone.com

Travis Stills, Esq.
Energy Conservation Law
1911 Main Avenue, Suite 238
Durango, Colorado 81301
stills@frontier.net

Jeffrey C. Parsons, Esq.
Western Mining Action Project
P.O. Box 349
Lyons, Colorado 80537
wmap@igc.org

Matt Sandler, Esq.
Rocky Mountain Wild
1536 Wynkoop St., Suite 303
Denver, Colorado 80202
matt@rockymountainwild.org

Dr. Robert Grossman
6215 Baseline Road
Boulder, Colorado 80303
grossman@colorado.edu

Original Signature on File
Lisa Garcia, Administrative Clerk
Judicial Arbiter Group, Inc.

BLM_0166924

# ATTACHMENT A

JAG No. 12 A 1318

IN RE: THE APPLICATION OF ENERGY FUELS RESOURCES, INC. FOR A
RADIOACTIVE MATERIALS LICENSE FOR THE **PIÑON RIDGE URANIUM MILL**

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING – JANUARY 14, 2013

By a Judicial Review Order entered June 13, 2012 by Judge John M. McMullen of the
Denver District Court in Action No. 2011CV861 the Colorado Department of Public Health and
the Environment (CDPHE) was ordered to convene a hearing pursuant to C.R.S. § 24-04-105.
On August 6, 2012 the undersigned was appointed as a hearing officer for that proceeding and
CDPHE issued a Notice of Public Hearing and Opportunity for Public Comment describing the
process for participation in the hearing and announcing, pursuant to a stipulation of the parties to
the District Court litigation and approval by the Court on August 7, 2012, a tentative schedule for
pre and post hearing procedures.

Without specific repeating each event here, the parties participated in a pre-hearing and
post-hearing process fully described in the Record of Proceedings circulated with this Ruling,
specifically including Minute Orders dated August 23, 2012, September 10, 2012, September 19,
2012, October 5, 2012, October 15, 2012, November 2, 2012, November 5, 2012, Hearing
Minutes, Index of Exhibits, and a Minute Order dated November 27, 2012. The findings and
conclusions made in each of those intermediate Orders and during the hearing are now
incorporated in and made a part of these Findings of Fact and Conclusions of Law.

Having concluded as a matter of law that this hearing is an intermediate step in CDPHE's
consideration of Energy Fuels application and considering that the administrative record may be
further expanded before a final agency action on the license application, the undersigned has
limited further Findings of Fact to listing issues and expressing opinions about the evidence
presented except in those situations where the evidence offered by all parties appears fully
developed.

### FINDINGS OF FACT

1) The District Court Order entered by Judge McMullen sitting in the Denver District
Court calls for this hearing as a substitute for a second public meeting occurring on February 17,
2012, and calls for this record to be a part of the record to be considered during CDPHE's
reconsideration and remaking of its licensing decision. The Notice of Public Hearing issued and
published by CDPHE described the purpose of the hearing as an opportunity to receive comment
and evidence on the application of Energy Fuels Resource Corp. (Energy Fuels) for a radioactive
materials license and on the Environmental Impact Assessment prepared by CDPHE.

2) Energy Fuels has had internal discussions about the capacity of the proposed mill and
the possibility of seeking an amendment or amendments to the license to allow for a greater

9

BLM_0166925

capacity of production.  Those discussion and related analysis and design documents do not mandate a modification of the application to reflect that greater capacity or require a modified Environmental Impact Assessment to reflect that increase capacity.  The application seeks to process 500 tons per day and any application to enlarge that capacity would require another full review by CDPHE.  There is no evidence offered supporting a conclusion that CDPHE would attempt to circumvent that full review.

3) Counsel for Sheep Mountain Alliance and a number of the individuals making public comments complain that there were too many informal conversations between Energy Fuels and CDPHE and that the informality of that relationship is evidence of a bias or at least a lack of objectivity on the part of CDPHE in favor of Energy Fuels.  Informality in the relationship between a regulated party and the regulator may simply indicate civility.  The evidence does not evidence a bias in the behavior of CDPHE or its employees.

4) Counsel for Rocky Mountain Wild, Center for Biological Diversity and Colorado Environmental Coalition, hereafter referred to as the "Wildlife Coalition", offered documentary evidence that the proposed mill site was a potential habitat area for a number of species of animals, birds and plaints and further that there has been an historical impact upon aquatic life in the rivers in the region from the uranium mining and milling industry.  With the exception of one sighting of the Gunnison Sage Grouse several years ago there was no evidence offered of the presence of an endangered or threatened species on or in the immediate proximity of the proposed mill site.  CDPHE is required to consider the evidence and comments offered during this hearing as a part of the administrative record.

5) Dr. Craig Little and Dr. Robert Grossman were qualified and testified as experts in the air modeling process and possible wind dispersion of radioactive dust from the tailings ponds and the materials storage piles at the proposed mill.  CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

6) Ann Maest testified as an expert to address the qualities of the caffeinate to be discharged to the tailings ponds and its comparison with water quality standards for the ground water and surface water in the vicinity of the proposed mill, the studies of and issues related to the designed pond liners and pond construction.  Kimberly F. Morrison testified as an expert to discuss the liner systems proposed for the tailings piles and netting to mitigate access of waterfowl.  CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

7) Constance L Travers testified as an expert to address the sufficiency of the ground water supply plan and the ground water investigation and monitoring plan and dispute the conclusion found in the application and the Environmental Impact Assessment (EIA) that no pathways are present for ground water below the site.  Roman Popielak testified as an expert to address the ground water investigation and the possibility of perched ground water evidenced in the test wells.  CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

BLM_0166926

8) Dr. Thomas M. Power and Sandra L. Goodman testified as experts about the socioeconomic impacts of the proposed mill, each using the employment prediction of Energy Fuels for direct jobs to be created and different study areas for a calculation of indirect jobs that might be created. Any cost-benefit analysis for this proposed site, as with any other site is entirely dependent upon the physical area of impact to be studied. The broader the area included in the study the less statistically significant the possible benefit would be and the greater the impact of a possible or potential risk. Considering the reports of each witness and the absence of separate and distinct economic data for the west end of Montrose County the conclusions reached by each of them seems highly speculative and without significant probative value. CDPHE is required to consider the evidence and comments they offered during this hearing as a part of the administrative record.

9) Many of the individuals offering public comments and counsel for Sheep Mountain Alliance challenge the adequacy of the bond amount set by CDPH although each relate their objections to the cost of remediation at historic mills that were more loosely regulated or to the cost that might be realized if an upset condition existed. CDPHE is required to consider the evidence and comments offered during this hearing as a part of the administrative record.

## CONCLUSIONS OF LAW

1) The hearing conducted as described in the record of these proceedings fully satisfies the requirements of C.R.S. §24-4-105 in that notice was properly issued; any entity or individual who sought party status was admitted as a party, the parties were offered the opportunity to call witnesses and offer exhibits and cross-examine the witnesses who testified without limitation; the rules of evidence were relaxed to allow the tender of documents as exhibits without foundation; each step of the proceedings were recorded by a reporter and transcripts of those proceedings were made available to the parties; and that oral and written comments were solicited from members of the public who had not sought party status, without limitation on the time they wished to speak or the content of their comments.

2) As an initial issue the undersigned must address the purpose and scope of this hearing. A broad issue is presented with the relief sought by those making public comments, either oral or written, and that broader issue requires some discussion of the role of CDPHE, and its appointed hearing officer, in the regulation of uranium milling. Those public comments offered in support of the application and the proposed license cited primarily the economic opportunities to be realized by bringing additional employment to the west end of Montrose County. Many of the public comments offered in opposition to the application and the proposed license discussed the general impact upon the environment of any energy development, the risk of nuclear power production as evidenced by incidents in the Ukraine and in Japan, the risk of nuclear power production compared to production from other energy sources, the adequacy of the regulatory process put in place to regulate uranium mining and milling, the inherent health and environmental risk from the processing and handling of radioactive materials, alternate possibilities for employment, the possible use of thorium as a safer nuclear fuel and the possible proliferation of nuclear weapons.

BLM_0166927

Decisions to allow the mining, milling and use of uranium have been made by the United States Congress through the Atomic Energy Act and the Uranium Mill Radiation Control Act and by the legislative process in Colorado through the Radiation Control Act. Through the agreement with the Nuclear Regulatory Commission and the provisions of the Radiation Control Act the regulation of the nuclear industry has been delegated to CDPHE which also receives its funding through the state budgetary process. Perhaps the more collegiate process suggested in the testimony of Dr. Grossman would produce a superior result but it is not the process provided by law. The statutory obligation of CDPHE to consider Energy Fuel's application may conflict with both its mission statement and its vision. Neither CDPHE nor its appointed hearing officer has the authority to simply ignore the statutory mandate to consider and act upon Energy Fuels Application. Consideration of the broader questions raised during the public comments must be addressed to the Congress of the United States or the Legislature of the State of Colorado.

3) Arguments and a number of public comments urge the possibility that the market price of the minerals produced will be inadequate to support construction and operation of the proposed mill. Economic consequences of that nature are highly speculative and are typically left to the market for resolution.

4) In addition to the general issues raised by those offering public comments there is a fundamental dispute between those granted party status about the scope and purpose of this hearing. Energy Fuels and CDPHE urge that the limited purpose of this hearing is to offer an adversarial hearing with an opportunity to participate, cross-examine and offer comments, and that that hearing becomes part of the record to be considered in the future deliberations of CDPHE about the Energy Fuels application. Sheep Mountain Alliance, the three environmental entities referred to as the "Wildlife Coalition", and the Town of Ophir urge that procedural and substantive deficiencies in Energy Fuel's application and in the Environmental Impact Analysis (EIA) prepared by CDPHE are sufficient to preclude the issuance of the requested license. Dr. Robert Grossman offered evidence and arguments challenging the air pollution conclusions and transportation issues discussed in the EIA and raised issues regarding the design and objectivity of the permitting process.

5) Considering the Order of the Denver District Court and the Published Notice of this Hearing compels a conclusion that this hearing is an intermediate step in CDPHE's consideration of Energy Fuel's application. The undersigned may make findings of fact or conclusions of law upon the evidence presented and the issues raised but those findings and conclusions are to be considered in the future deliberations of CDPHE and are not a final agency decision subject to appeal.

6) During cross examination of witnesses employed by CDPHE by counsel for Sheep Mountain Alliance it became apparent that each individual employee of CDPHE who played a part in the review of the license application at issue in this proceeding may have retained individual files relating to that review process and that those files may not have been placed in the public record available to the parties to this proceeding. Discovery of those files was conducted in a post hearing procedure in the office of CDPHE on November 27, 2012 as reflected in the Minute Order of that date. Sheep Mountain Alliance complains that those documents were not earlier produced in response to the general and broad requests for

12

BLM_0166928

production of documents earlier addressed to CDPHE.  There was no effort before the hearing to conduct depositions of those CDPHE employees and no reason to conclude that the existence of those individual files would not have been disclosed in any formal or informal discovery process. The documents discovered are now a part of the record in this proceeding.  The record does not support a conclusion that CDPHE failed to respond to reasonable discovery requests and sanctions for discovery violations or reopening the hearing are not appropriate.

Having concluded that this hearing is an intermediate step in CDPHE's consideration of Energy Fuels the single additional issue upon which a Conclusions of Law is made addresses the discovery issue arising from delayed production of personal files from CDPHE personnel.

This Ruling was scheduled to be delivered on January 11, 2013.  In light of the volume of material submitted in the proposed Findings of Fact and Conclusions of Law presented by the parties its completion and delivery was delayed until January 14, 2013.

Entered in Denver, Colorado this 14th day of January, 2013

s/Richard W. Dana
Richard W. Dana
Appointed Hearing Officer

BLM_0166929

Attachment C



**COLORADO**
Department of Public
Health & Environment

Dedicated to protecting and improving the health and environment of the people of Colorado

April 26, 2018

Pinon Ridge Resources Corporation
31161 Highway 90
PO Box 825
Nucla, CO 81424-0825

Attention: George Glasier, President and CEO

Re: Revocation – Colorado Radioactive Materials License Number CO 1170-01

On April 17, 2018, Richard W. Dana, Appointed Hearing Officer, issued the findings of fact, conclusions of law and ruling in response to Judge Robert L. McGahey, Jr.'s September 3, 2014 order on Colorado Radioactive Materials License Number CO 1170-01. In his ruling, Judge Dana concluded that Energy Fuels failed to meet its burden of proof on four issues and that the application of Energy Fuels for a license to mill radioactive materials should, absent an additional hearing, be denied.

Although the Department believes the original decision on the license application was appropriate, the department has elected not to challenge Judge Dana's decision. As such, this decision provides the Department with the rationale to revoke the license pursuant to Section 3.23.2 of the *Colorado Rules and Regulations Pertaining to Radiation Control*. Therefore, effective the date of this letter, Colorado Radioactive Materials License Number CO 1170-01 is revoked.

If you have any questions regarding this letter please contact me at 303-692-3403 or jennifer.opila@state.co.us.

*Jennifer T. Opila*

Jennifer T. Opila, MPA
Radiation Program Manager
Hazardous Materials and Waste Management Division

CC:      Steven Brown, Radiation Safety Officer
         Jerry Goad, Colorado Attorney General's Office



BLM_0166930

Attachment D

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: September 3, 2014 12:17 PM<br>CASE NUMBER: 2013CV32397 |
| SHEEP MOUNTAIN ALLIANCE and ROCKY MOUNTAIN WILD<br>Plaintiffs;<br>v.<br>COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT, JENNIFER OPILA, IN HER OFFICIAL CAPACITY; CDPHE EXECUTIVE DIRECTOR DR. CHRISTOPHER URBINA, IN HIS OFFICIAL CAPACITY;<br>and<br>DEFENDANT INDISPENSABLE PARTY ENERGY FUELS RESOURCES CORPORATION,<br>Defendants. | ▢COURT USE ONLY▢<br><br>Case No.  13CV32397<br><br>Division 409 |
| **ORDER RE: ENERGY FUELS RESOURCES CORPORATION'S MOTION FOR REMAND TO HEARING OFFICER** | |

THIS MATTER comes before me on Energy Fuels Resources Corporation's ("Energy Fuels") Motion for Remand to Hearing Officer, filed on May 2, 2014. I have reviewed the Motion, the Colorado Department of Public Health and Environment ("CDPHE") Response, the Sheep Mountain Alliance ("SMA") and others Response, Reply, the entire case file, as well as the applicable case and statutory law, and make the following findings of fact and conclusions of law:

## I.    Background

On November 18, 2009, indispensable party Energy Fuels submitted an application to defendant Colorado Department of Public Health and Environment ("CDPHE") for the issuance of a Radioactive Materials License. Energy Fuels sought to construct and operate a Uranium Mill in Montrose County, Colorado. CDPHE determined that the application, including a voluminous Environmental Impact Analysis, was substantially complete and ready to be presented for public hearings required by Colorado statute. *See* C.R.S. § 25-11-203 (2)(b)(I) (2013). Several public hearings were held, and the license was issued by CDPHE to Energy Fuels in 2011.

Plaintiff Sheep Mountain Alliance ("SMA"), among others, filed an appeal of CDPHE's license decision with the Colorado District Court, alleging that the public hearings held by Energy Fuels and CDPHE did not meet statutory requirements. On June 13, 2012, the Denver District Court found CDPHE's action of issuing Energy Fuels a license without first holding a hearing pursuant to C.R.S. § 24-4-105 to be illegal. The prior court invalidated the issued license and remanded with instructions to hold a §105 hearing, and included a new timeframe for the parties to follow.

The parties proceeded. At the Hearing Plaintiffs claimed the purpose of the Hearing was determine whether Energy Fuel's application met all criteria under state law for issuance of a license. Energy Fuel claimed the purpose was to gather evidence within the procedural confines of APA § 105. The Hearing Officer agreed with Energy Fuels and determined the Hearing was an intermediate step in CDPHE's granting the license. A decision was then reached by CDPHE granting a license to Energy Fuels.

Plaintiffs sought invalidation of a Radioactive Materials License issued to Energy Fuels by CDPHE on April 25, 2013. Plaintiffs made six claims in arguing that the license should be invalidated: (1) CDPHE deprived SMA of an "initial decision" following the required hearing, (2) the hearing officer failed to determine and adhere to an explicit burden of proof in the hearing as required by 6 C.C.R. 1007-1 § 18 ("part 18 regulations"), (3) the hearing officer did not apply the substantive protections of part 18 regulations, (4) the hearing lacked competent socioeconomic data in violation of part 18 regulations, (5) CDPHE arbitrarily relied on an unlawful Environmental Impact Analysis, and (6) cumulatively, CDPHE's licensing action and decision violates the Uranium Mill Tailings Radiation Control Act ("UMTRCA"), the Atomic Energy Act ("AEA"), the Administrative Procedure Act ("APA"), Colorado Radiation Control Act ("RCA"), and part 18 of the implementing regulations.

I denied CDHPE's Motion to Dismiss the Complaint on September 9, 2013 and denied Energy Fuels' Motion to Dismiss the Complaint on September 16, 2013.

In order to resolve issues raised in the Complaint, Energy Fuels requests that I hold its license in abeyance and remand the entire matter to CDPHE and the Hearing Officer to address all of Plaintiff's claims. Specifically, Energy Fuels moves that I (1) order the Hearing Officer render an initial decision based solely on the record from the initial Hearing and (2) determine which party bore the burden of proof and whether that burden was satisfied. Defendant moves that CDPHE review all Plaintiffs substantive and procedural claims (3), (4), (5), and (6). Defendant and Indispensable Party argue remand is appropriate, asserting that the Hearing Officer's Finding of Fact, Conclusions of Law, and Ruling were deficient. They also claim such and order would promote judicial efficiency.

### III.   Law and Analysis

### A.   Order is Not Prejudicial and Promotes Judicial Economy

A review of the case record suggests the Order is not Prejudicial because it is not likely to require Plaintiff to expend unnecessary resources. Further, judicial economy is served by remanding this case because it directly allows for the resolutions of issues raised by Plaintiff.

**B.      Hearing Officer Can Resolve Plaintiff's Claim Surrounding the Burden of Proof**

Public officials acting in an adjudicatory capacity are entitled to "quasi-judicial absolute immunity" if there are sufficient procedural safeguards in the adjudicatory actions. *Churchill v. Univ. of Colo. At Boulder*, 285 P.3d 986, 999-1005 (Colo. 2012). There is no case law to suggest that the remand of a post-hearing assignment of the burdens of proof is a violation of due process rights.

**C.      Remand is Appropriate**

The Administrative Procedure Act is to provide "a plain, simple, and prompt remedy to persons or parties . . . aggrieved by agency actions."   C.R.S. § 24-4-106(1).  When there can be no meaningful review on the merits, the proper action is to remand the case for appropriate proceedings.  *See Lawless v. Bach*, 489 P.2d 316, 318 (Colo. 1971); C.R.S. § 24-4-106(7).  Remand is appropriate where a hearing officer "failed to adopt any findings or conclusions or to give any reasons for its action." *Ivy v. State Personnel Bd.*, 860 P.2d 602, 605 (Colo. App. 1993).  "[T]he court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established." C.R.S. § 24-4-106(7).

Here, the Hearing Officer failed to make a conclusion as to whether Energy Fuels application met all criteria for issuance of a license pursuant to C.R.S. § 25-11-203. Additionally, there are no questions of law or constitutional issues that I need to resolve.

## IV.  Order

It is ordered that:  (1) **The Energy Fuels license is held in abeyance**, (2) **That this matter is remanded for hearing consistent with this Order**, including the following:

A. CDPHE is ordered to convene an appropriate Hearing Officer.  Original Hearing Officer shall be selected if he or she is available and are eligible to issue a *post hoc* determination of the burdens of proof in the hearing.  If Original Hearing Officer is unavailable or ineligible to issue a *post hoc* determination of the burdens of proof in the hearing, then CDPHE shall select another appropriate Hearing Officer.   That Hearing Officer shall review the record of the initial §105 hearing.

B. Limited Discovery shall be made available only for the purpose of determining whether the original Hearing Officer is eligible to enter *post hoc* determinations of the burdens of proof in the hearing due to post-hearing ex-parte communications.

BLM_0166933

C. After limited discovery, CDPHE shall decide whether the original Hearing Officer is eligible.

D. The Hearing Officer formally assigned to the case shall issue an initial decision as to whether Energy Fuels' application met all criteria under state law for issuance of a license pursuant to C.R.S. § 25-11-203. Hearing Officer shall also issue a *post hoc* determination of the burdens of proof in the hearing.

E. Said Hearing Officer shall make decisions based on the record from the initial §105 hearing.

F. Parties may modify terms of who is the Hearing Officer by written stipulation signed by all parties, provided that any such stipulation does not impair the rights of any party.

G. Following proceedings with the Hearing Officer, CDPHE shall review whether the original Hearing Officer in the original Hearing applied substantive protections of part 18 regulations, possessed competent socioeconomic data as per part 18 regulations, whether CDPHE arbitrarily relied on an unlawful Environmental Impact Analysis and whether the CDPHE's licensing violated UMTRCA, AEA, APA, RCA, and part 18 of the implementing regulations,

H. CDPHE shall review the determination of Energy Fuel's License with regards to prior §105 record and additional proceedings mandated by this order.


SO ORDERED this 3rd day of August, 2014.

BY THE COURT:

_____
Robert L. McGahey, Jr.
District Court Judge

BLM_0166934



# GOVERNMENT AFFAIRS/NATURAL RESOURCES

## LYNN PADGETT

April 23, 2018

RE: Draft Alternative E CA Meeting Follow-up

Dear Greg and Matt,

San Miguel County appreciates the opportunity to continue working with the Uncompahgre Field Office as a Cooperating Agency during the extended Resource Management Plan revision process.

Thank you for providing a draft of Uncompahgre Field Office (UFO) and Agency Preferred Alternative, new Alternative E as summarized in the draft revised Table 2-2 for us to review following the UFO RMP Cooperating Agency (CA) meeting held in Montrose on March 28 where some of the concepts of Alternative E were introduced. Immediately following the March 28 meeting, San Miguel County forwarded a comment document submitted by the Board of County Commissioners on the West-Wide Energy Corridor segment going north-south through San Miguel County for the Section 368 West-Wide Energy Corridors Region 2 Review comment period to help inform UFO and the RMP of our concerns regarding the location of this corridor.

We are grateful to you both for taking the time to meet with Commissioner May and me on April 16 to dialogue about questions and concerns San Miguel County has with the draft Alternative E.

It is our recollection that during our April 16 meeting we heard that Alternative E has been crafted to incorporate new information, BLM and administrative priorities, input from the BLM's interdisciplinary team, comments received from the public and Cooperating Agencies, and to reduce some of the complexities of having overlapping management prescriptions from special designations.

Our recollection and takeaways of our discussion of the important topics that were discussed during our April 16 meeting were:

- San Miguel County expressed a desire that the San Miguel River Expansion ACEC be designated in the final RMP. We heard from UFO that the mosaic of landownership makes management of the expanded area more difficult. San Miguel County suggested that the north end of an expanded ACEC could be terminated at the San Miguel County line. We indicated if this is not possible, that the existing San Miguel River ACEC and SRMA is supported by San Miguel County and is desired to have the highest possible visible resource management and be managed to protect and not degrade important riparian ecosystems and bird habitat and avoid conflicts between recreation, permitted outfitter activities, new routes and rights-of-way, and in-stream mining. We also asked

P.O. BOX 1170 • Telluride, Colorado 81435 • (970) 369-5469 •
lynnp@sanmiguelcountyco.gov

that the stipulations that had been part of Alternative D within the existing ACEC, specifically the codes LOCATE, HYDROE, SOLARE, and WINDE be retained in Alternative E with HYDROE being incorporated for all WSR segments being designated as Suitable, vs. just those classified as Wild.

- We asked that the San Miguel River SRMA have a visual resource management level of V-2.  With more protective stipulations that emphasize sustaining the ecological integrity and scenic beauty of the San Miguel River corridor, and Beaver and Saltado Creeks and important riparian habitat, San Miguel County can be supportive of not having an Ecological Emphasis Area co-designated.  We heard that the agency would consult with its interdisciplinary team about the current conditions, but that the UFO would not want to manage areas that have Visual Resource Management Class 3 characteristics as a Class 2.

- During this meeting, we learned more about why target shooting stipulations have changed between Alternatives D and E.

- We indicated concern with potential Gunnison Sage-grouse management differences if they are based on neighbor resource management plans that were created using pre-listing NEPA.  The Gunnison Sage-grouse was listed as a Threatened species and critical habitat was designated by the U.S. Fish and Wildlife Service (USFWS) in November of 2014.

- We indicated desire to have Burn Canyon managed as an SRMA vs. an ERMA as recommended in draft Alternative E, primarily to have the sensitive riparian areas in the drainages be retained as non-motorized area.  We learned from UFO that the BLM has concerns that an SRMA will over-emphasize and/or advertise recreational uses and potentially exacerbate access and enforcement conflicts vs. an ERMA.  UFO has put a lot of thought into this change and has taken into consideration the difficulty of access, the safety of access on existing narrow county roads, honoring and incorporating the recent Burn Canyon Travel Management Plan, and agency direction for energy dominance.

- San Miguel County compared the management codes between the SRMA in Alternative B and the ERMA in Alternatives D and E.  Burn Canyon would have had a clear NSO in Alternative B, with the riparian canyon portions closed to motorized and mechanized uses and/or have visual resource management levels of V-2.  We asked for the UFO to take another look at the ERMA stipulations which would only be CSU, V-3, and DAY for the entire area and re-consider adding more of the protective management to protect the scenic and riparian resources in this incredible area.

- San Miguel County requested more explanation of the new language in draft Alternative E that uses slight variations of language such as "...for greater than 80 percent of [stream segments/vegetation communities/etc.] in ACECs, WSAs, suitable wild and scenic river segments, lands managed to protect wilderness characteristics, and greater than 70 percent of [stream segments/vegetation communities/etc.] on the remaining BLM-administered lands, over 10 years with 80 percent confidence.  We wondered if this could result in losing 30 percent of special characteristics of a special area during successive 10-year intervals.  We also said one interpretation was that BLM was going to manage only 10 percent more of the stream/vegetation communities/etc. (see Rows 43, 63 and 75 for examples of the language) if they were in a special area vs. a non-special area

BLM_0166936