corridor designation.  These lands should be included in the conflict analysis as "high potential conflict areas" and avoided.

o   The Corridor Abstract states that "Corridor 130-274 is entirely within a medium potential conflict area and contains existing infrastructure." [33]  This seems to be contradicted by Figures 3a and 3b which mostly depict Corridor 130-274/130-274(E) to be in "No Conflict Identified" areas.  Figure 3a shows that the lands south, east, west, and intersecting the southern portion of Corridor 130-274/130-274(E) to be in High Conflict areas.  The Corridor Abstract figures and text need revisions for accuracy.

- Corridor Abstract Analysis Table:
  o   Row 2:  discussion notes that Corridor 130-274/130-274(E) is a Corridor of Concern and that the Tri-State coal-fired power plant is to be retired in 2022.  It notes that no realistic wind power generation opportunities have been identified in the region.  Is the logical conclusion that a corridor to accommodate high voltage electricity transmission is not warranted?
  o   Rows 3-4: discussion notes that BLM and USFS can only authorize projects on Federally-administered lands and that development in corridor "gaps" on State or private lands require coordination outside of the Agencies.  Corridors, where the "gaps" have high-conflict areas and environmentally sensitive areas such as ESA listed species and critical habitat, or conserved lands, should not be designated, as they are not leading to the location of corridors in favorable landscapes or maximizing avoidance of environmentally sensitive areas.  Corridors should not be sited where there will be impacts as great or greater than those that led to avoided siting in similar areas on federal lands.
  o   Row 8: discussion notes that per the Settlement Agreement, MP 4.2-4.6 of Corridor 130-274(E) and MP 6.2-13.2 of Corridor 130-274 should be re-routed to avoid critical GuSG habitat.  The mile markers are not quite accurate.  Both Corridors should be eliminated where they intersect GuSG critical habitat and conserved private lands.  "The Agency Review and Analysis state that they should consider opportunities for corridor revision to avoid most areas of critical habitat and still encompass existing infrastructure." [34] The Agencies have not analyzed cumulative impacts from repeated disturbance of the ROW of the existing pipeline for its own maintenance as well as if there were to be other infrastructure co-located with it.  This corridor creates impacts within critical occupied habitat and habitat located within 0.5 miles of multiple leks of the Miramonte subpopulation of the San Miguel Basin population of GuSG.  This is the most viable subpopulation of the GuSG.
  o   Row 8 should recognize BLM IM 2014-100[35] is in effect until rescinded and presents some of the best available interim guidance until the GuSG RMPa is finalized.  The Agency Review and Analysis should recognize BLM IM 2014-100 and adhere to the guidance requiring focusing any type of development

---

[33] https://bogi.evs.anl.gov/section368/abstracts/corridor-130-274.pdf Page 5
[34] http://corridoreis.anl.gov/documents/docs/conflict_assessment_table.pdf Row 8, Page 10.
[35] https://www.blm.gov/POLICY/IM-2014-100.

BLM_0167069

in non-habitat areas.  At a minimum, areas within 4-miles of a lek should be considered "high potential conflict areas."



Figure 3: Showing a portion of the SMC-created screen tool for examining GuSG and other conflicts of concern to SMC.  (The full-screen tool is provided as a layers-enabled pdf in Appendix A.)  MPs of Corridor 130-274 from southern San Miguel County line/MP 17 at bottom center of figure, and private lands encumbered with conservation easements for the purpose of conserving GuSG and critical habitat (green hatching); lands within 4-mile lek buffers and the BLM GuSG RMPa/EIS Decision Area in light gray shading; GuSG critical habitat in striped hatching and purple.  While the Corridors 130-274/130-274(E) in red outline at the top center intersect GuSG habitat and are discussed as needing re-routing in Row 8, the same reasons for re-routing on federal lands exist and should require re-routing on the State, private, and private conserved lands to the south.  The proximity of MPs 15-17 to the McKenna Peak WSA in red should be mentioned in the Assessment Table and Abstract.

      o   Row 9: discussion claims that GuSG conservation areas "have not been identified and are not a consideration for the review at this time."  Currently, the BLM GuSG Draft RMPa/EIS has an alternative that contemplates designation of an ACEC for all GuSG critical habitat on BLM-administered

BLM_0167070

SAN MIGUEL COUNTY

lands within 4-miles of a lek.  Private land conservation easements that have the primary conservation value of GuSG habitat conservation should be considered active conservation areas as should State Wildlife Areas (SWA) like the Dan Noble SWA.  The 2005 Rangewide Conservation Plan contains rangewide and local conservation strategies and best management practices that should be considered as de-facto GuSG conservation areas. [36]

- o   Rows 17, 19:  The Corridor must continue to avoid impacts and intersections to lands that are subject to the Proposed San Juan Mountains Wilderness designations, Naturita Canyon Colorado Roadless Area, and Menefee Mountain WSA. Proximity to McKenna Peak WSA should be mentioned, as it is as close as 1-mile to MPs 18-20.

- o   Row 21:  Scenic quality is extremely important to San Miguel County's economy, as mentioned in the original and First Amended Complaint about Declaratory and Injunctive Relief filed by the Wilderness Society in *The Wilderness Society, et al. v. United States Department of the Interior, et al., No. 3:09-cv-03048-JW (N.D. Cal)*. [37] The analysis table does not take into consideration the protection of visual resources desired by SMC and its citizens.

Thank you for the opportunity to provide our comments on the Region 2 Review Abstract and analysis of Corridor 130-274/130-274(E) and the need for these segments within SMC to be rerouted.

We encourage the Agencies to require that any Corridor is providing a ROW for fiber or broadband infrastructure, be required to make such broadband infrastructure open access and available for any purpose, including commercial use, to avoid any need in the future to have to go back and "perfect" easements.

We look forward to personally working with the Agencies and stakeholders to determine if a suitable corridor can be identified within San Miguel County that mitigates the concerns outlined in the Settlement Agreement and goals of the Agencies.  We are happy to provide any assistance or data we might have to inform the Corridor mapping tool better, abstract and analysis.

Sincerely,
SAN MIGUEL COUNTY, COLORADO
BOARD OF COUNTY COMMISSIONERS

_____

Kris Holstrom, Chair

---

[36] http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[37] https://eplanning.blm.gov/epl-front-office/projects/nepa/66455/81165/94671/Tri-State_MNC_Draft_POD.pdf
Page 1.

BLM_0167071

SAN MIGUEL COUNTY

**Attachment A: SMC Section 368 Corridor 130-274/130-274 (E) Screen Tool**

This is a layered .pdf file.  To make layers visible/invisible please open the layers contents, click on the layers list menu and click "Expand All."  The legend is on the bottom of the document.

15

BLM_0167072

# SMC Section 368 Corridor 130-274/130-274 (E) Screen Tool

Dolores R (MCGIS)
STREAMS (CDOT 2017)
TRFO RMPa Nominated ACECs (BLM 2017)

GUSG Functional Critical Habitat (CPW 083011)
Occupied
Potential
Vacant/Unknown

USFWS Designated GuSG Designated Critical Habitat (CPW 081314)
Occupied

Potential
Vacant
TRFO BLM Dolores River SRMA

Roads (SMCGIS SANMCO_911)
ARTERIAL
LOCAL; MAJOR COLLECTOR; MINOR COLLECTOR
PRIMITIVE

TRFO BLM Draft Route Inventory (TRFO BLM TMP 2017)
2WD - Road
Primitive Road - 4WD high clearance
Primitive Road - 4WD low clearance
Trail - ATV
Trail - Non Mechanized
Trail - Non Motorized
Trail - UTV
STATE HIGHWAYS (CDOT 2017)
PARCELS_UTM (SMC Geodata 2018)
SMC COUNTY BOUNDARY

BLM WSAs NEAR SMC
LAKES (CDOT 2017)
SMC PRIVATE CONSERVED LANDS

SMC LAND STATUS
OWNER
BLM
CDOW
PRIVATE OR OTHER EXEMPT
STATE LAND BOARD

USFS
Sec368_Corridor_of_Concern
Sec368_Energy_Corridor
Sec368_Energy_Corridor_Centerline
Sec368_Energy_Corridor_Centerline_MP
Sec368_Energy_Corridor_Milepost
Transmission_Line_TST

**Draft, San Miguel County**
**Section 368 Corridor Screen Tool**
**2/23/2018**

0 0.33 0.65 1.3 1.95 2.6 Miles

1: 60,000

**Attachment B:** *Section 368 Energy Corridor Regional Reviews – Region 2* **Corridor 130-274/130-274(E)** *San Juan/San Miguel Corridor* **(January 2018)**

Energy Corridor Abstract provided by Agencies for review, downloaded February 2018 at
http://bogi.evs.anl.gov/section368/abstracts/corridor-130-274.pdf.

BLM_0167074

# Corridor 130-274/130-274(E)
*San Juan/San Miguel Corridor*

## Introduction

Corridor 130-274/130-174(E) (Figures 1 and 2a,b) begins just south of the Montrose/San Miguel county line and extends generally southward terminating just south of State Route 160 at the Montezuma/La Plata county line. Corridor 130-274(E) is an additional braided segment extending east of Corridor 130-274 from MP 2 to MP 7. Federally designated portions of this corridor are 3,500 feet in width on BLM- and USFS-administered land. The Corridor 130-274(E) segment is designated as underground use only. The corridor is designated multi-modal for future electrical transmission and pipeline projects. Corridor 130-274 has 37.1 miles of designated corridor on BLM- and USFS-administered lands; the overall route including gaps is 65.5 miles. The designated area is 14,823.3 acres or 23.2 square miles. Corridor 130-274(E) has 4.4 miles of designated corridor on BLM- and USFS-administered lands; the overall route including gaps is 4.6 miles. The designated area is 1,760.9 acres or 2.7 square miles. Corridor 130-274 is in San Miguel, Dolores, and Montezuma counties in Colorado, and Corridor 130-274(E) is in San Miguel County; they are under the jurisdictions of the BLM Tres Rios and Uncompahgre Field Offices. Portions of the corridor also occur on the San Juan National Forest and Grand Mesa, Uncompahgre, Gunnison (GMUG) National Forests in Colorado. Corridor 130-274/130-274(E) is entirely in Region 2.



**Figure 1. Corridor 130-274/130-274(E)**

1

BLM_0167075

- Populated Place
- Substation *
- Renewable Energy Power Plant
- Non-Renewable Energy Power Plant
- **20** Subject Section 368 Energy Corridor Milepost
- Subject Section 368 Energy Corridor Centerline
- Subject Section 368 Energy Corridor
- Other Section 368 Energy Corridor
- Section 368 Energy Corridor Listed in WWEC ROD but Not Designated
- Section 368 Energy Corridor Revised in RMP Amendment
- Transmission Line *
- Pipeline *

**Major Road**
- Interstate
- U.S. Route
- State Route
- County Boundary
- State Boundary
- BLM Administrative Unit Boundary
- USFS Administrative Unit Boundary

**Regional Review Boundary**
- Subject Region
- Other Regions
- Solar Energy Zone
- National Conservation Area
- National Monument

**Surface Management Agency**
- Bureau of Land Management
- Bureau of Reclamation
- Department of Defense
- Department of Energy
- Fish and Wildlife Service
- Local
- National Park Service
- Other
- State
- Tribal
- U.S. Forest Service

\* Data source: © 2017 S&P Global Platts. All rights reserved.

CS078d

**Key for All Figures**

2

BLM_0167076



**Figure 2a. Corridor 130-274/130-274(E), Including Existing Energy Infrastructure**

BLM_0167077



**Figure 2b. Corridor 130-274, Including Existing Energy Infrastructure**

BLM_0167078

## Corridor Rationale

During scoping for the WWEC PEIS, routes generally following this corridor were suggested by the National Grid and the Western Utility Group. The initial portion of Corridor 130-274 from MP 0 to MP 8.5 was not previously designated, but the remainder of the corridor was previously identified as a locally designated corridor.

*Existing Infrastructure:* Corridor 13-274(E) is an existing management prescription 1D Utility Corridor occupied by a natural gas pipeline operated by TransColorado Gas Transmission Company, LLC. The portion of Corridor 130-274 on the GMUG National Forest is not occupied by any utility transmission, but the remainder of the corridor contains the TransColorado natural gas pipeline, a 230-kV transmission line operated by Western Area Power Administration from MP 30.1 to MP 36.6, and generally follows a 345-kV transmission line operated by Tri-State G & T Association, Inc. from MP 30.1 to MP 63.2. Also included along the corridor is the Nucla-Naturita Tel Co FLPMA Telephone-Telegraph line, the Tri-State 115-kV power transmission line, and the CDOT Federal Aid Highway.

*Potential for Future Development:* The Platts data do not show any planned projects near this corridor. Results from the Corridor Study indicate that there had been some interest by a transcontinental pipeline company for the San Juan National Forest segment, but there was no follow-up and no application was submitted. BLM analysis indicates that there are no pending projects within corridor and no pending utility-scale renewable projects in the area. It is possible that the corridor will be affected by the Gunnison Sage-Grouse Range-wide Draft RMP Amendment/Draft EIS.

## Corridor of Concern Status

Corridor 130-274/130-274(E) is a corridor of concern. Concerns regarding access to coal, direct or indirect impacts to Gunnison Sage-grouse conservation areas, occupied Gunnison Sage-grouse critical habitat, Colorado-proposed Wilderness, and USFS Inventoried Roadless Area were identified in Exhibit A of the Settlement Agreement. These corridor of concern issues are highlighted in yellow in the Corridor Analysis table.

## Conflict Map Analysis

Figures 3a and 3b reflect a comprehensive resource conflict assessment to help the Agencies identify a corridor's proximity to environmentally sensitive areas. The potential conflict assessment (low, medium, high) shown in the figures are based on criteria found on the WWEC Information Center at www.corridoreis.anl.gov. The conflict assessment criteria table was used to identify if the corridor meets the Settlement Agreement siting principles to provide maximum utility and minimum impact on the environment. This facilitates balance between resource protection and potential development. Where feasible, corridors should be sited in the areas of low conflict; however, to meet the requirements in the Energy Policy Act and the siting principles in the Settlement Agreement, corridors may be located in high potential conflict areas. Many energy corridors were designated in land use plans prior to being carried forward into Section 368 designation. In almost all instances, these existing corridors (pre-Section 368) contained existing infrastructure. Corridor 130-274 is entirely within a medium potential conflict area and contains existing infrastructure.

BLM_0167079

Case No. 1:20-cv-02484-MSK   Document 78-3   filed 04/29/21   USDC Colorado   pg 12 of 191



**Figure 3a. Mapping of Conflict Areas in Vicinity of Corridor 130-274/130-274(E)**

BLM_0167080



**Figure 3b. Mapping of Conflict Areas in Vicinity of Corridor 130-274**

BLM_0167081

## Corridor Analysis

The corridor analysis table below identifies issues potentially affecting Corridor 130-274/130-274(E), locations of resources within the corridor, and the results of the analysis by the Agencies. Issues are checked if they are known to apply to the corridor. Corridor of concern issues are highlighted in yellow.

☒ **Energy Planning Opportunities**

☒ **Energy Planning Issues**
  ☐ Physical barrier
  ☒ Jurisdiction
  ☒ Existing infrastructure/available space

☒ **Land Management Responsibilities and Environmental Resource Issues**
  ☐ Air quality
  ☒ Cultural resources
  ☒ Ecological resources
  ☒ Hydrological resources
  ☒ Lands and realty
  ☒ Lands with wilderness characteristics

☐ Livestock grazing
☐ Paleontology
☐ Public access and recreation
☐ Soils/erosion
☒ Specially designated areas
☐ Tribal concerns
☒ Visual resources

☐ **Interagency Operating Procedures**

| REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
| **ENERGY PLANNING OPPORTUNITIES** | | | | | | | |
| 130-274/ 130-274(E) .001 | USFS | San Juan National Forest | Montezuma and La Plata, CO | Substations | Corridor 130-274: MP 61.2 and MP 64.2 | GIS Analysis: two substations within 5 mi of corridor | Nearby substations provide an opportunity for the corridor to accommodate additional transmission. |
| 130-274/ 130-274(E) .002 | | | | Access to coal-fired generation | Not specified. | Settlement Agreement; RFI: re-route corridor to a location that can accommodate transmission tied to renewable energy development. | Currently there is a Tri-State coal-fired power plant near Nucla.  It is connected to transmission lines that do not go through either corridor.  Tri-State recently announced they would be decommissioning this power plant by the end of 2022.  In 2013, BLM evaluated the Four Corners terrain for potential wind power generation and determined there were no realistic opportunities to justify huge investments into this type of renewable energy prospects/ development by private industry. |

BLM_0167082

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| **REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE** | | | | | | | |
| **ENERGY PLANNING ISSUES** | | | | | | | |
| *Jurisdiction* | | | | | | | |
| 130-274/ 130-274(E) .003 | State | State | San Miguel and Dolores, CO | Discontinuous section of corridor | MP 15.5 to MP 18 | GIS Analysis: State lands in corridor gap. | BLM and USFS can only authorize projects on Federally-administered lands. Development in corridor gaps would require coordination outside of the Agencies. |
| 130-274/ 130-274(E) .004 | NA | Private and State | San Miguel and Dolores, CO | Private and state lands within corridor gap | MP 8.5 to 31.5 | RFI: impact that development within the corridor could have on state or privately owned parcels (jurisdictional corridor gaps –) that are located between designated corridor segments on Federal lands. Recommend that the Agencies extend assessment of existing corridors to non-federal lands, including private and state trust lands. | BLM and USFS can only authorize projects on Federally-administered lands. Development in corridor gap would require coordination outside of the Agencies. |
| *Existing Infrastructure/Available Space* | | | | | | | |
| 130-274/ 130-274(E) .005 | BLM and USFS | Tres Rios FO and San Juan National Forest | La Plata and Montezuma, CO | Existing infrastructure | MP 53.3 to MP 65.5 | GIS Analysis: several transmission lines, pipelines and the corridor both follow each other and intersect at angles. | Generally does not affect use of the corridor. Proposed project siting and colocation alternatives to address impacts would be analyzed during the ROW application process. |
| 130-274/ 130-274(E) .006 | BLM | San Juan National Forest | Montezuma and La Plata, CO | State Highway 145 and U.S. Highway 160 | MP 40.9 to MP 41 and MP 64.6 to MP 65 | GIS Analysis: roads and corridor intersect. | Generally does not affect use of the corridor. Consistent with BLM ROW regulations, notification to adjacent ROW holders would be provided. |
| **LAND MANAGEMENT RESPONSIBILITIES AND ENVIRONMENTAL RESOURCE ISSUES** | | | | | | | |
| *Cultural Resources* | | | | | | | |
| 130-274/ 130-274(E) .007 | BLM | Tres Rios FO | | Cultural sites | Not specified. | Agency Input: large known cultural sites with associated surveys. | Not a consideration for corridor-level planning. Section 106 process would be followed to identify possible impact of development during the ROW application process. |

BLM_0167083

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| | | | | | | | The Tres Rios FO RMP has no ROW exclusion or avoidance prescriptions for cultural resources, but the RMP does state that important cultural areas and traditional cultural properties need protection. |
| **Ecology: Special Status Animal Species** | | | | | | | |
| 130-274/ 130-274(E) .008 | USFS | GMUG National Forests | San Miguel, CO | Gunnison Sage-grouse critical habitat (ESA-listed: threatened) | MP 4.2 to MP 4.6 within Corridor 130- 274(E) and MP 6.2 to MP 13.2 | Settlement Agreement; RFI: reroute to avoid concern.  GIS Analysis: corridor intersects critical habitat in southernmost portion of the corridor on the GMUG National Forest. . | GMUG National Forest LRMP has no ROW exclusion or avoidance prescriptions for Gunnison Sage-grouse critical habitat. However, the LRMP does acknowledge the need to protect federally listed species and their habitats. The Agencies should consider opportunities for corridor revision to avoid most areas of critical habitat and still encompass existing infrastructure. |
| 130-274/ 130-274(E) .009 | USFS | GMUG National Forests | San Miguel, CO | Gunnison Sage-grouse conservation areas | Not specified. | Settlement Agreement; RFI: reroute to avoid concern. | Gunnison Sage-grouse conservation areas have not been identified and are not a consideration for the review at this time. |
| **Hydrology: Surface Water** | | | | | | | |
| 130-274/ 130-274(E) .010 | BLM and USFS | Uncompahgre FO and San Juan National Forest | Dolores and Montezuma, CO | Stream crossings: Disappointment Creek, Beaver Creek, Dolores River, Lost Canyon Creek, Chicken Creek, West Mancos River, Middle Mancos River, East Mancos River, and unidentified intermittent streams | MP 19.8, MP 32.9 to MP 33.5, MP 38.5 to MP 39.1, MP 41, MP 48.8 to MP 49.2, MP 55.4 to MP 56, MP 56.3 to MP 57, MP 60 to MP 60.9, and MP 62.2 to MP 63.7 | GIS Analysis: streams and corridor intersect. | Not a consideration for corridor-level planning. Linear ROWs can either span streams or be buried underneath them. |
| **Lands and Realty: Rights-of-Way and General Land Use** | | | | | | | |
| 130-274/ 130-274(E) .012 | BLM and USFS | Tres Rios FO and San Juan | Montezuma and La Plata, CO | NSO Area | MP 64.9 to MP 65.3 | GIS Analysis: NSO Area intersects corridor. | Pipeline must accommodate directional underground drilling only within two extremely steep river/canyon corridors |

At the top spanning the table: **REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE**

BLM_0167084

*Corridor 130-274/130-274 (E)*          *Section 368 Energy Corridor Regional Reviews - Region 2*          *January 2018*

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| | | National Forest | | | | Agency Input: NSO for riparian habitat exists in a small area of Corridor 130-274(E). | that are subject to landslides, including the Dolores River Canyon and Lost Canyon within the San Juan National Forest. Substantial investments in mitigation efforts/bonding are likely in these canyon corridors, if surface disturbance is warranted. |
| 130-274/130-274(E) .013 | USFS | GMUG National Forests | San Miguel, CO | Oil and gas leases | Not specified. | Agency Input: in the GMUG, the corridor is in an area available for oil and gas leasing per 1993 leading decision. | Controlled surface use stipulations would apply mostly in corridor areas. There are no existing leases on the GMUG, however there are existing leases to the west and northwest. |
| **Lands with Wilderness Characteristics** | | | | | | | |
| 130-274/ 130-274(E) .014 | | | | Citizens' proposed wilderness | Not specified. | Settlement Agreement; RFI: reroute to avoid concern. | This citizens' proposed wilderness is not in the RMP management prescriptions and is therefore not a consideration at the time of this review.<br><br>There are no wilderness proposals on the GMUG National Forests. The San Juan Mountain Wilderness Proposal currently identifies the Naturita Canyon, approximately 2 miles east of 130-274(E) as an area to be withdrawn from mineral leasing to prevent oil and gas leasing from occurring. Naturita Canyon is a Colorado Roadless Area and is not affected by the existing Transcolorado pipeline in Corridor 130-274(E). |
| **Public Access and Recreation** | | | | | | | |
| 130-274/ 130-274(E) .015 | State | Colorado Parks and Wildlife | Montezuma, CO | Mancos State Park | MP 57.1 to MP 59.9 | GIS Analysis: park is as close as 1.8 mi west of corridor. | The park does not intersect the corridor and is therefore not a consideration for use of the corridor at corridor-level planning. |

BLM_0167085

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| **REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE** | | | | | | | |
| *Specially Designated Areas* | | | | | | | |
| 130-274/ 130-274(E) .016 | USFS | San Juan National Forest | La Plata and Montezuma, CO | San Juan Skyway Scenic Byway | MP 40.9 to MP 41.1 and MP 64.6 to MP 64.9 | GIS Analysis: the San Juan Skyway Scenic Byway and the corridor intersect. | The San Juan National Forest LRMP has no ROW exclusion or avoidance prescriptions for the San Juan Skyway Scenic Byway. The corridor intersects the Scenic Byway only at its intersection (a relatively small portion of the Byway). Coordination with CDOT would be required to identify any management prescriptions related to the scenic highway, including methods to reduce visual impacts on the byway. |
| 130-274/ 130-274(E) .017 | BLM and USFS | San Juan National Forest and Uncompahgre FO | Montezuma and San Miguel, CO | Naturita Canyon and Storm Peak Colorado Roadless Areas | MP 8.5 (near), MP 38.4 to MP 45.6 (near) | Settlement Agreement; RFI: reroute to avoid concern; GIS Analysis: Storm Peak Colorado Roadless Area as close as 1.2 mi to corridor, Naturita Canyon Colorado Roadless Area as close as 1.5 mi to corridor. | The corridor is outside of the Colorado Storm Peak and Naturita Canyon Colorado Roadless Areas. The Colorado Roadless Areas would not influence development and management inside of the corridor. |

BLM_0167086

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| **REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE** | | | | | | | |
| 130-274/ 130-274(E) .018 | BLM and USFS | Tres Rios FO and San Juan National Forest | La Plata and Montezuma, CO | Old Spanish National Historic Trail | MP 64.8 to MP 64.9 | GIS Analysis: the OSNHT and the corridor intersect. <br><br> Agency Input: San Juan National Forest Plan guidelines for development of the corridor include: <br><br> -Other resource activities should be designed in order to meet scenic quality objectives for these special designation trails (generally, a foreground and middle-ground of very high to high scenic integrity or VRM Class II). <br><br> -A literature search and/or Class III cultural resources survey should be conducted within 0.5 mile of either side of the centerline of the congressionally designated OSNHT in high potential segments, prior to authorization of ground-disturbing activities or activities that could substantially interfere with the nature and purposes of the trail. | The OSNHT is a Congressionally designated trail. Adherence to IOPs would be required. Through project-specific environmental reviews, impacts would be analyzed in relation to any other alternatives that would be identified. <br><br> The Agencies have identified the need for a new IOP to address development in Section 368 energy corridors while protecting values in Congressionally designated NHTs. |
| 130-274/ 130-274(E) .019 | BLM | Tres Rios FO | Montezuma, CO | Menefee Mountain WSA | MP 65.1 (near) | GIS Analysis: WSA as close as 1.2 mi southwest of corridor. | The corridor does not cross the WSA and therefore is not a consideration for corridor-level planning. |

BLM_0167087

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| **REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE** | | | | | | | |
| *Visual Resources* | | | | | | | |
| 130-274/ 130-274(E) .020 | BLM | Tres Rios FO | Montezuma, CO | VRM Class I | MP 65.5 | GIS Analysis: VRM Class I areas are as close as 1.2 mi west of corridor. | There are no Class I areas within the corridor. |
| 130-274/ 130-274(E) .021 | BLM | Tres Rios FO | San Miguel and Dolores, CO | VRM Class II | MP 13.9 to MP 14.4 and MP 18 to MP 19.5 | GIS Analysis: VRM Class II areas in corridor gap. | Future development within the corridor could be limited as VRM Class II allows for low level of change to the characteristic landscape. Management activities may be seen, but should not attract the attention of the casual observer. |
| 130-274/ 130-274(E) .022 | BLM | Uncompahgre FO | San Miguel | VRI Class III | MP 0 to MP 4.5 MP 0 to MP 0.5 | GIS Analysis: VRI Class III areas and the corridor intersect. No VRM indicated in the San Juan/San Miguel RMP, 1985, so VRI data used. | The BLM utilizes the VRM system to manage and protect visual/scenic resources. VRM cannot occur in a systematic and objective manner without a proper inventory of visual resources. An accurate inventory of visual resources creates the needed baseline data to conduct VRM. The VRI is a methodical process intended to evaluate and determine the quality of visual resources and the value of those resources in a given area. A VRI was completed for the Uncompahgre FO in September of 2009. While not yet incorporated into the current RMP, this data is the most recent and comprehensive data available for visual resources within the Uncompahgre FO. |
| 130-274/ 130-274(E) .023 | BLM | Tres Rios FO | San Miguel, Montezuma, and La Plata, CO | VRM Class III | MP 0 and MP 64.6 to MP 65.5 MP 64.9 | GIS Analysis: VRM Class III areas and corridor intersect. Agency Input: The Old Spanish National Historic Trail and Road 109 transect a VRM Class III area of the corridor. A gas pipeline is currently located in the corridor | VRM Class III allows for moderate change to the characteristic landscape, although minimizing visual contrast remains a requirement. Management activities may attract the attention of the casual observer, but shall not dominate the view. |

BLM_0167088

| ID | Agency | Agency Jurisdiction | County | Primary Issue | Corridor Location (by Milepost [MP]) | Source | Agency Review and Analysis[1] |
|---|---|---|---|---|---|---|---|
| REGION 2 – CORRIDOR 130-274/130-274 (E) – ANALYSIS TABLE | | | | | | | |
| 130-274/ 130-274(E) .024 | USFS | San Juan National Forest | Montezuma, Dolores, CO | SIO classes | Not specified. | Agency Input: no Very High SIO but a few places of High SIO. | Future development within the corridor could be limited. Landscape character appears intact. Deviations may be present but must repeat the form, line, color, texture, and pattern common to the landscape. |

[1] Projects proposed in the corridor would be reviewed during the ROW application review process and would adhere to federal laws, regulations, and policy.

## Abstract Acronyms and Abbreviations

BLM = Bureau of Land Management; CDOT = Colorado Department of Transportation; FO = Field Office; EIS = Environmental Impact Statement; GIS = geographic information system; GMUG = Grand Mesa, Uncompahgre, Gunnison National Forests; IOP = Interagency Operating Procedure; IRA = Inventoried Roadless Area; LRMP = Land and Resources Management Plan; MP = milepost; NEPA = National Environmental Policy Act; NHT – National Historic Trail; MS = Manual Section; NSO = no surface occupancy; OSNHT = Old Spanish National Historic Trail; PEIS = Programmatic Environmental Impact Statement; RFI = Request for Information; RMP = Resource Management Plan; ROW = right-of-way; SIO = Scenic Integrity Objective;  USFS = U.S. Forest Service; VRI = Visual Resource Inventory; VRM = Visual Resource Management; WSA = Wilderness Study Area; WWEC = West-wide Energy Corridor.

BLM_0167089

SAN MIGUEL COUNTY

**Attachment C:  Conflict Assessment Criteria Table for Section 368 Energy Corridor Reviews**

Energy Corridor Conflict Assessment Criteria Table document provided by Agencies for review, downloaded February 2018 at http://www.corridoreis.anl.gov/documents/docs/conflict_assessment_table.pdf

17

Corridor reviews use a comprehensive resource conflict assessment to help the Agencies identify a corridor's proximity to environmentally sensitive areas. The potential conflict assessment (low, medium, high) is generated using the criteria from BLM's new regulations for prioritizing applications for solar and wind energy projects (43 CFR 2804.35(a)-(c)). The Agencies incorporated the criteria into the conflict assessment criteria table, shown below. The matrix was applied to each corridor to generate conflict maps to aid in reviewing whether the corridor's current location best meets the Settlement Agreement siting principles to provide maximum utility and minimum impact to the environment.

Where feasible, corridors should be sited in the areas of low conflict; however, to meet the requirements in the Energy Policy Act and the siting principles in the Settlement Agreement, corridors may be located in medium and high potential conflict areas. In those instances, it's important to note many energy corridors were already designated in land use plans prior to being carried forward into Section 368 designation. In almost all instances, these existing corridors (pre-Section 368) contained existing infrastructure. Retaining corridors through these areas may be the best option available for providing long-distance pathways for electrical transmission and pipelines while avoiding disperse development across Federal lands.

**Table 2-5 Conflict Assessment Criteria Table for Section 368 Energy Corridor Reviews**

The blue rows indicate the conflict criteria, while the white rows underneath are individual GIS data layers associated with the criteria.

| Low Potential Conflict Areas |
|---|
| **Lands designated as Visual Resource Management Class IV** |
| VRM Class IV |
| |
| **Previously disturbed sites or areas adjacent to previously disturbed or developed sites** BLM data were not available for inclusion in the figures in individual abstracts, but existing infrastructure can be viewed on the Section 368 Mapper. |
| Existing transmission lines |
| Existing pipelines |
| Existing roadways and railways |
| Existing telecommunication lines, communication sites |
| Existing agricultural uses |
| Other energy development (e.g. adjacent windfarms, solar farms, power generation facilities, substations) |
| **Lands identified in BLM land use plans as suitable for disposal** No BLM data are available for inclusion in the graphical display |
| **Lands specifically identified as appropriate for solar or wind energy development, other than designated leasing areas** |
| Solar Energy Zones |
| BLM AZ Renewable Energy Development Areas |
| DRECP Development Focus Areas Restricted to Solar and/or Geothermal Energy |

| Medium Potential Conflict Areas |
|---|
| ■ **BLM special management areas that provide for limited development, including recreation sites and facilities** |
| *Areas of Critical Environmental Concern* |
| *DRECP Extensive Recreation Management Areas* |
| *Other recreation sites and facilities, as data are available* |
| ■ **Lands with wilderness characteristics outside Wilderness and Wilderness Study Areas that have been identified in an updated wilderness characteristics inventory** |
| *Lands Inventoried and Managed for Wilderness Character* |
| ■ **ROW avoidance areas** |
| *ROW Avoidance Areas* |
| ■ **Areas where project development may adversely affect resources and properties listed in a national register, such as in the National Register of Historic Places, National Natural Landmarks, or National Historic Landmarks** |
| *Properties Listed in the National Register of Historic Places* |
| *National Natural Landmarks* |
| *National Historic Landmarks* |
| *National Historic Parks* |
| ■ **Sensitive habitat areas, including important species use areas, riparian areas, or areas of importance for Federal or State sensitive species** |
| *Greater Sage-grouse General Habitat Management Areas* |
| *Greater Sage-grouse Priority Habitat Management Areas* |
| *Desert Tortoise Designated Critical Habitat* |
| *DRECP Wildlife Allocations* |
| *Important Bird Areas* |
| *Sagebrush Focal Areas* |
| *USFWS-identified Desert Tortoise Connectivity Areas* |
| *Least Cost Corridors for Tortoise Population Connectivity* |
| *DRECP Tortoise Conservation Areas and Linkages* |
| ■ **Lands designated as Visual Resource Management Class III** |
| *VRM Class III* |
| ■ **DoD operating areas with land use or operational mission conflicts** |
| Military Training Route: Instrument Route Corridors |
| Military Training Route: Slow Route Corridors |
| Military Training Route: Visual Route Corridors |
| Special Use Airspace - Low Altitude |
| *DoD High Risk of Adverse Impact Areas* |
| ■ **Areas where project development may adversely affect lands acquired for conservation purposes** |
| *Lands Acquired with Federal Funds for Conservation Purposes* |
| *Boulder City Conservation Easement* |
| ■ **Projects with proposed groundwater uses within groundwater basins that have been allocated by State water resource agencies** |
| No data are available for inclusion in the graphical display |

| High Potential Conflict Areas |
|---|
| ■ **Lands designated by Congress, the President, or the Secretary for the protection of sensitive viewsheds, resources, and values (e.g., units of the National Park System, Fish and Wildlife Service Refuge System, some National Forest System units, and the BLM National Landscape Conservation System), which could be adversely affected by development** |
| Units of the National Park System |
| Units of the Fish and Wildlife Refuge System |
| National Monuments |
| Wilderness Areas |
| Wilderness Study Areas |
| National Conservation Areas (except CDNCA) |
| Other Lands in the NLCS |
| EPA Class I Air Quality Areas |
| DRECP California Desert National Conservation Lands |
| DRECP National Scenic Cooperative Management Areas |
| USFS Roadless Areas |
| National Historic Trails |
| National Scenic Trails |
| National Recreation Trails* |
| |
| ■ **Wild and Scenic Rivers and Recreational Rivers and river segments deemed suitable for Wild and Scenic River status, if project development could have significant adverse effects on sensitive viewsheds, resources, and values** |
| Wild and Scenic Rivers |
| Recreational Rivers* |
| River segments deemed suitable for Wild and Scenic River status* |
| |
| ■ **Designated critical habitat for federally threatened or endangered species, if project development could result in the destruction or adverse modification of that critical habitat** |
| Critical Habitat Areas |
| Critical Habitat Lines |
| |
| ■ **Lands designated as Visual Resource Management Class I or Class II** |
| Visual Resource Management Class I |
| Visual Resource Management Class II |
| |
| ■ **ROW exclusion areas** |
| ROW exclusion areas |
| |
| ■ **Lands designated as no surface occupancy for oil and gas development in BLM land use plans** |
| No Surface Occupancy |
| *No data are currently available for inclusion in the graphical display |

JUN 1 0 2009

# MEMORANDUM OF UNDERSTANDING

## BETWEEN

## SAN MIGUEL COUNTY, COLORADO

## AND THE

## BUREAU OF LAND MANAGEMENT

## UNCOMPAHGRE FIELD OFFICE

## I.   INTRODUCTION

The Bureau of Land Management (BLM), Uncompahgre Field Office, is undertaking a major revision of their Resource Management Plan (RMP) beginning in the spring of 2009. The BLM anticipates that the RMP revision and associated environmental impact statement (EIS) will take approximately four years to complete.

San Miguel County is eligible to become a Cooperating Agency for the duration of the RMP/EIS process. Cooperating Agency status provides an opportunity for the BLM, San Miguel County and other Cooperating Agencies to work together to enhance the BLM's planning efforts.

This Memorandum of Understanding (MOU) sets forth roles and responsibilities for the Cooperating Agencies as agreed upon between San Miguel County and the Uncompahgre Field Office (UFO) for the purposes of collaborative planning and production of the RMP and EIS.

## II.   PURPOSE

In carrying forth its responsibilities and mandates under the National Environmental Policy Act and Council of Environmental Quality regulations at 40 Code of Federal Regulations (CFR), Part 1500 and the Federal Land Policy and Management Act (as amended) CFR Part 1600, the BLM recognizes a compelling need to ensure that the interests of San Miguel County are accounted for, and that they are meaningfully engaged in the above stated resource management planning effort and associated EIS.

As such, San Miguel County has requested, and the BLM has agreed to grant, Cooperating Agency Status pursuant to 40CFR 1501.6, 1501.2, and 1501.8. Under the regulations, the BLM recognizes that San Miguel County has special expertise as it relates to various aspects of the planning effort described above.

## III.  AGENCY DESIGNATIONS

Appendix A specifies Agency Representatives. Each participating entity will designate one primary representative to attend meetings and to act as a point of contact to ensure coordination and exchange information between San Miguel County and the BLM during the planning process. An entity may change its representative at any time by providing written notice to the other party. Cooperating Agencies may also involve "in-house" specialists in discussions, when a specific topic warrants such expertise.

## IV.  AUTHORITIES FOR AGREEMENT

Authority for the BLM and San Miguel County to participate in this agreement is provided by the National Environmental Policy Act, 42 USC 4321 et seq. and 40 CFR 1501.6 – Cooperating Agencies, 1506.2 – Elimination of Duplication with State and Local Procedures, and 1508.5 – Cooperating Agency (CA).

Additional authority comes from the Federal Land Policy Management Act, 43 USC 1712 et seq., which mandates coordination of BLM planning and management efforts with the programs of state and local governments which may be affected by those planning actions.

## V.  ROLES AND RESPONSIBILITIES

### A.  RESPONSIBILITIES OF THE BUREAU OF LAND MANAGEMENT, UFO

The BLM UFO is responsible for the following:

i.  To prepare and ensure the content and quality of the Draft RMP/Draft EIS, the Proposed RMP/Final EIS, and the Record of Decision/Approved RMP.

ii.  To provide San Miguel County with meaningful opportunities for participation, including involvement in:

- identifying issues and concerns of relevance to the planning effort,

- identifying or providing data that is suitable, available and relevant to the planning effort,

- reviewing and commenting on draft sections of the EIS for which San Miguel County provided input due to its special expertise.

iii.  To consider and incorporate information and comments provided by San Miguel County into EIS documents to the extent possible and where appropriate.

iv.  To make all final determinations regarding the content of the EIS document.

BLM_0167095

B. RESPONSIBILITIES OF SAN MIGUEL COUNTY

San Miguel County has special expertise in a number of areas related to planning, and as such, is responsible for the following:

i. Along with other involved Cooperating Agencies, to participate in the planning process to the fullest extent possible.

ii. To assist the BLM with the identification of issues and concerns to be addressed through the planning effort.

iii. To provide data of potential relevance and value to the RMP revision/EIS effort. This data may include but is not limited to the following:

- approved San Miguel County programs, plans and policies potentially affected by the RMP,

- information regarding planning area resources and current and proposed uses and management actions,

- environmental analyses on issues for which San Miguel County has special expertise,

- socio-economic data such as demographics, activities and values.

iv. To review and provide comments during specified review periods on preliminary baseline and other technical reports for which San Miguel County has contributed data or other pertinent information.

v. To review and provide comments during specified review periods concerning the following sections of the preliminary Draft EIS:

- preliminary range of alternatives to be considered in detail,

- relevant portions of the "Affected Environment" section (including the socio-economic portion),

- relevant portions of the "Environmental Consequences" section,

- relevant portions of the "Consultation and Coordination" section, including information on consistency reviews.

vi. During public review periods for the Draft EIS, to provide the BLM with a consolidated comprehensive review of the Draft EIS.

vii. To assist the BLM with analyzing and reviewing public comments and data, and with the development of the Proposed RMP/Final EIS.

BLM_0167096

## VI.   FUNDING

Each entity agrees to fund its own expenses associated with this planning process.

## VII.   JOINT RESPONSIBILITIES

The parties agree to use their best efforts to meet the timeframes established in the agreement, to work cooperatively, and to resolve differences as quickly as possible.

## VIII.   IMPLEMENTATION, AMENDMENT AND TERMINATION

This agreement becomes effective upon signature by all parties, and may be subsequently amended through written agreement of all signatories.  The parties agree to jointly develop a framework for information exchange and feedback within 60 days of the signing of this agreement.

San Miguel County or the BLM may terminate this agreement by providing written notice of termination to the other party.  If not terminated sooner, this agreement will end when the Notice of Availability for the Final EIS is published in the Federal Register.

Nothing in this agreement will abridge or amend the authorities and responsibilities of San Miguel County or the BLM or any other party on any matter under their respective jurisdictions.

Nothing in this agreement may be construed to require either San Miguel County or the BLM to obligate or pay funds or in any other way take action in violation of the Anti-Deficiency Act (31 USC 1341) or any State or County law or ordinance.

## IX.   SOVEREIGN IMMUNITY

Neither signatory waives their sovereign immunity by entering into this Memorandum of Understanding.  Each fully retains all immunities and defenses provided by law with respect to any actions based on or occurring as a result of this agreement.

BLM_0167097

## X.   SIGNATURES

The parties hereto have executed this Memorandum of Understanding as of the dates shown below.

BUREAU OF LAND MANAGEMENT

_Barbara L. Sharrow_

Barbara L. Sharrow, Field Manager
Uncompahgre Field Office, BLM

6-8-09
Date

SAN MIGUEL COUNTY, COLORADO

_Elaine Fischer_

Elaine Fischer, Chair
San Miguel County Board of Commissioners

6/3/08
Date

Page 5 of 6

BLM_0167098

## APPENDIX A – AGENCY REPRESENTATIVE

REPRESENTING:      **SAN MIGUEL COUNTY, COLORADO**

Dave Schneck
County Administrator
San Miguel County
PO Box 1170
Telluride, CO  81435
Phone: (970) 728-0447
Fax: (970) 728-3718
Email: daves@sanmiguelcounty.org

REPRESENTING:      **BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE FIELD OFFICE**

Bruce Krickbaum
RMP Project Manager
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401
Phone: (970) 240-5384
Fax: (970) 240-5367
Email: bruce_krickbaum@blm.gov

BLM_0167099

# MEMORANDUM OF UNDERSTANDING

## BETWEEN

## SAN MIGUEL COUNTY

THE UNITED STATES DEPARTMENT OF THE INTERIOR

## BUREAU OF LAND MANAGEMENT

*BY AND THROUGH THE COLORADO STATE DIRECTOR*

REGARDING

DEVELOPMENT OF THE GUNNISON SAGE-GROUSE

ENVIRONMENTAL IMPACT STATEMENT

1

BLM_0167100

## Memorandum of Understanding
### Between San Miguel County, Colorado and the Bureau of Land Management

### 1. Parties to and Purpose for this Document:

This Memorandum of Understanding (MOU) is entered into between San Miguel County, Colorado and the United States Department of the Interior, Bureau of Land Management (BLM), by and through the Colorado State Director (BLM), for the purpose of coordinating and cooperating in conducting an environmental analysis and preparing the Environmental Impact Statement (EIS) for the BLM Gunnison Sage-Grouse EIS Plan Amendment (Project). This MOU establishes San Miguel County as a "cooperating agency" in the EIS and documentation process and establishes procedures through which San Miguel County and the BLM will participate on the BLM interdisciplinary team (IDT) to conduct the analyses and develop the EIS.

San Miguel County has designated County Commissioner Joan May, as primary representative, and County Environmental Health Director Dave Schneck, as alternate representative, to represent San Miguel County as its members on the IDT. The alternate representative may represent San Miguel County, if Commissioner May is unavailable.

### 2. Background:

The BLM is writing an Environmental Impact Statement to analyze incorporating new sage-grouse habitat conservation measures into its Resource Management Plans for the eleven planning units within the range of the Gunnison Sage-Grouse: the Monticello Field Office and the Moab Field Office in Utah, the Grand Junction Field Office, the Uncompahgre Field Office, the Tres Rios Field Office, the Gunnison Field Office, the San Luis Valley Field Office, the Dominguez-Escalante National Conservation Area, the McInnis Canyons National Conservation Area, the Gunnison Gorge National Conservation Area, and the Canyons of the Ancients National Monument in Colorado.

More than 625,000 surface acres of Gunnison Sage-Grouse habitat are on BLM lands across this range.

The EIS is to comply with National Environmental Policy Act of 1969, 42 U.S.C. 4321 et. seq., as amended (NEPA) and provide support for the Record of Decision (ROD), if applicable.

Consistent with NEPA, and pursuant to the Code of Federal Regulations (40 CFR 1501.6 and 1508.5), State or local governments may participate in the development of environmental documentation for projects where they have jurisdiction by law or special expertise.

The BLM has offered and San Miguel County has accepted cooperating agency status in the development of the EIS for the Project.

### 3. Term of MOU:

2

This MOU shall commence upon the day and date last signed and executed by the duly authorized representatives of the parties to this MOU, and shall remain in full force and effect until terminated. This MOU may be terminated, without cause, by either party upon thirty (30) days written notice to the other party, which notice shall be delivered by hand or by certified mail.

**4.   Responsibilities of San Miguel County:**

- San Miguel County will participate in the EIS and documentation process by providing information regarding environmental issues in which or where San Miguel County has jurisdiction by law or special expertise.

- San Miguel County will have one member appointed to the IDT, as identified in Paragraph 1 above. The San Miguel County member may attend and participate in IDT meetings, will provide supporting documentation, and will provide input as necessary, according to IDT protocol.

- San Miguel County will provide information from its records to the IDT, as needed.

- San Miguel County will submit information at its discretion or upon request by any IDT members or the BLM project manager, within the specified time frames.

- Through San Miguel County's IDT member, San Miguel County will have the opportunity for input to preliminary draft documents prepared during the EIS process. The IDT members may, at any time during the effective term of this MOU, request records by contacting San Miguel County point of contact identified in Section 8i.

- San Miguel County will provide public records, and other records deemed appropriate, and consistent with the provisions specified in Section 8g.

**5.   Responsibilities of the BLM:**

In accordance with 40 CFR 1501.5, the BLM is the Project lead agency.

- The BLM Project Manager is Leigh D. Espy.

- The BLM Project IDT Leader is Travis Haby.

- The BLM will keep all IDT members apprised of current events in relation to the development of the EIS.

- The BLM will consider San Miguel County input and proposals to the maximum extent possible, consistent with legal requirements and its responsibility as lead agency.

- Beyond including San Miguel County in all IDT meetings, the BLM will appropriately involve other cooperating agencies (including but not limited to other County

3

governments, Colorado and Utah State Governments, and federal agencies) in meetings where such involvement would be necessary or of benefit to the process.

- The BLM will ensure that input from San Miguel County is appropriately considered and incorporated into the EIS.

- Any final decisions on BLM-administered lands and federal mineral estate under BLM jurisdiction will be made by the BLM.

6. **Mutual Responsibilities of San Miguel County and the BLM:**

- San Miguel County and the BLM will cooperate in apprising each other, as far in advance as possible, of any related actions or issues that may affect the EIS and documentation process or that may affect either party.

- The parties will cooperate in the development and review of any operating guidelines or agreements between San Miguel County or the BLM and other entities involved in the preparation of the EIS.

- The BLM and San Miguel County agree to meet on issues concerning the EIS at the request of either party.

The San Miguel County representative, the Project IDT Leader, and the Project Manager will serve as the MOU core team. The purpose of the MOU core team will be to coordinate communication among the parties to the MOU throughout the EIS process. MOU core team members will be responsible for relaying information to and from their constituents on a timely basis.

7. **Payment:**

No payment shall be made to either party by the other as a result of this MOU, including but not limited to, payment for any cost incurred as a result of carrying out any responsibility identified above. Each party shall pay its own costs. During the course of the project, should it become necessary for one party to purchase from or make payment or reimbursement to the other party, such arrangements will be covered in a separate cooperative agreement.

8. **General Provisions:**

a. **Amendments.**

Either party may request changes in this MOU. Any changes, modifications, revisions, or amendments to this MOU, which are mutually agreed upon by and between the parties to this MOU, shall be incorporated by written instrument, executed and signed by all parties to this MOU and are effective in accordance with the terms of paragraph 3 above.

b. **Applicable Law.**

4

BLM_0167103

The construction, interpretation and enforcement of this MOU shall be governed by the applicable laws of the United States.

**c. Entirety of Agreement.**

This MOU, consisting of seven (7) pages, represents the entire and integrated agreement between the parties and supersedes all prior negotiations, representations and agreements concerning the EIS, whether written or oral.

**d. Severability.**

Should any portion of this MOU be determined to be illegal or unenforceable, the remainder of the MOU shall continue in full force and effect, and either party may renegotiate the terms affected by the severance.

**e. Sovereign Immunity.**

San Miguel County and the BLM do not waive their sovereign immunity by entering into this MOU, and each fully retains all immunities and defenses provided by law with respect to any action based on or occurring as a result of this MOU.

**f. Third Party Beneficiary Rights.**

The parties do not intend to create in any other individual or entity the status of third party beneficiary, and this MOU shall not be construed so as to create such status. The rights, duties and obligations contained in this MOU shall operate only between the parties to this MOU, and shall inure solely to the benefit of the parties to this MOU. The provisions of this MOU are intended only to assist the parties in determining and performing their obligations under this MOU. The parties to this MOU intend and expressly agree that only parties signatory to this MOU shall have any legal or equitable right to seek to enforce this MOU, to seek any remedy arising out of a party's performance or failure to perform any term or condition of this MOU, or to bring an action for the breach of this MOU.

**g. Exchange of Information.**

Parties to this MOU will have access to all information relevant to the fulfillment of their responsibilities under this agreement. Data provided pursuant to this agreement may contain confidential or proprietary BLM or San Miguel County information. All records or information requested of either party by the other will be reviewed by the releasing party prior to release. To the extent permissible under applicable law, any recipient of proprietary information agrees not to disclose, transmit, or otherwise divulge this information without prior approval from the releasing party. Any breach of this provision may result in termination of this MOU.

5

BLM_0167104

### h.  Administrative Considerations.

Pursuant to 204(b) of the Unfunded Mandates Reform Act of 1995, responsible Federal Agency officials may meet or enter into project level MOUs with officials of State and local Governments or their designees.  During such meetings and development, implementation and monitoring of such MOUs, views, information and advice are exchanged, or input relative to the implementation of Federal programs is obtained.  Such meetings and MOUs will further the administration of intergovernmental coordination.  The meetings or MOUs referred to include, but are not limited to, meetings called for the purpose of exchanging views, information, advice or recommendations, or for facilitating any other interaction relating to intergovernmental responsibilities or administration.

Nothing in this MOU will be construed as limiting or affecting in any way the authority or legal responsibility of San Miguel County or the BLM, or as binding either San Miguel County or the BLM to perform beyond the respective authority of each, or to require either assuming or expending any sum in excess of appropriations available.  It is understood that all the provisions herein must be within financial, legal, and personnel limitations, as determined practical by San Miguel County and the BLM for their respective responsibilities. This MOU is neither a fiscal nor a funds obligation document.

Nothing in this MOU will be construed to extend jurisdiction or decision-making authority to the BLM for planning and management of land and resource uses for any non-Federal lands or resources in the Project area.  Similarly, nothing in this MOU will be construed to extend jurisdiction or decision-making authority to San Miguel County for planning and management of land or resource uses on the Federal lands or mineral estates administered by the BLM.  Both San Miguel County and the BLM will work together cooperatively and will communicate about issues of mutual concern.

### i.  Contacts:

The primary points of contact for carrying out the provisions of this MOU are:

| **San Miguel County** | **BLM** |
|---|---|
| Joan May<br>County Commissioner<br>333 W. Colorado Ave, 3rd Floor<br>PO Box 1170<br>Telluride, CO 81435 | Leigh D. Espy<br>Project Manager<br>2850 Youngfield St.<br>Lakewood, CO 80215 |
| Dave Schneck<br>County Environmental Health Director<br>333 W. Colorado Ave, 3rd Floor<br>PO Box 1170<br>Telluride, CO 81435 | Travis Haby<br>Project IDT Leader<br>2850 Youngfield St<br>Lakewood, CO 80215 |

6

## 9. Signature:

In witness whereof, the parties to this MOU through their duly authorized representatives have executed this MOU on the days and dates set out below, and certify that they have read, understood, and agreed to the terms and conditions, of this MOU as set forth herein.

The effective date of this MOU is the date of the signature last affixed to this page.

ATTEST:

BOARD OF COUNTY COMMISSIONERS
OF SAN MIGUEL COUNTY, COLORADO

San Miguel County Clerk & Recorder
Chief Deputy Clerk — BOCC

By _____
Art Goodtimes, Chair

Date   8/27/14

U. S. DEPARTMENT OF THE INTERIOR,
BUREAU OF LAND MANAGEMENT,
by and through:

Ruth Welch
Colorado State Director

9/4/14
Date

7

| | |
|---|---|
| **From:** | Connell, Jamie E |
| **To:** | Gilbert, Megan A; Connolly, Stephanie A; Barangan, Jayson C; Shoop, Gregory P |
| **Subject:** | Fwd: [EXTERNAL] Letter from Sen. Bennet re BLM Uncompahgre Field Office RMP |
| **Date:** | Tuesday, October 22, 2019 10:55:02 AM |
| **Attachments:** | 10.21.19 Letter to Sec. Bernhardt on UFO PRMP.pdf |
| | GUNNISON COUNTY OFFICIAL PROTEST PROP RMP FEIS.pdf |
| | 07-29-2019 BLM UFO Resource Management Plan Protest - Ouray County.pdf |
| | Paonia_Signed BLM_RMP Letter-7-2019.pdf |
| | SF-VOGA-comment-final.pdf |
| | VOGA-Bennet-RMP-comments.pdf |
| | 2019 07 29 TWS et al UFO RMP Protest FINAL.PDF |

FYI and followup action as appropriate.

*Jamie*

Jamie E. Connell
Department of the Interior Upper Colorado Basin, Region (R7)
BLM Colorado State Director

office: 303-239-3700


---------- Forwarded message ---------
From: **Whitney, John (Bennet)** <John_Whitney@bennet.senate.gov>
Date: Mon, Oct 21, 2019 at 9:05 PM
Subject: [EXTERNAL] Letter from Sen. Bennet re BLM Uncompahgre Field Office RMP
To: jconnell@blm.gov <jconnell@blm.gov>


Jamie


Per my voicemail today here is the letter Senator Bennet sent to Secretary Bernhardt expressing his concerns of the RMP, as well as the relevant attachments. Please don't hesitate to call with any questions or comments.


John Whitney

MICHAEL F. BENNET
COLORADO

COMMITTEES:
AGRICULTURE, NUTRITION, AND FORESTRY

FINANCE

INTELLIGENCE

## United States Senate

WASHINGTON, DC 20510-0609

WASHINGTON, DC:
261 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5852

COLORADO:
CESAR E. CHAVEZ BUILDING
1244 SPEER BOULEVARD
DENVER, CO 80204
(303) 455-7600

http://www.bennet.senate.gov

October 21, 2019

Honorable David L. Bernhardt
Secretary
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Dear Secretary Bernhardt:

I write to highlight issues that the State of Colorado, local governments, sportsmen, businesses, conservationists, and agricultural leaders have raised regarding the proposed Resource Management Plan (PRMP) and final Environmental Impact Statement (FEIS) for the Bureau of Land Management's (BLM) Uncompahgre Field Office (UFO). The enclosed letters suggest the PRMP currently lacks adequate measures to protect water supplies, air quality, wildlife habitat, and the burgeoning recreation economy. I request that you reengage with the community to develop a balanced plan that respects local priorities before the Department finalizes the current proposal.

Local governments in the area are invested in the PRMP because the UFO's management of natural resources deeply affects their way of life. They have been engaged throughout the BLM UFO planning process, both on behalf of their residents and through their status as cooperating agencies. Yet the drastic and unexplained changes to the PRMP have undercut the governments' good faith engagement efforts. BLM's decision to introduce the PRMP with new provisions that directly contradict local feedback at the last minute and provide no opportunity for individuals, cooperating agencies, and stakeholders to share feedback undermines years of collaboration and local engagement. The lack of transparency and unwillingness to work with the involved communities is troubling.

As you will see in the attached letters, the communities that the PRMP affects are very concerned about what the plan will mean to the careful balance they have developed together over the years. Three Colorado counties have filed formal protests to the PRMP. Their concerns include threats to clean water, lack of consideration for at-risk wildlife, and negative effects on their local economies. The PRMP's proposed leasing in the North Fork Valley is particularly concerning to many agricultural producers in the Valley who believe that oil and gas development will threaten the already fragile local water infrastructure and harm their operations.

As a western Colorado native, I know that you share a love for the land and our diverse communities. As these communities continue to change, economies that once depended primarily on natural resource development now also rely on wildlife habitat, recreation, and agri-tourism. To thrive, they need partners in Washington who will listen to their concerns and act in their interests. Therefore, before your agency

BLM_0167108

finalizes any plan for the UFO, I request that you work with these communities to develop a final plan that respects long-standing local priorities and represents a balanced use of our nation's public lands.

Sincerely,

Michael F. Bennet
United States Senator

Cc: Jamie Connell, Colorado State Director, US Bureau of Land Management



**OFFICE OF THE GUNNISON COUNTY ATTORNEY**
David Baumgarten – County Attorney
Matthew R. Hoyt – Deputy County Attorney

July 26, 2019

Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20224-1383

<u>and</u>

Director (210)
Attn: Protest Coordinator
20 M. Street SE, Room 2134 LM
Washington, D.C. 20003

***U.S. Mail and Electronically Submitted
via Instructions Received:***
**https://www.blm.gov/programs/planning-and-nepa/public-participation/filing-a-plan-protest**

Re: Gunnison County Protest to Proposed RMP/Final EIS

Dear Protest Coordinator,

## I.   **INTRODUCTION:**

The Board of County Commissioners of Gunnison County, Colorado ("Gunnison County") respectfully submits this protest ("Protest") regarding the "Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office" ("Proposed RMP/Final EIS").  Pursuant to 43 § C.F.R. 1610.5-2, by this correspondence Gunnison County formally protests approval of the Proposed RMP/Final EIS.

The Proposed RMP/Final EIS contains a primary document numbering more than 800 pages, and 20 appendices numbering more than 2,600 pages, created at a cost

1

BLM_0167110

identified by the Bureau of Land Management ("BLM") to be $3,592,000. The Proposed RMP/Final EIS describes and analyzes five alternatives and one partial alternative for managing a planning area of approximately 3.1 million acres including 2,234,670 acres of federal mineral estate in southwestern Colorado throughout six counties, of which Gunnison County is one. The Proposed RMP/Final EIS does not intend to make any decisions for the BLM Gunnison Gorge in the Dominguez-Escalante Conservation Area, which is managed under separate RMPs. The Curecanti National Recreation Area is withdrawn to the U.S. Department of the Interior ("DOI"), Bureau of Reclamation ("BOR"), and managed by the National Park Service ("NPS") under a Memorandum of Understanding between NPS and BOR. However, while BOR's withdrawn lands within the boundary are withdrawn from appropriation under U.S. mining laws, the area is not closed to fluid minerals leasing or mineral materials disposal. (Proposed RMP/Final EIS, Vol. 1, 1-2.)

Gunnison County is exercising its opportunity to file this Protest within the required thirty (30) days of the date of the formal publication of the Proposed RMP/Final EIS.

Gunnison County identifies below its authority to bring this Protest, the analytical framework that the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act of 1976 ("FLPMA") require of the Proposed RMP/Final EIS, and a critical review of the Proposed RMP/Final EIS.

Gunnison County formally protests regarding the following issues and requests the BLM to consider these issues both individually and collectively:

A. Alternative E is a substantially new agency alternative that differs so dramatically from the alternatives canvassed in the Draft RMP/EIS – and which was drafted in disregard of the requirements of NEPA, FLPMA and the MOU between the BLM

BLM_0167111

and Gunnison County – as to preclude meaningful consideration by Gunnison County and the public. (See: Section V.A. below)

B. Alternative E was presented in the Proposed RMP/Final EIS without all supporting data and files being made publicly and timely available. (See: Section V.B. below)

C. The Proposed RMP/Final EIS was drafted without consideration of Gunnison County's formal planning and land use regulatory regimes. (See: Section V.C. below)

D. The Proposed RMP/Final EIS does not adequately consider the Gunnison Sage-grouse population, habitat and designation as a "threatened species." (See: Section V.D. below.)

E. The Proposed RMP/Final EIS does not adequately consider oil and gas development, its related impacts and, in particular, the newly adopted Colorado Senate Bill 19-181. (See Section V.E. below.)

F. The Proposed RMP/Final EIS does not adequately consider or provide protections for sensitive, threatened and endangered fish, including half mile riparian "no surface occupancy" ("NSO") setbacks and other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW"). (See Section V.F. below.)

G. The Proposed RMP/Final EIS does not adequately consider the consequences of climate change. (See: Section V.G. below.)

H. The Proposed RMP/Final EIS does not adequately consider protection and enhancement of agriculture. (See: Section V.H. below.)

I. The Proposed RMP/Final EIS does not adequately consider management, protection and enhancement of outdoor recreation. (See Section V.I. below.)

3

BLM_0167112

J.  The Proposed RMP/Final EIS does not adequately consider the negative consequences of allowing fluid mineral leasing in the Curecanti Unit.  (See: Section V.J. below.)

K.  The Proposed RMP/Final EIS does not adequately consider issues regarding coal mine methane, including capture and other mechanisms for mitigation of waste methane from existing and abandoned mines.  (See: Section V.K. below.)

L.  The Proposed RMP/Final EIS is based on inadequate NEPA analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources for fluid mineral leasing and surface disturbing activities.  (See: Section V.L. below.)

M.  Alternative E inappropriately contains lands identified for "disposal" that are within 4 miles of a Gunnison Sage-grouse lek, are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation. Gunnison County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the Protest period – or for the 2016 Draft RMP/Draft EIS.  (See: Section V.M. below.)

N.  Gunnison County protests that, regarding certain species, the BLM failed to make available the BLM Biological Assessment ("BA") and the Fish and Wildlife Service ("USFWS") Biological Opinion ("BO"); it is not clear what Alternative the BA and BO analyzed.  (See: Section V.N. below.)

O.  There is inadequate analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources from the impacts of fluid mineral leasing and other surface disturbing activities.  (See: Section V.O. below.)

4

## II. GUNNISON COUNTY'S AUTHORITY TO PROTEST

Gunnison County formally participated as a "cooperating agency" during the development of the Proposed RMP/Final EIS, and has authority to protest both procedural and substantive errors in the Proposed RMP/Final EIS.

Gunnison County has additional authority to file this Protest because, in June 2009, the BLM Uncompahgre Field Office and Gunnison County executed a written "Memorandum of Understanding Between Gunnison County, Colorado and the Bureau of Land Management Uncompahgre Field Office" ("MOU") in which the BLM recognized the "compelling need to ensure that the interests of Gunnison County are accounted for and that [Gunnison County will be] meaningfully engaged in the resource management planning effort and associated EIS." The MOU also recognized that Gunnison County "has special expertise" as it relates to the development of the Proposed RMP/Final EIS. Among the areas which the MOU expressly granted Gunnison County the opportunity to participate "to the fullest extent possible" were:

- Identification of issues and concerns to be addressed throughout the planning process;

- Identification of Gunnison County programs, plans and policies potentially affected by the Proposed RMP/Final EIS;

- Identification of socio-economic data such as demographics, activities and values; and

- Review of:

  o The preliminary range of alternatives to be considered in detail;

  o Relevant portions of the "Affected Environment" section;

  o Relevant portions of the "Environmental Consequences" section; and

  o Relevant portions of the "Consultation and Coordination" section – including information on consistency review.

5

Among other obligations, the MOU required the BLM to provide to Gunnison County the opportunity to review and comment on "draft sections of the EIS for which Gunnison County provided its input due to its special expertise." A copy of the MOU is attached as "Exhibit 1."

The formal cooperating agency relationship is intended to provide a framework for intergovernmental efforts by:

- Gaining early and consistent involvement;

- Incorporating local knowledge of economic, social, and environmental conditions and land use requirements;

- Addressing intergovernmental issues and avoiding duplication of effort;

- Enhancing credibility and support for EIS's;

- Building a relationship of trust and cooperation that results in better decisions.

As the government of general jurisdiction in Gunnison County, Colorado, which jurisdiction includes land use planning and activities, and protection of the health, safety and welfare of person in Gunnison County, and the protection of the environment and wildlife in Gunnison County, the Board of County Commissioners of Gunnison County has an interest which is or may be adversely affected by the approval of the Proposed RMP/Final EIS. Relevant statutes include Colo. Rev. Stat. § 18-9-117, 29-20-101, 30-28-101 et seq., 30-11-107 et seq., 38-1-202, 42-1-102, 42-4-106, 43-1-217, 43-2-101, 43-2-201.1.

### III.   RELATIONSHIP AMONG THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA"), THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 ("FLPMA"), AND THE PROPOSED RMP/FINAL EIS

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures... requir[ing] that agencies take a <u>hard look</u> at environmental consequences."

6

BLM_0167115

40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of the best available information and data, as well as disclosure of any inconsistencies with federal policies and plans. NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action, as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *DOT. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). The BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal v. Salazar*, 875 F. Supp. 2d 1233, 1249. (D. Colo. 2012).

Through the RMP planning process, the BLM Uncompahgre Field Office is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it, and takes into account, all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com. 146 U.S. App. D.C. 33*, 449 F.2d 1109, 1114 (1971).

7

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colo. Envtl. Coal.*, 185 F.3d 1162 at 1174 (10th Cir. 1999)(quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone*, 359 F.3d at 1277 (citing *Colo. Envtl. Coal.*, 185 F.3d 1162 at 1174); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow the BLM to take a hard look at the available options, courts apply the "rule of reason." *N.M. ex rel. Richardson v. the BLM.*, 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

"The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate." *Westlands*, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[1] *See Dombeck*, 185 F.3d at 1174–75;

---

[1] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," *Dombeck*, 185 F.3d at 1175.

BLM_0167117

*Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1520 (9th Cir. 1992).

FLPMA is the BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states:

"[I]t is the policy of the United States that … the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use…" 43 U.S.C. § 1701(a)(8).

The BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, subject to NEPA and undertaken pursuant to FLPMA, requires the BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate.  Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands;

9

BLM_0167118

consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9). Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)).  As provided by the Tenth Circuit:

> "It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses… BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public land]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration." *N.M. ex rel. Richardson*, 565 F.3d at 710.

Accordingly, the Proposed RMP/Final EIS revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with the potential value of development of those public lands. It is incumbent on the BLM Uncompahgre Field Office to evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. *See N.M. ex rel. Richardson,* 565 F.3d at 709.

10

BLM_0167119

As stated by the BLM:

> "The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses…BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy." Proposed RMP/Final EIS at 1-2.

This purpose does not take development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised national-level policy." *See N.M. ex rel. Richardson,* 565 F.3d at 710-11.

FLPMA also recognizes the importance of Gunnison County's role in the planning process providing that the BLM shall:

> "…to the extent consistent with the laws governing the administration of the public, lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the State and local governments within which the lands are located…assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs,

11

land use regulations, and land use decisions for public lands, including early

public notice of proposed decisions which may have a significant impact on non-

Federal lands…"  43 U.S.C. § 1702(c)(9).

## IV.     ALTERNATIVES

To facilitate review of this Protest, Gunnison County is informed of the following

"alternatives" identified in the Proposed RMP/Final EIS:

**Alternative A**

Alternative A meets the requirement that a "no action" alternative be considered.

Alternative A continues current management direction and prevailing conditions derived

from existing planning documents.

**Alternative B**

Alternative B emphasizes improving, rehabilitating, and restoring resources and

sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish

species, while allowing appropriate development scenarios for allowable uses (such as

mineral leasing, locatable mineral development, recreation, rights-of-way (ROW), and

livestock grazing). It particularly targets the habitats needed for the conservation and

recovery of federally listed, proposed, or candidate threatened and endangered plant and

animal species. Goals and objectives focus on environmental and social outcomes

achieved by sustaining relatively unmodified physical landscapes and natural and cultural

resource values for current and future generations. This alternative would establish the

greatest number of special designation areas such as areas of critical environmental

concern ("ACEC")[2] and special recreation management areas, with specific measures

---

[2] ACEC's are areas identified by the BLM in accord with the 1976 Federal Lands Policy and Management Act ("FLPMA") which established the first conservation ecology mandate for the BLM, where special management attention is needed to protect important historical, cultural, and scenic values, or fish and wildlife or other natural resources.

BLM_0167121

designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

**Alternative B.I**

Alternative B.I is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as the North Fork), primarily in portions of Delta and Gunnison counties. Alternative B.I is a resource-based set of recommendations provided by a community group. This partial alternative is treated as a subset of Alternative B and applies only to the North Fork Alternative Plan area, referred to as the "North Fork area." The North Fork area has 63,390 acres of the BLM-administered surface estate and 159,820 acres of federal mineral estate (underlying the BLM surface and split-estate), 139,540 acres of which are federal fluid minerals. The North Fork Alternative Plan would close certain areas to oil and gas leasing and impose development setbacks with strict surface use restrictions, including no surface occupancy ("NSO"), controlled surface use ("CSU"), and timing limitations ("TLs"), in places where leasing may be allowed. Management actions and allowable uses under Alternative B not superseded by those in Alternative B.I would also apply to the North Fork area.

**Alternative C**

Alternative C would emphasize maximizing utilization of resources, while mitigating impacts on land health. Management direction would recognize and expand existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, ROWs, renewable energy, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

**Alternative D**

13

BLM_0167122

Alternative D was the Agency-Preferred Alternative from the Draft RMP/EIS, dated 6/3/2016 which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape.

**Alternative E: Agency-Proposed RMP**

Alternative E, a wholly new proposed alternative not previously available for review or comment, is the BLM's Proposed RMP. The BLM proposes that Alternative E is a reasonable combination of objectives and actions from the five alternatives (A, B, B.1., C, and D) presented in the Draft RMP/EIS. The BLM states that, among other reasons for presentation of a wholly new alternative for the first time in the Proposed RMP/Final EIS, there are certain "changes in policy and guidance ..." (Proposed RMP/Final EIS Vol. 1, 1-9.) 43 U.S.C. § 1702(1). Presumably this relates to this Department of Interior's policies to prioritize oil and gas development above other uses, despite the clear direction of FLPMA's multiple use mandate. For example, both a March 28, 2017 Executive Order on "Promoting Energy Independence and Economic Growth" and the related March 29, 2017 Interior Secretarial Order 3349 issued to implement it seek to eliminate regulations and policies that "burden" energy development, but actually eliminate actions that would achieve the required balance that is essential to multiple use management. These policies have led to changes in agency policies, especially in managing oil and gas leasing and development, and also infuse the creation of Alternative E.

14

BLM_0167123

## V.   ISSUES PROTESTED BY GUNNISON COUNTY

A.  ISSUE 1: ALTERNATIVE E IS A SUBSTANTIALLY NEW AGENCY ALTERNATIVE THAT DIFFERS SO DRAMATICALLY FROM THE ALTERNATIVES CANVASSED IN THE DRAFT RMP/EIS – AND WHICH WAS DRAFTED IN DISREGARD OF THE REQUIREMENTS OF NEPA, FLPMA AND THE MOU BETWEEN THE BLM AND GUNNISON COUNTY – AS TO PRECLUDE MEANINGFUL CONSIDERATION BY GUNNISON COUNTY AND THE PUBLIC.

The overarching – and procedurally fatal – flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA.  FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process. 43 U.S.C. 1701(a)(5); 43 C.F.R. 1610.2.  The disregard of NEPA and FPLMA has denied to Gunnison County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BLM process that resulted in the Proposed RMP/Final EIS. "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public." *W. Org. of Res. Councils v. the BLM*, 591 F. Supp. 2d 1206, 1218 n.2 (D. Who. 2008), citing *California v. Block*, 690 f. 2d 753, 770 (9th Cir. 1982).

In addition, the creation of a wholly new Alternative E – with neither notice to Gunnison County nor an opportunity for Gunnison County to comment – is in direct contradiction to the BLM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Gunnison County are accounted for and that [Gunnison County will be] meaningfully engaged in the…resource management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Gunnison

15

County to participate "to the fullest extent possible" in the development of the Proposed

RMP/Final EIS.  This obligation is also set out in FLPMA, in the BLM's obligation to

provide for "meaningful" input and "early" notice to local governments with affected

lands and regulations, like Gunnison County.

While the BLM states that "(t)he policy of the BLM is to provide opportunities

for the public, various groups, other federal agencies, Native American Tribal

Governments, and state and local governments to participate meaningfully and

substantively by providing input and comments during the preparation of the RMP/EIS,"

(Proposed RMP/Final EIS, Vol. 1, ES-1), the BLM has created – in the Proposed

RMP/Final EIS – a wholly new Alternative E that thwarts the opportunity for such

participation.

REQUESTED REMEDY: Gunnison County asserts that the only solution to this

overarching and procedurally fatal flaw in the Proposed RMP/Final EIS is to provide a

full "comment" opportunity.  This is also required by NEPA, based on the new

alternative that has been created through the BLM's creation of Alternative E without

sufficient explanation other than an oblique reference to its new policies but

fundamentally changed the overall approach to management throughout the planning

area.  40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity

for comment, is required if an "agency makes substantial changes in the proposed action

that are relevant to environmental concerns"); see also *N.M. ex rel. Richardson*, 565 F.3d

at 705.

B.  ISSUE 2: ALTERNATIVE E WAS PRESENTED IN THE PROPOSED
    RMP/FINAL EIS WITHOUT ALL SUPPORTING DATA AND FILES
    BEING MADE PUBLICLY AND TIMELY AVAILABLE.

The 30-day Protest period was initiated by the publication of the official Notice of

Availability in the Federal Register on Friday, June 28, 2019.  On that date, on the federal

16

e-planning website[3] there were no GIS files newer than June 23, 2016.  Although the Proposed RMP/Final EIS states on page ES-1 "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process."  There were no GIS data files for the new Alternative E.  Further the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire Uncompahgre Field Office decision area across six counties.  This scale does not permit effective review of proposed disposal parcels in context.  Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner.

REQUESTED REMEDY:  Gunnison County asserts that the only solution to this fundamental and fatal flaw is to provide a full "comment period" that is fully informed by timely provision to the public of all supporting data and files.

C.  ISSUE 3: THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT CONSIDERATION OF GUNNISON COUNTY'S FORMAL PLANNING AND LAND USE REGIMES

The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands.  As noted above, this is also required by FLPMA, 43 U.S.C. § 1702(c)(9).  The Proposed RMP/Final EIS is fatally flawed because it does not consider – much less align with – fundamental Gunnison County regulatory regimes.

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&CurrentPageId=86604

17

The Proposed RMP/Final EIS, at Vol. 1, 1-7 through 1-8, identifies as a "related plan and authority," the Gunnison County Land Use Resolution (the "Gunnison County LUR").  But while the Gunnison County LUR is one of the County's significant land use planning and regulatory permitting mechanisms, the Proposed RMP/Final EIS neglects to mention, much less consider:

1. <u>The Gunnison County Regulations for Special Development Projects ("1041 Regulations").</u>  The 1041 Regulations are an exercise of Gunnison County's authority – expressly delegated by the State of Colorado – over subjects that include:

   • Development within mineral resource areas;

   • Development within natural hazard areas;

   • Development within areas around major facilities of a public utility;

   • Development within an area containing or having a significant impact upon historical, natural or archeological resources of statewide importance;

   • Efficient utilization of municipal and industrial water projects; and

   • Development of recreation opportunities.

   The 1041 Regulations are particularly significant because Colorado S.B. 19-181 – which was adopted earlier in 2019 – grants local governments additional authorities regarding siting and development of oil and gas resources.

2. <u>The Gunnison County Regulations for Oil and Gas Operations.</u>
   Pursuant to these regulations, Gunnison County considers potential impacts both on and off federal lands.  The U.S. Forest Service has explicitly recognized the efficacy of the regulations on federal lands.  Subjects considered by these regulations include:

   • Ownership of surface;

   • Ownership of minerals;

18

BLM_0167127

- Characteristics of and current condition of the operation location;

- Topographic features;

- Roads;

- Easements;

- Boundaries of districts, municipalities, or subdivisions;

- Operation plans;

- Water bodies and water structures;

- Access and transportation routes;

- Potential impacts on wildlife and wildlife habitat;

- Potential impacts on vegetation;

- Emergency response;

- Potential impacts on drinking water supplies;

- Municipal watersheds;

- Potential impacts on water quality;

- Waste management;

- Hydraulic fracturing fluids disposal and reporting; and

- Wildfire hazards.

3.  The Gunnison County Coal Resource Special Area Coal Mining Regulations.

These regulations have direct import for the North Fork Valley of the Gunnison

River.

REQUESTED REMEDY:  Gunnison County asserts that the only solution to the

BLM's lack of consideration of the formal Gunnison County planning and land use

regulations is to provide a full "comment period."  As discussed above, a new

opportunity for input is also required by NEPA, based on the new alternative that has

been created through the BLM's creation of Alternative E without sufficient explanation

19

BLM_0167128

other than an oblique reference to its new policies but fundamentally changes the management approach throughout the planning area in a manner that is inconsistent with Gunnison County's regulations and policies.  40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concerns"); see also *N.M. ex rel Richardson*, 565 F.3d at 705.

      D.   <u>ISSUE 4:  THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE GUNNISON SAGE-GROUSE POPULATION, HABITAT AND DESIGNATION AS A "THREATENED SPECIES"</u>

The Proposed RMP/Final EIS is fatally deficient in its consideration of Gunnison Sage-grouse ("GuSG").  The following are significant data not fully considered in the Proposed RMP/ Final EIS:

- The BLM Uncompahgre Field Office Proposed RMP/Final EIS was published in the Federal Register on 6/28/19, over 6 months after the Biological Opinion ("BO") was signed. The Proposed RMP/Final EIS does not address whether – or how - the BO is still applicable, particularly in the context of Alternative E, which appears to be a very new construct in the Proposed RMP/Final EIS.

- The U.S. Fish and Wildlife Service ("USFWS") received the request for a BO from the BLM on July 31, 2018, which included a BA, which Gunnison County has not seen, prepared by the BLM.

- The BLM determined in their BA that the Proposed RMP/Final EIS may affect, and is likely to adversely affect, the GuSG. The USFWS agreed with this determination.

- NSO's are limited to oil and gas and do not cover all rare earth or uranium deposits.

20

- The "action area" was determined to have the following occupied and unoccupied critical habitat areas:

- **Table 1. GuSG Habitat on the Uncompahgre[4]**

Field Office Occupied Critical Habitat

| Population | BLM Surface | Split Estate | Total |
|---|---|---|---|
| CSCSM | 4,526 | 8,332 | 12,858 |
| Crawford | 0 | 0 | 0 |
| Gunnison | 0 | 0 | 0 |
| San Miguel | 821 | 6,790 | 7,610 |
| **Total** | **5,347** | **15,122** | **20,469** |

Unoccupied Critical Habitat

| Population | BLM Surface | Split Estate | Total |
|---|---|---|---|
| CSCSM | 3,888 | 4,375 | 8,262 |
| Crawford | 2,727 | 4,159 | 6,887 |
| Gunnison | 326 | 21 | 347 |
| San Miguel | 0 | 1,228 | 1,228 |
| **Total** | **6,941** | **9,784** | **16,725** |

- There is an apparent discrepancy between Table 1 and mapped occupied habitat in the Crawford population. There are at least 5 known leks, all located on the BLM administered lands in the Crawford population. The BO states that "most of this population falls within the Gunnison Gorge National Conservation Area RMP," but GIS mapping indicates that not all does, and Gunnison County is aware that the BLM wildlife biologist from the BLM Uncompahgre Field Office has long been engaged in GuSG conservation activities. Therefore, the accuracy of this table is questionable, and it likely originated from the BLM's BA for the other populations.

---

[4] The source for this table was the USFWS's BO. This information is not available in the Proposed RMP/Final EIS. Because no GIS information has been provided, Gunnison County cannot verify the accuracy of this table.

BLM_0167130

- The BLM evaluated GuSG habitat in the Cerro Summit-Cimarron and Sims Mesa satellite populations in 2015 and 2016 using their Habitat Assessment Framework ("HAF") methodology. The data collection protocols for the HAF differ significantly from the data collection protocols used to develop the GuSG Rangewide Conservation Plan ("RCP") Habitat Guidelines. Gunnison County is unaware of any methodology that crosswalks the two protocols, and therefore assert that any "habitat suitability" assessments made by the BLM are, at minimum, questionable, and certainly not comparable with the RCP GuSG Habitat Guidelines.

- In their BA, the BLM assumed, among a number of other things, that permitted activities would be mitigated to ensure that threatened or endangered species would not be jeopardized, as that term is defined in the ESA, on a project specific basis or at a cumulative level. Mitigation, defined as alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures or adequate scientific study. Mitigation may be achieved by avoidance, minimization, rectification, reduction, and compensation. (Proposed RMP/Final EIS, Volume II, glossary 23). Though defined, there is no GuSG mitigation plan in the Proposed RMP/Final EIS, meaning that by definition, each and every project requiring mitigation would have a unique, one-off mitigation plan. Of particular note is that during the now-aborted development of the BLM Rangewide GuSG RMP/EIS, a mitigation plan was found to be virtually impossible to develop and adequately address lost habitat, direct impacts to the species and importantly, longevity of the mitigation (how long would it be

22

required to "last", who would monitor it, and if the mitigation failed, what would be the outcome, as the impacts to the species likely had already occurred.[5])

- The BLM stipulations under the Proposed RMP/Final EIS could be excepted, modified or waived by the BLM authorized officer, as described and defined in Appendix B of the Final EIS. Though exceptions are apparently rare in the BLM Uncompahgre Field Office, the USFWS determined they could not rely on this assumption for their BO analysis.

- The USFWS addressed the following impacts to GuSG in their BO:

  o Roads

    ▪ Habitat fragmentation

    ▪ Avoidance

    ▪ Increased human access

    ▪ Exotic plant invasions

  o Powerlines

    ▪ Habitat fragmentation

    ▪ Collision and electrocution risk

    ▪ Reduced lek recruitment

    ▪ Predator perches

    ▪ Reduced habitat use

  o Livestock grazing

    ▪ Decreased vegetation available for concealment

    ▪ Soil compaction (causing vegetation changes)

    ▪ Increased erosion

---

[5] In their BO, the USFWS appears to believe the solution to the uncertainties of mitigation is "adaptive management" without further definition. Gunnison County asserts that this is not a sufficient solution.

23

- Exotic plant species increases

- Trampling of nests/nest abandonment

- Negative aspects of certain types of water developments (primarily WNV)

- Positive aspects of livestock grazing/benefits to the habitat

o Fences

- Collisions

- Raptor and corvid perches

- Predator corridors

- Incursion of exotic species

- Habitat decline

- Positive aspects of fences, as related to grazing management

o Vegetation management

- Short term negative impacts post-treatment

- Long term positive impacts

o Recreation and travel management

- Roads and trails

- Habitat loss

- Degradation

- Fragmentation

- Human activity

- Proposed RMP "eliminates cross-country use in most of the planning area…"

- Beneficial aspects to travel restrictions

- Difficulty of enforcement of travel management restrictions

24

- Reduction of open, cross-country motorized use would be allowed on 3,950 acres within the action area

- Areas closed to motorized travel would be <u>reduced</u> compared to current management (Alternative A) (880 acres, 93 percent fewer acres than under current management). <u>Note: Gunnison County is certain that USFWS was reviewing Alternative E and, therefore, this conclusion may not be applicable</u>.

- Areas closed to motorized and mechanized travel would increase by 30 percent more than current management.

- Areas limited to travel on designated routes would increase 4 times from Alternative A.

- USFWS determined that overall, the Proposed RMP/Final EIS would reduce the potential for effects on GuSG associated with motorized and mechanized travel to a greater extent than current management (Alternative A).

o Lands and Realty

  ▪ ROW facilities may result in habitat loss, fragmentation and degradation

  - Pipelines

  - Roads

  - Transmission lines

  ▪ USFWS determined that they "…believe that the revised RMP directs the BLM to reduce the negative impacts of such request and is unlikely to result in significant losses of GuSG habitat within the

25

BLM_0167134

planning area." Because the term "significant" remains undefined in this context, this conclusion is valid.

- o Energy and Mineral Development

  - ▪ NSO stipulation within occupied GuSG habitat will limit effects to approximately 20,470 acres of occupied critical habitat and 2,800 acres of unoccupied critical habitat.

  - ▪ CSU stipulation on approximately 13,930 acres of unoccupied critical habitat, which could avoid or eliminate effects.

  - ▪ The use of exceptions, modifications and waivers within GuSG critical habitat <u>MAY</u> require re-initiation of Section 7 consultation. *Note: There are no criteria defined to determine who makes this decision nor how it is made.*

  - ▪ The following is a table of additional, specific concerns:

| Page # | Issue/Analysis |
|---|---|
|  |  |
| 2-38 | General – designated occupied habitat of known populations of federally threatened and endangered species as ROW avoidance |
|  | <u>Analysis:</u> Further restriction specific to GuSG lek habitat (1,330 acres, determined by the known lek area, plus a 0.6 mile radius) as ROW exclusion and critical habitat as ROW avoidance (same as above). |
| 2-38 | General - close all federally threatened, endangered and proposed plant species' occupied habitat to mineral materials disposal and non-energy solid mineral leasing. |
|  | <u>Analysis:</u> Affects the skiff milkvetch in Gunnison County |
| T-113 | Stipulation TL-16. GuSG winter habitat. Prohibits surface use and surface disturbing and disruptive activities in mapped important GuSG winter habitat, including but not limited to, all USFWS designated critical habitat and areas also defined by the BLM, USFWS and CPW, from Dec. 1 to March 15 (Appendix B; Figure 2-92, Appendix A) |
|  | <u>Analysis:</u> It is not clear whether this stipulation applies to only "important" (unclear who and how this is defined) winter habitat, or all designated critical habitat and/or areas defined by the BLM, USFWS and CPW as winter habitat or "all" habitat. |
| T-114 | Stipulation TL -18: Addresses GuSG breeding habitat (lek and nesting) and GuSG critical habitat. Prohibits surface use AND surface disturbing AND disruptive activities in USFWS designated OCCUPIED critical habitat, nesting habitat mapped and defined by the BLM, USFWS and CPW and within 4.0 miles of ACTIVE GuSG leks (if nesting habitat is not mapped) from March 1 to July 15 (Appendix B: Figure 2-92, Appendix A.) |

BLM_0167135

| | |
|---|---|
| | **Analysis:** Extends surface use, surface disturbing, surface disruptive activities to USFWS designated occupied critical habitat, mapped nesting habitat and within 4.0 miles of active GuSG leks if nesting habitat is not mapped from March 1 to July 15. It is not clear if the prohibitions are identified singly, or if they all have to occur to be prohibited. It is also not clear if the nesting habitat mapping has to be accomplished by all three agencies separately, or if the other two agencies can agree with determinations made by the third.  There is not a definition of an "active" GuSG lek. There appears to be a discrepancy between the written description of this stipulation and the mapped area impacted as depicted in Figure 2-92. |
| T-114 | Stipulation NSO-31/SSR-32: GuSG breeding habitat. Prohibits surface occupancy and use and applies SSR restrictions in USFWS GuSG OCCUPIED critical habitat and non-designated occupied breeding habitat as mapped and defined by the BLM, USFWS, and CPW (including federal minerals). Appendix B; Figures 2-91 and 2-93, Appendix A. |
| | **Analysis:** Appears to place a no-surface occupancy stipulation, with no timing limitation, on all USFWS designated critical habitat that is also mapped as occupied habitat. Further, it appears to extend that restriction to "non-designated" (outside of designated critical habitat) occupied breeding habitat (leks, nesting, early brood rearing.  The written stipulation does not appear to agree with the mapped areas in Figures 2-91 and 2-93. The applicable figure indicates it is for "fluid minerals", so it likely does not apply to other minerals (hard rock, gravel, etc.) |
| T-116 | Stipulation CSU-29/SSR-34: Gunnison sage-grouse potential habitat. Surface occupancy or use may be restricted and SSR restrictions applied in USFWS GuSG UNOCCUPIED critical habitat or to protect GuSG potentials habitats as mapped and defined by the BLM, USFWS and CPW (including ALL federal minerals). Identifies conservation measures that may be imposed as necessary. (Appendix B; Figures 2-91 and 2-93, Appendix A) |
| | **Analysis:** Allows but does not require (may be restricted) restriction of surface occupancy and use in unoccupied critical habitat and potential habitats identified by the BLM, USFWS and CPW outside of designated, unoccupied critical habitat. It then describes "conservation measures" that appear to be more appropriate in occupied habitat (relocation of operations from identified habitat features critical to brood rearing (only occurs in occupied habitat) |
| T-117 | Action: manage GuSG lek habitat (lek area plus 0.6-mile radius (1,330 acres) as ROW avoidance. |
| | **Analysis:** Appears to exclude ROW's from lek areas and a buffer of 0.6 miles. As lek areas are not circular, indicating a radius does not make sense. It should read "lek area plus a 0.6-mile buffer). If it does not the entirety of the lek use area will not be adequately protected in most cases. |
| T-99; 4-148 | NSO-22/SSR-21: PLANT ESA listed species. Prohibits surface occupancy and use applies SSR restrictions with a 200-meter buffer of the edge of habitat of federally listed, proposed or candidate plant species. |
| | This stipulation only applies to plant species. It would seem to be appropriate for GuSG. |
| T-424 | Line #517, Table T-1. Action: Consider other lands suitable for disposal by any method… |
| | The criteria specific to special status species is: "Are not parcels containing or integral to *significant* habitat for species status species; these parcels may be disposed of only if the habitat for the species of concern can be maintained and if USFWS and CPW concur." The Proposed RMP fails to define or quantify "significant." |

BLM_0167136

- USFWS' "biological opinion" is that implementation of the Proposed RMP/Final EIS, as proposed, is <u>not likely</u> to jeopardize the continued existence of the GuSG. The USFWS' rationale:

  - "Implementation of the RMP, including the conservation measures and use stipulations, will <u>reduce</u> multiple threats to the GuSG and could restore the species to formerly occupied range. We anticipate some low level of adverse effects to the GuSG, but the majority of these effects would be widely distributed across GuSG habitat in the UFO and likely be of low intensity and severity. Any subsequent actions implemented under the revised plan that may affect the GuSG or critical habitat <u>must</u> go through separate Section 7 consultation. *Note: Gunnison County is now certain that the USFWS did not base this upon the now published Proposed RMP/Final EIS, which includes Alternative E.*

  - USFWS provided a list of "additional recommendations"
    - Any activity that results in the permanent loss of proposed critical habitat should include mitigation of (to) offset such losses.
      - It is unclear whether this recommendation was followed by the BLM
    - Recreation – Only allow special recreation permits that have neutral or beneficial affects to occupied habitat areas.
      - It is unclear whether this recommendation was followed by the BLM.

28

BLM_0167137

- Lands/Realty – Retain public ownership of proposed critical habitat. Subject to valid existing rights, co-locate new rights-of-way within existing ROW's.

    - USFWS only addresses <u>proposed</u> critical habitat. The BLM appears to have addressed designated occupied critical and actual habitat in Alternative E.

    - It does not appear that co-locating is addressed in the Proposed RMP/Final EIS.

- Range Management – Within proposed critical habitat, incorporate GuSG habitat objectives and management considerations in all the BLM grazing allotments through allotment management plans or permits renewals. Work cooperatively on integrated ranch planning within GuSG habitat so operations with deeded/BLM allotments can be planned as single units. Design any new structural range improvements and location of supplements (i.e. salt or protein blocks) to conserve, enhance, or restore GuSG habitat through an improved grazing management system relative to GuSG objectives. When establishing or modifying water developments, use best management practices to mitigate potential impacts from WNV.

    - Incorporation of the Proposed RMP/Final EIS GuSG habitat objectives (guidelines) and management considerations into the BLM allotments has a positive impact in the Gunnison Basin for a number of years.

29

The BLM Proposed RMP/Final EIS seems to support the incorporation but only in proposed critical habitats.

- Historically, the Gunnison Basin GuSG CCA has successfully integrated ranch planning into the Gunnison Basin.

o Fluid Minerals – There is a useful criterion developed for the Northwest Colorado Greater Sage-grouse RMPA for consideration of waivers, exceptions and modifications within NSO designated areas.

- Gunnison County can find no indication that the BLM incorporated any of these criteria in the Proposed RMP/Final EIS

o Alternative E appears to allow the BLM to privatize – that is, dispose of – GSG critical habitat

- P. 21 Objective FW-OBJ-IVSP-02:

Treatment of cheatgrass in Gunnison Sage-grouse designated critical habitat is listed as a priority. Gunnison County suggests that prioritization of cheatgrass treatment across ownership/land manager boundaries (private, BLM, State of Colorado, etc.) be noted as the highest priority to achieve order of magnitude effectiveness and minimize/avoid re-infestation.

- P. 29 Desired Conditions FW-DC-SPEC-29

Gunnison County cautions the USFS that the accurate use of the GuSG structural habitat guidelines in the GuSG Rangewide Conservation Plan relies on utilization of sampling protocol that established the guidelines. Using a different sampling protocol then trying to "cross-walk" the data will result in erroneous conclusions regarding meeting/not meeting the habitat guidelines.

30

- P. 30 Objectives FW-OBJ-SPEC-31

  Because of the known impacts that off-leash pets have on Gunnison Sage-grouse, Gunnison County recommends a stronger approach to this issue. We recommend that it be a requirement, not a request, that all pets within Gunnison Sage-grouse habitat be leashed or under immediate command of the owner/public.

- P. 30 Objectives FW-OBJ-SPEC-32

  Fence marking near leks needs to be approached with caution; with consideration given to potential auditory or visual distractions which could impact lek attendance, breeding success, etc.

- P. 30 Objectives FW-OBJ-SPEC-33

  Winter travel is changing in the Gunnison Basin. Mechanical means, such as tracked ATVs, make areas normally not accessible to snowmobiles accessible for both individual users and outfitters. Gunnison County requests, at minimum, a provision for future regulation of over-the-snow travel within Gunnison Sage-grouse critical habitat.

- P. 30 Objectives FW-GDL-SPEC-34

  Gunnison County recommends that this guideline be amended to read "…surface disturbing activities should not be permitted within Tier 1 habitat as defined by the Gunnison Basin Gunnison Sage-grouse Habitat Prioritization Tool (HPT) unless no feasible alternative is available AND that NO surface disturbing activities should be permitted within 0.6 miles of a lek."

- P. 80 Monitoring Question/Indicators

  Gunnison County asks that the USFS clearly identify and define Gunnison Sage-grouse "Core Habitat," to prevent mis-interpretation as the Proposed RMP/Final EIS is implemented.

- FW-DC-SPEC-29

31

BLM_0167140

Forb and grass production and ground cover provide not only "residual" vegetation suitable for nesting cover, but provide hiding cover for all life stages. New vegetation provides food, directly and as a substrate of insects. FW-DC-SPEC-29 focuses only on residual cover. Gunnison County recommends that the SPEC focus not only on residual cover, but on new vegetative cover to address the life stage needs of the Gunnison Sage-grouse.

- Even though the Gunnison Sage-grouse was listed as threatened under the ESA between the Draft RMP/Draft EIS and the Proposed RMP/Final EIS, the BLM has not addressed this listing, and its consequences, sufficiently in the Proposed RMP/Final EIS.  Alternative E has reduced the protection for Gunnison Sage-grouse critical habitat from a right-of-way exclusion to right-of-way avoidance, reducing the certainty of protection.  Proposed RMP/Final EIS, pp.2-38 - 2-39. Alternative E also reduced protection from wind, solar and hydropower developments in Gunnison Sage-grouse breeding, nesting and critical habitat from exclusion to avoidance, removing the certainty that habitat will be safeguarded. Proposed RMP, p. 2-113.  In addition, the NSO stipulations that apply to Gunnison Sage-grouse habitat are subject to "standard" waiver, exception and modification, meaning they can be changed at the discretion of the BLM authorized officer without additional specific criteria being applied.  Proposed RMP/Final EIS, p. B-32.  This approach is significantly less protective than the management being applied to the Greater Sage-grouse, even after amendments completed in 2019 that were focused on increasing energy development and even though that species is not listed as threatened or endangered under the ESA. Under the 2019 Northwest Colorado Greater Sage-grouse Amendment, waivers, exceptions, or modifications of NSO stipulations may only be applied if specific criteria are met and then the State of Colorado must be consulted and agree.

32

BLM_0167141

(Northwest Colorado Greater Sage-grouse Amendment, pp. G-4 – G-7.)  This

management is insufficiently protective of the Gunnison Sage-grouse, is

inconsistent with Gunnison County's approach and will risk the current threatened

status of the species being upgraded to endangered, which will impact Gunnison

County.  Alternative E cannot be supported.  The BLM should return to more

protective management, as well as adopting an approach that requires the input of

the State of Colorado, for waivers, exception or modification of lease stipulations,

similar to that used for the Greater Sage-grouse.

REQUESTED REMEDY:  The numerous, significant and fundamental errors

and omissions regarding Gunnison Sage-grouse require correction through a

full "comment" opportunity.

E.  ISSUE 5: THE PROPOSED RMP/DRAFT EIS DOES NOT ADEQUATELY

    CONSIDER OIL AND GAS DEVELOPMENT, ITS RELATED IMPACTS

    AND IN PARTICULAR, NEWLY ADOPTED COLORADO SENATE BILL

    19-181.

- The BLM states it will "recognize the State's responsibility for permitting related

  to oil and gas activities and in regulating air quality impacts."  (Proposed

  RMP/Final EIS, Vol. 1, 1-5).

- However, Alternative E does not address Colorado S.B. 19-181, which was made

  law between the time of the Draft RMP/EIS and the Proposed RMP/Final EIS.

  S.B. 19-181 prioritizes public health, welfare and safety, the environment, and

  wildlife.[6]  In certain circumstances, this may constrain or even preclude oil and

---

[6] Appendix IV, R-329 contains the following: "Further, the Colorado Oil and Gas Conservation
Commission is the primary agency charged with fostering the responsible development of Colorado's oil
and gas natural resources in a manner consistent with the protection of public health, safety, and welfare,
including the environment and wildlife resources.  Although the BLM does have standards and regulations
for mineral extraction and development, the BLM requires that all operators be in full compliance with
standards and measures set by the Colorado Oil and Gas Conservation Commission when conducting

BLM_0167142

gas exploration and development.  In addition, S.B. 19-181 provides local government jurisdictions the ability to develop oil and gas land use regulations that could be more restrictive than the State's permitting requirements.  As the BLM is likely aware, Gunnison County has the authority to protect and promote the public health, welfare and safety of the people of Gunnison County, and the authority to regulate land use planning and quality and protection of the environment in the County.  To this end, Gunnison County has adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources including oil and gas.  It is critical for the BLM to include compliance with all Gunnison County regulations regarding oil and gas exploration, development, operation and upstream activities as a mandatory element of the Proposed RMP/Final EIS.  In addition, the BLM should include a requirement that any lessee comply with any other land use or environmental regulation imposed by Gunnison County in any way relates to operations on an oil and gas leasehold, including but not limited to water quality, public roads, emergency response, wildlife concerns, agricultural uses and recreation uses.

- Additionally, Alternative E does not provide for adequate "no leasing" and "no surface occupancy" set-backs from residences, steep slopes, geologic hazards, roads and other public use areas.

- Alternative E also does not provide adequate protections for waterbodies and water supply systems.  At a minimum, the Proposed RMP/Final EIS must include:

  NSO stipulations as described in Alternative B/B.I requiring minimum setbacks from water bodies and water supply systems, and in areas with

---

operations on public lands."  The mission of the Commission, as identified above, is consistent with the pre-SB-19-181 role but not the current commission mandate.

BLM_0167143

highly erodible and saline soils.  The Gunnison County Regulations for Oil and Gas Operations require certain mandatory setbacks for such operations in Gunnison County which ought to be adopted in the Proposed RMP/Final EIS at least for Gunnison County, and which can be a model for the Proposed RMP/Final EIS.

- In particular, the Proposed RMP/Final EIS must recognize Gunnison County's authority to regulate mineral development both on private and BLM lands within the County, particularly with regard to oil and gas development and operations.  Both the federal courts, and courts here in Colorado, have made clear that "neither the federal statutory scheme nor the case law relied upon by (oil and gas producers) supports the conclusion that Congress intended to preempt all local regulations in the area of oil and gas operations." See: Bd. of Cty. Comm'rs v. B.D.S. Int'l, LLC, 159 P.3d 773, 785 (Colo. App. 2006), citing Texas Oil and Gas Corp. v. Phillips Petroleum Co., 406 f. 2d 1303 (10th Cir. 1964), and Kirkpatrick Oil and Gas Co. v. United States, 675 f. 2d 1122, 1124 (10th Cir. 1982) ("Congress has prescribed limited, but not exclusive, controls over the leasing of federal lands for oil and gas production.")

- Proposed RMP/Final EIS included Mesa County in the socio-economic impact analysis – even though it is outside of the planning area.  This inclusion skews the economic impact data to enable development of an inaccurate picture of the true economic benefits of the oil and gas industry within the Uncompahgre Field Office managed areas.  We acknowledge the beneficial economic impacts of the industry within Gunnison County but feel that accurate and relevant data points of areas within the Uncompahgre Field Office managed areas ought be used in this analysis.

35

REQUESTED REMEDY: The numerous, significant and fundamental errors and omissions regarding oil and gas activities require correction through a full "comment" opportunity.

F.  ISSUE 6:  THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER OR PROVIDE PROTECTIONS FOR SENSITIVE, THREATENED AND ENDANGERED FISH, INCLUDING HALF MILE RIPARIAN "NO SURFACE OCCUPANCY" ("NSO") SETBACKS AND OTHER IMPORTANT WILDLIFE HABITAT MAPPED BY COLORADO PARKS AND WILDLIFE ("CPW").

- Alternatives B and B.I, and to a lesser degree Alternative D, provide necessary protections for sensitive, threatened and endangered fish, including half mile riparian NSO set-backs and for other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW").  Alternative E does not provide those necessary protections.  NSO stipulations must be adopted for riparian areas, and to achieve surface disturbance limits necessary for protecting wildlife corridors, critical habitats and concentration areas; these must include limits on surface occupancy and also seasonal restrictions.

REQUESTED REMEDY:  The failure of the BLM to include these necessary protections for wildlife requires a full "comment" opportunity.

G.  ISSUE 7: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE CONSEQUENCES OF CLIMATE CHANGE

- Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.

BLM_0167145

REQUESTED REMEDY:  An adequate RMP/EIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with those efforts of the State to meet the State's climate and carbon emission reduction goals.

H.   ISSUE 8: AGRICULTURAL VALUES: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER PROTECTION AND ENHANCEMENT OF AGRICULTURE.

- The upper reaches of the North Fork of the Gunnison River in Gunnison County are among the headwaters that provide the water supply to organic agriculture, wineries and farms and ranches in the North Fork of the Gunnison basin.  However, the Proposed RMP/Final EIS provides neither adequate nor specific protections to ensure that there are no negative impacts to the quality or quantity of these waters, operations or livelihoods.

REQUESTED REMEDY:  The failure of the BLM to include adequate and specific protections for agriculture requires a full "comment" opportunity.

I.   ISSUE 9: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER MANAGEMENT AND ENHANCEMENT OF OUTDOOR RECREATION

- In addition to hunting and fishing, which have been integral to local economies, outdoor recreation is a huge and growing driver to the area's economy.  Alternative B/B.I includes NL and NSO stipulations for parks, wildlife refuges, and for federal recreation lands such as Special Recreation Management Areas, including Jumbo Mountain, as well as for public lands recognized for their unique wilderness character.  At a minimum, NSO would ensure that the important, and increasing, recreational uses of these lands are

37

BLM_0167146

given the attention they warrant.  In addition, the economic analysis of the economic impacts of recreation within the UFO uses flawed and insufficient data to determine the comparative economic impacts of the multiple uses on the BLM land within the region.  There is clear and accurate information on recreation economic benefits within the 2019 Colorado Statewide Comprehensive Outdoor Recreation Plan (SCORP) and within the federal governments own 2019 US Bureau of Economic Analysis which has Outdoor Recreation as a stand-alone designation.  The BLM should redo its analysis utilizing these significant resources for its comparisons.

REQUESTED REMEDY:  A full "comment" opportunity is necessary to address these concerns.

J.   ISSUE 10: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE NEGATIVE CONSEQUENCES OF ALLOWING FLUID MINERAL LEASING IN THE CURECANTI UNIT.

- Section 1-2 states: "The Curecanti National Recreation Area is withdrawn to the US DOI, BOR and managed by the NPS under a Memorandum of Understanding between NPS and BOR.  Curecanti National Recreation Area is within the planning boundary until legislation supersedes.  BOR's withdrawn lands with the boundary are withdrawn from appropriation under the US mining laws, and the area is not closed to fluid mineral leasing or mineral materials disposal."

- The Curecanti Unit which includes both the Black Canyon of the Gunnison National Park and the Curecanti National Recreation area are contemplated in the Proposed RMP/Final EIS under Alternative E to be open for fluid mineral leasing which would be a drastic and wholesale change from previous drafts

38

and the BLM policies and would lead to certain precedence across the nation as to the ability for the DOI to allow for extractive industry to lease land within national parks, monuments and other federal recreation areas.  This change is certainly against the desire of the citizens of the United States who overwhelmingly support preservation of these national treasures.  It is almost unfathomable that fluid mineral leasing and mineral materials disposal would be considered available in one of the headwater water supply reservoirs that serve the downstream states of the Colorado River.

REQUESTED REMEDY:  A full "comment" opportunity is necessary to address these concerns.

K. ISSUE 11: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER ISSUES REGARDING COAL MINE METHANE FROM EXISTING AND ABANDONED MINES.

- Alternative E has no provisions nor does it mention the capture, mitigation and/or economic utilization of Coal Mine Methane ("CMM"), a significant greenhouse gas emission.  As the BLM is likely aware Gunnison County has consistently supported the exploration of methods to safely, economically and effectively recover methane from active and inactive coal mines, particularly in the North Fork Coal Mining Area.  In conjunction with Delta County, Gunnison County has convened a North Fork Coal Mine Methane Working Group ("NFCMMWG") which is comprised of stakeholders from industry, conservation, land management agencies and local, state and federal government with the mission to support coal mines and the surrounding communities in the North Fork Valley through the development of a comprehensive strategy for education, capture, exploration of mitigation, and

39

economic utilization of coal mine methane. That group has been meeting for over a year and has developed a robust discussion on various issues, barrier and technologies available for capture, mitigation and utilization of coal mine methane in both active and inactive mines.

- To the extent that CMM can be safely processed into less damaging constituents, or combusted for energy, there is potential to create local and federal economic benefits and to enhance environmental protection, both of which are benefits to the citizens of the United States.

- Through the collaborative work that has been accomplished within the NFCMMWG we have identified some potential CMM projects overlying general coal in the North Fork Region. While many challenges are still present in bringing these potential projects in reality, including technical and economic feasibility, an additional challenge is the legal authority for the mine operator/owners to manage CMM generated from the prior mining of federal coal.

REQUESTED REMEDY:  Gunnison County requests a full "comment" opportunity to ensure that the BLM includes in the Proposed RMP/Final EIS a lawful mechanism that would enable operators in the North Fork region to manage CMM other than by venting; so that operators can develop project(s) that are safe and environmentally sound.

L.   ISSUE 13:  THE PROPOSED RMP/FINAL HAS INADEQUATE NEPA ANALYSIS AND PROTECTIONS FOR WATERBODIES, AQUATIC, WETLAND AND HYDROLOGIC RESOURCES, SOURCE WATER PROTECTION AREAS, DOMESTIC WATER SUPPLIES, AND CULTURAL RESOURCES FOR FLUID MINERAL LEASING AND SURFACE DISTURBING ACTIVITIES.

40

- The Fluid mineral leasing acreage in the newly proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition. The current RMP predates the concerns for lynx, Gunnison Sage-grouse and many new conditions that have developed, including new science and data regarding climate change. There is no explanation for the changes in the newly proposed Alternative E. The acreage identified for NSO is severely cut in the new alternative. Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), and CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

REQUESTED REMEDY:  Chapter 2, Pages 2-8 and 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals with the contents of Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative.  BLM needs to allow public comment and reconsider Cooperating Agency input for this new Alternative E which severely degrades protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

M. ISSUE 14:  ALTERNATIVE E INAPPROPRIATELY CONTAINS LANDS IDENTIFIED "FOR DISPOSAL" THAT ARE WITHIN 4 MILES OF A GUNNISON SAGE-GROUSE LEK, ARE ADJACENT TO OR INTERSECTING GUNNISON SAGE-GROUSE CRITICAL HABITAT, OR ARE ADJACENT TO PRIVATE LAND CONSERVED FOR GUNNISON

41

SAGE-GROUSE HABITAT, OR THE DISPOSAL OF WHICH WOULD CONFLICT WITH EXISTING USER ACCESS TO PUBLIC OR PRIVATE LANDS, OR WATER RIGHTS AND IRRIGATION.  GUNNISON COUNTY FURTHER PROTESTS THE FACT THAT THE BLM DID NOT TIMELY OR PUBLICLY MAKE IDENTIFICATION OF THESE LANDS AVAILABLE FOR THE PROTEST PERIOD OR FOR THE 2016 DRMP/DEIS.

- Alternative E inappropriately contains lands identified "for disposal" that are within 4 miles of a Gunnison Sage-grouse lek, are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.  Gunnison County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the protest period or for the 2016 DRMP/DEIS.

REQUESTED REMEDY:  A full "comment" opportunity is necessary to address these concerns.

N. ISSUE 15: REGARDING CERTAIN SPECIES, AVAILABLE THE BIOLOGICAL ASSESSMENT ("BA") AND BIOLOGICAL OPINION ("BO"); LACK OF CLARITY ON WHAT ALTERNATIVE THE BA AND BO ANALYZED.

Gunnison County protests lands identified for disposal that are within 4 miles of a Gunnison Sage-grouse lek, adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.

42

Reference Citations include but are not limited to:

    a.   Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface – disturbing activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasing Minerals.

    b.   Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative.

The fluid mineral leasing acreage in the newly proposed Alternative E appears to retain the same open and closed acreage as Alternative A, the current condition. However, the current RMP predates the concerns for lynx, the listing of the Gunnison Sage-grouse as a "threatened species," and many new conditions that have developed, including new science and data regarding climate change.  And, the acreage identified for NSO is severely reduced in Alternative E.  Omission of certain stipulations are inadequate for protection of special resources.

Gunnison County, as a Cooperating Agency, has been denied the opportunity to comment on the new Proposed Alternative E in the Proposed RMP/Final EIS.  It is unclear how the proposed actions in the Proposed RMP/Final EIS were contemplated by the BLM's referenced BA, which has not been made available, or contemplated by the USFWS's BO, referenced in the Proposed RMP/Final EIS as having been signed on December 17, 2018, but also not provided for review.[7] The Proposed RMP/Final EIS was published in the Federal Register on June 28, 2019.  A Biological Opinion is a document prepared by USFWS stating their opinion as to whether or not a federal action will likely jeopardize the continued existence or adversely modify the habitat of a listed threatened

---

[7] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018.

BLM_0167152

or endangered species.  Note: Gunnison County is not certain that the USFWS made a determination or adverse modification of GuSG habitat for the Proposed RMP/Final EIS.

According to the Proposed RMP/Final EIS (page 5-2), the Biological Opinion was issued "concurring with the determinations that the Proposed RMP: 1) may affect, but is not likely to adversely affect, the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado pikeminnow, razorback sucker, bonytail, and humpback chub; and 2) may affect, and is likely to adversely affect, Colorado hookless cactus, clay-loving wild buckwheat (including designated critical habitat), and Gunnison sage-grouse (including designated critical habitat) (USFWS 2018d)."

In 2016, there was a robust Gunnison Sage-Grouse Rangewide RMP Amendment process underway that was considering making all GuSG critical habitat an Area of Critical Environmental Concern, and was considering protective stipulations for not just BLM lands designated as habitat and/or within 4-miles of GuSG leks, but also split estate.

The Gunnison Sage-Grouse (GuSG) was listed as a threatened species under the Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).

At the time of release of this Proposed RMP/Final EIS, the Gunnison Sage-Grouse Rangewide RMP Amendment has been canceled and the process terminated.  This new situation changes the context and significance of Gunnison County's comments and input into the need for necessary land protection, resource allocation, and stipulations to protect and enhance GuSG populations and habitat within the Uncompahgre Field Office managed areas.

44

BLM_0167153

Gunnison County desired the GuSG Rangewide RMP Amendment[8] to modify and strengthen the Proposed RMP/Final EIS measures after completion of this Uncompahgre Field Office Proposed RMP/Final EIS.  That is not going to happen. The Proposed RMP/Final EIS allows for discretion to waive the protective stipulations that are present in the new proposed Alternative E.

REQUESTED REMEDY:

(A) Provide the BLM's Biological Assessment and the USFWS BO for review and clarify whether the BO was based on the June 28, 2019 Proposed RMP/Final EIS or a different alternative.  The BLM should incorporate any recommendations of the BO into any Proposed RMP/Final EIS.  Cooperating Agencies and public should be allowed to comment on the new Proposed Alternative E within the current situational context, which is that there will not be a forthcoming GuSG Rangewide RMP Amendment and this Proposed RMP/Final EIS fails to adequately protect GuSG or address split estate.

(B) The BLM should fully follow and incorporate the recommendations of the BOp for GuSG[9] and the 2005 Rangewide Conservation Plan[10] which include:

*1) Protect occupied habitats from permanent loss. If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG. An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.*

---

[8] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681
[9] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Pages 27-28
[10] https://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx

45

*2) Coordinate with CPW in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e. unoccupied critical habitat).*

*3) Improve habitat within currently occupied and adjacent potential habitats.*

*4) Protect suitable unoccupied habitat areas from permanent loss.*

*5) Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.*

(C)  It is unacceptable to allow stipulations intended to protect GuSG be available for administrative waivers, exceptions and modifications without clear criteria and process.  The alternative within the Proposed RMP/Final EIS should follow the guidance of the BO[11]:

**Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:**

**Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:

1.  Topography/areas of non-habitat create an effective barrier to impacts

2.  No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).

3.  The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to landownership patterns).

---

[11] Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office. Western Slope Supervisor, US Department of the Interior, Fish and Wildlife Service, Ecological Services, Grand Junction, CO. December 17, 2018; Page 28

BLM_0167155

**In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above.

Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.

Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).

 (D)  Incorporate the management prescriptions and protective ACECs developed for the Gunnison Sage-Grouse Rangewide RMP Amendment into the Proposed RMP/Final EIS, since the Gunnison Sage-Grouse Rangewide RMP process is no longer active.  BLM and Cooperating Agencies invested many years into researching and developing that RMP.  Please see Attachment 3.

 (E)  Un-designate or relocate the portion of the Section 368 West Wide Energy Corridor that goes through San Miguel County.  There is no ROW on non-federal land that will not significantly impact GuSG habitat.

 O. <u>ISSUE 16:  THERE IS INADEQUATE ANALYSIS AND PROTECTIONS FOR WATERBODIES, AQUATIC, WETLAND AND HYDROLOGIC RESOURCES, SOURCE WATER PROTECTION AREAS, DOMESTIC WATER SUPPLIES, AND CULTURAL RESOURCES FROM THE IMPACTS OF FLUID MINERAL LEASING AND SURFACE DISTURBING ACTIVITIES.</u>

Among the citations that inform this section of the Protest are:

BLM_0167156

- Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals

- Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative

The fluid mineral leasing acreage in the new Proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition.  The current RMP predates the concerns for lynx, Gunnison Sage-Grouse and many new conditions that have developed, including new science and data regarding climate change.  There is no explanation for the changes in the new proposed Alternative E.  The acreage identified for NSO is severely cut in the new alternative.  Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), ad CSU-23/SSR-26 (B-67) are inadequate for protection of special resources.

REQUESTED REMEDY:  Chapter 2, Pages 2-8 to 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals with the contents of Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative.  BLM needs to allow public and Cooperating Agency input for this new Alternative which severely degrades protections for hydrologic, aquatic, riparian, water supply resources, as well

BLM_0167157

as cultural and wildlife resources.  Colorado Parks and Wildlife guidelines and standards need to be followed.

VI.  RESERVATION

Given the time constraints of filing this Protest, Gunnison County may not have addressed all issues.  Therefore, Gunnison County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

VII.  CONTACT INFORMATION:

Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

David Baumgarten
County Attorney for Gunnison County
200 E. Virginia Avenue
Gunnison, Colorado 81230
(p):  970.641.5300
(email):  dbaumgarten@gunnisoncounty.org

and

Matthew Hoyt
Deputy County Attorney for Gunnison County
200 E. Virginia Avenue
Gunnison, Colorado 81230
(p):  970.641.5300
(email):  mhoyt@gunnisoncounty.org

and

Laura Stanley
200 E. Virginia Avenue
Gunnison, Colorado 81230
(p):  970.641.5300
(email):  lstanley@gunnisoncounty.org

Signed on this 26th Day of July, 2019.

_____
David Baumgarten

49

BLM_0167158

County Attorney for Gunnison County
200 E. Virginia Avenue
Gunnison, Colorado 81230
(p):                970.641.5300
(email):         dbaumgarten@gunnisoncounty.org

50

BLM_0167159



JOHN E. PETERS
BEN TISDEL
DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

P.O. Box C  •  Ouray, Colorado 81427  •  970-325-7320  •  FAX: 970-325-0452

July 29, 2019

Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20224-1383

And

Director (210)
Attn: Protest Coordinator
20 M. Street SE, Room 2134 LM
Washington, D.C. 20003

*U.S. Mail and Electronically Submitted*
*via Instructions Received:*
https://www.blm.gov/programs/planning-and-nepa/public-participation/filing-a-plan-protest

Re: Ouray County Protest to Proposed RMP/Final EIS

Dear Protest Coordinator,

### I.  INTRODUCTION:

The Board of County Commissioners of Ouray County, Colorado ("Ouray County") respectfully submits this protest ("Protest") regarding the "Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office" ("Proposed RMP/Final EIS"). Pursuant to 43 § C.F.R. 1610.5-2, by this correspondence Ouray County formally protests approval of the Proposed RMP/Final EIS.

The Proposed RMP/Final EIS contains a primary document numbering more than 800 pages, and 20 appendices numbering more than 2,600 pages, created at a cost identified by the Bureau of Land Management ("BLM") to be $3,592,000. The Proposed RMP/Final EIS describes and analyzes five alternatives and one partial alternative for managing a planning area of approximately 3.1 million acres including 2,234,670 acres of federal mineral estate in southwestern Colorado throughout six counties, of which Ouray County is one.

Ouray County is exercising its opportunity to file this Protest within the required thirty (30) days of the date of the formal publication of the Proposed RMP/Final EIS.

Ouray County identifies below its authority to bring this Protest, the analytical framework that the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act of 1976 ("FLPMA") require of the Proposed RMP/Final EIS, and a critical review of the Proposed RMP/Final EIS.

Ouray County formally protests regarding the following issues and requests the BLM to consider these issues both individually and collectively:

A. In our letter dated November 1, 2016, we identified many parcels requested to not be identified as lands suitable for disposal. The Proposed RMP/Final EIS designates most of these lands as suitable for disposal.

B. Alternative E is a substantially new agency alternative that differs so dramatically from the alternatives canvassed in the Draft RMP/EIS – and which was drafted in disregard of the requirements of NEPA, FLPMA and the MOU between the BLM and Ouray County – as to preclude meaningful consideration by Ouray County and the public.

C. Alternative E was presented in the Proposed RMP/Final EIS without all supporting data and files being made publicly and timely available.

D. The Proposed RMP/Final EIS was drafted without consideration of Ouray County's formal planning and land use regulatory regimes.

E. The Proposed RMP/Final EIS does not adequately consider the Gunnison Sage-grouse population, habitat and designation as a "threatened species."

F. The Proposed RMP/Final EIS does not adequately consider oil and gas development, its related impacts and, in particular, the newly adopted Colorado Senate Bill 19-181.

G. The Proposed RMP/Final EIS does not adequately consider or provide protections for sensitive, threatened and endangered fish, including half mile riparian "no surface occupancy" ("NSO") setbacks and other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW").

H. The Proposed RMP/Final EIS does not adequately consider the consequences of climate change.

I. The Proposed RMP/Final EIS does not adequately consider protection and enhancement of agriculture.

J. The Proposed RMP/Final EIS does not adequately consider management, protection and enhancement of outdoor recreation.

K. The Proposed RMP/Final EIS is based on inadequate NEPA analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources for fluid mineral leasing and surface disturbing activities.

L. Alternative E inappropriately contains lands identified for "disposal" that are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.

Ouray County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the Protest period – or for the 2016 Draft RMP/Draft EIS.

M. Ouray County protests that, regarding certain species, the BLM failed to make available the BLM Biological Assessment ("BA") and the Fish and Wildlife Service ("USFWS") Biological Opinion ("BO"); it is not clear what Alternative the BA and BO analyzed.

N. There is inadequate analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources from the impacts of fluid mineral leasing and other surface disturbing activities.

## II. **OURAY COUNTY'S AUTHORITY TO PROTEST**

Ouray County formally participated as a "cooperating agency" during the development of the Proposed RMP/Final EIS, and has authority to protest both procedural and substantive errors in the Proposed RMP/Final EIS.

The formal cooperating agency relationship is intended to provide a framework for intergovernmental efforts by:

- Gaining early and consistent involvement;
- Incorporating local knowledge of economic, social, and environmental conditions and land use requirements;
- Addressing intergovernmental issues and avoiding duplication of effort;
- Enhancing credibility and support for EIS's;
- Building a relationship of trust and cooperation that results in better decisions.

As the government of general jurisdiction in Ouray County, Colorado, which jurisdiction includes land use planning and activities, and protection of the health, safety and welfare of persons in Ouray County, and the protection of the environment and wildlife in Ouray County, the Board of County Commissioners of Ouray County has an interest which is or may be adversely affected by the approval of the Proposed RMP/Final EIS. Relevant statutes include Colo. Rev. Stat. § 18-9-117, 29-20-101, 30-28-101 et seq., 30-11-107 et seq., 38-1-202, 42-1-102, 42-4-106, 43-1-217, 43-2-101, 43-2-201.1.

BLM_0167161

### III. RELATIONSHIP AMONG THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA"), THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 ("FLPMA"), AND THE PROPOSED RMP/FINAL EIS

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures... requir[ing] that agencies take a hard look at environmental consequences." 40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of the best available information and data, as well as disclosure of any inconsistencies with federal policies and plans. NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action, as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *DOT. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). The BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal v. Salazar*, 875 F. Supp. 2d 1233, 1249. (D. Colo. 2012).

Through the RMP planning process, the BLM Uncompahgre Field Office is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it, and takes into account, all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com. 146 U.S. App. D.C. 33*, 449 F.2d 1109, 1114 (1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colo. Envtl. Coal.*, 185 F.3d 1162 at 1174 (10th Cir. 1999)(quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone*, 359 F.3d at 1277 (citing *Colo. Envtl. Coal.*, 185 F.3d 1162 at 1174); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow the BLM to take a hard look at the available options, courts apply the "rule of reason." *N.M. ex rel. Richardson v. the BLM.*, 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

"The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate." *Westlands*, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[1] *See Dombeck*, 185 F.3d at 1174–75; *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992).

FLPMA is the BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states:

---

[1] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," *Dombeck*, 185 F.3d at 1175.

BLM_0167162

"[I]t is the policy of the United States that ... the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use..." 43 U.S.C. § 1701(a)(8).

The BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, subject to NEPA and undertaken pursuant to FLPMA, requires the BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. See 43 U.S.C. § 1712(c)(1)-(9).

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. See Norton v. S. Utah Wilderness All., 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As provided by the Tenth Circuit:

"It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses... BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public land]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration." N.M. ex rel. Richardson, 565 F.3d at 710.

Accordingly, the Proposed RMP/Final EIS revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with the potential value of development of those public lands. It is incumbent on the BLM Uncompahgre Field Office to evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. See 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. See N.M. ex rel. Richardson, 565 F.3d at 709.

As stated by the BLM:

"The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses...BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy." Proposed RMP/Final EIS at 1-2.

This purpose does not take development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances... and new or revised national-level policy." See N.M. ex rel. Richardson, 565 F.3d at 710-11.

FLPMA also recognizes the importance of Ouray County's role in the planning process providing that the BLM shall:

"...to the extent consistent with the laws governing the administration of the public, lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the State and local governments within which the lands are located...assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands..." 43 U.S.C. § 1702(c)(9).

## IV. ALTERNATIVES

To facilitate review of this Protest, Ouray County is informed of the following "alternatives" identified in the Proposed RMP/Final EIS:

### Alternative A

Alternative A meets the requirement that a "no action" alternative be considered.   Alternative A continues current management direction and prevailing conditions derived from existing planning documents.

### Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, rights-of-way (ROW), and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as areas of critical environmental concern ("ACEC")[2] and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

### Alternative B.I

Alternative B.I is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as the North Fork), primarily in portions of Delta and Gunnison counties.   Alternative B.I is a resource-based set of recommendations provided by a community group.

### Alternative C

Alternative C would emphasize maximizing utilization of resources, while mitigating impacts on land health. Management direction would recognize and expand existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, ROWs, renewable energy, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

### Alternative D

Alternative D was the Agency-Preferred Alternative from the Draft RMP/EIS, dated 6/3/2016 which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land

---

[2] ACEC's are areas identified by the BLM in accord with the 1976 Federal Lands Policy and Management Act ("FLPMA") which established the first conservation ecology mandate for the BLM, where special management attention is needed to protect important historical, cultural, and scenic values, or fish and wildlife or other natural resources.

uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape.

**Alternative E: Agency-Proposed RMP**

Alternative E, a wholly new proposed alternative not previously available for review or comment, is the BLM's Proposed RMP. The BLM proposes that Alternative E is a reasonable combination of objectives and actions from the five alternatives (A, B, B.1., C, and D) presented in the Draft RMP/EIS. The BLM states that, among other reasons for presentation of a wholly new alternative for the first time in the Proposed RMP/Final EIS, there are certain "changes in policy and guidance ..." (Proposed RMP/Final EIS Vol. 1, 1-9.) 43 U.S.C. § 1702(1). Presumably this relates to this Department of Interior's policies to prioritize oil and gas development above other uses, despite the clear direction of FLPMA's multiple use mandate. For example, both a March 28, 2017 Executive Order on "Promoting Energy Independence and Economic Growth" and the related March 29, 2017 Interior Secretarial Order 3349 issued to implement it seek to eliminate regulations and policies that "burden" energy development, but actually eliminate actions that would achieve the required balance that is essential to multiple use management. These policies have led to changes in agency policies, especially in managing oil and gas leasing and development, and also infuse the creation of Alternative E.

## V. ISSUES PROTESTED BY OURAY COUNTY

### A. ISSUE 1: ALTERNATIVE E IS A SUBSTANTIALLY NEW AGENCY ALTERNATIVE THAT DIFFERS SO DRAMATICALLY FROM THE ALTERNATIVES CANVASSED IN THE DRAFT RMP/EIS – AND WHICH WAS DRAFTED IN DISREGARD OF THE REQUIREMENTS OF NEPA, FLPMA AND THE MOU BETWEEN THE BLM AND OURAY COUNTY – AS TO PRECLUDE MEANINGFUL CONSIDERATION BY OURAY COUNTY AND THE PUBLIC.

The overarching – and procedurally fatal – flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA. FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process. 43 U.S.C. 1701(a)(5); 43 C.F.R. 1610.2. The disregard of NEPA and FPLMA has denied to Ouray County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BLM process that resulted in the Proposed RMP/Final EIS. "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public." *W. Org. of Res. Councils v. the BLM*, 591 F. Supp. 2d 1206, 1218 n.2 (D. Who. 2008), citing *California v. Block*, 690 f. 2d 753, 770 (9th Cir. 1982).

In addition, the creation of a wholly new Alternative E – with neither notice to Ouray County nor an opportunity for Ouray County to comment – is in direct contradiction to the BLM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Ouray County are accounted for and that [Ouray County will be] meaningfully engaged in the...resource management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Ouray County to participate "to the fullest extent possible" in the development of the Proposed RMP/Final EIS. This obligation is also set out in FLPMA, in the BLM's obligation to provide for "meaningful" input and "early" notice to local governments with affected lands and regulations, like Ouray County.

While the BLM states that "(t)he policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS," (Proposed RMP/Final EIS, Vol. 1, ES-1), the BLM has created – in the Proposed RMP/Final EIS – a wholly new Alternative E that thwarts the opportunity for such participation.

REQUESTED REMEDY: Ouray County asserts that the only solution to this overarching and procedurally fatal flaw in the Proposed RMP/Final EIS is to provide a full "comment" opportunity. This is also required by NEPA, based on the new alternative that has been created through the BLM's creation of Alternative E without sufficient explanation other than an oblique reference to its new policies but fundamentally changed the overall approach to management throughout the planning area. 40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concerns"); see also *N.M. ex rel. Richardson*, 565 F.3d at 705.

B. ISSUE 2: ALTERNATIVE E WAS PRESENTED IN THE PROPOSED RMP/FINAL EIS WITHOUT ALL SUPPORTING DATA AND FILES BEING MADE PUBLICLY AND TIMELY AVAILABLE.

The 30-day Protest period was initiated by the publication of the official Notice of Availability in the Federal Register on Friday, June 28, 2019. On that date, on the federal e-planning website[3] there were no GIS files newer than June 23, 2016. Although the Proposed RMP/Final EIS states on page ES-1 "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process." There were no GIS data files for the new Alternative E. Further the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire Uncompahgre Field Office decision area across six counties. This scale does not permit effective review of proposed disposal parcels in context. Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner.

REQUESTED REMEDY: Ouray County asserts that the only solution to this fundamental and fatal flaw is to provide a full "comment period" that is fully informed by timely provision to the public of all supporting data and files.

C. ISSUE 3: THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT CONSIDERATION OF OURAY COUNTY'S FORMAL PLANNING AND LAND USE REGIMES

The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands. As noted above, this is also required by FLPMA, 43 U.S.C. § 1702(c)(9). The Proposed RMP/Final EIS is fatally flawed because it does not consider – much less align with – fundamental Ouray County regulatory regimes.

D. ISSUE 7: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE CONSEQUENCES OF CLIMATE CHANGE

- Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives.

  REQUESTED REMEDY: An adequate RMP/EIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with those efforts of the State to meet the State's climate and carbon emission reduction goals.

E. ISSUE 14: ALTERNATIVE E INAPPROPRIATELY CONTAINS LANDS IDENTIFIED "FOR DISPOSAL" THAT ADJACENT TO OR INTERSECTING OURAY SAGE-GROUSE CRITICAL HABITAT, , OR THE DISPOSAL OF WHICH WOULD CONFLICT WITH EXISTING USER ACCESS TO PUBLIC OR PRIVATE LANDS, OR WATER RIGHTS AND IRRIGATION. OURAY COUNTY FURTHER PROTESTS THE FACT THAT THE BLM DID NOT TIMELY OR PUBLICLY MAKE IDENTIFICATION OF THESE LANDS AVAILABLE FOR THE PROTEST PERIOD OR FOR THE 2016 DRMP/DEIS.

- Alternative E inappropriately contains lands identified "for disposal" that are adjacent to or intersecting Ouray Sage-grouse critical habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation. Ouray County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the protest period or for the 2016 DRMP/DEIS.

REQUESTED REMEDY: A full "comment" opportunity is necessary to address these concerns.

VI. RESERVATION

Given the time constraints of filing this Protest, Ouray County may not have addressed all issues. Therefore, Ouray County reserves its right to further process regarding any and all issues identified by other protestors or commenters.

VII. CONTACT INFORMATION:

---

[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&CurrentPageId=86604

Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

Carol Viner
Masters and Viner LLP
County Attorney for Ouray County
PO BOX C
Ouray, Colorado 81427
(email): cav@mastersviner.com

and

Connie Hunt
County Administrator
PO Box C
Ouray, Colorado 81427
(email): chunt@ouraycountyco.gov

Signed on this 29th Day of July, 2019.

Ben Tisdel
Vice Chair, Ouray County Board of County Commissioners
PO Box C
Ouray, Colorado 81427

Enc.    Ouray County – 11-01-2016 UFO BLM Resource Management Plan / Environmental Impact Statement
Comment Letter

BLM_0167167



LYNN M. PADGETT

BEN TISDEL

DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

541 4ᵗʰ Street   •   P.O. Box C   •   Ouray, Colorado 81427   •   970-325-7320   •   FAX: 970-325-0452

November 1, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"].

In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and supporting continued federal ownership of federal public lands."

Ouray County's Master Plan[1], Land Use Code[2] and zoning[3], orient higher density development and commercial activity towards our municipalities in exchange for preserving our rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation opportunities towards the unincorporated portions of the county and our public lands. We have sections of our land use code addressing visual impact mitigation of development to protect our economically important scenic vistas, wildfire mitigation, protecting wildlife corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark skies. Our countywide economic goals include working toward abundant, affordable and redundant broadband, and enhancing outdoor recreation opportunities in all seasons.[4,5]

We offer the following comments on the DRMP/EIS:

**1. Land Disposals.**

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs."[6]

---

[1] http://co-ouraycounty.civicplus.com/DocumentCenter/View/144
[2] http://ouraycountyco.gov/DocumentCenter/Index/41
[3] http://ouraycountyco.gov/DocumentCenter/View/145
[4] http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
[5] http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf
[6] Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0167168

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62[7] and legal descriptions were provided in Appendix N.[8]

BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM. Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses.

Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014[9] and the map that comprises Exhibit A[10] for an inventory of designated public rights-of-way. There may be some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A.

In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones.

A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.

A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.

There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.

There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.

A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.

There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions.

---

[7] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.d at/App%20A%20Combined.pdf

[8] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File. dat/N_Disposal_UFO-DRMP-2016_508.pdf

[9] http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229

[10] http://ouraycountyco.gov/documentcenter/view/2476

The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner.  County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning.  This should be able to be accomplished with this parcel.

## 2.  Areas of Critical Environmental Concern (ACEC)s.

There are no existing ACECs in Ouray County.  Alternative B contemplates creating the Cerro Summit-Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [11]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[12] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[13] is dated November 9, 2014.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [14]

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."*  The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"* [15]

Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.   The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.   All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease

---

[11] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[12] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[13] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf
[14] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf
[15] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

is allowed a 20-year period with out-of-date stipulations and practices.  While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately.

## 3. Special Recreation Management Areas (SRMAs).

Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway.  This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado.  Local families with children are also enjoying the highly scenic trail system.  These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park.  We support RAT and COPMOBA in their comments and requests to enhance our trail systems.  The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.

Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"[16]  We are curious if "single-track" should have been included in the objective for Zone 2?

Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"[17]  Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other.

Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. [18]

## 4. Enhanced Ecological Areas (EEAs).

The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County.  It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte.  The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses.

In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA.

Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan.  However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

---

[16]Pages 2-258 to 2-262;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[17]Pages 2-281 to 2-287;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[18]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

BLM_0167171

Appendix D describes the proposed Ridgway EEA as:

| Ridgway | BLM land on Log Hill Mesa and around Billy Creek State Wildlife Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in critical big game wintering area. Divided into four zones. | Pinyon-juniper, mountain shrub | Mountain lion, mule deer, elk, bear |
| --- | --- | --- | --- |

We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel. It will be important to refine any stipulations for this Core Zone 1, to ensure that this possibility can be realized in the next few years.

The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located:



Figure 5.a. Showing parcels of the proposed Ridgway EEA.

Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking. Log Hill Mesa is home to approximately ⅓ of Ouray Country residents and this area.

The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa. Currently, outside of the southern portion of Log Hill Mesa, where

BLM_0167172

infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure.

## 5. Wildlife and Watchable Wildlife Viewing Areas

Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements.

Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife.

Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.

Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

## 6. Slopes

Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B.

## 7. Visual Resources and Dark Skies.

Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.

## 8. Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between

BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that BLM has eliminated the timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to BLM.

If there are any questions or clarifications regarding Ouray County's comments, please do not hesitate to contact us.

Respectfully submitted,

Lynn M. Padgett
Chair, Ouray County Board of County Commissioners

BLM_0167174



Date: July 25, 2019

To: Jamie Connell, BLM State Director

From: Paonia Board of Trustees

Dear Director Connell:

The Town of Paonia has appreciated being an active participant in with the Bureau of Land Management Uncompahgre Field Office for the Resource Management Plan. As an active past and continuing participant, the Town of Paonia hereby submits this formal protest of the Final Environmental Impact Statement and Proposed Resource Management Plan for the Uncompahgre Field Office on behalf of the Town of Paonia and the Board of Trustees, 970-527-4101, paonia@townofpaonia.com.

The Town of Paonia previously commented on the Draft EIS, in a letter submitted on October 27, 2016. This comment is referenced in the Appendix R Comment Summary of the FEIS and Proposed RMP as 500176_StewartC_20161027_TownofPaonia. In our comment, we requested the BLM adopt the North Fork Alternative Plan to provide a community driven management framework for oil and gas leasing and development to protect the North Fork Valley's thriving agricultural economy, scenic vistas, and healthy populations of wildlife and game. We expressed serious concerns with the draft EIS and the Preferred Alternative included therein, focusing on the issues of protections for the Town's source water and other domestic water supplies, impacts to Town infrastructure, health risks from natural gas development, adverse impacts to wildlife resources, and management of Jumbo Mountain. These are the issues that form the core of the Town of Paonia's protest. We also protest BLM's introduction of an entirely new Alternative E, without the proper public comment at the protest stage, which is radically different from the 4 alternatives that were the subject of the Draft EIS.

ISSUES
**Source Water Protections**
The Town of Paonia's original 2016 comment letter requested the BLM include all buffers and oil and gas restriction recommendations in the North Fork Alternative Plan, including a ½ mile setback and ¼ mile no leasing restriction between oil and gas operations and the Town's source water supplies, which is consistent with the Town's Source Water Protection Plan. This ½ mile setback is necessary to ensure that the Town is able to continue providing high-quality drinking water to its residents. The Proposed RMP imposes significantly less-protective setbacks and is inconsistent with the Town's Source Water Protection Plan.

Additionally, the town requested the BLM adopt the protections for irrigation water included in the North Fork Alternative to ensure the viability and sustainability of our Valley's agricultural industry. The BLM failed to properly analyze potential impacts to irrigation water from oil and gas development and do not adequately address the concerns we raised in our 2016 comment letter.

---

BLM_0167175

**Town Infrastructure**

The Town of Paonia is a municipal water company, Public Water System ID #CO 0115601. The Town of Paonia has severe concerns about the impact of oil and gas development on infrastructure the Town maintains. Paonia's water is acquired via 38 surface water influenced ground-water springs and the Town passed Watershed Ordinance 2003-02 on February 25, 2003. Paonia has also created a Source Water Protection Plan which the BLM needs to consider in the determination of the final RMP. The planning team for the source water protection plan recommended "Source Water Protection Best Management Practices" be considered for implementation by several agencies, including the BLM. As our water crisis highlighted, infrastructure is fragile, and the Town needs an RMP crafted with that in mind. The Town of Paonia asks that, in order to protect the quality and quantity of our domestic water, the final UFO RMP include all buffers and oil and gas restriction recommendations in the Source Water Protection Plan and Alternative B1. The level of increased oil and gas development anticipated in this Proposed RMP would significantly exacerbate this already serious issue.

**Health Risks**

The Town of Paonia has long been committed to providing a high quality of life for all of the people that call this area home. This quality of life is directly impacted by the quality of air and water in the North Fork Valley. The Town urges the BLM to make decisions using the best available data, as this is a requirement of the National Environmental Protection Act (NEPA). As the Sixth Edition of Physicians for Social Responsibility's "Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking" and numerous other studies demonstrate, there are clear risks of living downstream of oil and gas development. Our 2016 comment letter made clear the concerns the Town has about protecting our air and water supplies, and the health of our community.

Additionally, the Town of Paonia raised concerns regarding industries that would further degrade or risk the coal mining business in the North Fork Valley. Due to the unknown risks associated with nearby oil and gas development, the town supported limiting the areas where oil and gas development are allowed. This concern was not properly addressed by the BLM in the proposed RMP.

**Wildlife Resources**

Wildlife and its habitat have both their own intrinsic value, and significant value to the Town of Paonia. In our 2016 comment letter, we were very clear that wildlife resources need protection from oil and gas development. The town requested the BLM protect areas that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area, be protected from any potential negative impacts from oil and gas development. Rather than protecting wildlife resources, the RMP radically reduces the stipulations designed to protect wildlife and habitat in the North Fork Valley area from that which was originally considered in the original 4 alternatives proposed in the Draft EIS.

**Jumbo Mountain**

The Town of Paonia requested that areas in close proximity to town limits which are used for recreation must be protected from potential damage due to oil and gas development. As outlined in the North Fork Alternative Plan, we requested Special Recreation Management Area (SRMA)

BLM_0167176

designation for Jumbo Mountain. This designation must include no leasing and no surface occupancy stipulations. The SRMA should manage this land for the quality of hiking, biking, equestrian and ATV experiences, as well as historical uses such as hunting and grazing. Additionally, we requested this area should include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat. Maintaining the viability of the area for all forms of recreation within the Jumbo Mountain area is a key priority, and was ignored.

PLAN SECTIONS UNDER PROTEST
- **Alternative E in its entirety**
- **Section 3.4.2 Public Health & Safety**
- **Section 4.3.1 Air Quality & Climate**
- **Section 4.3.2 Soils & Geology**
- **Section 4.3.5 Water Resources**
- **Section 4.4.3 Fish & Wildlife**

CONCISE STATEMENT WHY STATE DIRECTOR'S DECISION IS WRONG
First, it is improper, and a violation of the National Environmental Policy Act for the BLM to publish an entirely new alternative here in this final proposed RMP. Alternative E, the proposed RMP, is wholly new. It has not been subject to any public comments or review. When the Town of Paonia commented on the Draft EIS for this RMP, we were unable to comment on Alternative E, because it did not exist. To offer a proposed RMP that has been subject to no public comment is unacceptable, doubly so when the new alternative is directly contrary to the comments submitted by over 40,000 members of the public, and the Town of Paonia.

The Final EIS ignores the input of the Town of Paonia across the board. The Final EIS downplays the significant health and environmental risks associated with oil and gas development, not to mention the impact on the local economy and offers 95% of the federal mineral estate to development, with no concern for Town of Paonia. The Town of Paonia requested no leasing within ¼ mile of public water supplies and a ½ mile no surface occupancy stipulation around the same to protect its water supply, and Alternative E minimizes the potential protections for springs, and reduces the setback distances for the entire North Fork of the Gunnison Corridor (among other rivers).

In our 2016 letter, the Town of Paonia supported the North Fork Alternative, Alternative B.1, that would have extensive No Surface Occupancy (NSO), Controlled Surface Use (CSU), and Timing Limitations (TL) areas to protect wildlife resources. Alternative E significantly reduces the amount of land area under those protective designations, in some cases eliminating them entirely, with no consideration for the wildlife resources. The Proposed RMP shrinks existing Areas of Critical Environmental Concern and eliminates Ecological Emphasis Areas entirely. Finally, the Town requested a 5020-acre Jumbo Mountain Special Recreation Management Area (SMRA) with a fluid mineral withdrawal. The Proposed RMP cuts the acreage of the SMRA to less than 1,600 acres and eliminates any NSO, and dramatically reduces the CSU and TL stipulations within the area. Oil and gas will therefore continue to threaten the future of Jumbo Mountain recreation.

BLM_0167071

Offering Alternative E at the protest stage, without public input is deeply flawed, and improper. Ignoring the input of the Town of Paonia and members of the public to create that alternative is also deeply flawed.

For these reasons, the Town of Paonia respectfully protests the Final EIS and Proposed RMP.

Sincerely

Mayor Pro-Tem, Chelsea Bookout

Trustee, Mary Bachran

Trustee, Karen Budinger

Trustee, Dave Knutson

Town Administrator, Ken Knight

Cc:    Town Clerk File
       Town Attorney
       Western Slope Conservation Center
       Citizen's for a Healthy Community

BLM_0167178

To: Jamie Connell, BLM State Director
From: Jim Brett
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 2019 July 26

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (reference 000184_BrettJ_20161017 in Volume IV, June 2019 RMP), I respectfully submit the following protest on behalf of Slow Food Western Slope and the Valley Organic Growers Association. (Original October 2016 comment document is included.)

My contact information is:
Jim Brett
1899 Hawks Haven
PO Box 1682
Paonia, CO 81428
970.210.9718
jmbimagery@icloud.com

My protest addresses the following issues that I have raised in my previous comments:
• Preferred Alternative: Adopting a wholly new alternative at this stage of the process is unacceptable
• Air Quality: Ozone levels are already exceeding EPA thresholds
• Health and Safety: Human health impacts need priority consideration
• Leasable Minerals - Fluid: Fluid mineral development would create negative impacts
• Recreation: The entire Jumbo Mountain unit must be a special recreation management area
• Socioeconomics and Environmental Justice: Oil and gas development threatens agricultural livelihoods
• Water Resources: Clean water is the lifeblood of the North Fork Valley
• Ecological Emphasis Areas: Need uninterrupted public land access for hunting, camping, fishing and travel

Those issues are addressed in the following sections of the RMP:
Section 2.3 - Alternatives Considered for Detailed Analysis
Section 4.3.1 - Air Quality & Climate
Section 4.6.2 - Public Health & Safety
Section 4.3.2 - Soils & Geology
Section 4.4.4 - Recreation
Section 4.6.3 - Socioeconomics and Environmental Justice
Section 4.3.5 - Water Resources
Section 4.4.3 - Fish & Wildlife

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
• Section 2.3: Alternative E was improperly adopted and was not subject to public comments. The RMP drastically decreases the stipulations in Alternative B and does not include a No-Leasing alternative.
• Section 4.3.1: Alternative E will contribute to increased greenhouse gas emissions thereby exacerbating climate change.
• Section 4.6.2: The Proposed RMP downplays public health risks, and ignores significant evidence provided (reference comment 000184_BrettJ_20161017-9) that shows increased oil and gas development can have serious adverse impacts on public health.
• Section 4.3.2: The BLM does not consider information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing,

BLM_0167179

injection wells and ongoing oil and gas operations. Also, the RMP does not adequately address the cumulative impacts of unregulated gas gathering lines.

- Section 4.4.4: Alternative E must designate the entire Jumbo Mountain unit as a special recreation management area with no leasing to protect the quality of the recreation experience.
- Section 4.6.3: The RMP does not sufficiently address the potential for soil, air and water contamination as a result of oil and gas development that could destroy the North Fork Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.
- Section 4.3.5: Since the RMP proposes to lease practically every acre of the North Fork to oil and gas, that would threaten the Valley's drinking and irrigation water. The RMP does not adequately address the permanent removal of water from the hydrologic cycle.
- Section 4.4.3: The RMP needs a No-Leasing alternative with No Surface Occupancy setbacks from streams, riparian areas and water bodies to sustain a multi-million-dollar outdoor industry in the area.

On behalf of Slow Food Western Slope and the Valley Organic Growers Association, I respectfully protest the Proposed RMP, and the sections outlined above. Without having considered a No-Leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities. Alternative E does not in any means support the BLM Mission "to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

Sincerely,

Jim Brett
Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association

BLM_0167180

Jim Brett
PO Box 1682
Paonia, CO 81428
Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association
Oct 17, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Thank you for the opportunity to comment on the draft Uncompahgre Field Office Resource
Management Plan (RMP). Slow Food Western Slope and the Valley Organic Growers
Association (VOGA) are glad the BLM is considering ways to protect important natural
resources like domestic and irrigation water, air quality, wild and scenic rivers, wildlife habitat
and recreation. In particular, we support the designation of ecological emphasis areas and
special recreation management areas. These will preserve habitat connectivity, wildlife
corridors, undeveloped open space and recreation opportunities within our region.

Slow Food Western Slope (http://slowfoodwesternslope.org/) functions as a chapter of Slow
Food USA, which is a 501(c)3 non-profit organization. Slow Food USA's and its chapters'
mission is to create a dramatic and lasting change in the food system. We envision a world in
which all people can eat food that is good for them, good for the people who grow it and good
for the planet: good, clean and fair food for all.

Our chapter promotes and supports over 60 farmers, orchardists, ranchers, agricultural
businesses and winemakers of the North Fork Valley - all of which depend on good and clean
water, air and soil.

Valley Organic Growers Association (http://www.vogaco.org/), a 501(c)5 non-profit organization,
was established in 1992 and has a membership of over 80 organic farms, ranches, orchards
and agricultural-related businesses and advocates, representing a vibrant and sustainable local
economy. Our guiding principles include the maintenance of healthy soil, air and water for the
production of nutritious food, free from synthetic inputs.

The North Fork Valley's scenic beauty and temperate growing season have attracted the largest
concentration of organic and chemical-free growers in the state of Colorado. Our region has a
long history of producing quality high-country, chemical-free food, with a well-deserved
reputation that extends around the state and nationally. This history, coupled with the emerging
consumer trend for organically crafted products has made this region increasingly known and
marketable.

The North Fork Valley has a forcefully developing market for agri-tourism, farm-stays and
agriculture-based education. Products from area farms supply markets and top restaurants in
towns around western Colorado, including Aspen, Telluride and Crested Butte and serve many
Front Range communities, including Colorado Springs, Golden, Denver, Boulder, Longmont and
Fort Collins. The farms' customers have created relationships with the growers and forged a

unique community that is the North Fork Valley. These relationships develop as our farmers have been able to furnish organic, high-quality fruits, vegetables, meat, dairy, wine and specialty products.

An October 5, 2016 Aspen Sojourner article (http://www.aspensojo.com/articles/2016/10/5/beyond-the-roundabout-autumn-perfection-in-paonia) highlights the items mentioned above providing credence the North Fork Valley is a destination that must be protected:

- - -

"Nestled in the North Fork Valley in Delta County, Paonia is home to the state's largest concentration of organic farmers thanks to its richly fertile land, which yields ample fruit (peaches, apples, cherries, pears, and plums) and veggies while supporting some of the country's best livestock. Incorporated in 1881 and named by founder Samuel Wade after the peony rootstock he brought in a covered wagon all the way from Ohio, the town has now grown into a haven for aging flower children, new-agers, liberal activists, and environmentalists…The town of just under 2,000 residents prides itself on its vibrant off-beat culture filled with farm-to-table restaurants, progressive media outlets, art galleries, boutiques, and wineries.

"It doesn't get more scenic then driving from Aspen to Paonia in the fall, with expansive views of the western Elk Mountains from McClure Pass. It's a direct route from the Roaring Fork Valley to the North Fork Valley via State Highway 133; the road takes you through Carbondale and Redstone, and is open year-round. The top of the pass is a prime spot for leaf-peeping. The drive then traces Muddy Creek down to Paonia State Park—worth a stop on your way there or back to take in the stunning sight of the Ragged Mountains.

"One of the few regions in Colorado to successfully cultivate and bottle pinot noir, the North Fork Valley is a hotbed for high-altitude grape growing, with plenty of vineyards to explore.

"Continue down the road to the home of Big B's juices and hard ciders, where you can pick apples, along with plenty of other produce, depending on the season. It's the quintessential autumn adventure…

"Founded in 2008 by husband and wife Mike and Gretchen King, [Revolution Brewing] uses locally grown hops with water directly from the springs on nearby Mount Lamborn for beer that's hand stirred and brewed on a six-barrel system."

- - -

Our producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy good and clean food. The potential for soil, air and water contamination as a result of oil and gas development could destroy our Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.

**Preferred Alternative**

The BLM's preferred alternative would open almost every acre of public lands in the region to oil and gas leasing (865,970 acres or 94.5% of total oil, gas and mineral acreage), and specifically

in sensitive air, water and food sheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks and more.

The potential for human, animal and environmental damage is too high.

Development would contaminate soils, water and air and impair human health, including increases in respiratory, endocrine, immune and cardiovascular disease.

Development of the public lands would destroy local investments and resources required in transitioning the economy to one based on agri-tourism, recreation, renewable energy, agriculture and organic/clean food. Also, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing, injection wells and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed.

BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. If the BLM will not consider a no-leasing alternative, then by all means it must make Alternative B1 as the preferred alternative.

In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

**Impact Areas**

Oil and Gas Development

As mentioned above, BLM's preferred alternative would open 94.5% of total oil and gas mineral acreage to leasing, which is .1% less than its current 30-year old RMP. BLM divides oil and gas leasing by potential for development. In its preferred alternative, BLM allocates 53% of the federal mineral estate to higher development potential and the remaining 47% to lower development potential. BLM has based its oil and gas drilling assumptions on a 2004 report, which assumes that 1271 wells will be drilled in the planning area.

Also, the RMP does not impose a cap on drilling.

BLM's assumption on the number of foreseeable wells could be significantly understated given, new research, hydraulic fracturing and multi-stage drilling technologies, which were not considered at the time of the report.

Here is at stake with oil and gas development for the North Fork Valley:

- Activities on public lands that have the potential to poison food sheds and threaten to wipe out food security for people on the Western Slope and the Front Range.

- The destruction of clean air, abundant fresh water and food sheds (including Colorado's largest concentration of organic farms).

- Significant harm to human health and a local economy based on agriculture and organic farms, recreation, hunting and tourism.

- Loss of unique biodiversity in Colorado.

- The future of the North Fork Valley. The final RMP will guide oil and gas development for the next 20-30 years.

<u>Other Related Oil and Gas Impacts</u>

*Water Resources*

Needless to say, water quality is important for good, clean, sustainable agriculture. Clean water is the lifeblood of the North Fork Valley. The BLM proposes to lease practically every acre of the North Fork to oil and gas, which would threaten our drinking and irrigation water.

Extracting fuel from shale formations requires pumping hundreds of thousands of gallons of water, sand and chemicals into the ground to break apart rock and free the gas. Some of that water, along with large quantities of existing underground water, returns to the surface, and it can contain high levels of salt, drilling chemicals, heavy metals and naturally occurring radioactive material. Drinking and irrigation water sources have been contaminated by oil and gas chemicals released through leaks and spills, naturally occurring gases and radioactive materials from disturbance of the geologic formation, and air-borne contaminants.

The oil and gas industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Therefore, there is a lack of meaningful regulation.

State regulation of hydraulic fracturing as it relates to potential contamination of ground and surface water is limited to casing construction requirements, setbacks, disposal of oil and gas wastes (hazardous materials), and reporting of leaks and spills. Produced water needs to be disposed of and can be disposed of 6 ways in Colorado:

1. Injection into a properly permitted Class II well;

2. Evaporation/percolation in a properly permitted pit;

3. Disposal at permitted commercial facilities;

BLM_0167184

4. Disposal by roadspreading on lease roads outside sensitive areas under certain conditions;

5. Discharging into state waters, in accordance with the Water Quality Control Act and related rules and regulations; or

6. Evaporation in a properly lined pit at a centralized exploration and production waste management facility permitted by the Colorado Oil and Gas Conservation Commission (COGCC).

For the fluids disposed of, the BLM states that "60 percent goes into deep and closely-regulated waste injection wells, 20 percent evaporates from lined pits and 20 percent is discharged as usable surface water"under permits from the Colorado Water Quality Control Commission." With all of this "deep and closely regulated" activity to protect citizens:

• There were 615 spills, 271 (44%) of which were from produced water, in 2015. That equates to nearly two spills every day in Colorado. 15% of the spills resulted in water contamination, with: 44% within 50 feet of ground water, 31% within 1000 feet of surface water, 39% within 1500 feet of a water well, and 9% within 500 feet of cows, pigs, sheep or other livestock as reported in 2015 by the Center for Western Priorities.

Also, naturally occurring radioactive material comes up with wastewater produced from oil and gas extraction. The waste can remain radioactive for millennia. Excessive radiation exposure can increase cancer risks; radon gas, for example, has been tied to lung cancer. BLM did not analyze the risks of exposure to radioactive waste, and Colorado does not have regulations in place to manage radioactive waste from oil and gas operations.

The BLM is required to honor community source water protection plans, which are developed to protect a community's drinking water source from contamination. The towns of Crawford, Hotchkiss, and Paonia secured source water plans, which were not taken into consideration by the BLM in its preferred alternative.

This video depicts what happened to well water when hydraulic fracturing occurred in Las Animas county in Colorado: https://www.facebook.com/greenpeaceusa/videos/10154706072859684/. This is completely unacceptable.

In addition, the BLM also did not consider the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Again, a no-leasing alternative is not only reasonable, but represents the best way to protect the North Fork Valley now and in the future. Alternative B1 would be acceptable if a no-leasing alternative cannot be included in the RMP.

*Air Quality*

The final plan must protect the health of the airshed. The North Fork Valley is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could

have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone and other particulates and gases hazardous to agriculture and public health.

In Garfield, Mesa, Gunnison and Delta counties, there are 11,825 oil and gas facilities. Within a half mile radius of these facilities, there are over 6,100 people. The American Lung Association gave Mesa County an F Air Quality rating and Gunnison a C rating. Even more disturbing is that Delta county does not monitor air quality.

The BLM does not have the adequate information to assess airshed impacts of oil and gas activities and did not consider that their own modeling of ozone levels in the Bull Mountain area that exceed EPA thresholds of 70 ppb.

The North Fork Valley producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy clean, organic food. The potential for air contamination as a result of oil and gas development could destroy Slow Food and VOGA member farms' ability to market their products as organic and safe.

*Health Impacts*

The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan.

Hundreds of peer reviewed scientific articles exist on all aspects of toxins related to unconventional oil and gas production. The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying low-dose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, malignancy as well as all the problems listed below.

The New York State Department of Health (NYSDOH) released *A Public Health Review Of High Volume Hydraulic Fracturing For Shale Gas Development* in December 2014. In this study, it found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This study led to their recommendation that fracking should be banned in New York State.

The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Below are some studies published in 2015 or 2014. The citing after each will read PSR-C then the page number.

Uncertainty.

- California Council on Science and Technology studied the impacts of well stimulation on human health from the exposure to fracking-related air pollution. The unknown number and toxicity of chemicals mixed in these fluids make it difficult to quantify risk but the paper identifies the potential health risks. One conclusion: that "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in

BLM_0167186

California's oil operations." (PSR-C p.72)

Birth defects, birth weight, and infant mortality.

- In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. (PSC-C p.76)

- University of Pittsburgh study of three heavily drilled PA counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller-than-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. (PSR-C p.72, 73)

- Health professionals in Vernal, Utah reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one health professional. (PSR-C p.76)

- Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5-kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The chances of a low APGAR score, a summary measure of the health of newborn children, roughly doubled, to more than 5 percent. (PSR-C p.77)

- Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. (PSR-C p.77; 72-73)

Rashes and upper respiratory problems.

- A Pennsylvania, Yale-led study found that health symptoms reported by residents increased in frequency as distance between residence and gas wells decreased. Those living less that one kilometer from drilling activities had increased reports of rashes and upper respiratory problems. (PSR-C p.73)

Urgent Care & Hospitalization.

- Hospitals in the Bakken Shale region reported a sharp rise in ambulance and emergency room visits since the boom in drilling and fracking. Drug overdoses and oil field related injuries accounted for 50% of the cases in one emergency room. (PSR-C p.76)

- University of Pennsylvania's Center of Excellence in Environmental Toxicology found the increasing number of gas wells in Pennsylvania is significantly correlated with inpatient rates

of hospitalization. (PSR-C p.75)

<u>Animal Health</u>.

- A Yale University School of Medicine study in SW Pennsylvania found evidence that dogs in households less than one kilometer from a gas well had elevated risks for health problems, especially dermal conditions. (PSR-C p.73)

- Food animals have been shown to have increased respiratory and growth problems over time. The life of a food animal is very short compared to that of humans and some wildlife where cumulative effects would be pronounced. (PSR-C p.73) Conditions like these will definitely harm ranchers' and other producers who raise animals and livestock for a living.

## Recreation

In conjunction with the visitor's agri-tourism experience of the North Fork Valley, recreation definitely plays a significant role.

<u>Jumbo Mountain Trails</u> - The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents and visitors. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Plus, Jumbo Mountain must be open to hiking, mountain biking (including pedal-assisted electric bikes) and horseback riding - no motorized vehicles are allowed.

<u>Hunting and Fishing</u> - Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of a no-leasing alternative or at least B1 which prohibits surface activities in critical wildlife habitat, and includes both No-Leasing and No Surface Occupancy setbacks from streams, riparian areas and water bodies.

<u>Future Recreation Development</u> - Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte and Robideau Canyon.

## Conclusion

BLM_0167188

- The draft RMP repeatedly describes how fluid mineral development would negatively impact, to some unknown degree, other resources such as wildlife habitat and migration corridors, grazing land, soil productivity, vegetative diversity, special status fish and aquatic wildlife, air quality and visual resources, as well as non-market values including ecosystem services, natural amenities, scenic beauty, human health, quality of life and sense of place.

- The draft RMP estimates that ecosystem services in the planning area could provide up to $1,492 million in value. (Chap. 4, pg.461)

- The draft RMP states that natural amenities like proximity to wilderness areas, national parks and other special protection areas have a positive impact on tourism, property values, population growth due to positive net migration, higher incomes and employment growth.

- The draft RMP states that approving an alternative that emphasizes "resource development over conservation likely would result in more impacts on nonmarket values and how planning area individuals perceive their own quality of life." (Chap. 4, pg.460)

So, why is Alternative D preferred - an alternative that will open the planning area to potential oil and gas development that will threaten the North Fork Valley's air, land and water?

Slow Food Western Slope and VOGA are opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. We are opposed to oil and gas leasing here because it has the potential to:

1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and
2) cause significant harm to human health and a local economy based on recreation, hunting, tourism and agriculture. We oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

And finally, the following is from the BLM's "Who We Are, What We Do" web page (http://www.blm.gov/wo/st/en/info/About_BLM.html):

"The BLM is focusing on the following priorities:

- The America's Great Outdoors initiative, which is aimed at enhancing the conservation of BLM-managed lands and resources and reconnecting Americans to the outdoors.

- The New Energy Frontier, which encourages and facilitates renewable energy development – solar, wind, and geothermal – on the Nation's public lands.

BLM_0167189

- Cooperative Landscape Conservation, a scientific initiative that recognizes the need to better understand the condition of BLM-managed landscapes at a broad level.

- Youth in the Great Outdoors, which supports programs and partnerships that engage youth in natural resource management and encourages young people and their families to visit, explore, and learn about the public lands.

- Climate Change, which is affecting public lands in ways that could impact on Americans' quality of life. The BLM is responding with two interconnected initiatives: a proposed landscape approach to land management and Rapid Ecoregional Assessments, which will improve the agency's understanding of public land conditions to inform future management decisions.

By strengthening existing and forging new partnerships with stakeholders, the BLM will ensure that the nation's public lands are managed and conserved for future generations of Americans to use and enjoy."

We request that the RMP align with these priorities above, especially in regards to the second item that encourages renewable energy. If the BLM does not consider oil and gas development on public lands a priority, then the Uncompahgre Field Office's RMP, which will probably be in for in for decades, must reflect that.

Jim Brett

Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association

BLM_0167190

Dear Senator Bennet,

The Valley Organic Growers Association (VOGA) and Slow Food Western Slope are protesting the BLM's Proposed RMP for the Uncompahgre Field Office. We request you review our grounds for protest, and advocate for us with the BLM in addressing the issues that those of us in the North Fork recognize as a threat to our livelihoods and our environment, as well as the inadequate process the BLM has used to address our concerns. Additionally, we request you encourage Governor Polis to take a strong stand against this RMP in his Governor's Review.

As the process continues, we also encourage you to find legislative means to protect the Valley and its resources.

Thank you for your time and your consideration of this issue, and please feel free to contact VOGA with questions or concerns. We'd be happy to meet with you or forward further information as needed.

Sincerely,

Emily Hartnett,
President, VOGA Board of Directors
vogaco@gmail.com

To: Jamie Connell, BLM State Director
From: Jim Brett
RE: Protest FEIS and Proposed RMP for Uncompahgre Field Office
Date: 2019 July 26

Dear Director Connell,

As a resident of the North Fork Valley who has previously submitted comments of the Draft RMP (reference 000184_BrettJ_20161017 in Volume IV, June 2019 RMP), I respectfully submit the following protest on behalf of Slow Food Western Slope and the Valley Organic Growers Association. (Original October 2016 comment document is included.)

My contact information is:
Jim Brett
1899 Hawks Haven
PO Box 1682
Paonia, CO 81428
970.210.9718
jmbimagery@icloud.com

My protest addresses the following issues that I have raised in my previous comments:
- Preferred Alternative: Adopting a wholly new alternative at this stage of the process is unacceptable
- Air Quality: Ozone levels are already exceeding EPA thresholds
- Health and Safety: Human health impacts need priority consideration
- Leasable Minerals - Fluid: Fluid mineral development would create negative impacts
- Recreation: The entire Jumbo Mountain unit must be a special recreation management area
- Socioeconomics and Environmental Justice: Oil and gas development threatens agricultural livelihoods
- Water Resources: Clean water is the lifeblood of the North Fork Valley
- Ecological Emphasis Areas: Need uninterrupted public land access for hunting, camping, fishing and travel

Those issues are addressed in the following sections of the RMP:
Section 2.3 - Alternatives Considered for Detailed Analysis
Section 4.3.1 - Air Quality & Climate
Section 4.6.2 - Public Health & Safety
Section 4.3.2 - Soils & Geology
Section 4.4.4 - Recreation
Section 4.6.3 - Socioeconomics and Environmental Justice
Section 4.3.5 - Water Resources
Section 4.4.3 - Fish & Wildlife

I believe the BLM has erred in adopting the Proposed RMP for the following reasons:
- Section 2.3: Alternative E was improperly adopted and was not subject to public comments. The RMP drastically decreases the stipulations in Alternative B and does not include a No-Leasing alternative.
- Section 4.3.1: Alternative E will contribute to increased greenhouse gas emissions thereby exacerbating climate change.
- Section 4.6.2: The Proposed RMP downplays public health risks, and ignores significant evidence provided (reference comment 000184_BrettJ_20161017-9) that shows increased oil and gas development can have serious adverse impacts on public health.
- Section 4.3.2: The BLM does not consider information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing,

injection wells and ongoing oil and gas operations. Also, the RMP does not adequately address the cumulative impacts of unregulated gas gathering lines.

- Section 4.4.4: Alternative E must designate the entire Jumbo Mountain unit as a special recreation management area with no leasing to protect the quality of the recreation experience.
- Section 4.6.3: The RMP does not sufficiently address the potential for soil, air and water contamination as a result of oil and gas development that could destroy the North Fork Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.
- Section 4.3.5: Since the RMP proposes to lease practically every acre of the North Fork to oil and gas, that would threaten the Valley's drinking and irrigation water. The RMP does not adequately address the permanent removal of water from the hydrologic cycle.
- Section 4.4.3: The RMP needs a No-Leasing alternative with No Surface Occupancy setbacks from streams, riparian areas and water bodies to sustain a multi-million-dollar outdoor industry in the area.

On behalf of Slow Food Western Slope and the Valley Organic Growers Association, I respectfully protest the Proposed RMP, and the sections outlined above. Without having considered a No-Leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities. Alternative E does not in any means support the BLM Mission "to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

Sincerely,

Jim Brett
Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association

BLM_0167193

Jim Brett
PO Box 1682
Paonia, CO 81428
Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association
Oct 17, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Thank you for the opportunity to comment on the draft Uncompahgre Field Office Resource
Management Plan (RMP). Slow Food Western Slope and the Valley Organic Growers
Association (VOGA) are glad the BLM is considering ways to protect important natural
resources like domestic and irrigation water, air quality, wild and scenic rivers, wildlife habitat
and recreation. In particular, we support the designation of ecological emphasis areas and
special recreation management areas. These will preserve habitat connectivity, wildlife
corridors, undeveloped open space and recreation opportunities within our region.

Slow Food Western Slope (http://slowfoodwesternslope.org/) functions as a chapter of Slow
Food USA, which is a 501(c)3 non-profit organization. Slow Food USA's and its chapters'
mission is to create a dramatic and lasting change in the food system. We envision a world in
which all people can eat food that is good for them, good for the people who grow it and good
for the planet: good, clean and fair food for all.

Our chapter promotes and supports over 60 farmers, orchardists, ranchers, agricultural
businesses and winemakers of the North Fork Valley - all of which depend on good and clean
water, air and soil.

Valley Organic Growers Association (http://www.vogaco.org/), a 501(c)5 non-profit organization,
was established in 1992 and has a membership of over 80 organic farms, ranches, orchards
and agricultural-related businesses and advocates, representing a vibrant and sustainable local
economy. Our guiding principles include the maintenance of healthy soil, air and water for the
production of nutritious food, free from synthetic inputs.

The North Fork Valley's scenic beauty and temperate growing season have attracted the largest
concentration of organic and chemical-free growers in the state of Colorado. Our region has a
long history of producing quality high-country, chemical-free food, with a well-deserved
reputation that extends around the state and nationally. This history, coupled with the emerging
consumer trend for organically crafted products has made this region increasingly known and
marketable.

The North Fork Valley has a forcefully developing market for agri-tourism, farm-stays and
agriculture-based education. Products from area farms supply markets and top restaurants in
towns around western Colorado, including Aspen, Telluride and Crested Butte and serve many
Front Range communities, including Colorado Springs, Golden, Denver, Boulder, Longmont and
Fort Collins. The farms' customers have created relationships with the growers and forged a

unique community that is the North Fork Valley. These relationships develop as our farmers have been able to furnish organic, high-quality fruits, vegetables, meat, dairy, wine and specialty products.

An October 5, 2016 Aspen Sojourner article (http://www.aspensojo.com/articles/2016/10/5/beyond-the-roundabout-autumn-perfection-in-paonia) highlights the items mentioned above providing credence the North Fork Valley is a destination that must be protected:

- - -

"Nestled in the North Fork Valley in Delta County, Paonia is home to the state's largest concentration of organic farmers thanks to its richly fertile land, which yields ample fruit (peaches, apples, cherries, pears, and plums) and veggies while supporting some of the country's best livestock. Incorporated in 1881 and named by founder Samuel Wade after the peony rootstock he brought in a covered wagon all the way from Ohio, the town has now grown into a haven for aging flower children, new-agers, liberal activists, and environmentalists…The town of just under 2,000 residents prides itself on its vibrant off-beat culture filled with farm-to-table restaurants, progressive media outlets, art galleries, boutiques, and wineries.

"It doesn't get more scenic then driving from Aspen to Paonia in the fall, with expansive views of the western Elk Mountains from McClure Pass. It's a direct route from the Roaring Fork Valley to the North Fork Valley via State Highway 133; the road takes you through Carbondale and Redstone, and is open year-round. The top of the pass is a prime spot for leaf-peeping. The drive then traces Muddy Creek down to Paonia State Park—worth a stop on your way there or back to take in the stunning sight of the Ragged Mountains.

"One of the few regions in Colorado to successfully cultivate and bottle pinot noir, the North Fork Valley is a hotbed for high-altitude grape growing, with plenty of vineyards to explore.

"Continue down the road to the home of Big B's juices and hard ciders, where you can pick apples, along with plenty of other produce, depending on the season. It's the quintessential autumn adventure…

"Founded in 2008 by husband and wife Mike and Gretchen King, [Revolution Brewing] uses locally grown hops with water directly from the springs on nearby Mount Lamborn for beer that's hand stirred and brewed on a six-barrel system."

- - -

Our producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy good and clean food. The potential for soil, air and water contamination as a result of oil and gas development could destroy our Valley's farms', orchards' and ranches' ability to market their products as organic and safe - thereby losing their livelihood.

**Preferred Alternative**

The BLM's preferred alternative would open almost every acre of public lands in the region to oil and gas leasing (865,970 acres or 94.5% of total oil, gas and mineral acreage), and specifically

in sensitive air, water and food sheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks and more.

The potential for human, animal and environmental damage is too high.

Development would contaminate soils, water and air and impair human health, including increases in respiratory, endocrine, immune and cardiovascular disease.

Development of the public lands would destroy local investments and resources required in transitioning the economy to one based on agri-tourism, recreation, renewable energy, agriculture and organic/clean food. Also, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact and environmental damage caused by hydraulic fracturing, injection wells and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed.

BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. If the BLM will not consider a no-leasing alternative, then by all means it must make Alternative B1 as the preferred alternative.

In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

**Impact Areas**

Oil and Gas Development

As mentioned above, BLM's preferred alternative would open 94.5% of total oil and gas mineral acreage to leasing, which is .1% less than its current 30-year old RMP. BLM divides oil and gas leasing by potential for development. In its preferred alternative, BLM allocates 53% of the federal mineral estate to higher development potential and the remaining 47% to lower development potential. BLM has based its oil and gas drilling assumptions on a 2004 report, which assumes that 1271 wells will be drilled in the planning area.

Also, the RMP does not impose a cap on drilling.

BLM's assumption on the number of foreseeable wells could be significantly understated given, new research, hydraulic fracturing and multi-stage drilling technologies, which were not considered at the time of the report.

Here is at stake with oil and gas development for the North Fork Valley:

- Activities on public lands that have the potential to poison food sheds and threaten to wipe out food security for people on the Western Slope and the Front Range.

- The destruction of clean air, abundant fresh water and food sheds (including Colorado's largest concentration of organic farms).

- Significant harm to human health and a local economy based on agriculture and organic farms, recreation, hunting and tourism.

- Loss of unique biodiversity in Colorado.

- The future of the North Fork Valley. The final RMP will guide oil and gas development for the next 20-30 years.

Other Related Oil and Gas Impacts

*Water Resources*

Needless to say, water quality is important for good, clean, sustainable agriculture. Clean water is the lifeblood of the North Fork Valley. The BLM proposes to lease practically every acre of the North Fork to oil and gas, which would threaten our drinking and irrigation water.

Extracting fuel from shale formations requires pumping hundreds of thousands of gallons of water, sand and chemicals into the ground to break apart rock and free the gas. Some of that water, along with large quantities of existing underground water, returns to the surface, and it can contain high levels of salt, drilling chemicals, heavy metals and naturally occurring radioactive material. Drinking and irrigation water sources have been contaminated by oil and gas chemicals released through leaks and spills, naturally occurring gases and radioactive materials from disturbance of the geologic formation, and air-borne contaminants.

The oil and gas industry, in particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Therefore, there is a lack of meaningful regulation.

State regulation of hydraulic fracturing as it relates to potential contamination of ground and surface water is limited to casing construction requirements, setbacks, disposal of oil and gas wastes (hazardous materials), and reporting of leaks and spills. Produced water needs to be disposed of and can be disposed of 6 ways in Colorado:

1. Injection into a properly permitted Class II well;

2. Evaporation/percolation in a properly permitted pit;

3. Disposal at permitted commercial facilities;

BLM_0167197

4. Disposal by roadspreading on lease roads outside sensitive areas under certain conditions;

5. Discharging into state waters, in accordance with the Water Quality Control Act and related rules and regulations; or

6. Evaporation in a properly lined pit at a centralized exploration and production waste management facility permitted by the Colorado Oil and Gas Conservation Commission (COGCC).

For the fluids disposed of, the BLM states that "60 percent goes into deep and closely-regulated waste injection wells, 20 percent evaporates from lined pits and 20 percent is discharged as usable surface water"under permits from the Colorado Water Quality Control Commission." With all of this "deep and closely regulated" activity to protect citizens:

•   There were 615 spills, 271 (44%) of which were from produced water, in 2015. That equates to nearly two spills every day in Colorado. 15% of the spills resulted in water contamination, with: 44% within 50 feet of ground water, 31% within 1000 feet of surface water, 39% within 1500 feet of a water well, and 9% within 500 feet of cows, pigs, sheep or other livestock as reported in 2015 by the Center for Western Priorities.

Also, naturally occurring radioactive material comes up with wastewater produced from oil and gas extraction. The waste can remain radioactive for millennia. Excessive radiation exposure can increase cancer risks; radon gas, for example, has been tied to lung cancer. BLM did not analyze the risks of exposure to radioactive waste, and Colorado does not have regulations in place to manage radioactive waste from oil and gas operations.

The BLM is required to honor community source water protection plans, which are developed to protect a community's drinking water source from contamination. The towns of Crawford, Hotchkiss, and Paonia secured source water plans, which were not taken into consideration by the BLM in its preferred alternative.

This video depicts what happened to well water when hydraulic fracturing occurred in Las Animas county in Colorado: https://www.facebook.com/greenpeaceusa/videos/10154706072859684/. This is completely unacceptable.

In addition, the BLM also did not consider the permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought.

Again, a no-leasing alternative is not only reasonable, but represents the best way to protect the North Fork Valley now and in the future. Alternative B1 would be acceptable if a no-leasing alternative cannot be included in the RMP.

*Air Quality*

The final plan must protect the health of the airshed. The North Fork Valley is affected by daily up and down-valley winds and any oil and gas activities occurring in higher elevations could

have direct impact on air quality at lower elevations, including from dust, methane, VOCs, ozone and other particulates and gases hazardous to agriculture and public health.

In Garfield, Mesa, Gunnison and Delta counties, there are 11,825 oil and gas facilities. Within a half mile radius of these facilities, there are over 6,100 people. The American Lung Association gave Mesa County an F Air Quality rating and Gunnison a C rating. Even more disturbing is that Delta county does not monitor air quality.

The BLM does not have the adequate information to assess airshed impacts of oil and gas activities and did not consider that their own modeling of ozone levels in the Bull Mountain area that exceed EPA thresholds of 70 ppb.

The North Fork Valley producers' commitment to quality and the stewardship of clean soil, water and air are crucial to consumers and their perception and choice to buy clean, organic food. The potential for air contamination as a result of oil and gas development could destroy Slow Food and VOGA member farms' ability to market their products as organic and safe.

*Health Impacts*

The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan.

Hundreds of peer reviewed scientific articles exist on all aspects of toxins related to unconventional oil and gas production. The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying low-dose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, malignancy as well as all the problems listed below.

The New York State Department of Health (NYSDOH) released *A Public Health Review Of High Volume Hydraulic Fracturing For Shale Gas Development* in December 2014. In this study, it found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This study led to their recommendation that fracking should be banned in New York State.

The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Below are some studies published in 2015 or 2014. The citing after each will read PSR-C then the page number.

Uncertainty.

- California Council on Science and Technology studied the impacts of well stimulation on human health from the exposure to fracking-related air pollution. The unknown number and toxicity of chemicals mixed in these fluids make it difficult to quantify risk but the paper identifies the potential health risks. One conclusion: that "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in

California's oil operations." (PSR-C p.72)

Birth defects, birth weight, and infant mortality.

- In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. (PSC-C p.76)

- University of Pittsburgh study of three heavily drilled PA counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller-than-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. (PSR-C p.72, 73)

- Health professionals in Vernal, Utah reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one health professional. (PSR-C p.76)

- Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5-kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The chances of a low APGAR score, a summary measure of the health of newborn children, roughly doubled, to more than 5 percent. (PSR-C p.77)

- Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. (PSR-C p.77; 72-73)

Rashes and upper respiratory problems.

- A Pennsylvania, Yale-led study found that health symptoms reported by residents increased in frequency as distance between residence and gas wells decreased. Those living less that one kilometer from drilling activities had increased reports of rashes and upper respiratory problems. (PSR-C p.73)

Urgent Care & Hospitalization.

- Hospitals in the Bakken Shale region reported a sharp rise in ambulance and emergency room visits since the boom in drilling and fracking. Drug overdoses and oil field related injuries accounted for 50% of the cases in one emergency room. (PSR-C p.76)

- University of Pennsylvania's Center of Excellence in Environmental Toxicology found the increasing number of gas wells in Pennsylvania is significantly correlated with inpatient rates

of hospitalization. (PSR-C p.75)

<u>Animal Health</u>.

- A Yale University School of Medicine study in SW Pennsylvania found evidence that dogs in households less than one kilometer from a gas well had elevated risks for health problems, especially dermal conditions. (PSR-C p.73)

- Food animals have been shown to have increased respiratory and growth problems over time. The life of a food animal is very short compared to that of humans and some wildlife where cumulative effects would be pronounced. (PSR-C p.73) Conditions like these will definitely harm ranchers' and other producers who raise animals and livestock for a living.


## Recreation

In conjunction with the visitor's agri-tourism experience of the North Fork Valley, recreation definitely plays a significant role.

<u>Jumbo Mountain Trails</u> - The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents and visitors. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.

Plus, Jumbo Mountain must be open to hiking, mountain biking (including pedal-assisted electric bikes) and horseback riding - no motorized vehicles are allowed.

<u>Hunting and Fishing</u> - Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of a no-leasing alternative or at least B1 which prohibits surface activities in critical wildlife habitat, and includes both No-Leasing and No Surface Occupancy setbacks from streams, riparian areas and water bodies.

<u>Future Recreation Development</u> - Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte and Robideau Canyon.


## Conclusion

- The draft RMP repeatedly describes how fluid mineral development would negatively impact, to some unknown degree, other resources such as wildlife habitat and migration corridors, grazing land, soil productivity, vegetative diversity, special status fish and aquatic wildlife, air quality and visual resources, as well as non-market values including ecosystem services, natural amenities, scenic beauty, human health, quality of life and sense of place.

- The draft RMP estimates that ecosystem services in the planning area could provide up to $1,492 million in value. (Chap. 4, pg.461)

- The draft RMP states that natural amenities like proximity to wilderness areas, national parks and other special protection areas have a positive impact on tourism, property values, population growth due to positive net migration, higher incomes and employment growth.

- The draft RMP states that approving an alternative that emphasizes "resource development over conservation likely would result in more impacts on nonmarket values and how planning area individuals perceive their own quality of life." (Chap. 4, pg.460)

So, why is Alternative D preferred - an alternative that will open the planning area to potential oil and gas development that will threaten the North Fork Valley's air, land and water?

Slow Food Western Slope and VOGA are opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. We are opposed to oil and gas leasing here because it has the potential to:

1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and
2) cause significant harm to human health and a local economy based on recreation, hunting, tourism and agriculture. We oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan (B1) would be carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable management possibilities.

And finally, the following is from the BLM's "Who We Are, What We Do" web page (http://www.blm.gov/wo/st/en/info/About_BLM.html):

"The BLM is focusing on the following priorities:

- The America's Great Outdoors initiative, which is aimed at enhancing the conservation of BLM-managed lands and resources and reconnecting Americans to the outdoors.

- The New Energy Frontier, which encourages and facilitates renewable energy development – solar, wind, and geothermal – on the Nation's public lands.

- Cooperative Landscape Conservation, a scientific initiative that recognizes the need to better understand the condition of BLM-managed landscapes at a broad level.

- Youth in the Great Outdoors, which supports programs and partnerships that engage youth in natural resource management and encourages young people and their families to visit, explore, and learn about the public lands.

- Climate Change, which is affecting public lands in ways that could impact on Americans' quality of life. The BLM is responding with two interconnected initiatives: a proposed landscape approach to land management and Rapid Ecoregional Assessments, which will improve the agency's understanding of public land conditions to inform future management decisions.

By strengthening existing and forging new partnerships with stakeholders, the BLM will ensure that the nation's public lands are managed and conserved for future generations of Americans to use and enjoy."

We request that the RMP align with these priorities above, especially in regards to the second item that encourages renewable energy. If the BLM does not consider oil and gas development on public lands a priority, then the Uncompahgre Field Office's RMP, which will probably be in for for decades, must reflect that.

Jim Brett

Leader, Slow Food Western Slope
Secretary, Valley Organic Growers Association

BLM_0167203

July 29, 2019

**Submitted via e-planning** *and* **FedEx**

BLM Director (210)
Attention: Protest Coordinator, WO-210
20 M St SE, Room 2134LM
Washington, D.C. 20003

Re:     Protest of Uncompahgre Field Office Proposed Resource Management Plan/Final
        Environmental Impact Statement

Please accept this timely protest of the Bureau of Land Management Uncompahgre Field Office
(UFO) Proposed Resource Management Plan and Final Environmental Impact Statement
(Proposed RMP/FEIS), submitted by The Wilderness Society, Western Slope Conservation
Center, San Juan Citizens Alliance, Sheep Mountain Alliance, Conservation Colorado, Western
Colorado Alliance, Great Old Broads for Wilderness, Wilderness Workshop, Rocky Mountain
Wild, and the National Audubon Society (Protesting Parties).

## INTERESTS OF THE PARTIES

**The Wilderness Society** (TWS) has a long-standing interest in the management of Bureau of Land
Management lands and engages frequently in the decision-making processes for land use planning
and project proposals that could potentially affect wilderness-quality lands, wildlife habitat, and
other natural resources managed by the BLM in the West.  TWS members and staff enjoy a myriad
of recreation opportunities on BLM-managed public lands, including hiking, biking, nature-
viewing, photography, and the quiet contemplation in the solitude offered by wild places.  Founded
in 1935, TWS's mission is to protect wilderness and inspire Americans to care for our wild places.

**Western Slope Conservation Center** (WSCC) is a 43-year old grassroots non-profit with over
600 members dedicated to building an active and aware community to protect and enhance the
lands, air, water, and wildlife of the Lower Gunnison Watershed.  Our members in the North Fork
Valley and Western Slope of Colorado recreate, work, live, and rely on BLM lands in the UFO.
The WSCC has a long history of engaging with the BLM and diverse stakeholders in public lands
management, including the UFO Resource Management Plan.

**San Juan Citizens Alliance** (SJCA) is a non-profit organization with over 1,000 members in the
Four Corners region.  SJCA has been actively involved in southwest Colorado for over 30 years
in monitoring and scrutinizing management of public lands, overseeing government decision-
making and compliance with environmental laws, advocating for cleaner air quality and better
stewardship of natural systems, promoting reduced energy consumption, energy efficiency and
renewable energy, and working for improvements to community health.  SJCA members in the

BLM_0167204

Four Corners region use the federal lands under the jurisdiction of the Uncompahgre Field Office for recreation, wildlife viewing, exploration, and rejuvenation.

**Sheep Mountain Alliance** represents over 850 members and supporters in Southwest Colorado, as well as thousands of visitors to our region. These constituents rely on the lands of the Uncompahgre Field Office of the BLM for their economic livelihoods, for recreation, as well as for the myriad ecosystem services these places provide for clean air, clean water, and wellbeing. They live, work, and play frequently on the lands of the UFO, and they have a direct stake in this RMP process. Our members include hikers, climbers, bikers, motorized users, boaters, hunters, and anglers to name a few. They are ranchers and business people, farmers and guides, and workers. Sheep Mountain Alliance represents their interests, and their voices. The future of our area depends the protection of the landscapes, waters, plants, and wildlife that form the base of our local economy.

**Conservation Colorado** is a grassroots advocacy organization working to protect Colorado's air, land, water, and people. For over 50 years, we have collaborated on the key environmental issues of the day and establishing strategic partnerships to find conservation success at the state and federal levels. Our organization has a long history of working on public lands issues across Colorado, particularly on Colorado's western slope. Among our thousands of members are those that live, work, recreate and enjoy the BLM lands of the Uncompahgre Field Office for a wide variety of activities and have a vested interest in the future management of those lands. Luke Schafer is authorized to file this protest on behalf of Conservation Colorado and its members and supporters as the West Slope Director for Conservation Colorado.

**Western Colorado Alliance** (formerly Western Colorado Congress) is an alliance for community action organizing people to build healthy, just, and self-reliant communities in Western Colorado. We have been working for land conservation and the responsible use and development of our natural resources for 38 years. Our work is based in the local knowledge and experience of our members who live, work and play in western slope communities surrounded by public lands. WCA is here to empower their voices and concerns regarding public land management. Our Alliance has over 2,000 members and supporters across Western Colorado.

**Great Old Broads for Wilderness** (Broads) is a national grassroots organization, led by women, that engages and inspires activism to preserve and protect wilderness and wild lands. With more than 8,500 members and advocates, the national headquarters is based in Durango, Colorado. Of 40 chapters (called "Broadbands") across the country, ten are located in Colorado. The organization has a vested interest in public lands in Colorado, including the management of Bureau of Land Management lands on the western slope. The Northern San Juan Broadband chapter, based in Ridgway, and the Grand Junction Broadband chapter, have spent years learning about and exploring BLM Lands with Wilderness Characteristics, reviewing land use planning documents, documenting conditions and concerns, and evaluating project proposals that could potentially affect wilderness-quality lands, wildlife, and other important natural resources managed by the BLM's Uncompahgre Field Office. Broads' members and staff enjoy many of the

BLM_0167205

recreation and solitude opportunities these BLM-managed public lands have to offer, including hiking, biking, nature-viewing, hunting, fishing and simply knowing that the land's intrinsic values are protected and preserved.

**Wilderness Workshop** (WW) is a non-profit organization engaged in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local public lands.  WW is based in Carbondale, Colorado and has approximately 800 members.  WW not only defends pristine public lands from new threats, but also strives to restore the functional wildness of landscapes fragmented by human activity.  WW works to protect and preserve existing wilderness areas, advocate for expanding wilderness, defend roadless areas from development that would destroy their wilderness character, and safeguard the ecological integrity of all federal public lands in the vicinity of the White River National Forest.  WW has a long history of participation in forest planning and public land management on the White River National Forest, the Grand Mesa Uncompahgre and Gunnison National Forest, and adjacent Bureau of Land Management lands, including the Uncompahgre Field Office.

**Rocky Mountain Wild** (RMW) is a non-profit organization that protects, connects, and restores wildlife populations and wildlands in the Southern Rockies region.  Public lands are fundamental for the protection of biodiversity in our region, and we actively engage in land planning processes, scientific research, public education, and advocacy to protect key habitats and wildlife movement corridors on Bureau of Land Management lands.  We have a long-standing interest in the habitats and species located in southwest Colorado, and our members use areas within the UFO for recreation, citizen science exploration, and wildlife viewing.

**The National Audubon Society** protects birds and the places they need, today and tomorrow.  A nonprofit conservation organization since 1905, Audubon works throughout the Americas using science, advocacy, education, and on-the-ground conservation.  State/regional offices, nature centers, chapters, and partners give Audubon an unparalleled wingspan that reaches millions of people each year to inform, inspire, and unite diverse communities in conservation action.  Audubon Rockies is a regional office of National Audubon Society, working with partners and ten independent Audubon chapters throughout Colorado.  Audubon serves over 25,000 members in Colorado.

A list of the names, mailing addresses, and telephone numbers of the above-listed groups are included below, as required in 43 C.F.R. § 1610.5-2(2)(i).  These groups submitted comments that covered all issues raised herein that were germane at the time, as required by 43 C.F.R. § 1610.5-2(2)(iv).  Issues raised herein for the first time are limited to those that resulted from changes to the Proposed Action and accompanying documents, and other new information.

The Protesting Parties have and will continue to participate in this planning process, including through scoping comments on the UFO RMP Revision submitted on March 29, 2010, and comments on the Draft RMP Amendment and EIS submitted November 1, 2016, all of which are incorporated herein by reference, along with their respective exhibits and attachments, and which

BLM_0167206

are attached as Exhibits 1 through 6 hereto.  The Protesting Parties care deeply about the proper management and conservation of federal lands, wildlife, and minerals covered by the UFO Proposed RMP/FEIS and have been integrally involved in the multi-year efforts that resulted in the Proposed RMP and FEIS.

This protest is filed in accordance with 43 C.F.R. § 1610.5-2 and addresses the following issues:

I.  BLM Failed to Comply with the Federal Land Policy and Management Ac

    A.  FLPMA Imposes a Multiple-Use/Sustained Yield Mandate Upon BLM

    B.  BLM's Proposed RMP/FEIS Violates FLPMA's MUSY Mandate with Respect to Lands with Wilderness Characteristics

    C.  BLM's Proposed RMP/FEIS Violates FLPMA's Direction to Prioritize the Designation and Protection of ACECs

    D.  BLM Failed to Coordinate with the State of Colorado Pursuant to FLPMA and DOI Secretarial Order 3362

    E.  The Proposed RMP/FEIS is Inconsistent with State and Local Interests as Required by FLPMA and DOI Secretarial Order 3356

    F.  The Proposed RMP/FEIS Violates FLPMA's Public Participation Requirements

    G.  BLM Improperly Rejected the North Fork Alternative Plan

II.  BLM Failed to Comply with the National Environmental Policy Act

    A.  BLM Must Prepare a Supplemental EIS that Analyzes and Discloses the Impacts of the Proposed Action

    B.  BLM's New Purpose and Need Statement is Inadequate

    C.  BLM Failed to Consider a Reasonable Range of Alternatives

    D.  BLM Failed to Take the Requisite Hard Look at Potential Environmental Impacts

        i.  Impacts on Water Quality and Aquatic Habitats

        ii.  Greenhouse Gas Emissions and Climate Change Impacts

    E.  BLM Failed to Respond to Substantive Comments Regarding Alternatives

III.  BLM Failed to Adequately Address Impacts to the Gunnison Sage-Grouse

The discussion of each of these issues below concisely states why we believe the Colorado State Director's decisions are wrong and identifies corresponding portions of the Proposed RMP/FEIS at issue, as well as our requested remedy for each issue addressed.

BLM_0167207

## I.   BLM Failed to Comply with the Federal Land Policy and Management Act

The BLM has failed to meet its obligations under the Federal Land Policy and Management Act (FLPMA) with respect to the protection of Lands with Wilderness Characteristics (LWC), Areas of Critical Environmental Concern (ACECs), and other resources. BLM's Proposed Action in the Proposed RMP/FEIS bears little resemblance to its Preferred Alternative in the November 2016 Draft RMP/EIS and improperly minimizes protections for LWC and ACECs in favor of energy development. BLM provides no explanation for this change of direction other than oblique references to realigning the RMP with the policies of the new Administration and attempts to bury the impacts of its decisions in a comparison to the no-action alternative. Its actions are arbitrary and capricious and must be revisited.

A federal agency's actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" will not withstand judicial review. 5 U.S.C. § 706(2)(A). "An agency action is arbitrary and capricious if the agency … entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [if the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (internal citations omitted). This analysis applies in the context of BLM's decisions in developing a resource management plan under FLPMA. *See San Juan Citizens Alliance v. Norton*, 586 F. Supp. 2d 1270 (D. N.M. 2008).

### A.   FLPMA Imposes a Multiple-Use/Sustained Yield Mandate Upon BLM

Under FLPMA, BLM is subject to a multiple-use and sustained yield mandate, which prohibits the Department of the Interior (DOI) from managing public lands primarily for energy development or in a manner that unduly or unnecessarily degrades other uses. *See* 43 U.S.C. § 1732(a)-(b). Instead, the multiple-use mandate directs DOI to achieve "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations." 43 U.S.C. § 1702(c). There is no mandate that DOI favor "the combination of uses that will give the greatest economic return or the greatest unit output." *Id*. FLPMA also requires that BLM "*shall*, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b) (emphasis added). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with this standard. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1075 (10th Cir. 1988).

Federal courts have consistently held that BLM must balance multiple land uses and have rejected efforts to affirmatively elevate development over other uses of public lands. In the seminal case, *New Mexico ex rel. Richardson v. BLM*, the Tenth Circuit put to rest the notion that BLM can manage chiefly for development, declaring that "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." 565 F.3d 683, 710 (10th Cir. 2009) ("*New Mexico*"); *see also S. Utah Wilderness Alliance v. Norton*, 542 U.S. 52, 58 (2004)

BLM_0167208

(defining "multiple use management" as "striking a balance among the many competing uses to which land can be put"). Other federal courts have agreed. *See, e.g., Colo. Envtl. Coalition v. Salazar*, 875 F. Supp. 2d 1233, 1249 (D. Colo. 2012) (rejecting oil and gas leasing plan that failed to adequately consider other uses of public lands).

By prioritizing development as the dominant use of public lands in the Proposed RMP/FEIS, as described below, BLM violates FLPMA's mandates to manage for multiple-use and sustained yield and to avoid unnecessary or undue degradation.

### B. BLM's Proposed RMP/FEIS Violates FLPMA's MUSY Mandate with Respect to Lands with Wilderness Characteristics

Federal courts have specifically recognized that LWC "retain vitality as a resource category covered by the BLM's multiple-use land use planning mandate" under FLPMA, *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1115 (9th Cir. 2010) ("*ONDA*"), and BLM must consider the protection of LWC in the development of a resource management plan. *Id.* at 1121-22. BLM "cannot ignore an obviously-present wilderness resource." *Or. Natural Desert Ass'n v. Shuford*, 2007 U.S. Dist. LEXIS 42614 at *30 (D. Or. June 8, 2007) (citing *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1167-68 (N.D. Cal. 2006)). If wilderness values "exist in the planning area," BLM's Land Use Planning Handbook provides that the plan should:

> Identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation). Include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics.

BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, LAND USE PLANNING HANDBOOK, H-1601-1 Appx. C 1, 12 (2005) ("2005 LUP Handbook"); *see also ONDA*, 625 F.3d at 1116-17 (discussing same). BLM's internal guidance on the consideration of LWC as part of the development of resource management plans requires that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, MANUAL 6320, CONSIDERING LANDS WITH WILDERNESS CHARACTERISTICS IN THE BLM LAND USE PLANNING PROCESS (PUBLIC) ("2012 LWC Manual") at .60(A)(1)(b) (Mar. 15, 2012). Specifically, BLM must consider "[t]he degree to which use or development of each [other] resource is compatible with or conflicts with management of the area to protect wilderness characteristics." *Id.* at .06(A)(1)(b)(v).

Furthermore, the FLPMA planning process requires BLM to specifically identify how it will mitigate environmental impacts in the context of its land use decisions. *See S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099, 1114 (D. Utah 2013) (opportunity for future mitigation

BLM_0167209

through NEPA process insufficient to comply with FLPMA). BLM's Land Use Planning Handbook states:

> Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-to-day activities occurring on public land.

2005 LUP Handbook at 13; *see also Nw. Indian Cemetery Protective Ass'n v. Peterson*, 764 F.2d 581, 588 (9th Cir. 1985), *rev'd on other grounds*, 485 U.S. 439 (1988) (agencies must "analyze the mitigation measures in detail [and] explain how effective the measures would be . . . A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."). This is the case in the LWC context: the 2012 LWC Manual specifies that "[i]n areas where the management decision is not to protect wilderness characteristics, [BLM should] consider measures to minimize impacts on those characteristics." 2012 LWC Manual at .06(A)(2)(d).

Here, BLM recognizes that the planning area contains 42,150 acres of inventoried LWC, but under the preferred alternative, the agency would affirmatively protect the wilderness characteristics of *none* of that acreage. BLM proposes to manage 18,320 acres "to minimize impacts on wilderness characteristics," and leave the balance as "not managed" to minimize or protect those characteristics. Proposed RMP/FEIS at Table 4-13. To the extent BLM presents this as adequate protection, it is a smokescreen – although BLM's Proposed Action commits the agency to "minimize impacts" to a certain portion of LWC, it does so only "when and where possible," an assessment that is apparently up to its sole discretion without serious consideration or discussion as to how those decisions might be reached. Proposed RMP/FEIS at 4-206.

Any supposed protections of LWC would fall by the wayside in the face of other land uses, most prominently development for energy production. Under its preferred alternative, BLM affirmatively indicates that it will "prioritize" other uses over the protection of LWC. Proposed RMP/FEIS at 2-137. In its discussion of the no-action alternative, BLM recognizes that "not managing for *the explicit protection* of the inventoried [LWC] would leave these lands vulnerable to surface-disturbing activities, which would likely diminish wilderness characteristics over time." *Id.* at 4-197 (emphasis added). While BLM is permitted to favor certain land uses over others in certain areas, the management strategy outlined in the RMP is far from the "delicate balancing" of land uses mandated by FLPMA. *New Mexico*, 565 F.3d at 710. LWC are a critical part of the agency's balancing under FLPMA and cannot be summarily dismissed. *ONDA*, 625 F.3d at 1121-21. Moreover, it does not comply with FLPMA's mandatory requirement that BLM protect the public lands from "unnecessary or undue degradation." 43 U.S.C. §1732(b).

BLM's proposals for effectuating its Proposed Action in this context are also deficient. BLM has provided only a cursory overview of its management strategies, frequently deferring to conditions that would be imposed by other programs to provide supposed impact minimization. *See, e.g.*,

7

Proposed RMP/FEIS at 4-206 (NSO stipulation applied to fluid mineral leases); *id.* at 4-207 (SSR restriction for surface-disturbing activities). There are no specific "conditions of use that would avoid or minimize impacts," 2005 LUP Handbook Appx. C at 12, or "measures or criteria that will be applied to guide day-to-day activities occurring on public land" as required by BLM's own policies. *Id.* at 13. Furthermore, there is no consideration of any concrete "measures to minimize impacts on [wilderness] characteristic." 2012 LWC Manual at .06(A)(2)(d). BLM punts its strategy on how to "minimize impacts" to its future site-specific decisions, stating only that it will "conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation." Proposed RMP/FEIS at 2-52. That approach is inconsistent with BLM's responsibilities under FLPMA, and the agency cannot rely on future, ambiguous measures to comply with its land-use planning obligations. *See Burke*, 981 F. Supp. 2d at 1114.

Even if the content of the Proposed RMP/FEIS itself passed muster, BLM violates its own procedures and policies in failing to provide the required weighing of resource values before deciding to prioritize other land uses over LWC. *See, e.g.*, 2012 LWC Manual at .60(A)(1)(b) (BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics"). There is simply no discussion of *why* BLM decides to favor other uses over the protection of LWC. BLM does not identify what values the other resource uses will generate that make its decision to forgo protections for LWC the right one.

Similarly, BLM provides no explanation for why its proposed plan differs so significantly from the Preferred Alternative in the Draft RMP/EIS. The Preferred Alternative provided substantially greater protections for LWC, and in the Proposed RMP/FEIS, BLM would remove nearly all of those protections without any specific reasoning or exploration of the differences between those approaches. The only clue to the agency's rationale comes from the BLM Newsletter, published with the Proposed RMP/FEIS, that notes that BLM made changes from the Draft to the Proposed RMP/FEIS based on public comments and an effort to "align[] with Administration priorities." *Uncompahgre RMP Newsletter*, Issue 3 at 1 (June 2019) ("*Newsletter*"). BLM's response to public comments on this issue does not address the shift to a less protective alternative, and in fact most commenters advocated for *greater* protections than the Preferred Alternative in the Draft RMP/EIS. Proposed RMP/FEIS Appx. R at 393-98. Furthermore, where the public did provide such substantial comments on a more protective alternative, a change in Administration, standing alone, does not justify this dramatic change in position to an alternative well outside the scope of what was initially considered in the Draft RMP/EIS.

## C. BLM's Proposed RMP/FEIS Violates FLPMA's Direction to Prioritize the Designation and Protection of ACECs

"In the development and revision of land use plans, the [DOI] shall *give priority to* the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c)(3) (emphasis added). "The priority afforded ACECs reflects Congress' intent to elevate the designation and protection of ACECs over BLM's default management for multiple use." *Rags Over the Ark. River, Inc. v. BLM*, 77 F. Supp. 3d 1038, 1056 (D. Colo. 2015). The failure to designate an area

BLM_0167211

as an ACEC where it otherwise meets the criteria because of "political concerns" is arbitrary and capricious, because the BLM is required to apply "the standards in FLPMA to the area in question." *Burke*, 981 F. Supp. 2d at 1114. BLM must consider the resource values in potential ACECs and determine whether those areas are appropriate for designation. *Id.*

In the Proposed RMP/FEIS, despite identifying more than 215,000 acres of land that meet the criteria to be designated as an ACEC, BLM basically proposes to keep designations at their existing level (approximately 30,000 acres), which also represents approximately 20,000 fewer acres than the Preferred Alternative discussed in the Draft RMP/EIS. These numbers, on their face, demonstrate that BLM has not given "priority to the designation and protection of [ACECs]." 43 U.S.C. § 1712(c)(3). The rationale for BLM's decision in this context is unclear and potentially based on flawed information. In comments to the BLM on the Draft EIS/RMP, many of the Protesting Parties noted that the scientific literature cited with respect to ecological emphasis areas was outdated when considered in the context of climate change. That research is also applicable to potential ACECs and has not been updated in the Final EIS/RMP in any meaningful way. *See* Proposed RMP/FEIS at Appx. D. Indeed, BLM does not appear to cite *any* research in its discussion of potential effects on ACECs or its designation decisions. This failure, together with the outdated research, calls into question whether BLM has properly considered whether individual potential ACECs have relevant and important values and should therefore be designated.

And, just as it did with respect to LWC, BLM provides no explanation for its change in approach to ACEC designations from the Draft to the Proposed RMP/FEIS. To the extent BLM claims to base its changes in position on "aligning with Administration priorities," *Newsletter* at 1, that is not a permissible rationale for declining to designate an area as an ACEC. *See Burke*, 981 F. Supp. 2d at 1114. The agency also fell short of its duties under FLPMA to prioritize designation and protection of ACECs.

### D. BLM Failed to Coordinate with the State of Colorado Pursuant to FLPMA and DOI Secretarial Order 3362

FLPMA requires that "land use plans of the Secretary under this section shall be consistent with State and local plans." 43 U.S.C. § 1712(c)(9). In accordance with this direction, the Department of the Interior issued Secretarial Order 3362, *Improving Habitat Quality in Western Big-Game Winter Range and Migration Corridors*, on November 15, 2018 ("SO 3362"). SO 3362 directs DOI Bureaus to work, "in close partnership" with the states "to enhance and improve the quality of big-game winter range and migration corridor habitat on Federal lands." More specifically, SO 3362 directs the DOI Bureaus to apply actions that conserve and improve habitat necessary to sustain local and regional big-game populations by avoiding development in the most crucial winter range or migration corridors. SO 3362 also directs DOI Bureaus to minimize development in areas that would fragment winter range and primary migrations corridors and limit disturbance of big game on winter range. The Proposed RMP/FEIS fails to implement this direction.

BLM_0167212

On July 17, 2018, Governor John W. Hickenlooper submitted a letter to the Acting Colorado State Director of the U.S. Bureau of Land Management, Gregory Shoop, providing scoping comments on the BLM's proposed December 2018 quarterly oil and gas lease sale. *See* Exhibit 7. In that letter, Governor Hickenlooper expressed concern that the timing limitation stipulations on oil and gas drilling activities are not adequate to protect big game use of critical winter habitats and migratory corridors. *Id.* at 2. Further, Hickenlooper recommended that additional limitations on the density of surface facilities are necessary to maintain big game populations in areas of heavily developed areas of oil and gas. *Id.* Specifically, because evidence suggests the impact of well pad densities that surpass one pad per square mile increases dramatically, Hickenlooper proposed that BLM incorporate a stipulation that limits the density of surface facilities to no more than one well pad per square mile. *Id.* at 2-3.

Further, the State specifically recommended CSU stipulations be applied to oil and gas operations to limit surface density to one pad per section to protect elk winter concentration area and mule deer critical winter range, *id.*, yet BLM failed to consider or apply these stipulations in the Proposed RMP/FEIS. Without these stipulations, and others recommended by the State of Colorado, the Proposed RMP/FEIS is lacking necessary protections for important winter habitat and other wildlife.

Instead of addressing encroachment on important habitat through durable landscape protections, the Proposed RMP/FEIS relies on timing limitations in seeking to minimize impacts on big game. As Governor Hickenlooper noted, there is a growing body of evidence that timing limitation stipulations on oil and gas drilling activities are not adequate to protect big game use of crucial winter habitats and migratory corridors. *Id.* at 2. Even if timing limitations were appropriate to address impacts to wildlife, the Proposed RMP/FEIS unnecessarily minimizes the timing limits to protect big game calving areas to May 15 – June 30 – even though the Proposed Action prohibits motorized and mechanized travel from April 15- June 30 in elk production and calving areas. The Proposed Action also includes the option to extend the seasonal closures to pedestrian or equestrian traffic, as needed. While the Proposed RMP/FEIS acknowledges that "[direct impacts on animals] are greater in areas with high densities of well pads, roads, and facilities and areas of high traffic," and while this matter was put squarely to the BLM by Governor Hickenlooper and Colorado Parks and Wildlife, the Proposed RMP/FEIS inexplicably fails to limit the density of well pad construction.

BLM must reiterate and expand on its commitment to coordinating with the State as required by SO 3362 and FLMPA. The Proposed RMP/FEIS must incorporate the State's recommendations to ensure adequate protection of big game in critical winter habitats and migratory corridors. BLM should reassess the previously considered plan to prohibit motorized and mechanized travel from April 15 - June 30 in elk production/calving areas and specify well pad density requirements to sustain critical winter range for big game.

BLM_0167213

### E. The Proposed RMP/FEIS is Inconsistent with State and Local Interests as Required by FLPMA and DOI Secretarial Order 3356

Department of the Interior issued Secretarial Order 3356, *Hunting, Fishing, Recreational Shooting, and Wildlife Conservation Opportunities and Coordination with States, Tribes, and Territories*, on September 15, 2017 ("SO 3356").  SO 3356 directs DOI Bureaus to "collaborate with state, tribal, and territorial fish and wildlife agencies to attain or sustain wildlife population goals during Department land-management planning and implementation, including prioritizing active habitat-management projects and funding that contribute to achieving wildlife population objectives, particularly for wildlife that is hunted or fished, and identifying additional ways to include or delegate to states habitat management work on Federal lands."

In comments on the Draft RMP/EIS, the Colorado Department of Natural Resources and Colorado Parks and Wildlife expressed concern that the Draft RMP/EIS should incorporate the objectives and commitments contained in several local plans and agreements important to the protection of wildlife and wildlife habitat.  Public lands within the planning area have long been known as important to deer and elk populations, and the UFO has in fact been scrutinized by federal courts for failing to adequately consider impacts to wildlife associated with oil and gas development.  *See Citizens for a Healthy Cmty. v. United States BLM*, 377 F. Supp. 3d 1223, 1246-47 (D. Colo. 2019).  The following local plans were suggested therein, yet were not addressed in the Proposed RMP/FEIS:

- The Range-wide conservation agreement and strategy for Roundtail Chub, Bluehead Sucker and Flannelmouth Sucker (2006);

- 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming;

- 2006 Conservation Strategy for Colorado River Cuttthroat Trout in the states of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010);

- Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010);

- E-20 (2005);

- RBS-21 West San Juan bighorn sheep DAU Plan;

- Colorado Bighorn Sheep management Plan 2009-2019; and

- State Wildlife Action Plan (2015).

Moreover, the Proposed RMP/FEIS fails to adequately protect perennial streams and aquatic species habitats.  The Proposed RMP/FEIS simply requires that the BLM "pursue" opportunities to enhance, protect or restore native aquatic species habitat.  Direction to "pursue" opportunities falls short of the requirements in SO 3356 to attain and sustain wildlife populations.  While the BLM claims that the Proposed Action provides more restrictions than Alternative A, *see, e.g.*

BLM_0167214

Proposed RMP/FEIS at 4-122, the protection are nevertheless inadequate to rise to the level of protection mandated by SO 3356.

Finally, instead of designating 177,700 acres as ecological emphasis areas and managing the area to preserve the continuity of habitats, vegetation communities and native wildlife within, while following vegetation mosaic objectives, the Proposed RMP/FEIS slashes protections for ACECs, removes all designations of ecological emphasis areas, and proposed and eligible wilderness lands, as discussed *supra*. These actions are not only inconsistent with FLPMA's multiple use and sustained yield mandate but also will likely have a detrimental impact on Colorado's fish and wildlife, in contravention of FLPMA and SO 3356.

To comply with FLPMA and SO 3356, BLM's RMP must include these plans or at least incorporate a clear rationale describing why the desired conditions, goals, and objectives in these plans are not addressed.

### F. The Proposed RMP/FEIS Violates FLPMA's Public Participation Requirements

FLPMA requires that BLM develop, maintain, and revise RMPs "with public involvement." 43 U.S.C. § 1712(a). BLM's regulations provide that "[t]he public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance." 43 C.F.R. § 1610.2(a).

BLM's regulations further require the agency to evaluate alternatives and their effects, identify a preferred alternative in a draft RMP and draft EIS, and take public comment on those alternatives and drafts. 43 C.F.R. § 1610.4-7. The agency must then evaluate those comments and recommend a Proposed RMP and final EIS. 43 C.F.R. § 1610.4-8. After BLM issues a Proposed RMP/FEIS, the public does not have a right to comment, but rather may only protest the decisions. *See* 43 C.F.R. §§ 1610.4-8, 1610.5-1, 1610.5-2. Taken together, these statutory and regulatory provisions do not allow BLM to insert a new alternative into the Proposed RMP/FEIS if the public did not have notice of and an opportunity to comment on the new alternative and its impacts.

But that is what BLM did here: the agency added and selected a new alternative, Alternative E, in the Proposed RMP/FEIS. BLM claimed the new Alternative E was merely a "reasonable combination of objectives and actions from the four alternatives" in the draft EIS. Proposed RMP/FEIS at 2-5. But that is simply not the case, as Alternative E significantly departed from the Draft RMP and EIS's preferred alternative, Alternative D, in several key ways. For example, Alternative E substantially reduced or eliminated conservation protections as evaluated in Alternative D, including:

BLM_0167215

| Resource | Preferred Alt | Proposed Action |
|---|---|---|
| Visual resource management areas | 7,850 acres | 0 |
| LWCs acres | 18,320 acres | 0 |
| Ecological emphasis areas | 177,700 acres | 0 |
| NSO leasing areas | 238,140 acres | 103,460 acres |
| ACECs | 51,320 acres | 30,190 acres |

The public did not have a "meaningful" opportunity to participate in the development and selection of Alternative E and was denied an opportunity to comment on this alternative and its effects. Accordingly, BLM violated FLPMA by inserting a new alternative into the Proposed RMP/FEIS without allowing for public involvement and comment.

## G. BLM Improperly Rejected the North Fork Alternative Plan

In addition to FLPMA's mandates identified above, the statute requires that BLM address other criteria when revising RMPs. 43 U.S.C. § 1712(c). These include: use of a systematic interdisciplinary approach that integrates considerations of physical, biological, economic, and other sciences; consideration of present and potential uses of public lands; consideration of the relative scarcity of the values involved and availability of alternative means and sites for realization of those values; and balance of long-term benefits to the public against short term benefits. 43 U.S.C. §1712(c)(2), (5)–(7).

The North Fork Alternative Plan – Alternative B1 in the Draft RMP/EIS and Proposed RMP/FEIS – balances these factors and multiple uses better than any of the other alternatives in the Final EIS. The North Fork Alternative was the product of 18 months of deliberations by the local community and was supported by local governments. It provides an overall management direction that is protective of the public lands, existing uses, and resources most vital to the communities, businesses, farms, ranches, and residents of the North Fork Valley. It identifies six primary resources and two key qualities that collectively comprise what is most prized, valued, and utilized by the community on their public lands, and sets out strong plan-based stipulations to ensure those values are protected. Only plan-based stipulations to protect these values are sufficient to provide local governments, businesses, farms, ranches, and residents the certainty they need to plan for, and complete their lives and businesses. These resources and qualities identified by this interdisciplinary and community-based process include: the existing economy, towns and community areas, water sources areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. The North Fork Alternative provided reasonable protections for these resources while still allowing some oil and gas development in areas that will not unreasonably compromise these resources. For these reasons, the North Fork Alternative best addresses the mandatory statutory factors by protecting present and potential use of public lands – including the agricultural, recreational, and other economic drivers of the community.

BLM_0167216

But BLM cast the local community's collaborative proposal aside and chose Alternative E, which leaves the key community resources vulnerable to harm from oil and gas drilling and other uses. For example, the North Fork Alternative reflected protections for agricultural operations by including stipulations to protect agricultural water in ditches from oil and gas leasing through stipulations. Alternative E and the Proposed RMP/FEIS do not include such a provision to protect agricultural operations and fail to explain how the lack of such protections are adequate to protect current and future uses, values, and benefits to the public. Additionally, the North Fork Alternative proposed a 5020-acre Special Recreation Management Area (SRMA) designation for Jumbo Mountain with no surface occupancy stipulations for oil and gas leasing; this would manage the area for the quality of hiking, biking, equestrian and ATV experiences, as well as historical uses such as hunting and grazing. But Alternative E and the Proposed RMP/FEIS rejected such protections for the current and future uses, values, and benefits of this area for the public. In doing so, the agency placed the short-term interests of oil and gas companies about the long-term interests of the public in using the public lands for other purposes.

Further, BLM did not consider these issues and factors adequately when evaluating the North Fork Alternative and failed to include a rational explanation for rejecting the North Fork Alternative. Courts have invalidated BLM EISs for failure to consider reasonable alternatives. *See, e.g., Colo. Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1250 (D. Colo. 2012). In particular, the Final EIS is misleading in its analysis because it downplayed the robust public support for this option. For example, the Town of Paonia expresses broad support for the North Fork Alternative and specifically points to the necessity of protections for drinking water, irrigation water, Jumbo Mountain SRMA, air quality and public health, and wildlife habitat such as those found in Alternative B1. *See* Proposed RMP/FEIS Appx. R at 204. In the BLM summary of comments, however, the town's support for the NFA is only mentioned in the drinking water section. *See id.* at 819. Similarly, the Paonia Chamber of Commerce supported the North Fork Alternative as it "maintains the possibility of continuing to develop a diverse, robust, thriving economy for Paonia and Delta County...." *See* Comment No. 000401_ShoemakerS_20161028. The BLM's summary of these comments in Appendix R of the Proposed RMP/FEIS includes no mention of the Chamber's support for the North Fork Alternative. In short, the BLM severely downplays the broad community support for the North Fork Alternative in the Final EIS.

By misrepresenting public support for and the potential benefits of the North Fork Alternative, BLM failed to adequately address FLMPA's criteria for land use plans, including the requirement that the agency consider current and future public uses of the lands, and balance short versus long-term benefits. *See* 43 U.S.C. § 1712(c). BLM should not have so readily and misleadingly dismissed a large segment of the local community's input on which alternatives best balanced the agency's multiple use mandate.

## II.    BLM Failed to Comply with the National Environmental Policy Act

In an EIS, BLM must consider the direct, indirect, and cumulative impacts of a proposed action. *New Mexico*, 565 F.3d at 703 (citing 42 U.S.C. § 4332(2)(C)); 40 C.F.R. pt. 1502 and §§ 1508.11,

BLM_0167217

1508.25(c). "The significance of an impact is determined by the action's context and its intensity." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1166 (10th Cir. 2012). "Applicable regulations require agencies to consider ten factors when assessing intensity, including the proposed action's effects on public health, the unique characteristics of the geographic area, the uncertainty of potential effects, and the degree of controversy surrounding the effects on the human environment." *Id.* (citing 40 C.F.R. § 1508.27(b)).

## A. BLM Must Prepare a Supplemental EIS that Analyzes and Discloses the Impacts of the Proposed Action

NEPA is designed to ensure that federal agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts" of their actions before they occur. *Robertson v. Methow Valley Citizens Council*, 490 U.S.332, 349 (1989); 40 C.F.R. § 1500.1(c). NEPA "also guarantees that the relevant information will be made available to the larger [public] audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson*, 490 U.S. at 349; 40 C.F.R. § 1500.1(b).

When crafting the "heart" of an EIS – the alternatives section – BLM must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits" and "[i]dentify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement…." 40 C.F.R. § 1502.14(b), (e).

Additionally, BLM must supplement a draft EIS where "(i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c); *see also Russell County Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011). Changes to alternatives that alter the location or extent of impacts warrant a supplemental EIS. *New Mexico*, 565 F.3d 683, 707.

As explained above, BLM added and selected a new alternative – Alternative E – in the Proposed RMP/FEIS without providing an opportunity for public comment, even though Alternative E was significantly different from alternatives in the draft. Alternative E included "substantial changes" to the proposed action and constituted "significant new circumstances" that required BLM to prepare a supplemental draft EIS. *See W. Expl., LLC v. U.S. Dept. of the Int.*, 250 F. Supp. 3d 718, 748 (D. Nev. 2017) (finding that changes in conservation protections for large swaths of lands constituted a "substantial change" relevant to environmental impacts that warranted an SEIS). BLM misled the public about the scope of these changes, downplaying them as merely a "reasonable combination" of the original alternatives. Proposed RMP/FEIS at 2-5. Absent preparation of a supplemental EIS, BLM has deprived the public of an opportunity to review and comment on Alternative E before the agency issued a Proposed RMP/FEIS, in violation of NEPA's mandates. This also violated BLM's obligation to provide "substantial treatment to each

BLM_0167218

alternative" in a way that allowed reviewers to "evaluate their comparative merits" during the public comment process.  *See* 40 C.F.R. §1502.14(b), (e).

## B.  BLM's New Purpose and Need Statement is Inadequate

NEPA requires BLM to include a statement that briefly describes "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. §1502.13.  Crafting a sufficiently broad purpose and need statement is crucial because it "dictates the range of alternatives" and renders alternatives unreasonable "if they do not respond to the purpose and need for the action."  BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, NATIONAL ENVIRONMENTAL POLICY ACT HANDBOOK H-17901 at 6.2.1 (Jan. 2008).

In the Proposed RMP/FEIS, BLM silently abandoned the purpose and need statement that was articulated in the Draft RMP/EIS and adopted a new one that is inadequate.  *Compare* Draft RMP/EIS at 1-2 *with* Proposed RMP/FEIS at 1-1.  As an initial matter, although the Proposed RMP/FEIS claims that changes between the Draft and Final EIS had been identified through shaded text, it did not do so with the changes to the purpose and need statement.  *See id.*  As a result, BLM misled the public by concealing the changes to readers who relied on BLM's statement that the agency flagged changes from the draft with shaded text.

Moreover, the final purpose and need statement is inadequate for several reasons.  First, it eliminated the Draft RMP/EIS's stated purpose "to provide broad-scale direction for the management of public lands and resources" in the planning area, but failed to replace it with any specific purpose for the Uncompahgre RMP.  *See* Proposed RMP/FEIS at 1-1 (stating only why RMPs are revised "[i]n general").  Second, it narrowed the need to revise the RMP from addressing "new information, revised laws and policies, emerging issues, and changed circumstances and resource conditions" to "ensure compliance with current mandates and to address issues that have arisen since their preparation."  *Compare* Draft RMP/EIS at 1-2 *with* Proposed RMP/FEIS at 1-1.  BLM provided no rational explanation for excluding new information, changed circumstances, and resource conditions from the enumerated factors that resulted in the need to revise the RMP.  Due to the critical role that the purpose and need statement plays in the evaluation and selection of alternatives, these changes were not harmless and do not comply with NEPA.

## C.  BLM Failed to Consider a Reasonable Range of Alternatives

NEPA requires BLM to study in detail all "reasonable" alternatives. 42 U.S.C. §§ 4332(2)(C)(iii) and (E); 40 C.F.R. §§ 1502.1, 1502.14(a).  Courts have interpreted this requirement to preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative. *See, e.g., Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195-96 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 994 (1991).  These authorities require agencies to define the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes. *Colo. Envtl. Coalition v. Dombeck*, 185 F. 3d 1162, 1175 (10th Cir. 1999).

16

BLM_0167219

The cover letter accompanying the Proposed RMP/FEIS states that the Proposed Action represents a reasonable combination of objectives and actions from the alternatives analyzed in the Draft RMP/EIS, released on June 3, 2016.   BLM, however, acted in contravention of NEPA's requirements as to alternatives in at least three respects.

First, BLM attempts to minimize its assessment of impacts by drawing comparisons to the no-action alternative (Alternative A), rather than to the Preferred Alternative contained in the Draft RMP/EIS.  A thematic issue throughout the Proposed RMP/FEIS is BLM's repeated comparison of the preferred alternative to the No-Action alternative – a decades-old RMP whose age is precisely why BLM sought to undertake the instant revision process.  That 1989 RMP did not and could not foresee the degree to which circumstances in the project area have changed, including the increasing reliance of area communities on tourism, recreation, and sustainable agriculture, and the current glut of natural gas that is likely to last for decades to come.  BLM frequently explicitly compares its new Proposed Action to that no-action alternative instead of to the Preferred Alternative contained in the Draft RMP/EIS, even though the 1989 RMP contained less specific management strategies than those considered in any of the alternatives included in the updated RMP.  The Proposed RMP/FEIS fails to analyze the difference between the Preferred Alternative and the Proposed Action and, intended or not, thus fails to accurately capture the difference between the draft on which the public commented and the final proposal.  For example, in its consideration of LWC, BLM states that "[b]ecause Alternative E would be managed to minimize impacts on wilderness characteristics, it would provide more protection of wilderness characteristics than Alternative A."  Proposed RMP/FEIS at 4-206.  Absent from the discussion is any comparison to Alternative D, the Preferred Alternative in the Draft RMP/EIS that was the basis of all public participation and comments.  In reality, Alternative E provides significantly less protection for LWC than Alternative D, but that fact is never addressed.

Next, BLM stepped outside of established NEPA parameters by declining to give more attention to the North Fork Alternative Plan, or Alternative B1.   NEPA requires BLM to develop "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *New Mexico*, 565 F.3d at 708 (internal citation omitted).  But as explained above, BLM failed to provide an adequate explanation of why the North Fork Alternative Plan did not comply with the agency's legal duties and misrepresented the scope of public support for this alternative. Furthermore, the agency failed to evaluate and disclose the cumulative benefits of this alternative to the community and underestimated and failed to disclose the cumulative impacts of Alternative E and the Proposed RMP/FEIS to the public. For these and other reasons, BLM's assessment and discussion of the North Fork Alternative fell short of the agency's duties under NEPA.

Finally, BLM impermissibly set up a straw-man no-leasing alternative and then rejected it, without providing sufficient real, viable alternatives that close more acreage to leasing.  This approach is in contravention of the standards set out in *Wilderness Workshop v. United States BLM*, 342 F. Supp. 3d 1145 (D. Colo. 2018).  In that case, plaintiffs argued that the range of alternatives in an

17

RMP revision violated NEPA by omitting any option that would meaningfully limit oil and gas leasing and development in the planning area, such as an alternative extending the type of protections contained in Alternative B1 across the entire resource area. Such an alternative had been requested in public comment, yet not thoroughly considered in the draft EIS and excluded from the final EIS without adequate explanation. In the draft EMP at issue in that case, none of the alternatives closed more than 179,900 acres (25.7%) of the 701,200-acre mineral estate to be managed through the RMP to future leasing – even though a significant portion of the areas left open to development were found to have a low potential for development. *Id.* at 1164. BLM attempted to excuse its cursory analysis of a no leasing alternative, explaining that because most of the high-potential areas were already leased, most future leasing would take place in lands adjacent to existing leases, and, further, that there was currently no interest in leasing outside of high potential areas. *Id.* at 1165. Because the BLM projected the likelihood that most development would occur only on high-development potential lands, it argued that a no leasing alternative was not practically different than the studied alternatives and that they were not required to consider an alternative where low and medium potential lands were closed to leasing. *Id.* The court rejected BLM's argument, finding that even if there is a minimal chance of development on low- or medium-potential lands, leasing them would detract from BLM designating those lands for other uses. *Id.* at 1166. Accordingly, the court found that the BLM failed to analyze a reasonable alternative that would consider what else may be done with the low- and medium-potential lands if they were not open for leasing. *Id.* at 1166-67.

As in *Wilderness Workshop*, the BLM should have considered an alternative in the UFO RMP that would eliminate oil and gas leasing in areas with "lower" potential for oil and gas development. Four of the six alternatives considered in the Proposed RMP/FEIS would close only 5% of the 916,030 total acres of federal mineral estate to leasing ( Alt. A= 5%, Alt. B = 24%; Alt. B1= 33.5%; Alt. C=5%; Alt. D=5.5%; Alt. E=5%), even though, in each alternative, a significant portion of the areas left open to development have a "lower potential" for development:

**Lower Potential Areas Left Open to Development**
Alt. A = 412,150 acres (47%)
Alt. B = 353,720 acres (48%)
Alt. B1 = 287,570 acres (46%)
Alt. C = 412,150 acres (47%)
Alt. D = 410,600 acres (47%)
Alt. E = 433,230 acres (50%)

Proposed RMP/FEIS at Tables 4-18, 4-21, 4-24, 4-26, 4-29, 4-32. This is hardly "provid[ing] legitimate consideration to alternatives that fall between the obvious extremes" as required by *Dombeck*. 185 F. 3d at 1175. While the Proposed RMP/FEIS does not estimate the likelihood that lower-potential lands would be developed, it is reasonable to have more acreage open for development only so long as appropriate and necessary restrictions are put in place for development of those areas. In fact, such restrictions appear to be one of the only differences between Alternative A (No Action) and Alternative E (Proposed Action). Both would open the

BLM_0167221

same amount of land to leasing – 95% of the decision area – but the Proposed Action would require more controls, like no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs).  For instance:

> Alternative E would be more restrictive of oil and gas exploration and development activities than Alternative A.  Although the amount of land available and unavailable for leasing is the same as under Alternative A (871,810 and 44,220 acres, respectively), fewer acres would be open to leasing, subject to standard terms and conditions (i.e., not subject to additional NSO and CSU stipulations; 373,760 acres compared with 726,340 acres under Alternative A).  Areas open to leasing that are devoid of NSO and CSU stipulations provide the most flexibility for oil and gas exploration and development, so reducing this acreage by 49 percent would impact oil and gas exploration and development.  Because of a larger percentage of the Decision Area would be subject to restrictions on the development of fluid mineral resources, siting of projects may be limited.  The restrictions on fluid mineral development could reduce the number of new and exploratory development wells and would reduce associated surface disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM, 2012d), as discussed under Section 4.1.1.

Proposed RMP/FEIS at 4-266 – 4-267.  BLM appears to argue that restrictions may limit or minimize development, and so the Proposed Action is different because it is more protective of wilderness and/or recreational values.  But there is a significant difference between closing an area – which provides certainty – and applying stipulations that are subject to waiver, exception, and modification.  Moreover, this is hypothetical, and as the court in *Wilderness Workshop* pointed out, what is certain is that even if there is minimal chance of development, leasing these lands would detract from BLM designating them for other uses. 342 F. Supp. 3d at 1166.

Similarly, BLM failed to consider a standalone alternative for evaluation of oil and gas allocations based on development potential, as suggested in public comments on the Draft RMP/EIS.  Protesting Party TWS provided with its comments on the Draft RMP/EIS a proposal for an updated approach to making oil and gas allocations and management decisions.  *See* Exhibit 4.  Under this approach, BLM would prioritize leasing outside of low-potential areas to avoid land-management conflicts later in time and to confer significant public benefits including increased economic return and opportunities to fulfill other objectives of its multiple-use mission.  The methodology suggested by TWS would have BLM map oil and gas potential across the planning area, define areas of high/medium/low/no resource conflict, make allocations for areas with high and medium oil and gas development potential, and make allocations for areas with low or no oil and gas potential.  This approach, TWS contended, would better reflect the BLM's multiple use and sustained yield mandate, lead to development of more balanced RMPs, and reduce conflict and costs associated with speculative leasing.

Notwithstanding this alternative approach that met the agency's purpose and need, and notwithstanding TWS's application of this methodology to the UFO planning area, BLM entirely

BLM_0167222

failed to address evaluation of oil and gas allocations based on development potential, in contravention of NEPA. This too is similar to the situation in *Wilderness Workshop*, where the court reinforced the importance of evaluating specific alternative approaches, including alternatives that could consider different approaches to fossil fuel development. Accordingly, BLM's failure to consider TWS's alternative approach to oil and gas allocations violated NEPA.

### D. BLM Failed to Take the Requisite Hard Look at Potential Environmental Impacts

BLM has not taken the required "hard look" at potential environmental impacts. Under NEPA, the BLM must take a "hard look" at the environmental consequences or a proposed action, and the requisite environmental analysis "must be appropriate to the action in question." *Metcalf v. Daley*, 214 F.3d 1135, 1151 (9th Circ. 2000); *Robertson*, 490 U.S. at 348.

#### i. Impacts on Water Quality and Aquatic Habitats

The BLM failed to adequately consider impacts on water quality and aquatic habitats resulting from the Proposed RMP/FEIS's provisions allowing increased oil and gas development, including the conduct of such activities on steep slopes.

Selenium loading has long been a concern in the UFO due to the prevalence of Mancos Shale geology and the potential for selenium to negatively impact streams and species who depend on them. According to the National Resources Conservation Service, areas dominated by Mancos Shale in its natural state contain up to 34 times the concentration of selenium in comparison to similar irrigated lands. Proposed RMP/FEIS at 3-21. In comments on the proposed oil and gas lease sale in the UFO in 2012, the US Fish and Wildlife Service (USFWS) wrote:

> Mancos Shale geology and soils are common in upper Gunnison River Basin and occur in a number of parcels proposed for leasing. Sediments derived from Mancos Shale are often high in selenium (USFWS 2009). . . . Related to fluid mineral development, selenium and other contaminant sources include reinjection, discharge, or improper use of produced water where there is a hydrologic connection with surface waters; impoundment in evaporation ponds or improper disposal or application of drilling wastes; accidental spills or leaks of pollutants; and soil erosion due to surface disturbance and/or inadequate stormwater management (EPA 2008). In addition to air emissions, produced water and drilling wastes were identified by EPA (2008) as the leading environmental concerns associated with oil and gas development in the region. Furthermore, water depletions, including those associated with energy development, continue to increase selenium concentrations, as well as that of heavy metals, salts, pesticides, and other contaminants in the Upper and Lower Colorado River Basins (USFWS 2009).

Exhibit 8 at 5. The impacts of selenium exposure are well known and include reproductive failure and deformities in fish and aquatic birds, generally, and are suspected to be the cause of

BLM_0167223

reproductive failures in select species in the Lower Gunnison River.  Proposed RMP/FEIS at 3-18.

In those lease sale comments, USFWS recommended that the BLM expand the applicability of the "highly erodible and saline soils" stipulation to address lands where selenium concentrations are high, or where the potential for contamination is significant.  If such stipulations cannot be added, or if existing stipulations could not be modified, to protect federally listed aquatic species, the USFWS recommended deferring those parcels where listed species or suitable habitats occur "until adequate stipulations are established."  Exhibit 8 at 6.

The Proposed RMP/FEIS states that the UFO has been coordinating with the Gunnison Basin Selenium Task Force to develop best management practices to minimize selenium yields from activities on BLM-administered lands.  Proposed RMP/FEIS at 3-8.  Notwithstanding this commitment and concern expressed by the BLM, the Proposed Action contains "no specific management decisions" as to areas mapped as having soils with elevated levels of salinity or selenium.  Proposed RMP/FEIS at 2-114.

In describing the environmental consequences of the Proposed Action as to selenium loading, the Proposed RMP/FEIS states that it would "implement management measures related to saline/selenium soils," and that the Proposed Action "allows the BLM to exert greater discretion and to implement a wider range of land use strategies to improve water quality."  Proposed RMP/FEIS at 4-80, 81.  Unfortunately, the BLM's selection of stipulations and reservation of discretion in this regard renders this assurance meaningless.  BLM explicitly declined to include in its Proposed Action either stipulation NL-1, which would close to oil and gas leasing and geophysical exploration soils with high and very high potential for selenium loading, or stipulation NSO-2, which would prohibit surface occupancy and use within 402 meters (0.25 mile) of soils with high and very high potential for selenium loading.  *See* Proposed RMP/FEIS at B-7 and B-15, *respectively*.  Instead, BLM chose to include Stipulation CSU-3/SSR-3, which provides that surface occupancy or use *may* be restricted on lands with selenium soils, that special design, construction or implementation measures (including relocation of operations by more than 200 meters) *may* be required, and that and operator *may* be required to submit engineering plans to minimize or mitigate potential effects to soil productivity.  *See* Proposed RMP/FEIS at B-54.  BLM failed to estimate how it would apply this discretion, or how doing so would impact water quality and aquatic habitat.  This failure was in violation of NEPA.

Additionally, the Proposed RMP/FEIS fails to take a hard look at cumulative impacts to water resources and endangered aquatic species from reasonably foreseeable oil and gas development and associated water use. Under the Proposed Action, oil and gas development has the potential to increase water use for oil and gas operations, including pre-development seismic exploration, well drilling and completion (including hydraulic fracturing), access road dust abatement, and hydrostatic pipeline testing, in the Gunnison River watershed and impact the Colorado River downstream.

BLM_0167224

While drilling and hydraulically fracturing horizontal wells requires significant water use, water depletions for fluid mineral withdrawal in the Colorado River Basin have the potential to impact federally listed Colorado River fish, including the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub. To address this, the USFWS issued a Programmatic Biological Opinion in 2008, later updated in 2017, that limits water depletion from the Colorado River Basin and sub-basins for oil and gas development. The Proposed RMP/FEIS states "[t]he 2017 Programmatic Biological Opinion (USFWS 2017) determined that the 607 acre-feet per year of BLM water depletions associated with BLM approved projects in the Gunnison River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub." However, it is unclear whether withdrawals from future "BLM approved projects" will increase water use above the 607 acre-feet threshold. BLM's failure to discuss and disclose this issue renders its analysis inadequate under NEPA.

### ii. Greenhouse Gas Emissions and Climate Change Impacts

BLM has only given a cursory glance at the indirect effects of downstream fossil fuel combustion and has not addressed those impacts in the context of the alternatives presented in the Proposed RMP/FEIS. Several federal courts have found that when developing an RMP, the NEPA process requires BLM to take a hard look at the indirect effects of downstream combustion of fossil fuels extracted from federal lands. *See, e.g., Citizens*, 377 F. Supp. 3d 1223; *Wilderness Workshop*, 342 F. Supp. 3d 1145; *San Juan Citizens Alliance v. United States BLM*, 326 F. Supp. 3d 1227, 1244 (D. N.M. 2018). BLM must "quantify and analyze the impacts," *San Juan*, 326 F. Supp. 3d at 1244, and may not dispense with that obligation by claiming that the indirect effects are "too speculative" without further analysis. *Wilderness Workshop*, 342 F. Supp. 3d at 1156. Specifically, BLM "cannot rely on production estimates while simultaneously claiming it would be too speculative to rely upon the predicted emissions from those same production estimates." *Citizens*, 377 F. Supp. 3d at 1237.

BLM states in the Proposed RMP/FEIS that its information on downstream combustion impacts is based upon an incorporation by reference of BLM Colorado's Annual Report on the Colorado Air Resource Protection Protocol, which itself incorporates several summaries of effects from other sources. *See* Proposed RMP/FEIS at 4-28 – 4-29. BLM then applies this methodology to "high" and "low" UFO oil and gas production scenarios, estimating that cumulative emissions of carbon dioxide would range from 8 million to 129 million tons. *Id.* at 4-29. In and of itself, this broad range is concerning.

However, BLM never discusses the impact of those estimates in the context of the alternatives discussed throughout the RMP. Instead, it proposes qualitative descriptions of relatively higher or lower indirect impact under a "business-as-usual" scenario and a "decreased emissions" scenario, both relative to various market conditions. BLM's apparent explanation is that "[a]ny single contribution on a subnational scale is dwarfed by the large number of comparable national and subnational contributors on a global scale," and "[t]he best surrogate for understanding the potential impact of subnational (e.g., UFO) emissions on climate is the behavior of the BLM-administered lands subnational emissions relative to all the other contributors." *Id.* at 4-30. In

BLM_0167225

other words, BLM claims that the indirect impacts from UFO oil and gas production are too small and speculative in the grand scheme of worldwide emissions to merit full and specific consideration under the various alternatives in the FEIS.

At the same time, BLM includes a robust "quantitative economic impact analysis of fluid mineral development…to examine differences in effects of proposed management decisions by alternative." *Id.* at 4-437. This analysis resulted in estimates of natural gas well development and the economic value of regional natural gas jobs, labor income, and direct output (e.g., sales). *See id.* at Tables 4-81 and 4-82. BLM also considered tax revenue derived from natural gas activity under six alternatives. *Id.* at Table 4-85.

This is not the reasoned analysis or hard look required by NEPA and runs directly contrary to the approach mandated by the federal courts. BLM has meticulously catalogued the potential benefits of oil and gas development under the six alternatives, but has provided only a scant, broad analysis on the downstream impacts of subsequent production – and none on the particularized impacts under the discussed alternatives. This is very similar to the scenario presented to the courts in both *Wilderness Workshop* and *Citizens*, both of which concluded that BLM acted in an arbitrary and capricious manner by failing to take a hard look at the indirect effect of fossil fuel combustion while simultaneously relying on production estimates and economic benefits. *See Wilderness Workshop*, 342 F. Supp. 3d at 1156 ("It is arbitrary and capricious for a government agency to use estimates of energy output for one portion of an EIS, but then state that it is too speculative to forecast effects based on those very outputs."); *Citizens*, 377 F. Supp. 3d at 1237 (same). These cases and the inadequate discussion of the indirect impacts here compels the same conclusion.

### E.  BLM Failed to Respond to Substantive Comments Regarding Alternatives

NEPA imposes on BLM an obligation to respond to substantive comments:

> An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:
>
> 1)      Modify alternatives including the proposed action
> 2)      Develop and evaluate alternatives not previously given serious consideration by the agency.
> 3)      Supplement, improve, or modify its analyses.
> 4)      Make factual corrections.
> 5)      Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

40 C.F.R. §1503.4(a). In the Proposed RMP/FEIS, the BLM failed to comply with this obligation.

BLM_0167226

The Proposed RMP/FEIS includes an Appendix that purports to set out a response to comments by first excerpting comments, then summarizing comments into categories, and then responding to those categories. *See* Proposed RMP/FEIS Appx. R. As to the alternative approach submitted by TWS as to prioritizing oil and gas allocations based on development potential, *see supra*, BLM excerpted relevant portions of TWS's comments on the Draft RMP, *see* Proposed RMP/FEIS Appx. R at 438-39, but then utterly failed to address them in its response to comments. It summarizes this five-page section of the TWS comments (pp. 96 to 101) and 21-page appendix (Appendix 5, included here as Exhibit 4) into a single paragraph comprising two sentences, and then it responds by simply pointing the reader to a chapter in the Draft RMP/EIS and explaining that BLM's alternatives do not address mineral potential on lands managed by the U.S. Forest Service. *See* Proposed RMP/FEIS Appx. R at 455. It also states summarily, "Future technologies could change the fluid minerals development potential assumptions, making areas viable in the future; therefore, current development potential alone was not used to allocate closures to fluid minerals."

Not only does this explanation fail to respond to the substance of TWS's detailed comments or alternative approach, but it implies that because technology is evolving, development potential is not relevant to allocating lands for mineral development. As relevant here, it also fails to demonstrate that the agency has individually considered or addressed the comments submitted or provided a response with sufficient explanation as required by NEPA. Moreover, the summarized comments and responses cover just over five pages, while the "parsed" comment excerpts on this topic require almost 50 pages – highlighting just how inadequate the agency's summaries and responses are. BLM's response to other comments – such as those in support of the North Fork Alternative – suffer from similar legal deficiencies.

Courts have reiterated that BLM must be more rigorous in its approach to responding to the substantive comments submitted and important issues raised with respect to the draft amendments and EISs. "An agency preparing an EIS has a duty to assess, consider, and respond to *all* comments." *ONDA*, 625 F.3d at 1120 (quoting *Or. Natural Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir.1995) (emphasis in original). Further, failure to respond to public comments in a manner consistent with 40 C.F.R. §1503.4 may constitute a failure to take a "hard look" in violation of NEPA. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 445-46 (4th Cir. 1996). Where an agency does not meet this "minimum requirement," courts will remand an EIS and require an agency to fulfill its duty under NEPA. *See, e.g., Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.2d. 520, 537 (8th Cir. 2003). BLM must provide responses to comments that comply with 40 C.F.R. § 1503.4(a).

## III.    BLM Failed to Adequately Address Impacts to Gunnison Sage-Grouse.

Through its various duties under FLPMA, NEPA, and the Endangered Species Act (ESA), BLM was required to evaluate the impacts of the Proposed RMP on Gunnison sage-grouse, to address the best available science about such impacts, to disclose those impacts to the public, and to impose mitigation measures that allow the species to survive and recover.

BLM_0167227

In crafting and adopting an RMP, BLM must adopt standards that fulfill FLPMA's purpose of managing public lands to protect ecological and environmental values, and to provide habitat for wildlife. 43 U.S.C. § 1701(a)(8). FLPMA also requires BLM to comply with its substantive duties to prevent unnecessary and undue degradation and to avoid permanent impairment of public lands and the environment. 43 U.S.C. § 1732(a)-(b); *id.* § 1702(c). To achieve those ends, BLM has adopted various manuals, handbooks, policies, and directives, including the Special Status Species Management Policy. *See* BUREAU OF LAND MGMT., U.S. DEP'T OF THE INTERIOR, SPECIAL STATUS SPECIES MANAGEMENT MANUAL 6840 (Dec. 2008) ("Special Species Manual").

The BLM failed to adequately consider reasonably foreseeable impacts on wildlife, including Gunnison Sage Grouse. Among other provisions that require BLM to protect species, that policy mandates that BLM implement a Biological Opinion (BiOp) issued by FWS about a proposed BLM action's impacts on a species listed under the ESA. *See* Special Species Manual at .1(F)(5)(g). The Special Species Manual also requires BLM "to use the best scientific and commercial data available." *Id.* at .1. Collectively, these various duties show that FLPMA imposes substantive requirements on BLM to protect and conserve threatened and endangered species like Gunnison sage-grouse. *See* Endangered and Threatened Wildlife and Plants; Threatened Status for Gunnison Sage-Grouse, 79 Fed. Reg. 69,192 (Nov. 20, 2014) (listing Gunnison sage-grouse as threatened under the ESA).

Under NEPA, BLM must ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b). "NEPA requires an agency to candidly disclose the risks of its proposed action and to respond to adverse opinions held by respected scientists." *W. Watersheds Project v. Bureau of Land Mgt.*, 552 F. Supp. 2d 1113, 1129 (D. Nev. 2008).

The ESA requires BLM to "insure that any action authorized, funded, or carried out" that it carries out "is not likely to jeopardize the continued existence" of any endangered or threatened species, or "result in the destruction or adverse modification of" critical habitat. 16 U.S.C. § 1536(a)(2). To fulfill this substantive requirement, the ESA requires BLM to consult with the USFWS under Section 7 before it takes an action that "may affect" a listed species like Gunnison sage-grouse. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Where an action is likely to adversely affect a listed species, FWS issues a BiOp that determines whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(g)(4), (h)(3). The ESA requires federal agencies to use the best scientific and commercial data available when consulting about whether federal actions may jeopardize listed species or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). After consultation is over, BLM has a continuing duty to comply with the ESA's substantive commands. *See Bennett v. Spear*, 520 U.S. 154, 170 (1997) ("The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril.").

BLM_0167228

While BLM consulted with FWS over the impacts of the draft RMP on Gunnison sage-grouse and other species and obtained a BiOp from FWS in December 2018, BLM essentially disregarded the BiOp's key opinions and mitigation measures when preparing the Proposed RMP/FEIS. For example, BLM disregarded FWS's recommendation that BLM apply the same protections for oil and gas leasing as BLM required in its Greater Sage-Grouse RMP. *See* U.S. FISH & WILDLIFE SERV., BIOLOGICAL OPINION FOR UFO RMP REVISION 28 (Dec. 17, 2018). The applicable 2019 Northwest Colorado Greater Sage-Grouse RMP Amendment *only* allows waivers, exceptions, and modifications of no surface occupancy stipulations to be applied if specific criteria are met, and then the State of Colorado must be consulted and agree. *See* BUREAU OF LAND MGMT., NORTHWEST COLORADO GREATER SAGE-GROUSE RMP AMENDMENT at G-4 - G-7 (Mar. 14, 2019). The Proposed Action weakens this requirement and subjects the no surface occupancy stipulations that apply to Gunnison sage-grouse habitat to a broad "standard" waiver, exception, and modification criteria; this means the no surface occupancy stipulations can be changed at the discretion of the BLM authorized officer without additional specific criteria being applied. *See* Proposed RMP/FEIS at. B-32. As a result, BLM is arbitrarily applying stronger protections for a species that is not listed under the ESA than for Gunnison sage-grouse that is listed under the ESA. Applying weaker standards in the Proposed RMP is particularly arbitrary because the Greater Sage-Grouse RMP Amendments were designed to promote oil and gas development. This is just one egregious example of BLM disregarding the 2018 BiOp's expert opinions and mitigation measures.

Furthermore, even though the Gunnison sage-grouse was listed as threatened under the ESA between the Draft RMP and the Proposed RMP, BLM did not disclose or address the issue, nor discuss mitigation measures to prevent the species from slipping closer to extinction. Rather than *increase* protections between the Draft RMP/EIS and the Proposed RMP/FEIS to address the species' new status as threatened, the Proposed Action actually *reduced* protections. For example, BLM eliminated a requirement to exclude rights-of-way from critical habitat and instead imposed a more permissive standard that allows BLM merely to avoid rights-of-way in critical habitat. Proposed RMP/FEIS at 2-38 – 2-39. The Proposed Action also reduced protection from wind, solar and hydropower developments in breeding, nesting and critical habitat from exclusion to avoidance, - again removing the certainty that habitat will be protected. *Id.* at 2-113.

As these examples highlight, BLM failed to adequately address impacts and mitigation measures identified in FWS's 2018 BiOp and reduced protections in the Proposed RMP/FEIS despite the listing of Gunnison sage-grouse under the ESA. BLM should have increased protections for the species from the Draft RMP/EIS to the Proposed RMP/FEIS, adopt the mitigation measures identified by FWS, and otherwise act consistently with the best available science to protect the species. However, it completely failed to do so, and this was arbitrary and renders the Proposed RMP/FEIS unlawful. Doing so was further inconsistent with FLPMA's mandates to avoid undue and unnecessary degradation and permanent impairment of wildlife like Gunnison sage-grouse and the agency's Special Status Species Policy that requires BLM to implement a BiOp for a listed species.

BLM_0167229

BLM also violated NEPA by leaving the public in the dark about key aspects of the BiOp and the absence of adequate mitigation measures in the Proposed RMP. *Cf., Ctr. for Biological Diversity v. U.S. Bureau of Land Mgt.*, 2011 U.S. Dist. LEXIS 114039, at *40 (D. Ariz. Sept. 30, 2011) (finding BLM did not violate NEPA where the agency actually discussed an ESA plan and FWS's concerns in an EIS, and FWS indicated that the RMPs at issue generally complied with the plan). This was particularly egregious, as the agency should have disclosed and evaluated the environmental consequences of excluding mitigation measures that FWS deemed necessary to protect Gunnison sage grouse. *See Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 476 (9th Cir. 2000) (explaining that NEPA requires an EIS to discuss mitigation measures "in sufficient detail to ensure that environmental consequences have been fairly evaluated"). BLM's failure to discuss key information reflects the opinions of the expert agency that Congress entrusted to opine about impacts of federal actions on listed species violates NEPA. See *W. Watersheds Project v. Salazar*, 2011 U.S. Dist. LEXIS 111728, at *37 – *41 (D. Idaho Sept. 28, 2011) (finding that BLM's failure in the EIS to discuss the best available science about sage grouse habitat protections violated NEPA).

Moreover, BLM cannot comply with its duties under the ESA to ensure against jeopardy of the species and adverse modification of its critical habitat under the ESA by disregarding key elements of the 2018 BiOp. The agency also should have also disclosed these shortcomings to the public under NEPA. 40 C.F.R. § 1508.27 (listing threatened violations of federal law as a significance factor requiring an EIS); *id.* at § 1506.2(d) (requiring discussions of possible conflicts with federal plans, policies, and controls for the area at issue in an EIS); *id.* at § 1502.2(d) (explaining EIS must state "how" alternatives will achieve requirements of "other environmental laws and policies").

For these reasons, BLM must disclose and discuss the 2018 BiOp's discussion of Gunnison sage-grouse and its mitigation measures in a supplemental EIS and modify the Proposed RMP to adopt adequate mitigation measures for Gunnison sage-grouse, including those provided for in the 2018 BiOp.

**CONCLUSION**

Thank you for your attention to the points raised herein. We look forward to receiving your prompt response, as required by 43 C.F.R. §1610.5-2(a)(3).

BLM_0167230

Sincerely,

**Phil Hanceford**
Conservation Director, Agency Policy and Planning
THE WILDERNESS SOCIETY
1660 Wynkoop Street, Suite 850
Denver, CO 80211
(303) 225.4636
phil_hanceford@tws.org

**Patrick Dooling**
Executive Director
WESTERN SLOPE CONSERVATION CENTER
PO Box 1612 / 204 Poplar Ave
Paonia, CO 81428
(970) 527-5307
director@theconservationcenter.org

**Mark Pearson**
Executive Director
SAN JUAN CITIZENS ALLIANCE
1309 East Third Avenue
PO Box 2461
Durango, CO 81302
(970) 259.3583 Ext. 1
mark@sanjuancitizens.org

**Karen (Lexi) Tuddenham**
Executive Director
SHEEP MOUNTAIN ALLIANCE
PO Box 389
Telluride, CO 81435
(970) 728-3729
lexi@sheepmountainalliance.org

BLM_0167231

**Luke Schafer**
West Slope Director
CONSERVATION COLORADO
546 Main St. #404
Grand Junction, CO 81501
(970) 756-5854
luke@conservationco.org

**Steve Allerton**
President
WESTERN COLORADO ALLIANCE
2481 Commerce BLVD
Grand Junction, CO 81505
westerncoloradoalliance.org
(970) 256-760
info@westerncoloradoalliance.org

**Peter Hart**
Staff Attorney
WILDERNESS WORKSHOP
PO Box 1442 / 520 S. 3rd St, Suite 27
Carbondale, CO 81623
(970) 963-3977 x12
peter@wildernessworkshop.org

BLM_0167232

**Great Old Broads for Wilderness**
PO Box 2924
Durango, CO 81302
 (970) 385-9577
www.greatoldbroads.org

Sherry Schenk, Chapter
Member
Grand Junction Broadband
Great Old Broads for
Wilderness

Robyn Cascade, Chapter
Leader
Northern San Juan Broadband
Great Old Broads for
Wilderness

Shelley Silbert
Executive Director
Great Old Broads for
Wilderness

**Tehri Parker**
Executive Director
Rocky Mountain Wild
1536 Wynkoop St, Ste. 900
Denver, CO 80202
(720) 446-8582
tehri@rockymountainwild.org

**Alison Holloran**
Executive Director, Audubon Rockies
Vice President, National Audubon Society
Fort Collins, CO
(970) 416-6931
aholloran@audubon.org

BLM_0167233

## EXHIBITS

1. TWS, et al., Comments on Draft RMP (Nov. 1, 2016).

2. WSCC Comments on Draft RMP (Nov. 1, 2016).

3. TWS, et al. Scoping Comments (Mar. 29, 2010).

4. TWS Oil and Gas Management Proposal (Nov. 1, 2016).

5. WCC-WSERC Scoping Comments (March 29, 2010)

6. North Fork Alternative Plan (December 2013)

7. State of Colorado, Scoping Comments on BLM December 2018 Oil and Gas Lease Sale (July 17, 2018)

8. US Fish & Wildlife Service, Comments on August 2012 Oil and Gas Lease Sale (Feb. 8, 2012)

BLM_0167234



JOHN E. PETERS

BEN TISDEL

DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

P.O. Box C   •   Ouray, Colorado 81427   •   970-325-7320   •   FAX: 970-325-0452

July 29, 2019

Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20224-1383

And

Director (210)
Attn: Protest Coordinator
20 M. Street SE, Room 2134 LM
Washington, D.C. 20003

*U.S. Mail and Electronically Submitted
via Instructions Received:*
https://www.blm.gov/programs/planning-and-nepa/public-participation/filing-a-plan-protest

Re: Ouray County Protest to Proposed RMP/Final EIS

Dear Protest Coordinator,

### I.   INTRODUCTION:

The Board of County Commissioners of Ouray County, Colorado ("Ouray County") respectfully submits this protest ("Protest") regarding the "Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office" ("Proposed RMP/Final EIS"). Pursuant to 43 § C.F.R. 1610.5-2, by this correspondence Ouray County formally protests approval of the Proposed RMP/Final EIS.

The Proposed RMP/Final EIS contains a primary document numbering more than 800 pages, and 20 appendices numbering more than 2,600 pages, created at a cost identified by the Bureau of Land Management ("BLM") to be $3,592,000. The Proposed RMP/Final EIS describes and analyzes five alternatives and one partial alternative for managing a planning area of approximately 3.1 million acres including 2,234,670 acres of federal mineral estate in southwestern Colorado throughout six counties, of which Ouray County is one.

Ouray County is exercising its opportunity to file this Protest within the required thirty (30) days of the date of the formal publication of the Proposed RMP/Final EIS.

Ouray County identifies below its authority to bring this Protest, the analytical framework that the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act of 1976 ("FLPMA") require of the Proposed RMP/Final EIS, and a critical review of the Proposed RMP/Final EIS.

Ouray County formally protests regarding the following issues and requests the BLM to consider these issues both individually and collectively:

A. In our letter dated November 1, 2016, we identified many parcels requested to not be identified as lands suitable for disposal.  The Proposed RMP/Final EIS designates most of these lands as suitable for disposal.

B. Alternative E is a substantially new agency alternative that differs so dramatically from the alternatives canvassed in the Draft RMP/EIS – and which was drafted in disregard of the requirements of NEPA, FLPMA and the MOU between the BLM and Ouray County – as to preclude meaningful consideration by Ouray County and the public.

BLM_0167235

C. Alternative E was presented in the Proposed RMP/Final EIS without all supporting data and files being made publicly and timely available.

D. The Proposed RMP/Final EIS was drafted without consideration of Ouray County's formal planning and land use regulatory regimes.

E. The Proposed RMP/Final EIS does not adequately consider the Gunnison Sage-grouse population, habitat and designation as a "threatened species."

F. The Proposed RMP/Final EIS does not adequately consider oil and gas development, its related impacts and, in particular, the newly adopted Colorado Senate Bill 19-181.

G. The Proposed RMP/Final EIS does not adequately consider or provide protections for sensitive, threatened and endangered fish, including half mile riparian "no surface occupancy" ("NSO") setbacks and other important wildlife habitat mapped by Colorado Parks and Wildlife ("CPW").

H. The Proposed RMP/Final EIS does not adequately consider the consequences of climate change.

I. The Proposed RMP/Final EIS does not adequately consider protection and enhancement of agriculture.

J. The Proposed RMP/Final EIS does not adequately consider management, protection and enhancement of outdoor recreation.

K. The Proposed RMP/Final EIS is based on inadequate NEPA analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources for fluid mineral leasing and surface disturbing activities.

L. Alternative E inappropriately contains lands identified for "disposal" that are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation.

Ouray County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the Protest period – or for the 2016 Draft RMP/Draft EIS.

M. Ouray County protests that, regarding certain species, the BLM failed to make available the BLM Biological Assessment ("BA") and the Fish and Wildlife Service ("USFWS") Biological Opinion ("BO"); it is not clear what Alternative the BA and BO analyzed.

N. There is inadequate analysis and protections for waterbodies, aquatic, wetland and hydrologic resources, source water protection areas, domestic water supplies, and cultural resources from the impacts of fluid mineral leasing and other surface disturbing activities.

## II. OURAY COUNTY'S AUTHORITY TO PROTEST

Ouray County formally participated as a "cooperating agency" during the development of the Proposed RMP/Final EIS, and has authority to protest both procedural and substantive errors in the Proposed RMP/Final EIS.

The formal cooperating agency relationship is intended to provide a framework for intergovernmental efforts by:

- Gaining early and consistent involvement;
- Incorporating local knowledge of economic, social, and environmental conditions and land use requirements;
- Addressing intergovernmental issues and avoiding duplication of effort;
- Enhancing credibility and support for EIS's;
- Building a relationship of trust and cooperation that results in better decisions.

As the government of general jurisdiction in Ouray County, Colorado, which jurisdiction includes land use planning and activities, and protection of the health, safety and welfare of persons in Ouray County, and the protection of the environment and wildlife in Ouray County, the Board of County Commissioners of Ouray County has an interest which is or may be adversely affected by the approval of the Proposed RMP/Final EIS. Relevant statutes include Colo. Rev. Stat. § 18-9-117, 29-20-101, 30-28-101 et seq., 30-11-107 et seq., 38-1-202, 42-1-102, 42-4-106, 43-1-217, 43-2-101, 43-2-201.1.

### III. RELATIONSHIP AMONG THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA"), THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 ("FLPMA"), AND THE PROPOSED RMP/FINAL EIS

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures... requir[ing] that agencies take a hard look at environmental consequences." 40 C.F.R. § 1500.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added). This includes the consideration of the best available information and data, as well as disclosure of any inconsistencies with federal policies and plans. NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action, as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); *DOT. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). The BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. In addition, the agency should address all other reasonable alternatives to the proposed action. *See Colorado Envtl. Coal v. Salazar*, 875 F. Supp. 2d 1233, 1249. (D. Colo. 2012).

Through the RMP planning process, the BLM Uncompahgre Field Office is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it, and takes into account, all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com. 146 U.S. App. D.C. 33*, 449 F.2d 1109, 1114 (1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." *Colo. Envtl. Coal.*, 185 F.3d 1162 at 1174 (10th Cir. 1999)(quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Greater Yellowstone*, 359 F.3d at 1277 (citing *Colo. Envtl. Coal.*, 185 F.3d 1162 at 1174); *see also Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 371 (D.C. Cir. 1981) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow the BLM to take a hard look at the available options, courts apply the "rule of reason." *N.M. ex rel. Richardson v. the BLM.*, 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

"The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate." *Westlands*, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.[1] *See Dombeck*, 185 F.3d at 1174–75; *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 668–69 (7th Cir. 1997); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992).

FLPMA is the BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states:

---

[1] While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," *Dombeck*, 185 F.3d at 1175.

BLM_0167237

"[I]t is the policy of the United States that ... the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use..." 43 U.S.C. § 1701(a)(8).

The BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, subject to NEPA and undertaken pursuant to FLPMA, requires the BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. *See* 43 U.S.C. § 1712(c)(1)-(9).

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As provided by the Tenth Circuit:

"It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses... BLM's obligation to manage for multiple use does not mean that development *must* be allowed on [a particular piece of public land]. Development is a *possible* use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration." *N.M. ex rel. Richardson*, 565 F.3d at 710.

Accordingly, the Proposed RMP/Final EIS revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with the potential value of development of those public lands. It is incumbent on the BLM Uncompahgre Field Office to evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. *See* 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. *See N.M. ex rel. Richardson*, 565 F.3d at 709.

As stated by the BLM:

"The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses...BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy." Proposed RMP/Final EIS at 1-2.

This purpose does not take development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances... and new or revised national-level policy." *See N.M. ex rel. Richardson*, 565 F.3d at 710-11.

FLPMA also recognizes the importance of Ouray County's role in the planning process providing that the BLM shall:

BLM_0167238

"...to the extent consistent with the laws governing the administration of the public, lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the State and local governments within which the lands are located...assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands..." 43 U.S.C. § 1702(c)(9).

## IV. ALTERNATIVES

To facilitate review of this Protest, Ouray County is informed of the following "alternatives" identified in the Proposed RMP/Final EIS:

### Alternative A

Alternative A meets the requirement that a "no action" alternative be considered. Alternative A continues current management direction and prevailing conditions derived from existing planning documents.

### Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, rights-of-way (ROW), and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as areas of critical environmental concern ("ACEC")[2] and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

### Alternative B.I

Alternative B.I is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as the North Fork), primarily in portions of Delta and Gunnison counties. Alternative B.I is a resource-based set of recommendations provided by a community group.

### Alternative C

Alternative C would emphasize maximizing utilization of resources, while mitigating impacts on land health. Management direction would recognize and expand existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, ROWs, renewable energy, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

### Alternative D

Alternative D was the Agency-Preferred Alternative from the Draft RMP/EIS, dated 6/3/2016 which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land

---

[2] ACEC's are areas identified by the BLM in accord with the 1976 Federal Lands Policy and Management Act ("FLPMA") which established the first conservation ecology mandate for the BLM, where special management attention is needed to protect important historical, cultural, and scenic values, or fish and wildlife or other natural resources.

BLM_0167239

uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape.

**Alternative E: Agency-Proposed RMP**

Alternative E, a wholly new proposed alternative not previously available for review or comment, is the BLM's Proposed RMP.  The BLM proposes that Alternative E is a reasonable combination of objectives and actions from the five alternatives (A, B, B.1., C, and D) presented in the Draft RMP/EIS. The BLM states that, among other reasons for presentation of a wholly new alternative for the first time in the Proposed RMP/Final EIS, there are certain "changes in policy and guidance ..." (Proposed RMP/Final EIS Vol. 1, 1-9.) 43 U.S.C. § 1702(1).  Presumably this relates to this Department of Interior's policies to prioritize oil and gas development above other uses, despite the clear direction of FLPMA's multiple use mandate.  For example, both a March 28, 2017 Executive Order on "Promoting Energy Independence and Economic Growth" and the related March 29, 2017 Interior Secretarial Order 3349 issued to implement it seek to eliminate regulations and policies that "burden" energy development, but actually eliminate actions that would achieve the required balance that is essential to multiple use management.  These policies have led to changes in agency policies, especially in managing oil and gas leasing and development, and also infuse the creation of Alternative E.

**V.  ISSUES PROTESTED BY OURAY COUNTY**

A.  ISSUE 1: ALTERNATIVE E IS A SUBSTANTIALLY NEW AGENCY ALTERNATIVE THAT DIFFERS SO DRAMATICALLY FROM THE ALTERNATIVES CANVASSED IN THE DRAFT RMP/EIS – AND WHICH WAS DRAFTED IN DISREGARD OF THE REQUIREMENTS OF NEPA, FLPMA AND THE MOU BETWEEN THE BLM AND OURAY COUNTY – AS TO PRECLUDE MEANINGFUL CONSIDERATION BY OURAY COUNTY AND THE PUBLIC.

The overarching – and procedurally fatal – flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA.  FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process.  43 U.S.C. 1701(a)(5); 43 C.F.R. 1610.2.  The disregard of NEPA and FPLMA has denied to Ouray County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BLM process that resulted in the Proposed RMP/Final EIS.  "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public."  *W. Org. of Res. Councils v. the BLM*, 591 F. Supp. 2d 1206, 1218 n.2 (D. Who. 2008), citing *California v. Block*, 690 f. 2d 753, 770 (9th Cir. 1982).

In addition, the creation of a wholly new Alternative E – with neither notice to Ouray County nor an opportunity for Ouray County to comment – is in direct contradiction to the BLM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Ouray County are accounted for and that [Ouray County will be] meaningfully engaged in the…resource management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Ouray County to participate "to the fullest extent possible" in the development of the Proposed RMP/Final EIS.  This obligation is also set out in FLPMA, in the BLM's obligation to provide for "meaningful" input and "early" notice to local governments with affected lands and regulations, like Ouray County.

While the BLM states that "(t)he policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS," (Proposed RMP/Final EIS, Vol. 1, ES-1), the BLM has created – in the Proposed RMP/Final EIS – a wholly new Alternative E that thwarts the opportunity for such participation.

REQUESTED REMEDY: Ouray County asserts that the only solution to this overarching and procedurally fatal flaw in the Proposed RMP/Final EIS is to provide a full "comment" opportunity.  This is also required by NEPA, based on the new alternative that has been created through the BLM's creation of Alternative E without sufficient explanation other than an oblique reference to its new policies but fundamentally changed the overall approach to management throughout the planning area.  40 C.F.R. § 1502.9(c)(1)(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concerns"); see also *N.M. ex rel. Richardson*, 565 F.3d at 705.

BLM_0167240

B. ISSUE 2: ALTERNATIVE E WAS PRESENTED IN THE PROPOSED RMP/FINAL EIS WITHOUT
ALL SUPPORTING DATA AND FILES BEING MADE PUBLICLY AND TIMELY AVAILABLE.

The 30-day Protest period was initiated by the publication of the official Notice of Availability in the
Federal Register on Friday, June 28, 2019. On that date, on the federal e-planning website[3] there were no GIS
files newer than June 23, 2016. Although the Proposed RMP/Final EIS states on page ES-1 "(t)his website
contains background information about the project, a public involvement and project timeline, maps and relevant
GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS
process." There were no GIS data files for the new Alternative E. Further the Proposed RMP/Final EIS maps in
Volume II, Appendix A are at a scale that shows the entire Uncompahgre Field Office decision area across six
counties. This scale does not permit effective review of proposed disposal parcels in context. Nor does this
scale allow for examination of proposed actions and the proposed Alternative E in an informed manner.

REQUESTED REMEDY: Ouray County asserts that the only solution to this fundamental and fatal flaw
is to provide a full "comment period" that is fully informed by timely provision to the public of all supporting data
and files.

C. ISSUE 3: THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT CONSIDERATION OF
OURAY COUNTY'S FORMAL PLANNING AND LAND USE REGIMES

The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing
plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the
purposes, policies, and programs of federal law, and regulations applicable to public lands. As noted above,
this is also required by FLPMA, 43 U.S.C. § 1702(c)(9). The Proposed RMP/Final EIS is fatally flawed because
it does not consider – much less align with – fundamental Ouray County regulatory regimes.

D. ISSUE 7: THE PROPOSED RMP/FINAL EIS DOES NOT ADEQUATELY CONSIDER THE
CONSEQUENCES OF CLIMATE CHANGE

- Alternative E does not acknowledge climate change, make climate change a priority, nor in any
substantial way include an analysis of climate impacts of any of the alternatives.

REQUESTED REMEDY: An adequate RMP/EIS must, at a minimum, include a carbon emission
reduction plan that is demonstrably consistent with those efforts of the State to meet the State's
climate and carbon emission reduction goals.

E. ISSUE 14: ALTERNATIVE E INAPPROPRIATELY CONTAINS LANDS IDENTIFIED "FOR
DISPOSAL" THAT ADJACENT TO OR INTERSECTING OURAY SAGE-GROUSE CRITICAL
HABITAT, , OR THE DISPOSAL OF WHICH WOULD CONFLICT WITH EXISTING USER ACCESS
TO PUBLIC OR PRIVATE LANDS, OR WATER RIGHTS AND IRRIGATION. OURAY COUNTY
FURTHER PROTESTS THE FACT THAT THE BLM DID NOT TIMELY OR PUBLICLY MAKE
IDENTIFICATION OF THESE LANDS AVAILABLE FOR THE PROTEST PERIOD OR FOR THE
2016 DRMP/DEIS.

- Alternative E inappropriately contains lands identified "for disposal" that are adjacent to or
intersecting Ouray Sage-grouse critical habitat, or the disposal of which would conflict with existing
user access to public or private lands, or water rights and irrigation. Ouray County further protests
the fact that the BLM did not timely or publicly make identification of these lands available for the
protest period or for the 2016 DRMP/DEIS.

REQUESTED REMEDY: A full "comment" opportunity is necessary to address these concerns.

VI. RESERVATION

Given the time constraints of filing this Protest, Ouray County may not have addressed all issues.
Therefore, Ouray County reserves its right to further process regarding any and all issues identified by other
protestors or commenters.

VII. CONTACT INFORMATION:

---

[3] https://eplanning.blm.gov/epl-front-
office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&CurrentPageId=86604

BLM_0167241

Pursuant to 43 C.F.R. 1610. 5-2, please send all notices and correspondence regarding this Protest to:

Carol Viner
Masters and Viner LLP
County Attorney for Ouray County
PO BOX C
Ouray, Colorado 81427
(email): cav@mastersviner.com

and

Connie Hunt
County Administrator
PO Box C
Ouray, Colorado 81427
(email): chunt@ouraycountyco.gov

Signed on this 29th Day of July, 2019.

Ben Tisdel
Vice Chair, Ouray County Board of County Commissioners
PO Box C
Ouray, Colorado 81427

Enc.   Ouray County – 11-01-2016 UFO BLM Resource Management Plan / Environmental Impact Statement
Comment Letter



LYNN M. PADGETT

BEN TISDEL

DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

541 4th Street • P.O. Box C • Ouray, Colorado 81427 • 970-325-7320 • FAX: 970-325-0452

November 1, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"].

In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and supporting continued federal ownership of federal public lands."

Ouray County's Master Plan[1], Land Use Code[2] and zoning[3], orient higher density development and commercial activity towards our municipalities in exchange for preserving our rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation opportunities towards the unincorporated portions of the county and our public lands. We have sections of our land use code addressing visual impact mitigation of development to protect our economically important scenic vistas, wildfire mitigation, protecting wildlife corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark skies. Our countywide economic goals include working toward abundant, affordable and redundant broadband, and enhancing outdoor recreation opportunities in all seasons. [4,5]

We offer the following comments on the DRMP/EIS:

**1. Land Disposals.**

> The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [6]

---

[1] http://co-ouraycounty.civicplus.com/DocumentCenter/View/144
[2] http://ouraycountyco.gov/DocumentCenter/Index/41
[3] http://ouraycountyco.gov/DocumentCenter/View/145
[4] http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
[5] http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf
[6] Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0167243

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62[7] and legal descriptions were provided in Appendix N.[8]

BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM. Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses.

Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014[9] and the map that comprises Exhibit A[10] for an inventory of designated public rights-of-way. There may be others, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A.

In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones.

A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.

A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.

There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.

There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.

A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.

There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions.

[7] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf

[8] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf

[9] http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229

[10] http://ouraycountyco.gov/documentcenter/view/2476

The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner.  County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning.  This should be able to be accomplished with this parcel.

## 2.  Areas of Critical Environmental Concern (ACEC)s.

There are no existing ACECs in Ouray County.  Alternative B contemplates creating the Cerro Summit-Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [11]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[12] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[13] is dated November 9, 2014.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [14]

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."*  The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"* [15]

Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.   The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.   All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease

[11] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php

[12] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf

[13] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf

[14] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

[15] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

is allowed a 20-year period with out-of-date stipulations and practices.  While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately.

## 3. Special Recreation Management Areas (SRMAs).

Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway. This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado.  Local families with children are also enjoying the highly scenic trail system.  These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park.  We support RAT and COPMOBA in their comments and requests to enhance our trail systems.  The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.

Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"[16]  We are curious if "single-track" should have been included in the objective for Zone 2?

Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"[17]  Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other.

Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. [18]

## 4. Enhanced Ecological Areas (EEAs).

The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County.  It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte.  The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses.

In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA.

Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan.  However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

---

[16]Pages 2-258 to 2-262;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[17]Pages 2-281 to 2-287;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[18]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

BLM_0167246

Appendix D describes the proposed Ridgway EEA as:

| Ridgway | BLM land on Log Hill Mesa and around Billy Creek State Wildlife Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in critical big game wintering area. Divided into four zones. | Pinyon-juniper, mountain shrub | Mountain lion, mule deer, elk, bear |
|---|---|---|---|

We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel.  It will be important to refine any stipulations for this  Core Zone 1, to ensure that this possibility can be realized in the next few years.

The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located:



Figure 5.a.  Showing parcels of the proposed Ridgway EEA.

Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking.  Log Hill Mesa is home to approximately ⅓ of Ouray Country residents and this area.

The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa.  Currently, outside of the southern portion of Log Hill Mesa, where

infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure.

## 5. Wildlife and Watchable Wildlife Viewing Areas

Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements.

Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife.

Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.

Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

## 6. Slopes

Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B.

## 7. Visual Resources and Dark Skies.

Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.

## 8. Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between

BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that BLM has eliminated the timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to BLM.

If there are any questions or clarifications regarding Ouray County's comments, please do not hesitate to contact us.

Respectfully submitted,

Lynn M. Padgett
Chair, Ouray County Board of County Commissioners

| | |
|---|---|
| **From:** | Gilbert, Megan A |
| **To:** | Vilsack - DNR, Douglas |
| **Cc:** | Holst - DNR, Jon; St George, Brian C; Reid DeWalt - DNR; Amy Laughlin - DNR; Dearstyne, Samuel R; Cory Chick - DNR; Magee, Brian; Karen Voltura - DNR; Larson, Gregory P; Berger, Keith E |
| **Subject:** | Re: [EXTERNAL] Re: Letter from Governor Polis - Colorado"s Consistency Review UFO PRMP/FEIS |
| **Date:** | Wednesday, November 6, 2019 9:16:41 AM |
| **Attachments:** | WILDLIFE BIG GAME CSU RGFO_11062019.docx |
| **Importance:** | High |

Hi Doug and team,

I wanted to share with you the modified CSU from the Royal Gorge Field Office that we are considering adopting in the Uncompahgre RMP as well. We still need to check with our Solicitors on the ability to include this at this late stage and see if the analysis covers it. I wanted to check in with you all on your thoughts and address some of the points below.

1) The CSU does identify development of a mitigation plan in coordinate with CPW.

2) The CSU does not specifically mention off-site mitigation but that doesn't mean that it could be considered in the development of the plan either as voluntary from the applicant or as required by state program, law or regulation.

3) I don't have the specific objective language from Keith on the ECRMP but the proposed changes to the Uncompahgre RMP were to include an objective stating the following which would require us to consider density limitations for other resource areas at the implementation stage.

*"Consider route and infrastructure densities to support CPW wildlife population objectives."*

If you could please let us know if you have any thoughts or concerns as soon as possible that would be appreciated. We are starting to get pressure to complete the governor's review process and subsequently produce a Record of Decision.  Please give me a call if you want to discuss or have any questions.

Best,
Megan Gilbert


**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*


On Fri, Oct 25, 2019 at 12:46 PM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:
> Megan,

Thanks for following up.  We appreciated the conversation about the proposed CSU on Monday with respect to the ECRMP, and are open to continuing the conversation about how a revised CSU could be applied in the Uncompahgre RMP to address our concerns.  My understanding is that Keith is going to revise the proposed CSU for the purposes of the ECRMP and address some of the other issues we discussed by:

1) Incorporating language that clearly references consulting with CPW to determine if a mitigation plan is required to address limitations on surface disturbance density;

2) Incorporating language from our proposed stipulation that acknowledges that on or offsite mitigation may be needed to meet the objectives of a state plan (DAU plan), program, or authorization.  With regard to your comment about compensatory mitigation not being included in any state program, law or regulation, C.R.S. 34-60-128 (see attached), does specifically provide for the utilization of compensatory mitigation to address wildlife impacts, and we would hope that any reference to compensatory mitigation in the ECRMP CSU would also be included in a CSU for for the Uncompahgre RMP.

3) Drafting an additional "Objective" for the plan that calls for limiting the density of facilities in winter range, migration corridors, and production areas in order to meet big game population objectives. This Objective would apply to all new authorizations (roads/trails/etc.), not just well pads.

Let me know when you think we might receive a revised CSU and "Objective" language from Keith.  We're happy to take a look at that and get back to you with further thoughts about its applicability to the Uncompahgre RMP.  Similarly, we'll have to circle up with Director Gibbs and the Governor to see where they land once we have a final proposed CSU/Objective in-hand.

Best,
Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Wed, Oct 23, 2019 at 9:51 AM Gilbert, Megan <magilbert@blm.gov> wrote:
Hi Jon and Doug,

We had discussed on the 9th that you would consider modifying the proposed stipulation to something you thought would fit within our range of alternatives and existing analysis in the Uncompahgre RMP. As written, we don't believe that we have the existing support in the EIS to include something with the specifics of the one per 640 restriction. Additionally, the compensatory mitigation language isn't appropriate as part of a stipulation as there isn't an existing program, law or regulation that it is tied to at this time. Not to say that it isn't something that could

be considered when a program exists.

We thought there were some really good discussions on Monday surrounding the proposed CSU from the Eastern Colorado RMP team and it seemed like you were all receptive to that CSU with some slight modifications regarding coordination with CPW. I have suggested to Greg that we consider if we could incorporate this CSU for oil and gas into the plan and he has said he will take a look at the analysis to see if it is within the range. The proposed CSU gives us the ability to use an adaptive approach with additional analysis at the leasing and site-specific level so that the plan does not have to have the level of detail that would be required to adopt a very specific density limitation. As we mentioned in the ECRMP meeting, we don't have the inventory of existing disturbance needed to provide a landscape scale analysis of the issue without considerable effort. In addition to the CSU for fluid mineral development, we would propose an objective in the plan similar to what we previously discussed that would tie in other potential development activities such as route development and rights-of ways. This objective would reference CPW population objectives.

We want to coordinate with our team and our solicitors to determine the feasibility of adopting these two changes into the Record of Decision and then we would also need to see where the State Director lands on the issues. In the meantime, we would still like to continue work on the letter of intent and are interested to get your feedback. Please feel free to call me with any questions.

Best,
Megan


**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*


On Mon, Oct 21, 2019 at 7:23 AM Gilbert, Megan <magilbert@blm.gov> wrote:
Thanks Jon,

We will take a look at this and compare it to what we have considered for ECRMP. There is call in information for the meeting. I have copied it below and will add you both to the invite

Call In Available 888-921-6805 4913217#

Talk to you this afternoon,

Megan

**Megan Gilbert**

*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Mon, Oct 21, 2019 at 7:20 AM Holst - DNR, Jon <jon.holst@state.co.us> wrote:

Megan,

Per our conversation on the 9th, please see the attached revised proposed lease stipulation/SSR to address well pad and route density for the Uncompahgre RMP. Hopefully this revision will provide BLM additional flexibility. To clarify, our intent is that this stipulation/SSR apply to new leases and authorizations.

Both Doug and I will need to attend today's call remotely. Do you have a call in number?

Thank you,

Jon

On Mon, Oct 14, 2019 at 12:10 PM Gilbert, Megan <magilbert@blm.gov> wrote:

Hi Doug,

I wanted to reach out to see if you or anyone else we have been discussing the broader issues with would be interested and available to attend a meeting we are having with CPW on the Eastern Colorado RMP next Monday October 21st from 1pm to 3pm at the BLM Colorado office in lakewood. I believe that several CPW folks will be there including the energy liaisons but in the interest of keeping everyone on the same page with these conversations I thought perhaps someone from DNR would like to attend. We might have some options for the Eastern Colorado RMP that are broader than the UFO RMP but we are in a similar place with the current analysis. Let me know your thoughts.

Best,
Megan

**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Mon, Oct 7, 2019 at 9:21 PM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:

Megan,

Let's do a call at 11am on Wednesday if that still works for you and your team. We can use our conference line at 303-866-3311 (ext: 7678).

BLM_0167253

Best,
Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Fri, Oct 4, 2019 at 3:19 PM Gilbert, Megan <magilbert@blm.gov> wrote:

Hi Doug,

Sorry for the delayed response. Took me some time to coordinate on schedules with our folks. We would like to set up a call next week and looks like Wednesday morning, anytime before 1pm, would work for us. Please let us know a time that works for you.

I appreciate the suggestion to continue looking at the Letter of Intent because I think that is our best bet for codifying some resolution on the issue in the short term and addressing the issue across several planning efforts.  Thanks for providing the additional materials, we will review prior to the meeting.

Best,
Megan

**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Thu, Oct 3, 2019 at 10:13 PM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:

Megan,

Thanks for reaching back out.  As I said in my voicemail this morning, I think it does make sense to set up a group call/meeting next week to continue our discussion.  Next Wednesday is fairly open for me for a call or meeting, and I could make a call work on Thursday afternoon as well.  Let us know what works for you and your team.

I have spoken with CDPHE and will leave it to John Putnam and Sean Hackett to provide any substantive comments to you on 1261/181, and I will circle back with our Sage Grouse folks before next week to get you any additional feedback on that front.

With regard to our conversation about density limitations, I have attached some additional documentation to make it clear that this issue did not just come up in the last 3-6 months, as was suggested on our last call. Our 2016 comments on the Draft RMP (attached) addressed the density issue, as have numerous comment letters on other RMPs and lease sales from as far back as a 2010 letter (also attached) attempting to comprehensively address many of the same issues we continue to discuss today.

In addition to attempting to resolve DNR's concerns about big game corridors/habitat with the Uncompahgre RMP, it likely makes sense to spend some time next week continuing the conversation that Brian initiated over the summer about a joint effort/agreement to address these concerns on a statewide basis. We'll take a look back at Brian's suggested LOI language and will be prepared the discuss next week.

Best,
Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Thu, Oct 3, 2019 at 7:43 AM Gilbert, Megan <magilbert@blm.gov> wrote:

Hi Doug,

I wanted to follow up my voicemail on Monday with an email to check in with you and your team on the issues relating to the Governor's Consistency Review for Uncompahgre RMP. During our call you noted that you needed to check in with a few other teams on our recommendations and previous coordination. I was hoping you had made some progress on that front.

As you know, we have some pressing demands on schedule from the Department and, while we feel that our coordination is certainly a reason to delay the schedule, we do want to make be able to report progress towards a resolution. If you think we should set up another group call we can do that or just feel free to give me a call with any updates.

Much appreciated,

Megan Gilbert
**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*

BLM_0167255

*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Fri, Sep 20, 2019 at 2:14 PM Vilsack - DNR, Douglas
<douglas.vilsack@state.co.us> wrote:

> Hi Megan,
>
>    1pm on Monday works for Amy Moyer and me, so let's just plan on
> that.  Send over a conference number if that works for you.
>
> Best,
> Doug
>
> **Doug Vilsack**
> **Assistant Director - Parks, Wildlife and Lands**
>
> 
>
> P 303.866.3311 x8664  |  C 720.456.8956
> 1313 Sherman Street #718, Denver, CO 80203
> douglas.vilsack@state.co.us  |  www.colorado.gov/DNR
>
>
> On Thu, Sep 19, 2019 at 3:35 PM Gilbert, Megan <magilbert@blm.gov>
> wrote:
>
>> Hi Doug,
>>
>> Thanks for getting back to us. I look forward to working with you
>> on the UFO RMP follow-up. I spoke to our Field Manager Greg
>> Larson and looks like we are both free Monday afternoon (9/23)
>> between 1 and 4 if there is a time that works for you. If that
>> doesn't work, let me know and I can try to work something out for
>> Tuesday. We can set up a conference line.
>>
>> Best,
>> Megan
>>
>> **Megan Gilbert**
>> *Branch Chief for Planning and Assessment*
>> *BLM Colorado State Office*
>> *(303) 239-3936 (desk)*
>>
>>
>> On Thu, Sep 19, 2019 at 12:17 PM St George, Brian
>> <bstgeorg@blm.gov> wrote:
>>
>>> Hi Doug. Gentle reminder to work on scheduling for this follow-up
>>> discussion.
>>>
>>> I'm officially transitioning out today and Megan Gilbert is stepping in
>>> as acting Deputy State Director. She will work on any additional

coordination, scheduling and negotiation.

I can imagine and appreciate how busy y'all are. We are schedule conscious here given our Departmental expectations and pressure to keep NEPA documents moving through a tight timeframe. We hope sincerely to resolve as many issues as possible informally, and avoid surprises in the Record of Decisions.

~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

On Mon, Sep 16, 2019 at 8:50 PM Brian St George <bstgeorg@blm.gov> wrote:
> Sure thing Doug. We can find some time next week as your schedules allow.
>
> Unfortunately, I'm going on a temporary assignment to DC for a couple months - starting on the 23rd. However, I have a very capable team behind me stepping up to fill in. And Director Connell has impressed on me that she wants our work to continue.
>
> ~ bsg
>
> Sent from my iPad so please excuse the typos!
>
> On Sep 16, 2019, at 6:18 PM, Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:
>
>> Brian,
>>
>> Thanks for reaching back out. We'll compare our schedules tomorrow, but for the sake of moving things along, do you have any open times on the 23rd or 24th? It seems like there is a little daylight on our calendars on those days.
>>
>> Best,
>> Doug
>>
>> **Doug Vilsack**
>> **Assistant Director - Parks, Wildlife and Lands**

BLM_0167257

P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Fri, Sep 13, 2019 at 9:50 AM St George, Brian
<bstgeorg@blm.gov> wrote:

> Gentlemen,
>
> On behalf of Jamie, I'd like to offer a follow-up
> discussion about the Governors letter and where we
> might work toward greater consistency between the
> UFO RMP and State law, policy and plans.
>
> Do you have opportunity next week? And would you
> share the request with our colleagues at CDPHE if
> appropriate? I don't have a contact person there.
>
> Cheers
> ~ bsg
>
> Brian St George
> Deputy State Director, Resources and Fire
> Colorado State Office
> Bureau of Land Management
> m (970) 275-2215
> o (303) 239-3768
>
>
>
> ---------- Forwarded message ---------
> From: **Jamie Connell** <jconnell@blm.gov>
> Date: Tue, Sep 10, 2019 at 12:36 AM
> Subject: Fwd: [EXTERNAL] Letter from Governor
> Polis - Colorado's Consistency Review UFO
> PRMP/FEIS
> To: Gregory Shoop <gshoop@blm.gov>, Brian St
> George <bstgeorg@blm.gov>, Stephanie Connolly
> <sconnolly@blm.gov>, <glarson@blm.gov>, Jayson
> Barangan <jbaranga@blm.gov>, cc: Richard Fields
> <rafields@blm.gov>
>
>
> FYI and (for some of us) follow-up action.
>
> Jamie
>
> Sent from my iPhone

Begin forwarded message:

**From:** "Polis - GOVOffice, Governor" <governorpolis@state.co.us>
**To:** <jconnell@blm.gov>
**Cc:** Dan Gibbs - DNR <dan.gibbs@state.co.us>, Jill Hunsaker Ryan - CDPHE <jill.hunsakerryan@state.co.us>
**Subject: [EXTERNAL] Letter from Governor Polis - Colorado's Consistency Review UFO PRMP/FEIS**

Director Connell:

In this email you will find a letter regarding Colorado's consistency review of the proposed Uncompahgre Field Office Resource Management Plan and Final Environmental Impact Statement, along with two attachments referenced within the letter.

A hard copy of this letter will be sent via US Mail.

Regards,

Jared Polis
Governor

--
*Jon Holst*
SW Region Energy Liaison



P 970.375.6713  | F 970.375.6705  |  C 970.759.9588
415 Turner Drive, Durango CO 81303
jon.holst@state.co.us  |   www.cpw.state.co.us
*"Even if you're on the right track, you'll get run over if you just sit there"* - Will Rogers