Lease Number: <LEASE_NUMBER>

### WILDLIFE BIG GAME WINTER, MIGRATION AND PRODUCTION AREA CSU RGFO CONTROLLED SURFACE USE

**Stipulation:** Surface occupancy or use may be restricted in big game winter, migration and production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM.

<SPECIES>

Prior to surface disturbance within big game severe winter range/winter concentration areas, migration and production areas, a mitigation plan may be required to be developed in coordination with BLM, CPW, and the applicant, in conformance to applicable state requirements, rules and regulations, as a component of the APD–Surface Use Plan of Operations.  The operator shall not initiate surface-disturbing activities unless the BLM authorized officer has approved the Plan (with conditions, as appropriate). The Plan must demonstrate to the authorized officer's satisfaction that the overall function and suitability of big game winter ranges, migration, and production areas will not be impaired. This may include special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. Measures included in the plan may include, but are not limited to limitations to surface disturbance density through efficient planning of facilities, roads and well locations, minimizing routine well/facility visits through use of remote sensing/control and avoiding visits during certain hours during winter season, reducing truck traffic by piping liquids, noise limits, etc.

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** Ensuring the function and suitability of big game winter range, migration, and production areas.

**Standard EXCEPTION, MODIFICATION, and WAIVER criteria apply.**

| | |
|---|---|
| **From:** | Gilbert, Megan A |
| **To:** | Berger, Keith E |
| **Subject:** | Fwd: [EXTERNAL] Re: Letter from Governor Polis - Colorado"s Consistency Review UFO PRMP/FEIS |
| **Date:** | Thursday, November 14, 2019 10:39:17 AM |

**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

---------- Forwarded message ---------
From: **Vilsack - DNR, Douglas** <douglas.vilsack@state.co.us>
Date: Wed, Nov 13, 2019 at 10:15 AM
Subject: Re: [EXTERNAL] Re: Letter from Governor Polis - Colorado's Consistency Review UFO PRMP/FEIS
To: Gilbert, Megan <magilbert@blm.gov>
Cc: Holst - DNR, Jon <jon.holst@state.co.us>, St George, Brian <bstgeorg@blm.gov>, Reid DeWalt - DNR <reid.dewalt@state.co.us>, Amy Laughlin - DNR <amy.moyer@state.co.us>, Samuel Dearstyne <sdearsty@blm.gov>, Cory Chick - DNR <cory.chick@state.co.us>, Magee, Brian <brian.magee@state.co.us>, Karen Voltura - DNR <karen.voltura@state.co.us>, Gregory Larson <glarson@blm.gov>, Keith Berger <kberger@blm.gov>, Vanessa Mazal - DNR <vanessa.mazal@state.co.us>

Megan,

    Thanks for your work on this. The modified Controlled Surface Use (CSU) lease stipulation only addresses oil and gas development. Per our Gov's Consistency Review comments and our protest, we are similarly concerned with other types of surface-disturbing development impacting these big game habitats. Thus, the plan also needs to incorporate a Site Specific Relocation (SSR) decision for other types of surface-disturbing activities to address these concerns. In our Gov's Consistency review we presented a proposed combined CSU/SSR decision to address this issue. Feel free to give me a call if you'd like to discuss.

    While we appreciate the constraints BLM is under for the UFO RMP due to the completion of the EIS, and your efforts to provide flexibility to achieve our objectives through the language of the modified CSU, we also recognize that the modified CSU will require significant staff input and negotiations on every project going forward in order to reach our desired density limits for permanent facilities and open roads and trails. I just want to be clear that incorporating a more definitive standard for the identified big game habitats (one facility per square mile, and one linear mile per square mile) remains our expectation for RMPs that are still in the NEPA process and for those RMPs with upcoming revisions.

    Finally, note that I'm Ccing Vanessa Mazal here, who is DNR's new Policy Advisor for Federal Affairs. Vanessa will be assisting as we address this and other issues involving federal lands.

Best,

Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Wed, Nov 6, 2019 at 9:17 AM Gilbert, Megan <magilbert@blm.gov> wrote:

Hi Doug and team,

I wanted to share with you the modified CSU from the Royal Gorge Field Office that we are considering adopting in the Uncompahgre RMP as well. We still need to check with our Solicitors on the ability to include this at this late stage and see if the analysis covers it. I wanted to check in with you all on your thoughts and address some of the points below.

1) The CSU does identify development of a mitigation plan in coordinate with CPW.

2) The CSU does not specifically mention off-site mitigation but that doesn't mean that it could be considered in the development of the plan either as voluntary from the applicant or as required by state program, law or regulation.

3) I don't have the specific objective language from Keith on the ECRMP but the proposed changes to the Uncompahgre RMP were to include an objective stating the following which would require us to consider density limitations for other resource areas at the implementation stage.

*"Consider route and infrastructure densities to support CPW wildlife population objectives."*

If you could please let us know if you have any thoughts or concerns as soon as possible that would be appreciated. We are starting to get pressure to complete the governor's review process and subsequently produce a Record of Decision.  Please give me a call if you want to discuss or have any questions.

Best,
Megan Gilbert

**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Fri, Oct 25, 2019 at 12:46 PM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:

> Megan,
>
> Thanks for following up.  We appreciated the conversation about the proposed CSU on Monday with respect to the ECRMP, and are open to continuing the conversation about how a revised CSU could be applied in the Uncompahgre RMP to address our concerns. My understanding is that Keith is going to revise the proposed CSU for the purposes of the ECRMP and address some of the other issues we discussed by:
>
> 1) Incorporating language that clearly references consulting with CPW to determine if a mitigation plan is required to address limitations on surface disturbance density;
>
> 2) Incorporating language from our proposed stipulation that acknowledges that on or offsite mitigation may be needed to meet the objectives of a state plan (DAU plan), program, or authorization.  With regard to your comment about compensatory mitigation not being included in any state program, law or regulation, C.R.S. 34-60-128 (see attached), does specifically provide for the utilization of compensatory mitigation to address wildlife impacts, and we would hope that any reference to compensatory mitigation in the ECRMP CSU would also be included in a CSU for for the Uncompahgre RMP.
>
> 3) Drafting an additional "Objective" for the plan that calls for limiting the density of facilities in winter range, migration corridors, and production areas in order to meet big game population objectives. This Objective would apply to all new authorizations (roads/trails/etc.), not just well pads.
>
> Let me know when you think we might receive a revised CSU and "Objective" language from Keith. We're happy to take a look at that and get back to you with further thoughts about its applicability to the Uncompahgre RMP.  Similarly, we'll have to circle up with Director Gibbs and the Governor to see where they land once we have a final proposed CSU/Objective in-hand.
>
> Best,
> Doug
>
> **Doug Vilsack**
> **Assistant Director - Parks, Wildlife and Lands**
>
> 
>
> P 303.866.3311 x8664  |  C 720.456.8956
> 1313 Sherman Street #718, Denver, CO 80203
> douglas.vilsack@state.co.us  |  www.colorado.gov/DNR
>
>
> On Wed, Oct 23, 2019 at 9:51 AM Gilbert, Megan <magilbert@blm.gov> wrote:
>
>> Hi Jon and Doug,
>>
>> We had discussed on the 9th that you would consider modifying the proposed stipulation to something you thought would fit within our range of alternatives and existing analysis in the Uncompahgre RMP. As written, we don't believe that

we have the existing support in the EIS to include something with the specifics of the one per 640 restriction. Additionally, the compensatory mitigation language isn't appropriate as part of a stipulation as there isn't an existing program, law or regulation that it is tied to at this time. Not to say that it isn't something that could be considered when a program exists.

We thought there were some really good discussions on Monday surrounding the proposed CSU from the Eastern Colorado RMP team and it seemed like you were all receptive to that CSU with some slight modifications regarding coordination with CPW. I have suggested to Greg that we consider if we could incorporate this CSU for oil and gas into the plan and he has said he will take a look at the analysis to see if it is within the range. The proposed CSU gives us the ability to use an adaptive approach with additional analysis at the leasing and site-specific level so that the plan does not have to have the level of detail that would be required to adopt a very specific density limitation. As we mentioned in the ECRMP meeting, we don't have the inventory of existing disturbance needed to provide a landscape scale analysis of the issue without considerable effort. In addition to the CSU for fluid mineral development, we would propose an objective in the plan similar to what we previously discussed that would tie in other potential development activities such as route development and rights-of ways. This objective would reference CPW population objectives.

We want to coordinate with our team and our solicitors to determine the feasibility of adopting these two changes into the Record of Decision and then we would also need to see where the State Director lands on the issues. In the meantime, we would still like to continue work on the letter of intent and are interested to get your feedback. Please feel free to call me with any questions.

Best,
Megan


**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*


On Mon, Oct 21, 2019 at 7:23 AM Gilbert, Megan <magilbert@blm.gov> wrote:
Thanks Jon,

We will take a look at this and compare it to what we have considered for ECRMP. There is call in information for the meeting. I have copied it below and will add you both to the invite

Call In Available 888-921-6805 4913217#

Talk to you this afternoon,

Megan

**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Mon, Oct 21, 2019 at 7:20 AM Holst - DNR, Jon <jon.holst@state.co.us> wrote:

> Megan,
>
> Per our conversation on the 9th, please see the attached revised proposed lease stipulation/SSR to address well pad and route density for the Uncompahgre RMP. Hopefully this revision will provide BLM additional flexibility. To clarify, our intent is that this stipulation/SSR apply to new leases and authorizations.
>
> Both Doug and I will need to attend today's call remotely. Do you have a call in number?
>
> Thank you,
>
> Jon

On Mon, Oct 14, 2019 at 12:10 PM Gilbert, Megan <magilbert@blm.gov> wrote:

> Hi Doug,
>
> I wanted to reach out to see if you or anyone else we have been discussing the broader issues with would be interested and available to attend a meeting we are having with CPW on the Eastern Colorado RMP next Monday October 21st from 1pm to 3pm at the BLM Colorado office in lakewood. I believe that several CPW folks will be there including the energy liaisons but in the interest of keeping everyone on the same page with these conversations I thought perhaps someone from DNR would like to attend. We might have some options for the Eastern Colorado RMP that are broader than the UFO RMP but we are in a similar place with the current analysis. Let me know your thoughts.
>
> Best,
> Megan
>
>
> **Megan Gilbert**
> *Deputy State Director for Resources and Fire (Acting)*
> *BLM Colorado State Office*
> *(303) 239-3768 (desk)*
>
>
> On Mon, Oct 7, 2019 at 9:21 PM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:
>
>> Megan,

BLM_0167265

Let's do a call at 11am on Wednesday if that still works for you and your team. We can use our conference line at 303-866-3311 (ext: 7678).

Best,
Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Fri, Oct 4, 2019 at 3:19 PM Gilbert, Megan <magilbert@blm.gov> wrote:

Hi Doug,

Sorry for the delayed response. Took me some time to coordinate on schedules with our folks. We would like to set up a call next week and looks like Wednesday morning, anytime before 1pm, would work for us. Please let us know a time that works for you.

I appreciate the suggestion to continue looking at the Letter of Intent because I think that is our best bet for codifying some resolution on the issue in the short term and addressing the issue across several planning efforts. Thanks for providing the additional materials, we will review prior to the meeting.

Best,
Megan

**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Thu, Oct 3, 2019 at 10:13 PM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:

Megan,

Thanks for reaching back out. As I said in my voicemail this morning, I think it does make sense to set up a group call/meeting next week to continue our discussion. Next Wednesday is fairly open for me for a call or meeting, and I could make a call work on Thursday afternoon as well. Let us know what works for you and your team.

I have spoken with CDPHE and will leave it to John Putnam and Sean

Hackett to provide any substantive comments to you on 1261/181, and I will circle back with our Sage Grouse folks before next week to get you any additional feedback on that front.

With regard to our conversation about density limitations, I have attached some additional documentation to make it clear that this issue did not just come up in the last 3-6 months, as was suggested on our last call. Our 2016 comments on the Draft RMP (attached) addressed the density issue, as have numerous comment letters on other RMPs and lease sales from as far back as a 2010 letter (also attached) attempting to comprehensively address many of the same issues we continue to discuss today.

In addition to attempting to resolve DNR's concerns about big game corridors/habitat with the Uncompahgre RMP, it likely makes sense to spend some time next week continuing the conversation that Brian initiated over the summer about a joint effort/agreement to address these concerns on a statewide basis. We'll take a look back at Brian's suggested LOI language and will be prepared the discuss next week.

Best,
Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Thu, Oct 3, 2019 at 7:43 AM Gilbert, Megan <magilbert@blm.gov> wrote:

> Hi Doug,
>
> I wanted to follow up my voicemail on Monday with an email to check in with you and your team on the issues relating to the Governor's Consistency Review for Uncompahgre RMP. During our call you noted that you needed to check in with a few other teams on our recommendations and previous coordination. I was hoping you had made some progress on that front.
>
> As you know, we have some pressing demands on schedule from the Department and, while we feel that our coordination is certainly a reason to delay the schedule, we do want to make be able to report progress towards a resolution. If you think we should set up another group call we can do that or just feel free to give me a call with any updates.

BLM_0167267

Much appreciated,

Megan Gilbert
**Megan Gilbert**
*Deputy State Director for Resources and Fire (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*


On Fri, Sep 20, 2019 at 2:14 PM Vilsack - DNR, Douglas
<douglas.vilsack@state.co.us> wrote:
> Hi Megan,
>
>    1pm on Monday works for Amy Moyer and me, so let's just plan on
> that.  Send over a conference number if that works for you.
>
> Best,
> Doug
>
> **Doug Vilsack**
> **Assistant Director - Parks, Wildlife and Lands**



> P 303.866.3311 x8664  |  C 720.456.8956
> 1313 Sherman Street #718, Denver, CO 80203
> douglas.vilsack@state.co.us  |  www.colorado.gov/DNR


On Thu, Sep 19, 2019 at 3:35 PM Gilbert, Megan
<magilbert@blm.gov> wrote:
> Hi Doug,
>
> Thanks for getting back to us. I look forward to working with
> you on the UFO RMP follow-up. I spoke to our Field Manager
> Greg Larson and looks like we are both free Monday afternoon
> (9/23) between 1 and 4 if there is a time that works for you. If
> that doesn't work, let me know and I can try to work something
> out for Tuesday. We can set up a conference line.
>
> Best,
> Megan
>
> **Megan Gilbert**
> *Branch Chief for Planning and Assessment*
> *BLM Colorado State Office*
> *(303) 239-3936 (desk)*


On Thu, Sep 19, 2019 at 12:17 PM St George, Brian
<bstgeorg@blm.gov> wrote:

BLM_0167268

Hi Doug. Gentle reminder to work on scheduling for this follow-up discussion.

I'm officially transitioning out today and Megan Gilbert is stepping in as acting Deputy State Director. She will work on any additional coordination, scheduling and negotiation.

I can imagine and appreciate how busy y'all are. We are schedule conscious here given our Departmental expectations and pressure to keep NEPA documents moving through a tight timeframe. We hope sincerely to resolve as many issues as possible informally, and avoid surprises in the Record of Decisions.
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768


On Mon, Sep 16, 2019 at 8:50 PM Brian St George
<bstgeorg@blm.gov> wrote:
> Sure thing Doug. We can find some time next week as your
> schedules allow.
>
> Unfortunately, I'm going on a temporary assignment to DC for a
> couple months - starting on the 23rd. However, I have a very
> capable team behind me stepping up to fill in. And Director
> Connell has impressed on me that she wants our work to continue.
>
>
> ~ bsg
>
> Sent from my iPad so please excuse the typos!
>
> On Sep 16, 2019, at 6:18 PM, Vilsack - DNR, Douglas
> <douglas.vilsack@state.co.us> wrote:
>
>> Brian,
>>
>>    Thanks for reaching back out.  We'll compare our
>> schedules tomorrow, but for the sake of moving
>> things along, do you have any open times on the 23rd
>> or 24th?  It seems like there is a little daylight on our
>> calendars on those days.

Best,
Doug

**Doug Vilsack**
**Assistant Director - Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR

On Fri, Sep 13, 2019 at 9:50 AM St George, Brian <bstgeorg@blm.gov> wrote:

> Gentlemen,
>
> On behalf of Jamie, I'd like to offer a follow-up discussion about the Governors letter and where we might work toward greater consistency between the UFO RMP and State law, policy and plans.
>
> Do you have opportunity next week? And would you share the request with our colleagues at CDPHE if appropriate? I don't have a contact person there.
>
> Cheers
> ~ bsg
>
> Brian St George
> Deputy State Director, Resources and Fire
> Colorado State Office
> Bureau of Land Management
> m (970) 275-2215
> o (303) 239-3768
>
>
> ---------- Forwarded message ---------
> From: **Jamie Connell** <jconnell@blm.gov>
> Date: Tue, Sep 10, 2019 at 12:36 AM
> Subject: Fwd: [EXTERNAL] Letter from Governor Polis - Colorado's Consistency Review UFO PRMP/FEIS
> To: Gregory Shoop <gshoop@blm.gov>, Brian St George <bstgeorg@blm.gov>, Stephanie Connolly <sconnolly@blm.gov>, <glarson@blm.gov>, Jayson Barangan <jbaranga@blm.gov>, cc: Richard Fields <rafields@blm.gov>

FYI and (for some of us) follow-up action.

Jamie

Sent from my iPhone

Begin forwarded message:

> **From:** "Polis - GOVOffice, Governor"
> <governorpolis@state.co.us>
> **To:** <jconnell@blm.gov>
> **Cc:** Dan Gibbs - DNR
> <dan.gibbs@state.co.us>, Jill
> Hunsaker Ryan - CDPHE
> <jill.hunsakerryan@state.co.us>
> **Subject: [EXTERNAL] Letter from
> Governor Polis - Colorado's
> Consistency Review UFO
> PRMP/FEIS**
>
> Director Connell:
>
> In this email you will find a letter
> regarding Colorado's consistency
> review of the proposed Uncompahgre
> Field Office Resource Management
> Plan and Final Environmental Impact
> Statement, along with two attachments
> referenced within the letter.
>
> A hard copy of this letter will be sent
> via US Mail.
>
> Regards,
>
> Jared Polis
> Governor

--
*Jon Holst*
SW Region Energy Liaison



P 970.375.6713 | F 970.375.6705 | C 970.759.9588
415 Turner Drive, Durango CO 81303
jon.holst@state.co.us | www.cpw.state.co.us

"*Even if you're on the right track, you'll get run over if you just sit there*" - Will Rogers

BLM_0167272

| From: | Gavre, Michael A on behalf of StateDirector, BLM_CO |
|---|---|
| To: | Connell, Jamie E; Shoop, Gregory P; Barangan, Jayson C; Hall, Steven B; Gilbert, Megan A |
| Subject: | Fwd: [EXTERNAL] Objection NF Mancos Master Development Plan |
| Date: | Wednesday, December 11, 2019 12:17:54 PM |

FYI

---------- Forwarded message ---------
From: **Red Robin** <may.five.horses@gmail.com>
Date: Wed, Dec 11, 2019 at 12:12 PM
Subject: [EXTERNAL] Objection NF Mancos Master Development Plan
To: <blm_co_statedirector@blm.gov>
Cc: <mindy.vogel@usda.gov>


File Code:  1570

In reference to your letter dated November 12, 2019.  Thank you for the extension so that you can thoroughly review and respond to the objections.

IAW T36, Code of Federal Regulation (CFR) Part 218.5(a) my previous objection still stands as follows:

**I, May M. Trumble, respectfully submit the following protest. My contact information is:**

**May Trumble 39417 Pitkin Road Paonia, CO 81428**

**My protest addresses the following issues that I have raised in my previous comments:**

**As a resident, concerned citizen, consumer or organic fruits and vegetables and meat, I truly believe that oil and gas opening up in the Northfork Valley, will gravely affect our health, welfare, watersheds, recreation, clean air, traffic, night skies. This proposed fracking area is on the 2nd most unstable seismic area in Colorado as noted by several geologists.**

**This RMP is not cohesive with SB181, HB1261 or 40,000+ comments from the Northfork Valley citizens.**

**The Proposed RMP would open more than 95% of the federal mineral estate to oil and gas development**

**The Proposed RMP drastically reduces the protective stipulations originally created in the Draft RMP's "Agency Preferred Alternative", ignores Alternative B.1, and ignores the community request for the highest levels of protections, including a no-leasing alternative.**

**The Proposed RMP does not consider that such proposed increases in oil and gas development on public lands have the potential to poison food sheds and threaten to wipe out food security for people on the Western Slope and the Front Range.**

The Proposed RMP does not the consider the potential for irreparable damage to clean air, abundant fresh water and food sheds (including Colorado's largest concentration of organic farms).

The Proposed RMP ignores the potential for significant harm to human health and a local economy based on agriculture and organic farms, recreation, hunting, and tourism.

The Proposed RMP could result in the loss of unique biodiversity in the State of Colorado, as it eliminates Ecological Emphasis Areas and significantly reduces existing Areas of Critical Environmental Concern.

This Proposed RMP will shape the future of the North Fork Valley. The final RMP will guide oil and gas development for the next 20-30 years.

I have worked with BLM since the beginning of the RMP development. The final RMP blatantly goes against the health and welfare of the area and citizens and the concerns and comments of all of the citizens that have written have been part of the RMP process.

Consider my protest on the grounds that you are not representing the citizens that put you into office. Err on the side of "do no harm" vs pushing forward with actions that can gravely damage our part of the earth irreparably.

Thank you,

Respectfully

May M. Trumble

Cc: Greg Larsen, Casey Hammond, David Bernhard, Gov Polis, Sen Bennett, Sen Gardner, Representative McCluskie, Rep Scott Tipton, Sen Kerry Donovan, Delta County Commmissioners

BLM_0167274



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7210
www.co.blm.gov



**JAN 0 8 2020**

The Honorable Jared Polis
Office of Policy
Attn: Dan Gibbs, Executive Director Colorado Department of Natural Resources
136 State Capital
Denver, CO 80203

Dear Governor Polis:

Thank you for your letter dated September 9, 2019 regarding your consistency review of the
Bureau of Land Management (BLM) Uncompahgre Field Office Proposed Resource
Management Plan/Final Environmental Impact Statement (PRMP/FEIS). We appreciate the State
of Colorado's feedback and have given these comments careful consideration. BLM Colorado
expects that the Approved RMP and Record of Decision (ROD), together with the explanations
below, will address the concerns you shared.

1.   Recently Enacted State Legislation

We have evaluated the concerns regarding potential inconsistencies between the foreseeable oil
and gas development identified in the PRMP/FEIS and two recently enacted State legislative
measures, HB19-1261 and SB19-181. The BLM will work with the State to identify ways it can
support the objectives of both measures. The PRMP is designed to adapt to new State laws by
providing for compliance with applicable pollution control laws, in accordance with 43 U.S.C. §
1712(c)(8). The PRMP will require compliance with applicable state and federal laws and
policies, and the BLM will review and evaluate the State's plan for achieving emission reduction
targets once it is complete. That evaluation will inform the BLM's implementation decisions.

The PRMP/FEIS contains an extensive analysis of air quality issues and includes management
actions designed to reduce harmful emissions, such as a decision to limit degradation of air
quality and related values. BLM Colorado adopted an adaptive management approach to address
air quality impacts, known as the Colorado Air Resource Protection Protocol. Through this
protocol, the BLM considers and applies mitigation measures, as well as best management
practices in its decision-making to protect air quality. Additionally, the RMP includes a lease
notice attached to new leases to inform lessees of necessary additional analysis at the drilling
stage. This analysis will identify appropriate mitigation and respond to potential changes in law
or policy. Public involvement is vital to the NEPA process and will continue to play a role in
how the BLM manages oil and gas resources and associated infrastructure on public lands in the
Uncompahgre Field Office planning area. This is a comprehensive approach designed to promote
consistency with the State's pending regulations.

2.      State Wildlife Plans

We have evaluated your concerns that the PRMP may not be consistent with several of Colorado's species management plans and agreements. BLM Colorado and the State have enjoyed many years of cooperation in managing wildlife resources. This cooperation continued during the development of the PRMP to ensure consistency with the State's wildlife plans and agreements, which includes a plan objective (line 97) to:

> *Provide for effective wildlife and fish habitat throughout the Decision Area with abundance and distribution commensurate with the capability of the land to sustain wildlife and fish populations. Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats. Consider route densities in travel management to support CPW [Colorado Parks and Wildlife] wildlife population objectives. Utilize current conservation plans, agreements, and strategies, including state habitat and species management and action plans, to direct management.*

This objective addresses consistency of managing wildlife habitats on public lands with the State's wildlife plans, and the BLM determined that none of the decisions in the PRMP conflict with those plans. The BLM considered and incorporated many of the State wildlife plan's objectives more directly in the PRMP management actions. The BLM believes this action, combined with the broader objective, ensures that wildlife habitats will be managed consistent with the State's wildlife plans. This objective gives the BLM flexibility to develop appropriate implementation-stage measures in response to potential State plan updates throughout the life of the RMP. Implementation decisions such as route designations and right-of-way authorizations must conform with the plan objective. To address the State's concern about the development of infrastructure, the BLM will modify the objective above as follows:

> *Consider route **and infrastructure** densities to support CPW wildlife population objectives.*

BLM Colorado has appropriately incorporated and considered the goals, objectives, and commitments of the State's wildlife plans and will continue to do so through implementation. While the PRMP/FEIS includes an objective that directs the BLM to utilize current plans, agreements, and strategies, the BLM is presently unable to include an objective that reflects plans or plan revisions that are still in development.

BLM policy encourages reliance on the State's existing plans. Many of the specific goals, objectives and commitments described in those plans apply at the implementation stage, rather than at higher-level planning. Your consistency review did not disclose any specific inconsistency where the BLM's PRMP would preclude effective implementation of the State's plans.

We reviewed CPW's 2016 comment letter on the Draft RMP and Draft EIS, and while BLM has not adopted every recommendation in that letter, the only inconsistency disclosed was that the BLM's Preferred Alternative was "not consistent with lease stipulations recommended to BLM

by CPW." The BLM worked closely with local CPW managers to address their recommended lease stipulations in the PRMP/FEIS and incorporated many of them; however, such recommendations do not comprise an officially approved policy or program for purposes of 43 C.F.R. § 1610.3-2.

2a.   Big Game Habitat and Migration Corridors

BLM Colorado determined that the PRMP decisions on big game winter range and migration corridors are consistent with Executive Order D-2019-001 and Colorado's Action Plan for Implementing Secretarial Order 3362. The goals and objectives in the PRMP are consistent with the State's emphasis on protecting big game winter range and migration corridors. The PRMP contains many management actions aimed at protecting and enhancing big game species habitat consistent with CPW's population objectives, as well as timing limitations that restrict disturbance during sensitive periods. The State's plans and policies do not specify mechanisms for achieving its population goals, and the State has not adopted restrictions or regulations specific to managing for big game habitats. Once the State does so, the BLM will consider those restrictions when making implementation decisions, as outlined in the plan objective (line 97) noted above.

Colorado's Action Plan for Implementing Secretarial Order 3362 identifies the Uncompahgre Plateau migration corridor and the associated threats to big game within that area. However, it does not identify specific management actions required to address those threats. Similarly, Executive Order D-2019-001 highlights the need to address big game impacts and sets a July 2020 deadline for the State to identify legislation, regulations, and policy to ensure conservation of seasonal big game habitat and migration corridors. Specific measures to accomplish the State's goals are not yet available for the BLM's consideration.

Your consistency review letter proposes adding a Controlled Surface Use (CSU) stipulation limiting routes to one linear mile per square mile and facilities to one per square mile. The letter further asserts that habitat effectiveness cannot be maintained with disturbance in excess of these standards and that compensatory mitigation should be required where route densities exceed one mile per square mile. BLM Colorado has not incorporated this recommendation in the RMP because this standard is not established in the State's wildlife plans.

Moreover, BLM policy (https://www.blm.gov/policy/im-2019-018) precludes the use of required compensatory mitigation except to comply with State requirements or other federal requirements. Under this policy, the BLM may work with CPW to consider compensatory mitigation requested by the State as part of a State plan or program. Nevertheless, the PRMP includes an objective supporting CPW's big game population goals through consideration of route densities. Consideration at the implementation/project phase will determine if densities below or in excess of this proposed standard are locally appropriate. While the BLM has not adopted the specific recommended CSU stipulation, we look forward to continuing to work with CPW to consider route density and population objectives in our implementation decisions.

BLM Colorado is committed to continued coordination with the Department of Natural Resources and CPW to develop landscape-scale solutions to address threats to big game habitat.

In response to your request, the BLM will include a modified version of the State's proposed CSU stipulation (Enclosure 1) in the approved RMP, which will ensure that the BLM and the State coordinate around big game habitat management issues when developing mitigation measures and plans of development. This will help minimize adverse impacts to provide for healthy populations and meet the State's population objectives, allowing the BLM and the State to continue developing effective management tools that can be applied across landscapes and land ownerships.

2b.    Gunnison Sage-Grouse Rangewide Conservation Plan

The PRMP/FEIS includes conservation measures for the Gunnison Sage-Grouse (GUSG) consistent with the 2006 GUSG range wide conservation plan. The PRMP/FEIS analyzes and proposes mitigation measures that avoid potential future impacts by closing public lands to certain uses or minimizing other potential future impacts by restricting certain uses on the public lands. Typically, it is not appropriate to analyze specific mitigation measures that rectify impacts, reduce impacts over time, or compensate for impacts, because approving an RMP does not directly incur any on-the-ground impacts.

Several fluid leasing and surface disturbance stipulations would apply for the protection of GUSG under the PRMP/FEIS (refer to TL-16, TL-18, NSO-31/SSR-32, and CSU-29/SSR-34 in Appendix B of the UFO PRMP/EIS). The BLM would also consider all appropriate mitigation measures during the decision-making process for future site-specific actions.

Your letter does not identify how the PRMP is inconsistent with the State's plan, but recommends that the BLM "incorporate the conservation strategies cited in the State Sage-Grouse Plan." BLM Colorado has determined that our respective plans are in fact consistent. The BLM's PRMP is a broad-scale planning document and as mentioned above, articulates our objective to "*[u]tilize current conservation plans, agreements, and strategies, including state habitat and species management and action plans, to direct management.*" However, many details in the State's plan are "Available Strategies" that can be applied as part of site-specific decisions. For this reason, they are more appropriately considered and applied during the BLM's implementation phase, rather than adopted as management actions in the RMP.

The BLM's review of the State's GUSG plan confirms that the PRMP is consistent both with its priority strategies and the specific strategies related to various land uses, based on the following considerations:

- Priority 1 - Protection of occupied habitats. The BLM has specified restrictive stipulations for fluid mineral development and other surface-disturbing activities in occupied habitats and manages them as right-of-way exclusion or avoidance areas.
- Priority 2 - Stabilization of existing populations. While the BLM focuses on managing wildlife habitat rather than populations, our partnership with CPW to protect and manage habitat will continue.
- Priority 3 - Habitat improvement. BLM Colorado's Public Land Health standards specify that "[s]pecial status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or

enhanced by sustaining healthy, native plant and animal communities." The PRMP specifies that the BLM will "[l]imit, modify, or manage the cause, where an activity has been demonstrated to be causing land health problems, to improve land health of lands, streams, and wetlands rated as not meeting the BLM Colorado Public Land Health Standards." The PRMP further specifies that we will "[p]ursue opportunities to enhance and restore wetland and riparian areas impacted by historic land use and flow regime modification," and "[m]anage vegetation for a mix of productive and resilient plant and biological soil crust communities that sustain native plant and animal species." Many of the management actions in the PRMP support ongoing efforts to improve habitat, with the remainder having a neutral effect.

- Priority 4 - Adaptive Management. Adaptive management is applied through implementation rather than high-level planning. To be effective, it requires an understanding of the success of past implementation and mitigation.
- Priority 5 - Protection of unoccupied suitable habitats. The PRMP includes management actions to protect large areas of unoccupied suitable habitats through its management of designated critical habitat and habitats as defined by CPW, as well as through the application of CSU 29/SSR 34 in GUSG Potential Habitat.

The BLM coordinated with the U.S. Fish and Wildlife Service (FWS), a cooperating agency, early in the planning process. In that role, the FWS provided input on planning issues, data collection and review, as well as alternatives development for analysis. To comply with Section 7(c) of the Endangered Species Act of 1973 (ESA), the BLM submitted a biological assessment to FWS requesting formal Section 7 consultation on the effect of the RMP on ESA-listed species and habitats. On December 17, 2018, the FWS issued the biological opinion for the preliminary PRMP/FEIS, which concluded the following:

> "Implementation of the RMP, including the conservation measures and use stipulations, will reduce multiple threats to the GUSG and could restore the species to formerly occupied range. We anticipate some low level of adverse effects to GUSG, but the majority of these effects would be widely distributed across GUSG habitat in the Uncompahgre Field Office and likely be of low intensity and severity."

The biological opinion is available online at the BLM's RMP website: https://go.usa.gov/xnpgD. Following publication of the PRMP/FEIS, the BLM corresponded with the FWS to confirm the changes from the preliminary Proposed plan since the FWS's review did not alter the conclusions of the biological opinion. The PRMP/FEIS complied with the National Environmental Policy Act by including a discussion of measures that may mitigate adverse environmental impacts to the extent appropriate for an RMP. The BLM has complied with the consultation requirements under Section 7(a)(2) of the ESA.

The BLM continues coordinating with the State and FWS to develop strategies to promote GUSG recovery. The FWS published the *Draft Recovery Plan for the Gunnison Sage-Grouse* on November 1, 2019, which provides an overview of the species' current status and identifies a recovery strategy with six broad priority actions. These actions include implementing regulatory mechanisms or other conservation plans or programs such as land-use management plans to reduce and ameliorate threats associated with habitat loss and degradation. The BLM will cooperate with the FWS to develop recovery implementation strategies. In coordination with

FWS, the BLM will evaluate existing management decisions to determine if current RMPs, including the final Uncompahgre RMP, would require an amendment to support the final GUSG recovery plan, expected to be completed in October 2020.

Consistent with the conservation measures identified in the FWS's biological opinion and recommendations from the State, the BLM will modify the GUSG stipulations in the PRMP to include consultation with the State on any proposed exceptions, waivers, and modifications, as well as a noise limitation requirement (See Enclosure 2). These modifications will better align with the conservation strategies identified in the State's GUSG plan.

Thank you providing your consistency review of the Uncompahgre Field Office PRMP/FEIS. The BLM believes our coordination with the State improved and strengthened this land use plan, and we are happy to have addressed your concerns. We look forward to working with you and your staff to continue making progress towards addressing these resource issues during implementation.

Please note that you have the opportunity to appeal our response to the Director of the BLM. An appeal must be submitted in writing within 30 days, as provided in 43 C.F.R § 1610.3-2.

If you have any questions, please contact BLM Colorado State Planning Lead Megan Gilbert at 303-239-3936 or the Acting BLM Colorado Communications Director at 303-239-3681.

Sincerely,

Jamie E. Connell
State Director

2 Enclosures:
*Proposed CSU*
*Gunnison Sage Grouse Stipulation Language*

## Enclosure 1: Proposed CSU

Lease Number: <LEASE_NUMBER>

### WILDLIFE BIG GAME WINTER, MIGRATION AND PRODUCTION AREA CSU RGFO

### CONTROLLED SURFACE USE

**Stipulation:** Surface occupancy or use may be restricted in big game winter, migration and production areas, as mapped in the Resource Management Plan, BLM's GIS database or other maps provided by local, state, federal or tribal agencies that are analyzed and accepted by the BLM.

<SPECIES>

Prior to surface disturbance within big game severe winter range/winter concentration areas, migration and production areas, BLM may require the applicant to develop a mitigation plan in coordination with BLM and CPW, in conformance with applicable state requirements, rules and regulations, as a component of the APD– Surface Use Plan of Operations. The operator shall not initiate surface-disturbing activities unless the BLM authorized officer has approved the Plan (with conditions, as appropriate). The Plan must demonstrate, to the authorized officer's satisfaction, that the overall function and suitability of big game winter ranges, migration, and production areas will not be impaired. This may include special design, construction and implementation measures, including relocation of operations by more than 200 meters (656 feet). Measures included in the plan may include, but are not limited to, limitations to surface disturbance density through efficient planning of facilities, roads and well locations; minimization of routine truck traffic associated with well/facility visits through use of remote sensing/control and pipelines to transport liquids; avoidance of visits during certain hours during the winter season; and limitations on noise.

**On the following lands:**

<LEGAL_DESCRIPTION>

**Purpose:** Ensuring the function and suitability of big game winter range, migration, and production areas.

**Standard EXCEPTION, MODIFICATION, and WAIVER criteria apply.**

### Enclosure 2: Gunnison Sage Grouse Stipulation Language

Stipulation CSU-29 will be modified with added design feature for noise:

"*Sound levels at leks, due to new project noise individually or cumulatively from anthropogenic sources, should not exceed 10 decibels (dB) above baseline sound levels at the perimeter of a lek during the breeding season (March 1 to May 15), 6 pm to 8 am. Baseline sound levels should be determined prior to project initiation. Sound level measurement and monitoring protocols will be coordinated with CPW.*"

Stipulation NSO-31 will be clarified with the following language about exceptions, modifications, and waivers:

*"Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison Sage-Grouse based on one of the following:*

- *Topography/areas of non-habitat create an effective barrier to impacts.*
- *No additional impacts would be realized above those created by existing major infrastructure (for example, a State Highway).*
- *The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to landownership patterns).*

*\*\*In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain agreement, including written justification, between the BLM District Manager and CPW that the proposed action satisfies at least one of the criteria listed above.*

*Waiver: No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined, through collaboration with the State of Colorado, to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.*

*This lease is subject to NSO and does not guarantee the lessee the right to occupy the surface of the lease for the purpose of producing oil and natural gas. In areas open to fluid mineral leasing with NSO stipulations, fluid mineral leasing activities are permitted, but surface-disturbing activities cannot be conducted on the surface of the land unless an exception, modification, or waiver is granted."*

| | |
|---|---|
| **From:** | Gilbert, Megan A |
| **To:** | Vilsack - DNR, Douglas |
| **Subject:** | Re: [EXTERNAL] Re: Uncompahgre Gov Consistency Review |
| **Date:** | Thursday, January 9, 2020 12:18:48 PM |

Hey Doug,

It looks like we can't update the invite because the person who made it is out sick. Could you please share the address with folks planning to attend? We will be on the second floor in the state director's suite and I put a list of names from the invite with the front desk but everyone should have some form of ID.

Colorado State Office
2850 Youngfield St
Lakewood CO 80215

Best,
**Megan Gilbert**
*Deputy State Director for Resources (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

On Thu, Jan 9, 2020 at 11:00 AM Megan Gilbert <magilbert@blm.gov> wrote:
> Thanks Doug, making that happen now.
>
> Get Outlook for iOS
>
> ---
>
> **From:** Vilsack - DNR, Douglas <douglas.vilsack@state.co.us>
> **Sent:** Thursday, January 9, 2020 10:47 AM
> **To:** Gilbert, Megan
> **Subject:** Re: [EXTERNAL] Re: Uncompahgre Gov Consistency Review
>
> Hi Megan, we're at your office tomorrow, right?   can you add the address/room to the invite?  Doug
>
> On Mon, Dec 23, 2019 at 10:08 AM Gilbert, Megan <magilbert@blm.gov> wrote:
>> You should have gotten an invite. Please add Doug and Zach as I didn't have their emails. Look forward to seeing you all here in a couple weeks.
>>
>> **Megan Gilbert**
>> *Deputy State Director for Resources (Acting)*
>> *BLM Colorado State Office*
>> *(303) 239-3768 (desk)*

On Mon, Dec 23, 2019 at 10:02 AM Gilbert, Megan <magilbert@blm.gov> wrote:
> Thanks Doug,
>
> I think that is going to work. We got it on her calendar.
>
> Best,
> Megan
> **Megan Gilbert**
> *Deputy State Director for Resources (Acting)*
> *BLM Colorado State Office*
> *(303) 239-3768 (desk)*

On Mon, Dec 23, 2019 at 9:04 AM Vilsack - DNR, Douglas <douglas.vilsack@state.co.us> wrote:
> Hi Megan, Thanks for the update. I haven't confirmed the schedules of our CPW team yet, but it looks like Dan Gibbs, Zach Pierce (Gov's office), and I can do 9am on Friday the 10th at your office. Does that work for you/Jamie? Best, Doug
>
> Doug Vilsack
> **Assistant Director - Parks, Wildlife and Lands**
>
> 
>
> P 303.866.3311 x8664 | C 720.456.8956
> 1313 Sherman Street #718, Denver, CO 80203
> douglas.vilsack@state.co.us | www.colorado.gov/DNR

On Fri, Dec 20, 2019 at 8:49 AM Gilbert, Megan <magilbert@blm.gov> wrote:
> Hey Doug,
>
> Hope you holidays are shaping up well. I am writing to update you on our progress on the Uncompahgre Governor's consistency review process. We were able to brief our Solicitors and our State Director on our proposed path forward and are currently routing a draft of our response letter through our leadership. We hope to have the letter finalized the first week of January and would like to set up a meeting the week of **January 6th** to share the letter with you in person here at the State Office. The meeting would also be an opportunity to discuss next steps and a few other proposed changes we are trying to make for the final plan.
>
> Ideally, both Jamie and Dan could attend but we understand schedules can be tight. I am writing to start talking about potential dates and proposed attendance for the meeting. Please let me know your initial thoughts or feel free to give me a call. I look forward to hearing from you and continuing our discussion.
>
> Happy Holidays,
> Megan

**Megan Gilbert**
*Deputy State Director for Resources (Acting)*
*BLM Colorado State Office*
*(303) 239-3768 (desk)*

--
**Doug Vilsack**
**Assistant Director – Parks, Wildlife and Lands**



P 303.866.3311 x8664  |  C 720.456.8956
1313 Sherman Street #718, Denver, CO 80203
douglas.vilsack@state.co.us  |  www.colorado.gov/DNR



*Bureau of Land Management Director's Summary Protest Resolution Report*

# Uncompahgre Field Office Resource Management Plan

February 7, 2020

BLM_0167286

This page intentionally left blank.

BLM_0167287

## Contents

Acronyms ........................................................................................................................................ ii

Protesting Party Index .................................................................................................................... 1

ESA ................................................................................................................................................ 3

Secretarial Order 3362 .................................................................................................................. 5

FLPMA – Areas of Critical Environmental Concern ...................................................................... 7

FLPMA – Consistency with other Plans ........................................................................................ 8

FLPMA – Unnecessary or Undue Degradation ........................................................................... 12

NEPA – Purpose and Need .......................................................................................................... 13

NEPA – Range of Alternatives ..................................................................................................... 14

NEPA – Range of Alternatives – Coal production ........................................................................ 17

NEPA – Range of Alternatives – Fluid Minerals ......................................................................... 18

NEPA – Selection of a New Alternative without Public Input ...................................................... 21

NEPA – Best Available Information .............................................................................................. 25

NEPA – Cooperating Agencies .................................................................................................... 26

NEPA – Cumulative Effects – Bighorn sheep .............................................................................. 27

NEPA – Cumulative Effects – Fish ............................................................................................... 28

NEPA – Impact Analysis – Air Quality ......................................................................................... 29

NEPA – Impact Analysis – Bighorn Sheep .................................................................................. 33

NEPA – Impact Analysis – Climate Change ................................................................................. 34

NEPA – Impact Analysis – Fish .................................................................................................... 36

NEPA – Impact Analysis – Fluid minerals ................................................................................... 37

NEPA – Impact Analysis – Gunnison Sage-grouse ..................................................................... 40

NEPA – Mitigation – Gunnison Sage-grouse ............................................................................... 43

NEPA – Impact Analysis – Human Health ................................................................................... 46

NEPA – Mitigation – Soil Selenium ............................................................................................. 48

NEPA – Impact Analysis – Water Quality .................................................................................... 49

NEPA – Impact Analysis – Wilderness Characteristics ............................................................... 50

NEPA – Impact Analysis -Mitigation ........................................................................................... 52

NEPA – Impacts Analysis – Carbon/Greenhouse Gas Emissions ............................................... 53

NEPA – Impacts Analysis – Renewable Energy .......................................................................... 58

NEPA – Impacts Analysis – Socioeconomics .............................................................................. 60

NEPA – Impacts Analysis – Uranium Mining .............................................................................. 62

NEPA – Response to Comments .................................................................................................. 64

BLM_0167288

## *Acronyms*

| | |
|---|---|
| °C | degrees Centigrade |
| ACEC | area of critical environmental concern |
| BA | biological assessment |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| BO | Biological Opinion |
| BOR | Bureau of Reclamation |
| CARMMS | Colorado Air Resources Management Modeling Study |
| CEQ | Council on Environmental Quality |
| CFR | Code Federal Regulations |
| CHHR | core herd home range |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalent |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| CURE | Curecanti National Recreation Area |
| DAU | Data Analysis Unit |
| DEIS | Draft Environmental Impact Statement |
| DOE | Department of Energy |
| DOI | Department of the Interior |
| DRMP | Draft Resource Management Plan |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| Fluid Mineral PBO | Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado |
| FWS | U.S. Fish and Wildlife Service |
| GHG | greenhouse gas |
| GIS | geographic information systems |
| GuSG | Gunnison sage-grouse |
| GWP | global warming potential |
| HAP | hazardous air pollutant |
| HB | House Bill |
| HIA | health impact assessment |
| IPCC | Intergovernmental Panel on Climate Change |
| IWG | Interagency Working Group |
| LUR | Land Use Resolution |
| LWC | lands with wilderness characteristics |
| MDP | Master Development Plan |
| MLA | Mineral Leasing Act |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NL | no leasing |

BLM_0167289

| | |
|---|---|
| **NPS** | National Park Service |
| **NSO** | no surface occupancy |
| **ORSA** | Outdoor Recreation Satellite Account |
| **PRMP** | Proposed Resource Management Plan |
| **RFD** | reasonably foreseeable development |
| **RMP** | Resource Management Plan |
| **ROW** | right-of-way |
| **S.B.** | Senate Bill |
| **SCC** | social cost of carbon |
| **SCORP** | Statewide Comprehensive Outdoor Recreation Plan |
| **SEIS** | Supplemental Environmental Impact Statement |
| **Service** | U.S. Fish and Wildlife Service |
| **SO** | Secretarial Order |
| **SSR** | site-specific relocation |
| **TRFO** | Tres Rio Field Office |
| **TWS** | The Wilderness Society |
| **U.S.C.** | United States Code |
| **UFO** | Uncompahgre Field Office |
| **ULMP** | Uranium Lease Management Program |
| **USFS** | U.S. Forest Service |
| **USFWS** | U.S. Fish and Wildlife Service |
| **UUD** | unnecessary or undue degradation |
| **VOC** | volatile organic compound |

BLM_0167290

This page intentionally left blank.

BLM_0167291

## Protesting Party Index

| Protester | Organization | Determination |
|---|---|---|
| David Baumgarten | Board of County Commissioners of Gunnison County, Colorado | Denied |
| Elaine Brett | | Denied |
| Nicholas Clabbers | The Wilderness Society | Denied |
| Dan Gibbs | Colorado Department of Natural Resources | Denied |
| Brent Helleckson | Terror Ditch and Reservoir Company | Denied |
| Hannah Hollenbeck | Ouray County | Denied |
| Laura King | Western Environmental Law Center | Denied |
| Kenneth Knight | Town of Paonia | Denied |
| Amy Markwell | San Miguel County, Colorado | Denied |
| Representative Julie McCluskie | Colorado House of Representatives | Denied |
| Eugenie McGuire | Desert Weyr, LLC | Denied |
| Jonathan Ratner | Western Watersheds Project | Denied |
| Karen Tuddenham | Sheep Mountain Alliance | Denied |
| Michael Burkley | | Dismissed – No Standing |
| James Matusoff | | Dismissed – No Standing |
| Paul Reilly | | Dismissed – No Standing |
| Charles Zick | | Dismissed – No Standing |
| Charles Beall | | Dismissed – Comments Only |
| Thomas Bender | | Dismissed – Comments Only |
| Sarah Bishop | | Dismissed – Comments Only |
| Jim Brett | Slow Food Western Slope | Dismissed – Comments Only |
| Dave Bristow | | Dismissed – Comments Only |
| Jennifer Chavez | | Dismissed – Comments Only |
| William Crompton | | Dismissed – Comments Only |
| Ralph D'Alessandro | | Dismissed – Comments Only |
| Steve Danuff | | Dismissed – Comments Only |
| Bill Day | | Dismissed – Comments Only |
| Michael Drake | | Dismissed – Comments Only |
| Krista Dudley | | Dismissed – Comments Only |
| Elyssa Edgerly | | Dismissed – Comments Only |
| Sven Edstrom | Colorado Plateau Mountain Bike Trails Association - Delta Area Mountain Bikers Chapter | Dismissed – Comments Only |
| Dylan Fixmer | | Dismissed – Comments Only |
| Susan Friar | | Dismissed – Comments Only |
| Greta Gibb | | Dismissed – Comments Only |
| Elena Goldstein | | Dismissed – Comments Only |
| Craig Grother | Backcountry Hunters & Anglers | Dismissed – Comments Only |
| Stephen Gulick | | Dismissed – Comments Only |
| Kay Hannah | | Dismissed – Comments Only |
| Amy Hayutin | | Dismissed – Comments Only |
| David Inouye | | Dismissed – Comments Only |
| Bonnie Inouye | | Dismissed – Comments Only |

BLM_0167292

| Protester | Organization | Determination |
|---|---|---|
| Lisa Joss | | Dismissed – Comments Only |
| Mary Jursinovic | | Dismissed – Comments Only |
| Viva Kellogg | | Dismissed – Comments Only |
| Scott Kellogg | | Dismissed – Comments Only |
| Cedar Keshet | | Dismissed – Comments Only |
| Sharon Kime | | Dismissed – Comments Only |
| Amber Kleinman | | Dismissed – Comments Only |
| Ethel Leslie | | Dismissed – Comments Only |
| Linda Lindsey | | Dismissed – Comments Only |
| David Livingston | | Dismissed – Comments Only |
| Michael McCarney | | Dismissed – Comments Only |
| Patrick McCarney | | Dismissed – Comments Only |
| Tracy McCurdy | | Dismissed – Comments Only |
| Rick McGavin | | Dismissed – Comments Only |
| Laurie Milford | | Dismissed – Comments Only |
| Sean Murphy | Mayor, Town of Telluride | Dismissed – Comments Only |
| Robin Nicholoff | | Dismissed – Comments Only |
| Ian Oeser | | Dismissed – Comments Only |
| Elizabeth O'Reilly | | Dismissed – Comments Only |
| Robert Oralndo | | Dismissed – Comments Only |
| Karen Ortiz | | Dismissed – Comments Only |
| Ursula Ostrander | | Dismissed – Comments Only |
| Joshua Paigen | | Dismissed – Comments Only |
| Erica Pelland | | Dismissed – Comments Only |
| Michael Price | | Dismissed – Comments Only |
| Tena Price | | Dismissed – Comments Only |
| Kate Redmond | | Dismissed – Comments Only |
| Katie Reily | | Dismissed – Comments Only |
| Kim Schultz | TEDX | Dismissed – Comments Only |
| Teresa Shishim | | Dismissed – Comments Only |
| Robin Smith | | Dismissed – Comments Only |
| Paige Smith | | Dismissed – Comments Only |
| Marilyn Stone | | Dismissed – Comments Only |
| Luke Tembrock | | Dismissed – Comments Only |
| Brad Thacker | | Dismissed – Comments Only |
| Kathy Thompson | | Dismissed – Comments Only |
| Greg Thompson | | Dismissed – Comments Only |
| Lincoln Vannah | | Dismissed – Comments Only |
| Patricia Walsh-Oeinck | | Dismissed – Comments Only |
| Trudy Welty | | Dismissed – Comments Only |
| Aiyana White | | Dismissed – Comments Only |
| Steve Wolcott | | Dismissed – Comments Only |
| Eli Wolcott | | Dismissed – Comments Only |
| Millicent Young | | Dismissed – Comments Only |
| Cynthia Ziegler | | Dismissed – Comments Only |

Protest Resolution Report for
Uncompahgre Field Office Resource Management Plan

February 7, 2020

BLM_0167293

# *ESA*

*UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** Reliance, however, in the UFO BiOp on the 2017 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 21), is improper for the reasons set forth below. First, the Fluid Mineral PBO addresses only impacts from water depletions, not other indirect impacts of authorizing oil and gas leasing, including (a) spills or surface and groundwater contamination by hydrocarbons, hydraulic fracturing fluids, or produced water; and (b) selenium loading to the Gunnison and/or Colorado Rivers resulting from ground disturbance, road construction, erosion, and sedimentation. The 2017 Fluid Mineral PBO does not fully take into account the enormous water depletion effects of horizontal drilling and stimulation techniques such as slickwater hydraulic fracturing. The 2017 PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to meet recommended stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

*UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** In sum, BLM's reliance on the 2017 Programmatic Biological Opinion for the Fluid Mineral Program for foreseeable depletions that will exceed the analysis in that Biologial Opinion is unlawful, and does not satisfy its duties to insure jeopardy against the endangered fish. BLM must reconsult with FWS to address these numerous flaws in the 2017 PBO. Further, BLM must prepare a NEPA analysis addressing water depletion 116 Id. 117 Compare PBO at 55 with PBO at 42, 44. 118 PBO at 69. 119 Id. CONSERVATION GROUPS' PROTEST UNCOMPAHGRE FIELD OFFICE PRMP AND FEIS 52 effects of horizontal drilling on the endangered fish, in light of climate change, population declines, mercury and selenium contamination, and Recovery Program failures in meeting recommended flows.

*UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** New scientific information regarding (a) mercury and selenium effects on fish reproduction and population viability, (b) mercury and selenium concentrations in Upper Colorado and White River fish, (c) the potential role of oil and gas development in mercury contamination levels in the White River, (d) the potential for development of the Mancos shale play to increase selenium pollution, and (e) the relationship between climate change and mercury and selenium toxicity constitutes new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an

BLM_0167294

extent that was not considered in the PBO, and requires reinitiation of consultation over the Fluid Mineral Program.

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** Additionally, the UFO RMP DEIS must analyze cumulative impacts from oil and gas projects moving forward in the Uncompahgre planning area, namely the Bull Mountain Unit Master Development Plan and North Fork Mancos Master Development Plan. In particular, the recently-amended North Fork Mancos Master Development Plan proposal will, on its own, authorize development for slickwater fracking resulting in water depletions that will exceed the thresholds analyzed for the Gunnison Basin in the 2017 Fluid Mineral PBO. By authorizing development that will foreseeably exceed the limits contemplated in the U.S. Fish and Wildlife Service's 2017 Fluid Minerals Programmatic BiOp, BLM will violate its duties under ESA Section 7 regarding water depletion impacts on the endangered fish. The Revised North Fork Mancos EA's disclosure of the substantial water demands of slickwater fracking makes clear that the project will foreseeably result in new annual consumptive water uses of Gunnison Basin water of at least 668.5 acre-feet per year, even accepting the questionable assumption that coalbed methane produced water is non-tributary groundwater.92 This level of water use, even without the foreseeable possibility of other potential fracking projects within the subbasin, clearly takes the proposed project, and all future water withdrawals within the Gunnison Basin, outside the scope of the 2017 PBO.

**Summary:**

The Uncompahgre Field Office (UFO) Biological Opinion's (BO's) reliance on the 2017 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO") is improper because the Fluid Mineral PBO:

- Only addresses impacts from water depletions, not other indirect impacts of oil and gas leasing;
- Does not fully account for water depletion effects of horizontal drilling and stimulation techniques; and
- Is unreliable due to significant new information revealing that the Fluid Mineral Program may have effects on endangered fish in a manner or to an extent not previously considered.

Additionally, the Bureau of Land Management (BLM) failed to incorporate new information from the oil and gas projects moving forward in the UFO Planning Area, namely the Bull Mountain Unit Master Development Plan (MDP) and Revised North Fork Mancos MDP, which resulted in faulty cumulative effects analysis because the new annual consumptive water uses would exceed the limits contemplated in the Fluid Mineral PBO.

**Response:**

Section 7(a)(2) of the Endangered Species Act (ESA) requires Federal agencies to ensure that their proposed actions will not be "likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of the critical habitat of such species" (16 United States Code [U.S.C.] 1336(a)(2)). If an agency determines through a finding in a biological assessment (BA) that a proposed action is likely to adversely affect listed species or designated critical habitat formal, consultation is required under 50 Code Federal Regulations (CFR) 402.14(a).

The BLM determined that the approval of the UFO Resource Management Plan (RMP) is likely to adversely affect listed species or critical habitat, and therefore underwent formal consultation with the U.S. Fish and Wildlife Service (USFWS). The BLM documented this determination in the BA for the UFO RMP, which was provided to the USFWS for its review and comment. The BLM used the same

BLM_0167295

information and biological data both to prepare the BA and to analyze the environmental impacts on affected species in the Environmental Impact Statement (EIS).

The BO is the formal opinion of the USFWS as to whether a Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. On December 17, 2018, the USFWS issued the BO for the UFO RMP, which concluded that implementation of the UFO RMP: (1) may affect, but is not likely to adversely affect, the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado pikeminnow, razorback sucker, bonytail, and humpback chub; and (2) may affect, and is likely to adversely affect, Colorado hookless cactus, clay-loving wild buckwheat (including designated critical habitat), and Gunnison sage-grouse (including designated critical habitat) and includes measures to avoid adverse modifications to critical habitat. On September 20, 2019, the BLM notified the USFWS of changes to the Proposed Resource Management Plan (PRMP)/Final Environmental Impact Statement (FEIS) (Alternative E) that occurred after USFWS Section 7 concurrence on December 17, 2018. BLM UFO biological staff determined that these changes to the Agency-Proposed Alternative E do not affect species or habitat that were consulted on in 2018. These conclusions are applicable to a revised UFO RMP drafted after the USFWS issued the BO because changes were not made to management actions relevant to threatened and endangered species. The BO is available on the RMP project's website: https://go.usa.gov/xnpgD.

In developing the UFO RMP, the BLM has complied with Section 7 of the ESA.

Sections 4.3.3 and 4.3.6 of the PRMP/FEIS contain text describing the 2017 Fluid Mineral PBO associated with the BLM's Fluid Minerals Program within the Upper Colorado River Basin in Colorado. Water depletions analyzed for the consultation with the USFWS were based on reasonably foreseeable development (RFD) scenarios. The projects analyzed in the Bull Mountain EIS and North Fork Mancos MDP are within the estimates contained in the 2012 UFO RFD report currently posted on the RMP project's ePlanning website (https://go.ussa.gov/xnpgD). The analysis of water depletions contained in the UFO RMP relies upon the number of projected wells and development included in the RFD report. Refer to Table 4-1 of the UFO PRMP/FEIS for the past, present, and reasonably foreseeable projects considered in the UFO RMP analysis including the Bull Mountain EIS and North Fork Mancos MDP.

As noted on page 4-131 of the FEIS, "The 2017 Programmatic Biological Opinion (USFWS 2017) determined that the 607 acre-feet per year of BLM water depletions associated with BLM approved projects in the Gunnison River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub. However, reduced flows associated with freshwater depletions from approved projects within the Planning Area [i.e., the Bull Mountain Unit MDP and North Fork Mancos MDP] could exacerbate the effects of selenium and mercury on these fish, as reduced flows could lessen beneficial dilution effects on concentrations of each chemical in a given river (BLM 2017a). The project is also not likely to destroy or adversely modify designated critical habitats for these endangered fish (designated critical habitat occurs in the Decision Area only for Colorado pikeminnow and razorback sucker; see Chapter 3)." The Final North Fork Mancos MDP Environmental Assessment (EA) notes that the project will use a single drill rig to drill all wells over 6 years. At that rate of water use, cumulative depletions from the project and two nearby oil and gas projects (Bull Mountain MDP and Dual Operator 5-Pad EA) would be well below the 607 acre-feet of annual depletions consulted on (Final North Fork Mancos MDP EA 2019, p. 107).

## *Secretarial Order 3362*

*UFORMP-096_GibbsD_20190728*
*Colorado Department of Natural Resources*
*Gibbs, Dan*
**Issue Excerpt Text:** At least one BLM Colorado Field Office, the Tres Rios Field Office, has recognized the need for a stipulation to limit the density of surface facilities by incorporating a Controlled Surface

BLM_0167296

Use (CSU) Stipulation in their 2015 RMP revision. Even prior to SO 3362, this stipulation was added to the Tres Rios RMP to address the lack of existing mechanisms to limit the density of surface facilities post-lease when faced with development proposals and individual drilling permits.7 The UFO and Colorado State Director's decision not to include similar stipulations in the UFO PRMP may simply be an oversight. Regardless, Colorado protests this decision and requests that the UFO follow in the TRFO's footsteps and, in accordance with 50 3362, take advantage of this planning process to include in the PRMP CSU stipulations to limit the density of surface facilities in critical big game winter range and migration corridors.

SO 3362 was signed after the 2016 Draft RMP/DEIS for the UFO was issued, but almost a year and a half prior to the PRMP/FEIS issuance in June 2019. However, the PRMP does not reference SO 3362, specify or provide additional protections for any big game winter range or migration corridors consistent with SO 3362 and CPW's previous comments, or provide other management guidelines for minimizing development that would fragment winter range and primary migration corridors. As reflected in Colorado's comments, the best available science demonstrates that seasonal timing limitations are not adequate to maintain big game populations in high density development areas; hence our request for stipulations limiting development density for both roads and oil and gas development to minimize development that would fragment winter range and priority habitats.4 Pursuant to recent conversations between CPW and BLM's Colorado State Office regarding SO 3362 implementation, BLM staff have indicated that they lack the appropriate authorization to address Colorado's desire to adopt a stipulation to address route and facility densities, but that they could address Colorado's recommendation when RMPs are being revised or amended. Yet, notwithstanding Colorado's repeated requests and the Secretarial Order, BLM has failed to take advantage of the UFO RMP planning process to include these stipulations

**Summary:**

The BLM did not consider Secretarial Order 3362 in development of the PRMP.

**Response:**

As of the development of the PRMP/FEIS, the State of Colorado's action plan for the implementation of Secretarial Order 3362 did not include any priority big game migration corridors within the UFO Planning Area. Therefore, this information was not ripe to include in the RMP effort to support additional decision-making or analyze the impacts of proposed density limitations. However, as shown in Appendix T of the PRMP/FEIS, the BLM collaborated with the State of Colorado (Colorado Parks and Wildlife [CPW]) during the planning process by considering CPW objectives in the development of UFO RMP management actions and goals, and by coordinating with CPW in the development of mitigation measures. Since release of the UFO PRMP/FEIS, CPW shared a revised action plan with the BLM Colorado State Office. The BLM will continue to coordinate with the State to further refine these data and to develop mutually beneficial strategies to address big game habitat and migration corridors consistent with Secretarial Order 3362. As a result of the Governor's Consistency Review, the BLM adopted a new controlled surface-use stipulation for fluid mineral leasing with the purpose of ensuring the function and suitability of big game winter range, migration, and production areas. The stipulation will require the development of a mitigation plan in coordination with CPW that demonstrates that the overall function and suitability of big game winter ranges, migration, and production areas will not be impaired.

BLM_0167297

# *FLPMA – Areas of Critical Environmental Concern*

### UFORMP-080_ClabbersN_20190728
### *The Wilderness Society*
### *Clabbers, Nicholas*
**Issue Excerpt Text:** In the Proposed RMP/FEIS, despite identifying more than 215,000 acres of land that meet the criteria to be designated as an ACEC, BLM basically proposes to keep designations at their existing level (approximately 30,000 acres), which also represents approximately 20,000 fewer acres than the Preferred Alternative discussed in the Draft RMP/EIS. These numbers, on their face, demonstrate that BLM has not given "priority to the designation and protection of [ACECs]." 43 U.S.C. § 1712(c)(3). The rationale for BLM's decision in this context is unclear and potentially based on flawed information. In comments to the BLM on the Draft EIS/RMP, many of the Protesting Parties noted that the scientific literature cited with respect to ecological emphasis areas was outdated when considered in the context of climate change. That research is also applicable to potential ACECs and has not been updated in the Final EIS/RMP in any meaningful way. See Proposed RMP/FEIS at Appx. D. Indeed, BLM does not appear to cite any research in its discussion of potential effects on ACECs or its designation decisions. This failure, together with the outdated research, calls into question whether BLM has properly considered whether individual potential ACECs have relevant and important values and should therefore be designated.

### UFORMP-102_KingL_20190728
### *Western Environmental Law Center*
### *King, Laura*
**Issue Excerpt Text:** Despite numerous, well-documented Areas of Critical Environmental concern nominated for designation in the Uncompahgre RMP revision, Alternative E adopts no Ecological Emphasis Areas and only 30,190 acres in six small ACECs. In particular, it arbitrarily declines to adopt any ACECs for the San Miguel Gunnison Sage-Grouse or Sims-Cerro Gunnison Sage Grouse ACECs. Despite the acknowledged inadequacy of the standard stipulations for sage-grouse habitat in Alternative E, the relatively low oil and gas potential in the area, and the extreme vulnerability of Gunnison sage-grouse satellite populations, BLM wrongfully and arbitrarily fails to prioritize designation of ACECs generally, and the sage-grouse ACECs in particular, in the FEIS and its preferred alternative.

BLM arbitrarily and in violation of FLPMA fails to adopt reasonable proposed Areas of Critical Environmental Concern for the San Miguel and Sims-Cerro populations of Gunnison sage-grouse. BLM acknowledges that the nominated San Miguel Gunnison Sage-Grouse ACEC and Sims Cerro Gunnison Sage-Grouse ACEC could provide additional protection for two isolated, fragmented populations of threatened Gunnison sage-grouse.

**Summary:**

The BLM has violated the Federal Land Policy and Management Act of 1976 (FLPMA) by failing to give priority to the designation and protection of areas of critical environmental concern (ACECs).

**Response:**

In FLPMA Section 103(a), an ACEC is defined as "an area on BLM-administered lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values; fish and wildlife resources; or other natural systems or processes, or to protect life and ensure safety from natural hazards." This special designation is used to delineate areas for special management to protect important and relevant resource values. Furthermore, FLPMA Section 202(c)(3) requires that, in the development and revision of land use plans, the BLM give priority to the designation and protection of ACECs. The implementing regulations at 43 CFR 1610.78-2 provide the agency with guidance for the identification and consideration of ACECs for designation and protection during the

BLM_0167298

resource management planning process. However, there is no statutory or regulatory requirement that the BLM designate any or all ACECs identified or considered during the planning process.

In accordance with BLM Manual 1613, Areas of Critical Environmental Concern (1983), the BLM interdisciplinary team reviewed BLM-administered lands in the Planning Area to determine whether new areas should be considered for designation as ACECs, and whether existing ACECs should continue to be managed as ACECs, or if they should be expanded or reduced to protect the ACEC values. The BLM determined that management actions as applied under the Proposed Alternative E are adequate to protect the relevant and important values of those potential ACECs that were not carried forward for designation.

The BLM has discretion to designate all, some, or none of the potential ACECs that were evaluated during the planning process; there is no requirement that the agency carry forward potential ACECs into the PRMP (see BLM Manual 1613.33.E). A comparison of estimated effects and trade-offs associated with the alternatives led to development and selection of the proposed plan (see PRMP/FEIS pp. 2-1 to 2-5).

## *FLPMA – Consistency with other Plans*

### *UFORMP-022_BaumgartenD_20190725*
### *Board of County Commissioners of Gunnison County*
*Baumgarten, David*
**Issue Excerpt Text:** THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT CONSIDERATION OF GUNNISON COUNTY'S FORMAL PLANNING AND LAND USE REGIMES The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands. As noted above, this is also required by FLPMA, 43 U.S.C. § 1702(c)(9). The Proposed RMP/Final EIS is fatally flawed because it does not consider - much less align with - fundamental Gunnison County regulatory regimes. The Proposed RMP/Final EIS, at Vol. 1, 1-7 through 1-8, identifies as a "related plan and authority," the Gunnison County Land Use Resolution (the "Gunnison County LUR"). But while the Gunnison County LUR is one of the County's significant land use planning and regulatory permitting mechanisms, the Proposed RMP/Final EIS neglects to mention, much less consider: 1. The Gunnison County Regulations for Special Development Projects ("1041 Regulations"). The 1041 Regulations are an exercise of Gunnison County's authority - expressly delegated by the State of Colorado - over subjects that include: * Development within mineral resource areas; * Development within natural hazard areas; * Development within areas around major facilities of a public utility; * Development within an area containing or having a significant impact upon historical, natural or archeological resources of statewide importance; * Efficient utilization of municipal and industrial water projects; and * Development of recreation opportunities. The 1041 Regulations are particularly significant because Colorado S.B. 19-181 - which was adopted earlier in 2019 - grants local governments additional authorities regarding siting and development of oil and gas resources. 2. The Gunnison County Regulations for Oil and Gas Operations. Pursuant to these regulations, Gunnison County considers potential impacts both on and off federal lands. The U.S. Forest Service has explicitly recognized the efficacy of the regulations on federal lands. Subjects considered by these regulations include: * Ownership of surface; * Ownership of minerals; * Characteristics of and current condition of the operation location; * Topographic features; * Roads; * Easements; * Boundaries of districts, municipalities, or subdivisions; * Operation plans; * Water bodies and water structures; * Access and transportation routes; * Potential impacts on wildlife and wildlife habitat; * Potential impacts on vegetation; * Emergency response; * Potential impacts on drinking water supplies; * Municipal watersheds; * Potential impacts on water quality; * Waste management; * Hydraulic fracturing fluids disposal and reporting; and * Wildfire hazards. 3. The Gunnison County Coal Resource Special Area Coal Mining Regulations. These regulations have direct import for the North Fork Valley of the Gunnison River.

BLM_0167299

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
### Baumgarten, David

**Issue Excerpt Text:** Alternative E does not address Colorado S.B. 19-181, which was made law between the time of the Draft RMP/EIS and the Proposed RMP/Final EIS. S.B. 19-181 prioritizes public health, welfare and safety, the environment, and wildlife.6 In certain circumstances, this may constrain or even preclude oil and gas exploration and development. In addition, S.B. 19-181 provides local government jurisdictions the ability to develop oil and gas land use regulations that could be more restrictive than the State's permitting requirements. As the BLM is likely aware, Gunnison County has the authority to protect and promote the public health, welfare and safety of the people of Gunnison County, and the authority to regulate land use planning and quality and protection of the environment in the County. To this end, Gunnison County has adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources including oil and gas. It is critical for the BLM to include compliance with all Gunnison County 6 Appendix IV, R-329 contains the following: "Further, the Colorado Oil and Gas Conservation Commission is the primary agency charged with fostering the responsible development of Colorado's oil and gas natural resources in a manner consistent with the protection of public health, safety, and welfare, including the environment and wildlife resources. Although the BLM does have standards and regulations for mineral extraction and development, the BLM requires that all operators be in full compliance with standards and measures set by the Colorado Oil and Gas Conservation Commission when conducting operations on public lands." The mission of the Commission, as identified above, is consistent with the pre-SB-19-181 role but not the current commission mandate regulations regarding oil and gas exploration, development, operation and upstream activities as a mandatory element of the Proposed RMP/Final EIS. In addition, the BLM should include a requirement that any lessee comply with any other land use or environmental regulation imposed by Gunnison County in any way relates to operations on an oil and gas leasehold, including but not limited to water quality, public roads, emergency response, wildlife concerns, agricultural uses and recreation uses.

### UFORMP-074_HollenbeckH_20190729
### Ouray County
### Hollenbeck, Hannah

**Issue Excerpt Text:** THE PROPOSED RMP/FINAL EIS WAS DRAFTED WITHOUT CONSIDERATION OF OURAY COUNTY'S FORMAL PLANNING AND LAND USE REGIMES The BLM stated that decisions on the Proposed RMP/Final EIS will strive to be compatible with existing plans and policies of local "agencies within the Planning Area" as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands. As noted above, this is also required by FLPMA, 43 U.S.C. § 1702(c)(9). The Proposed RMPlFinal EIS is fatally flawed because it does not consider - much less align with - fundamental Ouray County regulatory regimes.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** In addition, S.B. 19-181 provides local government jurisdictions the ability to develop oil and gas land use regulations that could be more restrictive than the State's permitting requirements. As the BLM is likely aware, Gunnison County has the authority to protect and promote the public health, welfare and safety of the people of Gunnison County, and the authority to regulate land use planning and quality and protection of the environment in the County. To this end, Gunnison County has adopted regulations to exercise such authorities including the review, approval or denial of proposed activities and uses of land and natural resources including oil and gas. It is critical for the BLM to include compliance with all Gunnison County regulations regarding oil and gas exploration, development, operation and upstream activities as a mandatory element of the Proposed RMP/Final EIS. In addition, the

BLM_0167300

BLM should include a requirement that any lessee comply with any other land use or environmental regulation imposed by Gunnison County in any way relates to operations on an oil and gas leasehold, including but not limited to water quality, public roads, emergency response, wildlife concerns, agricultural uses and recreation uses.

### UFORMP-076_KnightK_20190728
### Town of Paonia
### Knight, Kenneth
**Issue Excerpt Text:** The Town of Paonia's original 2016 comment letter requested the BLM include all buffers and oil and gas restriction recommendations in the North Fork Alternative Plan, including a ½ mile setback and ¼ mile no leasing restriction between oil and gas operations and the Town's source water supplies, which is consistent with the Town's Source Water Protection Plan. This ½ mile setback is necessary to ensure that the Town is able to continue providing high-quality drinking water to its residents. The Proposed RMP imposes significantly less-protective setbacks and is inconsistent with the Town's Source Water Protection Plan.

### UFORMP-076_KnightK_20190728
### Town of Paonia
### Knight, Kenneth
**Issue Excerpt Text:** Paonia's water is acquired via 38 surface water influenced ground-water springs and the Town passed Watershed Ordinance 2003-02 on February 25, 2003. Paonia has also created a Source Water Protection Plan which the BLM needs to consider in the determination of the final RMP. The planning team for the source water protection plan recommended "Source Water Protection Best Management Practices" be considered for implementation by several agencies, including the BLM. As our water crisis highlighted, infrastructure is fragile, and the Town needs an RMP crafted with that in mind. The Town of Paonia asks that, in order to protect the quality and quantity of our domestic water, the final UFO RMP include all buffers and oil and gas restriction recommendations in the Source Water Protection Plan and Alternative BL

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas
**Issue Excerpt Text:** To comply with FLPMA and SO 3356, BLM's RMP must include these [county] plans or at least incorporate a clear rationale describing why the desired conditions, goals, and objectives in these plans are not addressed.

SO 3356 directs DOI Bureaus to ""collaborate with state, tribal, and territorial fish and wildlife agencies to attain or sustain wildlife population goals during Department land-management planning and implementation, including prioritizing active habitat management projects and funding that contribute to achieving wildlife population objectives, particularly for wildlife that is hunted or fished, and identifying additional ways to include or delegate to states habitat management work on Federal lands.""" In comments on the Draft RMP/EIS, the Colorado Department of Natural Resources and Colorado Parks and Wildlife expressed concern that the Draft RMP/EIS should incorporate the objectives and commitments contained in several local plans and agreements important to the protection of wildlife and wildlife habitat. Public lands within the planning area have long been known as important to deer and elk populations, and the UFO has in fact been scrutinized by federal courts for failing to adequately consider impacts to wildlife associated with oil and gas development. See Citizens for a Healthy Cmty. v. United States BLM, 377 F. Supp. 3d 1223, 1246-47 (D. Colo. 2019). The following local plans were suggested therein, yet were not addressed in the Proposed RMP/FEIS: * The Range-wide conservation agreement and strategy for Roundtail Chub, Bluehead Sucker and Flannelmouth Sucker (2006); * 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming; * 2006 Conservation Strategy for Colorado River Cuttthroat Trout in the states of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010); * Uncompahgre Habitat Partnership

BLM_0167301

Program-Habitat Management Plan (2010); * E-20 (2005); * RBS-21 West San Juan bighorn sheep DAU Plan; * Colorado Bighorn Sheep management Plan 2009-2019; and * State Wildlife Action Plan (2015)."

**Summary:**

The PRMP/FEIS is in violation of FLPMA because it fails to include or incorporate all State, local, and tribal plans or provide a clear rationale describing why the desired conditions, goals, and objectives in these plans are not addressed in the PRMP/FEIS.

**Response:**

Section 202 (c)(9) of FLPMA requires that "land use plans of the Secretary under this section shall be consistent with state and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." However, BLM land use plans may be inconsistent with State, local, and tribal plans where it is necessary to meet the purposes, policies, and programs associated with implementing FLPMA and other Federal laws and regulations applicable to public lands (43 CFR 1610.3-2(a)).

In accordance with this direction, the BLM has given consideration to State, local, and tribal plans that are germane to the development of the UFO PRMP/FEIS and addressed inconsistencies to the extent these entities provided notification of such. The BLM has worked closely with State, local, and tribal governments during preparation of the UFO PRMP/FEIS. Chapter 5 of the FEIS describes coordination that has occurred throughout the development of the UFO PRMP/FEIS.

Assessment and protection of source water areas are presented on pages 3-28 through 3-31 of the UFO RMP/EIS. Additional levels of source water protection are discussed on pages 4-84 and 4-85 of the UFO RMP/EIS. Furthermore, compliance with the Clean Water Act, the Colorado River Salinity Control Act, the Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration, and application of site-specific best management practices (BMPs) and stipulations contained in Appendix B of the UFO RMP would reduce impacts on water resources. Furthermore, the Colorado Oil and Gas Conservation Commission has regulations on setbacks from designated source water protection areas. The BLM considers these and ensures development proposals are consistent with these rules and enforced Federal regulations.

Gunnison County's comment letter submitted on the Draft Environmental Impact Statement (DEIS) did not mention any of the regulations noted in its protest letter (i.e., the Gunnison County regulations for Special Development Projects, the regulations for Oil and Gas Operations, and the Gunnison County Coal Resource Special Area Coal Mining regulations), nor has the UFO been made aware of these plans by the County to date. In accordance with 43 CFR 1610.3-2, State Directors and Field Managers shall, to the extent practicable, keep apprised of State and local governmental and Indian tribal policies, plans, and programs, but they shall not be accountable for ensuring consistency if they have not been notified, in writing, by State and local governments or Indian tribes of an apparent inconsistency.

Colorado Senate Bill 19-181 does not yet have written regulations associated with it in order to provide for consistency.

The Ouray County protest letter makes the general statement that the RMP/Final EIS is "fatally flawed because it does not consider - much less align with - fundamental Ouray County regulatory regimes." FLPMA does not require alignment with local plans and allows for inconsistency with State, local, and tribal plans where it is necessary to meet the purposes, policies, and programs associated with implementing FLPMA and other Federal laws and regulations applicable to public lands (Section 202(c)(9)). The BLM did consider Ouray County regulatory regimes that are germane to the development of the UFO PRMP/FEIS. As an example, the Ouray County letter sent on the DEIS makes several references to land disposals described in the Ouray County Master Plan. The BLM addressed lands "available for disposal" in the RMP/FEIS (see Table 2-1, Lands and Realty; Table 2-2, Line 60). Legal descriptions of lands available for disposal are provided in Appendix N of the RMP/FEIS. Importantly,

BLM_0167302

while these tracts of public land have been found to meet criteria for disposal in accordance with FLPMA (Section 203 and/or Section 206) during this land use planning effort, the identification of a public land tract as having met FLPMA criteria for disposal is not, in itself, a decision to dispose of public lands. The BLM would evaluate any future disposal actions on a case-by-case basis under project-specific National Environmental Policy Act (NEPA) and appropriate regulations. By regulation, a Notice of Realty Action or Notice of Exchange Proposal must be published in the *Federal Register* for all tenure actions. There are no official plans to dispose of public lands within the UFO RMP Planning Area.

A list of the local, State, and tribal plans that the BLM considered can be found in Section 1.7 of the FEIS. The agency will discuss why any remaining inconsistencies between the UFO PRMP/FEIS and relevant local, State, and tribal plans cannot be resolved in the Record of Decision for the UFO PRMP.

## FLPMA – Unnecessary or Undue Degradation

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura
**Issue Excerpt Text:** FLPMA's unnecessary and undue degradation requirements are distinct from requirements under NEPA. "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." Ctr. for Biological Diversity, 623 F.3d at 645 (quoting Kendall's Concerned Area Residents, 129 I.B.L.A. 130, 140 (1994)). In the instant case, the UFO's failure to specifically account for UUD in the RMP and EIS - which is distinct from its compliance under NEPA - is also actionable on procedural grounds. Conservation Groups addressed this issue in their Comments on the DEIS, at p. 186.

**Summary:**

The BLM failed to specifically account for unnecessary or undue degradation in the RMP and EIS.

**Response:**

Section 302(b) of FLPMA requires that "in managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." The PRMP/FEIS provides for the balanced management of the public lands in the Planning Area. In developing the PRMP/FEIS, the BLM complied with its planning regulations (43 CFR 1610), the requirements of NEPA, and other statutes, regulations, and Executive Orders related to environmental quality. The PRMP/FEIS identifies appropriate allowable uses, management actions, and other mitigation measures that prevent the unnecessary or undue degradation of public lands. It does not authorize any use of the public lands, much less any that would result in unnecessary or undue degradation.

Congress recognized that through the BLM's multiple-use mandate, there would be conflicting uses and impacts on the public land. Because the PRMP/FEIS would not specifically authorize any uses of public lands, and the alternatives evaluated in the FEIS comply with all applicable statutes, regulations, and policies, the PRMP/FEIS will not result in "unnecessary or undue degradation of the lands" under Section 302(b) of FLPMA.

BLM_0167303

# NEPA – Purpose and Need

**UFORMP-080_ClabbersN_20190728**
**The Wilderness Society**
*Clabbers, Nicholas*
**Issue Excerpt Text:** In the Proposed RMP/FEIS, BLM silently abandoned the purpose and need statement that was articulated in the Draft RMP/EIS and adopted a new one that is inadequate. Compare Draft RMP/EIS at 1-2 with Proposed RMP/FEIS at 1-1. As an initial matter, although the Proposed RMP/FEIS claims that changes between the Draft and Final EIS had been identified through shaded text, it did not do so with the changes to the purpose and need statement. See id. As a result, BLM misled the public by concealing the changes to readers who relied on BLM's statement that the agency flagged changes from the draft with shaded text. Moreover, the final purpose and need statement is inadequate for several reasons. First, it eliminated the Draft RMP/EIS's stated purpose "to provide broad-scale direction for the management of public lands and resources" in the planning area but failed to replace it with any specific purpose for the Uncompahgre RMP. See Proposed RMP/FEIS at 1-1 (stating only why RMPs are revised "[i]n general"). Second, it narrowed the need to revise the RMP from addressing "new information, revised laws and policies, emerging issues, and changed circumstances and resource conditions" to "ensure compliance with current mandates and to address issues that have arisen since their preparation." Compare Draft RMP/EIS at 1-2 with Proposed RMP/FEIS at 1-1. BLM provided no rational explanation for excluding new information, changed circumstances, and resource conditions from the enumerated factors that resulted in the need to revise the RMP. Due to the critical role that the purpose and need statement plays in the evaluation and selection of alternatives, these changes were not harmless and do not comply with NEPA.

**Summary:**

BLM modified the purpose and need statement between the DEIS and FEIS and narrowed the scope without providing an explanation for the change.

**Response:**

In accordance with NEPA, the BLM has discretion to establish the purpose and need for a proposed action (40 CFR 1502.13). The BLM must construct its purpose and need to conform to existing decisions, policies, regulations, or laws (BLM Handbook H-1790-1, Section 6.2).

The purpose and need may not be so narrow that only one alternative becomes a foreordained outcome and may not be so broad that an infinite number of possibilities could accomplish the goals of the project. The purpose and need statement for the UFO RMP planning process provides the appropriate scope to allow the BLM to analyze a reasonable number of alternatives that represent alternative approaches for managing the public lands in the Planning Area.

The purpose and need statement established by the BLM for the UFO RMP planning process was edited between the DEIS and FEIS. These edits, which were made for readability and organization, did not substantially alter the purpose and need statement or narrow the scope. Furthermore, the purpose and need statement presented in the DEIS Executive Summary was simply carried forward into the FEIS Executive Summary and FEIS Chapter 1, as the BLM believed it represented a more clear version of the text provided in DEIS Chapter 1.

BLM_0167304

## *NEPA – Range of Alternatives*

*UFORMP-022_BaumgartenD_20190725*
**Board of County Commissioners of Gunnison County**
*Baumgarten, David*
**Issue Excerpt Text:** Section 1-2 states: "The Curecanti National Recreation Area is withdrawn to the US DOI, BOR and managed by the NPS under a Memorandum of Understanding between NPS and BOR. Curecanti National Recreation Area is within the planning boundary until legislation supersedes. BOR's withdrawn lands with the boundary are withdrawn from appropriation under the US mining laws, and the area is not closed to fluid mineral leasing or mineral materials disposal." * The Curecanti Unit which includes both the Black Canyon of the Gunnison National Park and the Curecanti National Recreation area are contemplated in the Proposed RMP/Final EIS under Alternative E to be open for fluid mineral leasing which would be a drastic and wholesale change from previous drafts and the BLM policies and would lead to certain precedence across the nation as to the ability for the DOI to allow for extractive industry to lease land within national parks, monuments and other federal recreation areas. This change is certainly against the desire of the citizens of the United States who overwhelmingly support preservation of these national treasures. It is almost unfathomable that fluid mineral leasing and mineral materials disposal would be considered available in one of the headwater water supply reservoirs that serve the downstream states of the Colorado River.

*UFORMP-022_BaumgartenD_20190725*
**Board of County Commissioners of Gunnison County**
*Baumgarten, David*
**Issue Excerpt Text:** The Fluid mineral leasing acreage in the newly proposed Alternative E, retains the same open and closed acreage as Alternative A, the current condition. The current RMP predates the concerns for lynx, Gunnison Sage-grouse and many new conditions that have developed, including new science and data regarding climate change. There is no explanation for the changes in the newly proposed Alternative E. The acreage identified for NSO is severely cut in the new alternative. Omission of stipulations NL-8 (Page B-9), NSO-6/SSR-8 (Page B-17), NSO-9/SSR-11 (Page B-18), NSO-11/SSR-13 (Page B-19), NSO-19/SSR-16 (Page B-23), NSO-31/SSR-32 (Page B-128), NSO-69 (Page B-52), CSU-16 (Page B-63), and CSU-23/SSR-26 (B-67) are inadequate for protection of special resources. REQUESTED REMEDY: Chapter 2, Pages 2-8 and 2-11, under the headers of Fluid Mineral Leasing, Restrictions for Surface-disturbing Activities, and Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals with the contents of Appendix B: Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities constitute an entirely new Alternative. BLM needs to allow public comment and reconsider Cooperating Agency input for this new Alternative E which severely degrades protections for hydrologic, aquatic, riparian, water supply resources, as well as cultural and wildlife resources. Colorado Parks and Wildlife guidelines and standards need to be followed.

*UFORMP-022_BaumgartenD_20190725*
**Board of County Commissioners of Gunnison County**
*Baumgarten, David*
**Issue Excerpt Text:** The fluid mineral leasing acreage in the newly proposed Alternative E appears to retain the same open and closed acreage as Alternative A, the current condition. However, the current RMP predates the concerns for lynx, the listing of the Gunnison Sage-grouse as a "threatened species," and many new conditions that have developed, including new science and data regarding climate change. And, the acreage identified for NSO is severely reduced in Alternative E. Omission of certain stipulations are inadequate for protection of special resources. Gunnison County, as a Cooperating Agency, has been denied the opportunity to comment on the new Proposed Alternative E in the Proposed RMP/Final EIS. It is unclear how the proposed actions in the Proposed RMP/Final EIS were contemplated by the BLM's referenced BA, which has not been made available, or contemplated by the USFWS's BO, referenced in

BLM_0167305

the Proposed RMP/Final EIS as having been signed on December 17, 2018, but also not provided for review.7 The Proposed RMP/Final EIS was published in the Federal Register on June 28, 2019.

## UFORMP-102_KingL_20190728
## Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** A Comparative Summary of Alternatives is presented in Table 2-1. FEIS 2-6. It shows that many resource uses were considered, including coal and fluid minerals, but, other than addressing ROWs and utility corridors generally, the table plainly illustrates how the Alternatives considered fail to incorporate renewable energy as a resource. The FEIS fails to even list renewable energy development as an Alternatives Considered but Eliminated from Detailed Analysis. FEIS 2-15 to 2-18. On the other hand, the FEIS provides an extensive look at coal and fluid minerals leasing. FEIS 4-236 to 4-273. The Uncompahgre Field Office also conducted an extensive Reasonably Foreseeable Development Scenario report for oil and gas development in 2012.6

Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that the demand for renewable energy ROWs ""would increase over the life of this RMP."" FEIS 4-312. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in 6 Uncompahgre Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, 2012, available at https://eplanning.blm.gov/epl-frontoffice/projects/nepa/66641/81689/95910/UncompahgreRFD_Feb2012.pdf (previously attached as Exhibit 40) (""UFO RFD""). 7 Uncompahgre Field Office, ""Renewable Energy Potential Report,"" Resource Management Plan Revision and Environmental Impact Statement, May 2010, available at: https://eplanning.blm.gov/epl-frontoffice/projects/lup/62103/78800/90467/UFO_RenewEnergy_05-25-2010_508.pdf (previously attached as Exhibit 39). 8 Id. at 3-5. CONSERVATION GROUPS' PROTEST UNCOMPAHGRE FIELD OFFICE PRMP AND FEIS 15 the planning area, stating that: ""Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential."" FEIS 3-117. The FEIS further states that ""the demand for renewable energy-related ROWs should increase nationally, although within the Planning Area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM."" FEIS 3-118. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy."

### Summary:

The BLM did not adequately consider public comment on the range of alternatives or allow for public comment and cooperating agency input during development of the PRMP (Alternative E). BLM failed to consider renewable energy potential and should consider an alternative with greater constraints on fluid mineral leasing for the protection of other resources.

### Response:

NEPA requires an agency preparing an EIS to rigorously explore and objectively evaluate all reasonable alternatives and, for alternatives that were eliminated from detailed study, to briefly discuss the reasons for their having been eliminated (40 CFR 1502.14(a)). When there are potentially a very large number of alternatives, the BLM may only analyze a reasonable number to cover the full spectrum of alternatives (BLM Handbook H-1790-1, Section 6.6.1 quoting Question 1b, Council on Environmental Quality [CEQ], Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981).

BLM_0167306

The BLM developed a reasonable range of alternatives that meet the purpose and need of the UFO PRMP/FEIS and that address resource issues identified during the scoping period. The UFO PRMP/FEIS analyzed six alternatives, which are described in Section 2.3 of the UFO PRMP/FEIS. The alternatives analyzed in the UFO PRMP/FEIS cover the full spectrum by varying in: (1) degrees of protection for each resource and use; (2) approaches to management for each resource and use; (3) mixes of allowable, conditional, and prohibited uses in various geographic areas; and (4) levels and methods for restoration.

As noted in Section 2.5 (*Considerations in Selecting a Preferred Alternative*) of the UFO Draft RMP/EIS, the range of alternatives offers strategies for resolving deficiencies in existing management and addresses issues identified through internal assessment and public scoping. Comments submitted by other government agencies, public organizations, State and tribal entities, and interested individuals were given careful consideration. Public scoping efforts enabled the BLM to identify and shape significant issues pertaining to recreational opportunities, wildlife habitat, mineral exploration and development, cultural resources, grazing, land tenure, potential ACECs, public land access, and other program areas. Cooperating agencies and the Southwest Resource Advisory Council Subgroup reviewed and provided comments at critical intervals during the alternative development process. Appendix R (*Comment Summary and Response Report*) of the UFO PRMP/FEIS describes the public comment and response process to finalize the EIS.

Per its enabling legislation found in PL106-76 (October 21, 1999), the Black Canyon of the Gunnison National Park is "withdrawn from all forms of entry, appropriation or disposal under the public land laws; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing." As noted on page 1-2 of the UFO PRMP/FEIS, "The Curecanti National Recreation Area (CURE) is withdrawn to the U.S. DOI, Bureau of Reclamation (BOR) and managed by the National Park Service (NPS) under a Memorandum of Understanding between NPS and BOR. CURE is within the planning boundary until legislation supersedes; BOR's withdrawn lands within the boundary are withdrawn form appropriation under the U.S. mining laws, and the area is not closed to fluid minerals leasing or mineral materials disposal." While the current UFO RMP does not make decisions on fluid leasing or mineral materials disposal in the CURE, Alternative E, Agency-Proposed Alternative, of the PRMP/FEIS includes a stipulation that prohibits surface occupancy and use within the boundaries of the CURE (p. B-45). Additionally, under all alternatives, the CURE would remain closed to coal leasing, in accordance with congressional mandates (FEIS p. 4-244).

As part of the planning effort, the BLM prepared a Renewable Energy Potential Report (2010) to identify the potential for development and potential locations of renewable energy on lands administered by the UFO. In addition, and in cooperation with the National Renewable Energy Laboratory, the BLM assessed renewable energy resources on public lands in the western U.S. The BLM reviewed the potential for concentrated solar power, photovoltaics, wind, and biomass energy on BLM, Bureau of Indian Affairs, and National Forest System lands in the western U.S., except Alaska. In December 2005, the BLM signed a Record of Decision for the Wind Programmatic EIS. In October 2012, the BLM signed a Record of Decision for the Solar Energy Development Programmatic EIS. These documents served as the baseline for analysis of renewable energy resources in the UFO PRMP/FEIS. Renewable energy potential within the Planning Area, excluding right-of-way exclusion areas, the Tabeguache Area, and wilderness study areas are discussed in Section 3.2 of the UFO PRMP/FEIS. Importantly, all action alternatives of the UFO PRMP/FEIS allow for renewable energy project development and operation, except in right-of-way exclusion areas and areas identified as exclusion in Table 2-3 (Renewable Energy Exclusion and Avoidance Areas).

BLM_0167307

## NEPA – Range of Alternatives – Coal production

**UFORMP-102_KingL_20190728**
**Western Environmental Law Center**
**King, Laura**
**Issue Excerpt Text:** Notably, the final EIS indicates that nearly all of the coal production in the resource area will come from a 40,000 acre area that is almost entirely open to leasing under each alternative: the Somerset coal field. FEIS at 4-454; S-104-289 ("Coal production would not change across alternatives even though there are differences in the number of acres. That is because production is expected to come from one mine, and those acres of federal coal are currently leased.") The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining-which BLM failed to do, in violation of NEPA. Conservation Groups here reiterate their previous request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in the resource area over the 20-year life of the plan, and another that will eliminate new coal leasing.

### Summary:

The BLM failed to provide a range of alternatives for the coal program.

### Response:

The BLM must analyze a reasonable range of alternatives, but not every possible alternative, to a proposed action: "In determining the alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative. 'Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant'" (BLM NEPA Handbook, H-1790-1, at 50, citing Question 2a, CEQ, Forty Most Asked Questions Concerning CEQ's NEPA Regulations, March 23, 1981; see also 40 CFR 1502.14).

The BLM developed a reasonable range of alternatives that meet the purpose and need of the UFO RMP and that address resource issues identified during the scoping period. The PRMP/FEIS analyzed five alternatives and a partial alternative, which are described in Section 2.3. The alternatives analyzed in the PRMP/FEIS cover the full spectrum by varying in: (1) degrees of protection for each resource and use; (2) approaches to management for each resource and use; (3) mixes of allowable, conditional, and prohibited uses in various geographic areas; and (4) levels and methods for restoration. The BLM considered areas acceptable/unacceptable for coal leasing based on the other resource values or land uses that would be protected through closure (see Table 2-2, Solid Leasable Minerals (coal), pp. 2-64 to 2-65; Table 4-16, Quantitative Impacts on Coal Leasing, p. 4-245). This includes but is not limited to wilderness study areas, surface water supplies, state wildlife areas, special recreation management areas, ACECs, and other important resource areas. The resource values protected through closures vary between alternatives. Areas determined to be acceptable for coal leasing in the RMP would be further evaluated prior to any future exploration or leasing. An alternative that would prohibit coal leasing throughout the Decision Area was considered but eliminated from detailed analysis because it would not meet the purpose and need for the RMP, part of which is management direction in accordance with principles of multiple use and sustained yield (see Section 2.4.3, p. 2-16).

New coal leases and development would be affected by an increase in the amount of lands allocated as unacceptable for coal leasing and development and unsuitable for surface mining and surface mining operations. Coal exploration and development on BLM-administered lands would continue under all alternatives on existing leases including the Somerset coal field, which has the greatest potential for continuing to produce the largest amount of coal in the Planning Area (p. 4-241). In terms of production, the BLM states in the PRMP/FEIS that coal production is expected to remain constant across all

BLM_0167308

alternatives (estimated at 9 to 11 million tons per year) and would not be affected by the planning decisions under consideration (p. 4-240).

The BLM considered a reasonable range of alternatives in the UFO PRMP/FEIS in full compliance with NEPA. This included consideration of an alternative that would prohibit coal leasing throughout the Decision Area, which was eliminated from detailed analysis as described in Section 2.4.4 of the PRMP/FEIS.

## NEPA – Range of Alternatives – Fluid Minerals

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas
Issue Excerpt Text: As in Wilderness Workshop, the BLM should have considered an alternative in the UFO RMP that would eliminate oil and gas leasing in areas with "lower" potential for oil and gas development. Four of the six alternatives considered in the Proposed RMP/FEIS would close only 5% of the 916,030 total acres of federal mineral estate to leasing (Alt. A= 5%, Alt. B = 24%; Alt. B1= 33.5%; Alt. C=5%; Alt. D=5.5%; Alt. E=5%), even though, in each alternative, a significant portion of the areas left open to development have a "lower potential" for development: Lower Potential Areas Left Open to Development Alt. A = 412,150 acres (47%) Alt. B = 353,720 acres (48%) Alt. B1 = 287,570 acres (46%) Alt. C = 412,150 acres (47%) Alt. D = 410,600 acres (47%) Alt. E = 433,230 acres (50%) Proposed RMP/FEIS at Tables 4-18, 4-21, 4-24, 4-26, 4-29, 4-32. This is hardly "provid[ing] legitimate consideration to alternatives that fall between the obvious extremes" as required by Dombeck. 185 F. 3d at 1175.

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas
Issue Excerpt Text: Proposed RMP/FEIS at 4-266 - 4-267. BLM appears to argue that restrictions may limit or minimize development, and so the Proposed Action is different because it is more protective of wilderness and/or recreational values. But there is a significant difference between closing an area - which provides certainty - and applying stipulations that are subject to waiver, exception, and modification. Moreover, this is hypothetical, and as the court in Wilderness Workshop pointed out, what is certain is that even if there is minimal chance of development, leasing these lands would detract from BLM designating them for other uses. 342 F. Supp. 3d at 1166.

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas
Issue Excerpt Text: Similarly, BLM failed to consider a standalone alternative for evaluation of oil and gas allocations based on development potential, as suggested in public comments on the Draft RMP/EIS. Protesting Party TWS provided with its comments on the Draft RMP/EIS a proposal for an updated approach to making oil and gas allocations and management decisions. See Exhibit 4. Under this approach, BLM would prioritize leasing outside of low-potential areas to avoid land-management conflicts later in time and to confer significant public benefits including increased economic return and opportunities to fulfill other objectives of its multiple-use mission. The methodology suggested by TWS would have BLM map oil and gas potential across the planning area, define areas of high/medium/low/no resource conflict, make allocations for areas with high and medium oil and gas development potential, and make allocations for areas with low or no oil and gas potential. This approach, TWS contended, would better reflect the BLM's multiple use and sustained yield mandate, lead to development of more balanced RMPs, and reduce conflict and costs associated with speculative leasing.

BLM_0167309

*UFORMP-102_KingL_20190728*
***Western Environmental Law Center***
*King, Laura*
**Issue Excerpt Text:** Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14. BLM claims that "a full closure to fluid mineral leasing alternative was not carried forward because the BLM has no suitable thresholds or standards to measure and compare the significance of impacts related to greenhouse gas emissions under that alternative relative to other alternatives." FEIS at 2-16. This excuse is inadequate under NEPA. BLM also does not address why it could not consider a "limited leasing" alternative. In fact, as Conservation Groups have explained, there are multiple scientifically robust methods to meaningfully disclose the impact of greenhouse gas emissions. One such tool is the social cost of carbon, which was "designed to quantify a project's contribution to costs associated with global climate change." High Country Conserv. Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174, 1189-90 (D. Colo. 2014). Specifically, the social cost of carbon protocol is a valid, well-accepted, credible, and interagency-endorsed method of calculating the costs of greenhouse gas emissions and understanding the potential significance of such emissions.4 The protocol is just the sort of tool that can be used as a proxy for understanding climate impacts and to compare alternatives, as required by NEPA. See 40 C.F.R. § 1502.22(a) (stating agency "shall" include all "information relevant to reasonably foreseeable significant adverse impacts [that] is essential to a reasoned choice among alternatives").

*UFORMP-102_KingL_20190728*
***Western Environmental Law Center***
*King, Laura*
**Issue Excerpt Text:** In rejecting a "no leasing alternative," BLM also states that "The Mineral Leasing Act (30 US Code 226) gives BLM the authority to lease and manage federal fluid mineral leases." But BLM fails to acknowledge that it also has legal authority under FLPMA, the MLA and NEPA to adopt a no-leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing.

*UFORMP-102_KingL_20190728*
***Western Environmental Law Center***
*King, Laura*
**Issue Excerpt Text:** As Conservation Groups urged in their comments on the Draft RMP/Draft EIS (attached as Exhibit 1-1) at pp. 22-28, BLM must also consider "no leasing" or "limited leasing" alternatives in light of the best available information and science, and in consideration of national policy. BLM failed to do so. Instead, all of the final EIS alternatives, including the new "agency-proposed" alternative E, propose to leave available extensive lands for fossil fuel leasing and development. FEIS at 2-8. BLM's range of alternatives fails to satisfy its statutory obligations under FLPMA and NEPA.

*UFORMP-102_KingL_20190728*
***Western Environmental Law Center***
*King, Laura*
**Issue Excerpt Text:** Even with only one operating oil and gas well, the UFO's Crawford Population has been in dramatic decline from 2000 through 2012, and had to be supplemented with birds from the Gunnison Basin in 2011 through 2013.176 BLM manages approximately 63% of the remaining occupied habitat for this population, as well as 13% of occupied habitat. Despite the precarious status of the Crawford Population in particular, the UFO DEIS fails either to take a hard look at the extensive science showing relationship between oil and gas density and sage-grouse population decline, or to consider any alternative that would either limit density of development or exclude oil and gas entirely from Gunnison sage-grouse occupied and/or suitable habitat. Given that 63% of the Crawford Population's remaining

BLM_0167310

habitat is on BLM land with "moderate" oil and gas decisions, BLM's failure to consider a no-leasing alternative for that area foregoes an opportunity to foster recovery and to eliminate a significant threat to the extirpation of one of the few remaining populations of Gunnison sage-grouse.

**UFORMP-030_McGuireE_20190727**
**Desert Weyr, LLC**
**McGuire, Eugenie**
**Issue Excerpt Text:** Without considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if include in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

**Summary:**

The BLM failed to consider a standalone alternative for evaluation of oil and gas allocations based on development potential, as suggested in public comments on the Draft RMP/EIS, and failed to consider "no leasing" or "limited leasing" alternatives. The BLM failed to consider any alternative that would either limit the density of development or exclude oil and gas entirely from the declining Crawford population of Gunnison sage-grouse occupied and/or suitable habitat. The BLM's range of alternatives fails to satisfy its statutory obligations under FLPMA and NEPA.

**Response:**

Agencies are allowed to dismiss an alternative from detailed analysis (40 CFR 1502.14). The agency must briefly discuss the reasons for having dismissed the alternative from detailed analysis (40 CFR 1502.14). An alternative may be eliminated from detailed study if it is determined not to meet the proposed action's purpose and need; it is determined to be unreasonable given the BLM mandates, policies, and programs; it is substantially similar in design to an alternative that is analyzed; its implementation is speculative or remote; or it is technically or economically infeasible (BLM Handbook, H-1790-1, Section 6.6.3).

The BLM considered but eliminated from detailed analysis alternatives that proposed exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses (Section 2.4). This included an alternative that would prohibit fluid mineral leasing throughout the Decision Area (Section 2.4.3). All of the alternatives propose closure of areas to fluid mineral leasing based on policy or legislation, or when is has been determined that resource values cannot be adequately protected even with restrictive lease stipulations. Resource values that can only be protected by prohibiting all fluid mineral leasing throughout the Decision Area have not been identified by the BLM. An alternative prohibiting fluid mineral leasing throughout the Decision Area would also not meet the purpose of and need for the RMP, part of which is management direction in accordance with principles of multiple use and sustained yield.

Each alternative analyzed in detail allowed for some level of support, protection, or use of all resources in the Planning Area. In some instances, the alternatives analyzed in detail did include various considerations for eliminating or maximizing individual resource values or uses in specific areas where conflicts existed. In regard to the alternatives considered for special status species, the BLM analyzed a range of limitations on oil and gas development across Alternatives A through E. For example, under Alternative B, the BLM considered a no surface occupancy (NSO) stipulation within habitat for federally listed wildlife and bird species such as the Gunnison sage-grouse to protect all known and currently occupied core habitats for federally protected species, in accordance with the ESA. Under Alternative D, the BLM analyzed NSO to protect all known and currently occupied core habitats for federally protected species to maintain the integrity of habitat for federally listed, proposed, or candidate threatened or endangered wildlife species and promote recovery of the species. The alternatives also evaluated timing limitations, CSU restrictions, and conditions of approval that would minimize impacts on resource values including Gunnison sage-grouse. Regarding the declining Crawford Gunnison sage-grouse population,

BLM_0167311

the bird's occupied critical habitat is entirely within the Gunnison Gorge National Conservation Area RMP Planning Area; there are small, isolated pieces of BLM-administered land within potential (unoccupied) critical habitat within the UFO RMP Decision Area.

The BLM considered alternatives proposed by the public, including the alternative for evaluation of oil and gas allocations based on development potential, as suggested in public comments on the Draft RMP/EIS, and documented the reason for dismissing the alternative from detailed study in Appendix R (p. R-456) of the UFO PRMP/FEIS. Additionally, Alternative B.I was developed from a resource-based set of recommendations provided by a community group and would close certain areas to oil and gas leasing and impose development setbacks with strict surface use restrictions in the North Fork and Smith Fork drainages of the Gunnison River (see p. 2-5 of the UFO RMP). The BLM's fluid minerals alternatives contain varying options for protection of resources, resulting in varying impacts that can be compared among all alternatives analyzed in the EIS. This includes direct and indirect impacts on sensitive resources, such as wildlife habitat, recreation areas, and sensitive water resources, as well as the analysis contained in the RFD scenario regarding potential development on UFO-administered lands, including the cumulative impacts of fluid mineral lease development in the UFO. Future technologies could change the fluid minerals development potential assumptions, making areas viable in the future; therefore, current development potential alone was not used to allocate closures to fluid minerals.

The BLM properly considered all alternatives submitted by the public and, consistent with 40 CFR 1502.14, the BLM properly dismissed an alternative that would prohibit fluid mineral leasing throughout the Decision Area from detailed analysis in the UFO RMP.

## NEPA – Selection of a New Alternative without Public Input

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas
**Issue Excerpt Text:** BLM added and selected a new alternative - Alternative E - in the Proposed RMP/FEIS without providing an opportunity for public comment, even though Alternative E was significantly different from alternatives in the draft. Alternative E included "substantial changes" to the proposed action and constituted "significant new circumstances" that required BLM to prepare a supplemental draft EIS. See W. Expl., LLC v. U.S. Dept. of the Int., 250 F. Supp. 3d 718, 748 (D. Nev. 2017) (finding that changes in conservation protections for large swaths of lands constituted a "substantial change" relevant to environmental impacts that warranted an SEIS). BLM misled the public about the scope of these changes, downplaying them as merely a "reasonable combination" of the original alternatives. Proposed RMP/FEIS at 2-5. Absent preparation of a supplemental EIS, BLM has deprived the public of an opportunity to review and comment on Alternative E before the agency issued a Proposed RMP/FEIS, in violation of NEPA's mandates. This also violated BLM's obligation to provide "substantial treatment to each alternative" in a way that allowed reviewers to "evaluate their comparative merits" during the public comment process. See 40 C.F.R. §1502.14(b), (e).

### UFORMP-092_McCluskieJ_20190728
### Colorado House of Representatives
### McCluskie, Julie
**Issue Excerpt Text:** The BLM's decision to create a wholly new and dramatically different "Alternative E", and to offer the new Alternative as the Proposed Alternative is extremely disappointing in light of those 42,000 no-leasing comments, and a clear violation of the intent of the National Environmental Policy Act (NEPA). NEPA guarantees that the public will have "meaningful opportunities" to comment on the entire range of alternatives. My constituents have the right to comment on all reasonable alternatives, and the BLM's decision here violates that right. Presenting Alternative E to the public without an opportunity for public input during the final protest period is unacceptable.

BLM_0167312

**UFORMP-122_TuddenhamK_201907**
**Sheep Mountain Alliance**
*Tuddenham, Karen*
**Issue Excerpt Text:** A 30-day comment period is insufficient for interested parties to read through and examine the proposed RMP in depth, particularly when materials such as map files were not publicly available for the majority of the 30-day period. In addition, in contravention of its own recommendations for the agency's preferred alternative (Alternative D) in the draft RMP, the BLM adopted an entirely new alternative, Alternative E, without providing opportunities for public comment and input. During the 2016 draft RMP process, the agency received over 50,000 comments, the majority of which supported reduction of oil and gas leasing, and many of which recommended the adoption of alternative B.1 (the North Fork Alternative Plan). The agency has summarily dismissed this plan, despite the public support and input into the process that created it. This is unacceptable.

**UFORMP-022_BaumgartenD_20190725**
**Board of County Commissioners of Gunnison County**
*Baumgarten, David*
**Issue Excerpt Text:** Alternative E inappropriately contains lands identified "for disposal" that are within 4 miles of a Gunnison Sage-grouse lek, are adjacent to or intersecting Gunnison Sage-grouse critical habitat, or are adjacent to private land conserved for Gunnison Sage-grouse habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation. Gunnison County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the protest period or for the 2016 DRMP/DEIS. REQUESTED REMEDY: A full "comment" opportunity is necessary to address these concerns.

**UFORMP-074_HollenbeckH_20190729**
**Ouray County**
*Hollenbeck, Hannah*
**Issue Excerpt Text:** The overarching - and procedurally fatal - flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA. FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process. 43 U.S.C. 1701 (a)(5); 43 C.F.R. 1610.2. The disregard of NEPA and FPlMA has denied to Ouray County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BlM process that resulted in the Proposed RMP/Final EIS. "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public." W. Org. of Res. Councils V. the BLM, 591 F. Supp. 2d 1206, 121B n,2 (D. Who. 200B), citing California v. Block, 690 f, 2d 753, 770 (91h Cir. 19B2).

**UFORMP-074_HollenbeckH_20190729**
**Ouray County**
*Hollenbeck, Hannah*
**Issue Excerpt Text:** In addition, the creation of a wholly new Alternative E - with neither notice to Ouray County nor an opportunity for Ouray County to comment - is in direct contradiction to the BlM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Ouray County are accounted for and that [Ouray County will be] meaningfully engaged in the ... resource management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Ouray County to participate "to the fullest extent possible" in the development of the Proposed RMPlFinal EIS. This obligation is also set out in FLPMA, in the BLM's obligation to provide for "meaningful" input and "early" notice to local governments with affected lands and regulations, like Ouray County. While the BLM states that "(t}he policy 01 the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the

BLM_0167313

RMP/EIS," (Proposed RMP/Final EIS, Vol. 1, ES-l), the BlM has created - in the Proposed RMP/Final EIS - a wholly new Alternative E that thwarts the opportun~y for such participation. REQUESTED REMEDY: Ouray County asserts that the only solution to this overarching and procedurally fatal flaw in the Proposed RMP/Final EIS is to provide a full "comment" opportunity. This is also required by NEPA, based on the new alternative that has been created through the BLM's creation of Alternative E without sufficient explanation other than an oblique reference to its new policies but fundamentally changed the overall approach to management throughout the planning area. 40 C.F.R. § 1502,9(c)(l )(i)(supplemental NEPA analysis, including an opportunity for comment, is required if an "agency makes substantial changes in the proposed action that are relevant to environmental concems"); see also N.M. ex reI. Richardson, 565 F.3d at 705.

### UFORMP-074_HollenbeckH_20190729
### Ouray County
#### Hollenbeck, Hannah
**Issue Excerpt Text:** Alternative E inappropriately contains lands identified "for disposal" that are adjacent to or intersecting Ouray Sage-grouse critical habitat, or the disposal of which would conflict with existing user access to public or private lands, or water rights and irrigation. Ouray County further protests the fact that the BLM did not timely or publicly make identification of these lands available for the protest period or for the 2016 DRMP/DEIS.

### UFORMP-076_KnightK_20190728
### Town of Paonia
#### Knight, Kenneth
**Issue Excerpt Text:** First, it is improper, and a violation of the National Environmental Policy Act for the BLM to publish an entirely new alternative here in this final proposed RMP. Alternative E, the proposed RMP, is wholly new. It has not been subject to any public comments or review. When the Town of Paonia commented on the Draft EIS for this RMP, we were unable to comment on Alternative E, because it did not exist. To offer a proposed RMP that has been subject to no public comment is unacceptable, doubly so when the new alternative is directly contrary to the comments submitted by over 40,000 members of the public, and the Town of Paonia.

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
#### Baumgarten, David
**Issue Excerpt Text:** The overarching - and procedurally fatal - flaw in the Proposed RMP/Final EIS is the development of a wholly new Alternative E in disregard of the requirements of NEPA and FLPMA. FLPMA requires the BLM to ensure that the views of the general public and third-party participation are adequately incorporated into the land planning process. 43 U.S.C. 1701(a)(5); 43 C.F.R. 1610.2. The disregard of NEPA and FPLMA has denied to Gunnison County the "meaningful opportunities" guaranteed by those laws to participate in the iterative BLM process that resulted in the Proposed RMP/Final EIS. "The agency (now) has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public." W. Org. of Res. Councils v. the BLM, 591 F. Supp. 2d 1206, 1218 n.2 (D. Who. 2008), citing California v. Block, 690 f. 2d 753, 770 (9th Cir. 1982).

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
#### Baumgarten, David
**Issue Excerpt Text:** In addition, the creation of a wholly new Alternative E - with neither notice to Gunnison County nor an opportunity for Gunnison County to comment - is in direct contradiction to the BLM's formal recognition, in the MOU, of the "compelling need to ensure that the interests of Gunnison County are accounted for and that [Gunnison County will be] meaningfully engaged in the…resource

BLM_0167314

management planning effort and associated 'EIS'" and the BLM's obligation to create the opportunity for Gunnison County to participate "to the fullest extent possible" in the development of the Proposed RMP/Final EIS. This obligation is also set out in FLPMA, in the BLM's obligation to provide for "meaningful" input and "early" notice to local governments with affected lands and regulations, like Gunnison County. While the BLM states that "(t)he policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS," (Proposed RMP/Final EIS, Vol. 1, ES-1), the BLM has created - in the Proposed RMP/Final EIS - a wholly new Alternative E that thwarts the opportunity for such participation.

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** In the FEIS, BLM includes for the first time a new alternative, Alternative E. While an agency can modify a proposed action in light of public comments, 40 C.F.R. § 1503.4(a), a supplemental EIS is required if BLM makes substantial changes that are relevant to environmental concerns, as it has in adopting the new Alternative E, 40 C.F.R. § 1502.9(c). Therefore, BLM must prepare a supplemental EIS.

*UFORMP-099_MarkwellA_20190728*
*San Miguel County, Colorado*
*Markwell, Amy*
**Issue Excerpt Text:** BLM should rescind the Proposed RMP based on the numerous substantive changes made to the alternatives without public and cooperating agency access to complete supporting materials and GIS files at the initial time of publication. Further supplemental analysis is required. An adequate public comment period is warranted due to the introduction of a new Alternative and lack of supporting documentation for review. All supporting background and data should be publicly available at the beginning of the comment period or protest period. References to the Gunnison Sage Grouse: The failure to make available the Biological Assessment (BA) and Biological Opinion (BO). A lack of clarity on which Alternative the BA and BO analyzed. Inadequate NEPA analysis and protections for Gunnison sage grouse and the designation of a Section 368 Energy Corridor that will negatively impact Gunnison sage grouse populations and habitat.

**Summary:**

The BLM added new content and management to the PRMP/FEIS, including lands identified for disposal, that were not presented in the Draft RMP/EIS and available for public review and comment. The BLM added and selected a new alternative—Alternative E—without providing an opportunity for public comment.

**Response:**

NEPA requires agencies to prepare supplements to either a draft or final EIS if the agency makes substantial changes to the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 CFR 1502.9 (c)). "Substantial changes" in the proposed action relevant to environmental concerns are changes that would result in significant effects outside the range of effects analyzed in the draft or final EIS (BLM Handbook H-1790-1, p. 29).

The BLM did introduce Alternative E, the Agency-Proposed Alternative, in the PRMP/FEIS. Importantly, however, Alternative E is a reasonable combination of objectives and actions from the four alternatives (A, B, C, and D) presented in the Draft RMP/EIS. The PRMP includes management actions and allowable uses from Alternatives A, B, C, and D with consideration given to public comments,

BLM_0167315

corrections, and rewording for clarification of purpose and intent. When developing the PRMP, the BLM focused on addressing public comments on the Draft RMP/EIS, while continuing to meet its legal, regulatory, and policy mandates (Section 1.8, pp. 1-9 to 1-10). No change in the range of alternatives is relevant to environmental concerns in the PRMP/FEIS. The BLM determined that there are no new significant circumstances or information relevant to environmental concerns bearing on the proposed plan or its impacts. The BLM adequately responded to public comments on the Draft RMP/EIS.

# NEPA – Best Available Information

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
*Baumgarten, David*
**Issue Excerpt Text:** The "action area" was determined to have the following occupied and unoccupied critical habitat areas: * Table 1. GuSG Habitat on the Uncompahgre4 Field Office Occupied Critical Habitat Population BLM Surface Split Estate Total CSCSM 4,526 8,332 12,858 Crawford 0 0 0 Gunnison 0 0 0 San Miguel 821 6,790 7,610 Total 5,347 15,122 20,469 Unoccupied Critical Habitat Population BLM Surface Split Estate Total CSCSM 3,888 4,375 8,262 Crawford 2,727 4,159 6,887 Gunnison 326 21 347 San Miguel 0 1,228 1,228 Total 6,941 9,784 16,725 4 The source for this table was the USFWS's BO. This information is not available in the Proposed RMP/Final EIS. Because no GIS information has been provided, Gunnison County cannot verify the accuracy of this table. * There is an apparent discrepancy between Table 1 and mapped occupied habitat in the Crawford population. There are at least 5 known leks, all located on the BLM administered lands in the Crawford population. The BO states that "most of this population falls within the Gunnison Gorge National Conservation Area RMP," but GIS mapping indicates that not all does, and Gunnison County is aware that the BLM wildlife biologist from the BLM Uncompahgre Field Office has long been engaged in GuSG conservation activities. Therefore, the accuracy of this table is questionable, and it likely originated from the BLM's BA for the other populations.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
*King, Laura*
**Issue Excerpt Text:** Moreover, Alternative E was presented in the FEIS without all supporting data and files being made publicly and timely available. GIS files for the new alternative were not made available when the protest period was initiated on June 28, 2019. The Proposed RMP/Final EIS states on page ES-1 that "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process." However, there were no GIS data files for the new Alternative E available until July 15, which shortened the meaningful time for comment. Further, the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire UFO decision area across six counties. This scale does not permit effective review of proposed disposal parcels in context. Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner. Additionally, the BLM did not make hard copies of the UFO RMP available for the public to review until well into halfway through the comment period, further frustrating public participation.

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
*Baumgarten, David*
**Issue Excerpt Text:** ALTERNATIVE E WAS PRESENTED IN THE PROPOSED RMP/FINAL EIS WITHOUT ALL SUPPORTING DATA AND FILES BEING MADE PUBLICLY AND TIMELY AVAILABLE. The 30-day Protest period was initiated by the publication of the official Notice of

BLM_0167316

Availability in the Federal Register on Friday, June 28, 2019. On that date, on the federal e-planning website3 there were no GIS files newer than June 23, 2016. Although the Proposed RMP/Final EIS states on page ES-1 "(t)his website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process." There were no GIS data files for the new Alternative E. Further the Proposed RMP/Final EIS maps in Volume II, Appendix A are at a scale that shows the entire Uncompahgre Field Office decision area across six counties. This scale does not permit effective review of proposed disposal parcels in context. Nor does this scale allow for examination of proposed actions and the proposed Alternative E in an informed manner.

**Summary:**

The BLM failed to provide supporting information for review concurrently with release of the UFO PRMP/FEIS.

**Response:**

All protests must be filed within 30 days of the date the U.S. Environmental Protection Agency (EPA) publishes the notice of availability of the FEIS in the *Federal Register* (43 CFR 1610.5-2(a)(1)). The 30-day protest period is prescribed by regulation.

The BLM made the document available at the UFO and on the BLM's ePlanning website the day the EPA published the Notice of Availability in the *Federal Register*, in full compliance with 43 CFR 1610.5-2(a)(1). The BLM made all supporting information available as soon as was practicable; however, the UFO RMP is considered a stand-alone document and its review is not dependent on supporting information.

The protest period for the PRMP/FEIS provided by the BLM was sufficient and, as noted in the *Federal Register* Notice of Availability for the UFO RMP, hard copy documents were available for review at the BLM UFO.

# NEPA – Cooperating Agencies

### UFORMP-096_GibbsD_20190728
### Colorado Department of Natural Resources
### Gibbs, Dan
**Issue Excerpt Text:** In addition to these issues, Colorado wishes to express its concern that the cooperating agencies were not given an opportunity to review and comment on the final PRMP - specifically, the final version of Alternative E. The cooperators were given one day to preview the final version of the PRMP before it was released to the public, triggering the 30-day protest period. In the year that passed between the time that the cooperators saw the first draft of Alternative E in 2018 and its final rollout in June 2019, substantial changes were made to Alternative E, including the elimination of Ecological Emphasis Areas and other changes that appear to favor energy resource development. During that same time period, the Service completed the Biological Opinion for the PRMP, which Colorado had to request from the Service, as BLM did not include it with the PRMP/FEIS. This abrupt rollout has damaged the good will that the UFO staff had been developing post-2016 and made it challenging for the cooperating agencies to review and digest the contents of the final PRMP and FEIS. This process is not consistent with the MOUs signed between the cooperators and the BLM, which require the BLM/UFO to provide the cooperating agency with "meaningful opportunities for participation." Moreover, it is inconsistent with the purpose of the cooperating agency relationship, which is intended to result in better decisions by fostering trust and cooperation between various federal, state, and local governments.

BLM_0167317

**Summary:**

The BLM did not properly involve cooperating agencies in the development of Alternative E, Agency-Proposed Alternative, before the PRMP/FEIS was released.

**Response:**

There is no requirement for how the BLM must involve a particular cooperating agency in the development of a land use planning and NEPA document. The specific role of each cooperating agency is based on jurisdiction by law or special expertise, which is determined on an agency-by-agency basis. The BLM works with cooperating agencies to develop and adopt a Memorandum of Understanding that includes their respective roles, assignment of issues, schedules, and staff commitments (43 CFR 46.225(d)). The UFO signed a Memoranda of Understanding with 18 cooperating agencies at the start of the RMP planning process and operated under these Memoranda of Understanding throughout for the duration of this effort.

All cooperating agencies were given opportunities to participate during various steps of the planning process, including identification of issues and data during scoping, regular briefings, requests for input on draft alternatives in the administrative Draft RMP/EIS, and a presentation of and requests for feedback on the draft proposed alternative presented prior to the BLM and Department of the Interior's review and approval, which resulted in additional changes for consistency with agency policy. Due to newly mandated streamlining efforts and scheduling requirements, the UFO was unable to present the revised proposed alternative to cooperating agencies. However, the BLM did reach out to the cooperating agencies prior to the publication of the PRMP/FEIS to explain the proposed alternative and that it fell well within the range of alternatives presented in the DEIS when it was presented to the cooperating agencies prior to issuance of the UFO PRMP/FEIS. The UFO RMP further describes the participation of cooperating agencies in Chapter 5, *Consultation and Coordination*.

## NEPA – Cumulative Effects – Bighorn sheep

*UFORMP-095_RatnerJ_20190728*
*Western Watersheds Project*
*Ratner, Jonathan*
**Issue Excerpt Text:** BLM fails to consider the cumulative effects of domestic sheep pathogens on bighorn sheep populations within the cumulative impact analysis area. In the last century, bighorn sheep populations have been reduced by more than 90% rangewide as a result of human activities, including the grazing of domestic livestock. Many herds remain small, isolated, and at risk of extirpation. The species has suffered significant and irreversible genetic losses, affecting individual and population fitness, mating success, resilience to disease and disturbance, and the ability to adapt to the effects of climate change. No bighorn sheep herd within the cumulative impact analysis area is secure from the threat of disease posed by domestic sheep on the landscape. The cumulative short- and long-term effects of authorized domestic sheep grazing on bighorn sheep throughout the impact area must be disclosed. This violates NEPA's "hard look" requirement.

**Summary:**

The BLM failed to consider the cumulative effects of domestic sheep on bighorn sheep populations.

**Response:**

The BLM must discuss the cumulative effects of the proposed action and the alternatives when preparing an EIS (BLM Handbook H-1790-1, Section 6.8.3). The CEQ regulations define cumulative effects as "...the impact on the environment which results from the incremental impact of the action when added to

BLM_0167318

other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7).

The cumulative impacts discussion in Section 4.3.6, *Special Status Species*, and Appendix K, *Bighorn/Domestic Sheep Risk of Association Modeling*, identifies relevant actions that were considered in the cumulative impacts analysis, and provides a basis for the cumulative impacts analysis. The cumulative impact analysis considered the effects of the planning effort when added to other past, present, and reasonably foreseeable (not highly speculative) Federal and non-Federal actions. This served as the determining factor for the level of analysis performed and presented. The information presented in the UFO RMP enables the decision-maker to make a reasoned choice among alternatives. The BLM analyzed the impacts on bighorn sheep in Section 4.3.6, *Special Status Species* (see pp. 4-133 through 4-139), the cumulative impacts section, and provided further detail on the potential effect that long-term association (intermingling) with domestic sheep has on bighorn sheep in Appendix K (see p. K-10).

## *NEPA – Cumulative Effects – Fish*

### *UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** One significant foreseeable cumulative impact from oil and gas development occurring adjacent to and in the Uncompahgre planning area are Colorado River water withdrawals necessary for fracking and horizontal drilling techniques. Indeed, millions of gallons of water are withdrawn from the Colorado River for oil and gas extraction, potentially impacting endangered fish in the Gunnison River and Uncompahgre Rivers and communities that rely on this water downstream in the North Fork Valley and elsewhere. BLM must analyze the effects of the massive water demand resulting from relatively new horizontal drilling techniques, such as slickwater fracking, already being deployed in the Gunnison Basin and Upper Colorado River Basin (the "Upper Basin") which would impact watersheds in the Uncompahgre planning area, including (1) the significant cumulative impacts on local water supplies and the Colorado River endangered fish under NEPA and (2) the cumulative impacts of water depletion effects on the Colorado River endangered fish under Section 7 of the Endangered Species Act.

### Summary:

The BLM must analyze the cumulative impacts of water demand resulting from oil and gas development on watersheds specifically for effects on local water supplies and depletions to the Colorado River.

### Response:

The BLM must discuss the cumulative effects of the proposed action and the alternatives when preparing an EIS (BLM Handbook H-1790-1, Section 6.8.3). The CEQ regulations define cumulative effects as "…the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions" (40 CFR 1508.7).

The BLM has complied with the requirements of 40 CFR 1508.7 and prepared a cumulative impact analysis based on the broad nature and scope of the proposed management options under consideration at the land use planning level. The cumulative impact analysis considered the effects of the planning effort when added to other past, present, and reasonably foreseeable (not highly speculative) Federal and non-Federal actions. Water supply and reductions are discussed under the nature and types of impacts in Section 4.3.3, and on page 4-131 in the *Effects Common to All* subsection of Section 4.3.6, *Special Status Species*. The analysis accounted for the relationship between the proposed action and these reasonably foreseeable actions. This served as the determining factor for the level of analysis performed and

BLM_0167319

presented. The information presented in the UFO RMP enables the decision-maker to make a reasoned choice among alternatives. Furthermore, the usage of fresh water in fluid mineral development projects is dependent on many variables that are best known at the site-specific project level and not the broad landscape-level of an RMP. Fresh water use during project development is not necessary in all projects, and would be speculative in an RMP. Unknown variables become apparent at the site-specific level and fresh water usage would then be compared to the relevant programmatic BO and compared cumulatively with other ongoing and potential projects. Any potential exceedances of thresholds contained in the programmatic BO would then require modifications to the proposed development to ensure compliance with the programmatic BO and USFWS's concurrence.

Furthermore, the USFWS noted in the July 2018 BO that the USFWS issued two programmatic Section 7 BOs in western Colorado for Colorado River fishes. The programmatic BOs analyzed water depletions from BLM activities including oil and gas exploration and development on the UFO and addressed adverse effects on the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail, and their respective critical habitats. Based on this analysis, the USFWS concluded that the BLM has fulfilled the Section 7 consultation requirement for water depletions effects on the Colorado River fishes.

## *NEPA – Impact Analysis – Air Quality*

### *UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
### *King, Laura*
**Issue Excerpt Text:** As Conservation Groups previously explained, DEIS Comments (Ex. 1-1) at pp. 99-109, BLM must take a closer look at impacts to air quality. First, BLM may not avoid including winter ozone modeling. BLM's excuse for not including winter ozone modeling-that wintertime ozone formation is not as likely to occur in the Uncompahgre planning area as in other parts of the Rocky Mountain region-is unresponsive. FEIS at R-119. BLM cannot merely summarily dismiss ozone impacts without the support of monitoring or other data. That subverts the purpose of NEPA to look before leaping.

### *UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
### *King, Laura*
**Issue Excerpt Text:** Additionally, the UFO should take a hard look at hazardous air pollutant ("HAP") impacts from the proposed development, including the impacts from 1,3-butadiene and secondary formaldehyde. BLM attempts to excuse its failure to take a hard look at HAPs by saying that "RMP-level impact analyses are broad and qualitative rather than quantitative or focused on site-specific actions," R-329, and that HAPs analyses "are developed at the project level stage." R-118. However, the BLM does not explain why HAPs analysis at the RMP stage is inappropriate or infeasible. On the contrary, there is no reason why HAP analysis may not be conducted at the RMP stage to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. See 40 C.F.R. §1508.27(b)(2).

### *UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
### *King, Laura*
**Issue Excerpt Text:** BLM's response to comments on the issue of health impacts is entirely unsatisfactory. BLM merely promises that "under all alternatives, lease stipulations and BMPs" that would be applied during subsequent site-specific NEPA analysis "would limit impacts on human health and safety." R-329. This excuse is conclusory and does not explain why analyzing human health impacts at the RMP stage would not be feasible or appropriate. Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide emissions in the United States. The relationship between air quality and human health must be analyzed as soon as possible in the NEPA process. The failure of the

BLM_0167320

UFO to do so here, in the RMP/EIS, represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs., 463 U.S. at 43 (1983).

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas

**Issue Excerpt Text:** BLM states in the Proposed RMP/FEIS that its information on downstream combustion impacts is based upon an incorporation by reference of BLM Colorado's Annual Report on the Colorado Air Resource Protection Protocol, which itself incorporates several summaries of effects from other sources. See Proposed RMP/FEIS at 4-28 –4-29. BLM then applies this methodology to "high" and "low" UFO oil and gas production scenarios, estimating that cumulative emissions of carbon dioxide would range from 8 million to 129 million tons. Id. at 4-29. In and of itself, this broad range is concerning.

However, BLM never discusses the impact of those estimates in the context of the alternatives discussed throughout the RMP. Instead, it proposes qualitative descriptions of relatively higher or lower indirect impact under a "business-as-usual" scenario and a "decreased emissions" scenario, both relative to various market conditions. BLM's apparent explanation is that "[a]ny single contribution on a subnational scale is dwarfed by the large number of comparable national and subnational contributors on a global scale," and "[t]he best surrogate for understanding the potential impact of subnational (e.g., UFO) emissions on climate is the behavior of the BLM-administered lands national emissions relative to all the other contributors." Id. at 4-30. In 23 other words, BLM claims that the indirect impacts from UFO oil and gas production are too small and speculative in the grand scheme of worldwide emissions to merit full and specific consideration under the various alternatives in the FEIS. At the same time, BLM includes a robust "quantitative economic impact analysis of fluid mineral development…to examine differences in effects of proposed management decisions by alternative." Id. at 4-437. This analysis resulted in estimates of natural gas well development and the economic value of regional natural gas jobs, labor income, and direct output (e.g., sales). See id. at Tables 4-81 and 4-82. BLM also considered tax revenue derived from natural gas activity under six alternatives. Id. at Table 4-85. This is not the reasoned analysis or hard look required by NEPA and runs directly contrary to the approach mandated by the federal courts. BLM has meticulously catalogued the potential benefits of oil and gas development under the six alternatives, but has provided only a scant, broad analysis on the downstream impacts of subsequent production - and none on the particularized impacts under the discussed alternatives. This is very similar to the scenario presented to the courts in Wilderness Workshop and Citizens, both of which concluded that BLM acted in an arbitrary and capricious manner by failing to take a hard look at the indirect effect of fossil fuel combustion while simultaneously relying on production estimates and economic benefits. See Wilderness Workshop, 342 F. Supp. 3d at 1156 ("It is arbitrary and capricious for a government agency to use estimates of energy output for one portion of an EIS, but then state that it is too speculative to forecast effects based on those very outputs."); Citizens, 377 F. Supp. 3d at 1237 (same). These cases and the inadequate discussion of the indirect impacts here compels the same conclusion.

### UFORMP-030_McGuireE_20190727
### Desert Weyr, LLC
### McGuire, Eugenie

**Issue Excerpt Text:** The RMP does not take into account the increased haze and dust from the miles of surface roads that would be required to develop in an area. With the Black Canyon nearby as well as other Wilderness areas any loss of visibility and clear air impacts the recreational and viewshed areas.

### Summary:

The PRMP/FEIS failed to adequately analyze impacts on air resources from oil and gas actions including:

BLM_0167321

- Not modeling for winter ozone formation;
- The effects of hazardous air pollutants;
- The relationship of reduced air quality on human health;
- The effects of downstream combustion; and
- The effects of development on visibility and air quality from potential increases of regional haze and dust.

**Response:**

NEPA directs that data and analyses in an environmental impact statement must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

The BLM analyzed the potential impacts on air quality from reasonably foreseeable actions under the PRMP/FEIS (see Section 4.3.1 in the FEIS). Analysis for the PRMP/FEIS followed the process outlined in the Memorandum of Understanding among the U.S. Department of Agriculture, U.S. Department of the Interior, and U.S. Environmental Protection Agency, Regarding Air Quality Analysis and Mitigation for Federal Oil and Gas Decisions through the National Environmental Policy Act Process[1] for determining the scope of the air quality analysis and relied on the Colorado Air Resources Management Modeling Study (CARMMS) 2.0 future year 2025 results for the UFO RMP Planning Area source emissions and for cumulative (regional) source emissions to estimate potential impacts on air quality and air quality–related values from RMP alternatives and cumulative sources. Data from the 2015 Annual Report on the Colorado Air Resource Protection Protocol for the UFO were incorporated by reference in this analysis to describe the cumulative impacts associated with the potential UFO RMP projected emissions under two future oil and gas development scenarios. This approach was selected because it provided the most current information and analysis, and because of uncertainties about the number, nature, and specific location of future sources and activities.

The BLM included estimates of downstream end-use combustion related greenhouse gas (GHG) emissions for two future projected UFO oil and gas production scenarios. Specifically, downstream GHG emissions were calculated for "high" and "low" future 30-year oil and gas production scenarios over the life of the plan (~years 2020–2050) that are based on CARMMS 2.0 future projected oil and gas production profiles. The CARMMS-based "high" scenario future oil and gas production estimates are based on information provided by BLM mineral specialists for new UFO oil and gas development and account for the RFD for the Planning Area, which includes the foreseeable oil and gas development projects Bull Mtn. MDP, North Fork Mancos MDP, and 25-well / 5-Pad Project. The "low" scenario

---

[1] Memorandum of Understanding among the U.S. Department of Agriculture, U.S. Department of the Interior, and U.S. Environmental Protection Agency, Regarding Air Quality Analysis and Mitigation for Federal Oil and Gas Decisions through the National Environmental Policy Act Process. 2011. https://www.epa.gov/sites/production/files/2014-08/documents/air-quality-analyses-mou-2011.pdf. Note that this Memorandum of Understanding was in effect at the time the air quality analysis scope was developed for the UFO RMP; however, on July 25, 2019, the signatories terminated and withdrew the memorandum.

BLM_0167322

represents the continuation of the current development pace for the Planning Area. The two scenarios therefore bound the levels of existing and new oil and gas production that could occur for the plan alternatives. Application of UFO-specific upper and lower bound estimates for describing potential downstream GHG emissions and climate impacts for the plan alternatives is reasonable because the variance in projected oil and gas production levels across the alternatives is very small relative to the larger-scale U.S. and global energy consumption profiles. The upper-bound RFD-based GHG estimate would adequately describe the potential downstream GHG emissions for each alternative, the lower bound estimate would not allow for most of the new oil and gas development associated with each alternative, and the difference between the CARMMS-based upper and lower bounds estimates would essentially equate to differences between the alternatives and baseline. Due to the uncertainty associated with the potential production levels of each alternative, this method is adequate to capture the potential range of impacts. The 30-year cumulative production totals for UFO were input into an Excel-based calculator with U.S. Energy Information Administration Annual Energy Outlook data to estimate downstream GHG emissions across the various energy consuming sectors (transportation, industrial, residential, etc.) that could be associated with future UFO oil and gas production and to determine the fraction of total U.S. emissions (years 2020–2050) that future UFO cumulative downstream GHG emissions would represent. Refer to the response for *NEPA – Impact Analysis – Carbon/Greenhouse Gas Emissions* for additional information on why the BLM did not utilize the social cost of carbon (SCC) protocol for the RMP.

The CARMMS 2.0 report provides a reasonable forecast of effects and supports the UFO emissions sources and a full cumulative impacts analysis for the Planning Area (FEIS at p. 4-21). The report includes ozone modeling and the results were incorporated by reference (see pp. 4-21 to 4-22 in the FEIS). Additionally, effects of hazardous air pollutants are discussed in the analysis (see pp. 4-19, 4-20, 4-26, 4-34, Q-2, and Q-41 to Q-51) as well as the relationship between reduced air quality and human health (see Section 4.6.2).

Wintertime ozone primarily occurs with two different processes: stratospheric intrusions associated with wintertime mid-latitude upper-level troughs in high-elevation areas, and cold-pool stagnant surface conditions in areas with high ozone precursor (volatile organic compound [VOC] and nitrogen oxide) emissions. The former is a natural phenomenon but the latter scenario occurs frequently in snow-covered basins of the Rocky Mountain Region where cold and very stable surface atmospheric conditions and high levels of oil and gas–related VOC and nitrogen oxide concentrations exist. Over approximately the last 15 years, oil and gas–related wintertime ozone formation has been identified in several basins in the Rocky Mountain Region, including the Green River Basin in Wyoming and Uinta Basin of Utah. Wintertime conditions in the Uinta Basin have caused ozone concentrations to exceed the National Ambient Air Quality Standards, and as the stagnant conditions in the basin subside, the westerlies have advected the elevated ozone plume into northwestern Colorado. BLM Colorado air quality monitoring data for Rangely and Meeker, Colorado, along with EPA and NPS monitoring data for northeastern Utah, have indicated that the wintertime ozone associated with oil and gas primarily forms in the "heart" of the Uinta Basin of Utah and progresses into parts of northwestern Colorado, including Rangely, but not as far east as Meeker, Colorado. These conditions (high levels of oil and gas emissions and adequate atmospheric conditions) do not readily exist together within the Planning Area. For this reason, the BLM did not conduct a refined local wintertime ozone analysis for the planning effort. Moreover, the current Photo-chemical Grid Modeling programs and applications do not simulate wintertime ozone formation adequately due to the complexities of accurately modeling fine-scale surface-based parameters and boundary layer phenomena. The BLM Colorado operates an ozone monitoring station in the North Fork

BLM_0167323

Valley just below the highest area of projected oil and gas development and production in the Planning Area, and would likely detect a wintertime ozone event in the Planning Area, should such an event occur.[2]

The BLM complied with NEPA's requirement to analyze the environmental consequences on air quality and climate change in the PRMP/FEIS.

## NEPA – Impact Analysis – Bighorn Sheep

### UFORMP-095_RatnerJ_20190728
### Western Watersheds Project
*Ratner, Jonathan*
**Issue Excerpt Text:** The proposed RMP does not provide meaningful security for bighorn sheep populations in and near the BLM Uncompahgre Field Office, and does not comply with BLM Sensitive Species policy, BLM Manual 1730, or Colorado Grazing Standard 3. As such, it fails to comply with the requirement that RMP's must provide requirements and limitations needed to resolve use conflicts at the RMP level.

### UFORMP-095_RatnerJ_20190728
### Western Watersheds Project
*Ratner, Jonathan*
**Issue Excerpt Text:** BLM fails to disclose the likely outcomes of bighorn sheep exposure to domestic sheep on BLM allotments under each of the plan alternatives. BLM does not quantify the probable population impacts due to die-offs, declines in lamb recruitment, and habitat limitations resulting from each alternative, so that the alternatives can be reliably compared. BLM also does not disclose the economic losses and losses of recreational opportunities relating to bighorn sheep associated with each alternative. This violates NEPA's "hard look" requirement.

### UFORMP-095_RatnerJ_20190728
### Western Watersheds Project
*Ratner, Jonathan*
**Issue Excerpt Text:** Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science.

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO IM for bighorn sheep which requires effective separation.

https://eplanning.blm.gov/epl-frontoffice/eplanning/planAndProjectSite.do?methodName= renderDefaultPlanOrProject Site&projectId=36859&dctmId=0b0003e88040d6d4 2.4.6 Alternative L - Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs). However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species. Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very

---

[2] U.S. Environmental Protection Agency. Air Data Quality Data Collected at Outdoor Monitors Across the US. https://www.epa.gov/outdoor-air-quality-data.

BLM_0167324

difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats. Appendix C contains a more detailed review of the effectiveness of BMPs."

**Summary:**

The BLM did not use best available science when creating BMPs related to bighorn sheep interaction with domestic sheep.

**Response:**

CEQ regulations implementing NEPA require that agencies use "high quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA Handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012).

Management of domestic sheep and goats to sustain wild sheep is integrated into RMPs as appropriate, and the UFO PRMP/FEIS includes management actions to comply with BLM Manual Section 1730.

The UFO RMP includes a bibliography (see the *References* section in Volume II of the FEIS), which lists information considered by the BLM in preparation of the UFO RMP. The BLM has reviewed the suggested Schommer 2009 document to determine if the information is substantially different than the information considered and cited in the UFO RMP, and has determined that Schommer 2009 does not provide additional information that would result in changes to management direction related to BMPs for bighorn sheep in the UFO RMP. It is not necessary to incorporate Schommer 2009 into the UFO RMP. The BLM relied on high-quality information and the best available data in preparation of the UFO PRMP/FEIS. The BMPs upon which the UFO PRMP/FEIS relies are taken from the Western Association of Fish and Wildlife Agencies Wild Sheep Working Group's 2012 Domestic Sheep and Goat Management in Wild Sheep Habitat strategy. This strategy contains a comprehensive set of recommendations to manage domestic sheep grazing and achieve effective separation in compliance with MS 1730. The strategy states that "Effective separation does not necessarily require removal of domestic sheep or goats in all situations..." and that BMPs are effective on a case-by-case basis. The Western Association of Fish and Wildlife Agencies strategy is the best available science.

Although the BLM did not conduct an economic analysis specific to bighorn sheep and recreational uses, page 3-156 presents information from a publication related to economic output from wildlife watching in southwestern Colorado. Table 3-53 also on page 3-156 presents economic impacts from hunting in the UFO Planning Area, which includes bighorn sheep.

## *NEPA – Impact Analysis – Climate Change*

*UFORMP-022_BaumgartenD_20190725*
**Board of County Commissioners of Gunnison County**
*Baumgarten, David*
**Issue Excerpt Text:** Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives. REQUESTED REMEDY: An adequate RMP/EIS must, at a minimum, include a carbon emission reduction plan that is

BLM_0167325

demonstrably consistent with those efforts of the State to meet the State's climate and carbon emission reduction goals.

### UFORMP-074_HollenbeckH_20190729
### Ouray County
### Hollenbeck, Hannah
**Issue Excerpt Text:** Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives. REQUESTED REMEDY: An adequate RMP/EIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with those efforts of the State to meet the State's climate and carbon emission reduction goals.

### UFORMP-099_MarkwellA_20190728
### San Miguel County, Colorado
### Markwell, Amy
**Issue Excerpt Text:** The Proposed PRMP/FEIS does not adequately consider the consequences of climate change. Alternative E does not acknowledge climate change, make climate change a priority, nor in any substantial way include an analysis of climate impacts of any of the alternatives. Requested Remedy: An adequate PRMP/FEIS must, at a minimum, include a carbon emission reduction plan that is demonstrably consistent with the efforts of the State to meet the State's climate and carbon emission reduction goals.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura
**Issue Excerpt Text:** In particular, HB 1261 enacts aggressive greenhouse gas emissions targets for the State- 26% by 2025, 50% by 2030, and 90% by 2050. The foreseeable development scenarios for the UFO RMP move in the opposite direction, anticipating an additional 1200 oil and gas wells while making vast acreages available for new oil, gas, and coal leasing. Estimated direct GHGs from development allowed in Alternatives D and E are 2,497,194 tons of $CO_2e$ per year and 2,512,570 tons per year, respectively (approximately 75 million tons of $CO_2e$ over a 30-year period) (Vol I pg. 4-22 of the FEIS). Estimated indirect GHGs from the high production scenario is approximately 129 million tons $CO_2e$ over a 30-year period. (Vol 1 pg. 4-29 of the FEIS). Together, direct and indirect emissions across 30 years are equivalent to the annual emissions of 52 coal-fired power plants. Colorado's climate goals and greenhouse gas reductions targets would be impossible to attain with BLM's expansion of fossil fuel development for another 20 years under the UFO RMP.

### UFORMP-122_TuddenhamK_201907
### Sheep Mountain Alliance
### Tuddenham, Karen
**Issue Excerpt Text:** Indeed, many of their jobs and livelihoods would be negatively impacted by the proposed RMP as written due to climate change impacts, as well as the likely air and water pollution, and wildlife productivity loss that would result from this plan. We believe that the BLM has both the responsibility and the capability to analyze the likely climate change impacts that this increased oil and gas leasing would have on human communities and ecosytems within the UFO.

**Summary:**

The BLM needs to include a carbon emissions reduction plan that is consistent with the State of Colorado's climate and carbon emission reduction goals and needs to adequately consider the impacts of climate change. The BLM failed to adequately analyze climate change impacts from potential increased oil and gas development in the Planning Area.

BLM_0167326

**Response:**

Section 202 (c)(9) of FLPMA requires that "land use plans of the Secretary under this section shall be consistent with state and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." However, BLM land use plans may be inconsistent with State, local, and tribal plans where it is necessary to meet the purposes, policies, and programs associated with implementing FLPMA and other Federal laws and regulations applicable to public lands (43 CFR 1610.3-2(a)).

The State of Colorado has not yet developed a plan for implementing the targets identified by House Bill 1261. The UFO RMP includes an action to comply with applicable State and Federal laws and regulations. As such, the BLM will ensure management is consistent with the State's plan as it identifies methods to account for oil and gas emissions goals in the projected targets, to the extent consistent with the purposes, policies, and programs of Federal laws and regulations. The BLM has worked closely with the State government during preparation of the UFO RMP, and the Colorado Climate Plan for limiting VOC and methane from oil and gas operations and requiring green completions was considered in the updated CARMMS analysis in the FEIS.

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO PRMP.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

The FEIS identified the 2015 Annual Report as the baseline, up-to-date information on oil and gas development (e.g., current regulations, drilling and production rates, and emissions inventories) and the state of the atmosphere (e.g., air pollutant concentration trends and air quality–related values) for each applicable BLM Colorado Field Office or respective planning area. The BLM provided a programmatic analysis of climate change/GHG emissions in Section 4.3.1, *Air Quality and Climate*, which included discussion of the potential effects of the alternatives in terms of the GHG emissions resulting from anticipated activities.

## NEPA – Impact Analysis – Fish

*UFORMP-080_ClabbersN_20190728*
**The Wilderness Society**
*Clabbers, Nicholas*
**Issue Excerpt Text:** While drilling and hydraulically fracturing horizontal wells requires significant water use, water depletions for fluid mineral withdrawal in the Colorado River Basin have the potential to impact federally listed Colorado River fish, including the Colorado pikeminnow, razorback sucker,

BLM_0167327

bonytail chub, and humpback chub. To address this, the USFWS issued a Programmatic Biological Opinion in 2008, later updated in 2017, that limits water depletion from the Colorado River Basin and sub-basins for oil and gas development. The Proposed RMP/FEIS states "[t]he 2017 Programmatic Biological Opinion (USFWS 2017) determined that the 607 acre-feet per year of BLM water depletions associated with BLM approved projects in the Gunnison River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub." However, it is unclear whether withdrawals from future "BLM approved projects" will increase water use above the 607 acre-feet threshold. BLM's failure to discuss and disclose this issue renders its analysis inadequate under NEPA.

**Summary:**

The BLM failed to analyze future water withdrawals that may increase water use above the amount identified in the Fluid Minerals PBO.

**Response:**

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO PRMP/EIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

As noted on page 4-65 of the UFO PRMP/FEIS, water depletions analyzed in the BA and FEIS were based on the RFD scenario. The RFD scenario technically analyzed the oil and gas resource known to occur and potentially occurring within the Planning Area and projects future development potential and activity levels for the period from 2010 through 2030. As a result, the 607-acre-foot water depletion estimate accounts for reasonably foreseeable water use through 2030 for BLM-approved projects.

The BLM complied with NEPA's requirement to analyze the environmental consequences/impacts on federally listed Colorado fish species and their critical habitats from water depletions associated with the BLM's fluid mineral program within the Upper Colorado River Basin in Colorado.

## *NEPA – Impact Analysis – Fluid minerals*

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** As described in detail in Conservation Groups' previous comments, DEIS Comments (Ex. 1-1) at 109-128, there is a wealth of information and reports stressing the dangers of

BLM_0167328

fracking that must be considered in the agency's subject NEPA analysis, including methane contamination of drinking water, spills of hydraulic fracturing fluid, and migration of fracking fluids into groundwater aquifers. The potential impacts that may result from hydraulic fracturing are myriad and significant and include, among others, impacts to water quality and supply, impacts to habitat and wildlife, impacts to human health, as well as impacts on greenhouse gas emissions and air quality. In its FEIS, BLM continues to fail to fully address the additional information on resource impacts from hydraulic fracturing provided by Conservation Groups in their comments on the DEIS. FEIS at R-329.

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** The re-fracking impacts analysis appears to still be absent from the EIS and must be conducted for all wells in the field office: private and public, existing and future, existing target formations, and potential new plays. Absent such analysis, BLM has failed to take a hard look at the direct, indirect or cumulative impacts of ongoing and reasonably foreseeable oil and gas development in the UFO.

The RMP/EIS and RFD also failed to consider impacts regarding the subsequent fracturing treatments, or re-fracking operations. The UFO's RMP and RFD focus on initial drilling operations and routine maintenance, while these documents remain silent on the frequency and impacts - direct, indirect, and cumulative - related to re-fracking operations."

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** It is still the case that, as discussed in Conservation Groups' previous comments, the Reasonably Foreseeable Development scenario fails to sufficiently consider increased oil and gas development due to fracking. For example, BLM estimates that-as projected by the RFD- 1,271 wells would be developed under the RMP on all federal minerals and private minerals within the planning area. FEIS at 4-2. However, this estimate does not allow for the likely scenario that advances in hydraulic fracturing technology will increase the number of drilled wells. The RFD is outdated and underestimates the number of potential wells. The RMP/EIS fails to take into account the most recent trends in well development, which are the most crucial in predicting the extent of development and its likely impacts. As detailed in Conservation Groups' previously comments, all evidence points to increased drilling in relation to historic trends, and this fact must be considered in BLM's NEPA analysis.

*UFORMP-019_BrettE_20190725*
*Brett, Elaine M.*
**Issue Excerpt Text:** The draft RMP does not address how fluid mineral development would strain emergency services such as volunteer fire, ems, and rescue groups.

*UFORMP-019_BrettE_20190725*
*Brett, Elaine M.*
**Issue Excerpt Text:** The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonable Foreseeable Development Scenario will have on an existing domestic and commercial water supplies, including springs, wells or surface irrigation water.

*UFORMP-030_McGuireE_20190727*
*Desert Weyr, LLC*
*McGuire, Eugenie*
**Issue Excerpt Text:** Nowhere in the RMP is there any discussions of the number of organic farms and risks that any development pose to this growing source of local income. The North Fork is home to Colorado's largest concentration of organic farms and any perceived or real contamination of those farms

BLM_0167329

through even the best managed oil and gas extraction will devastate an economy already hit hard by the loss of coal mining jobs.

### UFORMP-091_HellecksonB_20190729
### Terror Ditch and Reservoir Company
### Helleckson, Brent

**Issue Excerpt Text:** The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with the existing enterprise in the Valley and incompatible with the BLM mandate for multiple-use and sustained yield. It also argues for a "no leasing in the North Fork watershed" alternative.

### Summary:

The RMP/EIS fails to fully address the resource impacts from fluid mineral development activities, including hydraulic fracturing. Re-fracking impacts analysis appears to be absent from the EIS. Absent such analysis, the BLM has failed to take a hard look at the direct, indirect, or cumulative impacts of ongoing and reasonably foreseeable oil and gas development in the UFO. The RFD scenario is outdated and underestimates the number of potential wells. The impacts analysis does not take into account potential impacts of oil and gas development (and hydraulic fracturing) on local farming operations, emergency services, water supplies, water quality, wildlife, human health, air quality, and GHG emissions. The impacts analysis also fails to analyze a "no leasing in the North Fork watershed" alternative.

### Response:

The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO RMP, including the potential impacts of energy development, including hydraulic fracturing; see PRMP/FEIS pages 3-138 (*Public Health and Safety*); 4-18 through 4-40 (*Air Quality and Climate*); 4-42 (*Soils and Geology*); 4-63 through 4-66 and 4-70 (*Water Resources*); 4-112 (*Fish and Wildlife*); and 4-129 through 4-131 (*Special Status Species*).

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

As explained in Washington Office Instruction Memorandum 2004-089: "The RFD projects a baseline scenario of activity…The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas" (Washington Office Instruction Memorandum 2004-089, Attachment 1, p. 1-1). The fundamental purpose of the RFD scenario is to make a reasonable estimation of the overall level of development anticipated (i.e., number of wells) over a specified time horizon (e.g., 20 years), because the overall level of development is the basis for comparing relative impacts across the alternatives. Therefore, the RFD scenario is not meant to be continually updated as new development occurs; the RFD scenario is valid as long as the overall level of development assumed is still valid. The 2012 UFO RFD scenario anticipated the types and placement of development proposals currently being addressed by the field office within the UFO's resource area. It also included assumptions on adjacent U.S. Forest Service lands, private lands, and State lands. Refer to Table 4-1 of the UFO PRMP/FEIS for a list of past, present, and reasonably foreseeable projects, plans, or actions, specifically the fluid minerals sub-section of the energy and minerals development section in Table 4-1. The UFO RFD scenario anticipates approximately 489 conventional/horizontal gas wells and 782 coalbed natural gas wells to be "drilled" within a 20 year period. Comparatively, the current rate of drilling Federal

BLM_0167330

mineral estate within the field office has been fewer than two per year, with no drilling thus far in the current calendar year of 2019. Factors contributing to the pace of development include ongoing litigation and low market prices for produced gas.

BLM guidance states that RFD scenarios should be "based on a reasonable, technical, and scientific estimate of anticipated oil and gas activity based on the best available information and data at the time of the study" (Washington Office Instruction Memorandum 2004-089, Attachment 1). The BLM relied on the best available information at the time the RFD scenario for the PRMP/FEIS was prepared and accurately estimates the level of future oil and gas activities in the Planning Area. If the impacts from future oil and gas development were to exceed the impacts analyzed in the PRMP/FEIS, then, at the development stage, additional NEPA analysis for the development may be appropriate. It is the BLM's policy to perform a review of planning decisions when new circumstances or information arise (BLM Handbook H-1601-1, p. 37-44). The BLM typically performs these reviews as new information is available or on a 5-year evaluation schedule, whichever comes first. Should an amendment or revision of the RMP be necessary, the BLM will follow all applicable laws and policies.

The PRMP/FEIS adequately considers the potential impacts of oil and gas development on local farming operations as part of the socioeconomic analysis, noting that agriculture in the western end of the county has long been valued and still plays an important role in the local economy (see, for example, Section 3.4.3; Table 3-3, US Department of Agriculture Classified Prime and Unique Farmland in the Planning Area; Table 3-58, County Agricultural Data; Section 4.6.3). The BLM considered but eliminated from further consideration alternatives that would prohibit fluid mineral leasing throughout the Decision Area such as a "no leasing in the North Fork watershed" alternative (Section 2.4.3). All of the alternatives propose closure of areas to fluid mineral leasing based on policy or legislation, or when it has been determined that resource values cannot be adequately protected even with restrictive lease stipulations. However, resource values that can only be protected by prohibiting all fluid mineral leasing throughout the Decision Area were not identified by the BLM.

The range of alternatives in the PRMP/FEIS fully considers substantial restrictions in the North Fork Valley. For example, as described in p. 4-460, under Alternative B.1, additional restrictions would apply to oil and gas extraction in the North Fork area. Approximately 609,360 acres of Federal mineral estate would be open to leasing, 31 percent less than Alternative A. Approximately 306,670 acres would be closed to fluid mineral leasing, seven times greater than Alternative A. Closures and stipulations would be applied and would include no leasing (NL) within 0.25 mile of public water supplies (streams, wells, or springs) and NSO between 0.25 and 0.50 mile of these supplies; NL within 0.25 mile of domestic water wells, ditches, canals, dams, and other water conveyance; NL within 0.50 mile of major rivers and NSO between 0.50 and 1 mile of these features; and NSO within 0.25 mile of agricultural operations. All additional restrictions under Alternative B.1 would occur in the North Fork area only; Alternative B.1 would close 104,750 acres (75 percent) of the North Fork area to oil and gas leasing, which is 94,140 acres more than Alternative B. These closures and stipulations on oil and gas development are intended to protect local water sources for North Fork Valley residents and to maintain water quality for local agricultural operation.

## *NEPA – Impact Analysis – Gunnison Sage-grouse*

### *UFORMP-022_BaumgartenD_20190725*
### *Board of County Commissioners of Gunnison County*
### *Baumgarten, David*
**Issue Excerpt Text:** Even though the Gunnison Sage-grouse was listed as threatened under the ESA between the Draft RMP/Draft EIS and the Proposed RMP/FEIS, the BLM has not addressed this listing, and its consequences, sufficiently in the Proposed RMP/FEIS. Alternative E has reduced the protection for Gunnison Sage- grouse critical habitat from a right-of-way exclusion to right-of-way avoidance,

BLM_0167331

reducing the certainty of protection. Proposed RMP/FEIS, pp.2-38 - 2-39. Alternative E also reduced protection from wind, solar and hydropower developments in Gunnison Sage-grouse breeding, nesting and critical habitat from exclusion to avoidance, removing the certainty that habitat will be safeguarded. Proposed RMP, p. 2-113. In addition, the NSO stipulations that apply to Gunnison Sage-grouse habitat are subject to "standard" waiver, exception and modification, meaning they can be changed at the discretion of the BLM authorized officer without additional specific criteria being applied. Proposed RMP/Final EIS, p. B-32. This approach is significantly less protective than the management being applied to the Greater Sage-grouse, even after amendments completed in 2019 that were focused on increasing energy development and even though that species is not listed as threatened or endangered under the ESA. Under the 2019 Northwest Colorado Greater Sage-grouse Amendment, waivers, exceptions, or modifications of NSO stipulations may only be applied if specific criteria are met and then the State of Colorado must be consulted and agree. (Northwest Colorado Greater Sage-grouse Amendment, pp. G-4 - G-7.) This management is insufficiently protective of the Gunnison Sage-grouse, is inconsistent with Gunnison County's approach and will risk the current threatened status of the species being upgraded to endangered, which will impact Gunnison County. Alternative E cannot be supported. The BLM should return to more protective management, as well as adopting an approach that requires the input of the State of Colorado, for waivers, exception or modification of lease stipulations, similar to that used for the Greater Sage-grouse.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** Even with only one operating oil and gas well, the UFO's Crawford Population has been in dramatic decline from 2000 through 2012, and had to be supplemented with birds from the Gunnison Basin in 2011 through 2013. BLM manages approximately 63% of the remaining occupied habitat for this population, as well as 13% of occupied habitat. Despite the precarious status of the Crawford Population in particular, the UFO DEIS fails either to take a hard look at the extensive science showing relationship between oil and gas density and sage-grouse population decline, or to consider any alternative that would either limit density of development or exclude oil and gas entirely from Gunnison sage-grouse occupied and/or suitable habitat.

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
### Baumgarten, David

**Issue Excerpt Text:** The Proposed RMP/Final EIS is fatally deficient in its consideration of Gunnison Sage-grouse (""GuSG""). The following are significant data not fully considered in the Proposed RMP/Final EIS: * The BLM Uncompahgre Field Office Proposed RMP/Final EIS was published in the Federal Register on 6/28/19, over 6 months after the Biological Opinion (""BO"") was signed. The Proposed RMP/Final EIS does not address whether - or how - the BO is still applicable, particularly in the context of Alternative E, which appears to be a very new construct in the Proposed RMP/Final EIS. * The U.S. Fish and Wildlife Service (""USFWS"") received the request for a BO from the BLM on July 31, 2018, which included a BA, which Gunnison County has not seen, prepared by the BLM. * The BLM determined in their BA that the Proposed RMP/Final EIS may affect, and is likely to adversely affect, the GuSG. The USFWS agreed with this determination.

### Summary:

The UFO PRMP/FEIS failed to properly address the impacts on Gunnison sage-grouse because:

- It did not address the Federal listing of Gunnison sage-grouse;
- It did not adequately adopt protective measures for the species; and
- It is not consistent with Gunnison County's management approach.

BLM_0167332

Additionally, the BLM failed to take a hard look at the extensive science showing a relationship between oil and gas density and sage-grouse population decline.

**Response:**

NEPA requires the BLM to include a discussion of measures that may mitigate adverse environmental impacts (40 CFR 1502.14(f), 40 CFR 1502.16(h)). Potential forms of mitigation include: (1) avoiding the impact altogether by not taking a certain action or parts of an action; (2) minimizing impacts by limiting the degree or magnitude of the action and its implementation; (3) rectifying the impact by repairing, rehabilitating, or restoring the affected environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; or (5) compensating for the impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

Additionally, Section 7(a)(2) of the ESA requires Federal agencies to ensure that their proposed actions will not be "likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of the critical habitat of such species" (16 U.S.C. 1336(a)(2)). If an agency determines through a finding in a BA that a proposed action is likely to adversely affect listed species or designated critical habitat, formal consultation is required under 50 CFR 402.14(a).

Section 3.1.7, *Special Status Species*, of the UFO PRMP/FEIS addresses the Federal listing of the Gunnison sage-grouse (p. 3-59 and Table 3-21). Section 4.3.6, *Special Status Species*, specifically addresses potential impacts on Gunnison sage-grouse and habitat as described in the *Gunnison Sage-Grouse Rangewide Conservation Plan* and additional scientific literature (see pp. 4-128 to 4-129 regarding additional information on the relationship of oil and gas development on sage-grouse populations; see a summary of scientific literature in the *Northwest Colorado Greater Sage-Grouse RMP Amendment and Final EIS* [2015]). Chapter 5, Section 5.2, *Coordination and Consultation*, summarizes consultation regarding Gunnison sage-grouse with Federal, State, and coordinating agencies. References located in Volume II of the UFO PRMP/FEIS record Gunnison sage-grouse information sources used by the BLM in preparation of the UFO RMP. Regarding the declining Crawford Gunnison sage-grouse population, as noted in Appendix R, *Response to Comments*, the bird's occupied critical habitat is entirely within the Gunnison Gorge National Conservation Area RMP planning area; there are small, isolated pieces of BLM-administered land within potential (unoccupied) critical habitat within the UFO RMP Decision Area (see p. R-1040).

Appendix B of the UFO PRMP/FEIS provides a list of common standard operating procedures and BMPs that are applicable to all alternatives in the RMP. The PRMP/FEIS analyzes and adopts mitigation measures that avoid some potential future impacts altogether by closing public lands to certain uses and minimizes other potential future impacts by restricting certain uses on the public lands. At the RMP level, it is typically not appropriate to analyze specific mitigation measures that rectify impacts, reduce impacts over time, or compensate for impacts, because the approval of an RMP does not directly result in any on-the-ground impacts. Additionally, several fluid leasing and surface disturbance stipulations would apply for the protection of Gunnison sage-grouse under the PRMP/FEIS (refer to TL-16, TL-18, NSO-31/SSR-32, and CSU-29/SSR-34 in Appendix B of the UFO PRMP/FEIS). The BLM would also look at all appropriate mitigation measures during the decision-making process for future site-specific actions in the Planning Area. The environmental analysis document prepared for site-specific proposals such as oil and gas development (e.g., Applications for Permit to Drill and Sundry Notices) or other surface projects also needs to include and address any proposal to except, modify, or waive a surface stipulation. As noted in Appendix B, the BLM authorized officer may except or modify a stipulation if (1) the protection provided by the stipulation is no longer justified or necessary to meet resource objectives established in the RMP; (2) the protection provided by the stipulation is no longer sufficient to meet resource objectives established in the RMP (applies to modification only); or (3) proposed operations would not cause unacceptable impacts. The BLM authorized officer may waive a stipulation if it is determined that the factors leading to its inclusion in the lease or project no longer exist. The BLM authorized officer may

BLM_0167303

require additional plans of development, surveys, mitigation proposals, or environmental analysis, and may be required to consult with other government agencies and/or the public in order to make this determination. As a result of the Governor's Consistency Review, the BLM will modify stipulations associated with Gunnison Sage-grouse habitat to include consultation with CPW on any proposed exceptions, waivers and modifications.

As noted previously under *FLPMA – Consistency with Other Plans*, the BLM has given consideration to State, local, and tribal plans that are germane to the development of the UFO PRMP/FEIS and addressed inconsistencies to the extent these entities provided notification of such. The UFO had not been made aware of the County's Gunnison Sage-grouse provisions to date. In accordance with 43 CFR 1610.3-2, State Directors and Field Managers shall, to the extent practicable, keep apprised of State and local governmental and Indian tribal policies, plans, and programs, but they shall not be accountable for ensuring consistency if they have not been notified, in writing, by State and local governments or Indian tribes of an apparent inconsistency.

Through development of the UFO PRMP/FEIS, the BLM determined that the approval of the RMP is likely to adversely affect listed species or critical habitat, and therefore underwent formal consultation with the USFWS. The BLM documented this determination in the BA for the UFO PRMP/FEIS, which was provided to the USFWS for review and comment. The BLM used the same information and biological data both to prepare the BA and to analyze the environmental impacts on affected species in the EIS.

The BO is the formal opinion of the USFWS as to whether a Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. On December 17, 2018, the USFWS issued the BO for the UFO PRMP/FEIS, which concluded that implementation of the UFO PRMP/FEIS may affect, and is likely to adversely affect, Gunnison sage-grouse (including designated critical habitat) and includes USFWS-recommended conservation measures to avoid adverse impacts on sage-grouse and modifications to critical habitat. The BO is available online at the RMP's project website: https://go.usa.gov/xnpgD.

The UFO PRMP/FEIS complied with NEPA by including a discussion of measures that may mitigate adverse environmental impacts to the extent appropriate for an RMP, and has fully complied with requirements under Section 7(a)(2) of the ESA.

## NEPA – Mitigation – Gunnison Sage-grouse

*UFORMP-080_ClabbersN_20190728*
*The Wilderness Society*
*Clabbers, Nicholas*
**Issue Excerpt Text:** As these examples highlight, BLM failed to adequately address impacts and mitigation measures identified in FWS's 2018 BiOp and reduced protections in the Proposed RMP/FEIS despite the listing of Gunnison sage-grouse under the ESA. BLM should have increased protections for the species from the Draft RMP/EIS to the Proposed RMP/FEIS, adopt the mitigation measures identified by FWS, and otherwise act consistently with the best available science to protect the species. However, it completely failed to do so, and this was arbitrary and renders the Proposed RMP/FEIS unlawful. Doing so was further inconsistent with FLPMA's mandates to avoid undue and unnecessary degradation and permanent impairment of wildlife like Gunnison sage-grouse and the agency's Special Status Species Policy that requires BLM to implement a BiOp for a listed species.

BLM_0167334

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas

**Issue Excerpt Text:** Moreover, BLM cannot comply with its duties under the ESA to ensure against jeopardy of the species and adverse modification of its critical habitat under the 2018 BiOp by disregarding key elements of the 2018 BiOp. The agency also should have also disclosed these shortcomings to the public under NEPA. 40 C.F.R. § 1508.27 (listing threatened violations of federal law as a significance factor requiring an EIS); id. at § 1506.2(d) (requiring discussions of possible conflicts with federal plans, policies, and controls for the area at issue in an EIS); id. at § 1502.2(d) (explaining EIS must state "how" alternatives will achieve requirements of "other environmental laws and policies"). For these reasons, BLM must disclose and discuss the 2018 BiOp's discussion of Gunnison sagegrouse and its mitigation measures in a supplemental EIS and modify the Proposed RMP to adopt adequate mitigation measures for Gunnison sage-grouse, including those provided for in the 2018 BiOp.

### UFORMP-096_GibbsD_20190728
### Colorado Department of Natural Resources
### Gibbs, Dan

**Issue Excerpt Text:** finally, and critically, Colorado requests that, consistent with the recommendation in the Service's Biological Opinion. BLM include in the PRMP the criteria developed for the Northwest Colorado Greater Sage-grouse RMPA with respect to waivers, exceptions and modifications within NSO-designated areas. These criteria require, among other things, agreement between BLM's District Manager and CPW and written justification for granting any exceptions or modifications. As mentioned above, land use restrictions for Gunnison sage-grouse habitat should be at least as strong or stronger than those for an unlisted species like the greater sage-grouse. Colorado did not include these recommendations during the comment period on the Draft RMP because we were not alerted until June 2018 that the planning process for a rangewide RMP for Gunnison sagegrouse conservation had been postponed indefinitely.15 But now that it is up to the Field Offices to amend their RMPs to conserve Gunnison sage-grouse, Colorado respectfully requests that these measures. Recommended by the agency with jurisdiction over management of listed species, be adopted by the UFO, and protests their absence from the PRMP.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** BLM itself acknowledges that these allegedly ""refined"" management measures ""fall short of accepted minimum protection standards to maintain sage-grouse viability.""180 The FEIS describes Alternative E's sage-grouse standards as ""similar to Alternative D and would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats; Alternative E specifies that these include designated critical habitat (both designated occupied and unoccupied), winter habitat, and nondesignated occupied breeding habitat.""181 Under Alternative D, however, ""[b]reeding habitat would be protected with similar stipulations as Alternative C (NSO-31/SSR-32), and would similarly fall short of accepted minimum protection standards to maintain sage-grouse viability (Knick and Connelly 2011).""182 While ""additional conservation measures could be applied as needed under the CSU stipulation within breeding (non-lek) habitats to conserve high-quality sage-grouse habitat and to avoid habitat fragmentation and cumulative effects,"" FEIS at 4-145, the discretionary nature of that stipulation provides no certainty that ""additional conservation measures"" either will be applied, or that effective measures will be selected.

Section 7(a)(1) of the Endangered Species Act mandates that ""All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act."" BLM's failure to adopt reasonable measures, based on

BLM_0167335

the best available science, to conserve Gunnison sage-grouse and its critical habitat, violates this statutory mandate."

**Summary:**

The BLM failed to include or adequately address mitigation measures, specifically those included in the 2018 USFWS BO, for the Gunnison sage-grouse in the PRMP/FEIS, rendering it unlawful.

**Response:**

NEPA requires the BLM to include a discussion of measures that may mitigate adverse environmental impacts (40 CFR 1502.14(f), 40 CFR 1502.16(h)). Potential forms of mitigation include: (1) avoiding the impact altogether by not taking a certain action or parts of an action; (2) minimizing impacts by limiting the degree or magnitude of the action and its implementation; (3) rectifying the impact by repairing, rehabilitating, or restoring the affected environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; or (5) compensating for the impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

Additionally, Section 7(a)(2) of the ESA requires Federal agencies to ensure that their proposed actions will not be "likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of the critical habitat of such species" (16 U.S.C. 1336(a)(2)). If an agency determines through a finding in a BA that a proposed action is likely to adversely affect listed species or designated critical habitat formal, consultation is required under 50 CFR 402.14(a).

Appendix B of the UFO PRMP/FEIS provides a list of common standard operating procedures and BMPs that are applicable to all alternatives in the RMP. The UFO PRMP/FEIS analyzes and adopts mitigation measures that avoid some potential future impacts altogether by closing public lands to certain uses and minimizes other potential future impacts by restricting certain uses on the public lands. At the RMP level, it is typically not appropriate to analyze specific mitigation measures that rectify impacts, reduce impacts over time, or compensate for impacts, because the approval of an RMP does not directly result in any on-the-ground impacts. The BLM would also look at all appropriate mitigation measures during the decision-making process for future actions in the Planning Area.

Through development of the UFO PRMP/FEIS, the BLM determined that the approval of the RMP is likely to adversely affect listed species or critical habitat, and therefore underwent formal consultation with the USFWS. The BLM documented this determination in the BA for the UFO PRMP/FEIS, which was provided to the USFWS for its review and comment. The BLM used the same information and biological data both to prepare the BA and to analyze the environmental impacts on affected species in the EIS.

The BO is the formal opinion of the USFWS as to whether a Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. On December 17, 2018, the USFWS issued the BO for the UFO PRMP/FEIS, which concluded that implementation of the UFO PRMP/FEIS may affect, and is likely to adversely affect, Gunnison sage-grouse (including designated critical habitat) and includes the USFWS's conservation recommendations to avoid adverse impacts on sage-grouse and modifications to critical habitat. The BO is available online at the RMP's project website: https://go.usa.gov/xnpgD. On September 20, 2019, the BLM notified the USFWS of changes to the PRMP/FEIS (Alternative E) that occurred after USFWS Section 7 concurrence on December 17, 2018. BLM UFO biological staff determined that these changes to the Agency-Proposed Alternative E do not affect species or habitat that were consulted on in 2018.

The UFO PRMP/FEIS complied with NEPA by including a discussion of measures that may mitigate adverse environmental impacts to the extent appropriate for an RMP and has complied with requirements under Section 7(a)(2) of the ESA.

BLM_0167336

As a result of the Governor's Consistency Review, the BLM will modify stipulations associated with Gunnison Sage-grouse habitat to include consultation with CPW on any proposed exceptions, waivers and modifications.

## NEPA – Impact Analysis – Human Health

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** SB 181, which was signed into law on April 16, 2019, requires prioritization of public health, safety, and the environment when necessary and reasonable over oil and gas development. It also allows for non-production of oil and gas minerals when necessary and reasonable to protect public health, safety, welfare, the environment and wildlife. The UFO RMP takes the opposite approach; it prioritizes oil and gas development over protection of public health, safety, the environment and wildlife, which directly conflicts with Colorado policy. SB 181 also seeks to put communities impacted by oil and gas on the same level footing as industry and local government. The BLM ignored 42,000 public comments (80% of the total comments received), including local government comments of frontline impacted communities, regarding the incompatibility of leasing 95% of BLM lands and minerals to oil and gas with protecting the health, safety and welfare of the community. The UFO RMP undermines Colorado's goals to put protection of public health, safety, environment and wildlife first.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura

**Issue Excerpt Text:** As discussed in Conservation Groups' DEIS Comments, Ex. 1-1, at 170-181, BLM did not conduct a health impact assessment, or equivalent analysis, and, as a result, the agency's RMP/EIS does not satisfy NEPA and its implementing regulations. NEPA requires that the BLM employ at least the same level of effort to analyze human health impacts as it does to promote industry's interest in development when preparing the RFD and associated analyses regarding projected drilling levels. A health impact assessment ("HIA") or equivalent analysis would fulfill the regulations governing NEPA, to examine human health impacts "to the fullest extent possible." A HIA would be forward-looking and attempt to identify all of the potential direct, indirect, and cumulative links between a proposed activity and the health and well-being of affected communities, and to develop mitigation measures to minimize harms and maximize benefits. The RMP does not does not include this type of analysis of human health impacts.

**Summary:**

The BLM's impact analysis is deficient because it did not assess the effects of the plan's actions on human health.

BLM_0167337

**Response:**

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

The BLM described the impacts on public health and safety from proposed management actions of other resources and resource uses in Section 4.6.2, *Public Health and Safety*. Here, the BLM included a definition of the indicators for changes in human health, assumptions made for the analysis, and a general discussion of the nature and type of impacts that could be expected; see discussions for the nature and type of impacts anticipated from air and water contamination on pages 4-427 to 4-428.

The BLM notes that "potential for water contamination associated with hydraulic fracturing depends on many factors, including, but not limited to, the chemicals utilized in fracturing fluid, distance from the gas well to ground and surface water, and methods of transport and disposal of wastewaters (Jackson et al. 2011; Vidic et al. 2013). As discussed in Chapter 3, exposure to hazardous materials produced from oil and gas development, and unconventional natural gas development in particular, has been correlated with human health concerns in some studies, including, but not limited to, respiratory problems, cancer, and endocrine system disorders. Studies have not been conclusive as to the level of impacts; however, distance from the site of development has been identified as one key factor in determining the potential for impacts (Qingmin 2015)" (p. 4-428). The BLM analyzed the potential effects from well stimulation techniques to the extent necessary at the land use planning stage of the oil and gas process.

The Colorado Oil and Gas Conservation Commission is currently reviewing, modifying, and establishing new rules to comply with Senate Bill 19-181, which could place additional restrictions on the State permitting process. The BLM Colorado has authority over Federal actions on Federal public lands, and does not have local or State decision-making authority. The BLM Colorado is currently renewing a Memorandum of Understanding with the State of Colorado on how the State and Federal regulatory process will interact. The BLM complied with NEPA's requirement to analyze the impacts on human health from hazardous conditions in the PRMP/FEIS.

BLM_0167338

## NEPA – Mitigation – Soil Selenium

**UFORMP-080_ClabbersN_20190728**
**The Wilderness Society**
*Clabbers, Nicholas*
**Issue Excerpt Text:** In describing the environmental consequences of the Proposed Action as to selenium loading, the Proposed RMP/FEIS states that it would "implement management measures related to saline/selenium soils," and that the Proposed Action "allows the BLM to exert greater discretion and to implement a wider range of land use strategies to improve water quality." Proposed RMP/FEIS at 4-80, 81. Unfortunately, the BLM's selection of stipulations and reservation of discretion in this regard renders this assurance meaningless. BLM explicitly declined to include in its Proposed Action either stipulation NL-1, which would close to oil and gas leasing and geophysical exploration soils with high and very high potential for selenium loading, or stipulation NSO-2, which would prohibit surface occupancy and use within 402 meters (0.25 mile) of soils with high and very high potential for selenium loading. See Proposed RMP/FEIS at B-7 and B15, respectively. Instead, BLM chose to include Stipulation CSU-3/SSR-3, which provides that surface occupancy or use may be restricted on lands with selenium soils, that special design, construction or implementation measures (including relocation of operations by more than 200 meters) may be required, and that and operator may be required to submit engineering plans to minimize or mitigate potential effects to soil productivity. See Proposed RMP/FEIS at B-54. BLM failed to estimate how it would apply this discretion, or how doing so would impact water quality and aquatic habitat. This failure was in violation of NEPA.

### Summary:

The BLM failed to describe how it would apply stipulations for selenium soils and failed to analyze how not applying the stipulations would affect water quality and aquatic habitat.

### Response:

NEPA requires the BLM to include a discussion of measures that may mitigate adverse environmental impacts (40 CFR 1502.14(f), 40 CFR 1502.16(h)). Potential forms of mitigation include: (1) avoiding the impact altogether by not taking a certain action or parts of an action; (2) minimizing impacts by limiting the degree or magnitude of the action and its implementation; (3) rectifying the impact by repairing, rehabilitating, or restoring the affected environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; or (5) compensating for the impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

The PRMP/FEIS analyzed and incorporated mitigation measures that are expected to avoid, mitigate, and/or minimize anticipated impacts by restricting certain uses on the public lands. At the RMP level, it is typically not appropriate to analyze specific mitigation measures that rectify impacts, reduce impacts over time, or compensate for impacts, because the approval of an RMP does not directly result in any on-the-ground impacts. The BLM will continue to look at all appropriate mitigation measures during the decision-making process for future implementation actions in the Planning Area.

As presented in Appendix B of the PRMP/FEIS, NSO, CSU, and timing limitations are stipulations that may be applied to future fluid mineral leasing and development of Federal fluid mineral estate. Stipulations are designed to provide resource-specific protections. The BLM may modify the operations of surface and other disturbance activities caused by the presence of humans and to require additional specific or specialized mitigation. Stipulations are designed to provide resource-specific protections.

Site-specific relocation (SSR) is a restriction decision that applies to other activities on BLM-administered lands. An SSR restriction is similar to a CSU restriction in that it allows some use and occupancy of BLM-administered lands while protecting identified resources or values. SSR areas are

BLM_0167339

potentially open to surface-disturbing activities but the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value. As noted in Appendix B, *Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities*, "Lease stipulations and lease notices would be applied, as applicable, to all new leases and to expired leases that are reissued. On existing leases, the BLM would develop Conditions of Approval for Applications for Permit to Drill to achieve resource objectives of lease stipulations contained in this RMP" (43 CFR 3101.1-2).

The PRMP/FEIS complied with NEPA by including a discussion of measures that may mitigate adverse environmental impacts to the extent appropriate for an RMP.

## NEPA – Impact Analysis – Water Quality

**UFORMP-102_KingL_20190728**
**Western Environmental Law Center**
**King, Laura**
**Issue Excerpt Text:** The FEIS does not adequately address or analyze the risks of water quality contamination from surface storage of fracking fluid and other oil and gas wastes, including produced and flowback water from wells. Likewise, the BLM does not quantify, nor fully address, the risk of potentially catastrophic spills and blowouts at well sites.

**UFORMP-102_KingL_20190728**
**Western Environmental Law Center**
**King, Laura**
**Issue Excerpt Text:** The UFO also failed to sufficiently consider impacts to groundwater related to fracking. For the first time in the FEIS, BLM acknowledges "evidence of fugitive gas migration along wellbores," but dismisses this evidence as "likely due to faulty well construction." FEIS at 4-66. BLM concludes that "in some areas, the oil- and gas-related waters are not likely to reach drinking water aquifers, whereas in other areas, constituents of concern simply may not have yet reached the aquifer or have been diluted to below detection limits," without providing an analysis of the characteristics of the Project Area that would make it more, or less, vulnerable to contamination. FEIS at 4-66. This dismissive approach does not satisfy the requirements of NEPA.

### Summary:

The FEIS fails to analyze sufficiently the risks of water quality contamination from oil and gas development and impacts on ground- and surface water from fracking.

### Response:

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO RMP.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

BLM_0167340

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

The BLM provided an analysis of the risk to water quality from oil and gas development and associated assumptions in Section 4.3.3, and included spill data from the Colorado Oil and Gas Conservation Commission from 1999 to 2017, as well as a groundwater study (2012) that analyzes the potential for mixing of water from different aquifers due to hydraulic fracturing and disposal of produced water; a study on hydraulic fracturing and potential environmental impacts (2015); and a 2016 EPA report on impacts from hydraulic fracturing on drinking water. It is not feasible to address unlikely events or area-specific characterizations in an analysis of this scope. This will be analyzed in future, project-specific NEPA documents.

The BLM complied with NEPA's requirement to analyze the reasonably foreseeable impacts on water resources in the PRMP/FEIS.

## NEPA – Impact Analysis – Wilderness Characteristics

**UFORMP-080_ClabbersN_20190728**
**The Wilderness Society**
**Clabbers, Nicholas**
**Issue Excerpt Text:** Here, BLM recognizes that the planning area contains 42,150 acres of inventoried LWC, but under the preferred alternative, the agency would affirmatively protect the wilderness characteristics of none of that acreage. BLM proposes to manage 18,320 acres "to minimize impacts on wilderness characteristics," and leave the balance as "not managed" to minimize or protect those characteristics. Proposed RMP/FEIS at Table 4-13. To the extent BLM presents this as adequate protection, it is a smokescreen - although BLM's Proposed Action commits the agency to "minimize impacts" to a certain portion of LWC, it does so only "when and where possible," an assessment that is apparently up to its sole discretion without serious consideration or discussion as to how those decisions might be reached. Proposed RMP/FEIS at 4-206. Any supposed protections of LWC would fall by the wayside in the face of other land uses, most prominently development for energy production. Under its preferred alternative, BLM affirmatively indicates that it will "prioritize" other uses over the protection of LWC. Proposed RMP/FEIS at 2-137. In its discussion of the no-action alternative, BLM recognizes that "not managing for the explicit protection of the inventoried [LWC] would leave these lands vulnerable to surface-disturbing activities, which would likely diminish wilderness characteristics over time." Id. at 4-197 (emphasis added). While BLM is permitted to favor certain land uses over others in certain areas, the management strategy outlined in the RMP is far from the "delicate balancing" of land uses mandated by FLPMA. New Mexico, 565 F.3d at 710. LWC are a critical part of the agency's balancing under FLPMA and cannot be summarily dismissed. ONDA, 625 F.3d at 1121- 21. Moreover, it does not comply with FLPMA's mandatory requirement that BLM protect the public lands from "unnecessary or undue degradation." 43 U.S.C. §1732(b). BLM's proposals for effectuating its Proposed Action in this context are also deficient. BLM has provided only a cursory overview of its management strategies, frequently deferring to conditions that would be imposed by other programs to provide supposed impact minimization. See, e.g., 8 Proposed RMP/FEIS at 4-206 (NSO stipulation applied to fluid mineral leases); id. at 4-207 (SSR restriction for surface-disturbing activities). There are no specific "conditions of use that would avoid or minimize impacts," 2005 LUP Handbook Appx. C at 12, or "measures or criteria that will be applied to guide day-to-day activities occurring on public land" as required by BLM's own policies. Id. at 13. Furthermore, there is no consideration of any concrete "measures to minimize impacts on [wilderness] characteristic." 2012 LWC Manual at .06(A)(2)(d). BLM punts its strategy on how to

BLM_0167341

"minimize impacts" to its future site-specific decisions, stating only that it will "conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation." Proposed RMP/FEIS at 2-52. That approach is inconsistent with BLM's responsibilities under FLPMA, and the agency cannot rely on future, ambiguous measures to comply with its land-use planning obligations. See Burke, 981 F. Supp. 2d at 1114.

### UFORMP-080_ClabbersN_20190728
### The Wilderness Society
### Clabbers, Nicholas
**Issue Excerpt Text:** Even if the content of the Proposed RMP/FEIS itself passed muster, BLM violates its own procedures and policies in failing to provide the required weighing of resource values before deciding to prioritize other land uses over LWC. See, e.g., 2012 LWC Manual at .60(A)(1)(b) (BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics"). There is simply no discussion of why BLM decides to favor other uses over the protection of LWC. BLM does not identify what values the other resource uses will generate that make its decision to forgo protections for LWC the right one.

**Summary:**

The BLM's Preferred Alternative would not affirmatively protect the wilderness characteristics of inventoried lands with wilderness characteristics and would instead prioritize other uses over the protection of those characteristics. The management strategy outlined in the RMP does not reflect the "delicate balancing" of land uses mandated by FLPMA, does not comply with FLPMA's mandatory requirement that the BLM protect the public lands from "unnecessary or undue degradation," and fails to provide the required weighing of resource values before deciding to prioritize other land uses over protection of wilderness characteristics as specified in the 2012 BLM Lands with Wilderness Characteristics Manual 6340 at Section 1.6 (A)(1)).

**Response:**

Section 102(a)(7) of FLPMA declares that it is the policy of the United States that management of the public lands be on the basis of "multiple use" and "sustained yield." Section 103(c) of FLPMA defines "multiple use" as the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people.

FLPMA's multiple use policy does not require that all uses be allowed on all areas of the public lands. Through the land use planning process, the BLM evaluates and chooses an appropriate balance of resource uses, which involves tradeoffs between competing uses. The BLM has wide latitude to allocate the public lands to particular uses, and to employ the mechanism of land use allocation to protect for certain resource values, or, conversely, develop some resource values to the detriment of others, short of unnecessary and undue degradation.

All alternatives considered in the UFO RMP/EIS, as described in Chapter 2, provide an appropriate balance of uses on the public lands. All alternatives allow some level of all uses present in the Planning Area, in a manner that is consistent with applicable statutes, regulations, and BLM policy. The UFO RMP satisfies FLPMA's multiple use policy.

The UFO RMP provides for the balanced management of the public lands in the Planning Area. In developing the UFO RMP, the BLM complied with its planning regulations (43 CFR 1610), the requirements of NEPA, and other statutes, regulations, and Executive Orders related to environmental quality. The UFO RMP Proposed Alternative identifies appropriate allowable uses, management actions, and other mitigation measures that prevent the unnecessary or undue degradation of public lands. The UFO RMP/EIS analyzed and included mitigation measures that avoid potential future impacts altogether

BLM_0167342

by closing public lands to certain uses, and minimizes other potential future impacts by restricting certain uses on public lands.

The BLM conducted the analysis of lands with wilderness characteristics in the PRMP/FEIS in accordance with BLM Manual 6320 including analysis of both the benefits to and negative impacts on wilderness characteristics from a variety of planning decisions across all alternatives (see Section 4.3.12). Considering wilderness characteristics in the land use planning process may result in several outcomes including, but not limited to: (1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; (2) emphasizing other multiple uses, while applying management restrictions (e.g., conditions of use, mitigation measures) to reduce impacts on wilderness characteristics; or (3) prioritizing the protection of wilderness characteristics over other multiple uses (BLM Manual 6320). Under Alternative E, the agency's PRMP, the BLM would not manage lands to protect wilderness characteristics, and would instead manage to prioritize other multiple uses, while applying some management restrictions to minimize impacts on wilderness characteristics when and where possible.

The BLM outlined and defined the stipulations and mitigation measures that would be applied to resource uses to protect lands with wilderness characteristics. Specifically, Table 2-2 on page 2-53 references CSU-60, which would be applied to lands with wilderness characteristics. Page B-89 of Appendix B provides allowable uses associated with CSU-60.

Congress recognized that through the BLM's multiple-use mandate, there would be conflicting uses and impacts on the public land.

Because the UFO RMP would not authorize any uses of the public lands, and the alternatives evaluated in the FEIS comply with all applicable statutes, regulations, and policies, the UFO RMP will not result in "unnecessary or undue degradation of the lands" under Section 302(b) of FLPMA.

## NEPA – Impact Analysis -Mitigation

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** NEPA was enacted to promote efforts that will prevent or eliminate damage to the human environment. BMPs help "mitigate" environmental impacts. "Mitigation" is defined in CEQ regulations as measures to help, avoid, reduce or compensate for environmental impacts. 40 CFR 1508.20. BLM's failure to analyze the potential benefits of requiring these BMPs in alternatives does not satisfy NEPA's hard look mandate and frustrates the purpose of preparing an EIS (40 CFR 1502.1 states that the purpose of preparing an EIS is to "…provide full and fair discussion of significant environmental impacts and [ ] inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."). By failing to implement these BMPs in the RMP, BLM has failed to take adequate measures to minimize and mitigate the adverse impacts that will result from the RMP.

**Summary:**

The BLM has failed to take adequate measures to minimize and mitigate adverse impacts by not implementing BMPs in the RMP.

**Response:**

NEPA requires the BLM to include a discussion of measures that may mitigate adverse environmental impacts (40 CFR 1502.14(f), 40 CFR 1502.16(h)). Potential forms of mitigation include: (1) avoiding the impact altogether by not taking a certain action or parts of an action; (2) minimizing impacts by limiting the degree or magnitude of the action and its implementation; (3) rectifying the impact by repairing,

rehabilitating, or restoring the affected environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; or (5) compensating for the impact by replacing or providing substitute resources or environments (40 CFR 1508.20).

The UFO PRMP/FEIS analyzed stipulations that may be applied, as applicable, to all new leases and to expired leases that are reissued as well as BMPs and standard operating procedures as measures that avoid, minimize, or mitigate potential future impacts. Together, the stipulations noted in Appendix B, *Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities*, and the common standard operating procedures and BMPs listed in Appendix G, *Best Management Practices and Standard Operating Procedures*, help to minimize adverse impacts on the resources as noted in the impact analysis section on pages 4-237 through 4-239 and 4-242 through 4-244, and each alternative impact analysis on pages 4-247 through 4-271. At the RMP level, it is typically not feasible to analyze specific mitigation measures that rectify impacts, reduce impacts over time, or compensate for impacts, because the approval of an RMP does not authorize any specific implementation project or directly result in any on-the-ground impacts. The BLM would look at all appropriate mitigation measures during the decision-making process for future implementation actions in the Planning Area.

The UFO PRMP/FEIS complied with NEPA by including a discussion of measures that may mitigate adverse environmental impacts to the extent appropriate for an RMP.

## *NEPA – Impacts Analysis – Carbon/Greenhouse Gas Emissions*

### *UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
### *King, Laura*
**Issue Excerpt Text:** BLM failed to take a 'hard look' at the climate impacts of its preferred plan by refusing to consider carbon budgeting as a means of informing the public and decisionmakers about the impact of continued fossil fuel development in the planning area.9 BLM must disclose and assess the portion of the carbon budget that fossil fuel production under the UFO RMP will consume. On December 12, 2015, 197 nation-state and supra-national organization parties meeting in Paris at the 2015 United Nations Framework Convention on Climate Change Conference of the Parties consented to the Paris Agreement committing its parties to take action so as to avoid dangerous climate change. The Paris Agreement commits all signatories- including the United States-to a target holding long-term global average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels."10 Although President Trump announced on June 1, 2017 that the U.S. would withdraw from the Paris Agreement, the earliest possible effective withdrawal date is November 4, 2020, in accordance with Article 28 of the Agreement.

### *UFORMP-102_KingL_20190728*
### *Western Environmental Law Center*
### *King, Laura*
**Issue Excerpt Text:** BLM fails to adequately address climate change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable alternatives, mitigation measures and standards in the plan. Conservation Groups raised these issues in their comments on the DEIS, which is attached as Exhibit 1-1, at pp. 39-69. BLM acknowledges that "the projected emissions sources" from the Plan "will emit greenhouse gases and will thus contribute to the accumulation of atmospheric greenhouse gases, and potential climate change effects" as projected by the Intergovernmental Panel on Climate Change. FEIS at R-141. However, instead of taking action to reduce GHG impacts from the UFO planning area below the level of significance, e.g. by further limiting development and/or requiring further emission controls, the UFO insists that action is either not possible or not meaningful: Unfortunately, no analysis tools currently exist to describe the planning area's incremental contributions to the global phenomenon of climate change in terms of potential warming, drought, sea level rise, or other common environmental metrics

BLM_0167344

associated with increasing concentrations of greenhouse gases. The problem is, by nature, a cumulative issue, and any downscaling of the projected global climate changes effects to project/planning area scales (based on emissions scaling) does not provide meaningful analysis due to the fact that no studies have identified the precise relationship between specific levels of emissions from a particular source, and measurable differences in climate-change-related impacts. Nor has EPA or any other regulatory body adopted standards based on such impacts. Without specific thresholds with which to compare expected emissions, a quantitative analysis of potential differences in climate change impacts and mitigation among alternatives is not possible. FEIS at R-141. This type of dismissive approach fails to satisfy the guidance outlined in Department of Interior Secretarial Order 3226, discussed below, or the requirements of NEPA. "Reasonable forecasting and speculation is … implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
*King, Laura*
**Issue Excerpt Text:** The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 2,512,570 metric tons CO2e. FEIS at 4-22.55 BLM estimated 30-year total estimated cumulative indirect greenhouse gas emissions for "high" and "low" UFO oil and gas production scenarios: approximately 129 million tons CO2e for the "high" UFO oil and gas production scenario, and approximately 8 million tons CO2e for the "low" UFO oil and gas production scenario. FEIS at 4-29. Such emissions would make a significant contribution to total emissions from federal lands, and contribute significantly to total U.S. emissions.56 nowhere that we have found in the FEIS does BLM add up the direct and indirect emissions under the plan-a major failing that BLM must correct.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
*King, Laura*
**Issue Excerpt Text:** With respect to coal, BLM states that it is relying on a U.S. Forest Service EIS for the West Elk coal mine, which, according to the UFO, "concluded that it was not reasonable to assume that the 'No Action' Alternative (not making UFO coal available) would result in overall cumulative (global) greenhouse gas emissions reductions." FEIS at 4-29. That conclusion is incorrect. The Forest Service analysis referred to by BLM did conclude there would be substitution between coal and other fuels under a No Action scenario, such that overall U.S. GHG emissions would be different comparing Action and No Action alternatives. Moreover, the modeling the U.S. Forest Service relied on for West Elk assumed a full and immediate implementation of the Clean Power Plan.

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
*King, Laura*
**Issue Excerpt Text:** The volume of potential coal, oil and gas from the parcels available for lease in the UFO draft RMP and EIS is quantifiable, and the lifecycle GHG emissions impact from these new lease parcels must be disclosed to the public. In our comments on the DEIS (at pp. 44-48), we easily generated an accurate, site-specific impact analysis for each alternative by utilizing BLM's own Energy Policy and Conservation Act phase III Oil and Gas Inventory Model geodatabase and the Uncompahgre draft RMP DEIS alternative GIS shapefiles to establish future extractible oil and gas volume from the planning area.57 Then, we generated potential lifecycle greenhouse gas emissions for resultant oil and gas volumes using a peer-reviewed carbon calculator and lifecycle greenhouse gas emissions model developed by EcoShift consulting.58 This model is not novel in 57 Center for Biological Diversity, Maps and volume

estimates of future extractible oil and gas volume in the Uncompahgre planning area based on GIS mapping of U.S. Bureau of Land Management's EPCA Phase III Inventory GIS Data, published May 2008, found at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III/EPCA_III_geodata.html; U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html; Emails and Dropbox files from David Sinton, Geographic Information Systems Specialist, BLM Uncompahgre Field Office, re: Uncompahgre draft RMP and EIS shapefiles supplemental data (October 7, 2016 2:14 PM MT). Methodology used: Intersect the leasable oil and gas areas for each alternative provided in the Dropbox files and on the planning website for the Uncompahgre field office's draft RMP and EIS with the model layer from BLM's Oil and Gas Inventory Model Geodatabase. Then calculate new acreage for each polygon and multiply the "Total Oil Density" and "Total Gas Density" layers by this acreage to create volume data. The resultant maps are attached as Exhibits 79-83. 58 See Mulvaney (attached as Exhibit 23). its development or methodology. Numerous greenhouse gas calculation tools exist to develop lifecycle analyses, particularly for fossil fuel extraction, operations, and transport and end-user emissions. Despite the fact that Conservation Groups provided BLM with a complete GHG lifecycle emissions analysis, BLM failed to use it or conduct its own analysis.

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** As Conservation Groups stated in their comments on the DEIS (attached as Exhibit 1- I), at pp. 62-69, the BLM failed to monetize climate damages stemming from the UFO RMP. BLM uses faulty reasoning to defend why it has chosen not to use the social cost of greenhouse gas metric to monetize the RMP's emissions. First, the BLM reasons that "this action is not a rulemaking for which the SCC protocol was originally developed." FEIS at R-181. However, application of the social cost of carbon is not limited to rulemakings. NEPA requires agencies to fully and accurately estimate environmental, public health, and social welfare differences between alternatives, and the social cost of carbon is the best available tool to compare the climate impacts of alternatives. The tool, which provides a dollar estimate of the damage caused by each additional ton of carbon dioxide emitted into the atmosphere, operates the same way whether those emissions result from a federal agency rulemaking, a federal resource management plan, or a project level approval.

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** BLM should use the best tools available to it in order to fully analyze and disclose the climate impacts of its proposal. Given that the social cost of carbon and the social cost of methane were adopted by the IWG, which includes a dozen federal offices and agencies including the Department of Interior, BLM should use these tools to evaluate the climate impacts of its plan for the Uncompahgre planning area. Additionally, there are numerous studies that outline quantification tools that demonstrate the benefits of reducing greenhouse gas emissions and stabilizing the global climate as described above. BLM must utilize the latest climate tools to assign significance to the greenhouse gas emissions estimated in the UFO RMP FEIS as required by NEPA.

*UFORMP-102_KingL_20190728*
*Western Environmental Law Center*
*King, Laura*
**Issue Excerpt Text:** It is critically important to reduce methane waste from fossil fuel production in order to limit climate damages. Here, BLM failed to undertake a hard-look analysis of methane waste and global warming potential or adopt enforceable mitigation requirements to minimize methane emissions

BLM_0167346

and waste. Conservation Groups raised these issues in their DEIS Comments (attached as Exhibit 1-1), at pp. 69-89. The BLM discloses estimated direct (upstream and local midstream) annual methane emissions from the proposed action to be 64,532 metric tons. See FEIS Table 4-3. However, BLM does not disclose what leak rate this calculation represents, even though methane emission rates can differ quite dramatically from one oil and gas field to the next, as Conservation Groups have previously explained. Furthermore, the BLM underestimates the climate impact of these emissions. Specifically, BLM uses a global warming potential (GWP) of 34 over a 100-year time horizon (meaning that methane is assumed to be 34 times as potent as $CO_2$ over a 100-year time horizon). FEIS at 4-28. However, the 100-year GWP for methane was updated by the IPCC in a 2013 Report to reflect that methane is 36 times as potent as $CO_2$. Additionally, the IPCC's new research has calculated that methane is 84 times as potent as $CO_2$ over a 20-year time horizon. 72 Furthermore, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent as $CO_2$ over a twenty-year time period.73 These values should be used-or at the very least acknowledged-in the FEIS but are instead ignored. As one federal district court explained, in invalidating BLM's reliance exclusively on 100-year methane GWPs, "BLM's unexplained decision to use the 100-year time horizon, when other more appropriate time horizons remained available, qualifies as arbitrary and capricious." Western Org. of Res. Councils v. BLM, 2018 WL 1475470 at *15 (Mar. 26, 2018). The agency's quantitative assessment must account for methane's long-term (100-year) global warming impact and methane's short-term (20-year) warming impact using the latest peer-reviewed science to ensure that potentially significant impacts are not underestimated or ignored. See 40 C.F.R. § 1508.27(a) (requiring consideration of "[b]oth short- and long-term effects").

**Summary:**

BLM failed to adequately analyze GHG and carbon emissions in the FEIS because it:

- Did not consider or include a social cost of carbon analysis;
- Did not follow the guidance outlined in Department of the Interior Secretarial Order 3226;
- Did not complete a GHG lifecycle emissions analysis;
- Did not account for the latest peer-reviewed science for methane's long- and short-term warming impacts;
- Did not properly account for direct and indirect emissions; and
- Improperly relied on and interpreted the U.S. Forest Service study.

**Response:**

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground

BLM_0167347

changes. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

The FEIS used the Climate Change Baselines section of the BLM's 2015 Annual Report for an updated and comprehensive overview of the topography and climate for the region and a current understanding of the changes to global GHG emissions and climate that have occurred for the last few centuries. The information for the Annual Report section was obtained primarily from the latest Intergovernmental Panel on Climate Change Study (Fifth Assessment Report). For the 2015 Annual Report, the BLM Colorado estimated baseline downstream GHG emissions at approximately 17 percent of the total U.S. Federal oil and gas GHG emissions, and all Federal oil and gas downstream emissions are approximately 8.4 percent of the U.S. total oil and gas combustion (downstream) GHG emissions on an annual basis (see p. 3-4 in the FEIS).

For the RMP/EIS, the BLM developed projected total direct (upstream and local midstream) GHG emissions estimates for comparison across the alternatives. Table 4-3 shows GHG emissions totals by alternative for BLM/Federal activities only. These estimates were developed using RMP-specific information for the alternatives, along with CARMMS 2.0 calculators (for oil and gas) (see p. 4-22). The BLM provided a complete oil and gas development, production (extraction), and end-use life-cycle analysis, using CARMMS 2.0 oil and gas production projections for direct GHG emissions from existing and future Federal and non-Federal wells and estimated total 30-year (sum for years ~2020 to 2050) projected cumulative indirect (end-use) GHG emissions for "high" and "low" UFO oil and gas production scenarios. The indirect emissions were calculated using the 2018 U.S. Energy Information Administration's Annual Energy Outlook projected oil and gas production and associated GHG emissions estimates. In addition to end-use combustion-related GHG emissions (carbon dioxide and nitrous oxide), the CARMMS 2.0 calculators accounted for venting and fugitive methane emissions from various oil and gas equipment and operations including well completions, workovers, blow-downs, compressor engines, well-head fugitives, and tanks. EPA emissions factors and methodologies along with operator-provided information for western Colorado oil and gas development and operations were used to estimate these methane emissions.

In addition to the U.S. Forest Service EIS for the West Elk coal mine, the BLM used several other analyses and sources of information for assessing UFO coal-related potential GHG emissions and climate impacts over the life of the plan. Information from the BLM Energy-Focused GHG and Climate Change Report[3] was included in the RMP/EIS to describe potential future (years 2020 and 2030) GHG emissions for two energy development scenarios (normal and above-normal rates of energy production and consumption). The report contains emissions estimates for each BLM energy-related (oil, gas, coal) state, including Colorado, and included direct and indirect emissions from Federal and non-Federal energy-related development and consumption of coal, oil, natural gas, and natural gas liquids. The study used coal, oil, and natural gas production and consumption data presented in the U.S. Energy Information Administration's 2016 Annual Energy Outlook to determine growth factors to estimate 2020 and 2030 normal/high inventories. This report describes that Colorado Federal emissions due to coal production (direct) and consumption (indirect) are predicted to decrease from base year 2014 to 2030 for both the normal and high-growth scenarios. The RMP/EIS explains how overall GHG emissions reductions may occur while coal mining continues in the Planning Area.

Global warming potential (GWP) allows comparisons of the global warming impacts of different GHGs. Specifically, it is a measure of how much energy the emissions of 1 ton of a gas will absorb over a given period of time, relative to the emissions of 1 ton of carbon dioxide. The GWP was introduced in the Intergovernmental Panel on Climate Change's First Assessment Report, where it was also used to illustrate the difficulties in comparing components with differing physical properties using a single metric. The 100-year GWP was adopted by the United Nations Framework Convention on Climate

---

[3] Golder Associates Inc. 2017. Greenhouse Gas and Climate Change Report. Project Number 1539847.

BLM_0167348

Change and its Kyoto Protocol and is now used widely as the default metric. Per the GHG reporting rule under 40 CFR Part 98 Subpart A, the 100-year carbon dioxide equivalent factor of 25 is used for methane. While the methane GWP was updated in the Intergovernmental Panel on Climate Change's Fifth Assessment Report, the EPA's Inventory of U.S. Greenhouse Gas Emissions and Sinks complies with international GHG reporting standards under the United Nations Framework Convention on Climate Change. The choice of emission metric and time horizon depends on the type of application and policy context; hence, no single metric is optimal for all policy goals. In general, the uncertainty increases for metrics along the cause–effect chain from emission to effects. The 100-year GWP strikes a compromise between short-lived and long-lived GHG, as warming effects will be manifest over many hundreds of years, as opposed to short-lived GHGs exerting warming over only a few decades.

Regarding the information used for the analysis, the CEQ regulations implementing NEPA require that agencies use "high quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA Handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012).

For the analysis, operational, production, and construction activity data used to estimate emissions for proposed emission sources were obtained from UFO staff, the RFD scenario for oil and gas for the UFO, Colorado, and information about proposed projects within the Planning Area. Emission factors used to estimate proposed emissions were obtained primarily from the EPA's AP-42 Compilation of Air Pollutant Emission Factors (1995), EPA's nonroad engines, equipment, and vehicles emissions model (2009), EPA's Motor Vehicle Emissions Simulator (2010), American Petroleum Industry Compendium of Greenhouse Gas Emissions Estimation Methodologies for the Oil and Natural Gas Industry (2009), Colorado Department of Public Health and Environment, and Western Governors' Association – Western Regional Air Partnership (2005).

The BLM has explained the reasons for its choice not to utilize the SCC protocol for this RMP. See pages R-181 through R-183 of Appendix R of the FEIS (Secretarial Order 3289, 2009/10).

To summarize, the PRMP/FEIS did not undertake an analysis of SCC because (1) it is not engaged in a rulemaking for which the protocol was originally developed; (2) the Interagency Working Group, technical supporting documents, and associated guidance have been withdrawn; (3) NEPA does not require cost-benefit analysis and this NEPA process did not conduct an economic cost-benefit analysis; and (4) the full social benefits of energy production have not been monetized, and quantifying only the costs of GHG emissions but not the benefits would yield information that is both potentially inaccurate and not useful. The BLM complied with NEPA's requirement to analyze the impacts of carbon/GHG emissions in the PRMP/FEIS.

## NEPA – Impacts Analysis – Renewable Energy

### UFORMP-102_KingL_20190728
### Western Environmental Law Center
### King, Laura
**Issue Excerpt Text:** the BLM also fails to consider the impacts of coal and oil and gas development on renewable energy resources and the potential incompatibility of these resource uses. Instead, the FEIS simply states generally that: Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail: air quality, climate,

BLM_0167349

soils and water, vegetation, fish and wildlife, special status species, wild horses, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, energy and minerals, comprehensive trails and travel management, lands and realty, renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety. FEIS 4-321 (emphasis added). Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted: Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development . . . . FEIS 4-324. Given the urgent need to transition away from fossil fuels and toward renewable energy to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development.

**Summary:**

The BLM failed to analyze the impacts on renewable energy development from leasing allocations in the PRMP/FEIS.

**Response:**

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the PRMP/FEIS.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. This analysis identifies impacts that may result in some level of change to the resources, regardless of whether that change is beneficial or adverse.

As noted on page 4-449 of the PRMP/FEIS, solar energy has moderate to high potential in the Planning Area, while wind, geothermal, and biomass energy have low potential, due to the lack of commercial interest and existing infrastructure. The primary drivers of the pace of development will be market forces and policy variables outside the scope of the RMP. As discussed on page 4-320 of the PRMP/FEIS, of the four active coal fields in the Planning Area, two have limited potential for the next 20 years and the other two have limited rail service or produce low-quality coal. These coal fields have little overlap with areas of "moderate," "good," and "very good" solar energy potential in the Planning Area and are not anticipated to result in a substantial resource conflict (refer to Figure 5 of the Coal Resource and Development Potential Report and Figure 3-1 of the Renewable Energy Potential Report).

BLM_0167350

In addition, the BLM has complied with the requirements of 40 CFR 1508.7 and prepared a cumulative impact analysis based on the broad nature and scope of the proposed management options under consideration at the land use planning level. The cumulative impact analysis considered the effects of the planning effort when added to other past, present, and reasonably foreseeable (not highly speculative) Federal and non-Federal actions. The cumulative impacts section for renewable energy identifies actions that were considered in the cumulative impacts analysis and included actions in energy and mineral development, which include oil and gas activities as noted on page 4-324: "Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development." Additionally, in the RFD scenario, the BLM assumed the overall magnitude of development that could occur based on known oil and gas resources and current technologies and economic trends, which was considered in the impact analysis. However, it is not possible to estimate specific locations, times, and the pattern of oil and gas development, or rights-of-way for renewable energy projects in the PRMP/FEIS. Making assumptions regarding these factors would be speculative and would not contribute to a meaningful NEPA analysis. The BLM determined that oil and gas development has the potential to present a resource conflict with renewable energy development. As noted in Table 2-3 (PRMP/FEIS p. 2-115), an avoidance area allows some use and occupancy of BLM-administered lands, while protecting identified resources or values. These areas are potentially open to renewable energy projects, but the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value. All applications for renewable energy projects within the Decision Area would be reviewed on a site-specific basis when or if the BLM receives an application.

The analysis accounted for the relationship between the proposed action and these reasonably foreseeable actions. This served as the determining factor for the level of analysis performed and presented. The information presented in the PRMP/FEIS enables the decision-maker to make a reasoned choice among alternatives. The BLM adequately analyzed cumulative effects in the PRMP/FEIS.

## NEPA – Impacts Analysis – Socioeconomics

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
*Baumgarten, David*
**Issue Excerpt Text:** Proposed RMP/Final EIS included Mesa County in the socio-economic impact analysis - even though it is outside of the planning area. This inclusion skews the economic impact data to enable development of an inaccurate picture of the true economic benefits of the oil and gas industry within the Uncompahgre Field Office managed areas. We acknowledge the beneficial economic impacts of the industry within Gunnison County but feel that accurate and relevant data points of areas within the Uncompahgre Field Office managed areas ought be used in this analysis.

### UFORMP-022_BaumgartenD_20190725
### Board of County Commissioners of Gunnison County
*Baumgarten, David*
**Issue Excerpt Text:** In addition to hunting and fishing, which have been integral to local economies, outdoor recreation is a huge and growing driver to the area's economy. Alternative B/B.I includes NL and NSO stipulations for parks, wildlife refuges, and for federal recreation lands such as Special Recreation Management Areas, including Jumbo Mountain, as well as for public lands recognized for their unique wilderness character. At a minimum, NSO would ensure that the important, and increasing, recreational uses of these lands are given the attention they warrant. In addition, the economic analysis of the economic impacts of recreation within the UFO uses flawed and insufficient data to determine the comparative economic impacts of the multiple uses on the BLM land within the region. There is clear and accurate information on recreation economic benefits within the 2019 Colorado Statewide

BLM_0167351

Comprehensive Outdoor Recreation Plan (SCORP) and within the federal governments own 2019 US Bureau of Economic Analysis which has Outdoor Recreation as a stand-alone designation. The BLM should redo its analysis utilizing these significant resources for its comparisons.

**Summary:**

The socioeconomic analysis study area was not appropriate for analyzing the economic effects of the oil and gas industry within the UFO, and the economic impacts analysis of recreation failed to use adequate resources.

**Response:**

NEPA directs that data and analyses in an EIS must be commensurate with the importance of the impact (40 CFR 1502.15), and that NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail (40 CFR 1500.1(b)). The BLM is required to take a "hard look" at potential environmental impacts of adopting the UFO RMP.

The level of detail of the NEPA analysis must be sufficient to support reasoned conclusions by comparing the amount and the degree of change (impact) caused by the proposed action and alternatives (BLM Handbook H-1790-1, Section 6.8.1.2). The BLM need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.

The CEQ regulations implementing NEPA require that agencies use "high quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA Handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012).

A land use planning–level decision is broad in scope. For this reason, analysis of land use plan alternatives is typically broad and qualitative rather than quantitative or focused on site-specific actions. The baseline data provide the necessary basis to make informed land use plan–level decisions.

As the decisions under consideration by the BLM are programmatic in nature and would not result in on-the-ground planning decision or actions (e.g., the BLM is not approving an Application for Permit to Drill to start drilling), the scope of the analysis was conducted at a regional, programmatic level. The analysis focuses on the direct, indirect, and cumulative impacts that could potentially result from on-the-ground changes. The UFO Planning Area, as indicated in Section 1.2, includes lands in Mesa County, which are illustrated in Figure ES-1. The study area for the socioeconomic analysis is defined as all lands within the six counties that primarily compose the Planning Area (Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel). These counties were identified as the socioeconomic Planning Area because the BLM-administered lands of the UFO lie within these counties, and most of the effects on the population and economy would occur within this region. The Draft RMP/EIS analysis has been amended to include Mesa County because it is recognized that, as a regional economic center, Mesa County influences and is affected by jobs and economic activity in the Planning Area. The PRMP/FEIS notes that the Planning Area excludes Grand Junction and the surrounding metropolitan area, and the portion of Mesa County within the Planning Area is largely rural. As a result, county-wide data, which include Grand Junction, may not be reflective of the portion of the county within the Planning Area; however, there are regional economic ties between Grand Junction and communities in the Planning Area. These economic ties include supporting natural gas development in the Planning Area; therefore, it was appropriate to include Mesa County in the socioeconomic Planning Area analysis. Quantitative economic impacts associated with natural gas development were assessed for two phases—well development (including drilling and

completion) and production—and were based upon assumptions informed by the UFO RFD scenario (2012) estimates and BLM UFO minerals specialists. As stated in the PRMP/FEIS (p. 4-443), the regional economic impact of gas production on Planning Area land results primarily from expenditures to drill wells and to extract gas from completed wells. Changes to local economic activity would occur based on differing levels of drilling or extraction or changes in cost of development or extraction. Appendix S provides cost estimates that were used for the analysis. Additionally, the PRMP/FEIS indicates that "It is likely that the counties containing the most BLM-administered land, the most intensively used BLM-administered land, or the most split-estate minerals within the Planning Area would be most affected by changes in resource management. Similarly, the counties with the most BLM-administered lands are likely to be the most affected by funding to states and counties through federal payments in lieu of taxes (PILT) and uses of the public lands" (see p. 3-140).

The BLM acknowledges that the 2019 Colorado SCORP and the U.S. Bureau of Economic Analysis Outdoor Recreation Satellite Account (ORSA) data provide valuable information on the effect of outdoor recreation on the economy. For example, the ORSA provides an estimate of the size of the outdoor recreation economy and its contribution to the U.S. gross domestic product. Additionally, the ORSA provides gross output, compensation, and employment estimates for the U.S. outdoor recreation economy as well as information on how individual industries contribute to the U.S. outdoor recreation economy. The ORSA provides a look at the national economy as a whole and the contribution of outdoor recreation at that national scale; it does not provide this information at a state or regional scale. The 2019 Colorado SCORP does provide the economic contributions of outdoor recreation in Colorado on the State's economy as well as by regional economies. The 2019 Colorado SCORP also provides hunting economic contributions by county. The 2019 Colorado SCORP does not provide the economic contribution of outdoor recreation on UFO BLM lands on the local Planning Area economy.

In the UFO PRMP/FEIS, the BLM acknowledges that recreation plays a large role on public lands in the UFO, and many recreationists rely on BLM-administered lands for their activities. While entry fees are a source of income for the BLM, recreationists also spend money in the area on food, lodging, supplies, fuel, and other commodities. This spending has an economic impact on the local economy, and many smaller communities rely on this source of income from visitors. The economic analysis of recreation in the UFO PRMP/FEIS focused on the economic contributions that visitors/outdoor recreationists on UFO lands provide to the local Planning Area economy. There are two determining factors associated with analyzing economic contributions from outdoor recreation on UFO lands: (1) visitor numbers and (2) how much each visitor spends while in the area. Average visitor data from the BLM Recreation Management Information System for fiscal years 2012 through 2016 were used to estimate current visitor numbers. Spending profiles for recreationists in the Planning Area are assumed to be similar to those determined for other Federal lands in Colorado. Specifically, recent data from the Grand Mesa Uncompahgre National Forest visitor use monitoring surveys, which include expenditure data, were utilized for the spending profiles. A similar analytical process of utilizing Impact Analysis for Planning (IMPLAN) to determine economic contributions was conducted, as was done in the 2019 Colorado SCORP. The results from the UFO PRMP/FEIS and the 2019 Colorado SCORP are not comparable due to geographic scale differences in the study areas used (meaning the economies in which economic contributions were analyzed) and data used; however, the analysis in the UFO PRMP/FEIS provides a more nuanced approach by focusing solely on visitation/outdoor recreation on UFO lands (FEIS pp. 3-102–3-108 and pp. 4-273–4-305).

## NEPA – Impacts Analysis – Uranium Mining

**UFORMP-099_MarkwellA_20190728**
**San Miguel County, Colorado**
*Markwell, Amy*
**Issue Excerpt Text:** The current status of the public lands and the likelihood of uranium mining within the project area is set out in Federal District Court Judge Martinez's March 18, 2019 Order (see

BLM_0167353

attachments A-D) dissolving the injunction on lease tracts within the UFO jurisdiction where Dpt of Energy (DOE) manages the minerals and BLM manages the surface. The PRMP/FEIS relies on outdated information and analysis based on the now-invalidated Pinon Ridge Mill license. As stated in the Martinez ruling (page 11): "[T]he supplemental BA [the US Fish and Wildlife Service prepared for the uranium lease tracts jointly managed by BLM and DOE] plausibly and adequately explains why the Piñon Ridge Mill will likely never be constructed, and why substantial uranium mining is not likely to occur anyway". The Pinon Ridge license was revoked by Colorado regulators on April 26, 2018, based on the April 17, 2018 findings entered by Hearing Officer Dana, pursuant to the September 3, 2014 remand order of the Colorado District Judge McGahey that held the license in abeyance. Federal Judge Martinez's Order further confirms that "the only potential location that ULMP-generated uranium ore could be milled is the White Mesa Mill near Blanding, Utah, roughly 100 miles from Paradox Valley." (page 11). Both of Judge Martinez's conclusions - uranium mining is not likely, and White Mesa is the only potential mill for ore mined from the project area - must be applied to analysis of all uranium mines, whether part of the relocatable minerals BLM leads or the DOE lease program that BLM serves as the surface management agency. The PRMP/FEIS - and particularly the decision to adopt the new Alternative E - is devoid of accurate direct, indirect and cumulative impacts analysis of the current legal status or actual conditions that have changed since the DRMP/DEIS was issued.

**Summary:**

The BLM failed to adequately analyze the current conditions of uranium mining within the Planning Area.

**Response:**

The CEQ regulations implementing NEPA require that agencies use "high quality information" (40 CFR 1500.1(b)). NEPA regulations require the BLM to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" (40 CFR 1502.24).

The BLM NEPA Handbook also directs the BLM to "use the best available science to support NEPA analyses, and give greater consideration to peer-reviewed science and methodology over that which is not peer-reviewed" (BLM Handbook H-1790-1, p. 55). Under the BLM's guidelines for implementing the Information Quality Act, the BLM applies the principle of using the "best available" data in making its decisions (BLM Information Quality Act Guidelines, February 9, 2012).

The uranium-vanadium mineral resource potential of the Planning Area is classified according to the system outlined in BLM Manual 3031. Under this system, occurrence potential ratings are based on the geologic likelihood of a mineral's presence in a particular area. The ratings do not reflect the economic feasibility of developing a resource, as this can vary depending on demand and technology. The potential for development of uranium-vanadium mineral resources from the Morrison Formation in the Uravan Mineral Belt part of the Planning Area as projected over the life of the RMP, for 20 years, is rated as high occurrence potential with a high level of certainty. Figure 3-23 (Active Uranium Exploration Sites in the Morrison Formation) depicts active uranium exploration sites in the Morrison Formation within the Planning Area. In addition, in Chapter 4, Table 4-1 (Past, Present, and Reasonably Foreseeable Projects, Plans or Actions that Comprise the Cumulative Impact Scenario), it is stated that the Pinon Ridge Mill may be constructed. The section continues to characterize the status of energy and minerals development and was updated during the FEIS as depicted by shaded text.

The UFO RMP includes a *References* section in Volume II of the PRMP/FEIS, which lists information considered by the BLM in preparation of the PRMP/FEIS.

The BLM has considered the Federal District Court for the District of Colorado's March 18, 2019 Order in the *Colorado Environmental Coalition, et al. v. Office of Legacy Management and U.S. Department of*

BLM_0167354

*Energy* (No. 08-cv-1624) and determined the order does not provide significant new information, and the information would not result in effects outside the range of effects already analyzed in the PRMP/FEIS.

The BLM relied on high-quality information and the best available data in preparation of the PRMP/FEIS.

## *NEPA – Response to Comments*

### *UFORMP-022_BaumgartenD_20190725*
### *Board of County Commissioners of Gunnison County*
#### *Baumgarten, David*
**Issue Excerpt Text:** At the time of release of this Proposed RMP/Final EIS, the Gunnison Sage-Grouse Rangewide RMP Amendment has been canceled and the process terminated. This new situation changes the context and significance of Gunnison County's comments and input into the need for necessary land protection, resource allocation, and stipulations to protect and enhance GuSG populations and habitat within the Uncompahgre Field Office managed areas.

### *UFORMP-080_ClabbersN_20190728*
### *The Wilderness Society*
#### *Clabbers, Nicholas*
**Issue Excerpt Text:** As to the alternative approach submitted by TWS as to prioritizing oil and gas allocations based on development potential, see supra, BLM excerpted relevant portions of TWS's comments on the Draft RMP, see Proposed RMP/FEIS Appx. R at 438-39, but then utterly failed to address them in its response to comments. It summarizes this five-page section of the TWS comments (pp. 96 to 101) and 21-page appendix (Appendix 5, included here as Exhibit 4) into a single paragraph comprising two sentences, and then it responds by simply pointing the reader to a chapter in the Draft RMP/EIS and explaining that BLM's alternatives do not address mineral potential on lands managed by the U.S. Forest Service. See Proposed RMP/FEIS Appx. R at 455. It also states summarily, "Future technologies could change the fluid minerals development potential assumptions, making areas viable in the future; therefore, current development potential alone was not used to allocate closures to fluid minerals." Not only does this explanation fail to respond to the substance of TWS's detailed comments or alternative approach, but it implies that because technology is evolving, development potential is not relevant to allocating lands for mineral development. As relevant here, it also fails to demonstrate that the agency has individually considered or addressed the comments submitted or provided a response with sufficient explanation as required by NEPA.

**Summary:**

The BLM failed to respond to comments to the level required by NEPA.

**Response:**

The BLM is required to assess, consider, and respond to all substantive comments received (40 CFR 1503.4). Substantive comments are those that reveal new information, missing information, or flawed analysis that would substantially change conclusions (BLM Handbook H-1601-1, p. 23-24).

In compliance with NEPA, the BLM considered all public comments submitted on the Draft RMP/EIS. The BLM complied with 40 CFR 1503.4 by performing a detailed comment analysis that assessed and considered all substantive comments received. Appendix R of the FEIS presents the BLM's responses to all substantive comments.

The BLM summarized the issues raised by each comment letter and provided a meaningful response. The BLM's response identifies any modifications to the alternatives, improvements to the impacts analysis, or

BLM_0167355

factual corrections made as a result of public comment. The BLM's response also explains why certain public comments did not warrant further agency response.

BLM's comment response process does not treat public comments as if they were a vote for a particular action. The comment response process ensures that every comment is considered when preparing the PRMP/FEIS.

The BLM adequately responded to public comments on the Draft RMP/EIS.

BLM_0167356

| | |
|---|---|
| **From:** | Taylor McKinnon |
| **To:** | Losasso, Angela M; CFO_RMP, BLM_NM |
| **Cc:** | tmckinnon@biologicaldiversity.org; Diana Dascaiu-Joffe; Michael Saul |
| **Subject:** | [EXTERNAL] Supplementary information and comment on the Uncompahgre Field Office Proposed RMP/Final EIS and Carlsbad Field Office Draft RMP/EIS |
| **Date:** | Thursday, March 5, 2020 1:12:47 PM |
| **Attachments:** | Uncompahgre and Carlsbad RMP EIS New information Final.pdf |

Dear Mr. Gonzalez and Ms. Losasso:

The Center for Biological Diversity (Center) provides the attached supplementary information and comment in relation to the Proposed RMP/Final EIS for the Uncompahgre Field Office and Draft RMP/EIS for the Carlsbad Field Office, to which the Center earlier provided substantive comment.

Please do not hesitate to contact me with questions.

Thanks,

Taylor McKinnon
Center for Biological Diversity
(801) 300-2414
@PublicCarbon

 CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

5 March 2020

Hector Gonzalez, RMP Team Lead
Bureau of Land Management, Carlsbad Field Office
620 East Greene Street
Carlsbad, New Mexico 88220
blm_nm_cfo_rmp@blm.gov

Angela Losasso
Project Lead/Planner
Bureau of Land Management, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
alosasso@blm.gov

      Re:     Supplementary Information and Comment on the Proposed RMP/Final EIS for the
                  Uncompahgre Field Office and Draft RMP/EIS for the Carlsbad Field Office

Dear Mr. Gonzalez and Ms. Losasso,

      The Center for Biological Diversity (Center) provides the following supplementary
information and comment in relation to the Proposed RMP/Final EIS for the Uncompahgre Field
Office and Draft RMP/EIS for the Carlsbad Field Office, to which the Center has earlier
provided substantive comment.

      NEPA requires the Bureau of Land Management to not only quantify direct, indirect, and
cumulative greenhouse gas emissions from federal actions, but also analyze the impacts of these
emissions on our climate.  The following peer-reviewed studies provide metrics that link units of
greenhouse gas pollution or temperature change to specific observed and predicted future
physical measures of environmental change—Colorado River flow declines, and sea ice loss.
These metrics provide BLM with specific tools by which to measure changes that would be
expected to result to both Colorado River flows and sea ice extent given direct, indirect, and
cumulative greenhouse gas pollution that would result from greenhouse gas pollution from
federal fossil fuel development under the revised Carlsbad and Uncompahgre RMPs.  We urge
BLM to use information in these studies to render more specific assessments of the regional and
global environmental impacts that are likely to result from both plans' implementation and their
related direct, indirect, and cumulative greenhouse gas pollution. In particular, the increasing
volume and precision of studies linking declines in Colorado River system flows to greenhouse
gas emissions provide the agency with a clear and reliable method by which to understand the
relationship between emissions-increasing agency decisions and the regional impacts of resulting
climate change. Both studies are appended to this letter.

*Arizona • California • Colorado • Florida • N. Carolina • New York • Oregon • Virginia • Washington, D.C. • La Paz, Mexico*

P.O. Box 710, Tucson, AZ 85702-0710   tel (520) 623.5252   fax (520) 623.9797   BiologicalDiversity.org

1. **Colorado River flow dwindles as warming-driven loss of reflective snow energizes evaporation**

**Abstract:** The sensitivity of river discharge to climate-system warming is highly uncertain and governing processes are poorly understood, impeding climate-change adaptation. A prominent exemplar is the Colorado River, where meteorological drought and warming have been shrinking a water resource that supports more than USD 1 trillion per year of economic activity. Monte-Carlo simulation with a radiation-aware hydrologic model resolves the longstanding, wide disparity in sensitivity estimates and reveals the controlling physical processes. **We estimate that annual-mean discharge has been decreasing by 9.3% per °C of warming due to increased evapotranspiration, mainly driven by snow loss and consequent decrease of reflection of solar radiation**. Projected precipitation increases likely will not suffice to counter fully the robust, thermodynamically induced drying. Increasing risk of severe water shortages is expected.

2. **Observed Arctic sea-ice loss directly follows anthropogenic $CO_2$ emission**

**Abstract:** Arctic sea ice is retreating rapidly, raising prospects of a future ice-free Arctic Ocean during summer. Because climate-model simulations of the sea-ice loss differ substantially, we used a robust linear relationship between monthly-mean September sea-ice area and cumulative carbon dioxide ($CO_2$) emissions to infer the future evolution of Arctic summer sea ice directly from the observational record. **The observed linear relationship implies a sustained loss of 3 ± 0.3 square meters of September sea-ice area per metric ton of $CO_2$ emission.** On the basis of this sensitivity, Arctic sea ice will be lost throughout September for an additional 1000 gigatons of $CO_2$ emissions. Most models show a lower sensitivity, which is possibly linked to an underestimation of the modeled increase in incoming longwave radiation and of the modeled transient climate response.

Thank you for your consideration of this information.

Taylor McKinnon
Senior Public Lands Campaigner
Center for Biological Diversity
1536 Wynkoop St., Ste. 421
Denver, CO 80202
(801) 300-2414
tmckinnon@biologicaldiversity.org

Attachments: 2


*Science*

*REPORTS*

Cite as: P. C. D. Milly, K. A. Dunne, *Science*
10.1126/science.aay9187 (2020).

# Colorado River flow dwindles as warming-driven loss of reflective snow energizes evaporation

**P. C. D. Milly\* and K. A. Dunne**

U.S. Geological Survey, Princeton, NJ, USA.
\*Corresponding author. Email: cmilly@usgs.gov

**The sensitivity of river discharge to climate-system warming is highly uncertain and governing processes are poorly understood, impeding climate-change adaptation. A prominent exemplar is the Colorado River, where meteorological drought and warming have been shrinking a water resource that supports more than USD 1 trillion per year of economic activity. Monte-Carlo simulation with a radiation-aware hydrologic model resolves the longstanding, wide disparity in sensitivity estimates and reveals the controlling physical processes. We estimate that annual-mean discharge has been decreasing by 9.3% per °C of warming due to increased evapotranspiration, mainly driven by snow loss and consequent decrease of reflection of solar radiation. Projected precipitation increases likely will not suffice to counter fully the robust, thermodynamically induced drying. Increasing risk of severe water shortages is expected.**

The Upper Colorado River Basin (UCRB) supplies water to ~40 million people and supports ~16 million jobs (*1*). Atmospheric warming and recent precipitation deficits heighten concern about the future (*2–6*), but the response of river discharge to warming remains highly uncertain. An implicit assumption in the UCRB hydroclimatic change literature is that two climatic mean variables—precipitation and temperature—determine runoff (hence, river discharge) response, following constant sensitivities $\alpha$ (% discharge change per % precipitation change) and $\beta$ (% discharge change per °C warming). Empirical regression analyses imply large (–13 to –15% °C$^{-1}$) values of $\beta$ (*4, 6–8*), inconsistent with estimates in the range –2 to –9% °C$^{-1}$ obtained from perturbation of temperature inputs (the "delta" method) to hydrologic-model simulations (*2, 9, 10*) and from theory (*11*); for $\alpha$, regression and delta estimates are in much better agreement (*10*). The discrepancy in $\beta$, which is seen for rivers around the globe (*11*), translates into great uncertainty in magnitude of future impacts on human livelihood, economic activity and ecosystem health. The situation is exacerbated by limited process understanding in the presence of hydroclimatic non-stationarity (*12*). Indeed, the empiricism inherent in the regression approach and even in the estimation of energy-driven evaporative demand in the hydrologic models (*13*) leaves open to question the use of such methods for extrapolation of past observations to the future under anthropogenic climate change. Accordingly, we give special attention here to surface net radiation—the ultimate driver of evapotranspiration—and to its modulation by snow-affected surface albedo (*14*), rather than relying on temperature measurements as a surrogate for energy availability. We find a strong influence of snow-affected albedo on radiation balance in the UCRB (Fig.

1) (*15*), necessitating its consideration in process-based estimation of $\beta$.

Herein we address the following questions in turn by use of a monthly water-balance model grounded in a suite of observations: Does the model reproduce the historical regression-based $\beta$? What is the model's delta-based $\beta$, and why does it differ from the regression-based value? Can the two values be reconciled? What physical processes control $\beta$? How sensitive is our $\beta$ estimate to the assumptions in our analysis? How much did warming contribute to the historical hydrological drying in the UCRB? What future changes in UCRB discharge can be expected?

In addition to the snow-water equivalent (SWE), albedo and radiation measurements used to develop the relations in Fig. 1, we used observations of precipitation and temperature (Fig. 2 and Fig. 3, A and B), as well as discharge (Fig. 3G), to constrain a hydrologic simulation model (*15*), in order to elucidate the processes controlling sensitivity and to reconcile divergent empirical sensitivity estimates. The model has a monthly time step and divides the 290,000-km$^2$ UCRB into 960 subareas in order to capture the strong heterogeneity induced by rugged (2,700-m relief) topography (Fig. 2C). Rain-snow partitioning depends on temperature. Evaporative potential is set to the rate of non-water-stressed evapotranspiration under conditions of minimal advection (*16*). Fifteen model parameters are estimated by maximizing goodness of fit to observed discharge (*15*). Goodness of fit is measured with respect to mean, linear trend, regression-based sensitivities $\alpha$ and $\beta$, and Nash-Sutcliffe coefficient of efficiency. (Including a correction that accounts for temporary subsurface storage of runoff before entering the river (*11*), which has previously been neglected, and using an October–September

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167360

water year, we found observational regression-based $\alpha$ and $\beta$, ± one standard error of estimation, to be 1.98 ± 0.16 and −16.1 ± 2.9% °C$^{-1}$, respectively. Neglecting the storage correction yields $\beta = -13.1 \pm 2.4\%$ °C$^{-1}$, consistent with earlier analyses.) Sensitivity of our results to the goodness-of-fit criteria is presented in the Supplemental Materials (15).

Of 500,000 trial parameter sets, 171 satisfied the goodness-of-fit criteria (15), and these formed a model ensemble for subsequent analyses. As temperature rose, the ensemble-mean SWE and, hence, following the relations in Fig. 1, albedo decreased, leading to a basin-mean increase of net radiation by 3.0%/century over the study period (Fig. 3, C to E). With an associated increase in evapotranspiration (Fig. 3F), the ensemble-mean modeled annual discharge (Fig. 3G) fell by 20.1%/century, compared with 19.6%/century observed; $r^2$ between observed and ensemble-mean modeled annual discharge is 0.82. Within the ensemble, the models' regression-based, storage-corrected sensitivities $\alpha$ and $\beta$ ranged from 1.89 ± 0.16 to 2.08 ± 0.18 (mean 1.99) and from −15.4 ± 2.9 to −16.9 ± 3.0 (mean −15.9) % °C$^{-1}$, respectively, consistent with observational estimates.

The ensemble was re-run with temperature increased by 1°C and differences from the base simulations were used to estimate sensitivities. The delta-based $\beta$ ranged from −7.8 to −12.2 (mean −9.3) % °C$^{-1}$, consistent with higher-magnitude values from previous delta-based analyses (2, 10) and lower than regression-based estimates. Simulations with precipitation perturbed by +1% each month yielded delta-based $\alpha$ of 2.21 to 2.83 (mean 2.52). It is not surprising that some previous delta estimates of $\beta$ were as high as ours nor that some were lower, because models had a variety of features, with varying physical realism, differentially sensitizing their evapotranspiration to temperature, and the mechanisms underlying $\beta$ generally were neither identified nor constrained with measurements.

We found that the difference between the model's regression- and delta-based sensitivities is explained by confounding variables: seasonal shifts of precipitation that historically accompanied annual anomalies of temperature. During warm water years, precipitation tended to shift from December-April to August-September. Because discharge sensitivity to precipitation is strong in winter (3) (when extra precipitation tends to run off) and weak in summer (when extra precipitation tends to evaporate), runoff has been suppressed during warm years. To remove the confounding variables from our delta/regression comparison, we modified the original experiments so that the monthly course of precipitation in every year was set to climatology times a factor that preserved the observed annual anomaly; for temperature, the annual anomalies were applied as additive constants to the climatology. For these experiments, the models' regression-based $\alpha$ and $\beta$ were 2.26 ± 0.03 to 3.00 ± 0.08 (mean 2.59 ±

0.04) and −6.5 ± 0.7 to −11.6 ± 1.0% (mean −8.1 ± 0.7) °C$^{-1}$, respectively, in reasonable agreement with the delta-based values; the difference between −8.1 ± 0.7 and −9.5 is only marginally significant, and allowance must be made for the simple formulation of the storage correction for the regression estimate (15).

The substantial dependence of inferred sensitivities on seasonal distributions of climate perturbations implies that use of simple annual sensitivity parameters ($\alpha$ and/or $\beta$) can severely distort climate-change analyses. This is a shortcoming of both the regression and delta approaches. With regression, the derived sensitivities depend on basin-specific historical intra-annual and interannual variability, including the confounding precipitation-temperature covariance. In the usual delta approach, the perturbations have no seasonal variations, and the roles of precipitation and temperature are decoupled, so delta sensitivities are more readily interpreted. However, the best approach for hydroclimatic projections is to use the delta approach with projected monthly varying climate changes.

To understand the ensemble-mean −9.3 °C$^{-1}$ magnitude of the delta-based $\beta$ and its potential relevance for ongoing anthropogenic climate change, we consider the physical processes at play. Temperature enters the model in four ways: (1) because SWE depends on the phase of precipitation and the rate of snow melt, the surface albedo and hence the evaporative potential are temperature-dependent; (2) the maximum fraction of net radiation that is converted to latent heat flux depends on the temperature-dependent slope of the saturation vapor-pressure curve (11, 16); (3) evapotranspiration from soil ceases below a critical temperature, simulating winter dormancy of vegetation; and (4) other effects of snow storage. By disabling these processes one at a time, we found that the contributions from the first three processes were −6.2, −2.1, and −0.3% °C$^{-1}$, respectively; other snow-storage effects and nonlinear interactions account for the remainder. Figure 4 summarizes the foregoing reconciliation of sensitivity estimates.

We repeated the analysis under the assumption that a change in albedo induces negligible radiation feedbacks (Fig. 1B, red, instead of blue). We found an ensemble mean $\beta$ of −7.8% °C$^{-1}$, indicating that our findings are somewhat sensitive to uncertainties in albedo-radiation feedback.

Unaccounted factors in our analysis include externally driven changes in radiation (e.g., from changing atmospheric composition), changes in boundary-layer entrainment (17), and stomatal response to $CO_2$ fertilization (18); the latter two factors tend to decrease the efficiency of conversion of net radiation to potential evapotranspiration. We found the potential net effect of these factors on $\beta$ to be negligible (15).

Our parameterization of potential evapotranspiration by use of the Priestley-Taylor formulation (16), allowing no

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167361

atmospheric aridity feedback caused by actual (non-potential) evapotranspiration, could be questioned. We therefore repeated our analysis with allowance for this feedback (15), finding negligible difference in results. Another caveat to keep in mind is that our adoption of the Priestley-Taylor formulation, even when we consider the aridity feedback, implicitly assumes that variabilities (in particular, long-term trends) of wind speed and humidity will not affect the value of the Priestley-Taylor alpha, even though they do play a documented role in variabilities, on certain time scales, of pan evaporation (19) and of the American Society of Civil Engineers Standardized Reference Evapotranspiration (20).

How much have temperature changes contributed to the period-of-record discharge trend (−19.6/−20.1%/century observed/modeled) and the 2000-2017 discharge deficit (−15.9/−17.6% of previous mean observed/modeled)? If we set temperature every year to its climatology, the model yields a discharge trend of −8.4%/century and a discharge deficit of −8.1%. We conclude that temperature sensitivity accounts for more than half of both drying phenomena, consistent with a previous analysis (21).

What about the future? To characterize future temperature and precipitation, we used the eight out of 24 Coupled Model Intercomparison Project Phase 5 (CMIP5) climate models that simulated 1913-2017 discharge (area-weighted runoff) within a factor of 2 of the observed discharge. (The constraints used for climate-model selection were much less stringent than those used for selection of hydrologic-model parameter sets, because the hydrologic model was driven by historical climate time series, whereas the modeled climate time series were biased and independent of actual history.) From CMIP5's historical, RCP4.5, and RCP8.5 (RCP=Representative Concentration Pathway) scenarios, we computed month-of-year temperature climatology increases from 1913-2017 to 2036-2065, added them to the observed historical record, and re-ran the ensemble. Across the set of eight climate models, ensemble-mean discharge decreased 14-26% (RCP4.5) and 19-31% (RCP8.5).

Could possible future increases in precipitation counteract the temperature-driven drying? When month-of-year temperature increases and precipitation ratios from the climate models were both applied, the ensemble-mean discharge decreased 5-24% (RCP4.5); under RCP8.5, changes ranged from an increase of 3% to a decrease of 40%. Thus, it appears unlikely that precipitation changes will be sufficient to counter fully the temperature-induced drying, though they might moderate it.

Many water-stressed regions around the world depend on runoff from seasonally snow-covered mountains, and more than one sixth of the global population relies on seasonal snow and glaciers for water supply (22). It is well established that snow pack serves as a reservoir that beneficially regulates timing of water availability (23). Our findings imply that snow cover is also a protective shield that limits radiation absorption by, and consequently evaporative losses from, this natural reservoir; incidentally, this explains the observed phenomenon of precipitation as snowfall favoring runoff (24). The progressive diminution of this ecosystem service as a result of climate change will have a deleterious effect on water availability in snow-fed regions that are already stressed, including the UCRB.

**REFERENCES AND NOTES**

1. T. James, A. Evans, E. Madly, C. Kelly, "The economic importance of the Colorado River to the basin region" (L. William Seidman Research Institute, Arizona State Univ., 2014).
2. G. J. McCabe, D. W. Wolock, Warming may create substantial water supply shortages in the Colorado River basin. *Geophys. Res. Lett.* **34**, L22708 (2007). doi:10.1029/2007GL031764
3. C. A. Woodhouse, G. T. Pederson, K. Morino, S. A. McAfee, G. J. McCabe, Increasing influence of air temperature on upper Colorado River streamflow. *Geophys. Res. Lett.* **43**, 2174–2181 (2016). doi:10.1002/2015GL067613
4. G. J. McCabe, D. M. Wolock, G. T. Pederson, C. A. Woodhouse, S. McAfee, Evidence that recent warming is reducing Upper Colorado River flows. *Earth Interact.* **21**, 1–14 (2017). doi:10.1175/EI-D-17-0007.1
5. B. Udall, J. Overpeck, The twenty-first century Colorado River hot drought and implications for the future. *Water Resour. Res.* **53**, 2404–2418 (2017). doi:10.1002/2016WR019638
6. J. A. Vano, B. Udall, D. R. Cayan, J. T. Overpeck, L. D. Brekke, T. Das, H. C. Hartmann, H. G. Hidalgo, M. Hoerling, G. J. McCabe, K. Morino, R. S. Webb, K. Werner, D. P. Lettenmaier, Understanding uncertainties in future Colorado River streamflow. *Bull. Am. Meteorol. Soc.* **95**, 59–78 (2014). doi:10.1175/BAMS-D-12-00228.1
7. R. R. Revelle, P. E. Waggoner, in *Changing Climate: Report of the Carbon Dioxide Assessment Committee* (National Academy Press, 1983), pp. 418–432.
8. K. Nowak, M. Hoerling, B. Rajagopalan, E. Zagona, Colorado River Basin hydroclimatic variability. *J. Clim.* **25**, 4389–4403 (2012). doi:10.1175/JCLI-D-11-00406.1
9. L. L. Nash, P. H. Gleick, "The Colorado River basin and climatic change: The sensitivity of streamflow and water supply variations to temperature and precipitation" (U.S. Environmental Protection Agency, EPA 230-R-93-009, 1993).
10. J. A. Vano, T. Das, D. P. Lettenmaier, Hydrologic sensitivities of Colorado River runoff to changes in precipitation and temperature. *J. Hydrometeorol.* **13**, 932–949 (2012). doi:10.1175/JHM-D-11-069.1
11. P. C. D. Milly, J. Kam, K. A. Dunne, On the sensitivity of annual streamflow to air temperature. *Water Resour. Res.* **54**, 2624–2641 (2018). doi:10.1002/2017WR021970
12. P. C. D. Milly, J. Betancourt, M. Falkenmark, R. M. Hirsch, Z. W. Kundzewicz, D. P. Lettenmaier, R. J. Stouffer, Climate change. Stationarity is dead: Whither water management? *Science* **319**, 573–574 (2008). doi:10.1126/science.1151915 Medline
13. P. C. D. Milly, K. A. Dunne, A hydrologic drying bias in water-resource impact analyses of anthropogenic climate change. *J. Am. Water Resour. Assoc.* **53**, 822–838 (2017). doi:10.1111/1752-1688.12538
14. F. G. Hall, A. K. Betts, S. Frolking, R. Brown, J. M. Chen, W. Chen, S. Halldin, D. P. Lettenmaier, J. Schafer, in *Vegetation, Water, Humans and the Climate: A New Perspective on an Interactive System*, P. Kabat, M. Claussen, S. Whitlock, J. H. C. Gash, L. B. de Guenni, M. Meybeck, R. Pielke, C. J. Vörösmarty, R. W. A. Hutjes, S. Lütkemeier, Eds. (Springer, 2004), pp. 93–114.
15. Methods and supplementary text can be found in the supplementary materials.
16. C. H. B. Priestley, R. J. Taylor, On the assessment of surface heat flux and evaporation using large-scale parameters. *Mon. Weather Rev.* **100**, 81–92 (1972). doi:10.1175/1520-0493(1972)100<0081:OTAOSH>2.3.CO;2
17. P. A. Dirmeyer, Y. Jin, B. Singh, X. Yan, Trends in land-atmosphere interactions from CMIP5 simulations. *J. Hydrometeorol.* **14**, 829–849 (2013). doi:10.1175/JHM-D-12-0107.1

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167362

18. P. C. D. Milly, K. A. Dunne, Potential evapotranspiration and continental drying. *Nat. Clim. Chang.* **6**, 946–949 (2016). doi:10.1038/nclimate3046

19. M. L. Roderick, L. D. Rotstayn, G. D. Farquhar, M. T. Hobbins, On the attribution of changing pan evaporation. *Geophys. Res. Lett.* **34**, L17403 (2007). doi:10.1029/2007GL031166

20. M. T. Hobbins, The variability of ASCE Standardized Reference Evapotranspiration: A rigorous CONUS-wide decomposition and attribution. *Trans. Am. Soc. Ag. and Biol. Engineers* **59**, 561–576 (2016). doi:10.13031/trans.59.10975

21. M. Xiao, B. Udall, D. P. Lettenmaier, On the causes of declining Colorado River streamflows. *Water Resour. Res.* **54**, 6739–6756 (2018). doi:10.1029/2018WR023153

22. T. P. Barnett, J. C. Adam, D. P. Lettenmaier, Potential impacts of a warming climate on water availability in snow-dominated regions. *Nature* **438**, 303–309 (2005). doi:10.1038/nature04141 Medline

23. I. T. Stewart, D. R. Cayan, M. D. Dettinger, Changes in snowmelt runoff timing in western North America under a "business as usual" climate change scenario. *Clim. Change* **62**, 217–232 (2004). doi:10.1023/B:CLIM.0000013702.22656.e8

24. W. R. Berghuijs, R. A. Woods, M. Hrachowitz, A precipitation shift from snow towards rain leads to a decrease in streamflow. *Nat. Clim. Chang.* **4**, 583–586 (2014). doi:10.1038/nclimate2246

25. C. W. Thornthwaite, An approach toward a rational classification of climate. *Geogr. Rev.* **38**, 55–94 (1948). doi:10.2307/210739

26. G. J. McCabe, S. L. Markstrom, "A monthly water-balance model driven by a graphical user interface" (U.S. Geological Survey Open-File Report 2007–1088, 2007).

27. Natural Resource Conservation Service, "Snowmelt" in *National Engineering Handbook. Part 630 Hydrology* (U.S. Department of Agriculture, 2004).

28. M. J. Menne, C. N. Williams Jr., R. S. Vose, The United States Historical Climatology Network monthly temperature data, Version 2. *Bull. Am. Meteorol. Soc.* **90**, 993–1008 (2009). doi:10.1175/2008BAMS2613.1

29. S. Kato, F. G. Rose, D. A. Rutan, T. J. Thorsen, N. G. Loeb, D. R. Doelling, X. Huang, W. L. Smith, W. Su, S.-H. Ham, Surface irradiances of Edition 4.0 Clouds and the Earth's Radiant Energy System (CERES) Energy Balanced and Filled (EBAF) data product. *J. Climate* **31**, 4501–4527 (2018). doi:10.1175/JCLI-D-17-0523.1

30. A. F. Hamlet, D. P. Lettenmaier, Production of temporally consistent gridded precipitation and temperature fields for the continental United States. *J. Hydrometeorol.* **6**, 330–336 (2005). doi:10.1175/JHM420.1

31. R. J. Bouchet, Evapotranspiration réelle, evapotranspiration potentielle, et production Agricole. *Ann. Agron.* **14**, 743–824 (1963).

32. D. M. Kahler, W. Brutsaert, Complementary relationship between daily evaporation in the environment and pan evaporation. *Water Resour. Res.* **42**, W05413 (2006). doi:10.1029/2005WR004541

## ACKNOWLEDGMENTS

This study was facilitated by the Geophysical Fluid Dynamics Laboratory of the National Oceanic and Atmospheric Administration and by the several data providers cited in the Supplementary Materials. The authors gratefully acknowledge colleague reviews by Randal Koster and Thomas Delworth. **Funding:** The authors are supported by the U.S. Geological Survey. **Author contributions:** PCDM was responsible for conceptualization and overall direction of the work and wrote the original draft. PCDM and KAD carried out computations. KAD performed data curation and reviewed the original draft. **Competing interests:** Authors declare no competing interests. **Data and materials availability:** No original data collection was performed. The results of this study are reproducible and extensible by use of the cited data sources and other information in the Supplementary Materials.

## SUPPLEMENTARY MATERIALS

science.sciencemag.org/cgi/content/full/science.aay9187/DC1
Materials and Methods
Supplementary Text
Fig. S1
Tables S1 to S5

References (*25–32*)
Data S1 to S3

24 August 2019; accepted 4 February 2020
Published online 20 February 2020
10.1126/science.aay9187

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167363



Fig. 1. Observed relations among monthly snow-water equivalent (SWE), surface albedo, and surface net radiation in the UCRB. (A) Dependence of surface albedo on SWE (logarithmic scale) for each of 12 elevation ranges. 1st, 2nd, and 3rd quartiles of binned data are shown. Curves are least-squares fits to the unbinned data and are used in the model. (B) Inferred dimensionless sensitivity $\frac{\overline{C}}{R_n}\frac{dR_n}{dC}$ of net radiation, $R_n$, to co-albedo (one minus albedo), $C$, as function of mean elevation of 960 subareas by month of year. Blue curves are fitted to smoothed (30-point moving median; black) data from empirical regression estimates. Red curves are analogous fits for theoretical case where a change in absorbed solar radiation causes no radiative feedbacks. Fits to regressions are used in the model, except that fits to no-feedback data are used in a sensitivity experiment.

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167364



Fig. 2. Spatial distributions of annual climate variables and elevation over the UCRB, as resolved by the model discretization of space into 960 subareas. (A) total precipitation. (B) mean temperature. (C) elevation.

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167365



Fig. 3. Water-year time series of basin-mean, annual-mean (A) precipitation (mm y$^{-1}$), (B) temperature (°C), (C) April 1 SWE (mm), (D) surface albedo (-), (E) surface net radiation (W m$^{-2}$), (F) evapotranspiration (mm y$^{-1}$), and (G) discharge per unit area (mm y$^{-1}$). Blue curves represent estimates from observations, and grey bands represent ensemble range of model outputs. Least-squares linear fits also are shown.

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167366



**Fig. 4. Summary of estimates of β from previous studies and from this analysis.** Left to right: previous observational ("Obs") and model analyses (*2, 4, 6–10*) and results from this analysis. Error bars represent ± one standard error of estimation from the regressions. The multi-colored bar shows the contribution of each of the temperature-sensitive mechanisms to the magnitude of β. Excluded as unrealistic from the previous delta analyses are cases in which maximum daily temperature was perturbed while minimum was not (*10*). "P&T have anomalies only at annual scale" refers to the computations in which monthly course of precipitation in every year was set to climatology times a factor that preserved the observed annual anomaly.

Downloaded from http://science.sciencemag.org/ on February 24, 2020

BLM_0167367

# Science

**Colorado River flow dwindles as warming-driven loss of reflective snow energizes evaporation**

P. C. D. Milly and K. A. Dunne

published online February 20, 2020

| | |
|---|---|
| ARTICLE TOOLS | http://science.sciencemag.org/content/early/2020/02/19/science.aay9187 |
| SUPPLEMENTARY MATERIALS | http://science.sciencemag.org/content/suppl/2020/02/19/science.aay9187.DC1 |
| REFERENCES | This article cites 27 articles, 1 of which you can access for free http://science.sciencemag.org/content/early/2020/02/19/science.aay9187#BIBL |
| PERMISSIONS | http://www.sciencemag.org/help/reprints-and-permissions |

Downloaded from http://science.sciencemag.org/ on February 24, 2020

Use of this article is subject to the Terms of Service

*Science* (print ISSN 0036-8075; online ISSN 1095-9203) is published by the American Association for the Advancement of Science, 1200 New York Avenue NW, Washington, DC 20005. The title *Science* is a registered trademark of AAAS.

Copyright © 2020, American Association for the Advancement of Science

BLM_0167368

RESEARCH | REPORTS

the case, it must have occurred several centuries ago, as leprosy became increasingly scarce in the British Isles after the 17th century (3). It is also conceivable that humans may have been infected through contact with red squirrels bearing *M. leprae*, as these animals were prized for their fur and meat in former times (30). Our findings show that further surveys of animal reservoirs of leprosy bacilli are warranted, because zoonotic infection from such reservoirs may contribute to the inexplicably stubborn plateau in the incidence of the human leprosy epidemic despite effective and widespread treatment with multidrug therapy (1).

**REFERENCES AND NOTES**

1. World Health Organization, *Wkly. Epidemiol. Rec.* **88**, 365–379 (2013).
2. H. D. Donoghue et al., *Infect. Genet. Evol.* **31**, 250–256 (2015).
3. V. J. Schuenemann et al., *Science* **341**, 179–183 (2013).
4. A. Alter, A. Grant, L. Abel, A. Alcais, E. Schurr, *Mamm. Genome* **22**, 19–31 (2011).
5. S. H. Wong et al., *PLOS Pathog.* **6**, e1000979 (2010).
6. N. Fulton, L. F. Anderson, J. M. Watson, I. Abubakar, *BMJ Open* **6**, e010608 (2016).
7. R. Sharma et al., *Emerg. Infect. Dis.* **21**, 2127–2134 (2015).
8. R. Truman, *Lepr. Rev.* **76**, 198–208 (2005).
9. R. W. Truman et al., *N. Engl. J. Med.* **364**, 1626–1633 (2011).
10. X. Y. Han et al., *Am. J. Clin. Pathol.* **130**, 856–864 (2008).
11. P. Singh et al., *Proc. Natl. Acad. Sci. U.S.A.* **112**, 4459–4464 (2015).
12. M. Carey, G. Hamilton, A. Poole, C. Lawton, *The Irish Squirrel Survey 2007* (COFORD, Dublin, 2007).
13. S. Harris, G. B. Corbet, *The Handbook of British Mammals* (Mammal Society/Blackwell Scientific, ed. 3, 1991).
14. D. M. Tompkins, A. W. Sainsbury, P. Nettleton, D. Buxton, J. Gurnell, *Proc. R. Soc. B* **269**, 529–533 (2002).
15. E. Stokstad, *Science* **352**, 1268–1271 (2016).
16. Council of Europe, Convention on the Conservation of European Wildlife and Natural Habitats (ETS No. 104), Appendix III (1979). https://rm.coe.int/CoERMPublicCommonSearchServices/DisplayDCTMContent?documentId=0900001680304356
17. A. Meredith et al., *Vet. Rec.* **175**, 285–286 (2014).
18. V. Simpson et al., *Vet. Rec.* **177**, 206–207 (2015).
19. See supplementary materials on Science Online.
20. J. S. Spencer, P. J. Brennan, *Lepr. Rev.* **82**, 344–357 (2011).
21. J. S. Velarde-Félix, G. Alvarado-Villa, L. Vera-Cabrera, *Am. J. Trop. Med. Hyg.* **94**, 483–484 (2016).
22. L. Vera-Cabrera et al., *J. Clin. Microbiol.* **53**, 1945–1946 (2015).
23. M. Monot et al., *Nat. Genet.* **41**, 1282–1289 (2009).
24. A. J. Drummond, A. Rambaut, *BMC Evol. Biol.* **7**, 214 (2007).
25. B. P. Vieira, C. Fonseca, R. G. Rocha, *Anim. Biodivers. Conserv.* **38**, 45–58 (2015).
26. R. N. Kruzikk et al., *Nat. Med.* **9**, 525–532 (2003).
27. C. de Sales Marques et al., *J. Infect. Dis.* **208**, 120–129 (2013).
28. L. B. Acams et al., *Mem. Inst. Oswaldo Cruz* **107** (suppl. 1), 197–208 (2012).
29. P. G. Jessamine et al., *J. Drugs Dermatol.* **11**, 229–233 (2012).
30. P. Lurz, *Red Squirrel: Naturally Scottish* (Scottish Natural Heritage, 2010).

**ACKNOWLEDGMENTS**

We thank E. Sheehy, E. Goldstein, M. Flaherty, A. Zintl, the National Trust, Forestry Commission Scotland, and Saving Scotland's Red Squirrels for samples, help, and advice. We thank the Genomic Technologies Facility at the University of Lausanne for Illumina sequencing and technical support. Raw sequence read files have been

deposited in the Sequence Read Archive of the National Center for Biotechnology Information under accession numbers SRR3672737 to SRR3672758 (NCBI BioProject PRJNA325727), SRR3674396 to SRR3674450 (NCBI BioProject PRJNA325827), SRR3674451 to SRR3674453 (NCBI BioProject PRJNA325856), and SRR3673533; representative TLR1 sequences have been deposited in GenBank under accession numbers KX388139, KX388140, and KX388141. Phylogenetic trees and SNP alignments have been deposited at Treebase under Study Accession URL http://purl.org/phylo/treebase/phylows/study/TB2:S19692. Supported by the Fondation Raoul Follereau and Swiss National Science Foundation grant IZRJZ3_164174 (S.T.C.), the Scottish Government Rural and

Environment Science and Analytical Services Division (K.S.), and the Thomas O'Hanlon Memorial Award in Veterinary Medicine (F.McD.).

**SUPPLEMENTARY MATERIALS**

www.sciencemag.org/content/354/6313/744/suppl/DC1
Materials and Methods
Figs. S1 to S5
Tables S1 to S14
References (31–51)

21 June 2016; accepted 27 September 2016
10.1126/science.aah3783

**ARCTIC SEA ICE**

# Observed Arctic sea-ice loss directly follows anthropogenic CO2 emission

**Dirk Notz[1]\* and Julienne Stroeve[2,3]**

Arctic sea ice is retreating rapidly, raising prospects of a future ice-free Arctic Ocean during summer. Because climate-model simulations of the sea-ice loss differ substantially, we used a robust linear relationship between monthly-mean September sea-ice area and cumulative carbon dioxide ($CO_2$) emissions to infer the future evolution of Arctic summer sea ice directly from the observational record. The observed linear relationship implies a sustained loss of $3 \pm 0.3$ square meters of September sea-ice area per metric ton of $CO_2$ emission. On the basis of this sensitivity, Arctic sea ice will be lost throughout September for an additional 1000 gigatons of $CO_2$ emissions. Most models show a lower sensitivity, which is possibly linked to an underestimation of the modeled increase in incoming longwave radiation and of the modeled transient climate response.

The ongoing rapid loss of Arctic sea ice has far-reaching consequences for climate, ecology, and human activities alike. These include amplified warming of the Arctic (1), possible linkages of sea-ice loss to mid-latitude weather patterns (2), changing habitat for flora and fauna (3), and changing prospects for human activities in the high north (3). To understand and manage these consequences and their possible future manifestation, we need to understand the sensitivity of Arctic sea-ice evolution to changes in the prevailing climate conditions. However, assessing this sensitivity has been challenging. For example, climate-model simulations differ widely in their timing of the loss of Arctic sea ice for a given trajectory of anthropogenic $CO_2$ emissions: Although in the most recent Climate Model Intercomparison Project 5 (CMIP5) (4), some models project a near ice-free Arctic during the summer minimum already toward the beginning of this century, other models keep a substantial amount of ice well into the next century even for an external forcing based on largely undamped anthropogenic $CO_2$ emissions as described by the Representative Concentration Pathway scenario RCP8.5 (4, 5).

To robustly estimate the sensitivity of Arctic sea ice to changes in the external forcing, we identify and examine a fundamental relationship in the observational record: During the transition to a seasonally ice-free Arctic Ocean, the 30-year running mean of monthly mean September Arctic sea-ice area is almost linearly related to cumulative anthropogenic $CO_2$ emissions (Fig. 1). In the model simulations, the linear relationship holds until the 30-year running mean, which we analyze to reduce internal variability, samples more and more years of a seasonally ice-free Arctic Ocean, at which point the relationship levels off toward zero. For the first few decades of the simulations, a few models simulate a near-constant sea-ice cover despite slightly rising cumulative $CO_2$ emissions. This suggests that in these all-forcing simulations, greenhouse-gas emissions were initially not the dominant driver of sea-ice evolution. This notion is confirmed by the CMIP5 1% $CO_2$ simulations, where the initial near-constant sea-ice cover does not occur (fig. S3A). With rising greenhouse-gas emissions, the impact of $CO_2$ becomes dominating also in all all-forcing simulations, as evidenced by the robust linear trend that holds in all simulations throughout the transition period to seasonally ice-free conditions. We define this transition period as starting when the 30-year mean September Arctic sea-ice area in a particular simulation decreases for the first time to an area that is 10% or more below the simulation's minimum sea-ice cover during the period 1850 to 1900, and

[1]Max Planck Institute for Meteorology, Hamburg, Germany.
[2]National Snow and Ice Data Center, Boulder, CO, USA.
[3]University College, London, UK.
\*Corresponding author. Email: dirk.notz@mpimet.mpg.de

Downloaded from http://science.sciencemag.org/ on March 3, 2020

BLM_0167369





**Fig. 1. Relationship between September Arctic sea-ice area and cumulative anthropogenic CO₂ emissions. (A)** Actual values. The thick blue line shows the 30-year running mean of observed September sea-ice area, and the thinner red lines the 30-year running means from CMIP5 model simulations. For reference, we also show the annual values of observed September sea-ice area, based from 1953 to 1978 on HadISST (*31*) (circles) and from 1979 to 2015 on the NSIDC sea-ice index (*32*) (diamonds; see methods for details). **(B)** Normalized simulations. For this plot, the simulated CMIP5 sea-ice area is normalized by dividing by the simulated sea-ice area at the onset of the transition period as defined in the text. For each simulation, the cumulative emissions (*33*) are set to 0 at the onset of the transition period and then linearly scaled to reach 1 by the end of the transition period (compare table S1 for actual values). This linearization is only carried out to more explicitly visualize the linearity in the models. All analyses in the paper are based on the original data shown in (A).

Downloaded from http://science.sciencemag.org/ on March 3, 2020

as ending once the 30-year mean September Arctic sea-ice area drops for the first time below 1 million km² (see table S1 for specific numbers).

The existence of a robust, linear relationship between cumulative $CO_2$ emissions and Arctic sea-ice area in all CMIP5 models and in the observational record extends the findings of earlier studies that demonstrated such relationships for individual, sometimes more simplified models (*6, 7*), and of studies that have demonstrated a linear relationship between Arctic sea-ice area and either global mean temperature (*5, 8–12*) or atmospheric $CO_2$ concentration (*13, 14*). These linear relationships are highly suggestive of a fundamental underlying mechanism, which has been elusive so far. We will later suggest a conceptual explanation of the linearity, but we begin by discussing two implications of the observed linear relationship that are independent of its underlying mechanism.

First, the observed linear relationship allows us to estimate a sensitivity of 3.0 ± 0.3 m² of September Arctic sea-ice loss per metric ton of anthropogenic $CO_2$ emissions during the observational period 1953 to 2015. This number is sufficiently intuitive to allow one to grasp the contribution of personal $CO_2$ emissions to the loss of Arctic sea ice. For example, on the basis of the observed sensitivity, the average personal $CO_2$ emissions of several metric tons per year can be directly linked to the loss of tens of square meters of Arctic sea ice in every year (fig. S1).

Second, the linear relationship allows for a robust evaluation of climate-model simulations. Although a number of previous studies have found that the observed sea-ice retreat has been faster than projected by most climate-model simulations (*15, 16*), it has remained unclear whether these are primarily a man-



**Fig. 2. Relationship between annual mean incoming shortwave radiation and sea-ice area. (A)** Annual mean incoming top-of-the-atmosphere shortwave radiation at, and area within, a given latitude. The area within a given latitude band is calculated from simple spherical geometry. The latitudinal dependence of average daily incoming shortwave radiation at the top of the atmosphere is calculated from the very good approximation $S(\varphi) = 1 - 0.482 P_2(\sin(\varphi))$, where $P_2$ is the second Legendre polynom (*34*). **(B)** As in (A), but with the *x* axis exchanged for clarity.

ifestation of internal variability (*17, 18*). The sensitivity that we estimate here is, in contrast, based on the average evolution over many decades, thus eliminating internal variability to a substantial degree. A mismatch between the observed and the simulated sensitivity hence robustly indicates a shortcoming either in the

model or in the external forcing fields used for a simulation.

Evaluating the simulated sensitivity, we find that most CMIP5 models systematically underestimate the observed sensitivity of Arctic sea ice relative to anthropogenic $CO_2$ emissions of 3.0 ± 0.3 m² (see table S1 for details). Across the full

BLM_0167370

*RESEARCH* | REPORTS



**Fig. 3. Relationship between Arctic sea-ice loss and other metrics.** (**A**) Each dot represents the sensitivity of Arctic sea-ice loss in a particular model as a function of the increase in global mean incoming nonshortwave fluxes per $CO_2$ emission in the same model. The latter was obtained from a linear fit of incoming nonshortwave fluxes as a function of cumulative anthropogenic $CO_2$ emissions during the transition period of each individual model. (**B**) Same as (A), but fluxes only evaluated in the Arctic. (**C** and **D**) Same as (A) and (B), but neglecting sensible and latent heat fluxes. (**E**) Each dot represents the sensitivity of Arctic sea-ice loss in a particular model as a function of the transient climate response (24) in the same model. [See table S1 for actual values and supplementary text for more discussion on (E).] All correlations given in the figure are significant at the 1% level.

Downloaded from http://science.sciencemag.org/ on March 3, 2020

transition range to near ice-free conditions, the multimodel mean sensitivity is only $1.75 \pm 0.67$ m² loss of Arctic sea ice per metric ton of anthropogenic $CO_2$ emissions. Because of the linear response, a similar sensitivity is obtained for subperiods of the transition period that have the same length as our observational record, with overall maximum sensitivities over such 61-year-long time periods from individual simulations of $1.95 \pm 0.70$ m²/ton. These estimates of the models' sensitivity might be biased somewhat high, as previous studies found that the aerosol forcing of CMIP5 simulations might have been too weak in recent decades (19, 20). This would give rise to artificially amplified warming and thus amplified sea-ice loss in these simulations, rendering the true sensitivity of the models to be even lower than the values that we estimate here.

The low sensitivity of the modeled sea-ice response can be understood through a conceptual model that explains the linearity. To derive such a conceptual model, we consider the annual mean surface energy balance at the ice edge, which describes the fact that the net incoming shortwave radiation $(1 - \alpha)F_{SW}$ and the incoming nonshortwave flux $F_{nonSW,in}$ are balanced by the outgoing nonshortwave flux and the conductive heat flux at the surface of the ice.

With increasing atmospheric $CO_2$ concentration, the incoming nonshortwave flux increases at the ice edge in response to the rising atmospheric emissivity and related atmospheric feedbacks.

However, neither the outgoing nonshortwave flux nor the conductive heat flux in the ice will change much, as the surface properties of sea ice at the ice edge are largely independent of its location. We conjecture that this also holds for total albedo $\alpha$, because a possible rise in cloudiness caused by sea-ice loss (21) will primarily occur over the open water south of the moving ice edge, rather than at the ice edge itself. In addition, the albedo of clouds is comparable to that of the ice at the ice edge. Hence, it seems plausible to assume that the surface energy balance at the ice edge is primarily kept closed by a decrease in the incoming shortwave flux that compensates for the increase in incoming nonshortwave flux. Such decrease of the incoming shortwave radiation is obtained by the northward movement of the ice edge to a region with less annual mean solar irradiance. Equilibrium is reestablished at the ice edge when

$$\Delta F_{SW}(1 - \alpha) = -\Delta F_{nonSW,in} \qquad (1)$$

If, for simplicity, we assume a circular shape of the sea-ice cover centered at the North Pole, the sea-ice area that is enclosed by any given latitude has nearly the same latitudinal dependence as the annual mean incoming shortwave radiation at the top of the atmosphere. Hence, the change in area enclosed by the ice edge $\Delta A_{seaice}$ should be roughly proportional to

the change in incoming annual mean shortwave radiation at the ice edge (Fig. 2B)

$$\Delta A_{seaice} \propto \Delta F_{SW}(1 - \alpha) \qquad (2)$$

We additionally find empirically that the incoming nonshortwave flux is fairly linearly related to anthropogenic $CO_2$ emissions $E_{CO_2}$ across CMIP5 model simulations both in the Arctic, where the loss of sea ice might amplify the change in radiative forcing, and globally, where such amplification is small (fig. S2). The linearity arises because more of each ton of emitted $CO_2$ remains in the atmosphere as oceanic $CO_2$ uptake decreases in the future. This then roughly compensates for the logarithmic rather than linear change of atmospheric longwave emission with changes in atmospheric $CO_2$ concentration (22). It is hence a plausible assumption that the linearity of incoming longwave radiation with rising $CO_2$ emissions also holds at the ice edge, which we can express as

$$\Delta F_{nonSW,in} = \frac{dF_{nonSW,in}}{dE_{CO_2}} \Delta E_{CO_2} \qquad (3)$$

Inserting Eqs. 2 and 3 into Eq. 1 then finally gives

$$\Delta A_{seaice} = \frac{dF_{nonSW,in}}{dE_{CO_2}} \Delta E_{CO_2} \qquad (4)$$

which for constant $dF_{nonSW,in}/dE_{CO_2}$ is a possible explanation for the observed linear relationship

BLM_0167371

between Arctic sea-ice area and cumulative $CO_2$ emission.

On the basis of this expression, we can infer that most climate models underestimate the loss of Arctic sea ice because they underestimate the increase of incoming nonshortwave flux for a given increase of anthropogenic $CO_2$ emissions. An analysis of the available fields of surface heat fluxes in the CMIP5 archive confirms this notion, with high correlation between modeled sea-ice sensitivity and modeled changes in either incoming total nonshortwave flux or incoming longwave radiation, as the latter dominates the change in the nonshortwave flux (Fig. 3, A to D). Unfortunately, observational uncertainty is currently too large to test our finding of a lower-than-expected increase in incoming longwave radiation against independent records (23).

On a more regional scale, our conceptual explanation allows us to ascribe a minor role for the overall evolution of sea ice to processes that are unrelated to the large-scale change in atmospheric forcing. This includes a minor role of oceanic heat transport on the time scales that we consider here, because we can derive a linear relationship without considering these transports. Although it might alternatively be possible that the oceanic heat transports have changed monotonously in recent decades, we have no indication that this is the case from either observations or model simulations. The current minor role of oceanic heat transports implies that on time scales of several centuries, the linearity will most likely no longer hold, because sensitivity will increase once changes in oceanic heat content start measurably affecting Arctic sea-ice coverage (12).

Our results also suggest that regional differences in atmospheric heat-flux convergence or wind forcing do not appreciably affect the Arctic-wide mean energy balance on the time scales that we consider here. Furthermore, this also explains why the linear relationship does not hold in the Antarctic, where dynamical forcing from wind and oceanic heat transport are key drivers of the large-scale sea-ice evolution.

The apparent minor role of oceanic heat transport, and the correlation between the change in global surface fluxes and Arctic sea-ice loss, suggest that we can use the observed evolution of Arctic sea ice as an emergent constraint on transient climate sensitivity (TCR). This is commonly defined as the global-mean warming at the time of doubled atmospheric $CO_2$ concentration after a 1% $CO_2$ increase per year (24). Indeed, we find good correlation between the modeled sea-ice sensitivity and TCR both in the full-forcing simulations (Fig. 3E) and in the simulations with rising $CO_2$ only (fig. S3B).

Unfortunately, though indicative of a TCR at the higher end of simulated values, the correlation does not allow for a direct estimate of TCR for two reasons: (i) The loss of Arctic sea ice is more directly driven by the regional temperature rise in the Arctic than by the global temperature rise that is expressed by the TCR. Any failure of the models to realistically simulate the ratio between global and Arctic temperature rise, usually referred to as Arctic amplification, could hence lead to an erroneous quantitative estimate of the TCR based on the correlation that we identify. (ii) TCR is estimated from simulations where all non-$CO_2$ forcings are kept constant, whereas the non-$CO_2$ forcings change in the historical and RCP8.5 simulations that we consider here. This affects, at least to some degree, the robustness of the correlation (see supplementary text for details).

Previous studies that estimated climate sensitivity from emergent constraints have usually focused on the equilibrium climate sensitivity (ECS), which describes the equilibrium global-mean warming for a sustained doubling of atmospheric $CO_2$ concentration. They also come to the conclusion that the real sensitivity of the Earth climate system is at the higher end of simulated values, from analyzing either atmospheric convective mixing (25) or mid-troposphere relative humidity (26). By contrast, studies analyzing the Earth's energy budget, particularly after considering the recent slowing in atmospheric warming, find that the TCR should be at the lower end of simulated values (27, 28). This result, however, might be biased by the different data coverage in models and observations (29).

Regarding the future evolution of sea ice, our analysis suggests that there is little reason to believe that the observed sensitivity of Arctic sea-ice loss will change substantially in the foreseeable future. Hence, we can directly estimate that the remainder of Arctic summer sea ice will be lost for roughly an additional 1000 Gt of $CO_2$ emissions on the basis of the observed sensitivity of $3.0 \pm 0.3$ m$^2$ September sea-ice loss per ton of anthropogenic $CO_2$ emissions. Because this amount is based on the 30-year running mean of monthly averages, it is a very conservative estimate of the cumulative emissions at which the annual minimum sea-ice area drops below 1 million km$^2$ for the first time. In addition, internal variability causes an uncertainty of around 20 years as to the first year of a near-complete loss of Arctic sea ice (18, 30). Our current emissions of 35 Gt $CO_2$ per year, the limit of 1000 Gt will be reached before mid-century. However, our results also imply that any measure taken to mitigate $CO_2$ emissions will directly slow the ongoing loss of Arctic summer sea ice. In particular, for cumulative future total emissions compatible with reaching a 1.5°C global warming target—i.e., for cumulative future emissions appreciably below 1000 Gt—Arctic summer sea ice has a chance of long-term survival, at least in some parts of the Arctic Ocean.

## REFERENCES AND NOTES

1.  F. Pithan, T. Mauritsen, Nat. Geosci. 7, 181–184 (2014).
2.  T. Vihma, Surv. Geophys. 35, 1175–1214 (2014).
3.  W. N. Meier et al., Rev. Geophys. 52, 185–217 (2014).
4.  K. E. Taylor, R. J. Stouffer, G. A. Meehl, Bull. Am. Meteorol. Soc. 93, 485–498 (2012).
5.  J. Stroeve, D. Notz, Global Planet. Change 135, 119–132 (2015).
6.  K. Zickfeld, V. K. Arora, N. P. Gillett, Geophys. Res. Lett. 39, L05703 (2012).
7.  T. Herrington, K. Zickfeld, Earth Syst. Dyn. 5, 409–422 (2014).
8.  J. M. Gregory et al., Geophys. Res. Lett. 29, 28-1–28-4 (2002).
9.  M. Winton, J. Clim. 24, 3924–3934 (2011).
10.  I. Mahlstein, R. Knutti, J. Geophys. Res. 117, D06104 (2012).
11.  J. K. Ridley, J. A. Lowe, H. T. Hewitt, Cryosphere 6, 193–198 (2012).
12.  C. Li, D. Notz, S. Tietsche, J. Marotzke, J. Clim. 26, 5624–5636 (2013).
13.  O. Johannessen, Atmos. Ocean. Sci. Lett. 1, 51 (2008).
14.  D. Notz, J. Marotzke, Geophys. Res. Lett. 39, L051094 (2012).
15.  F. Massonnet et al., Cryosphere 6, 1383–1394 (2012).
16.  J. C. Stroeve et al., Geophys. Res. Lett. 39, LJ6502 (2012).
17.  G. Flato et al., in Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, T. Stocker et al., Eds. (Cambridge Univ. Press. 2013), chap. 9, pp. 741–866.
18.  D. Notz, Philos. Trans. R. Soc. A 373, 20140164 (2015).
19.  B. D. Santer et al., Nat. Geosci. 7, 185–189 (2014).
20.  G. A. Schmidt, D. T. Shindell, K. Tsigaridis, Nat. Geosci. 7, 158–160 (2014).
21.  I. V. Gorodetskaya, L-B. Tremblay, B. Liepert, M. A. Cane, R. I. Cullather, J. Clim. 21, 866–882 (2008).
22.  H. D. Matthews, N. P. Gillett, P. A. Stott, K. Zickfeld, Nature 459, 829–832 (2009).
23.  G. L. Stephens et al., Nat. Geosci. 5, 691–696 (2012).
24.  U. Cubasch et al., in Climate Change 2001: The Scientific Basis, J. T. Houghton et al., Eds. (Cambridge Univ. Press. 2001), chap. 9, pp. 525–582.
25.  S. C. Sherwood, S. Bony, J-L. Dufresne, Nature 505, 37–42 (2014).
26.  J. T. Fasullo, K. E. Trenberth, Science 338, 792–794 (2012).
27.  A. Otto et al., Nat. Geosci. 6, 415–416 (2013).
28.  N. P. Gillett, V. K. Arora, D. Matthews, M. R. Allen, J. Clim. 26, 6844–6858 (2013).
29.  M. Richardson, K. Cowtan, E. Hawkins, M. B. Stolpe, Nat. Clim. Chang. 6, 931–935 (2016).
30.  A. Jahn, J. E. Kay, M. M. Holland, D. M. Hall, Geophys. Res. Lett. 43, 9113–9120 (2016).
31.  Hadley Center for Climate Prediction and Research, Met Office, HadISST 1.1 - global sea-ice coverage and sea surface temperature (1870-2015); NCAS British Atmospheric Data Centre (2006); http://badc.nerc.ac.uk/data/hadisst/.
32.  F. Fetterer, K. Knowles, W. Meier, M. Savoie, Sea ice index, Digital media, National Snow and Ice Data Center, Boulder, CO (2002, updated 2014).
33.  M. Meinshausen et al., Clim. Change 109, 213–241 (2011).
34.  G. R. North, J. Atmos. Sci. 32, 2033–2043 (1975).

## ACKNOWLEDGMENTS

We are grateful to J. Marotzke for the suggestion to analyze the TCR and for helpful comments on the manuscript. We are also grateful to two anonymous reviewers, whose insightful comments were essential for framing the final version of our study. We further thank B. Soden, O. Olonscheck, and C. Li for helpful feedback. D.N. acknowledges funding through a Max Planck Research Fellowship. J.S. acknowledges funding from NASA grant NNX12AB75G and NSF grant PLR 1304246. All primary data used for this study are based on publicly available output from CMIP5 models and are also available upon request from publications@mpimet.mpg.de.

## SUPPLEMENTARY MATERIALS

www.sciencemag.org/content/354/6313/747/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S3
Table S1
References (35–37)

27 May 2016; accepted 12 October 2016
Published online 3 November 2016
10.1126/science.aag2345

Downloaded from http://science.sciencemag.org/ on March 3, 2020

BLM_0167372



**Observed Arctic sea-ice loss directly follows anthropogenic CO$_2$ emission**

Dirk Notz and Julienne Stroeve

*Science* **354** (6313), 747-750.
DOI: 10.1126/science.aag2345originally published online November 3, 2016

**Why we are losing sea ice**

Arctic sea ice is disappearing rapidly, leading to predictions of an ice-free summer in the near future. Simulations of the timing of summer sea-ice loss differ substantially, making it difficult to evaluate the pace of the loss. Notz and Stroeve observed a linear relationship between the monthly-mean September sea-ice area and cumulative CO$_2$ emissions. This allowed them to predict Arctic summer sea ice directly from the observational record. Interestingly, most models underestimate this loss.

*Science*, this issue p. 747

Downloaded from http://science.sciencemag.org/ on March 3, 2020

| | |
|---|---|
| ARTICLE TOOLS | http://science.sciencemag.org/content/354/6313/747 |
| SUPPLEMENTARY MATERIALS | http://science.sciencemag.org/content/suppl/2016/11/04/science.aag2345.DC1 |
| RELATED CONTENT | http://science.sciencemag.org/content/sci/354/6312/533.full |
| REFERENCES | This article cites 32 articles, 1 of which you can access for free http://science.sciencemag.org/content/354/6313/747#BIBL |
| PERMISSIONS | http://www.sciencemag.org/help/reprints-and-permissions |

Use of this article is subject to the Terms of Service

*Science* (print ISSN 0036-8075; online ISSN 1095-9203) is published by the American Association for the Advancement of Science, 1200 New York Avenue NW, Washington, DC 20005. The title *Science* is a registered trademark of AAAS.

Copyright © 2016, American Association for the Advancement of Science

BLM_0167373

3/10/2020

TO: Project File

FROM: Gregory Larson, Uncompahgre Field Manager; Megan Gilbert, Branch Chief for Planning and Assessment, BLM CO

SUBJECT: Inclusion of CSU Stipulation in response to Governor's consistency review, and other changes in ROD/ARMP

In response to the Governor of Colorado's request that BLM include a new Controlled Surface Use (CSU) stipulation limiting route and infrastructure density on big game winter range, production areas, and migration corridors, BLM deliberated adding a modified CSU stipulation under which mitigation planning could be required in those habitats. (*See response letter for details of CSU*). While working with the Governor's office and the Department of Natural Resources on the specifics of the potential revised CSU (hereafter the "new CSU"), BLM also considered whether such a CSU was within the range of alternatives analyzed in the FEIS.

This memo to the RMP project file documents that consideration, and supports BLM's conclusion that the CSU committed to in the response letter to the Governor does fit within the range of alternatives considered, and is adequately analyzed under NEPA to be included in the ROD and Approved RMP. The CSU is included in Appendix B of the ROD and Approved RMP, as "CSU-62 Wildlife Big Game Winter Migration and Production Area".

**Consideration 1:** 100% of the new CSU overlaps areas that the BLM analyzed either as a No Leasing (NL) decision, a No Surface Occupancy (NSO) stipulation or CSU stipulation under Alternative B1 on BLM lands. The same applies for 99.6% of BLM- managed mineral estate- close enough to 100% to be well within the sensitivity of analysis for a high-level planning document. (See table 1 and Figures 1 and 2, below)

**Consideration 2:** Although the NL decisions and NSO/CSU stipulations above (that overlap the new CSU) are not all specifically designed to protect big game habitat, the impacts to both oil and gas development (and therefore other resources like socioeconomics, air quality, etc.) and wildlife are still adequately considered by application of those stipulations for several reasons:

- Impacts to oil and gas (and related resources) are generally the same, and are considered the same in the RMP's analysis, irrespective of the specific resources the stipulations are designed to protect. Application of NL or stipulations is generally assumed to result in some level of reduction to the level of development and subsequent related effects.
- It is generally assumed in the RMP that all of those stipulation classes are generally protective of resources beyond those for which they are specifically applied. This is particularly true of NL and NSO. The RMP refers to the beneficial impacts to wildlife habitat of applying stipulations and site-specific environmental analysis: "The greater the area that is open to leasing and development, the more likely impacts, such as habitat fragmentation and avoidance described above, are to occur. Application of NSO, NGD, CSU, SSR, and TL stipulations would limit surface disturbance and associated impacts in varying degrees in certain areas. During the permit application process, the BLM would provide site-specific environmental

3/10/2020

analysis and apply appropriate mitigation to authorizations to avoid and minimize impacts on fish and wildlife." (PRMP/FEIS at 4-113)

- The new CSU stipulation, like the RMP, explicitly supports the State of Colorado's wildlife plans and population objectives. The CSU clarifies how that support will be realized at the implementation stage. While it does not change the intent of the plan or expected outcome, it provides a contractual tool through which BLM can communicate its expectations to prospective lessees.
- The beneficial impacts to wildlife from the CSU stipulation are consistent with the RMP's objectives relating to the management of wildlife. The RMP/FEIS also assumed, for analysis, that "Habitat would be managed in coordination with CPW herd objectives and species-specific plans" (FEIS at page 4-110). It is not possible to further analyze specific impacts to wildlife with the CSU in place because BLM's objectives remain the same, and the detailed effects to any particular animal/herd/population depend on the actual proposal, the mitigation plan devised, and other site-specific details.
- In many cases, the new CSU also overlaps timing limitations that are specifically applied to big game habitats.

In addition to the new CSU, two other changes were made in response to the Governor's review to clarify and add detail to two stipulations. Neither of the changes was such that it would change the analysis of the RMP. These changes are also shown in Appendix B of the ROD and Approved RMP.

- CSU-29 was modified to include a specific controlled surface use design feature for noise control near sage grouse leks during breeding season. The addition of this specific requirement does not change the intent of the CSU or expected outcome; it provides a contractual tool through which BLM can communicate its expectations to prospective lessees.
- NSO-31 was modified to clarify the process for consideration of exception, modifications, and waiver. The clarification does not change the intent of the NSO or the expected outcome; it provides a contractual tool through which BLM can communicate its expectations to prospective lessees.

Finally, three other changes were made to stipulations with respect to the protection of water resources under the ROD and Approved RMP. All were within the range of alternatives analyzed.

- NSO-9 (Hydrology River) and NSO-11 (Hydrology Feature) were included in the ROD and Approved RMP. They were analyzed under Alternative D.
- NSO-69 (Public Water Supplies) was modified to include groundwater source water protection areas (as delineated in a plan). These areas were analyzed as No Leasing under Alternative B.

3/10/2020

**Supporting Information:**

*Table 1: The proportion of area covered by Fluid Mineral Leasing stipulations within BLM Surface and BLM Mineral Estate within the RMP Planning area for Alternative-B & B1.  Acres and the proportion of area that is Priority Area for Big Game within BLM Surface and BLM Mineral Estate with stipulations and without stipulations is also listed.*

|  | BLM Surface Estate | Federal Mineral Estate |
|---|---|---|
| RMP Planning Area | 675,800 | 916,030 |
| Acres With Stipulations* | 675,800 | 910,530 |
| Acres Without Stipulations* | 0 | 5,500 |
| Big Game Priority Area - Acres | 528,340 | 647,500 |
| Big Game Priority Area - % | 78% | 71.1% |
| Big Game Priority Area in areas with Stipulations - Acres | 528,340 | 644,130 |
| Big Game Priority Area in areas with Stipulations - % | 100% | 99.6% |
| Big Game Priority Area in Areas Without Stipulations** - Acres | 0 | 2,867 |
| Big Game Priority Area in Areas Without Stipulations** - % | 0% | 0.4% |
| *Stipulations include NL, NSO, and CSU **No stipulations may include TLs | | |

The CPW big game priority area includes the following:

1. Uncompahgre Migration Corridor (D-19 and E-20) (CPW 2019)
2. Big game crucial wintering area (Mule Deer Winter Concentration, Mule Deer Severe Winter, Elk Winter Concentration, Elk Severe Winter Ranges as delineated by CPW)
3. Big game production area (Elk Production Area delineated by CPW)

BLM mineral estate in the decision area includes mineral estate underlying BLM-administered lands (surface estate), privately-owned lands, city lands, and state-owned lands.  Sub-surface rights include: all minerals; oil and gas; oil, gas, and coal; and other but does not include coal only.

REFERENCES:

Colorado Parks and Wildlife (CPW) 2019. Colorado Action Plan for Implementation of Department of the Interior Secretarial Order 3362: "Improving Habitat Quality in Western Big Game Winter Range and Migration Corridors".

3/10/2020



*Figure1: Big Game Priority Area within BLM surface and split estate.*

BLM_0167377

3/10/2020



*Figure 2: Big Game Priority Area in relation to BLM lands with Fluid Mineral Leasing Stipulations including NL, NSO, and CSU in Alternative B & B1.*

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received

MAR 3 1 2010

Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Loraine Adams*
Signature

LORAINE ADAMS
Print Name

PO Box 1532, 410 Vista Dr.
Address

Paonia          CO      81428
City            State   Zip Code



Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

· Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.
· Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.
· Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.
· Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.
· Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.
· Require all natural gas leases and permits to protect wildlife habitat from fragmentation.
· Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.
· Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

GREG AITKENHEAD
PO BOX 932
HOTCHKISS CO 81419

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



Received
MAR 2 4 2010
Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Print Name MARIANN A CALEY

Address 39709 Panorama Rd

City Paonia State CO Zip Code 81428

BLM_0167381

Received

MAR 1 2 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Dominic Anthony
Print Name

15529 Black Bridge rd
Address

Paonia          CO          81428
City            State       Zip Code

BLM_0167382

Received

FEB 2 4 2010

Uncompahgre Field Office

Feb. 23, 2010

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision
PLEASE NOTE...THIS IS NOT A FORM LETTER. READ THOROUGHLY!

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands to standards approved through public involvement.
I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to such standards by leasing and permitting natural gas development without an environmental review or publicly approved environmental guidelines and public input as called for under the National

**1 A-PI NRED**  ntal Policy Act.

In addition, I believe the revised RMP should:

[X] Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions by mandating that any leasee hire an independent company to monitor their practices and maintain water purity control.

**2 A-PI NRED**

[X] Create a publicly approved list of companies and/or agencies that can provide the necessary monitoring skills and manpower to closely regulate the impacts of drilling and transportation of gas on air, water, land, wildlife and humans in the regions of any drilling, wells and/or transportation pipelines and facilities.

**3 A-PI NRED**

[X] Mandate as part of a leasing agreement that such agencies be hired and maintained by the gas and oil companies and that their reports are maintained on file for public review and published in the main media of a given area. Regular public review opportunities shall be scheduled into the leasing agreements with the caveat that all activity must cease if there are breaches of the contracts or of regulatory standards.

**4 A-PI NRED**

[X] Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area and require that any leasee hire an independent company from a publicly approved list of monitoring agencies to ensure such adherence to strict standards.

**5 A-PI NRED**

[X] Require energy companies to fully disclose all drilling and hydraulic fracturing fluids. It has been my personal observation that such full disclosures are not currently nor have they been in the past adequately made. The practices of withholding vital information from the public for review is not acceptable.

**6 A-PI NRED**

[X] Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions and requiring all leasees to hire a third party approved independent monitoring company to ensure such air quality protection.

[X] Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

[X] Require and adequately police all natural gas leases and permits to protect wildlife habitat from fragmentation using strict standards.

[X] Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

[X] Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if. in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Chrys Bailey*
Signature

CHRYS BAILEY
Print Name

41225 Willow Rd.
Address

PAONIA
City

Co
State

81428
Zip Code

BLM_0167383

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received
MAR 2 6 2010
Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Larry E Beezley*
Signature

*Larry E. Beezley*
Print Name

*40733 Hwy 133*
Address

*Paonia          CO          81428*
City                State          Zip Code

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

*Received*
*MAR 2 4 2010*
*Uncompahgre Field Office*

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*[signature]*
Signature

HOWARD BERKMAN
Print Name

BOX 877
Address

PAONIA        CO        81428
City                State              Zip Code

BLM_0167386

410 Duke Hill Rd.
Hotchkiss, CO  81419
970-872-4898

FEB 2 6 2010

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

The BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. We are asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, we believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking our comments into consideration.

Sincerely,

Rosemary Bilchak                    Gordon A. MacAlpine

| | |
|---|---|
| **From:** | Smyth Boone |
| **To:** | UFORMP@blm.gov |
| **Subject:** | Public Comment |
| **Date:** | Friday, March 19, 2010 8:06:47 AM |

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

M. Smyth Boone
381 Price Rd.
Paonia, CO 81428

BLM_0167388

| IN |
| --- |

| | |
| --- | --- |
| **From:** | bruce_krickbaum@blm.gov |
| **To:** | Kate Wynant |
| **Cc:** | uformp@blm.gov |
| **Subject:** | Fw: Public comments on the UFO Resource Management Plan, attn: Bruce Krickbaum |
| **Date:** | Monday, April 12, 2010 8:48:18 AM |
| **Attachments:** | public comment letter on RMP 3-18, rev Mar 19 |

It appears there was a problem with the outgoing mail, so I am sending this again.

--Bruce

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 04/12/2010 08:45 AM -----

|  |  |  |
| --- | --- | --- |
| Bruce Krickbaum/MOFO/CO/BLM/DOI 04/09/2010 01:26 PM | To | Kate Wynant, uformp@blm.com |
|  | cc |  |
|  | Subject | Fw: Public comments on the UFO Resource Management Plan, attn: Bruce Krickbaum |

Kate,

This gentleman had left me a message on March 26 asking if his letter had been received;  I did not see it on the uformp email site.
He forwarded his comment to me today, and it shows a sent date of March 19 - so we will accept it as a comment.

Also note the last paragraph -- he wants to be added to the mailing list.

Thanks, Bruce

----- Forwarded by Bruce Krickbaum/MOFO/CO/BLM/DOI on 04/09/2010 01:18 PM -----

|  |  |  |
| --- | --- | --- |
| Kent Brakken <kent_glenwoodco@ yahoo.com> 04/09/2010 11:59 AM | To | Bruce_Krickbaum@blm.gov |
|  | cc |  |
|  | Subject |  |

BLM_0167389

Fw: Public comments on the UFO
Resource Management Plan, attn:
Bruce Krickbaum

----- Forwarded Message ----
From: Kent Brakken <kent_glenwoodco@yahoo.com>
To: UFOBLM@BLM.GOV
Sent: Fri, March 19, 2010 10:22:54 AM
Subject: Public comments on the UFO Resource Management Plan, attn: Bruce
Krickbaum

Bruce Krickbaum, RMP Project Manager

Bureau of Land Management, Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, Colorado 81401

Subject: Scoping Comments on the Uncompahgre Resource Management Plan (RMP)
Revision

Bruce:

I write this letter as a former soil scientist with the Bureau of Land
Management, Anchorage District Office and later the watershed program
manager with the Bureau, Alaska State Office. I later worked as a senior
scientist with ERT, Inc, Fort Collins and CH2MHill, Denver where I wrote
mine reclamation plans for surface mines and the surface-effects of
underground mining projects in Utah, Wyoming, West Virginia and North
Carolina.

I am thinking back to the National Environmental Policy Act signed by Richard Nixon in about 1971, when I was then joining the Forest Service as a soil scientist with the San Juan National Forest, Durango, CO. That law and the regulations later promulgated to implement the law required environmental planning to prevent irrevocable harm and irreversible decisions of all federal agencies as they conducted planning and made decisions on managing public lands and implementing all federal laws and regulations, for land managers and non-land management federal agencies and decision makers.

With 304 million people, the United States is the third-most populated nation behind China, 1.25 billion and India, 1.1 billion. While I was a federal employee, the US population grew from roughly 200 million to just under 300 million. The west is a very dry place with growing individual populations dependent on access to safe water to drink and abundant water to produce the crops we consume. These water resources resources are not just used here, they are used downstream across many western states as well as parts of northern Mexico. I am very concerned that the Bureau not make irrevocable decisions adversely affecting our limited long-term water supply in order to promote the short-term access to the more temporary energy resource. When the natural gas is developed and gone, we will find other energy resources; but when the water is exhausted, or polluted, we may not be able to replace that water resource.  However, I clearly recognize that the Bureau, representing the USA, take all reasonable and prudent steps to reasonably develop the nation's energy resources in order to meet the nation's energy needs, but do so effectively balancing, planning and protecting the many other resources it is responsible to manage and protect.

From what I read in the news and hear and see on television and documentaries, and hear in discussions, natural gas drilling in both western Colorado and in northeastern Colorado has had serious adverse impacts on local residents. In some cases, local resident wells were contaminated by not just by poorly-planned natural gas drilling and in-effective packing of the drill stem allowing gas migration between aquifers, but, in some cases, their potable water source may have been contaminated even when natural gas drilling and reservoir fragmentation was well-planned by the energy company seeking the resource following the best management practices available to the industry. I am very concerned that the Bureau conduct the necessary planning and take into account the best available information so as to ensure that:

That local wells, springs and potable ground water aquifers, currently developed and available in the future will not be contaminated or adversely affected by natural gas drilling and

3 A-PI NRED

development;
That all US citizens, local and distant, will not see their water resources, potable and otherwise, adversely affected by the short-term access to the natural gas resource;
Drilling pads, access roads and all areas disturbed in order to access the natural gas resource are planned accordingly to prevent soil erosion and require the best available and most appropriate reclamation and remediation following natural gas drilling and development;

4 A-PI NRED

Compressor- and pump-stations are effectively planned and located so as not pose a safety threat to local residents, both within and without the federal land boundary, and not present adverse visual, noise or reasonable land use impacts;

5 A-PI NRED

Access roads are effectively planned so as to prevent and avoid dust and hazard as the natural gas resource is developed and produced;
Toxic, hazardous, carcinogenic, or other potentially harmful fluids are not injected into the ground while drilling for natural gas on any federally leased, permitted or otherwise regulated area.

6 A-PI NRED

ompanies will be required to fully disclose all drilling and hydraulic fracturing fluids that they will use on all federal lands, these in Colorado and other federal lands;

7 A-PI NRED

The Bureau through its planning and and resource management role, that the energy companies through their planning role and the regulatory authority through its permitting and enforcement role will ensure that air, water and wildlife habitat quality and general natural resource health and welfare will not be degraded as a result of natural gas leasing, permitting, or unitization decisions;
The Bureau will protect private property rights by allowing affected berty and private surface rights owners, in the case of split estates, be actively involved in the planning and permitting process;

8 A-PI NRED

That the Bureau will do its best within the flexibility of federal, state and local laws and regulations to prohibit oil and gas development on private land within a unitized area without the written permission of the surface property owner; and
That the Bureau will ensure through the NEPA planning process and other applicable laws and regulations that natural gas leases and permits on public domain public lands protect wildlife habitat from fragmentation.

I suggest and recommend that the Bureau:

Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness; and
Temporarily close to leasing all areas that are open to new oil and gas leasing in the current RMP until that time that the issues raised here are effectively addressed and the multiple resources effectively protected, now, and into the future. When that planning has been conducted, and the resources protected, now and into the future, the Bureau can then withdraw the temporary closure.

I suggest that the Bureau carefully and thoroughly consider the requirements of the National Environmental Policy Act, to appropriately involve me, my neighbors and any and all US citizens with an interest in these multiple natural resources in your planning and decision process and that you manage these lands in order to reasonably protect the health and well-being of the people who live in and around those lands.

Further, please place me on your mailing list with attention to oil and gas leasing, mining, soil erosion, watershed management, in-stream flow, recreational uses of rivers and streams and ground water quality. My preferred method of communication is e mail at Kent_glenwoodco@yahoo.com.

Sincerely:

Kent Brakken

3743 1600 Road

Delta, CO 81416

970 874-5455

Soil scientist, forest ecologist and range scientist

(See attached file: public comment letter on RMP 3-18, rev Mar 19)

BLM_0167393

Received

MAR 24 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

• Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

• Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

• Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

• Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

• Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

• Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

• Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

• Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_____
Signature

Hal Brill
Print Name

PO Box 747
Address

Paonia          CO       81428
City            State    Zip Code

BLM_0167394

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received
MAR 2 3 2010
Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Gregory A Canfield
Signature

Gregory A. Canfield
Print Name

BOX 561
Address

Paonia          Co          81428
City             State       Zip Code



BLM_0167396

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received
MAR 2 4 2010
Uncompahgre Field Off...

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Print Name   well Clark

Address   34566 L Rd

City   Hotchkiss   State   CO   Zip Code   81419

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received
MAR 2 9 2010
Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

David Cuz
**Signature**

David Colby
**Print Name**

Po Box 1034
**Address**

Paonia                    Co          81428
**City**            **State**        **Zip Code**

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received
MAR 1 5 2010
Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_Lif Coker_
Signature

Leif Colson
Print Name

18201 HWY 133
Address

Somerset           CO           81434
City                  State        Zip Code



Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing
publicly owned lands in a way that ensures both the health of the land and the people who live in and
around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan
revision is completed because at times in the past, the BLM has failed to live up to this standard by
*leasing and permitting natural gas development* without an environmental review and public input as
called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of
  natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the
  ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a
  unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and
  Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can
  consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in
  the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Ivan Perez Contreras*
Signature

*Ivan Perez Contreras*
Print Name

1381 E 3Rd St Apt 2 t
Address

Delta    Colorado   81416
City          State          Zip Code

BLM_0167400

Received

MAR 24 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature: *John Cowell*

Print Name: John Cowell

Address: 1118 3rd St.

City: Paonia   State: CO   Zip Code: 81428



Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Print Name MARY DiFRANCO

PO BOX 685
Address

PAONIA       CO       81428
City              State         Zip Code

PLEASE TAKE
CARE OF OUR LAND
FOR MY CHILDREN'S
CHILDREN

BLM_0167402

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401



Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Print Name  MARY DiFRANCO

Address  PO BOX 685

City PAONIA   State CO   Zip Code 81428

BLM_0167403

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

*Received
MAR 2 4 2010
Uncompahgre Field Off.*

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_Signature_

Marty Durlin
Print Name

PoB 1092  (327 North Fork Ave)
Address

Paonia        CO        81428
City                    State              Zip Code

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

*Received*
*MAR 2 4 2010*
*Uncompahgre Field Office*

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Danielle Eavenson* (signature)
Signature

Danielle Eavenson
Print Name

15495 Black Bridge Rd.
Address

Paonia          CO          81428
City          State          Zip Code

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



Received
FEB 2 5 2010
Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Lisa Fairbank
Print Name

31424 HWY 92
Address

Hotchkiss, CO 81419
City          State          Zip Code

BLM_0167406



Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature: *Scott Fairbank*

Print Name: Scott Fairbank

Address: 9852 3100 Rd

City: Hotchkiss   State: Co.   Zip Code: 81419



Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

JOANNA M. FELDMAN
Print Name

15635 FIRE MOUNTAIN RD
Address

PAONIA        CO        81428
City                State              Zip Code

BLM_0167408

IN

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

RECEIVED

FEB 23 2010

BY:

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

1 A-GE    2 A-PI NRED

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

3 A-PI NRED

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

4 A-PI NRED

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

5 A-PI NRED

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

6 A-PI NRED

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

7 A-PI NRED

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

8 A-PI NRED

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

9 A-PI WSA

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

10 A-PI NRED

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*[signature]*

Signature

DAVID MAREK

Print Name

P.O. BOX 1387

Address

PAONIA           CO           81428

City                State         Zip Code

BLM_0167409

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

• Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

• Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

• Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

• Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

• Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

• Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

• Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

• Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

PAUL FRAZIER
Print Name

29581 Redlands Mesa Rd.
Address

Hotchkiss    COLO.    81419
City                     State              Zip Code

BLM_0167410

FEB 2 6 2010

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

February 23, 2010

Re: Scoping Comments on the Resource Management Plan (RMP)

Dear Mr. Krickbaum,

After extensive study on the issue of oil and gas leasing for the Uncompahgre RMP, it is our position that the BLM should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions,

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area,

- Require energy companies to fully disclose in readily available formats all hydraulic fracturing fluids used in natural gas drilling,

- Ensure that air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions,

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner,

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation,

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness,

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely,

In addition, we are asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed. We believe it vital to complete all proper and legally mandated environmental reviews as well as to solicit public input as called for under the National Environmental Policy Act.

---

**Donna Gershten and Mitchell Gershten MD**
15426 Fire Mountain Rd   Paonia, Colorado 81428   970-527-5741

BLM_0167411

Thank you for considering our comments.

BLM_0167412

Received

MAR ¨8 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

1   Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

2   Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

3   Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

4   Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

5   Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

6   Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

7   Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

8   Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature   *(signature)*

Print Name   GERALD   GERSHTEN

BLM_0167413

Bruce Krickbaum, RMP Project Manager

Bureau of Land Management, Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, Colorado  81401

RECEIVED
MAR  1 2010
BY:

February 24, 2010

Re: Scoping Comments on the Resource Management Plan (RMP)

Dear Mr. Krickbaum,

I have been very concerned about the prospect of oil and gas leasing in and about the North Fork Valley.  While recognizing that energy production is a mandate given to the BLM, I would like this done with the highest level or responsibility possible and in such a manner that protections to human and wildlife health and habitat are given the highest priority.  To that end, I would like the BLM to put in place regulation and enforcement to ensure that no domestic, irrigation, surface, or ground water becomes contaminated as a result of natural gas leasing, permitting, or unitization decisions.  I want prohibitions on the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.  I would like to see energy companies required to provide full, complete and readily accessible disclosure of the composition of hydraulic fracturing fluids used in natural gas drilling.

I want assurances that air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.  Further, it is important to me that all natural gas leases and permits are required to protect wildlife habitat from fragmentation,

In addition, I request a moratorium on all natural gas leasing and permitting until the plan revision is completed.  The NEPA was put in place to provide proper and legally mandated environmental reviews in the protection of my interests and I ask the BLM to see to it that they are.  I understand well that energy is needed and I have no issue in principle with obtaining it.  I merely request that it be done with precautionary principles firmly established in leasing, regulation and enforcement.  Ruining public lands in the name of short term private profits is folly.  This has gone on for too long and things must change.

Thank you for considering my comments.

Sincerely,

Rebecca Gershten

1592 Madison St.                17575 Johnson Rd.

Denver, CO 80206            Paonia, CO 81428

(mailing address)

IN

**From:** Greta Gibb
**To:** UFORMP@blm.gov
**Subject:** rules for gas drilling
**Date:** Wednesday, March 24, 2010 10:40:04 AM

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
1 A-PI NRED th Townsend Avenue
Montrose, Colorado  81401
Re: Scoping Comments on the Resource Management Plan (RMP) Revision
Dear Mr. Krickbaum,
Below is a letter that describes my thoughts about gas drilling in this country on our public lands. I find the comments listed below to be "no brainers". How can a government entity fail to protect its people and their resources. Air and water, to list a couple, are more precious resources than gas. Simply because the gas industry has more money (by earning it off of our lands) , and therefore more lobbyists should not mean that they are above some basic expectations. Please hold them accountable.
I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the-BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:
- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.
- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.
- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.
- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.
- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.
- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.
- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.
- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.
Sincerely,

Paul and Greta Gibb
P.O. Box 484
Paonia, CO  81428
greta@paonia.com

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401



REC___'ED
MAR 1 2010
BY:

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Joanna R. Gilbert*
Signature

JOANNA R. GILBERT
Print Name

PO Box 850 - 12388 - 3100 RD
Address

Hotchkiss   CO   81419
City          State        Zip Code

BLM_0167416

BLM_0167417

Received

MAR 2 3 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_Lynn Gillespie_
Signature

_Lynn Gillespie_
Print Name

_12506 Crawford Rd_
Address

_Paonia_          _Co_          _81428_
City                State        Zip Code

BLM_0167418

Received

MAR 2 4 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Jason Gold
Print Name

Po Box 1760
Address

PAONIA                    Co              81428
City                        State           Zip Code

BLM_0167419



Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Print Name   Yvon Geos

Address   PO910 - 12388 - 3100 RD

City   Hotchkiss   State   Co   Zip Code   81419

BLM_0167420

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received

MAR 2 3 2010

Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

Signature

Kay Hannah

Print Name: Kay Hannah

Address: 11589 Crawford Rd

City: Paonia    State: Co    Zip Code: 81428

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

*Received*
*MAR 2 6 2010*
*Uncompahgre Field Office*

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

*Jeffrey W. Haswell*
Signature

Jeffrey W. Haswell
Print Name

P.O. Box 1776
Address

Paonia, CO 81428
City          State          Zip Code

Received

MAR 8 2010

Uncompahgre Field Office

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because, at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas leasing twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_Marylee Hauze_
Signature

_Marylee Hauze_
Print Name

_326 Delta Ave_
Address

_Paonia            CO       81428_
City                State          Zip Code

BLM_0167424

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Received

MAR 2 6 2010

Uncompahgre Field Office

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_Jean Hennen_
Signature

JEAN HENNEN
Print Name

39083 PiTKiN RD
Address

PAONiA         Co         81428
City                      State                  Zip Code

BLM_0167425

RECEIVED
MAR 1 2010
BY:

Bruce Krickbaum, RMP Project Manager
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Scoping Comments on the Resource Management Plan (RMP) Revision

Dear Mr. Krickbaum,

I believe the BLM should state unequivocally in the revised RMP that it is fully committed to managing publicly owned lands in a way that ensures both the health of the land and the people who live in and around those lands. I am asking for a moratorium on all natural gas leasing and permitting until the plan revision is completed because at times in the past, the BLM has failed to live up to this standard by leasing and permitting natural gas development without an environmental review and public input as called for under the National Environmental Policy Act. In addition, I believe the revised RMP should:

- Ensure that no domestic, irrigation, surface, or ground water will become contaminated as a result of natural gas leasing, permitting, or unitization decisions.

- Prohibit the injection of toxic, hazardous, carcinogenic, or other potentially harmful fluids into the ground while drilling for natural gas on any federally leased, permitted, or unitized area.

- Require energy companies to fully disclose all drilling and hydraulic fracturing fluids.

- Ensure air quality will not be degraded as a result of natural gas leasing, permitting, or unitization decisions.

- Protect private property rights by prohibiting oil and gas development on private land within a unitized area without the written permission of the surface property owner.

- Require all natural gas leases and permits to protect wildlife habitat from fragmentation.

- Designate the Adobe Badlands Wilderness Study Area, Camel Back Wilderness Study Area, and Tabeguache Area as "suitable" for wilderness.

- Close to leasing all areas that are open to new oil and gas leasing in the current RMP. We can consider reopening these areas to oil and gas development twenty years from now in the next RMP if, in the ensuing time period, technology has been developed to extract these minerals safely.

Thank you for taking my comments into consideration.

Sincerely,

_Claudia Henshall_
Signature

_Claudia J. Henshall_
Print Name

_15360 Amsbury Road_
Address

_Peonia,      Colorado      81428_
City                State              Zip Code

BLM_0167426