| | |
|---|---|
| **From:** | Kate Wynant |
| **To:** | UFO AR |
| **Subject:** | FW: CDPHE Protocol Comments |
| **Date:** | Tuesday, September 06, 2011 10:46:25 AM |
| **Attachments:** | RMP 3 Western Field Offices July 6b.docx |

Kate Wynant
EMPSi Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160     fax:  866-625-0707
www.EMPSi.com         Twitter: EMPSInc         Facebook: EMPSi

Bringing clarity to the complex ™
GSA Contract GS10F-0412S        HUBZone-certified
Denver       Reno       San Francisco       Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.


-----Original Message-----
From: azahniser@blm.gov [mailto:azahniser@blm.gov]
Sent: Tuesday, July 19, 2011 1:03 PM
To: cewing@blm.gov; Drew Vankat; bkrickba@blm.gov; kasteven@blm.gov; jim@carterlakeconsulting.com; rmorris@environcorp.com
Subject: CDPHE Protocol Comments


Jim and Ralph,

Please see attached comments from CDPHE on the draft Protocol.  We have one more set coming in next week--Forest Service.

Angela


----- Forwarded by Angela L Zahniser/COSO/CO/BLM/DOI on 07/19/2011 01:01 PM -----

```
             "Dileo, Jim A."
             <Jim.Dileo@dphe.s
             tate.co.us>                               To
                              "azahniser@blm.gov"
             07/19/2011 08:42         <azahniser@blm.gov>
             AM                                        cc

                                                  Subject
                            RE: Meeting on Hiawatha Project
```

Angela,

Attached are comments from APCD on the Resource Management Plan for the Three Western Colorado Offices.  We had some confusion on the due date.

Jim DiLeo
NEPA Coordinator
APCD

-----Original Message-----
From: azahniser@blm.gov [mailto:azahniser@blm.gov]
Sent: Friday, July 15, 2011 1:35 PM
To: Machovec, Chuck M.
Cc: Wells, Dale M.; Jung, Doris W.; Dileo, Jim A.; Briggs, Kevin R.; McMillan, Mark; Waldman, Rose A.
Subject: RE: Meeting on Hiawatha Project

Chuck,

Thanks for getting back to me so quickly.  I will check with the others and hopefully we can confirm that August 16th will work.  I will let you know.
Have a great weekend!

Angela

|  |  |  |
|---|---|---|
| "Machovec, Chuck M." <Chuck.Machovec@dphe.state.co.us><br>07/14/2011 09:08 AM | To | "azahniser@blm.gov" <azahniser@blm.gov> |
|  | cc | "Wells, Dale M." <Dale.Wells@dphe.state.co.us>, "Briggs, Kevin R." <Kevin.Briggs@dphe.state.co.us>, "Waldman, Rose A." <Rose.Waldman@dphe.state.co.us>, "McMillan, Mark" <Mark.McMillan@dphe.state.co.us>, "Dileo, Jim A." <Jim.Dileo@dphe.state.co.us>, "Jung, Doris W." <Doris.Jung@dphe.state.co.us> |
|  | Subject | RE: Meeting on Hiawatha Project |

Angela,
Aug 16th works for the key APCD staff who should attend.

If it doesn't work for you, then the week of Aug 22 would be the next soonest availability.

At this point, given that the analysis appears to include both plume and grid modeling, the following staff may attend:
Kevin Briggs (photochemical modeling)
Dale Wells (emissions estimation and modeling) Rose Waldman (Oil/Gas team) Chuck Machovec (and/or someone else with expertise in plume modeling).

As you mentioned, I don't know at this point how involved APCD will be in this project given that most of the development is in Wyoming and WY DEQ has already been involved; however, since some of the project is in Colorado and there is a potential for the emissions to affect Colorado, APCD is very interested in knowing more about the development and being in the loop.

Regards,

Chuck Machovec
chuck.machovec@state.co.us
303-692-3249

Colorado Department of Public Health and Environment Air Pollution Control Division / Technical Services Program Modeling, Meteorology, and Emission Inventory Unit
APCD-TS-B1
4300 Cherry Creek Drive South
Denver, CO 80246


-----Original Message-----
From: Machovec, Chuck M.
Sent: Wednesday, July 13, 2011 5:47 PM
To: 'azahniser@blm.gov'
Subject: RE: Meeting on Hiawatha Project

Aug 15 (but meeting must conclude before 1:30pm because several of us have an APCD ozone planning meeting at 2pm) and 16th work for me. Otherwise I'm booked that week.

I sent a message to others at APCD. When I hear back from them, I'll let you know if the 15th or 16th work.

-----Original Message-----
From: azahniser@blm.gov [mailto:azahniser@blm.gov]
Sent: Wednesday, July 13, 2011 11:19 AM
To: Machovec, Chuck M.
Cc: mhovey@blm.gov; jspeck@blm.gov; eomara@blm.gov; jim@carterlakeconsulting.com
Subject: Re: Meeting on Hiawatha Project

Hi Chuck,


I'm following up on the email I sent below a few weeks ago. I would like to propose we get together sometime during the week of August 15th to discuss. I think it would also great if representatives from the BLM WY Rock Springs FO and BLM Little Snake FO attended (cc'd here). If a meeting during the week of August 15th works for you, please let me know and I'll check with others' availability. Also, please let me know who else at CDPHE you would like to bring in to this discussion.

Thanks,

Angela

       Angela L Zahniser/COSO/CO/BLM/DOI        To   Chuck M. Machovec
       06/15/2011 02:43 PM        cc
              Subject   Meeting on Hiawatha Project

HI Chuck,

I recently learned about a proposed oil and gas well project occurring near the Hiawatha area in NW Colorado. This project proposal spans across both Wyoming and Colorado. The majority of the proposed well development is in Wyoming, but some, about 1/3, are in Colorado. Since most of the activity is proposed to occur in Wyoming, the BLM WY Rock Springs Field Office, along with the BLM WY State Office, has taken the lead on this project.
There are two other concurrently proposed project in the same region in Wyoming, the Continental-Divide-Creston, and the Moxa Arch project. Since all three of these project proposals are in the same general region, BLM WY has planned to evaluate the potential AQ impacts in the same basic manner for all three projects. They have worked closely with the WY DEQ and other interested stakeholders. It is anticipated that both near-field and far-field photochemical grid modeling will be a part of the air quality impacts assessment for each of these projects.

I do not know your level of knowledge/involvement in this project. I would like to get you and others at CDPHE who may be interested engaged, at a minimum, to learn about this project, the background behind it, and to gauge your level of interest and if/how you want to be involved in the air quality analysis from here on out. Since I have also recently been informed of this project proposal, I think it would be good if BLM WY (Rock Springs Field Office and Melissa Hovey--air resource specialist at BLM WY State Office), and WY DEQ (Kelly Bott) were available to fill in the details and answer any questions you may have about the air quality assessment associated with this project proposal.

Would you be available for either an in-person meeting at your office or a conference call either July 6 or 7th, or during the week of July 11th to discuss?

Thanks,

Angela Zahniser
Air Resources Specialist
BLM Colorado State Office
2850 Youngfield Street
Lakewood, CO  80215

BLM_0168053

303.239.3883
Angela_Zahniser@blm.gov


(See attached file: RMP 3 Western Field Offices July 6b.docx)



# STATE OF COLORADO

John W. Hickenlooper, Governor
Christopher E. Urbina, MD, MPH
  Executive Director and Chief Medical Officer

Dedicated to protecting and improving the health and environment of the people of Colorado

4300 Cherry Creek Dr. S.          Laboratory Services Division
Denver, Colorado 80246-1530       8100 Lowry Blvd.
Phone (303) 692-2000              Denver, Colorado 80230-6928
Located in Glendale, Colorado     (303) 692-3090

http://www.cdphe.state.co.us

Colorado Department
of Public Health
and Environment

July 11, 2011

Angela Zahniser
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215

RE: Resource Management Plan for Western Colorado Field Offices

Dear Ms. Zahniser:

The Air Pollution Control Division (Division) of the Colorado Department of Public Health and Environment has reviewed the Resource Management Plan for the "Draft Air Resources Impact Assessment Protocol for the Bureau of Land Management Grand Junction Field Office, Uncompahgre Field Office, and the Dominguez-Escalante National Conservation Area Resource Management Plan Revisions" dated June 2011 and provides the following comments.

1. Various terms are used throughout the document to describe oil and gas categories of operations. These terms are not consistent, and it is not clear what operations are considering to be part of each category. Some examples include:
   - The term "oil and gas development and production" is used in the first paragraph on page one.
   - Text in the 2nd paragraph on page 27 indicates that there are two types of oil and gas activities – field development and production – however, Table 3.1 on the same page lists three categories, "Oil and Gas emissions from Construction," "Oil and Gas Production," and "Oil and Gas Mobile Sources."
   - Section 3.2.2, which begins on page 30, is titled "Emissions from Oil and Gas Production." This section primarily describes emissions from well sites and Table 3-3 only describes emission sources that are at well sites. However, gas plants and compressor stations are mentioned, although not described completely. For example, the only emission source described that is associated with gas plants is pneumatic pumps.
   - The last paragraph on page 49 uses the terms "...well production, field compression, and ancillary facilities..."
   - The 1st paragraph on page 51 uses the terms "...producing wells with compressor station(s) and/or a processing facility..."
   - In some sections, emissions from oil and gas related mobile sources are considering a separate category and in other sections, they are grouped with other categories. In at least one case, they

are in both: Table 3-1 on page 27 lists "Vehicle Traffic" under the "Oil and Gas Emissions from Construction" category and also lists a separate category called "Oil and Gas Mobile Sources." Another example from this table is that the first two activities ("Well pad and access road construction" and "Road surfacing and area disturbances") are emissions from mobile sources; it is not clear how these activities are different from the emissions from the category "Oil and Gas Mobile Sources."

- The numbered list on page 70 lists stationary point and area sources, on/non-road mobile sources, and oil and gas production sources. Because oil and gas production sources include point/area/on/off-road sources, it is not clear where various categories of oil and gas emission sources would fall. Also, it is not clear if oil and gas development/ drilling, completions, and processing are included in this list.
- The list on page 86 lists compressor engines as a separate category from production, but lists gas processing plants under production sources. Generally, gas processing plants are not considered to be in the production category. Here, construction is listed under the production category, but earlier in the document, construction is its own category.

It is recommended that oil and gas categories be defined and used consistently throughout the document.

2. This document refers to various sources of emission inventories. A report will be issued by ENVIRON in July 2011 that has emission data associated with oil and gas mobile sources in the Piceance Basin. It is recommended that this data be used to augment emission data from oil and gas mobile sources.
3. Some sections of the report are not complete. The Division was not able to comment on incomplete sections.
4. Section 3.2.1, 2nd paragraph, page 28: The last sentence indicates that emissions are from operation of heavy mobile equipment. Because some emissions associated with sources described in the 1st paragraph of this section are from sources other than heavy mobile equipment, it is recommended that the last sentence be revised to state "....VOC, and HAPs result *primarily* from the operation of heavy mobile equipment." (Emphasis added)
5. Section 3.2.1, 2nd paragraph, page 29: The report indicates that some assumptions will be used to calculate emissions: Tier 2 engines will be used, fuel will contain 15 ppm sulfur, and an operational load factor of 0.42 will be used. All assumptions that are used to calculate emissions should be included as minimum lease requirements. For example, companies should be required to use Tier 2 or higher engines.
6. Table 3-2, which begins on page 29: This table is titled "Summary of Federal and State Regulations Affecting Oil and Gas Source Categories." It is not a complete list of regulations. For example, the Colorado Oil and Gas Conservation Commission passed rules in 2009 that affect storage tanks (crude, condensate, and water), dehydrators, pneumatic devices, pits, and well completions. The State of Colorado has regulations that apply to pneumatic devices. Additionally, the most recent large group of changes to Regulation No. 7 were made in 2009 and effective beginning February 2009. Engine requirements were phased through January 2011. Condensate tank requirements were phased in through May 2011.
7. Section 3.2.2, which begins on page 30: This section is difficult to understand. Suggestions for revision:
    - Revisions based on comment number 1 (definitions of oil and gas categories)
    - 2nd sentence: This lists examples of "production facilities," however, some of the items in the sentence do not seem to be production facilities ("number of pumps per well," "type and percentage of facility consolidation," and "percentage of electrification of compressor engines."

- It is recommended that more commonly used emission source names be used. For example, dehydration heaters are commonly called "reboilers" and dehydration overhead vents are commonly called "still vents."
- Emissions from pneumatics, vents, and condensate tank flash are not considered to be fugitive emissions.

8. Section 3.3.1, 1st paragraph, page 39: The last sentence indicates that emissions from Montana and North Dakota will be negligible. Change "their VOC emissions will be negligible due to their far distance" to "their VOC emissions are assumed to be negligible due to their far distance."
9. Section 4.4 and 4.5, page 50: The 2nd and 4th paragraphs on this page indicate that come specific oil and gas emission sources will be modeled as point sources and some as volume sources. These lists are not complete. It is not clear why some emission sources were included in these lists while others were not.
10. Section 5.4.2.10.4, page 87, 1st paragraph: The 1st sentence describes some emission sources that are point sources in Colorado (this list in not complete). The 2nd sentence describes emission sources that are point sources in Utah. The last sentence states "The rest of the oil and gas sources will be modeled as area sources." It is not clear if the last sentence applies to just Utah or both Utah and Colorado. Colorado has many additional sources that could be modeled as point sources, including condensate tanks and dehydrators. Please clarify the text and revise as needed.
11. Section 4.2, page 45: Contact Emmett Malone (Emmett.malone@state.co.us) to obtain a meteorological determination for the AERMOD modeling. The Division's meteorological tower recommendations will include guidance for processing the data and determination of surface characteristics.
12. Section 4.4, page 50: The protocol states "Flat terrain will be simulated in the near-field." Justify this assumption and discuss the implications of the assumption.
13. General Comment on near-field AERMOD analysis: The Division is pleased to see a near-field analysis with AERMOD included in the protocol as it is important to disclose impacts at a variety of scales. In addition to adding a background concentration to project results, the Division recommends inclusion of large existing large point sources (i.e., see "nearby sources" in 40 CFR 51, Appendix W). While the Division recognizes that the exact locations of future sources is unknown, which makes it problematic to overlay future point source inventories on existing inventories, disclosure of existing modeled air quality levels from large sources along with the proposed actions is appropriate. Along with the other modeling analyses, it will help inform the process of siting additional air quality monitors as part of this or other actions. It will also provide various agencies and the public with more information about the types of concentration gradients associated with large existing point sources. Since an AERMOD analysis over several large modeling subdomains requires simplifying assumption, it would be appropriate to include a discussion in the modeling report on the limitations of the AERMOD analysis.
14. Table 4.5, page 54: The only Colorado Ambient Air Quality Standard (CAAQS) is for 3-hour SO2 (see http://www.cdphe.state.co.us/regulations/airregs/5CCR1001-14.pdf). Remove the other "CAAQS" standards from the table. Class I and Class II increments for PM2.5 were promulgated by EPA in 2010. List National Ambient Air Quality Standards using units of the standard (e.g., ppb for 1-hour NO2 and 1-hour SO2).
15. Table 5.17: see comment 13.
16. General comment: Due to resource constraints, a detailed review of the protocol was not completed by the Modeling, Meteorology, and Emission Inventory Unit. Please notify the Division if additional time is available for comments. If so, the Division may provide additional comments if warranted.

Thank you for the opportunity to review this document. I f you have any questions or concerns about these comments, please contact Ms. Rose Waldman of the Air Division Oil and Gas Team at 303-692-3145. If you have comments on items 11-16, please contact Chuck Machovec (chuck.machovec@state.co.us or 303-692-3249).

Sincerely,

Jim DiLeo
NEPA Coordinator
Air Pollution Control Division

CC: Mark McMillan, Rose Waldman, Chuck Machovec, APCD

are in both: Table 3-1 on page 27 lists "Vehicle Traffic" under the "Oil and Gas Emissions from Construction" category and also lists a separate category called "Oil and Gas Mobile Sources." Another example from this table is that the first two activities ("Well pad and access road construction" and "Road surfacing and area disturbances") are emissions from mobile sources; it is not clear how these activities are different from the emissions from the category "Oil and Gas Mobile Sources."

- The numbered list on page 70 lists stationary point and area sources, on/non-road mobile sources, and oil and gas production sources. Because oil and gas production sources include point/area/on/off-road sources, it is not clear where various categories of oil and gas emission sources would fall. Also, it is not clear if oil and gas development/ drilling, completions, and processing are included in this list.
- The list on page 86 lists compressor engines as a separate category from production, but lists gas processing plants under production sources. Generally, gas processing plants are not considered to be in the production category. Here, construction is listed under the production category, but earlier in the document, construction is its own category.

It is recommended that oil and gas categories be defined and used consistently throughout the document.

2. This document refers to various sources of emission inventories. A report will be issued by ENVIRON in July 2011 that has emission data associated with oil and gas mobile sources in the Piceance Basin. It is recommended that this data be used to augment emission data from oil and gas mobile sources.
3. Some sections of the report are not complete. The Division was not able to comment on incomplete sections.
4. Section 3.2.1, 2nd paragraph, page 28: The last sentence indicates that emissions are from operation of heavy mobile equipment. Because some emissions associated with sources described in the 1st paragraph of this section are from sources other than heavy mobile equipment, it is recommended that the last sentence be revised to state "....VOC, and HAPs result *primarily* from the operation of heavy mobile equipment." (Emphasis added)
5. Section 3.2.1, 2nd paragraph, page 29: The report indicates that some assumptions will be used to calculate emissions: Tier 2 engines will be used, fuel will contain 15 ppm sulfur, and an operational load factor of 0.42 will be used. All assumptions that are used to calculate emissions should be included as minimum lease requirements. For example, companies should be required to use Tier 2 or higher engines.
6. Table 3-2, which begins on page 29: This table is titled "Summary of Federal and State Regulations Affecting Oil and Gas Source Categories." It is not a complete list of regulations. For example, the Colorado Oil and Gas Conservation Commission passed rules in 2009 that affect storage tanks (crude, condensate, and water), dehydrators, pneumatic devices, pits, and well completions. The State of Colorado has regulations that apply to pneumatic devices. Additionally, the most recent large group of changes to Regulation No. 7 were made in 2009 and effective beginning February 2009. Engine requirements were phased through January 2011. Condensate tank requirements were phased in through May 2011.
7. Section 3.2.2, which begins on page 30: This section is difficult to understand. Suggestions for revision:
    - Revisions based on comment number 1 (definitions of oil and gas categories)
    - 2nd sentence: This lists examples of "production facilities," however, some of the items in the sentence do not seem to be production facilities ("number of pumps per well," "type and percentage of facility consolidation," and "percentage of electrification of compressor engines."

DOI-BLM
CO STATE OFFICE
COSO MAILROOM

# STATE OF COLORADO

John W. Hickenlooper, Governor
Christopher E. Urbina, MD, MPH
  Executive Director and Chief Medical Officer

Dedicated to protecting and improving the health and environment of the people of Colorado

4300 Cherry Creek Dr. S.        Laboratory Services Division
Denver, Colorado 80246-1530     8100 Lowry Blvd.
Phone (303) 692-2000            Denver, Colorado 80230-6928
Located in Glendale, Colorado   (303) 692-3090

http://www.cdphe.state.co.us



Colorado Department
of Public Health
and Environment

July 11, 2011

Angela Zahniser
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, CO 80215

RE: Resource Management Plan for Western Colorado Field Offices

Dear Ms. Zahniser:

The Air Pollution Control Division (Division) of the Colorado Department of Public Health and Environment has reviewed the Resource Management Plan for the "Draft Air Resources Impact Assessment Protocol for the Bureau of Land Management Grand Junction Field Office, Uncompahgre Field Office, and the Dominguez-Escalante National Conservation Area Resource Management Plan Revisions" dated June 2011 and provides the following comments.

1. Various terms are used throughout the document to describe oil and gas categories of operations. These terms are not consistent, and it is not clear what operations are considering to be part of each category. Some examples include:
    - The term "oil and gas development and production" is used in the first paragraph on page one.
    - Text in the 2nd paragraph on page 27 indicates that there are two types of oil and gas activities – field development and production – however, Table 3.1 on the same page lists three categories, "Oil and Gas emissions from Construction," "Oil and Gas Production," and "Oil and Gas Mobile Sources."
    - Section 3.2.2, which begins on page 30, is titled "Emissions from Oil and Gas Production." This section primarily describes emissions from well sites and Table 3-3 only describes emission sources that are at well sites. However, gas plants and compressor stations are mentioned, although not described completely. For example, the only emission source described that is associated with gas plants is pneumatic pumps.
    - The last paragraph on page 49 uses the terms "...well production, field compression, and ancillary facilities..."
    - The 1st paragraph on page 51 uses the terms "...producing wells with compressor station(s) and/or a processing facility..."
    - In some sections, emissions from oil and gas related mobile sources are considering a separate category and in other sections, they are grouped with other categories. In at least one case, they

Thank you for the opportunity to review this document. If you have any questions or concerns about these comments, please contact Ms. Rose Waldman of the Air Division Oil and Gas Team at 303-692-3145. If you have comments on items 11-16, please contact Chuck Machovec (chuck.machovec@state.co.us or 303-692-3249).

Sincerely,

Jim DiLeo
NEPA Coordinator
Air Pollution Control Division

CC: Mark McMillan, Rose Waldman, Chuck Machovec, APCD

- It is recommended that more commonly used emission source names be used. For example, dehydration heaters are commonly called "reboilers" and dehydration overhead vents are commonly called "still vents."
- Emissions from pneumatics, vents, and condensate tank flash are not considered to be fugitive emissions.

8. Section 3.3.1, 1st paragraph, page 39: The last sentence indicates that emissions from Montana and North Dakota will be negligible. Change "their VOC emissions will be negligible due to their far distance" to "their VOC emissions are assumed to be negligible due to their far distance."
9. Section 4.4 and 4.5, page 50: The 2nd and 4th paragraphs on this page indicate that come specific oil and gas emission sources will be modeled as point sources and some as volume sources. These lists are not complete. It is not clear why some emission sources were included in these lists while others were not.
10. Section 5.4.2.10.4, page 87, 1st paragraph: The 1st sentence describes some emission sources that are point sources in Colorado (this list in not complete). The 2nd sentence describes emission sources that are point sources in Utah. The last sentence states "The rest of the oil and gas sources will be modeled as area sources." It is not clear if the last sentence applies to just Utah or both Utah and Colorado. Colorado has many additional sources that could be modeled as point sources, including condensate tanks and dehydrators. Please clarify the text and revise as needed.
11. Section 4.2, page 45: Contact Emmett Malone (Emmett.malone@state.co.us) to obtain a meteorological determination for the AERMOD modeling. The Division's meteorological tower recommendations will include guidance for processing the data and determination of surface characteristics.
12. Section 4.4, page 50: The protocol states "Flat terrain will be simulated in the near-field." Justify this assumption and discuss the implications of the assumption.
13. General Comment on near-field AERMOD analysis: The Division is pleased to see a near-field analysis with AERMOD included in the protocol as it is important to disclose impacts at a variety of scales. In addition to adding a background concentration to project results, the Division recommends inclusion of large existing large point sources (i.e., see "nearby sources" in 40 CFR 51, Appendix W). While the Division recognizes that the exact locations of future sources is unknown, which makes it problematic to overlay future point source inventories on existing inventories, disclosure of existing modeled air quality levels from large sources along with the proposed actions is appropriate. Along with the other modeling analyses, it will help inform the process of siting additional air quality monitors as part of this or other actions. It will also provide various agencies and the public with more information about the types of concentration gradients associated with large existing point sources. Since an AERMOD analysis over several large modeling subdomains requires simplifying assumption, it would be appropriate to include a discussion in the modeling report on the limitations of the AERMOD analysis.
14. Table 4.5, page 54: The only Colorado Ambient Air Quality Standard (CAAQS) is for 3-hour SO2 (see http://www.cdphe.state.co.us/regulations/airregs/5CCR1001-14.pdf). Remove the other "CAAQS" standards from the table. Class I and Class II increments for PM2.5 were promulgated by EPA in 2010. List National Ambient Air Quality Standards using units of the standard (e.g., ppb for 1-hour NO2 and 1-hour SO2).
15. Table 5.17: see comment 13.
16. General comment: Due to resource constraints, a detailed review of the protocol was not completed by the Modeling, Meteorology, and Emission Inventory Unit. Please notify the Division if additional time is available for comments. If so, the Division may provide additional comments if warranted.

| | |
|---|---|
| **From:** | Drew Vankat |
| **To:** | gjfo ar; Kate Wynant (kate.wynant@empsi.com) |
| **Subject:** | FW: USFS Comments on the Air Quality Impact Assessment Protocol, GJFO, UFO, and D-E NCA Resource Management Plans |
| **Date:** | Monday, August 08, 2011 9:06:25 AM |

All comments are in.

Drew Vankat
EMPSi  Environmental Management and Planning Solutions, Inc.
3775 Iris Avenue, Suite 1A
Boulder, CO  80301
tel:  303-447-7160     fax:  866-625-0707
www.EMPSi.com        Twitter: EMPSInc        Facebook: EMPSi

Bringing clarity to the complex ™

GSA Contract GS10F-0412S        HUBZone-certified

Denver       Reno       San Francisco       Washington, DC

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.


-----Original Message-----
From: azahniser@blm.gov [mailto:azahniser@blm.gov]
Sent: Thursday, August 04, 2011 4:45 PM
To: jim@carterlakeconsulting.com; rmorris@environcorp.com; cewing@blm.gov; kasteven@blm.gov; bblom@blm.gov
Cc: Drew Vankat
Subject: Fw: USFS Comments on the Air Quality Impact Assessment Protocol, GJFO, UFO, and D-E NCA Resource Management Plans


Jim, Ralph,

Please see USFS comments on the protocol.  All comments are now in.  Are you in the process of preparing a comment/response table?  Please provide an update.

Drew, please see below for the admin. record.

Thanks,

Angela


----- Forwarded by Angela L Zahniser/COSO/CO/BLM/DOI on 08/04/2011 04:43 PM -----

            Bret A Anderson
            <baanderson02@fs.
            fed.us>                                             To
                              Angela_Zahniser@blm.gov
            08/03/2011 11:55                                    cc
            AM                Jeff A Sorkin <jasorkin@fs.fed.us>,

Debra C Miller <dcmiller@fs.fed.us>
Subject
USFS Comments on the Air Quality
Impact Assessment Protocol, GJFO,
UFO, and D-E NCA Resource
Management Plans

Angela,

On behalf of the United States Forest Service, I am submitting comments to the draft protocol for air quality impacts analyses for the GJFO, UFO, and
D-E NCA resource management plans.  We appreciate the opportunity to offer
comment and thank you for your patience with the tardiness of our comments.
I  hope you will find these of value in the development of a final
protocol.  In general, we found this to be a very well written protocol
with the technical rationale clearly explained and are supportive of the modeling platform(s) and
modeling team engaged to conduct this study.  We have identified several areas that we believe require
clarification or correction with respect to the interpretation of the FLAG 2010 guidance and also how
impacts are to be reported in light of the recently signed interagency memorandum of understanding
regarding air quailty impact analyses for NEPA related activities.  Our comments are delineated below:

1. p. 45 - identifies that 3-years of RAWS data will be used for the near-field impact analysis.  We suggest that quality assurance summaries for each of the proposed RAWS sites be included to insure that data would meet equivalency to EPA on-site meteorological monitoring guidance in light of the proposal to use 3-years of data instead of the traditional 5 years as mandated under 40 CFR Part 51, Appendix W.  We understand the difficulty in obtaining 5-years of representative meteorology in remote areas, and appreciate the need to use RAWS data, but special attention must be paid for data completeness and quality with RAWS data.
2. p. 66 - treatment of minimum Kv:  The USFS, EPA, and ENVIRON have an ongoing project evaluating CAMx performance for inert tracer releases to examine CAMx advection.  For the experiments conducted, evaluations of each  Kv diagnosis method and numerical advection scheme combination were evaluated.  This database could be useful in helping determine what Kv options would be suitable for this analysis.
3. p. 118 "FLAG 2010 screening analysis uses 1.0 dv change as the screening analysis impact for impacts from cumulative sources." This statement appears to be in error.  I have reviewed the FLAG 2010 document and can find no reference to a comparison of 1.0 dv for cumulative impacts.  Project levels emissions are most commonly evaluated against the 5% change with respect to natural conditions (p. 23, FLAG 2010).  We request that this statement be explained further and provide the citation to the location in the FLAG 2010 document.  If this statement is in error, we request that the protocol be corrected to reflect the correct FLAG 2010 recommendations.

    4. p. 118 "Some other Federal land management agencies also use this 0.5
dv change in light extinction...BLM will report results and compare
only to the 1.0 dv change in light extinction for each modeled
alternative."  This is not in keeping with the recently signed
interagency MOU, especially in light of the fact that all of the
Class I and sensitive Class II areas identified on p. 109 of the
protocol are NPS and USFS managed lands.  We request that the
protocol be modified to reflect the MOU agreement that visibility
impacts will be evaluated against the 0.5 dv threshold for project
impacts for non-BLM managed areas.

Thank you once again for the opportunity to provide comment on this protocol.  If you have any questions, please contact me at 970-295-5981 at your convenience.

Best regards,
Bret Anderson
USDA Forest Service