by century's end, depending on the equity assumptions used within a total global emissions limit. These represent a range of approximate equity assumptions for apportioning emissions quotas.[ii] Under any of those quotas, emissions from new federal fossil fuel leasing are precluded after factoring in the emissions of developing non-federal and already leased fossil fuels. (Figure 2.)



**Figure 2. Global carbon limits, U.S. emissions quotas and potential emissions from federal and non-federal fossil fuels.**

---

[i] In this report we use the terms "share of limit" and "quota" interchangeably and define them in the context of scientifically advised emission limitations exclusive of sequestration. In some cases, studies and reports also use the term "budget". Much of the literature, coverage, and usage of these terms utilizes the terms in this way; however, in some cases carbon "budgets" are defined more broadly to encompass sources, fluxes and sinks, while "quotas" are defined more narrowly to encompass only limits on future emissions necessary to meet a certain average global temperature target. We feel this usage is appropriate here since "carbon budgets" generally refer to the total cumulative mass of carbon emissions allowable over time, while this report describes the total cumulative mass of carbon under federal and non-federal lands which may or may not be emitted into the atmosphere over time.

[ii] We use Raupach et al. (2014) U.S. emissions quotas for illustration purposes only; this report and its authors do not endorse equity assumptions made therein. We use the ratio of 1.39 $CO_2e/CO_2$ reported in Meinshausen et al. (2009) to convert the values reported in Raupach et al. (2014) from $CO_2$ to $CO_2e$. We also exclude Raupach et al.'s "future committed emissions" from their published -30, 67 and 165 Gt $CO_2$ U.S. quotas to isolate the quotas from assumptions about "future committed emissions." Notably, under Raupach et al.'s "equity" scenario, "future committed emissions" already exceed the remaining U.S. quota; Raupach et al. thus report a remaining "equity" scenario quota of -30 Gt $CO_2$.



# II. Introduction

The Intergovernmental Panel on Climate Change (IPCC) recently warned that humanity must adhere to a strict "carbon limit" in order to preserve a likely chance of holding average global warming to less than 2°C (3.6°F) by the end of the century—a level of warming that still will cause extreme disruption to both human communities and natural ecosystems.[1] According to the IPCC, all future global emissions must be limited to about 1,000 gigatons ("Gt," one gigaton equals one billion tons) of carbon dioxide ($CO_2$) to have a likely (>66%) chance of staying below 2°C.[2] The International Energy Agency has projected that the entire remaining 1,000 Gt $CO_2$ (1,390 Gt $CO_2$e[iii]) carbon budget will be consumed by 2040 on the current emissions course.[3]

In 2013, the U.S. emitted 6.67 Gt $CO_2$e,[4] the majority (85%) coming from the burning of fossil fuels,[5] and accounting for 15% of global emissions.[6] A 2015 analysis by an international team of climate experts[7] suggests that for a likely probability of limiting warming to 2°C, the U.S. must reduce its GHG emissions in 2025 by 68 to 106% below 1990 levels, with the range of reductions depending on the sharing principles used.[8] Accordingly, U.S. GHG annual emissions in 2025 would have to range between 2 Gt $CO_2$e (i.e., 68% below 1990) and negative emissions of -0.4 Gt $CO_2$e (i.e., 106% below 1990), significantly below current emissions of ~6.7 Gt $CO_2$e. Where negative emissions are required, the remaining carbon budget has been exhausted.

Carbon quotas are the maximum amount of greenhouse gases humanity can emit while still preserving a given chance of limiting average global temperature rise to a level that will not be catastrophic. The Intergovernmental Panel on Climate Change has used a carbon limit to keep temperature increases below 2°C by century's end, a level at which dramatic adverse climate impacts are still expected to occur. Nation-specific emissions quotas are the amount of greenhouse gas emissions that an individual country can emit.[iv]

Studies that have apportioned global emissions quotas among the world's countries indicate that the U.S. share of the global emissions is limited, with varying estimates depending on the equity principles used. For example, Raupach et al. (2014) estimated three U.S. GHG emissions quota scenarios of 85 Gt $CO_2$e, 220 Gt $CO_2$e, and 356 Gt $CO_2$e necessary to maintain only a 50 percent likelihood of avoiding 2°C (3.6°F) warming by century's end, depending on the equity assumptions used within a total global emissions limit. These represent a range of approximate equity assumptions for apportioning emissions quotas.[v] Under any of those quotas, emissions from new federal fossil fuel leasing are precluded given the potential emissions from already-leased federal fossil fuels and those of non-federal fossil fuels.

Raupach et al.'s three scenarios are based on:

- **High (inertia):** Favors "grandfathering" of emissions, favoring a distribution of quota emissions to nations or regions with higher historical emissions.

- **Medium (blended):** Blends "inertia" and "equity" emissions.

- **Low (equity):** Favors a distribution of quota emissions based on population distribution, or emissions per capita, in regions or nations.



Under the current U.S. "all of the above" energy policy, federal agencies lease lands to private companies to extract and sell federal fossil fuel resources, including submerged offshore lands of the outer continental shelf. Leases initially last ten years, or twenty years in the case of coal, and may continue indefinitely once successful mineral extraction begins. Though these leases collectively span many tens of millions of acres, federal agencies have not been compelled by law or policy to track or report resultant GHG emissions on a cumulative basis. There have been studies that account for past emissions from federal fossil fuel leasing. For example, a 2014 Stratus Consulting report completed for The Wilderness Society, titled "Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update," estimated that, in calendar year 2012, emissions from federal fossil fuel production were 1.344 Gt $CO_2e$, or 21% of all U.S. GHG emissions that year.[9] A 2015 analysis completed by the Climate Accountability Institute for the Center for Biological Diversity and Friends of the Earth estimated that federal fossil fuel production accounted for 1.278 Gt $CO_2e$ of emissions in 2012, and during the past decade contributed approximately 25% of all U.S. GHG emissions associated with fossil fuel consumption, which represents around 3-4% of global fossil fuel emissions during that time.[10] Yet, until now there has been no assessment of the potential GHG savings from sequestering remaining unleased federal fossil fuels.



Photo Credit: EcoFLight.com

**Craig, Colorado — Coal Power Plant**

---

[iii] Intergovernmental Panel on Climate Change, Climate Change 2013 Synthesis Report: Approved Summary for Policymakers at SPM-8 (Nov. 1, 2014).

[iv] Emissions quotas are one among many mechanisms for determining equity and fairness in international climate negotiations. Equity principles generally include assumptions about different countries' historical responsibility for climate emissions and their ability to mitigate emissions, as well as measures of developed country support for emissions mitigation and adaptation in developing countries. While we are only using emissions quotas to illustrate the size of U.S. fossil fuel resources, we recognize that emissions quotas cannot be discussed independently from climate finance commitments.

[v] We use Raupach et al. (2014) U.S. emissions quotas for illustration purposes only; this report and its authors do not endorse equity assumptions made therein. We use the ratio of 1.39 $CO_2e/CO_2$ reported in Meinshausen et al. (2009) to convert the values reported in Raupach et al. (2014) from $CO_2$ to $CO_2e$. We also exclude Raupach et al.'s "future committed emissions" from their published -30, 67 and 165 Gt $CO_2$ U.S. quotas to isolate the quotas from assumptions about "future committed emissions." Notably, under Raupach et al.'s "equity" scenario, "future committed emissions" already exceed the remaining U.S. quota; Raupach et al. thus report a remaining "equity" scenario quota of -30 Gt $CO_2$.



This report models the total amounts and potential GHG emissions associated with the remaining federal and non-federal fossil fuels in the U.S. We compiled federal and industry inventories of total fossil fuel resources and, using standard life-cycle assessment guidelines, we calculated life-cycle GHG emissions associated with all phases of developing federal and non-federal coal, crude oil, natural gas, tar sands, and oil shale resources. We evaluated low, median, and high emission scenarios for each of the fossil fuels studied to account for some of the uncertainties associated with producing fossil fuels.



**Figure 3. Map of U.S. Federal Fossil Fuels. Map by Curt Bradley, Center for Biological Diversity.**

Our analysis focuses on the potential GHG emissions from the remaining unleased federal fossil fuel resources in the U.S. Keeping these fossil fuels in the ground would contribute significantly to global efforts to prevent combustion emissions from remaining fossil fuel resources. For the purposes of this report, unleased federal fossil fuels are those federal fossil fuel resources that are not currently leased to private companies. They include unleased recoverable federal coal reserves, federal oil shale, federal crude oil, federal natural gas, and federal tar sands. Unleased federal fossil fuels include resources that are available for leasing under current federal policy and that could become available for leasing under future federal policy.[11]



# Key terms

**All U.S. fossil fuels** include all federal and non-federal recoverable coal reserves, oil shale, crude oil, natural gas, and tar sands (onshore and offshore).

**Federal fossil fuels** are federally controlled, publicly owned fossil fuel resources. Federal fossil fuels are located beneath lands under federal and other ownerships, where the federal government owns subsurface mineral rights. They are also located "offshore," beneath submerged public lands of the outer continental shelf. Federal fossil fuels include recoverable federal coal reserves, federal oil shale, federal crude oil, federal natural gas, and unleased federal tar sands.

**Leased federal fossil fuels** are federal fossil fuel resources, including proved reserves and resources under non-producing leased land, as classified by the Bureau of Ocean Energy Management (BOEM) and Bureau of Land Management (BLM), which are currently leased to private companies. These include leased federal recoverable coal reserves, leased federal oil shale, leased federal crude oil, leased federal natural gas, and leased federal tar sands.

**Non-federal fossil fuels** are fossil fuel resources calculated by subtracting federal fossil fuel amounts from total technically recoverable oil resources, total technically recoverable natural gas resources, and total recoverable coal reserves in the U.S. as provided by Environmental Impact Assessment 2012a.

**Unleased federal fossil fuels** are federal fossil fuel resources that are not leased to private companies. These include unleased recoverable federal coal reserves, unleased federal oil shale, unleased federal crude oil, unleased federal natural gas, and unleased federal tar sands.

**Recoverable coal reserves** are the portion of the Demonstrated Reserve Base that the Energy Information Agency estimates may be available or accessible for mining. **Federal recoverable coal reserves** are the federally controlled portion of recoverable coal reserves.

**Crude oil** is onshore and offshore technically recoverable federal and non-federal crude oil

resources. **Federal crude oil** is federally controlled crude oil.

**Natural gas** is onshore and offshore technically recoverable federal and non-federal natural gas resources. **Federal natural gas** is federally controlled natural gas.

**Federal oil shale** is federally controlled oil shale that is geologically prospective according to deposit grade and thickness criteria in the BLM's 2012 Final Oil Shale and Tar Sands Programmatic Environmental Impact Statement and Record of Decision. Geologically prospective oil shale resources in Colorado and Utah are deposits that yield 25 gallons of oil per ton of rock (gal/ton) or more and are 25 feet thick or greater. In Wyoming, geologically prospective resources are deposits that yield 15 gal/ton or more and are 15 feet thick or greater.

**Tar sands** are estimated in-place tar sands resources. **Federal tar sands** are federally controlled tar sands.

**Proved or proven reserves** are estimated volumes of hydrocarbon resources that analysis of geologic and engineering data demonstrates with reasonable certainty are recoverable under existing economic and operating conditions. Reserve estimates change from year to year as new discoveries are made, existing fields are more thoroughly appraised, existing reserves are produced, and prices and technologies change. Because establishing proved reserves requires drilling, which first requires leasing, proved federal fossil fuel reserves are necessarily leased, and unleased federal fossil fuels necessarily are not proved.

**Technically recoverable** refers to oil and gas resources that are unleased but producible using current technology without reference to their economic viability.

**In-place resource** is the entire fossil fuel resource in a geologic formation regardless of its recoverability or economic viability.



# III. Research Methodology

Greenhouse gas (GHG) emissions associated with developing fossil fuel resources were estimated by (a) quantifying the volume and energy value of federal and non-federal fossil fuels, (b) determining the end uses and proportions of different end-use products made from fossil fuels, and (c) estimating the total GHG emissions from developing these resources and processing them into end-use products, by multiplying the total volume of energy value of fossil fuel products by their life-cycle emissions factors.



**Figure 4. Research methodology**

## A) Quantifying Fossil Fuel Resources Volumes and Energy Values

Federal and non-federal fossil fuel quantities were obtained from federal estimates by the Bureau of Land Management (BLM), Energy Information Agency (EIA), U.S. Geological Survey (USGS), Office of Natural Resource Revenue (ONRR), the Department of Interior (DOI), and Congressional Research Service (CRS). Federal agencies similarly report the technically recoverable resources for crude oil and natural gas based on a consistent definition. For coal, agencies estimate recoverable coal by assessing the accessibility and recovery rates for the demonstrated coal base. For oil shale and tar sands the quantity is based on the resource available and in-place resources, which do not attempt to characterize the resource based on the likelihood of development. Unleased volumes of federal fossil fuels were calculated by subtracting leased volumes from the sum of technically recoverable quantities.

Quantities of federal and non-federal crude oil, natural gas, coal, oil shale and tar sands were summed and converted into values that represent each fossil fuel's energy content, called its primary energy value. This was done by multiplying the fossil fuel volumes by a heating value factor that represents the resource's energy content. Lower heating values were used for all fuels except coal, where the higher heating value was taken as per convention for solid fuels in the U.S. Heating values for each resource were taken from Oak Ridge National Laboratory (ORNL), and can be found in the *Fossil Fuel Volumes to Primary Energy Conversions* section in Appendix I.





**Figure 5. Fossil fuels analyzed**

Figure 5 above shows the five fossil fuel types analyzed as they are broadly defined by federal agencies: Oil (onshore and offshore), gas (onshore and offshore), coal, oil shale, and tar sands. The hydrocarbons included within federal oil and gas definitions are reported in Table 1 below.

| Fossil Fuel Type | Crude oil | Condensate | Natural gas liquids | Dry natural gas | Gas, wet after lease separation | Non-associated gas, wet after separation | Natural gas associated— dissolved, wet after lease separation | Coalbed methane |
|---|---|---|---|---|---|---|---|---|
| Onshore oil | X | X | X | | | | | |
| Offshore oil | X | X | X | | | | | |
| Onshore gas | | | | X | X | X | X | X |
| Offshore gas | | | | X | X | X | X | X |

**Table 1. Hydrocarbons in the categories of crude oil and natural gas**

## B) Determining the End-Use Products Made from Fossil Fuels

Each fossil fuel resource was converted to a value that represents its energy content and divided into amounts used as inputs for different end-use products. We allocated the proportions of each resource into end-use products as follows:

- The energy in crude oil resources was proportionally divided into: finished motor gasoline, distillate fuel oil, kerosene, liquefied petroleum gases (LPG), petroleum coke, still gas, and residual fuel oil.

- The energy in natural gas resources was split into residential, commercial, industrial, electric power, and transportation end-use sectors.

- The energy in coal reserves was divided into electric power, coke, and other industrial uses.

- Energy in tar sands and oil shale was assumed to be processed into end-use products analogous to crude oil.

These proportions make it possible to apply end-use product-specific life-cycle emissions factors. For each product we determined the amount that could be yielded from the initial energy after processing, using a "primary energy factor" derived from figures and conversion factors from sources in the literature, such as those developed at the National Renewable Energy Laboratory (NREL).



**Figure 6. Steps to determine fossil fuel amounts and apply specific energy and emissions factors**





**Figure 7. Fossil fuel resources and end-use products and sectors**

## C) Multiplying the Quantity of Fossil Fuel Energy by GHG Emissions Factors

The total energy value of each fossil fuel product end use was multiplied by product-specific life-cycle emissions factors to estimate the total GHG emissions. Life-cycle GHG emissions factors represent the amount of GHGs released when burning one unit of energy. In peer-reviewed life-cycle assessments of fossil fuels, there are uncertainties associated with the GHG emissions of some fuels. For example, the life-cycle



emissions associated with land use change resulting from coal extraction can be a source of uncertainty given differing amounts of methane leakage. To account for these uncertainties, the analysis used three scenarios for each fossil fuel corresponding to high, median, low GHG emissions factors reported in the scientific literature. The low GHG emissions factor scenario was chosen as the base case, and the high emissions factor scenario is the worst case scenario (most inefficient use of fossil fuels).

Each scenario represents different magnitudes (high, median, and low) of global warming pollution associated with different fossil fuels. The high emissions scenario represents the worst-case GHG pollution scenario. Where available we used emissions factors from research by the U.S. national energy laboratories including Argonne National Laboratories' GREET tool and several meta-analyses from NREL that produced harmonized emissions factors based on extensive prior research. Although emissions factors can vary following changes in any of the parameters in the underlying study, Table 2 in Appendix II highlights key parameters that significantly affect the emissions factor and consequently influence whether it is characterized as low, median, or high.

Where necessary, the following end-use product-specific adjustments were made to improve the accuracy of life-cycle emissions factors:

- A carbon storage factor was determined for the following end-use products: metallurgical coke from coal, distillate fuel, liquefied petroleum gases (LPGs), petroleum coke from crude oil, and still gas.[12] This is to account for a proportion of carbon in the fossil fuel resource that is stored in the end product and not combusted or otherwise emitted. For example, some of the carbon in petroleum coke remains in products such as urea and silicon carbide, and the carbon storage factor reflects this.

- A shale-play weighting factor was applied to calculate emissions from natural gas to account for some studies that suggest that there may be higher amounts of methane released with natural gas extracted from shale versus conventional resources.[13]

- These calculations were summed to present results in 100-year Global Warming Potentials, represented as gigatons $CO_2$ equivalent (Gt $CO_2$e).







**Figure 8. High, median and low (base case) GHG emissions factor scenarios**

Appendix I provides detailed methodologies for estimating fossil fuel volumes, converting fossil fuel volumes to primary energy, and calculating resource and end-use product-specific life-cycle emission factors. The full list of sources used to estimate fossil fuel amounts, primary energy factors, proportions of end-use products and sectors, carbon storage factors, and product-specific life-cycle emissions factors is available in Appendix II.



# III. Results

Our results indicate that:

1. The potential GHG emissions from federal fossil fuels, leased and unleased, are 348.96 to 492.22 Gt $CO_2e$, representing 46% to 50% of potential emissions from all remaining U.S. fossil fuels. The potential GHG emissions of federal and non-federal fossil fuels are 697-1,070 Gt $CO_2e$. Unleased federal fossil fuels comprise 91% of the potential GHG emissions of all federal fossil fuels. The potential GHG emissions of unleased federal fossil fuel resources range from 319.00 to 449.53 Gt $CO_2e$. Leased federal fossil fuels represent from 29.96 to 42.69 Gt $CO_2e$.

2. Unleased federal recoverable coal accounts for 36% to 43% of the potential GHG emissions of all remaining federal fossil fuels, from 115.32 to 212.26 Gt $CO_2e$. Leased federal recoverable coal represents from 10.68 to 19.66 Gt $CO_2e$ of potential emissions.

3. Unleased federal oil shale accounts for 29% to 35% of potential GHG emissions of all remaining federal fossil fuels, ranging from 123.17 to 142.07 Gt $CO_2e$. Leased federal oil shale accounts for 0.3% to 0.6% of potential GHG emissions of all remaining federal fossil fuels, representing 2 Gt $CO_2e$.

4. Unleased federal natural gas accounts for 10% to 11% of potential GHG emissions of all remaining federal fossil fuels, ranging from 37.86 to 47.26 Gt $CO_2e$, of which 36% are onshore and 64% are offshore. Leased federal gas represents 10.39 to 12.88 Gt $CO_2e$, 47% of which are onshore and 53% are offshore.

5. Unleased federal crude oil accounts for 9% to 12% of potential GHG emissions of all remaining federal fossil fuels, ranging from 37.03 to 42.19 Gt $CO_2e$, of which 28% are onshore and 72% are offshore. Potential emissions from leased federal crude oil represents from 6.95 to 7.92 Gt $CO_2e$, of which 33% are onshore and 67% are offshore.

6. Unleased federal tar sands accounts for 1% to 2% of potential GHG emissions of all remaining federal fossil fuels, ranging from 5.62 to 5.75 Gt $CO_2e$.

## Federal Versus Non-Federal Fossil Fuels

The potential GHG emissions from federal and non-federal fossil fuels were compared to contextualize the proportion that is federally owned. The results indicate that 34% of all remaining fossil fuels, based on the energy content of those fuels, are federally owned; these represent 348.96 to 492.22 Gt $CO_2e$ of potential GHG emissions.

|  | Low | Median | High |
|---|---|---|---|
| Federal Leased | 29.96 | 34.65 | 42.69 |
| Federal Unleased | 319.00 | 369.98 | 449.53 |
| Non-federal | 348.49 | 435.14 | 577.78 |
| **TOTAL** | **697.45** | **839.77** | **1,070.00** |

**Table 2. GHG emissions (Gt $CO_2e$), from federal and non-federal fossil fuels**





**Figure 9. Relative potential emissions of federal and non-federal fossil fuels**

## Leased and Unleased Federal Fossil Fuels

Unleased and leased federal fossil fuels were examined to measure the GHG pollution from past leasing and to estimate the potential GHG emissions of unleased federal fossil fuels. Leased emissions are calculated using volumes of proved offshore and onshore oil and gas, volumes of offshore and onshore oil and gas underlying non-producing leased land, amounts of leased coal, and volumes of leased oil shale. The potential GHG emissions from unleased fossil fuel resources are approximately ten times greater than the emissions from currently leased federal fossil fuels.

|  | Low | Median | High |
|---|---|---|---|
| **Federal Leased (Total)** | 29.96 | 34.65 | 42.69 |
| *Crude Oil* | 6.95 | 7.38 | 7.92 |
| *Natural Gas* | 10.39 | 11.01 | 12.88 |
| *Coal* | 10.68 | 14.19 | 19.66 |
| *Oil Shale* | 1.94 | 2.07 | 2.23 |
| **Federal Unleased (Total)** | 319.00 | 369.98 | 449.53 |
| *Crude Oil* | 37.03 | 39.32 | 42.19 |
| *Natural Gas* | 37.86 | 40.13 | 47.26 |
| *Coal* | 115.32 | 153.19 | 212.26 |
| *Oil Shale* | 123.17 | 131.67 | 142.07 |
| *Tar Sands* | 5.62 | 5.67 | 5.75 |

**Table 3. GHG Emissions (Gt CO$_2$e) from leased and unleased federal fossil fuels**





**Figure 10. Low GHG emission  (Gt CO₂e) factor scenario for leased and unleased federal fossil fuels**

## Unleased Federal Fossil Fuels by Resource Type

The GHG emissions from unleased federal fossil fuels were evaluated by resource type. In a low emissions factor scenario, coal and oil shale are the biggest contributors of greenhouse gases. Under a high emissions factor scenario, coal is the biggest contributor of GHG pollution.

|  | Low | Median | High |
|---|---|---|---|
| **Federal Unleased** |  |  |  |
| *Crude Oil* | 37.03 | 39.32 | 42.19 |
| *Natural Gas* | 37.86 | 40.13 | 47.26 |
| *Coal* | 115.32 | 153.19 | 212.26 |
| *Oil Shale* | 123.17 | 131.67 | 142.07 |
| *Tar Sands* | 5.62 | 5.67 | 5.75 |

**Table 4. GHG emissions (Gt CO₂e) from unleased federal fossil fuels by resource type**





**Figure 11. GHG emissions from unleased federal fossil fuels by resource type (low emissions scenario)**

## Coal

The potential greenhouse gas emissions from unleased recoverable coal reserves and leased recoverable coal reserves range from 115 to 212 Gt $CO_2$e. This analysis used "recoverable coal reserves" when estimating the GHG emissions from coal, which is a common and conservative estimate of the portion of coal that could be extracted.

| | Mass (MMST) | Low | Median | High |
|---|---|---|---|---|
| **Federal Recoverable Coal Reserves** | | | | |
| *Unleased* | 86,204 | 115.32 | 153.19 | 212.26 |
| *Leased* | 7,376 | 10.68 | 14.19 | 19.66 |

**Table 5. GHG emissions (Gt $CO_2$e) from federal coal**





**Figure 12. GHG emissions (Gt CO$_2$e) from federal coal under low, median and high emissions scenarios**

## Oil Shale

We analyzed the potential GHG emissions of federal oil shale and the portion of federal oil shale that is available for leasing under current federal policies. Since the life-cycle GHG emissions of oil shale extraction and production are more than 50% greater than conventional crude oil per unit of energy, oil shale resource results in the most potential GHG emissions per unit of energy delivered for all fossil fuels except coal. Federal oil shale includes only the resource that is geologically prospective according to deposit grade and thickness criteria in the Bureau of Land Management's (BLM) 2012 Final Oil Shale and Tar Sands Programmatic EIS and Record of Decision. Geologically prospective oil shale resources in Colorado and Utah are deposits that yield 25 gallons of shale oil per ton of rock (gal/ton) or more and are 25 feet thick or greater. In Wyoming geologically prospective resources are deposits that yield 15 gal/ton or more and are 15 feet thick or greater. Our analysis assumes that geologically prospective federal oil shale resources that are not currently available for leasing can potentially become available for leasing in the future because they are under federal mineral rights.



|  | Volume (MMBbls) | Low | Median | High |
|---|---|---|---|---|
| **Federal Oil Shale** | | | | |
| *Available for Lease Under PEIS and ROD & RD&D Leases* | 75,606 | 24.65 | 26.35 | 28.44 |
| *Total in Place Resource* | 383,678 | 123.17 | 131.67 | 142.07 |

**Table 6. GHG emissions (Gt CO$_2$e) from federal geologically prospective oil shale**



**Figure 13. GHG emissions (Gt CO$_2$e) from federal oil shale under low, median and high emissions scenarios**

## Crude Oil

The potential GHG emissions of onshore and offshore federal crude oil range from 9.38 to 10.69 and 27.65 to 31.50 Gt $CO_2$e respectively. The potential GHG emissions of all federal crude oil range from 37.03 to 42.19 Gt $CO_2$e.

| | Volume (MMBbls) | Low | Median | High |
|---|---|---|---|---|
| **Unleased Federal Crude Oil** | | | | |
| *Onshore* | 33,648 | 9.38 | 9.96 | 10.69 |
| *Offshore* | 74,649 | 27.65 | 29.36 | 31.50 |
| *Total* | 120,433 | 37.03 | 39.32 | 42.19 |

**Table 7. GHG emissions (Gt $CO_2$e) from federal crude oil**



**Figure 14. GHG emissions (Gt $CO_2$e) from unleased federal crude oil**



## Natural Gas

Natural gas emissions were found to be 8-9% of total potential GHG emissions from federal fossil fuels.

|  | Volume (Tcfg) | Low | Median | High |
|---|---|---|---|---|
| **Unleased Federal Natural Gas** | | | | |
| *Onshore* | 231 | 13.79 | 14.61 | 17.21 |
| *Offshore* | 405 | 24.07 | 25.52 | 30.05 |
| *Total* | 635 | 37.86 | 40.13 | 47.26 |

**Table 8. GHG emissions (Gt CO$_2$e) from federal natural gas**



**Figure 15. GHG emissions (Gt CO$_2$e) from unleased federal natural gas**



## Tar Sands

Federal tar sands account for 1-2% of total potential GHG emissions from federal fossil fuels. However, it should be noted that the emissions per barrel of oil processed from tar sands is significantly greater than that of crude oil per unit of energy. Processing tar sands into gasoline increases the GHG intensity of gasoline compared to gasoline made from conventional petroleum sources.

|  | Volume (MMBbls) | Low | Median | High |
|---|---|---|---|---|
| **Federal Tar Sands** |  |  |  |  |
| *Lease Available* | 4,125 | 1.40 | 1.41 | 1.43 |
| *Total In Place Resource* | 16,551 | 5.62 | 5.67 | 5.75 |

**Table 9. GHG emissions (Gt $CO_2$e) from federal tar sands**



**Figure 16. GHG emissions (Gt $CO_2$e) from federal tar sands**



# IV. Conclusion

This report is the first to estimate the GHG emissions associated with developing federal and non-federal fossil fuels in the United States. Our results show the 100-year global warming potential of emissions resulting from the potential extraction, processing and combustion of fossil fuels under federal mineral rights. The potential GHG emissions savings associated with all federal fossil fuels, leased and unleased, is 349 to 492 Gt $CO_2$e. Our results indicate that a cessation of new federal fossil fuel leasing could keep up to 450 Gt $CO_2$e from the global pool of potential future GHG emissions.

Studies that have apportioned global emissions quotas among the world's countries indicate that the U.S. share of the remaining global emissions is limited, with varying estimates depending on the equity principles used. For example, Raupach et al. (2014) estimated three U.S. GHG emissions quota scenarios of 85 Gt $CO_2$e, 220 Gt $CO_2$e, and 356 Gt $CO_2$e necessary to maintain only a 50 percent likelihood of avoiding 2°C (3.6°F) warming by century's end, depending on the equity assumptions used within a total global emissions limit. These represent a range of approximate equity assumptions for apportioning emissions quotas. Under any of those quotas, emissions from new federal fossil fuel leasing are precluded given the potential emissions from already-leased federal fossil fuels and those of non-federal fossil fuels.



**Photo credit: EcoFLight.com**

**Piceance Basin, Oil Shale Development, Colorado**



# Appendix I: Methodology

## A1. Quantity of Fossil Fuels on Federal Lands

Determining the available fossil fuel volumes on federal lands is the starting point for analyzing the potential GHG emissions (see Appendix II: Table 1). Our approach classified fossil fuels into five broad categories: crude oil, natural gas, coal, oil shale, and tar sands. We reviewed the resources used in prior research and determined that the most reliable sources for volumes of fossil fuels on federal lands are the agencies that manage them such as the Bureau of Land Management (BLM), Energy Information Agency (EIA), US Geological Survey (USGS), Office of Natural Resource Revenue (ONRR), and the Department of Interior (DOI).

Where possible we have used the volumes of fossil fuels on federal lands as they are presented in our sources. Where no volume was available, we had to estimate volumes. Onshore and offshore crude oil and natural gas under lease do not have volume estimates available. Data from the ONRR on fiscal year 2014 lease volume revenue and acreage were used, alongside other fossil fuel resource data, to estimate volumes of crude oil and natural gas under lease. Oil shale available under BLM research, development and demonstration (RD&D) leases and its oil shale and tar sands programmatic environmental impact statement and record of decision (OSTS PEIS and ROD) do not have associated volume estimates. Volume estimates were constructed for:

- *Onshore Crude Oil Under Lease*
- *Offshore Crude Oil Under Lease*
- *Onshore Natural Gas Under Lease*
- *Offshore Natural Gas Under Lease*
- *Coal Under Lease*
- *Oil Shale Available for Lease Under PEIS and ROD*
- *Oil Shale Available Under RD&D Leases*
- *Total In Place Federal Oil Shale Resources*
- *Tar Sands: In Place Federally Owned Resources*
- *Tar Sands: Lease Available Special Tar Sands Areas*
- *Unleased Federal Crude Oil*
- *Unleased Federal Natural Gas*
- *Unleased Federal Coal*
- *Unleased Federal Oil Shale*
- *Unleased Federal Tar Sands*
- *Non-federal fossil fuels*



## Onshore Crude Oil Under Lease

The 2008 EPCA inventory estimates the amount of crude oil and natural gas. We used 2014 data to estimate what portion is under active lease. To calculate onshore crude oil under lease, we use the following equation:

$$OCO_{UL} = [ONG_{AUL} \times (FLA_{TRO} \div TA_{AFL})] + OCO_{PR}$$

Where:

$OCO_{UL}$ = Onshore Crude Oil Under Lease, in MMBls

$ONG_{AUL}$ = Fiscal Year 2014 Oil & Natural Gas Nonproducing Acres Under Active Lease

$FLA_{TRO}$ = Federal lease Available Technically Recoverable Onshore Oil

$TA_{AFL}$ = Total Acres Available for Lease from Figure ES3 of EPCA Phase 3 Inventory 2008

$OCO_{PR}$ = Onshore Crude Oil, Proved, from EPCA Phase 3 Inventory 2008

## Offshore Crude Oil Under Lease

*To calculate offshore crude oil under lease, we use the following equation:*

$$OFCO_{UL} = [OFA_{UAL} \times (OFCO_{LGM} \div OFCO_{LGMA})] + OFCO_P$$

Where:

$OFCO_{UL}$ = Offshore Crude Oil Under Lease, in MMBblsa

$OFA_{UAL}$ = 2015 Offshore Nonproducting Acres Under Active Lease

$OFCO_{LGM}$ = Offshore Crude Oil Leased in Gulf of Mexico Nonproducing Volume

$OFCO_{LGMA}$ = Offshore Crude Oil Nonproducing Acres Leased in Gulf of Mexico

$OFCO_{PR}$ = Offshore Crude Oil, Proved, from EPCA Phase 3 Inventory 2008

## Onshore Natural Gas Under Lease

To calculate onshore natural gas under lease, we use the following equation:

$$ONG_{UL} = [ONG_{AUL} \times (FLA_{TRNG} \div TA_{AFL})] + ONG_{PR}$$

Where:

$ONG_{UL}$ = Onshore Natural Gas Under Lease, in TCfg

$ONG_{AUL}$ = Fiscal Year 2014 Oil and Natural Gas Nonproducing Acres Under Lease

$FLA_{TRNG}$ = Federal Lease Available Technically Recoverable Onshore Natural Gas

$TA_{AFL}$ = Total Acres Available for Lease from Figure ES3 of Phase 3 Inventory 2008

$ONG_{PR}$ = Onshore Natural Gas, Proved, from EPCA Phase 3 Inventory 2008

## Offshore Natural Gas Under Lease

To calculate offshore natural gas under lease, we use the following equation:

$$OFNG_{UL} = [OFA_{UAL} \times (OFNG_{LGM} \div OFNG_{NP})] + OFNG_{PR}$$

Where:

$OFNG_{UL}$ = Offshore Natural Gas Under Lease, in Tcfg



$OFA_{UAL}$ = Offshore Nonproducing Acres Under Active Lease

$OFNG_{LGM}$ = Offshore Natural Gas Leased in Gulf Of Mexico Nonproducing Volume

$OFNG_{NP}$ = Offshore Natural Gas Nonproducing Acres Leased in Gulf of Mexico

$OFNG_{PR}$ = Offshore Natural Gas,Proved, from EPCA Phase 3 Inventory

## Coal Under Lease

Since nominal amounts of coal under lease were not available, we had to estimate them based on data from GAO, BLM, and the percentage of leased and unmined coal reserves remaining in the Powder River Basin. To calculate coal under lease, we used the following equation:

$$C_L = \sum RLC \, [(LFC_{A,1990-2012} \div LFC_{T,\,1990-2012}) \times LFC_{A,2013}] \times RFC_R$$

Where:

$C_L$= Coal Under Lease,in MST

$\sum RLC$ = Sum of Remaining Leased Coal for each of the following States (AL, CO, KY, MT, NM, ND, OK, UT, WY, Eastern States)

$LFC_{A,1990-2012}$ = Leased Federal Coal in Acres (for each state)for the period 1990-2012,from Table 1 in GAO 2013

$LFC_{T,\,1990-2012}$ = Total Leased Federal Coal Acres in Effect (for each state) in 2013 from BLM 2014

$RFC_R$ = Percentage of leased and unmined coal reserves remaining in Powder River Basin(40.4%) from Wright 2015

## Oil Shale Available for Lease Under PEIS and ROD

To calculate the volume of oil shale available for lease under both the PEIS and ROD, we separately estimate the available resource in Utah, Colorado and Wyoming, and sum these estimates.

To estimate the available resource for lease in Utah, we use the following equation:

$$OSR_{UT} = AAROD_{UT} \times AR_{UT}$$

Where:

$OSR_{UT}$ = Oil Shale Resource for lease in Utah, in MMBbls

$AAROD_{UT}$ = Available Area in Utah According to Record of Decision

$AR_{UT}$ = Average Resource in Utah' s Uintah Basin, in bbl/acre

To estimate the available resource for lease in Colorado, we use the following equation:

$$OSR_{CO} = AAROD_{CO} \times AR_{CO}$$

Where:

$OSR_{CO}$ = Oil Shale Resource in Colorado,in MMBbls

$AAROD_{CO}$ = Available Area in Colorado According to Record of Decision

$AR_{CO}$ =  Average Resource in Colorado's Piceance Basin,in bbl/acre

To estimate the available resource for lease in Wyoming, we use the following equation:

$$OSR_{WY} = AAROD_{WY} \times AR_{WY}$$



Where:

$OSR_{WY}$ = Oil Shale Resource in Wyoming, in MMBbls

$AAROD_{WY}$ = Available Area in Wyoming According to Record of Decision

$AR_{WY}$ = Average Resource in Wyoming's Green River and Washakie Basins, comprised of the average of 6 members, in bbl/acre

## Oil Shale Available Under RD&D Leases

To calculate the volume of oil shale available under RD&D leases, we summed up the estimated volumes for the 9 leases detailed in the *Assessment of Plans and Progress on US Bureau of Land Management Oil Shale RD&D Leases in the United States*.[14] Since volume estimates for the American Shale Oil LLC and AuraSource leases are not available in the document, we estimate them using the following equations:

$$OSR_{ASO} = AAL_{ASO} \times AR_{CO}$$

Where:

$OSR_{ASO}$ = Oil Shale Resource in the American Shale Oil, LLC Lease, in MMBbls

$AAL_{ASO}$ = Area Available For Lease (including preference right area) for the American Shale Oil, LLC lease

$AR_{CO}$ = Average Resource in Colorados's Piceance Basin, in bbl/acre

and

$$OSR_{AS} = AAL_{AS} \times AR_{UT}$$

Where:

$OSR_{AS}$ = Oil Shale Resouce in the AuraSource Lease, in MMBbls

$AAL_{AS}$ = Area Available For Lease (including preference right area) for the AuraSource lease

$AR_{UT}$ = Average Resource in Utah's Uintah Basin, in bbl/acre

## Total In Place and Geologically Prospective Federal Oil Shale Resources

To calculate the total in place federal oil shale resources, we summed the federal resource available in the Piceance Basin with a yield of over 25 GPT (gallon per ton) in USGS 2010, the federal resource available in the Green River and Washakie Basins of over 15 GPT in USGS 2011, and separately estimated the federal resource available in the Uintah basin.

To estimate the federal resource in the Uintah basin, we use the following equation:

$$FOSR_{UB} = AAROD_{UT} \times AR_{UT}$$

Where:

$FOSR_{UB}$ = Federal Oil Shale Resource in the Uintah Basin, in MMBbls

$AAROD_{UT}$ = Available Area in Utah According to Record of Decision

$AR_{UT}$ = Average Resource in Utah's Uintah Basin, in bbl/acre



## Tar Sands: In Place Federally Owned Resources

To calculate the volume of in place federally owned tar sands resources, we use the following equation:

$$TS_{FOR} = \sum SR_{fp}$$

Where:

$TS_{FOR}$ = In Place Federally Owned Tar Sands Resources, in MMBbl

$\sum SR_{fp}$ = The sum of the federally owned percentages of tar sands resource for each state

As mentioned above, we sum the federally owned percentages of tar sands resources as listed in *Natural Bitumen Resources of the United States*.[15] Where no federal ownership percentage is given in the document, we cite research by Keiter et al. 2012 for the percentage of Utah tar sands that are federal and Gorte et al. 2011 for all other states.

## Tar Sands: Lease Available STSAs

To calculate the volume for Lease Available STSAs (Special Tar Sands Area, a specific designation from the BLM), we multiply the area available for each STSA by the resource for that area. STSA areas are taken as presented in the 2013 ROD.[16]

The available resource for each area is taken from *Unconventional Energy Resources: 2013 Review*.[17] This review unfortunately does not provide estimates for Raven Ridge or San Rafael STSAs; for those, we used a low per-acre estimate (from the P.R. Spring STSA) of 25,900 barrels per acre. We then sum all of these volumes.

## Unleased Federal Crude Oil

To calculate unleased federal offshore crude oil, we use the following equation:

$$OFCO_{ULL} = OFCO_{TR}$$

Where:

$OFCO_{ULL}$ = Unleased Federal Offshore Crude Oil

$OFCO_{TR}$ = Technically Recoverable Federal Offshore Crude Oil

To calculate unleased federal onshore crude oil, we use the following equation:

$$OCO_{ULL} = OCO_{TR}$$

Where:

$OCO_{ULL}$ = Unleased Federal Onshore Crude Oil

$OCO_{TR}$ = Technically Recoverable Federal Onshore Crude Oil

## Unleased Federal Natural Gas

To calculate unleased federal offshore natural gas, we use the following equation:

$$OFNG_{ULL} = OFNG_{TR}$$



Where:

$OFNG_{ULL}$= Unleased Federal Offshore Natural Gas

$OFNG_{TR}$= Technically Recoverable Federal Offshore Natural Gas

To calculate unleased federal onshore natural gas, we use the following equation:

$ONG_{ULL} = ONG_{TR}$

Where:

$ONG_{ULL}$= Unleased Federal Onshore Natural Gas

$ONG_{TR}$= Technically Recoverable Federal Onshore Natural Gas

## Unleased Federal Coal

To calculate unleased federal coal, we use the following equation:

$$FC_{ULL} = FC_{RR} - \left\{ \left( \frac{FC_{TIR}}{BLM_{AUM}} \right) \times CLA_{2013} \right\}$$

Where:

$FC_{ULL}$= Unleased Federal Coal

$FC_{RR}$= Federal Recoverable Coal Reserves from NMA 2012

$FC_{TIR}$ = Total Federal In Place Coal Resource from USDA,USDOE,USDOI 2007

$BLM_{AUM}$ = Acres Under BLM Management from BLM 2014

$CLA_{2013}$ = 2013 Leased Coal Acres from BLM 2014

## Unleased Federal Oil Shale

To calculate unleased federal oil shale, we subtract Federal Oil Shale Available under RD&D Leases from DOE/BLM 2013 from Total In Place Geologically Prospective Federal Oil Shale Resources as described earlier.

## Unleased Federal Tar Sands

To calculate unleased federal tar sands, we assume the total in place federal tar sands resources are unleased.

## Non-federal Fossil Fuels

Non-federal fossil fuels volumes are calculated for each fossil fuel category by subtracting federal fossil fuel volumes from total technically recoverable oil resources, total technically recoverable natural gas resources, and total U.S. recoverable coal reserves as provided by EIA 2012a. There are no non-federal tar sands and oil shale resources examined in this study.



For each oil, natural gas and coal resource:

    *NFFF = TTR - FFF*

Where:

    *NFFF= Non-federal Fossil Fuel*

    *TTR = Total Technically Recoverable Resource*

    *FFF = Federal Fossil Fuel*

## A2. Fossil Fuel to Primary Energy Conversions

We converted volumes of fossil fuels into primary energy as this allowed us to make necessary adjustments and apply resource-specific life-cycle GHG emissions factors, as those are presented in units of energy. For example, the life-cycle GHG emissions factors are typically on a product-delivered basis (kWh of electricity, MJ of thermal energy), so the fossil fuel reserves must be adjusted because only a portion of the fossil fuel becomes a final product delivered.



**Figure A17. Determining quantities of energy to multiply by emissions factor**



We used the following assumptions to convert fossil fuel amounts to primary energy:

| Fossil Fuel | Energy Content | Source |
|---|---|---|
| Crude Oil | 5,746 MJ / barrel (LHV) | ORNL 2011 |
| Natural Gas | 983 btu / ft3 (LHV) | ORNL 2011 |
| Coal | 20.61 btu / ton (HHV) | ORNL 2011 |
| Oil Shale | 5,746 MJ / barrel (LHV) | ORNL 2011 |
| Tar Sands | 5,746 MJ / barrel (LHV) | ORNL 2011 |

**Table A10. Energy content of fossil fuels**

## Proportions of Resource Used as Input for End-use Products

The proportions of resource used as input for end-use products were needed in order to appropriately divide the initial fossil fuel amounts. The proportions make it possible to apply end-use product-specific life-cycle emissions factors, which account for the full life-cycle GHG emissions associated with each end-use product. These proportions do not take into account the energy required to process the fossil fuel resource and move it downstream. They only describe a percentage of the fossil fuel resource that will ultimately be used in end-use products and sectors.

## Crude Oil

Proportions of crude oil used for various end-use products were derived from the EIA.[18] To calculate proportions each of the top seven petroleum products consumed in 2013 was divided by the total annual consumption of petroleum products. These top seven products are:

- *Finished Motor Gasoline*
- *Distillate Fuel Oil*
- *Kerosene*
- *Liquefied Petroleum Gases (LPG)*
- *Petroleum Coke*
- *Still Gas*
- *Residual Fuel Oil*

Dividing the consumption of each end-product by the total annual consumption of petroleum products enabled us to reconstruct the demand for petroleum products, and thus the hypothetical product output of a crude oil refinery.



For this method, we used the following equation:

$$CO_{EUPP} = AC_{EUP} \div AC_{APP}$$

Where:

$CO_{EUPP}$ = Crude Oil End Use Product Proportion

$AC_{EUP}$ = Annual Consumption of End Use Product

$AC_{APP}$ = Annual Consumption of All Petroleum Products

## Natural Gas

Proportions of natural gas used for each end-use sector were derived from the EIA's *Natural Gas Consumption by Sector in the Reference case, 1990-2040: History: U.S. Energy Information Administration, Monthly Energy Review.*[19] For each end-use sector, the sector specific annual natural gas consumption was divided by the total annual natural gas consumption. These end-use sectors are:

- **Residential**
- **Commercial**
- **Industrial**
- **Electric Power**
- **Transportation**

For this method we used the following equation:

$$NG_{EUSP} = AC_{EUS} \div AC_{ANG}$$

Where:

$NG_{EUSP}$ = Natural Gas End Use Sector Proportion

$AC_{EUS}$ = Annual Consumption by End Use Sector

$AC_{ANG}$ = Annual Consumption of All Natural Gas

## Coal

Proportions of coal used for each end-use sector were derived from the EIA's *Quarterly Coal Report – April – June 2014: Table 32 - U.S. Coal Consumption by End-Use Sector, 2008 – 2014.*[20] For each end-use sector, the sector specific annual coal consumption was divided by the total annual coal consumption. These end-use sectors are:

- *Electric Power*
- *Coke*
- *Other Industrial Use*

For this method we used the following equation:

$$C_{EUSP} = AC_{EUS} \div AC_{AC}$$

Where:

$C_{EUSP}$ = Coal End Use Sector Proportion

$AC_{EUS}$ = Annual Consumption by End Use Sector

$AC_{AC}$ = Annual Consumption of All Coal



## Oil Shale

For oil shale we assume the same proportions of end-use products will be refined from a barrel of oil shale as is currently derived from a barrel of crude oil. We apply the same end-use product proportions as calculated for crude oil.

## Tar Sands

For tar sands we assume the same end-use products will be refined from a barrel of crude oil derived from tar sands as has been assumed in other research.[21] We apply the same end-use product proportions as calculated for crude oil.

## Primary Energy Factors

Making energy products requires energy. To account for the energy in the reserve required to make the final end products, we determined a ratio of primary energy to the end use, resulting in a Primary Energy Factor. The Primary Energy Factor represents the relationship between the amount of energy required to make the end product and the amount of end product. In the case of coal-based electricity, it is the amount of energy needed to make 1 kWh of coal-fired electricity, which will always be >1 kWh. For this study only about 30% of the total coal resource becomes electricity delivered from coal-fired generation; it requires about 3.3 kWh of coal resource to make and deliver 1 kWh of coal electricity. Our methodology assumes the energy required to process the fossil fuel resource into the end-product is internal, meaning it comes from the resource. This means that some portion of the fossil fuel resource is consumed making the fossil fuel product. The primary energy factor helps understand the total amount of fossil fuel products and has no impact on the life-cycle GHG emissions, which are accounted for in the emissions factors.

For many end-products, primary energy factors are available, as "source energy factors" from the National Renewable Energy Laboratory's *Fuels and Energy Precombustion LCI Data Module*.[22] We used these source energy factors, which represent the energy required to extract, process, and deliver fuel, as Primary Energy Factors. We used NREL's 'source energy factors' for all end products except:

- ***Natural Gas Use in the Electric Power Sector***
- ***Coal Use in the Electric Power Sector***
- ***Coal Use in manufacturing Metallurgical Coke***
- ***Coal Use in Other Industrial Use***
- ***End Products Derived from Oil Shale and Tar Sands***

## Natural Gas Use in the Electric Power Sector

To calculate the Primary Energy Factor for Natural Gas Use in the Electric Power Sector, we converted the volume (ft³) of Natural Gas delivered in 2013 to customers in the Electric Power Sector from EIA's *February*



*2015 Monthly Energy Review*[23] into kWh, took the 2013 net electrical generation from Natural Gas (kWh) by Electric Power Sector customers in EIA's *February 2015 Monthly Energy Review*,[24] and the source energy factor for Natural Gas from Deru and Torcellini 2007.

To calculate the Primary Energy Factor for Natural Gas Use in the Electric Power Sector, we used the following equation:

$$PEFNG_{EPS} = NGD_{EPS} \div NEGNC_{EPS}$$

Where:

$PEFNG_{EPS}$ = *Primary Energy Factor for Natural Gas Use in the Electric Power Sector*

$NGD_{EPS}$ = *Natural Gas Delivered to Electric Power Sector Customers in 2013*

$NEGNC_{EPS}$ = *Net Electrical Generation from Natural Gas by Electric Power*

For other natural gas end-use sectors, we assume all heat not converted to electricity is useful. For the Electric Power Sector, however, we assume all heat is lost.

## Coal Use in the Electric Power Sector

For Coal Use in the Electric Power Sector, we converted the quantity of coal consumed by the Electric Power Sector in *Quarterly Coal Report – April – June 2014: Table 32 - U.S. Coal Consumption by End-Use Sector, 2008 – 2014*[25] into kWh, we took the 2013 net electrical generation from Coal (kWh) by Electric Power Sector customers in EIA's *February 2015 Monthly Energy Review* (2015b), and the source energy factor for Coal.[26]

To calculate the Primary Energy for Coal Use in the Electric Power Sector, we used the following equation:

$$PEFC_{EPS} = CD_{EPS} \div NEGC_{EPS}$$

Where:

$PEFG_{EPS}$ = *Primary Energy Factor for Coal Use in the Electric Power Sector*

$CD_{EPS}$ = *Coal Delivered to Electric Power Sector Customers in 2013*

$NEGC_{EPS}$ = *Net Electrical Generation from Coal by Electric Power Customers in 2013*

For Coal Use in the manufacture of Metallurgical Coke, we used values in World Coal Association 2015. For Coal Use in Other Industrial Use, we use the same Primary Energy Factor as that calculated for Coal Use in the Electric Power sector.

## End Products Derived From Oil Shale and Tar Sands

The primary energy resource available for end products derived from oil shale and tar sands needs to be adjusted for the increased energy required to extract and process both the oil shale and tar sands. We assume the additional energy required for these processes comes from the primary energy resource itself, otherwise referred to as 'internal' energy. Since the primary energy factors used[27] are aggregates of several components (exploration, extraction, processing, and refining into end products), and do not list the primary



energy factors for each of these components, we had to disaggregate the factors and backwards calculate the primary energy factor of just the refining component. To do this we use the following equation for each end product derived from crude oil:

$$PEFCO_{REP} = (PEFCO_{EP}) - \left( \frac{1}{EROI_{CO}} \right)$$

Where:

$PEFCO_{REP}$ = Primary Energy Factor of Refining the End Product From Crude Oil, exclusive of energy required for exploration, extraction, and processing

$PEFCO_{EP}$ = Primary Energy Factor of End Product, inclusive of all processes

$EROI_{CO}$ = Energy Return On Investment from Crude Oil

For End Products Derived from Oil Shale, we adjust the Primary Energy Factors of refining components of end products derived from Crude Oil by the following adjustment mechanism:

$$PEFOS_{EP} = PEFCO_{REP} + \left( \frac{1}{EROI_{OS}} \right)$$

Where:

$PEFOS_{EP}$ = Primary Energy Factor of Oil Shale Derived End Product

$PEFCO_{REP}$ = Primary Energy Factor of Refining Component of End Product

$EROI_{OS}$ = Energy Return ON Investment from Oil Shale, from Brand 2009

For End Products Derived from Tar Sands, we adjust the Primary Energy Factors of refining components of end products derived from Crude Oil by the following adjustment mechanism:

$$PEFTS_{EP} = PEFCO_{REP} + \left( \frac{1}{EROI_{TS}} \right)$$

Where:

$PEFTS_{EP}$ = Primary Energy Factor of Tar Sands Derived End Product

$PEFCO_{REP}$ = Primary Energy Factor of Refining Component of End Product

$EROI_{TS}$ = Energy Return ON Investment from Tar Sands[28]

## Emissions Factors

The approach used in this study was to use emissions factors that represent the functional units for which we had data on fossil fuels amounts. For example, if the functional unit of the emissions factor was a kWh worth of electricity, we estimated the total amount of resource that can be converted into this functional unit. Where the emissions factor is provided on an energy unit basis that is not equivalent to that of the fossil fuel resource, we make the appropriate conversion.

All life-cycle emissions factors used in this study, and nearly all in the literature, are on an end-use product basis (i.e., kWh of electricity, MJ of final fuel combusted, km-travelled, etc.). To account for the energy in the feedstock required to make the end-use products, we determined a ratio of primary energy to the end-use product, as described earlier in this Appendix. This represents the relationship between the amount of energy required to make the final product.



We were able to find resource-specific life-cycle emissions factors for all fossil fuel categories. These life-cycle emissions factors account for the greenhouse gas emissions associated with all life-cycle stages associated with the production of an end-product derived from a fossil fuel feedstock.



**Figure A18. Example life-cycle stages accounted for in a life-cycle emissions factor**

For each emissions factor we evaluated low, median and high emission factor scenarios. The base case in this study is the low emissions factor scenario, which is the most conservative estimate of the GHG emissions from developing fossil fuels. This was done to account for a static emissions factor; we optimistically assume that GHG emissions per unit of energy improve over time compared to *ex post* emissions factors in the literature as more efficient energy and public policy and best practices limit fugitive emissions.

Where possible we used harmonized life-cycle emissions factors found in the literature. Harmonization is a meta-analytical process used to develop robust, analytically consistent and current comparisons of estimates of life-cycle GHG emissions factors, which have been scientifically studied and published in academic, peer-reviewed literature.

For some end-use products, however, specific emissions factors were not available in the literature. We make adjustments to the emissions factors for the following:

- *Natural Gas extracted from non-conventional, shale based natural gas resource*
- *All end products (except Gasoline) derived from Oil Shale*
- *Liquefied petroleum gas , Petroleum Coke, Still Gas, and Residual Fuel Oil derived from Tar Sands*
- *Natural Gas Used in the Transportation Sector*



## Natural Gas Extracted From Non-Conventional, Shale-based Natural Gas Resource

To account for the difference in emissions resulting from conventional natural gas extraction and non-conventional natural gas extraction, we apply shale gas-specific emissions factors to a percentage of the total natural gas fossil fuel volume. We assume this to be 27% and take this figure from EIA's *Technically Recoverable Shale Oil and Shale Gas Resources: An Assessment of 137 Shale Formations in 41 Countries Outside the United States* (2013). We use shale gas-specific emissions factors from Burnham et al. 2012 and Heath et al. 2014.

## All End Products (Except Gasoline) Derived From Oil Shale

Specific emissions factors for finished motor gasoline derived from oil shale were available in the literature. Emissions factors for the remainder of the end-products, however, were not.

To account for the difference in emissions between conventional crude oil extraction and processing and the extraction and processing of oil shale into an equivalent barrel of standard crude oil, we adjust the end-product-specific emissions factors using the following equation:

$$OSE_{AF} = (FMG_{OS} - FMG_{CO}) \div FMG_{CO}$$

Where:

$OSE_{AF}$ = Oil Shale Emissions Adjustment Factor

$FMG_{OS}$ = Finished Motor Gasoline from Oil Shale Emissions Factor from Brandt 2009

$FMG_{CO}$ = Finished Motor Gasoline from Crude Oil Emissions Factor from Burnham, et al. 2012

We then multiply each crude oil end product specific emissions factor by (1 + $OSE_{AF}$) to appropriately increase the emissions factor due to the increased emissions resulting from Oil Shale extraction and processing. The emissions factor from Brandt 2009 used above is an Oil Shale specific emissions factor.

## LPG, Petroleum Coke, Still Gas and Residual Fuel Oil Derived From Tar Sands

Specific emissions factors for finished motor gasoline, distillate fuel oil and kerosene were available in the literature. However, specific emissions factors for other end-use products were not. To account for the difference in emissions between conventional crude oil extraction and processing and the extraction and processing of Tar Sands into an equivalent barrel of standard crude oil, we adjust the end product specific emissions factors using the following equation:

$TSE_{AF}$ = the average of:

$(FMG_{TS} - FMG_{CO}) \div FMG_{CO}$ ;

$(DFO_{TS} - DFO_{CO}) \div DFO_{CO}$ ;

*and*



$$(K_{TS} - K_{CO}) \div K_{CO}$$

Where:

$TSE_{AF}$ = Tar Sands Emissions Adjustment Factor

$FMG_{TS}$ = Finished Motor Gasoline from Tar Sands Emissions Factor[29]

$FMG_{CO}$ = Finished Motor Gasoline from Crude Oil Emissions Factor[30]

$DFO_{TS}$ = Distillate Fuel Oil from Tar Sands Emissions Factor[31]

$DFO_{CO}$ = Distillate Fuel Oil from Crude Oil Emissions Factor[32]

$K_{TS}$ = Kerosene from Tar Sands Emissions Factor[33]

$K_{CO}$ = Kerosene from Crude Oil Emissions Factor[34]

We then multiply the LPG, Petroleum Coke, Still Gas and Residual Fuel Oil from Crude Oil emissions factors by $(1 + TSE_{AF})$.

## Natural Gas Used in the Transportation Sector

In order to more accurately estimate the emissions from natural gas use in the transportation sector, we use EIA data[35] to determine what percentage of natural gas is used by light duty compressed natural gas (CNG) vehicles, and what percentage is used by medium and heavy duty CNG vehicles. We then apply these proportions to the transportation portion of natural gas primary energy volumes.

To calculate GHG emissions, we use life-cycle emissions factors for CNG transportation.[36] Since the emissions factors from Burnham et al. are measured in km-travelled, we need the fuel economy to determine the distance each mode of transport can travel based upon a unit of gas. We use EPA data to estimate the fuel economy of light duty vehicles.[37] For the fuel economy of medium and heavy duty vehicles, we cite research from NREL.[38] Once energy available is expressed in the functional units of the life-cycle emissions factors, we can estimate potential GHGs.

## Research Limitations

There are several limitations to this model. The major limitation is the unavailability of some kinds of data that would allow for a better approximation of global warming potential from developing fossil fuels. For example, tar sands reserves are not well characterized as amounts are reported in "acres" and estimates must be made by applying a "barrel per acre" estimate instead of absolute amounts, which would be easier to compare with other reserves. In addition, existing fossil fuel amounts under lease were mostly unavailable. There is also no specific data for all of the crude oil end products. Literature on life-cycle emissions factors for oil shale and tar sands is not as extensive as for other resources and comes with higher ranges of uncertainty. There is also no federal ownership of figures for tar sands in Alabama, Texas, California, Kentucky, New Mexico, Wyoming and Oklahoma. Finally, emissions factors used in this study were static over time and based on *ex post* (actual) data. Our GHG emissions model assumes that the combustion efficiency or GHG intensity across the fleet of U.S. fossil fuel-fired power plants remains static over time.



# Appendix II: Data Sources

| Crude Oil | | |
|---|---|---|
| Offshore | | |
| Federal Technically Recoverable | 89,930 MMBbls | BOEM 2014 |
| Federal Proved (2013) | 5,137 MMBbls | EIA 2015a |
| FY 2014 Crude Oil Volume Revenues Reported | 396.36 MMBbls | ONRR 2014 |
| February 2015 Producing Leases – Acreage | 4,980,054 acres | BOEM 2015 |
| Acreage Under Active Lease | 32,184,001 acres | BOEM 2015 |
| Leased in Gulf of Mexico (non-producing/not subject to exploration & development plans) | 17,900 MMBbls | DOI 2012 |
| Non-producing Acreage Leased in Gulf of Mexico | 23,849,584 acres | BOEM 2015 |
| All Non-producing Acreage Leased | 27,203,947 acres | DOI 2012 |
| | | |
| **Onshore** | | |
| Federal Technically Recoverable | 30,503 MMBbls | EPCA Phase 3 Inventory 2008 |
| Federal Lease Available Technically Recoverable* | 18,989 MMBbls | EPCA Phase 3 Inventory 2008 |
| Federal Proved | 5,344 MMBbls | EPCA Phase 3 Inventory 2008 |
| FY 2014 Crude Oil Volume Revenues Reported | 146.23 MMBbls | ONRR 2014 |
| FY 2014 O&NG Producing Leases –Acreage | 12,690,806 acres | BLM 2014a |
| FY 2014 O&NG Acres Under Lease | 34,592,450 acres | BLM 2014a |
| | | |
| Total Technically Recoverable Resource | 220,200 MMBbls | EIA 2012a |
| | | |
| **Natural Gas** | | |
| **Offshore** | | |
| Technically Recoverable | 404.52 Tcfg | BOEM 2014 |
| Federal Proved Gas | 25.33 Tcfg | EIA 2014c |
| FY 2014 Natural Gas Volume Revenues Reported | 0.85 Tcg | ONRR 2014 |
| February 2015 Producing Leases –Acreage | 4,980,054 acres | BOEM 2015 |
| Acreage Under Active Lease | 32,184,001 acres | BOEM 2015 |
| Leased in Gulf of Mexico (non-producing/not subject to exploration & development plans) | 49.70 Tcfg | DOI 2012 |
| Non-producing Acreage Leased in Gulf of Mexico | 23,849,584 acres | BOEM 2015 |
| All Non-producing Acreage Leased | 27,203,947 acres | BOEM 2015 |



| *Onshore* | | |
|---|---|---|
| Technically Recoverable | 230.98 Tcfg | EPCA Phase 3 Inventory 2008 |
| Lease Available Technically Recoverable* | 194.907 Tcfg | EPCA Phase 3 Inventory 2008 |
| Proved Gas | 68.76 Tcfg | EPCA Phase 3 Inventory 2008 |
| | | |
| Total Technically Recoverable Resource | 2,203.30 Tcfg | EIA 2012a |
| | | |

## Coal

| | | |
|---|---|---|
| In Place Federal Coal Resources | 957,000 MST | USDA, DOE, DOI 2007 |
| Federal Recoverable Coal Reserves | 87,000 MST | National Mining Association 2012 |
| Total U.S. Recoverable Reserves | 256,000 MST | EIA 2012b |
| 2013 Leased Coal Acres | 474,025 acres | BLM 2014b |
| 2013 Coal Production | 422.25 MST | ONRR 2013 |
| | | |

## Oil Shale

| | | |
|---|---|---|
| Available Area According to ROD – UT* | 360,400 acres | BLM ROD 2013 |
| Available Area According to ROD – CO* | 26,300 acres | BLM ROD 2013 |
| Available Area According to ROD – WY* | 292,000 acres | BLM ROD 2013 |
| Average Resource – UT | 74,093 bbl/acre | BLM OSTS 2012 |
| Average Resource – WY | 120,117 bbl/acre | BLM OSTS 2012 |
| Average Resource – CO | 300,000 bbl/acre | Mercier, et al. 2010 |
| Resource Available in Piceance Basin | 284,800 MMBbls | USGS 2010 |
| Resource Available in Green River and Washakie Basins | 72,179 MMBbls | USGS 2011 |
| Resource Available in Uinta Basin | 26,699 MMBbls | BLM OSTS 2012; BLM ROD 2013 |
| Available Under RD&D Leases | 5,938 MMBbls | DOE/BLM 2013 |
| | | |

## Tar Sands

| | | |
|---|---|---|
| In Place Tar Sands Resources | 54,095 MMBbls | USGS 2006 |
| Federal Ownership of Utah Tar Sands | 58% | Keiter et al. 2011 |
| Federal Ownership of Other Tar Sands | 28% | Gorte et al. 2012 |
| Lease Available STSAs* | 4,125 MMBbls | BLM OSTS 2012 |

**Table A11. Fossil fuel amounts and sources**

\* "Lease-available" federal fossil fuels are unleased federal fossil fuels that are available for leasing under current federal policies and plans.



| End-use Product / Sector | Key Parameter(s) for Influencing Low, Median, High Emissions Scenarios | Life-Cycle Emissions Factor Source(s) Used |
|---|---|---|
| **Crude Oil** | | |
| Gasoline | Associated gas venting and flaring; vehicle end-use efficiency | Burnham et al. 2012 |
| Distillate Fuel Oil | Extraction and transport | NETL 2008, 2009 as cited in US DOS 2014 |
| Kerosene | Extraction and transport | NETL 2008, 2009 as cited in US DOS 2014 |
| Liquefied Petroleum Gases (LPG) | Extraction and transport | Venkatesh et al. 2010 |
| Petroleum Coke | Extraction and transport | Venkatesh et al. 2010 |
| Still Gas | Extraction and transport | Venkatesh et al. 2010 |
| Residual Fuel Oil | Extraction and transport | Venkatesh et al. 2010 |
| **Natural Gas** | | |
| Residential | Liquid unloadings (venting); well equipment (leakage and venting); transmission and distribution (leakage and venting) | Burnham et al. 2012 |
| Commercial | Liquid unloadings (venting); well equipment (leakage and venting); transmission and distribution (leakage and venting) | Burnham et al. 2012 |
| Industrial | Liquid unloadings (venting); well equipment (leakage and venting); transmission and distribution (leakage and venting) | Burnham et al. 2012 |
| Electric Power | Power conversion efficiency | Heath et al. 2014 |
| Transportation | Liquid unloadings (venting); well equipment (leakage and venting); transmission and distribution (leakage and venting) | Burnham et al. 2012 |
| **Coal** | | |
| Electric Power | Transmission and distribution losses; power conversion efficiency; coal mine methane | Whitaker et al. 2012 |
| Coke | | EPA 2004 |
| Other Industrial Use | | Whitaker et al. 2012 |
| | Transmission and distribution losses; power conversion efficiency; coal mine methane | |
| **Oil Shale** | | |
| Gasoline | Retorting; upgrading; refining | Brandt 2009 |
| Distillate Fuel Oil | Retorting; upgrading; refining; extraction | Brandt 2009; Burnham et al. 2012; NETL 2008, 2009 as cited in US DOS 2014 |
| Liquefied Petroleum Gases (LPG) | Retorting; upgrading; refining; extraction; transport | Brandt 2009; Burnham et al. 2012; Venkatesh et al. 2010 |



| Kerosene | Retorting; upgrading; refining; extraction; transport | Brandt 2009; Burnham et al. 2012; NETL 2008, 2009 as cited in US DOS 2014 |
| Petroleum Coke | Retorting; upgrading; refining; extraction; transport | Brandt 2009; Burnham et al. 2012; Venkatesh et al. 2010 |
| Still Gas | Retorting; upgrading; refining; extraction; transport | Brandt 2009; Burnham, et al. 2012; Venkatesh et al. 2010 |
| Residual Fuel Oil | Retorting; upgrading; refining; extraction; transport | Brandt 2009; Burnham et al. 2012; Venkatesh et al. 2010 |
| **Tar Sands** | | |
| Gasoline | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | Jacobs 2009, NETL 2008, 2009, and TIAX 2009 as cited in DOS 2014 |
| Distillate Fuel Oil | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | Jacobs 2009, and NETL 2008, 2009 as cited in DOS 2014 |
| Liquefied Petroleum Gases (LPG) | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | Jacobs 2009, NETL 2008, 2009, and TIAX 2009 as cited in US DOS 2014; Venkatesh et al. 2010 |
| Kerosene | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | NETL 2008, 2009 as cited in DOS 2014 |
| Petroleum Coke | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | Jacobs 2009, NETL 2008, 2009, and TIAX 2009 as cited in DOS 2014; Venkatesh et al. 2010 |
| Still Gas | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | Jacobs 2009, NETL 2008, 2009, and TIAX 2009 as cited in DOS 2014; Venkatesh et al. 2010 |
| Residual Fuel Oil | Feedstock mixture (consisting of dilbit, synthetic crude oil, bitumen) | Jacobs 2009, NETL 2008, 2009, and TIAX 2009 as cited in DOS 2014; Venkatesh et al. 2010 |

**Table A12. End-use products/sectors and life-cycle emissions factor sources**



| Crude Oil End-use Product | Proportion of Resource Used as Input for End-use Product | Carbon Storage Factor | Low Emissions Factor | Median Emissions Factor | High Emissions Factor | Primary Energy Factor |
|---|---|---|---|---|---|---|
| Finished Motor Gasoline | 46.46% | 0.00 | 86 tons $CO_2e$ / TJ Fuel Combusted | 92 tons $CO_2e$ / TJ Fuel Combusted | 98 tons $CO_2e$ / TJ Fuel Combusted | 1.19 |
| Distillate Fuel Oil | 17.92% | 0.50 | 89 tons $CO_2e$ / TJ Fuel Combusted | 90 tons $CO_2e$ / TJ Fuel Combusted | 96 tons $CO_2e$ / TJ Fuel Combusted | 1.16 |
| Kerosene | 7.51% | 0.00 | 86 tons $CO_2e$ / TJ Fuel Combusted | 88 tons $CO_2e$ / TJ Fuel Combusted | 91 tons $CO_2e$ / TJ Fuel Combusted | 1.21 |
| Liquefied Petroleum Gases | 12.75% | 0.59 | 80 tons $CO_2e$ / TJ Fuel Combusted | 88 tons $CO_2e$ / TJ Fuel Combusted | 100 tons $CO_2e$ / TJ Fuel Combusted | 1.15 |
| Petroleum Coke | 1.87% | 0.30 | 130 tons $CO_2e$ / TJ Fuel Combusted | 144 tons $CO_2e$ / TJ Fuel Combusted | 160 tons $CO_2e$ / TJ Fuel Combusted | 1.05 |
| Still Gas | 3.72% | 0.59 | 78 tons $CO_2e$ / TJ Fuel Combusted | 87 tons $CO_2e$ / TJ Fuel Combusted | 100 tons $CO_2e$ / TJ Fuel Combusted | 1.09 |
| Residual Fuel Oil | 1.70% | 0.00 | 88 tons $CO_2e$ / TJ Fuel Combusted | 95 tons $CO_2e$ / TJ Fuel Combusted | 110 tons $CO_2e$ / TJ Fuel Combusted | 1.19 |
| Asphalt* | 1.71% | 1.00 | | -- | | -- |
| Other Oils | 0.56% | 1.00 | | -- | | -- |
| Lubricants | 0.64% | 1.00 | | -- | | -- |
| Other | 5.16% | 1.00 | | -- | | -- |

**Table A13. Crude oil end products and emissions factors**

| Natural Gas End-use Sector (product) | Proportion of Resource Used as Input for End-use Product | Primary Energy Yield Factor | Low Emissions Factor | Median Emissions Factor | High Emissions Factor | Primary Energy Factor |
|---|---|---|---|---|---|---|
| **Residential (CHP)** | 18.76% | 100% | 72 tons $CO_2e$ / MJ of fuel combusted | 76 tons $CO_2e$ / MJ of fuel combusted | 81 tons $CO_2e$ / MJ of fuel combusted | 1.092 |
| **Commercial (CHP)** | 12.44% | 100% | 72 tons $CO_2e$ / MJ of fuel combusted | 76 tons $CO_2e$ / MJ of fuel combusted | 81 tons $CO_2e$ / MJ of fuel combusted | 1.092 |
| **Industrial (CHP)** | 34.14% | 100% | 72 tons $CO_2e$ / MJ of fuel combusted | 76 tons $CO_2e$ / MJ of fuel combusted | 81 tons $CO_2e$ / MJ of fuel combusted | 1.092 |
| **Electric Power (kWh)** | 31.69% | 43.39% | 117 tons $CO_2e$ / MJ of fuel combusted | 125 tons $CO_2e$ / MJ of fuel combusted | 180 tons $CO_2e$ / MJ of fuel combusted | 1.092 |
| **Transportation (km-travelled)** | 2.98% | 100% | 210 grams $CO_2e$ / km travelled | 230 grams $CO_2e$ / km travelled | 250 grams $CO_2e$ / km travelled | 1.092 |

**Table A14. Natural gas end-use sectors and factors**

The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels



| Coal End-use Sector (product) | Proportion of Resource Used as Input for End-use Product | Primary Energy Yield Factor | Low Emissions Factor | Median Emissions Factor | High Emissions Factor | Primary Energy Factor |
|---|---|---|---|---|---|---|
| Electric Power (kWh) | 92.78% | 31.65% | 203 tons $CO_2e$ / TJ of fuel combusted | 272 tons $CO_2e$ / TJ of fuel combusted | 381 tons $CO_2e$ / TJ of fuel combusted | 1.048 |
| Metallurgical Coke (pig iron) | 2.32% | n/a | | 1.35 tons of $CO_2e$ / ton of pig iron produced | | 1.167 |
| Other Industrial Use (kWh) | 4.89% | 31.65% | 203 tons $CO_2e$ / TJ of fuel combusted | 272 tons of $CO_2e$ / TJ of fuel combusted | 381 tons $CO_2e$ / TJ of fuel combusted | 1.048 |

**Table A15. Coal end-use sectors and factors**

| Oil Shale End-use Product | Proportion of Resource Used as Input for End-use Product | Carbon Storage Factor | Low Emissions Factor | Median Emissions Factor | High Emissions Factor | Primary Energy Factor |
|---|---|---|---|---|---|---|
| Finished Motor Gasoline | 46.46% | 0.00 | 130 tons $CO_2e$ / TJ Fuel Combusted | 141 tons $CO_2e$ / TJ Fuel Combusted | 150 tons $CO_2e$ / TJ Fuel Combusted | 1.187 |
| Distillate Fuel Oil | 17.92% | 0.50 | 135 tons $CO_2e$ / TJ Fuel Combusted | 138 tons $CO_2e$ / TJ Fuel Combusted | 147 tons $CO_2e$ / TJ Fuel Combusted | 1.158 |
| Kerosene | 7.51% | 0.00 | 130 tons $CO_2e$ / TJ Fuel Combusted | 135 tons $CO_2e$ / TJ Fuel Combusted | 139 tons $CO_2e$ / TJ Fuel Combusted | 1.205 |
| Liquefied Petroleum Gases | 12.75% | 0.59 | 121 tons $CO_2e$ / TJ Fuel Combusted | 135 tons $CO_2e$ / TJ Fuel Combusted | 153 tons $CO_2e$ / TJ Fuel Combusted | 1.151 |
| Petroleum Coke | 1.87% | 0.30 | 197 tons $CO_2e$ / TJ Fuel Combusted | 221 tons $CO_2e$ / TJ Fuel Combusted | 245 tons $CO_2e$ / TJ Fuel Combusted | 1.048 |
| Still Gas | 3.72% | 0.59 | 118 tons $CO_2e$ / TJ Fuel Combusted | 133 tons $CO_2e$ / TJ Fuel Combusted | 153 tons $CO_2e$ / TJ Fuel Combusted | 1.092 |
| Residual Fuel Oil | 1.70% | 0.00 | 133 tons $CO_2e$ / TJ Fuel Combusted | 146 tons $CO_2e$ / TJ Fuel Combusted | 168 tons $CO_2e$ / TJ Fuel Combusted | 1.191 |
| Asphalt | 1.71% | 1.00 | | -- | | -- |
| Other Oils | 0.56% | 1.00 | | -- | | -- |
| Lubricants | 0.64% | 1.00 | | -- | | -- |
| Other | 5.16% | 1.00 | | -- | | -- |

**Table A16. Oil shale end-use products and factors**



| Tar Sands End-use Product | Proportion of Resource Used as Input for End-use Product | Carbon Storage Factor | Low Emissions Factor | Median Emissions Factor | High Emissions Factor | Primary Energy Factor |
|---|---|---|---|---|---|---|
| Finished Motor Gasoline | 46.46% | 0.00 | 106 tons $CO_2e$ / TJ Fuel Combusted | 106 tons $CO_2e$ / TJ Fuel Combusted | 106 tons $CO_2e$ / TJ Fuel Combusted | 1.187 |
| Distillate Fuel Oil | 17.92% | 0.50 | 105 tons $CO_2e$ / TJ Fuel Combusted | 105 tons $CO_2e$ / TJ Fuel Combusted | 105 tons $CO_2e$ / TJ Fuel Combusted | 1.158 |
| Kerosene | 7.51% | 0.00 | 96 tons $CO_2e$ / TJ Fuel Combusted | 102 tons $CO_2e$ / TJ Fuel Combusted | 110 tons $CO_2e$ / TJ Fuel Combusted | 1.205 |
| Liquefied Petroleum Gases | 12.75% | 0.59 | 102 tons $CO_2e$ / TJ Fuel Combusted | 102 tons $CO_2e$ / TJ Fuel Combusted | 102 tons $CO_2e$ / TJ Fuel Combusted | 1.151 |
| Petroleum Coke | 1.87% | 0.30 | 156 tons $CO_2e$ / TJ Fuel Combusted | 167 tons $CO_2e$ / TJ Fuel Combusted | 176 tons $CO_2e$ / TJ Fuel Combusted | 1.048 |
| Still Gas | 3.72% | 0.59 | 93 tons $CO_2e$ / TJ Fuel Combusted | 101 tons $CO_2e$ / TJ Fuel Combusted | 110 tons $CO_2e$ / TJ Fuel Combusted | 1.092 |
| Residual Fuel Oil | 1.70% | 0.00 | 105 tons $CO_2e$ / TJ Fuel Combusted | 146 tons $CO_2e$ / TJ Fuel Combusted | 121 tons $CO_2e$ / TJ Fuel Combusted | 1.191 |
| Asphalt* | 1.71% | 1.00 | | -- | | -- |
| Other Oils* | 0.56% | 1.00 | | -- | | -- |
| Lubricants* | 0.64% | 1.00 | | -- | | -- |
| Other* | 5.16% | 1.00 | | -- | | -- |

Table A17. Tar sands end-use products and factors



# Bibliography

AAPG. 2013. Warwick, Peter D., and Paul C. Hackley. "Unconventional Energy Resources: 2013 Review." *Natural Resources Research* 23.1 (2014): 19-98.

APTA 2014. American Public Transportation Association. "2014 Public Transportation Fact Book APPENDIX A: HISTORICAL TABLES." http://www.apta.com/resources/statistics/Documents/FactBook/2014-APTA-Fact-Book-Appendix-A.pdf

ARNL 2014. United States Department of Energy, Argonne National Laboratory. "GREET - The Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation Model." https://greet.es.anl.gov/

BLM 2014a. United States Department of the Interior, Bureau of Land Management. "Oil and Gas Statistics." http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/statistics.html

BLM 2014b. United States Department of the Interior, Bureau of Land Management. "Total Federal Coal Leases in Effect, Total Acres Under Lease, and Lease Sales by Fiscal Year Since 1990." http://www.blm.gov/wo/st/en/prog/energy/coal_and_non-energy/coal_lease_table.html

BLM OSTS 2012. United States Department of the Interior, Bureau of Land Management. "Proposed Land Use Plan Amendments (PRMP Amendments) for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the Bureau of Land Management in Colorado, Utah, and Wyoming and Final Environmental Impact Statement (FEIS). – Appendix A " http://ostseis.anl.gov/documents/peis2012/index.cfm

BLM ROD 2013. United States Department of the Interior, Bureau of Land Management. "Approved Land Use Plan Amendments/Record of Decision (ROD) for Allocation of Oil Shale and Tar Sands Resources on Lands Administered by the Bureau of Land Management in Colorado, Utah, and Wyoming and Final Programmatic Environmental Impact Statement." http://ostseis.anl.gov/documents/index.cfm

BOEM 2015. United States Bureau of Ocean Energy Management. "Combined Leasing Report as of February 2, 2015." http://www.boem.gov/Combined-Leasing-Report-February-2015/

BOEM 2014. United States Bureau of Ocean Energy Management. "Assessment of Undiscovered Technically Recoverable Oil and Gas Resources of the Nation's Outer Continental Shelf, 2011(Includes 2014 Atlantic Update)." http://www.boem.gov/Assessment-of-Oil-and-Gas-Resources-2014-Update/

Brandt, A. et al. 2014. "Methane leaks from North American natural gas systems. *Science*. 343(6172): 733–735.

Brandt, Adam R. 2009. "Converting oil shale to liquid fuels with the Alberta Taciuk Processor: Energy inputs and greenhouse gas emissions." *Energy & Fuels* 23(12): 6253-6258.

Burnham, Andrew, et al. 2011. "Life-cycle greenhouse gas emissions of shale gas, natural gas, coal, and petroleum." *Environmental science & technology* 46(2): 619-627.

CDLE 2014. Colorado Department of Labor and Employment – Division of Oil and Public Safety. "Excise Tax for Compressed Natural Gas and Liquefied Natural Gas." https://www.colorado.gov/pacific/sites/default/files/ExciseTaxforCNG%26LNG.pdf

Clarke, L. et al. in Climate Change 2014: Mitigation of Climate Change. In Edenhofer, O. et al. (Eds.) Cambridge University Press.

Cleveland, Cutler J., and Peter A. O'Connor. 2011. "Energy return on investment (EROI) of oil shale." *Sustainability* 3.11 (2011): 2307-2322.

Deru, Michael P., and Paul Torcellini. 2007. *Source energy and emission factors for energy use in buildings*. Golden, CO: National Renewable Energy Laboratory, 2007.

DOE/BLM 2012. United States Department of Energy, United States Department of the Interior, Bureau of Land Management. "Assessment of Plans and Progress on US Bureau of Land Management Oil Shale RD&D Leases in the United States." http://energy.gov/sites/prod/files/2013/04/f0/BLM_Final.pdf



DOI 2012. United States Department of the Interior. "Oil and Gas Lease Utilization, Onshore and Offshore – Updated Report to the President." http://www.doi.gov/news/pressreleases/upload/Final-Report.pdf.

DOS 2014. United States Department of State. "Appendix U - Final Supplemental Environmental Impact Statement for the Keystone XL Project" http://keystonepipeline-xl.state.gov/finalseis/

Energy Information Agency [EIA] 2015a. United States Energy Information Administration. "Crude Oil Proved Reserves, Reserve Changes, and Production." http://www.eia.gov/dnav/pet/pet_crd_pres_dcu_RUSF_a.htm

EIA 2015a. United States Energy Information Administration. "U.S. Coal Reserves – January 21, 2015." http://www.eia.gov/coal/reserves/

EIA 2015b. United States Energy Information Administration. "Monthly Energy Review – February 2015" http://www.eia.gov/totalenergy/data/monthly/pdf/mer.pdf

EIA 2014a. United States Energy Information Administration (EIA), Automotive Fleet, as cited by The Boston Consulting Group. "A Realistic View of CNG Vehicles in the U.S." https://www.bcgperspectives.com/content/articles/energy_environment_automotive_realistic_view_cng_vehicles_us

EIA 2014b. United States Energy Information Administration (EIA). "Frequently Asked Questions" http://www.eia.gov/tools/faqs/faq.cfm?id=327&t=9

EIA 2014c. United States Energy Information Administration (EIA). "Natural Gas Reserves Summary as of Dec. 31." http://www.eia.gov/dnav/ng/ng_enr_sum_a_EPG0_r21_BCF_a.htm

EIA 2014d. United States Energy Information Administration (EIA). "Oil: Crude and Petroleum Products – Explained Use of Oil." http://www.eia.gov/energyexplained/index.cfm?page=oil_use

EIA 2014e. United States Energy Information Administration (EIA). "Quarterly Coal Report – April – June 2014. Table 32 - U.S. Coal Consumption by End-Use Sector, 2008 – 2014." http://www.eia.gov/coal/production/quarterly/pdf/t32p01p1.pdf

EIA 2013a. United States Energy Information Administration (EIA). "Technically Recoverable Shale Oil and Shale Gas Resources: An Assessment of 137 Shale Formations in 41 Countries Outside the United States." http://www.eia.gov/analysis/studies/worldshalegas/

EIA 2013b. United States Energy Information Administration (EIA). "Natural gas consumption by sector in the Reference case, 1990-2040: History: U.S. Energy Information Administration, *Monthly Energy Review.*" http://www.eia.gov/forecasts/aeo/excel/figmt39_data.xls

EIA 2012a. United States Energy Information Administration (EIA). "Annual Energy Review - Table 4.1  Technically Recoverable Crude Oil and Natural Gas Resource Estimates, 2009." http://www.eia.gov/totalenergy/data/annual/showtext.cfm?t=ptb0401

EIA 2012b. United States Energy Information Administration (EIA). "Annual Energy Review - Table 4.8  Coal Demonstrated Reserve Base, January 1, 2011." http://www.eia.gov/totalenergy/data/annual/showtext.cfm?t=ptb0408

EPA 2015. United States Department of Energy, United States Environmental Protection Agency. "Fuel Economy of 2015 Honda Civic Natural Gas." http://www.fueleconomy.gov/feg/bymodel/2015_Honda_Civic.shtml

EPA 2013. "Summary of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011." http://www.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2013-Main-Text.pdf

EPA 2004. "Unit Conversions, Emissions Factors, and Other Reference Data." http://www.epa.gov/cpd/pdf/brochure.pdf

EPCA Phase 3 Inventory 2008. United States Department of Agriculture, United States Department of Energy, United States Department of the Interior (USDA, DOE, DOI). "EPCA Phase III Inventory." http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III.html

GAO 2013. "Coal Leasing - BLM Could Enhance Appraisal Process, More Explicitly Consider Coal Exports, and Provide More Public Information." http://www.gao.gov/assets/660/659801.pdf



Gorte, Ross W., et al. 2012. "Federal land ownership: overview and data." *Congressional Research Service* 42346. https://fas.org/sgp/crs/misc/R42346.pdf

Heath, Garvin A., et al. 2014. "Harmonization of initial estimates of shale gas life cycle greenhouse gas emissions for electric power generation." *Proceedings of the National Academy of Sciences* 111.31 (2014): E3167-E3176.

Herweyer, M.C.; Gupta, A.K. Appendix D: Tar Sands/Oil Sands. The Oil Drum, 2008; Available  online: http://www.theoildrum.com/node/3839 (accessed on 1 June 2011).

Howarth RW, Santoro R, Ingraffea A. 2011. Methane and the greenhouse-gas footprint of natural gas from shale formations. Clim Change 106(4):679–690.

Intergovernmental Panel on Climate Change. 2014. 5th Assessment Report. http://ipcc.ch/report/ar5/

Jacobs 2009. Jacobs Consultancy. "Life Cycle Assessment Comparison of North American and Imported Crudes. Alberta Energy Research Institute and Jacobs Consultancy."
Johnson, Caley. 2010. *Business Case for Compressed Natural Gas in Municipal Fleets*. National Renewable Energy Laboratory, 2010.

Johnson, C. 2010. Business case for compressed natural gas in municipal fleets. National Renewable Energy Laboratory.

Keiter, Robert B., et al. 2011. "Land and Resource Management Issues Relevant to Deploying In-Situ Thermal Technologies." *University of Utah College of Law Research Paper Forthcoming. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2483277*

Meinshausen, M. et al. 2009. Greenhouse gas emission targets for limiting global warming to 2 degrees Celsius. *Nature* 458, 1158–1162.

Mercier, Tracey J., et al. 2010. "Methodology for Calculating Oil Shale and Nahcolite Resources for the Piceance Basin." From Chapter 3 of 7 Oil Shale and Nahcolite Resources of the Piceance Basin, Colorado, USGS. http://pubs.usgs.gov/dds/dds-069/dds-069-y/REPORTS/69_Y_CH_3.pdf

National Energy Technology Laboratory (NETL). 2009. National Energy Technology Laboratory. "An Evaluation of the Extraction, Transport and Refining of Imported Crude Oils and the Impact of Life Cycle Greenhouse Gas Emissions."

National Energy Technology Laboratory (NETL). 2008. "Development of Baseline Data and Analysis of Life Cycle Greenhouse Gas Emissions of Petroleum-Based Fuels."

National Mining Association. 2012. "National Coal Producer Survey, 2011." http://nma.dev2.networkats.com/pdf/members/coal_producer_survey2011.pdf.

National Renewable Energy Laboratory (NREL). 2005. U.S. LCI Database. www.nrel.gov/lci. Golden, CO: National Renewable Energy Laboratory (accessed June 6, 2005)
ONRR. 2014. United States Department of the Interior, Office of Natural Resources Revenue." Office of Natural Resources Revenue Statistical Information." http://statistics.onrr.gov/ReportTool.aspx

ORNL 2011. U.S. Department of Energy, Oak Ridge National Laboratory. "Biomass Energy Databook - Section: Appendix A Lower and Higher Heating Values of Gas, Liquid and Solid Fuels." http://cta.ornl.gov/bedb/appendix_a/Lower_and_Higher_Heating_Values_of_Gas_Liquid_and_Solid_Fuels.pdf

Pierce, Mark. 1998. "Comparing Values of Various Heating Fuels." http://www.human.cornell.edu/dea/outreach/upload/CompareHeatFuels.pdf

Stephenson T, Valle JE, Riera-Palou X. 2011. "Modeling the relative GHG emissions of conventional and shale gas production." Environ Sci Technol 45(24):10757–10764.

TIAX LLC. 2009. "Comparison of North American and Imported Crude Oil Lifecycle GHG Emissions." Alberta Energy Research Institute and TIAX LLC.

USDA, DOE, DOI 2007. United States Department of Agriculture, United States Department of Energy, United States Department of the Interior. "Inventory of Assessed Federal Coal Resources and Restrictions to their Development." http://www.law.indiana.edu/publicland/files/epact437_final_rpt.pdf



USGS 2011. United States Geological Survey. "In-Place Oil Shale Resources Underlying Federal Lands in the Green River and Washakie Basins, Southwestern Wyoming." http://pubs.usgs.gov/fs/2011/3113/FS11-3113.pdf

USGS 2010. United States Geological Survey. "In-Place Oil Shale Resources Underlying Federal Lands in the Piceance Basin, Western Colorado." http://pubs.er.usgs.gov/publication/fs20103041

USGS 2006. United States Geological Survey. "Natural Bitumen Resources of the United States." http://pubs.usgs.gov/fs/2006/3133/

Stratus Consulting. 2012. Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters. Prepared for the Wilderness Society.

Tschakert, P. 2015. 1.5°C or 2°C: a conduit's view from the science-policy interface at COP20 in Lima, Peru. Climate Change Responses 2:3.

Venkatesh, Aranya, et al. 2010. "Uncertainty analysis of life cycle greenhouse gas emissions from petroleum-based fuels and impacts on low carbon fuel policies."*Environmental science & technology* 45(1): 125–131.

Whitaker, Michael, et al. 2012. "Life Cycle Greenhouse Gas Emissions of Coal-Fired Electricity Generation." *Journal of Industrial Ecology* 16.s1 (2012): S53-S72.

Wright, S. 2015. Electronic mail correspondence with Steven S. Wright, P.E., MBA, Assistant District Manager, Solid Minerals, BLM Wyoming High Plains District dated Friday May 15, 2015.

World Coal Association. 2015. "Coal and Steel." http://www.worldcoal.org/coal/uses-of-coal/coal-steel/

World Resources Institute. 2013. Clearing the Air Reducing Upstream Greenhouse Gas Emissions from U.S. Natural Gas Systems. http://www.wri.org/publication/clearing-air

# End Notes

[1] UNFCC (United Nations Framework Convention on Climate Change). 2015. Report on the structured     expert dialogue on the 2013-2015 review. FCCC/SB/2015/INF.1; Tschakert, P. 2015. 1.5°C or 2°C: a     conduit's view from the science-policy interface at COP20 in Lima, Peru. Climate Change Responses 2:3.

[2] Intergovernmental Panel on Climate Change, *Climate Change 2013 Synthesis Report: Approved Summary     for Policymakers* at SPM-8 (Nov. 1, 2014).

[3] International Energy Agency, *World Energy Outlook 2014: Executive Summary* at 2 (Nov. 12, 2014).

[4] U.S. Environmental Protection Agency. 2015. Inventory of U.S. Greenhouse Gas Emissions and Sinks:  1990 – 2013. Available at:  http://www.epa.gov/climatechange/emissions/usinventoryreport.html. ES-4. Carbon   dioxide equivalent ($CO_2e$) is the standard measure of greenhouse gas emissions.  The measure accounts     for the different global warming potentials for different greenhouse gases such as $N_2O$, $CH_4$, and $CO_2$

[5] Ibid at  ES-18-19 (85% of total U.S. GHG emissions in 2013 were produced by fossil fuel combustion).

[6] Ibid at ES-4. Carbon dioxide equivalent ($CO_2e$) is the standard measure of greenhouse gas emissions.   The measure accounts for the different global warming potentials for different greenhouse gases such as $N_2O$,  $CH_4$, and $CO_2$.

[7] Climate Action Tracker is a joint project of Climate Analytics, Ecofys, Potsdam Institute for Climate Impact Research, and the NewClimate Institute.

[8] Climate Action Tracker. 2015. Are governments doing their "fair share"? New method assesses climate  action. 27 March 2015. See Figures 2 and 3.

[9] Stratus Consulting. 2014. Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands     and Waters.  Available at: http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf



[10] Heede, Rick. 2015.  Memorandum to Dunkiel Saunders and Friends of The Earth.  Climate Accountability   Institute. Available at: http://webiva-downton.s3.amazonaws.com/877/3a/7/5721/Exhibit_1-_ 1_ONRR_ProdEmissions_Heede_7May15.pdf

[11] A portion of unleased federal fossil fuel resources are precluded from future leasing by statutory restriction, such as being located within a designated wilderness area.  These were accounted for by excluding     categories 1 (no leasing by Executive Order) and 2 (no leasing by administrative reason) from Energy      Policy and Conservation Lands (EPCA).

[12] U.S. Environmental Protection Agency. 2015. Inventory of U.S. Greenhouse Gas Emissions and Sinks:  1990–2013. Available at:  http://www.epa.gov/climatechange/emissions/usinventoryreport.html. ES-4.

[13] Research by the World Resources Institute (WRI) 2013 and NREL (2014) suggest that there are no   differences between shale and conventional natural gas based on meta-analyses of prior research, although NREL notes that better methane measurements are needed to improve the accuracy of upstream  emissions and leakage issues with shale gas.

[14] DOE/BLM 2012. United States Department of Energy, United States Department of the Interior, Bureau of   Land Management. "Assessment of Plans and Progress on US Bureau of Land Management Oil Shale RD&D Leases in the United States." http://energy.gov/sites/prod/files/2013/04/f0/BLM_Final.pdf

[15] USGS 2006

[16] BLM ROD 2013

[17] AAPG 2013.

[18] EIA 2014d

[19] EIA 2013b.

[20] EIA 2014e.

[21] Brandt, A. 2011. Upstream greenhouse gas (GHG) emissions from Canadian oil sands as a feedstock for    European refineries. Report, January 18, 2011.

[22] Deru and Torcellini's 2007 technical paper Source Energy and Emission Factors for Energy Use in     Buildings.

[23] EIA 2015b.

[24] EIA 2015b.

[25] EIA 2014e.

[26] Deru and Torcellini, 2007.

[27] Deru and Torcellini, 2007.

[28] Herweyer and Gupta, 2008.

[29] This is the average of Jacobs 2009, TIAX 2009, and NETL 2008.

[30] Burnham, et al. 2012.

[31] This is the average of Jacobs 2009, TIAX 2009, and NETL 2009.

[32] NETL 2008, 2009

[33] NETL 2008, 2009

[34] NETL 2008, 2009.

[35] EIA, 2014a.

[36] Burnham et al., 2012.

[37] EPA, 2015.

[38] Johnson, 2010.





*Independent Statistics & Analysis*
**U.S. Energy Information Administration**

# Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014

July 2015

      

*Independent Statistics & Analysis*

www.eia.gov

U.S. Department of Energy

Washington, DC 20585

This report was prepared by the U.S. Energy Information Administration (EIA), the statistical and analytical agency within the U.S. Department of Energy. By law, EIA's data, analyses, and forecasts are independent of approval by any other officer or employee of the United States Government. The views in this report therefore should not be construed as representing those of the Department of Energy or other federal agencies.

# Contents

Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014 ......................... 1

    Summary ................................................................................................................................................ 1

    Sales from production on federal and Indian lands ............................................................................ 4

    Trends in federal and Indian lands production from FY 2003 through FY 2014 ...................................... 5

    State/offshore trends ......................................................................................................................... 7

    Data sources ....................................................................................................................................... 10

Appendix ................................................................................................................................................ 23

    State/area maps .................................................................................................................................. 23

# Tables

Table 1. Fossil fuel sales of production from federal lands, FY 2003-14 .................................................. 2
Table 2. Fossil fuel sales of production from Indian lands, FY 2003-14 ....................................................... 3
Table 3. Sales of crude oil and lease condensate production from federal and Indian lands, FY 2003-14 16
Table 4. Sales of natural gas production from federal and Indian lands, FY 2003-14 ............................... 16
Table 5.  Sales of natural gas plant liquids production from federal and Indian lands, FY 2003-14 ........... 17
Table 6.  Sales of coal from federal and Indian lands, FY 2003-14 ........................................................... 17
Table 7. Sales of fossil fuel production from federal and Indian lands by state/area, FY 2003-14 ............ 18
Table 8. Sales of crude oil and lease condensate production from federal and Indian lands by state/area, FY 2003-14 ............................................................................................................................................ 19
Table 9. Sales of natural gas production from federal and Indian lands by state/area, FY 2003-14 .......... 20
Table 10. Sales of natural gas plant liquids production from federal and Indian lands by state/area, FY 2003-14 ................................................................................................................................................ 21
Table 11. Sales of coal production from federal and Indian lands by state/area, FY 2003-14 ................... 22

# Figures

Figure 1. Fossil fuel production on federal lands, FY 2003-14 ................................................................... 6
Figure 2. Fossil fuel production on Indian lands, FY 2003-14 ................................................................... 7
Figure 3. Onshore federal and Indian lands .............................................................................................. 8
Figure 4. Fossil fuel production on federal and Indian lands, FY 2003-14 ................................................ 10
Figure 5. Crude oil production on federal and Indian lands, FY 2003-14 ................................................ 12
Figure 6. Natural gas production on federal and Indian lands, FY 2003-14 ............................................ 13
Figure 7. Natural gas liquids production on federal and Indian lands, FY 2003-14 ................................. 14
Figure 8. Coal production on federal and Indian lands, FY 2003-14 ....................................................... 15

Figure A1. Fossil fuel production on federal and Indian lands, FY 2014 .................................................. 23
Figure A2. Changes in fossil fuels production (trillion Btu) on federal and Indian lands, FY 2013-14 ........ 24
Figure A3. Crude oil production on federal and Indian lands, FY 2014 ................................................... 25
Figure A4. Changes in crude oil production on federal and Indian lands, FY 2013-14 ............................. 26
Figure A5. Natural gas production on federal and Indian lands, FY 2014 ............................................... 27
Figure A6. Changes in natural gas production on federal and Indian lands, FY 2013-14 .......................... 28
Figure A7. Natural gas liquids production on federal and Indian lands, FY 2014 ...................................... 29
Figure A8. Changes in natural gas liquids production on federal and Indian lands, FY 2013-14 ............... 30
Figure A9.  Coal production on federal and Indian lands, FY 2014 .......................................................... 31
Figure A10. Changes in coal production on federal and Indian lands by state, FY 2013-14 ...................... 32

# Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014

## Summary

The U.S. Energy Information Administration (EIA) estimates that total sales of fossil fuels from production[1] on federal and Indian lands increased slightly (less than 0.2%) during fiscal year[2] (FY) 2014. Total fossil fuels production on federal lands decreased by 24 trillion British thermal units (Btu) in FY 2014 (Table 1), while total fossil fuels production on Indian lands increased by 52 trillion Btu (Table 2).

In FY 2014 (compared with FY 2013), crude oil and lease condensate production on federal and Indian lands increased 7%, natural gas production declined 7%, natural gas plant liquids production increased by 8%, and coal production increased slightly.

| Land | Crude Oil and Lease Condensate | Natural Gas | Natural Gas Plant Liquids | Coal | All Fossil Fuels |
|---|---|---|---|---|---|
| Federal | Up 37 mmbbl, +6% | Down 284 bcf, -7% | Up 9 mmbbl, +8% | Up 1 mmst, +0.2% | -24 trillion Btu,-0.2% |
| Indian | Up 10 mmbbl, +22% | Up 0.3 bcf, +0.1% | Up 0.6 mmbbl, +16% | Down 0.3 mmst,-1.6% | +52 trillion Btu,+5.7% |

Notable developments in FY 2014 include:

- A 46.5 million barrel increase (7%) in oil production on federal and Indian lands, led by increases in the federal offshore Gulf of Mexico, North Dakota, and New Mexico
- A 284 billion cubic feet decline (-7%) in natural gas production, with most of that decrease in the federal offshore Gulf of Mexico and Wyoming

Breakdowns by state and area of the fuel production volumes on federal and Indian lands show that:

- The federal Gulf of Mexico produced 68% of the federal and Indian lands crude oil total in FY 2014
- Wyoming, the federal Gulf of Mexico, New Mexico, and Colorado together represented 86% of total production of natural gas on federal and Indian lands in FY 2014
- Wyoming produced 80% of the coal on federal and Indian lands in FY 2014

EIA's estimates are based on data provided by the U.S. Department of the Interior's (DOI) Office of Natural Resources Revenue (ONRR) and include sales of production from federal onshore and offshore lands, and from Indian lands.[3] EIA summarizes total sales of fossil fuels produced on federal and Indian lands in common energy units (British thermal units, or Btu) to allow for aggregation across fuels, including crude oil and lease condensate, natural gas, natural gas plant liquids(NGPL), and coal (Tables 1 and 2). The data presented in this report update the data previously reported by EIA[4] for FY 2003 through FY 2013.

The sales reported by ONRR are a reasonable proxy for marketed production for a fiscal year.  Sales are assigned to the fiscal year in which the sales were made rather than when royalties were collected. They also include production leaving the lease that is exempt from royalty payments under various royalty relief programs.

---

[1] Throughout this report, the term *production* means sales from production.

[2] The U.S. government's fiscal year runs from October 1 through September 30.

[3] Includes offshore and onshore areas the federal government owns or administers, including American Indian lands.

[4] Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2013, EIA, June 2014, found at http://www.eia.gov/analysis/requests/archive/2013/pdf/eia-federallandsales_061914.pdf

*July 2015*

## Table 1. Fossil fuel sales of production from federal lands, FY 2003-14

| Fiscal Year | Crude Oil and Lease Condensate | | | Natural Gas Plant Liquids [2] | | | Natural Gas | | | Coal | | | Fossil Fuels | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Million Barrels [1] | Trillion Btu | Percent of U.S. Total | Million Barrels [1] | Trillion Btu | Percent of U.S. Total | Billion Cubic Feet [1] | Trillion Btu | Percent of U.S. Total | Million Short Tons [1] | Trillion Btu | Percent of U.S. Total | Trillion Btu | Percent of U.S. Total |
| 2003 | 679 | 3,939 | 33.0% | 93 | 347 | 14.7% | 6,798 | 6,981 | 35.7% | 436 | 8,960 | 40.6% | 20,227 | 36.1% |
| 2004 | 670 | 3,884 | 33.3% | 104 | 386 | 15.7% | 6,376 | 6,545 | 34.0% | 451 | 9,226 | 41.0% | 20,041 | 35.8% |
| 2005 | 638 | 3,698 | 32.8% | 96 | 358 | 14.7% | 6,057 | 6,223 | 33.1% | 447 | 9,110 | 39.6% | 19,390 | 34.8% |
| 2006 | 571 | 3,313 | 31.3% | 85 | 315 | 13.8% | 5,373 | 5,523 | 29.6% | 429 | 8,715 | 37.2% | 17,867 | 32.4% |
| 2007 | 618 | 3,584 | 33.3% | 103 | 383 | 16.1% | 5,557 | 5,709 | 29.2% | 443 | 9,017 | 38.6% | 18,692 | 33.2% |
| 2008 | 565 | 3,276 | 30.7% | 103 | 382 | 15.5% | 5,532 | 5,681 | 27.6% | 483 | 9,771 | 41.6% | 19,110 | 33.3% |
| 2009 | 648 | 3,761 | 34.0% | 93 | 342 | 13.8% | 5,380 | 5,518 | 26.1% | 462 | 9,260 | 41.5% | 18,881 | 33.0% |
| 2010 | 724 | 4,201 | 36.4% | 131 | 482 | 17.6% | 5,086 | 5,206 | 24.4% | 457 | 9,188 | 42.8% | 19,076 | 33.3% |
| 2011 | 645 | 3,742 | 31.8% | 131 | 481 | 16.6% | 4,588 | 4,690 | 20.5% | 447 | 9,016 | 41.1% | 17,929 | 30.0% |
| 2012 | 601 | 3,489 | 26.4% | 130 | 478 | 14.9% | 4,261 | 4,361 | 17.8% | 442 | 8,924 | 42.1% | 17,251 | 27.7% |
| 2013 | 614 | 3,558 | 23.1% | 108 | 402 | 11.7% | 3,835 | 3,936 | 15.9% | 401 | 8,103 | 40.3% | 15,999 | 25.1% |
| 2014 | 651 | 3,774 | 21.4% | 117 | 434 | 11.3% | 3,551 | 3,649 | 14.1% | 402 | 8,118 | 40.8% | 15,975 | 23.7% |

[1] Includes sales volumes for production from federal lands including all classes of land owned by the federal government, including acquired military, Outer Continental Shelf, and public lands.

[2] Includes only those quantities for which the royalties were paid on the basis of the value of the natural gas plant liquids produced. Additional quantities of natural gas plant liquids were produced; however, the royalties paid were based on the value of natural gas processed. These latter quantities are included with natural gas.

Notes: Total fossil fuels are the sum of crude oil and lease condensate, natural gas plant liquids, natural gas, and coal. In addition, the sales volumes are reported for the fiscal year in which the sales occurred as opposed to the date of the royalty payment. Volumes include fossil fuels for which royalties were paid, as well as those amounts exempt from royalty payments, such as additions to the Strategic Petroleum Reserve.

Sources: **Physical Data:** U.S. Department of the Interior, Office of Natural Resources Revenue, ONNR Statistical Information Site (http://statistics.onrr.gov).

**Btu Data:** U.S. Energy Information Administration. Btu are calculated using average, calendar-year heat rates for production of each fossil fuel, as reported in the *Monthly Energy Review* (March 2015). The total Btu-content per fossil fuel is calculated by multiplying the physical data by the approximate heat content. The fossil fuel total is the sum of the total heat content for crude oil and lease condensate, natural gas plant liquids, natural gas, and coal.

**Percent of Total:** Percentages are calculated by dividing sales of production from federal by total U.S. production, then multiplying by 100. Fiscal year values for total U.S. production are the sum of October-September values from the *Monthly Energy Review* (March 2015) and reflect EIA's current data updates.

*July 2015*

## Table 2. Fossil fuel sales of production from Indian lands, FY 2003-14

| Fiscal Year | Crude Oil and Lease Condensate | | | Natural Gas Plant Liquids [2] | | | Natural Gas | | | Coal | | | Fossil Fuels | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Million Barrels [1] | Trillion Btu | Percent of U.S. Total | Million Barrels [1] | Trillion Btu | Percent of U.S. Total | Billion Cubic Feet [1] | Trillion Btu | Percent of U.S. Total | Million Short Tons [1] | Trillion Btu | Percent of U.S. Total | Trillion Btu | Percent of U.S. Total |
| 2003 | 10 | 59 | 0.5% | 2 | 6 | 0.3% | 283 | 291 | 1.5% | 30 | 616 | 2.8% | 972 | 1.7% |
| 2004 | 10 | 58 | 0.5% | 2 | 7 | 0.3% | 312 | 320 | 1.7% | 33 | 667 | 3.0% | 1,052 | 1.9% |
| 2005 | 10 | 59 | 0.5% | 2 | 7 | 0.3% | 327 | 336 | 1.8% | 34 | 698 | 3.0% | 1,100 | 2.0% |
| 2006 | 10 | 56 | 0.5% | 2 | 8 | 0.3% | 308 | 317 | 1.7% | 29 | 593 | 2.5% | 974 | 1.8% |
| 2007 | 10 | 56 | 0.5% | 3 | 10 | 0.4% | 284 | 292 | 1.5% | 27 | 558 | 2.4% | 916 | 1.6% |
| 2008 | 10 | 57 | 0.5% | 3 | 11 | 0.4% | 272 | 279 | 1.4% | 26 | 527 | 2.2% | 874 | 1.5% |
| 2009 | 10 | 61 | 0.5% | 3 | 10 | 0.4% | 266 | 273 | 1.3% | 26 | 521 | 2.3% | 864 | 1.5% |
| 2010 | 13 | 77 | 0.7% | 3 | 11 | 0.4% | 251 | 257 | 1.2% | 22 | 435 | 2.0% | 781 | 1.4% |
| 2011 | 20 | 115 | 1.0% | 3 | 12 | 0.4% | 254 | 260 | 1.1% | 22 | 444 | 2.0% | 831 | 1.4% |
| 2012 | 31 | 182 | 1.4% | 4 | 13 | 0.4% | 253 | 259 | 1.1% | 19 | 383 | 1.8% | 837 | 1.3% |
| 2013 | 46 | 269 | 1.8% | 4 | 14 | 0.4% | 241 | 247 | 1.0% | 19 | 387 | 1.9% | 916 | 1.4% |
| 2014 | 56 | 324 | 1.8% | 4 | 16 | 0.4% | 241 | 247 | 1.0% | 19 | 380 | 1.9% | 968 | 1.4% |

[1] Includes sales volumes for production from Indian lands.

[2] Includes only those quantities for which the royalties were paid on the basis of the value of the natural gas plant liquids produced. Additional quantities of natural gas plant liquids were produced; however, the royalties paid were based on the value of natural gas processed. These latter quantities are included with natural gas.

Notes: Total fossil fuels equals the sum of crude oil and lease condensate, natural gas plant liquids, natural gas, and coal. In addition, the sales volumes are reported for the fiscal year in which the sales occurred as opposed to the date of the royalty payment. Volumes include fossil fuels for which royalties were paid, as well as those amounts exempt from royalty payments, such as additions to the Strategic Petroleum Reserve.

Sources: **Physical Data:** U.S. Department of the Interior, Office of Natural Resources Revenue, ONRR Statistical Information Site (http://statistics.onrr.gov).

**Btu Data:** U.S. Energy Information Administration. Btu are calculated using average, calendar-year heat rates for production of each fossil fuel, as reported in the *Monthly Energy Review* (March 2015). The total Btu-content per fossil fuel is calculated by multiplying the physical data by the approximate heat content. The fossil fuel total is the sum of the total heat content for crude oil and lease condensate, natural gas plant liquids, natural gas, and coal.

**Percent of Total:** Percentages are calculated by dividing sales of production from Indian lands by total U.S. production, then multiplying by 100. Fiscal year values for total U.S. production are the sum of October-September values from the *Monthly Energy Review* (March 2015) and reflect EIA's current data updates.

## Sales from production on federal and Indian lands

### Federal lands

Coal represented 51% of fossil fuel sales from production on federal lands in FY 2014, measured in common Btu units, followed by crude oil and lease condensate (24%), natural gas (23%), and natural gas plant liquids (NGPL) (3%).   Total fossil fuels sales from production on federal lands decreased slightly from 15,999 trillion Btu in FY 2013 to 15,975 trillion Btu in FY 2014 (Table 1). On federal lands (only) in FY 2014:

- Sales of crude oil[5] from federal lands increased 6%, from 614 million barrels in FY 2013 to 651 million barrels in FY 2014.  Federal offshore and onshore oil production increased by 5% and 9%, respectively (Table 3). Despite this increase, crude oil production from federal lands as a share of total U.S. crude oil production decreased from 23% in FY 2013 to 21% in FY 2014. This decrease in the federal lands share of total production was the result of the 16% increase in total U.S. crude oil production.[6]
- Sales of natural gas from federal lands decreased 7%, from 3,835 billion cubic feet in FY 2013 to 3,551 billion cubic feet in FY 2014. Both offshore (11%) and onshore volumes (6%) declined (Table 4). Natural gas production on federal lands dropped to 14% of the U.S. total in FY 2014 from 16% in FY 2013. The largest portion of the drop in natural gas production on federal lands was from declines in the Gulf of Mexico and Wyoming.
- Sales of natural gas plant liquids (NGPL) produced on federal lands increased 8%, from 108 million barrels in FY 2013 to 117 million barrels in FY 2014. Both onshore (9%) and offshore volumes (7%) increased (Table 5). NGPL production from federal lands decreased from 12% to 11% of the U.S. total in FY 2014.
- Coal sales from production on federal lands increased slightly (0.2%) from 401 million short tons in FY 2013 to 402 million short tons in FY 2014 (Table 6). Coal produced on federal lands accounted for 41% of the U.S. total in FY 2014, up from 40% in FY 2013.

### Indian Lands

Coal represented 39% of fossil fuel sales from production on Indian lands in FY 2014, measured in common Btu units, followed by crude oil (33%), natural gas (26%), and NGPL (2%).  Total fossil fuels sales from production on Indian lands increased 6% from 916 trillion Btu in FY 2013 to 968 trillion Btu in FY 2014 (Table 2), as oil and NGPL production increased, natural gas production remained level, and coal production declined. On Indian lands (only) in FY 2014:

- Sales of crude oil produced on Indian lands increased 22%, increasing from 46 million barrels in FY 2013 to 56 million barrels in FY 2014 (Table 3). The increase in Indian lands oil production was attributable mostly to gains on tribal lands in North Dakota (Bakken formation) and, to a lesser extent, gains on tribal lands in New Mexico and Utah.
- Sales of natural gas from Indian lands remained at 241 billion cubic feet in FY 2014 (Table 4).

---

[5] Throughout this report, the term *crude oil* includes lease condensate.
[6] http://www.eia.gov/dnav/pet/pet_crd_crpdn_adc_mbblpd_a.htm.

- Sales of NGPL increased slightly and coal production decreased slightly on Indian lands in FY 2014, but these changes were negligible in the context of reported units (million short tons) in the tables of this report. Therefore, the production of NGPL and coal from Indian lands in FY 2014 matches that of FY 2013, 4 million barrels and 19 million short tons, respectively (Tables 5 and 6).

## Trends in federal and Indian lands production from FY 2003 through FY 2014

Overall fossil fuel production from federal lands generally declined between FY 2003 and FY 2014, down 21% in FY 2014 compared with FY 2003 (Table 1). This trend is primarily the result of a steady decline in federal offshore natural gas production between FY 2003 and FY 2014 and the 9% drop in coal production from federal lands from FY 2012 to FY 2013.

Conversely, overall fossil fuel production from Indian lands has risen since 2009 because of increasing crude oil and NGPL production. Total fossil fuels production on Indian lands in FY 2014 fell just short of surpassing the amount produced in FY 2003 (less than a 1% difference).

- Crude oil production from federal lands decreased 4% between FY 2003 and FY 2014 (Figure 1, Table 3). Production in the federal offshore declined 13% over that period, which outweighs the 49% increase in the federal onshore volumes over the same period. In FY 2014, the federal offshore still had the majority (77%) of total federal crude oil production, but its share declined compared with FY 2003 when it comprised 85% of all federal crude oil production.
- For the past six consecutive fiscal years, 2009-2014, oil production on Indian lands has increased (Figure 2). Between FY 2003 and FY 2014, oil production on Indian lands increased 460%.
- Natural gas production from federal lands has declined steadily, down 48% in FY 2014 from 2003(Figure 1, Table 4). The once-larger federal offshore volumes declined every year through FY 2014, down 76% from FY 2003.  That decrease was partially offset by the now-larger onshore volumes, which increased 9% over the same time period.  This declining natural gas production from federal lands, coupled with increasing total U.S. natural gas production[7], steadily reduced the federal lands share of total U.S. natural gas production.
- NGPL production from federal lands increased 26% between FY 2003 and FY 2014 (Figure 1, Table 5).  Following the natural gas trend, the once-larger federal offshore NGPL volumes declined 6%, while the now-larger onshore NGPL volumes increased 64% over the same period. NGPL production on Indian lands in FY 2014 was 4 million barrels, and while this level is twice the amount produced from Indian lands in FY 2003, it is a small volume compared with what was produced on federal lands (117 million barrels) in FY 2014.
- Federal land coal production declined 8% between FY 2003 and FY 2014 (Figure 1, Table 6). Coal production on Indian lands declined 37% over the same period.  U.S. total coal production was an estimated 1,072 million short tons in 2003 and declined to 997 million short tons in 2014 (a 7% decline). Coal production from federal and Indian lands totaled 421 million short tons (42% of the U.S. total) in FY 2014.

---

[7] http://www.eia.gov/dnav/ng/ng_prod_sum_dcu_NUS_a.htm.

*July 2015*

**Figure 1. Fossil fuel production on federal lands, FY 2003-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. ONNR Statistical Information Site (http://statistics.onrr.gov).

Total fossil fuel production from Indian lands increased each year since FY 2010.  Increases in oil production have almost completely offset the decreases in coal production and natural gas production between FY 2003 and FY 2014 (Table 2). The annual totals are less than 1% different, but the FY 2003 level was slightly higher.

- Crude oil production from Indian lands increased 460% from 10 million barrels in FY 2003 to 56 million barrels in FY 2014. Almost all of this increase took place since FY 2010 (Figure 2, Table 3), and mostly in North Dakota (primarily the Fort Berthold Indian Reservation in the western part of the state, part of the Bakken/Three Forks tight oil play).
- Natural gas production and coal production from Indian lands declined between FY 2003 and FY 2014 by 15% and 37%, respectively. Except for a small deviation in FY 2011, natural gas and coal production have steadily declined since FY 2005 (Figure 2).

*July 2015*

**Figure 2. Fossil fuel production on Indian lands, FY 2003-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

## State/offshore trends

The federal government owns nearly 650 million acres of land—almost 30% of the land area of the United States (Figure 3). Four agencies—the National Park Service, the Fish and Wildlife Service, the Bureau of Land Management (BLM) in the Department of the Interior, and the U.S. Forest Service in the Department of Agriculture—administer about 95% of those federally owned lands.[8],[9]

---

[8] Federal Land Ownership: Current Acquisition and Disposal Authorities, Congressional Research Service, December 13, 2012, found at https://www.fas.org/sgp/crs/misc/RL34273.pdf.

[9] Maps of the various kinds of federal lands can be seen at http://nationalatlas.gov/printable/fedlands.html.

*July 2015*

**Figure 3. Onshore federal and Indian lands**



Source: Produced by U.S. Energy Information Administration from Federal Lands and Bureau of Indian Affairs map layers at http://nationalatlas.gov/maplayers.html?openChapters=chpbound#chpbound

Most production of fossil fuels from federal and Indian lands falls under the purview of BLM. BLM manages 248 million acres and is responsible for 700 million acres of subsurface mineral resources.[10]

Federal land ownership is heavily concentrated in 12 western states:

- 62% of Alaska is federally owned.

---

[10] Federal Land Ownership: Overview and Data, Congressional Research Service, February 8, 2012, found at https://www.fas.org/sgp/crs/misc/R42346.pdf.

- 47% of the 11 western states[11] in the Lower 48 states is federally owned. In calendar year 2013, those 11 western states represented approximately 20% of total U.S. reserves of crude oil and lease condensate and 23% of total U.S. reserves of wet natural gas.[12]  Wyoming, Montana, Colorado, Utah, and New Mexico are the leading states producing fossil fuels from federal and Indian lands.
- Only 4% of the total area of all  the other states combined is federally owned.

Indian lands are primarily in the western United States, with concentrations in the four corners region of Arizona, New Mexico, Colorado, and Utah; North and South Dakota; and a few other states (Figure 3).

Figures 4 through 8 provide summary information for production from federal and Indian lands for leading states and offshore areas.  Complete state-level data on production from federal and Indian lands are provided in Tables 7 through11.[13]  The relative and absolute contribution of each state and offshore region in federal and Indian lands production varies significantly across fuels.  Some notable observations include:

- Wyoming and the federal Gulf of Mexico together produced 72% of the federal and Indian lands fossil fuels total in FY 2014 (Table 7, Figure 4). New Mexico, Colorado, and Utah were the next largest production states.
- The federal Gulf of Mexico produced 67% of the federal and Indian lands crude oil total in FY 2014 (Figure 5, Table 8). New Mexico, North Dakota, and Wyoming were the next largest crude oil producers on federal and Indian lands.
- Wyoming, the federal Gulf of Mexico, New Mexico, and Colorado together represented 86% of total production of natural gas on federal and Indian lands in FY 2014 (Figure 6, Table 9).
- The federal Gulf of Mexico, New Mexico, and Wyoming together produced 82% of NGPL from federal and Indian lands NGPL in FY 2014 (Figure 7, Table 10).
- Production of coal on federal and Indian lands is dominated by Wyoming, which accounted for 80% of the total in FY 2014 (Figure 8, Table11). Montana, Colorado, Utah, and New Mexico were the next biggest coal producers on federal and Indian lands. In FY 2014, coal production in Montana increased by 3 million short tons, and New Mexico production decreased by 2 million short tons.

---

[11] Montana, Wyoming, Colorado, New Mexico, Idaho, Utah, Arizona, Washington, Oregon, Nevada, and California.

[12] U.S. Crude Oil and Natural Gas Proved Reserves, 2013, Tables 6 and 10, EIA, December 2014, found at http://www.eia.gov/naturalgas/crudeoilreserves/.

[13] The Appendix presents information from these tables in the form of maps of the latest state-level production levels and changes.

*July 2015*

**Figure 4. Fossil fuel production on federal and Indian lands, FY 2003-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

## Data sources

U.S. Department of Interior program offices continually collect sales and royalty payment data on fossil fuel sales of production from federal and Indian lands. Near the end of the first quarter of each calendar year, ONRR issues the sales data it collected for the previous sales year. Sales are assigned to the fiscal year in which they occur, not necessarily the same year royalties were collected. Audits conducted by ONNR result in revisions to data previously reported.

This report is based on information reported to and processed by ONRR as of March 31, 2015. ONRR updates the data values it reports for prior years. The recently updated data provided by ONRR for FY 2003 through FY 2014 generally fall within 2% of the volumes EIA reported previously, although updates for some NGPL volumes slightly exceeded that threshold (e.g., FY 2013 NGPL production volume was revised upward 3.3% in May 2013).

Additional data, background information, and discussions of methodology and key drivers contributing to trends in sales from production on federal lands during the FY 2003 through FY 2013 period are available in *Sales of Fossil Fuels Produced on Federal and Indian Lands, FY 2003 through 2013* and on the ONRR website.

*July 2015*

The following table shows the fuels (commodities) listed on the ONRR website and the associated products, which were included in this report:

| Fuel (commodity) | Product |
|---|---|
| Coal | Coal |
| | Coal-Bituminous-Raw |
| Natural Gas | Coal Bed Methane |
| | Flash Gas |
| | Fuel Gas |
| | Gas Lost - Flared or Vented |
| | Processed (Residue) Gas |
| | Unprocessed (Wet) Gas |
| NGPL | Gas Plant Products |
| Oil | Condensate |
| | Drip or Scrubber Condensate |
| | Fuel Oil |
| | Inlet Scrubber |
| | Oil |
| | Oil Lost |
| | Other Liquid Hydrocarbons |

*July 2015*

**Figure 5. Crude oil production on federal and Indian lands, FY 2003-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

### Figure 6. Natural gas production on federal and Indian lands, FY 2003-14



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

**Figure 7. Natural gas liquids production on federal and Indian lands, FY 2003-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

**Figure 8. Coal production on federal and Indian lands, FY 2003-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

## Table 3. Sales of crude oil and lease condensate production from federal and Indian lands, FY 2003-14

million barrels

| Fiscal Year | Offshore Federal | Onshore Federal | Total Federal | Indian Lands |
|---|---|---|---|---|
| 2003 | 579 | 100 | 679 | 10 |
| 2004 | 572 | 97 | 670 | 10 |
| 2005 | 541 | 96 | 638 | 10 |
| 2006 | 471 | 100 | 571 | 10 |
| 2007 | 514 | 104 | 618 | 10 |
| 2008 | 462 | 103 | 565 | 10 |
| 2009 | 544 | 105 | 649 | 10 |
| 2010 | 616 | 108 | 724 | 13 |
| 2011 | 532 | 113 | 645 | 20 |
| 2012 | 476 | 125 | 601 | 31 |
| 2013 | 476 | 137 | 614 | 46 |
| 2014 | 502 | 149 | 651 | 56 |

Notes: Totals may not equal sum of components because of independent rounding. Onshore federal excludes volumes on Indian lands. Offshore federal only includes areas in federal waters.
Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONRR Statistical Information Site" (http://statistics.onrr.gov).

## Table 4. Sales of natural gas production from federal and Indian lands, FY 2003-14

billion cubic feet

| Fiscal Year | Offshore Federal | Onshore Federal | Total Federal | Indian Lands |
|---|---|---|---|---|
| 2003 | 4,522 | 2,276 | 6,798 | 283 |
| 2004 | 4,025 | 2,351 | 6,376 | 312 |
| 2005 | 3,523 | 2,534 | 6,057 | 327 |
| 2006 | 2,754 | 2,619 | 5,373 | 308 |
| 2007 | 2,700 | 2,857 | 5,557 | 284 |
| 2008 | 2,483 | 3,049 | 5,532 | 272 |
| 2009 | 2,213 | 3,167 | 5,380 | 266 |
| 2010 | 2,080 | 3,006 | 5,086 | 251 |
| 2011 | 1,692 | 2,896 | 4,588 | 254 |
| 2012 | 1,374 | 2,887 | 4,261 | 253 |
| 2013 | 1,198 | 2,637 | 3,835 | 241 |
| 2014 | 1,069 | 2,482 | 3,551 | 241 |

Notes: Totals may not equal sum of components because of  independent rounding.  Onshore federal excludes volumes on Indian lands. Offshore federal only includes areas in federal waters.
Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONRR Statistical Information Site" (http://statistics.onrr.gov).

**Table 5.  Sales of natural gas plant liquids production from federal and Indian lands, FY 2003-14**

million barrels

| Fiscal Year | Offshore Federal | Onshore Federal | Total Federal | Indian Lands |
|---|---|---|---|---|
| 2003 | 51 | 42 | 93 | 2 |
| 2004 | 62 | 41 | 104 | 2 |
| 2005 | 56 | 40 | 96 | 2 |
| 2006 | 46 | 39 | 85 | 2 |
| 2007 | 59 | 44 | 103 | 3 |
| 2008 | 53 | 50 | 103 | 3 |
| 2009 | 45 | 47 | 93 | 3 |
| 2010 | 58 | 73 | 131 | 3 |
| 2011 | 52 | 79 | 131 | 3 |
| 2012 | 45 | 85 | 130 | 4 |
| 2013 | 45 | 63 | 108 | 4 |
| 2014 | 48 | 69 | 117 | 4 |

Notes: Totals may not equal sum of components because of independent rounding.  Onshore federal excludes volumes on Indian lands. Offshore federal only includes areas in federal waters.
Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

**Table 6.  Sales of coal from federal and Indian lands, FY 2003-14**

million short tons

| Fiscal Year | Federal | Indian Lands |
|---|---|---|
| 2003 | 436 | 30 |
| 2004 | 451 | 33 |
| 2005 | 447 | 34 |
| 2006 | 429 | 29 |
| 2007 | 443 | 27 |
| 2008 | 483 | 26 |
| 2009 | 462 | 26 |
| 2010 | 457 | 22 |
| 2011 | 447 | 22 |
| 2012 | 442 | 19 |
| 2013 | 401 | 19 |
| 2014 | 402 | 19 |

Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

### Table 7. Sales of fossil fuel production from federal and Indian lands by state/area, FY 2003-14

trillion Btu

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 75 | 57 | 51 | 47 | 40 | 42 | 60 | 88 | 86 | 71 | 46 | 29 |
| Alaska | 61 | 66 | 68 | 52 | 32 | 28 | 27 | 23 | 21 | 19 | 18 | 21 |
| Arizona | 258 | 273 | 280 | 193 | 180 | 162 | 157 | 154 | 164 | 163 | 167 | 158 |
| Arkansas | 7 | 8 | 10 | 10 | 10 | 11 | 15 | 18 | 14 | 13 | 11 | 11 |
| California | 141 | 125 | 124 | 139 | 146 | 129 | 116 | 115 | 121 | 125 | 121 | 119 |
| Colorado | 785 | 842 | 960 | 906 | 905 | 931 | 846 | 868 | 917 | 952 | 875 | 877 |
| Florida | 0 | - | - | - | - | - | - | - | - | - | - | - |
| Illinois | 0 | - | - | - | - | - | - | - | - | - | - | - |
| Indiana | 0 | - | - | - | - | - | - | - | - | - | - | - |
| Kansas | 12 | 11 | 11 | 12 | 10 | 10 | 10 | 9 | 8 | 7 | 7 | 6 |
| Kentucky | 0 | - | - | 6 | 18 | 8 | 4 | 1 | 3 | 5 | 6 | - |
| Louisiana | 225 | 245 | 188 | 164 | 167 | 162 | 146 | 127 | 116 | 111 | 106 | 88 |
| Michigan | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 2 | 2 | 2 | 1 |
| Mississippi | 19 | 19 | 18 | 16 | 16 | 17 | 14 | 13 | 13 | 12 | 12 | 10 |
| Montana | 612 | 684 | 722 | 661 | 723 | 727 | 662 | 659 | 612 | 576 | 515 | 580 |
| Nebraska | 0 | - | 1 | 2 | 1 | - | - | - | - | - | - | - |
| Nevada | 3 | 3 | 3 | 2 | 2 | 2 | 3 | 3 | 2 | 2 | 2 | 2 |
| New Mexico | 1,823 | 1,750 | 1,696 | 1,627 | 1,570 | 1,474 | 1,447 | 1,333 | 1,339 | 1,365 | 1,408 | 1,403 |
| New York | 0 | - | - | - | - | - | - | - | - | - | - | - |
| North Dakota | 70 | 92 | 88 | 111 | 121 | 126 | 77 | 83 | 165 | 291 | 387 | 469 |
| Offshore Gulf | 7,570 | 7,086 | 6,484 | 5,289 | 5,553 | 5,046 | 5,235 | 5,587 | 4,713 | 4,078 | 3,907 | 3,949 |
| Offshore Pacific | 170 | 156 | 145 | 144 | 138 | 131 | 129 | 123 | 107 | 92 | 98 | 97 |
| Ohio | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | - |
| Oklahoma | 56 | 57 | 56 | 57 | 59 | 57 | 60 | 60 | 63 | 63 | 62 | 63 |
| Pennsylvania | 0 | - | - | - | - | - | - | - | - | - | - | - |
| South Dakota | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 1 | 1 |
| Texas | 119 | 113 | 90 | 87 | 87 | 67 | 64 | 49 | 54 | 76 | 62 | 50 |
| Utah | 586 | 637 | 677 | 654 | 621 | 647 | 622 | 632 | 570 | 734 | 733 | 738 |
| Virginia | 0 | - | 1 | 1 | - | - | - | - | - | - | - | - |
| Washington | 4 | - | - | - | - | - | - | - | - | - | - | - |
| West Virginia | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | - | - | - |
| Wyoming | 8,596 | 8,863 | 8,813 | 8,653 | 9,197 | 10,198 | 10,048 | 9,908 | 9,665 | 9,331 | 8,369 | 8,270 |
| **Total** | **21,200** | **21,096** | **20,493** | **18,841** | **19,607** | **19,984** | **19,748** | **19,859** | **18,760** | **18,091** | **16,915** | **16,944** |

Note: Totals may not equal sum of components because of independent rounding.

Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONRR Statistical Information Site" (http://statistics.onrr.gov)

*July 2015*

**Table 8. Sales of crude oil and lease condensate production from federal and Indian lands by state/area, FY 2003-14**

million barrels

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 4 | 5 | 5 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California | 23 | 21 | 21 | 23 | 24 | 21 | 19 | 19 | 19 | 19 | 19 | 19 |
| Colorado | 4 | 4 | 5 | 6 | 5 | 5 | 5 | 4 | 4 | 5 | 4 | 5 |
| Florida | 0 | - | - | - | - | - | - | - | - | - | - | - |
| Illinois | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana | 13 | 13 | 8 | 7 | 7 | 7 | 7 | 7 | 6 | 7 | 7 | 6 |
| Michigan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 3 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 32 | 30 | 26 | 25 | 25 | 26 | 28 | 31 | 35 | 42 | 51 | 59 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 6 | 6 | 6 | 7 | 7 | 7 | 8 | 12 | 19 | 34 | 48 | 57 |
| Offshore Gulf | 531 | 527 | 502 | 435 | 480 | 430 | 513 | 587 | 505 | 452 | 451 | 477 |
| Offshore Pacific | 23 | 22 | 20 | 20 | 19 | 19 | 19 | 18 | 16 | 14 | 15 | 15 |
| Ohio | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| Pennsylvania | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| Utah | 10 | 10 | 12 | 13 | 14 | 16 | 17 | 18 | 19 | 20 | 21 | 24 |
| Virginia | - | - | - | - | - | - | - | - | - | - | - | - |
| Washington | - | - | - | - | - | - | - | - | - | - | - | - |
| West Virginia | - | - | - | 0 | - | - | - | - | - | - | - | - |
| Wyoming | 34 | 34 | 34 | 35 | 36 | 36 | 35 | 35 | 35 | 35 | 36 | 38 |
| **Total** | **689** | **680** | **648** | **581** | **628** | **575** | **659** | **738** | **665** | **633** | **660** | **706** |

Note: Totals may not equal sum of components because of independent rounding.
Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

## Table 9. Sales of natural gas production from federal and Indian lands by state/area, FY 2003-14

billion cubic feet

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 71 | 53 | 48 | 44 | 36 | 34 | 30 | 32 | 27 | 20 | 21 | 20 |
| Alaska | 35 | 37 | 40 | 35 | 28 | 25 | 24 | 20 | 16 | 16 | 13 | 13 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | - |
| Arkansas | 7 | 8 | 9 | 10 | 10 | 10 | 15 | 18 | 14 | 12 | 11 | 10 |
| California | 6 | 5 | 5 | 7 | 7 | 7 | 7 | 7 | 10 | 13 | 8 | 8 |
| Colorado | 290 | 348 | 406 | 404 | 412 | 424 | 431 | 425 | 461 | 487 | 469 | 465 |
| Florida | - | - | - | - | - | - | - | - | - | - | - | - |
| Illinois | - | - | - | - | - | - | - | - | - | - | - | - |
| Indiana | - | - | - | - | - | - | - | - | - | - | - | - |
| Kansas | 11 | 10 | 9 | 8 | 8 | 8 | 7 | 7 | 6 | 5 | 4 | 4 |
| Kentucky | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana | 140 | 161 | 132 | 116 | 111 | 108 | 96 | 79 | 72 | 66 | 61 | 49 |
| Michigan | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 2 | 2 | 2 | 2 | 1 |
| Mississippi | 15 | 16 | 15 | 13 | 14 | 15 | 12 | 11 | 11 | 10 | 9 | 8 |
| Montana | 22 | 26 | 30 | 34 | 34 | 33 | 31 | 27 | 23 | 18 | 14 | 13 |
| Nebraska | 0 | - | 1 | 2 | 1 | 0 | 0 | - | 0 | 0 | 0 | 0 |
| Nevada | - | - | - | - | - | - | - | - | - | - | - | - |
| New Mexico | 1,005 | 997 | 986 | 966 | 926 | 875 | 848 | 792 | 760 | 735 | 704 | 688 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 8 | 8 | 9 | 10 | 10 | 9 | 9 | 9 | 10 | 15 | 22 | 31 |
| Offshore Gulf | 4,194 | 3,706 | 3,277 | 2,533 | 2,495 | 2,304 | 2,046 | 1,934 | 1,569 | 1,270 | 1,103 | 986 |
| Offshore Pacific | 32 | 27 | 25 | 26 | 25 | 21 | 20 | 20 | 15 | 12 | 12 | 11 |
| Ohio | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma | 32 | 32 | 32 | 35 | 33 | 33 | 38 | 39 | 40 | 41 | 38 | 39 |
| Pennsylvania | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas | 108 | 102 | 80 | 76 | 75 | 58 | 57 | 43 | 47 | 69 | 56 | 45 |
| Utah | 135 | 147 | 188 | 209 | 243 | 270 | 300 | 280 | 289 | 315 | 290 | 274 |
| Virginia | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington | - | - | - | - | - | - | - | - | - | - | - | - |
| West Virginia | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Wyoming | 964 | 997 | 1,083 | 1,144 | 1,366 | 1,563 | 1,670 | 1,590 | 1,468 | 1,406 | 1,238 | 1,125 |
| **Total** | **7,081** | **6,688** | **6,383** | **5,681** | **5,841** | **5,804** | **5,646** | **5,337** | **4,843** | **4,514** | **4,076** | **3,792** |

Note: Totals may not equal sum of components because of independent rounding.

Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONRR Statistical Information Site" (http://statistics.onrr.gov).

**Table 10. Sales of natural gas plant liquids production from federal and Indian lands by state/area, FY 2003-14**

million barrels

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - | - | - | 0 |
| Arizona | - | - | - | - | - | - | 0 | 0 | 0 | 0 | - | - |
| Arkansas | - | - | - | - | - | - | - | - | - | - | - | - |
| California | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 1 | 1 | 1 | 1 | 1 | 3 | 5 | 8 | 9 | 11 | 6 | 7 |
| Florida | - | - | - | - | - | - | - | - | - | - | - | - |
| Illinois | - | - | - | - | - | - | - | - | - | - | - | - |
| Indiana | - | - | - | - | - | - | - | - | - | - | - | - |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky | - | - | - | - | - | - | 0 | 0 | 0 | - | - | - |
| Louisiana | 1 | 2 | 2 | 1 | 3 | 3 | 2 | 2 | 1 | 1 | 1 | 1 |
| Michigan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi | 0 | 0 | - | - | - | - | - | - | - | 0 | 0 | - |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | - | - | - | - | - | 0 | - | - | - | - | - | - |
| Nevada | - | - | - | - | - | - | - | - | - | - | - | - |
| New Mexico | 31 | 32 | 31 | 30 | 31 | 31 | 30 | 31 | 32 | 32 | 31 | 31 |
| New York | - | - | - | - | - | - | - | - | - | - | - | - |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 |
| Offshore Gulf | 49 | 60 | 54 | 44 | 55 | 50 | 43 | 55 | 50 | 43 | 43 | 45 |
| Offshore Pacific | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio | - | - | - | - | - | - | - | - | - | 0 | 0 | - |
| Oklahoma | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| Pennsylvania | - | - | - | - | - | - | - | - | - | 0 | 0 | 0 |
| South Dakota | - | - | - | - | - | - | - | - | - | - | - | - |
| Texas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 1 | 1 | 1 | 1 | 1 | 2 | 4 | 5 | 6 | 8 | 7 | 8 |
| Virginia | - | - | - | - | - | - | - | - | - | - | - | - |
| Washington | - | - | - | - | - | - | - | - | - | - | - | - |
| West Virginia | - | - | - | - | - | - | - | - | - | - | - | - |
| Wyoming | 9 | 8 | 8 | 8 | 12 | 15 | 11 | 31 | 34 | 35 | 20 | 23 |
| **Total** | **94** | **105** | **98** | **87** | **106** | **106** | **95** | **134** | **134** | **133** | **112** | **121** |

Note: Totals may not equal sum of components because of independent rounding.

Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

## Table 11. Sales of coal production from federal and Indian lands by state/area, FY 2003-14

million short tons

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 3 | 2 | 1 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 13 | 13 | 14 | 9 | 9 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| Arkansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 22 | 22 | 25 | 22 | 22 | 23 | 18 | 19 | 19 | 19 | 17 | 17 |
| Florida | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 28 | 31 | 33 | 30 | 33 | 33 | 30 | 30 | 28 | 27 | 24 | 27 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 24 | 21 | 20 | 19 | 17 | 15 | 15 | 11 | 12 | 12 | 14 | 12 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 1 | 2 | 2 | 3 | 3 | 4 | 1 | 0 | 2 | 4 | 4 | 5 |
| Offshore Gulf | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Offshore Pacific | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 |
| Pennsylvania | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 19 | 21 | 20 | 18 | 14 | 14 | 10 | 11 | 7 | 13 | 14 | 14 |
| Virginia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 359 | 372 | 367 | 356 | 371 | 411 | 404 | 396 | 389 | 374 | 337 | 337 |
| **Total** | **466** | **484** | **482** | **458** | **471** | **509** | **488** | **478** | **470** | **461** | **420** | **421** |

Note: Totals may not equal sum of components because of independent rounding.
Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONRR Statistical Information Site" (http://statistics.onrr.gov).

# Map Appendix

## State/area maps

### Figure A1. Fossil fuel production on federal and Indian lands, FY 2014



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

## Figure A2. Changes in fossil fuels production (trillion Btu) on federal and Indian lands, FY 2013-14



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

**Figure A3. Crude oil production on federal and Indian lands, FY 2014**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

## Figure A4. Changes in crude oil production on federal and Indian lands, FY 2013-14



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

**Figure A5. Natural gas production on federal and Indian lands, FY 2014**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

**Figure A6. Changes in natural gas production on federal and Indian lands, FY 2013-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

### Figure A7. Natural gas liquids production on federal and Indian lands, FY 2014



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

## Figure A8. Changes in natural gas liquids production on federal and Indian lands, FY 2013-14



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

**Figure A9.  Coal production on federal and Indian lands, FY 2014**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).

*July 2015*

**Figure A10. Changes in coal production on federal and Indian lands by state, FY 2013-14**



Source: U.S. Energy Information Administration based on U.S. Department of the Interior, Office of Natural Resources Revenue. "ONNR Statistical Information Site" (http://statistics.onrr.gov).



THE SECRETARY OF THE INTERIOR

WASHINGTON

ORDER NO. 3289

Subject: Addressing the Impacts of Climate Change on America's Water, Land, and Other
Natural and Cultural Resources

Sec. 1 **Purpose and Background**. Secretarial Order No. 3285, issued on March 11, 2009, made
production and transmission of renewable energy on public lands a priority for the Department.
This Order establishes a Department-wide approach for applying scientific tools to increase
understanding of climate change and to coordinate an effective response to its impacts on tribes
and on the land, water, ocean, fish and wildlife, and cultural heritage resources that the
Department manages. This Order replaces Secretarial Order No. 3226, Amendment No. 1,
issued on January 16, 2009, and reinstates the provisions of Secretarial Order No. 3226, issued
on January 19, 2001.

To fulfill our nation's vision for a clean energy economy, Interior is now managing America's
public lands and oceans not just for balanced oil, natural gas, and coal development, but also –
for the first time ever – to promote environmentally responsible renewable energy development.
Sun, wind, biomass, and geothermal energy from our public and tribal lands is creating new jobs
and will power millions of American homes and electric vehicles.

The Department is also taking the lead in protecting our country's water, land, fish and wildlife,
and cultural heritage and tribal lands and resources from the dramatic effects of climate change
that are already occurring – from the Arctic to the Everglades. The realities of climate change
require us to change how we manage the land, water, fish and wildlife, and cultural heritage and
tribal lands and resources we oversee. For example:

- New water management imperatives associated with climate change may require
  restoration of natural systems and construction of new infrastructure to reduce new flood
  risks or to capture early run-off.
- Strategies to address sea level rise may require acquisition of upland habitat and creation
  of wetlands and other natural filters and barriers to protect against sea level rise and
  storm surges. It may be necessary to relocate certain iconic and culturally historic
  structures.
- Shifting wildlife and habitat populations may require investments in new wildlife
  corridors.
- New invasions of exotic species and new wildland fire threats due to longer fire seasons
  and more severe droughts will require innovation and more effective ways of managing
  the Department's resources.

The Department of the Interior, with its 67,000 employees and scientific and resource management expertise, is responsible for helping protect the nation from the impacts of climate change. In particular the Department must:

- Adapt its water management strategies to address the possibility of shrinking water supplies and more frequent and extended droughts to continue to supply drinking water to more than 31 million people and irrigation water to 140,000 farmers.
- Wisely manage millions of acres of parks, refuges and other public lands, and prudently exercise its shared responsibility for managing the 1.7 billion acres of the U.S. outer continental shelf.
- Conserve and manage fish and wildlife resources, including over 800 native migratory bird species and nearly 2,000 federally listed threatened and endangered species.
- Protect cultural and archaeological resources and iconic structures that may be affected by climate change.
- Address the impacts of climate change on American Indians and Alaska Natives, for whom the Department holds trust responsibilities on behalf of the Federal government.
- Continue to provide state-of-the art science to better understand the impacts of climate change and to develop science-based adaptive management strategies for natural and cultural resource managers.
- Continue its work to quantify the amount of carbon stored in our forests, wetlands, and grasslands, identifying areas where carbon dioxide can be safely stored underground, and ways to reduce the Department's carbon footprint.

Sec. 2 **Authority**. This Order is issued under the authority of Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended.

Sec. 3 **Coordinating the Department's Response to Climate Change Impacts on Our Resources**. This Order establishes a *Climate Change Response Council* within the Office of the Secretary that will execute a coordinated Department-wide strategy to increase scientific understanding of and development of effective adaptive management tools to address the impacts of climate change on our natural and cultural resources. The Climate Change Response Council will be composed of the Secretary (Chair), Deputy Secretary (Vice-Chair), Counselor to the Secretary (Vice-Chair), Assistant Secretaries, Bureau Directors and the Solicitor. The Council will help coordinate activities within and among the Department's agencies and bureaus to develop and implement an integrated strategy for responding to climate change impacts involving the resources managed by the Department. The Department's Climate Change Response Council will also coordinate its climate change activities with all relevant Federal Departments and agencies including, but not limited to, the Council on Environmental Quality, the Office of Energy and Climate Change, the Office of Science and Technology Policy, the National Science and Technology Council, the Department of Agriculture, the Department of Commerce, the Department of Defense, and the Environmental Protection Agency.

The Climate Change Response Council will implement Department-specific climate change activities through the following mechanisms:

(a)    Climate Change Response Planning Requirements. Each bureau and office of the Department must consider and analyze potential climate change impacts when undertaking long-

2

range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview. These requirements were set forth in Secretarial Order No. 3226, and remain in effect. The organizational changes made by this Order will enable the bureaus and agencies to fulfill these planning requirements.

(b)   DOI Regional Climate Change Response Centers.  Management decisions made in response to climate change impacts must be informed by science and require that scientists work in tandem with those managers who are confronting climate change impacts and evaluating options to respond to such impacts. Pursuant to P.L. 110-161, the United States Geological Survey (USGS) has been developing regional science centers to provide climate change impact data and analysis geared to the needs of fish and wildlife managers as they develop adaptation strategies in response to climate change. These centers are currently known as "regional hubs" of the National Climate Change and Wildlife Science Center, and are being developed in close collaboration with Interior agencies and other federal, state, university, and non-governmental partners.

The Climate Change Response Council will work with USGS and other Department bureaus to rename these regional science centers as Regional Climate Change Response Centers and broaden their mandate to encompass other climate-change-related impacts on Departmental resources. These eight Response Centers will synthesize and integrate climate change impact data and develop tools that the Department's managers and partners can use when managing the Department's land, water, fish and wildlife, and cultural heritage resources.

(c)   Landscape Conservation Cooperatives.  Given the broad impacts of climate change, management responses to such impacts must be coordinated on a landscape-level basis. For example, wildlife migration and related needs for new wildlife corridors, the spread of invasive species and wildfire risks, typically will extend beyond the borders of National Wildlife Refuges, BLM lands, or National Parks. Additionally, some bureau responsibilities (e.g., Fish and Wildlife Service migratory bird and threatened and endangered species responsibilities) extend nationally and globally. Because of the unprecedented scope of affected landscapes, Interior bureaus and agencies must work together, and with other federal, state, tribal and local governments, and private landowner partners, to develop landscape-level strategies for understanding and responding to climate change impacts. Interior bureaus and agencies, guided by the Climate Response Council, will work to stimulate the development of a network of collaborative "Landscape Conservation Cooperatives." These cooperatives, which already have been formed in some regions, will work interactively with the relevant DOI Regional Climate Change Response Center(s) and help coordinate adaptation efforts in the region.

Sec. 4  **Additional Departmental Action to Mitigate Climate Change**.  In accordance with Secretarial Order No. 3285, the Department has prioritized development of renewable energy on public lands and offshore waters to reduce our dependence on foreign oil and to reduce greenhouse gas pollution. This Order establishes two additional projects to mitigate climate change:  the DOI Carbon Storage Project, and the DOI Carbon Footprint Project. Additional mitigation projects will be encouraged and supported by the Climate Change Response Council.

3

(a)   The DOI Carbon Storage Project. This project is being implemented under P.L. 110-140, "The Energy Independence and Security Act of 2007," which gives the Department statutory responsibility to develop carbon sequestration methodologies for geological (i.e., underground) and biological (e.g., forests and rangelands) carbon storage. The USGS has the lead in administering the Carbon Storage Project, but will work closely with other bureaus and agencies in the Department and external partners to enhance carbon storage in geologic formations and in plants and soils in a manner consistent with the Department's responsibility to provide comprehensive, long-term stewardship of its resources. The DOI Carbon Storage Project is vital for successful domestic and global geological and biological carbon sequestration efforts.

(b)   The DOI Carbon Footprint Project. The project will develop a unified greenhouse gas emission reduction program, including setting a baseline and reduction goal for the Department's greenhouse gas emissions and energy use. The Assistant Secretary for Policy, Management and Budget will have the lead in administering the DOI Carbon Footprint Project, with the cooperation of all of the Department's agencies and bureaus.

Sec. 5  **American Indians and Alaska Natives**. Climate change may disproportionately affect tribes and their lands because they are heavily dependent on their natural resources for economic and cultural identity. As the Department has the primary trust responsibility for the Federal government for American Indians, Alaska Natives, and tribal lands and resources, the Department will ensure consistent and in-depth government-to-government consultation with tribes and Alaska Natives on the Department's climate change initiatives. Tribal values are critical to determining what is to be protected, why, and how to protect the interests of their communities. The Department will support the use of the best available science, including traditional ecological knowledge, in formulating policy pertaining to climate change. The Department will also support substantive participation by tribes in deliberations on climate-related mechanisms, agreements, rules, and regulations.

Sec. 6  **Implementation**. The Deputy Secretary is responsible for ensuring implementation of all aspects of this Order. This responsibility may be delegated as appropriate. This Order does not alter or affect any existing duty or authority of individual bureaus.

Sec. 7  **Effective Date**. This Order is effective immediately and will remain in effect until its provisions are converted to the Departmental Manual or until it is amended, superseded, or revoked, whichever occurs first.

Ken Salazar

Secretary of the Interior

Date:   SEP 1 4 2009

4



U.S. Department of the Interior
Bureau of Land Management

# News Release

BLM Colorado

**FOR IMMEDIATE RELEASE: May 27, 2016**
**Contact:  Shannon Borders, 970-240-5399**

### BLM Releases Draft Management Plan for Land and Mineral
### Estate Managed by Uncompahgre Field Office in Southwest Colorado

**MONTROSE, Colo. –**The Bureau of Land Management's Uncompahgre Field Office today announced the release of a draft plan for managing BLM-administered surface land and mineral estate in southwestern Colorado. The Draft Resource Management Plan Revision (RMP) features a wide range of alternatives reflecting different visions for administering these lands and seeks public review and comment to help refine the draft into a final plan to guide the overall management of these resources for the next two decades. The 90-day comment period on the draft will begin on June 3, 2016, with the publication of a Notice of Availability by the Environmental Protection Agency.

"We have worked with partners in 25 communities to develop the range of alternatives in this draft plan, including a community vision for the North Fork Valley," said Dana Wilson, Acting BLM Uncompahgre Field Manager. "These are some of the public's most spectacular landscapes, from canyon country to the foothills of the West Elk Mountains and Grand Mesa, providing recreational opportunities, wildlife habitat, forage for grazing and energy resources."

The Draft RMP will guide the management of about 675,800 acres of BLM-administered surface lands and 971,220 acres of federal mineral estate. Up to 2,650 jobs and $565 million in regional economic production could be generated annually from these public lands, including recreation, agriculture and energy development.

The plan analyzes the impacts of a wide range of possible alternatives. The BLM is required to identify a Preferred Alternative, but any of the management actions analyzed in these alternatives could become part of the Proposed RMP, which BLM will develop after analyzing the public comments on the Draft RMP.

The Proposed RMP for the Uncompahgre Field Office is scheduled for release in 2017. The BLM's Preferred Alternative emphasizes balancing resources and resource use among competing human interests, land uses and the conservation of natural and cultural resource values while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses.

The Uncompahgre Field Office currently operates under the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP. These plans typically last about 20 years and are revised to address changing environmental conditions and technological developments and to determine if management decisions contained within them are still current and adequate.

The BLM began the formal public scoping process for this draft plan on February 25, 2010, with the publication of the Notice of Intent in the *Federal Register*. The initial public scoping period closed March 29, 2010. The BLM hosted seven open houses to provide the public with opportunities to become involved, learn about the project and the planning process, meet the Uncompahgre Draft RMP team members, and offer comments. During the initial public scoping period, the BLM received 214 unique written submissions containing 2,496 separate comments. The issues identified during public scoping and outreach helped refine the development of alternatives for consideration in the Draft RMP.

This draft RMP also incorporates changes that have occurred since public scoping in 2010:  the Gunnison Sage-Grouse has been listed as threatened; coal, oil and gas activity in the planning area have decreased due to market forces; and the North Fork oil and gas sub-alternative has been analyzed within the RMP framework.

With respect to mineral development activities, the preferred alternative generally maintains the total area open to oil and gas leasing, however, it increases the area subject to no surface occupancy or controlled surface use stipulations in order to ensure that the development that occurs happens in a manner that protects important resource values. For the Draft RMP does not consider new areas for coal leasing, but the estimate of potential coal resources in the area has increased as compared to the RMP currently in place based on new information regarding the extent and recoverability of the coal resources in the planning area. This revised resource assessment does not impact production estimates, given that the vast majority of the newly identified coal resources are not in areas currently under production, are not of high quality and likely not economically recoverable. Production estimates were used to consider the impacts of potential greenhouse gas emissions, which have become increasingly important considerations in public land management decisions.

Additionally, the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application. The purpose of the RMPs is to provide balanced management of all of the resources in the area including wildlife habitat, ranching, recreation, conservation and mineral development. Several other processes, as well as compliance with Secretarial Order 3338, which orders a comprehensive review of the federal coal program, would be necessary before any additional coal leasing could occur.

In addition to Secretarial Order 3338, the Interior Department is working separately to pursue additional reforms to the federal coal program. These include proposals – such as the Stream Protection Rule – to address the environmental impacts of coal mining – and the Office of Natural Resource Revenue valuation rules – to make sure American taxpayers are getting a fair return on the coal resources managed by the federal government.

During the 90-day public comment period on this Draft RMP, the Uncompahgre Field Office is hosting six public open houses to provide information and an opportunity to comment on the draft plan. Members of the public can stop by anytime between 6-8 p.m. on the following dates at the following locations:

- Monday, June 20, at Ouray County 4-H Events Center, 22739 Hwy. 550 Ridgway, CO 81432

- Tuesday, June 21, at Naturita Public Library Conference Room, 107 W 1st Ave., Naturita, CO 81422
- Wednesday June 22, at Hotchkiss High School Commons Area, 438 Bulldog St., Hotchkiss, CO 81419
- Tuesday June 28, at Delta Center for the Performing Arts Community Room, 822 Grand Ave., Delta, CO 81416
- Wednesday June 29, at Montrose County Fairgrounds Friendship Hall, 1001 N. Second St., Montrose, CO 81401
- Thursday June 30, at Wilkinson Library Program Room, 100 W. Pacific Ave., Telluride, CO 81435

Written comments will be most effective if they are specific to the proposal or analysis and are received by Sept. 1, 2016. Please submit comments by email to uformp@blm.gov or by mail to the BLM, Uncompahgre Field Office, 2465 S. Townsend Ave., Montrose, CO 81401.

The plan and associated environmental documents are available at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html (or www.uformp.com). For more information, contact Gina Jones, National Environmental Policy Act Coordinator, at gmjones@blm.gov or (970) 240-5300.

Before including your address, phone number, e-mail address or other personal identifying information in your comment, be advised that your entire comment – including your personal identifying information – may be made publicly available at any time. While you can ask us in your comment to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so.

- BLM -



 (http://www.thenation.com/login/)

**FRACKING**   **CLIMATE CHANGE**   **FEATURE**   **APRIL 11-18, 2016 ISSUE**

# Global Warming's Terrifying New Chemistry

*Our leaders thought fracking would save our climate. They were wrong. Very wrong.*

*By Bill McKibben*

MARCH 23, 2016



A fracking well in the Eagle Ford Shale region, near Karnes City, Texas.
*(AP Photo / Aaron M. Sprecher)*

**G**lobal warming is, in the end, not about the noisy political battles here on the planet's surface. It actually happens in constant, silent interactions in the atmosphere, where the molecular structure of certain gases traps heat that would otherwise radiate back out to space. If you get the chemistry wrong, it doesn't matter how many landmark climate agreements you sign or how many speeches you give. And it appears the United States may have gotten the chemistry wrong. Really wrong.

There's one greenhouse gas everyone knows about: carbon dioxide, which is what you get when you burn fossil fuels. We talk about a "price on carbon" or argue about a carbon tax; our leaders boast about modest "carbon reductions." But in the last few weeks, $CO_2$'s nasty little brother has gotten some serious press. Meet methane, otherwise known as $CH_4$.

In February, Harvard researchers published an explosive paper in *Geophysical Research Letters*. Using satellite data and ground observations, they concluded that the nation as a whole is leaking methane in massive quantities. Between 2002 and 2014, the data showed that US methane emissions increased by more than 30 percent, accounting for 30 to 60 percent of an enormous spike in methane in the entire planet's atmosphere.

To the extent our leaders have cared about climate change, they've fixed on $CO_2$. Partly as a result, coal-fired power plants have begun to close across the country. They've been replaced mostly with ones that burn natural gas, which is primarily composed of methane. Because burning natural gas releases significantly less carbon dioxide than burning coal, $CO_2$ emissions have begun to trend slowly downward, allowing politicians to take a bow. But this new Harvard data, which comes on the heels of other aerial surveys showing big methane leakage, suggests that our new natural-gas infrastructure has been bleeding methane into the atmosphere in record quantities. And molecule for molecule, this unburned methane is much, much more efficient at trapping heat than carbon dioxide.

The EPA insisted this wasn't happening, that methane was on the decline just like $CO_2$. But it turns out, as some scientists have been insisting for years, the EPA was wrong. Really wrong. This error is the rough equivalent of the New York Stock Exchange announcing tomorrow that the Dow Jones isn't really at 17,000: Its computer program has been making a mistake, and your index fund actually stands at 11,000.

These leaks are big enough to wipe out a large share of the gains from the Obama administration's work on climate change—all those closed coal mines and fuel-efficient cars. *In fact, it's even possible that America's*

*contribution to global warming increased during the Obama years.* The methane story is utterly at odds with what we've been telling ourselves, not to mention what we've been telling the rest of the planet. It undercuts the promises we made at the climate talks in Paris. It's a disaster—and one that seems set to spread.

The Obama administration, to its credit, seems to be waking up to the problem. Over the winter, the EPA began to revise its methane calculations, and in early March, the United States reached an agreement with Canada to begin the arduous task of stanching some of the leaks from all that new gas infrastructure. But none of this gets to the core problem, which is the rapid spread of fracking. Carbon dioxide is driving the great warming of the planet, but $CO_2$ isn't doing it alone. It's time to take methane seriously.

\* \* \*

To understand how we got here, it's necessary to remember what a savior fracked natural gas looked like to many people, environmentalists included. As George W. Bush took hold of power in Washington, coal was ascendant, here and around the globe. Cheap and plentiful, it was most visibly underwriting the stunning growth of the economy in China, where, by some estimates, a new coal-fired power plant was opening every week. The coal boom didn't just mean smoggy skies

over Beijing; it meant the planet's invisible cloud of carbon dioxide was growing faster than ever, and with it the certainty of dramatic global warming.

So lots of people thought it was great news when natural-gas wildcatters began rapidly expanding fracking in the last decade. Fracking involves exploding the sub-surface geology so that gas can leak out through newly opened pores; its refinement brought online new shale deposits across the continent—most notably the Marcellus Shale, stretching from West Virginia up into Pennsylvania and New York. The quantities of gas that geologists said might be available were so vast that they were measured in trillions of cubic feet and in centuries of supply.

The apparently happy fact was that when you burn natural gas, it releases half as much carbon dioxide as coal. A power plant that burned natural gas would therefore, or so the reasoning went, be half as bad for global warming as a power plant that burned coal. Natural gas was also cheap—so, from a politician's point of view, fracking was a win-win situation. You could appease the environmentalists with their incessant yammering about climate change without having to run up the cost of electricity. It would be painless environmentalism, the equivalent of losing weight by cutting your hair.

And it appeared even better than that. If you were President Obama and had inherited a dead-in-the-water economy, the fracking boom offered one of the few economic bright spots. Not only did it employ lots of people, but cheap natural gas had also begun to alter the country's economic equation: Manufacturing jobs were actually returning from overseas, attracted by newly abundant energy. In his 2012 State of the Union address, Obama declared that new natural-gas supplies would not only last the nation a century, but would create 600,000 new jobs by decade's end. In his 2014 address, he announced that "businesses plan to invest almost $100 billion in factories that use natural gas," and pledged to "cut red tape" to get it all done. In fact, the natural-gas revolution has been a constant theme of his energy policy, the tool that made his restrictions on coal palatable. And Obama was never shy about taking credit for at least part of the boom. Public research dollars, he said in 2012, "helped develop the technologies to extract all this natural gas out of shale rock—reminding us that government support is critical in helping businesses get new energy ideas off the ground."

Obama had plenty of help selling natural gas—from the fossil-fuel industry, but also from environmentalists, at least for a while. Robert Kennedy Jr., who had enormous credibility as the founder of the Waterkeeper Alliance and a staff attorney at the Natural Resources Defense Council, wrote a paean in 2009 to the "revolution...over

the past two years [that] has left America awash in natural gas and has made it possible to eliminate most of our dependence on deadly, destructive coal practically overnight." Meanwhile, the longtime executive director of the Sierra Club, Carl Pope, had not only taken $25 million from one of the nation's biggest frackers, Chesapeake Energy, to fund his organization, but was also making appearances with the company's CEO to tout the advantages of gas, "an excellent example of a fuel that can be produced in quite a clean way, and shouldn't be wasted." (That CEO, Aubrey McClendon, apparently killed himself earlier this month, crashing his car into a bridge embankment days after being indicted for bid-rigging.) Exxon was in apparent agreement as well: It purchased XTO Energy, becoming the biggest fracker in the world overnight and allowing the company to make the claim that it was helping to drive emissions down.

For a brief shining moment, you couldn't have asked for more. As Obama told a joint session of Congress, "The development of natural gas will create jobs and power trucks and factories that are cleaner and cheaper, proving that we don't have to choose between our environment and our economy."

\* \* \*

Unless, of course, you happened to live in the fracking zone, where nightmares were starting to unfold. In recent decades, most American oil and gas exploration

had been concentrated in the western United States, often far from population centers. When there were problems, politicians and media in these states paid little attention.

The Marcellus Shale, though, underlies densely populated eastern states. It wasn't long before stories about the pollution of farm fields and contamination of drinking water from fracking chemicals began to make their way into the national media. In the Delaware Valley, after a fracking company tried to lease his family's farm, a young filmmaker named Josh Fox produced one of the classic environmental documentaries of all time, *Gasland*, which became instantly famous for its shot of a man lighting on fire the methane flowing from his water faucet.

This reporting helped galvanize a movement—at first town by town, then state by state, and soon across whole regions. The activism was most feverish in New York, where residents could look across the Pennsylvania line and see the ecological havoc that fracking caused. Scores of groups kept up unrelenting pressure that eventually convinced Governor Andrew Cuomo to ban it. Long before that happened, the big environmental groups recanted much of their own support for fracking: The Sierra Club's new executive director, Michael Brune, not only turned down $30 million in potential donations from fracking companies but came out swinging against

the practice. "The club needs to…advocate more fiercely to use as little gas as possible," he said. "We're not going to mute our voice on this." As for Robert Kennnedy Jr., by 2013 he was calling natural gas a "catastrophe."

In the end, one of the most important outcomes of the antifracking movement may have been that it attracted the attention of a couple of Cornell scientists. Living on the northern edge of the Marcellus Shale, Robert Howarth and Anthony Ingraffea got interested in the outcry. While everyone else was focused on essentially local issues—would fracking chemicals get in the water supply?—they decided to look more closely at a question that had never gotten much attention: How much methane was invisibly being leaked by these fracking operations?

Because here's the *unhappy* fact about methane: Though it produces only half as much carbon as coal when you burn it, if you don't—if it escapes into the air before it can be captured in a pipeline, or anywhere else along its route to a power plant or your stove—then it traps heat in the atmosphere much more efficiently than $CO_2$. Howarth and Ingraffea began producing a series of papers claiming that if even a small percentage of the methane leaked—maybe as little as 3 percent—then fracked gas would do *more* climate damage than coal. And their preliminary data showed that leak rates could be at

least that high: that somewhere between 3.6 and 7.9 percent of methane gas from shale-drilling operations actually escapes into the atmosphere.

To say that no one in power wanted to hear this would be an understatement. The two scientists were roundly attacked by the industry; one trade group called their study the "Ivory Tower's latest fact-free assault on shale gas exploration." Most of the energy establishment joined in. An MIT team, for instance, had just finished an industry-funded report that found "the environmental impacts of shale development are challenging but manageable"; one of its lead authors, the ur-establishment energy expert Henry Jacoby, described the Cornell research as "very weak." One of its other authors, Ernest Moniz, would soon become the US secretary of energy; in his nomination hearings in 2013, he lauded the "stunning increase" in natural gas as a "revolution" and pledged to increase its use domestically.

The trouble for the fracking establishment was that new research kept backing up Howarth and Ingraffea. In January 2013, for instance, aerial overflights of fracking basins in Utah found leak rates as high as 9 percent. "We were expecting to see high methane levels, but I don't think anybody really comprehended the true magnitude of what we would see," said the study's director. But such

work was always piecemeal, one area at a time, while other studies—often conducted with industry-supplied data—came up with lower numbers.

* * *

That's why last month's Harvard study came as such a shock. It used satellite data from across the country over a span of more than a decade to demonstrate that US methane emissions had spiked 30 percent since 2002. The EPA had been insisting throughout that period that methane emissions were actually falling, but it was clearly wrong—on a massive scale. In fact, emissions "are substantially higher than we've understood," EPA Administrator Gina McCarthy admitted in early March. The Harvard study wasn't designed to show why US methane emissions were growing—in other parts of the world, as new research makes clear, cattle and wetlands seem to be causing emissions to accelerate. But the spike that the satellites recorded coincided almost perfectly with the era when fracking went big-time.

To make matters worse, during the same decade, experts had become steadily more worried about the effects of methane in any quantity on the atmosphere. Everyone agrees that, molecule for molecule, methane traps far more heat than $CO_2$—but exactly how much wasn't clear. One reason the EPA estimates of America's greenhouse-gas emissions showed such improvement was because the agency, following standard procedures, was assigning

a low value to methane and measuring its impact over a 100-year period. But a methane molecule lasts only a couple of decades in the air, compared with centuries for $CO_2$. That's good news, in that methane's effects are transient—and very bad news because that transient but intense effect happens right now, when we're breaking the back of the planet's climate. The EPA's old chemistry and 100-year time frame assigned methane a heating value of 28 to 36 times that of carbon dioxide; a more accurate figure, says Howarth, is between 86 and 105 times the potency of $CO_2$ over the next decade or two.

If you combine Howarth's estimates of leakage rates and the new standard values for the heat-trapping potential of methane, then the picture of America's total greenhouse-gas emissions over the last 15 years looks very different: Instead of peaking in 2007 and then trending downward, as the EPA has maintained, our combined emissions of methane and carbon dioxide have gone steadily and sharply up during the Obama years, Howarth says. We closed coal plants and opened methane leaks, and the result is that things have gotten worse.

Since Howarth is an outspoken opponent of fracking, I ran the Harvard data past an impeccably moderate referee, the venerable climate-policy wonk Dan Lashof. A UC Berkeley PhD who has been in the inner circles of climate policy almost since it began, Lashof has helped write reports from the Intergovernmental Panel on

Climate Change and craft the Obama administration's plan to cut coal-plant pollution. The longtime head of the Clean Air Program at the Natural Resources Defense Council, he is now the chief operations officer of billionaire Tom Steyer's NextGen Climate America.

"The Harvard paper is important," Lashof said. "It's the most convincing new data I have seen showing that the EPA's estimates of the methane-leak rate are much too low. I think this paper shows that US greenhouse-gas emissions *may* have gone up over the last decade if you focus on the combined short-term-warming impact."

Under the worst-case scenario—one that assumes that methane is extremely potent and extremely fast-acting—the United States has actually slightly increased its greenhouse-gas emissions from 2005 to 2015. That's the chart below: the blue line shows what we've been telling ourselves and the world about our emissions—that they are falling. The red line, the worst-case calculation from the new numbers, shows just the opposite.

Lashof argues for a more moderate reading of the numbers (calculating methane's impact over 50 years, for instance). But even this estimate—one that attributes less of the methane release to fracking—wipes out as much as three-fifths of the greenhouse-gas reductions that the United States has been claiming. This more modest reassessment is the yellow line in the chart below; it

shows the country reducing its greenhouse-gas emissions, but by nowhere near as much as we had thought.



The lines are doubtless not as smooth as the charts imply, and other studies will provide more detail and perhaps shift the calculations. But any reading of the new data offers a very different version of our recent history. Among other things, either case undercuts the statistics that America used to negotiate the Paris climate accord. It's more upsetting than the discovery last year that China had underestimated its coal use, because China now appears to be cutting back aggressively on coal. If the Harvard data hold up and we keep on fracking, it will be nearly impossible for the United States to meet its promised goal of a 26 to 28 percent reduction in greenhouse gases from 2005 levels by 2025.



* * *

One obvious conclusion from the new data is that we need to move very aggressively to plug as many methane leaks as possible. "The biggest unfinished business for the Obama administration is to establish tight rules on methane emissions from existing [wells and drill sites]," Lashof says. That's the work that Obama and Canadian Prime Minister Justin Trudeau promised to tackle at their conclave in March—although given the time it takes for the EPA to draft new rules, it will likely be long after Obama's departure before anything happens, and the fossil-fuel industry has vowed to fight new regulations.

Also, containing the leaks is easier said than done: After all, methane is a gas, meaning that it's hard to prevent it from escaping. Since methane is invisible and odorless (utilities inject a separate chemical to add a distinctive smell), you need special sensors to even measure leaks. Catastrophic blowouts like the recent one at Porter

Ranch in California pour a lot of methane into the air, but even these accidents are small compared to the total seeping out from the millions of pipes, welds, joints, and valves across the country—especially the ones connected with fracking operations, which involve exploding rock to make large, leaky pores. A Canadian government team examined the whole process a couple of years ago and came up with despairing conclusions. Consider the cement seals around drill pipes, says Harvard's Naomi Oreskes, who was a member of the team: "It sounds like it ought to be simple to make a cement seal, but the phrase we finally fixed on is 'an unresolved engineering challenge.' The technical problem is that when you pour cement into a well and it solidifies, it shrinks. You can get gaps in the cement. All wells leak."

With that in mind, the other conclusion from the new data is even more obvious: We need to stop the fracking industry in its tracks, here and abroad. Even with optimistic numbers for all the plausible leaks fixed, Howarth says, methane emissions will keep rising if we keep fracking.

And if we didn't frack, what would we do instead? Ten years ago, the realistic choice was between natural gas and coal. But that choice is no longer germane: Over the same 10 years, the price of a solar panel has dropped at least 80 percent. New inventions have come online, such as air-source heat pumps, which use the latent heat in the

air to warm and cool houses, and electric storage batteries. We've reached the point where Denmark can generate 42 percent of its power from the wind, and where Bangladesh is planning to solarize every village in the country within the next five years. We've reached the point, that is, where the idea of natural gas as a "bridge fuel" to a renewable future is a marketing slogan, not a realistic claim (even if that's precisely the phrase that Hillary Clinton used to defend fracking in a debate earlier this month).

One of the nastiest side effects of the fracking boom, in fact, is that the expansion of natural gas has undercut the market for renewables, keeping us from putting up windmills and solar panels at the necessary pace. Joe Romm, a climate analyst at the Center for American Progress, has been tracking the various economic studies more closely than anyone else. Even if you could cut the methane-leakage rates to zero, Romm says, fracked gas (which, remember, still produces 50 percent of the $CO_2$ level emitted by coal when you burn it) would do little to cut the world's greenhouse-gas emissions because it would displace so much truly clean power. A Stanford forum in 2014 assembled more than a dozen expert teams, and their models showed what a drag on a sustainable future cheap, abundant gas would be. "Cutting greenhouse-gas emissions by burning natural gas is like dieting by eating reduced-fat cookies," the

principal investigator of the Stanford forum explained. "If you really want to lose weight, you probably need to avoid cookies altogether."

Of course, if you're a cookie company, that's not what you want to hear. And the Exxons have a little more political juice than the Keeblers. To give just one tiny example, during his first term, Obama's then–deputy assistant for energy and climate change, Heather Zichal, headed up an interagency working group to promote the development of domestic natural gas. The working group had been formed after pressure from the American Petroleum Institute, the chief fossil-fuel lobbying group, and Zichal, in a talk to an API gathering, said: "It's hard to overstate how natural gas—and our ability to access more of it than ever—has become a game changer, and that's why it's been a fixture of the president's 'All of the Above' energy strategy." Zichal left her White House job in 2013; one year later, she took a new post on the board of Cheniere Energy, a leading exporter of fracked gas. In the $180,000-a-year job, she joined former CIA head John Deutch, who once led an Energy Department review of fracking safety during the Obama years, and Vicky Bailey, a commissioner of the Federal Energy Regulatory Commission under Bill Clinton. That's how it works.

* * *

There was one oddly reassuring number in the Harvard satellite data: The massive new surge of methane from the United States constituted somewhere between 30 and 60 percent of the global growth in methane emissions this past decade. In other words, the relatively small percentage of the planet's surface known as the United States accounts for much (if not most) of the spike in atmospheric methane around the world. Another way of saying this is: We were the first to figure out how to frack. In this new century, we're leading the world into the natural-gas age, just as we poured far more carbon into the 20th-century atmosphere than any other nation. So, thank God, now that we know there's a problem, we could warn the rest of the planet before it goes down the same path.

Except we've been doing exactly the opposite. We've become the planet's salesman for natural gas—and a key player in this scheme could become the next president of the United States. When Hillary Clinton took over the State Department, she set up a special arm, the Bureau of Energy Resources, after close consultation with oil and gas executives. This bureau, with 63 employees, was soon helping sponsor conferences around the world. And much more: Diplomatic cables released by WikiLeaks show that the secretary of state was essentially acting as a broker for the shale-gas industry, twisting the arms of world leaders to make sure US firms got to frack at will.

To take just one example, an article in *Mother Jones* based on the WikiLeaks cables reveals what happened when fracking came to Bulgaria. In 2011, the country signed a $68 million deal with Chevron, granting the company millions of acres in shale-gas concessions. The Bulgarian public wasn't happy: Tens of thousands were in the streets of Sofia with banners reading Stop Fracking With Our Water. But when Clinton came for a state visit in 2012, she sided with Chevron (one of whose executives had bundled large sums for her presidential campaign in 2008). In fact, the leaked cables show that the main topic of her meetings with Bulgaria's leaders was fracking. Clinton offered to fly in the "best specialists on these new technologies to present the benefits to the Bulgarian people," and she dispatched her Eurasian energy envoy, Richard Morningstar, to lobby hard against a fracking ban in neighboring Romania. Eventually, they won those battles—and today, the State Department provides "assistance" with fracking to dozens of countries around the world, from Cambodia to Papua New Guinea.

So if the United States has had a terrible time tracking down and fixing its methane leaks, ask yourself how it's going to go in Bulgaria. If Canada finds that sealing leaks is an "unresolved engineering challenge," ask yourself how Cambodia's going to make out. If the State Department has its way, then in a few years Harvard's satellites will be measuring gushers of methane from every direction.

* * *

Of course, we can—and perhaps we should— forgive all that past. The information about methane is relatively new; when Obama and Clinton and Zichal started backing fracking, they didn't really know. They could have turned around much earlier, like Kennedy or the Sierra Club. But what they do now will be decisive.

There are a few promising signs. Clinton has at least tempered her enthusiasm for fracking some in recent debates, listing a series of preconditions she'd insist on before new projects were approved; Bernie Sanders, by contrast, has called for a moratorium on new fracking. But Clinton continues to conflate and confuse the chemistry: Natural gas, she said in a recent position paper, has helped US carbon emissions "reach their lowest level in 20 years." It appears that many in power would like to carry on the fracking revolution, albeit a tad more carefully.

Indeed, just last month, Cheniere Energy shipped the first load of American gas overseas from its new export terminal at Sabine Pass in Louisiana. As the ship sailed, Cheniere's vice president of marketing, Meg Gentle, told industry and government officials that natural gas should be rebranded as renewable energy. "I'd challenge everyone here to reframe the debate and make sure natural gas is part of the category of clean energy, not a fossil-fuel category, which is viewed as dirty and not part

of the solution," she said. A few days later, Exxon's PR chief, writing in the *Los Angeles Time*s, boasted that the company had been "instrumental in America's shale gas revolution," and that as a result, "America's greenhouse gas emissions have declined to levels not seen since the 1990s."

The new data prove them entirely wrong. The global-warming fight can't just be about carbon dioxide any longer. Those local environmentalists, from New York State to Tasmania, who have managed to enforce fracking bans are doing as much for the climate as they are for their own clean water. That's because fossil fuels are the problem in global warming—and fossil fuels don't come in good and bad flavors. Coal and oil and natural gas have to be left in the ground. All of them. ●

## 17 COMMENTS

**BILL MCKIBBEN** Bill McKibben is the author of a dozen books, most recently *The Bill McKibben Reader,* an essay collection. A scholar in residence at Middlebury College, he is co-founder of 350.org, the largest global grassroots organizing campaign on climate change.

To submit a correction for our consideration, click *here*.
For Reprints and Permissions, click *here*.





Samsung - 4.2 Cu. Ft. 9-Cycle High-
Efficiency Steam Front-Loading...

**Shop Now**

SAMSUNG

$809⁹⁹



**ELECTION 2016**    **GREEN PARTY**    **FEATURE**    **OCTOBER 10, 2016, ISSUE**

# Your Vote for Jill Stein Is a Wasted Vote

*If you want to join a party that has no chance of effecting progressive change, the Greens are for you!*

*By* <u>Joshua Holland</u>

**SEPTEMBER 21, 2016**



If the last three presidential elections are any guide, 75 to 90 percent of those who say that they're planning to vote for Green Party candidate Jill Stein in November won't follow through. Yes, there are some dedicated Green voters, but much of the party's support is an expression of contempt for the Democrats that evaporates in the voting booth. I'm a registered independent and a supporter of the Working Families Party, and my disdain for the Greens springs from my own experience with the party. I agree with much of the Greens' platform, but when I went to Green Party meetings, I found a wildly disorganized, mostly white group that was riven with infighting, strategically inept, and organized around a factually flawed analysis of American politics. There are effective Green parties in Europe, but ours is a hot mess. And while the Greens' bold ideas are attractive, what's the point of wasting one's time and energy on such a dysfunctional enterprise?

The Green Party claims to have "at least" 137 members in elected office. That might sound respectable, but that's 43 fewer than it had in 2003. And there's a reason that number is shrinking: The Greens focus the lion's share of their limited resources on getting their quixotic presidential campaigns on the ballot rather than on building the party from the bottom up. One could argue that running presidential campaigns earns candidates like Stein and David Cobb (for whom I voted in 2004, in a safe state) more media attention, but that hasn't resulted in a growing number of seats for the Greens. The hyper-local Working Families Party, which backed 111 candidates in New York State alone last year—71 of whom were successful—makes headlines by winning fights over things like minimum-wage hikes and school funding rather than running symbolic presidential campaigns.

The Green Party's primary pitch to voters on the left is that there still isn't a dime's worth of difference between the two major parties. When Ralph Nader made that claim in 2000, there was a kernel of truth to it. Today, that claim requires a great deal of dishonesty to make. By every measure, Democrats and Republicans have moved toward their respective ideological poles since the 1990s. According to Pew Research, since 2011, the most conservative Democrat on Capitol Hill has still been more liberal than the most liberal Republican, based on their aggregate voting records. It's also true of the Democratic base—according to Pew, the share of

Democrats who hold "mostly or consistently liberal" views almost doubled between 1994 and 2014. And it's true of the 2016 party platform, which Bernie Sanders, among others, hailed as the most progressive in the party's history. Today's low-information voter is as likely to be aware of the major-party candidates' differences as a highly engaged voter was in the mid-1970s.

You might notice that Greens tend to steer the conversation away from the myriad issues—health care, education, abortion, gun control, climate change, and on and on—where the Democrats and Republicans are diametrically opposed, and toward foreign policy and national security, where there really is significant overlap between the major parties' policies. I agree with the Greens on many of those issues. But they're not sufficient to substantiate the claim that there's no difference between the Democrats and Republicans at all.

And the Greens' critique of the Democrats is often unmoored from reality. Stein goes beyond (rightly) criticizing the Obama administration's strategy in the aftermath of the 2009 coup in Honduras by charging that then–Secretary of State Hillary Clinton gave it "a thumbs-up." (Not only did the US oppose the coup, American embassy personnel tried to talk Honduran military officials out of it.) During her 2012 campaign, Stein consistently claimed that the 2009 stimulus plan "was mostly tax breaks for the wealthy." The truth is that

tax breaks accounted for 38 percent of the plan, a majority of them targeted toward low- and middle-income households. That's not criticism from the left; it's a dishonest, scorched-earth campaign against the only party that can keep Republicans out of the White House. (And if you think that Stein wouldn't have attacked Bernie Sanders with the same vigor if he were the nominee, then it's a safe bet you've never attended a Green Party meeting. Remember that the Greens ran candidates against Ralph Nader in both 2004 and '08.)

Two disastrous wars and a few Wall Street–precipitated recessions have helped push the Democratic Party leftward. Demographic changes in the electorate have made it less reliant on courting white swing voters. But the shift in the party was in large part a result of tireless work by the Democrats' own base, passionate progressives who pushed the party to change.

Many Greens think that their vote isn't wasted because it sends a powerful "message" to Washington. But why would anyone in power pay attention to the 0.36 percent of the popular vote that Jill Stein won in 2012, when 42 percent of eligible voters just stayed home? Political parties are merely vessels. The Green Party provides a forum to demonstrate ideological purity and contempt for "the system." But the Democratic Party is a center of real power in this country. For all its flaws, and for all the work still to be done, it offers a viable means of

advancing progressive goals. One can't say the same of the perpetually dysfunctional and often self-marginalizing Greens.

*For a different view on voting for the Green Party this November, read Kshama Sawant here.* ●

## 62 COMMENTS

## JOSHUA HOLLAND

Joshua Holland is a contributor to *The Nation* and a fellow with The Nation Institute. He's also the host of Politics and Reality Radio.

To submit a correction for our consideration, click *here*.
For Reprints and Permissions, click *here*.

N

**POLICY**FORUM

to each patient this necessary information.

Clinicians are ethically free to filter incidental findings that have so little clinical significance that they would not actively seek them as secondary findings. Here, too, in keeping with shared decision-making, clinicians live up to their highest calling when they discuss how they will handle incidental findings with their patients.

**References and Notes**
1. S. Hilgenberg, "Recipient of a finding incidental to research," Incidental Findings in Research, presentation to the Presidential Commission for the Study of Bioethical Issues, 30 April 2013; http://bioethics.gov/node/1617.
2. Presidential Commission for the Study of Bioethical Issues, *Anticipate and Communicate: Ethical Management of Incidental and Secondary Findings in the Clinical, Research, and Direct-to-Consumer Contexts* (Presidential Commission for the Study of Bioethical Issues, Washington, DC, 2013).
3. U.S. Preventive Services Task Force Screening for Lung Cancer, Draft Recommendation Statement (AHRQ Publication No. 13-05196-EF-3, USPSTF, Rockville, MD, 2013); www.uspreventiveservicestaskforce.org/uspstf13/lungcan/lungcandraftrec.htm.
4. L. J. Esserman, I. M. Thompson, Jr, B. Reid, *JAMA* **310**, 797 (2013).
5. R. C. Green et al., *Genet. Med.* **15**, 565 (2013).
6. ACMG *Genet. Med.* **15**, 664 (2013).

10.1126/science.1248764

---

## CLIMATE CHANGE

# What Role for Short-Lived Climate Pollutants in Mitigation Policy?

Parallel strategies must focus on long- and short-lived pollutants, but not at the cost of reducing pressure for action on $CO_2$.

J. K. Shoemaker,[1] D. P. Schrag,[1*] M. J. Molina,[2] V. Ramanathan[3,4]

Short-lived climate pollutants (SLCPs) include methane ($CH_4$), black carbon (BC), tropospheric ozone, and hydrofluorocarbons (HFCs). They are important contributors to anthropogenic climate change, responsible for as much as one-third of the current total greenhouse forcing (1). An emerging strategy, which we refer to as hybrid climate mitigation (HCM), emphasizes reducing SLCPs in parallel with long-lived carbon dioxide ($CO_2$) so as to achieve climate goals, as well as health and food security benefits, associated with some of the SLCPs. Proponents of HCM argue that we should focus substantial effort on reducing SLCPs now, as we wait for sufficient political will to reduce $CO_2$ emissions (2–4). But others (5) worry that any strategy involving SLCPs risks delaying efforts to reduce $CO_2$, the main greenhouse gas most important for long-term warming if emissions continue as projected.

We attempt to clarify this emerging HCM strategy. Reducing emissions of SLCPs is an essential component of any comprehensive climate action plan for addressing both near-term and long-term climate change impacts (1, 3). There are real opportunities to reduce emissions of SLCPs without distracting from other mitigation efforts focused on $CO_2$. But the dangers of delaying efforts to reduce $CO_2$ emissions are serious and must be articulated clearly to the policy community. We believe that such a delay can be pre-

vented with appropriate policies, and that both short (decades) and long (century or longer) time scales must be considered.

Direct comparisons of the climate influence of SLCPs and $CO_2$ require making a judgment about the relative importance of short and long time scales. SLCPs have a powerful impact on climate, but they persist in the atmosphere for only a short time—days to weeks for BC, a decade for $CH_4$, and about 15 years for some HFCs. Thus, immediate reductions in SLCPs will result



**Climate temperature response to reductions in emissions of $CO_2$, SLCPs, or both.** Based on scenarios detailed in the supplemental material. Temperature change is shown relative to a pre-industrial baseline. In the Reference scenario, annual $CO_2$ emissions peak in 2080, after which they decline rapidly, while SLCP ($CH_4$, BC) emissions remain at or above current levels. In the "SLCP mitigation" scenario, deep cuts in BC (80%) and $CH_4$ (40%) emissions, relative to 2010 levels, are implemented linearly from 2010 to 2050. In the "$CO_2$ mitigation" scenario, $CO_2$ emissions are reduced by 20% relative to the reference scenario by 2050, followed by slowly decreasing emissions that intercept the reference scenario emissions at 2150. In this scenario, emissions of both BC and $CH_4$ are partially decreased relative to the reference scenario owing to those sources associated with fossil fuel consumption. The "HCM" scenario includes simultaneous mitigation of $CO_2$, $CH_4$, and BC, as described above. For simplicity, we ignore HFCs as well as different sulfate aerosol trajectories. Including these would slightly change the shape of the curves, but not the relative time scales between them.

in relatively immediate climate benefits, as the effects on climate depend largely on the emission rate, or flow, of SLCPs to the atmosphere. In contrast, $CO_2$ has a very long atmospheric lifetime; more than 20% will remain for thousands to tens of thousands of years (6). Thus, climate effects from $CO_2$ depend on the cumulative emissions, or stock, of $CO_2$ in the atmosphere (7).

In the next year, monthly mean $CO_2$ concentrations will reach 400 parts per million (ppm); annual mean $CO_2$ concentrations have been rising more than 2 ppm per year because of emissions from fossil fuel use, and this will continue for at least the next several decades because of the dominance of fossil fuels in our world energy system. Because it is the most dominant greenhouse gas, near-complete reduction in $CO_2$ emissions is the only way to limit the rise of global temperatures and to avoid the risk of catastrophic impacts. But a partial reduction in $CO_2$ emissions over the next few decades will produce minimal relief from climate impacts until mid-century because of the long time scales of $CO_2$ in the atmosphere and the momentum of climate change due to the $CO_2$ already emitted.

One way to diminish climate impacts in the next few decades is to also reduce emissions of

[1]Department of Earth and Planetary Sciences, Harvard University, Cambridge, MA 02138, USA. [2]Division of Physical Chemistry, University of California, San Diego, La Jolla, CA 92093, USA. [3]Scripps Institution of Oceanography. University of California San Diego, La Jolla, CA, 92093, USA. [4]UNESCO Professor, TERI University, New Delhi, DL 110070, India. *Corresponding author: schrag@eps.harvard.edu

Downloaded from www.sciencemag.org on December 16, 2013

**POLICY**FORUM

SLCPs. Some have argued that mitigating SLCPs to the maximum extent possible by using available technologies can reduce the projected warming by about a half, and sea level rise by about 25%, during this century, relative to a scenario in which only $CO_2$ emissions are reduced (8). Others have argued that the benefits would be smaller, because of the possibility that measures to mitigate $CO_2$ emissions will also mitigate emissions of SLCPs (9).

A key point is that the development of new, low-carbon technologies is driven by policies aimed at reducing $CO_2$ emissions. Removing political and economic pressure for their development can result in slower innovation, and lead to continued emissions and a warmer climate. In contrast, no new technological innovation is required for many cuts in SLCPs, such as sealing natural gas leaks or reducing biomass burning. Thus, if one delays societal pressure to reduce $CO_2$ emissions, one will end up with higher cumulative emissions and higher peak and long-term warming.

It is easy to understand why focusing on SLCPs is attractive. Reducing SLCPs achieves climate benefits on generational time scales. In contrast, a substantial reduction of $CO_2$ emissions requires a deep transformation of the world's fossil energy dependence. Some have argued that reducing emissions of SLCPs will help to avoid "tipping points" in the climate system, irreversible thresholds with drastic consequences. Exactly how to define a tipping point and when we might cross one remain controversial (10), but if such thresholds do exist, it is clear that reducing SLCPs alone can only delay by a few decades our reaching them (1, 11), as long as the concentration of atmospheric $CO_2$ continues to rise.

Another proposal is that an initial focus on SLCPs will slow the rate of warming by as much as 50% by 2050, allowing for easier adaptation by both human society and natural ecosystems (12), while we wait for political will to address $CO_2$ emissions. But if the focus on SLCPs inhibits actions to slow the growth of fossil $CO_2$ emissions, it will result in a higher peak temperature overall, and we will trade a slower rate of warming in the first half of this century for a steeper rise in temperature imposed thereafter (see the graph).

It is also important to recognize that $CO_2$ and SLCP emissions are not independent. Some of the steps to reduce $CO_2$ emissions will drive down emissions of SLCPs, as some of the largest sources of BC and methane are associated with fossil fuel pro-duction and combustion. There is also the complicated case of sulfur emissions, which produce sulfate aerosols that are short-lived, like BC, but reflect sunlight and cool the climate, partially compensating for greenhouse warming. Reducing some types of fossil fuel use, especially sulfur-rich coal and ship fuel, will also reduce the concentration of sulfate aerosols, which may amplify warming in the near-term, but reduce the peak warming over the long term.

A common metric for valuation of different greenhouse gases, the 100-year global warming potential (GWP) (13, 14), compares the average radiative forcing of a greenhouse gas relative to $CO_2$ over the next 100 years. Some have argued that the 100-year GWP undervalues SLCPs, as the formulation includes no discount rate to prioritize near-term impacts. Others have argued that the 100-year GWP overvalues SLCPs as the formulation completely ignores any impacts beyond 100 years. Efforts to improve the GWP metric have encountered criticism from both perspectives (15). Our view is that there is no scientifically correct answer, as it requires trading near-term benefits for avoidance of substantial costs passed down to future generations, essentially in perpetuity.

Policy discussions about SLCPs are happening now. For example, the U.S. State Department, along with five other countries, unveiled in early 2012 an initiative for reducing emissions of BC, HFCs, and $CH_4$, and many other nations have now joined the initiative. If successful, such an initiative could lead to important health, agriculture, and climate benefits in the near-term. At the same time, there is legitimate concern that this initiative could be used to shield some countries from international pressure to reduce $CO_2$ emissions. It is imperative that this does not happen. The only way to permanently slow warming is through lowering emissions of $CO_2$. The only way to minimize the peak warming this century is to reduce emissions of $CO_2$ and SLCPs.

We suggest that the best way to prevent the slowing of $CO_2$ mitigation efforts is to emphasize parallel strategies for reducing SLCP and $CO_2$ emissions. For example, efforts to reduce BC emissions can be undertaken through air pollution measures whose main focus is on public health, such as regulations on diesel exhaust or the promotion of cleaner cooking technologies. HFCs can be regulated through the Montreal protocol. Such strategies have already proven to be effective. In California, for example, new regulations of particle emissions from diesel exhaust resulted in a reduction in ambient BC over all of the state by 50% within the last 25 years (16). Another example is the recent agreement at the G-20 Summit in St. Petersburg to reduce use of HFCs.

An implication of our proposal is that trading between $CO_2$ and SLCP emissions, $CH_4$ in particular, should be discouraged. If efforts to reduce greenhouse gas emissions, both SLCPs and $CO_2$, were at a mature state with a well-developed market, we would embrace a broader discussion of the time scales of climate change and encourage society to reach a consensus on how to value short-term and long-term climate change. But we do not believe that real decisions about health policies and climate policies are made through an interconnected market, so parallel efforts are essential. We recognize that compromises may be required to achieve political goals; in particular, giving developing countries some form of "credit" for reductions in SLCPs may be important to broaden participation in international climate agreements. But more widespread trading between different greenhouse gases, especially when it may affect markets for low-carbon technologies, risks committing our children and grandchildren to even greater climate impacts in the more distant future.

### References and Notes

1. V. Ramanathan, Y. Xu, Proc. Natl. Acad. Sci. U.S.A. **107**, 8055 (2010).
2. J. S. Wallack, V. Ramanathan, Foreign Aff. **88**, 105 (2009).
3. M. Molina et al., Proc. Natl. Acad. Sci. U.S.A. **106**, 20616 (2009).
4. D. Shindell et al., Science **335**, 183 (2012).
5. R. Pierrehumbert, RealClimate.org (2010); www.realclimate.org/index.php/archives/2010/12/losing-time-not-buying-time/.
6. D. Archer, V. Brovkin, Clim. Change **90**, 283 (2008).
7. M. R. Allen et al., Nature **458**, 1163 (2009).
8. A. Hu, Y. Xu et al., Nat. Clim. Change **3**, 730 (2013).
9. S. J. Smith, A. Mizrahi, Proc. Natl. Acad. Sci. U.S.A. **110**, 14202 (2013).
10. E. Kriegler et al., Proc. Natl. Acad. Sci. U.S.A. **106**, 5041 (2009).
11. United Nations Environment Programme and World Meteorological Organization, "Integrated assessment of black carbon and tropospheric ozone" (UNEP, Nairobi, 2011).
12. D. Shindell, Milken Inst. Rev. **2013**, 36 (2013).
13. D. A. Lashof, D. R. Ahuja, Nature **344**, 529 (1990).
14. P. Forster et al., in Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, S. Solomon et al., Eds. (Cambridge Univ. Press, New York, 2007), pp. 131–234.
15. J. S. Fuglestvedt et al., Clim. Change **58**, 267 (2003).
16. V. Ramanathan et al., "Black carbon and the regional climate of California" (for the California Air Resources Board, Univ. of California, San Diego, 2013); www.arb.ca.gov/research/rsc/3-8-13/item8dfr08-323.pdf.

### Supplementary Materials
www.sciencemag.org/content/342/6164/1323/suppl/DC1

10.1126/science.1240162

*Published by AAAS*



# THE PRESIDENT'S CLIMATE ACTION PLAN

## Executive Office of the President

### June 2013



# Table of Contents

CUT CARBON POLLUTION IN AMERICA ........................................................................................... 6

I.   Deploying Clean Energy ............................................................................................................ 6

     Cutting Carbon Pollution from Power Plants ....................................................................... 6

     Promoting American Leadership in Renewable Energy........................................................ 6

     Unlocking Long-Term Investment in Clean Energy Innovation ........................................... 7

II.  Building a 21st-Century Transportation Sector ........................................................................ 8

     Increasing Fuel Economy Standards .................................................................................... 8

     Developing and Deploying Advanced Transportation Technologies..................................... 8

III. Cutting Energy Waste in Homes, Businesses, and Factories ................................................... 9

     Reducing Energy Bills for American Families and Businesses ............................................. 9

IV.  Reducing Other Greenhouse Gas Emissions ......................................................................... 10

     Curbing Emissions of Hydrofluorocarbons ....................................................................... 10

     Reducing Methane Emissions ............................................................................................ 10

     Preserving the Role of Forests in Mitigating Climate Change ........................................... 11

V.   Leading at the Federal Level .................................................................................................. 11

     Leading in Clean Energy...................................................................................................... 11

PREPARE THE UNITED STATES FOR THE IMPACTS OF CLIMATE CHANGE ................................. 12 I.

     Building Stronger and Safer Communities and Infrastructure............................................ 12

     Directing Agencies to Support Climate-Resilient Investment............................................. 12

     Establishing a State, Local, and Tribal Leaders Task Force on Climate Preparedness ........ 13

     Supporting Communities as they Prepare for Climate Impacts ......................................... 13

     Boosting the Resilience of Buildings and Infrastructure.................................................... 13

     Rebuilding and Learning from Hurricane Sandy ................................................................ 13

II.  Protecting our Economy and Natural Resources .................................................................. 14

     Identifying Vulnerabilities of Key Sectors to Climate Change ........................................... 14

     Promoting Resilience in the Health Sector ........................................................................ 14

     Promoting Insurance Leadership for Climate Safety ......................................................... 14

     Conserving Land and Water Resources .............................................................................. 15

     Maintaining Agricultural Sustainability ............................................................................ 15

     Managing Drought .............................................................................................................. 15

     Reducing Wildfire Risks ..................................................................................................... 15

     Preparing for Future Floods................................................................................................ 15

III. Using Sound Science to Manage Climate Impacts ................................................................ 16

Developing Actionable Climate Science ................................................................................ 16

Assessing Climate-Change Impacts in the United States ............................................... 16

Launching a Climate Data Initiative .................................................................................... 16

Providing a Toolkit for Climate Resilience:....................................................................... 16

LEAD INTERNATIONAL EFFORTS TO ADDRESS GLOBAL CLIMATE CHANGE............................ 17

I.   Working with Other Countries to Take Action to Address Climate Change ................................ 17

Enhancing Multilateral Engagement with Major Economies ........................................ 17

Expanding Bilateral Cooperation with Major Emerging Economies ........................... 17

Combatting Short-Lived Climate Pollutants ..................................................................... 17

Reducing Emissions from Deforestation and Forest Degradation .............................. 18

Expanding Clean Energy Use and Cut Energy Waste ..................................................... 18

Negotiating Global Free Trade in Environmental Goods and Services...................... 19

Phasing Out Subsidies that Encourage Wasteful Consumption of Fossil Fuels ...................... 20

Leading Global Sector Public Financing Towards Cleaner Energy .............................. 20

Strengthening Global Resilience to Climate Change......................................................... 20

Mobilizing Climate Finance .................................................................................................. 20

II.   Leading Efforts to Address Climate Change through International Negotiations ..................... 21

# PRESIDENT OBAMA'S CLIMATE ACTION PLAN

*"We, the people, still believe that our obligations as Americans are not just to ourselves, but to all posterity. We will respond to the threat of climate change, knowing that the failure to do so would betray our children and future generations. Some may still deny the overwhelming judgment of science, but none can avoid the devastating impact of raging fires and crippling drought and more powerful storms.*

*The path towards sustainable energy sources will be long and sometimes difficult. But America cannot resist this transition, we must lead it. We cannot cede to other nations the technology that will power new jobs and new industries, we must claim its promise. That's how we will maintain our economic vitality and our national treasure -- our forests and waterways, our croplands and snow-capped peaks. That is how we will preserve our planet, commanded to our care by God. That's what will lend meaning to the creed our fathers once declared."*

*-- President Obama, Second Inaugural Address, January 2013*

## THE CASE FOR ACTION

While no single step can reverse the effects of climate change, we have a moral obligation to future generations to leave them a planet that is not polluted and damaged. Through steady, responsible action to cut carbon pollution, we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment.

In 2009, President Obama made a pledge that by 2020, America would reduce its greenhouse gas emissions in the range of 17 percent below 2005 levels if all other major economies agreed to limit their emissions as well. Today, the President remains firmly committed to that goal and to building on the progress of his first term to help put us and the world on a sustainable long-term trajectory. Thanks in part to the Administration's success in doubling America's use of wind, solar, and geothermal energy and in establishing the toughest fuel economy standards in our history, we are creating new jobs, building new industries, and reducing dangerous carbon pollution which contributes to climate change. In fact, last year, carbon emissions from the energy sector fell to the lowest level in two decades. At the same time, while there is more work to do, we are more energy secure than at any time in recent history. In 2012, America's net oil imports fell to the lowest level in 20 years and we have become the world's leading producer of natural gas – the cleanest-burning fossil fuel.

While this progress is encouraging, climate change is no longer a distant threat – we are already feeling its impacts across the country and the world. Last year was the warmest year ever in the contiguous United States and about one-third of all Americans experienced 10 days or more of 100-degree heat. The 12 hottest years on record have all come in the last 15 years. Asthma rates have doubled in the past 30 years and our children will suffer more asthma attacks as air pollution gets worse. And increasing floods, heat waves, and droughts have put farmers out of business, which is already raising food prices dramatically.

These changes come with far-reaching consequences and real economic costs. Last year alone, there were 11 different weather and climate disaster events with estimated losses exceeding $1 billion each across the United States. Taken together, these 11 events resulted in over $110 billion in estimated damages, which would make it the second-costliest year on record.

In short, America stands at a critical juncture. Today, President Obama is putting forward a broad-based plan to cut the carbon pollution that causes climate change and affects public health. Cutting carbon pollution will help spark business innovation to modernize our power plants, resulting in cleaner forms of American-made energy that will create good jobs and cut our dependence on foreign oil. Combined with the Administration's other actions to increase the efficiency of our cars and household appliances, the President's plan will reduce the amount of energy consumed by American families, cutting down on their gas and utility bills. The plan, which consists of a wide variety of executive actions, has three key pillars:

1) **Cut Carbon Pollution in America:** In 2012, U.S. carbon emissions fell to the lowest level in two decades even as the economy continued to grow. To build on this progress, the Obama Administration is putting in place tough new rules to cut carbon pollution – just like we have for other toxins like mercury and arsenic – so we protect the health of our children and move our economy toward American-made clean energy sources that will create good jobs and lower home energy bills.

2) **Prepare the United States for the Impacts of Climate Change:** Even as we take new steps to reduce carbon pollution, we must also prepare for the impacts of a changing climate that are already being felt across the country. Moving forward, the Obama Administration will help state and local governments strengthen our roads, bridges, and shorelines so we can better protect people's homes, businesses and way of life from severe weather.

3) **Lead International Efforts to Combat Global Climate Change and Prepare for its Impacts:** Just as no country is immune from the impacts of climate change, no country can meet this challenge alone. That is why it is imperative for the United States to couple action at home with leadership internationally. America must help forge a truly global solution to this global challenge by galvanizing international action to significantly reduce emissions (particularly among the major emitting countries), prepare for climate impacts, and drive progress through the international negotiations.

Climate change represents one of our greatest challenges of our time, but it is a challenge uniquely suited to America's strengths. Our scientists will design new fuels, and our farmers will grow them. Our engineers will devise new sources of energy, our workers will build them, and our businesses will sell them. All of us will need to do our part. If we embrace this challenge, we will not just create new jobs and new industries and keep America on the cutting edge; we will save lives, protect and preserve our treasured natural resources, cities, and coastlines for future generations.

What follows is a blueprint for steady, responsible national and international action to slow the effects of climate change so we leave a cleaner, more stable environment for future generations. It highlights progress already set in motion by the Obama Administration to advance these goals and sets forth new steps to achieve them.

<u>CUT CARBON POLLUTION IN AMERICA</u>

In 2009, President Obama made a commitment to reduce U.S. greenhouse gas emissions in the range of 17 percent below 2005 levels by 2020. The President remains firmly committed to achieving that goal. While there is more work to do, the Obama Administration has already made significant progress by doubling generation of electricity from wind, solar, and geothermal, and by establishing historic new fuel economy standards. Building on these achievements, this document outlines additional steps the Administration will take – in partnership with states, local communities, and the private sector – to continue on a path to meeting the President's 2020 goal.

## I.    *Deploying Clean Energy*

**Cutting Carbon Pollution from Power Plants:** Power plants are the largest concentrated source of emissions in the United States, together accounting for roughly one-third of all domestic greenhouse gas emissions. We have already set limits for arsenic, mercury, and lead, but there is no federal rule to prevent power plants from releasing as much carbon pollution as they want. Many states, local governments, and companies have taken steps to move to cleaner electricity sources. More than 35 states have renewable energy targets in place, and more than 25 have set energy efficiency targets.

Despite this progress at the state level, there are no federal standards in place to reduce carbon pollution from power plants. In April 2012, as part of a continued effort to modernize our electric power sector, the Obama Administration proposed a carbon pollution standard for new power plants. The Environmental Protection Agency's proposal reflects and reinforces the ongoing trend towards cleaner technologies, with natural gas increasing its share of electricity generation in recent years, principally through market forces and renewables deployment growing rapidly to account for roughly half of new generation capacity installed in 2012.

With abundant clean energy solutions available, and building on the leadership of states and local governments, we can make continued progress in reducing power plant pollution to improve public health and the environment while supplying the reliable, affordable power needed for economic growth. By doing so, we will continue to drive American leadership in clean energy technologies, such as efficient natural gas, nuclear, renewables, and clean coal technology.

To accomplish these goals, President Obama is issuing a Presidential Memorandum directing the Environmental Protection Agency to work expeditiously to complete carbon pollution standards for both new and existing power plants. This work will build on the successful first-term effort to develop greenhouse gas and fuel economy standards for cars and trucks. In developing the standards, the President has asked the Environmental Protection Agency to build on state leadership, provide flexibility, and take advantage of a wide range of energy sources and technologies including many actions in this plan.

**Promoting American Leadership in Renewable Energy:** During the President's first term, the United States more than doubled generation of electricity from wind, solar, and geothermal sources. To ensure America's continued leadership position in clean energy, President Obama has set a goal to double renewable electricity generation once again by 2020. In order to meet

this ambitious target, the Administration is announcing a number of new efforts in the following key areas:

- **Accelerating Clean Energy Permitting:** In 2012 the President set a goal to issue permits for 10 gigawatts of renewables on public lands by the end of the year. The Department of the Interior achieved this goal ahead of schedule and the President has directed it to permit an additional 10 gigawatts by 2020. Since 2009, the Department of Interior has approved 25 utility-scale solar facilities, nine wind farms, and 11 geothermal plants, which will provide enough electricity to power 4.4 million homes and support an estimated 17,000 jobs. The Administration is also taking steps to encourage the development of hydroelectric power at existing dams. To develop and demonstrate improved permitting procedures for such projects, the Administration will designate the Red Rock Hydroelectric Plant on the Des Moines River in Iowa to participate in its Infrastructure Permitting Dashboard for high-priority projects. Also, the Department of Defense – the single largest consumer of energy in the United States – is committed to deploying 3 gigawatts of renewable energy on military installations, including solar, wind, biomass, and geothermal, by 2025. In addition, federal agencies are setting a new goal of reaching 100 megawatts of installed renewable capacity across the federally subsidized housing stock by 2020. This effort will include conducting a survey of current projects in order to track progress and facilitate the sharing of best practices.

- **Expanding and Modernizing the Electric Grid:** Upgrading the country's electric grid is critical to our efforts to make electricity more reliable, save consumers money on their energy bills, and promote clean energy sources. To advance these important goals, President Obama signed a Presidential Memorandum this month that directs federal agencies to streamline the siting, permitting and review process for transmission projects across federal, state, and tribal governments.

**<u>Unlocking Long-Term Investment in Clean Energy Innovation:</u>** The Fiscal Year 2014 Budget continues the President's commitment to keeping the United States at the forefront of clean energy research, development, and deployment by increasing funding for clean energy technology across all agencies by 30 percent, to approximately $7.9 billion. This includes investment in a range of energy technologies, from advanced biofuels and emerging nuclear technologies – including small modular reactors – to clean coal. To continue America's leadership in clean energy innovation, the Administration will also take the following steps:

- **Spurring Investment in Advanced Fossil Energy Projects:** In the coming weeks, the Department of Energy will issue a Federal Register Notice announcing a draft of a solicitation that would make up to $8 billion in (self-pay) loan guarantee authority available for a wide array of advanced fossil energy projects under its Section 1703 loan guarantee program. This solicitation is designed to support investments in innovative technologies that can cost-effectively meet financial and policy goals, including the avoidance, reduction, or sequestration of anthropogenic emissions of greenhouse gases. The proposed solicitation will cover a broad range of advanced fossil energy projects. Reflecting the Department's commitment to continuous improvement in program management, it will take comment on the draft solicitation, with a plan to issue a final solicitation by the fall of 2013.

- **Instituting a Federal Quadrennial Energy Review:** Innovation and new sources of domestic energy supply are transforming the nation's energy marketplace, creating economic

opportunities at the same time they raise environmental challenges. To ensure that federal energy policy meets our economic, environmental, and security goals in this changing landscape, the Administration will conduct a Quadrennial Energy Review which will be led by the White House Domestic Policy Council and Office of Science and Technology Policy, supported by a Secretariat established at the Department of Energy, and involving the robust engagement of federal agencies and outside stakeholders. This first-ever review will focus on infrastructure challenges, and will identify the threats, risks, and opportunities for U.S. energy and climate security, enabling the federal government to translate policy goals into a set of analytically based, clearly articulated, sequenced and integrated actions, and proposed investments over a four-year planning horizon.

## II.    *Building a 21st-Century Transportation Sector*

**Increasing Fuel Economy Standards:** Heavy-duty vehicles are currently the second largest source of greenhouse gas emissions within the transportation sector. In 2011, the Obama Administration finalized the first-ever fuel economy standards for Model Year 2014-2018 for heavy-duty trucks, buses, and vans. These standards will reduce greenhouse gas emissions by approximately 270 million metric tons and save 530 million barrels of oil. During the President's second term, the Administration will once again partner with industry leaders and other key stakeholders to develop post-2018 fuel economy standards for heavy-duty vehicles to further reduce fuel consumption through the application of advanced cost-effective technologies and continue efforts to improve the efficiency of moving goods across the United States.

The Obama Administration has already established the toughest fuel economy standards for passenger vehicles in U.S. history. These standards require an average performance equivalent of 54.5 miles per gallon by 2025, which will save the average driver more than $8,000 in fuel costs over the lifetime of the vehicle and eliminate six billion metric tons of carbon pollution – more than the United States emits in an entire year.

**Developing and Deploying Advanced Transportation Technologies:** Biofuels have an important role to play in increasing our energy security, fostering rural economic development, and reducing greenhouse gas emissions from the transportation sector. That is why the Administration supports the Renewable Fuels Standard, and is investing in research and development to help bring next-generation biofuels on line. For example, the United States Navy and Departments of Energy and Agriculture are working with the private sector to accelerate the development of cost-competitive advanced biofuels for use by the military and commercial sectors. More broadly, the Administration will continue to leverage partnerships between the private and public sectors to deploy cleaner fuels, including advanced batteries and fuel cell technologies, in every transportation mode. The Department of Energy's eGallon informs drivers about electric car operating costs in their state – the national average is only $1.14 per gallon of gasoline equivalent, showing the promise for consumer pocketbooks of electric-powered vehicles. In addition, in the coming months, the Department of Transportation will work with other agencies to further explore strategies for integrating alternative fuel vessels into the U.S. flag fleet. Further, the Administration will continue to work with states, cities and towns through the Department of Transportation, the Department of Housing and Urban Development, and the Environmental Protection Agency to improve transportation options, and lower transportation costs while protecting the environment in communities nationwide.

### III.   Cutting Energy Waste in Homes, Businesses, and Factories

**Reducing Energy Bills for American Families and Businesses:** Energy efficiency is one of the clearest and most cost-effective opportunities to save families money, make our businesses more competitive, and reduce greenhouse gas emissions. In the President's first term, the Department of Energy and the Department of Housing and Urban Development completed efficiency upgrades in more than one million homes, saving many families more than $400 on their heating and cooling bills in the first year alone. The Administration will take a range of new steps geared towards achieving President Obama's goal of doubling energy productivity by 2030 relative to 2010 levels:

- **Establishing a New Goal for Energy Efficiency Standards:** In President Obama's first term, the Department of Energy established new minimum efficiency standards for dishwashers, refrigerators, and many other products. Through 2030, these standards will cut consumers' electricity bills by hundreds of billions of dollars and save enough electricity to power more than 85 million homes for two years. To build on this success, the Administration is setting a new goal: Efficiency standards for appliances and federal buildings set in the first and second terms combined will reduce carbon pollution by at least 3 billion metric tons cumulatively by 2030 – equivalent to nearly one-half of the carbon pollution from the entire U.S. energy sector for one year – while continuing to cut families' energy bills.

- **Reducing Barriers to Investment in Energy Efficiency:** Energy efficiency upgrades bring significant cost savings, but upfront costs act as a barrier to more widespread investment. In response, the Administration is committing to a number of new executive actions. As soon as this fall, the Department of Agriculture's Rural Utilities Service will finalize a proposed update to its Energy Efficiency and Conservation Loan Program to provide up to $250 million for rural utilities to finance efficiency investments by businesses and homeowners across rural America. The Department is also streamlining its Rural Energy for America program to provide grants and loan guarantees directly to agricultural producers and rural small businesses for energy efficiency and renewable energy systems.

  In addition, the Department of Housing and Urban Development's efforts include a $23 million Multifamily Energy Innovation Fund designed to enable affordable housing providers, technology firms, academic institutions, and philanthropic organizations to test new approaches to deliver cost-effective residential energy. In order to advance ongoing efforts and bring stakeholders together, the Federal Housing Administration will convene representatives of the lending community and other key stakeholders for a mortgage roundtable in July to identify options for factoring energy efficiency into the mortgage underwriting and appraisal process upon sale or refinancing of new or existing homes.

- **Expanding the President's Better Buildings Challenge:** The Better Buildings Challenge, focused on helping American commercial and industrial buildings become at least 20 percent more energy efficient by 2020, is already showing results. More than 120 diverse organizations, representing over 2 billion square feet are on track to meet the 2020 goal: cutting energy use by an average 2.5 percent annually, equivalent to about $58 million in energy savings per year. To continue this success, the Administration will expand the program to multifamily housing – partnering both with private and affordable

building owners and public housing agencies to cut energy waste. In addition, the Administration is launching the Better Buildings Accelerators, a new track that will support and encourage adoption of State and local policies to cut energy waste, building on the momentum of ongoing efforts at that level.

## IV.   *Reducing Other Greenhouse Gas Emissions*

**Curbing Emissions of Hydrofluorocarbons:** Hydrofluorocarbons (HFCs), which are primarily used for refrigeration and air conditioning, are potent greenhouse gases. In the United States, emissions of HFCs are expected to nearly triple by 2030, and double from current levels of 1.5 percent of greenhouse gas emissions to 3 percent by 2020.

To reduce emissions of HFCs, the United States can and will lead both through international diplomacy as well as domestic actions. In fact, the Administration has already acted by including a flexible and powerful incentive in the fuel economy and carbon pollution standards for cars and trucks to encourage automakers to reduce HFC leakage and transition away from the most potent HFCs in vehicle air conditioning systems. Moving forward, the Environmental Protection Agency will use its authority through the Significant New Alternatives Policy Program to encourage private sector investment in low-emissions technology by identifying and approving climate-friendly chemicals while prohibiting certain uses of the most harmful chemical alternatives. In addition, the President has directed his Administration to purchase cleaner alternatives to HFCs whenever feasible and transition over time to equipment that uses safer and more sustainable alternatives.

**Reducing Methane Emissions:** Curbing emissions of methane is critical to our overall effort to address global climate change. Methane currently accounts for roughly 9 percent of domestic greenhouse gas emissions and has a global warming potential that is more than 20 times greater than carbon dioxide. Notably, since 1990, methane emissions in the United States have decreased by 8 percent. This has occurred in part through partnerships with industry, both at home and abroad, in which we have demonstrated that we have the technology to deliver emissions reductions that benefit both our economy and the environment. To achieve additional progress, the Administration will:

- **Developing an Interagency Methane Strategy:** The Environmental Protection Agency and the Departments of Agriculture, Energy, Interior, Labor, and Transportation will develop a comprehensive, interagency methane strategy. The group will focus on assessing current emissions data, addressing data gaps, identifying technologies and best practices for reducing emissions, and identifying existing authorities and incentive-based opportunities to reduce methane emissions.

- **Pursuing a Collaborative Approach to Reducing Emissions:** Across the economy, there are multiple sectors in which methane emissions can be reduced, from coal mines and landfills to agriculture and oil and gas development. For example, in the agricultural sector, over the last three years, the Environmental Protection Agency and the Department of Agriculture have worked with the dairy industry to increase the adoption of methane digesters through loans, incentives, and other assistance. In addition, when it comes to the oil and gas sector, investments to build and upgrade gas pipelines will not only put more Americans to work, but also reduce emissions and enhance economic productivity. For example, as part of the Administration's effort to improve federal

permitting for infrastructure projects, the interagency Bakken Federal Executive Group is working with industry, as well as state and tribal agencies, to advance the production of oil and gas in the Bakken while helping to reduce venting and flaring. Moving forward, as part of the effort to develop an interagency methane strategy, the Obama Administration will work collaboratively with state governments, as well as the private sector, to reduce emissions across multiple sectors, improve air quality, and achieve public health and economic benefits.

**Preserving the Role of Forests in Mitigating Climate Change:** America's forests play a critical role in addressing carbon pollution, removing nearly 12 percent of total U.S. greenhouse gas emissions each year. In the face of a changing climate and increased risk of wildfire, drought, and pests, the capacity of our forests to absorb carbon is diminishing. Pressures to develop forest lands for urban or agricultural uses also contribute to the decline of forest carbon sequestration. Conservation and sustainable management can help to ensure our forests continue to remove carbon from the atmosphere while also improving soil and water quality, reducing wildfire risk, and otherwise managing forests to be more resilient in the fact of climate change. The Administration is working to identify new approaches to protect and restore our forests, as well as other critical landscapes including grasslands and wetlands, in the face of a changing climate.

## V.   Leading at the Federal Level

**Leading in Clean Energy:** President Obama believes that the federal government must be a leader in clean energy and energy efficiency. Under the Obama Administration, federal agencies have reduced greenhouse gas emissions by more than 15 percent – the equivalent of permanently taking 1.5 million cars off the road. To build on this record, the Administration is establishing a new goal: The federal government will consume 20 percent of its electricity from renewable sources by 2020 – more than double the current goal of 7.5 percent. In addition, the federal government will continue to pursue greater energy efficiency that reduces greenhouse gas emissions and saves taxpayer dollars.

**Federal Government Leadership in Energy Efficiency:** On December 2, 2011, President Obama signed a memorandum entitled "Implementation of Energy Savings Projects and Performance-Based Contracting for Energy Savings," challenging federal agencies, in support of the Better Buildings Challenge, to enter into $2 billion worth of performance-based contracts within two years. Performance contracts drive economic development, utilize private sector innovation, and increase efficiency at minimum costs to the taxpayer, while also providing long-term savings in energy costs. Federal agencies have committed to a pipeline of nearly $2.3 billion from over 300 reported projects. In coming months, the Administration will take a number of actions to strengthen efforts to promote energy efficiency, including through performance contracting. For example, in order to increase access to capital markets for investments in energy efficiency, the Administration will initiate a partnership with the private sector to work towards a standardized contract to finance federal investments in energy efficiency. Going forward, agencies will also work together to synchronize building codes – leveraging those policies to improve the efficiency of federally owned and supported building stock. Finally, the Administration will leverage the "Green Button" standard – which aggregates energy data in a secure, easy to use format – within federal facilities to increase their ability to manage energy consumption, reduce greenhouse gas emissions, and meet sustainability goals.

## PREPARE THE UNITED STATES FOR THE IMPACTS OF CLIMATE CHANGE

As we act to curb the greenhouse gas pollution that is driving climate change, we must also prepare for the impacts that are too late to avoid. Across America, states, cities, and communities are taking steps to protect themselves by updating building codes, adjusting the way they manage natural resources, investing in more resilient infrastructure, and planning for rapid recovery from damages that nonetheless occur. The federal government has an important role to play in supporting community-based preparedness and resilience efforts, establishing policies that promote preparedness, protecting critical infrastructure and public resources, supporting science and research germane to preparedness and resilience, and ensuring that federal operations and facilities continue to protect and serve citizens in a changing climate.

The Obama Administration has been working to strengthen America's climate resilience since its earliest days. Shortly after coming into office, President Obama established an Interagency Climate Change Adaptation Task Force and, in October 2009, the President signed an Executive Order directing it to recommend ways federal policies and programs can better prepare the Nation for change. In May 2010, the Task Force hosted the first National Climate Adaptation Summit, convening local and regional stakeholders and decision-makers to identify challenges and opportunities for collaborative action.

In February 2013, federal agencies released Climate Change Adaptation Plans for the first time, outlining strategies to protect their operations, missions, and programs from the effects of climate change. The Department of Transportation, for example, is developing guidance for incorporating climate change and extreme weather event considerations into coastal highway projects, and the Department of Homeland Security is evaluating the challenges of changing conditions in the Arctic and along our Nation's borders. Agencies have also partnered with communities through targeted grant and technical-assistance programs—for example, the Environmental Protection Agency is working with low-lying communities in North Carolina to assess the vulnerability of infrastructure investments to sea level rise and identify solutions to reduce risks. And the Administration has continued, through the U.S. Global Change Research Program, to support science and monitoring to expand our understanding of climate change and its impacts.

Going forward, the Administration will expand these efforts into three major, interrelated initiatives to better prepare America for the impacts of climate change:

### I.    Building Stronger and Safer Communities and Infrastructure

By necessity, many states, cities, and communities are already planning and preparing for the impacts of climate change. Hospitals must build capacity to serve patients during more frequent heat waves, and urban planners must plan for the severe storms that infrastructure will need to withstand. Promoting on-the-ground planning and resilient infrastructure will be at the core of our work to strengthen America's communities. Specific actions will include:

**Directing Agencies to Support Climate-Resilient Investment:** The President will direct federal agencies to identify and remove barriers to making climate-resilient investments; identify and remove counterproductive policies that increase vulnerabilities; and encourage and support smarter, more resilient investments, including through agency grants, technical assistance, and other programs, in sectors from transportation and water management to conservation and

disaster relief. Agencies will also be directed to ensure that climate risk-management considerations are fully integrated into federal infrastructure and natural resource management planning. To begin meeting this challenge, the Environmental Protection Agency is committing to integrate considerations of climate change impacts and adaptive measures into major programs, including its Clean Water and Drinking Water State Revolving Funds and grants for brownfields cleanup, and the Department of Housing and Urban Development is already requiring grant recipients in the Hurricane Sandy–affected region to take sea-level rise into account.

**Establishing a State, Local, and Tribal Leaders Task Force on Climate Preparedness:** To help agencies meet the above directive and to enhance local efforts to protect communities, the President will establish a short-term task force of state, local, and tribal officials to advise on key actions the federal government can take to better support local preparedness and resilience-building efforts. The task force will provide recommendations on removing barriers to resilient investments, modernizing grant and loan programs to better support local efforts, and developing information and tools to better serve communities.

**Supporting Communities as they Prepare for Climate Impacts:** Federal agencies will continue to provide targeted support and assistance to help communities prepare for climate-change impacts. For example, throughout 2013, the Department of Transportation's Federal Highway Administration is working with 19 state and regional partners and other federal agencies to test approaches for assessing local transportation infrastructure vulnerability to climate change and extreme weather and for improving resilience. The Administration will continue to assist tribal communities on preparedness through the Bureau of Indian Affairs, including through pilot projects and by supporting participation in federal initiatives that assess climate change vulnerabilities and develop regional solutions. Through annual federal agency "Environmental Justice Progress Reports," the Administration will continue to identify innovative ways to help our most vulnerable communities prepare for and recover from the impacts of climate change. The importance of critical infrastructure independence was brought home in the Sandy response. The Federal Emergency Management Agency and the Department of Energy are working with the private sector to address simultaneous restoration of electricity and fuels supply.

**Boosting the Resilience of Buildings and Infrastructure:** The National Institute of Standards and Technology will convene a panel on disaster-resilience standards to develop a comprehensive, community-based resilience framework and provide guidelines for consistently safe buildings and infrastructure – products that can inform the development of private-sector standards and codes. In addition, building on federal agencies' "Climate Change Adaptation Plans," the Administration will continue efforts to increase the resilience of federal facilities and infrastructure. The Department of Defense, for example, is assessing the relative vulnerability of its coastal facilities to climate change. In addition, the President's FY 2014 Budget proposes $200 million through the Transportation Leadership Awards program for Climate Ready Infrastructure in communities that build enhanced preparedness into their planning efforts, and that have proposed or are ready to break ground on infrastructure projects, including transit and rail, to improve resilience.

**Rebuilding and Learning from Hurricane Sandy:** In August 2013, President Obama's Hurricane Sandy Rebuilding Task Force will deliver to the President a rebuilding strategy to be implemented in Sandy-affected regions and establishing precedents that can be followed

elsewhere. The Task Force and federal agencies are also piloting new ways to support resilience in the Sandy-affected region; the Task Force, for example, is hosting a regional "Rebuilding by Design" competition to generate innovative solutions to enhance resilience. In the transportation sector, the Department of Transportation's Federal Transit Administration (FTA) is dedicating $5.7 billion to four of the area's most impacted transit agencies, of which $1.3 billion will be allocated to locally prioritized projects to make transit systems more resilient to future disasters. FTA will also develop a competitive process for additional funding to identify and support larger, stand-alone resilience projects in the impacted region. To build coastal resilience, the Department of the Interior will launch a $100 million competitive grant program to foster partnerships and promote resilient natural systems while enhancing green spaces and wildlife habitat near urban populations. An additional $250 million will be allocated to support projects for coastal restoration and resilience across the region. Finally, with partners, the U.S. Army Corps of Engineers is conducting a $20 million study to identify strategies to reduce the vulnerability of Sandy-affected coastal communities to future large-scale flood and storm events, and the National Oceanic and Atmospheric Administration will strengthen long-term coastal observations and provide technical assistance to coastal communities.

## II.  *Protecting our Economy and Natural Resources*

Climate change is affecting nearly every aspect of our society, from agriculture and tourism to the health and safety of our citizens and natural resources. To help protect critical sectors, while also targeting hazards that cut across sectors and regions, the Administration will mount a set of sector- and hazard-specific efforts to protect our country's vital assets, to include:

**Identifying Vulnerabilities of Key Sectors to Climate Change:** The Department of Energy will soon release an assessment of climate-change impacts on the energy sector, including power-plant disruptions due to drought and the disruption of fuel supplies during severe storms, as well as potential opportunities to make our energy infrastructure more resilient to these risks. In 2013, the Department of Agriculture and Department of the Interior released several studies outlining the challenges a changing climate poses for America's agricultural enterprise, forests, water supply, wildlife, and public lands. This year and next, federal agencies will report on the impacts of climate change on other key sectors and strategies to address them, with priority efforts focusing on health, transportation, food supplies, oceans, and coastal communities.

**Promoting Resilience in the Health Sector:** The Department of Health and Human Services will launch an effort to create sustainable and resilient hospitals in the face of climate change. Through a public-private partnership with the healthcare industry, it will identify best practices and provide guidance on affordable measures to ensure that our medical system is resilient to climate impacts. It will also collaborate with partner agencies to share best practices among federal health facilities. And, building on lessons from pilot projects underway in 16 states, it will help train public-health professionals and community leaders to prepare their communities for the health consequences of climate change, including through effective communication of health risks and resilience measures.

**Promoting Insurance Leadership for Climate Safety:** Recognizing the critical role that the private sector plays in insuring assets and enabling rapid recovery after disasters, the Administration will convene representatives from the insurance industry and other stakeholders to explore best practices for private and public insurers to manage their own processes and

investments to account for climate change risks and incentivize policy holders to take steps to reduce their exposure to these risks.

**Conserving Land and Water Resources:** America's ecosystems are critical to our nation's economy and the lives and health of our citizens. These natural resources can also help ameliorate the impacts of climate change, if they are properly protected. The Administration has invested significantly in conserving relevant ecosystems, including working with Gulf State partners after the Deepwater Horizon spill to enhance barrier islands and marshes that protect communities from severe storms. The Administration is also implementing climate-adaptation strategies that promote resilience in fish and wildlife populations, forests and other plant communities, freshwater resources, and the ocean. Building on these efforts, the President is also directing federal agencies to identify and evaluate additional approaches to improve our natural defenses against extreme weather, protect biodiversity and conserve natural resources in the face of a changing climate, and manage our public lands and natural systems to store more carbon.

**Maintaining Agricultural Sustainability:** Building on the existing network of federal climate-science research and action centers, the Department of Agriculture is creating seven new Regional Climate Hubs to deliver tailored, science-based knowledge to farmers, ranchers, and forest landowners. These hubs will work with universities and other partners, including the Department of the Interior and the National Oceanic and Atmospheric Administration, to support climate resilience. Its Natural Resources Conservation Service and the Department of the Interior's Bureau of Reclamation are also providing grants and technical support to agricultural water users for more water-efficient practices in the face of drought and long-term climate change.

**Managing Drought:** Leveraging the work of the National Disaster Recovery Framework for drought, the Administration will launch a cross-agency National Drought Resilience Partnership as a "front door" for communities seeking help to prepare for future droughts and reduce drought impacts. By linking information (monitoring, forecasts, outlooks, and early warnings) with drought preparedness and longer-term resilience strategies in critical sectors, this effort will help communities manage drought-related risks.

**Reducing Wildfire Risks:** With tribes, states, and local governments as partners, the Administration has worked to make landscapes more resistant to wildfires, which are exacerbated by heat and drought conditions resulting from climate change. Federal agencies will expand and prioritize forest and rangeland restoration efforts in order to make natural areas and communities less vulnerable to catastrophic fire. The Department of the Interior and Department of Agriculture, for example, are launching a Western Watershed Enhancement Partnership – a pilot effort in five western states to reduce wildfire risk by removing extra brush and other flammable vegetation around critical areas such as water reservoirs.

**Preparing for Future Floods:** To ensure that projects funded with taxpayer dollars last as long as intended, federal agencies will update their flood-risk reduction standards for federally funded projects to reflect a consistent approach that accounts for sea-level rise and other factors affecting flood risks. This effort will incorporate the most recent science on expected rates of sea-level rise (which vary by region) and build on work done by the Hurricane Sandy Rebuilding Task Force, which announced in April 2013 that all federally funded Sandy-related rebuilding projects must meet a consistent flood risk reduction standard that takes into account increased risk from extreme weather events, sea-level rise, and other impacts of climate change.

### III.    Using Sound Science to Manage Climate Impacts

Scientific data and insights are essential to help government officials, communities, and businesses better understand and manage the risks associated with climate change. The Administration will continue to lead in advancing the science of climate measurement and adaptation and the development of tools for climate-relevant decision-making by focusing on increasing the availability, accessibility, and utility of relevant scientific tools and information. Specific actions will include:

**Developing Actionable Climate Science:** The President's Fiscal Year 2014 Budget provides more than $2.7 billion, largely through the 13-agency U.S. Global Change Research Program, to increase understanding of climate-change impacts, establish a public-private partnership to explore risk and catastrophe modeling, and develop the information and tools needed by decision-makers to respond to both long-term climate change impacts and near-term effects of extreme weather.

**Assessing Climate-Change Impacts in the United States:** In the spring of 2014, the Obama Administration will release the third U.S. National Climate Assessment, highlighting new advances in our understanding of climate-change impacts across all regions of the United States and on critical sectors of the economy, including transportation, energy, agriculture, and ecosystems and biodiversity. For the first time, the National Climate Assessment will focus not only on dissemination of scientific information but also on translating scientific insights into practical, useable knowledge that can help decision-makers anticipate and prepare for specific climate-change impacts.

**Launching a Climate Data Initiative:** Consistent with the President's May 2013 Executive Order on Open Data – and recognizing that freely available open government data can fuel entrepreneurship, innovation, scientific discovery, and public benefits – the Administration is launching a Climate Data Initiative to leverage extensive federal climate-relevant data to stimulate innovation and private-sector entrepreneurship in support of national climate-change preparedness.

**Providing a Toolkit for Climate Resilience:** Federal agencies will create a virtual climate-resilience toolkit that centralizes access to data-driven resilience tools, services, and best practices, including those developed through the Climate Data Initiative. The toolkit will provide easy access to existing resources as well as new tools, including: interactive sea-level rise maps and a sea-level-rise calculator to aid post-Sandy rebuilding in New York and New Jersey, new NOAA storm surge models and interactive maps from the National Oceanic and Atmospheric Administration that provide risk information by combining tidal data, projected sea levels and storm wave heights, a web-based tool that will allow developers to integrate NASA climate imagery into websites and mobile apps, access to the U.S. Geological Survey's "visualization tool" to assess the amount of carbon absorbed by landscapes, and a Stormwater Calculator and Climate Assessment Tool developed to help local governments assess stormwater-control measures under different precipitation and temperature scenarios.

## LEAD INTERNATIONAL EFFORTS TO ADDRESS GLOBAL CLIMATE CHANGE

The Obama Administration is working to build on the actions that it is taking domestically to achieve significant global greenhouse gas emission reductions and enhance climate preparedness through major international initiatives focused on spurring concrete action, including bilateral initiatives with China, India, and other major emitting countries. These initiatives not only serve to support the efforts of the United States and others to achieve our goals for 2020, but also will help us move beyond those and bend the post-2020 global emissions trajectory further. As a key part of this effort, we are also working intensively to forge global responses to climate change through a number of important international negotiations, including the United Nations Framework Convention on Climate Change.

## I.   *Working with Other Countries to Take Action to Address Climate Change*

**Enhancing Multilateral Engagement with Major Economies:** In 2009, President Obama launched the Major Economies Forum on Energy and Climate, a high-level forum that brings together 17 countries that account for approximately 75 percent of global greenhouse gas emissions, in order to support the international climate negotiations and spur cooperative action to combat climate change. The Forum has been successful on both fronts – having contributed significantly to progress in the broader negotiations while also launching the Clean Energy Ministerial to catalyze the development and deployment of clean energy and efficiency solutions. We are proposing that the Forum build on these efforts by launching a major initiative this year focused on further accelerating efficiency gains in the buildings sector, which accounts for approximately one-third of global carbon pollutions from the energy sector.

**Expanding Bilateral Cooperation with Major Emerging Economies:**
From the outset, the Obama Administration has sought to intensify bilateral climate cooperation with key major emerging economies, through initiatives like the U.S.-China Clean Energy Research Center, the U.S.-India Partnership to Advance Clean Energy, and the Strategic Energy Dialogue with Brazil.

We will be building on these successes and finding new areas for cooperation in the second term, and we are already making progress: Just this month, President Obama and President Xi Jinping of China reached an historic agreement at their first summit to work to use the expertise and institutions of the Montreal Protocol to phase down the consumption and production of HFCs, a highly potent greenhouse gas. The impact of phasing out HFCs by 2050 would be equivalent to the elimination of two years' worth of greenhouse gas emissions from all sources.

**Combatting Short-Lived Climate Pollutants:** Pollutants such as methane, black carbon, and many HFCs are relatively short-lived in the atmosphere, but have more potent greenhouse effects than carbon dioxide. In February 2012, the United States launched the Climate and Clean Air Coalition to Reduce Short-Lived Climate Pollution, which has grown to include more than 30 country partners and other key partners such as the World Bank and the U.N. Environment Programme. Major efforts include reducing methane and black carbon from waste and landfills. We are also leading through the Global Methane Initiative, which works with 42 partner countries and an extensive network of over 1,100 private sector participants to reduce methane emissions.

**Reducing Emissions from Deforestation and Forest Degradation:** Greenhouse gas emissions from deforestation, agriculture, and other land use constitute approximately one-third of global emissions. In some developing countries, as much as 80 percent of these emissions come from the land sector. To meet this challenge, the Obama Administration is working with partner countries to put in place the systems and institutions necessary to significantly reduce global land-use-related emissions, creating new models for rural development that generate climate benefits, while conserving biodiversity, protecting watersheds, and improving livelihoods.

In 2012 alone, the U.S. Agency for International Development's bilateral and regional forestry programs contributed to reducing more than 140 million tons of carbon dioxide emissions, including through support for multilateral initiatives such as the Forest Investment Program and the Forest Carbon Partnership Facility. In Indonesia, the Millennium Challenge Corporation is funding a five-year "Green Prosperity" program that supports environmentally sustainable, low carbon economic development in select districts.

The Obama Administration is also working to address agriculture-driven deforestation through initiatives such as the Tropical Forest Alliance 2020, which brings together governments, the private sector, and civil society to reduce tropical deforestation related to key agricultural commodities, which we will build upon.

**Expanding Clean Energy Use and Cut Energy Waste:** Roughly 84 percent of current carbon dioxide emissions are energy-related and about 65 percent of all greenhouse gas emissions can be attributed to energy supply and energy use. The Obama Administration has promoted the expansion of renewable, clean, and efficient energy sources and technologies worldwide through:

- Financing and regulatory support for renewable and clean energy projects
- Actions to promote fuel switching from oil and coal to natural gas or renewables
- Support for the safe and secure use of nuclear power
- Cooperation on clean coal technologies
- Programs to improve and disseminate energy efficient technologies

In the past three years we have reached agreements with more than 20 countries around the world, including Mexico, South Africa, and Indonesia, to support low emission development strategies that help countries to identify the best ways to reduce greenhouse gas emissions while growing their economies. Among the many initiatives that we have launched are:

- The U.S. Africa Clean Energy Finance Initiative, which aligns grant-based assistance with project planning expertise from the U.S. Trade and Development Agency and financing and risk mitigation tools from the U.S. Overseas Private Investment Corporation to unlock up to $1 billion in clean energy financing.

- The U.S.-Asia Pacific Comprehensive Energy Partnership, which has identified $6 billion in U.S. export credit and government financing to promote clean energy development in the Asia-Pacific region.

Looking ahead, we will target these and other resources towards greater penetration of renewables in the global energy mix on both a small and large scale, including through our

participation in the Sustainable Energy for All Initiative and accelerating the commercialization of renewable mini-grids.  These efforts include:

- **Natural Gas.** Burning natural gas is about one-half as carbon-intensive as coal, which can make it a critical "bridge fuel" for many countries as the world transitions to even cleaner sources of energy. Toward that end, the Obama Administration is partnering with states and private companies to exchange lessons learned with our international partners on responsible development of natural gas resources. We have launched the Unconventional Gas Technical Engagement Program to share best practices on issues such as water management, methane emissions, air quality, permitting, contracting, and pricing to help increase global gas supplies and facilitate development of the associated infrastructure that brings them to market. Going forward, we will promote fuel-switching from coal to gas for electricity production and encourage the development of a global market for gas. Since heavy-duty vehicles are expected to account for 40 percent of increased oil use through 2030, we will encourage the adoption of heavy duty natural gas vehicles as well.

- **Nuclear Power.** The United States will continue to promote the safe and secure use of nuclear power worldwide through a variety of bilateral and multilateral engagements. For example, the U.S. Nuclear Regulatory Commission advises international partners on safety and regulatory best practices, and the Department of Energy works with international partners on research and development, nuclear waste and storage, training, regulations, quality control, and comprehensive fuel leasing options. Going forward, we will expand these efforts to promote nuclear energy generation consistent with maximizing safety and nonproliferation goals.

- **Clean Coal.** The United States works with China, India, and other countries that currently rely heavily on coal for power generation to advance the development and deployment of clean coal technologies. In addition, the U.S. leads the Carbon Sequestration Leadership Forum, which engages 23 other countries and economies on carbon capture and sequestration technologies. Going forward, we will continue to use these bilateral and multilateral efforts to promote clean coal technologies.

- **Energy Efficiency.** The Obama Administration has aggressively promoted energy efficiency through the Clean Energy Ministerial and key bilateral programs. The cost-effective opportunities are enormous: The Ministerial's Super-Efficient Equipment and Appliance Deployment Initiative and its Global Superior Energy Performance Partnership are helping to accelerate the global adoption of standards and practices that would cut energy waste equivalent to more than 650 mid-size power plants by 2030. We will work to expand these efforts focusing on several critical areas, including: improving building efficiency, reducing energy consumption at water and wastewater treatment facilities, and expanding global appliance standards.

**Negotiating Global Free Trade in Environmental Goods and Services:** The U.S. will work with trading partners to launch negotiations at the World Trade Organization towards global free trade in environmental goods, including clean energy technologies such as solar, wind, hydro and geothermal. The U.S. will build on the consensus it recently forged among the 21 Asia-Pacific Economic Cooperation (APEC) economies in this area. In 2011, APEC economies agreed to reduce tariffs to 5 percent or less by 2015 on a negotiated list of 54 environmental goods. The

APEC list will serve as a foundation for a global agreement in the WTO, with participating countries expanding the scope by adding products of interest. Over the next year, we will work towards securing participation of countries which account for 90 percent of global trade in environmental goods, representing roughly $481 billion in annual environmental goods trade. We will also work in the Trade in Services Agreement negotiations towards achieving free trade in environmental services.

**Phasing Out Subsidies that Encourage Wasteful Consumption of Fossil Fuels:** The International Energy Agency estimates that the phase-out of fossil fuel subsidies – which amount to more than $500 billion annually – would lead to a 10 percent reduction in greenhouse gas emissions below business as usual by 2050. At the 2009 G-20 meeting in Pittsburgh, the United States successfully advocated for a commitment to phase out these subsidies, and we have since won similar commitments in other fora such as APEC. President Obama is calling for the elimination of U.S. fossil fuel tax subsidies in his Fiscal Year (FY) 2014 budget, and we will continue to collaborate with partners around the world toward this goal.

**Leading Global Sector Public Financing Towards Cleaner Energy:** Under this Administration, the United States has successfully mobilized billions of dollars for clean energy investments in developing countries, helping to accelerate their transition to a green, low-carbon economy. Building on these successes, the President calls for an end to U.S. government support for public financing of new coal plants overseas, except for (a) the most efficient coal technology available in the world's poorest countries in cases where no other economically feasible alternative exists, or (b) facilities deploying carbon capture and sequestration technologies. As part of this new commitment, we will work actively to secure the agreement of other countries and the multilateral development banks to adopt similar policies as soon as possible.

**Strengthening Global Resilience to Climate Change:** Failing to prepare adequately for the impacts of climate change that can no longer be avoided will put millions of people at risk, jeopardizing important development gains, and increasing the security risks that stem from climate change. That is why the Obama Administration has made historic investments in bolstering the capacity of countries to respond to climate-change risks. Going forward, we will continue to:

- Strengthen government and local community planning and response capacities, such as by increasing water storage and water use efficiency to cope with the increased variability in water supply

- Develop innovative financial risk management tools such as index insurance to help smallholder farmers and pastoralists manage risk associated with changing rainfall patterns and drought

- Distribute drought-resistant seeds and promote management practices that increase farmers' ability to cope with climate impacts.

**Mobilizing Climate Finance:** International climate finance is an important tool in our efforts to promote low-emissions, climate-resilient development. We have fulfilled our joint developed country commitment from the Copenhagen Accord to provide approximately $30 billion of climate assistance to developing countries over FY 2010-FY 2012. The United States contributed approximately $7.5 billion to this effort over the three year period. Going forward, we will seek

to build on this progress as well as focus our efforts on combining our public resources with smart policies to mobilize much larger flows of private investment in low-emissions and climate resilient infrastructure.

## II.   *Leading Efforts to Address Climate Change through International Negotiations*

The United States has made historic progress in the international climate negotiations during the past four years. At the Copenhagen Conference of the United Nations Framework Convention on Climate Change (UNFCCC) in 2009, President Obama and other world leaders agreed for the first time that all major countries, whether developed or developing, would implement targets or actions to limit greenhouse emissions, and do so under a new regime of international transparency. And in 2011, at the year-end climate meeting in Durban, we achieved another breakthrough: Countries agreed to negotiate a new agreement by the end of 2015 that would have equal legal force and be applicable to all countries in the period after 2020. This was an important step beyond the previous legal agreement, the Kyoto Protocol, whose core obligations applied to developed countries, not to China, India, Brazil or other emerging countries.
The 2015 climate conference is slated to play a critical role in defining a post-2020 trajectory. We will be seeking an agreement that is ambitious, inclusive and flexible. It needs to be ambitious to meet the scale of the challenge facing us.  It needs to be inclusive because there is no way to meet that challenge unless all countries step up and play their part. And it needs to be flexible because there are many differently situated parties with their own needs and imperatives, and those differences will have to be accommodated in smart, practical ways.

At the same time as we work toward this outcome in the UNFCCC context, we are making progress in a variety of other important negotiations as well. At the Montreal Protocol, we are leading efforts in support of an amendment that would phase down HFCs; at the International Maritime Organization, we have agreed to and are now implementing the first-ever sector-wide, internationally applicable energy efficiency standards; and at the International Civil Aviation Organization, we have ambitious aspirational emissions and energy efficiency targets and are working towards agreement to develop a comprehensive global approach.







June 30, 2014

U.S. Department of the Interior
Bureau of Land Management
1849 C Street NW., Room 2134 LM
Attn: WO-630
Washington, DC 20240-0001

*Via USPS and Federal eRulemaking Portal:  http://www.regulations.gov*

**RE:     1004-AE23**
**Waste Mine Methane Capture, Use, Sale, or Destruction, Advance Notice of Proposed**
**Rulemaking, 79 Fed. Reg. 23923 (April 29, 2014)**

The Sierra Club, Earthjustice, Center for Biological Diversity, Powder River Basin
Resource Council, and the Western Organization of Resource Councils hereby submit the
following comments to the Bureau of Land Management's ("BLM") Advanced Notice of
Proposed Rulemaking concerning Waste Mine Methane Capture, Use, Sale, or Destruction (the
"ANPR").[1] These comments are designed to inform BLM's decision-making process as it
considers and prepares a draft rule, and do so within the parameters outlined in BLM's notice
of proposed rulemaking.  The comments principally address the following issues, each of which
BLM has specifically identified for public comment in its rulemaking notice: BLM's regulatory
authority in crafting a rule that will lead to significant and meaningful reductions in methane
emissions from the coal mining sector consistent with President Obama's Climate Action Plan;

---

[1] Waste Mine Methane Capture, Use, Sale, or Destruction, Advance Notice of Proposed Rulemaking, 79 Fed. Reg.
23923 (April 29, 2014).

1

the problems with past efforts to reduce waste mine methane emissions by utilizing voluntary incentives; the technologies available for capture, use, sale, or destruction of waste mine methane; and the economics of various control technologies for active, underground coal mines in the context of the benefits that will be achieved when greenhouse gas emissions are reduced.

## I.      SUMMARY OF RECOMMENDATIONS

We agree with BLM's conclusion that the agency is vested with full and broad authority to require the capture, use, sale or destruction of waste mine methane ("WMM") that is liberated into the mine environment as a result of coal and other mineral mining operations under the Mineral Leasing Act ("MLA").[2]  Moreover, BLM has not only the authority, but also the affirmative duty to do so under the MLA, the Federal Land Policy and Management Act ("FLPMA"),[3] and the National Environmental Protect Act ("NEPA").[4]  <u>We urge BLM to expeditiously propose a rule setting forth the regulations necessary to accomplish this task.</u>

As a matter of law as well as policy, coal mines should be required to capture methane emissions where possible rather than vent them directly into the atmosphere.  BLM is ideally positioned to play a leading role in reducing methane emissions from public lands given its broad grant of authority and duty to administer federal lands and mineral estates.  Indeed, as BLM's ANPR and President Obama's Climate Action Plan have since made abundantly clear, reducing methane emissions from federal lands is a critical component of the Administration's ongoing efforts to combat climate disruption now and for future generations.

In this context, we make the following recommendations for BLM's proposed rulemaking:

- BLM's mine methane waste rule should <u>require</u> private companies that use public lands for coal mining to prevent methane waste; as demonstrated by the experiences in Colorado and the case study attached hereto, voluntary incentives have failed so far to result in meaningful reductions of methane emissions.

---

[2] 30 U.S.C. §§ 181 *et seq.*
[3] 43 U.S.C. § 1701(a).
[4] 42 U.S.C. §§ 4221 *et seq.*

2

- BLM's mine methane waste rule should consider and incorporate the true costs of coal development that reflects the social cost of methane, including the cost that methane waste imposes on public health, the climate, wildlife, and other natural resources.

- There are several available technologies already in use in the coal mining sector that effectively capture mine methane waste; BLM's mine methane waste rule should identify the best available control technology and mandate that all coal companies that choose to utilize public lands for underground mining use technology to capture, (or, in limited circumstances, combust) methane that corresponds to a specified technological standard keyed to the best available control technology.

- BLM's mine methane waste rule should include strong penalty provisions that ensure prompt compliance, including but not limited to the following: financial penalties to eliminate the economic benefit of non-compliance, the loss of any applicable royalty reduction previously granted, cancellation of leases, and the inability to procure future leases.

## II.   THE EFFECT OF METHANE EMISSIONS ON CLIMATE DISRUPTION

While much of the current discussion about greenhouse gas regulation has centered around carbon dioxide, methane is a harmful greenhouse gas that continues to be emitted into the atmosphere at an alarming rate.  The Intergovernmental Panel on Climate Change's Fifth Assessment Report, released in September 2013, estimates that methane has 34 times the global warming potential of $CO_2$ over a 100 year time frame and at least 86 times the global warming potential of $CO_2$ over a 20-year time frame.[5]  This estimate represents the current consensus of the scientific community based on the latest research.  It is that 20-year time frame that is most relevant to these considerations, since inaction during the next two decades virtually guarantees that irreversible tipping points – in addition to the already irreversible melting of Antarctic ice sheets – will be crossed.  For that reason, methane's 20-year global warming potential of 86 times that of $CO_2$ must be used when calculating the true cost of methane released into the atmosphere, against which any control or mitigation costs must be measured.

---

[5] Intergovernmental Panel on Climate Change (IPCC), Climate Change 2013, p. 714, available at https://www.ipcc.ch/report/ar5/wg1/#.Uxs205zpiqY (last visited June 24, 2014).

3

EPA's 2014 Greenhouse Gas Inventory estimates that in 2012, the U.S. emitted 29.8 million tons of methane,[6] which EPA concludes represents 9% of total U.S. greenhouse gas emissions.[7] Methane is more abundant in the Earth's atmosphere now than it has been at any time during the past 400,000 years, and the average atmospheric concentration of methane has increased 150% since 1750.[8] High concentrations of methane are "the unambiguous result of human activities."[9] Fortunately, as addressed in detail below, technology is currently available to significantly reduce, or even eliminate, methane and other harmful emissions from coal mining processes.

Because of methane's potency as a greenhouse gas, EPA has concluded that out of all the non-carbon dioxide greenhouse gases, methane "has the greatest mitigation potential."[10] This is also in part because methane has a significantly shorter atmospheric lifespan (12 years) compared to the lifespan of carbon dioxide (100 years and more).[11] Thus, reducing methane emissions has a greater effect in the short term to mitigate potential harms from climate disruption, and particularly during the next two crucial decades.

## III.   BACKGROUND: METHANE EMISSIONS FROM THE COAL MINING SECTOR

The coal mining industry is one of the largest emitters of methane in the United States, accounting for more than 10 percent of U.S. anthropogenic methane emissions according to EPA estimates,[12] making the U.S. the second largest emitter of coal mine methane, after

---

[6] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2012* (Apr. 2014) ("EPA 2014 Inventory"), Table ES-2 (estimating 567.3 Tg $CO_2$e from $CH_4$), available at http://epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2014-Chapter-Executive-Summary.pdf.

[7] *Id.* at Table 2-1, *available at* http://www.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2014-Chapter-2-Trends.pdf; *see also* U.S. EPA, *Methane: Science*, http://www.epa.gov/methane/scientific.html (last visited June 25, 2014).

[8] http://www.epa.gov/climatechange/EPAactivities/economics/nonco2projections.html (last visited June 29, 2014).

[9] U.S. EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(A) of the Clean Air Act, 74 Fed. Reg. 66496, 66517 (Dec. 15, 2009).

[10] U.S. ENVIRONMENTAL PROTECTION AGENCY: OFFICE OF ATMOSPHERIC PROGRAMS, GLOBAL MITIGATION OF NON-$CO_2$ GREENHOUSE GASES Ch 1, 1-21 (2006), *available at* http://www.epa.gov/climatechange/economics/downloads/GlobalMitigationFullReport.pdf (hereafter "Global Mitigation Report").

[11] http://epa.gov/climatechange/ghgemissions/gases/ch4.html (last visited June 29, 2014).

[12] *See* EPA 2014 Inventory, available at http://epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2014-Chapter-Executive-Summary.pdf (last visited June 29, 2014).

China.[13]  Methane, which is a byproduct of the natural process of converting organic materials into coal, is stored throughout the surrounding rock strata in varying sized pockets and, due to the greater overburden pressures, often increases in concentration the deeper the coal seam. Because methane creates hazardous working conditions for miners, it must be removed from underground mines.[14]

While methane escapes during the processing, transport, and storage of coal, 90% of the emissions come from the actual coal mining process.  Methane is emitted from all three categories of coal mines: surface mines, underground mines, and abandoned mines.  Although BLM has limited its proposed rulemaking to underground mines, it is important to note that its broad statutory authority ought to be used to generate the greatest reductions possible, and that to do so BLM should extend the rule to apply to surface mines, abandoned underground mines, coal processing facilities, as well as underground mines.

### A.  Underground coal mines

Most underground coal mines still do not recover and use methane. However, as EPA concluded more than four years ago, many mines are strong candidates for cost-effective methane recovery projects.[15] Furthermore, EPA's 2009 report on methane reduction opportunities in the U.S. notes that substantial environmental, economic, and energy benefits could be achieved if mines that currently emit methane were to recover and use it.[16]

Within the coal mining sector, underground mines emit the largest portion of methane into the atmosphere.[17]  According to the EPA, only 31% of the coal mined in the United States came from underground mines, but these mines generated over 60% of coal mining methane emissions.[18]  The EPA also estimates that in 2012, active coal mines emitted 24% of the

---

[13] U.S. ENVIRONMENTAL PROTECTION AGENCY, IDENTIFYING OPPORTUNITIES FOR METHANE RECOVERY AT U.S. COAL MINES: PROFILES OF SELECTED GASSY UNDERGROUND COAL MINES 2002-2006 at 2-3 (2009), available at http://www.epa.gov/coalbed/docs/profiles_2008_final.pdf (last visited June 29, 2014) (hereafter "EPA 2009 STUDY: IDENTIFYING OPPORTUNITIES").

[14] See, e.g., U.S. EPA, Coalbed Methane Outreach Program (CMOP), Basic Information, http://www.epa.gov/cmop/basic.html (last visited June 26, 2014) (explaining that methane is an explosive gas and concentrations of methane must be kept below 1% for safety reasons.  The precise concentration limits are regulated by mine safety authorities in each country.).

[15] EPA 2009 STUDY: IDENTIFYING OPPORTUNITIES at 1-7.

[16] Id.

[17] U.S. EPA, Coalbed Methane Outreach Program (CMOP), Basic Information, http://www.epa.gov/cmop/basic.html (last visited June 26, 2014).

[18] Id.

methane emissions from the U.S. energy sector,[19] documenting the enormous difference one gassy mine can make for total methane emissions.[20]

Given this massive contribution to overall U.S. methane emissions, mandating the recovery or combustion of methane currently emitted from underground coal mines would significantly reduce the amount of greenhouse gases emitted into the atmosphere.

### B.  Surface coal mines

BLM should include surface mines, including those on public lands administered by BLM, in BLM's rulemaking for mine methane recovery and utilization projects.  For coal seams located closer to the surface, mining companies employ surface mining techniques like strip mining and mountain-top removal.  The shallower the coal seam, the less overburden and pressure there is to keep methane in the seam.  Shallower seams thus tend to have lower concentrations of methane. [21] Methane escapes into the surface as the overburden is removed to expose the coal.[22]  In 1997, the EPA estimated that, even though surface mines accounted for over 61% of the coal production in the United States, they only accounted for 14% of coal mine methane emissions.[23]  More recent data shows that emissions from surface mines account for 22% of coal mine fugitive emissions.[24]  Mine methane recovery at surface mine opportunities are addressed in a 2009 EPA report entitled, *U.S. Surface Coal Mine Methane Recovery Project Opportunities.*[25]

### C.  Post-mined and underground abandoned coal mines

Even after coal extraction from an underground mine ceases, the mine still actively emits methane into the atmosphere.  These emissions can be significant.  The EPA has estimated that abandoned underground coal mines can emit 8% of the total coal mine methane

---

[19] *See* U.S. EPA, INVENTORY OF U.S. GREENHOUSE GAS EMISSIONS AND SINKS: 1990-2012 at 2-11, Table 2-4  (Apr. 2014), available at http://www.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2014-Chapter-2-Trends.pdf   (last visited June 30, 2014).

[20] U.S. ENVIRONMENTAL PROTECTION AGENCY, IDENTIFYING OPPORTUNITIES FOR METHANE RECOVERY AT U.S. COAL MINES: PROFILES OF SELECTED GASSY UNDERGROUND COAL MINES 2002-2006 at 5-11 (2009), *available at* http://www.epa.gov/coalbed/docs/profiles_2008_final.pdf (last visited June 29, 2014).

[21] U.S. ENVIRONMENTAL PROTECTION AGENCY, COAL MINING, U.S. METHANE EMISSIONS 1990 – 2020: INVENTORIES, PROJECTIONS, AND OPPORTUNITIES FOR REDUCTIONS at 4-2 (1999), *available at* http://www.epa.gov/methane/reports/04-coal.pdf (last visited June 29, 2014).

[22] *Id.*

[23] *Id.*

[24] For more information, see EPA's Coal Mine Outreach Program website at http://www.epa.gov/cmop/basic.html.

[25] Available at *http://www.epa.gov/cmop/docs/cmm_recovery_opps_surface.pdf* (last visited June 26, 2014).

emissions and post mining operations emit as much as 22%.[26]  Because these mines were once active underground mines, the same technologies as those applies to active mines can be used, post-mining, to extract methane.  The EPA has reported that there are several thousand abandoned coal mine throughout the United States and as many as 400 that are considered to be "gassy."[27]

### D.  Coal handling activities

According to a report by the EPA, methane emitting activities associated with coal handling at underground coal mines include "crushing, separation of impurities, size classification, drying, transportation, and storage."[28] The report further explains, "Different types of coals desorb methane at different rates, but since coal is usually removed from a mine within hours or days of being mined, some methane remains and is liberated from the coal during handling operations."[29] Thus, this report indicates that methane is released from coal during handling.

## IV.  BLM HAS BROAD LEGAL AUTHORITY AND AN OBLIGATION TO REGULATE THE CAPTURE, USE, SALE OR DESTRUCTION OF WASTE MINE METHANE

As BLM itself notes in the ANPR, section 30 of the MLA provides the agency with ample authority to prevent undue waste during mining operations. In fact, section 30 makes clear that waste prevention is not discretionary, but is a mandatory obligation. It provides:  "Each lease *shall* contain provision for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property; a provision that such rules for the safety and welfare of the miners *and for the prevention of undue waste* as may be prescribed by said Secretary *shall be observed . . . .*"[30]  Congress' use of the word "shall" here unambiguously demonstrates that waste prevention is a mandate.[31]

Similarly, as BLM also notes, section 32 of the MLA states that the Secretary "is authorized to prescribe necessary and proper rules and regulations and *to do any and all things*

---

[26] Kirchgessner, D.A., et al., "An Improved Inventory of Methane Emissions from Coal Mining in the United States" at 6, available at http://www.epa.gov/ttn/chief/ap42/ch14/related/mine.pdf (last visited June 26, 2014).
[27] See EPA, *U.S. Abandoned Coal Mine Methane Recovery Project Opportunities*, available on EPA's Coal Mine Outreach Program website at http://www.epa.gov/cmop/docs/amm_final_report.pdf (last visited June 26, 2014).
[28] Kirchgessner, D.A., et al., "An Improved Inventory of Methane Emissions from Coal Mining in the United States" at 6, available at http://www.epa.gov/ttn/chief/ap42/ch14/related/mine.pdf (last visited June 26, 2014).
[29] *Id.*
[30] MLA section 30, 30 U.S.C. § 187 (emphasis added).
[31] *See, e.g., Allied Pilots Ass'n v. Pension Ben. Guar. Corp., 334 F.3d 93, 98 (D.C. Cir. 2003)* ( "shall" is ordinarily a command).

*necessary to carry out and accomplish the purposes of*" the MLA provisions governing coal leasing.[32] Courts have held that this section constitutes a "broad" and "rather sweeping" grant of authority to the Interior Department.[33] In addition, the fact that a key "purpose" of the MLA was the prevention of waste was evident from the Act's legislative history. As the Supreme Court observed, "[c]onservation through control was the dominant theme of the debates" leading to the MLA's adoption.[34] To that end, Section 32's use of the phrase "any and all things necessary" provides the Secretary with broad authority to accomplish the prevention of waste, royalty collection, and environmental stewardship entrusted to her.

As the ANPR also notes, coal leases are specifically designed to allow the Secretary to carry out her statutory duties, including that of waste prevention. Section 7(a) of the MLA specifically provides that coal leases "shall include such other terms and conditions as the Secretary shall determine."[35] This broadly worded statute is an additional source of the Secretary's authority. In fact, lessees mining solid minerals on public lands must already "carry on all operations in accordance with approved methods and practices . . . having due regard for the . . . *prevention of waste, damage or degradation to any land, air, water, . . . and other resources, including mineral deposits . . .*"[36] As a potent global warming agent, release of waste mine methane into the atmosphere damages and degrades the air and environment. We urge the Secretary to require the capture, use, sale, or, where technically unavoidable, the destruction of methane not only by means of new regulations after notice and comment, but also by immediately including explicit requirements to this effect in new, amended, renewed or extended coal mine leases.[37]

---

[32] 30 U.S.C. § 189 (emphasis added).

[33] *Arch Mineral Corp. v. Lujan*, 911 F.2d 408, 415 (10th Cir. 1990) ("broad"); *Independent Petroleum Ass'n of America v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir 2002) ("rather sweeping").

[34] *Boesche v. Udall* 373 U.S. 472, 481 (1963)(citing H.R.Rep. No. 398, 66th Cong., 1st Sess. 12-13; H.R.Rep. No. 1138, 65th Cong., 3d Sess. 19).The MLA's focus on waste prevention is also reflected in those of its provisions dealing with the leasing of property for oil and gas extraction. The relevant statute states that "[a]ll leases of lands containing oil or gas . . . shall be subject to the condition that the lessee will . . . use all reasonable precautions to prevent waste of oil or gas developed in the land . . ." 30 U.S.C. § 225; *see also* 43 C.F.R. § 3161.2 (BLM to ensure the "maximum ultimate recovery of oil and gas with minimum waste . . .").

[35] MLA section 7(a), 30 U.S.C. § 207. *See also* MLA section 24, 30 U.S.C. § 262 (similar discretion regarding sodium leases).

[36] United States Dep't of the Interior, Bureau of Land Management, Coal Lease, Form 3400-12 (2013), available at http://www.blm.gov/pgdata/etc/medialib/blm/noc/business/eforms.Par.11548.File.dat/3400-012.pdf (last visited June 30, 2014) (emphasis added); *see also* MLA section 7, 30 U.S.C. § 207.

[37] The Secretary is authorized to do so without notice and comment. *See General Chemical (Soda Ash) Partners*, 176 IBLA 1, 24 (Sept. 10, 2008) (while "the Secretary *could* choose to prescribe certain lease terms by rule using the MLA's rulemaking authority at 30 U.S.C. § 189 (2000), he is not *required* to do so") (emphasis in original).

We note that methane liberated during mining operations unquestionably falls within the statutes cited above. Methane deposits on public lands, whether in embedded in coal or other minerals, is all of the following: an energy source used to fuel power plants, heat homes and cook food with a voraciously expanding market; a federally owned asset for which the Secretary must collect royalty payments; and a highly dangerous agent of global warning. Allowing waste mine methane escape into the atmosphere rather than capturing, using, selling or – where there is no other alternative – flaring, or otherwise combusting, it constitutes undue waste, environmental degradation and loss of federal royalty income *per se.*

Even if a specific grant of authority to BLM were lacking – and it is not – BLM can rely on its general grant of authority. As the Supreme Court has noted, the fact that the MLA does not confer specific authority to do a particular act "does not mean that the authority does not exist anywhere, for, in the absence of some direction to the contrary the general statutory provisions . . . vest it in the [agency]."[38] Certainly, the prevention of waste of royalty-bearing federal assets, and the control of a pollutant harmful to the environment, is within that general authority.

BLM also has the authority and duty to prevent the waste of mine methane under FLPMA. FLPMA requires BLM to manage the public lands so as to protect the environment, the air and the atmosphere "in a manner that will protect the quality of scientific, scenic, historical, ecological, *environmental, air and atmospheric*, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use."[39] As laid out in Section II above, methane is a potent global warming agent that significantly contributes to the amount of greenhouse gases in our air and atmosphere, with potentially catastrophic consequences for the air, atmosphere, and general environment. A failure to prevent the release of waste mine methane into the air by means of all necessary regulations and other actions would violate the agency's duties under FLPMA.

For the same reasons, BLM has an obligation to disclose the impacts of waste of mine methane under NEPA. NEPA directs the agency to take a "hard look" at the direct, indirect, and cumulative impacts of actions on the "human environment."[40] The impacts of methane on the

---

[38] *Cameron v. United States,* 252 U.S. 450, 461 (1920).
[39] 43 U.S.C. § 1701(a)(8)(emphasis added).
[40] 40 C.F.R. §§ 1502.16(a), (b); 1508.25(c). As to the Secretary's general responsibility to consider environmental concerns under the MLA, *see Jackson Hole Alliance for Responsible Planning v. Watt* (D.C. Wyo. 1983), 13 ELR 20994.

human environment, particularly on climate and public health, are laid out above, and uncontrolled waste mine methane indisputably contributes to these impacts.  Under NEPA, the agency must address "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))."[41]  The agency's hard look at these issues, in turn, must inform BLM's consideration of alternatives, helping the agency "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decision maker and the public."[42]  In light of the grave environmental impact of uncontrolled waste mine methane, a full and complete NEPA analysis will likely lead to the adoption of mitigation measures to capture, use, sell or destroy waste mine methane.

We also agree with BLM that it has broad authority to act under the President's March 10, 2014 Climate Action Plan – Strategy to Reduce Methane Emissions[43] and Secretarial Order 3289.[44]  The issuance of new and immediate amendment of existing coal and mineral mining leases to require the capture, use, sale or destruction of waste mine methane, and the issuance of regulations concerning these actions, is a necessary component of executing the President's plan.[45]

---

[41] 40 C.F.R. §§ 1502.16(e), (f), (h).

[42] 40 C.F.R. § 1502.14.

[43] The President's Climate Action Plan is available at http://www.whitehouse.gov/sites/default/files/strategy_to_reduce_methane_emissions_2014-03-28_final.pdf (last visited June 29, 2014).

[44] Secretarial Order 3289, Amendment No. 1 ("addressing the Impacts of Climate Change on America's Water, Land, and other Natural and Cultural Resources") (February 22, 2010).

[45] We also note that the General Accounting Office ("GAO") has documented the wastefulness of uncontrolled release of methane into the atmosphere in the context of oil and gas drilling.  The GAO's findings and recommendations apply here as well.  Specifically, the GOA found that venting and flaring of methane represents a massive waste of a valuable resource, a loss of federal revenue in the form of royalty payments, and unnecessary air pollution. It recommended that BLM should limit natural gas emissions by promoting the use of economically viable control technologies. For instance, the GAO states that "operators are not using available technologies in all cases to economically reduce vented and flared gas", and that "BLM guidance has not kept pace with the development of economically viable capture technologies for a number of sources of lost gas . . . ." U.S. GAO, *Federal Oil and Gas Leases, Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases* at 32 (2010). The same report noted that market forces and voluntary measures will not avoid this waste because operators are unaware of economic advantages of control technologies or do not have time or expertise to undertake a proper analysis; private industry's sometimes contentious relationship with the federal government, which can cultivate a lack of awareness regarding the technologies; and institutional inertia and reluctance to change. *Id.* at 24.

V.      THE SOCIAL COST OF METHANE

BLM has solicited comments on the economics of reducing mine methane waste emissions.  As BLM develops its proposed rulemaking, any economic assumptions or calculations must take into account the social cost of methane and not simply the cost to coal companies of installing and operating methane capture technologies.  This is a critical component of BLM's analysis, because private companies have a different mandate than BLM and are very unlikely to consider the social costs of pollution control equipment, as fully explained in the sections below.  BLM, however, has a separate mandate and must consider the cost that methane imposes on the public in addition to the cost that controls impose on operators.  Simply put, there is no absolute right for private companies to mine coal or other resources on public lands.  Those that choose to do so must mitigate the damage their mining imposes on the public to the extent possible, and BLM has the means and authority to make that happen.

EPA and other federal agencies have been using the social cost of carbon to estimate the climate benefits of rulemakings since it was first developed by a dozen agencies (including USDA, CEQ and EPA) and published by the Interagency Working Group in 2010.[46]  The social cost of carbon, usually expressed as a dollar-per-ton figure, provides an estimate of the economic damages associated with an increase in carbon dioxide ($CO_2$) emissions, conventionally one metric ton, in a given year.  The dollar figure can also represent the value of damages avoided for emission reductions achieved by federal rulemakings.  The social cost of carbon is designed to provide a comprehensive estimate of climate change damages, including, but not limited to, changes in net agricultural productivity, human health, and property damages from increased flood risk.  However, given current modeling and data limitations, even EPA has conceded that that the social cost of carbon protocol is likely a conservative estimate because it does not yet account for all important damages.[47]  Nevertheless, the protocol is designed for use in regulatory processes like this one, EPA has recommended using the social cost of carbon in NEPA documents, and a federal court recently held that agencies taking a hard look at the climate change impacts of coal mine methane pollution cannot claim that no method exists for disclosing the costs of such pollution, given the development and existence of the federal protocol.[48]

---

[46] http://www.epa.gov/climatechange/EPAactivities/economics/scc.html (last visited June 30, 2014).
[47] *Id.*
[48] *See High Country Conservation Advocates v. U.S. Forest Service*, No. 13-cv-1723 (RBJ) (D. Colo. June 27, 2014) (Order, Dkt. #91).

The Working Group that developed the federal social cost protocol has recognized that, despite some limitations, applying the social cost of carbon dioxide to methane on the basis of methane's global warming potentials may provide a reasonable estimate of the social costs of methane pollution.  For purposes of BLM's proposed rulemaking, any conversion from the social cost of carbon to the social cost of methane should incorporate methane's 20-year global warming potential rather than the 100-year figure.  As noted, methane is 86 times as potent as $CO_2$ over 20 years.  Even this figure, however, would likely underestimate the social cost of methane, as methane, has environmental and human health impacts not associated with emissions of $CO_2$, such as contributions to the formation of ozone (smog).  Thus, while using the social cost of carbon protocol to estimate the impacts of coal mine methane pollution is likely to not account for *all* of the costs of methane pollution, it will provide a reasonable, very conservative estimate, and will result in an accounting that is far more accurate than assuming the social cost of methane pollution is zero.

To improve upon the social cost of carbon as a tool for estimating the impacts of methane pollution, BLM should consider utilizing a more recent, peer-reviewed analysis by EPA economists estimating the social cost of methane pollution at $880 per short ton for the year 2015, assuming an annual discount rate of 3%.[49]  This figure was derived using the same methodology as used for the estimates of the social cost of carbon, building on work developed over several years and recently updated by the Interagency Working Group on the Social Cost of Carbon.  While this research presents an important starting point, subsequent research indicates that the $880 figure is too low.  In particular, since EPA's 2012 analysis was published, estimates of two inputs to this study – methane's global warming potential and the social cost of carbon – have been revised dramatically upward.  EPA's 2012 analysis used IPCC's fourth assessment report's estimates of methane's global warming potential, but the IPCC's fifth assessment report, released in September 2013, significantly increased the estimates of methane's 20- and 100-year global warming potential to 86 and 34 times that of $CO_2$, respectively.[50]  Similarly, in 2013 the Federal Interagency Working Group increased its

---

[49] *See* Marten, A.L., and Newbold, S.C., *Estimating the social cost of non-$CO_2$ GHG emissions: Methane and nitrous oxide*, 51 Energy Policy 957 (2012).

[50] *Compare id.* at 13 (citing Interagency Working Group on Social cost of Carbon, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (Feb. 2010)), *available at* http://www.whitehouse.gov/sites/default/files/omb/inforeg/for-agencies/Social-Cost-of-Carbon-for-RIA.pdf) *with* Interagency Working Group on Social Cost of Carbon, United States Government, *Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (Nov. 2013) at 3, *available at* http://www.whitehouse.gov/sites/default/files/omb/assets/inforeg/technical-update-social-cost-of-carbon-for-regulator-impact-analysis.pdf. The 2013 estimates are 50% higher for emissions in 2010, with greater percentage increases in subsequent years.

estimates of the social cost of carbon, using the same 3% annual discount rate, by 50%.[51]  Sierra Club and other environmental organizations, however, have commented elsewhere that even these social cost of carbon figures significantly underestimate the true social cost of carbon, possibly by several orders of magnitude.[52]  Economists have also argued that the social cost of carbon is far greater than the $21 per ton of $CO_2$ assumed by interagency protocol in 2010 and greater than the 2013 revision.[53]  For these reasons, the true social cost of methane likely exceeds the cited figure of $880 per short ton.

## VI.    AVAILABLE TECHNOLOGIES

Existing Coal Mine Methane Capture operations are economical and feasible.  As early as 2009, methane recovery projects were already are operating at some of the gassiest mines in the U.S., and EPA concluded that there were numerous additional gassy mines where methane recovery projects could be developed.[54]  As of 2006, at least 23 mines operated drainage systems, with drainage efficiencies in the range of 3% to 88%.

Twelve of these mines already sell recovered methane, and two mines consume methane onsite for power generation and to heat mine ventilation air.  Mines that already use drainage systems may be especially good candidates for the development of cost-effective methane recovery and use projects.

BLM staffers acknowledge this feasibility.  More than five years ago, a BLM staffer evaluating the mine expansion in Colorado concluded:

Clearly, there are very real limitations to the applicability of CMM [coal mine methane] projects.  However, they have been successfully demonstrated in many places and we

---

[51] *Id.* at 16 (referencing IPCC AR4 global warming potential figures (often listed as "GWPs")).

[52] *See* Sierra Club, *Comments on the Interagency Working Group's (IWG) Technical Support Document: Social Cost of Carbon (SCC) for Regulatory Impact Analysis Under Executive Order 12866* (Docket Not. OMB-2013-0007-0083) (Feb. 25, 2014), *available at* http://www.regulations.gov/#!documentDetail;D=OMB-2013-0007-0083.

[53] F. Ackerman & E. Stanton, Climate Risks and Carbon Prices: Revising the Social Cost of Carbon (2010) (the social cost of carbon could be over $800 per ton of $CO_2$ equivalent; F. Ackerman & E. Stanton, Climate Risks and Carbon Prices: Revising the Social Cost of Carbon, *in* Economics, vol. 6 (Apr. 4, 2012) (reaching similar conclusions), available online at http://www.economics-ejournal.org/economics/journalarticles/2012-10 (last visited June 27, 2014); P. Epstein *et al.*, Full cost accounting for the life cycle of coal, Ann. N.Y. Acad. Sci. (2011) (estimating the social cost of coal at between $10 and $100 per ton of $CO_2$ equivalent); L. Johnson & C. Hope, The social cost of carbon in U.S. regulatory impact analyses: an introduction and critique, J. Envtl. Stud. & Sci. (Sept. 9, 2012) (finding a social cost of a ton of $CO_2$ emissions to be 2.6 to over 12 times larger than the Interagency Working Group's central estimate of $21 per ton of $CO_2$) available online at http://link.springer.com/article/10.1007%2Fs13412-012-0087-7 (last visited June 27, 2014) E. Stanton et al., Comments on *the 2013 Technical Update of the Social Cost of Carbon*, January 27, 2014.

[54] EPA 2009 STUDY: IDENTIFYING OPPORTUNITIES at 1-4.

need to fully and honestly explore the possibilities before we claim we can not require or even allow them . . . .[55]

It is worth noting that EPA has an entire program decided to encouraging coal mines in the U.S. and around the world to mitigate or eliminate methane emissions.  We urge BLM to coordinate with the experts at EPA's Coalbed Methane Outreach Program concerning the use of these various technologies.[56]  We note, however, that regardless of EPA's authority on methane, BLM need not limit its regulatory approach to voluntary measures.

Further, coal mines around the world are successfully and efficiently incorporating capture, use, or destruction of waste-mine methane and ventilation air methane as described below.  At least one major coal company – CONSOL Energy – has said that it will build on its current methane capture projects to "evaluate options for generating electric power from low-quality methane streams that currently are intentionally vented or not captured."[57]

A 2007 EPA presentation documents numerous methods for preventing methane waste, including 10 capture and utilization projects at active mines in the United States that involve natural gas pipeline injection, mine air heating, and coal drying.[58]

BLM's waste  mine methane rulemaking should require one or more of these methods for capturing or combusting waste mine methane where technologically feasible as best available technology for mitigating the impacts of waste methane.  These methods include:

- Capture and sale through pipeline injection.  Methane released from ventilation wells is pressurized and injected into a commercial pipeline for sale.

- Capture and use for electricity production.  Methane from drainage wells is used to fire generators to make electricity to power mine operations and to sell to the local power grid.

---

[55] Email of A. Worstell, BLM to B. Sharrow, BLM (May 7, 2009 2:11 PM) (emphasis added) (email on file with Earthjustice and the Sierra Club).
[56] For more information on EPA's Coalbed Methane Outreach Program, see http://www.epa.gov/cmop/ (last visited June 30, 2014).
[57] CONSOL Corporate Responsibility Report (2012) at 53.  Available at http://www.consolenergy.com/CorporateResponsibilityReport/2012New/files/assets/common/downloads/Layout%201.pdf (last visited June 20, 2014).
[58] See P. Franklin, US EPA Coalbed Methane Outreach Program, "Coal Mine Methane Recovery & Utilization in the United States" (Sept. 25, 2007), at 8-11, available at http://www.epa.gov/cmop/docs/cmm_conference_sep07/franklin_cmop_st_louis_sept2007.pdf (last visited June 29, 2014).  Additional documentation of methane utilization projects is available in the EPA Coalbed Methane Outreach Program Technical Options Series on the Coalbed Methane Outreach Program's website, www.epa.gov/coalbed/resources/technical_options.html (last visited June 29, 2014).

- <u>Capture and use for production of process heat</u>.  Methane from ventilation wells is used in the boiler for supporting in-mine heating, and in coal-drying.

- <u>Capture and conversion to liquefied natural gas</u>.  Methane from ventilation wells is turned into liquefied natural gas ("LNG") for transportation and sale to market.

- <u>Flaring</u>.  Where none of the above options are technically feasible, flaring methane from ventilation wells is used to reduce the greenhouse gas potential of those emissions by 95% or more.

The above methods are most likely to be technically feasible for methane emitted from methane drainage wells in high concentrations.  In addition, BLM's waste mine methane rulemaking must address methods for mitigating or eliminating emissions from ventilation air methane ("VAM"), which are typically emitted in lower concentrations (i.e., 1% or less).  BLM must address, at a minimum, alternatives to venting ventilation air methane including:

- <u>Use in electricity production</u>.  Despite VAM's low concentration of methane (less than 1%), such methane can be used to produce electrical power through Thermal Flow-Reversal Reactor Technology.

- <u>Destruction</u>.  VAM may be destroyed (converted to CO2 and water) through use of thermal or catalytic oxidation technology.

## A.  Waste Methane Capture and Use – Pipeline Injection

Mines can capture methane for: 1) pipeline injection and 2) recovery for electricity generation.[59]  These options vary in cost-effectiveness according to regional energy prices and capital equipment requirements (including proximity to a commercial pipeline, and the terrain through which the mine must build additional pipeline).[60]  In 2009, a study by the EPA found that many of the gassy mines in the US "appear[ed] to be strong candidates for cost-effective recovery projects."[61]  It should be noted that EPA's conclusions were made before the IPCC released the updated values concluding that methane has a global warming potential that is 86 times that of $CO_2$ is used.  When this higher figure is used, all of the techniques above become cost-effective.

For injection into pipelines, generally methane must have a concentration of at least 95% and contain no more than 2% concentration of inert gases (i.e., carbon dioxide, nitrogen,

---

[59] EPA, Global Mitigation of Non-$CO_2$ Greenhouse Gasses: 2010-2030, EPA-430-R-13-011 (Sept. 2013) at II-9, available at: http://www.epa.gov/climatechange/Downloads/EPAactivities/MAC_Report_2013.pdf (last visited June 3, 2014).
[60] *Id.*
[61] EPA 2009 Study: Identifying Opportunities at 1-7.

helium).[62]  Coal mine methane is typically free of hydrogen sulfide and other impurities, and requires little or no additional treatment and processing aside from water removal.[63]  Because of the high methane concentrations required, pre-mining degas wells are preferred for pipeline injection, though high-quality methane obtained from gob wells may, in some cases, be upgraded to pipeline quality by blending with pre-mine drained gas or removing oxygen.[64]

Capture and sale of waste methane has been feasible for decades.  For example, CONSOL energy first began capturing and selling methane in the 1980s,[65] and continues to profitably sell captured methane today.[66]

As of 2009, EPA found that twelve of the gassiest mines in the US already sold recovered methane.[67]  For example:

- The Alpha coal gas recovery project in Pennsylvania captures methane from pre-mine degasification of the coal seam, with the extracted gas processed and delivered to a pipeline.[68]

- Cliff's Oak Grove mine in Alabama recovers a total of 140,000 cubic feet of 90 percent high concentration methane each day, and directs it into the natural gas pipeline.[69]

## B.  Waste Mine Methane Capture and Use – Electricity Production

Coal mine methane can be used to power generators to make electricity to power mine operations, and to sell to the local power grid.[70]  EPA has found that this option can utilize methane in concentrations as low as 30% – much lower than is required for pipeline injection.[71]

---

[62] *Id.* at 2-9.
[63] *Id.*
[64] *Id.*
[65] CONSOL 2012 Form 10K at 5. ("CONSOL Energy entered the natural gas business in the 1980s . . . by capturing methane from coal seams prior to mining") available at http://phx.corporate-ir.net/phoenix.zhtml?c=66439&p=irol-reports (last visited June 20, 2014).
[66] *Id.* ("Our gas operations capture coalbed methane from our underground coal mines") available at http://phx.corporate-ir.net/phoenix.zhtml?c=66439&p=irol-reports (last visited June 20, 2014); *See also* Scheyder, Ernest.  Reuters.  "PREVIEW-Consol to showcase coal-to-gas move after new U.S. EPA rules" (June 11, 2014) ("Consol captures coal bed methane . . . and sells it at a profit") available at http://in.reuters.com/article/2014/06/11/consolenergy-epa-idINL2N0OQ1N320140611 (last visited June 20, 2014).
[67] *See* EPA 2009 STUDY: IDENTIFYING OPPORTUNITIES.
[68] Sindicatum, Coal Mine Methane, US: Alpha CGR, Pennsylvania. available at: www.sindicatum.com/portfolio_item/coal-mine-methane-us-alpha-cgr-pennsylvania/ (last visited June 3, 2014).
[69] Cliffs, 2012 Sustainability Report, available at www.cliffsnaturalresources.com/EN/CorpResponsibility/ArchivedReports/Sustainability2012/Pages/default.aspx (last visited June 3, 2014).
[70] EPA, Global Mitigation of Non-$CO_2$ Greenhouse Gasses: 2010-2030, EPA-430-R-13-011 (Sept. 2013) at II-10, available at www.epa.gov/climatechange/Downloads/EPAactivities/MAC_Report_2013.pdf (last visited June 3, 2014).

Moreover, General Electric markets its Jenbacher engines based on how effective they are at using low concentration, variable methane emissions, at concentrations down to 25%.[72] Utilizing this option could result in significant savings to coal mines due to the energy-intensity of coal mining operations.[73]  Coal mining can demand more than 24 kWh per ton of coal produced, and ventilation systems alone can occupy up to 60% of a mine's electricity usage.[74] The EPA estimates that total installed capital cost for implementing a 2 MW facility would be $4.5 million, and estimates annual net income from the operation to be $400 thousand.[75]  This is a return on investment of 8.9%.

- In November, 2012, a $6 million, 3 MW power plant fueled by coal mine methane from the Elk Creek coal mine in Colorado began producing power.[76]  The coal mine methane is captured from coal mine emissions with an approximately 30% concentration of methane.[77]  The project is estimated to reduce emissions by 96,000 tons of $CO_2$e per year.[78]

- CONSOL Energy installed a 200 kW microturbine powered by CBM at its Fallowfield gas processing plant in Pennsylvania.  The system will prevent emissions of nearly 6,500 tons of $CO_2$e per year, and continuously while using gas with low methane content of only around 33%.  An executive from Capstone, the company that manufactured the turbine, observed that such "microturbines . . . can easily operate on methane gas, produce extremely low emissions, and are exceptionally reliable."[79]

---

[71] Id.

[72] http://www.ge-energy.com/content/multimedia/_files/downloads/AS_E_coalmine_Nov09_screen.pdf (last visited June 29, 2014).

[73] EPA, Global Mitigation of Non-$CO_2$ Greenhouse Gasses: 2010-2030, EPA-430-R-13-011 (Sept. 2013) at II-10, available at www.epa.gov/climatechange/Downloads/EPAactivities/MAC_Report_2013.pdf (last visited June 3, 2014).

[74] Id.

[75] Id. at II-10 to II-11.  The EPA estimates annual Operating and Maintenance costs of $800,000 and annual revenues from electricity sales as $1.2 million based on an electricity price of 7.5 cents/kWh.

[76] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 7, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014); Blevins, Jason.  The Denver Post. "Aspen Skiing Co. partners with coal mine for methane power"  (Nov. 9, 2012) available at: www.denverpost.com/ci_21966674/aspen-skiing-co-partners-coal-mine-methane-power (last visited June 3, 2014).

[77] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 7, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014).

[78] Id.

[79] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2014) at 7, available at: http://www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014); CONSOL Corporate Responsibility Report (2012) at 51.  Available at http://www.consolenergy.com/CorporateResponsibilityReport/2012New/files/assets/common/downloads/Layout%201.pdf (last visited June 20, 2014).

- In Australia, the 32 MW German Creek Power Station at the German Creek Coal Mine utilizes captured methane to produce an estimated 250,000 MWh per annum.[80]

- In Kazakhstan, coal mine methane ("CMM") from the Lenina Mine powers a generator that produced more than 8.7 million kWh between November, 2011 and early 2014, which is sufficient to reduce the electricity import of the mine by 20%.[81]

- Tower Colliery in the UK installed six 1.5 MW generators powered by methane drained from the active workings and feeds electricity generated direct into the grid. [82]

- Alkane Energy PLC in the UK has actively drained and sold methane for electricity generation from its Streetley and Markham mines, in addition to capturing methane from its abandoned mines. Alkane is also seeking to expand capture and sale at its Bevercotes, Whitwell, and Warsop mines.[83]

- The Duerping project in China produces 12 MW from CMM drained from the Duerping coalmine. Excess methane is flared. [84]

- Tunlan is a 24 MW CMM co-generation project in China utilizing captured CMM, of which the first phase of 12 MW is complete. Excess methane is flared.[85]

In sum, there is a mature industry in using coal waste methane to generate electricity.

### C. Waste Mine Methane Capture and Use – Process Heat

Mines can also recover gas 1) for use in the boiler for supporting in-mine heating, and 2) for use in coal-drying.[86] For use in mine-heating, existing boilers may need to be retrofitted to burn methane.[87]

---

[80] Ecogeneration. "German Creek Power Station" (Nov./Dec. 2007) available at http://ecogeneration.com.au/news/german_creek_power_station/004239/ (last visited June 20, 2014).
[81] EPA, Coalbed Methane Extra, EPA-430-N-00-004, "Kazakhstan CMM Success Story" (Winter 2014) at 8, available at www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014).
[82] See United Kingdom's Coal Authority, Coal Mine Methane Activity Within The UK, Coal Mine Methane Operators Activities, available at http://www.coal.gov.uk/publications/miningtechnology/coalminemethaneukactivity.cfm (last visited June 3, 2014).
[83] Id.
[84] Sindicatum, Coal Mine Methane, China: Duerping Phase 1 & 2, Shanxi Province. Available at: www.sindicatum.com/portfolio_item/coal-mine-methane-china-duerping-phase-1-2-shanxi-province/ (last visited June 3, 2014).
[85] Id.
[86] EPA, Global Mitigation of Non-$CO_2$ Greenhouse Gasses: 2010-2030, EPA-430-R-13-011 (Sept. 2013) at II-11, available at: http://www.epa.gov/climatechange/Downloads/EPAactivities/MAC_Report_2013.pdf (last visited June 3, 2014).
[87] Id.

For coal-drying, the existing coal-drying process can be retrofitted to burn methane in addition to burning coal.[88]

### D.   Waste Mine Capture and Use – Liquefied Natural Gas ("LNG")

Methane from ventilation wells could be essentially frozen and turned into liquefied natural gas ("LNG") for transportation and sale to market.[89]  The EPA supported a demonstration project for conversion to LNG at the Zory coal mine in Poland, as well as at six mines in the Chongquing municipality of China.[90,91]  The Zory project "proved that the [coal mine] methane resources . . . represent a promising potential for extraction and conversion to LNG in a way which is technically feasible and economically viable in the near future."[92]

### E.   Waste Mine Methane Flaring

Where it is technically infeasible to capture and use waste methane (and only under these circumstances), it can feasibly be flared where methane concentrations are greater than 30% using burners where the flame is exposed (open) or enclosed in a stack.[93]  EPA proposed a conceptual design for a coal mine methane flare nearly 15 years ago.[94]  Further, there is a long and safe history of flaring at working coal mines in the United Kingdom and Australia.  Active mine flaring has been conducted in at least six UK Coal collieries.[95]

---

[88] *Id.*

[89]  *See* Ray Zahradnik, Conversion of Coal Mine Methane to LNG for Heavy Vehicle Fuel (April 19, 2005), available at http://www.epa.gov/cmop/docs/cmm_conference_apr05/ray_zahradnik.pdf.

[90]  *See* U.S. EPA, The U.S. Government's Methane to Markets Partnership Accomplishments (Oct. 2009) at 16-17. Available at: http://www.epa.gov/globalmethane/pdf/2009-accomplish-report/m2m_usg_fullreport.pdf (last visited June 20, 2014).

[91] *See* EPA, "Feasibility Study of CMM Utilization for Songzao Coal and Electricity Company Coal Mines." (May 2009) at 85-105.  Available at www.epa.gov/cmop/docs/feasibility_study.pdf (last visited June 20, 2014).

[92] Institute for Ecology of Industrial Areas, Katowice, Poland.  "Methane to LNG Zory Coal Mine Project Final Report" (February 2010) at 78.  Available at https://www.globalmethane.org/data/348_lng2m_raport_final_8_12_10.pdf (last visited June 20, 2014).

[93] EPA, Global Mitigation of Non-$CO_2$ Greenhouse Gasses: 2010-2030, EPA-430-R-13-011 (Sept. 2013) at II-12, available at: http://www.epa.gov/climatechange/Downloads/EPAactivities/MAC_Report_2013.pdf (last visited June 3, 2014).

[94] EPA, Conceptual Design for a Coal Mine Gob Well Flare (Aug. 1999), available at http://www.epa.gov/cmop/docs/red009.pdf (last visited June 24, 2014).

[95]  *See* United Kingdom's Coal Authority, Coal Mine Methane Activity Within The UK, Coal Mine Methane Operators Activities, available at http://www.coal.gov.uk/publications/miningtechnology/coalminemethaneukactivity.cfm (last visited June 3, 2014); Global Methane Initiative Coal Subcommittee, Policy White Paper ver 2.0, "Flaring of Coal Mine Methane: Assessing Appropriate Opportunities," August 2013, (describing flaring in a number of countries, including Australia), available at http://www.vesselscoalgas.com/Coal_Flaring_WP_Rev_Final_EPA.pdf (last visited June 20, 2014).

Flaring projects at underground mines exist in Australia, the United Kingdom, the United States, South Africa, China, and Mexico.[96]

- In 2012, Minera del Norte S.A. de C.V. (MINOSA) began operating flares at active coal mines in Mexico.[97]  As of early 2013, MINOSA reported nearly 100% destruction efficiency, with no reported operational problems.[98]

- The Elk Creek Mine in Colorado incorporated an enclosed flare system, capable of oxidizing up to 3.7 million cubic feet of methane per day.[99]

- In addition, the Solvay Trona mine in Wyoming has utilized a mine gas flare, and is transitioning to a CMM utilization project.[100]  The system has the capacity to capture or destroy 300,000 tons of $CO_2$e annually, and is expected to reduce emissions by 1.3 million tons $CO_2$e over its lifetime.[101]

- The Beatrix Gold Mine in South Africa captures waste methane to power 4 MW of energy generation, which it anticipates will eliminate 1.7 million tons of $CO_2$e over its lifetime.[102]

At a conference sponsored by EPA in St. Louis in September 2007, evidence was presented that methane flaring at working coal mines is "[s]imple, low cost and reliable to operate" with "[l]ow maintenance requirements."[103]

---

[96] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 2, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014).

[97] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 1-3, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014) (these flares were installed at the Mine VII in the Sabinas Basin and the Esmeralda Mine in the Saltillo Basin).

[98] *Id.*

[99] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 7, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014). The equipment has continued operating even as the coal mine operations at Elk Creek have been idled.  EPA, Coalbed Methane Extra, EPA-430-N-00-004, "Elk Creek Mine Idled – CMM Project Still Operating" (Winter 2014) at 7, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014).

[100] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 3, 6, available at: http://www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014); EPA, "Methane Recovery at Non-coal Mines" available at www.epa.gov/cmop/docs/CMOP-Noncoal%20Flyer.pdf.

[101] EPA, Coalbed Methane Extra, EPA-430-N-00-004 (Winter 2013) at 6, available at: www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014).

[102] EPA, "Methane Recovery at Non-coal Mines," available at: http://www.epa.gov/cmop/docs/CMOP-Noncoal%20Flyer.pdf (last visited June 29, 2014).

[103] *See* Harworth Power Ltd., CMM Flaring PowerPoint (Sep. 2007) at 6 available at www.epa.gov/cmop/docs/cmm_conference_sep07/uk_coal_flaring.pdf (last visited June 4, 2014).

In the U.S., a coal mine in Wyoming has put in place a system that is functionally equivalent to flaring (on-site incineration).  MSHA's approval was apparently not required for this mitigation measure.[104]

Coal mine methane flaring will have costs of its own (air pollutants from burning), and fails to capture the potential economic value of combusting methane for energy generation. Thus, the ANPR should mandate methane flaring only if no other technical means exist to capture or use methane for beneficial use.

## F.   Ventilation Air Methane Capture and Use

Nearly 70% of total fugitive coal mine methane emissions are emitted through Ventilation Air Methane ("VAM") at low concentrations of less than 1%.[105]  Yet, since 2007, demonstrations have shown that despite its low methane content, VAM may be successfully used in power production by utilizing Thermal Flow-Reversal Reactor Technology.[106]  At the West Cliff Colliery in New South Wales, VAM with 0.9% methane content was used for combustion in gas-fired internal combustion engines, producing 6 MW of electrical power while consuming 250,000 cubic meters per hour (150,000 standard cubic feet per minute) of ventilation air at 0.9 percent methane.[107]  The project reduced methane emissions by 13,095 tons per year.[108]  Through the 3rd quarter of 2012, the project had produced over 180 GWh of electricity.[109]

In 2009, the U.S. and China also agreed to a joint project "to generate electricity from ventilation air methane (VAM) at a Chinese coal mine."[110]

## G.   Ventilation Air Methane Destruction

Where VAM is not used productively, as above, destruction of the methane at concentrations between 0.25% and 1.25% is possible through use of thermal or catalytic

---

[104]  *See* J. Liebert, Extracting Value from Coal Mine Methane, Coal Age (June 2009).

[105]  Karacan, Ozgen, et al.  "Coal Mine Methane: A review of capture and utilization practices with benefits to mining safety and to greenhouse gas reduction."  International Journal of Coal Geology, 86 (2011) at 123.

[106]  Somers, J.M. and Schultz, H.L.  "Thermal oxidation of coal mine ventilation air methane," 12th U.S./North American Mine Ventilation Symposium 2008 – Wallace (ed) at 303.  Available at www.smenet.org/docs/meetings/2008/045.pdf (last visited June 20, 2014).

[107]  EPA 2009 STUDY: IDENTIFYING OPPORTUNITIES at 1-7.

[108]  *Id.* (identifying methane reduction as 275,000 tons of CO2e, using a methane global warming potential of 21).

[109]  MEGTEC Wesbite, "Ventilation Air Methane" available at www.megtec.com/ventilation-air-methane-vam (last visited June 20, 2014).

[110]  Environmental Protection Agency, Coalbed Methane Extra (Dec. 2009) at 1, available at: http://www.epa.gov/cmop/docs/december_2009.pdf (last visited June 20, 2014).

oxidation technology.[111]  Oxidizers have been demonstrated successfully since 1994, when it was first used at British Coal's Thoresby Mine in Nottinghamshire, United Kingdom.[112]  For concentrations below this amount, supplemental gas may be added to bring the concentration into the feasible range for destruction.[113]

EPA has compiled numerous examples of the use or destruction of VAM in coal mines in the U.S., U.K., Australia, and China by at least seven companies.[114]

Many mines around the world have begun incorporating VAM destruction into their operations:

- In 2012, Verdeo Sindicatum Corp. (Verdeo) began operating a Regenerative Thermal Oxidizer (RTO) powered by ventilation air methane (VAM) on a ventilation shaft at CONSOL Energy's McElroy coal mine in northern West Virginia.  The system is capable of processing VAM with methane concentrations up to 1.2%, and will reduce emissions by 322,000 metric tonnes of $CO_2e$ per year.[115]  This is equivalent to the $CO_2$ emitted by a 50 MW coal-fired power plant.[116]

- CONSOL has also partnered with Green Holdings to install a VAM abatement system on the Enlow Fork Mine in Pennsylvania.  As of 2012, the system was in its design stage, but will be capable of reducing emissions by 201,000 metric tonnes of $CO_2e$ per year.[117]

- In 2007, the USEPA and CONSOL energy ran a demonstration project to oxidize simulated VAM emissions on the abandoned Windsor Mine in West Virginia.[118]  The

---

[111] EPA, Global Mitigation of Non-$CO_2$ Greenhouse Gasses: 2010-2030, EPA-430-R-13-011 (Sept. 2013) at II-12, available at www.epa.gov/climatechange/Downloads/EPAactivities/MAC_Report_2013.pdf (last visited June 3, 2014).
[112] Somers, J.M. and Schultz, H.L. "Thermal oxidation of coal mine ventilation air methane," 12th U.S./North American Mine Ventilation Symposium 2008 – Wallace (ed) at 3.  Available at: www.smenet.org/docs/meetings/2008/045.pdf  (last visited June 20, 2014).
[113] Id.
[114] See Environmental Protection Agency, Ventilation Air Methane (VAM) Utilization Technologies (Sept. 2009); see also http://www.epa.gov/cmop/docs/vam_technologies-12-2010.pdf (last visited June 29, 2014).
[115] EPA, Coalbed Methane Extra, EPA-430-N-00-004, "Microturbine Installed at CONSOL Gas Processing Plant" (Winter 2013) at 6, available at www.epa.gov/cmop/newsroom/newsletter.html (last visited June 3, 2014); CONSOL Corporate Responsibility Report (2012) at 51.  Available at http://www.consolenergy.com/CorporateResponsibilityReport/2012New/files/assets/common/downloads/Layout%201.pdf (last visited June 20, 2014).
[116] CONSOL Corporate Responsibility Report (2012) at 51.  Available at http://www.consolenergy.com/CorporateResponsibilityReport/2012New/files/assets/common/downloads/Layout%201.pdf (last visited June 20, 2014).
[117] Id.
[118] Somers, J.M. and Schultz, H.L. "Thermal oxidation of coal mine ventilation air methane," 12th U.S./North American Mine Ventilation Symposium 2008 – Wallace (ed) at 304-306.  Available at www.smenet.org/docs/meetings/2008/045.pdf (last visited June 20, 2014).

project demonstrated that that the technology can effectively oxidize simulated VAM containing less than 1.0 percent methane.[119]

- The Mine Safety Health Administration in 2008 approved the use of technology to eliminate VAM at an active coal mine in Alabama.[120]

## VII.   VOLUNTARY INCENTIVES WILL NOT EFFECTIVELY REDUCE WASTE METHANE EMISSIONS

We request that BLM review what has been a largely unsuccessful experiment to encourage holders of federal coal leases in Colorado to capture coal mine methane for use or power generation through voluntary measures.  This experiment indicates that voluntary measures to encourage methane capture have not resulted in significant reductions in methane emissions; thus, BLM must implement mandatory provisions – such as requiring coal mines to capture or combust methane – to require methane capture or combustion.

In January 2009, BLM's Colorado State Office began adding conditions to coal leases and coal lease modifications that authorize the coal lease holder to "capture for use or sale any or all of the coal mine methane . . . that [the company] would otherwise be required to vent."[121] The amendments permit the coal lease holder to use the methane "on or for the benefit of" coal mining on-site without paying any royalty on the use of federally-owned gas.[122]  The coal lease holder is *not* obligated to capture methane "if the capture of coal mine methane, independent of activities related to mining coal, is not economically feasible."[123]  Further, if the coal lease holder disputes "the economic or other feasibility of capturing for use or sale the coal mine methane, [BLM's] remedy as a prevailing party shall be limited to recovery of compensatory royalties on coal mine methane not captured for use or sale."[124]  Thus, if industry

---

[119] Somers, J.M. and Schultz, H.L.  "Thermal oxidation of coal mine ventilation air methane,"  12th U.S./North American Mine Ventilation Symposium 2008 – Wallace (ed) at 306.  Available at www.smenet.org/docs/meetings/2008/045.pdf (last visited June 20, 2014).

[120] *See* Biothermica, VAMOX, Create Value with VAM, available at www.biothermica.com/sites/biothermica.com/files/Biothermica%20VAM%20Brochure.pdf  (last visited June 29, 2014). As the company touts, the system has been fully operational since March 2009 at Walter Energy's Mine No. 4 in Brookwood, Alabama. As of March 2013, a total of 80,766 t $CO_2$e had been abated by the project and verified by an independent third party in accordance with the requirements of the rigorous U.S. Climate Action reserve standard. http://www.biothermica.com/node/153 (last visited June 29, 2014).

[121] *See, e.g.*, Lease Part I, Sec. 3.  Colorado BLM attached these conditions to several leases after the Interior Board of Land Appeals ruled that coal mine methane could not be competitively leased pursuant to FOOGLRA because coal mine methane was not found in "deposits."  *See Vessels Coal Gas, Inc.*, 175 IBLA 8 (2008)

[122] *Id.*, Lease Part II, Sec. 2(c).

[123] *Id.*, Lease Part I, Sec. 4.

[124] *Id.*

disputes BLM's conclusion that methane capture is economically feasible, the company may continue unabated methane pollution. In sum, these lease amendments will result in capture, but only, apparently, if the coal lease holder (and not BLM) concludes capture would be profitable enough. The lease amendments thus foreclose other options, including those that would mandate capture regardless of the cost to the mine.

Despite the fact that these lease provisions have been on the books for at least five years, the impact of the lease provisions appears to be minimal at best. The West Elk mine in western Colorado did prepare an economic analysis in response to the lease provisions, but concluded that no method of methane capture or flaring was economically feasible, a conclusion largely based on a flawed analysis.[125] And while another Colorado mine – Oxbow – is using mine methane to generate electricity, the volume combusted for power is a small portion of the mine's total methane emissions, which remained in 2012 over one million tons of $CO_2e$. Further, the Oxbow project is heavily subsidized by an outside entity (Aspen Ski Company) willing to pay a large premium for coal mine methane fuel. It is unclear what conditions would be needed to replicate such a project on a larger scale.

Because the lease addendum – which rely on a coal lease holder concluding it will make a significant profit from its pollution – have failed to result in a significant reduction in coal mine methane at active mines in Colorado, any BLM rulemaking must: (1) analyze and acknowledge the Colorado lease amendments and their apparent failure to significantly reduce methane emissions; and (2) consider what additional incentives and/or regulatory mandates beyond those in the lease amendments may be necessary to ensure a reduction in coal mine methane pollution.[126]

## VIII.   A CASE STUDY: THE WEST ELK UNDERGROUND COAL MINE IN COLORADO

The attached study from Ph.D. economist Dr. Tom Power addresses nearly every aspect of BLM's proposed rulemaking, with a particular emphasis on available control technologies and the facility-specific costs associated with each. Moreover, the study of the West Elk underground mine provides a detailed look at a gassy underground coal mine located on public lands—precisely the type of facility BLM has identified for its proposed rulemaking. As such,

---

[125] The economic analysis presented by the mine was refuted in a separate, independent report prepared by Dr. Thomas Power, "An Economic Analysis of the Capture and Use of Coal Mine Methane at the West Elk Mine, Somerset Colorado" (Dec. 2011) (attached as "Exhibit A").

[126]  The three coal mines in Colorado's North Fork Valley emitted a total of two million tons of $CO_2e$ of methane in both 2011 and 2012. *See* EPA Greenhouse Gas Inventory webpage: http://ghgdata.epa.gov/ghgp/main.do (last visited June 29, 2014).

this case study will be useful in highlighting some of the limitations that would come with any rule that provides only for voluntary incentives rather than a firm mandate that companies capture and use methane waste.

As background, in 2009 BLM directed Mountain Coal Company, which owns and operates the West Elk Mine near Somerset, Colorado, to analyze the economic feasibility of capturing and using coal mine methane released into the atmosphere at West Elk. Mountain Coal Company, through a series of consultants, carried out a study but found that there were no available technologies that could capture methane in a way that was economically feasible.

Dr. Power's report provides a critical review of the Mountain Coal Company's economic analysis of the coal mine methane releases from the West Elk drainage wells. Dr. Power concludes that there were in fact at least three economically viable means of capturing methane, two of which had been considered and rejected by Mountain Coal Company. Notably, these alternatives became economically feasible when the economic value of reducing emissions of methane – a powerful agent in climate disruption – was incorporated into the analysis. That is, the company's conclusion that there was no economically feasible solution to the methane waste problem was tied in part to its flawed assumption that there was no economic value associated with the reduction in emissions of methane.

Moreover, rather than treating any pollution control technology as part of the cost of doing business, Mountain Coal Company asserted the need to make greater than a 10% return on investment in that technology in order to be considered economically feasible. While Dr. Power's analysis shows how the company could nonetheless meet that criterion, BLM's rulemaking should reject the assumption that a private corporation is entitled to a return on investment for any required methane controls.

Finally, Dr. Power's analysis is useful to BLM in that it shows the length to which private industry has already gone to give the appearance of economic hardship with regard to capturing methane emissions from underground coal mines. His case study refutes seven critical and erroneous assumptions that Mountain Coal Company made to support its rejection of economic feasibility, including the volume of methane available for use, the cost of operating methane collection systems, the cost of electricity generation (applicable where a mine uses recovered methane to generate electricity), the length of time methane recovery equipment can be used, and treating pollution control costs as a corporate commercial investment, among others.

IX:  CONCLUSION

We are pleased to see BLM moving forward with the proposed rulemaking for mine methane waste from underground mines on public lands.  The rulemaking provides BLM with a significant opportunity to reduce greenhouse gas emissions from coal mining on public lands consistent with President Obama's Climate Action Plan.  As BLM proceeds with the rulemaking, we reiterate the core recommendations discussed in detail above: BLM has broad regulatory authority to require methane capture and/or destruction through the rulemaking process; voluntary incentive programs aimed at reducing methane emissions from coal mines have thus far been unsuccessful at generating meaningful methane reductions; several technologies to capture methane are already in use in the U.S. and elsewhere; BLM should identify the best available technology to capture waste mine methane and should <u>require</u> emission reductions at least in line with that technological standard; companies removing federal coal from federal land do not have a blanket right to pollute; and BLM must incorporate stringent penalty provisions that ensure any rulemaking will serve its intended purpose and protect the public from the harmful effects of methane emissions.

We look forward to engaging BLM and the public as BLM develops and implements the proposed rulemaking.  Should you have questions about any of the issues raised in these comments, we can be reached at the contact information listed below.

Respectfully submitted,


(*Signature brackets on following page*)

Nathaniel Shoaff
Staff Attorney
Sierra Club Environmental Law Program
85 Second Street, Second Floor
San Francisco, CA 94105
415-977-5610
nathaniel.shoaff@sierraclub.org

Edward Zukoski
Staff Attorney
Earthjustice Rocky Mountain Office
1400 Glenarm Place, Suite 300
Denver, CO 80202
303-996-9622
tzukoski@earthjustice.org

David Hobstetter
Center for Biological Diversity
Climate Law Institute Staff Attorney
351 California Street, Suite 600
San Francisco, CA 94104
415-436-9682
dhobstetter@biologicaldiversity.org

Shannon Anderson
Organizer
Powder River Basin Resource Council
934 N. Main St., Sheridan, WY 82801
307-672-5809
sanderson@powderriverbasin.org

Margaret MacDonald
Regional Organizer
Western Organization of Resource
Councils
220 S. 27th St, Suite B
Billings, MT 59101
406-252-9672
mmacdonald@worc.org

# Effective Gob Well Flaring

Daniel J. Brunner, Resource Enterprises
Karl Schultz, U.S. Environmental Protection Agency

*(Note:*   *This paper initially was presented at the International Coalbed Methane Symposium, held in Tuscaloosa, Alabama, May 3-7, 1999, and then at the Mine Ventilation Symposium at the University of Missouri-Rolla, June 7-10, 1999.  Subsequently, it was published in its current form in the September 1999 issue of CBM Review (World Coal, Palladian Publications, Ltd, UK.)*

USFS00722

# Effective Gob Well Flaring

Currently, over 30 U.S. coal mining operations employ a system of degasification to assist in reducing the emission of methane into their mine ventilation systems. All of these mines use vertical gob wells. This is an effective gob degasification technique for U.S. longwall coal mining operations, particularly when prime movers apply suction to the wellheads (active gas extraction).

Under ideal conditions, operators collect gob gas (methane in air mixture) directly at the wellhead for sale or on-site use. However, because of vertical gob well gas production characteristics (variable gas quality and quantity), difficulties in coordinating commercial gas recovery with underground mine degasification requirements, and because of the economics of commercializing gob gas, coal mine operators commonly vent gas from gob wells to the atmosphere. This practice raises safety and global environmental concerns, and wastes a potential resource.

This article presents a safe and controlled system of gob well flaring that would provide substantial global environmental benefits. It presents a conceptual design of a gob well flare that incorporates safety features and operating practices based on petroleum industry standards. It summarizes the safety benefits, the global environmental benefits, and the potential financial benefits to mine operators of application of this system in the U.S. In conclusion, it presents an actual application of gob well flaring at a mining operation in Australia.

## INTRODUCTION

In the U.S., and throughout the world, a growing number of companies are looking at low cost or profitable means of lowering or offsetting their greenhouse gas emissions. Since the United States signed and ratified the Earth Summit Treaty in Rio de Janeiro, Brazil, the *Climate Change Action Plan* was developed to provide partnerships between industry and the government to identify and realize economically viable measures to reduce greenhouse gas emissions. The U.S. Environmental Protection Agency's (U.S. EPA) Coalbed Methane Outreach Program is one of these programs, and has focussed its efforts on identifying and working with the coal industry to develop profitable projects to use coal mine methane, a potent greenhouse gas, rather than venting it to the atmosphere and contributing to global climate change. However, without external incentives, it is not always economic to employ all of the gas coming from degasification systems, in particular the gob gas of compromised quality and significant flow fluctuations. In these cases, companies interested in realizing significant reductions in greenhouse gas emissions could benefit from a low capital expenditure technology to combust this methane.

The U.S. EPA commissioned a conceptual design of a single gob well flare to constructively engage labor, industry and regulatory entities on the safety, technical, and cost aspects of constructing and operating a flare at an active gob well. Additionally, the U.S. EPA has been corresponding with technical experts in Australia regarding their experience with flaring, and the benefits that Australian coal mines have realized through their recent activities. Now the U.S. EPA seeks to help develop, in partnership with industry and labor, a demonstration facility in the U.S.

## BENEFITS OF METHANE FLARING

Gas flaring is a standard safety practice in many industries. For example, methane and other associated gasses are routinely flared during processing and production of oil and gas, and are continuously flared from landfill collection systems. The petroleum industry flares for safety reasons during system upsets when high concentrations and volumes are released in the vicinity of potential sources of ignition. In the landfill industry, methane contributes to approximately 50 percent of the gas recovered. Flaring is conducted to combust it and other associated toxins (hydrogen sulfide and non-methane organic compounds) which are ground-level ozone build-up gases. Unlike landfills, coal mine gob gas consists of a methane mixture in air and does not contain many toxins.

USFS00723

*Mine Benefits*

Incorporating a controlled flaring system at gob wells would minimize the potential of an unconfined deflagration occurring on surface at well discharge locations brought about by natural or man-made sources. An unconfined deflagration, under appropriate conditions, may lead to a confined deflagration or detonation which may propagate in processing pipeline, and potentially through gob wells to the mining horizon. Incorporating a controlled flaring system would minimize this risk to the underground mine and to the public.

Continuous monitoring provisions, necessary with a gob well flare, would provide uninterrupted records of gob well performance. These would be invaluable in comparing gob well production with underground conditions, investigation of mine incidents such as mine fan failures, changes to the ventilation system, or accidents. Currently most active gob wellhead installations in the U.S. do not use continuous monitoring equipment.

Controlled flaring would reduce background concentrations of methane and allow mine operators to locate mine intakes closer to production areas.

*Environmental Benefits*

As the global warming potential of methane is approximately 21 times that of $CO_2$ (over a 100-year time frame) (IPCC, 1996), combusting the methane released from vertical gob wells with a controlled flaring system would result in emission of a significantly less harmful gas. Assuming stochiometric combustion of methane in air, combusting methane through flaring releases 7.5 times less greenhouse gas than venting.

Methane also contributes to tropospheric ozone problems and harms vegetation at high concentrations. Flaring coal mine methane may also alleviate local air quality problems.

PROPOSED GOB WELL FLARE

A controlled flare system is proposed with flare flash-back prevention features, a prime gas mover, an elevated stack, a controlled pilot, and a continuous monitoring system. A concept design, suitable for demonstration to a single, actively extracted gob well is presented. The concept design is also suitable, with some modification, for connection to a multiple gob well gathering system.

*Flare Design Parameters*

The gob well flare concept design was derived for typical gob well performance characteristics.

<u>Methane Concentration.</u> The flare was designed for combustion of methane concentrations (in air) ranging from greater than 30 percent to 100 percent by volume.

<u>Gas Flow Rate.</u> The flare design was developed to accommodate a variable range of gas flows (methane and air mixture). Standard gas flows ranging from 0.007 $m^3$/s to 0.661 $m^3$/s (14 to 1400 scfm (20 mscfd to 2 mmscfd)) were specified.

<u>Gas Heating Values.</u> Flare performance was specified for gas heating values ranging from 11.17 $MJ/m^3$ to 37.3 $MJ/m^3$ (300 Btu/scf to 1000 Btu/scf).

USFS00724

*Codes and Guidelines*

Applicable codes and guidelines for utility, landfill, and flares used in the petrochemical industry were incorporated in the gob well flare concept design.

<u>40 CFR 60.18  General Control Device Requirements.</u>  These are control requirements to achieve EPA air emission standards and specify:

- no visible emissions (except for 5 minutes every 2 hours);
- flame presence at all times when emissions are vented;
- minimum gas quality (7.5 MJ/m$^3$ (200 Btu/scf) - unassisted flare);
- maximum gas exit velocity as a function of flare type and gas quality (18.3 m/s (60 fps) unassisted, variable quality);
- flares must be monitored for design conformance;
- the pilot flame must be continuously monitored.

Industry Handbooks

Applicable guidelines were obtained from flare gas systems handbooks.

<u>Flare Height.</u>  The height of the flare is based on ground level limitations of thermal radiation intensity. These are determined from maximum gas flows and heating values, including wind factors. Recommended limiting radiation intensities are:

- 1.4 kW/m$^2$ (440 Btu/hr-ft$^2$) for unlimited time exposure by personnel;
- 9.5 kW/m$^2$ (3000 Btu/hr-ft$^2$) maximum at base of flare;
- 4.7 kW/m$^2$ (1500 Btu/hr-ft$^2$) minimum fenced boundary limit;
- 2.4 kW/m$^2$ (750 Btu/hr-ft$^2$) maximum at property lines
- 4.7 kW/m$^2$ (1500 Btu/hr-ft$^2$) at digital equipment and controls.

<u>Noise.</u>  Noise emissions result from combustion of the turbulent gas stream.  The emitted decibel level is proportional to the second power of the quantity of the hydrocarbon burned.  In populated areas, a closed flare system may be necessary to reduce noise emissions.

<u>Luminance.</u>  Sufficiently mixed air and fuel gases will burn with a blue non-luminous flame.  If insufficient mixing occurs, the flame will become luminous.  Where luminance is a concern, an assisted, or closed flare system is recommended.

*Recommended Petroleum Industry Flaring Practices*

The petroleum industry provides guidelines for flare flash-back protection. Flare flash back protection is achieved by either (1) ensuring a minimum purge gas flow at all times out the stack, or (2) incorporating a passive protective system which mitigates air inflow into the top of the stack.  These measures are recommended in addition to a liquid seal which effectively arrests flame and detonation propagation upstream of the flare stack.

<u>Purge Gas Requirement.</u>  A purge gas flow prevents air from entering back down into the stack due to wind or thermal effects and potentially creating an explosive mixture.

<u>Gas Seals.</u>  Gas seals, commonly denoted as fluidic, or diode seals, are recommended to reduce the purge gas volume flow requirements.  These seals are typically comprised of stacked conical orifices installed inside the flare stack below the burner tip which impede vortex back-flow generated by wind or thermal effects.

USFS00725



# CMM Flaring: Technology and Case Studies



By 2020, the world's coal mines are expected to produce annual methane emissions of 671 MMTCO2E (46.9 BCM).[1] Higher quality drained gas at coal mines can be used in typical natural gas applications such as pipeline injection, power generation, and as boiler fuel. While utilization is the first priority, this may not be economically practical in every case and in these instances, destruction of methane through flaring may be the most appropriate option for reducing greenhouse gas emissions.  Flaring can also serve as an initial reduction option prior to or in combination with operation of a full-scale methane utilization project

Flares offer the potential advantage of shorter planning, design and installation schedules, in conjunction with much lower capital and operating costs, than many energy recovery project types. The capital cost of a typical CMM flaring project can be just 5 to 10 percent of the cost of a CMM electricity generation project.[2] However, revenue sources are limited to markets for greenhouse gas emission reductions.

Flaring gas at coal mines began in the 1990's, and has become more widely implemented in recent years. The Global Methane Initiative's (GMI) International Coal Mine Methane Project Database identifies 40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology.

In 2014, 20 of these projects were operating in 7 countries, including one project at a U.S. trona (soda ash) mine, demonstrating the potential for methane recovery and use in other types of underground mines.

> **When should a mine incorporate flaring into its methane management program?**
>
> - Where gas is stranded and utilization is not economically feasible;
>
> - Where transport or utilization of the gas is not technically possible;
>
> - As an initial GHG mitigation option prior to operation of an energy recovery facility;
>
> - As part of an integrated project incorporating methane utilization (e.g., power generation) where flares are used to destroy methane exceeding the capacity of the plant.



Operating Flare at Solvay Chemicals Green River Trona Mine, Wyoming, USA  (Courtesy of Solvay Chemicals)

## Technology

The technology for flaring projects is well understood and practiced.  There are two general designs, open or "candle stick" flares and enclosed or "ground" flares. Early projects utilized the candle stick flares because they were common in the oil and gas industry, but enclosed flares are now more typically used for reasons of aesthetics and higher destruction efficiencies, even though associated costs are higher.

Flaring projects are designed with important safeguards such as detonation and flame arrestors, sensors and proper seals, and the safety risks of flaring are comparable to those of a CMM-fired boiler.[3]

[1]  Global Anthropogenic Non-$CO_2$ Greenhouse Gas Emissions: 1990 – 2030
http://www.epa.gov/climatechange/Downloads/EPAactivities/EPA_Global_NonCO2_Projections_Dec2012.pdf
[2]  See CMOP's CMM Project Cash Flow Model to generate example costs.  http://www.epa.gov/cmop/resources/cashflow_model.html
[3]  United Nations Economic Commission For Europe and Methane to Markets Partnership, *Best Practice Guidance for Effective Methane Drainage and Use in Coal Mines*, ISBN 978-92-1-117018-4, ISSN 1014-7225,  2010

## CMM Flaring Case Studies

### Solvay Chemicals (Wyoming, USA)

The flare at the Green River trona (soda ash) mine operated by Solvay Chemicals is part of an integrated destruction/utilization project commissioned in July 2012. The Methane Recovery System (MaRS) captures methane liberated during the mining process that would otherwise be vented directly into the atmosphere.

The captured methane is directed either to be incinerated in an enclosed flare stack or piped, via a 4 mile long 14" pipeline, to the trona processing facility to recover the thermal energy via combustion. The flare stack was installed in 2010 and has a capacity of 2,549 m$^3$/hour. It is an enclosed flare. The Solvay project is especially notable because the MaRS system is the first in the U.S. to incinerate mine methane above an active longwall.

### MINOSA Mines (Mexico)

Minera del Norte S.A. de C.V. (MINOSA), a leading coal company in Mexico and a subsidiary of Grupo Acerero del Norte (GAN), began operating the first CMM flares at active coal mines in Mexico in October 2012. The MINOSA flaring project destroys mine methane from gas drainage systems at two of its mines in northern Mexico, Mine VII (Sabinas Basin) and the Esmeralda Mine (Saltillo Basin).



Minosa Mine, Mexico
(Courtesy M. Santillan Gonzales, GAN)

The flares, manufactured by Biogas Technology Ltd., are sited at fixed locations (not portable) and are enclosed flares with a combined air throughput capacity of 4,000 Nm3/hour (two 2000 Nm3/hour units).

### Duerping Mine (Shanxi Province, China)

The Duerping Mine, operated by Xishan Coal & Electricity Company, a subsidiary of Shanxi Coking Coal Co. Ltd, is located in the mountains just west of Taiyuan city in China's Shanxi Province. Since 2008, the site has hosted a 5,000 m$^3$/hour enclosed flare.

The flare was initially used as an interim emission reduction option before 12 MW of gas gensets were installed. Now, the flare destroys drained gas volumes in excess of those utilized by the gensets, or gas of concentration less than the permitted minimum (currently 30%) but higher than 25%. Approximately 20% of drained gas is expected to be flared.



Duerping Mine, Shanxi Province, China
(Courtesy of Sindicatum Sustainable Resources)

## Resources

To learn more about flaring CMM, please consult the following resources:

- The GMI Coal Mine Methane webpage
  https://www.globalmethane.org/coal-mines/index.aspx

- U.S. EPA Coalbed Methane Outreach Program
  www.epa.gov/cmop

- International CMM Projects Database
  https://www.globalmethane.org/coal-mines/cmm/index.aspx

- United Nations Economic Commission for Europe "Best Practice Guidance on Effective Methane Drainage and Use in Coal Mines"
  http://www.unece.org/energy/se/pdfs/cmm/pub/BestPractGuide_MethDrain_es31.pdf

The U.S. Environmental Protection Agency's Coalbed Methane Outreach Program (CMOP) is a voluntary program with a goal of reducing methane emissions from coal mining activities. Our mission is to promote the profitable recovery and utilization of CMM, a potent greenhouse gas (GHG) that contributes to climate change if emitted to the atmosphere. When collected and used for energy, CMM is a valuable fuel source.

# OXBOW MINING, LLC



3737 Hwy 133    P.O. Box 535    Somerset, Colorado 81434  USA  Tel (970)929-5122  Fax
(970)929-5177

October 14, 2011

Mr. Brock Bowles
Environmental Protection Specialist
Colorado Division of Reclamation, Mining and Safety
1313 Sherman Street, Room 215
Denver, Co. 80203

**RECEIVED**
OCT 17 2011
Division of Reclamation,
Mining and Safety

Re:    Oxbow Mining LLC, Permit No. C-1981-022
       TR-73 Application for Methane Utilization Facility and Relocation of Alluvial Monitor
       Well.

Dear Mr. Bowles,

The purpose of this letter is to request Technical Revision No. 73 to the Oxbow Mining LLC
(OMLLC) Permit No. C-1981-022.  This TR provides for 1) construction and operation by North
Fork Energy, LLC (NFELLC) of a coal mine methane fueled electricity generator and thermal
oxidation facility and 2) relocation of an alluvial monitor well.

1.     North Fork Energy, LLC (NFELLC)

North Fork Energy, LLC. has determined the economic viability of constructing and operating a
facility to utilize mine methane from Oxbow's underground mine methane collection system.
The location of the facility will be NE of the existing Elk Creek Mine fan. The ½ acre facility is
independent of the Elk Creek Mine and will utilize BMP's for sediment control. The site will be
fenced and operated independently from the rest of the Oxbow Mining operation.

2.     Relocation of Alluvial Monitor Well EC-14

Construction of the NFELLC facility will obliterate the existing EC-14 updip, alluvial monitor
well located along Elk Creek.  Included with this TR-73 is the relocation of the monitor well to a
location updip and just north of the NFLLC facility.

The revision consists of a revised PAP page 2.05-23c, Exhibit 2.05-E7, Page 3, Map 2.05-M1,
sheet 3 of 6, *General Facilities*, and Map 2.04-M4, sheet 3 of 4, *Drainage and Sediment Control
Plan.*

● Page 1

Attached please find a proposed public notice which will be published in the Delta County Independent upon notification by the Division that this application is complete. Please contact me at 970-929-5806 if I can provide any additional information or if you have any questions.

Sincerely,

James A. Kiger
Environmental Manager

Enclosures
Xc:    Jim Cooper (OMLLC)
       Gunnison County Planning Office
       David Rice, Delta County Planning
       Paonia Public Library
       USFS, Paonia Ranger District
       BLM, UFO
       Files



**COLORADO DIVISION OF MINERALS AND GEOLOGY**

1313 Sherman Street, Room 215, Denver, Colorado  80203, (303) 866-3567

## APPLICATION FORM FOR A REVISION
## TO A COAL MINING AND RECLAMATION PERMIT

This form must be completed and submitted with all requests for minor revisions, as defined in Rule 1.04(73), technical revisions, as defined in Rule 1.04(136), and permit revisions, as defined in Rule 1.04(90).  All revisions are to address the requirements of Rule 2.08.4.  Three (3) copies of the revision, including maps, must be submitted in order for it to be complete.

All revisions are to be formatted so they can be inserted into the permit to replace the revised sections, maps, tables and/or figures, with a revised table of contents, if necessary.  The revision submittal date should be printed in the lower right corner of each revision page.  A cover letter to the revision should explain the nature of the revision and reference the specific permit sections being revised.

For federal mines, a copy of the revision application must be submitted to all agencies on the federal mailing list (except OSM) at the same time the application is submitted to the Division, and proof of distribution must be submitted to the Division along with the application.  Copies of revision pages modified during the review process must be distributed in the same manner, along with proof of distribution.  Proof of distribution must be submitted prior to implementation of the revision.

**Permit No.:** C - __1981__ - __022__          **Date:** __Oct__ / __14__ / __2011__

**Permittee:** __Oxbow Mining, LLC.__

__Elk Creek Mine__

**Street:** __3737 State Highway 133__

__P.O. Box 535__

**City:** __Somerset__

**State:** __Co.__   **Zip Code:** __81434__ - _____

**Brief Description of Revision:** __TR-73   Coal Mine Methane Fueled__

__Electricity Generator and Thermal__

__Oxidation Facility.__

_____

**Public Notice Attached:** Yes ✓ No __  *(Required for PRs and TRs)*

**Bond Increase:** Yes __ No ✓   **Federal** ✓  **Non-Federal** __  **Mine**

**Proposed Change in:**

**Permit Area -**                                          **Surface Ownership -**

  **Disturbed**   (+/-) __ __ _0_ . __ Acres          **Private Land**   (+/-) __ __ _0_ . __ Acres

  **Permit**   (+/-) __ __ _0_ . __ Acres               **Federal Land**   (+/-) __ __ _0_ . __ Acres

  **Affected**   (+/-) __ __ _0_ . __ Acres             **State Land**   (+/-) __ __ _0_ . __ Acres

**Mineral Ownership -**

  **Mineral Private**   (+/-) __ __ _0_ . ___Acres     **Mineral State**   (+/-) __ __ _0_ . __ Acres

  **Mineral Federal**   (+/-) __ __ _0_ . __ Acres

## PUBLIC NOTICE

Oxbow Mining, LLC. (OMLLC), P.O. Box 535, 3737 Highway 133, Somerset, Colorado 81434, has filed a complete application to the Colorado Division of Reclamation, Mining and Safety (CDRMS) for Technical Revision TR-73 to its existing approved Permit No. C-1981-022.  The TR provides for 1) the construction and operation of a coal mine methane fueled electricity generator and thermal oxidation facility and 2) relocation of an alluvial monitor well.

OMLLC's approved permit area is located in Gunnison and Delta Counties and north of the town of Somerset and the North Fork of the Gunnison River.  OMLLC's current permit area would be included on the areas presented by the Somerset and Bowie USGS 7.5 minute quadrangle maps and is generally described as follows:

<div align="center">

Township 12 South, Range 90 West, 6th PM
All or parts of Sections 29 – 32

Township 12 South, Range 91 West, 6th PM
All or parts of Sections 25 – 27 and 34 - 36

Township 13 South, Range 89 West, 6th PM
All or parts of Sections 6 and 7

Township 13 South, Range 90 West, 6th PM
All or parts of Sections 1 – 12 and 17

Township 13 South, Range 91 West, 6th PM
All or parts of Sections 1 – 3 and 11 - 13

</div>

The permit area contains approximately 13,429.08 acres of surface lands of which 5,551 acres are located on private land and 7,878.08 acres are on Federal land.

Complete copies of the TR-73 application are on file at the CDRMS offices located at 1313 Sherman Street, Room 215, Denver, Colorado 80203,  Phone:(303) 866-3567; at the Gunnison County Planning Office, the Delta County Planning Office and at the Paonia Public Library.  Comments or objections concerning the application for revision should be directed to the CDRMS at the above address not later than 10 days after the date of publication of this notice in order to be considered.

P.      Elk Creek Generator and Thermal Oxidation Facility – Utilizing the methane from the above noted underground network of mine methane collection pipe and the exhauster facility, North Fork Energy, LCC (NFELLC) has located (2011) and operates an approximate ½ acre facility NE of the Elk Creek mine ventilation fan.  The facility consists of multiple methane fueled electric generator sets capable of utilizing the mine methane to produce electricity to be fed back onto the electric supply grid via a connection to the primary side of the Delta-Montrose Electric Association (DMEA) power line located at the nearby Elk Creek Mine facility substation.  A surface pipeline connected to the exhauster facility will cross Elk Creek and connect with the NFELLC facility. The facility will also contain a thermal oxidizer capable of oxidizing or "flaring" the mine methane to the atmosphere. The status of this facility is intended to be separate from the Elk Creek Mine facility.  There is a preference that the facility remain in place after the Elk Creek Mine is sealed and reclaimed. Extended testing of the methane resource will be necessary to determine the potential longevity of the facility. If the facility is to remain after mining and reclamation activities are concluded, the Elk Creek Mine reclamation plan will be modified to accommodate the continued use of the NFELLC facility. See Map 2.05-M1, Sheet 3 of 6, *General Facilities*, and Map 2.04-M4, Sheet 3 of 4, *Drainage and Sediment Control Plan* for the location of the facility.

**Exhibit 2.05-E7 continued...**

**Additional Information**

1.   In 2007 it was observed that the casing of Well BC-1 in Bear Creek had been damaged by being pushed over by someone parking in the area.  Subsequent monitoring indicated that depth to water could be determined but the damage to the plastic pipe prevented use of the baler to obtain water samples. The monitor well was replaced in 2007 and the former well sealed and abandoned.

2.  In 2011 the North Fork Energy, LLC  methane facility was constructed NE of the Elk Creek Fan. The construction of the facility obliterated the existing, shallow EC-14 alluvial monitor well.  During the Spring of 2012, the monitor well was re-established as EC-14B and located updip and just north of the NFELLC facility.

**RECEIVED**

MAR 19 2012

Division of Reclamation,
Mining and Safety



# OXBOW MINING, LLC

3737 Hwy 133   P.O. Box 535   Somerset, Colorado 81434  USA  Tel (970)929-5122  Fax (970)929-5177

March 15, 2012

Mr. Foster Kirby
Archaeologist
OSMRE Western Region
1999 Broadway, Suite 3320
Denver, CO 80202-3050

**Re:**   Oxbow Mining, LLC., CDRMS Permit No. C-1981-022, CDRMS Approval of MR-98 and TR-73.

Dear Mr. Kirby:

Enclosed, please find a copy of the CDRMS approved permit revision materials for the Oxbow Mining, LLC, CDRMS Permit No. C-1981-022, MR-98, Ownership and Control and TR-73, Methane Fueled Electricity Generator and Relocation of Alluvial Monitor Well.

The approved permit materials include PAP pages 2.03-6, 7, 8, 9, 2.05-23c, Exhibit 2.05-E7 page 3, Exhibit 2.04-E4 Part 3, Map 2.05-M1 sheet 3 of 6, and Map 2.05-M4 sheet 3 of 4.

Please contact me at 970-929-5806 if you have any questions or need additional information.

Sincerely,

James A. Kiger

James A. Kiger
Environmental Manager

Enclosures
Xc:    Jim Cooper (OMLLC)
       Brock Bowles, (CDRMS)
       Files

# An Economic Analysis of the Capture and Use of Coal Mine Methane at the West Elk Mine, Somerset, Colorado
## December 2011 Update

A Report Prepared by

**Thomas Michael Power**
**Donovan S. Power**

**Power Consulting**
www.powereconconsulting.com
920 Evans Avenue
Missoula, MT 59801
406 721 1391

December 2011

**About the Authors:**

**Thomas Michael Power** is the Principal in Power Consulting, Inc. and a Research Professor in the Economics Department at The University of Montana where he has been a researcher, teacher, and administrator for over 40 years. He received his undergraduate degree in Physics from Lehigh University and his MA and PhD in Economics from Princeton University.

**Donovan S. Power** received his undergraduate degree in Geosciences at the University of Montana and his M.S. in Geology from the University of Washington. He has been the principal scientist at Power Consulting, Inc. for the past three years.

## Executive Summary

Mountain Coal Company (MCC), which owns and operates the West Elk Mine near Somerset, Colorado, was directed by the U.S. Bureau of Land Management in 2009 to analyze the economic feasibility of capturing and using the coal mine methane (CMM) currently being released into the atmosphere at the West Elk Mine. Mountain Coal Company, through a set of consultants, carried out a study but found that there were no technologies currently available that could capture and use or destroy their methane in a way that was economically feasible.

This report provides a critical review of the Mountain Coal Company economic analysis of the coal mine methane releases from the West Elk Mine drainage wells. It represents an update of an earlier report of the same title released in January 2010. That updating involved adjusting the market value of natural gas, liquid natural gas, electricity, and credits for the reduction in greenhouse gas (GHG) emissions based on data sources available as of August 2011 when the empirical research for this update was completed.

Using primarily Mountain Coal Company data and assumptions, but modifying those economic assumptions in seven important areas where Mountain Coal Company's assumptions appeared to be unreasonable, this report found that there were in fact at least three alternatives ways, two of which MCC had also analyzed, of capturing, using, or destroying the methane currently being released into the atmosphere. These included safely flaring the methane, using the methane to generate electricity for use at the mine, and conversion of the methane into liquid natural gas (LNG) for sale to an existing LNG wholesale company.

All four of these alternatives were economically feasible when the economic value of reducing the emissions of this powerful greenhouse gas into the atmosphere was incorporated into the analysis. That economic benefit was quantified using the market value of the carbon offset credits associated with the reduction of this source of greenhouse gases as well as estimates of the social cost of greenhouse gas (GHG) emissions developed by a federal government taskforce. At carbon offset credit values at or below the average value in American voluntary carbon markets or the European compliance market, Mountain Coal Company would be able recover all of its costs, including the cost of borrowing, to install and operate the equipment necessary to use or destroy the coal mine methane currently being released by the West Elk Mine. It is important to understand that this does not mean that our results rely on those carbon market values. Our results, instead, rely on the assumption that greenhouse gas emissions cause economic damage at least as great as those estimated market carbon values.

Mountain Coal Company's conclusion that there is no economically feasible solution to the methane release problem is tied in part to Mountain Coal's assumption that there is no economic value associated with the reduction in the emissions of the powerful greenhouse gases that the West Elk Mine is currently emitting in large volumes.

These economic modeling results are summarized in the tables on the next two pages and discussed in detail in the main body of this report. They show the value, if any, that

needs to be assigned to the reduction in methane emissions in order for the return on the investments in methane control to meet two different rate-of-return targets. Mountain Coal Company, in its economic analysis, indicated that it needed to earn a 10.99 percent return for an investment to be economically feasible. This is one of the MCC assumptions we dispute in this report. However, in all alternatives, even using most of MCC's other assumption, methane capture, destruction or use is shown to allow a rate of return on investment at least as high as 10.99 percent. The tables below show the carbon values or avoided carbon costs that would have an implicit return of 10.99 percent. The tables also show the results if we assume that MCC only needs to recover its costs, including the cost of borrowing money which we estimate to be 6 percent, but does not need to earn a profit for its stockholders on such pollution control efforts.

### i. Destroying the Methane by Collecting It and Burning It in an Enclosed Flare

In order to cover the costs of collecting the coal mine methane including the cost of debt, a carbon value per metric tonne of carbon dioxide equivalent (CO2e) of about a dollar above the 2010 average value in the American *voluntary* carbon exchanges ($6.00) would be required (Table S1). That value is about 60 percent below the carbon values on the European compliance carbon exchange between 2008-2011. Using MCC's assumptions and  its commercial investment return target, the value of carbon reductions would have to be $13.25 per tonne, well below the 2008-2011 average value on the European market or the mid-December value on the California market.

Table S1 Flaring the Coal Mine Methane

| Carbon Value/Cost Needed to Meet Target Rate of Return:  E Seam Collection and Flare System | | |
|---|---|---|
| Assumptions | Target Return on Investment | Carbon Offset Values to Produce the Target Return on Investment ($/tonne of CO2 Equivalent) |
| | | 2010 |
| Power Consulting Assumptions | 6.00% | $6.97 |
| MCC Assumptions (except 20 year life) | 10.99% | $13.25 |

### ii. Using the Methane to Generate Electricity to Be Used at the West Elk Mine

In order to recover the cost associated with collecting the coal mine methane, moving it to a central location, and using it to generate electricity, no value would have to be assumed for the destroyed methane if that electricity allowed MCC to avoid the full per unit costs it is currently paying for electricity (Table S2). The value of the electricity would cover the costs if the investment was financed by money borrowed at 6 percent. MCC's desired rate of return could be reached if each tonne of carbon equivalent destroyed had a value of merely forty cents. If MCC could only avoid the energy part of its electricity costs, a carbon value of about a half-dollar above the 2010 average carbon value on the U.S. voluntary carbon exchanges would allow all costs, including debt cost, to be covered.

If, instead, we adopt most of MCC's assumptions, which we dispute in the main body of this report, carbon values could be slightly less than those on the U.S. voluntary carbon exchanges and MCC could still earn its desired rate of return of 10.99 percent. If MCC could only avoid the energy component of its current electricity costs by generating its own electricity, carbon values about two dollars less than the 2008-2011 average value on the European carbon compliance market would be necessary to earn the 10.99 percent.

**Table S2 Generating Electricity for Use at the Mine with the Coal Mine Methane**

| Carbon Value/Cost Needed to Meet Target Rate of Return: Electric Generation Alternative | | |
|---|---|---|
| Assumptions | Target Return on Investment | Carbon Offset Values to Produce the Target Return on Investment ($/tonne of CO2 Equivalent) 2010 |
| **Power Consulting Assumptions** | | |
| Full Electric Cost Savings | 6.00% | $0.00 |
| Full Electric Cost Savings | 10.99% | $0.40 |
| Save Only Electric Energy Costs | 6.00% | $6.55 |
| **MCC Assumptions (except 20 year life)** | | |
| Full Electric Cost Savings | 10.99% | $5.54 |
| Save Only Electric Energy Costs | 10.99% | $15.88 |

### iii. Converting the Coal Mine Methane into LNG for Use in Heavy Trucks

In the LNG alternative, the West Elk coal mine drainage methane would be captured and delivered to a central location where it would be processed to isolate the methane and liquefied to produce LNG which would be picked up at the mine site by a LNG distributor. A carbon value about a dollar more per tonne than the average on the U.S. voluntary carbon exchanges would be required to cover all of MCC's costs including the cost of debt (Table S3). If the avoided costs associated with the reduction in GHG emissions (the "social cost of carbon") established by a federal government task force ($21.40 per tonne of CO2e) were used to value the destroyed methane, the return on the investment would be almost 16 percent even using MCC's assumptions. Alternatively if the destroyed methane was worth two dollars less than established by the European compliance market in over the 2008-2011 period, MCC would realize its desired return even under its own assumptions.

These economic modeling results are not offered as the final word on the economic feasibility of the capture and use of the West Elk Mine's coal mine methane. Rather, they are offered to encourage a closer and more careful look at that possibility than that provided by Mountain Coal Company's initial negative analysis.

**Table S3 Producing Liquid Natural Gas (LNG) for Sale to a Wholesale Company**

| Results of Economic Modeling of the LNG Alternative: Wholesale Sales to a Third Party | | | | |
|---|---|---|---|---|
| Assumptions | NPV | IRR | Target Return on Investment | 2010 Carbon Value to Reach the Target Return on Investment |
| **Power Consulting Assumptions and** | | | | |
| 2010 Carbon Value of $6.00 | -3,776,984 | 4.5% | 6% | $6.91 |
| 2010 Carbon Cost of $21.40 | 53,334,516 | 22.0% | 6% | NA |
| 10% higher costs, $6 Carbon Value | -10,642,345 | 2.1% | 6% | $8.54 |
| **MCC Assumptions and** | | | | |
| 2010 Carbon Value of $6.00 | -20,499,174 | -1.7% | 10.99% | $16.15 |
| 2010 Carbon Cost of $21.40 | 9,668,775 | 15.7% | 10.99% | NA |
| 10% higher costs, $6 Carbon Value | -26,101,412 | -5.0% | 10.99% | $18.81 |

That additional analysis should not be constrained by considering only the modified assumptions we discuss below. As pointed out above, we have largely followed the conceptual approach and assumptions adopted by MCC and its consultants in order to show that even within that coal company context there are methane capture and use alternatives that appear to be economically feasible. In the additional analysis that we believe is necessary, all of those assumptions should be subjected to scrutiny and sensitivity analysis .

For instance, MCC assumes that when it comes to methane emissions, its investment in pollution control activities should earn a normal return for its stockholders. That is not how the economic feasibility of pollution control is typically analyzed. In that context the economic question is typically whether the cost of the pollution controls is justified by the avoided economic costs associated with the damage that otherwise would be done by the pollution. Within the company, economic feasibility would be a matter of finding the least cost way of controlling those polluting emissions. Economic feasibility within the coal company is a matter of whether the company can afford the cost of pollution control, not whether it can earn a normal return on the pollution control as a "stand-alone investment project." Pollution control is not ordinarily a profit-making corporate investment. It is a cost of doing business.

Executive Summary ................................................................................................... ii

   i. Destroying the Methane by Collecting It and Burning It in an Enclosed Flare...........iii

   ii. Using the Methane to Generate Electricity to Be Used at the West Elk Mine ..........iii

   iii. Converting the Coal Mine Methane into LNG for Use in Heavy Trucks...................iv

Introduction ............................................................................................................. 3

Modification of Key MCC Economic Assumptions............................................................ 4

The Alternative Uses of the Coal Mine Methane That Were Analyzed............................. 5

Economic Modeling.................................................................................................... 5

Including the Value of Reductions in GHG Emissions in the Economic Analysis ............ 6

   i. The Volume of CMM that Could Be Destroyed or Used............................................ 7

   ii. The Projected Future Value of Carbon Offset Credits................................................. 9

The Time Period Used in the Economic Analysis......................................................... 12

The Volume of Coal Mine Methane Available for Capture and Use .............................. 13

The Appropriate Cost of Money to Use in Measuring Economic Feasibility .................. 14

Economic Analysis of the Flaring Option.................................................................... 16

   The Costs of the Collection System and Flare........................................................... 16

   Results of the Economic Modeling of the E Seam Flare............................................. 18

The Electric Generation Alternative........................................................................... 19

   The Costs of the Electric Alternative........................................................................ 20

   The Value of the Electricity Produced.................................................................... 2221

   Results of the Economic Modeling of the Electric Generating Alternative ............ 2322

The LNG Options .................................................................................................... 2524

   The LNG Alternative: LNG taken off site by a third party.......................................... 27

Federal Royalties on the LNG Produced ............................................................. 30~~29~~

Results of the Economic Modeling of the LNG Alternative ................................... 30~~29~~

Conclusions.......................................................................................................... 31~~30~~

Bibliography ......................................................................................................... 32~~31~~

Appendix A........................................................................................................... 34~~33~~

The Calculation of Carbon Dioxide Equivalents for the Methane Destroyed............ 34~~33~~

The collection system ....................................................................................... 34~~33~~

The flare/ internal combustion engine............................................................... 35~~34~~

The LNG option ................................................................................................ 35~~34~~

Total project savings........................................................................................ 36~~35~~

## Introduction

The West Elk Mine near Somerset, Colorado, emits large quantities of methane, a powerful greenhouse gas (GHG), into the atmosphere. Citizens, NGOs, and government agencies have been concerned about these emissions. In response to that concern, the Bureau of Land Management (BLM) in March of 2009 directed the Mountain Coal Company (MCC) "to collect all economical Coal Mine Methane (CMM) and Vent Air Methane (VAM) that would normally be vented for the safety of miners…" at its West Elk Mine. The BLM also required MCC to carry out "an annual evaluation of the economics associated with the capture and/or use of the CMM and VAM" at that mine and provided guidance as to what, at a minimum, the economic evaluation should contain.[1] Similarly, the U.S. Department of Agriculture Forest Service in a discussion of the impacts of coal mining on the North Fork, including the West Elk Mine, stated:[2]

> "Methane, a gas produced in underground coal mines and removed for safety reasons, is a potent greenhouse gas and capturing or flaring gas produced from the existing, as well as future, coal leases could be an important contribution to greenhouse gas reduction."

In response to the BLM directive, MCC in September of 2009 submitted a "West Elk Mine E-Seam Gas Economic Evaluation Report" to the BLM.[3]  In that "Economic Evaluation Report," MCC and its consultants concluded that: "It is disappointing that no technology presently exists that would allow an economically feasible use of the methane…"[4]

That conclusion largely followed from the assumptions that MCC and its consultants made about costs and revenues.  Reasonable changes in those assumptions would reverse the conclusion that there are no economically feasible uses of the CMM. This report details some of those key assumptions, indicates what more reasonable values are, and then re-analyzes the economic feasibility of three alternatives that capture and destroy or use the CMM.

In our analysis, we primarily make use of MCC's approach to evaluating economic feasibility. We use MCC's basic economic modeling approach, its estimates of costs, and most of its various economic and financial parameters. We do this so as to minimize the number of issues in dispute and focus attention on a few key assumptions around which MCC built its economic analysis.

Before discussing those key assumptions in detail, we begin by briefly listing them. Then we briefly describe the alternative uses of the CMM whose economic feasibility we will explore.

---

[1] Letter of March 25, 2009, to Gene E. DiClaudi, MCC, from  Lynn E. Rust, BLM, reference numbers 3420 (CO-921), C-1362, COC56447, COC67232.
[2] Rulemaking for Colorado Roadless Areas Revised Draft Environmental Impact Statement, p.129.
[3] MCC, "West Elk Mine E-Seam Gas Economic Evaluation Report" (September 24, 2009).
[4] Ibid. p. 19

3

## Modification of Key MCC Economic Assumptions

a. *The Economic Benefits of Reduced Methane Emissions and/or the Value of Carbon Offset Credits*: MCC considers only very low values for carbon offsets and ultimately chooses to assume that the reduced methane emissions have **no** economic value. We look at the range of actual market values of confirmed and monitored reductions in GHG emissions both in jurisdictions where GHG emissions are regulated by law (European Union and California) as well as their value in voluntary carbon markets that have continued to operate in the United States and around the world. We also look at the estimates of the economic costs associated with carbon emissions, in particular those developed by the U.S. Environmental Protection Agency (EPA) and other professionals. We interpret the market value of GHG reductions to be a minimum reflection of the economic damages or costs associated with those emissions.

b. *The Volume of Methane Available for Use:* MCC's consultant used coal mine drainage gas production during the first part of 2009 to estimate the amount of methane that would be available for capture and use. Coal production in 2009 was far below previous and projected future production at West Elk mine: 4.5 versus 7 million tons per year. The amount of methane produced has to be increased to match the level of MCC's projection of coal production at West Elk.

c. *The Cost of the CMM Collection System*: MCC's consultant, Arista, initially proposed a significantly lower cost collection system. MCC rejected that system and asked Arista to design one that cost 40 percent more. In addition, besides adding a 10 percent management-engineering charge, MCC also added a 15 percent "contingency" charge.  We have used Arista's original lower cost system and removed the "contingency" charge.

d. *The Cost of Electric Generation*: MCC assumed electric generation would be much more costly than necessary. It included expensive emission controls and included un-itemized "adders" that increased by 56 percent the investment costs of its electric generation alternative. In addition, MCC assumed the electricity produced from CMM would be sold rather than used at the mine site. This reduces the value and increases the cost of the electricity. We remove those inflated costs and analyzed electric generation for use at the mine.

e. *The Gas Sales Alternative*:  MCC chose an overly costly way of marketing captured CMM: delivery of the gas to a natural gas pipeline. We, instead, analyzed the conversion of CMM to liquid natural gas (LNG) which is then sold to an existing LNG wholesale company in the area.

f.  *The Length of Time the West Elk Mine would operate*. MCC assumed that at the end of a 10 year period the mine and all CMM collection and use equipment would be abandoned. Recently, MCC has explicitly stated that it expects to continue mining at West Elk or on adjacent lands indefinitely into the future. We have, therefore, used a 20 year life for the CMM collection and use equipment.

g.  *Treating Pollution Control Costs As a Corporate Commercial Investment*: MCC assumes that it should earn a normal market return on these pollution control costs similar to what Arch Coal expects to earn on investments in purely commercial ventures. We assume debt finance at a lower financial cost for the purely pollution control aspects of CMM capture and destruction. This simply means that MCC covers all of its costs but does not earn a profit on these pollution control efforts. This is a very conservative assumption. When companies are required to install pollution control devices, they do not usually expect the net cost of that pollution control to be zero or to make money on the pollution control.

## The Alternative Uses of the Coal Mine Methane That Were Analyzed

We re-analyzed the economic feasibility of three alternative ways of capturing, destroying, and/or using the CMM at West Elk Mine. These will be discussed in more detail below.

      a.  Flaring the coal mine gas at a location above the current E Seam mining rather than near the electric sub-station in Sylvester Gulch.

      b.  Generating electricity for use at the mine.

      c.  Conversion of the coal mine methane to liquid natural gas (LNG) that would be sold to an existing LNG wholesaler and picked up at the mine site.

## Economic Modeling

In order to reduce the number of assumptions in dispute, we have largely adopted the approach to measuring the economic feasibility of capturing and using CMM adopted by MCC and its consultants. Both Burns and McDonnell and Verdeo appear to have used a simple cash flow analysis in which all of the investments were treated as if they were debt financed at the target return on investment specified by MCC (10.99 percent). From this they calculated either a net present value using that target return rate as the discount rate or calculated an internal rate of return (IRR). If that IRR was at 10.99 percent or above, the project was judged to be "economically feasible" by MCC. With one exception to be discussed below, we used the same approach.

Although for some of our analysis we have used MCC's asserted cost of capital, 10.99 percent, we also model the CMM capture and use using MCC's cost of long-term borrowing. We also believe that the 10.99 percent return MCC seeks is too high based on current and foreseeable future economic conditions. We provided a critique of the

5

MCC assumption in an earlier report. In that report we pointed out that a weighted cost of capital of around 9 percent was defensible given Arch Coal's long term debt cost of 6.5 percent, return on common equity of about 11 percent, and a capital structure with 40 percent long term debt in it.[5] In this analysis we estimate the cost of debt to be 6 percent and also analyze the impact of using this lower cost of capital on the feasibility of capturing and using the West Elk CMM.

Except for changes we will explicitly note, we have also used MCC's assumptions on other financial parameters including taxes, insurance, finance, royalty rate and method of calculation, the value of electric generation, annual operation and maintenance costs, and many capital costs.

## Including the Value of Reductions in GHG Emissions in the Economic Analysis

Reductions in GHG emissions clearly have value in the sense of avoiding future costs associated with climate change. They may also have commercial value in the sense that the value of those reductions can be sold on a carbon exchange market.

MCC and its economic consultants did not include the value of carbon offset credits directly in their analysis of the feasibility of CMM capture and use. The Burns and McDonnell (B&M) economic analysis was carried out ignoring any potential revenues from carbon offset credits. At the end of the B&M report, however, a "sensitivity analysis" was carried out to see how much various important economic parameters would have to change in order for various CMM capture and use projects to meet the 10.99 percent rate of return hurdle MCC says it must earn on investments (MCC Report, Exhibit G at 5-4 to 5-9). In the last part of this sensitivity analysis, B&M model how the value of carbon offset credits might change the economic feasibility of a CMM capture and use project (MCC Report, Exhibit G at 5-6). B&M found that with the value of carbon offset credits in the $14 per tonne of $CO_2$ equivalent range, one CMM flaring option would be economically feasible and, for values in the $15.50 range, electric generation (with supplemental flaring) could be economically feasible, too.

The monetized value of such GHG reductions clearly can have a significant impact on the determination of the economic feasibility of alternative ways of capturing and destroying or using CMM from the West Elk Mine. For that reason it is important to make sure that the estimates for the volume of potential carbon credits and the value of the carbon credits potentially available from the West Elk mine are estimated correctly. MCC did not do that. Instead, the MCC economic feasibility report:

  i. appears to have understated the amount of $CO_2$ equivalent available for carbon credits; and

---

[5] Re-Analyzing the Economic Feasibility of Coal Mine Methane Capture and Use at the West Elk Mine, Somerset, CO, November 11, 2009, pp. 5-6.

ii. failed to include the value of carbon credits or carbon costs directly into its analysis.

### i. The Volume of CMM that Could Be Destroyed or Used

The Climate Action Reserve (CAR) is a nationally recognized voluntary carbon offset trading program. CAR has a stringent set of protocols that allow for carbon offset credits to be given to industries that would otherwise be venting their greenhouse gasses to the atmosphere. Under these protocols the drained gas from the West Elk mine would qualify for carbon credits that could then be sold on the CAR or other carbon markets.

Coal production averaged over the 2002-2006 period at West Elk Mine was 6.2 million tons per year.[6] Coal production increased to 6.9 million tons in 2007. After 2007 coal production declined as West Elk shifted from mining the B Seam to the E Seam. West Elk ran into coal quality issues in the E Seam that required additional processing of the coal before it could be sold. In addition there were several safety problems that disrupted production. By 2008 weakness in the national economy reduced the demand for coal nationwide. As a result, by 2009 coal production at the West Elk mine had declined to 4.5 million tons. It was this lower volume of coal mining and accompanying drainage well methane release that were the basis of the MCC analysis of the economic feasibility of the capture and use of the drained well methane.

With the economy recovering and production problems resolved, including the construction of a coal upgrade facility, production at West Elk has increased and is expected to return to 2007 levels, about 7 million tons per year. The general manager of the Mountain Coal Company projected in May of 2010 that West Elk will be mining 7 million tons of coal by 2012.[7] This is also the mine capacity that Union Pacific Railroad, which transports the coal, plans around.[8] Data from the first six months of 2011 indicate West Elk was mining on a pace to remove over 7 million tons of coal this year.[9]

We have used an annual production level of 7 million tons of coal for our modeling of the economic feasibility of CMM capture and use/destruction. We have taken the 2009 methane drainage gas that was associated with mining 4.5 million tons per year and scaled it up to an annual mining level of 7 million tons. This higher level of coal production would boost the mine drained well methane gas releases at West Elk from 1.7 million cubic feet per day (mmcfd) in 2009[10] to 2.65 mmcfd going forward.

---

[6] Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002-2006. Page 110.
[7] Delta County *Independent*, May 12, 2010, "West Elk Mine GM: 'We plan to be around'"
http://www.miningconnection.com/longwall/featured_stories/article/arch_coals_west_elk_mines_general_manager_in_colorado_says_we_plan_to_be_around.html .
[8] http://www.uprr.com/customers/energy/coal/colorado/west_elk.shtml
[9] http://mining.state.co.us/Reports/0611CoalSummary.pdf .
[10] "Coal Mine Methane Recovery at Active U.S. Coal Mines: Current Projects and Potential Opportunities."

MCC reported average daily methane releases from the West Elk mine drainage wells during the first quarter of 2010 at 3.48 mmcfd, 31 percent higher than what we assume in this report.[11]

However, all of this methane would not qualify for carbon credits. For instance, the methane currently being burned by the exhausters that draw the coal mine gas out of the drainage wells would not qualify for carbon offset credits under the additionality rule.[12]  In addition, the combustion of captured CMM in a flare or an internal combustion engine to generate electricity would release carbon dioxide into the atmosphere. Those GHG emissions have to be accounted for as do losses of methane to the atmosphere due to the fact that none of the uses of the CMM, whether it is a flare, an internal combustion engine, or a liquefaction plant, would be 100 percent efficient in their use of the methane. Only the additional CMM that would be destroyed can be counted and then only after the methane combustion products are taken into account.[13]

MCC's consultants estimated that the exhausters that extract the CMM from the mine drainage wells and the proposed compressors that would be used to inject that drainage gas into and move it through a collection system to where it would be destroyed or used would together consume about 16 percent of drainage well methane. The part of the gas that was consumed by the exhausters cannot be counted although the part of the gas consumed by the compressors associated with the collection system that support new destruction of methane can be counted. In effect, we start the project to capture and destroy the CMM after the exhausters. The amount of methane available for new capture and destruction, therefore, is the gross volume of methane coming from the drainage wells less the methane consumed by the exhausters.

However, not all of the captured and used/destroyed methane can be counted under CAR's coal mine methane protocol for carbon credits. The captured methane that is combusted by a flare or electrical generator produces CO2 that counts against the GHG

---

[11] The coal production, however, during that time period, the first quarter of 2010, averaged, at an annual rate, only 4.3 million tons. (Colorado Division of Reclamation, Mining and Safety, Monthly Coal Detail Report, Period 1/2010 through 12/2010. Date of report: February 15, 2011. Page 6.) If this gas output were to be scaled up to a mine production level of 7 million tons per year, the methane release would be 5.7 mmcfd, over twice the level we have assumed. Both B and E seam mine drainage well methane releases are included in the 2010 first quarter methane release data. (Confidential letter from Rozellynn Hall, Environmental Engineer, Mountain Coal Company to Desty Dyer, Bureau of Land Management, Uncompahgre Basin Resource Area,, May 3, 2010, page 6.)

[12] In both voluntary and compliance contexts, carbon offsets would be recognized only if they actually represented a reduction in emissions in the absence of the measures under consideration. That is, measures that are already in place that reduce emissions (such as safety measures) cannot be counted as further reducing emissions.

[13] Note the conservative nature of the CAR protocols. If the CMM is used to generate electricity, it is likely that less fossil fuel will have to be burned to generate electricity. In that sense, the burning of the methane displaces the burning of coal or natural gas to produce electricity. From that point of view, most of the CO2 produced by burning the methane to produce electricity is not additional CO2 emissions. The same could be said of the use of the LNG to displace diesel fuel. However, the CAR protocols insist that the combustion products associated with the use or destruction of the CMM be counted against the reduced methane releases.

saved, and there is not 100% efficiency in the capture and use/destruction of the methane. It is necessary to take account of the efficiency of the compressors and the flare (or internal combustion engine) so that we can calculate the volume of gas that escapes as methane and the volume of CO2 that is produced when the rest of the methane is combusted. After accounting for methane whose destruction would not qualify for offset credits, we have the net methane that would qualify that the West Elk Mine could claim carbon offset credit for if it flares or uses the methane for electric generation. When these methane and CO2 volumes are deducted from the total drainage gas methane available, about 312,000 metric tonnes of CO2 equivalent are available for carbon credits. This is the total net amount of CO2 equivalent that would qualify under the CAR protocols for carbon credits as a result of capturing and destroying the methane with a flare or internal combustion engine to generate electricity at the West Elk facility. This carbon dioxide equivalent is approximately 35 percent higher than what MCC's consultant Arista calculated.[14] The 35 percent increase relative to Arista's calculation is larger than the 21 percent increase in the volume of methane being captured and used in our modeling. This is because Arista used a much lower conversion factor when translating the methane captured and destroyed into CO2e terms. Appendix A summarizes these calculations.

Our other alternative use of the CMM involves isolating the methane from the other gases that are in the mine drainage gas and then liquefying the methane to produce LNG (liquefied natural gas) which is then sold for use in heavy trucks modified to operate on LNG. Evaluating this LNG alternative requires similar calculations of the methane that escapes, the carbon dioxide that is released as methane is burned to compress and liquefy the methane, and the carbon dioxide emitted when the LNG is ultimately burned as a fuel in heavy trucks. See Appendix A for the details of this calculation.

### ii. The Projected Future Value of Carbon Offset Credits

The value of carbon credits in the future *is* uncertain. Previously the Environmental Protection Agency (EPA) and the Energy Information Administration (EIA), among other government agencies, attempted to model the value of carbon offset credits. MCC consultant Verdeo presented its analysis of the carbon market in Exhibit I of the MCC Economic Valuation.

In Verdeo's analysis for MCC (Exhibit I), it chose to present the EPA forecasted carbon offset values (p. 17). This led Verdeo to suggest an estimated value of $10 per tonne of CO2 equivalent in 2012. Another federal agency, the Department of Energy's EIA estimated values associated with CO2 equivalent in 2012 that were significantly higher, $18 per tonne (which was close to the carbon value in the European market in 2011.)

---

[14] The EPA methane conversion calculator (http://www.epa.gov/cmop/resources/converter.html) shows that the tonnage of CO2 equivalent used for carbon credits to be higher than that reported by MCC.  One tonne = 1000 kg, 1 cubic foot of methane weighs 19.2 g, methane is 21 times better at trapping heat than CO2..  19.2g/cf * (1kg / 1000g) * (1 tonne / 1000kg) * (2.236*10^6 cfd) * (365.24 day / year) * 21 = 311,587 tonnes CO2 equivalent.

At the EPA estimated value according to the Burns & McDonnell sensitivity analysis, none of the alternative uses of CMM at West Elk were economically feasible. At the EIA estimated CO2 equivalent values, however, the Burns and MacDonnell analysis indicated that both electric generation (reciprocating engine) and flaring over the E Seam were economically feasible (MCC Report, Exhibit G at 5-7– 5-8).

The analyses of carbon values by EPA, EIA, Verdeo, and Burns & McDonnell, however, were carried out at the time that the U.S. Congress was considering the adoption of GHG emission controls in the context of a cap and trade regime that would recognize carbon offset actions whose GHG savings could be sold to regulated GHG emitters to help them meet the mandated GHG emission targets. That legislation, however, did not pass, and, at the time of this writing (2011) no similar federal legislation seems likely in the near future.

However, EPA is preparing to regulate GHGs following a decision by the U.S. Supreme Court that EPA has the authority to do so if it finds that GHG's threaten the health and safety of Americans. As of late-2011, EPA appears poised to issue regulations restricting the GHG emissions of some of the largest emitters.

EPA has also worked with the U.S. Interagency Working Group on the Social Cost of Carbon to estimate the value of GHG emission reductions. A dozen federal agencies with energy and economic expertise made up the Working Group. The estimates of the social cost of carbon emissions were prepared for use by federal agencies in benefit-cost analyses of energy conservation measures such as higher appliance and automobile efficiency standards. The median value that the Working Group recommended was $21.40 per metric tonne of carbon dioxide equivalent in 2010.[15]  The range of values, however, was from $4.70 to $64.90 per metric tonne of carbon dioxide. Critics of the Working Group's estimates have argued that the $21 median value recommended for use seriously understates the actual economic costs associated with GHG emissions.[16]

In addition, the European Union has been regulating GHGs for five years and has developed a market for the permits required to emit each tonne of CO2e. As this European market for GHG emission permits has developed, the market values of the carbon emission permits has been quite volatile depending on the size of the required reductions in GHG emissions set by the government (which creates the *demand* for the carbon permits) and the *supply* of permits which was tied to the permits the European Union initially distributed free to emitters to partially cushion the impact of the regulation

---

[15] This dollar value is stated in 2007 dollars. It would have to be increased by the CPI for the years 2007 to 2010. Table 15A.1.1. Appendix 15A. Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866. Final Rule Technical Support Document: Energy Efficiency Program for Commercial and Industrial Equipment: Small Electric Motors, US Department of Energy, March 9, 2010. http://www1.eere.energy.gov/buildings/appliance_standards/commercial/sem_finalrule_tsd.html
[16] Climate Risks and Carbon Prices: Revising the Social Cost of Carbon, Frank Ackerman and Elizabeth A. Stanton, Economics for Equity and Environment, July 2011. http://www.e3network.org/papers/Climate_Risks_and_Carbon_Prices_executive_summary+full_report+comments.pdf

of carbon emissions. Since 2008 the average carbon price on the European market has been about 13 Euros or $17.80 per tonne. Since this spring and summer when the European carbon price was between 16 and 17 Euros per tonne, the carbon price has fallen to a new low of less than 7 Euros or about $8.70 per tonne.[17]

The 2011 Euro Zone crisis and threat or reality of a renewed recession in Europe has depressed the demand for carbon credits to support energy intensive production such as electric generation. In addition, it again appears that member states have distributed too many credits to industrial emitters, creating an oversupply. Finally, the European carbon market accepts United Nations Certified Emission Reductions (CER) credits from developing countries. The point of this UN arrangement was to arrange a flow of capital from richer countries to poorer countries where the reduction in GHG emissions was expected to be less costly. The flow of those carbon credits to the European carbon market has increased recently as several powerful industrial GHG that can be inexpensively controlled or destroyed, including the refrigerant byproduct HFC-23 and $NO_2$, have generated CER that have flooded the European carbon market. This "flood" of CER is tied to the fact that most carbon markets in the world will no longer accept them and the European market is about to do the same. As a result, traders are trying to unload them before they become unsalable. This flow of "junk" credits has also driven European carbon values downward.[18]

All of these are temporary forces, some ending early next year, some depending on the European Union reducing the carbon credits being distributed and reducing the allowed GHG emissions still more, and some are tied to the unknown speed of recovery of the European economies. Some projections are that carbon prices on the European market will reach 12.30 Euros per tonne in 2012, almost twice what it was in mid-December 2011.[19] In discussing the value of GHG capture and destruction at the West Elk Mine, something that is not likely to happen instantaneously, it is important to take a longer view of carbon values, looking both at values over recent years and projected future values.

In mid-2011 the average global price for CO2e on the various national carbon markets was similar, $20.40 per tonne.[20] Note that these latter values are quite close to the $21.40 social cost of carbon estimated by the federal government.

The State of California is also about to begin regulating GHGs and will use a cap-and-trade mechanism to lower the cost to firms of reducing their GHG emissions. The California legislation will allow carbon offset credits to partially satisfy the required GHG

---

[17] http://www.bloomberg.com/apps/quote?ticker=EUETSSY1:IND  The average exchange rate over the same time period has been used to convert the carbon price to dollars.
[18] http://www.risk.net/energy-risk/feature/2129803/eu-emissions-trading-scheme-survive-europes-debt-crisis .
http://www.sfgate.com/cgibin/article.cgi?f=/g/a/2011/12/07/bloomberg_articlesLVSNGM1A74E9.DTL .
[19] Ibid.
[20] http://www.commodities-now.com/news/environmental-markets/7085-carbon-markets-up-3-to-50-billion-in-h1-2011.htm l

emissions. That has led to the development of a market for such offsets. That compliance carbon market may also be used by other Western states and Canadian Provinces once the performance of that market has been evaluated.  In mid-December Reuters reported that the 2013 price of carbon offsets on that California market was $15.50/ton. To be comparable to world market values, which are stated in metric tonnes, $15.50/ton would be $17.05 per metric tonne .[21] This price is similar to the $17.80 per tonne that was the average carbon value on the European market between 2008 and 2011.

Separate and apart from jurisdictions where GHGs are regulated, there are several voluntary markets where companies and organizations can sell confirmed and monitored GHG emission reductions.[22] In 2010 an estimated 131 million metric tons of carbon dioxide equivalent (CO2e) reductions were traded on these voluntary markets. The sales value was $424 million dollars. The volume-weighted average price for these carbon credits was $6 per metric tonne of CO2e.[23]  The range of payments per tonne of CO2e, however, varied widely with the type of project from $0.10 to $136.30 per metric tonne.

In our analysis of the cost-effectiveness of capturing and using CMM at the West Elk mine, we will use both $6 and $21.40 for the value of a tonne of CO2e avoided or destroyed. We will also estimate the carbon value that would be necessary to make the alternative CMM uses economically feasible. These are conservative values. The $6 value is associated with the voluntary market and is at the very low end of any previous projections of carbon offset value. It is also close to where the European value was in mid-December 2011 after the collapse in European carbon prices in the second half of 2011 discussed above. The $21.40 value, which is tied to the EPA estimate social cost of carbon and close to the average of carbon prices on the various world exchanges in mid-2011 is somewhat above previous projections by the U.S. Department of Energy, the three-year average of European market values, and the California value in late 2011, which were in the $17 to $18 per tonne range.

## The Time Period Used in the Economic Analysis

MCC assumed an economic life of 10 years for the equipment used in the capture and use of CMM. Much of this equipment, such as the engine-generators and the gas processing and liquefaction plant, have economic lives much longer than 10 years, some as long as 30 years. MCC assumes that at the end of the ten years, this expensive capital equipment will have no economic value. This significantly biases the economic analysis of capital-intensive technologies to capture and use the CMM.

---

[21] Point Carbon, Thompson Reuters, http://www.pointcarbon.com/news/1.1702963?&ref=searchlist 15 December 21:45 CET.
[22] See the Ecosystem Marketplace and Bloomberg New Energy Finance paper "Back to the Future: State of the Voluntary Carbon Markets 2011," by Molly Peters-Stanley et al. 2011.
[23] Ibid, pp. 9-10. The average price was depressed by large volumes of carbon credits associated with the closing of the Chicago Climate Exchange being sold at extremely low prices.

MCC chose the 10-year economic life because it expects to finish its mining of the E Seam by 2020. This, however, does not mean MCC will abandon mining at the West Elk Mine at that time. MCC is actively pursuing lease modifications that would allow it to mine coal on the E Seam apparently beyond MCC's current 10-year mining plan.[24]  In addition, there is federal coal in the land immediately adjacent and to the east of the West Elk Mine lease. The BLM estimates that that adjacent land contains about 579 million tons of mineable coal and 290 million tons of recoverable coal.[25]  This could provide over 40 years of additional coal mining at MCC's projected 7 million tons per year at the West Elk Mine. Finally, MCC has invested about $27 million in a coal upgrading facility at the West Elk Mine. Clearly there is the potential for the West Elk Mine or a new adjacent mine to continue to mine coal in this area indefinitely into the future. In a May 2010 interview West Elk's general manager, Don Vickers, was quoted as saying that MCC plans to operate the West Elk mine indefinitely into the future, significantly beyond 2020. He also cited the leasable coal reserves surrounding West Elk's current lease and the substantial investments MCC has made in improving the mine as reasons that MCC was in the North Fork Valley to stay.[26]

This longer economic life of both the West Elk Mine and the capital equipment that would capture and use the CMM requires lengthening the period of the economic analysis and extending the time series of the costs and revenues beyond the 10 years MCC's consultants modeled to, say, 20 years. This is also the maximum length of time that carbon offset credits can be claimed for a project.[27]

## The Volume of Coal Mine Methane Available for Capture and Use

Arista estimated the volume of raw mine drainage gas being drawn out of the E Seam of the West Elk Mine by analyzing the drainage gas flow between January and August of

---

[24] In November 2011, the Forest Service consented to approval of two lease modifications for federal leases C-1362 and COC-67232 requested by Ark Land Company, the holding company for Arch Coal Inc. that owns MCC. The lease modifications would give MCC access to more than 10 million tons of coal, about a 1.5 year supply for the mine. Even if this particular expansion is challenged or does not go forward, MCC has its eye on years of additional coal on adjacent lands as will be discussed below.

[25] "Coal Resource and Development Potential (2006) of the Grand Mesa, Uncompahgre, and Gunnison National Forests, BLM Uncompahgre and Colorado State Field Offices. Figure 18 (p. 37), polygon C contains 15,825 acres (p. 36). BLM estimates that there are 1,830 tons per acre per foot of coal seam height and that the thickness of the mineable coal in that area is 20 feet (in multiple seams) (p. 39). That represents a total of 579 million tons of mineable coal of which the BLM estimates 50 percent is recoverable coal.

[26] Delta County *Independent*, May 12, 2010, "West Elk Mine GM: 'We plan to be around.'" http://www.deltacountyindependent.com/news/north-fork/15110-west-elk-mine-gm-we-plan-to-be-around.html . See also U.S. Forest Service, Draft EIS, Colorado Roadless Rule, Map 13 ("Existing Recoverable Coal Leases & Colorado Roadless Areas. Grand Mesa-Uncompahgre-Gunnison National Forests: Alternative 2* &4*)(May 2011) available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5291699.pdf . It shows thousands of acres of "recoverable coal resources" to the east of the West Elk Mine's current leases.

[27] The CAR protocols allow certification of carbon savings for a ten year period of time and allow a project to apply for another ten years.

2009. Arista noted that after March of 2009 the volume of drainage gas declined "significantly." Arista associated that decline beginning in April with "drastically reduced" coal production associated with both geologic (low quality coal) and economic reasons (the recession depressing coal demand).

Arista appears to use gas flows in the first three months of the year, which had a weighted average of 2.9 million cubic feet per day (mmcfd), to indicate that the "long wall mining operation would produce roughly an average of 3.0 mmcfd of raw" coal mine gas. To this it added an estimated production of 1.0 mmcfd from the mine drainage wells on various panels that were sealed, for a total of 4.0 mmcfd of coal mine drainage gas. Arista then studied the methane content of the gas coming from the six E Seam mine drainage wells in the first eight months of 2009 and concluded that the raw drainage gas contained 55 percent methane. From this the total methane being produced by the drainage wells was estimated to be 2.2 mmcfd.[28]

The daily coal production during the first three months of 2009 which Arista assumed represented more normal coal production than the following five months was 13,036 tons. That was also close to the average daily coal production across the entire year in 2009, 13,517 tons. Either rate of production would lead to annual production of about 4.8 million tons of coal, far below previous West Elk coal production and production currently projected by West Elk. The 2008 production was 6.9 million tons and MCC projects production for 2012 to be 7 million tons.[29] Data from the first six months of 2011 indicate West Elk was mining on a pace to remove over 7 million tons of coal this year.[30] We have scaled the CMM production upward to match coal production of 7 million tons rather than the 4.5 million tons of annual coal production in 2009. The result is an estimated gross methane production from the drainage wells of 2.7 mmcfd for this level of coal production.

## The Appropriate Cost of Money to Use in Measuring Economic Feasibility

MCC uses its parent company's, Arch Coal's, weighted average cost of capital, which it asserts to be 10.99 percent, as the return on investment that any CMM capture and use alternative must provide. That is, MCC expects efforts to control methane emissions from the West Elk Mine to generate a return to stockholders equal to that provided by a typical commercial investment in, say, a new mine or a new seam of coal.  Although there is some logic to that approach when the capture and use of CMM can be looked at as a potential profit center for the coal company, it is not clear that that is the appropriate way to look at pollution control costs or the costs of implementing other mine health and safety measures. Instead, it seems more appropriate to treat these as

---

[28] West Elk Mine E-Seam Gas Economic Evaluation Report, Mountain Coal Company LLC, September 24, 2009, Exhibit F, Arista Report, September 2009, pp. 3-4.
[29] http://www.miningconnection.com/longwall/featured_stories/article/arch_coals_west_elk_mines_general_manager_in_colorado_says_we_plan_to_be_ar/ .
[30] http://mining.state.co.us/Reports/0611CoalSummary.pdf .

a necessary *cost* of the coal mining enterprise rather than a profit-oriented stockholders' *investment*.[31]

The obvious objection to adopting that approach is that at this point MCC is not *required* to capture the methane it is currently releasing into the atmosphere.[32] In fact, the BLM lease *addenda* explicitly stated that: "Lessee shall not be obligated or required to capture for use or sale coal mine methane…if the capture of coal mine methane…is not economically feasible…" (Sec. 4)  But this still leaves open what "economically feasible" means in this setting. In particular, to be economically feasible does CMM capture and destruction have to provide a normal market return to stockholders as opposed to simply covering the costs actually incurred? For instance, if MCC borrowed the money to finance the capture and destruction of CMM, and revenues from that operation fully covered the costs of that debt, it seems reasonable to conclude that that operation was "economically feasible" in the sense that MCC did not lose money on the operation.

As of June 30th, 2009, the interest rates on Arch's long term debt averaged 6.51 percent. Short term debt costs in 2008 were approximately 2.7 percent.[33] In October of 2009, however, Arch Coal purchased the Jacobs Ranch mining complex in Wyoming from Rio Tinto. This was largely financed by issuing $600 million of senior *unsecured* notes bearing an interest rate of 8.75 percent.[34] This led the quantity of Arch's long term debt to increase steeply and interest expenses to nearly double between 2008 and 2010.[35] As a result, as of the end of March, 2011, the average interest rate on Arch's long term debt was reported by Value Line to be over 9 percent, the highest of all the coal companies on which Value Line reported.[36]

Arch is aware that that 9 percent interest is not what the market demands for reasonable investments in ongoing operations. Arch refinanced $500 million in debt in August of 2010 with senior *unsecured* notes bearing an interest rate of 7.25 percent. In evaluating the adequacy of Arch's employee retirement funds, balancing assets and liability, Arch used a discount rate of 5.97 percent for evaluating the adequacy of its

---

[31] If the entire mining project including the costs of controlling coal mine methane emissions were being analyzed, it might be appropriate to use Arch Coal's target rate of return to evaluate the coal mining venture combined with the methane capture and destruction. But the lease amendment specified that the economic feasibility analysis of CMM capture and destruction should be carried out as a stand-alone methane capture project not associated with the economics of the coal mining operation. In that setting such a methane control project should not be treated as a normal profit-making undertaking.

[32] It is important to note that if the federal or state government were to require the capture and use of CMM, then CMM capture and us would no longer qualify for carbon credits since it is only steps that otherwise would not have been undertaken that qualify. That may be important in negotiations between the federal government and MCC over CMM capture and use.

[33] Arch Coal 10-K SEC Annual Report, p. 59.

[34] Arch Coal 2010 Annual Report, p.51.

[35] Pp. 50, 59, and 60. In addition, in August of 2010 Arch issued another $500 million in senior unsecured notes bearing an interest rate of 7.25 percent to refinance long term debt that had a 6.75 percent interest rate that was coming due.

[36] June 10, 2011.

employee retirement funds pension benefits and 5.67 percent for evaluating other postretirement benefits.[37]

Corporate bond rates suggest a discount rate of 4.9 to 5.4 percent, the former being the 2010 average rate on Moody AAA industrial corporate bonds and the 5.4 percent being the average rate on those bonds over the last 5 years (2006-2010). The prime rate was 3.25 percent in 2010 while the five year average was 5.25 percent.[38]

Based on the information above, we assume that MCC can borrow the relatively small amount of money necessary to install CMM control and destruction/use equipment at 6 percent, and we evaluate the economic feasibility at that rate.

We have carried out our analysis of the E Seam Flare alternative as well as other alternatives to capture and destroy the CMM assuming that the project is entirely debt financed at contemporary long term debt costs of 6 percent.[39] If the internal rate of return is at least that high, we conclude that the E Seam Flare project to collect and destroy the CMM is economically feasible. For comparison purposes we also do the analysis using MCC's assumed 10.99 percent rate of return hurdle.


## Economic Analysis of the Flaring Option

The simplest "use" MCC could make of the methane-laden coal mine gas would be to collect it from the mine drainage wells (MDW) that are drilled over each coal panel to draw off the methane. MCC already installs exhaust pumps that are powered by the methane they are pumping out of the mine. Most of that coal mine gas pulled from the mine, however, is currently simply vented directly into the atmosphere. The flaring option would collect that gas and deliver it to a central location, removed from the mine drainage wells, and burn it in a safe, enclosed, manner.

In all of the alternative uses for the CMM that we analyzed, like all of the alternatives MCC analyzed, we include a flare that would destroy any CMM that cannot be used in another way. In this particular alternative, however, the destruction of the methane content of the mine gases is the *only* thing done with the methane.  Because the collected methane is not put to some other use, the only potential value that can offset the cost of the collection system and flare is the value associated with the reduction in the quantity of this powerful GHG that is currently being released into the atmosphere.

### *The Costs of the Collection System and Flare*

MCC's consultants considered two collection systems. One collected and moved the coal mine gas a considerable distance to near the current electric substation in

---

[37] 2010 Annual Report, p. F-30.
[38] All interest rates from the Federal Reserve Bank System interest rate series H 15.
http://www.federalreserve.gov/releases/h15/data.htm
[39] *Value Line,* Report dated September 11, 2009.

Sylvester Gulch close to the mouth of the mine. The other moved it to a convenient location over the E Seam that is currently being mined and flared the methane there. That was labeled the "Alternate Flare Option" by MCC's consultants.[40]

MCC's consultant, Arista, originally designed the collection system in the least cost fashion. It described its approach in the following manner:

> Arista initially proposed a top-of-ground gathering system built with 6" SDR 11 poly pipe laid between each of the MDWs using low impact construction method with narrow right-of-ways and limited tree clearing. This "straight line" lay out would minimize amount of pipe needed and would be relatively easy to install as a minimum number of roads would be impacted. (Arista, p. 8)

MCC, however, objected to this minimum cost and impact approach because it feared that the U.S. Forest Service would not allow the "additional impact" outside of the corridors for the roads that were already approved in order to put the mine drainage wells in. Arista, therefore, redesigned the system, burying about 50 percent of the pipe and following the roads. The latter added about 15 percent to the length of the collections system. When combined with burying much more of the pipe, the cost of the collection system rose by close to 40 percent.[41]

Since much of the collection system involves pipe that is only used for a short period of time, the original Arista system may have been not only least cost but also least impact. Rather than assuming that the federal land manager would have refused to permit it, this alternative should have been fully developed to determine its economic feasibility and then actually proposed to the federal land managers. If it is both low impact— including if it could be constructed in a way to minimize impacts to the natural and (in some areas) roadless values of the landscape-- and lower cost, land managers might well approve it, especially if the lower cost allowed a serious environmental problem, the methane currently being released into the atmosphere, to be solved. For that reason, for modeling purposes, we have reduced the cost of the collection system to account for that unnecessary 40 percent increase in investment cost.

In calculating the investment costs of the various alternatives, MCC's consultants made liberal use of various "adders" or "loaders" that significantly boosted the cost of each alternative. For instance, Burns and McDonnell at times added all of the following to the actual itemized investment costs: 10 percent for "engineering and management," 18 percent for "overhead," and 20 percent for "owners cost including contingency." These were added in a compounding way so that their impact, collectively, on the itemized costs totaled, at times, was 56 percent.[42]  For the collection system we have removed

---

[40] See Arista Appendix G, pp. 50-56.
[41] Arista, p. 8.
[42] Burns and McDonnell, pp. 3-7 and 3-13.  Burns and McDonnell are not consistent in the use of these "loading factors." For the gas processing plant in the gas sales alternative, only an engineering loader

the 15 percent contingency loader, leaving a 10 percent loader to cover management and engineering. This led to the costs shown in Table 2 below for the Alternate E Seam Flare alternative.

*Results of the Economic Modeling of the E Seam Flare*

Since MCC anticipates no revenue from the collection and flaring of CMM, its economic analysis necessarily produces nothing but the losses associated with analyzing only costs.

**Table 2**

| Cost Component | MCC Values | Power Consulting Values | | |
|---|---|---|---|---|
| | | remove 15% contingency fee | remove 40% excess collection syst. Cost | Power Consulting Values |
| Wellheads | $2,995,500 | $385,500 | | $2,610,000 |
| E Seam Collection | $4,926,655 | $629,685 | $376,240 | $3,920,730 |
| Control System | $180,000 | | | $180,000 |
| Flare | $450,000 | | | $450,000 |
| Engineering | $810,216 | | | $671,073 |
| Total Investment Cost | $9,362,371 | | | $7,831,803 |
| O&M Cost | $1,498,000 | | | $1,498,000 |

If we accept <u>all</u> of MCC's assumptions about the costs associated with the E Seam Flare and its underestimate of the quantity of carbon dioxide equivalent that is captured and destroyed but do the analysis over 20 years of mining and assign modest values to the GHGs destroyed by the flare, there is a dramatic reversal of the economic feasibility. For instance, with a carbon offset value of $13.25 per metric tonne of $CO_2e$ in 2010 dollars, escalating to $20.09 in real terms by 2033[43], the E Seam Flare would have an internal rate of return of 10.99%, MCC's target. If the estimated social cost of carbon of $21.40 per metric tonne of $CO_2e$ in 2010 escalating to $34.53 is used to measure the benefits of the flare, the project would have an internal rate of return of 21%, almost twice MCC's target rate of return, and a net present value in $2009 dollars of $15.5 million.

If, instead, we

---

(10%) is used. For the collection system both an engineering loader (10%) and a contingency loader (15%) were used. For electricity, as pointed out in the text, three loaders totaling 56 percent were used.

[43] The estimated value of the carbon offsets are stated in 2010$s, i.e. in dollars with the purchasing power they had in 2010 when this report was written. For the economic analysis, they then have to be escalated by the assumed general inflation rate through to 2033 using DOE EIA's estimate of 2.1 percent general inflation. In addition, the carbon values are assumed to rise at a 2.102 percent rate over and above general inflation. This is the estimated rate at which the Social Cost of Carbon in real terms is projected to increase by a Federal Task force that studied the social cost of carbon in 2010. See text above.

i.      reduce the investment cost of the collection system to eliminate the 40 percent increase in cost tied to MCC's judgment about what federal land managers would allow and the high "loadings" for "contingencies" and

ii.     increase the quantity of the CO2 equivalent associated with MCC's estimate of the CMM available in the mine gas being released by the mine drainage wells and

iii.    increase the amount of CMM available for capture to reflect MCC's projected level of coal production and

iv.     assume the flare is financed entirely with debt borrowed at 6 percent and that is the required target return required on the investment

the E Seam Flare looks even more attractive. About a $7 carbon value, about a dollar above the value on the voluntary carbon exchange in 2010 ($6) would assure that all costs were covered, including the 6 percent return to cover debt costs. If the captured and destroyed GHGs are valued at the estimated social cost of carbon, the return on investment is 33 percent and the net present value of the project would be $57 million.

Assigning almost any reasonable value to the capture and flaring of the CMM being produced from the West Elk Mine's methane drainage wells makes the flaring of the methane economically feasible. Only by putting a near zero value on the destruction of this pollutant can one come to the conclusion that its capture and destruction are not economically feasible.

These results are summarized in Tables 3 and 4 below.

**Table 3**

| Carbon Value/Cost Needed to Meet Target Rate of Return:  E Seam Collection and Flare System | | |
|---|---|---|
| Assumptions | | Target Return on Investment | Carbon Offset Values to Produce the Target Return on Investment ($/tonne of CO2 Equivalent) 2010 |
| Power Consulting Assumptions | | 6.00% | $6.97 |
| MCC Assumptions (except 20 year life) | | 10.99% | $13.25 |

**Table 4**

| Economic Analysis of Using a Enclosed Flare to Destroy West Elk Coal Mine Methane | | | | |
|---|---|---|---|---|
| Alternative Scenarios | Mountain Coal Company Assumptions 10.99% Target Rate of Return | | Power Consulting Assumptions 6% Target Rate of Return | |
| | Net Present Value | Internal Rate of Return | Net Present Value | Internal Rate of Return |
| Zero Value/Cost Associated with GHG Emissions | -$30,594,843 | NA | -$35,041,931.38 | NA |
| $6 per Tonne of CO2 Equivalent Value | -$16,213,570 | -6% | -$4,435,831.99 | 3% |
| $21.40 per Tonne of CO2 Equivalent Cost | $15,523,774 | 21% | $57,034,392.03 | 33% |

## The Electric Generation Alternative

Simply flaring the CMM destroys a potentially valuable energy resource, methane, the primary component of natural gas. Collecting the CMM and moving it to a site where its energy value can be realized could add additional environmental benefits by implicitly displacing the combustion of other fossil fuel sources, such as coal or natural gas, in addition to destroying a powerful greenhouse gas. In addition, financial value might be realized by the coal mine as it reduces its electric bill by self-generating much of the electricity it needs to operate the mine.

MCC analyzed the use of the CMM to generate electricity for sale into the regional grid. Its conclusion from that analysis was that the costs of doing so far outweighed the revenues generated. We have reanalyzed the electric generation alternative using MCC's reciprocating engine alternative, one of two electric generating alternatives MCC analyzed and the one with the highest economic performance.  While we begin with MCC's economic assumptions, as will be discussed below, we have modified several of them.

### The Costs of the Electric Alternative

MCC assumes that the electric generation would take place in Sylvester Gulch adjacent to the current electric substation. That means that the collection system has to be more extensive, moving the CMM from over the E Seam to Sylvester Gulch. The collection system moving the gas from the mine drainage wells to the main trunk line has the same problems we discussed above for the E Seam Flare. According to MCC's consultant, it is 40 percent more costly than necessary. In addition its costs are burdened by unreasonable "contingency" fees. We have made the same type of adjustment to the collection system that we made in the E Seam Flare analysis.

We reviewed MCC's estimated costs of the electric generators powered by the reciprocating engines by comparing them to the costs provided by the planning departments of various electric utilities. [44] When we used these utility estimates of the cost of reciprocating engine driven generators and added a 10 percent charge for planning, development, engineering, etc. we get a cost per megawatt of nameplate capacity similar to MCC's estimate for the engine -generators. We therefore have used MCC's implied cost per kw of capacity for these generating units.

---

[44] The costs associated with electric generators driven reciprocating engines operating on natural gas were obtained from the electric resource plans of the following utilities and utility agencies. The years in parentheses indicate the planning year: Pacificorp (2008), Portland General Electric (2009), NorthWestern Energy (2007 and 2009), and the Northwest Power and Conservation Council (2009). See, for instance, the Northwest Power and Conservation Council's sixth **Northwest Power Plan (Draft),** 9/3/09**,** http://www.nwcouncil.org/energy/powerplan/6/DraftSixthPowerPlan_090309.pdf . The U.S Environmental Protection Agency's "recommended values" for the capital cost of engine-generators sets in its financial model for the use of CMM is $1,100 to $1,500 per kw of installed capacity for reciprocating engines, similar to the costs the cited electric utilities used and well below the MCC cost of $1,890 per kw. "User's Manual for the CMOP Cost-Benefit Analysis Model, September 2008. http://www.epa.gov/cmop/resources/cashflow_model.html .

However, MCC also assumed that a state of the art air emission control system (selective catalytic reduction or SCR) that would add almost $5 million to the cost of the engine-generators would be required. The justification for this was a speculative assertion by Burns and McDonnell that the installation of an electric generation would force the West Elk Mine to obtain an operating permit and the very fact of having to obtain that permit would lead the Forest Service to mandate that the mine install "Best Available Control Technology" (BACT) (e.g. the selective catalytic reduction) on the engine-generators to avoid potential visibility impacts associated with air emissions.

In conversations with the Forest Service's Air Resource Program and the State of Colorado's Stationary Source Program[45], however, it was made clear that this would not be a requirement of either the Forest Service or the State of Colorado. This would especially be true if the higher pollution control costs associated with this expensive emissions control technologies would block progress at the West Elk Mine in reducing its largest air emission problem, the ongoing release of large amounts of methane into the atmosphere.

Because BACT is not likely to be imposed, the SCR emission control technology is not likely necessary for the CMM electric generation alternative. This means that the B&M cost estimates for the GE Jenbacher JMS 620 reciprocating engine generating technology needs to be revised downward to remove the cost of the SCR emissions controls. This led us to remove the $4.7 million capital cost associated with the air emission controls and the $41,000 in operation and maintenance costs associated with that equipment.

We project 20 percent more methane gas available to power the electric generators due to a significantly higher level of coal mining than in 2009 when MCC estimated the drainage well methane gas levels. We estimate that14.4 mw of generating capacity can be supported rather than the 12 mw MCC assumed in its analysis. We have, therefore, increased MCC's estimated capital and O&M costs for the engine-generators by a fifth. Table 5 below shows our capital and O&M cost as well as MCC's.

**Table 5**

| Comparison of the Costs Associated with | | |
|---|---|---|
| The Electric Generation Alternative (2009$s) | | |
| Type of Cost | MCC | Power Consult. |
| Investment Costs | 12 MW Nameplate | 14.4 MW Nameplate |
| Collection System | $        12,107,321 | $         9,935,819 |
| Flare | $             450,000 | $             450,000 |
| Engine-Generator | $        15,128,969 | $        18,194,087 |
| Air Emission Controls | $          4,741,334 | $                        - |
| Investment Cost Subtotal | $        32,427,624 | $        28,579,906 |
| Operation & Maintenance Costs | $          3,026,000 | $         3,160,654 |

---

[45] October 2009.

*The Value of the Electricity Produced*

We assume that MCC would use the electricity produced to displace currently purchased electricity. This has several advantages over sale of the electricity into the regional electric grid.

First, by supplying part of its own electricity, the West Elk Mine would reduce the peak load it imposed on the electric grid, avoiding part of the demand charges it currently faces for those peak loads. It would also, of course, avoid the energy charges.

Second, as production at the mine varies for economic, coal quality, or safety reasons, electric usage would also vary as would the production of CMM from the active panels. This complementary relationship would reduce the implicit cost associated with the reductions in electric generation when the mine reduced its level of production. Electric generation would fall when the demand for electricity also fell.

Third, electricity produced from CMM for mine use would not be subject to the federal 12.5 percent royalty, eliminating another cost that MCC included in its analysis.

We have valued the electricity produced based on what West Elk is currently paying per unit for electricity from the Delta-Montrose Electric Association from which West Elk currently purchases its electricity. Since West Elk would avoid a significant part of its current purchases, that is appropriate.

The MCC economic report expressed concern about the variability and quality of the coal mine gas being produced at West Elk. Some of that variability is associated with variation in the level of production at the mine and is not a major concern for the reasons discussed above. There is, however, a natural variation in the methane production with production high when a new panel is first entered but decreasing as the mining proceeds in that panel. The "saw tooth" production pattern can be dealt with in several ways. First gas drawn from sealed panels can be drawn on in the opposite time pattern to smooth out the quantity of methane delivered to the generator. Second, temporary very high levels of production can be partially flared and only the more stable portion of the methane supply used for generation. Finally, it may be worth considering the compression and storage of some of the temporary peaks in gas production for later use when gas production is in the declining portion of the "saw tooth" cycle.

In our modeling of the electric generating alternative, we have used the cost of electricity from Delta-Montrose Electric Association in mid-2011 and escalated that cost to 2014 when electric production is assumed to begin as well as for each year after that using the electric price escalation factor projected by the U.S. Department of Energy in its Annual Energy Outlook 2011. We have also increased the level of generation that is possible by scaling up the electric energy MCC projected was possible, 78,630 mwh, to account for the higher level of coal production MCC now expects (7 mm tons per year) and, therefore, higher level of methane gas production. As a result, we project twenty

percent more electric generation, 94,560 mwh.  We have used the same quantity and values for the carbon offset credits discussed above for the E Seam Flare.

MCC, in discussing the electric generation alternative points out that assuming that each mwh of electricity produced would allow MCC to avoid the current average mwh cost of that electricity establishes the *maximum* value of that self-generated electricity. To the extent that MCC would still plan to rely on Delta-Montrose for some of its electricity and for backup generation for emergencies if MCC's generation failed, some of the peak load charges currently being paid may not be avoided. We test the importance of that possibility by also modeling the economic outcome if only the electric energy mwh charge is actually avoided due to the self-generation from CMM.

### Results of the Economic Modeling of the Electric Generating Alternative

MCC's economic analysis indicated that electric generation was not economically feasible, causing a $20 million NPV loss. If all of MCC's assumptions are retained except that the electric generator operates for 20 years rather than MCC's assumption of 10 years and a modest 2010 value of $6 per metric tonne of $CO_2e$ is used to value the methane destroyed, the rate of return on the investment is 11.4 percent, just over MCC's target rate of return of 10.99 percent. The net present value of the earnings is just $1 million. If the value of the capture and destruction of the methane is anything above $5.54 per tonne of $CO_2e$, MCC's target rate of return of 10.99 percent would be reached if MCC's other assumptions are used. If, instead, the methane destroyed is valued at the Federal Task Force's social cost of carbon of $21.40 per metric tonne of $CO_2e$ destroyed (2010 value), the return on the investment would be 23 percent and the net present value of the benefits would be $29.6 million.

When the revised assumptions discussed above, lower costs of the engine-generators and higher levels of generation, are used instead of MCC's assumptions, even if no value is placed on the methane destroyed, the return on investment is almost 10 percent, a percentage point below MCC's 10.99 percent target. If the destroyed GHGs are worth more than forty cents per tonne, MCC could meet its target rate of return. Under that set of more reasonable assumptions, electric generation by itself largely economically justifies the project with just a tiny contribution from the value of the reduced GHGs. If the GHGs destroyed are valued at $6 or $21.40 per tonne, the net benefit is even larger as is the rate of return on the investment.  See Table 6 below.

If the electricity is assumed to be only worth the actual energy charge ($32.90 per mwh in 2010) West Elk was paying in 2011, but West Elk has to keep paying the demand charge on all of its current electric use, our alternative assumption would still generate MCC's target rate of return of 10.99 percent if the value of each tonne of $CO_2e$ destroyed is $9.58. At the estimated social cost of carbon, the return would be over 24 percent and the net present value of the revenues would be almost $30 million.

If instead of assuming that MCC needs to earn its normal commercial rate of return even on pollution control efforts, we assume instead that fully covering MCC's costs,

including the cost of borrowing the money (6 percent) to install the methane capture/destruction equipment, a value of $6.55 per tonne of CO2e destroyed would assure zero net costs to MCC even if it had to continue to pay the electric demand charges and only avoided the electric energy charges. If MCC's self-generation allowed it to avoid completely the cost of buying the electricity it generated itself, MCC could earn almost 10 percent on its investment and earn a net present value of almost $10 million even if no value is assigned to the reduced methane emissions. If the average carbon offset value associated with the American voluntary carbon market in 2010 is assigned to this reduction in GHGs ($6 per tonne), the return on investment would be over 17 percent. If the estimated social cost of carbon is assigned to those reductions in GHGs, the net present worth exceeds $59 million and the return on the investment is over 23 percent even if only the energy value of the electricity is saved. See Tables 6 and 7.

**Table 6**

| Carbon Value/Cost Needed to Meet Target Rate of Return: Electric Generation Alternative | | |
|---|---|---|
| Assumptions | Target Return on Investment | Carbon Offset Values to Produce the Target Return on Investment ($/tonne of CO2 Equivalent) 2010 |
| Power Consulting Assumptions | | |
| Full Electric Cost Savings | 6.00% | $0.00 |
| Full Electric Cost Savings | 10.99% | $0.40 |
| Save Only Electric Energy Costs | 6.00% | $6.55 |
| MCC Assumptions (except 20 year life) | | |
| Full Electric Cost Savings | 10.99% | $5.54 |
| Save Only Electric Energy Costs | 10.99% | $15.88 |

**Table 7**

| Economic Analysis of the Use of Coal Mine Methane to Generate Electricity for Use at the West Elk Mine | | | | | | | |
|---|---|---|---|---|---|---|---|
| Specific Assumptions Made on Key Variables | | | Results: Net Present Value (2009$s) and % IRR | | | | |
| Cost of Capital | Value of | Value of Carbon | Assumptions on Investment Cost and O&M Costs and Amount of Methane Avialable | | | | |
| Target Return | Electricity | Credits of Cost of | Mountain Coal | | Power Consulting | | |
| | | Carbon Emissions | NPV | IRR | NPV | IRR | |
| 10.99% | Energy & Demand | $0 | -$12,062,437 | 5% | -$1,138,437 | 10% | |
| 10.99% | Energy & Demand | $6 | $941,825 | 11% | $14,458,666 | 18% | |
| 10.99% | Energy & Demand | $21.40 | $29,584,716 | 23% | $54,413,005 | 33% | |
| 10.99% | Energy Only | $0 | -$36,291,342 | NA | -$29,584,516 | NA | |
| 10.99% | Energy Only | $6 | -$21,929,406 | -1% | -$10,460,443 | 5% | |
| 10.99% | Energy Only | $21.40 | $11,044,603 | 16% | $29,963,597 | 24% | |
| 6% | Energy & Demand | $0 | | | $9,734,178 | 10% | |
| 6% | Energy & Demand | $6 | | | $33,106,187 | 17% | |
| 6% | Energy & Demand | $21.40 | | | $93,062,446 | 32% | |
| 6% | Energy Only | $0 | | | -$32,449,724 | NA | |
| 6% | Energy Only | $6 | | | -$2,467,758 | 5% | |
| 6% | Energy Only | $21.40 | | | $59,070,757 | 23% | |

## The LNG Options

We modeled the production of liquid natural gas (LNG) as an alternative to the capture and use of the West Elk Mine CMM through flaring, electrical generation, or the delivery of natural gas to a regional pipeline. As discussed below, LNG has some distinct advantages that can make it an economically competitive alternative.

Much of the same equipment that MCC consultant Arista proposed for the processing of the coal mine gas into pipeline quality "natural" gas can be used to prepare that gas for liquefaction and sale as LNG. Arista described that equipment in the "gas plant" portion of its report which was Exhibit F of the overall MCC "West Elk Mine E-Seam Gas Economic Evaluation Report." The cleaning of the coal mine gas stream to produce pipeline-quality natural gas is very similar to cleaning in preparation for producing LNG. This allows us to use Arista's cost estimates (inflated to the year 2014) directly in our analysis of the LNG options. The compression of the final gas stream that would be necessary to access a high pressure natural gas pipeline is the only processing equipment on Arista's gas plant list that is not necessary for the LNG options. In the LNG options there is no need to compress the gas to pipeline levels. Instead the gas will be cooled into LNG and stored briefly on site.

There are a number of different pieces of gas processing and storage equipment that would need to be added to Arista's list of equipment for the LNG option. It is necessary to add a liquefaction unit and a storage tank. It is then necessary to consider the added O&M costs associated with the added equipment for the LNG options and finally to consider the value of the LNG that is produced.

Building a pipeline from the West Elk mine to the nearest natural gas pipeline, the alternative analyzed by MCC, is cost prohibitive because of both the distance and the terrain that the pipeline would have to cross and, in MCC's analysis, the fact that MCC

25

assumed that that pipeline would only be in use for 10 years. Distance, geography, and the short assumed economic life of MCC's natural gas sales alternative were the primary reason that alternative was not found to be economically feasible. It is also the reason we analyze a lower cost way of transporting the methane once it has been processed into a pipeline quality gas.

Table 8 below shows Arista's cost breakdown for the gas processing it proposed as well as the costs associated with the LNG alternatives we have developed. We will discuss these costs in more detail below.

As mentioned above, the core of our economic analysis of the LNG alternative begins with MCC's gas processing costs. It is important to note that MCC may have overestimated those costs because MCC assumes a relatively low concentration of methane in the coal mine gas being recovered from the mine drainage wells, 55 percent. This was based on Arista's analysis of the methane content of drainage well gas during the first eight months of 2009 when the mining was repeatedly interrupted and systematically reduced due to poor coal quality, safety problems, and reduced demand for coal. In addition, MCC reports that the coal mine drainage gas has a relatively high nitrogen and oxygen content. Nitrogen and oxygen are the primary components of air and are the most costly contaminants that need to be removed to produce pipeline quality gas or LNG.[46]

MCC consultants also report that methane concentrations in the exhausted mine ventilation air are often so low (less than 0.2 percent) that conventional processes to destroy that methane would not be self-sustaining.[47] The relatively low concentrations of methane and high nitrogen and oxygen content suggest that the gas exhausters on MCC's drainage wells are sucking significant quantities of mine ventilation air out of the mine along with the methane being released by the coal. This produces a gas stream that is more costly to process both because of its high volume and its low quality.

**Table 8**

---

[46] Upgrading Drained Coal Mine Methane to Pipeline Quality: A Report on the Commercial Status of System Suppliers, U.S. Environmental Protection Agency, EPA-430-R08-004, January 2008, p. 5. http://www.epa.gov/cmop/docs/red24.pdf

[47] Exhibit H, Verdeo VAM Analysis, MCC CMM Economic Analysis.

| The Costs of Coal Mine Gas Processing and Liquefaction | | |
|---|---|---|
| Type of Cost | Arista West Elk Gas Plant | LNG Alternative |
| Investment Cost | | LNG Picked Up at Mine Site |
| | | |
| Compression | $1,750,000 | $900,681 |
| Oxygen Removal | $1,750,000 | $2,115,245 |
| Glycol Dehydration | $125,000 | $151,089 |
| Nitrogen/Co2 Removal | $3,000,000 | $3,626,135 |
| Installation | $3,200,000 | $3,867,877 |
| Outlet Compression | $1,000,000 | $0 |
| Electrical | $400,000 | $483,485 |
| Sub-total: Gas Preparation | $11,225,000 | $11,144,512 |
| Liquefaction | $0 | $4,834,846 |
| Onsite Storage | $0 | $383,868 |
| Storage Tank Foundation | $0 | $302,178 |
| 10% Engineering | $1,122,500 | $1,666,540 |
| | | |
| Total Investment Cost | $12,347,500 | $18,331,944 |
| | | |
| O&M Costs | | |
| Arista O&M | $700,000 | $846,098 |
| Electricity for Liquefaction | $0 | $1,291,814 |
| Reduce Compression Costs | $0 | -$250,924 |
| Total O&M Costs | $700,000 | $1,886,988 |

This may not be necessary for the safety of the mine and its workers. It may be the result of temporary conditions associated with the initial mining of the E Seam. Coal production at the West Elk Mine was reduced significantly during the time period the gas from the mine drainage wells was being tested due to coal quality and market conditions. In addition, the mining of the E Seam was just beginning and a new ventilation shaft was being brought into service. Finally, the exhausters and ventilation system were not being operated to *both* protect worker safety and enhance the quality of the coal mine gas being drawn out of the mine drainage wells. It is possible that with some attention and effort, the quality of the coal mine gas being removed from the drainage wells could be improved significantly. That would reduce the cost of the equipment needed to convert the coal mine gas into pipeline quality gas below that estimated by MCC's consultants.[48]

*The LNG Alternative: LNG taken off site by a third party.*

Our LNG alternative is similar to the Arista gas plant option. In this option, as with the other alternatives, we scale up the methane supply to match MCC's current projection

---

[48] See the EPA report on "Upgrading Drained Coal Mine Methane to Pipeline Quality, p. 2, cited in footnote 19. Also see U.S. EPA, Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of Selected Gassy Underground Coal Mines 2002-2006, Revised, January 2009, EPA 430-K-04-003, p. 2-9

of coal mining at 7 million tons per year. In 2009 the methane being drawn out of the drainage wells at West Elk was 1.7 mmcfd while the amount of coal mined was 4.5 million tons.[49] We have to both scale up the methane available for a higher level of coal production (7 million tons per year) and take into account the losses associated with each part of the collection and processing system.[50] Our estimate of the methane that actually gets liquefied and is available for sale is 2,115 mcf per day or 26,377 gallons of LNG per day.[51] This is about 21 percent more pipeline quality gas being produced by the gas processing plant than Arista estimated for its gas pipeline alternative.

We have significantly scaled down Arista's cost of compression from its estimated $2.75 million. This scaling is appropriate because the gas processing equipment only needs to compress the gas to 150 psig instead of Arista's assumed 600 psig. In addition the cost of outlet compression is not included in the gas processing equipment ($1 million) since that compression was only to prepare the gas for injection into a high pressure natural gas pipeline.

A liquefaction unit needs to be installed at the downstream end of the gas processing plant at a cost of almost $5 million.[52]  A storage facility with a 30,000 gallon LNG capacity needs to be installed so that, given the variable daily volume of coal mine gas collected, all of the LNG produced could be stored for daily pick up. This storage facility would cost $686,000.[53]  The Arista gas processing plant that prepares the gas for liquefaction has a capital cost of $9.4 million when the adjustment for the cost of compression is made. We scaled those investment costs upward by 21 percent to account for the need to process a larger volume of gas. Combining these capital costs brings the total capital costs associated with LNG Alternative to $18.3 million.  This

---

[49] EPA reports 4.5 mm tons of coal produced and 1.7 mmcfd drainage methane produced in 2009. MCC reports to The Colorado Division of Reclamation, Mining and Safety indicated 4.88 million tons of coal being produced in 2009. *Monthly Coal Detail Report,* http://mining.state.co.us/Reports/2009Detail.pdf . For consistency we used both EPA's quantity of mine drainage well methane and coal produced.

[50] Arista is probably underestimating the losses associated with its gas processing technology. The Pressure Swing Adsorption equipment to remove the nitrogen and carbon dioxide is likely to involve the loss of about 10 percent of the methane in the coal mine gas stream. Arista mentions this (p. 16) but does not appear to account for it in its gas sales estimates. The lost methane would still be flared and capable of earning carbon offset credits.

[51] 12.47 gallons of LNG per mcf of methane.

[52] Estimate provided by Kryopak Inc. November 2009. The estimate was based on the volume and quality of the gas that Arista indicated would emerge from the gas processing plant it had designed. In addition, Clean Energy Fuels Corporation indicated that it estimated the cost of liquefying natural gas to produce LNG to cost about 15 cents per gallon. That was the basis of the price it offered to buy the LNG from the West Elk Mine. Our levelized cost of liquefying the methane was about 17 cents per gallon, 13 percent higher than Clean Energy's stated costs. This difference is likely due to the small scale of the West Elk Mine processing plant we are proposing compared to Clean Energy's nationwide operations and Clean Energy's negotiating strategy with potential suppliers.

[53] "Optimized LNG Storage Tanks for Fleet-Size Refueling Stations with Local LNG Liquefiers," J.A. Barclay, A.J. Corless, and E.H. Nelson, pp. 1199-1206, Figure 2, p. 1202, in *Advances in Cryogenic Engineering,* Volume 43, Part B, Proceedings of the 1997 Cryogenic Engineering Conference, edited by Peter Kittel,  Plenum Press, New York, 1998. Costs are approximately linear with volume of the tank at about $10.60 per gallon in 2009$s.

value can be compared to the Arista capital costs for the gas processing plant of $12.3 million without any liquefaction equipment.[54]

The O&M costs associated with the LNG Alternative are similar to the Arista O&M costs with a few key changes. There is a significant amount of additional electricity that has to be added to the O&M costs because the liquefaction process consumes a substantial amount of energy. The additional electricity is estimated to cost $1.3 million per year.[55] Since we no longer require outlet compression and we have substantially reduced inlet compression, we are subtracting $251,000 from Arista's calculated O&M costs of $700,000, but then we have scaled the resulting O&M costs up for the larger size of the plant needed to accommodate the larger volume of gas. This brings the total O&M associated with the LNG Alternative to about $1.9 million.

Table 8 above summarizes these capital and O&M costs and compares them to the Arista's gas processing plant costs that did not include the liquefaction unit.

The LNG will be stored onsite in a tank and a third party will pick it up daily with LNG tractor trailers. Any excess gas will be flared. Clean Energy Fuels Corporation (Clean Energy), the nation's largest distributor of LNG, has expressed interest in the West Elk LNG at the volumes discussed above. Clean Energy gave a price quote of 15 cents per gallon over the Platts Rocky Mountain Index (RMI) Natural Gas price to purchase and pick up the LNG at the mine site.[56] The July 1, 2011 RMI natural gas price was $4.08/MCF or 32.72 cents/gallon of LNG which would result in a price for the LNG of 47.72 cents per gallon.[57] Using Arista's estimate that there is 1,750 mcfd of methane available, 7.97 million gallons of LNG could be produced each year. The sale of that LNG would generate $3.8 million in revenue. Using our estimate of 2,115 mcf per day or 21 percent more methane available, 9.95 million gallons of LNG could be produced, generating $4.75 million in revenues per year.

The LNG, as well as the compressed natural gas, market is currently expanding across the United States as people look for cleaner fuels for trucks and automobiles. The value of LNG is constrained at the low end by the cost of natural gas plus the cost of "compression" (liquefaction) to produce LNG and constrained at the high end by the cost of diesel fuel (adjusted for energy content) since the primary new retail market for LNG is as a fuel for heavy trucks, displacing diesel fuel. There is a wide gap between this upper and lower potential value of the LNG. As of the summer of 2011 in Colorado, the "natural gas value plus compression costs" would suggest the value mention above, $0.48 cents per gallon. If wholesale diesel prices are about $3.40 per gallon, the price for the same amount of energy as is contained in a gallon of LNG would be about

---

[54]Burns and McDonnell report, Table 2-3, p 2-6, Exhibit G of the MCC Economic Analysis.
[55]"Appalachian Pacific's CMM Utilization Project," paper presented at the Western States Coal Mine Methane Workshop, Grand Junction, Colorado, April 19, 2005, p. 2. To produce 10,000 gallons per day of LNG, an estimated 1,000 kW of electrical power was necessary. We have scaled this up for the 22,000 gallons per day that the Arista estimated gas stream could produce. Delta-Montrose Electric Association electricity costs were used to value the electricity.
[56] Offer made November 18, 2009.
[57] There are 12.47 gallons of LNG in each thousand cubic feet (MCF) of methane.

$2.00.[58] Thus the value of a gallon of LNG as a fuel for heavy trucks could be between about $0.50 and $2.00. This difference in potential value has to compensate for the building and operating of a distribution infrastructure for LNG similar to what exists for diesel and gasoline as well as the cost of converting vehicles so that they can use LNG. There are other considerations including convenience, familiarity, performance, and vehicle emissions. Because of this uncertainty about the retail price at which LNG would actually sell, we have focused on the sale of the LNG to an existing wholesaler rather than on retail value.

### Federal Royalties on the LNG Produced

For gas produced for sale from the West Elk CMM, a 12.5 percent royalty would be due the federal government. Since this is not a normal natural gas operation where the royalty would be due on the value of the natural gas at the well-head, a site-specific market value of the CMM would have to be determined by the federal Minerals Management Service of the Department of Interior. In a New Mexico case, MMS ruled that the cost of removing $CO_2$ from coal bed methane was a cost of placing the gas in marketable condition and could not be deducted from the sale value of the gas when calculating the royalty.[59] That would suggest that the gas processing costs in preparation for producing LNG are not deductible from the gas value before calculating the royalty. A market value for the methane gas before it is liquefied, however, would still have to be determined in order to calculate the federal royalty. We have simply used the DOE Energy Information Administration's projections of real wellhead natural gas prices between 2011 and 2033 and escalated them at 2.1 percent per year, the DOE EIA projection of price inflation, to approximate the future market value of the methane before it is liquefied and have based the royalty on that value.[60] This may overestimate the royalty that would have to be paid.

### Results of the Economic Modeling of the LNG Alternative

The LNG alternative involves a third party LNG wholesaler picking up the LNG at the Sylvester Gulch site and selling the LNG through its own wholesale or retail outlets. The value of the reduction in the methane emissions would have to be $6.91 or more per metric tonne of $CO_2e$ destroyed for the conversion of the methane into a fuel to power heavy trucks to cover all of MCC's costs including the assumed 6 percent debt cost. This is about a dollar more than the average value of carbon on the *voluntary* market in the US in 2010. If the reduction in methane emissions is valued at the social cost of carbon, the benefits significantly outweigh the costs. The net present value would be over to $53 million and the return on investment would be almost 22 percent. These results are somewhat sensitive to the estimated costs of capturing and converting the methane into LNG. If those costs were 10 percent higher, the value of the carbon

---

[58] A gallon of diesel fuel contains about 1.7 times the Btus contained in a gallon of LNG. This can only be approximate because both LNG and diesel vary somewhat in terms of Btu content.
[59] http://www.mms.gov/ooc/press/2005/press0615.htm
[60] DOE EIA Annual Energy Outlook 2011.

credits would have to be $8.54 per metric tonne of CO2e or more to cover all costs including the cost of the debt.

If MCC's assumptions, which, as we have explained above, are factually flawed, are used for the economic analysis along with MCC's desire to earn a normal profit on what is a pollution control effort, the value of the reduction in GHGs would have to be $16.15 per tonne of CO2e to reach MCC's investment hurdle of 10.99 percent. If the investment costs were 10% higher than we have estimated, the value of the methane emission reductions would have to be above $18.81 per tonne of CO2, about the average value of carbon on the European carbon market between 2008 and 2011 and below the federal government's estimate of the social cost of carbon, to reach the 10.99 percent rate of return target.

These results are summarized in Table 9 below.

**Table 9**

| Results of Economic Modeling of the LNG Alternative: Wholesale Sales to a Third Party | | | | |
|---|---|---|---|---|
| Assumptions | | NPV | IRR | Target Return on Investment | 2010 Carbon Value to Reach the Target Return on Investment |
| **Power Consulting Assumptions and** | | | | | |
| 2010 Carbon Value of $6.00 | | -3,776,984 | 4.5% | 6% | $6.91 |
| 2010 Carbon Cost of $21.40 | | 53,334,516 | 22.0% | 6% | NA |
| 10% higher costs, $6 Carbon Value | | -10,642,345 | 2.1% | 6% | $8.54 |
| **MCC Assumptions and** | | | | | |
| 2010 Carbon Value of $6.00 | | -20,499,174 | -1.7% | 10.99% | $16.15 |
| 2010 Carbon Cost of $21.40 | | 9,668,775 | 15.7% | 10.99% | NA |
| 10% higher costs, $6 Carbon Value | | -26,101,412 | -5.0% | 10.99% | $18.81 |

## Conclusions

It is only when only very low value is placed on the reductions in the release of large volumes of powerful greenhouse gases that there appears to be no economically feasible ways to capture, use, and destroy the drainage methane released by the West Elk coal mine. Putting very modest economic values on the reduction in methane releases, values supported by the voluntary carbon markets in the United States and the average value on the compliance market in Europe between 2008 and 2011 and the late December 2011 value on California compliance market as well as federal estimates of the social cost of carbon, reverses MCC's economically feasibility conclusions: There are several economically feasible ways to capture, use, and destroy the coal mine methane being released by the West Elk Mine.

## Bibliography

Ackerman, F. Stanton, E.  Climate Risks and Carbon Prices: Revising the Social Cost of Carbon. Economics for Equity and Environment.  2011. http://www.e3network.org/papers/Climate_Risks_and_Carbon_Prices_executive_summary+full_report+comments.pdf

Appalachian Pacific. CMM Utilization Project.  Western States Coal Mine Methane Workshop, Grand Junction, Colorado, April 19, 2005, p. 2. 2005.

Arch Coal 10-K SEC Annual Report, p. 59. 2010. http://investor.archcoal.com/phoenix.zhtml?c=107109&p=irol-reportsAnnual

Arch Coal 2010 Annual Report, p.51. 2010. http://investor.archcoal.com/phoenix.zhtml?c=107109&p=irol-reportsAnnual

Barclay, J. Corless, A. Nelson, E. Optimized LNG Storage Tanks for Fleet-Size Refueling Stations with Local LNG Liquefiers. Advances in Cryogenic Engineering. Volume 43, Part B, Proceedings of the 1997 Cryogenic Engineering Conference. 1997.

Bloomberg. Spot Carbon Dioxide (CO2) Emissions EUA Price/Europe. 2011. http://www.bloomberg.com/apps/quote?ticker=EUETSSY1:IND

Browning, K. Arch Coal's West Elk Mines's General Manager in Colorado Says, "We Plan to be Around." Delta County Independent.  2010. http://www.deltacountyindependent.com/news/north-fork/15110-west-elk-mine-gm-we-plan-to-be-around.html

Commodities Now. Carbon Markets up 3% to 50 billion in H1 2011. Commodities-now.com.  2011.

Mountain Coal Company. West Elk Mine E-Seam Gas Economic Evaluation Report. 2009.

Northwest Power and Conservation Council. 6th Northwest Power Plan. 2009.

Peters-Stanley, M. Back to the Future: State of the Voluntary Carbon Markets 2011. Ecosystem Marketplace and Bloomberg New Energy Finance. 2011.

Power, T. Power, D. Re-Analyzing the Economic Feasibility of Coal Mine Methane Capture and Use at the West Elk Mine, Somerset, CO.  pp. 5-6. 2009.

Rust, L. Letter of March 25, 2009, to Gene E. DiClaudi, MCC, from  Lynn E. Rust, BLM, reference numbers 3420 (CO-921), C-1362, COC56447, COC67232. 2009.

Union Pacific Rail Road. West Elk Mine. 2011.
http://www.uprr.com/customers/energy/coal/colorado/west_elk.shtml

USDA. Forest Service. Rulemaking for Colorado Roadless Areas Revised Draft
Environmental Impact Statement . p.129. 2008.

US DOE. Final Rule Technical Support Document: Energy Efficiency Program for
Commercial and Industrial Equipment: Small Electric Motors, US Department of
Energy.  2010.
http://www1.eere.energy.gov/buildings/appliance_standards/commercial/sem_fin
alrule_tsd.html

US DOI. Joint Settlement Resolves Coalbed Methane Valuation. The NewsRoom. 2005.
http://www.boemre.gov/ooc/press/2005/press0615.htm

US DOI BLM. Coal Lease C-1362, COC-67232. 2009.

US DOI BLM.  Coal Resource and Development Potential of the Grand Mesa,
Uncompahgre, and Gunnison National Forests, BLM Uncompahgre and
Colorado State Field Offices. Figure 18 (p. 37). 2006.

US EPA. Coalbed Methane Outreach Program, Interactive Unit Converter. 2011.
http://www.epa.gov/cmop/resources/converter.html

US EPA. Coal Mine Methane Project Cash Flow Model. 2011.
http://www.epa.gov/cmop/resources/cashflow_model.html

US EPA. Coal Mine Methane Recovery at Active U.S. Coal Mines: Current Projects and
Potential Opportunities. 2010.

US EPA. Identifying Opportunities for Methane Recovery at U.S. Coal Mines: Profiles of
Selected Gassy Underground Coal Mines 2002-2006. Page 110. 2008.

US EPA. Upgrading Drained Coal Mine Methane to Pipeline Quality: A Report on the
Commercial Status of System Suppliers. EPA-430-R08-004. 2008.

US Federal Reserve. Historical Data. 2011.
http://www.federalreserve.gov/releases/h15/data.htm

Value Line. Arch Coal. September 11, 2009.

# Appendix A

## The Calculation of Carbon Dioxide Equivalents for the Methane Destroyed

The Climate Action Reserve (CAR) has a set of protocols for coal mine methane that establishes a method for consistently calculating the carbon dioxide equivalent (CO2e) tonnage of CMM projects.[61]  We used the CMM project protocol version 1.0 to determine the amount of CO2 that was coming from, and could be considered avoided, under each of our different scenarios.  The details of these calculations are a stepwise process that is as follows (table A1 below):

*The collection system*

There are two parts to the collection system.  The exhausters that pull the CMM out of the drainage wells and the compressors that move the gas through the collection system to a central location where the gas can be used.  Since MSHA already requires the drainage wells to remove methane from the mine, burning some of it to operate the exhausters, the methane that is already being burned cannot be counted toward CO2e tonnage that would qualify for carbon credits because doing so would conflict with the additionality rule established by CAR.[62]  The other part of the drainage gas that is used by the collection/compression system however, can count.  We assume the consumption of drainage gas methane is split evenly between these two uses. The total gas consumed by the collection system is estimated at 0.423 millions of cubic feet per day (mmcfd).  This is an increase of 20.9% over Arista's estimated daily gas volume to run the collection system.  The 20.9% increase was derived by scaling up the EPA estimates of the drainage gas methane coming from the West Elk mine in 2009 reflect the difference in the volume of coal production in 2009 (4.5 million tons) to the projected volume of coal production for 2012 provided by MCC (7 million tons).[63]

According to CAR protocol not all of the methane that is used by the compressor is burned.  CAR assumes 0.5% of the methane escapes into the atmosphere.  This fugitive methane accounts for 156 tonnes of CO2e[64] each year escaping from the

---

[61] http://www.climateactionreserve.org/how/protocols/adopted/coal-mine-methane/current/

[62] http://www.climateactionreserve.org/resources/faqs/ question 27.

[63] The EPA estimated that 1.7mmcfd of methane was coming from West Elk in 2009 in their "Coal Mine Methane Recovery at Active U.S. Coal Mines: Current Projects and Potential Opportunities."  The 7 million tons comes from this article…
http://www.miningconnection.com/longwall/featured_stories/article/arch_coals_west_elk_mines_general_manager_in_colorado_says_we_plan_to_be_ar.

[64] 0.5% of .423mmcfd of methane is 77.25 mmcf/ year.  77.25 mmcf/ year is 156 tonnes of CO2e given the CAR protocol which allows a methane to CO2 conversion multiplier of 21, the density of methane is 0.0423 lbCH4/scf  CH4, 0.000454 lb/tonne, and 365.24 days per year.

compressors and delivery pipeline.  Another 4,059 tonnes of CO2e is given off by the compressor in the form of combustion products.  The sum of the fugitive methane and the exhaust CO2 must be subtracted from the 30,999 tonnes of CO2e that is saved by the compressors resulting in a net CO2e savings of 26,784 tonnes of CO2e.

*The flare/ internal combustion engine*

Scaling up the EPA's volume of methane for the West Elk Mine in 2009 for the projected coal production in 2012 results in 2.659 mmcfd.  Subtracting the 0.423 mmcfd for the compressors and exhausters discussed above leaves 2.236 mmcfd of gas that can be flared, sent to an internal combustion engine (ICE) or to a gas processing-liquefaction plant.  CAR assumes that the flare or ICE will also allow 0.5% of the methane to escape into the atmosphere.  Applying the CAR protocol to this fugitive methane allows 1,646 tonnes of CO2e each year to escape from the flare/ICE.  Another 42,914 tonnes of CO2e is given off by the flare/ICE in the form of carbon dioxide exhaust.  The sum of the fugitive methane and the combustion products must be subtracted from the 329,354 tonnes of CO2e that is saved by the flare/ICE to give a net CO2e savings of 284,794 tonnes of CO2e.

*The LNG option*

As discussed earlier, 2.236 mmcfd of gas is available for alternate uses (in this case LNG).  Our LNG system, as described by Burns and McDonnell in section G, is 94.6% efficient as it cleans the gas.  Of the 5.4% that is used to power the cleaning system 99.5% is used in cleaning/flaring and .5% escapes as fugitive methane gas.  The 0.5% is the equivalent of 88.93 tonnes of CO2e each year.  The other 99.5% of the 5.4%  is the equivalent of 2,317 tonnes of CO2e each year.  The sum of the fugitive CO2e and combusted gas (2,406 tonnes CO2e) must be subtracted from the total methane saved by ultimately combusting the LNG in an heavy truck internal combustion engines.

After the processing of the methane, 772 mmcf/year are turned into LNG (9,633,975 gallons per year or 26,377 gallons per day).  When the LNG is burned in truck engines 0.5% of it is lost as fugitive methane. That is equivalent to 1,558 tonnes of CO2e every year.  Another 40,597 tonnes of CO2e is given off as exhaust by those truck engines.  The sum of the fugitive methane and the exhaust from the truck engines (42,155 tonnes CO2e) must be subtracted from the total CO2e of CMM saved from direct emission into the atmosphere by using it to produce LNG (329,354 tonnes of CO2e). This leaves a net savings of 287,199 tonnes CO2e as a result of  the capture and use of the CMM to produce LNG.  To get a net CO2e savings for the whole project the emissions produced by the cleaning system discussed above must also be subtracted leaving a total CO2e savings of 284,794 tonnes per year.

*Total project savings*

In all of our alternative uses of the CMM, the combination of the methane reductions associated with the collections system and the methane reductions associated with each alternative use results in the total CO2e savings is 311,578 tonnes of CO2e each year.

Table A1

| Emissions from Methane Collection | | | |
|---|---|---|---|
| | efficiency | volume | units |
| methane used to collect the gas | | 77.25 | mmcf/year |
| CO2 emissions combustion conversion factor for CH4 | 2.75 | | |
| CH4 to CO2 ratio | 21 | | |
| efficiency of exhauster/compressor | 99.5% | | |
| Fugitive CH4 | | 155.8 | tonnes CO2e |
| CO2 given off from combustion while moving drained CH4 | | 4,059.4 | tonnes CO2e |
| Total CO2e for moving drained CH4 | | 4,215.2 | tonnes CO2e |
| CO2 saved that we can count for CC | | 30,999.4 | tonnes CO2e |
| **Net CO2e savings for collection that count for CC** | | **26,784.2** | **tonnes CO2e** |
| | | | |
| **Emissions from methane destroyed by flare or electric generation driven by ICE** | | | |
| | efficiency | volume | units |
| methane attempted to be destroyed | | 816.7 | mmcf / year of CH4 |
| enclosed flare/ICE efficiency | 99.5% | | |
| methane not destroyed CO2e | | 1,646.8 | tonnes CO2e |
| methane destroyed CO2e | | 42,914.1 | tonnes CO2e |
| total CO2 given off by flare | | 44,560.9 | tonnes CO2e |
| CO2 saved for CC | | 329,354.4 | tonnes CO2e |
| **Net CO2e savings for collection that count for CC** | | **284,793.5** | **tonnes CO2e** |

| Carbon Credits for the LNG option | | | |
|---|---|---|---|
| | efficiency | volumes | units |
| efficiency of the cleaning system | 94.6% | 2.12 | mmcfd CH4 |
| flared methane | 5.4% | 0.12 | mmcfd CH4 |
| escaped methane from flare | | 0.0006 | mmcfd CH4 |
| escaped methane from flare CO2e | | 88.93 | tonnes CO2e |
| total methane flared | 99.5% | 43.88 | mmcf / year CH4 |
| CO2e of methane flared | | 2,317.4 | tonnes CO2e |
| net CO2e from flare of methane | | 2,406.3 | tonnes CO2e |
| efficiency of the ICE (trucks) | 99.5% | 768.7 | mmcf / year CH4 |
| Escaped methane from the ICE | 0.5% | 3.86 | mmcf / year CH4 |
| CO2 given off from escaped CH4 | | 1,557.8 | tonnes CO2e |
| CO2 given off from ICE | | 40,596.7 | tonnes CO2e |
| Net CO2e given off from ICE | | 42,154.6 | tonnes CO2e |
| total volume of CO2e to subtract from total | | 44,560.9 | tonnes CO2e |
| Total CO2e initially available | | 329,354.4 | tonnes CO2e |
| **Total CO2e available for CC** | | **284,793.5** | **tonnes CO2e** |
| | | | |
| **Total CO2e savings for Flare/ICE** | | **311,578** | **tonnes CO2e** |
| **Total CO2e savings for LNG** | | **311,578** | **tonnes CO2e** |



**US Department of the Interior**
**Bureau of Land Management**
**Uncompahgre Field Office, Colorado**

Resource Management Plan Revision and
Environmental Impact Statement

*RENEWABLE ENERGY POTENTIAL REPORT*

**MAY 2010**



# TABLE OF CONTENTS

Chapter                                                     Page

1. **INTRODUCTION** ................................................................... 1-1
     1.1      Purpose of this Report ................................................ 1-1
     1.2      Renewable Energy-Related BLM Policies and Regulations ................ 1-1
     1.3      How to Read This Document ................................ **Error! Bookmark not defined.**

2. **GEOTHERMAL ENERGY** ......................................................... 2-1
     2.1      What is Geothermal Energy? ........................................ 2-1
          2.1.1    Direct Use ........................................................ 2-1
          2.1.2    Indirect Use ...................................................... 2-2
     2.2      How is Geothermal Energy Developed? ............................... 2-2
          2.2.1    Flash Steam Power Plants ........................................... 2-2
          2.2.2    Binary-cycle Power Plants ........................................... 2-2
          2.2.3    Dry Steam Power Plants ............................................ 2-2
          2.2.4    Emerging Technologies .............................................. 2-3
     2.3      What BLM Actions are Involved in Geothermal Energy Development? ...... 2-4
          2.3.1    Geothermal Leasing Laws and Regulations ............................. 2-4
          2.3.2    Available and Unavailable Lands for Geothermal Leasing ............... 2-4
          2.3.3    Leasing Process, Rights, and Limitations ............................ 2-5
     2.4      How are Potential Levels Defined for Geothermal Energy? .............. 2-7
     2.5      Geothermal Potential ............................................... 2-8
          2.5.1    Data Sources ...................................................... 2-8
          2.5.2    Geothermal Potential Data Used in this Report ....................... 2-9
     2.6      Potential Areas within the Uncompahgre RMP Planning Area ............. 2-9
     2.7      Reasonable Foreseeable Development Scenario ......................... 2-10

3. **SOLAR ENERGY** ................................................................ 3-1
     3.1      What is Solar Energy? .............................................. 3-1
     3.2      How is Solar Energy Developed? ..................................... 3-1
          3.2.1    Photovoltaic Systems ............................................... 3-2
          3.2.2    Concentrating Solar Power Systems .................................. 3-3
          3.2.3    Thermal Energy Storage ............................................ 3-4
          3.2.4    Emerging Technologies .............................................. 3-4
     3.3      What BLM Actions are Involved in Solar Energy Development? ........... 3-4
     3.4      How are Potential Levels Defined for Solar Energy? .................. 3-5
     3.5      Solar Potential .................................................... 3-6
          3.5.1    Data Sources ...................................................... 3-6
          3.5.2    Solar Potential Data Used in This Report ........................... 3-8
     3.6      Potential Areas within the Uncompahgre RMP Planning Area ............. 3-8
     3.7      Reasonable Foreseeable Development Scenario ......................... 3-8

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                           Page

**4.    WIND ENERGY** .............................................................................................................. **4-1**

    4.1    What is Wind Energy? ............................................................................................ 4-1

    4.2    How is Wind Energy Developed? ......................................................................... 4-1

    4.3    What BLM Actions are Involved in Wind Energy Development? ..................... 4-2

    4.4    How are Potential Levels Defined for Wind Energy? ........................................ 4-3

    4.5    Wind Potential ........................................................................................................ 4-4

         4.5.1   Data Sources ............................................................................................ 4-4

         4.5.2   Wind Potential Data Used in this Report .......................................... 4-6

    4.6    Potential Areas within the Uncompahgre RMP Planning Area ......................... 4-6

    4.7    Reasonable Foreseeable Development Scenario ................................................. 4-6

**5.    BIOMASS** ........................................................................................................................ **5-1**

    5.1    What is Biomass? ..................................................................................................... 5-1

    5.2    How is Energy Produced from Biomass? ............................................................. 5-1

         5.2.1   Direct-firing ............................................................................................. 5-1

         5.2.2   Co-firing ................................................................................................... 5-2

         5.2.3   Gasification ............................................................................................... 5-2

         5.2.4   Pyrolysis ................................................................................................... 5-2

         5.2.5   Anaerobic Digestion ............................................................................... 5-2

    5.3    What BLM Actions are Involved in Biomass Projects? ...................................... 5-2

    5.4    How are Potential Levels Defined for Biomass-producing Areas? ................... 5-3

    5.5    Biomass Productivity .............................................................................................. 5-3

         5.5.1   Data Sources ............................................................................................ 5-3

         5.5.2   Biomass Productivity Data Used in this Report ................................ 5-4

    5.6    Biomass Productivity within the Uncompahgre RMP Planning Area .............. 5-6

    5.7    Reasonable Foreseeable Development Scenario ................................................. 5-4

**6.    REFERENCES** ................................................................................................................. **6-1**

# FIGURES

                                                                                                               Page

Figure 1-1        Uncompahgre RMP Planning Area ........................................................................ 1-3

Figure 2-1        Federal Mineral Estate ............................................................................................ 2-11

Figure 2-2        Geothermal Potential Area in the UFO ...................... **Error! Bookmark not defined.**

Figure 2-3        Geothermal Heat Flow Contours .......................................................................... 2-14

Figure 3-1        Solar Energy Potential ............................................................................................. 3-9

Figure 3-2        Developable Areas for Concentrating Solar Power ........................................... 3-13

Figure 4-1        Wind Potential ......................................................................................................... 4-7

Figure 5-1        Biomass Productivity ............................................................................................... 5-5

# TABLES

Page

Table 4-1 Classes of Wind Power Density at 10 Meters and 50 Meters ....................................................... 4-5

# ACRONYMS AND ABBREVIATIONS

Full Phrase

| | |
|---|---|
| BLM | United States Department of the Interior, Bureau of Land Management |
| CFR | Code of Federal Regulations |
| DOE | Department of Energy |
| EIS | Environmental Impact Statement |
| GIS | Geographic Information System |
| kWh/m²/day | kilowatt-hour per square meter per day |
| NDVI | normalized difference vegetation index |
| NREL | National Renewable Energy Laboratory |
| ROW | right-of-way |
| UFO | Uncompahgre Field Office |
| US | United States |

This page intentionally left blank.

# CHAPTER 1
# INTRODUCTION

## 1.1 PURPOSE OF THIS REPORT

The purpose of this report is to identify the potential for development and potential location of renewable energy on lands administered by the United States (US) Department of the Interior, Bureau of Land Management (BLM) within the Uncompahgre Field Office (UFO) Resource Management Plan planning area. The planning area encompasses 675,700 acres of public (BLM-administered) land in six Colorado counties: Montrose, Delta, Mesa, Gunnison, Ouray and San Miguel (**Figure 1-1**). It excludes the Gunnison Gorge and Dominguez-Escalante National Conservation Areas. Renewable energy addressed in this report includes geothermal, solar, wind, and biomass. In the case of solar, wind, and biomass energy, lands considered are all BLM-administered public lands in the planning area (675,700 acres). In the case of geothermal energy, lands considered are both BLM-administered public lands, as well as additional lands under other surface ownership (such as US Forest Service, private, or State lands) where the BLM controls the mineral estate ("split estate" lands). In total, lands considered for geothermal energy include 2.2 million acres of federal (subsurface) mineral estate.

## 1.2 RENEWABLE ENERGY-RELATED BLM POLICIES AND REGULATIONS

At the time of writing of this report, the BLM's renewable energy policy is directed by the regulations and executive orders listed below. The policies and procedures cited in this report are applicable at the time of writing but are expected to evolve over the timeframe of the RMP. Also at this time of writing, a new BLM solar energy policy is in preparation but was not completed in time for incorporation into this report. The right-of-way (ROW) authorization process, which is particularly important for solar and wind projects, is also expected to change over time.

As of 2010, the BLM's renewable energy policy is directed by the following regulations and executive orders:

- The Geothermal Steam Act of 1970, as amended, designates the BLM as being responsible for leasing Federal lands and reviewing permit applications for geothermal development. This authority encompasses about 570 million acres of

BLM land, National Forest System lands (with concurrence of the Forest Service), and other Federal lands, as well as private lands where the mineral rights have been retained by the Federal Government.

- The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the US Department of the Interior to approve at least 10,000 megawatts of renewable energy on public lands by 2015;

- The Energy Policy Act of 2005 (Title II, Sec. 222(d)), which requires that all future forest plans and RMPs in areas of geothermal resource potential consider geothermal leasing and development;

- The Energy Policy Act of 2005 (Title II, Sec. 223), which gives the Secretary of Interior authority to identify areas that could be leased exclusively for direct use of geothermal resources;

- Executive Order 13212, Actions to Expedite Energy-Related Projects, which requires federal agencies to expedite review of energy project applications; and

- Secretarial Order 3285, which requires the US Department of the Interior to identify and prioritize specific locations best suited for large-scale renewable energy production.

Additionally, the BLM has specific guidance for certain types of renewable energy. These are discussed in the respective energy-specific sections of this report. The main Instruction Memoranda are summarized here:

- 43 CFR 3200 provides the **Geothermal** Resource Leasing Rules and Regulations for the BLM.

- Instruction Memorandum 2009-022, **Geothermal** Leasing under the Energy Policy Act of 2005 (BLM 2009a), provides guidance for geothermal leasing.

- Instruction Memorandum 2007-097, **Solar** Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing solar energy systems on BLM administrative facilities and projects.

- Instruction Memorandum 2006-216, **Wind** Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands; Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.



Source: Bureau of Land Management 2010

*Uncompahgre Planning Area*



Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the most current and complete geospatial data available. No warranty is made by the BLM as to the accuracy, reliability, or completeness of this data. Using this map for other than its intended purpose may yield inaccurate or misleading results.

Figure 1-1

This page intentionally left blank.

- Instruction Memorandum 2004-227, **Biomass** Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the *Federal Register* revised the authority of 48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.

Solar, wind, and some aspects of geothermal projects are authorized via the right-of-way (ROW) process. Right-of-way applications for development on BLM lands must be accompanied by a processing fee as set forth in 43 CFR 2804.14. Right-of-way applications are generally accepted and processed on a first-come, first-served basis. The ROW regulations (43 CFR 2804.23[c]) provide authority for offering public lands under competitive bidding procedures for ROW authorizations. The BLM initiates a competitive process if a land use planning decision has specifically identified an area for competitive leasing. The BLM may also consider other public interest and technical factors in determining whether to offer lands for competitive leasing. Competitive bidding follows procedures required by 43 CFR 2804.23(c).

## 1.3   HOW TO READ THIS DOCUMENT

This report contains separate chapters for each of the four types of renewable energy considered: geothermal, solar, wind, and biomass. Each chapter contains a flow of information designed to provide a basic understanding of the energy type, the technologies used to harness that energy, the process of developing (making use of) that energy, and the BLM action involved. Each chapter then describes how potential levels are commonly defined for each energy type, including an overview of scientific terminology and units. Each chapter explains the major resource assessments that are commonly used to assess potential within an area and defines which source data is used for conducting the assessment in this report. Each chapter provides an overview of the potential energy levels across planning area lands (and, for geothermal, on split-estate lands) and estimates where development is likely to occur in the next 15 to 20 years through the presentation of a reasonable foreseeable development scenario.

This page intentionally left blank.

# CHAPTER 2
# GEOTHERMAL ENERGY

## 2.1   WHAT IS GEOTHERMAL ENERGY?

Geothermal energy is energy derived from the natural heat of the earth. Geothermal resources are typically underground reservoirs of hot water or steam created by heat from the earth, but geothermal resources also include subsurface areas of dry hot rock. In cases where the reservoir is dry hot rock, the energy is captured through the injection of cool water from the surface, which is then heated by the hot rock and extracted as fluid or steam. Geothermal steam and hot water can naturally reach the earth's surface in the form of hot springs, geysers, mud pots, or steam vents. Geothermal reservoirs of hot water are also found at various depths beneath the earth's surface. By drilling wells down into a geothermal reservoir, heat can be brought to the surface and be used either directly (direct use) for heating applications or indirectly (indirect use) to produce electricity.

According to the 43 CFR 3200, Geothermal Resource Leasing Rules and Regulations, the BLM is allowed to lease "geothermal steam and associated geothermal resources," which are defined as 1) all products of geothermal processes, including indigenous steam, hot water, and hot brines; 2) steam and other gases, hot water and hot brines resulting from water, gas, or other fluids artificially introduced into geothermal formations; 3) heat or other associated energy found in geothermal formations; and 4) any byproducts.

### 2.1.1   Direct Use

Geothermal reservoirs of low- to moderate-temperature water—68 degrees Fahrenheit to 302 degrees Fahrenheit (20 degrees Celsius to 150 degrees Celsius)—provide numerous opportunities for direct use. Direct use means utilization of geothermal resources for commercial, residential, agricultural, public facilities, or other energy needs other than the commercial production of electricity (43 CFR 3200.1). Direct use includes using heat energy from naturally occurring hot water or using other technology to capture the heat from the earth (e.g., heat pumps). Modern hot water direct-use systems access geothermal reservoirs by drilling into them from the surface to develop a steady stream of hot water. The water is brought up through the well, and a mechanical system consisting of piping, a heat exchanger, and controls

delivers the heat directly for its intended use. A disposal system then either injects the cooled water underground or disposes of it on the surface.

### 2.1.2   Indirect Use

Commercial electrical generation from geothermal resources is also called indirect use. Electrical generation uses geothermally heated fluid to produce steam, which turns a turbine connected to a generator. As discussed below, the fluid may be the naturally occurring steam or water in the geothermal reservoir or another fluid that has the geothermal heat transferred through a heat exchange system.

## 2.2   HOW IS GEOTHERMAL ENERGY DEVELOPED?

Geothermal power plants can be small (300 kilowatts to 10 megawatts), medium (10 to 50 megawatts) or large (50 megawatts and higher). Generation capacity is guided by the number of turbines within a plant. In general, commercial electrical generation requires hot geothermal reservoirs with a water temperature above 200 degrees Fahrenheit (93 degrees Celsius); however, new technologies have proven that lower-temperature water (e.g., 165 degrees Fahrenheit [74 degrees Celsius]) can also be used for electrical generation.

Three types of geothermal power plant systems—flash steam, binary-cycle, and dry steam—are commonly used to generate electricity depending on temperature, depth, and quality of the water and steam in the area. These plants can also be hybridized by including elements of the different technologies at a single location. All three methods re-inject the remaining geothermal fluid back into the ground to replenish the reservoir and recycle the hot water.

### 2.2.1   Flash Steam Power Plants

Flash steam power plants use hot water above 360 degrees Fahrenheit (182 degrees Celsius) from geothermal reservoirs. The high pressure underground keeps the water in the liquid state, although it is well above water's boiling point at standard atmospheric pressure. As the water is pumped from the deep, pressurized reservoir to the power plant at atmospheric pressure, the drop in pressure causes the water to convert, or "flash," into steam to power the turbine. Any water not converted into steam is injected back into the reservoir for reuse. Flash steam plants, like dry steam plants, emit small amounts of gases and steam.

### 2.2.2   Binary-cycle Power Plants

Binary-cycle power plants typically use cooler fluids than flash steam plants (165 to 360 degrees Fahrenheit [74 to 182 degrees Celsius]). The hot fluid from geothermal reservoirs is passed through a heat exchanger, which transfers heat to a separate pipe containing fluids with a much lower boiling point. These fluids, usually isobutane or isopentane, are vaporized to power the turbine. The advantage of binary-cycle power plants is their lower cost and increased efficiency. These plants do not emit any excess gas and, because they use fluids with a lower boiling point than water, are able to use lower-temperature geothermal reservoirs, which are much more common.

### 2.2.3   Dry Steam Power Plants

Dry steam power plants use very hot (greater than 455 degrees Fahrenheit [235 degrees Celsius]) geothermal reservoirs that exist primarily in the form of steam. The steam is routed to

the surface via a well and used to turn a turbine. The turbine drives a generator that produces electricity. While this is the rarest form of power plants, it was both the first type of geothermal reservoir used to produce electricity (at Lardarello, Italy, in 1904) and is the reservoir type being used at the world's largest geothermal production site, The Geysers in northern California. Dry steam power plants emit only excess steam and very minor amounts of gases. Geothermal sources with dry steam generation capability are very rare.

### 2.2.4   Emerging Technologies

The technologies described above are those that are in use as of the writing of this report. Leading up to 2010, there has substantial private and government investment into the development of new geothermal technologies to allow for the capture of heat from the earth at deeper temperatures and in locations where heat is present but water and fractured rock are not. The following paragraphs discuss emerging technologies known at the time of this writing. It is expected that further technological advancements will be made over time timeframe of the RMP.

***Geothermal Energy from Oil and Gas Production***

Oil and gas wells are typically thousands of feet deep and often produce very hot fluid. Along with the oil and gas, wells produce water that must be separated from the oil and gas and usually reinjected deep below domestic aquifers. The Rocky Mountain Oilfield Testing Center, located in the Teapot Dome Oilfield near Casper, Wyoming, is demonstrating the use of warm reservoir fluids from oil and gas production to produce electricity that can be used to power the oil and gas pumps (Rocky Mountain Oilfield Testing Center produced water cut (NREL 2006). Because the electricity is used on site, there is no need to purchase additional electricity, which eliminates the need for power lines to be run to oil and gas facilities. This technology could be applied at many oil and gas facilities throughout the West.

***Enhance Geothermal Systems***

Enhanced geothermal systems are engineered reservoirs created to produce energy from geothermal resources deficient in water and/or permeability (US Department of Energy 2006, 2007). With enhanced geothermal systems, a developing reservoir is targeted within a volume of rock that is hot and tectonically stressed. Through a combination of hydraulic, thermal, and chemical processes, the reservoir can be stimulated, causing fractures to open, extend, and interconnect. This creates a fluid-conductive fracture network and an interconnected reservoir system. The process can extend the margins of existing geothermal systems or can create entirely new ones wherever optimal thermal and tectonic conditions exist (University of Utah Energy and Geoscience Institute 2007). Enhanced geothermal systems technology is relatively new in the geothermal field and has been found to have great potential for providing electrical power; one study found the potential for 100 gigawatts of power (US Department of Energy 2006). Until recently, lack of research and development funding, government policies, and lack of incentives had not favored the growth of enhanced geothermal systems, with most development occurring outside of the United States (US Department of Energy 2006). It is anticipated that there may be applications for research and development drilling on public and NFS lands in the future. Until it becomes a technically and economically proven technology, it is unlikely that it will be applied at a large scale in the western US within the next 20 years.

## 2.3 WHAT BLM ACTIONS ARE INVOLVED IN GEOTHERMAL ENERGY DEVELOPMENT?

### 2.3.1 Geothermal Leasing Laws and Regulations

A geothermal lease is for the heat resource of the earth where there is federal mineral estate. Unless specifically owned in fee, the federal government does not own the hot water commonly associated with the heat; this falls under state water laws. Geothermal developers must obtain the appropriate water rights and state permits in addition to the federal lease for the resource.

The BLM has the delegated authority to issue geothermal leases on federal lands. It is the policy of the federal government, consistent with Section 2 of the Mining and Mineral Policy Act of 1970 and Sections 102(a)(7), (8), and (12) of the Federal Land Policy and Management Act of 1976 (43 US Code 1701 et seq.), to encourage the development of mineral resources, including geothermal resources, on federal lands. The Geothermal Steam Act of 1970 (30 US Code Section 1001, et seq.), which was amended and supplemented by the Energy Policy Act of 2005, provides statutory guidance for geothermal leasing by the BLM. New federal geothermal development regulations (43 CFR Parts 3000, 3200, and 3280: Geothermal Resource Leasing and Geothermal Resources Unit Agreements) were made effective June 1, 2007 (72 *Federal Register* 24358, May 2, 2007) as a result of a directive provided in the Energy Policy Act of 2005. These statutes and regulations delineate lands that are available and unavailable for leasing.

All geothermal project applications are subject to environmental review in accordance with the requirements of the National Environmental Policy Act of 1969. Applications triggering environmental review are typically received at each of the following three phases of a geothermal development project: (1) exploration (seismic surveys and/or temperature gradient hole drilling); (2) drilling operations (full bore exploration well drilling and well testing); and (3) utilization (construction and utilization of power plants and transmission lines and ancillary facilities).

### 2.3.2 Available and Unavailable Lands for Geothermal Leasing

In accordance with the Geothermal Steam Act of 1970, as amended (30 US Code 1001) and the Geothermal Resources Leasing Rule (43 CFR 3201.10), the BLM may issue leases on the following "available" lands:

- Lands administered by the US Department of the Interior, including public and acquired lands not withdrawn from such use;

- Lands administered by the US Department of Agriculture with its concurrence;

- Lands conveyed by the US where the geothermal resources were reserved to the US; and

- Lands subject to Section 24 of the Federal Power Act, as amended (16 US Code 818), with the concurrence of the Secretary of Energy.

Conversely, the BLM is prohibited from issuing leases on the following statutorily closed federal lands as defined in the Geothermal Resources Leasing Rule (43 CFR 3201.11). Other lands administered directly by the BLM and US Department of Agriculture, Forest Service may also be closed through other authorities.

- Lands where the Secretary of the Interior has determined that issuing the lease would cause unnecessary or undue degradation of public lands and resources;

- Lands contained within a unit of the National Park System or that are otherwise administered by the National Park Service;

- Lands where the Secretary of the Interior determines after notice and comment that geothermal operations, including exploration, development, or utilization of lands, are reasonably likely to result in a significant adverse effect on a significant thermal feature within a unit of the National Park System;

- Lands within a National Recreation Area;

- Fish hatcheries or wildlife management areas administered by the Secretary of the Interior;

- Indian trust or restricted lands within or outside the boundaries of Indian reservations;

- The Island Park Geothermal Area (in Idaho and Montana); and

- Lands where Section 43 of the Mineral Leasing Act (30 US Code 226-3) prohibits geothermal leasing, including:

  – Wilderness areas administered by the BLM or other surface-management agencies;

  – Lands designated by Congress as Wilderness Study Areas, except where the statute designating the study area specifically allows leasing to continue; and

  – Lands within areas allocated for wilderness or further planning in Executive Communication 1504, Ninety-sixth Congress (House Document 96-119), unless such lands are allocated to uses other than wilderness by a land and resource management plan or are released to uses other than wilderness by an act of Congress.

### 2.3.3   Leasing Process, Rights, and Limitations

The BLM grants access to geothermal resources through a formalized leasing process based on the end use. For direct uses, an applicant can apply noncompetitively for a lease. For indirect use, such as commercial electrical generation, the BLM awards leases through a competitive bidding process. Historically, certain lands were designated as known geothermal resource areas. All lands designated within known geothermal resource areas were leased through a competitive bidding process. Until the passage of the Energy Policy Act of 2005, lands outside of known geothermal resource areas could be leased noncompetitively. Section 222 of the Energy Policy Act of 2005 modified the Geothermal Steam Act of 1970 to allow only competitive lease sales for all federal geothermal resources and their associated lands. The geothermal leasing regulations provide for four types of lands available for noncompetitive leasing:

- Parcels of land that did not receive bids in a competitive sale;

- Lands available exclusively for direct use;

- Lands subject to mining claim and a current plan of operation; and

- Lands for which a lease application was pending on August 8, 2005, if the applicant so chooses.

Blocks of land can either be nominated by the public or the BLM itself for inclusion in a lease sale. When the BLM receives a nomination, it is adjudicated and configured into lease parcels by the respective BLM state office. Lease parcels are then forwarded to the appropriate Field office where the Field Office determines whether the lease is in conformance with the applicable land use plan or plan amendment(s) and whether BLM can properly rely upon existing NEPA documents that analyze the potential impacts of geothermal leasing.

The four stages of geothermal resource development within a lease are exploration, drilling operations, utilization, and reclamation and abandonment. Each stage requires a permit from the BLM. Leasing geothermal resources by the BLM vests with the lessee a non-exclusive right to future exploration and an exclusive right to produce and use the geothermal resources within the lease area, subject to existing laws, regulations, formal orders, and the terms, conditions, and stipulations in or attached to the lease form or included as conditions of approval to permits. Lease issuance alone does not authorize any ground-disturbing activities to explore for or develop geothermal resources without site-specific approval for the intended operation. Such approval could include additional environmental reviews and permits. Also at each stage, the BLM can issue site-specific conditions of approval to protect resource values.

A lease is issued for a primary term of ten years and may be extended for two five-year periods. Each of these extensions is available provided the lessee meets the work commitment requirements or the lessee made payment in lieu of the minimum work requirements of each year. At any time a lease may receive a five- year drilling extension. Once commercial production is established, the lease may receive a production extension of up to 35 years and a renewal period of up to 55 years. The lease must continue to produce to remain in effect. The BLM may grant a suspension of operations and production on a lease when justified by the operator (refer to 43 CFR 3207).

Geothermal exploration and production on federal land conducted through leases is subject to terms and stipulations to comply with all applicable federal and state laws pertaining to various considerations for tribal interests, sanitation, water quality, wildlife, safety, cultural resources, and reclamation.

### Exploration
The exploration phase focuses on finding potential sources of geothermal energy. The goal of geothermal exploration is to locate sites that can be used consistently into the future for the purpose of energy generation, and to evaluate the suitability of such sites for geothermal development.

There are various ways to conduct exploration, including satellite and air photo mapping, geologic and structural mapping, volcanological studies, gravity, magnetics, geochemical sampling, seismic exploration, and temperature gradient well creation.

During exploration, geologists must find areas that are consistently geologically active to justify the expense of establishing a power plant, and they must consider the environmental impact of

the energy production. In areas with limited water supplies, for example, dedicating water to geothermal production may not be feasible. Likewise, injecting water into the earth's crust can cause instability in the soil, which is not a desirable outcome. These factors all need to be taken account in geothermal exploration.

### Drilling Operations

Drilling operations, which would include flow-testing wells that are drilled, would characterize the geothermal resources within the leased area to determine whether future development of geothermal resources would be feasible, and would determine whether drainage of the geothermal resource may be occurring.

If deep exploration encounters a geothermal resource, well testing would be conducted to define resource characteristics. The proponent would test each well to evaluate fluid flow and temperature and determine the potential for production as a viable geothermal energy resource. Flow testing involves using specialized equipment to measure temperature and flow rate.

### Utilization

Once geothermal resources have been identified and deemed viable, the next phase focuses on building the power plant and ancillary facilities to both produce electricity and move it to the electrical power grid. This phase includes construction of the actual electrical generation facilities (power plant), roads, and transmission lines; developing the wells; and setting up the well field. This includes connecting wells to the power plant via pipelines and setting up pumping, where needed, to bring the geothermal resources to the surface and to re-inject cooled fluids.

### Reclamation and Abandonment

Reclamation and abandonment activities occur after production ceases. During this phase, the site would be restored (reclaimed) to conform to BLM and FS standards. Typical activities during the reclamation phase include closure of all facilities and wells; removal of aboveground components and gravel from well pads, access roads (if not maintained for other uses), and other ancillary facility sites; recontouring the surface; and revegetation.

## 2.4    HOW ARE POTENTIAL LEVELS DEFINED FOR GEOTHERMAL ENERGY?

Geothermal potential is difficult to determine without site-specific exploration activities. Even in areas of supposed high potential, many exploration wells result in no viable resource. A viable resource requires high enough temperatures, the presence of water at that depth, and a sufficiently fractured geology so that the hot water can move through the rocks to the well.

At sufficient depth, sufficient heat can be found from any location on earth; however, because technical challenges and the cost of drilling increase with depth, economically and technically viable resources are those that occur closer to the earth's surface. Potential areas are those areas that are believed to (a) have temperatures high enough to either produce electricity (for indirect use) given current power plant technologies or to serve direct use functions at the surface, and (b) be at depths that are economically and technically feasible to drill, given current drilling technologies. Data collection to estimate potential areas come in the form of existing hot springs and other natural hydrothermal features, and are often combined with bottom-hole temperature data from oil, gas, water, and geothermal wells. Existing wells and their associated

data can be few and far between, particularly in remote areas, and so computer modeling has been used to develop potential maps that extrapolate this data to estimate the geographic extent of various temperatures at depth. A limited understanding of the subsurface environment renders these extrapolations fairly speculative and this is compounded in areas of sparse downhole temperature data.

Geothermal potential maps are often binary in nature, showing only potential versus non-potential. Unlike solar or wind resources where intensity of the resource is easily documented, the geothermal resource remains unknown until it is drilled into. As such, potential areas are usually identified as being inclusive of any form of usable geothermal resources. Once drilled into and evaluated, those resources are typically described as high, medium, or low temperature resources. These resource categories are typically described as follows:

- High: Greater than 300 degrees Fahrenheit.
- Medium: Between 195 and 300 degrees Fahrenheit.
- Low: Less than 195 degrees Fahrenheit.

Efficient electrical production requires a resource that is at least 40 degrees hotter than the temperature of the cooling medium used in the power plant. This medium can be air, surface water, or groundwater. Thus, hotter resources are required for areas with hotter weather. The lowest temperature resource being used for electrical generation is 153 degrees Fahrenheit, although this is being done in northern Alaska where the surface water used for cooling never rises above 45 degrees Fahrenheit.

Heat flow maps are a type of geothermal potential map that show heat flow values. Heat flow values are a measure of the heat flux moving from the earth's interior to the earth's surface. High heat flow values often indicate a high potential for geothermal development and are the result of various geologic situations such as: 1) an area of relatively thinner crustal rock above the mantle, 2) presence of an igneous pluton at depth, 3) resident heat from geologically recent volcanism or plutonic activity, or 4) upwelling of deep, heated groundwater.

## 2.5   GEOTHERMAL POTENTIAL

### 2.5.1   Data Sources

There are two main sets of geothermal resource data available: the Southern Methodist University-produced Heat Flow Map of North America (Blackwell and Richards 2004) and the Interpretive Geothermal Heat Flow Map of Colorado (Colorado Geological Survey 2008). The potential area for Colorado that was used in the Geothermal PEIS was provided by the Colorado Geological Survey and that data is discussed below. Additionally, the Geothermal PEIS includes a Reasonably Foreseeable Development scenario (RFD) for Colorado, which drew from the 2006 Western Governors' Association Geothermal Task Force Report. The 2006 report identified a total of 20 megawatts of anticipated near-term geothermal capacity over an estimated 9 sites across Colorado (Western Governors' Association 2006).

### Heat Flow Map of North America

This map (Blackwell and Richards 2004) was developed using heat flow values. The map was produced from a compilation of various data sets of bottom-hole temperature data collected from oil, gas, geothermal, and water wells. Approximately 4,000 data points were used to create the map. Hot springs data were also included.

Heat flow data are not evenly distributed throughout Colorado. Small areas with clustered data surrounded by wide areas containing sparse data are characteristic of the heat flow map. As such, the contours are well constrained in areas of clustered data and more interpretive in areas of sparse data.

### Interpretive Geothermal Heat Flow Map of Colorado

The Interpretive Geothermal Heat Flow Map of Colorado (Colorado Geological Survey 2008) was developed by the Colorado Geological Survey in 2007. The map shows areas of direct use or electrical power potential for Colorado. This map includes the area of all known hot spring locations along with oil and gas basins that have potential for geothermal resources by virtue of bottom-hole temperatures. Colorado geothermal heat flow and gradient data were also considered in creating the map. The Colorado Geological Survey produced a Geographic Information System (GIS) shape file boundary to define the area of geothermal potential for the Final Programmatic EIS for Geothermal Leasing in the Western US (Colorado Geological Survey 2007).

### 2.5.2   Geothermal Potential Data Used in this Report

The Colorado Geological Survey shape file for the Interpretive Geothermal Heat Flow Map of Colorado was used for this report because it is the most recent Colorado-specific assessment available, was produced in-state by State of Colorado geologists, and combines data from both bottom-hole temperatures and hot springs. Three maps are provided in this report: **Figure 2-1** shows the federal mineral estate across the planning area, highlighting those areas that are withdrawn from the Federal mineral estate, and those BLM- and Forest Service-administered lands that have no Federal mineral estate or an unknown Federal mineral estate status; **Figure 2-2** shows areas determined to have potential for direct or indirect use resources by the Colorado Geological Survey on lands that have Federal mineral estate within the planning area; this is the same area that was used in the Geothermal PEIS; and **Figure 2-3** shows the distribution of heat flow contours across the planning area; this data was provided by the Colorado Geological Survey and was used to determine the potential area shown in Figure 2-2, The electrical production RFD from the Geothermal PEIS, as based on the 2006 Western Governors' Association report, was also considered in this report.

## 2.6    POTENTIAL AREAS WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

The Uncompahgre RMP decision area has 552,500 acres with Federal mineral estate and geothermal potential. Additionally, within the planning area there are:

- 1,202,300 acres of Forest Service lands that have Federal mineral estate;
- 27,100 acres of National Park Service lands that have Federal mineral estate;

- 220,000 acres of private land that have Federal mineral estate; and

- 6,300 acres of state land that have Federal mineral estate.

Additional acreages of land with Federal mineral estate and geothermal potential may be contained within the planning area on lands that have an unknown status with respect to Federal mineral estate. Of the lands within this category, 17,900 acres are on Forest Service land and 6,400 are BLM-administered. These lands are shown in Figure 2-1.

Aside from the westernmost portion, the entire planning area is considered to have geothermal potential. This is shown in Figure 2-2. Specific geothermal surface features within the planning area are limited to Orvis Hot Spring (126 degrees Fahrenheit) and Ouray Hot Spring (156 degrees Fahrenheit), which have the potential for expansion of both direct use and indirect (electrical) use applications for the communities near those resources. While neither of these hot springs are located on BLM-administered lands, such lands are nearby and could potentially be involved in future development of these geothermal resources.

## 2.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

The likelihood of future development of geothermal projects in the Uncompahgre RMP planning area and BLM split-estate lands in the UFO can be estimated by considering the extent of existing geothermal resources and projects in the area, the number of pending lease applications within the UFO, the quality of geothermal resources in the UFO compared with other areas in the region, and expressions of interest by geothermal companies.

Three hot springs are in the southern part of the Uncompahgre RMP planning area; none are on BLM-administered lands:

- Orvis Hot Springs (126 degrees Fahrenheit) located approximately two miles south of the town of Ridgway on US Highway 550;

- Ouray Hot Spring (Radium Hot Spring) (156 degrees Fahrenheit) located less than one mile north of the city of Ouray on US Highway 550; and

- Lemon Hot Spring (91 degrees Fahrenheit) in the town of Placerville.

There are no geothermal facilities or pending applications for geothermal facilities in the UFO. As of March 2010, Colorado has three expressions of interest: two in the Gunnison Field Office and one in Royal Gorge Field Office near Mount Princeton. While there are no geothermal leases on BLM-administered lands anywhere in Colorado, the BLM geothermal program is relatively new and the time period leading up to and beyond year 2030 is expected to be a time of rapid expansion of renewable energy. BLM-administered lands do exist close to existing hot springs within the UFO.

The UFO is close to the Great Basin geologic unit, which extends from the western half of Utah, west to California, north into Idaho, and south into Mexico. The Great Basin is recognized as having some of the best geothermal resources in the world, and many projects are already operating or in various phases of planning of development in this region. Geothermal companies



Federal Mineral Estate

Source: Bureau of Land Management 2010



Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the
most current and complete geospatial data available.
No warranty is made by the BLM as to the accuracy, reliability,
or completeness of this data. Using this map for other than its
intended purpose may yield inaccurate or misleading results.

Figure shows all fluid minerals in the federal mineral estate
on BLM-administered lands in the Uncompahgre RMP Planning
Area regardless of current management constraints.

Figure 2-1

This page intentionally left blank.



Source: Bureau of Land Management 2010,
Colorado Geological Survey 2007

Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the
most current and complete geospatial data available.
No warranty is made by the BLM as to the accuracy, reliability,
or completeness of this data. Using this map for other than its
intended purpose may yield inaccurate or misleading results.

## Geothermal Energy Potential on Federal Mineral Estate

Figure shows geothermal potential on federal mineral estate lands in the
Uncompahgre RMP Planning Area regardless of current management constraints.

Figure 2-2

This page intentionally left blank.



Case No. 1:20-cv-02484-MSK Document 83 filed 05/06/21 USDC Colorado pg 252 of 443

Source: Bureau of Land Management 2010, Colorado Geological Survey 2007

## Geothermal Heat Flow Countours

Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the most current and complete geospatial data available. No warranty is made by the BLM as to the accuracy, reliability, or completeness of this data. Using this map for other than its intended purpose may yield inaccurate or misleading results.

Figure shows geothermal heat flow contours on BLM-administered lands in the Uncompahgre RMP Planning Area regardless of current management constraints.

Figure 2-3

This page intentionally left blank.

tend to develop in areas where the resources are well understood and where exploration will render the highest likelihood of finding a viable resource. This consideration further reduces the likelihood that a geothermal company would choose to invest in exploration funds in areas such as the UFO where resources are not proven.

Despite the many above-discussed factors that suggest a low level of geothermal development in the UFO planning area in the near future, longer term trends indicate that such development can be expected over the mid-to-long term. These factors include the ongoing national rapid expansion of renewable energy development and the possible future trend toward locally produced renewable energy. Given these longer-term trends, the BLM considers it to be reasonably foreseeable that one indirect use (electrical generation) project and two direct use projects would occur within the decision area by year 2030. The indirect use project would be assumed to have a capacity of 10 MW.

Given the proximity of the Ouray, Orvis and Lemon hot springs to existing communities, any direct use projects would be expected to occur in association with these hot springs in their respective communities of Ouray, Ridgway, and Placerville; however, other communities within the planning area could conduct exploratory drilling to seek geothermal resources for local direct use projects.

Given the heat flow patterns and the presence of existing transmission lines shown in Figure 2-3, the indirect use project is expected to occur either near Montrose or Paonia. BLM-administered lands occur in abundance to the east, south, and west of Montrose, and several transmission lines cross these areas as well. This same combination of factors exists around Paonia. While the highest temperatures are expected to occur in the southern portion of the planning area from Ridgway to the south, there is a lack of transmission lines to provide connection to the electrical grid.

This page intentionally left blank.

# CHAPTER 3
# SOLAR ENERGY

## 3.1   WHAT IS SOLAR ENERGY?

Solar energy is the energy produced in the sun's core through nuclear fusion. This energy reaches the earth in form of electromagnetic radiation, mostly in the visible and near-visible (ultraviolet and near-infrared) bands. The intensity of radiation striking the top of earth's atmosphere is 1,367 watts per square meter. This value varies by plus or minus three percent as the earth orbits the sun on an elliptical orbit (University of Oregon 2002). The amount of solar radiation that reaches earth's surface is known as insolation or "incident solar radiation." Insolation values are affected by location (latitude and elevation), season, time of day, local landscape, and local weather.

As solar radiation passes through the atmosphere, some of it is scattered, absorbed, and reflected by air molecules, water vapor, clouds, ozone, and other agents in the atmosphere. On a clear day at Noon, only about 25 percent or 1,000 watts per square meter of the incident direct radiation reaches the earth's surface. The solar radiation that reaches earth's surface directly without being scattered is called direct normal irradiance. The radiation that has been scattered before reaching the earth's surface is called diffuse solar radiation. The total solar radiation (sum of direct normal irradiance and diffuse solar radiation) projected onto a horizontal surface is called global radiation, which is sometimes referred to as global horizontal irradiance.

## 3.2   HOW IS SOLAR ENERGY DEVELOPED?

Solar radiation may be harnessed through various technologies and transformed to usable energy such as heat and electricity. It has small-scale applications such as powering solar vehicles and generating electricity or heating water for residences. It may also be used for large-scale commercial applications such as generating electricity in solar power plants.

Two basic solar energy technologies that produce electrical power are photovoltaic systems and concentrating solar power systems. These can be combined with natural gas or other fossil-fueled power technologies to form hybrid systems.

### 3.2.1   Photovoltaic Systems

Photovoltaic systems use solar cells, which are semiconductor materials similar to those used in computer chips, to capture the energy in sunlight and convert it directly into electricity. Photovoltaic systems must be scaled over a very large area in order to be effective for utility-scale applications. Due to the high cost of photovoltaic cell productions, large photovoltaic electrical generating systems are less likely to be used in commercial utility application. Photovoltaic systems are generally used to provide power to individual homes and small buildings. They are also found in rural areas on communication towers, water pumps, and road and traffic signs.

The process by which a photovoltaic cell converts sunlight into electricity is called the photoelectric effect. Through this process, the sunlight absorbed by the semiconductor material knocks electrons loose from their atoms, allowing them to flow through the material and generate electric current.

There are three main types of materials used for solar cells. Traditional solar cells are made from silicon. These cells are usually flat-plate and are the most efficient. The second type is thin-film solar cells made from amorphous silicon or non-silicon materials such as cadmium telluride. The third and newest type of solar cells is made from a variety of new materials besides silicon, including solar inks, solar dyes, and conductive plastics. Some new solar cells use plastic lenses or mirrors to concentrate sunlight onto high-efficiency photovoltaic materials. These systems are cost effective for use in utility-scale applications because they use less of more-efficient and expensive materials (National Renewable Energy Laboratory [NREL] 2009a).

Photovoltaic cells are connected together to form photovoltaic modules, which in turn are combined to make photovoltaic arrays. The size of an array depends on the amount of sunlight and the needs of the customer. For utility-scale electricity generation, hundreds of arrays are interconnected to form a single large system. Modules and arrays are often combined with other components such as those that convert the current within the cell material to usable electricity, batteries to store some of the electricity, and mounting structures that point them toward the sun. These components, referred to as the balance-of-system components, combined with modules and arrays create a complete photovoltaic system. There are two types of photovoltaic systems in use today: flat-plate systems and concentrated photovoltaic systems.

#### Flat-plate Photovoltaic Systems

The most common array designs use flat-plate photovoltaic panels, which can either be fixed in place or allowed to track the sun. These panels respond to both diffuse and direct solar radiation, making them useful even on cloudy days when the diffuse radiation accounts for nearly 100 percent of the total radiation. On a sunny day, an estimated 10 to 20 percent of the total solar radiation comes from the diffuse component of sunlight.

Generally, flat-plate photovoltaic panels are mounted on stationary structures with a tilt at a fixed angle determined by the latitude of the site, the requirement of the load, and the availability of sunlight. The fixed arrays are advantageous in that they are simple, inexpensive, and lightweight. However, because their orientation to the sun is fixed and at an angle often less than optimal, they receive less energy per unit area compared with a tracking array. The flat-

plate tracking arrays are primarily mounted on one-axis tracking structures, which are designed to track the sun from east to west.

### Concentrated Photovoltaic Systems

Concentrated photovoltaic systems use lenses or mirrors to concentrate sunlight on solar cells. The concentration of sunlight allows for greater efficiency and reduction in size and number of cells. These systems must track the sun to keep light focused on the photovoltaic cells. They are primarily mounted on two-axis tracking structures, which are designed to track the sun's daily and seasonal course. One-axis tracking systems are also sometimes used.

Both reflectors and lenses have been used to concentrate light for photovoltaic systems. The most promising lens for concentrated photovoltaic application is the Fresnel lens, which uses a miniature sawtooth design to focus incoming light. The best lenses, however, can transmit only 90 to 95 percent (and in practice even less) of incident light. In addition, lenses cannot focus diffuse sunlight, which makes up nearly 10 to 20 percent of the radiation on a clear day.

While concentrated photovoltaic systems lower costs by reducing photovoltaic material needs, they require sophisticated tracking devices and expensive concentrating optics. High concentration ratios also introduce an excessive heat, which can decrease cell efficiencies and damage solar cells.

### 3.2.2   Concentrating Solar Power Systems

Concentrating solar power technologies use mirrors to concentrate sunlight onto receivers that convert it to heat. The thermal energy is then used to drive a generator via a steam turbine or heat engine to produce electricity. Concentrating solar power technologies are the most suitable solar technologies for large utility-scale applications. The three main types of concentrating solar power technologies are linear concentrator, dish/engine, and power tower systems.

### Linear Concentrator Systems

Linear concentrating solar power systems use a large field of long, rectangular, U-shaped mirrors tilted toward the sun that capture and focus solar energy onto linear receiver tubes that run along the length of the mirrors. The receiver contains a fluid (oil or water/steam) that is heated by the sunlight and used to boil water in a steam-turbine generator to produce electricity.

The two major types of linear concentrating solar power systems are parabolic trough systems and linear Fresnel reflector systems. Parabolic trough systems are the predominant concentrating solar power systems currently in operation in the US. They use collectors in which the receiver tube is positioned along the focal line of each parabolic mirror. Currently the largest individual trough systems generate 80 megawatts of electricity.

In linear Fresnel reflector systems, the receiver tube is positioned above several flat or slightly curved mirrors that are mounted on tracking structures. Sometimes a small parabolic mirror may be added atop the receiver to further focus the sun's rays.

### Dish/Engine Systems

The dish/engine system produces relatively small amounts of electricity (3 to 25 kilowatts) compared to other types of concentrating solar power technologies. It uses a parabolic mirrored dish similar to a large satellite to concentrate sunlight onto a thermal receiver. The thermal receiver, mounted at the focal point of the dish, absorbs and transfers the heat to an engine or generator. The most common type of heat engine used today in dish/engine systems is the Stirling engine. A Stirling engine uses the fluid heated by the receiver to move pistons and create mechanical power. Mechanical work turns a crankshaft, which drives a generator and produces electricity. To maximize the amount of solar energy captured by the dish/engine collectors, the dish assembly is mounted on a tracking structure that follows the sun across the sky.

### Power Tower Systems

Power tower systems use a large field of flat, sun-tracking mirrors, known as heliostats, to focus sunlight onto a receiver, which is located atop a tower. A fluid in the receiver, either water/steam or molten nitrate salt, is heated and used to generate steam, which, in turn, is used in a conventional turbine generator to produce electricity. The molten nitrate salt has heat-transfer and energy-storage capabilities, which allows for production of electricity during cloudy weather and at night.

### 3.2.3   Thermal Energy Storage

Sunlight is an intermittent resource. No solar radiation is available at night, and cloud cover, smog, or haze can further limit generation from a solar power plant. In a concentrating solar power system, fossil fuel hybridizations provide a means to produce power during periods of low or non-existent solar radiation. In addition, heat energy storage is viable for power tower and parabolic trough technologies in which oil or molten salt is used as the heat-transfer medium.

Thermal energy storage technologies include two-tank indirect systems, two-tank direct systems, and single-tank thermocline systems. A two-tank direct thermal energy storage system stores the thermal energy in the same fluid that was used to collect it. A two-tank indirect thermal energy storage system uses different fluids to collect and store the heat. Both systems store the fluid in two separate tanks—one at high temperature and the other at low temperature. A single-tank thermocline system stores the thermal energy in a solid medium, most commonly silica sand, located in a single tank.

### 3.2.4   Emerging Technologies

The technologies described above are those that are in use at the time of this writing. Leading up to 2010, there has substantial private and government investment into the development of new solar technologies to allow for the cheaper and more efficient capture of solar energy. It is expected that further technological advancements will be made over time timeframe of the RMP.

## 3.3   WHAT BLM ACTIONS ARE INVOLVED IN SOLAR ENERGY DEVELOPMENT?

Solar energy development on BLM-administered lands is managed through ROW authorization under Title V of the Federal Land Policy and Management Act of 1976, 43 CFR 2800, and

current applicable BLM Instruction Memoranda. This guidance is expected to change over time and new IMs are expected to be developed.

A ROW grant is an authorization that allows for specific use of a piece of public land for a certain project. A solar energy development ROW authorizes all facilities on public lands including solar collectors, tower, turbine generator, fossil-fuel fired generator for hybrid systems, thermal storage, access roads, electrical and transmission facilities, and other testing and support facilities. Installation of a photovoltaic system as part of another authorized facility or use does not require a separate authorization. The ROW authorization contains appropriate stipulations relating to all aspects of project development including, but not limited to, road construction and maintenance; vegetation removal; natural, cultural, and biological resources mitigation and monitoring; and site reclamation. In addition, an approved plan of development for construction and operation of the solar facility must be completed prior to beginning construction.

Right-of-way applications for solar energy development projects are identified as a high-priority BLM Field Office workload, consistent with the President's National Energy Policy of 2001 and the Energy Policy Act of 2005. The term length of the authorization is not limited by regulation (43 CFR 2805.10[a][3]); however, it should recognize the overall costs and useful life of solar energy facilities (43 CFR 2805.11[b][3]). The term of the solar energy authorization for a commercial facility should not exceed the design life of the project, typically 30 years. The authorization may be renewed consistent with the provisions of the regulations (43 CFR 2807.22[a]). Other compatible uses may be authorized but are unlikely due to the intensive use of the site for photovoltaic or concentrating solar power facility equipment. All solar energy ROW authorizations are subject to annual rent, as established by the BLM, unless they are specifically exempt from rent by statute or regulation.

In addition, the solar energy development policy requires that all solar energy project ROW applications be subjected to environmental review in accordance with the requirements of the National Environmental Policy Act of 1969. The scope of the National Environmental Policy Act analysis and compliance requirements of the Endangered Species Act, Migratory Bird Treaty Act, National Historic Preservation Act, and other laws for a solar energy development ROW application should address the installation,  maintenance and reclamation of solar collectors, water for steam generation and cooling purposes, oil or gas used by backup generators, thermal or electrical storage, turbines or engines, access roads, electrical inverters, and transmission facilities.

## 3.4   HOW ARE POTENTIAL LEVELS DEFINED FOR SOLAR ENERGY?

Solar energy potential is determined using solar insolation values measured in kilowatt-hours per square meter per day (kWh/m²/day). Concentrating solar power solar resource potential is based on direct normal solar radiation values. Photovoltaic solar insolation values represent the resource available to a flat-plate collector, oriented due south, at an angle from horizontal equal to the latitude of the collector location.

In addition to solar insolation values, factors such as slope of the land, proximity to roads, transmission lines, water resources, and population centers, as well as average wind speeds and

vegetation concentration must be considered when determining a site's potential for solar development.

## 3.5   SOLAR POTENTIAL

### 3.5.1   Data Sources

The main source of solar potential data in the US is available through the US Department of Energy's (DOE) NREL. The NREL offers national 10-kilometer and 40-kilometer resolution maps of photovoltaic and concentrating solar power resources. The maps provide annual and monthly average daily totals for each resource type. For photovoltaic solar radiation, the insolation values represent the resource available to a flat-plate collector, oriented due south, at an angle from horizontal equal to the latitude of the collector location. The concentrating solar power solar radiation maps represent direct normal radiation values for receptors that track the sun throughout the day. In addition to direct normal irradiance maps, typical for concentrating solar power, and Latitude Tilt maps, typical for photovoltaic solar, the NREL provides global horizontal irradiance data, which represents total solar radiation (the sum of direct, diffuse, and ground-reflected radiation).

The 10-kilometer resolution maps are based on the State University of New York data, which use a model that incorporates hourly radiance images from geostationary weather satellites, daily snow cover data, and monthly averages of atmospheric water vapor, trace gases, and the amount of aerosols in the atmosphere to calculate the hourly total insolation falling on a horizontal surface. The 40-kilometer resolution maps are based on the Climatological Solar Radiation model, which used information on cloud cover, atmospheric water vapor and trace gasses, and the amount of aerosols in the atmosphere to calculate daily total insolation falling on a horizontal surface.

The NREL also provides a Dynamic Solar Atlas that provides resource information for any location in the US. It provides access to spreadsheets giving average monthly radiation values for 14 different types of solar collectors. Data for individual collectors are also available for fixed, flat-plate photovoltaic collectors on five different orientations. The dynamic map also accesses the monthly average Photovoltaic Watts calculator, a software program that calculates electrical energy produced by grid-connected photovoltaic systems.

The NREL provides additional concentrating solar power resource maps for the southwest on its Concentrating Solar Power Research page of its website (NREL 2010a). These maps of direct-normal solar radiation are filtered by solar resource and land availability and identify the most economically suitable lands available for deployment of large-scale concentrating solar power plants. There are two types of maps provided for each state: maps that exclude lands with slopes greater than one percent, and those that exclude lands with slopes greater than three percent. Major urban areas, potentially sensitive environmental lands, water features, and areas with less than one square kilometer are excluded from these maps.

The 10–kilometer resolution maps provide a higher level of detail on solar irradiance than the 40-kilometer resolution maps. Given the size of the planning area being considered in this

assessment, a higher resolution data set was considered more appropriate. Thus, the 10-kilometer State University of New York data were used for this analysis.

There are two major existing BLM assessments addressing solar resource potential on public lands in the US that utilize the NREL solar potential data. These include the BLM and DOE's Renewable Potential Energy Assessment (BLM and DOE 2003) and the Draft Solar Energy Development Programmatic EIS (BLM and DOE 2010).

### BLM/DOE Renewable Potential Energy Assessment

In 2003, the BLM, in collaboration with the NREL, conducted an assessment (BLM and DOE 2003) of renewable energy resources including solar, biomass, geothermal, water, and wind energy on BLM lands in the western US. The objective of this assessment was to identify BLM lands with highest potential for renewable energy development.

This assessment used NREL 40-kilometer resolution solar data and developed screening criteria in order to analyze and assess the potential solar energy resources on public lands. The screening criteria for the concentrating solar power central generation technology were (in order of importance):

- Direct normal radiation of at least 5 kWh/m²/day;
- Slope of the land less than 5 percent;
- Transmission availability within 50 miles (within the 69- to 435-kilovolt range) and transmission capacity availability;
- Minimum parcel size of 40 acres;
- Within 50 miles of roads or railroads; and
- BLM-compatible land use.

The screening criteria for large-scale photovoltaic development included:

- Direct normal radiation of at least 5 kWh/m²/day;
- Transmission availability within 50 miles of transmission lines within the 115- to 345-kilovolt capacity range; and
- BLM-compatible land use.

### Solar Energy Development Programmatic EIS

The Solar Energy Development Programmatic EIS (BLM and DOE 2010) is being prepared by the DOE's Energy Efficiency and Renewable Energy Program and the BLM to assess environmental impacts associated with the development of utility-scale solar energy in six western states (Arizona, California, Colorado, New Mexico, Nevada, and Utah). The Programmatic EIS will analyze potential impacts associated with utility-scale solar projects that can generate 10 megawatts or more of electricity to be put directly into the transmission grid. Trough, dish, and tower concentrating solar power, as well as flat-panel and concentrating photovoltaic technologies, will be included in the Programmatic EIS analysis.

Maps representing low, moderate, and high potential for concentrating and photovoltaic solar resources on BLM lands for the six states included in the analysis are included. The data for this analysis was obtained from the NREL 10- kilometer resolution database.

In the Programmatic Environmental Impact Statement, lands with excellent solar resources, suitable slope, proximity to roads and transmission lines, and containing at least 2,000 acres of BLM-administered lands were considered for solar energy study areas. Sensitive lands, wilderness, and other high-conservation-value lands, as well as lands with conflicting uses, were excluded. Solar energy study areas in Colorado include Antonio Southeast, De Tilla Gulch, Fourmile East, and Los Mogotes East. None of the study areas are in the Uncompahgre RMP planning area.

The Programmatic EIS has also committed to analyze lands with solar insolation levels greater than 6.5 kWh/m²/day and slopes of less than 5 percent that exclude Wilderness Study Areas, National Conservation Areas, Areas of Critical Concern, and other sensitive lands. These areas must also be larger than one square kilometer to be considered for solar energy development. The maps for these areas are not yet available.

### 3.5.2   Solar Potential Data Used in This Report

All of the available assessments on solar radiation, including the solar Programmatic EIS, used either the 10-kilometer resolution State University of New York data or the 40-kilometer resolution Climatological Solar Radiation model data, are available through the NREL GIS database. Both data sets include maps of resource potentials for photovoltaic and concentrating solar power solar radiation nationwide, which were integrated into the US Atlas of Renewable Resources (NREL 2010b). In this interactive resource map, layers representing 10-kilometer resource data from 1998 through 2005 for Direct Normal, Global Horizontal, and Latitude Tilt data are available. The 40-kilometer resolution solar layer representing data sets gathered from 1961 to 1990 only for flat-plate tilted south at latitude are available.

This report uses 10-kilometer resolution data, direct normal for concentrating solar power and Latitude Tilt for photovoltaic available in NREL's GIS database.

### 3.6   POTENTIAL AREAS WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

As shown in **Figure 3-1**, on BLM-administered lands within the Uncompahgre RMP planning area, 557,000 acres have good concentrating solar power resource potential (6 to 7 kWh/m²/day), and 118,400 acres have moderate (5 to 6 kWh/m²/day) concentrating solar power resource potential. Photovoltaic solar potential is very good on all 675,700 acres of BLM-administered land within the Uncompahgre RMP planning area (Figure 3-1). The identified high-potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the Uncompahgre RMP planning area.

### 3.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects





Case No. 1:20-cv-02484-MSK Document 83 filed 05/06/21 USDC Colorado pg 264 of 443

Source: Bureau of Land Management 2010, National Renewable Energy Laboratory 2009a

*Solar Energy Potential*

Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the most current and complete geospatial data available. No warranty is made by the BLM as to the accuracy, reliability, or completeness of this data. Using this map for other than its intended purpose may yield inaccurate or misleading results.

Figure shows solar energy potential on BLM-administered lands in the Uncompahgre RMP planning area regardless of current management constraints.

Figure 3-1

This page intentionally left blank.

in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.

As described in Section 3.6, all planning area lands have very good potential for photovoltaic applications and 557,000 acres have good potential for concentrating solar power applications. As shown in **Figure 3-2**, of the area with good (6 to 7 kWh/m²/day) potential for concentrating solar power applications, there are 163,500 acres with slopes of less than five percent, and of the area with moderate (5 to 6 kWh/m²/day) potential for concentration solar power applications, there are 18,400 acres with slopes of less than five percent. No commercial-scale solar projects currently exist within the UFO on BLM-administered lands or otherwise, and there are no solar installation projects on BLM-administered lands anywhere in Colorado. There are no pending ROW applications within Colorado.

Despite the lack of existing projects, ROW applications, low-slope lands, and interest by the solar industry at the time of this writing, changes in national policy, economic factors (such as incentives, regulation of carbon emissions), and technology could reasonably result in one commercial-scale solar project on lands within the Uncompahgre RMP planning area within the next 15 to 20 years. Additionally, as technology changes, there may be a shift toward smaller commercial or community scale solar facilities, potentially resulting in several such smaller projects by year 2030.

This page intentionally left blank.



Concentrated Solar Energy Potential

Annual Clear Sky Direct Normal kWh/m$^2$

- ■ Moderate (5-6)
- ■ Good (6-7)
- Uncompahgre RMP Planning Area

- ☐ Uncompahgre Field Office
- ■ National Conservation Area
- Existing Transmission Lines
- County Boundaries
- City



Source: Bureau of Land Management 2010,
National Renewable Energy Laboratory 2009a

*Developable Areas for*
*Concentrating Solar Power*

Figure shows all solar energy potential on BLM-administered lands in the
Uncompahgre RMP planning area with slopes of five percent or less.

Figure 3-2

Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the
most current and complete geospatial data available.
No warranty is made by the BLM as to the accuracy, reliability,
or completeness of this data. Using this map for other than
its intended purpose may yield inaccurate or misleading results.

This page intentionally left blank.

# CHAPTER 4
# WIND ENERGY

## 4.1   WHAT IS WIND ENERGY?

Wind is a form of solar energy. Solar radiation causes uneven heating of the atmosphere, producing regions of high and low pressure. This pressure gradient results in movement of air from high-pressure to low-pressure regions, creating wind. Wind flow patterns are modified by the earth's terrain, bodies of water, and vegetative cover. This wind flow when harvested by modern wind turbines can be used to generate electricity.

The terms wind energy or wind power describe the process by which the wind is used to generate mechanical power or electricity. Because air has mass, moving air carries with it kinetic energy. Wind turbines convert the wind's kinetic energy into mechanical power. This mechanical power can be used for specific tasks such as grinding grain, pumping water, or producing electricity.

## 4.2   HOW IS WIND ENERGY DEVELOPED?

A wind turbine is a mechanical assembly that converts the energy of wind into electricity. A wind turbine consists of a blade or rotor, a drive train (usually including a gearbox and a generator), a tower, and other equipment including controls, electrical cables, ground support equipment, and interconnection equipment. The blades turn in the moving air and power an electric generator that supplies an electric current. The blades act much like an airplane wing. When the wind blows, a pocket of low-pressure air forms on the downwind side of the blade, causing the blade to be pulled toward that pocket. This force causes the rotor to spin like a propeller and turn a shaft. The rotational energy of the shaft turns the generator and makes electricity. Wind turbines are mounted on a tower to enable them to capture the most energy. Tower height affects the amount of power that can be extracted by a given wind turbine. At 30 meters or more above ground, wind turbines can take advantage of the faster and less-turbulent wind.

Wind turbines fall into two basic groups, which include the horizontal-axis variety (propeller-style) like traditional farm windmills and the vertical-axis design like the eggbeater-style Darrieus model. The horizontal-axis type turbines are the most common, constituting nearly all the

utility-scale turbines. These typically have either two or three blades. The three-blade turbines are operated upwind with their blades facing into the wind.

Wind turbines are available in a variety of sizes, and therefore power ratings. Utility-scale wind turbines for land-based wind farms have rotor diameters ranging from 40 to about 120 meters, and towers of roughly 40 to 130 meters high. Wind turbines can also be installed offshore, where the wind speeds are generally higher and larger turbines can be incorporated. The size and design of offshore wind turbines are variable and depend on many factors, including the water depth and distance to shore of the installation site. Small wind turbines intended for residential or small business typically have rotors between 2 and 8 meters in diameter and are mounted on towers 30 to 40 meters above ground.

Utility-scale turbines range in power rating from 100 kilowatts to as large as several megawatts. Larger turbines are grouped together into wind farms, which provide bulk power to a utility power grid. Wind power plants are modular, which means they consist of small individual modules (turbines) and, depending on electricity demand, can easily be made larger or smaller.

Single small turbines, below 100 kilowatts, are used for homes, telecommunications, or water pumping. Small wind systems also have potential as distributed energy resources. These systems, called hybrid wind systems, operate in connection with diesel generators, batteries, and photovoltaic systems in remote, off-grid locations where a connection to the utility grid is not available.

## 4.3   WHAT BLM ACTIONS ARE INVOLVED IN WIND ENERGY DEVELOPMENT?

Wind energy development on BLM-administered lands is managed, at the time of this writing, through ROW authorization in accordance with the terms and conditions of BLM's Wind Energy Development Policy (Instruction Memorandum 2009-043 [BLM 2009b]). This guidance is expected to change over time.

BLM's Wind Energy Development Policy provides guidance on processing ROW applications for wind energy site testing and monitoring facilities, as well as applications for wind energy development projects on BLM-administered lands. Under this policy, all wind energy applications are processed in accordance with the requirements of Title V of the Federal Land Policy and Management Act of 1976 and 43 CFR 2800, "Right-of-Way under the Federal Land Policy Management Act." Under this policy, developers may apply for the following three types of wind energy ROW grants:

- A site-specific grant for testing and monitoring;

- A project-area grant for testing and monitoring; and

- A development grant.

A site-specific grant is used to authorize individual meteorological towers and instrumentation facilities. The area authorized for these facilities is the minimum area required for construction and maintenance of the temporary facility (including access roads). Under the current guidance, the term of this grant is limited to three years from the date of issuance and may not be renewed. The BLM may allocate numerous site-specific grants to various ROW holders in the

same area without any exclusive rights regarding future wind energy development. In addition, the BLM retains the right to authorize other compatible uses of public lands in the area.

A project-area grant with provisions for renewal beyond the three-year term authorizes wind energy site testing and monitoring facilities for a project area. The project area describes an area of land where wind resource information is being collected to determine the area's wind energy resource potential. The holder of the project area grant retains an interest in the site testing and monitoring project area, which precludes other wind energy ROW applications during the three-year term of the grant. However, it is required that for any future wind energy development proposals, the holder of the grant submit a separate ROW application and plan of development to the BLM for review.

A development grant authorizes all facilities related to a commercial wind energy development project on public lands. This authorization includes the wind turbine facilities, onsite access roads, electrical and distribution facilities, and other support facilities authorized by the wind energy development ROW grant. The lands involved in the development grant are defined by aliquot legal land descriptions and configured to minimize the amount of land involved, while still allowing an adequate distance between turbine positions and reasonable ROW boundaries. In the absence of any specific local zoning and management issues, no turbine will be positioned closer than five rotor-diameters from the center of the wind turbine to the ROW boundary in the dominant upwind or downwind direction to avoid potential wind turbulence interference issues with adjacent wind energy facilities, unless it can be demonstrated that site conditions, such as topography, natural features, or other conditions (e.g., offsets of turbine locations) warrant a lesser distance. Further, for safety reasons, no turbine on public land will be positioned closer than 1.5 times the total height of the wind turbine to the ROW boundary.

In addition, the wind energy development policy requires that all wind energy project ROW applications, whether for site testing and monitoring or for commercial development, be subjected to environmental review in accordance with the requirements of National Environmental Policy Act of 1969 and that such development be in compliance with the requirements of the Endangered Species Act, Migratory Bird Treaty Act, National Historic Preservation Act, and other appropriate laws.

## 4.4    HOW ARE POTENTIAL LEVELS DEFINED FOR WIND ENERGY?

Wind speed is a crucial element in projecting turbine performance, and a site's wind speed is measured through wind resource assessment prior to a wind system's construction. The power available in the wind is proportional to the cube of its speed, which means that a slightly higher wind speeds will produce a significantly higher power. Generally, an annual average wind speed greater than four meters per second (nine miles per hour) is required for small wind electric turbines. Less wind is required for water-pumping operations. Utility-scale wind power plants require minimum average wind speeds of 6 meters per second (13 miles per hour). Wind resources are characterized by wind power density classes, which range from Class 1 (the lowest) to Class 7 (the highest).

While the technical characteristics of the wind in a specific location are very important, many other factors also contribute to siting decisions. A location far removed from the power

transmission grid might be uneconomic, as new transmission lines would be required to connect the wind farm to the grid. Soil conditions and the terrain must be suitable for the construction of the towers' foundations. Surface roughness is another determining factor because it determines the amount of turbulence a turbine will experience. Turbulent winds put greater stresses on the rotor and tower, reducing the turbine's lifespan as a result.

## 4.5  WIND POTENTIAL

### 4.5.1  Data Sources

The main source of data on wind potential in the US is available through the DOE's NREL. The NREL's GIS offers a national wind resource assessment of the US as well as high-resolution wind data. The national wind resource assessment was developed in 1986 for the DOE by the Pacific Northwest Laboratory, which is documented in the Wind Energy Resource Atlas of the US (DOE 1986). The NREL website (NREL 2009b) provides a dynamic map based on the Wind Energy Resource Atlas of the US (NREL 2010c). In this assessment, the conterminous US was divided into grid cells one quarter of a degree of latitude by one third of a degree of longitude. Each grid cell was assigned a wind power class ranging from 1 (the lowest) to 7 (the highest), representative of the range of wind power densities. The wind power density limits for each wind power class are shown in **Table 4-1**, below.

In Table 4-1, the wind power classes represent different wind power densities at different heights above ground (10 and 50 meters). The data depicted in the NREL's wind resource potential map represents wind power densities at 50 meters above ground, which is typical for utility-scale wind turbine application. Estimates at the 30-meter level are useful for identifying small wind turbine opportunities; however, such data are yet to be developed. In the NREL's assessment, areas designated class 3 or greater are considered suitable for utility-scale applications, while class 2 areas are marginal, and class 1 areas are generally not suitable for utility-scale uses. According to the NREL's assessment, wind power class 2 may be suitable for rural applications, and wind power class 1 in a few locations such as exposed hilltops (not shown on the map) may be adequate for wind turbine applications.

High-resolution data are separated into two groups: NREL-produced and TrueWind-produced/NREL validated. The NREL-produced map data apply to areas of low surface roughness (e.g., grasslands) and areas with slopes less than 20 percent, while the TrueWind-produced estimates factor in surface roughness and include all slopes. The data produced by TrueWind were obtained in cooperation with the DOE's Wind Powering America program and have been validated by NREL and other wind energy meteorological consultants.

The Wind Powering America program provides a nationwide wind resource map, which is a combination of high-resolution and low-resolution databases for the US. The map shows the annual average wind power estimates at a height of 50 meters. The areas unlikely to be developed onshore due to land use or environmental issues have been excluded from this assessment. Only moderate- and high-potential areas (wind power class 3 and above) are represented in this assessment.

**Table 4-1**
**Classes of Wind Power Density at 10 Meters and 50 Meters**

| Wind Power Class | Resource Potential (Utility Scale) | Wind Power Density (watts per square meter) at 10 Meters Above Ground | Speed (miles per hour) at 10 Meters Above Ground | Wind Power Density (watts per square meter) at 50 Meters Above Ground | Speed (miles per hour) at 50 Meters Above Ground |
|---|---|---|---|---|---|
| 1 | Poor | 0–100 | 0–9.8 | 0–200 | 0–12.5 |
| 2 | Marginal | 100–150 | 9.8–11.5 | 200–300 | 12.5–14.3 |
| 3 | Moderate | 150–200 | 11.5–12.5 | 300–400 | 14.3–15.7 |
| 4 | Good | 200–250 | 12.5–13.4 | 400–500 | 15.7–16.8 |
| 5 | Excellent | 250–300 | 13.4–14.3 | 500–600 | 16.8–17.9 |
| 6 | Outstanding | 300–400 | 14.3–15.7 | 600–800 | 17.9–19.7 |
| 7 | Superb | 400–1000 | 15.7–21.1 | 800–2000 | 19.7–26.6 |

Source: NREL 2009b

The Wind Powering America program also provides high-resolution data at 50 meters for individual states (when such data are available). The data represent low-, moderate-, and high-potential areas for wind development. According to this assessment, wind power class 4 or higher is sufficient for generating wind power with utility-scale turbines. Particular locations in class 3 areas could have higher wind power class values at 80 meters than values at 50 meters.

There are two major existing BLM assessments addressing wind resource potential on public lands that utilize the NREL wind potential data. These include the BLM/DOE Renewable Potential Energy Assessment (BLM and DOE 2003) and the Wind Energy Development Programmatic Environmental Impact Statement (BLM 2005).

**BLM/DOE Renewable Potential Energy Assessment**
In 2003, the BLM, in collaboration with the NREL, conducted an assessment (BLM and DOE 2003) of renewable energy resources including solar, biomass, geothermal, water, and wind energy on BLM lands in the western US. The objective of this assessment was to identify BLM lands in the western US with highest potential for renewable energy development. The assessment used NREL's high-resolution data, when such data were available, and the 1987 low-resolution data, also available through the NREL. The following screening criteria (in order of importance) were developed for targeting high-potential wind resource potential areas:

- Wind power class 3 and above;

- Within 25 miles of transmission lines with capacity in the range of 69 to 345 kilovolts;

- Within 50 miles of a major road or railroad; and

- BLM-compatible land use.

***Wind Energy Development Final Programmatic EIS***

The Wind Energy Development Final Programmatic EIS (BLM 2005) evaluates the potential impacts associated with wind energy development on BLM-administered lands in the western US, excluding Alaska. For this Programmatic EIS, the NREL developed a maximum potential development scenario in order to define the potential for future wind energy development on BLM-administered lands. The NREL utilized the same methodology and screening criteria that was employed in the BLM's 2003 Renewable Potential Energy Assessment (BLM and DOE 2003) discussed above. In addition to the maximum potential development scenario, the NREL used a different model (the Wind Deployment System) to project the amount of wind power that might be generated over the next 20 years in the study area.

Maps depicting BLM-administered lands with low, medium, and high potential for wind energy development are available for 11 western states (BLM 2005). Wilderness Areas, Wilderness Study Areas, National Monuments, and National Conservation Areas were excluded from the maps. Lands categorized as having low potential fall in wind power classes 1 and 2. Lands with wind power class 3 are considered medium potential, while wind resources of class 4 and above are economically developable with current technology. Most of the BLM lands in the UFO have only low potential for wind energy development.

### 4.5.2   Wind Potential Data Used in this Report

For this analysis, the available high-resolution data created by TrueWind Solutions were used, as was done in the Wind Energy Development Final Programmatic EIS (BLM 2005). These data have been verified by the NREL and are also utilized in the assessment done by the Wind Powering America program.

## 4.6   POTENTIAL AREAS WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

Within the Uncompahgre RMP planning area, wind potential is generally marginal to poor. Outstanding wind potential areas (class 6) have been identified on 40 acres, while 50 acres have excellent (class 5) wind potential, and an additional 60 acres have good (class 4) wind potential. The identified high-potential areas are located on the eastern side of the planning area and are shown with these potential classes in **Figure 4-1**.

## 4.7   REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

The likelihood of future development of wind projects in the Uncompahgre RMP planning area can be estimated by considering the quality of wind resources, existing wind projects in the area, the number of pending ROW applications within the UFO, the quality of wind resources in the UFO compared with other areas in the region, and expressions of interest by wind companies.

Wind energy potential is generally marginal to poor in the planning area, and only small areas (areas of 50 acres or smaller) have been identified as having high potential (class 4 or higher) for



Source: Bureau of Land Management 2010,
National Renewable Energy Laboratory 2009a

*Wind Energy Potential*



Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the
most current and complete geospatial data available.
No warranty is made by the BLM as to the accuracy, reliability,
or completeness of this data. Using this map for other than
its intended purpose may yield inaccurate or misleading results.

Figure shows all wind energy potential areas on BLM-administered land in the
Uncompahgre RMP planning area regardless of current management constraints.

Data show average wind resource potential at a height of 50 meters.

Figure 4-1

This page intentionally left blank.

wind energy development. As stated above, the planning area has one 40-acre area of outstanding wind resource, one 50-acre area of excellent wind resource, and three areas (30 acres, 20 acres, and 10 acres) of good wind resource. All of these areas are along the Cimarron Ridge near Slagel Pass along the border of Ouray and Gunnison Counties, except for the 10-acre good area, which is approximately 2 miles to the north, also along the Cimarron Ridge, along the border of Ouray and Montrose Counties near Storm King Mountain and Castle Rock. Potential transmission connections could be made to any power lines running along Highway 550 approximately 7 miles to the west-southwest, or along Highway 50 approximately 10 miles to the north-northeast.

No major wind projects exist within the UFO or anywhere in western Colorado. There are no existing wind ROWs or pending wind ROW applications within the UFO. A number of ROWs are authorized or pending for wind testing sites across Colorado, as follows: 1 authorized (Grand Junction), 3 pending (Royal Gorge), 1 pending (White River). Two additional ROWs are pending for wind test sites in the nearby Vernal Field Office in Utah.

The closest ROW authorization is located near Palisade, Colorado, in the Grand Junction Field Office and is for Wazee Energy, LLC, which is seeking to determine the feasibility of developing a wind farm. This application was approved in September 2009. Wazee Energy erected a single meteorological tower to test wind speed at the end of 2009 and expressed an intention to install up to three more towers if results were favorable.

Superb wind resources are located along the Front Range of Colorado, running north-south through central Colorado. Fair to good wind resources are located in Colorado's eastern plains.

The UFO has received no expressions of interest in developing wind resources within the planning area from wind developers. Attempts to contact the wind energy companies with pending or existing ROW authorizations in Colorado yielded no results.

Due to the limited size of plots of BLM-administered land with good-quality wind resources, the lack of wind projects in the UFO or western Colorado, the lack of pending ROW applications in the UFO, and the fact that much better wind resources occur in other parts of the state, it is not expected that many, if any, commercial-scale wind energy projects would be developed within the planning area by year 2025. If such development were to occur, it is expected it would be along Cimarron Ridge in the area described above.

This page intentionally left blank.

# CHAPTER 5
# BIOMASS

## 5.1   WHAT IS BIOMASS?

Biomass energy or bioenergy is the energy from plants and plant-derived materials. These include food crops, grassy and woody plants, residues from agriculture or forestry, and the organic component of municipal and industrial wastes. Even the fumes from landfills such as methane and natural gas can be used as a biomass energy source.

Biomass can be converted to liquid fuels (biofuels), such as ethanol and biodiesel, and used to meet transportation fuel needs. It can also be developed for power production to generate heat and electricity. In addition to biofuels and biopower, biomass can be converted into chemicals for making plastics and other products that would otherwise be made from fossil fuels. Using biomass for fuels, power productions, and products has the potential to greatly reduce greenhouse gas emissions and dependence on foreign oil, and to increase support of US agricultural and forest-product industries.

## 5.2   HOW IS ENERGY PRODUCED FROM BIOMASS?

Biopower, or biomass power technologies, convert biomass to heat and electricity using processes similar to that used with fossil fuels. Biopower system technologies include direct-firing, co-firing, gasification, pyrolysis, and anaerobic digestion. All of these technologies may be employed in small, modular systems that would be more applicable to villages, farms, and small industry.

### 5.2.1   Direct-firing

Most biopower plants use direct-firing, the burning of bioenergy feed stocks in a boiler to produce high-pressure steam. The steam rotates a turbine, which then turns a generator that produces electricity. The direct-fired power plants' efficiencies are limited (in the low 20-percent range). In some biomass industries, the spent steam from the power plant is used for manufacturing processes or heating buildings. Such combined heat and power systems greatly increase overall energy efficiency.

### 5.2.2   Co-firing

Co-firing involves mixing biomass with fossil fuels, typically coal, in an existing power plant furnace. Because much of the existing power plant equipment can be used without major modification, co-firing is the most economic near-term option for introducing new biomass power generation. Such plants can significantly reduce sulphur dioxide, nitrogen oxides, and other air emissions. Adding biomass results in little or no loss of efficiency. Such power plants allow biopower production with 30 to 37 percent efficiency.

### 5.2.3   Gasification

Gasification is a thermo-chemical process that converts biomass into a combustible, synthetic gas using high temperatures and an oxygen-starved environment. This synthetic gas, also called syngas, contains hydrogen, carbon monoxide, water vapor, carbon dioxide, tar vapor, and ash particles. The syngas retains 70 to 80 percent of the energy originally present in the biomass feedstock and can be chemically converted to other fuels or products, burned in a conventional boiler, or used instead of natural gas in a gas turbine.

Using syngas offers advantages over directly burning the biomass. Syngas can be cleaned and filtered to remove tar and particulate matter from the gas. It can also be used in more-efficient power-generation systems called combined cycles, which combine gas and steam turbines to produce electricity with efficiencies up to 60 percent.

### 5.2.4   Pyrolysis

Pyrolysis systems use a similar thermo-chemical process as in gasification but an oxygen-free environment to convert biomass into liquid. The pyrolysis oil can be burned to generate electricity or used for making plastics, adhesives, or other bioproducts.

### 5.2.5   Anaerobic Digestion

Anaerobic digestion refers to a biochemical process in which particular kinds of bacteria digest biomass in an oxygen-free environment and produce a gas composed primarily of methane and carbon dioxide. Methane, a combustible gas, is filtered and cleaned, then burned to produce electricity. Anaerobic digestion may be used to produce biogas from animal manure and organic biomass solids in municipal sewage. This process also occurs naturally in underground landfills. In such cases, wells can be drilled in order to release and capture the biogas that is produced.

## 5.3   WHAT BLM ACTIONS ARE INVOLVED IN BIOMASS PROJECTS?

Biomass resources are a byproduct of BLM actions on public lands and are not specifically cultivated for feedstock production. The BLM defines woody biomass as "the woody plants and portions of the trees, including limbs, tips, needles, leaves, and other woody parts, or rangeland environment, that are the byproducts of the management, restoration, and/or hazardous fuel reduction treatment." Biomass can be collected and harvested from BLM lands through any vegetation management activity related to wildlife, range resources, or forestry. Typically, biomass is primarily generated from timber sales, stewardship, and hazardous fuels reduction activities.

Although fire wood is biomass for energy, it is not considered in this report. The UFO will consider fire wood (personal use and commercial) along with other woodland products as it develops alternatives in the RMP.

## 5.4   HOW ARE POTENTIAL LEVELS DEFINED FOR BIOMASS-PRODUCING AREAS?

Potential levels for biomass-producing areas are generally calculated based on biomass feedstock yield. Biomass feed stocks include crop residues, forest residues, primary and secondary mill residues, urban wood waste, and methane emissions from manure management, landfills, and domestic wastewater treatment.

Another biomass resource data that may be used in defining potential levels is the normalized difference vegetation index (NDVI), which computes surface vegetation using visible and near-infrared satellite data.

## 5.5   BIOMASS PRODUCTIVITY

### 5.5.1   Data Sources

There are two main sets of biomass resource data available for the US. These include NREL's biomass resource potential maps of the US available through US Atlas of Renewable Resources (NREL 2010b) and NDVI values computed from NASA's Advanced Very High Resolution Radiometer Land Pathfinder Satellite program (US Department of Agriculture 2009).

#### Biomass Resource Maps

The NREL offers GIS layers showing biomass resources of the US by county, through the interactive US Atlas of Renewable Resources (NREL 2010b). The data represented here include crop residues, forest residues, primary and secondary mill residues, urban wood waste, and methane emissions from manure management, landfills, and domestic wastewater management. The NREL also offers static US maps of biomass resources measured in thousands of tons per county per year. Additionally, the NREL offers separate static maps for each biomass resource. There are separate analyses for crop residues, forest residues, primary mill residues, secondary mill residues, urban wood waste, methane emissions from landfills, methane emissions from manure management, and methane emissions from domestic wastewater treatment.

In the NREL maps and analyses, biomass resource values less than 50,000 tons per county per year are considered low potential, while values of greater than 500,000 tons per county per year are considered high potential. According to the data presented here, Montrose County BLM lands in the planning area have biomass resources of 50,000 to 100,000 tons per county per year, while BLM lands in the remaining Uncompahgre RMP planning area all have biomass resources that are less than 50,000 tons per county per year.

#### Normalized Difference Vegetation Index

The NDVI computed from NASA's Advanced Very High Resolution Radiometer Land Pathfinder Satellite program (US Department of Agriculture 2009) measures vegetation vigor caused by chlorophyll activity. The NDVI has been shown to be highly correlated to surface vegetation and is derived from the visible and near-infrared channel reflectances. Very low values of NDVI (0.1 and below) correspond to barren areas of rock, sand, and snow. Moderate values (0.2 to 0.3)

represent shrub and grassland, while high values (0.6 to 0.8) indicate temperate and tropical rainforests. NDVI values can theoretically range from -1 to +1.

The BLM/DOE's Renewable Potential Energy Assessment (BLM and DOE 2003) utilized NDVI values for the western US and developed screening criteria in order to identify high-productivity areas on public lands. The screening criteria used for this assessment were (in order of importance):

- NDVI of 0.4 or greater for at least 4 months between April and September 2000;

- Terrain slope of less than 12 percent;

- Site within 50 miles of a town with at least 100 people; and

- BLM-compatible land use.

These data include only areas that maintained the minimum NDVI of 0.4 for at least 4 months; such lands are present within the Uncompahgre RMP planning area.

### 5.5.2  Biomass Productivity Data Used in this Report

While NDVI data were considered the most appropriate for this assessment, NDVI data are not available in GIS format. As a proxy, BLM vegetation GIS data were used to indicate areas where biomass may be harvested.

Because biomass is a byproduct of other land management activities, such as fire management and stewardship, biomass does not require lands to be designated as open or closed for biomass collection; however, the BLM may choose to include an alternative in the RMP Amendment/EIS that designates certain areas for biomass harvesting. **Figure 5-1** shows the vegetation types in areas considered to be feasible for biomass collection. Feasibility was considered to be areas within 50 miles of a road and with a slope of less than 30 percent.  Aside from informing a biomass harvesting alternative in the RMP Amendment/EIS, the information in this assessment will serve as an informational tool so that BLM staff can keep biomass in mind as a potential useful byproduct when they are planning other actions and can arrange for its sale to biomass processors.

## 5.6    BIOMASS PRODUCTIVITY WITHIN THE UNCOMPAHGRE RMP PLANNING AREA

Figure 5-1 shows the vegetation types with slopes of 30 percent or less within the Uncompahgre RMP planning area. Biomass productivity attributes were not associated with the vegetation types. Biomass productivity from the lands supporting these vegetation types depends on how the BLM is managing the vegetation (i.e., how much of the vegetation is removed and how often).

## 5.7    REASONABLE FORESEEABLE DEVELOPMENT SCENARIO

Biomass energy production typically involves the collection of materials from BLM lands as the byproduct of other actions. In this case, a reasonable foreseeable development scenario is not applicable. However, because of some past interest in exploring the feasibility of harvesting local forests and woodlands solely for biomass, setting aside an area for biomass harvest (feedstock) could be considered as an alternative in the RMP.



Source: Bureau of Land Management 2010

*Developable Biomass Areas*



Datum: NAD 83
Projection: UTM, Zone 13

The Bureau of Land Management (BLM) attempts to use the most current and complete geospatial data available. No warranty is made by the BLM as to the accuracy, reliability, or completeness of this data. Using this map for other than its intended purpose may yield inaccurate or misleading results.

Figure depicts vegetation types on BLM-administered lands with slopes of 30 percent or less.

Figure 5-1

This page intentionally left blank.

The location of a biomass energy facility is not dependent upon the location of biomass resources (i.e., resources are typically hauled up to 50 miles to a biomass energy facility from various sources). Therefore, the presence of biomass resources on BLM-administered lands does not increase the likelihood that a private energy developer would seek to locate a biomass energy facility on BLM-administered lands. Biomass energy facilities are likely to be located on private land.

Given the flexibility in siting a power plant and the likelihood that a developer would prefer private lands over public lands, it is not expected that any biomass energy facilities would be developed in the planning area by year 2025. Biomass materials are likely to be produced from lands within the planning area during certain BLM activities such as stewardship and fire management actions.

This page intentionally left blank.

# CHAPTER 6
# REFERENCES

BLM (US Department of the Interior, Bureau of Land Management). 2004. Instruction Memorandum 2004-227, Biomass Utilization Strategy. August 16, 2004. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction.html. Accessed on February 20, 2010.

_____. 2005. Record of Decision for the Programmatic Environmental Impact Statement on Wind Energy Development. December 2005. Internet Web site: http://windeis.anl.gov/documents/docs/WindPEISROD.pdf. Accessed on February 20, 2010.

_____. 2006. Instruction Memorandum 2006-216, Wind Energy Development Policy. August 24, 2006. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2006/2006-216___.html. Accessed on February 20, 2010.

_____. 2007. Instruction Memorandum 2007-097, Solar Energy Development Policy. April 4, 2007. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2007/im_2007-097___.html. Accessed on February 20, 2010.

_____. 2009a. Instruction Memorandum 2009-022, Geothermal Leasing under the Energy Policy Act of 2005. October 9, 2008. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2009/IM_2009-022.html. Accessed on February 20, 2010.

_____. 2009b. Instruction Memorandum 2009-043, Wind Energy Development Policy. December 19, 2008. Internet Web site: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2009/IM_2009-043.html. Accessed on February 22, 2010.

_____. 2010. Geographic Information System. Unpublished Data. BLM, Uncompahgre Field Office, Colorado.

BLM (US Department of the Interior, Bureau of Land Management) and DOE (US Department of Energy). 2003. Renewable Potential Energy Assessment. Available at Internet Web site: http://www.nrel.gov/docs/fy03osti/33530.pdf.

_____. 2010. Solar Energy Development Programmatic EIS Information Center. Internet Web site: http://solareis.anl.gov/. Accessed on February 22, 2010.

Blackwell, D. D., and Richards, M. 2004. Geothermal Map of North America. American Assoc. Petroleum Geologist (AAPG), 1 sheet, scale 1:6,500,000.

Colorado Gap Analysis Project. 1999. Vegetation data. Accessed through the UFO BLM GIS server.

Colorado Geological Survey. 2007. Geographic Information System (GIS) shape file boundary to define the area of geothermal potential for the Final Programmatic EIS for Geothermal Leasing in the Western US. Provided by Matt Sares of the Colorado Geological Survey to EMPSi. November 28, 2007.

_____. 2008. Interpretive Geothermal Heat Flow Map of Colorado. November 14, 2008.

DOE (US Department of Energy). 1986. Wind Energy Resource Atlas of United States. Internet Web site: http:/rredc.nrel.gov/wind/pubs/atlas/atlas_index.html. Accessed on February 23, 2010.

_____. 2010. Solar Energy Technologies Program. Internet Web site: http://www1.eere.energy.gov/solar/technologies.html. Accessed on January 15, 2010.

First Solar Inc. 2009. Personal communication between Leilah Krohn of First Solar and Amanda Davila of EMPSi. December 9, 2009.

NREL (US Department of Energy, National Renewable Energy Laboratory). 2006. Geothermal – The Energy Under our Feet: Geothermal Resource Estimates for the United States. Technical Report NREL/TP-840-40665. By Bruce Green and Gerald Nix. November 2006.

_____. 2009a. Data Analysis and Tools: download data and tools. Internet Web site: http://www.nrel.gov/gis/data_analysis.html. Accessed on November 2, 2009.

_____. 2009b. Dynamic Maps, GIS Data, and Analysis Tools. Wind Maps. Internet Web site: http://www.nrel.gov/gis/wind.html. Accessed on December 9, 2009.

_____. 2010a. Concentrating Solar Power Resource Maps. Internet Web site: http://www.nrel.gov/csp/maps.html. Accessed on February 23, 2010.

_____. 2010b. United States Atlas of Renewable Resources. Internet Web site: http://mapserve2.nrel.gov/website/Resource_Atlas/viewer.htm. Accessed on February 23, 2010.

_____. 2010c. United States Annual Wind Resource Potential. Internet Web site: http://mapserve2.nrel.gov/website/wind_resource1/viewer.htm. Accessed on February 23, 2010.

University of Utah Energy and Geoscience Institute. 2007. Enhanced Geothermal Systems. Available at: http://egs.egi.utah.edu/home/main2.htm. Website accessed on December 18, 2007.

US Department of Agriculture. 2009. Vegetation Condition from AVHRR NDVI Data. National Agricultural Statistics Service. Research and Development Division. Internet Web site: http://www.nass.usda.gov/research/avhrr/avhrrmnu.htm. Accessed on December 16, 2009.

US Department of Energy. 2006. The Future of Geothermal Energy: Impact of Enhanced Geothermal Systems (EGS) on the United States in the 21st Century. Prepared for the US DOE and Idaho National Laboratory by the Massachusetts Institute of Technology.

_____. 2007. Enhanced Geothermal Systems Technology. Available at: http://www1.eere.energy.gov/geothermal/egs_technology.html. Website accessed on December 18, 2007.

University of Oregon. 2002. Solar Radiation Monitoring Laboratory. Internet Web site: http://solardat.uoregon.edu/SolarRadiationBasics.html. Accessed on January 15, 2010.

Western Governors' Association. 2006. Geothermal Task Force Report. January 2006.

This page intentionally left blank.

# REASONABLE FORESEEABLE DEVELOPMENT SCENARIO FOR OIL AND GAS FOR THE UNCOMPAHGRE FIELD OFFICE, COLORADO



Mancos Shale along the North Fork of the Gunnison River north of Paonia on State Highway 133.



Dakota Sandstone along U.S. 550 near Ridgeway showing coal seam near base of section.



Mesaverde Group showing paleo-river channel along State Highway 133 near McClure Pass.

**DEAN P. STILWELL,
ALFRED M. ELSER, Ph.D.,
AMBER L. ROBBINS, and
STAN W. DAVIS-LAWRENCE**

**UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

## FINAL REPORT

**February 16, 2012**

# UNITED STATES DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT

## *WYOMING STATE OFFICE*
## *RESERVOIR MANAGEMENT GROUP*

# FINAL
## Reasonable Foreseeable Development Scenario for Oil and Gas, Uncompahgre Field Office, Colorado
## February 16, 2012

**Prepared By:**

| Signature | Signature | Signature | Signature |
|---|---|---|---|
| Dean P. Stilwell | Alfred M. Elser, Ph.D | Amber L. Robbins | Stan W. Davis-Lawrence |
| Name | Name | Name | Name |
| Geologist, PG-1070 | Geologist | Geologist | Petroleum Engineer |
| Title | Title | Title | Title |
| 02/16/2012 | 02/16/2012 | 02/16/2012 | 02/16/2012 |
| Date | Date | Date | Date |

**Reviewed By:**

Signature

J. David Chase
Name

Chief Reservoir Mgmt. Group
Title

02/16/2012
Date

**INTRODUCTION**   **8**

**GEOLOGIC OVERVIEW**   **11**

**EXPLORATORY AND PRODUCTION ACTIVITY AND OPERATIONS**   **12**

**EXPLORATORY ACTIVITY AND OPERATIONS**   **12**
**FEDERAL DEVELOPMENT CONTRACTS**   **19**
**FEDERAL OIL AND GAS UNIT AGREEMENTS**   **19**
**TYPICAL DRILLING AND COMPLETION SEQUENCE**   **21**
**DRAINAGE PROTECTION**   **22**
**HISTORICAL DRILLING AND COMPLETION ACTIVITY AND TECHNIQUES EMPLOYED FOR CONVENTIONAL OIL AND GAS**   **23**
EARLY EXPLORATION AND DEVELOPMENT ACTIVITY   23
PRODUCING ZONES   24
TECHNOLOGY DEVELOPMENT   25
DRILLING AND COMPLETION ACTIVITY   27
MARGINAL WELLS   28
DEEP WELL DRILLING: GREATER THAN 15,000 FEET   29
DEEP WELL DRILLING AND COMPLETION ACTIVITY: 10,000 TO 15,000 FEET   29
SHALLOWER WELL DRILLING: 5,000 TO 9,999 FEET   29
SHALLOWEST WELL DRILLING: LESS THAN 5,000 FEET   30
SUMMARY OF CURRENT DRILLING TECHNIQUES   31
Directional and Horizontal Drilling and Completion Activity   31
Slimhole Drilling and Coiled Tubing   33
Light Modular Drilling Rigs and Pad Drilling   33
Pneumatic Drilling   34
Measurement-While-Drilling   34
Improved Drill Bits   34
SUMMARY OF CURRENT COMPLETION TECHNIQUES   35
DRILLING AND COMPLETION COSTS   35
**SUMMARY OF CONVENTIONAL OIL AND GAS PRODUCTION AND ABANDONMENT TECHNIQUES**   **36**
HYDROGEN SULFIDE OCCURRENCE   38
CARBON DIOXIDE   38
ACID GAS REMOVAL AND RECOVERY   39
ARTIFICIAL LIFT OPTIMIZATION   39
GLYCOL DEHYDRATION   40
PRODUCED WATER MANAGEMENT   40
LEAK DETECTION AND LOW-BLEED EQUIPMENT   41
VAPOR RECOVERY UNITS   41
**UNDERGROUND GAS STORAGE**   **41**

**PREVIOUS ASSESSMENTS OF OIL AND GAS RESOURCES**     **42**

**RECOVERABLE NATURAL GAS RESOURCES – ENERGY INFORMATION ADMINISTRATION, POTENTIAL GAS COMMITTEE, AND NATIONAL PETROLEUM COUNCIL**     **42**

ASSUMPTIONS TO THE ANNUAL ENERGY OUTLOOK 2010 WITH PROJECTIONS TO 2035 ENERGY INFORMATION ADMINISTRATION (2010)     42

THE NATIONAL PETROLEUM COUNCIL (2003)     43

**ATLAS OF MAJOR ROCKY MOUNTAIN GAS RESERVOIRS (1993)**     **44**

**MAJOR OIL PLAYS IN UTAH AND VICINITY: QUARTERLY TECHNICAL PROGRESS REPORTS (2003-2008)**     **45**

**INVENTORY OF ONSHORE FEDERAL OIL AND NATURAL GAS RESOURCES AND RESTRICTIONS TO THEIR DEVELOPMENT: PHASE III INVENTORY— ONSHORE UNITED STATES (2008)**     **47**

**OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE DEVELOPMENT SCENARIOS IN THE SAN JUAN NATIONAL FOREST AND BLM PUBLIC LANDS, COLORADO (2006)**     **48**

**RESOURCE POTENTIAL AND GEOLOGY OF THE GRAND MESA, UNCOMPAHGRE, AND GUNNISON (GMUG) NATIONAL FORESTS AND VICINITY, COLORADO (2004)**     **49**

**PETROLEUM SYSTEMS AND GEOLOGIC ASSESSMENT OF OIL AND GAS IN THE UINTA-PICEANCE PROVINCE, UTAH AND COLORADO (2002)—ALONG WITH THE PARADOX BASIN (1995) UNITED STATES GEOLOGICAL SURVEY**     **49**

**A NEW APPROACH TO ASSESSING GAS AND OIL RESOURCES IN THE INTERMOUNTAIN WEST (2001): RAND SCIENCE AND TECHNOLOGY ASSESSMENT**     **50**

**ASSESSMENT OF THE COALBED NATURAL GAS RESOURCE**     **51**

**COALBED NATURAL GAS ACTIVITY**     **51**

**SUMMARY OF COAL FIELDS IN THE STUDY AREA**     **53**

GRAND MESA COAL FIELD     53

SOMERSET COAL FIELD     54

CARBONDALE COAL FIELD     54

NUCLA-NATURITA COAL FIELD     54

TONGUE MESA COAL FIELD     55

**OIL AND GAS OCCURRENCE POTENTIAL**     **56**

**PROJECTIONS OF FUTURE OIL AND GAS ACTIVITY 2012-2031**     **57**

**OIL AND GAS PRICE ESTIMATES**     **58**

GAS PRICES                                                                    58
OIL PRICES                                                                    59
**LEASING**                                                                   **60**
**PROJECTIONS OF FUTURE OIL AND GAS DRILLING ACTIVITY**                       **61**
PROJECTED OIL AND GAS DRILLING ACTIVITY                                       61
PROJECTED COALBED NATURAL GAS DRILLING ACTIVITY                               64
**PROJECTIONS OF FUTURE OIL AND GAS PRODUCTION**                              **66**
**ESTIMATED FUTURE CONVENTIONAL OIL AND GAS PRODUCTION**                      **67**
**OTHER POTENTIAL FUTURE OIL AND GAS ACTIVITIES**                             **67**
RESOURCE PLAYS                                                                67
COAL GASIFICATION                                                             71
CARBON DIOXIDE SEQUESTRATION                                                  71


**POTENTIAL OIL AND GAS SURFACE DISTURBANCE**                                 **72**


**WELL ASSUMPTIONS – WELLS DRILLED, WELLS DRILLED PER DISTURBED SITE (PAD),**
**COMPLETION SUCCESS, AND BUREAU AND FOREST SERVICE MANAGED OIL AND GAS**
**MINERALS**                                                                  **73**
**SURFACE DISTURBANCE ASSUMPTIONS**                                           **75**
DRILL PADS                                                                    75
ACCESS ROADS (ALL WELL CATEGORIES)                                            75
PIPELINES                                                                     76
**ANALYSIS RESULTS**                                                          **76**


**SUMMARY**                                                                   **77**


**APPENDIX 1 – U.S. GEOLOGICAL SURVEY ASSESSMENTS OF**
**UNDISCOVERED TECHNICALLY RECOVERABLE OIL AND GAS**
**RESOURCES WITHIN THE UNCOMPAHGRE STUDY AREA**                               **78**


**INTRODUCTION**                                                              **78**
**PARADOX BASIN PROVINCE ASSESSMENT**                                         **79**
PLAY SUMMARY                                                                  79
PLAY DESCRIPTIONS                                                             80
*Salt Anticline Flank*                                                        80
*Buried Fault Blocks*                                                         80
*Fractured Interbed*                                                          80
*Porous Carbonate Buildup*                                                    81
*Permian-Pennsylvanian Marginal Clastics*                                     81
PLAY RESOURCE RESULTS                                                         81
**UINTA-PICEANCE BASIN PROVINCE ASSESSMENT**                                  **82**
PLAY SUMMARIES                                                                83
TOTAL PETROLEUM SYSTEMS AND ASSESSMENT UNIT SUMMARIES                         83
*Mesaverde Total Petroleum System*                                           83

*Mancos/Mowry Total Petroleum System*         86
*Phosphoria Total Petroleum System*         87
ASSESSMENT UNIT RESOURCE RESULTS         89

**REFERENCES**         **91**

**GLOSSARY**         **103**

## Figure List

**Figure 1.**  The Uncompahgre Field Office and its location within Colorado.
**Figure 2a.**  Location of Uncompahgre Study Area within Uncompahgre Field Office.
**Figure 2b.**  Location of oil and gas mineral ownership within the Uncompahgre Study Area.
**Figure 3a.**  Location and initial status of all conventional oil and gas wells drilled within the Uncompahgre Study Area.
**Figure 3b.**  Location and initial status of all coalbed natural gas wells drilled within the Uncompahgre Study Area.
**Figure 4.**  Major structural elements and selected geologic units of the Uncompahgre Study Area.
**Figure 5.**  Generalized stratigraphic chart of the Paradox basin within the Study Area (after Huffman, 1995; Stevenson and Wray, 2009), with hydrocarbon and carbon dioxide producing zones.
**Figure 6a.**  Generalized stratigraphic chart of the Piceance basin within the Study Area (after Johnson and Roberts, 2003), with hydrocarbon producing zones.
**Figure 6b.** Generalized stratigraphic chart of the Mesaverde Group of the Piceance basin within the Study Area (after Hettinger and Kirschbaum, 2002; Cole and Cumella, 2003), with hydrocarbon producing zones.
**Figure 7.**  Oil and gas fields within the Uncompahgre Study Area.
**Figure 8.**  Location and initial classification of Uncompahgre Study Area oil, gas, and coalbed natural gas wells spudded between January 1, 2000 and December 31, 2009.
**Figure 9.**  Location and present status of Uncompahgre Study Area oil, gas, and coalbed natural gas wells spudded between January 1, 2000 and December 31, 2009.
**Figure 10.**  Location of oil and gas units and a communitization agreement within the Uncompahgre Study Area.
**Figure 11.**  Conventional and coalbed natural gas wells spud by decade within the Uncompahgre Study Area.
**Figure 12.**  Conventional and coalbed natural gas wells spud within the Uncompahgre Study Area for 2000-2009.
**Figure 13.**  Uncompahgre Study Area locations of all conventional gas and coalbed natural gas wells that have been spudded and not completed and those still in an active status.
**Figure 14.**  True vertical depths of vertical, directional, and horizontal wells drilled within the Uncompahgre Study Area.

**Figure 15.** Existing and proposed directional and horizontal borehole locations within the Uncompahgre Study Area.

**Figure 16.** Geographic distribution of water quality samples across the Uncompahgre Study Area and distribution of sample salinity.

**Figure 17.** Location of coal fields within the Uncompahgre Field Office.

**Figure 18.** Potential for occurrence of oil and gas (excluding coalbed natural gas) within the Uncompahgre Study Area.

**Figure 19.** Potential for occurrence of coalbed natural gas within the Uncompahgre Study Area.

**Figure 20.** Colorado historical natural gas prices with future natural gas price projections (Energy Information Administration, 2011).

**Figure 21.** Colorado historical crude oil prices with future oil price projections (Energy Information Administration, 2011).

**Figure 22.** Leased and unleased Federal oil and gas minerals within the Uncompahgre Study Area.

**Figure 23a.** Conventional oil and gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.

**Figure 23b.** Conventional oil and gas development potential and projected drilling densities on Bureau managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Figure 23c.** Conventional oil and gas development potential and projected drilling densities on Forest Service managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Figure 24a.** Coalbed natural gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.

**Figure 24b.** Coalbed natural gas development potential and projected drilling densities on Bureau managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Figure 24c.** Coalbed natural gas development potential and projected drilling densities on Forest Service managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

## Table List

**Table 1.** Historical conventional oil, gas, and water production from formations within the Uncompahgre Study Area.

**Table 2.** Historical coalbed natural gas, oil, and water production from formations within the Uncompahgre Study Area.

**Table 3.** Estimated conventional oil and gas development potential classification acres, number of townships, projected average drilling densities, and percentage of the entire Uncompahgre Study Area for each development potential classification type for the period 2010 through 2030.

**Table 4.** Estimated coalbed natural gas development potential classification acres, number of townships, projected average drilling densities, and percentage of the Uncompahgre Study Area within each development potential classification type for the period 2010 through 2030.

**Table 5.** Annual conventional and coalbed natural gas well spuds projected for the Uncompahgre Study Area.

**Table 6a.** Annual conventional natural gas and oil production projected for the Uncompahgre Study Area.

**Table 6b.** Annual conventional natural gas and oil production projected for wells on Bureau managed oil and gas minerals the Uncompahgre Study Area.

**Table 7a.** Annual coalbed natural gas production and associated oil production projected for the Uncompahgre Study Area.

**Table 7b.** Annual coalbed natural gas production and associated oil production projected for wells on Bureau managed oil and gas minerals in the Uncompahgre Study Area.

**Table 8a.** Uncompahgre Study Area surface disturbance associated with new drilled wells and existing wells for the baseline scenario (short-term disturbance) for the 2010-2030 period.

**Table 8b.** Uncompahgre Study Area surface disturbance associated with new active wells and existing wells determined to remain in an active status for the baseline scenario (long-term disturbance) for the 2010-2030 period.

## Appendix 1 Figure List

**Figure A1-1.** Location of the Uinta-Piceance 2002 and Paradox Basin 1995 province boundaries within the Uncompahgre Study Area.

**Figure A1-2.** Location of the 1995 Paradox Basin Province Salt Anticline Flank, Buried Fault Blocks, and Fractured Interbedded Plays within the Uncompahgre Study Area.

**Figure A1-3.** Location of the 1995 Paradox Basin Province Carbonate Buildup and Permian-Pennsylvanian Margin Clastic Plays within the Uncompahgre Study Area.

**Figure A1-4.** Location of the 1995 Piceance Basin Province conventional accumulation plays within the Uncompahgre Study Area.

**Figure A1-5.** Location of the 1995 Piceance Basin Province continuous accumulation plays within the Uncompahgre Study Area.

**Figure A1-6.** Location of the 2002 Uinta-Piceance Basin Mesaverde Total Petroleum System within the Uncompahgre Study Area.

**Figure A1-7.** Location of the 2002 Uinta-Piceance Basin Mesaverde Total Petroleum System Coalbed Gas Assessment Unit within the Uncompahgre Study Area.

**Figure A1-8.** Location of the 2002 Uinta-Piceance Basin Mancos/Mowry Total Petroleum System within the Uncompahgre Study Area.

**Figure A1-9.** Location of the 2002 Uinta-Piceance Basin Phosphoria Total Petroleum System within the Uncompahgre Study Area.

## Appendix 1 Table List

**Table A1-1.** U.S. Geological Survey 1995 assessment of undiscovered conventional accumulation plays in the Paradox Basin Province, Uncompahgre Study Area.

**Table A1-2.** U.S. Geological Survey 1995 assessment of undiscovered conventional and continuous resource plays in the Paradox Basin Province and Uncompahgre Study Area.

**Table A1-3.** U.S. Geological Survey 2002 assessment of undiscovered conventional accumulation assessment units in the Uinta-Piceance Basin Province, Uncompahgre Study Area.

**Table A1-4.**  U.S. Geological Survey 2002 assessment of undiscovered continuous accumulation assessment units in the Uinta-Piceance Basin Province, Uncompahgre Study Area.

**Table A1-5.**  U.S. Geological Survey 2002 assessment of undiscovered conventional and continuous resource assessment units in the Uinta-Piceance Basin Province and Uncompahgre Study Area.

# INTRODUCTION

The Uncompahgre Planning Area (hereafter the Planning Area) represents the lands managed by the Uncompahgre Field Office of the Colorado Bureau of Land Management (hereafter the Bureau).  The Uncompahgre Field Office (Figure 1) is responsible for managing more than 900,000 acres of public land in southwestern Colorado, including the Gunnison Gorge National Conservation Area and Wilderness, as well as portions of the newly designated Dominguez-Escalante National Conservation Area and Dominguez Canyon Wilderness Area and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre).

 A Resource Management Plan and associated Environmental Impact Statement are currently being prepared for the Planning Area.  The Resource Management Plan will replace the existing 1985 San Juan/ San Miguel Resource Management Plan and the 1989 Uncompahgre Basin Resource Management Plan.  The lands studied for this analysis will henceforth be called the Study Area.  The Study Area (Figure 2a) is located in Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties, Colorado.  The area encompasses approximately 675,677 acres of public land, and excludes the Gunnison Gorge National Conservation Area and the Dominguez-Escalante National Conservation Area, which are managed under separate Resource Management Plans.

In support of the Resource Management Plan revision, this reasonable foreseeable development projection technically analyzes the oil and gas resource known to occur and potentially occurring within the Study Area and projects future development potential (See Glossary for development potential) and activity levels for the period 2010 through 2030.

Hydrocarbon activities and projections of future development will be discussed separately for coalbed natural gas (see Glossary for coalbed natural gas and natural gas) and for all other types of oil and gas (hereafter referred to as conventional oil and gas).  When both types of hydrocarbon are being referenced, we will hereafter refer to them as oil and gas.  Figure 3a presents historic and present conventional oil and gas related development areas for all lands within the Study Area.  Figure 3b presents historic and present coalbed natural gas related development areas for all lands within the Study Area.

Our analysis makes a base line projection that assumes future conventional oil and gas and coalbed natural gas related activity levels on all assessed lands within the Study Area will not be constrained by management-imposed conditions (Rocky Mountain Federal Leadership Forum, 2004).  National Forest lands, other Federal agency lands, and State and Private managed lands are included in the base line projection for those lands assessed for future development.  Certain other federally managed lands within the Study Area are not assessed for the potential for future reasonable foreseeable conventional oil and gas and coalbed natural gas related development.  Those lands with legislatively imposed restrictions (no leasing) are not included in this base line projection since activities will not be allowed in the foreseeable future.  Those restricted lands are National Forest managed wilderness, Bureau managed wilderness and wilderness study

areas, and Black Canyon of the Gunnison National Park (Figure 2a). In addition, a separate baseline projection is made for just those lands managed by the Bureau.

The reasonable foreseeable development evaluation and projections presented below review and analyze past, present, and potential future exploratory, development, and production operations and activities. It also presents occurrence potential (See Glossary for occurrence potential) for conventional oil and gas, coalbed natural gas, and deep conventional oil and gas (at depths greater than 15,000 feet) as well as available estimates of the hydrocarbon resources that may be present within the Study Area. Additional factors used to project future activities include (but are not limited to) a review of published resource information (including a number of on-line databases) for the area, a call for data from conventional oil and gas and coalbed natural gas operators, a review of petroleum (see Glossary) technology research and development, geophysical activity, and limitations on access and infrastructure. It must be emphasized that the reasonable foreseeable development projections presented are possible and/or likely to happen and should not be considered to be worst-case scenarios, but reasonable and science based projections of the anticipated activity that use logical and technically based assumptions to make those projections (Rocky Mountain Federal Leadership Forum, 2004). Finally, projections of future activity levels for each resource management plan alternative are presented.

The Study Area contains about 3,099,400 surface acres of all mineral ownership types (Figure 2b). Mineral ownership types were obtained from the Bureau's Colorado State Office. This data base may not be a complete and accurate representation of all Federal oil and gas minerals within the Study Area. Oil and gas mineral ownership is not included for lands within the Gunnison Gorge National Conservation Area Planning Area or the Dominguez-Escalante National Conservation Area.

The Study Area contains about 2,162,580 acres of Federal oil and gas mineral ownership (Figure 2b), or about 71 percent of total acres. The remaining 936,820 acres (29 percent) is managed by state and private interests. The Bureau manages a portion of the Federal oil and gas mineral lands in the Study Area (904,096) acres, or about 41.8 percent of the 2,162,580 acres. The Bureau manages all oil and gas minerals beneath BLM Wilderness on Figure 2b. We assume that about 236,614 acres of state and private surface lands within Study Area boundaries overlie Bureau managed oil and gas mineral lands. All Bureau managed oil and gas mineral lands will be covered by decisions made in the associated Resource Management Plan Environmental Impact Statement.

The U.S. Forest Service manages about 1,229,892 acres (Figure 2b), or 56.9 percent of Federal oil and gas mineral lands within the Study Area. The Forest Service manages all oil and gas minerals beneath Forest Service Wilderness on Figure 2b. About 27,123 acres (1.3 percent) are managed by the National Park Service. Decisions made as part of the Resource Management Plan Environmental Impact Statement for the Study Area will not be made for these lands.

We would like to thank Ms. Cathy Stilwell of the Bureau of Land Management Wyoming State Office Reservoir Management Group staff for the important Geographic Information System contributions that she has made to this reasonable foreseeable development analysis. In addition we would like to thank Thane Stranathan of the Bureau of Land Management Uncompahgre Field Office staff for his assistance in preparing the analysis for the surface disturbance section of this document. We would also like to thank Ryan Taylor (USFS Paonia Ranger District Geologist), Pam Leschak (Bureau of Land Management Tres Rios Field Office Fluid Minerals Geologist), and Pat Gallagher (Bureau of Land Management Colorado State Office Petroleum Engineer) for their comments on the draft of this report.

# GEOLOGIC OVERVIEW

Most of the Study Area is within the Colorado Plateau physiographic province, a region of distinct topography and geology. The Colorado Plateau is actually a large basin ringed by highlands and containing many plateaus within western Colorado, northwestern New Mexico, southern and eastern Utah, and northern Arizona. The portion of the Study area lying in and around the Black Canyon of the Gunnison and the area to the east lies within the Southern Rocky Mountains physiographic province.

The major structural elements (uplifts, basins, anticlines, synclines, and faults) and Precambrian, Tertiary igneous, and Mesaverde rock outcrops of the Study Area are shown on Figure 4. The Paradox basin lies mostly in eastern Utah and southwestern Colorado. It has been further divided into smaller tectonic divisions, with the Paradox Fault and Fold Belt area located in the northern part of the larger Paradox basin. The Fault and Fold Belt includes the Nucla-Naturita and Norwood parts of the Study Area and lands to the north as far as the Uncompahgre Uplift. This area is also often termed the Salt Anticline region because it contains a number of salt cored anticlines such as the Paradise Valley Salt Cored Anticline on the southwest side of the Study Area.

Local topography in the Paradox basin portion of the Study Area is dominated by fairly flat or gently dipping mesas that are dissected by steep canyons. Cretaceous aged rock dominates the mesa areas, with older rocks outcropping in the canyons. The Paradox basin developed during Pennsylvanian-Permian time and has been modified by later uplifts. It is a strongly asymmetrical basin with its thickest sequence of sedimentary deposits on its northeast flank and near the adjacent Uncompahgre uplift (Figure 4). Structural relief has been estimated to be greater than 25,000 feet (Molenaar, 1972). Numerous surface igneous dikes and faults are located in the southeast part of the basin in the Sawpit region of the Study Area. Very little historic oil and gas production is reported from the portion of the Paradox basin lying within the Study Area.

The Uncompahgre uplift trends in a northwesterly direction along the northeastern border of the Paradox basin and it lies partly in Colorado and Utah. It occupies the central part of the Study Area. The uplift's southwestern boundary is defined by the thrust fault shown in Figure 4. Major uplift occurred during the Pennsylvanian and Permian (Stone, 1977). "During the Laramide orogeny, the uplift was regionally tilted to the northeast," (Stone, 1977). The Uncompahgre uplift contains a Precambrian core, with Precambrian outcrops shown on Figure 4. No historic oil and gas production has been reported from that portion of the Uncompahgre uplift lying within the Study Area.

The western parts of the San Juan Volcanic Field lie along the eastern border of the Study Area. The area was blanketed by thick volcanic sequences erupted from multiple centers to the southeast and east. The volcanic activity that deposited these sequences occurred from about 30 to 22 million years before present. No historic oil and gas production has been reported from that portion of the San Juan Volcanic Field lying within the Study Area.

The Gunnison uplift runs in a northwest-southeast direction, sub parallel to the Grand Mesa syncline (Figure 4). Precambrian rocks outcrop in the core of the uplift. About 60 million years ago, during the Laramide Orogeny, these rocks were uplifted to near the surface. The area was later covered by volcanic rocks that produced the San Juan Volcanic Field. Over time most of the volcanic deposits have been eroded from the area and the Gunnison River has cut down through the Precambrian rocks, creating today's Black Canyon of the Gunnison. No historic oil and gas production has been reported from that portion of the Gunnison uplift lying within the Study Area.

The Piceance basin lies in the northernmost part of the Study Area. The outcrop of the Mesaverde Formation marks the approximate southern boundary of the Piceance basin in the Study Area (Figure 4). The Piceance basin is northwest-trending, is asymmetric in shape (gently dipping strata on its southwest limb), and is Laramide in age. Maximum thickness of sediments in the basin is 27,000 feet (Dunn, 1972) although maximum thickness in the Study Area is much less (probably less than 20,000 feet). Present oil and gas production and coalbed natural gas production in the Study Area comes from Piceance basin sediments.

# EXPLORATORY AND PRODUCTION ACTIVITY AND OPERATIONS

The following discussion brings together known information on past and present exploratory and production operations and activity for the Study Area. Information is presented in the approximate sequence that occurs when project areas or fields (see Glossary) are explored and then developed. The sequence begins when initial exploratory activity begins, and ends when projects are abandoned.

## EXPLORATORY ACTIVITY AND OPERATIONS

The petroleum industry in the United States has historically relied on continual improvements in technology to better understand the oil and gas resource locked in the earth and to find and produce it. Some of the biggest breakthroughs have been:
- the anticlinal theory (1885) that oil and gas tend to accumulate in anticlinal structures, which allowed drillers to locate better drilling spots with improved opportunities to find oil and gas;
- rotary drilling rigs (1900s), which became the chief method of drilling deeper wells (see Glossary for rotary drilling rig);
- seismograph (1914), which allowed one dimensional subsurface imaging;
- well logging (1924), which allowed measurement of subsurface rock and fluid properties;
- offshore drilling (1930s), which allowed drillers to access new areas and basins;
- digital computing (1960s), which allowed two dimensional imaging of data;
- directional drilling (1970s), which allowed more cost efficient management of reservoirs;

- three dimensional seismic (1980s), which allowed more accurate subsurface imaging;
- three dimensional modeling and four dimensional seismic (1990s), which allowed the prediction of fluid movement in the subsurface;
- identification of new types of reservoirs and improved exploitation methods (1990s to present) allowed development of heavy oil, tight gas, shale gas, coalbed natural gas, shale oil, and the use of carbon dioxide in the flooding process to increase recoveries; and
- multi-discipline collaboration (2000s), which allows for better drilling decisions, higher success rates, improved risk assessment, and enhanced reservoir development.

Exploratory activity includes:
- the study and mapping of surface and subsurface geologic features to recognize potential oil and gas traps,
- determining a geologic formations potential for containing economically producible oil and gas,
- pinpointing locations to drill exploratory wells to test all potential traps,
- drilling additional wells to establish the limits of each discovered trap,
- testing wells to determine geologic and engineering properties of geologic formation(s) encountered, and
- completing wells that appear capable of producing economic quantities of oil and gas.

A number of components can control and characterize potential oil and gas accumulations (see Glossary) in the Study Area.  Those major components of accumulations can be:

1. Locations of major tectonic features (Figure 4) that have developed over many millions of years.  Some features (anticlines and faults) may improve opportunities for the development of oil and gas reservoirs while others (igneous intrusive and Precambrian rocks) may indicate reduced opportunities for the development of reservoirs.
2. The Paradox and Piceance basins contain thick sections of sediments (Molenaar, 1972 and Dunn, 1972).  In the Paradox basin, thick accumulations of Paleozoic and Mesozoic aged carbonates, sandstones, and shales (potential source and reservoir rocks) exist, with thin near surface coals present in the Dakota Sandstone.  Figure 5 presents a stratigraphic chart for the Paradox Basin portion of the Study Area showing nomenclature used for these accumulations in our report.  Hydrocarbon producing zones (including carbon dioxide production) in the Paradox basin are also shown.  Although few of these zones have been productive in the Study Area, there is potential that additional production from some of these zones could be obtained in the future.
3. The Piceance basin contains thick accumulations of Paleozoic and Mesozoic aged carbonates, sandstones, and shales (potential source and reservoir rocks) exist, with coals present in the Mesaverde Group.  Figure 6a presents a stratigraphic chart for the Piceance basin part of the Study Area showing nomenclature used

for these accumulations in our report. Although no Paleozoic or Cenozoic zones have been productive in the Study Area, there is potential that production from some of these zones could be obtained in the future. Mesozoic zones (Mesaverde Group, Mancos Shale, Dakota Sandstone, and Morrison Formation) have had the only historic production within the Study Area. The predominate hydrocarbon producers in the Study Area have been units within the Mesaverde Group. Since this group has a complicated depositional history authors have been able to further subdivide this group into formations and members (Figure 6b), all of which have been productive, from coal beds and/or sandstones.

4. Figure 7 shows all oil and gas fields lying within or partly within the Study Area. These fields help define areas were there has been the greatest historical interest in exploring for and developing the oil and gas resource within the Study Area. Most fields lie within the Piceance basin on the north end of the Study Area.

5. Burial and thermal histories that could promote the development and preservation of diagenetic pore-throat traps (see Glossary) and oil and gas generation in the center of the Piceance and Paradox basins.

6. Structure traps (see Glossary), that have played a role in localizing some oil and gas accumulations within the Study Area.

7. Stratigraphic traps (see Glossary), have played a role in exploration and development activities within the Study Area.

8. Pressure regimes, ranging from slightly under-pressured to highly over-pressured, could be important near the center of the Paradox basin and in deeper zones in that part of the Piceance basin within the Study Area. In areas of abnormally high pressures, productive capacity can be greatly increased. Over-pressuring also creates problems in drilling and completion, increasing the cost of both.

9. Secondary porosity, produced by the dissolution of unstable grains (see Glossary) and rock fragments, is important in local accumulations.

We believe that these components are also important in exploring for and developing new oil and gas resources in the Study Area. In the last 10 years 57 new exploratory and development wells (Figure 8) have been spudded (see glossary). Thirteen wells have been spudded in the Paradox basin part of the Study Area, with 11wells initially classed as new field wildcats, one well classed as a wildcat outpost well, and one as a development well. Three of these wells (one new field wildcat, one wildcat outpost, and one development well) were drilled in the vicinity of Hamilton Creek Field and the remaining nine wildcat wells were scattered across the basin.

Forty-four of the 57 new wells spudded in the past ten years are located in the Piceance basin part of the study area (Figure 8). Twenty-seven of the 44 wells were initially spudded as coalbed gas tests with two being stratigraphic tests (see Glossary), eight new field wildcats, 16 development wells, and the remaining well a deepening of a development well. Seventeen new wells in the area were spudded as conventional well tests, with 12 new field wildcats, one wildcat outpost well, one unclassified well, and three development wells. Most of the new wells in this part of the Piceance basin have been spudded in or around the oil and gas fields shown on Figure 7.

Potential nonconventional (unconventional) gas resources (see Glossary) make up a portion of the hydrocarbon resource that may be explored for and developed in the Study Area in the future. Nonconventional gas is a potentially large resource, although it is technically challenging to develop. Three types of unconventional gas have potential for future development within the Study Area.

1. Tight Sands Gas – formed in sandstone or carbonate (called tight gas sands) with low permeability, which prevents the gas from naturally flowing to a borehole.
2. Coalbed Natural Gas – formed in coal deposits and adsorbed (see Glossary) by coal particles.
3. Shale Gas – formed in fine-grained shale rock (called gas shales) with low permeability in which gas has been adsorbed by clay particles or is held within minute pores and microfractures.

U. S production from the above types of unconventional reservoirs has increased from 15 percent in 1990 to 41 percent in 2004 (Boswell, 2006) and 43 percent in 2006 (Kuuskraa, 2007a). It accounted for more than half of the reported 196 trillion cubic feet of proved natural gas (see Glossary) in the lower 48 states in 2006 (Kuuskraa, 2007b). The tight sands gas and shale gas types of reservoirs have a lower drilling, completion, and operating risk, lower finding costs, and lower reserve decline rates. Technological advances needed to produce these types of reservoirs have been in:

- Reservoir knowledge,
- Hydrofracing,
- Stimulation,
- Horizontal drilling,
- Drilling fluids, and
- Three-dimensional seismic.

Commonly these types of unconventional gas resources have lower reserves (see Glossary) per well and many wells are required to develop the resource. There is a need for well cost and environmental footprint control when developing these resources.

Of the 57 wells spudded in the last 10 years (January 1, 2000 to December 31, 2009), their type, present status, and percentage of the total were:

- Coalbed Gas – Producing              13 wells          22.81 percent,
- Coalbed Gas – Shut-In or
         Waiting on Orders          8 wells           14.04 percent,
- Coalbed Gas – Abandoned          6 wells           10.53 percent,
- Conventional Gas – Producing      5 wells            8.77 percent,
- Conventional – Shut-In,
  Temporarily Abandoned, or
  Waiting on Orders                14 wells          24.56 percent,
- Conventional – Spudded            1 well            1.75 percent,
- Conventional – Abandoned          8 wells           14.04 percent, and
- Injection – Waiting on Orders      2 wells            3.51 percent.

Locations of these wells are shown in Figure 9. To date only 14 wells (24.56 percent) have been abandoned, while the remaining 43 wells (75.46 percent) are still active. There were a total of 36 new field wildcats, wildcat outpost wells, stratigraphic tests, or

unclassified wells drilled for 63.2 percent of the total. Of the 57 boreholes spudded, only one was redrilled as a coalbed natural gas test after an earlier completion as a conventional well. All but three wells were drilled as vertical well tests. The three wells drilled with a directional trajectory are located in the Paradox basin part of the Study Area.

Of the 57 wells spudded in the last 10 years (January 1, 2000 through December 31, 2009), 38.6 percent were drilled in seven fields (Figure 7):

- Spaulding Peak            7 wells,
- Hamilton Creek            3 wells,
- Oil Well Mountain         3 wells,
- Ragged Mountain           3 wells,
- Bull Mountain             2 wells,
- Coal Basin                2 wells, and
- West Muddy Creek          2 wells.

No recent drilling occurred in the three other fields located within the Study Area.

Of the 17 coalbed natural development wells completed during the past 10 years, only two wells (11.76 percent) have been abandoned. An additional 10 wells were drilled as new field wildcats or stratigraphic tests. Four of these wells (40 percent) have been abandoned.

Of the four conventional oil and gas development wells spudded during the past 10 years, all are presently still active (including one spudded well that has not been completed). An additional 24 wells were drilled as wildcats (including one unclassified well). Eight of these wells (33.33 percent) have been abandoned.

Two injection wells have been drilled in the past 10 years and they are classified by the Colorado Oil and Gas Conservation Commission (2010) as waiting on orders.

There were five operators active in the Paradox basin part of the Study Area during the 10-year period from January 1, 2000 to December 31, 2009. They accounted for 13 boreholes drilled there. Encana O & G (USA) Incorporated was the operator for seven wells. Cabot Oil & Gas Corporation and Redwine Resources Incorporated each operated two wells and Cleary Petroleum Corporation and Devon Energy Corporation each drilled one well.

There were only three operators active in the Piceance basin part of the Study Area during the 10-year period from January 1, 2000 to December 31, 2009. They accounted for 44 boreholes drilled there. Gunnison Energy Corporation operated 24 wells, SG Interests I, LTD operated 16 wells, and Aspen Operating Company, LLC operated the remaining four wells.

During the last 10 year period, completions have been made in the Permian Cutler Formation and Pennsylvanian Honaker Trail Formation in the Paradox basin part of the Study Area (Figure 5). In the Piceance basin part of the Study Area, coalbed natural gas

completions have been made in coals of the Upper Cretaceous Mesaverde Group (Figure 6b). Conventional completions have also been made in sandstone members of the Upper Cretaceous Mesaverde Group, the Upper Cretaceous Mancos Shale, and the Lower Cretaceous Dakota Sandstone.

Drilling depths for Paradox basin wells drilled in the last 10-year period from January 1, 2000 to December 31, 2009 have ranged from 6,585 to 14,421 feet. Seven wells were drilled to 10,000 feet or deeper. The deepest well was a new field wildcat drilled near the center of the basin in section 4 of township 47 north, range 19 west as a dry hole (Figure 9) on the south flank of the Paradise Valley Salt Cored Anticline (Figure 4). The deepest completed interval was in the Permian Cutler Formation (10,205 to 10,165 feet) in section 7 of township 44 north, range 14 west (Figure 9) at Hamilton Creek Field (Figure 7).

Drilling depths for Piceance basin coalbed natural gas wells drilled in the last 10-year period from January 1, 2000 to December 31, 2009 have ranged from 2,400 to 7,865 feet. Two coalbed natural gas stratigraphic tests only drilled to 460 and 1,240 feet. Cameo Coal (Figure 6b) completions have been as shallow as the 1,738 to 1,800 foot interval and as deep as the 6,845 to 6,928 foot interval. Drilling depths for other types of wells have been in the 3,000 to 9,800 foot range.

Innovative drilling and completion techniques have enabled the United States oil and gas industry to drill fewer dry holes and to recover more oil and gas reserves per well. Smaller accumulations once thought to be uneconomic can now also be produced. In some cases these improvements have also allowed down spacing to occur. Increased drilling success rates have cut the number of both wells drilled and dry holes (U.S. Department of Energy, 1999). The Energy Information Administration (2007a) has projected the increase in percentage of United States wells drilled successfully will be 0.2 percent per year to 2030.

During the last 10 years, exploratory and development activity has concentrated on that part of the Piceance basin within the Study Area to explore for and develop coalbed natural gas resources and other Cretaceous aged sediments. Additional future exploratory drilling will be required to discover new resources in this area and other parts of the Study Area. Since the risk of failure is higher for these types of exploratory activities, the success rates could decline slightly in the future.

Advances in technology have boosted exploration efficiency, and additional future advances will continue this trend. Significant progress that has and will continue to occur is expected in:
- computer processing capability and speed;
- remote sensing and image-processing technology;
- developments in global positioning systems;
- advances in geographical information systems;

- three-dimensional and four-dimensional time-lapse imaging technology that permits better interpretation of subsurface traps and characterization of reservoir fluid;
- improved borehole logging tools that enhance our understanding of specific basins, plays (see Glossary), and reservoirs; and
- advances in drilling that allow more cost-efficient tests of undepleted zones in mature fields, testing deeper zones in existing fields, and exploring new regions.

New technologies will allow companies to target higher-quality prospects and improve well placement and success rates. As a result, fewer drilled wells will be needed to find a new trap, and total production per well will increase (U.S. Department of Energy, 1999). Also, drilling fewer wells will reduce surface disturbance and volumes of waste, such as drill cuttings and drilling fluids. An added benefit of improved remote sensing technology is the ability to identify any oil and gas "seeps" so that they can be cleaned up. These seeps can also help pinpoint undiscovered oil and gas.

Technology improvements have also cut the average cost of finding oil and gas reserves in the United States. Finding costs are the costs of adding proven reserves of oil and natural gas via exploration and development activities and the purchase of properties that might contain reserves. The U.S. Department of Energy (1999) estimated finding costs were approximately 2 to 16 dollars per barrel of oil equivalent in the 1970's. Finding costs then dropped to 4 to 8 dollars per barrel of oil equivalent in the 1993 to 1997 period. Finding costs then fluctuated around the higher end of this range for a number of years. During the 2003 to 2005 period, finding costs were 7.05 dollars per barrel of oil equivalent and they then increased by 60.9 percent to 11.34 dollars per barrel for the 2004 to 2006 period (Energy Information Administration, 2007b). Since the 2004 to 2006 period finding costs have increased considerably. During the 2005 to 2007 period they went to 13.72 dollars per barrel and then they jumped by 77 percent to 24.31 dollars per barrel for the 2006 to 2008 period (Energy Information Administration, 2009a). Most of this increase was reported to have come from a rise in exploration and development spending, which was amplified by a drop in reserves found. Producers have been willing to spend more to find oil and gas since prices received during this period had been higher.

Once hydrocarbons have been found, acquired, and developed for production the expense of operating and maintaining wells and related equipment and facilities is tracked. This cost is referred to as a lifting or production cost. During 2006, lifting costs in the United States were 9.09 dollars per barrel of oil equivalent, which was an increase of 20.0 percent from a 2005 cost of 7.57 dollars per barrel (Energy Information Administration, 2007b). Lifting costs increased to 12.16 dollars in 2007 and then increased over 24 percent in 2008 to 15.10 dollars (Energy Information Administration, 2009a). Lifting costs have increased in recent years because more producers have been willing to spend more to produce oil and natural gas since their selling prices for oil and gas have been higher.

## FEDERAL DEVELOPMENT CONTRACTS

The United States approves development contracts between operating companies with a number of oil and gas leases sufficient to justify operations for discovery, development, or production of the oil or gas resource. Contracts are approved when the United States determines that conservation of oil and gas products or the public convenience, necessity, or interests of the United States is best served. This program is intended to stimulate exploration on Federal lands. Contracts are usually approved for large, relatively unexplored areas of Federal lands. The contract normally calls for definite exploratory objectives, a timetable for accomplishing those objectives, significant financial expenditures, and it may require a definite drilling obligation. No development contracts presently lie within the Study Area.

## FEDERAL OIL AND GAS UNIT AGREEMENTS

A Federal unit agreement is a contract between the Federal Government and lessees that hold leases over a potential oil and gas reservoir or over oil reservoirs which are candidates for enhanced recovery. Federal units are intended to facilitate the orderly and timely exploration, development, and operation of multiple leases under a single operator. Units may overlie a portion of, or an entire geologic structure. An approved agreement establishes performance obligations, promotes the exploration of unproven acreage or logical enhanced recovery procedures, and permits controlled development of the unit. This process stimulates exploration and/or development of Federal lands and encourages the drilling of the optimum number of wells needed to maximize resource recovery.

A need to conserve oil and gas resources in the United States was identified early in the 20th century and was reinforced by national security issues surrounding the importance of petroleum in fighting the First World War (Avery and Miller, 1934). Congress in 1930 enacted temporary legislation providing for participation in unit operations or cooperative development among lessees of public lands (46 Stat. 1007). The first unit approval (January 6, 1931) in the United States was of the Little Buffalo Basin gas unit in the Bighorn basin of Wyoming. In the following years thousands of units have been created in the United States. Many are still active while others have terminated.

Federal oil and gas leases are incorporated into 11 active conventional oil and gas unit agreement areas that lie wholly within the Field Office boundary (Figure 10). Active units wholly within the Study Area encompass lands totaling 113,438 acres, or approximately 3.7 percent of the total Study Area lands. Additionally, there are two active units with lands partially within the Field Office boundary, but administered by other Field Offices: Hamilton Unit managed by the Dolores Field Office, and Whitewater Unit, managed by the Grand Junction Field Office. Study Area lands within these two units' total 22,589 acres, or approximately 0.7 percent of the total Study Area lands.

All of the above units were initiated as exploratory units and they are in various stages of development. The earliest, the Leon Lake Unit, was approved in 1980. It has since contracted to its producing area. Three other units were also approved in the early 1980s:

Ragged Mountain (1980), Coal Basin (1981), and Hamilton (1983). All three have also contracted to their producing areas. Of the remaining nine active units, all have been formed since 2000 and include the Huntsman (2000), Bull Mountain (2003), Somerset (2008), Whitewater (2008), Horn (2008), Deadman Gulch (2010), Spaulding Peak (2011), Iron Point (2011), and Dugout Creek (2011) units.

Six companies operate the 13 active exploratory gas unit agreement areas. These are: Encana O & G (USA) Incorporated (Hamilton and Horn units), Fram Operating LLC (Whitewater Unit), Gunnison Energy Corporation (Leon Lake, Spaulding Peak, Deadman Gulch, and Iron Point units), Petrox Resources Incorporated (Somerset Unit), Riviera Drilling & Exploration Company (Ragged Mountain Unit), and SG Interests I, LTD (Bull Mountain, Coal Basin, Huntsman, and Dugout Creek units).

The largest of the 13 active exploratory units with lands wholly or partially within the Study Area is the Whitewater Unit. The unit covers over 90,400 acres; approximately 22,419 acres are located in the Study Area. This unit's most recent plan of development indicates few wells will be constructed on lands within the Study Area (Fram Operating, 2011).

The exploratory units in the northern part of the Study Area will target coalbed natural gas, shale gas, and/or Upper Cretaceous aged sandstones of the Mesaverde Group (see Figure 6b). At Spaulding Peak unit Gunnison Energy Corporation has proposed drilling 18 gas wells on 15 locations (15 vertical and three directional wells). The project is still in its early exploratory stage, with one Mancos Shale well that is still in a testing and evaluation stage. If results are encouraging, additional exploration will occur.

At Bull Mountain unit, SG Interests has 11 existing wells capable of producing natural gas. They propose as many as 150 wells on as many as 55 multiple-well pads. This unit lies mostly on private surface.

Gunnison Energy Corporation has drilled one shale gas well in the Iron Point unit. It is still in a testing and evaluation stage.

Ragged Mountain and Coal Basin units produce primarily from sandstones of the Cozzette Member and also from the Corcoran Member (Figure 6b). Coalbed natural gas wells have been drilled in Spaulding, Iron Point, Bull Mountain, and Deadman Gulch units.

No units have been approved for secondary recovery, as gas storage, or just for coalbed natural gas production within the Study Area.

## COMMUNITIZATION AGREEMENTS

Communitization Agreements may be authorized when a Federal lease cannot be independently developed and operated in conformity with an established well-spacing or

well-development program.  In Colorado, the following circumstances can constitute good reason for communitization to occur.

- Communitization is required in order to form a drilling unit that conforms to acceptable spacing patterns (see Glossary) established by State or Bureau order.
- Adequate engineering and/or geological data is presented to indicate that communitizing two or more leases or unleased Federal acreage will result in more efficient reservoir management of an area.
- Communitization is required when the logical spacing for a well includes both unit and non-unit land.

At present, only one active communitization agreement lies within the Study Area (Figure 10).  This agreement covers an area of about 160 acres and was established for the Corcoran and Cozzette members of the Upper Cretaceous Iles Formation.  The operator is Riviera Drilling & Exploration Company.

## TYPICAL DRILLING AND COMPLETION SEQUENCE

Before an oil or gas well is drilled, an Application for Permit to Drill must be approved by the Colorado Oil and Gas Conservation Commission http://cogcc.state.co.us/.  If the well will be located on Federal lands, an Application for Permit to Drill must also be approved by the Bureau.  Not every approved application is actually drilled.  The drilling and completion sequence for a targeted reservoir in the Study Area generally involves:

- constructing the well pad, associated reserve pits, and the access road prior to moving the drilling equipment on to the well location;
- using rotary equipment, hardened drill bits, weighted drill pipe/collars, and drilling fluids to cool and lubricate the drill bit, which all result in easier penetration of the earth's surface;
- for horizontal boreholes, geosteering (intentional directional control of the borehole based on the results of downhole geological logging measurements) the drill bit to maintain correct hole trajectory and keep a borehole in a particular reservoir to maximize economic production;
- inserting casing and cementing it in place to protect the subsurface and control the flow of fluids (oil, gas, and water) from the reservoir;
- perforating the well casing at the depth of the producing formation to allow flow of fluids from the formation into the borehole (many horizontal well completions do not contain casing in the horizontal part of the borehole);
- hydraulically fracturing and propping fractures open with sized particles and/or acidizing the formation to increase permeability and the deliverability of oil and gas to the borehole;
- inserting tubing into each well to allow for controlled flow of fluids (oil, gas, and water) from the reservoir to the surface;
- installing a wellhead at the surface to regulate and monitor fluid flow and prevent potentially dangerous blowouts;
- reclaiming the portions of the well pad and access road that will not be used in the production phase of the well; and

- reclaiming the entire pad and access road if the well is not successful and is immediately plugged and abandoned after drilling, or after the well has ceased production and is plugged and abandoned.

The cost of developing conventional deposits of oil and gas in the Rocky Mountain region is higher than the average for the onshore 48 contiguous states (Cleveland, 2003). Factors that may contribute to higher costs in the Study Area could be:
- access to some well sites can be more difficult when they are remote from the main activity areas and when they are located in steep terrain,
- harsh environments (particularly cold temperatures),
- changes in rig availability,
- changes in development priority as industry focus on certain plays evolves with new discoveries and changes in oil and gas price,
- labor market conditions, and
- restrictions (many of them environmental restrictions of some type) on land use.

Drilling improvements have occurred in new rotary rig types, coiled tubing, drilling fluids, and borehole condition monitoring during the drilling operation. Improvements in technology are allowing directional and horizontal drilling use in many applications. New bit types have boosted drilling productivity and efficiency. New casing designs have reduced the number of casing strings (see Glossary) required. Environmental benefits of drilling and completion technology advances include:
- smaller footprints (less surface disturbance),
- reduced noise and visual impact,
- less frequent maintenance and workovers of producing wells with less associated waste,
- reduced fuel use and associated emissions,
- enhanced well control for greater worker safety and protection of groundwater resources,
- less time on site with fewer associated environmental impacts
- lower toxicity of discharges, and
- better protection of sensitive environments and habitat.

## DRAINAGE PROTECTION

Producing oil and gas wells may cause drainage (migration of hydrocarbons toward the borehole) from nearby lands. This drainage will result in the loss of oil and gas from those lands and result in loss of royalty revenues for landowners. Drainage is most often avoided or reduced by the drilling of a protective well. By protecting Federal lands from drainage the Federal Government may stimulate drilling and development activity in an area and help to insure timely and more efficient management of the producing reservoir.

## HISTORICAL DRILLING AND COMPLETION ACTIVITY AND TECHNIQUES EMPLOYED FOR CONVENTIONAL OIL AND GAS

The existence of oil and gas in western Colorado has been known for more than 100 years. Earliest geologic work was done by the King and Hayden surveys of the 1870s and 1880s. Oil and gas seeps were reported during these early years of exploration in other parts of the Piceance basin. Earliest drilling in the region was in 1890 north of the Study Area near the White River gas seeps west of the town of Meeker (Dunn, 1972). In 1902 oil in shallow fractured Mancos Shale was discovered at Rangely field on the northwest edge of the Piceance basin.

### Early Exploration and Development Activity

Information on early periods of exploration and development of oil and gas within the Paradox basin is available from Molenaar (1972) and within the Piceance basin from Dunn (1972).

The earliest known well test in the Study Area appears to have been on the northeast flank of the Uncompahgre uplift in 1907 (IHS Energy Group, 2010). This test was drilled to 1,706 feet and it was dry and abandoned in section 35 of township 49 north, range 10 west (Figure 3a). No additional drilling occurred until the 1920s when a period of surface mapping of anticlinal structures began (Dunn, 1972). The next test in the Study Area was also the earliest known test in the Paradox basin. It was drilled in 1924 to 4,160 feet and was located in section 4 of township 46 north, range 17 west. Shows of oil and gas were encountered before abandonment.

Figure 11 shows the rate that conventional and coalbed natural gas wells were spudded in the Study Area by decade. Little drilling occurred in the Study Area until the late 1940s, apparently due to the regions remoteness from markets and the lack of success in the few wells drilled before then. In addition, the first oil pipeline out of the Piceance basin was not installed until 1945 and the first gas pipeline was not installed until 1955. Outside markets were not easily accessible until these pipelines were installed.

An additional 19 wells were drilled and abandoned at scattered locations across the Study Area before the first producing well was completed in 1947 in the Paradox basin area. A small volume, shallow Mancos Shale gas well (410 feet) was discovered near the town of Ridgeway in township 45 north, range 8 west (Figure 3a). An additional 13 wells have been drilled in the vicinity of this test with only three wells completed as Mancos Shale producers. The state (Colorado Oil and Gas Conservation Commission, 2010) reports that three of the four wells are still productive, but they have no records of production for these wells. The remaining well has apparently been converted to a domestic use of the gas.

Between 1947 and 1957 an additional 42 wells (not including those drilled near the Ridgeway wells) were drilled and abandoned before the next producing well was drilled in the Study Area. This well was the discovery for the Montrose Dome field (Figure 7).

This well was completed as a Hermosa Group discovery between 5,138 and 5,196 feet and has since been abandoned.

Between the discovery in 1957 and the next discovery in 1963, an additional 18 wells were drilled and abandoned in the Study Area. This discovery was the first in the Piceance basin area. It was completed as a Mesaverde Group producer between 4,150 and 4,154 feet and has since been abandoned.

Through the year 1999, there were 190 conventional wells spudded that were initially completed as productive gas, oil, or carbon dioxide wells or they were abandoned (wells in an injection, service, temporary abandonment, or shut-in status were not included in this count). Only 26 wells were completed as productive (IHS Energy Group, 2010). During this period the success rate was only 13.68 percent. Figure 12 shows an annual breakdown of conventional wells drilled from 2000 through 2009. During this period 18 conventional wells were spudded that were initially completed as gas productive or they were abandoned (wells in a service, temporary abandonment, or shut-in status were not included in this count). In addition, six wells are in a spudded but not completed status. Ten wells were completed as productive (IHS Energy Group, 2010). During this period the success rate improved to 55.56 percent for completed wells.

The first coalbed natural gas well was spudded in the Piceance basin part of the Study Area in 1982, but was not completed until 1985. Through the year 1999 a total of 5 wells were completed as coalbed natural gas tests and two conventional wells were reentered and completed as coalbed natural gas tests (Figure 11). Only one of the seven wells was originally completed as an abandoned well. Since then an additional five of these wells have been plugged and abandoned and the remaining well is in a shut-in status (Colorado Oil and Gas Conservation Commission, 2010). Figure 12 shows an annual breakdown of coalbed natural gas wells drilled for 2000 through 2009. During this period 24 coalbed natural gas wells were spudded that were initially completed as productive or they were abandoned. In addition, three wells are in a spudded but not completed status. Twenty-two wells were completed as productive (IHS Energy Group, 2010). During this period the success rate was 91.67 percent for completed wells.

All fields in the Study Area are considered to be gas fields. Only two wells were completed as predominantly oil producers and they are now abandoned.

**Producing Zones**

Oil and gas can occur in numerous geologic formations within the Study Area (Figures 5, 6a, and 6b), but the formations with actual reported historic production are much more limited. Reported conventional oil and gas occurring in the Paradox basin part of the Study Area (Figure 4) is reported only from the Permian Cutler Formation, the Pennsylvanian Hermosa Group, and the Honaker Trail Formation (Table 1). One well in each zone has been reported to be productive in the period from 1974 to present (IHS Energy Group, 2010). Only 520 barrels of oil and 227,651,000 cubic feet of gas have

been produced from these wells.  Cumulative water production is reported as 4,395 barrels.

All other wells listed in Table 1 produce in the Piceance basin part of the Study Area (Figure 4).  The Dakota Sandstone is Lower Cretaceous in age (Figure 6a), while the remaining zones are from the Upper Cretaceous (Figure 6b).  The Corcoran and Cozzette members of the Iles Formation are productive in most wells in this area.  Cumulative oil production for the 31 Piceance basin wells from 1974 to present (IHS Energy Group, 2010) is reported as 6,010 barrels of oil, 3,023,875,000 cubic feet of gas, and 10,812 barrels of water.

Production from coalbeds comes only from the Piceance basin part of the Study Area (Figure 3b).  Operators in the area were asked to indicate which wells they now classify as coalbed gas wells.  Table 2 shows these wells with their reported production and zones that have produced gas, oil, and water (IHS Energy Group).  It is possible that some of the reported production in the Corcoran and Cozzette members comes from earlier production associated with the sandstones in these two zones before those wells were reentered and completed as coalbed gas zones.  Coalbed production in the Study Area presently only comes from sediments of Upper Cretaceous age (Figure 6b).  Most of the water produced in these wells has been re-injected into a deeper formation in the Hotchkiss Federal 12-89 #18-22D, which lies in section 18 of township 12 south, range 89 west (Figure 3a).  This well began taking water in April of 2007, with 1,701,657 barrels re-injected.

**Technology Development**

"Technology has historically contributed significantly to the ability of the petroleum industry to find, develop, and produce natural gas resources" (National Petroleum Council, 2003).  Reeves et al. (2007) noted strong levels of industry investment in oil and gas recovery research and development during the 1980s and early 1990s and a decline after that.  The National Petroleum Council (2003) postulated that technology improvements would play a lesser role in gas resource enhancement in the 2003-2008 time periods.  They also assumed that technology improvements would play a greater role after 2008 when higher gas prices would motivate industry to invest more in development of technology.  Future average improvement rates for certain types of technology were assumed to be:

- Exploration well success rate                0.53% annual improvement
- Development well success rate               0.46% annual improvement
- Estimated ultimate recovery per well        0.87% annual improvement
- Drilling cost reduction                     1.81% annual improvement
- Completion cost reduction                   1.37% annual improvement
- Initial production rate                      0.74% annual improvement
- Infrastructure cost reduction               1.18% annual improvement
- Fixed operation cost reduction              1.00% annual improvement.

Unconventional gas plays, sometimes called resource plays, will be a significant potential component of future exploration and production within the Study Area if reserves can be established. We use the term Resource Play to describe accumulations of hydrocarbons known to exist over a large areal extent and/or thick vertical section, may be self-sourcing, may be developed with horizontal well completions, and are driven by development efficiencies rather than geologic risk. Initial exploration and development for these types of plays will most likely be centered in the northeast part of the Study Area (southeast Piceance basin) and possibly in the Paradox basin area, if the shale gas plays being explored to the south of the Study Area can be extended into the Study Area. The Energy Policy Act of 2005 established funding for unconventional gas research and development and selected the Research Partnership to Secure Energy for America to oversee and manage new projects (Reeves et al., 2007). The goals of this organization are to:

- Increase the volume of the technically recoverable unconventional gas resource base by 30 trillion cubic feet,
- Convert 10 trillion cubic feet of technically recoverable unconventional gas to economically recoverable gas,
- Develop technologies for developing unconventional resources with minimum environmental impact, and
- Emphasize science-building capacity and effective technology dissemination.

Technologies that will be required to tap currently undeveloped unconventional gas resources (Reeves et al., 2007) may be:

- Detection methods to find where the highly productive, naturally fractured "fairways" of a play exist,
- Improving reservoir characterization in order to identify the entire productive pay interval,
- Advanced well stimulation methods to establish the low-end of reservoir quality for using well stimulation to yield economic results, and
- Enhanced recovery technology using injection of nitrogen and/or carbon dioxide to accelerate and increase gas recovery from coals, shales, and possibly tight sands.

With the rise in well drilling and well stimulation costs in recent years there had been concerns that much of the unconventional resource may become uneconomic to pursue. Gobec et al. (2007) have projected that the pursuit of efficiencies and technology improvements will at least partially offset the recent increases in costs. Most recently, costs have begun to level out and in some cases they have decreased in recent months, due to decreases in oil and gas demand and in price. We do not expect costs to increase significantly in the near future. Once oil and gas demand and prices begin to increase again in the long-term, then costs will also likely begin to rise.

The National Petroleum Council (1999) suggested that access restrictions can add 25 thousand dollars to the average cost of drilling a well in the Rocky Mountains. They also suggested that access restrictions can delay drilling activity by an average of two years.

## Drilling and Completion Activity

There have been 254 surface well locations spudded or completed in the Study Area through April 20, 2010 (IHS Energy Group, 2010 and Colorado Oil and Gas Conservation Commission, 2010).  Of the 254 wells spud or completed in the Study Area, 70 wells (27.6 percent) appear to have been located on Bureau managed oil and gas lands.  In addition, 50 wells (19.69 percent) appear to have been located on U.S. Forest Service managed oil and gas lands.

Figure 13 presents the locations of all wells that are in an active status or are locations with a proposal to perform new drilling or additional testing (IHS Energy Group, 2010 and Colorado Oil and Gas Conservation Commission, 2010) as of April 20, 2010.  Of these 82 wells, their well type and present status is:

- Coalbed Gas – Location Filed                     3 wells
- Coalbed Gas – Producing                          13 wells
- Coalbed Gas – Shut-In or Waiting on Orders        9 wells
- Gas – Location Filed                             17 wells
- Gas – Spudded                                     1 well
- Gas – Producing                                   8 wells
- Gas – Domestic Production                         1 well
- Gas – Shut-In, Waiting on Orders, or
  Temporarily Abandoned                            27 wells
- Injection – Water                                 1 well
- Injection – Waiting on Orders                     2 wells.

One well location is listed twice in the above compilation.  A location notice has been filed for one of the above shut-in gas wells to reenter and test for coalbed gas production.  Some of the above gas wells produce some associated oil, but no well in the Study Area presently produces enough oil to qualify it as an oil well.  All three injection wells are, or will be used solely for disposal purposes.

At present only 62 wells shown in Figure 13 have been spudded or drilled to total depth, with the rest having only a drilling location notice filed.  These 62 wells, account for about 24.4 percent of all the 254 oil and gas wells spudded or drilled to total depth within the Study Area.

About 75.6 percent (192 wells) of the 254 total wells have been plugged and abandoned and their surface locations have been reclaimed or are in the process of final reclamation.  Wells have been abandoned because:

- they were "dry" – no hydrocarbons were encountered, hydrocarbons were not present in economic quantities, or mechanical difficulties within a borehole prevented economic oil and gas production;
- they were considered to be stratigraphic tests just drilled to obtain information about subsurface geologic horizons and their depths; or

- they initially were capable of producing hydrocarbons but they became uneconomic to produce at a later date or they were used as disposal or service wells and were no longer needed for those purposes.

## Marginal Wells

Low-volume oil and gas wells, known as "marginal" or "stripper" wells, contribute an important percentage of the hydrocarbons produced in the United States. In 2006, about 29 percent of crude oil production and more than 10 percent of natural gas production was credited to marginal wells (Duda and Covatch, 2005). In 2007, their contribution remained relatively constant: approximately 28 and 11 percent, respectively (Interstate Oil and Gas Compact Commission, 2008).

Producing oil or natural gas wells are considered to be "marginal" when their producing rate is at the limit of profitability. The Interstate Oil and Gas Compact Commission (2008) defines marginal or stripper wells as wells that are producing 10 or fewer barrels of oil per day and no more than 60,000 cubic feet per day of natural gas. The majority of marginal wells are owned, maintained, and produced by independent operators rather than integrated exploration and production firms which operate globally. They account for a large proportion of the jobs and corresponding economic growth associated with the petroleum industry in this country (Duda and Covatch, 2005). The Interstate Oil and Gas Compact Commission (2008) estimates that the abandonment of marginal wells in 2007 cost an estimated 719 million dollars of lost Federal royalty revenue and nearly 2,000 jobs nationwide. In addition to the economic and employment impacts, keeping marginal wells in production allows for additional opportunities to use advanced technology to enhance recovery.

In 2008, Colorado ranked 12th of the 30 major producing states in the number of marginal oil wells, and 10th of the 28 major gas producing states (Interstate Oil and Gas Compact Commission, 2008). In the previous year there were 6,866 marginal oil wells that produced 7,170,856 barrels of oil in the state of Colorado, and 10,740 marginal gas wells which produced 102,321,123 thousand cubic feet of gas (data for 2008 was not available at the time of this writing). These totals represent 29.8 and 5.1 percent of the total production of oil and gas for the state, respectively (Interstate Oil and Gas Compact Commission, 2008, and Energy Information Administration, 2010a).

As of June 2009, no marginal oil wells and 18 marginal gas wells (both shut-in and producing) were located within the Study Area (IHS Energy, 2010). None of these wells are located on Bureau managed oil and gas minerals. According to the Interstate Oil and Gas Compact Commission (2008), the average daily production for marginal gas wells in Colorado in 2007 was 26.1 thousand cubic feet of gas. Assuming these averages have not changed significantly since the 2007 data was analyzed, production from marginal wells within the Study Area may account for approximately 172 million cubic feet of gas annually.

**Deep Well Drilling: Greater than 15,000 feet**

Dyman et al. (1990, 1993a, 1993b, and 1997) characterized deep wells as those drilled to depths greater than 15,000 feet. Drilling and completing deep wells is very costly due to the extremely high temperatures and variable pressures and hard rock that can be encountered at great depth. Only five of the 252 wells with an available depth measurement (1.98 percent) have been drilled to 15,000 feet or greater (IHS Energy Group, 2010) in the Study Area (Figure 14). All wells are located in the Paradox basin area, with the three westernmost wells located on or near the Paradise Valley Salt Cored Anticline and the other two wells located near the axis of the San Miguel Syncline (Figure 4).

The first deep well in the Study Area was completed in 1958 and the last one in 1992. The deepest well was an 18,354 foot drilled and abandoned wildcat located in section 26 of township 48 north, range 17 west that was spudded in April of 1962 and completed earlier in April almost a year later. It bottomed in the Permian Cutler Formation.

None of the five deep wells were completed as oil or gas producers. In 1988 the U.S. Bureau of Reclamation completed a 16,000 foot injection well in section 30 of township 47 north, range 18 west that penetrated Precambrian rocks. This well is used to dispose of salt-water and appears to be the only deep well still active in the Study Area.

**Deep Well Drilling and Completion Activity: 10,000 to 15,000 feet**

Only 20 of 252 wells (7.94 percent), with an available depth measurement in the Study Area have drilled to the 10,000- to 14,999-foot depth range (IHS Energy Group, 2010). As Figure 14 shows, all wells in this depth range are located in the Paradox basin part of the Study Area. Most wells are concentrated along the Paradise Valley Salt Cored Anticline and the anticlinal trend to the southeast, with three additional wells located between the San Miguel Syncline and the thrust fault that marks the southern boundary of the Uncompahgre Uplift (Figure 4). Most wells have been completed as drilled and abandoned, with one well junked and abandoned (IHS Energy Group, 2010). Presently one well is in a temporarily abandoned status and two are classed as gas wells (Colorado Oil and Gas Conservation Commission, 2010). Both gas wells are considered as Hamilton Creek field producers with one producing from the Cutler Formation and the other from the Hermosa Group. Both wells produce from perforations that extend just beyond the 10,000-foot depth.

**Shallower Well Drilling: 5,000 to 9,999 feet**

There are 68 of 252 wells (26.98 percent), with an available depth measurement, in the Study Area, that were drilled to the 5,000- to 9,999-foot depth range (IHS Energy Group, 2010). As Figure 14 shows, 32 wells in this depth range are scattered across the Paradox basin part of the Study Area, and the other 36 wells lie in the Piceance basin part; from the Mesaverde Formation outcrop (Figure 4) and northward. Completion status of most of the Paradox basin wells has been drilled and abandoned. Four wells were initially

completed as gas wells (two at Hamilton Creek field, one at Montrose Dome field and one at an unnamed field) and two were temporarily abandoned (unnamed fields).  All the gas wells have been plugged and abandoned and one well has been converted to a shut-in status while the other remains temporarily abandoned.   Completions were made in the Cutler and Honaker Trail formations and in the Hermosa Group.

Ten of the 36 wells in the Piceance basin part of the Study Area were drilled as coalbed natural gas wells.  Nine wells were completed as coalbed natural gas producers and the remaining well is still recorded as being in a spudded status.  Some coalbed natural gas well completions were as deep as the 6,800 to 6,900 foot range.  Three of these wells have since been plugged and abandoned while the remaining six are productive, shut-in, or waiting on orders.

Twelve of the remaining 26 wells in the Piceance basin part of the Study Area were initially drilled and abandoned.  The status of the others was:
- Spudded                    2 wells,
- Gas                        9 wells,
- Temporarily Abandoned      2 wells, and
- Injection                  1 well.

The gas wells were completed as Cozzette and/or Corcoran member producers.  All of the gas wells and temporarily abandoned wells are presently in a shut-in status (Colorado Oil and Gas Conservation Commission, 2010).

## Shallowest Well Drilling: Less than 5,000 feet

The most wells (159 wells, or 63.1 percent of the 252 total wells with an available depth measurement) in the Study Area have drilled to less than 5,000 feet (IHS Energy Group, 2010).  Locations of these wells (Figure 14) are:
- on the Paradise Valley Salt Cored Anticline (a small number of this type of well),
- just south of the thrust fault bounding the south flank of the Uncompahgre Uplift and southeast to the vicinity of the town of Ridgeway,
- in flank areas of the Grand Mesa Syncline and the southern flank of the Piceance basin (south of the Mesaverde Formation outcrop, and
- the Piceance basin part of the Study Area.

Twenty-three of the 159 wells in this depth range were drilled as coalbed natural gas wells.  Three wells were completed as drilled and abandoned or junked and abandoned, 19 were completed as coalbed natural gas wells, and one was spudded.  Nine of these 19 wells still produce, while nine have been plugged and abandoned and one is presently shut-in.  Of the remaining 136 wells, 106 wells were drilled and abandoned.  Completion status of the remaining 30 wells was:
- Spudded                    4 wells,
- Service                    2 wells,
- Oil                        2 wells,
- Gas                        13 wells,
- Carbon Dioxide             1 well,

- Shut-In                           1 well, and
- Temporarily Abandoned             7 wells.

The oil and carbon dioxide wells have been abandoned as have three of the gas wells, two temporarily abandoned wells, and one service well. The remaining the remaining 21 wells are still in an active status (Colorado Oil and Gas Conservation Commission, 2010).

## Summary of Current Drilling Techniques

Most Study Area oil and gas wells are recorded as having been drilled vertically (IHS Energy Group, 2010), with only four directional wells and one horizontal well drilled to date (April 20, 2010). Developments in drilling techniques have allowed for more widespread use of directional and horizontal drilling technology. Directional drilling has many benefits, but also some limitations. For instance, directional drilling may be employed to avoid sensitive or inaccessible surface features, increase the area that a borehole contacts a producing formation, and when multiple directional wells are drilled from the same vertical borehole or from the same surface location, reduce drilling time, associated waste volumes and emissions, and provide greater protection of sensitive environments. Most of this technology will be tested first in other regions where economic returns on investment are higher than in the Study Area. Where technology is shown to provide significant cost benefits, local operators will apply those methods when appropriate.

### Directional and Horizontal Drilling and Completion Activity

In addition to the benefits of directional and horizontal drilling outlined above, such boreholes will often be allowed to "drift" updip along the flanks of geologic structures (e.g., along the axis of a plunging anticline), thereby naturally contacting more of the producing formation. Depending on subsurface geology, technology advances now allow operators to deviate boreholes by anywhere from a few degrees to completely horizontal. Deviation allows operators to reach reservoirs that are not located directly beneath the drilling rig, or to allow the borehole to contact more of the reservoir. In some cases directional drilling may be used specifically for avoidance of unfavorable surface locations. Directional wells also have the benefit of providing the operator with the option of drilling multiple wells from the same location, substantially reducing the surface disturbance, potentially avoiding environmentally sensitive areas, and reducing the number of facilities needed.

Drilling and completion costs for directional and horizontal wells are typically significantly higher than for conventional vertical boreholes, even when the cost savings associated with reduced need for surface disturbance is taken into account. Eustes (2003) and Fritz and others (1991) identified the following specialized requirements and risk factors unique to horizontal and directional drilling that can affect drilling and completion costs for these types of wells:

- specialized equipment (e.g., mud motors, measurement while drilling tools) and specially trained personnel,

- a larger drilling rig and associated equipment,
- casing and drilling string modifications to address problems associated with ovality and bending stresses,
- increased risk of borehole damage due to unique tectonic stresses,
- slower penetration rates that lengthen overall drilling time on location, and/or
- increased torque and drag on borehole equipment.

In addition to increased costs, the risk of losing the well due to geologic and/or mechanical failures is also greater in directional and especially horizontal boreholes than in conventional vertical boreholes.   As a result of these increased costs and risk, operators tend to prefer vertical over directional or horizontal boreholes unless special circumstances exist that make such drilling a necessity or economically attractive.   As an example, the geology of a reservoir may be such that a vertical borehole may only contact a few feet of the productive horizon, while a horizontal borehole may be able to contact tens to thousands of feet depending on factors such as how the well is completed and the areal extent of the pool.   In a case such as this, the operator must make the determination that the increased potential for productivity outweighs the additional costs and inherent risks involved in directional and horizontal drilling.

Almost all of the oil and gas wells and all of the coalbed natural gas wells in the Study Area have been drilled vertically.   Only four wells have been drilled directionally and one well has been drilled horizontally (Figure 15).   All four directionally drilled wells have been drilled in the Paradox basin part of the Study Area.   One well was completed in 2007 as a Cutler Formation gas well and it still produces at a measured depth of just over 10,100 feet.   Two other wells were drilled and abandoned (in 1988 and 2002) and the fourth well was temporarily abandoned in 2008 and remains in that status.   Since most directional well bores are S-shaped, the true vertical depth and measured depths (borehole lengths) are usually within a few percent of each other.

The only horizontal well was completed in 1994 in the Piceance basin part of the Study Area (Figure 15) and is presently shut-In.   It was completed as a Cozzette member gas well at just over 6,000 feet in true vertical depth.

On April 20, 2010 there were active proposals for three directional wells and one horizontal well (Figure 15) in the Study Area.   In the Paradox basin part of the Study Area a 10,757 foot directional test to the Cutler Formation was proposed.   In the Piceance basin part of the Study Area a 6,336 foot Corcoran member directional test and a 4,368 foot Cozzette/Corcoran member test were proposed.   Also, in this area a horizontal coalbed natural gas well was proposed to test the Cameo Coal.

Increased use of directional and horizontal boreholes is anticipated in the future.   At the Whitewater unit (Figure 10) the operator has proposed pad drilling with up to 10 directional wellbores per pad.   In additional, we anticipate that any future development of gas shale prospects would likely be via horizontal boreholes.   Gas shale prospects are reviewed in more detail latter in this report under the "Resource Plays" discussion.

<u>Slimhole Drilling and Coiled Tubing</u>

Slimhole drilling—a technique used to tap into reserves in mature fields—has not yet been used much in the Rocky Mountain Area.  In eastern Colorado the technology has been used in the Niobrara unconventional gas play.

Coiled tubing—used effectively for drilling in reentry, underbalanced, and highly deviated wells—is often used in slimhole drilling.  Most coiled tubing rigs are limited to relatively shallow drilling.  These types of rigs have been used in the Niobrara play in eastern Colorado and to the north in other parts of the Piceance basin

A review of coiled tubing drilling and intervention (well work during the life of a well) and its advantages, disadvantages, and limitations was presented for the U.S. Department of Energy (2005).  Most likely, future applications may be for drilling shallow development wells (including coalbed natural gas wells), reservoir data monitoring holes, shallow re-entry wells, and deeper exploration holes (Spears & Associates, Inc., 2003).  Brown (2006) has reported that slimhole drilling with coiled tubing may soon begin to replace conventional rotary drilling in the shallow depths across the United States.  He reported that cost savings can range from 25 to 35 percent per hole, and other advantages include:

- good hole quality,
- improved safety,
- minimal cuttings, and
- reduced chance of damaging underpressured formations.

Coiled tubing will most likely be first used in some workover situations in the Study Area.  We expect both of these drilling and completion techniques to be used more often in the future.  U.S. Department of Energy (1999) has identified the environmental benefits of using these techniques, which include:

- lower waste volumes,
- smaller surface disturbance areas,
- reduced noise and visual impacts,
- reduced fuel use and emissions, and
- protection of sensitive environments.

<u>Light Modular Drilling Rigs and Pad Drilling</u>

Now in production, new light modular drilling rigs can be more easily used in remote areas and are quickly disassembled and moved.  Rig components are made with lighter and stronger materials and their modular nature reduces surface disturbance impacts.  Also, these rigs reduce fuel use and emissions.  Use of this type of rig in the Study Area is not likely in the near future.  Other Rocky Mountain plays (western Wyoming, the Piceance basin north of the Study Area, and North Dakota) have a higher priority for new rigs since more prolific reservoirs are being developed in those locations than reservoirs are known to be capable of within the Study Area.

Light modular rigs also have potential for use in situations where pad drilling is being used. Pad drilling refers to the drilling of multiple directional boreholes from one surface location. Pads are the flat graded land surfaces that serve as the foundation for the drilling rig. Since modular rigs allow quicker breakdown and movement to new locations, they reduce time to drill and rig costs. Several formations could conceivably contain resource plays which generally lend themselves to horizontal completions and thus pad drilling. The Mancos Shale in the Piceance basin and the Hovenweep and Gothic shales in the Paradox basin are three such potential plays, though others may exist as well. Gas shale prospects are reviewed in more detail latter in this report under the "Resource Plays" discussion.

Pneumatic Drilling

Pneumatic drilling is a technique in which boreholes are drilled using air or other gases rather than water or other drilling liquids. This type of drilling can be used in mature fields and formations with low downhole pressures and where formations are sensitive to the fluids commonly used in drilling. Few fields in the Study Area are expected to meet these criteria. It is an important tool that can be used when drilling horizontal wells, so it could be used in those types of situations in the future. This type of drilling significantly reduces waste, shortens drilling time, cuts surface disturbance, and decreases power consumption and emissions.

Measurement-While-Drilling

Measurement-while-drilling systems measure borehole and formation parameters during the actual drilling process. These systems allow more efficient and accurate drilling. They can reduce costs, improve safety of operations, reduce time on site, and fewer wells may need to be drilled. At present, measurement-while-drilling would be critical for use in drilling future horizontal boreholes within the Study Area. In the future, use of this type of drilling system may become more widespread and may be used when drilling other types of directional boreholes.

Improved Drill Bits

Advances in materials technology and bit hydraulics have yielded tremendous improvement in drilling performance. Latest-generation polycrystalline diamond compact bits drill 150 to 200 percent faster than similar bits just a few years ago (U.S. Department of Energy, 1999). Additional improvements have continued to be made to enable faster drilling. Environmental benefits of improved bits include:
- lower waste volumes,
- reduced maintenance and workovers,
- reduced fuel use and emissions,
- enhanced well control,
- less time on site, and
- less noise.

Reducing time the rig is on the drill site reduces potential impacts on soils, groundwater, wildlife, and air quality.

## Summary of Current Completion Techniques

Standard completion techniques for the Study Area will be described below.  Once the operator determines that a well should be completed for production, the first step is to place casing in the borehole and cement it in-place.  Since the potential producing zones are then sealed off by the casing and cement, perforations (holes made through the casing and cement and into the formation) are made in order for the oil and/or gas to flow into the borehole.  The casing also serves to protect sources of groundwater from contamination by oilfield fluids.

Some form of hydraulic fracturing is then usually used to improve hydrocarbon flow into the borehole.  Hydraulic fracturing of reservoirs can enhance well performance, minimize drilling, and allow the recovery of otherwise inaccessible oil and gas resources. The flow of hydrocarbons is restricted in some low-permeability, tight formations and in nonconventional reservoirs (such as coalbed natural gas), but can be stimulated by hydraulic fracturing to produce economic quantities of hydrocarbons.  Fluids are initially pumped into the formation at pressures high enough to cause fractures to open in the reservoir rock.  Sand slurry is pumped into the opened fractures, which keeps the fractures propped open, allowing hydrocarbons in the reservoir to more easily enter the borehole.  Improvements such as carbon dioxide-sand fracturing, new types of additives, and fracture mapping, promise more effective fractures and greater ultimate hydrocarbon recovery.

Only one horizontal well has been drilled to date in the Study Area.  New types of horizontal fracturing technology will likely be used to stimulate these types of wells in the future.  Development could be similar to that used to stimulate the Bakken Formation Middle Member in North Dakota.  For horizontal boreholes, multi-stage fracture stimulations could be used.  The Energy Information Administration (2006a) has reported that once the Bakken Formation has been fractured an un-cemented pre-perforated liner is installed in the borehole.

The final completion step is to place production tubing in the borehole to carry the hydrocarbons to the surface.  At the surface it is connected to a Christmas tree (a collection of valves) used to control the well's production.

## Drilling and Completion Costs

Expenditures for exploration and development in the United States onshore increased 30 percent from 2005 to 29 billion dollars in 2006 (Energy Information Administration, 2007c).  This was more than three times the average annual expenditure level in the 1990s and the highest amount since 1982.  Most of the expenditures in 2006 were for development (26 billion dollars).

The National Petroleum Council (2003) reported drilling and completion costs for vertical wells in the Uinta-Piceance basin region and the Great Basin & Paradox basin. All cost components such as permitting, location construction, mobilization, rentals and services, tangible items, and stimulations were assumed to be included in these costs. They reported the average gas well cost for wells in four depth ranges.  Those costs for the Uinta-Piceance basin were:

- 0 to 5,000 feet                           216 thousand dollars,
- 5,000 to 10,000 feet            570 thousand dollars,
- 10,000 to 15,000 feet          1.574 million dollars, and
- 15,000 to 20,000 feet          4.407 million dollars.

Gas well costs for the Great Basin & Paradox basin were:

- 0 to 5,000 feet                 222 thousand dollars,
- 5,000 to 10,000 feet            712 thousand dollars,
- 10,000 to 15,000 feet          1.697 million dollars, and
- 15,000 to 20,000 feet          5.412 million dollars.

Since oil wells have been so rarely drilled within the Study Area, those costs are not included in this report.

Reported dry hole well costs for the Uinta-Piceance basin were estimated to be:

- 0 to 5,000 feet                 113 thousand dollars,
- 5,000 to 10,000 feet            295 thousand dollars,
- 10,000 to 15,000 feet          739 million dollars, and
- 15,000 to 20,000 feet          2.506 million dollars.

Reported dry hole well costs for the Great Basin & Paradox basin were estimated to be:

- 0 to 5,000 feet                 138 thousand dollars,
- 5,000 to 10,000 feet            288 thousand dollars,
- 10,000 to 15,000 feet          821 million dollars, and
- 15,000 to 20,000 feet          2.468 million dollars.

Since 2003, operators in the Rocky Mountain region had been faced with increases in drilling and completion costs.  Drilling rates had increased 20-50 percent (Rocky Mountain Oil Journal, 2005) and service costs had also increased.  Drilling rates and service costs continued to increase into 2008 and rig shortages affected most of the Rocky Mountain region.  Costs have since declined to some extent and rigs are now available, at least in the short-term.

## SUMMARY OF CONVENTIONAL OIL AND GAS PRODUCTION AND ABANDONMENT TECHNIQUES

Once production begins application of reservoir management procedures are needed to ensure the maximum hydrocarbon production at the lowest possible cost, with minimal waste and environmental impact.  In earlier days, recovery was only about 10 percent of

the oil-in-place (see Glossary for in-place) in a given field, and sometimes, the associated natural gas was vented or flared. Newer recovery techniques have allowed the production of up to 50 percent of the oil-in-place. Also, 75 percent or more of the natural gas-in-place in a typical reservoir is now recovered. Operators have also taken significant steps in reducing production costs. U.S. Department of Energy estimated that costs of production had decreased from a range of nine to 15 dollars per barrel of oil equivalent in the 1980's to an average of about five to nine dollars per barrel of oil equivalent in 1999.

Operating costs in the United States have been rising in recent years. Annual Rocky Mountain operating costs rose to about 55,000 dollars per 12,000 foot well in 2005, as reported by Kim (2007).

Since 1990, most reserve additions in the United States (89 percent of oil reserve additions and 92 percent of gas reserve additions) have come from finding new reserves in old fields (U.S. Department of Energy, 1999). The U.S. Department of Energy (1999) reports that about half of new reserve additions in the United States are from more intensive development within the limits of known reservoirs. They report that the other half of reserve additions have come from finding new reservoirs in old fields and extending field limits. Our review indicates that most recent reserve additions in the Study Area have come from development of the coalbed natural gas resource in the Piceance basin area.

The Energy Information Administration (2006b) has shown that the cost of equipping and operating gas wells in the Rocky Mountains is higher than the average for the rest of the onshore 48 contiguous states. Cleveland (2003) indicated a number of reasons why Rocky Mountain gas wells may be more expensive to equip and operate. Reasons for extra costs that may apply to parts of the Study Area are:
- remoteness and cold temperatures which often requires dehydrators and line heaters, more expensive types of steel casing, and insulation of surface equipment;
- workovers and preventive maintenance is more frequent which minimizes shut-in days in the winter when well site access is difficult; and
- lack of rig availability due to its lower drilling priority in the Rockies.

Recovering oil and gas from a geologic reservoir often occurs in a staged process using different recovery techniques (or a combination of techniques) as the reservoir is drained. Traditionally, processes were referred to as primary, secondary, or tertiary depending on when the process was applied. However, as technology has improved and the price of oil and gas has increased, reservoirs that had previously been bypassed are now being tapped using secondary or tertiary processes from the outset. Therefore, the terms "secondary" and "tertiary" are seeing less usage, or are more narrowly defined. "Secondary recovery" has become synonymous with water flooding and gas (not carbon dioxide) injection and "enhanced recovery" broadly encompasses any recovery techniques that are not part of primary recovery or waterflooding. The following definitions will be used in this report:

- <u>Primary Recovery</u> - Primary recovery produces oil, gas, and/or water using the natural pressure in the reservoir.  Wells may be stimulated to improve the flow of oil and gas to the borehole.  Other techniques, including artificial lift, pumping, and gas lift, help extend productive life when a reservoir's natural pressure dissipates.
- <u>Secondary Recovery</u> – Stimulation of reservoir production via injection of water into the producing formation thereby driving oil to production wells, or via injection of gas to expand the gas cap and/or regulate the reservoir pressure.  Since there presently are no unplugged oil wells within the Study Area, this process will not be used in the future unless new oil reserves are discovered and first go through the primary recovery process.
- <u>Enhanced Oil Recovery</u> - Injection of fluids (e.g., water, surfactants, polymers, or carbon dioxide) or sources of heat (steam or hot water) to stimulate hydrocarbon flow and move hydrocarbons that were bypassed in earlier recovery phases.  This phase also will not occur within the Study Area unless new oil reserves are discovered and first go through the primary recovery and secondary recovery processes.

**Hydrogen Sulfide Occurrence**

Hydrogen sulfide is a colorless, flammable gas that occurs naturally in most crude oil and many natural gas reservoirs (Levorsen, 1967).  Hydrogen sulfide is toxic to humans and animals, and a single breath may provide enough exposure to be fatal (International Programme on Chemical Safety, 1994).  It has a characteristic foul, or "rotten egg" odor, and is heavier than air, so it tends to accumulate in low-lying areas.  Hydrogen sulfide is an impurity that must be removed from oil or natural gas through desulfurization in oil refineries and natural gas "sweetening" plants (natural gas containing hydrogen sulfide is commonly referred to as "sour gas") (Skrtic, 2006).  The presence of hydrogen sulfide in hydrocarbons is problematic not only because it is an impurity that must be removed in processing, but also because it is corrosive to metals both as a free gas and in solution, and because of its toxicity to personnel, wildlife, and the public.  On Federal lands, operators are required by law to follow specific safety practices and have public protection plans in place where hydrogen sulfide can "reasonably be expected to be present in concentrations of 100 parts per million or more in the gas stream" (43 CFR 3160).  To date, no fields in the Study Area have been identified as containing hydrogen sulfide gas.  Nearest known hydrogen sulfide produced with hydrocarbons is at Lisbon Valley field in Utah and at southeast Lisbon field to the south of the Study Area in San Miguel County, Colorado (Wilson et al., 2003).  If future test wells are drilled within the Paradox basin part of the Study Area they could encounter hydrogen sulfide in older sediments such as the Mississippian Leadville Limestone and Devonian McCracken Member of the Elbert Formation.

**Carbon Dioxide**

Carbon dioxide has been discovered during oil and gas exploration at numerous places within the Colorado Plateau and Southern Rocky Mountain physiographic provinces.  In

the region it has been found in concentrations that exceed 98 percent (Allis et al., 2001). Uses have included dry ice sales, industrial uses, and for injection into oil reservoirs to enhance oil recovery. Enhanced oil recovery has been the dominate use for the carbon dioxide resource.

In the Colorado part of the Paradox basin carbon dioxide in large quantities is found in the Mississippian Leadville Limestone at McElmo Dome field in Montezuma County) and at Doe Canyon, Impel Redd, and Gulf Gillespie fields in Dolores County (Wilson et al., 2003). Smaller quantities are found at Lisbon Valley field in Utah and at southeast Lisbon field to the south of the Study Area in San Miguel County, Colorado (Wilson et al., 2003). If future test wells are drilled within the Paradox basin part of the Study Area they could encounter carbon dioxide in older sediments such as the Mississippian Leadville Limestone.

There is also some potential for carbon dioxide to occur in the Leadville Limestone in the Piceance basin (Wilson et al., 2003). If the Leadville Limestone is encountered in deep tests in that part of the Piceance basin within the Study Area, then carbon dioxide needs to be considered as a potential resource.

One well in the Study Area (section 12, of township 14 north, range 97 west) was completed as a carbon dioxide producer in the Morrison Formation (Figure 3a). That well was completed in 1982 with a test of 408,760 cubic feet of gas. No production was reported from this well and it was plugged and abandoned in 1992 (Colorado Oil and Gas Conservation Commission, 2010).

## Acid Gas Removal and Recovery

Before natural gas or oil can be transported safely, any hydrogen sulfide or carbon dioxide gas must be removed. Special plants are needed to recover these unwanted gases and sweeten the hydrocarbon product for sale. Improvements in the removal process have made it possible to produce sour natural hydrocarbon resources, almost eliminate noxious emissions, and recover almost all of the elemental sulfur and carbon dioxide for later sale or disposal. Presently producing oil and gas formations within the Study Area do not produce hydrogen sulfide or carbon dioxide, or they produce in such minor amounts that removal is not required.

## Artificial Lift Optimization

Artificial lift is used to produce oil once reservoir pressure declines and natural processes can no longer push the oil to the surface. Improvements in artificial lift have enhanced production, lowered costs, and lowered power consumption, which reduce air emissions. Artificial lift could be used in the future if oil production is discovered in the future.

**Glycol Dehydration**

In the Study Area, dehydration systems use Glycol to remove water from wet natural gas before the gas can be directed to a pipeline. During operation, these dehydration systems may vent methane, other volatile organic compounds, and hazardous air pollutants. Improvements to these systems have allowed increased gas recovery and have reduced unwanted emissions.

**Produced Water Management**

Coproduction of a variable amount of water with oil and gas and with coalbed natural gas is unavoidable at most locations. Table 1 shows the cumulative volume of produced water from conventional oil and gas wells in the Study Area and Table 2 shows the cumulative volume of water produced with coalbed natural gas. Colorado allows produced water to be disposed of as follows:

1. Injection into a Class II well, permitted in accordance with Rule 325;
2. Evaporation/percolation in a properly permitted pit;
3. Disposal at permitted commercial facilities;
4. Disposal by road spreading on lease roads outside sensitive areas for produced waters with less than 3,500 milligrams per liter total dissolved solids when authorized by the surface owner;
5. Discharge into state waters, in accordance with the Water Quality Control Act and the rules and regulations promulgated thereunder; and
6. Evaporation in a properly lined pit at a centralized Exploration & Production waste management facility permitted in accordance with Rule 908.

Figure 16 documents the geographic distribution of water quality samples across the Study Area and shows the distribution of sampled salinity, expressed as total dissolved solids, in those water samples. This information is from a U.S. Geological Survey (2008a) database of water quality samples. Water quality information is available for only eight samples and total dissolved solids range from 3,659 to 299,590 milligrams per liter. Water quality sample distribution and sampled zones are:

- less than 5,000 milligrams per liter – 1 sample (Cutler Formation),
- 5,000 to 9,999 milligrams per liter – 1 sample (Cutler Formation),
- 10,000 to 49,999 milligrams per liter – 3 samples (Rollins/Cozzette members, Burro Canyon Formation, and Mississippian)
- Greater than 50,000 milligrams per liter – 3 samples (one Devonian and two Mississippian samples).

The Bureau considers total dissolved solids concentrations of less than 10,000 milligrams per liter to be fresh water. Only two of the eight water quality samples fall within this range. The samples from these two wells were also from the shallowest zones tested (less than 4,100 feet). Water quality samples that have a total dissolved solids concentration of greater than 10,000 milligrams per liter are from deeper zones and from older formations.

A new freeze-thaw/evaporation process has been shown to be useful in separating out dissolved solids, metals, and chemicals that are contained in water produced along with the oil and gas production of wells.  In 1998, this type of produced water facility was determined to be successful in southwestern Wyoming (PTTC, 2002) and the San Juan basin in New Mexico (Boysen and Boysen, 2008).  It could probably be successfully used in higher elevation/colder climate parts of the Study Area, in locations where production of poor quality water cannot be disposed of by other means.

The Gas Technology Institute tested the performance and costs associated with the application of electrodialysis to produced water management (Hayes, 2004).  Pilots have been run in the Rocky Mountain region and could be used in the Study Area in the future.

### Leak Detection and Low-bleed Equipment

New technology is facilitating the detection of hydrocarbon leaks in equipment.  The replacement of equipment that bleeds significant gas allows for increased worker safety and reduced emissions of methane.  Not allowing gas to bleed from equipment increases recovery rates and usage of this valuable resource.  No record of use of this equipment is available for the Study Area.

### Vapor Recovery Units

Vapor recovery can reduce a lot of the fugitive hydrocarbon emissions that vaporize from crude oil storage tanks, mainly from tanks associated with high-pressure reservoirs, high vapor releases, and large operations.  The emissions usually consist of 40 to 60 percent methane, along with other volatile organic compounds, and hazardous air pollutants (U.S. Department of Energy, 1999).  Where useable, this technology can capture over 95 percent of these emissions.  No record of use of this equipment is available for the Study Area.

## UNDERGROUND GAS STORAGE

Produced gas can be stored in some existing good quality reservoirs that have already been depleted of their native gas content.  The objective of gas storage is to allow lands to be used to store natural gas during periods of excess production so that those supplies can be made available to meet peak gas demands and to maximize the efficiency of the gas delivery system.  At present there are no gas storage projects within the Study Area.

# PREVIOUS ASSESSMENTS OF OIL AND GAS RESOURCES

## RECOVERABLE NATURAL GAS RESOURCES – ENERGY INFORMATION ADMINISTRATION, POTENTIAL GAS COMMITTEE, AND NATIONAL PETROLEUM COUNCIL

A number of recent assessments of technically recoverable gas resources have been made for the Rocky Mountain region.  Each estimate has been prepared using somewhat different assumptions.  They all show a large natural gas resource for the Rocky Mountain region.

- The Energy Information Administration (2003) uses a natural gas resource base of 345 trillion cubic feet for the Rocky Mountain region.
- The Potential Gas Committee (2003) estimated 288 trillion cubic feet of natural gas; including 50 trillion cubic feet of proved reserves (see Glossary).
- As part of a study done in compliance with the Energy Policy and Conservation Act Amendments of 2000 (U.S. Departments of Interior, Agriculture, and Energy, 2003) the U.S. Geological Survey estimated the technically recoverable gas resource for five basins in the Rocky Mountain region at 226 trillion cubic feet. Of that total, they estimated a conventional gas resource of 13 trillion cubic feet, tight gas sand and shale gas resources of 127 trillion cubic feet, and 43 trillion cubic feet each of coal-bed natural gas and proved reserves.
- The National Petroleum Council (2003) estimated 284 trillion cubic feet of natural gas for the Rocky Mountain region.  The Council also presented a comparative analysis of their estimates with those of the Energy Information Administration, Potential Gas Committee and U.S. Geological Survey to better understand the factors that influenced the differences among each estimate.

**Assumptions to the Annual Energy Outlook 2010 with Projections to 2035 Energy Information Administration (2010)**

In April 2010, the Energy Information Administration released their update for total technically recoverable resources (see Glossary).  As of January 1, 2008, estimated total technically recoverable crude oil resources for the Rocky Mountain region are 20.9 billion barrels of oil (Energy Information Administration, 2010b).  For the total United States, the estimated total technically recoverable resources for crude oil are 208.4 billion barrels of oil.  Total technically recoverable natural gas resources as of January 1, 2008 for the Rocky Mountain region vary based on sources of natural gas.  Natural gas from conventional reservoirs is estimated to have 345.0 trillion cubic feet of total technically recoverable resources in the Rocky Mountain region (2010). Natural gas technically recoverable as shale gas and coal-bed natural gas is estimated at 21.9 and 94.3 trillion cubic feet of gas respectively in the Rocky Mountain region.  Total recoverable natural gas resources in the United States are estimated to be 2,118.7 trillion cubic feet (2010). Marc Humphries, Analyst in Energy Policy from the Congressional Research Service,

stated that 37 percent of natural gas and 17 percent of oil in the United States comes from the Rocky Mountain Region (Humphries, 2004).

**The National Petroleum Council (2003)**

The National Petroleum Council (2003) has divided remaining natural gas resources into proved natural gas reserves, proved growth reserves, and undiscovered technically recoverable resources (see Glossary for descriptions of each). They further divided undiscovered technically recoverable resources into conventional and unconventional (also known as nonconventional) types (see Glossary for descriptions of each).

As of January 1, 2002, the National Petroleum Council (2003) estimated Rocky Mountain region proved natural gas reserves to be 50 trillion cubic feet. Energy Information Administration (2004) was able to split out proved tight sand gas reserves (26.8 trillion cubic feet) and proved coal-bed natural gas reserves (14.8 trillion cubic feet) for the Rocky Mountain region. Growth of proved gas reserves in the Rockies was estimated at 26 trillion cubic feet (National Petroleum Council, 2003). Finally, undiscovered technically recoverable resources for conventional gas were estimated to be 173 trillion cubic feet, while unconventional gas resources were estimated to be 209 trillion cubic feet (National Petroleum Council, 2003).

The U.S. Department of Energy (2003) has reported that "as geologic knowledge and technology for finding and producing natural gas have improved, the estimated volume of natural gas resources in the Rocky Mountain States has grown." They assumed that as long as investment continued towards expanding the geologic knowledge base and technology progress, then there would be a continued upward trend in future resource assessment volumes and recovery would be expected to continue to increase. These reserve additions will be needed in the future to replace those that are being depleted due to production and consumption.

"The importance of natural gas as a primary energy source in the United States has grown considerably during the past decade" (Curtis and Montgomery, 2002). Rising demand in this country will result in a 1.1 percent average annual increase in our consumption of energy to 2030 (Energy Information Administration, 2007a). During that period natural gas consumption is expected to rise from 21.08 trillion cubic feet in 2005 to 26.9 trillion cubic feet in 2030 (Energy Information Administration, 2007b). Domestic production rose from 17.7 to 19.7 trillion cubic feet (11.3 percent increase) from 1990 to 2000 (Curtis and Montgomery, 2002) and then dropped to 18.3 trillion cubic feet by 2005. It is expected to rise to 20.6 trillion cubic feet by 2030 (Energy Information Administration, 2007b). North American producing areas are expected to provide 75 percent of long-term domestic gas needs, but they will be unable to meet the entire projected demand (National Petroleum Council, 2003). The gap between consumption and production has necessitated a rise in imports and concern about future domestic energy supply.

## ATLAS OF MAJOR ROCKY MOUNTAIN GAS RESERVOIRS (1993)

The Atlas of Major Rocky Mountain Gas Reservoirs assessed both the Paradox basin and the Uinta-Piceance basin in 1993 (Morgan and Hemborg, 1993).  The Paradox basin has a fold and fault belt in the northern part of the basin.  There are salt-cored anticlines in this area.  The three main gas producers of the Paradox basin include the Cutler-Honaker Trail, Paradox Formation, and Leadville Limestone plays.  Source rocks are primarily from shale in the Paradox Formation.  Hydrocarbons are stored in algal mounds of the Paradox Formation.

The Paradox Formation play has eight plays that produced more than 330 billion cubic feet of gas (Morgan and Hemborg, 1993).  Reservoirs occur in algal mounds and oolitic bank deposits in the Ismay and Desert Creek zones of the Pennsylvanian Paradox Formation.  Gas and oil are produced from these reservoirs.  Due to decreased circulation in a past sea, thick deposits of salts and anhydrite were deposited in the area resulting in alternating beds of shale and salt in the Paradox Formation.

An important play in the Paradox basin in the Study Area is the Cutler-Honaker Trail play.  Andy's Mesa field had cumulative production of 18.5 billion cubic feet of non-associated gas as of 1993 (Morgan and Hemborg, 1993).  The original field pressure was 2,345 psi at 6,915 ft.  The last discovery in the Cutler-Honaker Trail play was the Hamilton Creek field in 1976.  The Hamilton Creek Field is in Township 44 North, Range 14 West of the Study Area.  Monthly field production peaked at 377 million cubic feet of gas in 1970.  Production declined to 34.7 million cubic feet of gas per month by 1990.  There were 16 total wells drilled in this play with 9 of those wells producing gas (Morgan and Hemborg, 1993).

In the Paradox basin, five reservoirs have produced more than 608 billion cubic feet of gas from the Leadville Limestone.  A major field in the Leadville Limestone is the Lisbon field.  Just west of the Study Area and in San Miguel County, the Lisbon field produced 538 billion cubic feet of the total 608 billion cubic feet produced in the Leadville Limestone (Morgan and Hemborg, 1993).  Also, the Lisbon field has produced 48 million barrels of condensate oil and contains an estimated recoverable reserve of 250 billion cubic feet of gas.  The driving mechanism of the migration of hydrocarbons is likely gas expansion and gravity.  Although the field is productive, numerous downfalls preclude the field from being highly economic.

The Greater Piceance Plays include those in the Piceance, Uinta, and North Park basins.  Six gas plays with 46 major reservoirs are in these basins (Tremain et al., 1993).  Cumulative production was 1.867 trillion cubic feet of gas as of 1993.  Production is mainly from the Wasatch, Green River, and Mesaverde Formations.  The Greater Piceance Plays have produced more gas than any other area in Colorado.  The authors of the Atlas suggested that advancements in technology would need to occur to develop more gas in the area.

The Mesaverde Group was also analyzed in the Atlas of Major Rocky Mountain Gas Reservoirs. In the Piceance basin, the Mesaverde Group produces gas from lenticular, fluvial sands (Tremain et al., 1993). There are seven major reservoirs that had produced approximately 118 billion cubic feet of gas as of 1993. In addition, 30 smaller reservoirs had produced 30 billion cubic feet of gas. The assessment determined the best technique for producing gas was from "unstimulated wells containing reservoirs with natural fractures" (Tremain et al., 1993).

Cumulative production of natural gas as of December of 1990 in the Upper Mancos Shale of Colorado and Utah was 359.5 billion cubic feet (Tremain, 1993). Production was from 37 fields along the Douglas Creek arch and the margins of the Uinta and Piceance basins. Approximately 87 percent of production was from the Emery Sandstone in the middle Mancos Shale. There were 400 producing wells added since 1976, with an average production of one to two billion cubic feet of gas per well. The decline rate for this area averaged 6 percent as of 1993 (Tremain, 1993).

In the Dakota Sandstone, Cedar Mountain Formation, and Morrison Formation there were 18 major fields that produced more than 362 billion cubic feet of natural gas as of December 31, 1990 (Tremain, 1993). Average drilling depths ranged from 3,000 to 8,800 feet. Many of the reservoirs in this area have high nitrogen and carbon dioxide concentrations. The depositional framework for these formations ranges from fluvial to nearshore marine (Tremain, 1993).

The Entrada and Weber Sandstones were also analyzed in The Atlas of Major Rocky Mountain Gas Reservoirs. The play areas (see Glossary) identified in the atlas, do not extend into the Study Area.

## MAJOR OIL PLAYS IN UTAH AND VICINITY: QUARTERLY TECHNICAL PROGRESS REPORTS (2003-2008)

Another assessment completed in the Paradox basin was "Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Reports ", by Thomas C. Chidsey, Jr. Reports from July 2003, to February 2008, were analyzed for pertinent data to the Study Area and reviewed below.

The July 2003 report discussed optimal drilling techniques in the Paradox basin. These techniques include increasing mud weight during drilling to 12.5 pounds, centralize treatment facilities, and mix produced water down dip to reduce salt precipitation. The optimal drilling horizon at that time was noted to be the Desert Creek zone of the Paradox Formation in the Blanding sub-basin. Other techniques discussed included disposal of produced water and maintenance of reservoir pressure to create a low-cost waterflood (Chidsey et al., July 2003)

The September 2003 report stated the Paradox basin reservoirs are heterogeneous, which is the principle reason for low recovery rates. Heterogeneity is due to gaps in algal mounds in the Paradox Formation. As of Sept. 2003, horizontal drilling has had no

commercial success in the Paradox, except the Greater Aneth field (Chidsey et al., September 2003).

The March 2004 report discusses the Leadville Limestone in the Paradox basin. The Leadville Limestone is a major oil and gas reservoir. Most of the Leadville Limestone is found in the Paradox basin fold and fault belt, which occurs in the southwestern portion of the Study Area (Chidsey et al., March 2004).

The April 2005 report details the Leadville Limestone extensively. It had produced over 53 million barrels of oil and 845 billion cubic feet of gas as of this report. The seals were noted as the clastic beds of the Molas Formation and evaporite beds of the Paradox Formation. Traps include structural traps with closure on anticlines, faults, and fault planes. Source rocks are from the Paradox Formation. The Leadville Limestone has varying porosity and permeability. Dolomitization has partly occurred along with leaching. Fracturing is present in the limestone. To the east of the Study Area, the Leadville Limestone in San Miguel County had an initial reservoir pressure of 2,340 pounds per square inch in the Lisbon Southeast field. Average monthly production was 313 barrels of oil and 50,295 thousand cubic feet of gas. Cumulative production was 164,922 barrels of oil and 16.2 billion cubic feet of gas as of the 2005 report (Chidsey, April 2005).

In the July 2006 report the Paradox Formation was discussed in detail. It was reported that over 500 million barrels of oil and 650 billion cubic feet of gas had been produced in Utah. Most of the gas produced was cycled for pressure maintenance. The characteristics of Paradox Formation oil are sweet, paraffinic, and the average API gravity is 43 degrees. Viscosity ranges from 33 to 49 seconds at 100 degrees Fahrenheit (Chidsey, July 2006).

The November 2006 report also discussed the Paradox Formation. The Cane Creek shale member total organic content is 15 to 28 percent. The Chimney Rock shale member total organic content is 1 to 3 percent with an average vitrinite reflectance of 1.3 to 2.5 percent. The Gothic Shale member has a total organic content of 1.5 to 4 percent and a vitrinite reflectance of 1.3 to 2.5 percent. The Gothic Shale member occurs in the southern part of the Study Area, south of the Uncompahgre Uplift. This report also notes that the Paradox Formation only produced gas in the southeast part of the basin in Colorado (Chidsey, November 2006).

The May 2007 report discusses seals and source rocks for the Paradox Formation. The vertical reservoir seals include shale, halite, and anhydrite. The lateral seals include un-fractured beds, off mound mudstone, wackestone, and anhydrite) and anhydrite. Source rocks are the Cane Creek, Chimney Rock, and Gothic Shales (Chidsey, May 2007).

The February 2008 report detailed sources of carbon dioxide in the Paradox basin. The McElmo Dome field in southwest Colorado is a carbon dioxide source. The Ouray Formation and Leadville Limestone supply carbon dioxide to the Greater Aneth Field southwest of the Study Area (Chidsey et al., February 2008).

## INVENTORY OF ONSHORE FEDERAL OIL AND NATURAL GAS RESOURCES AND RESTRICTIONS TO THEIR DEVELOPMENT: PHASE III INVENTORY—ONSHORE UNITED STATES (2008)

For oversight and regulatory purposes, the Department of Interior is required by the Energy Act of 2000 to report oil and gas resources underlying Federal lands.  Restrictions and causes for delays are also required in the report.  The Inventory of Onshore Federal Oil and Natural Gas Resources and Restrictions to Their Development; Phase III Inventory—Onshore United States fulfilled this requirement in 2003, 2006, and 2008.  The Phase III report (2008) contains the most current Onshore United States inventory.

The 2008 report gave estimates for undiscovered technically recoverable resources, remaining proved ultimate recovery growth, and proved reserves on Federal Lands including the Study Area.  The proved liquid reserves in the Uinta-Piceance basin were 254 million barrels of oil.  Federal government reserves were 143 million barrels of oil (U.S. Departments of the Interior, 2008).  Proved gas reserves in the Uinta-Piceance basin were 7,182 billion cubic feet of gas.  Federal government reserves were 3,794 billion cubic feet of gas.  These reserve estimates were made in 2008.  The Paradox basin proved liquid reserves were 119 million barrels of oil with 36 million barrels of oil on Federal Land.   The total proved gas reserves in the Paradox basin were 14,156 billion cubic feet of gas with 7,497 billion cubic feet of gas on Federal Land (2008).  .

Of these reserves, different accessibility levels exist that constrain oil and gas development in the Uinta-Piceance basin and Paradox basin.   Federal Land in the Uinta-Piceance basin is broken up as follows: 40.4% (5,301,000 acres) is not accessible and there is no leasing or no surface occupancy, 32.4% (4,257,000 acres) is accessible and can be leased but there are timing limitations or controlled surface use, and 27.1% (3,549,000 acres) is accessible and can be leased with standard leasing terms (U.S. Departments of the Interior, 2008).  The same accessibility issues relate to the Paradox basin.  Federal Land in the Paradox basin is broken up as follows: 59.4% (8,698,000 acres) is not accessible and there is no leasing or no surface occupancy, 14% (2,039,000 acres) is accessible and can be leased but there are timing limitations or controlled surface use, and 26.5% (3,878,000 acres) is accessible and can be leased with standard leasing terms (2008).

Standard leasing terms include conditions of approval and stipulation exception factors.  In the Study Area, conditions of approval for the Uncompahgre Field Office include studies of archeology, big game, construction, noise, pipeline, roads, and soil (U.S. Departments of the Interior, 2008).  Stipulation exception factors in the Uinta-Piceance basin are big game winter range and raptors with an extended drilling buffer zone of 0.25 miles.  In the Paradox basin, big game winter range, raptors, and bald eagle winter roost are the stipulation exception factors.  The extended drilling buffer zone is 0.50 miles (2008).

The "Inventory of Onshore Federal Oil and Natural Gas Resources and Restrictions to Their Development; Phase III Inventory—Onshore United States" was completed in 2008. Any updates to the proved reserves are in this Reasonable Foreseeable Development Scenario

## OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE DEVELOPMENT SCENARIOS IN THE SAN JUAN NATIONAL FOREST AND BLM PUBLIC LANDS, COLORADO (2006)

The "Oil and Gas Potential and Reasonable Foreseeable Development Scenarios in the San Juan National Forest and BLM Public Lands, Colorado" (Gault Group Inc., 2006) encompasses lands immediately south of the Study Area. The Reasonable Foreseeable Development Scenarios projected 25 wells per year would be drilled in conventional fields over a 15 year period in the Paradox Basin Province (2006). The San Juan National Forest is southeast of the Paradox Basin Province. Since it is in close proximity to the Study Area it is prudent to discuss the projections made for the San Juan National Forest. Coal-bed natural gas is produced from the Fruitland Formation in the San Juan Basin Province. In the Study Area, the Tongue Mesa coal field also produces from the Fruitland Formation. It was projected that 60 coal-bed natural gas wells per year would be drilled at the current 160 acre spacing (2006). Spacing decreases were anticipated with potential for more wells to be drilled than projected. Also, it was projected that 2 wells per year would be drilled on conventional-type fields. Overall, 1,185 new wells were projected to be drilled over the 15 year period. These wells would produce 19 million barrels of oil and 3.25 trillion cubic feet of gas. The total surface disturbance from wells would be 212 acres per year for a total of 3,181.2 acres over the 15 year period. The total disturbance from pipelines would be 424 to 937 acres (Gault Group Inc., 2006).

## OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE DEVELOPMENT SCENARIOS IN THE GRAND MESA, UNCOMPAHGRE, AND GUNNISON (GMUG) NATIONAL FORESTS, COLORADO (2004)

The "Oil and Gas Potential and Reasonable Foreseeable Development (RFD) Scenarios in the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests, Colorado" was prepared by Bruce Fowler and Pat Gallagher from the Bureau of Land Management. The report was published August 27, 2004. The report encompasses the entire Study Area and it states that the Piceance basin contains reservoirs mainly in the Mesaverde Group. The Paradox basin contains plays mainly in Paleozoic rocks. From drilling history and industry input, the subject predicted there would be a total of 45 wells drilled over the next 15 years (from 2004 to 2019). Total disturbance was predicted to be 153 acres. After temporary reclamation, the total disturbance was predicted to be 82 acres (Fowler and Gallagher, 2004). Spencer (2006) updated the well projections to 48 sandstone wells and 88 coalbed natural gas wells. Beecham (2010) further updated the projections for the remaining nine years of the analysis (2011-2019). He projected that 103 wells would be drilled from 58 locations. He also modified previous assumptions about acres disturbed.

The Grand Mesa National Forest had a high occurrence potential based on major plays including the Williams Fork fluvial sands, Cameo coal zone, and Cozzette/Corcoran reservoirs.  The Gunnison National Forest has a high gas potential in the north and decreases to low potential in the southwest as predicted in the Reasonable Foreseeable Development Scenarios for the Grand Mesa, Uncompahgre, and Gunnison National Forests in 2004. The Uncompahgre National Forest shows medium to low oil and gas occurrence potential in the 2004 assessment.  Refer to Figures 18 and19, to see our occurrence potential maps (see "Oil and Gas Occurrence Potential") and Figures 23, and 24 to see our development potential maps (see "Projections of Future Oil and Gas Drilling Activity") for the Study Area.

## RESOURCE POTENTIAL AND GEOLOGY OF THE GRAND MESA, UNCOMPAHGRE, AND GUNNISON (GMUG) NATIONAL FORESTS AND VICINITY, COLORADO (2004)

The U.S. Geological Survey assessed the Grand Mesa, Uncompahgre, and Gunnison National Forests and the vicinity in 2004.  The report mainly discussed potential mineral deposits, excluding oil and gas.  The main content pertinent to the Study Area and this report was the assessment of coal underlying the national forests.  Information relating to coal and coal resource potential can be found under "Summary of Coal Fields in the Study Area" in this Reasonable Foreseeable Development scenario.  In general, the main coal-bearing formations are of Upper Cretaceous age (U.S. Geological Survey, 2004). The estimated combined coal resource under the Grand Mesa, Uncompahgre, and Gunnison National Forests is 38 billion short tons (Hettinger et al., 2004).  Along with the coal resource assessment, this report also discusses the geochemistry of mineral deposits, gravity, aeromagnetics, and radiometrics of the area, and mines and mineralized areas.  The report was revised in 2006 by the U.S. Forest Service.  The report is titled "Grand Mesa, Uncompahgre, and Gunnison National Forests: Coal Resource and Development Potential Report".  Most of the information remains the same but some updates exist.

## PETROLEUM SYSTEMS AND GEOLOGIC ASSESSMENT OF OIL AND GAS IN THE UINTA-PICEANCE PROVINCE, UTAH AND COLORADO (2002)—ALONG WITH THE PARADOX BASIN (1995) UNITED STATES GEOLOGICAL SURVEY

The U.S. Geological Survey is responsible for preparing the National Oil and Gas Resource Assessment for all provinces within the United States.  Their overview of the "1995 National Assessment of United States Oil and Gas Resources" (U.S. Geological Survey, 1995) presents information about potential undiscovered accumulations of oil and gas in 71 geologic or structural provinces within the United States.  The Uinta-Piceance Basin Province and Paradox Basin Province assessed at that time were partly within the Study Area.  The National Oil and Gas Resource Assessment, was updated in 2002.  The Uinta-Piceance Basin Province was updated in the 2002 Assessment.  The

Paradox Basin Province was not updated in the 2002 Assessment. Summaries of the Uinta-Piceance Basin Province (both 1995 and 2002 assessments) and the Paradox Basin Province (1995 assessment) can be found in Appendix I.

The Uinta-Piceance Basin Province boundary for the 1995 U.S. Geological Survey assessment is defined by the Uinta Mountain Uplift to the north and the southern Park Range and Sawatch Uplift on the east. North of the Uncompahgre Uplift axis defines the southern boundary. The Utah thrust belt defines the western boundary (Spencer, 1995). The Douglas Creek arch separates the Uinta-Piceance basin in two halves. In the south-central portion of the Uinta-Piceance Basin Province there is a fold belt and igneous intrusions in the southeast. Numerous folds are in the northeastern Piceance basin along with many normal faults in the western Uinta basin. Normal faulting occurs in the middle of the Uinta-Piceance basin (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 2, 2003). The southern boundary of the 1995 assessment for the Uinta-Piceance Basin Province matches the northern boundary of the 1995 Paradox Basin Province Boundary. Conversely, the southern boundary of the 2002 Uinta-Piceance Basin Province assessment is defined by Uncompahgre Uplift and the San Rafael Swell. A gap on the east side of the Study Area, between the Uinta-Piceance 1995 and 2002 southern boundaries, was not assessed because there are no play areas or assessment units (see Glossary) covering this gap.

The Paradox Basin Province covers an area of approximately 33,000 square miles in Colorado and Utah and occupies approximately 2,447.94 square miles (1,566,681.48 acres) of the Study Area. The province is 280 miles long and 200 miles wide (Huffman, 1995). Located in southwestern Colorado, the Paradox Basin Province is bounded by the Uncompahgre Plateau to the northeast, the San Juan Dome to the east, and the Monument uplifts, Circle Cliffs, and the Henry Mountains to the west. The San Rafael Swell is the northwest boundary. The Paradox basin, Kaiparowits, Henry Mountains basin, and the Wasatch and Pausaugunt Plateaus are other geologic features in the Paradox Basin Province. The province has thick sequences of Phanerozoic sediments with 5,000 to 8,000 feet of sediment in the central part of the basin. There is greater than 15,000 feet of total sediment in the Paradox basin, Kaiparowits basin, and the Wasatch Plateau (Huffman, 1995). A small gap exists where the San Juan Basin Province boundary comes into the Study Area. The gap had no play areas or assessment units that covered this area, so it was not assessed. Refer to Appendix I for a detailed summary of the 1995 Paradox Basin Province and the 2002 and 1995 Uinta-Piceance Province U.S. Geological Survey Assessments.

## A NEW APPROACH TO ASSESSING GAS AND OIL RESOURCES IN THE INTERMOUNTAIN WEST (2001): RAND SCIENCE AND TECHNOLOGY ASSESSMENT

The William and Flora Hewlett Foundation funded research assessments of natural gas and oil resources of the Rocky Mountain region. The assessment was performed by RAND Corporation, a non-profit research organization aspiring to improve policy and decision making. A number of reports were published as a result of the RAND Science

and Technology study (LaTourrette et al, 2002a; LaTourrette et al., 2002b; LaTourrette et al, 2003; and Vidas et al, 2003).  The LaTourrette et al., (2002a and 2002b) reports were prepared to:

- review existing resource assessment methodologies and results,
- evaluate recent studies of federal land access restrictions in the Intermountain West,
- consider a set of criteria that can be used to define the "viable" hydrocarbon resource, with particular attention to issues relevant to the Intermountain West,
- develop a more comprehensive assessment methodology for the viable resource, and
- employ this methodology to assess the viable resource in Intermountain West basins.

Issues were raised that the term "technically recoverable" was not inclusive of oil and natural gas that is actually producible.  The report continues to state that "technically recoverable" resources do not include exploration and production costs, infrastructure and transportation costs, and environmental impacts (2003).  The American Association of Petroleum Geologists' Secretary, Charles J. Mankin, dismissed this contention based on the fact that "viability" of future oil and gas production is more dependent on technology advances and public demand of resources than on cost (Nation, 2002).  Therefore, the term and assessment of "technically recoverable" resources is still used today.

In "Assessing Gas and Oil Resources in the Intermountain West" (LaTourrette, p. 16, 2002b), a graph shows Rocky Mountain Region technically recoverable gas resources to be approximately 310 trillion cubic feet of gas.  In contrast, the economically recoverable gas at the well head was approximately 60 trillion cubic feet of gas.  This difference was emphasized in the RAND reports as to why "viable" resources should be reported instead of "technically recoverable" resources.  Debra Knopman, a Senior Engineer at RAND, testified to the Subcommittee on Energy and Mineral Resources that their report is not meant to replace previous assessments, but their suggestions are meant to enhance, build upon, and more clearly define future reports (2002).  The RAND Corporation incorporated their approach in the Greater Green River basin (LaTourrette, 2003).  The lead author was contacted in August of 2006, and we asked for the information regarding the Greater Green River basin in order to see the details of how the methodology was applied. Unfortunately, that information had been lost and was no longer available.  Therefore, their analysis methodology has not been used to analyze the Study Area.

# ASSESSMENT OF THE COALBED NATURAL GAS RESOURCE

## COALBED NATURAL GAS ACTIVITY

The Colorado Plateau contains coal deposits in Colorado, Utah, Arizona, and New Mexico.  The major coal deposits are of Cretaceous age with older coals in the western

plateau grading to younger coals in the eastern plateau. These coal deposits are found in the Mount Garfield Formation, Mesaverde Formation, Fruitland Formation, and Dakota Sandstone (Kirschbaum, chapter A, 2000). The Study Area contains the Nucla-Naturita, Tongue Mesa, Somerset, and Grand Mesa coal fields. Figure 17 shows coal fields within the Study Area. Coal fields are determined by the U.S. Geological Survey based on four criteria:

- Areas containing significant mineral ownership that is administered by the federal government,
- Areas that have active coal mining,
- Areas where coal-bed methane is currently being produced or coal is the source rock for gas production, and
- Areas that have a high resource or development potential .

In the entire Colorado Plateau, it is estimated that 40 to 68 percent of the coal is recoverable (Kirschbaum, chapter A, 2000). Intrusives are associated with the Piceance Deep, Somerset, and Carbondale coal fields (Figure 17) and could have influenced gas generation in the nearby coals (Spencer, 1995).

In the Colorado Plateau, the U.S. Geological Survey (2000) estimated 173 trillion cubic feet of in-place coal-bed natural gas resource within the Piceance basin in Colorado, San Juan basin in Colorado and New Mexico, and the Uinta basin in Utah. Most of the estimated in-place coal-bed gas is outside of the Study Area. However, exploration for coal bed methane is taking place in the northern part of the Study Area in the Piceance basin.

Only 36 coal-bed natural gas wells have been drilled in the Study Area (Figure 3b). All 36 wells are in the Piceance basin. Four wells have been plugged, five wells are locations, and the remaining wells are producing gas (IHS Energy Group, 2010). A location means the well will likely be drilled or the data has not been updated. The six companies that drilled the 36 coal-bed natural gas wells were:

- Amoco Production Company,
- BDS International LLC,
- DIA and Associates Inc.,
- Gunnison Energy Corporation,
- Riviera Drilling and Exploration Company, and
- SG Interests, Ltd.

Amoco Production Company drilled four coal-bed natural gas wells from 1982 to 1987 at depths averaging 2,350 feet (IHS Energy Group, 2010). Two of the wells have no reported production. Cumulative production for the other two wells is 3,400 thousand cubic feet of natural gas (IHS Energy Group, 2010). All four wells are plugged and abandoned according to the Colorado Oil and Gas Conservation Commission.

BDS International LLC drilled two coal-bed natural gas wells in 2003. Average drilling depth was 7,152 feet (IHS Energy Group, 2010). Cumulative gas production for both wells is 199,642 thousand cubic feet of gas. Cumulative water production is 7,006

barrels of water.  Oil was produced from these two wells along with water and gas. Cumulative oil production is 815 barrels of oil.  Both wells are plugged and abandoned according to the Colorado Oil and Gas Conservation Commission.

DIA & Associates Inc. drilled one coal-bed natural gas well in the Study Area in 1991. The well was completed in 1993 with a total drilled depth of 3,050 feet.  The IHS database reports the well was drilled and abandoned while the Colorado Oil and Gas Conservation Commission reports the well as shut-in.  Production tests show 30 thousand cubic feet of gas and 78 barrels of water were produced.

Gunnison Energy Corporation drilled 16 coal-bed natural gas wells in the Study Area from 2003 to 2007.  Average depth drilled was 2,292 feet.  Cumulative gas production is 1,510,513 thousand cubic feet for all 16 wells (IHS Energy Group, 2010).  Cumulative water production is 1,734,404 barrels of water.  Cumulative oil production is 683 barrels of oil.  Nine out of the 16 wells had reported production.  Two wells are plugged and abandoned.  Three wells are labeled as locations.  The other wells are active gas wells (IHS Energy Group and Colorado Oil and Gas Conservation Commission, 2010).

Riviera Drilling & Exploration Company drilled one well in the Study Area in 1977 with an updated status in 1981.  Its current status is shut-in (Colorado Oil and Gas Conservation Commission, 2010).  The well was drilled to 4,125 feet.  There is no production data for this well.

SG Interest I LTD drilled 12 coal-bed methane wells in the Study Area from 2002 to 2008.  Average drilled depth of the 12 wells is 4,790 feet (IHS Energy Group and Colorado Oil and Gas Conservation Commission, 2010).  Two wells are locations and the remaining 10 wells are active gas wells.  Seven of the 12 wells report production in the IHS Energy Group database.  Cumulative production for the seven wells is 3,099,690 thousand cubic feet of gas, 21,751 barrels of water, and 6,980 barrels of oil (IHS Energy Group, 2010).

## SUMMARY OF COAL FIELDS IN THE STUDY AREA

### Grand Mesa Coal Field

The Grand Mesa coal field is in the northwestern part of the Study Area.  The Mesaverde Formation is the major coal bearing formation in the Grand Mesa coal field.  Coal present in the Mount Garfield Formation has an ash content of 2.1 to 23.3 percent, a sulfur content of 0.4 to 2.2 percent, and a heating value of 8,300 to 13,490 British thermal units (see Glossary) per pound (Kirschbaum et al., chapter B, 2000).  In coal beds greater than five feet thick it is estimated that 8.6 billion short tons of coal are recoverable with an overburden of 6,000 feet (2000).  The Roadside mine is the only active mine in the Grand Mesa coal field.  A small portion of the Grand Mesa coal field is within the Grand Mesa National Forest.  There is a high occurrence potential for coal-bed natural gas in the Grand Mesa Coal Field (Figure 19).  Development potential is moderate in the Grand Mesa Coal Field for coal bed natural gas development (Figure 24).

**Somerset Coal Field**

The Somerset coal field is in the north and northeast part of the Study Area. Numerous mines are located in this area. These mines include the West Elk Mine, Sanborn Creek Mine, Bear Creek #3 Mine, and the Bowie Mine #1 (Kirschbaum et al., chapter B, 2000). All of these mines are underground mines. Coal bed thickness ranges from 8.5 to 30 feet with coal zones residing in the Mesaverde Formation. Quality of coal is bituminous, of coking capability, and has an ash content of 2.4 to 29.9 percent. Sulfur content is 0.3 to 3.2 percent and the heating value is 8,160 to 14,380 British thermal units per pound (2000). Eight billion short tons of coal is the resource estimate down to 6,000 feet. Occurrence potential for coal-bed natural gas in the Somerset Coal Field is high. Development potential for coal-bed natural gas in the Somerset Coal Field is moderate.

**Carbondale Coal Field**

The Carbondale Coal Field is in the northeast part of the Study Area in the Piceance basin. Coal is sourced from three zones in the Williams Fork Formation (U.S. Forest Service, 2006). The Illes Formation also sources coal in the Carbondale Coal Field (Kirschbaum et al., chapter B, 2000). The three zones in the Williams Fork Formation are the Cameo-Wheeler, South Canyon, and Coal Ridge zones. Individual coal beds in these zones average 25 feet thick (U.S. Forest Service, 2006). Coal in this area is metamorphosed by igneous intrusions to bituminous and anthracite ranked coal with strong coking abilities. Methane levels range from 1,000 to 4,000 cubic feet of gas per ton and a heating value of 10,160 to 15,190 British thermal units per pound (2006). Ash content is between 1.9 and 16.2 percent. Sulfur content ranges from 0.3 to 2.1 percent (2006). Original in-place estimates of coal were 5.2 billion short tons (Kirschbaum et al, chapter B, 2000). Thirteen mines operated in this field between 1888 and 1990 (2000).

**Nucla-Naturita Coal Field**

The Nucla-Naturita coal field is located in the southwestern part of the Study Area in the Paradox basin. The Dakota Sandstone is the coal bearing formation. The Dakota Sandstone averages 330 feet thick with three to five foot thick mineable coal beds. The quality of coal is as follows: ash content is 6.1 to 12.8 percent, sulfur content is 0.5 to 1.1 percent and the heating value is 10,010 to 13,380 British thermal units per pound (Kirschbaum et al., chapter B, 2000). The estimated resource value is 114 million short tons of coal in a portion of the coal field having an area of 15 square miles. The New Horizon Mine is an active surface mine in the Nucla-Naturita coal field. This mine supplies coal to the Nucla power plant. The Uncompahgre National Forest covers the north and southeast Nucla-Naturita Coal Field. The occurrence potential for coal-bed natural gas ranges from moderate to low potential (Figure 19). Coal-bed natural gas development potential is very low to none in the Nucla-Naturita Coal Field (Figure 24).

**Tongue Mesa Coal Field**

Tongue Mesa Coal Field is located in the eastern part of the Study Area (Figure 17).  It is within the 1995 Piceance basin boundary and the 1995 Paradox basin boundary.  The coal is sourced from the Fruitland Formation in an isolated section of the northern San Juan Mountains.  The Uncompahgre National Forest covers the southern half of the Tongue Mesa Coal Field.  Multiple coal beds are within the Fruitland Formation.  About 200 feet of coal bearing strata is within the Tongue Mesa Coal Field within the Uncompahgre National Forest (Hettinger et al., chapter M, 2004).  Maximum coal bed thickness is 40 feet.  Minimum coal bed thickness is five feet.  The rank of coal is subbituminous with 6.7 to 8.4 percent ash content, 0.5 to 0.9 percent sulfur content, and 9,350 to 10,200 British thermal units per pound (Kirschbaum et al., chapter B, 2000).  Estimated resource quantity is as high as 4,000 million short tons (2000).  Historically, underground coal mines have operated in this area but currently none are active.  The occurrence potential for coal-bed natural gas in the Tongue Mesa Coal Field is moderate.  The development potential for coal-bed natural gas is low.

The U.S. Geological Survey analyzed the southern Piceance basin coal.  They defined coal beds with greater than 1 feet thick beds and less than 6,000 feet deep as a "coal resource".  Coals outside this criterion are non-resources.  In the Study Area, the Cameo-Fairfield coal group contains large quantities of the coal and natural gas in the southern part of the Piceance basin.  The Cameo-Fairfield coal group is in the Williams Fork, Mount Garfield, and Mesaverde Formations.   The coal zones in the Cameo-Fairfield coal group are the Cameo-Wheeler, South Canyon, and Coal Ridge.   As much as 140 feet of net coal exists in the Cameo-Fairfield coal group.  There are 26 coal beds that make up the 140 feet net coal thickness with each bed ranging from one to 44 feet thick each (Hettinger et al., chapter O, 2000)  Coal rank ranges from subbituminous A to anthracite with coking properties.  Mineral resources for this area include 34 billion short tons of mineable coal.  Thirteen billion short tons of coal are non-minable but may be a good resource for coal-bed methane.  Coal with overburden of 3,000 to 14,000 feet deep is non-mineable but contains 170 billion short tons of coal (2000).  These deep coal beds currently have small potential for coal-bed methane production because most coal-beds are produced from wells at depths less than 3,000 feet.  Potential for mining and natural gas in the Cameo-Fairfield coal is high.  Gas content for coals in the Piceance basin is as much as 604 cubic feet per short ton.  The U.S. Geological Survey estimated in 2000 that there was 60 billion cubic feet of coal resource per square mile in the deepest part of the Piceance basin.

R.D. Hettinger, L.N.R. Roberts, and M.A. Kirschbaum discuss coal under Forest Service lands that have less than 6,000 feet of overburden in the 2004 report "Coal Resources and Coal Resource Potential".  The national forests assessed were the Uncompahgre National Forest, the Grand Mesa National Forest, and the Gunnison National Forest.  In areas underlain by the Dakota Sandstone, there is low to moderate potential for development of coal.  The Dakota Sandstone has discontinuous, thin coal-beds and is not developed.  There is moderate to high development potential in areas underlain by the Fruitland Formation and the Mesaverde Group and Mesaverde Formation.  The Mesaverde Group

and Formation is a source for natural gas.  There are many constraints on development of coal in these areas.  For example, in underground mining, coal needs to be less than 3,000 feet deep, 3.5 feet thick coal beds or greater, dipping strata less than 12 degrees, and no more than 14 feet of coal can be mined (Hettinger et al., chapter M, 2004).

The Tongue Mesa Cretaceous coal field is in the east part of the Study Area and within the Uncompahgre National Forest.  It has approximately 1,000 feet of section in the Mesaverde Formation, with 200 feet of the section assigned to the Fruitland Formation.  The Fruitland Formation coal has one 20 to 40 feet thick coal-bed and multiple coal-beds that are 5 to 13 feet thick.  The original coal resource of the Fruitland Formation coal is approximately 2,355 million short tons to 4,000 million short tons within and outside the forest service.

# OIL AND GAS OCCURRENCE POTENTIAL

The Bureau has established criteria to use in rating the oil and gas occurrence potential (See Glossary for occurrence potential) of lands studied for planning documents such as the Resource Management Plan to be prepared for the Study Area.  This rating is based on guidance outlined in Bureau of Land Management Handbook H-1624-1 which states:

"Due to the nearly ubiquitous presence of hydrocarbons in sedimentary rock... the following [is used] for classifying oil and gas [occurrence] potential:

- HIGH:  Inclusion in an oil and gas play as defined by the USGS [U.S. Geological Survey] national assessment, or, in the absence of play designation by the USGS, the demonstrated existence of: source rock, thermal maturation, and reservoir strata possessing permeability and/or porosity, and traps. Demonstrated existence is defined by physical evidence or documentation in the literature.
- MEDIUM:  Geophysical or geological indications that the following may be present: source rock, thermal maturation, and reservoir strata possessing permeability and/or porosity, and traps.  Geologic indication is defined by geological inference based on indirect evidence.
- LOW:  Specific indications that one or more of the following may not be present: source rock, thermal maturation, reservoir strata possessing permeability and/or porosity, and traps.
- NONE:  Demonstrated absence of (1) source rock, (2) thermal maturation, or (3) reservoir rock that precludes the occurrence of oil and/or gas. Demonstrated absence is defined by physical evidence or documentation in the literature."

Using the above criteria, we consider that Study Area lands have either high or low potential for the occurrence of oil and gas (excluding coalbed natural gas) as shown in Figure 18.  All areas within the Paradox basin, the Piceance basin, and the Uinta-Piceance basin provinces are contained within specific plays or assessment units designated by the U.S. Geological Survey (1995 and 2003) so are considered to have high occurrence potential.  All areas outside the provinces are designated as low occurrence

potential since one or more specific indicators of the presence of hydrocarbons (source rock, thermal maturation, reservoir strata possessing permeability and/or porosity, and traps) may not be present.

A separate map of occurrence potential for coalbed natural gas was prepared (Figure 19). The lands within the Uinta-Piceance Basin, Mesaverde Total Petroleum System (see Glossary), Coalbed Gas Assessment Unit as mapped by the U.S. Geological Survey (2010), were designated as having high occurrence potential. Portions of the Study Area which are known to contain Cretaceous aged sediments that can contain coalbeds, but were not assessed by the U.S. Geological Survey in their most recent assessment, were designated as having medium occurrence potential. The presence of coalbeds indicates that the criterion for a designation of medium occurrence potential is met. All areas outside the high and medium occurrence potential areas are designated as having an occurrence potential of "none" since geologic mapping (Stoeser et al., 2005) shows that in these areas Cretaceous aged rocks have been removed by erosion. Only Cretaceous aged sediments in the Study Area are known to contain coalbeds which act as the source rock and the reservoir strata for coalbed natural gas resources.

# PROJECTIONS OF FUTURE OIL AND GAS ACTIVITY 2012-2031

The Annual Energy Outlook 2011, written by the Energy Information Administration (EIA), focuses on the factors that shape the U. S. energy system over the long term. Key results highlighted in the Annual Energy Outlook 2011 include:

• Strong growth in shale gas production. Shale gas production continues to increase strongly in the Annual Energy Outlook 2011 reference case, growing almost fourfold from 2009 to 2035. Shale gas production grows to 12.2 trillion cubic feet in 2035, when it makes up 47 percent of total U.S. production—up considerably from the 16 percent share in 2009. Shale gas production could become important in the part of the Piceance Basin that lays in the northeast part of the Study Area (Figure 4), if Mancos Shale exploration occurring there is determined to be economically successful. It could also become important in the Paradox basin part of the Study Area (Figure 4) it the Gothic and Hovenweep shale plays extended from their current location to the south of the Study Area.

• Growing use of natural gas and renewables in electric power generation. The role of natural gas in power generation grows due to low natural gas prices and the relatively low capital costs for new natural gas plants that make it more attractive than coal. The share of generation of power from natural gas increases from 23 percent in 2009 to 25 percent in 2035.

• Declining reliance on imported liquid fuels. Although U. S. consumption of liquid fuels continues to grow through 2035, reliance on petroleum imports as a share of total liquids consumption decreases. Total U.S. consumption of liquid fuels rises from about 18.8 million barrels per day in 2009 to 21.9 million barrels per day in 2035. The import share

which reached 60 percent in 2005 falls to 42 percent in 2035.  Rising fuel prices spur domestic energy production across all fuels.

The above projected increases in demand and in oil and gas prices indicate continued industry emphasis on searching for additional oil and natural gas supplies in the Study Area.  The combination of horizontal drilling and hydraulic fracturing technologies has made it possible to produce shale gas and tight gas economically.  Much of the Study Area oil and gas supply growth is expected to come from production from existing known reservoirs, with most new reservoir discoveries potentially coming from exploration for nonconventional plays in the continuous assessment units (including shale gas and coalbed natural gas) identified by the U.S. Geological Survey in Appendix 1.

## OIL AND GAS PRICE ESTIMATES

Anticipated oil and gas prices are an important factor controlling the amount of future drilling and production activity in the Planning Area.  Kaiser (2012) reported that "unconventional gas resources are abundant, but their development is particularly sensitive to technologic risk, geologic uncertainty, and gas price".  Conventional plays in 2010 reportedly had an operational costs break-even price of $3-4 per thousand cubic feet (Schaefer, 2010).  The National Petroleum Council (2011) stated "Significant technology advances have unlocked abundant natural gas and oil resources, but the potential benefits can only be realized if developed prudently."

### Gas Prices

In 1996, natural gas prices in Colorado started on a general increase (Figure 20).  Several peaks and valleys in the price trend have occurred since that time, but by 2005, prices had increased to an average of $7.43 per thousand cubic feet.  Colorado wellhead prices declined sharply from 2005 to 2007 ($4.57 per thousand cubic feet), peaking again in 2008.  As world economies struggled in 2009, Colorado wellhead gas prices fell to $3.21 per thousand cubic feet.  In recent months gas prices have fallen below $3 per thousand cubic feet.  "Natural gas in the New York market slipped further below $2.50/MMBTU, and given the more mild weather forecasts, we don't expect this to improve much anytime soon" (Raymond James, 2012).

Data for Figure 20 (historical and projected future natural gas prices) were obtained from the Energy Information Administration (2011).  In the Annual Energy Outlook 2012 (Lower 48), average annual wellhead prices for natural gas remain below $5 per thousand cubic feet (nominal dollars) through 2017.  The projected prices reflect continued industry success in tapping the Nation's extensive shale gas resource.  Natural gas prices rise as production gradually shifts to resources that are less productive and more expensive. Natural gas wellhead prices (nominal dollars) reach $10.24 per thousand cubic feet in 2035.  The forecasted natural gas price using 2009 dollars is $6.42 per thousand cubic feet in 2035.

The natural gas price projections allow for some generalizations concerning future gas drilling and production activity in the Uncompahgre Planning Area.  For the short term, the interest in natural gas exploration in the Uncompahgre Planning Area will likely continue or decrease since prices dropped sharply in 2011 and 2012.  Similarly, recent interest in new exploration of potential gas plays may be curtailed by low gas prices.  The resilience of drilling levels, despite low natural gas prices, is in part a result of high crude oil prices, which significantly improve the economics of natural gas plays that have high concentrations of crude oil, condensates, or natural gas liquids.  The level of future drilling activity will likely be driven more by the success of drilling efforts currently underway in the southern Piceance basin, than by wellhead prices.

Increases in future natural gas production to accommodate projected increased demand is anticipated to come partly from the Rocky Mountain area, in particular shale gas resources.  It is difficult to predict how much new gas production is expected to come from reservoirs in the Study Area.  According to the United States Geological Survey, 0.06 percent of the total United States undiscovered conventional gas resource is attributed to the Piceance basin, and 0.91 percent attributed to the Paradox basin (U.S. Geological Survey, 2008c).  Much of the current gas production from these basins lies outside of the Study Area.  Any additional gas produced from the Study Area plays is expected to come mainly from new Cretaceous shale gas and coalbed gas discoveries in the southern Piceance basin, and possibly the extension of Pennsylvanian (Gothic and Hovenweep) shale gas plays into the Paradox basin part of the Study Area.  If these plays prove successful in the Study Area, gas drilling will likely be at levels not historically experienced in the Study Area.

## Oil Prices

U.S. energy demand and economic activity in 2012 will gain some momentum from last year's doldrums but growth for each will remain anemic (Radler, 2012).  Total energy demand will increase by 1.2% in the U. S., according to Oil & Gas Journal's annual Forecast & Review.  Early estimates indicate that in 2011 demand climbed by a mere 0.3%.  But uncertainties abound this year—from the state of the European Union and its economies weakened by debt defaults to the effect of the West's reactions to Iran's development of nuclear capabilities—and it's those uncertainties that will drive the 2012 oil market.

Data for Figure 21 (historical and projected crude oil prices) were obtained from the Energy Information Administration (2011).  The data are projected averages of low sulfur light crude oil prices and are made in nominal dollars.  Historical prices represent the actual average price at the wellhead and show the historic volatility that has occurred in crude oil prices in Colorado.  Prices began declining in the early 1980's from a high of $35.69 in 1981 to a low of $12.56 in 1998.  A significant climb is seen in oil prices starting in 1999 up to 2008.  The rise from a low of $12.56 per barrel to the most recent average high of nearly $100 per barrel represents nearly an order of magnitude increase in prices in just eleven years.

Prices for crude oil in 2011 remained generally in a range between $74 and $100 per barrel. Low sulfur light crude oil prices (nominal dollars) in the Annual Energy Outlook rise to $125 per barrel in 2019 as pipeline capacity from Cushing, Oklahoma, to the Gulf Coast increases, the world economy recovers, and global demand grows more rapidly than the available supplies of liquids from producers outside the Organization of the Petroleum Exporting Countries (OPEC). In 2035, the average real price of crude oil is about $125 per barrel in 2009 dollars, or about $200 per barrel in nominal dollars.

The Annual Energy Outlook assumes that limitations on access to energy resources restrain the growth of non-OPEC conventional liquids production between 2012 and 2035, and that OPEC targets a relatively constant market share of total world liquids production. There is a wide range of price scenarios and a great deal of uncertainty surrounding future world oil prices. In several resource rich regions, high oil prices, oil sands, expanded infrastructure, further investment in exploration and drilling contribute to additional non-OPEC oil production.

Historically, exploration for oil in the Study Area has been minimal and only two wells have been classified as oil producers. Data from the U.S. Geological Survey's 1995 and 2002 oil and gas assessments for the Paradox and Piceance basins suggests that in the Study Area, only 30 million and 0.74 million barrels of oil exists as an undiscovered resource (U.S. Geological Survey, 1995 and 2002). Two-thirds of the undiscovered resource in the Paradox basin is attributed to the hypothetical Fractured Interbed continuous oil play. If any exploration specifically for oil is to occur in the Study Area it will likely occur in the Paradox basin. However, none of the wells drilled to date have made oil discoveries in the Study Area's portion of the Paradox basin, and any future drilling is thus expected to be minimal. Any new discoveries would most likely come from plays associated with U.S. Geological Survey's Fractured Interbed continuous oil play.

The future gas drilling target areas discussed in the above "Gas Prices" discussion will generally also produce condensate in association with the gas production.

## LEASING

After initial fieldwork, research, and subsurface mapping (which frequently includes use of seismic data), leasing is often the next step in oil and gas development. Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices.

Leases on lands where the United States owns the oil and gas rights are offered via oral auction at least quarterly. Starting in 2010 these auctions will be held on the first Tuesday of the second month in each quarter. A list of parcels that will be offered for lease, plus their associated environmental stipulations, is published in a "Notice of Competitive Oil and Gas Lease Sale" which is posted at least 45 days prior to the date of each sale. Leasing is a discretionary act of the Secretary of Interior. Parcels offered for lease may be withdrawn at any time prior to lease issuance.

Maximum lease size is 2,560 acres and the minimum bid is two dollars per acre.  A 365 dollar per parcel administrative fee is charged and the successful bidder must meet citizenship and legal requirements.  In addition to the lease bonus, a 1.50 dollar per acre rental is charged for the first five years of the lease and two dollar per acre is charged thereafter.  Leases are issued for a ten-year term and a 12.5 percent royalty on any production is required.  Leases that become productive are held-by-production and normally do not terminate until all wells on the lease have ceased production.  Many private oil and gas leases contain a "Pugh clause," which allows only the developed portion of the lease to be held by production (see Glossary).  However, Federal leases have no such clause, allowing one well to hold an entire lease.

Since August 1996, only lands nominated by industry have been offered for lease.  Before that date, virtually all Federal lands available for competitive leasing were offered at each sale.  Each new lease is reviewed for resource conflicts and contains restrictive stipulations which protect potentially affected, mainly surface, resource values.

Oil and gas prices and exploration success will, to a great extent, determine the amount of acreage leased and bonus bids received.  Forty-nine percent of the money earned from oil and gas leases on public domain (see Glossary) minerals goes to the State of Colorado.  The rest stays with the Federal treasury, where it is split between the conservation fund and the general fund on a 4:1 ratio, respectively.

Figure 22 presents the locations of leased and unleased Federal oil and gas minerals within the Study Area.

## PROJECTIONS OF FUTURE OIL AND GAS DRILLING ACTIVITY

It is difficult to predict what will occur a few years into the future, but it is even more difficult to predict 20 years ahead.  In an attempt to gain more insight as to what may occur in the Study Area, geologists and engineers in the oil and gas industry were approached for their input.  Major oil and gas companies operating in the Study Area were contacted by letter and asked what development activity they anticipated during the next 20 years.  The Bureau also contacted many of these companies by telephone, either a few days after the letters were sent, or in order to clarify information after replies were received.  In addition, minerals staff of the Bureau's Uncompahgre and Grand Junction field offices were consulted to get their ideas and input for our projections.  Information obtained was compiled and used to help predict locations and amounts of future drilling activity within the Study Area.  A review of available technical data was also used to help make these predictions.  Much of the data reviewed has been summarized above.

### Projected Oil and Gas Drilling Activity

For a base line, unconstrained reasonable foreseeable development projection (Rocky Mountain Federal Leadership Forum, 2004, page 13) we estimate that during the planning cycle of 2010 through 2030, as many as 1,271 wells will be drilled in the Study Area.  Up to 782 of these wells could be coalbed natural gas wells (to be discussed latter)

and the remaining wells (up to 489 wells) would be considered to be conventional type wells.

As many as 10 of the conventional wells could be deep wells (greater than 15,000 feet in depth) that would be located in the deeper parts of the Paradox basin.  At present, identified plays and known interest in the Paradox basin is for oil and gas targets at depths shallower than 15,000 feet.  Any future deep wells would be part of a potential high-risk exploratory play that has not yet been identified.  Our projection assumes that operators not currently exploring deep targets could show an interest in this type of exploration during the Analysis Period.  As such development is at this point hypothetical, no provisions were made in our calculations to include additional disturbance from deep wells (all conventional wells were treated the same for surface disturbance calculations to be discussed later).

The estimated conventional oil and gas development potential and drilling densities within the entire Study Area during the Analysis Period (see Glossary) are shown in Figure 23a.  Figure 23b shows potential just on Bureau managed oil and gas minerals and Figure 23c shows potential just on Forest Service managed minerals.  No leasing areas (wilderness lands), shown on map 23a, are not shown on maps 23b and 23c to reduce confusion.  Estimated acres, number of townships, and percentage of the entire Study Area within each development potential classification type shown in Figure 23a are summarized in Table 3.  The percentage of Bureau managed oil and gas minerals of each conventional oil and gas development potential type is:

- Very high        15 percent,
- High              98 percent,
- Moderate          48 percent,
- Low                6 percent,
- Very low          29 percent, and
- Negligible        12 percent.

Overall, the Bureau manages about 30 percent of all Study Area lands assigned a development potential.

The percentage of Forest Service managed oil and gas minerals of each conventional oil and gas development potential type is:

- Very high        74 percent,
- High               0 percent,
- Moderate          25 percent,
- Low               42 percent,
- Very low          34 percent, and
- Negligible        40 percent.

Overall, the Forest Service manages about 36 percent of all Study Area lands assigned a development potential.

We estimate that the **_average_** ranges of drilling densities per township (one township is about 36 square miles) during the Analysis Period will be:

- Very High          >12 wells,
- High               > 6 to 12 wells,
- Moderate           > 2 to 6 wells,
- Low                > 1 to 2 wells,
- Very Low           > 0.25 to 1 wells, and
- Negligible         less than 0.25 wells.

Forest Service wilderness lands and Bureau wilderness and wilderness study areas were not assessed for future oil and gas development potential activities since those areas cover Federal lands that are removed from oil and gas leasing and thus, oil and gas development cannot occur.

The boundary of the very high potential was drawn to include two U.S. Geological Survey (2003) assessment units within their Mancos/Mowry Total Petroleum (Piceance Basin Continuous Gas and Uinta-Piceance Transitional and Migrated Gas assessment units). Hydrocarbons generated from the marine Mancos/Mowry shales, where maturation has reached a vitrinite reflectance (see Glossary) of at least 0.75 percent, has potentially charged all porous sandstones and fractured beds of Cretaceous age. Three groups of reservoirs rocks can be present within this area of very high potential. They are:

1. Lower Cretaceous – Morrison Formation, Cedar Mountain Formation, and Dakota Sandstone (Figure 6a);
2. Lower part of Upper Cretaceous – Frontier Formation, Mancos Shale, and the Mancos B (Figure 6a); and
3. Upper part of Upper Cretaceous – Rollins, Cozzette, and Corcoran sandstone members of the Iles Formation (Figure 6b).

Production in this part of the Study Area has historically come from the third group of reservoirs and recent horizontal well completions have been made in the Mancos Shale (see following "Resource Plays" discussion for more information about the Mancos Shale play) of the second group of reservoirs. The dominate future targets in the very high potential area are expected to be for reservoir groups two and three.

Although we assume an average township in the area of very high potential will contain 25 conventional wells (Table 3), it is likely that actual drilling locations will be preferentially located on private/state surface ownership where it is traditionally easier for operators to negotiate for use of drilling locations than it is on National Forest lands. Most of the oil and gas minerals beneath these private/state lands are managed by the Bureau, with minor amounts controlled by private/state ownership.

The part of the Whitewater Unit lying within the Study Area is assigned a high potential for development. The operator (Fram Operating LLC) presently proposes to develop the Dakota Formation in a part of the unit just north of the Study Area with well pads that may accommodate up to nine wells. Over the analysis period it is possible that one or two additional pads could be located within the Study Area.

As much as 29 percent of the conventional wells projected in the Study Area, could be drilled in areas of moderate potential.  The Paradox basin portion of the Study Area was assigned a moderate development potential based on past moderate rates of exploration and development activity and potential for additional exploration related to three existing plays defined by the U.S. Geological Survey (1995).  The three plays include the Salt Anticline Flank and Buried Fault Blocks, Fractured Interbed, and Porous Carbonate Buildup plays (see Appendix 1 for additional discussion of these plays).  Also included is the potential for future shale gas related exploration in shales such as the Gothic and Hovenweep in this part of the Paradox basin.  The area of moderate potential on the north contains Cretaceous aged sediments that may be deep enough to contain hydrocarbons that may be associated with the Phosphoria Total Petroleum System of the U.S. Geological Survey (2003).  Some limited activity has occurred here in recent years.

A limited number of wells (less than seven percent of the 489 wells projected) are projected in areas of low, very low, and negligible potential.  None of the oil and gas industry operators surveyed for this report indicated an interest in future drilling in any of these three potential areas.  Only a limited number of wells in these areas have been completed as productive by historical drilling and only a few very low production gas wells are still reported to be active near the town of Ridgeway.  Most of the townships in these three areas will not receive any drilling activity during the Analysis Period.  If new field discoveries are made in any of these three areas, subsequent drilling density could increase in those areas immediately around a discovery.  However, predicting a well density for such areas is not possible at this time.

Historically, about 90 percent of conventional wells have drilled to a depth of less than 10,000 feet, with drilling spread from very shallow to deep.  We anticipate that future drilling depths will be predominantly within the range of 5,000 to 10,000 feet.

## Projected Coalbed Natural Gas Drilling Activity

As previously stated, up to 782 coalbed natural gas wells are projected in the Study Area for the Analysis Period.  The estimated coalbed natural gas development potential and drilling densities within the Study Area during the Analysis Period are shown in Figure 24a.  Figure 24b shows potential just on Bureau managed oil and gas minerals and Figure 24c shows potential just on Forest Service managed minerals.  No leasing areas (wilderness lands), shown on map 24a, are not shown on maps 24b and 24c to reduce confusion.  Estimated acres, number of townships, and percentage of the entire Study Area within each development potential classification type shown in Figure 24a are summarized in Table 4.    The percentage of Bureau managed oil and gas minerals of each coalbed natural gas development potential type is:

- High          19 percent,
- Moderate     22 percent,
- Low          26 percent,
- Very low      27 percent, and
- None          38 percent.

Overall, the Bureau manages about 30 percent of all Study Area lands assigned a development potential.

The percentage of Forest Service managed oil and gas minerals of each coalbed natural gas development potential type is:
- High            68 percent,
- Moderate        64 percent,
- Low             39 percent,
- Very low        23 percent, and
- None            40 percent.

Overall, the Forest Service manages about 36 percent of all Study Area lands assigned a development potential.

We estimate that the **average** ranges of drilling densities per township (one township is about 36 square miles) during the Analysis period will be:
- High            $\geq$ 40 wells,
- Moderate:       20 to 39 wells,
- Low:            2 to 19 wells,
- Very Low:       > 2 wells, and
- None            no drilling activity expected.

Forest Service wilderness lands and Bureau wilderness and wilderness study areas were not assessed for future oil and gas development potential activities since those areas cover Federal lands that are removed from oil and gas leasing and thus, oil and gas development cannot occur.

The areas we projected as having high and moderate coalbed natural gas development potential during the Analysis Period lie within the boundary of the Mesaverde Total Petroleum System, Coalbed Gas Assessment Unit (Figure A1-7).  In addition, historical drilling data and operator supplied information was used to define which parts of the assessment unit would have high potential and which would have moderate potential.  As many as 95 percent of the 782 projected coalbed natural gas wells could be drilled in these two areas.

Although we assume an average township in the area of high and moderate potential will contain 60 (high potential) or 30 (moderate potential) coalbed natural gas wells (Table 4), it is likely that actual drilling locations will be preferentially located on private/state surface ownership where it is traditionally easier for operators to negotiate for use of drilling locations than it is on National Forest Lands.  Most of the oil and gas minerals beneath these private/state lands are managed by the Bureau, with minor amounts controlled by private/state ownership.

The area of low potential outlines the Tongue Mesa Coal Field (figure 17) where individual coal beds are up to 40 feet thick.  To outline the area of very low potential, remaining areas containing Cretaceous aged sediments that could contain coal (in beds generally less than six feet thick) were buffered back one half mile from their outcrop.

No present interest in coalbed natural gas exploration has been identified in the short-term for either the low or very low potential areas, but some limited activity could occur at a later date in the Analysis Period.  Areas of no potential for coalbed natural gas activity during the Analysis Period are those determined to have no occurrence potential (see Figure 19) and those areas with Cretaceous sediments near the outcrop (a one half mile buffer back from the outcrop).

Historically, most coalbed gas wells have produced at depths between 2,000 and 5,000 feet, although one well has completed in an interval between 6,845 and 6,928 feet.  We anticipate that future drilling producing intervals will remain predominantly within the range of 2,000 to 5,000 feet.

## PROJECTIONS OF FUTURE OIL AND GAS PRODUCTION

Natural gas production from the Rocky Mountains has grown steadily since 1992 (National Petroleum Council, 2003).  The Rockies are currently the largest producing region in the onshore lower 48 states.  Much of this growth has been from unconventional resources, although conventional production has also been increasing.

When the Energy Information Administration (2004) looked at past United States gas production they found that "Just a few years ago, it was believed that natural gas supplies would increase relatively easily in response to an increase in wellhead prices because of the large domestic natural gas resource base.  This perception has changed over the past few years.  While average natural gas wellhead prices since 2002 have generally been higher than during the 1990's and have led to significant increases in drilling, the higher prices have not resulted in a significant increase in production.  With increasing rates of production decline, producers are drilling more and more wells just to maintain current levels of production.  A significant increase in conventional natural gas production is no longer expected.  Drilling deeper wells in conventional reservoirs is expected to slow the overall decline."   More recent analysis has confirmed this trend.  Foss (2007) found that gas production in the United States has been lower than the recent high of 20.5 trillion cubic feet reported in 2001.  This decline in total production for the United States has occurred even while drilling has reached an all-time high.  Foss (2007) indicated that the United States resource base (conventional oil and gas reservoirs) is maturing and unconventional plays are increasingly the target of drilling.  Since unconventional plays tend to have a lower ultimate oil and gas recovery, overall production from new wells does not match historical results, nor is it expected to in the future.  In general, we expect that new gas wells drilled within the Study Area will follow this trend of reduced production per well from new wells completed, unless a new gas play develops.

Onshore oil production in the lower 48 states has been declining since the late 1980s and is expected to continue into the future (Energy Information Administration (2006c).  Oil production in the Study Area presently is as a byproduct that is associated with the primary gas production.

## ESTIMATED FUTURE CONVENTIONAL OIL AND GAS PRODUCTION

As indicated above, we projected 489 conventional oil and gas wells and 782 coalbed natural gas wells could be drilled within the Analysis Period of 2010 through 2030.  The first step in projecting future production activity was to project a spudded well count for conventional wells and coalbed natural gas wells.  The following data tables for spudded well counts and production were generated via analysis through the program scripting language, Octave.  The constraints used for the well spuds for both conventional wells and coalbed natural gas wells were cumulative values and historical trend.  A historical cumulative of spudded well data generates a smoother curve from which yearly differences can be extracted to produce annual projected well counts.  The resulting calculation of mean spudded conventional and coalbed natural gas wells is presented in Table 5.

Decline curves were then generated for gas and oil for both the conventional and coalbed natural gas analysis.  The decline curves were then normalized and convolved with the historical spudded well counts to generate a best fit with the **historical** production of gas and oil.  The normalized decline curves were then convolved with the projected spudded well counts to produce annual mean projected conventional oil and gas production (Table 6a) for the Analysis Period.  About 31.27 percent of projected conventional wells are expected to be located on Bureau managed oil and gas minerals, so we project that production associated with these wells will also be about 31.27 percent of that projected in Table 6a.  Table 6b projects conventional oil and gas production associated with Bureau managed oil and gas minerals.

The same methods described above were used to projection production of coalbed natural gas hydrocarbons (Table 7a) for the Analysis Period.  Some small amounts of oil have been produced in conjunction with the gas production so we projected associated oil production for the Analysis Period.  About 33.91 percent of projected coalbed natural gas wells are expected to be located on Bureau managed oil and gas minerals, so we project that production associated with these wells will also be about 33.91 percent of that projected in Table 7a.  Table 7b projects coalbed natural gas hydrocarbons associated with Bureau managed oil and gas minerals.

Since projected well activity is expected to increase over the Analysis Period, conventional and coalbed natural gas related hydrocarbon production is also expected to increase.  If future drilling activity does not meet our projections then production will not increase at the rates projected.

## OTHER POTENTIAL FUTURE OIL AND GAS ACTIVITIES

### Resource Plays

We use the term Resource Play to describe accumulations of hydrocarbons known to exist over a large areal extent and/or thick vertical section, may be self-sourcing, may be

developed with horizontal well completions, and are driven by development efficiencies rather than geologic risk. Within the Study Area, resource plays could include continuous resource plays and assessment units identified by the U.S. Geological Survey (1995 and 2002). In the Piceance basin, those assessment units could include the:

- Mancos/Mowry Total Petroleum System, Uinta-Piceance Basin, Continuous Gas (Figure A1-8),
- Mancos/Mowry Total Petroleum System, Uinta-Piceance Basin, Transitional and Migrated Gas (Figure A1-8),
- Mesaverde Total Petroleum System, Uinta-Piceance Basin, Continuous Gas (Figure A1-6), and
- Mesaverde Total Petroleum System, Uinta-Piceance Basin, Transitional Gas (Figure A1-6).

In the Paradox basin the Fractured Interbed (hypothetical) Play (Figure A1-2) could be included as a resource play. In addition to the hypothetical Fractured Interbed Play, operators in the Paradox basin immediately south of the Study Area have successfully targeted the shale gas resource plays of the Pennsylvanian Gothic and Hovenweep shales (Ismay member of the Paradox Formation).

Coalbed natural gas assessment units could be included as resource plays, but are not since their potential for future development has already been discussed.

The Fractured Interbed Play is the only identified oil resource play in the Study Area. As it is still hypothetical and no operators have shown recent interest in exploration within the play, the likelihood for its development in the Study Area during the Analysis Period is very low.

Carbonaceous shale is expected to be an important future source of natural gas in the United States. At present, there is little production information available to fully characterize any shale gas play that may be present within the Study Area. In the Piceance basin portion of the Study Area, the Mancos/Mowry Total Petroleum System assessment units (Continuous Gas and Transitional and Migrated Gas assessment units) are the most likely to be developed for shale gas resource plays in the Study Area. Though still in the early exploration phase, operators have targeted the Mancos shale in the area covered by these two assessment units, in the northern portion of the Study Area. Figure A1-8 shows the location of these two plays. The Mancos is a ubiquitous formation throughout many western basins deposited during the Late Cretaceous, and is of approximately the same age as other known shale gas resource plays in the region including the Baxter, Hilliard, and Niobrara shales. These shales have proven attractive targets for gas drilling in recent years and a number of successful plays have been developed or are being developed in the Green River, Washakie, Sand Wash, Powder River, Denver, and Uintah basins (Energy Information Administration, 2010e). Occasionally these plays are explored using vertical wellbores with multiple frac/perforation zones, as appears to be the case with the wells spud in the Study Area, but full development generally occurs using horizontal wellbores and large fracs.

Three wells are presently reporting gas production from the Mancos in the very high conventional development potential area of Figure 23a. Two are operated by Gunnison Energy Corporation (section 17 of T. 12 S., 89 W. and section 23 of T. 12 S., Range 94 W.) and one is operated by SG Interests (section 15 of T. 11 S., R. 90 W). The SG Interests well has produced for 18 months (through November of 2011). One Gunnison Energy Corporation well has produced gas for 21months while the other produced seven months, but did not report production for November of 2011. One additional test of the Mancos was made by Gunnison Energy Corporation at a location outside the very high development potential area defined in Figure 23a (section 12, of T 13 S., R. 93 W.). A test of the Mancos Shale in this well only recovered water. A better understanding of this potential play should be available once additional testing of the play is undertaken and its economics becomes clearer.

Exploration and development activities in the Gothic and Hovenweep shale gas resource plays of the Paradox basin have been recently initiated immediately south of the Study Area, with initial Gothic Shale wells located in Dolores and Montezuma counties and Hovenweep Shale wells located in San Miguel County. The development potential for these areas south of the Study Area were recently been assessed by Leschak (2009). Developed by predominately using horizontal wellbores and large hydraulic fracs, these plays are in their infancy (fewer than ten wells are presently drilled), but are proving to be productive. In the area being explored south of the Study Area, these shales tend to lie at around 9,000-10,000 feet below the surface (Colorado Oil and Gas Conservation Commission, 2010). While the recently completed wells have provided encouraging results, the likelihood the plays will extend into the Study Area is low. The Paradox basin is distinctly asymmetrical, with the deepest portion of the basin (thickest sedimentary rock column) located adjacent to the Uncompahgre Uplift in the southern portion of the Study Area (Schamel, 2009). Several thousand feet of additional vertical drilling would be required to encounter the Gothic or Hovenweep shales in the Study Area, pushing the limits of the economics. Additionally, the Gothic Shale is likely to become less productive as it nears the clastic input from the Silverton Delta (a river delta developed contemporaneously to the deposition of these shales). The delta is mapped as occurring in western San Miguel County, with input of clastic material to the deltaic system having occurred from paleo-rivers to the east. Thus, only extreme western Montrose County would be likely to have shallow enough sediment packages located distally enough from the Silverton Delta to present a reasonable target for exploration.

When and if the Mancos, Gothic, or Hovenweep shale gas plays are fully characterized for the Study Area and technology and well completion methods are optimized, this energy source could become important. If adjacent to or overlapping existing plays, development would likely commence at a faster rate than if found to be geographically separated from such areas. Such an overlap appears to be the case with the initial Mancos wells located within the areal boundary of the coalbed play presently being developed.

When a shale gas play overlaps an existing play in the Study Area, as is the case with the Mancos, existing wellbores may be utilized in addition to new wells drilled specifically for the shale gas. However, the nature of shale gas plays would likely require drilling of

horizontal wells, so the existing wellbores would likely still have to be re-entered and a horizontal lateral drilled into the zone of interest using the existing wellbore as a pilot. Shale has very low permeability and as is the case with shale gas plays being developed in the region, large hydraulic fracture stimulations will probably be necessary to liberate the gas (Bereskin and Mavor, 2003). Existing coalbed gas well pads could similarly be utilized for the drilling of new shale gas wells, or new pads could be configured to allow simultaneously.

The Mesaverde Total Petroleum System Uinta-Piceance Basin Continuous and Transitional Gas assessment units are also present, but are quite small in areal extent, covering only 2,088 acres (0.06%) and 45,360 acres (1.41%), of the Study Area, respectively. These plays are characterized as upper Mesaverde fluvial sandstone reservoirs sourced from the underlying thermally mature coals and carbonaceous shales of the lower part of the Mesaverde (i.e., the Iles Formation coal and shale members) (U.S. Geological Survey, 2002). Only limited exploration of these plays has occurred in the Study Area. Of the 13 wells drilled to the Mesaverde Formation and its members (not including coalbed natural gas wells), four were dry and abandoned, one is temporarily abandoned, one has been converted to a water injection well, and only seven have been completed as Mesaverde gas wells, all of which were either shut-in or choked back due to pipeline constraints at the time of this writing (IHS Energy Group, 2010; Colorado Oil and Gas Conservation Commission, 2010). If this play becomes fully characterized in the Study Area, development would be expected to proceed similarly to the aforementioned shale gas plays. However, being characterized as fluvial sandstone reservoirs, large hydraulic fracs would not be as necessary, and development would be more likely to occur using vertical wells, or multiple directional wells drilled from a single pad.

Although there has not been a lot of past interest in exploration of the Study Area's potential resource plays, some operators have indicated an interest in exploration during the Analysis Period. Their projections were used to assist in preparing the development potential map (Figure 23) and projection of 489 conventional wells for the Analysis Period. The development potential in parts of the Study Area underlain by the four assessment units in the Piceance basin (Figures A1-6 and A1-8) and for the Gothic and Hovenweep shales in the Paradox basin is predominantly tied to operator identified plays associated with these assessment units or our projections of potential for development of these assessment units.

A large portion of the wells projected in the very high conventional development potential area (Figure 23a) could be Mancos wells if this play is determined to be economic in the Study Area. Our projections of moderate conventional development potential in the Paradox basin part of the Study assumes at least some potential for exploration of the Gothic and Hovenweep shales in the future. If one or both shales become economic to produce in this area, a large portion of the wells projected for this area would be related to Gothic and/or Hovenweep shale drilling.

## Coal Gasification

Underground coal gasification may be a potential future process that is applied to coal deposits within the Study Area. This process burns the coal in-situ producing a combustible gas with a low heating value that can be used in industrial processes and gas turbines. Air or oxygen commingled with steam is injected into the coal seam resulting in the coal being burned outward from the injection well. The combustion products react with the non-burned coal to form hydrogen, carbon monoxide, and pyrolysis products that are produced at a production well. There is evidence that combustion gases preferentially absorb to the coal cleat faces and displace coalbed natural gas from the coal, which increases the heating value of the produced gas. The heat of reaction of the burned coal heats up the unburned coal in front of the combustion front and drives off the hydrocarbon volatile matter contained in the coal. The removal of volatile matter is essentially the same process that coal goes through in the geologic process of changing from lignite to anthracite by adding geothermal heat (increasing burial depth) and geologic time.

Underground coal gasification is usually at depths too deep to be economically mined. Depth is a positive factor in the gasification process as the higher pressures at depth appear to give better reaction results and a gas with a higher heating value. The limiting factor in depth would be potential reduced permeability of the coal and the ability to efficiently inject and produce the gas.

Underground coal gasification uses essentially the same injection/production process that is utilized in water flooding oil reservoirs and in the carbon dioxide tertiary oil recovery process. Because the coal is burned and removed, subsidence may be a problem but the thin zones, greater depths, and strong cap rocks in most of the northern part of the Study Area should limit this.

There are coal beds in the Study Area at depths too deep for mining but good candidates for underground gasification. Presently, the underground gasification technology involving deep coal beds does not appear to be economic and there is no known research activity into future development in the Study Area. Considering the relatively experimental status of underground coal gasification and the abundant coal found elsewhere in the region, there is a very low probability that this process will be utilized in the Study Area during the Analysis Period.

## Carbon Dioxide Sequestration

Carbon dioxide sequestration is a method of storing captured carbon dioxide gas, a greenhouse gas. The primary industrial sources of carbon dioxide include electrical power plants, oil refineries, chemical refineries, agricultural processing plants, cement works, and iron and steel production. Power and industrial plants, agricultural processing, chemical processing, and petroleum and natural gas processing (including refineries and sources associated with pipeline infrastructure) have been identified as the

major industrial sources of carbon dioxide (U.S, Department of Energy, 2007).  Of these sources, electrical power plants produce the most carbon dioxide by a substantial margin.

Within the Study Area and the region, the largest carbon dioxide emission sources are power plants.  Small amounts or carbon dioxide may be produced in association with oil and gas production within the Study Area, but no information was available to quantify amounts.

Capturing and storing carbon dioxide has been proposed to reduce the environmental effects caused by releasing the gas to the atmosphere.  Three types of geologic formations have been identified as potential carbon dioxide sequestrations sites, with only two of these occurring in the Study Area (U.S. Department of Energy, 2008).  Those formation types are:

- Mature Oil and gas reservoirs – These reservoirs have hosted natural accumulations of oil and/or gas and could, in the future, be used to store carbon dioxide.  The entrapment of hydrocarbons indicates that a containment seal is present and any associated water (see Glossary) is assumed to be nonpotable.  The Study Area is not known to contain any large oil and gas reservoirs that could be considered for sequestration, nor could the known reservoirs be considered as mature.

- Unminable coal seams – Unminable coal seams are considered to be those that are too deep or too thin to be economically mined.  Many of the Cretaceous coals in the Study Area meet these criteria.  If methane contained in the Study Area coal beds grows to a more mature stage of development then there could be a future opportunity to inject carbon dioxide, which could sweep additional methane from the coalbeds and allow adsorption by the coals of the carbon dioxide.  Since coal beds preferentially adsorb carbon dioxide, they provide excellent storage sites.

- Saline formations – Saline formations suitable for carbon sequestration were defined in the U.S. Department of Energy (2008) atlas as porous and permeable rocks containing water with total dissolved solids greater than 10,000 milligrams per liter, which have the capacity to store large volumes of carbon dioxide.  Saline rocks can have a large potential for carbon dioxide storage.  Many of these potential formations are made up of reactive carbonate rocks that could potentially react with and convert the carbon dioxide into compounds for storage in the host rock.  Currently, there are no projects to evaluate this process in saline formations within the Study Area.

## POTENTIAL OIL AND GAS SURFACE DISTURBANCE

As a first step, assumptions were made about the numbers of wells drilled in each well type category, the number of new wells drilled per pad (disturbed site), completion success, and percentages of Bureau managed oil and gas minerals.  These were then combined with assumptions about disturbance associated with well pads and associated

roads and pipelines. Data obtained from operators, the Uncompahgre Field Office, and our historical analysis was used to make the following assumptions.

## Well Assumptions – Wells Drilled, Wells Drilled per Disturbed Site (Pad), Completion Success, and Bureau and Forest Service Managed Oil and Gas Minerals

As stated previously, the conventional oil and gas well category includes all wells that may be drilled other than coalbed natural gas wells. Thus, any shale gas wells that may be drilled are included in the conventional category. The method used to determine the number of new wells drilled during this period has been previously discussed. In addition, we assumed that:

1. In the high conventional potential area (Whitewater Unit) there will be one pad with up to nine wells per pad. Bureau managed oil and gas minerals will cover more than 98 percent of wells and all surface pads will be on Bureau managed oil and gas minerals. No Forest Service managed oil and gas minerals lie within high conventional development potential. The success rate will be 75 percent for wells, with the one pad remaining active in the short-term and long-term.

2. In the very high conventional development potential area of the Piceance basin, wells spudded between January 1, 2000 and December 31, 2009 were: 27.78 percent on Bureau managed oil and gas minerals; 19.44 percent on Forest Service managed oil and gas minerals; and 52.78 percent on private/state managed oil and gas minerals.

3. In the very high and moderate conventional development potential and high and moderate coalbed natural gas parts of the Piceance basin, coalbed natural gas wells would use vertical wellbores. The conventional wells could be for shale gas targets or for sandstones of the Mesaverde Group and could be drilled either conventionally or with multiple horizontal wellbores to minimize the number of well pads required to drain the resource.

4. In the very high and moderate conventional development potential and high and moderate coalbed natural gas parts of the Piceance basin, 32 of the 52 existing one well locations will receive an average of 3 additional wells (one additional coalbed natural gas well and two additional conventional wells on each existing location). Up to 96 new wells are projected. Bureau managed oil and gas mineral lands cover over 27.78 percent of the locations in the area and 19.44 percent on Forest Service managed oil and gas mineral lands, with the remaining locations on private/state oil and gas minerals. The success rate for coalbed natural gas wells will be 90 percent and for conventional wells it will be 75 percent, with all 32 pads remaining active in the short-term and long-term.

5. In the very high and moderate conventional development potential and high and moderate coalbed natural gas parts of the Piceance basin, 125 new pads will be constructed with an average of two coalbed natural gas wells and two

conventional wells on each pad for a total of 500 wells. About one third of the new pads will be on Bureau managed oil and gas mineral lands, one third on Forest Service managed oil and gas minerals and one third on private/state lands. The success rate for coalbed natural gas wells will be 90 percent and for conventional wells it will be 75 percent, with 98 percent of all 125 pads remaining active in the short-term and the remaining two percent abandoned. In the long-term, remaining pads will continue to be active.

6.  In the Piceance basin part of the Study Area, 229 new pads will be constructed with an average of two coalbed natural gas wells on each pad for a total of 458 wells. About one third of the new pads will be on Bureau managed oil and gas mineral lands, one third on Forest Service managed oil and gas minerals and one third on private/state lands. The success rate for coalbed natural gas wells will be 90 percent, with 95 percent of all 229 pads remaining active in the short term and the remaining five percent abandoned. In the long-term, all remaining pads will continue to be active.

7.  In the rest of the Study Area (areas of low and very low coalbed natural gas potential), 42 single coalbed natural gas well pads will be constructed. The Bureau will manage oil and gas mineral lands on about 26 percent of the wells in areas of low potential and about 27 percent of the wells in the areas of very low potential. The Forest Service will manage oil and gas mineral lands on about 39 percent of the wells in areas of low potential and about 23 percent of the wells in the areas of very low potential. The success rate for coalbed natural gas wells will be 90 percent, with 10 percent abandoned after drilling. In the long-term, remaining wells will continue to be active.

8.  In the rest of the Study Area (areas of moderate and low conventional oil and gas development potential in the Paradox basin and the very low and negligible development potential areas), the remaining 166 conventional wells will be drilled, with an average of 1.5 wells per pad. The Bureau will manage oil and gas mineral lands on about 49 percent of the wells in areas of moderate potential, six percent of the wells in areas of low potential, about 29 percent of the wells in the areas of very low potential, and about 12 percent of the wells in the areas of negligible potential. The Forest Service will manage oil and gas mineral lands on about 23 percent of the wells in areas of moderate potential, 42 percent of the wells in areas of low potential, about 34 percent of the wells in areas of very low potential, and about 40 percent in areas of negligible potential. The success rate for conventional wells will be 75 percent, with 25 percent abandoned after drilling. In the long-term, remaining wells will continue to be active.

9.  The projected numbers of new wells per pad were derived from industry sources, consultation with the Uncompaghre Field Office, and our analysis.

10. The average well life for the new projected conventional and coalbed natural gas wells will be at least 20 years.
11. All presently active wells completed prior to 1990 (not including one water injection well) will be abandoned during the analysis period.  This totals 15 wells that would be abandoned in the long-term.

## Surface Disturbance Assumptions

Assumptions about the different types of surface disturbance associated with drilling new wells were also made.  The assumptions include those made for the potential types of drill pads, roads associated with the drill pads, and pipelines associated with drill pads.

### Drill Pads

Drill Pad disturbance is projected to vary with the number of wells planned for each pad and the local topography.  If a well is successfully completed, then the operator will be required to begin mandatory interim reclamation of a large part of the area initially disturbed during preparation for drilling of all wells on the pad.  This interim reclamation reduces the amount of disturbed surface and the resulting unreclaimed pad area is labeled below as long term disturbance. [If a well is unsuccessful, the entire well pad will be reclaimed and no long-term disturbance will occur.]  Average surface disturbance will remain whether wells are drilled conventionally or horizontally.

Conventional Wells

| Development potential | Average initial disturbance (acres/pad) | Long term disturbance (acres/pad) |
|---|---|---|
| **Multi-Well Pads** | 6 | 2.0 |
| **Single & 2 Well Pads** | 4 | 1.5 |

Coalbed Natural Gas Wells

| Development potential | Average initial disturbance (acres/pad) | Long term disturbance (acres/pad) |
|---|---|---|
| **Multi-Well Pads** | 4 | 1.5 |
| **Single Well Pads** | 3 | 1.5 |

### Access roads (all well categories)

A detailed study of recent development in the entire Uncompaghre Field Office was completed.  The areas that were studied have been developed with four pads per section in moderate to severe terrain.  The area had no prior existing roads, or the existing roads required major upgrades.  The study indicates an access road disturbance of **8.0** acres per section has occurred.   The 8.0 acre surface disturbance per section assumes a road disturbance width of 40 feet, which equates to an equivalent of 4.85 acres per linear mile of road (1.65 mile of road per section).

**Pipelines**

The table below assumes that with the well and well pad densities described above that
- pipelines would be run parallel to the access roads,
- pipeline Right-Of-Way widths would average 50, and
- full reclamation would occur at the time of installation.

The assumption that the pipelines and access roads be run parallel may result in higher estimates of surface disturbance than what is actually approved; in some installations, the construction areas may overlap which will reduce the initial disturbance figures.

| Development potential | Pipeline average initial disturbance (acres per section) | Pipeline long term disturbance (acres per section) |
|---|---|---|
| **CBM, Conventional, Shale ( all categories)** | 10.0 acres  (1.65 miles@ 50') | 0 |

## Analysis Results

Table 8a shows our projection of new exploratory and development wells (1,271 wells with 418 of those wells drilled on Bureau managed oil and gas minerals) that could be drilled in the Study Area from 2010 through 2030.  There are an additional 62 existing active well locations (IHS Energy Group, (2010) and Colorado Oil and Gas Conservation Commission, 2010), as of April 2010, for a total of 1,333 existing and projected coalbed natural gas and conventional oil and gas wells in the short-term.  Of those 1,333 existing and projected wells; 432 will lie on Bureau managed oil and gas minerals.  Bureau managed wells were calculated using a percentage for well type.  Those percentages are presented above in "Well Assumptions."   The 1,271 new wells drilled will be located on 540 disturbed sites, with 174 sites projected on Bureau managed oil and gas minerals.

Table 8a also calculates associated acres of total surface disturbance (short-term disturbance) directly associated with all new wells and existing active wells (as of April 2010).  Number of disturbed sites are multiplied by acres of disturbance (per site) to calculate total acres of surface disturbance and Bureau managed well disturbance for each well type (e.g., total disturbed sites * (access roads and pipelines + well pad).  For well sites that are abandoned (two percent for Coalbed Gas/Conventional Well Multipads, five percent for Coalbed Gas Multipads, 10 percent for Coalbed Gas Single Well Pads, and 25 percent for Conventional One and Two Well Pads) pipelines will not be installed so pipeline disturbance is not included in the calculation.  Approximately 10,984 acres of new short-term surface disturbance (3,578 acres of disturbance on Bureau managed oil and gas minerals) could occur if all 1,271 projected wells are drilled.  Total short-term surface disturbance (for all well types) would be 11,201 acres, with 3,627 of those acres on Bureau managed oil and gas minerals.

Table 8b includes our long-term projections of wells and associated disturbance.  This projection factors in the dry-hole abandonment and reclamation of some new wells

drilled (see above assumptions) and abandonment of some presently active wells. In the long-term 1,070 (352 Bureau managed) of the projected 1,271 (418 Bureau managed) new wells drilled will remain active at the end of the Analysis Period. We also project that 494 (159 Bureau managed) of the 540 (174 Bureau managed) new disturbed sites will also remain active. Total wells in active status will be 1,117 (366 Bureau managed) in the long term, with 541 active disturbed wells sites (173 Bureau managed disturbed well sites).

Finally, Table 8b shows the calculated unreclaimed acres of total surface disturbance (long-term disturbance) directly associated with all remaining active wells. Approximately 4,465 acres of new unreclaimed surface disturbance (1,456 acres of unreclaimed Bureau managed oil and gas minerals) from new wells drilled during the Analysis Period could remain in the long-term. Total unreclaimed long-term surface disturbance (for all well types) would be 4,630 acres, with 1,505 of those acres on Bureau managed oil and gas minerals.

Both Table 8a and 8b use calculations that contain decimals, but all results shown are rounded to whole numbers. As a result of this rounding, the whole numbers shown may not exactly add up to the totals shown.

# SUMMARY

For our base line projection we analyzed the oil and gas resource within the Study Area, discussed types of future development that may occur, estimated the development potential for each type of resource, and projected base line activity levels for the Analysis Period 2010 through 2030. We projected that as many as 489 conventional oil and gas wells and 782 coalbed natural gas wells could be drilled during this period. Our forecast of annual oil and gas production for 2010 through 2029 is presented in Table 7. Short-term and long-term surface disturbance associated with existing wells and future projected wells is presented in Tables 8a and 8b for all lands and for Bureau managed oil and gas mineral lands. For our analysis of the base line projection, we assumed that the only land use restrictions on future oil and gas resource development would be those that have been legislatively imposed.

# APPENDIX 1 – U.S. GEOLOGICAL SURVEY ASSESSMENTS OF UNDISCOVERED TECHNICALLY RECOVERABLE OIL AND GAS RESOURCES WITHIN THE UNCOMPAHGRE STUDY AREA

## INTRODUCTION

The U.S. Geological Survey has published a number of resource assessments of undiscovered technically recoverable oil and gas resources that cover parts of the Uncompahgre Study Area. Their "1995 National Assessment of United States Oil and Gas Resources" (Huffman, 1995) scientifically estimated the amount of crude oil, natural gas, and natural gas liquids (see Glossary) that could be added to proved reserves in the United States, assuming existing technology. It presented information about potential undiscovered accumulations of oil and gas in 71 geologic or structural provinces within the United States. Two of those provinces, the Uinta-Piceance basin and the Paradox basin, lie within the Study Area. Figure A1-1 shows the location of the two provinces within the field office. The Uinta-Piceance basin was assessed in both the U.S. Geological Survey 1995 Assessment and the U.S. Geological Survey 2002 Assessment. Because of the change in methodology from the 1995 assessment to the updated 2002 assessment (see below), the two assessments have different southern boundaries defined for the Piceance basin.

Recently the U.S. Geological Survey revised their methods for preparing oil and gas resource assessments. Thirty two basins have been reassessed or will be re-assessed since the 1995 report. The U.S. Geological Survey used the new method to update their quantitative estimate of undiscovered technically recoverable oil and gas resource for the Uinta-Piceance Basin Province (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 1, 2003). The Paradox Basin Province was not updated in the 2002 report. The 1995 Paradox Basin Province assessment, the 1995 Uinta-Piceance Basin assessment, and the updated 2002 Uinta-Piceance Basin assessment are summarized below to describe the potential undiscovered technically recoverable oil and gas resources lying within the Uncompahgre Study Area. Also included is a summary of each Total Petroleum System and the Assessment Units within the Study Area. The area southeast of the 2002 Piceance Basin boundary and the area southeast of Ouray County, labeled as San Juan, are two gaps with no Assessment Units or play areas. The two gaps were not analyzed for undiscovered accumulations. Figure A1-1 shows the basin boundaries. The information was taken from the U.S. Geological Survey Assessments. For more detailed information, please refer to the complete reports published by the U.S. Geological Survey.

# PARADOX BASIN PROVINCE ASSESSMENT

The Paradox Basin Province occupies approximately 2,447.94 square miles (1,566,681.48 acres) of the Study Area. It covers an area of approximately 33,000 square miles, is 280 miles long, and 200 miles wide throughout Colorado and Utah (Huffman, 1995). Located in southwestern Colorado, the Paradox Basin Province is bounded by the Uncompahgre Plateau to the northeast, the San Juan Dome to the east, and the Monument uplifts, Circle Cliffs, and the Henry Mountains to the west. The San Rafael Swell is the northwest boundary. The Paradox basin, Kaiparowits Plateau, Henry Mountains basin, and the Wasatch and Pausaugunt Plateaus are other geologic features in the Paradox Basin Province. The province has thick sequences of Phanerozoic sediments with 5,000 to 8,000 feet of sediment in the central part of the basin. There is greater than 15,000 feet of total sediment in the Paradox basin, Kaiparowits basin, and the Wasatch Plateau (Huffman, 1995).

Production in the province is mainly from porous carbonate buildups (algal mounds). The Paradox Basin Province is one of four principal oil and gas producing regions in Colorado. The Giant Aneth field, containing more than one billion barrels of oil in place, is located in the Paradox basin. The Aneth field is southwest of the Study Area. There have been at least 84 wells drilled in the Paradox basin within the Study Area as of June 30, 2009 (IHS Energy Group, 2009). No coal bed gas wells have been drilled in the Study Area as of June, 2009 (IHS Energy Group, 2009). In the Paradox Basin Province, the Paradox basin is defined by "the maximum extent of salt in the Middle Pennsylvanian Paradox Formation" (Nuccio et al., 1996). There are eight wells that reached total depth in the Pennsylvanian salt of the Paradox basin in the Study Area (IHS Energy Group, 2009). The northern part of the basin includes a structural fold and fault belt.

## Play Summary

The "1995 National Assessment of United States Oil and Gas Resources" (Beeman et al., 1996; Charpentier et al., 1996; Gautier et al., 1996) did not update the Paradox Basin Province assessment with the latest U.S. Geologic Survey assessment of oil and gas resources completed in 2002. The 1995 resource assessment includes six conventional oil and gas plays. Five of these plays are within the Study Area (Figures A1-2 and A1-3). The five play areas in the Study Area include the Salt Anticline Flank, Porous Carbonate Buildup, Permian-Pennsylvanian Marginal Clastics, Fractured Interbed, and Buried Fault Blocks. Each play area is a set of discovered or undiscovered oil and gas accumulations or prospects that are geologically related. The U.S. Geological Survey defined a play "by the geological properties (such as trapping style, type of reservoir, nature of the seal) that are responsible for the accumulations or prospects" (Huffman, 1995). The U.S. Geological Survey has made available some statistical information for these plays. Listed in Table A1-1 is the information for the Salt Anticline Flank, Porous Carbonate Buildup, Permian-Pennsylvanian Marginal Clastics, and Buried Fault Blocks plays. Since there is only one unconventional play, the Fractured Interbed play is only discussed in paragraph form, below.

## Play Descriptions

### Salt Anticline Flank

The Salt Anticline Flank play is located in the southwest part of the Study Area.  It encompasses approximately 784,741.75 acres.  Gas is the predominant hydrocarbon produced from this play.  Six wells in the Salt Anticline Flank play, within the Study Area, have produced in the past. Reservoirs include the Hermosa Group limestone and the Cutler Formation arkosic sandstone (Huffman, 1995).  Amongst these reservoirs is a well-developed fracture system with good vertical communication.  Source rocks are from the Hermosa Group black dolomitic shale and the contact between the Cutler-Hermosa which is coaly carbonaceous shale.  Gas migration coincided with salt movement and anticlinal growth.  Traps include thinning and permeability pinchouts. Seals are from steeply dipping flanks of salt anticlines and updip termination against salt diapirs.  Exploration in this play is mainly outside the Study Area in Andy's Mesa. Projections from the 1995 assessment state a low resource potential for oil and fair to good resource potential for gas (Huffman, 1995)  See Figure A1-2 for the location of the Salt Anticline Flank play within the Study Area.

### Buried Fault Blocks

The Buried Fault Blocks play is in the southwest part of the Study Area (Figure A1-2).  It shares a common boundary with the Salt Anticline Flank play and the Fractured Interbed play.  There are 784,750.244 acres of the Buried Fault Blocks play within the Study Area. The reservoirs in this play store oil in the Leadville dolomite or dolomitic limestone and the McCracken Sandstone Member of the Elbert Formation (Huffman, 1995).  The source rock for this area is the Paradox Formation black dolomitic shale.  Traps are on uplifted fault blocks with the Paradox Formation evaporite beds as a seal.  Future resource potential is low to moderate.  Unexplored fields are predicted to be small to medium sized with a minimal oil column (Huffman, 1995).

### Fractured Interbed

The Fractured Interbed play is the only unconventional play in the Paradox basin within the Study Area (Figure A1-2).  An unconventional accumulation includes "oil and gas resources that exist as geographically extensive accumulations that generally lack well-defined oil/water or gas/water contacts…" (Beeman et al., 1996; Charpentier et al., 1996; and  Gautier et al., 1996). Coal-bed gas, tight gas, and oil and gas shales are examples of unconventional oil and gas plays.   The Fractured Interbed play has approximately 784,741.75 acres within the Study Area.  The median cell size is 960 acres.  A cell is a volume having dimensions related to the drainage area of an individual well (Beeman et al., 1995: Charpentier et al., 1996: Gautier et al., 1996).  The median cell total is 1,812 with a median untested cell total of 99.34 percent.  The median untested cells with potential to add reserves were 20 percent.  Information was not available regarding median carbon-dioxide content.  The drilling depth range to the Fractured Interbed play is 8,000 to 10,000 feet (Huffman, 1995).

*Porous Carbonate Buildup*

The Porous Carbonate Buildup play is in the far south portion of the Study Area (Figure A1-3).  It contains only 11,306.79 Acres.  This play is primarily an oil play. The Great Aneth field is developed in this play.  Reservoirs include the Hermosa Group limestone and dolomite (Huffman, 1995).  Zones in the Hermosa Group are the Alkali Gulch, Barker Creek, Akah, Desert Creek, and Ismay.  The Desert Creek and Ismay are the largest producers in the play.  The Paradox Formation dolomite and mudstone are the primary source of hydrocarbons.  There is one to five percent total organic carbon content in these source rocks.  Stratigraphic traps predominate.  Seals include porosity differences in overlying evaporate beds and interbedded shale.  Most fields in the play produce between one and three million barrels of oil.  The one exception is the Great Aneth (Huffman, 1995).

*Permian-Pennsylvanian Marginal Clastics*

Within the Study Area, the Permian-Pennsylvanian Marginal Clastics play is 255,863.61 acres.  It is located in the southern part of the Study Area (Figure A1-3).  The play is gas prone.  The hydrocarbon-bearing reservoir, with shows present, is the Cutler Formation sandstone (Huffman, 1995).  Hydrocarbons are sourced from Desmoinesian dolomitic shale and mudstone.  Traps include a combination of sandstone lenses pinched out on folds and faults.  The seal is formed from shale beds or low permeable clays.  There is little to no exploration in the area and not production existed as of 1995 (Huffman, 1995).

## Play Resource Results

Unlike the "2002 National Assessment of United States Oil and Gas Resources", the U.S. Geological Survey (Beeman et al., 1996; Charpentier et al., 1996; Gautier et al., 1996) did not use a forecast span to estimate undiscovered technically recoverable resource quantities for the five play areas from their "1995 National Assessment of United States Oil and Gas Resources."  Below is a summary of the estimated volumes of hydrocarbons in the four conventional plays and the one unconventional (continuous-type) play, which lie at least partly within the Study Area.

In Table A1-2, the U.S. Geological Survey resource estimates for three types of hydrocarbons (oil, gas, and natural gas liquids) are shown for the conventional plays and the continuous play in the Paradox Basin Province, together with our projection of the amount of those hydrocarbons that could be present within the Study Area.  To determine the potential resource within the Study Area we:
- assumed a homogenous distribution of each hydrocarbon type within each Assessment Unit or play area,
- calculated the percent of each Assessment Unit or play area that lies within the Study Area, and

- multiplied that percentage by the U.S. Geological Survey resource value estimates for each entire Assessment Unit or play area to calculate Study Area resource values.

The U.S. Geological Survey estimates of recoverable resources for each play area within the province are presented as a range of possibilities. There is a high estimate of recoverable petroleum resources, a mean estimate, and a low estimate of petroleum resources. The high estimate of recoverable petroleum products is the least probable to be recoverable. Therefore, it is shown as a five percent probability of occurrence. The low estimate of recoverable resources is the most likely amount of petroleum product to be recovered. Ninety-five percent probability of occurrence of recovery is likely to occur for the low estimate. The mean is an average of all the probabilities of occurrence. Similarly, the Bureau of Land Management followed the U.S. Geological Survey example to estimate potential abundance of petroleum resources for the Uncompahgre Field Office. We estimate that the Study Area contains a **mean undiscovered cumulative volume of 29.44 million barrels of oil, 144.78 billion cubic feet of gas, and 4.14 million barrels of natural gas liquids, in the Paradox Basin Province play areas for the 1995 assessment** (Table A1-2).

In addition, we estimate that the Study Area's oil resource in the Paradox Basin Province could **range from 5.60 to 75.04 million barrels, the gas resource could range from 13.74 to 339.88 billion cubic feet, and the natural gas liquids resource could range from 0.35 to 11.05 million barrels** (Table A1-2). These estimates are based on the 1995 assessment.

## UINTA-PICEANCE BASIN PROVINCE ASSESSMENT

The Uinta-Piceance Basin Province is located in southwestern Colorado and southeastern Utah. It has approximately 21 trillion cubic feet of undiscovered natural gas (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 1, 2002). Most of the natural gas is in unconventional (continuous) accumulations. Thirteen trillion cubic feet of gas lies within the Mesaverde Total Petroleum System and seven trillion cubic feet of gas reside in the Mancos/Mowry Total Petroleum System. An average of sixty million barrels of oil is undiscovered. The main source rocks for the Uinta-Piceance basin include the Phosphoria Formation, Mancos Shale, Mancos/Mowry Shales, Mesaverde group, and Green River formations (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 2, 2002). Within the Study Area there have been at least 255 conventional wells and 36 coal-bed methane wells drilled as of April 29, 2010 (IHS Energy Group, 2010).

The Uinta-Piceance Basin Province boundary for the 1995 U.S. Geological Survey assessment is defined by the Uinta Mountain Uplift to the north and the southern Park Range and Sawatch Uplift on the east. North of the Uncompahgre Uplift axis defines the southern boundary. The Utah thrust belt defines the western boundary (Spencer, 1995). The Douglas Creek arch separates the Uinta-Piceance basin in two halves. In the south-central portion of the Uinta-Piceance Basin Province there is a fold belt and igneous

intrusions in the southeast.  Numerous folds are in the northeastern Piceance basin along with many normal faults in the western Uinta basin.  Normal faulting occurs in the middle of the Uinta-Piceance basin (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 2, 2003).

## Play Summaries

The "1995 National Assessment of United States Oil and Gas Resources" (Spencer, 1995) had three conventional accumulation (see Glossary) plays within the Study Area: the Basin Margin Subthrust, Upper Cretaceous Conventional Play, and the Cretaceous Dakota to Jurassic Gas Oil plays (Figure A1-4).  Continuous accumulation (see Glossary) play areas inside the Study Area include the Tight Gas Piceance Mesaverde Williams Fork Continuous Gas, Piceance Basin-Divide Creek Anticline Coal-bed Gas, Piceance Basin-Igneous Intrusion Coal-bed Gas, and Piceance Basin-Western Basin Margin Coal-bed Gas plays (Figure A1-5).  Each play area is a set of discovered or undiscovered oil and gas accumulations or prospects that are geologically related.  The U.S. Geological Survey defined a play "by the geological properties (such as trapping style, type of reservoir, nature of the seal) that are responsible for the accumulations or prospects."  A conventional play contains oil and gas accumulations having hydrocarbon-water contacts and seals that hold or trap hydrocarbons.  The hydrocarbons in these plays can be recovered using traditional development and production practices.  Supporting geologic studies for these play areas are available at http://certmapper.cr.usgs.gov/data/noga95/prov20/text/prov20.pdf (Spencer, 1995).  Since the Uinta-Piceance Basin Province was re-assessed in 2002, estimates of resources in the area were only calculated for the Uinta-Piceance Basin Province 2002 assessment.

## Total Petroleum Systems and Assessment Unit Summaries

In their newest assessment (written in 2002 and published in 2003), the U.S. Geological Survey divided the Uinta-Piceance Basin Province into "Total Petroleum Systems" and "Assessment Units" (see Glossary definitions) rather than "plays."  Summaries of the Total Petroleum Systems and Assessment Units are provided below.

### *Mesaverde Total Petroleum System*

The Mesaverde Total Petroleum System encompasses approximately 20,000 square miles (12,800,000 acres) in the Uinta-Piceance Province.  Within the Study Area, the Mesaverde Total Petroleum System covers approximately 1,722.36 square miles (1,102,312.93 acres).   Sediment thickness ranges from less than 1,500 feet on the northwest boundary of the Study Area to greater than 10,000 feet in the deepest part of the Piceance basin (Johnson et al., chapter 7, 2003).  There are seven gas Assessment Units within the Mesaverde Total Petroleum System, with four of these units lying within the Study Area (Figure A1-6, Figure A1-7).  The four Assessment Units in the Study Area include the Piceance Basin Continuous Gas Assessment Unit, the Piceance Basin Transitional Gas Assessment Unit, the Mesaverde Sandstone Gas Assessment Unit, and the Mesaverde Group Coal-bed Methane Assessment Unit.

The U.S. Geological Survey defines a Total Petroleum System as being mappable, contains genetically related petroleum from source rocks, and contains a reservoir and seal, with migration and timing as critical components (2003). The Mesaverde Total Petroleum System's source rocks are from coals and carbonaceous shales in the Cretaceous Mesaverde Group. The main gas producing coal deposit in the Piceance basin is the Cameo-Fairfield coal group of the Williams Fork Formation. Reservoirs in the Piceance basin (the northern focus of the Study Area) are fluvial channel sandstone beds of the Wasatch Formation and Fort Union Formation. The seal of the Mesaverde Total Petroleum System is likely lacustrine shales of the Tertiary Green River Formation. The trapping mechanism is likely from capillary seal or water block (Johnson et al., chapter 7, 2003).

The upper limit of the Mesaverde Total Petroleum System in the study area is defined by the Tertiary Green River Formation (Johnson et al., chapter 7, 2003). The lower limit of the Mesaverde Total Petroleum System has an indistinct seal throughout the Uinta-Piceance basin because the Mancos/Mowry Total Petroleum System intertongues with the Mesaverde Total Petroleum System. In the Piceance basin, the lower limit is defined as the lowest coal zone of the Williams Fork Formation. Gas generation began 55 million years ago and peaked between 47 and 39 million years ago in the Piceance basin (2003). There are no major gas fields that lie within the Mesaverde Total Petroleum System of the Study Area. Of the 96 wells that tested the Mesaverde Total Petroleum System, approximately 22 wells have production (gas only) sourced from the Mesaverde Total Petroleum System (IHS Energy Group, 2009). Thirty-one Coal-bed natural gas wells tested the Mesaverde Total Petroleum System. Approximately 26 of those Coal-bed natural gas wells have production sourced from the Mesaverde Total Petroleum System. No wells produce oil in this Total Petroleum System.

*Piceance Basin Continuous Gas Assessment Unit*

The Piceance Basin Continuous Gas Assessment Unit covers less than one-tenth a township (2,088.28 acres) in the Study Area (Figure A1-6). Located in the northeastern portion of the Study Area, the Assessment Unit boundary is defined by a vitrinite reflectance line of 1.10 percent R0 (Johnson et al., chapter 7, 2003). Since the vitrinite reflectance represents thermally mature source rocks, the potential for gas is high. Fluvial channels in the Williams Fork and Wasatch Formations are the primary gas producing stratigraphy. Permeability in the sandstone from these formations is low. A well defined fracture system is has not been identified, so enhancement of permeability is likely to produce gas in this Assessment Unit (2003). Ninety percent of the Assessment Unit remains unexplored so values in Table A1-5 are estimates. There are no wells in the Piceance Basin Continuous Gas Assessment Unit that lie within the Study Area.

*Piceance Basin Transitional Gas Assessment Unit*

Approximately 45,358.31 acres of the Piceance Basin Transitional Gas Assessment Unit lie within the Study Area (Figure A1-6). The boundary of the Assessment Unit is defined

by the vitrinite reflectance values between 0.75 percent and 1.10 percent $R_0$ (Johnson et al., chapter 7, 2003).  The main petroleum product produced is natural gas from the White River Dome, Divide Creek, and Parachute fields located outside the Study Area. Reservoir rocks from these fields are fluvial channel sandstone mainly in the Mesaverde Group and partly in the Wasatch Formation.   The reservoir rocks are likely more water-saturated due to less mature source rocks of the Cameo-Fairfield (Mesaverde Group) coal group, resulting in fewer successful future tests (2003).  From the base of the Cameo-Fairfield coal group to the base of the first significant lacustrine shale in the Green River Formation are the Assessment Unit's stratigraphic extents. Pressure in the Assessment Unit formations is variable and the maximum estimated ultimate recovery is four billion cubic feet of gas (Table A1-5).  Ninety percent of the field remains unexplored (2003).

*Mesaverde Sandstone Gas Assessment Unit*

The Mesaverde Sandstone Gas Assessment Unit is a conventional oil and gas resource (Figure A1-6 and Table A1-3).  The trapping mechanisms include both structural and stratigraphic with distinct gas-water contacts (Johnson et al., chapter 7, 2003).  Source rocks from the lower Mesaverde Group include coal beds and carbonaceous units.  The reservoirs are primarily fluvial channel sandstones from the Wasatch Formation.  While there is small potential for conventional-type hydrocarbons in the Mesaverde Group in the basin margins, production was only allocated from the Wasatch Formation.  The conventional-type accumulations from the Wasatch Formation are located primarily in the Piceance Creek Dome and Sulphur Creek fields in the north-central Piceance basin. The average well depth in these fields is 4,800 feet with a minimum field size of 0.5 million barrels of oil equivalent (2003).

*Mesaverde Group Coal-bed Methane Assessment Unit*

The approximate area of the Mesaverde Group Coal-bed Methane Assessment Unit is 4,815,000 acres in the Uinta-Piceance Basin Province (Figure A1-7).  While the Assessment Unit is largely untested, the maximum estimated ultimate recovery is five billion cubic feet of gas, assuming future Coal-bed methane technology advances (Johnson et al., chapter 7, 2003).  The Grand Valley and Parachute fields were not used by the Survey in calculating the estimated ultimate recovery because these fields commingle Coal-bed methane and sandstone reservoirs.  Overall, Coal-bed methane production has not been commercially successful, likely due to thin coal beds, under saturation of gas, steeply dipping beds, and gas leakage (2003).  Exceptions are in the White River Dome and Pinyon Ridge fields.  These fields have more production likely due to folding and fracturing.  The coal beds in the Mesaverde Group Coal-bed Methane Assessment Unit are less than 7,000 feet deep in the Williams Fork Formation in the Piceance basin.  Thermal maturity of the coals ranges from less than 0.65 percent to 1.35 percent $R_0$.  Thirty-one Coal-bed methane wells have been drilled in this Assessment Unit.  Twenty-six of these wells have been productive.

*Mancos/Mowry Total Petroleum System*

The Mancos/Mowry Total Petroleum System is in the northern part of the Study Area and encompasses 287,576.47 acres (449.34 square miles) of the Study Area. The Piceance Basin Continuous gas Assessment Unit and the Uinta-Piceance Transitional and Migrated Gas Assessment Unit are the two Assessment Units within the Mancos/Mowry Total Petroleum System that reside in the Study Area (Figure A1-8). The Mancos/Mowry Total Petroleum System is rich in organic shales and interbedded sandstones (Kirschbaum, chapter 6, 2003). Permeability was enhanced by a Laramide orogeny fracture system and gas generation. There is more than 5,000 feet of Mancos Shale and Mowry Formation sediment (2003).

Reservoirs in the Mancos/Mowry Total Petroleum System can be in fluvial, tidal, and shoreface deposits. Fluvial deposits include the Morrison Formation, Cedar Mountain Formation, and the Dakota Sandstone. These fluvial reservoirs are predominantly tight and underpressured (Kirschbaum, chapter 6, 2003). Well spacing is typically 60 to 640 acres. Tidal and shoreface deposits include the Dakota, Castlegate, Sego Sandstone, Moraps Sandstone member of the Mancos Shale, Corcoran-Cozzette-Rollins Sandstone members of the Iles Formation or Mount Garfield Formation, and the Mancos B. Gas production is mainly from tight sandstones but these formations vary in hydrocarbon production, pressure, porosity, and permeability. The Douglas Creek Arch has a gas cap in the Mancos B/Emery sandstone. Oil may be under the gas cap where trapping allows. Traps include stratigraphic and structural traps. Seals are from the Mancos and Mowry shales and mudstone. The system is sourced by hydrocarbons generated from 9 to 76 million years ago. Maximum hydrocarbon generation was 19 to 35 years ago (2003).

There were 68 wells tested in the Mancos/Mowry Total Petroleum System as of June 30th, 2009 (IHS Energy Group, 2009). Of these 68 wells, four wells were completed in the Dakota Sandstone. Two of the wells were completed as gas wells and are therefore sourced from the Mancos/Mowry Total Petroleum System. The remaining two wells were completed as oil wells and appear to be sourced from the Phosphoria Total Petroleum System.

*Piceance Basin Continuous Gas Assessment Unit*

The Piceance Basin Continuous Gas Assessment Unit's boundary is defined by the vitrinite reflectance of greater than 1.1 percent $R_0$ at the base of the Mancos Shale (Kirschbaum, chapter 6, 2003). The Assessment Unit has approximately 92,747.77 acres (144.92 square miles) in the Study Area (Figure A1-8). Potential to recover hydrocarbons is dependent on the depth of the reservoir. The lower reservoir group is the Morrison, Cedar Mountain, and Dakota Formations. The upper reservoir group is the Iles sandstones. Historical production for the lower reservoir is at depths less than 10,000 feet. The upper reservoir has historical production at depths less than about 6,000 feet. Outside these depths there is no potential for producing hydrocarbons. The economic depths to drill may vary with technological advances. Table A1-5 shows the estimated undiscovered technically recoverable resource quantities for the Piceance Basin

Continuous Gas Assessment Unit.  Please note that this Assessment Unit is labeled as "Mancos/Mowry Total Petroleum System Piceance Basin Continuous Gas Assessment Unit" in Table A1-5 to distinguish it from the Piceance Basin Continuous Gas Assessment Unit residing in the Mesaverde Total Petroleum System.

*Uinta-Piceance Transitional and Migrated Gas Assessment Unit*

The Uinta-Piceance Transitional and Migrated Gas Assessment Unit's boundary is where vitrinite reflectance values from 0.75 percent to 1.1 percent $R_0$ occur at the base of the Mancos shale (Kirschbaum, chapter 6, 2003).  Within the Study Area, the Assessment Unit covers approximately 194,828.70 acres (304.42 square miles).  The reservoirs in this Assessment Unit include the Morrison Formation, Cedar Mountain Formation, Dakota Sandstone, Frontier Formation, Mancos B, Castlegate Sandstone, Sego Sandstone, Morapos Sandstone, Niobrara Formation, and Blackhawk Formation (hypothetical).  These reservoirs are tight with pressures from normal to underpressured.  Continuous accumulations are predominant, but conventional gas/water contacts or water-saturated reservoirs exist (2003).  Table A1-4 shows details of the Assessment Unit and Table A1-5 shows estimated undiscovered technically recoverable resource quantities.  Figure A1-8 shows the Uinta-Piceance Transitional and Migrated Gas Assessment Unit within the Study Area.

**Phosphoria Total Petroleum System**

The Phosphoria Total Petroleum System encompasses approximately 1,822,437.72 acres (2,847.56 square miles) within the Study Area.  Oil in the Phosphoria Total Petroleum System has accumulated in the Weber Sandstone, Phosphoria and Park City  Formations, Shinarump Member of the Chinle Formation, Entrada Sandstone, Curtis Formation, Morrison Formation, and the Dakota Sandstone (Figure 6a).  The boundary of the Phosphoria Total Petroleum System is based on the extent of the Phosphoria-type oil.  The trapping mechanisms include both stratigraphic and structural traps.  Stratigraphic traps are dominated by eolian and alluvium deposits intertonguing.  The structural traps include thrusted and cluster anticlines.  The seal includes carbonate rocks and mudstone with low porosity and permeability (Johnson, chapter 9, 2003).  The Assessment Units within the Phosphoria Total Petroleum System that also lie within the Study Area include the Hanging Wall Assessment Unit and the Paleozoic/Mesozoic Assessment Unit (Figure A1-9, Table A1-3).

There are 41 wells that penetrated the Phosphoria Total Petroleum System in the Study Area (IHS Energy Group, 2009).  Of these 41 wells, two conventional oil wells have production that appears to be sourced from the Phosphoria Total Petroleum System.  The other 39 wells are plugged and abandoned.  No gas or coal-bed gas wells produce from the Phosphoria Total Petroleum System in the Study Area.

*Hanging Wall Assessment Unit*

The Hanging Wall Assessment Unit has only 120.77 acres (0.19 square miles) that are within the Study Area (Figure A1-9).  It contains conventional type hydrocarbon accumulations in structural and stratigraphic-structural traps (Johnson, chapter 9, 2003). The structural traps are thrusted anticlines. The sealing mechanism is from low-permeability rocks.  Source rocks include the Middle Pennsylvanian Minturn Formation, Phosphoria Formation, and the Mancos Shale.  The Hanging Wall Assessment Unit contains non-associated gas likely sourced from Mesaverde coals.  Oil is mainly from the Phosphoria Formation (2003).  There are no wells from this Assessment Unit that are within the Study Area.

*Paleozoic/Mesozoic Assessment Unit*

The Paleozoic/Mesozoic Assessment Unit covers the north half of the Study Area (Figure A1-9).  The Assessment Unit includes rocks from the Paleozoic time period or a combination of Paleozoic and Mesozoic rocks.  The source rock is mainly from the Phosphoria Formation.  Paleozoic source rocks are known to have high concentrations of carbon dioxide and inert gases when produced.  Reservoir rocks are from sandstones and carbonate rocks (Johnson, chapter 9, 2003).  These include the Lower Permian Kaibab Limestone, Lower Triassic Moenkopi Formation, Entrada Sandstone, Morrison Formation, Cedar Mountain Formation, and the Dakota Sandstone.  Trapping is from anticlinal features associated with the Douglas Creek arch and Uncompahgre Uplift.  The seal includes rocks with low permeability.  This Assessment Unit mainly produces oil from the Dakota Formation.  The two producing oil wells discussed above appear to be from the Paleozoic/Mesozoic Assessment Unit.

Each Assessment Unit falls within one of two types of potential undiscovered accumulation: conventional and continuous accumulations (see Glossary definitions).  Of the five Assessment Units evaluated in the "2002 National Assessment of United States Oil and Gas Resources" in the Uinta-Piceance Basin Province, three Assessment Units lie within Field Office boundaries: the Paleozoic/Mesozoic, Mesaverde Sandstone, and the Hanging Wall Assessment Units (Tables A1-3, A1-5).

Continuous accumulations include tight reservoirs, shale reservoirs, unconventional reservoirs, basin-centered reservoirs, fractured reservoirs, Coal-beds, oil shales, and shallow biogenic gas.  Assessment Units categorized as continuous accumulations that lie within the Study Area include the Mesaverde Total Petroleum System Piceance Basin Continuous Gas, Uinta-Piceance Transitional and Migrated Gas, Piceance Basin Transitional Gas, Mancos/Mowry Total Petroleum System Piceance Basin Continuous Gas, and the Mesaverde Group Coal-bed Gas (Tables A1-4 and A1-5).

Conventional accumulations have "discrete geographic entities with well-delineated hydrocarbon-water contacts" (U.S. Geological Survey Uinta-Piceance Assessment Team, chapter 1, 2003).  Also, conventional accumulations have rocks with high permeability, discrete seals and traps, and high recovery factors (2003).  In the Study Area, the

Assessment Units categorized as conventional resources are the Paleozoic/Mesozoic Conventional Oil, Mesaverde Sandstone Gas, and Hanging Wall Assessment Units (Tables A1-3 and A1-5).

## Assessment Unit Resource Results

The U.S. Geological Survey estimated undiscovered technically recoverable resource quantities of oil and gas that could be added to the proved reserves within each Assessment Unit, using a forecast span of 30 years.  A 30-year forecast span affects the minimum undiscovered accumulation size, the number of years in the future that reserve growth is estimated, economic assessments, the accumulations chosen for consideration, and the assessment of risk.  Below is a summary of estimated hydrocarbon volumes in the three conventional Assessment Units and five continuous Assessment Units that reside in the Field Office boundaries.

In Table A1-5, the U.S. Geological Survey resource estimates for three types of hydrocarbons (oil, gas, and natural gas liquids) are shown for the both conventional and continuous Assessment Units in the Uinta-Piceance Basin Province, together with our projection of the amount of those hydrocarbons that could be present within the Study Area.  To determine the potential resource within the Study Area we:

- assumed a homogenous distribution of each hydrocarbon type within each Assessment Unit,
- calculated the percent of each Assessment Unit that lies within the Study Area, and
- multiplied that percentage by the U.S. Geological Survey resource value estimates for each entire Assessment Unit to calculate Study Area resource values.

The U.S. Geological Survey estimates of recoverable resources for each Assessment Unit or play area within the province are presented as a range of possibilities.  There is a high estimate of recoverable petroleum resources, a mean estimate, and a low estimate of petroleum resources.  The high estimate of recoverable petroleum products is the least probable to be recoverable.  Therefore, it is shown as a five percent probability of occurrence.  The low estimate of recoverable resources is the most likely amount of petroleum product to be recovered.  Ninety-five percent probability of occurrence of recovery is likely to occur for the low estimate.  The mean is an average of all the probabilities of occurrence.  Similarly, the Bureau of Land Management followed the U.S. Geological Survey example to estimate potential abundance of petroleum resources for the Uncompahgre Field Office.   For the 2002 report, we estimated the total undiscovered technically recoverable resource that the Study Area contains is a **mean undiscovered cumulative volume of 0.74 million barrels of oil, 308.85 billion cubic feet of gas, and 0.56 million barrels of natural gas liquids, in the Uinta-Piceance Basin Province Assessment Units** (Table A1-5).

In addition, we estimate that the Study Area's oil resource in the Paradox Basin Province could **range from 0.31 to 1.36 million barrels, the gas resource could range from**

**187.78 to 489.93 billion cubic feet, and the natural gas liquids resource could range from 0.19 to 1.18 million barrels** (Table A1-5).

# REFERENCES

Allis, R., T. Chidsey, W. Gwynn, C. Morgan, S. White, M. Adams, and J. Moore, 2001, Natural CO2 reservoirs on the Colorado Plateau and Southern Rocky Mountains: in First National Conference on Carbon Sequestration, 19 pages.  Available online: http://www.netl.doe.gov/publications/proceedings/01/carbon_seq/6a2.pdf .

Avery, C.D., and J.C. Miller, 1934, Relationship of geology to unit operation of oil and gas fields, involving Government lands: Bulletin of the American Association of Petroleum Geologists, volume 18, number 11, pp. 1454-1492.

Beecham, C., 2010, Bureau of Land Management, Colorado State Office letter to Liane Mattson, Leasable and Salable Minerals Program Leader, U.S. Forest Service; Delta, Colorado: 3 pages with one attachment.

Beeman, W. R., Obuch, R. C., and Brewton, J. D., 1996, Digital map data, text, and graphical images in support of the 1995 National Assessment of United States oil and gas resources: U.S. Geological Survey Digital Data Series 35.

Bereskin, B. and M. Mavor, 2003, Shale gas geology and engineering: an overview. Course notes available from American Association of Petroleum Geologists, 1444 South Boulder Avenue, Tulsa, Oklahoma, 74119, 135 pages.

Bon, R.L. and Chidsey, T.C, November 2006, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey. Department of Energy, Office of Fossil Energy; p. i-vii, 1-10. Reporting period April 1 to June 30, 2006.

Boswell, R.S., 2006, Impediments to Developing Unconventional Natural Gas Resource Plays: presented at "14[th] Annual EIA Energy Outlook and Modeling Conference," March 27, 2006.  Available online: http://www.eia.doe.gov/oiaf/aeo/conf/boswell/boswell.pdf.

Boysen, J. and D. Boysen, 2008, The freeze-thaw/evaporation process for produced water treatment, disposal and beneficial uses: 39 pages.  Downloaded from http://ipec.utulsa.edu/Conf2008/Manuscripts%20&%20presentations%20received/Boysen_37_FreezeThaw.pdf

Brown, D., 2006, Slimhole CTD Targets Shallow Plays:  AAPG Explorer magazine, volume 27, number 12, pages 8 and 10.

Charpentier, R. R., Klett, T. R., Obuch, R. C., and Brewton, J. D., 1996, Tabular data, text, and graphical images in support of the 1995 National Assessment of United States oil and gas resources: U.S. Geological Survey Digital Data Series 36.

Chidsey, T.C, January 2003, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-v, 1-17. Reporting period July 1 to Sept. 30, 2002.

Chidsey, T.C, Morgan, C.D., and Bon, R.L., July 2003, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-iv, 1-13. Reporting period Jan. 1 to March 31, 2003.

Chidsey, T.C, Morgan, C.D., McClure, K., and Willis, G.C., September 2003, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-vi, 1-29. Reporting period April 1 to June 30, 2003.

Chidsey, T.C, Morgan, C.D., McClure, K., Sprinkel, D.A., Bon, R.L., and Doelling, H.H., March 2004, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-viii, 1-32. Reporting period Oct. 1 to Dec. 31, 2003.

Chidsey, T.C, April 2005, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-v, 1-24. Reporting period Jan. 1 to March 31, 2005.

Chidsey, T.C, July 2006, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-viii, 1-59. Reporting period Jan. 1 to March 31, 2006.

Chidsey, T.C, November 2006, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-v, 1-10. Reporting period April 1 to June 30, 2006.

Chidsey, T.C, May 2007, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. By Utah Geological Survey, Department of Energy, Office of Fossil Energy; p. i-viii, 1-45. Reporting period Jan. 1 to March 31, 2007.

Chidsey, T.C, Morgan, C.D., and Eby, D.E., February 2008, Major Oil Plays in Utah and Vicinity: Quarterly Technical Progress Report. In: Oil and Natural Gas Technology. Department of Energy, Office of Fossil Energy; p. i-viii, 1-40. Reporting period July 1 to Sept. 30, 2007.

Cleveland, C.J., 2003, A Preliminary Economic Assessment of Scientific Inventory of Onshore Federal Lands' Oil and Gas Resources and Reserves and the Extent and Nature of Restrictions or Impediments to their Development: CEES Working Paper Series #0301, 12 pages.  Available online: http://www.bu.edu/cees/research/workingp/0302.html.

Cole, R.D., and Cumella, S.P., 2003, Stratigraphic architecture and reservoir characteristics of the Mesaverde Group, southern Piceance Basin, Colorado, *in* K.M. Peterson, T.M. Olson, and D.S. Anderson, eds., Piceance Basin 2003 Guidebook: Denver, Colorado, Rocky Mountain Association of Geologists, p. 385-442.

Colorado Oil and Gas Conservation Commission, 2010, Colorado well data and statistics: Colorado Oil and Gas Conservation Commission Online database.   Available online: http://cogcc.state.co.us.

Curtis, J.B., and S.L. Montgomery, 2002, Recoverable natural gas resource of the United States: Summary of recent estimates: American Association of Petroleum Geologists Bulletin, volume 86, number 10, p. 1671-1678.

Duda, J.R., and G. Covatch, 2005, Projections of marginal wells and their contributions to oil and natural gas supplies, 2005 Society of Petroleum Engineers Eastern Regional Meeting, SPE 98014, 11 pages.

Dunn H., 1972, Piceance Basin and Las Animas Arch: in W.M. Murphy ed., Geologic Atlas of the Rocky Mountain Region United States of America; Rocky Mountain Association of Geologists, p. 278-282.

Dyman, T.S., D.T. Nielsen, R.C. Obuch, J.K. Baird, and R.A. Wise, 1990, Deep oil and gas wells and reservoirs in the United States from the Well History Control System and Petroleum Data System, *in* L.M.H. Carter, ed., USGS Research on Energy Resources: U.S. Geological Survey Circular 1060, p. 27-28.

Dyman, T.S., D.D. Rice, D.T. Nielsen, R.C. Obuch, and J.K. Baird, 1993a, Geologic and production characteristics of deep oil and gas wells and reservoirs in the conterminous U.S.: Oklahoma Geological Survey Circular 95, P. 208-215.

Dyman, T.S., D.D. Rice, J.W. Schmoker, C.J. Wandrey, R.C. Burruss, R.A. Crovelli, G.L. Dolton, T.C. Hester, C.W. Keighin, J.G. Palacas, W.J. Perry, Jr., L.C. Price, C.W. Spencer, and D.K. Vaughan, 1993b, Geologic studies of deep natural-gas resources in the United States: U.S. Geological Survey Professional Paper 1570, p. 171-203.

Dyman, T.S., D.D. Rice, and P.A. Westcott, eds., 1997, Geologic controls of deep natural gas resources in the United States: U.S. Geological Survey Bulletin 2146, 239 pages.

Energy Information Administration, 2004, Annual energy outlook 2004 with projections to 2025: U.S. Department of Energy, Office of Oil and Gas, Energy Information Administration; DOE/EIA-0383(2004), 263 pages.  Available online: http://eia.doe.gov/oiaf/aeo/index.html.

Energy Information Administration, 2006a, Annual energy outlook 2006 with projections to 2030: U.S. Department of Energy, Office of Oil and Gas, Energy Information Administration; DOE/EIA-0383(2006), 221 pages.

Energy Information Administration, 2006b, Oil and Gas Lease Equipment and Operating Costs 1987 Through 2006: 11 pages and excel spreadsheet.  Available online: http://www.eia.doe.gov/pub/oil_gas/natural_gas/data_publications/cost_indices_equipment_production/current/coststudy.html and excel spreadsheet available online: http://www.eia.doe.gov/pub/oil_gas/natural_gas/data_publications/cost_indices_equipment_production/current/coststudy.xls.

Energy Information Administration, 2006c, Overview of the Annual Energy Outlook 2005, presented by J.J. Conti at 2005 EIA Midterm Analysis and Forecasting Conference in Washington, DC on April 12, 2005.  Available online: http://www.eia.doe.gov/oil_gas/natural_gas/data_publications/crude_oil_natural_gas_reserves/cr.html.

Energy Information Administration, 2007a, Assumptions to the Annual Energy Outlook 2007 with projections to 2030: U.S. Department of Energy, Office of Oil and Gas, Energy Information Administration; DOE/EIA-0554(2007), 176 pages.  Available online: http://www.eia.doe.gov/oiaf/aeo/assumption/index.html.

Energy Information Administration 2007b, Performance profiles of major energy producers 2006: U.S. Department of Energy, Office of Energy Markets and End Use, published December, 2007; DOE/EIA-0206(06), 102 pages.  Available online: http://tonto.eia.doe.gov/FTPROOT/financial/020606.pdf.

Energy Information Administration 2007c, U.S. crude oil, natural gas, and natural gas liquids reserves 2006 annual report: U.S. Department of Energy; DOE/EIA-0216(2007), 162 pages.  Available online: http://www.eia.doe.gov?neic/infosheets/petroleumreserves.html.

Energy Information Administration 2009a, Performance profiles of major energy producers 2008: U.S. Department of Energy, Office of Energy Markets and End Use, published December, 2009; DOE/EIA-0206(08), 108 pages.  Available online: http://tonto.eia.doe.gov/FTPROOT/financial/020608.pdf.

Energy Information Administration, 2009c, Annual Energy Outlook 2009 with Projections to 2030, Updated Annual Energy Outlook 2009 Reference Case with ARRA, DOE/EIA-0383(2009), 230 pages.  Available online: http://www.eia.doe.gov/oiaf/aeo/index.html.

Energy Information Administration, 2010a, Colorado state energy profile, downloaded September 15, 2008 from http://tonto.eia.doe.gov/state/state_energy_profiles.cfm?sid=CO.

**Wyoming State Office Reservoir Management Group**                    **- 94 -**

Energy Information Administration, 2010b, Assumptions to the Annual Energy Outlook 2010 with projections to 2035: Oil and Gas Supply Module. U.S. Department of Energy, Office of Oil and Gas, Energy Information Administration; DOE/EIA-0554(2010), p. 195. Available online: http://www.eia.doe.gov/oiaf/aeo/assumption/pdf/0554(2010).pdf

Energy Information Administration, 2010c, Petroleum product spot prices.  Available online:  http://tonto.eia.doe.gov/dnav/pet/pet_pri_top.asp.

Energy Information Administration, 2010d, Annual Energy Outlook 2010 Early Release Overview; Updated Annual Energy Outlook 2010 Reference Case, DOE/EIA-0383(2010), downloaded April 28, 2009 from http://www.eia.doe.gov/oiaf/aeo/index.html .

Energy Information Administration, 2010e, Shale Gas Plays, Lower 48 States. Digital map updated March 10, 2010, downloaded from http://www.eia.doe.gov/oil_gas/rpd/shale_gas.jpg.

Energy Information Administration, 2011, Annual energy outlook with projections to 2035: DOE/EIA-0383(2011), 246 pages.  Available online: http://www.eia.gov/forecasts/archive/aeo11/index.cfm

Energy Information Administration, 2012, Annual Energy Outlook 2012 Early Release Overview.  DOE/EIA-0383ER(2012), 13 pages.  Retrieved January 23, 2012, from the Energy Information Administration website: http://www.eia.gov/forecasts/aeo/er/early_prices.cfm.

Eustes, A.W. III, 2003, Directional Drilling Seminar; Course notes from Bureau of Land Management Directional Drilling Seminar held in Casper, Wyoming, March 18 and 19, 2003.

Foss, M.M., 2007, United States natural gas prices to 2015: Oxford Institute for Energy Studies NG 18, 40 pages.  Available online: http://www.oxfordenergy.org/pdfs/NG18.pdf.

Fowler, B. and Gallagher, P., 2004, Oil and Gas Potential and Reasonable Foreseeable Development (RFD) Scenarios in the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests, Colorado. Bureau of Land Management; p. 1-51.

Fram Operating, 2011, The proposed Whitewater unit master development plan: submitted to BLM August 17, 2011, 35 pages.  Available online: http://www.blm.gov/co/st/en/fo/gjfo/energy/proposed_whitewater.html .

Fritz, R.D., Horn, M.K., and Joshi, S.D. (eds.), Geological Aspects of Horizontal Drilling; AAPG Continuing Education Course Note Series No. 33, 563 pages.

Gault Group Inc., 2006, Oil and Gas Potential and Reasonable Foreseeable Development (FRD) Scenarios in the San Juan National Forest and BLM Public Lands, Colorado. Prepared by: United States Forest Service: Department of the Interior; p. 1-117.

Gautier, D. L., Dolton, G. L., Takahashi, K. I., and Varnes, K. L., eds., 1996, 1995 National Assessment of United States oil and gas resources – results, methodology, and supporting data: U.S. Geological Survey Digital Data Series 30, version 2 corrected.

Gobec, M., T. Van Leeuwen, and V. Kuuskraa, 2007, Economics of unconventional gas: OGJ Unconventional Gas Article #5, 14 pages.  Available online: http://www.adv-res.com/Literature.asp.

Hayes, T., 2004, The electrodialysis alternative for produced water management: Gas Tips, Volume 10, Number 3, pages 15-20.  Available online: http://www.netl.doe.gov/technologies/oil-gas/publications/GasTIPS/GasTIPS-Summer04.pdf .

Hettinger, R.D., and Kirschbaum, M.A., 2002, Stratigraphy of the Upper Cretaceous Mancos Shale (upper part) and Mesaverde Group in the southern part of the Uinta and Piceance basins, Utah and Colorado, U.S. Geological Survey, Pamphlet to accompany Geologic Investigations Series I-2764, 21 pp.

Hettinger, R.D., Roberts, L.N.R., and Gognat, T.A., edited by Kirschbaum, M.A., Roberts, L.N.R., and Biewick, L.R.H., 2000, Chapter O: Investigations of the Distribution and Resources of Coal in the Southern Part of the Piceance Basin, Colorado. In: Geologic Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah: U.S. Geological Survey Professional Paper 1625-B; p. O1-O101.

Hettinger, R.D., Roberts, L.N.R., and Kirschbaum, M.A., edited by Bankey, V., 2004, Chapter M: Coal Resources and Coal Resource Potential.  In: Resource Potential and Geology of the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests and Vicinity, Colorado: U.S. Geological Survey Bulletin 2213-M; p. 191-223.

Huffman, A.C., Jr., 1995, Paradox Basin Province (021), *in* D.L. Gautier, G.L. Dolton, K.I. Takahashi, and K.L. Varnes, eds., 1995 National Assessment of United States Oil and Gas Resources, U.S. Geological Survey Digital Data Series DDS-30. Available online: http://certmapper.cr.usgs.gov/data/noga95/prov21/text/prov21.pdf .

Humphries, M., 2004, Oil and gas exploration and development on public lands: Congressional Research Service Report for Congress, The Library of Congress, RL32315, 23 pages.

IHS Energy Group, 2010, Rocky Mountain US Well Data: Network License for PI/Dwights PLUS Version 1.7.

International Programme on Chemical Safety, 1994, Assessing human health risks of chemicals: derivation of guidance values for health-based exposure limits: Geneva, World Health Organization (Environmental Health Criteria 170). Available online: http://www.inchem.org/documents/cicads/cicads/cicad53.htm .

Interstate Oil and Gas Compact Commission, 2008, Marginal Wells: Fuel for Economic Growth, 2008 Edition, 49 pp, downloaded May 28, 2009 from http://iogcc.publishpath.com/Websites/iogcc/pdfs/2008-Marginal-Well-Report.pdf .

Johnson, E.A., 2003, Geologic Assessment of the Phosphoria Total Petroleum System, Uinta-Piceance Province, Utah and Colorado, Chapter 9. In: Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado, U.S. Geological Survey Digital Data Series DDS—69—B, p. 1-37.

Johnson, R.C., and Roberts, S.B., 2003, The Mesaverde Total Petroleum System, Uinta-Piceance Province, Utah and Colorado, Chapter 7 of Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Colorado and Utah. U.S. Geological Survey, Digital Data Series DDS-69-B, 63 pp.

Kaiser, Mark J., (2012). Louisiana Haynesville Shale: Oil & Gas Journal. Vol. 110. Retrieved January 23, 2012 from http://www.ogj.com/articles/print/vol-110/issue-1a/exploration-development/louisiana-haynesville-p1.html.

Kim, E, 2007, North America gas production trends & issues: presentation for Wood Mackenzie Research and Consulting at Gas/Electric Partnership Workshop on February 8, 2007; 34 pages. Available online: http://www.gaselectricpartnership.com/AAWOODMAC.pdf .

Kirschbaum, M.A and Biewick, L.R.H, edited by Kirschbaum, M.A., Roberts, L.N.R., and Biewick, L.R.H., 2000, Chapter B: A Summary of the Coal Deposits in the Coal Deposits in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah. In: Geologic Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah: U.S. Geological Survey Professional Paper 1625-B; p. B1-B33.

Kirschbaum, M.A, edited by Kirschbaum, M.A., Roberts, L.N.R., and Biewick, L.R.H., 2000, Chapter A:  Introduction: Geologic Assessment of Coal in the Colorado Plateau. In: Geologic Assessment of Coal in the Colorado Plateau: Arizona, Colorado, New Mexico, and Utah: U.S. Geological Survey Professional Paper 1625-B; p. A1-A34.

Kirschbaum, M.A., 2003, Geologic Assessment of Undiscovered Oil and Gas Resources of the Mancos/Mowry Total Petroleum System, Uinta-Piceance Province, Utah and Colorado, Chapter 6. In: Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado, U.S. Geological Survey Digital Data Series DDS—69—B, p. 1-42.

Knopman, D., 2002, Assessing Gas and Oil Resources in the Intermountain West: RAND CT-195, p. 1-13. Available online: http://www.rand.org/pubs/testimonies/CT195/.

Kuuskraa, V., 2007a, Unconventional Gas-1: Reserves, production grew greatly during last decade: Oil & Gas Journal, Volume 105, Issue 33, September 03, 2007.

Kuuskraa, V., 2007b, Unconventional Gas-2: Resource potential estimates likely to change: Oil & Gas Journal, Volume 105, Issue 35, September 17, 2007.

LaTourrette, T., M. Bernstein, P. Holtberg, C. Pernin, B. Vollaard, M. Hanson, K. Anderson, and D. Knopman, 2002a, A New Approach to Assessing Gas and Oil Resources in the Intermountain West: RAND  Issue Paper IP-225-WFHF,  8 pages.  Available online: http://www.rand.org/pubs/.

LaTourrette, T., M. Bernstein, P. Holtberg, C. Pernin, B. Vollaard, M. Hanson, K. Anderson, and D. Knopman, 2002b, Assessing Gas and Oil Resources in the Intermountain West: Review of Methods and Framework For a New Approach: RAND MR-1553-WFHF,  94 pages.  Available online: http://www.rand.org/pubs/.

LaTourrette, T., M. Bernstein, M. Hanson, C. Pernin, D. Knopman, and A. Overton, 2003, Assessing Natural Gas and Oil Resources: An Example of a New Approach in the Greater Green River Basin: RAND  112 pages.  Available online: http://www.rand.org/pubs/.

Leschak, P., 2009, 2009 addendum to the oil and gas potential and reasonable foreseeable development (RFD) scenarios in the San Juan National Forest and BLM public lands, Colorado: 47 pages.  Available online: http://ocs.fortlewis.edu/forestplan/supplement/supporting-documents.htm.

Levorsen, A.I., 1967, Geology of Petroleum: Second edition, W.H. Freeman Company, San Francisco, 724 pages.

Matthews, V. (ed.) , KellerLynn, K. (ed.) , & Fox, B. (ed.). 2003. Messages in stone: Colorado's colorful geology. Colorado Geological Survey. p. 43, 62.

Molenaar, C.M., 1972, Paradox Basin: in W.M. Murphy ed., Geologic Atlas of the Rocky Mountain Region United States of America; Rocky Mountain Association of Geologists, p. 282-284.

Morgan, C.D., Hemborg, T.H., 1993, Paradox Basin [Px] Plays. In: Atlas of Major Rocky Mountain Gas Reservoirs; Rocky Mountain Bureau of Mines and Mineral Resources, p. 90-94.

Nation, L., 2002, Resource Paper Taken to Task: Congressional Panel Hears Mankin. In: *Explorer* by AAPG. Available online: http://www.aapg.org/explorer/2002/06jun/testimony.cfm.

National Petroleum Council, 1999, Meeting the Challenges of the Nation's Growing Natural Gas Demand, Volume 11, Task Group Reports, p. S-21.

National Petroleum Council, 2003, Balancing natural gas policy: Volume 1 Summary of findings and recommendations, 118 pages downloaded on 01-29-04, Volume 2 Integrated Report, 366 pages downloaded 04-22-04 and Volume 4 Supply task Group Report, 479 pages.  Available online: http://www.npc.org.

National Petroleum Council, (2011). Prudent Development: Realizing the Potential of North America's Natural Gas and Oil Resources. Retrieved January 23, 2012 from http://www.ogj.com/articles/print/vol-110/issue-1a/exploration-development/louisiana-haynesville-p1.html.

Nuccio, V.F., Condon, S.M, 1996, Burial and Thermal History of the Paradox Basin, Utah and Colorado, and Petroleum Potential of the Middle Pennsylvanian Paradox Formation; U.S. Geological Survey Bulletin 2000-O.

,Potential Gas Committee, 2003, Potential supply of natural gas in the United States, report of the Potential Gas Committee (December 31, 2002), Darrell L. Pierce, President and General Chairman, Colorado School of Mines, Golden, Colorado, 316 pages.

PTTC (Petroleum Technology Transfer Council), 2002, Commercialization of the freeze-thaw/evaporation purification process: Rockies Newsletter, volume 5, number 2, page 1.

Radler, Marilyn, (2012). US energy demand to stay weak in 2012 amid strong oil, gas production. Retrieved January 23, 2012 from http://www.ogj.com/articles/print/vol-110/issue-1a/exploration-development/louisiana-haynesville-p1.html .

Raymond James & Associates Inc., (2012). Market Watch: Gas prices continue falling compared with small decline for oil. *Oil & Gas Journal*. Retrieved January 23, 2012 from http://www.ogj.com/articles/2012/01/market-watch-gas-prices-rises.article.html .

Reeves., S.R., G.J. Koperna, and V.A. Kuuskraa, 2007, Nature and importance of technology progress for unconventional gas: OGJ Unconventional Gas Article #4, 14 pages.  Available online: http://www.adv-res.com/Literature.asp.

Rocky Mountain Federal Leadership Forum, 2004, Reasonably foreseeable development scenarios and cumulative effects analysis; *for oil and gas activities on Federal lands in the greater Rocky Mountain region*: U.S.D.O.I Bureau of Land Management, U.S. Environmental Protection Agency, U.S.D.O.I. Fish and Wildlife Service, U.S.D.O.I. National Park Service, and U.S.D.A Forest Service: Final Report published January 16, 2004; 100 pages.

Rocky Mountain Oil Journal, 2005, Weekly News Periodical.

Schaefer, K., (2010), The 3-break even prices for natural gas. *Oil and Gas Investment Bulletin*, April 12, 2010 issue (online). Retrieved March 18, 2011 from http://oilandgas-investments.com/2010/natural-gas/the-3-break-even-prices-for-natural-gas/ .

Schamel, S. 2009, Shale gas potential of the Paradox Basin, Colorado and Utah, *in* W.S. Houston, L.L. Wray, and P.G. Moreland, eds., The Paradox Basin revisited – New Developments in Petroleum Systems and Basin Analysis: RMAG 2009 Special Publication – The Paradox Basin, p. 568-603.

Skrtic, L., 2006. Hydrogen Sulfide, Oil and Gas, and People's Health: Master of Science thesis, Energy and Resources Group, University of California, Berkley, 77 pages.

Sieminski, A., 2008, Oil Market Issues and Outlook: Select Committee on Energy Independence and Global Warming, U.S. House of representatives, June 11 2008. Available online: http://globalwarming.house.gov/tools/2q08materials/files/0056.pdf .

Spears & Associates, Inc., 2003, U.S. Department of Energy microhole initiative workshop summary.  Available online: http://www.fossil.energy.gov/programs/oilgas/microhole/microhole-workshop-report.pdf.

Spencer, C.W., 1995, U.S. Geological Survey, Uinta-Piceance Basin Province (020): National Oil and Gas Assessment; Available online: http://certmapper.cr.usgs.gov/data/noga95/prov20/text/prov20.pdf.

Spencer, D., 2006, Bureau of Land Management, Colorado State Office letter to Charles S. Richmond, Supervisor Grand Mesa-Uncompahgre-Gunnison National Forests: 9 pages.  Available online: http://www.fs.usda.gov/detail/gmug/landmanagement/planning/?cid=fsbdev7_003218 by selecting "Update to the 2004 RFD (BLM, 2006)."

Stoeser, D.B., G.N. Green, L.C. Morath, W.D. Heran, A.B. Wilson, D.W. Moore, and B.S. Van Gosen, 2005, Preliminary integrated geologic map databases for the United States: U.S. Geological Survey, Open-File Report (2005-1351).  Available online: http://pubs.usgs.gov/of/2005/1351/ .

Stone, D.S., 1977, Tectonic history of the Uncompaghre uplift:  in H.K. Veal ed., Exploration frontiers of the central and southern Rockies; Rocky Mountain Association of Geologists, p. 23-30.

Tremain, C.M., Hemborg, H.T., Noe, D.C., Morgan, C.D., 1993, Greater Piceance Plays. In: Atlas of Major Rocky Mountain Gas Reservoirs; Rocky Mountain Bureau of Mines and Mineral Resources, p. 95-104.

U.S. Department of Energy, 1999, Environmental benefits of advanced oil and gas exploration and production technology: DOE-FE-0385, 168 pages.

U.S. Department of Energy, 2005, Coiled tubing: state of the industry and role for NETL: Topical report prepared for U.S. Department of Energy, National Energy Technology Laboratory under contract DE-AD26-00Nt00612, 32 pages. Available online: http://www.netl.doe.gov/technologies/oil-gas/publications/AP/Coiled%20Tubing%20Topical%20Report%20June%202005.pdf.

U.S. Department of Energy, 2007, Carbon sequestration atlas of the United States and Canada.  Available online: http://www.netl.doe.gov/technologies/carbon_seq/refshelf/atlas/index.html.

U.S. Department of Energy, 2008, 2009 carbon sequestration atlas of the United States and Canada, second edition: 89 pages.  Available online: http://www.netl.doe.gov/technologies/carbon_seq/refshelf/atlasII/index.html .

U.S. Departments of the Interior, Agriculture and Energy, 2003, Scientific inventory of onshore Federal lands' oil and gas resources and reserves and the extent and nature of restrictions or impediments to their development–The Paradox/San Juan, Uinta/Piceance, Greater Green River, and Powder River basins and the Montana Thrust Belt: BLM/WO/GI-03/002+3100.  Available online: http://www.blm.gov/epca/.

U.S. Departments of the Interior, Agriculture and Energy, 2006, Scientific inventory of onshore Federal lands' oil and gas resources and reserves and the extent and nature of restrictions or impediments to their development–Phase II Cumulative Inventory: Northern Alaska, Montana Thrust Belt,  Powder River Basin, Wyoming Thrust Belt, Greater Green River Basin, Denver Basin,  Uinta/Piceance Basin, Paradox/San Juan Basins, Appalachian Basin, Black Warrior Basin and Florida Peninsula: BLM/WO/GI-03/002+3100/REV06.  Available online: http://www.blm.gov/epca/.

U.S. Departments of the Interior, Agriculture, and Energy, 2008, Inventory of Onshore Federal Oil and Natural Gas Resources and Restrictions to Their Development: Phase III Inventory—Onshore United States. p. 1-392. Available online: http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III.html.

U.S. Geological Survey, 1995, 1995 National Assessment of United States Oil and Gas Reservoirs; By U.S. Geological Survey. U.S. Geological Survey Circular 1118. p. 1-30.

U.S. Geological Survey (Uinta-Piceance Assessment Team), 2003, Executive Summary—Assessment of undiscovered oil and gas resources of the Uinta-Piceance Province of Utah and Colorado, 2002, Chapters 1 and 2. In: Petroleum Systems and Geologic Assessment of Oil and Gas in the Uinta-Piceance Province, Utah and Colorado. National Assessment of Oil and Gas Project, USGS Digital Data Series DDS-69-B, Version 1.0.

U.S. Geological Survey, 2004, Resource Potential and Geology of the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National forests and Vicinity, Colorado. Department of the Interior. U.S. Geological Survey Bulletin 2213; p. 1-222.

U.S. Geological Survey, 2006, Coal Resource and Development Potential Report; Grand Mesa, Uncompahgre, and Gunnison National Forest.  Revised from Coal Resources and Coal Resource Potential. In: Resource Potential and Geology of the Grand Mesa, Uncompahgre, and Gunnison (GMUG) National Forests and Vicinity, Colorado: U.S. Geological Survey Bulletin 2213-M; p. 1-44.

U.S. Geological Survey, 2008a, Produced waters database.  Available online: http://energy.cr.usgs.gov/prov/prodwat/intro.htm.

U.S. Geological Survey, 2008b, Mean Continuous Gas Resources (excluding coalbed methane) (Undiscovered Technically recoverable Resources); 2008 National Oil and Gas Assessment update, map.  Available online: http://certmapper.cr.usgs.gov/data/noga00/natl/graphic/2008/mean_cont_gas_08.pdf.

U.S. Geological Survey, 2008c, USGS Assessment of Oil and Gas Resources Update. Retrieved April 11, 2011 from http://certmapper.cr.usgs.gov/data/noga00/natl/tabular/2008/summary_08.pdf .

Vidas, E.H., R.H. Hugman, and P.S. Springer, 2003, Assessing Natural Gas and Oil Resources: Technical Details of Resource allocation and Economic Analysis: RAND, 79 pages.  Available online: http://www.rand.org/pubs/.

Wilson, M.S., K.W. Grove, and A.B. Wilson, 2003, Exploration of the Mississippian Leadville Limestone in the Piceance basin, western Colorado: in Piceance Basin 2003 Guidebook of the Rocky Mountain Association of Geologists, p. 252-270.

# GLOSSARY

**Accumulation.**  An accumulation is one or more pools or reservoirs of petroleum that make up an individual production unit and is defined by trap, charge, and reservoir characteristics.  Two types of accumulations are recognized, conventional and continuous.

**Adsorbed (adsorption).**  The adherence of gas molecules to the surface of solids (coal or shale particles) with which they are in contact.

**Analysis period.**  January 1, 2010 through December 31, 2030.

**Associated water.**  Water that is produced from a well that also produces coalbed natural gas.

**Assessment unit.**  A mappable volume of rock within a total petroleum system that encompasses accumulations (discovered and undiscovered) that share similar geologic traits and socio-economic factors.  Accumulations within an assessment unit should constitute a sufficiently homogenous population such that the chosen methodology of resource assessment is applicable.  A total petroleum system might equate to a single assessment unit.  If necessary, a total petroleum system can be subdivided into two or more assessment units in order that each unit is sufficiently homogeneous to assess individually.  An assessment unit may be identified as conventional, if it contains conventional accumulations (see Glossary), or as continuous, if it contains continuous accumulations (see Glossary).

**Brittish Thermal Unit.**  A measure of heat energy.  One million BTU's is the heating value of one thousand cubic feet of methane.

**Borehole.**  Any narrow shaft drilled in the earth, either vertically or horizontally, to explore for or release oil, gas, water, etc.

**Casing string.**  An assembled length of steel pipe configured to suit a specific borehole. The sections of pipe are connected and lowered into a borehole, then cemented in place. Casing is run to protect or isolate formations next to the borehole.

**Coalbed natural gas.**  The gas that is produced from coalbeds.  It is mostly biogenic and may include nitrogen and carbon dioxide.  Coalbed natural gas is used inerchangeably with coalbed gas.

**Continuous accumulation.**  Common geologic characteristics of a continuous accumulation include occurrence down dip from water-saturated rocks, lack of obvious trap and seal, pervasive oil or gas charge, large aerial extent, low matrix permeability, abnormal pressure (either high or low), and close association with source rocks. Common production characteristics include a large in-place petroleum volume, low recovery factor, absence of truly dry holes, dependence on fracture permeability, and

sweet spots within the accumulation that have generally better production characteristics but where individual wells still have serendipitous hit or miss production characteristics (Schmoker, 2003).

**Conventional accumulation.**  The U.S. Geological Survey has defined conventional accumulations "by two geologic characteristics: (1) they occupy limited, discrete volumes of rock bounded by traps, seals, and down-dip water contacts, and (2) they depend upon the buoyancy of oil or gas in water for their existence" (Schmoker and Klett, 2003).

**Development potential.**  A projection of expected oil and gas and coalbed natural gas activity that is reasonably assumed to occur during the Planning Period (2010 through 2030).  This activity projection projects the types and levels of anticipated exploratory and development activity and is primarily based on operator input, geology, and past and present activity in the Study Area.  Economics, drilling and completion technology, accessibility to drilling locations and infrastructure, and risk some of the factors used to project development potential.

**Diagenetic pore-throat trap.**  A stratigraphic configuration of the reservoir and/or its sealing units formed by post depositional processes that cause variations in pore-throat aperture sizes (constricted openings connecting pore spaces between sediment grains) that create the trap boundaries between the reservoir and seal.

**Field.**  A production unit consisting of a collection of oil and gas pools that when projected to the surface form an approximately contiguous area that can be circumscribed.

**Held by production**.  This usually refers specifically to oil and gas leased that are productive and are held beyond their primary term because they are producing oil or gas in economic quantities.

**In-place.**  The total volume of oil and/or gas thought to exist (both discovered and yet-to-be discovered) without regard to the ability to either access or produce it.  Although the in-place resource is primarily a fixed, unchanging volume, the current understanding of that volume is continually changing as technology improves.

**Natural gas.**  Any gas of natural origin that consists primarily of hydrocarbon molecules producible from a borehole.

**Natural gas liquids.**  Hydrocarbons found in natural gas that are liquefied at the surface in field facilities or in gas processing plants.  Natural gas liquids are commonly reported separately from crude oil.

**Nonconventional gas (Unconventional gas).**  Nonconventional gas is generally thought of as gas that is created in formations without the permeability necessary to allow significant migration.  It is generally described as those gas accumulations that are hard

to discover, characterize, and commercially produce by common exploration and production technologies. It may include coalbed natural gas, tight sand, tight carbonates, shale, or deep gas.

**Occurrence Potential.** A rating of the potential for the presence of hydrocarbon resources to occur within the Study Area. The rating is based on geological and geophysical indications that hydrocarbons are present. Other factors, such as, accessibility, exploration cost, risk, oil and gas prices, and analysis period are not include in an analysis of Occurrence Potential.

**Petroleum.** A collective term for oil, gas, natural gas liquids, and tar.

**Play.** A set of known or postulated oil and gas accumulations sharing similar geologic, geographic, and temporal properties, such as source rock, migration pathway, timing, trapping mechanism, and hydrocarbon type. A play may differ from an assessment unit; an assessment unit can include one or more plays.

**Play area.** An area where productive oil or gas wells may be drilled based on a specific geologic concept.

**Proved growth reserves or reserve growth.** The increases in known petroleum volume that commonly occur as oil and gas accumulations are developed and produced, synonymous with field growth.

**Proved reserves.** The volume of oil and gas demonstrated, on the basis of geologic and engineering information, to be recoverable from known oil and gas reservoirs under present-day economic and technological conditions.

**Public domain.** Minerals that have been owned continuously by the United States.

**Reserves.** Oil and gas that has been proven by drilling and is available for profitable production.

**Rotary drilling rig.** A modern drilling unit capable of drilling a well with a bit attached to a rotating column of steel pipe.

**Spacing pattern.** The pattern of well locations, which could be one well location per 40, 80, 160, 320, or 640 acres for in the Study Area.

**Spudded.** To break ground with a drilling rig at the start of well-drilling operations.

**Stratigraphic test.** A well drilled to obtain geologic and/or engineering data about the coal.

**Stratigraphic trap.**  A trap (any barrier to the upward movement of oil or gas, allowing either or both to accumulate) that is the result of lithologic changes rather than structural deformation.

**Structure trap**.  A trap (any barrier to the upward movement of oil or gas, allowing either or both to accumulate) that is the result of folding, faulting, or other deformation.

**Technically recoverable resources.**  The volume of hydrocarbons which are recoverable using current exploration and production technology without regard to cost, which is a proportion of the estimated in-place resource.

**Total petroleum system.**  A total petroleum system consists of all genetically related petroleum generated by a pod or closely related pods of mature source rocks.  Particular emphasis is placed on similarities of the fluids of petroleum accumulations and is therefore closely associated with the generation and migration of petroleum.  The geologic elements of a total petroleum system, include (1) source-rock distribution, thickness, organic richness, maturation, petroleum generation, and migration; (2) reservoir-rock type (conventional or continuous), distribution, and quality; and (3) character of traps and time of formation with respect to petroleum generation and migration.

**Undiscovered technically recoverable resource.**  A subset of the in-place resource hypothesized to exist on the basis of geologic knowledge, data on past discoveries, or theory, and that is contained in undiscovered accumulations outside of known fields.  Estimated resource quantities are producible using current recovery technology but without reference to economic viability.  These resources are therefore dynamic, constantly changing to reflect our increased understanding of both the in-place resource as well as the likely nature of future technology.  Only accumulations greater than or equal to 1 million barrels of oil or 6 billion cubic feet of gas were included in the earlier 1995 assessment.

**Unstable grains.**  Said of mineral grains within a sedimentary rock, that don't resist chemical change after deposition.

**Vitrinite reflectance.**  The most common thermal maturity indicator.  Vitrinite is a maceral derived from the woody tissues of vascular plants.  Vitrinite reflectance is a measure of the amount of light reflected by vitrinite present in the rock's organic component.  Generation of gas is considered to begin at 0.75 percent.

**Figure 1.**
The Uncompahgre Field Office and it's location within Colorado.



Little Snake

Kremmling

Meeker

Glenwood Springs

Grand Junction

Rio Grande

Uncompahgre

Gunnison

Saguache

Dolores

Divide

Columbine

Pagosa
Springs

La Jara

0    20    40 Miles

1:2,000,000

April, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with
other data.  Original data was compiled from various sources.  This information was developed through digital means and may be updated without notification.





**Figure 2a.**
Location of Uncompahgre Study Area within Uncompahgre Field Office.

**Figure 2b.**
Location of oil and gas mineral ownership within the Uncompahgre Study Area.

**Lands Excluded From Reasonable Forseeable Development Analysis**

- Gunnison Gorge National Conservation Area Planning Area
- Dominguez-Escalante National Conservation Area

**No Leasing**

- BLM Wilderness
- Forest Service Wilderness
- Black Canyon of the Gunnison National Park
- BLM Wilderness Study Areas
- Dominguez Canyon Wilderness

**Oil and Gas Mineral Ownership**

- Bureau Managed
- Forest Service
- Park Service
- Private/State

0 15 30 Miles

1:700,000

January, 2012

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

N





**Figure 3a.**
Location and initial status of all conventional oil and gas wells drilled within the Uncompahgre Study Area. Data from IHS Energy Group (2010) and Colorado Oil and Gas Conservation Commission (2010).



**Conventional Oil and Gas Wells**

National Forest Lands

**Lands Excluded From Reasonable Forseeable Development Analysis**

Gunnison Gorge National Conservation Area Planning Area

Dominguez-Escalante National Conservation Area

**No Leasing**

BLM Wilderness

Forest Service Wilderness

Black Canyon of the Gunnison National Park

BLM Wilderness Study Areas

Dominguez Canyon Wilderness

☼ Gas
● Oil
✴ Shut-in andTemporarily Abandoned
○ Spud
● Injection or Service
◇ Abandoned

0        15        30 Miles

1:700,000

April, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.





**Figure 3b.**

Location and initial status of all coalbed natural gas wells drilled within the Uncompahgre Study Area. Data from IHS Energy Group (2010) and Colorado Oil and Gas Conservation Commission (2010).



**Figure 4.**
Major structural elements and selected geologic units of the Uncompahgre Study Area.

April, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

**Figure 5.** Generalized stratigraphic chart of the Paradox basin within the Study Area (after Huffman, 1995; Stevenson and Wray, 2009), with hydrocarbon and carbon dioxide producing zones.

| Era | Age | Stratigraphic Unit | | | Hydrocarbon Production[1] |
|---|---|---|---|---|---|
| Cenozoic | Tertiary | Wasatch Formation | | | Gas Oil |
| Mesozoic | Cretaceous | Mesaverde Group | | | Gas |
| | | Mancos Shale (includes Ferron Sandstone member) | | | Gas Oil |
| | | Dakota Sandstone | | | Gas Oil |
| | | Burro Canyon Formation | | | Gas Oil |
| | Jurassic | Morrison Formation | Recapture member | | Gas Oil |
| | | | Bluff Sandstone | | Gas Oil |
| | | Carmel Formation | | | |
| | | Glen Canyon Group | Navajo Sandstone | | Oil |
| | | | Kayenta Formation | | |
| | | | Wingate Sandstone | | |
| | Triassic | Chinle Formation (includes Shinarump member) | | | |
| | | Moenkopi Formation | Timoweap member | | Oil |
| | | | Hoskinnini member | | |
| Paleozoic | Permian | Cutler Formation | Kaibab Limestone, White Rim and De Chelley Sandstones | | Oil (White Rim S.S.) |
| | | | Organ Rock Tongue member | | Gas (Cutler Formation undifferentiated) |
| | | | Cedar Mesa Sandstone | | |
| | | | Halgaito Tongue member | | |
| | Pennsylvanian | Hermosa Group | Honaker Trail Formation | | Gas |
| | | | Paradox Formation | Ismay member (includes Hovenweep and Gothic Shales) | Gas Oil |
| | | | | Desert Creek member (includes Chimney Rock Shale) | Gas Oil |
| | | | | Akah member | Gas Oil |
| | | | | Barker Creek member | Gas Oil |
| | | | | Cane Creek Shale | Gas Oil |
| | | | Pinkerton Trail Formation | | |
| | Mississippian | Molas Formation | | | |
| | | Leadville Limestone | | | Gas Oil CO$_2$ |
| | Devonian | Ouray Limestone | | | CO$_2$ |
| | | Elbert Formation (includes McCracken member) | | | Gas Oil |
| | | Aneth Formation | | | |
| | Silurian | hiatus | | | |
| | Ordovician | | | | |
| | Cambrian | Lynch Dolomite | | | |
| | | Muav Limestone | | | |
| | | Bright Angel Shale | | | |
| | | Tapeats Sandstone/Ignacio Quartzite | | | |

[1]Only limited production has occurred in the Study Area portion of the Paradox basin. Thus, basin-wide hydrocarbon producing zones (including CO2) are shown here.

Figure 6a: Generalized stratigraphic chart of the Piceance basin within the Study Area (after Johnson and Roberts, 2003), with hydrocarbon producing zones.

| Era | Age | Stratigraphic Unit NW | SE | Hydrocarbon Production |
|---|---|---|---|---|
| Cenozoic | Tertiary | Green River Formation | | Gas |
| | | Wasatch Formation | | Gas |
| | | Fort Union Formation | | Gas |
| Mesozoic | Cretaceous | Mesaverde Formation or Group[1] | | Gas Oil |
| | | Mancos Shale or Group | | Gas |
| | | "Mancos B" | | Gas Oil |
| | | Ferron Sandstone | Frontier Formation | Gas |
| | | Mowry Shale | | Oil |
| | | Dakota Sandstone | | Gas Oil |
| | | Cedar Mountain Formation | hiatus | Gas |
| | Jurassic | Morrison Formation | | Gas Oil |
| | | Stump Formation | Curtis Formation | Oil (Curtis) |
| | | Entrada Sandstone | | Gas Oil (Entrada) |
| | Triassic | Glen Canyon Sandstone and equivalents | | |
| | | Chinle Formation (includes Shinarump member) | | Oil (Shinarump) |
| | | Moenkopi Formation | | |
| Paleozoic | Permian | Park City Formation | Phosphoria Formation | Oil |
| | | Upper Weber Sandstone | | Oil |
| | Pennsylvanian | Lower Weber Sandstone | | Oil |
| | | Morgan Formation | Mintum Formation | |
| | | hiatus | Belden Shale | |
| | Mississippian | Leadville Limestone | | |
| | Devonian | Chaffee Group | | |
| | Silurian | hiatus | | |
| | Ordovician | hiatus | Manitou Formation | |
| | Cambrian | Dotsero Formation | | |
| | | Sawatch Sandstone | | |

[1]See Figure 6b for detailed stratigraphic relationships within the Mesaverde Group.

Figure 6b: Generalized stratigraphic chart of the Mesaverde Group of the Piceance basin within the Study Area (after Hettinger and Kirschbaum, 2002; Cole and Cumella, 2003), with hydrocarbon producing zones.

| Era | Age | Stratigraphic Unit | | | Hydrocarbon Production |
| | | Group | Formation | Member | |
| --- | --- | --- | --- | --- | --- |
| Mesozoic | Upper Cretaceous | Mesaverde | Williams Fork | Ohio Creek | Gas Oil (Williams Fork -- undifferentiated) |
| | | | | Bowie Shale[1] | Gas (including coal bed gas) |
| | | | Iles | Rollins | Gas |
| | | | | Cozzette[2] | Gas |
| | | | | Corcoran[2] | Gas |

[1]Includes the Cameo coal zone.
[2]The Cozzette Sandstone and Corcoran Sandstone members of the Iles Formation have an intertonguing relationship with the underlying Mancos Shale. As a result, occasionally these members are found in stratigraphically lower positions that the Mancos.

**Figure 7.**
Oil and gas fields within the Uncompahgre Study Area.  Data from Colorado Oil and Gas Conservation Commission (2010).



**Figure 8.**
Location and initial classification of Uncompahgre Study Area oil, gas, and coalbed natural gas wells spudded between January 1, 2000 and December 31, 2009. Data from IHS Energy Group (2010).



**Figure 9.**
Location and present status of Uncompahgre Study Area oil, gas, and coalbed natural gas wells spudded between January 1, 2000 and December 31, 2009. Data from IHS Energy Group (2010) and Colorado Oil and Gas Conservation Commission (2010).

May, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.



**Figure 10.**

Location of oil and gas units and a communitization agreement within the Uncompahgre Study Area. Data from Bureau files.



**Figure 11.** Conventional and coalbed natural gas wells spud by decade within the Uncompahgre Study Area.  Data from IHS Energy Group (2010).



Note: Coalbed natural gas wells include three wells which co-produce coalbed and conventional gas; conventional wells excluded two wells for which no spud date was available.

**Figure 12.** Conventional and coalbed natural gas wells spud within the Uncompahgre Study Area for 2000-2009.  Data from IHS Energy Group (2010).



Note: Coalbed natural gas wells include three wells which co-produce coalbed and conventional gas; conventional wells exclude two wells for which no spud date was available.

**Figure 13.**
Uncompahgre Study Area locations of all conventional gas and coalbed natural gas wells that have been spudded and not completed and those still in an active status.  Data from Colorado Oil and Gas Conservation Commission (2010) and IHS Energy Group (2010).





**Figure 14.**
True vertical depths of vertical, directional, and horizontal wells drilled within the Uncompahgre Study Area. Data from IHS Energy Group (2010).

**Figure 15.**
Existing and proposed directional and horizontal borehole locations within the Uncompahgre Study Area. Data from IHS Energy Group (2010).

May, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.



**Figure 16.**
Geographic distribution of water quality samples across the Uncompahgre Study Area and distribution of sample salinity. Data from U.S. Geological Survey (2008a).





**Figure 17.**
Location of coal fields within the Uncompahgre Study Area.

April, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.



**Figure 18.**

Potential for occurrence of oil and gas (excluding coalbed natural gas) within the Uncompahgre Study Area.

June, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.



**Figure 19.**
Potential for occurrence of coalbed natural gas within the Uncompahgre Study Area.

June, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

**Figure 20.** Colorado historical natural gas prices with future natural gas price projections (Energy Information Administration, 2011).



**Figure 21.** Colorado historical crude oil prices with future oil price projections (Energy Information Administration, 2011).



**Figure 22.**
Leased and unleased Federal oil and gas minerals within the Uncompahgre Study Area.  Data from Bureau files.



June, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

**Figure 23a.**
Conventional oil and gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.



**Conventional Oil and Gas Development Potential (2010-2030)**

- Very High - more than 12 wells per township
- High - more than 6 to 12 wells per township
- Moderate - more than 2 to 6 wells per township
- Low - more than 1 to 2 wells per township
- Very Low - 0.25 to 1 well per township
- Negligible - less than 0.25 wells per township

National Forest Lands

**Lands Excluded From Reasonable Foreseeable Development Analysis**

- Gunnison Gorge National Conservation Area Planning Area
- Dominguez-Escalante National Conservation Area

**No Leasing**

- BLM Wilderness
- Forest Service Wilderness
- Black Canyon of the Gunnison National Park
- BLM Wilderness Study Areas
- Dominguez Canyon Wilderness

0        15        30 Miles

1:700,000

January, 2012

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.



**Figure 23b.**
Conventional oil and gas development potential and projected drilling densities on Bureau managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.





**Conventional Oil and Gas Development Potential (2010-2030)**

- Very High - more than 12 wells per township
- High - more than 6 to 12 wells per township
- Moderate - more than 2 to 6 wells per township
- Low - more than 1 to 2 wells per township
- Very Low - 0.25 to 1 well per township
- Negligible - less than 0.25 wells per township
- National Forest Lands

**Lands Excluded From Reasonable Foreseeable Development Analysis**
- Gunnison Gorge National Conservation Area Planning Area
- Dominguez-Escalante National Conservation Area



January, 2012

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

1:700,000

**Figure 23c.**
Conventional oil and gas development potential and projected drilling densities on Forest Service managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.



**Conventional Oil and Gas Development Potential (2010-2030)**

- Very High - more than 12 wells per township
- High - more than 6 to 12 wells per township
- Moderate - more than 2 to 6 wells per township
- Low - more than 1 to 2 wells per township
- Very Low - 0.25 to 1 well per township
- Negligible - less than 0.25 wells per township

National Forest Lands

**Lands Excluded From Reasonable Forseeable Development Analysis**

- Gunnison Gorge National Conservation Area Planning Area
- Dominguez-Escalante National Conservation Area

January, 2012

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

0        15        30 Miles

1:700,000

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.



**Figure 24a.**
Coalbed natural gas development potential and projected drilling densities within the Uncompahgre Study Area for 2010 through 2030.

**Coalbed Natural Gas Development Potential (2010-2030)**

- High - 40 or more wells per township
- Moderate - 20 to 39 wells per township
- Low - 2 to 19 wells per township
- Very Low - Less than 2 wells per township
- None - No drilling activity is anticipated during 2010-2030

National Forest Lands

**Lands Excluded From Reasonable Forseeable Development Analysis**

- Gunnison Gorge National Conservation Area Planning Area
- Dominguez-Escalante National Conservation Area

**No Leasing**

- BLM Wilderness
- Forest Service Wilderness
- Black Canyon of the Gunnison National Park
- BLM Wilderness Study Areas
- Dominguez Canyon Wilderness

0        12.5        25 Miles

1:700,000

February, 2012

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

**Figure 24b.**
Coalbed natural gas development potential and projected drilling densities on Bureau managed oil and gas minerals within the Uncompahgre
Study Area for 2010 through 2030.



**Coalbed Natural Gas Development Potential (2010-2030)**

High - 40 or more wells per township

Moderate - 20 to 39 wells per township

Low - 2 to 19 wells per township

Very Low - Less than 2 wells per township

None - No drilling activity is anticipated during 2010-2030

National Forest Lands

**Lands Excluded From Reasonable Forseeable Development Analysis**

Gunnison Gorge National Conservation Area Planning Area

Dominguez-Escalante National Conservation Area

0      15      30 Miles

1:700,000

February, 2012

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with
other data. Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.





**Figure 24c.**
Coalbed natural gas development potential and projected drilling densities on Forest Service managed oil and gas minerals within the Uncompahgre Study Area for 2010 through 2030.

**Table 1.**  Historical conventional oil, gas, and water production from formations within the Uncompahgre Study Area.  Data from IHS Energy Group (2010).

| CONVENTIONAL WELLS WITH PRODUCTION | | | | |
|---|---|---|---|---|
| RESERVOIR NAME | NUMBER OF WELLS | CUMULATIVE OIL (barrels) | CUMULATIVE GAS (cubic feet) | CUMULATIVE WATER (barrels) |
| Corcoran | 8 | 2,126 | 663,568,000 | 3,180 |
| Corcoran/Cozzette | 7 | 2,048 | 1,712,799,000 | 5,850 |
| Cozzette | 8 | 260 | 359,170,000 | 834 |
| Cutler | 1 | 405 | 57,442,000 | 2,987 |
| Dakota | 1 | 1,004 | 1,629,000 | 0 |
| Hermosa | 1 | 120 | 41,087,000 | 1,308 |
| Honaker Trail | 1 | 0 | 129,122,000 | 0 |
| Mesaverde | 1 | 26 | 3,884,000 | 968 |
| Rollins | 2 | 0 | 9,954,000 | 0 |
| Williams Fork | 3 | 322 | 142,547,000 | 69 |
| Williams Fork Cameo | 1 | 219 | 130,324,000 | 11 |
| TOTALS | 34 | 6,530 | 3,251,526,000 | 15,207 |

**Table 2.** Historical coalbed natural gas, oil, and water production from formations within the Uncompahgre Study Area. Data from IHS Energy Group (2010).

| COALBED NATURAL GAS WELLS WITH PRODUCTION | | | | |
|---|---|---|---|---|
| RESERVOIR NAME | NUMBER OF WELLS | CUMULATIVE OIL (barrels) | CUMMULATIVE GAS (cubic feet) | CUMULATIVE WATER (barrels) |
| Cameo | 1 | 16 | 51,929,000 | 7,686 |
| Cameo Coal | 3 | 236 | 103,281,000 | 6,695 |
| Cameo Coal Williams Fork | 1 | 0 | 64,000 | 7 |
| Corcoran | 2 | 1,083 | 1,100,237,000 | 1,484 |
| Corcoran/ Cozzette/ Mesaverde | 1 | 532 | 80,125,000 | 899 |
| Cozzette | 1 | 4 | 15,329,000 | 768 |
| Mesaverde | 3 | 4 | 18,704,000 | 768 |
| Williams Fork | 10 | 6,519 | 3,385,018,000 | 1,746,012 |
| Williams Fork Coal | 1 | 96 | 48,688,000 | 1,519 |
| Williams Fork Cameo | 1 | 0 | 3,000 | 0 |
| **TOTALS** | **24** | **8,490** | **4,803,378,000** | **1,765,838** |

**Table 3.**  Estimated conventional oil and gas development potential classification acres, number of townships, projected average drilling densities, and percentage of the entire Uncompahgre Study Area for each development potential classification type for the period 2010 through 2030.

| Development Potential | Acres | Area (townships) | Average new wells per township | % of Study Area |
|---|---|---|---|---|
| Very High | 280,901 | 12.19 | 25 | 8.73 |
| High | 22,419 | 0.97 | 9 | 0.70 |
| Moderate | 807,514 | 35.05 | 4 | 25.10 |
| Low | 119,013 | 5.17 | 1.5 | 3.70 |
| Very Low | 1,167,738 | 50.68 | 0.50 | 36.30 |
| Negligible | 425,608 | 18.47 | 0.10 | 13.23 |
| Not Assessed | 393,739 | 17.09 | 0 | 12.24 |
| **Totals** | **3,216,933** | **139.62** | | **100** |

**Table 4.** Estimated coalbed natural gas development potential classification acres, number of townships, projected average drilling densities, and percentage of the Uncompahgre Study Area within each development potential classification type for the period 2010 through 2030.

| Development Potential | Acres | Area (townships) | Average new wells per township | % of Study Area |
|---|---|---|---|---|
| High | 114,462 | 4.97 | 60 | 3.56 |
| Moderate | 339,344 | 14.73 | 30 | 10.55 |
| Low | 33,652 | 1.46 | 10 | 1.05 |
| Very Low | 1,262,581 | 54.80 | 0.50 | 39.25 |
| None | 1,072,891 | 46.57 | 0 | 33.35 |
| Not Assessed | 393,739 | 17.09 | 0 | 12.24 |
| **Totals** | **3,216,668** | **139.62** | | **100** |

**Table 5.** Annual conventional and coalbed natural gas well spuds projected for the Uncompahgre Study Area.

| YEAR | CONVENTIONAL SPUDS | COALBED NATURAL GAS SPUDS |
|---|---|---|
| 2010 | 2 | 7 |
| 2011 | 3 | 6 |
| 2012 | 5 | 11 |
| 2013 | 7 | 7 |
| 2014 | 11 | 12 |
| 2015 | 17 | 17 |
| 2016 | 22 | 22 |
| 2017 | 25 | 20 |
| 2018 | 26 | 17 |
| 2019 | 28 | 32 |
| 2020 | 31 | 30 |
| 2021 | 32 | 54 |
| 2022 | 32 | 60 |
| 2023 | 31 | 47 |
| 2024 | 30 | 71 |
| 2025 | 29 | 71 |
| 2026 | 28 | 94 |
| 2027 | 28 | 58 |
| 2028 | 34 | 83 |
| 2029 | 42 | 62 |

**Table 6a.** Annual conventional natural gas and oil production projected for the Uncompahgre Study Area.

| YEAR | CONVENTIONAL GAS (thousand cubic feet) | CONVENTIONAL OIL (Barrels) |
|---|---|---|
| 2010 | 10,262 | 0 |
| 2011 | 15,804 | 0 |
| 2012 | 12,982 | 0 |
| 2013 | 46,215 | 0 |
| 2014 | 88,775 | 0 |
| 2015 | 157,500 | 961 |
| 2016 | 260,700 | 2,749 |
| 2017 | 391,200 | 5,159 |
| 2018 | 531,020 | 7,845 |
| 2019 | 666,310 | 10,400 |
| 2020 | 809,060 | 12,454 |
| 2021 | 965,490 | 13,776 |
| 2022 | 1,125,400 | 14,367 |
| 2023 | 1,271,800 | 14,490 |
| 2024 | 1,397,200 | 14,553 |
| 2025 | 1,509100 | 14,948 |
| 2026 | 1,601,600 | 15,856 |
| 2027 | 1,672,400 | 17,090 |
| 2028 | 1,744,500 | 18,042 |
| 2029 | 1,857,200 | 17,755 |

**Table 6b.** Annual conventional natural gas and oil production projected for wells on Bureau managed oil and gas minerals in the Uncompahgre Study Area.

| YEAR | CONVENTIONAL GAS (thousand cubic feet) | CONVENTIONAL OIL (Barrels) |
|---|---|---|
| 2010 | 3,209 | 0 |
| 2011 | 4,942 | 0 |
| 2012 | 4,059 | 0 |
| 2013 | 14,451 | 0 |
| 2014 | 27,760 | 0 |
| 2015 | 49,250 | 301 |
| 2016 | 81,521 | 860 |
| 2017 | 122,328 | 1,613 |
| 2018 | 166,050 | 2,453 |
| 2019 | 208,355 | 3,252 |
| 2020 | 252,993 | 3,894 |
| 2021 | 301,909 | 4,308 |
| 2022 | 351,913 | 4,493 |
| 2023 | 397,692 | 4,531 |
| 2024 | 436,904 | 4,551 |
| 2025 | 471,896 | 4,674 |
| 2026 | 500,820 | 4,958 |
| 2027 | 522,959 | 5,344 |
| 2028 | 545,505 | 5,642 |
| 2029 | 580,746 | 5,552 |

**Table 7a.** Annual coalbed natural gas production and associated oil production projected for the Uncompahgre Study Area.

| YEAR | GAS (thousand cubic feet) | OIL (Barrels) |
|------|---------------------------|---------------|
| 2010 | 697,341 | 1,139 |
| 2011 | 1,014,091 | 1,335 |
| 2012 | 1,672,897 | 2,171 |
| 2013 | 1,714,779 | 1,977 |
| 2014 | 2,094,916 | 2,567 |
| 2015 | 2,726,814 | 3,597 |
| 2016 | 3,657,532 | 4,690 |
| 2017 | 4,143,067 | 4,920 |
| 2018 | 4,080,733 | 4,570 |
| 2019 | 5,114,376 | 6,617 |
| 2020 | 5,765,390 | 7,142 |
| 2021 | 8,320,738 | 10,848 |
| 2022 | 10,548,777 | 13,425 |
| 2023 | 10,998,736 | 12,455 |
| 2024 | 12,804,283 | 15,735 |
| 2025 | 13,856,355 | 17,003 |
| 2026 | 16,744,206 | 20,732 |
| 2027 | 15,635,355 | 17,314 |
| 2028 | 16,454,692 | 19,315 |
| 2029 | 14,962,892 | 17,304 |

**Table 7b.**  Annual coalbed natural gas production and associated oil production projected for wells on Bureau managed oil and gas minerals in the Uncompahgre Study Area.

| YEAR | GAS (thousand cubic feet) | OIL (Barrels) |
|------|---------------------------|---------------|
| 2010 | 236,468 | 386 |
| 2011 | 343,878 | 453 |
| 2012 | 567,279 | 736 |
| 2013 | 581,482 | 670 |
| 2014 | 710,386 | 870 |
| 2015 | 924,663 | 1,220 |
| 2016 | 1,240,269 | 1,590 |
| 2017 | 1,404,914 | 1,668 |
| 2018 | 1,383,777 | 1,550 |
| 2019 | 1,734,285 | 2,244 |
| 2020 | 1,955,044 | 2,422 |
| 2021 | 2,821,562 | 3,679 |
| 2022 | 3,577,090 | 4,552 |
| 2023 | 3,729,671 | 4,223 |
| 2024 | 4,341,932 | 5,336 |
| 2025 | 4,698,690 | 5,766 |
| 2026 | 5,677,960 | 7,030 |
| 2027 | 5,301,949 | 5,871 |
| 2028 | 5,579,786 | 6,550 |
| 2029 | 5,073,917 | 5,868 |

Table 8a. Uncompahgre Study Area surface disturbance associated with new drilled wells and existing wells for the baseline scenario (short-term disturbance) for the 2010-2030 period.

| Wells | | | Disturbed Sites | | | Acres of Surface Disturbance (per site) | | Acres of Disturbance by Well Type | |
|---|---|---|---|---|---|---|---|---|---|
| Type | Total | BLM Managed | New Wells per pad (average) | Total Disturbed Sites | BLM Managed Disturbed Sites | Access Roads and Pipelines | Well Pad | Total | BLM Managed |
| Wells in Whitewater Unit | 9 | 9 | 9 | 1 | 1 | 18 | 6 | 23 | 23 |
| Additional Coalbed Gas/Conventional Wells at 32 Existing Locations | 96 | 27 | 3 | 32 | 9 | 0 | 2 | 64 | 18 |
| Coalbed Gas/Conventional Well Multipads | 500 | 167 | 4 | 125 | 42 | 18 | 6 | 2,975 | 992 |
| Coalbed Gas Multipads | 458 | 153 | 2 | 229 | 76 | 18 | 4 | 4,924 | 1,641 |
| Coalbed Gas Single Well Pads | 42 | 11 | 1 | 42 | 11 | 18 | 3 | 840 | 228 |
| Conventional One and Two Well Pads | 166 | 52 | 1.5 | 111 | 35 | 18 | 4 | 2,158 | 677 |
| Total New Exploratory and Development Wells | 1,271 | 418 | Total New Exploratory and Development Well Disturbed Sites | 540 | 174 | Total New Exploratory and Development Well Surface Disturbance | | 10,984 | 3,578 |
| Existing Active Coalbed Natural Gas Wells | 22 | 6 | 1 | 22 | 6 | 2 | 1.5 | 77 | 21 |
| Existing Active Conventional Wells | 40 | 8 | 1 | 40 | 8 | 2 | 1.5 | 140 | 28 |
| Total Existing Active Wells | 62 | 14 | Total Existing Disturbed Well Sites | 62 | 14 | Total Existing Well Surface Disturbance | | 217 | 49 |
| Total Wells | 1,333 | 432 | Total Short-Term Disturbed Well Sites | 602 | 188 | Total Short-Term Disturbance | | 11,201 | 3,627 |

**Table 8b.** Uncompahgre Study Area surface disturbance associated with new active wells and existing wells determined to remain in an active status for the baseline scenario (long-term disturbance) for the 2010-2030 period.

| Wells | | | Disturbed Sites | | | Acres of Surface Disturbance (per site) | | Acres of Disturbance by Well Type | |
|---|---|---|---|---|---|---|---|---|---|
| Type | Total | BLM Managed | Wells per pad (average) | Total Disturbed Sites | BLM Managed Disturbed Sites | Access Roads and Pipelines | Well Pad | Total | BLM Managed |
| Wells in Whitewater Unit | 7 | 6 | 9 | 1 | 1 | 8 | 2 | 10 | 10 |
| Additional Coalbed Gas/Conventional Wells at 32 Existing Locations | 77 | 21 | 3 | 32 | 9 | 0 | 0.5 | 16 | 4 |
| Coalbed Gas/Conventional Well Multipads | 413 | 137 | 3 | 123 | 41 | 8 | 2 | 1,225 | 408 |
| Coalbed Gas Multipads | 412 | 137 | 2 | 218 | 73 | 8 | 1.5 | 2,067 | 689 |
| Coalbed Gas Single Well Pads | 38 | 10 | 1 | 38 | 10 | 8 | 1.5 | 359 | 97 |
| Conventional One and Two Well Pads | 125 | 39 | 1.5 | 83 | 26 | 8 | 1.5 | 789 | 247 |
| Total New Active Wells | 1,070 | 352 | Total New Active Disturbed Well Sites | 494 | 159 | Total New Active Well Surface Disturbance | | 4,465 | 1,456 |
| Remaining Active Coalbed Natural Gas Wells | 22 | 6 | 1 | 22 | 6 | 2 | 1.5 | 77 | 21 |
| Remaining Active Conventional Wells | 25 | 8 | 1 | 25 | 8 | 2 | 1.5 | 88 | 28 |
| Total Remaining Active Wells | 47 | 14 | Total Remaining Well Sites | 47 | 14 | Total Remaining Wells Surface Disturbance | | 165 | 49 |
| **Total Wells** | **1,117** | **366** | **Total Long-Term Disturbed Well Sites** | **541** | **173** | **Total Long-Term Well Disturbance** | | **4,630** | **1,505** |

**Figure A1-1.**
Location of the Uinta-Piceance 2002 and Paradox Basin 1995 province boundaries within the Uncompahgre Study Area.  Data from United States Geological Survey (2010).



**Province Boundaries**



Paradox Basin

Uinta-Piceance Basin



0        15        30 Miles

1:700,000

May, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.
Original data was compiled from various sources.  This information was developed through digital means and may be updated without notification.



**Figure A1-2.**
Location of the 1995 Paradox Basin Province Salt Anticline Flank, Buried Fault Blocks, and Fractured Interbed Plays within the Uncompahgre Study Area.
Data from United States Geological Survey (2010).





**Paradox Basin Plays**

Salt Anticline Flank and Buried Fault Blocks

Fractured Interbed



0        15        30 Miles

1:700,000

May, 2010

Dean Stilwell, Geologist
Al Elser, Geologist
Amber Robbins, Geologist
Stan Lawrence, Petroleum Engineer

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data.
Original data was compiled from various sources. This information was developed through digital means and may be updated without notification.

N