# **Green Completions: Preconditions**

✴ Must have permanent equipment on site before cleanup

  ◆ **Piping from well-head to sales line**

  ◆ **Dehydrator**

  ◆ **Lease meter**

  ◆ **Stock tank**

✴ Sales line gas can be used for fuel and/ or gas lift in low pressure wells



# Green Completions:
# Low Pressure Wells

⁎ Can use portable compressors to start-up the well when reservoir pressure is low

   ◆ **Artificial gas lift to clear fluids**

   ◆ **Boost gas to sales line**

⁎ Higher cost to amortize investment in portable equipment



Portable Compressors, Separator and Other Equipment on a trailer

Source: Herald



*Reducing Emissions, Increasing Efficiency, Maximizing Profits*    Slide 8

# Is Recovery Profitable?

✧ Partners report recovering 2% - 89% (average of 53%) of total gas produced during well completions and workovers

✧ Estimate 7- 12,500 Mcf (average of 3,000 Mcf) of natural gas can be recovered from each cleanup

✧ Estimate 1- 580 Bbl of condensate can be recovered from each cleanup



Note: Values for high pressure wells

*Reducing Emissions, Increasing Efficiency, Maximizing Profits*   Slide 9

# **Green Completions: Benefits**

✴ Reduced methane emissions during completions and workovers

✴ Sales revenue from recovered gas and condensate

✴ Improved relations with state agencies and public neighbors

✴ Improved safety

✴ Reduced disposal costs



*Reducing Emissions, Increasing Efficiency, Maximizing Profits*

# BP Experience

* Capital investment ~ $1.4 million on portable three-phase separators, sand traps and tanks

* Used Green Completions on 106 wells

* Total natural gas recovered ~ 350 MMcf/year

* Total condensate recovered ~ 6,700 Bbl/year



# **BP Experience**

★ Total value of natural gas and condensate recovered ~ $840,000 per year

★ Investment recovered in 2+ years



Portable Three Phase Separator, Source: BP

Note:

- Value of natural gas at $1.99/Mcf

- Value of condensate at $22/bbl



*Reducing Emissions, Increasing Efficiency, Maximizing Profits*   Slide 12

# Weatherford Durango Experience

⚝ Successfully completed pilot project in the Fruitland coal formations in Durango, Colorado

- ◆ **Well depth: 2,700 to 3,200 feet**
- ◆ **Pore pressure: estimated at 80 pounds per square inch gauge (psig)**
- ◆ **Well type: coal bed methane**
- ◆ **Hole size: 5 ½ inches**
- ◆ **No. of wells: 3 well pilots**

⚝ Captured 2 MMcf of gas and sold by client



*Reducing Emissions, Increasing Efficiency, Maximizing Profits*     Slide 13

# Weatherford Portable Equipment



*Reducing Emissions, Increasing Efficiency, Maximizing Profits*   Slide 14

# **Weatherford Green Completions**

* Use pipeline gas with proprietary foaming agent as compressible fluid to initiate cleanout

* System includes

   - **Wet screw compressor when well pressure is less than 80 psig**
   - **Booster compressor, three phase separator and sand trap**

* Estimate cleanup pressure of 300 to 400 psig at a well depth of 8000 feet

* Suggest use in all kinds of completion and workover cleanup operations

NaturalGas
EPA POLLUTION PREVENTER

# Discussion Questions

* To what extent are you implementing this opportunity?

* Can you suggest other approaches for reducing well venting?

* How could these opportunities be improved upon or altered for use in your operation?

* What are the barriers (technological, economic, lack of information, regulatory, focus, manpower, etc.) that are preventing you from implementing this practice?



*Reducing Emissions, Increasing Efficiency, Maximizing Profits*    Slide 16

# Anthropogenic emissions of methane in the United States

Scot M. Miller[a,1], Steven C. Wofsy[a], Anna M. Michalak[b], Eric A. Kort[c], Arlyn E. Andrews[d], Sebastien C. Biraud[e], Edward J. Dlugokencky[d], Janusz Eluszkiewicz[f], Marc L. Fischer[g], Greet Janssens-Maenhout[h], Ben R. Miller[i], John B. Miller[i], Stephen A. Montzka[d], Thomas Nehrkorn[f], and Colm Sweeney[i]

[a]Department of Earth and Planetary Sciences, Harvard University, Cambridge, MA 02138; [b]Department of Global Ecology, Carnegie Institution for Science, Stanford, CA 94305; [c]Department of Atmospheric, Ocean, and Space Sciences, University of Michigan, Ann Arbor, MI 48109; [d]Global Monitoring Division, Earth System Research Laboratory, National Oceanic and Atmospheric Administration, Boulder, CO 80305; [e]Earth Sciences Division, and [g]Environmental Energy Technologies Division, Lawrence Berkeley National Laboratory, Berkeley, CA 94720; [f]Atmospheric and Environmental Research, Lexington, MA 02421; [h]Institute for Environment and Sustainability, European Commission Joint Research Centre, 21027 Ispra, Italy; and [i]Cooperative Institute for Research in Environmental Sciences, University of Colorado Boulder, Boulder, CO 80309

Edited by Mark H. Thiemens, University of California, San Diego, La Jolla, CA, and approved October 18, 2013 (received for review August 5, 2013)

This study quantitatively estimates the spatial distribution of anthropogenic methane sources in the United States by combining comprehensive atmospheric methane observations, extensive spatial datasets, and a high-resolution atmospheric transport model. Results show that current inventories from the US Environmental Protection Agency (EPA) and the Emissions Database for Global Atmospheric Research underestimate methane emissions nationally by a factor of ~1.5 and ~1.7, respectively. Our study indicates that emissions due to ruminants and manure are up to twice the magnitude of existing inventories. In addition, the discrepancy in methane source estimates is particularly pronounced in the south-central United States, where we find total emissions are ~2.7 times greater than in most inventories and account for 24 ± 3% of national emissions. The spatial patterns of our emission fluxes and observed methane–propane correlations indicate that fossil fuel extraction and refining are major contributors (45 ± 13%) in the south-central United States. This result suggests that regional methane emissions due to fossil fuel extraction and processing could be 4.9 ± 2.6 times larger than in EDGAR, the most comprehensive global methane inventory. These results cast doubt on the US EPA's recent decision to downscale its estimate of national natural gas emissions by 25–30%. Overall, we conclude that methane emissions associated with both the animal husbandry and fossil fuel industries have larger greenhouse gas impacts than indicated by existing inventories.

climate change policy | geostatistical inverse modeling

**M**ethane ($CH_4$) is the second most important anthropogenic greenhouse gas, with approximately one third the total radiative forcing of carbon dioxide (1). $CH_4$ also enhances the formation of surface ozone in populated areas, and thus higher global concentrations of $CH_4$ may significantly increase ground-level ozone in the Northern Hemisphere (2). Furthermore, methane affects the ability of the atmosphere to oxidize other pollutants and plays a role in water formation within the stratosphere (3).

Atmospheric concentrations of $CH_4$ [~1,800 parts per billion (ppb)] are currently much higher than preindustrial levels (~680–715 ppb) (1, 4). The global atmospheric burden started to rise rapidly in the 18th century and paused in the 1990s. Methane levels began to increase again more recently, potentially from a combination of increased anthropogenic and/or tropical wetland emissions (5–7). Debate continues, however, over the causes behind these recent trends (7, 8).

Anthropogenic emissions account for 50–65% of the global $CH_4$ budget of ~395–427 teragrams of carbon per year $(TgC \cdot y)^{-1}$ (526–569 Tg $CH_4$) (7, 9). The US Environmental Protection Agency (EPA) estimates the principal anthropogenic sources in the United States to be (in order of importance) (*i*) livestock (enteric fermentation and manure management), (*ii*) natural gas production and distribution, (*iii*) landfills, and (*iv*) coal mining (10). EPA assesses human-associated emissions in the United States in 2008 at 22.1 TgC, roughly 5% of global emissions (10).

The amount of anthropogenic $CH_4$ emissions in the US and attributions by sector and region are controversial (Fig. 1). Bottom-up inventories from US EPA and the Emissions Database for Global Atmospheric Research (EDGAR) give totals ranging from 19.6 to 30 TgC·y$^{-1}$ (10, 11). The most recent EPA and EDGAR inventories report lower US anthropogenic emissions compared with previous versions (decreased by 10% and 35%, respectively) (10, 12); this change primarily reflects lower, revised emissions estimates from natural gas and coal production Fig. S1. However, recent analysis of $CH_4$ data from aircraft estimates a higher budget of 32.4 ± 4.5 TgC·y$^{-1}$ for 2004 (13). Furthermore, atmospheric observations indicate higher emissions in natural gas production areas (14–16); a steady 20-y increase in the number of US wells and newly-adopted horizontal drilling techniques may have further increased emissions in these regions (17, 18).

These disparities among bottom-up and top-down studies suggest much greater uncertainty in emissions than typically reported. For example, EPA cites an uncertainty of only ±13% for the for United States (10). Independent assessments of bottom-up inventories give error ranges of 50–100% (19, 20), and

**Significance**

Successful regulation of greenhouse gas emissions requires knowledge of current methane emission sources. Existing state regulations in California and Massachusetts require ~15% greenhouse gas emissions reductions from current levels by 2020. However, government estimates for total US methane emissions may be biased by 50%, and estimates of individual source sectors are even more uncertain. This study uses atmospheric methane observations to reduce this level of uncertainty. We find greenhouse gas emissions from agriculture and fossil fuel extraction and processing (i.e., oil and/or natural gas) are likely a factor of two or greater than cited in existing studies. Effective national and state greenhouse gas reduction strategies may be difficult to develop without appropriate estimates of methane emissions from these source sectors.

Author contributions: S.M.M., S.C.W., and A.M.M. designed research; S.M.M., A.E.A., S.C.B., E.J.D., J.E., M.L.F., G.J.-M., B.R.M., J.B.M., S.A.M., T.N., and C.S. performed research; S.M.M. analyzed data; S.M.M., S.C.W., A.M.M., and E.A.K. wrote the paper; A.E.A., S.C.B., E.J.D., M.L.F., B.R.M., J.B.M., S.A.M., and C.S. collected atmospheric methane data; and J.E. and T.N. developed meteorological simulations using the Weather Research and Forecasting model.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission.

[1]To whom correspondence should be addressed. E-mail: scot.m.miller@gmail.com.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1314392110/-/DCSupplemental.



**Fig. 1.** US anthropogenic methane budgets from this study, from previous top-down estimates, and from existing emissions inventories. The south-central United States includes Texas, Oklahoma, and Kansas. US EPA estimates only national, not regional, emissions budgets. Furthermore, national budget estimates from EDGAR, EPA, and Kort et al. (13) include Alaska and Hawaii whereas this study does not.

values from Kort et al. are 47 ± 20% higher than EPA (13). Assessments of $CH_4$ sources to inform policy (e.g., regulating emissions or managing energy resources) require more accurate, verified estimates for the United States.

This study estimates anthropogenic $CH_4$ emissions over the United States for 2007 and 2008 using comprehensive $CH_4$ observations at the surface, on telecommunications towers, and from aircraft, combined with an atmospheric transport model and a geostatistical inverse modeling (GIM) framework. We use auxiliary spatial data (e.g., on population density and economic activity) and leverage concurrent measurements of alkanes to help attribute emissions to specific economic sectors. The work provides spatially resolved $CH_4$ emissions estimates and associated uncertainties, as well as information by source sector, both previously unavailable.

**Model and Observation Framework**

We use the Stochastic Time-Inverted Lagrangian Transport model (STILT) to calculate the transport of $CH_4$ from emission points at the ground to measurement locations in the atmosphere (21). STILT follows an ensemble of particles backward in time, starting from each observation site, using wind fields and turbulence modeled by the Weather Research and Forecasting (WRF) model (22). STILT derives an influence function ("footprint," units: ppb $CH_4$ per unit emission flux) linking upwind emissions to each measurement. Inputs of $CH_4$ from surface sources along the ensemble of back-trajectories are averaged to compute the $CH_4$ concentration for comparison with each observation.

We use observations for 2007 and 2008 from diverse locations and measurement platforms. The principal observations derive from daily flask samples on tall towers (4,984 total observations) and vertical profiles from aircraft (7,710 observations). Tower-based observations are collected as part of the National Oceanic and Atmospheric (NOAA)/Department of Energy (DOE)

cooperative air sampling network, and aircraft-based data are obtained from regular NOAA flights (23), regular DOE flights (24), and from the Stratosphere-Troposphere Analyses of Regional Transport 2008 (START08) aircraft campaign (25); all data are publicly available from NOAA and DOE. These observations are displayed in Fig. 2 and discussed further in the *SI Text* (e.g., Fig. S2). We use a GIM framework (26, 27) to analyze the footprints for each of the 12,694 observations, and these footprints vary by site and with wind conditions. In aggregate, the footprints provide spatially resolved coverage of most of the continental United States, except the southeast coastal region (Fig. S3).

The GIM framework, using footprints and concentration measurements, optimizes $CH_4$ sources separately for each month of 2007 and 2008 on a 1° × 1° latitude–longitude grid for the United States. The contributions of fluxes from natural wetlands are modeled first and subtracted from the observed $CH_4$ (2.0 TgC·$y^{-1}$ for the continental United States); these fluxes are much smaller than anthropogenic sources in the United States and thus would be difficult to independently constrain from atmospheric data (*SI Text*).

The GIM framework represents the flux distribution for each month using a deterministic spatial model plus a stochastic spatially correlated residual, both estimated from the atmospheric observations. The deterministic component is given by a weighted linear combination of spatial activity data from the EDGAR 4.2 inventory; these datasets include any economic or demographic data that may predict the distribution of $CH_4$ emissions (e.g., gas production, human and ruminant population densities, etc.). Both the selection of the activity datasets to be retained in the model and the associated weights (emission factors) are optimized to best match observed $CH_4$ concentrations. Initially, seven activity datasets are included from ED-GAR 4.2, (*i*) population, (*ii*) electricity production from power plants, (*iii*) ruminant population count, (*iv*) oil and conventional gas production, (*v*) oil refinery production, (*vi*) rice production, and (*vii*) coal production.

We select the minimum number of datasets with the greatest predictive ability using the Bayesian Information Criterion (BIC) (*SI Text*) (28). BIC numerically scores all combinations of available datasets based on how well they improve goodness of fit and applies a penalty that increases with the number of datasets retained.

The stochastic component represents sources that do not fit the spatial patterns of the activity data (Fig. S4). GIM uses



**Fig. 2.** $CH_4$ concentration measurements from 2007 and 2008 and the number of observations associated with each measurement type. Blue text lists the number of observations associated with each stationary tower measurement site.

EARTH, ATMOSPHERIC, AND PLANETARY SCIENCES

a covariance function to describe the spatial and temporal correlation of the stochastic component and optimizes its spatial and temporal distribution simultaneously with the optimization of the activity datasets in the deterministic component (*SI Text*, Fig. S5) (26–28). Because of the stochastic component, the final emissions estimate can have a different spatial and temporal distribution from any combination of the activity data.

If the observation network is sensitive to a broad array of different source sectors and/or if the spatial activity maps are effective at explaining those sources, many activity datasets will be included in the deterministic model. If the deterministic model explains the observations well, the magnitude of $CH_4$ emissions in the stochastic component will be small, and the assignment to specific sectors will be unambiguous, and uncertainties in the emissions estimates will be small. This result is not the case here, as discussed below (see *Results*).

A number of previous studies used top-down methods to constrain anthropogenic $CH_4$ sources from global (29–33) to regional (13–15, 34–38) scales over North America. Most regional studies adopted one of three approaches: use a simple box model to estimate an overall $CH_4$ budget (14), estimate a budget using the relative ratios of different gases (15, 37–39), or estimate scaling factors for inventories by region or source type (13, 34–36). The first two methods do not usually give explicit information about geographic distribution. The last approach provides information about the geographic distribution of sources, but results hinge on the spatial accuracy of the underlying regional or sectoral emissions inventories (40).

Here, we are able to provide more insight into the spatial distribution of emissions; like the scaling factor method above, we leverage spatial information about source sectors from an existing inventory, but in addition we estimate the distribution of emissions where the inventory is deficient. We further bolster attribution of regional emissions from the energy industry using the observed correlation of $CH_4$ and propane, a gas not produced by biogenic processes like livestock and landfills.

## Results

**Spatial Distribution of $CH_4$ Emissions.** Fig. 3 displays the result of the 2-y mean of the monthly $CH_4$ inversions and differences from the EDGAR 4.2 inventory. We find emissions for the United States that are a factor of 1.7 larger than the EDGAR inventory. The optimized emissions estimated by this study bring the model closer in line with the observations (Fig. 4, Figs. S6 and S7). Posterior emissions fit the $CH_4$ observations [$R^2 = 0.64$, root mean square error (RMSE) = 31 ppb] much better than EDGAR

v4.2 ($R^2 = 0.23$, RMSE = 49 ppb). Evidently, the spatial distribution of EDGAR sources is inconsistent with emissions patterns implied by the $CH_4$ measurements and associated footprints.

Several diagnostic measures preclude the possibility of major systematic errors in WRF–STILT. First, excellent agreement between the model and measured vertical profiles from aircraft implies little bias in modeled vertical air mixing (e.g., boundary-layer heights) (Fig. 4). Second, the monthly posterior emissions estimated by the inversion lack statistically significant seasonality (Fig. S8). This result implies that seasonally varying weather patterns do not produce detectable biases in WRF–STILT. *SI Text* discusses possible model errors and biases in greater detail.

$CH_4$ observations are sparse over parts of the southern and central East Coast and in the Pacific Northwest. Emissions estimates for these regions therefore rely more strongly on the deterministic component of the flux model, with weights constrained primarily by observations elsewhere. Therefore, emissions in these areas, including from coal mining, are poorly constrained (*SI Text*).

**Contribution of Different Source Sectors.** Only two spatial activity datasets from EDGAR 4.2 are selected through the BIC as meaningful predictors of $CH_4$ emissions over the United States: population densities of humans and of ruminants (Table S1). Some sectors are eliminated by the BIC because emissions are situated far from observation sites (e.g., coal mining in West Virginia or Pennsylvania), making available $CH_4$ data insensitive to these predictors. Other sectors may strongly affect observed concentrations but are not selected, indicating that the spatial datasets from EDGAR are poor predictors for the distribution of observed concentrations (e.g., oil and natural gas extraction and oil refining). Sources from these sectors appear in the stochastic component of the GIM (*SI Text*).

The results imply that existing inventories underestimate emissions from two key sectors: ruminants and fossil fuel extraction and/or processing, discussed in the remainder of this section.

We use the optimized ruminant activity dataset to estimate the magnitude of emissions with spatial patterns similar to animal husbandry and manure. Our corresponding US budget of $12.7 \pm 5.0$ TgC·y$^{-1}$ is nearly twice that of EDGAR and EPA (6.7 and 7.0, respectively). The total posterior emissions estimate over the northern plains, a region with high ruminant density but little fossil fuel extraction, further supports the ruminant estimate (Nebraska, Iowa, Wisconsin, Minnesota, and South Dakota). Our total budget for this region of $3.4 \pm 0.7$ compares with 1.5 TgC·y$^{-1}$ in EDGAR. Ruminants and agriculture may also be



**Fig. 3.** The 2-y averaged $CH_4$ emissions estimated in this study (*A*) compared against the commonly used EDGAR 4.2 inventory (*B* and *C*). Emissions estimated in this study are greater than in EDGAR 4.2, especially near Texas and California.

PNAS



**Fig. 4.** A model–measurement comparison at several regular NOAA/DOE aircraft monitoring sites (averaged over 2007–2008). Plots include the measurements; the modeled boundary condition; the summed boundary condition and wetland contribution (from the Kaplan model); and the summed boundary, wetland, and anthropogenic contributions (from EDGAR v4.2 and the posterior emissions estimate).

partially responsible for high emissions over California (41). EDGAR activity datasets are poor over California (42), but several recent studies (34, 36–38, 41) have provided detailed top-down emissions estimates for the state using datasets from state agencies.

Existing inventories also greatly underestimate $CH_4$ sources from the south-central United States (Fig. 3). We find the total $CH_4$ source from Texas, Oklahoma, and Kansas to be $8.1 \pm 0.96$ $Tg C \cdot y^{-1}$, a factor of 2.7 higher than the EDGAR inventory. These three states alone constitute ~24 ± 3% of the total US anthropogenic $CH_4$ budget or 3.7% of net US greenhouse gas emissions [in $CO_2$ equivalents (10)].

Texas and Oklahoma were among the top five natural gas producing states in the country in 2007 (18), and aircraft observations of alkanes indicate that the natural gas and/or oil industries play a significant role in regional $CH_4$ emissions. Concentrations of propane ($C_3H_8$), a tracer of fossil hydrocarbons (43), are strongly correlated with $CH_4$ at NOAA/DOE aircraft monitoring locations over Texas and Oklahoma ($R^2 = 0.72$) (Fig. 5). Correlations are much weaker at other locations in North America ($R^2 = 0.11$ to 0.64).

We can obtain an approximate $CH_4$ budget for fossil-fuel extraction in the region by subtracting the optimized contributions

associated with ruminants and population from the total emissions. The residual (Fig. S4C) represents sources that have spatial patterns not correlated with either human or ruminant density in EDGAR. Our budget sums to $3.7 \pm 2.0$ $Tg C \cdot y^{-1}$, a factor of $4.9 \pm 2.6$ larger than oil and gas emissions in ED-GAR v4.2 (0.75 $Tg C \cdot y^{-1}$) and a factor of $6.7 \pm 3.6$ greater than EDGAR sources from solid waste facilities (0.55 $Tg C \cdot y^{-1}$), the two major sources that may not be accounted for in the deterministic component. The population component likely captures a portion of the solid waste sources so this residual methane budget more likely represents natural gas and oil emissions than landfills. *SI Text* discusses in detail the uncertainties in this sector-based emissions estimate. We currently do not have the detailed, accurate, and spatially resolved activity data (fossil fuel extraction and processing, ruminants, solid waste) that would provide more accurate sectorial attribution.

Katzenstein et al. (2003) (14) were the first to report large regional emissions of $CH_4$ from Texas, Oklahoma, and Kansas; they cover an earlier time period (1999–2002) than this study. They used a box model and 261 near-ground $CH_4$ measurements taken over 6 d to estimate a total Texas–Oklahoma–Kansas $CH_4$ budget (from all sectors) of $3.8 \pm 0.75$ $Tg C \cdot y^{-1}$. We revise their

EARTH, ATMOSPHERIC, AND PLANETARY SCIENCES



**Fig. 5.** Correlations between propane and $CH_4$ at NOAA/DOE aircraft observation sites in Oklahoma (*A*) and Texas (*B*) over 2007–2012. Correlations are higher in these locations than at any other North American sites, indicating large contributions of fossil fuel extraction and processing to $CH_4$ emitted in this region.

estimate upward by a factor of two based on the inverse model and many more measurements from different platforms over two full years of data. *SI Text* further compares the CH$_4$ estimate in Katzenstein et al. and in this study.

## Discussion and Summary

This study combines comprehensive atmospheric data, diverse datasets from the EDGAR inventory, and an inverse modeling framework to derive spatially resolved CH$_4$ emissions and information on key source sectors. We estimate a mean annual US anthropogenic CH$_4$ budget for 2007 and 2008 of 33.4 $\pm$ 1.4 TgC·y$^{-1}$ or ~7–8% of the total global CH$_4$ source. This estimate is a factor of 1.5 and 1.7 larger than EPA and EDGAR v4.2, respectively. CH$_4$ emissions from Texas, Oklahoma, and Kansas alone account for 24% of US methane emissions, or 3.7% of the total US greenhouse gas budget.

The results indicate that drilling, processing, and refining activities over the south-central United States have emissions as much as 4.9 $\pm$ 2.6 times larger than EDGAR, and livestock operations across the US have emissions approximately twice that of recent inventories. The US EPA recently decreased its CH$_4$ emission factors for fossil fuel extraction and processing by 25–30% (for 1990–2011) (10), but we find that CH$_4$ data from across North America instead indicate the need for a larger adjustment of the opposite sign.

ACKNOWLEDGMENTS. For advice and support, we thank Roisin Commane, Elaine Gottlieb, and Matthew Hayek (Harvard University); Robert Harriss (Environmental Defense Fund); Hanqin Tian and Bowen Zhang (Auburn University); Jed Kaplan (Ecole Polytechnique Fédérale de Lausanne); Kimberly Mueller and Christopher Weber (Institute for Defense Analyses Science and Technology Policy Institute); Nadia Oussayef; and Gregory Berger. In addition, we thank the National Aeronautics and Space Administration (NASA) Advanced Supercomputing Division for computing help; P. Lang, K. Sours, and C. Siso for analysis of National Oceanic and Atmospheric Administration (NOAA) flasks; and B. Hall for calibration standards work. This work was supported by the American Meteorological Society Graduate Student Fellowship/Department of Energy (DOE) Atmospheric Radiation Measurement Program, a DOE Computational Science Graduate Fellowship, and the National Science Foundation Graduate Research Fellowship Program. NOAA measurements were funded in part by the Atmospheric Composition and Climate Program and the Carbon Cycle Program of NOAA's Climate Program Office. Support for this research was provided by NASA Grants NNX08AR47G and NNX11AG47G, NOAA Grants NA09OAR4310122 and NA11OAR4310158, National Science Foundaton (NSF) Grant ATM-0628575, and Environmental Defense Fund Grant 0146-10100 (to Harvard University). Measurements at Walnut Grove were supported in part by a California Energy Commission Public Interest Environmental Research Program grant to Lawrence Berkeley National Laboratory through the US Department of Energy under Contract DE-AC02-05CH11231. DOE flights were supported by the Office of Biological and Environmental Research of the US Department of Energy under Contract DE-AC02-05CH11231 as part of the Atmospheric Radiation Measurement Science Program (ARM, ARM Aerial Facility, and Terrestrial Ecosystem Science Program. Weather Research and Forecasting–Stochastic Time-Inverted Lagrangian Transport model development at Atmospheric and Environmental Research has been funded by NSF Grant ATM-0836153, NASA, NOAA, and the US intelligence community.

1. Butler J (2012) The NOAA annual greenhouse gas index (AGGI). Available at http://www.esrl.noaa.gov/gmd/aggi/. Accessed November 4, 2013.
2. Fiore AM, et al. (2002) Linking ozone pollution and climate change: The case for controlling methane. *Geophys Res Lett* 29:1919.
3. Jacob D (1999) *Introduction to Atmospheric Chemistry* (Princeton Univ Press, Princeton).
4. Mitchell LE, Brook EJ, Sowers T, McConnell JR, Taylor K (2011) Multidecadal variability of atmospheric methane, 1000-1800 CE. *J Geophys Res Biogeosci* 116:G02007.
5. Dlugokencky EJ, et al. (2009) Observational constraints on recent increases in the atmospheric CH$_4$ burden. *Geophys Res Lett* 36:L18803.
6. Sussmann R, Forster F, Rettinger M, Bousquet P (2012) Renewed methane increase for five years (2007-2011) observed by solar FTIR spectrometry. *Atmos Chem Phys* 12:4885–4891.
7. Kirschke S, et al. (2013) Three decades of global methane sources and sinks. *Nat Geosci* 6:813–823.
8. Wang JS, et al. (2004) A 3-D model analysis of the slowdown and interannual variability in the methane growth rate from 1988 to 1997. *Global Biogeochem Cycles* 18:GB3011.
9. Ciais P, et al. (2013) Carbon and Other Biogeochemical Cycles: Final Draft Underlying Scientific Technical Assessment (IPCC Secretariat, Geneva).
10. US Environmental Protection Agency (2013) *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2011, Technical Report EPA 430-R-13-001* (Environmental Protection Agency, Washington).
11. Olivier JGJ, Peters J (2005) CO$_2$ from non-energy use of fuels: A global, regional and national perspective based on the IPCC Tier 1 approach. *Resour Conserv Recycling* 45:210–225.
12. European Commission Joint Research Centre, Netherlands Environmental Assessment Agency (2010) *Emission Database for Global Atmospheric Research (EDGAR)*, Release Version 4.2. Available at http://edgar.jrc.ec.europa.eu. Accessed November 4, 2013.
13. Kort EA, et al. (2008) Emissions of CH$_4$ and N$_2$O over the United States and Canada based on a receptor-oriented modeling framework and COBRA-NA atmospheric observations. *Geophys Res Lett* 35:L18808.
14. Katzenstein AS, Doezema LA, Simpson IJ, Blake DR, Rowland FS (2003) Extensive regional atmospheric hydrocarbon pollution in the southwestern United States. *Proc Natl Acad Sci USA* 100(21):11975–11979.
15. Pétron G, et al. (2012) Hydrocarbon emissions characterization in the Colorado Front Range: A pilot study. *J Geophys Res Atmos* 117:D04304.
16. Karion A, et al. (2013) Methane emissions estimate from airborne measurements over a western United States natural gas field. *Geophys Res Lett* 40:4393–4397.
17. Howarth RW, Santoro R, Ingraffea A (2011) Methane and the greenhouse-gas footprint of natural gas from shale formations. *Clim Change* 106:679–690.
18. US Energy Information Administration (2013) *Natural Gas Annual 2011*, Technical report (US Department of Energy, Washington).
19. National Research Council (2010) *Verifying Greenhouse Gas Emissions: Methods to Support International Climate Agreements* (National Academies Press, Washington).
20. Dlugokencky EJ, Nisbet EG, Fisher R, Lowry D (2011) Global atmospheric methane: Budget, changes and dangers. *Philos Trans A Math Phys Eng Sci* 369(1943):2058–2072.
21. Lin JC, et al. (2003) A near-field tool for simulating the upstream influence of atmospheric observations: The Stochastic Time-Inverted Lagrangian Transport (STILT) model. *J Geophys Res Atmos* 108(D16):4493.
22. Nehrkorn T, et al. (2010) Coupled Weather Research and Forecasting-Stochastic Time-Inverted Lagrangian Transport (WRF-STILT) model. *Meteorol Atmos Phys* 107:51–64.
23. NOAA ESRL (2013) *Carbon Cycle Greenhouse Gas Group Aircraft Program*. Available at http://www.esrl.noaa.gov/gmd/ccgg/aircraft/index.html. Accessed November 4, 2013.
24. Biraud SC, et al. (2013) A multi-year record of airborne CO$_2$ observations in the US southern great plains. *Atmos Meas Tech* 6:751–763.
25. Pan LL, et al. (2010) The Stratosphere-Troposphere Analyses of Regional Transport 2008 Experiment. *Bull Am Meteorol Soc* 91:327–342.
26. Kitanidis PK, Vomvoris EG (1983) A geostatistical approach to the inverse problem in groundwater modeling (steady state) and one-dimensional simulations. *Water Resour Res* 19:677–690.
27. Michalak A, Bruhwiler L, Tans P (2004) A geostatistical approach to surface flux estimation of atmospheric trace gases. *J Geophys Res Atmos* 109(D14):D14109.
28. Gourdji SM, et al. (2012) North American CO$_2$ exchange: Inter-comparison of modeled estimates with results from a fine-scale atmospheric inversion. *Biogeosciences* 9:457–475.
29. Chen YH, Prinn RG (2006) Estimation of atmospheric methane emissions between 1996 and 2001 using a three-dimensional global chemical transport model. *J Geophys Res Atmos* 111(D10):D10307.
30. Meirink JF, et al. (2008) Four-dimensional variational data assimilation for inverse modeling of atmospheric methane emissions: Analysis of SCIAMACHY observations. *J Geophys Res Atmos* 113(D17):D17301.
31. Bergamaschi P, et al. (2009) Inverse modeling of global and regional CH4 emissions using SCIAMACHY satellite retrievals. *J Geophys Res Atmos* 114(D22):D22301.
32. Bousquet P, et al. (2011) Source attribution of the changes in atmospheric methane for 2006-2008. *Atmos Chem Phys* 11:3689–3700.
33. Monteil G, et al. (2011) Interpreting methane variations in the past two decades using measurements of CH$_4$ mixing ratio and isotopic composition. *Atmos Chem Phys* 11:9141–9153.
34. Zhao C, et al. (2009) Atmospheric inverse estimates of methane emissions from central California. *J Geophys Res Atmos* 114(D16):D16302.
35. Kort EA, et al. (2010) Atmospheric constraints on 2004 emissions of methane and nitrous oxide in North America from atmospheric measurements and receptor-oriented modeling framework. *J Integr Environ Sci* 7:125–133.
36. Jeong S, et al. (2012) Seasonal variation of CH$_4$ emissions from central California. *J Geophys Res* 117:D11306.
37. Peischl J, et al. (2012) Airborne observations of methane emissions from rice cultivation in the Sacramento Valley of California. *J Geophys Res Atmos* 117(D24):D00V25.
38. Wennberg PO, et al. (2012) On the sources of methane to the Los Angeles atmosphere. *Environ Sci Technol* 46(17):9282–9289.
39. Miller JB, et al. (2012) Linking emissions of fossil fuel CO2 and other anthropogenic trace gases using atmospheric 14CO2. *J Geophys Res Atmos* 117(D8):D08302.
40. Law RM, Rayner PJ, Steele LP, Enting IG (2002) Using high temporal frequency data for CO$_2$ inversions. *Global Biogeochem Cycles* 16(4):1053.
41. Jeong S, et al. (2013) A multitower measurement network estimate of California's methane emissions. *J Geophys Res Atmos*, 10.1002/grd.50854.
42. Xiang B, et al. (2013) Nitrous oxide (N2O) emissions from California based on 2010 CalNex airborne measurements. *J Geophys Res Atmos* 118(7):2809–2820.
43. Koppmann R (2008) *Volatile Organic Compounds in the Atmosphere* (Wiley, Singapore).



# Toward a better understanding and quantification of methane emissions from shale gas development

Dana R. Caulton[a,1], Paul B. Shepson[a,b], Renee L. Santoro[c], Jed P. Sparks[d], Robert W. Howarth[d], Anthony R. Ingraffea[c,e], Maria O. L. Cambaliza[a], Colm Sweeney[f,g], Anna Karion[f,g], Kenneth J. Davis[h], Brian H. Stirm[i], Stephen A. Montzka[f], and Ben R. Miller[f,g]

Departments of [a]Chemistry, [b]Earth, Atmospheric and Planetary Science, and [i]Aviation Technology, Purdue University, West Lafayette, IN 47907; [c]Physicians, Scientists and Engineers for Healthy Energy, Ithaca, NY 14851; Departments of [d]Ecology and Evolutionary Biology and [e]Civil and Environmental Engineering, Cornell University, Ithaca, NY 14853; [f]National Oceanic and Atmospheric Administration, Boulder, CO 80305; [g]Cooperative Institute for Research in Environmental Sciences, University of Colorado, Boulder, CO 80309; and [h]Department of Meteorology, The Pennsylvania State University, University Park, PA 16802

Edited* by Barbara J. Finlayson-Pitts, University of California, Irvine, Irvine, CA, and approved March 12, 2014 (received for review September 4, 2013)

The identification and quantification of methane emissions from natural gas production has become increasingly important owing to the increase in the natural gas component of the energy sector. An instrumented aircraft platform was used to identify large sources of methane and quantify emission rates in southwestern PA in June 2012. A large regional flux, 2.0–14 g $CH_4$ $s^{-1}$ $km^{-2}$, was quantified for a ~2,800-$km^2$ area, which did not differ statistically from a bottom-up inventory, 2.3–4.6 g $CH_4$ $s^{-1}$ $km^{-2}$. Large emissions averaging 34 g $CH_4$/s per well were observed from seven well pads determined to be in the drilling phase, 2 to 3 orders of magnitude greater than US Environmental Protection Agency estimates for this operational phase. The emissions from these well pads, representing ~1% of the total number of wells, account for 4–30% of the observed regional flux. More work is needed to determine all of the sources of methane emissions from natural gas production, to ascertain why these emissions occur and to evaluate their climate and atmospheric chemistry impacts.

unconventional gas | greenhouse gas | hydraulic fracturing

Methane is a very important component of the Earth's atmosphere: it represents a significant component of the natural and anthropogenically forced greenhouse effect, with a global warming potential 28–34 times greater than $CO_2$ using a 100-y horizon and even greater on shorter time scales (1, 2). It also is an important sink for the hydroxyl radical, the dominant agent that defines the atmosphere's cleansing capacity (3), has a significant impact on tropospheric ozone, and is one of the important sources of water vapor in the stratosphere, which in turn impacts stratospheric ozone and climate (4). The recent observation that global methane concentrations have begun increasing (5), after a decade of static or decreasing emissions in the late 1990s to ~2007, has renewed interest in pinpointing the causes of global methane trends. Recently natural gas has been explored as a potential bridge to renewable energy, owing in part to the reduction in carbon emissions produced from electricity generation by natural gas compared with coal (6–9). Advances in drilling and well stimulation techniques have allowed access to previously locked reservoirs of natural gas, such as the Marcellus shale formation in Pennsylvania, which has led to a boom in natural gas production in the last decade (10). This has led to estimations of the carbon footprint of natural gas to examine the impact of increasing our reliance on natural gas for various energy needs (11–16). An important unresolved issue is the contribution of well-to-burner tip $CH_4$ emission to the greenhouse gas footprint of natural gas use. Given that $CH_4$ is a much more potent greenhouse gas than $CO_2$, quantifying $CH_4$ emissions has become critical in estimating the long- and short-term environmental and economic impacts of increased natural gas use. According to a recent study, if total $CH_4$ emissions are greater than approximately 3.2% of production, the immediate net radiative forcing for natural gas use is worse than for coal when used to generate electricity (8).

The first estimates for $CH_4$ emissions from shale gas development were reported in late 2010 and are based on uncertain emission factors for various steps in obtaining the gas and getting it to market (17, 18). In the short time since these first estimates, many others have published $CH_4$ emission estimates for unconventional gas (including tight-sand formations in addition to shales), giving a range of 0.6–7.7% of the lifetime production of a well emitted "upstream" at the well site and "midstream" during processing and 0.07–10% emitted "downstream" during transmission, storage, and distribution to consumers (reviewed in refs. 18 and 19). The highest published estimates for combined upstream and midstream methane emissions (2.3–11.7%) are based on actual top-down field-scale measurements at specific regions (20, 21). Whereas a recent shale gas study (22) based on field sites across the United States to which the authors were given access scaled actual measurements up to the national level and found lower emissions than US Environmental Protection Agency (EPA) estimates, an equally recent study (23) used atmospheric measurements of greenhouse gases across the United States to inform a model and found $CH_4$ emissions, cumulatively and specifically from fossil fuel production activities, to be underestimated by the EPA.

The current range of observed $CH_4$ emissions from US natural gas systems (2.3–11.7%), if it were representative of the national scale, applied to the reported 2011 unassociated gas production number yields a range of $CH_4$ emissions between 5.6 and 28.4 Tg

**Significance**

We identified a significant regional flux of methane over a large area of shale gas wells in southwestern Pennsylvania in the Marcellus formation and further identified several pads with high methane emissions. These shale gas pads were identified as in the drilling process, a preproduction stage not previously associated with high methane emissions. This work emphasizes the need for top-down identification and component level and event driven measurements of methane leaks to properly inventory the combined methane emissions of natural gas extraction and combustion to better define the impacts of our nation's increasing reliance on natural gas to meet our energy needs.

Author contributions: P.B.S., J.P.S., R.W.H., M.O.L.C., and B.H.S. designed research; D.R.C., P.B.S., and R.L.S. performed research; D.R.C., P.B.S, R.L.S., J.P.S., R.W.H., A.R.I., K.J.D., S.A.M., and B.R.M. analyzed data; D.R.C., P.B.S., R.L.S., J.P.S., R.W.H., A.R.I., C.S., A.K., S.A.M., and B.R.M. wrote the paper; and B.H.S. designed and installed aircraft setup.

The authors declare no conflict of interest.

*This Direct Submission article had a prearranged editor.

[1]To whom correspondence should be addressed. E-mail: dcaulton@purdue.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1316546111/-/DCSupplemental.

ENVIRONMENTAL SCIENCES

$CH_4$, whereas the EPA reports 6.7 Tg $CH_4$ from natural gas systems in 2011 and only 28 Tg $CH_4$ total anthropogenic emissions (24). Natural gas systems are currently estimated to be the top source of anthropogenic $CH_4$ emission in the United States, followed closely by enteric fermentation, but the top-down observations suggest that natural gas may play a more substantial role than previously thought (24). Inadequate accounting of greenhouse gas emissions hampers efforts to identify and pursue effective greenhouse gas reduction policies.

Although it is clear that analysis of the effect of natural gas use would benefit from better measurements of emissions from unconventional gas wells, the inaccessible and transient nature of these leaks makes them difficult to identify and quantify, particularly at a scale at which they are useful for bottom-up inventories or mitigation strategies (i.e., leak rates of individual components or activities). Previous techniques have used either bottom-up inventories of the smallest scale of contributions or top-down apportionment of observed large-scale regional enhancements over a complex area to identify the source of the enhancements (11, 17, 20–23, 25). Although the latter suggest that the leak rate may be higher than what bottom-up inventories have allocated, they give little to no information about where in the upstream production process these leaks occur, thus hampering the interpretation of these data for bottom-up inventories or mitigation purposes.

Here we use an aircraft-based approach that enables sampling of methane emissions between the regional and component level scales and can identify plumes from single well pads, groups of well pads, and larger regional scales, giving more information as to the specific $CH_4$ emission sources. We implemented three types of flights over 2 d in June 2012: investigative (I), mass-balance flux (MB), and regional flux (RF). Details of each flight are presented in Table 1. Our results indicate a large regional $CH_4$ flux in southwestern PA. We show that the methane emission flux from the drilling phase of operation can be 2 to 3 orders of magnitude greater than inventory estimates, providing an example and improved understanding of the differences between observed data and bottom-up inventories.

## Results and Discussion

We conducted measurements in southwestern PA in the Marcellus shale formation region in June 2012. For two morning flights we calculated a regional flux of 2.0–13.0 g $CH_4$ $s^{-1}$ $km^{-2}$ for RF-1 over a box that approximates the size of our flight path (dashed box in Fig. 1) that we define as the original sampling area (OSA) and 2.0–14.9 g $CH_4$ $s^{-1}$ $km^{-2}$ for RF-2. These ranges represent our analysis of the combined effect of all sources of uncertainty, which is dominated by the range of accumulation time scales over which the enhancement may have occurred (i.e., a maximum of 18 h commencing with the time of collapse of the boundary layer the day before, to a minimum of 5–6 h for air to flush through the sampling area). These estimates are not statistically different from the range of estimates obtained by summing up bottom-up emissions



**Fig. 1.** Regional enhancement of methane at 250 m AGL on the morning of June 20th. The dashed orange box represents the OSA, 2,844 $km^2$, and the gray dots show well locations.

estimates for oil and gas development, coal mining, and other sources for the OSA depicted by the dashed orange box in Fig. 1 (corresponding to a ~6-h time scale) and for the 18-h upwind accumulation area (UAA) shown in Fig. S1: 2.3–4.6 g $CH_4$ $s^{-1}$ $km^{-2}$. Methane emissions from natural gas contribute 22–62% of the estimated bottom-up flux in this region. Using our top-down flux measurements, the assumed range of methane from natural gas contribution (22–62%), and industry reported production rates, we estimate a possible range for the fugitive methane emission rate of 2.8–17.3% of production in this region, which applies only to these two specific study dates.

It is important to note that we could find no evidence from state records or from our analysis of photographs taken during flights of wells in flowback after hydraulic fracturing in the area during the sampling time (discussed in SI Text). Flowback is the period after fracturing when a portion of the fracturing fluid used returns up the wellbore, flushing out with it substantial amounts of natural gas. We used data submitted voluntarily by oil and gas operators to FracFocus.org to identify one potential flowback event (for a pad not sampled in this study) and included the emissions in our bottom-up inventory. We would expect the regional emission rate to be greater if more wells were in flowback (11, 17, 18).

Although our top-down and bottom-up flux estimates are not statistically different, the top-down flux estimate encompasses a range of larger magnitude fluxes compared with the bottom-up method, and the upper limit for the fraction of production emitted is large enough to provide ample motivation to pursue investigation of possible significant methane emission processes not included in the bottom-up inventory. To quantify emission rates from significant sources of $CH_4$ emissions in this shale gas

**Table 1. Meteorological conditions and time duration of each aircraft flight experiment**

| Flight type | Flight no. | Date | Start time (EDT) | Duration, min | Wind speed, m/s | Wind direction |
|---|---|---|---|---|---|---|
| RF | 1 | 6/20/2012 | 10:00 | 96 | 3.0 | 276 |
| RF | 2 | 6/21/2012 | 8:55 | 89 | 3.7 | 270 |
| MB | 1 | 6/20/2012 | 11:55 | 30 | 3.1 | 236 |
| MB | 2 | 6/20/2012 | 15:15 | 56 | 3.3 | 239 |
| MB | 3 | 6/21/2012 | 16:00 | 60 | 5.5 | 252 |
| MB | 4 | 6/21/2012 | 14:05 | 73 | 4.7 | 226 |
| I | 1 | 6/20/2012 | 12:25 | 5 | 3.0 | 258 |
| I | 2 | 6/21/2012 | 15:22 | 6 | 4.7 | 227 |
| I | 3 | 6/21/2012 | 9:14 | 15 | 4.2 | 257 |

Flights are classified into three flight types: RF, MB, and I (defined in text). Investigative flights were short and occurred between and during the longer RF and MB flights. Flights are identified by their flight type and flight number (e.g., RF-1, MB-3, etc). Note that flights MB-1 through MB-3 are near pad Delta and flight MB-4 is near pad Tau.

drilling region we conducted mass-balance flights (MB-1–MB-4) for well pads with observed enhancements large enough to use the aircraft-based mass-balance technique, as described in ref. 26. In the region between Washington, PA and south to the border of WV we observed multiple high concentration methane plumes and investigated two areas where initial observations revealed well pads with potentially high methane emission rates. The high density of pads in this region and the prevailing wind direction (SW) during the time of measurement combined to make plume attribution to single pads difficult. In cases in which fluxes from individual pads could not be isolated, we averaged the calculated flux from a wider region over the number of pads that could have possibly contributed. Fig. 2 shows the downwind methane concentrations in a vertical plane perpendicular to the mean wind direction from an isolated pad designated "Delta" (shown in Fig. 1 near the northern hotspot). Attribution of the flux to that (or any specific) source involved maneuvering in a circular pattern around the prospective source, with observed enhanced methane concentrations only on the downwind side, as shown in Fig. S2. Fig. 3 shows the downwind methane concentrations that include signal enhancement from a pad "Tau" (shown in Fig. 1 near the southern hotspot), as well as from other upwind pads, coal-bed methane wells, and a significant plume from an adjacent coal mine. The high density of potential upwind sources around Tau made attribution to specific sources impossible, although it is probable that some of this flux comes from at least one pad in the drilling stage (Tau). Combining results of MB-1 thru MB-3 yielded an average of 236 g $CH_4$ s$^{-1}$ per pad for seven high emitting pads, corresponding to 34 g $CH_4$ s$^{-1}$ per well. Individual MB flight results are presented in Table 2. Note that these seven pads, with ~40 wells, representing approximately 1% of the wells in the 2,844-km$^2$ OSA region, contributed a combined emission flux of 1.7 kg $CH_4$ s$^{-1}$, equal to 4.3–30% of our top-down measured flux.

The methane emissions from the gas wells reported in Table 2 are surprisingly high considering that all of these wells were still being drilled, had not yet been hydraulically fractured, and were not yet in production. The Pennsylvania Department of Environmental Protection (27) confirmed that total vertical depth had not yet been reached in these wells at the time of the sampling, and our photographic evidence recorded equipment typical during the drilling phase, as shown in Fig. S3. Because of the large number of wells in our study region we were not able to review all well files to determine the total number of wells being drilled during the time of study. EPA greenhouse gas inventories report a total of 51.3 kg $CH_4$ per well from the entire drilling period that typically lasts 2 wk (24). Using, as limits, a 2-wk and a 2-d (the duration of our observations) drilling phase time scale, this leads to an estimated flux of 0.04–0.30 g $CH_4$ s$^{-1}$ per well, 2 to 3 orders of magnitude lower than our observed average flux per well (for the high emitters we studied) of 34 g $CH_4$ s$^{-1}$. Although we only quantitatively sampled pads where we saw significant enhancement above the background, it is important to note



**Fig. 2.** Interpolated methane concentration ~1 km downwind of pad Delta, showing isolated methane plume near the center of the transect.



**Fig. 3.** Interpolated methane concentration from several pads near pad Tau. A distinct methane plume from a nearby coal mine occurs around 3 km.

that we could detect little to no emission from many other pads, particularly in the region north of the OSA, from Washington north to Pittsburgh. Thus, we do not intend for our regional flux estimate to be taken as necessarily representative of the Marcellus as a whole but only for the region defined as the OSA for these days. We also note that some sources were too intermittent to determine a flux via the aircraft mass-balance method. At a compressor station north of Washington we observed methane concentrations up to 45 ppm, but there was no consistent plume between consecutive passes downwind of the station.

Bottom-up emission factor studies usually assume no emission from gas wells during this prehydraulic fracturing period (11–16). Release from gas kicks—gas entry into the wellbore during vertical drilling despite efforts to keep the wellbore at a higher pressure than surrounding rock, a technique known as overbalanced drilling—is one possible explanation. However, it is generally assumed that gas kicks are not significant emission sources and are transient (28), although we observed comparable emissions on consecutive days. Alternatively, underbalanced drilling methods may have been used on these wells, where lower pressure in the wellbore allows fluids and gas from the various geological formations (i.e., coal deposits) being drilled through to seep into the wellbore and up to the surface, resulting in emission of hydrocarbons, including methane, during the drilling phase if the emissions are not contained or flared (28). Note that although these well pads were not permitted as coal bed methane wells the entire southwest region of Pennsylvania contains underlying coal deposits. The underbalanced drilling hypothesis is supported by aerial pictures that show a lack of a shale shaker or mud pits at these sites that are typically used in overbalanced drilling. Whatever the source of high emissions from the pads we identified as in the drilling stage, these emissions, equaling 0.6g $CH_4$ km$^{-2}$, are not included in our bottom-up estimate (or any other bottom-up estimate). The addition of this emission to our bottom-up inventory would shift the estimates slightly higher, but because our original results were not statistically different owing to the large range of estimates from our top-down approach, our conclusions are no different.

During the morning RF-2 flight we acquired whole-air samples using the National Oceanic and Atmospheric Administration (NOAA) programmable flask package, which were analyzed for hydrocarbons and $CH_4$. We found that relative to other studies of shale-well natural gas, the air samples in this region exhibited much lower mole ratios of propane and n-butane to methane, at $0.007 ± 0.001$ and $0.0018 ± 0.0003$, respectively. Previous reports indicate molar ratios of ~0.05 for propane (28, 29) and ~0.01 for n-butane (30). However, the observed n-butane to propane ratio, $0.27 ± 0.1$, is very similar to values reported in previous work, which average 0.24 (31). These findings suggest that the shale natural gas signal is being diluted by an essentially pure $CH_4$ source. Although this is not the only possibility, these results support the hypothesis that the methane plumes derive from underbalanced drilling methods as wells are drilled through

ENVIRONMENTAL SCIENCES

**Table 2.   Results from four MB experiments and the number of pads and wells contributing to the flux**

| Flight | Flight MB-1 | Flight MB-2* | Flight MB-3 | Flight MB-4 | Average $\pm \sigma$ |
|---|---|---|---|---|---|
| Total flux (g $CH_4$/s) | 380 | 248 | 1,880 | 1,490 | — |
| Total pads contributing | 2 | 1 | 7 | — | — |
| Flux (g $CH_4$/s) per pad | 190 | 248 | 269 | — | $236 \pm 41$ |
| Total permitted wells | 15 | 8 | 41 | — | — |
| Flux (g $CH_4$/s) per well | 25 | 31 | 46 | — | $34 \pm 11$ |

Flights 1–3 were conducted near pad Delta and flight 4 near pad Tau. Flux per pad and per well is obtained by dividing the total flux by either the total number of pads or total number of wells.
*Isolated pad Delta.

formations such as shallow coal pockets producing coal-bed methane during the drilling phase. Coal-bed methane is typically composed of very high percentages of $CH_4$ (~98%), with trace heavier hydrocarbons (32).

**Conclusions**

This work shows that it is possible to interrogate and quantify emissions from individual pads and pad clusters at scales relevant to bottom-up inventories and mitigation strategies and to estimate the emission rate for a region encompassing a large number of well pads using the aircraft measurement approach. The range of regional leak rates found here for the OSA (3–17%) is similar to leak rates found by recent studies across the United States in the CO Denver-Julesburg Basin (20) and the UT Uintah Basin (21). Additionally, although a leakage rate was not calculated, a study over large areas of TX, OK, and KS (25) found surprisingly high methane emissions, indicating that high fugitive emission rates are likely to be a national-scale issue, although the mechanisms of these fugitive leaks may be different at each site. Although a recent study (22) found production sites, to which they were given access, to be emitting less $CH_4$ than EPA inventories suggest, these regional scale findings and a recent national study (23) indicate that overall sites leak rates can be higher than current inventory estimates. Additionally, a recent comprehensive study of measured natural gas emission rates versus "official" inventory estimates found that the inventories consistently underestimated measured emissions and hypothesized that one explanation for this discrepancy could be a small number of high-emitting wells or components (33).

These high leak rates illustrate the urgent need to identify and mitigate these leaks as shale gas production continues to increase nationally (10). The identification presented here of emissions during the drilling stage 2 to 3 orders of magnitude larger than inventory estimates indicates the need to examine all aspects of natural gas production activity to improve inventory estimates and identify potential opportunities for mitigation strategies and that top-down measurements provide an important complement to bottom-up inventory determinations. Shale gas production is expected to increase globally as many shale gas plays are starting to be explored (34). If a midrange value of the reported fraction of production that is emitted, 7%, is applied to the projected global peak shale gas production rate, 23 trillion $ft^3$ per year (34), it would correspond to 24 Tg $CH_4$ emitted per year, or ~4% of the current global total (natural and anthropogenic) $CH_4$ emission rate (35). Further studies are needed to enable better understanding of the operational details that lead to the largest emissions, how they might be better controlled, and to provide a more detailed picture of the expected life cycle-integrated emissions from unconventional gas wells.

**Table 3.   Total expected emissions from all sources and percent contribution to the total emission for the OSA and the UAA using Howarth et al. (11) emission factors and for the OSA using NETL (16) emission factors**

| Area | Source | Expected emissions, g $CH_4$ $s^{-1}$ $km^{-2}$ | Contribution, % |
|---|---|---|---|
| OSA (Howarth EFs) | Natural gas | 0.85 (low)–2.23 (high) | 21.9–42.0 |
| | Oil | 0 | 0 |
| | Coal | 2.96 | 55.7–76.3 |
| | Flowback | 0.05–0.10 | 1.3–1.9 |
| | AFO | 0.015 | 0.3–0.4 |
| | Other | 0 | 0 |
| | Total (average) | 3.88–5.31 (4.60) | |
| UAA (Howarth et al. EFs) | Natural gas | 0.76 (low)–1.70 (high) | 42.0–61.6 |
| | Oil | 0 | 0 |
| | Coal | 1.01 | 36.6–55.8 |
| | Flowback | 0.01–0.02 | 0.6–0.7 |
| | AFO | 0.015 | 0.5–0.8 |
| | Other | 0.019 | 0.7–1.0 |
| | Total (average) | 1.81–2.76 (2.29) | |
| OSA (NETL EFs) | Natural gas | 1.41 | 31.4–31.8 |
| | Oil | 0 | 0 |
| | Coal | 2.96 | 65.9–66.7 |
| | Flowback | 0.05–0.10 | 1.1–2.3 |
| | AFO | 0.015 | 0.3 |
| | Other | 0 | 0 |
| | Total (average) | 4.42–4.49 (4.46) | |

AFO, animal feeding operation; EFs, emission factors; NETL, National Energy Technology Laboratory.

**Table 4. Natural gas portion of the top-down flux as a percentage of the unassociated natural gas production rate**

| Parameter | 18-h Estimate | | 5 to 6-h Estimate | |
|---|---|---|---|---|
| | Low | High | Low | High |
| Top-down flux, g $CH_4$ $s^{-1}$ $km^{-2}$ | 2.0 | 4.2 | 6.6 | 14.0 |
| $CH_4$ from natural gas, % | 22 | 62 | 22 | 62 |
| Natural gas production rate, g $CH_4$ $s^{-1}$ $km^{-2}$ | 15.9 | | 50.1 | |
| Natural gas flux/ production rate, % | 2.8 | 16.4 | 2.9 | 17.3 |

## Methods

Measurements were conducted between June 18, 2012 and June 21, 2012 over southwestern PA using Purdue's Airborne Laboratory for Atmospheric Research, a modified Beechcraft Duchess aircraft. This aircraft is equipped with a 50-Hz Best Air Turbulence probe, described by ref. 36, that measures wind vectors and pressure, a 50-Hz microbead thermistor that measures temperature, a 50-Hz global positioning system/inertial navigation system, and a 0.5-Hz high precision Picarro $CO_2/CH_4/H_2O$ cavity ring down spectrometer (CRDS). The CRDS has ~0.05% (1 ppb) precision for methane determined during in-flight calibration, and comparable accuracy, using three NOAA Earth System Research Laboratory tanks with $CH_4$ concentrations of 1.8030, 2.2222, and 2.5995 ppm. A programmable flask package (PFP) provided by NOAA for whole-air sampling was also installed on the aircraft. The PFP consists of 12 flasks that hold air pressurized to 2.7 atm in 0.7-L bottles. Flasks are analyzed for 55 species, including $CH_4$, and hydrocarbons, by NOAA.

We calculated a regional flux on two mornings by integrating the enhancement in $CH_4$ above the background in the OSA (enhancement area of 2,844 $km^2$). The height of the box was defined as the boundary layer height, which was determined from the earliest [~10:00 AM Eastern Daylight Time (EDT)] vertical profiles of potential temperature, $H_2O$, $CH_4$, and $CO_2$. Boundary layer heights were observed to be 370 m above ground level (AGL) for flight RF-1 and 500 m AGL for flight RF-2 and assumed to be constant during the data collection period for each flight. The raw $CH_4$ data from flight at a constant altitude (~250 m AGL) around the area of interest was interpolated using the EasyKrig3.0 program (37). For RF-1 the observed concentrations are presented in Fig. 1, and the flight data for RF-2 are shown in Fig. S4. The 2D interpolation output was turned into a 3D matrix of $CH_4$ values by assuming the $CH_4$ concentration decreased linearly with height up to the boundary layer top, with background concentrations of 1.89 ppm $CH_4$. This assumption was based on the observed vertical profiles that depict an approximately linear decrease of the $CH_4$ mole ratio with altitude. We compared integration of $CH_4$ under the actual vertical profile and a linear regression of the vertical profile, shown in Fig. S5, and found less than a 7% difference, which supports use of the linear approximation for the whole study region. Fig. S5 shows a vertical profile obtained during flight RF-1 at ~10:00 AM EDT. The profile extends into the residual layer above the stable boundary layer. The residual layer represents well mixed (i.e., clean, air from the previous day as the boundary layer collapsed and is used to estimate the $CH_4$ background concentration, 1.89 ppm on both days). The $CH_4$ enhancement was then calculated by removing the background value and converting to mol·$m^{-3}$. Multiplying the enhancement by the pixel volume, 29,386.5 $m^3$ (171.6 m longitudinal·171.25 m latitudinal·1 m vertical), and integrating over all pixels in the sample area produces the total enhancement in moles, which can be converted to units of g or kg. To obtain a flux, the enhancement was then divided by a chosen time scale, discussed below, and divided by the total area of the OSA, 2,844 $km^2$, to obtain the flux in g $s^{-1}km^{-2}$.

Uncertainty was assessed by examining the range of reasonable assumptions to calculate the $CH_4$ enhancement and the time scale of the accumulation. A simpler $CH_4$ enhancement estimate was done by assuming a spatially uniform $CH_4$ enhancement in the box taken from the observed $CH_4$ vertical profile after it had been smoothed. The $CH_4$ enhancement differed by approximately ±30% using this technique. In addition, the effect of background $CH_4$ estimate was quantified by using reasonable upper limits in background concentration from background air observed in the southwest and west of the OSA during both flights, which was generally higher than the concentrations observed in the residual layer. We estimate the upper limit to the background concentration to be 2.00 ppm. In this scenario a 20% difference in the calculated $CH_4$ enhancement is observed. The time scale was changed to reflect different possibilities for accumulation. The lower limit to the accumulation time scale used (6 h for RF-1, 5 h for RF-2) was the time for the observed winds to flush the box. The flush time of the box represents the physical minimum time for enhanced air to be replaced

with assumed cleaner upwind air, at the observed wind speeds. This assumption is supported by the observation that both RF-1 and RF-2 show cleaner air in the upwind area at the time of flight (W corner of the OSA box; Fig. 1 and Fig. S4), consistent with much smaller density of wells, as can be seen in Fig. 1 and Fig. S4. The longest time scale used (18 h) represents the time from the collapse of the boundary layer the day before (~6:00 PM) to the time observations were made. These component uncertainties are then propagated to produce the total range of the flux estimate.

A complicating factor affecting our ability to directly compare the top-down flux estimate with the bottom-up inventory is the influence of advective transport. At night, surface winds are typically low and unsustained, leading to very slow transport of air masses, and winds on the morning of our flights were low (2–3 m/s). However, for an 18-h accumulation, it is likely that these observations include mixing with air containing emissions (and/or cleaner air) from a region upwind (SW) of the measurement region. To investigate the potential impact of the upwind area we used the NOAA Hybrid Single Particle Lagrangian Integrated Trajectory Model (HYSPLIT) to predict the maximum size of the upwind area (ready.arl.noaa.gov/HYSPLIT.php). Starting at the time of observations (10:00 AM EDT) we ran an 18-h matrix back trajectory encompassing the area of observations. The 18-h time scale was chosen because it presents the largest estimate of potential upwind influence. We chose the isobaric mode with an effective altitude that is constant at 50 m to represent transport within the stable surface layer. The resulting area of influence, which we call the UAA, covers 14,597 $km^2$ and is shown in Fig. S1. This area is five times larger than the original sample area. An appropriate comparison with a bottom-up inventory will, therefore, have to include an estimate for an area encompassing the entire 18-h back trajectory region (UAA) and an estimate for the OSA. The average emissions over the UAA corresponds to a lower limit for the bottom-up flux, because the top-down measurements likely did not sample completely mixed air, and in this case the upwind area contains cleaner air, which dilutes the emissions. Likewise, the OSA represents an upper limit for comparison with the bottom-up flux because the top-down measurements similarly did not sample air exclusively influenced by the OSA (which has a higher density of emission sources), and accumulation may have effectively occurred over a time scale greater than the estimated 5–6 h.

Bottom-up inventories including energy sector, agriculture, landfill, and other miscellaneous emissions were produced for both the OSA and the UAA and are described in SI Text. Energy sector emissions were computed using the following national and state databases: Pennsylvania Department of Environment databases of oil, gas, and coal production and locations; West Virginia Department of Environment databases of oil, gas, and coal production and locations; Ohio Department of Natural Resources databases of oil, gas, and coal production; Energy Information Administration databases of state to state pipeline transmission and location; Department of Labor database of Employment and Production; and the Pipeline and Hazardous Material Safety Administration database of pipeline transmission. Default gas compositions were used (38), and all conversions between volume and mass assume standard gas conditions: 15 °C and 1 atm. Emission factors from ref. 11 are used to calculate routine fugitive emissions from natural gas production and processing and for life cycle fugitive emissions from coal and all energy sectors. Emissions from natural gas transmission and distribution and well flowback events are calculated from emission factors provided in refs. 16 and 17, respectively. For comparison, a bottom-up inventory of natural gas sector emissions using only ref. 16 emission factors was also completed for the OSA. Methane emissions from the agriculture sector were calculated from total animal counts in the counties of interest (39) multiplied by methane emission factors from refs. 40 and 41. Other methane emissions were included from EPA-reported greenhouse gas emissions from landfills and other miscellaneous sources (42). Table 3 shows the total emissions from the bottom-up inventory for the OSA and UAA, as well as the comparison inventory for the OSA. More detailed emissions are presented for the OSA in Table S1 and the UAA in Table S2.

The comparison of uncaptured natural gas emissions as a percentage of total natural gas produced has been used as a standard of comparison between studies. We used the bottom-up inventories to compute the proportion of our observed top-down flux that would be expected to come from the natural gas sector. As shown in Table 3, the total contribution of methane emissions from the natural gas sector is assumed to be between 22% and 62% in this region. This range was used to calculate the contributing portion of natural gas emissions from the extrema in the top-down flux to be divided by the local unassociated production rates of 50.1 g $CH_4$ $s^{-1}$ $km^{-2}$ for the OSA and 15.9 g $CH_4$ $s^{-1}$ $km^{-2}$ for the UAA, as shown in Table 4. We report emission rates in Table 4 and estimate a fugitive emission rate between 2.8% and 17.3% of natural gas production for this region on these particular days. This estimate should be compared with other estimates with caution because these estimates generally use more comprehensive temporal data (16, 17, 19, 20).

ENVIRONMENTAL SCIENCES

Nevertheless, the upper range of this emission rate is surprisingly high, particularly because there were no major or widespread activities such as flowback events or well workovers of which we are aware that are typically associated with higher methane emission rates.

The mass-balance technique used here is described in ref. 26. Briefly, $CH_4$ concentration data are collected at varying altitudes downwind of a source approximately perpendicular to the prevailing wind direction. Downwind transects were flown to the top of the boundary layer, determined from vertical profiles of potential temperature, $H_2O$, $CH_4$, and $CO_2$, or more commonly, until the signal reached background levels. The observation of plumes that did not extend all of the way to the boundary layer top is attributed to the fact that downwind transects were typically flown 2–5 km downwind of a source, corresponding to too short a transport time scale for complete vertical mixing but necessary to isolate sources in a landscape with a dense distribution of pad potential sources. Fig. S6 shows raw $CH_4$ transect data 1.1 km downwind of pad Delta during flight MB-2. Interpolation of the raw transect data to create a 2D matrix of $CH_4$ values was done using EasyKrig3.0 (37). Fig. 2 shows the output from the interpolation of the raw data in Fig. S6. After the interpolated $CH_4$ and horizontal wind matrices are obtained, the flux is calculated according to Eq. 1.

$$F = \int_0^{z_i} \int_{-x}^{x} \Delta |CH_4|_{ij} \times M_{\perp ij} \, dx dz \qquad [1]$$

Here the limit $z_i$ is the top of the boundary layer, or the height at which the plume stops, and the limits $x$ and $-x$ are the horizontal limits determined from an arbitrary reference point in the middle of the transects. $\Delta CH_4$ is obtained by converting $CH_4$ concentrations from ppm to mol·m$^{-3}$ using measured temperature and pressure, then subtracting an average background $CH_4$ value, calculated by averaging the edges of the interpolated matrix, from each point in the interpolated $CH_4$ matrix, denoted by the subscripts $ij$. $M_\perp$ is the component of the mean wind that is perpendicular to the plane downwind of the source, which has also been interpolated from observations. Integrating across $x$ and $z$ and multiplying by $dx$, 110 m, and $dz$, 20 m, gives the flux in mol/s per cell, which can then be converted to units of g/s or kg/s. In cases in which there were multiple well pads contributing, the number of potential upwind pads was determined from visually inspecting the $CH_4$ data and spatial distribution of pads in the upwind direction.

Hydrocarbon concentration values were obtained from flask samples taken during flight RF-2. Of the 12 flasks, 2 were sampled in the free troposphere and excluded from hydrocarbon ratio calculations. The lowest hydrocarbon mole ratios in a single flask within the boundary layer were used as an estimate of background values and subtracted from the remaining nine flasks to obtain delta hydrocarbon values. The least-squares regression, forced through zero, between delta values of hydrocarbons, was used to find the hydrocarbon ratio. The uncertainty in the ratio reported is the uncertainty in the least-squares regression slope.

**ACKNOWLEDGMENTS.** We thank Karen Edelstein and Bongghi Hong for their help in compiling the bottom-up inventory and Carolina Siso for flask VOC analysis. The data presented here can be made available by the authors, by contacting pshepson@purdue.edu. Funding was provided by the David R. Atkinson Center for a Sustainable Future at Cornell University.

1. Stocker T, et al. (2013) in *Climate Change 2013: The Physical Science Basis: Technical Summary*, eds Joussaume S, Penner J, Fredolin T (Cambridge University Press, New York), Table 8.7.
2. Shindell DT, et al. (2009) Improved attribution of climate forcing to emissions. *Science* 326(5953):716–718.
3. Thompson AM (1992) The oxidizing capacity of the Earth's atmosphere: Probable past and future changes. *Science* 356(5060):1157–1165.
4. Solomon S, et al. (2010) Contributions of stratospheric water vapor to decadal changes in the rate of global warming. *Science* 327(5970):1219–1223.
5. Frankenberg C, et al. (2011) Global column-averaged methane mixing ratios from 2003 to 2009 as derived from SCIAMACHY: Trends and variability. *J Geophys Res* 116(D4):D04302.
6. Pacala S, Socolow R (2004) Stabilization wedges: Solving the climate problem for the next 50 years with current technologies. *Science* 305(5686):968–972.
7. Myhrvold NP, Caldeira K (2012) Greenhouse gases, climate change and the transition from coal to low-carbon electricity. *Environ Res Lett*, 10.1088/1748-9326/7/1/014019.
8. Alvarez RA, Pacala SW, Winebrake JJ, Chameides WL, Hamburg SP (2012) Greater focus needed on methane leakage from natural gas infrastructure. *Proc Natl Acad Sci USA* 109(17):6435–6440.
9. Venkatesh A, Jaramillo P, Griffin WM, Matthews HS (2011) Uncertainty in life cycle greenhouse gas emissions from United States natural gas end-uses and its effects on policy. *Environ Sci Technol* 45(19):8182–8189.
10. US Energy Information Administration (2013) EIA annual energy outlook 2013. Available at www.eia.gov/forecasts/aeo/pdf.0383(2013).pdf. Accessed August 7, 2013.
11. Howarth RW, Santoro RL, Ingraffea A (2011) Methane and the greenhouse-gas footprint of natural gas from shale formations. *Clim Change* 106(4):679–690.
12. Hultman N, Rebois D, Scholten M, Ramig C (2011) The greenhouse impact of unconventional gas for electricity generation. *Environ Res Lett*, 10.1088/1748-9326/6/4/044008.
13. Jiang M, et al. (2011) Life cycle greenhouse gas emissions of Marcellus shale gas. *Environ Res Lett*, 10.1088/1748-9326/6/3/034014.
14. Stephenson T, Valle JE, Riera-Palou X (2011) Modeling the relative GHG emissions of conventional and shale gas production. *Environ Sci Technol* 45(24):10757–10764.
15. Burnham A, et al. (2012) Life-cycle greenhouse gas emissions of shale gas, natural gas, coal, and petroleum. *Environ Sci Technol* 46(2):619–627.
16. National Energy Technology Laboratory (2011) *Life Cycle Greenhouse Gas Inventory of Natural Gas Extraction, Delivery and Electricity Production* (DOE/NETL Publication 2011/1522). Available at www.netl.doe.gov/File%20Library/Research/Energy%20Analysis/Life%20Cycle%20Analysis/NG-GHG-LCI.pdf. Accessed December 11, 2012.
17. US Environmental Protection Agency (2010) Greenhouse gas emissions reporting from the petroleum and natural gas industry: Background technical support document. Available at www.epa.gov/ghgreporting/documents/pdf/2010/Subpart-W_TSD.pdf. Accessed December 15, 2011.
18. Howarth RW, Shindell D, Santoro RL, Ingraffea A, Phillips N, Townsend-Small A (2011) *Methane Emissions from Natural Gas Systems.* National Climate Assessment, Feb. Report No. 2011-003 (Office of Science and Technology Policy, Washington, DC).
19. Weber CL, Clavin C (2012) Life cycle carbon footprint of shale gas: Review of evidence and implications. *Environ Sci Technol* 46(11):5688–5695.
20. Pétron G, et al. (2012) Hydrocarbon emissions characterization in the Colorado Front Range: A pilot study. *J Geophys Res*, 10.1029/2011JD016360.
21. Karion A, et al. (2013) Methane emissions estimate from airborne measurements over a western United States natural gas field. *Geophys Res Lett*, 10.1002/grl.50811.
22. Allen DT, et al. (2013) Measurements of methane emissions at natural gas production sites in the United States. *Proc Natl Acad Sci USA* 110(44):17768–17773.
23. Miller SM, et al. (2013) Anthropogenic emissions of methane in the United States. *Proc Natl Acad Sci USA* 110(50):20018–20022.
24. US Environmental Protection Agency (2013) *Inventory of US Greenhouse Gas Emissions and Sinks: 1990-2011.* EPA Publication 430-R-13-001 (US Environmental Protection Agency, Washington, DC).
25. Katzenstein AS, Doezema LA, Simpson IJ, Blake DR, Rowland FS (2003) Extensive regional atmospheric hydrocarbon pollution in the southwestern United States. *Proc Natl Acad Sci USA* 100(21):11975–11979.
26. Mays KL, et al. (2009) Aircraft-based measurements of the carbon footprint of Indianapolis. *Environ Sci Technol* 43(20):7816–7823.
27. Pennsylvania Department of Environmental Protection (2012) Internal File Review: Permitted Wells: 12524400-02, 12524425, 125124516, 12524517, 12524529-41, 12524552, 12524553, 12524555-58, 12524563, 12524564, 12524589, 12524600, 12524617, 12524618, 12524627, 12524628, 12524696, 12524713, 12524714, 12524762 (Pennsylvania Department of Environmental Protection, Southwest Regional Office, Pittsburgh).
28. American Society of Mechanical Engineers Shale Shaker Committee (2005) *Drilling Fluids Processing Handbook* (American Society of Mechanical Engineers Shale Shaker Committee, Amsterdam, NY).
29. US Environmental Protection Agency (2012) ANNEX 3: Methodological descriptions for additional source or sink categories. Available at www.epa.gov/climatechange/ghgemissions/usinventoryreport.html. Accessed February 19, 2013.
30. Braziel ER (2011) Infrastructure projects connect Marcellus shale to ethane, NGL markets. Available at www.aogr.com/index.php/magazine/cover-story/infrastructure-projects-connect-marcellus-shale-to-ethane-ngl-markets. Accessed November 26, 2012.
31. Osborn SG, McIntosh JC (2010) Chemical and isotopic tracers of the contribution of microbial gas in Devonian organic-rich shales and reservoir sandstones, northern Appalachian basin. *Appl Geochem* 25(3):456–471.
32. Kotarba MJ (2001) Composition and origin of coalbed gases in the Upper Silesian and Lublin basins, Poland. *Org Geochem* 32(1):163–180.
33. Brandt AR, et al. (2014) Energy and environment. Methane leaks from North American natural gas systems. *Science* 343(6172):733–735.
34. Mohr SH, Evans GM (2011) Long term forecasting of natural gas production. *Energy Policy* 39(9):5550–5560.
35. Długokencky EJ, Nisbet EG, Fisher R, Lowry D (2011) Global atmospheric methane: budget, changes and dangers. *Phil Trans R Soc A* 369(1943):2058–2072.
36. Garman KE, et al. (2006) An airborne and wind tunnel evaluation of a wind turbulence measurement system for aircraft-based flux measurements. *J Atmos Ocean Technol* 23(12):1696–1708.
37. Chu D (2004) The GLOBEC kriging software package–EasyKrig3.0. Available at http://globec.whoi.edu/software/kriging/easy_krig/easy_krig.html. Accessed January 7, 2011.
38. American Petroleum Institute (2009) Compendium of greenhouse gas emissions methodologies for the oil and natural gas industry. Available at www.api.org/ehs/climate/new/upload/2009_ghg_compendium.pdf. Accessed December 14, 2012.
39. Hong B, Swaney DP, Howarth RW (2011) A toolbox for calculating net anthropogenic nitrogen inputs (NANI). *Environ Model Softw* 26(5):623–633.
40. Jorgensen H (2007) Methane emission by growing pigs and adult sows as influenced by fermentation. *Livest Sci* 109(1-3):216–219.
41. Zhou JB, Jiang MM, Chen GQ (2007) Estimation of methane and nitrous oxide emission from livestock and poultry in China during 1949-2003. *Energy Policy* 35(7):3759–3767.
42. US Environmental Protection Agency (2010) EPA greenhouse gas reporting program 2010 summary. Available at www.epa.gov/ghgreporting/ghgdata/2010data.html. Accessed May 8, 2013.

Caulton et al.

**RESEARCH** ARTICLE

# Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security

Drew Shindell,[1]* Johan C. I. Kuylenstierna,[2] Elisabetta Vignati,[3] Rita van Dingenen,[3] Markus Amann,[4] Zbigniew Klimont,[4] Susan C. Anenberg,[5] Nicholas Muller,[6] Greet Janssens-Maenhout,[3] Frank Raes,[3] Joel Schwartz,[7] Greg Faluvegi,[1] Luca Pozzoli,[3]† Kaarle Kupiainen,[4] Lena Höglund-Isaksson,[4] Lisa Emberson,[2] David Streets,[8] V. Ramanathan,[9] Kevin Hicks,[2] N. T. Kim Oanh,[10] George Milly,[1] Martin Williams,[11] Volodymyr Demkine,[12] David Fowler[13]

Tropospheric ozone and black carbon (BC) contribute to both degraded air quality and global warming. We considered ~400 emission control measures to reduce these pollutants using current technology and experience. We identified 14 measures targeting methane and BC emissions that reduce projected global mean warming ~0.5°C by 2050. This strategy avoids 0.7 to 4.7 million annual premature deaths from outdoor air pollution and increases annual crop yields by 30 to 135 million metric tons due to ozone reductions in 2030 and beyond. Benefits of methane emissions reductions are valued at $700 to $5000 per metric ton, which is well above typical marginal abatement costs (less than $250). The selected controls target different sources and influence climate on shorter time scales than those of carbon dioxide–reduction measures. Implementing them substantially reduces the risks of crossing the 2°C threshold.

Tropospheric ozone and black carbon (BC) are the only two agents known to cause both warming and degraded air quality. Although all emissions of BC or ozone precursors [including methane ($CH_4$)] degrade air quality, and studies document the climate effects of total anthropogenic BC and tropospheric ozone (1–4), published literature is inadequate to address many policy-relevant climate questions regarding these pollutants because emissions of ozone precursors have multiple cooling and warming effects, whereas BC is emitted along with other particles that cause cooling, making the net effects of real-world emissions changes obscure. Such information is needed, however, because multiple stakeholders are interested in mitigating climate change via control of non–carbon dioxide ($CO_2$)–forcing

agents such as BC, including the G8 nations (L'Aquila Summit, 2009) and the Arctic Council (Nuuk Declaration, 2011). Here, we show that implementing specific practical emissions reductions chosen to maximize climate benefits would have important "win-win" benefits for near-term climate, human health, agriculture, and the cryosphere, with magnitudes that vary strongly across regions. We also quantify the monetized benefits due to health, agriculture, and global mean climate change per metric ton of $CH_4$ and for the BC measures as a whole and compare these with implementation costs.

Our analysis proceeded in steps. Initially, ~400 existing pollution control measures were screened with the International Institute for Applied Systems Analysis Greenhouse Gas and Air Pollution Interactions and Synergies (IIASA GAINS) model (5, 6). The model estimated potential worldwide emissions reductions of particulate and gaseous species on the basis of available real-world data on reduction efficiencies of these measures where they have been applied already and examined the impact of full implementation everywhere by 2030. Their potential climate impact was assessed by using published global warming potential (GWP) values for each pollutant affected. All emissions control measures are assumed to improve air quality. We then selected measures that both mitigate warming and improve air quality, ranked by climate impact. If enhanced air quality had been paramount, the selected measures would be quite different [for example, measures primarily reducing sulfur dioxide ($SO_2$) emissions improve air quality but may increase warming]. The screen-

ing revealed that the top 14 measures realized nearly 90% of the maximum reduction in net GWP (table S1 and fig. S2). Seven measures target $CH_4$ emissions, covering coal mining, oil and gas production, long-distance gas transmission, municipal waste and landfills, wastewater, livestock manure, and rice paddies. The others target emissions from incomplete combustion and include technical measures (set "Tech"), covering diesel vehicles, clean-burning biomass stoves, brick kilns, and coke ovens, as well as primarily regulatory measures (set "Reg"), including banning agricultural waste burning, eliminating high-emitting vehicles, and providing modern cooking and heating. We refer to these seven as "BC measures," although in practice, we consider all co-emitted species (7).

We then developed future emissions scenarios to investigate the effects of the emissions control measures in comparison with both a reference and a potential low-carbon future: (i) a reference scenario based on energy and fuel projections of the International Energy Agency (IEA) (8) regional and global historic projections (9) and incorporating all presently agreed policies affecting emissions (10); (ii) a $CH_4$ measures scenario that follows the reference but also adds the $CH_4$ measures; (iii) $CH_4$+BC measures scenarios that follow the reference but add the $CH_4$ and one or both sets of BC measures; (iv) a $CO_2$ measures scenario under which $CO_2$ emissions follow the IEA's "450 $CO_2$-equivalent" scenario (8) as implemented in the GAINS model (affecting $CO_2$ and co-emissions of $SO_2$ but not other long-lived gases); and (v) a combined $CO_2$ plus $CH_4$ and BC measures scenario. Measures are phased in linearly from 2010 through 2030, after which only trends in $CO_2$ emissions are included, with other emissions kept constant.

Emissions from these scenarios were then used with the ECHAM5-HAMMOZ (11) and GISS-PUCCINI (12) three-dimensional composition-climate models to calculate the impacts on atmospheric concentrations and radiative forcing (7). Changes in surface $PM_{2.5}$ (particles of less than 2.5 micrometers) and tropospheric ozone were used with published concentration-response relationships (13–15) to calculate health and agricultural impacts. $CH_4$ forcing was calculated from the modeled $CH_4$ concentrations. Direct ozone and aerosol radiative forcings were produced by using the fraction of total anthropogenic direct radiative forcing removed by the emission control measures, as calculated in the two models, multiplied by the best estimate and uncertainty range for direct forcing, which was determined from a literature assessment. Albedo forcing was similarly estimated on the basis of the fractional decrease of BC deposition to snow and ice surfaces. Indirect and semidirect forcings were estimated by simply assuming that these had the same fractional changes as the direct forcings (16). Initially, analytic equations representing rapid and slow components of the climate system

[1]NASA Goddard Institute for Space Studies and Columbia Earth Institute, Columbia University, New York, NY 10025, USA. [2]Stockholm Environment Institute, Environment Department, University of York, York YO10 5DD, UK. [3]Joint Research Centre of the European Commission, Ispra 21027, Italy. [4]International Institute for Applied Systems Analysis, Laxenburg A-2361, Austria. [5]U.S. Environmental Protection Agency, Washington, DC 20460, USA. [6]Department of Economics, Middlebury College, Middlebury, VT 05753, USA. [7]Department of Environmental Health, Harvard School of Public Health, Boston, MA 02215, USA. [8]Argonne National Laboratory, Argonne, IL 60439, USA. [9]Scripps Institute of Oceanography, University of California, San Diego, San Diego, CA 92093, USA. [10]Asian Institute of Technology, Bangkok 10400, Thailand. [11]Environmental Research Group, King's College London, London SE1 9NH, UK. [12]United Nations Environment Programme (UNEP), Nairobi 00100, Kenya. [13]Center for Ecology and Hydrology, Midlothian EH26 0QB, UK.

*To whom correspondence should be addressed. E-mail: drew.t.shindell@nasa.gov

†Present address: Eurasia Institute of Earth Sciences, Istanbul Technical University, Istanbul 34469, Turkey.

EMBARGOED UNTIL 2PM U.S. EASTERN TIME ON THE THURSDAY BEFORE THIS DATE:

RESEARCH ARTICLE

(*17*) were used to estimate global and regional (*18*) mean temperature response to the forcings.

This analytic analysis shows that the measures substantially reduce the global mean temperature increase over the next few decades by reducing tropospheric ozone, $CH_4$, and BC (Fig. 1). The short atmospheric lifetime of these species allows a rapid climate response to emissions reductions. In contrast, $CO_2$ has a very long atmospheric lifetime (hence, growing $CO_2$ emissions will affect climate for centuries), so that the $CO_2$ emissions reductions analyzed here hardly affect temperatures before 2040. The combination of $CH_4$ and BC measures along with substantial $CO_2$ emissions reductions [a 450 parts per million (ppm) scenario] has a high probability of limiting global mean warming to <2°C during the next 60 years, something that neither set of emissions reductions achieves on its own [which is consistent with (*19*)].

Work to this stage was largely in support of the Integrated Assessment of Black Carbon and Tropospheric Ozone (*20*). Here, we present detailed climate modeling and extend impact analyses to the national level, where regulations are generally applied and which provides detailed spatial information that facilitates regional impact analyses. We also analyze cost/benefit analyses.

**Climate modeling.** We performed climate simulations driven by the 2030 $CH_4$ plus BC measures, by greenhouse gas changes only, and by reference emissions using the GISS-E2-S model; the same GISS atmosphere and composition models were coupled to a mixed-layer ocean (allowing ocean temperatures, but not circulation, to adjust to forcing). Direct, semidirect (aerosol effects on clouds via atmospheric heating), indirect (aerosol effects on clouds via microphysics), and snow/ice albedo (by BC deposition) forcings were calculated internally (*7*). We analyzed the equilibrium response 30 to 50 years after imposition of the measures, which is comparable with the latter decades in the analytic analysis.

The global mean response to the $CH_4$ plus BC measures was −0.54 ± 0.05°C in the climate model. The analytic equations yielded −0.52°C (−0.21 to −0.80°C) for 2070, which is consistent with these results. Climate model uncertainty only includes internal variations, whereas the analytic estimate includes uncertainties in forcing and climate sensitivity (but has no internal variability).

We also examined individual forcing components. Direct global mean aerosol forcings in the ECHAM and GISS models are almost identical (Table 1), despite large uncertainties generally present in aerosol forcing and the two aerosol models being fundamentally different [for example, internal versus external mixtures (*7*)]. $CH_4$ and ozone responses to $CH_4$ changes are also quite similar. Ozone responses to changes in CO, volatile organic compounds, and $NO_x$ associated with the BC measures are quite different, however. This is consistent with the nonlinear response of ozone to these precursors (*21*).

The combined indirect and semidirect radiative forcing by all aerosols in the GISS model is negative for the BC Tech and Reg measures. Although sulfate increases slightly—largely because of increases in the oxidant $H_2O_2$—in all emissions control scenarios, the BC measures primarily decrease BC and organic carbon (OC). The negative forcing suggests that a decreased positive semidirect effect may outweigh decreased negative indirect effects of BC and OC in this model [studies differ on the magnitude of these effects (*22*–*24*)]. Indirect effects are much larger than net direct effects for the Tech measures.

Global mean BC albedo forcing in the model is very small (Table 1), but we assume its



**Fig. 1.** Observed temperatures (*42*) through 2009 and projected temperatures thereafter under various scenarios, all relative to the 1890–1910 mean. Results for future scenarios are the central values from analytic equations estimating the response to forcings calculated from composition-climate modeling and literature assessments (*7*). The rightmost bars give 2070 ranges, including uncertainty in radiative forcing and climate sensitivity. A portion of the uncertainty is systematic, so that overlapping ranges do not mean there is no significant difference (for example, if climate sensitivity is large, it is large regardless of the scenario, so all temperatures would be toward the high end of their ranges; see www.giss.nasa.gov/staff/dshindell/Sci2012).

**Table 1.** ECHAM and GISS forcing (W/m²) at 2030 due to the measures relative to the reference. Dashes indicate forcing not calculated.

| | CH₄ measures | CH₄+BC Tech measures | All measures |
|---|---|---|---|
| ECHAM ozone | −0.09 | −0.10 | −0.10 |
| GISS ozone | −0.10 | −0.17 | −0.19 |
| ECHAM direct aerosols* | −0.01 | −0.06 | −0.15 |
| GISS direct aerosols* | −0.01 | −0.06 | −0.17 |
| (BC, OC, sulfate, nitrate) | (0.00, 0.00, −0.02, 0.00) | (-0.10, 0.06, −0.02, 0.01) | (−0.22, 0.07, −0.02, 0.01) |
| ECHAM CH₄† | −0.22 | −0.22 | −0.20 |
| GISS CH₄† | −0.20 | −0.20 | −0.18 |
| GISS indirect and semidirect aerosols | — | −0.14 ± 0.03 | −0.16 ± 0.04 |
| GISS BC albedo (effective forcing ×5) | — | −0.010 (−0.05) | −0.017 (−0.09) |
| GISS net‡ | −0.32 | −0.60 | −0.77 |

*For aerosols, the value for ECHAM is the sum of the direct BC+OC+sulfate forcing. For GISS, the same sum is presented first, and individual components are listed afterward (the ECHAM model has more realistic internally mixed aerosols, so components are not separable).   †CH₄ forcing at 2030 is roughly 75% of the forcing that is eventually realized from CH₄ emission changes through 2030.   ‡The net forcing given here includes the effective value for BC albedo forcing. Uncertainties due to internal variability in the models are 0.01 W/m² or less for direct forcings and 0.001 W/m² for BC albedo forcing.

**EMBARGOED UNTIL 2PM U.S. EASTERN TIME ON THE THURSDAY BEFORE THIS DATE:**

RESEARCH ARTICLE

"effective" forcing is five times the instantaneous value (25, 26). Albedo forcing can be important regionally (Fig. 2), especially in the Arctic and the Himalayas, where the measures decrease forcing up to 4 W/m² (not including the factor of 5). Such large regional impacts are consistent with other recent studies (27, 28) and would reduce snow and ice melting.

Roughly half the forcing is relatively evenly distributed (from the CH₄ measures). The other half is highly inhomogeneous, especially the strong BC forcing, which is greatest over bright desert and snow or ice surfaces. Those areas often exhibit the largest warming mitigation, making the regional temperature response to aerosols and ozone quite distinct from the more homogeneous response to well-mixed greenhouse gases (Fig. 2) [although the impact of localized forc-

ing extends well beyond the forcing location (29)]. BC albedo and direct forcings are large in the Himalayas, where there is an especially pronounced response in the Karakoram, and in the Arctic, where the measures reduce projected warming over the next three decades by approximately two thirds and where regional temperature response patterns correspond fairly closely to albedo forcing (for example, they are larger over the Canadian archipelago than the interior and larger over Russia than Scandinavia or the North Atlantic).

The largest precipitation responses to the CH₄ plus BC measures are seen in South Asia, West Africa, and Europe (Fig. 2). The BC measures greatly reduce atmospheric forcing—defined as top-of-the-atmosphere minus surface forcing—in those parts of Asia and Africa (fig. S4), which

can strongly influence regional precipitation patterns (30–32). In comparison with a semiempirical estimate (33), the two composition-climate models represent present-day atmospheric forcing reasonably well (fig. S4). The response to greenhouse gases alone shows different spatial structure over South Asia and Europe and is much weaker everywhere (per unit of global mean forcing). The BC measures moderate a shift in the monsoon westward away from Southeast Asia into India seen during 20th- and 21st-century GISS-E2 simulations, with especially strong impacts at the Indian west coast and from Bengal to the northwest along the Himalayan foothills. Climate models' simulations of monsoon responses to absorbing aerosols vary considerably (30–32). The results suggest that the BC measures could reduce drought risk in Southern Europe and the





**Fig. 2.** (**A** and **B**) June-September precipitation change, (**C** and **D**) annual average surface temperature change, and (**E**) BC albedo forcing due to [(A), (C), and (E)] CH₄ plus BC measures and [(B) and (D)] CH₄ measures alone (the scales change in each panel). Changes are equilibrium responses relative to the reference in the GISS-E2-S climate model (mixed-layer ocean). Albedo forcings are directly simulated values rather than the enhanced "effective" values. Colored areas are statistically significant (95% confidence for temperature and forcing, 90% confidence for precipitation). Precipitation changes are small in areas not shown. Forcing from CH₄ plus BC measures is roughly double the CH₄ measures forcing (Table 1), so that equivalent colors in the two columns indicate comparable responses per unit forcing.

**EMBARGOED UNTIL 2PM U.S. EASTERN TIME ON THE THURSDAY BEFORE THIS DATE:**

RESEARCH ARTICLE

Sahel while reversing shifting monsoon patterns in South Asia.

**Global mean impacts of packages of measures.** Having established the credibility of the analytic climate calculations at the global scale [air quality simulations were shown to be realistic in (20)], we now briefly compare the global effects of the separate packages of measures (Table 2). The $CH_4$ measures contribute more than half the estimated warming mitigation and have the smallest relative uncertainty. BC Tech measures have a larger climate impact and a substantially smaller fractional uncertainty than that of the Reg measures because aerosols contribute a larger portion of the total forcing in the Reg case (and uncertainty in radiative forcing by BC or OC is much larger than for $CH_4$ or ozone). In the Reg case, the temperature range even includes the possibility of weak global warming, although the distribution shows a much larger probability of cooling.

For yield losses of four staple crops due to ozone, the mean values for $CH_4$ and BC Tech measures are comparable, whereas BC Reg measures have minimal impact. The health benefits from BC measures are far larger than those from the $CH_4$ measures because health is more sensitive to reduced exposure to $PM_{2.5}$ than to ground-level ozone. The large ranges for health impacts stem primarily from uncertainty in concentration-response relationships. The estimated 0.7 to 4.7 million annually avoided premature death are substantial in comparison with other causes of premature death projected for 2030, including tuberculosis (0.6 million), traffic accidents (2.1 million), or tobacco use (8.3 million) (34). There would also be large health benefits from improved indoor air quality. Because of limited data, we only estimated these for India and China, where implementation of all BC measures leads to an additional 373,000 annually avoided premature deaths (7).

**Cost and benefit valuation.** Economic analyses use the value of a statistical life (VSL) for health, world market prices for crops, and the social cost of carbon (SCC) along with global mean impacts relative to $CO_2$ for climate (7). Valuation is dominated by health effects and hence by the BC measures (Table 2). Climate valuation is large for the $CH_4$ measures, although it depends strongly on the metrics used. If instead of the 100-year GWP, the 100-year global temperature potential (GTP) of $CH_4$ is used (35), the value becomes $159 billion. Similarly, benefits scale with differing choices for the SCC. Climate benefits for the BC measures are based on the $CH_4$ measures' climate benefits times the relative global mean climate impact of the BC measures because published GWP or GTP values do not cover all species and ignore some factors affecting climate (such as aerosol indirect effects), and the ratio of the temperature responses is similar to the ratio of the integrated forcing due to a single year's emissions (GWP). This method still neglects regional effects of these

pollutants on temperatures, precipitation, and sunlight available for photosynthesis.

Because the $CH_4$ measures largely influence $CH_4$ emissions alone, and $CH_4$ emissions anywhere have equal impact, it is straightforward to value $CH_4$ reductions by the metric ton. Climate benefits dominate, at $2381 per metric ton, with health second and crops third. The climate benefit per metric ton is again highly dependent on metrics. For example, instead of a $265 SCC (36)—a typical value assuming a near-zero discount rate—a value of $21 consistent with a ~3% discount rate could be used. Because discounting emphasizes near-term impacts, we believe a 20-year GWP or GTP should be used with the $21 SCC, in which case the valuation is $599 or $430 per metric ton, respectively. Health and agricultural benefits could also be discounted to account for the time dependence of the ozone response. Using a 5% discount rate, the mean health and agricultural benefits decrease relative to the undiscounted Table 2 values to $659 and $18 per metric ton, respectively. Climate benefits always exceed the agricultural benefits per metric ton, but climate values can be less or more than health benefits depending on the metric choices (the health benefits are similarly dependent on the assumed VSL).

A very conservative summation of benefits, using $430 for climate and discounted health and agricultural values, gives a total benefit of ~$1100 per metric ton of $CH_4$ (~$700 to $5000 per metric ton, using the above analyses). IEA estimates (37) indicate roughly 100 Tg/year of $CH_4$ emissions can be abated at marginal costs below $1100, with more than 50 Tg/year costing less than 1/10 this valuation (including the value of $CH_4$ captured for resale). Analysis using more recent cost information in the GAINS model (38, 39) finds that the measures analyzed here

could reduce 2030 $CH_4$ emissions by ~110 Tg at marginal costs below $1500 per metric ton, with 90 Tg below $250. The full set of measures reduce emissions by ~140 Tg, indicating that most would produce benefits greater than— and for approximately two-thirds of reductions far greater than—the abatement costs. Of course, the benefits would not necessarily accrue to those incurring costs.

Prior work valued $CH_4$ reductions at $81 ($48 to $116) per metric ton, including agriculture (grains), forestry, and nonmortality health benefits using 5% discounting (40). Their agricultural valuation was ~$30 ($1 to $42) per metric ton. Hence, our agriculture values are smaller but well within their large range. Those results suggest that forestry and nonmortality health effects contribute another ~$50 per metric ton of $CH_4$. Nonlinearities imply all valuations may shift somewhat as the background atmospheric composition changes.

GAINS estimates show that improved efficiencies lead to a net cost savings for the brick kiln and clean-burning stove BC measures. These account for ~50% of the BC measures' impact. The regulatory measures on high-emitting vehicles and banning of agricultural waste burning, which require primarily political rather than economic investment, account for another 25%. Hence, the bulk of the BC measures could probably be implemented with costs substantially less than the benefits given the large valuation of the health impacts (Table 2).

**$CH_4$ measures by sector and region.** It is also straightforward to separate the impact of $CH_4$ reductions in each region and sector on forcing. Because $CH_4$ is relatively well mixed globally, other impacts (such as crop yields) have the same proportionality as forcing. Emissions reductions in the coal mining and oil/gas production sectors

**Table 2.** Global impacts of measures on climate, agriculture, and health and their economic valuation. Valuations are annual values in 2030 and beyond, due to sustained application of the measures, which are nearly equal to the integrated future valuation of a single year's emissions reductions (without discounting). Climate valuations for $CH_4$ use GWP100 and an SCC of $265 per metric ton (36). Crop and health valuations use 95% confidence intervals, whereas climate valuations use ~67% uncertainty range. All values are in 2006 dollars.

|  | $CH_4$ measures | BC Tech measures | BC Reg measures |
|---|---|---|---|
| **Physical Impacts** | | | |
| Avoided warming in 2050 (°C) | 0.28 ± 0.10 | 0.12 (+0.06/–0.09) | .07 (+.04/–0.09) |
| Annually avoided crop yield losses (millions metric tons; sum of wheat, rice, maize, and soy) | 27 (+42/–20) | 24 (+72/–21) | 2 (+13/–3) |
| Annually avoided premature deaths (thousands) | 47 (+40/–34) | 1720 (+1529/–1188) | 619 (+639/–440) |
| **Valuation** | | | |
| Climate, billions $US ($US per metric ton $CH_4$) | 331 ± 118 (2381 ± 850) | 142 (+71/–106) | 83 (+47/–106) |
| Crops, billions $US ($US per metric ton $CH_4$) | 4.2 ± 1.2 (29 ± 8) | 3.6 ± 2.6 | 0.4 ± 0.6 |
| Health, billions $US ($US per metric ton $CH_4$) | 148 ± 99 (1080 ± 721) | 3717 (+3236/–2563) | 1425 (+1475/–1015) |

**EMBARGOED UNTIL 2PM U.S. EASTERN TIME ON THE THURSDAY BEFORE THIS DATE:**

RESEARCH ARTICLE

have the largest impacts, with municipal waste third (Fig. 3). Globally, sectors encompassing fossil fuel extraction and distribution account for nearly two thirds of the benefits because technology to control emissions from these sectors is readily available.

Examining benefits by sector and region, the largest by a considerable amount are from coal mining in China (Fig. 3). Oil and gas production in Central Africa, the Middle East, and Russia are next, followed by coal mining in South Asia, gas transmission in Russia (in high-pressure mains), and municipal waste in the United States and China. Ranking is obviously quite sensitive to regional groupings and country size, and there is substantial uncertainty in emissions from certain sectors in some regions. In particular, using national emission factors (instead of the Intergovernmental Panel on Climate Change default methodology) would lower the coal-mining potential from India and Southern Africa substantially. Nonetheless, those eight regional/sectoral combinations alone represent 51% of the total impact from all $CH_4$ measures.

**Regional and national impacts.** Upon examination of impacts of the $CH_4$ plus BC measures, avoided warming is greatest in central and northern Asia, southern Africa, and around the Mediterranean (Fig. 4, fig. S5, and table S5). Three of the top four national-level responses are in countries with strong BC albedo forcing (Tajikistan, Kyrgyzstan, and Russia). In contrast, the atmospheric forcing linked to regional hydrologic cycle disruption is reduced most strongly

in south Asia and west Africa, where the measures greatly decrease BC emissions. Total numbers of avoided premature deaths are greatest in developing nations in Asia and Africa with large populations and high PM concentrations (and large emissions changes). Turning to per capita impacts, premature deaths are reduced most strongly in countries of south Asia, followed by central Africa, then east and southeast Asia, in a pattern quite similar to the atmospheric forcing impacts.

For crop production, China, India, and the United States, followed by Pakistan and Brazil, realize the greatest total metric tonnage gains. Looking instead at percentage yield changes, impacts are largest in the Middle East, with large changes also in central and south Asia. There is a large impact on percentage crop yields in Mexico that is quite distinct from neighboring countries, reflecting the influence of local emission changes. Impacts vary greatly between crops for changes in total production (fig. S6), with largest impacts occurring where the distribution and seasonal timing of crop production coincide with high ozone concentrations (7). Percentage crop yield changes are more consistent, however. Additional crop yield benefits would result from the avoided climate change, but they are not considered here.

Avoided warming is spread much more evenly over the Earth than other impacts. Both climate benefits in terms of reductions in regional atmospheric forcing and air quality–related human health benefits are typically largest in the countries of south Asia and central Africa, whereas

agricultural benefits are greatest in the Middle East, where ozone reductions are large. Because many nations in these areas face great development challenges, realization of these benefits would be especially valuable in those areas.

**Discussion.** The results clearly demonstrate that only a small fraction of air quality measures provide substantial warming mitigation. Nonetheless, the $CH_4$ and BC emissions reduction measures examined here would have large benefits to global and regional climate, as well as to human health and agriculture. The $CH_4$ measures lead to large global climate and agriculture benefits and relatively small human health benefits, all with high confidence and worldwide distribution. The BC measures are likely to provide substantial global climate benefits, but uncertainties are much larger. However, the BC measures cause large regional human health benefits, as well as reduce regional hydrology cycle disruptions and cryosphere melting in both the Arctic and the Himalayas and improve regional agricultural yields. These benefits are more certain and are typically greatest in and near areas where emissions are reduced. Results are robust across the two composition-climate models. Protecting public health and food supplies may take precedence over avoiding climate change in most countries, but knowing that these measures also mitigate climate change may help motivate policies to put them into practice.

We emphasize that the $CH_4$ and BC measures are both distinct from and complementary to $CO_2$ measures. Analysis of delayed implemen-





**Fig. 3.** Global mean radiative forcing (bottom *x* axes) and temperature response (top *x* axes) from $CH_4$ and ozone in response to $CH_4$ measures. Global totals by (**left**) emission control measure, and (**right**) values by region and sector are shown. Temperature response is the approximate equilibrium value. Uncertainties are ~10% in forcing and ~50% in response.

EMBARGOED UNTIL 2PM U.S. EASTERN TIME ON THE THURSDAY BEFORE THIS DATE:



**Fig. 4.** National benefits of the $CH_4$ plus BC measures versus the reference scenario. Circle areas are proportional to values for (**A** and **B**) climate change, (**C** and **D**) human health (values for population over age 30), and (**E** and **F**) agriculture. Surface temperature changes are from the GISS-E2-S simulation. Health, agriculture, and atmospheric forcing impacts are based on the average of GISS and ECHAM concentration changes and are for 2030 and beyond. Uncertainties are ~60% for global mean temperatures, with national scale uncertainties likely greater, ~60% for atmospheric forcing, ~70% for health, and roughly −70%/+100% for crops [see (7) for factors included in uncertainties, most of which are systematic for atmospheric forcing, health, and agriculture so that much smaller differences between regions are still significant]. Interactive versions providing values for each country are at www.giss.nasa.gov/staff/dshindell/Sci2012, whereas alternate presentations of these data are in fig. S5 and table S5.

tation of the $CH_4$ and BC measures (fig. S3) shows that early adoption provides much larger near-term benefits but has little impact on long-term temperatures (20). Hence, eventual peak warming depends primarily on $CO_2$ emissions, assuming air quality–related pollutants are removed at some point before peak warming.

Valuation of worldwide health and ecosystem impacts of $CH_4$ abatement is independent of where the $CH_4$ is emitted and usually outweighs abatement costs. These benefits are therefore potentially suitable for inclusion in international mechanisms to reduce $CH_4$ emissions, such as the Clean Development Mechanism under the United Nations Framework Convention on Climate Change or the Prototype Methane Financing Facility (41). Many other policy alternatives exist to implement the $CH_4$ and BC measures, including enhancement of current air quality regulations. The realization that these measures can slow the rate of climate change and help keep global warming below 2°C relative to preindustrial in the near term, provide enhanced warming mitigation in the Arctic and the Himalayas, and reduce regional disruptions

to traditional rainfall patterns—in addition to their local health and local-to-global agricultural benefits—may help prompt widespread and early implementation so as to realize these manifold benefits.

#### References and Notes

1. M. Z. Jacobson, *J. Geophys. Res.* **115** (D14), D14209 (2010).
2. D. T. Shindell *et al.*, *J. Geophys. Res.* **111**, D08302 (2006).
3. P. Forster *et al.*, in *Climate Change 2007: The Physical Science Basis*, S. Solomon, Ed. (Cambridge Univ. Press, New York, 2007).
4. P. Stier, J. Feichter, E. Roeckner, S. Kloster, M. Esch, *Atmos. Chem. Phys.* **6**, 3059 (2006).
5. Z. Klimont *et al.*, *Tellus B Chem. Phys. Meterol.* **61**, 602 (2009).
6. K. Kupiainen, Z. Klimont, *Atmos. Environ.* **41**, 2156 (2007).
7. Materials and methods are available as supporting material on *Science* Online.
8. International Energy Agency, *World Energy Outlook* (OECD/IEA, Paris, 2009).
9. N. Alexandratos *et al.*, "World agriculture: Towards 2030/2050. Interim report. Prospects for food, nutrition, agriculture and major commodity groups" (Food and Agriculture Organization, Rome, 2006).
10. J. Cofala, M. Amann, Z. Klimont, K. Kupiainen, L. Hoglund-Isaksson, *Atmos. Environ.* **41**, 8486 (2007).
11. L. Pozzoli *et al.*, *J. Geophys. Res.* **113** (D7), D07308 (2008).
12. D. T. Shindell *et al.*, *Atmos. Chem. Phys.* **6**, 4427 (2006).
13. D. Krewski *et al.*, "Extended follow-up and spatial analysis of the American Cancer Society study linking particulate air pollution and mortality" (Health Effects Institute, Boston, 2009).
14. M. Jerrett *et al.*, *N. Engl. J. Med.* **360**, 1085 (2009).
15. R. Van Dingenen *et al.*, *Atmos. Environ.* **43**, 604 (2009).
16. V. Ramaswamy *et al.*, in *Climate Change 2001*, J. T. Houghton, Ed. (Cambridge Univ. Press, Cambridge, 2001), pp. 349–416.
17. O. Boucher, P. Friedlingstein, B. Collins, K. P. Shine, *Environ. Res. Lett.* **4**, 044007 (2009).
18. D. Shindell, G. Faluvegi, *Atmos. Chem. Phys.* **10**, 3247 (2010).
19. V. Ramanathan, Y. Xu, *Proc. Natl. Acad. Sci. U.S.A.* **107**, 8055 (2010).
20. United Nations Environment Programme and World Meteorological Organization, "Integrated Assessment of Black Carbon and Tropospheric Ozone" (Nairobi, 2011).
21. S. Sillman, *Atmos. Environ.* **33**, 1821 (1999).
22. D. Koch, A. Del Genio, *Atmos. Chem. Phys.* **10**, 7685 (2010).
23. S. E. Bauer, S. Menon, D. Koch, T. C. Bond, K. Tsigaridis, *Atmos. Chem. Phys.* **10**, 7439 (2010).
24. W. T. Chen, Y. H. Lee, P. J. Adams, A. Nenes, J. H. Seinfeld, *Geophys. Res. Lett.* **37**, L09801 (2010).
25. M. G. Flanner, C. S. Zender, J. T. Randerson, P. J. Rasch, *J. Geophys. Res.* **112** (D11), D11202 (2007).
26. D. Koch *et al.*, *J. Clim.* **22**, 2659 (2009).

27. Y. Qian, M. G. Flanner, L. R. Leung, W. Wang, *Atmos. Chem. Phys.* **11**, 1929 (2011).
28. M. Kopacz *et al.*, *Atmos. Chem. Phys.* **11**, 2837 (2011).
29. D. Shindell *et al.*, *J. Geophys. Res.* **115**, D19110 (2010).
30. G. A. Meehl, J. M. Arblaster, W. D. Collins, *J. Clim.* **21**, 2869 (2008).
31. C. Wang, D. Kim, A. M. L. Ekman, M. C. Barth, P. J. Rasch, *Geophys. Res. Lett.* **36**, L21704 (2009).
32. V. Ramanathan *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* **102**, 5326 (2005).
33. V. Ramanathan, G. Carmichael, *Nat. Geosci.* **1**, 221 (2008).
34. C. D. Mathers, D. Loncar, *PLoS Med.* **3**, e442 (2006).
35. J. S. Fuglestvedt *et al.*, *Atmos. Environ.* **44**, 4648 (2010).
36. R. S. J. Tol, *Economics: The Open-Access, Open-Assessment E-Journal* **2**, 1 (2008).
37. International Energy Agency, "Building the Cost Curves for the Industrial Sources of Non-CO2 Greenhouse Gases" (IEA Greenhouse Gas R&D Programme Cheltenham, UK, 2003).
38. L. Höglund-Isaksson, W. Winiwarter, A. Tohka, "Potentials and costs for mitigation of non-CO2 greenhouse gases in the European Union until 2030—Methodology" (IIASA Report, Laxenburg, Austria, 2010).
39. M. Amann *et al.*, *Environ. Model. Softw.* **26**, 1489 (2011).
40. J. J. West, A. M. Fiore, *Environ. Sci. Technol.* **39**, 4685 (2005).
41. www.globalmethanefund.org; accessed 23 May 2011.
42. J. Hansen *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* **103**, 14288 (2006).

**Acknowledgments:** Funding was provided by UNEP and the World Meteorological Organization (WMO), NASA's Applied Sciences and Atmospheric Chemistry Modeling and Analysis Programs, and the Clean Air Task Force to IIASA. We thank all the authors and reviewers who contributed to the UNEP/WMO Integrated Assessment of Black Carbon and Tropospheric Ozone.

**Supporting Online Material**
www.sciencemag.org/cgi/content/full/335/6065/183/DC1
Materials and Methods
Figs. S1 to S6
Tables S1 to S5
References

20 June 2011; accepted 28 November 2011
10.1126/science.1210026

# REPORTS

# Periodic Emission from the Gamma-Ray Binary 1FGL J1018.6–5856

The Fermi LAT Collaboration*

Gamma-ray binaries are stellar systems containing a neutron star or black hole, with gamma-ray emission produced by an interaction between the components. These systems are rare, even though binary evolution models predict dozens in our Galaxy. A search for gamma-ray binaries with the Fermi Large Area Telescope (LAT) shows that 1FGL J1018.6–5856 exhibits intensity and spectral modulation with a 16.6-day period. We identified a variable x-ray counterpart, which shows a sharp maximum coinciding with maximum gamma-ray emission, as well as an O6V((f)) star optical counterpart and a radio counterpart that is also apparently modulated on the orbital period. 1FGL J1018.6–5856 is thus a gamma-ray binary, and its detection suggests the presence of other fainter binaries in the Galaxy.

Two types of interacting binaries containing compact objects are expected to emit gamma rays [1]: microquasars—accreting black holes or neutron stars with relativistic jets [2]—and rotation-powered pulsars interacting with the wind of a binary companion [3]. Microquasars should typically be powerful x-ray sources when active, and hence such gamma ray–emitting systems may already be known as x-ray binaries. Indeed, the bright x-ray source Cygnus X-3 is now known to be such a source [4, 5]. The existence of pulsars interacting with stellar companions of early spectral types is predicted as an initial stage in the formation of high-mass x-ray binaries (HMXBs) containing neutron stars [3]. These interacting pulsars are predicted to be much weaker x-ray emitters and may not yet be known or classified x-ray sources. Gamma-ray binaries may thus not be as rare as they appear to be, and many systems may await detection.

A gamma-ray binary is expected to show orbitally modulated gamma-ray emission due to a combination of effects, including changes in viewing angle and, in eccentric orbits, the degree of the binary interaction, both of which depend on binary phase. Periodic gamma-ray modulation has indeed been seen in LS 5039 (period 3.9

days), LS I +61° 303 (26.5 days), and Cygnus X-3 (4.8 hours) [4, 7, 8], and gamma-ray emission is at least orbital phase–dependent for the PSR B1259+63 system (3.4 years) [9]. However, the putative gamma-ray binary HESS J0632+057, for which a 321-day x-ray period is seen, has not yet been shown to exhibit periodic gamma-ray emission [10]. PSR B1259–63 contains a pulsar, and LS 5039 and LS I +61° 303 are suspected, but not proved, to contain pulsars, whereas Cygnus X-3 is a black hole candidate. A search for periodic modulation of gamma-ray flux from LAT sources may thus lead to the detection of further gamma-ray binaries, potentially revealing the predicted HMXB precursor population. The first Fermi LAT [11] catalog of gamma-ray sources ("1FGL") contains 1451 sources [12], a large fraction of which do not have confirmed counterparts at other wavelengths and thus are potentially gamma-ray binaries.

To search for modulation, we used a weighted photon method to generate light curves for all 1FGL sources in the energy range 0.1 to 200 GeV [13]. We then calculated power spectra for all sources. From an examination of these, in addition to modulation from the known binaries LS I +61° 303 and LS 5039, we noted the presence of a strong signal near a period of 16.6 days from 1FGL J1018.6–5856 (Fig. 1). 1FGL J1018.6–5856 has a cataloged 1- to 100-GeV flux of $2.9 \times 10^{-8}$

photons cm$^{-2}$ s$^{-1}$, making it one of the brighter LAT sources. The source's location at right ascension (R.A.) = $10^h 18.7^m$, declination (decl.) = $-58° 56.30'$ (J2000; $\pm 1.8'$, 95% uncertainty) means that it lies close to the galactic plane ($b = -1.7°$), marking it as a good candidate for a binary system. 1FGL J1018.6–5856 has been noted to be positionally coincident with the supernova remnant G284.3–1.8 [12] and the TeV source HESS J1018–589 [14], although it has not been shown that these sources are actually related.

The modulation at a period of 16.6 days has a power more than 25 times the mean value of the power spectrum and has a false-alarm probability of $3 \times 10^{-8}$, taking into account the number of statistically independent frequency bins. From both the power spectrum itself [15] and from fitting the light curve, we derived a period of $16.58 \pm 0.02$ days. The folded light curve (Fig. 1) has a sharp peak together with additional broader modulation. We modeled this to determine the epoch of maximum flux $T_{max}$ by fitting a function consisting of the sum of a sine wave and a Gaussian function, and obtained $T_{max}$ = modified Julian date (MJD) $55403.3 \pm 0.4$.

The gamma-ray spectrum of 1FGL J1018.6–5856 shows substantial curvature through the LAT passband. To facilitate discussion of the lower-energy (<1 GeV) and higher-energy (>1 GeV) gamma rays, we adopted as our primary model a broken power law with photon indices $\Gamma_{0.1\ 1}$ and $\Gamma_{1\ 10}$ for energies below and above 1 GeV, respectively. The best-fit values [13] are $\Gamma_{0.1\ 1}$ = $2.00 \pm 0.04_{stat} \pm 0.08_{syst}$ and $\Gamma_{1\ 10}$ = $3.09 \pm 0.06_{stat} \pm 0.12_{syst}$, along with an integral energy flux above 100 MeV of $(2.8 \pm 0.1_{stat} \pm 0.3_{syst}) \times 10^{-10}$ erg cm$^{-2}$ s$^{-1}$. A power law with exponential cutoff [7, 8], $dN/dE \sim E^\Gamma \exp(-E/E_c)$, gives an acceptable fit with $\Gamma = 1.9 \pm 0.1$ and $E_c = 2.5 \pm 0.3$ GeV (statistical errors only). Although this spectral shape is qualitatively similar to that of pulsars and of LS I +61° 303 and LS 5039, so far no detection of pulsed gamma-ray emission has been reported [16].

To investigate variability on the 16.6-day period, we folded the data into 10 uniform bins in orbital phase and then refit the broken power-law parameters within each phase bin. The resulting

*All authors with their affiliations appear at the end of this paper.

**EMBARGOED UNTIL 2PM U.S. EASTERN TIME ON THE THURSDAY BEFORE THIS DATE:**

**NaturalGas**
EPA POLLUTION PREVENTER

# EPA Natural Gas STAR
# Program Accomplishments

## Introduction

Established in 1993, the Natural Gas STAR Program is a flexible, voluntary partnership that encourages oil and natural gas companies—both in the United States and internationally—to adopt proven, cost-effective technologies and practices that improve operational efficiency and reduce methane emissions. Given that methane is the primary component of natural gas and is a potent greenhouse gas—21 times more powerful than carbon dioxide ($CO_2$) in trapping heat in the atmosphere over a 100-year period—reducing methane emissions can result in environmental, economic, and operational benefits.

Natural Gas STAR partners have operations in all of the major industry sectors (production, gathering and processing, transmission, and distribution) that deliver natural gas to end users. Program partners represent 59 percent of the natural gas industry in the United States. Since the inception of the program, these domestic partners have eliminated more than 994 billion cubic feet (Bcf) of methane emissions by implementing approximately 150 cost-effective technologies and practices.

With the launch of Natural Gas STAR International in 2006, the Program has expanded to include companies worldwide, significantly increasing opportunities to reduce methane emissions from oil and natural gas operations. Natural Gas STAR International builds off of the framework of the Global Methane Initiative (GMI), an international public-private partnership that advances the cost-effective, voluntary recovery of methane for use as a clean energy source. To date, international partners have reduced methane emissions by 77.8 Bcf.

Today, Natural Gas STAR and Natural Gas STAR International together have more than 130 partner companies—14 of which are international partners. This document highlights the methane emissions reductions that both domestic and international partners have achieved, as well as the variety of technologies and practices they have implemented to reduce methane emissions.

## 2010: Ongoing Success in the U.S.

For calendar year 2010, nearly 80 percent of U.S. partners submitted an annual report detailing their efforts to reduce methane emissions from their operations. These voluntary activities consisted of nearly 100 technologies and practices and resulted in domestic emissions reductions of 94.1 Bcf for the year. These methane emissions reductions have cross-cutting benefits on domestic energy supply, industrial efficiency, revenue generation, and greenhouse gas emissions reductions. The 2010 voluntary domestic emission reductions are equivalent to:

- The additional revenue of more than $376 million in natural gas sales (assumes an average natural gas price of $4.00 per thousand cubic feet).
- The avoidance of 38.1 million tonnes $CO_2$ equivalent.
- The carbon sequestered annually by 8.1 million acres of pine or fir forests.
- The annual greenhouse gas emissions from nearly 7.3 million passenger vehicles.

**Domestic Natural Gas STAR Methane Emissions Reductions as of 2010**



**2010 Methane Emissions Reductions by Sector (94 Bcf)**





## Domestic Emissions Reductions by Sector

The following section illustrates the major sources of methane emissions from each industry sector and the technologies and practices implemented by partners to reduce emissions. The information showing the breakdown of emissions sources was taken from the *EPA Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2009*, dated April 2011, and the information showing Natural Gas STAR partner activities was taken from partner reports and Natural Gas STAR historical data. The following diagram shows some of the top methane emission reduction opportunities for each sector:



**Oil Production**
- Install VRUs on crude oil storage tanks
- Route casinghead gas to VRU or compressor for recovery & use or sale

**Gas Production & Processing**
- Perform reduced emissions completions
- Install plunger lifts
- Aerial leak detection using laser and/or infrared technology
- Eliminate unnecessary equipment and/or systems

**Gas Transmission**
- DI&M at compressor stations
- Use fixed/portable compressors for pipeline pumpdown
- Install VRUs on pipeline liquid/condensate tanks

**Gas Storage**
- Convert gas pneumatic controls to instrument air
- Replace bi-directional orifice metering with ultrasonic meters
- Reduce methane emissions from compressor rod packing systems

**Gas Distribution**
- DI&M at surface facilities
- Identify and replace high-bleed pneumatic devices
- Survey and repair leaks

Picture courtesy of American Gas Association.

### Capacity Building

Many methane emission reduction technologies and practices promoted by Natural Gas STAR have become widely implemented as a result of Program events and resources which allow partners to share their experiences across the industry. This outreach and partner exchange occurs through the development of technical documents and articles, tools, Program sponsored workshops, meetings and study tours. Noteworthy events in 2010 included:

- The 17th Annual Implementation Workshop was held in conjunction with the GMI Oil & Gas Subcommittee meeting during November 1-3, 2010. This unique event included a tour of nearby oil and natural gas operations and technical sessions. It also provided an opportunity for attendees to learn how Natural Gas STAR and GMI work collaboratively to encourage implementation of projects that reduce methane emissions and enhance operational efficiency and safety on a global scale. More information on this and other workshop events can be found at epa.gov/gasstar/workshops/index.html.

- Natural Gas STAR and GMI hosted a Study Tour pairing three Natural Gas STAR International Partners with their U.S.-based peers to visit facilities and exchange ideas for accelerating project implementation and methane capture and use. Specifically, representatives of ONGC, Gazprom, ENAP Sipetrol, Chevron, Occidental Oil and Gas, and ConocoPhillips travelled through West Texas and New Mexico to visit sites where specific methane emissions reduction projects were successfully implemented. Observed projects included vapor recovery units, plunger lifts, and reduced emission completions.

More information on these and all Natural Gas STAR sponsored events can be found at epa.gov/gasstar/workshops/index.html.



## Production Sector Accomplishments

### 2009 Production Sector Methane Emissions (397 Bcf)



**Source:** *EPA Inventory of U.S. Greenhouse Emissions and Sinks: 1990 – 2009,* April 2011.

Available at:
epa.gov/climatechange/emissions/usinventoryreport.html.

Production sector partners reported 73.1 Bcf of methane emissions reductions in 2010—and a total of 684.7 Bcf since 1990. The top technologies and practices employed by production sector partners are displayed in the charts below.



**Top Technologies in 2010**
Total Sector Reductions in 2010 = 73.1 Bcf



**Top Technologies Since 1990**
Cumulative Sector Reductions = 684.7 Bcf





## Gathering and Processing Sector Accomplishments

### 2009 Gathering and Processing Sector Methane Emissions (44 Bcf)



Other Sources **1 Bcf**

Dehydrators and Pumps **1 Bcf**

Plant Fugitives **2 Bcf**

Blowdowns **2 Bcf**

**Source:** *EPA Inventory of U.S. Greenhouse Emissions and Sinks: 1990 – 2009*, April 2011.

Available at:

epa.gov/climatechange/emissions/usinventoryreport.html.

Gathering and processing sector partners reported 6 Bcf of methane emissions reductions in 2010—and a total of 45.3 Bcf since 1990. The top technologies and practices employed by gathering and processing sector partners are displayed in the charts below.





**Top Technologies in 2010**
Total Sector Reductions in 2010 = 6.0 Bcf

- D&M at compressor stations
- Redesign blowdown/alter ESD practices
- Improve measurement systems to track gas loss
- D&M at gas plants and booster stations
- D&M: aerial leak detection using laser and/or infrared technology
- Install flash tank separators on glycol dehydrators
- Eliminate unnecessary equipment and/or systems
- Other



**Top Technologies Since 1990**
Cumulative Sector Reductions = 45.3 Bcf

- D&M: aerial leak detection using laser and/or infrared technology
- Optimize nitrogen rejection unit to reduce methane in N₂ reject stream
- Eliminate unnecessary equipment and/or systems
- Redesign blowdown/alter ESD practices
- D&M: leak detection using IR camera/optical imaging
- D&M at gas plants and booster stations
- Improve measurement systems to track gas loss
- Other




## Transmission Sector Accomplishments

### 2009 Transmission Sector Methane Emissions (110 Bcf)



**Source:** *EPA Inventory of U.S. Greenhouse Emissions and Sinks: 1990 – 2009*, April 2011.

Available at:

epa.gov/climatechange/emissions/usinventoryreport.html.

Transmission sector partners reported 13.3 Bcf of methane emissions reductions in 2010—and a total of 232.8 Bcf since 1993. The top technologies and practices employed by transmission sector partners are displayed in the charts below.



Top Technologies in 2010
Total Sector Reductions in 2010 = 13.3 Bcf



Top Technologies Since 1993
Cumulative Sector Reductions = 232.8 Bcf




## Distribution Sector Accomplishments

### 2009 Distribution Sector Methane Emissions (72 Bcf)



**Source:** *EPA Inventory of U.S. Greenhouse Emissions and Sinks: 1990 – 2009,* April 2011.

Available at:

epa.gov/climatechange/emissions/usinventoryreport.html.

Distribution sector partners reported 2.6 Bcf of methane emissions reductions in 2010—and a total of 43.7 Bcf since 1993. The top technologies and practices employed by distribution sector partners are displayed in the charts below.





 

## Natural Gas STAR International

In addition to the success reported under the domestic Program, progress is also being made in reducing global methane emissions through Natural Gas STAR International. International partners reported 6.8 Bcf in methane emissions reductions for a total of 77.8 Bcf since the inception of Natural Gas STAR International Program. To date, international partners have undertaken methane emission reduction activities in Argentina, Brazil, Canada, Equatorial Guinea, India, and Nigeria. For 2010, these companies reported methane emissions reductions from the implementation of 34 technologies and practices.

The 2010 voluntary international methane emissions reductions are equivalent to:

- The additional revenue of more than $27 million in natural gas sales (assumes an average natural gas price of $4.00 per thousand cubic feet).
- The avoidance of 2.7 million tonnes $CO_2$ equivalent.
- The carbon sequestered annually by nearly 586,000 acres of pine or fir forests.
- The annual greenhouse gas emissions from more than 525,000 passenger vehicles.

**Natural Gas STAR International Methane Emissions Reductions as of 2010**



### New Tools and Resources

**New Look for the Global Methane Initiative (globalmethane.org/participate/index.aspx)**

The GMI has a new look. Building on the momentum surrounding the recent GMI (formerly the Methane to Markets Partnership) launch, the Administrative Support Group unveiled a new "look" to brand and unify GMI's website and materials. The new logo features the methane flame and sun rays, representing a new beginning for the program as well as methane's far-reaching potential for global change.

**New Tools Help Partners Measure Fugitive Methane Emissions**

Natural Gas STAR's technical guidance has assisted many partners in the purchase of equipment to measure methane emissions from their operations. Specifically, the equipment is being used by internal teams to assess leaks in order to evaluate and adopt cost-effective technologies and practices to reduce methane emissions. Partners have reported purchasing equipment such as infrared cameras, flue gas analyzers, natural gas flow measurement systems, and probe leak detectors.

Draft MS-1794 – Regional Mitigation, (P)

i

# Table of Contents

1.1 Purpose ........................................................................................................... 1

1.2 Objective ...................................................................................................... 1

1.3 Authority ...................................................................................................... 1

1.4 Responsibilities ........................................................................................... 2

1.5 References .................................................................................................... 2

1.6 Policy ........................................................................................................... 2

    A.    General ................................................................................................... 3

    B.    Regional Mitigation Strategies ............................................................ 3

    1.    General ................................................................................................... 3

    2.    Regional Mitigation Strategies ............................................................ 4

    C.    Regional Mitigation Planning ............................................................. 4

    D.    Mitigation Implementation – Identifying and Implementing Appropriate Mitigation for Specific Land Use Authorizations ............................................ 5

    1.    Types of Mitigation .............................................................................. 5

    2.    Mitigation as a Project Condition ....................................................... 5

    3.    Mitigating Onsite vs. Mitigating Outside the Area of Impact ............ 6

    4.    Mitigation Priority Order ..................................................................... 6

    5.    Mitigation on Federal and Non-Federal Lands ................................... 6

    6.    Non-BLM Impacts - Mitigated on BLM-managed Lands .................. 7

    7.    Determining Whether Mitigation Outside the Area of Impact is Appropriate ............ 7

    8.    Identifying Levels of Acceptable and Unacceptable Impacts ............ 7

    9.    Direct Benefit to the Resource, Not Another Authorized Resource User ............ 8

    10. Types of Mitigation:  In-kind and Out-of-kind ................................. 9

    11. Considering the Degree of Impact and the Importance of the Affected Resource ........ 10

    12. Long-term Durability ......................................................................... 11

    13. Phasing-in Mitigation ........................................................................ 12

    14. Mitigating Post-Approval, but Prior to Development ....................... 12

    15. Quality and Quantity ......................................................................... 12

    16. Co-Benefits or Layering Mitigation .................................................. 13

    17. Identifying Mitigation through the NEPA Analysis and Decision Process ............ 13

    18. Managing Mitigation Outside the Area of Impact ............................ 16

    19. Types of Contributions ...................................................................... 17

    20. The BLM's Acceptance of Monetary Contributions ......................... 17

    21. Financial Contribution Agreements ................................................... 19

Draft MS-1794 – Regional Mitigation, (P)

ii

22. The Role of Agency Cooperators. ............................................................. 19

23. Non-Federal Parties Managing Mitigation on Non-Federal Lands ........................... 19

E. The BLM's Mitigation Authority. ........................................................... 20

1.7 File and Records Maintenance ............................................................... 21

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-1

**1.1 Purpose.** This **[DRAFT]** manual section provides policies, procedures, and instructions for:

A. **Regional Mitigation Strategies.** Developing strategies that identify and facilitate mitigation opportunities at the regional scale, including mitigation opportunities on both BLM-managed public lands and non-BLM-managed lands (other Federal lands, as well as Tribal, State, and private lands);

B. **Regional Mitigation Planning.** Using the land use planning process to identify potential mitigation sites and measures (e.g., land treatments, infrastructure modification or removal) on BLM-managed lands at a regional level (including by considering and potentially incorporating any Regional Mitigation Strategies); and

C. **Mitigation Implementation.** Identifying and implementing appropriate mitigation within (onsite) or outside the area of impact for particular land-use authorizations.

This manual does not apply to authorizations under 43 CFR subparts 3809 or 3715.

**1.2 Objective.** The objectives of this policy are to provide guidance to the BLM on how to (1) develop Regional Mitigation Strategies, (2) incorporate regional mitigation into the land use planning process, and (3) identify and implement appropriate mitigation measures for particular land-use authorizations.

**1.3 Authority.** Principal authorities relating to development of Regional Mitigation Strategies, mitigation planning, and mitigation implementation are:

A. **The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. 1701 et seq.**

B. **National Environmental Policy Act (NEPA) of 1969, 42 U.S.C. 4321 et seq.**

C. **Mineral Leasing Act of 1920, as amended, 30 U.S.C. 181 et seq.**

D. **Endangered Species Act, 7 U.S.C. 136, 16 U.S.C. 1531 et seq.**

E. **The Wyden Amendment, 16 U.S.C. 1011.**

F. **Council on Environmental Quality (CEQ) Regulations, 40 CFR 1500-1508.**

G. **Department of the Interior (DOI) NEPA Regulations, 43 CFR Part 46.**

H. **Bureau of Land Management Planning Regulations, 43 CFR Part 1600.**

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-2

**1.4 Responsibilities.**

**A.  It is the responsibility of the Bureau of Land Management (BLM) Director to:**

   1.  Establish policies, procedures, and instruction for the use of mitigation.

**B.  It is the responsibility of the State Directors to:**

   1.  Implement national policy and provide statewide program coordination and guidance for the use of regional mitigation.

   2.  Provide program development, technical management assistance, and support to district and field offices as required for considering the use of regional mitigation.

   3.  Process mitigation monies in accordance with applicable law.

**C.  It is the responsibility of the District Managers and Field Managers to**:

   1.  Implement national policy.

   2.  Consider and analyze potential mitigation opportunities through the NEPA process.

   3.  Monitor the use of mitigation and make adaptive changes as necessary.

**1.5 References.**  Principal references for this guidance are:

**A.  FLPMA, 43 U.S.C. 1701 *et seq.***

**B.  NEPA, 42 U.S.C. 4321 *et seq.***

**C.  MLA of 1920, as amended, 30 U.S.C. 181 et seq.**

**D.  ESA, 7 U.S.C. 136, 16 U.S.C. 1531 et seq.**

**E.  The Wyden Amendment, 16 U.S.C. 1011.**

**F.  CEQ Regulations, 40 CFR 1500-1508.**

**G.  DOI NEPA Regulations, 43 CFR Part 46.**

**H.  BLM Land Management Planning Regulations, 43 CFR Part 1600.**

**I.  BLM Handbook H-1601-1, *Land Use Planning*.**

**1.6 Policy.**

DRAFT

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-3

**A. General.**

Regional mitigation is a landscape-scale approach to mitigating impacts to resources and values managed by the BLM, from authorizations approved by the BLM in order to provide for sustained yield of resources on the Public Lands. This regional approach involves anticipating future mitigation needs and strategically identifying mitigation sites and measures that can help the BLM achieve its resource and value objectives. The BLM may accomplish this through the development of regional mitigation strategies, land use planning, and implementation decisions. A regional approach to mitigation occurs across the landscape and focuses on attaining the highest mitigation benefit, regardless of land ownership. A regional mitigation approach also shifts the BLM's mitigation focus from a permit-by-permit perspective to a proactive regional-scale mitigation planning perspective. This regional-scale planning perspective will enhance the BLM's ability to mitigate resource impacts; increase permitting efficiencies; and provide greater certainty to permit applicants, partners, stakeholders, and the public.

**B. Regional Mitigation Strategies.**

1. <u>General</u>. The BLM will endeavor to take a regional (i.e. landscape-level) approach to identifying potential mitigation opportunities (including sites and measures) to promote sustained yield of resources on BLM-managed lands. This approach will enhance and streamline the BLM's consideration of appropriate project-specific mitigation measures (e.g., land treatments, infrastructure removal). The BLM will incorporate this approach using the tools identified in parts B.2, and C of this manual, and such an approach should:

   a. Anticipate future mitigation needs and identify potential sites that could benefit from mitigation projects and measures;

   b. Prioritize potential mitigation sites and measures that have the potential for multiple, landscape-scale benefits;

   c. Consider evaluating potential mitigation opportunities on both BLM and non-BLM-managed lands;

   d. Identify mitigation sites and measures that will be effective and durable over time;

   e. Utilize high quality, scientific information when considering potential mitigation sites, projects, and measures, including science-based studies and methodologies where available (e.g., the BLM's Rapid Eco-regional Assessments or the Western Governors' Association Crucial Habitat Assessment Tool); and

   f. Consider sites where impacts to several resources or values can be mitigated at one location.

DRAFT

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-4

2. <u>Regional Mitigation Strategies</u>.  Where the BLM anticipates large-scale development projects, regional mitigation strategies can be an effective tool for preliminarily studying and allowing public input on regional mitigation opportunities.

Regional Mitigation Strategies can help to:

    a.  Increase permitting efficiency and financial predictability for applicants by studying potential mitigation needs and opportunities on both BLM and non-BLM-managed lands, which can help to inform subsequent land-use authorization or planning decisions; and

    b.  Enhance the ability of Federal and State governments, tribes, nongovernmental organizations, and resource users to invest in larger scale mitigation efforts through prioritization of investments and pooling of financial resources.

Regional Mitigation Strategies are not decisions, but are instead assessments or studies that can inform subsequent BLM planning and implementation decisions.  For that reason, the BLM can develop Regional Mitigation Strategies outside of the NEPA and planning processes.  The BLM can also combine its development of a Regional Mitigation Strategy with a land use planning process (see section C below).

Regional Mitigation Strategies should include:

    a.  A transparent stakeholder engagement process;

    b.  A description of regional baseline conditions against which unavoidable impacts are assessed;

    c.  A discussion of potential regional mitigation objectives;

    d.  An evaluation of appropriate mitigation sites, projects and/or measures;

    e.  A discussion of potential methods for calculating mitigation fees for unavoidable adverse impacts that warrant mitigation;

    f.  A discussion of a potential structure to hold and apply mitigation investment funds; and

    g.  An evaluation of appropriate long-term monitoring and adaptive management to evaluate and maximize the effectiveness of mitigation projects and measures.

C. **Regional Mitigation Planning.**  The BLM may use the land use planning process to identify potential mitigation sites and measures on BLM-managed lands.  When addressing regional mitigation opportunities through the land use planning process, the BLM should:

    a.  Describe regional baseline conditions against which unavoidable impacts are assessed;

DRAFT

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-5

    b.   Establish and prioritize regional mitigation objectives for the planning area;

    c.   Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and

    d.   Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

**D.  Mitigation Implementation – Identifying and Implementing Appropriate Mitigation for Specific Land Use Authorizations**

<u>General</u>.  The BLM cannot always mitigate the direct and indirect impacts from land-use authorizations to an acceptable level at the location of the impacts (onsite mitigation).  To achieve and sustain BLM resource and value objectives, it may be appropriate to compensate for the direct and indirect impacts of a BLM authorization by conditioning that authorization on the performance of mitigation outside the area of impact.  Mitigation outside the area of impact occurs by replacing or providing similar or substitute resources or values through restoration, enhancement, creation, or preservation.  The BLM's policy is to consider mitigation outside the area of impact when it is not feasible or practical to mitigate impacts to an acceptable level in the same area as the use-authorization.

1.   <u>Types of Mitigation</u>.  When a resource or value will be degraded or lost due to a land-use authorization, the BLM may need to consider whether restoration, enhancement, creation, and/or preservation outside the area of impact, may be appropriate.  Restoration, enhancement, creation, or preservation each has advantages and disadvantages and the value of each will vary based on many factors.

    a.   Restoration is the re-establishment or rehabilitation of resources or values with the goal of returning natural or historic functions and characteristics.

    b.   Creation is the development of a resource or value through manipulation of the physical, chemical, and/or biological characteristics of the site where the resource or value did not previously exist.

    c.   Enhancement is the heightening, intensifying, or improving of one or more resources or values.

    d.   Preservation is the permanent or long-term protection of important resources or values through the implementation of appropriate legal and physical mechanisms (i.e., conservation easements, title transfers, or land use plan decisions).  This includes the reduction or exclusion of incompatible uses.

2.   <u>Mitigation as a Project Condition.</u>  When conditioning a BLM authorization on the performance of mitigation outside the area of impact, the BLM should identify a reasonable relationship between the resources and values affected by the authorization

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-6

and the resources and values benefitted by the mitigation.  This relationship and the benefit to the resources and values that will be impacted must be clear in the NEPA document analyzing the land-use authorization.

The BLM may expressly condition its approval of the land-use authorization on an applicant's commitment to perform or cover the costs of mitigation, both onsite and outside the area of impact.

3. <u>Mitigating Onsite vs. Mitigating Outside the Area of Impact</u>.  Consistent with the CEQ's definition of "mitigation" (40 CFR 1508.20) and requirement to consider appropriate mitigation for identified impacts (40 CFR 1502.14(f)), BLM policy is to place a priority on mitigating impacts to an acceptable level onsite, to the extent practical, through avoidance, minimization, rectification, or reduction of impacts over time.  There are times when onsite mitigation alone may not be sufficient to adequately mitigate impacts and achieve BLM resource and value objectives.  In these cases, it may be appropriate to consider mitigation outside the area of impact (e.g., compensating for the impact) to achieve BLM resource and value objectives.

4. <u>Mitigation Priority Order</u>.  The priority order for mitigating resource impacts is to 1) avoid, 2) minimize, 3) rectify, or 4) reduce the impact over time, and if necessary, 5) mitigate outside the area of impact, preferably at regionally selected mitigation sites.  However, in some cases, mitigation sites near where the resource or value impact is occurring (but still outside the area of impact), will be the most appropriate location for performing mitigation activities.

Example - Local:  Some local populations of wildlife or special status plants may be dependent on the maintenance of sustainable population numbers; therefore, those locally affected populations should receive the direct benefit of mitigation outside the area of impact rather than populations farther away, or in other regions.

Example - Local:  If impacts from a land-use authorization occur in land that is legally designated for conservation purposes by a presidential proclamation or congressional action (e.g., National Landscape Conservation System (NLCS) units), it may be the most appropriate for mitigation to occur in the affected conservation area.

Example - Regional:  Focusing sage-grouse habitat improvement projects within core/priority habitat areas and genetic connectivity corridors, even though they may not be adjacent to the project impact.

5. <u>Mitigation on Federal and Non-Federal Lands</u>.  Mitigation sites, projects, and measures should be focused where the impacts of the use authorization can be best mitigated and BLM can achieve the most benefit to its resource and value objectives, regardless of land ownership.  The most appropriate area for mitigation projects may be on Federal lands (the BLM or another agency) or on non-Federal lands.

DRAFT

Example:  A proposed development project on BLM-managed land will directly impact habitat for a sensitive species, yet the best opportunity to create, enhance, restore, and/or preserve habitat for the same sensitive species is on nearby private lands.  In this case, the purchase of a conservation easement on private lands could provide long-term habitat protection.

The BLM should ensure adequate management, protection, and monitoring of the mitigation during the expected lifetime of the development project and its associated impacts.  For management of mitigation on non-BLM-managed lands, the BLM must obtain written assurances from the relevant land management agency or surface owner and the authorization holder that mitigation conducted on those lands is agreed to and will receive adequate management, protection, and site access for monitoring during the expected lifetime of the land-use authorization and its associated impacts.  These assurances should be in the form of enforceable, binding agreements between private parties and the BLM or similarly detailed commitments (e.g., memoranda of understanding, cooperative agreements) between the Federal agencies and the BLM.

6.  <u>Non-BLM Impacts - Mitigated on BLM-managed Lands</u>.  Consistent with a regional approach, mitigation projects may also occur on BLM-managed lands, when the site of the impact is located on lands not managed by the BLM.  The BLM may authorize these mitigation projects and measures through a land-use authorization, which may include a cooperative agreement.  The non-BLM surface owner or project proponent will be responsible for conducting the mitigation on the BLM-managed lands.  In accordance with applicable law, the BLM may collect cost recovery for processing the authorizations and monitoring compliance with the agreements.

Example:  Incorporating BLM-managed lands into Endangered Species Act Habitat Conservation Plans or Clean Water Act Mitigation Banks, which are created to mitigate impacts to endangered species or waterways on non-BLM-managed land.

7.  <u>Determining Whether Mitigation Outside the Area of Impact is Appropriate</u>.  Mitigation outside the area of impact may be an appropriate consideration for the BLM when:

a.  It is expected that the direct and indirect impacts of the proposal would not be mitigated to an acceptable level onsite; and

b.  Mitigation outside the area of impact can successfully mitigate the remaining unavoidable impacts (i.e., those not mitigated onsite) to an acceptable level.

Mitigation outside the area of impact may also be an appropriate consideration for the BLM when other land management agencies or landowners identify indirect impacts to lands they own and/or manage from a project on BLM-managed lands and the impacts cannot be adequately mitigated onsite.

8.  <u>Identifying Levels of Acceptable and Unacceptable Impacts</u>.  Although appropriate mitigation must be considered (see 40 CFR 1502.14(f)), not all adverse or unavoidable

impacts can or must be fully mitigated, either onsite or outside the area of impact.  A certain level of adverse or unavoidable impact may be acceptable, and the BLM will identify these impacts during the NEPA analysis and acknowledge them in the decision document (such as a Decision Record or Record of Decision).

Adverse or unavoidable impacts may be acceptable when an appropriate level of mitigation will be conducted onsite, and the remaining:

    a.  Impacts to soil or vegetation resources would not result in unnecessary or undue degradation, violate land use plan resource and value objectives, or lead to a violation of applicable laws, such as the Clean Water Act;

    b.  Impacts to wildlife will not exceed established resource and value objectives for species identified as BLM-sensitive species or Endangered Species Act listed species;

    c.  Noise levels will not violate local, State, or land use plan noise standards; and

    d.  Impacts to air quality from emissions or dust would not contribute to violations of the National Ambient Air Quality Standards or air quality related values (e.g., visibility) for Class I designated areas as defined by the Clean Air Act.

However, under the provisions of Section 302 of FLPMA, the BLM may not authorize a proposed use that would result in unnecessary or undue degradation onsite even if mitigation conducted outside the area of impact could potentially reduce the impacts of that proposed use (see: §1.6(F)(2)).

There may be instances when impacts to BLM resource and value objectives are unavoidable and cannot be adequately mitigated, either onsite or outside the area of impact.  If the applicant cannot adequately mitigate impacts from the project, and the BLM is, therefore, unable to achieve its resource and value objectives, then the BLM may deny the land-use authorization in the decision document.

9.  <u>Direct Benefit to the Resource, Not Another Authorized Resource User</u>.  Mitigation should be designed with the focus on the benefits to the resources impacted; the BLM should not design mitigation measures with the primary intent of providing direct benefits to other authorized uses or users of a resource that may be adversely affected by the action.

    Example:  An energy company conducting an activity that removes a large amount of vegetation would not compensate a grazing permit holder for loss of the use of the vegetation.  However, the company may partially or fully mitigate for the loss of vegetation onsite by conducting interim and final reclamation of the site.  In this example, the BLM may need to adjust the grazing use to reflect the loss of vegetation until the vegetation returns to pre-disturbance levels.  Note, the BLM or applicant may be required to compensate the permittee/lessee for loss of authorized permanent range improvements.

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-9

10. <u>Types of Mitigation:  In-kind and Out-of-kind</u>.  "In-kind" mitigation is generally preferred to "out-of-kind," although there may be exceptions, depending on circumstances.

    a.  In-kind.  In-kind mitigation is the replacement or substitution of resources or values that are of the same type and kind as those impacted.

        Example:  For every acre of new, long-term surface disturbance in suitable sage-grouse nesting/early brood-rearing habitat in Area (A), the applicant agrees to reclaim, treat, or plant sagebrush in (X) acres of unsuitable habitat in Area (B) to create new or suitable nesting/early brood-rearing sage-grouse habitat, or purchase nearby land or obtain a conservation easement to protect (Y) acres of suitable nesting/early brood-rearing sage-grouse habitat.  In these examples, the habitat type that is impacted is the same as the habitat type created over time or protected.

        Example:  For every mile of new transmission lines that will be constructed in suitable sage-grouse habitat in Area (A), the applicant agrees to bury (X) miles of older, existing distribution power lines; or remove old, abandoned power poles and lines so they cannot be used as hunting perches by raptors in Area (B).  These are actions that could compensate for impacts to sage-grouse from the addition of the new powerlines in Area (A).

    b.  Out-of-kind:  Out-of-kind is the replacement or substitution of resources or values that are not the same type and kind as those impacted, but are related or similar.

        Example:  For every acre of new, long-term surface disturbance in suitable sage-grouse winter habitat in Area (A), (X) acres of nesting/early brood-rearing sage-grouse habitat is reclaimed, treated, or conserved in Area (B).  In this example, winter habitat is lost, but new nesting habitat is enhanced or conserved.  The sage-grouse habitat types are not the same, but are related in that they both are needed by sage-grouse.

        Example:  An operator proposes to drill an oil and gas well along a BLM backcountry byway designated for its high scenic and archaeological values.  The proximity of the drilling and oil and gas production will impact the backcountry byway's scenic values, but not the archaeological values.  While proposing Best Management Practices to minimize onsite impacts to the scenic values, the applicant also agrees to construct a wayside pullout with interpretive signs at the petroglyph archaeological site 4 miles farther down the byway.

DRAFT

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-10

11. <u>Considering the Degree of Impact and the Importance of the Affected Resource</u>.

    a.  General.  When considering the use of mitigation, it is important to weigh the degree to which a resource or value is affected and the relative importance of the affected resource or value.

    b.  The Degree of Impact.  Mitigation outside the area of impact may be appropriate if the degree of impact will limit the BLM's ability to achieve its sustained-yield resource and value objectives through onsite mitigation alone.

        Example:  Mitigation outside the area of impact may be appropriate for addressing impacts from large development projects that have substantial undesirable cumulative effects that cannot be sufficiently mitigated onsite. These projects may include:

            i.   Oil, gas, or geothermal fields, or individual wells that will constitute a large field and associated rights-of-way;
            ii.  Major road, electric transmission, or pipeline rights-of-way projects;
            iii.  Wind, solar, or hydropower development;
            iv.  Mining operations (other than locatable minerals); and
            v.   Land disposals.

        Example:  Mitigation outside the area of impact may be appropriate where a proposed project's impacts are of such a magnitude as to prevent the BLM from meeting its habitat condition objectives (identified in the land use plan) in an important part of a priority species' range through onsite mitigation alone.

        Example:  Mitigation outside the area of impact may be appropriate for smaller-scope development projects when they will be part of a larger-scope proposed use or project, such as a planned gas field.

        Example:  Mitigation outside the area of impact may not be appropriate for resource use or development projects when onsite mitigation is sufficient or when authorizing new, small-scale proposals that do not have an individual or cumulative impact on resources of concern.

            i.   Grazing (levels of use or management would be adjusted to achieve an acceptable level of impact onsite);
            ii.  Short-term events or activities that require Special Recreation Permits (rarely large, substantially displacing, or having long-term impact);
            iii.  Minor rights-of-way (generally small in size, isolated); or
            iv.  Small mining operations (generally small and isolated).  (Note that the mitigation policy in this manual does not apply to authorizations under 43 CFR subparts 3809 or 3715.)

    c.   The Relative Importance of the Affected Resource.  Some resources, values, and/or areas can be viewed as having higher value than others and may make a land-use authorization's impacts unacceptable.  This can be based on multiple factors such as:

        i.   The legal or policy status of the resource.  For example, land that is legally designated for conservation purposes by a presidential proclamation or a congressional action are considered to be of high importance, as are "BLM sensitive species" identified by BLM policy.  Special land designations include, among others, the units of the NLCS (National Monuments, National Conservation Areas, Wilderness Areas, Wilderness Study Areas, Wild and Scenic Rivers, and National Scenic and Historic Trails);

        ii.   The value placed on the resource in the land use plan.  For example, the BLM often designates Areas of Critical Environmental Concern (ACEC) in land use plans due to their important resources; Visual Resource Management Class II has a higher level of importance than Class III; and acre-per-acre, the BLM generally considers riparian areas to be more ecologically important than uplands, depending on the resource scarcity and values;

        iii.   The rarity of the resource.  For example, BLM-sensitive species or candidate species under the Endangered Species Act.  Their habitat may be important on a range-wide and inter-regional basis as well as having local importance; and

        iv.   The scientifically determined resilience, or lack thereof, of the resource in the face of changing conditions and impacts, such as development, changing climate, fire, and invasive species.  For example, some animal species may acclimate fairly well to certain levels or types of development, while other species may decrease in population or temporarily or permanently abandon the area.

12.  <u>Long-term Durability</u>.  The BLM should ensure that mitigation conducted outside the area of impact will, at a minimum, be effective for as long as the land-use authorization affects the resources and values.  This would include the time it takes to appropriately restore the affected onsite resources and values after the expiration of the land-use authorization.  The land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects.  The durability of particular mitigation measures depends in part on the location of the mitigation measures, the land status and ownership of the lands in that location (i.e., private, State, or Federal) and the particular legal regime governing those lands.

        Example:  A priority for habitat protection or enhancement efforts would be an area protected from future disturbance.  An area with valid existing leases or permits may benefit from mitigation, but may not provide opportunity for

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-12

long-term protection.  The land use plan may be the most effective tool for protecting important mitigation sites from future impacts.

Example:  If onsite impacts will be long-term or permanent, such as for the development of an oil and gas field; wind farm; or the construction of a high use, permanent road; then the mitigation should also be effective for the life of that project, long-term or permanent.  This would also include the time it takes to complete final reclamation and the restoration of lost resources or values.

13. <u>Phasing-in Mitigation</u>.  It may be appropriate to compensate for the expected slow decline in an onsite resource or value by restoring or improving lands outside the area of impact over a period of several years.  This phased-in mitigation may be appropriate where the onsite resource is important, but is not a critical or protected resource or value or is not critical to the overall functioning of that resource or value in the local area or region.

There may also be times when an applicant phases in a construction project over time, such as for a transmission line.  In such cases, it may be appropriate to phase-in mitigation over time, as well.

14. <u>Mitigating Post-Approval, but Prior to Development</u>.  It may be appropriate to compensate for the impacts of a land-use authorization in advance of those impacts occurring (but after approval of the land-use authorization).  This may be necessary where any impacts would have an immediate and substantial negative impact on the achievement of BLM resource and value objectives.  In these cases, the use-authorization may need to require implementation of the mitigation prior to beginning the authorized land use.

Example:  The BLM predicts that an energy development or transmission project may affect a remnant population of sage-grouse.  To maintain the viability of the population as a whole, it may be necessary, prior to initiating the project, to take actions to:

    i.   Reduce or eliminate existing causes of direct mortality (e.g., fence collisions, predation); or
    ii.  Implement habitat improvement measures that will increase population numbers elsewhere in the population range and achieve certain specified objectives.

15. <u>Quality and Quantity</u>.  One acre of mitigation outside the area of impact may not necessarily be sufficient to compensate for one acre of direct onsite surface impact.  The BLM will identify mitigation ratios through the NEPA process.  Mitigation must be roughly proportional to the impact caused by the regulated activity and reasonably related to the impact.

Example:  An acre of surface disturbance for a new road and its associated short- and long-term use may result in impacts such as wildlife avoidance,

DRAFT

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-13

direct mortality, and resulting habitat fragmentation over larger areas. It may be necessary to improve multiple acres of existing habitat at another location in order to compensate for the 1 acre of new surface disturbance (e.g., 1:3, where 1 acre of new surface disturbance equates to 3 acres of restoration).

Example: It may take multiple years for the mitigation to become fully effective. In these cases, it may be appropriate to increase the mitigation ratio to account for this delay (e.g., 1:2 becomes 1:3).

Example: An increased mitigation ratio may also be necessary for land-use authorizations in the NLCS due to its conservation, protection, and restoration mission (P. L. 111-11 § 2002).

16. <u>Co-Benefits or Layering Mitigation</u>. To increase efficiency and avoid duplicating mitigation efforts, consider how mitigation for one resource or value may also have the co-benefit of mitigating for other resources or values. Consider, as a part of the selection criteria, sites where impacts to several resources or values can be mitigated at one location outside the area of impact.

Example: Mitigating a loss of habitat at a solar energy site by closing and reclaiming old roads at another location may also have the co-benefit of mitigating a loss of scenic quality at the solar project site.

Example: A proposed project may warrant mitigation for impacts to three resources, such as sage-grouse habitat, a protected setting associated with a National Historic Trail, and a scarce visual resource. Selecting one mutually beneficial site to mitigate all three resources may reduce the overall cost and increase the value of the mitigation investment, provided the objectives for all affected resources are met.

17. <u>Identifying Mitigation through the NEPA Analysis and Decision Process</u>**.**

   a. General. The BLM will consider and analyze proposals for mitigation through the NEPA process. The BLM may condition approval of a project on the applicant's commitment to address avoidable impacts through onsite mitigation and unavoidable impacts through mitigation conducted outside the area of impact (e.g., at a regionally selected mitigation site). In deciding whether to authorize the land use, the BLM will consider the potential effectiveness of both the onsite mitigation and the proposed mitigation outside the area of impact (see: §1.6(D)). Considerations may include, but are not limited to, the mitigation's benefit in the local and regional context.

   Prior to initiating the NEPA process, the BLM and the applicant should discuss onsite mitigation and, if appropriate, options for conducting mitigation outside the area of impact. For BLM-initiated actions, the BLM will determine whether mitigation outside the area of impact is appropriate and will design the mitigation into the project proposal. Opportunities for onsite mitigation and options for

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-14

conducting mitigation outside the area of impact that are developed prior to initiation of the NEPA process will be provided for public comment as soon as practicable within the NEPA process.

b.  Adequacy of the Applicant's Proposal.  When the BLM expects that an applicant's initial proposal for mitigation will be inadequate to satisfactorily address impacts of the authorized use, and the BLM anticipates that mitigation outside the area of impact may be appropriate, the BLM will notify the applicant in order to provide the applicant with an opportunity to propose alternative mitigation.

>   Example:  To avoid or minimize the need for conducting mitigation outside the area of impact, the applicant may offer a proposal for reducing surface disturbance or adjusting the pace or location of oil and gas development.

The BLM should notify the applicant about the potential need for mitigation outside the area of impact as early as possible, optimally during the pre-application phase of initial project planning.  The expectation is that the applicant and the BLM will discuss appropriate mitigation, outside the area of impact or otherwise, prior to the BLM deciding on appropriate mitigation and taking final action on an authorization application.  The BLM will decide to approve the authorization, deny it, or approve it with modifications (including project mitigation).

c.  If the BLM and the Applicant Cannot Reach Agreement.  If the BLM anticipates that mitigation may be necessary outside the area of impact and the BLM and the applicant cannot reach agreement on the mitigation, the following may occur:

>   i.   The applicant may withdraw or amend the project proposal to present an alternative siting proposal or mitigation strategy.
>
>   ii.  The BLM may evaluate the need for additional mitigation and identify acceptable forms of mitigation in the NEPA document as an alternative to the applicant's proposed action (see §1.6(D)(4)(a)).
>
>   iii. The authorized officer may deny the application and provide an explanation for the denial to the applicant.  The applicant may be able to appeal the denial to the Interior Board of Land Appeals or, in certain instances, directly to Federal district court.  The BLM should consult with the Solicitor's Office before denying an application in cases where, due to existing contractual or property rights, a holder or applicant may raise a takings or breach-of-contract claim.

d.  NEPA Analysis Process.  When considering mitigation outside the area of impact, it should be examined as a feature of one or more of the alternatives in a NEPA

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-15

document, such as a project-level environmental assessment (EA) or an environmental impact statement (EIS), or when applicable, a resource management plan (RMP)/EIS revision, or RMP amendment EA/EIS.

e. Alternatives.  When an applicant's proposed action includes a proposal for conducting mitigation outside the area of impact, the BLM will analyze a reasonable range of alternatives to the applicant's proposal.

When mitigation outside the area of impact may be necessary, but the applicant proposes none, the BLM will analyze the applicant's proposed action and the proposed action with mitigation, in separate alternatives.

If the applicant proposes specific mitigation measures as a feature of its proposed action and the BLM believes the proposed mitigation may be inadequate, then the BLM will identify and evaluate in the NEPA document an alternative(s) to the applicant's proposal.

If evaluating mitigation that would occur outside the area of impact through a NEPA document without the applicant's full agreement on the type and/or degree of the mitigation, the BLM should limit consideration to in-kind mitigation on BLM-managed lands or monetary contributions that would directly benefit the resource or value subject to impacts on BLM-managed lands.

f. Feasibility and Effectiveness.  The BLM will analyze the need, feasibility, and effectiveness of the proposed mitigation (e.g., how the proposed mitigation will actually mitigate the impacts).  The BLM will also disclose the impacts and expected outcomes of the mitigation.

g. Monitoring.  The BLM should address the long-term project monitoring and maintenance responsibilities in the decision document, if applicable, including performance objectives, methods for measuring effectiveness/success, reporting requirements, funding source, and responsible parties.  Monitoring plans should reference and comply with BLM monitoring principles described in the BLM's *Assessment, Inventory, and Monitoring Strategy* (AIM).

h. Decision.  Once the BLM analyzes the proposed mitigation in the NEPA document and records its conclusion in the decision document, the BLM may incorporate the mitigation into the final use authorization where it will then become a requirement of the approved authorization.

The BLM may be able to approve mitigation for a new authorization without detailed analysis in a new NEPA document if the BLM has adequately evaluated the mitigation in an existing NEPA document, such as a land use plan/EIS or programmatic NEPA document.  (See BLM NEPA Handbook H-1790-1, Chapter 5, Using Existing Environmental Analyses).

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-16

18. Managing Mitigation Outside the Area of Impact.

    a. Implementation Monitoring.  The BLM's decision document that identifies mitigation requirements for the authorization holder should also identify the monitoring that the BLM, another agency, or authorization holder will take to ensure the mitigation is implemented as designed and remains effective.[1]

    b. Implementation Tracking.  The BLM's decision should identify how tracking of the mitigation will occur.

    c. Responsible Party and Oversight.  The BLM's decision should identify whether the BLM, another agency, or the authorization holder is responsible for monitoring the effectiveness of mitigation and whether the BLM must receive monitoring reports.  If the authorization holder is responsible for the project's monitoring, the BLM or other agency should provide oversight inspections to ensure the responsible party has implemented and maintained the projects as designed.

    d. Performance Bonding.  For mitigation projects implemented by the authorization holder, the applicant must provide the BLM with an adequate performance bond expressly covering the approved mitigation, monitoring, and foreseeable follow-up actions.  For example, statewide or nationwide bonds covering only oil and gas operations are not adequate to assure compliance with approved mitigation that occurs outside of the lease.

    e. Implementation and Monitoring Plan.  For mitigation projects implemented by the authorization holder, the BLM may condition the authorization with a requirement for a Mitigation Implementation and Monitoring Plan.  The plan will be subject to the BLM's review and approval prior to the authorization holder receiving a "notice to proceed" from the BLM.  The plan should address long-term project monitoring, adaptive management (e.g., corrective actions), and maintenance responsibilities, if applicable, including performance objectives, methods for measuring effectiveness/success, reporting requirements, funding source, and responsible parties.

    f. Enforcement.  If the authorization holder does not satisfy any mitigation requirements in accordance with the authorization, the BLM may suspend or terminate the authorization or the holder may forfeit or relinquish the

---

[1] For additional guidance on monitoring, refer to:  Executive Office of the President, Council on Environmental Quality *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact* January 14, 2011 (http://ceq.hss.doe.gov/current_developments/ docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf).

DRAFT

authorization.  If operations have already begun, but mitigation has not been undertaken in accordance with the authorization, the BLM will initiate an appropriate enforcement action, such as a "notice of noncompliance," giving the holder a specific time to come into compliance.  In appropriate circumstances, the BLM could pursue penalties for violations, including cancellation of the authorization.  In appropriate circumstances, the BLM may also attach (access) the project or authorization bond if one exists.

19. <u>Types of Contributions</u>.  In addition to onsite mitigation, the applicant may agree to perform mitigation outside the area of impact by implementing mitigation projects and measures directly (labor), purchasing private land or conservation easements, and/or contributing financially to a mitigation fund.

Financially contributing to a mitigation fund involves one or more payments to a natural resource management agency, foundation, or other appropriate organization for performance of mitigation that addresses the impacts of the land-use authorization.  As with all forms of mitigation outside the area of impact, the BLM must identify a reasonable relationship between the resources and values affected by the authorization and the resources and values benefitted by the mitigation (here, a financial contribution).

20. <u>The BLM's Acceptance of Monetary Contributions</u>.  Subject to the requirements of part a., below, the BLM may accept an offer of monies from an applicant to fund specific mitigation projects, either on or off BLM-managed lands.  The BLM may also accept an offer of monies from individual applicants for pooling funds towards completion of larger mitigation efforts.  This is especially efficient for mitigating the impact of multiple actions when it is not feasible to require individual applicants to manage their own mitigation projects.  The BLM will not, however, allow unnecessary or undue degradation onsite even if mitigated through payment of monies.

The BLM may use monetary contributions for implementing mitigation projects and measures (including purchases of land and conservation easements), associated monitoring, adaptive management (e.g., corrective actions), and administrative costs.  In order to qualify, the funds collected must be identified for specific mitigation projects.  The decision document must be specific regarding what types of mitigation projects and measures the BLM will fund and how the projects will contribute to BLM resource and value objectives.

a.  Managing Monetary Contributions.  When the applicant makes monetary contributions directly to the BLM, a formal agreement is necessary and must have the prior approval of the BLM State Director.

i.  BLM-managed Lands.  The BLM may receive, manage, and expend funds for mitigation measures taking place on public lands under the authority of FLPMA Section 307(b), which provides the authority to enter into contracts and cooperative agreements, and FLPMA Section 307(c), which provides the authority to accept contributions or donations of money for management and

DRAFT

protection of the public lands.  The BLM also has authority to enter into certain cooperative agreements for mitigation measures under the Wyden Amendment.[2]  The mitigation measures for which the BLM may expend contributed funds under the Wyden Amendment are limited to activities involving the protection, restoration, and enhancement of fish and wildlife habitat and other resources or for the reduction of risk of natural disaster where public safety is threatened that also benefit resources on public lands within the watershed.

Example:  Based on the expected need for native plant materials, the applicant may contribute funding to support the BLM's Native Plant Materials Development Program, or provide for the collection and long-term storage of rare plant species in the Center for Plant Conservation's National Collection of Endangered Species.

ii.   Non-BLM-managed Lands.  In more limited circumstances, the BLM may also receive and manage funds for mitigation activities on non-BLM lands (including other Federal, Tribal, State, or private lands.  Before accepting money intended for expenditure on non-BLM lands, managers must confirm that they have sufficient authority to accept and expend funds in the proposed manner.  This authority may be found in the Wyden Amendment in combination with the BLM's authority to accept contributions or donations of funds under Section 307(b) of FLPMA.  Absent additional specific legislative authority, when accepting funds intended for activities that will take place on non-BLM-managed lands, the BLM's authority is limited to the scope of activities authorized by the Wyden amendment, as listed in E.(5)(a) above.  There must be an agreement reflecting the assent of necessary parties to the proposed mitigation, which must include the non-Federal landowner (if applicable) and the State or Federal agencies with regulatory responsibility for the affected resource.

iii.   Form 4120-9.  The funds to perform mitigation measures must be properly recorded on Form 4120-9 ("Proffer of Monetary Contributions") and deposited into the appropriate 7100 account

---

[2]  The Wyden Amendment, 16 U.S.C. 1011, provides: "For fiscal year 1997 and each fiscal year thereafter appropriations made for the Bureau of Land Management … may be used by the Secretary of the Interior for the purpose of entering into cooperative agreements with the heads of other Federal agencies, Tribal, State, and local governments, private and nonprofit entities, and landowners for the protection, restoration, and enhancement of fish and wildlife habitat and other resources on public or private land and the reduction of risk from natural disaster where public safety is threatened that benefit these resources on public lands within the watershed."

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-19

(usually 7122) for redistribution for activities on BLM or other lands to offset adverse impacts for a particular action or class of actions.

    iv.    Project Codes.  Accounts for mitigation measures require assignment of specific project codes to track the contributions and subsequent expenditures.  State office budget staff can provide assistance in establishing the project codes.

21. Financial Contribution Agreements.

    a.    Mitigation or financial contribution agreements must address the following items:

        i.    Authority to enter into an agreement;
        ii.    Disposition of excess funds, if any;
        iii.    Project codes and tracking of funds incoming and outgoing (especially in the case of multiple contributors);
        iv.    Administrative surcharges;
        v.    Other agency rules and requirements for agency cooperators; and
        vi.    Adequacy of funds for specific mitigation projects.

    b.    Agreements may also address:

        i.    Identification of specific projects or types of projects;
        ii.    Project implementation commitments and timelines; and
        iii.    Project progress reports.

22. The Role of Agency Cooperators.  It is usually appropriate to involve cooperating agencies (such as State fish and wildlife agencies) and other interested parties in planning and implementing specific mitigation projects.  However, the BLM must retain decision-making authority for projects conducted on BLM-managed public lands.  In undertaking cooperative efforts, the authorized officer must ensure compliance with the Federal Advisory Committee Act (FACA), if applicable.  (For additional information, refer to Appendix B of the BLM *Land Use Planning Handbook* (H-1601-1).)

23. Non-Federal Parties Managing Mitigation on Non-Federal Lands.  Non-Federal parties may carry out mitigation on non-Federal lands when the resource impact is on lands managed by the BLM.  In such circumstances, the BLM's role is to consider the proposed mitigation in its authorization decision, as well as to ensure the non-Federal party informs the BLM on the progress and/or completion of proposed mitigation measures and the effectiveness of the measures over the life of the project.

    a.    Third-Party Fund Management.  A third party, such as a State natural resource management agency, foundation, or other appropriate organization, may hold or manage funds for mitigation on non-Federal lands.  The applicant should enter into an agreement with the third-party recipient and the relevant regulatory agency(s) documenting the purposes for which the funds will be used.  The

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-20

applicant must include a copy of the agreement with the project application for the BLM's approval.

> Example:  The applicant may make payment to a BLM-approved organization based on the number of acres of sage-grouse habitat that will be disturbed in exchange for a commitment from the recipient to apply the funds toward appropriate sage-grouse core habitat protection or restoration projects.

b.  The BLM's Role.  The BLM will not assume, by agreement or otherwise, control over the use of such funds.  This includes direct control, such as by the controlling vote in a decisionmaking group, or constructive control, such as by having the power to veto an expenditure decision.  The BLM may participate, however, in decisions as to their use, so long as the BLM does not have ultimate decisionmaking authority.  The purpose of this restriction is to ensure that such funds do not inadvertently become Federal funds and thereby subject to Federal rules governing their expenditure.

## E.  The BLM's Mitigation Authority.

1.  General.  The intent of this manual section is to provide guidance regarding the planning and implementation of mitigation conducted outside the area of impact, and in particular, planning and implementing a regional approach to mitigation.  In addition to the guidance provided herein, the BLM must consider individual projects or authorizations in the context of the particular law, regulation, and policy applicable to that project or authorization.  The applicable law, regulation, or policy may provide additional or different authority for the consideration and use of mitigation.

2.  Federal Land Policy and Management Act of 1976.  The BLM's authority to address the mitigation of impacts on public lands associated with a use authorization issued by the BLM derives from FLPMA.  In FLPMA, Congress declared that it is the policy of the United States that "management be on the basis of multiple use and sustained yield" FLPMA §102(a)(7), and "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values…" (FLPMA §102(a)(8), 43 U.S.C. 1701(a)(8)).  The development and revision of land use plans also includes the consideration of "…the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;" (FLPMA §202 (c)(6)).  In addition, the use, occupancy, and development of public lands must be regulated by the Secretary, subject to other applicable laws, through easements, permits, leases, licenses, or other instruments (FLPMA §302(b), 43 U.S.C. 1732(b)).  The laws governing specific uses of the public lands such as the Mineral Leasing Act of 1920, as amended, contain additional authority.

> Note:  The FLPMA requires the BLM to take action "…to prevent unnecessary or undue degradation of the lands…" (FLPMA Section 302(b), 43 U.S.C. 1732(b)).  The BLM does not allow unnecessary or undue degradation on the public lands and it, therefore, must either deny authorization for a project that will result in unnecessary

DRAFT

Draft MS-1794 – Regional Mitigation Manual Section (P)

1-21

or undue degradation or require onsite mitigation such that the proposal will no longer cause unnecessary or undue degradation.  Because mitigation that is conducted outside the area of impact does not directly mitigate impacts onsite, mitigation outside the area of impact may not be used to compensate for unnecessary or undue degradation onsite.

3.  <u>Limitations on the Use of this Guidance</u>.  This guidance may supplement, but does not replace, mitigation requirements that may result from formal consultation under law or regulation, such as Section 7 of the Endangered Species Act, the National Historic Preservation Act, or wetlands mitigation requirements available to other agencies under the Clean Water Act.

In instances related to development of minerals where ownership of the surface and minerals estates are split (i.e., split estate), it is BLM policy to provide for reasonable onsite mitigation to reduce impacts to non-Federal surface resources.  However, the guidance in this manual section for mitigation outside the area of impact does not apply in split estate situations unless the non-Federal surface resource is also closely associated with the management of the same resource on nearby BLM-managed surface lands.  An example would be the interdependence of wildlife populations and habitat across private and Federal surface lands that are in close proximity.

Because the BLM has limited discretion to disapprove proposed plans of operation or proposed use or occupancy under the Mining Law of 1872 that will not cause unnecessary or undue degradation, the mitigation policy in this manual section does not apply to authorizations under 43 CFR subparts 3809 or 3715.  However, mining claimants may voluntarily commit to mitigation projects and measures outside the area of impact, and these commitments will receive appropriate analysis.

**1.7 File and Records Maintenance.**

[Reserved]



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
DENVER, CO  80202-1129
Phone 800-227-8917
http://www.epa.gov/region08

July 11, 2012

Ref: 8EPR-N

Sherry Hazelhurst
Acting Forest Supervisor
Grand Mesa, Umcompahgre &
 Gunnison National Forest
2250 Highway 50
Delta, Colorado 81416
comments-rocky-mountain-gmug@fs.fed.us

<div align="right">

Re:   West Elk Coal Mine, Federal Coal Lease
      Modifications COC-1362 & COC-67232
      DEIS, CEQ # 20120160

</div>

Dear Ms. Hazelhurst:

The U.S. Environmental Protection Agency Region 8 (EPA) has reviewed the *Draft Environmental Impact Statement (DEIS) for the Federal Coal Lease Modifications COC-1362 and COC-672324* for the West Elk Coal Mine. As described in the DEIS, the proposed lease modifications would add approximately 1.6 years to the approximately 11-12 years of mining under existing leases at the West Elk mine. This underground coal mine is located near Somerset, CO and is operated by Mountain Coal Company (MCC), an Arch Coal subsidiary. Our comments are provided for your consideration pursuant to our responsibilities and authority under Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4332(2)(C), and Section 309 of the Clean Air Act, 42 U.S.C. Section 7609.

We appreciated the opportunity to discuss and provide feedback to the U.S. Forest Service and the Bureau of Land Management (BLM) in May regarding the proposed West Elk lease modifications. We also appreciate the efforts to address our preliminary suggestions. Based on our recent discussions and review of the DEIS and its attachments, the EPA is offering comments on one major topic: greenhouse gas mitigation. We are also offering additional more detailed technical comments via Enclosure 1 of this letter.

**Comments on Greenhouse Gas Mitigation:**

The DEIS considered but did not analyze in detail any alternatives to reduce the potential greenhouse gas emissions of the project through methane capture/use or flaring. According to the DEIS, the reason these alternatives were eliminated from detailed study was that their use was deemed economically infeasible in the *West Elk E-Seam Gas Economic Evaluation* Report, dated September 24, 2009 (2009 Report). This

report, which was prepared under the direction of the mine owner, Mountain Coal Company (MCC), contains a detailed economic analysis of various greenhouse gas reduction options and concluded that greenhouse gas reduction for the entire mine was not economically feasible. We therefore have three recommendations:

1.  Amend the FEIS Alternatives Section or add a new FEIS section to include a discussion about how individual methane mitigation technologies could be utilized at the mine. As you know, the DEIS and the 2009 Report looked at a full suite of these technologies, but the DEIS did not explain how these technologies could be used as mitigation measures. One way to reconsider this would be to add a table to the FEIS containing the following information: (1) methane reduction options evaluated; (2) whether the technology could be applied to mine drainage well emissions (MDW) (more concentrated methane), ventilation air methane (VAM) (more dilute concentrations) or both; (3) the pros and cons of each technology; and (4) identification of the more promising mitigation measures and why they are promising.

    Given the key role the 2009 Report plays in the DEIS conclusion not to require any greenhouse gas emissions reduction technologies, the EPA reviewed all available portions of the Report (note, some portions were deemed "Confidential Business Information"). From our review of the Report, and knowledge about advances in commercially available technologies, we believe several of the technologies may warrant further evaluation as mitigation  measures for a portion of the methane from the mine. Specifically, the following mitigation measures could reduce the projected capital and operating costs associated with methane collection while still providing a reduction in methane emissions:

    - Collect and use/flare a portion of methane from the mine instead of collecting all of the methane as evaluated in the 2009 Report
    - Reduce winter operations to reduce seasonally higher operation and maintenance and construction costs
    - Reduce the number of internal combustion engines generating power from methane from four (as analyzed in the 2009 Report) to two engines, and flaring any methane greater than the capacity of the generators.

2.  Require MCC to periodically update its evaluation of the economic and technical feasibility of mitigating greenhouse gas emissions and develop a proposal to implement those mitigation measures demonstrated to be feasible. We note that our recommendation is consistent with BLM's requirement that MCC prepare an annual evaluation of the economics associated with the capture and/or use of coal mine methane and vent air methane, as discussed in BLM's March 25, 2009 letter to MCC (Enclosure 2). Periodic reevaluations are important because energy price fluctuations can affect the cost-effectiveness of mitigation measures. For example, measures that currently may not be economically feasible may become feasible with coal price increases. Encourage MCC to take advantage of several opportunities to employ current commercially green house gas emission reduction strategies. Although we do not anticipate that these changes will be made as part of the FEIS, we do recommend that they be considered by MCC for use at the West Elk mine.

3.  Explore non-traditional options for improving the economic feasibility of methane mitigation measures such as developing a greenhouse gas offset proposal to attract funding from outside investors. The recently announced Elk Creek coal mine methane capture/ carbon offset project to

2

generate electricity from methane emissions with a $5.4 million investment from the Aspen Skiing Company serves as a good example of this recommendation. This collaborative partnership among the mine owner, a coal gas company, the local electric cooperative, and the Aspen Skiing Company, facilitates methane emissions capture and the conversation of the methane into approximately 3 megawatts of energy that the Aspen Ski Company will use to offset 100% of its energy consumption.

**EPA's Rating**

Based on our review, the EPA is rating the DEIS as "Environmental Concerns -- Insufficient Information" (EC-2). The "EC" rating means EPA's review has identified potential impacts that should be avoided in order to fully protect the environment. Corrective measures may require changes to the preferred alternative or application of mitigation measures that can reduce these impacts. The "2" rating means that the DEIS does not contain sufficient information for the EPA to fully assess environmental impacts that should be avoided in order to fully protect the environment. EPA's rating system is described at: http://www.epa.gov/compliance/nepa/comments/ratings.html.

Thank you for the opportunity to review the DEIS. If you have any questions or would like to discuss our comments, please contact me at (303) 312-6925. You may also contact Dana Allen, lead reviewer for this project, at (303) 312-6870 or by email at allen.dana@epa.gov.

Sincerely,

Suzanne J. Bohan
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation

Enclosures

cc: Barbara Sharrow, BLM Uncompahgre Field Office
Leigh Espy, Deputy State Director, BLM Colorado State Office

Enclosure 1

<div align="center">

**EPA's Detailed Comments**
*Federal Coal Lease Modifications COC-1362 & COC-67232* **for the**
**West Elk Mine**

</div>

## Additional Detailed Comments on DEIS

EPA Comments on Section 2.2 Alternatives Considered but Eliminated from Detailed Study: *Reduce the potential GHG emissions of the project through methane flaring, methane capture, or through the use of ventilation air methane (VAM)* (pages 33-37)

1.  We suggest revising the sub-sections entitled Flaring &VAM, Methane Capture & VAM, and VAM Technology (including RTO) to differentiate between the mitigation measures used for reducing greenhouse gas emissions from the methane drainage wells (MDW) (which emit more concentrated methane emissions) and mitigation measures used to dilute ventilation air methane (VAM). For example, it should be noted that flaring is an appropriate mitigation technology only for MDW methane emissions and not for reducing methane emissions from VAM as was suggested on page 35 of the DEIS.

    EPA believes that appropriate mitigation technologies for VAM emissions would be thermal or catalytic oxidation, converting methane to carbon dioxide. We recommend that the sections regarding the feasibility of VAM technologies (on page 66 of the FEIS) be revised to reflect the commercial availability of VAM oxidizers that could handle the large air volumes anticipated at the West Elk mine. We also suggest separating discussions regarding the potential difficulties associated with siting the VAM oxidation equipment at the West Elk mine from the discussions of the overall technical feasibility of VAM oxidation.

2.  We recommend that the FEIS explain that since 2009, the Mine Safety Health Administration (MSHA) and state mining regulatory agencies have had increased experience with the reliability and safety of coal mine methane (CMM) mitigation equipment such as ventilation air methane (VAM) oxidizers and flares for more concentrated mine methane releases. In particular, the commercial availability and regulatory acceptance of technologies for VAM oxidation has improved since the 2009 study. See the comments in the next section for more information about recent installations of these technologies.

3.  The description of the regenerative thermal oxidation (RTO) on pages 36 and 65 of the FEIS should be revised to be more technically accurate (see last paragraph starting with "*adsorption media at the gas inlet to separate out and concentrate VAM exhaust to the particular saturation point of the media . . .*").[1] Specifically, the discussion should clarify that the ceramic media in RTOs does not adsorb methane and does not need to be regenerated by heating. The ceramic media is inert and is placed in the RTO bed to provide even distribution of the gas and thermal energy (heat).

    For future alternatives analyses, it should be noted that mines can recover energy from RTOs in contrast to the information in the last paragraph on page 65. RTOs can supply direct thermal energy to the mine (for heating of air and water, etc.) or generate steam which may be used in a

---

[1] The Verdeo VAM analysis accurately describes several specific commercially available technologies and lists specific vendor websites for more detailed information.  See also the EPA Coalbed Methane Outreach Program resources related to VAM: http://www.epa.gov/coalbed/resources/vam.html

<div align="center">4</div>

steam turbine electric generator. For example, the WestVAMP project in Australia, which began operating in 2007, generates 5 MW of electricity from their VAM oxidation system utilizing a high efficiency heat transfer system to drive a steam turbine.

4. To support full disclosure, the discussion on pages 36, 37 and 66 should acknowledge that revenues for carbon credits are available via several existing markets. More specifically, there currently is a market for carbon credits in the United States. Relevant information, including methodologies for coal mine methane capture projects, is likely available from the four carbon registries that currently exist in the U.S.

- Climate Action Reserve (CAR) - www.climateactionreserve.org
- Verified Carbon Standard (VCS) - http://v-c-s.org
- Chicago Climate Exchange Offsets Registry - www.theice.com/ccx
- American Carbon Registry (ACR) - www.americancarbonregistry.org

5. It appears that the statement on page 34 of the DEIS "West Elk does use some methane liberated from the mine to heat air at surface openings of the mine to prevent ice build-up" is no longer accurate. It is EPA's understanding that as of June 2012, the West Elk mine heating project was discontinued and the equipment has been sold to another mine. That project combusted methane in enclosed horizontal flares for mine heating, which operated for several weeks in the winter time for a number of years. The methane came from a sealed mine district and the combustor fuel was piped through the mine to a location near the vent shaft, through a vertical borehole and pump station.  Please correct or clarify this in the FEIS.

6. We recommend that the FEIS clarify whether there are situations when royalties would need to be paid for use of methane from the mine, since this could affect the economic feasibility of mitigation measures. The current and proposed revisions to the lease stipulations authorize the mine to use or combust methane that would otherwise be vented for safety purposes, without having to pay royalties. However, the DEIS does not clearly explain whether royalties would need to be paid if the gas is sold or if the methane is used to generate electricity that is sold.  In particular Section 2(C) states that . . . "*Leasees shall have no obligation to pay royalties on any coal mine methane that is used on or for the benefit of mineral extraction at the West Elk coal mine. When not inconsistent with any express provision of this lease, the lease is subject to all rules and regulations related to Federal gas royalty collection in Title 30 of the Code Federal Regulations*" . . . Please clarify whether royalties would need to be paid if methane or electricity from the West Elk mine was used elsewhere.

7. We recommend that the FEIS clarify that MCC could voluntarily implement methane mitigation measures even if the measures were not considered to be economical under current assumptions. The DEIS appears to suggest that MCC would be prohibited from implementing mitigation measures if the methods were not cost effective.

**Additional Detailed Comments on the MCC 2009 Report**

1. **Commerical VAM Technologies.** The commercial availability and regulatory acceptance of technologies for oxidation of VAM has improved since the 2009 Report. There are currently two VAM oxidation projects operating at active underground U.S. coal mines: the JWR Mine 7 in Alabama, which has been operating since January 2009, and the CONSOL McElroy mine in West

Virginia. A third project is currently under development at a CONSOL mine in Pennsylvania (Enlow Fork Mine). These projects have been reviewed and approved by MSHA.

These three U.S. projects use two different technology vendors. Globally, there are VAM oxidation projects at about ten active underground coal mines including mines in Australia and China. Several VAM oxidation projects recover and use the energy for heating or electricity generation using commercially available technologies. These VAM mitigation projects have all been undertaken in the absence of regulatory requirements, and a number of them are receiving financial revenues based on their carbon emissions reductions.

2. **Capacity of VAM oxidizers to handle large volumes.** VAM oxidizers are capable of handling very large air volumes. The units are modular and multiple units can be configured to handle the appropriate ventilation flow rates. [2] In fact, several coal mines in Australia and China that have large air flows have installed VAM oxidation units. The modular design of these systems provides the flexibility to increase or decrease capacity, depending on shaft location and exhaust air flow rate as the location of mining activities change. In addition, RTOs are not directly connected to the exhaust shaft and therefore, they are adaptable to various exhaust shaft configurations.

3. **Applicability of VAM oxidation based on site-specific conditions at West Elk.** VAM oxidation systems typically operate in the range of 0.2-1.2% methane. Based on the 2009 Report which included an economic analysis conducted for West Elk, MCC predicted that the VAM concentration at Shaft #4 will range between 0.15% - 0.31%, and therefore concluded that the lower end of this operating range would make VAM mitigation a non-viable alternative.

EPA recommends that the reevaluation include the option of combining high-methane concentration gas from the MDW with the VAM, to boost the lower end of the concentration range so that it would be maintained at a sufficiently high level to make a thermal oxidation system self sustaining. This is being done in Australia at the WestVAMP project, where BHP Billiton is blending drained gas with the VAM, in order to boost the methane concentration to 0.9%, as well as to even out any variations in methane concentration of the VAM.

It is also not clear whether the predictions of the VAM concentrations used in the 2009 Report are still accurate and whether if they were updated the technological prognosis would change.

4. **VAM Technology Safety.** It should be noted that VAM systems are designed with safety features in mind. For instance, for safety purposes, a physical gap is created between the exhaust shaft (evasé) and oxidizers, so the oxidizer is not directly attached to the mine ventilation system and therefore does not impede air flow from the mine fan. Since the RTO intake is physically and electrically separated from the exhaust shaft, it removes any potential impact on the ventilation system if there were to be a sudden stoppage of airflow to the RTO (or RTO system failure). Another safety feature includes automatic dampers to immediately block airflow to the RTO whenever methane concentrations in the ventilation shaft airflow reach a certain threshold. Another safety feature is the length of the ducting between the ventilation exhaust shaft and RTO intake (approximately 100 feet), which is designed to allow sufficient time to actuate the damper and stop flows into the RTO in the event of a high methane concentration detection.

5. **Flaring**: EPA recommends that the reevaluation include additional information regarding the potential feasibility of flaring the methane from the vent wells (MDW). While the Arista report (Appendix F to the 2009 Report) included cost estimates for two flaring scenarios, and the Burns and McDonnell report (Appendix G to the 2009 Report) used the Arista information to evaluate

---

[2] http://www.megtec.com/documents/MEGTEC%20VAM%20Processing.pdf

the feasibility of installing power generation capacity and evaluated the economic feasibility of all the options, the DEIS evaluation did not provide or discuss any monetary benefit to flaring as a mitigation option such as carbon credits which could improve the economic feasibility of flaring. Furthermore, EPA believes it is worth disclosing the potential health and safety benefits attributable to using a flare to destroy VOCs and hazardous air pollutants (HAPs). More specifically, flaring of methane gas is a standard safety practice in many industries and is routinely used during processing and production of oil and gas, from landfill collection systems and the petroleum industry. Flaring appears to provide substantial benefit with less capital cost than flaring and power generation.

The reevaluation of flaring should also disclose the increasing commercial availability and acceptance of flaring by regulatory agencies. The MSHA safety concerns expressed in the DEIS (page 35) do not make flaring infeasible. It is EPA's understanding that MSHA has not received or reviewed any applications for flaring at a U.S. coal mine. EPA agrees with the characterization in the DEIS that describes MSHA's policy of reviewing mine applications for flaring on a case-by-case basis. MSHA does not have an official policy on flaring of gas at coal mines, therefore MSHA would review each flaring plan individually to ensure that it adequately incorporates appropriate protections such as bubble traps, fail-safe valving, flame arresters, or monitoring and control systems.

MSHA has in fact authorized a flare for mine methane from a mine degasification system that was commissioned in August 2010[3] and is now operating at Solvay's underground trona mine near Green River, Wyoming.[4] It is EPA's understanding that Solvay now intends to utilize the gas for productive use in their processing plant. Trona mines have similar characteristics to underground coal mines in terms of their methane gas production and degasification technologies, and the experience at the Solvay trona mine should be applicable to underground coal mine operations.

While there are currently no United States underground coal mines operating with flares, there are approximately 23 installed coal mine methane flares elsewhere in the world. Methane flaring at underground coal mines has been approved as a safe practice by national level mine safety oversight agencies in the United Kingdom and Australia. Flares can combust methane in air with fluctuating concentrations between 30 to 100 percent by volume. Portable flares are also commercially available, to provide flexibility to move to different wells.[5]

---

[3] http://www.sindicatum.com/portfolio_item/coal-mine-methane-us-solvay-wyoming/

[4] http://www.epa.gov/coalbed/docs/cmm_conference_oct10/Sherer.pdf

[5] http://www.globalmethane.org/documents/toolsres_coal_flaring.pdf

7

Enclosure 2



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7093
www.blm.gov/co



In Reply Refer to:                    AR 2 5 2009
3420 (CO-921)
C-1362, COC56447, COC67232


Gene E. DiClaudio
President
Mountain Coal Company
One Cityplace Drive, Ste. 300
St. Louis, MO 63141

Dear Mr. DiClaudio:

As a result of the January 16, 2009 addendum to the West Elk Leases and the language contained
in the Technical Revision No. 111 and PR 14 approval documents, the Bureau of Land
Management (BLM) is requiring that Mountain Coal Company supplement the existing
Resource Recovery and Protection Plan (R2P2) to comply with the language contained in the
addendum and the approval document.

The Revision No. 111 and PR 14 approval document directs Mountain Coal Company to collect
all economical Coal Mine Methane (CMM) and Vent Air Methane (VAM) that would normally
be vented for the safety of the miners and compliance with applicable MSHA regulations.  The
addendum to the Mountain Coal Company leases provided a mechanism that allows for the
capture and use of the CMM and VAM.  To ensure compliance with the addendum and the
approval document Mountain Coal Company must supplement the existing R2P2 to include an
annual evaluation of the economics associated with the capture and/or use of the CMM and
VAM. The economic evaluation should contain at a minimum the following:

- An analysis of the costs associated with collection of vented CMM from holes developed
  specifically for the purpose of the venting of the CMM for safety purposes.
- An analysis of the costs associated with collection/capture of VAM
- All costs associated with the collection of the CMM that is above and beyond what is
  associated with normal venting operations including but not limited to construction of
  gathering systems, roads, pipelines, etc.
- All costs associated with putting the CMM or VAM in a marketable condition including
  compressing and refining systems and transportation to the point of sale.
- An analysis of the costs associated with collection and beneficial use of CMM or VAM.
- All projected revenue from the sale of the CMM or VAM.

- Any carbon credit offsets acquired as a result of the capture/sale of the CMM or VAM must be taken into account.
- The economic evaluation will include a reasonable cost of capital and employ commonly used analytical tools used in project finance, such as a discounted cash flow analysis.

CMM or VAM that is used on site for beneficial use will not be subject to a royalty. Beneficial use includes all uses of CMM or VAM onsite including fueling mine heaters and the generation of electricity that is used onsite at the West Elk Mine. Vented or flaired CMM or VAM that is not economic is not subject to a royalty.

All activities associated with the beneficial use or economic collection and sale of CMM or VAM must be approved in a supplement to the R2P2. The R2P2 must be supplemented to include the methods and equipment used to measure all CMM or VAM that is used for beneficial use or sold. The measurement of CMM or VAM sold should comply with the applicable measurement regulations found at 43 CFR 3162.7-3 and Oil and Gas Onshore Order No. 5.

Within six months of receipt of this letter Mountain Coal Company is required to provide to the appropriate Bureau of Land Management office an economic evaluation of the capture and use of the CMM and VAM and a proposal detailing the equipment and methodology to be used in monitoring the CMM or VAM production. The reported produced value for VAM should be the same value currently reported to the BLM as part Mountain Coal Company's methane venting submittal until such time that capture of VAM is considered economic at which time a detailed submittal outlining equipment and methodology will be required.

If there are any questions or concerns please feel free to contact Charlie Beecham, Branch Chief for Solid Minerals at (303) 239-3773.

Sincerely

Lynn E. Rust
Deputy State Director
Energy, Lands and Minerals



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 8**
1595 Wynkoop Street
DENVER, CO  80202-1129
Phone 800-227-8917
http://www.epa.gov/region08

OCT 2 7 2010

Ref:   8EPR-N

Thomas Malecek, District Ranger
Divide Ranger District
Rio Grande National Forest
13308 West Highway 160
Del Norte, CO  81132

> RE: EPA Comments on Draft Environmental
> Impact Statement, Big Moose Vegetation
> Management Project, CEQ # 20100367

Dear Mr. Malecek:

In accordance with our responsibilities under the National Environmental Policy Act (NEPA), 42 U.S.C. Section 4321, *et seq.*, and Section 309 of the Clean Air Act, 42 U.S.C. Section 7609, the U.S. Environmental Protection Agency Region 8 (EPA) has reviewed the August 2010 Draft Environmental Impact Statement (DEIS) for the Big Moose Vegetation Management Project. This DEIS was prepared by the Divide Ranger District of the U.S. Department of Agriculture Forest Service (USFS) Rio Grande National Forest to analyze potential environmental impacts associated with managing timber stands affected by spruce beetle and the potential impacts of aspen regeneration efforts using various treatment methods, including prescribed burning.

The Big Moose Vegetation Management Project area covers 22,152 acres and lies approximately 15 miles southwest of the town of Creede, in Hinsdale and Mineral Counties, Colorado. The Weminuche Wilderness Area borders the south and southwest sides and private land borders the north and northeast sides of the project area. The analysis area includes the Love Lake Fishing Area, portions of the Copper Mountain/Sulphur, Ruby Lake, and Sulphur Tunnel Roadless Areas, and numerous trails and trailheads.

Four alternatives are analyzed in the DEIS and range from no action (Alternative 1) through increasingly more action to Alternative 4 (Preferred Alternative). All action alternatives would harvest and regenerate timber stands killed by, or infested with, spruce beetle and would treat areas to promote aspen regeneration and health through a mix of timber harvest, reforestation, and prescribed fire to promote aspen. For the most part, the existing road network would be sufficient for access with varying degrees of need for reopening old roads and minor temporary new road construction (to be closed after project completion), depending on the

alternative. A brief summary of the alternatives is as follows:

- Alternative 1 – No Action - No vegetation management treatments associated with this project would occur. Current activities such as livestock grazing, recreation, and road maintenance on 35 miles of existing open roads would continue.

- Alternative 2 (Limited Action Alternative) - Designed to be a scaled down version of Alternative 3, this alternative would harvest timber on approximately 2,608 acres using sanitation/salvage harvesting (2,354 acres) and clearcut harvesting (253 acres) to yield up to 35 million board feet (MMBF) of timber products. After harvest, reforestation would occur on 300-1,250 acres. Prescribed fire treatment would occur on approximately 1,263 acres (in some areas used in conjunction with timber harvest). New temporary road construction of 0.8 miles would be necessary for access and 11.8 miles of currently closed roads would be temporarily re-opened.

- Alternative 3 (Proposed Action) – This alternative would use the same treatments as Alternative 2 but on a larger area. Timber harvest would occur on approximately 4,273 acres using sanitation/salvage harvesting (3,803 acres) and clearcut harvesting (469 acres) to yield up to 55 MMBF of timber products. After harvest, reforestation would occur on 800-2,500 acres. Prescribed fire treatment would occur on approximately 3,133 acres (in some areas used in conjunction with timber harvest). New temporary road construction of 1.1 miles would be necessary and approximately 19 miles of currently closed roads would be temporarily re-opened.

- Alternative 4 (Preferred Action) – In addition to applying the same treatments as Alternatives 2 and 3 but on more acreage, this alternative includes the use of pre-commercial thinning. Timber harvest would occur on up to 5,190 acres using sanitation/salvage harvesting (up to 4,430 acres) and clearcut harvesting (up to 760 acres) to yield up to 65 MMBF of timber products. Pre-commercial thinning on up to 500 acres would occur in areas of dense spruce and fir trees. After harvest, reforestation would occur on approximately 1,000-2,500 acres. Prescribed fire treatment would occur on up to 6,000 acres (in some areas used in conjunction with timber harvest). New temporary road construction of 2.5 miles would be necessary and 19 miles of currently closed roads would be temporarily re-opened.

In an April 3, 2009 letter, EPA provided input during the scoping process for this project, and we appreciate that the USFS addressed several of our comments in the DEIS. As a result, our concerns with the August 2010 DEIS have been narrowed to these remaining issues: (1) air quality; (2) aquatic resources; and (3) threatened and endangered species. These concerns are the basis for the EPA rating discussed at the conclusion of this letter.

**Air Quality**

The project area is near the town of Creede, as well as a mandatory Class I Federal area (Weminuche Wilderness Area). In addition to health-based standards to protect ambient air quality, the Clean Air Act requires special protection of visibility in the nation's large National Parks and Wilderness Areas (identified as mandatory Class I Federal areas) and establishes a national goal for "the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory Class I federal areas which impairment results from man-made air pollution." EPA's Clean Air Act implementing regulations require states to submit State Implementation Plans that, among other things, demonstrate attainment of the National Ambient Air Quality Standards (NAAQS), as well as reasonable progress toward the national visibility goal. Actions by Federal Land Managers that lack adequate mitigation of air quality impacts could impede a state's ability to meet Clean Air Act requirements.

Data: EPA is concerned that no air quality data regarding existing conditions are provided in the DEIS, even though it appears such data is readily available from the Colorado Air Pollution Control Division and/or the EPA AirExplorer site (http://www.epa.gov/airexplorer/) and VIEWS site for air quality related values (AQRVs) (http://views.cira.colostate.edu/web/). Information regarding current conditions will be an important tool for monitoring the impacts of the various activities contemplated under the preferred alternative. Decision-makers will need to understand baseline conditions in an effort to ensure that Big Moose Vegetation Management Project activities, when combined with air quality impacts from external sources, do not adversely impact the NAAQS or AQRVs such as visibility. At a minimum, the Final EIS should summarize existing air quality in and around the project area, including trending of air quality at Weminuche Wilderness Area over the past several years, and should identify sensitive receptors (such as surrounding population centers and other Class I and Class II areas in the vicinity).

Prescribed Fire: The action alternatives of the Big Moose Vegetation Management Project include the application of prescribed burning to acreage varying from 1,263 to 6,000 acres, depending on the alternative. This significant prescribed fire activity may cause degradation of air quality and visibility in the region. While we realize that the individual burn plans for this project would quantify expected emissions from the prescribed burns, EPA is concerned that the DEIS does not contain any air impact analysis presenting direct, indirect, or cumulative air quality impacts that would be associated with prescribed burning on the large acreage under consideration. Such information should be included in the Final EIS and is necessary for the decision-maker to ensure protection of air quality and visibility if the prescribed burns are ultimately conducted.

In addition, we recommend that USFS consult with the Colorado Air Pollution Control Division for any modeling, mitigation, or other measures required under State regulations or the State Implementation Plan to address Clean Air Act requirements. Further, we recommend that the Final EIS include: (1) discussion of appropriate smoke monitoring techniques and mitigation (including meteorological conditions favorable for mitigated prescribed fire smoke and alternatives to prescribed fire such as mechanical fuel reduction methods); (2) requirements for

3

the incorporation of the Interagency Prescribed Fire Planning and Implementation Procedures Guide (July 2008) into the site-specific burn plans designed for each prescribed burn conducted under this project; and (3) commitment to public notification of pending burns.

Harvest-, Transportation-, and Dust-Related Emissions:  Air quality and AQRVs are also negatively impacted by emissions from heavy diesel equipment utilized for harvesting/thinning of trees, idling trucks used for transportation of wood products, and dust generated from proposed activities.  EPA is concerned that the DEIS does not contain an inventory of predicted emissions that would be associated with the harvesting/thinning of trees and the associated activities on the large acreage under consideration.  The Final EIS should include such an emissions inventory.  If emissions are significant, then the Final EIS also should include an air impact analysis presenting direct, indirect, and cumulative impacts of these activities.

Further, these emissions should be addressed through project design criteria and monitoring.  Example measures to consider include the following:

- Prohibit unnecessary idling of transportation trucks;
- Use low-sulfur or alternative fuels;
- Require heavy diesel equipment to use cleanest available engines or retrofits with diesel particulate control technology;
- Maintain engines;
- Expand application area for dust abatement measures and require detailed plans for dust control;
- Require prompt revegetation along new roadways and monitor for five years post-revegetation to ensure success; and
- Monitor effectiveness of road closures after project completion.

Indirect Emissions:  The indirect impacts from the use of harvested and/or thinned trees for fuel should be discussed in the DEIS.  The DEIS should describe the likely end use for the substantial amount of board feet expected to be generated and should assess any air emissions that may result.  For instance, if any of the harvested timber would be used as feedstock for supplying fuel at a facility that provides heat and/or power, or would be converted to wood pellets or biofuels, then the DEIS should include a discussion of the specific use and related air quality impacts, including greenhouse gas (GHG) emissions.  There may be mitigation options available to address these indirect emissions.

**Aquatic Resources**

Although the DEIS provides a description of the current health of watersheds and streams in the project area, we are concerned with the lack of baseline water quality data and wetlands conditions.  Baseline information will be important for the decision-maker to assess impacts of the proposed activities.  A brief discussion and summary of the best available water quality monitoring data for the Big Moose Vegetation Management Project area should be included in the Final EIS.  These data should include *Escherichia coli*, nutrient concentrations, temperature,

and turbidity, if they exist. In addition, both jurisdictional and non-jurisdiction wetlands acreage in the analysis area should be quantified and described.

EPA notes Executive Order (EO) 11990 - Protection of Wetlands (May 24, 1977) states in pertinent part: "Section 1. (a) Each agency shall provide leadership and shall take action to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities for (1) acquiring, managing, and disposing of Federal lands and facilities; and (2) providing Federally undertaken, financed, or assisted construction and improvements; and (3) conducting Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities. (b)This Order does not apply to the issuance by Federal agencies of permits, licenses or allocations to private parties for activities involving wetlands on non-Federal property." EPA recognizes the challenges facing the USFS in analyzing, understanding, and ultimately managing wetland resources in a large planning area. However, the Final EIS should describe how the USFS will show compliance with Executive Order 11990, Protection of Wetlands, with regard to this project.

Most activities contemplated under this project (including harvesting/thinning timber, reopening currently closed roads, constructing new temporary roads, and applying prescribed fire) would impact water resources. We are pleased with the selection of project design criteria and monitoring measures to reduce the potential for impacts. We recommend expanding these criteria and measures, as follows: include new temporary roads in the design criteria related to existing roads; monitor revegetation efforts for five years; and monitor breakdown of hydrophobic soils for five years post prescribed burn. In addition, for the design of stream crossings, EPA recommends Best Management Practices (BMPs) to prevent sedimentation of surface waters and restoration as soon as possible to prevent sedimentation flow into streams. The BMPs should be inspected and maintained frequently and should be adjusted in response to inspection findings to protect streams (including fishery spawning areas), wetlands, and riparian corridors from adverse impacts associated with vegetation management activities. Streambank stabilization should utilize bioengineering methods or soft bank protection (as opposed to riprap) to ensure full restoration.

While the DEIS notes that "changes in runoff and flow characteristics, for the most part resulting from beetle kill decreasing live basal area, will likely be a long term effect in the Big Moose Project analysis watersheds regardless of whether harvest operations occur," it is also noted that "[p]resence of standing dead trees and residual live trees and understory in the watershed mitigates increases in water yield." Since the science is still unclear and the pros and cons of beetle kill impacts to watersheds will vary by watershed, we recommend that the DEIS provide a balanced disclosure of positive and negative impacts of both leaving the beetle-killed trees in place and removing them within this particular project area, as well as in the broader context of beetle-killed trees within the entire National Forest.

In addition, the presence and handling of beetle-killed trees has the potential to impact public water supplies by increasing the organic loading to a waterbody. Organic matter interacts

with disinfectants used in the drinking water treatment process to form disinfection byproducts, which are a human health concern. Organic loading may also decrease oxygen levels which can lead to the release of metals such as arsenic, manganese, and iron from sediments. EPA recommends that the Final EIS identify any public water supply intakes downstream from the project area and assess the potential for impacts to drinking water treatment and supplies.

Finally, given the recent court conclusion that logging roads are point sources and thus require National Pollutant Discharge Elimination System (NPDES) permits as a source of industrial stormwater, the DEIS should acknowledge that new and recommissioned logging roads may require permit coverage. See *Northwest Envt'l Def. Ctr. v. Marvin Brown, Oregon State Forester* no. 07-35266 (9th Cir. Aug. 17, 2010).

**Threatened and Endangered Species**

As noted in the DEIS, suitable and/or potential habitat, consisting of downed woody debris and dense horizontal cover, exists in the Big Moose Vegetation Management Project area for the Canada Lynx, an Endangered Species Act-listed threatened species. The project area occurs within the Hogback Lynx Analysis Unit (LAU). As directed by the Southern Rockies Lynx Amendment (SRLA) of 2008, which applies to National Forests in Colorado & southern Wyoming, the USFS assessed potential effects on Canada Lynx by comparing LAU baseline conditions to changes predicted from the project alternatives. The USFS determined that all action alternatives would increase the amount of temporarily unsuitable habitat within the Hogback LAU. The main activity influencing the determination for all action alternatives is the proposed prescribed fire treatment, particularly in areas outside of the Wildland Urban Interface (WUI) which contain dense horizontal cover and in which aspen is a minor component of the stand. This type of activity is not consistent with the SRLA.

Based on this assessment, the USFS determined that Alternative 2 (Limited Action) best meets the intent of the SRLA because prescribed fire *would not be* used in areas outside of the WUI which contain dense horizontal cover and in which aspen is a minor component of the stand. While the DEIS concludes Alternative 2 is not likely to adversely affect lynx and lynx habitat, we note that USFWS concurrence with this determination is required.

However, the USFS has determined that both Alternatives 3 (Proposed Action) and 4 (Preferred Alternative) are not consistent with the SRLA because prescribed fire *would be* used in areas outside of the WUI which contain dense horizontal cover and in which aspen is a minor component of the stand. A determination was made that both Alternatives 3 and 4 are likely to adversely affect lynx and lynx habitat. Formal consultation with the U.S. Fish and Wildlife Service (USFWS) is required for either of these alternatives.

The DEIS does not include an analysis or determination as to whether the prescribed burning component of the proposed action and preferred alternative would result in a significant impact to lynx and would require an amendment to the Forest Plan (with its own additional NEPA analysis requirements). For purposes of disclosing impacts, as well as clarifying the

6

NEPA process for this project, this information should be included in the Final EIS. In addition, while it is helpful that the DEIS includes a discussion of project design criteria and monitoring measures selected to reduce potential impacts to lynx from the various project activities, these measures may need revision or expansion in the Final EIS. Based on conversations with the USFWS, we understand that although USFS has had informal discussions with USFWS on this project, formal consultations have not been completed to satisfy Endangered Species Act (ESA) Section 7 requirements. Given your determination that the preferred alternative "may affect – likely to adversely affect" lynx and lynx habitat, at a minimum it appears that the USFWS may require specified measures to protect the lynx population in the project area. Therefore, in addition to disclosing impacts to lynx and measures to mitigate those impacts, we expect that the results of formal consultation, including any USFWS requirements, would be discussed in detail in the Final EIS for this project. The related USFWS biological opinion would provide important information with regard to impacts and mitigation measures and should be included in the Final EIS.

**Additional Comments**

National Historic Preservation Act: As noted in the DEIS, concurrence is still pending from the Colorado State Historic Preservation Officer regarding your determination of no adverse effect for the proposed action. We would expect any such documentation related to National Historic Preservation Act Section 106 consultations to be included in the Final EIS.

Inventoried Roadless Areas: Under the alternatives section (Chapter 2), it is noted that no treatments will occur in Roadless Areas. However, under the affected environment and environmental consequences section (Chapter 3), it is simply stated that the project is consistent with Management Area prescription and the reader is referred to the Forest Plan. Given that the basic premise of the Roadless Area Conservation Rule is to prohibit road construction and timber harvesting in Inventoried Roadless Areas, we recommend that the discussion in Chapter 3 be expanded to describe efforts to ensure that no treatments will occur in Roadless Areas. Description of these efforts would more obviously assist the reader in understanding your determination that the project will not result in significant impacts to Inventoried Roadless Areas.

Climate Change: The DEIS discussion related to the effects of the proposed project on climate change should be expanded. To fully inform the decision-makers and the public of the proposed project's GHG emissions and potential climate change impacts, we recommend that the Final EIS quantify or qualitatively discuss the expected GHG emissions in $CO_2$-equivalent terms; translate them into equivalencies that are easily understood; and describe any potential inconsistencies between the action and any relevant Regional, Tribal or State climate change plans or goals, as well as the extent to which the USFS would reconcile, through mitigation or otherwise, its action with such plans. In addition, the Final EIS should qualitatively discuss the link between GHG emissions and climate change. As discussed in the CEQ draft guidance on NEPA and Climate Change, "[b]ecause climate change is a global problem that results from global GHG emissions, there are more sources and actions emitting GHGs (in terms of both absolute numbers and types) than are typically encountered when evaluating the emissions of

7

other pollutants. From a quantitative perspective, there are no dominating sources and fewer sources that would even close to dominating total GHG emissions. The global climate change problem is much more the result of numerous and varied sources, each of which might seem to make a relatively small addition to global atmospheric GHG concentrations." EPA recommends that the DEIS climate change discussion be revised to reflect the incremental contribution of the action's GHG emissions, when added to past, present, and reasonably foreseeable future human activities affecting global atmospheric GHG concentrations.

The Final EIS should discuss reasonable alternatives and/or potential means to mitigate or offset the GHG emissions from the action. We understand that the action is intended to mitigate the likelihood of future stronger and potentially wide-ranging wildfires in the area. Nevertheless, the Final EIS should discuss whether there are any reasonable alternatives or means to mitigate GHG emissions associated with the proposed action (*e.g.*, would GHG emissions be reduced with alternatives that entail the harvest but omit the prescribed burning proposed under Alternatives 3 and 4?).

Further, EPA recommends that the "Affected Environment" section of the Final EIS include a brief summary of the ongoing and projected climate change impacts relevant to the action area, based on U.S. Global Change Research Program assessments and other relevant peer-reviewed studies. In addition, EPA recommends that the Final EIS identify any potential need to adapt the proposed action to ongoing and projected regional climate change, as well as any potential impacts from the proposed action that may be exacerbated by climate change. For example, how might ongoing and predicted climate change affect the viability of the DEIS goal of promoting aspen regeneration in this area? With regard to exacerbation of impacts, how might climate change exacerbate the water quality and other impacts from this proposed action?

**EPA's Rating and Recommendation**

Consistent with Section 309 of the Clean Air Act, it is EPA's responsibility to provide an independent review and evaluation of the potential environmental impacts of this project. Based on the procedures EPA uses to evaluate the adequacy of the information and the potential environmental impacts of the proposed action, EPA is rating this DEIS as Environmental Concerns – Insufficient Information (EC-2). The "EC" rating indicates that EPA review has identified environmental impacts that should be avoided in order to fully protect the environment. The "2" rating indicates that EPA has identified additional information, data, analyses, or discussion that should be included in the Final EIS. A full description of EPA's rating system is enclosed.

We hope that our comments regarding air quality, aquatic resources, and threatened and endangered species will assist you in further reducing the environmental impacts of this project. We appreciate the opportunity to review and comment on this DEIS. If we may provide further explanation of our comments, please contact me at 303-312-6004, or your staff may contact Amy Platt at 303-312-6449.

Sincerely,

Larry Svoboda
Director, NEPA Compliance and Review Program
Ecosystems Protection and Remediation

Enclosure

9

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and between ConocoPhillips Company ("COP") and Edmund G. Brown Jr., Attorney General of California, on behalf of the People of the State of California ("Attorney General"), and is dated and effective as of September 10, 2007 (the "Effective Date"). COP and the Attorney General are sometimes collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, on or about May 27, 2005, COP submitted an application to the County of Contra Costa (the "County") for a project known and referred to as the Clean Fuels Expansion Project (the "Project"). COP states that the Project is designed to use the heavy gas oil that is already produced at COP's Rodeo, California Refinery ("the Refinery"), and that currently is being sold in the fuel oil market, to produce instead cleaner-burning gasoline and diesel fuels. Without importing any additional crude oil to the Refinery, COP believes that the Project will enable the Refinery to increase the supply of cleaner-burning fuels into the California market by approximately 1 million gallons per day. Increased production of cleaner-burning fuels is now mandated by the California Air Resources Board ("CARB") and the United States Environmental Protection Agency. The Project includes a Hydrogen Plant, to be constructed, owned, and operated by Air Liquide (the "Hydrogen Plant"), which will produce steam and electricity, as well as hydrogen, for use in Refinery processes;

WHEREAS, on or about September 12, 2005, in accordance with the requirements of the California Environmental Quality Act ("CEQA"), the County prepared and circulated a Notice of Preparation of an Environmental Impact Report for the Project. A Draft Environmental Impact Report for the Project was circulated for comment in November 2006. Comments were received on the EIR; the County prepared responses to those comments and completed the Final Environmental Impact Report for the Project (the "EIR") in April 2007. COP contends that the EIR adequately addressed, among other things, the greenhouse gas emissions ("GHG") from the Project and associated issues of climate change, and that the County Planning Commission was correct in concluding, based on substantial evidence, that further discussion in the EIR relating to GHGs would be speculative. The EIR was certified and the Project permit was approved by the County Planning Commission on May 8, 2007;

WHEREAS, on May 18, 2007, the Attorney General filed an appeal to the Contra Costa County Board of Supervisors of the Planning Commission's approval of the Project and certification of the EIR, on the alleged ground that

the EIR failed to adequately address the GHG emissions from the Project and associated climate change impacts (the "AG Appeal"); and

WHEREAS, given the uncertainties of the outcome of the disputes and issues relating to the AG Appeal, and subject to the terms and conditions set forth herein, the Parties wish to resolve the issues raised by the AG Appeal without the need for further administrative hearing or judicial proceedings.  .

NOW, THEREFORE, in consideration of the terms, conditions and covenants set forth herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.  The EIR for the Project states that the Project will result in 1.25 million metric tons of CO2 emissions, mostly attributable to the Hydrogen Plant.  At least initially, COP will not be using the entire capacity of the Hydrogen Plant, and emissions from the Hydrogen Plant associated with COP's usage will be approximately 500,000 metric tons of CO2 per year.  Without admitting any liability or obligation to do so, and solely as a compromise of the issues raised by the AG Appeal, COP agrees to offset those GHG emissions by taking the following actions:

> a. COP has registered its Santa Maria Refinery calcining plant with the California Climate Action Registry, and estimates that the annual CO2 emissions from the plant are 70,000 tons.  COP agrees to permanently surrender its operating permit for that facility by no later than December 31, 2007.

> b.  By March 31, 2008, COP will conduct a facility-wide energy efficiency audit of its Rodeo Refinery using an outside consultant, in order to identify possible energy efficiency measures that may be taken at the facility.  COP may choose, but shall not be obligated to implement any of the findings of that audit.

> c.  By December 31, 2008, COP will complete a greenhouse gas emissions audit of its California refineries.  This audit will include a review of the greenhouse gases emitted from those facilities, including carbon dioxide, methane, CFC and HFC compounds.  The audit will be conducted to identify sources of these emissions and potential emissions reduction opportunities at COP's California refineries.  COP will take the information contained in the audit into consideration as part of its  strategy for compliance with California Health and Safety code Division 25.5, sections 38500, et seq., the California Global Warming Solutions Act ("AB32").

d. By no later than June 1, 2009, COP will make a one-time payment of $7 million (Seven Million Dollars) to a carbon offset fund to be created by the Bay Area Air Quality Management District (BAAQMD). This payment will be used by the BAAQMD, pursuant to a Memorandum of Understanding ("MOU") to be entered into between the Attorney General and the BAAQMD, to fund grants for projects undertaken in the San Francisco Bay Area to achieve verifiable, quantifiable reductions in GHG emissions, with priority given to projects near the Rodeo Refinery. In the event (1) the fund has not been created; or (2) the MOU has not been signed by June 1, 2009, then COP and the Attorney General will meet to agree upon an alternative recipient for the funds. COP's payment obligation under this paragraph 1 (d) shall be reduced by $25 per ton for each ton of GHG emissions reductions per year that COP achieves at its Rodeo Refinery by implementing measures identified in the facility-wide audit of the Refinery, or otherwise reviewed and verified by the BAAQMD.

e. By no later than June 1, 2009, COP will pay $200,000 (Two Hundred Thousand Dollars) to the Audubon Society for the restoration of San Pablo Bay wetlands to offset the Project's emissions of GHGs by increasing the sequestration of carbon. In the event the Audubon Society, (1) does not exist on the date for payment under this subparagraph; (2) does not agree to the use of the funds specified herein; or (3) does not accept the funds for any reason, then COP and the Attorney General will meet to agree on an alternate recipient.

f. By no later than June 1, 2009, COP will pay $2.8 million (Two Million Eight Hundred Thousand Dollars) to California Wildfire ReLeaf, subject to California Wildfire ReLeaf's written agreement to use the funds for reforestation and/or conservation projects (the "forestry projects") in California to be conducted in accordance with the California Climate Action Registry's Forestry Project Protocol. California Wildfire ReLeaf will be responsible for ensuring that it complies with Registry requirements for certification of a reduction inventory for projects receiving these funds. This payment will offset the Project's emissions of GHGs by funding planting and/or conservation of trees that sequester carbon. COP currently estimates that these forestry projects will sequester 1,500,000 metric tons of $CO_2$ over the life span of the trees. In the event California Wildfire ReLeaf, (1) does not exist at the time the payment under this subparagraph is due; (2) does not agree to the use of the funds specified herein; or (3) does not accept the funds for any reason, COP and the Attorney General will meet to agree on an alternate recipient.

g. COP's obligation to make the payments set forth in paragraphs 1 (d) through (f) of this Agreement is contingent upon COP obtaining a valid Contra Costa County land use permit for the Project, containing the

terms of this Agreement as permit conditions. If the Project is proceeding (being built or in operation) on June 1, 2009, COP shall make the payments, even if CEQA litigation concerning the Project is still pending. If the Parties dispute whether payment should be made pursuant to this sub-paragraph, they will meet in a timely fashion and attempt to resolve the dispute.

h.  COP agrees to offset $CO_2$ emissions from the Hydrogen Plant in excess of 500,000 metric tons of $CO_2$ per year (which is equivalent to an expected COP use of 50 MM standard cubic feet per day of hydrogen production), if any, for the period from the start-up of the Hydrogen Plant until regulations are adopted for the implementation of AB-32 [cite], but only to the extent those emissions are attributable to COP's use of more than 50 MM standard cubic feet per day of hydrogen production from that Plant. Such offsets may include, but are not limited to, reduction in rates and/or shutdown of existing hydrogen plants and/or other operating equipment within the Rodeo Refinery. To the extent there are $CO_2$ emissions from the Hydrogen Plant in excess of 500,000 metric tons per year of $CO_2$ in the period between start-up of the Hydrogen Plant and the adoption of regulations for the implementation of AB-32, but which are attributable to the use of excess capacity by third parties other than COP, then Air Liquide, along with its third party customers, will be responsible to provide the required offsets and COP will not be responsible for offsetting those emissions. In the event that AB-32 is modified or replaced by an equivalent California law prior to implementation, or is pre-empted by federal law concerning GHG's or climate change, the offset requirements in this paragraph will apply to the period from plant start-up to the implementation of the relevant state or federal law.

3.  COP may apply to receive offset and/or credit status for reductions achieved through the projects and activities funded pursuant to this Agreement, under AB-32 or any equivalent state or federal law or regulation.

4.  The Attorney General recognizes that COP's significant efforts to mitigate GHG emissions from the Clean Fuels Project, in advance of the establishment of regulations and guidelines under AB 32, and without the need for the initiation of litigation by the Attorney General, helps to achieve the goals of AB 32. Therefore, on or before the Effective Date of this Agreement, the Attorney General will provide the County with a letter withdrawing the AG Appeal of the Project permit. This Agreement shall be attached to the letter withdrawing the AG Appeal. The Attorney General further agrees not to file any documents or pleadings in any administrative or judicial proceedings concerning the Project, pending now or in the future, that would tend to support a challenge to the Project, the EIR, or the Project approvals, including but not limited to the appeals

filed by Communities for a Better Environment and the Center for Biological Diversity.

5. This Agreement represents the entire agreement of the Parties with respect to the subject matter herein, and merges and supersedes any prior written or oral representations, discussions, understandings or agreements by or between the Parties relating to the subject matter of this Agreement.

6. No addition to or modification of any term or provision of this Agreement will be effective unless set forth in writing and signed by an authorized representative of each of the Parties.

7. In agreeing to make the payments identified herein, COP does not admit the necessity of implementing any additional offset or mitigation measures for the Project, and COP agrees to make these payments solely as a compromise and settlement of the AG Appeal.

8. Each Party represents and warrants that it has the right, power, and authority to execute this Agreement. Each Party represents and warrants that it has given any and all notices, and obtained any and all consents, powers and authorities, necessary to permit it, and the persons executing this Agreement for it, to enter into this Agreement.

9. This Agreement shall be binding on and inure to the benefit of the successors and assigns of the Parties to the Agreement.

10. Each Party to this Agreement shall bear its own attorney's fees and costs incurred in connection with the AG Appeal and this Settlement Agreement.

11. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

12. This Agreement may be executed in counterparts, each of which shall be deemed an original. This Agreement shall be binding upon the receipt of facsimile signatures.

13. This Agreement shall be deemed to have been jointly drafted, so that the general rule of construction that it be construed against the drafter shall not apply.

14. Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to be given when served personally, or on the third day after mailing if mailed in the United States mail, postage prepaid, addressed to the address for each Party set forth below:

Attorney General:

    Sandra Goldberg
    Office of the Attorney General
    1515 Clay St., PO Box 70550
    Oakland, CA  94612-0550

COP:

    Elissa Warantz
    3900 Kilroy Airport Way, Ste 210
    Long Beach, CA  90806

15. The Parties will execute all further and additional documents as shall be convenient, necessary or desirable to carry out the intent and provisions of this Agreement.

In witness whereof, this Agreement is executed by the following:

PEOPLE OF THE STATE OF CALIFORNIA
BY AND THROUGH ATTORNEY GENERAL
EDMUND G. BROWN

*Sandra Goldberg*

Sandra Goldberg, Deputy Attorney General
Dated: 9/10/07

CONOCOPHILLIPS
COMPANY

*[signature]*

Dated: 9-10-07

This is a preprint of an article submitted for consideration in

**Human and Ecological Risk Assessment: an International Journal**

2011 Copyright Taylor & Francis


*Human and Ecological Risk Assessment: an International Journal*

is available online at: http://www.tandfonline.com

For a copy of the published article go to:

http://www.tandfonline.com/doi/abs/10.1080/10807039.2011.605662#preview

# Natural Gas Operations from a Public Health Perspective

**Theo Colborn, Carol Kwiatkowski, Kim Schultz, and Mary Bachran**


TEDX, The Endocrine Disruption Exchange, Paonia, CO, USA


Address correspondence to Theo Colborn, TEDX, P.O. Box 1407, Paonia, CO 81428, USA,

Ph: 970-527-4082 Fx: 970-527-4082, E-mail: tedxadmin@tds.net

**Running Head:** Natural Gas Operations from a Public Health Perspective

Received 8 June 2010; revised manuscript accepted 4 September 2010-

1

## ABSTRACT

The technology to recover natural gas depends on undisclosed types and amounts of toxic chemicals. A list of 944 products containing 632 chemicals used during natural gas operations was compiled. Literature searches were conducted to determine potential health effects of the 353 chemicals identified by Chemical Abstract Service (CAS) numbers. More than 75% of the chemicals could affect the skin, eyes, and other sensory organs, and the respiratory and gastrointestinal systems. Approximately 40-50% could affect the brain/nervous system, immune and cardiovascular systems, and the kidneys; 37% could affect the endocrine system; and 25% could cause cancer and mutations. These results indicate that many chemicals used during the fracturing and drilling stages of gas operations may have long-term health effects that are not immediately expressed. In addition, an example was provided of waste evaporation pit residuals that contained numerous chemicals on the CERCLA and EPCRA lists of hazardous substances. The discussion highlights the difficulty of developing effective water quality monitoring programs. To protect public health we recommend full disclosure of the contents of all products, extensive air and water monitoring, coordinated environmental/human health studies, and regulation of fracturing under the U.S. Safe Drinking Water Act.

**Key Words**: drilling, health, hydraulic fracturing, natural gas, ozone, pollution.

## INTRODUCTION

Over the past two decades, in an effort to reduce dependence on imported fossil fuels, the U.S. government has supported increased exploration and production of natural gas. The responsibility for overseeing the nation's underground minerals lies with the U.S. Department of Interior, Bureau of Land Management (BLM) with some oversight from the U.S. Environmental Protection Agency (USEPA). Attempting to meet the government's need for energy self-sufficiency, the BLM has auctioned off thousands of mineral leases and issued permits to drill across vast acreages in the U.S. Rocky Mountain West. Since 2003, natural gas operations have increased substantially, with annual permits in Colorado alone increasing from 2,249 to 8,027 in 2008 (Colorado Oil and Gas Conservation Commission 2010).

In tandem with federal support for increased leasing, legislative efforts have granted exclusions and exemptions for oil and gas exploration and production from a number of federal environmental statutes, including the Clean Water Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, better known as the Superfund Act), the Resource Conservation and Recovery Act (RCRA), the Toxic Release Inventory under the Emergency Planning and Community Right-to-Know Act (EPCRA), and the National Environmental Policy Act (NEPA) (Oil and Gas Accountability Project 2007). The most recent of these efforts was an amendment included in the 2005 Energy Policy Act that prevented the use of the Safe Drinking Water Act to regulate certain activities, known as hydraulic fracturing, which are involved in 90% of natural gas drilling.

The cumulative effect of these exemptions and exclusions has been to create a federal void in environmental authority over natural gas operations, leaving the responsibility primarily up to the states. Although some states have oil and gas commissions to watch over natural gas production activity, the primary mission of these agencies has been to facilitate natural gas extraction and increase revenues for the states. In addition, when states issue permits to drill, they have not traditionally required an accounting of how the resulting liquid and solid waste would be handled. In short, their focus has not typically been on health and the environment.

### The Need for Chemicals

In keeping with the rush to produce more natural gas, technological advances have permitted the industry to drill deeper and expand wider, tapping into gas reserves with greater facility and profitability. While these advances have allowed the mining of vast, newly discovered gas deposits, the new technology depends heavily on the use of undisclosed types and amounts of toxic chemicals.

3

Chemicals are used throughout operations to reach and release natural gas. First, combinations of chemicals are added to the "muds" used to drill the bore hole. Chemicals are added to increase the density and weight of the fluids in order to facilitate boring, to reduce friction, to facilitate the return of drilling detritus to the surface, to shorten drilling time, and to reduce accidents. After drilling, hydraulic fracturing (also known as fracking, frac'ing, or stimulation) is done to break up the zone in which the gas is trapped and make it easier for the methane to escape, increasing a well's productivity. In the U.S. West, approximately a million or more gallons of fluid containing toxic chemicals are injected underground during this operational stage. As with drilling, chemicals are used in fracking fluids for many purposes (Table 1). One well can be fracked 10 or more times and there can be up to 30 wells on one pad. An estimated 10% to 90% of the fracking fluid is returned to the surface during well completion and subsequent production (BC Oil and Gas Commission 2010; New York State Department of Environmental Conservation Division of Mineral Resources 2009), bringing with it toxic gasses, liquids, and solid material that are naturally present in underground oil and gas deposits. Under some circumstances, none of the injected fluid is recovered.

In most regions of the country, raw natural gas comes out of the well along with water, various liquid hydrocarbons including benzene, toluene, ethylbenzene, and xylene (as a group, called BTEX), hydrogen sulfide ($H_2S$), and numerous other organic compounds that have to be removed from the gas. When the gas leaves the well it is passed through units called heater treaters that are filled with triethylene glycol and/or ethylene glycol that absorbs the water from the gas. Once the glycol solution becomes saturated with water, the heaters turn on and raise the temperature enough to boil off the water, which is vented through a closed system and upon cooling, ends up in a nearby tank labeled "produced water". The glycol fluid, which has a higher boiling point than water, cools and is reused. During the heating process at critical temperatures the oily substances that came up with the gas become volatile and then re-condense into a separate holding tank. This is known as "condensate" water. The contaminated water can be re-injected underground on the well pad or off site, common practices in the eastern U.S., or hauled off the well pad to waste evaporation pits in the U.S. West. Temporary pits are also constructed during drilling to hold the cuttings, used drilling mud which is often re-used, and any other contaminated water that comes to the surface while drilling. These reserve pits on well pads are supposed to be drained and covered with top soil or other suitable material within a month after drilling stops.

**An Unexpected Side Effect: Air Pollution**

In addition to the land and water contamination issues, at each stage of production and delivery tons of toxic volatile compounds (VOCs), including BETX, other hydrocarbons, and fugitive natural gas (methane), can escape and mix with nitrogen oxides (NOx) from the exhaust of diesel-fueled, mobile, and stationary equipment, to produce ground-level ozone (CH2MHILL 2007; Colorado Department of Public Health and Environment [CDPHE] 2007; URS 2008; U.S. Congress, Office of Technology Assessment 1989). One highly reactive molecule of ground level ozone can burn the deep alveolar tissue in the lungs, causing it to age prematurely. Chronic exposure can lead to asthma and chronic obstructive pulmonary diseases (COPD), and is particularly damaging to children, active young adults who spend time outdoors, and the aged (Islam *et al.* 2007; Tager *et al.* 2005; Triche *et al.* 2006). Ozone combined with particulate matter less than 2.5 micrometers produces smog (haze) that has been demonstrated to be harmful to humans as measured by emergency room admissions during periods of elevation (Peng *et al* 2009). Gas field ozone has created a previously unrecognized air pollution problem in rural areas, similar to that found in large urban areas, and can spread up to 200 miles beyond the immediate region where gas is being produced (U.S. Congress, Office of Technology Assessment 1989; Roberts 2008). Ozone not only causes irreversible damage to the lungs, it is similarly damaging to conifers, aspen, forage, alfalfa, and other crops commonly grown in the western U.S. (Booker *et al.* 2009; Reich 1987; U.S. Congress, Office of Technology Assessment 1989). Adding to this air pollution is the dust created by fleets of diesel trucks working around the clock hauling the constantly accumulating condensate and produced water to large waste facility evaporation pits on unpaved roads. Trucks are also used to haul the millions of gallons of water from the source to the well pad.

**PROJECT DESIGN**

The following project grew from a year 2004 request by OGAP (Oil and Gas Accountability Project) to TEDX (The Endocrine Disruption Exchange) to explore the potential health effects of chemicals used during drilling, fracking, processing, and delivery of natural gas. OGAP, a project of Earthworks, is a national non-profit organization established in 1999 to watchdog the oil and natural gas industry. TEDX is a non-profit organization dedicated to compiling and disseminating technical information on chemicals that affect health and the environment.

**Data Sources**

In order to find out what chemicals were being used to extract natural gas, we took advantage of the information on the Material Safety Data Sheets (MSDSs) that accompany each product used during natural gas operations. MSDSs detailing specific products in use were provided by multiple sources including the BLM, U.S. Forest Service, state government departments, and the natural gas industry. MSDSs are designed to inform those who handle, ship, and use products that contain dangerous chemicals. They provide information about the physical and chemical characteristics of the chemicals in a product, and the immediate and chronic health effects, in order to prevent injury while working with the products. They are also designed to inform emergency response crews in case of accidents or spills. In addition to the MSDSs, we also used State Tier II Reports that must be filed by storage facilities under EPCRA. This Act sets a minimum amount above which a product that contains a hazardous substance in a storage facility has to be reported. We also supplemented our analysis with product information from disclosures in Environmental Impact Statements, Environmental Assessment Statements, and accident and spill reports. At first we looked only at what was taking place in Colorado and over the course of several years we acquired information from Wyoming, New Mexico, Texas, Washington, Montana, Pennsylvania, and New York. The list of products and chemicals quickly grew, making it apparent that hundreds of different products serving many purposes were being used in natural gas operations across the country. The number of chemical products manufacturers has also grown, making this a highly competitive industry.

It should be clear that our list of products is not complete, but represents only products and chemicals that we were able to identify, through a variety of sources, as being used by industry during natural gas operations. For most products, we cannot definitively say whether they were used during drilling or during fracking. However, an accidental blow-out of the Crosby well in Wyoming provided a unique opportunity to analyze the chemicals used during drilling, as fracking had not yet begun on that well. When the blow-out occurred, methane and other gases, petroleum condensates, and drilling fluids (muds) were released from fissures in the ground adjacent to the well. During the 58 hours the eruption took place, 25,000 square feet of soil surface in the area were contaminated. The driller released copies of the MSDSs for the products used during the blow-out and later we found the names of several more products from remedial action work plans to clean up the site (Terracon 2007).

On another occasion we were provided data from a 2007 New Mexico study, sponsored by 19 oil and gas companies and conducted by a third party consultant and analytical laboratory. This

gave us the opportunity to explore the health effects of chemicals in samples of pit solids drawn from six evaporation pits where gas operations were ceasing.

**Data Limitations**

MSDSs and Tier II reports are fraught with gaps in information about the formulation of the products. The U.S. Occupational Safety and Health Administration (OSHA) provides only general guidelines for the format and content of MSDSs. The manufacturers of the products are left to determine what information is revealed on their MSDSs. The forms are not submitted to OSHA for review unless they are part of an inspection under the Hazard Communication Standard (U.S. Department of Labor 1998). Some MSDSs report little to no information about the chemical composition of a product. Those MSDSs that do may only report a fraction of the total composition, sometimes less than 0.1%. Some MSDSs provide only a general description of the content, such as "plasticizer", "polymer", while others describe the ingredients as "proprietary" or just a chemical class. Under the present regulatory system all of the above "identifiers" are permissible. Consequently, it is not surprising that a study by the U.S. General Accounting Office (1991) revealed that MSDSs could easily be inaccurate and incomplete.

Tier II reports can be similarly uninformative, as reporting requirements vary from state to state, county to county, and company to company. Some Tier II forms include only a functional category name (*e.g.,* "weight materials" or "biocides") with no product name. The percent of the total composition of the product is rarely reported on these forms.

The most critical limiting factor in our research was that Chemical Abstract Service (CAS) numbers were often not provided on MSDSs. The American Chemical Society has established the CAS number system to identify unique chemical substances. A single substance can have many different names, but only one CAS number. CAS numbers identify substances that may be a single chemical, an isomer of a chemical, a mixture of isomers, polymers, biological sequences, or a mixture of related chemicals. For purposes of accuracy, our research into the health effects of chemicals used in natural gas operations was restricted to only chemicals for which a CAS number was available.

**Health Effects**

Information on the health effects associated with identified chemicals was obtained from MSDSs, as well as government toxic chemical databases such as TOXNET and the Hazardous

Substances Database, and through literature searches of biomedical studies. Information available for some chemicals is limited due to lack of access to studies performed on the toxicity of the substance. For example, many laboratory studies submitted to USEPA for the registration of chemicals are not accessible on the basis that the information is proprietary to the industry.

Health effects were divided into 14 health categories, focusing on the main target organs or systems that are identified on MSDSs, government toxicological reports, and in medical literature. The categories include all seven priority health conditions identified by the Agency for Toxic Substances and Disease Registry (ATSDR 2010) associated with uncontrolled hazard waste sites listed as required by CERCLA, 1984, as amended (U.S. Environmental Protection Agency 1984). We reduced these to 12 categories by combining developmental and reproductive health impacts under endocrine disruption. The resulting 12 categories included: skin, eye and sensory organ, respiratory, gastrointestinal and liver, brain and nervous system, immune, kidney, cardiovascular and blood, cancer, mutagenic, endocrine disruption, other, and ecological effects.

**Data Analysis**

Using the data sources described above, we entered the names of all the products and chemicals into a spreadsheet. Initially, chemicals were separated according to the state in which the data source originated. Analysis of the profiles of health effects revealed minimal differences across states, thus for this report we combined all the data into one multi-state analysis. Using only the chemicals on the multi-state list for which CAS numbers were available, we produced a profile based on how often each of the 12 possible health effects were associated with the chemicals. We created separate profiles for the water soluble chemicals alone, and the volatile chemicals alone. We also did an analysis of the drilling chemicals from the Wyoming well-blowout and an analysis of the chemicals found in the New Mexico evaporation pits. Finally, we tested the utility of the spreadsheet for providing guidance for water quality monitoring, focusing on the most potentially harmful and frequently used chemicals.

**RESULTS**

**Product Information**

As of May, 2010, TEDX identified 944 products used in natural gas operations in the U.S. Of these, between 95 and 100% of the ingredients were available for 131 (14%) of the products (Figure 1). For 407 (43%) of the products, less than 1% of the total product composition was available. For

8

those 407 products, only the name of the product with no identifiable chemical name or percent composition was reported. A total of 632 chemicals were reported in the products and we were able to locate CAS numbers for 353 (56%) of them.

**Health Effects Profile**

Using the health effect information for the 353 chemicals with CAS numbers, we created a profile of possible health effects that depicts the percentage of chemicals associated with each of the 12 health effect categories (Figure 2). Viewing the profile from left to right, more than 75% of the chemicals on the list can affect the skin, eyes, and other sensory organs, the respiratory system, the gastrointestinal system, and the liver. More than half the chemicals show effects on the brain and nervous system. These first four categories represent effects that would likely be expressed upon immediate exposure, such as eye and skin irritation, nausea and/or vomiting, asthma, coughing, sore throat, flu-like symptoms, tingling, dizziness, headaches, weakness, fainting, numbness in extremities, and convulsions. Products containing chemicals in powder form, irritants, or highly corrosive and volatile chemicals would all come with MSDS warnings in one or more of these categories. In all probability, none of the chemicals in these categories would normally be ingested during natural gas operations, but immediate eye, nasal, dermal contact, and inhalation could lead to rapid absorption and cause direct exposure to the brain and other vital organ systems.

Health categories that reflect chronic and long-term organ and system damage comprise the middle portion of Figure 2. These included the nervous system (52%), immune system (40%), kidney (40%), and the cardiovascular system and blood (46%). More than 25% of the chemicals can cause cancer and mutations. Notably, 37% of the chemicals can affect the endocrine system that encompasses multiple organ systems including those critical for normal reproduction and development. The category of 'other' is more common, and includes effects on weight, teeth, and bone and the ability of a chemical to cause death. More than 40% of the chemicals have been found to have ecological effects, indicating that they can harm aquatic and other wildlife.

**Volatile and Soluble Chemicals**

Organization of the data by pathway of exposure, separate health category profiles are shown in Figure 3 for the volatile and water soluble chemicals. Approximately 37% of the chemicals are volatile and can become airborne. More than 89% of these chemicals can harm the eyes, skin, sensory organs, respiratory tract, gastrointestinal tract, or liver. Compared with the soluble chemicals, far more of the volatile chemicals (81%) can cause harm to the brain and nervous system. Seventy

one percent of the volatile chemicals can harm the cardiovascular system and blood, and 66% can harm the kidneys. Overall, the volatile chemicals produce a profile that displays a higher frequency of health effects than the water soluble chemicals. In addition, because they vaporize, not only can they be inhaled, but also ingested and absorbed through the skin, increasing the chance of exposures.

**Drilling Chemicals**

The profile for the 22 drilling chemicals identified from the well blow-out in Wyoming are shown in Figure 4. The profile was unique in the following ways. All the chemicals used in the drilling fluids were associated with respiratory effects. Nearly 60% were associated with 'other' effects, a category that includes outright mortality as an end point. A relatively high percentage of chemicals that affect the immune system were used.

**Evaporation Pit Chemicals**

Shown in Figure 5 are the health effects of the 40 chemicals and metals reported in the New Mexico evaporation pits. These chemicals produced a health profile even more hazardous than the pattern produced by the drilling and fracking chemicals. Upon further investigation, we discovered that 98% of the 40 chemicals found in the pits are listed on USEPA's 2005 CERCLA (Superfund) list and 73% are on the 2006 EPCRA List of Lists of reportable toxic chemicals. Of the nine chemicals found to exceed the New Mexico state limits, all are on the CERCLA list and all but one are on the EPCRA List of Lists.

**Analyses for Water Quality Monitoring**

For the purpose of water quality monitoring guidance, we analyzed the data according to the most potentially harmful chemicals and the most frequently used chemicals. In Table 2 is provided a list of the most egregious chemicals, those with 10 or more health effects. Roughly half of these chemicals are used in only one product on our list, making it impractical and a waste of time and money to try to test water for the most harmful chemicals. A more practical approach would be to test for the most frequently used chemicals. Although we do not know how often each product is used, we assume that the more products that contain a given chemical, the more likely it is to be detected in a water sample. Shown in Table 3 are all the chemicals on our list that were found in at least seven different products. Many of these chemicals are relatively harmless. The most frequently cited chemical was crystalline silica (quartz), which was reported in 125 different products. Note that petroleum distillates and a variety of alcohols are found in numerous products, as are several forms

10

of potassium, which is a relatively easy and inexpensive chemical to detect in water. This list may prove useful in devising a water monitoring program. Regardless of how many health effects a chemical has, elevated levels of frequently used chemicals found in a water source could provide evidence of communication between natural gas operations and water resources.

## DISCUSSION

Industry representatives have said there is little cause for concern because of the low concentrations of chemicals used in their operations. Nonetheless, pathways that could deliver chemicals in toxic concentrations at less than one part-per-million are not well studied and many of the chemicals on the list should not be ingested at any concentration. Numerous systems, most notably the endocrine system, are extremely sensitive to very low levels of chemicals, in parts-per-billion or less. The damage may not be evident at the time of exposure but can have unpredictable delayed, life-long effects on the individual and/or their offspring. Effects of this nature would be much harder to identify than obvious impacts such as skin and eye irritation that occur immediately upon contact. Health impairments could remain hidden for decades and span generations. Specific outcomes could include reduced sperm production, infertility, hormone imbalances, and other sex-related disorders. Further compounding this concern is the potential for the shared toxic action of these contaminants, especially those affecting the same and/or multiple organ systems.

It was difficult to arrive at a 'short list' of chemicals that would be informative for water quality monitoring because of the vast array of products constantly being developed, and the wide selection of chemicals used in those products. We can, however, provide some guidance by pointing out four types of chemicals that are used in a relatively high number of products. These include (1) the silicas, which appear frequently as product components; (2) potassium based chemicals, which are also found in numerous products, although with relatively low toxicity; (3) petroleum derived products, which take on many different forms (including some without CAS numbers), and some of which are toxic at low concentrations and might be detected with diesel or gasoline range organics tests; and (4) the alcohols for which new detection technology is being developed, and because they are among the chemicals with the most health effects.

Detection of increasing or elevated concentrations of these chemicals near gas operations could indicate that communication between natural gas activities and a water resource such as a domestic well, creek, pond, wetland, *etc.*, is occurring. If a longitudinal monitoring program were to reveal any increase in concentration in one of these target groups, even if the concentrations were well below any water quality standards, it should trigger more testing immediately.

11

For many years, drillers have insisted that they do not use toxic chemicals to drill for gas, only guar gum, mud, and sand. While much attention is being given to chemicals used during fracking, our findings indicate that drilling chemicals can be equally, if not more dangerous. What we have learned about the chemicals used in the Crosby well blowout provides insight into why citizens living nearby suffered severe respiratory distress, nausea, and vomiting and had to be evacuated from their homes for several days. It might also shed light on why other individuals living near gas operations have experienced similar symptoms during the gas drilling phase (prior to fracking).

From the first day the drill bit is inserted into the ground until the well is completed, toxic materials are introduced into the borehole and returned to the surface along with produced water and other extraction liquids. In the western U.S. it has been common practice to hold these liquids in open evaporation pits until the wells are shut down, which could be up to 25 years. These pits have rarely been examined to ascertain their chemical contents outside of some limited parameters (primarily metals, chlorides, and radioactive materials). Our data reveal that extremely toxic chemicals are found in evaporation pits and indeed, these and other similar sites may need to be designated for Superfund cleanup. In the eastern U.S., and increasingly in the west, these chemicals are being re-injected underground, creating yet another potential source of extremely toxic chemical contamination. In other words, what ends up in evaporation pits in the West, will in other parts of the country be injected underground.

**RECOMMENDATIONS**

TEDX has collected the names of nearly a thousand products used in natural gas operations in the U.S. We have no idea how many more products are in use. We have health data on only a small percentage of the chemicals in use because CAS numbers are often not provided on MSDSs and without a CAS number it is impossible to search for health data. Working under the assumption that our results underestimate the consequences of the health impacts to the labor force, residents living in close proximity to the wells, and those dependent upon potable and agricultural water that could be affected by natural gas operations, we make the following recommendations:

(1) Product labels and/or MSDSs must list the complete formulation of each product, including the precise name and CAS number and amount of every chemical, as well as the composition of the vehicle used to fill the product container. To prevent serious injury and mortality the products used during natural gas operations should be exempt from confidentiality.

12

(2) If an ingredient does not have a CAS number it must be clearly defined, leaving no doubt about its possible health impact(s).

3) Records should be kept for each drilling and fracking operation, listing the total volume of fluid injected, the amount of each product used, the depth at which the products were introduced, and the volume of fluid recovered.

4) The volume and concentration of all liquids and solids removed from the work sites should be made available to the public. Without this information the full health and environmental hazards posed by natural gas production cannot be predicted.

(5) Air quality monitoring for individual VOCs as well as ozone must become standard procedure in any region where natural gas activity is taking place and must commence prior to initiation of operations to establish baseline levels. Estimating tonnage of VOCs and NOx released and ignoring ozone should no longer be the practice.

(6) Comprehensive water monitoring programs should be established in every gas play across the U.S. both prior to and after gas production commences, that include new chemical species indicators based on toxicity and mobility in the environment, and pollution of sub-surface and above-surface domestic and agricultural water resources, and all domestically-used aquifers and underground sources of drinking water.

(7) We recommend the development of labeled isotopic fingerprints of the chlorinated compounds in products used to drill and fracture. Each manufacturer would have its own fingerprint. A plot of this isotopic data found down gradient of a hydraulically fractured well would aid a state or federal regulator in identifying the contamination source.

(8) Given the general consistency of reported adverse health effects by citizens and laborers across many gas plays, public health authorities should establish an epidemiological monitoring program that merges at the state and national level in order to increase power and be able to reach conclusions early on. The design of the study should include environmental monitoring of air and water as well as any health changes in those living and working in regions of natural gas operations. The health monitoring should be able to detect early trends in parameters, such as asthma, hypertension, chemical sensitization, chronic skin and eye irritation, and neurological alterations, to mention a few.

(9) As underground injection of waste is becoming the most frequent choice for waste disposal, rigid accounting of the date, volume, and source of all materials, and the exact location in the geological formation(s) in which it is injected should be become a part of permanent government records that will be publicly available for future generations.

13

(10) Before a permit is issued to drill for natural gas, complete waste management plans should be reviewed and approved and become part of the permit.

(11) The injection of hydraulic fracturing fluids should be regulated under the Safe Drinking Water Act. This is needed to assure mechanical integrity of the injection wells and isolation of the injection zone from underground sources of drinking water.

## ACKNOWLEDGMENTS

We thank The New York Community Trust, the Winslow Foundation, and the U.S. Environmental Protection Agency (Grant No. EQ-97838701) for their support. This data collection and analyses were partially funded through a USEPA grant. USEPA makes no claims regarding the accuracy or completeness of the information in this article. Competing interest declaration: The authors have no conflicts of interest.

## REFERENCES

ATSDR (Agency for Toxic Substances and Disease Registry). 2010. US Department of Health and Human Services, Atlanta, GA, USA. Available at: http://www.atsdr.cdc.gov/

Booker F, Muntifering R, McGrath M, *et al*. 2009. The ozone component of global change: potential effects on agricultural and horticultural plant yield, product quality and interactions with invasive species. J Integrative Plant Biol 51:337-51

BC Oil and Gas Commission. 2010. Fracturing (Fraccing) and Disposal of Fluids. Oil and Gas Commission Fact Sheet. Available at: http://www.bcogc.ca/documents/publications/Fact%20Sheets/Fracturing_and_Disposal_of_Fluids_FINAL.pdf

CH2MHILL. 2007. Review of Oil and Gas Operation Emissions and Control Options. Final report. Prepared for Colorado Department of Public Health and Environment Air Pollution Control Division, Denver, CO, USA

Colorado Department of Public Health and Environment. 2007. Pit Monitoring Data for Air Quality. Denver, CO, USA

Colorado Oil and Gas Conservation Commission. Staff Report. January 11, 2010. Available at: http://cogcc.state.co.us/

Islam T, Gauderman WJ, Berhane K, *et al*. 2007. Relationship between air pollution, lung function and asthma in adolescents. Thorax 62:957-63

New York State Department of Environmental Conservation Division of Mineral Resources. 2009. Draft Supplemental Generic Environmental Impact Statement on the Oil, Gas and Solution Mining Regulatory Program – Well Permit Issuance for Horizontal Drilling and High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs. Bureau of Oil and Gas Regulation,

Albany, New York.

Oil and Gas Accountability Project. 2007. The Oil and Gas Industry's Exclusions and Exemptions to Major Federal Environmental Statutes. Available at: http://www.earthworksaction.org/pubs/PetroleumExemptions1c.pdf

Peng RD, Bell ML, Geyh AS, *et al.* 2009. Emergency admissions for cardiovascular and respiratory diseases and the chemical composition of fine particle air pollution. Environ Health Perspect 117:957-63

Reich PB. 1987. Quantifying plant response to ozone: A unifying theory. Tree Physiol 3:63-91

Roberts RE. 2008. USEPA Region 8. Revised Draft Supplemental Environmental Impact Statement for the Pinedale Anticline Oil and Gas Exploration and Development Project, Sublette County, Wyoming. CEQ #20070542. 14 February 2008 [Final EPA comments]. Letter to: Robert A. Bennett, State Director, Bureau of Land Management, Wyoming State Office, 5353 Yellowstone Road, Cheyenne, Wyoming 82009, USA

Tager IB, Balmes J, Lurmann F, *et al.* 2005. Chronic exposure to ambient ozone and lung function in young adults. Epidemiology 16:751-9

Terracon Consulting Engineers & Scientists. 2007. Remedial Investigation Work Plan. Crosby 25-3 Natural Gas Well Release, Road 1AB, Clark, Park County, Wyoming. Final draft. Project No. 26067064. Olathe, KS, USA

Triche EW, Gent JF, Holford TR, *et al.* 2006. Low-level ozone exposure and respiratory symptoms in infants. Environ Health Perspect 114:911-6

US Congress. Office of Technology Assessment. 1989. Catching Our Breath: Next Steps for Reducing Urban Ozone. OTA-O-412.

US Department of Labor, OSHA. 1998. CPL 02-02-038 - CPL 2-2.38D - Inspection Procedures for the Hazard Communication Standard. Available at: http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=DIRECTIVES&p_id=1551#purp

USEPA (US Environmental Protection Agency). 1984. Amendment to national oil and hazardous substance contingency plan; national priorities list. Fed Reg 49:19480-2

US General Accounting Office. 1991. OSHA Action Needed To Improve Compliance With Hazard Communication Standard. GAO/HRD-92-8. Available at: http://archive.gao.gov/t2pbat7/145328.pdf

URS. 2008. Sampling and Analysis Plan for Exploration and Production. Pit Solids and Fluids in Colorado Energy Basins. Revision B. Denver, CO, USA

**Table 1.** Functional categories of hydraulic fracturing chemicals.

| | |
|---|---|
| Acids | To achieve greater injection ability or penetration and later to dissolve minerals and clays to reduce clogging, allowing gas to flow to the surface. |
| Biocides | To prevent bacteria that can produce acids that erode pipes and fittings and break down gellants that ensure that fluid viscosity and proppant transport are maintained. Biocides can produce hydrogen sulfide ($H_2S$) a very toxic gas that smells like rotten eggs. |
| Breakers | To allow the breakdown of gellants used to carry the proppant, added near the end of the fracking sequence to enhance flowback. |
| Clay stabilizers | To create a fluid barrier to prevent mobilization of clays, which can plug fractures. |
| Corrosion inhibitors | To reduce the potential for rusting in pipes and casings. |
| Crosslinkers | To thicken fluids often with metallic salts in order to increase viscosity and proppant transport. |
| Defoamers | To reduce foaming after it is no longer needed in order to lower surface tension and allow trapped gas to escape. |
| Foamers | To increase carrying-capacity while transporting proppants and decreasing the overall volume of fluid needed. |
| Friction reducers | To make water slick and minimize the friction created under high pressure and to increase the rate and efficiency of moving the fracking fluid. |
| Gellants | To increase viscosity and suspend sand during proppant transport. |
| pH control | To maintain the pH at various stages using buffers to ensure maximum effectiveness of various additives. |
| Proppants | To hold fissures open, allowing gas to flow out of the cracked formation, usually composed of sand and occasionally glass beads. |
| Scale control | To prevent build up of mineral scale that can block fluid and gas passage through the pipes. |
| Surfactants | To decrease liquid surface tension and improve fluid passage through pipes in either direction. |

**Table 2.** Chemicals with CAS numbers that have 10 or more adverse health effects.

| Chemical | CAS # | Number of Products |
|---|---|---|
| (2-BE) Ethylene glycol monobutyl ether | 111-76-2 | 22 |
| 2,2',2"-Nitrilotriethanol | 102-71-6 | 3 |
| 2-Ethylhexanol | 104-76-7 | 7 |
| 5-Chloro-2-methyl-4-isothiazolin-3-one | 26172-55-4 | 2 |
| Acetic acid | 1186-52-3 | 1 |
| Acrolein | 107-02-8 | 1 |
| Acrylamide (2-propenamide) | 79-06-1 | 6 |
| Acrylic acid | 79-10-7 | 2 |
| Ammonia | 7664-41-7 | 3 |
| Ammonium chloride | 12125-02-9 | 2 |
| Ammonium nitrate | 6484-52-2 | 2 |
| Aniline | 62-53-3 | 1 |
| Benzyl chloride | 100-44-7 | 2 |
| Boric acid | 10043-35-3 | 4 |
| Cadmium | 7440-43-9 | 1 |
| Calcium hypochlorite | 7778-54-3 | 1 |
| Chlorine | 7782-50-5 | 1 |
| Chlorine dioxide | 10049-04-4 | 2 |
| Dibromoacetonitrile | 3252-43-5 | 1 |
| Diesel 2 | 68476-34-6 | 19 |
| Diethanolamine | 111-42-2 | 4 |
| Diethylenetriamine | 111-40-0 | 1 |
| Dimethyl formamide | 68-12-2 | 1 |
| Epidian | 25068-38-6 | 1 |
| Ethanol (acetylenic alcohol) | 64-17-5 | 8 |
| Ethyl mercaptan | 75-08-1 | 1 |
| Ethylbenzene | 100-41-4 | 7 |
| Ethylene glycol | 107-21-1 | 17 |
| Ethylene oxide | 75-21-8 | 2 |
| Ferrous sulfate | 7720-78-7 | 1 |
| Formaldehyde | 50-00-0 | 4 |
| Formic acid | 64-18-6 | 8 |
| Fuel oil #2 | 68476-30-2 | 9 |
| Glutaraldehyde | 111-30-8 | 11 |
| Glyoxal | 107-22-2 | 2 |
| Hydrodesulfurized kerosene | 64742-81-0 | 1 |
| Hydrogen sulfide | 7783-06-4 | 1 |
| Iron | 7439-89-6 | 3 |
| Isobutyl alcohol (2-methyl-1-propanol) | 78-83-1 | 3 |
| Isopropanol (propan-2-ol) | 67-63-0 | 47 |
| Kerosene | 8008-20-6 | 3 |

| | | |
|---|---|---|
| Light naphthenic distillates, hydrotreated | 64742-53-6 | 2 |
| Mercaptoacidic acid | 68-11-1 | 2 |
| Methanol | 67-56-1 | 74 |
| Methylene bis(thiocyanate) | 6317-18-6 | 2 |
| Monoethanolamine | 141-43-5 | 5 |
| NaHCO3 | 144-55-8 | 5 |
| Naphtha, petroleum medium aliphatic | 64742-88-7 | 2 |
| Naphthalene | 91-20-3 | 18 |
| Natural gas condensates | 68919-39-1 | 1 |
| Nickel sulfate | 7786-81-4 | 1 |
| Paraformaldehyde | 30525-89-4 | 2 |
| Petroleum distillate naptha | 8002-05-9 | 7 |
| Petroleum distillate/ naphtha | 8030-30-6 | 1 |
| Phosphonium, tetrakis(hydroxymethly)-sulfate | 55566-30-8 | 2 |
| Propane-1,2-diol | 57-55-6 | 6 |
| Sodium bromate | 7789-38-0 | 1 |
| Sodium chlorite (chlorous acid, sodium salt) | 7758-19-2 | 1 |
| Sodium hypochlorite | 7681-52-9 | 1 |
| Sodium nitrate | 7631-99-4 | 3 |
| Sodium nitrite | 7632-00-0 | 3 |
| Sodium sulfite | 7757-83-7 | 1 |
| Styrene | 100-42-5 | 1 |
| Sulfur dioxide | 7446-09-5 | 1 |
| Sulfuric acid | 7664-93-9 | 1 |
| Tetrahydro-3,5-dimethyl-2H-1,3,5-thiadiazine-2-thione (Dazomet) | 533-74-4 | 3 |
| Titanium dioxide | 13463-67-7 | 2 |
| Tributyl phosphate | 126-73-8 | 1 |
| Triethylene glycol | 112-27-6 | 1 |
| Urea | 57-13-6 | 3 |
| Xylene | 1330-20-7 | 11 |

**Table 3.** Chemicals with CAS numbers found in the highest number of products.

| Chemical | CAS # | Number of products | Number of health effects |
|---|---|---|---|
| Crystalline silica, quartz | 14808-60-7 | 125 | 7 |
| Methanol | 67-56-1 | 74 | 11 |
| Isopropanol (propan-2-ol) | 67-63-0 | 47 | 10 |
| Petroleum distillate hydrotreated light | 64742-47-8 | 26 | 6 |
| (2-BE) Ethylene glycol monobutyl ether | 111-76-2 | 22 | 11 |
| Bentonite | 1302-78-9 | 20 | 6 |
| Diesel 2 | 68476-34-6 | 19 | 10 |
| Naphthalene | 91-20-3 | 18 | 12 |
| Aluminum oxide | 1344-28-1 | 17 | 3 |
| Ethylene glycol | 107-21-1 | 17 | 10 |
| Sodium hydroxide | 1310-73-2 | 17 | 5 |
| Barite (BaSO4) | 7727-43-7 | 15 | 5 |
| Heavy aromatic petroleum naphtha (aromatic solvent) | 64742-94-5 | 15 | 5 |
| Crystalline silica, cristobalite | 14464-46-1 | 14 | 5 |
| Mica | 12001-26-2 | 14 | 3 |
| Sodium chloride | 7647-14-5 | 14 | 9 |
| Crystalline silica, tridymite | 15468-32-3 | 13 | 3 |
| Hydrochloric acid (HCl) | 7647-01-0 | 13 | 7 |
| Glutaraldehyde | 111-30-8 | 11 | 11 |
| Xylene | 1330-20-7 | 11 | 10 |
| Guar gum | 9000-30-0 | 10 | 3 |
| Iron oxide (Fe203, diiron trioxide) | 1309-37-1 | 10 | 5 |
| Potassium chloride | 7447-40-7 | 10 | 8 |
| Potassium hydroxide | 1310-58-3 | 10 | 7 |
| Xanthan gum | 11138-66-2 | 10 | 4 |
| Fuel oil #2 | 68476-30-2 | 9 | 11 |
| Hydrotreated heavy petroleum naphtha | 64742-48-9 | 9 | 8 |
| Limestone (calcium carbonate) | 1317-65-3 | 9 | 2 |
| Polyacrylamide/polyacrylate copolymer | 25085-02-3 | 9 | 3 |
| Sodium carboxymethylcellulose (polyanionic cellulose) | 9004-32-4 | 9 | 5 |
| Calcium hydroxide | 1305-62-0 | 8 | 8 |
| Crystalline silica (silicon dioxide) | 7631-86-9 | 8 | 4 |
| Ethanol (acetylenic alcohol) | 64-17-5 | 8 | 12 |
| Formic acid | 64-18-6 | 8 | 11 |
| Graphite | 7782-42-5 | 8 | 4 |
| 2-Ethylhexanol | 104-76-7 | 7 | 11 |
| Acetic acid | 64-19-7 | 7 | 9 |
| Asphaltite (gilsonite, hydrocarbon black solid) | 12002-43-6 | 7 | 4 |
| Butanol (n-butyl alcohol, butan-1-ol, 1-butanol) | 71-36-3 | 7 | 8 |
| Calcium carbonate (sized) | 471-34-1 | 7 | 6 |
| Calcium chloride | 10043-52-4 | 7 | 8 |
| Ethoxylated nonylphenol | 9016-45-9 | 7 | 6 |
| Ethylbenzene | 100-41-4 | 7 | 11 |

19

| | | | |
|---|---|---|---|
| Petroleum distillate naptha | 8002-05-9 | 7 | 12 |
| Propargyl alcohol (prop-2-yn-1-ol) | 107-19-7 | 7 | 9 |
| Tetramethylammonium chloride | 75-57-0 | 7 | 8 |

**Figure 1.** Percent of composition disclosed for 944 products used in natural gas operations.



**Figure 2.** Profile of possible health effects of chemicals with CAS numbers used in natural gas operations



**Figure 3.** Profile of possible health effects of soluble and volatile chemicals with CAS numbers used in natural gas operations.



**Figure 4**. Profile of possible health effects of chemicals with CAS numbers used to drill the Crosby 25-3 well, Wyoming.



**Figure 5**. Profile of possible health effects of chemicals with CAS numbers found in six New Mexico drilling evaporation pits.



**TECHNICAL PAPER**

ISSN:1047-3289 *J. Air & Waste Manage. Assoc.* 59:1111–1118
DOI:10.3155/1047-3289.59.9.1111
Copyright 2009 Air & Waste Management Association

# Regional Impacts of Oil and Gas Development on Ozone Formation in the Western United States

**Marco A. Rodriguez**
*Cooperative Institute for Research in the Atmosphere, Colorado State University, Fort Collins, CO*

**Michael G. Barna**
*Air Resources Division, National Park Service, Fort Collins, CO*

**Tom Moore**
*Western Regional Air Partnership, Western Governors' Association, Fort Collins, CO*

## ABSTRACT

The Intermountain West is currently experiencing increased growth in oil and gas production, which has the potential to affect the visibility and air quality of various Class I areas in the region. The following work presents an analysis of these impacts using the Comprehensive Air Quality Model with extensions (CAMx). CAMx is a state-of-the-science, "one-atmosphere" Eulerian photochemical dispersion model that has been widely used in the assessment of gaseous and particulate air pollution (ozone, fine [$PM_{2.5}$], and coarse [$PM_{10}$] particulate matter). Meteorology and emissions inventories developed by the Western Regional Air Partnership Regional Modeling Center for regional haze analysis and planning are used to establish an ozone baseline simulation for the year 2002. The predicted range of values for ozone in the national parks and other Class I areas in the western United States is then evaluated with available observations from the Clean Air Status and Trends Network (CASTNET). This evaluation demonstrates the model's suitability for subsequent planning, sensitivity, and emissions control strategy modeling. Once the ozone baseline simulation has been established, an analysis of the model results is performed to investigate the regional impacts of oil and gas development on the ozone concentrations that affect the air quality of Class I areas. Results indicate that the maximum 8-hr ozone enhancement from oil and gas (9.6

parts per billion [ppb]) could affect southwestern Colorado and northwestern New Mexico. Class I areas in this region that are likely to be impacted by increased ozone include Mesa Verde National Park and Weminuche Wilderness Area in Colorado and San Pedro Parks Wilderness Area, Bandelier Wilderness Area, Pecos Wilderness Area, and Wheeler Peak Wilderness Area in New Mexico.

## INTRODUCTION

High ozone ($O_3$) levels at the Earth's surface, such as the photochemical smog that frequently envelopes Los Angeles in the summer, have typically been regarded as an urban air quality problem. However, a disturbing trend in recent years has been the rise of tropospheric $O_3$ in remote regions of the western United States,[1] many of which are Class I areas (international parks, national wilderness areas that exceed 5000 acres in size, national memorial parks that exceed 5000 acres in size, and national parks that exceed 6000 acres in size) as designated by the Clean Air Act. Possible explanations for this trend include increasing background concentrations, largely due to emissions from Asia[2–4] or changes in the magnitude or distribution of regional emissions.[1]

$O_3$ is a strong oxidant that can reduce lung function and damage plant tissue at relatively low concentrations. In March 2008, the U.S. Environmental Protection Agency (EPA) tightened existing National Ambient Air Quality Standards (NAAQS) for $O_3$ to 75 parts per billion (ppb; assessed as the fourth highest monitored $O_3$ concentration value over a running average 8-hr period, averaged over 3 consecutive years) from the previous 80 ppb, effectively reducing the compliance level of the $O_3$ NAAQS by 9 ppb. In April 2008, the EPA Clean Air Science Advisory Committee clarified earlier recommendations to the EPA administrator that a primary $O_3$ standard between 60 and 70 ppb is necessary to protect human health.[5]

$O_3$ is formed through a complex series of chemical reactions involving nitrogen oxides ($NO_x$) and volatile organic compounds (VOCs) in the presence of sunlight. To combat rising $O_3$ levels, these precursors must be reduced. However, as oil and gas development in the western United States continues to accelerate, there is significant potential that emissions from these sources will

**IMPLICATIONS**
Population growth in the western United States is driving a rapid increase in the generation of electricity and fossil fuel production, leading to higher $NO_x$ emissions and the potential to affect the visibility and air quality of Class I areas in the region. Although total emissions from oil and gas development are small compared with other categories such as coal-fired power plants and automobiles, they occur in remote locations and can have a disproportionate effect on the air quality of national parks and wilderness areas. The following work provides an analysis of these impacts on ozone concentrations using a state-of-the-science photochemical dispersion model.

*Rodriguez, Barna, and Moore*

exacerbate the existing $O_3$ problem. Although emissions from oil and gas development may appear small as compared with other emission categories such as coal-fired power plants and automobiles, they typically occur in remote regions of the country, far removed from urban areas, and can have a disproportionate effect on the air quality of Class I areas. For example, $NO_x$ emissions from an internal combustion engine at a gas well may react with terpenes (a reactive VOC) emitted from pine forests and form $O_3$ in an area where the right mix of precursors was previously not available for this reaction to take place. This is especially worrisome because recent observations indicate that many remote wilderness areas and national parks, such as Mesa Verde National Park in southwestern Colorado, are confronted with $O_3$ concentrations that are trending toward the EPA's acceptable limits. Very near Mesa Verde National Park are rapidly growing oil and gas extraction operations in northwestern New Mexico. As this type of development continues throughout the west, it is essential to understand its potential negative impact on air quality in some of our nation's most cherished protected areas. It is important to notice that wintertime $O_3$ concentrations exceeding 140 ppb were recently observed near the Jonah-Pinedale Anticline natural gas field in Wyoming's Upper Green River Basin.[6]

This study uses sophisticated meteorological and air pollution models to simulate air quality in the western United States, with a particular focus on $O_3$ concentrations in our national parks and wilderness areas. The Western Regional Air Partnership (WRAP) provided the necessary inputs to the model for meteorology, emissions, and boundary concentrations, originally developed for regional haze analysis and planning. The modeling system used in this work is similar to other systems used in demonstrating compliance with current NAAQS.[7,8]

Understanding the impacts of emissions from particular source categories such as oil and gas development is crucial to develop effective strategies that help reduce regional air pollution. Although this article focuses on the impact of $O_3$ pollution, the concept of "one-atmosphere" computer modeling is identified in the WRAP 2008-12 Strategic Plan for future regional air quality analyses.[9] This approach is used to investigate several issues related to regional formation and transport of air pollutants such as the primary and secondary NAAQS for $O_3$ and particulate matter, visibility protection, and mitigating health and ecosystem effects due to excessive nitrogen deposition and toxic air pollutants such as mercury.

## APPROACH
The modeling system comprises three major components: the Penn State University/National Center for Atmospheric Research Mesoscale Model (known as MM5[10]), a regional weather model; CAMx (Comprehensive Air Quality Model with Extensions[11]), a chemistry transport model; and SMOKE (Sparse Matrix Operator Kernel Emissions[12]), an emissions processing system that chemically, spatially, and temporally allocates the raw emissions data. CAMx simulates the emissions, dispersion, chemical reac-

tions, and removal of pollutants in the troposphere by solving the pollutant continuity equation for each chemical species on a three-dimensional grid. Although computationally expensive, this type of simulation accounts for the complex physical and chemical processes that govern the fate of pollutants. The 36-km coarse-grid horizontal domain used for the air quality modeling consists of the contiguous 48 U.S. states, contiguous lands and waters of southern Canada and northern Mexico, portions of the Pacific and Atlantic oceans, most of the Gulf of Mexico, all of the Gulf of California, and the southern Hudson Bay region. The CAMx 36-km grid includes 148 cells in the east-west dimension and 112 cells in the north-south dimension. The vertical grid used in the MM5 modeling defines the CAMx vertical structure. The MM5 simulations used a terrain-following coordinate system defined by pressure using 34 layers that extend from the surface to the model top at 100 mbar. To reduce computational costs, a layer-averaging scheme was adopted, reducing the original 34 layers to 19 vertical layers. Figure 1 presents a map of the computational modeling domain; it also shows the states that form the western region of the United States, the area of interest for this analysis. MM5 provides the wind fields that CAMx needs to determine the transport of chemical species, as well as other meteorological variables such as temperature and pressure. A detailed emission inventory specifies the hourly flux of emissions from numerous area and point pollutant sources. The emission inventory focuses on pollutants that are important for regional haze and visibility in the selected model domain, which includes the contiguous United States, southern Canada, and northern Mexico. The inventory consists of 22 emission categories (e.g., automobiles, power plants, forest fires, and oil and gas development) and was originally developed in support of WRAP's regional haze simulations.[13] Figure 2 shows the annual $NO_x$ emissions associated with oil and gas development in the western United States. Note that significant emissions occur throughout the Intermountain West, particularly in the Four Corners region of northwestern New Mexico.

The oil and gas emission inventory used here was initially compiled for WRAP's regional modeling, with a focus on $NO_x$ and oxidized sulfur ($SO_x$) emissions, which are precursors to fine particulate nitrate and sulfate, respectively. However, subsequent versions of this inventory have been developed and improved, and emissions of some species, such as VOCs, have been substantially revised. Although this study uses an earlier version of the WRAP oil and gas emission inventory, it is anticipated that the general trends presented provide a gross indication of the impact of this source category on regional $O_3$ formation.

In this study, a simulation for the year 2002 is performed with CAMx and corresponds to the "base modeling year" being investigated by WRAP and the latest year in which detailed emissions were readily available. The first step in this analysis is the comparison between predicted $O_3$ concentrations with available observations. Once the model performance of this base-case simulation is deemed adequate, a second CAMx simulation that includes all of the base-case emissions except those from oil

*Rodriguez, Barna, and Moore*



**Figure 1.** Map of the 36-km computational domain used in this study. The shaded area shows the analysis domain and corresponds to those states that are part of the contiguous WRAP region (Alaska and Hawaii are WRAP members, but are not in the modeling domain). The circles in the figure indicate the location of CASTNET sites used in this study for the model performance evaluation of $O_3$.

and gas is used to evaluate their air quality impacts in the western United States. The impacts are determined by looking at the difference between the base case and the "absent oil and gas emissions" simulations.

## ANALYSIS
### Model Performance Evaluation

$O_3$ concentrations predicted by the model are evaluated by comparing the surface layer values with available



**Figure 2.** Annual 2002 WRAP $NO_x$ emissions (t/yr) from oil and gas exploration and production activities in the western United States.

hourly measurements of ground-level $O_3$ at 22 sites from the Clean Air Status and Trends Network (CASTNET)[14] monitoring network. These sites fall within the western region of the United States and are indicated by circles in Figure 1. An evaluation of CAMx's skill in predicting $O_3$ is done in accordance with the EPA's suggested performance guidelines for $O_3$ modeling.[15,16] Observation/prediction pairs are excluded from the analysis when the observed concentration is below a certain cutoff level. The EPA has suggested a cutoff value of 60 ppb; however, most of the sites considered here are located in remote, pristine areas, and thus the cutoff value is set at 20 ppb because natural $O_3$ levels range typically between 10 and 25 ppb.[17] Table 1 shows the annual model performance statistics for 1-hr $O_3$ in the western region of the United States during 2002. In general, CAMx is able to consistently predict the general annual trends for $O_3$ concentrations, with a mean normalized bias of $-1.6\%$ and a mean absolute normalized error of 22.7%, falling well within the EPA's guidelines for acceptable model performance. Figure 3 shows estimated monthly normalized error and bias bar plots. Throughout the year, the model also performs within EPA goals; for instance, the largest errors are less than 25% during the summer (August). The model seems to show some seasonality in the errors and biases; its performance is better for the winter and fall and slightly worse for the spring and summer. The model has a tendency to underpredict $O_3$ concentrations during the summer and fall, with the largest biases in August ($-15\%$), whereas it overpredicts $O_3$ during the winter and spring. Table 1 also shows the

*Rodriguez, Barna, and Moore*

**Table 1.** Annual model performance statistics for 1-hr $O_3$ calculated with 22 CASTNET sites in the contiguous WRAP region of the western United States.

| Statistic | EPA Goal | Mesa Verde National Park | Gunnison National Park | Canyonlands National Park | Fitzpatrick | CASTNET Sites (Western United States) |
|---|---|---|---|---|---|---|
| Mean observation | | 46 | 50 | 48 | 48 | 47 |
| Mean estimation | | 46 | 52 | 43 | 46 | 44 |
| Standard deviation observations | | 10 | 9 | 10 | 8 | 13 |
| Standard deviation estimates | | 13 | 10 | 11 | 9 | 12 |
| Mean bias error | | −0.02 | 2.6 | −5 | −1.5 | −3 |
| Mean normalized bias error (%) | < ±15% | 0.9 | 7.3 | −8.4 | −1.7 | −1.6 |
| Mean absolute gross error | | 8 | 7 | 9.6 | 7.2 | 10 |
| Mean absolute normalized gross error (%) | <35% | 16.9 | 15.7 | 19.8 | 14.9 | 22.7 |
| Mean fractional error (%) | | 16.9 | 14.6 | 22 | 15.2 | 23 |
| Mean fractional bias (%) | | −1.4 | 5.3 | −11.9 | −3.5 | −5.8 |

*Notes:* All values in ppb except where indicated.

annual performance statistics for sites located near places for which the impacts from oil and gas emissions will be discussed in the following sections. It is important to notice that for these specific sites the predicted hourly $O_3$ concentrations also fall within EPA guidelines for acceptable model performance. In general, the performance in most of these sites is better than in the western United States as a whole, with normalized errors ranging from 14.9% (Fitzgerald) to 19.8% (Canyonlands National Park). Many of these sites are located in very complex terrain, so given the coarse resolution of the model, its performance is reasonable and even comparable to that of other studies.[18–20] Figure 4 shows 8-hr moving averages of predictions and observations for the CASTNET sites presented in Table 1. The figure illustrates that the model does not seem to accurately capture the complex diurnal variations in the observations. However, it shows that throughout the year the model follows the general trends revealed by the observations, particularly on a monthly average basis. In the case of Canyonlands, the model variation is larger than the other sites and the model has a pronounced tendency to underpredict observations during the summer and fall.

## Oil and Gas Impacts

As indicated above, this study relies on two separate CAMx simulations to estimate the potential impacts of oil and gas emissions in the western United States. A more regional perspective of $O_3$ formation is illustrated in Figure 5. Figure 5a shows the highest 8-hr $O_3$ concentration at each model grid cell that occurred during the 2002 base-case simulation. As expected, there are high concentrations (exceeding 110 ppb) downwind of major urban areas such as Los Angeles, San Francisco, Salt Lake City, and Denver. The figure also demonstrates that for a large region of the southwestern United States that includes remote regions of Nevada, Wyoming, Utah, Arizona, New Mexico, and Colorado, the new 8-hr primary NAAQS-related threshold for ground-level $O_3$ (75 ppb) is exceeded at least once during 2002 for many Class I areas. Generally, these maxima occur during hot, sunny days with light winds, when the meteorology is most favorable for $O_3$ production. These periods also typically correspond to peak VOC emissions from biogenic and anthropogenic sources. The impact of $NO_x$ and VOC emissions from oil and gas development on $O_3$ in the western United States is shown in Figure 5b. Note that the values for each grid cell in Figure 5b correspond to the dates for which $O_3$




**Figure 3.** Monthly model performance (a) mean absolute normalized gross error and (b) mean normalized bias bar plots for 1-hr $O_3$ calculated with 22 CASTNET sites in the WRAP region.

*Rodriguez, Barna, and Moore*



**Figure 4.** Time series comparison between model (black line) and observed (red line) 8-hr average $O_3$ (base case) for the CASTNET sites included in Table 1: (a) Mesa Verde National Park, (b) Black Canyon of the Gunnison National Park, (c) Canyonlands National Park, and (d) the Fitzpatrick Class I area included in Table 1.

maxima occur (Figure 5a), but in this case, the $O_3$ concentration is solely due to emissions from oil and gas development. Although the peak $O_3$ maxima throughout the west are typically quite small, there is a strong signature of 1–2 ppb of $O_3$ throughout New Mexico, Colorado, and Wyoming, with a pattern that approximates the



**Figure 5.** Peak predicted annual $O_3$ maxima (ppb, 8-hr average) in the western United States from (a) the 2002 base-case simulation and (b) the enhancement from VOC and $NO_x$ emissions from oil and gas development that correspond to the dates and times of $O_3$ maxima. The locations of all Class I areas in the region are indicated with red crosses.

*Rodriguez, Barna, and Moore*



**Figure 6.** Peak predicted annual $O_3$ (ppb, 8-hr average) enhancement from VOC and $NO_x$ emissions from (b) oil and gas development in the western United States and (a) corresponding $O_3$ concentrations from the 2002 base-case simulation. The locations of all Class I areas in the region are indicated with red crosses.

emissions shown in Figure 2. However, the maximum possible impacts of oil and gas emissions do not necessarily coincide in time with the maximum possible $O_3$ concentrations, as illustrated in Figure 6. The maxima 8-hr $O_3$ enhancement from oil and gas alone shown in Figure 6b demonstrates that significant $O_3$ concentrations (maximum of 9.6 ppb) could affect southwestern Colorado and northwestern New Mexico. Class I areas in this region that are likely to be impacted by increased $O_3$ include Mesa Verde National Park and Weminuche Wilderness Area in Colorado and San Pedro Parks Wilderness Area, Bandelier Wilderness Area, Pecos Wilderness Area, and Wheeler Peak Wilderness Area in New Mexico. $O_3$ concentrations for the base-case simulation during this period (Figure 6a) range from 40 to 70 ppb; thus in some places (e.g., Mesa

Verde National Park and Weminuche) oil and gas have the potential to put these places out of compliance with the new EPA $O_3$ standard. Figure 6b shows that there are three regions where oil and gas have the potential for maximum impacts on Class I areas: southwestern Colorado and northern New Mexico, the southeast corner of New Mexico, and western Wyoming. Table 2 shows the date when the maximum impacts due to oil and gas emissions are achieved and their corresponding base-case concentrations for some of the Class I area sites. In general, these results show that most of the impacts occur during the summer and early fall. However, from this table alone it is not possible to know, for each site, the percentage of time when high impacts are observed in spring and early summer compared with summer and

**Table 2.** Maximum $O_3$ impacts due to oil and gas, date the maxima occur, and base-case concentration in some Class I area sites located in the western United States.

| Class I Area | Latitude (°) | Longitude (°) | Base-Case Concentration (ppb) | Maximum Impact Oil and Gas (ppb) | Date Maximum Impact Occurs |
|---|---|---|---|---|---|
| Weminuche | 37.65 | −107.80 | 40 | 7 | August 5 |
| San Pedro Parks | 36.11 | −106.81 | 35 | 5 | September 8 |
| Carlsbad Caverns | 32.14 | −104.48 | 49 | 4 | August 27 |
| Wheeler Peak | 36.57 | −105.42 | 37 | 3 | August 24 |
| Pecos | 35.93 | −105.64 | 40 | 3 | September 13 |
| Bandelier | 35.78 | −106.26 | 61 | 3 | June 30 |
| Mesa Verde | 37.20 | −108.48 | 64 | 3 | July 13 |
| Saltcreek | 33.61 | −104.37 | 49 | 3 | July 29 |
| Great Sand Dunes | 37.72 | −105.51 | 33 | 2 | September 8 |
| La Garita | 37.96 | −106.81 | 38 | 2 | August 6 |
| Bridger | 42.97 | −109.75 | 52 | 2 | April 4 |
| Fitzpatrick | 43.27 | −109.57 | 52 | 2 | April 4 |
| Grand Teton | 43.68 | −110.73 | 50 | 1 | April 24 |
| Washakie | 43.95 | −109.59 | 44 | 1 | September 10 |

*Rodriguez, Barna, and Moore*



**Figure 7.** Time series of (a) simulated base-case $O_3$ (ppb, 8-hr average) for sites representative of one of the three main regions identified as having larger impacts from oil and gas emissions (Weminuche, Saltcreek, and Fitzpatrick Class I areas). (b) The change in $O_3$ concentration (ppb, 8-hr average) at each site solely due to VOC and $NO_x$ emissions from oil and gas development.

early fall. Figure 7 is a much better indicator of this tendency. Figure 7 shows 8-hr moving average time series for the base case and the oil and gas impacts for a few selected sites from Table 2, including Weminuche, where the largest impacts are observed. The other sites represent one of the other two main regions identified as having larger impacts from oil and gas emissions. The general trend of modeled $O_3$ (Figure 7a) is low concentrations during the colder winter months, when limited photochemistry will occur, and higher concentrations during the warmer late spring and summer months, when meteorological conditions are more favorable to $O_3$ production. Additionally, enhanced biogenic VOC emissions that occur during the spring and summer will further influence $O_3$ formation in the region. The dashed lines in Figure 7a show the new EPA standards for $O_3$. It is evident from the figure that

there are various instances in which $O_3$ concentrations are higher than the new NAAQS in many of these Class I areas, particularly during the late spring and early summer. Figure 7b shows the resulting changes in predicted $O_3$ concentrations that are attributed solely to emissions from oil and gas development. This estimate was calculated by evaluating two CAMx simulations: the base-case simulation, in which all emission categories are accounted, and a "no oil and gas" simulation, which is similar to the base case except that oil and gas emissions are removed. The difference between these two simulations represents the contribution of oil and gas emissions on regional $O_3$. Notable in Figure 7b is the fact that oil and gas emissions can actually decrease $O_3$ concentrations at various sites through the process of "$NO_x$ scavenging," in which available $O_3$ is consumed by reacting

*Rodriguez, Barna, and Moore*

with nitric oxide (NO). This effect is most prevalent in the winter, when $O_3$ concentrations are lower. However, in the summer, the situation is reversed, and warm, stagnant conditions yield an increase in $O_3$ from oil and gas emissions. Although these impacts appear relatively small (e.g., an increase of a few ppb in the summer), it should be remembered that this period corresponds with seasonally high $O_3$ concentrations.

## CONCLUSIONS

A regional air quality model has been applied to the western United States to investigate the impacts of emissions from oil and gas development on $O_3$ concentrations. Incremental $O_3$ increases (8-hr average) ranging from less than 1 to 7 ppb were predicted at several western Class I areas, and a peak incremental $O_3$ concentration of 10 ppb was simulated in the Four Corners region. This study, although not exhaustive, does indicate a clear potential for oil and gas development to negatively affect regional $O_3$ concentrations in the western United States, including several treasured national parks and wilderness areas in the Four Corners region. It is likely that accelerated energy development in this part of the country will worsen the existing problem. The formation of $O_3$ pollution examined here represents a complex phenomenon involving nonlinear physical and chemical processes, uncertain emission inventories, and fine-scale transport in mountainous terrain. These simulations will be refined when updated emission inventories are available from WRAP. Regional air quality modeling requires significant resources but remains the only feasible option for developing emission control strategies that have the potential to reduce $O_3$ concentrations and protect air quality.

## REFERENCES

1. Jaffe, D.; Ray, J. Increase in Surface Ozone at Rural Sites in the Western US; *Atmos. Environ.* **2007**, *41*, 5452-5463.
2. Fiore, A.M.; Jacob, D.J.; Bey, I.; Yantosca, R.M.; Field, B.D.; Fusco, A.C.; Wilkinson, J.G. Background Ozone over the United States in Summer: Origin, Trend, and Contribution to Pollution Episodes; *J. Geophys. Res.* **2002**, *107*, 4275; doi: 10.1029/2001JD000982.
3. Jaffe, D.A.; Parrish, D.; Goldstein, A.; Price, H.; Harris, J. Increasing Background Ozone during Spring on the West Coast of North America; *Geophys. Res. Lett.* **2003**, *30*, 1613; doi: 10.1029/2003GL017024.
4. Jacob, D.J.; Logan, J.A.; Murti, P.P. Effect of Rising Asian Emission on Surface Ozone in the United States; *Geophys. Res. Lett.* **1999**, *26*, 2175-2178.
5. *Clean Air Science Advisory Committee Recommendations Concerning the Final Rule for the National Ambient Air Quality Standards for Ozone*, April 7, 2008; U.S. Environmental Protection Agency; Office of the Administrator Science Advisory Board: Washington, DC, 2008; available at *http://yosemite.epa.gov/sab/sabproduct.nsf/264cb1227d55e02c85257402-007446a4/4AF87643243312888525742S0069E494/$File/EPA-CASAC-08-009-unsigned.pdf* (accessed 2009).
6. Schnell, R.C.; Oltmans, S.J.; Neely, R.R.; Endres, M.S.; Molenar, J.V.; White, A.B. Rapid Photochemical Production of Ozone at High Concentrations in a Rural Site during Winter; *Nat. Geosci.* **2009**, *2*, 120-122.
7. Hogrefe, C.; Civerolo, K.L.; Hao, W.; Ku, J.-Y.; Zalewsky, E.E.; Sistla, G. Rethinking the Assessment of Photochemical Modeling Systems in Air Quality Planning Applications; *J. Air & Waste Manage. Assoc.* **2008**, *58*, 1086-1099; doi: 10.3155/1047-3289.58.8.1086.
8. Gilliland, A.B.; Hogrefe, C.; Pinder, R.W.; Godowitch, J.M.; Foley, K.L.; Rao, S.T. Dynamic Evaluation of Regional Air Quality Models: Assessing Changes in $O_3$ Stemming from Changes in Emissions and Meteorology; *Atmos. Environ.* **2008**, *42*, 5110-5123.
9. *Western Regional Air Partnership 2008-12 Strategic Plan; March 2008*; Western Governors' Association; Western Regional Air Partnership: Denver, CO, 2008; available at *http://www.wrapair.org/WRAP/documents/WRAP_2008-12_Strategic_Plan3_08final.pdf* (accessed 2009).
10. Grell, G.A.; Dudhia, J.; Stauffer, D.R. *A Description of the Fifth Generation Penn State/NCAR Mesoscale Model (MM5)*; National Center for Atmospheric Research (NCAR) Technical Note TN-398-STR; NCAR: Boulder, CO, 1994.
11. *CAMx v. 4.20 User's Guide*; Environ International Corporation: Novato, CA, 2005.
12. Houyoux, M.; Vukovich, J.; Brandmeyer J.E. *Sparse Matrix Operator Kernel Emissions Modeling System-SMOKE User Manual*; MCNC-2002; Environmental Modeling Center: Research Triangle Park, NC, 2002.
13. Tonnesen, G.; Wang, Z.; Omary, M.; Chien, C.-J.; Wang, Y.; Morris, R.; Kemball-Cook, S.; Jia, Y.; Lau, S.; Koo, B.; Adelman, Z.; Holland, A.; Wallace, J. *Final Report for the Western Regional Air Partnership (WRAP) 2002 Visibility Model Performance Evaluation*; Western Governors' Association; Western Regional Air Partnership: Denver, CO, 2006; available at *http://pah.cert.ucr.edu/aqm/308/reports/final/2002_MPE_report-_main_body_FINAL.pdf* (accessed 2009).
14. *Clean Air Speciation and Trends Network*; U.S. Environmental Protection Agency: Washington, DC, 2008; available at *http://www.epa.gov/castnet* (accessed 2009).
15. *Guideline for Regulatory Application of the Urban Airshed Model*; EPA-450/4-91-013; U.S. Environmental Protection Agency: Research Triangle Park, NC, 1991.
16. *Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze*; EPA-454/B-07-002; U.S. Environmental Protection Agency: Research Triangle Park, NC, 2007.
17. Fiore, A.; Jacob, D.J.; Liu, H.; Yantosca, R.M.; Fairlie, T.D.; Li, Q. Variability in Surface Ozone Background over the United States: Implications for Air Quality Policy; *J. Geophys. Res.* **2003**, *108*, 4787; doi: 10.1029/2003JD003855
18. Nghiem, L.-H.; Kim Oanh, N.T. Evaluation of the Mesoscale Meteorological Model (MM5)-Community Multi-Scale Air Quality Model (CMAQ) Performance in Hindcast and Forecast of Ground-Level Ozone; *J. Air & Waste Manage. Assoc.* **2008**, *58*, 1341-1350; doi: 10.3155/1047-3289.58.10.1341.
19. Sistla, G.; Hogrefe, C.; Hao, W.; Ku, J.-Y.; Zalewsky, E.; Henry, R.F.; Civerolo, K. An Operational Assessment of the Application of the Relative Reduction Factors in the Demonstration of Attainment of the 8-hr Ozone National Ambient Air Quality Standard; *J. Air & Waste Manage. Assoc.* **2004**, *54*, 950-959.
20. Emery, C.; Jia, Y.; Kemball-Cook, S.; Mansell, G.; Lau, S.; Yarwood, G. Modeling an August 13–22, 1999 Ozone Episode in the Dallas/Fort Worth Area, Final Report; Environ International Corporation: Novato, CA, 2004.

**About the Authors**

Dr. Marco A. Rodriguez is a research scientist with the Cooperative Institute for Research in the Atmosphere at Colorado State University. Dr. Michael G. Barna is an affiliated scientist with the National Park Service Air Resources Division. Tom Moore is Coordinator of WRAP and Air Quality Program Manager of the Western Governors' Association. Please address correspondence to: Marco A. Rodriguez, Cooperative Institute for Research in the Atmosphere, Colorado State University, 1375 Campus Delivery, Fort Collins, CO 80523-1375; phone: +1-970-491-8101; fax: +1-970-491-8598; e-mail: rodriguez@cira.colostate.edu.



# LETTERS

PUBLISHED ONLINE: 18 JANUARY 2009 | DOI: 10.1038/NGEO415

# Rapid photochemical production of ozone at high concentrations in a rural site during winter

Russell C. Schnell[1]*, Samuel J. Oltmans[1], Ryan R. Neely[1], Maggie S. Endres[2], John V. Molenar[3] and Allen B. White[1]

**Ozone is an air pollutant that can cause severe respiratory health effects. Photochemical ozone production near the Earth's surface is considered a summertime, urban phenomenon[1-3], where hourly average ozone concentrations can exceed 150 p.p.b., compared with background values of about 50 p.p.b., and wintertime ozone concentrations in the US are usually in the range of 35–50 p.p.b. (refs 1-3). Here we report rapid, diurnal photochemical production of ozone during air temperatures as low as −17 °C, in the rural Upper Green River Basin, Wyoming, in the vicinity of the Jonah-Pinedale Anticline natural gas field. We find that hourly average ozone concentrations rise from 10–30 p.p.b. at night to more than 140 p.p.b. shortly after solar noon, under the influence of a stagnant, high-pressure system that promotes cold temperatures, low wind speeds and limited cloudiness. Under these conditions, an intense, shallow temperature inversion develops in the lowest 100 m of the atmosphere, which traps high concentrations of ozone precursors at night. During daytime, photolytic ozone production then leads to the observed high concentrations. We suggest that similar ozone production during wintertime is probably occurring around the world under comparable industrial and meteorological conditions.**

Ozone air pollution is generally considered to be produced photochemically at levels above health-based standards only in urban areas in the summertime. As such, ozone monitoring is generally not required in the winter in the US. In February 2008, hourly average ozone concentrations above 140 p.p.b. (8 h average of 122 p.p.b.) were recorded in rural Wyoming, near the 400 km² Jonah–Pinedale Anticline (JPA) natural gas field. The US Environmental Protection Agency averaging time of 8 h at 75 p.p.b. (ref. 4) was exceeded on 14 days and resulted in the first ever wintertime ozone advisories in Wyoming[5].

Year-round air-quality measurements have been conducted in the JPA gas-field area (42.50° N, 109.71° W) at three sites since 2005 and an additional eight sites for 2 months in the winter of 2008 (ref. 6). Rapid ozone-production events with hourly average ozone concentrations greater than 75 p.p.b. were first observed in January–March 2005 (http://www.esrl.noaa.gov/gmd/obop/Wyoming_Ozone_Long.pdf). In 2007 there were few events, coincident with low snow cover in the Upper Green River Basin (UGRB) (~75 km × 75 km centred on 42.5° N, 110° W); the snow and ozone-production relationship is discussed later. In January–March 2008 balloon-borne ozonesonde measurements were conducted in the JPA region. This paper focuses on 2008 because of the availability of the ozonesonde and ancillary data, and on the Jonah site.

In 2007 the JPA field produced ~20 million m³ yr⁻¹ (~2 billion cubic feet per day) of natural gas[7-9], enough to supply the natural-gas needs of 17 million US homes and valued at ~$4 billion. Drilling rigs and pipeline compressors are powered by diesel/natural-gas engines operating 24 h per day. We calculate there was ~200,000 hp (150 million watts) of engine power operating at any one time in the JPA gas field in February 2008. In 2008 there were ~2,200 wells in operation in the Jonah field; wells are expected to number 10,000 by 2020 (ref. 9).

Hourly average ozone, solar radiation and NO_x (precursor for ozone production) levels for a typical ozone production event (18–25 February 2008) are presented in Fig. 1 for the Jonah site (42.42° N, 109.68° W; 2,027 m above sea level) at the southern edge of the gas field. From this figure it may be observed that ozone concentrations track solar radiation with a 1–2 h time lag. On 22 February, hourly average ozone concentrations at Jonah increased to 120 p.p.b. by 14:30 MST from 37 p.p.b. 4 h earlier. Ozone precursor NO_x concentrations (Fig. 1b) show high anticorrelation with ozone and attained maximum concentrations of ~200 p.p.b. during the morning of 21 February, when much of the NO_x was in the form of NO_2 (measured along with NO, but not plotted). Later in the day NO_x concentrations dropped below 15 p.p.b. as the NO_2 photolysed to NO, which is recycled through the reaction with peroxy radicals and ensuing ozone formation (discussed later).

The synoptic-scale meteorological condition controlling the high-ozone-production event is the movement of high pressure into western Wyoming on 19 February, bringing colder temperatures and lower wind speeds over the UGRB (Fig. 1c). Snow had fallen earlier across the basin. The falling air temperatures (to a low of −17 °C on 22 February), low wind speeds, clear nights and snow cover combined to produce exceptionally strong temperature inversions, a meteorological condition in which the temperature of the air above the surface becomes warmer with increasing height. In a well mixed atmosphere, the air temperature decreases (that is, becomes colder) on average by 6.5 °C for every 1,000 m increase in altitude. At the Jonah site air temperature is monitored at 2 and 10 m above ground level. A measure of the highly stable lapse rate present at low altitude during the ozone production period is presented in Fig. 1c, where the temperature difference between 10 and 2 m is plotted. Positive values show that on the nights of 20 and 22 February the temperature was up to 6 °C higher at 10 m than at 2 m. This exceptional thermal stratification serves to curtail vertical mixing and subsequent dilution of volatile organic compounds (VOCs), NO and other gaseous effluents emitted near the surface, constraining them into a de facto 'chemical retort'. During the day, the air near the surface warms, reducing the low-level temperature gradient (Fig. 1c), but the solar heating is insufficient to erode the

---

[1]Earth System Research Laboratory, National Oceanic and Atmospheric Administration (NOAA), 325 Broadway, Boulder, Colorado 80305, USA, [2]Wyoming Department of Environmental Quality, 122 West 25th Street, Cheyenne, Wyoming 82002, USA, [3]Air Resource Specialists, Inc. 1901 Sharp Point Drive, Suite E, Ft. Collins, Colorado 80525, USA. *e-mail: russell.c.schnell@noaa.gov

© 2009 Macmillan Publishers Limited. All rights reserved.

**NATURE GEOSCIENCE** DOI: 10.1038/NGEO415

# LETTERS









**Figure 2 | Ozonesonde profile 10 km north of the gas field showing ozone and temperature profiles, surface to 2,600 m, 21 February 2008.**
Balloon-borne ozonesondes were launched at 11:20 and 16:20 MST and passed through 2,600 m (top of graph) ~30 min later. The top of the ozone production zone at 100 m corresponds to the top of the temperature-inversion layer (red line), and even though the boundary-layer air warmed during the day the 'chemical retort' bounded by the ground surface and the top of the inversion layer remained intact throughout the day.

**Figure 1 | Hourly average solar radiation, ozone, NO$_x$ and temperature data for the Jonah air-quality-monitoring site, 18–25 February 2008.**
**a,** Rapid production and elevated concentrations of ozone closely track solar radiation with a 1–2 h time lag. **b,** Ozone and NO$_x$ at Jonah showing high anticorrelation during the enhanced-ozone-formation period (19–23 February), at below-freezing temperatures. **c,** Ambient air temperature and wind speed at 2 m above the ground surface, and temperature difference between 2 and 10 m above ground level.

entire depth of the strong inversions, especially when the ground is snow covered[10,11]. By 23 February the cold air moved southeast from the UGRB, temperatures warmed, inversion strength decreased, mixing increased and rapid diurnal ozone production was lowered.

In Fig. 2 are presented vertical profiles of ozone and temperature obtained from balloon-borne ozonesondes launched at 11:20 and 16:20 MST on 21 February, 35 km north of the Jonah monitoring site and ~10 km beyond the northern edge of the gas field. The stable atmospheric boundary layer was ~100 m deep throughout the day, as shown in the temperature and ozone profiles. Ozone was relatively constant at around 45 p.p.b. throughout the 11:20 profile. By 16:20, ozone concentrations had increased to around 117 p.p.b. throughout the boundary layer. We interpret the lack of ozone

formation in the 11:20 sounding compared with Jonah, where ozone had increased from a nocturnal average of ~30–80 p.p.b. by the same time, as being due to wind flow that had not yet brought ozone precursors and ozone from the gas field to the ozonesonde site. A similar pattern has been observed at other monitoring sites located outside the boundaries of the gas field; the presence of elevated ozone outside the gas field is predicated on wind direction over the previous 3–6 h transporting ozone precursors or ozone-enriched air to the remote sites. The two primary photolytic reactions in the photochemical ozone production cycle[12] are the photolysis of NO$_2$ to form NO and atomic O, and the combination of O$_2$ with the O atom to form ozone (see the Methods section). In these cold wintertime conditions the relative importance of the radical sources that are the other primary drivers of local photochemical ozone production is not well understood. However, for net ozone production, the NO$_2$ must be produced from NO—either directly emitted, or produced from NO$_2$ without consuming ozone in the process. This conversion process is accomplished in the atmosphere when NO reacts with peroxy radicals. These peroxy radicals are produced when VOCs are oxidized by the hydroxyl radical, OH. Generally, the most important source of OH is the reaction of O($^1D$) with a water molecule to yield two OH radicals. However, at the very low temperatures found in these wintertime situations, the concentration of water vapour is very low, and it is expected that nearly all O($^1D$) will simply be collisionally quenched to O($^3P$), followed by reformation of ozone. It is possible that still undetermined processes dominate the OH production, especially in the hours immediately after sunrise, when it is difficult to initiate the photochemistry. Alternative OH production processes include direct formation through photolysis of formaldehyde or nitrous acid, HONO. Formaldehyde may accumulate overnight owing to direct emissions from the combustion sources responsible for the observed high concentrations of NO$_x$ and VOCs. HONO is produced from the heterogeneous reaction of NO$_2$ with water on moist surfaces, such as snow cover or atmospheric aerosols. Future research should be directed towards investigating the relative importance of these and other OH radical formation processes.

The spectral photolysis rates of these reactions depend solely on the actinic flux, absorption cross-section and quantum yield for disassociation, and are independent of temperature. Conventional thought is that during the northern-hemisphere winter

© 2009 Macmillan Publishers Limited.  All rights reserved.

these photolysis rates are dramatically reduced compared with mid-summer rates owing to the low solar-zenith angles.

To examine the effects of reduced columnar ozone and high surface albedo, the tropospheric ultraviolet and visible radiation model (TUV)[13] was used to calculate hourly actinic flux and spectral photolysis rates for all important atmospheric photolytic reactions in wintertime in the JPA field. Two days were modelled, 22 February 2008, a high-ozone-production day with snow on the ground, and 21 June (a day with the highest solar-zenith angle). For 22 February, satellite-measured total-column vertical ozone of 339 Dobson units was measured over the UGRB (ref. 14) and surface albedo was set at 0.9 for the freshly snow-covered surface. Total vertical columnar ozone of 350 Dobson units and a surface albedo of 0.1 were input for 21 June. The resulting modelled peak photolysis rate for $NO_2$ is $\sim$50% greater on 22 February than 21 June, emphasizing the role of fresh snow cover as a factor in the UGRB ozone-formation process (see the Methods section).

We suggest that the exceptionally high photochemical ozone production observed in the UGRB in winter is the result of $NO_x$ and VOC effluents released in the production of natural gas in the area. These effluents become contained within a relatively shallow stagnant, stable air-layer near the surface and are then rapidly converted photochemically to ozone, which in turn is also trapped in the shallow, stable boundary layer.

Other possible explanations for the rapid, diurnal ozone production such as stratospheric ozone intrusions seem unlikely, as the presence of a high-pressure system over the region essentially precludes stratospheric air reaching the surface[15]. Vorticity cross-sections (measure of ozone-rich stratospheric air entering the troposphere) centred on the JPA gas field during days of elevated surface ozone production showed no evidence of stratospheric air contributing to the high surface ozone levels. This is reinforced by ozonesonde profiles in which elevated ozone was confined to a shallow layer near the surface with no enhancements at higher altitudes, nor was ozone excessive at the Pinedale CASTNET site 20 km north and 221 m higher in elevation than the Jonah site ($\sim$100 m above the top of the inversion). Finally, the strong, repeated diurnal ozone production correlated with solar insolation does not follow the pattern of ozone input from the stratosphere[14].

We conclude by noting that similar low-temperature ozone formation is probably occurring in other regions of the western US, and in Canada, Russia, Kazakhstan, Mongolia and China, where fossil fuel extraction occurs in similar terrain and under similar meteorological conditions. At present, ozone measurements in most of these regions in winter are non-existent.

## Methods

This study was carried out on data provided by the Wyoming Department of Environmental Quality (WDEQ) collected in a large air-quality programme in the UGRB. All these data are quality controlled to US Environmental Protection Agency procedures 40 CFR 50 and 58. Synoptic-scale meteorological data were accessed at <http://www.hpc.ncep.noaa.gov/dailywxmap/>. Snow-coverage data were available from multiple web cameras located at the air-quality monitoring stations accessed through the WDEQ site. Basic data analysis was carried out by plotting and comparing the time series of the chemical and meteorological parameters. This analysis revealed a consistent pattern of strong coherence in each of the events that was studied, over multiple years, reinforcing the robustness of the results.

To examine the effects of reduced vertical ozone and increased surface albedo on the ozone-production reactions ((1)–(4) below)

$$NO_2 + h\nu \rightarrow NO + O(^3P) \qquad (1)$$

$$O_3 + h\nu \rightarrow O_2 + O(^1D) \qquad (2)$$

$$HCHO + h\nu \rightarrow H_2 + CO \qquad (3)$$

$$HCHO + h\nu \rightarrow H^{\cdot} + HC^{\cdot}O \qquad (4)$$

the TUV radiative-transfer model was used to calculate photolysis rates. TUV outputs actinic flux and spectral photolysis rates for all important atmospheric photolysis reactions. Normalization was done by dividing all hourly rates by the peak 21 June rate for each reaction. As expected, using average total vertical ozone of 350 Dobson units and a dark surface (albedo = 0.1), the 22 February peak rates are significantly lower than on 21 June, supporting the conventional wisdom of suppressed photochemistry during winter months. Decreasing the total vertical ozone by 100 Dobson units almost doubles the peak rate for $O_3$ photolysis but the increases in $NO_2$ and $CH_2O$ photolytic rates are minor at best. This is because the actinic flux for $NO_2$ and $CH_2O$ photolysis is driven by wavelengths that are not absorbed by ozone, thus varying total vertical ozone will have little effect. Increased $O_3$ photolysis rate without a simultaneous increase in $NO_2$ and $CH_2O$ photolytic rates will probably not support enhanced photochemistry. However, very large increases in the peak photolytic rates (>50%) are seen for all reactions when a snow-covered surface (albedo = 0.9) is used. The peak photolytic rate is not the only factor determining the extent of the ozone production. The duration of actual photolysis must also be considered. This is done by stating the integrated reaction rates for 22 February simulations as a percentage of the integrated 21 June rates.

Received 27 October 2008; accepted 18 December 2008; published online 18 January 2009

## References

1. Logan, J. A. Ozone in rural areas of the United States. *J. Geophys. Res.* **94**, 8511–8532 (1989).
2. Pinto, J. P., Rizzo, M., McCluney, L. & Fitz-Simons, T. *Extended Abstracts, Ninth Conf. on Atmospheric Chemistry* 1–7 (American Meteor. Soc., 2007).
3. Trainer, M. *et al.* Models and observations of the impact of natural hydrocarbons on rural ozone. *Nature* **329**, 705–707 (1987).
4. US EPA; <http://www.epa.gov/air/ozonepollution/standards.html>.
5. <http://deq.state.wy.us/out/downloads/ozonealert2.26.08.doc>.
6. UGWOS 2008 Database 8/04/2008 available at <http://deq.state.wy.us/aqd/Monitoring%20Data.asp>.
7. Wyoming Oil and Gas Conservation Commission Online Database: <http://wogcc.state.wy.us/>.
8. <http://www.eia.doe.gov/emeu/recs/recs2005/hc2005_tables/c&e/excel/tableus3.xls>.
9. Jonah Infill Final EIS and Record of Decision and Pinedale Supplemental Final EIS and Record of Decision: <www.blm.gov/wy/st/en/info/NEPA/pfodocs/jonah.html>.
10. Whiteman, C. D. Breakup of temperature inversions in deep mountain valleys: Part I. Observations. *J. Appl. Meteorol.* **21**, 270–289 (1982).
11. Whiteman, C. D. & McKee, T. B. Breakup of temperature inversions in deep mountain valleys: Part II. Thermodynamic model. *J. Appl. Meteorol.* **21**, 290–302 (1982).
12. Crutzen, P. J. in *Composition, Chemistry, and Climate of the Atmosphere* (ed. Sing, H. B.) 349–393 (Van Nostrand Reinhold Publ., 1995).
13. Tropospheric Ultraviolet and Visible radiation (TUV) model, National Center for Atmospheric Research; <http://cprm.acd.ucar.edu/Models/TUV/>.
14. Total ozone data: <http://jwocky.gsfc.nasa.gov/teacher/ozone_overhead_v8.html>.
15. Danielsen, E. F. Stratospheric–tropospheric exchange based on radioactivity, ozone and potential vorticity. *J. Atmos. Sci.* **25**, 502–518 (1968).

## Acknowledgements

This research was supported by the NOAA, Earth System Research Laboratory, Boulder, Colorado. Data were provided by the Wyoming Department of Environmental Quality, Cheyenne, Wyoming. P. J. Crutzen, Max-Planck Institute, Mainz, Germany, and D. D. Parrish and J. A. deGouw, NOAA Earth System Research Laboratory, Boulder, Colorado, provided helpful suggestions on ozone formation chemistry.

## Author contributions

R.C.S., S.J.O., R.R.N., J.V.M. and A.B.W. conducted the data analysis; J.V.M. assisted in field data collection and ran the TUV model; M.S.E. brought the ozone-production phenomenon to our attention and facilitated access to the data. Conclusions expressed should be considered those of the NOAA authors.

## Additional information

Reprints and permissions information is available online at http://npg.nature.com/reprintsandpermissions. Correspondence and requests for materials should be addressed to R.C.S.

© 2009 Macmillan Publishers Limited. All rights reserved.





Article

pubs.acs.org/est

Terms of Use

# Highly Elevated Atmospheric Levels of Volatile Organic Compounds in the Uintah Basin, Utah

D. Helmig,* C. R. Thompson, J. Evans, P. Boylan, J. Hueber, and J.-H. Park

Institute of Arctic and Alpine Research (INSTAAR), University of Colorado, Boulder, Colorado 80309-0450, United States

Ⓢ Supporting Information

**ABSTRACT:** Oil and natural gas production in the Western United States has grown rapidly in recent years, and with this industrial expansion, growing environmental concerns have arisen regarding impacts on water supplies and air quality. Recent studies have revealed highly enhanced atmospheric levels of volatile organic compounds (VOCs) from primary emissions in regions of heavy oil and gas development and associated rapid photochemical production of ozone during winter. Here, we present surface and vertical profile observations of VOC from the Uintah Basin Winter Ozone Studies conducted in January−February of 2012 and 2013. These measurements identify highly elevated levels of atmospheric alkane hydrocarbons with enhanced rates of $C_2-C_5$ nonmethane hydrocarbon (NMHC) mean mole fractions during temperature inversion events in 2013 at 200−300 times above the regional and seasonal background. Elevated atmospheric NMHC mole fractions coincided with build-up of ambient 1-h ozone to levels exceeding 150 ppbv (parts per billion by volume). The total annual mass flux of $C_2-C_7$ VOC was estimated at $194 \pm 56 \times 10^6$ kg yr$^{-1}$, equivalent to the annual VOC emissions of a fleet of ~100 million automobiles. Total annual fugitive emission of the aromatic compounds benzene and toluene, considered air toxics, were estimated at $1.6 \pm 0.4 \times 10^6$ and $2.0 \pm 0.5 \times 10^6$ kg yr$^{-1}$, respectively. These observations reveal a strong causal link between oil and gas emissions, accumulation of air toxics, and significant production of ozone in the atmospheric surface layer.



## ■ INTRODUCTION

Tropospheric ozone is a secondary air pollutant produced photochemically through complex reactions involving volatile organic compounds (VOCs) and nitrogen oxides (NO$_x$).[1] The current EPA National Ambient Air Quality Standard (NAAQS) for 8-h average ozone levels is 75 ppbv (parts per billion by volume, i.e., nmol mol$^{-1}$). Levels above this threshold are considered to be harmful to human health, and high levels of ozone are known to cause respiratory distress and be responsible for an estimated 5000 premature deaths in the U.S. per year.[2] Because of the photochemical nature of ozone production, tropospheric ozone pollution has traditionally been considered an urban, summertime phenomenon; thus, the discovery of rapid, photochemical ozone production during the winter months in 2008 in the Green River Basin of Wyoming was unexpected.[3,4] Since that time, high wintertime ozone has also been discovered in the Uintah Basin in northeastern Utah.[5,6] These two regions are similar in that they are both topographic basins, they are predominantly rural (Uintah County is home to ~30,000 people), and they are home to two of the highest producing oil and gas fields in the United States. Currently, the Uintah Basin has approximately 4300 oil and 6900 gas producing wells in operation, with proposals in place for nearly 25,000 more.

Elevated ambient air ozone levels were first reported in the Uintah Basin in the winter of 2009/2010 at Ouray in the center of the Basin. Follow-up measurements from an expanding network of ozone monitoring stations have since shown a preponderance of high ozone conditions, with ozone levels exceeding the 8-h NAAQS at all stations located inside the Basin, and with the number of exceedences reaching up to 39 days at individual monitoring stations (Ouray, winter of 2013), and 1- and 8-h ozone maxima in the Uintah Basin exceeding those reported for recent years for summertime values from the Los Angeles Basin.[7] Here, we report findings from the 2012 and 2013 Uintah Basin Winter Ozone Studies (UBWOS), which aimed at elucidating the causes for the wintertime ozone production events seen in this region.

## ■ METHOD DESCRIPTION

Experiments reported here were conducted at the Horse Pool site, at 40.14°N, 109.47°W, 1530 m asl. This site is on the northern edge of the most extensive gas field in the Basin, with ~160 well pads surrounding the site within a 5 km radius (Figure 1). Continuous measurements of ozone, methane, and a suite of nonmethane hydrocarbons (NMHCs) were conducted from January 30 through February 26, 2012, and from January 25 through February 19, 2013, from sampling inlets located on a 2-m tower and on a tethered balloon. The

Received: November 12, 2013
Revised: February 25, 2014
Accepted: March 13, 2014
Published: March 13, 2014

Environmental Science & Technology                                                          Article



**Figure 1.** Location of the Horse Pool study site in the Uintah Basin, in northeast Utah, USA, with reported oil (red) and gas (blue) producing wells and yellow markers showing wells under development (end of 2012). The Horse Pool site, shown by the yellow triangle in the inset, is located at the northern edge of the gas production area in the eastern part of the Basin. The five closest active wells were at approximate distances of 291, 311, 498, 516, 567, and 621 m.

vertical profiling used a stationary 20-foot diameter Sky-Doc balloon for raising three long sampling lines that delivered air to monitors in a mobile laboratory near the balloon winch (Supporting Information, Figure 1). Each sampling line was made of thin-wall, black Teflon of 0.78 cm o.d., 0.64 cm i.d., and ~190 m length. Lines were thoroughly cleaned, conditioned with elevated ozone (24 h at 300 ppbv), and repeatedly tested for compound recoveries prior to and during the field campaign, with recoveries for all reported species of >95%. Sampling inlets were made of AcroDisc, 50 mm diameter glass fiber inlet filters (Pall Corporation, Port Washington, NY) and air was drawn through these lines continuously at ~4 L min$^{-1}$ with individual monitors then pulling a fraction from this flow for the respective gas measurements inside the trailer. Inlets were attached to a secondary balloon tether line and raised with the SkyDoc to heights above ground of ~51, 102, and 153 m. Surface-level measurements were made by sampling from a fourth inlet at 2 m above the ground from a tower ~12 m south of the trailer. All sampling line measurements were intercompared and corrected for small line and instrument biases (<5%) by once daily running all inlets side by side on the tower. Ozone measurements were conducted continuously from each line at 1 min time resolution using a total of five UV absorption ozone monitors (one Thermo Environmental (TEI) Corp. Model 49i, one TEI Model 49, one Advanced Pollution Instrumentation Inc. (API) Model 400, and two MonitorLabs Model 8810). These monitors were calibrated against a reference transfer standard that was calibrated against a reference standard at the NOAA-Global Monitoring Division, Earth System Research Laboratory in Boulder, CO. Accuracy and precision of the ozone measurements are estimated at 1 ppbv (respectively 1% > 100 ppbv) and 0.5 ppbv for 1-min data, respectively. Other

gases were analyzed with one dedicated monitor by sequentially connecting the sampling flow path to one of the four inlet lines using valves and a manifold. Methane was measured at 3 min time resolution with a gas chromatograph (GC)−flame ionization detector (FID) Methane Analyzer (Baseline, Lyons, CO), which was calibrated using a 1.03 ppmv (parts per million by volume, i.e., $\mu$mol mol$^{-1}$) gravimetric standard (Scott-Marrin Inc., Riverside, CA). The uncertainty of the methane measurement was estimated at 0.8%, derived from the uncertainty in the standard (0.01%), and the measured mean precision of standard measurements (0.8%). NMHCs were analyzed in the sample stream by gas chromatography after directing the sample stream through a sodium thiosulfate-coated glass fiber filter for removal of ozone. A GC with a Peltier-cooled microadsorbent trap for sample prefocusing, followed by thermal desorption and temperature-programmed separation with FID, was operated at the site. This instrument is similar to the one described in Tanner et al. in 2006.[8] It was configured for analysis of $C_2$−$C_{10}$ VOC with a sample collected every ~30 min over a 6-min sampling time. Quantified compounds were those listed in Table 1, which together made for >85% of the observed VOC peak area. Whole air samples were also collected over a ~ 2-min sampling time in programmable flask packages (PFP, Atmospheric Observing Systems, Boulder, CO) for later analysis on two different laboratory GCs with similar sample preconcentration techniques, with one of the instruments equipped with an FID and the other one operating with a mass spectrometer and FID detector after splitting the column flow. The GC-FID instrument is of the same configuration as the one used in the Global VOC Monitoring Program.[9] A series of five gravimetric and ambient air calibration standards were used for the GC response factor determination (see the Supporting

dx.doi.org/10.1021/es405046r | Environ. Sci. Technol. 2014, 48, 4707−4715

Environmental Science & Technology   Article

**Table 1. Molar and Mass Ratios of NMHC/Methane from All Combined 2012 and 2013 Surface Measurements and Estimated Annual NMHC Flux**

| compound | molar NMHC/CH$_4$ ratio[a] | mass NMHC/CH$_4$ ratio | annual flux[b] 10$^6$ kg yr$^{-1}$ |
|---|---|---|---|
| ethane | 0.063 | 0.14 | 65 |
| propane | 0.031 | 0.097 | 47 |
| iso-butane | 0.0061 | 0.025 | 12 |
| $n$-butane | 0.0089 | 0.037 | 18 |
| iso-pentane | 0.0042 | 0.022 | 10 |
| $n$-pentane | 0.0032 | 0.017 | 8.0 |
| $n$-hexane | 0.0018 | 0.011 | 5.4 |
| benzene | 0.00058 | 0.0032 | 1.6 |
| toluene | 0.00064 | 0.0042 | 2.0 |
| Σ minor NMHC[c] | | 0.053 | 25 |
| total | | 0.40 | 194 |

[a] The ratios in column 2 reflect the correlation results as shown in the examples in Figure 4. [b]Flux estimate was derived by scaling the NMHC/methane ratio to the 55 × 10$^3$ kg h$^{-1}$ flux for Feb 3, 2012, reported by Karion et al.[21] and extrapolating to a full year assuming a constant flux. [c]Not individually quantified NMHCs were estimated to be ~15% of the sum of the listed species. See the Supporting Information, note 1.

Information for details of the standards). Our laboratory GC calibration scale has been cross-referenced against other national and international laboratories, including two audits by the World Calibration Centre for VOC,[11] with VOC results meeting all quality objectives of the WMO-GAW.[10] Increasing volume sample collections were conducted to affirm linearity of

the NMHC quantification beyond the nominal calibration gas scale. Uncertainty in the VOC measurements is estimated at ~5%, resulting from an on average 2−5% measurement precision error and ~2% uncertainty in the standard accuracy.

Regional NMHC background mole fractions were determined by extracting data for 40°N latitude from the representation of the global NMHC distribution (see the example for ethane in the Supporting Information, Figure 2) from data collected in the Global VOC Monitoring Program.[12] From the 40°N seasonal cycle the data for the period of the experiment from 2006 to 2010 were averaged for comparison with the UBWOS results. Correlations between NMHCs and methane were determined by combining the 2012 and 2013 surface data and determining the regression line slope using a bisquare-weighted least-squares analysis.

## ■ RESULTS AND DISCUSSION

The conditions in 2012 and 2013 were markedly different. The 2012 winter was unseasonably warm with no snow-cover. Under these conditions, daytime surface heating caused mixed boundary layer conditions breaking up nighttime surface inversions and diluting accumulated surface emissions. The 2013 winter had lower temperatures and persistent snow-cover, causing prolonged temperature inversion "cold-pool" events and accumulation of surface emissions over multiple days. More in depth discussion of boundary layer mixing will be presented in forthcoming publications.

Time series data and composite diurnal cycles for surface (2 m) ozone and methane measurements from the 2012 and 2013 studies are presented in Figure 2 (see the Supporting Information, Figure 3, for the composite diurnal ethane



**Figure 2.** Time series data (top) and composite diurnal cycle of average hourly data (bottom) of methane and ozone measured at 2 m above the ground during the 2012 and 2013 experiments, with error bars indicating the 25−75 percentile range of the data in each hour bin.

   dx.doi.org/10.1021/es405046r | Environ. Sci. Technol. 2014, 48, 4707−4715

Environmental Science & Technology                                                                    Article



**Figure 3.** Relationship between ozone and methane during 2012 and 2013. Data shown are from 8 am − 4 pm only, with data points colored by the time of measurement. The insert in panel A shows an enlargement for the 2012 30−60 ppbv ozone data.



**Figure 4.** NMHC (ethane, propane, benzene, toluene) to methane relationship in all of the 2012 and 2013 surface data (for toluene 2013 only). The included regression line is the best fit through the combined 2012 and 2013 data, with regression slope results shown in the legend.

results). In 2012, the mole fractions of both gases were highly variable, with methane showing highest values during night-time, frequently building up to ~10 ppmv at night, and dropping to values in the 1.9–2.0 ppmv range during the middle of the day, These nighttime methane levels are exceptionally high, largely exceeding the ~1.9 ppmv methane background mole fraction.[13] Similar enhancements in methane mole fractions have previously been reported from other oil and

gas producing areas.[14,15] Ozone dropped to minimum levels of ~20 ppbv at night and showed rapid growth to ~40–50 ppbv after sunrise, reaching maximum values in the early afternoon. In 2013, both methane and ozone ambient air mole fractions were significantly higher than in 2012. Two distinct periods are evident during which ambient ozone exhibited strong build-up over 5–9 days (Jan 30–Feb 7, Feb 13–17) and reaching up to nearly 150 ppbv, coinciding with persistent surface temperature

                            dx.doi.org/10.1021/es405046r | Environ. Sci. Technol. 2014, 48, 4707−4715

**Environmental Science & Technology**                                                                                          Article



**Figure 5.** Examples of diurnal evolution of ethane vertical profiles on Feb 12, 2012 (left) and Feb 2, 2013 (right). Sampling intervals indicate the period during which individual profiles were collected, with individual height samples collected over 6 min (in situ GC) sampling time consecutively during that period with 30 min intervals in between. (Note the ∼4-fold difference in the x-axis scale between both graphs; error bars indicate the 1σ-uncertainty in the measurement.)



**Figure 6.** Box-whisker plots showing the vertical distribution of ethane and propane during both experiments (left) from all available tethered balloon data, with the 2-m data filtered for times when the balloon was up. Boxes outline the 25−75 percentile of the data, the vertical line inside the box the median, the dots the mean, and the whiskers the minimum and maximum values. The right panel shows the buildup of ethane with height and time during the Jan 31−Feb 9, 2013, ozone pollution event, with the circle size being proportional to the measured ethane mole fraction, and ozone measured from the 2-m tower inlet.

inversion events. Methane, likewise, showed accumulation in the surface layer during the inversion events; methane remained elevated during day and night and regularly exceeded 10 ppmv. In 2013, 1-h ozone levels peaked above 140 ppbv on 3 days during the campaign. The 8-h 75 ppbv NAAQS was exceeded during 340 h, representing 56% of the time during the 2013 experiment. The intermittent drop in both methane and ozone during Feb 9−12, 2013, was caused by passage of a low-pressure system that broke up the capping inversion and brought in air from the west of the Uintah Basin over the Wasatch Range. A noteworthy feature in the 2013 data is the similarity in the multiday timing of the buildup of methane and ozone. Concentration changes of VOC mirrored those of methane (see discussions below); this relationship suggests a tight coupling between emissions and accumulation of VOC

with ozone production. The 2013 data, much in contrast to 2012, show correlation between ozone and methane (Figure 3) with the slope of the regression increasing with time of day; afternoon, i.e., 12−4 pm data only, yield an $R^2 = 0.5$. Ozone continued to increase for another 3−5 days after methane reached constant levels (Figure 2b). This feature suggests continuing ozone buildup after its precursors leveled out at steady state concentrations.

Figure 4 shows the results for four NMHC/methane correlations in the 2012 and 2013 surface measurements. Similar to methane, NMHC levels were higher during 2013 in comparison to the prior snow-free year, but both years show similar correlation behavior. The data in Table 1 summarize the slope results for these analyses. Included are results for the two aromatic compounds benzene and toluene, which have been

**Environmental Science & Technology**  <span style="float:right">Article</span>



**Figure 7.** Statistical box-whisker plot comparison of the 2012 and 2013 surface (2 m) observations of ethane, propane, isobutane, *n*-butane, benzene, and toluene during the UBWOS with other selected published data. Boxes outline the 25−75 percentile of the data, the horizontal line inside the box the median, dots the mean, and the whiskers the minimum and maximum values. The dot inside the box shows the mean value. Values above the whisker bars give the mean value for the study. Explanation of the letter code for the listed studies:
[a]Statistics of 330 individual NMHC measurements. [b]Statistics of 136 individual NMHC measurements. [c]Mean value of 554 individual measurements, February 18−March 7, 2011.[20] [d]Statistics of 28 mean values for 28 major U.S. cities from canister samples collected during August−September between 1999 and 2005.[30] [e]Mean value of 19 individual canister samples, August−September 2004.[30] [f]Mean value of a subset of 230 canister samples collected during morning hours at four urban sites in Mexico City, Feb. 2002 and April−May 2003.[31]

regulated by the EPA for over 30 years, as these, besides contributing to ozone production, are known to cause direct health impacts from short and long-term exposure, with benzene being a human carcinogen.[16,17] Ambient air mole fractions regularly exceeded the 1.4 ppbv chronic effects screening level health threshold[18] for benzene (22 out of 136 measurements in 2012; 254 out of 329 measurements in 2013).

Analogous to methane, during the 2013 campaign, NMHCs built up to higher levels than in 2012 and remained elevated throughout the day and night during the majority of the campaign. NMHC atmospheric mole fractions during most times were highest near the surface and decreased with height. Diurnal NMHC vertical profiles are shown in Figure 5, and the statistical analysis of all available ethane and propane tethered balloon data is shown in Figure 6. These graphs illustrate that

in 2012 NMHCs were elevated throughout the lowest 160 m of the atmosphere, with highest levels at the surface. Concentrations built up throughout the night but dropped to lower levels during daytime hours due to the breakup of the surface inversion and mixing of cleaner air from aloft. In 2013, NMHC were even more elevated throughout the lowest 160 m of the atmosphere (note the different *x*-axis scales of the Figure 5 graphs), with again the overall highest mole fractions observed nearest to the surface. In contrast to the preceding year, in 2013, elevated surface concentrations were sustained throughout the day due to the lower degree of vertical mixing. NMHC vertical gradients with enhanced NMHC concentrations near the surface were also seen in the vertical tower gradient data set in a recent study conducted in Erie, on the western edge of the Denver−Julesburg Basin oil and gas area in Weld County,

dx.doi.org/10.1021/es405046r | *Environ. Sci. Technol.* 2014, 48, 4707−4715

$CO_2$;[19] however, absolute levels of light NMHC alkanes in the 2013 Uintah data are on the order of one magnitude higher. The right panel of Figure 6 shows that ethane built up over time and with height and that ozone buildup at the surface coincided with the increase in the ethane mole fraction. These vertical profile data are a clear indicator of the nearby surface source of NMHC emissions and strongly suggest a role of NMHC in the development of ozone pollution events.

In Figure 7, we compare the statistical distribution of the UBWOS NMHC surface measurements in 2012 and 2013 with selected recently published data from Erie; data from Salt Lake City, the one major city ~220 km upwind of the Uintah Basin; a comprehensive set of measurements from 28 US urban sites; as well as available data from Mexico City, considered one of the most polluted urban atmospheres. Note that due to the seasonal cycle of atmospheric NMHCs and long-term trends seen in urban areas, these data sets from different years and seasons can only facilitate a relatively rough comparison, which however, is useful to gauge the order of magnitude of the observed ambient NMHC mole fractions. The 2013 NMHC UBWOS light alkane data are the highest of all reported values, followed by the 2012 data set. For both years, the Uintah Basin measurements are on the order of 10–100 times higher than average ambient air mole fractions reported from the largest US cities. Uintah Basin light NMHC values are on the same order, or exceed (i.e., ethane), those for Mexico City. Interestingly, the Erie, CO, data[20] included in these graphs show a similar tendency of highly elevated ambient air NMHCs and are comparable to the 2012 Uintah County data. Additional measurements from the Colorado Front Range[14] provide further support for these highly elevated NMHC ambient air concentrations. Values measured in Salt Lake City were much lower than at the study site, by ~2 orders of magnitude for the light alkanes. This difference is much higher than what could be explained by seasonal cycles or NMHC trends (given that the reference data were collected during early fall and 8–9 years earlier). Consequently, this comparison provides a convincing argument that outflow from the state capital (which during the 2013 study period had westerly winds, and thus was upwind of the Uintah Basin ~30% of the time (see the Supporting Information, Figure S4)) is not a predominant source to the elevated Uintah Basin NMHC values.

Measurements from the NOAA/INSTAAR Global VOC Monitoring Network[9] allow the approximate seasonal and regional background levels of these NMHCs at the location of the study site to be defined if there were no immediate emission sources (see the Supporting Information for method description). Mean UBWOS values for ethane were 41 times (2012) and 179 times (2013) greater than background levels. The corresponding values for propane, iso-butane, n-butane, iso-pentane, and n-pentane were 42/205 (2012/2013), 49/236, 50/213, 54/220, and 83/5333, respectively (Table 2). These enhancement ratios increase with increasing molecular size, due to decreasing NMHC lifetime, resulting in lower background air concentrations and higher UBWOS/background molar ratios. This feature is a clear indication of the relatively low degree of atmospheric processing, i.e., "freshness", of the emissions.

During UBWOS 2012, Karion et al.[21] used data from light aircraft measurements and a mass balance approach to estimate the methane flux for the Uintah Basin oil and gas fields. Their estimated flux of 55 ± 15 × 10³ kg h⁻¹ for February 3, 2012, can be used to scale up our NMHC observations for a first-

**Table 2. Comparison of UBWOS 2012 and 2013 NMHC Surface Data Results with the Estimated NMHC Regional Atmospheric Background Mole Fractions**

| compound | Uintah 2012 (n = 233) min – max avg (std dev) (ppbv) | Uintah 2013 (n = 327) min – max average (std dev) (ppbv) | regional background 40°N, Jan 20–Feb 20 (ppbv) | enhancement factor: Uintah 2012/2013 vs background |
|---|---|---|---|---|
| ethane | 2.04–367 74 (79) | 36–1125 323 (196) | 1.8 | 41/179 |
| propane | 1.07–158 33 (35) | 19–478 158 (93) | 0.77 | 42/205 |
| iso-butane | 0.19–36 6.8 (7.6) | 4.2–102 33 (20) | 0.14 | 49/236 |
| n-butane | 0.37– 57 12 (13) | 6.3 - 151 51 (30) | 0.24 | 50/213 |
| iso-pentane | 0.11–29 5.5 (6.3) | 0.98–69 22 (14) | 0.10 | 54/220 |
| n-pentane | 0.098–29 5.0 (5.8) | 2.4–60 20 (11) | 0.06 | 83/333 |
| n-hexane | 0.047–14 2.1 (2.3) | 1.2–2.5 11 (6.5) | n.a. | n.a. |

order estimate of the magnitude of the NMHC flux. Note that this estimate relies on a number of simplifying assumptions, such as basin-wide constant NMHC/methane ratios and constant emissions throughout the year. For this calculation, we use the individual and total NMHC/methane ratios listed in Table 1 and scale these fluxes to a year. These calculations show that fugitive annual emissions for the compounds quantified here range from 1.6–65 × 10⁶ kg yr⁻¹. The summation of these individual species, plus an estimated 15% for not individually quantified NMHCs (see the Supporting Information, note 1), yields a total NMHC flux estimate of (194 ± 56) × 10⁶ kg yr⁻¹ (Supporting Information, note 2, for the uncertainty estimation), with the uncertainty estimate not considering the uncertainty in the assumptions noted above. The mass equivalent of the annual flux is approximately equivalent to 1.4 million barrels of crude oil, a ~US$140 million value (Supporting Information, note 3). This flux can also be scaled to automobile emissions; however, it needs to be noted that this is a mass flux comparison only, which does not consider the different reactivity and toxicity of the oil and gas versus automobile emissions. VOC emissions of the current automobile fleet are on the order of 100 mg km⁻¹.[22] Consequently, the fugitive NMHC mass flux from the Uintah Basin is equivalent to the VOC emissions resulting from driving a distance of 1.9 × 10¹² km; or, at an annual per vehicle average driving distance of 20,000 km, equivalent to the annual VOC emissions from ~100 million automobiles (Supporting Information, note 4).

Interestingly, our flux estimates for Uintah County are of similar magnitude as recent reports for the Weld County oil and gas development region. There, propane was estimated to have an annual flux of (28.5–46.3) × 10⁶ kg yr⁻¹, and 40 × 10⁶ kg yr⁻¹ as calculated by Petron et al.[14] and Swarthout et al.,[19] respectively, compared to our Uintah Basin result of 41 × 10⁶ kg yr⁻¹. For benzene, our result of 1.6 × 10⁶ kg yr⁻¹ is somewhat higher compared to the (0.6–1.1) × 10⁶ kg yr⁻¹ [14] and 0.57 × 10⁶ kg yr⁻¹ [19] Weld County estimates.

Karion et al. estimated the fugitive methane flux to be 6.2– 11.7% of the hourly natural gas production in Uintah County. Scaling our NMHC/methane mass ratio of 0.36 to this result

**Article**

yields a fugitive total NMHC flux of 2.2−4.2% of the natural gas production during the encountered conditions. Combining methane and NMHC yields a total hydrocarbon/natural gas production loss rate of 8.4−15.9%. It should be noted that because NMHCs have significantly shorter atmospheric lifetimes than methane, atmospheric NMHC/methane ratios will be lower than emission ratios, with the ratio increasing with the aging of the air and the rate of the increase increasing with molecule size. This effect will cause a negative bias in these flux estimates, causing our NMHC results to likely be lower range estimates, and actual fluxes to possibly be higher than our reported findings.

The 2013 observations from the Uintah Basin oil and gas development area are, to the best of our knowledge, among the highest ever reported mole fractions of alkane NMHCs in ambient air; mole fractions for the aromatic compounds reach or exceed those reported from the most heavily polluted inner cities. This is a remarkable finding, as the study region is a remote, rural Bureau of Land Management (BLM) area far distant from any major urban and industrial regions, which hitherto have been considered the primary emission regions for photochemical pollutants. Atmospheric NMHC levels measured in the Uintah Basin exceed results from a series of other recently published studies that demonstrated highly elevated ambient air VOC levels in oil and gas operation areas.[14,19,20,23,24] The cold-pool events in 2013 allowed for the accumulation of ozone precursor compounds for several days within the shallow inversion layer, leading to much enhanced pollutant levels compared with 2012. The higher albedo of the snow-covered ground in 2013 additionally led to enhanced photochemical reaction rates and higher production rates of ozone. The tight relationships between NMHCs and methane, and between ozone and methane, are a clear indication for the high ozone production resulting from emissions associated with the oil and gas extraction. These findings also support recent modeling work that investigated and postulated ozone production from oil and gas emissions[25−27] including the recent publication by Edwards et al.,[25] which utilized the UBWOS 2012 data for assessing ozone production under the conditions encountered at the Horse Pool site. These simulations, incorporating effects of snow cover and a 2-fold enhancement of VOC and radical precursors during cool pool event inversion conditions, modeled an approximate doubling of ozone production rates (i.e., from 16 to 34.6 ppbv day$^{-1}$) compared to snow-free conditions. Our 2012 versus 2013 NMHC data comparison (Table 2) points toward a 4-fold increase in ambient NMHC mole fractions under snow cover conditions. Given that the photochemistry in the Uintah Basin appears to be highly sensitive to VOC,[25] these findings suggest higher ozone production rates than those that were modeled.[25] These elevated VOC levels exert health impacts through two different routes, i.e., by exceeding chronic health thresholds for long-term exposure (benzene) and by their role in contributing to ozone production resulting in exceedances of the ozone NAAQS. Oil and gas operations are increasingly moving into residential areas. Current setbacks in Colorado are ∼150 m, which is less than the distance between the closest operating wells and the Horse Pool experiment site, which raises concern regarding the long-term exposure of citizens residing nearby oil and gas wells and emphasizes the importance for monitoring and assessing air quality and health impacts from oil and natural gas operations.[28,29]

## ■ ASSOCIATED CONTENT

**Ⓢ Supporting Information**

Illustration of the experimental setup for the tethered balloon vertical profiling experiment, graph showing global latitudinal and seasonal distribution of ethane from the INSTAAR-NOAA/GMD global VOC monitoring program and the ethane time series extracted for 40°N, graph with the composite diurnal cycle of ethane during 2012 and 2013, and data analysis and processing details. This information is available free of charge via the Internet at http://pubs.acs.org/.

## ■ AUTHOR INFORMATION

**Corresponding Author**

*Tel: 001 303 492-2509. Fax: 001 303 492-6233. E-mail: detlev.helmig@colorado.edu.

**Notes**

The authors declare no competing financial interest.

## ■ ACKNOWLEDGMENTS

Lee Mauldin, Abigale Curtis, Jason Sauer, Brie van Dam, and Jorrel Torres helped with the field work. Brian Seok assisted with data acquisition programming. Funding and the methane/THC monitor were provided by the State of Utah Department of Environmental Quality. We thank our colleagues from NOAA CSD and GMD for help with the field project. Sam Oltmans, NOAA GMD, provided the map used in Figure 1.

## ■ REFERENCES

(1) Chameides, W. L.; Fehsenfeld, F.; Rodgers, M. O.; Cardelino, C.; Martinez, J.; Parrish, D.; Lonneman, W.; Lawson, D. R.; Rasmussen, R. A.; Zimmerman, P.; Greenberg, J.; Middleton, P.; Wang, T. Ozone precursor relationships in the ambient atmosphere. *J. Geophys. Res.-Atmos.* **1992**, *97* (D5), 6037−6055.

(2) Bell, M. L.; Dominici, F.; Samet, J. M. Meta-analysis of ozone and mortality. *Epidemiology* **2005**, *16* (5), S35−S35.

(3) Schnell, R. C.; Oltmans, S. J.; Neely, R. R.; Endres, M. S.; Molenar, J. V.; White, A. B. Rapid photochemical production of ozone at high concentrations in a rural site during winter. *Nature Geoscience* **2009**, *2* (2), 120−122.

(4) Rappenglueck, B.; Ackermann, L.; Alvarez, S.; Golovko, J.; Buhr, M.; Field, R.; Slotis, J.; Montague, D. C.; Hauze, B.; Adamson, S.; Risch, D.; Wilkerson, G.; Bush, D.; Stoeckenius, T.; Keslar, C. Strong wintertime ozone events in the Upper Green River Basin, Wyoming. *Atmos. Chem. Phys. Discuss.* **2013**, *13*, 17953−18005.

(5) Utah, Final Report. 2012 Uintah Basin Winter Ozone & Air Quality Study. Department of Environmental Quality, 2012, 1−281. http://rd.usu.edu/files/uploads/ubos_2011-12_final_report.pdf (accessed March 2014).

(6) Oltmans, S.; Schnell, R. C.; Johnson, B.; Petron, G.; Mefford, T.; Neely, R. N. I. Anatomy of wintertime ozone associated with oil and natural gas extraction activity in Wyoming and Utah. *Elementa* **2014**, DOI: 10.12952/journal.elementa.000024.

(7) South Coast Air Quality Management District (S. C. A. Q. M.) http://www.aqmd.gov/smog/o3trend.html (accessed March 2014).

(8) Tanner, D.; Helmig, D.; Hueber, J.; Goldan, P. Gas chromatography system for the automated, unattended, and cryogen-free monitoring of C2 to C6 non-methane hydrocarbons in the remote troposphere. *J. Chromatogr. A* **2006**, *1111* (1), 76−88.

(9) Helmig, D.; Bottenheim, J.; Galbally, I. E.; Lewis, A.; Milton, M. J. T.; Penkett, S.; Plass-Duelmer, C.; Reimann, S.; Tans, P.; Theil, S., Volatile Organic Compounds in the Global Atmosphere. *Eos Trans. AGU* **2009**, *90*, (52).

(10) WMO. A WMO/GAW Expert Workshop on Global Long-Term Measurements of Volatile Organic Compounds (VOCs). WMO

Article

Report No. 171, 2007, Geneva, Switzerland, 30 Jan—1 Feb 2006, 36 pp.

(11) World Calibration Centre for Volatile Organic Compounds (WCC-VOC). Karlsruhe Institute of Technology. http://imk-ifu.fzk.de/wcc-voc/ (accessed March 2014).

(12) Global Atmospheric Volatile Organic Compound Monitoring Program. http://instaar.colorado.edu/arl/Global_VOC.html (accessed March 2014).

(13) Dlugokencky, E. J.; Nisbet, E. G.; Fisher, R.; Lowry, D. Global atmospheric methane: budget, changes and dangers. *Philos. Trans. R. Soc. A-Math. Phys. Eng. Sci.* **2011**, *369* (1943), 2058—2072.

(14) Pétron, G.; Frost, G.; Miller, B. R.; Hirsch, A. I.; Montzka, S. A.; Karion, A.; Trainer, M.; Sweeney, C.; Andrews, A. E.; Miller, L.; Kofler, J.; Bar-Ilan, A.; Dlugokencky, E. J.; Patrick, L.; Moore, C. T.; Ryerson, T. B.; Siso, C.; Kolodzey, W.; Lang, P. M.; Conway, T.; Novelli, P.; Masarie, K.; Hall, B.; Guenther, D.; Kitzis, D.; Miller, J.; Welsh, D.; Wolfe, D.; Neff, W.; Tans, P. Hydrocarbon emissions characterization in the Colorado Front Range: A pilot study. *J. Geophys. Res.-Atmos.* **2012**, *117*, 1—19.

(15) Tollefson, J. Air sampling reveals high emissions from gas field. *Nature* **2012**, *482* (7384), 139—140.

(16) Wallace, L. Environmental exposure to benzene: An update. *Environ. Health Perspect.* **1996**, *104*, 1129—1136.

(17) Suh, H. H.; Bahadori, T.; Vallarino, J.; Spengler, J. D. Criteria air pollutants and toxic air pollutants. *Environ. Health Perspect.* **2000**, *108*, 625—633.

(18) TCEQ Guidelines to Develop Toxicity Factors. RG-442 Revised DRAFT, 2012. http://www.tceq.state.tx.us/toxicology/esl/list_main.htm (accessed January 2014).

(19) Swarthout, R. F.; Russo, R. S.; Zhou, Y.; Hart, A. H.; Sive, B. C. Volatile organic compound distributions during the NACHTT campaign at the Boulder Atmospheric Observatory: Influence of urban and natural gas sources. *J. Geophys. Res.-Atmos.* **2013**, *118* (18), 10614—10637.

(20) Gilman, J. B.; Lerner, B. M.; Kuster, W. C.; de Gouw, J. A. Source signature of volatile organic compounds from oil and natural gas operations in northeastern Colorado. *Environ. Sci. Technol.* **2013**, *47* (3), 1297—1305.

(21) Karion, A.; Sweeney, C.; Petron, G.; Frost, G.; Hardesty, M.; Kofler, J.; Miller, B. R.; Newberger, T.; Wolter, S.; Banta, R.; Brewer, A.; Dlugokencky, E. J.; Lang, P.; Montzka, S. A.; Schnell, R. C.; Tans, P.; Trainer, M.; Zomora, R.; Conley, S. Methane emissions estimate from airborne measurements over a western United States natural gas field. *Geophys. Res. Lett.* **2013**, *40*, 1—5.

(22) Ho, K. F.; Lee, S. C.; Ho, W. K.; Blake, D. R.; Cheng, Y.; Li, Y. S.; Ho, S. S. H.; Fung, K.; Louie, P. K. K.; Park, D. Vehicular emission of volatile organic compounds (VOCs) from a tunnel study in Hong Kong. *Atmos. Chem. Phys.* **2009**, *9* (19), 7491—7504.

(23) Katzenstein, A. S.; Doezema, L. A.; Simpson, I. J.; Balke, D. R.; Rowland, F. S. Extensive regional atmospheric hydrocarbon pollution in the southwestern United States. *Proc. Natl. Acad. Sci. U.S.A.* **2003**, *100* (21), 11975—11979.

(24) Simpson, I. J.; Blake, N. J.; Barletta, B.; Diskin, G. S.; Fuelberg, H. E.; Gorham, K.; Huey, L. G.; Meinardi, S.; Rowland, F. S.; Vay, S. A.; Weinheimer, A. J.; Yang, M.; Blake, D. R. Characterization of trace gases measured over Alberta oil sands mining operations: 76 speciated $C_2$-$C_{10}$ volatile organic compounds (VOCs), $CO_2$, $CH_4$, CO, NO, $NO_2$, NOy, $O_3$ and $SO_2$. *Atmos. Chem. Phys.* **2010**, *10* (23), 11931—11954.

(25) Edwards, P. M.; Young, C. J.; Aikin, K.; deGouw, J. A.; Dubé, W. P.; Geiger, F.; Gilman, J. B.; Helmig, D.; Holloway, J. S.; Kercher, J.; Lerner, B.; Martin, R.; McLaren, R.; Parrish, D. D.; Peischl, J.; Roberts, J. M.; Ryerson, T. B.; Thornton, J.; Warneke, C.; Williams, E. J.; Brown, S. S. Ozone photochemistry in an oil and natural gas extraction region during winter: simulations of a snow-free season in the Uintah Basin, Utah. *Atmos. Chem. Phys. Discuss.* **2013**, *13* (3), 7503—7552.

(26) Kemball-Cook, S.; Bar-Ilan, A.; Grant, J.; Parker, L.; Jung, J. G.; Santamaria, W.; Mathews, J.; Yarwood, G. Ozone impacts of natural gas development in the Haynesville Shale. *Environ. Sci. Technol.* **2010**, *44* (24), 9357—9363.

(27) Carter, W. P. L.; Seinfeld, J. H. Winter ozone formation and VOC incremental reactivities in the Upper Green River Basin of Wyoming. *Atmos. Environ.* **2012**, *50*, 255—266.

(28) McKenzie, L. M.; Witter, R. Z.; Newman, L. S.; Adgate, J. L. Human health risk assessment of air emissions from development of unconventional natural gas resources. *Sci. Total Environ.* **2012**, *424*, 79—87.

(29) Colburn, T.; Schultz, K.; Herrick, L.; Kwiatkowski, C., An exploratory study of air quality near natural gas operations. *Hum. Ecol. Risk Assess.* **2013**, doi.org/10.1080/10807039.2012.749447.

(30) Baker, A. K.; Beyersdorf, A. J.; Doezema, L. A.; Katzenstein, A.; Meinardi, S.; Simpson, I. J.; Blake, D. R.; Rowland, F. S. Measurements of nonmethane hydrocarbons in 28 United States cities. *Atmos. Environ.* **2008**, *42* (1), 170—182.

(31) Velasco, E.; Lamb, B.; Westberg, H.; Allwine, E.; Sosa, G.; Arriaga-Colina, J. L.; Jobson, B. T.; Alexander, M. L.; Prazeller, P.; Knighton, W. B.; Rogers, T. M.; Grutter, M.; Herndon, S. C.; Kolb, C. E.; Zavala, M.; de Foy, B.; Volkamer, R.; Molina, L. T.; Molina, M. J. Distribution, magnitudes, reactivities, ratios and diurnal patterns of volatile organic compounds in the Valley of Mexico during the MCMA 2002 & 2003 field campaigns. *Atmos. Chem. Phys.* **2007**, *7*, 329—353.

   dx.doi.org/10.1021/es405046r | *Environ. Sci. Technol.* 2014, 48, 4707—4715



http://www.epa.gov/apti/ozonehealth/population.html
Last updated on 02/03/2012

## Ozone and Your Patients' Health
Training for Health Care Providers

Office of Air Quality Planning and Standards     Air Pollution Training Institute     Ozone and Your Patients' Health     Health Effects of Ozone in the General Population

# Health Effects of Ozone in the General Population

- Introduction
- How are people exposed to ozone?
- How does ozone react in the respiratory tract?
- What are ozone's acute physiological and symptom effects?
- What effects does ozone have at the cellular level?
- How does response vary among individuals?
- What are the effects of ozone on mortality?
- What are other potential effects of short-term ozone exposure?
- At what exposure levels are effects observed?
- What are the effects of recurrent or long-term exposure to ozone?

**Review Key Points**

## Introduction

Breathing ground-level ozone can result in a number of health effects that are observed in broad segments of the population. Some of these effects include:

- Induction of respiratory symptoms
- Decrements in lung function
- Inflammation of airways

Respiratory symptoms can include:

- Coughing
- Throat irritation
- Pain, burning, or discomfort in the chest when taking a deep breath
- Chest tightness, wheezing, or shortness of breath

In addition to these effects, evidence from observational studies strongly indicates that higher daily ozone concentrations are associated with increased asthma attacks, increased hospital admissions, increased daily mortality, and other markers of morbidity. The consistency and coherence of the evidence for effects upon asthmatics suggests that ozone can make asthma symptoms worse and can increase sensitivity to asthma triggers.



**Figure 2: Pyramid of effects caused by ozone**
The relationship between the severity of the effect and the proportion of the population experiencing the effect can be presented as a pyramid. Many individuals experience the least serious, most common effects shown at the bottom of the pyramid. Fewer individuals experience the more severe effects such as hospitalization or death.



This section of the course addresses exposure and health effects issues common to all people.  The next section of the course, Health Effects in Patients with Asthma and Other Chronic Respiratory Disease, addresses those issues specific to people with asthma and other chronic lung disease.

### How are people exposed to ozone?

Primary exposure occurs when people breathe ambient air containing ozone. The rate of exposure for a given individual is related to the concentration of ozone in the surrounding air and the amount of air the individual is breathing per minute (minute ventilation).  The cumulative amount of exposure is a function of both the rate and duration of exposure.

Although ozone concentrations in the outside (ambient) air are generally similar across many locations in a particular airshed, a number of factors can affect ozone concentration in "microenvironments" within the larger airshed (e.g., inside a residence, inside a vehicle, along a roadway). Ozone concentrations indoors typically vary between 20% and 80% of outdoor levels depending upon whether windows are open or closed, air conditioning is used, or other factors such as indoor sources.  People with the greatest cumulative exposure are those heavily exercising outdoors for long periods of time when ozone concentrations are high.  In addition, during exercise people breathe more deeply, and ozone uptake may shift from the upper airways to deeper areas of the respiratory tract, increasing the possibility of adverse health effects.  People with the lowest cumulative exposure are those resting for most of the day in an air-conditioned building with little air turnover.

Ozone levels may also affect indoor levels of some aldehydes formed as reaction products of ozone with indoor substances (Apte et al 2008).  This provides a potential pathway for people indoors to experience respiratory effects mediated by ozone reaction products.  Further research is needed to test the importance of these exposures on health effects.

### How does ozone react in the respiratory tract?

Because ozone has limited solubility in water, the upper respiratory tract is not as effective in scrubbing ozone from inhaled air as it is for more water soluble pollutants such as sulfur dioxide ($SO_2$) or chlorine gas ($Cl_2$).  Consequently, the majority of inhaled ozone reaches the lower respiratory tract and dissolves in the thin layer of epithelial lining fluid (ELF) throughout the conducting airways of the lung.

In the lungs, ozone reacts rapidly with a number of biomolecules, particularly those containing thiol or amine groups or unsaturated carbon-carbon bonds.  These reactions and their products are poorly characterized, but it is thought that the ultimate effects of ozone exposure are mediated by free radicals and other oxidant species in the ELF that then react with underlying epithelial cells, with immune cells, and with neural receptors in the airway wall.  In some cases, ozone itself may react directly with these structures.  Several effects with distinct mechanisms occur simultaneously following a short-term ozone exposure and will be described below.



**Figure 3: Ozone is highly reactive in the respiratory tract**



When breathed into the airways, ozone interacts with proteins and lipids on the surface of cells or present in the lung lining fluid, which decreases in depth from 10 μm in the large airways to 0.2 μm in the alveolar region. Epithelial cells lining the respiratory tract are the main target of ozone and its products. These cells become injured and leak intracellular enzymes such as lactate dehydrogenase into the airway lumen, as well as plasma components. Epithelial cells also release a variety of inflammatory mediators that can attract polymorphonuclear leukocytes (PMNs) into the lung, activate alveolar macrophages, and initiate a train of events leading to lung inflammation. Antioxidants present in cells and lining fluid may protect the epithelial barrier against damage by ozone or its reaction products.
*Source: Devlin et al., (1997)*

🔍🖨 **Enlarge or print this figure**

## What are ozone's acute physiological and symptom effects?

The predominant physiological effect of short-term ozone exposure is being unable to inhale to total lung capacity.  Controlled human exposure studies have demonstrated that short-term exposure - up to 8 hours - causes lung function decrements such as reductions in forced expiratory volume in one second (FEV1), and the following respiratory symptoms:

- Cough
- Throat irritation
- Pain, burning, or discomfort in the chest when taking a deep breath
- Chest tightness, wheezing, or shortness of breath

The effects are reversible, with improvement and recovery to baseline varying from a few hours to 48 hours after an elevated ozone exposure.

Current thinking is that changes in symptoms and lung function are due to stimulation of airway neural receptors (probably airway C-fibers) and transmission to the central nervous system via afferent vagal nerve pathways.  Although ozone exposure results in some airway narrowing, neural inhibition of inhalation effort at high lung volumes is believed to be the primary cause of being unable to inhale to total lung capacity.



**Figure 4: Ozone induces neurally mediated responses in the bronchial airways**
Stimulation of nociceptive interepithelial nerve fibers by ozone leads to reflex cough and a decrease in maximal inspiration that is relieved by opioid agonists, which block sensory pathways.  Two possible mechanisms are involved: (1) stimulation of irritant receptors contributes to cough and induces a vagally mediated reflex that increases airway resistance, probably via airway smooth muscle contraction that is blocked by atropine; (2) C fiber stimulation releases neurokinins such as substance P that dilate nearby capillaries, activate mucous glands, and contract airway smooth muscle via neurokinin receptors. Prostaglandin E2 released by epithelial cells exposed to ozone or to ozone reaction products also sensitizes C fibers.
*Source: Devlin et al. (1997)*

🔍🖨 **Enlarge or print this figure**

The overall effect is thus primarily restrictive in nature with a smaller obstructive component that reflects itself in decreases in forced vital capacity (FVC), FEV1 and other spirometric measures that require a full inspiration. It is likely that these lung function changes and respiratory symptoms are responsible for observations that short-term ozone exposure limits maximal exercise capability.

Ozone-induced changes in breathing pattern to more rapid shallow breathing may also be a manifestation of C-fiber stimulation and may be a protective response to limit penetration of ozone deep into the respiratory tract.  Such effects may also contribute to changes in deposition pattern and retention of other inhaled substances such as allergens and particle pollution (also called particulate matter).



**Figure 5: Effects of ozone on lung function**
Ozone reduces the maximal inspiratory position (at the left of the curves) and may slightly increase the residual volume (at the right).  Reduction in maximum inspiration reduces forced vital capacity (FVC), and this causes a reduction in expiratory flow measurements, such as flow at 50% of FVC expired (FEF50%). Because ozone causes only a small change in resistance, the relationship between flow and volume is not changed to a large extent.
*Source: Devlin et al. (1997)*

🔍 🖨 **Enlarge or print this figure**

**What effects does ozone have at the cellular level?**

As a result of short-term exposure, ozone and/or its reactive intermediates cause injury to airway epithelial cells followed by a cascade of other effects.  These effects can be measured by a technique known as bronchoalveolar lavage (BAL), in which samples of epithelial lining fluid (ELF) are collected during bronchoscopy on volunteers experimentally exposed to ozone.  Cells and biochemical markers in the lavage fluid and in the blood can be analyzed to provide insight into the effects of exposure.

Evidence for airway inflammation following ozone exposure includes visible redness of the airway seen during bronchoscopy as well as an increase in the numbers of neutrophils in the lavage fluid. Cellular injury is suggested by an increase in the concentration of lactate dehydrogenase (LDH), an enzyme released from the cytoplasm of injured epithelial cells, in the ELF.  Mediators (e.g., cytokines, prostaglandins, leukotrienes) that are released by injured cells include a number that attract inflammatory cells resulting in a neutrophilic inflammatory response in the airway.  In addition, ozone reaction products as well as some mediators produced in the lung can be detected in the blood providing a possible mechanism for extrapulmonary effects of ozone exposure.



**Figure 6: Effects of ozone on lung function**
These photos show a healthy lung airway (left) and an inflamed lung airway (right). *Photos courtesy of PENTAX Medical Company.*

🔍 🖨 **Enlarge or print this figure**

Other documented ozone-induced effects that may be related to the underlying injury and

Health Effects of Ozone in the General Population | Ozone and...                    http://www.epa.gov/apti/ozonehealth/population.html

inflammatory response are:

- An increase in small airway obstruction
- A decrease in the integrity of the airway epithelium
- An increase in nonspecific airway reactivity
- A decrease in phagocytic activity of alveolar macrophages

The decrease in epithelial integrity can be measured by an increase in the concentration of plasma proteins appearing in the ELF following exposure and by more rapid clearance of inhaled radio-labeled markers from the lung to the blood.  This has the potential for allowing increased movement of inhaled substances (e.g. allergens or particulate air pollution) from the airway to the interstitium or the blood and could modify the known effects of inhaled allergen on asthma and particulate matter on mortality.

Although the significance of increased nonspecific airway reactivity to substances such as methacholine or histamine is not understood in healthy individuals, it is clearly of concern for people with asthma, as increased airway reactivity is a predictor for asthma exacerbations.   (See section entitled How does ozone affect people with asthma?).

A decrease in macrophage function has the potential to interfere with host defense. Over a period of several days following a single short-term exposure, inflammation, small airway obstruction, and increased epithelial permeability resolve; damaged ciliated airway epithelial cells are replaced by underlying cells; and damaged type I alveolar epithelial cells are replaced by more ozone-resistant type II cells.  Over a period of weeks, the type II cells differentiate into type I cells, and following this single exposure, the airway appears to return to the pre-exposure state.

### How does response vary among individuals?

One striking characteristic of the acute responses to short-term ozone exposure is the large amount of variability that exists among individuals.  For example, for a 2-hour exposure to 40 ppb ozone (note: 40 ppb is equal to .04 ppm) that includes 1 hour of heavy exercise, the least responsive individual may experience no symptom or lung function changes while the most responsive individual may experience a 50% decrement in FEV1 and have severe coughing, shortness of breath, or pain on deep inspiration.  A similar range of response is evident for a 6.6-hour exposure to 80 ppb with 5 hours of moderate activity.  Other individual responses fall into what appears to be a unimodal distribution between these two extremes.  Those with large responses following exposure on one day also tend to have large responses upon re-exposure.  Similarly, those with small responses following exposure on one day tend to have small responses upon re-exposure.  A small fraction of the observed variability in lung function and symptom responsiveness can be explained by differences in age and in body mass index (BMI) with young adults (teens to thirties) and those with high BMI being much more responsive than older adults (fifties to eighties) and those with low BMI. Results similar to those in Figure 8 are also seen with longer duration exposures to concentrations more relevant to ambient levels (e.g. over a range of 60 to 120 ppb).



**Figure 7: Variability of response to ozone exposure**
*Source: Devlin et al. (1997)*

**Figure 8: Sensitivity to ozone exposure is age related**
*Source: Devlin et al. (1997)*

Health Effects of Ozone in the General Population | Ozone and...                                    http://www.epa.gov/apti/ozonehealth/population.html



Individual differences in the intensity of the inflammatory response also exist, and it appears that these differences in response are also stable over time.  The magnitude of the neurally-mediated lung function response, however, is not related to the degree of cell injury and inflammation for a given individual suggesting that these two effects are the result of different mechanisms of action.  Further evidence for multiple mechanisms of action is provided by drug intervention studies.  There is some evidence that Vitamin C and E supplements may slightly reduce the lung function effects of ozone but not the inflammatory or symptom responses.  Pre-treatment with non-steroidal anti-inflammatory drugs (NSAID) reduces lung function and symptom responses but not the inflammatory responses in non-asthmatics.  In asthmatic volunteers NSAID pretreatment did not block the restrictive lung function changes seen in nonasthmatics, but did blunt some of the changes due to airway obstruction.  Pre-treatment with high doses of inhaled steroids has been shown to reduce the neutrophil influx following ozone exposure in people with asthma, but not in those without asthma.

True differences in individual responsiveness to ozone can be the result of either environmental or genetic factors.  Research has demonstrated that genetic differences among strains of mice can explain the large range of inflammatory responses seen.  Some preliminary evidence suggests that genetic polymorphisms for antioxidant enzymes and for genes regulating the inflammatory response may modulate the effect of ozone exposure on pulmonary function and airway inflammation.

**What are the effects of ozone on mortality?**

Studies show:

- Ozone is associated with increased mortality
- The absolute effect of ozone on mortality is considerably higher in older adults
- The ozone-mortality relationship is most prominent during the warm season

Recent epidemiologic research has clearly demonstrated that both short-term and longer-term exposures to low concentrations of particle pollution, a common air pollutant, are associated with increased mortality.  Re-examination of the data upon which these findings are based as well as new studies indicate that short-term exposure to ozone is also associated with increased daily mortality.

The study most representative of the U.S. population (Bell et al 2004) evaluated the relationships between daily mortality counts and ambient ozone concentration for 95 large U.S. communities over the period of 1987-2000.  Although there was considerable heterogeneity in the magnitude of effect among the various communities, a 0.5 % overall excess risk in non-accidental daily mortality was observed for each 20 ppb increase in the 24-hour average ozone concentration (approximately equal to a 30 ppb increase in the 8-hour average) on the same day.  There was evidence that the effect was greatest on the day of exposure with smaller residual effects being evident for several days.  A cumulative 1.04% excess risk was observed for each 20 ppb increase in the 24-hour average concentration during the previous week.  The ozone-mortality relationship was robust even after controlling for possible effects of particulate matter and other air pollutants.

Although ozone mortality risk estimates tend to be only slightly higher for the older population compared to the younger population (based predominantly on Medicare studies of people 65 and

older), the absolute effect of ozone on mortality is considerably higher in older adults due to their higher baseline death rates.  Even for older adults, however, the risk of dying on any given day as a result of ozone exposure is quite small.  However, because of the large number of individuals at risk across the country, an effect of this magnitude has meaningful public health implications.

A preponderance of other time series studies supports the existence of an ozone-mortality relationship although with a wider range of effect estimates primarily due to the smaller sizes of the studies.  An independent review of this literature by the National Research Council concludes that short-term ozone is likely to be associated with premature mortality.

Other observations made in these studies include the finding that the ozone-mortality relationship is most prominent during the warm season, with few or smaller effects in the winter.  It also appears that the ozone-mortality association persists when deaths are limited to those caused by either cardiac or pulmonary disease or to those caused by cardiovascular disease alone.  Risk estimates for other causes of death are generally inconsistent across studies probably reflecting the lower statistical power associated with smaller daily death rates.  In the Bell study of 95 cities, the observed city-specific effect rates varied widely.  The degree to which this variability reflects different ozone-mortality relationships in the different cities is not clear, but it does raise the question as to whether a single average 0.5% increase in daily mortality rates should be applied to all cities.  Other unanswered questions pertain to the lowest concentrations at which these effects occur and the possible mechanisms of action responsible for increased mortality among many who spend much of their time indoors where ozone levels are generally quite low.  Bell et al. divided days into those with a 24-hour average ozone concentration above and below 60 ppb and found that the relationship was similar for both subsets suggesting that the relationship is present at even very low levels of ozone.  Biological mechanisms responsible for the ozone-mortality relationship are largely unknown although effects of ozone on the autonomic control of the cardiovascular system, on coagulation mechanisms, and on vasoactive substances in the blood are being actively investigated.

### What are the other potential effects of short-term ozone exposure?

Other potential effects of short-term ozone exposure include:

- hospital admissions and emergency room visits for respiratory causes
- school absences

There is consistent epidemiologic evidence that ambient ozone levels are associated with other markers of respiratory morbidity, particularly during the warm season.  In general, studies have reported positive relationships between short-term ozone concentrations and hospital admissions and emergency room visits for respiratory causes.  Although not all studies have found significant effects, risk estimates for the majority of studies are positive.  It is likely that those most at risk of serious respiratory morbidity are those with underlying respiratory disease.  The evidence indicates that some of the increase in hospital visits for respiratory morbidity is due to exacerbations of asthma and possibly chronic obstructive pulmonary disease (COPD).  Because of the small numbers of daily hospital admissions, the effects of ozone on other subcategories of respiratory disease are not clear.

A relationship has also been observed between ozone and school absences in two studies.  However, in one case the absences were related to a measure of longer-term exposure, and in the other case absences were not limited to those due to illness.  Although these latter results are consistent with increased infections secondary to impaired host defense, more research needs to be done before reaching any conclusion regarding any effect of ozone exposure on respiratory infection.



**Figure 9: The number of emergency or urgent daily respiratory admissions to**

 **acute care hospitals is related to estimated ozone exposure**
Respiratory admission rates to 168 hospitals in Ontario, Canada during the period 1983 through 1988 are plotted against the distribution (deciles) of the daily 1-hour maximum ozone concentration, lagged by 1 day. Admission rates were adjusted for seasonal patterns, day-of-week effects, and hospital effects. Ozone displayed a positive and statistically significant association with respiratory admissions for 91% of the hospitals during the Spring through Fall seasons, but not during the Winter months of December to March when ozone levels were low. *Source: Burnett et al., 1994; U.S. EPA, 1996*

 **Enlarge or print this figure**

Ozone has been associated with daily hospitalizations for cardiovascular disease in some studies but it is not a consistent finding. A number of studies have explored the relationships between ozone and various other aspects of cardiovascular pathophysiology including heart rate variability, acute myocardial infarction, and tachyarrhythmias in those with implanted cardiac devices. Although some data are suggestive of a relationship, the results at this time do not fully substantiate a relationship between ozone exposure and adverse cardiovascular events.

**At what exposure levels are effects observed?**

The concentration of ozone at which effects are first observed depends upon the level of sensitivity of the individual as well as the dose delivered to the respiratory tract. The dose, in turn, is a function of the ambient concentration, the minute ventilation, and the duration of exposure. This can be expressed as a rough formula:

Dose = Ambient concentration X Level of exertion (minute ventilation) X Duration of exposure.

Thus individuals performing strenuous activity (higher minute ventilation) for several hours are likely to respond to lower concentrations than when exposed at rest (lower minute ventilation) for a shorter time. The following examples illustrate this point:

- An average young adult playing an active sport such as soccer or full court basketball outdoors for 2 hours would be expected to experience small to moderate lung function and symptom effects as well as lung injury and inflammation following exposure to 120 ppb ozone.
- If the same average young adult is at rest outdoors for the two hours, such effects would not be expected until exposures reach 300-400 ppb.
- An average outdoor laborer doing intermittent work might experience similar small to moderate lung function and symptom effects as well as lung injury and inflammation following an 8-hour exposure to 60 to 70 ppb ozone.

More sensitive individuals will experience such effects at lower concentrations while less sensitive individuals will experience these effects only at higher concentrations.

Children without asthma experience lung function decrements similar to those of young adults. But children often do not report respiratory symptoms at the lowest ozone concentrations. It is not clear whether this is the result of reduced sensitivity with regard to symptoms or whether children are less likely to recognize and report symptoms.

There are chamber studies and field studies that look at the ozone exposure level at which effects are first observed. It is not surprising that field studies show effects at much lower levels than chamber studies. This is because field studies can look at sensitive populations (including children),

include exposure to all oxidant species of pollution, and may include longer exposure times. For example, field studies of agricultural workers and hikers suggest that lung function changes may be associated with prolonged ozone exposures at lower levels than those observed in chamber studies. Below are findings from key field and observational studies.

Although the results vary somewhat, several field studies suggest that the lung function of highly active asthmatic and ozone sensitive children and the exercise performance of endurance athletes may be affected on days when the 8-hour maximum ozone concentration is less than 80 ppb ozone.

Emergency room data from one study indicate that asthma attacks in the most sensitive population (e.g., children with asthma or reactive airway disease) increase following days on which the 1-hour maximum ozone concentrations exceeded 110 ppb (approximately equivalent to an 8-hour average of 82 ppb). (White et al., 1994)  Another study observed increased emergency room visits for asthma on days following those when 7-hour averages exceeded 60 ppb compared to those with lower ozone concentrations. (Weisel et. al., 1995).

For effects measured in some other types of observational studies, the lowest levels at which effects are expected to occur are more difficult to identify for a number of reasons.  Effects of ozone on daily mortality have been detected even when study days are restricted to those with a 24-hour average ozone concentration below 60 ppb (approximately equivalent to an 8-hour average below 90 ppb).  In one study, hospital admissions for respiratory causes appear to follow a linear relationship down to background levels.  (Figure 9).  Limited exposure-response modeling suggests that if a population threshold for these ozone effects exists, it is likely near the lower limit of ambient ozone concentrations in the United States.

### What are the effects of recurrent or long-term exposure to ozone?

One of the major unanswered questions about the health effects of ozone is whether repeated episodes of damage, inflammation, and repair induced by years of recurrent short-term ozone exposures result in adverse health effects beyond the acute effects themselves.

Daily ozone exposure for a period of 4 days results in an attenuation of some of the acute, neurally-mediated effects (e.g., lung function changes and symptoms) for subsequent exposures occurring within 1 to 2 weeks. Some health experts have, therefore, suggested that individuals living in high ozone areas may be protected from any harmful effects of long-term ozone exposure.  Others suggest, however, that the attenuation of the ozone-induced tendency to take rapid and shallow breaths may blunt a protective mechanism, resulting in greater delivery and deposition of ozone deeper in the respiratory tract and other airway responses described below.

Studies including bronchoalveolar lavage and bronchial mucosal biopsies indicate that, unlike the neurally-mediated lung function changes, the processes of airway injury, inflammation, and repair continue to occur during repeated exposure.  After either 4 or 5 days of exposure, markers of cell injury and increased epithelial permeability remain elevated, and an increase in airway mucosal PMN, which was not present following a single exposure, has been noted.  Also, unlike the neurally-mediated effects, small airway function has been observed to remain depressed over the course of exposures and is thought to be related to the ongoing inflammation.

Studies of laboratory animals have consistently demonstrated that long-term exposure to ozone concentrations above ambient levels results in persistent morphological changes that could be a marker of chronic respiratory disease.  Exposed animals experience mucous cell metaplasia and epithelial cell hyperplasia in the upper airway as well as structural changes in the lower airway including an increase in fibrous tissue in the basement membrane area and a remodeling of the distal conducting airways.  In addition to airway remodeling and basement membrane changes,

concurrent long-term exposure of very young primates to ozone and house dust mite allergen has been observed to result in changes in the innervation of the airways as well as an accumulation of eosinophils in the distal airways suggesting induction of an allergic phenotype.  Other studies indicate that sensitization of animals to antigen occurs more easily during ongoing ozone exposures. Based on traditional measures, there is little evidence that long-term exposure in animals results in substantial changes in airway function.   However, these morphological findings suggest that long-term ozone exposure might play a role in the development or progression of chronic lung disease and/or asthma.

The epidemiologic evidence is inconclusive with regard to whether long-term exposure of humans is related to chronic respiratory health effects in humans.  Several cross-sectional studies have found that young adults who spent their childhoods in locales with high ozone concentrations had lower measures of lung function than those from locales with lower ozone.  Similar results have not been observed, however, in a recent well-conducted longitudinal study of lung function in children or in other cross-sectional studies.  Two longitudinal studies have observed associations between development of asthma and long-term ozone concentrations in subgroups of the population.  These findings have not been confirmed in other longitudinal or cross-sectional studies, but they are consistent with the animal toxicological literature.  Part of the difficulty in evaluating such associations has been the small number of longitudinal epidemiologic studies specifically designed to evaluate respiratory health in samples with differing ozone exposures. The mobility of the population as well as the inability to precisely estimate exposure to ozone and other potential confounders over a period of many years degrades the power of, and leads to bias in, both longitudinal and cross-sectional studies.

In spite of the inconclusive nature of the epidemiologic literature, the repeated cycles of damage, inflammation, and repair in humans and the morphological findings from the animal toxicological studies suggest that it would be prudent to avoid repeated short-term exposures, particularly in young children, until more is known about the effects of long-term ozone exposure.



**Review Key Points**

**Peer-reviewed and accepted for publication by Human and Ecological Risk Assessment (November 9, 2012).**

# An Exploratory Study of Air Quality near Natural Gas Operations

Theo Colborn, Kim Schultz, Lucille Herrick, and Carol Kwiatkowski

TEDX, The Endocrine Disruption Exchange, Paonia, CO, USA

Address correspondence to Carol Kwiatkowski, PhD, Executive Director, TEDX. PO Box 1407, Paonia, CO 81428. Phone and fax: 970 527 4082. Email: carolkw@tds.net.

**Running Head:** Air Quality near Natural Gas Operations

Received 11 September 2012; revised manuscript accepted 8 November 2012

**Relevant abbreviations and definitions:**

| | |
|---|---|
| COGCC | Colorado Oil and Gas Conservation Commission |
| Mcf | thousand cubic feet |
| ng/m$^3$ | nanograms per cubic meter |
| NMHCs | non-methane hydrocarbons |
| PAHs | polycyclic aromatic hydrocarbons |
| ppbc | parts per billion carbon |
| ppbv | parts per billion by volume |
| pptv | parts per trillion by volume |
| μg/m$^3$ | micrograms per cubic meter |
| μg/ml | micrograms per milliliter |
| VOCs | volatile organic compounds |

**ABSTRACT**

This exploratory study was designed to assess air quality in a rural western Colorado area where residences and gas wells co-exist. Sampling was conducted before, during, and after drilling and hydraulic fracturing of a new natural gas well pad. Weekly air sampling for 1 year revealed that the number of non-methane hydrocarbons (NMHCs) and their concentrations were highest during the initial drilling phase and did not increase during hydraulic fracturing in this closed-loop system. Methylene chloride, a toxic solvent not reported in products used in drilling or hydraulic fracturing, was detected 73% of the time; several times in high concentrations. A literature search of the health effects of the NMHCs revealed that many had multiple health effects, including 30 that affect the endocrine system, which is susceptible to chemical impacts at very low concentrations, far less than government safety standards. Selected polycyclic aromatic hydrocarbons (PAHs) were at concentrations greater than those at which prenatally exposed children in urban studies had lower developmental and IQ scores. The human and environmental health impacts of the NMHCs, which are ozone precursors, should be examined further given that the natural gas industry is now operating in close proximity to human residences and public lands.

**Key Words:** drilling, endocrine disruptors, hydraulic fracturing, natural gas, non-methane hydrocarbons, PAHs, VOCs.

2

**INTRODUCTION**

Over the past 25 years the U.S. Environmental Protection Agency (USEPA) has supported research on ozone, particulate matter, and VOCs derived from the combustion of gasoline and diesel fuel by mobile and stationary sources. Air quality monitoring has focused primarily on large urban and industrialized areas in and around heavily populated regions across the U.S. and along chemical factory fence lines. Quantitative results dating back several decades are available from studies designed to test detection methodologies and to detect the quantity of selected VOC compounds in large urban areas or specific cities (Baker *et al.* 2008; Mohamed *et al.* 2002; Seila *et al.* 1989). This kind of air sampling has typically been done in regions of ozone non-compliance to determine the source of the precursors to ozone, providing guidance for regulating the source. Studies of urban air have also documented the damage these compounds cause to human health (Brunekreef *et al.* 2009; Chahine *et al.* 2007; Crüts *et al.* 2008; Dejmek *et al.* 2000; Green *et al.* 2009; Koren *et al.* 1989; Perera *et al.* 1999).

In the past two decades, natural gas development and production in the U.S. has increased rapidly by tapping into domestic resources. Natural gas wells are now being drilled in close proximity to urban and rural communities, and across broad expanses of public lands. Potential sources of air pollution from natural gas operations include volatile chemicals introduced during drilling and hydraulic fracturing (in which fluids are injected under high pressure to fracture the underlying formation that holds the gas), combustion byproducts from mobile and stationary equipment, chemicals used during maintenance of the well pad and equipment, and numerous NMHCs that surface with the raw natural gas. The USEPA estimates that on average the mass composition of unprocessed natural gas is 78.3% methane, 17.8% NMHCs, 1.8% nitrogen, 1.5% carbon dioxide, 0.5% hydrogen sulfide, and 0.1% water (Skone *et al.* 2011; USEPA 2011).

Two independent air sampling studies conducted near natural gas fields in Colorado have recently been published. McKenzie *et al.* (2012) measured air quality around the perimeter of natural gas wells from a stationary site among rural residences and ranches, assessing several NMHCs for the purpose of risk assessment. Petron *et al.* (2012) took a regional approach using data collected over 3 years by both fixed and mobile sampling equipment looking for sources and mixing ratios of methane and benzene and several other NMHCs. The authors identified an

3

alkane signature as evidence of oil and gas activity. Both studies indicate a need for better air monitoring and research on air quality near natural gas operations.

The present study was designed to explore the presence of volatile chemicals, many of which are associated with the production of natural gas, in a rural natural gas production area for 1 year. The sampling period spanned the time before, during, and after development of a natural gas well pad. Development included drilling, hydraulic fracturing, and production operations. To our knowledge, no study of this kind has been published to date.

**PROJECT DESIGN**

Baseline and weekly air samples were collected between July, 2010, and October, 2011, from a fixed sampling station near a well pad on which 16 vertical (directional) gas wells had been drilled, hydraulically fractured and put into production during the course of the study. Air sample data are presented along with a timeline of events on the well pad, including drilling, fracturing and production dates acquired from the website of the Colorado Oil and Gas Conservation Commission (COGCC). The COGCC serves as the primary government resource for the public regarding oil and gas development in Colorado and maintains a publicly available online information system as part of its oil and gas regulatory processes (COGCC 2012a).

**Sampling Site**

Site selection was dictated by our ability to set up a permanent sampling station with access to electricity near a well pad about to be developed. In July, 2010, a permanent air sampling location was selected in Garfield County, Colorado, at approximately 5,850 feet (1783 m) elevation and 0.7 miles (1.1 km) from the well pad of interest. The site was located at a rural residence in semi-arid terrain surrounded by pinyon, juniper, sagebrush, and native grasses. One major highway (I-70) runs through the area, approximately 1.1 miles (1.8 km) north of the sampling site. According to the COGCC (2012a), there were 130 wells producing natural gas within 1 mile (1.6 km) of the sampling site at the time of the study. In addition, two other well pads were developed using vertical drilling within 1 mile (1.6 km) of the sampling site after development of the well pad of interest, and within the timeframe of the study.

**Natural Gas Well Pad**

4

The vertical well pad of interest penetrated the Williams Fork Formation of the Mesa Verde Group at a total depth of approximately 8,300 feet (2530 km) in tight sands (FracFocus 2012). The land for the well pad was cleared of vegetation and leveled and service roads were constructed in the spring of 2010.

According to the COGCC website, drilling of the first of 16 wells started on October 22, 2010, and the last well was started on March 16, 2011. Hydraulic fracturing of the first four wells began on January 4, 2011. Fracturing reportedly began on another five wells on February 15, 2011 (not including the seventh drilled well, which was not fractured until April 20th). Between April 14 and 16, 2011, six more wells were fractured. Volumes of hydraulic fracturing fluids ranged between 1.1 and 2.3 million gallons (4.2 and 8.7 million liters) per well (FracFocus 2012). Wells typically went into production within 5 days of being fractured.

According to the COGCC, the well pad was located in a sensitive area with regard to wildlife habitat and water resources, and was in close proximity to surface and domestic water wells (COGCC 2010). This required the operator to abide by a variety of requirements and best management practices designed to minimize impacts. For example, a closed loop drilling system was used that requires drilling fluids to be captured in tanks instead of separated from the cuttings and held in an open pit. A closed loop system was also used to pipe fracturing fluids to the pad and immediately capture the flow back fluids and pipe them to another facility for treatment.

**METHODS**

A baseline air sample for VOCs was collected July 17, 2010. A complete set of baseline samples was taken on October 19, 2010. Weekly sampling commenced beginning November 2, 2010 through October 11, 2011. Samples were collected on all dates except for December 28, 2010 because the lab was closed for Christmas. Samples were collected every 7 days and shipped by a trained technician according to standard operating procedure for each instrument (AAC 2012a; SKC Inc. 2001; Tisch Environmental, Inc.). The 24-hour samples were taken weekly from noon Monday to noon Tuesday, and the 4-hour samples were taken from 10:00–2:00 on Tuesdays.

Samples were sent to two USEPA certified laboratories using chain of custody procedures to assure proper handling of the samples from the technician to the lab. VOCs were

5

sampled over a 4-hour period using a Six-Liter Summa Canister. Lab analyses were conducted to test for the following VOCs: 56 speciated C2-C12 hydrocarbons using USEPA Method TO-12/USEPA PAMS Protocol (Photochemical Assessment Monitoring Stations, using gas chromatography/flame ionization detection); methane, using USEPA Method 18 (to detect fixed gases by gas chromatography/flame ionization detection/ thermal conductivity); and 68 target VOCs using USEPA Method TO-15 (to detect VOCs using gas chromatography/mass spectrometry).

PAHs were sampled over 24 hours using a Filter/PUF (Polyurethane) combination. Sixteen PAHs were tested using USEPA Method TO-13A (to detect a select group of PAHs with gas chromatography/mass spectrometry). Carbonyls were sampled over a 4-hour period using a DNPH (2-4 dinitrophenylhydrazine) coated Silica Gel Cartridge, and 12 carbonyls were tested using USEPA Method TO-11A (to detect aldehydes and ketones using high-pressure liquid chromatography with a UV detector).

The 4-hour sampling of VOCs and carbonyls was extended to 6 hours, generally from 9:00 am to 3:00 pm with a few samples taken from 10:00 am to 4:00 pm, beginning April 5, 2011. This change was made upon approval by the lab, in order to accommodate the schedule of the sampling technician. Additionally, due to the high cost of the PAH assay, and the findings of PAH concentrations three orders of magnitude lower than the other NMHCs, PAH sampling was discontinued when drilling on the well pad of interest ended (after March 29, 2011).

The samples from the Summa Canisters and the DNPH Cartridges were analyzed by Atmospheric Analysis & Consulting, Inc., Ventura, CA, a National Environmental Laboratory Accreditation Conference approved air quality analytical laboratory. The Filter/PUF analyses were conducted by American Environmental Testing Laboratory, Inc., Burbank, CA. Quality control data including duplicate and spike recoveries was provided in all laboratory reports. Chemicals analyzed in more than one assay are reported as follows: for hexane, toluene, heptane, benzene, and cyclohexane, TO-12 values were used instead of TO-15; and for acetone, TO-15 values were used instead of TO-11A.

All test values were reported by the laboratories without problems, with the exception of one Summa Canister sample with a pressure problem, and six DNPH Cartridge samples—two with equipment problems and four with visible water contamination. The results of all tests with

reported problems were omitted from analysis, resulting in 48 samples reported for VOCs, 21 for
PAHs, and 43 for carbonyls.

**Analyses**

Means, ranges, and standard deviations are presented for all chemicals detected at least
once. Means were calculated by summing the values for each chemical and dividing by the
number of detects for that chemical. Mean, standard deviation, and range values are reported in
parts-per-billion (ppbv) or parts-per-trillion (pptv) volume. Conversions from parts-per-billion
carbon and ng/m$^3$ were conducted as necessary to arrive at this common reporting unit (AAC
2012b). Sample detection values greater than one standard deviation above the mean for each
chemical were defined as spikes. Because of the exploratory nature of the study and the
relatively small data set, values for non-detects were not imputed, no data transformations were
performed, and statistical tests of significance were not conducted.

**RESULTS**

Chemicals that were tested but never detected (non-detects) are presented in Table 1,
along with the Method Reporting Limit (MRL). Shown in Table 2 are basic descriptive statistics
for all the VOCs and carbonyls detected at least once during the sampling period, in order of the
percent of detections. Among the VOCs, four chemicals were detected in every sample: methane,
ethane, propane, and toluene. Chemicals with the highest mean values across the sampling period
include (in order of mean value): methane, methylene chloride, ethane, methanol, ethanol,
acetone, and propane. Regarding the carbonyls, formaldehyde and acetaldehyde were detected in
every sample. The highest values were for crotonaldehyde and formaldehyde. Also shown in
Table 2 are the numbers of times each chemical spiked during the sampling period.

Shown in Table 3 are the results for the PAHs, which were sampled from November 2,
2010, to March 29, 2011. Naphthalene was the only PAH detected in every sample and it was
also found at the highest concentration among the PAHs detected.

**Related Events on the Well Pad**

Pertinent events on the pad (*e.g.*, start dates for drilling and hydraulic fracturing) are
shown in Figure 1. Dates are included for the well pad of interest (Pad #1) as well as for the two

7

pads that were developed during the latter half of sampling (Pads #2 and #3). The percent and number of chemicals detected on each date of sampling is also shown in Figure 1. Percents were calculated by dividing the number of chemicals detected on a particular date by the total number of chemicals analyzed on that day, not including chemicals that were never detected during the study. The number and percent of detections were generally higher during development of Pad #1 than Pads #2-3. The most chemical detections occurred during the first four months of drilling, at a time when only one fracturing event occurred, which did not change the pattern of detections.

The number of spikes on each date of sampling is shown in Figure 2, presented separately by type of compound (VOC, PAH, carbonyl). By far the most spikes occurred during drilling of Pad #1, particularly between mid-December and mid-January. The carbonyls spiked on and around March 15, 2011. There were also spikes beginning in July, 2011, when drilling of Pad #3 began.

**DISCUSSION**

The data in this study show that air sampling near natural gas operations reveals numerous chemicals in the air, many associated with natural gas operations. Some of the highest concentrations in the study were from methane, ethane, propane, and other alkanes that have been sourced to natural gas operations (Baker *et al.* 2008; Gilman *et al.* 2012). In contrast we found very low levels of chemicals such as ethene and other alkenes that are more likely to come from urban road-based pollution (Baker *et al.* 2008; Gilman *et al.* 2012). Acetylene, which is only formed from combustion, was found at low concentrations and in only four samples. Isoprene, which arises primarily from vegetation, was only detected in one sample throughout the study, attesting to the semi-arid landscape of the sampling site (Baker *et al.* 2008; Jobson *et al.* 1994). The chemicals reported in this exploratory study cannot, however, be causally connected to natural gas operations.

Air Resource Specialists, Inc. provides quarterly weather reports from Parachute, Colorado, which is 7.4 miles (11.9 km) southwest of the sampling site (Air Resource Specialists, Inc. 2011a, 2011b, 2011c, 2011d). Wind rose data show that the predominant wind directions throughout the year are from the NE and SW, which is aligned with the topography of the valley along the Colorado River Corridor. During all four quarters of the study year the wind blew from

the ESE (from the well pad toward the sampling site) 2–3% of the time, independent of the time of year. There was no correlation between detected emissions (which varied by quarter and were highest in the winter) and wind direction.

Calm winds, however, (wind under 1 mph) were greatest during times when detections were highest. For example, in the fourth quarter of 2010, winds were calm 10.9% of the time, and in the first quarter of 2011 they were calm 8.1% of the time. During the second and third quarters of 2011, when air sampling detections were lower, calm winds were reported 3.5% and 1.8% of the time, respectively. Because of the rugged topography of the area under study it is subject to air inversions, particularly in winter, which trap air at ground level and tend to increase air pollution from local sources (Sexton and Westberg *et al.* 1984). The phenomena of air inversions may explain the higher readings during December and January than in other months.

There was a great deal of variability across sampling dates in the numbers and concentrations of chemicals detected. Notably, the highest percentage of detections occurred during the initial drilling phase, prior to hydraulic fracturing on the well pad. This is not surprising, considering the numerous opportunities for release of NMHCs during drilling. On a typical well pad, when the raw natural gas surfaces it is piped to a glycol dehydrator (heater treater) on the pad where it is heated to evaporate off the water, which then condenses and is stored on the pad in tanks marked "produced water". During the heating process numerous NMHCs are vented while others are piped to a condensate tank on the pad. NMHCs also escape when the glycol in the dehydrator is being regenerated. Transferring of fluids from the produced water and condensate tanks to tanker trucks is another opportunity for the release of NMHCs. Next, the gas goes to a compressor station where is prepped and sent on to a processing plant where the BTEXs (benzene, toluene, ethylbenzene, and xylene), and other NMHCs, some of which are liquids at low temperatures are removed. A number of volatile chemicals, such as benzene, toluene, xylenes and others, have economic value and are captured and used to make diverse products such as plastics, glass, construction material, pesticides, detergents, cosmetics, and pharmaceuticals, and in the U.S. they are added to gasoline.

For well pad #1 in the present study, after all the wells were completed and hooked into the national supply line, according to the COGCC the well pad produced 487,652 Mcf (thousand cubic feet) of raw natural gas during June, 2011 (COGCC 2012b). Using the USEPA estimate of

17.8% NMHCs, that calculates to 2,893 Mcf per day of NMHCs potentially released into the air while the pad is producing, although not all the NMHCs are released on-site.

Methylene chloride stood out due to the extremely high concentrations in some of the samples, including one reading of 1730 ppbv, and three other readings more than 563 ppbv (the cutoff value for spikes) during the period of well development. In contrast, after activity on the pad came to an end and the wells went into production, the highest level of methylene chloride detected was 10.6 ppb. Methylene chloride is not a natural component in raw gas, and is predominantly used as a solvent (USEPA 2000). As far as we are aware, it is not a component in drilling or fracturing fluids. It does not appear on two extensive lists of more than 750 chemicals that companies admit they use during either operation (Colborn *et al.* 2011; US House of Representatives Committee on Energy and Commerce Minority Staff 2011) and it does not appear on the voluntary fracturing chemical disclosure registry (FracFocus 2012) for the well pad of interest in this study. However, residents and gas field workers have reported that methylene chloride is stored on well pads for cleaning purposes. Raw gas in the region under study also contains commercially valuable levels of a mixture of alkanes referred to as paraffin wax that becomes solid at ambient temperatures. As the raw gas escapes on the pad, this slippery material could build up on equipment, requiring cleaning. Given that methylene chloride was found in such high concentrations in air samples in the present study, its source and potential exposure scenarios should be explored with respect to exposure of individuals working on the pads and living nearby.

Regarding the PAHs, although concentrations found in this study appear low, they may have clinical significance. Several studies have been published by the Columbia Center for Children's Environmental Health in which pregnant women in urban settings wore personal air monitors that measured their level of exposure to eight PAHs (benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(g,h,i)perylene, benzo(k)fluoranthene, chrysene, dibenzo(a,h)anthracene, indeno(1,2,3-cd)pyrene). In 2006, Perera *et al.* demonstrated that among children in New York City, those who were prenatally exposed to eight PAHs with a summed concentration greater than 4.16 ng/m$^3$ had lower mental development scores at age three. In 2009, Perera *et al.* reported lower IQ scores among 5-year olds with prenatal exposure greater than 2.26 ng/m$^3$. In a similar study in Krakow, Poland, Edwards *et al.* (2010) found decreased IQ scores among 5-year olds prenatally exposed to PAHs greater than 17.96 ng/m$^3$. In the present

10

study, the summed composite of the same eight PAHs was 15.5 ng/m$^3$. There are many sources of variability when comparing personal air monitoring and ambient air sampling results. For example, not all eight PAHs summed above were detected in every one of our samples. Nonetheless, these findings suggest that the concentrations of PAHs in rural neighborhoods near natural gas operations deserve further investigation, regardless of the source.

The concentrations of the carbonyls were lowest during the time when the VOCs and PAHs were spiking, but spiked later when the other chemicals did not. Many carbonyls, such as formaldehyde and acetaldehyde, are formed from the reaction of VOCs with nitrogen oxide and sunlight, and thus have peak seasons, which may have accounted for the spikes (Ho *et al.* 2002; National Research Council 1981). Carbonyls are also used as solvents and are associated with diesel emissions (ATSDR 1999; Mitran *et al.* 1997). It is possible that solvents were needed following the accident that occurred when a drilling contractor was removing drill cuttings from the mud tanks (COGCC 2011), which coincided with the time the carbonyls spiked in March.

In order to identify potential hazards associated with the chemicals detected during development of the well pad of interest, a rigorous literature search was conducted. Thirty-five chemicals were found to affect the brain/nervous system, 33 the liver/metabolism, and 30 the endocrine system, which includes reproductive and developmental effects. The categories with the next highest numbers of effects were the immune system (28), cardiovascular/blood (27), and the sensory and respiratory systems (25 each). Eight chemicals had health effects in all 12 categories. There were also several chemicals for which no health effect data could be found. The categories of health effects for each chemical are presented in Table 4, which is supported by Supplemental Material available from the authors that contains a complete list of 400 references. It should be mentioned that laboratory studies typically measure exposure to one chemical at a time, while real-life conditions entail exposure to several volatile chemicals at once, with interactions that cannot be predicted.

The health effects found in the literature are relevant as indicators of potential hazards associated with the chemicals detected in the air samples. They do not address the issue of exposure. The concentrations at which these chemicals were detected in the air are far less than U.S. government safety standards such as NIOSH Recommended Exposure Limits and OSHA Permissible Exposure Limits (NIOSH 1992; OSHA 1993). However, government standards are typically based on the exposure of a grown man encountering relatively high concentrations of a

11

chemical over a brief time period, for example, during occupational exposure. Consequently, such standards may not apply to exposure scenarios faced by individuals (including pregnant women, children, and the elderly) experiencing chronic, sporadic, low-level exposure, 24 hours a day 7 days a week in natural gas neighborhoods. Safety standards also do not account for the kinds of effects found from low-level exposure to endocrine disrupting chemicals (Vandenberg *et al.* 2012), which can be particularly harmful during prenatal development and childhood.

Lessons can be learned from the results of this simple exploratory investigation into air quality in a rural neighborhood interspersed with natural gas operations. In retrospect, we regret not having continued sampling PAHs throughout the entire year. It was not until we began searching the literature for health effects of the chemicals that we discovered the developmental effects of extremely low levels of PAHs. In addition, our study would have benefited from more baseline samples. Unfortunately, there was no way to know exactly when drilling would start and we were only alerted when the drill rig was being installed. If we were to sample again, we would rotate sampling every six days and at varied times around the clock. Most importantly, we would record meteorological data on-site throughout each sampling period. In rural mountainous areas, where local topography varies greatly, public sources of weather data may not be applicable for air quality research.

While natural gas development and production continues to spread across the land it is moving closer to homes, schools, and places of business. At the same time more and more raw gas will be released into the atmosphere on a steady, daily basis. In order to determine how to reduce human exposure for both those who work on the well pads and those living nearby, systematic air quality monitoring of natural gas operations must become a regular part of permitting requirements. It is apparent from what is presented in this paper that the NMHCs need far more attention not only because of their potential immediate and long term chronic health effects, but also for their secondary indirect health and environmental impacts as precursors to ozone.

## ACKNOWLEDGMENTS

Funding for this study was provided by The Winslow Foundation, Cornell Douglas Foundation, New-Land Foundation, Arkansas Community Trust, and an individual donor.

12

**Competing financial interests declaration:** The authors declare no competing financial interests.

# REFERENCES

AAC (Atmospheric Analysis and Consulting, Inc.). 2012a. Summa Canister Sampling Procedure. Available at http://www.aaclab.com/assets/pdf/sampling-instructions/AAC-Summa-Canister-Sampling-Procedure.pdf

AAC. 2012b. Unit calculator. Available at http://www.aaclab.com/tools-and-resources/unit-calculator.html

Air Resource Specialists, Inc. 2011a. Garfield County Quarterly Monitoring Report, Fourth Quarter October 1 through December 31, 2010. Available at http://www.garfield-county.com/air-quality/documents/airquality/2010_Quarter4_Air_Monitoring_Report.pdf

Air Resource Specialists, Inc. 2011b. Garfield County Quarterly Monitoring Report, First Quarter January 1 through March 31, 2011. Available at http://www.garfield-county.com/air-quality/documents/airquality/2011_Quarter1_Air_Monitoring_Report.pdf

Air Resource Specialists, Inc. 2011c. Garfield County Quarterly Monitoring Report, First Quarter April 1 through June 30, 2011. Available at http://www.garfield-county.com/air-quality/documents/airquality/2011_Quarter2_Air_Monitoring_Report.pdf

Air Resource Specialists, Inc. 2011d. Garfield County Quarterly Monitoring Report, First Quarter July 1 through September 30, 2011. Available at http://www.garfield-county.com/air-quality/documents/airquality/2011_Quarter3_Air_Monitoring_Report.pdf

ATSDR (Agency for Toxic Substances and Disease Registry). 1999. Toxicological Profile for Formaldehyde. US Public Health Service. Atlanta, GA, USA. Available at www.atsdr.cdc.gov/toxprofiles/tp111-p.pdf

Baker AK, Beyersdorf AJ, Doezema LA, *et al.* 2008. Measurements of nonmethane hydrocarbons in 28 United States cities. Atmos Environ 42:170-82

Brunekreef B, Stewart AW, Anderson HR, *et al.* 2009. Self-reported truck traffic on the street of residence and symptoms of asthma and allergic disease: a global relationship in ISAAC phase 3. Environ Health Perspect 117:1791-8

Chahine T, Baccarelli A, Litonjua A *et al.* 2007. Particulate air pollution, oxidative stress genes, and heart rate variability in an elderly cohort. Environ Health Perspect 115(11):1617–22

COGCC (Colorado Oil and Gas Conservation Commission). 2010. Oil and Gas Location Assessment Form 2A. Document number 400032160. Denver, CO: Colorado Oil and Gas Information System,. Available at http://cogcc.state.co.us/

COGCC. 2011. Accident Report. Document number 2213143. Denver, CO: Colorado Oil and Gas Information System, Available at http://cogcc.state.co.us/

COGCC. 2012a. Facilities Database. Colorado Oil and Gas Information System, Available at http://cogcc.state.co.us/

COGCC. 2012b. Production Database. Colorado Oil and Gas Information System, Available at http://cogcc.state.co.us/

Colborn T, Kwiatkowsi C, Schultz K, *et al.* 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17:1039-56 [Online 20 Sep 2010]

Crüts B, van Etten L, Törnqvist H, *et al.* 2008. Exposure to diesel exhaust induces changes in EEG in human volunteers. Part Fibre Toxicol 5:4

Dejmek J, Solansky´ 1, Benes 1, *et al.*2000. The impact of polycyclic aromatic hydrocarbons and fine particles on pregnancy outcome. Environ Health Perspect 108:1159-64

Edwards SC, Jedrychowski W, Butscher M, *et al.* 2010. Prenatal exposure to airborne polycyclic aromatic hydrocarbons and children's intelligence at 5 years of age in a prospective cohort study in Poland. Environ Health Perspect 118:1326-31

FracFocus. 2012. Hydraulic fracturing chemical registry database. Available at http://fracfocus.org/

Gilman J, Lerner B, Graus M, *et al.* 2012. VOCs: Ground-based observations. NOAA Earth System Research Laboratory. Available at http://www.savecoloradofromfracking.org/harm/Resources/gilman.pdf

Green R, Malig B, Windham GC, *et al.* 2009. Residential exposure to traffic and spontaneous abortion. Environ Health Perspect 117:1939–44

Ho KF, Lee SC, and Chiu GM. 2002. Characterization of selected volatile organic compounds, polycyclic aromatic hydrocarbons and carbonyl compounds at a roadside monitoring station. Atmos Environ 36:57-65

Jobson BT, Wu Z, and Niki H. 1994. Seasonal trends of isoprene, $C_2$-$C_5$ alkanes, and acetylene at a remote boreal site in Canada. J Geophys Res 99:1589-99

Koren HS, Devlin RB, Graham DE, *et al.* 1989. Ozone-induced inflammation in the lower airways of human subjects. Am Rev Respir Dis 139:407-15

McKenzie LM, Witter RZ, Newman LS, *et al.* 2012. Human health risk assessment of air emissions from development of unconventional natural gas resources. Sci Total Environ 424:79-87

Mitran E, Callender T, Orha B, *et al.* 1997. Neurotoxicity associated with occupational exposure to acetone, methyl ethyl ketone, and cyclohexanone. Environ Res 73:181-8

Mohamed MF, Kang D, and Aneja VP. 2002. Volatile organic compounds in some urban locations in United States. Chemosphere 47:863-82

National Research Council. 1981. Formaldehyde and Other Aldehydes. National Academy Press, Washington, DC, USA

NIOSH (National Institute for Occupational Safety and Health). 1992. NIOSH Recommendations for Public Safety and Health. DHHS (NIOSH) Publication No. 92-100. US Department of Health and Human Services, Cincinnati, OH, USA

OSHA (Occupational Safety and Health Administration). 1993. Occupational Safety and Health Standards Toxic and Hazardous Substances 1910.1000 Table Z-1 Limits for Air Contaminants. US Department of Labor, Washington, DC, USA

Perera FP, Jedrychowski W, Rauh V *et al.* 1999. Molecular epidemiologic research on the effects of environmental pollutants on the fetus. Environ Health Perspect 107(suppl 3):451-60

Perera FP, Rauh V, Whyatt RM, *et al.* 2006. Effect of prenatal exposure to airborne polycyclic aromatic hydrocarbons on neurodevelopment in the first 3 years of life among inner-city children. Environ Health Perspect 114:1287-92

Perera FP, Zhigang L, Whyatt R, *et al.* 2009. Prenatal airborne polycyclic aromatic hydrocarbon exposure and child IQ at age 5 years. Pediatrics 124 (2):e195-e202

Pétron G, Frost G, Miller BR, *et al.* 2012. Hydrocarbon emissions characterization in the Colorado Front Range: A pilot study. J Geophys Res 117, D04304

Seila RL, Lonneman WA, and Meeks SA. 1989. Determination of $C_2$ to $C_{12}$ Ambient Air Hydrocarbons in 39 U.S. Cities, from 1984 through 1986. EPA/600/S3-89/058. US Environmental Protection Agency, Center for Environmental Research Information, Cincinnati, OH, USA

Sexton K and Westberg H. 1984. Nonmethane hydrocarbon composition of urban and rural atmospheres. Atmos Environ 18(6):1125-32

SKC Inc. Operating Instructions AirChek XR5000. 2001. Form 38047. Available at http://www.skcinc.com/instructions/38047.pdf

Skone TJ, Littlefield J, and Marriott J. 2011. Life Cycle Greenhouse Gas Inventory of Natural Gas Extraction, Delivery and Electricity Production. DOE/NETL-2011/1522.: US Department of Energy, National Energy Technology Laboratory, Pittsburgh, PA, USA. Available at http://www.netl.doe.gov/energy-analyses/pubs/NG-GHG-LCI.pdf

Tisch Environmental, Inc. Operations Manual for TE-PUF Poly-Urethane Foam High Volume Air Sampler. Available at http://tisch-env.com/pdf/te1000.PDF

USEPA (US Environmental Protection Agency). 2000. Methylene Chloride Hazard Summary. Available at http://www.epa.gov/ttn/atw/hlthef/methylen.html#ref1

USEPA. 2011. Greenhouse Gas Emissions Reporting from the Petroleum and Natural Gas Industry Background Technical Support Document. Climate Change Division, Washington, DC, USA. Available at http://www.epa.gov/ghgreporting/documents/pdf/2010/Subpart-W_TSD.pdf

US House of Representatives Committee on Energy and Commerce Minority Staff. 2011. Hydraulic Fracturing Report. Available at http://democrats.energycommerce.house.gov/sites/default/files/documents/Hydraulic%20Fracturing%20Report%204.18.11.pdf

Vandenberg L, Colborn T, Hayes T, *et al.* 2012. Hormones and endocrine-disrupting chemicals: low-dose effects and nonmonotonic dose responses. Endocr Rev 33(3):378-455

15

**Table 1.** Chemicals not detected in air samples in western Colorado
from July, 2010 to October, 2011.

| Chemical | CAS# | Reporting limit[a] |
|---|---|---|
| 1,1,1-trichloroethane | 71-55-6 | 0.5 ppbv |
| 1,1,2,2-tetrachloroethane | 79-34-5 | 0.5 ppbv |
| 1,1,2-trichloro-1,2,2-trifluoroethane | 76-13-1 | 0.5 ppbv |
| 1,1,2-trichloroethane | 79-00-5 | 0.5 ppbv |
| 1,1-dichloroethane | 75-34-3 | 0.5 ppbv |
| 1,1-dichloroethene | 75-35-4 | 1 ppbv |
| 1,2,3-trimethylbenzene | 526-73-8 | 1 ppbv |
| 1,2,4-trichlorobenzene | 120-82-1 | 0.5 ppbv |
| 1,2-dibromoethane | 106-93-4 | 0.5 ppbv |
| 1,2-dichloro-1,1,2,2-tetrafluoroethane | 76-14-2 | 0.5 ppbv |
| 1,2-dichlorobenzene | 95-50-1 | 0.5 ppbv |
| 1,2-dichloroethane | 107-06-2 | 0.5 ppbv |
| 1,2-dichloropropane | 78-87-5 | 0.5 ppbv |
| 1,3,5-trimethylbenzene | 108-67-8 | 1 ppbc |
| 1,3-butadiene | 106-99-0 | 0.5 ppbv |
| 1,3-dichlorobenzene | 541-73-1 | 0.5 ppbv |
| 1,4-dichlorobenzene | 106-46-7 | 0.5 ppbv |
| 1,4-dioxane | 123-91-1 | 0.5 ppbv |
| 1-butene | 106-98-9 | 1 ppbc |
| 1-hexene | 592-41-6 | 1 ppbc |
| 1-pentene | 109-67-1 | 1 ppbc |
| 2,2,4-trimethylpentane | 540-84-1 | 1 ppbc |
| 2,2-dimethylbutane | 75-83-2 | 1 ppbc |
| 2,3,4-trimethylpentane | 565-75-3 | 1 ppbc |
| 2,3-dimethylpentane | 565-59-3 | 1 ppbc |
| 2,4-dimethylpentane | 108-08-7 | 1 ppbc |
| 2-hexanone | 591-78-6 | 0.5 ppbv |
| 4-ethyltoluene | 622-96-8 | 0.5 ppbv |
| acenaphthene | 83-32-9 | 2 ng/m³ (pql) |
| acrolein | 107-02-8 | 0.025 µg/ml |
| acrylonitrile | 107-13-1 | 1 ppbv |
| allyl chloride | 107-05-1 | 0.5 ppbv |
| anthracene | 120-12-7 | 2 ng/m³ (pql) |
| benzyl chloride | 100-44-7 | 0.5 ppbv |
| bromodichloromethane | 75-27-4 | 0.5 ppbv |
| bromoform | 75-25-2 | 0.5 ppbv |
| bromomethane | 74-83-9 | 0.5 ppbv |
| carbon disulfide | 75-15-0 | 0.5 ppbv |
| carbon tetrachloride | 56-23-5 | 0.5 ppbv |
| chlorobenzene | 108-90-7 | 0.5 ppbv |
| chlorodifluoromethane | 75-45-6 | 0.5 ppbv |

16

**Table 1.** (cont.)

| Chemical | CAS# | Reporting limit[a] |
|---|---|---|
| chloroethane | 75-00-3 | 0.5 ppbv |
| chloroform | 67-66-3 | 0.5 ppbv |
| chloromethane | 74-87-3 | 0.5 ppbv |
| cis-1,2-dichloroethylene | 156-59-2 | 0.5 ppbv |
| cis-1,3-dichloropropene | 10061-01-5 | 0.5 ppbv |
| cis-2-butene | 590-18-1 | 1 ppbc |
| cis-2-pentene | 627-20-3 | 1 ppbc |
| dibromochloromethane | 124-48-1 | 0.5 ppbv |
| dichlorodifluoromethane | 75-71-8 | 0.5 ppbv |
| dichlorofluoromethane | 75-43-4 | 0.5 ppbv |
| ethyl acetate | 141-78-6 | 0.5 ppbv |
| fluoranthene | 206-44-0 | 2 ng/m$^3$ (pql) |
| hexachlorobutadiene | 87-68-3 | 0.5 ppbv |
| isooctane | 540-84-1 | 0.5 ppbv |
| isopropyl alcohol | 67-63-0 | 2 ppbv |
| m-diethylbenzene | 141-93-5 | 1 ppbc |
| methyl isobutyl ketone (MIBK) | 108-10-1 | 0.5 ppbv |
| methyl tert-butyl ether | 1634-04-4 | 0.5 ppbv |
| m-ethyltoluene | 620-14-4 | 1 ppbc |
| m-tolualdehyde | 620-23-5 | 0.025 µg/ml |
| n-propylbenzene | 103-65-1 | 1 ppbc |
| n-undecane | 1120-21-4 | 1 ppbc |
| o-ethyltoluene | 611-14-3 | 1 ppbc |
| o-xylene | 95-47-6 | 1 ppbc |
| p-diethylbenzene | 105-05-5 | 1 ppbc |
| propylene oxide | 75-56-9 | 1 ppbv |
| pyrene | 129-00-0 | 2 ng/m$^3$ (pql) |
| t-1,3-dichloropropene | 10061-02-6 | 0.5 ppbv |
| tetrachloroethene | 127-18-4 | 0.5 ppbv |
| trans-1,2-dichloroethylene | 156-60-5 | 0.5 ppbv |
| trans-2-butene | 624-64-6 | 1 ppbc |
| trans-2-pentene | 646-04-8 | 1 ppbc |
| trichloroethene | 79-01-6 | 0.5 ppbv |
| trichlorofluoromethane | 75-69-4 | 0.5 ppbv |
| valeraldehyde | 110-62-3 | 0.025 µg/ml |
| vinyl acetate | 108-05-4 | 1 ppbv |
| vinyl bromide | 593-60-2 | 0.5 ppbv |
| vinyl chloride | 75-01-4 | 0.5 ppbv |

[a]Reporting limit is mrl (method reporting limit) unless pql (practical quantification limit) is specified.

17

**Table 2.** Volatile chemicals detected in air samples in western Colorado from July, 2010 to October, 2011.

| Chemical name | CAS # | *n* Detects | % Detects | Mean ppbv | Range ppbv | Std Dev ppbv | *n* Spikes |
|---|---|---|---|---|---|---|---|
| **VOCs** | | | | | | | |
| methane | 74-82-8 | 48 | 100 | 2472.9 | 1600.0-5500.0 | 867.3 | 6 |
| ethane | 74-84-0 | 48 | 100 | 24.4 | 3.6-118.0 | 23.7 | 5 |
| propane | 74-98-6 | 48 | 100 | 9.3 | 1.1-46.7 | 9.0 | 7 |
| toluene | 108-88-3 | 48 | 100 | 1.2 | 0.4-4.3 | 0.9 | 4 |
| isopentane | 78-78-4 | 43 | 90 | 1.8 | 0.4-7.3 | 1.3 | 6 |
| n-butane | 106-97-8 | 42 | 88 | 3.2 | 0.8-14.0 | 2.6 | 4 |
| isobutane | 75-28-5 | 42 | 88 | 2.9 | 0.6-13.5 | 2.5 | 4 |
| acetone | 67-64-1 | 41 | 85 | 9.5 | 3.4-28.3 | 6.2 | 6 |
| n-pentane | 109-66-0 | 40 | 83 | 1.5 | 0.4-5.6 | 1.0 | 5 |
| n-hexane | 110-54-3 | 38 | 79 | 0.9 | 0.3-3.0 | 0.6 | 4 |
| methylcyclohexane | 108-87-2 | 36 | 75 | 0.9 | 0.3-3.1 | 0.6 | 4 |
| methylene chloride | 75-09-2 | 35 | 73 | 206.2 | 2.7-1730.0 | 357.4 | 4 |
| m/p-xylenes | 108-38-3/ 106-42-3 | 29 | 60 | 0.4 | 0.2-0.7 | 0.2 | 6 |
| 2-methylpentane | 107-83-5 | 27 | 56 | 0.8 | 0.3-2.2 | 0.4 | 3 |
| n-heptane | 142-82-5 | 22 | 46 | 0.6 | 0.3-1.4 | 0.3 | 3 |
| 3-methylpentane | 96-14-0 | 21 | 44 | 0.8 | 0.3-2.0 | 0.4 | 3 |
| benzene | 71-43-2 | 21 | 44 | 0.5 | 0.3-1.1 | 0.2 | 3 |
| methanol | 67-56-1 | 19 | 40 | 18.3 | 12.1-30.6 | 5.6 | 4 |
| methylcyclopentane | 96-37-7 | 18 | 38 | 0.6 | 0.3-1.3 | 0.3 | 3 |
| cyclohexane | 110-82-7 | 17 | 35 | 0.6 | 0.3-1.6 | 0.4 | 2 |
| n-octane | 509-84-7 | 15 | 31 | 0.4 | 0.2-0.8 | 0.2 | 3 |
| 3-methylhexane | 589-34-4 | 12 | 25 | 0.5 | 0.3-1.1 | 0.3 | 1 |
| 2-butanone (mek) | 78-93-3 | 10 | 21 | 3.4 | 2.3-5.1 | 1.0 | 2 |
| 2-methylhexane | 591-76-4 | 9 | 19 | 0.4 | 0.2-0.7 | 0.2 | 2 |
| ethylene | 74-85-1 | 8 | 17 | 1.2 | 0.8-1.8 | 0.4 | 1 |
| acetylene | 2122-48-7 | 4 | 8 | 1.4 | 0.9-2.4 | 0.7 | 1 |
| isoprene | 78-79-5 | 4 | 8 | 0.6 | 0.4-0.7 | 0.2 | 0 |
| n-nonane | 111-84-2 | 4 | 8 | 0.2 | 0.2-0.3 | 0.0 | 1 |
| 2,3-dimethylbutane | 79-29-8 | 3 | 6 | 0.4 | 0.4-0.5 | 0.1 | 1 |
| ethanol | 64-17-5 | 3 | 6 | 11.4 | 3.2-19.4 | 8.1 | 0 |
| 2-methylheptane | 592-27-8 | 3 | 6 | 0.3 | 0.3 | 0.0 | 0 |
| 1,2,4-trimethylbenzene | 95-63-6 | 2 | 4 | na | 0.2-0.3 | na | 0 |
| tetrahydrofuran | 109-99-9 | 1 | 2 | na | 2.1 | na | 0 |
| styrene | 100-42-5 | 1 | 2 | na | 0.9 | na | 0 |
| ethylbenzene | 100-41-4 | 1 | 2 | na | 0.7 | na | 0 |
| cyclopentane | 287-92-3 | 1 | 2 | na | 0.4 | na | 0 |
| 3-methylheptane | 589-81-1 | 1 | 2 | na | 0.3 | na | 0 |

18

**Table 2.** (cont.)

| Chemical name | CAS # | *n* Detects | % Detects | Mean ppbv | Range ppbv | Std Dev ppbv | *n* Spikes |
|---|---|---|---|---|---|---|---|
| isopropylbenzene | 98-82-8 | 1 | 2 | na | 0.3 | na | 0 |
| n-dodecane | 112-40-3 | 1 | 2 | na | 0.3 | na | 0 |
| **Carbonyls** | | | | | | | |
| formaldehyde | 50-00-0 | 43 | 100 | 1.0 | 0.3-2.4 | 0.5 | 6 |
| acetaldehyde | 75-07-0 | 43 | 100 | 0.6 | 0.3-1.8 | 0.3 | 4 |
| crotonaldehyde | 123-73-9 | 42 | 98 | 1.3 | 0.1-3.0 | 0.8 | 8 |
| mek & butyraldehyde | 78-93-3/ 123-72-8 | 37 | 86 | 0.2 | 0.0-0.4 | 0.1 | 7 |
| hexaldehyde | 66-25-1 | 9 | 21 | 0.1 | 0.1-0.2 | 0 | 2 |
| propionaldehyde | 123-38-6 | 6 | 14 | 0.1 | 0.1-0.2 | 0 | 1 |
| benzaldehyde | 100-52-7 | 5 | 12 | 0.1 | 0.1 | 0 | 1 |
| methacrolein | 78-85-3 | 5 | 12 | 0.1 | 0.1 | 0 | 1 |

na = not applicable. Statistics were not calculated for chemicals in which there were fewer than three detections.

**Table 3.** PAHs detected in air samples in western Colorado from October, 2010 to March, 2011.

| Chemical name | CAS # | *n* Detects | % Detects | Mean pptv | Range pptv | Std Dev pptv | *n* Spikes |
|---|---|---|---|---|---|---|---|
| naphthalene | 91-20-3 | 21 | 100 | 3.01 | 0.81-6.08 | 1.44 | 4 |
| phenanthrene | 85-01-8 | 16 | 76 | 0.36 | 0.21-0.61 | 0.14 | 4 |
| fluorene | 86-73-7 | 11 | 52 | 0.20 | 0.15-0.32 | 0.06 | 2 |
| indeno(1,2,3-cd)pyrene | 193-39-5 | 8 | 38 | 0.18 | 0.09-0.49 | 0.13 | 1 |
| benzo(g,h,i)perylene | 191-24-2 | 7 | 33 | 0.22 | 0.09-0.45 | 0.13 | 1 |
| dibenzo(a,h)anthracene | 53-70-3 | 7 | 33 | 0.20 | 0.11-0.51 | 0.15 | 1 |
| benzo(a)pyrene | 50-32-8 | 5 | 24 | 0.21 | 0.13-0.36 | 0.09 | 1 |
| benzo(b)fluoranthene | 205-99-2 | 5 | 24 | 0.20 | 0.13-0.26 | 0.05 | 1 |
| benzo(k)fluoranthene | 207-08-9 | 5 | 24 | 0.18 | 0.13-0.25 | 0.05 | 1 |
| benzo(a)anthracene | 56-55-3 | 2 | 10 | na | 0.13-0.16 | na | 0 |
| chrysene | 218-01-9 | 2 | 10 | na | 0.12-0.16 | na | 0 |
| acenaphthylene | 208-96-8 | 1 | 5 | na | 0.20 | na | 0 |

na = not applicable. Statistics were not calculated for chemicals in which there were fewer than three detections.

20

**Table 4.** Health effects[a] of chemicals detected in air samples collected in western Colorado.

| Chemical Name | Sens | Resp | Gastr | Brain/Nerv | Imm-une | Kidn | Card/Bld | Canc/Tum | Geno-toxic | Endo | Liver/Met | Othr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,2,4-trimethylbenzene | X | X | | X | X | X | X | X | X | X | X | X |
| 2,3-dimethylbutane | | | | | | | | | | | | |
| 2-butanone (mek) | | | | X | | X | | | | X | X | |
| 2-methylheptane | | | | | | | | | | | | |
| 2-methylhexane | | | | | | | | | | | | |
| 2-methylpentane | | | | X | | | | | | | | |
| 3-methylheptane | | | | | | | | | | | | |
| 3-methylhexane | | | | | | | | | | | | |
| 3-methylpentane | | | | X | | | | | | | | |
| acenaphthylene | | | | | | | | | | X | X | X |
| acetaldehyde | X | X | X | X | X | X | X | X | X | X | X | X |
| acetone | X | X | X | X | X | X | X | | | X | X | X |
| acetylene | | | | | | | | | | | | |
| benzaldehyde | X | X | X | X | X | X | X | | X | X | X | X |
| benzene | X | X | | X | X | | X | X | X | X | X | X |
| benzo(a)anthracene | X | X | | | | | | X | X | | X | X |
| benzo(a)pyrene | X | X | X | X | X | X | X | X | X | X | X | X |
| benzo(b)fluoranthene | | X | | | X | X | | X | X | X | X | X |
| benzo(g,h,i)perylene | | | | | | | | | X | | | |
| benzo(k)fluoranthene | | | | | X | | X | X | X | X | X | |
| butyraldehyde | | | | X | | | | | | | | |
| chrysene | | X | | | X | X | X | X | X | X | X | X |
| crotonaldehyde | | X | X | X | X | X | X | X | X | X | X | X |
| cyclohexane | | | | X | | X | | X | | | X | |
| cyclopentane | | | | X | | | | | | | | |
| dibenzo(a,h)anthracene | X | X | X | X | X | X | X | X | X | X | | X |
| ethane | | | | | | | | | | | | |
| ethanol | X | X | X | X | | | X | X | | X | X | X |
| ethylene | | | | | | | | | | X | X | X |
| fluorene | X | | | X | X | X | X | | | | X | X |
| formaldehyde | X | X | X | X | X | X | X | X | X | X | X | X |
| hexaldehyde | X | | | X | X | | X | | X | X | | X |
| indeno(1,2,3-cd)pyrene | | X | | X | X | | | X | X | | | |
| isobutane | | | | | | | | | | | | |
| isopentane | | | | | | | | | | | | |
| isoprene | X | X | X | X | X | X | X | X | X | X | X | X |
| methacrolein | X | X | | | | | | | | | | |
| methane | | | | | | | | | | | | |
| methylcyclohexane | | | | | | | | | | | | |
| methylcyclopentane | | | | X | | | | | | | | |
| methylene chloride | X | X | X | X | X | X | X | X | X | X | X | X |
| m-xylene | X | X | | X | X | X | X | | | X | X | |
| naphthalene | X | X | X | X | X | X | X | X | X | X | X | X |
| n-butane | | | | X | | | X | | | | | X |

**Table 4.** (cont.)

| Chemical Name | Sens | Resp | Gastr | Brain/ Nerv | Imm -une | Kidn | Card/ Bld | Canc/ Tum | Geno -toxic | Endo | Liver /Met | Othr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| n-decane | X | X | | X | X | | | | | | | X |
| n-heptane | X | | | X | | | X | | X | X | X | |
| n-hexane | | | | X | X | | X | | | X | X | |
| n-nonane | X | | | X | X | X | X | | | X | X | X |
| n-octane | X | X | | X | X | X | X | | | X | X | X |
| n-pentane | | | | | | | | | | | | |
| phenanthrene | X | X | | X | X | | X | | | X | X | X |
| propane | | | | | | | | | | | | |
| propionaldehyde | | | | | X | | | | X | | | X |
| propylene | X | X | | X | X | X | | | | X | X | |
| p-xylene | X | X | | X | | | X | | X | X | X | X |
| tetrahydrofuran | | | X | X | X | X | X | X | X | X | X | X |
| toluene | X | X | X | X | X | X | X | | X | X | X | X |
| | | | | | | | | | | | | |
| Total | 25 | 25 | 14 | 35 | 28 | 23 | 27 | 18 | 23 | 30 | 33 | 29 |

[a]Sens = skin/eye/sensory organ; Resp = respiratory; Gastr = gastrointestinal; Brain/Nerv = brain/nervous system; Immune = immune system; Kidn = kidney; Card/Bld = cardiovascular/blood; Canc /Tum = cancer/ tumorigen; Genotoxic = genotoxic; Endo = endocrine system; Liver/Met = liver/metabolic; Othr = other.

22

**Figure 1.** Percent and number[a] of chemicals detected in air samples collected in western Colorado from July, 2010 to October, 2011, and drilling/fracturing events, by date.


**Figure 2.** Number of chemical spikes[a] from air samples collected in western Colorado from November, 2010 to October, 2011, by compound type and date of sampling event.

23

Figure 1.





ᵃ The number of chemicals detected is shown at the end of each bar.

D1 FI: Drilling and fracturing events during development of Pad #1.

D2 F2: Drilling and fracturing events during development of Pad #2.

D3 F3: Drilling and fracturing events during development of Pad #3.

Figure 2.



<sup>a</sup> A spike is a detected chemical level that is at least one standard deviation above the mean.

<sup>b</sup> PAHs were sampled from 11/2/10 to 3/29/11.

Research | Children's Health

All *EHP* content is accessible to individuals with disabilities. A fully accessible (Section 508–compliant) HTML version of this article is available at http://dx.doi.org/10.1289/ehp.1306722.

# Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado

*Lisa M. McKenzie,[1] Ruixin Guo,[2] Roxana Z. Witter,[1] David A. Savitz,[3] Lee S. Newman,[1] and John L. Adgate[1]*

[1]Department of Environmental and Occupational Health, and [2]Department of Biostatistics and Informatics, Colorado School of Public Health, Aurora, Colorado, USA; [3]Department of Epidemiology, Brown University, Providence, Rhode Island, USA

BACKGROUND: Birth defects are a leading cause of neonatal mortality. Natural gas development (NGD) emits several potential teratogens, and U.S. production of natural gas is expanding.

OBJECTIVES: We examined associations between maternal residential proximity to NGD and birth outcomes in a retrospective cohort study of 124,842 births between 1996 and 2009 in rural Colorado.

METHODS: We calculated inverse distance weighted natural gas well counts within a 10-mile radius of maternal residence to estimate maternal exposure to NGD. Logistic regression, adjusted for maternal and infant covariates, was used to estimate associations with exposure tertiles for congenital heart defects (CHDs), neural tube defects (NTDs), oral clefts, preterm birth, and term low birth weight. The association with term birth weight was investigated using multiple linear regression.

RESULTS: Prevalence of CHDs increased with exposure tertile, with an odds ratio (OR) of 1.3 for the highest tertile (95% CI: 1.2, 1.5); NTD prevalence was also associated with the highest tertile of exposure (OR = 2.0; 95% CI: 1.0, 3.9, based on 59 cases), compared with the absence of any gas wells within a 10-mile radius. Exposure was negatively associated with preterm birth and positively associated with fetal growth, although the magnitude of association was small. No association was found between exposure and oral clefts.

CONCLUSIONS: In this large cohort, we observed an association between density and proximity of natural gas wells within a 10-mile radius of maternal residence and prevalence of CHDs and possibly NTDs. Greater specificity in exposure estimates is needed to further explore these associations.

CITATION: McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect 122:412–417; http://dx.doi.org/10.1289/ehp.1306722

## Introduction

Approximately 3.3% of U.S. live-born children have a major birth defect (Centers for Disease Control and Prevention 2013; Parker et al. 2010); these defects account for 20% of infant deaths as well as 2.3% of premature death and disability (McKenna et al. 2005). Oral clefts, neural tube defects (NTDs), and congenital heart defects (CHD) are the most common classes of birth defects (Parker et al. 2010). These defects are thought to originate in the first trimester as a result of polygenic inherited disease or gene–environment interactions (Brent 2004). Suspected nongenetic risk factors for these birth defects include folate deficiency (Wald and Sneddon 1991), maternal smoking (Honein et al. 2006), alcohol abuse and solvent use (Romitti et al. 2007), and exposure to benzene (Lupo et al. 2010b; Wennborg et al. 2005), toluene (Bowen et al. 2009), polycyclic aromatic hydrocarbons (PAHs) (Ren et al. 2011), and petroleum-based solvents, including aromatic hydrocarbons (Chevrier et al. 1996). Associations between air pollution [volatile organic compounds (VOCs), particulate matter (PM), and nitrogen dioxide (NO$_2$)] and low birth weight and preterm birth have been reported (Ballester et al. 2010; Brauer et al. 2008; Dadvand et al. 2013; Ghosh et al. 2012; Llop et al. 2010). Many of these air pollutants are emitted during development and production of natural gas (referred to herein as NGD), and concerns have been raised that they may increase risk of adverse birth outcomes and other health effects (Colborn et al. 2011; McKenzie et al. 2012). Increased prevalence of low birth weight and small for gestational age and reduced APGAR scores were reported in infants born to women living near NGD in Pennsylvania (Hill 2013).

Technological advances in directional drilling and hydraulic fracturing have resulted in a global boom of drilling and production of natural gas reserves [U.S. Energy Information Administration (EIA) 2011a, 2011b; Vidas and Hugman 2008]. NGD is an industrial process resulting in potential worker and community exposure to multiple environmental stressors (Esswein et al. 2013; King 2012; Witter et al. 2013). Diesel-powered heavy equipment is used for worksite development as well as transporting large volumes of water, sand, and chemicals to sites and for waste removal (Witter et al. 2013). It is increasingly common for NGD to encroach on populated areas, potentially exposing more people to air and water emissions as well as to noise and community-level changes that may arise from industrialization [Colorado Oil and Gas Conservation Commission (COGCC) 2009]. Studies in Colorado, Texas, Wyoming, and Oklahoma have demonstrated that NGD results in emission of VOCs, NO$_2$, sulfur dioxide (SO$_2$), PM, and PAHs from either the well itself or from associated drilling processes or related infrastructure (i.e., drilling muds, hydraulic fracturing fluids, tanks containing waste water and liquid hydrocarbons, diesel engines, compressor stations, dehydrators, and pipelines) (CDPHE 2007; Frazier 2009; Kemball-Cook et al. 2010; Olaguer 2012; Walther 2011; Zielinska et al. 2011). Some of these pollutants, such as toluene, xylenes, and benzene, are suspected teratogens (Lupo et al. 2010b; Shepard 1995) or mutagens (Agency for Toxic Substances and Disease Registry 2007) and are known to cross the placenta (Bukowski 2001), raising the possibility of fetal exposure to these and other pollutants resulting from NGD. Currently, there are few studies on the effects of air pollution or NGD on birth outcomes.

In this analysis, we explored the association between maternal exposure to NGD and birth outcomes, using a data set with individual-level birth data and geocoded natural gas well locations. We conducted a retrospective cohort study to investigate the association between density and proximity of natural gas wells within a 10-mile radius of maternal residences in rural Colorado and three classes of birth defects, preterm birth, and fetal growth.

## Methods

*Study population.* We used information available in the publically accessible Colorado Oil and Gas Information System (COGIS) to

Address correspondence to L. McKenzie, Department of Environmental and Occupational Health, Colorado School of Public Health, 13001 E. 17th Pl., Campus Box B119, Aurora, CO 80045 USA. Telephone: (303) 724-5557. E-mail: Lisa.McKenzie@ucdenver.edu

Supplemental Material is available online (http://dx.doi.org/10.1289/ehp.1306722).

This study was supported by the Department of Environmental and Occupational Health at the Colorado School of Public Health. The Colorado Department of Public Health and Environment's (CDPHE) Health Statistics and Colorado Responds to Children with Special Needs provided outcome data for this study.

The CDPHE specifically disclaims responsibility for any analyses, interpretations, or conclusions.

The authors declare they have no actual or potential competing financial interests.

Received: 27 February 2013; Accepted: 28 January 2014; Advance Publication: 28 January 2014; Final Publication: 1 April 2014.

Natural gas development and birth outcomes

build a geocoded data set with latitude, longitude, and year of development (1996–2009) for all gas wells in rural Colorado (COGIS 2011). Live birth data were obtained from the Colorado Vital Birth Statistics (CDPHE, Denver, CO). Geocoded maternal addresses at time of birth were linked to the well locations. Distance of each maternal residence from all existing (not abandoned) natural gas wells within a 10-mile radius was then computed using spherically adjusted straight line distances. We conducted our analysis on the final de-identified database containing maternal and birth outcome data described below and distance to all wells within the 10-mile radius. The Colorado Multiple Institutional Review Board reviewed and approved our study protocol. Informed consent was not required.

We restricted analysis to births occurring from 1996 through 2009 to focus our analysis on growth of unconventional NGD, characterized by use of hydraulic fracturing and/or directional drilling (King 2012), which expanded rapidly in Colorado beginning around 2000 (COGIS 2011). We also restricted our analysis to rural areas and towns with populations of < 50,000 (excluding the Denver metropolitan area, El Paso County, and the cities of Fort Collins, Boulder, Pueblo, Grand Junction, and Greeley) in 57 counties to reduce potential for exposure to other pollution sources, such as traffic, congestion, and industry. The final study area included locations with and without NGD. We conducted a retrospective study on the resulting cohort of 124,842 live births to explore associations between birth outcomes and exposure to NGD operations. We restricted eligibility to singleton births and excluded the small proportion (< 5%) of non-white births because there were too few to analyze separately.

*Birth outcomes.* Identified birth outcomes were *a)* oral cleft, including cleft lip with and without cleft palate as well as cleft palate [*International Classification of Diseases, Ninth Revision, Clinical Modification* (ICD-9-CM) code 749.xx] (National Center for Health Statistics 2011); *b)* NTD, including anencephalus, spina bifida without anencephaly, and encephalocele (ICD-9-CM 740.xx, 741.xx, and 742.0); *c)* CHD, including transposition of great vessels, tetralogy of Fallot, ventricular septal defect, endocardial cushion defect, pulmonary valve atresia and stenosis, tricuspid valve atresia and stenosis, Ebstein's anomaly, aortic valve stenosis, hypoplastic left heart syndrome, patent ductus arteriosis, coarctation of aorta, and pulmonary artery anomalies (codes 745.xx, 746.xx, 747.xx, excluding 746.9, 747.5); *d)* preterm birth (< 37 weeks completed gestation); *e)* term low birth weight (≥ 37 weeks completed gestation and birth weight < 2,500 g); and *f)* term birth weight

as a continuous measure. Births with an oral cleft, NTD, or CHD were excluded from preterm birth and term low birth weight analysis. Preterm births were excluded from term birth weight analysis. Oral cleft, CHD, and NTD cases in the Colorado Responds to Children with Special Needs (CRCSN) birth registry, obtained from hospital records, the Newborn Genetics Screening Program, the Newborn Hearing Screening Program, laboratories, physicians, and genetic, developmental, and other specialty clinics (CRCSN 2011) were matched with Colorado live birth certificates. Cases are reflective of reporting as of 12 July 2012, were not necessarily confirmed by medical record review, and are subject to change as CRCSN ascertains diagnosis up to 3 years of child's age and/or supplements information by medical record review. We analyzed birth defects in three heterogeneous groups to increase statistical power. Data set information was not sufficient to distinguish between multiple and isolated birth anomalies or to identify chromosomal birth anomalies. In an exploratory analysis, we considered seven clinical diagnostic groupings of CHDs: *a)* conotruncal defects (tetralogy of Fallot and transposition of great vessels); *b)* endocardial cushion and mitrovalve defects (EMD; endocardial cushion defect and hypoplastic left heart syndrome); *c)* pulmonary artery and valve defects (PAV; pulmonary artery atresia and stenosis and pulmonary artery anomalies); *d)* tricuspid valve defects (TVD; tricuspid valve atresia and stenosis and Ebstein's anomaly); *e)* aortic artery and valve defects (aortic valve stenosis and coarctation of aorta); *f)* ventricular septal defects (VSD); and *g)* patent ductus arteriosis in births > 2,500 g (Gilboa et al. 2005).

*Exposure assessment.* Distribution of the wells within a 10-mile radius of maternal residence shows 50% and 90% of wells to be within 2.3 and 7.7 miles of maternal residence, respectively. We used an inverse distance weighted (IDW) approach, commonly used to estimate individual air pollutant exposures from multiple fixed locations (Brauer et al. 1998; Ghosh et al. 2012), to estimate maternal exposure. Our IDW well count accounts for the number of wells within the 10-mile radius of the maternal residence, as well as distance of each well from the maternal residence, giving greater weight to wells closest to the maternal residence. For example, an IDW well count of 125 wells/mile could be computed from 125 wells each located 1 mile from the maternal residence or 25 wells each located 0.2 miles from the maternal residence. We calculated the IDW well count of all existing natural gas wells in the birth year within a 10-mile radius of each maternal residence as a continuous exposure metric:

$$\text{IDW well count} = \sum_{i=1}^{n} \frac{1}{d_i} \qquad [1]$$

where IDW well count is the IDW count of existing wells within a 10-mile radius of maternal residence in the birth year; $d_i$ is the distance of the $i$th individual well from maternal residence; and $n$ is the number of existing wells within a 10-mile radius of maternal residence in the birth year.

The IDW well count was calculated for each maternal residence with ≥ 1 gas wells within 10 miles. The final distribution then was divided into tertiles (low, medium, and high) for subsequent logistic and linear regression analysis. Each tertile was compared with the referent group of maternal residences with no wells within 10 miles, IDW well count = 0).

*Statistical analysis.* We used logistic regressions to study associations between each dichotomous outcome and IDW exposure group. We also considered term birth weight as a continuous outcome using multiple linear regression. First, we estimated the crude odds ratio (OR) associated with IDW exposure tertile for each binary outcome, followed by a Cochran–Armitage test to evaluate linear trends in binominal proportions with increasing IDW exposure (none, low, medium, and high). We further investigated associations by adjusting for potential confounders, as well as infant and maternal covariates selected based on both *a priori* knowledge and empirical consideration of their association with exposure and an outcome. Specifically, covariates in our analysis of all outcomes except outcomes with very few events (i.e., NTDs, conotruncal defects, EMDs, and TVDs) included maternal age, education (< 12, 12, 13–15, ≥ 16 years), tobacco use (smoker, nonsmoker), ethnicity (Hispanic, non-Hispanic white), and alcohol use (yes, no), as well as parity at time of pregnancy (0, 1, 2, > 2) and infant sex. Gestational age was also included in the analysis of term birth weight. Elevation of maternal residence also was considered in the analysis because most wells are < 7,000 feet, and elevation has been associated with both preterm birth and low birth weight (Niermeyer et al. 2009). For 272 births where elevation of maternal residence was missing, elevation was imputed using mean elevation for maternal ZIP code. For outcomes with very few events, only elevation was included in the multiple logistic modeling to avoid unstable estimates. The ORs and their 95% CIs were used to approximate relative risks for each outcome associated with IDW count exposure tertile (low, medium, and high) compared with no wells within 10 miles, which is reasonable because of the rarity of the outcomes. We considered the statistical significance of the association, as well as the trend, in evaluating results, at an alpha of 0.05. We evaluated the confounding potential of the 1998 introduction of folic acid fortification on the birth defect outcomes and found only a decrease in

413

McKenzie et al.

NTD prevalence after 1998 (see Supplemental Material, Table S1).

In a sensitivity analyses, we explored reducing exposure to 2- and 5-mile buffers around the maternal residence, as well as restricting the cohort to births occurring between 2000 and 2009 to exclude births before the expansion of NGD. We report estimated associations with 95% CIs. All statistical analyses were conducted using SAS® software version 9.3 (SAS Institute Inc., Cary, NC).

## Results

Births were approximately evenly divided between exposed and unexposed groups (0 wells in a 10-mile radius versus ≥ 1 well in a 10-mile radius) (Table 1). Estimated exposure, represented by IDW well counts, tended to be higher for births to mothers with residence addresses at lower elevations (< 6,000 feet), and among nonsmoking and Hispanic mothers (Table 1).

Both crude and adjusted estimates indicate a monotonic increase in the prevalence of CHDs with increasing exposure to NGD, as represented by IDW well counts (Table 2). Births to mothers in the most exposed tertile (> 125 wells/mile) had a 30% greater prevalence of CHDs (95% CI: 1.2, 1.5) than births to mothers with no wells within a 10-mile radius of their residence.

Prevalence of NTDs was positively associated with only the third exposure tertile, based on crude and estimated adjusted ORs for elevation (Table 2). Births in the highest tertile (> 125 wells/mile) were 2.0 (95% CI: 1.0, 3.9) times more likely to have a NTD than those with no wells within a 10-mile radius, based on 59 available cases. We observed no statistically significant associations between oral clefts and NGD, based on trend analysis across categorical IDW well count exposure (Table 2).

Both crude and adjusted estimates for preterm birth suggest a slight (< 10%) decreased risk of preterm birth with increasing exposure to NGD (Table 3). Crude term low birth weight measures suggested decreased risk of term low birth weight with increasing exposure to NGD. A weak nonlinear trend remained after adjusting for elevation and other covariates. This association is consistent with the multiple linear regression results for continuous term birth weight, in which mean birth weights were 5–24 g greater in the higher IDW well count exposure tertiles than the referent group.

We observed a monotonic increase in the prevalence of NTDs with increasing exposure to NGD in our sensitivity analyses using 2- and 5-mile exposure radii as well as some attenuation in decreased risk for preterm birth and term low birth weight (see Supplemental Material, Tables S2–7). Restricting births

to 2000 through 2009, the period of most intense NGD in Colorado, attenuated the positive association between NTDs in the highest tertile and did not alter observed relationships for other birth outcomes (see Supplemental Material, Tables S2–S7).

Exploratory analysis of CHDs by clinical diagnostic groups indicates increased prevalence of PAV defects by 60% (95% CI: 1.1, 2.2), VSDs by 50% (95% CI: 1.1, 2.1), and TVDs by 400% (95% CI: 1.3, 13) in the most exposed tertile compared with those with no wells within a 10-mile radius (Table 4).

## Discussion

We found positive associations between density and proximity of natural gas wells within a 10-mile radius of maternal residence and birth prevalence of CHDs and possibly NTDs. Prevalence of CHDs increased monotonically from the lowest to highest exposure tertile, although even in the highest tertile the magnitude of the association was modest. Prevalence of NTDs was elevated only in the highest tertile of exposure. We also observed small negative associations between density and proximity of natural gas wells within a 10-mile radius of maternal residence and

**Table 1.** Study population characteristics for unexposed and exposed subjects from rural Colorado 1996–2009.

| Maternal or infant characteristic | Total | Referent group (0 wells within 10 miles) | Low (first tertile)[a] | Medium (second tertile)[a] | High (third tertile)[a] |
|---|---|---|---|---|---|
| Total n (%) | 124,842 | 66,626 (53) | 19,214 (15) | 19,209 (15) | 19,793 (16) |
| Median | 27 | 27 | 26 | 27 | 27 |
| 25th percentile | 22 | 22 | 21 | 22 | 23 |
| 75th percentile | 32 | 32 | 30 | 31 | 31 |
| Maternal ethnicity (%)[b] | | | | | |
| Non-Hispanic white | 73 | 74 | 72 | 76 | 69 |
| Sex (%) | | | | | |
| Male | 51 | 51 | 51 | 51 | 51 |
| Maternal smoking (%)[c] | | | | | |
| Smokers | 11 | 11 | 14 | 13 | 8 |
| Maternal alcohol (%)[c] | | | | | |
| No | 99 | 98 | 99 | 99 | 99 |
| Parity (%) | | | | | |
| 0 | 33 | 33 | 31 | 32 | 32 |
| 1 | 23 | 23 | 24 | 24 | 25 |
| 2 | 19 | 19 | 20 | 19 | 20 |
| > 2 | 25 | 25 | 26 | 25 | 24 |
| Residential elevation (feet) | | | | | |
| Median | 5,000–5,999 | 6,000–6,999 | < 5,000 | 5,000–5,999 | < 5,000 |
| 25th percentile | < 5,000 | 5,000–5,999 | < 5,000 | < 5,000 | < 5,000 |
| 75th percentile | 7,000–7,999 | 7,000–7,999 | 5,000–6,999 | 6,000–6,999 | 5,000–5,999 |
| Maternal education (%) | | | | | |
| < 12 years | 21 | 20 | 26 | 19 | 22 |
| 12 years | 30 | 30 | 33 | 29 | 28 |
| 13–15 years | 23 | 22 | 25 | 25 | 24 |
| ≥ 16 years | 26 | 28 | 18 | 26 | 27 |

[a]First tertile, 1–3.62 wells/mile; second tertile, 3.63–125 wells/mile; third tertile, 126–1,400 wells/mile. [b]Includes both Non-Hispanic and Hispanic white. [c]During pregnancy.

**Table 2.** Association between inverse distance weighted well count within 10-mile radius of maternal residence and CHDs, NTDs, and oral clefts.

| Inverse distance weighted well count[a] | 0 wells within 10 miles | Low (first tertile) | Medium (second tertile) | High (third tertile) | Cochran–Armitage trend test p-value[b] |
|---|---|---|---|---|---|
| Live births (n) | 66,626 | 19,214 | 19,209 | 19,793 | |
| CHDs | | | | | |
| Cases (n) | 887 | 281 | 300 | 355 | |
| Crude OR | 1 | 1.1 | 1.2 | 1.3 | < 0.0001 |
| Adjusted OR (95% CI)[c] | | 1.1 (0.93, 1.3) | 1.2 (1.0, 1.3) | 1.3 (1.2, 1.5) | |
| NTDs | | | | | |
| Cases (n) | 27 | 6 | 7 | 19 | |
| Crude OR | 1 | 0.77 | 0.90 | 2.4 | 0.01 |
| Adjusted OR (95% CI)[d] | | 0.65 (0.25, 1.7) | 0.80 (0.34, 1.9) | 2.0 (1.0, 3.9) | |
| Oral clefts | | | | | |
| Cases (n) | 139 | 31 | 41 | 40 | |
| Crude OR | 1 | 0.77 | 0.97 | 0.82 | 0.9 |
| Adjusted OR (95% CI)[c] | | 0.65 (0.43, 0.98) | 0.89 (0.61, 1.3) | 0.82 (0.55, 1.2) | |

[a]First tertile, 1–3.62 wells/mile; second tertile, 3.63–125 wells/mile; third tertile, 126–1,400 wells/mile. [b]Performed as two-tailed test on unadjusted logistic regression. [c]Adjusted for maternal age, ethnicity, smoking, alcohol use, education, and elevation of residence, as well as infant parity and sex. [d]Adjusted only for residence elevation because of low numbers.

Natural gas development and birth outcomes

preterm birth and term low birth weight, and a small positive association with mean birth weight. We found no indication of an association between density and proximity of natural gas wells within a 10-mile radius of maternal residence and oral cleft prevalence.

Nongenetic risk factors for CHDs and NTDs possibly attributable to NGD include maternal exposure to benzene (Lupo et al. 2010b; Wennborg et al. 2005), PAHs (Ren et al. 2011), solvents (Brender et al. 2002; Chevrier et al. 1996; Desrosiers et al. 2012; McMartin et al. 1998), and air pollutants ($NO_2$, $SO_2$, PM) (Vrijheid et al. 2011). NGD emits multiple air pollutants, including benzene and toluene, during the "well completion" phase (when gas and water flow back to the surface after hydraulic fracturing) as well as from related infrastructure (CDPHE 2009a, 2009b; Garfield County Public Health Department 2009; Gilman et al. 2013; McKenzie et al. 2012; Pétron et al. 2012). Ambient benzene levels in areas with active NGD in Northeast Colorado ranged from 0.03 to 6 parts per billion by volume (ppbv) (CDPHE 2012; Gilman et al. 2013; Pétron et al. 2012). Furthermore, 24-hr average ambient air benzene levels near active well development sites in western Colorado ranged from 0.03 to 22 ppbv (McKenzie et al. 2012).

Two previous case–control studies have reported associations between maternal exposure to benzene and birth prevalence of NTDs and/or CHDs (Lupo et al. 2010b; Wennborg et al. 2005). The study by Lupo et al. (2010b) of 4,531 births in Texas found that mothers living in census tracts with the highest ambient benzene levels (0.9–2.33 ppbv) were 2.3 times more likely to have offspring with spina bifida than mothers living in census tracts with the lowest ambient benzene levels (95% CI: 1.22, 4.33). An occupational study of Swedish laboratory employees found a significant association between exposure to occupational levels of benzene in the critical window between conception, organogenesis, and neural crest formation and neural crest malformations (Wennborg et al. 2005). Children born to 298 mothers exposed to benzene had 5.3 times greater prevalence of neural crest malformations than children born to mothers not exposed to benzene (95% CI: 1.4, 21.1). Other studies of maternal exposures to organic solvents, some of which contain benzene, have reported associations between maternal occupational exposure to organic solvents and major birth defects (Brender et al. 2002; Desrosiers et al. 2012; McMartin et al. 1998). Although exposure to benzene is a plausible explanation for the observed associations, further research is needed to examine whether these associations are replicated and whether benzene specifically explains these associations.

Air pollutants emitted from diesel engines used extensively in NGD also may be associated with CHDs and/or NTDs. Trucks with diesel engines are used to transport supplies, water, and waste to and from gas wells, with 40 to 280 truck trips per day per well pad during development (Witter et al. 2013). Generators equipped with diesel engines are used in both drilling wells and hydraulic fracturing. Air pollutants in diesel exhaust include $NO_2$, $SO_2$, PM, and PAHs. A meta-analysis of four studies suggested associations of maternal $NO_2$ and $SO_2$ exposures with coarctation of the aorta and tetralogy of Fallot, and maternal $PM_{10}$ exposure with arterial septal defects (Vrijheid et al. 2011). Two case–control studies in China reported positive associations between PAH concentrations in maternal blood and the placenta and NTDs (Li et al. 2011; Naufal et al. 2010). Several CHDs were associated with traffic related carbon monoxide and ozone pollution in a case control study of births from 1987 to 1993 in Southern California (Ritz et al. 2002).

The small negative associations with term low birth weight and preterm birth in our study population were unexpected given that other studies have reported positive associations between these outcomes and air pollution (Ballester et al. 2010; Brauer et al. 2008; Dadvand et al. 2013; Ghosh et al. 2012; Llop et al. 2010) and proximity to natural gas wells (Hill 2013). It is possible that rural air quality near natural gas wells in Colorado is not as compromised as urban air quality in these studies, and exposure represented as IDW well count may not adequately

**Table 3.** Association between inverse distance weighted well count within 10-mile radius of maternal residence and preterm birth and term low birth weight.

| Inverse distance weighted well count[a] | 0 wells within 10 miles | Low (first tertile) | Medium (second tertile) | High (third tertile) | Cochran–Armitage trend test $p$-value[b] |
|---|---|---|---|---|---|
| **Preterm birth** | | | | | |
| Live births (n) | 65,506 | 18,884 | 18,854 | 19,384 | |
| Cases (n) | 4,849 | 1,358 | 1,289 | 1,274 | |
| Crude OR | 1 | 0.97 | 0.92 | 0.88 | < 0.0001 |
| Adjusted OR (95% CI)[c] | | 0.96 (0.89, 1.0) | 0.93 (0.87, 1.0) | 0.91 (0.85, 0.98) | |
| **Term low birth weight** | | | | | |
| Full-term live births (n) | 60,653 | 17,525 | 17,565 | 18,104 | |
| Cases (n) | 2,287 | 525 | 471 | 432 | |
| Crude OR | 1 | 0.79 | 0.70 | 0.62 | < 0.0001 |
| Adjusted OR (95% CI)[c] | | 1.0 (0.9, 1.1) | 0.86 (0.77, 0.95) | 0.9 (0.8, 1) | |
| Mean difference in birth weight (g)[d] | 0 | 5 (–2.2, 13) | 24 (17, 31) | 22 (15, 29) | |

[a]First tertile, 1–3.62 wells/mile; second tertile, 3.63–125 wells/mile; third tertile, 126–1,400 wells/mile. [b]Performed as two-tailed test on unadjusted logistic regression. [c]Adjusted for maternal age, ethnicity, smoking, alcohol use, education, and elevation of residence, as well as infant parity and sex. [d]Adjusted for maternal age, ethnicity, smoking, alcohol use, education, and elevation of residence, as well as infant parity, sex, and gestational age.

**Table 4.** Association between inverse distance weighted well count within 10-mile radius of maternal residence and CHD diagnostic groups.

| Inverse distance weighted well count[a] | 0 wells within 10 miles | Low (first tertile) | Medium (second tertile) | High (third tertile) |
|---|---|---|---|---|
| **Conotruncal defects** | | | | |
| Cases (n) | 40 | 14 | 13 | 15 |
| Adjusted OR (95% CI)[b] | 1 | 1.1 (0.57, 2.2) | 1.1 (0.55, 2.0) | 1.2 (0.6, 2.2) |
| **Ventricular septal defects** | | | | |
| Cases (n) | 210 | 68 | 59 | 84 |
| Adjusted OR (95% CI)[b] | 1 | 1.3 (0.96, 1.8) | 1.1 (0.81, 1.5) | 1.5 (1.1, 2.1) |
| **Endocardial cushion and mitrovalve defects** | | | | |
| Cases (n) | 39 | 14 | 12 | 12 |
| Adjusted OR (95% CI)[b] | 1 | 0.81 (0.42, 1.6) | 0.80 (0.41, 1.5) | 0.67 (0.33, 1.32) |
| **Pulmonary artery and valve defects** | | | | |
| Cases (n) | 137 | 52 | 62 | 66 |
| Adjusted OR (95% CI)[c] | 1 | 1.3 (0.89, 1.8) | 1.5 (1.1, 2,1) | 1.6 (1.1, 2,2) |
| **Tricuspid valve defects** | | | | |
| Cases (n) | 9 | 5 | 8 | 8 |
| Adjusted OR (95% CI)[b] | 1 | 2.6 (0.75, 9.1) | 3.9 (1.3, 11) | 4.2 (1.3, 13) |
| **Aortic artery and valve defects** | | | | |
| Cases (n) | 75 | 22 | 21 | 24 |
| Adjusted OR (95% CI)[c] | 1 | 1.1 (0.68, 1.9) | 1.0 (0.62, 1.8) | 1.2 (0.73, 2.1) |
| **Patent ductus arteriosis** | | | | |
| Cases (n) | 59 | 18 | 17 | 15 |
| Adjusted OR (95% CI)[b] | 1 | 1.0 (0.56, 1.8) | 0.96 (0.55, 1.7) | 0.83 (0.44, 1.5) |

[a]First tertile, 1–3.62 wells/mile; second tertile, 3.63–125 wells/mile; third tertile, 126–1,400 wells/mile. [b]Adjusted only for residence elevation of because of low numbers. [c]Adjusted for maternal age, ethnicity, smoking, alcohol use, education, and elevation of residence, as well as infant parity and sex.

McKenzie et al.

represent air quality. In addition, the power of our large cohort increases the likelihood of false positive results for small associations close to the null. Although associations were consistent across measures of birth weight (i.e., reduced risk of term low birth weight and increase in mean birth weight), they attenuated toward the null in sensitivity analysis for 2- and 5-mile radii (see Supplemental Material, Tables S6–S7). If causal, stronger associations would be expected with more stringent exposure definitions. Our incomplete ability to adjust for socioeconomic status, health, nutrition, prenatal care, and pregnancy complications likely accounts for these unexpected findings.

This study has several limitations inherent in the nature of the available data. Not all birth defects were confirmed by medical record review. Also, birth defects are most likely undercounted, because stillbirths, terminated pregnancies, and later-life diagnoses (after 3 years of age) are not included. Birth weight and gestational age were obtained from birth certificates, which are generally accurate for birth weight and useful but less accurate for gestational age (DiGiuseppe et al. 2002). Data on covariates were obtained from birth certificates and were limited to basic demographic, education, and behavioral information available in the vital records. Distribution of covariates among exposure tertiles and the unexposed group was similar; nevertheless, our incomplete ability to adjust for socioeconomic status, health, nutrition, prenatal care, and pregnancy complications may have resulted in residual confounding. In addition, low event outcomes (e.g., NTDs) were adjusted only for elevation. The data set did not contain information on maternal folate consumption and genetic anomalies, both independent predictors of our outcomes, which may have confounded these results. We did observe a large decrease in the prevalence of NTDs after the introduction of folic acid in 1998, and small increases in the prevalence of CHDs and oral clefts, although none of the estimates are statistically significant (see Supplemental Material, Table S1). Further study is needed to determine whether unaccounted folate confounding is attenuating our results toward the null. There is no evidence indicating genetic anomalies would differ by IDW well count around maternal residence.

Because of the rarity of specific birth defects in the study population, birth defects were aggregated into three general groups. This limited our study in that associations with specific birth defects may have been obscured. An exploratory analysis of CHDs by clinical diagnostic groups indicates increased prevalence of specific diagnostic groups (i.e., PAV, VSD, and TVD) compared with aggregated CHDs (Table 4).

Another limitation of this study is the lack of temporal and spatial specificity of the exposure assessment. Because we did not have maternal residential history, we assumed that maternal address at time of delivery was the same as maternal address during the first trimester of pregnancy—the critical time period for formation of birth defects. Studies in Georgia and Texas estimate that 22–30% of mothers move residence during their pregnancy, and most mothers move within their locality (Lupo et al. 2010a; Miller et al. 2010), potentially introducing some exposure misclassification for the early pregnancy period of interest. However, these studies found little difference in mobility between cases and controls (Lupo et al. 2010a; Miller et al. 2010), and maternal mobility did not significantly influence the assessment of benzene exposure (Lupo et al. 2010a). We were able to determine only whether a well existed within the calendar year of birth (e.g., 2003) and did not have sufficient data to determine if a well existed within the first trimester of the pregnancy. Therefore, some nondifferential exposure misclassification is likely and the overall effect of this is unknown.

Similarly, we had consistent information only on existence of a well in the birth year. Lack of information on natural gas well activity levels, such as whether or not wells were producing or undergoing development, may have resulted in exposure misclassification. Actual exposure to natural gas–related pollutants likely varies by intensity of development activities. Lack of temporal and spatial specificity of the exposure assessment would most likely have tended to weaken associations (Ritz et al. 2007; Ritz and Wilhelm 2008). To address spatial and temporal variability, additional air pollution measurements and modeling would be needed to improve exposure estimates at specific locations. Last, information on the mother's activities away from her residence, such as work and recreation, as well as proximity of these activities to NGD was not available and may have led to further exposure misclassification and residual confounding.

## Conclusion

This study suggests a positive association between greater density and proximity of natural gas wells within a 10-mile radius of maternal residence and greater prevalence of CHDs and possibly NTDs, but not oral clefts, preterm birth, or reduced fetal growth. Further studies incorporating information on specific activities and production levels near homes over the course of pregnancy would improve exposure assessments and provide more refined effect estimates. Recent data indicate that exposure to NGD activities is increasingly common. The COGCC estimates that 26% of the > 47,000 oil and gas wells in Colorado are located within 150–1,000 feet of a home or other type of building intended for human occupancy (COGCC 2012). Taken together, our results and current trends in NGD underscore the importance of conducting more comprehensive and rigorous research on the potential health effects of NGD.

## References

Agency for Toxic Substances and Disease Registry. 2007. Toxicological Profile for Benzene. Available: http://www.atsdr.cdc.gov/ToxProfiles/TP.asp?id=40&tid=14 [accessed 22 May 2013].

Ballester F, Estarlich M, Iniguez C, Llop S, Ramon R, Esplugues A, et al. 2010. Air pollution exposure during pregnancy and reduced birth size: a prospective birth cohort study in Valencia, Spain. Environ Health 9:6; doi:10.1186/1476-069X-9-6.

Bowen S, Irtenkauf S, Hannigna J, Stefanski A. 2009. Alterations in rat morphology following abuse patterns of toluene exposure. Reprod Toxicol 27:161–169.

Brauer M, Lencar C, Tamburic L, Koehoorn M, Demers P, Karr C. 2008. A cohort study of traffic-related air pollution impacts on birth outcomes. Environ Sci Technol 116:680–686.

Brender JD, Suarez L, Hendricks KA, Baetz RA, Larsen R. 2002. Parental occupation and neural tube defect–affected pregnancies among Mexican Americans. J Occup Environ Med 44:650–656.

Brent RL. 2004. Environmental causes of human congenital malformations: the pediatrician's role in dealing with these complex clinical problems caused by a multiplicity of environmental and genetic factors. Pediatrics 113:957–968.

Bukowski JA. 2001. Review of the epidemiological evidence relating toluene to reproductive outcomes. Regul Toxicol and Pharmacol 33:147–156.

CDPHE (Colorado Department of Public Health and Environment). 2007. Garfield County Air Toxics Inhalation: Screening Level Human Health Risk Assessment: Inhalation Of Volatile Organic Compounds Measured In Rural, Urban, and Oil & Gas Areas In Air Monitoring Study (June 2005–May 2007). Available: http://www.garfield-county.com/public-health/documents/Working%20Draft%20CDPHE%20Screeing%20Level%20Risk%20Air%20Toxics%20Assessment%2012%2020%2007.pdf [accessed 22 May 2013].

CDPHE (Colorado Department of Public Health and Environment). 2009a. Garfield County Emissions Inventory. Available: http://www.garfield-county.com/air-quality/documents/airquality/Garfield_County_Emissions_Inventory-2009.pdf [accessed 22 May 2013].

CDPHE (Colorado Department of Public Health and Environment). 2009b. State of Colorado Technical Support Document for Recommended 8-Hour Ozone Designations. Available: http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheadername1=Content-Disposition&blobheadername2=Content-Type&blobheadervalue1=inline%3B+filename%3D%22Recommended+8-+Hour+Ozone+Area+Designations.pdf%22&blobheadervalue2=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1251808873080&ssbinary=true [accessed 22 May 2013].

CDPHE (Colorado Department of Public Health and Environment). 2012. Air Emissions Case Study Related to Oil and Gas Development in Erie, Colorado. Available: http://www.colorado.gov/airquality/tech_doc_repository.aspx [accessed 22 May 2013].

Centers for Disease Control and Prevention. 2013. Birth Defects. Available: http://www.cdc.gov/ncbddd/birthdefects/index.html [accessed 22 May 2013].

Chevrier C, Dananche B, Bahuau M, Nelva A, Herman C, Francannet C, et al. 1996. Occupational exposure to organic solvent mixtures during pregancy and the the risk of non-syndromic oral clefts. Occup Environ Med 63:617–623.

COGCC (Colorado Oil and Gas Conservation Commission). 2009. Statement of Basis, Specific Statutory Authority, and Purpose: New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 ccr 404-1. Available: http://cogcc.state.co.us/ [accessed 22 May 2013].

COGCC (Colorado Oil and Gas Conservation Commission). 2012. Staff Report. Colorado Department of Natural Resources. Available: http://cogcc.state.co.us/ [accessed 22 May 2013].

COGIS (Colorado Oil and Gas Information System). 2011. Well Production Database. Vol. 2011. Available: http://cogcc.state.co.us/ [accessed 22 May 2013].

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Asses 17:1039–1056.

CRCSN (Colorado Responds to Children with Special Needs). 2011. Birth Defects Dataset Details. Available: http://www.cdphe.state.co.us/cohid/crcsndata.html [accessed 6 October 2011].

Dadvand P, Parker JD, Bell ML, Bonzini M, Brauer M, Darrow L, et al. 2013. Maternal exposure to particulate air pollution and term birth weight: a multi-country evaluation of effect and heterogeneity. Environ Health Perspect 121:367–373; doi:10.1289/ehp.1205575.

Desrosiers TA, Lawson CC, Meyer RE, Richardson DB, Daniels JL, Waters MA, et al. 2012. Maternal occupational exposure to organic solvents during early pregnancy and risks of neural tube defects and orofacial clefts. Occup Environ Med 69:493–499.

DiGiuseppe DL, Aron DC, Ranbom L, Harper DL, Rosenthal GE. 2002. Reliability of birth certificate data: a multi-hospital comparison to medical records information. Matern Child Health J 6:169–179.

Esswein EJ, Breitenstein M, Snawder J, Kiefer M, Sieber K. 2013. Occupational exposure to respirable crystalline silica during hydraulic fracturing. J Occup Environ Hyg 10(7):347–356; doi:10.1080/15459624.2103.788352.

Frazier A. 2009. Analysis of Data Obtained for the Garfield County Air Toxics Study—Summer 2008. Available: http://www.garfield-county.com/air-quality/documents/airquality/2008_Targeted_Oil_and_Gas_Monitoring_Report.pdf [accessed 22 May 2013].

Garfield County Public Health Department. 2009. Garfield County 2009 Air Quality Monitoring Summary. Available: http://www.garfield-county.com/air-quality/documents/airquality/2009_Air_Monitoring_Report.pdf [accessed 22 May 2013].

Ghosh JKC, Wilhelm M, Su J, Goldberg D, Cockburn M, Jerrett M, et al. 2012. Assessing the influence of traffic-related air pollution on risk of term low birth weight on the basis of land-use-based regression models and measures of air toxics. Am J Epidemiol 175:1262–1274.

Gilboa SM, Mendola P, Olshan AF, Langlois PH, Savitz DA, Loomis D, et al. 2005. Relation between ambient air quality and selected birth defects, Seven County Study, Texas, 1997–2000. Am J Epidemiol 162(3):238–252.

Gilman JB, Lerner BM, Kuster WC, de Gouw J. 2013. Source signature of volatile organic compounds (VOCs) from oil and natural gas operations in northeastern Colorado. Environ Sci Technol 47(3):1297–1305.

Hill EL. 2013. Unconventional Natural Gas Development and Infant Health: Evidence from Pennsylvania. Ithaca, NY:Charles Dyson School of Applied Economics and Management, Cornell University. Available: http://dyson.cornell.edu/research/researchpdf/wp/2012/Cornell-Dyson-wp1212.pdf [accessed 7 March 2014].

Honein M, Rasmussen S, Reefhuis J, Romitti P, Lammer E, Sun L, et al. 2006. Maternal smoking and environmental tobacco smoke exposure and the risk of orofacial clefts. Epidemiology 18:226–233.

Kemball-Cook S, Bar-Ilan A, Grant J, Parker L, Jung J, Santamaria W, et al. 2010. Ozone impacts of natural gas development in the Haynesville shale. Environ Sci Technol 44:9357–9363.

King GE. 2012. Hydraulic Fracturing 101: What Every Representative, Environmentalist, Regulator, Reporter, Investor, University Researcher, Neighbor and Engineer Should Know About Estimating Frac Risk and Improving Frac Performance in Unconventional Gas and Oil Wells. Available: http://fracfocus.org/sites/default/files/publications/hydraulic_fracturing_101.pdf [accessed 6 March 2014].

Li Z, Zhang L, Ye R, Pei L, Liu J, Zheng X, et al. 2011. Indoor air pollution from coal combustion and the risk of neural tube defects in a rural population in Shanxi Province, China. Am J Epidemiol 174:451–458.

Llop S, Ballester F, Estarlich M, Esplugues A, Rebagliato M, Iñiguez C. 2010. Preterm birth and exposure to air pollutants during pregnancy. Environ Res 110:778–785.

Lupo PJ, Symanski E, Chan W, Mitchell LE, Waller DK, Canfield MA, et al. 2010a. Differences in exposure assignment between conception and delivery: the impact of maternal mobility. Paediatr Perinat Epidemiol 24:200–208.

Lupo P, Symanski E, Waller D, Chan W, Langlosi P, Canfield M, et al. 2010b. Maternal exposure to ambient levels of benzene and neural tube defects among offspring, Texas 1999–2004. Environ Health Perspect 119:397–402; doi:10.1289/ehp.1002212.

McKenna MT, Michaud CM, Murray CJL, Marks JS. 2005. Assessing the burden of disease in the United States using disability-adjusted life years. Am J Prev Med 28:415–423.

McKenzie LM, Witter RZ, Newman LS, Adgate JL. 2012. Human health risk assessment of air emissions from development of unconventional natural gas resources. Sci Total Environ 424:79–87.

McMartin KI, Chu M, Kopecky E, Einarson TR, Koren G. 1998. Pregnancy outcome following maternal organic solvent exposure: a meta-analysis of epidemiologic studies. Amn J Ind Med 34:288–292.

Miller A, Siffel C, Correa A. 2010. Residential mobility during pregnancy: patterns and correlates. Matern Child Heath J 14:625–634.

National Center for Health Statistics. 2011. Classification of Diseases and Injuries. Available: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Publications/ICD-9/ucod.txt [accessed 22 May 2013].

Naufal Z, Zhiwen L, Zhu L, Zhou GOD, McDonald T, He LY, et al. 2010. Biomarkers of exposure to combustion by-products in a human population in Shanxi, China. J Expos Sci Environ Epidemiol 20:310–319.

Niermeyer S, Andrade Mollinedo P, Huicho L. 2009. Child health and living at high altitude. Arch Dis Child 94:806–811.

Olaguer EP. 2012. The potential near-source ozone impacts of upstream oil and gas industry emissions. J Air Waste Manag Assoc 62:966–977.

Parker SE, Mai CT, Canfield MA, Rickard R, Wang Y, Meyer RE, et al. 2010. Updated national birth prevalence estimates for selected birth defects in the United States, 2004–2006. Birth Defects Res A Clin Mol Teratol 88:1008–1016.

Pétron G, Frost G, Miller BR, Hirsch AI, Montzka SA, Karion A, et al. 2012. Hydrocarbon emissions characterization in the Colorado front range: a pilot study. J Geophys Res 117:D04304; doi:10.1029/2011JD016360.

Ren A, Qiu X, Jin L, Ma J, Li Z, Zhang L, et al. 2011. Association of selected persistent organic pollutants in the placenta with the risk of neural tube defects. Proc Natl Acad Sci USA 108:12770–12775.

Ritz B, Wilhelm M. 2008. Ambient air pollution and adverse birth outcomes: Methodologic issues in an emerging field. Basic Clinl Pharmacol Toxicol 102:182–190.

Ritz B, Wilhelm M, Hoggatt KJ, Ghosh JKC. 2007. Ambient air pollution and preterm birth in the environment and pregnancy outcomes study at the University of California, Los Angeles. Am J of Epidemiol 166:1045–1052.

Ritz B, Yu F, Fruin S, Chapa G, Shaw GM, Harris JA. 2002. Ambient air pollution and risk of birth defects in southern California. Am J Epidemiol 155:17–25.

Romitti P, Sun L, Honein M, Reefhuis J, Correa A, Rasmussen S. 2007. Maternal periconceptual alcohol consumption and risk of orofacial clefts. Am J Epidemiol 166:775–785.

Shepard T. 1995. Agents that cause birth defects. Yonsei Med J 36:393–396.

U.S. EIA (U.S. Energy Information System). 2011a. International Energy Outlook 2011. DOE/EIA-0484(2011). Washington, DC:U.S. EIA.

U.S. EIA (U.S. Energy Information System). 2011b. Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays. Available: http://www.eia.gov/analysis/studies/usshalegas/pdf/usshaleplays.pdf [accessed 22 May 2013].

Vidas H, Hugman B. 2008. Availability, Economics, and Production Potential of North American Unconventional Natural Gas Supplies. Available: http://www.ingaa.org/File.aspx?id=7878 [accessed 22 May 2013].

Vrijheid M, Martinez D, Manzanares S, Dadvand P, Schembari A, Rankin J, et al. 2011. Ambient air pollution and risk of congenital anomalies: a systematic review and meta-analysis. Environ Health Perspect 119:598–606; doi:10.1289/ehp.1002946.

Wald N, Sneddon J. 1991. Prevention of neural tube defects: Results of the medical research council vitamin study. Lancet 338:131.

Walther E. 2011. Screening Health Risk Assessment Sublette County, Wyoming. SR2011-01-03. Available: http://www.sublettewyo.com/DocumentCenter/Home/View/438 [accessed 22 May 2013].

Wennborg H, Magnusson L, Bonde J, Olsen J. 2005. Congenital malformations related to maternal exposure to specific agents in biomedical research laboratories. J Occup Environ Med 47:11–19.

Witter R, McKenzie L, Stinson K, Scott K, Newman L, Adgate J. 2013. The use of health impact assessment for a community undergoing natural gas development. Am J Public Health 103 (6): doi: 10.2105/AJPH.2012.301017.

Zielinska B, Fujita E, Campbell D. 2011. Monitoring of Emissions from Barnett Shale Natural Gas Production Facilities for Population Exposure Assessment. Desert Research Institute. Available: https://sph.uth.edu/mleland/attachments/Barnett%20Shale%20Study%20Final%20Report.pdf [accessed 22 May 2013].

# EXHIBIT 158





# Natural Gas, Hydraulic Fracking and a Bridge to Where?



**A. R. Ingraffea**
*Dwight C. Baum Professor*
*Cornell University*
*and*
*Physicians, Scientists, and Engineers for*
*Sustainable and Healthy Energy, Inc.*

*April 23, 2012*

1

# CO$_2$ Concentration in the Atmosphere: NOAA



RECENT MONTHLY MEAN CO$_2$ AT MAUNA LOA

Seasonal fluctuation

December 2011:    391.80 ppm
December 2010:    389.68 ppm

~ 2 ppm increase per year
450 ppm a "tipping point"
We have about 30 years...

PARTS PER MILLION

YEAR

January 2012

2

# Natural Gas Systems Now Produce  39% of Total U.S. Methane Emissions



(Howarth et al. 2012, based on 2011 EPA data for 2009)

3

# Gas Is Supposed to Rise
# Inside the Production Casing,
# Not Outside



VIDEO of
Methane Bubbling
At Well Head

4

# Bubbling in Muncy Creek, Lycoming County, PA: Example of Migration of Hydrocarbons



Video Courtesy of Ralph Kisberg,  Responsible Drilling Alliance

# Marcellus Well Being "Finished" Outside Dimock, Pa June, 2011: Major Source of Methane Emission



Photo and FLIR Methane-Tuned Video Courtesy Frank Finan

6

# Marcellus Well Being "Finished" Outside Dimock, Pa. June, 2011: Major Source of Methane Emission



Video

Video courtesy of Frank Finan



**Howarth & Ingraffea,** *Nature***, 15 September 2011**

# Methane Emissions and Climate Change: Recent Per-Reviewed Literature

## Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security

Drew Shindell,[1*] Johan C. I. Kuylenstierna,[2] Elisabetta Vignati,[3] Rita van Dingenen,[3] Markus Amann,[4] Zbigniew Klimont,[4] Susan C. Anenberg,[5] Nicholas Muller,[6] Greet Janssens-Maenhout,[3] Frank Raes,[3] Joel Schwartz,[7] Greg Faluvegi,[1] Luca Pozzoli,[3]† Kaarle Kupiainen,[4] Lena Höglund-Isaksson,[4] Lisa Emberson,[2] David Streets,[8] V. Ramanathan,[9] Kevin Hicks,[2] N. T. Kim Oanh,[10] George Milly,[1] Martin Williams,[11] Volodymyr Demkine,[12] David Fowler[13]

Steven P. Hamburg[e]

ry Biology, 106A Guyot Hall, 23; [d]School of the Environment,

Petron G, et al. (2012). Hydrocarbon Emissions Characterization in the Colorado Front Range – A Pilot Study. *Journal of Geophysical Research, in press,* doi:10.1029/2011JD016360.

**JGR** | Journal of Geophysical Research

## Greenhouse gases, climate change and the transition from coal to low-carbon electricity

**Environmental Research Letters**

9

N P Myhrvold[1] and K Caldeira[2]

# EPA New Emissions Rules, April 2012: Crucial for Methane Control

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 63

[EPA-HQ-OAR-2010-0505; FRL-          ]

RIN 2060-AP76

Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews

## Should We Be Pleased?

10

# EPA Issues New Emissions Rules:
# And Caves to Industry?

**July 2011:**
"The proposed NSPS is anticipated to prevent significant new emissions, including 37,000 tons of hazardous air pollutants (HAPs), 540,000 tons of VOCs, **and 3.4 million tons of methane (~74 million metric tonnes $CO_2$e)**"

This value is **22% of national oil and gas methane emissions** reported in the National GHG Inventories.

**April 2012:**
"EPA estimates the following combined annual emission reductions when the rules are fully implemented :
        VOCs: 190,000 to 290,000 tons;
        HAPS: 12,000 to 20,000 tons; and
        **Methane 1.0 to 1.7 million short tons [about 19 to 33 million tonnes $CO_2$e]**"

Only about **8% - 13% of oil and gas methane emissions** reported in the National GHG Inventories.

11

# Maximum "well-to-wheels" (WTW) natural gas leak rate versus number of years needed to achieve net climate benefit for electricity generation: coal vs. natural gas



# Measured Methane Concentration in the Atmosphere: NOAA



ftp://ftp.cmdl.noaa.gov/ccg/ch4/in-situ/mlo/ch4_mlo_surface-insitu_1_ccgg_month.txt

13

# Why Is Controlling Methane ($CH_4$) Emission So Important?



Shindell, *et al. Science* **335, 183 (2012)**

14

# "There is no time to waste...."

"Natural gas is a delaying tactic...There is no time to waste...
We have to decide whether we are in the business of delaying
bad outcomes or whether we are in the business of preventing
bad outcomes."

Ken Caldiera, Senior Scientist
Department of Global Ecology,
Carnegie Institution, Stanford, CA
April 15, 2012

15



# Thank You for Attending and Participating Today



www.psehealthyenergy.org



**Fracking**
**Gas Drilling's Environmental Threat**

# New Study Predicts Frack Fluids Can Migrate to Aquifers Within Years



*A Cabot Oil and Gas hydraulic fracturing site on Jan. 17, 2012, in Springville, Pa. (Spencer Platt/Getty Images)*

*by Abrahm Lustgarten*
*ProPublica, May 1, 2012, 3:29 p.m.*



A new study has raised fresh concerns about the safety of gas drilling in the Marcellus Shale, concluding that fracking chemicals injected into the ground could migrate toward drinking water supplies far more quickly than experts have previously predicted.

More than 5,000 wells were drilled in the Marcellus between mid-2009 and mid-2010, according to the study, which was published in the journal Ground Water [1] two weeks ago. Operators inject up to 4 million gallons of fluid, under more than 10,000 pounds of pressure, to drill and frack each well.

Scientists have theorized that impermeable layers of rock would keep the fluid, which contains benzene and other dangerous chemicals, safely locked nearly a mile below water supplies. This view of the earth's underground geology is a cornerstone of the industry's argument that fracking poses minimal threats to the environment.

But the study, using computer modeling, concluded that natural faults and fractures in the Marcellus, exacerbated by the effects of fracking itself, could allow chemicals to reach the surface in as little as "just a few years."

"Simply put, [the rock layers] are not impermeable," said the study's author, Tom Myers, an independent hydrogeologist whose clients include [2] the federal government and environmental groups.

"The Marcellus shale is being fracked into a very high permeability," he said. "Fluids could move from most any injection process."

The research for the study was paid for by Catskill Mountainkeeper and the Park Foundation, two upstate New York organizations that have opposed gas drilling and fracking in the Marcellus.

Much of the debate about the environmental risks [3] of gas drilling has centered on the risk that spills could pollute surface water or that structural failures would cause wells to leak.

Though some scientists believed it was possible for fracking to contaminate underground water supplies, those risks have been considered secondary. The study in Ground Water is the first peer-reviewed research evaluating this possibility.

The study did not use sampling or case histories to assess contamination risks. Rather, it used software and computer modeling to predict how fracking fluids would move over time. The simulations sought to account for the natural fractures and faults in the underground rock formations and the effects of fracking.

The models predict that fracking will dramatically speed up the movement of chemicals injected into the ground. Fluids traveled distances within 100 years that would take tens of thousands of years under natural conditions. And when the models factored in the Marcellus' natural faults and fractures, fluids could move 10 times as fast as that.

Where man-made fractures intersect with natural faults, or break out of the Marcellus layer into the stone layer above it, the study found, "contaminants could reach the surface areas in tens of years, or less."

The study also concluded that the force that fracking exerts does not immediately let up when the process ends. It can take nearly a year to ease.

As a result, chemicals left underground are still being pushed away from the drill site long after drilling is finished. It can take five or six years before the natural balance of pressure in the underground system is fully restored, the study found.

Myers' research focused exclusively on the Marcellus, but he said his findings may have broader relevance. Many regions where oil and gas is being drilled have more permeable underground environments than the one he analyzed, he said.

"One would have to say that the possible travel times for a similar thing in Arkansas or Northeast Texas is probably faster than what I've come up with," Myers said.

Ground Water is the journal of the National Ground Water Association [4], a non-profit group that represents scientists, engineers and businesses in the groundwater industry.

Several scientists called Myers' approach unsophisticated and said that the assumptions he used for his models didn't reflect what they knew about the geology of the Marcellus Shale. If fluids could flow as quickly as Myers asserts, said Terry Engelder, a professor of geosciences at Penn State University who has been a proponent of shale development, fracking wouldn't be necessary to open up the gas deposits.

"This would be a huge fracture porosity," Engelder said. "So I read this and I say, 'Golly, does this guy really understand anything about what these shales look like?' The concern then arises from using a model rather than observations."

Myers likened the shale to a cracked window, saying that samples showing it didn't contain fractures were small in size and were akin to only examining an intact section of glass, while a broader, scaled out view would capture the faults and fractures that could leak.

Both scientists agreed that direct evidence of fluid migration is needed, but little sampling has been done to analyze where fracking fluids go after being injected underground.

Myers says monitoring systems could be installed around gas well sites to measure for changes in water quality, a measure required for some gold mines, for example. Until that happens, Myers said, theoretical modeling has to substitute for hard data.

"We were trying to use the basic concepts of groundwater and hydrology and geology and say can this happen?" he said. "And that had basically never been done."

*Like this story? Sign up for our daily newsletter [6] to get more of our best work.*

---

1. http://onlinelibrary.wiley.com/journal/10.1111/(ISSN)1745-6584;jsessionid=BC23355888AE384813C75FF3AE8C10B9.d02t02
2. http://water.nv.gov/hearings/past/springetal/browseabledocs/exhibits/5CCTGR%20Exhibits/CTGR_EXH_006%20Statement%20of%20Qualifications%20of%20Tom%20Myers,%20Ph.D..PDF
3. http://www.propublica.org/series/fracking
4. http://www.ngwa.org/Pages/default.aspx
5. http://twitter.com/AbrahmL
6. http://www.propublica.org/forms/newsletter_daily_email

© Copyright 2016 Pro Publica Inc.

**Steal Our Stories**
*Unless otherwise noted, you can republish our stories for free if you follow these rules.*

**Download Our Data**

**Send Us Tips or Documents Securely**

Case No. 1:20-cv-02484-MSK Document 88-1 filed 05/06/21 USDC Colorado pg 189 of
345

# EXHIBIT 160

# THE SKY IS PINK:

# ANNOTATED DOCUMENTS

— Southwestern Energy

— Oilfield Review | Schlumberger

— Watson | Bacchu

— Dusseault, Gray + Nawrocki | SPE International

— Archer

— Colorado Oil and Gas Conservation Commission [COGCC]

*If it is not possible for gas to migrate from targeted formations, why does industry show so much evidence to the contrary in these, their very own documents?*



# SOUTHWESTERN ENERGY



The gas industry asserts that the target formation is thousands of feet from water supply aquifers and that the aquifers therefore cannot be contaminated by migration of natural gas, radioactivity, VOCs and other chemicals.

However, SOUTHWESTERN ENERGY'S own powerpoint deck shows three ways that just such a scenario can occur



**CEMENT CHANNELING**
The cement forms incomplete bond to the casing, sometimes caused by exposure while curing to pressurized gas.



**LEAK THROUGH CASING**
The casing itself starts to corrode over time due to exposure to moisture and chemicals.



**INSUFFICIENT CEMENT COVERAGE**
The annulus around a casing string is not cemented to the surface, allowing pressurized fluids access upwards to a freshwater aquifer.



# GASLAND

# OILFIELD REVIEW | SCHLUMBERGER



> Wells with SCP by age. Statistics from the United States Mineral Management Service (MMS) show the percentage of wells with SCP for wells in the outer continental shelf (OCS) area of the Gulf of Mexico, grouped by age of the wells. These data do not include wells in state waters or land locations.

The science of constructing gas wells is thousands of years old. Legend has it that the Chinese dug the first natural gas well before 200 BC and transported the gas through bamboo pipelines.

In this article from *Oilfield Review*, it is stated that sustained casing pressure is an indication of communication to the annulus from a sustainable pressure source because of inadequate zonal isolation, caused by gas migration due to faulty cement or casings.

This chart shows the number of wells in the Gulf of Mexico with SCP - or the failure rate - by age. As you can see, 6% fail immediately, and within 15 years, over 50% have failed.

Migration is a common problem in Canada. Most of the SCP/migration is due to gas.

It is acknowledged that the search for energy in ever more remote locations — "extreme energy" — will push technology and operators to the limit: the consequences of "poor zonal isolation" are more failures.

SCP can result from direct communication with gas in shallow formations as well as the target formations, usually caused by poor primary cementing.



# OILFIELD REVIEW | SCHLUMBERGER

There are 4 commonly understood causes of SCP, although identifying the precise cause is often difficult, likely for the same reason that remediating is difficult.

A — Tubing | migration leaks. If they lead to a failure of production casing, the outcome can be catastrophic, jeopardizing personnel safety, production facilities and the environment.

B — Poor mud displacement leads to poor zonal isolation and gas migration.

C — Cement loses volume as it sets, leading to unbalanced hydrostatic pressure.

constructing a gas well, an oil well, or both, long-term, durable zonal isolation is key to minimizing problems associated with annular gas flow and SCP development.[1]

**Identifying Causes of Gas Migration**

Annular gas may originate from a pay zone or from noncommercial, gas-bearing formations. Some of the most hazardous gas flows have originated from unrecognized gas behind conductor, surface or intermediate casing. Typically, gas flow that occurs immediately after cementing or before the cement set is referred to as annular gas flow, or annular gas migration. This flow is generally massive and can be internal, charging lower-pressured formations, or can flow to the surface and requires control procedures. Flow to surface occurs ... in the life of the well is known as SCP. ... re flow also can be from gas-bearing form... m to formations of lower pressure, generally at shallower depths.

Determining the precise source of annular flow or sustained casing pressure is often difficult, although likely causes can be divided into four primary categories: tubing and casing leaks, poor mud displacement, improper cement slurry design and damage to primary cement after setting [failed].

*Tubing and casing leaks*—Production tubing failures may present the most serious SCP problem.[2] Leaks can result from poor thread connection, corrosion, thermal-stress cracking or mechanical rupture of the inner string, or from a packer leak. Production casing is typically designed to handle tubing leaks, but if the pressure from a leak causes a failure of the production casing, the outcome can be catastrophic. With pressurization of the outer casing strings, leaks to surface or underground blowouts may jeopardize personnel safety, production-platform facilities and the environment.

*Poor mud displacement*—Inadequate removal of mud or spacer fluids prior to cement placement may result in failure to achieve zonal isolation. There are several reasons for mud-removal failure, including, but not limited to, poor borehole conditions, improper displacement mechanics and failures in displacement process or execution. Inadequate removal of mud from the borehole during displacement is a major contributing factor to poor zonal isolation and gas migration. Mud displacement is discussed in greater detail (see "From Mud to Cement," page 60).

*Improper cement slurry design*—Flow occurring before cement has set is a result of loss in hydrostatic pressure to the point that the well is no longer overbalanced—hydrostatic pressure is less than formation pressure. This decrease in hydrostatic pressure results from several phenomena that occur as part of the cement-setting process.[3] The change from a highly fluid, pumpable slurry to a set, rock-like material involves a gradual transition of the cement from fluid to gel and finally to a set condition. This may require several hours, depending on the temperature, quantity and characteristics of retarding compounds added to prevent setting of the cement prior to placement. As the cement begins to gel, bonding between the cement, casing and borehole allows the slurry to become partially self-supporting.

This self-supporting condition would not be a problem if it occurred alone. The difficulty arises because, while the cement becomes self-supporting, it loses volume as a result of at least two factors. First, where the formation is permeable, the hydrostatic pressure overbalance drives water from the cement into the formation. The rate of water loss depends on the pressure differential, formation permeability, the condition and permeability of any residual mudcake and fluid loss characteristics of the cement. A second cause of volume loss is hydration volume reduction as the cement sets. This occurs because set cement is denser and occupies less volume than the liquid slurry. Volume loss is relatively small at first, since little solid product forms during early hydration. However,



**A**

[1] Scenarios for gas flow. Shown are possible scenarios of gas migration to the surface resulting in SCP. Tubing and packer leaks may allow gas to migrate. Microannulus may develop soon or long after cementing operations. Poor mud displacement may result in inadequate zonal isolation. Gas may slowly displace residual nonhydrated drilling fluid, eventually pressurizing the annular space between tubing and casing strings. Gas may also flow through poorly designed nongas-tight permeable cement.



# OILFIELD REVIEW | SCHLUMBERGER

ultimately the volume loss can be as much as 8%.[8] Volume loss coupled with the interaction between partially set cement, borehole wall and casing causes a loss of hydrostatic pressure, leading to an underbalanced condition.

While the hydrostatic pressure in the partially set cement is below formation pressure, gas may invade. If unchecked, the invasion of gas may create a channel through which gas can flow, effectively compromising cement quality and zonal isolation.

Free water in cement may also cause a channel. Under static conditions, slurry instability may lead to water separating from a cement slurry. This water may migrate to the borehole wall and collect, forming a channel. This is of particular concern in deviated wellbores where gravity may drive density separation and fluid inversion, resulting in the development of a free-fluid channel on the top side of the borehole.

*Cement damage after setting*—SCP can occur long after the well-construction process. Even a flawless primary cement job can be damaged by rig operations or well activities occurring after the cement has set. Changing stresses in the wellbore may cause microannuli, stress cracks, or both, often leading to SCP.[9]

The mechanical properties of casing and cement vary significantly. Consequently, they do not behave in a uniform manner when exposed to changes in temperature and pressure. As the casing and cement expand and contract, the bond between the cement sheath and casing may fail, causing a microannulus, or flow path, to develop.

Decreasing the internal casing pressure during completion and production operations may also lead to microannuli development. Underbalanced perforating, gas-lift operations or increased drawdown in response to reservoir depletion all reduce internal casing pressure.

Any of these conditions—casing or casing leaks, poor mud displacement, improper cement system design or damage to cement after setting—may result in flow paths for gas in the form of discrete conductive cement fractures, or microannuli. Once the gas-migration mechanism is understood, steps can be taken to mitigate the process.

## Controlling Gas Migration

As the borehole reaches deeper into the earth, previously isolated layers of formation are exposed to one another, with the borehole as the conductive path. Isolating these layers, or establishing zonal isolation, is key to minimizing the migration of formation fluids between zones or

  

^ Cuttings response to drilling fluids. Cuttings samples were taken from a well in the southern Gulf of Mexico drilled with oil-base mud; these cuttings had not been exposed to water-base mud prior to testing. After cleaning oil from the cuttings surface, Schlumberger laboratory technicians sorted the rock pieces. Three initially identical samples of rock were photographed after receiving a different treatment. Sample A (left) was placed in tap water, Sample B (middle) into a generic lignosulfonate drilling fluid and Sample C (right) was immersed in a glycol-polymer-potassium chloride fluid. Each sample was rolled in a stainless-steel cell in a hot-roll oven for 16 hours at 250°F [121°C] to simulate drilling and transport up the borehole to surface. The sample in tap water, Sample A, was most damaged, and Sample C in the glycol-polymer-potassium chloride fluid was essentially undamaged. The lignosulfonate system generated intermediate damage for Sample B. Drilling with a mud having low inhibition values would be expected to generate borehole instability and washout. In contrast, excellent clay control would be obtained by a more advanced chemistry, such as glycol-polymer-potassium chloride.

to the surface where SCP will develop. Crucial to this process are borehole condition, effective mud removal, and cement-system design for placement, durability and adaptability to the well life cycle.

Wellbore condition depends on many factors, including rock type, formation pressures, local stresses, the type of mud used and drilling operational parameters, such as hydraulics, penetration rate, hole cleaning and fluid-density balance.

The ultimate condition of the borehole is often determined early in the drilling process as drilling mud interacts with newly exposed formation. If mismatched, the interaction of the drilling mud with formation clays can have serious detrimental effects on borehole gauge and rugosity. Once a well is drilled, displacement, cementing and ultimately, zonal-isolation efficiency are dependent on a stable borehole with minimal rugosity and tortuosity.

Mud companies have created high-performance water-base muds that incorporate various polymers, glycols, silicates and amines, or a combination thereof, for clay control. Today, water-base and nonaqueous invert-emulsion fluids account for 90% of all drilling fluids used. The majority, about 70%, are water-base and range from clear water to mud that is highly treated with chemicals.

Drilling fluid engineers and related technical specialists have applied various techniques to investigate rock response to drilling fluid chemistry; these include exposing core samples to

drilling fluids under simulated downhole conditions and physical examination of core and cuttings with scanning electron microscopy.[10] The results are often inconsistent, as drilling fluid selection often is based simply on field history. Many times, particularly in new fields where formation clay chemistry may be unknown, effective field development may hinge on understanding the nature of formation clays as they vary with depth [above].

8. For more on zonal isolation: Abbas R, Cunningham E, Munk T, Bjelland B, Chukwueke V, Fern A, Garrison G, Hollies D, Labat C and Moussa O: "Solutions for Long-Term Zonal Isolation," *Oilfield Review* 14, no. 3 (Autumn 2002): 16–29.

9. Boed A and Pafitis D: "Getting to the Root of Gas Migration," *Oilfield Review* 8, no. 1 (Spring 1996): 36–49.

8. Bourgoyne A, Scott S and Manowski W: "Review of Sustained Casing Pressure Occurring on the OCS," http://www.mms.gov/tarprojects/308/08SCB.pdf (posted April 2000)

9. Wojtanowicz AK and Zhou Q: "New Model of Pressure Reduction to Annulus During Primary Cementing," paper IADC/SPE 59137, presented at the IADC/SPE Drilling Conference, New Orleans, Louisiana, USA, February 23–25, 2000.

10. Parreuzak PA and Savit PH: "Cement Shrinkage and Elasticity: A New Approach for a Good Zonal Isolation," paper SPE 13176, presented at the 58th SPE Annual Technical Conference and Exhibition, Houston, Texas, USA, September 16–18, 1984

11. A microannulus is a small gap between cement and a pipe or a formation. This phenomenon has been documented by running sequential cement bond logs, first with no pressure inside the casing and then with the casing pressured. The bond log clearly indicates that applied pressure often closes a microannulus.

12. Galal M: "Can We Visualize Drilling Fluid Performance Before We Start?" paper SPE 81475, presented at the SPE 13th Middle East Oil Show & Conference, Bahrain, June 9–12, 2000.

D — Even after a flawless cement job, the cement can still be damaged by the routine operation of the well. Also, the mechanical properties of casing and cement vary over time: differential expansion and contraction due to temperature, pressure or vibration can cause the bond between casing and cement to fail.

D


GASLAND

# OILFIELD REVIEW | SCHLUMBERGER







These three drawings illustrate a concern over migration from non-target shallow gas zones through vertical fractures into non-gas-bearing sand formations as a result of poorly bonded cement.

From Mud to Cement—Building Gas Wells



This and previous 2 pages from "From Mud to Cement—Building Gas Wells".



WATSON|BACCHU

# Evaluation of the Potential for Gas and CO$_2$ Leakage Along Wellbores

**Theresa L. Watson**, T.L. Watson & Associates, and **Stefan Bachu**, Alberta Energy Resources Conservation Board[*]

**Summary**

Implementation of carbon dioxide (CO$_2$) storage in geological media requires a proper assessment of the risk of CO$_2$ leakage from storage sites. Leakage pathways may exist through and along wellbores, which may penetrate or be near to the storage site. One method of assessing the potential for CO$_2$ leakage through wells is by mining databases that usually reside with regulatory agencies. These agencies collect data concerning wellbore construction, oil
most likely to leak or have future abandonment liability and if these wellbores will impact CO$_2$-storage schemes adversely in the future. The analysis is based on data for more than 315,000 wells drilled up to the end of 2004 in the province of Alberta.

**Background**

**Potential Wellbore-Leakage Pathways. Figs. 1a and 1b** illustrate typical wellbore-construction and -abandonment profiles for Alberta. From these diagrams, one can identify potential leakage



Fig. 8—Historical levels of drilling activity and SCVF/GM occurrence in Alberta: (a) by year of well spud and (b) by cumulative wells drilled.

> These charts show a correlation of increased well failures over time, by year of well spud, and cumulatively.

Nonroutine-abandonment information includes reported openhole plug failures, re-entry information, and other special abandonment requests and approvals. This information was used to provide a baseline of known wellbore leakage against which potential indicators can be evaluated. **Fig. 8** shows historical drilling activity and occurrence of SCVF in Alberta over the last 100 years, both as a percentage of wells spudded in a given year and as cumulative over time.

Historical documents within the ERCB's archive library were reviewed to determine regulatory changes that may have impacted the potential for wellbore leakage. **Fig. 9** indicates important historical regulatory changes against the occurrence of SCVF/GM in time. The archives were also used to develop an electronic-data table of historical primary-cementing requirements. Actual annular cement-top information was not available within the existing electronic information, and the historical-regulation requirement was used as a default for the cement top in the wellbore. The historical oil price, obtained from public sources and expressed in constant USD, was used as an indicator for the level of economic activity that potentially could have affected drilling, well completion, and well abandonment practices. Because the data mining was performed in 2005 based on the data to the end of 2004, Figs. 8 and 9 do not include the recent increase in oil price and the sustained level of drilling of approximately 20,000 new

wells per year; however, the absence of these very recent data do not affect the conclusions of the study because very few of the newly drilled wells have been abandoned.

Casing-inspection logs that indicated both internal and external corrosion were evaluated against cement-bond logs (or equivalent). Data were collected for analysis on the basis of the existence of both SCVF/GM and casing failure in the same well or on the basis of geographic location in fields known to have a high incidence of SCVF/GM or casing failure. Information on casing and cement condition were recorded against a depth register to determine the effects of cementing on casing corrosion. A smaller subset of these wells (142) had adequate data to conduct full evaluations.

Alberta Environment, the provincial agency responsible for the protection of nonsaline groundwater, maintains and is currently updating a public database that indicates the depth, either in metres or by formation, to which groundwater must be protected. This information was used to determine groundwater depths compared to surface-casing, annular-cement, and casing-failure depths.

**Results**

Various factors were investigated using the assembled database to determine if the potential for leakage could be assessed on the basis of well information that is generally available for a large



> This chart shows a correlation of migration in wells with SCVF with oil price changes, suggesting a trend to less vigilance at times of increased financial pressure.

1. Oil and Gas Act
2. First SC requirements
3. Field cement requirements
4. Update of SC and cementing requirements
5. Update of SC and cementing requirements
6. Intermediate casing
7. Conductor pipe requirements
8. Update of SC requirements for SE Alberta
9. Update of SC requirements for south-central Alberta
10. Cementing guide
11. Update of cementing guide
12. Requirements for GW protection and SCVF checking
13. 10-year inactive well program initiated
14. Well abandonment guide, sour well licensing
15. Requirements for SCVF/GM testing
16. Long Term Liability program replaces 10-year inactive well program
17. Update of allowable gradient for serious SCVF

Fig. 9—Occurrence of SCVF/GM in Alberta in relation to oil price and regulatory changes (SC: surface casing, GW: ground water, WTI: West Texas Intermediate).



WATSON|BACCHU

| TABLE 2—COMPARISON OF SCVF/GM OCCURRENCE IN THE PROVINCE TO THE TEST AREA | | | | |
|---|---|---|---|---|
| | Alberta | Test Area | Percentage in the Test Area | Deviated Wells in the Test Area |
| Total number of wells | 316,439 | 20,725 | 6.5% | 4,580 |
| Wells with SCVF | 12,456 | 1,902 | 15.3% | 1,472 |
| Wells with GM | 1,843 | 1,181 | 64.0% | 1,550 |
| Wells with GM/SCVF | 176 | 116 | 65% | |
| SCVF percentage | 3.9% | 9.2% | – | 32.3% |
| GM percentage | 0.6% | 5.7% | – | 34% |
| Combined percentage | 4.6% | 15.6% | – | 66% |

the occurrence of wellbore leakage. In areas of high well density, well-to-well cross flow may occur and result in a single well leaking to surface through many nearby wellbores. However, this was not supported in the analysis of the test area. One possible reason is that areas with higher well density comprise newer wells that may not have been tested sufficiently or that are cemented better. Because this factor has been reported in other studies, it has been retained as a minor factor for this analysis.

*Topography.* Information about serious SCVFs and GM flows, saline-water flows, and liquid-hydrocarbon flows at wells located in or near river valleys has been reported anecdotally, and in some cases has been well documented, such as in the case of a well in the valley of Peace River in Alberta that discharged brine and natural gas for decades (Bellis et al. 2004). River valleys may facilitate GM and SCVF because of the removal of overburden. This reduction in elevation reduces the available hydrostatic pressure that controls flows to surface. The potentially shallow overpressured gas zones (in comparison to elevation at drill location) pose problems on well control and have a higher potential for GM through cement even in properly cemented wellbores (Gonzalo et al. 2005). However, data analysis did not find a strong correlation between topography and SCVF/GM occurrences.

**Factors Showing Major Impact, Geographic Area.** Fig. 5 indicates a specific test area within the province of Alberta. In the test area, it is required by regulation to conduct GM testing on all wells. Table 2 summarizes the occurrence of SCVF/GM in the entire province compared to the test area. It is not clear if the extra testing requirements in this area result in a greater percentage of leaks being reported or if the occurrence rates are actually higher. It is presumed that the ERCB designated this area for special consideration because of observed problems, and thus, it is likely that the data accurately identify wells in this area as having a higher probability of leakage.

*Wellbore Deviation.* For the purpose of this study, any well with total depth greater than the true vertical depth was considered a deviated or slant well. Wells were investigated within the test area because both SCVF and GM testing is required in this area, hence the data set is more complete. Table 2 and Fig. 11 summarize the data. From these results, it appears that well deviation does not significantly affect whether a well will have GM or SCVF because the occurrence rate is similar. However, the occurrence of GM and SCVF is higher in deviated wells than in vertical wells, indicating that wellbore deviation is a factor affecting overall wellbore leakage. Mechanical aspects such as casing centralization and cement slumping may contribute to the increased incidence of wellbore leakage in deviated wells (Jakobsen et al. 1991).

*Well Type.* Drilled and abandoned wells had reported SCVF/GM leakage-occurrence rates of approximately 0.5%. The overall leakage-occurrence rate reported for all wells, as shown in Fig. 8, is approximately 4.5%. Wells cased and abandoned have an overall leakage-occurrence rate of approximately 14%, with cased wells accounting for more than 98% of all leakage cases reported. This difference may be attributed to more-stringent abandonment requirements for drilled/abandoned wells historically.

Wells cased, completed, and abandoned have another potential leak path inside of the casing because of the perforated, or otherwise-completed, interval (see Fig. 1b).

*Abandonment Method.* The abandonment method in cased and completed wells in Alberta is predominantly bridge plugs capped with cement. Investigations into the security of this abandonment method indicated that overall, bridge plugs held a pressure test of 7000 kPa in 90% of cases investigated in a small sampling of wells re-entered for production purposes. These bridge plugs had been in service for 5 to 30 years. Generally, the cement plug placed on top of the bridge plug was not evident, even though a tour-report review indicated that the cement had been dump bailed on the bridge plug. It is estimated from experience and from this small sample that, over a long period of time (hundreds of years), approximately 10% of these types of zonal abandonments will fail and allow formation gases to enter the wellbore. Other abandonment methods, such as placing a cement plug across completed intervals using a balanced-plug method or setting a cement retainer and squeezing cement through perforations, are expected to have lower failure rates long into the future.

In situations where $CO_2$ may have been injected for storage into depleted producing formations, bridge-plug failures may be higher because of $CO_2$ effects on the elastomers and metal used in the mechanical-plugging device (Schremp and Roberson 1975).

The final barrier to reservoir gases escaping to the overlying soil and the atmosphere is the welded casing cap. From investigations on well re-entry, these caps are highly unreliable. However, the casing cap failures may in fact reduce the risk of overpressuring the surface-casing shoe, uncemented formations, and groundwater aquifers. Small leaks in the cap may act as an early warning that the wellbore integrity has been compromised. These leaks are generally identified as soil GM and are observed as dead vegetation directly above the abandoned wellbore.



Fig. 11—Comparison of the occurrences of SCVF/GM in all the wells in the test area in Alberta (see Fig. 5) and in deviated wells only in the same region.



# DUSSEAULT, GRAY + NAWROCKI
## SPE INTERNATIONAL

This study explores the issue of migration long after a well has ceased production and has been plugged:

"Explanatory mechanisms include channelling, poor cake removal, shrinkage, and high cement permeability. The reason is probably cement shrinkage that leads to circumferential fractures that are propagated upward by the slow accumulation of gas under pressure behind the casing.

SPE 64733

## Why Oilwells Leak: Cement Behavior and Long-Term Consequences

Maurice B. Dusseault, SPE, Porous Media Research Institute, University of Waterloo, Waterloo, Ontario; Malcolm N. Gray, Atomic Energy of Canada Limited, Mississauga, Ontario; and Pawel A. Nawrocki, CANMET, Sudbury, Ontario

Copyright 2000, Society of Petroleum Engineers Inc.

This paper was prepared for presentation at the SPE International Oil and Gas Conference and Exhibition in China held in Beijing, China, 7–10 November 2000.

This paper was selected for presentation by an SPE Program Committee following review of information contained in an abstract submitted by the author(s). Contents of the paper, as presented, have not been reviewed by the Society of Petroleum Engineers and are subject to correction by the author(s). The material, as presented, does not necessarily reflect any position of the Society of Petroleum Engineers, its officers, or members. Papers presented at SPE meetings are subject to publication review by Editorial Committees of the Society of Petroleum Engineers. Electronic reproduction, distribution, or storage of any part of this paper for commercial purposes without the written consent of the Society of Petroleum Engineers is prohibited. Permission to reproduce in print is restricted to an abstract of not more than 300 words; illustrations may not be copied. The abstract must contain conspicuous acknowledgment of where and by whom the paper was presented. Write Librarian, SPE, P.O. Box 833836, Richardson, TX 75083-3836, U.S.A., fax 01-972-952-9435.

## Abstract

Oil and gas wells can develop gas leaks along the casing years after production has ceased and the well has been plugged and abandoned (P&A). Explanatory mechanisms include channelling, poor cake removal, shrinkage, and high cement permeability. The reason is probably cement shrinkage that leads to circumferential fractures that are propagated upward by the slow accumulation of gas under pressure behind the casing. Assuming this hypothesis is robust, it must lead to better practice and better cement formulations

## Introduction, Environmental Issues

This discussion is necessarily superficial, given the complexity of the issue and attendant practical factors such as workability, density, set retardation, mud cake removal, entrainment of formation gas, shale sloughing, pumping rate, mix consistency, and so on. A conceptual model will be developed in this article to explain slow gas migration behind casing, but we deliberately leave aside for now the complex operational issues associated with cement placement and behavior.

In 1997, there were ~35,000 inactive wells in Alberta alone, tens of thousands of abandoned and orphan wells[1], plus tens of thousands of active wells. Wells are cased for environmental security and zonal isolation. In the Canadian heavy oil belt, it is common to use a single production casing string to surface (Figure 1); for deeper wells, additional casing strings may be necessary, and surface casing to isolate shallow unconsolidated sediments is required. As we will see, surface casings have little effect on gas migration, though they undoubtedly give more security against blowouts and protect shallow sediments from mud filtrate and pressurization.

To form hydraulic seals for conservation and to isolate deep strata from the surface to protect the atmosphere and shallow groundwater sources, casings are cemented using water-cement slurries. These are pumped down the casing, displacing drilling fluids from the casing-rock annulus, leaving a sheath of cement to set and harden (Figure 1). Casing and rock are prepared by careful conditioning using centralizers, mudcake scrapers, and so on. During placement, casing is rotated and moved to increase the sealing effectiveness of the cement grout. Recent techniques to enhance casing-rock-cement sealing may include vibrating the casing, partial cementation and annular filling using a small diameter tube.

Additives may be incorporated to alter properties, but Portland Class G (API rating) oil well cement forms the base of almost all oil well cements.[1] Generally, slurries are placed at densities about 2.0 Mg/m$^3$, but at such low densities will shrink and will be influenced by the elevated pressures (10–70 MPa) and temperatures (35 to >140°C) encountered at depth.

The consequences of cement shrinkage are non-trivial: in North America, there are literally tens of thousands of abandoned, inactive, or active oil and gas wells, including gas storage wells, that currently leak gas to surface. Much of this enters the atmosphere directly, contributing slightly to greenhouse effects. Some of the gas enters shallow aquifers, where traces of sulfurous compounds can render the water non-potable, or where the methane itself can generate unpleasant effects such as gas locking of household wells, or gas entering household systems to come out when taps are turned on.

Methane from leaking wells is widely known in aquifers in Peace River and Lloydminster areas (Alberta), where there are anecdotes of the gas in kitchen tap water being ignited. Because of the nature of the mechanism, the problem is unlikely to attenuate, and the concentration of the gases in the shallow aquifers will increase with time.

This implies that current standards for oilwell cementing and P&A are either not well founded, or the criteria are based on a flawed view of the mechanism. This is not a condemnation of industry: all companies seek to comply with standards.[1] Nevertheless, we believe that the AEUB Interim Directive 99-03[1] is flawed with respect to gas leakage around casings. To rectify this, the mechanisms must be identified correctly. Practise can then be based on correct physical mechanisms, giving a better chance of success (though we do not believe

# GASLAND

# DUSSEAULT, GRAY + NAWROCKI
## SPE INTERNATIONAL

"Strength is not the major issue in oil well cementing under any circumstances... cement cannot resist the shear that is the most common reason for oil well distortion and rupture during operation..."

SPE 64733                                   WHY OILWELLS LEAK                                   3

**Cement Strength and Rigidity.** API standards for oilwell cement specify certain strength criteria. Strength is not the major issue in oil well cementing under any circumstances. Based on extensive modelling, cement clearly cannot resist the shear that is the most common reason for oilwell distortion and rupture during service production.[13] If compaction or heave (from solids injection) is taking place, the cement itself provides minimal resistance to buckling (compression) or thread popping (tension). If the annulus could be filled with relatively dense sand, the resistance to shear would be better than current ordinary oilwell cement formulations.

Based on over 50 triaxial tests at various confining stresses, we have shown that 28-day cured oilwell cements are contractile (volume reduction during shear) at all confining stresses above 1 MPa (150 psi). This is also the case for 70% silica flour cements, and for the new products based on extremely finely ground cement. (Specimens were cured under water at 20°C or at 90°C.) However, dense concretes used in Civil Engineering are dilatant, and therefore resistant to shear, at all working stresses.

The stiffness modulus of typical oilwell cement is small compared to that of low porosity rocks, and vastly lower than that of steel.[14] The stiffness moduli are roughly 2-4% that of steel, though there is a wide range depending on density, content, and confining stress. Depending on depth (~stress) and induration (~porosity), rock moduli may vary from 2% to 50% of steel, and a reasonable value is 5-15% in most intermediate cases of moderate porosity (10-20%).

**Bond.** Cement will not bond to salt, oil sand, high porosity shale, and perhaps other materials. Also, bond strength (i.e. the tensile resistance of the cement-rock interface) is quite small; in fact, the tensile strength of carefully mixed and cured oilwell cement at recommended formulations is generally less than 1-2 MPa. Given that fluid pressures of 10's of MPa may have to be encountered, given that pressure cycling of a well can easily debond the rock and cement (there is strain incompatibility because of the different stiffnesses), and given that de-bonding is generally a fracturing process with a sharp leading edge rather than a conventional tensile pull-apart process, a large cement bond to rock cannot be assumed in any reasonable case. Initiation and growth of a circumferential fracture ("micro-annulus") at the casing-rock interface will not be substantially impeded by a cohesive strength at this interface.

The presence of "good bond" on a cement bond log is in fact not an indicator of bond, but an indicator of intergranular contact maintained by a sufficient radial effective stress. The lack of bond on a bond log is actually evidence of the inability to transmit high frequency sonic impulses because of the presence of an "open zone", that is, a circumferential fracture that is open by at least a few microns. Thus, maintaining "bond" actually means maintaining effective radial stress. Note that if effective radial stress cannot be maintained, then hydraulic fracturing conditions must exist at the interface.

## The Gas Leakage Model
A good conceptual model must explain the following typical aspects of oilwell behavior that are observed in practice.

- Generally there are no open circumferential fractures detectable after a typical good quality cement job ("good bond" is observed on the log traces).
- Such fractures develop over time and with service.
- Even in cases where bond appears reasonable over substantial sections of the casing, gas leakage may be evidenced some years or decades later.
- The process is invariably delayed; thus, there must be physically reasonable rate-limiting processes.
- The gas often appears at surface rather than being pressure injected into another porous stratum encountered in the stratigraphic column.
- The presence of surface casing provides no assurance against gas leakage.

Whereas we do not deny that mud channeling, poor mud cake removal, gas channeling, and so on can occur in isolated cases, we believe that a better hypothesis exists to rationally explain the points listed above.

Figure 2 shows the effect of shrinkage on near-wellbore stresses. (Plots are schematic, but have been confirmed by numerical modeling, to be published later.) Initially, cement pressure $p_c(z) \approx \gamma_c \cdot z$, almost always higher than $p_o$, but lower than $\sigma_{hmin}$ (lateral minimum total stress). Set occurs and a small amount of shear stress develops between the rock and the cement; then, hydrostatic pressure in the cement is no longer transmitted along the annulus. Thereafter, even minor shrinkage (~0.1-0.2%) will reduce the radial stress ($\sigma_r = \sigma'_r + p_o$) between cement and rock because rock is stiff (4-20 GPa for softer rocks), and small radial strains (0.001-0.003) cause relaxation of $\sigma_r$ and increase in $\sigma_\theta$. A condition of $p_o > \sigma_r$ ($\sigma_3$) is reached; i.e. the hydraulic fracture criterion. A circumferential fracture (i.e. $\perp$ to $\sigma_3 = \sigma_r$), typically no wider than 10-20 µm, develops at the rock-cement interface.

A thin fracture aperture is sufficient to appear as "loss of bond" in a geophysical bond log. Because in situ stresses are always deviatoric (e.g. $\sigma_{hmin} \neq \sigma_{HMAX}$), bond loss will usually appear first on one side of the trace, or on two opposite sides (direction of $\sigma_{hmin}$). Wells that have experienced several pressure or thermal cycles will almost always show loss of bond, sometimes for vertical distances in excess of 100 m.

A zone of $p_o > \sigma_r$ ($\sigma_3$) can extend for considerable heights. Nevertheless, this is still not a mechanism for vertical growth. To understand vertical growth, consider Figure 3, where a hypothetical case is presented. The static circumferential fracture of length L is filled with formation water of density $\gamma_w$, giving a gradient of about 10.5 kPa/m for typical oilfield brine, but the gradient of lateral stress ($\partial\sigma_h/\partial z$) is generally on the order of 18-24 kPa/m. This means that if the fracture contains a fluid pressure sufficient to just keep it open at the bottom, there is an excess pressure at the upper tip equal to ~L·(21-10.5) = about 10 kPa/m, in typical Alberta conditions, for example. Thus, because of the imbalance between the pressure gradient in the fracture and the stress gradient in the

"The presence of surface casing provides no assurance against gas leakage."







In this slide presentation, loss of well integrity is recognized as a ubiquitous and common problem.

20% of catastrophic well failures are due to loss of well bore integrity.



# [COLORADO OIL AND GAS CONSERVATION COMMISSION]

COGCC

**2010 REPORT TO THE**

WATER QUALITY CONTROL COMMISSION
and
WATER QUALITY CONTROL DIVISION
of
THE COLORADO DEPARTMENT OF
PUBLIC HEALTH AND ENVIRONMENT

by
THE COLORADO OIL AND GAS CONSERVATION COMMISSION

---

provides quarterly reports on the status of the seep remediation and these status reports are available on the COGCC website (www.cogcc.state.co.us) under Library, Piceance Basin. The low-flow air sparge system designed to remediate shallow ground water contaminated with benzene, toluene, ethylbenzene, and total xylenes (BTEX), continues to decrease concentrations and areal extent of these compounds in the impacted area. The concentration and areal extent of thermogenic methane in the ground water in the impacted area also continues to decrease although at a lower rate than the BTEX compounds. There were no detections of BTEX compounds in any West Divide Creek surface water sample locations in 2010.

### DeBeque Orphan Natural Gas and Oil Wells – Mesa County

The COGCC identified 11 orphaned natural gas or oil wells in Mesa County during 2010. Orphaned natural gas or oil wells are those for which the operators have gone out of business and no current operator of the wells can be located. Historic records were located for some of the orphaned natural gas wells indicating that they were drilled in 1911. Others are believed to have been drilled in the mid-1920's. Seven of the orphaned wells identified are discharging produced water to the ground surface from the surface casing; and water is flowing into nearby drainages, ditches or water features from four of those wells.

The COGCC has successfully plugged and abandoned one of the seven wells so that it is no longer discharging produced water. An attempt to plug and abandon a second orphan well was not successful because surface casing could not be located before the limits of the excavator were reached. The scope of work required to plug and abandon this orphan well exceeded that anticipated and funded. Funding from the COGCC emergency response appropriation will be used to plug this well and one of the others. The plugging and abandonment of the remaining orphan wells will be prioritized based on potential risk and impact to the environment, including ground and surface water resources, and public health and safety. Plugging and abandonment of these wells will proceed as time and funding allows.

### Northeast Colorado

#### Oil and Gas E&P Activity

Oil and gas activity in the northeastern portion of the state remains high, although overall numbers of new permits are lower than previous years. In general this reflects the slowdown related to low natural gas prices. In 2010, approximately 38% of the total number of well permits approved by the COGCC was issued to operators in Weld County (Wattenberg Field), which has the largest number of active wells in the State. Smaller oil and gas fields with lower levels of activity are located in other counties throughout northeast Colorado. In 2010 approximately 172 billion cubic feet (BCF) of gas were produced in northeast Colorado (approximately 16% of the total gas production for the State) and 13 million barrels (bbls) of crude oil were produced (approximately 65% of the total crude oil production for the State).

#### Public Involvement

COGCC staff continues to receive and follow-up on complaints from the Weld County Department of Public Health & Environment, Tri-County Health Department, Larimer County Environmental Advisory Board, Morgan County Office of Emergency Management, Northeast Colorado Health Department, other municipalities, and the public throughout northeastern Colorado.

17

Orphaned wells — wells that have been abandoned by their owners/operators and are no longer productive — are a migration pathway to aquifers and the surface.

Often, the original operator of a well is long gone, and there are insufficient funds to remediate these sources of contamination.

It is estimated that there are 35,000 abandoned wells in New York State. The locations of many are unknown.





In cooperation with the Wyoming Department of Environmental Quality

# Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming, April and May 2012

Data Series 718

**U.S. Department of the Interior**
**U.S. Geological Survey**

# Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming, April and May 2012

By Peter R. Wright, Peter B. McMahon, David K. Mueller, and Melanie L. Clark

In cooperation with the Wyoming Department of Environmental Quality

Data Series 718

**U.S. Department of the Interior**
**U.S. Geological Survey**

**U.S. Department of the Interior**
KEN SALAZAR, Secretary

**U.S. Geological Survey**
Marcia K. McNutt, Director

U.S. Geological Survey, Reston, Virginia: 2012

For more information on the USGS—the Federal source for science about the Earth, its natural and living resources, natural hazards, and the environment, visit http://www.usgs.gov or call 1–888–ASK–USGS.

For an overview of USGS information products, including maps, imagery, and publications, visit http://www.usgs.gov/pubprod

To order this and other USGS information products, visit http://store.usgs.gov

Any use of trade, firm, or product names is for descriptive purposes only and does not imply endorsement by the U.S. Government.

Although this information product, for the most part, is in the public domain, it also may contain copyrighted materials as noted in the text. Permission to reproduce copyrighted items must be secured from the copyright owner.

Suggested citation:
Wright, P.R., McMahon, P.B., Mueller, D.K., Clark, M.L., 2012, Groundwater-quality and quality-control data for two monitoring wells near Pavillion, Wyoming, April and May 2012: U.S. Geological Survey Data Series 718, 26 p.

# Contents

Abstract.................................................................................................................................1
Introduction...........................................................................................................................1
    Description of Study Area..............................................................................................2
    Purpose and Scope........................................................................................................2
Methods.................................................................................................................................2
    Sampling Design............................................................................................................2
    Sample Collection at Monitoring Well MW01...............................................................4
    Redevelopment of Monitoring Well MW02 and Collection of Associated Quality-Control
        Samples...................................................................................................................10
    Analytical Methods.......................................................................................................10
    Quality-Control Sample Collection and Data Analysis.................................................10
        Blank Samples.........................................................................................................10
        Laboratory Spike Samples......................................................................................10
        Replicate Samples...................................................................................................11
        Major-Ion Balances.................................................................................................11
Groundwater-Quality Data...................................................................................................11
    Monitoring Well MW01.................................................................................................12
        Field Water-Quality Properties and Hydrologic Data Measured During the Well
            Purge..................................................................................................................12
        Field Water-Quality Properties and Inorganic and Radioactive Constituents.........12
        Organic Constituents...............................................................................................20
        Dissolved Gasses.....................................................................................................20
        Isotopes and Environmental Tracers.......................................................................23
        Quality-Control Results for Monitoring Well MW01................................................23
    Quality-Control Results for Monitoring Well MW02.....................................................23
References Cited...................................................................................................................25
Appendix 1. Monitoring Well MW01 field notes—Field instrument calibration notes,
    general project notes, groundwater-quality notes for samples 1 and 2, alkalinity/acid
    neutralizing capacity titration field notes and results (figures 1.1.1–1.3.2).....................link
Appendix 2. Monitoring Well MW01 laboratory-related documents—Analytical Services
    Request forms, Chain of Custody records (figures 2.1.1–2.9.7)..........................................link
Appendix 3. Monitoring Well MW01 photographs (figures 3.1–3.1.6)........................................link
Appendix 4. Monitoring Well MW02 field notes—Groundwater-quality and field notes for
    collection of samples related to work at this well (figures 4.1–4.2)..................................link
Appendix 5. Monitoring Well MW02 laboratory-related documents—Analytical Services
    Request forms, Chain of Custody records (figures 5.1.1–5.2.4)..........................................link
Appendix 6. Monitoring Well MW02 photographs (figures 6.1–6.6)..........................................link
Appendix 7. Tentatively identified compounds quantified in environmental and quality-control
    samples collected for monitoring well MW01 near Pavillion, Wyoming...........................link

iv

## Figures

1.  Location of monitoring wells MW01 and MW02 near the town of Pavillion, Wyoming....3
2.  Graphs showing water level, specific conductance, and pH measured during purge of monitoring well MW01 and beginning of collection of environmental samples 1 and 2.........................................................................................13

## Tables

1   Stabilization criteria and calibration guidelines for field water-quality properties...........4
2   Environmental and quality-control samples collected for monitoring wells MW01 and MW02 near Pavillion, Wyoming, April and May 2012 .............................................5
3   Analyses conducted on environmental and quality-control samples collected for monitoring wells MW01 and MW02 near Pavillion, Wyoming, April and May 2012.........6
4.  Field water-quality properties measured during purge of monitoring well MW01 near Pavillion, Wyoming, April 2012 ........................................................................8
5.  Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012...................14
6.  Inorganic constituents in quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming, April 2012......................................................... link
7.  Organic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012......................................................... link
8.  Organic constituents in quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming, April 2012......................................................... link
9.  Dissolved gasses in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.........................................................21
10. Dissolved gasses in quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming, April 2012......................................................... link
11. Isotopes and environmental tracers in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.................................24
12. Inorganic constituents in quality-control samples collected for monitoring well MW02 near Pavillion, Wyoming, May 2012 .......................................................... link
13. Organic constituents in quality-control samples collected for monitoring well MW02 near Pavillion, Wyoming, May 2012 .......................................................... link
14. Dissolved gasses in quality-control samples collected for monitoring well MW02 near Pavillion, Wyoming, May 2012.......................................................... link

v

# Conversion Factors

Inch/Pound to SI

| Multiply | By | To obtain |
|---|---|---|
| Length | | |
| foot (ft) | 0.3048 | meter (m) |
| Volume | | |
| gallon (gal) | 3.785 | liter (L) |
| Flow rate | | |
| gallon per minute (gal/min) | 0.06309 | liter per second (L/s) |
| gallon per hour (gal/h) | 3.785 | liter per hour (L/h) |
| Concentration | | |
| part per million (ppm) | 1.0 | milligram per liter (mg/L) |
| part per billion | 1.0 | microgram per liter (µg/L) |

Temperature can be converted to degrees Fahrenheit (°F) or degrees Celsius (°C) as follows:
°F=(1.8×°C)+32
°C=(°F-32)/1.8

Horizontal coordinate information is referenced to the North American Datum of 1983 (NAD 83).

Specific conductance is given in microsiemens per centimeter at 25 degrees Celsius (µS/cm at 25 °C).

Concentrations of most chemical constituents in water are given either in milligrams per liter (mg/L) or micrograms per liter (µg/L).

vi

## Abbreviations

| | |
|---|---|
| > | greater than |
| < | less than |
| ≤ | less than or equal to |
| ± | plus or minus |
| ASR | Analytical Services Request (U.S. Geological Survey) |
| bls | below land surface |
| $\delta^{13}C$ | ratio of carbon-13 to carbon-12 isotopes in the sample relative to the ratio in a reference standard |
| CFC | chlorofluorocarbon |
| COC | chain-of-custody |
| DRO | diesel-range organics |
| GRO | gasoline-range organics |
| $^3H$ | tritium (hydrogen-3) |
| $\delta^2H$ | ratio of hydrogen-2 to hydrogen-1 isotopes in the sample relative to the ratio in a reference standard |
| $^3He$ | ratio of helium-3 to helium-4 isotopes in the sample relative to the ratio in a reference standard |
| $^3He$ | helium-3 |
| $^4He$ | helium-4 |
| HCl | hydrochloric acid |
| NWIS | National Water Information System (U.S. Geological Survey) |
| NWQL | National Water Quality Laboratory (U.S. Geological Survey) |
| PAHs | polycyclic aromatic hydrocarbons |
| QC | quality control |
| RPD | relative percent difference |
| SAP | sampling and analysis plan (U.S. Geological Survey) |
| SC | specific conductance |
| $SF_6$ | sulfur hexafluoride |
| SVOC | semivolatile organic compound |
| TICs | tentatively identified compounds |
| USEPA | U.S. Environmental Protection Agency |
| USGS | U.S. Geological Survey |
| VOC | volatile organic compound |
| WDEQ | Wyoming Department of Environmental Quality |

# Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming, April and May 2012

By Peter R. Wright, Peter B. McMahon, David K. Mueller, and Melanie L. Clark

## Abstract

In June 2010, the U.S. Environmental Protection Agency installed two deep monitoring wells (MW01 and MW02) near Pavillion, Wyoming, to study groundwater quality. During April and May 2012, the U.S Geological Survey, in cooperation with the Wyoming Department of Environmental Quality, collected groundwater-quality data and quality-control data from monitoring well MW01 and, following well redevelopment, quality-control data for monitoring well MW02. Two groundwater-quality samples were collected from well MW01—one sample was collected after purging about 1.5 borehole volumes, and a second sample was collected after purging 3 borehole volumes. Both samples were collected and processed using methods designed to minimize atmospheric contamination or changes to water chemistry. Groundwater-quality samples were analyzed for field water-quality properties (water temperature, pH, specific conductance, dissolved oxygen, oxidation potential); inorganic constituents including naturally occurring radioactive compounds (radon, radium-226 and radium-228); organic constituents; dissolved gasses; stable isotopes of methane, water, and dissolved inorganic carbon; and environmental tracers (carbon-14, chlorofluorocarbons, sulfur hexafluoride, tritium, helium, neon, argon, krypton, xenon, and the ratio of helium-3 to helium-4). Quality-control sample results associated with well MW01 were evaluated to determine the extent to which environmental sample analytical results were affected by bias and to evaluate the variability inherent to sample collection and laboratory analyses. Field documentation, environmental data, and quality-control data for activities that occurred at the two monitoring wells during April and May 2012 are presented.

## Introduction

Groundwater is the primary source of domestic water supply for the town of Pavillion, Wyoming, and its rural residential neighbors. On December 8, 2011, the U.S. Environmental Protection Agency (USEPA) released the draft report *Investigation of Ground Water Contamination near Pavillion, Wyoming* (U.S. Environmental Protection Agency, 2011) for public review. The report described and interpreted data collected for two USEPA monitoring wells from 2010 to 2011, and indicated that groundwater may contain chemicals associated with gas production practices. The Wyoming Department of Environmental Quality (WDEQ) wanted additional groundwater-quality samples collected from these USEPA monitoring wells and discussed this need with the U.S. Geological Survey (USGS) Wyoming Water Science Center. The monitoring wells are identified as wells MW01 and MW02. During April and May 2012, the USGS, in cooperation with the WDEQ, collected groundwater-quality and associated quality-control (QC) data from monitoring well MW01, and redeveloped and collected QC data from monitoring well MW02.

Both USEPA monitoring wells were installed during the summer of 2010 as part of a multi-phase investigation of groundwater quality in the Pavillion area (U.S. Environmental Protection Agency, 2011). Well MW01 was completed to a depth of 785 feet (ft) below land surface (bls) and well MW02 was completed to a depth of 980 ft bls. Both wells have a 20-ft screened interval. A dedicated submersible 3-horsepower pump was installed in each well. Detailed construction information for both wells is presented in the USEPA report (U.S. Environmental Protection Agency, 2011).

Well MW01 was purged and sampled by the USGS and USEPA on April 24, 2012. Only data collected by the USGS are presented in this report. The USGS collected two groundwater-quality (environmental) samples from well MW01—one sample was collected after purging about 1.5 borehole volumes of water from the well, and a second sample was collected after purging 3 borehole volumes. QC samples were collected in conjunction with both environmental samples from well MW01.

Using well hydraulic data collected in 2011, the USEPA estimated a yield of about 1 gallon per hour, or about 0.017 gallon per minute from well MW02 (U.S. Environmental Protection Agency, oral commun., 2012). Because of low yield, resulting in long recovery or purge times relative to the standard procedures and recommendations given in the

USGS National Field Manual (U.S. Geological Survey, variously dated), well MW02 was redeveloped by the USGS in an attempt to increase well yield. A description of the USGS efforts to redevelop well MW02 during the week of April 30, 2012, is provided in the *Sampling and Analysis Plan for the Characterization of Groundwater Quality in Two Monitoring Wells near Pavillion, Wyoming* (SAP) (Wright and McMahon, 2012). After well MW02 was redeveloped, well yield data were collected by the USEPA with assistance from the USGS. These data are described in the USGS SAP (Wright and McMahon, 2012). Well yield was not increased as a result of the redevelopment effort; consequently, well MW02 was not sampled for this study. Nevertheless, QC samples were collected to characterize water added to well MW02 during redevelopment, and to ensure that a downhole camera used to examine the well screen was clean. Analytical results for the QC samples associated with redevelopment of well MW02 are presented in this report.

## Description of Study Area

The study area is in Fremont County near the town of Pavillion, Wyoming (fig. 1). This small, sparsely populated agricultural community of 231 people (U.S. Census Bureau, 2010) is composed primarily of large-acreage irrigated farms. Natural-gas development began in the area northeast of Pavillion in the early 1960s, increased in the 1980s, and in recent years has increased again, under a succession of different owner-operators (James Gores and Associates, 2011). The town of Pavillion and rural households in the area obtain their water supply from wells installed in the areally extensive, Tertiary-age (Eocene) Wind River Formation (James Gores and Associates, 2011) that underlies the town and adjacent areas.

## Purpose and Scope

The purposes of this report are to present (1) the analytical results for groundwater-quality samples collected from USEPA well MW01 during April 2012; (2) analytical results for QC samples collected in association with sampling of well MW01 during April 2012; and (3) analytical results for QC samples collected in association with USGS redevelopment of USEPA well MW02 during May 2012. Methods used to collect and analyze the groundwater-quality and QC samples are described in the Methods section. Groundwater-quality samples were analyzed for field water-quality properties (water temperature, pH, specific conductance, dissolved oxygen, oxidation potential); inorganic constituents including naturally occurring radioactive compounds (radon, radium-226 and radium-228); organic constituents; dissolved gasses; stable isotopes of methane, water, and dissolved inorganic carbon; and environmental tracers [carbon-14, chlorofluorocarbons (CFCs), sulfur hexafluoride ($SF_6$), tritium ($^3H$), helium, neon, argon, krypton, and xenon , and ratio of helium-3 to helium-4 isotopes in the sample relative to the ratio in a reference standard ($\delta^3He$)].

## Methods

Samples collected during this study included two groundwater-quality samples from well MW01, several QC samples associated with well MW01, and two QC samples related to the redevelopment of well MW02. A brief description of the sampling design and sample collection at well MW01, the collection of QC samples related to well MW02 redevelopment, and methods used for laboratory and quality-control analyses are presented in this section.

### Sampling Design

Groundwater-quality and QC samples were collected and processed using procedures described in the *Sampling and Analysis Plan for the Characterization of Groundwater Quality in Two Monitoring Wells near Pavillion, Wyoming* (SAP) (Wright and McMahon, 2012). A brief summary of the field sampling design described in the SAP is provided in this section.

Collection of two sets of groundwater-quality samples was planned for well MW01. The first sample set (environmental sample 1) was to be collected after one borehole volume of water was purged from the well. For this study, a borehole volume is defined as the wetted volume of unscreened casing plus the borehole volume throughout the screened interval, but excluding the volume of prepacked sand adjacent to the screened interval. An example of how the borehole volume was calculated is included in Wright and McMahon (2012). Sample collection also was contingent on stabilization of water temperature, specific conductance (SC), and pH of the water in successive field measurements. Stabilization of these properties was evaluated on the basis of the variability of five consecutive measurements made during a period of about 20 minutes at regularly timed intervals (Wilde, variously dated) (table 1). Water-quality properties are listed in table 1 (water temperature, SC, pH, dissolved oxygen, turbidity, and oxidation-reduction potential) that regularly are collected during groundwater sampling. Based on data USEPA had collected from well MW01, including low dissolved oxygen concentrations and excessive degassing in the sampling line, measurements of three of the properties (dissolved oxygen, turbidity, and oxidation-reduction potential) were thought to be less reliable than measurements of temperature, SC, and pH; therefore, the properties of dissolved oxygen, turbidity, and oxidation-reduction potential were not used as stabilization criteria. The second sample set (environmental sample 2) was to be collected after removal of three borehole volumes of water; sample collection was contingent on meeting the stabilization criteria for the same three field water-quality properties. In addition to the environmental samples, many different types of QC samples were proposed for the study. Three blank samples were scheduled to be collected before the well purge began (a source-solution blank, ambient blank, and a field blank), three replicate QC

**Figure 1.** Location of monitoring wells MW01 and MW02 near the town of Pavillion, Wyoming.

**4    Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming, April and May 2012**

samples were scheduled to be collected with each environmental sample (a replicate, matrix spike, and matrix-spike duplicate), and a trip blank traveled with sample bottles at all times. These QC sample types are defined in the SAP (Wright and McMahon, 2012).

## Sample Collection at Monitoring Well MW01

On April 23 and 24, 2012, the USGS collected several blank samples, two groundwater-quality (environmental) samples, and several QC samples from monitoring well MW01 (table 2.) The USGS 15-digit site number and the date and time each sample was collected are shown in table 2. Sample collection generally followed the sampling design described in the SAP (Wright and McMahon, 2012), with a few modifications as described in this section. Documentation of field activities at monitoring well MW01 including field instrument calibration notes, general project notes, groundwater-quality notes for samples 1 and 2, purge logs, and alkalinity/acid-neutralizing capacity titration field notes are included in appendix 1 (figs. 1.1-1.4). As planned, three QC samples (source-solution blank, ambient blank, and field blank) were collected before beginning the well purge.

USEPA personnel measured the water level in well MW01 before and during the well purge using a sonic water-level meter. USEPA personnel also measured the pumping rate during the well purge. The pumping rate was measured using a flow meter and was verified using a bucket and a stopwatch.

Collection of environmental sample 1 and the associated QC samples was intended to begin after one borehole volume of water was purged from the well. Once a sufficient volume had been purged, sample collection started as soon as values for both SC and pH met stabilization criteria (table 1). The stabilization criterion for temperature was not used because the water line was exposed to solar heating and air temperature, so by the time water temperature was measured it was not a good indication of conditions in the well. Turbidity was not a stabilization criterion, and a turbidity sensor was not included on the multiparameter water-quality instrument. Only two turbidity measurements were made (sample aliquots collected from the sample discharge line and turbidity measured with a HACH 2100P meter; Hach Chemical Company, 2008) and noted on the purge log; both were very low, and were similar to each other. Values of SC met the criterion only briefly, but by then sampling had begun. Because it took longer for field water-quality properties of SC and pH to reach stability (based on criteria in table 1), collection of environmental sample 1 and associated QC samples actually began after about 1.5 borehole volumes had been purged from well MW01.

**Table 1.**   Stabilization criteria and calibration guidelines for water-quality properties (modified from Wilde, variously dated).

[±, plus or minus value shown; °C, degrees Celsius; ≤, less than or equal to value shown; µS/cm, microsiemens per centimeter at 25°C; >, greater than shown; NA, not applicable; NTRU, nephelometric turbidity ratio units; <, less than value shown; mg/L, milligrams per liter]

| Water-quality property | Stabilization criteria[1] (variability should be within value shown) | Calibration guidelines |
|---|---|---|
| **Temperature:** | | Calibrate annually, check calibration quarterly. |
| Thermistor | ±0.2°C | |
| **Specific conductance (SC):** | | Calibrate each morning and at end of each day. Check calibration at each additional site; recalibrate if not within 3 to 5 percent of standard value. |
| for ≤100 µS/cm at 25°C | ±5 percent | |
| for >100 µS/cm at 25°C | ±3 percent | |
| **pH:** | ±0.1 standard pH units. | Calibrate each morning and at end of each day. Check calibration at each additional site; recalibrate if not within 0.05 pH units of standard . |
| (displays to 0.01 standard units) | Allow ±0.3 pH units if drifting persists. | |
| **Dissolved oxygen:** | NA[2] | Calibrate each morning and at end of each day. If electrode uses a Teflon® membrane, inspect electrode for bubbles under membrane at each sample site; replace if necessary. |
| Amperometric or optical/ luminescent-method sensors | | |
| **Turbidity:** | NA[2] | Calibrate with a primary standard on a quarterly basis. Check calibration against secondary standards (HACH GELEX) each morning and at end of each day; recalibrate if not within 5 percent. |
| **Oxidation-reduction potential** | NA[2] | Check against Zobell's solution each morning and at end of each day. Recalibrate if not within ±5 millivolts. |

[1]Allowable variation between five or more sequential field measurements.

[2]These field-measured properties were not used in this study as stabiliization criteria. However, the following criteria were still considered while evaluating other properties: for dissolved oxygen, ±0.2 to ±0.3 mg/L; for turbidity, ±0.5 NTRU or 5 percent of the measured value, whichever is greater when <100 NTRU; oxidation-reduction potential was not used as a stabilzation criterion; however, this property can provide useful information for groundwater studies.

**Table 2.**   Environmental and quality-control samples collected for monitoring wells MW01 and MW02 near Pavillion, Wyoming, April and May 2012.

[USGS, U.S. Geological Survey; NWQL, National Water Quality Laboratory; IBW, inorganic free blank water; OWB, organic free blank water]

| Sample | Sample collection date | Type of water | Assigned sample time |
|---|---|---|---|
| Well MW01 (431525108371901) | | | |
| Source-solution blank | 4/23/2012 | USGS NWQL certified IBW and OBW | 2000 |
| Ambient blank | 4/24/2012 | USGS NWQL certified IBW and OBW | 0800 |
| Field blank | 4/24/2012 | USGS NWQL certified IBW and OBW | 0830 |
| Primary environmental sample 1 | 4/24/2012 | Environmental water | 1330 |
| Sample 1 replicate | 4/24/2012 | Environmental water | 1331 |
| Matrix spike | 4/24/2012 | Environmental water | 1332 |
| Matrix-spike duplicate | 4/24/2012 | Environmental water | 1333 |
| Trip blank | 4/24/2012 | Laboratory-prepared blank water | 1334 |
| Primary environmental sample 2 | 4/24/2012 | Environmental water | 1830 |
| Sample 2 replicate | 4/24/2012 | Environmental water | 1831 |
| Well MW02 (431511108354101) | | | |
| Riverton development water | 5/1/2012 | City of Riverton public-supply system water | 1000 |
| Trip blank | 5/1/2012 | Laboratory-prepared blank water | 1004 |
| Camera blank | 5/1/2012 | USGS NWQL certified IBW and OBW | 1700 |

In addition to collection of environmental sample 1, all the planned QC samples (replicate, matrix spike, and matrix-spike duplicate samples) were collected. Laboratory analyses for each sample are listed in table 3. Sample collection was sequential; collecting a full set of containers for each analytical method—first, the environmental sample was collected; then, the replicate sample was collected; finally, the matrix spike and matrix-spike duplicate were collected. All water samples sent to the TestAmerica, Eberline, Woods Hole Oceanographic Institute, and USGS Tritium laboratories were collected inside a sampling chamber (a polyvinyl chloride frame with a clear plastic bag mounted inside, reducing sample exposure to airborne contamination sources) located within a mobile water-quality laboratory. The sample for analysis of the ratio of carbon-13 to carbon-12 isotopes ($\delta^{13}C$) of dissolved inorganic carbon, sent to the USGS Reston Stable Isotopes laboratory, also was collected inside the sampling chamber. After these samples were collected, dissolved gas, radon, remaining isotopes, and environmental tracer samples were collected outside of the mobile laboratory next to the well head. For each of these analyses, different sampling equipment was required such that the sampling chamber in the mobile laboratory could not be used; however, airborne contamination sources were not a concern. The SAP provides additional information on collection of these types of samples (Wright and McMahon, 2012).

All matrix spike and matrix-spike duplicate samples were spiked at the laboratory. Analytical Services Request (ASR) forms and chain-of-custody (COC) records are presented in appendix 2 (figs. 2.1–2.9). Photographs of groundwater-sampling activities are presented in appendix 3 (figs. 3.1–3.16).

Samples for analysis of some organic constituents were collected in duplicate with one set of bottles preserved with hydrochloric acid (HCl) and a second bottle set unpreserved. Field data collected by the USEPA during previous investigations of well MW01 indicated the pH of the groundwater would be greater than 11. Samples for volatile organic compounds (VOCs), gasoline-range organics (GRO), and some of the hydrocarbon gasses [ethane, ethylene, methane, and propane analyzed by USEPA method RSKSOP-175 (U.S. Environmental Protection Agency, 1994)] commonly are preserved by adding HCl to each sample container at the time of sample collection to lower the pH to less than 2, thus extending the sample holding time (time before a sample must be analyzed by a laboratory). Because HCl reactions within these samples potentially could cause gas loss resulting in a decrease in constituent recoveries, two bottle sets were sequentially collected for VOCs, GRO, and hydrocarbon gasses. One set of bottles was preserved with HCl at the time of collection and the second bottle set was left unpreserved.

Collection of environmental sample 2 began after three borehole volumes of water were purged from well MW01. Because collection of sample 2 began late in the day (time 1830) and it would not be safe to complete field activities after dark, the matrix spike and matrix-spike duplicate samples were not collected. In the end, a full suite of samples was collected for the environmental sample and a partial suite of samples was collected in replicate (table 3).

Field water-quality properties measured during the purge of well MW01 are presented in table 4.

**Table 3.**   Analyses done for environmental and quality-control samples collected for monitoring wells MW01 and MW02 near Pavillion, Wyoming, April and May 2012.

[--, sample not collected; X, sample collected; USEPA, U.S. Environmental Protection Agency; mod, modified; SIM, selective ion monitoring; DAI, direct aqueous injection; BTEX, the compounds benzene, toluene, ethyl benzene, and xylene; MTBE, methyl tert-butyl ether; $N_2$, nitrogen; Ar, argon; $CH_4$, methane; $CO_2$, carbon dioxide; $O_2$, oxygen; $\delta^{18}O$, ratio of oxygen-18 to oxygen-16 isotopes in the sample relative to the ratio in a reference standard; $\delta^{2}H$, ratio of hydrogen-2 to hydrogen-1 isotopes in the sample relative to the ratio in a reference standard; $\delta^{13}C$, ratio of carbon-13 to carbon-12 isotopes in the sample relative to the ratio in a reference standard; $\delta^{3}He$, ratio of helium-3 to helium-4 isotopes in the sample relative to the ratio in a reference standard]

| Laboratory analytical method[1] | Analysis | Analysis group | MW01 | | | | | | | | | | MW02 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Source solution blank | Ambient blank | Field blank | Environmental sample 1 | Sample 1 replicate | Matrix spike | Matrix spike duplicate | Trip blank | Environmental sample 2 | Sample 2 replicate | Riverton development water | Trip blank | Camera blank |
| U.S. Geological Survey field analyses | | | | | | | | | | | | | | | |
| | Ferrous iron, field | Inorganic constituents | -- | -- | -- | X | -- | -- | -- | -- | X | -- | -- | -- | -- |
| | Dissolved oxygen, low range, field | Inorganic constituents | -- | -- | -- | X | -- | -- | -- | -- | X | -- | -- | -- | -- |
| | Alkalinity and associated constituents, field | Inorganic constituents | -- | -- | -- | X | -- | -- | -- | -- | X | -- | -- | -- | -- |
| | Acid neutralizing capacity and associated constituents, field | Inorganic constituents | -- | -- | -- | X | -- | -- | -- | -- | X | -- | -- | -- | -- |
| TestAmerica Laboratories | | | | | | | | | | | | | | | |
| USEPA method 6010B | Major cations and silica | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 9056 | Major anions | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 350.1 | Nitrogen, ammonia | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 353.2 | Nitrate + nitrite | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 365.1 | Phosphorus, dissolved | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 6010B and 6020 | Trace elements | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 7470 | Mercury | Inorganic constituents | -- | X | X | X | X | X | X | -- | X | -- | X | X | X |
| USEPA method 8260B | Volatile organic compounds (VOCs) | Organic constituents | X | X | X | X | X | X | X | X | X | X | X | X | X |
| USEPA method 8260B | Volatile organic compounds (VOCs), unpreserved | Organic constituents | X | X | X | X | X | X | X | X | X | X | -- | | -- |
| USEPA method 8270C and 8270/SIM | Semivolatile organic compounds (SVOCs) and polycyclic aromatic hydrocarbons (PAHs) | Organic constituents | -- | X | X | X | X | X | X | X | X | X | X | X | X |
| EPA 8015B DAI in Water (8015B) | Diesel range organics (DRO) | Organic constituents | X | -- | X | X | X | X | X | -- | X | X | X | X | X |

**Table 3.** Analyses done for environmental and quality-control samples collected for monitoring wells MW01 and MW02 near Pavillion, Wyoming, April and May 2012.—Continued

[--, sample not collected; X, sample collected; USEPA, U.S. Environmental Protection Agency; mod, modified; SIM, selective ion monitoring; DAI, direct aqueous injection; BTEX, the compounds benzene, toluene, ethyl benzene, and xylene; MTBE, methyl tert-butyl ether; $N_2$, nitrogen; Ar, argon; $CH_4$, methane; $CO_2$, carbon dioxide; $O_2$, oxygen; $\delta^{18}O$, ratio of oxygen-18 to oxygen-16 isotopes in the sample relative to the ratio in a reference standard; $\delta^2H$, ratio of hydrogen-2 to hydrogen-1 isotopes in the sample relative to the ratio in a reference standard; $\delta^{13}C$, ratio of carbon-13 to carbon-12 isotopes in the sample relative to the ratio in a reference standard; $\delta^3He$, ratio of helium-3 to helium-4 isotopes in the sample relative to the ratio in a reference standard]

| Laboratory analytical method[1] | Analysis | Analysis group | MW01 | | | | | | | | | | MW02 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Source solution blank | Ambient blank | Field blank | Environmental sample 1 | Sample 1 replicate | Matrix spike | Matrix spike duplicate | Trip blank | Environmental sample 2 | Sample 2 replicate | Riverton development water | Trip blank | Camera blank |
| USEPA 8015B DAI in Water (8015B) | Glycols, ethanol, isobutanol, isopropyl alcohol, n-butanol | Organic constituents | X | -- | X | X | X | X | X | X | X | X | X | X | X |
| USEPA 8015B/8021 mod | Gasoline range organics (GRO) + BTEX + MTBE | Organic constituents | X | X | X | X | X | X | X | X | X | X | X | X | X |
| USEPA 8015B/8021 mod | Gasoline range organics (GRO) + BTEX + MTBE, unpreserved | Organic constituents | X | X | X | X | X | X | X | X | X | X | -- | -- | -- |
| RSK-SOP 175 | Methane, ethane, ethylene, and propane | Dissolved gases | X | X | X | X | X | X | X | X | X | X | X | X | X |
| RSK-SOP 175 | Methane, ethane, ethylene, and propane (unpreserved) | Dissolved gases | X | X | X | X | X | X | X | X | X | X | -- | -- | -- |
| USEPA method 425.1 | Methylene blue active substances | Organic constituents | -- | X | X | X | X | X | X | X | X | X | -- | -- | -- |
| Eberline Laboratory | | | | | | | | | | | | | | | |
| | Radium-226 and radium-228 | Inorganic constituents | -- | -- | -- | -- | -- | -- | -- | -- | X | -- | -- | -- | -- |
| U.S. Geological Survey National Water Quality Laboratory | | | | | | | | | | | | | | | |
| | Radon-222 | Inorganic constituents | -- | -- | -- | X | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Isotech Laboratories, Inc. | | | | | | | | | | | | | | | |
| | Compositional analysis of hydrocarbon gasses | Dissolved gases | -- | -- | -- | X[2] | -- | -- | -- | -- | X | -- | -- | -- | -- |
| | $\delta^{13}C$ and $\delta^2H$ of methane | Stable isotopes | -- | -- | -- | X[2] | -- | -- | -- | -- | X | -- | -- | -- | -- |
| Lamont-Doherty Laboratory | | | | | | | | | | | | | | | |
| | Helium, neon, argon, krypton, xenon, and $\delta^3He$ | Environmental tracers | -- | -- | -- | X[3] | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| U.S. Geological Survey Reston Chlorofluorocarbon Laboratory | | | | | | | | | | | | | | | |
| | Dissolved gasses ($N_2$, Ar, $CH_4$, $CO_2$, $O_2$) | Dissolved gases | -- | -- | -- | X | -- | X | -- | -- | X | -- | -- | -- | -- |
| | Helium | Environmental tracers | -- | -- | -- | X | -- | -- | -- | -- | X | -- | -- | -- | -- |
| | Chlorofluorocarbons (CFCs) | Environmental tracers | -- | -- | -- | X | -- | -- | -- | -- | X | -- | -- | -- | -- |
| | Sulfur hexafluoride ($SF_6$) | Environmental tracers | -- | -- | -- | X | -- | X | -- | -- | X | -- | -- | -- | -- |
| U.S. Geological Survey Reston Stable Isotope Laboratory | | | | | | | | | | | | | | | |
| LC 1142 | $\delta^{18}O$ and $\delta^2H$ of water | Stable isotopes | -- | -- | -- | X | -- | -- | -- | -- | -- | -- | -- | -- | -- |

**Methods    7**

**Table 3.** Analyses done for environmental and quality-control samples collected for monitoring wells MW01 and MW02 near Pavillion, Wyoming, April and May 2012.—Continued

[--, sample not collected; X, sample collected; USEPA, U.S. Environmental Protection Agency; mod, modified; SIM, selective ion monitoring; DAI, direct aqueous injection; BTEX, the compounds benzene, toluene, ethyl benzene, and xylene; MTBE, methyl tert-butyl ether; $N_2$, nitrogen; Ar, argon; $CH_4$, methane; $CO_2$, carbon dioxide; $O_2$, oxygen; $\delta^{18}O$, ratio of oxygen-18 to oxygen-16 isotopes in the sample relative to the ratio in a reference standard; $\delta^2H$, ratio of hydrogen-2 to hydrogen-1 isotopes in the sample relative to the ratio in a reference standard; $\delta^{13}C$, ratio of carbon-13 to carbon-12 isotopes in the sample relative to the ratio in a reference standard; $\delta^3He$, ratio of helium-3 to helium-4 isotopes in the sample relative to the ratio in a reference standard]

| Laboratory analytical method[1] | Analysis | Analysis group | MW01 | | | | | | | | | MW02 | | |
| | | | Source solution blank | Ambient blank | Field blank | Environmental sample 1 | Sample 1 replicate | Matrix spike | Matrix spike duplicate | Trip blank | Environmental sample 2 | Sample 2 replicate | Riverton development water | Trip blank | Camera blank |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | U.S. Geological Survey Menlo Park Tritium Laboratory | | | | | | | | | | | | |
| LC 1565 | Tritium | Environmental tracers | -- | | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| | | | Woods Hole Oceanographic Institute | | | | | | | | | | | | |
| LC 3212 | $\delta^{13}C$ and carbon-14 of dissolved inorganic carbon | Stable isotopes and environmental tracers | -- | -- | -- | X[3] | -- | -- | -- | -- | X | -- | -- | -- | -- |

[1]Laboratory analytical methods, approaches and method references are provided in table 3 of Wright and McMahon (2012).
[2]Sample was collected but could not be analyzed because of broken bottle.
[3]Sample was collected but has not yet been analyzed as of August 20, 2012.

**Table 4.** Field water-quality properties measured during purge of monitoring well MW01 near Pavillion, Wyoming, April 2012.

[Highlighted value indicates property met purge criteria[1] for last five measurements. ft, feet; BMP, below measuring point; gal/min, gallons per minute; °C, degrees Celsius; SC, specific conductance at 25 degrees Celsius; µS/cm, microsiemens per centimeter; DO, dissolved oxygen; mg/L, milligrams per liter; ORP, oxidation reduction potential; mV, millivolts; NTRU, nephelometric turbidity ratio units; --, no data; <, less than]

| Time | Water level (ft BMP) | Draw down (ft) | Pumping rate (gal/min) | Volume (gallons) | Borehole volumes | Water Temperature (°C) | Variability[2] of last 5 temperature measurements | SC (µS/cm) | Variability[3] of last 5 SC measurements (percent) | pH (standard units) | Variability | DO (mg/L) | ORP (mV) | Turbidity (NTRU) | Comments |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 11:10 | 201.35 | 0.00 | -- | 0 | 0.00 | -- | -- | -- | -- | -- | -- | -- | -- | -- | Pump started. |
| 11:20 | 287.94 | 86.59 | 6.05 | 61 | 0.14 | 19.02 | -- | -- | -- | 11.5 | -- | 0.5 | −170.50 | -- | |
| 11:30 | 315.58 | 114.23 | 6.05 | 121 | 0.28 | 14.45 | -- | 3,396 | -- | 12.1 | -- | <0.2 | −236.30 | -- | |
| 11:40 | 329.73 | 128.38 | 6.11 | 182 | 0.42 | 14.96 | -- | 3,101 | -- | 12.1 | -- | <0.2 | −248.20 | -- | |
| 11:50 | 334.04 | 132.69 | 6.10 | 243 | 0.57 | 15.74 | -- | 2,839 | -- | 12.0 | -- | <0.2 | −262.80 | -- | |
| 12:00 | 334.42 | 133.07 | 6.04 | 304 | 0.71 | 15.73 | 4.57 | 2,549 | -- | 11.9 | 0.64 | <0.2 | −272.80 | -- | |
| 12:09 | 325.58 | 124.23 | 6.00 | 358 | 0.83 | 17.45 | 3.00 | 2,306 | 38.40 | 11.8 | 0.33 | <0.2 | −283.00 | -- | Pumping rate decreased to 2.61. |
| 12:15 | 301.47 | 100.12 | 2.63 | 373 | 0.87 | 12.83 | 4.62 | 2,087 | 39.36 | 11.8 | 0.30 | <0.2 | −288.60 | -- | |
| 12:20 | 294.34 | 92.99 | 2.50 | 386 | 0.90 | 14.60 | 4.62 | 2,181 | 31.43 | 11.8 | 0.23 | <0.2 | −294.00 | -- | |
| 12:25 | 287.15 | 85.80 | 2.58 | 399 | 0.93 | 14.52 | 4.62 | 1,930 | 28.00 | 11.7 | 0.21 | <0.2 | −296.10 | -- | |
| 12:30 | 281.73 | 80.38 | 2.58 | 412 | 0.96 | 14.55 | 4.62 | 1,831 | 22.98 | 11.6 | 0.17 | <0.2 | −299.40 | 1.95 | |
| 12:35 | 278.47 | 77.12 | 2.60 | 425 | 0.99 | 14.45 | 1.77 | 1,812 | 18.75 | 11.6 | 0.21 | <0.2 | −302.20 | -- | |
| 12:40 | 278.48 | 77.13 | 2.68 | 438 | 1.02 | 14.31 | 0.29 | 1,735 | 23.50 | 11.6 | 0.21 | <0.2 | −303.90 | -- | |
| 12:45 | 273.66 | 72.31 | 2.52 | 451 | 1.05 | 15.11 | 0.80 | 1,763 | 10.75 | 11.5 | 0.16 | <0.2 | −307.50 | -- | |
| 12:50 | 271.89 | 70.54 | 2.56 | 463 | 1.08 | 14.54 | 0.80 | 1,751 | 5.40 | 11.5 | 0.10 | <0.2 | −310.30 | -- | |

**Table 4.** Field water-quality properties measured during purge of monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[Highlighted value indicates property met purge criteria[1] for last five measurements. ft, feet; BMP, below measuring point; gal/min, gallons per minute; °C, degrees Celsius; SC, specific conductance at 25 degrees Celsius; µS/cm, microsiemens per centimeter; DO, dissolved oxygen; mg/L, milligrams per liter; ORP, oxidation reduction potential; mV, millivolts; NTRU, nephelometric turbidity ratio units; --, no data; <, less than]

| Time | Water level (ft BMP) | Draw down (ft) | Pumping rate (gal/min) | Volume (gallons) | Borehole volumes | Water Temperature (°C) | Variability[2] of last 5 temperature measurements | SC (µS/cm) | Variability[3] of last 5 SC measurements (percent) | pH (standard units) | Variability | DO (mg/L) | ORP (mV) | Turbidity (NTRU) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:55 | 270.84 | 69.49 | 2.59 | 476 | 1.11 | 14.53 | 0.80 | 1,757 | 4.37 | 11.5 | 0.06 | < 0.2 | −312.70 | -- | |
| 13:00 | 269.96 | 68.61 | 2.65 | 490 | 1.14 | 15.09 | 0.80 | 1,701 | 3.56 | 11.5 | 0.05 | < 0.2 | −316.30 | -- | |
| 13:05 | 269.24 | 67.89 | 2.55 | 502 | 1.17 | 14.86 | 0.58 | 1,704 | 3.57 | 11.5 | 0.03 | < 0.2 | −318.40 | -- | |
| 13:12 | 268.41 | 67.06 | 2.57 | 520 | 1.21 | 14.18 | 0.91 | 1,700 | 3.31 | 11.5 | 0.04 | < 0.2 | −319.90 | 1.22 | |
| 13:15 | 268.24 | 66.89 | 2.59 | 528 | 1.23 | 14.19 | 0.91 | 1,737 | 3.31 | 11.5 | 0.03 | < 0.2 | −320.70 | -- | |
| 13:31 | 267.92 | 66.57 | 2.58 | 569 | 1.33 | 14.57 | 0.91 | 1,665 | 4.23 | 11.5 | 0.05 | < 0.2 | −328.10 | -- | |
| 13:40 | 266.64 | 65.29 | 2.62 | 593 | 1.38 | 15.04 | 0.86 | 1,657 | 4.73 | 11.5 | 0.06 | < 0.2 | −335.50 | -- | |
| 13:48 | 266.42 | 65.07 | 2.52 | 613 | 1.43 | 14.89 | 0.86 | 1,635 | 6.08 | 11.4 | 0.08 | < 0.2 | −336.70 | -- | |
| 13:56 | 265.21 | 63.86 | 2.63 | 634 | 1.48 | 15.54 | 1.35 | 1,642 | 6.12 | 11.4 | 0.10 | < 0.2 | −340.20 | -- | |
| 14:10 | 266.21 | 64.86 | 2.46 | 669 | 1.56 | 14.99 | 0.97 | 1,621 | 2.68 | 11.4 | 0.10 | < 0.2 | −343.70 | -- | Collection of environmental sample 1 began. |
| 14:20 | 266.37 | 65.02 | 2.32 | 692 | 1.61 | 15.77 | 0.88 | 1,602 | 3.37 | 11.3 | 0.12 | < 0.2 | −347.60 | -- | |
| 14:30 | 261.41 | 60.06 | 2.18 | 714 | 1.66 | 15.45 | 0.88 | 1,566 | 4.71 | 11.3 | 0.12 | < 0.2 | −349.80 | -- | |
| 14:45 | 268.03 | 66.68 | 2.63 | 753 | 1.76 | 15.47 | 0.78 | 1,519 | 7.74 | 11.3 | 0.16 | < 0.2 | −355.50 | -- | |
| 15:15 | 268.56 | 67.21 | 2.63 | 832 | 1.94 | 14.92 | 0.85 | 1,459 | 10.43 | 11.2 | 0.15 | < 0.2 | −360.80 | -- | |
| 15:30 | 268.50 | 67.15 | 2.67 | 872 | 2.03 | 14.81 | 0.96 | 1,442 | 10.54 | 11.2 | 0.15 | < 0.2 | −364.40 | -- | |
| 15:45 | 268.60 | 67.25 | 2.59 | 911 | 2.12 | 14.88 | 0.66 | 1,455 | 8.33 | 11.1 | 0.18 | < 0.2 | −368.40 | -- | |
| 16:00 | 269.94 | 68.59 | 2.70 | 951 | 2.22 | 15.10 | 0.66 | 1,458 | 5.25 | 11.1 | 0.18 | < 0.2 | −371.40 | -- | |
| 16:15 | 269.00 | 67.65 | 2.67 | 991 | 2.31 | 15.34 | 0.53 | 1,401 | 4.02 | 11.0 | 0.18 | < 0.2 | −374.90 | -- | |
| 16:30 | 269.22 | 67.87 | 2.30 | 1,026 | 2.39 | 15.39 | 0.58 | 1,426 | 3.97 | 11.0 | 0.20 | < 0.2 | −377.80 | -- | |
| 16:45 | 269.33 | 67.98 | 2.67 | 1,066 | 2.48 | 15.14 | 0.51 | 1,401 | 3.99 | 11.0 | 0.17 | < 0.2 | −380.30 | -- | |
| 17:00 | 269.55 | 68.20 | 2.59 | 1,105 | 2.58 | 15.05 | 0.34 | 1,403 | 4.02 | 10.9 | 0.16 | < 0.2 | −382.20 | -- | |
| 17:15 | 269.83 | 68.48 | 2.23 | 1,138 | 2.65 | 15.31 | 0.34 | 1,416 | 1.77 | 10.9 | 0.17 | < 0.2 | −384.20 | -- | |
| 17:30 | 269.93 | 68.58 | 2.58 | 1,177 | 2.74 | 15.10 | 0.34 | 1,396 | 2.13 | 10.8 | 0.15 | < 0.2 | −385.80 | -- | |
| 17:35 | 269.88 | 68.53 | 2.52 | 1,190 | 2.77 | 15.04 | 0.27 | 1,380 | 2.57 | 10.8 | 0.15 | < 0.2 | −385.50 | -- | |
| 17:40 | 269.82 | 68.47 | 2.61 | 1,203 | 2.80 | 15.08 | 0.27 | 1,392 | 2.58 | 10.8 | 0.11 | < 0.2 | −386.20 | -- | |
| 17:45 | 269.99 | 68.64 | 2.57 | 1,215 | 2.83 | 15.02 | 0.29 | 1,393 | 2.58 | 10.8 | 0.07 | < 0.2 | −387.40 | -- | |
| 17:50 | 269.98 | 68.63 | 2.57 | 1,228 | 2.86 | 14.96 | 0.14 | 1,398 | 1.29 | 10.8 | 0.03 | < 0.2 | −389.10 | -- | |
| 17:55 | 270.04 | 68.69 | 2.62 | 1,241 | 2.89 | 15.01 | 0.12 | 1,378 | 1.44 | 10.8 | 0.03 | < 0.2 | −388.40 | -- | |
| 18:00 | 270.04 | 68.69 | 2.44 | 1,254 | 2.92 | 15.09 | 0.13 | 1,373 | 1.80 | 10.7 | 0.06 | < 0.2 | −388.60 | -- | |
| 18:05 | 270.09 | 68.74 | 2.59 | 1,267 | 2.95 | 14.86 | 0.23 | 1,380 | 1.81 | 10.7 | 0.06 | < 0.2 | −388.90 | -- | |
| 18:10 | 270.15 | 68.80 | 2.47 | 1,279 | 2.98 | 14.93 | 0.23 | 1,379 | 1.81 | 10.7 | 0.06 | < 0.2 | −390.00 | -- | |
| 18:15 | 270.15 | 68.80 | 2.61 | 1,292 | 3.01 | 14.86 | 0.23 | 1,373 | 0.51 | 10.7 | 0.07 | < 0.2 | −389.80 | -- | Collection of environmental sample 2 began. |
| 18:25 | 270.31 | 68.96 | 2.42 | 1,316 | 3.07 | 14.58 | 0.51 | 1,379 | 0.51 | 10.7 | 0.05 | < 0.2 | −389.90 | -- | |
| 18:35 | 270.42 | 69.07 | 2.09 | 1,337 | 3.12 | 14.71 | 0.35 | 1,383 | 0.73 | 10.7 | 0.07 | < 0.2 | −391.50 | -- | |
| 18:45 | 270.31 | 68.96 | 2.49 | 1,362 | 3.17 | 14.71 | 0.35 | 1,382 | 0.73 | 10.7 | 0.08 | < 0.2 | −393.00 | -- | |
| 19:00 | 270.15 | 68.80 | 2.10 | 1,393 | 3.25 | 15.07 | 0.49 | 1,375 | 0.73 | 10.6 | 0.12 | < 0.2 | −392.90 | -- | |
| 19:15 | 270.09 | 68.74 | 2.39 | 1,429 | 3.33 | 14.74 | 0.49 | 1,385 | 0.72 | 10.6 | 0.11 | < 0.2 | −394.20 | -- | |
| 19:27 | 270.09 | 68.84 | 2.73 | 1,462 | 3.41 | 14.58 | 0.49 | 1,373 | 0.87 | 10.6 | 0.10 | < 0.2 | −395.90 | -- | Pump shut off. |

[1]Purge criteria for this sampling program are listed in table 1.

[2]Variability for this property was calculated by subtracting the minimum of the last five measurements from the maximum of the last five measurements.

[3]Variability for this property was calculated by subtracting the minimum of the last five measurements from the maximum of the last five measurements and dividing this result by the average of the last five measurements. The result is then multiplied by 100.

## Redevelopment of Monitoring Well MW02 and Collection of Associated Quality-Control Samples

In an attempt to increase well yield, monitoring well MW02 was redeveloped by the USGS during the week of April 30, 2012. Redevelopment included surging the well and bailing from the top and the bottom of the water column. As part of the redevelopment effort, potable water obtained from the public water supply of the city of Riverton was added to well MW02 before pump removal in order to decrease methane concentrations in the well and reduce the explosion hazard. A sample of the Riverton water added to the well was collected to characterize its chemical quality. The sample was collected from a sampling port in the pumping line while water was recirculated through the pump, hose, and tank used by the driller to add water to well MW02. This water, identified as Riverton development water, was analyzed for the chemical constituents listed in table 3. Documentation of field activities, including instrumentation and sampling logs; ASR forms COC records; and photographs of field activities are in appendixes 4 (figs. 4.1–4.7), 5 (figs. 5.1–5.2), and 6 (figs. 6.1–6.6), respectively.

During redevelopment of well MW02, a downhole camera was used to view and evaluate the condition of the well casing and screen. Before deploying the downhole camera, an equipment blank was collected for the camera. This camera blank was collected by pouring blank water over the camera and collecting it in sample containers. The camera blank samples were analyzed for the chemical constituents listed in table 3.

## Analytical Methods

Nine laboratories analyzed samples for this study: TestAmerica Laboratories in Arvada, Colorado, Woods Hole Oceanographic Institute-National Ocean Sciences Accelerator Mass Spectrometry Facility in Woods Hole, Massachusetts, and Eberline Laboratories in Richmond, Calif., under contract with the USGS National Water Quality Laboratory (NWQL) in Lakewood, Colorado; four USGS laboratories (NWQL, Reston Chlorofluorocarbon Laboratory, Reston Stable Isotope Laboratory, and Menlo Park Tritium Laboratory); Lamont-Doherty Earth Observatory Noble Gas Laboratory in Palisades, New York (contracted by the Reston Chlorofluorocarbon Laboratory); and Isotech Laboratories, Inc., in Champaign, Illinios. Analytical methods for each laboratory are listed in table 3. A list of analytical methods and method references are provided in table 3 of the SAP (Wright and McMahon, 2012).

## Quality-Control Sample Collection and Data Analysis

Analytical results from QC samples collected in the field and prepared in the laboratories were used to assess the quality of data reported for environmental samples. Data from QC samples collected at well MW01 (table 2) were evaluated to determine whether qualification of environmental sample analytical data was warranted before use in interpretive reports. Specifically, QC sample results were used to evaluate the extent to which environmental data were affected by bias (for example, contamination of samples in the field or laboratory) and were used to evaluate the variability inherent to sample collection and laboratory analyses. The QC samples used to estimate bias included a variety of blanks, prepared with water that is certified free of analytes of interest (blank water), and samples that were spiked with known concentrations of target analytes. Variability was estimated by collecting replicate samples in the field and comparing the analytical results to results for the primary environmental samples.

### Blank Samples

Procedures for the collection of field QC samples included in this report are described in the SAP (Wright and McMahon, 2012). Four types of blank samples were submitted to TestAmerica Laboratories for analysis: source-solution, ambient, field, and trip blanks. Each of these blank samples could have been subjected to contamination during various stages of sample collection, processing, shipping, and analysis. In addition, TestAmerica Laboratories provided results for a laboratory blank sample, prepared with reagent water. A quantified result in any blank sample was considered evidence that contamination could have affected environmental sample analytical results; consequently, analytical results for the two primary samples (environmental sample 1 and environmental sample 2) and associated replicates were compared to the maximum quantified concentration in the five blanks. In accordance with USEPA guidance (U.S. Environmental Protection Agency, 1989, p. 5–17), a reported concentration in an environmental sample that is less than five times the concentration in a related blank sample should be treated as a nondetection, and the reported concentration should be considered the quantitation limit for the analyte in that sample. These analytes are identified by a project data qualifier in the data tables (tables 5–14) presented in this report. Overall, results were qualified for 18 constituents detected in the 2 primary environmental samples. All these qualifications were based on quantified results in laboratory, ambient, or field blank samples; results for all analyses of source-solution and trip blank samples were less than method detection limits. For 13 of the constituents detected in blank samples, quantified concentrations were reported for more than 1 type of blank sample.

### Laboratory Spike Samples

Laboratory reagent and matrix spike samples also contribute to evaluation of analytical bias that can affect results. This bias can be evaluated by determining the recovery of a known amount of an analyte that is spiked into reagent water or sample matrix (water collected at the field site). For this study, duplicate matrix spike samples were collected in addition to environmental sample 1. TestAmerica Laboratories spiked

these matrix samples, as well as duplicate reagent samples, at the laboratory. Analyte recovery from matrix spike samples was calculated by adjusting for background concentration in the environmental sample using the following equation:

$$R = \frac{C_{ms} - C_{env}}{C_{spiked}} \times 100$$

(1)

where

$R$ = analyte recovery, in percent

$C_{ms}$ = concentration of the analyte in the matrix spike sample,

$C_{env}$ = background concentration of the analyte in the environmental sample,

and $C_{spiked}$ = concentration of the spiked analyte expected in the matrix sample.

All matrix spikes collected from well MW01 were associated with environmental sample 1, so analyte concentrations in that sample were used as background concentrations in recovery calculations. Analyte recovery in the laboratory reagent samples was calculated simply as the ratio of the analyte concentration in the matrix spike sample to the expected concentration of the spiked analyte, because no background concentrations were present.

Control limits on acceptable recovery are established by the analyzing laboratory for each analyte. Recoveries outside acceptable limits are identified in the laboratory data qualifiers column in the data tables presented in this report. In addition, the project data qualifiers identify analytes with recoveries less than 70 percent or greater than 130 percent. Although these recoveries do not necessarily correspond to control limits, they provide a consistent identification of analytes for which results might be low or high because of analytical bias. Another laboratory data qualifier identifies matrix samples for which the background concentration exceeds four times the spiked concentration, in which case recovery is uncertain and control limits are not applicable. In these cases, project data qualifiers for low and high bias also were considered inapplicable. Finally, project data qualifiers for high bias were not applied if the analyte concentration was censored (reported as less than the method detection limit), because, in this case, the potential bias did not have a measurable effect. Overall, the low-bias qualifier was applied to 10 constituents and the high-bias qualifier was applied to 4 constituents.

## Replicate Samples

Potential variability in reported analyte concentrations is estimated by comparison of replicate samples. Replicates were collected for both environmental samples 1 and 2 from well MW01, although the replicate for environmental sample 2 was not analyzed for all analytes. Variability for each analyte is estimated as the relative percent difference (RPD) between the two replicates:

$$RPD = \frac{\left| C_{env} - C_{rep} \right|}{\left( C_{env} + C_{rep} \right)/2} \times 100$$

(2)

where

$\left| C_{env} - C_{rep} \right|$ = absolute value of the difference between concentrations of the analyte in the primary environmental sample and the replicate sample, and

$(C_{env} + C_{rep})/2$ = mean concentration of the analyte in the primary environmental sample and replicate sample.

The RPD cannot be calculated if the concentration is censored in either or both samples. For this study, RPD values greater than 20 percent were considered indicative that analytical results might be affected by high variability. Analytes with RPDs outside this criterion are identified with a project data qualifier on the primary environmental sample and replicate sample in the relevant data tables. Overall, eight constituents were qualified because of high variability in environmental sample 1, and three constituents were qualified in environmental sample 2.

In summary, four criteria for inclusion of project data qualifiers were applied to analytes in environmental samples and replicates:

1. Contamination bias: quantified concentration was less than five times the maximum concentration in a blank sample,
2. Recovery bias: potential low bias—recovery was less than 70 percent in one or more spike samples,
3. Recovery bias: potential high bias—recovery was greater than 130 percent in one or more spike samples (applied only to constituents with quantified results), and
4. Variability: RPD between the environmental sample and replicate sample was greater than 20 percent.

## Major-Ion Balances

Major-ion data were quality assured by calculating a cation-anion balance. The sum of concentrations of dissolved cations in milliequivalents per liter should equal the sum of concentrations of dissolved anions in milliequivalents per liter (Hem, 1985). The percent difference between the sum of concentrations of cations and anions in milliequivalents per liter was calculated using equation 3.

$$Percent\ difference = \left( \frac{sum\ of\ dissolved\ cations - sum\ of\ dissolved\ anions}{sum\ of\ dissolved\ cations + sum\ of\ dissolved\ anions} \right) \times 100$$

(3)

# Groundwater-Quality Data

Results from analyses of groundwater and QC samples collected from monitoring well MW01 are presented in tables 5 through 11. Many organic constituents were collected in duplicate (one set of bottles preserved with HCl and a second

bottle set unpreserved). To identify the preservation method used for each of the organic constituents, a column was added to tables 7 through 10 to indicate whether preservative was added to the sample bottle. Constituent concentrations for samples that were preserved using HCl are identified in the "preservative added to bottle" column with Yes, and constituent concentrations for samples that were unpreserved are identified with No. The QC samples collected for well MW02 are included in tables 12 through 14. Analytical results for tritium, some noble gasses (neon, krypton, and xenon), and helium isotope ratios had not been received as of August 17, 2012, and are not presented in this report; when received from the laboratories, analytical results for these constituents will be available through the USGS National Water Information System (NWIS) Web Interface, accessible at *http://waterdata. usgs.gov/wy/nwis/qw*. Analytical results for tritium have been added to table 11. The analysis for some noble gasses (neon, krypton, xenon) and helium isotope ratios were not completed due to a compromised sample container. Hence, analytical results for neon, krypton, xenon and helium isotope ratios are not available. The USGS 15-digit site number, sample collection dates, and times needed to access water-quality data using the NWIS Web Interface are listed in table 2.

## Monitoring Well MW01

### Field Water-Quality Properties and Hydrologic Data Measured During the Well Purge

Field water-quality properties and basic hydrologic data measured during the purge of monitoring well MW01 are listed in table 4. Field water-quality properties and basic hydrologic data were measured at regular intervals and recorded on a purge log (see appendix 1, figs. 1.16–1.20). Water levels and pumping rates were measured to calculate water-level drawdown in response to pumping and the total volume of water purged from the well. The water level in well MW01 during the purge and sampling is shown in figure 2A. Variability of water temperature, SC, and pH of the pumped water during purging also were evaluated (table 4). Values of specific conductance and pH are shown in relation to purge volume in figures 2B and 2C, respectively. A graph of water temperature is not included in this report because these data were affected by heating in the sampling line between the well and the point of measurement; therefore, they do not represent conditions in the well.

The borehole volume of water purged from well MW01 was calculated using equation 2 in the SAP (Wright and McMahon, 2012); one borehole volume was about 429 gallons. Sample collection began after this amount of water had

been pumped and as soon as both SC and pH met stabilization criteria. Stabilization criteria were met and collection of environmental sample began at time 14:10 on April 24, 2012 (table 4), and although SC only met the stabilization criteria briefly, sampling had already begun. The sample time associated with environmental sample 1 (time 13:30 on April 24, 2012; table 2) had been assigned to the sample in advance, in anticipation of sample collection starting after one borehole volume had been purged from the well. Collection of a water sample from MW01 after purging one borehole volume of water had been a stated objective in the SAP (Wright and McMahon, 2012). Collection of environmental sample 1 and associated QC samples included the filling of 214 sample containers, equaling collection of approximately 18 gallons of water, and took more than 2 hours to complete.

### Field Water-Quality Properties and Inorganic and Radioactive Constituents

Concentrations of inorganic constituents, including naturally occurring radioactive constituents (radon, radium-226, and radium-228), in the environmental samples and replicates collected from well MW01 are listed in table 5. The data for blank and spike samples are listed in table 6.

Samples were titrated in the field to determine alkalinity (filtered sample) and acid-neutralizing capacity (unfiltered sample). Based on these titration data, the USGS alkalinity calculator, which is described in Chapter A6, Section 6.6.5.C of the USGS National Field Manual (Wilde, variously dated), was used to calculate concentrations of bicarbonate, carbonate, and hydroxide.

Ionic charge balances calculated for environmental sample 1, sample 1 replicate, and environmental sample 2 were -1.94, 0.03, and 0.23 percent, respectively. An ionic charge balance within plus or minus 5 percent is considered acceptable (Clesceri and others, 1998). An ionic charge balance was not calculated for the sample 2 replicate because major ions were not included in the analysis of that sample set.

Of the inorganic constituents detected in the environmental samples (table 5), sodium and sulfate were measured at the highest concentrations. Six detected inorganic constituents (filtered magnesium and unfiltered ammonia, phosphorus, cadmium, thallium, and uranium) were measured at concentrations less than five times the maximum concentration detected in the blank samples. Quantified concentrations for several constituents in tables 5 and 6 include an "E" remark because the concentrations are less than the reporting level, but equal to or greater than the method detection limit. Most of the nondetected inorganic constituents are trace elements (for example, beryllium, chromium, cobalt, copper, lead, mercury, selenium, silver, and zinc).



**Figure 2.** Graphs showing water level, specific conductance, and pH measured during purge of monitoring well MW01 and beginning of collection of environmental samples 1 and 2. *A*, Water levels during well purge. *B*, Specific conductance during well purge. *C*, pH during well purge.

**Table 5.** Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.

[RPD, relative percent difference; µs/cm, microsiemens per centimeter; mg/L, milligrams per liter; CaCO₃, calcium carbonate; µg/L, micrograms per liter; pCi/L, picocuries per liter; N, value was not determined; --, not applicable]

| Field water-quality property or inorganic constituent Name | Units | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | | Sample 2 replicate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD |
| U.S. Geological Survey field measurements and analyses | | | | | | | | | | | | | | | | | | | |
| Water temperature | degrees Celsius | -- | 15.0 | -- | -- | -- | N | -- | -- | -- | -- | 14.9 | -- | -- | -- | N | -- | -- | -- |
| Specific conductance at 25 degrees Celsius | µS/cm | -- | 1,640 | -- | -- | -- | N | -- | -- | -- | -- | 1,380 | -- | -- | -- | N | -- | -- | -- |
| pH | standard units | -- | 11.4 | -- | -- | -- | N | -- | -- | -- | -- | 10.7 | -- | -- | -- | N | -- | -- | -- |
| Dissolved oxygen | mg/L | < | 0.2 | -- | -- | -- | N | -- | -- | -- | < | 0.2 | -- | -- | -- | N | -- | -- | -- |
| Dissolved oxygen, low-range method | mg/L | -- | 0.19 | -- | -- | -- | N | -- | -- | -- | -- | 0.11 | -- | -- | -- | N | -- | -- | -- |
| Alkalinity (in filtered water) | mg/L CaCO₃ | -- | 215 | -- | -- | -- | 213 | -- | -- | 0.9 | -- | 174 | -- | -- | -- | 182 | -- | -- | 4.5 |
| Hydroxide (in filtered water) | mg/L | -- | 10.6 | -- | -- | E | 12 | -- | -- | 12.4 | -- | 3.7 | -- | -- | -- | 4.3 | -- | -- | 15.0 |
| Carbonate (in filtered water) | mg/L | E | 101.0 | -- | -- | E | 98.0 | -- | -- | 3.0 | -- | 76.3 | -- | -- | -- | 81.1 | -- | -- | 6.1 |
| Bicarbonate (in filtered water) | mg/L | E | 19.1 | -- | -- | E | 19.0 | -- | -- | 0.5 | -- | 44.1 | -- | -- | -- | 42.3 | -- | -- | 4.2 |
| Acid neutralizing capacity (in unfiltered water) | mg/L CaCO₃ | -- | 199 | -- | -- | -- | 194 | -- | -- | 2.5 | -- | N | -- | -- | -- | N | -- | -- | -- |
| Hydroxide (in unfiltered water) | mg/L | E | 5.6 | 2 | -- | -- | 7.8 | 2 | -- | 32.8 | -- | N | -- | -- | -- | N | -- | -- | -- |
| Carbonate (in unfiltered water) | mg/L | E | 91.8 | -- | -- | -- | 90.0 | -- | -- | 2.0 | -- | N | -- | -- | -- | N | -- | -- | -- |
| Bicarbonate (in unfiltered water) | mg/L | E | 35.3 | 2 | -- | -- | 25.1 | 2 | -- | 33.8 | -- | N | -- | -- | -- | N | -- | -- | -- |
| Ferrous iron | mg/L | -- | 0.02 | -- | -- | -- | N | -- | -- | -- | -- | 0.04 | -- | -- | -- | N | -- | -- | -- |
| TestAmerica Laboratories | | | | | | | | | | | | | | | | | | | |
| Calcium (in filtered water) | µg/L | -- | 9,400 | 6 | -- | -- | 9,400 | 6 | -- | 0.0 | -- | 8,900 | 6 | -- | -- | N | -- | -- | -- |
| Calcium (in unfiltered water) | µg/L | -- | 9,000 | 6 | -- | -- | 9,000 | 6 | -- | 0.0 | -- | 8,800 | 6 | -- | -- | N | -- | -- | -- |

**Table 5.** Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[RPD, relative percent difference; µs/cm, microsiemens per centimeter; mg/L, milligrams per liter; CaCO$_3$, calcium carbonate; µg/L, micrograms per liter; pCi/L, picocuries per liter; N, value was not determined; --, not applicable]

| Field water-quality property or inorganic constituent | | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | | Sample 2 replicate | | | | |
| Name | Units | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Magnesium (in filtered water) | µg/L | E | 140 | 1 | J | E | 150 | 1, 6 | J | 6.9 | E | 170 | 1 | J | -- | N | -- | -- | -- |
| Magnesium (in unfiltered water) | µg/L | E | 140 | -- | J | E | 140 | 6 | J | 0.0 | E | 180 | -- | -- | -- | N | -- | -- | -- |
| Sodium (in filtered water) | µg/L | -- | 270,000 | -- | B | -- | 280,000 | 6 | B | 3.6 | -- | 280,000 | 6 | B | -- | N | -- | -- | -- |
| Sodium (in unfiltered water) | µg/L | -- | 270,000 | -- | -- | -- | 270,000 | 6 | -- | 0.0 | -- | 270,000 | 6 | -- | -- | N | -- | -- | -- |
| Potassium (in filtered water) | µg/L | -- | 15,000 | -- | -- | -- | 16,000 | 6 | -- | 6.5 | -- | 13,000 | -- | -- | -- | N | -- | -- | -- |
| Potassium (in unfiltered water) | µg/L | -- | 15,000 | -- | -- | -- | 15,000 | 6 | -- | 0.0 | -- | 13,000 | -- | -- | -- | N | -- | -- | -- |
| Chloride (in filtered water) | mg/L | -- | 26 | -- | -- | -- | 26 | -- | -- | 0.0 | -- | 27 | -- | -- | -- | N | -- | -- | -- |
| Sulfate (in filtered water) | mg/L | -- | 380 | -- | -- | -- | 380 | -- | -- | 0.0 | -- | 410 | -- | -- | -- | N | -- | -- | -- |
| Bromide (in filtered water) | mg/L | E | 0.2 | -- | J | E | 0.2 | -- | J | 0.0 | E | 0.2 | -- | J | -- | N | -- | -- | -- |
| Fluoride (in filtered water) | mg/L | -- | 3 | -- | -- | -- | 3 | -- | -- | 3.3 | -- | 3 | -- | -- | -- | N | -- | -- | -- |
| Silicon (in filtered water) | µg/L | -- | 9,000 | -- | -- | -- | 8,700 | -- | -- | 3.4 | -- | 6,400 | -- | -- | -- | N | -- | -- | -- |
| Silica (in unfiltered water) | µg/L | -- | 18,000 | -- | B | -- | 18,000 | -- | B | 0.0 | -- | 13,000 | -- | B | -- | N | -- | -- | -- |
| Dissolved solids (in filtered water) | mg/L | -- | 800 | -- | -- | -- | 800 | -- | -- | 0.0 | -- | 800 | -- | -- | -- | N | -- | -- | -- |
| Ammonia as nitrogen (in unfiltered water) | mg/L | -- | 0.79 | 1, 3 | B | E | 0.71 | 1, 3 | B | 10.7 | E | 0.34 | 1, 3 | B | -- | N | -- | -- | -- |
| Nitrate-plus-nitrite as nitrogen (in unfiltered water) | mg/L | < | 0.019 | -- | -- | < | 0.019 | -- | -- | -- | < | 0.02 | -- | -- | -- | N | -- | -- | -- |
| Phosphorus (in filtered water) | µg/L | -- | 57 | 2, 3 | -- | -- | 89 | 2, 3 | -- | 43.8 | -- | 61 | 3 | -- | -- | N | -- | -- | -- |
| Phosphorus (in unfiltered water) | µg/L | -- | 100 | 1 | B | -- | 98 | 1 | B | 2.0 | -- | 84 | 1 | B | -- | N | -- | -- | -- |

**Table 5.** Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[RPD, relative percent difference; µs/cm, microsiemens per centimeter; mg/L, milligrams per liter; $CaCO_3$, calcium carbonate; µg/L, micrograms per liter; pCi/L, picocuries per liter; N, value was not determined; --, not applicable]

| Field water-quality property or inorganic constituent | | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | | Sample 2 replicate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Units | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD |
| Dissolved organic carbon (in filtered water) | mg/L | -- | 4.3 | 6 | -- | -- | 4.4 | 6 | -- | 2.3 | -- | 3 | 6 | -- | -- | N | -- | -- | -- |
| Total organic carbon (in unfiltered water) | mg/L | -- | 4.0 | 6 | -- | -- | 4.1 | 6 | -- | 2.5 | -- | 2.9 | 6 | -- | -- | N | -- | -- | -- |
| Dissolved inorganic carbon (in filtered water) | mg/L | -- | 20 | -- | -- | -- | 19 | -- | -- | 5.1 | -- | 21 | -- | -- | -- | N | -- | -- | -- |
| Total inorganic carbon (in unfiltered water) | mg/L | -- | 22 | -- | -- | -- | 21 | -- | -- | 4.7 | -- | 22 | -- | -- | -- | N | -- | -- | -- |
| Aluminum (in filtered water) | µg/L | -- | 170 | -- | -- | -- | 170 | -- | -- | 0.0 | -- | 100 | -- | -- | -- | N | -- | -- | -- |
| Aluminum (in unfiltered water) | µg/L | -- | 170 | -- | -- | -- | 170 | -- | -- | 0.0 | -- | 110 | -- | -- | -- | N | -- | -- | -- |
| Antimony (in filtered water) | µg/L | < | 0.4 | -- | -- | E | 0.54 | 1, 6 | J, ^, B | -- | < | 0.4 | -- | -- | -- | N | -- | -- | -- |
| Antimony (in unfiltered water) | µg/L | < | 0.4 | -- | -- | < | 0.4 | 6 | -- | -- | < | 0.4 | -- | -- | -- | N | -- | -- | -- |
| Arsenic (in filtered water) | µg/L | E | 0.62 | 6 | J | < | 0.33 | -- | -- | -- | < | 0.33 | -- | -- | -- | N | -- | -- | -- |
| Arsenic (in unfiltered water) | µg/L | E | 0.38 | 2, 6 | J | E | 0.51 | 2 | J | 29.2 | E | 0.48 | -- | J | -- | N | -- | -- | -- |
| Barium (in filtered water) | µg/L | -- | 23 | 6 | -- | -- | 20 | -- | -- | 14.0 | -- | 21 | -- | -- | -- | N | -- | -- | -- |
| Barium (in unfiltered water) | µg/L | -- | 19 | 6 | -- | -- | 20 | -- | -- | 5.1 | -- | 21 | -- | -- | -- | N | -- | -- | -- |
| Beryllium (in filtered water) | µg/L | < | 0.08 | -- | -- | < | 0.08 | -- | -- | -- | < | 0.08 | -- | -- | -- | N | -- | -- | -- |
| Beryllium (in unfiltered water) | µg/L | < | 0.08 | -- | -- | < | 0.08 | -- | -- | -- | < | 0.08 | -- | -- | -- | N | -- | -- | -- |
| Boron (in filtered water) | µg/L | -- | 130 | -- | -- | -- | 130 | 6 | -- | 0.0 | -- | 120 | 6 | -- | -- | N | -- | -- | -- |
| Boron (in unfiltered water) | µg/L | -- | 130 | -- | -- | -- | 120 | 6 | -- | 8.0 | -- | 110 | 6 | -- | -- | N | -- | -- | -- |

**Table 5.**   Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[RPD, relative percent difference; µs/cm, microsiemens per centimeter; mg/L, milligrams per liter; CaCO₃, calcium carbonate; µg/L, micrograms per liter; pCi/L, picocuries per liter; N, value was not determined; --, not applicable]

| Field water-quality property or inorganic constituent | | | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | | Sample 2 replicate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Units | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD |
| Cadmium (in filtered water) | µg/L | < | 0.1 | -- | -- | < | 0.1 | -- | -- | -- | < | 0.1 | -- | -- | -- | N | -- | -- | -- |
| Cadmium (in unfiltered water) | µg/L | E | 0.11 | 1 | J | < | 0.1 | -- | -- | -- | < | 0.1 | -- | -- | -- | N | -- | -- | -- |
| Chromium (in filtered water) | µg/L | < | 0.5 | -- | -- | < | 0.5 | -- | -- | -- | < | 0.5 | -- | -- | -- | N | -- | -- | -- |
| Chromium (in unfiltered water) | µg/L | < | 0.5 | -- | -- | < | 0.5 | -- | -- | -- | < | 0.5 | -- | -- | -- | N | -- | -- | -- |
| Cobalt (in filtered water) | µg/L | < | 0.054 | -- | -- | < | 0.054 | -- | -- | -- | < | 0.054 | -- | -- | -- | N | -- | -- | -- |
| Cobalt (in unfiltered water) | µg/L | < | 0.054 | -- | -- | < | 0.054 | -- | -- | -- | < | 0.054 | -- | -- | -- | N | -- | -- | -- |
| Copper (in filtered water) | µg/L | < | 0.56 | -- | -- | < | 0.56 | -- | -- | -- | < | 0.56 | -- | -- | -- | N | -- | -- | -- |
| Copper (in unfiltered water) | µg/L | < | 0.56 | -- | -- | < | 0.56 | -- | -- | -- | < | 0.56 | -- | -- | -- | N | -- | -- | -- |
| Iron (in filtered water) | µg/L | < | 22 | -- | -- | < | 22 | -- | -- | -- | < | 22 | -- | -- | -- | N | -- | -- | -- |
| Iron (in unfiltered water) | µg/L | < | 22 | -- | -- | < | 22 | -- | -- | -- | E | 55 | -- | J^ | -- | N | -- | -- | -- |
| Lead (in filtered water) | µg/L | < | 0.18 | -- | -- | < | 0.18 | -- | -- | -- | < | 0.18 | -- | -- | -- | N | -- | -- | -- |
| Lead (in unfiltered water) | µg/L | < | 0.18 | -- | -- | < | 0.18 | -- | -- | -- | < | 0.18 | -- | -- | -- | N | -- | -- | -- |
| Lithium (in filtered water) | µg/L | -- | 44 | -- | -- | -- | 45 | 6 | -- | 2.2 | -- | 33 | -- | -- | -- | N | -- | -- | -- |
| Lithium (in unfiltered water) | µg/L | -- | 44 | -- | -- | -- | 43 | 6 | -- | 2.3 | -- | 36 | -- | -- | -- | N | -- | -- | -- |
| Manganese (in filtered water) | µg/L | < | 0.31 | -- | -- | -- | 1 | 6 | -- | -- | E | 0.42 | -- | J | -- | N | -- | -- | -- |
| Manganese (in unfiltered water) | µg/L | E | 0.57 | 2 | J | E | 0.46 | 2, 6 | J | 21.4 | E | 0.80 | -- | J | -- | N | -- | -- | -- |
| Mercury (in filtered water) | µg/L | < | 0.027 | -- | -- | < | 0.027 | -- | -- | -- | < | 0.027 | -- | -- | -- | N | -- | -- | -- |
| Mercury (in unfiltered water) | µg/L | < | 0.027 | -- | -- | < | 0.027 | -- | -- | -- | < | 0.027 | -- | -- | -- | N | -- | -- | -- |
| Molybdenum (in filtered water) | µg/L | -- | 10 | 6 | -- | -- | 9.7 | -- | -- | 3.0 | -- | 7.6 | -- | -- | -- | N | -- | -- | -- |

**Table 5.** Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[RPD, relative percent difference; µs/cm, microsiemens per centimeter; mg/L, milligrams per liter; CaCO₃, calcium carbonate; µg/L, micrograms per liter; pCi/L, picocuries per liter; N, value was not determined; --, not applicable]

| Name | Units | Re-mark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Re-mark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD | Re-mark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | Re-mark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Molybdenum (in unfiltered water) | µg/L | -- | 9.8 | 6 | -- | -- | 10 | -- | -- | 2.0 | -- | 7.8 | -- | -- | -- | N | -- | -- | -- |
| Nickel (in filtered water) | µg/L | < | 0.3 | -- | -- | < | 0.3 | -- | -- | -- | < | 0.3 | -- | -- | -- | N | -- | -- | -- |
| Nickel (in unfiltered water) | µg/L | E | 0.3 | 2 | J | E | 0.44 | 2 | J | 37.8 | < | 0.3 | -- | -- | -- | N | -- | -- | -- |
| Selenium (in filtered water) | µg/L | < | 0.7 | -- | -- | < | 0.7 | -- | -- | -- | < | 0.7 | -- | -- | -- | N | -- | -- | -- |
| Selenium (in unfiltered water) | µg/L | < | 0.7 | -- | -- | < | 0.7 | -- | -- | -- | < | 0.7 | -- | -- | -- | N | -- | -- | -- |
| Silver (in filtered water) | µg/L | < | 0.033 | -- | -- | < | 0.033 | -- | -- | -- | < | 0.033 | -- | -- | -- | N | -- | -- | -- |
| Silver (in unfiltered water) | µg/L | < | 0.033 | -- | -- | < | 0.033 | -- | -- | -- | < | 0.033 | -- | -- | -- | N | -- | -- | -- |
| Strontium (in filtered water) | µg/L | -- | 300 | -- | -- | -- | 310 | 6 | -- | 3.3 | -- | 280 | -- | -- | -- | N | -- | -- | -- |
| Strontium (in unfiltered water) | µg/L | -- | 300 | -- | -- | -- | 300 | 6 | -- | 0.0 | -- | 280 | -- | -- | -- | N | -- | -- | -- |
| Thallium (in filtered water) | µg/L | < | 0.05 | -- | -- | < | 0.05 | -- | -- | -- | < | 0.05 | -- | -- | -- | N | -- | -- | -- |
| Thallium (in unfiltered water) | µg/L | E | 0.068 | 1 | J | < | 0.05 | -- | -- | -- | E | 0.096 | 1 | J | -- | N | -- | -- | -- |
| Titanium (in filtered water) | µg/L | < | 0.6 | -- | -- | < | 0.6 | -- | -- | -- | < | 0.6 | -- | -- | -- | N | -- | -- | -- |
| Titanium (in unfiltered water) | µg/L | < | 0.6 | -- | -- | < | 0.6 | -- | -- | -- | < | 0.69 | -- | J | -- | N | -- | -- | -- |
| Uranium (in filtered water) | µg/L | < | 0.05 | -- | -- | < | 0.05 | -- | -- | -- | < | 0.05 | -- | -- | -- | N | -- | -- | -- |
| Uranium (in unfiltered water) | µg/L | E | 0.14 | 1 | J | < | 0.05 | -- | -- | -- | E | 0.14 | 1 | J | -- | N | -- | -- | -- |
| Vanadium (in filtered water) | µg/L | E | 0.6 | 6 | J | < | 0.5 | -- | -- | -- | < | 0.5 | -- | -- | -- | N | -- | -- | -- |
| Vanadium (in unfiltered water) | µg/L | < | 0.5 | 6 | -- | < | 0.5 | -- | -- | -- | E | 0.53 | -- | J | -- | N | -- | -- | -- |
| Zinc (in filtered water) | µg/L | < | 2 | -- | ^ | < | 2 | -- | ^ | -- | < | 2 | -- | ^ | -- | N | -- | -- | -- |
| Zinc (in unfiltered water) | µg/L | < | 2 | -- | -- | < | 2 | -- | -- | -- | < | 2 | -- | -- | -- | N | -- | -- | -- |

**Table 5.**   Field water-quality properties and inorganic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[RPD, relative percent difference; µs/cm, microsiemens per centimeter; mg/L, milligrams per liter; CaCO$_3$, calcium carbonate; µg/L, micrograms per liter; pCi/L, picocuries per liter; N, value was not determined; --, not applicable]

| Field water-quality property or inorganic constituent | | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | | Sample 2 replicate | | | | |
| Name | Units | Re-mark[1] | Value | Project data qualifiers[2] | Labora-tory data qualifiers[3] | Re-mark[1] | Value | Project data qualifiers[2] | Labora-tory data qualifiers[3] | RPD | Re-mark[1] | Value | Project data qualifiers[2] | Labora-tory data qualifiers[3] | Re-mark[1] | Value | Project data qualifiers[2] | Labora-tory data qualifiers[3] | RPD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eberline Laboratory | | | | | | | | | | | | | | | | | | | | |
| Radium-226 (in filtered water) with radon method | pCi/L | -- | 0.087 | -- | -- | -- | N | -- | -- | -- | -- | 0.100 | -- | -- | -- | N | -- | -- | -- |
| Radium-228 (in filtered water) | pCi/L | R | 0.16 | -- | -- | -- | N | -- | -- | -- | -- | 0.23 | -- | -- | -- | N | -- | -- | -- |
| U.S. Geological Survey National Water Quality Laboratory | | | | | | | | | | | | | | | | | | | | |
| Radon-222 (in unfiltered water) | pCi/L | -- | 1,060 | -- | -- | -- | N | -- | -- | -- | -- | N | -- | -- | -- | N | -- | -- | -- |

[1]Remarks used in table:

<, less than.

E, less than the reporting level, but equal to or greater than the method detection limit.

R, value below sample-specific critical level.

[2]Project data qualifiers used in table:

1 - Quantified concentration in the environmental sample is less than five times the maximum concentration in a blank sample.

2 - Relative percent difference (RPD) between the environmental sample and replicate sample was greater than 20 percent.

3 - Potential low bias; recovery was less than 70 percent in one or more spike samples.

4 - Potential high bias; recovery was greater than 130 percent in one or more spike samples (only applied to constituents with quantified results).

5 - Value is mean of two results reported by the laboratory.

6 - Filtered value exceeds unfiltered value.

[3]Laboratory data qualifiers used in table:

^ - Instrument related quality control exceeds the control limits.

4 - The analyte present in the environmental sample is four times greater than the matrix spike concentration; therefore, control limits are not applicable.

E - Result exceeded calibration range.

F - Recovery in the matrix spike or matrix-spike duplicate exceeds the control limits.

B - Detected compound was also found in the laboratory blank.

J - Result is less than the reporting limit but greater than or equal to the method detection limit, and the concentration is an approximate value.

**Table 6.** Inorganic constituents in quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming, April 2012. (Excel file)

## Organic Constituents

Concentrations of organic constituents included in analysis of the environmental samples and sample replicates collected from well MW01 are listed in table 7. Blank and spike sample analytical results are listed in table 8. Acrylonitrile was the only VOC detected, and that compound was detected only in the sample 1 replicate. Acrylonitrile is a component of nitrile gloves, which were worn during sample collection and processing. Nitrile gloves also were used by TestAmerica Laboratories (TestAmerica Laboratories, oral commun., 2012). VOCs could go undetected in an environmental sample if the analytical method used to measure them has poor recovery for those compounds. Of the 80 VOCs that were analyzed, only 1,1,2,2-tetrachloroethane, carbon disulfide, and isopropanol had spike recoveries less than 70 percent for any spiked sample.

Four semivolatile organic compounds (SVOCs)—3- and 4-methylphenol, benzoic acid, benzyl alcohol, and phenol— were detected in environmental samples; however, the concentration for benzyl alcohol (table 7) was less than five times the maximum concentration detected in associated laboratory and field blank samples (table 8). Benzoic acid was detected in all the environmental samples; however, spike recoveries for this compound were greater than 130 percent (table 8), indicating these concentrations might be biased high. Reported concentrations for several SVOCs include an "E" remark (table 7) because they are less than the reporting level, but equal to or greater than the method detection limit. Five of the SVOCs (2,4-dimethylphenol, 3,3'-dichlorobenzidine, aniline, hexachlorocyclopentadiene, and hexachloroethane) that were not detected in environmental samples had spike recoveries less than 70 percent (table 8). For example, the recovery for hexachlorocyclopentadiene was as low as 12 percent.

Analytical results from methods used to analyze VOCs and SVOCs included tentatively identified compounds (TICs), which are not part of the standard suite of reported analytes. TIC analyses provide a qualitative measure of the presence of compounds, but require additional analytical testing to confirm. Concentrations of TICs included in analysis of the environmental samples and QC samples (replicates and blanks) collected from well MW01 are listed in appendix 7. Thirty VOC TICs and three SVOC TICs were quantified in various environmental samples and blanks. One of these compounds (cyclotetrasiloxane, octamethyl-) was identified only in a laboratory blank; one other compound (silanol, trimethyl-) was identified in a single environmental sample, but also in two blanks at similar concentrations, indicating potential contamination bias. Eight compounds were identified in all environmental samples, both preserved and unpreserved. Concentrations of these were similar within each sample set (environmental sample and replicate), but were different

between the two samples (1 and 2). Concentrations of propane in the TIC analyses were less than one-half the concentrations reported by TestAmerica Laboratories for dissolved gas analysis (table 9). One compound of interest in the Pavillion area, 2-butoxyethanol, was not identified in the TIC analyses of any of the environmental samples.

**Table 7.** Organic constituents in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012. (Excel file)

**Table 8.** Organic constituents in quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming, April 2012. (Excel file)

Concentrations for several other classes of organic compounds (tables 7 and 8) also included an "E" remark (less than the reporting level, but equal to or greater than the method detection limit). Diesel-range organics and gasoline-range organics were detected in all environmental samples and associated replicates, although all the concentrations for diesel-range organics (DRO) included an "E" remark. Twelve polycyclic aromatic hydrocarbons (PAHs) were detected in the environmental samples and associated replicates, but the maximum concentrations for 10 of these PAHs were less than five times the maximum concentration detected in associated laboratory and field blanks. All reported PAH concentrations included an "E" remark. No glycols were detected in any samples. Spike recoveries for glycols ranged from 93 to 106 percent, and method detection limits ranged from 7.73 to 18.70 milligrams per liter (mg/L). Methylene blue active substances were detected in the environmental samples, but all reported concentrations included an "E" remark and are less than five times the maximum concentration detected in the field blank.

## Dissolved Gasses

Dissolved gasses measured in environmental samples and QC samples (replicates) collected from well MW01 are listed in table 9. Blank and spike sample analytical results are listed in table 10. Several different hydrocarbon gasses, including methane, ethane, propane, and several higher molecular weight compounds, were detected in the groundwater-quality samples. Many of the gasses (including argon, carbon dioxide, ethane, ethylene, methane, nitrogen, oxygen, and propane) were analyzed by more than one laboratory; using different analytical methods. For example, methane was analyzed by TestAmerica Laboratories, Isotech Laboratories, Inc., and the USGS Chlorofluorocarbon Laboratory. Because of the laboratory overlap of analyses of several dissolved gasses, a short description of the differences in gas concentrations between laboratories follows.

Methane concentrations reported by TestAmerica Laboratories and the USGS Reston Chlorofluorocarbon Laboratory are similar (table 9). For example, TestAmerica reported

**Table 9.**  Dissolved gasses in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.

[All constituents analyzed in unfiltered water. RPD, relative percent difference; μg/L, micrograms per liter; mg/L, milligrams per liter; --, not applicable; N, value was not determined]

| Name | Alternative name | Units | Preservative added to bottle | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | RPD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | |
| *TestAmerica Laboratories* | | | | | | | | | | | | | | | | | | | | | |
| Methane | -- | μg/L | Yes | -- | 27,500 | 5 | -- | -- | 30,500 | 5 | -- | 10.3 | -- | 25,500 | 5 | -- | -- | 27,000 | 5 | -- | 5.7 |
| Methane | -- | μg/L | No | -- | 27,000 | 5 | -- | -- | 27,000 | 5 | -- | 0.0 | -- | 20,000 | 5 | -- | -- | 22,000 | 5 | -- | 9.5 |
| Ethane | -- | μg/L | Yes | -- | 3,600 | 4 | -- | -- | 4,000 | 4 | -- | 10.5 | -- | 3,200 | 4 | -- | -- | 3,300 | 4 | -- | 3.1 |
| Ethane | -- | μg/L | No | -- | 3,800 | 4 | -- | -- | 3,800 | 4 | -- | 0.0 | -- | 2,600 | 4 | -- | -- | 2,800 | 4 | -- | 7.4 |
| Ethylene | -- | μg/L | Yes | < | 7.2 | 5 | -- | < | 7.2 | 5 | -- | -- | < | 7.2 | 5 | -- | < | 7.2 | 5 | -- | -- |
| Ethylene | -- | μg/L | No | < | 7.2 | 5 | -- | < | 7.2 | 5 | -- | -- | < | 7.2 | 5 | -- | < | 7.2 | 5 | -- | -- |
| Propane | -- | μg/L | Yes | -- | 1,400 | -- | -- | -- | 1,300 | -- | -- | 7.4 | -- | 1,100 | -- | -- | -- | 1,000 | -- | -- | 9.5 |
| Propane | -- | μg/L | No | -- | 1,300 | -- | -- | -- | 1,100 | -- | -- | 16.7 | -- | 1,000 | -- | -- | -- | 970 | -- | -- | 3.0 |
| *Isotech Laboratories, Inc.* | | | | | | | | | | | | | | | | | | | | | |
| Argon | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.446 | | | -- | N | | | -- |
| Carbon monoxide | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | U | -- | | | -- | N | | | -- |
| Carbon dioxide | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | U | -- | | | -- | N | | | -- |
| Hydrogen | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | U | -- | | | -- | N | | | -- |
| Oxygen | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.078 | | | -- | N | | | -- |
| Nitrogen | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 20.40 | | | -- | N | | | -- |
| Methane | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 73.44 | | | -- | N | | | -- |
| Ethane | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 4.18 | | | -- | N | | | -- |
| Ethylene | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.001 | | | -- | N | | | -- |
| Propane | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.913 | | | -- | N | | | -- |
| Propylene | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.001 | | | -- | N | | | -- |
| n-Butane | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.178 | | | -- | N | | | -- |
| Iso-butane | 2-Methyl-propane | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.213 | | | -- | N | | | -- |
| n-Pentane | -- | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.030 | | | -- | N | | | -- |
| Iso-pentane | 2-Methyl-butane | mole percent | Yes | -- | N | | | -- | N | | | -- | -- | 0.066 | | | -- | N | | | -- |

**Table 9.**   Dissolved gasses in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.—Continued

[All constituents analyzed in unfiltered water. RPD, relative percent difference; µg/L, micrograms per liter; mg/L, milligrams per liter; --, not applicable; N, value was not determined]

| Dissolved Gas | | | Preservative added to bottle | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | | Sample 2 replicate | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Alternative name | Units | | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | RPD |
| Hexanes plus | -- | mole percent | Yes | -- | N | -- | -- | -- | N | -- | -- | -- | -- | 0.053 | -- | -- | -- | N | -- | -- | -- |
| U.S. Geological Survey Reston Chlorofluorocarbon Laboratory | | | | | | | | | | | | | | | | | | | | | |
| Argon | -- | mg/L | No | -- | 0.183 | 5 | -- | -- | 0.186 | 5 | -- | 1.3 | -- | 0.305 | 5 | -- | -- | N | -- | -- | -- |
| Carbon dioxide | -- | mg/L | No | -- | 129.1 | 5 | -- | -- | 125.0 | 5 | -- | 3.2 | -- | 121.1 | 5 | -- | -- | N | -- | -- | -- |
| Oxygen | -- | mg/L | No | -- | 0.1 | 5 | -- | -- | 0.1 | 5 | -- | 0.0 | -- | 0.1 | 5 | -- | -- | N | -- | -- | -- |
| Methane | -- | mg/L | No | -- | 26 | 5 | -- | -- | 26 | 5 | -- | 1.6 | -- | 28 | 5 | -- | -- | N | -- | -- | -- |
| Nitrogen | -- | mg/L | No | -- | 3.86 | 5 | -- | -- | 4.01 | 5 | -- | 3.8 | -- | 7.95 | 5 | -- | -- | N | -- | -- | -- |

[1]Remarks used in table:
   <, less than.
   U, analyzed for but not detected.

[2]Project data qualifiers used in table:
   1 - Quantified concentration in the environmental sample is less than five times the maximum concentration in a blank sample.
   2 - Relative percent difference (RPD) between the environmental sample and replicate is greater than 20 percent.
   3 - Potential low bias; recovery is less than 70 percent in one or more spike samples.
   4 - Potential high bias; recovery is greater than 130 percent in one or more spike samples (only applied to constituents with quantified results).
   5 - Value is mean of two results reported by the laboratory.
   6 - Filtered value exceeds unfiltered value.

methane concentrations ranging from 20 to 30.5 mg/L (or 20,000 to 30,500 micrograms per liter) for environmental sample 1 and the sample 1 replicate, and the USGS Reston Chlorofluorocarbon Laboratory reported methane concentrations ranging from 26 to 28 mg/L.

Carbon dioxide concentrations reported by Isotech Laboratories, Inc., and the USGS Reston Chlorofluorocarbon Laboratory are not similar. Isotech Laboratories, Inc., did not detect carbon dioxide in environmental sample 2, whereas the USGS Reston Chlorofluorocarbon Laboratory reported carbon dioxide concentrations in environmental sample 2 greater than 100 mg/L. This difference may be due to different methods for stripping gas from solution before the analysis. Isotech Laboratories, Inc., and the USGS Reston Chlorofluorocarbon Laboratory reported very small concentrations of dissolved oxygen in the samples, which is in agreement with the field measurements (table 5).

A full suite of QC samples (replicates; laboratory, source solution, trip, ambient and field blanks; and reagent and matrix spikes) were collected and analyzed for dissolved gas samples sent to TestAmerica Laboratories (table 10). Dissolved gasses were not detected in any of the blank samples. Recoveries of dissolved gasses in the reagent spikes ranged from 89 to 95 percent. Recoveries in the matrix spikes were much more variable ranging from -33 to 1,004 percent; this large variability likely is due to the dissolved gasses present at concentrations at least four times greater than the matrix spike concentration. In these cases, recovery-control limits likely are not applicable.

Two dissolved gas samples (environmental sample 1 and environmental sample 2) were sent to Isotech Laboratories, Inc., for analysis. The container for environmental sample 1 was cracked, and therefore, was not analyzed. Environmental sample 2 was analyzed for 16 dissolved gasses; 13 gasses were detected (table 9). These data have no qualifiers because no QC samples were sent to Isotech Laboratories, Inc., for analysis.

**Table 10.** Dissolved gasses in quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming, April 2012. (Excel file)

## Isotopes and Environmental Tracers

Isotopic values and concentrations of environmental tracers in environmental samples collected from well MW01 are listed in table 11. Stable isotopic data are provided for methane (hydrogen and carbon), water (hydrogen and oxygen), and dissolved inorganic carbon (carbon). Groundwater-quality samples also were analyzed for environmental tracers, including carbon-14 of dissolved inorganic carbon, the chlorofluorocarbons CFC-11, CFC-12, and CFC-113; $SF_6$; tritium; the noble gasses helium, neon, argon, krypton, and xenon; and $\delta^3He$. Analytical results for tritium, neon, krypton, xenon, and $\delta^3He$ had not been reported by the laboratories

as of August 17, 2012, but analytical results will be entered in the USGS NWIS database when available and will be accessible through the USGS NWIS Web Interface at *http://waterdata.usgs.gov/wy/nwis/qw*. Many of these environmental tracers can be used to determine the presence of young or modern water or the apparent age of groundwater (Dunkle and others, 1993; Ekwurzel and others, 1994; Busenberg and Plummer, 2000; Plummer and others, 2004; McMahon and others, 2011).

## Quality-Control Results for Monitoring Well MW01

The implications of QC results for the environmental sample results from monitoring well MW01 can be summarized from project data qualifiers listed in tables 5, 7, 9, and 11. Laboratory analytical results were reported for 234 constituents in various samples. Results were less than method detection limits in all blank samples for 215 (92 percent) of those constituents. There were 1,194 total analytical results for those 234 constituents in the 2 environmental samples and 2 replicate samples. Forty-three results (3.6 percent) were qualified because they were less than 5 times the maximum concentration in associated blanks. Concentrations for replicate samples were reported for 244 constituents in 570 environmental-sample/replicate pairs. Variability was within 20 percent for 559 (98 percent) of those pairs. One result each for 11 constituents was qualified because replicate variability exceeded the 20-percent criterion. Recoveries for spike samples were available for 210 constituents. Recoveries were within 70–130 percent for 195 (93 percent) of those constituents. Of the 1,050 results for those 210 constituents in the 2 environmental samples and 2 replicates, 42 results (4 percent) were qualified because of low recovery and 16 results (1.5 percent) were qualified because of high recovery. Overall, 646 analytical results were available for constituents with some type of QC data for the 2 primary environmental samples. Sixty-one of these results (9.4 percent) were qualified because of potential blank contamination, high variability, high recovery, or low recovery.

## Quality-Control Results for Monitoring Well MW02

Groundwater-quality samples were not collected from monitoring well MW02. The USGS redeveloped well MW02 during the week of April 30, 2012. Two QC samples were collected during redevelopment.

The QC samples were analyzed for several inorganic and organic constituents and dissolved gasses (table 3). Analytical results for both QC samples are listed in tables 12, 13, and 14. Analytical results from these two samples are not described further in this report because well MW02 was not sampled.

**Table 11.** Isotopes and environmental tracers in environmental samples collected from monitoring well MW01 near Pavillion, Wyoming, April 2012.

[All constituents analyzed in unfiltered water except δ13C of dissolved inorganic carbon and carbon-14 of dissolved inorganic carbon, which were filtered using a 0.45-micron capsule filter. RPD, relative percent difference; δ13C, ratio of carbon-13 to carbon-12 isotopes in the sample relative to the ratio in a reference standard; per mil, parts per thousand; VPDB, Vienna PeeDee Belemnite; δ2H, ratio of hydrogen-2 to hydrogen-1 isotopes in the sample relative to the ratio in a reference standard; VSMOW, Vienna Standard Mean Ocean Water; CFC, chlorofluorocarbon; --, not applicable; N, value was not determined]

| Analyte | Units | Environmental sample 1 | | | | Sample 1 replicate | | | | | Environmental sample 2 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers[3] | RPD | Remark[1] | Value | Project data qualifiers[2] | Laboratory data qualifiers |
| | | | | | *Isotech Laboratories, Inc.* | | | | | | | | | |
| δ13C of methane | per mil, relative to VPDB | -- | N | -- | -- | -- | -- | -- | -- | -- | -- | −38.54 | -- | -- |
| δ2H of methane | per mil, relative to VSMOW | -- | N | -- | -- | -- | -- | -- | -- | -- | -- | −208.0 | -- | -- |
| | | | | | *U.S. Geological Survey Reston Chlorofluorocarbon Laboratory* | | | | | | | | | |
| CFC-11 | picogram per kilogram | -- | 2 | -- | -- | -- | -- | -- | -- | -- | -- | N | -- | -- |
| CFC-113 | picogram per kilogram | U | | -- | -- | -- | -- | -- | -- | -- | -- | N | -- | -- |
| CFC-12 | picogram per kilogram | -- | 13 | -- | -- | -- | -- | -- | -- | -- | -- | N | -- | -- |
| Helium | 10-9 cubic centimeters of helium per gram of water at standard temperature and pressure | -- | 1,170 | 5 | -- | -- | 1,190 | 5 | -- | 0.8 | -- | 2,940 | -- | -- |
| Sulfur hexafluoride (SF6) | femtogram per kilogram | < | 1.00 | -- | -- | -- | -- | -- | -- | -- | < | 1.00 | -- | -- |
| | | | | | *U.S. Geological Survey Reston Stable Isotope Laboratory* | | | | | | | | | |
| δ18O of water | per mil, relative to VSMOW | -- | −13.32 | -- | -- | -- | −13.38 | -- | -- | −0.4 | -- | −13.39 | -- | -- |
| δ2H of water | per mil, relative to VSMOW | -- | −113 | -- | -- | -- | −113 | -- | -- | 0.0 | -- | −113 | -- | -- |
| | | | | | *Woods Hole Oceanographic Institute* | | | | | | | | | |
| δ13C of dissolved inorganic carbon | per mil, relative to VPDB | -- | −14.39 | -- | -- | -- | -- | -- | -- | -- | -- | −14.11 | -- | -- |
| Carbon-14 of dissolved inorganic carbon | percent carbon, normalized | -- | 2.22 | -- | -- | -- | -- | -- | -- | -- | -- | 1.53 | -- | -- |
| | | | | | *U.S. Geological Survey Menlo Park Tritium Laboratory* | | | | | | | | | |
| Tritium in water | picocuries per liter | -- | 0.60 | -- | -- | < | 0.2 | -- | R | -- | -- | 0.30 | -- | -- |

[1]Remarks used in table:
  <, less than.
  U, analyzed for but not detected.

[2]Project data qualifiers used in table.
  1 - Quantified concentration in the environmental sample is less than five times the maximum concentration in a blank sample.
  2 - Relative percent difference (RPD) between the environmental sample and replicate is greater than 20 percent.
  3 - Potential low bias; recovery is less than 70 percent in one or more spike samples.
  4 - Potential high bias; recovery is greater than 130 percent in one or more spike samples (only applied to constituents with quantified results).
  5 - Value is mean of two results reported by the laboratory.
  6 - Filtered value exceeds unfiltered value.

[3]Laboratory data qualifiers used in table.
  R - radchem non-detect, below sample specific critical level.

**Table 12.** Inorganic constituents in quality-control samples collected for monitoring well MW02 near Pavillion, Wyoming, May 2012. (Excel file)

**Table 13.** Organic constituents in quality-control samples collected for monitoring well MW02 near Pavillion, Wyoming, May 2012. (Excel file)

**Table 14.** Dissolved gasses in quality-control samples collected for monitoring well MW02 near Pavillion, Wyoming, May 2012. (Excel file)

# References Cited

Busenberg, E., and Plummer, L.N., 2000, Dating young groundwater with sulfur hexafluoride—Natural and anthropogenic sources of sulfur hexafluoride: Water Resources Research, v. 36, p. 3,011–3,030.

Clesceri, L.S., Greenberg, A.E., and Franson, M. A. H., eds.., 1998, Standard methods for the examination of water and wastewater (20th ed.): Washington, D.C., American Public Health Association [variously paged].

Dunkle, S.A., Plummer, L.N., Busenberg, E., Phillips, P.J., Denver, J.M., Hamilton, P.A., Michel, R.L., and Coplen, T.B., 1993, Chlorofluorocarbons ($CCl_3F$ and $CCl_2F_2$) as dating tools and hydrologic tracers in shallow groundwater of the Delmarva Peninsula, Atlantic Coastal Plain, United States: Water Resources Research, v. 29, p. 3,837–3,860.

Ekwurzel, B., Schlosser, P., Smethie, W.M., Plummer, L.N., Busenberg, E., Michel, R.L., Weppernig, R., and Stute, M., 1994, Dating shallow groundwater: comparison of the transient tracers $^3H/^3He$, chlorofluorocarbons, and $^{85}Kr$: Water Resources Research, v. 30, p. 1,693–1,708.

Hach Chemical Company, 2008, Portable Turbidimeter, Model 2100P, Instrument and Procedure Manual: accessed September 9, 2012, at *http://www.hach.com/2100p-portable-turbidimeter/product-downloads?id=7640450099.*

Hem, J.D., 1985, Study and interpretation of chemical characteristics of natural water (3d ed.): U.S. Geological Survey Water-Supply Paper 2220, 81 p.

James Gores and Associates, 2011, Pavillion area water supply, Level I study: Riverton, Wyo., James Gores and Associates, P.C. Report, 136 p.

McMahon, P.B., Plummer, L.N. , Böhlke, J.K. , Shapiro, S., and Hinkle, S.R., 2011, A comparison of recharge rates in aquifers of the United States based on groundwater-age data: Hydrogeology Journal, v. 19, p. 779–800.

Plummer, L.N., Bexfield, L.M., Anderholm, S.K., Sanford, W.E., and Busenberg, E., 2004, Geochemical characterization of groundwater flow in the Santa Fe Group aquifer system, Middle Rio Grande Basin, New Mexico: U.S. Geological Survey Water-Resources Investigations Report 03–4131, 395 p.

U.S. Census Bureau, 2010, 2010 Census interactive population search, accessed January 21, 2012, at *http://2010.census.gov/2010census/popmap/ipmtext.php?fl=56.*

U.S. Environmental Protection Agency, 1989, Data evaluation, chap. 5 *in* Risk assessment guidance for Superfund—Volume 1—Human health evaluation manual (Part A): Washington, D.C., Office of Emergency and Remedial Response, U.S. Environmental Protection Agency Report EPA/540/1–89/002, 30 p., accessed July 17, 2012, at *http://www.epa.gov/oswer/riskassessment/ragsa/pdf/ch5.pdf.*

U.S. Environmental Protection Agency, 1994, Sample preparation and calculations for dissolved gas analysis in water samples using a GC headspace equilibration technique, RSKSOP-175, rev. 0, August 1994: Ada, Oklahoma, U.S. Environmental Protection Agency, R.S. Kerr Environmental Research Laboratory, 14 p.

U.S. Environmental Protection Agency, 2011, Investigation of groundwater contamination near Pavillion, Wyoming: U.S. Environmental Protection Agency Report EPA–600–R–00–000, 104 p., accessed July 25, 2012, at *http://www.epa.gov/region8/superfund/wy/pavillion/.*

U.S. Geological Survey, variously dated, National field manual for the collection of water-quality data: U.S. Geological Survey Techniques of Water-Resources Investigations, book 9, chaps. A1–A9, accessed August 13, 2012, at *http://water.usgs.gov/owq/FieldManual/.*

Wilde, F.D., ed., variously dated, Field measurements: U.S. Geological Survey Techniques of Water-Resources Investigations, book 9, chap. A6, with sec. 6.0–6.8, accessed August 13, 2012, at *http://pubs.water.usgs.gov/twri9A6/.*

Wright, P.R., and McMahon, P.B., 2012, Sampling and analysis plan for the Characterization of groundwater quality in two monitoring wells near Pavillion, Wyoming: U.S. Geological Survey Open-File Report 2012–1197, 91 p.

## Appendix 1. Monitoring Well MW01 field notes—Field instrument calibration notes, general project notes, groundwater-quality notes for samples 1 and 2, alkalinity/acid-neutralizing capacity titration field notes and results (figures 1.1.1–1.3.2)

This appendix contains copies of field related project notes collected for activities related to monitoring well MW01. Specifically this appendix contains field instrument calibration notes (figures 1.1.1 and 1.1.2), general project notes (figures 1.2.1 through 1.2.12), groundwater-quality notes for Monitoring Well MW01 environmental sample 1 (figures 1.2.13 through 1.2.15, 1.2.21), the purge log for Monitoring Well MW01 samples 1 and 2 (figures 1.2.16 through 1.2.20), a list of analytes collected from Monitoring Well MW01 during sample 1 (figures 1.2.22 through 1.2.24), groundwater-quality notes for Monitoring Well MW01 environmental sample 2 (figures 1.2.25 through 1.2.27), field analysis notes for alkalinity, acid-neutralization capacity and miscellaneous measurements for Monitoring Well MW01 samples 1 and 2 (figures 1.3.1 through 1.3.9), and alkalinity and acid-neutralization capacity results for Monitoring Well MW01 samples 1 and 2 (figures 1.4.1 through 1.4.6).

## Appendix 2. Monitoring Well MW01 laboratory-related documents—Analytical Services Request forms, Chain of Custody records (figures 2.1.1–2.9.7)

This appendix contains copies of laboratory analytical request forms (ASRs) and chain-of-custody forms (CoC), which accompanied environmental and quality-control samples during shipment to respective laboratories. This appendix includes ASR/CoC forms for the source solution (figures 2.1.1 through 2.1.3); ambient (figures 2.2.1 through 2.2.4) and field blanks (figures 2.3.1 through 2.3.5); ASR and COC forms for environmental sample 1 (figures 2.4.1 through 2.4.8, 2.4.10, and 2.4.17); the sample 1 replicate (2.5.1 through 2.5.5); environmental sample 2 (figures 2.6.1 through 2.6.7); the sample 2 replicate (2.7.1 through 2.7.4); the matrix spike sample (figures 2.8.1 through 2.8.5); the matrix-spike duplicate sample (figures 2.9.1 through 2.9.5); and the trip blank (2.9.6 and 2.9.7). Chain-of-custody records that relate to both samples 1 and 2 are included as figures 2.4.9 and 2.4.11 through 2.4.16.

## Appendix 3. Monitoring Well MW01 photographs (figures 3.1–3.1.6)

This appendix contains a selection of photographs taken April 24, 2012, to document sampling activities at Monitoring Well MW01.

## Appendix 4. Monitoring Well MW02 field notes—Groundwater-quality and field notes for collection of samples related to work at this well (figures 4.1–4.7)

This appendix contains copies of field related project notes collected for activities related to monitoring well MW02. Specifically, this appendix includes project notes (figure 4.1), groundwater- quality notes for the collection of a sample of public water supply of the city of Riverton, Wyoming (figures 4.2 through 4.6), and field notes for the collection of a downhole camera equipment blank (figure 4.7).

## Appendix 5. Monitoring Well MW02 laboratory-related documents—Analytical Services Request forms, Chain of Custody records (figures 5.1.1–5.2.4)

This appendix contains copies of laboratory analytical request forms (ASRs) and chain-of-custody forms (CoC) that accompanied the sample of public water supply of the city of Riverton, Wyoming (figures 5.1.1 through 5.1.5) and the downhole camera blank (figures 5.2.1 through 5.2.4) to TestAmerica Laboratories.

## Appendix 6. Monitoring Well MW02 photographs (figures 6.1–6.6)

This appendix contains a selection of photographs taken May 1st and 2nd, 2012 to document redevelopment related activities at Monitoring Well MW02.

## Appendix 7. Tentatively identified compounds identified in environmental and quality-control samples collected for monitoring well MW01 near Pavillion, Wyoming

Case No. 1:20-cv-02484-MSK   Document 88-1   filed 05/06/21   USDC Colorado   pg 237 of 345





**Injection Wells**
The Hidden Risks of Pumping Waste Underground

# The Trillion-Gallon Loophole: Lax Rules for Drillers that Inject Pollutants Into the Earth



*The remains of a tanker truck after an explosion ripped through an injection well site in a pasture outside of Rosharon, Texas, on Jan. 13, 2003, killing three workers. The fire occurred as two tanker trucks, including the one above, were unloading thousands of gallons of drilling wastewater. (Photo courtesy of the Chemical Safety Board)*

*by Abrahm Lustgarten*
*ProPublica, Sep. 20, 2012, 11:12 a.m.*



On a cold, overcast afternoon in January 2003, two tanker trucks backed up to an injection well site in a pasture outside Rosharon, Texas. There, under a steel shed, they began to unload thousands of gallons of wastewater for burial deep beneath the earth.

The waste – the byproduct of oil and gas drilling – was described in regulatory documents [1] as a benign mixture of salt and water. But as the liquid rushed from the trucks, it released a billowing vapor of far more volatile materials, including benzene and other flammable hydrocarbons.

The truck engines, left to idle by their drivers, sucked the fumes from the air, revving into a high-pitched whine. Before anyone could react, one of the trucks backfired, releasing a spark that ignited the invisible cloud.

Fifteen-foot-high flames enveloped the steel shed and tankers. Two workers died, and four were rushed to the hospital with burns over much of their bodies. A third worker died six weeks later.

What happened that day at Rosharon was the result of a significant breakdown [2] in the nation's efforts to regulate the handling of toxic waste, a ProPublica investigation shows.

The site at Rosharon is what is known as a "Class 2" well. Such wells are subject to looser rules and less scrutiny than others designed for hazardous materials. Had the chemicals the workers were disposing of that day come from a factory or a refinery, it would have been illegal to pour them into that well. But regulatory concessions won by the energy industry over the last three decades made it legal to dump similar substances into the Rosharon site – as long as they came from drilling.

Injection wells have proliferated over the last 60 years, in large part because they are the cheapest, most expedient way to manage hundreds of billions of gallons of industrial waste generated in the U.S. each year. Yet the dangers of injection are well known: In accidents

dating back to the 1960s, toxic materials have bubbled up to the surface or escaped, contaminating aquifers that store supplies of drinking water.

There are now more than 150,000 Class 2 [3] wells in 33 states, into which oil and gas drillers have injected at least 10 trillion gallons of fluid.  The numbers have increased rapidly in recent years, driven by expanding use of hydraulic fracturing to reach previously inaccessible resources.

ProPublica analyzed records summarizing more than 220,000 well inspections conducted between late 2007 and late 2010, including more than 194,000 for Class 2 wells. We also reviewed federal audits of state oversight programs, interviewed dozens of experts and explored court documents, case files, and the evolution of underground disposal law over the past 30 years.

Our examination shows that, amid growing use of Class 2 wells, fundamental safeguards are sometimes being ignored or circumvented. State and federal regulators often do little to confirm what pollutants go into wells for drilling waste. They rely heavily on an honor system in which companies are supposed to report what they are pumping into the earth, whether their wells are structurally sound, and whether they have violated any rules.

More than 1,000 times in the three-year period examined, operators pumped waste into Class 2 wells at pressure levels they knew could fracture rock and lead to leaks. In at least 140 cases, companies injected waste illegally or without a permit.

In several instances, records show, operators did not meet requirements to identify old or abandoned wells near injection sites until waste flooded back up to the surface, or found ways to cheat on tests meant to make sure wells aren't leaking.

"The program is basically a paper tiger," said Mario Salazar, a former senior technical advisor to the Environmental Protection Agency who worked with its injection regulation program for 25 years. While wells that handle hazardous waste from other industries have been held to increasingly tough standards, Salazar said, Class 2 wells remain a gaping hole in the system. "There are not enough people to look at how these wells are drilled ... to witness whether what they tell you they will do is in fact what they are doing."

Thanks in part to legislative measures and rulemaking dating back to the late 1970s, material from oil and gas drilling is defined as nonhazardous, no matter what it contains. Oversight of Class 2 wells is often relegated to overstretched, understaffed state oil and gas agencies, which have to balance encouraging energy production with protecting the environment. In some areas, funding for enforcement has dropped even as drilling activity has surged, leading to more wells and more waste overseen by fewer inspectors.

"Class 2 wells constitute a serious problem," said John Apps, a leading geoscientist and injection expert who works with the U.S. Department of Energy's Lawrence Berkeley National Laboratory. "The risk to water? I think it's high, partially because of the enormous number of these wells and the fact that they are not regulated with the same degree of conscientiousness."

In response to questions about the adequacy of oversight, the EPA, which holds primary regulatory authority over injection wells, reissued a statement it supplied to ProPublica for an earlier article [3] in June.

"Underground injection has been and continues to be a viable technique for subsurface storage and disposal of fluids when properly done," a spokesperson wrote. "EPA recognizes that more can be done to enhance drinking water safeguards and, along with states and tribes, will work to improve the efficiency of the underground injection control program."

Some at the EPA and at the Department of Justice, which prosecutes environmental crimes, say the system's blind spots suggest that many more violations likely go undiscovered – at least until they mushroom into a crisis.



That's what happened at Rosharon.

The accident prompted the EPA to examine what else had been dumped at the site, ultimately exposing a scheme [4] by a company that was not involved in the explosion, Texas Oil and Gathering, to pass off deadly chemicals from a petroleum refining plant as saltwater from drilling.

The switch saved the company substantial fees by allowing it to dispose of the material in a Class 2 well, instead of a more stringently controlled well for hazardous waste, federal investigators said.

Texas Oil and Gathering's owner and operations manager were convicted of conspiring to dump illegal waste and violating the Safe Drinking Water Act. Both declined to comment for this article.

Texas officials acknowledged that they had not looked beyond the paperwork submitted by the operators using the well. The delivery trucks weren't inspected; the wastewater was not sampled.

"Staff had no reason to believe at the time that such testing was necessary at this facility," Ramona Nye, a spokeswoman for the Railroad Commission of Texas, which regulates the oil and gas industry activity in the state, wrote in an email. "The likelihood of unpermitted

material being disposed of is low."

William Miller, the EPA's chief investigator on the case, points out that the only reason anyone was held accountable for injection-related violations was because the site blew up.

"If you can get the stuff down the well how is anyone ever going to know what it was?" said Miller, who retired from the EPA in 2011. "There is no way to recover it. It's an easy way to commit a crime and not have any evidence left of it afterwards."

**States and Industry Resist Environmental Protections**

One reason that Texas Oil and Gathering was able to dump toxic waste for years without getting caught is that environmental regulations governing how the oil and gas industry disposes of material underground were weakened almost as soon as they were written.

A series of injection accidents beginning in the 1960s – involving pesticide waste in Colorado, dioxins in Beaumont, Texas [5], and drilling waste that spread for miles through a drinking water aquifer in Arkansas – prompted lawmakers to impose tougher rules on injection wells.

Wells were divided into classes [6], depending on the source of the waste they handled. Class 1 wells for chemical, pharmaceutical and other industrial wastes, along with Class 2 wells for the oil and gas industry, were subjected to tough controls under the Safe Drinking Water Act of 1974. From the start, the EPA says, oil and gas waste was treated as less toxic than waste from other industries, but all such material was seen as dangerous to drinking water.

Companies drilling the wells were required to do geological modeling to ensure that surrounding rock layers would not allow waste to escape through fissures or fault lines. They also were required to check for the presence of other wells that could be a conduit for contamination. The EPA set baseline standards and mandated periodic inspections for defects. In many cases, states oversaw their implementation.

The ink had barely dried on the new regulations when the oil and gas industry – aided by sympathetic state regulators who thought their existing oversight was sufficient – began arguing that its waste should be treated differently.

Industry officials lobbied for state oil and gas agencies, some of which already had rules in place, to oversee Class 2 wells, not federal or local environmental officials. Some argued state energy regulators had greater expertise in well construction and regional geology.

In 1980, California Rep. Henry Waxman sponsored a measure that allowed the EPA to delegate authority to oversee Class 2 injection to state oil and gas regulators, even if the rules they applied varied from the Safe Drinking Water Act and federal guidelines.

A few years later, Dick Stamets, New Mexico's chief oil and gas regulator at the time, told a crowd of state regulators and industry representatives that the Waxman amendment was a biblical deliverance from oppressive federal oversight for the drilling industry.

"The Pharaoh EPA did propose regulations and there was chaos upon the earth," Stamets said. "The people groaned and labored, and great was their suffering until Moses Section 1425 (the Waxman amendment) did lead them to the Promised Land."

In the late 1980s, the EPA moved to impose more stringent measures on injection wells after Congress banned injection of "hazardous" waste. The new rules barred underground dumping unless companies could prove the chemicals weren't a health threat. To earn permission to inject the waste,  companies would have to conduct exhaustive scientific reviews to dispose of hazardous materials, proving their waste wouldn't migrate underground for at least 10,000 years.

The energy industry moved preemptively to shield itself from these changes, too. The Safe Drinking Water Act prohibited the EPA from interfering with the economics of the oil and gas industry unless there was an imminent threat to health or the environment. The industry argued that its waste was mostly harmless brine and that testing and inspecting hundreds of thousands of wells for waste that would qualify as "hazardous" would delay drillers or cost them a fortune.

"It would have been crippling to U.S. oil and gas production," said Lee Fuller, vice president of government relations for the Independent Petroleum Association of America. Fuller was a former staff member for the Senate Environment and Public Works Committee, whose ranking member at the time, the late Texas Sen. Lloyd Bentsen, led the fight against the hazardous waste rule. "So yes, the industry was very aggressively seeking some mechanism to address those consequences."

Bentsen had won the industry a temporary reprieve in 1980 by persuading Congress to redefine any substance that resulted from drilling – or "producing" – an oil or gas well as "non-hazardous," regardless of its chemical makeup, pending EPA study.  In 1988, the EPA made it permanent, handing oil and gas companies a landmark exemption [7].  From then on, benzene from the fertilizer industry was considered hazardous, threatening health and underground water supplies; benzene derived from wells for the oil and gas industry was not.

The effect was that the largest waste stream headed for underground injection, that from the oil and gas industry, was exempted from one of the most effective parts of environmental rules governing hazardous waste disposal.

"A blanket exemption without any sense of what the actual chemistry of these wastewaters is, is very concerning," said Briana Mordick, a geologist at the Natural Resources Defense Council.

Other protections also began to unravel, widening the gap between Class 1 and Class 2 well regulations. Both regulators and the industry regularly refer to drilling waste as "salt water" even though, according to a 2002 EPA internal training document [8] obtained by ProPublica, "on any given day, the injectate of a Class II-D well has the potential to contain hazardous concentrations of solvents, acids, and other... hazardous wastes."

Once the wastes were defined as nonhazardous, there was little justification for holding Class 2 wells to the same rules as other waste being injected deep underground.

Today, for example, Class 1 wells for hazardous waste [9] are tested for pressure continuously and are supposed to be inspected for cracks and leaks every 12 months. Oil and gas wells – though the goal is to inspect their sites annually – have to be tested only once every five years.

Injection wells are known to cause earthquakes, so Class 1 wells usually have rigorous seismic and geologic siting requirements. Often, Class 2 wells do not. An EPA staff member might spend an entire year reviewing an application for a new hazardous waste well. Class 2 wells are often permitted in bulk, meaning hundreds can be green-lighted in a matter of days.

Where Class 1 hazardous waste is injected, companies have to inspect a two-mile radius for old wells, making sure contaminants will have no avenue to shoot back up into drinking water aquifers or to the surface. The minimum standard for oil and gas companies is to inspect within 400 yards, even though it is widely believed, according to internal EPA memorandums obtained by ProPublica, that such a rule is arbitrarily defined, runs against "much existing evidence [10]" and "may not afford adequate protection [11]" of drinking water.

EPA officials acknowledge that their Class 1 regulations represent the best practices to keep water safe and that the risk of a Class 2 well leaking is no different than the risk of a Class 1 well leaking. The contrast in regulations reflects "varying legal authorities, not varying levels of confidence," an agency spokeswoman wrote in an email, referring to the mandate not to let environmental rules interfere with the nation's drilling progress.

State injection regulators counter that much drilling-related waste is put in the same geologic formations that produce oil and gas, in which contaminants like benzene naturally occur. The water close to these wells is often already undrinkable, they say, so lesser protections make sense.

According to the EPA's most recent inventory, the number of Class 2 wells is near an all-time high.

Oklahoma, Texas, Kansas and California use tens of thousands of Class 2 wells to push out oil and gas or dispose of fracking fluids and "produced" water, as the waste derived from drilling is called. In North Dakota, injection permits have increased [12] tenfold, with more wells being permitted in one month – September 2011 –than is typical in an entire year. New Mexico [13] issued twice as many permits last year as it did in 2007. Ohio injected twice as much waste in 2011 as it did in 2006 and is evaluating applications for dozens of new injection sites. largely for waste exported by Pennsylvania and New York, where such wells are deemed unsafe.

As much as 70 percent of the waste destined for Class 2 facilities would be considered toxic if it were not for the loopholes in the law, according to Wilma Subra, a chemist and activist who sits on the board of STRONGER [14], a partnership of oil and gas industry representatives and state regulators aimed at bolstering state standards.

Recently, Stark Concerned Citizens, an anti-drilling group, asked Ohio regulators why radioactive materials such as radium weren't identified or disclosed when injected into Class 2 wells.

"The law allows it," Tom Tomastik, a geologist with Ohio's Department of Natural Resources and a national expert on injection well regulation, replied in a Sept. 17 email. "It does not matter what is in it. As long as it comes from the oil and gas field it can be injected."

**Well Operators Game Safety Tests**

When Carl Weller showed up, shovel in hand, at a Kentucky farm field dotted with injection wells in June 2007, he was acting on a tip. Weller, a contracted EPA injection inspector, was an expert in testing for what regulators call "mechanical integrity," using air pressure to check if wells have leaks or cracks.

Such tests are among the only ways to know whether cement and steel well structures are intact, preventing brine and other chemicals from reaching drinking water.

Using his shovel, Weller dug around the top of a well, unearthing the steel tubing near the surface. A few inches down, he came across an apparatus he had never seen before: A section of high-pressure tubing ran out of the well bore and connected to a three-foot-long section of steel pipe, sealed at both ends. The apparatus appeared designed to divert air pumped into the well into the pipe instead, making the well test as if it were airtight.

"The only reason that I know of that that device would be installed would be to perform a false mechanical integrity test, more than likely because the well itself would not pass," Weller testified in 2009 as part of a case against the well's operator. The EPA did not make Weller available to comment for this article.

When EPA inspectors kept digging, they found the buried devices on 10 more wells.

The case stunned regulators. Weller had been inspecting the site's injection wells, which were used to enhance the recovery of oil, for the better part of a decade, certifying them as safe. After the EPA's discoveries, workers at the company that operated the wells, Roseclare Oil, accused its manager [15], Daniel Lewis, of having conspired to cheat the tests for much of that time.

In 2009, Lewis was convicted [16] of a felony charge for gaming the safety tests on Roseclare's wells and was sentenced to 3 years probation and a $5,000 fine. He maintains his innocence, saying the wells were rigged by his father, who ran the company's local operations until his death, but said such practices were typical in Kentucky's oil and gas industry. "I'd say it's pretty common," said Lewis, whose probation was commuted in 2011. "But it's not something people go around talking about either."

From Lewis' perspective, injection well operators sometimes have little choice but to try to fool inspectors. Many wells are decades old and were drilled before the current regulations were written. Some are decrepit, their cement aging and cracked. They also can't be easily – or cheaply – repaired.

Lewis, who is now a part-owner of Roseclare and continues to run its operations, said that before wells were due for EPA inspections he would pretest them himself. If one failed, he'd enter problem-solving mode, prepping the site for the EPA's arrival. Two of his employees testified that he ordered them to fabricate and install the diverters.

"You go and work in it and try to get it to hold and it won't hold," Lewis said of the wells. "What are you going to do? It's kind of a 'Don't ask, don't tell.'"

Randy Ream, the Assistant U.S. Attorney for Kentucky's Western District who prosecuted the case against Lewis, called his scheme unusually elaborate but agreed that efforts to get around the rules for injection wells are common. Sometimes, he said, they result in the contamination of private drinking water wells.

"We have people who have constructed wells that are not certified injection wells, or we have people who will put their brine in a tank and carry it over and put it in somebody else's well," Ream said. "One guy, he's got oil coming out of his shower head."

"There is just so much brine," Ream added, "and you have to get rid of it."

**So Many Wells, So Few Inspectors**

One obstacle to more effective enforcement in Kentucky and elsewhere, Ream said, is that regulators cannot always keep up with well tests and inspections.

According to EPA records, Kentucky has 3,403 Class 2 wells, which are supposed to be tested for mechanical integrity once every five years. But since 2007, an average of just 253 wells a year have been tested, less than half as many as there should have been to remain on schedule.

A spokeswoman for the EPA's regional office in Atlanta said in an email that only half of Kentucky's injection wells are actively used and only active wells can be tested. She said mechanical integrity tests are performed on each well every 36 months, but did not address the discrepancy between this schedule and the number of tests reflected in EPA data.

The EPA employs just six people to check its wells across the southeast, not just in Kentucky, but in Tennessee and Florida, too. Those same people are also responsible for working with state inspection programs in North and South Carolina, Georgia, Alabama and Mississippi, which have their own inspection staffs.

Most states aim to visit injection sites at least once a year, and some meet or exceed that schedule, EPA records show. Ohio, for example, recently added staff dedicated exclusively to injection oversight and visits its active injection sites every 12 weeks. (Ohio also insists that Class 2 wells meet many of the more stringent testing and permitting regulations it uses for Class 1 hazardous waste wells.)

"Ohio's [rules] are based on what we felt we needed to develop to continue to alleviate any concerns," said Tomastik, of Ohio's Department of Natural Resources. "Obviously without regulatory presence in the field, the operator is not concerned about operating within the requirements."

But understaffing seems to be endemic across drilling states, especially where state regulatory agencies are responsible for checking both producing oil and gas wells and injection wells for waste or to enhance production.

In Montana, EPA auditors [17] noted that inspectors are choosing which wells to inspect and have a "significant" workload. In North

Dakota, EPA auditors also noted [12] the pressures of "exponential" growth and an "increasing workload."

To meet the goal of inspecting each well annually, Texas inspectors would have to visit eight wells a day, every day, including Sundays and Christmas. That's after Texas' Railroad Commission hired 65 staffers last year to help inspect the state's 428,000 wells.

Nye, the commission's spokeswoman, said the state had sufficient funding and inspected each of its commercial disposal wells twice last year.

"The Commission has a stringent and comprehensive review process for these wells," Nye wrote in an email.  "Railroad Commission staff work diligently to ensure saltwater disposal wells are not and will not be a problem."

But inspectors don't check on private disposal wells, which are far more numerous, with the same regularity. Nor do they keep a schedule for when officials should conduct such visits.

Other states are struggling under similar burdens. In Wyoming, inspectors would also have to check eight wells a day for each well to be checked once a year – a pace possible if wells are clustered together, experts said, but otherwise difficult to achieve. In West Virginia and Kansas, inspectors would have to check seven wells per day.

Visiting injection wells often ranks low among inspectors' priorities unless there is an accident or spill, according to a 2007 Texas auditor's report [18]. The most urgent responsibility for regulators, beyond responding to emergencies, is typically overseeing the development of new oil and gas wells.

The result is that several years can pass between inspections of many injection well sites. In 2010, state regulators visited less than half of the Class 2 sites that a federal well inventory shows they were responsible for monitoring, ProPublica's analysis showed.  EPA inspectors checked on such wells even less frequently, visiting less than one-quarter of the sites under their jurisdiction in 2010.

"I don't give a darn whether you have federal regulations, or a squeaky clean permitting system," said Bill Bryson, a member of the Kansas Geological Survey and the former head of Kansas' oil and gas commission. "If you don't have somebody going out and looking at the wells it doesn't do any good, and if you don't have the right people looking ... it doesn't do any good either."

Much of the problem with oversight comes down to money, critics say. In some states, budgets and staff for oil and gas agencies have dropped relative to the number of new wells being drilled over the last nine years.

Kansas employs about the same number of inspectors as it did in 2003, even though it drills four times as many new wells. New drilling has nearly doubled in Louisiana over the same period, but the state's enforcement staff has remained static and its oil and gas budget has increased modestly. In Illinois, drilling has nearly doubled, while the number of enforcement staff has been reduced.

Since the Underground Injection Control program is run under a federal mandate, states rely partly on money from the EPA to fund oversight and enforcement. Federal dollars make up 20 percent of Texas' budget, for example. But in the last 22 years, the EPA's annual operating budget for injection has remained about the same: $10 million. Taking inflation into account, funding has dropped at least 40 percent from 1990 to 2012, though the regulations for all well classes have only grown more complex.

"The UIC program has been flat funded for years," said Dan Jarvis, the field operations manager for Utah's Division of Oil, Gas and Mining.  "With more manpower, obviously you put them on the ground and you're going to have better compliance. Our field people are some of the greatest guys going, but they are overworked."

The EPA declined to disclose the operating budget for regional offices that monitor waste wells under federal jurisdiction or oversee state injection programs. Documents show, [19] however, that in 2011 the agency suspended its travel budget for visits to some of the states that have the largest injection programs, including Louisiana, Texas and Oklahoma.

"Do you think we are doing more now than we were doing 30 years ago? No, there is no money," said Salazar, the former EPA injection expert. "There are not enough people to know what is going on. It is the ideal storm for industry. Less and less people, more and more things that the EPA has to do."

Ultimately, much of the responsibility for meeting EPA standards falls to companies themselves. Some operators routinely exceed the minimum requirements of injection regulations, says Hughbert Collier, who runs a Texas environmental engineering firm that consults with injection well operators. They conduct their own integrity tests every year and make sure employees visit well sites once a month.

But operators inclined to cut corners have little to hold them back.

"What most people would be surprised about is that regulators don't have real good control over everything that goes on in the regulated community," said Miller, the former EPA criminal investigator in Texas. "Most of our environmental law requires self-reporting and that requires honest people."

When violations are identified – such as the 140 times waste was illegally injected and noted in the regulatory reports – the consequences

can be minimal, and only in rare cases do transgressions rise to the level of criminal prosecution. In the three years of national data reviewed by ProPublica, which included more than 24,000 formal notices of violations, only one case was referred to criminal investigators.

Usually, violations result in citations or informal warnings. If operators do not address violations, then modest fines may be levied; in some cases, wells are temporarily shut down. There is no central source of information on the size of fines, but an audit of Louisiana's injection program [19] provides a glimpse: In 2011, the state collected an average of $158 for each violation.

After three deaths, two federal worker safety investigations and a criminal prosecution, few injection sites nationwide received as much regulatory scrutiny as those in Rosharon, Texas. Yet, despite all the attention, the wells there later failed on the most basic level.

On Feb. 17, 2010, thousands of gallons of waste that had been deposited into these wells gurgled to the surface [20] in what the Railroad Commission described as a "breakout." Materials injected far below the earth had managed to migrate back up to the surface, perhaps through an old well missed by regulators.

As of this June, investigators were still analyzing whether the chemicals injected underneath the site had reached water supplies.

*Jesse Nankin contributed research for this report.*

**Like this story? Sign up for our daily newsletter [22] to get more of our best work.**

1. http://www.propublica.org/documents/item/435949-well-permits-and-records-salt-water-005-001.html
2. http://www.propublica.org/documents/item/435925-csb-report-blsr-report.html
3. http://www.propublica.org/article/injection-wells-the-poison-beneath-us
4. http://www.propublica.org/documents/item/435924-texasoil-indictment.html
5. http://www.propublica.org/documents/item/355342-1985-report-uic-regulatory-oversightpb85185916
6. http://www.propublica.org/documents/item/371035-epa-1985-report-to-congress-haz-waste-study-uic.html
7. http://www.propublica.org/documents/item/435927-oil-gas-exemptions-epa.html
8. http://www.propublica.org/documents/item/435928-uic-epa-training-doc-good-dwauic-uicpermit.html
9. http://www.propublica.org/documents/item/435929-epa-2004-5-3-uicv-techguide-uic-tech-overview.html
10. http://www.propublica.org/documents/item/435932-fixed-aor-letter-epa-2004-good-aor-zei.html
11. http://www.propublica.org/documents/item/435933-codrington-memo-good-quarter-mile-aor-not.html
12. http://www.propublica.org/documents/item/435198-nd-1425-fy-11-review.html
13. http://www.propublica.org/documents/item/435941-nm-nmed-eoyfy11.html
14. http://www.strongerinc.org/
15. http://www.propublica.org/documents/item/435944-kentucky-case-lewis-indictment-show-temp-pl.html
16. http://www.propublica.org/documents/item/435945-kentucky-case-lewis-appeals-11a0571n-06.html
17. http://www.propublica.org/documents/item/435197-mt-1425-fy-11-review.html
18. http://www.propublica.org/documents/item/435206-texas-railroad-commission-auditor-report-aug2007.html
19. http://www.propublica.org/documents/item/435207-la-ldnr-eoyfy11.html
20. http://www.propublica.org/documents/item/435948-propublicajune2012blsr-cancel-ltr.html
21. http://twitter.com/AbrahmL
22. http://www.propublica.org/forms/newsletter_daily_email

© Copyright 2016 Pro Publica Inc.

**Steal Our Stories**
Unless otherwise noted, you can republish our stories
for free if you *follow these rules.*

**Download Our Data**

**Send Us Tips or Documents Securely**



# Breaking
# All the Rules

## THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT

### STATES ARE BETRAYING THE PUBLIC BY FAILING TO ENFORCE OIL AND GAS DEVELOPMENT RULES

SEPTEMBER 2012

EARTHWORKS™
OIL & GAS ACCOUNTABILITY PROJECT



Photo by: Kari Matsko

## ACKNOWLEDGEMENTS

This report was researched and written by Lisa Sumi, author the Earthworks publications: *Oil and Gas at Your Door? A Landowner's Guide to Oil and Gas Development* and *Our Drinking Water at Risk: What EPA and the Oil and Gas Industry Don't Want Us to Know About Hydraulic Fracturing*.

Thank you to Susan Law, for providing research assistance on state oil and gas penalties, and to Bruce Baizel of Earthworks for research and editing. Thank you, as well, to the people who attended the meetings in Denver and Pittsburgh, for providing valuable insight and suggestions for this research. The report was reviewed by Earthworks staff (Jennifer Krill, Gwen Lachelt, Alan Septoff, Nadia Steinzor, Sharon Wilson), as well as several others including Wilma Subra (Subra Company and member of the State Review of Oil and Gas Regulations/STRONGER Board); Deborah Goldberg (Earthjustice) and Judy Jordan. Finally, this work could not have been undertaken without the generous support of The Heinz Endowments.

Please visit the Earthworks web site for state-specific fact sheets and enforcement information, as well as research that did not make it into this report. http://enforcement.earthworksaction.org

September 25, 2012

Earthworks' Oil & Gas Accountability Project
Offices in New York State, Maryland, New Mexico, Colorado, Texas and California
EARTHWORKS • 1612 K St., NW, Suite 808 Washington, D.C., USA 20006
www.earthworksaction.org • www.ogap.org • 202.887.1872





# Table of Contents

LIST OF TABLES .................................................................................................................. 5
LIST OF CHARTS ................................................................................................................. 5
LIST OF FIGURES ............................................................................................................... 6
LIST OF APPENDICES ......................................................................................................... 6
PRIMARY ACRONYMS AND ABBREVIATIONS IN THIS REPORT ...................................... 7

**EXECUTIVE SUMMARY** ................................................................................................. **8**

**INTRODUCTION** ............................................................................................................ **18**

**1. CURRENT STATE OF OIL AND GAS ENFORCEMENT** ................................................. **20**

1.1. INSPECTIONS ............................................................................................................ 22

    INSPECTIONS DATA ................................................................................................... 22

    STATE COMPARISON OF INSPECTIONS ...................................................................... 23

    INSPECTION TRIAGE ................................................................................................... 24

    INSPECTION POLICIES AND GUIDELINES ................................................................... 26

    INCREASE ENVIRONMENTAL MONITORING DURING AND IN ADDITION TO INSPECTIONS .... 29

    INSPECTIONS DATA: RECOMMENDATIONS ............................................................... 30

1.2. VIOLATIONS ............................................................................................................. 32

    STATE-BY-STATE VIOLATION TRENDS ...................................................................... 33

    Colorado: No strong trend .......................................................................................... 33
    New Mexico: Decreasing violations reported ............................................................. 33
    New York: Violations data not available ...................................................................... 35
    Ohio: When inspectors go looking, they find violations .............................................. 35
    Pennsylvania: Increasing violations ............................................................................ 37
    Texas: Downward trend in violations .......................................................................... 39

    ARE CURRENT EFFORTS REDUCING VIOLATIONS AND INCREASING COMPLIANCE? ............. 40

    Companies violate the same rule on many well sites .................................................... 41
    Companies repeatedly violate the same rules on the same sites ................................... 43

    VIOLATIONS DATA: RECOMMENDATIONS ................................................................ 44

1.3.    ENFORCEMENT ACTIONS AND PENALTIES ............................................................. 45

    MAXIMUM PENALTIES ARE OUTDATED .................................................................... 45

    RECENT EFFORTS TO INCREASE PENALTY AMOUNTS ................................................ 47

    THE HOW, WHEN, AND WHO OF ASSESSING CIVIL PENALTIES ................................... 48

    TRENDS IN PENALTIES AND ENFORCEMENT ACTIONS .............................................. 49

*Table of Contents*

Colorado ................................................................................................ 49
New Mexico ........................................................................................... 50
New York ................................................................................................ 51
Ohio ....................................................................................................... 51
Pennsylvania ......................................................................................... 52
Texas ...................................................................................................... 54

PENALTIES: DO THEY INCREASE COMPLIANCE? ................................................ 55

ENFORCEMENT ACTIONS: RULES INCONSISTENTLY APPLIED ............................. 57

REMOVING THE ECONOMIC BENEFIT OF NON-COMPLIANCE ............................. 61

PENALTIES AND ENFORCEMENT ACTIONS RECOMMENDATIONS ........................ 63

1.4.   OTHER ENFORCEMENT OPTIONS ............................................................. 64

CEASE AND DESIST ORDERS .............................................................. 64

SUSPEND, MODIFY, OR REVOKE PERMITS ........................................ 66

STOP PRODUCTION ........................................................................... 67

NO NEW PERMITS .............................................................................. 71

OTHER ENFORCEMENT OPTIONS: RECOMMENDATIONS .............. 71

1.5.   CITIZEN COMPLAINTS ............................................................................... 72

CITIZEN COMPLAINTS: RECOMMENDATIONS ................................... 75

2. FACTORS THAT IMPEDE ENFORCEMENT ...................................................... 77

2.1.   AGENCY BUDGETS ..................................................................................... 77

SOME STATE BUDGETS FOR OIL AND GAS AGENCIES HAVE INCREASED ........... 77

BUDGET INCREASES HAVE NOT RESULTED IN ADEQUATE STAFF .................... 78

GENERATION AND DISTRIBUTION OF OIL AND GAS REVENUES AND FEES ......... 80

AGENCY BUDGETS: RECOMMENDATIONS ........................................ 82

2.2.   STAFFING ISSUES ....................................................................................... 82

NOT ENOUGH STAFF .......................................................................... 82

CONFLICTS OF INTEREST AND THE REVOLVING DOOR ...................... 83

STAFFING ISSUES: RECOMMENDATIONS ........................................... 85

2.3.   DATA COLLECTION, MANAGEMENT, AND TRANSPARENCY ....................... 86

2.4.   OTHER FACTORS ........................................................................................ 87

MORE RESOURCES ALLOCATED TO PERMITTING RATHER THAN ENFORCEMENT ...... 87

*Table of Contents*

BARRIERS TO CITIZEN INVOLVEMENT IN ENFORCEMENT ..................................................89

THE BURDEN OF PROOF MUST BE SHIFTED...........................................................................89

**3. THE PATH FORWARD.................................................................................................. 91**

## LIST OF TABLES

Table 1. State-by-state comparison of inspection staff and activity (2010)....................................23
Table 2. Estimated number of active wells that were not inspected in 2010....................................25
Table 3. Texas RRC Field Operations Job Priorities (2010 policy)..................................................26
Table 4. Activities requiring notification of Ohio oil and gas inspectors..........................................27
Table 5. Suggested inspection frequencies in Pennsylvania, North Dakota, and New York.................28
Table 6. Violation data by state (2010)........................................................................................32
Table 7. Violations related to oil and gas wells in Ohio, 2008-2011..............................................36
Table 8. Violations found by type of inspections in Ohio (2011)....................................................36
Table 9. Trends in violations for the top offenders in Pennsylvania...............................................39
Table 10. Ten Railroad Commission of Texas rules most frequently violated in 2009......................41
Table 11. Operators with more than one recurring violation in the eFACTS database......................43
Table 12. Civil penalties for violations of oil and gas regulations state...........................................46
Table 13. Civil penalties collected (2009 or 2010). ......................................................................49
Table 14. Texas fees, fines, penalties, and other revenues from oil and gas violations ($mill).........55
Table 15. Inconsistent OCD enforcement (2011).........................................................................59
Table 16. Inconsistent enforcement actions in Pennsylvania........................................................60
Table 17. Complaints related to oil and gas operations in Colorado...............................................73
Table 18. Complaints related to oil and gas operations in Texas....................................................74
Table 19. Pennsylvania inspections conducted in response to complaints (2007 - 2011).................75
Table 20. COGCC program expenditures and other information (2005-2010)..................................79
Table 21. Texas RRRC oil and gas program expenditures in millions of dollars (2008 & 2011). .........80

## LIST OF CHARTS

Chart 1. Spills in Colorado (2005-2011)......................................................................................20
Chart 2. Ohio pollution-related violations.....................................................................................21
Chart 3. NOAV and inspections in Colorado (2005-2011). .............................................................33
Chart 4. Letters of Violation in New Mexico..................................................................................34
Chart 5. Non-compliance letters received by some New Mexico operators.......................................34
Chart 6. Ohio Inspections and Violations (2001 – 2011). ...............................................................37
Chart 7. Violations in Pennsylvania (2008-2011)..........................................................................38
Chart 8. Pennsylvania inspections and violations. ........................................................................38
Chart 9. Texas operators with most violations of Rule 14(B)(2)......................................................42
Chart 10. Pennsylvania operators with the most Rule 102.4 violations............................................42
Chart 11. Enforcement actions in Colorado...................................................................................49
Chart 12. Operators and penalties assessed in Colorado...............................................................50
Chart 13. Penalties collected in New Mexico.................................................................................50
Chart 14. Penalties collected in New York. ...................................................................................51
Chart 15. Recent enforcement actions and violations in Ohio.........................................................51
Chart 16. Enforcement actions and penalties in Ohio.....................................................................52
Chart 17.  Recent trends in enforcement in Pennsylvania. .............................................................52



*Table of Contents*

Chart 18. Violations, enforcement actions and penalties in Pennsylvania.........................................................53
Chart 19. Enforcement referrals and violations in Texas...........................................................................................54
Chart 20. Stock prices following Chesapeake's record-breaking fine. ...............................................................57
Chart 21. Severances for field rule violations. ..............................................................................................................69
Chart 22. Percentage of severances and seals that have been resolved...........................................................70
Chart 23. Changes in oil and gas agency budgets in TX, CO and PA (2008 and 2011). ............................78

## LIST OF FIGURES

Figure 1. Oil and gas inspectors in CO, NM, TX, OH, NY and PA (2010)...........................................................23

## LIST OF APPENDICES

Appendix 1. State comparisons
Appendix 2. Colorado data
Appendix 3. New Mexico data
Appendix 4. New York data
Appendix 5. Ohio data
Appendix 6. Pennsylvania data
Appendix 7. Texas data

*Table of Contents*

## PRIMARY ACRONYMS and ABBREVIATIONS IN THIS REPORT

| | |
|---|---|
| **AOC** | Administrative Order of Consent (Colorado) |
| **BLM** | Bureau of Land Management (federal) |
| **CACP** | Consent Assessments of Civil Penalties (Pennsylvania) |
| **COGCC** | Colorado Oil and Gas Conservation Commission |
| **DEC** | Department of Environmental Conservation (New York) |
| **DEP** | Department of Environmental Protection (Pennsylvania) |
| **DMR** | Division of Mineral Resources (New York) |
| **DOGRM** | Division of Oil and Gas Resource Management (Ohio) |
| **EMNRD** | Energy, Minerals  and Natural Resources Department (New Mexico) |
| **LOV** | Letter of Violation |
| **NMED** | New Mexico Environment Department |
| **NOAV** | Notice of alleged violation |
| **NOV** | Notice of violation |
| **OCD** | Oil Conservation Division (New Mexico) |
| **ODNR** | Ohio Department of Natural Resources |
| **RBDMS** | Risk Based Data Management System (Ohio) |
| **RRC** | Railroad Commission (of Texas) |
| **STRONGER** | State Review of Oil and Natural Gas Environmental Regulations, Inc. |

*Introduction*

# Executive Summary

**A CRISIS IN PUBLIC OVERSIGHT:**
**STATES DO NOT ENFORCE OIL AND GAS EXTRACTION REGULATIONS**

The U.S. faces a crisis in the enforcement of rules governing the oil and gas industry. The shale gas and shale oil boom has brought an expansion of oil and gas activity unseen in many parts the country since the 19th century. Unfortunately, as this report shows, states are dangerously unprepared to oversee current levels of extraction, let alone increased drilling activity from the shale boom.

Battles over rulemakings can be intense – stakeholders spend considerable effort to influence the process whenever regulations are created or revised.  They do so because they believe that rules matter – that after the rules are created, the government will enforce them. This report reveals, in the case of state oil and gas rules, that is simply not true.

**Based on their own data, every state we studied fails to adequately enforce regulations on the books.**

Among our findings:
- Every year hundreds of thousands of oil and gas wells – 53 to 91% of wells in the states studied (close to 350,000 active wells in the six states in 2010) – are operating with no inspections to determine whether they are in compliance with state rules.
- When inspections do uncover rule violations, the violations often are not formally recorded – and the decision whether or not to record a violation is often left to the discretion of the individual inspector.
- When violations are recorded, they result in few penalties.
- When penalties are assessed, they provide little incentive for companies to not offend again.

The full report examines in detail the current state of oil and gas enforcement in Colorado, New Mexico, New York, Ohio, Pennsylvania and Texas. It also addresses systemic factors that impede enforcement.  Woven throughout are commonsense recommendations to fix the problem.

**INSPECTIONS: INADEQUATELY STAFFED, ARBITRARILY CARRIED OUT**

**Inspection capacity – egregiously lacking**

Overall, and without exception, inspection capacity for each of the six states examined is egregiously lacking.

However, there is significant variation in inspection capacity among the states. Inspectors in New Mexico and Texas have much larger workloads than their counterparts in other states. The average number of inspections carried out by each inspector in 2010 varied from as few as 154 (New York) to 1,598 (New Mexico). The total number of inspections in



*Introduction*

from as few as 154 (New York) to 1,598 (New Mexico). The total number of inspections in Colorado and Pennsylvania was similar (approximately 16,000), but Colorado performed the inspections with one-fifth of the number of inspectors as Pennsylvania.

In all six states, the number of wells that go uninspected each year is immense. For example, in 2010 Pennsylvania inspectors were unable to monitor more than 82,000 active wells (91% of the state's active wells), Ohio failed to inspect more than 58,000 wells (91% of active wells), and Texas inspectors did not inspect approximately 139,000 wells (53% of active wells).

A few states have developed guidelines or made statements regarding how frequently wells should be inspected. For example, Pennsylvania recommends at least five inspections, and New York recently announced it would require at least 13 inspections of each well during the drilling and completion stages, and Pennsylvania recommends at least one inspection per year thereafter for producing wells. Despite the importance of monitoring potential contamination from inactive and plugged wells, no states have explicit requirements for periodic inspections of these wells.

None of the six states come anywhere near to meeting this recommended inspection guideline.

Some states, such as Pennsylvania, Colorado, and Ohio, have increased their overall oil and gas agency budgets in response to increased drilling. Even with the budget increases, however, funding remains insufficient to provide for thorough and adequate inspections of oil and gas activities.

Additionally, inspectors are rarely provided with the equipment necessary to catch all of the problems that may be occurring at oil and gas facilities. For example, there may be leaks or air emissions that pose health and safety concerns but cannot be seen and often not smelled. It is possible to instantaneously detect air emissions, but few oil and gas agencies have the equipment to do so.

RECOMMENDATION:  *Inspection capacity needs to be increased in all states. This can be accomplished by increasing agency budgets, staff numbers, and employee remuneration to retain experienced staff.*

RECOMMENDATION:  *Agencies should establish required minimum inspector-to-well ratios, and annual-inspections-per-well requirements for each stage of well development (including inactive wells, which fail over time). Also, follow-up inspections should be conducted as frequently as is necessary to ensure that violations have been corrected in a timely and complete manner.*

RECOMMENDATION:  *To ensure consistency of inspections across a state, agencies should develop binding inspection protocols on how to carry out inspections, and how to document and respond to violations.*

RECOMMENDATION:  *To ensure that actual operating conditions are observed, the bulk of inspections should not be announced or planned in advance with the operator.*



*Introduction*

RECOMMENDATION: *State agencies should invest in equipment to help inspectors detect emissions from oil and gas facilities as a matter of everyday practice, not as an exceptional procedure.*

RECOMMENDATION: *Companies should be required to transparently conduct comprehensive and ongoing environmental monitoring of air, water, and soil in order to detect concentrations of emissions that can damage ecosystems or cause acute or chronic health problems for workers and residents.*

RECOMMENDATION: *Statistics on inspections and individual inspection files should be recorded in an electronic format that is easy to use and available to the public.*

RECOMMENDATION: *Agencies should increase fees for permits related to oil and gas development to help cover the costs of inspection, monitoring, and enforcement.*

RECOMMENDATION: *Oil and gas agencies should continue to press state legislatures to increase agency enforcement budgets. In states where oil and gas severance taxes are collected, oil and gas agencies should request that sufficient funds from this income source be allocated to their agencies to cover enforcement budgets.*

**Public inspectors**

Citizens living in or near oil and gas fields have the potential to play an important role in aiding agency enforcement staff because they live with the development on a daily basis. Other than workers at a well site or facility, citizens are the ones most likely to notice when problems such as spills and releases occur.

Information gathered for this report suggests that citizen complaints have led to inspections that have, in turn, found violations. Unfortunately, the agency responses to citizen complaints have not always been immediate or thorough, and there may be little or no follow-up with the citizen who filed the complaint. Also, many states do not track citizen complaints in a manner that allows either agency staff or citizens to determine whether or not complaints have been adequately resolved.

Texas prioritizes citizen complaints about active pollution or safety, and requires inspectors to respond, typically within 24 hours. This is just a policy, however, that would be much more beneficial codified as an enforceable regulation so that inspectors would be required to take citizen complaints, pollution events, and other hazards seriously.

RECOMMENDATION: *Agencies should be required to maintain publicly accessible complaint databases that include basic information including the operators and/or oil and gas facilities, if an inspection occurred as a result of the complaint, any violations found, any enforcement actions taken, and when and how the complaint was fully resolved.*

RECOMMENDATION: *Agencies should be required to publish a binding policy that outlines how to respond to citizen complaints (e.g., required response time, follow-up procedures) to ensure fair treatment of all complaints, transparency, and clear communication with the public.*

**VIOLATIONS: INFREQUENTLY AND UNEVENLY ASSESSED**

Information on oil- and gas-related violations is poorly tracked in most states.


BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

10

*Introduction*

In New Mexico and Colorado, information on violations is accessible on a well-by-well basis but statistics on the overall number of violations are not publicly available. In New York no data on violations are available. Texas tracks statistics on violations, but up until this year, statistics were not published in an online, publicly accessible format.

Currently, statistics on violations are not a reliable indicator of non-compliance because not all operators who break the rules are issued violations. For example, in Colorado, even though some inspections are "unsatisfactory," violations of rules may not be recorded. And, if the violations are not recorded, these unsatisfactory inspections become invisible to the public.

New Mexico is particularly troublesome in the discretion afforded to inspectors to decide whether or not to issue a Letters of Violation. Because of this unfettered discretion, operators may receive different treatment simply because their site is visited by inspector X instead of inspector Y, or their well is located in a district A rather than district B.

Largely as a consequence of the discretion in the field and the lack of systematic reporting, there is no clear trend in violations data for the six states examined for this report. Violations have increased in some states, decreased in others, or have fluctuated from year to year with no discernible pattern.

In Pennsylvania, violations have increased in the past few years. Violations had been on the decline in Ohio, but increased in 2011. In both of these states, it appears that when the number of inspections increases, more violations are found.

In Texas, the number of violations found by inspectors decreased between 2006 and 2010, but with more than 70,000 violations identified in 2010, it is clear that a very serious problem with compliance still exists. Texas inspectors find more violations per inspection than their counterparts in other states.

What data are available indicate that even where violation reports are routinely made, they are ineffective in getting companies to come into compliance.  The data show that companies continue to violate the same rules at many well sites and the same rules get violated year after year.

RECOMMENDATION: *Agencies should issue notices of violation whenever rules are broken. If combined with adequate penalties, these could greatly deter potential violators.*

RECOMMENDATION: *Agencies should monitor and analyze violations data to better understand where to focus their enforcement efforts.*

RECOMMENDATION: *Agencies should document violations in a consistent manner with clear definitions, and publish statistics and details of violations in a publicly accessible, online, searchable format.*

RECOMMENDATION: *Agencies should track operators that repeatedly violate rules and/or refuse to resolve problems in a timely manner. Operators that demonstrate a pattern of non-compliance should be singled out for stronger enforcement action.*



RECOMMENDATION: *When serious violations occur, such as well blowouts, significant chemical spills, waste dumping, or illegal venting, the associated facilities should generally be shut down until the environmental and property impacts are fully remediated.*

**ENFORCEMENT ACTIONS/SANCTIONS:**
**Infrequently assessed, and too small to deter**

Enforcement actions do not appear to be consistently applied in most states.

When violations are found, oil and gas agencies have a variety of enforcement options. These include informal conversations with operators, letters alerting operators to issues of non-compliance, orders requiring operators to come into compliance by a certain date, or the assessment of penalties for violations.

In 2010, for the six states reviewed, Pennsylvania had 866 enforcement actions, Colorado had 332 and Texas had 447 enforcement referrals – recommendations to enforce, not actual enforcement actions. Ohio, New York, and New Mexico undertake very few enforcement actions every year.

Although Pennsylvania took the most enforcement actions, the percentage of violations resulting in enforcement action is decreasing in that state as the gas industry expands. In 2008, enforcement action was taken on more than half of the oil and gas violations in Pennsylvania, but by 2011 action was taken on less than a quarter of violations.

Despite the shale oil and gas boom, enforcement actions have not kept pace. The numbers of enforcement actions and total dollar amount in penalties have either remained fairly constant or have dropped in all six states over the past few years. The only exception is Colorado, where penalties collected in 2010 and 2011 increased because a backlog of old enforcement cases was finally addressed.

**Financial Penalties**
One of the enforcement options with the greatest potential to deter irresponsible operators is the financial penalty, i.e. fines.

Data from Texas and Pennsylvania show that numerous oil and gas operators are repeat violators. For example, in 2009 Chesapeake Energy had 123 violations. In 2010, Chesapeake received the largest oil and gas-related fine in Pennsylvania history, which should have improved Chesapeake's subsequent behavior. However, the next year the company's compliance record actually got worse – in 2011 Chesapeake had 161 violations.

The likely reason fines are failing as a deterrent is that the dollar amounts are too low. In 2010 Pennsylvania and Colorado collected about a million dollars each in total penalties. Ohio, New York, and New Mexico each collected less than $200,000. Penalty data for 2010 could not be found for Texas, but in 2009 the state collected more than $2 million in penalties from oil and gas violations.



*Introduction*

To illustrate this issue, the value of the gas from one average Marcellus shale gas well is $2.9 million.  So, the value of the gas in one well is greater than the total penalties collected by each state in 2010.  And in 2010 there were between 10,000 and 260,000 active wells in each state we studied.  So there is no financial incentive in the current value of the fines to operate wells in a more responsible manner – it is cheaper to simply accept a small fine and keep on operating without change.

(EIA 6/2012 wellhead price: $2.54 per 1,000 cubic feet. http://www.eia.gov/dnav/ng/hist/n9190us3M.htm. USGS 7/2012 mean "estimated ultimate recovery" of an Interior Marcellus well: 1.158 billion cubic feet http://pubs.usgs.gov/of/2012/1118/OF12-1118.pdf)

The explanation for these low fine totals: maximum penalties are set by outdated state statutes.

New Mexico has not updated its penalty schedule since 1934, while many other states have not changed penalties in the past few decades. Pennsylvania recently increased the maximum penalty for violations at unconventional oil and gas wells from $25,000 to $75,000 plus $5,000 for each day that the violation continues. It is too soon to know if the increase will improve operator compliance.

RECOMMENDATION:  *Agencies should develop policies that set the appropriate enforcement action for different types of violations, and require all inspectors to consistently adhere to these policies. Policies should include escalating penalties/enforcement for operators who repeatedly violate rules and multiple offenses of the same type, and possibly mandatory enforcement actions for significant violations.*

RECOMMENDATION:  *Agencies should codify their penalty schedules to reduce the discretion used in assessing the amount of a fine.*

RECOMMENDATION:  *Penalties must be increased so that they are sufficient to deter future violations. Penalty amounts should include the following considerations: the actual impact of the type of violation in question (e.g., permanent damage to drinking water supplies or wildlife habitat), the true subsequent cost to the public with regard to remediation and continued oversight, and the economic value that would have been realized by the operator had the violation gone undetected.*

RECOMMENDATION:  *Agencies should publicize significant penalties to highlight bad actors, as a means of deterring other companies from violating the rules.*

**Operation suspension/prevention**
In addition to penalties, most states have even stronger tools to deter violations:
- The power to suspend operations where violations occur; and
- The power to prevent an operator from receiving new permits to drill when they control other operations that are in violation of the rules.

These tools are more powerful because they stop revenue generation. Wells that can't produce gas also can't generate revenue. And an operator who can't receive new permits will have a much harder time attracting new investment capital.



*Introduction*

"Bad actor" rules prevent operators in violation at one operation from receiving new permits to drill at other locations. Pennsylvania and Colorado have this provision, although there are constraints on its use. For example, in Colorado there has to be evidence of a "knowing and willful pattern of violation." Even with this threshhold, however, Colorado regulators have denied some operators new permits to drill.

Most states in this review have some form of regulatory power to suspend operations at a site that is in violation of the rules. These powers can take different forms, including
- Cease and desist orders that leave the operating permit and lease intact,
- Powers to suspend, modify and revoke the permit but leave the lease intact, and
- The power to sever the operator's underlying lease.

Although these powers exist, all states we examined that have them have two things in common: 1) They use them very rarely and 2) The decision making process through which they are used is largely hidden to the public.

RECOMMENDATION: : *Agencies should send a clear message that non-compliance will not be tolerated by making greater use of the range of enforcement tools at their disposal. All states must have the power to shut down production and the ability to suspend or modify existing permits and deny new permits until an operator's existing wells are in compliance.*

RECOMMENDATION: *To increase the deterrence value of these enforcement actions, agencies should track and publicize the use of cease and desist orders, shutting-in of wells, and placing holds on permits, and make data on these actions publicly available.*

**Citizen enforcement**
In most states, citizens lack the statutory right to challenge companies that fail to comply with oil and gas rules. Although these "citizen suit" provisions exist in many federal laws, and have been used effectively to stimulate better compliance, they are notably absent in the majority of state environmental laws. This point is especially critical in light of the lack of adequate enforcement staffing and resources available to state agencies.

Other issues that act as barriers to citizen involvement in enforcement efforts include a lack of cooperation between state agencies and citizens, intimidation by industry representatives of citizens who try to document problems or publicly express concerns with industry practices, and lack of training that would enable citizens to spot and properly document violations. Additionally, the inaccessible nature of key information (e.g., data on oil and gas permits, wells, and enforcement and compliance records) can make it difficult for citizens to monitor operations or conduct thorough file reviews in order to make objections or push for enforcement in specific cases.

RECOMMENDATION: *States should add citizen suit provisions to oil and gas statutes and environmental statutes that pertain to oil and gas operations. This would enable citizens to hold companies accountable for following rules to protect the environment, public health and safety, and, in turn, facilitate the prevention and remediation of damage caused to individuals and property.*



*Introduction*

## OTHER FACTORS IMPEDING ENFORCEMENT

### Staffing Issues

The relationship between oil and gas agency staff and the industry they regulate is often very close. In some states, agency employees are even allowed to receive small gifts from oil and gas companies. This issue, as well as the movement of employees between public oil and gas agencies and private companies raises questions as to the impartiality of state regulators – and thus their ability to fully hold violators accountable.

Relatively low agency salaries are a serious problem in many states, and act as a barrier to enlisting and retaining experienced inspection and enforcement staff. There are many examples of agency employees who have opted to leave government for higher-paying industry jobs. This represents not only a loss of institutional knowledge; it also wastes taxpayer dollars that have been invested in training these public servants. Clearly, state agencies need to increase their staffing budgets in order to hold on to valuable employees, for without experienced staff, inspection and enforcement programs cannot be effective.

RECOMMENDATION: *To avoid conflict-of-interest issues, oil and gas inspectors and enforcement staff should not be allowed to receive gifts from oil and gas companies or employees.*

RECOMMENDATION: *Laws should prohibit past employees of oil and gas agencies from representing or assisting private companies with matters relating to the agency. Ex-agency staff should also be restricted from disclosing the state's confidential information to their private sector employers.*

RECOMMENDATION: *Enforcement staff wages and benefits should be increased to make public employment more competitive.*

### Data tracking and transparency

In 2011, the Texas Sunset Commission criticized the RRC for its poor tracking of serious violations and repeated violations by the same operator, writing that without this type of information, "the Commission cannot determine or ensure effective and consistent enforcement across the state." The same poor tracking and record-keeping was found in all states examined in this report.

Not only are resources needed for better tracking of violations, there is also a need to improve data collection and reporting of inspections, penalties, enforcement actions and citizen complaints to enhance transparency and public accountability.

RECOMMENDATION:  *Agencies need to document, track, and publish annual or quarterly statistics on inspections, violations, penalties, different types of enforcement actions, and complaints.*

RECOMMENDATION:  *All data on inspections, violations, penalties, enforcement actions and complaints should be made publicly available through searchable, downloadable, online databases. Only then can the public analyze aggregate data, look up specific cases, and determine resolution of violations or complaints.*



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

15

*Introduction*

**Bias toward oil and gas permitting, not enforcement**

During oil and gas booms, state agencies typically come under pressure from the oil and gas industry (as well as some elected officials) to expedite permits for drilling and other oil and gas development processes. By reducing the time spent on reviewing permits, agencies are less likely to consider site-specific permit conditions, which could ultimately impede enforcement actions.

For example, in Pennsylvania the total review time for a drilling permit can be as short as 35 minutes. Such a cursory review leaves little time to consider and include necessary permit provisions or technical requirements to protect public health and the environment. In Pennsylvania, citizens have conducted research and file reviews that have exposed deficiencies in permits. But citizens do not have the resources to review all permits, nor should they be doing the work that agencies are charged to do.

RECOMMENDATION: *Agencies should focus on a thorough review of permits and specific conditions related to the permit, including provisions that can be enforced or that are more likely to result in regulatory violations, rather than focusing primarily on expediting permit approvals.*

RECOMMENDATION: *Agencies should require permitting staff to communicate with inspections staff and/or consult agency databases on inspections, violations, and enforcement actions to ensure that a company's history of compliance is given full consideration during the permitting process.*

**Burden of proof**

When violations of oil and gas rules involve pollution, state agencies or citizens often have to expend financial resources to conduct sampling and monitoring to show that industry impacted air, water, or health. In the absence of baseline information, these cases can be notoriously difficult to prove, and the industry is able to draw on a cadre of its own scientists to dispute data generated by agencies, independent labs, or citizen monitoring.

Furthermore, a high burden of proof is often placed on state agencies seeking to use some of their enforcement tools. For example, some enforcement actions may only be taken if there is an emergency situation or it can be shown that the violation is causing imminent danger to health and safety. This heavy burden of proof also falls on citizens who have experienced health impacts, or damage/contamination of their property – most citizens do not have the resources to scientifically prove health impacts or contamination of well water. Until there is a shift in the burden of proof requiring industry to prove that they have not caused harm, or at least a decrease in that burden, state agencies will not be able to fully use the enforcement tools available to them, citizens will be left with little recourse, and the bad industry actors will continue to get away with practices that harm human health and the environment.

RECOMMENDATION: *Changes should be made to regulations to reduce the burden of proof that must be met before agencies can take enforcement action against operators that violate oil and gas rules.*

RECOMMENDATION: *Companies should be required to conduct pre-and post-drilling water (quality and quantity), air and soil monitoring. This baseline data should be submitted to oil*



*Introduction*

*and gas and other relevant agencies (e.g., environment departments), and be made publicly available so that it can be reviewed and utilized by citizens.*

**THE PATH FORWARD**

This report shows that states across the nation are betraying one of the basic agreements between government and the governed: to enforce the law. That betrayal feeds into the growing lack of confidence that government should be about equal treatment and not about financial or political clout.

This betrayal of the public interest also severely weakens state claims that they can protect the public from the impacts of the shale boom. A rule – even an improved rule – on the books means little if an oil or gas company knows that it can be ignored with little or no consequence.

To address the problem we call upon states to take the following steps::

**Acknowledge that public health is at risk because state enforcement of existing oil and gas rules is broken:**
- More than half of all wells go uninspected year: hundreds of thousands of wells.
- Those companies that are found in violation are rarely penalized: ambiguous policies and rules leave the consequence for violations unclear to the public, companies and inspectors. Consequences appear to vary violation by violation.
- Penalties are so weak that it is cheaper for violators to pay the penalty than comply with the law.

**Fix state enforcement by making common sense policy and regulatory changes:**
- Writing into rule the minimum number of inspections/inspectors per number of wells, and providing adequate money and equipment to perform the inspections.
- Establishing clear rules so inspectors, companies, and the public know when operators are in violation, and the consequences.
- Formalize the public's role in enforcement, including sharing information with the public and allowing citizen suits. The public lives with gas development in their communities – they often know of violations before anyone else, including inspectors.

**Until state enforcement is fixed, refuse new permits to drill:**
- Oil and gas regulations are the law of the land. Oil and gas extraction is permitted on a well-by-well basis, conditioned upon compliance with the law. Until states can demonstrate in good faith that they are upholding the, they cannot maintain the public trust if they continue to permit new drilling.



*Introduction*

# INTRODUCTION

As technologies unlock previously inaccessible oil and gas reserves, drilling booms have emerged across the country. In response, some states have revisited their regulations governing oil and gas development.

Adequate regulations are essential to responsible oil and gas development and to minimizing impacts to public health and the environment.

However, regulations alone do not prevent irresponsible development.  Regulatory enforcement is necessary too.

Unfortunately, in recent years the ability of state oil and gas agencies to enforce existing rules has declined. "Agency enforcement staff levels have not kept pace with the rapid expansion of oil and gas development."[1] That was written in 2005, when the Western Organization of Resource Councils released a report on oil and gas inspection and enforcement programs in five western states.

In 2009, the online investigative news service *ProPublica* compared the rapid expansion of drilling in 22 states with oil and gas agency staffing levels and found a declining capacity to enforce environmental protections. Regulators were overwhelmed as they tried "to keep tabs on the nation's nearly one million active oil and gas wells, a number that's likely to climb as the feverish growth in natural gas exploration continues."[2]

The crisis in enforcement, however, spreads well beyond inadequate monitoring and inspections at oil and gas facilities. Perhaps more significant is that when violations are found, state agencies do not use the tools available to them to enforce the laws.

As core research for this report, Earthworks held discussions with former state oil and gas agency decision-makers, a local government oil and gas inspector, a board member of a national multi-stakeholder oil and gas organization, a former management-level employee of a multinational oil and gas company, an oil and gas attorney, members of conservation organizations, environmental attorneys, and representatives of academic institutions.

Additional research, primarily using state agency databases, was conducted by Earthworks to provide the data and information for this report.

The report begins with an examination of oil and gas enforcement in six states: Texas, New Mexico, Colorado, Ohio, New York, and Pennsylvania. These states represent a range of development scenarios. While all have some historic oil and gas development, shale gas development is booming in Pennsylvania and Texas; Colorado recently experienced a tight gas drilling boom and is on the verge of major shale oil and liquids development; Ohio is in

---

[1] Utesch, P. Cited in:  Feb. 2, 2005. "Report finds need to strengthen state and federal oil and gas programs," Press Release. http://www.worc.org/userfiles/file/Law-&-Order-release.pdf

[2] Lustgarten, A. Dec. 30, 2009. "State oil and gas regulators are spread too think to do their jobs," *ProPublica*. http://www.propublica.org/article/state-oil-and-gas-regulators-are-spread-too-thin-to-do-their-jobs-1230



*Introduction*

the beginning stages of shale development; New York may be poised to begin horizontal drilling for shale gas; and New Mexico has seen a decline in drilling over the past decade, but exploration for shale gas and oil is beginning to occur.

The second section of the report, "Factors that Impede Enforcement," expands on some of the ideas generated during the meetings in Denver and Pittsburgh.

Drawing from input gathered at our two meetings, the report provides recommendations for achieving improvements in enforcement of state oil and gas regulations.

*Current State of Oil and Gas Enforcement*

# 1 Current State of Oil and Gas Enforcement

This section explores the current state of oil and gas enforcement by examining oil-and-gas-related inspections, violations, enforcement actions (penalties and others), and citizen complaints.

If oil and gas enforcement programs were working, one would expect to see a high proportion of companies in regulatory compliance. There would also be a low incidence of pollution and environmental damage, and safe working conditions for oil and gas industry employees.

Most state agencies do not maintain publicly (or easily) accessible databases or consistent statistics on the impacts from oil and gas development. Publicly available data indicate enforcement efforts are too weak to motivate companies to comply with rules. For example, in 2009 Texas oil and gas inspectors found more than 18,000 water protection violations, yet took enforcement action on less than 1 percent of those violations.[3] Also, as shown in the following charts, data from Colorado and Ohio reveal a high incidence of problems and an increasing trend of negative impacts on the public and the environment.

**Chart 1. Spills in Colorado (2005-2011)**



The number of oil- and gas-related spills in Colorado has increased in the past seven years.[4] In fiscal year (FY) 2011, 133 of the 513 reported spills (26%) contaminated either ground or surface water.[5]

There is no real incentive for operators to replace faulty equipment or train employees to prevent spills, as the Colorado Oil and Gas Conservation Commission (COGCC) rarely penalizes companies for spills, even when they cause environmental damage. Also, enforcement actions are not taken in a timely manner. For example, in 2011 the COGCC imposed fines for a mere five spills, all of which had happened in previous years.[6]

---

[3] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* pp. 33, 34. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[4] All years represent fiscal years, i.e., from July 1 to June 30. 2011 data: 2005–2010 data: Colorado Oil and Gas Conservation Commission (**hereafter referred to as COGCC**) Annual Reports to Water Quality Control Commission. http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/AnnualReports.htm
2011 data from COGCC database. http://www.cogcc.co.us, select Database, then Inspection/Incident, then Spill/Release.

[5] Fiscal years were used because that is how COGCC reports spills to the Water Quality Control Commission. For fiscal year 2011, spill records were downloaded from the COGIS spills database, and the number of spills affecting ground and surface water were counted.

[6] Finley, B. Sept. 13, 2011. "Drilling spills rise in Colorado, but fines rare," *Denver Post.* http://www.denverpost.com/popular/ci_18881512?source=pop_neighbors_colorado See Earthworks' Colorado Enforcement page for more information on individual spills. http://enforcement-co.earthworksaction.org



*Current State of Oil and Gas Enforcement*

In 2010 and 2011, Noble Energy had more spills than any other operator in Colorado (126 spills – 81 affected ground water, 6 surface water).[7] Yet, in August 2011, Noble Energy received an Outstanding Operator Award for environmental protection from the COGCC.[8] Congratulating the worst spill offender for its efforts at preventing pollution sends the message to both the public and other operators that spills don't matter and there are no real consequences for breaking the rules.

**Chart 2. Ohio pollution-related violations.**



Ohio is only beginning to experience oil and gas shale drilling.  As of August 2012, just 131 horizontal oil and gas wells had been drilled in the Marcellus and Utica shale formations in Ohio.[9]

Even though a shale gas and oil drilling boom has not yet occurred in Ohio environmental impacts are on the rise. As seen here, in 2011 oil and gas pollution-related violations were at their highest level in years.[10]

It must be noted that this chart does not include all oil- and gas-related spills, because Ohio operators are not required to report spills to the Division of Oil and Gas Resources Management (DOGRM). Reporting spills is required in most other oil-and-gas-producing states.[11]

---

[7] COGCC Incident Database. http://cogcc.state.co.us/cogis/IncidentSearch.asp, select Spill/Release. Search Operator: Noble. Other companies with large number of spills in 2010 and 2011 included Kerr-McGee (124), Encana (114).

[8] Finley, B. Sept. 13, 2011. "Drilling spills rise in Colorado, but fines rare," *Denver Post*. http://www.denverpost.com/popular/ci_18881512?source=pop_neighbors_colorado

[9] Ohio Division of Oil and Gas Resources Management (**hereafter referred to as DOGRM**) web site: Oil and natural gas well and shale development resources. "Recent Marcellus and Utica Shale – Ohio Activity" (for week of 8/12/2012) http://www.ohiodnr.com/oil/shale/tabid/23174/Default.aspx Data accessed August 28, 2012.

[10] Data on pollution violations from Ohio DOGRM database. For detailed numbers and information on how Earthworks came up with these numbers, visit Earthworks' "Ohio Oil & Gas Enforcement – Violations" web page: http://www.earthworksaction.org/issues/detail/ohio_oil_gas_enforcement_violations

[11] States like Colorado, Texas and Pennsylvania require oil and gas operators to report spills of crude oil, condensate or other produced liquids (typically for spills greater than 5 barrels) to state agencies that regulate oil and gas. Ohio does not have such a reporting requirement, even though the 2011 review by STRONGER Inc. recommended that Ohio implement such a requirement. (Source: State Review of Oil and Natural Gas Environmental Regulations (STRONGER), Inc. Jan. 2011. Ohio Hydraulic Fracturing State Review. pp. 12, 13. http://www.dnr.state.oh.us/Portals/11/oil/pdf/stronger_review11.pdf



*Current State of Oil and Gas Enforcement*

## 1.1.  INSPECTIONS

### INSPECTIONS DATA

Data on inspections vary from state to state. In some cases, the only publicly available data are published in annual summaries included in agency publications. In most cases it is not simple or even possible to search online agency databases to obtain inspection statistics.

- **Colorado:**  the COGCC's Oil and Gas Information System (COGIS) database contains information on inspections. The system allows users to download actual inspection reports. Searches, however, appear to be limited to 1,000 records, which makes it difficult to tabulate statistics on inspections going back more than a year.[12]

- **Pennsylvania**:  Pennsylvania's Department of Environmental Protection (DEP) recently created its Oil and Gas Compliance Report system, which is an online, searchable database.[13] The new Oil and Gas Compliance Report system allows users to generate their own searches on inspections by company, date, county, municipality, and generate statistics on number of inspections per time period. Data go back to 1982. The site does not allow users to view or download actual inspection reports.

- **Ohio:** Ohio's Division of Oil and Gas Resources Management (DOGRM) provides detailed inspection information to the public through its Risk Based Data Management System (RBDMS). The system includes data going back to 1980, and once the system is installed on a personal computer the data can be updated weekly so that even members of the public can access recent data. The system, however, is very large and data analysis is not straightforward. For example, an Earthworks' search of RBDMS inspections led to different results than what were provided to Earthworks by DOGRM.[14]

- **New Mexico:** New Mexico Oil Conservation Division's E-permitting database on "Well Information" allows users to see the date of last inspection for a site, but there is no way to extract inspection information from the database.[15]

- **Texas/New York:** The Texas Railroad Commission (RRC) and New York's Department of Environmental Conservation (DEC) do not have any publicly accessible databases containing oil and gas inspection information.

---

[12] The system says that 5,000 reports can be accessed, but when attempts were made as recently as on 08/28/12 to access 5,000 records an error message was received. It was possible to access 1,000 records. (Source: COGCC web site: "Colorado Oil and Gas Information System." http://cogcc.state.co.us/cogis/IncidentSearch.asp)

[13] Legere, L. Jan. 28, 2012. "New databases improve access to state drilling records," *Pottsville Republican Herald*. http://republicanherald.com/news/new-databases-improve-access-to-state-gas-drilling-records-1.1263776

[14] For more information, please visit Earthworks' "Ohio Oil & Gas Enforcement – Inspections" web page http://www.earthworksaction.org/issues/detail/ohio_oil_gas_enforcement_inspections

[15]New Mexico Oil Conservation Division (**hereafter referred to as OCD**) web site: E-Permitting System. "Well Information", "Well Search." Under "General Well Information, Event Dates" the date of last inspection is noted. There are no details provided, nor is there a link to an actual inspection report. https://wwwapps.emnrd.state.nm.us/ocd/ocdpermitting//Report/WellInformation.aspx





*Current State of Oil and Gas Enforcement*

## STATE COMPARISON OF INSPECTIONS

As seen in Figure 1, the number of inspections carried out by oil and gas agency staff varies from state to state. Data used in the map can be found in Table 1.

**Figure 1. Oil and gas inspectors in CO, NM, TX, OH, NY and PA (2010).**



Table 1 shows that in 2010, inspectors in Colorado, Texas, and New Mexico conducted, on average, more than 1,000 inspections per year. Inspectors in New York, Pennsylvania and Ohio conducted far fewer inspections than their western counterparts.[16] Data sources for this table can be found in Appendix 1.

**Table 1. State-by-state comparison of inspection staff and activity (2010).**

| State | Inspectors | Inspections | Inspections per inspector |
|-------|-----------|-------------|---------------------------|
| Colorado | 15 | 16,228 | 1,082 |
| New Mexico | 12 | 20,780 | 1,732 |
| New York | 16 | 2,460 | 154 |
| Ohio | 21 | 10,472 | 499 |
| Pennsylvania | 65 | 15,368 | 236 |
| Texas | 88 | 121,123 | 1,376 |

It is reasonable to assume that an inspector who conducted fewer than 500 inspections did so in a much more thorough manner than an inspector who conducted double or triple that number. However, this may not be entirely accurate as those carrying out fewer

---

[16] Also, a similar table with 2011 data is available in Appendix 1, Table A1-2. The 2011 were not included here because there was no information for New York. Although the numbers have changed slightly, the trends in 2011 were the same as 2010.



*Current State of Oil and Gas Enforcement*

inspections may have had to inspect more drilling, cementing, stimulation, and plugging operations, which are likely to take more time than an inspection of a producing well site. Or some inspections may have taken longer because the inspections occurred in remote areas, or were conducted by less experienced staff (as described in Section 2.2, some agencies are having a difficult time retaining experienced inspectors).

Still, the difference between having to conduct several hundred versus more than 1,000 inspections is quite dramatic, and shows that inspectors in states like Colorado, Texas and New Mexico have much greater inspection burdens than their counterparts in New York, Pennsylvania and Ohio.

## INSPECTION TRIAGE

Due to the overwhelming number of new drilling sites, combined with the number of existing oil and gas facilities (actively producing wells, inactive wells, tank batteries, compressors, impoundments, brine injection wells), both federal and state oil and gas agencies have been forced to triage inspections.

In 2009, the Bureau of Land Management (BLM) was inspecting active wells on federal lands just once every 2 to 10 years, and inspections for environmental compliance were only occurring every 4 to 59 years.[17] In 2010, recognizing that there was no way to monitor all oil and gas sites given their resources, BLM implemented a risk-based inspection and enforcement strategy, which prioritized inspections based on a set of "risk factors".[18]

Evidence of inspection triage can be found at the state level as well. For example, in 2008 the district supervisor for New Mexico Oil Conservation Division's (OCD) Aztec office said his staff tried to inspect each of the district's 24,000 active wells once every five years.[19] That year, the entire state of New Mexico employed 18 inspectors.[20] In 2011 there were six fewer inspectors in the state,[21] so it almost certain that wells inspected by the Aztec office of OCD are still only inspected once every five years, at most.

Few states have detailed statistics on the number of oil and gas facilities that require regulatory oversight. For example, while Texas, New Mexico and New York provide accessible data or statistics on inactive wells (i.e., wells that have been temporarily shut-in or plugged)[22] data are less accessible in Colorado, and Pennsylvania.[23]

---

[17] Western Organization of Resource Councils. 2009. *Law and Order in the Oil and Gas Fields – a review of inspection and enforcement programs in five western states.* 2009 Update.
http://www.worc.org/userfiles/file/Oil%20Gas%20Coalbed%20Methane/LAO-2009.pdf

[18] U.S. Bureau of Land Management. "Fiscal Year 2011 Oil and Gas Inspection and Enforcement Strategy Matrices."
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2011/IM_2011-023.html

[19] Haywood, P. March 1, 2008. "Inspectors struggle to monitor vast area," *Santa Fe New Mexican.*
http://www.santafenewmexican.com/Local%20News/Inspectors-struggle-to-monitor-vast-area

[20] Haywood, P. March 2, 2008. "Drilling's hidden Costs," *Santa Fe New Mexican.*
http://www.santafenewmexican.com/Local%20News/Drilling-s-hidden-costs

[21] In 2011 there were 12 OCD inspectors in New Mexico. (Source: Personal communication between Lisa Sumi, Earthworks and New Mexico OCD Enforcement and Compliance Manager, Daniel Sanchez, OCD attorney, Sonny Swazo, and New Mexico Environment Department (**hereafter NMED**) & Energy, Minerals & Natural Resources Department (**hereafter EMNRD**) Communications officer, Jim Winchester. March 5, 2012)

[22] Texas Railroad Commission (**hereafter RRC**). Well distribution reports contain statistics on inactive wells.
http://www.rrc.state.tx.us/data/wells/welldistribution/welldistributionarchive.php New Mexico OCD. Inactive well list.
https://wwwapps.emnrd.state.nm.us/ocd/ocdpermitting/stats/IPermitting.aspx?report=InactiveWells New York Department



*Current State of Oil and Gas Enforcement*

Texas is one state that provides statistics (although not detailed information) on the number of oil and gas facilities in the state. In 2011, there were close to 411,000 wells and related oil and gas facilities Texas. The RRC conducted just 115,000 inspections that year, meaning 72% of oil and gas facilities in Texas failed to be inspected in 2011.[24] (See Appendix 7 for data)

Given the lack of data on all oil and gas facilities, Table 2 provides estimates of the number of <u>active wells</u> that were **not** inspected in 2010.[25] To come up with estimates, it was assumed that every inspection reported by an agency was done at a different active well site. Consequently, if anything, our estimates of "active wells not inspected" are low, because at least some of the inspections would have been for facilities other than active wells, and some wells may have been inspected more than once.

Data sources for the table can be found in Appendix 1.

**Table 2. Estimated number of active wells that were not inspected in 2010.**

|  | Number of inspections | Number of wells inspected | Number of active wells | Active wells NOT inspected | % of active wells NOT inspected | Active wells per inspector |
|---|---|---|---|---|---|---|
| CO | 16,228 | 16,228 (est) | 43,354 | 27,126 | 63 | 2,890 |
| NM | 20,780 | 20,780 (est) | 53,063 | 32,283 | 61 | 4,422 |
| NY | 2,460 | 2,460 (est) | 10,195 | 7,855 | 76 | 637 |
| OH | 10,472 | 5,644 (actual) | 64,378 | 58,734 | 91 | 3,066 |
| PA | 15,368 | 8,565 (actual) | 91,167 | 82,602 | 91 | 1,403 |
| TX | 121,123 | 121,123 (est) | 260,104 | 138,981 | 53 | 2,956 |

As seen in the table, the number of active wells per inspector varies from 637 in New York to more than 4,000 in New Mexico. With such an overwhelming ratio of wells to inspectors

---

of Environmental Conservation (**hereafter DEC**). Oil and Gas Searchable Database. One can search by: Well status = inactive. http://www.dec.ny.gov/cfmx/extapps/GasOil/search/wells/index.cfm

[23] The COGCC database allows users to search for wells, and when listed there is information on the status of the well (e.g., active, temporarily abandoned, shut-in, etc.). There is no way, however, to search only the wells with a particular status. Similarly, Pennsylvania DEP databases (e.g., Well Inventory by Operator) do not allow users to search by well status, but status information does appear when other data are searched.

[24] Oil and gas facility data and inspection statistics from: Texas RRC. August 2012. *Legislative Appropriations Request for Fiscal Years 2014-2015*. 3.A. Strategy Request, page 25 of 51. http://www.rrc.state.tx.us/about/divisions/2014-15LAR.pdf

[25] <u>Active wells.</u> There is no universal definition of an active well. Generally, active wells refer to wells that are operating, as opposed to wells that have been permanently plugged or temporarily shut-in or abandoned. Those wells that are inactive due to temporary shut-in should still be monitored, but for the purposes of this paper we did not include inactive wells because the statistics were not found for Colorado.
<u>Estimates of wells inspected.</u> Ohio and Pennsylvania are the only states for which data could be found on the number of oil and gas wells inspected. Because these data were lacking for other states, it was assumed that each inspection was done for a different well. In most states, some wells are visited more than once a year (e.g., if violations are found and follow-up inspections are required), so it is highly possible that fewer active well sites were visited in CO, NM and NY than what is reflected in Table 2. In Texas, it is possible that more active well sites were visited than what is reflected in the table because an inspector may visit several wells during one lease inspection. Until Texas and other states publish more information on inspections the number of wells inspected will remain highly uncertain.



*Current State of Oil and Gas Enforcement*

it is not surprising that in all states but New York, tens of thousands of active wells were not inspected in 2010. (New York only had 10,195 active wells in 2010.)

According to Pennsylvania DEP data, in 2010 the agency inspected 8,565 wells,[26] meaning that more than 82,000 active wells were not inspected at all. At that rate of inspection, it would take ten and a half years to inspect all existing active wells in Pennsylvania. In Ohio, 91% of the 59,000 active wells had no agency oversight in 2010. Texas had the largest number of wells that were not checked by an inspector in 2010 (more than 138,000). This number represents 53% of active wells in the state.[27]

Clearly, inspection triage is going to continue until more funds become available to state agencies. In most states, there hasn't been political will to do so. In 2009, *Propublica* was told by the Texas Railroad Commission that the agency had requested funding for more staff from the state legislature at least three times in the last five years and been turned down every time.[28]

## INSPECTION POLICIES AND GUIDELINES

Given that oil and gas agency staff cannot possibly keep up with necessary inspections, how have the agencies coped with their oversight responsibilities? As seen below, some of the states have policies outlining the frequency, number, and prioritization of inspections.

**Table 3. Texas RRC Field Operations Job Priorities (2010 policy).**

| First Priority | Second Priority | Third Priority | Fourth Priority |
|---|---|---|---|
| • Emergency Incidents that pose immediate/imminent threat to public health/safety* <br> • Blowouts <br> • Major spills that impact or pose imminent threat to environ. sensitive areas <br> • Accidents/Injuries/Deaths resulting from possible violation of RRC Rules <br> • Active Pollution/Safety Complaints* | • Well Plugging <br> • Surface Casing <br> • Reportable Spills <br> • Hydrogen Sulfide-related Inspections <br> • General Complaints <br> • Mechanical-Integrity Testing <br> • Commercial Disposal Operations: UIC wells, landfarms and pits. <br> • Lease Inspections (sensitive areas) <br> • Hydrocarbon Storage Operations <br> • Pit Permits/Landfarming/Minor Permits | • General Lease Inspections (Non-sensitive areas) <br> • General UIC inspections <br> • Plant Inspections | • Enforcement Action: Well Sealing for other sections <br> • Oil Theft <br> • Production Testing <br> • Audits |

---

[26] Pennsylvania Department of Environmental Protection (**hereafter DEP**). Compliance Report system. Data accessed March 20, 2012. http://www.depreportingservices.state.pa.us/ReportServer/Pages/ReportViewer.aspx?/Oil_Gas/OG_Compliance Search: 01/01/2010 to 12/31/2010. Inspections with violations only: No. Download data into Excel. Then filtered by Permit #, selecting "unique records" to find how many wells were inspected.

[27] As of Dec. 31, 2010 there were 282,896 active wells. Texas RRC. Dec. 30, 2010. Well Counts by Type and Status. http://www.rrc.state.tx.us/data/wells/welldistribution/welldistribution122910.pdf

[28] Lustgarten, A. Dec. 30, 2009. "State oil and gas regulators are spread too think to do their jobs," *ProPublica*. http://www.propublica.org/article/state-oil-and-gas-regulators-are-spread-too-thin-to-do-their-jobs-1230



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT <br> Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

26

*Current State of Oil and Gas Enforcement*

**Texas:** In 2012, the RRC set a performance goal of 113,400 oil and gas facility inspections.[29] The rationale for this inspection goal is not clear, and it does not necessarily reflect the number of inspections that need to be done to ensure adequate compliance with regulations.[30]

In 2001, RRC developed a *Job Priority Schedule,* which was updated in 2010. The 2010 *Field Operations: Job Priorities* policy states that, "Until staffing levels improve we will continue to use this guideline to select the types of field jobs we perform. This may significantly reduce some of the fieldwork we currently do such as 'general lease inspections' in non-sensitive areas."[31]

Table 3 lists the four categories of priorities found in the RRC field operations priorities policy. The activities with asterisks (*) represent time-sensitive activities, which due to the unpredictability of their frequency/timing are seen by RRC as a "major hindrance in our ability to effectively plan 'proactive' type field projects."[32]

**Ohio:** Ohio has an inspector priority matrix that assesses risk and defines the work priorities for inspectors,[33] but efforts to obtain a copy of this matrix were unsuccessful.

The DOGRM web site says that employees inspect drilling, restoration, and plugging of all oil and gas wells in the state,[34] but there is no detail regarding how often these inspections occur. We heard in one of our interviews that Ohio routinely has someone on site during well construction, and according to a STRONGER Inc. report, "an inspector must be on site to witness plugging unless this presence is waived by the chief."[35]

**Table 4. Activities requiring notification of Ohio oil and gas inspectors.**

| Activity | Notification requirement |
|---|---|
| **Cementing of conductor and surface casing (1509.17(C))** | Notify inspector upon notification of person to perform cementing |
| **Drilling, reopening, converting, stimulation or plugback (1509.06(J))** | Notify inspector 24 hours prior to any/all of these activities |
| **Plugging wells (1509.13 (C))** | Notify inspector 24 hours prior to plug job unless requirement waived by inspector |

While the Ohio rules require that inspectors be <u>notified</u> of certain activities such as cementing, drilling and plugging (Table 4), nothing was found in the rules that requires

---

[29] RRC of Texas. Feb. 27, 2012. Operating Budget for the Fiscal Year 2012. Section III.A. p. 15. http://www.rrc.state.tx.us/about/divisions/opBudget.pdf

[30] At the end of 2011 there were more than 260,000 producing oil and gas wells. See Appendix 7. There's no data on the number of other oil and gas facilities (e.g., compressors, gas plants, etc.) that are also require RRC oversight.

[31] Ross, Charles C. Deputy Director, Field Operations, RRC of Texas. Feb. 1, 2010. "Field Operations: Job Priorities." Obtained from Texas RRC Open Records Coordinator, Debra Ravel, via email. Sept.29, 2011.

[32] ibid.

[33] State Review of Oil and Natural Gas Environmental Regulations (STRONGER), Inc. Jan. 2011. *Ohio Hydraulic Fracturing State Review.* p. 6. http://www.dnr.state.oh.us/Portals/11/oil/pdf/stronger_review11.pdf

[34] Ohio DOGRM web site: "Oil and Gas." http://www.ohiodnr.com/tabid/10371/default.aspx

[35] See footnote 33, p. 12.



*Current State of Oil and Gas Enforcement*

inspectors to be present at any of these activities.[36]

**Pennsylvania:** In 1987, the Pennsylvania DEP published its "Inspection Policy for Oil and Gas Well Activities." While not a requirement, the policy sets forth the DEP's "intended" frequency of inspections, and the circumstances under which a well operator can expect an inspection by the Department.[37] This policy was adopted into the Pennsylvania Code on July 28, 1989.[38]

In addition to the routine inspections shown in Table 5,[39] the policy outlines inspection frequencies for non-routine events, such as verifying that violations have been corrected.

**Table 5. Suggested inspection frequencies in Pennsylvania, North Dakota, and New York.**

|  | Pennsylvania At least: | North Dakota | New York |
|---|---|---|---|
| During well permitting/siting | 1 |  | 1 |
| During drilling | 1 | 1/wk (vertical); 2/wk (horizontal) | 1 |
| During casing | 1 |  |  |
| During cementing | 1 |  |  |
| During completing | 1 |  |  |
| During altering | 1 |  |  |
| During stimulation | 1 |  |  |
| Post-drilling | 1 (within 3 months) |  | 1 |
| Producing wells | 1 per year | Every 2 months |  |
| Prior to well getting inactive status | 1 |  |  |
| During plugging | 1 |  | 1 |
| After plugging, site restoration | 1 (within 3 months) |  |  |
| Before bond released | 1 |  |  |

As seen in Table 5, DEP's inspection policy is more stringent than those found for other states (North Dakota[40] and New York), although as indicated below, New York has stated that it will need to increase the number of oil and gas inspections when and if horizontal shale gas and oil wells are permitted in the state.

---

[36] Ohio Revised Code. Chapter 1509: Division of Oil and Gas Resources Management. http://codes.ohio.gov/orc/1509

[37] Pennsylvania DEP, Bureau of Oil and Gas Management. June 25, 2005. *Compliance Monitoring of Oil and Gas Wells and Related Facilities and Activities.* Document number 550-3000-001. http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-48286/550-3000-001.pdf

[38] Pennsylvania Code. Title 25 §78.901-906. "Inspection Policy Regarding Oil and Gas Wells." http://www.pacode.com/secure/data/025/chapter78/subchapXtoc.html

[39] Pennsylvania: ibid.
North Dakota: Western Organization of Resource Councils. 2005. *Law and Order in the Gas Fields.* p. 7. http://www.worc.org/userfiles/file/Law-&-Order-report.pdf
New York: Division of Mineral Resources. *2009 Oil, Gas and Mineral Resources Annual Report.* p. 20. http://www.dec.ny.gov/pubs/36033.html

[40] Not one of the states analyzed in the report, but data included for comparison purposes.



*Current State of Oil and Gas Enforcement*

Pennsylvania DEP, however, is not even close to meeting its suggested inspection frequencies. For example, there were 2,843 new wells drilled in Pennsylvania in 2010.[41] Under the Inspection Policy there should have been close to 20,000 inspections of those wells. Also, each of the 70,000 wells that produced oil or gas in 2010 should have received an inspection.[42] If DEP had been following its adopted policy, it would have performed more than 90,000 inspections. However, DEP carried out just 15,368 inspections, (see Table 2) or 19 percent of the inspections suggested in the policy.

**New York**: The frequency of inspections in Table 5 comes from the New York Department of Environmental Conservation's (DEC) *2009 Oil, Gas, and Mineral Resources Annual Report*.[43] The frequency of inspections, at least for some types of oil and gas wells, may increase in New York if horizontal drilling of shale gas wells is permitted. In DEC's revised draft environmental impact statement related to Marcellus shale development, the agency proposed to "limit [drilling] permit issuance to match the Department resources that are made available to review and approve permit applications, and to adequately inspect well pads and enforce permit conditions and regulations." In July 2012, a DEC spokesperson put a number on what it means to adequately inspect wells: "the state's draft plan would require at least 13 inspections during each well drilling and completion."[44] This is a vast improvement over the agency's current inspection protocol, and is more stringent than any of the other state oil and gas inspection requirements in this report.

**Colorado:** The state does not have a written inspection policy or checklist. Regional supervisors work with field inspectors to develop goals for number of wells, number of surface casings, and other inspections to accomplish in a year.[45]

## INCREASE ENVIRONMENTAL MONITORING DURING AND IN ADDITION TO INSPECTIONS

While inspectors are trained to observe infractions of oil and gas rules, some violations are not easily detected during a typical oil and gas inspection. For example, leaking pits or air emissions that pose health and safety concerns may be occurring even if they cannot be seen or smelled.

In the case of pits, some states have regulations that require the use of secondary liners and leak detection systems, which can help reduce the potential for wastes to contaminate air, soil, and groundwater. Cementing rules and pressure tests can help minimize the chances for natural gas (methane) to migrate from compromised well casings into groundwater. In both of these situations, a requirement for groundwater monitoring and reporting may be the best way to catch leaks at an early stage.

---

[41] Pennsylvania DEP, Bureau of Oil and Gas Management. Jan. 25, 2011. *2010 Year End Report*. p. 6.
http://files.dep.state.pa.us/OilGas/BOGM/BOGMPortalFiles/OilGasReports/2010/2010_Year_End_Reports.pdf
[42] This number is based on active wells that produced oil or gas. See Pennsylvania "Well Data from DEP Oil and Gas Production Database" table to find out how these numbers were generated.
http://www.earthworksaction.org/images/uploads/Table_pennsylvania_active_well_data_footnotes.gif
[43] New York Division of Mineral Resources. *2009 Oil, Gas and Mineral Resources Annual Report*. p. 20.
http://www.dec.ny.gov/pubs/36033.html
[44] Nearing, B. July 17, 2012. "State well inspections 'inadequate'," *Times Union*.
http://www.timesunion.com/local/article/State-well-inspections-inadequate-3714717.php#ixzz20yzn41Mu
[45] Pers. Comm. between Lisa Sumi, Earthworks and Margaret Ash, Field Inspections Manager, COGCC. Sept. 26, 2011.

 BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

29

*Current State of Oil and Gas Enforcement*

In the case of air pollutants, tools exist that can be used by inspectors to find leaks. Instantaneous or "real-time" monitoring devices are available to detect air emissions of methane, volatile organic compounds, and other air pollutants. For example, infrared equipment such as Forward Looking Infrared (FLIR) cameras "allows enforcement officers to 'see' emissions that are otherwise not visible to the human-eye."[46]

Unfortunately, these devices are not used routinely during inspections by oil and gas agency personnel. They are, however, used by other agencies, typically environmental protection-focused agencies that are tasked with overseeing air quality. In some states, these environmental agencies may occasionally visit oil and gas well sites and facilities (e.g., in response to complaints), but they do not visit sites nearly as frequently as oil and gas inspectors. For example, in the Barnett Shale region of Texas the Commission on Environmental Quality (TCEQ) office has four FLIR cameras to take into the field to look for leaks, as well as access to mobile monitoring units and the ability to conduct grab samples of air.[47] This equipment is used when the office responds to air-related complaints (including those from oil and gas facilities).

The air quality bureau of the Pennsylvania DEP has also used FLIR or similar equipment to conduct several short-term air quality screening studies related to oil and gas development. The air quality bureau, however, does not perform routine inspections of oil and gas sites.

## INSPECTIONS DATA: RECOMMENDATIONS

RECOMMENDATION: *Inspection capacity needs to be increased in all states. This can be accomplished by increasing agency budgets, staff numbers, and employee remuneration (to retain experienced staff).*

RECOMMENDATION: *Agencies should establish required minimum inspector-to-well ratios, and annual-inspections-per-well requirements for each stage of well development (including inactive wells, which fail over time). Also, follow-up inspections should be conducted as frequently as is necessary to ensure that violations have been corrected in a timely and complete manner.*

RECOMMENDATION: *To ensure consistency of inspections across a state, agencies should develop binding inspection protocols on how to carry out inspections, and how to document and respond to violations (i.e., what is the required enforcement action for different types of violations).*

RECOMMENDATION: *To ensure that actual operating conditions are observed, the bulk of inspections should not be announced or planned in advance with the operator.*

RECOMMENDATION: *State agencies should invest in equipment to help inspectors detect emissions from oil and gas facilities as a matter of everyday practice, not as an exceptional procedure.*

---

[46] U.S. Environmental Protection Agency. Region 6. "Real-time Enforcement." http://www.epa.gov/region6/6en/a/oil_and_gas.htm

[47] Sheedy, K. Nov. 17, 2011. "Oil and gas operations and air monitoring in Texas," *Marcellus Summit 2011.* http://www.iogcc.state.ok.us/Websites/iogcc/images/2011MarcellusPresentations/Sheedy.pdf



*Current State of Oil and Gas Enforcement*

RECOMMENDATION: *Companies should be required to transparently conduct comprehensive and ongoing environmental monitoring of air, water, and soil in order to detect concentrations of emissions that can damage ecosystems or cause acute or chronic health problems for workers and residents.*

RECOMMENDATION: *Statistics on inspections and individual inspections files should be recorded in an electronic format that is easy to use and available to the public.*

*Current State of Oil and Gas Enforcement*

## 1.2. VIOLATIONS

When operators break oil and gas rules they may be issued violations by oil and gas regulators. However, the number of violations does not reflect the actual level of non-compliance that occurs in oil and gas fields because there is a large amount of discretion as to what is recorded as a violation.

Table 6 shows data collected on oil and gas violations in the six states for 2010. See Appendix 1 for more information.

**Table 6. Violation data by state (2010).**

| State | Violations | Inspections | Violations found per inspection | Notes |
|---|---|---|---|---|
| Colorado | No data | 16,228 | | 319 Notices of alleged violations |
| New Mexico | No data | 20,780 | | 418 Letters of violation |
| New York | No data | 2,460 | No data | No data |
| Ohio | 1,094 | 10,472 | 0.10 | Violations |
| Pennsylvania | 2,704 | 16,199 | 0.17 | Violations |
| Texas | 71,646 | 121,123 | 0.59 | Violations |

As seen from the table, no violations data were found for New York.[48] For other states, data related to violations are reported in different ways. For example, New Mexico keeps statistics on letters of violation sent to operators, but each letter may contain multiple violations, while Colorado only reports data on Notices of Alleged Violations (NOAV), which does not reflect the total number of violations found. This issue is discussion in more detail later in State-by-State Violation Trends, below.

Texas records more violations per inspection than any other state. It's unclear, however, if Texas oil and gas operators have a greater problem with compliance, or if Texas oil and gas inspectors simply do a better job of recording violations.

One concerned gaspatch resident was told by an inspector that if an operator fixes a problem "while we're there, then there is no violation." The participant, however, was clear that this was not the behavior of all inspectors in Pennsylvania.

Similarly, when a violation is found by a Colorado inspector, it does not necessarily result in an official record of the violation or an official notice issued to an operator. Inspections are rated as satisfactory or unsatisfactory. A search of 1,000 inspections that took place

---

[48] In response to an email request for information on inspections, violations, and complaints Earthworks received this reply: "The Division of Mineral Resources does not currently have a database for the information requested below. We are preparing to have one in operation at the time high-volume hydraulic fracturing activities are approved to go forward in the state. We do have paper records located in the field offices where the proposed wells were drilled. The record [sic] are filed by county, operator and by well name. You can review the paper records at our . . . offices."(Source: Email from New York Division of Mineral Resources <dmnog@gw.dec.state.ny.us> to Lisa Sumi. Sept 31, 2011.)



*Current State of Oil and Gas Enforcement*

between August 3 and Sept. 23, 2011, showed 145 "unsatisfactory" inspections, yet only 77 of those inspections noted violations.[49] If rules are not broken, then it's not clear what makes an inspection "unsatisfactory." If rules were violated, then states should keep some record of the violation.

## STATE-BY-STATE VIOLATION TRENDS

### Colorado: No strong trend

Colorado does not publish aggregate statistics on violations found during inspections, making it impossible to determine if the number of violations is increasing or decreasing. The only statistics related to violations that are publicly available from the COGCC are for "Notices of Alleged Violations" (NOAV), which do not represent the actual number of violations because in Colorado the discovery of a violation does not necessarily lead to an NOAV.[50]

**Chart 3. NOAV and inspections in Colorado (2005-2011).**



There is no strong trend in NOAV being issued in Colorado. There was a dramatic increase in NOAV in 2007 (549), but in most other years, approximately 250 to 300 NOAV were issued to oil and gas operators in Colorado.[51]

Unlike in Pennsylvania and Ohio, NOAV and inspections in Colorado do not seem to be linked. The increased inspections in 2005-2006 and 2009-2010 did not result in significant increases in NOAV.

### New Mexico: Decreasing violations reported

OCD maintains an internal database that tracks notifications sent to operators regarding violations, enforcement actions taken, and compliance data, but this database is not accessible by the public. Nor does the agency publish statistics on violations found during inspections. Upon request, the OCD did provide Earthworks with statistics on the number of Letters of Violation (LOV) sent to operators in 2009, 2010, and 2011,[52] as well as

---

[49] Colorado Oil and Gas Information System (COGIS). Inspection Inquiry. Select Inspection, search for 1000 records (the maximum). Search conducted Sept. 27, 2011. http://cogcc.state.co.us/cogis/IncidentSearch.asp

[50] See discussion later in the report, in the section on "Enforcement Actions: rules inconsistently applied."

[51] 2007–2010 data: COGCC staff report. Jan. 13, 2011. http://cogcc.state.co.us/Staff_Reports/2011/2011_01_SR.pdf 2005-2007 data: COGCC staff report. Jan. 8, 2007. http://cogcc.state.co.us/Staff_Reports/2007/January2007SR2.pdf

[52] Information request to Jim Winchester, NMED and EMNRD from Lisa Sumi, Earthworks. Feb. 24, 2012.



*Current State of Oil and Gas Enforcement*

"Compliance Summaries" from the database for 2010 and 2011 that indicated follow-up actions taken.[53]

**Chart 4. Letters of Violation in New Mexico.**



As seen in the chart, there has been a sharp decrease in the number of LOV sent to operators over the past few years. Less than one-third of the total 2009 LOVs were issued in 2011.

The annual LOV statistics provided by OCD <u>do not</u> reflect the total number of violations per year, as each letter may contain multiple violations.[54] Also, operators receive other types of notifications regarding rule violations (e.g., phone calls or more general non-compliance letters) that are not included in the LOV statistics.[55]

**Chart 5. Non-compliance letters received by some New Mexico operators.**



OCD data also show that the same operators receive high numbers of non-compliance letters from one year to the next, and numerous violations remain unresolved for years.[56]

Linn Operating, Chapparel, Occidental, Pride Energy and COG all had more incidents of non-compliance in 2011 than 2010, and other companies continued to have high numbers of violations in 2011 (e.g., Apache, Oxy USA, ConocoPhillips).

---

[53] Email from Jim Winchester, NMED and EMNRD Communications officer, to Lisa Sumi, Earthworks. March 5, 2012.

[54] Personal communication between Lisa Sumi, Earthworks and New Mexico OCD Enforcement and Compliance Manager, Daniel Sanchez, OCD attorney, Sonny Swazo, and NMED and EMNRD Communications officer, Jim Winchester. March 5, 2012.

[55] When OCD inspectors find what they deem to be serious violations, they typically send Letters of Violation (LOV) to the operators. These are the violations that are most likely to be followed up by OCD. If they find less serious violations, they may not issue an official Letters of Violation, but may still send a letter informing the operator that that it is out of compliance.

[56] It was not possible, due to time constraints, to summarize data for all operators, so the chart contains a selection of operators receiving enforcement letters (LOV, FVI or LET in the compliance summaries) in 2010 and 2011.



*Current State of Oil and Gas Enforcement*

How quickly operators resolve violations is another important factor to consider when evaluating the effectiveness of an enforcement program. The Compliance Summaries provided to Earthworks by OCD included information on "Date compliance achieved."[57] As of February 16, 2012 compliance had been achieved in 311 (39%) of the 797 incidents that resulted in letters of non-compliance in 2010, and compliance had been achieved in 170 of the 453 cases in 2011 (38% compliance).

With respect to the more serious violations, OCD data showed slightly higher rates of compliance. In 2010, 414 LOV were sent to operators, and as of February 16, 2012 compliance had been achieved for 220 (53%) of the cases.[58] In 2011, 203 LOV were sent, and compliance had been achieved for 101 (50%) of the cases.  When only half of the serious problems are resolved within a year or two, there is clearly a significant problem with compliance.

## New York: Violations data not available

The New York Division of Mineral Resources (DMR) does not publish data on violations in its annual report,[59] and New York does not yet keep violations data in a publicly accessible electronic database.[60]

## Ohio: When inspectors go looking, they find violations

The Ohio DOGRM does not publish statistics on oil and gas violations on its web site, nor are any published in the Ohio Department of Natural Resources' *Oil and Gas Summaries.*

Violations data are accessible to the public through the RBDMS database. As indicated in Table 7 below, Earthworks' analysis of data from the RBDMS "Failed Inspections Table" showed 1,667 distinct rule violations in 2011.[61] The RBDMS data show that the total number of violations recorded during DOGRM inspections of oil and gas wells was higher in 2011 than in any of the three previous years. Between 2010 and 2011 alone, there was a jump of more than 570 violations.

---

[57] According to OCD the information on whether or not compliance has been achieved may not be entirely accurate because inspectors may not have entered the data into the system, operators may have corrected problems but not notified OCD, or inspectors may not have carried out a follow-up inspection to ensure that violations had been corrected. It may not be entirely accurate, but it is the best information available at this time.

[58] The number of wells in compliance was determined by counting the number of LOV that had a date in the column "Dt Comp." Achv'd."

[59] New York Division of Mineral Resources annual reports include very basic statistics on inspections. Reports available at: http://www.dec.ny.gov/pubs/36033.html

[60] In response to an email request for information on inspections, violations, and complaints Earthworks received this reply: "The Division of Mineral Resources does not currently have a database for the information requested below. We are preparing to have one in operation at the time high-volume hydraulic fracturing activities are approved to go forward in the state. We do have paper records located in the field offices where the proposed wells were drilled. The record [sic] are filed by county, operator and by well name. You can review the paper records at our . . . offices."(Source: Email from New York Division of Mineral Resources <dmnog@gw.dec.state.ny.us> to Lisa Sumi.  Sept 31, 2011.)

[61] Ohio Division of Mineral Resources Management. Risk Base Data Management System (RBDMS) Database. http://www.ohiodnr.com/mineral/production/tabid/15389/Default.aspx RBDMS data updated and accessed March 7, 2012. Downloaded "tblInspFail". Filtered by DT_MOD (1/1/2011 to 12/31/2011). Filtered TYP_INSP to remove inspections not related to oil and gas production wells (removed administrative inspections (AM), brine hauler (BH), enhanced recovery (ER), solution mining projects (SM), storage wells (SO) and saltwater injection wells (SW)). Column OAC (violations of Ohio Administrative Code) had 1,667 entries.



*Current State of Oil and Gas Enforcement*

**Table 7. Violations related to oil and gas wells in Ohio, 2008-2011.**

|  | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| **RBDMS Number of violations related to oil and gas wells** | 1,275 | 1,252 | 1,094 | 1,667 |
| **DOGRM Statistics on oil and gas violations** | 722 | 634 | 615 | 692 |

Table 7 also includes data on violations provided to Earthworks by DOGRM.[62] The increase in violations from 2010 to 2011 is seen in the DOGRM data, but the violation totals differ. It's not clear how DOGRM derived its total of 692 violations for 2011.[63] Earthworks' analysis of RBDMS data shows that violations were found during 819 inspections of oil and gas facilities. As seen in Table 8,[64] violations were found during inspections at 676 oil and gas "Production Wells" (PW). This is closer to the 692 violations number provided by DOGRM. When inspections of drilled/deepened/reopened wells, production wells, plugged wells, and urban deepened wells were added together, there were 692 inspections that found violations– the same number provided by DOGRM. If this is how DOGRM derived its statistic, it clearly leaves out many other types of oil and gas well inspections (such as those at urban oil and gas wells), and does not include all violations.

**Table 8. Violations found by type of inspections in Ohio (2011).**

| RBDMS Inspection Code | RBDMS Inspection Code Description | Number of oil and gas well inspections finding violations |
|---|---|---|
| **AD** | Annular Disposal | 16 |
| **CT** | Completion Testing | 0 |
| **DD** | Drill / Deepen / Reopen | 6 |
| **FR** | Final Restoration | 37 |
| **ND** | Not Drilled | 0 |
| **NF** | Field Inspected, Well Not Found | 0 |
| **NW** | Non Well | 0 |
| **OR** | Orphan | 3 |
| **PB** | Plug / Plug Back | 6 |
| **PL** | Preliminary Restoration | 33 |
| PW | Production Wells | 676 |
| **SC** | Surface Facility Construction | 4 |
| **UD** | Urban Drill / Deepen / Reopen | 4 |
| **UL** | Urban Preliminary Restoration | 0 |
| **UP** | Urban Production Wells | 34 |
|  | **TOTAL** | **819** |

---

[62] See footnote 60.

[63] For a more in-depth analysis of this question, visit Earthworks' "Ohio Oil & Gas Enforcement – Violations" web page: http://www.earthworksaction.org/issues/detail/ohio_oil_gas_enforcement_violations

[64] See Appendix 5 for more details on how we obtained these numbers.



*Current State of Oil and Gas Enforcement*

When DOGRM reports statistics on violations related to oil and gas activities, the agency should make it clear how those statistics are derived. Based on our examination of the data, we believe that statistics on oil and gas violations should include, at minimum, violations found during production, annular disposal, completion testing, surface facility construction, drilling/deepening/reopening of wells, orphan wells, plugging operations, and site restoration at urban and non-urban well sites, as well as at orphan wells.

**Chart 6. Ohio Inspections and Violations (2001 – 2011).**



Chart 6 uses oil and gas inspection and violation data extracted from the RBDMS database.[65] We included inspection and violation data for all of the types of facilities mentioned in the preceding paragraph.

As seen from the chart, there is a fairly strong relationship between the number of wells that are inspected and the number of wells that DOGRM finds to have violations.

In other words, when Ohio inspectors go looking, they find violations.

## Pennsylvania: Increasing violations

In January 2012, the DEP released an online "Oil and Gas Compliance Report" system. This system allows users to search for, and download information on, oil and gas violations, enforcement actions, and inspections in Pennsylvania.[66]

---

[65] Data for the chart can be found in Tables A5-2 and A5-5, Appendix 5.

[66] Prior to the new online data system, the Pennsylvania DEP published fairly detailed "Inspections, Enforcement and Violations" spreadsheets. The spreadsheets are no longer available on the web site. Oil and Gas Compliance Report system is at: http://www.portal.state.pa.us/portal/server.pt/community/oil_and_gas_compliance_report/20299



*Current State of Oil and Gas Enforcement*

**Chart 7. Violations in Pennsylvania (2008-2011).**



As seen in Chart 7, since 2008 there has generally been an increase in the number of violations found at oil and gas wells in Pennsylvania. In 2011, there were 4,069 violations found during inspections.  Generally, there has also been an increase in the contribution of Marcellus shale wells to the total number of violations. In 2010, 1,273 (45%) of the total number of violations (2,861) were found at Marcellus Shale well sites. In 2011, however, violations at non-Marcellus wells showed a dramatic increase, while violations at Marcellus wells dropped slightly to 1,189.

Data for Charts 7 and 8 can be found in Appendix 6.

**Chart 8. Pennsylvania inspections and violations.**



Chart 8 compares the number of inspections to the number of violations found at oil and gas well sites from 2000 to 2011. There is a fairly strong relationship between inspections and violations in Pennsylvania.

In some years, such as 2000 and 2009, inspectors found considerably more violations than other years, but otherwise, it appears that when DEP inspectors carry out more inspections, more violations are found.

It also appears that many of the top violators in Pennsylvania are not improving their records. Table 9 shows the top 12 Pennsylvania oil and gas operators with the most violations in 2011, as well as the number of violations that they had in 2009 and 2010.[67] For each operator, the highest number of violations per month is highlighted in red.

---

[67] Violations data: Pennsylvania DEP. Oil and Gas Compliance Report system. Search by operator, Inspections find violations, 2009, 2010 and 2011. http://www.portal.state.pa.us/portal/server.pt/community/oil_and_gas_compliance_report/20299
Data on number of active wells: DEP Office of Oil and Gas Management. Wells Inventory by Operator. Removed wells permitted after Dec. 31, 2011. Filterer results for Well Status: "active."
http://www.depreportingservices.state.pa.us/ReportServer/Pages/ReportViewer.aspx?/Oil_Gas/Operator_Well_Inventory_By_Operator



*Current State of Oil and Gas Enforcement*

**Table 9. Trends in violations for the top offenders in Pennsylvania.**

|  | Active wells | Violations per year | | |
|---|---|---|---|---|
| Operator | 2011 | 2009 | 2010 | 2011 |
| Catalyst Energy Inc. | 1,633 | 41 | 27 | **187** |
| Chesapeake Appalachia LLC | 1,378 | 123 | 157 | **161** |
| Cabot Oil & Gas Corp | 315 | 82 | 115 | **174** |
| N. Amer. Oil & Gas Drilling Co. Inc. | 1,001 | 26 | 0 | **128** |
| Chief Oil & Gas LLC | 181 | 33 | **178** | 95 |
| Range Resources Appalachia LLC | 5,068 | 12 | 54 | **95** |
| Farrington & Hepler Gas & Oil Inc. | 70 | 4 | 20 | **88** |
| XTO Energy Inc | 4,747 | 23 | 68 | **81** |
| Eagle Resources Corp | 61 | 7 | 0 | **70** |
| Ultra Resources Inc. | 222 | 25 | 59 | **70** |
| Anadarko E&P Co. LP | 480 | 8 | **83** | 70 |
| Allegheny Natural Resources Inc. | 33 | 4 | 8 | **55** |

These data suggest that the practices of many operators are getting worse, not better, with time. All but two companies (Chief and Anadarko) had more violations in 2011 than in previous years, and many operators have had consistently large numbers of violations for three years running (e.g., Chesapeake, Cabot, Chief, Range, XTO, Ultra).

It should be noted that the operators with the most violations are not necessarily those with the largest number of wells. There are 23 operators in Pennsylvania with more than 1,000 active wells,[68] yet only five of them appear in Table 9.

## Texas: Downward trend in violations

While some general statistics on violations are now published on the RRC website,[69] the RRC does not have a publicly accessible database that allows citizens or operators to examine the tens of thousands of violations and Notices of Violation (NOV) sent to operators every year.

Currently, the only publicly accessible RRC database that includes information on violations is the "severance" database.[70] This database includes all wells that have been required to

---

[68] Pennsylvania DEP. Office of Oil and Gas Management. "Operators having more than 100 active wells." http://www.depreportingservices.state.pa.us/ReportServer/Pages/ReportViewer.aspx?/Oil_Gas/Operators_With_GT100_Active_Wells Data accessed April 18, 2012.

[69] Rider 17 of the 2012-2013 GAA required the RRC to publish information about violations on its web site: "the agency shall publish information about enforcement data on its website, including inspection and enforcement activity, violations and the amount of final enforcement penalties assessed to the operator. (General Appropriations Act for the 2012-13 Biennium. 82nd Texas Legislature Regular Session. Sept. 12, 2011.p. VI-60. http://www.lbb.state.tx.us/Bill_82/GAA.pdf) The statistics are available on the RRC web site at: http://www.rrc.state.tx.us/compliance/enforcement/index.php

[70] RRC of Texas. Online System. Oil and Gas Data Queries. Severance Query. http://webapps2.rrc.state.tx.us/EWA/ewaMain.do;jsessionid=5pLSTGQTBywCmhGBmWNtw8ltvLBT76X5tCCLTpK73py5hynHNnQjI1808539119



*Current State of Oil and Gas Enforcement*

stop producing oil and gas because of rule violations, but it does not contain <u>all</u> violations because not all wells with violations are ordered to stop producing – for example, in 2010, approximately 7,000 severances/seals were issued, while the RRC recorded more than 70,000 violations.[71]

In 2010 inspectors conducted more inspections but found fewer violations than they did in 2006. The number of violations found by oil and gas inspectors in Texas decreased from approximately 90,000 in 2006 to just over 71,000 in 2010.[72] A decrease of approximately 20,000 violations between 2006 and 2010 is a significant drop. Over that same time period, the number of inspections increased by approximately 3,500 per year (from 118,000 in 2006 to 121,667 in 2010).

There are several possible reasons for the drop in violations in 2010:  1) by conducting more inspections there has been a more visible presence of Texas RRC personnel in the field, causing operators to work more carefully; 2) each inspectors conducted more inspections in 2010, so inspections were not as thorough as in 2006; or 3) inspectors did not issue violations for minor offenses (were instructed to treat violations differently in 2010). Former Railroad Commission District Director, Mark Henkhaus, recently wrote that, "I know that a Commission field technician is able to detect 'technical violations' on almost any lease or well site. . . many less-serious violations are dealt with in the Commission's district office by district staff in person, on the telephone. . ."[73]

## ARE CURRENT EFFORTS REDUCING VIOLATIONS AND INCREASING COMPLIANCE?

Despite the drop in violations between 2006 and 2010, the fact that there were 70,000 violations in 2010 makes it clear that a very serious problem with compliance exists in Texas.

In its 2011 review of the RRC, the Texas Sunset Advisory Commission ("Sunset Commission") required the agency to provide data on the top ten most frequently violated oil and gas rules in the state. RRC provided data for 2009 (summarized in Table 10.[74])

The Sunset Commission remarked on the excessive number of violations of Statewide Rule 3, which requires proper identification at well sites. The Commission suggested that some operators will not follow some rules "unless found in violation by an inspector."[75]

---

[71] See Appendix 7, Tables A7-4 and A7-5.

[72] See Appendix 7, Tables A7-1 and A7-4.

[73] Letter from Mark Henkhaus, EXCO Resources to Ramon Fernandez, RRC of Texas. March 12, 2012. Re: Comments on Proposed 16 TAC 3.107 Statewide Rule 107: Penalty Guideline for Oil and Gas Violations. p. 2. http://www.rrc.state.tx.us/rules/Comments-EXCO-Resources-3-107-March2012.PDF

[74] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas*. p. 35. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[75] "…inspectors reported nearly 24,000 sign violations, more than any other single type of violation. While signs may not seem important on an individual basis, safety and public information reasons exist for these requirements. The numbers suggest some operators do not install required signs unless found in violation by an inspector." (Source: Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas*. p. 34. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf)



*Current State of Oil and Gas Enforcement*

**Table 10. Ten Railroad Commission of Texas rules most frequently violated in 2009.**

| Statewide Rule No. | Rule | Total Violations |
|---|---|---|
| 3 | Identification of properties, wells, and tanks | 23,969 |
| 8 | Water protection | 18,035 |
| 14B2 | Plugging extension | 17,124 |
| 91 | Clean up of soil contaminated by crude oil spill | 5,371 |
| 13 | Casing, cementing, drilling and completion requirements | 2,808 |
| 46 | Fluid injection into productive reservoir | 2,396 |
| 14 | Plugging | 1,514 |
| 9 | Disposal wells | 1,174 |
| 36 | Oil, gas, or geothermal resource operation in hydrogen sulfide areas | 1,048 |
| 22 | Protection of birds | 1,044 |

Even when companies are issued violations, however, it may not necessarily lead to increased compliance. As detailed below, two indicators that behavior may not be seriously affected when companies are issued a violation are that: 1) companies violate the same rules on many well sites (one violation does not alter their behavior); and 2) companies repeatedly violate the same rule (i.e., have recurring violations). Both trends indicate that some companies have little regard for the rules.

## Companies violate the same rule on many well sites

In Texas, operators with inactive wells are required to conduct an H-15 (e.g., mechanical integrity) test "to establish that an inactive well over 25 years old does not pose a potential threat of harm to natural resources, including surface and subsurface water, oil and gas."[76]

---

[76] The actual test is generally either a static well fluid level test (FL) or a mechanical integrity test (MIT). (Source: RRC of Texas web site: "H-15 Program - Testing of Older Inactive Wells Over 25 Years Old Frequently Asked Questions (FAQs)." http://www.rrc.state.tx.us/about/faqs/h15faqs.php) According to the severance database, failure to file the H-15 test report is a violation of Statewide Rule 14(B)(2).For an example, see http://preview.tinyurl.com/ckbt5dx).



*Current State of Oil and Gas Enforcement*

### Chart 9. Texas operators with most violations of Rule 14(B)(2).



This chart shows companies with 15 or more delinquent H-15 reports over a two-year period (2010 and 2011).[77]

During this time period there were 1,713 delinquent H-15 reports for natural gas leases.

Devon Energy and Pioneer Natural Resources were the worst offenders, with 100 and 82 delinquent reports/violations, respectively.

### Chart 10. Pennsylvania operators with the most Rule 102.4 violations.



This chart shows operators in Pennsylvania that most frequently violated DEP Rule 102.478 (which governs erosion and sediment control requirements) in 2010 and 2011.[79]

Chesapeake had the worst record, with 25 violations of rule 102.4 in 2010, and 35 violations of the rule in 2011.

In addition to Chesapeake, there were several other companies that appear to have a problem complying with Rule 102.4. Cabot, Chief and Ultra Resources all had numerous violations of this rule in 2010 and again in 2011.

Texas is not the only state where there are operators that have multiple violations of the same rule. Using data downloaded from the Pennsylvania DEP Compliance Reporting system, it was possible to sort the data to determine which companies frequently violated a particular rule in that state (Chart 10).

---

[77] RRC of Texas Online System. Severance Query. Search Criteria – Well Type: Gas, Severance/Seal Cert. Ltr. Reason: Delinquent H-15. Severance/Seal  Letter Date: 01/01/2010 to 12/31/2011. Current records.  Data accessed Feb. 29, 2012. http://webapps2.rrc.state.tx.us/EWA/severanceQueryAction.do

[78] Pennsylvania Code. Title 25. Chapter 102. §102.4. Erosion and sediment control requirements. http://www.pacode.com/secure/data/025/chapter102/s102.4.html

[79] Using data downloaded from the Pennsylvania DEP Compliance Reporting system, it was possible to sort the data by "Violation Code" to determine which companies frequently violated a particular rule. See Appendix 6 for data.



*Current State of Oil and Gas Enforcement*

## Companies repeatedly violate the same rules on the same sites

Many states do a poor job of tracking companies with recurring or repeated violations. For example, according to the Sunset Commission, Texas RRC field staff record all violations, but "the Commission does not specifically track repeat violations unless the violation is one of the 4 percent brought forward to enforcement. As a result, the Commission cannot be certain that operators are not committing repeated violations."[80]

Other states make it impossible for the public to track repeat violators because they have no accessible data on violations (e.g., New York and New Mexico), or the data are only available in individual inspection files rather than in databases that allow information to be sorted and analyzed (e.g., Colorado).

**Pennsylvania**: The Pennsylvania DEP eFACTS database allows users to search for companies that have recurring violations. Data from eFACTS suggest that 21 companies have had recurring violations over the past five years.[81] Those with more than one recurring violation are included in Table 11.

**Table 11. Operators with more than one recurring violation in the eFACTS database.**

| Operator | Inspections showing "Recurring Violations" and "Violations and Recurring Violations" |
|---|---|
| Synd Enterprises Inc. | 4 |
| CNX Gas Co LLC | 2 |
| Energy Corp of Amer. | 2 |
| Range Resources Appalachia LLC | 2 |
| Seneca Resources Corp. | 2 |
| XTO Energy Inc. | 2 |
| No operator data provided | 2 |

The eFACTS database, unfortunately, does not appear to be an entirely reliable source of information.[82] Data fro the DEP Compliance Report system could be analyzed to look for repeated violations of a particular rule by a particular operator at a particular well site, but for the public that task would be quite complex and time-consuming.

---

[80] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 34. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[81] Pennsylvania DEP. eFACTS web site: Inspection Search. All fields blank except: Inspection Results: "Recurring Violations," and Program: "Oil and Gas"  Add to second search: Inspection Results: "Violations and Recurring Violations", and Program: "Oil and Gas." Data accessed Feb. 28, 2012.  Table 11 includes data for 2007 through 2011. No operator name found for Inspection ID: 2013884 or 1972214.  Data accessed Feb. 28, 2012. http://www.ahs2.dep.state.pa.us/eFACTSWeb/criteria_inspection.aspx

[82] For example, a search of eFACTs "inspections" turned up just one inspection for U.S. Energy Development Corp. since 1995 (Client ID 46132). (DEP eFACTS web site: Inspection Search. Program: Oil and Gas, Client ID: 46132. http://www.ahs2.dep.state.pa.us/eFACTSWeb/criteria_inspection.aspx) Yet DEP's Compliance Report system indicates that in 2009, 2010 and 2011 alone, the company had 131, 26 and 30 inspections finding violations, respectively. (Pennsylvania DEP. Oil and Gas Compliance Report system. Searched: U.S. Energy Development Corp. Inspections with Violations Only: Yes. Searched for years 2009, 2010 and 2011.



*Current State of Oil and Gas Enforcement*

**Texas:** The RRC severance database allows users to search by "reissuance of a severance." As of the end of September 2011 there were 474 severances that were listed as being reissued.

When specific well records were examined, evidence was found that companies repeatedly violated the same rules at the same facility. For example, in 1995, 1997, 1999, 2002, 2004, and 2006 Chesapeake Operating, Inc. was sent certified letters for failing to file H-15 forms for the Detijerina, H.C. lease as required by law.[83] Similarly, Devon Energy Production Company, L.P. was issued certified letters because of delinquent H-15 filings on its Fagan H.F. lease in 1994, 1995, 1996, 1999, 2001, 2002, 2003, 2004, and 2009.[84]

## VIOLATIONS DATA: RECOMMENDATIONS

RECOMMENDATION: *Agencies should issue notices of violation whenever rules are broken. If combined with adequate penalties, these could greatly deter potential violators.*

RECOMMENDATION: *Agencies should monitor and analyze violations data to better understand where to focus their enforcement efforts. For example, they could track the rules most commonly violated and strengthen actions toward and fines for operators who violate these rules.*

RECOMMENDATION: *Agencies should document violations in a consistent manner with clear definitions, and publish statistics and details of violations in a publicly accessible, online, searchable format.*

RECOMMENDATION:  *Agencies should track operators that repeatedly violate rules and/or refuse to resolve problems in a timely manner. Operators that demonstrate a pattern of non-compliance should be singled out for strong enforcement action. For example, company track records could be publicized, there could be automatic fines for recurring violations, pending permit applications for repeat violators could be put on hold until all facilities are brought into compliance, or existing operations that are out of compliance could be shut down until all operations are in compliance.*

RECOMMENDATION: *When serious violations occur, such as well blowouts, significant chemical spills, waste dumping, or illegal venting), the associated facilities should generally be shut down until the environmental and property impacts are fully remediated.*

---

[83] RRC of Texas.  Severance Query. Oil Lease No./Gas Well ID No: = 054104. Click on lease number on next two screens. View results at: http://tinyurl.com/64l8dgn

[84] ibid. Oil Lease No./Gas Well ID No: = 01193. View results at: http://tinyurl.com/3lajh5s



*Current State of Oil and Gas Enforcement*

## 1.3.  ENFORCEMENT ACTIONS AND PENALTIES

*"I would like to see an oil and gas manual. They used to have one—if you didn't follow it, you were fined. I'd like to get back to that. . ."*

-EXCO President Wendy Straatmann.[85]

*If operators are rarely brought in for enforcement action, a pattern of non-compliance can develop leading to escalating violations, which can eventually result in costly State-managed well plugging or remediation, large environmental impacts, or public safety hazards.*

-Texas Sunset Advisory Commission.[86]

When violations occur, a range of enforcement actions can be taken, from verbal warnings to written notices to legal action. State regulators may have the ability to assess administrative penalties, civil penalties/fines, criminal penalties, issue administrative orders, suspend certain activities, revoke permits, put new permits on hold, stop production at an operation, require bond forfeiture, issue cease and desist orders, or negotiate agreements with companies that may include orders to correct violations by a specific date and payment of penalties.

This section focuses on the use of penalties as a means to encourage compliance with oil and gas regulations. As described by the Sunset Commission of Texas, " an effective enforcement process should balance monitoring, compliance, and penalties. Monitoring is expensive and inspectors cannot reasonably oversee the significant amount of oil and gas activity. . . The efficient and fair use of penalties plays a key role in deterring and punishing violators, and thus increases compliance."[87]

### MAXIMUM PENALTIES ARE OUTDATED

Table 12 provides information on maximum penalties that can be assessed for various oil and gas violations in the six states examined for this report. References for this table can be found in Appendix 1.

As seen in Table 12, civil penalties for failing to adhere to oil and gas rules are relatively low. In most states, the penalty provisions in oil and gas statutes have not been updated for many decades. As a result, the penalties—which should be high enough to serve as a deterrent to damaging protect public health, safety, and the environment—have not kept up with increased revenues per well, changes in technologies, or level of impact, or inflation.

---

[85] Leonard, K. Nov. 17, 2008. "Gas firms pull rigs, complain state obstructs Marcellus drilling," *Pittsburgh Tribune-Review*. http://www.pittsburghlive.com/x/pittsburghtrib/business/s_598785.html#ixzz1YQhlJTf5

[86] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas*. p. 35. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[87] ibid. p. 33.



*Current State of Oil and Gas Enforcement*

For example, in New Mexico the maximum fine—which has not changed since the inception of the 1935 *Oil and Gas Act*—is $1,000 per day.[88] If the penalty amount is adjusted for inflation, the maximum penalty would be close to $17,000 per day in 2012 dollars.[89] Not only is New Mexico's current maximum penalty extremely low, but also the requirements for assessing this penalty are extremely high: penalties can only be sought by the OCD if an operator knowingly and willfully commits the violation.[90]

What is perhaps even more notable is that Colorado, which updated its penalty schedule as recently as 2008,[91] also has an extremely low maximum daily fine of $500 - $1,000. This amount can be levied for each day that a violation continues; for example, if a violation continues to occur for 20 days, the COGCC could assess a fine of $20,000.

**Table 12. Civil penalties for violations of oil and gas regulations state.**

| State | Maximum penalty | When maximum penalty is applied |
|-------|-----------------|--------------------------------|
| Texas | Max $1000 - $10,000 for each day violation continues | Amount depends on rule that is violated. Largest penalty only applies if the provision, rule, or order pertains to safety or the prevention or control of pollution |
| Ohio | Max $2,500 – $20,000 per each continuing day of violation | Amount depends on which section of Code is violated. Largest penalty primarily applies to rules to prevent pollution from extraction, storage and injection of brine, oil, natural gas or other fluids. |
| New Mexico | Max $1,000 for each day violation continues | Applies to anyone who knowingly and willfully violates the Oil and Gas Act |
| New York | Max $8,000 per violation plus $1,000 - $2,000 for each day violation continues | Applies to violation of Article 23 or any regulation, order or permit condition. |
| Colorado | $500 - $1,000/day that violation continues | Maximum total fine for violations that do not have adverse effects on public health/welfare/resources is $10,000 regardless of # of days of continued violation. For violations that affect public health/welfare/resources the total may exceed $10,000. |
| Pennsylvania | $25,000 per violation plus $1,000 for each day violation continues (conventional wells) and $75,000 per violation plus $5,000 for each day (unconventional well) | Applies to violations of Title 58 Oil and Gas. |

---

[88] New Mexico Legislative Finance Committee. Feb. 17, 2011. F*iscal Impact Report for HB 176, Oil & Gas Act Enforcement*. p. 6. http://www.nmlegis.gov/sessions/11%20regular/firs/HB0176.pdf

[89] U.S. Bureau of Labor Statistics. "CPI Inflation Calculator." http://www.bls.gov/data/inflation_calculator.htm

[90] New Mexico Statutes. 1978. Article 2. Oil Conservation Commission; Division; Regulation of Wells. Section 70-2-31. Violations of the Oil and Gas Act; penalties. http://law.justia.com/codes/new-mexico/2011/chapter70/article2/section70-2-31/

[91] COGCC. 2008 Rulemaking. "COGCC Amended Rules Redline." Accessed March 2, 2012. http://cogcc.state.co.us/rr_docs_new/FinalRulesTBLNew2.cfm



*Current State of Oil and Gas Enforcement*

The Ohio Revised Code, most recently revised in June 2012, establishes a maximum penalty of $20,000 per day for certain violations.[92] Prior to these revisions the maximum amount was $20,000 per violation, no matter how many days an operator remained in violation.

In Texas, the maximum penalty for violation of oil and gas pollution prevention rules was set in 1983.[93] Twenty-nine years later, it is still $10,000 per day.[94] If the penalty amount is adjusted for inflation, the maximum penalty would amount to $22,800/day in 2012 dollars.[95]

In Pennsylvania, penalties for unconventional wells were increased to $75,000 plus $5000 per day in 2012, but penalties for conventional wells have not changed since 1984 when the Pennsylvania *Oil and Gas Act* was enacted. If the $25,000 maximum fine for conventional wells were adjusted for inflation, the penalty amount in 2012 would be approximately $54,500, plus more than $2,000 for each day of continued violation.[96]

## RECENT EFFORTS TO INCREASE PENALTY AMOUNTS

While in many states the penalty amounts have not changed for decades, some state agencies have recognized the need to increase the amount of fines to better reflect the level of damage that can be caused by modern-day oil and gas operations. In early 2012, at the urging of the DEP, Pennsylvania amended its oil and gas act to increase maximum civil penalties for unconventional gas wells to $75,000 for each day of violation.[97]

Legislators in other states have not been as responsive. For example, in 2011, a bill was proposed that would have amended the New Mexico *Oil and Gas Act* to require larger penalties, but the bill failed to pass.[98] Also in 2011, Texas Senate Bill 1293 proposed to increase the maximum civil penalty for oil and gas violations from $10,000 to $25,000. This bill did not pass.[99]

In these times of budgetary deficits, with legislatures scrambling to find revenue sources, the fact that proposals to increase penalties for violations have not been successful in several states is disappointing, and suggests a strong influence of the oil and gas industry on legislators.

[92] Ohio Revised Code. Title 15. Chapter 509: Division of Oil and Gas Resources Management. 1509.33 Civil Penalties. Section (C). States that "Whoever violates division (D) of section 1509.22 [Storage or disposal of brine, crude oil, natural gas, or other fluids] or division (A)(1) of section 1509.222 [Registration certificate and identification number for transportation of brine] of the Revised Code shall pay a civil penalty of not less than two thousand five hundred dollars nor more than twenty thousand dollars for each violation." http://codes.ohio.gov/orc/1509.33
[93] RRC of Texas web site: "Surface Waste Management Manual." http://www.rrc.state.tx.us/forms/publications/SurfaceWasteManagementManual/chapter1.php and "History of Railroad Commission" (Sept. 1, 1983) http://www.rrc.state.tx.us/about/history/chronological/chronhistory04.php
[94] Texas Natural Resources Code. Section 81.0531. "Administrative Penalty." http://www.statutes.legis.state.tx.us/Docs/NR/htm/NR.81.htm#81.0531
[95] U.S. Bureau of Labor Statistics. "CPI Inflation Calculator." http://www.bls.gov/data/inflation_calculator.htm
[96] U.S. Bureau of Labor Statistics. "CPI Inflation Calculator." http://www.bls.gov/data/inflation_calculator.htm
[97] Feb. 14, 2012. "Pennsylvania passes comprehensive amendments to Oil and Gas Laws." Morgan Lewis. http://www.morganlewis.com/index.cfm/publicationID/cfd3c31d-64a3-4e9e-9e49-ee9506deac03/fuseaction/publication.detail
[98] New Mexico Legislature. 2011 Regular Session. HB 176. "Oil and Gas Enforcement." http://www.nmlegis.gov/lcs/_session.aspx?chamber=H&legtype=B&legno=%20176&year=11
[99] Texas Legislature Online. Bill: SB 1293, Session 82(R). http://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=82R&Bill=SB1293



*Current State of Oil and Gas Enforcement*

## THE HOW, WHEN, AND WHO OF ASSESSING CIVIL PENALTIES

When oil and gas rules are violated, most states have the ability to assess "civil" monetary penalties (i.e., fines). Prior to 1980, civil penalties for oil and gas violations were often assessed by district courts in suits brought by a state's Attorney General at the request of and on behalf of the regulating agency.[100]

Agencies in New Mexico and Ohio <u>still</u> must go through this resource and time intensive process. Not surprisingly, then, the amount of penalties collected for oil and gas violations in New Mexico and Ohio is low compared to other states in this report (see Table 13).

Most other state oil and gas agencies have the authority to assess penalties without having to go through the courts.  In Texas, Colorado, and New York regulating agencies have the ability to assess penalties after the operators have had the opportunity for a hearing.[101]

In Pennsylvania, it is not the DEP but rather the Environmental Hearing Board that has the ability to assess civil penalties after a hearing.[102] In 2011, Pennsylvania Governor Corbett's Marcellus Shale Advisory Commission recommended that in order to be consistent with other environmental statutes, "DEP should be able to assess civil penalties, rather than the Environmental Hearing Board."[103] While perhaps not as resource intensive as going through the Attorney General's office to bring a civil penalty suit in court, going through the Environmental Hearing Board is more cumbersome than allowing the DEP itself to assess penalties. Nevertheless, this has not stopped Pennsylvania from assessing the highest penalties of all six states in this report.

The burden of proof for assessing civil penalties varies from state to state. Of the states examined in this report, the most stringent burden exists in New Mexico, where OCD must prove that a violator acted "knowingly and willfully" in order to assess civil penalties.[104] New Mexico can be contrasted with Pennsylvania, where civil penalties "may be assessed whether or not the violation was willful."[105] In other states such as Texas and Ohio, the higher level of proof is required only for criminal penalties, which is consistent with typical criminal codes.

---

[100] Texas Comptroller of Public Accounts. 1991. Breaking the Mold – New ways to govern Texas. Volume 2. NR-7. "Economic Benefit From Violating Environmental Laws Should Be Eliminated." http://www.window.state.tx.us/tpr/btm/btmnr/nr07.html

[101] "Any such penalty shall be imposed by order of the commission, after a hearing in accordance with section 34-60-108, or by an administrative order by consent entered into by the commission and an operator." (Sources: Colorado Revised Statutes. Title 34. Article 60. Section 34-60-121. http://www.michie.com/colorado/lpext.dll/cocode/1/56c58/57b00/57b02/57b04/57cc1?f=templates&fn=document-frame.htm&2.0 AND and New York Code. Environmental Conservation. Title 71. Article 13.  Section 71-1307. "Sanctions." http://codes.lp.findlaw.com/nycode/ENV/71/13/71-1307)

[102] Pennsylvania Consolidated Statute. Title 58- Oil and Gas; Chapter 32, Subchapter E. § 3256. Civil penalties. http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/00.032..HTM

[103] Marcellus Shale Advisory Commission. July 22, 2011. Final Report. p. 105. http://files.dep.state.pa.us/PublicParticipation/MarcellusShaleAdvisoryCommission/MarcellusShaleAdvisoryPortalFiles/MSAC_Final_Report.pdf

[104] A legislative effort in 2011 attempted to remove this burden of proof, but it failed. (Source: New Mexico Legislative Finance Committee. Fiscal Impact Report for HB 176 "Oil and Gas Enforcement." http://www.nmlegis.gov/Sessions/11%20Regular/firs/HB0176.pdf)

[105] Pennsylvania Consolidated Statute. Title 58- Oil and Gas; Chapter 32, Subchapter E. § 3256. Civil penalties. http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/00.032..HTM



*Current State of Oil and Gas Enforcement*

## TRENDS IN PENALTIES AND ENFORCEMENT ACTIONS

Table 13 includes data on penalties collected in either 2009, and, when it was possible to find data, 2010 and 2011. (See Appendix 1 for data sources.) The total dollar amount in penalties collected for violations of state oil and gas rules is low. Of the six states examined in this report, three collected more than a million dollars worth of penalties per year in 2009, 2010 or 2011 (Pennsylvania, Texas, and Colorado), Ohio collected less than $200,000 in all three years, and New York, and New Mexico collected less than $50,000.

To put these penalty totals in context, the estimated total value of the gas extracted from one average Marcellus shale gas well is $2.9 million.[106] The six states examined harbor almost 350,000 active wells.

**Table 13. Civil penalties collected (2009 to 2011).**

|      | Pennsylvania | Texas       | Colorado    | Ohio         | New York | New Mexico |
|------|--------------|-------------|-------------|--------------|----------|------------|
| 2009 | $1.6 million | $ 2.0 million | $162,000  | $17,500      | $40,000  | No data    |
| 2010 | $4.0 million | No data     | $1.2 million | $194,000    | No data  | $14,000    |
| 2011 | $1.3 million | No data     | $3.0 million | $73,935 (FY) | No data  | No data    |

## Colorado

COGCC's enforcement actions include Notices of Alleged Violation, Administrative Orders of Consent (AOC) and Orders Finding Violation (OFV).

**Chart 11. Enforcement actions in Colorado.**



As seen in Chart 11, the number of enforcement actions (NOAV, AOC and OFV) taken by the COGCC in 2011 was lower than other years.[107] The number of NOAV hit a seven-year low that year.

NOAV are not issued for every violation, and Colorado does not publish statistics on the number of violations found per year, so it is not possible to see if violations also declined in 2011.

---

[106] Based on data from: U.S. Energy Information Administration. June, 2012 wellhead price: $2.54 per 1,000 cubic feet. http://www.eia.gov/dnav/ng/hist/n9190us3M.htm AND U.S. Geological Survey. June, 2012 mean "estimated ultimate recovery" of an interior Marcellus well: 1.158 billion cubic feet  http://pubs.usgs.gov/of/2012/1118/OF12-1118.pdf

[107] NOAV, AOC and OFV data from COGCC Staff Reports. January 23, 2012 (for 2007 – 2011 data) and Dec. 9, 2008 (for 2005, 2006, 2007 data). http://cogcc.state.co.us/Staff_Reports/StaffReports.html (Note: Where there were discrepancies in data, the more recent report was used.) Data can be found in Appendix 2.



*Current State of Oil and Gas Enforcement*

**Chart 12. Operators and penalties assessed in Colorado.**



The COGCC provides statistics on the number of operators receiving penalties and the amount of penalties collected.

As seen in this table, the total penalties assessed per year stayed within a fairly narrow range until 2010, when the COGCC collected three times the typical amount. This change occurred because in 2010, "the COGCC pursued a backlog of enforcement matters, most of which involved incidents that had occurred in previous years."[108] Therefore, one cannot assume that the higher total amount of penalties assessed in 2010 is going to continue in future years.

Very few operators in Colorado receive penalties for violating rules: 314 NOAV were issued in 2010, but only ten operators received penalties. In 2011, 230 NOAV were issued and 22 operators were fined.

## New Mexico

**Chart 13. Penalties collected in New Mexico.**



OCD does not publish data on penalties. The following chart includes information gathered from newspaper and legislative finance committee reports. Data on enforcement actions (LOV) come from OCD.

As seen in the chart, there was a period in the late 2000s when New Mexico collected considerable penalties. In 2009, however, an oil and gas company won a court case that effectively stopped the government from collecting penalties for rule violations.

The $14,000 collected in 2010 was largely through penalties for violating the terms of agreed compliance orders, not specifically for rule violations.[109] The number of enforcement actions in New Mexico also dramatically declined in 2010. This is not surprising, given the cost and time required for OCD to pursue further enforcement actions against operators that violate oil and gas rules.

---

[108] COGCC. Report to Water Quality Control Commission and Water Quality Control Division of the CO Department of Public Health and the Environment. 2010, p. 9. http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/AnnualReports.htm

[109] New Mexico Legislative Finance Committee. Feb. 17, 2011. *Fiscal Impact Report for HB 176 Oil and Gas Enforcement.* http://www.nmlegis.gov/Sessions/11%20Regular/firs/HB0176.pdf



*Current State of Oil and Gas Enforcement*

## New York

### Chart 14. Penalties collected in New York.



The New York DEC's Division of Mineral Resources annual reports contain some information about penalties and sporadic information on enforcement actions taken against oil and gas operators.

The reports show that in 2006 only 12 enforcement cases resulted in penalties, and in 2007 the number dropped to 10 penalties. (See Appendix 4)

As seen in Chart 14, penalties for rule violations are rarely issued in New York, and typically, the amount collected annually has been less than $20,000. In 2009 there was a sharp increase in penalties collected, but it still only amounted to $40,000.

## Ohio

No statistics or information on enforcement actions and penalties were found on the DOGRM web site or in its publications, but the division did respond to a request for this information.[110]

### Chart 15. Recent enforcement actions and violations in Ohio.



As seen in this chart, Ohio does not take many enforcement actions against oil and gas violators, and the number has been declining in the past few years.

According to the RBDMS database, more violations were found in Ohio in 2011 than 2008. Meanwhile, enforcement actions in Ohio decreased from 55 actions in 2008 and to 29 actions in 2011.

In 2008, one enforcement action was taken for every 23 violations, whereas in 2011 one enforcement action was taken for every 57 violations. (See Appendix 5 for data and references)

---

[110] Email request for data made Sept. 16, 2011, data received Oct. 4, 2011 from Beth Wilson, Public Information officer with Ohio DOGRM.



*Current State of Oil and Gas Enforcement*

**Chart 16. Enforcement actions and penalties in Ohio.**



Although fewer enforcement actions have been taken, there has been an increase in the amount of penalties assessed for violations since 2008.

The amount of penalties collected jumped from $16,500 in 2008 to $194,000 in 2010. Penalties dropped to $73,935 in the 2011 Fiscal Year.

(See Appendix 5 for data and references)

## Pennsylvania

According to DEP, "environmental inspectors have had greater authority since April [2012] to penalize operators ... and enforce violations."[111] Yet enforcement actions have not increased relative to violations.

**Chart 17.  Recent trends in enforcement in Pennsylvania.**



As seen in Chart 17, the total number of enforcement actions in Pennsylvania more than doubled from 426 in 2002 to 976 in 2011. But there was an even greater increase in violations over the same time period: violations more than tripled from approximately 1,156 in 2002 to more than 4,065 in 2011.

In April, May and June of 2012 (the period in which inspectors have had "greater authority" to enforce violations) an average of 20% of violations resulted in enforcement actions. This is down from 2011, when enforcement action was taken on 24% of violations, and nowhere near 2004, when DEP took action for more than half of all violations.

(See Appendix 6 for data and references)

---

[111] Zrinski, T. July 7, 2012. "Marcellus gas: No bust, just glut," *Beaver County Times.* http://www.timesonline.com/news/local_news/marcellus-gas-no-bust-just-glut/article_ddd0676d-7fcb-5672-be5a-f271caec242a.html



*Current State of Oil and Gas Enforcement*

DEP does not provide annual statistics on oil- and gas-related penalties assessed and collected by the agency, and the penalty data that are available in DEP's Compliance Report system are repetitive,[112] possibly incomplete,[113] and "can be confusing to interpret."[114]

**Chart 18. Violations, enforcement actions and penalties in Pennsylvania.**



**The annual penalties in Chart 18 were derived by removing redundant penalties from the data.[115]**

**As seen in Chart 18, although violations remained high in 2011 the dollar amount of assessed penalties plummeted.**

**Similarly, the number of enforcement actions taken in 2011 was higher than in previous years while total amount of penalties declined.**

**Data used in Charts 17 and 18 can be found in Appendix 6.**

---

[112] When a Consent Assessment of Civil Penalty (CACP) or a Consent Order and Agreement (COA) is negotiated between an operator and DEP, the negotiated penalty amount may be listed multiple times in spreadsheets downloaded from the DEP Compliance Report system. The penalty shows up beside each individual violation. This erroneously suggests that a certain penalty, e.g., $5,000, was paid <u>per</u> violation, when in reality a lump sum of $5,000 was paid for <u>all violations</u> in the CACP.

[113] For example, a May 17, 2011 DEP News Release announced that Chesapeake Energy was fined "$1,088,000 for violations related to natural gas drilling activities," but the Compliance Report system shows just $189,500 in penalties assessed to Chesapeake in 2011. (Sources: Pennsylvania DEP. May 17, 2011. "DEP fines Chesapeake Energy more than $1 million," News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=17405&typeid=1
PA DEP Compliance Report Search: Chesapeake, Jan.1, 2011 to Dec. 31, 2011. Note: there are four penalties of $188,000 listed, each for a different violation, but there was just one Consent Order Agreement negotiated for a total of $188,000.)

[114] Kelso, M. May 9, 2012. "Pennsylvania Marcellus Fines Data," Fractracker.
http://www.fractracker.org/2012/05/pennsylvania-marcellus-fines-data/

[115] All violations per year were downloaded from the Compliance Report system. Enforcement actions includeWhere penalty data existed, data were only counted once for each distinct CACP, COA or NOV.



*Current State of Oil and Gas Enforcement*

## Texas

Prior to 2012, there was no straightforward way to find statistics related to oil and gas enforcement actions in Texas. As a result of Rider 17 of the 2012-2013 General Appropriations Act, the RRC now has to publish enforcement data on its web site.[116]

In its 2011 review, the Sunset Commission found that, "the Commission takes relatively few enforcement actions, resulting in a lack of deterrence for future noncompliance. While there is no standard for how many violations should result in a monetary sanction, action should be frequent enough to deter future violations."[117]

### Chart 19. Enforcement referrals and violations in Texas.



* approximate number of violations

As seen in the Chart 19, the number of violations referred to enforcement staff for possible action declined in 2010 compared to 2008 and 2009. (See Appendix 7 for data and references)

In 2010 there were 71,646 violations and 447 enforcement referrals in Texas. This one enforcement action per 160 violations. That same year, in Pennsylvania approximately one in every 3.6 violations led to an enforcement action in 2010.[118]

In 2012, the RRC set goals of documenting 250 enforcement referrals and 81,000 rule violations.[119] A goal of just 250 enforcement actions per 81,000 violations (which is one enforcement action per 324 violations) is not a rate that is likely to motivate oil and gas companies to comply with the Texas rules.

The Texas Legislative Budget Service (LBS) publishes Non-Tax Collected Revenue Surveys for the various state agencies, including information on "fees, fines, penalties and other collected revenues" from RRC oil and gas violations (Table 14).[120]

---

[116] Including enforcement activity, violations, the amount of final enforcement penalties assessed to the operator, and a quarterly report that includes a section on enforcement trends. (Source: 82nd Texas Legislature. Regular Session, 2011. *General Appropriations Act for the 2012-13 Biennium.* Sept. 12, 2011.p. VI-60. http://www.lbb.state.tx.us/Bill_82/GAA.pdf)

[117] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 33. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[118] See Appendix 6 for Pennsylvania data.

[119] RRC of Texas. 2012 Operating Budget. Data from Table III.A. Strategy Level Detail. Page 15 of 29. http://www.rrc.state.tx.us/about/divisions/opBudget.pdf

[120] Data for 2005 – 2010: Legislative Budget Board of Texas. Revenue Survey – NCR. Found under "Other Publications and Resources." http://www.lbb.state.tx.us/ Data for 2011: RRC of Texas. 2012 Operating Budget. Table IV.D. Estimated Revenue Collections Supporting Schedule. Pages 1 and 3 of 10. http://www.rrc.state.tx.us/about/divisions/opBudget.pdf



*Current State of Oil and Gas Enforcement*

**Table 14. Texas fees, fines, penalties, and other revenues from oil and gas violations ($mill).**

|  | FY 2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|---|
| **Appropriated** | $2.6 | $2.8 | $5.3 | $4.5 | $2.8 | $3.8 |
| **Non-appropriated** | $0.14 | $0.14 | $0.09 | $1.1 | $1.6 | $1.6 |
| **Total** | $2.7 | $2.9 | $5.4 | $5.6 | $4.4 | $5.4 |

Penalties are just a portion of the revenue collected by RRC for oil and gas violations. For example, the Texas State Auditor reports that, "in fiscal year 2006, the Commission assessed $1.4 million in penalties and received $2.7 million in oil and gas violation revenue."[121] RRC collected more than $2 million in penalties in 2009,[122] compared to the $5.5 million in revenues collected for oil and gas violations shown in Table 14.

Penalties not only provide a source of revenue to the Railroad Commission, they can also help to motivate operators to comply with RRC rules. According to the Sunset Commission, "An effective enforcement process should balance monitoring, compliance, and penalties… The efficient and fair use of penalties plays a key role in deterring and punishing violators, and thus increases compliance."[123]

The 2011 Sunset review also noted that "Part of the reason for the large number of violations is that the [RRC's] enforcement process is not structured to deter repeat violations."[124] In 2012, the RRC amended its rules to provide guidance (not requirements) to enforcement staff on enhancing penalties for repeat violators.[125] The enhancements, although a step in the right direction, appear to be far too small to provide much of a deterrent effect. For example, if an operator has a record of five or more violations in the previous seven years, the potential enhancement amount is $5,000. A $5,000 fine for operators who have a habit of non-compliance sends a weak deterrence message.

## PENALTIES: DO THEY INCREASE COMPLIANCE?

It is reasonable to think that fines or penalties would be an effective enforcement tool, or at least help prevent continued bad behavior or intentional violations. However, several participants at our meetings voiced that the concern that fines do not deter companies from violating rules, but instead are viewed as the cost of doing business. These concerns are especially relevant in light of the low penalty amounts that can be levied in response to oil and gas rule violations in most states.

---

[121] State Auditor's Office (Texas). August 2007. *An Audit Report on Inspections and Enforcement Activities in the Field Operations Section of the Railroad Commission.* p. i. http://www.sao.state.tx.us/Reports/report.cfm/report/07-046

[122] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 8. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[123] ibid. p. 33.

[124] ibid.

[125] RRC of Texas. Rule 3.107: Penalty Guidelines for Oil and Gas Violations. Adopted August 7, 2012. http://www.sos.state.tx.us/texreg/archive/August242012/adopted/16.ECONOMIC%20REGULATION.html#221



*Current State of Oil and Gas Enforcement*

As explained earlier in this section, many states' fines are too low to be of any consequence. Many states have not increased their penalties for decades, greatly reducing any intended deterrent effect that penalties may have had when originally outlined in statute. Another reason that fines or penalties may not lead to increased compliance is that fines are not being issued frequently enough, as seen in Colorado where fewer than 10 operators receive fines in a typical year even though many operators violate the rules.

> *To effectively deter future violations, an agency needs to ensure that its regulated community is aware of its enforcement actions. This means assessing fines frequently enough to send the message to operators that if they commit a violation, a penalty may be assessed, even if the operator comes into compliance.*[126]
>
> Texas Sunset Advisory Commission

In 2005, the Ohio Division of Minerals Resources Management (now DOGRM) stated that, "the DMRM seeks to resolve most issues without the use of penalties, finding that it improves compliance."[127] Given that the total amount of penalties collected in 2010 was $194,000 (see Table 13), it appears that this is still the agency's modus operandi.

The Sunset Commission of Texas, however, holds the view that, "even modest fines for less serious, but frequent violations can substantially affect compliance, especially once word spreads that coming into compliance will no longer suffice to avoid a penalty."[128]

Some companies have said that fines do affect their behavior. In 2010, Chief Oil and Gas "was moved to change after it saw [Pennsylvania] DEP figures showing it had more violations than almost any Marcellus Shale driller in the state and more fines."[129] Chief reduced its violations from 14.8 violations per month in 2010 to approximately 8 per month in 2011.[130] While this is an improvement, Chief remains one of the worst violators in the state (after Chesapeake Energy and Cabot Oil and Gas).

---

[126] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 35. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf
[127] State Review of Oil and Natural Gas Environmental Regulations (STRONGER), Inc. June 2005. *Ohio Follow-up and Supplemental Review.* p.15. http://www.dnr.state.oh.us/Portals/11/oil/pdf/stronger_review05.pdf
[128] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 34. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf
[129] Hamill, S. April 17, 2011. "What fines reveal about drilling in state," *Pittsburgh Post Gazette.* http://www.post-gazette.com/pg/11107/1139961-503-0.stm#ixzz1TuUNK3Mu
[130] See Table 9, and divide annual totals by 12 to get average violations per month.



*Current State of Oil and Gas Enforcement*

**Chart 20. Stock prices following Chesapeake's record-breaking fine.**



Range Resources has said that, "There have been cases where an operator got a significant fine, or a repeat offender got another fine, and all of our stock prices took a hit."[131] But on May 17, 2011, after the largest oil and gas penalty in Pennsylvania history was levied against Chesapeake Energy (more than $1 million for a well blowout and spill), the negative impact on the company's stock prices did not appear to be significant.

As seen in Chart 20, stock prices for EOG Resources and Talisman Energy did experience a downward trend after Chesapeake's fine was levied, but their stock prices were already starting to go down.[132] Meanwhile, Chesapeake, Cabot, and Range Resources stock prices remained fairly even or experienced an increase in value in the months following the Chesapeake fine.

## ENFORCEMENT ACTIONS: RULES INCONSISTENTLY APPLIED

Where some violations are minor and can be remedied on the spot, some discretion with respect to whether or not to actually issue violations is understandable.[133]  However, clear guidance should exist regarding when enforcement actions need to be taken for violations. Such guidance either does not exist or is not being followed in the majority of states in this report.

**Colorado:** The COGCC does not appear to consistently take enforcement actions against violators. When violations are found, the first official enforcement measure is to issue a Notice of Alleged Violation. The use of NOAV is inconsistent, and appears to be somewhat arbitrary.

---

[131] Hamill, S. April 17, 2011. "What fines reveal about drilling in state," *Pittsburgh Post Gazette.* http://www.post-gazette.com/pg/11107/1139961-503-0.stm#ixzz1TuUNK3Mu

[132] MSN Money. Chesapeake Energy Corp (CHK). http://investing.money.msn.com/investments/stock-price?Symbol=CHK&ocid=qbeb  Accessed September, 2011.

[133] For example, if inspectors find open lids on tanks, these can be closed immediately. In many states operators are issued verbal warnings, and if companies correct problems these are not recorded as "violations," even though technically a rule was broken.



*Current State of Oil and Gas Enforcement*

As mentioned in Section 1.2, a search of 1,000 inspections between August 3 and Sept. 23, 2011 revealed 145 "unsatisfactory" inspections, yet only 77 of those inspections noted violations. Of the 77 inspections showing violations, only 11 NOAV were issued to operators.[134] In some cases, the violations were minor, such as not having the proper signs on tanks. In other cases, however, NOAV failed to be issued when there were spills or contamination events,[135] or when the inspection report indicated that the operator had already been informed of the violation twice before.[136] There were also cases where a similar type of violation (such as an open wellbore that needed to be plugged) resulted in an NOAV for one operator, but not for another.[137]

**New Mexico:** In New Mexico, OCD issues Letters of Violation (LOV) for what it deems are more significant or serious violations.[138] For less serious violations, noncompliance letters (LET) or Field Visit Inspection Letters (FVI) may be sent.

OCD inspectors have a large amount of discretion in determining when violations become serious enough to warrant enforcement action. According to OCD, "each inspector has his own criteria" for determining when LOV are issued to operators.[139] As a result, operators may receive different treatment simply because their site was inspected by inspector X instead of inspector Y.

Also, there are regional differences in the use of LOV as an enforcement tool. Very few LOV are issued out of the Aztec field office – a district that has more than 22,000 active oil and gas wells.[140] According to OCD, the Aztec District has a "different type of working relationship with operators," than other OCD districts. There are fewer operators, and so Aztec inspectors convey non-compliance through emails, phone calls or letters that are not official LOV.[141]

---

[134] Colorado Oil and Gas Information System (COGIS). Inspection Inquiry. Select Inspection, search for 1000 records (the maximum). Search conducted Sept. 27, 2011. http://cogcc.state.co.us/cogis/IncidentSearch.asp

[135] For example, "large area of oily soil from well leak at stuffing box," "upon arrival at well, it was discovered that a supply line (for injection) had broke. The water was coming out of the ground 3 feet from the well and traveling down grade," "oil saturated soil around well head," some pooling oil," "tank bottoms from Christianson Tank Batter were dumped," "open-cased wellbore was observed and hydrocarbon odor was noted," "partially buried crude tank appears to be leaking," "oil in berms, oily soil in 50% of tank pad, oily soil at end of load lines," "install secondary containment for chemical tank," "chemical tank without containment," "location has not been reclaimed." (Citations taken from various COGCC field inspection reports. Visit Earthworks' Colorado Enforcement – Violations web page (see Box 2) for links to COGCC inspection reports. http://www.earthworksaction.org/issues/detail/colorado_oil_gas_enforcement_violations

[136] COGIS field inspection report. Sept. 19, 2011. API Number: 05-017-06894. Wiepking-Fullerton Energy LLC. Skarphol 32-10 #2 well. http://cogcc.state.co.us/cogis/FieldInspectionDetail.asp?doc_num=200321648 AND COGIS field inspection report. Sept. 19, 2011. API Number: 05-017-06725.  Wiepking-Fullerton Energy LLC. WECO-UPRC William #33H-11#5 well. http://cogcc.state.co.us/cogis/FieldInspectionDetail.asp?doc_num=200321647

[137] COGIS field inspection report. Aug. 26, 2011. API Number: 05-103-40191. Equity Oil Co. McLaughlin #68 http://cogcc.state.co.us/cogis/FieldInspectionDetail.asp?doc_num=200319598 (no NOAV issued) AND COGIS field inspection report. Aug. 26, 2011. API Number: 05-103-01357. D & D Resources, Inc. Emerald-C #E-97 http://cogcc.state.co.us/cogis/FieldInspectionDetail.asp?doc_num=200319966 (NOAV issued)

[138] Personal communication between Lisa Sumi, Earthworks and New Mexico OCD Enforcement and Compliance Manager, Daniel Sanchez, OCD attorney, Sonny Swazo, and NMED and EMNRD Communications officer, Jim Winchester. March 26, 2012.

[139] ibid. April 11, 2012.

[140] OCD Well Search.  https://wwwapps.emnrd.state.nm.us/ocd/ocdpermitting/Data/Wells.aspx

[141] Personal communication between Lisa Sumi and Gwen Lachelt, Earthworks and New Mexico OCD Enforcement and Compliance Manager, Daniel Sanchez, OCD attorney, Sonny Swazo, and NMED and EMNRD Communications officer, Jim Winchester. April 11, 2012.



*Current State of Oil and Gas Enforcement*

**Table 15. Inconsistent OCD enforcement (2011).**

| Violation | LOV | FVI | LET |
|---|---|---|---|
| **No well sign** | 17 | 2 | 14 |
| **Well sign incorrect** | 4 | 0 | 8 |
| **Failed pressure tests (MIT, BHP)** | 8 | 11 | 7 |

OCD data illustrate this variation in enforcement actions in New Mexico. As seen in the table above, in 2011 the very same rule violations resulted in an LOV, LET or an FVI.[142] Enforcement actions were inconsistently applied for minor violations as well as more serious violations such as failed pressure tests. For example, only half of the operators that did not have signs on their wells received an LOV, while half received FVI or LET. Similarly, the more serious violation of a "failed pressure test" resulted in just 8 LOV, while 18 received FVI or LET.[143] (See Appendix 3 for a detailed list of wells from Table 15)

A discretionary or inconsistent approach to enforcement of rule violations is, at best, confusing to the public, and can lead to perceptions of lax enforcement.

**Pennsylvania:** The Pennsylvania DEP developed an enforcement policy in 2002 that includes basic principles, such as:[144]

- An appropriate enforcement action is to be taken for each identified violation;
- No violation is to be ignored; and
- All companies are to be treated fairly and equally by the Department.

Despite the policy to treat all violators fairly and equally, there appears to be a great deal of discretion used in the application of enforcement actions.

---

[142] The table includes all wells in the OCD Compliance Summaries where these particular problems were identified in the inspection comments. Not all wells in the compliance summary had comments. Earthworks' table "Different New Mexico OCD enforcement actions for the same time of violation" provides a more detailed table that includes operators and well numbers: http://www.earthworksaction.org/images/uploads/New_Mexico_inconsistent_sanctions_table.gif

[143] These examples include violations of OCD Rule 19.15.26.11, and Failed Mechanical Integrity Tests (MIT) or Bradenhead Pressure Tests (BHT), pressure on annulus, pressure on production casing, pressure drop, injection over pressure limit.

[144] Pennsylvania DEP. Revised 2005. *Enforcement Actions by DEP's Oil and Gas Management Program*. Document 550-4000-001. p. 1. http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-48291/01%20550-4000-001.pdf

 BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

59

*Current State of Oil and Gas Enforcement*

**Table 16. Inconsistent enforcement actions in Pennsylvania.**

| Operator | 201TAG violations | 210UNPLUG violations | Other violations[145] | Enforcement Actions | Penalty |
|---|---|---|---|---|---|
| **Clarion** | 16 | 13 | 401CSL, 601.101 and 78.96 | None | 0 |
| **Alpha** | 10 | 2 | 201INADPLUG, 203TAG, 78.124, 78.86 and 78.96 | • 9 NOV for 201TAG violations<br>• 2 NOV for 210UNPLUG violations<br>• 3 NOV - one for 78.124, 78.86 and 78.96 violations | 0 |
| **Baker** | 1 | 1 | | • NOV and CACP for 201TAG<br>• NOV and CACP for 210UNPLUG | $2,000 |
| **Oil and Gas Mngmt** | 1 | 1 | | • NOV and CACP for 201TAG<br>• NOV and CACP for 210UNPLUG | $2,250 |

A review of 2010 data shows inconsistent application of enforcement actions and penalties for companies that violate the same rules in Pennsylvania. As seen in Table 16, Clarion Oil and Gas and Alpha Well Inc. both repeatedly violated the same rules,[146] yet Alpha was issued NOV for the violations and Clarion was not. This is despite the fact that Clarion violated the two rules much more often than Alpha (Clarion had 29 violations, Alpha 12).

Baker Gas Inc. and Oil and Gas Management Inc. also violated the 201TAG and 210UNPLUG rules in 2010, yet both companies were issued NOV <u>and</u> were penalized for their actions. What is even more interesting is that these companies violated each rule just once (in contrast to the numerous violations incurred by Clarion and Alpha).

It is possible that the different treatment resulted from regional discrepancies in how enforcement actions are applied: Baker Gas' violations occurred in Armstrong County, Oil and Gas Management Inc.'s violations took place in Indiana County, while Clarion's and Alpha Well Inc.'s violations occurred in Clarion County.

There are also cases in Pennsylvania in which the punishment fails to address the severity of the violation(s). For example, between 2007 and 2009, DEP inspectors found more than 300 violations at U.S. Energy Development Corp. well sites.[147] Yet the company received a penalty of just $29,750 in 2009. In 2010, U.S. Energy Development Corp had 44 violations

---

[145] 401CSL - Discharge of pollutional material to waters of Commonwealth; 601.101 - O&G Act 223-General (Used only when a specific O&G Act code cannot be applied; 78.96 - Failure to mark plugged well; 201INADPLUG - Leaking plug or failure to stop vertical flow of fluids; 203TAG - Failure to submit annual production report; 78.124 - Failure to submit plugging certificate 30 days after well plugged; 78.86 - Failure to report defective, insufficient, or improperly cemented casing w/in 24 hrs or submit plan to correct w/in 30 days

[146] The 2010 Pennsylvania DEP Inspections/Violations spreadsheet provided the following description for 201TAG: "Failure to install, in a permanent manner, the permit number on a completed well," and the following description for 210PLUG: "Failure to plug a well upon abandonment." (No longer accessible on DEP web site)

[147] Pennsylvania DEP. July 10, 2009. "DEP Orders U.S. Energy to Cease Drilling Operations throughout Pennsylvania," News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2273&typeid=1



*Current State of Oil and Gas Enforcement*

and resolved just 29 of them.[148] While this is a better record than 2009, it is clear that the company did not learn to correct violations in a timely manner. When such a record of noncompliance receives small or no fines, the possibility that enforcement serves as a deterrence factor for bad behavior declines dramatically.

**Texas:**  According to the Texas Sunset Commission, the RRC relies on the discretion of each district office to determine which violations should be forwarded for enforcement action.[149] In 2009, Texas oil and gas inspectors found more than 80,000 violations of state rules, yet field staff forwarded less than four percent of these violations to the agency's central office for enforcement action. In contrast, the Texas Commission on Environmental Quality (TCEQ) forwarded about 20 percent of its more than 11,000 violations for enforcement action. TCEQ has formalized processes for ranking violations to ensure that serious or repeat offenses of lower-level violations are referred for enforcement action.[150]

## REMOVING THE ECONOMIC BENEFIT OF NON-COMPLIANCE

Violators can gain an economic advantage over companies who comply with the rules. For example, by refusing or delaying compliance, companies can avoid costs related to: installing and operating safety or pollution control equipment; hiring qualified employees to maintain facilities and ensure that permit conditions and rules are being met; and failing to install, operate and maintain monitoring equipment.

"Including the calculation of economic benefit in the penalty calculation is critical to achieving deterrence"[151] and removing the economic advantage created by non-compliance.

Colorado, New York and Pennsylvania have provisions that allow oil and gas enforcement staff to assess additional penalties known as a "benefit component"[152] or "savings to the violator."[153]  It is unclear, however, how often this additional penalty is applied, and how the calculations of the cost savings to operators who fail to comply with the rules are made.

---

[148] Pennsylvania DEP web site: Oil and Gas Inspections – Violations- Enforcements page. 2011 Year to Date Resolved Violations (to Aug. 31, 2011). Accessed Sept. 26, 2011.
http://www.dep.state.pa.us/dep/deputate/minres/oilgas/OGInspectionsViolations/OGInspviol.htm

[149] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas*. pp. 33, 34.
http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[150] ibid. p. 35.

[151] U.S. EPA. 1999. "Guidance on Calculating the Economic Benefit of Noncompliance by Federal Agencies."
http://www.epa.gov/oecaerth/resources/policies/federalfacilities/enforcement/cleanup/econben20.pdf

[152] COGCC Rule 523 d. says: "The fine may be increased (if base fine is less than $1000) or decreased by application of the aggravating and mitigating factors set forth below. . .(8) The violation resulted in economic benefit to the violator, including the economic benefit associated with noncompliance with the applicable rule, in which case the amount of such benefit may be taken into consideration." https://cogcc.state.co.us/RR_Docs_new/rules/500Series.pdf
New York: "If a penalty is to achieve deterrence, both the violator and the general public must be convinced that the penalty places the violator in a worse position than those who have voluntarily complied in a timely fashion. For this reason, it is DEC policy that, at a minimum, penalties should remove any economic benefit that results from a failure to comply with the law." New York DEC. 1990. DEE-1: Civil Penalty Policy. http://www.dec.ny.gov/regulations/25227.html

[153] "A penalty assessment may include an amount equal to the savings or economic benefit realized by the violator as a result of the violation, had it not been penalized." Pennsylvania DEP. 2002. Civil Penalty Assessments in the Oil and Gas Management Program. p. 7. http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-48287/550-4180-001.pdf



*Current State of Oil and Gas Enforcement*

Some older examples were found of the COGCC applying additional fines to penalize operators who derived economic benefit from their violations, but nothing more recent than 2004.[154] And the penalties for economic benefit do not appear to reflect the actual economic benefits that operators derive from non-compliance as no calculations are provided by COGCC.[155]

No information was found to suggest that Texas RRC, Ohio DOGRM or New Mexico OCD have the ability to assess an additional "economic benefit" penalty.

The U.S. Environmental Protection Agency has a policy that any civil penalty should at least recapture the economic benefit the violator has obtained through its unlawful actions. (See box for more information) EPA enforcement staff typically use the BEN (short for benefit) computer model to perform the economic benefit calculations.[156]

Only New York DEC includes in its policy that enforcement staff may use EPA's BEN to calculate the economic benefit.[157] The New York policy also states that "The Division of Environmental Enforcement, working with Program Divisions, should develop guidance for the use of models and formula which provide a rational basis to calculate economic benefit of non-compliance."[158] This is a recommendation that should be applied by oil and gas enforcement agencies in all states.

> **How a Firm Obtains an Economic Benefit From Delaying and/or Avoiding Compliance Costs:**
>
> "An organization's compliance with environmental regulations usually entails a commitment of financial resources, both initially (in the form of a capital investment or one-time expenditure) and over time (in the form of continuing, annually recurring costs). These expenditures should result in better protection of public health or environmental quality, but they are unlikely to yield any direct economic benefit (i.e., net gain) to the organization…If these financial resources are not used for compliance, then they presumably are invested in projects with an expected financial return to the organization. This concept of alternative investment—that is, the amount the violator would normally expect to make by investing in something other than pollution control—is the basis for calculating the economic benefit of noncompliance."
>
> U.S. Environmental Protection Agency

---

154 Searched within COGCC 1V orders for "economic benefit." The most recent examples was from 2004. Order 1V-271. http://cogcc.state.co.us/orders/orders/1v/271.html More recently, the only time "economic benefit" was mentioned was when penalties were decreased because the "cost of correcting the violation reduced or eliminated any economic benefit to the violator." E.g., See Order 1V-388. http://cogcc.state.co.us/orders/orders/1v/388.html

155 COGCC's approach appears to be to double the penalty – not establish the actual economic benefit of non-compliance. For example: "Rule 523. specifies a base fine of One Thousand dollars ($1,000) for a violation of Rule 326. . .A monetary penalty of Two Thousand dollars ($2,000) should be assessed against BIC, in accordance with Rule 523.a. and Rule 523.d., for violation of Rule 326.b. Aggravating factors in determining the fine recommendation are the violation was intentional, and the violation resulted in economic benefit to the violator." COGCC Order IV-225. http://cogcc.state.co.us/orders/orders/1v/225.html

156 U.S. EPA. 2005. *Calculation of the Economic Benefit of Noncompliance in EPA's Civil Penalty Enforcement Cases.* Notice in the Federal Register. p. 50326. http://www.gpo.gov/fdsys/pkg/FR-2005-08-26/pdf/05-17033.pdf

157 New York DEC. 1990. DEE-1: Civil Penalty Policy. Section IVc. http://www.dec.ny.gov/regulations/25227.html

158 No such guidance was found in DEC's enforcement policies. http://www.dec.ny.gov/regulations/2379.html



*Current State of Oil and Gas Enforcement*

## PENALTIES AND ENFORCEMENT ACTIONS RECOMMENDATIONS

RECOMMENDATION: *Agencies should develop policies for that set out the appropriate enforcement action for different types of violations, and require all inspectors to consistently adhere to these policies. Policies should include escalating penalties/enforcement for operators who repeatedly violate rules and multiple offenses of the same type, and possibly mandatory enforcement actions for certain types of significant violations.*

RECOMMENDATION: *Agencies should codify their penalty schedules to reduce the discretion used in assessing the amount of a fi*

RECOMMENDATION: *Outdated penalties must be increased so that they are sufficient to deter future violations. Increased. Penalty amounts should include the following considerations: the actual impact of the type of violation in question (e.g., permanent damage to drinking water supplies or wildlife habitat), the true subsequent cost to the public with regard to remediation and continued oversight, the economic value that would have been realized by the operator had the violation gone undetected*

RECOMMENDATION: *Agencies should publicize significant penalties to highlight bad actors, as a means of deterring other companies from violating the rules.*

RECOMMENDATION: *Agencies need to do a better job of documenting penalties and enforcement actions. All information should be documented in a consistent manner with clear definitions, and should be made publicly available via an online database.*

*Current State of Oil and Gas Enforcement*

## 1.4.   OTHER ENFORCEMENT OPTIONS

In addition to penalties and other enforcement actions, some states have more powerful means to encourage oil and gas operators to comply with requirements and rules. In some states, agencies can order companies to "cease and desist" particular activities, suspend or revoke permits, require operators to shut-in wells that are in violation of rules, or deny permits to operators who are out of compliance.

Most state agencies do not specifically track how often these enforcement mechanisms are used. Consequently, there are no reliable statistics to look at trends for most of the following enforcement tools.

### CEASE AND DESIST ORDERS

Colorado and Pennsylvania both have the ability to issue Cease and Desist orders. These orders usually apply to specific wells that are in violation, rather than extending to all of an operator's producing wells. In a few instances, however, Pennsylvania has used Cease and Desist orders to temporarily suspend all drilling or well completion activities of a particular company in the state (See the example of the U.S. Energy Development Corporation below).

**Colorado:** The COGCC has the ability to issue Cease and Desist orders in two situations: (1) whenever an operator fails to take required corrective action required by a final Administrative Order by Consent or an Order Finding Violation, or (2) whenever the Commission has evidence that a violation of any provision of the Act, any rule, permit, or order of the Commission has occurred under circumstances deemed to constitute an emergency situation.[159]  Also, in a few instances, the COGCC has ordered wells to be shut-in without issuing a Cease and Desist order.[160]

We found records for at least nine Cease and Desist orders since 1996.[161] The most recent was issued in April 2012 when an operator drilled through potentially toxic landfill waste.[162] In most of the orders, operators have been required to stop operating wells due to the frequency of violations, failure to pay a fine, or environmental contamination. Curiously, a recent Cease and Desist order issued to Nonsuch Natural Gas Inc., does not include any language regarding "shutting in the well" or ceasing operations or production.[163]

**Pennsylvania:** The state's *Oil and Gas Act* provides that ". . . the department shall have the authority to issue such orders as are necessary to aid in the enforcement" of the act,

---

[159] Rule 522. D. Cease and Desist Orders. http://cogcc.state.co.us/RR_Docs_new/Rules/Completed%20Rules.pdf

[160] COGCC Order No. 1 V-2. Jan. 21, 1975. http://cogcc.state.co.us/orders/orders/1V/2.html

[161] The COGCC "Orders" database lists nine orders in the "Cause 1c" section. Accessed July 16, 2012. http://cogcc.state.co.us/Orders/orders.cfm?cause_num=1C It's likely there are more, because some "Cease and Desist" Orders are mentioned in other hearing files.  E.g., In order 1C-3 (http://cogcc.state.co.us/orders/orders/1C/3.html) it says that a Cease and Desist Order was issued to Gopher drilling in 1998 " and Order 1V-332 (http://cogcc.state.co.us/orders/orders/1v/332.html) says that "Staff issued a cease and desist order [to Star Acquisition VIII, LLC] on April 12, 2007." But no actual Cease and Desist Orders were found for these cases.

[162] COGCC Order No. 1 C-9. April 12, 2012. http://cogcc.state.co.us/orders/orders/1c/9.html

[163] COGCC Order No. 1 C-7. Jan. 15, 2008. http://cogcc.state.co.us/orders/orders/1c/7.html



*Current State of Oil and Gas Enforcement*

including the immediate cessation of drilling operations.[164]  The DEP can also require operators to "cease all operations" and plug wells when operators have failed to make payments of fees or phased collateral (i.e., in lieu of bonds).[165]

Orders are to be used when a site condition creates an existing or imminent danger to health or safety; or is causing, or can be expected to cause, pollution or other environmental damage; or when the operator indicates a failure to comply with a previously cited violation."[166]

DEP's compliance database shows that in 2008, one company, U.S. Energy Development Corp, received a "Cessation Order" (CESOR). In 2009, two companies, U.S. Energy Development Corp[167] and Cabot Oil & Gas[168] were issued CESORs.

There were no CESORs found for 2010 or 2011; however, incidents requiring companies to cease certain operations were reported in DEP news releases and by other sources. For example, in May 2010, DEP announced that Rex Energy was required to halt all activities at two locations and undertake restoration work for violating erosion and sediment control requirements near a wetland.[169] In April 2011, DEP ordered Catalyst Energy to cease all drilling and hydraulic fracturing operations at 36 of its wells in Forest County after DEP confirmed that two private water supplies had been contaminated by natural gas migration.[170] Finally, in March 2011, DEP ordered Chesapeake Energy to cease work on a natural gas drilling well pad in Potter County for failing to control erosion and impacting one of Galeton Borough Water Authority's water sources. The order to cease work came after Chesapeake failed to respond to a DEP NOV for several violations of the Clean Streams Law and Oil and Gas Act.[171]

---

[164] Pennsylvania Statutes and Consolidated Statutes Annotated. Title 58 - Oil and Gas; Chapter 32, Subchapter E. § 3253. Enforcement Orders. http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/00.032.051.000..HTM

[165] Pennsylvania Statutes and Consolidated Statutes Annotated. Title 58 - Oil and Gas; Chapter 32, Subchapter E. § 3225. Bonding. http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/58.HTM

[166] June 25, 2005. Enforcement Actions by DEP's Oil and Gas Management Program. Document No. 550-4000-001. p. 5. http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-48291/01%20550-4000-001.pdf

[167] In July 2009 a CESOR order was issued to U.S. Energy Development Corp (USDC) for persistent and repeated violations of environmental laws and regulations (302 violations). The order prohibited the company from conducting all earth disturbance, drilling and hydraulic fracturing operations in the state, but allowed USDC to continue producing at existing wells." The company was allowed to resume drilling the month after the Cease and Desist order was issued because they signed a consent order and agreement with DEP. (Sources: Pennsylvania DEP. July 10, 2009. "DEP Orders U.S. Energy to Cease Drilling Operations throughout Pennsylvania," News Release.
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2273&typeid=1 AND Pennsylvania DEP. Aug. 12, 2009.  "DEP reaches agreement with U.S. Energy." News Release.
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2322&typeid=1)

[168] The Cabot order required the cessation of hydraulic fracturing activities, after the company spilled thousands of gallons of fracking fluid that contaminated Stevens Creek. (Source: URS. Oct. 2009. *Engineering Study in response to Order dated Sept. 24, 2009.* Submitted to the Pennsylvania DEP. http://www.pressconnects.com/assets/pdf/CB1446181016.PDF)

[169] Pennsylvania DEP. May 13, 2010.  "DEP Fines Rex Energy Operating Corp. $45,000 for Environmental Violations in Clearfield County," News Release.
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=11369&typeid=1

[170] Pennsylvania DEP. "DEP Orders Catalyst to stop operations at gas wells in Forest County Village," News Release.
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=16894&typeid=1

[171] Pennsylvania DEP. March 23, 2011. "DEP shuts down Potter County gas well pre-construction site over violations impacting public water supply," News Release.
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=16727&typeid=1

 BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

65

*Current State of Oil and Gas Enforcement*

## SUSPEND, MODIFY, OR REVOKE PERMITS

In several states, oil and gas agencies have the ability to suspend, modify, or revoke permits when operators are failing to comply with rules or requirements. Some examples were found, but largely, this enforcement tool appears to be underutilized.

**Colorado:** If operators fail to perform required corrective action/abatement or fail to comply with a cease and desist order, the COGCC may issue an order suspending, modifying, or revoking a permit or permits authorizing the operation.[172] No examples of this were found.

**New Mexico:** Under certain circumstances, the OCD has the ability to deny, cancel, or suspend a permit.[173] More details on this can be found in the following section related to stopping production.

**New York:** The DEC has the general authority to modify, deny, suspend, condition or revoke permits and to refuse to contract with persons or their investors who are found to be unsuitable. Suitability includes such factors as past compliance records, criminal and civil violations.[174] No examples of permit suspensions, modifications or revocations were found for oil and gas operations.

**Ohio:** In Ohio, the chief of the Division of Oil and Gas Resources Management has the ability to "issue an order to suspend drilling, operating, or plugging activities that are related to a material and substantial violation and suspend and revoke an unused permit after finding either of the following: (1) An operator has failed to comply with an order that is final and nonappealable, or (2) An operator is causing, engaging in, or maintaining a condition or activity presents an imminent danger to the health or safety of the public or that results in or is likely to result in immediate substantial damage to the natural resources of the state.[175] No examples were found of this power being used.

**Pennsylvania:** DEP has the power to suspend or revoke a well permit or registration for any well that is in continuing violation of [the *Oil and Gas Act*] 13, the *Clean Streams Law*, the *Solid Waste Management Act,* or other statutes administered by DEP. It may also suspend or revoke a permit if the likely result of a violation is an unsafe operation or environmental damage. The suspension, however, automatically terminates if DEP deems the violation is corrected and the well is brought into compliance.[176]

There have been cases in which DEP has suspended drilling activities. For example, as noted above, DEP issued an order against EOG "to suspend its natural gas well drilling activities in Pennsylvania after a June 3 blowout at one of the company's Clearfield County wells sent natural gas and at least 35,000 gallons of drilling wastewater into the sky and

---

[172] COGCC Rule 525a. Permit-related Penalties. http://cogcc.state.co.us/RR_Docs_new/Rules/Completed%20Rules.pdf

[173] New Mexico Administrative Code. Title 19, Chapter 15, Part 5. Enforcement and Compliance. 19.15.5.10 Compliance Proceeding. http://www.emnrd.state.nm.us/ocd/documents/20098-5currentrules-new17and39.pdf

[174] New York DEC. 1993. *DEE-16: Record of Compliance Enforcement Policy.* http://www.dec.ny.gov/regulations/25244.html

[175] Ohio Revised Code. Title 14. Chapter 1509. Division of Oil and Gas Resources Management. Section 1509.04. Enforcement – injunction against violation. http://codes.ohio.gov/orc/1509.04

[176] Pennsylvania Consolidated Statutes Annotated. Title 58 - Oil and Gas; Chapter 32. Subchapter E. § 3253. Enforcement Orders. http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/58.HTM



*Current State of Oil and Gas Enforcement*

over the ground for 16 hours. Then-DEP-Secretary John Hanger said that while the order banned all drilling and hydraulic fracturing operations for a specified period of time, the suspension would remain in effect until DEP completed a comprehensive investigation into the leak and the company implemented any needed changes."[177]

There are also cases in which DEP revoked or modified permits. In two of the cases, the revisions occurred because of citizen pressure. For example:

- In October 2009, DEP revoked three erosion and sedimentation permits for two operators due to technical deficiencies discovered after DEP approved the permits. The deficiencies were found because the three permits were appealed to the state Environmental Hearing Board by the Chesapeake Bay Foundation, prompting DEP officials to re-examine the permits to determine if they met regulatory requirements.[178]
- In December 2010, Lake Erie Energy Partners was issued drilling permits for two wells. Township residents contacted DEP after observing water supply notification shortcomings in the permit applications. In April 2011, DEP modified the permits (i.e., issued two corrected natural gas well-drilling permits) to the company after it provided complete information to remedy the original defects in the application.[179] In April 2011, DEP revoked four of Lake Erie Energy Partners' permits because the operator omitted required information in the original drilling permit application.[180]

**Texas:** In 2009, the RRC submitted a "Self Evaluation Report" to the Sunset Commission. In it, the RRC said that it can "revoke, modify, or suspend any permit upon a demonstration that the permittee violated the terms and conditions of the permit, failed to pay an assessed penalty, or used false or misleading information or fraud to obtain the permit."[181] A non-exhaustive review found examples where the RRC canceled an organization report (P-5) and permits,[182] and revoked a P-5 report and cancelled certificates of compliance.[183]

## STOP PRODUCTION

According to the Texas RRC, "the most effective enforcement mechanisms available to the RRC (seals and severances) are directly tied to oil and gas production."[184] Texas is the only state examined for this report that has the broad power to shut down production in cases other than an emergency situations. New Mexico has more limited power to stop

---

[177] Pennsylvania DEP. June 7, 2010. "DEP orders EOG Resources to halt all Natural Gas Drilling Activities in PA," News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=11925&typeid=1

[178] Pennsylvania DEP. Oct. 28, 2009. "DEP Revokes Erosion and Sedimentation Control Permits for Two Gas Companies." News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2409&typeid=1

[179] Pennsylvania DEP. April 4, 2011. "DEP Issues Corrected Well Drilling Permits to Lake Erie Energy Partners." News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=16895&typeid=1

[180] ibid.

[181] RRC of Texas. Sept. 2009. *Self-Evaluation Report.* Submitted to Texas Sunset Advisory Commission. p. 102. http://www.rrc.state.tx.us/about/divisions/RRCSelfEvaluationReport2009.pdf

[182] RRC of Texas. Oil and Gas Docket No. 20-0241862. June 2005. "Commission Called Hearing to Give Central Basin Oil Inv. Co the Opportunity to Show Cause Why Its P-5 Organization Report and Other Permits Should Not Be Cancelled." *Final Order.* http://www.rrc.state.tx.us/meetings/ogpfd/documents/20-41862ord.pdf

[183] RRC of Texas.. Oil and Gas Docket No. 01-0244431. June 2006. "Commission Called Hearing to Show Cause Why the Organization Report (Commission Form P-5) Issued to Seelye, William L. Should Not Be Revoked in Accordance with Tex. Nat. Res. Code. Ann. Section 91.114(H). Final Order. http://www.rrc.state.tx.us/meetings/ogpfd/documents/1-44431mfe-ORD.pdf

[184] RRC of Texas. Sept. 2009. *Self-Evaluation Report.* Submitted to Texas Sunset Advisory Commission. p. 96. http://www.rrc.state.tx.us/about/divisions/RRCSelfEvaluationReport2009.pdf



*Current State of Oil and Gas Enforcement*

production under certain circumstances.

**New Mexico:** The New Mexico *Oil and Gas Act* provides OCD with the power to stop production by ordering wells to be plugged and abandoned.[185] OCD threatened to use this power in a recent compliance proceeding when an operator failed to remediate multiple well sites.[186]

OCD rules also allow the division to shut in a well or wells if an operator has a certain number of inactive wells.[187] The OCD used these powers a few times in 2010 and 2011.[188]

**Texas:** The Texas Administrative Code states that, "The Commission may shut in and seal any well if it appears that the operator of a well has violated or is violating <u>any</u> statutes, rules, permits, or orders of the Commission. Prior to shutting in or sealing a well operators are sent a letter by the Commission that instructs them to correct the violation, and provides a date by which compliance must be achieved. If compliance does not occur, the Commission may then seal the well."[189]

A severance or seal is intended to prevent an operator from producing oil and gas and from transporting oil or gas from a well with a lease.[190]

---

[185] The *Act* states that "If <u>any of the requirements</u> of the *Oil and Gas Act* or the rules promulgated pursuant to that act have not been complied with, the oil conservation division, after notice and hearing, <u>may order any well plugged and abandoned by the operator</u> or surety or both in accordance with division rules." (Source: New Mexico Oil and Gas Act. NMSA 1978. Section 70-2-14.B http://law.justia.com/codes/new-mexico/2006/nmrc/jd_70-2-14-193b9.html)

[186] In this case, the operator was ordered to fully comply with the previous order to remediate 11 wells sites or else it would be required to plug and abandon "all of the wells it operates in New Mexico." New Mexico OCD. Jan. 25, 2011. Case No. 14393 (Re-opened). Order No. R-13197-A. Application of the New Mexico OCD for a Compliance Order Against Marks And Garner Prod. Ltd. Co, Eddy County. http://ocdimage.emnrd.state.nm.us/Imaging/FileStore/santafeadmin/ho/91714/r-13197-a_1_ho.pdf

[187] New Mexico Administrative Code. Title 19, Chapter 15, Part 5. Enforcement and Compliance. 19.15.5.10 Compliance Proceeding. http://www.emnrd.state.nm.us/OCD/documents/SearchablePDFofOCDTitle19Chapter15created3-2-2012.pdf

[188] New Mexico OCD. Nov. 29, 2010. Order No. R-13448. http://ocdimage.emnrd.state.nm.us/Imaging/FileStore/santafeadmin/ho/202038/r-13448_1_ho.pdf and Order No. R-13197-A. http://ocdimage.emnrd.state.nm.us/Imaging/FileStore/santafeadmin/ho/90344/r-13144-a_1_ho.pdf and Order No. R-12913-G. http://ocdimage.emnrd.state.nm.us/Imaging/FileStore/santafeadmin/ho/85929/r-12913-g_1_ho.pdf

[189] Texas Administrative Code. Title 16, Part 1, Chapter 3, Rule §3.73. Pipeline Connection; Cancellation of Certificate of Compliance; Severance. http://info.sos.state.tx.us/pls/pub/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=16&pt=1&ch=3&rl=73

[190] RRC of Texas. Sept. 2009. *Self-Evaluation Report*. Submitted to Texas Sunset Advisory Commission. p. 101. http://www.rrc.state.tx.us/about/divisions/RRCSelfEvaluationReport2009.pdf



*Current State of Oil and Gas Enforcement*

### Chart 21. Severances for field rule violations.



**What types of wells get severed or sealed?**

A 2012 investigation by EnergyWire found that the RRC is more likely to sever or seal wells for production violations, e.g., a late or erroneous production report or 'overproduction', than for health, environmental or safety violations. RRC told EnergyWire that the reason more wells are shut down for production than safety problems is that production severances are computer-generated and the agency can look at every well monthly.[191]

EnergyWire reported that in 2010 less than 10 percent of the total number of severed or sealed leases were shut down for "field rule violations" (problems found during inspections).[192]

Our analysis of RRC data shows that the number of severances and seals applied for field rule violations hit an 11-year low in 2011.[193] The data clearly show that this is an enforcement tool that has been more widely used in the past.

In the past five years, RRC has issued between 6,000 and 8,500 severances/seals per year.[194] The power of the severance or seal is that it is supposed to stop production of oil or gas at a well or lease, and consequently operators lose revenue until they can bring the wells back into compliance.

---

[191] Soraghan, M. April 4, 2012. "Enforcement: Texas inspectors use their strongest punishment against paper violations," *EnergyWire.* http://www.eenews.net/public/energywire/2012/04/04/1

[192] ibid.

[193] RRC of Texas Online System, Oil and Gas Data Query, Severance Query. Data accessed April 8, 2012. Search for Oil and Gas Wells, Severance/Seal Cert. Ltr. Reason: Field Rule Violation, Severance/Seal Letter Date for each year, Outstanding and Resolved, Current. http://webapps2.rrc.state.tx.us/EWA/severanceQueryAction.do (See Appendix 7 for more details).

[194] RRC of Texas Online System, Oil and Gas Data Query, Severance Query. Data accessed April 8, 2012. http://webapps2.rrc.state.tx.us/EWA/severanceQueryAction.do  Searched for oil and gas severances/seals. Did not specify a district, field, operator, who the letter was issued by, or reason for the issuance. Searched for severance/seal letter date by year – e.g., 01/01/2011 to 12/31/2011. Did this for years 2000 through 2011. Searched Outstanding, then All (Outstanding and Resolved), then calculated Resolved. Searched only Current records. See data in Appendix 7.



*Current State of Oil and Gas Enforcement*

**Chart 22. Percentage of severances and seals that have been resolved.**



**Does severing/sealing a well encourage compliance?**

**The potential loss of revenue should be a motivation to quickly resolve compliance problems. But as seen in Chart 22, the percentage of resolved severances on oil leases and seals on gas leases is dropping. (See Appendix 7 for data).**

**The drop in resolved severances and seals suggests that operators are becoming less conscientious about coming into compliance once actual production has been cut off. It also suggests a need for follow-up inspections to ensure that the violations that result in severances/seals are corrected within a certain timeframe. If they are not corrected, the cases should be referred to RRC enforcement for further legal action.**

**Severing or sealing wells does not always stop production.**

In 2002, there were 1,214 operators that continued producing and/or selling production after having been found in violation of RRC rules and ordered to cease operations.[195] No statistics on this problem were found for subsequent years. But some specific examples were found of wells that continued to produce for months after seals had been issued.[196]

There are a couple of reasons that production does not necessarily stop following the issuance of a severance or seal. First, these actions do not always involve an inspector going to the site and physically sealing the well to prevent production. In speaking with RRC compliance and field operations staff, we were told that because the agency is understaffed it could be a month or more before inspectors physically get to wells that have been severed—if they make it there at all. RRC was not able to provide a statistic on how many wells are physically sealed. Second, even when wells are physically sealed, operators sometimes break the seals and continue producing oil or gas or injecting oilfield wastes.

While the ability to stop production at wells found in violation is a powerful enforcement tool, the addition of more enforcement staff to ensure that wells are physically sealed to stop production, and more staff to monitor production at severed/sealed wells could increase the effectiveness of severances and seals in Texas.

---

[195] March 2003. "RRC Bags Bad Operator – Begins Era of Strong Enforcement," News from Railroad Commission Chairman Michael L. Williams. http://www.rrc.state.tx.us/pressreleases/2003/030312.php

[196] Visit our web site for examples of wells that have not stopped producing oil or gas despite being severed. Earthworks' "Texas Enforcement – Enforcement Actions" web page. http://www.earthworksaction.org/issues/detail/texas_oil_gas_enforcement_penalties



*Current State of Oil and Gas Enforcement*

## NO NEW PERMITS

Colorado[197] and Pennsylvania[198] have provisions that allow the "punishment" of bad behavior by withholding or denying new permits to operators. The COGCC has exercised this enforcement power a number of times since the early 1990s.[199] We could find no examples where Pennsylvania's DEP, which has the ability to deny permits if operators have wells out of compliance, had exercised this power.

## OTHER ENFORCEMENT OPTIONS: RECOMMENDATIONS

Of the enforcement tools available, the ability to issue "cease and desist" or "cessation" orders to control problems at well sites and facilities is one valuable enforcement mechanism available in some states. In Colorado and Pennsylvania these types of orders are use sparingly, and primarily when there are significant environmental violations. The ability to order an operator to shut down or stop production (sever or seal) on wells that are out of compliance appears to be a powerful mechanism for achieving compliance in Texas. The ability to deny permits when companies are out of compliance is another useful tool that exists in Pennsylvania and Colorado, but examples of its use were only found for Colorado.

RECOMMENDATION: *Agencies should send a clear message that non-compliance will not be tolerated by making greater use of the range of enforcement tools at their disposal. All states must have the power to shut down production and the ability to suspend or modify existing permits and deny new permits until an operator's existing wells are in compliance.*

RECOMMENDATION: *To increase the deterrence value of these enforcement actions, agencies should track and publicize the use of cease and desist orders, shutting-in of wells, and placing holds on permits, and make data on these actions publicly available.*

---

[197] COGCC. Rule 525b. (Permit-related Penalties) states that whenever there is evidence that "a knowing and willful pattern of violation exists," the COGCC or its Director may issue an order to prohibit the issuance of any new permits to that operator. http://cogcc.state.co.us/RR_Docs_New/Rules/500.htm

[198] Title 58 - Oil and Gas; Chapter 32. Subchapter E. § 3211 e(1) of the Pennsylvania Consolidated Statutes (http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/58.HTM) says that: DEP may deny a permit if it finds that the operator, or any parent or subsidiary corporation, is in continuing violation of Act 13, any other statutes administered by DEP, and any plan approvals, permits or orders issued by DEP "unless the violation is being corrected to the satisfaction of the department."

[199] COGCC. Orders: 1V – 75, 1V – 114, 1V-332, 1V – 364, 1V – 364, 1V-370. Available at: http://cogcc.state.co.us/Orders/orders.cfm?cause_num=1V



*Current State of Oil and Gas Enforcement*

## 1.5. CITIZEN COMPLAINTS

Citizen complaints often draw attention to problematic operations that might otherwise go unmonitored for long periods of time. In Texas, the RRC has stated that, "Citizens are viewed as extra eyes to help the RRC identify problems."[200] Yet, not all agencies routinely collect complaint information. In addition, some impacted citizens are reluctant to report problems to state agencies that they feel are not committed to helping them.[201]

Citizens living in oil and gas development areas have the potential to aid agency enforcement staff because they live with the development on a daily basis, and they are often the first ones to notice a problem. Information gathered for this report suggests that citizen complaints have led to inspections that have found violations and resulted in stronger enforcement actions. For these "extra eyes" to be used more effectively, however, state oil and gas agencies must work cooperatively with citizens and dedicate sufficient resources to respond to their complaints in an effective and timely manner, and to maintain communication with citizens and communities regarding actions being taken and conditions on the ground.

**Colorado:** The COGCC online database enables users to view the 5,000 most recent complaints. A description of the complaint, information on the location and name of the facility in question, and COGCC's response to each complaint can be viewed through this database.[202]

Statistics on citizen complaints are more accessible in Colorado than in many other states, although in some respects the agency is becoming less transparent than it used to be.[203] For example, as seen in Table 17, in 2010 the COGCC stopped reporting the number of complaints that have been resolved.[204] In 2007, COGCC was required by legislation to submit a quarterly report to the General Assembly concerning the number of complaints received by the Commission.[205] The report included a list of all complaints, type of complaint, information on the complainant's identity, and the commission's response. Unfortunately, in 2010, subsection III was repealed,[206] and as a result the COGCC no longer publishes data on resolved complaints.

---

[200] RRC of Texas. Sept. 2009. *Self Evaluation Report.* Submitted to the Sunset Advisory Commission. p. 102. http://www.sunset.state.tx.us/82ndreports/rct/ser.pdf

[201] We have been told that citizens in Pennsylvania have filed complaints with DEP (either by calling the complaint hotline or filing a complaint online) but never heard back from the agency, or the agency failed to respond to complaints in a timely manner (e.g., DEP inspected a spill complaint days after it occurred, and after rains had washed away the material). Citizens also claim that DEP employees have refused to answer questions about their procedures. Many citizens, frustrated and unsure of their rights in these situations, hesitate to file new complaints with the state.

[202] COGCC web site: COGIS – Inspection/Incident Inquiry. Select Complaints. http://cogcc.state.co.us/cogis/IncidentSearch.asp

[203] From *COGCC Report to Water Quality Control Commission and Water Quality Control Division of the Colorado Department of Public Health and the Environment.* Data from reports for 2010, p. 4; 2009, p. 4; 2008, p. 3; 2007, p. 3; 2006, p. 3; 2005, p. 3. Reports available at: http://cogcc.state.co.us/Library/WQCD_WQCD_AnnualReports/AnnualReports.htm

[204] ibid.

[205] COGCC web site: "Quarterly Complaint Reports." http://cogcc.state.co.us/Library/ComplaintReports/QtrComplaintRpt.htm

[206] Colorado Revised Statutes. Title 34. Article 60. Section 34-60-104. Oil and gas conservation commission. http://www.lexisnexis.com/hottopics/colorado?source=COLO;CODE&tocpath=1OUNX9SKRlS2QOAK9,2DT0WOCRR8Q11DJG 8,31NIKS5F9BSWWEQIK;1SXGPUSO2YQDTCL8A,2QRCL8Y8IKJCQEO00,38ALLG4AZAICDMJ8S;1SPBJWTOAAWBIC1PY,2SSCH63 RMGC7S2QCL,3OLJPO2AGHKGKIKPR;103U42BXZ9STGLI6C,2N762IAL4O5ZDNT2B,3B371MED4M1Q51L19&shortheader=no



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT       72
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

*Current State of Oil and Gas Enforcement*

Additionally, the COGCC does not publish statistics on how many complaint investigations resulted in violations or enforcement actions.

**Table 17. Complaints related to oil and gas operations in Colorado.**

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **Total Complaints** | 348 | 296 | 200 | 164 | 249 |
| **Resolved Complaints** | 260 | 97 | 159 | Not reported | Not reported |
| **% Resolved** | 75 | 33 | 80 | - | - |

**New Mexico:** No aggregate data are available on complaints in New Mexico. It is possible to look up individual well files, which include a category on "complaints, incidents, and spills,"[207] but the data are not summarized in the OCD's statistics, nor is there a separate database that contains detailed information on complaints.[208]

**New York:** The Bureau of Oil and Gas Permitting and Management web site states that the Bureau investigates and resolves citizen complaints and non-routine incidents.[209] Currently, the Bureau does not track these complaints in a manner that is accessible to the public.[210]

**Ohio:** Ohio does not have a publicly accessible database of complaints, but an inquiry made to the DOGRM yielded the following information: in the years 2008, 2009, and 2010, DOGRM received 140, 176, and 146 complaints, respectively.[211]

**Texas:** In 2011, the Sunset Commission recommended that the RRC collect information on the number of complaints received and how the complaints were resolved, as well as other enforcement data.[212]

According to RRC, all citizen complaints are entered into a database that tracks and stores the complaint information,[213] yet no publicly accessible electronic database of complaints exists on the RRC web site. In fact, very little information on citizens' complaints concerning

---

[207] For an example, see https://wwwapps.emnrd.state.nm.us/ocd/ocdpermitting/Data/WellDetails.aspx?api=30-039-20199

[208] New Mexico OCD web site: "Statistics." http://www.emnrd.state.nm.us/OCD/statistics.html

[209] New York Division of Mineral Resources, Bureau of Oil & Gas Permitting and Management web site: http://www.dec.ny.gov/about/801.html

[210] On Sept. 27, a request was made by Earthworks to New York Division of Mineral Resource's Bureau of Oil and Gas Permitting and Management for information regarding citizen complaints: *"Does the Bureau maintain a database on citizen complaints? Is this database accessible by the public? If it is not publicly accessible, can you provide any statistics on the number of citizen complaints related to oil and gas facilities in the years 2005 through 2011? Also, do you keep records on how the complaints were dealt with (were there inspections? did these inspections uncover any violations?"* The response from DMR was *"The Division of Mineral Resources does not currently have a database for the information requested below. We are preparing to have one in operation at the time high-volume hydraulic fracturing activities are approved to go forward in the state."* Email from DMNOG, Sept. 30, 2011.

[211] Email request for data made Sept. 16, 2011, data received Oct. 4, 2011, from Beth Wilson, Public Information officer with Ohio Division of Minerals Resources Management.

[212] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 38. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf

[213] RRC of Texas. Sept. 2009. *Self-Evaluation Report.* Submitted to Sunset Advisory Commission. p. 102. http://www.sunset.state.tx.us/82ndreports/rct/ser.pdf



*Current State of Oil and Gas Enforcement*

oil and gas production is available on the RRC web site.[214]

Beginning in 2012, the Texas legislature required the RRC to publish "quarterly trends of enforcement data, including the number of complaints received and how the complaints were resolved…" on its web site.[215] Mere statistics on complaints received and resolved shed very little light on the nature and severity of the problems that citizens are encountering, and whether or not there are patterns of problems occurring (e.g., certain operators that are frequently mentioned, regional hotspots, etc.).

**Table 18. Complaints related to oil and gas operations in Texas.**

|  | **2007** | **2008** | **2009** | **First three quarters FY 2012** |
|---|---|---|---|---|
| **Complaints pending from prior yrs** | 262 | 270 | No data | No data |
| **Complaints occurring in year** | No data | No data | 681 | 550 |
| **Avg. # days for resolution** | 79 | 72 | No data | No data |
| **Resolved** | 773 | 868 | No data | 312 |
| **Violations as a result of complaints** | 669 NOV | 725 NOV | 1,997 | No data |
| **Complaints resulting in disciplinary action** | 41 Admin penalties | 45 Admin penalties | 91 enf. actions | No data |

Cumulative data from the first three quarterly reports are shown in Table 18. Data from 2007, 2008 and 2009 gathered from other sources are also included in the table.[216]
As seen in the table, citizen complaints help the RRC identify violations. In 2009, the RRC received 681 complaints related to oil and gas and found 1,997 violations based on these complaints. Enforcement action was taken for just 91, or 4 percent, of violations found during complaint inspections. In 2007 and 2008 penalties were assessed for approximately six percent of the violations found during complaint inspections.

The RRC has been criticized for a lack of consistent enforcement for violations identified because of complaints. In 2011, the Sunset Commission said that this lack of consistency "can contribute to a public perception that the Commission is not willing to take strong enforcement action."[217]

---

[214] The site has a "Complaints Filing" section, where informal complaint statistics related to natural gas purchasing, selling, shipping, transportation or gathering are posted. But these statistics do not include complaints related to oil and gas production. (RRC web site: Complaints filing. http://www.rrc.state.tx.us/complaints/complaints/index.php) It is only when complaints result in RRC hearings that details can be found on the RRC web site. But most if not all of these hearings focus on complaints filed by one operator against another, not citizen complaints related to environment, health, or safety issues. (RRC Oil and Gas Proposals for Decisions and Orders. "Complaints Index."
http://www.rrc.state.tx.us/meetings/ogpfd/ogpocomp/compindx.php)
[215] General Appropriations Act for the 2012-13 Biennium. 82nd Texas Legislature Regular Session, 2011. Sept. 12, 2011.p. VI-60. http://www.lbb.state.tx.us/Bill_82/GAA.pdf
[216] 2007/2008 data from: RRC of Texas. Sept. 2009. *Self-Evaluation Report.* Submitted to Sunset Advisory Commission p. 102. http://www.sunset.state.tx.us/82ndreports/rct/ser.pdf  2009 data from: Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 35. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf  2012 data from: RRC web site. "Enforcement Activities." Rider 17 2012 , 3rd Quarter Rpt. http://www.rrc.state.tx.us/compliance/enforcement/index.php
[217] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 35. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf.

 BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

74

*Current State of Oil and Gas Enforcement*

**Pennsylvania:** In Pennsylvania, citizens clearly play an important role in alerting agencies to potential violations. Data from DEP's eFACTS database show that in the years 2007 through 2011 at least 2,891 inspections took place because of complaints.[218] This statistic is lower than the actual number of complaint-driven inspections, however, because not every complaint inspection is documented in eFACTS.[219]

**Table 19. Pennsylvania inspections conducted in response to complaints (2007 - 2011).**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| **Number of complaint inspections** | 353 | 500 | 585 | 690 | 763 | 2,891 |
| **Result of complaint inspection** |  |  |  |  |  |  |
| De minimum violations noted |  |  | 1 |  | 1 |  |
| Recurring violations |  | 2 |  | 1 |  |  |
| Violations(s) and outstanding violations |  | 1 |  | 1 |  |  |
| Outstanding violations – viols required |  | 4 |  |  | 3 |  |
| Violations noted & immediately corrected | 10 | 2 | 8 | 14 | 8 |  |
| Violations noted | 113 | 93 | 170 | 119 | 152 |  |
| **Complaint inspections with violations** | **123** | **102** | **179** | **135** | **164** | **703** |

As seen in Table 19, in more than 700 of the complaint-driven inspections, at least one violation was found (see Appendix 6 for more information).

While Pennsylvania keeps a database of inspections that occur as a result of complaints, it does not have a publicly accessible database on all oil-and-gas-related complaints, so it is difficult to find any details such as date and location, the nature of the complaint, and whether or not complaints have been resolved.

## CITIZEN COMPLAINTS: RECOMMENDATIONS

RECOMMENDATION: *Agencies should maintain publicly accessible complaint databases that include information on date and location of the complaint, any operators and/or oil and gas facilities mentioned in the complaint, if and when an inspection occurred as a result of the complaint, any violations found, any enforcement actions taken as a result, and when and how the complaint was fully resolved.*

---

[218] Pennsylvania DEP. eFACTS database. Inspection Search: Inspection Type = Complaint Inspection; Program = Oil and Gas. Data downloaded into Excel. Separated data into years, filtered by code to find number of each type of complaint result. Data accessed April 18, 2012. http://www.ahs2.dep.state.pa.us/eFACTSWeb/criteria_inspection.aspx

[219] "There is no spreadsheet for the complaint and the complaint inspections available publically. On the inspections, some of the inspectors sometimes enter the complaint IDs sometimes they don't and other inspectors don't even enter them." Email from Roger Dietz, IT Generalist 1, Bureau of Oil and Gas Management, Pennsylvania DEP. Sept. 20, 2011.



*Current State of Oil and Gas Enforcement*

RECOMMENDATION: *Agencies should publish (and follow) a policy that outlines how to respond to citizen complaints (e.g., required response time, follow-up procedures) to ensure fair treatment of all complaints, transparency, and communication with the public.*

*Factors that Impede Enforcement*

# 2   FACTORS THAT IMPEDE ENFORCEMENT

Barriers exist within government, industry, and civil society that impede the enforcement of oil and gas regulations. Some of the key issues identified through our research are discussed in the following sections.

## 2.1.  AGENCY BUDGETS

During the current economic recession, many aspects of state government have been subject to cutbacks, including environmental regulation. Political disagreements regarding the role of regulation have also grown more visible nationwide. For example, in 2008, funding for the New Mexico OCD was cut by $302,000. Some division staff and others, including then-Governor Bill Richardson, suggested the cuts were retaliation for the tougher environmental regulations proposed by the division.[220]

### SOME STATE BUDGETS FOR OIL AND GAS AGENCIES HAVE INCREASED

It is not easy to find budgets specific to state oil and gas programs. No data were found for New York, Ohio, and New Mexico.

Pennsylvania data are based not on state or departmental budget reports (because DEP does not provide a line item for the Bureau of Oil and Gas Management), but rather on reports of the revenue generated by well permit fees. According to DEP, all revenue from the increase in the oil and gas permit fee instituted in 2009 is being used to increase oversight.[221] In 2008, the revenue from the fees was used to fund the addition of 68 new staff, including 37 inspectors.[222] The new fee generated $12.5 million in Fiscal Year (FY) 2010-11, and DEP anticipates collecting $15.4 million in fees for FY 2011-12.[223] Prior to the change the annual revenue from the drilling fee was $700,000.[224]

At the same time Pennsylvania's oil and gas program budget was increasing, the general DEP budget was severely reduced (by 36 percent between 2008 and 2011).[225] DEP's funding level is less than 60 percent of what it was a decade ago.[226] Cuts in other DEP

---

[220] Haywood, P. March 1, 2008. "Inspectors struggle to monitor vast area," *Santa Fe New Mexican.* http://www.santafenewmexican.com/Local%20News/Inspectors-struggle-to-monitor-vast-area

[221] Pennsylvania DEP. Revised April 2011. "Marcellus Shale: Tough regulations, greater enforcement." Doc: 0130-FS-DEP4288. http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-84024/0130-FS-DEP4288.pdf

[222] "The 68 additional personnel will be funded entirely from money generated by new, higher permitting fees that were instituted in 2009—the first such increase since 1984. The new fees were put in place with bipartisan support from the General Assembly, industry and environmental organizations." Pennsylvania DEP. Jan. 28, 2008. "Governor Rendell: PA Taking aggressive action to protect public, environment as Marcellus Shale drilling operations expand," News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=3115&typeid=1

[223] March 16, 2011. *Budget presentation by the Department of Conservation and Natural Resources to the House of Representatives Appropriation Committee.* p. 8. http://www.legis.state.pa.us/cfdocs/legis/tr/transcripts/2011_0034T.pdf

[224] Swift, R. January 29, 2010. "DEP hiring more gas drilling inspectors," *Times-Tribune.* http://thetimes-tribune.com/news/dep-hiring-more-gas-drilling-inspectors-1.579626#axzz1Y98LK400

[225] March 28, 2011. "Environmental groups, legislators call for end of DEP budget cuts," *PA Environment Digest.* http://www.paenvironmentdigest.com/newsletter/default.asp?NewsletterArticleID=18543&SubjectID=

[226] Philadelphia Inquirer. "PA DEP budget: halved in a decade." March 24, 2011. http://www.philly.com/philly/news/politics/PA-DEP-budget-has-dropped-.html



*Factors that Impede Enforcement*

programs also result in less oversight of certain aspects of oil and gas development.[227]

**Chart 23. Changes in oil and gas agency budgets in TX, CO and PA (2008 and 2011).**



Chart 23 includes data on Texas RRC expenditures for its "Oil and Gas Monitoring and Inspections" program, the Colorado expenditures for all COGCC programs, and the revenue generated by Pennsylvania DEP's new permit fee (to go toward oil and gas oversight). Data and citations for the chart can be found in Appendix 1.

As seen here, between 2008 and 2011 Pennsylvania's revenue for oil and gas oversight grew much more significantly than did budgets for oil and gas oversight in Colorado and Texas. By 2011 the DEP's budget surpassed what was being spent by the Texas RRC on its oil and gas monitoring and inspections program.

In Texas, the amount spent on monitoring and inspections decreased from more than $14 million in 2008 to about $12 million in 2010, but $15.7 million has been budgeted by RRC for oil and gas monitoring program for the 2012 Fiscal Year.[228]

**Ohio:** In 2009, DOGRM spent approximately $2.9 million on oil and gas regulation.[229] In 2010, Senate Bill 165 was signed into law. Within the bill were a series of new and modified fees, which were projected to increase revenue by almost $3 million a year. In the bill's fiscal note, it was estimated that 33 new staff would be added to the oil and gas program "supported in large part by the new and increased fees proposed in the bill." This should have almost doubled the staff from 2009 levels, when there were 35 full-time equivalent employees.[230]

## BUDGET INCREASES HAVE NOT RESULTED IN ADEQUATE STAFF

As mentioned above, in 2010 the Ohio Oil and Gas Law was updated with the intention of adding 33 new regulatory staff. There were 21 oil and gas inspectors in Ohio in 2010. By 2012, there were 27 inspectors.[231] The additional staff did little to relieve the enormous burden placed on each inspector in Ohio. With 64,500 active wells in 2011, each inspector had oversight responsibility for an average of 2,388 active wells. (See Appendix 5) It is next

---

[227] Cuts in other DEP departments affect oversight of oil and gas activities. For example, if oil and gas inspectors find a violation of wetlands laws, they need to refer the problem to staff in the appropriate section of the DEP; and if that section is understaffed, then the violation may not be investigated or result in an enforcement action.

[228] General Appropriations Act for the 2012-13 Biennium. 82nd Texas Legislature Regular Session, 2011. Sept. 12, 2011."Railroad Commission." Strategy C.1.1. Oil/gas monitor & inspections. p. VI-53. http://www.lbb.state.tx.us/Bill_82/GAA.pdf

[229] Ohio Legislative Service Commission. Feb. 10, 2010. Fiscal Note & Local Impact Statement for H.B. 426 of the 128th General Assembly. http://www.lsc.state.oh.us/fiscal/fiscalnotes/128ga/hb0426in.htm

[230] Ohio Legislative Service Commission. March 31, 2010. Fiscal Note & Local Impact Statement for Sub. S.B. 165 of the 128th G.A. http://www.lsc.state.oh.us/fiscal/fiscalnotes/128ga/sb0165en.htm

[231] Based on current listing of oil and gas field inspectors. Does not include supervisors, but does include back-up inspectors. (Accessed March 7, 2012). http://www.ohiodnr.com/mineral/inspectors/tabid/10355/Default.aspx Click on region for details.



*Factors that Impede Enforcement*

to impossible for one inspector to visit, let alone carefully inspect more than two thousand active well sites a year.

In Pennsylvania, increased revenue has led to an increase in enforcement staff. According to the DEP, revenue from new fees was used to hire 37 inspectors in 2009,[232] and 45 new enforcement staff were added in 2010.[233] The increase in staff has led to a dramatic increase in the number of inspections (the number doubled between 2008 and 2011). Also, the number of inspections finding violations tripled over that time period. But the increase in oversight has not led to more enforcement actions. In 2008, close to half of all violations resulted in an enforcement action, while in 2011, this was true for only 24% of violations. (See Appendix 6 for data)

*DEP has been able to increase fees in certain divisions thanks to the growth of natural gas drilling, however this has neither been able to meet the inspection needs for the five fold increase in Marcellus Shale gas wells in the past two years, nor has it been able to meet the overall monetary needs of the DEP as a whole.[234]*

Clean Water Action

Like Pennsylvania, Colorado's oil and gas program budget increases have resulted in the addition of oil and gas enforcement staff. Table 20 shows the agency's expenditures and number of inspection staff approximately doubled between 2005 and 2010.[235]

**Table 20. COGCC program expenditures and other information (2005-2010).**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **COGCC Program Expenditures ($ mill)** | $ 3.4 | $ 7.6 | $ 4.5 | $ 5.4 | $ 6.0 | $ 6.4 |
| **COGCC FTE** | 38 | 49 | 55 | 56 | 69 | 69 |
| **COGCC inspectors** | 7 | 9 | 9 | 9 | 12 | 15 |
| **Active oil and gas wells** | 29,181 | 31,096 | 35,686 | 37,459 | 40,956 | 43,354 |
| **Drilling permits approved** | 4,323 | 5,848 | 6,375 | 8,029 | 5,159 | 5,996 |

While this increase might seem impressive, Colorado's inspection staff is much smaller than other states. In 2010 COGCC's 15 inspectors carried out a number of inspections similar to Pennsylvania DEP's 65 inspectors (16, 228 versus 15,368 inspections for Colorado and Pennsylvania, respectively). It is difficult to imagine that each COGCC inspector could visit

---

[232] Pennsylvania DEP. Jan. 28, 2010. "Governor Rendell: PA Taking aggressive action to protect public, environment as Marcellus Shale drilling operations expand," News Release.
http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=3115&typeid=1

[233] Shankman, S. Feb. 9, 2010. "New gas drilling rules, more staff for Pennsylvania's environmental agency," *Propublica*.
http://www.propublica.org/article/new-gas-drilling-rules-more-staff-for-pennsylvanias-environmental-agency

[234] Clean Water Action. June 30, 2010. "DEP funding decline," http://www.cleanwateraction.org/publication/dep-funding-decline

[235] Citations for this table can be found in Appendix 2.



*Factors that Impede Enforcement*

four times as many sites, over a much larger geographic region, and do as thorough a job as the much larger cadre of inspectors in Pennsylvania.

By some metrics, the increase in COGCC staff has not greatly improved things on the ground. As shown in Chart 1, the number of oil and gas-related spills in Colorado more than doubled from 257 in 2005 to 516 in 2011. More than 25 percent of spills in 2011 affected groundwater or surface water. Also, citizen complaints, which had declined the four years previous, jumped from 164 in 2010 to 249 in 2011. (See Appendix 2)

In Texas, expenditures on oil and gas monitoring and inspections decreased by more than $2 million between 2008 and 2011 (Table 21).[236] During the same time period, funds going toward energy resource development,[237] which includes processing drilling permits and other applications, increased by $800,000. The number of inspectors working during this period actually increased, from 83 in 2008 to 97 full-time inspectors in 2011,[238] but this level of staffing did not increase oversight as the number of inspections fell from a high of 128,000 in 2009 to 115,000 in 2011.

**Table 21. Texas RRRC oil and gas program expenditures in millions of dollars (2008 & 2011).**

|  | Oil and Gas Monitoring & Inspections | Energy Resource Development | Oil and Gas Remediation | Oil and Gas Well Plugging | GIS and Well Mapping | Public Info and Services | Total Oil and Gas Budget |
|---|---|---|---|---|---|---|---|
| **2008** | $14.8 (29.4%) | $6.0 (12.0%) | $7.5 (14.9%) | $18.9 (37.6%) | $0.6 (1.2%) | $2.4 (4.8%) | $50.2 (100%) |
| **2011** | $12.2 (28.7%) | $6,8 (15.9%) | $5.1 (11.9%) | $15.8 (37.0%) | $0.7 (1.7%) | $2.1 (4.8%) | $42.6 (100%) |

## GENERATION AND DISTRIBUTION OF OIL AND GAS REVENUES AND FEES

In oil and gas producing states, companies usually pay a mix of severance taxes, mineral royalties, production taxes, and various fees. Some of this revenue helps to fund the agencies responsible for regulating the industry. In many states, however, large portions of revenue from oil and gas industry fees and taxes are diverted to fund unrelated state or local services and programs.[239]

---

[236] Data from Table 22 from: RRC of Texas. 2010 Operating Budget. IIA. Summary of Budget by Strategy.. p. 1 of 3. http://www.lbb.state.tx.us/External_Links/OB/Railroad_2010.pdf and RRC of Texas. 2012 Operating Budget. IIA. Summary of Budget by Strategy. p. 1&2 of 3. http://www.rrc.state.tx.us/about/divisions/opBudget.pdf

[237] The key function of the Energy Resource Development program is to administer state statutes and RRC rules . . .to prevent waste and promote conservation of hydrocarbons and to protect the correlative rights . . . Major activities . . . include: issuing drilling permits, developing field rules, processing of organizational reports, reviewing applications for compliance with spacing and density rules, issuing certificates of compliance, assigning production allowables, and reviewing applications for certification for incentives. (Source: RRC of Texas. Sept. 2009. Self-Evaluation Report. Submitted to Texas Sunset Advisory Commission. p. 51. http://www.rrc.state.tx.us/about/divisions/RRCSelfEvaluationReport2009.pdf)

[238] 2008 data from: Oct. 14, 2008. RRC. Oil and Gas Division presentation. http://www.fortworthgov.org/uploadedFiles/Gas_Wells/RRC%20-%20Oil%20and%20Gas%20Division.pdf 2011 data from: Pers. Comm. between Bruce Baizel, Earthworks and Leslie Savage, RRC of Texas. April 10, 2012. An email from RRC clarified that "We. . .provided for an additional 21+ full time inspector positions in the past year. . ." and the RRC has "97 full-time inspectors" but lead techs, state pluggers, and cleanup coordinators "also spend a relatively large percentage of their time in the field." When the latter positions are added in, there are 153 employees who carry out some inspection duties.

[239] Public Sector Consultants. Feb. 13, 2012. (Revised) *An Overview of State Tax Revenue Models for Four Natural Resource Extractive Industries.* pp. 10, 11. http://bridgemi.com/wp-content/uploads/2012/02/Severance-Tax-Report-Revised-2-13-12.pdf



*Factors that Impede Enforcement*

There are differing opinions on how to fund oil and gas agencies and their enforcement programs, as well as how revenue generated from oil and gas activities should be disbursed. While this section does not delve into the oil and gas revenue allocation issue, it does provide some ideas for generating funds to support strong oil and gas enforcement programs.

There are several examples of a "pay-as-you-go" approach to funding oil and gas enforcement.

- In 2009, the Pennsylvania DEP Bureau of Oil and Gas Management increased its well permit fees for the first time since the state's *Oil and Gas Act* was enacted in 1984. According to the STRONGER board, "Pennsylvania's oil and gas program is now completely funded by well permit fees. The increase in permit fees allowed DEP to increase the size of its permitting, compliance and enforcement staff."[240]
- An Ohio law adopted in 2010 required that DOGRM oil and gas well inspectors "draw their salaries from fees paid by drilling companies."[241]
- Michigan imposes a $0.0029 fee against total production, which is used by the Michigan Department of Environmental Quality to cover the costs of oil and gas oversight.[242]
- In 2011, the Sunset Commission in Texas recommended that the RRC's Oil and Gas program become self-supporting, and that this should be done by increasing fees for permits, licenses, certificates, and reports levied on the oil and gas industry. The Commission's rationale for having the program be self-supporting, rather than relying on general revenue, was two-fold: other regulatory agencies in Texas have statutory means to ensure that fee revenues cover the costs of regulation, and using general revenue to regulate the oil and gas industry unfairly shifts oversight costs from the industry to taxpayers.[243]

In addition to funding enforcement through permit and other fees, the revenue from penalties is a potential source of funding for oil and gas agencies that should be considered—particularly at a time when drilling is expanding and state budgets are declining. Taking enforcement actions, increasing maximum penalties, and actually assessing and collecting penalties could help fund improved oversight of oil and gas operations.

Texas provides an example of the revenue that could be generated from penalties. In 2009, there were close to 24,000 sign violations at oil and gas facilities in Texas, and the Sunset Commission reported that, "if operators had to pay a fine of $250[244] for each sign violation,

---

[240] STRONGER (State Review of Oil and Natural Gas Environmental Regulations, Inc.). Sept. 2010. *Pennsylvania Hydraulic Fracturing State Review*. p. 6. http://www.shalegas.energy.gov/resources/071311_stronger_pa_hf_review.pdf
[241] Wolf, I. Nov. 27, 2010. "Fracking practice for natural gas puts water wells at risk, critics say," *Naples News*. http://www.naplesnews.com/news/2010/nov/27/natrual-gas-drilling-well-fracking-water-supply/
[242] Public Sector Consultants. Feb. 13, 2012. (Revised) *An Overview of State Tax Revenue Models for Four Natural Resource Extractive Industries*. p. 10. http://bridgemi.com/wp-content/uploads/2012/02/Severance-Tax-Report-Revised-2-13-12.pdf
[243] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas*. p. 3. http://www.sunset.state.tx.us/82ndreports/rct/rct_fr.pdf
[244] $250 was the standard penalty suggested well sign violations. (Source: TX RRC document "Recommended Standard Penalty Schedule for Enforcement Cases." Obtained from RRC) The 2012 changes to rule 3.1 "Penalty Guidelines for Oil and



*Factors that Impede Enforcement*

the number of these violations would decrease."[245] If a $250 fine had automatically been applied for all of those violations, it would have generated $6 million in 2009,[246] which could have helped to fund more inspectors.

## AGENCY BUDGETS: RECOMMENDATIONS

RECOMMENDATION: *Agencies should increase revenue for oil and gas enforcement programs by taking more enforcement actions, increasing maximum penalties, and assessing and collecting maximum penalties that are allowed by law.*

RECOMMENDATION: *Agencies should increase fees for various permits related to oil and gas development to help partially or completely cover monitoring and enforcement costs.*

RECOMMENDATION: *Oil and gas agencies should continue to press state legislatures to increase agency budgets. In states where oil and gas severance taxes are collected, oil and gas agencies could request that sufficient funds from this income source be allocated to their agencies to cover monitoring and enforcement budgets.*

## 2.2.  STAFFING ISSUES

### NOT ENOUGH STAFF

All the states examined for this report have insufficient agency staff to adequately inspect oil and gas well sites. For example, there are just 12 inspectors in New Mexico to oversee more than 50,000 active oil and gas wells. (See Tables 1 and 2)

Oil and gas agencies in many states have acknowledged a shortage of staff. In 2010, a policy document instructed Texas inspectors, when dealing with clients, to "never use our limited staffing problem as an excuse for not doing a good job. Use the positive approach that we are doing the best we can, but could do even more with increased funding and staffing levels."[247]

In 2008, Mark Fesmire, then-director of the New Mexico OCD stated that, "We have 60 employees. . . There is no way, given our budget, that we can look over their [the oil and gas industry] shoulder the whole time."[248] Charlie Perrin, district supervisor for OCD's Aztec office, stated that his staff tries to inspect each of the 24,000 active wells in his district every five years. "The public wants us to do our jobs. But our hands are tied with political things. There's not enough money, not enough trucks; [fuel] is too expensive."[249]

---

Gas Violations" increased it to $500. (See Figure : 16 TAC §3.107(e)(1).
http://www.sos.state.tx.us/texreg/archive/August242012/adopted/16.ECONOMIC%20REGULATION.html#221)

[245] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas*. p. 34.
http://www.sunset.state.tx.us/82ndreports/rct/rct_fr.pdf

[246] 24,000 violations x $250 per violation = $6 million.

[247] Ross, Charles C. Deputy Director, Field Operations, RRC of Texas. February 1, 2010. "Field Operations: Job Priorities." Obtained from TX RRC Open Records Coordinator, Debra Ravel, via email. Sept.29, 2011.

[248] Haywood, P. March 2, 2008. "Drilling's hidden Costs," *Santa Fe New Mexican*.
http://www.santafenewmexican.com/Local%20News/Drilling-s-hidden-costs

[249] Haywood, P. March 1, 2008. "Inspectors struggle to monitor vast area," *Santa Fe New Mexican*.
http://www.santafenewmexican.com/Local%20News/Inspectors-struggle-to-monitor-vast-area



*Factors that Impede Enforcement*

## CONFLICTS OF INTEREST AND THE REVOLVING DOOR

In the wake of the BP Macondo well blowout in the Gulf of Mexico, numerous media reports focused on the close ties between oil and gas companies and federal government employees tasked with overseeing them. Documents obtained by the *Associated Press* showed that 1 of every 5 employees involved in inspections in the Gulf had been recused from some duties because of the risk of coming into contact with a family member or friend working for a company that the inspector regulated. The press report also cited a U.S. Inspector General report finding that some government workers tipped off companies about upcoming inspections, and that accepting gifts from oil and gas companies was commonplace in some regional offices.[250]

Another newspaper reported that offshore companies invited federal agency staff to skeet-shooting contests, hunting and fishing trips, golf tournaments, and crawfish boils in 2005, 2006, and 2007, but just one employee in the region reported receiving gifts and reimbursements for travel in required disclosure forms.[251]

The close relationship between the oil and gas industry and government inspectors is not unique to the federal level. In 2007, employees of the Texas RRC reported to the State Auditors Office that they accepted meals, caps, gift baskets, and other small gifts from oil and gas operators that they were regulating.[252]

Another aspect of the close relationship between regulators and industry is the problem of the "revolving door." Agencies hire personnel who have worked for the industry because they have technical expertise. Agency employees often leave to work in industry because corporate salaries are much higher.

In West Virginia, inspectors are currently <u>required</u> to have six years of industry experience.[253] Randy Huffman, secretary of the WVDEP recently said that he wants the industry-experience requirement lifted because "it makes his agency compete with industry for hiring, needlessly limits the pool of candidates, and could raise concerns about whether inspectors are impartial."[254]

In many states, the exodus of oil and gas agency employees to industry is a real concern. This 'revolving door' that delivers regulators into the employ of oil and gas companies creates questions from the public such as, "How long were particular oil and gas employees considering jobs with industry while still supposedly regulating them?"

In recent years, there have been some high profile cases of top government employees leaving government and quickly taking positions within industry. For example, in 2009, the

---

[250] Cappiello, D. July 26, 2011. "AP IMPACT: Gulf oil industry-gov't ties persist," *Associated Press*. Available at: http://seattletimes.com/html/nationworld/2015732566_apusoffshoredrillingrevolvingdoor.html

[251] Dloughy, J.A. May 26, 2010. "Report says MMS workers took energy company gifts," *Houston Chronicle*. http://www.chron.com/business/energy/article/Report-says-MMS-workers-took-energy-company-gifts-1609147.php

[252] State Auditor's Office (Texas). August 2007. *An Audit Report on Inspections and Enforcement Activities in the Field Operations Section of the Railroad Commission*. SAO Report No. 07-046. p. 9. http://www.sao.state.tx.us/Reports/report.cfm/report/07-046

[253] Knezevich, A. Aug.4, 2011. "Lawmakers may change hiring process for gas inspectors," *Charleston Gazette*. http://wvgazette.com/News/201108041407?page=2&build=cache

[254] Soraghan, M. Nov. 30, 2011. "Drilling regulators pull double duty as industry promoters," *Greenwire*. http://www.eenews.net/public/Greenwire/2011/11/30/1



*Factors that Impede Enforcement*

federal Office of the Inspector General (IG) found that Steve Henke, District Manager of the Bureau of Land Management in Farmington, New Mexico, took gifts and solicited donations from an oil and gas company, misused travel funds to attend a PGA golf tournament as a guest of an oil and gas company, and expedited permits for a company that provided Henke's son with an internship—all without disclosing this information as required by the federal government.[255] In August 2010, three months after retiring from the BLM, Henke was hired as president of the New Mexico Oil and Gas Association, the leading industry group in the state.[256]

In 2012, the director of the Colorado Oil and Gas Conservation Commission, David Neslin, resigned and immediately went to work for the law firm Davis Graham & Stubbs LLP, to be "part of a team serving energy industry clients."[257] That firm represented multiple oil and gas industry clients in 2008, when the COGCC was overhauling its oil and gas regulations.[258] In 2007, Neslin's predecessor at COGCC, Brian Macke, accepted a position with Delta Petroleum a little more than a month after his departure from the COGCC.[259]

But it is not just top-level bureaucrats who are leaving government for industry.

- According to the New Mexico OCD's enforcement and compliance manager, Daniel Sanchez, currently the OCD is short-staffed because, "[industry] can pay much more than government."[260] This is not a new problem in New Mexico. In 2008, Charlie Perrin, district supervisor for the state's Aztec office, had a difficult time keeping his office staffed. "State salaries (from $12 to $23 per hour, depending on experience and education) make it hard to keep inspectors." Consequently, several of Perrin's staff members at the time were "just learning the job."[261]
- In 2011, in its review of the Texas RRC, the Sunset Commission found that ". . . inadequate pay and lack of career advancement resulted in 26 employees under the age of 40 leaving in 2009," and ". . .having to compete with higher paying private sector jobs also creates barriers to recruiting employees."[262]
- In 2011, before he left his post as secretary of the Pennsylvania DEP, John Hanger told the *Citizens' Voice* that during this time of high unemployment DEP has not had a problem hiring new staff for its oil and gas program, but that retention was a challenge.

[255] Office of Inspector General. U.S. Dept. of Interior. Report of Investigation – Henke, Steven P. June 7, 2010. Case Number OI-CO-09-0259-I. p. 1. Report available at: http://pogo.ly/qjeyrH

[256] Montoya Bryan, S. July 21, 2010. "Steve Henke, former BLM director, selected to lead New Mexico's oil and gas industry group," *Huffington Post.* http://www.huffingtonpost.com/2010/07/21/steve-henke-former-blm-di_n_654923.html

[257] Tsai, C. Feb. 1, 2012. "Colorado Oil and Gas Commission director resigning," *Colorado Springs Gazette.* http://www.gazette.com/articles/gas-132752-oil-colorado.html#ixzz1ldY2rzeX

[258] "Mueller, K. (DGS Law). "Colorado Oil & Gas Conservation Commission Issues Final Revised Rules." http://www.dgslaw.com/attorneys/ReferenceDesk/DGS-Client-Alert-021109-Spill-Prevention-Control-Countermeasure-Rule.html

[259] Macke's last day of work was Oct. 31, 2007, (Source: Merritt, G. Oct. 19, 2007. "Head of state oil, gas commission resigns amid big changes," *Glenwood Springs Post Independent.* http://www.postindependent.com/article/20071019/VALLEYNEWS/110190068) and was hired by Delta Petroleum in December of 2007. (Source: Dec. 13, 2007. "Delta Petroleum Adds Macke to Senior Management Team," *Rigzone.* http://www.rigzone.com/news/article.asp?a_id=54006)

[260] Pers. Comm. with New Mexico OCD Enforcement and Compliance Manager, Daniel Sanchez. July 29, 2011.

[261] Haywood, P. March 1, 2008. "Inspectors struggle to monitor vast area," *Santa Fe New Mexican.* http://www.santafenewmexican.com/Local%20News/Inspectors-struggle-to-monitor-vast-area

[262] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* pp. 52,53. http://www.sunset.state.tx.us/82ndReports/RCT/RCT_FR.pdf.



*Factors that Impede Enforcement*

"The turnover in staff is one of the hurdles that has to be overcome."[263] The article listed a litany of defections from DEP to oil and gas companies: Range Resources, Chesapeake Energy, and Atlas Energy together hired at least four former well site inspectors; a 30-year veteran with DEP had been hired by Chief Oil and Gas; and Barbara Sexton, the department's second-highest ranking official, became director of governmental affairs for Chesapeake.[264]

While there may not be much that an agency can do to prevent employees from negotiating with companies for employment opportunities, it is possible to enact laws to prevent former employees from interacting with the agency for a period of time.[265]

The importance of retaining experienced staff cannot be overstated. In an interview for this report, an ex-regulator commented that, "It can be difficult to find real violations. You need experience technically to really know what is happening. State employees are not always the most experienced."

The Texas RRC has similarly acknowledged the importance of experienced staff.  "Retention of employees in the engineering and technical oilfield disciplines is particularly difficult. Without these employees, progressive regulatory models cannot be implemented, and basic services may begin to deteriorate. A program to provide competitive salaries to attract and retain the RRC's human resources is critical." [266]

Clearly, it has, and continues to be, a challenge for state oil and gas agencies to retain staff with the level of experience necessary to adequately enforce the rules. More must be done to attract and keep these valuable employees. Otherwise, adequate enforcement is not going to occur.

## STAFFING ISSUES: RECOMMENDATIONS

RECOMMENDATION: *To avoid conflict-of-interest issues, oil and gas inspectors and enforcement staff should not be allowed to receive gifts (either material or in-kind, e.g., meals, travel, and entertainment) from oil and gas companies or employees.*

RECOMMENDATION: *Statutory restrictions should be placed on past employees of oil and gas agencies to prohibit them (for a period of time) from representing or assisting private companies in dealing with matters related to the agency. These past agency employees should also be prevented from disclosing to new employers any confidential information obtained while in the employ of an agency.*

---

[263] Legere, L. January 25, 2011. "DEP losing staff to gas drilling industry," *The Citizens' Voice*. http://citizensvoice.com/news/drilling/dep-losing-staff-to-gas-drilling-industry-1.1094471
[264] ibid.
[265] For example, Delaware has "post-employment restrictions that relate to conflict of interest: *"No person who has served as a state employee, state officer or honorary state official shall represent or otherwise assist any private enterprise on any matter involving the State, for a period of 2 years after termination of employment or appointed status with the State, if the person gave an opinion, conducted an investigation or otherwise was directly and materially responsible for such matter in the course of official duties as a state employee, officer or official. Nor shall any former state employee, state officer or honorary state official disclose confidential information gained by reason of public position nor shall the person otherwise use such information for personal gain or benefit."* Delaware Code. Title 29, Chapter 58, Subchapter 1, Section 5805: *Prohibitions relating to conflicts of interest*. http://codes.lp.findlaw.com/decode/29/58/I/5805
[266] RRC of Texas. Sept. 2009. *Self-Evaluation Report*. Submitted to Texas Sunset Advisory Commission. p. 14. http://www.rrc.state.tx.us/about/divisions/RRCSelfEvaluationReport2009.pdf



*Factors that Impede Enforcement*

RECOMMENDATION: *Enforcement staff wages and benefits should be increased to make public employment more competitive.*

## 2.3. DATA COLLECTION, MANAGEMENT, AND TRANSPARENCY

This report contains numerous examples of poor record-keeping and data collection, management, and availability.  Lack of access to information is a significant barrier to citizen enforcement efforts (i.e., it can be difficult for citizens to access and interpret data), as well as to agency enforcement efforts.

The Sunset Commission of Texas shares this opinion, berating the RRC for its poor data management and tracking. For example, while the RRC does track violations according to which rule was violated, "…the data do not indicate whether the violations are serious or how many represent repeated violations by the same operator. By relying on this limited information the Commission cannot determine or ensure effective and consistent enforcement across the state." [267]  When the Sunset Commission asked the RRC how many of the 18,000 water protection violations in 2009 resulted in an enforcement action, the agency had to do a manual count of each violation in the enforcement dockets to produce the total.[268]

In 2010, *Scripps Howard News Service* reported that the Ohio Department of Natural Resources had data to show that well operators had received 14,409 Notices of Violation since 2000. Nearly 2,000 of these lacked any electronic record of when, or if, the violations had been resolved. Similarly, Pennsylvania officials told the news service that their violation files—which include thousands of notations of violations with no accompanying resolution data—could not be trusted to be accurate. Instead of keeping this information up-to-date (and thus available for use by citizens, advocates, or policymakers), "…inspectors are devoting their limited manpower in the field rather than completing paperwork."[269]

RECOMMENDATION: *Agencies need to document, track, and publish annual or quarterly statistics on inspections, violations, penalties, different types of enforcement actions, and complaints. By doing so, it will help the agencies know where to focus enforcement efforts (e.g., highlight bad actors, identify rules that are frequently violated) and show differences in compliance among regions and operators.*

RECOMMENDATION: *In addition to publishing statistics, all data on inspections, violations, penalties, enforcement actions and complaints should be made publicly available through searchable online databases and for download so that the public can analyze the data in the aggregate, look up specific cases, and find information as to whether or not violations or complaints have been resolved. This level of data transparency will help hold agencies accountable for their inspection and enforcement practices, and companies can be held accountable for their violations.*

---

[267] Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 34. http://www.sunset.state.tx.us/82ndreports/rct/rct_fr.pdf
[268] ibid.
[269] Wolf, I. Nov. 27, 2010. "Fracking practice for natural gas puts water wells at risk, critics say," *Naples News.* http://www.naplesnews.com/news/2010/nov/27/natrual-gas-drilling-well-fracking-water-supply/



*Factors that Impede Enforcement*

## 2.4.  OTHER FACTORS

### MORE RESOURCES ALLOCATED TO PERMITTING RATHER THAN ENFORCEMENT

In 2005, the Government Accountability Office (GAO) reported that the number of oil and gas drilling permits approved by the federal BLM had tripled from 1,800 in 1999 to 6,400 in 2004. The GAO found that "increases in permitting activity are compromising the agency's ability to conduct certain mitigation activities—such as inspections and idle well reviews—because staff responsibilities are being shifted away from these important activities to process permits."[270]

It is also common for state agencies to respond to booms in oil and gas development by expediting permitting processes. The pressure to approve permits can jeopardize the thorough gathering and review of information that is critical when making a permitting determination, such as proximity of a facility to a water source or impacts on nearby residential areas.

In 1998, industry in Texas pushed regulators hard to streamline the oil and gas permitting process. At the time, it took three to five days to process a permit application. Texas RRC Commissioners and staff met with oil and gas industry representatives and developed a permitting system that focused on electronic processing "for the purpose of increasing process efficiencies and to reduce industry and RRC costs." With the help of industry, the RRC received $1.4 million from the Texas Legislature, as well as $700,000 from the U.S. Department of Energy to undertake the electronic permitting project.[271] As a result of this initiative, approximate processing times are anywhere from one to seven days for expedited permits and three to 14 days for standard drilling permits.[272]

During the past two years, Colorado has also reduced its permitting times significantly, although not to the same degree as Texas. In 2010 and 2009, the median times were 45.7 and 52.3 days, respectively, while in 2011 the median time required to process a drilling permit was 27 days.[273]

In 2009 and 2010 Ohio averaged 12 days to issue drilling permits (no data are available for 2011).[274]

---

[270] Government Accountability Office. June 2005. *Oil and Gas Development: Increased Permitting Activity Has Lessened BLM's Ability to Meet Its Environmental Protection Responsibilities.* GAO-05-418. p. 48. http://www.gao.gov/new.items/d05418.pdf

[271] Cisco, S. and LaHood, D. May 8, 2000. "Texas Railroad Commission introduced Internet-based permit process," *Oil and Gas Journal.* http://www.ogj.com/articles/print/volume-98/issue-19/drilling-production/texas-railroad-commission-introduces-internet-based-permit-process.html

[272] RRC of Texas web site: "Drilling Permit Processing Time." Accessed September 19, 2011. and August 30, 2012. http://www.rrc.state.tx.us/data/drilling/index.php

[273] (Median permitting times are for the first quarter of each year). Neslin, D. April 25, 2011. "Memorandum to the Colorado Oil and Gas Conservation Commission." http://cogcc.state.co.us/announcements/CommissionLtr4_25_11.pdf

[274] This total includes permits issued to convert, deepen, drill, plugback, plug and abandon, reissue, and reopen wells. (Source:  Ohio Division of Mineral Resources Management. 2010. *Summary of Ohio Oil and Gas Activities.* p. 1. http://www.ohiodnr.com/portals/11/publications/pdf/oilgas10.pdf)



*Factors that Impede Enforcement*

No agency statistics were found on the average time to issue permits in Pennsylvania. In April 2011, it was revealed that even though multiple DEP staff sign off on drilling permits, the total review time for a drilling permit in Pennsylvania could be as little as 35 minutes.[275]

During discussions with stakeholders conducted for this report, the consequences of speeding up the permitting process were highlighted, including a lack of time to consult with the specialists who may be able to include permit conditions (such as those who can verify the location of springs, know whether an area is prone to hydrogen sulfide gas, and can apply the definition of "wild and scenic" areas) that can ultimately prevent or mitigate impacts. In skipping thorough analysis, operators may evade proper special permit requirements or stipulations that could aid enforcement efforts.

Citizens and independent organizations have helped bring to light some of the consequences of the expedited permitting processes in Pennsylvania, including –

- In October 2009, DEP revoked three erosion and sedimentation permits due to technical deficiencies discovered after permit approval.[276] As part of a July 2011 settlement agreement of the permit appeals, DEP agreed to prevent the use of its "expedited" permitting process when considering drilling applications located near streams with the highest water quality and considered to be of exceptional value.[277]
- In December 2010, Lake Erie Energy Partners LLC was issued two drilling permits. DEP revoked the permits after North East Township residents contacted DEP to alert them to water supply notification shortcomings in the permit applications.[278]

Unfortunately, citizens are simply not able to review all permits (nor should they be expected to carry this responsibility in the absence of agency action). If a regulatory agency cannot perform a thorough review of permits on its own, the permitting process should be revamped.

RECOMMENDATION: *Agencies should focus on a thorough review of permits and specific conditions related to the permit, including provisions that can be enforced or that are more likely to result in regulatory violations, rather than focusing on expediting permit approvals.*

RECOMMENDATION: *Agencies should require permitting staff to communicate with inspections staff and/or consult the agency database on inspections, violations, and enforcement actions to ensure that a company's history of compliance is taken into consideration during the permitting process.*

---

[275] Rubinkam, M. April 13, 2011. "Pennsylvania is approving gas drilling permits with scant review," *Associated Press*. Reprinted in USA Today: http://www.usatoday.com/money/industries/energy/2011-04-13-pa-gas-drilling-permits.htm

[276] Pennsylvania DEP. Oct. 28, 2009. "DEP Revokes Erosion and Sedimentation Control Permits for Two Gas Companies." http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=2409&typeid=1
The three permits were appealed to the state Environmental Hearing Board by the Chesapeake Bay Foundation, which prompted DEP officials to re-examine the permits to determine if they met the regulatory requirements, and ultimately led to the permit revocations. (Chesapeake Bay Foundation. July 7, 2011. "Settlement reached in Marcellus permit appeal case," Press Release. http://www.cbf.org/page.aspx?pid=2561)

[277] Pennsylvania DEP. Jan. 20, 2012. "DEP accepts public comment on oil and gas erosion control permits," News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=19225&typeid=1

[278] Pennsylvania DEP. April 4, 2011. "DEP Issues Corrected Well Drilling Permits to Lake Erie Energy Partners." News Release. http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=16895&typeid=1



*Factors that Impede Enforcement*

## BARRIERS TO CITIZEN INVOLVEMENT IN ENFORCEMENT

Citizen enforcement is a feature of many federal environmental statutes, allowing citizens to sue companies for violations when the government fails to do so. Traditionally, Congress has viewed citizen enforcement as an important supplement to agency enforcement.[279] It is also a means of holding agency regulators accountable for enforcing pollution laws.[280]

Unfortunately, most state environmental or resource statutes do not have citizen suit provisions. However, a few, such as New York, allow citizens to take operators to court to ask for an injunction against oil and gas violations if the state fails to do so.[281]

Citizen involvement in enforcement is further hampered because of the poor state of record-keeping and lack of publicly accessible online inspection and enforcement data. Most citizens and citizen advocacy organizations lack the resources to perform paper file reviews, which in the absence of online data are necessary to build citizen enforcement cases.

RECOMMENDATION: *States should add citizen suit provisions to oil and gas statutes and environmental statutes that pertain to oil and gas operations. This would enable citizens to hold agencies accountable for enforcing rules to protect the environment, public health and safety, and, in turn, facilitate the remediation of damage caused to individuals and property.*

## THE BURDEN OF PROOF MUST BE SHIFTED

Currently, enforcement action often requires that agencies and citizens first prove that harm has occurred. It can be very difficult and expensive to prove a direct connection between problems such as groundwater pollution or health impacts and oil and gas activity. In addition, companies are often able to draw on a cadre of their own scientists and attorneys to dispute agency or citizen science.[282]

A high burden of proof is often placed on state agencies seeking to use enforcement tools. As mentioned above, the New Mexico OCD must prove that a violator acted "knowingly and willfully" in order to assess civil penalties.[283] Also, as described in Section 1.4, in some states, cease and desist orders or denial of new permits may only be used in "emergency situations," or "if there is a material and substantial violation," or the violation "presents an

---

[279] Center for Progressive Regulation. "Environmental Enforcement." http://www.progressiveregulation.org/perspectives/environEnforce.html

[280] April 23, 2009. "Poisoned Waters," *PBS Frontline*. http://www.pbs.org/wgbh/pages/frontline/poisonedwaters/involved/action.html

[281] New York Code. Environmental Conservation. Article 71. Enforcement. Title 13: Enforcement of Article 23. Section 71-311. Injunction against violations. http://codes.lp.findlaw.com/nycode/ENV/71/13/71-1311

[282] For example, after a well blowout in Leroy Township, PA, water tests in a nearby water well revealed post-blowout concentrations of methane and other constituents at 10-times the concentration found in the baseline water sample (Source: Agency of Toxic Substances and Disease Control (ATSDR). Nov. 4, 2011. *Health Consultation – Chesapeake ATGAS 2H Well Site. Leroy Township, Bradford County, PA.* pp. 17, 18. http://www.atsdr.cdc.gov/HAC/pha/ChesapeakeATGASWellSite/ChesapeakeATGASWellSiteHC110411Final.pdf) Cheseapeake responded saying the predrilling baseline water test was unrepresentative of the actual conditions that existed prior to drilling. (Cheseapeake Energy Corporation. Submission to ATSDR of Information Quality Request for Correction. http://aspe.hhs.gov/infoquality/request&response/41a-Petition.pdf )

[283] A legislative effort in 2011 to remove this burden of proof failed. (Source: New Mexico Legislative Finance Committee. Feb. 17, 2011. Fiscal Impact Report for HB 176 "Oil and Gas Enforcement." http://www.nmlegis.gov/Sessions/11%20Regular/firs/HB0176.pdf)

---



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

89

*Factors that Impede Enforcement*

imminent danger to the health or safety of the public," or "a knowing and willful pattern of violation exists." In all of these cases, the state agencies are prevented from utilizing the enforcement tools against violations unless they can prove that near-catastrophic conditions exist.

Citizens' and agencies' burdens of proof are made heavier by a lack of pre-drilling environmental data (e.g., ground- and surface-water and air quality data), as well as a lack of monitoring data collected or reported during drilling and production. This means that it is virtually impossible for the public or agencies to track the gradual decline in environmental quality, or to find violations as they are happening.

In Pennsylvania, many oil and gas operators test for chemicals in private water supplies  in the vicinity of proposed oil and gas well locations because operators are presumed responsible if water supplies become polluted after drilling (some conditions apply).[284] But companies are not presumed responsible for impacts to water quantity. Thus, if changes to water quantity occur after drilling, it is up to citizens and DEP to prove the companies wrong.[285] So citizens, who may or may not be reaping any benefits from oil and gas wells drilled near their property, are shouldering the cost of proving that their water quantity has been affected by drilling.

Until there is a shift in the burden of proof onto industry, or at least a reduction of the burden placed on agencies and citizens, state agencies will not be able to fully use the enforcement tools available to them, and bad actors will continue to get away with practices that impact or threaten human health and the environment.

RECOMMENDATION: *Changes should be made to regulations to reduce the burden of proof that must be met before agencies can take enforcement action against operators that violate oil and gas rules.*

RECOMMENDATION: *Companies should be required to conduct pre-and post-drilling water (quality and quantity), air and soil monitoring. The data should be submitted to oil and gas and other relevant agencies (e.g., environment departments), and be made publicly available so that it can be reviewed and used by citizens.*

---

[284] The presumption exists under certain conditions – e.g., Unless rebutted, the Act presumes that an operator is responsible for pollution of a water supply if the affected water supply is 1,000 feet from a conventional well or 2,500 feet from an unconventional well and that pollution occurred within 6 or 12 months of the later of completion, drilling, stimulation or alteration of the conventional and unconventional well, respectively.  (PA Act 13 of 2012. Section § 3218. Protection of water supplies. http://www.ctbpls.com/www/PA/11R/PDF/PA11RHB01950CC1.pdf )

[285] Pennsylvania State Extension. 2011. Marcellus Shale Gas Well Drilling: Regulations *to Protect Water Supplies in Pennsylvania.* p. 3. http://www.cce.cornell.edu/EnergyClimateChange/NaturalGasDev/Documents/PDFs/marcellus_regulations_fact_sheet[1].pdf



*Factors that Impede Enforcement*

# 3   THE PATH FORWARD

This report shows that states across the nation are betraying one of the basic agreements between government and the governed:  to enforce the law.  That betrayal feeds into the growing lack of confidence that government should be about equal treatment and not about financial or political clout.

This betrayal of the public interest also severely weakens state claims that they can protect the public from the impacts of the shale boom.  A rule – even an improved rule – on the books means little if an oil or gas company knows that it can be ignored with little or no consequence.

To address the problem we call upon states to take the following steps::

**Acknowledge that public health is at risk because state enforcement of existing oil and gas rules is broken:**
- More than half of all wells go uninspected year: hundreds of thousands of wells.
- Those companies that are found in violation are rarely penalized: ambiguous policies and rules leave the consequence for violations unclear to the public, companies and inspectors. Consequences appear to vary violation by violation.
- Penalties are so weak that it is cheaper for violators to pay the penalty than comply with the law.

**Fix state enforcement by making common sense policy and regulatory changes:**
- Writing into rule the minimum number of inspections/inspectors per number of wells, and providing adequate money and equipment to perform the inspections.
- Establishing clear rules so inspectors, companies, and the public know when operators are in violation, and the consequences.
- Formalize the public's role in enforcement, including sharing information with the public and allowing citizen suits. The public lives with gas development in their communities – they often know of violations before anyone else, including inspectors.

**Until state enforcement is fixed, refuse new permits to drill:**
Oil and gas regulations are the law of the land.  Oil and gas extraction is permitted on a well-by-well basis, conditioned upon compliance with the law. Until states can demonstrate in good faith that they are upholding the, they cannot maintain the public trust if they continue to permit new drilling.



Appendix 1- State-by-state data

### Table A1-1. Comparison of inspection staff and activity–2010.

| State | Inspectors | Active wells[1] | Number of wells inspected | Inspections | Active wells per inspector | Inspections per inspector |
|-------|-----------|-----------|---------------------------|-------------|---------------------------|---------------------------|
| CO | 15[2] | 43,354[3] | No data | 16,228[4] | 2,890 | 1,082 |
| NM | 12[5] | 53,063[6] | No data | 20,780[7] | 4,422 | 1,732 |
| NY | 16[8] | 10,315[5] | No data | 2,460[9] | 645 | 154 |
| OH | 21[10] | 64,378[11] | 5,644[12] | 9,374[13] or 10,472[14] | 3,066 | 446 or 499 |
| PA | 65[15] | 91,167[16] | 8,565[17] | 15,368[18] | 1,403 | 236 |
| TX | 88[19] | 260,104[20] | No data | 121,123[21] | 2,956 | 1,376 |

### Table A1-2. Comparison of inspection staff and activity–2011.

| State | Inspectors | Active wells | Number of wells inspected | Inspections | Active wells per inspector | Inspections per inspector |
|-------|-----------|-----------|---------------------------|-------------|---------------------------|---------------------------|
| CO | 15[22] | 46,835[23] | No data | 12,239[24] | 3,122 | 816 |
| NM | 12[25] | 53,209[26] | No data | 25,543[27] or 29,394[28] | 4,434 | 2,129 or 2,450 |
| NY | 14[29] | 11,852[30] | No data | No data | 848 | No data |
| OH | 27[31] | 64,481[32] | 6,590[33] | 10,422[34] | 2,388 | 341 |
| PA | 84[35] or 88[36] | 77,898[37] | 11,283[38] | 22,670[39] | 927 or 885 | 270 or 258 |
| TX | 97[40] | 261,476[41] | No data | 114,878[42] | 2,696 | 1,184 |

### Table A1-3. Estimated number of active wells not inspected in 2010.

| State | Number of inspections[43] | Number of wells inspected[44] | Number of active wells[45] | Approx. # of active wells NOT inspected | % of active wells NOT inspected |
|-------|---------------------------|-------------------------------|----------------------------|-----------------------------------------|--------------------------------|
| CO | 16,228 | 16,228 (estimated) | 43,354 | 27,126 | 63 |
| NM | 20,780 | 20,780 (estimated) | 53,063 | 32,283 | 61 |
| NY | 2,460 | 2,460 (estimated) | 10,315 | 7,855 | 76 |
| OH | 10,472 | 5,644 (actual) | 64,378 | 58,734 | 91 |
| PA | 15,368 | 8,565 (actual) | 91,167 | 82,602 | 91 |
| TX | 121,123 | 121,123 (estimated) | 260,104 | 138,981 | 53 |

### Table A1-4. Oil and gas violations and inspections by state–2010.

| State | Violations | Inspections[46] | Violations found per inspection | Notes |
|-------|-----------|-----------------|--------------------------------|-------|
| CO | No data | 16,228 | | 319 Notices of alleged violations[47] |
| NM | No data | 20,780 | | 418 Letters of violation[48] |
| NY | No data | 2,460 | No data | No data |
| OH | 1,094[49] | 10,472 | 0.10 | Violations |
| PA | 2,861[50] | 15,368 | 0.19 | Violations |
| TX | 71,646[51] | 121,123 | 0.59 | Violations |

BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A1-1

*Appendix 1- State-by-state data*

**Table A1-5. Civil penalties collected (2009 to 2011).**

|  | Colorado[52] | New Mexico[53] | New York[54] | Pennsylvania[55] | Ohio[56] | Texas[57] |
|---|---|---|---|---|---|---|
| **2009** | $162,000 |  | $40,000 | $1.6 million | $17,500 | $ 2.0 million |
| **2010** | $1.2 million | $14,000 |  | $4.0 million | $194,000 |  |
| **2011** | $3.0 million |  |  | $1.3 million | $73,935 (FY) |  |

**Table A1-6. Civil penalties for violations of oil and gas regulations state.**

| State | Maximum penalty | When maximum penalty is applied |
|---|---|---|
| **Texas**[58] | Max $1000 - $10,000 for each day violation continues | Amount depends on rule that is violated. Largest penalty only applies if the provision, rule, or order pertains to safety or the prevention or control of pollution |
| **Ohio**[59] | Max $2,500 – $20,000 per each continuing day of violation | Amount depends on which section of Code is violated. Largest penalty primarily applies to rules to prevent pollution from extraction, storage and injection of brine, oil, natural gas or other fluids. |
| **New Mexico**[60] | Max $1,000 for each day violation continues | Applies to anyone who knowingly and willfully violates the Oil and Gas Act |
| **New York**[61] | Max $8,000 per violation plus $1,000 - $2,000 for each day violation continues | Applies to violation of Article 23 or any regulation, order or permit condition. |
| **Colorado**[62] | $500 - $1,000/day that violation continues | Maximum total fine for violations that do not have adverse effects on public health/welfare/resources is $10,000 regardless of # of days of continued violation. For violations that affect public health/welfare/resources the total may exceed $10,000. |
| **Pennsylvania**[63] | $25,000 per violation plus $1,000 for each day violation continues (conventional wells) and $75,000 per violation plus $5,000 for each day (unconventional well) | Applies to violations of Title 58 Oil and Gas. |

**Table A1-8.  Oil and gas program budgets (2008 and 2011).**

|  | Colorado[64] | Pennsylvania[65] | Texas[66] |
|---|---|---|---|
| **2008** | $5.4 million | $0.7 million | $14.8 million |
| **2011** | $6.5 million | $12.5 million | $12.2 million |

---

**ENDNOTES**

[1] Active well data. There is no universal definition of an active well. Generally, active wells refer to wells that are operating, as opposed to wells that have been temporarily plugged or shut-in or permanently plugged and abandoned. Those wells that are inactive due to temporary shut-in should still be monitored, but for the purposes of this paper we did not include inactive wells. The Railroad Commission of Texas (**hereafter RRC**) does the best job of reporting well status, separating inactive from active wells, and separating active wells into oil and gas wells, stripper wells (those that produce small amounts of oil or gas), injection wells and others. Active wells in Pennsylvania were determined by counting the number of wells in DEP's "Production Reporting Database" whose well status indicated "active." The Colorado Oil and Gas Conservation Commission (**hereafter COGCC**) reports the number of "active" wells in its staff report.  New Mexico does not consistently report active wells, so "producing wells" were used. New York used active producing well data. (See citations for each state for more information)

 BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

*Appendix 1- State-by-state data*

---

[2] COGCC. *2010 Report to the Water Quality Control Commission and Water Quality Control Division of the Colorado Department of Public Health and the Environment.* 2010, p. 3. http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/WQCC09_10RPT.pdf

[3] COGCC. January 13, 2011. Staff Report. p. 24. http://cogcc.state.co.us/Staff_Reports/2011/2011_01_SR.pdf

[4] ibid. p. 25.

[5] Pers. Comm. Daniel Sanchez, Sonny Swazo (NM Oil Conservation Division, **hereafter OCD**) and Jim Winchester and Lisa Sumi, Earthworks. March 5, 2012.

[6] We looked for data on "active" wells, but the OCD does not have active well statistics on its web site. The New Mexico Energy, Minerals and Natural Resources Annual Reports for 2010 and 2011 have information on the number of "wells," while previous reports, e.g., 2008 and 2009 have data on "active producing wells." (http://www.emnrd.state.nm.us/main/Publications.htm Because of this lack of consistency, we decided to report the number of producing wells, based on data from the Petroleum Recovery Research Center. GO-TECH web site. "General Production Data Search." Data accessed March 22, 2012. http://octane.nmt.edu/gotech/Petroleum_Data/General.aspx Search 2010. Select: Production. Ignore wells with no data (to omit wells with no associated production data from search results.). Summary provides a well count that produced oil or gas in 2010.

[7] Information request to Jim Winchester, New Mexico Environment Department & Energy (**hereafter NMED**), Minerals & Natural Resources Department from Lisa Sumi, Earthworks. Feb. 24, 2012.

[8] Sickle, A. April 28, 2010. "New York DEC staff shorthanded to reply to 14,000 Marcellus Shale comments – environmental inspectors down to 16," National Security News Service. http://www.dcbureau.org/20100429137/natural-resources-news-service/new-york-dec-staff-shorthanded-to-reply-to-13500-marcellus-shale-comments-environmental-inspectors-down-to-16.html

[9] McAllister, E. June 29, 2011. "Insight: NY water at risk from lack of natgas inspectors?" *Reuters.* http://www.reuters.com/article/2011/07/29/us-newyork-shale-drilling-idUSTRE7655FA20110729

[10] State Review of Oil and Natural Gas Environmental Regulations (STRONGER), Inc. January 2011. Ohio Hydraulic Fracturing State Review. p. 6. http://www.dnr.state.oh.us/Portals/11/oil/pdf/stronger_review11.pdf

[11] Ohio Division of Mineral Resources Management. 2010. *Summary of Ohio Oil and Gas Activities.* p. i. http://www.ohiodnr.com/portals/11/publications/pdf/oilgas10.pdf

[12] Ohio Department of Oil and Gas Resources Management (**hereafter DOGRM**). Risk Base Data Management System (RBDMS) Database. Data updated and accessed March 7, 2012. http://www.ohiodnr.com/mineral/production/tabid/15389/Default.aspx. Filtered "tblInspections" by dates: 1/1/2010 to 12/31/2010. Filtered to include only oil and gas well inspections – i.e., codes AD, CT, DD, FR, OR, PB, PL, PW, SC, UD, UL, UP and WR. (This returned 9,373 inspections). Filtered by API_WELLNO to include unique records only. (This returned 5,644 oil and gas inspections with unique API numbers.)

[13] Ohio RBDMS. Downloaded tblInspections into Excel. Filtered by dates: between 1/1/2010 and 12/31/2010 or 1/1/2011 and 12/31/2011. Then filtered to include only oil and gas well inspections – i.e., codes AD, CT, DD, FR, OR, PB, PL, PW, SC, UD, UL, UP and WR.

[14] Email request for data made Sept. 16, 2011. Data received Oct. 4, 2011. Updated information received March 1, 2012. Beth Wilson, Public Information officer, DOGRM.

[15] As of early 2011, Pennsylvania Department of Environmental Protection (**hereafter DEP**) said they had 65 inspectors. So it is assumed that this is the number that were working in Pennsylvania in 2010. "The DEP's enforcement staff has increased nearly four-fold in the past two years, to about 130 people, 65 of whom are inspectors." (Source: Kusnetz, N. Feb. 3, 2011. "Many PA gas wells go unreported for months," *Propublica.* http://www.propublica.org/article/many-pa-gas-wells-go-unreported-for-months)

[16] Data from PA DEP Oil and Gas Reporting web site. Statewide Data Downloads. Data accessed March 16, 2012. https://www.paoilandgasreporting.state.pa.us/publicreports/Modules/Welcome.aspx  Had to download two spreadsheets for Marcellus wells (July 2009-June 2010 and June-Dec 2010). Combined the data into one spreadsheet. To find number of active wells we filtered the data to select Well Status: "ACTIVE" and to avoid duplicates from the two datasets filtered by Well Permit # to find "unique records only." (There were 5,722 active Marcellus wells). For non-Marcellus wells we downloaded the Annual O&G without Marcellus spreadsheet for 2010, then filtered to select only Well Status: "ACTIVE". (There were 85,445 active non-Marcellus wells). Total active wells = 5,722 + 85,445 = 91,167.

[17] Pennsylvania DEP. Compliance Report system. Data accessed March 20, 2012. Search: 01/01/2010 to 12/31/2010. Inspections with violations only: No. Download data into Excel. Then filtered by Permit #, selecting "unique records" to find how many wells were inspected. http://www.depreportingservices.state.pa.us/ReportServer/Pages/ReportViewer.aspx?/Oil_Gas/OG_Compliance

[18] ibid. Search: 01/01/2010 to 12/31/2010. Inspections with violations only: No. Downloaded data into Excel. When data are downloaded into Excel, the spreadsheet has a statistic for Inspections. Data accessed March 20, 2012.

[19] RRC presentation. July 2011. Slide 8. http://www.dallascityhall.com/pdf/GasDrilling/RRC_July2011.pdf

[20] Texas has data for active wells, (see their Well Distribution Tables http://www.rrc.state.tx.us/data/wells/welldistribution/index.php) but the number includes wells not used for oil and gas extraction (e.g., hydrocarbon storage, withdrawal, brine mining, injection disposal and other. So we used the number of producing oil and natural wells to represent active oil and gas wells. (Source: RRC "Natural Gas Production and Well Counts (1935-2011)" and "Oil Production and Well Counts (1935-2011)" found at: http://www.rrc.state.tx.us/data/production/index.php )

[21] Statistics from 2007 – 2011 from: Texas Legislative Budget Board. Agency Budget and Performance Measures for Fiscal Years 2007-2011. Search: "Railroad Commission." http://bapm.lbb.state.tx.us/main.aspx?FiscalYear=2011

[22] COGCC. 2011 *Report to the Water Quality Control Commission and Water Quality Control Division of the Colorado Department of Public Health and the Environment.* 2011, p. 3. http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/WQCC10_11RPT.pdf

[23] COGCC. January 20, 2012. Staff Report. p. 26. http://cogcc.state.co.us/Staff_Reports/2012/2012_01SR.pdf

[24] COGCC. January 20, 2012. Staff Report. p. 27. http://cogcc.state.co.us/Staff_Reports/2012/2012_01SR.pdf

[25] Pers. Comm. Daniel Sanchez, Sonny Swazo (NM OCD) and Jim Winchester and Lisa Sumi, Earthworks. March 5, 2012.

[26] Petroleum Recovery Research Center. GO-TECH web site. "General Production Data Search." Data accessed March 22, 2012. http://octane.nmt.edu/gotech/Petroleum_Data/General.aspx Search 2011. Select: Production. Ignore wells with no data (to omit wells with no associated production data from search results.). Summary provides a well count. Data accessed March 22, 2012.

[27] See endnote 7.

[28] *New Mexico Energy, Minerals and Natural Resources Departmental Annual Report.* (No publication date). Page 43. http://www.emnrd.state.nm.us/main/documents/EMNRD-2011-Annual-Report.pdf

[29] McAllister, E. June 29, 2011. "Insight: NY water at risk from lack of natgas inspectors?" *Reuters.* http://www.reuters.com/article/2011/07/29/us-newyork-shale-drilling-idUSTRE7655FA20110729

[30] New York Department of Environmental Conservation (hereafter DEC) web site. DEC Oil & Gas Searchable Database. "Wells Search." (http://www.dec.ny.gov/cfmx/extapps/GasOil/search/wells/index.cfm) 1) Performed Well Data Search on Nov. 3, 2011. Searched Well Status = active. On that date there were 11,844 active wells. 2) On April 17, 2012 performed Well Data Search. Searched  Spud/Start Drilling Date greater than or equal to 11/04/2011 and Spud/Start Drilling Date less than or equal to 12/31/2011. There were 22 wells spudded (which started to be drilled) between Nov. 4 and Dec. 31, 2011. 3) Performed Well Data Search – Plugging and Abandonment Date greater than or equal to



BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A1-3

*Appendix 1- State-by-state data*

---

11/04/2011 and Plugging & Abandonment Date less than or equal to 12/31/2011. 14 wells were plugged and abandoned between Nov. 4 and Dec. 31, 2011. 4) Therefore, 11,844 + 22 – 14 = approximately 11,852 active wells at the end of 2011.

[31] Based on current listing of oil and gas field inspectors. Does not include supervisors, but does include back-up inspectors. (Accessed March 7, 2012). http://www.ohiodnr.com/mineral/inspectors/tabid/10355/Default.aspx

[32] For 2011 active wells, used Ohio RBDMS. Downloaded "tblWells." Filtered by dates: between 1/1/2011 and 12/31/2011. Counted number of wells plugged and abandoned (DT_PA). Counted number of wells spud (DT_SPUD). Subtracted wells plugged from wells spud. This is the total number of active wells added in 2011. Added this to number of active wells in 2010.

[33] Ohio RBDMS. (See endnote 12) Data updated and accessed March 7, 2012. To find number of oil and gas wells inspected: Filtered by dates: between 1/1/2011 and 12/31/2011. Then filtered to include only oil and gas well inspections – i.e., codes AD, CT, DD, FR, OR, PB, PL, PW, SC, UD, UL, UP and WR. Then filtered by API_WELLNO to include unique records only.

[34] Ohio RBDMS. (See endnote 12) Data updated and accessed March 7, 2012. Downloaded tblInspections.into Excel. Filtered by dates: between 1/1/2010 and 12/31/2010 or 1/1/2011 and 12/31/2011. Then filtered to include only oil and gas well inspections – i.e., codes AD, CT, DD, FR, OR, PB, PL, PW, SC, UD, UL, UP and WR.

[35] "Today, 202 staff members are assigned to the program – 84 of whom are devoted exclusively to well site inspection." (Source: Governor's Marcellus Shale Advisory Commission. July 22, 2011. Report. p. 66. http://files.dep.state.pa.us/PublicParticipation/MarcellusShaleAdvisoryCommission/MarcellusShaleAdvisoryPortalFiles/MSAC_Final_Report.pdf)

[36] "Pennsylvania, whose natural gas production has rocketed in recent years thanks to drilling in its slice of the Marcellus, has 202 workers charged with oil and gas inspections for more than 22,000 wells. Eighty-eight of these staffers specialize in actual well inspection." (Source: McAllister, E. June 29, 2011. "Insight: NY water at risk from lack of natgas inspectors?" Reuters. http://www.reuters.com/article/2011/07/29/us-newyork-shale-drilling-idUSTRE7655FA20110729)

[37] We had to download two spreadsheets for Marcellus wells (Jan-June 2011 and June-Dec 2011). We combined the data into one spreadsheet, filtered the data to select Well Status: "ACTIVE", and then we filtered by Well Permit # to find "unique records only." For non-Marcellus wells we downloaded the Annual O&G, without Marcellus spreadsheet for 2011, then filtered to select only Well Status: "ACTIVE". (Source: DEP Oil and Gas Reporting web site. Statewide Data Downloads. Data accessed March 16, 2012. https://www.paoilandgasreporting.state.pa.us/publicreports/Modules/Welcome/Welcome.aspx)

[38] PA DEP. Compliance Report system. (See endnote 17) Data accessed March 20, 2012. Search: 01/01/2011 to 12/31/2011. Inspections with violations only: No. Download data into Excel. Then filteed by Permit #, selecting "unique records" to find how many wells were inspected.

[39] PA DEP. Compliance Report system. (See endnote 17) Search: 01/01/2011 to 12/31/2011. Inspections with violations only: No. Downloaded data into Excel. When data are downloaded into Excel, the spreadsheet has a statistic for inspections. Data accessed March 20, 2012.

[40] A January 2012 press release from the Railroad Commission said that "As a result of an increased appropriation from the 82nd Legislature, the Commission increased the number of oil and gas inspectors from 88 to 153." (Source: RRC. Jan. 18, 2012. "2011: Year of Railroad Commission Accomplishments." News Release. http://www.rrc.state.tx.us/pressreleases/2012/011812.php)
An email from RRC clarified that RRC "provided for an additional 21+ full time inspector positions in the past year." And that the RRC has "97 Full-time inspectors" but that lead techs, state pluggers, and cleanup coordinators "also spend a relatively large percentage of their time in the field." When the latter positions are added in, there are 153 employees who carry out some inspection duties. (Source: Email from Leslie Savage, Railroad Commission of Texas to Bruce Baizel, Earthworks. April 10, 2012.)

[41] See endnote 20.

[42] Railroad Commission of Texas. Jan. 18, 2012. "2011: Year of Railroad Commission Accomplishments." News Release. http://www.rrc.state.tx.us/pressreleases/2012/011812.php

[43] See Table A1-1.

[44] Because data for number of wells inspected were lacking for states other than Ohio and Pennsylvania (data from Table 1), it was assumed that each inspection was done for a different well. In most states, some wells are visited more than once a year (e.g., if violations are found and follow-up inspections are required), so it is highly possible that fewer active well sites were visited in CO, NM and NY than what is reflected in the table.

[45] See Table A1-1.

[46] See Table A1-1.

[47] COGCC Staff Report. January 23, 2012. http://cogcc.state.co.us/Staff_Reports/2012/2012_01SR.pdf

[48] See endnote 7.

[49] Ohio RBDMS (See endnote 12). Data updated and accessed March 7, 2012. Downloaded "tblInspFail". Filtered by DT_MOD (1/1/2011 to 12/31/2011) and similarly for other years. Filtered TYP_INSP to remove inspections not related to oil and gas production wells (removed administrative inspections (AM), brine hauler (BH), enhanced recovery (ER), solution mining projects (SM), storage wells (SO) and saltwater injection wells (SW)). Column OAC (violations of Ohio Administrative Code) had 1,667 entries for 2011.

[50] Pennsylvania DEP. Compliance Report system. (See endnote 17) Most data accessed Feb. 28, 2012. Data for 2008-2011 accessed March 20, 2012. Search: by year - 01/01/2008 to 12/31/2008, etc. Inspections with violations only: No. Download data into Excel. When data are downloaded into Excel, the spreadsheet has a statistic for number of inspections.

[51] Railroad Commission of Texas presentation. July 2011. Slide 51. http://www.dallascityhall.com/pdf/GasDrilling/RRC_July2011.pdf

[52] From COGCC Annual Reports to Water Quality Control Commission and Water Quality Control Division of the Colorado Department of Public Health and the Environment. All annual reports available at: http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/AnnualReports.htm

[53] This amount was collected "largely through violations of the terms of agreed compliance orders," not civil penalties per se. (Source: New Mexico Legislative Finance Committee. Feb. 17, 2011. Fiscal Impact Report for HB 176 "Oil and Gas Enforcement." http://www.nmlegis.gov/Sessions/11%20Regular/firs/HB0176.pdf)

[54] New York Division of Mineral Resources. 2009 Oil, Gas and Mineral Resources Annual Report. p. 20. http://www.dec.ny.gov/pubs/36033.html (No annual reports published since the 2009 report)

[55] Pennsylvania DEP. Oil and Gas Compliance Report. Accessed March 20, 2012. (See endnote 17) Searched violations for each year (e.g., from 1/1/2011 to 12/31/2011). Where penalty data existed, data were only counted once for each distinct CACP, COA or NOV. This was done by sorting the database to show all penalties, and then filtering the column Enforcement ID number to include "unique records only." This ensured that the penalty for each enforcement action was only counted once.

[56] Email requests for data made Sept. 16, 2011 and Feb. 28, 2012. Data received Oct. 4, 2011 and March 1, 2012 from Beth Wilson, Public Information officer with Ohio Division of Minerals Resources Management.

[57] Sunset Advisory Commission. January 2011. Sunset Advisory Commission Decision. Railroad Commission of Texas. p. 8. http://www.sunset.state.tx.us/82ndreports/rct/rct_dec.pdf



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A1-4

*Appendix 1- State-by-state data*

---

58 Texas Natural Resources Code (TNRC). Title 3. Oil and Gas; Subtitle B. Conservation and Regulation of Oil and Gas; Chapter 85. Conservation of Oil and Gas; Subchapter A. General Provisions; Section 85.381. Penalty for violation of laws, rules and orders. http://www.statutes.legis.state.tx.us/Docs/NR/htm/NR.85.htm

59 Ohio Revised Code; Title (15) XV Conservation of Natural Resources; Chapter 1509: Division of Mineral Resources Management-Oil and Gas; Section 1509.33. http://codes.ohio.gov/orc/1509.33

60 New Mexico Statutes Annotated 1978; Chapter 70 Oil and Gas; Article 2 Oil Conservation Commission; Division; Regulation of Wells; 70-2-31. Violations of the Oil and Gas Act; Penalties http://www.nmonesource.com/nmpublic/gateway.dll/nmsa1978/stat/ch70/27446/27478?f=templates$fn=document-frameset.htm$q=[field%20folio-destination-name:%2770-2-31%27]$x=Advanced#0-0-0-109803

61 New York Consolidated Laws. Environmental Conservation. Article 71. Enforcement. Title 13. Enforcement of Article 23 (Mineral Resources). Section 71-1307. Sanctions. http://public.leginfo.state.ny.us/LAWSSEAF.cgi?QUERYTYPE=LAWS+&QUERYDATA=$$ENV71-1307$$@TXENV071-1307+&LIST=LAW+&BROWSER=BROWSER+&TOKEN=13266643+&TARGET=VIEW

62 COGCC Rules. 523. Procedure for assessing fines. http://cogcc.state.co.us/RR_Docs_new/rules/500Series.pdf

63 Pennsylvania Consolidated Statute. Title 58- Oil and Gas; Chapter 32, Subchapter E. § 3256. Civil penalties. http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/58/00.032..HTM

64 These are actual program expenditures in the fiscal year. Data are from: Colorado Transparency Online Project. Budget to Actual Fiscal Year Reports from Fiscal Year 2005-2005 through 2009-2010. http://tops.state.co.us/tops_Bud2ActFY.htm

65 2008 data from: Swift, R. January 29, 2010. "DEP hiring more gas drilling inspectors," *Times-Tribune*. http://thetimes-tribune.com/news/dep-hiring-more-gas-drilling-inspectors-1.579626#axzz1Y98LK400
2011 data from: March 16, 2011. *Budget presentation by the Department of Conservation and Natural Resources to the House of Representatives Appropriation Committee*. p. 8. http://www.legis.state.pa.us/cfdocs/legis/tr/transcripts/2011_0034T.pdf

66 2008 data from: RRC. *2010 Operating Budget*. Operating Budget. IIA. Summary of Budget by Strategy. p. 1 of 2. http://www.lbb.state.tx.us/External_Links/OB/Railroad_2010.pdf  2011 data from: *RRC. 2012 Operating Budget*. IIA. Summary of Budget by Strategy. p. 1&2 of 3. http://www.rrc.state.tx.us/about/divisions/opBudget.pdf



*Appendix 2 - Colorado*

**Table A2-1. Colorado inspection data.**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| **Inspectors**[1] | 7 | 9 | 9 | 9 | 12 | 15 | 15 |
| **Inspections**[2] | 7,497 | 9,667 | 10,120 | 9,454 | 9,991 | 16,228 | 12,239 |
| **Inspections per inspector** | 1,071 | 1,074 | 1,124 | 1,050 | 833 | 1,082 | 816 |
| **Active wells at end of year**[3] | 28,952 | 31,096 | 33,815 | 37,359 | 40,956 | 43,354 | 46,835 |
| **Active wells per inspector** | 4,136 | 3,455 | 3,757 | 4,151 | 3,413 | 2,980 | 3,122 |
| **Active wells NOT inspected per year**[4] | 21,455 | 21,429 | 23,695 | 27,905 | 30,965 | 27,126 | 34,596 |
| **% of active wells NOT inspected per year** | 74.1 | 68.9 | 70.1 | 74.7 | 75.6 | 62.6 | 73.9 |

**Table A2-2. Colorado enforcement actions and penalty data.**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| **Enforcement Actions**[5] | | | | | | | |
| **Notices of Alleged Violation (NOAV)** | 255 | 247 | 542 | 308 | 260 | 319 | 230 |
| **Administrative Orders of Consent** | 5 | 12 | 9 | 16 | 8 | 10 | 10 |
| **Orders Finding Violation** | 4 | 5 | 0 | 2 | 1 | 3 | 19 |
| **TOTAL Enforcement Actions** | **264** | **264** | **551** | **326** | **269** | **332** | **259** |
| **Number of operators with NOAV**[6] | 95 | 86 | 125 | 109 | 115 | 83 | 79 |
| **Number of operators receiving penalties**[7] | 15 | 12 | 13 | 11 | 6 | 10 | 22 |
| **Penalties collected ($mill)**[8] | $0.48 | $0.26 | $0.089 | $0.48 | $0.17 | $1.2 | $3.0 |

\* In 2010 and 2011, the COGCC pursued a backlog of enforcement matters, most of which involved incidents that had occurred in previous years.[9]

**Table A2-3. Colorado citizen complaints.**[10]

|  | 2004/ 2005 | 2005/ 2006 | 2006/2 007 | 2007/2 008 | 2008/ 2009 | 2009/ 2010 | 2010/ 2011 |
|---|---|---|---|---|---|---|---|
| **Total Complaints** | 144 | 277 | 348 | 296 | 200 | 164 | 249 |
| **Resolved Complaints**\* | 116 | 152 | 260 | 97 | 159 | NR\* | NR\* |
| **% Resolved** | 81 | 55 | 75 | 33 | 80 | | |

\* The COGCC used to publish statistics on how many complaints were received, and how many were resolved. In 2007 COGCC was required by Section 34-60-104 (III) (A) of the Colorado Revised Statutes to submit a quarterly report to the General Assembly concerning the number of complaints received by the Commission.[11] The report included a list of all complaints, type of complaint, information on the complainant's identity, and the commission's response. Unfortunately, in 2010, subsection III was repealed,[12] and as a result the COGCC no longer publishes data on resolved complaints.

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A2-1

*Appendix 2 - Colorado*

**Table A2-4. COGCC expenditures and staffing levels.**

|  | 2004/ 2005 | 2005/ 2006 | 2006/ 2007 | 2007/ 2008 | 2008/ 2009 | 2009/ 2010 | 2010/ 2011 |
|---|---|---|---|---|---|---|---|
| **COGCC Program Expenditures ($ mill)**[13] | $3.40 | $7.60 | $4.50 | $5.40 | $6.00 | $6.40 | $6.54 |
| **COGCC Full-Time Eq. Employees (FTE)**[14] | 38 | 49 | 55 | 56 | 69 | 69 | 69 |
| **COGCC inspectors**[15] | 7 | 9 | 9 | 9 | 12 | 15 | 15 |
| **Active oil and gas wells**[16] | 28,952 | 31,096 | 33,815 | 37,459 | 40,956 | 43,354 | 46,835 |

**Table A2-5. Colorado oil- and gas-related spills.**[17]

|  | 2004/ 2005 | 2005/ 2006 | 2006/ 2007 | 2007/ 2008 | 2008/ 2009 | 2009/ 2010 | 2010/ 2011 |
|---|---|---|---|---|---|---|---|
| **Spills/releases** | 257 | 364 | 313 | 380 | 346 | 438 | 516 |
| **Resolved\*** | 214 | 328 | NR | NR | NR | NR | NR |
| **% resolved** | 83 | 90 | - | - | - | - | - |

\* In the past, the Colorado Oil and Gas Conservation Commission would report the number of spill incidents that had been resolved (as seen in 2005, 2006 data). The agency no longer reports that information.

*Appendix 2 - Colorado*

**Table A2-6. The five spills that led to penalties in 2011.**

| Operator | Date of NOAV | Spill details | Enforcement Action | Penalty Amount |
|---|---|---|---|---|
| **OXY USA WTP LP** | 7/17/08 | The NOAV stated "Unauthorized discharge of E&P waste has occurred in the vicinity of a cabin owned by Mr. Ned Prather. That discharge has impacted waters of the state, specifically an unnamed spring located 2,300 feet to the east of the above-referenced well."[18] No spill volume reported by OXY, but cause of spill reported to be a torn pit liner.[19] | OXY denied a release occurred from the well pad. OXY and COGCC signed an Administrative Order on Consent (AOC), which required OXY to pay a penalty but stated that "nothing in this AOC shall constitute or be construed as an admission by OXY that any discharge occurred from the Well Pad or that it committed any violations of any rules of the COGCC or other applicable law"[20] | $90,000 "to settle NOAV" + $60,000 to fund a public project in Garfield County |
| **Grynberg, Jack J.** | 11/9/09 | The NOAV stated "Staff observed oil on the surface of the pit. Fluid contents had breached the containment of the pit and pooled up on the surface of the pad."[21] Spill not reported by Grynberg.[22] | Grynberg and COGCC signed an AOC, which stated that "Grynberg does not admit to the alleged violations but agrees to pay the total fine. . ." and "nothing in this AOC shall constitute or be construed as an admission by Grynberg that it committed any violations of any rules of the COGCC or other applicable law."[23] | $32,500 "for the Rule violations" |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A2-3

*Appendix 2 - Colorado*

**Table A2-6 (continued). The five spills that led to penalties in 2011.**

| Berry Petroleum | 11/28/07 | The NOAV stated "Berry Petroleum notified the COGCC of the release of an unknown volume of drilling fluids from a reserve pit at the subject location. At that time, the Operator also described a series of two prior releases from the same pit and their resulting countermeasures including two unsuccessful attempts to repair the pit liner. . . releases have impacted Waters of the State in a tributary to Garden Gulch & currently threaten to impact Garden Gulch. Prior to 01-21-208, Berry Petroleum had not notified the NRC, the COGCC, & the CDPHE-WQCD as required."[24] No spill volume reported by Berry.[25] | Berry signed an AOC with COGCC, which stated that "Following its January 21, 2008 report to COGCC, Berry fully cooperated with the COGCC Staff's response actions and requirements. . . .Berry does not admit to the alleged violations but agrees to pay the total fine. . . nothing in this AOC shall constitute or be construed as an admission by Berry that any discharge occurred from the Well Pad or that it committed any violations of any rules of the COGCC or other applicable law."[26] | $100,000 "to settle NOAV" + $73,000 to fund a public project.[27] |
|---|---|---|---|---|
| Marathon Oil | 1/31/08 | The NOAV stated "the operator notified the COGCC of the release of 31,590 bbl of water from a lined reserve pit. The released water was flow-back from a hydrofracture job that was being stored in the reserve pit in anticipation of being reused. The released fluid has infiltrated the subsurface, moved laterally, and discharged from a cliff above Garden Gulch."[28] | Marathon and COGCC signed an AOC, which stated that "COGCC Staff believes that the release of flow-back fluids . . . resulted in a significant adverse impact to the environment and public health, safety, and welfare.  Marathon does not agree. . ." And "Marathon does not admit to the alleged violations but agrees to pay the total fine. . . nothing in this AOC shall constitute or be construed as an admission by Marathon that it committed any violations of any rules of the COGCC or other applicable law."[29] | $143,000 for the Rule violation.[30] |
| S & S Oil & Gas Operating | 5/1/05 | NOAV for Tanner SEC REC Unit #501 well stated "Inspection required oily soil at water tanks to be remediated and berms raised to provide appropriate amount of secondary containment at both oil production tanks and water tanks."[31] | At an August 8, 2011 COGCC Commission hearing COGCC staff requested that S & S be found in violation of Rules 210.b.(1), 309., 319.b.(3), 326.b.(1), 906.a., and 906.e.(1) at the Tanner SEC REC Unit #501 well, and pay a fine of $60,000.[32] S&S failed to show up for that hearing, as well as a second hearing in Sept. 19, 2011.[33] | $60,000 assessed. Penalty not paid as of Sept. 2011. |

## ENDNOTES

[1] From COGCC annual reports to Water Quality Control Commission (WQCC) and Water Quality Control Division (WQCD) of the Colorado Department of Public Health and the Environment. 2010, p. 3; 2009, p. 3; 2008, p. 2; 2007, p. 2; 2006, p. 2; 2005, p. 2.  All annual reports available at: http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/AnnualReports.htm



*Appendix 2 - Colorado*

---

[2] From COGCC Staff Reports. January 20, 2012. p. 26. (for 2009 – 2011 data), Feb. 22, 2010, p. 23 (2007, 2008) and Jan. 13, 2009, p. 19 (for 2005, 2006 data). http://cogcc.state.co.us/Staff_Reports/StaffReports.html (Note: Where there were discrepancies in data, I used the more recent report.)

[3] ibid. January 20, 2012. p. 25. (for 2009 – 2011 data), Feb. 22, 2010, p. 22 (2007, 2008) and Jan. 8, 2007, p. 25 (for 2005, 2006 data).

[4] Calculated by subtracting the number of inspections from the number of wells. We assumed each inspection was conducted at a different well site. In reality, some wells sites would have been visited more than once per year (e.g., follow-up inspections if violations are found, in response to complaints, etc.). So the number of active wells NOT inspected would be even larger than the number reflected in the chart.

[5] NOAV, AOC and OFV data from COGCC Staff Reports. See endnote 2.

[6] COGIS Inspection/Incident Inquiry. NOAV search. Downloaded data. For each year filtered results to determine the number of operators with NOAV. Data accessed August 31, 2012. http://cogcc.state.co.us/COGIS/LiveQuery.html

[7] From COGCC annual reports to WQCC/WQCD (See endnote 1). 2010, p. 9; 2009, p. 9; 2008, p. 7; 2007, p. 7; 2006, p. 7; 2005, p. 8.

[8] ibid.

[9] ibid. 2010, p.9 and 2011, p. 11

[10] COGCC annual reports to WQCC/WQCD (See endnote 1).

[11] COGCC web site: "Quarterly Complaint Reports." http://cogcc.state.co.us/Library/ComplaintReports/QtrComplaintRpt.htm

[12] Colorado Revised Statutes. Title 34. Article 60. Section 34-60-104. Oil and gas conservation commission. http://www.lexisnexis.com/hottopics/colorado?source=COLO;CODE&tocpath=1OUNX9SKRIS2QOAK9,2DT0WOCRR8Q11DJG8,31NIKS5F9BSW WEQIK;1SXGPUSO2YQDTCL8A,2QRCL8Y8IKJCQEO00,38ALLG4AZAICDMJ8S;1SPBJWTOAAWBIC1PY,2SSCH63RMGC7S2QCL,3OLJPO2AGHKGKIK PR;103U42BXZ9STGLI6C,2N762IAL4O5ZDNT2B,3B371MED4M1Q51L19&shortheader=no

[13] These amounts show ACTUAL expenditures in the fiscal year. So for 2005, the expenditures take place from July 2004 thorough June 2005. Data are from: Colorado Transparency Online Project. Budget to Actual Fiscal Year Reports from Fiscal Year 2005-2005 through 2009-2010. http://tops.state.co.us/tops_Bud2ActFY.htm

[14] See footnote 2. 2010, p. 3; 2009, p. 3; 2008, p. 2; 2007, p. 2; 2006, p. 2; 2005, p. 2.

[15] ibid.

[16] See footnote 3.

[17] Spills data for 2005 – 2011 from COGCC Annual Reports to the Water Quality Control Commission of the Colorado Department of Public Health and the Environment. http://cogcc.state.co.us/Library/WQCC_WQCD_AnnualReports/AnnualReports.htm

[18] NOAV report. Oxy USA. August 10, 2008. http://cogcc.state.co.us/cogis/NOAVReport.asp?doc_num=200193504

[19] Spill Report. Oxy USA. Jun 23, 2009. http://cogcc.state.co.us/cogis/SpillReport.asp?doc_num=200220400

[20] COGCC Order No. 1V-365. http://cogcc.state.co.us/orders/orders/1v/365.html

[21] NOAV Report. Grynberg, Jack J. Nov. 11, 2009. http://cogcc.state.co.us/cogis/NOAVReport.asp?doc_num=200221984

[22] COGIS – Inspection/Incident Inquiry. Select Spill/Release. Search Operator: Grynberg. No spill reported in 2009 or 2010. http://cogcc.state.co.us/cogis/IncidentSearch.asp

[23] COGCC Order No. 1V-367. http://cogcc.state.co.us/orders/orders/1v/367.html

[24] NOAV report. Berry Petroleum. March 5, 2008. http://cogcc.state.co.us/cogis/NOAVReport.asp?doc_num=200127625

[25] Spill Report. Berry Petroleum. Jan. 28, 2008. http://cogcc.state.co.us/cogis/SpillReport.asp?doc_num=1981710

[26] COGCC Order No. 1V-372. http://cogcc.state.co.us/orders/orders/1v/372.html

[27] ibid.

[28] NOAV report. Marathon Oil Co. April 11, 2008. http://cogcc.state.co.us/cogis/NOAVReport.asp?doc_num=200130139

[29] COGCC Order No. 1V-373. http://cogcc.state.co.us/orders/orders/1v/373.html

[30] ibid.

[31] NOAV report. S & S Oil and Gas Operating. March 15, 2009. http://cogcc.state.co.us/cogis/NOAVReport.asp?doc_num=200205807

[32] COGCC Order No. 1V-379. http://cogcc.state.co.us/orders/orders/1v/379.html

[33] COGCC Order No. 1V-384. http://cogcc.state.co.us/orders/orders/1v/384.html


EARTHWORKS

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A2-5