*Appendix 3 - New Mexico*

**Table A3-1. Summary of OCD inspections and sanctions.[1]**

|  | Inspections | Letters of violation | Penalties assessed[2] |
|---|---|---|---|
| **2008** |  |  | $479,250 |
| **2009** | 27,160 | 673 | $727,500 |
| **2010** | 20,780 | 418 | $14,000 |
| **2011** | 25,543 | 202 | No data |

**Table A3-2. New Mexico OCD inspection statistics**

|  | Inspectors[3] | Total number of inspections[4] | Average # of inspections per inspector | Producing oil and gas wells[5] | Active (producing) wells per inspector |
|---|---|---|---|---|---|
| **2008** | 13 |  |  | 53,179 | 4,091 |
| **2009** | 9 | 27,160 | 3,018 | 52,545 | 5,838 |
| **2010** | 12 | 20,780 | 1,732 | 53,063 | 4,422 |
| **2011** | 12 | 25,543 | 2,129 | 53,209 | 4,434 |

**Table A3-3.  Active producing wells in New Mexico (OCD vs PTTC data).**

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **OCD** | 50,662 active producing wells [6] | 51,574 active producing wells [7] | 51,968 active producing wells[8] | 55,695 wells[9] | 56,337 wells[10] |
| **PTTC[11]** | 53,184 | 53,179 | 52,545 | 53,063 | 53,209 |

**Table A3-4. Data on OCD letters of violation and other letters of non-compliance.**

|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| **Letters of Violation** | | | |
| **OCD statistics (provided 02/27/12)[12]** | 673 | 418 | 202 |
| **LOV data from OCD Compliance Summaries (provided 03/05/12)[13]** |  | 414 | 203 |
| **Compliance achieved as of 02/16/12** |  | 220 | 101 |
| **All non-compliance letters sent** | | | |
| **Data from OCD Compliance Summaries (provided 03/05/12)** |  | 797 | 453 |
| **Compliance achieved as of 02/16/12** |  | 311 | 170 |

BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A3-1

*Appendix 3 - New Mexico*

### Table A3-5. Inconsistent OCD enforcement actions for the same types of violation - 2011.

| Well Sign | API | Operator | Description/Comments | Rule | LOV | FVI | LET |
|---|---|---|---|---|---|---|---|
| MARSHALL COM 006 | 3002507017 | STEPHENS & JOHNSON OP CO | No well sign | None | 1 | | |
| BLACK MAMBA 15 STATE 001 | 3002539808 | DEVON ENERGY PROD CO, LP | No well sign | 19.15.16.8 | 1 | | |
| NEW MEXICO D 001 | 002520783 | CONOCOPHILLIPS COMPANY | No well sign | 19.15.16.8 | 1 | | |
| BRITT-LAUGHLIN COM 004 | 3002506005 | ENERVEST OPERATING L.L.C. | No well sign | 19.15.16.8 | 1 | | |
| BRITT-LAUGHLIN COM 005 | 3002505907 | ENERVEST OPERATING L.L.C. | No well sign | 19.15.16.8 | 1 | | |
| LEE STEBBINS NCT B 003 | 3002510061 | OXY USA INC | No well sign | 19.15.16.8 | 1 | | |
| CHRISTMAS COWDEN 001 | 3002510053 | BEC CORP | No well sign | 19.15.16.8 | 1 | | |
| E N GRIZZELL 002 | 3002525293 | APACHE CORP | No well sign | 19.15.16.8 | 1 | | |
| JALMAT YATES UNIT 010 | 3002527073 | LEGACY RESERVES OP, LP | No well sign | 19.15.16.8 | 1 | | |
| JALMAT YATES UNIT 015 | 3002526405 | LEGACY RESERVES OP, LP | No well sign | 19.15.16.8 | 1 | | |
| WEST DOLLARHIDE QUEEN SAND 075 | 3002529984 | CHAPARRAL ENERGY LLC | No well sign. | 19.15.16.8 | 1 | | |
| WEST DOLLARHIDE QUEEN SAND 082 | 3002530006 | CHAPARRAL ENERGY LLC | No well sign. | 19.15.16.8 | 1 | | |
| STATE AO 001 | 3002504441 | BURGUNDY OIL & GAS INC | No well sign. | 19.15.16.8 | 1 | | |
| BP MCDONALD WN STATE 021 | 3002509015 | APACHE CORP | No well sign. | 19.15.16.8 | 1 | | |
| WALTER LYNCH 013 | 3002540079 | APACHE CORP | No well sign. | 19.15.16.8 | 1 | | |
| WALTER LYNCH 011 | 3002537555 | APACHE CORP | No well sign. | 19.15.16.8 | 1 | | |
| WALTER LYNCH 012 | 3002537556 | APACHE CORP | No well sign. | 19.15.16.8 | 1 | | |
| BELL LAKE UNIT 016 | 3002524910 | KAISER-FRANCIS OIL CO | No well sign. | 103 | | 1 | |
| STATE 1 002 | 3002537774 | CIMAREX ENERGY CO. OF CO | No well sign. | 103 | | 1 | |
| KRIS BMU STATE COM 002 | 3002536564 | YATES PETROLEUM CORP | Need sign. | 19.15.16.8 | | | 1 |
| U 0 SAWYER 001 | 3002503629 | EOR OPERATING COMPANY | Need to install well sign. | 19.15.16.8 | | | 1 |
| J P COLLIER 001 | 3002500996 | PRIDE ENERGY COMPANY | Need to install well sign. | 19.15.16.8 | | | 1 |
| HOUSTON A 001 | 3002507202 | CHAPARRAL RESOURCES LLC | Need well sign. | 19.15.16.8 | | | 1 |
| MOZART 001 | 3002526294 | EVERQUEST ENERGY CORP | Need well sign. | 19.15.16.8 | | | 1 |
| CHAVEROO SAN ANDRES UNIT 028 | 3000520899 | RIDGEWAY ARIZONA OIL CORP. | No well sign. | 19.15.16.8 | | | 1 |
| SOUTH DENTON 6 STATE 002 | 3002539734 | BC OPERATING, INC. | No well sign. | 19.15.16.8 | | | 1 |
| AMERADA HARDIN 001 | 3002507312 | AVRA OIL CO | No sign. Also diked area has been full of liquids | 19.15.16.8 | | | 1 |
| MILNESAND UNIT036 | 3004100087 | EOR OPERATING COMPANY | No well sign. | 19.15.16.8 | | | 1 |
| GRIFFIN 001 | 3002523781 | FASKEN OIL & RANCH LTD | No well sign. | 19.15.16.8 | | | 1 |
| MILNESAND UNIT 124 | 3004100031 | EOR OPERATING COMPANY | Unable to find sign. | 19.15.16.8 | | | 1 |
| COASTAL A STATE 002 | 3002523813 | DWIGHT A TIPTON | Still need well sign installed. | 19.15.16.8 | | | 1 |
| CLIPPER A STATE 001 | 3002525713 | EVERQUEST ENERGY CORP | 2nd letter. Still needs sign. | 19.15.16.8 | | | 1 |
| COASTAL A STATE 001 | 3002523799 | DWIGHT A TIPTON | 3rd letter. Still no sign. | 19.15.16.8 | | | 1 |
| | | | | | 17 | 2 | 14 |

BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A3-2

*Appendix 3 - New Mexico*

| Failed pressure tests | API | Operator | Description/Comments | Rule | LOV | FVI | LET |
|---|---|---|---|---|---|---|---|
| JALMAT YATES UNIT 028 | 3002526872 | LEGACY RESERVES OPERATING | Pressure test failure. Possible tubing or packing leak. | None | 1 | | |
| NORTH HOBBS G/SA UNIT 331 | 3002507538 | OCCIDENTAL PERMIAN LTD | MIT failure. | None | 1 | | |
| LANGLIE MATTIX PENROSE SAND 221 | 3002510476 | LEGACY RESERVES OPERATING | Failed pressure test. 5-year test. | None | 1 | | |
| LANGLIE MATTIX PENROSE SAND 192 | 3002510473 | LEGACY RESERVES OPERATING | Failed 5-yr pressure test. | None | 1 | | |
| NORTH HOBBS G/SA UNIT 131 | 3002505484 | OCCIDENTAL PERMIAN LTD | Failed pressure test. 5-year test. | None | 1 | | |
| LANGLIE MATTIX QUEEN UNIT 022 | 3002523186 | LINN OPERATING, INC | Failed MIT. Post-workover test. | None | 1 | | |
| NORTH HOBBS GISA UNIT 241 | 3002507364 | OCCIDENTAL PERMIAN LTD | Failed MIT test. Fluid to surface out intermediate. | None | 1 | | |
| BELL LAKE UNIT 002 | 3002508489 | KAISER-FRANCIS OIL CO | Failed annual IMIT. Possible tubing/packing failure. | None | 1 | | |
| STATE L 736 001 | 3002523937 | EVERQUEST ENERGY CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| NORTH MONUMENT G/SA UNIT 002B | 3002512466 | APACHE CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| NORTH MONUMENT G/SA UNIT 003 | 3002504155 | APACHE CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| NORTH MONUMENT G/SA UNIT 004 | 3002505910 | APACHE CORP | Failed BHT. Continuous flow of fluid on surface. | 19.15.26.11 | | 1 | |
| NORTH MONUMENT G/SA UNIT 013 | 3002505623 | APACHE CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| EAST BLINEBRY DRINKARD UNIT 003 | 3002506325 | APACHE CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| NORTHEAST DRINKARD UNIT 103 | 3002509897 | APACHE CORP | Failed BHT. Communication between tubing and casing | 19.15.26.11 | | 1 | |
| NORTHEAST DRINKARD UNIT 805 | 3002506736 | APACHE CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| WEST BLINEBRY DRINKARD 023 | 3002521225 | APACHE CORP | Failed BHT. Fluid on surface casing. | 19.15.26.11 | | 1 | |
| S. EUNICE SEVEN RIVERS QUEEN 427 | 3002509025 | APACHE CORP | Failed annulus pressure test (annual IMIT) | 19.15.26.11 | | 1 | |
| EAST BLINEBRY DRINKARD UNIT 031 | 3002506541 | APACHE CORP | Attempted PT. Well failed due to vacuum on casing | 19.15.26.11 | | 1 | |
| MCA UNIT 273 | 3002523730 | CONOCOPHILLIPS COMPANY | Annual IMIT (pressure test) failed. | None | | | 1 |
| MCA UNIT 123 | 3002500705 | CONOCOPHILLIPS COMPANY | Annual IMIT (pressure test) failed. | None | | | 1 |
| MCA UNIT 084 | 3002500639 | CONOCOPHILLIPS COMPANY | Annual IMIT (pressure test) failed. | None | | | 1 |
| CENTRAL VACUUM UNIT 073 | 3002525728 | CHEVRON U S A INC | Failed 2nd attempt to run IMIT. | None | | | 1 |
| WATTAM FEDERAL 006 | 3000520814 | DORAL ENERGY CORP. | Failed MIT/pressure test. | 19.15.26.11 | | | 1 |
| TOM 36 STATE 001 | 3000520686 | DORAL ENERGY CORP. | Failed BHT. Show of wtr. | 19.15.26.11 | | | 1 |
| MILLER FEDERAL 006 | 3000520530 | DORAL ENERGY CORP. | BHT failed. Pressure on prod csg. Show of oil. | 19.15.26.11 | | | 1 |
| | | | | | 8 | 11 | 7 |

Original data from OCD Compliance Summaries. Additional data from Letter of Violation documents in OCD well files (i.e., scanned copies of letters sent to operators).[14]

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A3-3

EARTHWORKS

*Appendix 3 - New Mexico*

**Copy of orientation letter sent to new operators in New Mexico.**

### As the operator of record of wells in New Mexico,

1. I am responsible for ensuring that the wells and related facilities comply with applicable statutes and rules, and am responsible for all regulatory filings with the OCD. I am responsible for knowing all applicable statutes and rules, not just the rules referenced in this list. I understand that the OCD's rules are available on the OCD website under "Rules," and that the Water Quality Control Commission rules are available on the OCD website on the "Publications" page.

2. I understand that if I acquire wells from another operator, the OCD must approve the operator change before I begin operating those wells. See 19.15.9.9.B NMAC. I understand that if I acquire wells or facilities subject to a compliance order addressing inactive wells or environmental cleanup, before the OCD will approve the operator change it may require me to enter into an enforceable agreement to return those wells to compliance. See 19.15.9.9.C[2] NMAC.

3. I must file a monthly C-115 report showing production for each non-plugged well completion for which the OCD has approved an allowable and authorization to transport, and injection for each injection well. See 19.15.7.24 NMAC. I understand that the OCD may cancel my authority to transport from or inject into all the wells I operate if I fail to file C-115 reports. See 19.15.7.24.C NMAC.

4. I understand that New Mexico requires wells that have been inactive for certain time periods to be plugged or placed on approved temporary abandonment. See 19.15.25.8 NMAC. I understand the requirements for plugging and approved temporary abandonment in 19.15.25 NMAC. I understand that I can check my compliance with the basic requirements of 19.15.25.8 NMAC by using the "Inactive Well List" on OCD's website.

5. I must keep current with financial assurances for well plugging. I understand that New Mexico requires each state or fee well that has been inactive for more than two years and has not been plugged and released to be covered by a single-well financial assurance, even if the well is also covered by a blanket financial assurance and even if the well is on approved temporary abandonment status. See 19.15.8.9.C NMAC. I understand that I can check my compliance with the single-well financial assurance requirement by using the "Inactive Well Additional Financial Assurance Report" on the OCD's website.

6. I am responsible for reporting releases as defined by 19.15.29 NMAC. I understand the OCD will look to me as the operator of record to take corrective action for releases at my wells and related facilities, including releases that occurred before I became operator of record.

7. I have read 19.15.5.9 NMAC, commonly known as "Part 5.9," and understand that to be in compliance with its requirements I must have the appropriate financial assurances in place, comply with orders requiring corrective action, pay penalties assessed by the courts or agreed to by me in a settlement agreement, and not have too many wells out of compliance with the inactive well rule (19.15.25.8 NMAC). *If I am in violation of Part 5.9, I may not be allowed to drill, acquire or produce any additional wells, and will not be able to obtain any new injection permits. See 19.15.16.19 NMAC, 19.15.26.8 NMAC, 19.15.9.9 NMAC and 19.15.14.10 NMAC. If I am in violation of Part 5.9 the OCD may, after notice and hearing, revoke my existing injection permits. See 19.15.26.8 NMAC.*

8. For injection wells, I understand that I must report injection on my monthly C-115 report and must operate my wells in compliance with 19.15.26 NMAC and the terms of my injection permit. I understand that I must conduct mechanical integrity tests on my injection wells at least once every five years. See 19.15.26.11 NMAC. I understand that when there is a continuous one-year period of non-injection into all wells in an injection or storage project or into a saltwater disposal well or special purpose injection well, authority for that injection automatically terminates. See 19.15.26.12 NMAC. I understand that if I transfer operation of an injection well to another operator, the OCD must approve the transfer of authority to inject, and the OCD may require me to demonstrate the well's mechanical integrity prior to approving that transfer. See 19.15.26.15 NMAC.

9. I am responsible for providing the OCD with my current address of record and emergency contact information, and I am responsible for updating that information when it changes. See 19.15.9.8.C NMAC. I understand that I can update that information on the OCD's website under "Electronic Permitting."

10. If I transfer well operations to another operator, the OCD must approve the change before the new operator can begin operations. See 19.15.9.9.B NMAC. I remain responsible for the wells and related facilities and all related regulatory filings until the OCD approves the operator change. I understand that the transfer will not relieve me of responsibility or liability for any act or omission which occurred while I operated the wells and related facilities.

| | |
|---|---|
| Operator Company Name | Signature of Individual Signing for Operator |
| Date | Printed Name and Title of Individual Signing for Operator |

*Last revised 10-7-09*


BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

EARTHWORKS

A3-4

*Appendix 3 - New Mexico*

---

## ENDNOTES

[1] Inspections and Letters of Violation from Oil Conservation Division Information Request. Received February 27, 2012 from Jim Winchester, New Mexico Environment Department & Energy, Minerals & Natural Resources Department Communications officer.

[2] Data for 2008 - 2010 from: New Mexico Legislative Finance Committee. Feb. 17, 2011. Fiscal Impact Report for HB 176 "Oil and Gas Enforcement." http://www.nmlegis.gov/Sessions/11%20Regular/firs/HB0176.pdf

[3] Pers. Comm. Daniel Sanchez, New Mexico Oil Conservation Division Enforcement and Compliance Manager, Sonny Swazo, OCD attorney, Jim Winchester, New Mexico Environment Department & Energy, Minerals & Natural Resources Department Communications officer, and Lisa Sumi, Earthworks. March 5, 2012.

[4] Email from Jim Winchester, New Mexico Environment Department & Energy, Minerals & Natural Resources Department Communications officer. Received February 27, 2012.

[5] Petroleum Recovery Research Center. GO-TECH web site. "General Production Data Search." Data accessed March 22, 2012. http://octane.nmt.edu/gotech/Petroleum_Data/General.aspx

Search years: 2008, 2009, 2010, 2011.  Select: Production. Ignore wells with no data (to omit wells with no associated production data from search results.). Summary provides a well count. NOTE: this number does not include injection wells.

[6] "As of November 2007, there were 23,181 active oil producing wells, 27,481 active gas producing wells." Source: *2007 New Mexico Energy, Minerals and Natural Resources Annual Report.* p. 56. http://www.emnrd.state.nm.us/main/documents/EMNRDAnnualReport07_WEB.pdf

[7] "As of December 2008, there were 23,321 active oil producing wells, 28,253 active gas producing wells." Source: *2008 New Mexico Energy, Minerals and Natural Resources Annual Report.* p. 55. http://www.emnrd.state.nm.us/main/documents/EMNRD-Annual-Report-2008.pdf

[8] "As of December, 2009, there were 23,464 active oil producing wells and 28,504 active gas producing wells." Source: *2009 New Mexico Energy, Minerals and Natural Resources Annual Report.* p. 55. http://www.emnrd.state.nm.us/main/documents/EMNRD2009AnnualReportWeb.pdf

[9] "As of November 2010, there were 25,761 oil wells, 29,934 gas wells." Source: *2010 New Mexico Energy, Minerals and Natural Resources Annual Report.* p. 103. http://www.emnrd.state.nm.us/main/documents/EMNRD-2010-Annual-Report.pdf

[10] "As of November 2011, there were 26,624 oil wells, 29,713 gas wells." Source: *2011 New Mexico Energy, Minerals and Natural Resources Annual Report.* p. 40. http://www.emnrd.state.nm.us/main/documents/EMNRD-2011-Annual-Report-Updated-4-12.pdf

[11] Petroleum Recovery Research Center. GO-TECH web site. "General Production Data Search." Data accessed March 22, 2012. http://octane.nmt.edu/gotech/Petroleum_Data/General.aspx

Search years: 2007, 2008, 2009, 2010, 2011.  Select: Production. Ignore wells with no data (to omit wells with no associated production data from search results.). Summary provides a well count. NOTE: this number does not include injection wells.

[12] OCD maintains an internal database that tracks notifications sent to operators regarding violations, enforcement actions taken, and compliance data, but this database is not accessible by the public. Nor does the agency publish statistics on violations found during inspections. Upon request, the OCD did provide Earthworks with statistics on the number of Letters of Violation (LOV) sent to operators in 2009, 2010, and 2011 (Information request to Jim Winchester, NMED and EMNRD from Lisa Sumi, Earthworks. Feb. 24, 2012.)

[13] ibid. Compliance Summaries for 2010 and 2011 received from OCD. (Email from Jim Winchester, NMED and EMNRD Communications officer, to Lisa Sumi, Earthworks. March 5, 2012. )

[14] Looked at Letter of Violation documents in OCD well files (i.e., scanned copies of letters sent to operators). Searched by API. https://wwwapps.emnrd.state.nm.us/ocd/ocdpermitting/Data/Wells.aspx

BREAKING ALL THE RULES:  THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A3-5

EARTHWORKS

*Appendix 4 - New York*

**Table A4-1. New York inspection statistics.**[1]

| | Inspectors | Inspections | Inspections per Inspector | Active wells | Active wells per inspector | % of active wells inspected* |
|---|---|---|---|---|---|---|
| **2012** | 17[2] | | | 10,761[3] | 633 | |
| **2011** | 14[4] | | | 10,317[5] | 737 | |
| **2010** | 16[6] | 2,460[4] | 154 | 10,315[5] | 645 | 23.8 |
| **2009** | 16[7] | 2,243 | 132 | 10,029 | 627 | 22.4 |
| **2008** | 19[7] | 2,445 | | 10,292 | 542 | 23.8 |
| **2007** | 19[2] | 2,481 | | 10,242 | 539 | 24.2 |
| **2006** | 19[7] | 2,555 | | 9,403 | 495 | 27.1 |
| **2005** | 19[7] | 2,577 | | 8,724 | 459 | 29.5 |
| **2004** | 19[7] | 2,491 | | 9,229 | 486 | 27.0 |
| **2003** | 20[2] | 2,486 | | 9,023 | 451 | 27.5 |
| **2002** | | 3,394 | | 8,879 | | 38.2 |
| **2001** | | 3,443 | | 9,322 | | 36.9 |

* assumes each inspection occurred at a different well

**Table A5-1. New York penalty statistics.**[8]

| | Administrative fines and penalties for oil and gas violations | Environmental Benefit Projects | Cases brought by Attorney General | Number of enforcement actions |
|---|---|---|---|---|
| **2011** | No data found | | | |
| **2010** | No data found | | | |
| **2009** | $40,000 | | | |
| **2008** | $10,500 | | | |
| **2007** | $19,000 | $75,000 | $6,719 | 10 administrative cases |
| **2006** | $14,000 | $50,000 | $175,756 | 12 administrative cases |
| **2005** | $18,250 | $137,500 | | |
| **2004** | $109,172 | | | |
| **2003** | $141,551 | | | |
| **2002** | $21,00 | | | |
| **2001** | $4,500 | | | |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A4-1

*Appendix 4 - New York*

## ENDNOTES

[1] Unless otherwise noted, inspection and active well data from: New York Department of Environmental Conservation. *Oil, Gas and Mineral Resources Annual Reports* (2001 through 2009). Reports available at: http://www.dec.ny.gov/pubs/36033.html **(Note:** active well data obtained by adding the number of active oil wells and active gas wells for a particular year. All active well data from the *2009 Oil, Gas and Mineral Resources Annual Report*, Part Three – Appendices. p. A-1. http://www.dec.ny.gov/docs/materials_minerals_pdf/09anrpt3.pdf)

[2] Nearing, B. July 17, 2012. "State well inspections 'inadequate'," *Times Union.* http://www.timesunion.com/local/article/State-well-inspections-inadequate-3714717.php

[3] New York Department of Environmental Conservation web site: "Wells Data Search." http://www.dec.ny.gov/cfmx/extapps/GasOil/search/wells/index.cfm Well Status = active, Well type(s) = dry hole, dry wildcat, gas development, gas wildcat, gas extension, oil development, oil wildcat, oil extension. Data accessed July 25, 2012.

[4] McAllister, E. June 29, 2011. "Insight: NY water at risk from lack of natgas inspectors?" *Reuters.* http://www.reuters.com/article/2011/07/29/us-newyork-shale-drilling-idUSTRE76S5FA20110729

[5] New York Department of Environmental Conservation web site: "Annual Well Production Search." http://www.dec.ny.gov/cfmx/extapps/GasOil/search/production/index.cfm Build Search: Producing Year 2010, Well Status = active, Well type(s) = dry hole, dry wildcat, gas development, gas wildcat, gas extension, oil development, oil wildcat, oil extension.Did the same for producing year 2011 and 2012. Data accessed July 25, 2012.

[6] Sickle, A. April 28, 2010. "New York DEC staff shorthanded to reply to 14,000 Marcellus Shale comments – environmental inspectors down to 16," *National Security News Service.* http://www.dcbureau.org/20100429137/natural-resources-news-service/new-york-dec-staff-shorthanded-to-reply-to-13500-marcellus-shale-comments-environmental-inspectors-down-to-16.html

[7] Lustgarten, A. Dec. 30, 2009. "State oil and gas regulators are spread too thin to do their jobs," *Propublica.* http://www.propublica.org/article/state-oil-and-gas-regulators-are-spread-too-thin-to-do-their-jobs-1230

[8] Data from New York Department of Environmental Conservation. *Oil, Gas and Mineral Resources Annual Reports* (for 2009, 2008, 2007, 2006, 2005. 2004, 2003, 2002 and 2001). http://www.dec.ny.gov/pubs/36033.html

Appendix 5 - Ohio

**Table A5-1. Ohio Pollution-related violations.[1]**

| Violation description | Section of OAC / ORC violated | Well type | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| Well operation causing pollution and contamination | 9-1-07 / 22(A) | AD, PW, SC, UD, UP | 148 | 139 | 128 | 108 | 136 |
| Drilling operation causing pollution and contamination | 9-1-07 / 22(A) | DD | 9 | 7 | 2 | 1 | 1 |
| Defective casing, leaking well | NONE / 12A | OR | 1 | 1 | 0 | 0 | 0 |
| Defective casing, leaking well | NONE18 / 12A | PW | 0 | 0 | 0 | 10 | 56 |
| Defective casing, leaking well | NONE3 / 12A | PB | | | | | 1 |
| Uncontrolled flow of oil and gas from a well | 9-9-04(D) / 23 | PB | 0 | 0 | 0 | 0 | 2 |
| Unlawful venting or flaring of gas | 9-9-05(B) / 23 | UP, PW, AD, OR | 17 | 11 | 11 | 9 | 28 |
| Pollution and contamination | NONE) / 22(A) | PB | 1 | 0 | 1 | 1 | 1 |
| Pollution and contamination | NONE. / 22(A) | CT | 0 | 1 | 0 | 0 | 1 |
| | Total Pollution-Related Violations | | 176 | 159 | 142 | 129 | 226 |

**Table A5-2. Data from Ohio Division of Oil and Gas Resources Management.[2]**

| | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Oil and gas inspections | 14,528 | 12,546 | 10,472 | 9,194 |
| Oil and gas violations | 722 | 634 | 615 | 692 |
| Enforcement actions taken | 55 | 21 | 23 | 29 |
| Citizen complaints | 140 | 176 | 146 | 411 |

**Table A5-3. Ohio Inspection Data from RBDMS.**

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| Inspectors | - | - | - | - | - | 21[3] | 27[4] |
| Oil and gas well inspections[5] | 13,450 | 13,706 | 13,581 | 13,509 | 11,682 | 9,374 | 10,422 |
| Oil and gas well inspections performed per inspector | - | - | - | - | - | 446 | 386 |
| Active wells[6] | 62,675 | 62,966 | 63,654 | 64,207 | 64,427 | 64,378 | 64,481 |
| Active wells per inspector | - | - | - | - | - | 3,066 | 2,388 |
| Wells inspected[7] | 9,317 | 9,395 | 8699 | 8,418 | 7,507 | 5,644 | 6,590 |
| Active wells not inspected[8] | 53,358 | 53,571 | 54,955 | 55,789 | 56,920 | 58,734 | 57,871 |
| % of active wells not inspected | 85 | 85 | 86 | 87 | 88 | 91 | 90 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A5-1

*Appendix 5 - Ohio*

**Table A5-4. Ohio Violations and Penalty Data.**

| | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| **RBDMS Number of violations related to oil and gas wells**[9] | 1,275 | 1,252 | 1,094 | 1,667 |
| **RBDMS Number of oil and gas wells with violations)**[10] | 599 | 585 | 535 | 708 |
| **Enforcement actions taken**[11] | 55 | 21 | 23 | 29 |
| **Enforcement actions (EA) per RBDMS violations**[12] | 0.043 (1 EA per 23 violations) | 0.017 (1 EA per 60 violations) | 0.021 (1 EA per 48 violations) | 0.017 (1 EA per 57 violations) |
| **Penalties assessed**[13] | $16,500 | $17,500 | $194,000 | $73,935 (Fiscal Year) |

**Table A5-5. All Inspections vs. Inspections Related to Oil and Gas Wells (2011).**[14]

| RBDMS Inspection Code | RBDMS Inspection Code Description | All RBDMS Inspections | RBDMS Inspections related to oil and gas well sites |
|---|---|---|---|
| AD | Annular Disposal | 292 | 292 |
| AM | Administrative Inspection | 220 | Not included |
| CT | Completion Testing | 143 | 143 |
| DD | Drill / Deepen / Reopen | 1,230 | 1,230 |
| ER | Enhanced Recovery Project | 435 | Not included |
| FR | Final Restoration | 1,042 | 1,042 |
| ND | Not Drilled | 43 | Not included |
| NF | Field Inspected, Well Not Found | 240 | Not included |
| NW | Non Well | 8 | Not included |
| OR | Orphan | 158 | 158 |
| PB | Plug / Plug Back | 863 | 863 |
| PL | Preliminary Restoration | 919 | 919 |
| PW | Production Wells | 5,122 | 5,122 |
| SC | Surface Facility Construction | 28 | 28 |
| SM | Solution Mining Project | 16 | Not included |
| SO | Storage Well | 324 | Not included |
| SW | Salt Water Injection Well | 924 | Not included |
| UD | Urban Drill / Deepen / Reopen | 281 | 281 |
| UL | Urban Preliminary Restoration | 167 | 167 |
| UP | Urban Production Wells | 160 | 160 |
| WR | Work Over Reconditioning | 17 | 17 |
| | **TOTAL** | **12,632** | **10,422** |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

EARTHWORKS

A5-2

*Appendix 5 - Ohio*

**Table A5-6. Violations found during inspections of oil and gas wells in Ohio (2011).**[15]

| RBDMS Inspection Code | RBDMS Inspection Code Description | All DOGRM inspections finding violations | "Oil and gas well" inspections finding violations | Violations from oil and gas well inspections |
|---|---|---|---|---|
| AD | Annular Disposal | 16 | 16 | 53 |
| AM | Administrative Inspection | 12 | Not included | Not included |
| CT | Completion Testing | 0 | 0 | 4 |
| DD | Drill / Deepen / Reopen | 6 | 6 | 3 |
| ER | Enhanced Recovery Project | 21 | Not included | Not included |
| FR | Final Restoration | 37 | 37 | 51 |
| ND | Not Drilled | 0 | Not included | Not included |
| NF | Field Inspected, Well Not Found | 0 | Not included | Not included |
| NW | Non Well | 0 | Not included | Not included |
| OR | Orphan | 3 | 3 | 4 |
| PB | Plug / Plug Back | 6 | 6 | 11 |
| PL | Preliminary Restoration | 33 | 33 | 34 |
| PW | Production Wells | 676 | 676 | 1,438 |
| SC | Surface Facility Construction | 4 | 4 | 3 |
| SM | Solution Mining Project | 0 | Not included | Not included |
| SO | Storage Well | 0 | Not included | Not included |
| SW | Salt Water Injection Well | 33 | Not included | Not included |
| UD | Urban Drill / Deepen / Reopen | 4 | 4 | 3 |
| UL | Urban Preliminary Restoration | 0 | 0 | 0 |
| UP | Urban Production Wells | 34 | 34 | 62 |
| WR | Work Over Reconditioning | 0 | 0 | 1 |
| | TOTAL | 885 | 819 | 1,667 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A5-3

*Appendix 5 - Ohio*

---

## ENDNOTES

[1] Ohio Division of Oil and Gas Resources Management (DOGRM). Risk Based Data Management System (RBDMS). http://www.ohiodnr.com/mineral/production/tabid/15389/Default.aspx  Data from the Failed Inspection table (tblInspFail in RBDMS). This table lists API number of the well with violations, type of inspection, and section of the OAC (Ohio Administrative Code) that was violated. Users can search by violation date. We filtered results by 01/01/2007 to 12/31/2007 and similarly for all other years in our table. Using the information in the Failed Inspection Description table or RBDMS (tblInspFIDesc) we were able to get descriptions of the particular rule violations, as well as the section of the Ohio Revised Code (from Chapter 1509: Division of Oil and Gas Resources Management) that was violated. Some of the descriptions changed based on well type (e.g., if the OAC column showed NONE5, the description was "defective casing, leaking well" if the well type was AD, and "well stimulation; failure to protect USDW, failure to complete well integrity testing" if the well types was PB. Thus, for each description in the table, we show the well type as well as the OAC code.

[2] Email request for data made Sept. 16, 2011. Data received Oct. 4, 2011. Updated information received March 1, 2012. Beth Wilson, Public Information officer with Ohio DOGRM.

[3] State Review of Oil and Natural Gas Environmental Regulations (STRONGER), Inc. January 2011. *Ohio Hydraulic Fracturing State Review.* p. 6. http://www.dnr.state.oh.us/Portals/11/oil/pdf/stronger_review11.pdf

[4] Based on current listing of oil and gas field inspectors. Does not include supervisors, but does include back-up inspectors. (Accessed March 7, 2012). http://www.ohiodnr.com/mineral/inspectors/tabid/10355/Default.aspx

[5] RBDMS Database. (See endnote 1) Data updated and accessed March 7, 2012. To find oil and gas inspections for different years: Filtered tblInspection by dates: between 1/1/2011 and 12/31/2011 (similarly for other years). Then filtered to include only oil and gas well inspections – i.e., codes AD (annular disposal), CT (completion testing), DD (drill/deepe/reopen), FR (final restoration), OR (orphan), PB (plug/plug back), PL (preliminary restoration), PW (production well), SC (surface facility construction), UD (urban drill/deepen/reopen), UL (urban prelim. restoration), UP (urban production well) and WR (work over reconditioning). We included AD (annular disposal) because it is a type of waste disposal using an oil or gas well. It involves injection of drilling waste slurry through the space between two casing strings (known as the annulus). At the lower end of the outermost casing string, the slurry enters the formation. (Source: Veil, J. et al. 2003. "An Introduction to Slurry Injection Technology for Disposal of Drilling Wastes. p. 6. http://www.ead.anl.gov/pub/dsp_detail.cfm?PubID=1628) We included SC (surface facility construction) because construction of well pads can lead to erosion, which can pollute surface waters, or other problems. We excluded data on AM (administrative inspections), BH (brine hauler), ER (enhanced recovery), SM (solution mining projects), SO (storage wells) and SW (saltwater injection wells) because administrative inspections may occur at any type of well, and the other types of inspections relate to wells that are part of the oil and gas development process but are not used to produce oil or gas.

[6] Ohio Division of Mineral Resources Management. *Summary of Ohio Oil and Gas Activities.* 2005 to 2011 reports found at: http://www.ohiodnr.com/publications/tabid/10370/Default.aspx

[7] RBDMS Database. See endnote 1. To find number of oil and gas wells inspected: Filtered by dates: between 1/1/2011 and 12/31/2011 (similarly for other years). Then filtered to include only oil and gas well inspections – i.e., codes AD, CT, DD, FR, OR, PB, PL, PW, SC, UD, UL, UP and WR. Then filtered by API_WELLNO to include unique records only. (See endnote 5 for more information on rationale for our filtering choices)

[8] Equals "active wells" minus "active wells not inspected".

[9] RBDMS. See endnote 1. Data updated and accessed March 7, 2012. Downloaded "tblInspFail". Filtered by DT_MOD (1/1/2011 to 12/31/2011) and similarly for other years. Filtered TYP_INSP to remove inspections not related to oil and gas production wells (removed administrative inspections (AM), brine hauler (BH), enhanced recovery (ER), solution mining projects (SM), storage wells (SO) and saltwater injection wells (SW)). Column OAC (violations of Ohio Administrative Code) had 1,667 entries for 2011.

[10] RBDMS. See endnote 1. Data updated and accessed March 7, 2012. Downloaded "tblInspection." Filtered by DT_MOD (1/1/2011 to 12/31/2011) and similarly for other years. Sorted by VIOL (violation), looked for response "TRUE." Filtered TYP_INSP to remove inspections not related to oil and gas production wells (removed administrative inspections (AM), brine hauler (BH), enhanced recovery (ER), solution mining projects (SM), storage wells (SO) and saltwater injection wells (SW)). A total of 819 inspections found violations. To find number of wells, filtered API_WELLNO column to find unique records only. This returned 708 wells for 2011.

[11] Email request for data made Sept. 16, 2011. Data received Oct. 4, 2011. Updated information received March 1, 2012 from Beth Wilson, Public Information officer with Ohio DOGRM.

[12] ibid. Data on enforcement actions and penalties from DOGRM.

[13] ibid.

[14] See endnote 5.

[15] RBDMS data updated and accessed March 7, 2012. Inspections Finding Violations:  Downloaded RBDMS "tblInspection." Filtered by DT_MOD (1/1/2011 to 12/31/2011). Sorted by VIOL (violation), looked for response "TRUE." There were 885 inspections that found violations. To find "oil and gas inspections with violations," filtered TYP_INSP to remove inspections not related to oil and gas production wells (e.g., removed administrative inspections (AM), brine hauler (BH), enhanced recovery (ER), solution mining projects (SM), storage wells (SO) and saltwater injection wells (SW)). There were a total of 819 oil and gas well inspections that found violations.
Violations data: Downloaded RBDMS "tblInspFail." Filtered by DT_MOD (1/1/2011 to 12/31/2011). Filtered TYP_INSP for each type of oil and gas well inspection (AD, CT, DD, FR, OR, PB, PL, PW, SC, UD, UL, UP, WR). Recorded the number of violations for each type of inspection.
(See endnote 5 for more information on rationale for our filtering choices)



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A5-4

*Appendix 6 - Pennsylvania*

**Note:** data from the PA DEP Oil and Gas Compliance System is updated frequently, and as a result data – even from previous years - changes from month to month.  For example, data on the number of inspections conducted in 2010 were downloaded on February 28, 2012, and again in March 20, 2012. The February data showed 16,472 inspections, and the March data showed 15,368 inspections. Statistics shown in the following tables came from data downloaded in March 2012.

**Table A6-1. Pennsylvania Inspections Data.**

| | Inspections[1] | Inspectors | Inspections per inspector | Active wells[2] | Active wells per inspector | Wells inspected[3] | Inspections that identified violations[4] |
|---|---|---|---|---|---|---|---|
| **2008** | 10,057 | No data | - | 76,062 | - | 6,302 | 978 |
| **2009** | 13,199 | No data | - | 77,938 | - | 8,419 | 1,912 |
| **2010** | 15,368 | 65[5] | 236 | 91,167 | 1,403 | 8,565 | 1,614 |
| **2011** | 22,670 | 84[6] or 88[7] | 270 or 258 | 77,898 | 927 or 885 | 11,283 | 2,317 |

**Table A6-2. Pennsylvania Well Data from DEP Oil and Gas Production Database.[8]**

| | All non-Marcellus wells | Active non-Marcellus wells[9] | Active non-Marcellus wells with production[10] | All Marcellus wells | Marcellus active wells[11] | Marcellus active wells with production[12] | Total active wells | Total active wells with production |
|---|---|---|---|---|---|---|---|---|
| **2008** | 80,952 | 76,062 | 67,111 | NA | NA | NA | 76,062 | 67,111 |
| **2009** | 83,459 | 77,938 | 64,258 | NA | NA | NA | 77,938 | 64,258 |
| **2010** | 95,005 | 85,445 | 68,389 | 10,304 | 5,722 | 1,237 | 91,167 | 69,626 |
| **2011** | 70,093 | 69,682 | 53,615 | 15,012 | 8,216 | 2,197 | 77,898 | 55,812 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks Oil & Gas Accountability Project • www.earthearthworksaction.org

A6-1

*Appendix 6 - Pennsylvania*

**Table A6-3. Pennsylvania Inspections and Violations.**[13]

|  | Inspections | Violations (all wells) | Violations (Marcellus wells) |
|---|---|---|---|
| **2002** | 7,236 | 1,153 | |
| **2003** | 7,288 | 1,573 | |
| **2004** | 7,591 | 1,044 | |
| **2005** | 8,001 | 915 | |
| **2006** | 7,647 | 1,342 | 8 |
| **2007** | 9,194 | 1,327 | 24 |
| **2008** | 10,057 | 1,515 | 232 |
| **2009** | 13,199 | 3,359 | 675 |
| **2010** | 15,368 | 2,861 | 1,273 |
| **2011** | 22,670 | 4,069 | 1,189 |

**Table A6-4. Data for Chart on Rule 102.4 Violations.**[14]

|  | 2010 | 2011 |
|---|---|---|
| **Chesapeake Appalachia** | 25 | 35 |
| **Cabot Oil & Gas** | 7 | 22 |
| **Catalyst Energy** | 1 | 19 |
| **Williams Field Svc. Co.** | 0 | 17 |
| **Homeland Energy Vent.** | 1 | 15 |
| **US Energy Dev. Corp.** | 4 | 14 |
| **Chief Oil & Gas** | 13 | 12 |
| **NFG Midstream Trout Run** | 0 | 12 |
| **Ultra Resources** | 15 | 11 |
| **PVR Marcellus Gas Gath.** | 2 | 11 |
| **Snyder Bros.** | 2 | 10 |
| **Williams Prod. Appalachia** | 0 | 10 |
| **Appalachia Midstream** | 0 | 10 |
| **Allegheny Enterprises** | 11 | 2 |
| **East Resources** | 14 | 1 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks Oil & Gas Accountability Project • www.eartheartworksaction.org

A6-2

*Appendix 6 - Pennsylvania*

**Table A6-5. Inspections Conducted in Response to Complaints (2007 - 2011).**[15]

| Result of complaint inspection | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| **Complaint inspections with violations noted:** | | | | | | |
| De minimum violations noted | | | 1 | | 1 | |
| Recurring violations | | 2 | | 1 | | |
| Violations(s) and outstanding violations | | 1 | | 1 | | |
| Outstanding violations – viols req'd | | 4 | | | 3 | |
| Violations noted and immediately corrected | 10 | 2 | 8 | 14 | 8 | |
| Violations noted | 113 | 93 | 170 | 119 | 152 | |
| **Total complaint inspections finding violations** | **123** | **102** | **179** | **135** | **164** | **703** |
| **Complaint inspections without violations noted:** | | | | | | |
| Pending | | 2 | 12 | 6 | 19 | |
| Repairs or upgrade required | 1 | 1 | | | | |
| Outstanding violations – no viols req'd | 2 | 21 | 3 | 50 | 21 | |
| Administratively closed | 10 | | | | | |
| No adverse event or action reported | | 1 | 1 | | | |
| No Violations noted | 217 | 373 | 390 | 499 | 559 | |
| **Total complaint inspections that did not find violations** | **353** | **500** | **585** | **690** | **763** | **2,891** |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks Oil & Gas Accountability Project • www.earthearthworksaction.org

A6-3

*Appendix 6 - Pennsylvania*

## Table A6-6. Pennsylvania Enforcement Data

| | Violations[16] | Enforcement actions[17] | % of violations resulting in enforcement action[18] | Ratio of enforcement actions to violations[19] |
|---|---|---|---|---|
| 2002 | 1,153 | 426 | 37 | 1 : 2.7 |
| 2003 | 1,573 | 426 | 27 | 1 : 3.7 |
| 2004 | 1,044 | 529 | 51 | 1 : 2.0 |
| 2005 | 915 | 371 | 41 | 1 : 2.5 |
| 2006 | 1,342 | 444 | 33 | 1 : 3.0 |
| 2007 | 1,327 | 533 | 40 | 1 : 2.5 |
| 2008 | 1,515 | 697 | 46 | 1 : 2.2 |
| 2009 | 3,359 | 781 | 23 | 1 : 4.3 |
| 2010 | 2,861 | 866 | 30 | 1 : 3.3 |
| 2011 | 4,069 | 976 | 24 | 1 : 4.2 |

## Table A6-7. Pennsylvania Penalty Data

| | Number of penalties[20] | Penalties assessed[21] ($) | Penalties collected[22] ($) |
|---|---|---|---|
| 2008 | 101 | 1,045,191 | 1,042,941 |
| 2009 | 122 | 1,588,769 | 1,578,444 |
| 2010 | 130 | 3,989,991 | 3,952,306 |
| 2011 | 124 | 1,352,456 | 1,307,734 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks Oil & Gas Accountability Project • www.earthearthworksaction.org

A6-4

*Appendix 6 - Pennsylvania*

**Table A6-8. Suggested inspections in DEP Oil and Gas Inspection Policy.**[23]

| Suggested Routine Inspections |
| --- |
| At least once during siting a well |
| At least once during drilling a well |
| At least once during casing a well |
| At least once during cementing a well |
| At least once during completing a well |
| At least once during altering a well |
| At least once during stimulating a well. |
| At least once during, or within 3 months after, the time period in which the owner or operator is required to restore the site, after drilling the well |
| At least once prior to a well being granted inactive status. |
| At least once during well plugging |
| At least once during, or within 3 months after, the period in which the owner or operator is required to restore the site, after the well is plugged or abandoned. |
| At least once before the bond or other financial security is released. |
| At least once a year to determine whether compliance with the statutes administered by DEP has been achieved. |

**Table A6-8 (continued). Suggested inspections in DEP Oil and Gas Inspection Policy**

| Special Inspections |
| --- |
| At least once prior to the issuance of a permit, if a waiver or exception is requested by the permit applicant. |
| At least once in verifying or resolving objections or determining the Department's response to objections, when objections are raised to a permit application. |
| At least once prior to the authorization to use an alternate method for plugging, casing or equipping the well |
| At least once during the periods that an alternative method for plugging, casing or equipping the well is being used or installed. |
| At least once when a well is being reconditioned or repaired or when casing is being replaced. |
| At least once a year, if there is onsite brine disposal or residual waste disposal subject to the statutes referenced in § 78.902 (relating to policy). |
| At least twice a year if the well is located in a gas storage reservoir or in a gas storage reservoir protective area. |
| If there is a violation, at least once to determine whether the violation has been corrected, or whether there is a continuing violation. |
| At least once, in response to a complaint. |



*Appendix 6 - Pennsylvania*

## ENDNOTE

[1] Pennsylvania Department of Environmental Protection. Oil and Gas Compliance Report system. Data accessed Feb. 28, 2012. http://www.depreportingservices.state.pa.us/ReportServer/Pages/ReportViewer.aspx?/Oil_Gas/OG_Compliance Search: 01/01/2008 to 12/31/2008, etc. Inspections with violations only: No. When data are downloaded into Excel, the spreadsheet has a statistic for "Inspections."

[2] See Table A6-2, "Total active wells."

[3] Pennsylvania DEP. Compliance Report system. See endnote 2. Searched: 01/01/2008 to 12/31/2008, etc. Inspections with violations only: No. Download data into Excel. Then filtered by Permit #, selecting "unique records" to find how many wells were inspected. (Removed blank cells)

[4] Pennsylvania DEP. Compliance Report system. See endnote 1. Searched: 01/01/2008 to 12/31/2008, etc. Inspections with violations only: No. When data are downloaded into Excel, the spreadsheet has a statistic for "Inspections with Violations."

[5] As of early 2011, DEP said they had 65 inspectors. So it is assumed that this is the number that were working in Pennsylvania in 2010. "The DEP's enforcement staff has increased nearly four-fold in the past two years, to about 130 people, 65 of whom are inspectors." (**Source:** Kusnetz, N. Feb. 3, 2011. "Many PA gas wells go unreported for months," *Propublica*. http://www.propublica.org/article/many-pa-gas-wells-go-unreported-for-months)

[6] "Today, 202 staff members are assigned to the program – 84 of whom are devoted exclusively to well site inspection." (Source: Governor's Marcellus Shale Advisory Commission. July 22, 2011. *Report*. p. 66. http://files.dep.state.pa.us/PublicParticipation/MarcellusShaleAdvisoryCommission/MarcellusShaleAdvisoryPortalFiles/MSAC_Final_Report.pdf)

[7] "Pennsylvania, whose natural gas production has rocketed in recent years thanks to drilling in its slice of the Marcellus, has 202 workers charged with oil and gas inspections for more than 22,000 wells. Eighty-eight of these staffers specialize in actual well inspection." (Source: McAllister, E. June 29, 2011. "Insight: NY water at risk from lack of natgas inspectors?" *Reuters*. http://www.reuters.com/article/2011/07/29/us-newyork-shale-drilling-idUSTRE76S5FA20110729)

[8] (rpdictopm database/

[9] Data from Pennsylvania DEP Oil and Gas Reporting web site. Statewide Data Downloads. Data accessed March 16, 2012. https://www.paoilandgasreporting.state.pa.us/publicreports/Modules/Welcome/Welcome.aspx Downloaded the Annual O&G without Marcellus spreadsheet for 2010, then filtered to select only Well Status: "Active".

[10] Data from Pennsylvania DEP Oil and Gas Reporting web site. Statewide Data Downloads. See endnote 9. Downloaded the Annual O&G without Marcellus spreadsheet for 2010, then filtered to select only Well Status: "Active" and then Production Indicator: "Y" to find wells that produced oil or gas during the year.

[11] Data from Pennsylvania DEP Oil and Gas Reporting web site. Statewide Data Downloads. See endnote 9. We had to download two spreadsheets for Marcellus wells (July 2009-June 2010 and June-Dec 2010). Combined the data into one spreadsheet. To find the number of active wells we filtered the data to select Well Status: "Active" and to avoid duplicates from the two datasets filtered by Well Permit # to find "unique records only."

[12] Data from Pennsylvania DEP Oil and Gas Reporting web site. Statewide Data Downloads. See endnote 9. We had to download two spreadsheets for Marcellus wells (July 2009-June 2010 and June-Dec 2010). Combined the data into one spreadsheet. To find the number of active wells we filtered the data to select Well Status: "Active" and to avoid duplicates from the two datasets filtered by Well Permit # to find "unique records only." Then filtered by Production Indicator: "Y" to find wells that produced oil or gas during the year.

[13] Pennsylvania DEP. Compliance Report system. (See endnote 1) Most data accessed Feb. 28, 2012. Data for 2008-2011 accessed March 20, 2012. Search: by year - 01/01/2008 to 12/31/2008, etc. Inspections with violations only: No. Download data into Excel. When data are downloaded into Excel, the spreadsheet has a statistic for number of inspections. For Marcellus wells, did the same thing but selected Marcellus Only: Yes during search.

[14] Pennsylvania DEP. Oil and Gas Compliance Report system. (See endnote 1) Data accessed Jan. 26, 2012. Search Inspections in 2010 and 2011. Sort the data by "Violation Code,"and then by Rule 104 and operator to determine which companies frequently violated the rule.

[15] Pennsylvania Department of Environmental Protection. eFACTS database. Inspection Search: Inspection Type = Complaint Inspection; Program = Oil and Gas. Data downloaded into Excel. Separated data into years, filtered by code to find number of each type of complaint result. Data accessed April 18, 2012. http://www.ahs2.dep.state.pa.us/eFACTSWeb/criteria_inspection.aspx

[16] Pennsylvania DEP. Compliance Report system. See endnote 1. Most data accessed Feb. 28, 2012. Data for 2008-2011 accessed March 20, 2012. Searched: by year - 01/01/2008 to 12/31/2008, etc. Inspections with violations only: Yes. Download data into Excel. When data are downloaded into Excel, the spreadsheet has a statistic for Violations.

[17] ibid. The spreadsheet has a statistic for Enforcement Actions.

[18] Calculated by dividing the number of enforcement actions by the number of violations, multiplied by 100.

[19] Calculated by dividing the number of enforcement actions and the number of violations by the number of enforcement actions.

[20] Number of distinct enforcement actions (i.e., Enforcement IDs) that resulted in a penalty.

[21] Pennsylvania DEP. Compliance Report system. Data accessed March 20, 2012. See endnote 1. Searched: by year - 01/01/2008 to 12/31/2008, etc. Inspections with violations only: Yes. Data downloaded into Excel spreadsheet. There are columns for penalties assessed and penalties collected. But when DEP negotiates a Consent Assessment of Civil Penalties (CACP) with an operator, the negotiated penalty amount shows up beside each individual violation. This erroneously suggests that a certain penalty, e.g., $5,000, was paid per violation, when in reality a lump sum of $5,000 was paid for all violations negotiated in the CACP. The annual penalty amounts shown in the chart were derived by removing redundant penalties from the data, i.e., penalty amounts were only counted once for each distinct CACP (as identified by a specific Enforcement ID number).

[22] ibid.

[23] Pennsylvania Code. Title 25 §78.901-906. "Inspection Policy Regarding Oil and Gas Wells." http://www.pacode.com/secure/data/025/chapter78/subchapXtoc.html



*Appendix 7 - Texas*

**Table A7-1. Texas Railroad Commission inspection and well data (producing wells)**

|  | Inspectors | Inspections[1] | Inspections per Inspector | Wells Drilled[2] | Active oil and gas wells[3] | Active wells per inspector |
|---|---|---|---|---|---|---|
| **1993** | 117 | 115,000 | 983 | 9,969 | 237,136 | 2,027 |
| **2002** |  | 106,462 |  | 9,877 | 221,551 |  |
| **2003** | 81.5[4] | 115,474 | 1,417 | 10,420 | 221,949 | 2,723 |
| **2004** |  | 110,624 |  | 11,587 | 223,442 |  |
| **2005** |  | 115,393 |  | 12,664 | 227,796 |  |
| **2006** | 87[5] | 118,109 | 1,358 | 13,854 | 235,050 | 2,701 |
| **2007** |  | 119,131 |  | 20,619 | 241,534 |  |
| **2008** | 83[6] | 120,866 | 1,456 | 22,615 | 253,090 | 3,049 |
| **2009** | 87[7] | 128,270 | 1,474 | 20,956 | 258,904 | 2,976 |
| **2010** | 88[8] | 121,123 | 1,376 | 9,477 | 260,104 | 2,956 |
| **2011** | 97[9] | 114,878[10] | 1,184 | 8,391 | 270,233 | 2,786 |

**Table A7-2. Oil and gas violations and inspections by state (2010).**

| State | Violations | Inspections | Violations per inspection |
|---|---|---|---|
| **Ohio**[11] | 1,094 | 10,472 | 0.104 |
| **Pennsylvania**[12] | 2,861 | 15,368 | 0.186 |
| **Texas**[13] | 71,646 | 121,123 | 0.591 |

**Table A7-3. Violations and Enforcement Data.**

|  | Violations | Number of Enforcement Referrals for Legal Action[14] | % of violations referred for enforcement | Enforcement referrals per violation |
|---|---|---|---|---|
| **2003** |  | 520 |  |  |
| **2004** |  | 295 |  |  |
| **2005** |  | 439 |  |  |
| **2006** | 90,000+[15] | 498 | 0.55 | 1 per 181 violations |
| **2007** | 84,170[16] | 484 | 0.58 | 1 per 174 violations |
| **2008** | 81,620[17] | 535 | 0.66 | 1 per 153 violations |
| **2009** | 80,384[18] | 549 | 0.68 | 1 per 146 violations |
| **2010** | 71,646[19] | 447[20] | 0.62 | 1 per 160 violations |
| **2011** | No data | 549 | 0.68 | 1 per 146 violations |
| **2012*** | 40,575 | 820 | 2.02 | 1 per 49 |

* first three quarters of fiscal year

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A7-1

*Appendix 7 - Texas*

**Table A7-4. Average penalty per enforcement action.**[21]

|  | FY 2006 | FY 2009 | FY 2012 (first three quarters) |
|---|---|---|---|
| **Penalties** | $1.4 million | $2 million + | $856,868 |
| **Enforcement referrals** | 498 | 549 | 802 |
| **Avg. penalty** | **$2,811** | **$3,643** | **$1,070** |

## Severances and Seals Data

The RRC maintains a "Severance" database that includes information on oil and gas leases that have been severed or sealed, but the database may not be complete. We found cases where data in the severance database were not consistent with media reports of wells being sealed. For example, an injection well that was sealed during an April 2002 field inspection was missing from the database.[22] Similarly, in November 2008, a newspaper report described an injection well in Aledo that was shut in and sealed by the RRC.[23] A query of the RRC severance database did not show a severance/seal in 2008 for this injection well, although it did show a severance in 2011.[24]

The Severance Query database offers the option of looking at severances and seals by "Current" or "Historical" or "Both" (Current and Historical). It is assumed that Current refers to severances that took place in that particular year, and that Current and Historical includes severances that took place prior to that year but were outstanding at some point during that year. But this is simply a guess. The web site does not provide an explanation for the difference between Current and Historical, nor was the Information Technology Services Help Desk able to provide an explanation.[25] So the table below show severances/seals for both Current and Current and Historical searches.

As seen from the table, the % of severances and seals resolved during the various years is not very different in the Current or Current and Historical searches.

**Table A7-5. Severances and seals by year and type (outstanding vs. resolved).**[26]

|  | CURRENT | | | | CURRENT AND HISTORICAL | | | |
|---|---|---|---|---|---|---|---|---|
|  | Outstanding | Resolved | Outstanding and Resolved | % Resolved | Outstanding | Resolved | Outstanding and Resolved | % Resolved |
| **2000** | 1,248 | 4,858 | 6,106 | 80 | 1,419 | 7,034 | 8,453 | 83 |
| **2001** | 1,221 | 6,111 | 7,332 | 83 | 1,576 | 9,629 | 11,205 | 86 |
| **2002** | 1,186 | 5,760 | 6,946 | 83 | 1,388 | 7,827 | 9,215 | 85 |
| **2003** | 975 | 5,153 | 6,128 | 84 | 1,304 | 6,747 | 8,051 | 84 |
| **2004** | 849 | 4,144 | 4,993 | 83 | 1,173 | 5,362 | 6,535 | 82 |
| **2005** | 756 | 3,978 | 4,734 | 84 | 1,022 | 4,818 | 5,840 | 83 |
| **2006** | 1,894 | 4,065 | 5,959 | 68 | 2,340 | 5,051 | 7,391 | 68 |
| **2007** | 1,546 | 4,696 | 6,242 | 75 | 1,852 | 5,433 | 7,285 | 75 |
| **2008** | 2,229 | 5,611 | 7,840 | 72 | 2,750 | 6,193 | 8,943 | 69 |
| **2009** | 2,418 | 4,763 | 7,181 | 66 | 2,817 | 5,197 | 8,014 | 65 |
| **2010** | 2,922 | 3,881 | 6,803 | 57 | 3,202 | 4,171 | 7,373 | 57 |
| **2011** | 4,189 | 4,296 | 8,485 | 51 | 4,455 | 4,566 | 9,021 | 51 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

A7-2

*Appendix 7 - Texas*

**Table A7-6. Oil severances and gas seals by year and yype (outstanding vs. resolved).[27]**

| | OIL SEVERANCES | | | | GAS SEALS | | | |
|---|---|---|---|---|---|---|---|---|
| | Outstanding | Resolved | Outstanding and Resolved | % Resolved | Outstanding | Resolved | Outstanding and Resolved | % Resolved |
| 2001 | 990 | 4,692 | 5,682 | 83 | 231 | 1,416 | 1,647 | 86 |
| 2002 | 1,013 | 4,507 | 5,520 | 82 | 173 | 1,252 | 1,425 | 88 |
| 2003 | 801 | 4,051 | 4,852 | 83 | 174 | 1,102 | 1,276 | 86 |
| 2004 | 704 | 3,335 | 4,039 | 83 | 144 | 809 | 953 | 85 |
| 2005 | 569 | 3,162 | 3,731 | 85 | 186 | 815 | 1,001 | 81 |
| 2006 | 1,447 | 3,169 | 4,616 | 69 | 447 | 896 | 1,343 | 67 |
| 2007 | 1,205 | 3,537 | 4,742 | 75 | 340 | 1,159 | 1,499 | 77 |
| 2008 | 1,743 | 3,711 | 5,454 | 68 | 485 | 1,901 | 2,386 | 80 |
| 2009 | 1,740 | 3,488 | 5,228 | 67 | 675 | 1,277 | 1,952 | 65 |
| 2010 | 1,888 | 2,901 | 4,789 | 61 | 1,020 | 994 | 2,014 | 49 |
| 2011 | 2,481 | 2,938 | 5,419 | 54 | 1,686 | 1,377 | 3,063 | 45 |

**Table A7-7. Operators with the most severances and seals for delinquent H-15s on gas leases.[28]**

| | Severances/seals for delinquent H-15s (2010 and 2011) |
|---|---|
| Devon Energy | 100 |
| Pioneer Natural Res. | 82 |
| Hilcorp Energy | 35 |
| XTO Energy | 23 |
| K&S Oil and Gas | 19 |
| Braka Operating | 19 |
| Petrolia Group | 18 |
| Square One Energy | 16 |
| Momentum Prod. | 16 |
| Oxy USA | 15 |
| Mantle Oil and Gas | 15 |
| KD Energy | 15 |
| Chesapeake Operating | 15 |

**Table A7-8. Data for severances and seals issued for field rule violations, oil and gas leases.[29]**

| Year | Severances/Seals for Field Rule Violations |
|---|---|
| 2000 | 1,324 |
| 2001 | 1,262 |
| 2002 | 1,083 |
| 2003 | 950 |
| 2004 | 892 |
| 2005 | 821 |
| 2006 | 761 |
| 2007 | 705 |
| 2008 | 720 |
| 2009 | 813 |
| 2010 | 776 |
| 2011 | 563 |

**Table A7-9. Operators with oil/gas product spills from equipment failures at tank batteries.[30]**

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|
| Chesapeake Operating | 4 | 8 | 1 | 5 | 5 | 7 | 30 |
| Anadarko E&P/Petroleum | 7 | 5 | 2 | 4 | 3 | 10 | 31 |
| Devon Energy | 5 | 2 | 11 | 6 | 11 | 1 | 36 |
| XTO Energy | 7 | 8 | 13 | 7 | 7 | 7 | 49 |
| Apache Corporation | 8 | 20 | 17 | 18 | 15 | 17 | 95 |
| Pioneer Natural Resources | 16 | 10 | 16 | 19 | 20 | 29 | 110 |

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www.earthworksaction.org

EARTHWORKS

A7-3

*Appendix 7 - Texas*

---

## ENDNOTES

[1] Statistics from 2002 – 2006 from: State Auditor's Office, Texas. August 2007. *An Audit Report on Inspections and Enforcement Activities in the Field Operations Section of the Railroad Commission.* SAO Report No. 07-046. p. 1. http://www.sao.state.tx.us/Reports/report.cfm/report/07-046 Statistics from 2007 – 2011 from: Texas Legislative Budget Board. Agency Budget and Performance Measures for Fiscal Years 2007-2011. Search: "Railroad Commission." http://bapm.lbb.state.tx.us/main.aspx?FiscalYear=2011

[2] Railroad Commission of Texas (**hereafter RRC**) web site: "Texas Drilling Statistics." Accessed May 23, 2012. http://www.rrc.state.tx.us/data/drilling/txdrillingstat.pdf

[3] Texas has data for active wells, (see RRC Well Distribution Tables http://www.rrc.state.tx.us/data/wells/welldistribution/index.php) but the number includes wells not used for oil and gas extraction (e.g., hydrocarbon storage, withdrawal, brine mining, injection disposal and other. So we used the number of producing oil and natural wells to represent active oil and gas wells(Source: RRC "Natural Gas Production and Well Counts (1935-2011)" and "Oil Production and Well Counts (1935-2011)" found at: http://www.rrc.state.tx.us/data/production/index.php )

[4] State Review of Oil and Natural Gas Environmental Regulations, Inc. August 2003. *Texas State Review.* p. 28. http://www.strongerinc.org/documents/Texas%20Follow-up%20Review%208-2003.pdf

[5] State Auditor's Office. August 2007. p. i. See endnote 1.

[6] RRC Oct. 14, 2008. Oil and Gas Division Presentation. p. 4. http://www.fortworthgov.org/uploadedFiles/Gas_Wells/RRC%20-%20Oil%20and%20Gas%20Division.pdf

[7] Sunset Commission. January 2011. Sunset Commission Decision - Railroad Commission of Texas. p. 12. http://www.sunset.state.tx.us/82ndreports/rct/rct_dec.pdf

[8] RRC presentation. July 2011. Slide 8. http://www.dallascityhall.com/pdf/GasDrilling/RRC_July2011.pdf

[9] A January 2012 press release from the Railroad Commission said that "As a result of an increased appropriation from the 82nd Legislature, the Commission increased the number of oil and gas inspectors from 88 to 153." (Source: RRC. Jan. 18, 2012. "2011: Year of Railroad Commission Accomplishments." News Release. http://www.rrc.state.tx.us/pressreleases/2012/011812.php) An email from RRC clarified that RRC "provided for an additional 21+ full time inspector positions in the past year." And that the RRC has "97 Full-time inspectors" but that lead techs, state pluggers, and cleanup coordinators "also spend a relatively large percentage of their time in the field." When the latter positions are added in, there are 153 employees who carry out some inspection duties. (Source: Email from Leslie Savage, Railroad Commission of Texas to Bruce Baizel, Earthworks. April 10, 2012.)

[10] ibid.

[11] See Appendix 5 in this report.

[12] See Appendix 6 in this report.

[13] See Tables A7-1 and A7-3 in this Appendix for data sources.

[14] Data in this column come from Propublica, unless otherwise noted. (According to ProPublica, "Enforcement actions provided by the Texas Railroad Commission." Texas statistics in "Buried secrets – gas drilling's environmental impact," Propublica. http://projects.propublica.org/gas-drilling-regulatory-staffing/states/TX). 2012 data from: Rider 17 Third Quarter report. http://www.rrc.state.tx.us/compliance/complaints/Rider17_3rdQTR_FY12.pdf

[15] State Auditor's Office, Texas. August 2007. p. i. See endnote 1.

[16] See endnote 6.

[17] RRC. Sept. 2009. *Self-Evaluation Report.* Submitted to Texas Sunset Commission. p. 91. http://www.rrc.state.tx.us/about/divisions/RRCSelfEvaluationReport2009.pdf

[18] RRC. Dec. 21, 2010. Letter from Michael Williams, RRC Commissioner to Glenn Hegar, Chairman, Sunset Advisory Commission. p.3. http://www.sunset.state.tx.us/82ndreports/rct/responses/135.pdf

[19] RRC presentation. July 2011. Slide 51. http://www.dallascityhall.com/pdf/GasDrilling/RRC_July2011.pdf

[20] ibid.

[21] Penalty Data: 2006 data from: State Auditor's Office (Texas). p.i. See endnote 1. 2009 data from: Sunset Advisory Commission. July 2011. *Final Report - Railroad Commission of Texas.* p. 8. 2012 data from: Rider 17 Third Quarter report. http://www.rrc.state.tx.us/compliance/complaints/Rider17_3rdQTR_FY12.pdf Enforcement data: see Table A7-3 in this Appendix. Average Penalty: calculated by dividing total penalties by number of enforcement referrals.

[22] RRC Online System. Severance Query. Severance records for the Savage lease (Severance query for lease 27005: http://webapps2.rrc.state.tx.us/EWA/severanceQueryAction.do) do not indicate that the well was sealed during an inspection on April 25, 2002, as reported in TX RRC Oil and Gas Docket 08-0231748 (www.rrc.state.tx.us/meetings/ogpfd/8-31748-DEF.pdf).

[23] Huffman, D. Nov. 3, 2008. "Injection well capped," *Weatherford Democrat.* http://weatherforddemocrat.com/local/x1155988924/Injection-well-capped

[24] RRC. Severance Query. Search operator: CES SWD Texas Inc. http://webapps2.rrc.state.tx.us/EWA/severanceQueryAction.do

[25] Contacted Railroad Commission of Texas Information Technology Services (1-512-463-7229) on April 6, 2012.

[26] RRC Online System, Oil and Gas Data Query, Severance Query. Data accessed April 8, 2012. http://webapps2.rrc.state.tx.us/EWA/severanceQueryAction.do Searched for oil and gas severances/seals. Did not specify a district, field, operator, who the letter was issued by, or reason for the issuance. Searched for severance/seal letter date by year – e.g., 01/01/2011 to 12/31/2011. Did this for years 2000 through 2011. To determine Outstanding and Resolved: 1) Searched Severance/Seal Category: Outstanding and Resolved (which provides – a list of all leases on which an issue ever existed, regardless of its current status). Did this for years 2000 through 2011. 2) Selected only "Current" records. To determine Outstanding: 1) Searched Severance/Seal Category: Outstanding. 2) Selected only "Current" records. Calculated Resolved by subtracting the number of Outstanding from the number of Outstanding and Resolved severances/seals in each year. Converted the number of Outstanding and number of Resolved into percentages.

[27] ibid. Data accessed April 9, 2012. Searched for oil severances. Did not specify a field, operator, who the letter was issued by, or reason for the issuance. Searched for severance/seal letter date by year – e.g., 01/01/2011 to 12/31/2011. Did this for years 2000 through 2011. To determine Outstanding and Resolved: 1) Searched Severance/Seal Category: Outstanding and Resolved (which provides – a list of all leases on which an issue ever existed, regardless of its current status). Did this for years 2000 through 2011. 2) Selected only "Current" records. To determine Outstanding: 1) Searched Severance/Seal Category: Outstanding. 2) Selected only "Current" records. Calculated Resolved by subtracting the number of Outstanding from the number of Outstanding and Resolved severances/seals in each year. Converted the number of Outstanding and number of Resolved into percentages. Repeated all previous steps for gas seals.



BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

A7-4

*Appendix 7 - Texas*

---

[28] ibid. Search Criteria – Well Type: Gas, Severance/Seal Cert. Ltr. Reason: Delinquent H-15. Severance/Seal Letter Date: 01/01/2010 to 12/31/2011. Current records. Data accessed Feb. 29, 2012.

[29] ibid. Search for Oil and Gas Wells, Severance/Seal Cert. Ltr. Reason: Field Rule Violation, Severance/Seal Letter Date for each year (e.g., between 01/01/2011 and 12/31/2011), Outstanding and Resolved, Current. Data

[30] RRC web site: Data from Crude Oil, Gas Well Liquids or Associated Products (H-8) Loss Reports. Copied data for each month/year into spreadsheet. Filtered by Facility = "tank battery." Filtered by Cause of Loss = "equipment failure." Counted number of occurrences for each of the operators in Table. http://www.rrc.state.tx.us/environmental/spills/h8s/index.php

BREAKING ALL THE RULES: THE CRISIS IN OIL & GAS REGULATORY ENFORCEMENT
Earthworks' Oil & Gas Accountability Project • www. earthworksaction.org

EARTHWORKS

A7-5







EARTHWORKS™
www.earthworksaction.org


OGAP



# Lighting Up the Prairie

## *Economic Considerations in Natural Gas Flaring*

September 5, 2012

© **Copyright 2012 Energy Policy Research Foundation, Inc.** 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



## Executive Summary

Advances in oil and gas drilling and production technology have made the U.S. the world's largest producer of natural gas. These same technological breakthroughs that have brought about a surge in domestic natural gas output are now yielding large and sustainable increases in domestic oil production. The rise in oil production also has been accompanied by substantial increases in the flaring of associated natural gas, gas that comes up the wellbore along with the production of crude oil. Policy makers, regulators, environmental groups, and a large number of commentators have raised concerns that the flaring of natural gas is both wasteful and harmful to the environment. In July 2012 the World Bank published new satellite data on flaring showing the U.S. provided the single largest addition to world flaring in 2011 (total U.S. flaring lags far behind Russia and Nigeria in comparison).

EPRINC has undertaken an assessment of recent trends in the flaring of natural gas in North Dakota and concluded the following:

1) Total flaring volumes will likely decline now that many companies have met leasing requirements and are beginning infill drilling and holding acreage by production. Many leases signed at the beginning of the boom (2007-2008) required companies to drill wells and begin production within a short period of time, typically 3-5 years. Companies had to produce oil in order to hold their leases. The necessary infrastructure to capture and sell the gas was unable to keep pace with such rapid development.

2) There may be some *temporary* increases in flaring as infrastructure is connected to new wells. These increases are the direct result of connecting new wells to existing gas gathering pipelines. Existing wells connected to gathering systems often need to be temporarily disconnected from the gas pipeline network and allowed to flare as newer wells with higher production volumes are incorporated into the pipeline network. Existing producing wells cannot be safely disconnected from the pipeline network unless flaring is permitted.

3) In North Dakota, associated gas is of high value because it is rich in natural gas liquids (NGLs), providing a strong financial incentive to capture the associated gas. However, because the technology to process NGLs is more costly and complex than the infrastructure required to capture dry gas, it will likely take longer to bring about major reductions in natural gas flaring. Nevertheless, large-scale deployment of new gas processing equipment is now underway in North Dakota.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



4) Calculations by EPRINC show that if all flaring were halted in North Dakota, the pace of crude oil production would be delayed substantially.  Although prohibiting flaring would preserve currently burned natural gas and NGLs for future sale into the U.S. pipeline and product network, the financial penalties associated with delaying oil production outweigh the benefits from gas savings for two reasons: 1) Crude oil is more valuable than gas (even gas that is rich in NGLs) and 2) The financial penalty from delayed oil production exceeds the financial losses of flared gas.  If a prohibition on natural gas flaring delayed oil production by just three years or five years, the present value financial loss would be $36 billion and $50 billion respectively for North Dakota alone.  Policy prohibitions on flaring would have to weigh these losses against any gains in environmental protection and saved gas.  Such a policy would have to conclude that the environmental benefits of prohibiting flaring would outweigh the economic costs of delayed oil production.  However, the losses in natural gas production are not trivial and clearly justify policy strategies which shorten the time to build out the natural gas infrastructure.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



## I. Introduction: North Dakota's Infrastructure Challenges

Public concerns about flaring have led to suggestions that it should be prohibited even if it means permanently or temporarily halting crude production.  A decision to flare natural gas is made because it enables the production of the more valuable crude stream until associated gas capturing infrastructure is installed.   Producers prefer to extract as much value from their wells as possible by capturing and selling both oil and associated gas, but this is sometimes prevented by infrastructure constraints.

The large disparity between crude oil and natural gas prices is at a historic level; crude oil is valued over 30 times that of natural gas based on energy content.

### Figure 1. Crude Oil and Natural Gas Spot Prices



Source: EIA data, EPRINC calculations

Associated gas in North Dakota is more valuable than in many other U.S. oil plays (see figures 11, 12, and 13).  The associated gas co-produced with oil in Bakken[1] wells is very rich in natural gas liquids (NGLs) and therefore has a much higher value than dry gas sold at Henry Hub prices.

---

[1] "Bakken" refers generally to the name of the oil play in North Dakota, but specifically refers to the rock formation



However, because the gas is rich in NGLs, it also requires large capital investments to build processing infrastructure to strip out the valuable NGL components.

Flaring in North Dakota has grown rapidly because of the recent growth in oil production, and therefore growth in associated gas production.  Since January 2008 oil production has risen by 500,000 b/d (barrels per day) and gas production (largely associated gas from Bakken wells) has risen by 500,000 mcf/day (thousand cubic feet per day). Associated gas production has outpaced the installation of gas gathering infrastructure including gathering pipelines from the wellhead and compressors (to compress the gas so that it can be transported down the pipeline), resulting in large gas volumes being flared.

Natural gas processing facilities, pipelines, and compressors are only one component of many lagging factors in the oil boom.  There is also a lack of oil pipelines and infrastructure, manpower, housing, and roads.  The entire range of services required to support the oil boom are in short supply.  North Dakota has been an oil producing state for 60 years, but only during the past four years has the Bakken oil boom turned North Dakota into a major U.S. oil province. It is currently the second largest oil producing state in the country and one of the largest onshore plays in the United States. Bakken oil is conventional, light-sweet crude oil with an API gravity of 46 degrees[2].

---

[2] For more information on Bakken oil development, please see EPRINC's 2011 report The Bakken Boom: An Introduction to North Dakota's Shale Oil. The Bakken extends beyond North Dakota into Eastern Montana and neighboring territories of Saskatchewan and Manitoba in Canada and is a shale/tight oil play.  The Bakken shale play consists of three layers, an upper layer of shale rock, a middle layer of sandstone/dolomite, and a lower layer of shale rock. The middle sandstone layer is what is commonly drilled and fracked with the horizontal lateral today.  Below the Bakken lies the productive Three Forks.



Figure 2 below illustrates the recent increase in U.S. and North Dakota oil production.

## Figure 2. U.S. and North Dakota Crude Oil Production



Source: EIA, NDIC data



## II. Associated Gas, Flaring, and North Dakota Regulations

Oil producers in North Dakota are targeting crude oil in the Bakken and Three Forks formations. North Dakota is producing 660,000 b/d of oil and about 713,000 mcf/day of gas as of June 2012. For every barrel of oil produced slightly over one mcf of associated gas is also produced.  The vast majority of North Dakota's produced gas is associated gas from oil wells.[3]  About one third of the produced gas is being flared.

Millions of dollars have already been deployed for natural gas infrastructure and $4 billion of investment is expected over the next several years. However, despite the large growth in gas capturing, gathering capacity has thus far failed to keep up with new flaring.

Flaring of gas is done by burning off the gas at the well site with a flare stack. Regulations in North Dakota allow for companies to flare gas from an oil well for up to one year before being forced to shut in the well, pay royalties, or connect it to natural gas gathering lines and facilities so it can be used for on-site power or sold into the market.  Exemptions are permitted if a company can prove that it is not feasible to hook up the well to the necessary infrastructure. Unlike oil, which can be transported by pipeline, truck or rail, gas must be transported by pipeline and requires compression and then processing.  Under the North Dakota Century Code section "38-08-06.4. Flaring of Gas Restricted-Imposition of Tax-Payment of Royalties-Industrial Commission Authority" the basic rules are stated as follows:

> *As permitted under rules of the industrial commission, gas produced with crude oil from an oil well may be flared during a one-year period from the date of first production from the well.  Thereafter, flaring of gas from the well must cease and the well must be capped, connected to a gas gathering line, or equipped with an electrical generator that consumes at least seventy-five percent of the gas from the well.  An electrical generator and its attachment units to produce electricity from gas must be considered to be personal property for all purposes.  For a well operated in violation of this section, the producer shall pay royalties to royalty owners upon the value of the flared gas and shall also pay gross production tax on the flared gas at the rate imposed under section 57-51-02.2.  The industrial commission may enforce this section and, for each well operator found to be in violation of this section, may determine the value of flared gas for purposes of payment of royalties under this section and its determination is final.  A producer may obtain an exemption from this section from the industrial commission upon application and a showing that connection of the well*

---

[3] "Associated gas is produced during crude oil production and is the gas that is associated with crude oil.  Crude oil cannot be produced without producing some of its associated gas, which comes out of solution as the pressure is reduced on the way to and on the surface.  Properly designed crude oil well completions and good reservoir management are used to minimize the production of associated gas so as to retain maximum energy in the reservoir and thus increase ultimate crude oil recovery.  Crude oil in the reservoir with minimal or no dissolved associated gas is rare and as dead crude oil is often difficult to produce as there is little energy to drive it." Mokhatab et al. 'Handbook of Natural Gas Transmission and Processing' Oxford, 2006.



*to a natural gas gathering line is economically infeasible at the time of the application or in the foreseeable future or that a market for the gas is not available and that equipping the well with an electrical generator to produce electricity from gas is economically infeasible.*

If deemed infeasible, the North Dakota Industrial Commission (NDIC) grants the right to the producer to continue flaring the well past a period of one year.  The NDIC says it periodically follows the activity of many of these wells to see if the circumstances of the permit have changed.  However, there are currently no regulations in place which require a mandatory follow-up.

Flaring (and or venting) is typically used in modern oil and gas facilities either for safety and pressure relief or for the disposal of associated gas due to the lack of capturing and processing facilities.  It is necessary to have the option to flare for safety purposes in case there is a power outage or risk of explosion.  Additionally, when new wells are being connected to gathering lines they are often producing more associated gas than older wells that have been connected previously.  Due to the surge in new production, the older wells may need to flare for a period of time so the gathering lines can safely handle the new volumes from the newly connected well.

Flaring is most commonly seen in countries like Russia and Nigeria due to lack of enforced regulation, little economic incentive to capture the gas, as well as inadequate and aged infrastructure.  The major concerns surrounding the flaring of natural gas are related to air emissions and contaminants, increasing GHG (greenhouse gas) emissions, and wasting a non-renewable fossil fuel.  Flaring produces mainly $CO_2$ emissions and venting produces mainly methane emissions.  Methane has a significantly higher greenhouse effect than $CO_2$.  Venting gas is the process of releasing the gas stream directly into the atmosphere instead of burning or flaring it.

### How much natural gas is being flared in North Dakota?

While new gathering lines and processing facilities are being put into place there still remains a large gap between gas produced and gas sold.  Currently, about 36% of produced natural gas is not being captured. However, not all of this is attributable to flaring. Just over thirty percent (about 32%) of the produced natural gas in North Dakota is being flared.  Between 2 – 3% of

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



the unsold gas can be attributed to an enhanced oil recovery method, called fireflooding, being used in Bowman County.[4]

### Figure 3. Amount of Natural Gas Produced, Sold, and Not Sold (Flared + Fireflooding)



Source: Data from NDIC

Because over a hundred new wells come on line each month (147 new wells came online in the month of June 2012), the number of wells without gas sales (i.e. wells that are flaring) remains above pre-Bakken boom levels; however, the growth in wells with gas sales (i.e. wells that are capturing gas) has far outpaced the growth of wells without sales.

---

[4] When the method of fireflooding is used the produced gas from the reservoir is flue gas, largely nitrogen. Because the produced gas is only around 40% methane, the amount flared is therefore discounted 60% (60% is nitrogen and cannot be flared). Thus, the flaring percentage in North Dakota is slightly less than the difference between produced and sold gas.

The enhanced oil recovery in Bowman County is targeting the Red River formation not the Bakken. Fireflooding refers to a thermal recovery method "...in which a flame front is generated in the reservoir by igniting a fire at the sand face of an injection well. Continuous injection of air or other gas mixture with high oxygen content will maintain the flame front. As the fire burns, it moves through the reservoir toward production wells. Heat from the fire reduces oil viscosity and helps vaporize reservoir water to steam. The steam, hot water, combustion gas and a bank of distilled solvent all act to drive oil in front of the fire toward production wells" (Schlumberger Oilfield Glossary).



## Figure 4. Number of Wells With and Without Gas Sales



Source: Data from NDIC

## Figure 5. Number of Wells with First Time Gas Sales each Month



Source: Data from NDIC

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



Figure 5 indicates there is a steady increase in the number of new wells connected to a gathering system for the first time each month.

Due to the level of infrastructure investment, natural gas flaring in North Dakota may have peaked. However, a number of infrastructure developments must come together for flaring to be dramatically reduced.  Each producing well must be hooked up to a gathering pipeline.  The gas must then be sent to a compressor and then sent to a processing facility (gas processing plant).  This process requires a great deal of planning, permitting, investment, and construction time.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



## III. Natural Gas Infrastructure Investment

Four billion dollars are being invested by the oil and gas industry for natural gas gathering and processing in North Dakota from now until 2017.  Currently, natural gas processing plant capacity in North Dakota is keeping up with natural gas production, but there still remains a lag in flaring which indicates that there are infrastructure delays in the building of gathering lines to individual wells, likely due to rights of way and related construction delays (discussed more in next section).

Figure 6 below demonstrates how natural gas processing plant capacity has more than kept pace with natural gas production in North Dakota (and is set to continue this pace).  The gas processing plants, which take in raw gas and separate out the NGLS, are being built in tandem with gas production; however, the individual gathering lines that hook up each well and send the gas to the processing plant are still lagging, creating high flaring volumes.

### Figure 6. North Dakota Natural Gas Processing Capacity vs. Actual Production



Source: NDIC and NDPA raw data with EPRINC conversions

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org   **12**



Figure 7 below shows planned investments for a variety of gas gathering and production infrastructure, from dry gas pipelines and compressors to gas plant processing facilities and NGL pipelines.  Typically the state of North Dakota approves permits within a few months; however, permitting alone does not secure the necessary rights of way (needed by producers from landowners to build gathering pipelines from the wellhead).

*Figure 17. Table of Projects and Investment Dollars*

| COMPANY/*Project | Investment | Completion Date | Notes<br>MMcfd = Million Cubic Feet Per Day |
|---|---|---|---|
| -------------------------------- | ------------------- | --------------------- | ------------------------------------------------------------------------- |
| **ONEOK** | $1.9-2.2 Billion | | |
| *Bakken NGL Pipeline | $450-550 Million | Early 2013 | 60,000 bpd, 525 Mile Pipeline transporting raw NGLs from the Bakken to Overland Pass Pipeline in CO |
| *Bakken NGL Pipeline Expansion | $100 Million | Q3 2014 | Additional pump stations will increase capacity from initial 60,000 bpd to 135,000 bpd |
| *Stateline I Gas Plant | $300-355 Million | Q3 2012 | 100MMcfd, Williams County |
| *Stateline II Gas Plant | $260-305 Million | Early 2013 | 100MMcfd, Williams County |
| *Garden Creek II Gas Plant | $310-345 Million | Q3 2014 | 100MMcfd, adjacent to existing Garden Creek I plant |
| *Divide County Gathering System | $140-160 Million | Late 2013/2014 | 270 miles of pipeline bringing gas from Williston Basin producers to Stateline Facilities |
| **NEW FRONTIER MIDSTREAM** | $250 Million | | New Frontier total natural gas investment, including South Heart Plant and Parallel Pipelines |
| *South Heart Cryogenic Gas Plant | see company total | Spring 2013 | 40MMcfd, Stark County (near South Heart, ND) |
| *Parallel Pipeline | see company total | Spring 2013 | Connecting from Stark County, Montana to ONEOK & Williston Basin Interstate Pipeline |
| **HESS** | | | |
| *Tioga Gas Plant Expansion | $325 Million | Late 2012/2013 | Increase capacity by 120-150MMcfd, increasing total capacity to 250MMcfd |
| **MISTRAL ENERGY** | | | |
| *Vantage Pipeline | $300 Million | 2013 | 430 Mile Pipeline (80mi in US) bringing ethane from HESS Tioga Plant to Alberta |
| **SADDLE BUTTE PIPELINE** | | | |
| *Grasslands Gathering System | n/a | On-going | 80 mi lateral pipelines, 100 mi trunk lines for Natural Gas, NGLs, and crude oil, located south of Watford City |
| *Little Missouri Plant Expansion | n/a | On-going | Increasing capacity from 25mmscfd to 65mmscfd, produces truckable NGLs, future expansion to ethanol production |
| *Wellhead Processing Units | n/a | On-going | Mobile units capable of producing truckable NGL on well-site using associated gas |
| **PLAINS ALL-AMERICAN** | | | |
| *Ross Gas Plant Expansion | n/a | 2013 | Increase total capacity to 50-75MMcfd |
| **WHITING/MDU RESOURCES** | | | |
| *Robinson Lake Gas Plant Expansion | n/a | 2012 | Increase total capacity by 30MMcfd to 90MMcfd |
| *General investment | $3.7 Billion | 2012-2017 | $3.7 Billion over 5 years to increase oil and gas production in the Bakken |
| **ALLIANCE PIPELINE** | | | |
| *Tioga Lateral Pipeline | $141 Million | Spring 2013 | 79 Miles of Pipeline (106.5MMcfd) to bring gas from Williston Basin to the Alliance Mainline |
| **STATOIL** | | | |
| *Diesel Conversions | n/a | On-going | Converting on-rig diesel engines to bi-fuel systems that can utilize associated gas for powering drilling rigs |
| **BLAISE ENERGY** | | | |
| *On-site Grid Power Generation | $7.4 Million | On-going | Project to prove viability of using natural gas for on-rig electricity and grid power generation |
| **AUX SABLE** | | | |
| *Truck Unloading Facility | n/a | 2012 | Facility at Palermo Gas Plant will accept NGLs including high ethane mixes for entry to Prairie Rose Pipeline |

Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



EPRINC

## Figure 8. Map of North Dakota Processing Plants

Orange indicates PLANNED, not operational
*Expanding to 250 MMcf/day
**Note, they use their gas at their leases

Map source: EPRINC map and additions. blank map from waterproofpaper.com. data from NDPA



## IV. Understanding Infrastructure Development

Size of Play and Speed of Development

The geographic extent of activity in the Bakken, across state and national borders, must be taken into account when addressing the construction of infrastructure, particularly building natural gas gathering pipelines to connect every single new well.  Rapid oil development has been taking place across a 15,000 square mile play since 2006 and it is only now that companies are beginning to hold their acreage by production.  Leasing requirements meant that companies had to get wells drilled as quickly as possible to legally hold onto their acreage.  Many leases signed at the beginning of the boom (2007-2008) required companies to drill wells and begin production within a short period of time, typically 3-5 years. Companies had to produce oil in order to hold their leases.  The necessary infrastructure to capture and sell gas was unable to keep pace with such rapid development.  Flaring may have a chance to decline now that many companies are beginning infill drilling (decreases acre spacing per well, adding more wells to an existing field) and holding their acreage by production.[5]

Figures 9 and 10 below illustrate the size of the play. In figure 9, the red dots correspond to every well that began production in 2011.  Figure 10 shows all U.S. Bakken wells.

### Figure 9. 2011 Bakken Well Activity (U.S.)



Source: HPDI, Includes Three Forks

---

[5] The North Dakota Industrial Commission estimates that in two years most acreage will be held by production with a rate of 225 rigs (recent activity update presentation to Chamber of Commerce Aug 2012).



### Figure 10. All Bakken Wells (U.S.)



Source: HPDI, includes Three Forks

**Feasibility and Economic Viability of Immediately Getting Gas to Market**

Most of these wells will in time be hooked up to gas gathering processing facilities; however, some wells are too far from any other existing wells or gathering facilities for gas to be economically captured. The widespread extent of development and the speed at which wells come online, over 100 wells per month, is important to understanding why every well is not immediately connected to a gathering line.

**Valuable Associated Natural Gas Rich in Natural Gas Liquids**

Many critics contend that companies are simply flaring associated gas from Bakken wells because relative to oil, gas offers little value to the producer given that Henry Hub natural gas prices are currently below $3 per mcf (thousand cubic feet). The truth is that Bakken gas is very rich in NGLs (natural gas liquids) and offers considerable value to producers and midstream participants.

Dry gas is considered to be lean and mainly methane. It contains about one gallon of NGLs per mcf. Wet gas is rich in NGLs, but the amount (gallons per mcf) varies from play to play. The Bakken is said to produce six to twelve gallons of NGLs per mcf of natural gas, making it one of

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



the richer gas plays in the country.[6]   Because of this, the cost of flaring is actually greater in North Dakota's Bakken than in other plays (see figure 11 below).

### Figure 11.  Gallons of Natural Gas Liquids per Mcf by Shale Play

| Rich Gas Shales | NGL GPM [1] |
|---|---|
| Avalon/ Bone Springs [2] | 4.0 to 5.0 |
| Bakken [2] | 6.0 to 12.0 |
| Barnett | 2.5 to 3.5 |
| Cana-Woodford | 4.0 to 6.0 |
| Eagle Ford [3] | 4.0 to 9.0 |
| Granite Wash | 4.0 to 6.0 |
| Green River [2] | 3.0 to 5.0 |
| Niobrara [2] | 4.0 to 9.0 |
| Piceance-Uinta | 2.5 to 3.5 |
| Montney | 3.0 to 4.5 |
| Marcellus-Utica [3] | 4.0 to 9.0 |
| 1. GPM = gallons NGLs per mcf | |
| 2. Oil Shale Plays | |
| 3. Oil and Gas Shale Play | |

Source: Veresen, Presentation Bakken Product Markets and Take-Away Denver Jan 31-Feb 1 2012

---

[6] Veresen, presentation from Bakken Product Markets and Take-Away Denver Jan 31-Feb 1 2012

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



The NGL stream includes ethane (about 40%), propane (about 30%), butane, iso-butane, and natural gasoline.[7]  Figure 12 below indicates the NGL stream in Bakken crude once processed.

## Figure 12. Bakken Well NGL Production

| Typical Bakken Well | | | |
|---|---|---|---|
| | BTU | 1,534 | |
| | | Mol% | GPM |
| | | | |
| Methane | C1 | 51.246 | |
| Nitrogen | N2 | 4.626 | |
| Carbon Dioxide | CO2 | 0.858 | |
| Ethane | C2 | 20.374 | 5.447 |
| Propane | C3 | 13.407 | 3.693 |
| Iso-Butane | Ic4 | 1.443 | 0.472 |
| Normal Butane | nC4 | 5.335 | 1.682 |
| Iso Pentane | iC5 | 0.909 | 0.332 |
| Normal Pentane | nCS | 1.403 | 0.508 |
| Natural Gasoline | C6+ | 0.399 | 0.164 |
| Total | | 100 | 12.298 |



Source: BearTracker Energy, Presentation Bakken Product Markets and Take-Away Denver Jan 31-Feb 1 2012

Associated gas must be processed and separated to remove the different components in the NGL stream.  This means building the necessary infrastructure to gather, compress, and process the gas.  The value of these NGLs varies according to the market, but can easily add $6 to $12 per barrel of oil if captured and processed.[8]  This is a significant incentive to the oil producer considering oil produced in North Dakota suffers a steep price discount due to its distance from major refining centers.

---

[7] Petrochemical facilities use "the individual components of the NGL stream to produce olefins such as ethylene." They crack or break down the larger "hydrocarbons (NGLs, Naphtha, Gas-oil) into olefins (ethylene, propylene, and butadiene)" → used to make plastic, fiber, and elastic.  Propane is used by domestic and industrial users for heating and in propane engines.  Butanes, isobutanes, and natural gasoline are used by the refining industry as blending components for products. Source: Raymond James, Feb 21, 2012

[8] Referenced from Veresen, presentation from Bakken Product Markets and Take-Away Denver Jan 31-Feb 1 2012 showing value of NGLs in a Bakken well using a cryogenic processing plant, which yields a higher ethane cut than older processing plants, using 2011 pricing estimates.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org    19



Figure 13 below shows NGL prices in both Conway and Mont Belvieu (two major NGL pricing hubs) for May 2012.

### Figure 13. NGL Prices May 2012

| NGL Value in $/MMBtu | | | | |
|---|---|---|---|---|
| May 2012 | Conway | Change from last month | Mont Belvieu | Change from last month |
| Ethane | 0.56 | -26.79% | 1.70 | -30.41% |
| Propane | 2.00 | -30.72% | 2.70 | -31.72% |
| Normal Butane | 1.43 | -14.86% | 1.52 | -25.41% |
| Isobutane | 0.87 | -25.81% | 0.95 | 25.55% |
| Pentane | 2.49 | -14.39% | 2.48 | -17.65% |
| *Total bbl. value in $/MMBtu* | 7.35 | -21.92% | 9.35 | -26.50% |
| **Margin** | 5.01 | -30.55% | 6.98 | -33.35% |

Source: Midstream Business July/August 2012

### Natural Gas Transmission and Processing Hurdles

Unlike crude oil which can be transported via rail in tank cars, by truck, or by pipeline, natural gas *must* be transported via pipeline, sent to a compressor, and then sent to a proper facility to separate the products in the natural gas stream. Associated gas from Bakken wells is rich in NGLs and low in pressure, which means it needs to be compressed at a compressor station in order to be sent to a gas plant for processing. Plant processing construction in North Dakota is currently keeping pace with natural gas production (in terms of volumetric capacity), however, flaring still remains a problem (see figure 6 in Section III).



**Figure 14. Process of Transmitting Natural Gas from Wellhead to End User**

Source: EPRINC Diagram

Building gathering capabilities is not typically done by the producer, but rather by a third party company and requires designing facilities, receiving the necessary permits and rights of way, acquiring the manpower, aligning the capital investment, and complying with regulatory requirements. While obtaining the necessary permits from the State of North Dakota has largely been a non-issue, obtaining rights of way from landowners has been a rising obstacle. Due to the intense level of oil activity in the Bakken, landowners are experiencing fatigue and companies are experiencing increasing difficulty getting all the landowners along individual pipeline routes to agree to pipeline construction (whether it is for gathering gas or for moving crude). The stickiness between project permitting to the time of construction is causing lags in infrastructure completion and exacerbating natural gas gathering needs (as well as oil gathering needs.)[9] The State of North Dakota has been working with companies and landowners to try and better understand these issues.

---

[9] North Dakota is facing increasing truck traffic from trucks moving equipment, proppant, and crude. Local North Dakotans have expressed unhappiness with the increasing traffic and wait times getting to and from locations.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



## Manpower, Housing, and Weather

The oil boom in North Dakota (and the entire Bakken area) is causing infrastructure bottlenecks across several related sectors, including the midstream, housing, and labor.  Building new gathering and processing facilities means bringing in new workers and crews.  Finding a home for a new employee or crew in North Dakota is a feat in itself.  "Mancamps" or company lodging for crews, camper villages, and tents are commonplace in the Bakken.  Like natural gas gathering lines, North Dakota housing production has been unable to keep up with rising demand.  The housing shortage was exacerbated last summer by flooding from severe rains which destroyed hundreds of newly built homes.  The 2011 summer flooding followed a historic winter with significant snowfall and common temperatures below -40 degrees Fahrenheit. While the past winter and spring has been unseasonably mild, North Dakota's weather is usually an infrastructure impediment in itself.  Building natural gas lines or homes becomes difficult or impossible in such severe conditions and may cause delays.

Building more pipelines to move crude means getting more of these trucks off the road, but resistance from landowners to build pipelines delays this process.



## V. North Dakota in Context

The World Bank recently published updated numbers on flaring across the globe. The United States illustrated the highest increase in flaring for the year 2011. And the Word Bank pointed to North Dakota as the primary source for this flaring increase. However, historical data correlated to increases in U.S. production indicates that North Dakota may not be responsible for the majority of this increase. U.S. flaring has had the most significant increase in 2011, but it should be noted that in comparison to the world's largest flaring country, Russia, the U.S. only flares a small fraction. In 2011 Russia flared over five times as much as the U.S. at 1,321 bcf (billion cubic feet) while the U.S. flared 251 bcf.

### Figure 15. World Bank Global Flaring



Source: NOAA Satellite data via World Bank

When discussing flaring in the U.S., the pace of oil development must be taken into consideration. U.S. oil production is well over 6 million barrels per day. Since January 2008 production has grown by over one million barrels per day. Many oilfields such as the Permian Basin have extensive legacy production. However, other plays, such as the Eagle Ford in southern Texas, have had little to no production and therefore have almost no infrastructure to manage the oncoming associated gas. Even the prolific Permian Basin is seeing significant infrastructure constraints as its older facilities are proving inadequate to handle such vast volumes of new oil and gas.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



The amount of production growth in such a short period of time is historic and the repeatability of such high well performance is unprecedented.  Wells in both the Eagle Ford in Texas and the Bakken in North Dakota often have initial production (IP) rates of 4,000 b/d of oil.  They also produce large volumes of associated gas.[10]  And while billions of dollars of investment are taking place across the United States to build gathering and processing facilities to capture this natural gas, it does not necessarily mean flaring numbers will rapidly decline overnight.  For example, many wells in North Dakota are being connected to gathering lines and processing facilities; however, when a new well comes online that has significant production; previously connected wells may actually need to start flaring again so the gathering pipelines can safely handle the new gas volumes.

**Figure 16. U.S. and North Dakota Flaring with U.S. Oil Production**



Source: EIA, World Bank, NDIC, NOTE that the 2011 U.S. flaring number is from World Bank satellite flaring data and therefore not venting

---

[10] In North Dakota the gas to oil ratio is 1.079 mcf of gas per barrel of oil. EPRINC estimates associated gas production in the Eagle Ford to be approximately 2 mcf of gas per barrel of oil.



Figure 16 above shows U.S. oil production and natural gas flaring/venting since the 1930's. U.S. flaring/venting peaked in the 1940's, several decades before U.S. crude oil production peaked. Since then there have been several temporary increases in flaring/venting, notably in the 1960's as crude oil production was growing towards its peak, but flaring/venting has remained between approximately 100 bcf and 300 bcf per year since the late 1970's. Flaring/venting actually declined during 1976-1985, a period in which crude oil production grew by almost 1 million barrels per day. The spike in flaring/venting in the mid-1990s corresponds to the same spike in figure 17, "U.S. and Major Flaring and Venting States through 2010" indicating that flaring/ventingventing in Wyoming lead to this increase.

Figure 17 below indicates that while North Dakota flaring/venting (almost all flaring in ND) has significantly increased, substantial volumes through 2010 are attributable to Texas and Wyoming.[11] Since 2009, Texas oil production has risen by nearly 800,000 barrels per day. This is due to booming oil and liquids rich formations such as the Eagle Ford and Permian Basin.

### Figure 17. U.S. and Major Flaring and Venting States through 2010



Source: EIA

---

[11] EPRINC's research indicates the flaring/venting volumes in Wyoming are largely attributable to venting from plants.



Texas is known for having judicious permitting in the oil and gas sector (which should allow for gas gathering infrastructure to help keep pace with oil development); however, with the surge in oil production in recent years, Texas permits for flaring have increased.  Texas issued 306 flaring permits in 2010 and 651 permits in 2011.[12]

Figure 18 below shows total U.S. flaring not including North Dakota.

### Figure 18. Total U.S. Flaring Without North Dakota



Source: US EIA and ND DMR

---

[12] Fuelfix.com, "Gas flaring permits surge in Texas," April 9th 2012

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



## VI. Calculations of Lost Economic Value due to Regulations Prohibiting Flaring

While flaring can be inefficient and harmful to the environment, prohibiting the production of crude oil has significant economic costs.  A typical 2012 Bakken well has an expected lifespan of 45 years and will produce 615,000 barrels of oil.  It creates $20 million in net profit, pays $4 million in taxes, $7 million in royalties, $2 million in wages, and $2 million in operating expenses.[13]

At $80 a barrel a Bakken well would lose $1 million for every year it is shut in.[14] This loss assumes equal production across the 45-year life of the well.  Because Bakken wells experience sharp declines during their first few years of production this loss would be significantly higher in the well's earlier years.  Additionally, shutting in a well could result in reservoir damage. Bakken wells produce extremely high initial production rates due to the overpressure inherent in the formation.  As a Bakken well is tapped, oil is initially forced to the surface at high pressure and in large volumes, but production declines substantially during the first few years of a well's life and eventually plateaus at a low level.

### Figure 19. Typical Bakken Oil Well Production



Source: NDIC

---

[13] According to estimates by the North Dakota Industrial Commission
[14] 615,000 barrels/45 years = 13666 barrels per year x $80 barrel = $1,093,280



As oil production declines substantially in the first few years of a well's life, so does associated gas production. The longer a producer waits to connect an oil well to gas gathering and processing facilities to sell associated gas, the more money it loses. The economic incentive for a producer is to connect a well to gas sales at the very beginning of the production cycle, when gas and oil production is at their highest levels (see appendix for gas decline curves).

### Figure 20. Typical Bakken Well Economics: Oil, Gas, and NGLs

| Year | Barrels of Crude Oil Per Year | MCF Per Year of Associated Gas* | Crude Value at $80 WTI | Dry Gas Value at $3/mcf | NGLs Value at $10/mcf | Total Value of Well Per Year (Oil, Dry Gas, and NGLs) |
|------|------|------|------|------|------|------|
| 1 | 365,000 | 393,385 | $29,200,000 | $1,181,505 | $3,933,850 | $34,315,355 |
| 2 | 175,200 | 189,041 | $14,016,000 | $567,123 | $1,890,410 | $16,473,533 |
| 3 | 65,700 | 70,890 | $5,256,000 | $212,670 | $708,900 | $6,177,570 |
| 4 | 36,500 | 39,384 | $2,920,000 | $118,152 | $393,840 | $3,431,632 |
| 5 | 29,200 | 31,507 | $2,336,000 | $94,521 | $315,070 | $2,745,591 |

Source: EPRINC Calculations using NDIC data of a typical Bakken well[15]

As figure 20 indicates, the value of the well is mostly in first few years of production. Additionally, figure 20 shows that the value of oil far outweights both dry gas and NGLs with assumed prices of $3/mcf for dry gas and $10/mcf for NGLs.

EPRINC constructed a present value (PV) model to better understand the financial incentives associated with natural gas flaring in North Dakota. These are financial calculations and do not take into account calculations with regard to environmental gains or losses. This model examines the present value implications of banning any new flaring in order to construct

---

[15] Oil production from typical Bakken oil well, *using current production ratio of 660,000 barrels of oil to 712,000 mcf of gas = 1.079 mcf of gas for every barrel of oil



sufficient natural gas infrastructure to capture all associated gas. Scenarios were designed around hypothetical regulations prohibiting the flaring of natural gas and therefore prohibiting vast amounts of new oil production.  The three scenarios include: No Restrictions on new wells, continued natural gas flaring at a rate of 32% and declines by 2% a year from 2013 to 2017 and 3% a year from 2017-2022 as additional infrastructure is installed; 3 Year delay on new wells, subsequently 100% of natural gas is captured, 0% flaring; and a 5 Year delay on new wells, subsequently 100% of natural gas is captured, 0% flaring.[16]   EPRINC's model holds oil production constant at the current level of 660,000 barrels per day in both the three and five year scenarios. This is based on an estimate that enough new oil production will come online without creating additional flaring, offsetting production declines from existing wells. Continued drilling would be needed to maintain current production levels under the three and five year delay scenarios.   This could take place without new flaring as new gathering infrastructure comes online.  Some new drilling will occur on developed acreage with existing gas gathering facilities.

---

[16] These calculations assume a current ratio of 1.079 mcf/barrel of oil; they are reflective of the NDPA low case oil forecast; in the no restriction scenarios current flaring is at 32% declines by 2% a year from 2013 to 2017 and 3% a year from 2017-2022 as additional infrastructure is installed.  Oil and natural gas prices used are from the EIA's AEO 2012. NGL prices were calculated using an $8 per mcf assumption.

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



**Figure 21. Combined Present Value of Oil and Gas Production in North Dakota Under 3 Scenarios (through July 2022)**



Source: NDIC current production data, NDPA forecasts, EPRINC calculations, 5% annual discount rate, EIA's AEO 2012 oil and natural gas prices, $8 of NGLs produced for every mcf of dry gas



## Figure 22. Lost Value Due to Flaring Restrictions

| $ Billions | No Restrictions | 3 Year Delay | 5 Year Delay |
|---|---|---|---|
| Cumulative PV of Oil, NGLs, and Gas Production | 320 | 284 | 270 |
| Difference vs. No Restriction Scenario | | -36 | -50 |

Source: NDIC current production data, NDPA forecasts, EPRINC calculations

Figure 22 breaks down the differences in value between the no restrictions scenario and the 3 year and 5 year delay.  With a three year delay in oil production due to regulations prohibiting flaring there is a PV loss of $36 billion.  In the five year delay scenario there is a PV loss of $50 billion.

Figure 23 below illustrates crude oil production in the three scenarios (see appendix for gas figure).  The cumulative production for scenario 1 with no restrictions is 3,257 million barrels; scenario 2 with a three year delay is 2,946 million barrels; and scenario three with a five year delay is 2,714 million barrels.

## Figure 23. North Dakota Oil Production Under 3 Scenarios



Source: NDIC current production data, NDPA forecasts, EPRINC calculations

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org



## VII. Alternative Ways to Use the Natural Gas

Oil companies in the Bakken and the State of North Dakota have recently been speaking of the potential to fuel drilling rigs with natural gas. Utilizing natural gas to fuel rigs could provide a dual benefit of reducing natural gas flaring as well as reducing rig fuel costs for the producer.[17] Statoil is currently using multiple bi-fuel rigs which are powered by a combination of diesel and natural gas. Because companies generally use a contractor for their rigs rather than owning them, a conversion to natural gas power may not be a rapid transition. The drilling rig contractor must see the economic benefit in either retrofitting the rig or purchasing new natural gas rigs for their fleet. Additionally, because many rigs use both electricity and diesel for power, natural gas generators on-site may be an efficient way to help power rigs as well as reduce flaring. Blaise Energy's on-site natural gas generators create electricity that can be used for on-rig electricity as well as being sold back into the grid.[18]

Efforts to support these medium term solutions as well as the investment in gathering and processing offer great promise to reduce flaring in North Dakota. While flaring continues to remain at elevated levels, more new wells are being connected to gathering lines. As acreage becomes held by production and operators begin infill drilling where they have established infrastructure, more new wells will likely be connected to gathering lines immediately. All of these factors taken together suggest that flaring is a short-term problem that can be remedied with near-term solutions and curtailed over the course of the next several years.

---

[17] The Exploration and Production (E&P) company (i.e., the oil producer) pays for the fuel in a drilling rig whether diesel, natural gas, or electricity.

[18] Blaise Energy is getting 300kw of power by recycling 76 mcf/day of gas (Blaise Energy website)

Through the Oil and Gas Research Program the State of North Dakota has used taxes from oil and gas production and extraction to help fund solutions to curb natural gas flaring in the Bakken. Three such programs were submitted and approved by the Oil and Gas Research Program and given partial funding. Blaise Energy is one such program and is working to illustrate "the commercial viability" of using associated gas "for on-site electrical power generation and its subsequent sale to the grid of the electricity as an alternative to flaring." The other two programs include the Environmental Energy Research Center (EERC) which is researching multiple ways utilize wellhead gas and Bakken Express which is evaluating the use of compressed natural gas (CNG) to economically capture and move natural gas as well as natural gas liquids (NDPA Webinar Summer 2011, Oil and Gas Research Program Presentation).



## APPENDIX

## North Dakota Bakken and Three Forks Gas Vintage Type Curve (Decline Rate)



Source: HPDI Aug 27th, 2012

## North Dakota Dry Natural Gas Captured Under 3 Scenarios



Source: NDIC current production data, NDPA forecasts, EPRINC calculations

© Copyright 2012 Energy Policy Research Foundation, Inc. 1031 31st Street, NW Washington, DC 20007 · 202.944.3339 · eprinc.org   33

PNAS

# Greenhouse gas growth rates

**James Hansen\* and Makiko Sato**

National Aeronautics and Space Administration Goddard Institute for Space Studies and Columbia University Earth Institute, 2880 Broadway, New York, NY 10025

Contributed by James Hansen, September 29, 2004

We posit that feasible reversal of the growth of atmospheric $CH_4$ and other trace gases would provide a vital contribution toward averting dangerous anthropogenic interference with global climate. Such trace gas reductions may allow stabilization of atmospheric $CO_2$ at an achievable level of anthropogenic $CO_2$ emissions, even if the added global warming constituting dangerous anthropogenic interference is as small as 1°C. A 1°C limit on global warming, with canonical climate sensitivity, requires peak $CO_2 \approx$ 440 ppm if further non-$CO_2$ forcing is +0.5 W/m², but peak $CO_2 \approx$ 520 ppm if further non-$CO_2$ forcing is −0.5 W/m². The practical result is that a decline of non-$CO_2$ forcings allows climate forcing to be stabilized with a significantly higher transient level of $CO_2$ emissions. Increased "natural" emissions of $CO_2$, $N_2O$, and $CH_4$ are expected in response to global warming. These emissions, an indirect effect of all climate forcings, are small compared with human-made climate forcing and occur on a time scale of a few centuries, but they tend to aggravate the task of stabilizing atmospheric composition.

climate change | carbon dioxide | methane | fossil fuels

Global surface temperature increased in the past century by >0.5°C (1, 2). This warming is, at least in part, a result of anthropogenic climate-forcing agents (3).

A climate forcing is an imposed, natural or anthropogenic, perturbation of the Earth's energy balance with space (4, 5). Increasing anthropogenic greenhouse gases (GHGs) cause the largest positive (warming) forcing. Aerosols are also a major climate forcing, but they are not well measured. Aerosols are increasing in some regions but decreasing in others (3, 6), so continued growth of GHGs is likely to provide the predominant global anthropogenic climate forcing in the 21st century.

Climate sensitivity to forcings is defined as the equilibrium global temperature change per unit forcing. Empirical data from the Earth's history, as well as climate models, indicate that climate sensitivity is ≈0.75 ± 0.25°C per W/m² (7). Climate model studies suggest that the simple concept of a global mean response to forcings works well provided that an "efficacy" factor is included for forcings that are inhomogeneously distributed, such as aerosols, ozone, and surface albedo changes (4, 5, 8).

The thermal inertia of the climate system, primarily due to the ocean, partially delays the global response to forcings. One consequence of this inertia is additional global warming "in the pipeline" due to gases already in the atmosphere (9). Based on climate models (7, 9) and the observed rate of ocean heat storage (10), the climate system is presently out of energy balance by 0.5–1 W/m², i.e., solar energy absorbed by the Earth exceeds outgoing thermal radiation by that amount.

The United Nations Framework Convention on Climate Change has the goal of stabilizing atmospheric composition at a level that avoids "dangerous anthropogenic interference" (DAI) with the climate system. One of us argues (11) that the level of DAI is set by the need to preserve global coastlines, and this goal implies that additional global warming should not exceed ≈1°C. Others using the sea level criterion suggest that up to 2°C additional warming may be acceptable (12). Taking account of the Earth's energy imbalance and the transient climate response to forcings, a 1°C limit on further warming requires a limit on added climate forcing $\Delta F \approx 1.5$ W/m² in the 21st century. Scenarios considered by the Intergovernmental

Panel on Climate Change (IPCC) (3) have $\Delta F$ in the range ≈3–7 W/m².

Here we examine observed growth rates of GHG climate forcings. Current trends provide indications about prospects for future GHG changes and changes in emissions that would be needed to keep global warming within specified bounds.

## Climate Forcing Due to Observed GHG Changes

We calculate climate forcings as a function of GHG changes by using analytic relationships (table 1 in ref. 13). These forcings are similar to those of IPCC (3), although our sensitivity for $CO_2$ is ≈10% larger (4.1 vs. 3.7 W/m² for doubled $CO_2$).

## Montreal Protocol Trace Gases (MPTGs) and Other Trace Gases (OTGs).

Fig. 1A shows the growth rate of climate forcing due to gases covered by the Montreal Protocol. Production of MPTGs is being phased out because they contain chlorine or bromine that has a destructive effect on stratospheric ozone. Measured growth rates for 10 of the 13 MPTGs that cause a significant greenhouse effect are available at ftp.cmdl.noaa.gov. We use IPCC projections (3) for the other 3 of these 13 MPTGs, which is probably an upper limit because measured amounts of the 10 measured MPTGs have fallen below IPCC projections.

The net annual change of climate forcing by these 13 MPTGs declined to near zero in 2003 (Fig. 1A). A watershed is thus just being passed, because the future net change should be negative. This negative growth of climate forcing is mainly due to the declining abundances of CFC (chlorofluorocarbon)-11, $CH_3CCl_3$, and CFC-113, and the fact that CFC-12 is just changing from positive to negative growth. These declines balance continuing increases of some of the 13 gases, with positive growth almost entirely due to hydrochlorofluorocarbon (HCFC)-22. HCFC-22, with lifetime ≈12 years, has been a temporary substitute for longer-lived CFCs for refrigeration applications, but it also is being phased out, and its abundance should begin to decline within about a decade.

The total climate forcing by the MPTGs, now >0.3 W/m² (Fig. 1B), should decline to ≈0.1 W/m² by 2100 as the production of these gases is phased out and the longer-lived constituents are slowly photolyzed in the stratosphere. This reduced climate forcing could be more than offset by increases of OTGs that are not controlled by the Montreal Protocol. A midrange scenario (A1B) of IPCC (3) has the forcing of 12 OTGs ($CF_4$, $C_2F_6$, $SF_6$, HFC-23, HFC-32, HFC-125, HFC-134a, HFC-143a, HFC-152a, HFC-227ea, HFC-245ca, and HFC-43–10mee) increasing to ≈0.3 W/m² by 2100, with almost half of the growth due to HFC-134a (Fig. 1B). Other IPCC scenarios have this 12-gas OTG forcing ranging from 0.15 W/m² (scenario B1) to 0.34 W/m² (scenario A2p).

There are additional minor OTGs besides the 12 mentioned above. No additional OTG with forcing as great as 0.01 W/m² has been identified, but new ones may be developed. We conclude only

Freely available online through the PNAS open access option.

Abbreviations: GHG, greenhouse gas; BC, black carbon; CFC, chlorofluorocarbon; HCFC, hydrochlorofluorocarbon; HFC, hydrofluorocarbon; DAI, dangerous anthropogenic interference; IPCC, Intergovernmental Panel on Climate Change; MPTG, Montreal Protocol trace gas; OTG, other trace gas; ppb, parts per billion.

*To whom correspondence should be addressed. E-mail: jhansen@giss.nasa.gov.

**ENVIRONMENTAL SCIENCES**

PNAS



**Fig. 1.** Growth rates of climate forcing by trace gases. (*A*) Growth rate of climate forcings for 13 gases controlled by the Montreal Protocol (CFC-11, CFC-12, CFC-113, CFC-114, CFC-115, CCl₄, CH₃CCl₃, HCFC-22, HCFC-141b, HCFC-142b, HCFC-123, CF₂BrCl, and CF₃Br). CFC, chlorofluorocarbon; HCFC, hydrochlorofluorocarbon; HFC, hydrofluorocarbon. Measured abundances of 10 of these gases are reported by the National Oceanic and Atmospheric Administration Climate Monitoring and Diagnostics Laboratory (ftp://ftp.cmdl.noaa.gov). Abundances of CFC-114, CFC-115, and HCFC-123 are from IPCC (3) projections. (*B*) Climate forcing by trace gases for the 21st century baseline scenario (A1B) of IPCC (3).

that the likely change in MPTG + OTG forcing between 2000 and 2100 is in the range −0.25 to +0.25 W/m². A negative change probably requires phasing out gases that contribute most to OTG forcing, such as HFC-134a.

We argue below that prospects for avoiding DAI depend on control of the OTGs and that the OTG climate forcing even influences the rate at which the major atmospheric GHGs are sequestered. First, however, we look at the trends of the major GHGs.

**CO₂, CH₄, and N₂O.** Fig. 2 shows observed growth rates of global CO₂, CH₄ and N₂O. Methods used to obtain global means from measurements at specific locations are described in *Supporting Text* (which is published as supporting information on the PNAS web site).

The annual increase of global atmospheric CO₂ (Fig. 2*A*) doubled between 1958, when annual *in situ* measurements began, and the 1970s. The annual increment continued to increase, on average, over the past three decades. We show below that the decadal trends of the atmospheric CO₂ growth rate are an accurate reflection of the CO₂ emission rate from fossil fuel burning. Year-to-year fluctuations of atmospheric CO₂ growth must reflect fluctuations of the land and ocean sinks for CO₂ and the biomass-burning source.

Annual CH₄ growth (Fig. 2*B*) accelerated after World War II, in a manner similar to the growth of CO₂. However, since 1980 the CH₄ growth rate has decreased by at least two-thirds. This slowdown could result from a leveling off or decrease of one or more of the CH₄ sources, such as leakage during the mining, production, and distribution of fossil fuels (coal, oil, and gas) and emissions from landfills, waste-management lagoons, and rice farming (14). It is also possible that the CH₄ lifetime changed because of changes in the abundance of atmospheric OH, the primary sink for CH₄ (14).

Annual N₂O growth (Fig. 2*C*) shows practically zero trend (constant growth rate) during the period (since 1978) of annual *in situ* data. Principal anthropogenic sources responsible for the N₂O growth are believed to be agricultural soils, cattle and feedlots, industry, and biomass burning, but there are large uncertainties in the magnitudes of each of these sources (14). The greatest potential for source reduction is perhaps more carefully measured application of nitrogen fertilizers.

The "alternative" scenario for future CO₂, CH₄, and N₂O growth rates in Fig. 2 is defined so as to keep added GHG climate forcing in the period 2000–2050 at ≈1 W/m² (13). In the alternative scenario, it is assumed that the added forcing by MPTGs and OTGs

is ≈0. A1B is a midrange IPCC scenario. The colored range for IPCC scenarios in Fig. 2 is defined by the scenarios that yield the extreme IPCC climate forcings in 2100.

**GHG Climate Forcings.** Fig. 3 shows the annual growth of climate forcing due to well mixed GHGs (O₃ and stratospheric H₂O, which



**Fig. 2.** Growth rates of atmospheric CO₂ (ppm/year) (*A*), CH₄ (parts per billion per year) (*B*), and N₂O (parts per billion per year) (*C*) based on ice core and *in situ* observations (see *Supporting Text*). A1B is the midrange baseline IPCC (3) scenario. ppb, parts per billion.



**Fig. 3.** Annual growth rate of climate forcing by well mixed GHGs.

are not well mixed or well measured, are not included). The highest growth rates occurred in the late 1970s and the 1980s, when the MPTGs and CH$_4$ made large contributions. (See also Fig. 8, which is published as supporting information on the PNAS web site.)

CO$_2$ has accounted for 90% or more of the increased GHG climate forcing in recent years. In 2003, the portions of added forcing were CO$_2$ (90%), N$_2$O (5%), CH$_4$ (4%), and MPTGs and OTGs (1%). Recent changes of CO$_2$, CH$_4$, and N$_2$O growth rates are affected by short-term fluctuations of sinks as well as sources and are not necessarily indicative of future trends.

CO$_2$ increases are the main cause of the increasing anthropogenic greenhouse gas forcing, so efforts to mitigate global warming must focus on CO$_2$. However, it would be a mistake to infer that non-CO$_2$ forcings are unimportant relative to CO$_2$. Future non-CO$_2$ gas changes can be positive or negative, thus adding to or subtracting from the CO$_2$ forcing. Given the difficulty of halting near-term CO$_2$ growth, the only practical way to avoid DAI this century may be simultaneous efforts to reverse the growth of some non-CO$_2$ gases while slowing and eventually halting the growth of CO$_2$.

Fig. 4 shows the growth rate of GHG climate forcing in the industrial era, including scenarios for the 21st century. Histories of the gases and non-IPCC scenarios are tabulated, respectively, in Tables 1 and 2, which are published as supporting information on the PNAS web site.

The slowdown in the growth rate of GHG climate forcing from the peak in the 1980s is due mainly to the phase-out of CFC production. If the 10% per year exponential growth of CFC production that existed until the 1970s had continued for several more years, the MPTG climate forcing (mostly from CFC-11 and CFC-12) now would exceed that of CO$_2$ (15).

The reason for the slowdown of CH$_4$ growth is not well understood, but it may reflect a leveling off of anthropogenic emissions (14). The slowdown in CH$_4$ growth could be temporary. A warming climate itself may add to CH$_4$ growth, as discussed below.

We have suggested (13) that a concerted effort to reduce CH$_4$ emissions could yield a negative forcing, which would be amplified ≈40% by the indirect effects of CH$_4$ on stratospheric H$_2$O and

tropospheric O$_3$. CH$_4$ by itself could yield a forcing change of −0.25 W/m$^2$ if it were reduced from today's 1,755 ppb to 1,215 ppb, which would require reducing anthropogenic CH$_4$ emissions by 40–50% (ref. 14 and Drew Shindell, personal communication). Conversely, CH$_4$ could provide large positive forcing if emissions grow, e.g., CH$_4$ increases to 3,140 ppb in 2100 in the IPCC (3) IS92a scenario, yielding +0.5 W/m$^2$ forcing.

The alternative scenario (Fig. 4) limits added GHG forcing to 1 W/m$^2$ during 2000–2050 (13). The extension of that scenario to 2100 and the 2°C scenario are designed to limit global warming to 1°C and 2°C, respectively, above the temperature in 2000 assuming climate sensitivity 0.75°C per W/m$^2$ (11).

Growth rates of climate forcings in the past several years have fallen below all IPCC (2001) scenarios (Fig. 4). Forcings for observations and scenarios are calculated with the same equations (table 1 in ref. 13), so the gap between the IPCC scenarios and observations is not an artifact of calculation uncertainties. Scenarios and observations include CO$_2$, CH$_4$, N$_2$O, MPTGs, and OTGs, but they do not include tropospheric O$_3$ and stratospheric H$_2$O. If the latter gases were included, the gap between the alternative and IPCC scenarios would widen, because these gases decrease in the alternative scenario (due to decreasing CH$_4$) but increase in IPCC scenarios.

**Bonuses for Non-CO$_2$ Forcing Reductions**

If the global warming that constitutes DAI is as small as 1°C (11), or even 2°C (12), aggressive efforts to reduce emissions of both CO$_2$ and non-CO$_2$ gases will be needed. We point out here several factors that warrant attention in strategic planning to limit global warming.

**Soaking-up CO$_2$ Bonus.** Consider the following gedanken experiment. Case A: CO$_2$ increases by an amount (≈16 ppm) that causes a climate forcing of +0.25 W/m$^2$, whereas CH$_4$ decreases by an amount (≈0.5 ppm) that causes a climate forcing of −0.25 W/m$^2$. Case B: CO$_2$ decreases so as to cause a forcing of −0.25 W/m$^2$, whereas CH$_4$ increases to cause a forcing of +0.25 W/m$^2$. Cases A and B both yield no net forcing and thus no tendency for a climate change. However, case A has practical advantages.

One advantage of case A is that CO$_2$ is removed from the atmosphere at a faster rate. Stated differently, the climate is in equilibrium (no warming) with a larger anthropogenic CO$_2$ source. The larger amount of CO$_2$ in the air in case A causes the ocean and biosphere to remove CO$_2$ at a higher rate. Atmospheric CO$_2$ is greater in case A than in case B, but climate forcings are identical.

The magnitude of this effect can be estimated from the assumption that the net uptake of CO$_2$ from the air is proportional to "excess" atmospheric CO$_2$, i.e., the difference ($\Delta$CO$_2$) between ambient CO$_2$ and the equilibrium CO$_2$ that would exist for the current climate without any anthropogenic CO$_2$ emissions. As a first approximation, let us take this equilibrium CO$_2$ as 285 ppm (the

ENVIRONMENTAL SCIENCES



**Fig. 4.** Five-year mean of the growth rate of climate forcing by well mixed GHGs (CO$_2$, CH$_4$, N$_2$O, MPTGs, and OTGs). O$_3$ and stratospheric H$_2$O, which are neither well mixed nor well measured, are not included.

PNAS



**A**   CO₂ Airborne Fraction



**B**   Global Fossil Fuel CO₂ Emissions



**C**   Soaked-Up CO₂/(Atm. CO₂ − 285 ppm)

**Fig. 5.** Measures of atmospheric $CO_2$ growth rate. (A) $CO_2$ airborne fraction, i.e., the ratio of observed atmospheric $CO_2$ increase to fossil fuel $CO_2$ emissions. (B) Global fossil fuel $CO_2$ emissions and division into portions that remain airborne and are soaked up by the ocean and continents. (C) Ratio of soaked-up $CO_2$ to the excess $CO_2$ in the air (atmospheric $CO_2 − 285$ ppm). Atm., atmospheric.

amount in 1850) and today's $CO_2$ as 370 ppm. Then case A has $\Delta CO_2 = 101$ ppm, and case B has $\Delta CO_2 = 69$ ppm.

Today, with $CO_2 = 370$ ppm, the rate at which $CO_2$ is taken up by the ocean plus land is ≈2.8 gigatons of C per year (40% of the 7 gigatons of C fossil fuel emissions). In case A, the flux of $CO_2$ out of the atmosphere (removed by the ocean and continents) is ≈3.3 gigatons of C per year, whereas in case B it is 2.3 gigatons of C per year, assuming that 40% of excess $CO_2$ continues to be taken up. Cases A and B have the same climate forcing, but in case A the flux of $CO_2$ out of the atmosphere is 47% larger than in case B. Cases A and B have the same climate, but case A has fossil fuel emissions that are larger by 1 gigaton of C per year.

Let us check the assumption that the earth absorbs $CO_2$ in proportion to excess atmospheric $CO_2$. Fig. 5A shows the $CO_2$ "airborne fraction," the ratio of the annual increase in atmospheric $CO_2$ to annual fossil fuel $CO_2$ emissions. Despite large year-to-year fluctuations, the airborne fraction has been remarkably constant at ≈60% of emissions during the post World War II period of high fossil-fuel emissions. Interpretation of the 60% airborne fraction as the fraction of total emissions requires an assumption that imbalance between any $CO_2$ deforestation source and compensating biomass regrowth is small compared with the fossil-fuel source.

Fossil-fuel emissions (Fig. 5B) increased by >4-fold in the past half-century (16). There are large year-to-year fluctuations in the apportionment of emissions into airborne and "soaked-up" portions. However, averaged over several years, the behavior has been consistent. Fig. 5C shows that, whereas emissions increased a factor of 4, soaked-up $CO_2$ remained nearly proportional to "excess" atmospheric $CO_2$. The time constant for removal of excess atmospheric $CO_2$ (right scale) is ≈65 years. If land-use change has been a net $CO_2$ source, the time constant for $CO_2$ uptake should be reduced accordingly, and the soaked-up fraction is >40%. Recent analysis (17) suggests that over the industrial era, the terrestrial biosphere has been a net source of $CO_2$ $16 \pm 11\%$ as large as the fossil fuel source.

Fig. 5C implies that the earth (ocean plus land, including terrestrial biosphere and soil), for at least a half-century, has been taking up $CO_2$ consistently at a rate of ≈40 megatons of C per excess ppm of $CO_2$ in the air. This rate need not continue; indeed, we discuss below a concern that the Earth may become a less efficient sink for $CO_2$ as global warming proceeds. Further, there are limits on the ability of the Earth to absorb fossil $CO_2$. $CO_2$ entering the ocean exerts a back-pressure on the atmosphere (18) such that of the order of 10% of the fossil fuel emissions will remain in the atmosphere even after thousands of years (18,19) and larger amounts on shorter time scales. However, it is for this reason that reduction of non-$CO_2$ forcings, and collection of associated bonuses, is important.

Existence of the soaking-up $CO_2$ bonus requires only that the $CO_2$ airborne fraction is <100%. Some modeling studies (20) suggest that global warming might induce the terrestrial biosphere

to release large amounts of $CO_2$, yet the airborne fraction in those studies remained <100%. We anticipate that if $CO_2$ emissions leveled out and began to decline in the next few decades, as in the alternative scenario, the airborne fraction would stay well below 100%.

Our emphasis is on the next 25–50 years. Thus, empirical data from the past half-century are relevant, as are empirical data from paleoclimate variations of the past 400,000 years, during which time the global mean temperature did not exceed the present level by more than ≈1°C. The next 25–50 years are important because the world's energy infrastructure makes it difficult, if not impossible, to reverse growth rates of $CO_2$ emissions in a brief period.

The soaking-up $CO_2$ bonus is especially valuable if we are close to the level of DAI (11). The permitted level of continuing $CO_2$ emissions depends significantly on the magnitude of non-$CO_2$ climate forcings.

**GHG Indirect Forcings.** Paleoclimate data indicate that the atmosphere contains more $CO_2$, $CH_4$, and $N_2O$ when the Earth is warmer (21–23). Cause and effect work both ways, i.e., warming releases GHGs and GHGs cause warming, but the temperature changes tend to lead, indicating that at least in part the GHG change is a feedback on climate change.

The climate–GHG feedbacks should continue to operate today, even though GHG amounts are now controlled primarily by human emissions and land-use changes. The GHG changes resulting from global warming should be book-kept as an indirect climate forcing apportioned among all forcings that give rise to the global warming. Thus, for example, MPTGs, OTGs, $O_3$, and black carbon (BC) aerosols may deserve a fraction of the "blame" for global warming that normally is associated with $CO_2$, $CH_4$, and $N_2O$. As we shall see, however, this climate–GHG feedback is small compared with anthropogenic GHG changes, and much of the indirect effect is probably still in the pipeline.

Fig. 6A is time series of temperature, $CO_2$ and $CH_4$ from the Vostok ice core (ref. 21; more information on the data is in *Supporting Text*). The vertical placement of gas amount relative to temperature is such that their means coincide. The amplitude of the temperature and gas amount scales is chosen so that the root-mean-square variations are equal. The time scale has been adjusted for the ice–gas age difference associated with the time for air bubbles to be sealed (21), which introduces an uncertainty in relative timing of several hundred years, and corrected for variations of climate in the water vapor source regions (24).

Fig. 6B is the correlation of the temperature and gas amounts as a function of temporal displacement of the curves. The time of peak correlation and the shape of the correlation curves indicate that the temperature tends to lead the gas change, as inferred by others (21–23). The peak correlation has both $CO_2$ and $CH_4$ changes lagging the temperature change by several hundred years. Such a lag is not inconsistent with the ocean-overturning time and perhaps a



**Fig. 6.** Antarctic ice core records. (*A*) Temperature $CO_2$ (*Upper*) and $CH_4$ (*Lower*) time series (thousands of years before present) from the Vostok Antarctic ice core (21, 24). (*B*) Correlation of the temperature in *A* with the gas amounts as a function of a temporal shift of the curves.

comparable time for changes of continental vegetation distributions, factors that could be involved in the response of the carbon cycle to climate change.

Fig. 7 is scatter plots of the correlation of $CO_2$ and $CH_4$ with temperature based on the Vostok ice core data (21). We approximate global temperature change as half that in Antarctica, a typical polar enhancement of global temperature change suggested by climate models (3) as well as empirical paleoclimate data. We infer from Fig. 7 levels of 18 ppm $CO_2$ per °C global warming and 49 ppb $CH_4$ per °C. $N_2O$, which has both soil and ocean upwelling sources, has shown rapid (century time scale) response to regional and global temperature change (25) with the glacial–interglacial change suggesting a positive feedback of 15 ppb per °C.

The eventual GHG changes that might be associated with the observed 0.7°C warming of the past century are, thus, ≈13 ppm $CO_2$, 34 ppb $CH_4$, and 10 ppb $N_2O$. These correspond to 14%, 4%, and 25% of the observed 1850–2003 increases of $CO_2$, $CH_4$, and $N_2O$, respectively. Only some fraction of these increases, perhaps less than half, would be realized to date, with the remainder in the pipeline. Thus, it appears that small portions of the $CO_2$ and $N_2O$ increases could be feedbacks due to global warming, which should

be attributed as indirect effects of the forcings that caused global warming. The eventual climate forcing associated with gas changes induced by 0.7°C warming is ≈0.4 W/m², with $CO_2$, $CH_4$, and $N_2O$ responsible for 85%, 5%, and 10% of this forcing, respectively.

This eventual indirect GHG climate forcing is ≈25% of either the 1850–2000 $CO_2$ forcing or the net 1850–2000 anthropogenic forcing that we have estimated (11). However, only an uncertain fraction of this forcing has been realized, so we cannot assign a quantitative indirect forcing for 1850–2000 among the primary forcing mechanisms. Nevertheless, it is worth bearing in mind that other positive forcings, especially $O_3$ and BC aerosols, probably are responsible for a small fraction of the observed $CO_2$, $N_2O$, and $CH_4$ increases.

Anthropogenic emissions are directly responsible for most of the observed GHG increases. Other anthropogenic effects, such as land use changes, may exceed the magnitude of the "natural" feedback effect (indirect forcing) that we are discussing. However, the fact that this climate feedback on atmospheric composition is exceeded by other effects provides no reason to believe that it does not continue to operate in the present climate system.

Fig. 7 also allows us to address the concern that global warming may unleash nonlinear biogeochemical feedbacks that greatly accelerate climate change, e.g., release of methane from permafrost or methane clathrates. The data in Fig. 7 reveal no indication of nonlinear sensitivity for the available range of global temperature, which is up to 1°C warmer than today. This finding suggests that the alternative scenario, with a maximum global warming of 1°C, would not run the risk of a large nonlinear positive climate feedback.

**Other Bonuses.** Reduction of non-$CO_2$ positive climate forcings has practical benefits. Reducing $CH_4$ tends to reduce tropospheric $O_3$ and stratospheric $H_2O$ (3, 13), thus further reducing global warming and ameliorating $O_3$ impacts on human health and agricultural productivity (26). Reduction of BC aerosols has positive effects on human health, agriculture, and environmental aesthetics (26).

## Summary and Implications

**$CO_2$ Growth Rate.** Annual growth of atmospheric $CO_2$ fluctuates widely from year to year. It is sometimes said that mean $CO_2$ growth in recent decades has been reasonably stable at ≈1.5 or 1.6 ppm/yr.



**Fig. 7.** Scatter plots of $CO_2$ (*A*) and $CH_4$ (*B*) in the Vostok ice core (21, 24) as a function of global temperature change, approximated as half of the polar temperature change.

ENVIRONMENTAL SCIENCES

However, the long-term near constancy of the $CO_2$ airborne fraction at ≈60% (Fig. 5A) indicates that the more steadily changing fossil-fuel emissions provide a good measure of the underlying $CO_2$ growth rate. Fossil-fuel emissions have increased 50% since 1973 to ≈7 gigatons/yr. Thus, the underlying atmospheric $CO_2$ growth rate is now ≈7 gigatons/yr × 60% × 0.453 ppm/gigaton = 1.9 ppm/yr. One consequence is that, unless $CO_2$ emissions begin to level off soon and then decline, it will become impractical to limit additional global warming to 1°C (13).

**GHG Feedback and Indirect Forcings.** Global warming itself probably causes the major GHGs ($CO_2$, $N_2O$, and $CH_4$) to increase, with a full response time that may be as long as hundreds of years. On the basis of paleoclimate evidence, this climate feedback is unlikely to cause a large nonlinear effect if additional global warming is held to ≈1°C or less.

**$CO_2$ Emissions.** Stabilization of atmospheric composition requires $CO_2$ emissions to be reduced to match the $CO_2$ absorbed by the ocean and biosphere. We point out that the permitted level for the atmospheric $CO_2$ amount depends sensitively on the magnitude of non-$CO_2$ forcings. The corresponding $CO_2$ emissions depend on the time scale considered, because of the limited ability of the ocean and biospheric sinks to absorb more $CO_2$.

For example, if non-$CO_2$ climate forcing decreases this century by 0.5 W/m², rather than increasing by 0.5 W/m², the allowed $CO_2$ emissions are higher and more plausibly attainable. Say, as in the alternative scenario, that the aim is to keep added forcing <1.5 W/m². If non-$CO_2$ forcings increase 0.5 W/m², the remaining 1 W/m² allowed for $CO_2$ corresponds to $\Delta CO_2$ = 69 ppm or $CO_2$ = 439 ppm. Conversely, if non-$CO_2$ forcings decrease 0.5 W/m², the 2 W/m² allowed for $CO_2$ correspond to $\Delta CO_2$ = 150 ppm or $CO_2$ = 520 ppm (≈540 ppm for IPCC $CO_2$ sensitivity). A different choice for the maximum forcing would not alter the large impact of non-$CO_2$ forcings on the permissible $CO_2$ amount.

The near-term permitted $CO_2$ emissions in these two cases also differ. If 1.6% of excess atmospheric $CO_2$ continues to be taken up, as in the past half century (Fig. 5C), the case with $CO_2$ = 439 ppm would have atmospheric $CO_2$ being soaked up at a rate of 5.3 gigatons of C per yr (75% of today's fossil fuel emission rate), whereas the case with $CO_2$ = 520 ppm would have $CO_2$ being taken up at a rate of 8.0 gigatons of C per yr (115% of today's emissions).

In reality, the ability of the ocean and terrestrial biosphere to take up $CO_2$ is expected to decline as anthropogenic emissions continue. $CO_2$ emissions consistent with stable atmospheric composition will be less than the above percentages and will decline with time. The aim of our gedanken experiment is not to quantify allowed emissions but, rather, to show that non-$CO_2$ forcings have a large impact on allowed $CO_2$ emissions. If non-$CO_2$ forcings are reduced, acceptable $CO_2$ emissions in coming decades may be greater than commonly assumed.

**Practical Implications.** The success of the Montreal Protocol in reversing the growth of MPTGs, at moderate cost, suggests a similar approach for OTGs. The machinery in place for MPTGs could be used, e.g., with the World Bank supporting the phase-out of gases such as HFC-134a. Indeed, some of the OTGs are a consequence of the phase-out of MPTGs, so it is not difficult to rationalize that approach.

$CH_4$ deserves special attention in efforts to stem global warming, for reasons given in this paper. We suggest that a reward approach for emission reductions, analogous to that used for MPTGs, could achieve much reduced $CH_4$ emissions at low cost.

$N_2O$ and BC aerosols are other significant climate forcings that have received inadequate research support and regulatory attention, given their potential to impact the level of constraints that will be needed for $CO_2$. BC reductions are needed to counterbalance expected reductions of reflective aerosols and would have numerous other benefits (26).

We thank Jack Kaye, Don Anderson, Phil DeCola, and Tsengdar Lee of the National Aeronautics and Space Administration headquarters for support of our research; the members of the National Oceanic and Atmospheric Administration Climate Monitoring and Diagnostics Laboratory for access to current measurements of GHGs; Jean Jouzel and Francoise Vimeux for the Vostok ice core data; Inez Fung, Jos Lelieveld, Michael Prather, and Gavin Schmidt for criticisms of the manuscript; and Darnell Cain for technical assistance.

1. Hansen, J., Ruedy, R., Sato. M., Imhoff, M., Lawrence, W., Easterling, D., Peterson, T. & Karl, T. (2001) *J. Geophys. Res.* **106**, 23947–23963.
2. Jones, P. D. & Moberg, A. (2003) *J. Climate* **16**, 206–223.
3. Houghton J. T., Ding, Y., Griggs, D. J., Noguer, M., van der Linden, P. J., Dai, X., Maskell, K. & Johnson, C. A., eds. (2001) *Climate Change 2001: The Scientific Basis: Contributions of Working Group I to the Third Assessment Report of the Intergovernmental Panel on Climate Change* (Cambridge Univ. Press, Cambridge. U.K.).
4. Hansen, J., Sato, M. & Ruedy, R. (1997) *J. Geophys. Res.* **102**, 6831–6864.
5. Ramaswamy, V. (2001) in *Climate Change 2001: The Scientific Basis: Contributions of Working Group I to the Third Assessment Report of the Intergovernmental Panel on Climate Change*, eds. Houghton J. T., Ding, Y., Griggs, D. J., Noguer, M., van der Linden, P. J., Dai, X., Maskell, K. & Johnson, C. A. (Cambridge Univ. Press, Cambridge, U.K.), pp. 349–416.
6. Ramanathan, V. Crutzen, P. J., Kiehl, J. T. & Rosenfeld, D. (2001) *Science*, **294**, 2119–2124.
7. Hansen, J., Lacis, A., Ruedy, R., Sato, M. & Wilson, H. (1993) *Natl. Geogr. Res. Explor.* **9**, 142–158.
8. Hansen, J. & Nazarenko, L. (2004) *Proc. Natl. Acad. Sci. USA* **101**, 423–428.
9. Hansen, J., Lacis, A., Rind, D., Russell, G. Stone, P., Fung, I., Ruedy, R. & Lerner, I. (1984) *Geophys. Monogr.* **29**, 130–163.
10. Levitus, S., Antonov, J. I., Boyer, T. P. & Stephens, C. (2000) *Science* **287**, 2225–2229.
11. Hansen, J. (2004) *Sci. Am.* **290** (3), 68–77.
12. O'Neill, B. C. & Oppenheimer, M. (2002) *Science* **296**, 1971–1972.
13. Hansen, J. E., Sato, M., Ruedy, R., Lacis, A. & Oinas, V. (2000) *Proc. Natl. Acad. Sci. USA* **97**, 9875–9880.
14. Prather, M. & Ehhalt, D. (2001) in *Climate Change 2001: The Scientific Basis: Contributions of Working Group I to the Third Assessment Report of the Intergovernmental Panel on Climate Change*, eds. Houghton J. T., Ding, Y., Griggs, D. J., Noguer, M., van der Linden, P. J., Dai, X., Maskell, K. & Johnson, C. A. (Cambridge Univ. Press, Cambridge, U.K.), pp. 239–287.
15. Hansen, J., Lacis, A. & Prather, M. (1989) *J. Geophys. Res.*, **94**, 16417–16421.
16. Marland, G. & Boden, T. (2004) *CO2 Information Center* (Oak Ridge Natl. Lab., Oak Ridge, TN).
17. Sabine, C. L., Feely, R. A., Gruber, N., Key, R. M., Lee. K., Bullister, J. L., Wanninkhof. R., Wong, C. S., Wallace, D. W. R., Tilbrook, B., *et al.* (2004) *Science* **305**, 367–371.
18. Broecker, W. S., Takahashi, T., Simpson, H. J. & Peng. T. H. (1979) *Science* **206**, 409–418.
19. Archer, D. E., Kheshgi, H. & Maier-Reimer, E. (1998) *Global Biogeochem. Cycles* **12**, 259–276.
20. Friedlingstein, P., Defresne, J. L., Cox, P. M. & Rayner, P. (2003) *Tellus* **55B**, 692–700.
21. Petit, J. R., Jouzel, J., Raynaud, D., Barkov, N. I., Barnola, J. M., Basile, I., Bender, M., Chappellaz, J., Davis, M., Delaygue, G., *et al.* (1999) *Nature* **399**, 429–436.
22. Fischer, H., Wahlen, M., Smith, J., Mastroianni, D. & Deck, B. (1999) *Science* **283**, 1712–1714.
23. Cuffey, K. M. & Vimeux, F. (2001) *Nature* **412**, 523–527.
24. Vimeux, F., Cuffey, K. M. & Jouzel, J. (2002) *Earth Planet Sci. Lett.* **203**, 829–843.
25. Fluckiger, J., Blunier, T., Stauffer. B., Chappellaz, J., Spahni, R., Kawamura, K., Schwander, J., Stocker, T. F. & Dahl-Jensen, D. (2004) *Science* **285**, 227–230.
26. Hansen, J. E., ed. (2002) *Conference Proceedings: Air Pollution as a Climate Forcing* (NASA Goddard Institute for Space Studies, New York).

PNAS

**United States Government Accountability Office**

# GAO

Report to the Ranking Member,
Committee on Science, Space, and
Technology, House of Representatives

September 2012

# ENERGY-WATER NEXUS

# Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs



**G A O**

Accountability * Integrity * Reliability



**G A O**
Accountability * Integrity * Reliability

# Highlights

Highlights of GAO-12-880, a report to the Ranking Member, Committee on Science, Space, and Technology, House of Representatives

September 2012

## ENERGY-WATER NEXUS

## Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs

## Why GAO Did This Study

Water and energy are inextricably linked and mutually dependent, with each affecting the other's availability. Since 2009, GAO has issued five reports on the interdependencies between energy and water. These reports have shown that a considerable amount of water is used to cool thermoelectric power plants, grow feedstocks and produce biofuels, and extract oil and natural gas. Some of these sources of energy may also negatively affect water quality. In addition, developing oil and gas resources can produce wastewater—known as "produced water"—that must be managed or treated. Conversely, significant amounts of energy are needed to extract, transport, treat, and use water in urban areas.

GAO was asked to identify key energy-water nexus issues that Congress and federal agencies need to consider when developing and implementing national policies for energy and water resources. To conduct this work, GAO systematically reviewed its five reports to identify key nexus issues. GAO also used a content analysis of related literature and interviews with specialists to validate these themes.

## What GAO Recommends

GAO is recommending that DOE take the actions necessary to establish a program to address the energy-water nexus, with involvement from other federal agencies, as described in the Energy Policy Act of 2005. DOE agreed with the recommendation and stated that it will work with other federal agencies and experts to implement it.

View GAO-12-880. For more information, contact Anu K. Mittal at (202) 512-6100 or mittala@gao.gov or Frank Rusco at (202) 512-3841 or ruscof@gao.gov.

## What GAO Found

As GAO's past work has shown, and other studies and specialists have confirmed, there are a number of key energy-water nexus issues that Congress and federal agencies need to consider when developing and implementing national policies for energy and water resources. Specifically:

- Location greatly influences the extent to which energy and water affect one another. For example, as GAO reported in November 2009, the impact of increased biofuel production on water resources will depend on where the feedstock is grown and whether or not irrigation is required. Consequently, it is important for Congress and federal agencies to consider the effects that national energy production and water use policies can have at the local level.
- Although technologies and approaches exist to reduce the impact of energy development on water resources and reduce the energy needed to move, use, and treat water, their widespread adoption is inhibited by barriers such as economic feasibility and regulatory challenges. In implementing energy and water policies, Congress and federal agencies will also need to be cognizant of the barriers when deciding whether to promote the adoption of these technologies and approaches.
- Making effective policy choices will continue to be challenging without more comprehensive data and research. GAO's past work has identified the need for more data and research related to the energy-water nexus, for example, to better understand hydrological processes, including aquifer recharge rates and groundwater movement. In the absence of such data and research, developing and implementing effective policies could continue to be a challenge for Congress and federal agencies.
- Improved energy and water planning will require better coordination among federal agencies and other stakeholders. GAO's work has demonstrated that energy and water planning are generally "stove-piped," with decisions about one resource made without considering impacts to the other resource. Improved planning will require federal agencies to work with one another and other stakeholders, such as state and local agencies, academia, industry, and environmental groups. Congress and some agencies have taken steps to improve coordination, but these actions are incomplete or in their early stages. For example, in the Energy Policy Act of 2005, Congress directed the Department of Energy (DOE) to establish a federal program to address the energy-water nexus, but DOE has not done so.
- Uncertainties affecting energy and water resources cannot be ignored because they could significantly affect the future supply and demand of both resources. For example, specialists GAO talked to and literature GAO reviewed identified climate change, population growth, and demographic shifts as significant uncertainties expected to exacerbate the challenges associated with managing both the supply and demand of water and energy. These uncertainties must, therefore, be accounted for when developing national policies that affect both of these resources.

_____

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | Key Issues to Consider When Developing and Implementing National Policies for Energy and Water Resources | 10 |
| | Conclusions | 27 |
| | Recommendation for Executive Action | 27 |
| | Agency Comments and Our Evaluation | 28 |

| Appendix I | Objectives, Scope, and Methodology | 30 |
|---|---|---|

| Appendix II | Comments from the Department of Energy | 32 |
|---|---|---|

| Appendix III | GAO Contacts and Staff Acknowledgments | 34 |
|---|---|---|

| Figures | | |
|---|---|---|
| | Figure 1: Diagram of a Boiler Loop in a Power Plant | 5 |
| | Figure 2: Biofuels Life Cycle | 6 |
| | Figure 3: Key Stages of the Urban Water Life Cycle | 9 |

### Abbreviations

| | |
|---|---|
| DOE | Department of Energy |
| EIA | Energy Information Administration |
| EPA | Environmental Protection Agency |
| Interior | Department of the Interior |
| RD&D | research, development, and demonstration |
| USDA | U.S. Department of Agriculture |
| USGS | U.S. Geological Survey |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

September 13, 2012

The Honorable Eddie Bernice Johnson
Ranking Member
Committee on Science, Space, and Technology
House of Representatives

Dear Ms. Johnson:

Water and energy are inextricably linked and mutually dependent, with each affecting the other's availability. Water is needed for energy development and generation, and energy is required to supply, use, and treat drinking water and wastewater. Water and energy are also essential to our health, quality of life, and economic growth, and consequently the demand for both of these resources continues to rise. Water is increasingly in demand to meet the needs of the public, farms, and industries, and for recreation and wildlife; and while freshwater flows abundantly in many of our nation's lakes, rivers, and streams, it is a dwindling resource in many parts of the country. Similarly, energy is increasingly in demand to support manufacturing and transportation, among other things. As the demand for water increases, the demand for energy is similarly expected to grow. While the growth rate in energy consumption in the United States has slowed over time, overall consumption continues to rise, with estimates from the Department of Energy's (DOE) Energy Information Administration (EIA) showing an expected growth of 10 percent between 2010 and 2035. To help meet this increased energy demand, domestic energy production is rising, along with its associated water usage. According to the Congressional Research Service, the energy sector has been the fastest growing water consumer in the United States in recent years and is projected to account for 85 percent of the growth in domestic water consumption between

2005 and 2030.[1] This increase in water use associated with energy development is being driven, in part, by rising energy demand, increased development of domestic energy, and shifts to more water-intense energy sources and technologies.

Since 2009, we have issued five reports on the interdependencies that exist between energy and water.[2] These reports have shown that a considerable amount of water is used to cool thermoelectric power plants,[3] grow feedstocks and convert them into biofuels, and extract oil and natural gas from geologic formations. Oil shale development would also require a great deal of water if commercial production of this energy source becomes economically feasible in the future.[4] Some of these

---

[1]Water consumption refers to the portion of the water withdrawn that is no longer available to be returned to a water source, such as when it has evaporated. Energy production (which includes biofuel production), together with thermoelectric power, are the second largest consumer of water in the United States, accounting for approximately 11 percent of water consumption in 2005. Irrigation was the largest consumer, at approximately 74 percent. (Elcock, D., "Future U.S. Water Consumption: The Role of Energy Production," *Journal of the American Water Resources Association*, vol. 46, no. 3 (2010): 447-460.). However, according to the U.S. Geological Survey, in terms of water withdrawal, thermoelectric power was the largest source of water withdrawals (49 percent) in 2005, followed by irrigation at 31 percent. Water withdrawal refers to water removed from the ground or diverted from a surface water source, such as an ocean, river, or lake.

[2]GAO, *Energy-Water Nexus: Improvements to Federal Water Use Data Would Increase Understanding of Trends in Power Plant Water Use*, GAO-10-23 (Washington, D.C.: Oct. 16, 2009); GAO, *Energy-Water Nexus: Many Uncertainties Remain about National and Regional Effects of Increased Biofuel Production on Water Resources*, GAO-10-116 (Washington, D.C.: Nov. 30, 2009); GAO, *Energy-Water Nexus: Amount of Energy Needed to Supply, Use, and Treat Water Is Location-Specific and Can Be Reduced by Certain Technologies and Approaches*, GAO-11-225 (Washington, D.C.: Mar. 23, 2011); GAO, *Energy-Water Nexus: A Better and Coordinated Understanding of Water Resources Could Help Mitigate the Impacts of Potential Oil Shale Development*, GAO-11-35 (Washington, D.C.: Oct. 29, 2010); and GAO, *Energy-Water Nexus: Information on the Quantity, Quality, and Management of Water Produced during Oil and Gas Production*, GAO-12-156 (Washington, D.C.: Jan. 9, 2012).

[3]Thermoelectric power plants use a fuel source—for example, coal, natural gas, nuclear material such as uranium, or the sun—to boil water to produce steam. The steam turns a turbine connected to a generator to produce electricity.

[4]Production of oil shale requires the heating of rock containing solid organic matter to between 650 and 1000 degrees Fahrenheit and injecting water into the formation to stimulate the oil to flow. To date, there has been no commercial production of oil shale resources, in part, because the energy requirements to heat the rock and the water needed to stimulate the flow of oil make the process too costly to compete with other sources of oil.

sources of energy—for example, biofuels, which require the use of large amounts of fertilizers and pesticides to grow the feedstock—may also negatively affect water quality. In addition, development of oil and gas resources can produce large volumes of wastewater—known as "produced water"—that must be disposed of or treated to allow for its reuse. Conversely, significant amounts of energy are needed to extract, transport, treat, and use water in urban areas, additionally contributing to energy demand. Two of these reports contained recommendations, which the agencies generally agreed with and are currently in the process of implementing.

In light of the challenges we have identified in increasing the development of various domestic energy sources while ensuring they do not have detrimental impacts on water availability and quality in the future, you asked us to provide an overview of the analysis from our five energy-water nexus reports and highlight areas that Congress and federal agencies should focus on in setting and implementing water and energy policy. Based on a review of our recent work in this area as well as a review of published literature and interviews with specialists, this report examines key issues for Congress and federal agencies to consider when developing and implementing national policies for energy and water resources.

To conduct this work, we systematically reviewed our five prior reports on the energy-water nexus and identified key issues that affect the development and implementation of national policies for energy and water resources. To validate these themes, we conducted a content analysis of key literature that examines this nexus, including peer-reviewed scientific periodicals, government-sponsored research and studies, and reports from nongovernmental research organizations. We also included in the content analysis interviews with a wide range of specialists whom we identified as having expertise related to the energy-water nexus in the United States. We selected these specialists using an iterative process, soliciting additional names from each person we interviewed. From among those identified, we conducted structured interviews with specialists who could provide a broad range of perspectives on the energy-water nexus, as well as specialists whom we identified during our systematic review of studies who have analyzed (1) the energy-water nexus in general or (2) particular segments (i.e., water use by thermoelectric power plants) of the nexus. These specialists represented a variety of organizations, including federal officials; university researchers; water and energy industry representatives from groups such as the American Water Works Association and the Electric Power

Research Institute; and nongovernmental organizations, such as the Pacific Institute.[5] Representatives from federal agencies included officials, scientists, and researchers from DOE's national laboratories and EIA, the U.S. Department of Agriculture (USDA), the Department of the Interior's (Interior) U.S. Geological Survey (USGS), and the Environmental Protection Agency (EPA). We also reviewed federal laws and regulations as applicable. To conduct the content analysis of key literature and information gathered through interviews with specialists, we reviewed each study and interview and coded statements within them based on themes we developed from the GAO reports. For the purposes of reporting the results of our analysis, we used the following categories to quantify the literature and responses of specialists: "some" refers to at least two studies or specialists, "several" refers to at least five studies or specialists, and "many" refers to eight or more studies or specialists. Appendix I discusses our scope and methodology in more detail.

We conducted this performance audit from March 2012 to September 2012, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

As our series of reports on the energy-water nexus has shown, many aspects of energy development and delivery, including resource extraction, refining and processing, generation, storage, and transportation, can affect water resources. Conversely, supplying water in an urban setting requires energy to extract, treat, and supply water to consumers. Specifically, our prior work related to the energy-water nexus focused on the following five areas:

- *Thermoelectric power plants.* In 2007, around three-fourths of the United States' electricity-generating capacity consisted of thermoelectric power plants, which rely heavily on water for cooling,

---

[5]The Pacific Institute conducts interdisciplinary research and partners with stakeholders to produce solutions that advance environmental protection, economic development, and social equity in California, nationally, and internationally.

as discussed in our October 2009 report.[6] Thermoelectric power plants use a fuel source—including coal; natural gas; nuclear material, such as uranium; or the sun—to boil water to produce steam, which is used to turn a turbine connected to a generator that makes electricity. As shown in figure 1, the water used to make steam (boiler water) generally circulates in a closed loop. That is, the steam from the boiler water is cooled and converted back to liquid water—referred to as condensing—in a device called a condenser and, finally, moved back to the heat source to again make steam. In typical thermoelectric plants, the water used to cool and condense the steam—known as cooling water—flows from a separate source. Power plants can use various types of water for cooling—such as freshwater or saline water—and different water sources, including surface water; groundwater; and alternative water sources, such as reclaimed water from industrial uses.

**Figure 1: Diagram of a Boiler Loop in a Power Plant**



Source: GAO analysis of various national laboratory and industry sources.

---

[6]GAO-10-23.

- *Biofuels*. In recent years, the federal government has increasingly encouraged the use of biofuels and other alternatives to petroleum in response to concerns over the nation's dependence on imported oil, climate change, and other issues.[7] As we reported in November 2009,[8] water supply and quality can be affected by many stages of the biofuel life cycle, as can similar practices devoted to food production (see fig. 2). To cultivate feedstocks, crops can be either rainfed, with all needed water provided by natural precipitation and soil moisture, or irrigated, with at least some portion of these water requirements met through water applied from surface or groundwater sources. Water is also used in the fermentation, distillation, and cooling processes of converting the feedstock into biofuel.

**Figure 2: Biofuels Life Cycle**



Source: DOE.

---

[7]The Energy Policy Act of 2005 created a Renewable Fuel Standard that generally required gasoline and diesel in the United States to contain renewable fuels, such as ethanol and biodiesel. Pub. L. No. 109-58 § 1501 (2005). The Energy Independence and Security Act of 2007 expanded the Renewable Fuel Standard. Pub. L. No. 110-140 § 201 (2007).

[8]GAO-10-116.

- *Oil shale*. As we reported in October 2010,[9] it may become economically feasible to develop the vast amounts of oil generated from U.S. oil shale—a sedimentary rock containing solid organic material that converts into a type of crude oil when heated—and, if it does, this source could help satisfy the nation's future oil demands. Current known processes for producing oil from oil shale deposits, however, are not economically feasible—the oil costs more to produce than it could be sold for. However, if oil prices were to rise high enough to make oil shale production cost effective, and if other challenges associated with developing this resource were resolved, we reported that producing oil from oil shale could require large amounts of water. As a result, while water is expected to be available for the initial development of an oil shale industry, the ultimate potential size of any industry might be limited by water availability, among other things. Furthermore, in the absence of effective mitigation measures, water resources could be affected by ground disturbances caused by the construction of roads and production facilities; the withdrawal of water from streams and aquifers for oil shale operations; underground mining and extraction; and the discharge of waters produced from or used in oil shale operations.

- *Produced water*. The process of producing oil and gas yields several byproducts, including produced water that must be managed as part of the oil and gas operation's waste stream. Produced water may contain a variety of contaminants, including naturally occurring radionuclides, salts, and chemicals injected into some wells to help extract the oil and gas. In January 2012,[10] we reported that most produced water is reinjected into wells designed for this purpose because it requires little or no treatment and is often the least costly option,[11] but some produced water is deemed to be clean enough without extensive treatment to be used for other purposes, such as agricultural or livestock operations. However, if produced water is not appropriately managed or treated, contaminants in the water may present human health and environmental risks.

- *Energy for water supply*. Providing drinking water and wastewater services to an urban environment involves extracting, moving, and

---

[9] GAO-11-35.

[10] GAO-12-156.

[11] According to federal estimates, more than 90 percent of all produced water is managed through underground injection.

treating water. As we described in our March 2011 report,[12] energy plays a crucial role throughout this life cycle. Energy is needed to extract raw water from the source—such as lakes, rivers, and underground aquifers—and convey it to the facility where it is treated and distributed as drinking water to customers. Furthermore, energy is needed to circulate, pressurize, and heat water for use inside households and businesses and for outdoor water-related uses by customers, such as for watering lawns. Finally, energy is required to convey wastewater to treatment facilities, treat the wastewater, and discharge the treated effluent into a receiving body of water. (See fig. 3 for the key stages in the water life cycle.)

---

[12]GAO-11-225.

**Figure 3: Key Stages of the Urban Water Life Cycle**



Sources: GAO analysis. Photos from left to right: GAO; US EPA Photo, Eric Vance; Art Explosion; DC Water; and GAO.

## Key Issues to Consider When Developing and Implementing National Policies for Energy and Water Resources

Our past energy-water nexus work has identified a number of key issues for Congress and federal agencies to consider when developing and implementing national policies for energy and water resources. These include (1) the varying local impacts of federal energy and water policy choices, (2) the mitigation of barriers to using innovative technologies and approaches, (3) the challenge of making effective policy choices in the absence of more comprehensive data and research, (4) the importance of coordination among governmental and nongovernmental stakeholders in order to improve planning, and (5) the attention to the uncertainties that affect energy and water resources when setting and implementing federal policies for these resources. The importance of these issues was also emphasized by the literature that we reviewed and the specialists we spoke with.

## Federal Energy and Water Policy Choices Can Have Varying Local Impacts

Our past work, as well as the literature that we reviewed and the specialists we spoke with, emphasized that the amount and quality of surface and groundwater used to produce energy resources, as well as the amount and quality of water produced during oil and gas extraction, varies considerably across different locations, and this variation greatly influences how energy and water affect one another. Consequently, we believe that it will be important for Congress and federal agencies to consider the effects that national policies related to energy production and water use can potentially have at the local level. For example:

- As we reported in November 2009 on biofuels,[13] the impact of increased biofuel production on water resources will depend on where the feedstock is grown and whether or not irrigation is required. Specifically, some of the largest increases in corn acres for biofuel production are projected to occur in the Northern Plains, which relies on irrigation and is already water-constrained. Furthermore, parts of the region draw heavily from the Ogallala Aquifer, where water withdrawals for agriculture and other uses are already greater than the natural recharge rate from precipitation. As a result, developing national policies that encourage additional biofuel production could have a greater impact on local water resources in certain areas than in others.
- Similarly, because both water and energy permitting and regulations vary by state, the extent to which these two resources will affect each

---

[13]GAO-10-116.

other depends on the state in which the development of these resources occurs. For example, as we reported in October 2009 on thermoelectric power plants,[14] some states, such as Arizona and Georgia, require thermoelectric power plant developers to obtain water use permits, while Alabama does not require such permits. As a result, the further expansion of the thermoelectric power industry in certain states can be more challenging than in others, in part, because of the need to meet state permitting and regulatory requirements for water use at those locations.

- In our January 2012 report on produced water,[15] we identified significant variations in the amount of water produced by oil and gas wells on the basis of location-related differences, such as variation in local or regional geology. For example, wells in the Barnett Shale formation in Texas, which is generally known to be a "wetter" formation than the Marcellus Shale formation in the Northeast, typically produce 3 to 4 times more water than shale gas wells in the Marcellus. We noted that even within the same formation, produced water volumes and quality can vary greatly. The quality of produced water also varies considerably across different formations. Some produced water can be used for livestock or agricultural applications because the water is generally of high enough quality to not require extensive treatment, while other produced water may not be used in this way because it is of poor quality; for example, it may contain contaminants, such as naturally occurring radionuclides, salts, metals, oils, and production chemicals. Such water is typically re-injected into wells designed for this purpose largely because it is less costly to do so than to treat the water sufficiently to enable other uses. It will be important for federal regulators to be cognizant of these location-related variations in the quantity and quality of produced water and their related disposal and treatment implications when they develop national regulatory policies for oil and gas development.

- As some of our energy-water nexus reports have documented, the energy needed to transport water is greatly influenced by location-specific factors like topography, distance, and the type and quality of the water source. For example, in our March 2011 report on energy for water supply,[16] we reported that because pumping water accounts

---

[14]GAO-10-23.

[15]GAO-12-156.

[16]GAO-11-225.

for 80 to 90 percent of the energy used to supply drinking water in some systems, moving water over hills and long distances can increase the level of energy consumption significantly. Consequently, when developing national policies for energy and water, policymakers need to consider the potential energy costs that can be associated with the transport and distribution of water in various settings.

In addition, the literature we reviewed and several specialists we spoke with stated that water is generally undervalued in the United States, and its prices do not reflect the true cost of providing the resource, which can result in its overuse. Some specialists also told us that the extent to which water is undervalued varies by location, with water-scarce areas being more likely to value their water resources. Furthermore, as one specialist told us, the price customers are charged for the water they consume does not reflect all of the costs required to extract, treat, and supply the water. Therefore, consumers may be unaware of the true costs of water and more likely to waste it, which in turn leads to unnecessary energy use to produce more water.

## Realizing the Benefits of Innovative Technologies and Approaches Also Depends on Mitigating Barriers to Their Use

Our past work, supported by other literature we reviewed and specialists we spoke with, has identified a variety of technologies and approaches that can reduce the impact of energy development on water resources, as well as the energy use associated with water supply, use, and treatment. However, we also identified a number of significant barriers that Congress and federal agencies will need to be cognizant of when deciding whether to promote and ensure the more widespread adoption of these technologies and approaches, as the following examples illustrate:

- As we reported in October 2009 on thermoelectric power plants,[17] advanced cooling technologies, such as dry cooling that uses air rather than water for cooling, can reduce water use at thermoelectric power plants. However, these technologies may incur "energy penalties"—that is, the energy required to power the cooling systems may reduce the plant's net energy production to a greater extent than traditional cooling systems, potentially leading to higher electricity prices. In addition, advanced cooling technologies can have capital costs that are up to 4 times as expensive as traditional cooling systems, and they may operate less efficiently in dry, arid locations,

---

[17]GAO-10-23.

among other concerns. As a result, policymakers seeking to encourage the adoption of these technologies by thermoelectric power plants with the goal of reducing water use will also have to consider ways to increase their economic feasibility and reduce their costs to plant operators and electricity consumers.

- As we reported in our 2009 reports on thermoelectric power plants and on biofuels,[18] the use of alternative water sources, such as treated effluent or groundwater unsuitable for drinking or irrigation, can reduce dependence on freshwater at thermoelectric power plants and biofuel refineries but may present drawbacks, such as adverse effects on cooling equipment, the need for expensive treatment equipment, and regulatory challenges. For example, power plants must comply with a number of water quality and air regulations, and the presence of certain pollutants in alternative water sources can make compliance more challenging. Furthermore, the physical layout of power plants and biorefineries may need to be changed to accommodate the use of alternative water sources. Consequently, if the goal of national water and energy policy is to encourage the use of alternative water sources instead of freshwater sources for the production of energy, then it would also be important to focus on developing better information about the tradeoffs of using alternative water sources.

- As we discussed in our 2009 report on biofuels,[19] agricultural conservation practices can reduce the potential effects of increased biofuel feedstock cultivation on water resources, but there are barriers to their widespread adoption. For example, conservation tillage practices—such as "no-till" systems or reduced tillage systems, where the previous year's crop residues are left on the fields and new crops are planted directly into these residues—can help reduce soil erosion. Research conducted by USDA has shown a substantial reduction in cropland erosion since 1985, when incentives were put in place to encourage the adoption of conservation tillage practices. However, many farmers do not have the expertise or training to implement certain agricultural practices, and some practices may be less suited for some places. For example, farmers usually need a year or more of experience with reduced tillage before they can achieve the same crop yields they had with conventional tillage, and the amount of agricultural residue that can be removed varies by region and even by

---

[18]GAO-10-23. GAO-10-116.

[19]GAO-10-116.

farm. Consequently, a national policy encouraging additional biofuel production would benefit from continued education and outreach provided by the federal government to help farmers better understand the advantages of adopting such conservation practices.

- More energy-efficient equipment could reduce the energy required to move and treat water, but the adoption of such technology may be hindered by the costs of retrofitting water treatment facilities and other obstacles, as we discussed in our March 2011 report on energy for water supply.[20] For example, the use of variable frequency drives at water treatment facilities, which allow operators to accommodate variations in water flows and run pumps at lower speeds, can reduce energy use by 5 to 50 percent or more. However, installing the drives can be cost prohibitive, and they are not necessarily well suited in all instances, such as when water flow is relatively constant. Therefore, federal policies to reduce energy consumption would also have to recognize the challenges faced by treatment facility operators in reducing energy consumption at their facilities and explore opportunities to assist them with this transition.

- As we also reported in March 2011 on energy for water supply,[21] water conservation is an approach to reducing the energy needed for the urban water lifecycle. Specifically, decreased customer water use could directly translate into energy savings, and water conservation also reduces the amount of energy used to convey, treat, and distribute water to customers. Similarly, energy conservation measures would also decrease water use. Therefore, when considering the development of additional energy and water conservation measures, policymakers may want to consider not only those that can be used by utilities but also those that can be used by consumers.

## Making Effective Policy Choices Will Continue to Be a Challenge in the Absence of Comprehensive Data and Research

Our past work, supported by other literature we reviewed and specialists we spoke with, identified a dearth of key data and research related to energy and water. We believe that developing and implementing effective policies will continue to be a challenge for Congress and federal agencies in the absence of such data and research. Support for this data development will be essential to improved decisionmaking, as the following examples demonstrate:

---

[20]GAO-11-225.

[21]GAO-11-225.

- As a number of our energy-water nexus reports have found, data on the availability of freshwater and alternative water supplies are limited, and the lack of such data makes it challenging to fully assess the impact that particular energy policy choices will have on water resources. Several specialists we spoke with raised concerns that such data will be even harder to obtain in light of decreased funding for USGS's monitoring efforts. Specifically, as we discussed in our October 2009 report on thermoelectric power plants,[22] some state regulators and water experts expressed concern about a reduction in the number of streamflow gauges, which they said may make evaluating trends in water availability and water planning more difficult in the future. Without accurate data on water availability, water planning and decisions involving allocation of water resources—including power plant permitting decisions—may be less informed, according to regulators and experts we spoke with. In addition, our past work and some specialists we spoke with identified a need for more data on the quantity and quality of existing water supplies. For example, in our October 2010 report on oil shale,[23] we reported that data on the water quantity and quality baseline conditions of groundwater and surface water supplies are not sufficient for monitoring the potential impacts of oil shale development in the future. We believe that effective decisions about withdrawing water from existing supplies for energy production cannot be made without first understanding how much water is actually available and the quality of these supplies, and that the federal government plays a key role in generating these kinds of important data.

- Additional research and data on hydrological processes are needed. Our reports and discussions with specialists identified a number of areas needing more research, including the interactions between groundwater and surface water, to understand the possible transport of contaminants from energy development, aquifer recharge rates and groundwater movement, and precipitation runoff, as well as how much water is available for and used by crops.[24] For example, as we previously discussed in our November 2009 report on biofuels,[25]

---

[22]GAO-10-23.

[23]GAO-11-35.

[24]An aquifer is a geologic formation or structure that stores and/or transmits water, such as to wells and springs. Aquifer recharge is the process by which water is added to an aquifer, such as through rainfall that seeps into the ground.

[25]GAO-10-116.

several specialists and agency officials have stated that research into hydrogeological processes is needed to understand the rate at which aquifers are replenished and the impacts of increased biofuel production on those aquifers. Although research suggests there should be sufficient water resources to meet future feedstock production demands at a national level, increases in this production may lead to significant water shortages in certain regions. Even in typically water-rich states, such as Iowa, concerns have arisen over the effects of increased biofuel production, and research is needed to assess the hydrology and quality of a state's aquifers to help ensure the state is on a path to sustainable biofuel production. Consequently, not only is there a need for baseline data on existing water supplies, but there is also a need for more information on how quickly such supplies are replenished and how they are affected by contaminants, so that as Congress and federal agencies are developing and implementing national energy policies they can ensure that they are considering sustainable water supplies for energy production over the long term.

- Research to determine how new technologies will affect the energy-water nexus has not been conducted to demonstrate the effects of these technologies at commercial scales. For example, according to many specialists we spoke with and some studies we reviewed, implementing carbon capture and sequestration technologies would consume large amounts of freshwater and could affect the quality of nearby water supplies,[26] but the extent of such effects is not well known.[27] In the case of biofuels, next generation feedstocks for biofuels—such as algae or cellulosic materials, including stalks, stems, branches, and leaves—have the potential for fewer negative effects on water resources, but the magnitude of these effects remains largely unknown because these feedstocks have not yet been grown on a commercial scale. For example, as we discussed in our November 2009 report on biofuels,[28] conversion of cellulosic

---

[26]Carbon capture and sequestration technologies separate and capture carbon dioxide from other gases produced when combusting or gasifying coal, compress it, then transport it to underground geologic formations where it is injected for long-term storage.

[27]In 2010, EPA promulgated a rule establishing minimum requirements under the Safe Drinking Water Act for the underground injection of carbon dioxide for the purpose of geologic sequestration. According to EPA officials, they are in the process of implementing the rule, and they believe the rule is fully protective of underground sources of drinking water.

[28]GAO-10-116.

feedstocks is expected to use less water compared with conventional feedstocks in the long run. However, commercial-scale production has not yet been demonstrated; therefore, any estimates on water use by cellulosic biorefineries are simply projections at this time. Focusing only on certain potential benefits of new technologies without understanding the full impacts of such technologies can have unintended consequences, a concern voiced by several of the specialists we spoke with. Therefore, along with federal support for data and research into new technologies it will also be essential for Congress and federal agencies to support data and research to gain a better understanding of how adopting these technologies will affect both energy and water resources as well as the environment more broadly.

- Data on water or energy use by existing technologies and research into how to optimize these technologies is needed, according to our past reports and specialists we spoke with. For example, as we previously discussed in our November 2009 report on biofuels,[29] research into biorefinery cooling systems could help reduce the water used during conversion of feedstocks into biofuels. According to DOE officials, research and development is also needed to improve hybrid wet-dry cooling systems for thermoelectric power plants. In addition, several specialists told us that analyses are needed on the amount of energy or water used throughout the entire life cycle of supplying water and producing energy. For example, in the case of thermoelectric power, a life-cycle analysis would look beyond just the water consumed in cooling towers and would assess the amount of water needed to mine, refine, transport, and burn the coal; however, such an analysis would require a level of detail beyond that which is currently available for water data, according to specialists we spoke with. Additional data gathering and research on existing technologies can help energy and water suppliers better understand the true impacts of existing technologies on energy and water resources and consider those impacts in comparison with the potential advantages of new technologies. Data gathering and research is another area where we believe that federal agencies could play an important role and assist with such analyses.

In addition, research into and development of better models and decision support tools would help inform decisions related to the energy-water nexus, according to some reports we reviewed and specialists we spoke

---

[29] GAO-10-116.

with. For example, as one specialist told us, while there are many national climate change models, regional models are needed to increase the accuracy of projections. Efforts are underway to develop downscaled models, but data may not be available to populate the models.[30] In addition, EPA officials told us that the U.S. Global Climate Research Program, which coordinates and integrates federal research on global environmental changes and their implications for society, is considering regional modeling and studies for cross-agency climate change in the future; however, these plans are not yet final. In the absence of improved models and decision support tools, Congress and federal agencies may be making decisions that affect energy and water supplies without fully understanding the impact of these decisions.

## Coordination among Governmental and Nongovernmental Entities Is Key to Improved Planning

Our past work, the literature we reviewed, and specialists we spoke with noted that, in general, energy and water planning are "stove-piped" and frequently split across federal, state, and local levels, which results in decision making that does not adequately account for the interactions between energy and water. Improved energy and water planning will require federal agencies with oversight of these resources to coordinate with one another as well as with other stakeholders, such as state and local agencies, academia, industry, and environmental groups, as the following examples demonstrate:

- Our previous reports have highlighted the need for a better understanding of the energy-water nexus, and two of these reports recommended that federal agencies collaborate on research and data collection efforts related to it. Specifically, in our October 2009 thermoelectric power plant report,[31] we recommended that EIA and USGS establish a process for regularly coordinating with each other, other federal agencies, and water and electricity industry experts, among others, to improve the overall quality of data collected on water use from power plants. DOE and Interior generally agreed with our recommendation, and both agencies are currently in the process of implementing it. Specifically, EIA and USGS have held two meetings to discuss such matters. USGS organized the initial meeting in

---

[30] We reported on the need for downscaled climate information in *Climate Change Adaptation: Strategic Federal Planning Could Help Government Officials Make More Informed Decisions*, GAO-10-113 (Washington, D.C.: Oct. 7, 2009).

[31] GAO-10-23.

November 2010, and EIA hosted the second meeting in March 2012. Invitees to the meetings also included representatives from federal agencies and national laboratories. USGS is scheduled to host the next meeting in October 2012. In addition, in our October 2010 oil shale report,[32] we recommended that the Secretary of the Interior coordinate with DOE and state agencies with regulatory authority over water resources on oil shale data collection and modeling efforts, and provide a mechanism for water-related research collaboration and results sharing. Interior generally agreed and has begun to take some steps to implement the recommendation. Specifically, Interior stated that it was working to improve coordination with DOE and state agencies with regulatory authority over water resources. The literature we reviewed and many specialists we spoke with concurred that federal agencies should collaborate to better understand the energy-water nexus. As some specialists told us, without such coordination and collaboration between federal agencies, it will be difficult to ensure that energy-water tradeoffs are properly considered.

- Our previous reports recognized that adequately addressing the energy-water nexus will require federal agencies to seek input from relevant stakeholders outside of the federal government. Specifically, we recommended in both our thermoelectric power plant and oil shale reports that federal agencies collaborate with entities outside of the federal government. In response to the recommendation in our October 2009 report on thermoelectric power plants,[33] DOE and Interior generally agreed with our recommendation and, as described earlier, EIA and USGS have since held two meetings. In addition to the federal agencies that participated, nonfederal invitees to the meetings included industry groups, such as the Nuclear Energy Institute; universities, such as Southern Illinois University; and environmental groups, such as The Nature Conservancy. In our October 2010 oil shale report,[34] Interior generally agreed with our recommendation to collaborate with entities outside of the federal government and has begun to take some steps to implement the recommendation. Specifically, Interior stated that it was working with state agencies that have regulatory authority over water resources. The literature we reviewed and many specialists we spoke with also

---

[32]GAO-11-35.

[33]GAO-10-23.

[34]GAO-11-35.

believed collaboration with stakeholders outside the federal government is needed. For example, in its 2006 report to Congress,[35] DOE reported that the lack of integrated energy and water planning and management has already affected energy production in many basins and regions across the country, and that collaboration on energy and water resource planning is needed among federal, regional, and state agencies, as well as with industry and other stakeholders. As some specialists told us, state and local agencies are primarily responsible for allocating and managing water resources; therefore, energy-water nexus discussions need to involve officials from other levels of government. Similarly, public utility commissions make energy decisions in many states, and the role of these commissions is important to consider when addressing the energy-water nexus.[36] Furthermore, as DOE officials noted, many political boundaries between states are formed by water bodies. Therefore, multiple counties and states can be involved in water management decisions, which can lead to conflicts and be an impediment to water planning. Because of the various stakeholders with a role in managing energy and water, we believe that it will be important for federal agencies to improve coordination including with their nonfederal partners in order to enhance energy and water planning and put the United States on a path that is more sustainable for the long run.

- Many specialists told us that, because of the stove-piped nature of energy and water issues in the federal government, a top-down emphasis on collaboration among federal agencies and with other groups outside of the federal government is needed. Some specialists pointed to a recent memorandum of agreement between three federal agencies on unconventional oil and gas research as a good model. Specifically, in March 2011, the White House released the *Blueprint for a Secure Energy Future*, a comprehensive plan to reduce America's oil dependence, save consumers money, and make the United States the leader in clean energy industries. The Blueprint instructed the federal government to conduct research to examine the impacts of hydraulic fracturing on water resources. To fulfill this

---

[35]DOE, *Energy Demands on Water Resources: Report to Congress on the Interdependency of Energy and Water* (December 2006).

[36]In many states, public utility commissions are responsible for approving the rates (or prices) electric utilities charge their customers and ensuring they are reasonable. As part of approving rates, these commissions approve utility investments and, as a result, may consider whether specific technologies are reasonable.

directive, DOE, Interior, and EPA signed a memorandum in April 2012 describing their plans for multiagency collaboration on unconventional oil and gas research. According to the specialists we spoke with, direction from the White House is what led to action on the part of the agencies and the signing of the memorandum, and they believe a similar high-level push would be needed to spur meaningful collaborative action to address other energy-water nexus issues.

Recognizing the need for better coordination, Congress and some federal agencies have taken or are beginning to take some steps on energy-water nexus issues, but many of these actions are either in their early stages or incomplete, as the following examples illustrate:

- With the Energy Policy Act of 2005, Congress directed the Secretary of Energy, through DOE's Office of Science,[37] to carry out a number of programs related to a wide variety of energy sciences. In particular, the act directs the Secretary to carry out a program to address the energy-water nexus and assess the effectiveness of existing programs at DOE and other federal agencies to address the nexus.[38] The provision also directs the Secretary to consult with the Administrator of EPA, the Secretary of the Interior, the Chief Engineer of the Army Corps of Engineers, the Secretary of Commerce, the Secretary of Defense, and other federal agencies as appropriate, to carry out the provision. DOE officials told us, however, that to date they have neither received nor requested any funding specifically designated to carry out the provision, nor has the agency requested funds for this purpose for fiscal year 2013. Furthermore, according to DOE officials, the Office of Science is not the appropriate office within DOE to carry out the program because the office conducts research

---

[37]The Office of Science is the lead federal agency supporting fundamental scientific research for energy and the nation's largest supporter of basic research in the physical sciences.

[38]Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 971, 979, 119 Stat. 594, 905 (codified at 42 U.S.C. §§ 16311, 16319 (2006)). Specifically, the act directs the Secretary to carry out a program of research, development, demonstration, and commercial application to (1) address energy-related issues associated with the provision of adequate water supplies, optimal management, and efficient use of water; (2) address water-related issues associated with the provision of adequate supplies, optimal management, and efficient use of energy; and (3) assess the effectiveness of existing programs within the department and other federal agencies to address these energy and water related issues. The program is to include, among other things, planning, analysis, and modeling of energy and water supply and demand.

on the fundamentals of science. Instead, officials stated that the Office of the Under Secretary, which oversees work in areas such as energy efficiency and renewable and fossil energy, would be the more appropriate office to conduct such research.[39] Regardless of which office is best suited for this activity, by not carrying out this provision, we believe that DOE is missing an important opportunity to provide information that could possibly help fill some of the research and data gaps we and others have identified.

- Congress is also considering pending legislation related to energy and water that calls for enhanced collaborative efforts. A House bill, the Energy and Water Research Integration Act of 2012, would direct the Secretary of Energy to (1) integrate water considerations into energy research, development, and demonstration (RD&D) programs and projects; (2) develop a strategic plan identifying RD&D needs for those programs and projects; (3) collaborate with other federal agencies, within DOE, and with nongovernmental entities in developing the plan; and (4) develop an Energy-Water Architecture Council consisting of federal agencies and nongovernmental entities to promote data collection, reporting, and technology innovation.[40] Another House bill, the Coordinating Water Research for a Clean Water Future Act of 2012, would, among other things, direct the President to begin implementation of a National Water and Research Development Initiative to, among other things, conduct research on how to ensure the systematic and coordinated collection of publicly available data on regional and national water resources and provide for interagency coordination of federal water research and development.[41]

- Some federal agencies have recognized the importance of collaboration on the energy-water nexus and have acted accordingly. For example, in April 2012, EPA proposed six principles to foster collaboration in the water and energy sectors to meet water and energy needs nationally and locally. One of the principles called for key stakeholders—governments, utilities, manufacturers, and consumers—in both sectors to move toward integrated energy and

---

[39]The Office of Science may be able to enter into inter- and intra-agency agreements, under authorities like the Economy Act, with other federal offices to assist in carrying out the provision to the extent those offices are able to provide relevant assistance. *See* 31 U.S.C. § 1535 (2006).

[40]H.R. 5827, 112th Cong. (2012).

[41]H.R. 5826, 112th Cong. (2012).

water management from source, production, and generation, to the end user. Actions to support the principle include breaking down institutional barriers, improving transparency, and maximizing efficiencies; encouraging government agencies to look across missions; and developing partnerships between government and service providers.

- DOE, led by Sandia National Laboratories, held a series of workshops on energy and water issues in 2005 and 2006, according to DOE's 2006 report to Congress. The effort, known as the Energy-Water Roadmap process, included representatives from a broad range of groups, including environmental organizations; policy and regulatory groups; industry associations; and federal, state, and tribal government agencies. It was intended to help DOE and the United States assess current energy and water issues and concerns and identify appropriate interactions and coordination approaches. As part of this effort, participants at the workshops identified (1) gaps between current federal and state energy and water research and management programs and (2) major science and technology research and development steps necessary to address the challenges and gaps. According to the website for the Sandia National Laboratories, the Energy-Water Roadmap process was expected to result in a report summarizing needs; prioritization criteria; major gaps; innovative technical approaches and associated research needs; research and development priorities and strategies; and associated policy, regulatory, and economic assessments. However, as of September 2012, no report has been issued.

## Uncertainties that Affect Energy and Water Must Be Considered in Setting Federal Policies Related to These Resources

Uncertainties—including the future makeup of the nation's energy portfolio and the potential impacts of climate change—must be considered when developing and implementing national energy and water policies, according to our past work on the energy-water nexus, studies we reviewed, and specialists we spoke with. As the following examples demonstrate, these uncertainties could significantly affect the future supply and demand of both energy and water, and therefore are external factors that must be accounted for when developing national policies:

- The magnitude of the impacts on water resources stemming from the nation's future energy use will vary depending on what sources of energy are pursued. For example, developing unconventional energy

sources, such as shale oil and shale gas,[42] could have significant impacts on the quality and quantity of water resources, but the magnitude of these impacts is unknown because of uncertainty about the future scale and scope of shale oil and gas development. Similarly, if oil shale becomes economically feasible to produce on a commercial scale, the industry could have significant impacts on water quality and quantity, but the magnitude of these impacts is unknown because of technological uncertainties and because the size of a future oil shale industry is unknown, as we discussed in our October 2010 report on oil shale.[43] In addition, a recent report from DOE's National Renewable Energy Laboratory looked at a variety of scenarios for the increased use of renewable energy sources to generate electricity. For example, the laboratory reported that if the country were able to switch to 80 percent renewable electricity by the year 2050, such a switch could reduce the power sector's annual water use by approximately 50 percent.[44] However, renewable energy sources also vary in their water use, so the type of renewable energy we use in the future will have varying impacts on water supplies. For example, solar photovoltaic panels and wind turbines consume minimal water during normal operation.[45] However, concentrating solar power plants that use wet cooling could significantly increase water demand, consuming up to twice as much water per unit of

---

[42]Shale oil and shale gas refers to product that is trapped within underground shale formations; these fine-grain sedimentary rocks can be rich sources of oil and natural gas. Unlike oil shale, shale oil and shale gas do not require heating for resource extraction.

[43]GAO-11-35.

[44]The report looked at a variety of scenarios, ranging from 30- to 90-percent renewable generation in 2050. The report focused on 80-percent renewable generation because the laboratory's analyses concluded that renewable energy generation from technologies that are commercially available today, in combination with a more flexible electric system, would be technically adequate to supply 80 percent of projected U.S. electricity generation in 2050, albeit at increased electricity prices compared with today's baseline. Nearly 50 percent of the renewable electricity in this 80-percent scenario consists of variable wind and solar photovoltaic generation. (National Renewable Energy Laboratory, *Renewable Electricity Futures Study: Exploration of High-Penetration Renewable Electricity Futures*, vol. 1 (2012).)

[45]Solar photovoltaic panels and wind turbines use small amounts of water for panel and blade washing, respectively.

electricity produced as traditional fossil fuel power plants.[46] Concerns with concentrating solar power plants are particularly acute in the Southwest—a prime location for siting these facilities because of abundant sunshine—because water supplies in the region are already limited.[47] Consequently, not fully understanding and accounting for the potential differences in the future energy portfolio's impact on water supply and quality when developing a national energy policy may result in negative unintended consequences.

- As we previously discussed in our March 2011 report on energy for water supply,[48] to address growing concerns about emerging contaminants and nutrients in the nation's water bodies, additional or more stringent regulatory standards could increase the energy demands of treatment processes in the future, but the degree to which energy use would increase depends on the regulations that are implemented. Specifically, promulgation of more stringent standards would most likely require additional levels of treatment, and the use of more energy-intensive technologies, such as ozonation and membrane filtration,[49] may be necessary to meet such new standards.[50] Regulatory changes could also increase energy demands at other stages of the urban water life cycle. For example, higher standards for effluent discharge from wastewater treatment plants could increase the energy required for treatment of the effluent. Furthermore, stricter water quality standards for receiving waters

---

[46]Concentrating solar power plants operate by using mirrors to reflect and concentrate sunlight onto receivers that collect the solar energy and convert it to heat. This thermal energy is used to produce electricity via a steam turbine or heat engine driving a generator to produce electricity.

[47]According to DOE officials, concentrating solar power plants are generally being built with dry cooling systems in the Southwest to minimize water use. However, according to a 2009 DOE report to Congress, while dry cooling can eliminate over 90 percent of the water consumed by wet-cooled concentrating solar power plants, wet cooling is preferred to minimize cost and maximize efficiency.

[48]GAO-11-225.

[49]Ozonation is a water treatment process that destroys bacteria and other microorganisms through the infusion of ozone, a gas produced by subjecting oxygen molecules to high electrical voltage. Membrane filtration uses pressure to force untreated water through a semipermeable membrane, thereby filtering out bacteria and other microorganisms, particulate material, and natural organic matter.

[50]Such standards may include drinking water standards set under the Safe Drinking Water Act or standards for the treatment of wastewater discharged from municipal wastewater treatment plants under the Clean Water Act.

could necessitate that more plants employ advanced treatment standards, resulting in increased energy use for the additional treatment or to pump effluent farther away to other waters. As a result, policymakers will need to consider the energy inputs that will be required to meet new water quality standards when developing these regulatory choices.

According to the literature we reviewed and specialists we spoke with, climate change, population growth, increased competition for resources, and demographic shifts are expected to exacerbate the challenges associated with water and energy supply and demand, and shifts in any of these areas are expected to increase demand for both of these resources. Moreover, the effects of climate change are expected to vary by location and, in some locations, are expected to increase demand for both energy and water resources while simultaneously decreasing water supplies. According to the literature we reviewed, higher temperatures from climate change are expected to lead to additional demand for air conditioning and, therefore, electricity. This increased electricity demand will, in turn, lead to increases in water consumption associated with power generation. However, at the same time, climate change is expected to change the quantity and reliability of water supplies so that less water may be available in some regions, thereby resulting in reduced water supplies for use by the energy sector, according to some specialists we spoke with. In addition, as one specialist told us, higher temperatures from climate change will produce more evaporation from water reservoirs and other bodies of water, such as the Great Lakes, which can produce significant water losses. Furthermore, the literature we reviewed and specialists we spoke with noted that the impacts of climate change are uncertain with some areas receiving more precipitation than they currently experience, rather than drought.

Problems associated with climate change are only exacerbated by population growth and competition for water resources. Specifically, more people will consume more water, increasing the municipal sector's water demand. To meet these increasing demands, some states, especially those in areas that are already water stressed, such as Texas, have pursued alternative sources of water, such as desalinated water, which are more energy-intensive than traditional groundwater and surface water supplies. In addition, because of a warmer climate and decreased precipitation, farmers are expected to withdraw more water to irrigate crops. Minimum water levels are also necessary for other uses, such as recreation and industry, as well as to support wildlife and maintain ecosystems. Furthermore, demographic shifts, such as migration to the

hot, arid Southwest, could place additional demands on both energy and water supplies. In light of all of these uncertainties, some specialists told us that water and energy policies must be resilient and flexible enough to adapt to changing circumstances. For example, these specialists told us that because of the uncertain effects of climate change, the development of plans and policies should be adaptable to account for variability over time and by location.

# Conclusions

The growth in water and energy demands for development and other uses is occurring at a time when the nation's supplies are stressed by a growing population, a variety of new and changing uses, and environmental challenges such as climate change. A number of agencies have responsibility for managing specific aspects of the energy-water nexus, including DOE, EPA, USDA, and Interior, but these agencies do not consistently or strategically collaborate on these inextricably linked issues to ensure a harmonized approach to energy and water resource planning. This lack of coordination often results in a stove-piped approach to managing these resources that does not take into account all the possible tradeoffs and interrelationships. Some agencies have taken steps to examine this issue within their own agency, such as DOE and Interior's jointly organized meetings to improve thermoelectric power plant data in response to a recommendation from our October 2009 report. However, in general, federal efforts remain uncoordinated. Moreover, there is a need for enhanced research and data efforts that could benefit from greater interagency cooperation. The Energy Policy Act of 2005 requires DOE to implement a program of research, development, demonstration, and commercial action to address energy and water issues and assess existing federal programs, but DOE has not yet implemented this program. In not carrying out this directive, DOE is missing an opportunity to provide information that could help Congress, other federal agencies, and the public better understand the key energy-water nexus issues identified in our series of reports and take coordinated action to protect these invaluable resources.

# Recommendation for Executive Action

To help address some of the research and data gaps that we and others have identified related to the tradeoffs associated with the energy and water nexus, and to ensure collaboration to address the nexus, we recommend that the Secretary of Energy take the actions necessary to establish a program to address the energy-water nexus, with involvement from other federal agencies as described in the Energy Policy Act of 2005.

## Agency Comments and Our Evaluation

We provided a draft of this report to USDA, DOE, Interior, and EPA for review and comment. In its written comments, reproduced in appendix II, DOE agreed with our recommendation. Specifically, DOE stated that it already has a number of research activities underway related to the energy-water nexus, such as energy-water data collection and modeling. In addition, DOE stated that it will initiate more assertive engagement with program managers through an internal workshop to discuss existing activities and clarify priority areas for further data collection and analysis. As part of its efforts, DOE stated that it will continue to engage other agencies and collaborate with experts.

EPA provided technical comments, which we incorporated as appropriate. In its technical comments, EPA stated that the agency supported the findings of the report, but noted that more emphasis should be placed on the changes in population demographics that stress the supply of energy and water. Specifically, the agency identified increasing population shifts to coastal areas, desalinization, increased use of air conditioning, and agricultural irrigation as stressors of particular concern. We agree that these areas could affect the energy-water nexus, as we discuss in our report. EPA also identified the need for a comprehensive systems analysis of energy, water, and agricultural cycles and their feedback loops to help avoid unintended consequences. USDA and Interior did not provide any comments.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the Secretary of Energy, the appropriate congressional committees, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact Anu K. Mittal at (202) 512-6100 or mittala@gao.gov or Frank Rusco at (202) 512-3841 or ruscof@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page

of this report. GAO staff who made key contributions to this report are listed in appendix III.

Sincerely yours,

Anu K. Mittal
Director, Natural Resources and Environment

Frank Rusco
Director, Natural Resources and Environment

# Appendix I: Objectives, Scope, and Methodology

To conduct this work, we systematically reviewed GAO's five prior reports on the energy-water nexus to develop the key issues that Congress and federal agencies need to consider when developing and implementing national policies for energy and water resources. To validate these themes, we conducted a content analysis of 11 key studies and reports that examine this nexus, including peer-reviewed scientific periodicals, government-sponsored research and studies, and reports from nongovernmental research organizations. We also included in the content analysis 19 interviews with a wide range of 37 specialists whom we identified as having expertise related to the energy-water nexus in the United States. For the purposes of our interview analysis, each interview represents the views of one specialist even if more than one specialist was present at the interview. We selected these specialists using an iterative process, soliciting additional names from each person we interviewed. From among those identified, we conducted structured interviews with specialists who could provide us with a broad range of perspectives on the energy-water nexus as well as specialists whom we identified during our systematic review of studies who have analyzed (1) the energy-water nexus in general or (2) particular segments (i.e., water use by thermoelectric power plants) of the nexus. These specialists represented a variety of organizations, including federal officials; university researchers; water and energy industry representatives from groups such as the American Water Works Association and the Electric Power Research Institute; and nongovernmental organizations, such as the Pacific Institute.[1] Representatives from federal agencies included officials, scientists, and researchers from the Department of Energy's national laboratories and Energy Information Administration; the Environmental Protection Agency; the Department of the Interior's U.S. Geological Survey; and the U.S. Department of Agriculture. We also reviewed federal laws and regulations as applicable.

We conducted a content analysis on the key literature and interviews with specialists using NVivo software. Content analysis is a methodology for structuring and analyzing written material. Specifically, using our systematic review of GAO's energy-water nexus reports to identify key issues that Congress and federal agencies need to consider when developing and implementing national policies for energy and water

---

[1]The Pacific Institute conducts interdisciplinary research and partners with stakeholders to produce solutions that advance environmental protection, economic development, and social equity in California, nationally, and internationally.

**Appendix I: Objectives, Scope, and Methodology**

resources, we reviewed each study and interview and coded statements within them based on themes we developed from the GAO reports. The coding was conducted independently by two GAO analysts after checking for intercoder reliability. We developed agreement statistics and discussed and resolved any discrepancies in coding. We used the following categories to quantify the literature and responses of specialists: "some" refers to at least two studies or specialists, "several" refers to at least five studies or specialists, and "many" refers to eight or more studies or specialists.

We conducted this performance audit from March 2012 to September 2012, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Comments from the Department of Energy



**Department of Energy**
Washington, DC 20585

August 28, 2012

Mr. Frank Rusco
Director
Natural Resources and Environment
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Mr. Rusco:

The Department of Energy (DOE) welcomes the opportunity to respond to the recommendation by the U.S. Government Accountability Office (GAO) for the agency to act to address the energy-water nexus. DOE recognizes America's national interest in sound management of all natural resources, including water and energy. The issues raised by the nexus between energy and water span beyond any one technology program at the DOE, and, in fact, they reach virtually every energy program.

Current DOE research activities relevant to the energy-water nexus include but are not limited to lifecycle cost analysis, energy-water data collection and modeling (including for transmission planning purposes), development of more water-efficient energy technologies and more energy-efficient technologies involving water, integration of renewable energy in the electric power grid, drought and climate change vulnerability assessments within the energy sector. Because of the variety of roles that water plays across different energy technologies, DOE can best address the issues by incorporating consideration of water directly into the specific energy programs, rather than creating a separate silo focused on the energy-water nexus.

Recognizing that there is much more yet to analyze, DOE accepts the GAO recommendation that additional effort be committed to help address some of the gaps in data and analysis for decision-makers. Because multiple DOE research program offices have an interest in the water input and output attributes of various energy technologies, these experts are already in dialogue, and DOE will benefit from improved awareness and communication about energy-water interdependencies. With the GAO recommendation, DOE will initiate more assertive engagement with program managers through an internal workshop to surface any further existing activities and clarify priority areas for further data collection and analysis. In addition to integrating considerations about the energy-water nexus into activities across the applied energy research and development programs, DOE will also continue to engage other agencies relevant to the energy-water nexus in order to coordinate and collaborate with experts who


Printed with soy ink on recycled paper

**Appendix II: Comments from the Department of Energy**

have complementary interests and information resources and will expand these efforts where appropriate.

DOE appreciates the contribution GAO has made to an important policy dialogue through its series of reports on energy and water. and particularly in this capstone report highlighting some of the persistent challenges and opportunities for the Federal government.

Sincerely,

David B. Sandalow
Under Secretary of Energy (Acting) and
Assistant Secretary for Policy and
International Affairs

# Appendix III: GAO Contacts and Staff Acknowledgments

## GAO Contacts

Anu K. Mittal, (202) 512-6100 or mittala@gao.gov

Frank Rusco, (202) 512-3841 or ruscof@gao.gov

## Staff Acknowledgments

In addition to the contacts named above, Elizabeth Erdmann (Assistant Director), Antoinette Capaccio, Janice Ceperich, Alison O'Neill, Steven Putansu, Rebecca Shea, and Lisa Vojta made key contributions to this report.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.

# NO MORE DRILLING IN THE DARK:
## Exposing the Hazards of Natural Gas Production and Protecting America's Drinking Water and Wildlife Habitats

**N A T I O N A L   W I L D L I F E   F E D E R A T I O N    2 0 1 1**





# Acknowledgments

This report was researched and written by Richard Forrest.

I would like to thank those who reviewed drafts of this report, including Steve Bender, Jan Jarrett, Bentley Johnson, Todd Keller, John Kostyack, Joe Mendelson, Jen Mihills, Stephanie Pappas, Tim Warman and Kate Zimmerman. Barbara Sgouros provided the design and layout.

I would also like to thank EcoFlight and www.marcellus-shale.us for kindly providing many of the photos used in this report.

**No More Drilling in the Dark:**
**Exposing the Hazards of Natural Gas**
**Production and Protecting America's**
**Drinking Water and Wildlife Habitats**
August 2011

Prepared by National Wildlife Federation Staff:
    Richard Forrest, Energy Specialist

©2011 by the National Wildlife Federation
All Rights Reserved.
Larry J. Schweiger
President and Chief Executive Officer

Cover photo: istockphoto.com

**FOR MORE INFORMATION ON NWF'S WORK ON CLIMATE AND ENERGY ISSUES, PLEASE VISIT WWW.NWF.ORG/GLOBAL-WARMING.ASPX**

# Contents



Courtesy of EcoFlight

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Unconventional Natural Gas Extraction –
What it Involves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Impacts on Water Quality and Supply . . . . . . . . . . . . . 9

Impacts on Terrestrial Habitats and Wildlife . . . . . . 12

Impacts on Air Quality . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Impacts on Greenhouse Gas Emissions . . . . . . . . . . 15

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Recommendations – Toward a Responsible Policy
Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# Executive Summary



Bureau of Land Management

In recent years, there has been explosive growth in industry activities to extract natural gas from shale formations located throughout America. While the growth of the natural gas industry has provided some economic benefits to local economies, it has also been accompanied by growing public fears. In particular, concern and opposition have centered on the process of hydraulic fracturing ("fracking") used to extract shale gas.

This report provides an overview of unconventional gas drilling and the key concerns and potential threats that such drilling raises for America's land, water, air and wildlife. It also provides a number of recommendations for addressing and reducing related environmental impacts.

While many potential impacts remain unknown, there have been documented cases of pollution and impacts on habitats that raise serious concerns. Fracking chemicals and methane have contaminated underground water resources. The clearing of forests for the construction of drilling pads and access roads has fragmented habitats and led to silt runoff. Drilling accidents have led to pollution of streams and other water bodies. Fracking fluids have been shown to be harmful or deadly for plants and animals. Exhaust from drilling-related machinery has worsened air pollution. Methane leakages have contributed to increased emissions of greenhouse gases in the atmosphere, which scientists link to climate change and ocean acidification.

While some state and federal agencies have begun working to respond to the growth of the industry and provide improved regulation and oversight, much more needs to be done. The National Wildlife Federation recommends a number of actions to ensure that the development of unconventional natural gas resources is pursued in an

environmentally responsible manner. Needed improvements to regulatory frameworks and industry practices include greater transparency, improved research and monitoring, eliminating existing loopholes and exemptions from environmental laws, establishing mitigation and compensation mechanisms, and improving practices to reduce impacts on water resources and habitats.

To the extent that natural gas can be substituted for coal and oil – and especially if its use can help us avoid energy sources such as tar sands and oil from risky offshore drilling – there can be some environmental benefits. Nevertheless, natural gas produces greenhouse gas emissions – and is a limited fossil fuel resource that will someday be depleted. It is therefore no more than a temporary stopgap as our nation makes a necessary transition to renewable energy sources.

America should choose extraction practices that do not endanger the long-term integrity and health of our forests, rivers and grasslands, and the wildlife species that depend on them. The National Wildlife Federation will remain committed to educating the public and lawmakers about the risks posed by unconventional natural gas exploitation, and we will work for the enactment of prudent regulations to safeguard our nation's land, air, water and wildlife.



Courtesy of EcoFlight

# Introduction

**Over the past few years, a shale gas revolution has swept America. New applications of drilling technologies have made it feasible to extract large quantities of natural gas from "unconventional" resources trapped in shale rock formations found throughout the United States.[1] These natural gas-rich shale formations are found thousands of feet below the surface — often beneath rural back-yards, fields and forests — and in places, such as Arkansas and Michigan, that have never before seen intensive gas drilling. The largest of these deposits is the Marcellus Shale, which underlies much of New York, Ohio, Pennsylvania and West Virginia.**



iStockphoto

While increasing the extraction of natural gas can help to provide energy for America's future, the new approach to natural gas drilling poses new risks to our environment. There are many reasons for concern. There have been reports of flammable methane migrating into drinking water supplies located near active drilling sites. Spills of drilling fluids and contaminated water are believed to have killed livestock, as well as fish and other aquatic life in ponds and streams. The construction of roads, drilling pads and pipelines — and enormous numbers of truck trips associated with drilling activities on once quiet byways — are impacting rural communities and affecting America's landscape. So while the shale gas boom has excited investors, it has also concerned residents of swiftly industrializing rural areas and those who live and recreate downstream.

Indeed, unconventional natural gas exploitation has become very controversial, with strong views staked out on opposing sides. One key technology, high-volume hydraulic fracturing — also known as "fracking" — has become the subject of especially heated debate. Residents have risen up in protest in some communities to protect their water and lands from the potential impacts from fracking operations. Natural gas proponents, in turn, claim that such concerns are exaggerated. Unfortunately, information about impacts has not been systematically collected, and scientific research has not dispelled such fears. The concerns over fracking have led to the practice being banned in the Canadian province of Quebec[2] and France;[3] the state of New York also had a temporary de facto moratorium on fracking, and as of August 2011 was in the process of establishing new regulations to guide future drilling operations.

Unfortunately, fear is fed by a lack of certainty — and much about the effects of shale gas drilling, especially the long-term effects, remain unknown. Fracking takes place in deep subterranean strata, beyond the ability of governments, scientists and citizens to closely monitor — or for industry to remediate contamination that may occur. For those who are concerned with the environmental impact of these new large-scale drilling activities, a key concern is that comprehensive baseline research, surveys and monitoring studies are not being conducted. Unless safeguards are put in place, tens of thousands of wells could be drilled in various

regions throughout our nation before we understand how this will affect our land, water, air, and wildlife.

Every approach to energy development has its own risks and potential impacts. When compared to coal and oil, unconventional natural gas extraction may be somewhat less polluting — but only if it is pursued in a responsible and cautious way, avoiding the most damaging practices and impacts.

As America charts a course for its energy future, decisions must be based on a full consideration of the impacts of energy development activities. This requires full transparency, intensive research, and comprehensive monitoring. The situation is complicated by the fact that the impacts of unconventional natural gas production are wide-ranging and complex; no single indicator can capture the full impacts. The issue is so complicated that in July 2011, the Marcellus Shale Advisory Commission, which had been established to advise the governor of Pennsylvania, made 96 different recommendations — 43 concerning the environment — for improving the regulation of natural gas development.[4]

This report provides an overview of unconventional gas drilling and the key concerns and potential threats that it raises for America's land, water, air and wildlife. It also provides a number of recommendations for addressing and minimizing the environmental impacts of unconventional natural gas development. By adopting a sensible system of regulatory safeguards, the impact of shale gas extraction can be better understood and managed.

It is time for the entire process to be better understood, open to public scrutiny, and guided by sound oversight and environmental protections.



## UNITED STATES SHALE GAS PLAYS

**FIGURE 1:** Areas of shale gas resources (known in the industry as "plays") are widely distributed throughout the United States. (Source: U.S. Energy Information Administration)

# Unconventional Natural Gas Extraction — What it Involves

Hydraulic fracturing — or "fracking" — is a process in which large volumes of fluids — a mixture of water, sand and chemicals — are injected at high pressure underground to fracture or crack open layers of shale rock. This stimulates the natural gas, which is trapped in tiny pores in the rock, to flow out and be captured aboveground at the wellhead.

Combined with horizontal drilling (also known as directional drilling), fracking allows for the extraction of large volumes of previously unrecoverable natural gas resources. Many of these resources are in areas that previously had not experienced intensive natural gas extraction, and the fees paid to owners of subsurface mineral rights can provide attractive sources of income for some. Drilling operations can also be a significant, although potentially short-term, source of jobs and economic development in areas that are usually rural and lacking other economic development opportunities.

Fracturing of the shale can take place 3,000-15,000 feet below the surface. As shown in the schematic image below, wells that are drilled down to a level of thousands of feet can traverse natural aquifers that lie closer to the surface (typically less than one thousand feet below the surface) and which people may tap into through wells in order to obtain water for drinking, bathing, and agricultural uses. The process of drilling through these water tables can allow pollution to enter such subsurface water resources, especially if well casings (the steel pipes lining the well hole) rupture or otherwise fail.

Although fracking takes place below the water table, the drilling necessarily requires puncturing through layers of rock and water closer to the surface. To claim that aquifers cannot be impacted is therefore a logical impossibility; failure of a well casing at the depth of an aquifer would allow drilling fluids to enter the aquifer. In addition, the high pressures involved in the fracking process can put severe stresses on the well casings, cement and other components of a well. Hydraulic fracturing may therefore lead to more well failures (cracking and rupturing and release of gases and fluids) compared to non-fracked wells, with consequences for safety as well as air and water pollution.

The process of exploiting unconventional natural gas resources involves a number of phases, beginning with aerial and seismic exploration to determine promising drilling sites; planning and well siting; drilling of the well using a temporary drilling derrick; and "well development" or "stimulation" —



**FIGURE 2:** Hydraulic fracturing (fracking) gas drilling concept illustration.



Courtesy of www.marcellus-shale.us

when the hydraulic fracturing process takes place — to release the natural gas trapped in the shale. This is followed by the so-called "completion phase," in which the derrick is removed and a mechanism called a production wellhead (or "Christmas tree") is installed to collect the natural gas which flows out of the underground rock over a period of months and years. Various stages throughout this process involve the collection and handling of waste water and chemicals. The natural gas extracted also needs to be transported through pipelines to distant markets and processing facilities. A single well may be repeatedly stimulated through multiple hydraulic fracturing operations and new drilling holes may be drilled in different directions, but once a well has reached the end of its productive life, it is closed.

## FRACKING FLUIDS

Fracking fluids are comprised mainly of water and sand (the sand serves as a "proppant," holding open the fissures created when the shale is fractured); a small percentage of the fracking fluid is made up of various chemicals. These chemicals may include acids (such as hydrochloric acid), biocides, corrosion inhibitors (such as the highly toxic chemical methanol), gelling agents (such as ethylene glycol), and surfactants (such as naphthalene and isopropyl alcohol).[5] The chemicals used in fracking may include known toxic chemicals, including carcinogens.[6]

The specific mixture of chemicals used depends on the geological and other conditions of the drilling site. Companies have tended to not release full information on the specific chemical mixtures they use;

companies may wish to protect their proprietary corporate brands of mixtures of chemicals as trade secrets. Drilling companies may also use "off-the-shelf" chemical mixtures supplied by vendors, without knowing exactly what chemicals they include.

There would appear to be no legitimate reason to not fully disclose all of the chemicals used in fracking operations. Some companies are on record in support of full disclosure, and recognize the importance of transparency in gaining public trust.[7]

Some chemicals have many alternative names, complicating regulation and monitoring activities. For example, the website FracFocus lists 28 names in use for the chemical ethylene glycol,[8] which is a common component of fracking fluids and which is known for its use as antifreeze. The sheer number of

chemicals and their combinations are daunting; a report for the U.S. House of Representatives Committee on Energy and Commerce found that between 2005 and 2009, fourteen oil and gas service companies that responded to a request for information had "used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components."[9]

Many of the chemicals used are hazardous to humans and wildlife. According to the House committee report, "the hydraulic fracturing companies used 95 products containing 13 different carcinogens."[10] Although the toxic components of fracking fluid are used in dilute concentrations, and the health impacts of any pollutants depend on concentrations and length of exposure, the fate of fracking fluids underground is almost completely unstudied.

The federal Safe Water Drinking Act (SWDA) of 1974 was created in part for the Environmental Protection Agency to control materials that are injected underground and to therefore protect underground sources of drinking water. Unfortunately, injections for the purpose of hydraulic fracturing were specifically exempted from such regulation under an amendment to the Energy Policy Act of 2005.[11] The use of diesel fuels for fracking remained subject to SWDA regulation, however; despite this, as well as an additional pledge by key drilling companies to not use diesel fuels in fracking operations, members of the U.S. House of Representatives Committee on Energy & Commerce

notified the EPA that an investigation had found that "Between 2005 and 2009, oil and gas service companies injected 32.2 million gallons of diesel fuel or hydraulic fracturing fluids containing diesel fuel in wells in 19 states."[12]

Once the fracturing occurs, a substantial proportion — anywhere from 15 to 90 percent[13] — of the injected water flows back to the surface (such water is known as "flowback water"); it therefore contains the chemicals that were originally injected as fracking fluid — as well as other components, including radioactive isotopes, that can leach out of the rock layers that the water has flowed through. "Produced water," which is usually highly saline water

that naturally occurs underground, may also flow out of the well bore as a result of the drilling and stimulation of the well, bringing with it impurities. Some of the flowback water and produced water can be reused in certain operations, but often the water is too saline to reuse. This water may be reinjected into the ground in some areas having appropriate geological formations to accommodate such reinjections.[14] If not reinjected, the waste water is normally held in an open pit near the drilling pad, or trucked to wastewater treatment plants — although in some locations, particularly in the western U.S., produced water is also discharged directly into streams.[15]



**FIGURE 3:  Detailed schematic view of the hydraulic fracturing process in the Marcellus Shale, where shale gas resources are concentrated roughly 7,000 feet below the surface; shale gas may be extracted from other depths in other regions. (Note that "fracing" is an alternative spelling for the now more common "fracking.")**
(Diagram by Al Granberg; Creative Commons image courtesy of ProPublica.)

# Impacts on Water Quality and Supply

Perhaps the most controversial and potentially damaging risks from unconventional natural gas exploitation are the potential impacts on water.

Fears of water pollution related to fracking have been the central focus of opposition by many affected communities. Newspapers and websites have reported numerous cases in which drinking water has likely been impacted by natural gas drilling operations. There are also multiple incidents where drilling companies have paid fines or compensation for impacts on water quality — although in many such cases they have done so without formally admitting legal liability. It is difficult to draw causal links between a company's drilling operations and underground water contamination, especially considering that subterranean geological features and hydrologic flows lie far beyond the ability of investigators to examine directly. For chemicals placed underground without markers, it may take decades to identify the source of underground pollution plumes. It may not be possible to clearly link cause and effect in such cases, which hampers proper investigations and the imposition of legal remedies for problems that may arise.

Some in the natural gas industry have claimed that there have been no documented cases of fracking fluid impacting water sources. Nevertheless, in early August 2011, news articles publicized a 1987 report by the U.S. Environmental Protection Agency documenting a case in which fracking chemicals were found to have contaminated a drinking water well in West Virginia in 1984.[16] The lack of documentation of other similar cases appears to be the result of a lack of access to information; according to the *New York Times*, researchers "were unable to investigate many suspected



iStockphoto

cases" of similar potential contamination, "because their details were sealed from the public when energy companies settled lawsuits with landowners."[17]

The overall process of drilling for unconventional natural gas, which involves fracking for as much as ninety percent of wells,[18] has involved various kinds of stresses on America's water resources.

## SURFACE WATER USE AND WITHDRAWALS

Each time that a well is hydraulically fractured, hundreds of thousands of gallons of water are required. As this procedure may be carried out many times, each well may therefore require several million gallons of water for fracking operations.[19]

This water normally must be withdrawn from nearby wells, lakes, rivers, or industrial or municipal water systems. Large-scale water withdrawals

may result in reducing the flow of streams below levels acceptable for fish (such as brook trout) and other wildlife. Such lowered stream flows can also lead to higher water temperatures and other impacts on wildlife habitat conditions. Water usage is of particular concern in areas experiencing drought, including the Eagle Ford shale gas region in Texas, where officials and residents have been concerned that the use of limited water resources for natural gas extraction activities will result in insufficient water for other important uses.[20]

## METHANE MIGRATION INTO GROUNDWATER

The process of releasing natural gas from layers of rock through fracking is believed to potentially lead to the migration of gases into other geological layers, including aquifers. Groundwater near drilling wells has in fact been contaminated with methane,



Courtesy of www.marcellus-shale.us

the main component of natural gas. This can pose a fire and explosion hazard; the health risks of drinking methane-contaminated water remain unknown.

While some cases of methane in water may be due to other causes, a peer-reviewed study by researchers from Duke University found that water from wells closer to active natural gas drilling sites had higher concentrations of methane.[21] The researchers sampled water from wells and found that "Methane concentrations were 17-times higher on average...in shallow wells from active drilling and extraction areas than in wells from nonactive areas." This study was conducted in limited areas of New York and Pennsylvania, and conditions in other areas and states remain unknown.

Migration of methane into groundwater can be caused by the failure of drilling well casings. In 2009, the State of Pennsylvania Department of Environmental Protection (DEP) issued a Notice of Violation to Cabot Oil and Gas Company related to their operations in Dimock, Pennsylvania; an investigation by the DEP "revealed that Cabot had caused or allowed [natural] gas from lower formations to enter fresh groundwater."[22] Cabot was requested to provide free methane detectors and alternative water

supplies for several affected families, was required to pay a $4.1 million settlement,[23] and had its drilling activities in the area suspended. The DEP also cited improper well casing and cementing as a cause of the migration into groundwater of shallow, non-shale natural gas in an incident in Bradford County, Pennsylvania, which led to the contamination of drinking water used by 16 families. For this incident, the company Chesapeake Energy was fined over $1 million.[24] Many cases in which groundwater resources have been impacted by methane migration involve wells that would not have been drilled if fracking were not a part of the overall drilling operation, making such drilling profitable.

Clearly, the mechanisms and impacts of such underground gas migration call for a greatly enhanced program of research, monitoring, and precautionary safeguards to avoid impacts on underground water sources that are used by so many Americans.

## OTHER SUBSURFACE WATER QUALITY IMPACTS

While comprehensive studies of the impact of unconventional natural gas extraction activities on water quality have not been undertaken, impacts are quite likely to emerge over time,

given the nature of the geological pathways that exist or that are created as a result of fracking operations. A study by the New York City Department of Environmental Protection[25] (NYC DEP) concluded that layers of rock normally serve as a natural barrier between shale formations and the more shallow aquifers that can be used for drinking water. However,

"This protection may be compromised during gas well drilling and stimulation. Casing or grouting failures, existing subsurface fractures, and fractures created during stimulation that propagate beyond the target formation can create or enhance hydraulic pathways between previously isolated formations. These pathways can allow drilling and fracturing chemicals or formation material (e.g., hydrocarbons or saline water) to contaminate shallow groundwater and surface water resources.

"...Subsurface conditions are not static, and faults can develop or widen over time. Natural gas development activities may increase the likelihood of movement of existing, naturally occurring faults. Induced seismicity is known to be associated with injection wells, and has reportedly been linked with hydrofracturing operations."

NYC DEP also found that wells "may result in contact with saline aquifers or formations that contain hydrocarbons, heavy metals, radionuclides or other potential contaminants."[26]

Underground water does not always stay underground; it may come to the surface in springs that lead to water bodies where wildlife species drink, feed or breed. Water pumped out of the ground through wells may also be applied to agricultural fields inhabited or frequented by wildlife species. This

highlights the need to address the risks that natural gas extraction may create new hydraulic pathways allowing underground radioactive or other toxic material to be brought to the surface.

## OTHER SURFACE WATER IMPACTS

Unconventional natural gas drilling operations create waste water, including fracking fluids, flowback water and produced water. This waste water needs to be handled in a way that will not impact surface water, such as lakes and rivers. There have been reports of inappropriate disposal of high-salinity produced water, which entered rivers and streams. Waste water from drilling operations is often held in large open air waste pits, or "evaporation pits," which may leak as a result of improper linings, ruptures, fires and other accidents.

Even when wastewater is handled in accordance with regulations, it may be transported to wastewater treatment facilities that have been built mainly to treat household or industrial waste. The components of waste water from drilling operations are likely to be different from other wastes, and can include salts, heavy metals and radionuclides, which may therefore not be properly treated by such treatment facilities, ending up in public waterways.

The drilling pad, which needs to accommodate dozens of tanker trucks and other machinery, requires an area that needs to be cleared and leveled. Soil disturbed during this process may flow into rivers and lakes when there is a rainstorm, as soil denuded of vegetation can be washed down hillsides. This can lead to the silting of streams, which can impact fish and other organisms. Although there are some regulations established to address such stormwater flows in general, including the stormwater permitting provisions under the federal Clean Water Act,[27] construction activities for oil and gas drilling

operations have actually been exempted from the Clean Water Act,[28] under what has come to be known as the "Storm Water Runoff Loophole."

Drilling operations also involve heavy machinery, which may require lubricants, diesel fuel and other fluids that may spill and contaminate land and water in cases of accidents or improper handling. Accidents of many kinds — including drilling rig fires and explosions, spills, blowouts, failure of retention ponds, and overturned trucks — have released pollution that can flow into water bodies. A study by the Massachusetts Institute of Technology summarized the readily available accounts of pollution problems associated with natural gas drilling; this report identified 43 reports of pollution-related incidents, some of which involved fish kills and other impacts on wetlands and aquatic wildlife.[29] There are many cases of water contamination in which fracking has been suspected as a cause;[30] in many such cases, proper scientific studies do not appear to have been performed, in part due to lack of legal mandates and funds available to those affected.

Other energy technologies also have significant impacts on water. In comparison to other energy technologies, the extraction of natural gas in general requires less water per unit of usable energy produced. When natural gas is used in electricity generation facilities, less water is consumed than in the case of coal-fired plants or nuclear power plants.[31] In terms of unconventional natural gas, a recent study concluded that "natural gas produced by hydraulic fracturing consumes seven times more water than conventional gas extraction but roughly the same amount of water as conventional oil drilling."[32] When compared to the production of ethanol and other biofuels, unconventional natural gas production requires significantly less water on average — although these demands on water

resources may still have quite significant impacts, especially in arid regions in the western U.S.

The water impacts of unconventional natural gas drilling may be very localized; however, given the uncertainties of underground hydrology, it may be possible that larger regions and areas substantially removed from drilling sites may experience impacts, which may emerge only after years or decades. A key question, therefore, is how much of a risk to America's water are we willing to tolerate in order to develop unconventional natural gas resources?



iStockphoto

# Impacts on Terrestrial Habitats and Wildlife

The Nature Conservancy of Pennsylvania estimated that an average of 8.8 acres is required for each drilling pad in the Marcellus Shale region, including the area needed for storage facilities.[33] While the impact of a single drilling operation may not be enormous, the cumulative impact of many drilling locations can add up. Many thousands of wells may be drilled in regions to be developed for shale gas.

Drilling pads also require access roads, which may need to be newly constructed, along with waste pits. To transport the natural gas that is produced to end users, pipelines need to be built, as well as compressor stations, storage tanks and other facilities.

The cumulative effects of all of these activities can leave a large footprint on the landscape, reducing the available habitat for certain species. Wildlife species that depend on forest ecosystems can be impacted by the fragmentation of forested areas. Disruptions can affect areas beyond that taken up by the infrastructure itself; many wildlife species avoid cleared areas, and the "edge effects" of new clearings can prevent species from entering areas they previously used, and can also allow invasive species to displace native ones.

While the drilling of multiple horizontal wells from a single drilling pad has the advantage of potentially reducing the overall surface area required for drilling operations, the impact on the land is still significant. In the report "Pennsylvania Energy Impacts Assessment," The Nature Conservancy of Pennsylvania projected that 60,000 natural gas wells will be drilled over the coming two decades in the Marcellus Shale area of Pennsylvania,[34] in addition to the more than 3,000 drilled already. The organization projected that this would result in the clearing of 33,800 acres of forest, and that "Indirect impacts to adjacent forest interior habitats would total an additional 81,500 acres."[35]

Drilling activities can also negatively impact species dependent on habitats outside of forests. In determining whether the greater sage-grouse warranted protection under the Endangered Species Act, the United States Fish and Wildlife Service concluded that oil and gas drilling in western sagebrush habitats poses a serious threat to the viability of the species.[36] On the Pinedale Anticline in western Wyoming, researchers have documented a 60% drop in mule deer populations in areas impacted by gas drilling operations.[37]

Wildlife and their habitats can also be harmed by the discharges of water that accompany drilling operations. Fracking fluids can be deadly to plants. An experiment was conducted by a soil scientist with the U.S. Forest Service in which 75,000 gallons of fracking fluids were applied to the ground in a forested area one-quarter acre in size; this resulted in the death of much of the area's plants.[38] According to the abstract for this study,

"During application, severe damage and mortality of ground vegetation was observed, followed about 10 [days] later by premature leaf drop by the overstory trees. Two years after fluid application, 56% of the trees within the fluid application area were dead."

Fracking fluid spills have also impacted animals. In 2009, 17 cows were reported to have died in Caddo Parish, Louisiana, after rains washed fracking fluid into their grazing area.[39] Studies apparently have not been conducted to determine the effects on wildlife of contact with fracking fluids; wildlife would clearly be at risk from spills of fracking fluids or exposure to pits holding fracking flowback water, in which they could also become trapped. Wildlife and pets are known to be attracted to ethylene glycol, a common component of fracking fluids; ingestion can cause death.[40] While wastewater



iStockphoto

from natural gas drilling activities has reportedly been used in some areas for dust suppression and de-icing of roads,[41] intentionally spreading or spraying such wastewater on roads or vegetated areas would be expected to detrimentally impact flora and fauna.

The several hundred truck trips that may be required for the entire drilling process at a single well, as well as the noise and light from machinery, can also impact wildlife, disrupting and impeding their breeding and feeding activities.

Natural gas is highly flammable and also poses an explosion hazard. Accidents involving natural gas pipelines can be deadly. On September 9, 2010, a natural gas pipeline exploded in San Bruno, California, killing at least eight people. There have also been explosions at drilling sites, as occurred in February 2011 at a natural gas drilling site in Washington County, Pennsylvania.[42] After the immediate effects of a rupture of a natural gas well or pipeline, natural gas will dissipate into the air, unlike oil; spills of oil often require expensive clean up operations and can lead to significant harm to the marine environment or to rivers that serve as wildlife habitat and water sources for agriculture or human consumption. Nevertheless, natural gas explosions or fires could set off forest fires, especially in arid regions.

Given the novel and complex nature of shale gas development, and the fact that inexperienced landowners will be involved in granting rights for drilling operations on their land, it will be especially important that the regulatory framework err on the side of caution. A team of U.S. Forest Service scientists worked with a company that was going to drill at the Fernow Experimental Forest in West Virginia, seeking to minimize the environmental impacts of the drilling – yet even these experts concluded that they could not manage and anticipate all of the related impacts. They wrote,



Gary Kramer/USFWS

"The unexpected will always happen, and should be part of any planning discussions. The unexpected did occur during the development of the gas well and pipeline on the Fernow. We attribute such occurrences to accidents, equipment failures, and misconceptions about what to expect...Discussions of the process between the energy developer and the landowners/managers should happen early and often to be sure that all parties' expectations are clear...While we recognize that it is impossible to foresee every eventuality, we suggest that a thorough analysis of risks to natural resources, using alternative 'what-if' scenarios, should be conducted.

"Much more research is needed immediately to better understand and predict the effects of natural gas exploration and development on forests, particularly in the eastern United States. We were surprised by the paucity of peer-reviewed research evaluating effects of natural gas development on forest lands in the eastern United States...We also know little about the effects of exploration and development on ground water hydrology and water quality, and surprisingly little about effects on downstream surface waters. In general, information about effects on most fauna also is lacking..."[43]

The impacts on land, ecosystems and wildlife depend on the specific geology, watersheds, and proximity to habitat for wildlife and rare species. Nevertheless, such impacts should be considered whenever unconventional gas development is planned or pursued.



iStockphoto

# Impacts on Air Quality

The use of natural gas should be seen in comparison to other competing methods of electricity production. Using natural gas can improve air quality if it can replace the use of other fossil fuels that are more polluting.

Natural gas is composed mainly of methane, along with other hydrocarbon impurities – including butane, ethane and propane – and tends to have far fewer impurities that can cause air pollution

The use of natural gas for electricity generation is growing, which can be good for air quality, if natural gas power plants can supplant highly-polluting coal-fired electricity generating plants. In comparison to the burning of coal, the burning of natural gas results in far lower emissions of sulfur oxides (which contribute to acid rain), particulates and mercury. Natural gas combustion also results in lower emissions of volatile organic compounds and nitrous oxides, which contribute to the formation of the pollutants ground-level ozone and photochemical smog, and can lead to respiratory ailments.

Focusing on the air quality impacts of natural gas *combustion* does not tell the whole story, however. The *extraction* of unconventional natural gas can also create short- and long-term air quality problems that can impact the health of people and wildlife. Drilling rigs and gas compressor stations may involve the use of machinery, often powered by diesel generators, producing exhaust resulting in noxious odors and air pollution, including emissions of volatile organic compounds and nitrogen oxides, which contribute to regional ozone and smog levels.

The expansion of shale gas drilling is expected to increase ozone and smog levels in areas of the country that have not had to deal with this problem before. For example, despite its rural character, Wyoming's Upper Green River Basin experienced ozone pollution levels in March 2011 that were higher than levels of this pollutant that had been recorded in the dense urban area of Los Angeles at any time during the previous year.[44] Such air pollution can impact human health by exacerbating asthma and other respiratory ailments, and can also be expected to impact wildlife.

Clearly, if the industry fails to rein in pollution, there will likely be strengthened and ongoing opposition to unconventional natural gas extraction activities. Cleaning up this air pollution is not only essential, but can even be done at low cost. In July 2011, the Environmental Protection Agency proposed an updated set of air quality standards for the oil and gas industry that would reduce smog-creating volatile organic compounds and other pollutants.[45] The EPA concluded that significantly cleaning up these air pollutants would actually result in a net savings to the industry, while at the same time significantly reducing risks of respiratory problems and cancer.

# Impacts on Greenhouse Gas Emissions

Another impact on our atmosphere is greenhouse gas emissions. Greenhouse gases (GHGs) are those gases in the atmosphere — including water vapor, carbon dioxide, methane and chlorofluorocarbons — which block infrared radiation and thereby prevent heat from radiating into space. Increased concentrations of GHGs in Earth's atmosphere are expected by climate scientists to lead to increasing global temperatures and associated changes in climatic conditions, including more severe droughts, rainfall and heat waves. Such changes combine with habitat destruction and other threats to plants and animals, which can eventually lead to population declines and extinction of some species.[46]

Natural gas is mainly made up of methane; when burned, methane combines with oxygen in the air and is chemically converted to carbon dioxide and water vapor. The burning of natural gas results in lower emissions of carbon dioxide than burning other fossil fuels to produce the same amount of energy; natural gas has roughly one-half of the carbon dioxide emissions of coal on an energy-output basis.[47]

Focusing solely on the effects of combustion, numerous studies have concluded that replacing coal-fired power plants with natural gas-fired plants would help to reduce greenhouse gas emissions, all other things being equal. An MIT study found that switching over older coal-fired power plants to efficient natural gas power generation could decrease total U.S. carbon dioxide emissions by 8%.[48] Natural gas plants can also be more efficient overall than coal plants; new "combined cycle" power plants, which burn natural gas and also utilize the turbine exhaust to power a generator, are a particularly attractive approach to electricity generation.

However, a full life-cycle analysis of competing energy sources is necessary before reaching any conclusions about the greenhouse gas benefits of a transition from coal to natural gas. This is because methane is itself a potent greenhouse gas, and leakages of unburned methane from storage equipment and pipelines contribute to a higher overall life-cycle "greenhouse gas footprint" for natural gas as an energy source. If such unintentional releases, known as "fugitive emissions," are high, the overall greenhouse gas footprint of natural gas may in fact be worse than that of other energy sources. A study by researchers from Cornell University estimated that 3.6% to 7.9% of the "methane from shale-gas production escapes to the atmosphere in venting and leaks over the lifetime of a well."[49] Fugitive methane emissions are believed to be higher for shale gas than for conventional natural gas production,[50] specifically as a result of the hydraulic fracturing process, because methane can become mixed with the drilling flowback water, which reemerges above ground, where the methane can enter the atmosphere. The drilling process to reach deep shale gas deposits may also involve puncturing shallower reservoirs of methane, which can then seep out of the drill hole.

The amount of methane that is released at the various steps in the extraction and delivery process is not known. Even if the total amount of methane released through unconventional natural gas drilling activities could be known with certainty, assessing the lifecycle



iStockphoto

greenhouse gas impact of natural gas in comparison to that of other fossil fuels requires an arbitrary determination of the time-span that is to be considered. Methane has a "global warming potential" (GWP) that is far greater than that of carbon dioxide (that is, a given mass of methane traps a total amount of infrared radiation equivalent to many times the same mass of carbon dioxide; by definition, the GWP for carbon dioxide is 1.0 for all time spans). According to the United Nations Framework Convention on Climate Change, over a 20-year time span, the GWP of methane is 56[51] and over a 100-year time span it is 21. However, a new estimate indicates that the GWP of methane may be as high as 105 on a 20-year time span and 33 on a 100-year time span.[52] The Cornell study suggests that over a short time span, such as 20 years, the GHG footprint of unconventional gas is significantly greater than that for conventional gas.[53] The conclusions of this study are very preliminary, and the researchers acknowledge that further research is needed.



Unfortunately, the lifecycle greenhouse gas emissions associated with unconventional gas drilling are an area for which very little research has been conducted. It would be important to fully understand this important impact before promoting further natural gas extraction, as this could be contrary to the goal of reducing GHG emissions, if methane emissions are in fact as high as some estimate.

In addition to research on the lifecycle greenhouse gas impacts of fuels, much more research is urgently needed to develop systems for monitoring and eliminating fugitive methane emissions from natural gas infrastructure. Many technologies exist – such as reduced-emission valves – that can reduce methane emissions. Placing a high priority on the fugitive emissions issue can help spur the development and use of monitoring and control technologies to reduce overall GHG emissions.

# Conclusion

All energy development activities have environmental impacts; we should pursue those energy options that are the least damaging to human health and the environment, including habitats and wildlife.

Unfortunately, natural gas exploitation is taking place today in a rushed manner, before all of the needed environmental safeguards have been properly put in place, including adequate inspection systems and monitoring procedures.

Because unconventional natural gas development currently is proceeding without the full range of needed environmental safeguards, the natural gas that is being produced is cheaper than it would be if the full social and environmental costs of drilling were to be included. Current development activities are therefore fueled by a distorted sense of outsized future profits and underappreciated costs for ensuring safe operations that do not harm the environment. Such artificially cheap natural gas can undercut investors' support for renewable energy sources, such as wind and solar, which produce far less pollution.

Utilizing unconventional natural gas resources may in some cases be less damaging to the environment than utilizing other energy sources, such as tar sands, coal obtained through mountaintop removal mining, and oil from offshore drilling. Nevertheless, natural gas is a fossil fuel, one that results in emissions of the pollutants linked to global warming. It is also a resource that may be effectively depleted over coming decades; it is therefore no more than a temporary solution to our nation's energy needs.

Because natural gas will be a component of our energy future, America should choose extraction practices that do not endanger the long-term integrity and health of our forests, rivers and grasslands, and the wildlife species that depend on these habitats. A system of responsible environmental regulations and safeguards should be put in place to ensure that any exploitation of unconventional natural gas resources is conducted in a manner that will minimize environmental impacts and which will garner the trust of the public and be of long-term benefit to communities.



Courtesy of www.marcellus-shale.us



Courtesy of EcoFlight

# Recommendations — Toward a Responsible Policy Framework

The potential environmental and health risks of natural gas exploitation are real and must be addressed. The exploitation of unconventional natural gas resources is currently being pursued with insufficient public access to related information, and without the necessary research and monitoring taking place. The public needs more information, more participation in decisions, and for more safeguards to be put in place.

Natural gas development, transportation, processing and use must avoid, minimize and mitigate (in that order of priority) any potential damage to wildlife habitat and air and water quality. If delays in projects are required before such a framework can be put in place, then that is a small price to pay for safeguarding our nation's land, air, water and wildlife.

To ensure that the development of unconventional gas resources is done in an environmentally responsible manner, National Wildlife Federation recommends that unconventional natural gas resource development should proceed in keeping with a set of responsible environmental safeguards and regulatory frameworks. These should include:

- **Ensuring Transparency**

  The potential risks justify complete transparency and full public disclosure of all of the components of fracking fluids and their concentrations, as well as information regarding all other aspects of drilling operations that may impact the environment. Some states have recently passed laws to improve fracking chemical disclosure, but they allow for the exemption of "trade secret" items.[54] FracFocus, a new website for voluntary disclosure has been set up by the industry and lists those chemicals mandated for reporting by OSHA,[55] but all fracking operations should be mandated to report all of the components and concentrations of the chemicals used in fracking fluids. For this purpose, the FRAC Act (Fracturing Responsibility and Awareness of Chemicals Act), which ends the exemptions for drilling operations under the Safe Drinking Water Act, should be enacted.[56]

- **Improving Research and Monitoring**

  There is not enough information about the impacts, especially cumulative impacts, of hydraulic fracturing operations and unconventional natural gas exploitation. A comprehensive national program for research should be instituted, along with comprehensive monitoring of drilling operations by local, state and federal agencies. Independent audits of impacts should be supported and funded. A program for monitoring of methane leakages should be instituted, and support should be enhanced for the EPA's Natural Gas STAR Program, which promotes the adoption of technologies and practices that reduce methane emissions.[57] Research into mechanisms of methane contamination of groundwater and baseline surveys of water quality before drilling activities should be the norm. There should also be increased research on the potential impacts on wildlife and habitats from drilling activities.

- **Eliminating Loopholes and Exemptions**

  Fracking and drilling operations have been exempted from certain provisions of key laws that have been established to protect our nation's water and environment. The exemption under the Safe Water Drinking Act of regulation of fracking fluids injected



Courtesy of EcoFlight



Courtesy of www.marcellus-shale.us

underground should be removed. Fracking fluids should be categorized as industrial waste, unless operators can prove that their composition does not include toxic chemicals. There should be no exemptions in environmental laws for drilling operations; the existing Storm Water Runoff Loophole under the Clean Water Act and the air pollution exemptions that currently exist under the Clean Air Act should also be removed.

- **Establishing Mitigation and Compensation Mechanisms**

    If contamination of water resources or other major impacts occur, it will be essential for those affected to be able to be properly compensated, and for cleanup operations to be undertaken. Proper investigations should be mandated for any cases of water contamination in areas of shale gas extraction; this could be funded through state or federal funding mechanisms established through fees on drilling. Appropriate mechanisms for funding such activities should be mandatory in resource development areas. As it may not always be possible to establish cause and effect relationships for impacts that occur underground, and the responsibility of drilling companies for contaminating drinking water wells, innovative compensation mechanisms, such as state or federally backed compensation funds, could be contemplated. The principle of presumptive liability, under which cases of groundwater contamination in the vicinity of drilling operations are assumed to be caused by drilling activities, should be legislated.[58] Companies should also be required to include chemical markers that will allow for tracking the sources of contamination back to specific drilling operations. Adequate local impact fees, which will allow authorities to address environmental and community needs, and to deal with problems that may arise, should be assessed on drilling operations. Companies should also be required to fund activities to mitigate impacts on habitats resulting from the development of drilling pads and other infrastructure.

- **Reducing the Impact of Drilling on Water**

    More environmentally friendly mixtures of fracking fluids have been developed, such as those not requiring toxic chemicals.[59] These kinds of improved fluid mixtures should be used throughout the industry and the industry should move swiftly away from the use of any chemicals that are highly toxic to humans or wildlife. Although gas yields may be slightly lower, and costs slightly higher, the benefits that will accrue in terms of safeguarding water resources will be well worth it.

    Water use plans should be developed to ensure that drilling and related operations do not negatively impact water resources and other water uses; "cradle-to-grave" water tracking systems should be the norm. Emergency response and remediation plans, including strict spill prevention and management plans, should be developed for each site prior to any drilling operations, based on industry best practices for construction and lining of pits. Water withdrawals for natural gas operations should ensure adequate stream flows for fish and other wildlife. Waste water recycling and reuse should take place whenever possible. To prevent erosion and silting of water bodies, properly installed and maintained silt fences should be required, and drilling operations should not be exempted from relevant regulations, such as those requiring regulation of stormwater runoff.

- **Reducing the Impact of Drilling on Habitats**

    Wildlife surveys should be conducted prior to the initiation of drilling operations; drilling pads and infrastructure should be sited so as to maintain the ecological integrity of important wildlife habitats and to minimize potential impacts on habitats and species. Adequate minimum setbacks from surface water resources should be ensured. Drilling plans should be



USFWS

based on reducing the area of habitat that will be converted or fragmented. Activities to restore drilling sites after well closures should be designed and monitored to ensure that they adequately restore native vegetation and habitats.

### Reducing the Impact of Drilling on Air Quality

The proposed improvements to EPA air quality standards, including for hydraulic fracturing and natural gas transportation infrastructure (including compressors, storage tanks and other components), should be adopted and enforced in a stringent manner. Efforts to reduce emissions of the air pollutants that contribute to global warming should be strengthened, including through applying in a mandatory fashion the best practices that have been developed under voluntary programs for capturing fugitive methane emissions.

### Safeguarding Parks, Tribal Lands and Other Special Areas

Many publicly-owned lands and tribal lands require special planning processes and protections from drilling operations for aesthetic, cultural, and ecological reasons, as well as to ensure that the precious

landscapes and critical habitats they contain can be preserved, and so that revenues from tourism and recreation are not negatively impacted. Drilling should not be allowed in parks and areas of high conservation value. Areas with particularly sensitive wildlife habitat or having other important conservation and aesthetic value may be inappropriate for natural gas extraction or other energy development activities. Environmental and wildlife organizations have called for the exclusion of certain federal public lands from drilling activities, including the Roan Plateau in Colorado, Otero Mesa in New Mexico, Book Cliffs in Utah and the Rocky Mountain Front in Montana,[60] as well as the George Washington National Forest.

### Promoting Clean, Renewable Energy Sources

Fossil fuels will eventually be depleted. Preference should therefore be given to energy conservation and energy sources that are renewable. All government subsidies and preferential incentives for oil, gas and coal production should therefore be removed.

### Improved Oversight and Inspections

Standards, regulations and monitoring should be strengthened. To minimize accidents and pollution, the permitting process should be reviewed to identify procedures to prevent drilling-related activities that could lead to environmental damage. Permits should be required for all stages of the drilling process, based on strict environmental and safety criteria and procedures, including reviews by specialists trained in minimizing environmental hazards, as well as studies of surface and subsurface water flows and chemical composition (thus providing a baseline against which potential contamination can be measured). All operations should be inspected, including through unannounced inspections; all information gathered during such inspections should be made available to the public. Ongoing sampling of surface water and groundwater quality, as well as air quality, should be undertaken, with results made publicly available. Oversight and inspections should be fully funded by the natural gas industry and by the producers themselves.

### Public Involvement

Communities, residents and other stakeholders (such as natural resource user groups, including hunters and anglers) in areas where unconventional natural gas exploitation is planned or contemplated should always be fully informed of all procedures to be undertaken, and should have sufficient opportunities to review and provide public comments on any related plans.

# Endnotes

[1] In contrast to *conventional* natural gas resources which are found in pools between geological strata, *unconventional* natural gas is typically trapped in tiny spaces within a layer of sedimentary rock, such as shale, sandstone or limestone. Methane is also found in coal seams; this resource is known as coal bed methane (CBM), and can also be extracted through the use of hydraulic fracturing technologies.

[2] Dougherty, Kevin. "Minister Confirms Ban on Fracking in Quebec." *Calgary Herald* 17 Mar. 2011. Web. <http://www2.canada.com/calgaryherald/news/calgarybusiness/story.html?id=6c0f3da4-f4d1-4b86-99e3-4d0b91cbe46b>

[3] Patel, Tara. "France Vote Outlaws 'Fracking' Shale for Natural Gas, Oil Extraction - Bloomberg." *Bloomberg - Business & Financial News, Breaking News Headlines.* 1 July 2011. Web. <http://www.bloomberg.com/news/2011-07-01/france-vote-outlaws-fracking-shale-for-natural-gas-oil-extraction.html>

[4] Marcellus Shale Advisory Commission. *Governor's Marcellus Shale Advisory Commission.* Rep. 22 July 2011. Web. <http://files.dep.state.pa.us/PublicParticipation/MarcellusShaleAdvisoryCommission/MarcellusShaleAdvisoryPortalFiles/MSAC_Final_Report.pdf>. P. 8.

[5] "What Chemicals Are Used." *FracFocus Chemical Disclosure Registry.* Ground Water Protection Council and the Interstate Oil and Gas Compact Commission. Web. <http://fracfocus.org/chemical-use/what-chemicals-are-used>.

[6] United States. Cong. House. Committee on Energy and Commerce. *Chemicals Used in Hydraulic Fracturing.* 112 Cong., 1st sess. H. Doc. *Committee on Energy and Commerce Democrats.* Web. <http://democrats.energycommerce.house.gov/sites/default/files/documents/Hydraulic%20Fracturing%20Report%204.18.11.pdf >. P. 8.

[7] Southwestern Energy Company. *Southwestern Energy Supports Fracking Disclosure Law. PR Newswire.* United Business Media, 15 July 2011. Web. <http://www.prnewswire.com/news-releases/southwestern-energy-supports-fracking-disclosure-law-125638743.html>. The company statement read in part: "Southwestern Energy Company strongly supports Governor Perry's decision to require the public disclosure of all the chemicals contained in hydraulic fracturing fluids. Developing America's shale gas resources is important for meeting our country's growing energy needs, but so is transparency in how we access these resources. It is essential that we do everything reasonably possible to ensure public trust and acceptance of hydraulic fracturing operations."

[8] "What Chemicals Are Used." *FracFocus Chemical Disclosure Registry.* Ground Water Protection Council and the Interstate Oil and Gas Compact Commission. Web. <http://fracfocus.org/chemical-use/what-chemicals-are-used>.

[9] United States. Cong. House. Committee on Energy and Commerce. *Chemicals Used in Hydraulic Fracturing.* 112 Cong., 1st sess. H. Doc. *Committee on Energy and Commerce Democrats.* Web. <http://democrats.energycommerce.house.gov/sites/default/files/documents/Hydraulic%20Fracturing%20Report%204.18.11.pdf >. P. 1.

[10] United States. Cong. House. Committee on Energy and Commerce. *Chemicals Used in Hydraulic Fracturing.* 112 Cong., 1st sess. H. Doc. *Committee on Energy and Commerce Democrats.* Web. <http://democrats.energycommerce.house.gov/sites/default/files/documents/Hydraulic%20Fracturing%20Report%204.18.11.pdf >. P. 9.

[11] "Regulation of Hydraulic Fracturing by the Office of Water." *US EPA.* United States Environmental Protection Agency. Web. <http://water.epa.gov/type/groundwater/uic/class2/hydraulicfracturing/wells_hydroreg.cfm>.

[12] "Waxman, Markey, and DeGette Investigation Finds Continued Use of Diesel in Hydraulic Fracturing Fluids." *Committee on Energy and Commerce Democrats.* 31 Jan. 2011. Web. <http://democrats.energycommerce.house.gov/index.php?q=news/waxman-markey-and-degette-investigation-finds-continued-use-of-diesel-in-hydraulic-fracturing-f>.

[13] *Hydraulic Fracturing Research Study.* Working paper no. EPA/600/F-10/002. United States Environmental Protection Agency, June 2010. Web. <http://www.epa.gov/safewater/uic/pdfs/hfresearchstudyfs.pdf>.

[14] Such reinjections of waste water may also contribute to increased seismic activity; a number of injection wells were closed for this reason in Arkansas in July 2011. See The Associated Press. "Arkansas: Disposal Well Is Ordered Closed." *New York Times.* The New York Times Company, 27 July 2011. Web. <http://www.nytimes.com/2011/07/28/us/28brfs-DISPOSALWELL_BRF.html>.

[15] Fucik, K. W. "Toxicity Identification And Characteristics Of Produced Water Discharges From Colorado And Wyoming." *Produced Water: Technological/Environmental Issues and Solutions.* Ed. James P. Ray and F. Rainer. Engelhardt. New York: Plenum, 1992. 187. Print.

[16] Urbina, Ian. "A Tainted Water Well, and Concern There May Be More." *New York Times.* The New York Times Company, 3 Aug. 2011. Web. <http://www.nytimes.com/2011/08/04/us/04natgas.html>. This article also states that "Dan Derkics, a 17-year veteran of the environmental agency who oversaw research for the report, said that hundreds of other cases of drinking water contamination were found, many of which looked from preliminary investigations to have been caused by hydraulic fracturing like the one from West Virginia. But they were unable to learn more about them."

[17] Urbina, Ian. "A Tainted Water Well, and Concern There May Be More." *New York Times.* The New York Times Company, 3 Aug. 2011. Web. <http://www.nytimes.com/2011/08/04/us/04natgas.html>.

[18] Interstate Oil and Gas Compact Commission. *National Registry Provides Public and Regulators Access to Information on Chemical Additives Used. Interstate Oil and Gas Compact Commission.* 11 Apr. 2011. Web. <http://www.iogcc.state.ok.us/news>.

[19] For example, in the case of the Marcellus Shale region, the company Chesapeake Energy estimates that hydraulic fracturing for a "typical Chesapeake horizontal deep shale gas or oil well requires an average of 4.5 million gallons per well." See "Water Usage." *Hydraulic Fracturing Facts. Chesapeake Energy.* Web. <http://www.hydraulicfracturing.com/Water-Usage/Pages/Information.aspx>. For comparison, an Olympic-sized swimming pool may contain as much as 660,000 gallons of water. See "How Much Water Does an Olympic Sized Swimming Pool Hold." *Answers.com.* Answers Corporation. Web. <http://wiki.answers.com/Q/How_much_water_does_an_Olympic_sized_swimming_pool_hold>.

[20] Magill, Jim. "Despite Texas Drought, Officials Confident of Eagle Ford Growth." *Platts.* The McGraw-Hill Companies, 14 June 2011. Web. <http://www.platts.com/RSSFeedDetailedNews/RSSFeed/NaturalGas/6188971>.

[21] Osborn, Stephen G., Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson. "Methane Contamination of Drinking Water Accompanying Gas-well Drilling and Hydraulic Fracturing." *PNAS* 108.20 (2011): 8172-176. Print.

[22] Lobins, S Craig. Cabot Notice of Violation. Digital image. *Marcellus Drilling News.* Marcellus Drilling News, 10 Mar. 2009. Web. <http://marcellusdrilling.com/wp-content/uploads/2009/03/cabot-notice-of-violation-feb-27-2009.pdf>.

[23] Smith, Michael. "Dimock Residents to Share $4.1 Million, Receive Gas Mitigation Systems Under DEP-Negotiated Settlement with Cabot Oil and Gas." *Commonwealth of Pennsylvania Department of Environmental Protection.* Commonwealth of Pennsylvania, 16 Dec. 2010. Web.<http://www.portal.state.pa.us/portal/server.pt/ community/newsroom/14287?id=15595&typeid=1>.

[24] Gresh, Katy. "DEP Fines Chesapeake Energy More Than $1 Million." *Commonwealth of Pennsylvania Department of Environmental Protection.* Commonwealth of Pennsylvania, 17 May 2011. Web. <http://www.portal.state.pa.us/portal/server.pt/community/newsroom/14287?id=17405&typeid=1>.

[25] New York City Department of Environmental Protection. *Impact Assessment of Natural Gas Production in the New York City Water Supply Watershed.* Rep. 2009. Web. P. 3-4. <http://www.nyc.gov/html/dep/pdf/natural_gas_drilling/rapid_impact_assessment_091609.pdf>.

[26] New York City Department of Environmental Protection. *Impact Assessment of Natural Gas Production in the New York City Water Supply Watershed.* Rep. 2009. Web. <http://www.nyc.gov/html/dep/pdf/natural_gas_drilling/rapid_impact_assessment_091609.pdf>.

[27] EARTHWORKS. EARTHWORKS Celebrates Effort to Close Clean Water Act Loophole. *EARTHWORKS.* 1 July 2010. Web. <http://www.earthworksaction.org/EWcearelease.cfm>

[28] See "Clean Water Act, Section 402: National Pollutant Discharge Elimination System." *US EPA.* United States Environmental Protection Agency. Web. <http://water.epa.gov/lawsregs/guidance/wetlands/section402.cfm>.

[29] *MIT Study on the Future of Natural Gas Appendix 2E: Overview and Analysis of Publicly Reported Incidents Related to Gas Well Drilling.* MIT, 2011. Web. <http://web.mit.edu/mitei/research/studies/documents/natural-gas-2011/NaturalGas_Appendix2E.pdf>. P. 3-7.

[30] See, for example, Mall, Amy. "Incidents Where Hydraulic Fracturing Is a Suspected Cause of Drinking Water Contamination." Web log post. *Switchboard.* National Resource Defense Council, 14 June 2011. Web. <http://switchboard.nrdc.org/blogs/amall/incidents_where_hydraulic_frac.html>.

[31] Glassman, Diana, Michele Wucker, Tanushree Isaacman, and Corinne Champilou. *The Water-Energy Nexus: Adding Water to the Energy Agenda*. Publication. World Policy Institute, Mar. 2011. Web. <http://www.worldpolicy.org/sites/default/files/policy_papers/THE%20 WATER-ENERGY%20NEXUS_0.pdf>. P. 13.

[32] Glassman, Diana, Michele Wucker, Tanushree Isaacman, and Corinne Champilou. *The Water-Energy Nexus: Adding Water to the Energy Agenda*. Publication. World Policy Institute, Mar. 2011. Web. <http://www.worldpolicy.org/sites/default/files/policy_papers/THE%20 WATER-ENERGY%20NEXUS_0.pdf>. P. 5.

[33] McGowan, Elizabeth. "Fracking's Environmental Footprint to Transform Pennsylvania Landscape." *Reuters*. Thomson Reuters, 25 Apr. 2011. Web. <http://www.reuters.com/article/2011/04/25/idUS308837987220110425>.

[34] Johnson, Nels. *Pennsylvania Energy Impacts Assessment Report 1: Marcellus Shale Natural Gas and Wind*. Rep. The Nature Conservancy, 15 Nov. 2010. Web. <http://www.nature.org/media/pa/tnc_energy_analysis.pdf>. P. 13.

[35] Johnson, Nels. *Pennsylvania Energy Impacts Assessment Report 1: Marcellus Shale Natural Gas and Wind*. Rep. The Nature Conservancy, 15 Nov. 2010. Web. <http://www.nature.org/media/pa/tnc_energy_analysis.pdf>. P. 18.

[36] "12-Month Findings for Petitions to List the Greater Sage-Grouse (Centrocercus urophasianus) as Threatened or Endangered: Notice of 12-month petition findings." 75 Fed. Reg. 13910, 13942 (March 23, 2010)

[37] Sawyer, Hall, and Ryan Nielson. *Mule Deer Monitoring in the Pinedale Anticline Project Area: 2010 Annual Report*. Rep. Pinedale Anticline Planning Office, 14 Sept. 2010. Web. <http://wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf>.

[38] Adams, Mary Beth. "Land Application of Hyrofracturing Fluids Damages a Deciduous Forest Stand in West Virginia." *Journal of Environmental Quality* 40.4 (2011): 1340-344. Print.

[39] Welborn, Vickie. "Chesapeake, Schlumberger Fined $22,000 Each in Cows' Deaths." *Shreveport Times*. Un-naturalgas.org, 25 Mar. 2010. Web. <http://un-naturalgas.org/weblog/2010/04/chesapeake-schlumberger-fined-22000-each-in-hydraulic-fracturing-related-deaths-of-cattle/>.

[40] According to the National Oceanic and Atmospheric Administration, "Ethylene Glycol has a sweet smell and taste which is attractive to children and pets and is highly toxic." See "Antifreeze Factsheet." *NOAA-Safety and Environmental Compliance Office. United States Department of Commerce*. Web. <http://www.seco.noaa.gov/ENV/Factsheets/antifreeze.html>.

[41] Aaron, G. Jeffrey. "Wastewater from Gas Drilling Being Used for Area Road Maintenance." *Pressconnects.com*. A Gannett Company, 20 July 2011. Web. <http://www.pressconnects.com/article/20110720/NEWS01/107200369/ Wastewater-from-gas-drilling-being-used-area-road-maintenance>.

[42] Hasch, Michael, and Adam Brandolph. "Three Burned at Marcellus Shale Drilling Site near Avella Read More: Three Burned at Marcellus Shale Drilling Site near Avella." *Pittsburgh Tribune-Review*. Trib Total Media, Inc, 24 Feb. 2011. Web. <http://www.pittsburghlive.com/x/pittsburghtrib/s_724408.html#ixzz1U qPiFWkH>.

[43] Adams, Mary Beth, W. Mark Ford, Thomas M. Schuler, and Melissa Thomas-Van Gundy. "Effects of Natural Gas Development on Forest Ecosystems." *Proceedings, 17th Central Hardwood Forest Conference*. United States Forest Service, 2011. Web. <http://www.nrs.fs.fed.us/pubs/gtr/gtr-p-78papers/23adamsp78.pdf>. P. 219-226.

[44] Gruver, Mead. "Wyoming is beset by a big-city problem: Smog." *USA Today*. 8 March 2011, <http://www.usatoday.com/money/industries/ energy/2011-03-08-natural-gas-ozone-wyoming_N.htm>

[45] "Proposed Amendments to Air Regulations for the Oil and Natural Gas Industry- Fact Sheet." *US EPA*. United States Environmental Protection Agency, 2011. Web. <http://www.epa.gov/airquality/oilandgas/pdfs/20110728factsheet.pdf>.

[46] Pachauri, R. K., and A. Reisinger, eds. *Climate Change 2007: Synthesis Report; Contribution of Working Groups I, II and III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change. Intergovernmental Panel on Climate Change*. Web. <http://www.ipcc.ch/publications_and_data/publications_ipcc_fourth_as sessment_report_synthesis_report.htm>.

[47] "Natural Gas." *US EPA*. United States Environmental Protection Agency. Web. <http://www.epa.gov/cleanenergy/energy-and-you/affect/natural-gas.html>.

[48] Soraghan, Mike. "Senators to Hear Details of MIT Gas Report." *E&E Daily*. Media Monitoring, 18 July 2011. Web. <http://mediamonitoring.dvn.com/apps/mm/Lists/Posts/Post.aspx?ID= 9190>.

[49] Howarth, Robert W., Renee Santoro, and Anthony Ingraffea. "Methane and the Greenhouse Gas Footprint of Natural Gas from Shale Formations." *Climate Change Letters* (2011). From Abstract.

[50] Howarth, Robert W., Renee Santoro, and Anthony Ingraffea. "Methane and the Greenhouse Gas Footprint of Natural Gas from Shale Formations." *Climate Change Letters* (2011). P. 680.

[51] *Climate Change 1995, The Science of Climate Change: Summary for Policymakers and Technical Summary of the Working Group*. Rep. *Global Warming Potentials*. United Nations Framework Convention on Climate Change. Web. <http://unfccc.int/ghg_data/items/3825.php>.

[52] Howarth, Robert W., Renee Santoro, and Anthony Ingraffea. "Methane and the Greenhouse Gas Footprint of Natural Gas from Shale Formations." *Climate Change Letters* (2011). P. 685.

[53] Howarth, Robert W., Renee Santoro, and Anthony Ingraffea. "Methane and the Greenhouse Gas Footprint of Natural Gas from Shale Formations." *Climate Change Letters* (2011). From Abstract.

[54] "Frequently Asked Questions." *FracFocus Chemical Disclosure Registry*. Ground Water Protection Council and the Interstate Oil and Gas Compact Commission, 2011. Web. <http://fracfocus.org/faq>.

[55] "Frequently Asked Questions." *FracFocus Chemical Disclosure Registry*. Ground Water Protection Council and the Interstate Oil and Gas Compact Commission, 2011. Web. <http://fracfocus.org/faq>. This website notes that "Only wells fractured after January 1st will be entered into the system."

[56] In mid-August 2011, as this report was being written, a special advisory committee established by the Department of Energy issued a set of draft recommendations, including for disclosure of chemicals used in fracking. The final report of this committee was scheduled for release on November 18, 2011. See *The SEAB Shale Gas Production Subcommittee Ninety-Day Report*. Working paper. Shale Gas Subcommittee of the Secretary of Energy Advisory Board, 11 Aug. 2011. Web. <http://www.shalegas.energy.gov/resources/ 081111_90_day_report.pdf>. P. 3.

[57] "Natural Gas STAR Program- Basic Information." *US EPA*. United States Environmental Protection Agency. Web. <http://www.epa.gov/gasstar/basic-information/index.html>.

[58] A recommendation of the Marcellus Shale Advisory Commission in Pennsylvania in July 2011 was to "Extend a well operator's presumptive liability for pollution or water loss from 1,000 feet to 2,500 feet." See Swift, Robert. "Shale Panel Recommends Generic Impact Fee." *Citizensvoice.com*. The Citizens' Voice, 16 July 2011. Web. <http://citizensvoice.com/news/drilling/shale-panel-recommends-generic-impact-fee-1.1176001#ixzz1STO5UKEe>.

[59] Examples include the "CleanStim® Hydraulic Fracturing Fluid System" (see "CleanStim® Hydraulic Fracturing Fluid System - Halliburton." *Halliburton*. Halliburton. Web. <http://www.halliburton.com/ps/default.aspx?pageid=4184>) and "The BJ SmartCare System" (see "The BJ SmartCare System." *Bakerhughes.com*. Baker Hughes, Inc. Web. <http://public.bakerhughes.com/ShaleGas/collateral/31157.SmartCare_P O_1210.pdf>.)

[60] *Hunting and Fishing Imperiled*. Rep. Sportsmen for Responsible Energy Development, 2008. Web. <http://www.sportsmen4responsibleenergy.org/FullTextReport.pdf>.

**National Wildlife Federation**
11100 Wildlife Center Drive
Reston, VA 20190
703-438-6000
www.nwf.org



**INSPIRING AMERICANS TO PROTECT WILDLIFE FOR OUR CHILDREN'S FUTURE.**



USDA

United States
Department of
Agriculture

Forest Service

**Northern
Research Station**

Research Paper-NRS-14



# Chloride Concentration Gradients in Tank-Stored Hydraulic Fracturing Fluids Following Flowback

**Pamela J. Edwards
Linda L. Tracy
William K. Wilson**



## Abstract

A natural gas well in West Virginia was hydraulically fractured and the flowback was recovered and stored in an 18-foot-deep tank. Both in situ field test kit and laboratory measurements of electrical conductivity and chloride concentrations increased substantially with depth, although the laboratory measurements showed a greater increase. The field test kit also underestimated chloride concentrations in prepared standards when they exceeded 8,000 mg $L^{-1}$, indicating that laboratory analyses or other more accurate methods of detection should be used to determine chloride concentrations in flowback when they may be approaching West Virginia regulatory levels (12,500 mg $L^{-1}$) that disallow disposal by land application. The gradation of chloride with depth also has implications for procedures used to collect flowback samples from reserve pits or tanks before disposal to ensure the resulting composite chloride concentration is representative of the total volume.

## Cover Photo

William Wilson uses a field kit to determine the chloride concentrations of a flowback sample. Photo by Pamela Edwards, U.S. Forest Service.

The use of trade, firm, or corporation names in this paper is for the information and convenience of the reader. Such use does not constitute an official endorsement or approval by the U.S. Department of Agriculture or the Forest Service of any product or service to the exclusion of others that may be suitable.

Manuscript received for publication 16 November 2010

Published by:

U.S. FOREST SERVICE
11 CAMPUS BLVD SUITE 200
NEWTOWN SQUARE  PA  19073

July  2011

For additional copies:

U.S. Forest Service
Publications Distribution
359 Main Road
Delaware, OH 43015-8640
Fax: (740)368-0152
Email: nrspubs@fs.fed.us

Visit our homepage at: **http://www.nrs.fs.fed.us/**

## INTRODUCTION

Production of natural gas generally involves a process known as hydraulic fracturing, which is more commonly called hydrofracing or fracing (sometimes spelled fracking). As its name implies, hydraulic fracturing creates fractures that extend from the well bore hole out into adjacent geology; these fractures then act as conduits through which the natural gas held in the geologic formation can flow back to the well. Fracing typically is accomplished by injecting a mixture of acids, water, gases, and additives under high pressure through the bore hole (Agbaji et al. 2009). Nitrogen and carbon dioxide, typically in their liquid phase (Agbaji et al. 2009), have become a relatively recent component of fracing fluids (Reidenbach et al. 1986) and are used to reduce the volume of needed water (Agbaji et al. 2009), which can range from several tens of thousands to several millions of gallons (Weston 2008).

The exact composition of fracing fluids depends upon the geologic layer to be fractured and the availability of the individual acids, water, gases, and additives (Agbaji et al. 2009); however, fracing additives fall into a variety of applications, and each application has a specific purpose during the fracturing process (Table 1). Additives may not be needed for every application and therefore would not be included in all fracing fluid formulations (URS 2009). Typically, most of the chemicals involved are in low concentrations because large volumes of water are used in the fracing process (URS 2009). Proppants, which are used to "prop" open fractures and voids to allow gas to flow to the well, are often present in substantially higher concentrations than the other additives in fracing fluids (Arthur et al. 2009). Sand is the most common proppant (GWPC and ALL Consulting 2009).

Once fracing is completed, a portion of the fracing fluid is recovered through a process called flowback (Sullivan et al. 2004, URS 2009, Woodroof et al. 2003a). The recovered fluid (also called flowback) typically is stored temporarily in open pits near the well called reserve pits (Deuel et al. 1999, Leuterman et al. 1988) or sumps (French 1980). These pits also may hold drill cuttings, drilling fluids, lubricants and soaps, rig wash, wastes from casing cement operations, and precipitation (Thurber 1992, Veil 2002). In some situations, flowback is stored in tanks (Agbaji et al. 2009), but this is more typical in wells that undergo refracing (after the pit has been emptied and reclaimed) or in locations that have restrictions on the use of open pits for storing drilling-related fluids.

*The Authors*

PAMELA J. EDWARDS, *research hydrologist, currently is engaged in research on the effects of forest management and energy development on hydrology and water quality, and on the development of new techniques and tools for assessing the implementation and effectiveness of best management practices used within forested landscapes. She works at the Northern Research Station's Timber and Watershed Laboratory in Parsons, WV.*

LINDA L. TRACY, *geologist, has managed the minerals and geology program on the Mongahela National Forest for 33 years. Her office is located in Elkins, WV.*

WILLIAM K. WILSON, *mineral assistant, has 19 years of minerals administration experience. He currently oversees and administers the mineral operations on the Monongahela National Forest and works out of the Greenbrier Ranger District Office in Bartow, WV.*

Table 1.—**Applications and purposes of additives used in hydraulic fracturing for natural gas production (Adapted from URS 2009)**

| Application | Purpose |
| --- | --- |
| Proppants | "Props" open fractures to allow produced gas to flow to the well |
| Acids | Helps create fractures |
| Breakers | Reduces viscosity of fracing fluid to release proppant into fractures and to improve recovery of fracing fluids in flowback |
| Bactericides | Prevents the growth of organisms that could generate gases that would contaminate produced natural gas. Also prevents growth of organisms that could reduce proppant flow into fractures |
| Clay stabilizers | Prevents clay swelling and release and movement of clays associated with the formation that could clog pores and fractures |
| Corrosion inhibitors | Used with fracing fluids that include acids, to reduce oxidation of steel tubing, casings, tools, and storage tanks |
| Iron controls | Inhibits the metal oxide precipitation in the formation to keep fractures open |
| Crosslinking agents | Increases the viscosity of the fracing fluid to allow greater amounts of proppants to flow into the fractures |
| Gelling agents | Increases the viscosity of the fracing fluid to allow greater amounts of proppants to flow into the fractures |
| Friction reducers | Reduces friction to allow more optimal injection of fracing fluid |
| Scale inhibitors | Prevents precipitation of carbonate and sulfate compounds that could clog pores and fractures |
| Surfactants | Reduces the surface tension of fracing fluids to improve recovery of flowback |

Fluids held within the reserve pit are disposed of in several ways. The more common techniques are recycling, onsite treatment, treatment at a publically owned treatment plant, treatment at an industrial treatment plant, injection into depleted wells or deep safe formations through permitted Underground Injection Control wells, or land disposal (Nesbit and Sanders 1981, URS 2009). Recycling is done only on a limited basis (GWPC and ALL Consulting 2009) because the chemistry of flowback is not entirely suitable for fracing, so fresh additives and water need to be added to the mixture before it can be reused (URS 2009). A primary reason for recycling is to reduce the amount of freshwater needed (GWPC and ALL Consulting 2009, URS 2009, Weston 2008). Onsite or offsite treatment is expensive so both are uncommon, and onsite treatment typically occurs only at the largest well sites (Al-Harthy and Al-Ajmi 2009, URS 2009). Flowback is generally considered industrial wastewater (Gaudlip et al. 2008, URS 2009), so treatment is regulated and permitted as such. Only a small subset of privately or publically owned facilities is equipped to treat flowback fluids (URS 2009). Underground injection has been the most common

method of flowback disposal (Burnett 2008, GWPC and ALL Consulting 2009), and it is sometimes used in combination with treatment for disposing of residual chemicals (URS 2009). Injection has the negative consequence of removing the fracing water from the hydrologic cycle (Agbaji et al. 2009). Land disposal can occur by either burial (French 1980, McFarland et al. 1994, Nesbit and Sanders 1981) or surface application (Bauder et al. 2005, Nelson et al. 1984). Land disposal is allowed only in some states. Where allowed, however, land disposal may be common because it is economical.

There are environmental implications associated with the chemical composition of fracing fluids and their disposal, but research on these issues has been outpaced by research and development of extraction techniques. The proprietary nature of newer fracing chemicals can make it difficult to find out their exact chemical content (Soeder and Kappel 2009). But even when the chemical content can be determined from material safety data sheets (MSDS), the differences in concentrations between the raw chemicals and the much more diluted concentrations present in fracing fluids (and thus flowback) limit the

**Table 2.—Additives contained in the initial fracing fluid mixture used May 23, 2008, for gas well B-800[a]**

| Product trade name/Additives contained in product | Application | Concentration |
|---|---|---|
| Sand – premium/Crystal silica, quartz (60-100%) | Proppant | 1,300 lb/1,000 gal |
| SP Breaker/Sodium persulfate (60-100%) | Breaker | 0.25 lb/1,000 gal |
| WLC-6 Fluid Loss Additive/Tallow soap (60-100%) | Surfactant | 150 lb/100,000 gal |
| HC-2/Sodium chloride (5-10%) + inner salt of alkyl amines (10-30%) | Scale inhibitor | 2 gal/1,000 gal |
| Clayfix-II Material/Alkylated quaternary chloride (30-60%) | Clay stabilizer | 1 gal/1,000 gal |
| GBW-30 Breaker/Hemicellulase enzymes (5-15%) + carbohydrates (85%) | Breaker | 1 lb/1,000 gal |
| BC-140/Monoethanolamine + ethylene glycol + boric acid solution (10-30% for each) | Crosslinker | 2.5 gal/1,000 gal |
| OPTIFLO-HTE/Walnut hulls (60-100%) + crystalline silica (quartz) (10-30%) | Breaker | 0.25 lb/1,000 gal |
| LGC-35 CBM/Paraffinic solvent (30-60%) + polysaccharide (30-60%) | Gelling agent | 5.75 gal/1,000 gal |
| BE-3S Bactericide/2-mononbromo-3-nitrilopropionamide (1-5%) + 2, 2 dibromo-nitrilopropionamide (60-100%) | Biocide | 1 lb/10,000 gal |

[a]Four thousand (4,000) gallons of hydrochloric acid were introduced into the well bore under pressure; mixture of approximately 70,350 gallons of water obtained from a local stream, proppant, and fracing chemicals was forced into the well bore following the hydrochloric acid.

usefulness of the MSDS information for projecting biological effects (Bishop 2009). Available studies show fluids can impact plant growth negatively because of high concentrations of salts or toxic metals (e.g., McFarland et al. 1992, 1994; Miller and Pesaran 1980; Miller et al. 1980; Nelson et al. 1984; Younken and Johnson 1980), and there is a broader concern about how reserve pit chemicals may affect ground water and surface water quality (Harrison 1983, Hudak and Blanchard 1997, Soeder and Kappel 2009). More information about the chemical characteristics and behavior of fracing fluids and flowback would be valuable for better deciding upon treatment or disposal options or for developing more thorough science-based recommendations for land applications, such as establishing maximum allowable loadings for the most concentrated and/or toxic chemicals present.

## Background of this Study

In 2008, a natural gas well (well B-800) was drilled by a private oil and gas lessee on the Fernow Experimental Forest in Tucker County, West Virginia. This experimental forest is part of the Monongahela National Forest (MNF) and is administered by the U. S. Forest Service, Northern Research Station. The well is 7,882 feet deep and was drilled into the Oriskany Sandstone and Huntersville Chert geologic formations. After drilling was completed, the bedrock at that depth was prepared for release of gas by fracing with a 70,350-gallon mixture of fracing fluids (Table 2) injected into the well bore hole under high pressure. When fracing was completed, flowback was stored temporarily in an open pit just downslope of the well pad that also contained drilling fluids and drilling waste. Pit fluid was treated with activated carbon to bring fluids into compliance with the general water pollution control permit (GP-WV-1-88) requirements for land application, and it was mixed by circulating fluid within the pit using pumps. Land application of the pit fluid began after 2 days of settling time.

In accordance with West Virginia minerals laws, fracing fluids may be land applied if the Cl concentration of the pit-stored fluid is less than 12,500 mg L$^{-1}$ (http://www.wvdep.org/Docs/16150_General%20Water%20Pollution%20Control%20Permit%20.pdf). The Cl concentration of the pit fluid on the Fernow was determined using the procedure required by state

regulations: the well owner's contractor obtained a single composite sample collected by mixing equal volumes of six equally distributed grab samples taken from various locations in the pit and then determined the chloride (Cl) concentration in the field using a color-indicator field test kit on the day of, but prior to, land application. There is no formal explanation in the state regulations of what is meant by six equally distributed samples from various locations in the pit, but the individual who collected the samples stated they were collected from around the edge of the pit, just below the layer of floating scum (pers. comm., Charles Krushansky, Action Environmental, Jan. 26, 2010). The field test kit Cl concentration of that composite sample was approximately 7,500 mg L$^{-1}$, so land application proceeded.

The fluids were pumped through a hose and hand sprayed onto two previously approved areas. During the 12-day application period in June 2008, additional fracing fluid samples were taken at the hose nozzle by Forest Service personnel. Several of these samples were analyzed for Cl by ion chromatography at the Forest Service's Timber and Watershed Laboratory, using EPA-approved procedures (Edwards and Wood 1993).

The results from these samples indicated that Cl concentrations applied to the land varied temporally, ranging from 10,200 to 14,200 mg L$^{-1}$. Consequently, there was speculation that the Cl concentrations in the pit fluids may have become spatially nonhomogeneous between treatment and mixing and the start of land application 3 days later. Therefore, well refracing in October 2009 to improve gas production was seen as an opportunity to examine Cl characteristics of flowback during short-term storage.  Well refracing was done in the Sycamore Grit Formation in the hopes of reaching more gas with less associated water. This formation lies above the Oriskany Sandstone and Huntersville Chert Formations that were originally fraced, so the well was plugged beneath the Sycamore Grit to better confine fracing within that formation.

This paper describes the Cl results associated with flowback obtained from the Sycamore Grit Formation.

## METHODS

## Refracing and Recovery Processes

The 2009 fracing process differed from the original operation in 2008. First, 500 gallons of hydrochloric acid (30-60%) were injected into the well under pressure on September 27, 2009, several days before the other fracing fluids were injected. An unknown percentage of this acid was recovered into the well's production tank (not the tank where flowback was collected) and then transported offsite.

On October 7, 2009, refracing was accomplished using a chemical formulation that involved a relatively high percentage of foam to reduce the volume of water needed (pers. comm., David Berry, October 7, 2009). The refracing process began by introducing approximately 840 gallons of fresh water into the well bore. This was followed by a foam mixture composed of approximately 1,000 gallons of water and 1,197,110 standard ft$^3$ of liquid nitrogen. The remaining fracturing additives were then combined using the following mixture and injected under pressure into the well bore:

- 14,406 gal of water, 242 lb WG-35 gelling agent, and 28.8 gal BC-140 crosslinker
- 6,429 gal of water and 108 lb WG-35 gelling agent
- 750,000 lb of premium sand
- 20 lb of GBW-30 breaker
- 3 lb of BE-3S bactericide
- 7 gal of LOSURF-300M surfactant
- 31 gal of Clayfix-II material organic salt additive
- 12 gal of GasPerm 1000 surfactant
- 3 gal of HC-2 salt additive

Another approximately 4,200 gallons of fresh water with no chemical additives were introduced into the well bore to push the fracing fluids into the formation for hydraulic fracturing. Based on the total volume of water used (~26,875 gallons), the final concentration of each of the fracturing additives is given in Table 3.

4

**Table 3.—Additives contained in the fracing fluid mixture used for the October 7, 2009, refracturing of well B-800**

| Product trade name/Additives contained in product | Application | Concentration |
|---|---|---|
| Sand – premium/Crystalline silica (quartz) (60-100%) | Proppant | 2,787 lb/1,000 gal |
| BC-140/Monoethanolamine + boric acid + ethylene glycol (10-30% for each) | Crosslinker | 1.70 gal/1,000 gal |
| BE-3S Bactericide/2-mononbromo-3-nitrilopropionamide (1-5%) + 2, 2 dibromo-nitrilopropionamide (60-100%) | Biocide | 1.12 lb/10,000 gal |
| Clayfix-II Material/Alkylated quaternary chloride (30-60%) | Clay stabilizer | 1.15 gal/1,000 gal |
| GBW-30 Breaker/Hemicellulase enzymes (5-15%) + carbohydrates (85%) | Breaker | 0.744 lb/1,000 gal |
| HC-2/Sodium chloride (5-10%) + inner salt of alkyl amines (10-30%) | Scale inhibitor | 0.112 gal/1,000 gal |
| WG-35 Gelling Agent/Guar gum (60-100%) | Gelling agent | 13.02 lb/1,000 gal |
| LOSURF -300M/1,2,4 Trimethylbenzene (0-1%) + Naphthalene (0-1%) + Poly(oxy-1,2-ethanediyl), alpha-(4-nonylphenyl)-omega-hydroxy-, branched (5-10%) + heavy aromatic petroleum (10-30%) + ethanol (30-60%) | Surfactant | 0.26 gal/1,000 gal |
| GasPerm 1000/Isopropanol (10-30%) + terpenes and terpenoids of sweet orange-oil (10-30%) | Surfactant | 0.558 gal/1,000 gal |

Approximately 11,000 gallons of fracing fluid were recovered during flowback, which were stored in two 18-foot-tall metal tanks brought to the site for short-term storage (Fig. 1). One tank was filled and the second held the remaining ~500 gallons. Initially, the well owner's contractor intended to land apply this fluid (excluding the hydrochloric acid) at a site mutually agreed upon with the Forest Service. However, because the volume of fluid was relatively small, the contractor transported all of the fracing fluid offsite for disposal.



Figure 1.—The tank on the right is the one from which the flowback was sampled following refracing of well B-800 on the Fernow Experimental Forest. The access inlet is on the top of the tank between the top of the ladder and the person preparing for sampling. The valves for emptying or sampling fluid are located near the base of the ladder; there are two valves on each of these tanks and they are visible on the second tank from the right, just above the buckets on the ground. Photo by William Wilson, U.S. Forest Service.



Figure 2.—The capped PVC pipe attached to the conductivity cell cable contains water that was used to provide extra weight to the cell to keep it from becoming buoyant when lowered into the flowback fluid in the tank. Photo by Frederica Wood, U.S. Forest Service.

Had land application occurred, the fluid would have been mixed by recirculating it among tanks using a pump. Following state regulations, a 10-day waiting period would have been required to allow solids to settle before the Cl concentration was tested. However, in the current situation, the contents of the tanks were not mixed because the operator decided against land application. Therefore, the measurements described in this report were made on fluids that received no additional mechanical mixing other than what occurred during chemical preparation, high pressure injection, and flowback.

## Field Methods

The current investigation of the Cl concentrations took place on October 14, 7 days after the fluid was pumped into the storage tanks. Only the single tank that held the ~10,500 gallons of fluid was included in the study.

Access to the tank was through a covered inlet on top of the tank (Fig. 1). To obtain some initial immediate information about the tank contents, a YSI EcoSense® EC300 conductivity cell was lowered into the tank and conductivity measurements were taken every 2 feet, beginning at 0 feet (i.e., just below the fluid surface). Intervals of 2 feet were chosen somewhat arbitrarily, but the authors believed this spacing would be sufficient to define the general characteristics and variability of the tank's contents.  A weight constructed of 0.75-inch-diameter x 11.5-inch-long PVC pipe filled with water was attached to the conductivity cell cable just above the cell (Fig. 2) to reduce the buoyancy of the conductivity cell in the fracing fluid. Two-foot intervals were delineated on the cable (measured from the contact points of the cell) using permanent marker. The conductivity cell provides temperature-adjusted readings and can shift automatically between $\mu S\ cm^{-1}$ and $mS\ cm^{-1}$ units as needed, depending upon the conductivity of the solution.

After the conductivity measurements were taken and the cell was removed from the tank, fracing fluid samples were collected from 4-, 8-, 12-, and 16-foot depths (measured from the top of the fluid level) using a model 3700 ISCO® automatic water sampler with 25 feet of uptake tubing with 1-foot intervals marked on the tubing. The pump motor was disconnected from the case for use (Fig. 3). The strainer was retained on the end of the tubing to provide weight to reduce the



Figure 3.–An ISCO® 3700 sampler removed from its housing was used to obtain flowback fluid samples from the tank at 4-, 8-, 12-, and 16-foot depths. The strainer (i.e., intake) of the sampler is the perforated tube on the left front of the photograph. Photo by Frederica Wood, U.S. Forest Service.

buoyancy of the tubing (Fig. 3). An approximately 1-L sample was collected at each of the four depths using the manual setting on the ISCO® sampler. Only one sample was collected from each of the four depths because the small tank opening and flexibility of the uptake tubing made it difficult to take multiple samples from different locations at those depths. To avoid carryover between samples, after the tubing was lowered to the 8-, 12-, and 16-foot depths, a volume of sample that exceeded the bore volume of the 25 feet of tubing was pumped into a refuse container. After all sampling was completed, the fluid in the refuse container was poured back into the storage tank.

A subsample of each of the four samples was analyzed in the field for Cl concentration using a model CD-51 Hach® High Range Chloride Test Kit. The analysis is colorimetric and uses silver nitrate as the titrant, and chloride measurements are estimated in 500-mg $L^{-1}$ increments for concentrations up to 10,000 mg $L^{-1}$. The field measurements were made by the MNF geologist,

using the same techniques and equipment normally used on the MNF for assessing Cl concentrations in fracing fluids before land application. This brand of kit also is used commonly in West Virginia to make field assessments of Cl concentrations in reserve pits.

## Laboratory Methods

The fracing fluid samples were returned to the Timber and Watershed Laboratory for laboratory determinations of electrical conductivity and Cl concentrations. Electrical conductivity was measured because there was some concern that the field measurements made at 0-, 2-, 4-, and 6-foot depths were incorrect because the conductivity values were extremely low and the readings were unstable (described later). Laboratory measurements of electrical conductivity were determined using a Radiometer® CDM 83 conductivity meter with a platinum cell. The conductivity cell was calibrated at a single value, 995 µS $cm^{-1}$.

Chloride concentrations were determined in the laboratory using a Dionex® DX500 ion chromatograph to obtain more accurate readings than the field tests because those tests estimate Cl concentrations only to the nearest 500 mg L$^{-1}$. Each sample was vacuum filtered through 0.45-μm glass microfiber filters. Two to three hours were required to filter approximately 50 ml because of the high viscosity of the fracing fluid. Three replicate dilutions were prepared for each sample using 1:1,000 dilutions for the 4- and 8-foot samples and 1:5,000 dilutions for the 12- and 16-foot samples. The required dilution levels needed to obtain results within the instrument's calibration range were determined from the field-measured results (described later).

Because of the limited amount of data collected in this study, analyses are limited to descriptive statistics of means, standard deviations, and coefficients of variation (Sokal and Rohlf 1994). Those statistics were calculated using Microsoft® Office Excel® 2007 software.

## RESULTS

Field conductivities increased markedly with depth (Table 4). At depths ≤6 feet, they were very low and seemed suspect because of the continuous drift of the readings and general inability to obtain a stable measurement. Such drift had not occurred during previous use with this meter in low ionic strength stream water. These shallow readings became even more suspect when the deeper values showed much higher conductivities (Table 4) that did not drift. Indeed, the laboratory-measured conductivity values (Table 4) for the 4- and 8-foot depth samples were much greater than those obtained in the field. We believe the ≤6-foot-deep field-measured values were in error because there was poor contact between the fluid and conductivity cell, perhaps due to particles that partially blocked the sensor contacts or gas bubbles in the cell that became dislodged as the head increased with depth.

The field-measured conductivity readings below 6 feet in combination with the four laboratory measurements of conductivity suggest that the Cl concentrations increased to about a depth of 14 feet (Table 4). Deeper than 14 feet, conductivity varied much less, suggesting that Cl

**Table 4.—Field-measured and laboratory-measured electrical conductivities of fracing fluids**

| Distance below fluid surface in tank | Electrical conductivity | |
|---|---|---|
| | Field | Laboratory |
| (ft) | | |
| 0 | 4.1 μS cm$^{-1}$ | -- |
| 2 | 7.0 μS cm$^{-1}$ | -- |
| 4 | 11.9 μS cm$^{-1}$ | 3.490 mS cm$^{-1}$ |
| 6 | 26.3 μS cm$^{-1}$ | -- |
| 8 | 1.375 mS cm$^{-1}$ | 8.770 mS cm$^{-1}$ |
| 10 | 4.330 mS cm$^{-1}$ | -- |
| 12 | 21.00 mS cm$^{-1}$ | 23.20 mS cm$^{-1}$ |
| 14 | 23.09 mS cm$^{-1}$ | -- |
| 16 | 23.26 mS cm$^{-1}$ | 23.70 mS cm$^{-1}$ |
| 18 | 23.30 mS cm$^{-1}$ | -- |

concentrations also stabilized. Differences in the physical appearances of the shallow (4- and 8-foot) and deeper (12- and 16-foot) samples also suggested the overall chemistry of these samples was quite different. The two shallower samples were a whitish opaque color, while the deeper samples were a darker orange or rust (Fig. 4).

Field and laboratory determinations of Cl confirm the gradient suggested by the conductivity results. The field-measured Cl concentrations in the 12- and 16-foot samples were 7,500 and 8,500 mg L$^{-1}$, respectively, which were about 2 to 4 times greater than the concentrations at the shallower depth (Table 5). The concentration gradient was even more striking for the laboratory-measured values. The average laboratory-measured Cl concentrations at 12- and 16-foot depths were between 11,000 and 13,000 mg L$^{-1}$ and were 4 to 10 times greater than the 927 and 3,463 mg L$^{-1}$ averages at 4- and 8-foot depths, respectively. The largest increases in concentrations for both types of Cl measurements occurred between 8 and 12 feet; the concentrations from 4 to 8 feet increased by about 1,000 to 2,000 mg L$^{-1}$, depending upon whether the analysis was in the field or in the laboratory. The concentrations from 12- to 16-foot depths increased by 1,000 mg L$^{-1}$ for field testing while the average decreased by about 1,000 mg L$^{-1}$ for laboratory measurements (Table 5).



Figure 4.—Four flowback samples collected for laboratory analyses, showing the color differences between the shallow (4- and 8-foot) and deep (12- and 16-foot) samples. Photo by Pamela Edwards, U.S. Forest Service.

Not surprisingly, the largest standard deviations for the laboratory measurements of Cl were associated with the two samples containing the greatest Cl concentrations and involving the 1:5,000 dilutions (Table 5). However, the largest coefficient of variation, 24.8 percent, corresponds to the 4-foot-deep sample that had the lowest replicate and average Cl concentrations. The coefficient of variation for the 12- and 16-foot-deep samples ranged from about 11 to 14 percent and was only 2 percent for the 8-foot-deep sample.

Field and laboratory testing yielded similar concentrations of Cl for the two shallowest samples. The 4- and 8-foot samples had lower laboratory-measured concentrations than obtained by field testing, but the 8-foot field measurement was essentially equal to all three laboratory replicates and the average. By contrast, as the Cl concentrations increased, the deviation between the field and laboratory measurements increased substantially. For 12- and 16-foot-deep samples, the laboratory averages were approximately 3,000 to 5,000 mg $L^{-1}$ greater than the field values, and the individual replicate values were 2,000 to 6,650 mg $L^{-1}$ greater than the field-measured values.

## DISCUSSION

Before sampling, we were uncertain whether the flowback fluid would have elevated Cl concentrations because the primary source of Cl was the hydrochloric acid in the fracing fluids, which had been recovered separately

**Table 5.–Field-measured Cl concentrations determined using model CD-51 Hach® High Range Chloride Test Kit and laboratory-measured Cl concentrations determined using ion chromatography**

| Depth | Field measurement | Laboratory measurement | | | | |
|---|---|---|---|---|---|---|
| | | Replicate | | | Mean ± 1 std. dev. | Coefficient of variation |
| | | 1 | 2 | 3 | | |
| (ft) | ------------------------------------ mg $L^{-1}$ ------------------------------------ | | | | | (%) |
| 4 | 2,000 | 1,160 | 700 | 920 | 927 ± 230 | 24.8 |
| 8 | 3,000 | 3,530 | 3,470 | 3,390 | 3,463 ± 70 | 2.0 |
| 12 | 7,500 | 11,900 | 11,700 | 14,150 | 12,583 ± 1,360 | 10.8 |
| 16 | 8,500 | 11,300 | 13,200 | 10,050 | 11,517 ± 1,586 | 13.8 |

before the other additives were introduced. There were Cl-containing compounds in the fluids, but they were generally in relatively low concentrations (Table 3) so their influence on flowback chemistry was not expected to be substantial.

Both the field and laboratory data show that Cl concentrations present in the flowback were substantial. Carryover of chemicals from the storage tank from use at other sites is not believed to be an important source of the Cl because tanks are emptied and the inside surfaces are hosed out to remove residual material before removal from a site. While reactions between the entire suite of fracing chemicals and the geology may have released some Cl, it is likely that much of it was attributable to unrecovered hydrochloric acid. We do not have data to estimate the percent of recovery of the hydrochloric acid, but flowback recoveries are never complete (Sullivan et al. 2004; Woodroof et al. 2003a,b). Recovery data are largely unavailable on a broad scale (Sullivan et al. 2004), but recovery from wells drilled in the Marcellus Shale in Pennsylvania averaged 35 to 40 percent, with a maximum recovery for a single well of 62 percent (URS 2009). This average approximates the post-acidized recovery of fluid found in the non-Marcellus Shale in this investigation; if it is representative of the percentage of hydrochloric acid recovered in the earlier, separate acid flowback, about half or more of the acid would have remained in the geologic formation. Thus, residual hydrochloric acid was a likely source of much of the Cl recovered in the post-acidized flowback.

Samples from the tank showed that the Cl concentrations increased with depth, and differences in fluid characteristics with depth also were evident visually. But it is impossible to know whether this gradation occurred after flowback was complete or if the fluid delivered to the tank had variable chloride concentrations during the delivery period that resulted in the increasing concentrations with depth. The composition of flowback has been documented to change during flowback recovery (URS 2009); limited data from drilling in the Marcellus Shale in Pennsylvania showed increases in total dissolved solids, chloride, and barium concentrations over time through flowback processes (URS 2009). In the current study, the tank was filled from the top,

so decreasing Cl concentrations through the flowback process would have been required for the gradation we observed. Even if some Cl differences existed during flowback, substantial mixing within the tank would be expected due to the 18-foot-deep tank being filled from the top and the resulting turbulence from fluid falling into the tank. These pieces of evidence suggest that Cl gradation occurred following flowback and not as the result of temporal differences in flowback chemistry.

The occurrence of Cl gradation has several potential implications with respect to land application of fracing fluids. For tank-stored fluids, depending on how the composite sample is taken before land application, very different Cl concentrations could result. If the composite sample is taken from the valves at the bottom of the tank (Fig. 1), based on our findings this sample would be expected to approximate the highest Cl concentrations in the tank. By contrast, a composite sample taken from the top of the tank could grossly underestimate both the maximum and the average Cl concentrations in the tank.

Because a tank is physically different from an open pit, and pits are used to hold both drilling fluids and fracing fluids, there is some uncertainty about how these results apply to pit-stored fluids. However, Cl concentrations in the samples collected during 2008 land application following the original well fracing support either that gradation occurred or that Cl chemistry in the pit was spatially nonhomogeneous even after mixing. Because the field conductivity data and the Cl results showed that the greatest change in Cl concentrations occurred between 10- and 12-foot-depths, concentration differences may be most evident in pits that are at least that deep. If Cl differences can occur through time, the samples taken from near the surface and edges of reserve pits may not adequately represent the Cl chemistry present, and further study on reserve pit chemistry is warranted.

The comparisons of the field and laboratory results currently have only limited implications because only one test kit was used and only four samples were tested. However, we also compared known Cl concentrations of standards prepared from sodium chloride mixed in deionized water to measurements of those standards made with the Hach® kit. Using the manufacturer's

10

**Table 6. —Chloride concentrations of known standards determined by CD-51 Hach® test kit**

| Hach® method | Cl standard concentration | Hach® test-kit concentration |
|---|---|---|
| | --------------mg L⁻¹-------------- | |
| High Range Cl Test | 500 | 1,000 |
| | 1,000 | 1,500 |
| | 2,000 | 2,500 |
| | 5,000 | 5,000 |
| | 8,000 | 8,500 |
| | 10,000 | 10,000 |
| | | |
| Expanded High Range | 10,000 | 15,000 |
| Cl Test | 12,000 | 15,000 |
| | 15,000 | 15,000 |
| | 20,000 | 25,000 |
| | 25,000 | 30,000 |

instructions, the Hach® High Range Cl Test method was used for determining concentrations up to 10,000 mg L⁻¹, and the Hach® Expanded High Range Cl Test (also a titration with silver nitrate) was used for concentrations of 10,000 to 25,000 mg L⁻¹. In the expanded range, the Hach® test estimates concentrations only to the nearest 5,000 mg L⁻¹.

The Hach® methods routinely overestimated Cl concentrations in the range of 500 to 25,000 mg L⁻¹ (Table 6). That the Cl concentrations in the flowback samples were underestimated in only the highest concentration samples (Table 5) suggests chemicals were present in those flowback samples that interfered with the titration results. Therefore, simple calibration of this type of field kit to conventional "clean" standards may be insufficient to understand how their results will compare to more rigorous laboratory measurements.

Because it would be difficult and expensive to develop calibration standards that contain similar chemical constituencies to those found in flowback, it may be easier to use laboratory analyses to determine Cl concentrations in flowback for assessing allowable disposal methods. It would obviously take longer to obtain results from laboratory procedures than field test kits, but the results would be more accurate. The field test

kit is useful as a filter, so if Cl concentrations are reasonably low subsequent laboratory testing would not be necessary; for this particular kit, concentrations of approximately 8,000 mg L⁻¹ appear to be in the range that would not require additional laboratory testing and could be assumed to be less than 12,500 mg L⁻¹. Because analysis with the field test kit requires use of the Expanded High Range Cl Test for concentrations above 10,000 mg L⁻¹, even if this brand of field kit had a 1:1 relationship with laboratory results, it would be necessary to default to laboratory procedures or some other type of more sensitive field analysis to determine actual concentrations (since results for the Expanded High Range Test are reported only to the nearest 5,000 mg L⁻¹).

Laboratory results also have some level of error associated with them, and preparation of dilutions can add to that variability. Because only small amounts of flowback fluid were pipetted for the dilutions, very small differences in delivered volumes can lead to relatively large differences in calculated concentrations, especially for the 1:5,000 dilutions. The high viscosity of the fracing fluid also may affect the efficacy and repeatability of pipette delivery.

The variability among replicates of an individual sample ranged from tens to thousands of milligrams per liter, with the greatest absolute variability associated with concentrations that were above 10,000 mg L⁻¹ (Table 5). In both the 12- and 16-foot-deep samples, one of the replicates exceeded the 12,500-mg L⁻¹ maximum concentration for land application (had land application been considered), while the other two replicate values and the average of all three values were below that concentration (Table 5). Therefore, even if laboratory procedures are used to determine Cl concentrations, it may be prudent to analyze 2 or 3 replicates of a sample when the Cl concentrations are within 2,000 to 3,000 mg L⁻¹ of the threshold value (12,500 mg L⁻¹) and use the average concentration to determine whether land application is appropriate.

It is important to note that the results presented here are from a single tank at a single point in time, and the data result from fracing a specific geologic layer using a specific fracing technique and additive mixture. However, these limitations do not make the data inconsequential

because there are few data of this type in the literature. Different Cl concentrations or differences in their spatial relationships may result if different fracing additives, fracing techniques, and/or geologic layers are involved or if flowback efficiencies are substantially different. Consequently, much more research is needed to build relevant databases from which the physical and chemical conditions associated with flowback can be characterized and the associated environmental impacts of holding and disposing of those fluids can be better understood.

## CONCLUSION

Following refracing of a natural gas well in West Virginia, flowback was recovered and stored in a 10,500-gallon tank. In situ electrical conductivity and laboratory analyses of electrical conductivity and Cl concentrations made after 7 days of storage showed that the Cl concentrations in flowback increased substantially with depth. This finding suggests that Cl associated with flowback stored in reserve pits also has the ability to become graded with depth. In West Virginia, land application of flowback is permitted only if the Cl concentration of a representative sample is less than 12,500 mg $L^{-1}$. Thus, if samples collected to make that assessment are not representative of the pit or the tank in which they are stored, the selected disposal method may be inappropriate or unnecessary relative to state regulations.

Chloride concentrations in the tank-stored flowback were underestimated by a common type of colorimetric field test kit at concentrations above 3,000 mg $L^{-1}$. For field measurements of approximately 8,000 mg $L^{-1}$ or greater, reanalysis of the sample using laboratory procedures is recommended to ensure that more accurate results are obtained on which to base decisions about fluid disposal. Calibration of the field unit to typical "clean Cl" standards will not be sufficient to compensate for differences between laboratory and field kit test results, because flowback fluid may have chemicals that interfere with colorimetric tests. Additionally, we recommend that replicate laboratory analyses be used so an average of those results is employed to represent the Cl concentration of flowback, whether stored in pits or tanks.

This study examined the contents of only a single tank of flowback. However, there is surprisingly little information in the literature on flowback chemistry, and substantial additional research is needed to fully understand the character and environmental effects of fracing fluids and flowback. This information becomes increasingly important as the Nation turns to its own natural gas reserves for energy independence.

## ACKNOWLEDGMENTS

The authors thank David Berry, owner of Berry Energy, Inc., for his cooperation in providing access to the tank and information on fracing additives and procedures. We also thank Charles Krushansky of Action Environmental, Inc., for providing information about the procedures used to collect flowback samples from the B-800 gas well reserve pit. Finally, we thank John Pearce and Frederica Wood for their assistance in preparing and analyzing Cl samples in the laboratory.

## LITERATURE CITED

Agbaji, A.; Lee, B.; Kumar, H.; Belvalkar, R.; Eslambolchi, S.; Guiadem, S.; Park, S. 2009. **Report on sustainable development and design of Marcellus shale play in Susquehanna, PA.** Prepared for Integrated Design of Energy and Mineral Engineering Systems 580. Unpublished Report. Available at http://www.ems.psu.edu/~elsworth/courses/egee580/gas_final_2009.pdf (Accessed March 16, 2011).

Al-Harthy, M.H.; Al-Ajmi, A. 2009. **How to economically evaluate drilling fluid plant? A systematic approach.** International Journal of Oil, Gas, and Coal Technology. 2: 280-296.

Arthur, J.D.; Bohm, B.; Coughlin, B.J.; Layne, M. 2009. **Evaluating the environmental implications of hydraulic fracturing in shale gas reservoirs.** Society of Petroleum Engineers Americas E&P environmental and safety conference; 2009 March 23-25; San Antonio, TX. Paper No. 121038-MS. 15 p.

Bauder, T.A.; Barbarick, K.A.; Ippolito, J.A.; Shanahan, J.F.; Ayers, P.D. 2005. **Soil properties affecting**

**wheat yields following drilling-fluid application.** Journal of Environmental Quality. 34: 1687-1696.

Bishop, R.E. 2009. **Beyond MSDS: A review of hazardous materials used in New York's natural gas industry.** Available at http://www.fmce.org/Beyond%20MSDS.pdf (Accessed March 16, 2011).

Burnett, D.B. 2008. **Novel cleanup agents designed exclusively for oil field membrane filtration systems: low cost field demonstrations of cleanup agents in controlled experimental environments.** A Global Petroleum Research Institute Report. U.S. Department of Energy DE-FC26-04NT15543. 53 p.

Deuel, L.E., Jr.; Hokanson, S.; Holliday, G.H. 1999. **Measurement of solute transport from an earthen reserve pit during drilling and post-closure operational phases: Part I. Site characteristics and experimental design.** Society of Petroleum Engineers E&P environmental conference; 1999 March 1-3; Austin, TX. Paper No. 52735-MS. 15 p.

Edwards, P.J.; Wood, F. 1993. **Field and laboratory quality assurance/quality control protocols and accomplishments for the Fernow Experimental Forest watershed acidification study.** Gen. Tech. Rep. NE-177. Radnor, PA: U.S. Department of Agriculture, Forest Service, Northeastern Forest Experiment Station. 15 p.

French, H.M. 1980. **Terrain, land use, and waste drilling fluid disposal problems, Arctic Canada.** Arctic. 33: 794-806.

Gaudlip, A.W.; Paugh, L.O.; Hayes, T.D. 2008. **Marcellus shale water management challenges in Pennsylvania.** Society of Petroleum Engineers Shale gas production conference; 2008 Nov. 16-18; Fort Worth, TX. Paper No. 119898-MS. 12 p.

Ground Water Protection Council and ALL Consulting. 2009. **Modern shale gas development in the United States: a primer.** Report prepared for U.S. Department of Energy, Office of Fossil Energy, and National Energy Technology Laboratory. Contract No. DE-FG26-04NT15455. 116 p. Available at http://www.all-llc.com/publicdownloads/ShaleGasPrimer2009.pdf (Accessed March 16, 2011).

Harrison, S.S. 1983. **Evaluating system for ground-water contamination hazards due to gas-well drilling on the glaciated Appalachian Plateau.** Groundwater. 21: 689-700.

Hudak, P.F.; Blanchard, S. 1997. **Land use and groundwater quality in the Trinity group outcrop of north-central Texas, USA.** Environment International. 23: 507-517.

Leuterman, A.J.J.; Jones, F.V.; Candler, J.E. 1988. **Drilling fluids and reserve pit toxicity.** Journal of Petroleum Technology. 40: 1441-1444.

McFarland, M.L.; Ueckert, D.N.; Hons, F.M.; Hartmann, S. 1992. **Selective-placement burial of drilling fluids: effects on soil properties, buffalograss and fourwing saltbrush.** Journal of Environmental Quality. 21: 140-144.

McFarland, M.L.; Ueckert, D.N.; Hons, F.M.; Hartmann, S. 1994. **Selective-placement burial of drilling fluids: effects on soil properties, buffalograss and fourwing saltbrush after 4 years.** Journal of Range Management. 47: 475-480.

Miller, R.W.; Pesaran, P. 1980. **Effects of drilling fluids on soils and plants: complete drilling fluid mixtures.** Journal of Environmental Quality. 9: 552-556.

Miller, R.W.; Honarvar, S.; Hunsaker, B. 1980. **Effects of drilling fluids on soils and plants: individual fluid components.** Journal of Environmental Quality. 9: 547-552.

Nelson, D.W.; Liu, S.L.; Sommers, L.E. 1984. **Extractability and plant uptake of trace elements from drilling fluids.** Journal of Environmental Quality. 13: 562-566.

13

Nesbit, L.E.; Sanders, J.A. 1981. **Drilling fluid disposal.** Journal of Petroleum Technology. 33: 2377-2381.

Reidenbach, V.G.; Harris, P.C.; Lee, Y.N.; Lord, D.L. 1986. **Rheological study of foam fracturing fluids using nitrogen and carbon dioxide.** SPE Production Engineering. 1: 31-41.

Soeder, D.J.; Kappel, W.M. 2009. **Water resource and natural gas production from the Marcellus shale.** Fact Sheet 2009-3032. U.S. Geological Survey. 6 p.

Sokal, R.R.; Rohlf, F.J. 1994. **Biometry: the principles and practices of statistics in biological research.** 3rd ed. New York: W.H. Freeman. 880 p.

Sullivan, R.; Woodroof, R.; Steinberger-Glaser, A.; Fielder, R.; Asadi, M. 2004. **Optimizing fracturing fluid cleanup in the Bossier Sand using chemical frac tracers and aggressive gel breaker deployment.** Society of Petroleum Engineers annual technical conference and exhibition; 2004 Sept. 26-29; Houston, TX. Paper No. 90030-MS. 24 p.

Thurber, N.E. 1992. **Waste minimization for land-based drilling operations.** Journal of Petroleum Technology. 44: 542-547.

URS Corporation. 2009. **Water-related issues associated with gas production in the Marcellus shale: additives use, quality and quantities, regulations, on-site treatment, green technologies, alternative water sources, water well-testing.** Prepared for the New York State Energy Research and Development Authority, Sept. 16, 2009. NYSERDA Contract PO Number 10666. URS Corporation, Fort Washington, PA. Unpublished report. Available at http://www.nyserda.org/publications/02%20 Chapter%202%20-%20URS%202009-9-16.pdf (Accessed March 16, 2011).

Veil, J.A. 2002. **Drilling waste management: past, present, and future.** Society of Petroleum Engineers annual technical conference and exhibition; 2002 Sept. 29-Oct. 2; San Antonio, TX. Paper No. 77388-MS. 7 p.

Weston, R.T. 2008. **Development of the Marcellus Shale – water resource challenges.** Prepared for Kirkpatrick & Lockhart Preston Gates Ellis, LLP. Unpublished report. Available at http://canaaninstitute.org/docs/MarcellusShale_and_Water_Resources.pdf (Accessed March 16, 2011).

Woodroof, R.A., Jr.; Asadi, M.; Leonard, R.S.; Rainbolt, M. 2003a. **Monitoring fracturing fluid flowback and optimizing fracturing fluid cleanup in the Bossier Sand using chemical frac tracers.** Society of Petroleum Engineers annual technical conference and exhibition; 2003 Oct. 5-8; Denver, CO. Paper No. 84486-MS. 12 p.

Woodroof, R.A., Jr.; Asadi, M.; Warren, M. 2003b. **Monitoring fracturing fluid flowback and optimizing fracturing fluid cleanup using chemical frac tracers.** Society of Petroleum Engineers European formation damage conference; 2003 May 13-14; The Hague, Netherlands. Paper No. 82221-MS. 12 p.

Younken, W.E.; Johnson, D.L. 1980. **The impact of waste drilling fluids on soils and vegetation in Alberta.** In: Proceedings of Research on Environmental Fate and Effects of Drilling Fluids and Cuttings; 1980 Jan. 21-24; Lake Buena Vista, FL. Washington, DC: American Petroleum Institute: 98-114.

Edwards, Pamela J.; Tracy, Linda L.; Wilson, William K. 2011. **Chloride concentration gradients in tank-stored hydraulic fracturing fluids following flowback**. Res. Pap. NRS-14. Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station. 14 p.

A natural gas well in West Virginia was hydraulically fractured and the flowback was recovered and stored in an 18-foot-deep tank. Both in situ field test kit and laboratory measurements of electrical conductivity and chloride concentrations increased substantially with depth, although the laboratory measurements showed a greater increase. The field test kit also underestimated chloride concentrations in prepared standards when they exceeded 8,000 mg $L^{-1}$, indicating that laboratory analyses or other more accurate methods of detection should be used to determine chloride concentrations in flowback when they may be approaching West Virginia regulatory levels (12,500 mg $L^{-1}$) that disallow disposal by land application. The gradation of chloride with depth also has implications for procedures used to collect flowback samples from reserve pits or tanks before disposal to ensure the resulting composite chloride concentration is representative of the total volume.

KEY WORDS: natural gas, unconventional well development, hydraulic fracturing, flowback recovery, chloride concentrations, specific conductivity

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternate means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202)720-2600 (voice and TDD). To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, DC 20250-9410, or call (800)795-3272 (voice) or (202)720-6382 (TDD). USDA is an equal opportunity provider and employer.


Printed on Recycled Paper



*www.nrs.fs.fed.us*

United States
Environmental Protection
Agency

Office of Solid Waste
and Emergency Response
Washington, DC 20460

EPA/530-SW-88-003
December 1987

Solid Waste



# Report to Congress

## Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy

Volume 1 of 3
Oil and Gas



# REPORT TO CONGRESS

## MANAGEMENT OF WASTES FROM THE EXPLORATION, DEVELOPMENT, AND PRODUCTION OF CRUDE OIL, NATURAL GAS, AND GEOTHERMAL ENERGY

VOLUME 1 OF 3

OIL AND GAS

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

Office of Solid Waste and Emergency Response
Washington, D.C.   20460

December 1987

TABLE OF CONTENTS

Chapter                                                                 Page

Chapter I - INTRODUCTION
    Statutory Requirements and General Purpose.....................I-1
    Study Approach.................................................I-3
    Study Factors.................................................I-3

Chapter II - OVERVIEW OF THE INDUSTRY
    Description of the Oil and Gas Industry.......................II-1
    Exploration and Development..................................II-2
    Production...................................................II-8
      Downhole Operations........................................II-9
      Surface Operations.........................................II-10
    Definition of Exempt Wastes..................................II-16
    Scope of the Exemption.......................................II-16
    Waste Volume Estimation Methodology..........................II-19
      Estimating Volumes of Drilling Fluids and
        Cuttings.................................................II-19
          EPA's Estimates........................................II-21
          American Petroleum Institute's Estimates...............II-23
      Estimating Volumes of Produced Water.......................II-24
          EPA's Estimates........................................II-24
          API's Estimates........................................II-25
    Waste Volume Estimates.......................................II-26
      Characterization of Wastes.................................II-26
    Sampling Methods.............................................II-31
      EPA Sampling Procedures....................................II-31
        Pit Sampling.............................................II-31
        Produced Water...........................................II-32
        Central Treatment Facilities.............................II-32
      API Sampling Methods.......................................II-32
    Analytical Methods...........................................II-32
      EPA Analytical Methods.....................................II-33
      API Analytical Methods.....................................II-33
    Results......................................................II-34
      Chemical Constituents Found by EPA in Oil and Gas..........II-34
      Comparison to Constituents of Potential Concern
        Identified in the Risk Analysis..........................II-36

TABLE OF CONTENTS (continued)

Chapter II - Continued                                            Page

    Facility Analysis...........................................II-39
        Central Treatment Facility..............................II-40
        Central Pit Facility....................................II-40
        Drilling Facilities.....................................II-40
        Production Facility.....................................II-40
    Waste Characterization Issues...............................II-41
        Toxicity Characteristic Leaching Procedure (TCLP).......II-41
        Solubility and Mobility of Constituents.................II-43
        Phototoxic Effect of Polycyclic Aromatic
            Hydrocarbons (PAH)..................................II-44
        pH and Other RCRA Characteristics.......................II-45
        Use of Constituents of Concern..........................II-47
    References..................................................II-49

Chapter III - CURRENT AND ALTERNATIVE WASTE MANAGEMENT PRACTICES
    Introduction...............................................III-1
        Sources of Information.................................III-3
        Limitations............................................III-3
    Drilling-Related Wastes....................................III-5
        Description of Waste...................................III-5
            Drilling Fluids (Muds).............................III-5
            Cuttings...........................................III-6
            Waste Chemicals....................................III-6
            Fracturing and Acidizing Fluids...................III-11
            Completion and Workover Fluids....................III-12
            Rigwash and Other Miscellaneous Wastes............III-13
        Onsite Drilling Waste Management Methods..............III-13
            Reserve Pits......................................III-14
            Annular Disposal of Pumpable Drilling Wastes......III-18
            Drilling Waste Solidification.....................III-20
            Treatment and Discharge of Liquid Wastes to Land
                or Surface Water..............................III-21
            Closed Cycle Systems..............................III-22
            Disposal of Drilling Wastes on the North Slope of
                Alaska........................................III-24
        Offsite Waste Management Methods......................III-27
            Centralized Disposal Pits.........................III-27
            Centralized Treatment Facilities..................III-29

ii

TABLE OF CONTENTS (continued)

Chapter III - Continued                                    Page

      Commercial Landfarming.......................................III-30
      Reconditioning and Reuse of Drilling Media...................III-32
   Production-Related Wastes.......................................III-33
      Waste Characterization.......................................III-33
      Produced Water...............................................III-33
      Low-Volume Production Wastes.................................III-34
   Onsite Management Methods.......................................III-34
      Subsurface Injection.........................................III-35
      Evaporation and Percolation Pits............................III-44
      Discharge of Produced Waters to Surface Water
         Bodies....................................................III-44
      Other Production-Related Pits................................III-45
   Offsite Management Methods......................................III-46
      Road or Land Applications....................................III-46
   Well Plugging and Abandonment...................................III-47
   References......................................................III-49

Chapter IV - DAMAGE CASES
   Introduction.......................................................IV-1
      Purpose of Damage Case Review..................................IV-1
      Methodology for Gathering Damage Case Information..............IV-2
         Information Categories......................................IV-4
         Sources and Contacts........................................IV-7
         Case Study Development......................................IV-7
         Test of Proof...............................................IV-9
         Review by State Groups and Other Sources....................IV-9
      Limitations of the Methodology and Its Results................IV-9
         Schedule for Collection of Damage Case Information..........IV-9
         Limited Number of Oil- and Gas-Producing States
            in Analysis..............................................IV-9
         Difficulty in Obtaining a Representative Sample...........IV-10
      Organization of this Presentation............................IV-11
      New England..................................................IV-12
      Appalachia...................................................IV-12
      Operations...................................................IV-12
      Types of Operators...........................................IV-13
      Major Issues.................................................IV-13

iii

TABLE OF CONTENTS (continued)

Chapter IV - (Continued)                                    Page

    Contamination of Ground Water from Reserve Pits..........IV-13
    Illegal Disposal of Oil Field Wastes in Ohio.............IV-14
    Contamination of Ground Water from Annular Disposal
        of Produced Water....................................IV-16
    Illegal Disposal of Oil and Gas Waste in
        West Virginia........................................IV-17
    Illegal Disposal of Oil Field Waste in
        Pennsylvania.........................................IV-19
    Damage to Water Wells From Oil or Gas Well Drilling
        and Fracturing.......................................IV-21
    Problems with Landspreading in West Virginia.............IV-23
    Problems with Enhanced Oil Recovery (EOR) and
        Abandoned Wells in Kentucky..........................IV-24
  Southeast...................................................IV-26
  Gulf........................................................IV-26
  Operations..................................................IV-26
  Types of Operators..........................................IV-28
  Major Issues................................................IV-29
    Ground Water Contamination from Unlined Produced
        Water Disposal Pits and Reserve Pits.................IV-29
    Allowable Discharge of Drilling Mud Into Gulf Coast
        Estuaries............................................IV-30
    Illegal Disposal of Oil Field Waste in the Louisiana
        Gulf Coast Area......................................IV-32
    Illegal Disposal of Oil Field Waste in Arkansas..........IV-35
    Improperly Operated Injection Wells......................IV-38
  Midwest.....................................................IV-38
  Operations..................................................IV-38
  Types of Operators..........................................IV-39
  Major Issues................................................IV-39
    Groundwater Contamination in Michigan....................IV-39
  Plains......................................................IV-41
  Operations..................................................IV-42
  Types of Operators..........................................IV-42
  Major Issues................................................IV-43
    Poor Lease Maintenance...................................IV-43
    Unlined Reserve Pits.....................................IV-45

TABLE OF CONTENTS (continued)

Chapter IV - Continued                                                    Page

    Problems with Injection Wells...........................IV-46
Texas/Oklahoma.............................................IV-47
    Operations.............................................IV-47
    Types of Operators.....................................IV-48
    Major Issues...........................................IV-48
    Discharge of Produced Water and Drilling Mud into Bays
      and Estuaries of the Texas Gulf Coast..............IV-48
    Leaching of Reserve Pit Constituents into Ground Water....IV-52
    Chloride Contamination of Ground Water from Operation
      of Injection Wells................................IV-53
    Illegal Disposal of Oil and Gas Wastes.................IV-54
Northern Mountain.........................................IV-56
    Operations.............................................IV-56
    Types of Operators.....................................IV-57
    Major Issues...........................................IV-57
    Illegal Disposal of Oil and Gas Wastes.................IV-57
    Reclamation Problems...................................IV-58
    Discharge of Produced Water into Surface Streams.........IV-59
Southern Mountain........................................IV-60
    Operations.............................................IV-60
    Types of Operators.....................................IV-61
    Major Issues...........................................IV-61
    Produced Water Pit and Oil Field Waste Pit Contents
      Leaching into Ground Water........................IV-61
    Damage to Ground Water from Inadequately Maintained
      Injection Wells...................................IV-65
West Coast................................................IV-66
    Operations.............................................IV-66
    Types of Operators.....................................IV-67
    Major Issues...........................................IV-67
    Discharge of Produced Water and Oily Wastes to
      Ephemeral Streams.................................IV-67
Alaska....................................................IV-69
    Operations.............................................IV-69
    Types of Operators.....................................IV-70
    Major Issues...........................................IV-70
    Reserve Pits, North Slope.............................IV-70

TABLE OF CONTENTS (continued)

Chapter IV - Continued                                              Page

        Waste Disposal on the North Slope.....................IV-73
        Disposal of Drilling Wastes, Kenai Peninsula..........IV-74
    Miscellaneous Issues......................................IV-76
        Improper Abandoned and Improperly Plugged Wells.......IV-76
        Contamination of Ground Water with Hydrocarbons.......IV-79
        Oil Spills in the Arctic..............................IV-80

Chapter V - RISK MODELING
    Introduction..............................................V-1
        Objectives............................................V-1
        Scope and Limitations.................................V-2
    Quantitative Risk Assessment Methodology..................V-5
        Input Data............................................V-7
        Environmental Settings................................V-16
        Modeling Procedures...................................V-16
    Quantitative Risk Modeling Results: Human Health..........V-23
        Onsite Reserve Pits -- Drilling Wastes................V-23
            Nationally Weighted Risk Distributions............V-24
            Zone-Weighted Risk Distributions..................V-28
            Evaluation of Major Factors Affecting Health Risk.V-29
        Underground Injection -- Produced Fluids..............V-34
            Nationally Weighted Risk Distribution.............V-34
                Grout Seal Failure............................V-35
                Well Casing Failure...........................V-37
            Zone-Weighted Risk Distributions..................V-40
            Evaluation of Major Factors Affecting Health Risk.V-41
        Direct Discharge of Produced Water to Surface Streams.V-44
        Potentially Exposed Population........................V-45
    Quantitative Risk Modeling Results:  Resource Damage......V-50
        Potential Ground-Water Damage -- Drilling Wastes......V-51
        Potential Ground-Water Damage -- Produced Water.......V-53
        Potential Surface Water Damage........................V-54
    Assessment of Waste Disposal on Alaska's North Slope......V-55
    Locations of Oil and Gas Activities in Relation to
        Environments of Special Interest......................V-61
    Conclusions...............................................V-64
        General Conclusions...................................V-64
        Drilling Wastes Disposed of in Onsite Reserve Pits....V-65
        Produced Fluid Wastes Disposed of in Injection Wells..V-67

TABLE OF CONTENTS (continued)

Chapter V - Continued                                                    Page

    Stripper Well-Produced Fluid Wastes Discharged
        Directly into Surface Water.................................V-69
    Drilling and Production Wastes Disposed of on Alaska's
        North Slope................................................V-69
    Locations of Oil and Gas Activities in Relation to
        Environments of Special Interest...........................V-70
    References.....................................................V-71

Chapter VI - COSTS AND ECONOMIC IMPACTS OF ALTERNATIVE
             WASTE MANAGEMENT PRACTICES
    Overview of the Cost and Economic Impact Analysis.............VI-1
    Cost of Baseline and Alternative Waste Management
        Practices..................................................VI-3
        Identification of Waste Management Practices...............VI-3
        Cost of Waste Management Practices.........................VI-6
    Waste Management Scenarios and Applicable Waste
        Management Practices.......................................VI-14
        Baseline Scenario..........................................VI-15
        Intermediate Scenario......................................VI-15
        The Subtitle C Scenario....................................VI-16
        The Subtitle C-1 Scenario..................................VI-17
        Summary of Waste Management Scenarios......................VI-18
    Cost and Impact of the Waste Management Scenarios for
        Typical New Oil and Gas Projects...........................VI-18
        Economic Models............................................VI-18
        Quantities of Wastes Generated by the Model Projects.......VI-21
        Model Project Waste Management Costs.......................VI-21
        Impact of Waste Management Costs on Representative
            Projects...............................................VI-25
    Regional and National-Level Compliance Costs of the
        Waste Management Scenarios.................................VI-30
    Closure Analysis for Existing Wells...........................VI-32
    Intermediate and Long-Term Effects of the Waste
        Management Scenarios.......................................VI-35
        Production Effects of Compliance Costs.....................VI-35
        Additional Impacts of Compliance Costs.....................VI-37
    References....................................................VI-42

Chapter VII - CURRENT REGULATORY PROGRAMS
    Introduction..................................................VII-1
    State Programs................................................VII-1
    Federal Programs - EPA........................................VII-2
        Underground Injection Control.............................VII-2
        Effluent Limitations Guidelines...........................VII-4

TABLE OF CONTENTS (continued)

Chapter VII - Continued                                          Page

    Summary of Major Regulatory Activity Related
        to Onshore Oil and Gas.................................VII-5
    Onshore Segment Subcategories.............................VII-6
        Onshore...............................................VII-6
        Stripper (Oil Wells)..................................VII-6
        Coastal...............................................VII-7
        Wildlife and Agriculture Use..........................VII-7
    Federal Programs - Bureau of Land Management..............VII-8
        Introduction..........................................VII-8
        Regulatory Agencies...................................VII-8
        Rules and Regulations.................................VII-9
        Drilling.............................................VII-10
        Production...........................................VII-11
        Disposal in Pits.....................................VII-11
        Injection............................................VII-13
        Plugging/Abandonment.................................VII-13
    Implementation of State and Federal Programs.............VII-14
    References...............................................VII-35

Chapter VIII - CONCLUSIONS...................................VIII-1

Chapter IX - RECOMMENDATIONS..................................IX-1

LIST OF TABLES

Table                                                                      Page

II-1    Partial List of Exempt and Nonexempt Wastes..............II-20
II-2    Estimated U.S. Drilling Waste Volumes, 1985..............II-27
II-3    Estimated U.S. Produced Water Volumes, 1985..............II-29
II-4    Constituents of Concern Found in Waste Streams
        Sampled by EPA and API...................................II-37
II-5    EPA Samples Containing Constituents of Concern...........II-38
II-6    pH Values for Exploration, Development, and Production
        Wastes (EPA Samples).....................................II-46
II-7    Comparison of Potential Constituents of Concern that
        Were Modeled in Chapter V................................II-48

III-1   States with Major Oil Production Used as Primary
        References in This Study................................III-4
III-2   Characterization of Oil and Gas Drilling Fluids.........III-7

IV-1    Types of Damage of Concern to This Study.................IV-3
IV-2    List of States from Which Case Information Was
        Assembled................................................IV-5
IV-3    Sources of Information Used in Developing Damage Cases...IV-6

V-1     Model Constituents and Concentrations....................V-11
V-2     Toxicity Parameters and Effects Thresholds...............V-12
V-3     Drilling Pit Waste (Waste-Based) Management Practices.....V-14
V-4     Produced Water Waste Management Practices................V-15
V-5     Values and Sources for Environmental Setting Variables....V-17
V-6     Definition of Best-Estimate and Conservative Release
        Assumptions..............................................V-18
V-7     Definition of Flow Fields Used in Groundwater
        Transport Modeling.......................................V-22
V-8     Surface Water Flow Rates at Which Concentrations of
        Waste Stream Constituents in the Mixing Zone Will
        Exceed Reference Levels..................................V-46
V-9     Population Potentially Exposed Through Private Drinking
        Water Wells at Sample Drilling and Production Areas.....V-48
V-10    Population Potentially Exposed Through Public Water
        Supplies at Sample Drilling and Production Areas........V-49
V-11    Surface Water Flow Rates at Which Concentrations of
        Waste Stream Constituents in the Mixing Zone Will
        Exceed Aquatic Effects and Resource Damage Thresholds...V-56

## LIST OF TABLES (continued)

Table                                                                                    Page

VI-1    Summary of Baseline Disposal Practices.....................VI-5
VI-2    Summary of Engineering Design Elements for Baseline
        and Alternative Waste Management Practices..............VI-7
VI-3    Unit Costs of Drilling Waste Disposal Options, by Zone....VI-12
VI-4    Unit Costs of Underground Injection of Produced Water,
        by Zone....................................................VI-13
VI-5    Assumed Waste Management Practices for Alternative
        Waste Management Scenarios...............................VI-19
VI-6    Economic Parameters of Model Projects for U.S.
        Producing Zones..........................................VI-22
VI-7    Average Quantities of Waste Generated, by Zone...........VI-23
VI-8    Weighted Average Regional Costs of Drilling Waste
        Management for Model Projects Under Alternative
        Waste Management Scenarios...............................VI-26
VI-9    Weighted Average Unit Costs of Produced Water
        Management for Model Projects Under Alternative
        Waste Management Scenarios...............................VI-27
VI-10   Impact of Waste Management Costs on Model Projects:
        Comparisons of After-Tax Internal Rate of Return........VI-28
VI-11   Impact of Waste Management Costs on Model Projects:
        Increase in Total Cost of Production....................VI-29
VI-12   Annual Regional and National RCRA Compliance
        Costs of Alternative Waste Management Scenarios.........VI-31
VI-13   Distribution of Oil Production Across Existing
        Projects, 1985...........................................VI-33
VI-14   Impact of Waste Management Cost on Existing Production....VI-34
VI-15   Long-Term Impacts on Production of Cost Increases
        Under Waste Management Scenarios........................VI-38
VI-16   Effect of Domestic Production Decline on Selected
        Economic Parameters in the Year 2000....................VI-39

VII-1   Reserve Pit Design, Construction, and Operation.........VII-15
VII-2   Reserve Pit Closure/Waste Removal.......................VII-20
VII-3   Produced Water Pit Design and Construction..............VII-24
VII-4   Produced Water Surface Discharge Limits.................VII-26
VII-5   Produced Water Injection Well Construction..............VII-28
VII-6   Well Abandonment/Plugging...............................VII-31
VII-7   State Enforcement Matrix................................VII-33
VII-8   BLM Enforcement Matrix..................................VII-34

## LIST OF FIGURES

| Figure | | Page |
|---|---|---|
| I-1 | Oil and Gas Production Zones | I-6 |
| II-1 | Typical Rotary Drilling Rig | II-4 |
| II-2 | Typical Production Operation, Showing Separation of Oil, Gas, and Water | II-11 |
| II-3 | Average Water Production with Dissolved/Associated Gas | II-12 |
| II-4 | Oil Production with High Oil/Water Ratio Without Significant Dissolved Associated Gas | II-13 |
| III-1 | Annular Disposal of Waste Drilling Fluid | III-19 |
| III-2 | Typical Produced Water Disposal Design | III-37 |
| III-3 | Annular Disposal Outside Production Casing | III-38 |
| III-4 | Pollution of a Freshwater Aquifer Through Improperly Abandoned Wells | III-48 |
| V-1 | Overview of Quantitative Risk Assessment Methodology | V-6 |
| V-2 | Overview of Modeling Scenarios Considered in the Quantitative Risk Assessment | V-9 |
| V-3 | Nationally Weighted Distribution of Health Risk Estimates | V-25 |
| V-4 | Weighted vs. Unweighted Distribution of Cancer Risk Estimates | V-27 |
| V-5 | Health Risk Estimates (Unweighted) as a Function of Size and Distance | V-32 |
| V-6 | Health Risk Estimates (Unweighted) as a Function of Ground-Water Type | V-33 |
| V-7 | Nationally Weighted Distribution of Health Risk Estimates | V-36 |
| V-8 | Nationally Weighted Distribution of Health Risk Estimates | V-38 |
| V-9 | Nationally Weighted Distribution of Health Risk Estimates | V-39 |
| V-10 | Health Risk Estimates (Unweighted) as a Function of Ground-Water Type | V-43 |

LIST OF EXHIBITS

<u>Exhibit</u>                                                        <u>Page</u>

Exhibit 1    Section 8002(m) Resource Conservation and
             Recovery Act as amended by PL 96-482...............I-13

# CHAPTER I

# INTRODUCTION

## STATUTORY REQUIREMENTS AND GENERAL PURPOSE

Under Section 3001(b)(2)(A) of the 1980 Amendments to the Resource Conservation and Recovery Act (RCRA), Congress temporarily exempted several types of solid wastes from regulation as hazardous wastes, pending further study by the Environmental Protection Agency (EPA).[1] Among the categories of wastes exempted were "drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy." Section 8002(m) of the Amendments requires the Administrator to study these wastes and submit a final report to Congress. This report responds to those requirements. Because of the many inherent differences between the oil and gas industry and the geothermal energy industry, the report is submitted in three volumes. Volume 1 (this volume) covers the oil and gas industry; Volume 2 covers the geothermal energy industry; Volume 3 covers State regulatory summaries for the oil and gas industry and includes a glossary of terms. This report discusses wastes generated only by the onshore segment of the oil and gas industry.

The original deadline for this study was October 1982. EPA failed to meet that deadline, and in August 1985 the Alaska Center for the Environment sued the Agency for its failure to conduct the study.

---

[1] EPA is also required to make regulatory determinations affecting the oil and gas and geothermal energy industries under several other major statutes. These include designing appropriate effluent limitations guidelines under the Clean Water Act, determining emissions standards under the Clean Air Act, and implementing the requirements of the underground injection control program under the Safe Drinking Water Act.

EPA entered into a consent order, obligating it to submit the final Report to Congress on or before August 31, 1987. In April 1987, this schedule was modified and the deadline for submittal of the final Report to Congress was extended to December 31, 1987.

Following submission of the current study, and after public hearings and opportunity for comment, the Administrator of EPA must determine either to promulgate regulations under the hazardous waste management provisions of RCRA (Subtitle C) or to declare that such regulations are unwarranted. Any regulations would not take effect unless authorized by an act of Congress.

This does not mean that the recommendations of this report are limited to a narrow choice between application of full Subtitle C regulation and continuation of the current exemption. Section 8002(m) specifically requires the Administrator to propose recommendations for "[both] Federal and non-Federal actions" to prevent or substantially mitigate any adverse effects associated with management of wastes from these industries. EPA interprets this statement as a directive to consider the practical and prudent means available to avert health or environmental damage associated with the improper management of oil, gas, or geothermal wastes. The Agency has identified a wide range of possible actions, including voluntary programs, cooperative work with States to modify their programs, and Federal action outside of RCRA Subtitle C, such as RCRA Subtitle D, the existing Underground Injection Control Program under the Safe Drinking Water Act, or the National Pollution Discharge Elimination System under the Clean Water Act.

In this light, EPA emphasizes that the recommendations presented here do not constitute a regulatory determination. Such a determination cannot be made until the public has had an opportunity to review and comment on this report (i.e., the determination cannot be made until June 1988). Furthermore, the Agency is, in several important areas, presenting optional approaches involving further research and consultation with the States and other affected parties.

## STUDY APPROACH

The study factors are listed in the various paragraphs of Section 8002(m), which is quoted in its entirety as Exhibit 1 (page I-13). For clarity, the Agency has designed this report to respond specifically to each study factor within separate chapters or sections of chapters. It is important to note that although every study factor has been weighed in arriving at the conclusions and recommendations of this report, no single study factor has a determining influence on the conclusions and recommendations.

The study factors are defined in the paragraphs below, which also introduce the methodologies used to analyze each study area with respect to the oil and gas industry. More detailed methodological discussions can be found later in this report and in the supporting documentation and appendices.

## STUDY FACTORS

The principal study factors of concern to Congress are listed in subparagraphs (A) through (G) of Section 8002(m)(1) (see Exhibit 1). The introductory and concluding paragraphs of the Section, however, also contain directives to the Agency on the content of this study. This work has therefore been organized to respond to the following comprehensive interpretation of the 8002(m) study factors.

### Study Factor 1 - Defining Exempt Wastes

RCRA describes the exempt wastes in broad terms, referring to "drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy." The Agency, therefore, relied to the extent possible on the legislative history of the amendments, which provides guidance on the definition of other wastes. The tentative scope of the exemption is discussed in Chapter II of this volume.

I-3

Study Factor 2 - Specifying the Sources and Volumes of Exempt Wastes

In response to Section 8002(m)(1)(A), EPA has developed estimates of the sources and volumes of all exempt wastes. The estimates are presented in Chapter II, "Overview of the Industry."

Comprehensive information on the volumes of exempt wastes from oil and gas operations is not routinely collected nationwide; however, estimates of total volumes produced can be made through a variety of approaches.

With respect to drilling muds and related wastes, two methods for estimating volumes are presented. The first, developed early in the study by EPA, estimates drilling wastes as a function of the size of reserve pits. The second method is based on a survey conducted by the American Petroleum Institute (API) on production of drilling muds and completion fluids, cuttings, and other associated wastes discharged to reserve pits. Both methods and their results are included in Chapter II.

Similarly, EPA and API developed independent estimates of produced water volumes. EPA's first estimates were based on a survey of the injection, production, and hauling reports of State agencies; API's were based on its own survey of production operations. Again, this report presents the results of both methodologies.

Study Factor 3 - Characterizing Wastes

Section 8002(m) does not directly call for a laboratory analysis of the exempted wastes, but the Agency considers such a review to be a necessary and appropriate element of this study. Analysis of the principal high-volume wastes (i.e., drilling fluids and produced waters) can help to indicate whether any of the wastes may be hazardous under the

definitions of RCRA Subtitle C.  Wastes were examined with regard to whether they exhibited any of the hazardous characteristics defined under 40 CFR 261 of RCRA, including extraction procedure toxicity, ignitability, corrosivity, and reactivity.  Also, a compositional analysis was performed for the purpose of determining if hazardous constituents were present in the wastes at concentrations exceeding accepted health-based limits.

EPA therefore conducted a national screening type program that sampled facilities to compile relevant data on waste characteristics. Sites were selected at random in cooperation with State regulatory agencies, based on a division of the United States into zones (see Figure I-1).  Samples were subjected to extensive analysis, and the results were subjected to rigorous quality control procedures prior to their publication in January 1987.  Simultaneously, using a different sampling methodology, API sampled the same sites and wastes covered by the EPA-sponsored survey.  Chapter II of this report, "Overview of the Industry," presents a summary of results of both programs.

## Study Factor 4 - Describing Current Disposal Practices

Section 8002(m)(1)(B) calls for an analysis of current disposal practices for exempted wastes.  Chapter III, "Current and Alternative Waste Management Practices," summarizes EPA's review, which was based on a number of sources.  Besides reviewing the technical literature, EPA sent representatives to regulatory agencies of the major oil- and gas-producing States to discuss current waste management technologies with State representatives.  In addition, early drafts of this study's characterizations of such technologies were reviewed by State and industry representatives.



**Figure I-1**
**Oil and Gas Production Zones**

Divisions of the United States
Used for the
RCRA Section 8002(m) Study of
Oil and Gas Wastes

The Agency intentionally has not compiled an exhaustive review of waste management technologies used by the oil and gas industry. As stressed throughout this volume, conditions and methods vary widely from State to State and operation to operation. Rather, the Agency has described the principal and common methods of managing field-generated wastes and has discussed these practices in general and qualitative terms in relation to their effectiveness in protecting human health and the environment.

## Study Factor 5 - Documenting Evidence of Damage to Human Health and the Environment Caused by Management of Oil and Gas Wastes

Section 8002(m)(1)(D) requires EPA to analyze "documented cases" of health and environmental damage related to surface runoff or leachate. Although EPA has followed this instruction, paragraph (1) of the section also refers to "adverse effects of such wastes [i.e., exempted wastes, not necessarily only runoff and leachate] on humans, water, air, health, welfare, and natural resources...."

Chapter IV, "Damage Cases," summarizes EPA's effort to collect documented evidence of harm to human health, the environment, or valuable resources. Cases were accepted for presentation in this report only if, prior to commencement of field work, they met the standards of the test of proof, defined as (1) a scientific study, (2) an administrative finding of damage under State or other applicable authority, or (3) determination of damage by a court. Many cases met more than one such test of proof.

A number of issues of interpretation have been raised that must be clarified at the outset. First, in the Agency's opinion, the case study approach, such as that called for by Section 8002(m), is intended only to define the nature and range of known damages, not to estimate the frequency or extent of damages associated with typical operations. The

results presented here should not be interpreted as having statistical significance. The number of cases reported in each category bears no statistically significant relationship to the actual types and distribution of damages that may or may not exist across the United States.

Second, the total number of cases bears no implied or intended relationship to the total extent of damage from oil or gas operations caused at present or in the past.

Third, Section 8002(m)(1)(D) makes no mention of defining relationships between documented damages and violations of State or other Federal regulations. As a practical necessity, EPA has in fact relied heavily on State enforcement and complaint files in gathering documentation for this section of the report.[2] Consequently, a large proportion of cases reported here involve violations of State regulations. However, the fact that the majority of cases presented here involve State enforcement actions implies nothing, positive or negative, about the success of State programs in enforcing their requirements on industry.

## Study Factor 6 - Assessing Potential Danger to Human Health or the Environment from the Wastes

Section 8002(m)(1)(C) requires analysis of the potential dangers of surface runoff and leachate. These potential effects can involve all types of damages over a long period of time and are not necessarily limited to the categories of damages for which documentation is currently available.

---

[2] Other sources have included evidence submitted by private citizens or supplied by attorneys in response to inquiries from EPA researchers.

Several methods of estimating potential damages are available, and EPA has combined two approaches in responding to this study factor in Chapter V, "Risk Modeling." The first has been to use quantitative risk assessment modeling techniques developed for use elsewhere in the RCRA program. The second has been to apply more qualitative methods, based on traditional environmental assessment techniques.

The goal of both the quantitative and the qualitative risk assessments has been to define the most important factors in causing or averting human health risk and environmental risk from field operations. For the quantitative evaluation, EPA has adapted the EPA Liner Location Model, which was built to evaluate the impacts of land disposal of hazardous wastes, for use in analyzing drilling and production conditions. Since oil and gas operations are in many ways significantly different from land disposal of hazardous wastes, all revisions to the Liner Location Model and assumptions made in its present application have been extensively documented and are summarized in Chapter V. The procedures of traditional environmental assessment needed no modification to be applied.

As is true in the damage case work, the results of the modeling analysis have no statistical significance in terms of either the pattern or the extent of damages projected. The Agency modeled a subset of prototype situations, designed to roughly represent significant variations in conditions across the country. The results are very useful for characterizing the interactions of technological, geological, and climatic differences as they influence the potential for damages.

## Study Factor 7 - Reviewing the Adequacy of Government and Private Measures to Prevent and/or Mitigate any Adverse Effects

Section 8002 (m)(1) requires that the report's conclusions of any adverse effects associated with current management of exempted wastes

include consideration of the "adequacy of means and measures currently employed by the oil and gas industry, Government agencies, and others" to dispose of or recycle wastes or to prevent or mitigate those adverse effects.

Neither the damage case assessment nor the risk assessment provided statistically representative data on the extent of damages, making it impossible to compare damages in any quantitative way to the presence and effectiveness of control efforts. The Agency's response to this requirement is therefore based on a qualitative assessment of all the materials gathered during the course of assembling the report and on a review of State regulatory programs presented in Chapter VII, "Current Regulatory Programs." Chapter VII reviews the elements of programs and highlights possible inconsistencies, lack of specificity, potential problems in implementation, or gaps in coverage. Interpretation of the adequacy of these control efforts is presented in Chapter VIII, "Conclusions."

## Study Factor 8 - Defining Alternatives to Current Waste Management Practices

Section 8002 (m)(1) requires EPA to analyze alternatives to current disposal methods. EPA's discussion in response to this study factor is incorporated in Chapter III, "Current and Alternative Waste Management Practices."

Chapter III merges the concepts of current and alternative waste management practices. It does not single out particular technologies as potential substitutes for current practices because of the wide variation in practices among States and among different types of operations. Furthermore, waste management technology in this field is fairly simple. At least for the major high-volume waste streams, no significant, field-proven, newly invented technologies that can be considered "innovative" or "emerging" are in the research or development stage.

Practices that are routine in one location may be considered innovative or alternative elsewhere. On the other hand, virtually every waste management practice that exists can be considered "current" in one specific situation or another.

This does not mean that improvements are not possible: in some cases, currently available technologies may not be properly selected, implemented, or maintained. Near-term improvements in waste management in these industries will likely be based largely on more effective use of what is already available.

Study Factor 9 - Estimating the Costs of Alternative Practices

Subparagraph (F) calls for analysis of costs of alternative practices. The first several sections of Chapter VI, "Costs and Economic Impacts of Alternative Waste Management Practices," present the Agency's analysis of this study factor.

For the purposes of this report, EPA based its cost estimates on 21 prototypical regional projects, defined so as to capture significant differences between major and independent companies and between stripper operations and other projects. The study evaluates costs of waste disposal only for the two principal high-volume waste streams of concern, drilling fluids and produced waters, employing as its baseline the use of unlined reserve pits located at the drill site and the disposal of produced waters in injection wells permitted under the Federal Underground Injection Control Program and located off site.

The study then developed two alternative scenarios that varied the incremental costs of waste management control technology, applied them to each prototype project, and modeled the cost impacts of each. The

first scenario imposes a set of requirements typical of full Subtitle C management rules; the second represents a less stringent and extensive range of requirements based, in essence, on uniform nationwide use of the most up-to-date and effective controls now being applied by any of the States. Model results indicate cumulative annual costs, at the project level, of each of the more stringent control scenarios.

## Study Factor 10 - Estimating the Economic Impacts on Industry of Alternative Practices

In response to the requirements of subparagraph (G), the final two sections of Chapter VI present the Agency's analysis of the potential economic impacts of nationwide imposition of the two control scenarios analyzed at the project level.

Both the cost and the economic impact predicted in this report are admittedly large. Many significant variations influence the economics of this industry and make it difficult to generalize about impacts on either the project or the national level. In particular, the price of oil itself greatly affects both levels. Fluctuations in the price of oil over the period during which this study was prepared have had a profound influence on project economics, making it difficult to draw conclusions about the current or future impacts of modified waste management practices.

Nevertheless, the Agency believes that the analysis presented here is a reasonable response to Congress's directives, and that the results, while they cannot be exact, accurately reflect the general impacts that might be expected if environmental control requirements were made more stringent.

EXHIBIT 1:
Section 8002(m) Resource Conservation and Recovery Act as amended by PL 96-482

"(m) Drilling Fluids, Produced Waters, and Other Wastes Associated with the Extraction, Development, or Production of Crude Oil or Natural Gas or Geothermal Energy.- (1) The Administrator shall conduct a detailed and comprehensive study and submit a report on the adverse effects, if any, of drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas or geothermal energy on human health and the environment, including, but not limited to the effects of such wastes on humans, water, air, health, welfare, and natural resources and on the adequacy of means and measures currently employed by the oil and gas and geothermal drilling and production industry, Government agencies, and others to dispose of and utilize such wastes and to prevent or substantially mitigate such adverse effects. Such study shall include an analysis of-

"(A) the sources and volume of discarded material generated per year from such wastes;

"(B) present disposal practices;

"(C) potential danger to human health and the environment from the surface runoff or leachate;

"(D) documented cases which prove or have caused danger to human health and the environment from surface runoff or leachate;

"(E) alternatives to current disposal methods;

"(F) the cost of such alternatives; and

"(G) the impact of those alternatives on the exploration for, and development and production of, crude oil and natural gas or geothermal energy.

In furtherance of this study, the Administrator shall, as he deems appropriate, review studies and other actions of other Federal agencies concerning such wastes with a view toward avoiding duplication of effort and the need to expedite such study. The Administrator shall publish a report of such and shall include appropriate findings and recommendations for Federal and non-Federal actions concerning such effects.

"(2) The Administrator shall complete the research and study and submit the report required under paragraph (1) not later than twenty-four months from the date of enactment of the Solid Waste Disposal Act Amendments of 1980. Upon completion of the study, the Administrator shall prepare a summary of the findings of the study, a plan for research, development, and demonstration respecting the findings of the study, and shall submit the findings and the study, along with any recommendations resulting from such study, to the Committee on Environment and Public Works of the United States Senate and the Committee on Interstate and Foreign Commerce of the United states House of Representatives.

"(3) There are authorized to be appropriations not to exceed $1,000,000 to carry out the provisions of this subsection.

# CHAPTER II

## OVERVIEW OF THE INDUSTRY

### DESCRIPTION OF THE OIL AND GAS INDUSTRY

The oil and gas industry explores for, develops, and produces petroleum resources. In 1985 there were approximately 842,000 producing oil and gas wells in this country, distributed throughout 38 States. They produced 8.4 million barrels[1] of oil, 1.6 million barrels of natural gas liquids, and 44 billion cubic feet of natural gas daily. The American Petroleum Institute estimates domestic reserves at 28.4 billion barrels of oil, 7.9 billion barrels of natural gas liquids, and 193 trillion cubic feet of gas. Petroleum exploration, development, and production industries employed approximately 421,000 people in 1985.[2]

The industry is as varied as it is large. Some aspects of exploration, development, and production can change markedly from region to region and State to State. Well depths range from as little as 30 to 50 feet in some areas to over 30,000 feet in areas such as the Anadarko Basin of Oklahoma. Pennsylvania has been producing oil for 120 years; Alaska for only 15. Maryland has approximately 14 producing wells; Texas has 269,000 and completed another 25,721 in 1985 alone. Production from a single well can vary from a high of about 11,500 barrels per day (the 1985 average for wells on the Alaska North Slope) to less than 10 barrels per day for many thousands of "stripper" wells located in Appalachia and

---

[1] Crude oil production has traditionally been expressed in barrels. A barrel is equivalent to 5.61 ft$^3$, 0.158 m$^3$, or 42 U.S. gallons.

[2] These numbers, provided to EPA by the Bureau of Land Management (BLM), are generally accepted.

the more developed portions of the rest of the country.[3]  Overall,
70 percent of all U.S. oil wells are strippers, operating on the margins
of profitability.  Together, however, these strippers contribute 14
percent of total U.S. production--a number that appears small, yet is
roughly the equivalent of the immense Prudhoe Bay field in Alaska.

Such statistics make it clear that a short discussion such as this
cannot provide a comprehensive or fully accurate description of this
industry.  The purpose of this chapter is simply to present the
terminology used in the rest of this report[4] and to provide an
overview of typical exploration, development, and production methods.
With this as introduction, the chapter then defines which oil and gas
wastes EPA considers to be exempt within the scope of RCRA Section 8002;
estimates the volumes of exempt wastes generated by onshore oil and gas
operations; and presents the results of sample surveys conducted by EPA
and the American Petroleum Institute to characterize the content of
exempt oil and gas wastes.

Exploration and Development

Although geological and geophysical studies provide information
concerning potential accumulations of petroleum, the only method that can
confirm the presence of petroleum is exploratory drilling.  The majority
of exploratory wells are "dry" and must be plugged and abandoned.  When
an exploratory well does discover a commercial deposit, however, many
development wells are typically needed to extract oil or gas from that
reservoir.

---

[3] The definition of "stripper" well may vary from State to State.  For example, North Dakota
defines a stripper as a well that produces 10 barrels per day or less at 6,000 feet or less; 11 to
15 barrels per day from a depth of 6,001 feet to 10,000 feet; and 16 to 20 barrels per day for wells
that are 10,000 feet deep.

[4] A glossary of terms is also provided in Volume 3.

Exploratory and development wells are mechanically similar and generate similar wastes up to the point of production. In order to bring a field into production, however, development wells generate wastes associated with well completion and stimulation; these processes are discussed below. From 1981 to 1985, exploration and development drilling combined averaged 73,000 wells per year (API 1986). Drilling activity declined in 1986 and by mid-1987 rebounded over 1986 levels.

In the early part of the century, cable-tool drilling was the predominant method of well drilling. The up-and-down motion of a chisel-like bit, suspended by a cable, causes it to chip away the rock, which must be periodically removed with a bailer. Although an efficient technique, cable-tool drilling is limited to use in shallow, low-pressure reservoirs. Today, cable-tool drilling is used on a very limited basis in the United States, having been replaced almost entirely by rotary drilling.

Rotary drilling provides a safe method for controlling high-pressure oil/gas/water flows and allows for the simultaneous drilling of the well and removal of cuttings, making it possible to drill wells over 30,000 feet deep. Figure II-1 illustrates the process. The rotary motion provided by mechanisms on the drill rig floor turns a drill pipe or stem, thereby causing a bit on the end of the pipe to gouge and chip away the rock at the bottom of the hole. The bit itself generally has three cone-shaped wheels tipped with hardened teeth and is weighted into place by thick-walled collars. Well casing is periodically cemented into the hole, providing a uniform and stable conduit for the drill stem as it drills deeper into the hole. The casing also seals off freshwater aquifers, high-pressure zones, and other troublesome formations.

Most rotary drilling operations employ a circulation system using a water- or oil-based fluid, called "mud" because of its appearance. The

II-4



Figure II-1. Typical Rotary Drilling Rig

mud is pumped down the hollow drill pipe and across the face of the bit to provide lubrication and remove cuttings. The mud and cuttings are then pumped back up through the annular space between the drill pipe and the walls of the hole or casing. Mud is generally mixed with a weighting agent such as barite, and other mud additives, thus helping it serve several other important functions: (1) stabilizing the wellbore and preventing cave-ins, (2) counterbalancing any high-pressure oil, gas, or water zones in the formations being drilled, and (3) providing a medium to alleviate problems "downhole" (such as stuck pipe or lost circulation).

Cuttings are removed at the surface by shale shakers, desanders, and desilters; they are then deposited in the reserve pit excavated or constructed next to the rig. The reclaimed drilling mud is then recirculated back to the well. The type and extent of solids control equipment used influences how well the cuttings can be separated from the drilling fluid, and hence influences the volume of mud discharged versus how much is recirculated. Drilling mud must be disposed of when excess mud is collected, when changing downhole conditions require a whole new mud formulation, or when the well is abandoned. The reserve pit is generally used for this purpose. (Reserve pits serve multiple waste management functions. See discussion in Chapter III.) If the well is a dry hole, the drilling mud may be disposed of downhole upon abandonment.

The formation of a drilling mud for a particular job depends on types of geologic formations encountered, economics, availability, problems encountered downhole, and well data collection practices. Water-based drilling muds predominate in the United States. Colloidal materials, primarily bentonitic clay, and weighting materials, such as barite, are common constituents. Numerous chemical additives are available to give the mud precise properties to facilitate the drilling of the well; they include acids and bases, salts, corrosion inhibitors, viscosifiers,

dispersants, fluid loss reducers, lost circulation materials, flocculants, surfactants, biocides, and lubricants. (See also Table III-2.)

Oil-based drilling fluids account for approximately 3 to 10 percent of the total volume of drilling fluids used nationwide. The oil base may consist of crude oil, refined oil (usually fuel oil or diesel), or mineral oil. Oil-based drilling fluid provides lubrication in directionally drilled holes, high-temperature stability in very deep holes, and protection during drilling through water-sensitive formations.

In areas where high-pressure or water-bearing formations are not anticipated, air drilling is considerably faster and less expensive than drilling with water- or oil-based fluids. (Air drilling cannot be used in deep wells.) In this process, compressed air takes the place of mud, cooling the bit and lifting the cuttings back to the surface. Water is injected into the return line for dust suppression, creating a slurry that must be disposed of. In the United States, air drilling is most commonly used in the Appalachian Basin, in southeastern Kansas/northeastern Oklahoma, and in the Four Corners area of the Southwest. Other low-density drilling fluids are used in special situations. Gases other than air, usually nitrogen, are sometimes useful. These may be dispersed with liquids or solids, creating wastes in the form of mist, foam, emulsion, suspension, or gel.

Potential producing zones are commonly measured and analyzed (logged) during drilling, a process that typically generates no waste. If hydrocarbons appear to be present, a drill stem test can tell much about their characteristics. When the test is completed, formation fluids collected in the drill pipe must be disposed of.

If tests show that commercial quantities of oil and gas are present, the well must be prepared for production or "completed." "Cased hole"

completions are the most common type. First, production casing is run into the hole and cemented permanently in place. Then one or more strings of production tubing are set in the hole, productive intervals are isolated with packers, and surface equipment is installed. Actual completion involves the use of a gun or explosive charge that perforates the production casing and begins the flow of petroleum into the well.

During these completion operations, drilling fluid in the well may be modified or replaced by specialized fluids to control flow from the formation. A typical completion fluid consists of a brine solution modified with petroleum products, resins, polymers, and other chemical additives. When the well is produced initially, the completion fluid may be reclaimed or treated as a waste product that must be disposed of. For long-term corrosion protection, a packer fluid is placed into the casing/tubing annulus. Solids-free diesel oil, crude oil, produced water, or specially treated drilling fluid are preferred packer fluids.

Following well completion, oil or gas in the surrounding formations frequently is not under sufficient pressure to flow freely into the well and be removed. The formation may be impacted with indigenous material, the area directly surrounding the borehole may have become packed with cuttings, or the formation may have inherent low permeability.

Operators use a variety of stimulation techniques to correct these conditions and increase oil flow. Acidizing introduces acid into the production formation, dissolving formation matrix and thereby enlarging existing channels in carbonate-bearing rock. Hydraulic fracturing involves pumping specialized fluids carrying sand, glass beads, or similar materials into the production formation under high pressure; this creates fractures in the rock that remain propped open by the sand, beads, or similar materials when pressure is released.

Other specialized fluids may be pumped down a production well to enhance its yield; these can include corrosion inhibitors, surfactants, friction reducers, complexing agents, and cleanup additives. Although the formation may retain some of these fluids, most are returned to the surface when the well is initially produced or are slowly released over time. These fluids may require disposal, independent of disposal associated with produced water.

Drilling operations have the potential to create air pollution from several sources. The actual drilling equipment itself is typically run by large diesel engines that tend to emit significant quantities of particulates, sulfur oxides, and oxides of nitrogen, which are subject to regulation under the Clean Air Act. The particulates emitted may contain heavy metals as well as polycyclic organic matter (POMs). Particularly for deep wells, which require the most power to drill, and in large fields where several drilling operations may be in progress at the same time, cumulative diesel emissions can be important. Oil-fired turbines are also used as a source of power on newer drilling rigs. Other sources of air pollution include volatilization of light organic compounds from reserve pits and other holding pits that may be in use during drilling; these are exempt wastes. These light organics can be volatilized from recovered hydrocarbons or from solvents or other chemicals used in the production process for cleaning, fracturing, or well completion. The volume of volatile organic compounds is insignificant in comparison to diesel engine emissions.

## Production

Production operations generally include all activities associated with the recovery of petroleum from geologic formations. They can be divided into activities associated with downhole operations and activities associated with surface operations. Downhole operations include primary, secondary, and tertiary recovery methods; well workovers; and well stimulation activities. Activities associated with

surface operations include oil/gas/water separation, fluid treatment, and disposal of produced water. Each of these terms is discussed briefly below.

Downhole Operations

Primary recovery refers to the initial production of oil or gas from a reservoir using natural pressure or artificial lift methods, such as surface or subsurface pumps and gas lift, to bring it out of the formation and to the surface. Most reservoirs are capable of producing oil and gas by primary recovery methods alone, but this ability declines over the life of the well. Eventually, virtually all wells must employ some form of secondary recovery, typically involving injection of gas or liquid into the reservoir to maintain pressure within the producing formation. Waterflooding is the most frequently employed secondary recovery method. It involves injecting treated fresh water, seawater, or produced water into the formation through a separate well or wells.

Tertiary recovery refers to the recovery of the last portion of the oil that can be economically produced. Chemical, physical, and thermal methods are available and may be used in combination. Chemical methods involve injection of fluids containing substances such as surfactants and polymers. Miscible oil recovery involves injection of gases, such as carbon dioxide and natural gas, which combine with the oil. Thermal recovery methods include steam injection and in situ combustion (or "fire flooding"). When oil eventually reaches a production well, injected gases or fluids from secondary and tertiary recovery operations may be dissolved or carried in formation oil or water, or simply mixed with them; their removal is discussed below in conjunction with surface production operations.

Workovers, another aspect of downhole production operations, are designed to restore or increase production from wells whose flows are

inhibited by downhole mechanical failures or blockages, such as sand or paraffin deposits. Fluids circulated into the well for this purpose must be compatible with the formation and must not adversely affect permeability. They are similar to completion fluids, described earlier. When the well is put back into production, the workover fluid may be reclaimed or disposed of.

Other chemicals may be periodically or continuously pumped down a production well to inhibit corrosion, reduce friction, or simply keep the well flowing. For example, methanol may be pumped down a gas well to keep it from becoming plugged with ice.

Surface Operations

Surface production operations generally include gathering of the produced fluids (oil, gas, gas liquids, and water) from a well or group of wells and separation and treatment of the fluids. See Figures II-2, II-3, and II-4. As producing reservoirs are depleted, their water/oil ratios may increase steeply. New wells may produce little if any water; stripper wells may vary greatly in the volume of water they produce. Some may produce more than 100 barrels of water for every barrel of oil, particularly if the wells are subject to waterflooding operations.

Virtually all of this water must be removed before the product can be transferred to a pipeline. (The maximum water content allowed is generally less than 1 percent.) The oil may also contain completion or workover fluids, stimulation fluids, or other chemicals (biocides, fungicides) used as an adjunct to production. Some oil/water mixtures may be easy to separate, but others may exist as fine emulsions that do

Figure  II-2   Typical Production Operation, Showing Separation of Oil, Gas, and Water

Produced waters are not always injected as indicated in this figure.  Produced water may be trucked to central treatment and disposal facilities, discharged into disposal pits, discharged to surface or coastal waters, or used for beneficial or agricultural use.

II-12



Figure  II-3    Oil Production With Average $H_2O$ Production With Dissolved/Associated Gas

Produced waters are not always injected as indicated in this figure.  Produced water may be trucked to central treatment and disposal facilities, discharged into disposal pits, discharged to surface or coastal waters, or used for beneficial or agricultural use.

Figure II-4    High Oil/$H_2O$ Ratio Without Significant Dissolved/Associated Gas

Produced waters are not always injected as indicated in this figure.  Produced water may be trucked to central treatment and disposal facilities, discharged into disposal pits, discharged to surface or coastal waters, or used for beneficial or agricultural use.

11-13

not separate of their own accord by gravity. Where settling is possible, it is done in large or small tanks, the larger tanks affording longer residence time to increase separation efficiency. Where emulsions are difficult to break, heat is usually applied in "heater treaters." Whichever method is used, crude oil flows from the final separator to stock tanks. The sludges and liquids that settle out of the oil as tank bottoms throughout the separation process must be collected and discarded along with the separated water.

The largest volume production waste, produced water, flows from the separators into storage tanks and in the majority of oil fields is highly saline. Most produced water is injected down disposal wells or enhanced recovery wells. Produced water is also discharged to tidal areas and surface streams, discharged to storage pits, or used for beneficial or agricultural use. (Seawater is 35,000 ppm chlorides. Produced water can range from 5,000 to 180,000 ppm chlorides.) If the produced water is injected down a disposal well or an enhanced recovery well, it may be treated to remove solids, which are also disposed of.

Tank bottoms are periodically removed from production vessels. Tank bottoms are usually hauled away from the production site for disposal. Occasionally, if the bottoms are fluid enough, they may be disposed of along with produced water.

Waste crude oil may also be generated at a production site. If crude oil becomes contaminated with chemicals or is skimmed from surface impoundments, it is usually reclaimed. Soil and gravel contaminated by crude oil as a result of normal field operations and occasional leaks and spills require disposal.

Natural gas requires different techniques to separate out crude oil, gas liquids, entrained solids, and other impurities. These separation processes can occur in the field, in a gas processing plant, or both, but

more frequently occur at an offsite processing plant. Crude oil, gas liquids, some free water, and entrained solids can be removed in conventional separation vessels. More water may be removed by any of several dehydration processes, frequently through the use of glycol, a liquid dessicant, or various solid dessicants. Although these separation media can generally be regenerated and used again, they eventually lose their effectiveness and must be disposed of.

Both crude oil and natural gas may contain the highly toxic gas hydrogen sulfide, which is an exempt waste. (Eight hundred ppm in air is lethal to humans and represents an occupational hazard, but not an ambient air toxics threat to human health offsite.) At plants where hydrogen sulfide is removed from natural gas, sulfur dioxide ($SO_2$) release results. (EPA requires compliance with the National Ambient Air Quality Standards (NAAQS) for sulfur dioxide; DOI also has authority to regulate these emissions.) Sulfur is often recovered from the hydrogen sulfide ($H_2S$) as a commercial byproduct. $H_2S$ dissolved in crude oil does not pose any danger, but when it is produced at the wellhead in gaseous form, it poses serious occupational risks through possible leaks or blowouts. These risks are also present later in the production process when the $H_2S$ is separated out in various "sweetening" processes. The amine, iron sponge, and selexol processes are three examples of commercial processes for removing acid gases from natural gas. Each $H_2S$ removal process results in spent or waste separation media, which must be disposed of. EPA did not sample hydrogen sulfide and sulphur dioxide emissions because of their relatively low volume and infrequency of occurrence.

Gaseous wastes are generated from a variety of other production-related operations. Volatile organic compounds may also be released from minute leaks in production equipment or from pressure vents on separators and storage tanks. When a gas well needs to be cleaned out, it may be produced wide open and vented directly to the atmosphere.

II-15

Emissions from volatile organic compounds are exempt under Section 3001(b)(2)(A) of RCRA and represent a very low portion of national air emissions. Enhanced oil recovery steam generators may burn crude oil as fuel, thereby creating air emissions. These wastes are nonexempt.

## DEFINITION OF EXEMPT WASTES

The following discussion presents EPA's tentative definition of the scope of the exemption.

### Scope of the Exemption

The current statutory exemption originated in EPA's proposed hazardous waste regulations of December 18, 1978 (43 FR 58946). Proposed 40 CFR 250.46 contained standards for "special wastes"--reduced requirements for several types of wastes that are produced in large volume and that EPA believed may be lower in toxicity than other wastes regulated as hazardous wastes under RCRA. One of these categories of special wastes was "gas and oil drilling muds and oil production brines."

In the RCRA amendments of 1980, Congress exempted most of these special wastes from the hazardous waste requirements of RCRA Subtitle C, pending further study by EPA. The oil and gas exemption, Section 3001(b)(2)(A), is directed at "drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas." The legislative history does not elaborate on the definition of drilling fluids or produced waters, but it does discuss "other wastes" as follows:

> The term "other wastes associated" is specifically included to designate waste materials intrinsically derived from the primary field operations associated with the exploration, development, or production of crude oil and natural gas. It would cover such substances as: hydrocarbon bearing soil in and around related facilities; drill cuttings; and materials (such as hydrocarbons,

water, sand and emulsion) produced from a well in conjunction with crude oil and natural gas and the accumulated material (such as hydrocarbons, water, sand, and emulsion) from production separators, fluid treating vessels, storage vessels, and production impoundments. (H.R. Rep No. 1444, 96th Cong., 2d Sess. at 32 (1980)).

The phrase "intrinsically derived from the primary field operations..." is intended to differentiate exploration, development, and production operations from transportation (from the point of custody transfer or of production separation and dehydration) and manufacturing operations.

In order to arrive at a clear working definition of the scope of the exemption under Section 8002(m), EPA has used these statements in conjunction with the statutory language of RCRA as a basis for making the following assumptions about which oil and gas wastes should be included in the present study.

- Although the legislative history underlying the oil and gas exemption is limited to "other wastes associated with the exploration development or production of crude oil or natural gas," the Agency believes that the rationale set forth in that history is equally applicable to produced waters and drilling fluids. Therefore, in developing criteria to define the scope of the Section 3001(b)(2) exemption, the Agency has applied this legislative history to produced waters and drilling fluids.

- The potential exists for small volume nonexempt wastes to be mixed with exempt wastes, such as reserve pit contents. EPA believes it is desirable to avoid improper disposal of hazardous (nonexempt) wastes through dilution with nonhazardous exempt wastes. For example, unused pipe dope should not be disposed of in reserve pits. Some residual pipe dope, however, will enter the reserve pit as part of normal field operations; this residual pipe dope does not concern EPA. EPA is undecided as to the proper disposal method for some other waste streams, such as rigwash that often are disposed of in reserve pits.

Using these assumptions, the test of whether a particular waste qualifies under the exemption can be made in relation to the following three separate criteria. No one criterion can be used as a standard when defining specific waste streams that are exempt. These criteria are as follows.

1. Exempt wastes must be associated with measures (1) to locate oil or gas deposits, (2) to remove oil or natural gas from the ground, or (3) to remove impurities from such substances, provided that the purification process is an integral part of primary field operations.[5]

2. Only waste streams intrinsic to the exploration for, or the development and production of, crude oil and natural gas are subject to exemption. Waste streams generated at oil and gas facilities that are not uniquely associated with the exploration, development, or production activities are not exempt. (Examples would include spent solvents from equipment cleanup or air emissions from diesel engines used to operate drilling rigs.)

   Clearly those substances that are extracted from the ground or injected into the ground to facilitate the drilling, operation, or maintenance of a well or to enhance the recovery of oil and gas are considered to be uniquely associated with primary field operations. Additionally, the injection of materials into the pipeline at the wellhead which keep the lines from freezing or which serve as solvents to prevent paraffin accumulation is intrinsically associated with primary field operations. With regard to injection for enhanced recovery, the injected materials must function primarily to enhance recovery of oil and gas and must be recognized by the Agency as being appropriate for enhanced recovery. An example would be produced water. In this context, "primarily functions" means that the main reason for injecting the materials is to enhance recovery of oil and gas rather than to serve as a means for disposing of those materials.

3. Drilling fluids, produced waters, and other wastes intrinsically derived from primary field operations associated with the exploration, development, or production of crude oil, natural gas, or geothermal energy are subject to exemption. Primary field operations encompass production-related activities but not transportation or manufacturing activities. With respect to oil production, primary field operations encompass those activities occurring at or near the wellhead, but prior to the transport of oil from an individual field facility or a centrally located facility to a carrier (i.e., pipeline or trucking concern) for transport to a refinery or to a refiner. With respect to natural gas production, primary field operations are those activities occurring at or near the wellhead or at the gas plant but prior to that point at which the gas is transferred from an individual field facility, a centrally located facility, or a gas plant to a carrier for transport to market.

---

[5] Thus, wastes associated with such processes as oil refining, petrochemical-related manufacturing, or electricity generation are not exempt because those processes do not occur at the primary field operations.

Primary field operations may encompass the primary, secondary, and tertiary production of oil or gas. Wastes generated by the transportation process itself are not exempt because they are not intrinsically associated with primary field operations. An example would be pigging waste from pipeline pumping stations.

Transportation for the oil and gas industry may be for short or long distances. Wastes associated with manufacturing are not exempt because they are not associated with exploration, development, or production and hence are not intrinsically associated with primary field operations. Manufacturing (for the oil and gas industry) is defined as any activity occurring within a refinery or other manufacturing facility the purpose of which is to render the product commercially saleable.

Using these definitions, Table II-1 presents definitions of exempted wastes as defined by EPA for the purposes of this study. Note that this is a partial list only. Although it includes all the major streams that EPA has considered in the preparation of this report, others may exist. In that case, the definitions listed above would be applied to determine their status under RCRA.

Waste Volume Estimation Methodology

Information concerning volumes of wastes from oil and gas exploration, development, and production operations is not routinely collected nationwide, making it necessary to develop methods for estimating these volumes by indirect methods in order to comply with the Section 8002(m) requirement to present such estimates to Congress. For this study, estimates were compiled independently by EPA and by the American Petroleum Institute (API) using different methods. Both are discussed below.

Estimating Volumes of Drilling Fluids and Cuttings

EPA considered several different methodologies for determining volume estimates for produced water and drilling fluid.

II-19

Table II-1  Partial List of Exempt and Nonexempt Wastes

## EXEMPT WASTES

Drill cuttings

Drilling fluids

Well completion, treatment, and stimulation fluids

Packing fluids

Sand, hydrocarbon solids, and other deposits removed from production wells

Pipe scale, hydrocarbon solids, hydrates, and other deposits removed from piping and equipment

Hydrocarbon-bearing soil

Pigging wastes from gathering lines

Wastes from subsurface gas storage and retrieval

Basic sediment and water and other tank bottoms from storage facilities and separators

Produced water

Constituents removed from produced water before it is injected or otherwise disposed of

Accumulated materials (such as hydrocarbons, solids, sand, and emulsion) from production separators, fluid-treating vessels, and production impoundments that are not mixed with separation or treatment media

Drilling muds from offshore operations

Appropriate fluids injected downhole for secondary and tertiary recovery operations

Liquid hydrocarbons removed from the production stream but not from oil refining

Gases removed from the production stream, such as hydrogen sulfide, carbon dioxide, and volatilized hydrocarbons

Materials ejected from a production well during the process known as blowing down a well

Waste crude oil from primary field operations

Light organics volatilized from recovered hydrocarbons or from solvents or other chemicals used for cleaning, fracturing, or well completion

## NONEXEMPT WASTES

Waste lubricants, hydraulic fluids, motor oil, and paint

Waste solvents from clean-up operations

Off-specification and unused materials intended for disposal

Incinerator ash

Pigging wastes from transportation pipelines
Table II-1

Sanitary wastes, trash, and gray water

Gases, such as SOx, NOx, and particulates from gas turbines or other machinery

Drums (filled, partially filled, or cleaned) whose contents are not intended for use

Waste iron sponge, glycol, and other separation media

Filters

Spent catalysts

Wastes from truck- and drum-cleaning operations

Waste solvents from equipment maintenance

Spills from pipelines or other transport methods

II-20

EPA's estimates:  For several regions of the country, estimates of volumes of drilling fluids and cuttings generated from well drilling operations are available on the basis of waste volume per foot of well drilled.  Estimates range from 0.2 barrel/foot (provided by the West Virginia Dept. of Natural Resources) to 2.0 barrels/foot (provided by NL Baroid Co. for Cotton Valley formation wells in Panola County, Texas).  EPA therefore considered the possibility of using this approach nationwide.  If it were possible to generate such estimates for all areas of the country, including allowances for associated wastes such as completion fluids and waste cement, nationwide figures would then be comparatively easy to generate.  They could be based on the total footage of all wells drilled in the U.S., a statistic that is readily available from API.

This method proved infeasible, however, because of a number of complex factors contributing to the calculation of waste-per-foot estimates that would be both comprehensive and valid for all areas of the country.  For instance, the use of solids control equipment at drilling sites, which directly affects waste generation, is not standardized.  In addition, EPA would have to differentiate among operations using various drilling fluids (oil-based, water-based, and gas-based fluids).  These and other considerations caused the Agency to reject this method of estimating volumes of drilling-related wastes.

Another methodology would be to develop a formal model for estimating waste volumes based on all the factors influencing the volume of drilling waste produced.  These factors would include total depth drilled, geologic formations encountered, drilling fluid used, solids control equipment used, drilling problems encountered, and so forth.  Such a model could then be applied to a representative sample of wells drilled nationwide, yielding estimates that could then be extrapolated to produce nationwide volumes estimates.

This method, too, was rejected as infeasible. It would have required access to data derived from the driller's logs and mud logs maintained at individual well sites, which would have been very difficult to acquire. Beyond this, other data and analytical needs for building such a model proved to be beyond the resources available for the project.

With these methodologies unavailable, EPA developed its estimates by equating the wastes generated from a drilling operation with the volume of the reserve pit constructed to service the well. Typically, each well is served by a single reserve pit, which is used primarily for either temporary or permanent disposal of drilling wastes. Based on field observations, EPA made the explicit assumption that reserve pits are sized to accept the wastes anticipated from the drilling operation. The Agency then collected information on pit sizes during the field sampling program in 1986 (discussed later in this chapter), from literature searches, and by extensive contact with State and Federal regulatory personnel.

EPA developed three generic pit sizes (1,984-, 22,700-, and 87,240-barrel capacity) to represent the range of existing pits and assigned each State a percent distribution for each pit size based on field observation and discussion with selected State and industry personnel. For example, from the data collected, Utah's drilling sites were characterized as having 35 percent small pits, 50 percent medium pits, and 15 percent large pits. Using these State-specific percent distributions, EPA was then able to readily calculate an estimate of annual drilling waste volumes per year for each State. Because Alaska's operations are generally larger than operations in the other oil- and gas-producing States, Alaska's generic pit sizes were different (55,093- and 400,244-barrel capacity.)

Although the EPA method is relatively simple, relying on a well site feature that is easily observable (namely, the reserve pit), the method does have several disadvantages. It does not explicitly account for waste volume increases and decreases due to evaporation, percolation, and rainwater collection. The three generic pit sizes may not adequately represent the wide range of pit sizes used for drilling, and they all assume that the total volume of each reserve pit, minus a nominal 2 feet of freeboard, will be used for wastes. Finally, the information collected to determine the percent distributions of pit sizes within States may not adequately characterize the industry, and adjusting the distribution would require gathering new information or taking a new survey. All of these uncertainties detract from the accuracy of a risk assessment or an economic impact analysis used to evaluate alternative waste management techniques.

The American Petroleum Institute's estimates: As the largest national oil trade organization, the API routinely gathers and analyzes many types of information on the oil and gas industry. In addition, in conducting its independent estimates of drilling waste volumes, API was able to conduct a direct survey of operators in 1985 to request waste volume data--a method that was unavailable to EPA because of time and funding limitations. API sent a questionnaire to a sample of operators nationwide, asking for estimated volume data for drilling muds and completion fluids, drill cuttings, and other associated wastes discharged to the reserve pit. Completed questionnaires were received for 693 individual wells describing drilling muds, completion fluids, and drill cuttings; 275 questionnaires also contained useful information concerning associated wastes. API segregated the sampled wells so that it could characterize drilling wastes within each of 11 sampling zones used in this study and within each of 4 depth classes. Since API maintains a data base on basic information on all wells drilled in the U.S., including location and depth, it was able to estimate a volume of wastes for the more than 65,000 wells drilled in 1985. The API survey does have

several significant limitations. Statistical representativeness of the survey is being analyzed by EPA. Respondents to the survey were primarily large oil companies. The survey was accompanied by a letter that may have influenced the responses. Also, EPA experience with operators indicates that they may underestimate reserve pit volumes.

Even though volumetric measurement and statistical analysis represent the preferred method for estimating drilling waste volumes, the way in which API's survey was conducted and the data were analyzed may have some drawbacks. Operators were asked to estimate large volumes of wastes, which are added slowly to the reserve pit and are not measured. Because the sample size is small in comparison to the population, it is questionable whether the sample is an unbiased representation of the drilling industry.

Estimating Volumes of Produced Water

By far the largest volume production waste from oil and gas operations is produced water. Of all the wastes generated from oil and gas operations, produced water figures are reported with the most frequency because of the reporting requirements under the Underground Injection Control (UIC) and National Pollution Discharge Elimination System (NPDES) programs.

EPA's estimates: Because produced water figures are more readily available than drilling waste data, EPA conducted a survey of the State agencies of 33 oil- and gas-producing States, requesting produced water data from injection reports, production reports, and hauling reports. For those States for which this information was not available, EPA derived estimates calculated from the oil/water ratio from surrounding States (this method used for four States) or derived estimates based on information provided by State representatives (this method used for six States).

API's estimates:  In addition to its survey of drilling wastes, API conducted a supplemental survey to determine total volumes of produced water on a State-by-State basis.  API sent a produced water survey form to individual companies requesting 1985 crude oil and condensate volumes and produced water volumes and distribution.  Fourteen operators in 23 States responded.  Because most of the operators were active in more than one State, API was able to include a total of 170 different survey points.  API then used these data to generate water-to-oil ratios (number of barrels of water produced with each barrel of oil) for each operator in each State.  By extrapolation, the results of the survey yield an estimate of the total volume of produced water on a statewide basis; the statewide estimated produced water volume total is simply the product of the estimated State ratio (taken from this survey) and the known total oil production for the State.  API reports this survey method to have a 95 percent confidence level for produced water volumes. No standard deviation was reported with this confidence level.

For most States, the figure generated by this method agrees closely with the figure arrived at by EPA in its survey of State agencies in 33 oil-producing States.  For a few States, however, the EPA and API numbers are significantly different; Wyoming is an example.  Since most of the respondents to the API survey were major companies, their production operations may not be truly representative of the industry as a whole.  Also, the API method did not cover all of the States covered by EPA.

Neither method can be considered completely accurate, so judgment is needed to determine the best method to apply for each State.  Because the Wyoming State agency responsible for oil and gas operations believes that the API number is greatly in error, the State number is used in this report.  Also, since the API survey did not cover many of the States in the Appalachian Basin, the EPA numbers for all of the Appalachian Basin States are used here.  In all other cases, however, the API-produced water volume numbers, which were derived in part from a field survey, are believed to be more accurate than EPA numbers and are therefore used in this report.

II-25

Waste Volume Estimates

Drilling waste volumes for 1985, calculated by both the EPA and API methods, appear in Table II-2. Although the number of wells drilled for each State differs between the two methods, both methods fundamentally relied upon API data. The EPA method estimates that 2.44 billion barrels of waste were generated from the drilling of 64,508 wells, for an average of 37,902 barrels of waste per well. The API method estimates that 361 million barrels of waste were generated from the drilling of 69,734 wells, for an average of 5,183 barrels of waste per well. EPA has reviewed API's survey methodology and believes the API method is more reliable in predicting actual volumes generated. For the purposes of this report, EPA will use the API estimates for drilling waste volumes.

Produced water volumes for 1985, calculated by both the EPA and API methods, appear in Table II-3. The EPA method estimates 11.7 billion barrels of produced water. The API method estimates 20.9 billion barrels of produced water.

## CHARACTERIZATION OF WASTES

In support of this study, EPA collected samples from oil and gas exploration, development, and production sites throughout the country and analyzed them to determine their chemical composition. The Agency designed the sampling plan to ensure that it would cover the country's wide range of geographic and geologic conditions and that it would randomly select individual sites for study within each area (USEPA 1987). One hundred one samples were collected from 49 sites in 26 different locations. Operations sampled included centralized treatment facilities, central disposal facilities, drilling operations, and production facilities. For a more detailed discussion of all aspects of EPA's sampling program, see USEPA 1987.

Table II-2  Estimated U.S. Drilling Waste Volumes, 1985

| State | EPA method | | API method | |
|---|---|---|---|---|
| | Number of wells drilled | Volume[a] 1,000 bbl | Number of wells drilled | Volume[b] 1,000 bbl |
| Alabama | 343 | 15,179 | 367 | 5,994 |
| Alaska | 206 | 4,118 | 242 | 1,816 |
| Arizona | 3 | 56 | 3 | 23 |
| Arkansas | 975 | 43,147 | 1,034 | 8,470 |
| California | 3,038 | 82,276 | 3,208 | 4,529 |
| Colorado | 1,459 | 27,249 | 1,578 | 8,226 |
| Florida | 21 | 929 | 21 | 1,068 |
| Georgia | NC[c] | NC | 1 | 2 |
| Idaho | NC | NC | 3 | 94 |
| Illinois | 2,107 | 57,063 | 2,291 | 2,690 |
| Indiana | 910 | 24,645 | 961 | 1,105 |
| Iowa | NC | NC | 1 | 1 |
| Kansas | 5,151 | 96,818 | 5,560 | 17,425 |
| Kentucky | 2,141 | 8,683 | 2,482 | 4,874 |
| Louisiana | 4,645 | 205,954 | 4,908 | 46,726 |
| Maryland | 85 | 345 | 91 | 201 |
| Michigan | 823 | 22,289 | 870 | 3,866 |
| Mississippi | 568 | 25,136 | 594 | 14,653 |
| Missouri | 22 | 596 | 23 | 18 |
| Montana | 591 | 36,302 | 623 | 4,569 |
| Nebraska | 261 | 4,906 | 282 | 761 |
| Nevada | 34 | 1,070 | 36 | 335 |
| New Mexico | 1,694 | 31,638 | 1,780 | 13,908 |
| New York | 395 | 1,602 | 436 | 1,277 |
| North Dakota | 485 | 9,116 | 514 | 4,804 |
| Ohio | 3,413 | 13,842 | 3,818 | 8,139 |
| Oklahoma | 6,978 | 383,581 | 7,690 | 42,547 |
| Oregon | 5 | 135 | 5 | 5 |
| Pennsylvania | 2,466 | 10,001 | 2,836 | 8,130 |

3648Z

Table II-2 (continued)

| State | EPA method | | API method | |
|---|---|---|---|---|
| | Number of wells drilled | Volume[a] 1,000 bbl | Number of wells drilled | Volume[b] 1,000 bbl |
| South Dakota | 44 | 827 | 49 | 289 |
| Tennessee | 169 | 685 | 228 | 795 |
| Texas | 22,538 | 1,238,914 | 23,915 | 133,014 |
| Utah | 332 | 6,201 | 364 | 4,412 |
| Virginia | 85 | 345 | 91 | 201 |
| Washington | NC[c] | NC[c] | 4 | 15 |
| West Virginia | 1,188 | 4,818 | 1,419 | 3,097 |
| Wyoming | 1,409[d] | 86,546[d] | 1,497 | 13,528 |
| U.S. Total | 64,499 | 2,444,667 | 69,734 | 361,406 |

[a]   Based on total available reserve pit volume, assuming 2 ft of freeboard (ref.).
[b]  Based on total volume of drilling muds, drill cuttings, completion fluids, circulated cement, formation testing fluids, and other water and solids.
[c]   Not calculated.
[d] EPA notes that for Wyoming, the State's numbers are 1,332 and 11,988,000, respectively.

Table II-3  Estimated U.S. Produced Water Volumes, 1985

| State | EPA volumes 1,000 bbl | Source | API volumes 1,000 bbl | Source |
|---|---|---|---|---|
| Alabama | 34,039 | a | 87,619 | g |
| Alaska | 112,780 | b | 97,740 | g |
| Arizona | 288 | b | 149 | g |
| Arkansas | 226,784 | b | 184,536 | g |
| California | 2,553,326 | b | 2,846,978 | g |
| Colorado | 154,255 | d | 388,661 | g |
| Florida | 85,052 | b | 64,738 | g |
| Illinois | 8,560 | e | 1,282,933 | g |
| Indiana | 5,846 | d | -- | h |
| Kansas | 1,916,250 | f | 999,143 | g |
| Kentucky | 16,055 | d | 90,754 | g |
| Louisiana | 794,030 | f | 1,346,675 | g |
| Maryland | 0 | b | --- | h |
| Michigan | 64,046 | b | 76,440 | g |
| Mississippi | 361,038 | e | 318,666 | g |
| Missouri | 2,177 | a | -- | h |
| Montana | 159,343 | b | 223,558 | g |
| Nebraska | 73,411 | b | 164,688 | g |
| Nevada | 3,693 | a | -- | h |
| New Mexico | 368,249 | e | 445,265 | g |
| New York | 4,918 | e | -- | h |
| North Dakota | 88,529 | b | 59,503 | g |
| Ohio | 13,688 | e | -- | h |
| Oklahoma | 1,627,390 | f | 3,103,433 | g |
| Oregon | 33 | b | -- | h |
| Pennsylvania | 31,131 | f | -- | h |
| South Dakota | 3,127 | b | 5,155 | g |
| Tennessee | 800 | f | -- | h |
| Texas | 2,576,000 | e | 7,838,783 | g |
| Utah | 126,000 | e | 260,661 | g |
| Virginia | 0 | b | -- | h |
| West Virginia | 7,327 | d | 2,844 | g |
| Wyoming | 253,476* | f | 985,221 | g |
| U.S. Total | 11,671,641 | | 20,873,243** | |

Sources:
a.  Injection Reports
b.  Production Reports
c.  Hauling Reports
d.  Estimate calculated from water/oil ratio from surrounding States
e.  Estimate calculated from water/oil ratio from other years for which data were available
f.  Estimate calculated from information provided by State representative. See Table I-8, (Westec, 1987) to explain footnotes a-f
g.  API industry survey
h.  Not surveyed

*   Wyoming states that 1,722,599,614 barrels of produced water were generated in the State in 1985. For the work done in Chapter VI, the State's numbers were used.
**  Includes only States surveyed.

Central pits and treatment facilities receive wastes from numerous oil and gas field operations. Since large geographic areas are serviced by these facilities, the facilities tend to be very large; one pit in Oklahoma measured 15 acres and was as deep as 50 feet in places. Central pits are used for long-term waste storage and incorporate no treatment of pit contents. Typical operations accept drilling waste only, produced waters only, or both. Long-term, natural evaporation can concentrate the chemical constituents in the pit. Central treatment and disposal facilities are designed for reconditioning and treating wastes to allow for discharge or final disposal. Like central pits, central treatment facilities can accept drilling wastes only, produced water only, or both.

Reserve pits are used for onsite disposal of waste drilling fluids. These reserve pits are usually dewatered and backfilled. Waste byproducts present at production sites include saltwater brines (called produced waters), tank bottom sludge, and "pigging wax," which can accumulate in the gathering lines.

Extracts from these samples were prepared both directly and following the proposed EPA Toxicity Characteristic Leaching Procedure (TCLP). They were analyzed for organic compounds, metals, classical wet chemistry parameters, and certain other analytes.

API conducted a sampling program concurrent with EPA's. API's universe of sites was slightly smaller than EPA's, but where they overlapped, the results have been compared. API's methodology was designed to be comparable to that used by EPA, but API's sampling and analytical methods, including quality assurance and quality control procedures, varied somewhat from EPA's. These dissimilarities can lead to different analytical results. For a more detailed discussion of all aspects of API's sampling program, see API 1987.

Sampling Methods

Methods used by EPA and by API are discussed briefly below, with emphasis placed on EPA's program.

EPA Sampling Procedures

Pit sampling: All pit samples were composited grab samples. The EPA field team took two composited samples for each pit--one sludge sample and one supernatant sample. Where the pit did not contain a discrete liquid phase, only a sludge sample was taken. Sludge samples are defined by EPA for this report as tank bottoms, drilling muds, or other samples that contains a significant quantity of solids (normally greater than 1 percent). EPA also collected samples of drilling mud before it entered the reserve pit.

Each pit was divided into four quadrants, with a sample taken from the center of each quadrant, using either a coring device or a dredge. The coring device was lined with Teflon or glass to avoid sample contamination. This device was preferred because of its ease of use and deeper penetration. The quadrant samples were then combined to make a single composite sample representative of that pit.

EPA took supernatant samples at each of the four quadrant centers before collecting the sludge samples, using a stainless steel liquid thief sampler that allows liquid to be retrieved from any depth. Samples were taken at four evenly spaced depths between the liquid surface and the sludge-supernatant interface. EPA followed the same procedure at each of the sampling points and combined the results into a single composite for each site.

To capture volatile organics, volatile organic analysis (VOA) vials were filled from the first liquid grab sample collected. All other

sludge and liquid samples were composited and thoroughly mixed and had
any foreign material such as stones and other visible trash removed prior
to sending them to the laboratory for analysis (USEPA 1987).

Produced water: To sample produced water, EPA took either grab
samples from process lines or composited samples from tanks. Composite
samples were taken at four evenly spaced depths between the liquid
surface and the bottom of the tank, using only one sampling point per
tank. Storage tanks that were inaccessible from the top had to be
sampled from a tap at the tank bottom or at a flow line exiting the
tank. For each site location, EPA combined individual samples into a
single container to create the total liquid sample for that location.
EPA mixed all composited produced water samples thoroughly and removed
visible trash prior to transport to the laboratory (USEPA 1987).

Central treatment facilities: Both liquid and sludge samples were
taken at central treatment facilities. All were composited grab samples
using the same techniques described above for pits, tanks, or process
lines (USEPA 1987).

API Sampling Methods

The API team divided pits into six sections and sampled in an "S"
curve pattern in each section. There were 30 to 60 sample locations
depending upon the size of the pit. API's sampling device was a metal or
PVC pipe, which was driven into the pit solids. When the pipe could not
be used, a stoppered jar attached to a ridged pole was used. Reserve pit
supernatant was sampled using weighted bottles or bottom filling
devices. Produced waters were usually sampled from process pipes or
valves. API did not sample central treatment facilities (API 1987).

Analytical Methods

As for sampling methods, analytical methods used by EPA and by API
were somewhat different. Each is briefly discussed below.

EPA Analytical Methods

EPA analyzed wastes for the RCRA characteristics in accordance with the Office of Solid Waste test methods manual (SW-846). In addition, since the Toxicity Characteristic Leaching Procedure (TCLP) has been proposed to be a RCRA test, EPA used that analytical procedure for certain wastes, as appropriate. EPA also used EPA methods 1624 and 1625, isotope dilution methods for organics, which have been determined to be scientifically valid for this application.

EPA's survey analyzed 444 organic compounds, 68 inorganics, 19 conventional contaminants, and 3 RCRA characteristics for a total of 534 analytes. Analyses performed included gas and liquid chromatography, atomic absorption spectrometry and mass spectrometry, ultraviolet detection method, inductively coupled plasma spectrometry, and dioxin and furan analysis. All analyses followed standard EPA methodologies and protocols and included full quality assurance/quality control (QA/QC) on certain tests (USEPA 1987).

Of these 534 analytes, 134 were detected in one or more samples. For about half of the sludge samples, extracts were taken using EPA's proposed Toxicity Characteristic Leaching Procedure (TCLP) and were analyzed for a subset of organics and metals. Samples from central pits and central treatment facilities were analyzed for 136 chlorinated dioxins and furans and 79 pesticides and herbicides (USEPA 1987).

API Analytical Methods

API analyzed for 125 organics, 29 metals, 15 conventional contaminants, and 2 RCRA characteristics for each sample. The same methods were used by API and EPA for analysis of metals and conventional

pollutants with some minor variations.  For organics analysis EPA used methods 1624C and 1625C, while API used EPA methods 624 and 625.  While the two method types are comparable, method 1624 (and 1625C) may give a more accurate result because of less interference from the matrix and a lower detection limit than methods 624 and 625.  In addition, QA/QC on API's program has not been verified by EPA.  See USEPA 1987 for a discussion of EPA analytical methods.

Results

Chemical Constituents Found by EPA in Oil and Gas Extraction Waste Streams

As previously stated, EPA collected a total of 101 samples from drilling sites, production sites, waste treatment facilities, and commercial waste storage and disposal facilities.  Of these 101 samples, 42 were sludge samples and 59 were liquid samples (USEPA 1987).

Health-based numbers in milligrams per liter (mg/L) were tabulated for all constituents for which there are Agency-verified limits.  These are either reference doses for noncarcinogens (Rfds) or risk-specific doses (RSDs) for carcinogens.  RSDs were calculated, using the following risk levels: 10-6 for class A (human carcinogen) and 10-5 for class B (probable human carcinogen).  Maximum contaminant limits (MCLs) were used, when available, then Rfds or RSDs.  An MCL is an enforceable drinking water standard that is used by the Office of Solid Waste when ground water is a main exposure pathway.

Two multiples of the health-based limits (or MCLs) were calculated for comparison with the sample levels found in the wastes.  Multiples of 100 were used to approximate the regulatory level set by the EP toxicity test (i.e., 100 x the drinking water standards for some metals and

pesticides). Multiples of 1,000 were used to approximate the concentration of a leachate which, as a first screen, is a threshold level of potential regulatory concern. Comparison of constituent levels found by direct analysis of waste with multiples of health-based numbers (or MCLs) can be used to approximate dispersion of this waste to surface waters. Comparison of constituent levels found by TCLP analysis of waste with multiples of health-based numbers (or MCLs) can be used to approximate dispersion of this waste to ground water.

For those polyaromatic hydrocarbons (PAHs) for which verified health-based numbers do not exist, limits were estimated by analogy with known toxicities of other PAHs. If structure activity analysis (SAR) indicated that the PAH had the potential to be carcinogenic, then it was assigned the same health-based number as benzo(a)pyrene, a potent carcinogen. If the SAR analysis yielded equivocal results, the PAH was assigned the limit given to indeno-(1,2,3-cd) pyrene, a PAH with possible carcinogenic potential. If the SAR indicated that the PAH was not likely to be carcinogenic, then it was assigned the same number as naphthalene, a noncarcinogen.

The analysis in this chapter does not account for the frequency of detection of constituents, or nonhuman health effects. Therefore, it provides a useful indication of the constituents deserving further study, but may not provide an accurate description of the constituents that have the potential to pose actual human health and environmental risks. Readers should refer to Chapter V, "Risk Modeling," for information on human health and environmental risks and should not draw any conclusions from the analysis presented in Chapter II about the level of risk posed by wastes from oil and gas wells.

EPA may further evaluate constituents that exceeded the health-based limit or MCL multiples to determine fate, transport, persistence, and toxicity in the environment. This evaluation may show that constituents

designated as secondary in the following discussion may not, in fact, be of concern to EPA.

Although the Toxicity Characteristics Leaching Procedure (TCLP) was performed on the sludge samples, the only constituent in the leach exhibiting concentrations that exceeded the multiples previously described was benzene in production tank bottom sludge. All of the other chemical constituents that exceeded the multiples were from direct analysis of the waste.

Constituents Present at Levels of Potential Concern

Because of the limited number of samples in relation to the large universe of facilities from which the samples were drawn, results of the waste sampling program conducted for this study must be analyzed carefully. EPA is conducting a statistical analysis of these samples.

Table II-4 shows EPA and API chemical constituents that were present in oil and gas extraction waste streams in amounts greater than health-based limits multiplied by 1,000 (primary concern) and those constituents that occurred within the range of multiples of 100 and 1,000 (secondary concern). Benzene and arsenic, constituents of primary and secondary concern respectively, by this definition, were modeled in the risk assessment chapter (Chapter V). The table compares waste stream location and sample phase with the constituents found at that location and phase. Table II-5 shows the number of samples compared with the number of detects in EPA samples for each constituent of potential concern.

The list of constituents of potential concern is not final. EPA is currently evaluating the data collected at the central treatment facilities and central pits, and more chemical constituents of potential concern may result from this evaluation. Also, statistical analysis of the sampling data is continuing.

Table II-4  Constituents of Concern Found in Waste Streams Sampled by EPA and API

| Chemical Constituents | Production | | | Central treatment | | | Central pit | Drilling | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Midpoint | Tank bottom | Endpoint | Influent | Tank | Effluent | Central pit | Drilling mud | Tank bottoms | Pit |
| **Primary concern** | | | | | | | | | | |
| Benzene | L# | S# S+ | L L#• | | S# | L S | S# | | S# | S S• |
| Phenanthrene | | S# | L L#• | | S# . | | S # | S | S# | |
| Lead | | | | S# | | S# | S# | | L# | L# L• S# S#• |
| Barium | | | L | S# | S# | S# | S# | S# | L | L# L#• S# S#• |
| **Secondary concern** | | | | | | | | | | |
| Arsenic | | S | L | | | S | S | | | S S• |
| Fluoride | | | | S | S | S | S | | | L S |
| Antimony | | | L• | | | | | | | |

Legend:
L:    Liquid sample > 100 x health-based number
S:    Sludge sample > 100 x health-based number
#:    Denotes > 1,000 x health-based number
L,S:  EPA samples
L•,S•:  API samples
+:    TCLP extraction
—    All values determined from direct samples except as denoted by "+"

Table II-5  EPA Samples Containing Constituents of Concern

| | Production | | | Central treatment | | | Central pit | Drilling | | |
| | Midpoint | Tank bottom | Endpoint | Influent | Tank | Effluent | Central pit | Drilling mud | Tank bottoms | Pit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Primary concern** | | | | | | | | | | |
| Benzene | L5 (3) | S1 (1) + | L21 (16) | | S2 (1) | L3 (2) S3 (1) | S3 (1) | | S1 (1) | S18 (7) |
| Phenanthrene | | S1 (1) | L21 (5) | | S2 (2) | | S3 (1) | S2 (1) | S1 (1) | |
| Lead | | | | S1 (1) | | S3 (3) | S3 (3) | | L1 (1) | L17 (17) S21 (21) |
| Barium | | | L24 (21) | S1 (1) | S2 (1) | S3 (3) | S3 (3) | S1 (1) | L1 (1) | L17 (17) S21 (21) |
| **Secondary concern** | | | | | | | | | | |
| Arsenic | | S1 (1) | L24 (9) | | | S3 (3) | S3 (1) | | | S21 (11) |
| Fluoride | | | | S1 (1) | | S3 (3) | S3 (3) | | | L17 (17) S20 (20) |

Legend:
L:   Liquid sample
S:   Sludge sample
# (#)  Number of samples (number of detects)
+   TCLP extract and direct extracts

II-38

Comparison to Constituents of Potential Concern Identified in the Risk
Analysis

This report's risk assessment selected the chemical constituents that
are most likely to dominate the human health and environmental risks
associated with drilling wastes and produced water endpoints.   Through
this screening process, EPA selected arsenic, benzene, sodium, cadmium,
chromium VI, boron, chloride, and total mobile ions as the constituents
to model for risk assessment.[6]

The chemicals selected for the risk assessment modeling differ from
the constituents of potential concern identified in this chapter's
analysis for at least three reasons.   First, the risk assessment
screening accounted for constituent mobility by examining several factors
in addition to solubility that affect mobility (e.g., soil/water
partition coefficients) whereas, in Chapter II, constituents of potential
concern were not selected on the basis of mobility in the environment.
Second, certain constituents were selected for the risk assessment
modeling based on their potential to cause adverse environmental effects
as opposed to human health effects; the Chapter II analysis considers
mostly human health effects.   Third, frequency of detection was
considered in selecting constituents for the risk analysis but was not
considered in the Chapter II analysis.

Facility Analysis

Constituents of potential concern were chosen on the basis of
exceedances in liquid samples or TCLP extract.   Certain sludge samples
are listed in Tables II-4 and II-5, since these samples, through direct

---

[6]   Mobile ions modeled in the risk assessment include chloride, sodium, potassium,
calcium, magnesium, and sulfate.

II-39

chemical analysis, indicated the presence of constituents at levels exceeding the multiples previously described. One sludge sample analyzed by the TCLP method contained benzene in an amount above the level of potential concern. This sample is included in Tables II-4 and II-5. The sludge samples are shown for comparison with the liquid samples and TCLP extract and were not the basis for choice as a constituent of potential concern. Constituents found in the liquid samples or the TCLP extract in amounts greater than 100 times the health-based number are considered constituents of potential concern by EPA.

Central Treatment Facility
---

Benzene, the only constituent found in liquid samples at the central treatment facilities, was found in the effluent in amounts exceeding the level of potential concern.

Central Pit Facility
---

No constituent was found in the liquid phase in amounts exceeding the level of potential concern at central pit facilities.

Drilling Facilities
---

Lead and barium were found in amounts exceeding the level of potential concern in the liquid phase of the tank bottoms and the reserve pits that were sampled. Fluoride was found in amounts that exceeded 100 times the health-based number in reserve pit supernatant.

Production Facility
---

Benzene was present in amounts that exceeded the level of potential concern at the midpoint and the endpoint locations. Exceedances of the

II-40

level of potential concern that occurred only at the endpoint location
were for phenanthrene, barium, arsenic, and antimony.  Benzene was
present in amounts exceeding the multiple of 1,000 in the TCLP leachate
of one sample.

# WASTE CHARACTERIZATION ISSUES

Toxicity Characteristic Leaching Procedure (TCLP)

The TCLP was designed to model a reasonable worst-case mismanagement
scenario, that of co-disposal of industrial waste with municipal refuse
or other types of biodegradable organic waste in a sanitary landfill.  As
a generic model of mismanagement, this scenario is appropriate for
nonregulated wastes because those wastes may be sent to a municipal
landfill.  However, most waste from oil and gas exploration and
production is not disposed of in a sanitary landfill, for which the test
was designed.  Therefore, the test may not reflect the true hazard of the
waste when it is managed by other methods.  However, if these wastes were
to go to a sanitary landfill, EPA believes the TCLP would be an
appropriate leach test to use.

For example, the TCLP as a tool for predicting the leachability of
oily wastes placed in surface impoundments may actually overestimate that
leachability.  One reason for this overestimation involves the fact that
the measurement of volatile compounds is conducted in a sealed system
during extraction.  Therefore, all volatile toxicants present in the
waste are assumed to be available for leaching to ground water.  None of
the volatiles are assumed to be lost from the waste to the air.  Since
volatilization is a potentially significant, although as yet
unquantified, route of loss from surface impoundments, the TCLP may
overestimate the leaching potential of the waste.  Another reason for
overestimation is that the TCLP assumes that no degradation--either
chemical, physical, or biological--will occur in the waste before the

leachate actually leaves the impoundment. Given that leaching is not likely to begin until a finite time after disposal and will continue to occur over many years, the assumption of no change may tend to overestimate leachability.

Conversely, the TCLP may underestimate the leaching potential of petroleum wastes. One reason for this assumption is a procedural problem in the filtration step of the TCLP. The amount of mobile liquid phase that is present in these wastes and that may migrate and result in ground-water contamination is actually underestimated by the TCLP. The TCLP requires the waste to be separated into its mobile and residue solid phases by filtration. Some production wastes contain materials that may clog the filter, indicating that the waste contains little or no mobile fraction. In an actual disposal environment, however, the liquid may migrate. Thus, the TCLP may underestimate the leaching potential of these materials. Another reason for underestimation may be that the acetate extraction fluid used is not as aggressive as real world leaching fluid since other solubilizing species (e.g., detergents, solvents, humic species, chelating agents) may be present in leaching fluids in actual disposal units. The use of a citric acid extraction media for more aggressive leaching has been suggested.

Because the TCLP is a generic test that does not take site-specific factors into account, it may overestimate waste leachability in some cases and underestimate waste leachability in other cases. This is believed to be the case for wastes from oil and gas exploration and production.

The EPA has several projects underway to investigate and quantify the leaching potential of oily matrices. These include using filter aids to prevent clogging of the filter, thus increasing filtration efficiency, and using column studies to quantitatively assess the degree to which oily materials move through the soil. These projects may result in a leach test more appropriate for oily waste.

## Solubility and Mobility of Constituents

Barium is usually found in drilling waste as barium sulfate (barite), which is practically insoluble in water (Considine 1974). Barium sulfate may be reduced to barium sulfide, which is water soluble. It is the relative insolubility of barium sulfate that greatly decreases its toxicity to humans; the more soluble and mobile barium sulfide is also much more toxic (Sax 1984). Barium sulfide formation from barium sulfate requires a moist anoxic environment.

The organic constituents present in the liquid samples in concentrations of potential concern were benzene and phenanthrene. Benzene was found in produced waters and effluent from central treatment facilities, and phenanthrene was found in produced waters.

An important commingling effect that can increase the mobility of nonpolar organic solvents is the addition of small amounts of a more soluble organic solvent. This effect can significantly increase the extent to which normally insoluble materials are dissolved. This solubility enhancement is a log-linear effect. A linear increase in cosolvent concentration can lead to a logarithmic increase in solubility. This effect is also additive in terms of concentration. For instance, if a number of cosolvents exist in small concentrations, their total concentration may be enough to have a significant effect on nonpolar solvents with which the cosolvents come in contact (Nkedi-Kizza 1985, Woodburn et al. 1986). Common organic cosolvents are acetone, toluene, ethanol, and xylenes (Brown and Donnelly 1986).

Other factors that must be considered when evaluating the mobility of these inorganic and organic constituents in the environment are the use of surfactants at oil and gas drilling and production sites and the

general corrosivity of produced waters.  Surfactants can enhance the
solubility of many constituents in these waters.  Produced waters have
been shown to corrode casing (see damage cases in Chapter IV).

Changes in pH in the environment of disposal can cause precipitation
of compounds or elements in waste and this can decrease mobility in the
environment.  Also adsorption of waste components to soil particles will
attenuate mobility.  This is especially true of soils containing clay
because of the greater surface area of clay-sized particles.

## Phototoxic Effect of Polycyclic Aromatic Hydrocarbons (PAH)

New studies by Kagan et al. (1984), Allred and Giesy (1985), and
Bowling et al. (1983) have shown that very low concentrations (ppb in
some cases) of polycyclic aromatic hydrocarbon (PAH) are lethal to some
forms of aquatic wildlife when they are introduced to sunlight after
exposure to the PAHs.  This is called the phototoxic effect.

In the study conducted by Allred and Giesy (1985), it was shown that
anthracene toxicity to Daphnia pulex resulted from activation by solar
radiation of material present on or within the animals and not in the
water.  It appeared that activation resulted from anthracene molecules
and not anthracene degeneration products.  Additionally, it was shown
that wavelengths in the UV-A region (315 to 380 nm) are primarily
responsible for photo-induced anthracene toxicity.

It has been shown that PAHs are a typical component of some produced
waters (Davani et al., 1986a).  The practice of disposal of produced
waters in unlined percolation pits is allowing PAHs and other
constituents to migrate into and accumulate in soils (Eiceman et al.,
1986a, 1986b).

pH and Other RCRA Characteristics

Of the RCRA parameters reactivity, ignitability, and corrosivity, no waste sample failed the first two.  Reactivity was low and ignitability averaged 200°F for all waste tested.  On the average, corrosivity parameters were not exceeded, but one extreme did fail this RCRA test (See Table II-6).  A solid waste is considered hazardous under RCRA if its aqueous phase has a pH less than or equal to 2 or greater than or equal to 12.5.  As previously stated, a sludge sample is defined by EPA in this document as a sample containing a significant quantity of solids (normally greater than 1 percent).

Of the major waste types at oil and gas facilities, waste drilling muds and produced waters have an average neutral pH.  Waste drilling fluid samples ranged from neutral values to very basic values, and produced waters ranged from neutral to acidic values.  In most cases the sludge phase tends to be more basic than the liquid phases.  An exception is the tank bottom waste at central treatment facilities, which has an average acidic value.  Drilling waste tends to be basic in the liquid and sludge phases and failed the RCRA test for alkalinity in one extreme case.  At production facilities the pH becomes more acidic from the midpoint location to the endpoint.  This is probably due to the removal of hydrocarbons.  This neutralizing effect of hydrocarbons is also shown by the neutral pH values of the production tank bottom waste.  An interesting anomaly of Table II-6 is the alkaline values of the influent and effluent of central treatment facilities compared to the acidic values of the tank bottoms at these facilities.  Because central treatment facilities accept waste drilling fluids and produced waters, acidic constituents of produced waters may be accumulating in tank bottom sludges.  The relative acidity of the produced waters is also indicated by casing failures, as shown by some of the damage cases in Chapter IV.

Table II-6  pH Values for Exploration, Development and Production Wastes (EPA Samples)

II - 46

| | Midpoint | Tank bottom | Endpoint | Influent | Tank | Effluent | Central pit | Tank bottoms | Pit |
|---|---|---|---|---|---|---|---|---|---|
| **Production** | | | | | | | | | |
| Sludge | | 7.0; 7.0; 7.0 | | | | | | | |
| Liquid | 6.4; 6.6; 8.0 | | 2.7; 7.6; 8.1 | | | | | | |
| **Central treatment** | | | | | | | | | |
| Sludge | | | | 8.8; 8.8; 8.8 | 2.0; 3.9; 5.8 | 6.7; 8.2; 10.0 | | | |
| Liquid | | | | 5.7; 6.5; 7.3 | | 7.0; 8.2; 10.1 | | | |
| **Central pit** | | | | | | | | | |
| Sludge | | | | | | | 7.2; 8.0; 9.2 | | |
| Liquid | | | | | | | 5.7; 7.5; 8.5 | | |
| **Drilling** | | | | | | | | | |
| Sludge | | | | | | | | | 6.8; 9.0; 12.8 |
| Liquid | | | | | | | | 7.1; 7.1; 7.1 | 6.5; 7.7; 12.7 |

Legend:

#; #; # - minimum; average; maximum

Use of Constituents of Concern

The screening analysis conducted for the risk assessment identified arsenic, benzene, sodium, cadmium, chromium VI, boron, and chloride as the constituents that likely pose the greatest human health and environmental risks. The risk assessment's findings differ from this chapter's findings since this chapter's analysis did not consider the frequency of detection of constituents, mobility factors, or nonhuman health effects (see Table 11-7). Some constituents found in Table II-4 were in waste streams causing damages as documented in Chapter IV.

Table II-7  Comparison of Potential Constituents of Concern
That Were Modeled in Chapter V

| Chemical | Chapter II[*] | V[**] | Reasons for not including in Chapter V risk analysis [***] |
|---|---|---|---|
| Benzene | P | Yes | N/A |
| Phenanthrene | P | No | Low frequency in drilling pit and produced water samples; low ground-water mobility; relatively low concentration-to-toxicity ratio; unverified reference dose used for Chapter 2 analysis. |
| Lead | P | No | Low ground-water mobility. |
| Barium | P | No | Low ground-water mobility. |
| Arsenic | S | Yes | N/A |
| Fluoride | S | No | Relatively low concentration-to-toxicity ratio. |
| Antimony | S | No | Low frequency in drilling pit and produced water samples. |

\*   P = primary concern in Chapter II; S = secondary concern in Chapter II.

\*\*   Yes = modeled in Chapter V analysis; no = not modeled in Chapter V analysis.

\*\*\*   Table summarizes primary reasons only; additional secondary reasons may also exist.

# REFERENCES

Allred, P. M., and Giesy, J. P. 1985.  Solar radiation induced toxicity of anthracene to daphnia pulex.  Environmental Toxicology Chem. 4: 219-226.

API.  1986.  American Petroleum Institute.  Comments to the docket on the proposed toxicity characteristic leaching procedure (Doc. #F-86-TC-FFFFF).  August 12, 1986.

_____. 1987.  American Petroleum Institute.  Oil and gas industry exploration and production wastes (Doc. #471-01-09).

Baker, F.G., and Brendecke, C.M. 1983.  Groundwater.  21:  317.

Bowling, J. W., Laversee, G. J., Landram, P. F., and Giesy, J. P. 1983. Acute mortality of anthracene contaminated fish exposed to sunlight. Aquatic Toxicology.  3:  79-90.

Brown, K.W., and Donnelly, K.C. 1986.  The occurrence and concentration of organic chemicals in hazardous and municipal waste landfill leachate.  In Press.

Considine, Douglas M., ed. 1974.  Chemical and process technology encyclopedia.  New York: McGraw Hill Inc.

Davani, B., Ingram, J., Gardea, J.L., Dodson, J.A., and Eiceman, G.A. 1986a.  Hazardous organic compounds in liquid waste from disposal pits for production of natural gas.  Int. J. Environ. Anal. Chem. 20 (1986):  205.

Davani, B., Gardea, J.S., Dodson, J.A., and Eiceman, G.A.  1986b.  Organic compounds in soils and sediments from unlined waste disposal pits for natural gas production and processing.  Water, Air and Soil Pollution.  27:  267-276.

Eiceman, G.A., Davani, B., and Ingram, J.  1986a.  Depth profiles for hydrocarbons and PAH in soil beneath waste disposal pits from production of natural gas.  Int. J. Environ. Anal. Chem.  20 (1986): 508.

Eiceman, G.A., McConnon, J.T., Zaman, M., Shuey, C., and Earp, D. 1986b.  Hydrocarbons and aromatic hydrocarbons in groundwater surrounding an earthen waste disposal pit for produced water in the Duncan Oil Field of New Mexico.  Int. J. Environ. Anal. Chem. 24 (1986):  143-162.

Environmental Defense Fund. 1986. Comments of the Environmental Defense Fund on the June 13, 1986 proposed Toxicity Characteristic Leaching Procedure (Doc #F-86-TC-FFFFF). August 12, 1986.

Kagan, J., Kagan, P. A., and Buhse, H. E., Jr. 1984. Toxicity of alpha terthienyl and anthracene toward late embryonic stages of ranapieines. J. Chem. Ecol. 10: 1015-1122.

Nkedi-Kizza, P., et al. 1985. Influence of organic cosolvents on sorption of hydrophobic organic chemicals by soils. Environ. Sci. Technol. 19: 975-979.

Sax, N. Irving. 1984. Dangerous properties of industrial materials. New York: Nostrand Reinhold Company.

USEPA. 1987. U.S. Environmental Protection Agency. Technical report: exploration development and production of crude oil and natural gas; field sampling and analytical results (appendices A-G), EPA #530-SW-87-005. (Doc. # OGRN FFFF).

Woodburn, K. B., et al. 1986. Solvophobic approach for predicting sorption of hydrophobic organic chemicals on synthetic sorbents and soils. J. Contaminant Hydrology 1: 227-241.



ENVIRONMENTAL WORKING GROUP

# Cracks in the Façade

## 25 Years Ago, EPA Linked "Fracking" to Water Contamination

Dusty Horwitt, Senior Counsel, Environmental Working Group

August 3, 2011







www.ewg.org/gas-drilling-and-fracking

## Contents

### Background

i.   Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

ii.  EPA Report Contradicts Industry Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

iii. Parsons Well Was Drilled and Fractured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

iv.  Gas, Gel in Parsons' Water Well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

v.   Gel in Water Consistent with Fracturing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

vi.  Aquagel: An Alternative Explanation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

vii. Were Older Wells the Source of Contamination? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

viii. Four Old Wells Within 1,700 Feet of Parsons' Gas Well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

ix.  Fractures Can Extend up to 2,500 Feet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

x.   West Virginians Say Problems Persist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

xi.  Couple Says Home Became Unlivable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

xii. Summary and Recommendations: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

xiii. References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

### Illustrations

i.   EPA Traced Pollution of Underground Water Supply to Hydraulic Fracturing . . . . . . . . . . . . . . . . . . . . . .8

ii.  Families Say Drilling, Fracturing Polluted Water. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

### Acknowledgments

EWG's Cracks in the Façade was made possible thanks to the generosity of the Park Foundation, Civil Society Institute and EWG's community of online supporters.

Our thanks to EWG's staff designer Aman Anderson for his work in layout and illustration, Tylan Yalniz for his work in designing the report's website and interns James Meinert and Justine Chow for their research.

The opinions expressed in this report are those of the authors and editors and do not necessarily reflect the views of our supporters. EWG is responsible for any errors of fact or interpretation contained in this report.

© 2011. Environmental Working Group.

# EXECUTIVE SUMMARY
## 25 Years Ago, EPA Linked "Fracking" to Water Contamination

In 2006, a Dallas-based company riding a nationwide natural gas boom drilled and hydraulically fractured a gas well in a sandstone and shale formation in Jackson County, W. Va. Just after EXCO Resources fractured the well, area residents said that two nearby water wells became polluted.[1]

"When the water actually went bad was after they fractured," says Paul Strohl, 69, a retired firefighter who lives in Jackson County.

"Even the consistency changed," said his wife Janet, 67. "It was slimy."

After the problems surfaced, Paul Strohl says, Tyler Mountain Water, a company based in Poca, W. Va., began delivering water to the affected residents. "After they fracked, this water truck started showing up delivering water. I don't think it takes more than a third-grade education to figure out what that means."[2]

The landowners whose water wells were involved in the incident have declined to comment, saying they signed confidentiality agreements with EXCO. The Strohls' account bears striking similarities to a report issued almost 25 years ago by the Environmental Protection Agency, which concluded that hydraulic fracturing (colloqui-ally known as "fracking") could – and did – contaminate underground drinking water sources. That all-but-forgotten report from December 1987, uncovered by Environmental Working Group and Earthjustice, contradicts the drilling industry's insistence that there has never been a documented case of groundwater contamination caused by hydraulic fracturing.

Used in more than 90 percent of natural gas and oil wells, fracking involves injecting a mix of water, sand and chemicals into a well under high pressure in order to fracture underground rock formations and unlock trapped gas and oil.

EPA's long-ignored 1987 report found that fracturing fluid from a shale gas well more than 4,000 feet deep had contaminated well water just across the road from the Strohls' home, that the contamination was "illustrative" of the types of pollution associated with natural gas and oil drilling, and that EPA's investigation had been hampered by confidentiality agreements between industry and affected landowners.

Since then, the industry has hydraulically fractured hundreds of thousands of wells and is continuing a historic push into natural gas-bearing shale formations, once considered inaccessible, that lie beneath populated areas in a number of states, including West Virginia, New York, Pennsylvania, Ohio, Michigan, Louisiana and Arkansas. To access these formations, drillers often

www.ewg.org/gas-drilling-and-fracking

use a relatively new combination of horizontal drilling and higher-volume fracturing. As drilling activity has intensified, reports of pollution have sparked a growing national debate over the actual or potential environmental risks, including contamination of groundwater, the source of drinking water for more than 100 million Americans, according to the U.S. Geological Survey.[3] As the West Virginia case and others like it indicate, the risk of groundwater contamination is greatly increased because decades of oil and gas exploration have left many regions of the country riddled with thousands of abandoned and often poorly sealed wells. Government and industry studies show that fracking fluids from new wells can potentially infiltrate these older bores and rise back up to the level of drinking water aquifers closer to the surface.

In the debate over these risks, EPA and Congress have never cited the agency's own 1987 report and have largely exempted fracturing from regulation.

"During the fracturing process," EPA investigators wrote in the 1987 report, which focused on the handling of natural gas, oil and geothermal wastes generally, "fractures can be produced, allowing migration of native brine, fracturing fluid and hydrocarbons from the oil or gas well to a nearby water well. When this happens, the water well can be permanently damaged and a new well must be drilled or an alternative source of drinking water found."[4]

In an introduction to the chapter on contamination cases, including the case in Jackson County, the EPA noted that "within each [geographic] zone, the report presents one or more categories of damages that EPA has selected as fairly illustrative of practices and conditions within that zone."[5]

Industry representatives reviewed EPA's report and appeared to reach different conclusions about the case.

In the EPA docket center in Washington, EWG discovered comments submitted by the American Petroleum Institute (API), the natural gas and oil industry's major trade association. Although API was generally critical of EPA's investigation, calling it "inaccurate" and "careless,"[1] API did not specifically dispute EPA's conclusions about the West Virginia case in several written comments. Indeed, the industry's comments indicate that the association agreed with EPA that the case involved contamination of groundwater as a result of fracturing.

"One case," the API wrote, referring to the West Virginia contamination case, "resulted in a workover operation fracturing into groundwater as a result of equipment failure or accident. As described in the detail write-up this is not a normal result of fracturing as it ruins the productive ca-

pability of the wells." Another document attached to API's comment noted that in the West Virginia case "the damage here results from an accident or malfunction of the fracturing process....The process requires the fractures to be created to be limited to the producing formation.  If they are not as is the apparent case here oil and gas are lost from the reservoir and are unrecoverable."[6]

A group of state oil and natural gas associations took a different approach in comments submitted to EPA in 1988.  "EPA is incorrect in its statement that the fracturing of a well can result in contamination of nearby water wells...." the associations wrote.  "Such a statement is completely without support in the study.  In fact, we know of no case where this has occurred given proper casing.  The zones which are fractured are several thousand feet below the deepest fresh water zones making contamination of the fresh water zones extremely unlikely."[7]

Environmental Working Group recently conducted its own year-long investigation and concluded that a variety of evidence indicates that the West Virginia case was indeed an example of hydraulic fracturing pollution of groundwater, though it could not rule out that another stage of the drilling process could have caused the problem.

A former EPA official who worked on the 1987 report and asked not to be named said that the agency was aware of other cases of groundwa-ter pollution involving hydraulic fracturing but did not include them in the report because the details were sealed under confidential legal settlements reached between affected property owners and energy companies. The 1987 document noted that such settlements often presented hurdles for the EPA's investigation.

"Private citizens rarely bring cases to court because court cases are expensive to conduct," the EPA reported, "and most of these cases are settled out of court.... In addition to concealing the nature and size of any settlement entered into between the parties, impoundment curtails access to scientific and administrative documentation of the incident."[8]

The former official said the EPA identified other cases of groundwater contamination caused by fracturing but excluded them from the report because they involved pollution by migrating natural gas or oil, not by the chemical-laced fluids injected in the fracking process itself. Contamination by leaking natural gas and oil was considered outside the scope of the report, which focused only on the management of wastes from the natural gas, oil and geothermal industries. The report also noted that because EPA had only three months to collect cases from across the nation, "there was limited time available for damage case review."[9] The former EPA official explained that EPA had to complete the study quickly because the agency

www.ewg.org/gas-drilling-and-fracking

had missed a Congressionally mandated deadline and was working under a court-ordered timetable.

Both the 2006 incidents in West Virginia and the 1987 EPA study, which involved dozens of documented incidents of apparent contamination by fracking, drilling wastewater stored in pits and other drilling techniques, raise new questions about the agency's commitment to protecting the public as it pursues its current two-year study of hydraulic fracturing's risks.

Inexplicably, the EPA failed to mention its own finding when it produced a second report in 2004, a document that an internal whistleblower sharply criticized for its lack of scientific rigor and for relying on a review panel stacked with current or former industry employees.[10] The 2004 analysis concluded that hydraulic fracturing in coal bed methane natural gas wells, a relatively small subset of natural gas and oil wells, posed no risks to underground water supplies. The study set the stage for a Congressional vote in 2005 that legally exempted fracking for all types of natural gas and oil wells from regulation under the federal Safe Drinking Water Act, a law specifically designed to prevent contaminants injected underground from migrating through abandoned natural gas and oil wells.[11]

In its 2004 report, the EPA announced that it was limiting its review to coal bed methane wells in large part because such wells "tend to be shallower and closer to [underground sources of drinking water] than conventional oil and gas production wells" and "EPA has not heard concerns from citizens regarding any other type of hydraulic fracturing."[12]

It made that decision despite the findings of its own 1987 report on the West Virginia case, which found that hydraulic fracturing for natural gas in a shale deposit more than 4,000 feet deep had polluted a water well only 400 feet from the surface.

EWG's investigation also turned up recent industry and government reports that sharpen concerns about fracturing and may help explain the West Virginia case featured in the EPA's report. These documents show that fractures from one well can spread unpredictably and are known to have caused fracturing fluid to migrate into other nearby natural gas and oil wells, sometimes known as "offset wells."

"Fractures are usually enormous features," wrote engineer and drilling industry consultant M.C. Vincent in a paper that he presented at a hydraulic fracturing conference held near Houston in January 2009. "In many reservoirs, fractures are mapped to extend beyond 1,000 feet (half-length) from the wellbore. In some reservoirs, half-lengths exceeding 2,200 feet have been confirmed as treatments have broken into offset wellbores…"[13]

State regulators in Illinois and Texas, as well as Congress' investigative arm, the Government Accountability Office, have also documented contamination problems caused when oil and gas waste fluids injected underground for disposal migrated up nearby older wells and broke out near the surface, where groundwater is found, a phenomenon sometimes called "saltwater breakout."[14] One case in Texas involved fluid that traveled half a mile underground from an injection well and then migrated up through an old, improperly plugged well.[15] There were four abandoned natural gas wells within about 1,700 feet of the gas well and water well involved in the West Virginia case documented by the EPA in 1987.

Currently, both EPA and the Department of Energy are reviewing the environmental risks of hydraulic fracturing. These multiple pieces of independent evidence underscore how essential it is that both agencies tackle these issues in a far more thorough way than EPA did in its cursory and deeply flawed 2004 review.

www.ewg.org/gas-drilling-and-fracking

# EPA Traced Pollution of Underground Water Supply to Hydraulic Fracturing

In 1982, Kaiser Gas Co. drilled and hydraulically fractured a natural gas well on the property of James Parsons in Jackson County, W. Va. The EPA concluded in a 1987 report to Congress that the process contaminated Parsons' water well with fracturing fluid. It is unclear how the "fracking" fluids may have entered the water well, but four old natural gas wells nearby could have been the conduits for contamination.



**Old Well**
Drilled 1941-42



**New Well**
Drilled 1982



**Jackson County, WV**

**1 Hydraulic Fractures**
According to industry studies, hydraulic fractures can extend up to 2,500 feet horizontally, well within range of old natural gas wells near Parsons' property. Studies found that fractures have broken into nearby oil and gas wells and that fracking fluid has migrated up old wells to the surface.

**2 1940s Wells Nearby**
Four old natural gas wells were located within 1,700 feet of the gas well drilled on James Parsons' property. Each of the wells was "shot," an early fracturing process in which companies detonated explosives inside a well to help access gas or oil deposits.



**3 Fluid Migration**
Government studies have found that oil and natural gas waste fluids injected underground can migrate up old oil and natural gas wells.

**4 Breakout into Aquifer**
These fluids can break into aquifers near the surface if the old wells have deteriorated casings, lack cement plugs or contain cracked cement. This phenomenon is known as "salt water breakout." It is possible that hydraulic fracturing fluids migrated in a similar way into Parsons' water well.

# EPA Report Contradicts Industry Claims

Fracturing in the drilling industry dates to the 1800s, when companies began exploding glycerin or dynamite deep inside their wells to open passages through which natural gas or oil could flow more rapidly into drilling pipes for collection. In 1947, drillers for the first time used hydraulic fracturing on a gas well operated by the Pan American Petroleum Corp. in Kansas, and the process is now used in more than 90 percent of natural gas and oil wells.[16]

In hydraulically fracturing a well today, also known as "stimulating" it, drillers inject a mix of water, sand and chemicals (some of them toxic) under extremely high pressure. The process, which uses anywhere from tens of thousands to millions of gallons of fluid, creates new fractures in the rock or re-opens pre-existing natural fractures. The sand props the fractures open, dramatically increasing production. The chemicals facilitate various aspects of the process, including helping to thicken the fluid so that sand can be carried farther into the fractures.[17]

The industry maintains that hydraulic fracturing has never contaminated groundwater. "To our knowledge, there have been a million wells fracked, and no documented cases of contamination of groundwater from hydraulic fracturing," Exxon CEO Rex Tillerson told the House Energy and Commerce Committee in January 2010, echoing other industry representatives.[18]

"In its 60-year history, hydraulic fracturing has not resulted in a single case of water contamination – a fact reinforced by the Environmental Protection Agency," wrote Lee Fuller, executive director of Energy In Depth, an industry-backed website, and vice president of government relations for the Independent Petroleum Association of America, in a 2010 letter to the Ithaca (N.Y.) Journal.[19]

A 1987 Environmental Protection Agency report tells a different story.

In concluding that hydraulic fracturing can – and did – contaminate groundwater, the EPA detailed its investigation of a contaminated water well on land owned by James Parsons of Ripley, W. Va., a town of 3,300 in Jackson County, halfway between Charleston and Parkersburg. The case summary reads:

> In 1982, Kaiser Gas Co. drilled a gas well on the property of Mr. James Parsons. The well was fractured using a typical fracturing fluid or gel. The residual fracturing fluid migrated into Mr. Parson's water well (which was drilled to a depth of 416 feet), according to an analysis by the West Virginia Environmental Health Services Lab of well water samples taken from the property. Dark and light gelati-

nous material (fracturing fluid) was found, along with white fibers. (The gas well is located less than 1,000 feet from the water well). The chief of the laboratory advised that the water well was contaminated and unfit for domestic use, and that an alternative source of domestic water had to be found. Analysis showed the water to contain high levels of fluoride, sodium, iron and manganese. The water, according to DNR officials, had a hydrocarbon odor, indicating the presence of gas. To date Mr. Parsons has not resumed use of the well as a domestic water source. (API states that this damage resulted from a malfunction of the fracturing process. If the fractures are not limited to the producing formation, the oil and gas are lost from the reservoir and are unrecoverable.)

## Parsons Well Was Drilled and Fractured

On Aug. 8, 1982, according to records on file with the West Virginia Office of Oil and Gas, the state issued a permit to Ravenswood, W. Va.-based Kaiser Exploration and Mining Co. to drill a natural gas well on the Parsons property. By Aug. 25, Kaiser had bored through ten layers of shale, limestone and sandstone to complete the 4,572-foot-deep well, which reached a Devonian Brown Shale formation that is similar to the shale formations where companies are drilling for natural gas today. The company was seeking to extract gas from a "pay zone" between 4,216 and 4,364 feet underground, nearly 4,000 feet beneath Parsons' water well but less than two football fields away horizontally.[20]

On Aug. 31, Kaiser fractured the well in the pay zone with more than 13,000 gallons of water, 60,000 pounds of sand and 760,000 standard cubic feet of nitrogen injected at a pressure of up to 3,100 pounds per square inch.[21] [By comparison, water generally flows through a fire hose at between 100 and 150 pounds per square inch.[22]]

West Virginia state records show that Kaiser used three layers of casing and cement to seal the new gas well from adjacent rock formations and that Jerry Tephaback, a state inspector, checked the well three years later and found the casing and cement to be in compliance with state standards (State records do not reflect any earlier inspection of the casing and cement).[23] Prior to reviewing documents associated with the case, EWG spoke briefly with Tephaback by telephone, but he did not comment substantively. Tephaback did not respond to two later calls seeking comment.

Parsons' water well was lined with a steel casing, according to a state well inspection form and a lawsuit Parsons later filed.[24]

## Gas, Gel in Parsons' Water Well

A year and a half after Kaiser fractured the gas well, Parsons' well water became polluted.

Parsons declined to speak to EWG about the incident, citing privacy concerns, but a well inspection form completed in June 1984 by the West Virginia Department of Mines Office of Oil and Gas reported that a problem first developed in "March-April" 1984 when someone (the form does not say who) smelled a rotten egg odor coming from the water well. In June, there were white fibers and natural gas in the water. "Gas in water well…will burn at vent tube," the state report said.[25]

On Oct. 2, 1984, Michael Lewis, an engineer with the West Virginia Office of Oil and Gas, wrote in a letter to Parsons that "the well drilled on your property by Kaiser could have been a possible source of contamination as you have suggested. The Office of Oil and Gas, however, can not determine fault or liabilities in such a matter. State law does address this matter in Code 22-4-19, which says 'there shall be a rebuttable presumption that any oil or gas well drilled within 1000 feet of a water supply is the proximate cause of contamination or deprivation of such water supply'… I know you are concerned about compensation for your trouble and expenses incurred with the water problems. The Office of Oil and Gas has no means of awarding you compensation. Should you feel that Kaiser's well was indeed the source of contamination to your water and that they,

therefore, owe you compensation and will not pay, your only recourse is to file a civil suit for damages. In such an action, Code 22-4-19 is applicable and for your protection."[26]

The West Virginia Department of Public Health's Environmental Health Services Lab collected and tested five samples of Parsons' well water between June and November 1984.[27] On Nov. 8, James E. Rosencrance, chief of the lab, wrote to Perry Merritt, a water official in Jackson County, regarding tests on three of the samples:

> "… an evaluation of the three reports (copies enclosed) would indicate that this water supply is contaminated from a chemical point of view, which may have resulted from oil and gas drilling operations in the vicinity of the Parsons water supply. It is not unusual to find high alkalinity, high fluoride, high sodium and high total dissolved solids in the underground water in that particular area of Jackson County, but is (sic) would be unusual to find the gelatinous material which we isolated unless it had been used by the drilling industry. This laboratory has identified the presence of hydrocarbons in one of the samples, which is indicative of petroleum type products. The laboratory is not familiar with the chemical characteristics of this well previous to the samples analyzed in July, August and

www.ewg.org/gas-drilling-and-fracking

*September of 1984. Any attempt to filter the water would be futile since the gelatinous material would clog the filter in a very short period of time. Such things as sodium, fluoride, high alkalinities and extraneous materials are not easily removed in home type supplies. A new source of water is suggested for the Parsons residence.[28]*

In one of the lab reports, Rosencrance typed, "The gelatinous material in this sample is not of bacterial origin. It does appear to be a gel type material and perhaps used as a sealant in the oil and gas drilling industry. Microscopi[c] exams rule out bacterial populations."[29] In another report, Rosencrance described "dark and light gelatinous material indicative of a gel."[30] In a third report, he noted: "Microscopic examination reveals large glossy gelatinous masses indicative of a gel. There were numerous rod-shaped particles present which were not readily distinguishab[le] as a nuisance bacterial growth. The…odor is of a putrefying description."[31]

According to legal records in the Parsons case, Kaiser commissioned BCM, a company based in Dunbar, W. Va., to conduct its own test of Parsons' well in November 1984. In March 1985 it commissioned a second test by NOWSCO Well Service Ltd., based in Calgary, Canada. NOWSCO concluded that "these results are indicative of very fresh water… no contamination from frac water is evident in the sample from the water well." The BCM report did not draw a conclusion.[32]

BCM, NOWSCO and the West Virginia state lab did not report testing for benzene, toluene, ethylbenzene or xylene (known as BTEX), common pollutants in drilling and fracturing, nor did they report testing the chemical composition of the gel.[33] An employee at BCM's office in Plymouth Meeting, Penn., said the company no longer has a laboratory and she did not know how to reach those who worked for the lab in the 1980s. NOWSCO is now owned by B.J. Services, one of the world's largest hydraulic fracturing companies, according to a representative who answered the phone at NOWSCO's former office in Calgary. A phone message left last November for one of the NOWSCO representatives listed on the lab report was not returned.

On April 3, 1985, Rosencrance wrote to Parsons that "it is our understanding that a gas well was fractured within 600 feet of your water well and may be involved with the pollutants found in the water. There are no funds or programs available within the State of West Virginia which would financially assist you in correcting the pollution problem with your well water."[34] Rosencrance died on June 24, 1999, according to an obituary in the Charleston Gazette.[35]

On Feb. 4, 1986, Parsons and his wife, N. Ruth Parsons, filed suit against Kaiser in the Circuit Court of Jackson County, W. Va., seeking $50,000 (equiva-

lent to $100,000 today) in compensation for damages to their water well, according to court records. Kaiser denied the charges. On May 29, 1987, the parties agreed to an undisclosed settlement and the case was dismissed.[36]

R.A. Pryce, the agent for Kaiser Gas listed in the state records, passed away several years ago, said his son, Lance, in a telephone interview.[37] According to state records, Kaiser has been taken over by a succession of companies since it drilled the well on Parsons' property. It is now owned by Dallas-based EXCO Resources (WV) Inc. Larry Sanders, the regulatory manager for EXCO, told EWG in November 2010, that he had passed questions about the company's past and present drilling operations to EXCO's legal department. The legal department has not responded.

On the same day that the Parsons settled with Kaiser, Ted M. Streit, deputy director of West Virginia's Inspection and Enforcement Division, said in a letter to a lawyer representing several state oil and gas associations, including the West Virginia Oil and Natural Gas Association, that as a result of Parsons' case, the state had discovered a previously unknown source of fresh water underground near Parsons' water well and had implemented tougher requirements for cementing oil and natural gas wells nearby.[38]

## Gel in Water Consistent with Fracturing

While the West Virginia lab did not conclude that hydraulic fracturing caused the contamina-tion of Parsons' well, the gel found in the water is consistent with contamination from hydraulic fracturing fluid. Drilling companies have used gels in hydraulic fracturing since the process was first developed in 1947, bolstering the EPA's conclusion that the gel in Parsons' water came from fracturing. In the Stimulation Treatment Handbook, published by PennWell Books in 1985, chemist and industry consultant John W. Ely wrote that, "The first fracturing fluid, utilized in the late 1940s, was war surplus napalm. Napalm is an aluminum gel used to thicken gasoline." In the 1960s, Ely wrote, companies began using guar, an additive found in food, to make fracturing gels. Ely noted that "this material was also marketed as the toy called 'Slime'".[39]

According to the EPA's 2004 study, gels are important in fracturing fluid because they can carry sand or other "proppants" deeper into rock fractures than water alone. Proppants literally prop open the fractures to prevent them from closing. "Diesel fuel has been frequently used in lieu of water to dissolve the guar powder because its carrying capacity per unit volume is much higher," the EPA found.[40]

The fact that Kaiser reported using nitrogen could mean that the company used a nitrogen-based foam, called a "foamed gel" by EPA in 2004. The agency noted that "the most widely used foam fracturing fluids employ nitrogen

www.ewg.org/gas-drilling-and-fracking

or carbon dioxide as their base gas… foaming agents can be used in conjunction with gelled fluids to achieve an extremely effective fracturing fluid."[41] Richard Morris, who inspected the gas well drilled by Kaiser in 1982 when he worked for the West Virginia Oil and Gas Division, said he did not recall details about the well, but that the fracturing mix would likely have contained a gelling agent, along with nitrogen, water, sand and foam. He added that while it is possible that hydraulic fracturing caused the contamination, he believes another explanation is more likely. Morris left the state agency later that year to open his own natural gas and oil drilling company.[42]

The hydrocarbons in Parsons' water could be explained if Kaiser used diesel or other petroleum distillates in its fracturing fluid. Officials in Pennsylvania and New York report that companies currently use a variety of petroleum distillates in fracking fluid.[43] A liquid hydrocarbon called "condensate," which typically comes to the surface with natural gas and contains carcinogenic benzene, could also have accounted for the hydrocarbons and "putrefying odor" in Parsons' well. Marathon, a natural gas and oil company, has reported that "condensate sour" smells like rotten eggs, a smell similar to that reported by West Virginia inspectors.[44]

## Aquagel: An Alternative Explanation

Former West Virginia inspector Morris said that while it is possible that the gel in Parsons' water came from hydraulic fracturing fluid, he believes that an underground limestone layer would have prevented the fluid from migrating upward enough toward the surface to enter an aquifer. A more likely explanation for the contamination, he said, is that the material in Parsons' water was Aquagel, a mixture of bentonite clay and water. Companies regularly inject Aquagel into a well bore after drilling is complete to remove loose rock cuttings, he said. These cuttings can prevent cement from forming a tight bond with the adjacent rock when drillers subsequently cement a well's steel casing into place. Morris said the aquagel could have migrated into the underground aquifer before the company installed the layers of casing and cement to protect the aquifer from drilling fluids.[45] Maurice Dusseault, a professor at the University of Waterloo in Ontario who specializes in rock mechanics and is a member of the Society of Petroleum Engineers, said that this explanation is, indeed, possible.

The only way to know the exact source of the gel would have been to test it and compare it to the aquagel and the fracking fluid. However, there is no record that West Virginia's or Kaiser's scientists conducted such testing. If they had, they would have had to know the composition of

Kaiser's fracking fluid for comparison – information that companies have routinely kept secret.

## Were Older Wells the Source?

Morris and Dusseault also said, however, that the water contamination could have come from hydraulic fracturing fluid that migrated into nearby abandoned gas wells that had not been properly plugged and cased to seal them off. From there, the fluid could have traveled up the wells, broken out near the surface and migrated into the aquifer serving Parsons' water well. In the 1980s, the EPA, state regulators in Illinois and Texas, and Congress' investigative arm, the Government Accountability Office, all highlighted this type of contamination from the injection of natural gas and oil industry waste fluids into underground disposal wells.[46] There are four old natural gas wells dating to the 1940s within 1,700 feet of the gas well drilled on Parsons' property in 1982 – well within range of hydraulic fractures, according to modern industry and government studies.

In its 1987 report, the EPA noted the risk of contamination via old wells, citing Illinois' investigation of drilling pollution. "To avoid degradation of ground water and surface water, it is vital that abandoned wells be properly plugged," the EPA noted. "Plugging involves the placement of cement over portions of a wellbore to permanently block or seal formations containing hydrocar-

bons or high-chloride waters (native brines). Lack of plugging or improper plugging of a well may allow native brines or injected wastes [from a waste fluid disposal well] to migrate to freshwater aquifers or to come to the surface through the wellbore."[47]

The EPA did not specifically address the risk of contamination via old wells as a result of hydraulic fracturing, but both hydraulic fracturing and injection disposal wells involve underground injection of fluid under pressure.

In the files for EPA's 1987 report at the EPA headquarters in Washington, D.C., is a 1985 study from the Texas Department of Agriculture (TXDA), which investigated 4,658 complaints related to natural gas and oil production. "When a water well is experiencing an oilfield pollution problem (typically, high chlorides)," the Texas agency found, "the pollution source is often difficult to track down. The source could be a leak in the casing of a disposal well, leakage behind the casing due to poor cement bond, old saltwater evaporation pits, or, most often, transport of contaminants through an improperly plugged abandoned well" (underscore in original).[48]

In 1989, the General Accounting Office (now the Government Accountability Office) found that "if these abandoned wells are not properly plugged – that is, sealed off – and have cracked casings, they can serve as pathways for injected

www.ewg.org/gas-drilling-and-fracking

brines [waste fluids from natural gas and oil drilling] to enter drinking water. Because groundwater moves very slowly, any contaminants that enter it will remain concentrated for long periods of time, and cleanup, if it is technically feasible, can be prohibitively costly."[49]

According to a 1999 report from the Department of Energy, there were then approximately 2.5 million abandoned oil and natural gas wells in the U.S.[50] At least tens of thousands of these abandoned wells are located in states that are home to shale formations that companies have been targeting in recent years for natural gas. According to 2010 data supplied by the West Virginia Geological and Economic Survey, there are nearly 39,000 documented abandoned wells in that state.[51] New York's Department of Environmental Conservation estimates that 75,000 wells have been drilled in the state since the 1820s and that about half are undocumented.[52]

The Pennsylvania Department of Environmental Protection estimates that 325,000 natural gas and oil wells have been drilled in that state since 1859. Of these, about 130,000 are currently operating, 47,000 are known to be plugged and about 8,500 are unplugged. The status of the remaining estimated 185,000 wells is either partially documented or unknown.[53] In Ohio, according to 2011 data from the Ohio Department of Natural Resources, there were about 64,000 documented plugged or abandoned natural gas and oil wells and 40,000 wells of unknown status.[54]

Dusseault said that, in general, it is "highly improbable" that hydraulic fractures could intersect with an abandoned well and cause contamination, noting that it would take a complex series of events for this to occur. First, companies would have to have used enough fluid to create a fracture that extended as far as an adjacent well. The odds of such long fractures are probably greater in shale formations such as the one involved in Parsons' well, he said, because shale has few pores into which fluid can leak off; all or most of the fluid is channeled into the fracture. Second, fractures tend to spread in just one direction, depending on the formation in which a well is located, reducing the odds that a fracture would spread in the very direction of an abandoned well. Third, the old well would have to be improperly plugged, enabling fluid to migrate and break out into an aquifer. And last, the fracturing fluid or other contaminants would have to have enough force to make it from the bottom of the old well to the aquifer.

"Those things put together make it improbable," he said. However, he added that in the case of the Parsons well, in which there were multiple abandoned wells in several different directions, "your probability of intersecting those wells has just gone up tremendously."

## Four Old Wells Within 1,700 Feet

According to digital latitude and longitude data and satellite maps provided by the West Virginia Geological and Economic Survey (WVGES), when Kaiser drilled its gas well in 1982 on the Parsons' property, there were four abandoned gas wells within 1,700 feet – well within the documented distance that hydraulic fractures can spread. One of the old gas wells was drilled in 1941 less than 1,100 feet north of the gas well drilled in 1982 and about 700 feet northeast of the Parsons' water well. The old well is in the backyard of Janet and Paul Strohl, located just across the road from the Parsons' home.[55]

The Strohls, who can light a flame from a vent on top of their own salt-tainted water well, suspect that this old gas well is the source of their contamination (salty water is often produced along with natural gas), which they discovered the moment they moved into their home in 2004 and drilled for water. For washing and cleaning, they fill a Volkswagen Beetle-sized plastic tank in their basement with rain water from their gutters and supplement that by paying $106 per truckload to have water delivered. They drink bottled water.[56]

A rusted metal pipe sticking out of the ground, marked as well number 470350160, is still visible at the site of the old gas well next to their fence. According to records on file at the state Oil and Gas Division, United Carbon Co., based in Charleston, W. Va., drilled the well between June 13 and Sept. 21, 1941. On the way down, the company hit gas once and water three times, including "salt water" at 1,455 feet, before it completed the well in a layer of limestone 5,244 feet down, approximately 700 feet deeper than the 1982 gas well drilled on Parsons' property.

On Sept. 21, 1941, United Carbon used the fracturing technique of its day when it "shot" the well by exploding 80 quarts of glycerin between 5,161 and 5,201 feet underground in a sandstone formation.[57]

According to the 2007 edition of the Texas Comptroller of Public Accounts' Oil Well Servicing Tax Manual, "in the years between 1890 and 1950, the oil industry used liquid and later solidified nitroglycerin to stimulate wells by detonating an explosive charge in the wellbore. The object of shooting a well was to fracture the oil or gas bearing formation in order to increase both the initial flow and the ultimate recovery of oil… Shooting of the formation with explosives was very hazardous to those working with the explosives and frequently damaged the well casing, preventing subsequent selective treatment of the producing zone. Then with the advent of commercial hydraulic fracturing in 1948, shooting an oil or gas well was practically eliminated."[58]

State records show that United Carbon

removed most of the casing when it plugged the well between Sept. 28, 1945 and Oct. 12, 1946, including all seven-inch casing above a depth of 4,800 feet. This casing might have protected the well at the 4,216 foot-to-4,364 foot depth where Parsons' 1982 gas well was fractured. The company installed four plugs above this level with red clay, wood plugs and cement, beginning at 2,360 feet down and at several shallower depths.[59]

Dusseault said that removing casings has been a relatively common cost-saving technique in the industry, because they can be reused on subsequent wells. He said that plugging a well with cement in the absence of steel casing probably creates a more effective seal because the casing can corrode over time, providing a pathway for gas and other contaminants to rise up the well and potentially contaminate aquifers. The 1987 EPA study, citing the state of Illinois' research, indicated that casings could corrode and lead to fluid migration.[60]

Dusseault has also noted in a published paper that vertical pathways are likely to develop due to shrinkage and fracturing of cement placed between the casing and rock wall. The upward pressure of natural gas likely exacerbates the fractures, he wrote. Both Dusseault and the EPA's 1987 study also indicated that cement alone would not necessarily guard against the upward migration of contaminants.[61]

Dusseault said that it is virtually impossible to know whether a company had properly sealed a well.

"Was the cement high-quality cement?" Dusseault asked in an interview with EWG. "Was it properly placed or did they just fill out the forms? The records from [old] wells are so bad," he said. "Ninety-five percent of these things that are done [to plug a well] are done without the presence of a regulator," he said. He added that perhaps the only way to know whether an old well was properly sealed would be to drill out the old cement and seal it again. "It's a nightmare to try to fix up those old wells," he said.[62]

Because of their own contaminated water well, the Strohls persuaded the state Department of Environmental Protection to re-plug the old gas well in their backyard with cement in 2005. "No casing in the well," the Office of Oil and Gas inspection and release form read. The agency re-plugged the well to a depth of 900 feet, but the Strohls have continued to see gas in their water and showed EWG researchers in June 2010 that they could light a flame from their well.[63]

Oil and Gas Division records show that United Carbon Company drilled a second gas well near Parsons' property in 1941, this one approximately 1,500 feet southeast of the gas well drilled in 1982 and about 2,000 feet southeast of Parsons' water well. United Carbon drilled the well between Jan. 22 and May 13, 1941 to a depth of 5,210

feet, approximately 640 feet deeper than the well drilled in 1982. On the way down, the company hit water at four different depths. On May 13, United Carbon "shot" the well at a depth of 5,113 to 5,150 feet, using 75 quarts of glycerin. United Carbon plugged the well between July 28 and August 18, 1949. The company pulled out much of its casing, but left some of it in the well at a depth of 4,216 to 4,364 feet, where Parsons' well was fractured. The company plugged the well using alternating placements of cement, clay and "clay and stone."[64]

According to WVGES records, in 1941 the Columbian Carbon Co. also drilled a gas well at a spot about 1,150 feet northwest of the 1982 gas well on Parsons' property and about 850 feet northwest of his water well – the third documented well within 1,700 feet of the 1982 gas well. The Columbian Carbon Company drilled the old well between Sept. 16 and Dec. 13, 1941 to a depth of 5,125 feet, 550 feet deeper than Parsons' gas well. Like United Carbon, Columbian Carbon also "shot" this well, this time on Dec. 14, 1941, at a depth of 5,051 to 5,106 feet. State records are unclear on exactly what substance Columbian used to shoot the well, but it appears to have been 550 pounds of explosive, 80 percent of which was gelatin or, in the terminology of the state form, "550#

80% gelatin." The Bureau of Alcohol, Tobacco and Firearms publishes an annual list of explosives that includes "blasting gelatin," "explosive gelatins," "gelatinized nitrocellulose" and "nitro-gelatin explosive," suggesting that the company used one of these types of explosives.[65]

According to the Oil and Gas Division records, Columbian Carbon plugged the well between July 3 and July 13, 1944. The company left in place the bottom 2,310 feet of seven-inch casing, which spanned the 4,216-to-4,364 depth at which Parsons' 1982 well was fractured, and extracted the rest along with portions of other casings. Records indicate that the company set several cement plugs in the well and injected aquagel between them – potentially an alternative source of the gel in Parsons' water if it persisted underground for 40 years.[66]



**Paul and Janet Strohl near their contaminated water well.**

www.ewg.org/gas-drilling-and-fracking

Columbian Carbon drilled the fourth documented gas well near the Parsons' property in 1941-1942 at a location about 1,700 feet northeast of the 1982 gas well and 1,600 feet northeast of the Parsons' water well. The company drilled the well between Aug. 13, 1941 and Feb. 18, 1942 to a depth of 5,160 feet, about 600 feet deeper than the 1982 gas well. Columbian Carbon shot the well between 5,073 and 5,133 feet deep with what appears to have been 600 pounds of explosive, 80 percent of which was gelatin or, in the terminology of the state, "600# 80% Gelatin."[67]

According to Oil and Gas Division records, Columbian Carbon plugged the well between June 28, 1945 and July 9, 1945. The company removed the casing at the depth of 4,216 to 4,364 feet at which Parsons' 1982 well was fractured, along with some of the other casing, and set a series of cement plugs throughout the well. The company used aquagel both in drilling and plugging the well, another potential source of the gel that later appeared in Parsons' water well.[68]

## Fractures Can Extend up to 2,500 Feet

Recent industry and government studies show that fractures can spread unpredictably underground, have broken into adjacent oil and gas wells and can travel up to 2,500 feet horizontally, approximately 800 feet farther than the distance between the gas well fractured on Parsons'

property in 1982 and the most distant of the nearby older gas wells.

On May 20, 2010, the British Columbia Oil and Gas Commission issued a safety advisory after hydraulic fracturing caused a large "kick," or unintended entry of fluid or gas, in an adjacent gas well. The commission reported that it was aware of 18 incidents in British Columbia and one in Western Alberta in which hydraulic fractures had broken into adjacent gas wells. "Large kicks resulted in volumes up to 80m$^3$ [about 100 cubic yards] of fluids produced to surface. Invading fluids have included water, carbon dioxide, nitrogen, sand, drilling mud, other stimulation fluids and small amounts of gas." These incidents occurred in horizontal wells with a distance between wellbores of up to 2,300 feet, the commission reported. "It is recommended," the commission advised, "that operators cooperate through notifications and monitoring of all drilling and completion operations where fracturing takes place within 1000m [3,280 feet] of well bores existing or currently being drilled."[69]

Engineer and drilling industry consultant M.C. Vincent echoed the British Columbia commission in a paper published by the Society of Petroleum Engineers that he presented at a hydraulic fracturing conference held near Houston in January 2009.

"Contrary to common expectations," he wrote,

"there are numerous examples of fractures intersecting offset wells [existing oil or natural gas wells near the well being fractured] but subsequently providing little or no sustained hydraulic connection between the wells. There is an understandable reluctance to publish reports documenting the intersection of adjacent wellbores with hydraulic fractures. Such information could unnecessarily alarm regulators or adjacent leaseholders who may infer that well spacing or fracture treatments are allowing unexpected capture of reserves."[70]

EWG asked Vincent about his findings by telephone and email, but he declined to comment on the record.

According to his paper, fractures have intersected with offset wells in the Piceance field in Colorado and Utah, Wyoming's Jonah field, Alaska's Prudhoe field, Texas' Barnett Shale, the Middle Bakken formation in Montana and North Dakota, and the Dan Field in the North Sea. Vincent noted that in one case in the Barnett Shale near Fort Worth, Texas, fracking fluids entered the wellbores of five adjacent vertical wells, temporarily halting gas production.[71]

"In the design of hydraulic fractures, it is necessary to make simplifying assumptions," Vincent wrote. "Although computing tools have improved, as an industry we remain incapable of fully describing the complexity of the fracture, reservoir, and fluid flow regimes."[72]

Another paper highlighting the complexity of hydraulic fractures, co-authored by M.K. Fisher, vice president of Business Management at Pinnacle, a service of Halliburton "specializing in the optimization of hydraulic fracturing," referred to the "highly complex fracture behavior in the Barnett shale" and the shale's "extremely complex fracture network." In the paper, published by the Society of Petroleum Engineers in 2005, Fisher and his coauthors noted that in one well drilled in the Barnett Shale, a fracture spread approximately 2,500 feet horizontally in two directions. The authors include the case cited by Vincent in which fractures from a well in the Barnett Shale broke into five adjacent wells.[73]

"Because of several factors, including the presence of natural fractures," the authors wrote, "a fracture treatment in the Barnett is more likely to look like the 'very complex' fracture description than the 'simple' case. This allows a fracture fairway to be created during a treatment with many fractures in multiple orientations, resulting in large surface areas potentially contributing to production."[74]

"Natural fractures may be activated (i.e. opened) during a hydraulic fracture treatment," they added.[75]

In a telephone interview, however, Fisher said it would be unlikely for fracturing to contaminate underground water supplies. He said his

firm has collected microseismic data on thousands of hydraulic fracturing operations in Texas' Barnett shale and the Marcellus shale beneath Eastern states and has found that the fractures remain thousands of feet below underground water supplies, a conclusion that he published in July 2010 in the American Oil & Gas Reporter, a Wichita, Kan.-based publication that serves the independent sector of the natural gas and oil industry. He said his firm has not conducted water testing, and the possibility of fractures contaminating water supplies by intersecting with abandoned wells was outside his area of research.[76]

Monte Besler, a consulting petroleum engineer who specializes in hydraulic fracturing, co-authored a 2007 paper that raised concerns about the unpredictability of fracturing behavior in Montana and North Dakota's Middle Bakken Formation. "Several operators have reported difficulty keeping fractures contained within the target Bakken horizon," Besler and his coauthors wrote. They delivered the paper at the Society of Petroleum Engineers' Annual Technical Conference and Exhibition in Anaheim, Calif.[77]

Like Fisher, Besler said that despite some unpredictability of fracture spread underground, there is little chance that fracturing would contaminate underground water supplies, in large part because fractures would not rise high enough to contaminate underground water sources that lie thousands of feet above.

He said, however, that there are three scenarios in which fracturing could potentially contaminate water supplies: 1) if a well is drilled in a shallow formation within several hundred feet vertically and horizontally of a water source – the distance most fractures are likely to travel, 2) if a well is improperly cemented, allowing the escape of fracturing fluids or hydrocarbons up the well bore, where they could pollute water closer to the surface; or 3) if the hydraulic fracture intersects with an old natural gas or oil well that was improperly plugged and cased, allowing fluid to migrate up the well and burst out near the surface. He said that he has personally fractured hundreds of wells and has never seen water contamination from hydraulic fracturing.

"We don't want produced water," he said. "We want oil and gas; we go out of our way to avoid fracking into water."[78]

## West Virginians Say Problems Persist

West Virginia residents who live near the Parsons' property believe that drilling companies there are not doing enough to address water contamination problems that may have been caused by hydraulic fracturing. In these cases, old wells may have played a role, too.

In the case of contamination that the Strohls say they witnessed in 2006, state records show

that when EXCO drilled and fractured its gas well, there were five old gas wells within 2,500 feet, including one within 440 feet and a second within 1,000 feet. Each of the older wells was deeper than the well EXCO drilled, meaning that a horizontal fracture from EXCO's well could have intersected with the old wells if it traveled far enough.[79] EXCO's gas well was less than 1,000 feet from the water wells that the Strohls said became polluted.

A "Well Operators Report of Well Work," filed with the West Virginia Office of Oil and Gas, shows that EXCO began drilling the well near two Jackson County homes on July 20, 2006. On July 22, according to handwritten notes on an inspector's permit form filed with the Office of Oil and Gas, EXCO "hit water could not continue – had to cement to shut off." The next day, the company "started drilling – hit water again – cemented to surface with expanding cement."

On July 31, after boring through 17 layers of shale, sandstone and limestone, EXCO finally completed the well at a total depth of 4,426 feet. EXCO used three layers of casing and cement to seal off the well from the surrounding formations.[80]

The company then hydraulically fractured two formations where it intended to extract natural gas, a berea sandstone between 2,560 and 2,564 feet deep and a brown shale formation between 3,936 and 4,380 feet deep. EXCO fractured the sandstone with 6,174 gallons of "gelled water," 29,500 pounds of sand and 340,000 cubic feet of nitrogen. The company fractured the shale with 7,812 gallons of "gelled water," 49,000 pounds of sand and 608,400 cubic feet of nitrogen. State records do not indicate when the fracturing occurred, but it is likely that it was before Aug. 28, when David L. Cox, manager of geology, completed the well operator's form for EXCO.[81]

Shortly thereafter, the Strohls reported that water wells for the two homes became polluted. The Strohls had a keen interest in the residents' water because they wanted to compare it to their own polluted well.

Before the 2006 drilling, "they were actually bragging about their water being good," Janet said of the other residents. "It *was* good," said Paul. Tyler Mountain Water, the company that began delivering water to the two homes according to the Strohls, did not return two phone calls requesting comment.

The Strohls have petitioned the Southern Jackson County Public Service District, on which Paul Strohl serves as a board member, to extend public water lines to their home and other homes with contaminated wells, including some wells that they believe were polluted by natural gas drilling. In November 2010, the district submitted an application to a clearinghouse for federal infrastructure funds to extend public water lines

www.ewg.org/gas-drilling-and-fracking

to the Strohls' general area. The project would cost approximately $3.6 million for 60 users. In April 2011, the clearinghouse said that the project was technically feasible and forwarded it to a funding committee for review to determine the most cost effective and environmentally sound alternative to address the area's drinking water needs.[82]

## Couple Says Home Became Unlivable

In June 2010, at a board meeting of the public service district, Paul Strohl introduced EWG researchers to Dennis and Tammy Hagy of Sandyville, W. Va., both in their early 50s, who said that the area near Route 33 East is not the only part of Jackson County impacted by drilling and fracturing.

The Hagys, who once lived in nearby Romance, said drilling and fracturing ruined their water and left their home, set on 80 wooded acres, unlivable. In this case, too, previously drilled wells nearby may have played a role.

Records from the West Virginia Department of Environmental Protection show that between Nov. 15, 2007 and June 11, 2008, Equitable Production Co. of Charleston, W. Va., drilled three horizontal wells in a Devonian shale formation about 1,000 feet north of the Hagys' home and water well. At least part of the formation is in the Marcellus Shale, which holds one of the nation's largest natural gas deposits. Equitable drilled through several layers of sandstone, salt sand,

limestone and shale to depths between 3,410 and 4,712 feet. Then, inside each well, the company steered the drill bit to bore horizontally another 3,000 to 4,000 feet before hydraulically fracturing the wells.[83]

Equitable fractured the first well in the Lower Huron Formation seven times on Feb. 19, 2008 at a depth of 3,410 feet, using a total of 7,388 gallons of water, 7.1 million cubic feet of nitrogen and 7,152 gallons of acid at a maximum pressure of 5,692 pounds per square inch.[84] Equitable fractured the well in the Marcellus Shale six times on Feb. 22, 2008 at a depth of 4,712 feet, using a total of 6,817 gallons of water, 4.8 million cubic feet of nitrogen and 6,018 gallons of acid at a maximum pressure of 5,798 pounds per square inch.[85] Equitable fractured a third well three times on Feb. 23, 2008 at a depth of 4,153 feet, using a total of 974 gallons of water, 1.4 million cubic feet of nitrogen and 2,030 gallons of acid at a maximum pressure of 5,498 pounds per square inch.[86] There is no record that Equitable completed a fourth well that was permitted for the site, but the Hagys say the company began drilling a fourth well and then stopped.[87]

The Hagys said that their water, which had been pristine, started turning brown in July 2008, five months after Equitable fractured its third well. Dennis Hagy said they experienced "weakness, headaches, nausea, eyes burning."

"You'd get in the shower and when you got out, you'd be sick," he said. Tammy Hagy said she developed a rash. She added that she stopped bottling water from their well for her son to take back to his home in Columbus, Ohio.

"My son called and said I'm going to have to stop drinking your water because I've got some problems with my throat," she said. The amount of water in the Hagys' wells and springs has declined significantly, they said.[88]

According to a ["Complaint Information Form"](#) dated Feb. 12, 2009, on file with the West Virginia Department of Environmental Protection's Office of Oil and Gas, Dennis Hagy first complained to the agency about water quality on Nov. 17, 2008, approximately nine months after Equitable fractured its third well. "He and his wife have been sick for over a year with Nausea (sic) and cramping stomach, etc. Silver flakes and black goo in well water," the form said. "DEP/OOG Inspector Jamie Stevens made inspections on several occasions. No violations were written."[89]

Stevens referred questions to James Martin, the chief of the Office of Oil and Gas. Martin told EWG that he had no more information than what appeared in the state's files.[90]

The state Department of Environmental Protection file included [several tests](#) of the Hagys' water on behalf of the department, Equitable

Production Co. and Dennis Hagy. The tests were conducted both before and after Equitable drilled. However, none of the tests looked for common drilling-related contaminants benzene, toluene, ethylbenzene and xylene.[91]

According to the West Virginia Code of State Rules, drilling companies must conduct tests of water supplies if they are within 1,000 feet of



Dennis and Tammy Hagy in front of their former home.

a natural gas or oil well; the Hagys' water well was just outside this distance, according to the Hagys.[92] The rules require testing only for pH, iron, total dissolved solids, chloride, detergents and "any others (sic) parameters as determined by the operator [drilling company]."[93] Martin said that the state might require additional tests

www.ewg.org/gas-drilling-and-fracking

based on the nature of a particular complaint and, indeed, in October 2010, the state tested the Hagys' water for benzene, toluene, ethylbenzene and xylene (BTEX), among other contaminants. The state detected no BTEX. However, the state conducted the tests more than two years after the Hagys first noticed contamination. The EPA has found that volatile organic compounds such as BTEX can biodegrade over time, so it is possible that the chemicals were once present and biodegraded by the time of the state's test.[94]

The Hagys said that on Nov. 13, 2008, Jeremy White, an Equitable "landman" who negotiates drilling leases with landowners, told them that the company had contaminated their water. The next day, the company brought bottled water to their home, and it later paid for them to stay in a local motel for two months. But when Dennis refused to sign a form releasing Equitable from legal liability and retained an attorney, the Hagys said company officials stopped paying for the motel and denied that Equitable had contaminated their water. In November 2010, in a telephone interview, Kevin West, Equitable's managing director of external affairs, said he would look into the Hagys' case. Three days later, EWG left a voicemail for West, but he has not responded.

Next door to the Hagys, Ben Thornton, 23, said his family's water well also went bad after the drilling and fracturing. "We had some black stuff coming out the well that wasn't there before," he said. "Everybody got sick there for a while" before the family began buying bottled water.

Thornton added that farm animals that had drunk the well water began to die after the drilling. He said he lost 70 chickens, eight or nine goats and 15 rabbits.

"I don't know if it was from the water, but they was doin' fine" before the drilling, he said, adding that he now waters his animals with rainwater collected from the roof of a shed. Thornton said he complained to Equitable, but the company did not offer help. "They ain't never give me nothing," he said.

State records show that existing wells in the area were close enough that they could have acted as conduits for the spread of contaminants from the hydraulic fracturing on the Hagys' land. In 1940, Godfrey L. Cabot, Inc. of Charleston, W.Va. drilled a gas well approximately 2,000 feet northeast of Equitable's wells.[95] The company drilled the well between June 8, 1940 and November 18, 1940 to a depth of 5,256 feet, more than 500 feet deeper than the deepest of the three wells drilled on the Hagys' property, meaning that a horizontal fracture from one or more of Equitable's three new wells could have intersected with the old well. Godfrey L. Cabot "shot" the old well twice on Nov. 19, 1940 – once with 20 quarts of explosive between 5,196 and 5,206 feet deep and

# Families Say Drilling, Fracturing Polluted Their Water

In 2007 and 2008, a Charleston, W.Va.-based natural gas company, Equitable Production Co., drilled and hydraulically fractured three natural gas wells on the property of Dennis and Tammy Hagy in Jackson Co. W.Va. In July, 2008, five months after Equitable fractured its third well, the Hagys say their water started turning brown and they became sick. A neighbor, Ben Thornton, said his family's water also became polluted and that he and his family got sick until they switched to bottled water.



**Old Wells**
Drilled 1940-2007



**New Wells**
Drilled 2007-08



**Jackson County, WV**

**1** **Hydraulic Fractures**
According to industry studies, hydraulic fractures can extend up to 2,500 feet horizontally within range of two preexisting natural gas wells near the Hagys' and Thortons' homes. Studies found that fractures elsewhere have broken into nearby oil and gas wells and that fracturing fluid has migrated up the old wells to surface.

**2** **Two Preexisting Wells Nearby**
Two natural gas wells, one drilled in 1940, the other in 2007, were located within 2,300 feet of the wells drilled near the Hagys and Thorntons.

**3** **Fluid Migration**
Government studies have found that oil and natural gas waste fluids injected underground can migrate up old oil and natural gas wells.

**4** **Breakout into Aquifer**
These fluids can break into aquifers near the surface if the old wells have deteriorating casings, lack cement plugs or contain cracked cement. This phenomenon is known as "salt water breakout." It is possible that hydraulic fracturing fluids migrated in a similar way into the Hagys' and Thorntons' water wells.

then a second time with 15 quarts of explosive between 5,243 and 5,250 feet deep.

The company sealed the well between Sept. 13, 1948 and Oct. 1, 1948 using several cement plugs. The company removed some of its casing from the well, including almost all of the casing below 2,019 feet, which would have been adjacent to the depths at which Equitable fractured its three nearby wells.[96]

Equitable drilled a well in June and July of 2007 approximately 2,300 feet west from the three wells it later drilled on the Hagys' property.[97] Equitable drilled this preexisting well between June 23 and July 26 to a depth of 5,130 feet, about 400 feet deeper than the deepest of the three wells drilled on the Hagys' property. Equitable fractured the preexisting well three times, once with 900,000 standard cubic feet of nitrogen and 750 gallons of acid at a maximum pressure of 3,135 psi, a second time with 900,000 standard cubic feet of nitrogen and 600 gallons of acid at a maximum pressure of 2,155 psi, and a third time with 247,226 standard cubic feet of nitrogen and 350 gallons of acid with a maximum pressure of 2,145 psi. There is no plugging data for the well in the public record; the state lists it as active.[98]

The Hagys said nearly 70 people in their community have signed a petition to the Southern Jackson County Public Service District requesting public water by an extension of public water lines.

At least some of their neighbors signed because they believe natural gas drilling had polluted their water, they added. As of February 2010, the estimated project cost was $1.7 million, according to the Southern Jackson County Public Service District, though there is no guarantee that this project will be funded.[99]

In October 2010, the Hagys filed suit against four drilling companies, including Equitable, in Jackson County Circuit Court seeking damages for impacts to their property and health. In December 2010, the case was moved to U.S. District Court for the Southern District of West Virginia, where it is now pending before Chief Judge Joseph R. Goodwin.[100]

## Summary and Recommendations:

Contrary to industry's insistence that hydraulic fracturing is safe for underground water supplies, EWG's investigation established that hydraulic fracturing poses significant risks to the drinking water sources on which more than 100 million Americans depend. The EPA's 1987 report, combined with industry and government papers showing that fractures can spread unpredictably and can intersect with adjacent wells, strongly indicate that hydraulic fracturing puts these water supplies in danger. Fracturing involves the use of toxic chemicals and is designed to open underground passages for natural gas and oil, which often come to the surface with naturally occur-

ring toxics such as benzene. The prevalence of abandoned wells that could serve as conduits for contamination, current allegations of fracturing contamination, a lack of rigorous water testing and the industry's secretive practices all intensify the concern. Local, state and federal governments should take the following steps to protect water supplies and human health, recognizing that hydraulic fracturing is only one part of the drilling process and that other components of drilling carry their own risks:

1. Implement a moratorium on hydraulic fracturing near drinking water supplies until rigorous scientific investigation establishes the risks of fracking. Before fracturing is allowed near water supplies, citizens and policymakers must know the risks so that they can make informed decisions about when and how it should be permitted. Industry and government studies show that fractures can spread up to 2,500 feet underground and that hydraulic fracturing can open natural fractures, suggesting that the moratorium should apply to a considerable margin around water sources.

2. Repeal the exemption for hydraulic fracturing under the Safe Drinking Water Act. The act is specifically designed to protect underground drinking water from the spread of contaminants through underground injections. It already covers tens of thousands of disposal wells into which the drilling industry injects wastes, including fracturing fluid. The law should apply to hydraulic fracturing, too.

3. Require pre-drilling surveys to identify and remediate old abandoned and deteriorating wells and conduct seismic testing to locate and avoid natural fractures. Mandate testing of water supplies within 2,500 feet of drilling operations:
a. before drilling begins
b. after drilling and before fracturing, to determine if the drilling process itself has an effect on water supplies, and
c. after fracturing, to determine if fracturing is having an effect on drinking water supplies.
Labs should conduct tests for benzene, toluene, ethylbenzene, xylene and other likely contaminants from natural gas and oil operations. Tests should use standard test methods and should be designed to determine whether chemicals exceed established safe levels.

4. Require companies to publicly disclose the contents of their fracturing fluids so that the public can know whether the fluids are safe and researchers can know

www.ewg.org/gas-drilling-and-fracking

what chemicals to test for. Disclosure should occur before and after fracturing and should be accessible to the public, including mailing notices to nearby residents and identifying each chemical by its unique Chemical Abstracts Service (CAS) registry number. CAS numbers would allow scientists, regulators and citizens to know precisely what substances are being used and would facilitate accurate testing of potentially contaminated water sources such as wells and springs.

5. Require all drilling companies to use non-toxic tracers in their fracturing fluid and require testing of nearby water supplies for these tracers after fracturing. The presence or absence of the tracers months or years later would enable scientists to link contamination to fracturing — or determine that there is no link.

# References

1. West Virginia Division of Environmental Protection. Office of Oil and Gas, Well Operator's Report of Well Work, API No. 47-035-02717, Aug. 28, 2006. West Virginia Department of Environmental Protection. Inspectors Permit Summary Form, API No. 47-3502717, received Oct. 10, 2006.

2.Interview with Janet and Paul Strohl (June 16, 2010). Telephone interviews with Janet and Paul Strohl (Oct. 27 and 28, 2010).

3. U.S. Geological Survey. Briefing on Contaminants in Groundwater Used for Public Supply, News Release, May 14, 2010. Accessed online Dec. 6, 2010 at http://www.usgs.gov/newsroom/article.asp?ID=2462.

4. U.S. Environmental Protection Agency, Report to Congress: Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy, Dec. 1987 [hereinafter EPA 1987].

5. EPA 1987, supra note 4, at IV-11.

6. American Petroleum Institute. API Comments on Preliminary Draft Report to Congress on Oil, Gas and Geothermal Wastes, Aug. 10, 1987, at 1375, 1416 (on file at EPA Docket Center, F-88-OGRA-SO679.) An online glossary on the website of Schlumberger Limited, one of the world's largest hydraulic fracturing companies, says that a "workover operation" involves "the repair or stimulation of an existing production well for the purpose of restoring, prolonging or enhancing the production of hydrocarbons." See Schlumberger, Oilfield Glossary, Workover, noun, drilling. Accessed online Oct. 28, 2010 at http://www.glossary.oilfield.slb.com/Display.cfm?Term=workover. Hydraulic fracturing is a form of stimulation; hydrocarbons include natural gas and oil. The "detail write-up" may have been the second document about the West Virginia case included with API's comments. See U.S. Environmental Protection Agency. Damage Cases Report Form and Summary, File Ref# WV17, Mar. 4, 1987 (on file at EPA Library, Washington, DC).

7. Independent Oil and Gas Association of New York et al. Comments Regarding the United States Environmental Protection Agency's Report to Congress with Respect to the Management of Waste from the Exploration, Development and Production of Crude Oil, Natural Gas and Geothermal Energy, Mar. 14, 1988, at 1223 (on File at EPA Docket Center, F-88-OGRA-00073).

8. EPA 1987, supra note 4, at IV-9 and IV-11.

9. EPA 1987, supra note 4, at IV-1, IV-2, IV-9..

10. Wilson, Weston. Letter from Weston Wilson, EPA Employee, Denver Colorado to U.S. Senator Wayne Allard et al., Oct. 8, 2004. Accessed online November 8, 2010 at http://www.earthworksaction.org/publications.cfm?pubID=372. Hamburger, Tom and Alan C. Miller. A Changing Landscape: Halliburton's Interests Assisted by White House, Los Angeles Times, Oct. 14, 2004, at A1.

11. Safe Drinking Water Act Hydraulic Fracturing Exemption. Pub. L. No. 109-58 (codified at 42 USC 300h (d)(1)(B)(ii) (2008)). Congress exempted fracturing from the Safe Drinking Water Act except for fracturing with diesel fuel.

12. U.S. Environmental Protection Agency. Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs, Final, June 2004, at ES-7 [hereinafter EPA 2004]. Accessed online Mar. 13, 2009 at http://www.epa.gov/safewater/uic/wells_coalbedmethanestudy.html.

13. Vincent, M.C. Examining Our Assumptions – Have Oversimplifications Jeopardized Our Ability to Design Optimal Fracture Treatments? Presented to 2009 Society of Petroleum Engineers Hydraulic Fracturing Technology Conference held in The Woodlands, Texas, Jan. 19-21, 2009, Published by Society of Petroleum Engineers, Number SPE 119143, 2009. Schlumberger, Oilfield Glossary, Flowline. Accessed online Nov. 2, 2010 at http://www.glossary.oilfield.slb.com/Display.cfm?Term=flowline (defining a "flowline" as a pipe on the surface that directs drilling mud flowing out of the wellbore into equipment for treating the mud; a flowline can also be a surface pipeline for oil, gas or water that connects the wellhead to production facilities or to an arrangement of piping used to control or monitor fluids known as a "manifold"). Schlumberger, Oilfield Glossary, Test Separator. Accessed online Nov. 2, 2010 at http://www.glossary.oilfield.slb.com/Display.cfm?Term=test%20separator (defining a "surface test separator" as "a vessel used to separate and meter relatively small quantities of oil and gas."

14. EPA 1987, supra note 3, at III-48. Illinois Oil Field Brine Disposal Assessment, Staff Report, Illinois Environmental Protection Agency, 1978. Illinois Oil Field Brine Disposal Assessment, Phase II Report, Illinois Environmental Protection Agency, 1981. Status of the Brine Problem in Illinois, Illinois Department of Energy and Natural Resources, Document No. RE-EA-85/05, 1985. Texas Department of Agriculture, Department of Natural Resources. Agricultural Land and Water Contamination from Injection Wells, Disposal Pits, and Abandoned Wells used in Oil and Gas Production, 1985. U.S. General Accounting Office, Report of the Chairman, Environment, Energy, and Natural Resources, Subcommittee, Committee on Government Operations, House of Representatives, July 1989.

15. Texas Department of Agriculture, supra note 14, at 13.

16. EPA 2004, supra note 11, Appendix A. Texas Comptroller of Public Accounts, Oil Well Servicing Tax Manual, Chapter 3, Description of Oil and Gas Well Services. Accessed online Oct. 22, 2010 at http://www.

www.ewg.org/gas-drilling-and-fracking

window.state.tx.us/taxinfo/audit/oilwellservicing/. Carrillo, Victor (IOGCC Carrillo). 2005. Testimony submitted to the House Committee on Energy and Commerce by Victor Carrillo, Chairman, Texas Railroad Commission Representing the Interstate Oil and Gas Compact Commission, Feb. 10, 2005. Accessed online Oct. 18, 2005 at http://www.rrc.state.tx.us/commissioners/carrillo/press/energytestimony.php.

17. EPA 2004, supra note 11, at ES-11, Chapter 4 (reporting that coalbed methane wells can use between 50,000 and 350,000 gallons of fluid for fracturing and that fracturing fluids include thickeners). Schein, Gary. Hydraulic Fracturing in Gas Shale Plays – Are They all the Same? Presentation at Barnett Shale Breakfast Symposium, Feb. 29, 2008. Accessed online Mar. 15, 2009 at http://www.barnettshalenews.com/studies.htm (commenting that shale formations in the Barnett Shale may require four million gallons of fracturing fluid). Burnett, D.B. and Vavra, C.J. Desalination of Oil Field Brine, Presentation for "The Future of Desalination in Texas," Global Petroleum Research Institute, Texas A&M University, College Station, Texas, Aug. 6-8, 2006. Accessed online Mar. 15, 2009 at http://www.pe.tamu.edu/gpri-new/home/BrineDesal/MembraneWk-shpAug06/Burnett8-06.pdf (commenting that wells in the Barnett Shale use five to six million gallons of fracturing fluid; an industry source told Environmental Working Group that the figure can range as high as six million gallons). New York Department of Environmental Conservation. Draft Supplemental Generic Environmental Impact Statement Relating to Drilling for Natural Gas in New York State Using Horizontal Drilling and Hydraulic Fracturing, Sept. 30, 2009, at Chapter 5 [hereinafter NYDEC DSGEIS 2009]. Accessed online Nov. 6, 2009 at http://www.dec.ny.gov/energy/46288.html. Besler, Monte et al. Improving Well Productivity and Profitability in the Bakken – A Summary of Our Experiences Drilling, Stimulating, and Operating Horizontal Wells, Presented to 2007 Society of Petroleum Engineers Annual Technical Conference and Exhibition in Anaheim, California, Nov. 11-14, 2007, Published by Society of Petroleum Engineers, 2007.

18. Tillerson, Rex. Testimony to U.S. House of Representatives, Committee on Energy and Commerce. "The ExxonMobil-XTO Merger: Impact on U.S. Energy Markets" (Washington, D.C., Jan. 20, 2010), p.87. Accessed online June 1, 2010 at http://energycommerce.house.gov/index.php?option=com_content&view=article&id=1873:the-exxonmobil-xto-merger-impacts-on-us-energy-markets&catid=130:subcommittee-on-energy-and-the-environment&Itemid=71.

19. Fuller, Lee. "Fracking Would be a Boon to Region," Ithaca Journal, Dec. 3, 2010. Accessed online Dec. 4, 2010 http://www.theithacajournal.com/article/20101203/VIEWPOINTS03/12030303/1129/Fracking-would-be-a-boon-to-region.

20. West Virginia Department of Mines, Oil and Gas Division. Well Operator's Report of Drilling, Fracturing and/or Stimulating, or Physical Change, Well Number 47-35-1746 Oct. 26, 1982 (on file with West Virginia Office of Oil and Gas).

21. Id.

22. Willette, Ken, Telephone interview with Ken Willette, Manager of the Public Fire Protection Division of the National Fire Protection Association (Oct. 20, 2010).

23. West Virginia Department of Mines, supra note 20. See also West Virginia Department of Mines, Oil and Gas Division, Well Operator's Report of Drilling, Fracturing and/or Stimulating, or Physical Change, July 16, 1985 (on file with West Virginia Office of Oil and Gas). West Virginia Department of Mines, Oil and Gas Division. Final Inspection Report, Inspectors Compliance Report, Aug. 7, 1985 (on file with West Virginia Office of Oil and Gas).

24. West Virginia Department of Mines, Oil and Gas Division. Water Well Inspection Report, 1984 (exact date is indecipherable) (on file at EPA Library, Washington, DC). Parsons v. Kaiser Exploration & Mining Co., complaint filed in the Circuit Court of Jackson County, West Virginia, Feb. 4, 1986.

25. West Virginia Department of Mines, supra note 24.

26. Lewis, Michael W.  Letter from Michael W. Lewis, engineer, West Virginia Department of Mines, Oil and Gas Division, to James Parsons, Oct. 2, 1984.

27. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841023, Date of Collection, June 29, 1984, Date of Analysis, Aug. 3, 1984. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841516, Date of Collection, July 1, 1984, Date of Analysis, Sept. 20, 1984. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841420, Date of Collection, Aug. 31, 1984, Date of Analysis, Sept. 18, 1984. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841517, Date of Collection, Sept. 17, 1984, Date of Analysis, Sept. 24, 1984. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841842, Date of Collection, Nov. 23, 1984, Date of Analysis, Nov. 30, 1984.

28. Rosencrance, James E. Letter from James E. Rosencrance, Chief Environmental Health Services Lab to Perry R. Merritt, Sanitarian IV, Jackson County Health Department, Nov. 8, 1984 [hereinafter Rosencrance to Merritt].

29. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number

841023, supra note 27.

30. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841420, supra note 27.

31. West Virginia State Health Department, Water Analysis Report – Inorganics, Environmental Health Services Laboratory, Laboratory Number 841516, supra note 27.

32. NOWSCO Well Service Ltd., Re: Kem 244 Parsons Contamination Analysis, Report No. NRD – 85 – 202. March 11, 1985. BCM Laboratory Division, Appalachian Group, BCM Number D408760, Client Sample ID James Parsons, Date Sampled Nov. 15, 1984, Date Received Nov. 15, 1984, Date of Final Report Nov. 21, 1984.

33. Batheja, Aman (Batheja). 2010. Texas Proposes New Rules for Gas, Oil Drillers, Fort Worth Star-Telegram, July 29, 2010 (reporting that Texas "is proposing to change the air emission limits on drilling sites that would focus more on toxic chemicals most associated with natural gas drilling, including benzene and toluene"). Accessed online Dec. 6, 2010 at http://www.mcclatchydc.com/2010/07/29/98309/texas-proposes-new-rules-for-gas.html#ixzz14idYZvw3. Environmental Working Group, Drilling Around the Law, Jan. 20, 2010 (finding that BTEX are often found in petroleum distillates used for hydraulic fracturing). Accessed online Nov. 8, 2010 at http://www.ewg.org/drillingaroundthelaw. Marathon, Material Safety Data Sheets, Marathon Oil Company Products, Natural Gas-Condensate C2-C8, 0197MAR001 (showing that benzene is a component of condensate, a naturally-occurring liquid hydrocarbon that is often produced along with natural gas). Accessed online Oct. 20, 2010 at http://www.marathonpetroleum.com/Products/MSDS/. NYDEC DSGEIS 2009, supra note 17 at 5-53 (finding that BTEX are used in fracturing). EPA 1987, supra note 4, at II-36 through II-38 (reporting that the EPA found benzene in oil and natural gas wastes).

34. Rosencrance, James E. Letter from James E. Rosencrance, Chief Environmental Health Services Lab to James Parsons, Apr. 3, 1985.

35. Charleston Gazette. James Rosencrance Obituary, June 26, 1999 at 12A (reporting that James Rosencrance died on June 24, 1999).

36. Parsons v. Kaiser complaint, supra note 24. Parsons v. Kaiser Exploration & Mining Company, answer filed in the Circuit Court of Jackson County, West Virginia, Jan. 24, 1987. Parsons v. Kaiser Exploration & Mining Co., dismissal order entered by Judge George M. Scott in the Circuit Court of Jackson County, West Virginia, May 29, 1987.

37. Pryce, Lance. Telephone interview (Aug. 12, 2010).

38. Streit, Ted M.  Letter from Ted M. Streit, deputy director, Inspection and Enforcement, Division of Oil and Gas, West Virginia Department of Energy, to Dave Flannery, Robinson and McElwee, May 29, 1987.

39. Ely, John W. Stimulation Treatment Handbook, 1st Ed., 1985, at 52-61.

40. EPA 2004, supra note 12 at 1-3, 1-4, 4-3 and 4-4.

41. Id. at 4-5.

42. Morris, Richard. Telephone interview with Richard Morris, former inspector with the West Virginia Department of Mines, Oil and Gas Division (Nov. 17, 2010).

43. Rosencrance to Merritt, supra note 30. NYDEC DSGEIS 2009, supra note 18, at 5-53. Pennsylvania Department of Environmental Protection (PADEP). 2010. Chemicals Used by Hydraulic Fracturing Companies in Pennsylvania For Surface and Hydraulic Fracturing Activities. Accessed online Dec. 23, 2010 at http://www.dep.state.pa.us/dep/deputate/minres/oilgas/new_forms/marcellus/marcellus.htm. An earlier version of the list entitled Summary of Hydraulic Fracture Solutions – Marcellus Shale is on file with Environmental Working Group. It was accessed online Aug. 19, 2009 at http://www.dep.state.pa.us/dep/deputate/minres/oilgas/new_forms/marcellus/marcellus.htm. It includes information submitted by BJ Services, Fractech, Universal, Halliburton and Superior. Two companies said that they used petroleum distillates. BJ Services said that it used "petroleum distallate (sic) blend" and "hydrotreated light distillate." Superior said that it used "hydrotreated light distillate" and "mineral spirits." An official with the Pennsylvania Bureau of Oil and Gas said that the state received the list in 2008. Personal communication, Aug. 19, 2009.

44. Marathon, Material Safety Data Sheets, Marathon Oil Company Products, Natural Gas-Condensate C2-C8, 0197MAR001, supra note 35. Marathon. Material Safety Data Sheets, Marathon Oil Company Products, Natural Gas-Condensate Sour, 0245MAR001. Accessed online Oct. 20, 2010 at http://www.marathonpetroleum.com/Products/MSDS/.

45. Morris, Richard, supra note 42. Halliburton. Aquagel – Product Data Sheet. Accessed online Dec. 23, 2010 at http://www.halliburton.com/halcomsearch.aspx?k=aquagel. Halliburton. Aquagel Gold Seal® – Product Data Sheet. Accessed online Dec. 5, 2010 at http://www.halliburton.com/halcomsearch.aspx?k=aquagel.

46. Morris, Richard, supra note 45. Dusseault, Maurice B. Telephone interviews with Maurice Dusseault (Jan. 25, 2011 and June 28, 2011). Dusseault, Maurice B. et al. Why Oilwells Leak: Cement Behavior and Long-Term Consequences, prepared for presentation at the Society of Petroleum Engineers' International Oil and Gas Conference and Exhibition in Bejing, China, Nov. 7-10, 2000. EPA 1987, supra note 3, at III-47,

www.ewg.org/gas-drilling-and-fracking

47. EPA 1987, supra note 4, at III-47. Illinois Oil Field Brine Disposal Assessment, Staff Report, Illinois Environmental Protection Agency, 1978. Illinois Oil Field Brine Disposal Assessment, Phase II Report, Illinois Environmental Protection Agency, 1981, supra note 14, at 44.

48. Texas Department of Agriculture. supra note 15, at 5.

49. U.S. General Accounting Office, supra note 15, at 2.

50. U.S. Department of Energy, Office of Fossil Energy, Environmental Benefits of Advanced Oil and Gas Exploration and Production Technology, Technology Fact Sheets: Site Restoration, Oct. 5, 1999.

51. West Virginia Geological and Economic Survey, Oil and Gas Well Data for West Virginia on DVD, January 2010 (on file with Environmental Working Group).

52. New York Department of Environmental Conservation, Division of Mineral Resources. New York State Oil, Gas and Mineral Resources, 2008, at 23. Accessed online Dec. 5, 2010 at http://www.dec.ny.gov/pubs/36033.html.

53. Electronic mail from Pennsylvania Department of Environmental Protection to Environmental Working Group, July 19, 2011 and July 21, 2011 (on file with Environmental Working Group).

54. Ohio Department of Natural Resources, Division of Mineral Resources Management, RBDMS, received July 2011 (on file with Environmental Working Group).

55. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0160, completed September 21, 1941. Accessed online July 6. 2011 at "http://www.wvnet.edu/oginfo/pipeline/pipeline2.asp"http://www.wvgs.wvnet.edu/oginfo/pipeline/pipeline2.asp. West Virginia Department of Mines. Oil and Gas Division, Well Record, Permit No. Jac-160, Oct. 15, 1941. GPS Latitude and Longitude Distance Calculator. Accessed online December 23, 2010 at http://www.csgnetwork.com/gpsdistcalc.html.

56. Interviews with Janet and Paul Strohl, supra note 2.

57. West Virginia Department of Mines. Oil and Gas Division, Well Record, Permit No. Jac-160, supra note 55.

58. Texas Comptroller of Public Accounts, supra note 16.

59. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-160, Oct. 12, 1946.

60. EPA 1987, supra note 4, at III-47, III-48.

61. Dusseault, Maurice B. Telephone interviews, supra note 46. Dusseault, Maurice B. et al., supra note 47. EPA 1987, supra note 4, at III-47, 48.

62. Dusseault, Maurice B. Telephone interviews, supra note 46.

63. West Virginia Department of Environmental Protection, Office of Oil and Gas, Well Plugging Inspection & Release Form, Well No. 47-035-0160, Dec. 15, 2005.

64. West Virginia Department of Mines, Oil and Gas Division, Well Record, Permit No. Jac-111, Oct. 15. 1941. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0111. Accessed online Feb. 21, 2011 at http://www.wvgs.wvnet.edu/oginfo/pipeline/pipeline2.asp. GPS Latitude and Longitude Distance Calculator, supra note 53. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-111, Aug. 18, 1949.

65. West Virginia Department of Mines, Oil and Gas Division, Well Record, Permit No. Jac-200, Feb. 4, 1942. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-200, July 18, 1944. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0200. Accessed online Feb. 21, 2011 at http://www.wvgs.wvnet.edu/oginfo/pipeline/pipeline2.asp. GPS Latitude and Longitude Distance Calculator, supra note 55. Bureau of Alcohol, Tobacco and Firearms. Commerce in Explosives; List of Explosive Materials (2009R–18T), 75 Fed. Reg. 1,085-1,087 (Jan. 8, 2010).

66. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-200, July 18, 1944, supra note 65.

67. West Virginia Department of Mines, Oil and Gas Division, Well Record, Permit No. Jac-188, March 23, 1942. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-188, July 16, 1945. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0188. Accessed online February 21, 2011 at http://www.wvgs.wvnet.edu/oginfo/pipeline/pipeline2.asp. GPS Latitude and Longitude Distance Calculator, supra note 55.

68. West Virginia Department of Mines, Oil and Gas Division, Well Record, Permit No. Jac-188, supra note 67. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-188, supra note 67. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0188, supra note 67.

69. British Columbia Oil and Gas Commission. Safety Advisory 2010-03, May 20, 2010. Accessed online December 19, 2010 at http://www.ogc.

gov.bc.ca/.

70. Vincent, supra note 13, at 13.

71. Id. at 13.

72. Id. at 13.

73. Fisher, M.K. et al. Integrating Fracture-Mapping Technologies to Improve Stimulations in the Barnett Shale, Presented at the 2002 SPE Annual Technical Conference and Exhibition in San Antonio, Texas, Sept. 29-Oct. 2, 2002, Published by Society of Petroleum Engineers in revised form, 2005, at 85, 87.

74. Id. at 85.

75. Id. at 85.

76. Fisher, Kevin. "Data Confirm Safety of Well Fracturing," The American Oil & Gas Reporter, July 2010. Fisher, Kevin. Telephone interview with Kevin Fisher, Vice President of Business Management at Pinnacle, a service of Halliburton (Nov. 17, 2010).

77. Besler, Monte et al. Improving Well Productivity and Profitability in the Bakken – A Summary of Our Experiences Drilling, Stimulating, and Operating Horizontal Wells, Presented to 2007 Society of Petroleum Engineers Annual Technical Conference and Exhibition in Anaheim, California, Nov. 11-14, 2007, Published by Society of Petroleum Engineers, 2007, at 1, 2, 4.

78. Telephone interviews with Monte Besler, consulting petroleum engineer (July 28 and 29, 2010).

79. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0111, supra note 64. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0160, supra note 55. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0188, supra note 67. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-0200, supra note 65. West Virginia Geological and Economic Survey. Pipeline Database, Well Number 47-35-1746. Accessed online Feb. 21, 2011 at http://www.wvgs.wvnet.edu/oginfo/pipeline/pipeline2.asp.

80. West Virginia Department of Environmental Protection. Inspectors Permit Summary Form, API No. 47-3502717, supra note 1.

81. West Virginia Division of Environmental Protection. Office of Oil and Gas, Well Operator's Report of Well Work, API No. 47-035-02717, supra note 1.

82. Southern Jackson County Public Service District staff. Telephone interview (Oct. 28, 2010).

83. West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502837, July 29, 2008.  Plat for Well No. WV 511044, API Well No. 47-035-02837, Prepared by Gregory A. Smith, Professional Surveyor (indicating that the well's horizontal leg traveled northwest). West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502844, Sept. 26, 2008. Plat for Well No. WV 511356, API Well No. 47-035-02844, Prepared by Gregory A. Smith, Professional Surveyor (indicating that the well's horizontal leg traveled northwest). West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502846, Jan. 22, 2009. Plat for Well No. WV 511358, API Well No. 47-035-02846, Prepared by Gregory A. Smith, Professional Surveyor (indicating that the well's horizontal leg traveled southeast).

84. West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502837, supra note 83.

85. West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502844, supra note 83.

86. West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502846, supra note 83.

87. West Virginia Department of Environmental Protection, Section of Oil and Gas, Well Operator's Report of Well Work, API # 4703502845, Jan. 22, 2009.

88. Hagy, Dennis and Tammy. Interviews with Dennis and Tammy Hagy (June 16 and 17, 2010). Telephone interviews with Dennis and Tammy Hagy (Oct. 26 and 27, 2010).

89. West Virginia Department of Environmental Protection, Office of Oil and Gas, Complaint Information Form, Taken by Gene Smith, Reported by Dennis Hagy, Complaint against Equitable, February 12, 2009.

90. Telephone interview with James Martin, supra note 51.

91. Sturm Environmental Services. Water Test of Hagy Well for Equitable Production Company, Sampled by Smith Land Surveying, Ben Stewart, Oct. 17, 2007. Microbac Labratories, Inc. Electronic Certificate of Analysis, Sample 002 511044 5478/Hagy, Dates Sampled: 10/17/2007-10/23/2007, Date Recieved: 10/25/2007, Date Reported 11/05/2007. Sturm Environmental Services. Water Tests of Hagy Well for Equitable

www.ewg.org/gas-drilling-and-fracking

Production Company, Sampled by Smith Land Surveying, Mike Shiflet Nov. 7, 2008 and Dec. 16, 2008. Sturm Environmental Services. Water Test of Hagy well and nearby wells for West Virginia Department of Environmental Protection, Sampled by Gene Smith, Mar. 31, 2009. West Virginia Department of Health and Human Resources/Bureau for Public Health, Office of Laboratory Services, Environmental Chemistry Laboratory, Laboratory Analytical Report, Submitter: Dennis Hagy, Sample # W09000554-01-001, Collection Point: Cellar faucet Date Collected: Mar. 26, 2009, Dates Sampled: Mar. 26, 2009-April 14, 2009.

92. Telephone interview with Dennis Hagy (July 15, 2011).

93. West Virginia Code of State Rules. W. Va. Code St. R. tit. 35, § 4-19 (2010).

94. Martin, James. Telephone interview with James Martin, supra note 51. Hagy, Dennis and Tammy. Interviews with Dennis and Tammy Hagy, supra note 88. REI Consultants, Inc., Analytical Results, Client: West Virginia Department of Environmental Protection, Client Sample ID: 1-Hagy Water Well, Collection Date: Oct. 8, 2010, Dates Analyzed: Oct. 9-Oct. 14, 2010 (the lab tested for BTEX on Oct. 11, 2010). U.S. Environmental Protection Agency, Technical Factsheet on Benzene. Accessed online July 9, 2011 at www.epa.gov/ogwdw000/pdfs/factsheets/voc/tech/benzene.pdf. U.S. Environmental Protection Agency, Technical Factsheet on Toluene. Accessed online July 9, 2011 at www.epa.gov/ogwdw000/pdfs/factsheets/voc/tech/toluene.pdf. U.S. Environmental Protection Agency, Technical Factsheet on Ethylbenzene. Accessed online July 9, 2011 at www.epa.gov/ogwdw/pdfs/factsheets/voc/tech/ethylben.pdf. U.S. Environmental Protection Agency, Technical Factsheet on Xylenes. Accessed online July 9, 2011 at www.epa.gov/ogwdw000/pdfs/factsheets/voc/tech/xylenes.pdf.

95. West Virginia Department of Mines, Oil and Gas Division, Well Record, Permit No. Jac-83, April 7, 1941. West Virginia Geological and Economic Survey, Pipeline Database, Well Number 47-35-0083. Accessed online February 21, 2010 at http://www.wvgs.wvnet.edu/oginfo/pipeline/pipeline2.asp.

96. West Virginia Department of Mines, Oil and Gas Division, Affidavit of Plugging and Filling Well, Permit No. Jac-83, October 18, 1948.

97. West Virginia Division of Environmental Protection, Office of Oil and Gas, Well Operator's Report of Well Work, API No. 47-035-02784, Nov. 7, 2007.

98. Id. . West Virginia Department of Environmental Protection, Office of Oil and Gas, Database Information, Search Oil and Gas Database, Oil and Gas Wells, Abandoned Well. Accessed online July 15, 2011 at http://apps.dep.wv.gov/oog/wellsearch_new.cfm?CFID=11197&CFTOKEN=41318047&jsessionid=3a3036420372e9a1f6524d182d4522e744a2TR.

99. Southern Jackson County Public Service District staff. Telephone interviews (Oct. 28, 2010 and July 8, 2011).

100. Telephone interview with Dennis Hagy (July 14, 2011). Telephone interview with staff of Joseph R. Goodwin, Chief Judge of U.S. District Court for the Southern District of West Virginia (July 14, 2011).



http://www.ewg.org/gas-drilling-and-fracking



UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON ENERGY AND COMMERCE
MINORITY STAFF
APRIL 2011

# CHEMICALS USED IN HYDRAULIC FRACTURING

**PREPARED BY COMMITTEE STAFF FOR:**

Henry A. Waxman
Ranking Member
Committee on Energy
and Commerce

Edward J. Markey
Ranking Member
Committee on Natural
Resources

Diana DeGette
Ranking Member
Subcommittee on Oversight
and Investigations

**TABLE OF CONTENTS**

I.  EXECUTIVE SUMMARY..........................................................................1

II.  BACKGROUND..................................................................................2

III.  METHODOLOGY................................................................................4

IV.  HYDRAULIC FRACTURING FLUIDS AND THEIR CONTENTS.....5

    A.  Commonly Used Chemical Components......................................6

    B.  Toxic Chemicals.............................................................8

V.  USE OF PROPRIETARY AND "TRADE SECRET" CHEMICALS.....11

VI.  CONCLUSION...................................................................................12

    APPENDIX A.....................................................................................13

## I.   EXECUTIVE SUMMARY

Hydraulic fracturing has helped to expand natural gas production in the United States, unlocking large natural gas supplies in shale and other unconventional formations across the country.  As a result of hydraulic fracturing and advances in horizontal drilling technology, natural gas production in 2010 reached the highest level in decades.  According to new estimates by the Energy Information Administration (EIA), the United States possesses natural gas resources sufficient to supply the United States for approximately 110 years.

As the use of hydraulic fracturing has grown, so have concerns about its environmental and public health impacts.  One concern is that hydraulic fracturing fluids used to fracture rock formations contain numerous chemicals that could harm human health and the environment, especially if they enter drinking water supplies.  The opposition of many oil and gas companies to public disclosure of the chemicals they use has compounded this concern.

Last Congress, the Committee on Energy and Commerce launched an investigation to examine the practice of hydraulic fracturing in the United States.  As part of that inquiry, the Committee asked the 14 leading oil and gas service companies to disclose the types and volumes of the hydraulic fracturing products they used in their fluids between 2005 and 2009 and the chemical contents of those products.  This report summarizes the information provided to the Committee.

Between 2005 and 2009, the 14 oil and gas service companies used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components.  Overall, these companies used 780 million gallons of hydraulic fracturing products – not including water added at the well site – between 2005 and 2009.

Some of the components used in the hydraulic fracturing products were common and generally harmless, such as salt and citric acid.  Some were unexpected, such as instant coffee and walnut hulls.  And some were extremely toxic, such as benzene and lead.  Appendix A lists each of the 750 chemicals and other components used in hydraulic fracturing products between 2005 and 2009.

The most widely used chemical in hydraulic fracturing during this time period, as measured by the number of compounds containing the chemical, was methanol.  Methanol, which was used in 342 hydraulic fracturing products, is a hazardous air pollutant and is on the candidate list for potential regulation under the Safe Drinking Water Act.  Some of the other most widely used chemicals were isopropyl alcohol (used in 274 products), 2-butoxyethanol (used in 126 products), and ethylene glycol (used in 119 products).

Between 2005 and 2009, the oil and gas service companies used hydraulic fracturing products containing 29 chemicals that are (1) known or possible human carcinogens, (2) regulated under the Safe Drinking Water Act for their risks to human health, or (3) listed as hazardous air pollutants under the Clean Air Act.  These 29 chemicals were components of more than 650 different products used in hydraulic fracturing.

The BTEX compounds – benzene, toluene, xylene, and ethylbenzene – appeared in 60 of the hydraulic fracturing products used between 2005 and 2009. Each BTEX compound is a regulated contaminant under the Safe Drinking Water Act and a hazardous air pollutant under the Clean Air Act. Benzene also is a known human carcinogen. The hydraulic fracturing companies injected 11.4 million gallons of products containing at least one BTEX chemical over the five year period.

In many instances, the oil and gas service companies were unable to provide the Committee with a complete chemical makeup of the hydraulic fracturing fluids they used. Between 2005 and 2009, the companies used 94 million gallons of 279 products that contained at least one chemical or component that the manufacturers deemed proprietary or a trade secret. Committee staff requested that these companies disclose this proprietary information. Although some companies did provide information about these proprietary fluids, in most cases the companies stated that they did not have access to proprietary information about products they purchased "off the shelf" from chemical suppliers. In these cases, the companies are injecting fluids containing chemicals that they themselves cannot identify.

## II.    BACKGROUND

Hydraulic fracturing – a method by which oil and gas service companies provide access to domestic energy trapped in hard-to-reach geologic formations — has been the subject of both enthusiasm and increasing environmental and health concerns in recent years. Hydraulic fracturing, used in combination with horizontal drilling, has allowed industry to access natural gas reserves previously considered uneconomical, particularly in shale formations. As a result of the growing use of hydraulic fracturing, natural gas production in the United States reached 21,577 billion cubic feet in 2010, a level not achieved since a period of high natural gas production between 1970 and 1974.[1] Overall, the Energy Information Administration now projects that the United States possesses 2,552 trillion cubic feet of potential natural gas resources, enough to supply the United States for approximately 110 years. Natural gas from shale resources accounts for 827 trillion cubic feet of this total, which is more than double what the EIA estimated just a year ago.[2]

Hydraulic fracturing creates access to more natural gas supplies, but the process requires the use of large quantities of water and fracturing fluids, which are injected underground at high volumes and pressure. Oil and gas service companies design fracturing fluids to create fractures and transport sand or other granular substances to prop open the fractures. The composition of these fluids varies by formation, ranging from a simple mixture of water and sand to more complex mixtures with a multitude of chemical additives. The companies may use these

---

[1] Energy Information Administration (EIA), *Natural Gas Monthly (Mar. 2011)*, Table 1, U.S. Natural Gas Monthly Supply and Disposition Balance (online at www.eia.gov/dnav/ng/hist/n9070us1A.htm) (accessed Mar. 30, 2011).

[2] EIA, *Annual Energy Outlook 2011 Early Release* (Dec. 16, 2010); EIA, *What is shale gas and why is it important?* (online at www.eia.doe.gov/energy_in_brief/about_shale_gas.cfm) (accessed Mar. 30, 2011).

chemical additives to thicken or thin the fluids, improve the flow of the fluid, or kill bacteria that can reduce fracturing performance.[3]

Some of these chemicals, if not disposed of safely or allowed to leach into the drinking water supply, could damage the environment or pose a risk to human health. During hydraulic fracturing, fluids containing chemicals are injected deep underground, where their migration is not entirely predictable. Well failures, such as the use of insufficient well casing, could lead to their release at shallower depths, closer to drinking water supplies.[4] Although some fracturing fluids are removed from the well at the end of the fracturing process, a substantial amount remains underground.[5]

While most underground injections of chemicals are subject to the protections of the Safe Drinking Water Act (SDWA), Congress in 2005 modified the law to exclude "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production activities" from the Act's protections.[6] Unless oil and gas service companies use diesel in the hydraulic fracturing process, the permanent underground injection of chemicals used for hydraulic fracturing is not regulated by the Environmental Protection Agency (EPA).

Concerns also have been raised about the ultimate outcome of chemicals that are recovered and disposed of as wastewater. This wastewater is stored in tanks or pits at the well site, where spills are possible.[7] For final disposal, well operators must either recycle the fluids for use in future fracturing jobs, inject it into underground storage wells (which, unlike the fracturing process itself, are subject to the Safe Drinking Water Act), discharge it to nearby surface water, or transport it to wastewater treatment facilities.[8] A recent report in the *New York*

---

[3] U.S. Environmental Protection Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs* (June 2004) (EPA 816-R-04-003) at 4-1 and 4-2.

[4] For instance, Pennsylvania's Department of Environmental Protection has cited Cabot Oil & Gas Corporation for contamination of drinking water wells with seepage caused by weak casing or improper cementing of a natural gas well. *See Officials in Three States Pin Water Woes on Gas Drilling*, ProPublica (Apr. 26, 2009) (online at www.propublica.org/article/officials-in-three-states-pin-water-woes-on-gas-drilling-426) (accessed Mar. 24, 2011).

[5] John A. Veil, Argonne National Laboratory, *Water Management Technologies Used by Marcellus Shale Gas Producers*, prepared for the Department of Energy (July 2010), at 13 (hereinafter "*Water Management Technologies*").

[6] 42 U.S.C. § 300h(d). Many dubbed this provision the "Halliburton loophole" because of Halliburton's ties to then-Vice President Cheney and its role as one of the largest providers of hydraulic fracturing services. *See The Halliburton Loophole*, New York Times (Nov. 9, 2009).

[7] *See* EPA, *Draft Hydraulic Fracturing Study Plan* (Feb. 7, 2011), at 37; *Regulation Lax as Gas Wells' Tainted Water Hits Rivers*, New York Times (Feb. 26, 2011).

[8] *Water Management Technologies*, at 13.

3

*Times* raised questions about the safety of surface water discharge and the ability of water treatment facilities to process wastewater from natural gas drilling operations.[9]

Any risk to the environment and human health posed by fracturing fluids depends in large part on their contents. Federal law, however, contains no public disclosure requirements for oil and gas producers or service companies involved in hydraulic fracturing, and state disclosure requirements vary greatly.[10] While the industry has recently announced that it soon will create a public database of fluid components, reporting to this database is strictly voluntary, disclosure will not include the chemical identity of products labeled as proprietary, and there is no way to determine if companies are accurately reporting information for all wells.[11]

The absence of a minimum national baseline for disclosure of fluids injected during the hydraulic fracturing process and the exemption of most hydraulic fracturing injections from regulation under the Safe Drinking Water Act has left an informational void concerning the contents, chemical concentrations, and volumes of fluids that go into the ground during fracturing operations and return to the surface in the form of wastewater. As a result, regulators and the public are unable effectively to assess any impact the use of these fluids may have on the environment or public health.

## III.   METHODOLOGY

On February 18, 2010, the Committee commenced an investigation into the practice of hydraulic fracturing and its potential impact on water quality across the United States. This investigation built on work begun by Ranking Member Henry A. Waxman in 2007 as Chairman of the Committee on Oversight and Government Reform. The Committee initially sent letters to eight oil and gas service companies engaged in hydraulic fracturing in the United States. In May 2010, the Committee sent letters to six additional oil and gas service companies to assess a

---

[9] *Regulation Lax as Gas Wells' Tainted Water Hits Rivers*, New York Times (Feb. 26, 2011).

[10] Wyoming, for example, recently enacted relatively strong disclosure regulations, requiring disclosure on a well-by-well basis and "for each stage of the well stimulation program," "the chemical additives, compounds and concentrations or rates proposed to be mixed and injected." *See* WCWR 055-000-003 Sec. 45. Similar regulations became effective in Arkansas this year. *See* Arkansas Oil and Gas Commission Rule B-19. In Wyoming, much of this information is, after an initial period of review, available to the public. *See* WCWR 055-000-003 Sec. 21. Other states, however, do not insist on such robust disclosure. For instance, West Virginia has no disclosure requirements for hydraulic fracturing and expressly exempts fluids used during hydraulic fracturing from the disclosure requirements applicable to underground injection of fluids for purposes of waste storage. *See* W. Va. Code St. R. § 34-5-7.

[11] *See Ground Water Protection Council Calls for Disclosure of Chemicals Used in Shale Gas Exploration*, Ground Water Protection Council (Oct. 5, 2010) (online at www.wqpmag.com/Ground-Water-Protection-Council-Calls-for-Disclosure-of-Chemicals-in-Shale-Gas-Exploration-newsPiece21700) (accessed Mar. 24, 2011).

4

broader range of industry practices.[12]  The February and May letters requested information on the type and volume of chemicals present in the hydraulic fracturing products that each company used in their fluids between 2005 and 2009.

The 14 oil and gas service companies that received the letter voluntarily provided substantial information to the Committee.  As requested, the companies reported the names and volumes of the products they used during the five-year period.[13]  For each hydraulic fracturing product reported, the companies also provided a Material Safety Data Sheet (MSDS) detailing the product's chemical components.  The Occupational Safety and Health Administration (OSHA) requires chemical manufacturers to create a MSDS for every product they sell as a means to communicate potential health and safety hazards to employees and employers.  The MSDS must list all hazardous ingredients if they comprise at least 1% of the product; for carcinogens, the reporting threshold is 0.1%.[14]

Under OSHA regulations, manufacturers may withhold the identity of chemical components that constitute "trade secrets."[15]  If the MSDS for a particular product used by a company subject to the Committee's investigation reported that the identity of any chemical component was a trade secret, the Committee asked the company that used that product to provide the proprietary information, if available.

## IV.    HYDRAULIC FRACTURING FLUIDS AND THEIR CONTENTS

Between 2005 and 2009, the 14 oil and gas service companies used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components.[16]  Overall, these companies used 780 million gallons of hydraulic fracturing products in their fluids between 2005 and 2009.  This volume does not include water that the companies added to the fluids at the well site before injection.  The products are comprised of a wide range of chemicals.  Some are seemingly harmless like sodium chloride (salt), gelatin, and citric acid.  Others could pose a severe risk to human health or the environment.

---

[12] The Committee sent letters to Basic Energy Services, BJ Services, Calfrac Well Services, Complete Production Services, Frac Tech Services, Halliburton, Key Energy Services, RPC, Sanjel Corporation, Schlumberger, Superior Well Services, Trican Well Service, Universal Well Services, and Weatherford.

[13] BJ Services, Halliburton, and Schlumberger already had provided the Oversight Committee with data for 2005 through 2007.  For BJ Services, the 2005-2007 data is limited to natural gas wells.  For Schlumberger, the 2005-2007 data is limited to coalbed methane wells.

[14] 29 CFR 1910.1200(g)(2)(i)(C)(1).

[15] 29 CFR 1910.1200.

[16] Each hydraulic fracturing "product" is a mixture of chemicals or other components designed to achieve a certain performance goal, such as increasing the viscosity of water.  Some oil and gas service companies create their own products; most purchase these products from chemical vendors.  The service companies then mix these products together at the well site to formulate the hydraulic fracturing fluids that they pump underground.

Some of the components were surprising.  One company told the Committee that it used instant coffee as one of the components in a fluid designed to inhibit acid corrosion.  Two companies reported using walnut hulls as part of a breaker—a product used to degrade the fracturing fluid viscosity, which helps to enhance post-fracturing fluid recovery.  Another company reported using carbohydrates as a breaker.  One company used tallow soap—soap made from beef, sheep, or other animals—to reduce loss of fracturing fluid into the exposed rock.

Appendix A lists each of the 750 chemicals and other components used in the hydraulic fracturing products injected underground between 2005 and 2009.

## A.    Commonly Used Chemical Components

The most widely used chemical in hydraulic fracturing during this time period, as measured by the number of products containing the chemical, was methanol.  Methanol is a hazardous air pollutant and a candidate for regulation under the Safe Drinking Water Act.  It was a component in 342 hydraulic fracturing products.  Some of the other most widely used chemicals include isopropyl alcohol, which was used in 274 products, and ethylene glycol, which was used in 119 products.  Crystalline silica (silicon dioxide) appeared in 207 products, generally proppants used to hold open fractures.  Table 1 has a list of the most commonly used compounds in hydraulic fracturing fluids.

| Table 1.  Chemical Components Appearing Most Often in Hydraulic Fracturing Products Used Between 2005 and 2009 | |
| --- | --- |
| Chemical Component | No. of Products Containing Chemical |
| Methanol (Methyl alcohol) | 342 |
| Isopropanol (Isopropyl alcohol, Propan-2-ol) | 274 |
| Crystalline silica - quartz (SiO2) | 207 |
| Ethylene glycol monobutyl ether (2-butoxyethanol) | 126 |
| Ethylene glycol (1,2-ethanediol) | 119 |
| Hydrotreated light petroleum distillates | 89 |
| Sodium hydroxide (Caustic soda) | 80 |

Hydraulic fracturing companies used 2-butoxyethanol (2-BE) as a foaming agent or surfactant in 126 products. According to EPA scientists, 2-BE is easily absorbed and rapidly distributed in humans following inhalation, ingestion, or dermal exposure. Studies have shown that exposure to 2-BE can cause hemolysis (destruction of red blood cells) and damage to the spleen, liver, and bone marrow.[17] The hydraulic fracturing companies injected 21.9 million gallons of products containing 2-BE between 2005 and 2009. They used the highest volume of products containing 2-BE in Texas, which accounted for more than half of the volume used. EPA recently found this chemical in drinking water wells tested in Pavillion, Wyoming.[18] Table 2 shows the use of 2-BE by state.

| Table 2. States with the Highest Volume of Hydraulic Fracturing Fluids Containing 2-Butoxyethanol (2005-2009) | |
|---|---|
| **State** | **Fluid Volume** (gallons) |
| Texas | 12,031,734 |
| Oklahoma | 2,186,613 |
| New Mexico | 1,871,501 |
| Colorado | 1,147,614 |
| Louisiana | 890,068 |
| Pennsylvania | 747,416 |
| West Virginia | 464,231 |
| Utah | 382,874 |
| Montana | 362,497 |
| Arkansas | 348,959 |

[17] EPA, *Toxicological Review of Ethylene Glycol Monobutyl Ether* (Mar. 2010) at 4.

[18] EPA, *Fact Sheet: January 2010 Sampling Results and Site Update, Pavillion, Wyoming Groundwater Investigation* (Aug. 2010) (online at www.epa.gov/region8/superfund/wy/pavillion/PavillionWyomingFactSheet.pdf) (accessed Mar. 1, 2011).

### B.    Toxic Chemicals

The oil and gas service companies used hydraulic fracturing products containing 29 chemicals that are (1) known or possible human carcinogens, (2) regulated under the Safe Drinking Water Act for their risks to human health, or (3) listed as hazardous air pollutants under the Clean Air Act. These 29 chemicals were components of 652 different products used in hydraulic fracturing. Table 3 lists these toxic chemicals and their frequency of use.

| Table 3.  Chemicals Components of Concern:  Carcinogens, SDWA-Regulated Chemicals, and Hazardous Air Pollutants | | |
|---|---|---|
| Chemical Component | Chemical Category | No. of Products |
| Methanol (Methyl alcohol) | HAP | 342 |
| Ethylene glycol (1,2-ethanediol) | HAP | 119 |
| Diesel[19] | Carcinogen, SDWA, HAP | 51 |
| Naphthalene | Carcinogen, SDWA, HAP | 44 |
| Xylene | SDWA, HAP | 44 |
| Hydrogen chloride (Hydrochloric acid) | HAP | 42 |
| Toluene | SDWA, HAP | 29 |
| Ethylbenzene | SDWA, HAP | 28 |
| Diethanolamine (2,2-iminodiethanol) | HAP | 14 |
| Formaldehyde | Carcinogen, HAP | 12 |
| Sulfuric acid | Carcinogen | 9 |
| Thiourea | Carcinogen | 9 |
| Benzyl chloride | Carcinogen, HAP | 8 |
| Cumene | HAP | 6 |
| Nitrilotriacetic acid | Carcinogen | 6 |
| Dimethyl formamide | HAP | 5 |
| Phenol | HAP | 5 |
| Benzene | Carcinogen, SDWA, HAP | 3 |
| Di (2-ethylhexyl) phthalate | Carcinogen, SDWA, HAP | 3 |
| Acrylamide | Carcinogen, SDWA, HAP | 2 |
| Hydrogen fluoride (Hydrofluoric acid) | HAP | 2 |
| Phthalic anhydride | HAP | 2 |
| Acetaldehyde | Carcinogen, HAP | 1 |
| Acetophenone | HAP | 1 |
| Copper | SDWA | 1 |
| Ethylene oxide | Carcinogen, HAP | 1 |
| Lead | Carcinogen, SDWA, HAP | 1 |
| Propylene oxide | Carcinogen, HAP | 1 |
| p-Xylene | HAP | 1 |
| Number of Products Containing a Component of Concern | | 652 |

[19] According to EPA, diesel contains benzene, toluene, ethylbenzene, and xylenes. *See* EPA, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs* (June 2004) (EPA 816-R-04-003) at 4-11.

*1.*     *Carcinogens*

Between 2005 and 2009, the hydraulic fracturing companies used 95 products containing 13 different carcinogens.[20] These included naphthalene (a possible human carcinogen), benzene (a known human carcinogen), and acrylamide (a probable human carcinogen). Overall, these companies injected 10.2 million gallons of fracturing products containing at least one carcinogen. The companies used the highest volume of fluids containing one or more carcinogens in Texas, Colorado, and Oklahoma. Table 4 shows the use of these chemicals by state.

| Table 4.  States with at Least 100,000 Gallons of Hydraulic Fracturing Fluids Containing a Carcinogen (2005-2009) | |
| --- | --- |
| State | Fluid Volume (gallons) |
| Texas | 3,877,273 |
| Colorado | 1,544,388 |
| Oklahoma | 1,098,746 |
| Louisiana | 777,945 |
| Wyoming | 759,898 |
| North Dakota | 557,519 |
| New Mexico | 511,186 |
| Montana | 394,873 |
| Utah | 382,338 |

*2.*     *Safe Drinking Water Act Chemicals*

Under the Safe Drinking Water Act, EPA regulates 53 chemicals that may have an adverse effect on human health and are known to or likely to occur in public drinking water systems at levels of public health concern. Between 2005 and 2009, the hydraulic fracturing companies used 67 products containing at least one of eight SDWA-regulated chemicals. Overall, they injected 11.7 million gallons of fracturing products containing at least one chemical regulated under SDWA. Most of these chemicals were injected in Texas. Table 5 shows the use of these chemicals by state.

---

[20] For purposes of this report, a chemical is considered a "carcinogen" if it is on one of two lists:  (1) substances identified by the National Toxicology Program as "known to be human carcinogens" or as "reasonably anticipated to be human carcinogens"; and (2) substances identified by the International Agency for Research on Cancer, part of the World Health Organization, as "carcinogenic" or "probably carcinogenic" to humans.  See U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program. *Report on Carcinogens, Eleventh Edition* (Jan. 31, 2005) and World Health Organization, International Agency for Research on Cancer, *Agents Classified by the IARC Monographs* (online at http://monographs.iarc.fr/ENG/Classification/index.php) (accessed Feb. 28, 2011).

9

The vast majority of these SDWA-regulated chemicals were the BTEX compounds – benzene, toluene, xylene, and ethylbenzene. The BTEX compounds appeared in 60 hydraulic fracturing products used between 2005 and 2009 and were used in 11.4 million gallons of hydraulic fracturing fluids. The Department of Health and Human Services, the International Agency for Research on Cancer, and EPA have determined that benzene is a human carcinogen.[21] Chronic exposure to toluene, ethylbenzene, or xylenes also can damage the central nervous system, liver, and kidneys.[22]

| Table 5. States with at Least 100,000 Gallons of Hydraulic Fracturing Fluids Containing a SDWA-Regulated Chemical (2005-2009) | |
| --- | --- |
| **State** | **Fluid Volume (gallons)** |
| Texas | 9,474,631 |
| New Mexico | 1,157,721 |
| Colorado | 375,817 |
| Oklahoma | 202,562 |
| Mississippi | 108,809 |
| North Dakota | 100,479 |

In addition, the hydraulic fracturing companies injected more than 30 million gallons of diesel fuel or hydraulic fracturing fluids containing diesel fuel in wells in 19 states.[23] In a 2004 report, EPA stated that the "use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water.[24] Diesel fuel contains toxic constituents, including BTEX compounds.[25]

EPA also has created a Candidate Contaminant List (CCL), which is a list of contaminants that are currently not subject to national primary drinking water regulations but are known or anticipated to occur in public water systems and may require regulation under the Safe Drinking Water Act in the future.[26] Nine chemicals on that list—1-butanol, acetaldehyde, benzyl

---

[21] U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Benzene* (Aug. 2007).

[22] EPA, *Basic Information about Toluene in Drinking Water, Basic Information about Ethylbenzene in Drinking Water,* and *Basic Information about Xylenes in Drinking Water* (online at http://water.epa.gov/drink/contaminants/basicinformation/index.cfm) (accessed Oct. 14, 2010).

[23] Letter from Reps. Henry A. Waxman, Edward J. Markey, and Diana DeGette to the Honorable Lisa Jackson, Administrator, U.S. Environmental Protection Agency (Jan. 31, 2011).

[24] EPA, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs* (June 2004) (EPA 816-R-04-003) at 4-11.

[25] *Id.*

[26] EPA, *Contaminant Candidate List 3* (online at http://water.epa.gov/scitech/drinkingwater/dws/ccl/ccl3.cfm) (accessed Mar. 31, 2011).

chloride, ethylene glycol, ethylene oxide, formaldehyde, methanol, n-methyl-2-pyrrolidone, and propylene oxide— were used in hydraulic fracturing products between 2005 and 2009.

### 3.   Hazardous Air Pollutants

The Clean Air Act requires EPA to control the emission of 187 hazardous air pollutants, which are pollutants that cause or may cause cancer or other serious health effects, such as reproductive effects or birth defects, or adverse environmental and ecological effects.[27]  Between 2005 and 2009, the hydraulic fracturing companies used 595 products containing 24 different hazardous air pollutants.

Hydrogen fluoride is a hazardous air pollutant that is a highly corrosive and systemic poison that causes severe and sometimes delayed health effects due to deep tissue penetration. Absorption of substantial amounts of hydrogen fluoride by any route may be fatal.[28]  One of the hydraulic fracturing companies used 67,222 gallons of two products containing hydrogen fluoride in 2008 and 2009.

Lead is a hazardous air pollutant that is a heavy metal that is particularly harmful to children's neurological development.  It also can cause health problems in adults, including reproductive problems, high blood pressure, and nerve disorders.[29]  One of the hydraulic fracturing companies used 780 gallons of a product containing lead in this five-year period.

Methanol is the hazardous air pollutant that appeared most often in hydraulic fracturing products.  Other hazardous air pollutants used in hydraulic fracturing fluids included formaldehyde, hydrogen chloride, and ethylene glycol.

## V.   USE OF PROPRIETARY AND "TRADE SECRET" CHEMICALS

Many chemical components of hydraulic fracturing fluids used by the companies were listed on the MSDSs as "proprietary" or "trade secret."  The hydraulic fracturing companies used 93.6 million gallons of 279 products containing at least one proprietary component between 2005 and 2009.[30]

---

[27] Clean Air Act Section 112(b), 42 U.S.C. § 7412.

[28] HHS, Agency for Toxic Substances and Disease Registry, *Medical Management Guidelines for Hydrogen Fluoride* (online at www.atsdr.cdc.gov/mhmi/mmg11.pdf) (accessed Mar. 24, 2011).

[29] EPA, *Basic Information about Lead* (online at www.epa.gov/lead/pubs/leadinfo.htm) (accessed Mar. 30, 2011).

[30] This is likely a conservative estimate.  We included only those products for which the MSDS says "proprietary" or "trade secret" instead of listing a component by name or providing the CAS number.  If the MSDS listed a component's CAS as N.A. or left it blank, we did not count that as a trade secret claim, unless the company specified as such in follow-up correspondence.

11

The Committee requested that these companies disclose this proprietary information. Although a few companies were able to provide additional information to the Committee about some of the fracturing products, in most cases the companies stated that they did not have access to proprietary information about products they purchased "off the shelf" from chemical suppliers. The proprietary information belongs to the suppliers, not the users of the chemicals.

Universal Well Services, for example, told the Committee that it "obtains hydraulic fracturing products from third-party manufacturers, and to the extent not publicly disclosed, product composition is proprietary to the respective vendor and not to the Company."[31] Complete Production Services noted that the company always uses fluids from third-party suppliers who provide an MSDS for each product. Complete confirmed that it is "not aware of any circumstances in which the vendors who provided the products have disclosed this proprietary information" to the company, further noting that "such information is highly proprietary for these vendors, and would not generally be disclosed to service providers" like Complete.[32] Key Energy Services similarly stated that it "generally does not have access to the trade secret information as a purchaser of the chemical(s)."[33] Trican also told the Committee that it has limited knowledge of "off the shelf" products purchased from a chemical distributor or manufacturer, noting that "Trican does not have any information in its possession about the components of such products beyond what the distributor of each product provided Trican in the MSDS sheet."[34]

In these cases, it appears that the companies are injecting fluids containing unknown chemicals about which they may have limited understanding of the potential risks posed to human health and the environment.

## VI.   CONCLUSION

Hydraulic fracturing has opened access to vast domestic reserves of natural gas that could provide an important stepping stone to a clean energy future. Yet questions about the safety of hydraulic fracturing persist, which are compounded by the secrecy surrounding the chemicals used in hydraulic fracturing fluids. This analysis is the most comprehensive national assessment to date of the types and volumes of chemical used in the hydraulic fracturing process. It shows that between 2005 and 2009, the 14 leading hydraulic fracturing companies in the United States used over 2,500 hydraulic fracturing products containing 750 compounds. More than 650 of these products contained chemicals that are known or possible human carcinogens, regulated under the Safe Drinking Water Act, or listed as hazardous air pollutants.

---

[31] Letter from Reginald J. Brown to Henry A. Waxman, Chairman, Committee on Energy and Commerce, and Edward J. Markey, Chairman, Subcommittee on Energy and Environment (Apr. 16, 2010).

[32] Letter from Philip Perry to Henry A. Waxman, Chairman, Committee Energy and Commerce, and Edward J. Markey, Chairman, Subcommittee on Energy and Environment (Aug. 6, 2010).

[33] E-mail from Peter Spivack to Committee Staff (Aug. 5, 2010).

[34] E-mail from Lee Blalack to Committee Staff (July 29, 2010).

**Appendix A.  Chemical Components of Hydraulic Fracturing Products, 2005-2009[35]**

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| 1-(1-naphthylmethyl)quinolinium chloride | 65322-65-8 | 1 |
| 1,2,3-propanetricarboxylic acid, 2-hydroxy-, trisodium salt, dihydrate | 6132-04-3 | 1 |
| 1,2,3-trimethylbenzene | 526-73-8 | 1 |
| 1,2,4-trimethylbenzene | 95-63-6 | 21 |
| 1,2-benzisothiazol-3 | 2634-33-5 | 1 |
| 1,2-dibromo-2,4-dicyanobutane | 35691-65-7 | 1 |
| 1,2-ethanediaminium, N, N'-bis[2-[bis(2-hydroxyethyl)methylammonio]ethyl]-N,N'-bis(2-hydroxyethyl)-N,N'-dimethyl-,tetrachloride | 138879-94-4 | 2 |
| 1,3,5-trimethylbenzene | 108-67-8 | 3 |
| 1,6-hexanediamine dihydrochloride | 6055-52-3 | 1 |
| 1,8-diamino-3,6-dioxaoctane | 929-59-9 | 1 |
| 1-hexanol | 111-27-3 | 1 |
| 1-methoxy-2-propanol | 107-98-2 | 3 |
| 2,2'-azobis (2-amidopropane) dihydrochloride | 2997-92-4 | 1 |
| 2,2-dibromo-3-nitrilopropionamide | 10222-01-2 | 27 |
| 2-acrylamido-2-methylpropanesulphonic acid sodium salt polymer | * | 1 |
| 2-bromo-2-nitropropane-1,3-diol | 52-51-7 | 4 |
| 2-butanone oxime | 96-29-7 | 1 |
| 2-hydroxypropionic acid | 79-33-4 | 2 |
| 2-mercaptoethanol (Thioglycol) | 60-24-2 | 13 |
| 2-methyl-4-isothiazolin-3-one | 2682-20-4 | 4 |
| 2-monobromo-3-nitrilopropionamide | 1113-55-9 | 1 |
| 2-phosphonobutane-1,2,4-tricarboxylic acid | 37971-36-1 | 2 |
| 2-phosphonobutane-1,2,4-tricarboxylic acid, potassium salt | 93858-78-7 | 1 |
| 2-substituted aromatic amine salt | * | 1 |
| 4,4'-diaminodiphenyl sulfone | 80-08-0 | 3 |
| 5-chloro-2-methyl-4-isothiazolin-3-one | 26172-55-4 | 5 |
| Acetaldehyde | 75-07-0 | 1 |
| Acetic acid | 64-19-7 | 56 |
| Acetic anhydride | 108-24-7 | 7 |
| Acetone | 67-64-1 | 3 |
| Acetophenone | 98-86-2 | 1 |
| Acetylenic alcohol | * | 1 |
| Acetyltriethyl citrate | 77-89-4 | 1 |
| Acrylamide | 79-06-1 | 2 |
| Acrylamide copolymer | * | 1 |
| Acrylamide copolymer | 38193-60-1 | 1 |

---

[35] To compile this list of chemicals, Committee staff reviewed each Material Safety Data Sheet provided to the Committee for hydraulic fracturing products used between 2005 and 2009. Committee staff transcribed the names and CAS numbers as written in the MSDSs; as such, any inaccuracies on this list reflect inaccuracies on the MSDSs themselves.

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Acrylate copolymer | * | 1 |
| Acrylic acid, 2-hydroxyethyl ester | 818-61-1 | 1 |
| Acrylic acid/2-acrylamido-methylpropylsulfonic acid copolymer | 37350-42-8 | 1 |
| Acrylic copolymer | 403730-32-5 | 1 |
| Acrylic polymers | * | 1 |
| Acrylic polymers | 26006-22-4 | 2 |
| Acyclic hydrocarbon blend | * | 1 |
| Adipic acid | 124-04-9 | 6 |
| Alcohol alkoxylate | * | 5 |
| Alcohol ethoxylates | * | 2 |
| Alcohols | * | 9 |
| Alcohols, C11-15-secondary, ethoxylated | 68131-40-8 | 1 |
| Alcohols, C12-14-secondary | 126950-60-5 | 4 |
| Alcohols, C12-14-secondary, ethoxylated | 84133-50-6 | 19 |
| Alcohols, C12-15, ethoxylated | 68131-39-5 | 2 |
| Alcohols, C12-16, ethoxylated | 103331-86-8 | 1 |
| Alcohols, C12-16, ethoxylated | 68551-12-2 | 3 |
| Alcohols, C14-15, ethoxylated | 68951-67-7 | 5 |
| Alcohols, C9-11-iso-, C10-rich, ethoxylated | 78330-20-8 | 4 |
| Alcohols, C9-C22 | * | 1 |
| Aldehyde | * | 4 |
| Aldol | 107-89-1 | 1 |
| Alfa-Alumina | * | 5 |
| Aliphatic acid | * | 1 |
| Aliphatic alcohol polyglycol ether | 68015-67-8 | 1 |
| Aliphatic amine derivative | 120086-58-0 | 2 |
| Alkaline bromide salts | * | 2 |
| Alkanes, C10-14 | 93924-07-3 | 2 |
| Alkanes, C13-16-iso | 68551-20-2 | 2 |
| Alkanolamine | 150-25-4 | 3 |
| Alkanolamine chelate of zirconium alkoxide (Zirconium complex) | 197980-53-3 | 4 |
| Alkanolamine/aldehyde condensate | * | 1 |
| Alkenes | * | 1 |
| Alkenes, C>10 alpha- | 64743-02-8 | 3 |
| Alkenes, C>8 | 68411-00-7 | 2 |
| Alkoxylated alcohols | * | 1 |
| Alkoxylated amines | * | 6 |
| Alkoxylated phenol formaldehyde resin | 63428-92-2 | 1 |
| Alkyaryl sulfonate | * | 1 |
| Alkyl (C12-16) dimethyl benzyl ammonium chloride | 68424-85-1 | 7 |
| Alkyl (C6-C12) alcohol, ethoxylated | 68439-45-2 | 2 |
| Alkyl (C9-11) alcohol, ethoxylated | 68439-46-3 | 1 |
| Alkyl alkoxylate | * | 9 |
| Alkyl amine | * | 2 |

14

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Alkyl amine blend in a metal salt solution | * | 1 |
| Alkyl aryl amine sulfonate | 255043-08-04 | 1 |
| Alkyl benzenesulfonic acid | 68584-22-5 | 2 |
| Alkyl esters | * | 2 |
| Alkyl hexanol | * | 1 |
| Alkyl ortho phosphate ester | * | 1 |
| Alkyl phosphate ester | * | 3 |
| Alkyl quaternary ammonium chlorides | * | 4 |
| Alkylaryl sulfonate | * | 1 |
| Alkylaryl sulphonic acid | 27176-93-9 | 1 |
| Alkylated quaternary chloride | * | 5 |
| Alkylbenzenesulfonic acid | * | 1 |
| Alkylethoammonium sulfates | * | 1 |
| Alkylphenol ethoxylates | * | 1 |
| Almandite and pyrope garnet | 1302-62-1 | 1 |
| Aluminium isopropoxide | 555-31-7 | 1 |
| Aluminum | 7429-90-5 | 2 |
| Aluminum chloride | * | 3 |
| Aluminum chloride | 1327-41-9 | 2 |
| Aluminum oxide (alpha-Alumina) | 1344-28-1 | 24 |
| Aluminum oxide silicate | 12068-56-3 | 1 |
| Aluminum silicate (mullite) | 1302-76-7 | 38 |
| Aluminum sulfate hydrate | 10043-01-3 | 1 |
| Amides, tallow, n-[3-(dimethylamino)propyl],n-oxides | 68647-77-8 | 4 |
| Amidoamine | * | 1 |
| Amine | * | 7 |
| Amine bisulfite | 13427-63-9 | 1 |
| Amine oxides | * | 1 |
| Amine phosphonate | * | 3 |
| Amine salt | * | 2 |
| Amines, C14-18; C16-18-unsaturated, alkyl, ethoxylated | 68155-39-5 | 1 |
| Amines, coco alkyl, acetate | 61790-57-6 | 3 |
| Amines, polyethylenepoly-, ethoxylated, phosphonomethylated | 68966-36-9 | 1 |
| Amines, tallow alkyl, ethoxylated | 61791-26-2 | 2 |
| Amino compounds | * | 1 |
| Amino methylene phosphonic acid salt | * | 1 |
| Amino trimethylene phosphonic acid | 6419-19-8 | 2 |
| Ammonia | 7664-41-7 | 7 |
| Ammonium acetate | 631-61-8 | 4 |
| Ammonium alcohol ether sulfate | 68037-05-8 | 1 |
| Ammonium bicarbonate | 1066-33-7 | 1 |
| Ammonium bifluoride (Ammonium hydrogen difluoride) | 1341-49-7 | 10 |
| Ammonium bisulfate | 7783-20-2 | 3 |
| Ammonium bisulfite | 10192-30-0 | 15 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Ammonium C6-C10 alcohol ethoxysulfate | 68187-17-7 | 4 |
| Ammonium C8-C10 alkyl ether sulfate | 68891-29-2 | 4 |
| Ammonium chloride | 12125-02-9 | 29 |
| Ammonium fluoride | 12125-01-8 | 9 |
| Ammonium hydroxide | 1336-21-6 | 4 |
| Ammonium nitrate | 6484-52-2 | 2 |
| Ammonium persulfate (Diammonium peroxidisulfate) | 7727-54-0 | 37 |
| Ammonium salt | * | 1 |
| Ammonium salt of ethoxylated alcohol sulfate | * | 1 |
| Amorphous silica | 99439-28-8 | 1 |
| Amphoteric alkyl amine | 61789-39-7 | 1 |
| Anionic copolymer | * | 3 |
| Anionic polyacrylamide | * | 1 |
| Anionic polyacrylamide | 25085-02-3 | 6 |
| Anionic polyacrylamide copolymer | * | 3 |
| Anionic polymer | * | 2 |
| Anionic polymer in solution | * | 1 |
| Anionic polymer, sodium salt | 9003-04-7 | 1 |
| Anionic water-soluble polymer | * | 2 |
| Antifoulant | * | 1 |
| Antimonate salt | * | 1 |
| Antimony pentoxide | 1314-60-9 | 2 |
| Antimony potassium oxide | 29638-69-5 | 4 |
| Antimony trichloride | 10025-91-9 | 2 |
| a-organic surfactants | 61790-29-8 | 1 |
| Aromatic alcohol glycol ether | * | 2 |
| Aromatic aldehyde | * | 2 |
| Aromatic ketones | 224635-63-6 | 2 |
| Aromatic polyglycol ether | * | 1 |
| Barium sulfate | 7727-43-7 | 3 |
| Bauxite | 1318-16-7 | 16 |
| Bentonite | 1302-78-9 | 2 |
| Benzene | 71-43-2 | 3 |
| Benzene, C10-16, alkyl derivatives | 68648-87-3 | 1 |
| Benzenecarboperoxoic acid, 1,1-dimethylethyl ester | 614-45-9 | 1 |
| Benzenemethanaminium | 3844-45-9 | 1 |
| Benzenesulfonic acid, C10-16-alkyl derivs., potassium salts | 68584-27-0 | 1 |
| Benzoic acid | 65-85-0 | 11 |
| Benzyl chloride | 100-44-7 | 8 |
| Biocide component | * | 3 |
| Bis(1-methylethyl)naphthalenesulfonic acid, cyclohexylamine salt | 68425-61-6 | 1 |
| Bishexamethylenetriamine penta methylene phosphonic acid | 35657-77-3 | 1 |
| Bisphenol A/Epichlorohydrin resin | 25068-38-6 | 5 |
| Bisphenol A/Novolac epoxy resin | 28906-96-9 | 1 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Borate | 12280-03-4 | 2 |
| Borate salts | * | 5 |
| Boric acid | 10043-35-3 | 18 |
| Boric acid, potassium salt | 20786-60-1 | 1 |
| Boric acid, sodium salt | 1333-73-9 | 2 |
| Boric oxide | 1303-86-2 | 1 |
| b-tricalcium phosphate | 7758-87-4 | 1 |
| Butanedioic acid | 2373-38-8 | 4 |
| Butanol | 71-36-3 | 3 |
| Butyl glycidyl ether | 2426-08-6 | 5 |
| Butyl lactate | 138-22-7 | 4 |
| C10-C16 ethoxylated alcohol | 68002-97-1 | 4 |
| C-11 to C-14 n-alkanes, mixed | * | 1 |
| C12-C14 alcohol, ethoxylated | 68439-50-9 | 3 |
| Calcium carbonate | 471-34-1 | 1 |
| Calcium carbonate (Limestone) | 1317-65-3 | 9 |
| Calcium chloride | 10043-52-4 | 17 |
| Calcium chloride, dihydrate | 10035-04-8 | 1 |
| Calcium fluoride | 7789-75-5 | 2 |
| Calcium hydroxide | 1305-62-0 | 9 |
| Calcium hypochlorite | 7778-54-3 | 1 |
| Calcium oxide | 1305-78-8 | 6 |
| Calcium peroxide | 1305-79-9 | 5 |
| Carbohydrates | * | 3 |
| Carbon dioxide | 124-38-9 | 4 |
| Carboxymethyl guar gum, sodium salt | 39346-76-4 | 7 |
| Carboxymethyl hydroxypropyl guar | 68130-15-4 | 11 |
| Cellophane | 9005-81-6 | 2 |
| Cellulase | 9012-54-8 | 7 |
| Cellulase enzyme | * | 1 |
| Cellulose | 9004-34-6 | 1 |
| Cellulose derivative | * | 2 |
| Chloromethylnaphthalene quinoline quaternary amine | 15619-48-4 | 3 |
| Chlorous ion solution | * | 2 |
| Choline chloride | 67-48-1 | 3 |
| Chromates | * | 1 |
| Chromium (iii) acetate | 1066-30-4 | 1 |
| Cinnamaldehyde (3-phenyl-2-propenal) | 104-55-2 | 5 |
| Citric acid (2-hydroxy-1,2,3 propanetricarboxylic acid) | 77-92-9 | 29 |
| Citrus terpenes | 94266-47-4 | 11 |
| Coal, granular | 50815-10-6 | 1 |
| Cobalt acetate | 71-48-7 | 1 |
| Cocaidopropyl betaine | 61789-40-0 | 2 |
| Cocamidopropylamine oxide | 68155-09-9 | 1 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Coco bis-(2-hydroxyethyl) amine oxide | 61791-47-7 | 1 |
| Cocoamidopropyl betaine | 70851-07-9 | 1 |
| Cocomidopropyl dimethylamine | 68140-01-2 | 1 |
| Coconut fatty acid diethanolamide | 68603-42-9 | 1 |
| Collagen (Gelatin) | 9000-70-8 | 6 |
| Complex alkylaryl polyo-ester | * | 1 |
| Complex aluminum salt | * | 2 |
| Complex organometallic salt | * | 2 |
| Complex substituted keto-amine | 143106-84-7 | 1 |
| Complex substituted keto-amine hydrochloride | * | 1 |
| Copolymer of acrylamide and sodium acrylate | 25987-30-8 | 1 |
| Copper | 7440-50-8 | 1 |
| Copper iodide | 7681-65-4 | 1 |
| Copper sulfate | 7758-98-7 | 3 |
| Corundum (Aluminum oxide) | 1302-74-5 | 48 |
| Crotonaldehyde | 123-73-9 | 1 |
| Crystalline silica - cristobalite | 14464-46-1 | 44 |
| Crystalline silica - quartz (SiO2) | 14808-60-7 | 207 |
| Crystalline silica, tridymite | 15468-32-3 | 2 |
| Cumene | 98-82-8 | 6 |
| Cupric chloride | 7447-39-4 | 10 |
| Cupric chloride dihydrate | 10125-13-0 | 7 |
| Cuprous chloride | 7758-89-6 | 1 |
| Cured acrylic resin | * | 7 |
| Cured resin | * | 4 |
| Cured silicone rubber-polydimethylsiloxane | 63148-62-9 | 1 |
| Cured urethane resin | * | 3 |
| Cyclic alkanes | * | 1 |
| Cyclohexane | 110-82-7 | 1 |
| Cyclohexanone | 108-94-1 | 1 |
| Decanol | 112-30-1 | 2 |
| Decyl-dimethyl amine oxide | 2605-79-0 | 4 |
| Dextrose monohydrate | 50-99-7 | 1 |
| D-Glucitol | 50-70-4 | 1 |
| Di (2-ethylhexyl) phthalate | 117-81-7 | 3 |
| Di (ethylene glycol) ethyl ether acetate | 112-15-2 | 4 |
| Diatomaceous earth | 61790-53-2 | 3 |
| Diatomaceous earth, calcined | 91053-39-3 | 7 |
| Dibromoacetonitrile | 3252-43-5 | 1 |
| Dibutylaminoethanol (2-dibutylaminoethanol) | 102-81-8 | 4 |
| Di-calcium silicate | 10034-77-2 | 1 |
| Dicarboxylic acid | * | 1 |
| Didecyl dimethyl ammonium chloride | 7173-51-5 | 1 |
| Diesel | * | 1 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Diesel | 68334-30-5 | 3 |
| Diesel | 68476-30-2 | 4 |
| Diesel | 68476-34-6 | 43 |
| Diethanolamine (2,2-iminodiethanol) | 111-42-2 | 14 |
| Diethylbenzene | 25340-17-4 | 1 |
| Diethylene glycol | 111-46-6 | 8 |
| Diethylene glycol monomethyl ether | 111-77-3 | 4 |
| Diethylene triaminepenta (methylene phosphonic acid) | 15827-60-8 | 1 |
| Diethylenetriamine | 111-40-0 | 2 |
| Diethylenetriamine, tall oil fatty acids reaction product | 61790-69-0 | 1 |
| Diisopropylnaphthalenesulfonic acid | 28757-00-8 | 2 |
| Dimethyl formamide | 68-12-2 | 5 |
| Dimethyl glutarate | 1119-40-0 | 1 |
| Dimethyl silicone | * | 2 |
| Dioctyl sodium sulfosuccinate | 577-11-7 | 1 |
| Dipropylene glycol | 25265-71-8 | 1 |
| Dipropylene glycol monomethyl ether (2-methoxymethylethoxy propanol) | 34590-94-8 | 12 |
| Di-secondary-butylphenol | 53964-94-6 | 3 |
| Disodium EDTA | 139-33-3 | 1 |
| Disodium ethylenediaminediacetate | 38011-25-5 | 1 |
| Disodium ethylenediaminetetraacetate dihydrate | 6381-92-6 | 1 |
| Disodium octaborate tetrahydrate | 12008-41-2 | 1 |
| Dispersing agent | * | 1 |
| d-Limonene | 5989-27-5 | 11 |
| Dodecyl alcohol ammonium sulfate | 32612-48-9 | 2 |
| Dodecylbenzene sulfonic acid | 27176-87-0 | 14 |
| Dodecylbenzene sulfonic acid salts | 42615-29-2 | 2 |
| Dodecylbenzene sulfonic acid salts | 68648-81-7 | 7 |
| Dodecylbenzene sulfonic acid salts | 90218-35-2 | 1 |
| Dodecylbenzenesulfonate isopropanolamine | 42504-46-1 | 1 |
| Dodecylbenzenesulfonic acid, monoethanolamine salt | 26836-07-7 | 1 |
| Dodecylbenzenesulphonic acid, morpholine salt | 12068-08-5 | 1 |
| EDTA/Copper chelate | * | 2 |
| EO-C7-9-iso-, C8-rich alcohols | 78330-19-5 | 5 |
| Epichlorohydrin | 25085-99-8 | 5 |
| Epoxy resin | * | 5 |
| Erucic amidopropyl dimethyl betaine | 149879-98-1 | 3 |
| Erythorbic acid | 89-65-6 | 2 |
| Essential oils | * | 6 |
| Ethanaminium, n,n,n-trimethyl-2-[(1-oxo-2-propenyl)oxy]-,chloride, polymer with 2-propenamide | 69418-26-4 | 4 |
| Ethanol (Ethyl alcohol) | 64-17-5 | 36 |
| Ethanol, 2-(hydroxymethylamino)- | 34375-28-5 | 1 |
| Ethanol, 2, 2'-(Octadecylamino) bis- | 10213-78-2 | 1 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Ethanoldiglycine disodium salt | 135-37-5 | 1 |
| Ether salt | 25446-78-0 | 2 |
| Ethoxylated 4-nonylphenol (Nonyl phenol ethoxylate) | 26027-38-3 | 9 |
| Ethoxylated alcohol | 104780-82-7 | 1 |
| Ethoxylated alcohol | 78330-21-9 | 2 |
| Ethoxylated alcohols | * | 3 |
| Ethoxylated alkyl amines | * | 1 |
| Ethoxylated amine | * | 1 |
| Ethoxylated amines | 61791-44-4 | 1 |
| Ethoxylated fatty acid ester | * | 1 |
| Ethoxylated nonionic surfactant | * | 1 |
| Ethoxylated nonyl phenol | * | 8 |
| Ethoxylated nonyl phenol | 68412-54-4 | 10 |
| Ethoxylated nonyl phenol | 9016-45-9 | 38 |
| Ethoxylated octyl phenol | 68987-90-6 | 1 |
| Ethoxylated octyl phenol | 9002-93-1 | 1 |
| Ethoxylated octyl phenol | 9036-19-5 | 3 |
| Ethoxylated oleyl amine | 13127-82-7 | 2 |
| Ethoxylated oleyl amine | 26635-93-8 | 1 |
| Ethoxylated sorbitol esters | * | 1 |
| Ethoxylated tridecyl alcohol phosphate | 9046-01-9 | 2 |
| Ethoxylated undecyl alcohol | 127036-24-2 | 2 |
| Ethyl acetate | 141-78-6 | 4 |
| Ethyl acetoacetate | 141-97-9 | 1 |
| Ethyl octynol (1-octyn-3-ol,4-ethyl-) | 5877-42-9 | 5 |
| Ethylbenzene | 100-41-4 | 28 |
| Ethylene glycol (1,2-ethanediol) | 107-21-1 | 119 |
| Ethylene glycol monobutyl ether (2-butoxyethanol) | 111-76-2 | 126 |
| Ethylene oxide | 75-21-8 | 1 |
| Ethylene oxide-nonylphenol polymer | * | 1 |
| Ethylenediaminetetraacetic acid | 60-00-4 | 1 |
| Ethylene-vinyl acetate copolymer | 24937-78-8 | 1 |
| Ethylhexanol (2-ethylhexanol) | 104-76-7 | 18 |
| Fatty acid ester | * | 1 |
| Fatty acid, tall oil, hexa esters with sorbitol, ethoxylated | 61790-90-7 | 1 |
| Fatty acids | * | 1 |
| Fatty alcohol alkoxylate | * | 1 |
| Fatty alkyl amine salt | * | 1 |
| Fatty amine carboxylates | * | 1 |
| Fatty quaternary ammonium chloride | 61789-68-2 | 1 |
| Ferric chloride | 7705-08-0 | 3 |
| Ferric sulfate | 10028-22-5 | 7 |
| Ferrous sulfate, heptahydrate | 7782-63-0 | 4 |
| Fluoroaliphatic polymeric esters | * | 1 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Formaldehyde | 50-00-0 | 12 |
| Formaldehyde polymer | * | 2 |
| Formaldehyde, polymer with 4-(1,1-dimethyl)phenol, methyloxirane and oxirane | 30704-64-4 | 3 |
| Formaldehyde, polymer with 4-nonylphenol and oxirane | 30846-35-6 | 1 |
| Formaldehyde, polymer with ammonia and phenol | 35297-54-2 | 2 |
| Formamide | 75-12-7 | 5 |
| Formic acid | 64-18-6 | 24 |
| Fumaric acid | 110-17-8 | 8 |
| Furfural | 98-01-1 | 1 |
| Furfuryl alcohol | 98-00-0 | 3 |
| Glass fiber | 65997-17-3 | 3 |
| Gluconic acid | 526-95-4 | 1 |
| Glutaraldehyde | 111-30-8 | 20 |
| Glycerol (1,2,3-Propanetriol, Glycerine) | 56-81-5 | 16 |
| Glycol ethers | * | 9 |
| Glycol ethers | 9004-77-7 | 4 |
| Glyoxal | 107-22-2 | 3 |
| Glyoxylic acid | 298-12-4 | 1 |
| Guar gum | 9000-30-0 | 41 |
| Guar gum derivative | * | 12 |
| Haloalkyl heteropolycycle salt | * | 6 |
| Heavy aromatic distillate | 68132-00-3 | 1 |
| Heavy aromatic petroleum naphtha | 64742-94-5 | 45 |
| Heavy catalytic reformed petroleum naphtha | 64741-68-0 | 10 |
| Hematite | * | 5 |
| Hemicellulase | 9025-56-3 | 2 |
| Hexahydro-1,3,5-tris(2-hydroxyethyl)-s-triazine (Triazine) | 4719-04-4 | 4 |
| Hexamethylenetetramine | 100-97-0 | 37 |
| Hexanediamine | 124-09-4 | 1 |
| Hexanes | * | 1 |
| Hexylene glycol | 107-41-5 | 5 |
| Hydrated aluminum silicate | 1332-58-7 | 4 |
| Hydrocarbon mixtures | 8002-05-9 | 1 |
| Hydrocarbons | * | 3 |
| Hydrodesulfurized kerosine (petroleum) | 64742-81-0 | 3 |
| Hydrodesulfurized light catalytic cracked distillate (petroleum) | 68333-25-5 | 1 |
| Hydrodesulfurized middle distillate (petroleum) | 64742-80-9 | 1 |
| Hydrogen chloride (Hydrochloric acid) | 7647-01-0 | 42 |
| Hydrogen fluoride (Hydrofluoric acid) | 7664-39-3 | 2 |
| Hydrogen peroxide | 7722-84-1 | 4 |
| Hydrogen sulfide | 7783-06-4 | 1 |
| Hydrotreated and hydrocracked base oil | * | 2 |
| Hydrotreated heavy naphthenic distillate | 64742-52-5 | 3 |
| Hydrotreated heavy paraffinic petroleum distillates | 64742-54-7 | 1 |

21

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Hydrotreated heavy petroleum naphtha | 64742-48-9 | 7 |
| Hydrotreated light petroleum distillates | 64742-47-8 | 89 |
| Hydrotreated middle petroleum distillates | 64742-46-7 | 3 |
| Hydroxyacetic acid (Glycolic acid) | 79-14-1 | 6 |
| Hydroxyethylcellulose | 9004-62-0 | 1 |
| Hydroxyethylethylenediaminetriacetic acid, trisodium salt | 139-89-9 | 1 |
| Hydroxylamine hydrochloride | 5470-11-1 | 1 |
| Hydroxypropyl guar gum | 39421-75-5 | 2 |
| Hydroxysultaine | * | 1 |
| Inner salt of alkyl amines | * | 2 |
| Inorganic borate | * | 3 |
| Inorganic particulate | * | 1 |
| Inorganic salt | * | 1 |
| Inorganic salt | 533-96-0 | 1 |
| Inorganic salt | 7446-70-0 | 1 |
| Instant coffee purchased off the shelf | * | 1 |
| Inulin, carboxymethyl ether, sodium salt | 430439-54-6 | 1 |
| Iron oxide | 1332-37-2 | 2 |
| Iron oxide (Ferric oxide) | 1309-37-1 | 18 |
| Iso amyl alcohol | 123-51-3 | 1 |
| Iso-alkanes/n-alkanes | * | 10 |
| Isobutanol (Isobutyl alcohol) | 78-83-1 | 4 |
| Isomeric aromatic ammonium salt | * | 1 |
| Isooctanol | 26952-21-6 | 1 |
| Isooctyl alcohol | 68526-88-0 | 1 |
| Isooctyl alcohol bottoms | 68526-88-5 | 1 |
| Isopropanol (Isopropyl alcohol, Propan-2-ol) | 67-63-0 | 274 |
| Isopropylamine | 75-31-0 | 1 |
| Isotridecanol, ethoxylated | 9043-30-5 | 1 |
| Kerosene | 8008-20-6 | 13 |
| Lactic acid | 10326-41-7 | 1 |
| Lactic acid | 50-21-5 | 1 |
| L-Dilactide | 4511-42-6 | 1 |
| Lead | 7439-92-1 | 1 |
| Light aromatic solvent naphtha | 64742-95-6 | 11 |
| Light catalytic cracked petroleum distillates | 64741-59-9 | 1 |
| Light naphtha distillate, hydrotreated | 64742-53-6 | 1 |
| Low toxicity base oils | * | 1 |
| Maghemite | * | 2 |
| Magnesium carbonate | 546-93-0 | 1 |
| Magnesium chloride | 7786-30-3 | 4 |
| Magnesium hydroxide | 1309-42-8 | 4 |
| Magnesium iron silicate | 1317-71-1 | 3 |
| Magnesium nitrate | 10377-60-3 | 5 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Magnesium oxide | 1309-48-4 | 18 |
| Magnesium peroxide | 1335-26-8 | 2 |
| Magnesium peroxide | 14452-57-4 | 4 |
| Magnesium phosphide | 12057-74-8 | 1 |
| Magnesium silicate | 1343-88-0 | 3 |
| Magnesium silicate hydrate (talc) | 14807-96-6 | 2 |
| Magnetite | * | 3 |
| Medium aliphatic solvent petroleum naphtha | 64742-88-7 | 10 |
| Metal salt | * | 2 |
| Metal salt solution | * | 1 |
| Methanol (Methyl alcohol) | 67-56-1 | 342 |
| Methyl isobutyl carbinol (Methyl amyl alcohol) | 108-11-2 | 3 |
| Methyl salicylate | 119-36-8 | 6 |
| Methyl vinyl ketone | 78-94-4 | 2 |
| Methylcyclohexane | 108-87-2 | 1 |
| Mica | 12001-26-2 | 3 |
| Microcrystalline silica | 1317-95-9 | 1 |
| Mineral | * | 1 |
| Mineral Filler | * | 1 |
| Mineral spirits (stoddard solvent) | 8052-41-3 | 2 |
| Mixed titanium ortho ester complexes | * | 1 |
| Modified alkane | * | 1 |
| Modified cycloaliphatic amine adduct | * | 3 |
| Modified lignosulfonate | * | 1 |
| Monoethanolamine (Ethanolamine) | 141-43-5 | 17 |
| Monoethanolamine borate | 26038-87-9 | 1 |
| Morpholine | 110-91-8 | 2 |
| Mullite | 1302-93-8 | 55 |
| n,n-dibutylthiourea | 109-46-6 | 1 |
| N,N-dimethyl-1-octadecanamine-HCl | * | 1 |
| N,N-dimethyloctadecylamine | 124-28-7 | 3 |
| N,N-dimethyloctadecylamine hydrochloride | 1613-17-8 | 2 |
| n,n'-Methylenebisacrylamide | 110-26-9 | 1 |
| n-alkyl dimethyl benzyl ammonium chloride | 139-08-2 | 1 |
| Naphthalene | 91-20-3 | 44 |
| Naphthalene derivatives | * | 1 |
| Naphthalenesulphonic acid, bis (1-methylethyl)-methyl derivatives | 99811-86-6 | 1 |
| Natural asphalt | 12002-43-6 | 1 |
| n-cocoamidopropyl-n,n-dimethyl-n-2-hydroxypropylsulfobetaine | 68139-30-0 | 1 |
| n-dodecyl-2-pyrrolidone | 2687-96-9 | 1 |
| N-heptane | 142-82-5 | 1 |
| Nickel sulfate hexahydrate | 10101-97-0 | 2 |
| Nitrilotriacetamide | 4862-18-4 | 4 |
| Nitrilotriacetic acid | 139-13-9 | 6 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Nitrilotriacetonitrile | 7327-60-8 | 3 |
| Nitrogen | 7727-37-9 | 9 |
| n-Methylpyrrolidone | 872-50-4 | 1 |
| Nonane, all isomers | * | 1 |
| Non-hazardous salt | * | 1 |
| Nonionic surfactant | * | 1 |
| Nonyl phenol ethoxylate | * | 2 |
| Nonyl phenol ethoxylate | 9016-45-6 | 2 |
| Nonyl phenol ethoxylate | 9018-45-9 | 1 |
| Nonylphenol | 25154-52-3 | 1 |
| Nonylphenol, ethoxylated and sulfated | 9081-17-8 | 1 |
| N-propyl zirconate | * | 1 |
| N-tallowalkyltrimethylenediamines | * | 1 |
| Nuisance particulates | * | 2 |
| Nylon fibers | 25038-54-4 | 2 |
| Octanol | 111-87-5 | 2 |
| Octyltrimethylammonium bromide | 57-09-0 | 1 |
| Olefinic sulfonate | * | 1 |
| Olefins | * | 1 |
| Organic acid salt | * | 3 |
| Organic acids | * | 1 |
| Organic phosphonate | * | 1 |
| Organic phosphonate salts | * | 1 |
| Organic phosphonic acid salts | * | 6 |
| Organic salt | * | 1 |
| Organic sulfur compound | * | 2 |
| Organic titanate | * | 2 |
| Organiophilic clay | * | 2 |
| Organo-metallic ammonium complex | * | 1 |
| Other inorganic compounds | * | 1 |
| Oxirane, methyl-, polymer with oxirane, mono-C10-16-alkyl ethers, phosphates | 68649-29-6 | 1 |
| Oxyalkylated alcohol | * | 6 |
| Oxyalkylated alcohols | 228414-35-5 | 1 |
| Oxyalkylated alkyl alcohol | * | 1 |
| Oxyalkylated alkylphenol | * | 1 |
| Oxyalkylated fatty acid | * | 2 |
| Oxyalkylated phenol | * | 1 |
| Oxyalkylated polyamine | * | 1 |
| Oxylated alcohol | * | 1 |
| Paraffin wax | 8002-74-2 | 1 |
| Paraffinic naphthenic solvent | * | 1 |
| Paraffinic solvent | * | 5 |
| Paraffins | * | 1 |
| Perlite | 93763-70-3 | 1 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Petroleum distillates | * | 26 |
| Petroleum distillates | 64742-65-0 | 1 |
| Petroleum distillates | 64742-97-5 | 1 |
| Petroleum distillates | 68477-31-6 | 3 |
| Petroleum gas oils | * | 1 |
| Petroleum gas oils | 64741-43-1 | 1 |
| Phenol | 108-95-2 | 5 |
| Phenol-formaldehyde resin | 9003-35-4 | 32 |
| Phosphate ester | * | 6 |
| Phosphate esters of alkyl phenyl ethoxylate | 68412-53-3 | 1 |
| Phosphine | * | 1 |
| Phosphonic acid | * | 1 |
| Phosphonic acid | 129828-36-0 | 1 |
| Phosphonic acid | 13598-36-2 | 3 |
| Phosphonic acid (dimethlamino(methylene)) | 29712-30-9 | 1 |
| Phosphonic acid, [nitrilotris(methylene)]tris-, pentasodium salt | 2235-43-0 | 1 |
| Phosphoric acid | 7664-38-2 | 7 |
| Phosphoric acid ammonium salt | * | 1 |
| Phosphoric acid, mixed decyl, octyl and ethyl esters | 68412-60-2 | 3 |
| Phosphorous acid | 10294-56-1 | 1 |
| Phthalic anhydride | 85-44-9 | 2 |
| Pine oil | 8002-09-3 | 5 |
| Plasticizer | * | 1 |
| Poly(oxy-1,2-ethanediyl) | 24938-91-8 | 1 |
| Poly(oxy-1,2-ethanediyl), alpha-(4-nonylphenyl)-omega-hydroxy-, branched (Nonylphenol ethoxylate) | 127087-87-0 | 3 |
| Poly(oxy-1,2-ethanediyl), alpha-hydro-omega-hydroxy | 65545-80-4 | 1 |
| Poly(oxy-1,2-ethanediyl), alpha-sulfo-omega-(hexyloxy)-, ammonium salt | 63428-86-4 | 3 |
| Poly(oxy-1,2-ethanediyl),a-(nonylphenyl)-w-hydroxy-, phosphate | 51811-79-1 | 1 |
| Poly-(oxy-1,2-ethanediyl)-alpha-undecyl-omega-hydroxy | 34398-01-1 | 6 |
| Poly(sodium-p-styrenesulfonate) | 25704-18-1 | 1 |
| Poly(vinyl alcohol) | 25213-24-5 | 2 |
| Polyacrylamides | 9003-05-8 | 2 |
| Polyacrylamides | * | 1 |
| Polyacrylate | * | 1 |
| Polyamine | * | 2 |
| Polyanionic cellulose | * | 2 |
| Polyepichlorohydrin, trimethylamine quaternized | 51838-31-4 | 1 |
| Polyetheramine | 9046-10-0 | 3 |
| Polyether-modified trisiloxane | 27306-78-1 | 1 |
| Polyethylene glycol | 25322-68-3 | 20 |
| Polyethylene glycol ester with tall oil fatty acid | 9005-02-1 | 1 |
| Polyethylene polyammonium salt | 68603-67-8 | 2 |
| Polyethylene-polypropylene glycol | 9003-11-6 | 5 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Polylactide resin | * | 3 |
| Polyoxyalkylenes | * | 1 |
| Polyoxyethylene castor oil | 61791-12-6 | 1 |
| Polyphosphoric acid, esters with triethanolamine, sodium salts | 68131-72-6 | 1 |
| Polypropylene glycol | 25322-69-4 | 1 |
| Polysaccharide | * | 20 |
| Polyvinyl alcohol | * | 1 |
| Polyvinyl alcohol | 9002-89-5 | 2 |
| Polyvinyl alcohol/polyvinylacetate copolymer | * | 1 |
| Potassium acetate | 127-08-2 | 1 |
| Potassium carbonate | 584-08-7 | 12 |
| Potassium chloride | 7447-40-7 | 29 |
| Potassium formate | 590-29-4 | 3 |
| Potassium hydroxide | 1310-58-3 | 25 |
| Potassium iodide | 7681-11-0 | 6 |
| Potassium metaborate | 13709-94-9 | 3 |
| Potassium metaborate | 16481-66-6 | 3 |
| Potassium oxide | 12136-45-7 | 1 |
| Potassium pentaborate | * | 1 |
| Potassium persulfate | 7727-21-1 | 9 |
| Propanol (Propyl alcohol) | 71-23-8 | 18 |
| Propanol, [2(2-methoxy-methylethoxy) methylethoxyl] | 20324-33-8 | 1 |
| Propargyl alcohol (2-propyn-1-ol) | 107-19-7 | 46 |
| Propylene carbonate (1,3-dioxolan-2-one, methyl-) | 108-32-7 | 2 |
| Propylene glycol (1,2-propanediol) | 57-55-6 | 18 |
| Propylene oxide | 75-56-9 | 1 |
| Propylene pentamer | 15220-87-8 | 1 |
| p-Xylene | 106-42-3 | 1 |
| Pyridinium, 1-(phenylmethyl)-, ethyl methyl derivatives, chlorides | 68909-18-2 | 9 |
| Pyrogenic silica | 112945-52-5 | 3 |
| Quaternary amine compounds | * | 3 |
| Quaternary amine compounds | 61789-18-2 | 1 |
| Quaternary ammonium compounds | * | 9 |
| Quaternary ammonium compounds | 19277-88-4 | 1 |
| Quaternary ammonium compounds | 68989-00-4 | 1 |
| Quaternary ammonium compounds | 8030-78-2 | 1 |
| Quaternary ammonium compounds, dicoco alkyldimethyl, chlorides | 61789-77-3 | 2 |
| Quaternary ammonium salts | * | 2 |
| Quaternary compound | * | 1 |
| Quaternary salt | * | 2 |
| Quaternized alkyl nitrogenated compound | 68391-11-7 | 2 |
| Raffinates (petroleum), sorption process | 64741-85-1 | 2 |
| Residues (petroleum), catalytic reformer fractionator | 64741-67-9 | 10 |
| Resin | 8050-09-7 | 2 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Rutile | 1317-80-2 | 2 |
| Salt of phosphate ester | * | 3 |
| Salt of phosphono-methylated diamine | * | 1 |
| Salts of oxyalkylated fatty amines | 68551-33-7 | 1 |
| Secondary alcohol | * | 7 |
| Silica (Silicon dioxide) | 7631-86-9 | 47 |
| Silica, amorphous | * | 3 |
| Silica, amorphous precipitated | 67762-90-7 | 1 |
| Silicon carboxylate | 681-84-5 | 1 |
| Silicon dioxide (Fused silica) | 60676-86-0 | 7 |
| Silicone emulsion | * | 1 |
| Sodium (C14-16) olefin sulfonate | 68439-57-6 | 4 |
| Sodium 2-ethylhexyl sulfate | 126-92-1 | 1 |
| Sodium acetate | 127-09-3 | 6 |
| Sodium acid pyrophosphate | 7758-16-9 | 5 |
| Sodium alkyl diphenyl oxide sulfonate | 28519-02-0 | 1 |
| Sodium aluminate | 1302-42-7 | 1 |
| Sodium aluminum phosphate | 7785-88-8 | 1 |
| Sodium bicarbonate (Sodium hydrogen carbonate) | 144-55-8 | 10 |
| Sodium bisulfite | 7631-90-5 | 6 |
| Sodium bromate | 7789-38-0 | 10 |
| Sodium bromide | 7647-15-6 | 1 |
| Sodium carbonate | 497-19-8 | 14 |
| Sodium chlorate | 7775-09-9 | 1 |
| Sodium chloride | 7647-14-5 | 48 |
| Sodium chlorite | 7758-19-2 | 8 |
| Sodium cocaminopropionate | 68608-68-4 | 2 |
| Sodium diacetate | 126-96-5 | 2 |
| Sodium erythorbate | 6381-77-7 | 4 |
| Sodium glycolate | 2836-32-0 | 2 |
| Sodium hydroxide (Caustic soda) | 1310-73-2 | 80 |
| Sodium hypochlorite | 7681-52-9 | 14 |
| Sodium lauryl-ether sulfate | 68891-38-3 | 3 |
| Sodium metabisulfite | 7681-57-4 | 1 |
| Sodium metaborate | 7775-19-1 | 2 |
| Sodium metaborate tetrahydrate | 35585-58-1 | 6 |
| Sodium metasilicate, anhydrous | 6834-92-0 | 2 |
| Sodium nitrite | 7632-00-0 | 1 |
| Sodium oxide (Na2O) | 1313-59-3 | 1 |
| Sodium perborate | 1113-47-9 | 1 |
| Sodium perborate | 7632-04-4 | 1 |
| Sodium perborate tetrahydrate | 10486-00-7 | 4 |
| Sodium persulfate | 7775-27-1 | 6 |
| Sodium phosphate | * | 2 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Sodium polyphosphate | 68915-31-1 | 1 |
| Sodium salicylate | 54-21-7 | 1 |
| Sodium silicate | 1344-09-8 | 2 |
| Sodium sulfate | 7757-82-6 | 7 |
| Sodium tetraborate | 1330-43-4 | 7 |
| Sodium tetraborate decahydrate | 1303-96-4 | 10 |
| Sodium thiosulfate | 7772-98-7 | 10 |
| Sodium thiosulfate pentahydrate | 10102-17-7 | 3 |
| Sodium trichloroacetate | 650-51-1 | 1 |
| Sodium tripolyphosphate | 7758-29-4 | 2 |
| Sodium xylene sulfonate | 1300-72-7 | 3 |
| Sodium zirconium lactate | 174206-15-6 | 1 |
| Solvent refined heavy naphthenic petroleum distillates | 64741-96-4 | 1 |
| Sorbitan monooleate | 1338-43-8 | 1 |
| Stabilized aqueous chlorine dioxide | 10049-04-4 | 1 |
| Stannous chloride | 7772-99-8 | 1 |
| Stannous chloride dihydrate | 10025-69-1 | 6 |
| Starch | 9005-25-8 | 5 |
| Steam cracked distillate, cyclodiene dimer, dicyclopentadiene polymer | 68131-87-3 | 1 |
| Steam-cracked petroleum distillates | 64742-91-2 | 6 |
| Straight run middle petroleum distillates | 64741-44-2 | 5 |
| Substituted alcohol | * | 2 |
| Substituted alkene | * | 1 |
| Substituted alkylamine | * | 2 |
| Sucrose | 57-50-1 | 1 |
| Sulfamic acid | 5329-14-6 | 6 |
| Sulfate | * | 1 |
| Sulfonate acids | * | 1 |
| Sulfonate surfactants | * | 1 |
| Sulfonic acid salts | * | 1 |
| Sulfonic acids, petroleum | 61789-85-3 | 1 |
| Sulfur compound | * | 1 |
| Sulfuric acid | 7664-93-9 | 9 |
| Sulfuric acid, monodecyl ester, sodium salt | 142-87-0 | 2 |
| Sulfuric acid, monooctyl ester, sodium salt | 142-31-4 | 2 |
| Surfactants | * | 13 |
| Sweetened middle distillate | 64741-86-2 | 1 |
| Synthetic organic polymer | 9051-89-2 | 2 |
| Tall oil (Fatty acids) | 61790-12-3 | 4 |
| Tall oil, compound with diethanolamine | 68092-28-4 | 1 |
| Tallow soap | * | 2 |
| Tar bases, quinoline derivatives, benzyl chloride-quaternized | 72480-70-7 | 5 |
| Tergitol | 68439-51-0 | 1 |
| Terpene hydrocarbon byproducts | 68956-56-9 | 3 |

| Chemical Component | Chemical Abstract Service Number | No. of Products Containing Chemical |
|---|---|---|
| Terpenes | * | 1 |
| Terpenes and terpenoids, sweet orange-oil | 68647-72-3 | 2 |
| Terpineol | 8000-41-7 | 1 |
| Tert-butyl hydroperoxide | 75-91-2 | 6 |
| Tetra-calcium-alumino-ferrite | 12068-35-8 | 1 |
| Tetraethylene glycol | 112-60-7 | 1 |
| Tetraethylenepentamine | 112-57-2 | 2 |
| Tetrahydro-3,5-dimethyl-2H-1,3,5-thiadiazine-2-thione (Dazomet) | 533-74-4 | 13 |
| Tetrakis (hydroxymethyl) phosphonium sulfate | 55566-30-8 | 12 |
| Tetramethyl ammonium chloride | 75-57-0 | 14 |
| Tetrasodium 1-hydroxyethylidene-1,1-diphosphonic acid | 3794-83-0 | 1 |
| Tetrasodium ethylenediaminetetraacetate | 64-02-8 | 10 |
| Thiocyanate sodium | 540-72-7 | 1 |
| Thioglycolic acid | 68-11-1 | 6 |
| Thiourea | 62-56-6 | 9 |
| Thiourea polymer | 68527-49-1 | 3 |
| Titanium complex | * | 1 |
| Titanium oxide | 13463-67-7 | 19 |
| Titanium, isopropoxy (triethanolaminate) | 74665-17-1 | 2 |
| Toluene | 108-88-3 | 29 |
| Treated ammonium chloride (with anti-caking agent a or b) | 12125-02-9 | 1 |
| Tributyl tetradecyl phosphonium chloride | 81741-28-8 | 5 |
| Tri-calcium silicate | 12168-85-3 | 1 |
| Tridecyl alcohol | 112-70-9 | 1 |
| Triethanolamine (2,2,2-nitrilotriethanol) | 102-71-6 | 21 |
| Triethanolamine polyphosphate ester | 68131-71-5 | 3 |
| Triethanolamine titanate | 36673-16-2 | 1 |
| Triethanolamine zirconate | 101033-44-7 | 6 |
| Triethanolamine zirconium chelate | * | 1 |
| Triethyl citrate | 77-93-0 | 1 |
| Triethyl phosphate | 78-40-0 | 1 |
| Triethylene glycol | 112-27-6 | 3 |
| Triisopropanolamine | 122-20-3 | 5 |
| Trimethylammonium chloride | 593-81-7 | 1 |
| Trimethylbenzene | 25551-13-7 | 5 |
| Trimethyloctadecylammonium  (1-octadecanaminium, N,N,N-trimethyl-, chloride) | 112-03-8 | 6 |
| Tris(hydroxymethyl)aminomethane | 77-86-1 | 1 |
| Trisodium ethylenediaminetetraacetate | 150-38-9 | 1 |
| Trisodium ethylenediaminetriacetate | 19019-43-3 | 1 |
| Trisodium nitrilotriacetate | 18662-53-8 | 8 |
| Trisodium nitrilotriacetate (Nitrilotriacetic acid, trisodium salt monohydrate) | 5064-31-3 | 9 |
| Trisodium ortho phosphate | 7601-54-9 | 1 |
| Trisodium phosphate dodecahydrate | 10101-89-0 | 1 |
| Ulexite | 1319-33-1 | 1 |

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOHN D. DINGELL, MICHIGAN
CHAIRMAN EMERITUS
EDWARD J. MARKEY, MASSACHUSETTS
RICK BOUCHER, VIRGINIA
FRANK PALLONE, JR., NEW JERSEY
BART GORDON, TENNESSEE
BOBBY L. RUSH, ILLINOIS
ANNA G. ESHOO, CALIFORNIA
BART STUPAK, MICHIGAN
ELIOT L. ENGEL, NEW YORK
GENE GREEN, TEXAS
DIANA DeGETTE, COLORADO
VICE CHAIRMAN
LOIS CAPPS, CALIFORNIA
MIKE DOYLE, PENNSYLVANIA
JANE HARMAN, CALIFORNIA
JAN SCHAKOWSKY, ILLINOIS
CHARLES A. GONZALEZ, TEXAS
JAY INSLEE, WASHINGTON
TAMMY BALDWIN, WISCONSIN
MIKE ROSS, ARKANSAS
ANTHONY D. WEINER, NEW YORK
JIM MATHESON, UTAH
G.K. BUTTERFIELD, NORTH CAROLINA
CHARLIE MELANCON, LOUISIANA
JOHN BARROW, GEORGIA
BARON P. HILL, INDIANA
DORIS O. MATSUI, CALIFORNIA
DONNA CHRISTENSEN, VIRGIN ISLANDS
KATHY CASTOR, FLORIDA
JOHN SARBANES, MARYLAND
CHRISTOPHER MURPHY, CONNECTICUT
ZACHARY T. SPACE, OHIO
JERRY McNERNEY, CALIFORNIA
BETTY SUTTON, OHIO
BRUCE BRALEY, IOWA
PETER WELCH, VERMONT

JOE BARTON, TEXAS
RANKING MEMBER

RALPH M. HALL, TEXAS
FRED UPTON, MICHIGAN
CLIFF STEARNS, FLORIDA
NATHAN DEAL, GEORGIA
ED WHITFIELD, KENTUCKY
JOHN SHIMKUS, ILLINOIS
JOHN B. SHADEGG, ARIZONA
ROY BLUNT, MISSOURI
STEVE BUYER, INDIANA
GEORGE RADANOVICH, CALIFORNIA
JOSEPH R. PITTS, PENNSYLVANIA
MARY BONO MACK, CALIFORNIA
GREG WALDEN, OREGON
LEE TERRY, NEBRASKA
MIKE ROGERS, MICHIGAN
SUE WILKINS MYRICK, NORTH CAROLINA
JOHN SULLIVAN, OKLAHOMA
TIM MURPHY, PENNSYLVANIA
MICHAEL C. BURGESS, TEXAS
MARSHA BLACKBURN, TENNESSEE
PHIL GINGREY, GEORGIA
STEVE SCALISE, LOUISIANA

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

MAJORITY (202) 225-2927
FACSIMILE (202) 225-2525
MINORITY (202) 225-3641

energycommerce.house.gov

## MEMORANDUM

## February 18, 2010

**To:**   **Members of the Subcommittee on Energy and Environment**

**Fr:**   **Chairman Henry A. Waxman and Subcommittee Chairman Edward J. Markey**

**Re:**   **Examining the Potential Impact of Hydraulic Fracturing**

Today, we are sending letters to eight oil and gas service companies regarding the chemicals they use in their hydraulic fracturing fluids. This memorandum explains why we are taking this action.

## Executive Summary

One of the most promising trends in U.S. energy supplies is the development of new technologies for extracting natural gas from shale deposits and other unconventional sources. Hydraulic fracturing, along with horizontal drilling technology, has allowed oil and gas companies to reach and extract oil and natural gas once thought unattainable. As a result, proven domestic reserves of natural gas have expanded exponentially in recent years. Reliable access to this cleaner-burning fossil fuel could enhance our energy independence and reduce our reliance on more carbon-heavy sources of energy.

As the oil and gas industry applies this technology to more wells in more parts of the country, it is important to ensure that the process is safe and environmentally sound. Environmental organizations, public health groups, and local communities have expressed concerns about the potential impact of the injection of hydraulic fracturing fluids in wells located in or near underground sources of drinking water. Others have raised concerns about the quantity of water needed to hydraulically fracture oil and gas wells and the disposal of contaminated wastewater from fracturing operations. The letters that we are sending today are designed to help answer these questions.

In 2003, EPA entered into a voluntary memorandum of agreement (MOA) with the three largest hydraulic fracturing companies, Halliburton, BJ Services, and Schlumberger, to eliminate diesel fuel from hydraulic fracturing fluids injected into certain wells located in underground

sources of drinking water. Aside from this MOA, there is virtually no federal regulation of hydraulic fracturing. In 2005, Congress exempted the practice of hydraulic fracturing from the Safe Drinking Water Act (SDWA), except when the injected fluids contain diesel fuel. Oil and gas companies can use additives and chemicals besides diesel fuel in their hydraulic fracturing fluids, but federal regulators have no authority to limit the types and volumes of these substances. Indeed, oil and gas companies do not need to report to federal regulators what their fracturing fluids contain or where they are used.

As Chairman of the House Committee on Oversight and Government Reform in the last Congress, Chairman Waxman requested and received some data from Halliburton, BJ Services, and Schlumberger on the chemicals used in their fracturing fluids. According to this data, two of these companies used diesel fuel as a fracturing fluid between 2005 and 2007. Halliburton reported using more than 807,000 gallons of seven diesel-based fluids, a potential violation of the MOA. BJ Services reported using 1,700 gallons of two diesel-based fluids in several fracturing jobs in Arkansas and Oklahoma. In a letter to the Oversight Committee, BJ Services acknowledged that these events were "in violation of the MOA." The companies also indicated that they used other chemicals in their fracturing fluids – such as benzene, toluene, ethylbenzene, and xylenes – that could pose environmental and human health risks.

The information provided to the Oversight Committee did not specify whether these fluids were injected into wells located in or near underground sources of drinking water. This is an important issue because injecting the chemicals in or near sources of drinking water could create contamination risks. In addition, it could be a violation of the Safe Drinking Water Act if the fluids contain diesel fuel. The information also did not address how the companies dispose of their fracturing fluids and whether this is being done in an environmentally safe manner.

Three of the letters being sent today seek additional information from Halliburton, BJ Services, and Schlumberger on these and related issues. In addition, we are seeking similar information from five smaller fracturing companies that comprise a growing share of the market.

The extraction of natural gas from unconventional sources appears to hold great potential for enhancing our energy independence and reducing air pollution, including carbon emissions. But as the development of this new technology proceeds, it should be conducted in an environmentally safe manner. The purpose of the letters is to help the Committee assess whether the new technology poses any environmental or public health risks that Congress should address.

## I.    Background

### A.    The Promise of Developing Unconventional Natural Gas Supplies

Estimates of domestic natural gas reserves have increased sharply in recent years. In a biennial report released earlier this year, the Potential Gas Committee, a group of academics and industry experts supported by the Colorado School of Mines, raised its assessment of proven and potential U.S. natural gas reserves by 35%. The group attributed this substantial jump to the

increased accessibility of shale gas.[1]  The consulting firm PFC Energy reports that shale gas production has expanded from 1% of U.S. natural gas production in 2000 to approximately 10% today.[2]  And experts expect a sustained swell in exploration of unconventional sources.  The Energy Information Administration (EIA) within the Department of Energy predicts that unconventional gas exploration will be the largest contributor to increases in domestic natural gas production over the next two decades, with its share of domestic production growing to 56% in 2030.[3]  While EIA foresees tight sand formations as the largest source of unconventional natural gas, it notes that shale is the fastest growing source and predicts that accelerated shale gas production will continue.[4]

Formations with shale gas potential stretch across much of the United States.  Exploration of these formations in Texas, Arkansas, and Louisiana has been underway for years, and exploration in the Marcellus Shale that spans New York, Pennsylvania, and West Virginia is intensifying.  Experts at Pennsylvania State University believe that the Marcellus Shale alone could hold enough gas to meet U.S. demand for 14 or more years.[5]

New natural gas supplies could enhance the stability and environmental sustainability of U.S. energy use.  Unconventional sources of natural gas would reduce disruptions to supply from Gulf Coast hurricanes and limit the nation's reliance on natural gas imports.  In addition, increased use of natural gas to power vehicles could reduce domestic imports of petroleum.  Natural gas emits only about half as much carbon as coal, making it an attractive source of electricity generation as the nation seeks to reduce its production of greenhouse gases.  Unlike coal-burning and nuclear power plants, natural gas plants can cut on and off quickly and could supplement energy from wind and solar power.[6]  For these reasons, many experts, including U.N. Foundation leader and former Colorado Senator Timothy Wirth, believe that "natural gas can serve as a bridge fuel to a low-carbon, sustainable energy future."[7]

---

[1] Potential Gas Committee, *Potential Gas Committee reports unprecedented increase in magnitude of U.S. natural gas resource base* (June 18, 2009).

[2] *An Energy Answer in the Shale Below? New Technology Opens Vast Stores of Natural Gas, and the Land Rush Is On,* Washington Post (Dec. 3, 2009).

[3] U.S. Department of Energy, Energy Information Administration, *Annual Energy Outlook 2009*, at 77 (online at http://www.eia.doe.gov/oiaf/aeo/pdf/trend_4.pdf) (accessed Feb. 2, 2010).

[4] *Id.*

[5] *An Energy Answer in the Shale Below? New Technology Opens Vast Stores of Natural Gas, and the Land Rush Is On*, Washington Post (Dec. 3, 2009).

[6] *Id.*

[7] *Id.*

### B.   Concerns about Hydraulic Fracturing

According to the Department of Energy, advances in hydraulic fracturing technology, as well as a rise in the price of natural gas, have made it possible for oil and gas companies to extract gas resources once thought unattainable.[8]  In hydraulic fracturing, the companies force fracturing fluids and propping agents into existing oil and gas production wells at extremely high pressure, which cracks the oil or gas seams and allows trapped natural gas and oil to escape. Without hydraulic fracturing and improvements in horizontal drilling, oil and gas companies likely would not be able to access unconventional sources of oil and natural gas in an economical manner.

Hydraulic fracturing is not without controversy and concern.  Oil and gas companies use a variety of additives and chemicals in their fracturing fluids with the goal of widening and extending the length of the fractures and transporting large amounts of material to "prop open" the fractures.  While some of these additives are harmless, such as sand used as a proppant, others may contain constituents of potential concern to human health and the environment.[9] Several communities have raised concerns about this practice's potential impact on drinking water, with some alleging that hydraulic fracturing is to blame for the contamination of local wells.[10]

Federal regulators currently do not have access to a full accounting of the types and quantities of chemicals used in hydraulic fracturing fluids, although some states require disclosure.  Under the Emergency Planning and Community Right to Know Act, approximately 22,000 industrial and federal facilities must report to EPA the quantity of toxic chemicals they release, store, or transfer, which is then made public in the annual Toxics Release Inventory (TRI).  Oil and gas exploration and production facilities are exempt from this reporting requirement.[11]  EPA also does not have authority under the Safe Drinking Water Act (SDWA) to require disclosure of the chemicals injected in hydraulic fracturing operations.

---

[8] U.S. Department of Energy, *Modern Shale Gas Development in the United States:  A Primer* (Apr. 2009) at 9.

[9] Environmental Protection Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs* (June 2004) (EPA 816-R-04-003) at 4-3.

[10] *See, e.g.*, *With Natural Gas Drilling Boom, Pennsylvania Faces an Onslaught of Wastewater*, ProPublica (Oct. 4, 2009); *Dirty Well Water Raises Stink Near Drilling Sites; Residents Cite Gas Firm for Poor Quality*, Arkansas Democrat-Gazette (July 5, 2009); *Debate Shows Merits, Dangers of Drilling Technique*, Associated Press (Dec. 23, 2008); *Controversial Path to Possible Glut of Natural Gas*, Christian Science Monitor (Sept. 18, 2008).

[11] 40 C.F.R. § 372.23.

EPA has raised particular concerns about diesel fuel, noting that the "use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water.[12]  Diesel contains constituents regulated under SDWA because of their toxicity, including benzene, toluene, ethylbenzene, and xylenes (BTEX chemicals).[13]  The Department of Health and Human Services, the International Agency for Research on Cancer, and EPA have determined that benzene is a human carcinogen.[14]  Chronic exposure to toluene, ethylbenzene, or xylenes can damage the central nervous system, liver, and kidneys.[15]

In December 2003, EPA entered into a voluntary memorandum of agreement with the three largest hydraulic fracturing companies, Halliburton, BJ Services, and Schlumberger, to "eliminate diesel fuel in hydraulic fracturing fluids injected into coalbed methane production wells in underground sources of drinking water."[16]  The MOA focused on coalbed methane wells, as these wells tend to be shallower and closer to underground sources of drinking water than conventional oil and gas production wells.  The MOA does not contain any enforcement provisions nor does it confer immunity in an action to enforce the SDWA or EPA's regulations on underground injection.[17]

In 2005, Congress exempted hydraulic fracturing from regulation under the SDWA as part of the Energy Policy Act.[18]  Many dubbed this provision the "Halliburton loophole" because of Halliburton's ties to then-Vice President Cheney and its role as one of the largest providers of hydraulic fracturing services.[19]  Specifically, Congress modified the definition of "underground injection" to exclude "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production

---

[12] U.S. Environmental Protection Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs* (June 2004) (EPA 816-R-04-003) at 4-11.

[13] *Id.*

[14] U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Benzene* (Aug. 2007).

[15] U.S. Environmental Protection Agency, *Basic Information about Toluene in Drinking Water* (online at www.epa.gov/safewater/contaminants/basicinformation/toluene.html), *Basic Information about Ethylbenzene in Drinking Water* (online at www.epa.gov/safewater/contaminants/basicinformation/ethylbenzene.html) and *Basic Information about Xylenes in Drinking Water* (online at www.epa.gov/safewater/contaminants/basicinformation/xylenes.html) (accessed Feb. 2, 2010).

[16] Memorandum of Agreement between the U.S. Environmental Protection Agency and BJ Services Company, Halliburton Energy Services, Inc., and Schlumberger Technology Corporation (Dec. 12, 2003).

[17] *Id.*

[18] Pub. L. No. 109-58 (2005).

[19] *The Halliburton Loophole*, New York Times (Nov. 9. 2009).

activities."[20]  As a result of this exemption, EPA cannot use the SDWA to regulate hydraulic fracturing unless it can show the use of diesel fuels.

Environmental groups, public health officials, and communities across the country have raised other concerns about hydraulic fracturing, beyond potential impacts on drinking water.  In Texas, state regulators are responding to tests showing high levels of benzene in the air near wells in the Barnett Shale gas fields.[21]  In Pennsylvania, state regulators are facing a new challenge of how to ensure proper disposal of the millions of gallons of wastewater generated from natural gas development in the Marcellus Shale.[22]  In New York, the state Department of Environmental Conservation analyzed wastewater extracted from wells and found levels of radium-226 as high as 267 times the limit safe for discharge into the environment and thousands of times the limit safe for people to drink.[23]  Others have raised concerns about water scarcity, since the drilling and hydraulic fracturing of a horizontal shale gas well may require 2 to 4 million gallons of water.[24]

### C.    EPA's Recent Work on Hydraulic Fracturing

In May 2009, EPA Administrator Lisa Jackson said that she found allegations of drinking water contamination linked to hydraulic fracturing "startling" and told members of Congress that it may be time to take another look at the safety of the hydraulic fracturing process.[25]  EPA hired a consulting firm to survey media reports and publicly available documents describing several cases of drinking water contamination allegedly linked to hydraulic fracturing.  Based on this review of available literature, the firm concluded that 12 of the contaminant cases examined "may have a possible link to hydraulic fracturing, but, to date, EPA has insufficient information on which to make a definitive decision."[26]

In Pavillion, Wyoming, EPA, using its authority under the Superfund program, has been testing residential and municipal wells, in response to community concerns about declining drinking water quality.  The first phase of testing found hydrocarbons and 2-butoxyethanol, a

---

[20] 42 U.S.C. § 300h(d).

[21] *State worried about air pollution near Barnett Shale wells*, Star-Telegram (Nov. 22, 2009); *Agency finds high benzene levels on Barnett Shale*, Associated Press (Jan. 27, 2010).

[22] *What can be done with wastewater?*, Pittsburgh Post-Gazette (Oct. 4, 2009).

[23] *Is New York's Marcellus Shale Too Hot to Handle?*, ProPublica (Nov. 9, 2009).

[24] Department of Energy, *Modern Shale Gas Development in the United States:  A Primer* (Apr. 2009) at 64.

[25] House Committee on Appropriations, Subcommittee on Interior, Environment, and Related Agencies, Testimony of the Honorable Lisa Jackson, Administrator, U.S. Environmental Protection Agency, *Hearing on the Environmental Protection Agency,* 111th Cong. (May 19, 2009).

[26] Cadmus Group, *Hydraulic Fracturing: Preliminary Analysis of Recently Reported Contamination* (Sept. 2009).

foaming agent used in hydraulic fracturing fluids, in several wells. While EPA has been unable to "pinpoint any specific source at this time," the agency acknowledged a potential connection between this contamination and nearby oil and gas production activities.[27]

The conference report for the Department of the Interior, Environment, and Related Agencies Appropriations Act for Fiscal Year 2010, signed into law on October 30, 2009, requested that EPA conduct a new scientific study of the hydraulic fracturing process. Specifically, the report states that EPA is to "carry out a study of the relationship between hydraulic fracturing and drinking water, using a credible approach that relies on the best available science, as well as independent sources of information."[28]

## II.    The Oversight Committee Investigation

As Chairman of the House Committee on Oversight and Government Reform, Chairman Waxman wrote to the CEOs of Halliburton, BJ Services, and Schlumberger and requested data on the types and volume of chemicals used in their hydraulic fracturing fluids between 2005 and 2007.[29] The information provided shows that at least two of these companies continued to use diesel fuel in their fracturing fluids after signing the 2003 agreement with EPA. It also shows that they use other chemicals in their fluids that could be a cause for concern if they entered drinking water supplies.

### A.      Halliburton

Halliburton provided data to the Oversight Committee revealing that it continued to use diesel and BTEX chemicals in the company's fracturing fluids after signing the MOA:

- Halliburton reported using fluids containing diesel fuel in 2005, 2006, and 2007 to fracture oil and gas wells in 15 states. Specifically, Halliburton reported using more than 807,000 gallons of seven diesel-based fluids over the three year period.[30]

---

[27] U.S. Environmental Protection Agency, *Pavillion Groundwater Investigation, Pavillion, Wyoming: Phase I Sampling Results* (Aug. 11, 2009).

[28] Conference Report for the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2010, 111th Cong. (2009) (Rept. 111-316).

[29] Letter from Henry A. Waxman, Chairman, Committee on Oversight and Government Reform, to David Lesar, Chairman, President, and CEO, Halliburton (Nov. 26, 2007); Letter from Henry A. Waxman, Chairman, Committee on Oversight and Government Reform, to Andrew Gould, Chairman and CEO, Schlumberger (Nov. 26, 2007); Letter from Henry A. Waxman, Chairman, Committee on Oversight and Government Reform, to J.W. Stewart, Chairman, President, and CEO, BJ Services (Nov. 26, 2007).

[30] Halliburton Material Safety Data Sheet (MSDS), *BC-200* (Jan. 2009); Halliburton MSDS, *CL-22M Crosslinker* (Jan. 2009); Halliburton MSDS, *Diesel Fuel* (Jan. 2008); Halliburton MSDS, *LGC-8* (Jan. 2009); Halliburton MSDS, *LGC-35* (Jan. 2009); Halliburton MSDS, *LGC-V* (Jan. 2007); Halliburton MSDS, *LGC-VI* (Jan. 2009).

- Halliburton also reported using fracturing fluids containing BTEX chemicals in 2005, 2006, and 2007 to fracture oil and gas wells in 14 states. Specifically, Halliburton reported using nearly 235,000 gallons of six fracturing fluids containing BTEX chemicals over the three year period.[31]

Halliburton's data did not distinguish between fracturing fluids used in oil wells versus natural gas wells and did not specify whether the company used fracturing fluids containing diesel in coalbed methane wells located within underground sources of drinking water, as prohibited by the MOA.

### B.    BJ Services

BJ Services provided data to the Oversight Committee revealing that it continued to use diesel and BTEX chemicals in the company's fracturing fluids in coalbed methane wells after signing the MOA:

- BJ Services reported using 1,706 gallons of diesel-based slurry in two dozen coalbed methane fracturing jobs in Arkansas and Oklahoma in 2005, 2006, and 2007.[32] In a letter to the Oversight Committee, counsel for BJ Services acknowledged that these events "were in violation of the MOA" and expressed a commitment to uncovering how they occurred. The company's counsel also noted that BJ Services subsequently sent a reminder to "all employees who design or perform fracturing operations about the requirements of the MOA."[33]

- In addition to the diesel-based slurries, BJ Services reported using 833 gallons of other fluids containing diesel fuel to fracture coalbed methane wells in Arkansas and Oklahoma in 2005, 2006, and 2007.[34] Counsel for BJ Services also reported that the company uses "biodegradable balls (typically about an inch in diameter) that are pumped into the wellbore to seal the perforation openings; they ultimately break apart, fall to the bottom of the wellbore, and dissolve, never actually entering the oil/gas reservoir."[35] These

---

[31] Halliburton MSDS, *Aromatic 100* (Jan. 2008); Halliburton MSDS, *Barsol D-100* (Jan. 2007); Halliburton MSDS, *Parachek 160 Paraffin Inhibitor* (June 2007); Halliburton MSDS, *Parasperse Cleaner* (June 2007); Halliburton MSDS, *Xylene* (June 2007); Halliburton MSDS, *Xylene Bottoms* (Jan. 2007).

[32] BJ Services Company MSDS, *XLFC-1* (Nov. 2006); BJ Services Company MSDS, *XLFC-5* (Nov. 2006).

[33] Letter from Counsel to Henry A. Waxman, Chairman, Committee on Oversight and Government Reform (Jan. 24, 2008).

[34] BJ Services Company MSDS, *FLC-42L* (Oct. 2006); BJ Services Company MSDS, *GW-3L* (Oct. 2006).

[35] Letter from Counsel to Henry A. Waxman, Chairman, Committee on Oversight and Government Reform (Jan. 24, 2008).

biodegradable balls contain diesel fuel, according to company documents.[36]  The company did not say explicitly whether it used these fracturing fluids and materials in violation of the MOA.

- BJ Services also reported using 217 gallons of a fluid containing xylene, one of the toxic BTEX chemicals, to fracture coalbed methane wells in three states in 2005, 2006, and 2007.[37]

BJ Services provided data only on fluids used to fracture coalbed methane wells.  The Oversight Committee did not receive data on whether BJ Services used diesel-based fluids in other types of fracturing jobs between 2005 and 2007.

### C.    Schlumberger

Based on the data Schlumberger provided to the Oversight Committee, we have no evidence that the company used diesel-based fluids to fracture coalbed methane wells between 2005 and 2007.  Schlumberger did report using 170 gallons of two corrosion inhibitors that contain nonspecific "aromatic hydrocarbons."[38]  This is a category of chemicals that can include benzene and other BTEX chemicals.[39]  Schlumberger did not provide data on its fracturing activities in other types of wells.

### III.    The Need for Additional Investigation

The information provided by the companies raises several questions.  First, the use of diesel fuel in fracturing fluids by Halliburton and BJ Services raises questions about the effectiveness of the 2003 MOA and whether the companies violated the Safe Drinking Water Act when they used these fluids.

Second, the companies provided data on which chemicals they used in their hydraulic fracturing fluids, but they did not specify whether they injected these fluids in wells located in, near, or below underground sources of drinking water.  This information is needed to assess whether the use of the chemicals posed a threat to drinking water supplies.

Third, the responses indicated that the companies used other potentially dangerous chemicals besides diesel fuel in hydraulic fracturing fluids.  Halliburton and BJ Services, for example, both reported using some BTEX chemicals in their fluids.  According to the New York

---

[36] BJ Services Company MSDS, *BioSealers* (Oct. 2006).

[37] BJ Services Company MSDS, *NE-118* (Oct. 2006).

[38] Schlumberger MSDS, *Corrosion Inhibitor A261* (Feb. 2005); Schlumberger MSDS, *Corrosion Inhibitor A262* (Apr. 2005).

[39] *See* New York Department of Environmental Conservation, *Draft Supplemental Generic Environmental Impact Statement Well Permit Issuance for Horizontal Drilling And High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs* (Sept. 2009) at 5-53.

State Department of Environmental Conservation, oil and gas companies have proposed using hundreds of chemicals in hydraulic fracturing fluids in the Marcellus Shale formation in New York, including more than a dozen different petroleum distillates.[40] More information about these chemicals and their use is required to assess their potential environmental impact.

Another set of questions involves the practices of smaller companies. When Halliburton, BJ Services, and Schlumberger signed the diesel MOA in 2003, the three companies performed 95% of the hydraulic fracturing jobs in the United States each year.[41] Since that time, smaller companies have increased their market share. Frac Tech, for example, describes itself as "one of the largest and fastest growing land stimulation companies."[42] Superior Well Services says it is a "growing oilfield services company operating in many of the major oil and natural gas producing regions of the United States."[43] Little is known about the practices of these and other small and medium sized companies that provide fracturing services across the country.

Finally, many have raised concerns about how oil and gas companies dispose of fracturing fluids and other produced water after it is extracted from the well. The Oversight Committee did not request any information on wastewater produced from hydraulic fracturing operations. More information is needed to assess the chemical contents of this waste and determine how companies can dispose of it in an environmentally safe manner.

## IV.    The Committee's Letters

To help answer these questions, the Subcommittee on Energy and Environment is sending a new request to eight companies engaged in hydraulic fracturing in the United States: Halliburton, BJ Services, and Schlumberger, as well as Frac Tech Services, Superior Well Services, Universal Well Services, Sanjel Corporation, and Calfrac Well Services, five smaller companies that comprise a growing share of the market. The Committee is requesting the most recent data on the types and quantities of chemicals used in hydraulic fracturing fluids with additional information on whether the companies injected these fluids in, near, or below an underground source of drinking water. The Committee also is requesting documents related to any allegations that the hydraulic fracturing caused harm to human health or the environment. In

---

[40] New York City Council Committee on Environmental Protection, Testimony of Dusty Horwitt, Senior Counsel, Environmental Working Group, (Oct. 23, 2009), citing New York Department of Environmental Conservation, *Draft Supplemental Generic Environmental Impact Statement Well Permit Issuance for Horizontal Drilling And High-Volume Hydraulic Fracturing to Develop the Marcellus Shale and Other Low-Permeability Gas Reservoirs* (Sept. 2009) at 5-45-5-51, 5-53.

[41] Environmental Protection Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs* (June 2004) (EPA 816-R-04-003) at 4-19.

[42] Frac Tech Services Home Page (online at www.fractech.net/about/index.htm) (accessed Feb. 1, 2010).

[43] Superior Well Services Home Page (online at www.superiorwells.com/index.php) (accessed Feb. 1, 2010).

addition, the Committee is requesting information on the chemical contents of water produced from hydraulic fracturing operations and how the companies dispose of this waste.

Hydraulic fracturing and other new technologies for unlocking unconventional natural gas supplies have tremendous potential.  These technologies have created a natural gas boom in parts of the country that can contribute to the nation's energy independence and reduce carbon emissions.  But as the use of these technologies expands, there needs to be oversight to ensure that their use does not threaten the public health of nearby communities.  The goal of this investigation is to provide the Committee with a fuller understanding of the promise and the potential risks posed by the use of hydraulic fracturing to produce oil and natural gas from unconventional sources.

For additional information, please contact Alison Cassady or Stacia Cardille of the Committee staff at (202) 226-2424.

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOE BARTON, TEXAS
RANKING MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

February 18, 2010

Mr. Andrew Gould
Chairman and Chief Executive Officer
Schlumberger
5599 San Felipe, 17th Floor
Houston, TX 77056

Dear Mr. Gould:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts. We request your cooperation in this investigation.

In January 2008, Schlumberger replied to a request from the House Committee on Oversight and Government Reform for documents and data on the company's hydraulic fracturing activities from 2005 to 2007. The Subcommittee is continuing this inquiry. To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and the potential impacts on human health or the environment, please provide the Committee with the following documents:

1.   Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, in 2008 and 2009. For natural gas wells that your company hydraulically fractured between 2005 and 2009, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States. Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2.   Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, in 2008 and 2009. For natural gas wells, please provide data from 2005 through 2009, arranged by year and state, on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3.   All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

Mr. Andrew Gould
February 18, 2010
Page 2

4.      All documents relating to any allegations that the products used by your company in hydraulic fracturing caused harm to human health or the environment.

5.      Documents sufficient to show the percentage of hydraulic fracturing fluids your company recovered in each state, by year, between 2005 and 2009, and all documents estimating your company's fluid recovery efficiency.

6.      Documents sufficient to show the volume of flowback and produced water, and the chemicals contained therein, generated from your company's hydraulic fracturing operations in each state, by year, between 2005 and 2009, and the methods by which your company disposed of this water in each state, by year, between 2005 and 2009.  If you are not responsible for recovery and disposal of flowback and produced water, please provide the Committee with a list of companies that would bear such responsibility.

Please produce the requested documents by Friday, March 5, 2010.  In addition, we ask that you advise the Committee by Thursday, February 25, 2010, whether you will comply with this request on a voluntary basis.  Attachments to this letter provide additional information about responding to Committee document requests.

If you have any questions regarding this request, please contact Alison Cassady or Stacia Cardille with the Committee staff at (202) 226-2424.

Sincerely,

Henry A. Waxman
Chairman

Edward J. Markey
Chairman
Subcommittee on Energy
    and Environment

Enclosure

cc:     The Honorable Joe Barton
        Ranking Member

        The Honorable Fred Upton
        Ranking Member
        Subcommittee on Energy
            and Environment

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOE BARTON, TEXAS
RANKING MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

February 18, 2010

Mr. David J. Lesar
Chairman and Chief Executive Officer
Halliburton
3000 North Sam Houston Parkway East
Houston, TX 77032

Dear Mr. Lesar:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts.  We request your cooperation in this investigation.

In January 2008, Halliburton replied to a request from the House Committee on Oversight and Government Reform for documents and data on the company's hydraulic fracturing activities from 2005 to 2007.  The Subcommittee is continuing this inquiry.  To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and the potential impacts on human health or the environment, please provide the Committee with the following documents:

1.  Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, between 2007 and 2009.  For natural gas wells that your company hydraulically fractured between 2005 and 2009, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States.  Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2.  Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, between 2007 and 2009.  For natural gas wells, please provide data from 2005 through 2009, arranged by year and state, on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3.  All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

Mr. David J. Lesar
February 18, 2010
Page 2

4.      All documents relating to any allegations that the products used by your company in
        hydraulic fracturing caused harm to human health or the environment.

5.      Documents sufficient to show the percentage of hydraulic fracturing fluids your company
        recovered in each state, by year, between 2005 and 2009, and all documents estimating
        your company's fluid recovery efficiency.

6.      Documents sufficient to show the volume of flowback and produced water, and the
        chemicals contained therein, generated from your company's hydraulic fracturing
        operations in each state, by year, between 2005 and 2009, and the methods by which your
        company disposed of this water in each state, by year, between 2005 and 2009.  If you are
        not responsible for recovery and disposal of flowback and produced water, please provide
        the Committee with a list of companies that would bear such responsibility.

        Please produce the requested documents by Friday, March 5, 2010.  In addition, we ask
that you advise the Committee by Thursday, February 25, 2010, whether you will comply with
this request on a voluntary basis.  Attachments to this letter provide additional information about
responding to Committee document requests.

        If you have any questions regarding this request, please contact Alison Cassady or Stacia
Cardille with the Committee staff at (202) 226-2424.

                                        Sincerely,

Henry A. Waxman                         Edward J. Markey
Chairman                                Chairman
                                        Subcommittee on Energy
                                           and Environment

Enclosure

cc:     The Honorable Joe Barton
        Ranking Member

        The Honorable Fred Upton
        Ranking Member
        Subcommittee on Energy
           and Environment

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOE BARTON, TEXAS
RANKING MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

**COMMITTEE ON ENERGY AND COMMERCE**

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

February 18, 2010

Mr. Douglas R. Ramsay
President and Chief Executive Officer
Calfrac Well Services
411 - 8 Avenue Southwest
Calgary, Alberta T2P 1E3

Dear Mr. Ramsay:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts.  We request your cooperation in this investigation.

To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and the potential impacts on human health or the environment, please provide the Committee with the following documents:

1.    Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, between 2005 and 2009.  For natural gas wells, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States.  Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2.    Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, between 2005 and 2009.  For natural gas wells, please provide data by year and state on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3.    All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

Mr. Douglas R. Ramsay
February 18, 2010
Page 2

4.      All documents relating to any allegations that the products used by your company in hydraulic fracturing caused harm to human health or the environment.

5.      Documents sufficient to show the percentage of hydraulic fracturing fluids your company recovered in each state, by year, between 2005 and 2009, and all documents estimating your company's fluid recovery efficiency.

6.      Documents sufficient to show the volume of flowback and produced water, and the chemicals contained therein, generated from your company's hydraulic fracturing operations in each state, by year, between 2005 and 2009, and the methods by which your company disposed of this water in each state, by year, between 2005 and 2009.  If you are not responsible for recovery and disposal of flowback and produced water, please provide the Committee with a list of companies that would bear such responsibility.

Please produce the requested documents by Friday, March 5, 2010.  In addition, we ask that you advise the Committee by Thursday, February 25, 2010, whether you will comply with this request on a voluntary basis.  Attachments to this letter provide additional information about responding to Committee document requests.

If you have any questions regarding this request, please contact Alison Cassady or Stacia Cardille with the Committee staff at (202) 226-2424.

Sincerely,

Henry A. Waxman
Chairman

Edward J. Markey
Chairman
Subcommittee on Energy
   and Environment

Enclosure

cc:     The Honorable Joe Barton
        Ranking Member

        The Honorable Fred Upton
        Ranking Member
        Subcommittee on Energy
           and Environment

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

February 18, 2010

Mr. J.W. Stewart
Chairman, President, and Chief Executive Officer
BJ Services Company
4601 Westway Park Boulevard
Houston, TX 77041

Dear Mr. Stewart:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts. We request your cooperation in this investigation.

In January 2008, BJ Services replied to a request from the House Committee on Oversight and Government Reform for documents and data on the company's hydraulic fracturing activities from 2005 to 2007. The Subcommittee is continuing this inquiry. To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and potential impacts on human health or the environment, please provide the Committee with the following documents:

1. Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, in 2008 and 2009. For natural gas wells that your company hydraulically fractured between 2005 and 2009, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States. Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2. Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, in 2008 and 2009. For natural gas wells, please provide data from 2005 through 2009, arranged by year and state, on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3. All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

Mr. J.W. Stewart
February 18, 2010
Page 2

4.      All documents relating to any allegations that the products used by your company in
        hydraulic fracturing caused harm to human health or the environment.

5.      Documents sufficient to show the percentage of hydraulic fracturing fluids your company
        recovered in each state, by year, between 2005 and 2009, and all documents estimating
        your company's fluid recovery efficiency.

6.      Documents sufficient to show the volume of flowback and produced water, and the
        chemicals contained therein, generated from your company's hydraulic fracturing
        operations in each state, by year, between 2005 and 2009, and the methods by which your
        company disposed of this water in each state, by year, between 2005 and 2009.  If you are
        not responsible for recovery and disposal of flowback and produced water, please provide
        the Committee with a list of companies that would bear such responsibility.

        Please produce the requested documents by Friday, March 5, 2010.  In addition, we ask
that you advise the Committee by Thursday, February 25, 2010, whether you will comply with
this request on a voluntary basis.  Attachments to this letter provide additional information about
responding to Committee document requests.

        If you have any questions regarding this request, please contact Alison Cassady or Stacia
Cardille with the Committee staff at (202) 226-2424.

                                Sincerely,


Henry A. Waxman                         Edward J. Markey
Chairman                                Chairman
                                        Subcommittee on Energy
                                            and Environment


Enclosure

cc:     The Honorable Joe Barton
        Ranking Member

        The Honorable Fred Upton
        Ranking Member
        Subcommittee on Energy
            and Environment

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOE BARTON, TEXAS
RANKING MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

**COMMITTEE ON ENERGY AND COMMERCE**

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

February 18, 2010

Mr. David E. Wallace
Chairman and Chief Executive Officer
Superior Well Services
121 Airport Professional Building
Indiana, PA 15701

Dear Mr. Wallace:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts. We request your cooperation in this investigation.

To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and the potential impacts on human health or the environment, please provide the Committee with the following documents:

1.  Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, between 2005 and 2009. For natural gas wells, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States. Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2.  Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, between 2005 and 2009. For natural gas wells, please provide data by year and state on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3.  All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

4.  All documents relating to any allegations that the products used by your company in hydraulic fracturing caused harm to human health or the environment.

Mr. David E. Wallace
February 18, 2010
Page 2

5.    Documents sufficient to show the percentage of hydraulic fracturing fluids your company
      recovered in each state, by year, between 2005 and 2009, and all documents estimating
      your company's fluid recovery efficiency.

6.    Documents sufficient to show the volume of flowback and produced water, and the
      chemicals contained therein, generated from your company's hydraulic fracturing
      operations in each state, by year, between 2005 and 2009, and the methods by which your
      company disposed of this water in each state, by year, between 2005 and 2009.  If you are
      not responsible for recovery and disposal of flowback and produced water, please provide
      the Committee with a list of companies that would bear such responsibility.

      Please produce the requested documents by Friday, March 5, 2010.  In addition, we ask
that you advise the Committee by Thursday, February 25, 2010, whether you will comply with
this request on a voluntary basis.  Attachments to this letter provide additional information about
responding to Committee document requests.

      If you have any questions regarding this request, please contact Alison Cassady or Stacia
Cardille with the Committee staff at (202) 226-2424.

                              Sincerely,


Henry A. Waxman                        Edward J. Markey
Chairman                               Chairman
                                       Subcommittee on Energy
                                          and Environment


Enclosure

cc:    The Honorable Joe Barton
       Ranking Member

       The Honorable Fred Upton
       Ranking Member
       Subcommittee on Energy
          and Environment

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOE BARTON, TEXAS
RANKING MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

**COMMITTEE ON ENERGY AND COMMERCE**

2125 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

February 18, 2010

Mr. Dan Wilks
Chief Executive Officer
Frac Tech Services
16858 IH20
Cisco, TX 76437

Dear Mr. Wilks:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts. We request your cooperation in this investigation.

To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and the potential impacts on human health or the environment, please provide the Committee with the following documents:

1.    Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, between 2005 and 2009. For natural gas wells, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States. Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2.    Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, between 2005 and 2009. For natural gas wells, please provide data by year and state on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3.    All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

4.    All documents relating to any allegations that the products used by your company in hydraulic fracturing caused harm to human health or the environment.

Mr. Dan Wilks
February 18, 2010
Page 2

5.     Documents sufficient to show the percentage of hydraulic fracturing fluids your company
       recovered in each state, by year, between 2005 and 2009, and all documents estimating
       your company's fluid recovery efficiency.

6.     Documents sufficient to show the volume of flowback and produced water, and the
       chemicals contained therein, generated from your company's hydraulic fracturing
       operations in each state, by year, between 2005 and 2009, and the methods by which your
       company disposed of this water in each state, by year, between 2005 and 2009.  If you are
       not responsible for recovery and disposal of flowback and produced water, please provide
       the Committee with a list of companies that would bear such responsibility.

       Please produce the requested documents by Friday, March 5, 2010.  In addition, we ask
that you advise the Committee by Thursday, February 25, 2010, whether you will comply with
this request on a voluntary basis.  Attachments to this letter provide additional information about
responding to Committee document requests.

       If you have any questions regarding this request, please contact Alison Cassady or Stacia
Cardille with the Committee staff at (202) 226-2424.

                                   Sincerely,


Henry A. Waxman                              Edward J. Markey
Chairman                                     Chairman
                                             Subcommittee on Energy
                                                and Environment


Enclosure

cc:    The Honorable Joe Barton
       Ranking Member

       The Honorable Fred Upton
       Ranking Member
       Subcommittee on Energy
          and Environment

HENRY A. WAXMAN, CALIFORNIA
CHAIRMAN

JOE BARTON, TEXAS
RANKING MEMBER

ONE HUNDRED ELEVENTH CONGRESS

# Congress of the United States

## House of Representatives

**COMMITTEE ON ENERGY AND COMMERCE**

2125 Rayburn House Office Building

Washington, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

February 18, 2010

Mr. Roger Willis
President
Universal Well Services
201 Arch Street
Meadville, PA 16335

Dear Mr. Willis:

The Subcommittee on Energy and Environment is examining the practice of hydraulic fracturing and its potential impacts. We request your cooperation in this investigation.

To help inform the Subcommittee about the chemicals used in the hydraulic fracturing process and the potential impacts on human health or the environment, please provide the Committee with the following documents:

1. Documents sufficient to show the number of wells that your company hydraulically fractured in each state, by year, between 2005 and 2009. For natural gas wells, please provide data by year and state on the number of wells fractured to produce shale gas, coalbed methane, and tight sandstone gas in the United States. Please also provide data indicating for each natural gas well whether the fracturing occurred in, near, or below an underground source of drinking water as defined by the Safe Drinking Water Act.

2. Documents sufficient to show the identity and total volume of the products, including the chemicals contained therein, that your company used in hydraulic fracturing in each state, by year, between 2005 and 2009. For natural gas wells, please provide data by year and state on the identity and total volume of the products, including the chemicals contained therein, that your company used to produce shale gas, coalbed methane, and tight sandstone gas in the United States.

3. All documents relating to the health or environmental effects of the products, including the chemicals contained therein, used by your company in hydraulic fracturing.

4. All documents relating to any allegations that the products used by your company in hydraulic fracturing caused harm to human health or the environment.

Mr. Roger Willis
February 18, 2010
Page 2

5.      Documents sufficient to show the percentage of hydraulic fracturing fluids your company recovered in each state, by year, between 2005 and 2009, and all documents estimating your company's fluid recovery efficiency.

6.      Documents sufficient to show the volume of flowback and produced water, and the chemicals contained therein, generated from your company's hydraulic fracturing operations in each state, by year, between 2005 and 2009, and the methods by which your company disposed of this water in each state, by year, between 2005 and 2009. If you are not responsible for recovery and disposal of flowback and produced water, please provide the Committee with a list of companies that would bear such responsibility.

Please produce the requested documents by Friday, March 5, 2010. In addition, we ask that you advise the Committee by Thursday, February 25, 2010, whether you will comply with this request on a voluntary basis. Attachments to this letter provide additional information about responding to Committee document requests.

If you have any questions regarding this request, please contact Alison Cassady or Stacia Cardille with the Committee staff at (202) 226-2424.

Sincerely,

Henry A. Waxman
Chairman

Edward J. Markey
Chairman
Subcommittee on Energy
    and Environment

Enclosure

cc:     The Honorable Joe Barton
        Ranking Member

        The Honorable Fred Upton
        Ranking Member
        Subcommittee on Energy
            and Environment

comment:  how does one violate a voluntary agreement?  if it's voluntary, they can do what they like.

# Energy & Commerce Committee Investigates Potential Impacts of Hydraulic Fracturing

## Publications

*Thursday, 18 February 2010 08:58*

Chairman Henry A. Waxman and Subcommittee Chairman Edward Markey today sent letters to eight oil and gas companies that use hydraulic fracturing to extract oil and natural gas from unconventional sources in the United States. The Committee is requesting information on the chemicals used in fracturing fluids and the potential impact of the practice on the environment and human health.

"Hydraulic fracturing could help us unlock vast domestic natural gas reserves once thought unattainable, strengthening America's energy independence and reducing carbon emissions," said Chairman Waxman.  "As we use this technology in more parts of the country on a much larger scale, we must ensure that we are not creating new environmental and public health problems.  This investigation will help us better understand the potential risks this technology poses to drinking water supplies and the environment, and whether Congress needs to act to minimize those risks."

"Natural gas can play a very important role in our clean energy future, provided that it is produced in a safe and sustainable way," said Subcommittee Chairman Markey.  "By getting more information from the industry about hydraulic fracturing practices, Congress can help ensure that development of this important resource moves forward in a manner that does not harm the environment."

As Chairman of the Committee on Oversight and Government Reform in the last Congress, Rep. Waxman requested and received information from the largest hydraulic fracturing companies - Halliburton, BJ Services, and Schlumberger - on the chemicals used in their fracturing fluids. According to this data, two of these companies used diesel fuel in their fracturing fluids between 2005 and 2007, potentially **violating a voluntary agreement with EPA to cease using diesel.** Halliburton reported using more than 807,000 gallons of seven diesel-based fluids.  BJ Services reported using 2,500 gallons of diesel-based fluids in several fracturing jobs.  **Halliburton and BJ Services also indicated that they used other chemicals - such as benzene, toluene, ethylbenzene, and xylene - that could pose environmental risks in their fracturing fluids.**

Today Chairmen Waxman and Markey sent letters seeking additional information from Halliburton, BJ Services, and Schlumberger on these and related issues.  The Chairmen requested similar information from five smaller fracturing companies that comprise a growing share of the market:  Frac Tech Services, Superior Well Services, Universal Well Services, Sanjel Corporation, and Calfrac Well Services.

In addition, the Chairmen sent a memo to Members of the Subcommittee on Energy and Environment detailing the background on the issue, including EPA's recent work on hydraulic fracturing, the Committee on Oversight and Government Reform's investigative findings, and **the need for additional oversight and investigation.**

**Documents** [comment:  all included below.  the responses to these letters will be most interesting indeed!  I would love to see encana answer these questions about their secret fracs into and very near to alberta drinking water aquifers!]

- Examining the Potential Impact of Hydraulic Fracturing, Feburary 18, 2010
- Letter to Andrew Gould
- Letter to Roger Willis
- Letter to David J. Lesar
- Letter to Douglas R. Ramsay
- Letter to Darin MacDonald
- Letter to J.W. Stewart
- Letter to Dan Wilks
- Letter to David E. Wallace

Links to above letters are here:
http://energycommerce.house.gov/index.php?option=com_content&view=article&id=1896:energy-a-commerce-committee-investigates-potential-impacts-of-hydraulic-fracturing&catid=122:media-advisories&Itemid=55

# EXHIBIT 174

# Investigation into Complaint of New Gas Seep West Divide Creek 2007-2008

## Colorado Oil & Gas Conservation Commission

### Margaret Ash
### Environmental Protection Supervisor

Colorado Oil & Gas Conservation Commission

1

# OUTLINE

- Introduction
- Site Description
- Background
- Results
- Conclusions

Colorado Oil & Gas Conservation Commission

# Introduction

- COGCC has received several complaints since October 2007 alleging that a "new gas seep" has appeared in West Divide Creek.
  - Black material "seep"
  - Sheen on surface water and soil
  - Stressed vegetation
  - Gas bubbling in creek or ponds
  - Changes in river bank deposits
- Investigated through field visits, sampling and analysis, and data review.

Colorado Oil & Gas Conservation Commission

# Site Description

- Location
  - Section 12 Township 7 South Range 92 West
  - Garfield County
- Description
  - Braided stream channel  in an intermountain canyon
  - Stream flows highly variable
  - Wetlands
  - Ponds develop near creek due to beaver dams and debris piles
  - Alluvial deposits consist of clay, silt, sand, gravel, cobbles and boulders along stream channel
  - Wasatch Formation underlies alluvial deposits and forms canyon walls.

Colorado Oil & Gas Conservation Commission

# Site Visit - November 2007






Colorado Oil & Gas Conservation Commission

5

# Site Visit - December 2007






Colorado Oil & Gas Conservation Commission

# Site Visit - September 2008






Colorado Oil & Gas Conservation Commission

# Site Visit - September 2008






Colorado Oil & Gas Conservation Commission

8

# Background

- 6  field visits conducted by COGCC environmental and or engineering staff from November 2007 to December 2008.

- Sampling and Analysis

  - Samples

    - 9 soil samples

    -  1 evaporative deposit sample

    - 2 groundwater samples (water well and seep from river bank)

    - 2 surface water samples

    - 2 gas samples

# Background

- 2 samples of "stressed" vegetation
- 3 mineralogical samples
- Samples submitted for analysis of:
  - dissolved methane, stable isotopes
  - volatile organics (VOC), semi-volatile organic (SVOC)
  - gasoline range organics (GRO), diesel range organics (DRO)
  - x ray diffraction (XRD) and polarized light microscopy (PLM)
  - Plant diagnostics

Colorado Oil & Gas Conservation Commission

# RESULTS

- No VOC, SVOC or GRO were detected.
- Dissolved Methane: 43 ug/l in (area 2) surface water sample and 28 ug/l in water well (EB-culvert).
- Stable isotopes from 2007 consistent with 2004 samples indicting gas bubbling in surface water features is of biogenic origin.

Colorado Oil & Gas Conservation Commission

11

# RESULTS

- 3 DRO detections ranging from 8.1 to 12 mg/kg.
  - Concentrations near method detection limit.
  - These detections were not consistent with a diesel fuel
  - DRO detections considered to be more indicative of naturally occurring hydrocarbon material such as terpenes from pine needles, tannic acid from leaves and or other aromatic oils from sage and similar plants (EAL).

Colorado Oil & Gas Conservation Commission

12

# RESULTS

- Plant Samples – CSU Plant Diagnostic Lab
  - Oak leaves dry with black spots
    - Natural senescence, the black spots have a fungus growing on them, but are secondary colonizers and not the cause of the decline.
  - Grass
    - The grass has been colonized with advanced stage fungi.

Colorado Oil & Gas Conservation Commission

13

# CONCLUSIONS

- Black Seep material
  - No VOC, SVOC or GRO compounds were detected and the DRO detections are outside the pattern that a diesel fuel would generate.
  - Appears to be naturally occurring organic rich alluvial material (sand with silt and clay).

14

# CONCLUSIONS

- Sheens/biofilm
    - The orange and purple sheens  noted on surface water and soils are naturally occurring biofilms.
    - BART testing shows that IRB and SRB bacteria exist in the surface water.
    - Laboratory testing indicates that the surface water, ground water and soils contain iron and manganese which are used in oxidizing process by IRB.
    - Biofilms occur naturally in wetland environments and are not necessarily an indication of impact from oil and gas activity.
    - No biofilms were noted during the December 2008 site visit.

Colorado Oil & Gas Conservation Commission

15

# CONCLUSIONS

- Plant studies conducted by CSU Plant Diagnostic Laboratory showed no indication of impacts from oil and gas activities.

- River Bank Deposits - Mineralogical  Studies

  - Material was collected from along stream channel and compared to an EnCana frac sand sample.
  - River bank material is not consistent with frac sand.
  - Material differs from frac sand in texture, grain size, and composition.

Colorado Oil & Gas Conservation Commission

# CONCLUSIONS

- Gas Sampling
  - Two gas samples collected by COGCC in 2007.
  - Isotopic analysis identified gas as near surface microbial methane.
  - No gas bubbles noted in fall site visits and only trace amounts noted during December 2008 site visit.
- Data does not indicate a new gas seep is occurring.

Colorado Oil & Gas Conservation Commission

Colorado Oil & Gas Conservation Commission

| | Located* | Description of Issue | Lab Sample ID | Laboratory Analysis | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Landowner concerned has sand that been extruded into subsurface and onto surface causing distressed vegetation. | | GC-MS VOLATILE ORGANICS BTEX | GC-MS VOLATILE ORGANICS-GRO | GC-MS SEMI VOLATILES/DRO | GRO | pH, S | |
| Area 2 | | | | GC/MS VOLATILE ORGANICS | GC-MS SEMI VOLATILES/DRO | METHANE | TOTAL METALS | GENERAL CHEMISTRY | |
| Area 3 | | | | DISSOLVED METALS | | | | | |
| Area 1 | | | | BTEX GC/MS | GC-MS VOLATILE ORGANICS-GRO | GC-MS SEMI VOLATILES/DRO | | | |
| Area 4 | | | | BTEX GC/MS | GC-MS VOLATILE ORGANICS-GRO | GC-MS SEMI VOLATILES/DRO | GRO | pH, S | |
| Area 5 | | | Landowner had previously observed black material bubbling. | | GC-MS VOLATILE ORGANICS GRO | GC-MS SEMI VOLATILES/DRO | | | | |
| Area 6 | No GPS | | Landowner believes trees are stressed, black spots observed. | no samples submitted | | | | | |
| Area 7 | No GPS | | Stressed vegetation | no samples submitted | | | | | |
| Area 8 | | | Black soil near creek | | GC-MS VOLATILE ORGANICS GRO | GC-MS SEMI VOLATILES/DRO | | | | |
| Area 9 | No GPS | | Orange and purple biofilm | | GC-MS SEMI VOLATILES/DRO | | | | |
| Area 10 | | | Stressed vegetation and white/orange precipitate material | | | | GRO | TOTAL METALS | pH, SC, |
| FR Water Well | No GPS readings | Culvert | Water quality monitoring | | GC/MS VOLATILE ORGANICS | GC/MS SEMI VOLATILES | METHANE | | DISSOLVED METALS | GENERAL CHEMISTRY |
| FR Water Well | No GPS readings | Culvert | Water quality monitoring | | | | | | | TOTAL METALS |
| FH | No GPS AT FILTER HOUSE | Filter House | Stressed vegetation by creek filter housing | | GC/MS VOLATILE ORGANICS BTEX | GC/ VOLATILES GRO | GC-MS SEMI VOLATILES/DRO | | | |
| CREEK BANK WEST SIDE | NO GPS | CREEK TERRACE | Groundwater seeping from creek bank. No odors, clear. | | BTEX | TOTAL VOLATILE HYDROCARBONS | TOTAL EXTRACTABLE HYDROCARBON | METHANE | DISSOLVED METALS | TOTAL METALS |
| black seep soil | | creek bank | | | | | | | | |
| orange seep water | | creek bank | | | | | | | | |

Colorado Oil & Gas Conservation Commission

Colorado Oil & Gas Conservation Commission

*STATE OF*
*COLORADO*
# OIL & GAS
**CONSERVATION COMMISSION**

DEPARTMENT OF NATURAL RESOURCES
*Bill Ritter, Jr., Governor*
1120 Lincoln St. Suite 801
Denver, CO 80203
Phone: (303) 894-2100
FAX: (303) 894-2109
www.colorado.gov/cogcc

August 7, 2009

Mr. and Mrs. Ellsworth
20991 Weld Count Road 20
Fort Lupton, CO 80621

RE:   Ellsworth Water Well Investigation (WW Permit No. 201558)
        SESE Section 16 – Township 2 North - Range 65 West
        COGCC Complaint Investigation No. 200196553
        Weld County, Colorado

Dear Mr. and Mrs. Ellsworth:

This letter summarizes the process, results, and conclusions of the Colorado Oil and Gas
Conservation Commission (COGCC) staff investigation into the occurrence of hydrocarbon
gases in your water well under COGCC Complaint Investigation No. 200196553.

The Division of Water Resources (DWR) permit number for your water well is No. 201558 and
according to the DWR water well record it was drilled in October 1998 to a total depth of 695
feet below the ground surface (fbgs) and completed as a Laramie-Fox Hills Aquifer water well.
The well is screened from 475 to 685 fbgs. The well was drilled under a permit issued to Ronald
Lakey of Longmont, Colorado. In 2001, the Dickhausens of Thornton, Colorado submitted to
DWR a Pump Installation and Test Report for this water well. The test report shows the
installation of a submersible water pump with an intake at a depth of 500 fbgs and a pumping
rate of 15 gallon per minute.

On or around September 18, 2008, Mrs. Ellsworth contacted COGCC staff for assistance in
investigating the occurrence of methane gas in your water well. You indicated that you had
recently purchased the property and water well at 20991 WCR 2, and that when the water well
was pumped you noticed significant bubbling in the water and when the water treatment system
was "back-washed" into the septic tank the septic pump shut off automatically. On your behalf,
a third party contractor had collected and analyzed samples of the gas collected from the house
kitchen sink and determined that the gas was methane. Because there are active oil and gas
production wells and facilities in the area in which you live, you were concerned that the
methane gas in your water well might be related to a release from one of these facilities/wells.

On August 10, 2008, you had also collected samples from the water well and submitted these
samples to Weld County Department of Public Health and Environment (WCDPHE) for
analysis. Methane was not one of the constituents analyzed by the WCDPHE. You have
provided the COGCC staff with the analytical results from that sampling.