August 7, 2009
Ellsworth – Complaint No. 200196553
Page 2

In response to your complaint, on September 22, 2008, COGCC staff collected samples from your water well for analysis of general water quality parameters, organic compounds associated with oil and gas production, gas composition and stable isotopes of methane and deuterium, and for nuisance bacteria. Upon receipt of the analytical results the COGCC staff sent you a summary letter on October 27, 2008, presenting and discussing the results from the COGCC sampling. In addition, the COGCC letter compared the results with those from the WCDPHE analyses. The methane gas present in the September 22, 2009, COGCC sample was identified as being a mixture of thermogenic and biogenic gas and the heavier hydrocarbon gases were thermogenic. The thermogenic gases are likely related to oil and gas operations.

As a result of the determination that the gas in your water well was in part thermogenic, the COGCC staff began an investigation of the producing oil and gas wells in the vicinity of your water well for evidence of a release of production gas into the Laramie-Fox Hills Aquifer. The operators of these wells are Noble Energy (Noble) and Kerr McGee/Anadarko (KMG). COGCC staff contacted Noble and KMG to inform them that a water well impacted by thermogenic gas had been discovered and that the COGCC would be investigating the source of the gas.

From the date of your original contact with the COGCC, the staff has devoted significant resources to try to determine the source of the thermogenic hydrocarbon gases in your water well. Six staff members have been involved to varying degrees in this effort. As is the COGCC's standard procedure, you have been kept informed about all phases of the investigation. When available, analytical results and a discussion of the COGCC's interpretation of the results have been sent to you. The COGCC staff has answered numerous inquiries from you totaling approximately 40 separate email and telephone communications. In addition, staff has prepared approximately 20 written communications for you explaining the steps being taken in our investigation. The following is a summary of our investigation activities and conclusions.

## ENGNEERING AND WATER WELL INVESTIGATION

### Engineering Investigation – Oil and Gas Wells

Concurrent with evaluation of your water well sample results, the COGCC Engineering staff initiated review of drilling, well construction, and well completion records for the 37 oil and gas wells within a one-mile radius of your water well. The review included checking the surface casing depth, checking whether the Laramie-Fox Hills Aquifer was protected by the well construction, and checking whether there were anomalies in gas production that might indicate gas leakage from the well.

Based on COGCC staff experience investigating impacts to ground water, we focused the field testing of oil and gas wells to those within ½ mile of your water well. This is because, except in very rare instances, oil and gas wells that have impacted water wells are located less than 1,000 feet from the impacted water well, so our process of field testing oil and gas wells located up to ½ mile or 2,640 feet from an impacted water well extends by more than 2½ times this distance. In addition, thermogenic gas or a mixture of thermogenic and biogenic gas was not detected in

any other water wells so we conclude that the impact to the Laramie-Fox Hills Aquifer that is affecting your well is localized.

There are nine oil and gas wells within ½ mile of your water well. On October 15, 2008, COGCC staff witnessed measurement of bradenhead pressures on these nine wells. The bradenhead valve is connected to the open space between the production casing and the surface casing and opening the valve to measure pressure and check for gas and fluids is a technique used to help determine whether there is a casing or wellhead leak. Bradenhead pressures were not measured and fluids were not present in any of the nine wells tested.

On January 8, 2009, Noble performed a mechanical integrity test (MIT) on the Powers 21-22 well which had been selected by the COGCC staff for further investigation based on some earlier well casing/well cementing issues. The MIT involves pressuring-up the production casing of an oil and gas well and observing any pressure loss which would indicate a possible production casing leak. This well passed the MIT. In March 2009, the remaining wells within the ½ mile radius were MITed. All these wells passed the MITs.

The results of the bradenhead pressure measurements and MITs indicate that the oil and gas wells within ½ mile of your water well are operating properly and not leaking gas, but do not negate the possibility of a prior leak that was subsequently remediated.

**Former Powers No. 1 well**

Staff review of COGCC well files showed that an old well, the Powers No. 1 (API 05-123-05076), had been drilled sometime around 1946 in Section 22, Township 2 North, Range 65 West, which is southeast of your property. However, the COGCC records regarding the Powers No. 1 did not specify the exact well location or include information about the depth, casing, or how the well was abandoned. Because of the limited amount of information in the COGCC records and because this old well had the potential to be a source or conduit for ground water contamination, the COGCC conducted a search for additional information about this well. Records concerning the Powers No. 1 well were found at the Denver Earth Resources Library, which provided a specific location and information about both well casing and depth. According to the records, the Powers No. 1 well was spud on April 18, 1946 by J. Clayton and drilled to a total depth of 1,005 fbgs with well casing set to a depth of 335 fbgs. Other than some information about the rocks encountered during the drilling of the well (i.e., lithologic information), no additional information was found.

Between May 26, 2009, and June 16, 2009, the COGCC reentered the old well bore, sampled the well for gas and general water quality, and abandoned the well by cementing the borehole from total depth to the surface. Results of a sample collected on May 27, 2009, show that the former Powers No. 1 did not have gas in it and there were no unusual water quality results observed. A second sample collected on June 11, 2009, was analyzed for gas composition and stable isotopes of carbon and hydrogen. A small amount of biogenic methane gas, similar to the biogenic gas that occurs frequently in the Laramie-Fox Hills aquifer, was detected.

As a result of the reentry and sampling, the COGCC staff determined that the Powers No. 1 well is not the source of the thermogenic gas observed in your water well. The COGCC spent approximately $107,000 on reentering and properly plugging this well.

## Water Well Investigation

On February 20, 2009, COGCC staff collected a second sample of gas from your water well and on March 11, 2009, a second water sample was collected. The analytical results for these two samples are similar to the results for the water and gas samples collected by staff on September 22, 2008.

Between October 22, 2008, and April 7, 2009, COGCC staff collected production gas samples from the nine oil and gas wells within ½ mile of your water well for gas composition and stable isotope analysis. As part of the COGCC staff evaluation of the theromgenic gas in your water well, the analytical results of these production gas samples were compared to the analytical results for the gas from your water well. Unfortunately, after a thorough review of all of the analytical results the COGCC staff is unable to identify any of the oil and gas wells within ½ mile of your water well as the source of the thermogenic hydrocarbon gases (methane, ethane, propane, iso- and n-butanes, iso- and n-pentanes, and hexanes) present in your well.

Throughout large areas of Weld County the Laramie-Fox Hills Aquifer, in which your water well is completed, has naturally occurring bacterially produced methane (biogenic methane). The source of this natural methane is likely from coals present in the aquifer. Isotopically and compositionally, this biogenic gas has a distinctive signature that is different from the composition of the thermogenic gas and the stable isotopes of the methane produced from the oil and gas wells in your area. Generally, these differences make identifying the presence of thermogenic gas in a water well versus naturally occurring biogenic gas relatively straight forward. However, when the gas in a water well is a mixture of biogenic and thermogenic gas the isotopic signature of the gas is not as definitive a tool for determining the source. When this occurs, the evaluation of the other hydrocarbon gases, propane, iso- and n-butanes, iso- and n-pentanes, and hexanes (C3 through C6), which are present in the production gas, is very important and often helps in identifying a possible source. The biogenic gas in the Laramie-Fox Hills Aquifer does not contain C3 through C6 gases and, when present in a Laramie-Fox Hills Aquifer water well, it is evidence of an impact from thermogenic gas (as was noted in the October 2008 evaluation of your water well).

Comparison of the C3 through C6 compounds from an impacted water well to those in the gas produced from oil and gas wells in the area is a tool used by the COGCC staff to identify a possible source. The COGCC staff looked at both the isotopes of methane and the occurrences of the other hydrocarbon gases in the samples collected both from your water well and the oil and gas wells. The methane gas in your water well is a mixture of both naturally occurring biogenic gas and thermogenic gas which, as discussed earlier, makes the identification of a specific source difficult. Based on isotopic evaluation of the methane in your water well and the samples from the production wells, the COGCC staff are unable to identify a particular oil and gas well as the source of thermogenic gas in your water well. Our evaluation of the C3 through

C6 compounds from the production well samples and your water well also failed to positively identify a particular oil and gas well as the source.

**Other Water Well Sampling**

As part of the investigation into the occurrence of methane gas in your water well and to determine whether other water wells had been impacted, 26 water wells were sampled. This sampling and analysis was conducted by the COGCC, Noble, and KMG. Thermogenic gas was not detected in any of these other water wells. Because the results of this sampling and analysis have been discussed in earlier communication and correspondence with you, they will not be discussed in this letter. The COGCC spent approximately $30,000 collecting and analyzing samples from water wells and oil and gas wells.

You have expressed concern that some of the samples collected from water wells were collected at a time when nearby oil and gas wells had been "killed." You have further stated that the "killing" of these wells rendered the analytical results invalid because it had effectively cut off gas that was leaking out of a well or wells. However, it is COGCC's experience that if an oil and gas well has leaked and impacted ground water the effects of that leak can be detected long after the leak has been repaired or the well has been plugged and abandoned; therefore, we believe that if another water well had been impacted by gas leaking from an oil and gas well the thermogenic gas that would have been entrained in the ground water would still be present and would have been detected in the water sample. That being said, if any of your neighbors still believe that their water well contains thermogenic gas or has been impacted by gas leaking from an oil and gas well they should contact us and we will collect additional samples from their water well for laboratory analysis.

**Mitigation of the Gas in Your Water Well**

On March 21, 2009, Noble voluntarily began providing you with temporary substitute water for domestic use at your home. By letter dated June 17, 2009, you and Noble jointly advised me that you had recently agreed upon certain measures to further mitigate the natural gas detected in your water well. That letter states that Noble will install a filtration system to remove the gas from your water well and make such well safe for your use. The letter also states that you and Noble have further agreed to cooperate and work diligently to resolve any remaining issues between you. It is our understanding that the filtration system is designed to mitigate the methane and other gases entrained in your water and eliminate possible fire or explosion hazards and is now operating.

**CONCLUSION**

The method used by the COGCC staff to investigate and address the impact to your water well has been thorough and appropriate. The COGCC staff's conclusion, supported by all the investigation records, is that your water well contains a mixture of both biogenic and thermogenic gas and that the thermogenic gas appears to be from oil and gas activity; however, the COGCC staff has been unable to identify any current activity or existing well as the source of the impact. As previously discussed, all current oil and gas wells within ½ mile of your water well are operating properly and not leaking gas, but this does not negate the possibility of a prior leak that was subsequently remediated. Based on our experience investigating other groundwater impacts, as well as our review of oil and gas well records and water well samples, we do not believe that the gas in your water well is attributable to an oil and gas well located more than ½ mile away.

Because no responsible party for the water well impact can be identified, the staff will not be issuing a notice of violation (NOAV) or pursuing enforcement against any oil and gas operator as a result of the investigation of Complaint No. 200196553. Because Noble voluntarily has constructed a water treatment system to mitigate the gas in your well water and because all oil and gas wells within ½ mile of your water well are operating properly, the COGCC staff considers the situation mitigated and COGCC complaint No. 200196553 closed. Nonetheless, if you wish, the COGCC staff will continue to collect samples from your water well for gas composition and stable isotope analysis on an annual basis. In the event that such analysis or any other future information allows us to identify the party responsible for the thermogenic gas in your water well, then we may issue an NOAV or pursue enforcement at that time.

Under COGCC Rule 522, you as the complainant, have the right to file an application for a hearing with the Commission regarding this complaint if you are not satisfied with this resolution. If you wish to apply for a hearing, please contact Rob Willis, COGCC Hearings Officer at 303-894-2100 ext. 5125.

If you have any questions or would like to discuss these matters further, please contact me at 303-894-2100 ext. 5122, or Debbie Baldwin, COGCC Environmental Manager at ext. 5111, or Dave Dillon, COGCC Engineering Manager at ext. 5104.

Respectfully,

David S. Neslin

David Neslin
Director
Colorado Oil & Gas Conservation Commission

cc: Weld County Commissioners



United States
Environmental Protection
Agency

EPA 600/R-00/000 | December 2011 | www.epa.gov/ord

# DRAFT

Investigation of Ground Water
Contamination near
Pavillion, Wyoming



Office of Research and Development
National Risk Management Research Laboratory, Ada, Oklahoma 74820

**DRAFT**

**DRAFT**

# Investigation of Ground Water Contamination near Pavillion, Wyoming

**Dominic C. DiGiulio**
**Richard T. Wilkin**
**Carlyle Miller**

U.S. Environmental Protection Agency
Office of Research and Development
National Risk Management Research Laboratory
919 Kerr Research Drive
Ada, OK 74820

**Gregory Oberley**

U.S. Environmental Protection Agency
Region 8
1595 Wynkoop Street
Denver, CO 80202

**Office of Research and Development**
**National Risk Management Research Laboratory, Ada, Oklahoma 74820**

**DRAFT**

# Notice

This report has been reviewed and approved by the U.S. Environmental Protection Agency's Office of Research and Development. Approval does not signify that the contents necessarily reflect the views and policies of the Agency, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

DRAFT

# Foreword

The U.S. Environmental Protection Agency (EPA) is charged by Congress with protecting the Nation's land, air, and water resources.  Under a mandate of national environmental laws, the Agency strives to formulate and implement actions leading to a compatible balance between human activities and the ability of natural systems to support and nurture life.  The scientific arm of EPA, the Office of Research and Development (ORD), conducts leading-edge research that helps provide the solid underpinning of science and technology for the Agency. The work at ORD laboratories, research centers, and offices across the country helps improve the quality of air, water, soil, and the way we use resources.  The research described in this report was designed and conducted by ORD's National Risk Management Research Laboratory in Ada, Oklahoma, working in close collaboration with scientists from EPA Region 8 in Denver, Colorado.

DRAFT

# Acknowledgements

The authors would to like to acknowledge valuable comments from 1 internal and 3 external reviewers used to improve this manuscript.  We would also like to acknowledge Dr. Randall Ross, Dr. Junqi Huang, Dr. Doug Beak, Mr. Steve Acree,  Mr. Tony Lee, Mr. Ken Jewell, Mr. Tim Lankford, Mr. Russell Neil, and Ms. Kristie Hargrove from ORD/NRMRL/Ada and Mr. Christopher Ruybal and Ms. Alexandra Kirkpatrick (student contractors) for their assistance in collecting ground water and gas samples. We would like to acknowledge Dr. Jennifer Gundersen of EPA's Region 3 Laboratory for conducting analysis water samples for glycols and 2-butoxyethanol and Dr. William Batschelet of EPA's Region 8 Laboratory for conducting and arranging the analysis of water samples for a number of classes of compounds.  We also thank Mr. John Cox, Mr. Steve Markham, Ms. Tracy Pardue, Dr. Feng Lu, Mr. Joseph Karikari, Ms. Lisa Hudson, Dr. Sujith Kumar, Mr. Joe Tyburski, Mr. David Kessler, Mr. Jim Wilson (Shaw Environmental and Infrastructure), Mr. Mark White, Ms. Lynda Callaway, and Mr. Dennis Miller (ORD/NRMRL/Ada) for analytical support.  We would like to thank Mr. Nathan Wiser, Mr. Robert Parker, and Ms. Johanna Miller of EPA Region 8 and Mr. Ron Mellor (SEE employee) for assistance in interpreting data and numerous helpful comments.  We would like to acknowledge Mr. Steve Vandegrift of ORD/NRMRL/Ada for providing helpful comments in improving QA/QC aspects of this investigation and overseeing development of the QAPP and ADQs.  We would like to acknowledge Dr. John Wilson for assistance in interpretation of data.  We are grateful to Ms. Ayn Schmit of EPA Region 8 and Dr. David Jewett of ORD/NRMRL/Ada for ongoing support in their respective management roles and ability to effectively communicate technical details in this manuscript to others.  We would like to express our appreciation to Mr. Jeff Locker and Ms. ZoeAnn Randall for access to their property for monitoring well installation and to Mr. Louis Meeks for access to his property for domestic well sampling.  We are grateful to Mr. John Fenton for access to his property for domestic well sampling and facilitating contact with domestic well owners in the area.  We are grateful to Ms. Kathy Tynsky of SRA for assistance in developing graphics in this document.

DRAFT

# Contents

**Notice** .................................................................................................................................. ii

**Foreword** ............................................................................................................................. iii

**Acknowledgements** ........................................................................................................... iv

**Figures** ................................................................................................................................ vi

**Tables** ................................................................................................................................. ix

**Extended Abstract** ............................................................................................................. xi

**1.0 Site Background** ............................................................................................................ 1

**2.0 Methods** ........................................................................................................................ 5

    Sampling Chronology ...................................................................................................... 5

    Deep Monitoring Well Installation ................................................................................. 5

    Ground Water Sampling of Deep Monitoring Wells in Phase III and IV ...................... 11

    Gas Sampling from Casing of Deep Monitoring Wells in Phase III and IV .................. 15

    Domestic Well Sampling for Methane Using a Closed System in Phase IV ................. 15

    Review of Borehole Geophysical Logs .......................................................................... 15

    Review of Cement Bond/Variable Density Logs ........................................................... 16

**3.0 Results and Discussion** ............................................................................................... 17

    Ground Water and Soil Sample Results near Three Pits ............................................. 17

    Inorganic Geochemistry ............................................................................................... 17

    Organic Geochemistry .................................................................................................. 23

    Natural Gas Migration .................................................................................................. 27

    Evaluation of Cement Bond/Variable Density Logs Along Transect ............................ 29

    Potential Migration Pathways ...................................................................................... 32

**4.0 Conclusions** .................................................................................................................. 33

**5.0 References** .................................................................................................................... 40

**Appendices** ........................................................................................................................ A1

    Appendix A – Summary of Analytical Results ............................................................. A1

    Appendix B – Quality Assurance and Quality Control (QA/QC) for Analysis ............. B1

    Appendix C – Photographic Log of Deep Monitoring Well Construction ................... C1

    Appendix D – Photographic Log of Ground Water Sampling ...................................... D1

    Appendix E – Examples of Cement Bond/Variable Density Log Interpretation ......... E1

**DRAFT**

# Figures

**Figure 1. (a)** Location of Wind River Basin in Wyoming. **(b)** Location of Pavillion Gas Field in the Wind River Basin. Figure from Johnson et al. 2007 ................................................................................................................................1

**Figure 2.** Chronology of production well completion at the Pavillion Gas Field ........................................................2

**Figure 3.** Histograms summarizing depths of top of perforation interval of production wells, base of surface casing of production wells, and base of screened interval of domestic wells ...........................................................2

**Figure 4.** Generalized stratigraphic columns and correlations of Mississippian through Eocene strata in the Wind River Basin, Wyoming. The Pavillion Gas Field is located in the Western Wind River Basin. Figure from Johnson et al. 2007 ................................................................................................................................................... 3

**Figure 5.** Map illustrating location of oil and gas production wells, sampled PGDWxx series domestic wells (only numbers shown to conserve space), two deep monitoring wells, and three shallow monitoring wells near pits. PGDW07 and PGDW08 are municipal wells in the town of Pavillion ........................................................................6

**Figure 6a.** Schematic illustrating construction of MW01 .......................................................................................9

**Figure 6b.** Schematic illustrating construction of MW02 .....................................................................................10

**Figure 7.** Resistivity as a function of depth in MW01 and MW02. MW01 and MW02 were screened at 233 - 239 m and 293 - 299 m bgs respectively corresponding to elevated resistivity and presence of coarse-grained sandstone. FID readings in MW01 denote detections of methane during open air logging of mud. FID monitoring at MW02 was sporadic and is not illustrated here .............................................................................11

**Figure 8.** Variation of water level as a function of time in MW01 during Phase 4 well purging. The initial pumping rate was 24.2 L/min. After approximately 30 minutes of purging, the flow rate was decreased to 7.6 L/min. This reduced flow rate caused partial recovery of the water level and confirmation that formation water was being accessed ..............................................................................................................................................12

**Figure 9.** Flow-cell readings as a function of time for specific conductance, dissolved oxygen, pH, and oxidation-reduction potential (well MW02, Phase IV sampling) ...........................................................................................13

**Figure 10.** Schematic of closed (no contact to atmosphere) sampling train for domestic wells. Water flow from domestic well and into sparge cell was approximately 5 and 1 L/min respectively. Excess water bled through valve used for sampling prior to sample collection. Gas flow into sparge cell and portable FID/PID sparge cell was approximately 20 and 1 L/min. Excess air was bled through splitter above sparge cell .................................16

**Figure 11.** Durov diagram showing ground water chemistry trends obtained in Phase I - IV sampling events and the composition of irrigation water ................................................................................................................17

**Figure 12.** Depth trends of chloride, pH, sulfate, and potassium (filled black squares = domestic wells, filled red circles = monitoring wells) ................................................................................................................................18

# DRAFT

**Figure 13.**  Saturation indices for **(a)** gypsum versus sulfate concentration and **(b)** calcite versus calcium concentration.  Saturation Index is equal to the logarithm of the ratio of the ion activity product to the mineral solubility product.  A Saturation Index of 0 corresponds to chemical equilibrium; values less than 0 and greater than 0 correspond to undersaturated and oversaturated conditions, respectively .................................................19

**Figure 14.** Concentration trends versus specific conductivity. Note the monitoring wells show high pH and low sulfate, calcium, and sodium relative to the general trend observed in the domestic wells (filled black squares = domestic wells, filled red circles = monitoring wells) ..............................................................................21

**Figure 15.  (a)** Results of KOH titration models plotted as pH versus grams of KOH added per kilogram of solution.  Initial water compositions are from PGDW49, PGDW20, and PGDW32.  Model accounts for reactions taking place in solution as KOH is added and equilibrated.  pH range in deep monitoring wells shown for reference; **(b)** Buffer Intensity plot or first derivative of titration plot, pH versus change in concentration of base ($C_B$) per change in pH...........................................................................................................................22

**Figure 16.**  Hydrogen and oxygen isotope values (permil, Vienna Standard Mean Ocean Water, VSMOW) for ground water samples (black squares=domestic wells; red circles=deep monitoring wells) relative to the Global Meteoric Water Line from Craig (1961) .................................................................................................22

**Figure 17.** Organic compounds detected in deep monitoring wells MW01 and MW02 during Phase III and IV sampling events...........................................................................................................................................25

**Figure 18.  (a)** Stable isotope ratios of carbon of methane versus ratio of methane ($C_1$) to ethane ($C_2$) and propane ($C_3$) in gas from production wells, monitoring wells, and domestic wells. Values of 100,000 are used to denote non detection of ethane and propane in samples. **(b)** Stable isotope ratios of carbon versus hydrogen of methane in gas from production wells (both literature and measured values), monitoring wells, and domestic wells. δD was not determined for PGDW32. Oxidation pathway (enrichment of [13]C of remaining $CH_4$ with biodegradation) is illustrated. **(c)** Methane concentration in domestic and monitoring wells as a function of proximity to production wells and depth. Values of 1.0 were used for non-detection (detection limit 5 µg/L) ....28

**Figure 19.**  Map illustrating transect used to develop lithologic cross section and evaluation of CBL/VDLs ..........30

**Figure 20.**  Lithologic cross-section along transect illustrating production wells (with evaluation of CBL/VDLs), domestic wells, and blowout location.  Red arrows denote depths of hydraulic fracturing of unknown areal extent .....................................................................................................................................................31

**Figure C1.**  Photograph of drilling rig on platform with shakers for mud recirculation at MW02..........................C2

**Figure C2.**  Photograph of blowout prevention (BOP) for annular space at base of drilling rig platform at MW02 ......................................................................................................................................................................C2

**Figure C3.**  Photograph of blowout preventer for drillstem ..................................................................................C2

**Figure C4.**  Photograph of bit and drillstem with bit for mud rotary drilling at MW02 ..........................................C3

**Figure C5.**  Photograph of water truck used to transport water to mix mud ..........................................................C4

**Figure C6.**  Photograph of Quik-Gel bentonite (Halliburton) used to create mud for drilling .................................C4

**Figure C7.**  Photograph of mud additives EZ Mud Gold (Halliburton) and Dense Soda Ash .....................................C4

# DRAFT

**Figure C8.**  Photograph of mud additive Penetrol (Halliburton) ............................................................C4

**Figure C9.**  Photograph of flow of mud and cuttings from borehole at MW02 ......................................C5

**Figure C10.**  Photograph of monitoring of mud and cuttings using a Thermo Scientific TVA-1000B FID/PID at MW02 ................................................................................................................................................C5

**Figure C11.**  Photograph of pump used to transport mud and cuttings to shakers at MW02 ...............C6

**Figure C12.**  Photograph of flow of mud and cuttings to shakers at MW02.........................................C6

**Figure C13.**  Photograph of shakers separating mud from cuttings at MW02 .....................................C7

**Figure C14.**  Photograph of cuttings transported to disposal bins at MW02.......................................C8

**Figure C15.**  Photograph of pumping of mud back to borehole at MW02 ...........................................C9

**Figure C16.**  Photograph of injection of mud to borehole at MW02 ...................................................C10

**Figure C17.**  Photograph of collection of cuttings for lithologic characterization at MW02 ...............C11

**Figure C18.**  Photograph of removal of mud from cuttings at MW02 ................................................C11

**Figure C19.**  Photograph of white coarse-grained sand targeted by local well drillers and media in which screens are set in for both deep monitoring wells..............................................................................C11

**Figure C20.**  Photograph of setting of stainless-steel pre-packed screen and sand basket into borehole at MW02 ..............................................................................................................................................C12

**Figure C21.**  Photograph of securing sand basket and casing above screen........................................C13

**Figure C22.**  Photograph of placement of sand in sandbasket ..........................................................C13

**Figure C23.**  Photograph of well development at MW02 ...................................................................C14

**Figure D1.**  Photograph of flow from submersible pump through flowmeter at MW02.......................D2

**Figure D2.**  Photograph of flow of water to purge water disposal tank at MW02 ...............................D2

**Figure D3.**  Photograph (close-up) of flow of water into purge water disposal tank at MW02 ...........D3

**Figure D4.**  Photograph of water (foaming) flowing into YSI flow cell at MW02..................................D3

**Figure D5.**  Photograph of sampling at MW02.  The sample train was split prior to entry into purge water disposal container ...............................................................................................................................D4

**Figure D6.**  Photograph of field filtering samples for metals analysis at MW02 ..................................D4

**Figure D7.**  Photograph of sample collection at PGDW14 .................................................................D5

**Figure D8.**  Photograph of cooler packed with samples for shipment..................................................D5

**DRAFT**

**Figure E1.** Example of CBL/VDL indicating "no cement" at Pavillion Fee 34-03B. The CBL/VDL indicates no cement 2750 feet below ground surface at the time of logging................................................................E2

**Figure E2.** Example of "sporadic bonding" at Pavillion Fee 41-10 from 1000 to 1640 ft bgs. Hydraulic fracturing occurred at 1618 feet below ground surface. Arrow denotes interval of hydraulic fracturing.............................E3

**Figure E3a.** Example of "sporadic bonding" at Pavillion Fee 11-11B. Hydraulic fracturing occurred at 1516 feet below ground surface. Arrow denotes interval of hydraulic fracturing. Depths on CBL/VDL difficult to read and inserted on left margin................................................................................................................................E4

**Figure E3b.** Example of "sporadic bonding" Pavillion Fee 11-11B between 2350-3200 feet below ground suface. Hydraulic fracturing occurred at 3165 feet below ground surface. Arrow denotes interval of hydraulic fracturing. Depths on CBL/VDL difficult to read and inserted on left margin.................................................................E5

**Figure E4.** Example of "Sporadic Bonding" at Tribal Pavillion 24-02. Hydraulic fracturing occurred at 1538 feet bgs. Arrow denotes interval of hydraulic fracturing .............................................................................................E6

**Figure E5.** Example of "Good Bonding" (from surface casing at 645 ft bgs to 820 ft bgs) followed by "Sporadic Bonding" (from 820 ft bgs 1310 ft bgs) to "Good Bonding" at 1310 to target depth at Pavillion Fee 41-10B. ........E7

# Tables

**Table 1.** Drilling additives, properties and product use recommendations...............................................................7

**Table 2.** Analytical results of additives (compounds listed are those detected in ground water) ...........................8

**Table 3.** Geochemical impacts in deep ground water monitoring wells.................................................................24

**Table 4.** Association of inorganic and organic anomalies with compounds used for hydraulic fracturing ............26

**Table A1.** Summary of subsurface sample locations, depth of sample collection, times (phases) of sampling, target analytes, laboratories utilized, and analytical methods ................................................................................ A2

**Table A2a.** Geochemical results for Pavillion ground water ................................................................................. A8

**Table A2b.** Charge balance calculations for deep monitoring wells ...................................................................... A9

**Table A3a.** Summary of aqueous analysis of light hydrocarbons ........................................................................ A10

**Table A3b.** Summary of gas and headspace analysis of light hydrocarbons ...................................................... A12

**Table A3c.** Summary of isotopic data for dissolved, gas phase, and headspace analysis.................................... A14

**Table B1.** Sample collection containers, preservation, and holding times for ground water samples ..................B2

**Table B2.** Field QC samples for ground water analysis ..........................................................................................B3

# DRAFT

**Table B3.**  QA/QC requirements for analysis of metals and major ions ...................................................................B3

**Table B4.**  QA/QC requirements for analysis of dissolved gases, DIC/DOC, VOCs, low molecular weight acids and stable isotopes of water ................................................................................................................................................B4

**Table B5.**  QA/QC requirements for analysis of semi-volatiles, GRO, and DRO......................................................B5
**Table B6.**  QA/QC requirements for LC/MS/MS analysis of glycols .........................................................................B6

**TableB7a.**  ICP-OES blank results for Phase III and Phase IV sampling ....................................................................B7

**Table B7b.**  ICP-OES blank results for Phase III and Phase IV sampling ...................................................................B7

**Table B7c.**  ICP-MS blank results for Phase III and Phase IV sampling....................................................................B8

**Table B8.**  Blank results for Capillary Electrophoresis, Lachat Flow Injection Analysis, Dissolved Inorganic Carbon (DIC) and Dissolved Organic Carbon analyses for Phase III and Phase IV sampling.................................................B8

**Table B9.**  Blank results for Volatile Organic Compounds (µg/L) in Phase III and Phase IV sampling (Region 8 laboratory, Golden, CO) ...................................................................................................................................................B9

**Table B10.**  Blank results for Volatile Organic Compounds (µg/L) in Phase IV sampling (ORD laboratory, Ada, OK) ................................................................................................................................................................................. B11

**Table B11.**  Blank results for Semi-Volatile Organic Compounds (µg/L) in Phase III and Phase IV sampling (Region 8 laboratory, Golden, CO) .................................................................................................................................. B12

**Table B12.**  Blank results for GRO and DRO analyses for Phase III and Phase IV sampling (Region 8 laboratory, Golden, CO) and blank results for glycol ethers in Phase IV sampling (Region 3 laboratory, Fort Meade, MD) . B13

**Table B13.**  Duplicate data for selected major ions, DOC, and DIC in ground water samples collected during Phase III and Phase IV sampling activities........................................................................................................... B14

**Table B14.**  Duplicate data for methane and selected dissolved organic compounds in ground water samples collected during Phase III and Phase IV sampling activities ................................................................................... B15

**Table B15.**  QA/QC requirements for analysis of $\delta^{13}$C of DIC............................................................................. B16

**Table B16.**  QA/QC requirements for analysis for $\delta^{13}$C and $\delta$D of light hydrocarbons for aqueous and gas samples ................................................................................................................................................................. B16

**Table B17.**  QA/QC requirements for analysis of fixed gases and light hydrocarbons for aqueous and gas samples ................................................................................................................................................................. B16

**Table B18.** Summary of quality control samples, purpose, method, and frequency to support gas analysis...... B17

**Table B19.** Summary of analytes, instruments, calibration, and check standards for portable gas analyzers.... B17

**Table B20.** QA/QC Requirements for portable gas analyzers ............................................................................ B17

x

DRAFT

# Extended Abstract

In response to complaints by domestic well owners regarding objectionable taste and odor problems in well water, the U.S. Environmental Protection Agency initiated a ground water investigation near the town of Pavillion, Wyoming under authority of the Comprehensive Environmental Response, Compensation, and Liability Act. The Wind River Formation is the principal source of domestic, municipal, and stock (ranch, agricultural) water in the area of Pavillion and meets the Agency's definition of an Underground Source of Drinking Water. Domestic wells in the area of investigation overlie the Pavillion gas field which consists of 169 production wells which extract gas from the lower Wind River Formation and underlying Fort Union Formation. Hydraulic fracturing in gas production wells occurred as shallow as 372 meters below ground surface with associated surface casing as shallow as 110 meters below ground surface. Domestic and stock wells in the area are screened as deep as 244 meters below ground surface. With the exception of two production wells, surface casing of gas production wells do not extend below the maximum depth of domestic wells in the area of investigation. At least 33 surface pits previously used for the storage/disposal of drilling wastes and produced and flowback waters are present in the area. The objective of the Agency's investigation was to determine the presence, not extent, of ground water contamination in the formation and if possible to differentiate shallow source terms (pits, septic systems, agricultural and domestic practices) from deeper source terms (gas production wells).

The Agency conducted four sampling events (Phase I - IV) beginning in March 2009 and ending in April, 2011. Ground water samples were collected from domestic wells and two municipal wells in the town of Pavillion in Phase I. Detection of methane and dissolved hydrocarbons in several domestic wells prompted collection of a second round of samples in January, 2010 (Phase II). During this phase, EPA collected additional ground water samples from domestic and stock wells and ground water samples from 3 shallow monitoring wells and soil samples near the perimeter of three known pit locations. Detection of elevated levels of methane and diesel range organics (DRO) in deep domestic wells prompted the Agency to install 2 deep monitoring wells screened at 233 - 239 meters (MW01) and 293 - 299 meters (MW02) below ground surface, respectively, in June 2010 to better evaluate to deeper sources of contamination. The expense of drilling deep wells while utilizing blowout prevention was the primary limiting factor in the number of monitoring wells installed. In September 2010 (Phase III), EPA collected gas samples from well casing from MW01 and MW02. In October 2010, EPA collected ground water samples from MW01 and MW02 in addition to a number of domestic wells. In April 2011 (Phase IV), EPA resampled the 2 deep monitoring wells to compare previous findings and to expand the analyte list to include glycols, alcohols, and low molecular weight acids.

Detection of high concentrations of benzene, xylenes, gasoline range organics, diesel range organics, and total purgeable hydrocarbons in ground water samples from shallow monitoring wells near pits indicates that pits are a source of shallow ground water contamination in the area of investigation. When considered separately, pits represent potential source terms for localized ground water plumes of unknown extent. When considered as whole they represent potential broader contamination of shallow ground water. A number of stock and domestic wells in the area of investigation are fairly shallow (e.g., < 30 meters below ground surface) representing potential receptor pathways.

Determination of the sources of inorganic and organic geochemical anomalies in deeper ground water was considerably more complex than determination of sources in shallow media necessitating the use of mulitiple

# DRAFT

lines of reasoning approach common to complex scientific investigations.  pH values in MW01 and MW01 are highly alkaline (11.2-12.0) with up to 94% of the total alkalinity contributed by hydroxide suggesting addition of a strong base as the causative factor.  Reaction path modeling indicates that sodium-sulfate composition of ground water typical of deeper portions of the Wind River Formation provides little resistance to elevation of pH with small addition of potassium hydroxide. Potassium hydroxide was used in a crosslinker and in a solvent at this site.

The inorganic geochemistry of ground water from the deep monitoring wells is distinctive from that in the domestic wells and expected composition in the Wind River formation.  Potassium concentration in MW02 (43.6 milligrams per liter) and MW01 (54.9 milligrams per liter) is between 14.5 and 18.3 times values in domestic wells and expected values in the formation.  Chloride concentration in monitoring well MW02 (466 milligrams per liter) is 18 times the mean chloride concentration (25.6 milligrams per liter) observed in ground water from domestic wells and expected in the formation. Chloride enrichment in this well is significant because regional anion trends show decreasing chloride concentration with depth. In addition, the monitoring wells show low calcium, sodium, and sulfate concentrations compared to the general trend observed in domestic well waters. The formulation of fracture fluid provided for carbon dioxide foam hydraulic fracturing jobs typically consisted of 6% potassium chloride. Potassium metaborate was used in crosslinkers. Potassium hydroxide was used in a crosslinker and in a solvent. Ammonium chloride was used in crosslinker.

A number of synthetic organic compounds were detected in MW01 and MW02.  Isopropanol was detected in MW01 and MW02 at 212 and 581 micrograms per liter, respectively.  Diethylene glycol was detected in MW01 and MW02 at 226 and 1570 micrograms per liter, respectively. Triethylene glycol was detected in MW01 and MW02 at 46 and 310 micrograms per liter, respectively. Another synthetic compound, *tert*-butyl alcohol, was detected in MW02 at a concentration of 4470 micrograms per liter. Isopropanol was used in a biocide, in a surfactant, in breakers, and in foaming agents. Diethylene glycol was used in a foaming agent and in a solvent. Triethylene glycol was used in a solvent.  *Tert*-butyl alcohol is a known breakdown product of methyl *tert*-butyl ether (a fuel additive) and *tert*-butyl hydroperoxide (a gel breaker used in hydraulic fracturing).  Material Safety Data Sheets do not indicate that fuel or tert-butyl hydroperoxide were used in the Pavillion gas field. However, Material Safety Data Sheets do not contain proprietary information and the chemical ingredients of many additives.  The source of *tert*-butyl alcohol remains unresolved. However, *tert*-butyl alcohol is not expected to occur naturally in ground water.

Benzene, toluene, ethylbenzene, and xylenes (BTEX) were detected in MW02 at concentrations of 246, 617, 67, and 750 micrograms per liter, respectively. Trimethylbenzenes were detected in MW02 at 105 micrograms per liter.  Gasoline range organics were detected in MW01 and MW02 at 592 and 3710 micrograms per liter.  Diesel range organics were detected in MW01 and MW02 at 924 and 4050 micrograms per liter, respectively. Aromatic solvent (typically BTEX mixture) was used in a breaker.  Diesel oil (mixture of saturated and aromatic hydrocarbons including naphthalenes and alkylbenzenes) was used in a guar polymer slurry/liquid gel concentrate and in a solvent.  Petroleum raffinates (mixture of paraffinic, cycloparaffinic, olefinic, and aromatic hydrocarbons) were used in a breaker.  Heavy aromatic petroleum naphtha (mixture of paraffinic, cycloparaffinic and aromatic hydrocarbons) was used in surfactants and in a solvent. Toluene and xylene were used in flow enhancers and a breaker.

Detections of organic chemicals were more numerous and exhibited higher concentrations in the deeper of the two monitoring wells. Natural breakdown products of organic contaminants like BTEX and glycols include

**DRAFT**

acetate and benzoic acid.  These breakdown products are more enriched in the shallower of the two monitoring wells, suggesting upward/lateral migration with natural degradation and accumulation of daughter products. Hydraulic gradients are currently undefined in the area of investigation. However, there are flowing conditions in a number of deep stock wells suggesting that upward gradients exist in the area of investigation.

Alternative explanations were carefully considered to explain individual sets of data.  However, when considered together with other lines of evidence, the data indicates likely impact to ground water that can be explained by hydraulic fracturing.  A review of well completion reports and cement bond/variable density logs in the area around MW01 and MW02 indicates instances of sporadic bonding outside production casing directly above intervals of hydraulic fracturing. Also, there is little lateral and vertical continuity of hydraulically fractured tight sandstones and no lithologic barrier (laterally continuous shale units) to stop upward vertical migration of aqueous constituents of hydraulic fracturing in the event of excursion from fractures.  In the event of excursion from sandstone units, vertical migration of fluids could also occur via nearby wellbores. For instance, at one production well, the cement bond/variable density log indicates no cement until 671 m below ground surface. Hydraulic fracturing occurred above this depth at nearby production wells.

A similar lines of reasoning approach was utilized to evaluate the presence of gas in monitoring and domestic wells.  A comparison of gas composition and stable carbon isotope values indicate that gas in production and monitoring wells is of similar thermogenic origin and has undergone little or no degradation.  A similar evaluation in domestic wells suggests the presence of gas of thermogenic origin undergoing biodegradation. This observation is consistent with a pattern of dispersion and degradation with upward migration observed for organic compounds.

Elevated levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells. Near surface concentrations of methane appear highest in the area encompassing MW01. Ground water is saturated with methane at MW01 which is screened at a depth (239 meters below ground surface) typical of deeper domestic wells in the area.  A blowout occurred during drilling of a domestic well at a depth of only 159 meters below ground surface close to MW01. A mud-gas log conducted in 1980 (prior to intensive gas production well installation) located only 300 m from the location of the blowout does not indicate a gas show (distinctive peaks on a gas chromatograph) within 300 meters of the surface.  Again, with the exception of two production wells, surface casing of gas production wells do not extend below the maximum depth of domestic wells in the area of investigation. A number of production wells in the vicinity of MW01 have sporadic bonding or no cement over large vertical instances. Again, alternate explanations of data have been considered.  Although some natural migration of gas would be expected above a gas field such as Pavillion, data suggest that enhanced migration of gas has occurred within ground water at depths used for domestic water supply and to domestic wells.  Further investigation would be needed to determine the extent of gas migration and the fate and transport processes influencing migration to domestic wells.

**DRAFT**

# 1.0
# Site Background

In early 2008, the U.S. Environmental Protection Agency (EPA) received complaints from several domestic well owners near the town of Pavillion, Wyoming regarding sustained objectionable taste and odor problems in well water following hydraulic fracturing at nearby gas production wells.  In response to these complaints, EPA initiated a comprehensive ground water investigation in September 2008 under authority of the Comprehensive Environmental Response, Compensation, and Liability Act.  The area of investigation is a sparsely populated rural area in west-central Wyoming directly east of the town of Pavillion.  Land use by residents consists primarily of ranching (horse and cattle) and alfalfa hay production for use by ranchers and commercial sale.  Fields are periodically flooded using water obtained from canals and laterals.

Domestic wells in the area of investigation overlie the Pavillion gas field which is one of several gas fields within the Wind River Basin - a large, complex, structural, asymmetric, deep sedimentary basin covering much of central Wyoming (**Figure 1**).  Oil and gas exploration wells were drilled in the 1950s. Commercial natural gas extraction in the field commenced in 1960 (Single 1969) with gas production well installation activity intensifying in the late 1990s through 2006 (**Figure 2**).  The field currently consists of approximately 169 vertical production wells. Ninety-seven production wells are designated as "Tribal Pavillion" and are regulated by the U.S. Bureau of Land Management (BLM). The remaining wells are designated as "Pavillion Fee" and are regulated by Wyoming Oil and Gas Conservation Commission (WOGCC).



Figure 1. (a) Location of Wind River Basin in Wyoming. (b) Location of Pavillion gas field in the Wind River Basin.  Figure from Johnson et al. 2007.

**DRAFT**



**Figure 2.** Chronology of production well completion at the Pavillion gas field.

A review of production well records obtained on line from WOGCC indicates that hydraulic fracturing in gas production wells occurred as shallow as 372 m (1220 ft) below ground surface (bgs) with associated surface casing in production wells as shallow as 110 m (361 ft) bgs. Information obtained from the Wyoming State Engineer's Office and homeowners indicates that domestic wells (including stock wells) in the area of investigation are screened as deep as 244 m (800 ft) bgs. With the exception of two production wells, surface casings of gas production wells do not extend below the maximum depth of domestic wells in the area of investigation (**Figure 3**).



**Figure 3.** Histograms summarizing depths of top of perforation interval of production wells, base of surface casing of production wells, and base of screened interval of domestic wells.

Gas extraction occurs from both the lower Eocene Wind River Formation and underlying Paleocene Fort Union Formation (**Figure 4**). The Wind River Formation consists of interbedded layers of sandstones and shale with coarse-grained meandering stream channel deposits (Osiensky et al. 1984) and extends from the surface to approximately 1036 m (3400 ft) bgs. The Fort Union Formation ranges in thickness from 762 to 914 m (2500 to 3000 ft) in the area (Flores and Keighin 1993). The Waltman Shale Member in the Fort Union Formation is absent below the Pavillion Gas Field. The most productive zone of gas extraction in the Wind River Formation occurs at its base and is often targeted for gas extraction (Single 1969). Gas trapping in the lower Wind River and Fort Union Formations occurs in localized stratigraphic sandstone pinchouts on the crest and along flanks of a broad dome (Mueller 1989, Keefer and Johnson 1993).

There is substantial vertical and lateral stratigraphic variation over short distances in both formations (Single 1969, Flores and Keighin 1993). Individual productive sandstones in the two formations generally vary in thickness from 1 to 21 m with permeability varying from 0.1 to 300 millidarcies and porosity ranging from 4 to 28 percent (Single 1969). Gas from the Fort Union and lower Wind River Formations varies little in $\delta^{13}C$ for methane, ethane, and propane with depth from the lower Eocene Wind River Formation to deeper mature and post-mature Upper Cretaceous source rocks (**Figure 4**) suggesting upward gas migration (Johnson and Rice 1993, Johnson and Keighin 1998) from deep source rocks. $\delta^{13}C$ is defined as

$$\delta^{13}C(\%o) = \left[ \frac{\left(^{13}C/^{12}C\right)sample}{\left[\left(^{13}C/^{12}C\right)standard\right]} - 1 \right] x1000$$

where the standard is the Pee Dee Belemnite (PDB) reference standard. Stable isotope ratios are reported as the relative difference in the ratio of the less abundant heavier isotope to the more abundant lighter isotope of the sample with respect to a

2

**DRAFT**



**Figure 4.** Generalized stratigraphic columns and correlations of Mississippian through Eocene strata in the Wind River Basin, Wyoming. The Pavillion Gas Field is located in the Western Wind River Basin. Figure from Johnson et al. 2007.

**DRAFT**

reference standard. Ratios are expressed in parts per thousand or permil (‰).  A substantial amount of additional compositional and isotopic data is available on the Wind River and Fort Union Formations but is classified as Confidential Business Information by the gas field operator.

Ground water from the upper Wind River Formation is the principal source of domestic, municipal, and stock (ranching, agriculture) water in the Pavillion area (WY State Water Plan 2003).  The Wind River Formation meets the definition of an Underground Source of Drinking Water (USDW) under the United States Code of Federal Regulations, Title 40, Section 144.3.  Water yields from wells in the upper Wind River Formation range up to 11,300 L/min with total dissolved-solids (TDS) concentrations ranging from 100 to 5,110 mg/L (WY State Water Plan 2003, Daddow 1996). The town of Pavillion has five municipal wells screened at depths ranging from 122 to 158 m bgs with average daily use estimated at 60,000 L/day (WY State Water Plan 2003).  Fluids used for hydraulic fracturing were injected directly into the Wind River Formation.

DRAFT

# 2.0
# Methods

## Sampling Chronology

Four sampling events (Phase I - IV) were conducted commencing in March 2009 and ending in April 2011. In March 2009 (Phase I), EPA collected aqueous samples from 35 domestic wells (including two samples from post reverse osmosis systems) in the area of investigation and 2 municipal wells in the town of Pavillion.  Detection of methane and dissolved hydrocarbons in several domestic wells prompted collection of a second round of samples in January 2010 (Phase II).  During this phase, EPA collected: (1) ground water samples from 17 domestic wells (10 previously sampled), 4 stock wells, and 2 municipal wells; (2) a filter sample from a reverse osmosis system; (3) surface-water and sediment samples from 5 locations along Five-Mile Creek (a creek traversing the area of investigation); (4) gas and produced water/condensate samples (organic compounds only) from 5 production wells; and (5) ground water samples from 3 shallow monitoring wells and soil samples near the perimeter of three known pit locations.

Detection of elevated levels of methane and diesel range organics (DRO) in deep domestic wells prompted EPA to install 2 deep monitoring wells in June 2010 to differentiate potential deep (e.g., gas production related) versus shallow (e.g., pits) sources of ground water contamination.  Monitoring wells MW01 and MW02 were screened at 233 - 239 m (765 – 785 ft) and 293 - 299 m (960 – 980 ft) bgs, respectively.  The expense of drilling deep wells while utilizing blowout prevention was the primary limiting factor in the number of monitoring wells installed.  In September 2010 (Phase III), EPA collected gas samples from well casing from MW01 and MW02.  In October 2010, EPA collected ground water samples from MW01 and MW02 in addition to a previously unsampled domestic well and two previously sampled

domestic wells.  In April 2011 (Phase IV), EPA resampled the 2 deep monitoring wells to compare previous findings and expand the analyte list to include glycols, alcohols, and low molecular weight acids.  Eight previously sampled domestic wells and three previously sampled stock/irrigation wells were also sampled at this time.  Sampling chronology and analytical methods for all sampling events are summarized in **Table A1**.  The location of production wells, monitoring wells, and sampled domestic wells is illustrated in **Figure 5**.

## Deep Monitoring Well Installation

EPA installed two deep monitoring wells (designated as MW01 and MW02) using air (0 - 6 m bgs) and mud rotary (6 m bgs to target depth).  Mud rotary was selected for installation of deep monitoring wells because it allowed the use of blowout prevention (BOP).  Use of mud rotary with BOP was necessary given that a blowout occurred during installation of a domestic well at only 159 m (522 ft) bgs in December 2005 in the vicinity of MW01.  Both deep monitoring wells were located away from gas production wells, known locations of pits, and areas of domestic waste disposal (abandoned machinery). There were no incidents of fuel spillage used to power pumps and generators.

Mud rotary required the use of drilling mud to remove cuttings and additives to avoid heaving of shale during drilling and well placement.  Jet Lube Well Guard hydrocarbon free lubricant was used for outside threads for drillstem and submersible pipe connections.  Mud composition consisted of formation water, municipal drinking water from Riverton, WY (transported on site by water truck), Quik-Gel high yield bentonite and additives listed on **Table 1**.  Municipal water was mixed with bentonite to create drilling mud.  The pH of mud during drilling varied between pH 8 - 9.  Aqua-Clear (Halliburton) was used during well development to facilitate removal of mud.  Drilling additives were extracted in water (1:20 to 1:100 dilution) and analyzed for pH, inorganics, organics, glycols, and alcohols.  Despite the highly concentrated nature of these solutions (not



**Figure 5.** Map illustrating location of oil and gas production wells, sampled PGDWxx series domestic wells (only numbers shown to conserve space), two deep monitoring wells, and three shallow monitoring wells near pits.  PGDW07 and PGDW08 are municipal wells in the town of Pavillion.

**DRAFT**

| Ingredient | Manufacturer | Purpose | Composition from MSDS | Specific gravity | Recommended mixture with water (wt/wt) | pH | Properties |
|---|---|---|---|---|---|---|---|
| **Aqua-Clear PFD** | Halliburton | Dispersant/ mud removal | anionic polyacrylamide (30-60%) | 1.2-1.4 | 1:2500 | neat 6.5 to 7.5 | liquid |
| **Penetrol** | Halliburton | Non-ionic wetting agent | diethanolamine (1-5%) and coco diethanolamide (10-30%) | 0.98 | 1:400 to 1:100 | 1% solution 9.5 | liquid |
| **EZ-Mud Gold** | Halliburton | Clay/shale stabilizer | "no hazardous substances" | 0.8-1 | 1:1400 to 1:350 | 1% solution 7.75 | solid |
| **Dense Soda Ash** | OCI Chemical Corp | Improve bentonite | Sodium carbonate (100%) | 2.5 | 1:100 to 1:50 | 5% solution 11.5 | solid |
| **Quik-Gel** | Halliburton | Viscosifier/ bentonite | bentonite (60%), crystalline silica quartz (1-5%), crystalline silica cristobalite (0-1%), crystalline silica tridymite (0-1%). | 2.6 | 1:60 to 1:30 | 3% solution 8.9 | solid |
| **Quik-Trol Gold** | Halliburton | Ease of mixing and improved filtration | cellulose derivative (polysaccharide) (60-100%) | 0.6 - 0.9 | 1:3500 to 1:200 | 1% solution 6 -8 (listed) | solid |

Table 1. Drilling additives, properties and product use recommendations

representative of significantly lower levels in drilling mud, see recommended product use mixture listed in **Table 1**), the pH of samples varied between 6.6 to 11.2, potassium varied between 0.1 to 1.2 mg/L, chloride varied between not detected to 214 mg/L, ethanol and isopropanol detections were less than 90 μg/L, and acetone, *tert*-butyl alcohol (TBA), benzene, toluene, ethylbenzene, xylenes (BTEX), trimethylbenzenes, and glycols were not detected (**Table 2**). Organics were not analyzed in the dense soda ash and Quik-Gel because dissolved organic carbon concentrations were low and because of difficulties in analyzing the viscous gel (Quik-Gel). Since inorganic and organic concentration patterns measured in the drilling additives do not match patterns observed in the deep monitoring wells and because large volumes of ground water were extracted from the wells during development and prior to sampling, it is unlikely that ground water chemistry was impacted by drilling additives.

Composite samples of cuttings were collected and sent to TestAmerica Laboratories in Denver, Colorado for Toxic Characteristic Leaching Procedure (TCLP). Samples were analyzed for TCLP volatile organic compounds using gas chromatography-mass spectrometry (GC-MS) in accordance with EPA SW-846 Methods 1311/8260B, and for TCLP semivolatile organic compounds (GC-MS) in accordance with EPA SW-846 Methods 1311/8270C, for TCLP metals in accordance with EPA SW-846 Methods 1311/ 6010B, for TCLP mercury in accordance with EPA SW-846 Methods 1311/7470A. Acetone, toluene, and m & p-xylene were detected in one sample at 6.9, 0.63, and 1.0 μg/L, respectively. Cuttings were disposed offsite in a landfill.

A photographic log of drilling, mud circulation, examination of cuttings, screen placement, and well development is provided in **Appendix C**. Well construction schematics are provided for MW01 and

**DRAFT**

| Table 2. Analytical results of additives (compounds listed are those detected in ground water) | | | | | | |
|---|---|---|---|---|---|---|
| | **Aqua-Clear PFD** | **Penetrol** | **EZ-Mud Gold** | **Dense Soda Ash** | **Quik-Gel** | **Blank** |
| **Extraction ratio (wt/wt)** | 1:20 | 1:20 | 1:100 | 1:100 | 1:100 | ----- |
| **pH measured** | 7.96 | 8.51 | 6.64 | 11.2 | 8.35 | ----- |
| **Specific Conductance (mS/cm)** | 13.3 | 0.47 | 0.24 | 15.5 | 0.20 | ----- |
| **Dissolved Organic Carbon (ppm)** | 1640 (1650) † | 1500 | 388 | 0.58 | 2.11 | 0.28 |
| **Cl (ppm)** | 214 (230) † | 85 | 2.22 | 7.03 | nd | nd |
| **SO4 (ppm)** | 121 (117) † | 597 | nd | nd | 3.53 | nd |
| **K (ppm)** | 0.40 (0.40) † | 0.63 | 1.16 | 0.12 | 0.09 | 0.07* |
| **Acetone (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Tert-butyl alcohol (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Isopropanol (µg/L)** | 85 (87)†* | 43* | 27* | ----- | ----- | nd |
| **Ethanol (µg/L)** | 59 (62) †* | 58* | nd | ----- | ----- | nd |
| **Benzene (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Toluene (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Ethylbenzene (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Xylene (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Trimethylbenzenes (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Naphthalene** | nd | 2.00 | nd | ----- | ----- | nd |
| **Ethylene glycol (µg/L)** | nd | nd | nd | ----- | ----- | nd |
| **Diethylene glycol (µg/L)** | nd | nd | nd | ----- | ----- | nd |

nd – not detected. ----- not measured. Drilling additives were extracted at the specified weight ratio into deionized water. † - Duplicate analysis. Blank sample is analysis of water used for the extraction of drilling additives. * Concentration above minimum detection limit, but below the level of quantification.

MW02 in **Figures 6a** and **6b**, respectively. During installation of MW02, cuttings were allowed to settle at the cessation of drilling and form a 5 m (17 ft) base for placement of the screen. Cuttings were never added to the borehole. Since a significant vertical distance existed between the depth of drilling and screen placement at MW01, cement grout was utilized to form the base for screen placement. No lubricants were used to attach sections of casing or casing to screens. Well screens, sections of casing and tremie pipe were mounted above ground (never touched soil) and power washed (no detergents used) prior to deployment. Locations of both MW01 and MW02 were in fields used for alfalfa hay production away from production wells, pads, and pits.

Cuttings were continuously examined during drilling by manually washing drilling mud from rock fragments with observations recorded as a function of depth in borehole logs. At the cessation of drilling, open-hole geophysical logging (caliper, density, resistivity, spontaneous potential, natural gamma) was conducted by Colog Inc., prior to placement of well

**DRAFT**



**Figure 6a.** Schematic illustrating construction of MW01.

**DRAFT**



**Figure 6b.** Schematic illustrating construction of MW02.

**DRAFT**

construction materials.  Examination of resistivity and cuttings indicated elevated resistivity at depths where white coarse-grained sandstone was observed.  This relationship was utilized to place screens at both deep monitoring wells at the deepest observed interval of white coarse-grained sand (**Figure 7**).  White coarse-grained sandstones in the area of investigation contain little or no shale and are targeted by local well drillers for domestic well installation.  During drilling, mud and cuttings were monitored in an open atmosphere with a TVA-1000B Thermo-Scientific portable flame- and photo-ionization detector (FID/PID) for health and safety monitoring.  Comparison of FID and PID readings (PID readings remained at background and are not sensitive to methane) indicates the presence of methane at various intervals from ground surface in MW01 (**Figure 7**).



**Figure 7.** Resistivity as a function of depth in MW01 and MW02.  MW01 and MW02 were screened at 233 - 239 m and 293 - 299 m bgs, respectively, corresponding to elevated resistivity and presence of coarse-grained sandstone.  FID readings in MW01 denote detections of methane during open air logging of mud.  FID monitoring at MW02 was sporadic and is not illustrated here.

## Ground Water Sampling of Deep Monitoring Wells in Phase III and IV

Ground water in deep monitoring wells was sampled using dedicated explosion proof submersible pumps (10-cm Franklin Electric 3HP).  Wells were purged at a flow rate of approximately 5 to 30 L/min. The rate of pumping was measured using a Model TM0050 in-line turbine flow meter with associated Model FM0208 flow monitor manufactured by Turbines, Inc. Drawdown during pumping was measured with a sonic water level sensor obtained from Eno Scientific, Inc. (Model WS2010 PRO).  The flow was split, with one portion going to waste and the other portion going to a flow-cell equipped with a YSI 5600 multiparameter probe to track stabilization of pH (<0.02 standard units per minute), oxidation-reduction potential (<2 mV per minute), specific conductance (<1% per minute), dissolved oxygen (DO), and temperature.  Purge volumes prior to sampling ranged from about 200 to 450 L (Phase III) and 1100 to 1250 L (Phase IV).  Lower purge volumes in Phase III sampling were due to initial gas invasion into the screened intervals that caused cavitation and concern about prolonged pump operation.  By the time of Phase IV sampling, disruptive gas invasion was no longer observed and extended purging was possible. Turbidity ranged from 1.7 to 29.7 Nephelometric Turbidity Units (NTUs) in domestic wells (Phase III and IV).  Turbidity in MW01 was 7.5 NTUs in Phase III and 7.9 NTUs in Phase IV.  Turbidity in MW02 was 28.8 NTUs in Phase III and 24.0 NTUs in Phase IV.  Turbidity measurements in MW01 and MW02 could be impacted by gas exsolution.  A photographic log of deep monitoring and domestic well sampling is provided in **Appendix D**.

In April 2011, the static water level in MW01 prior to purging was 61.2 m (200.8 ft) below the top of the casing (BTOC) measured using the Well Sounder 2010. The initial pumping rate was approximately 27.6 L/min. The pumping rate declined during purging to approximately 24.2 L/min as a result of the increasing depth to water.  At approximately 30 min after the

DRAFT

start of purging, the pumping rate was reduced using an in-line valve to 7.6 L/min. This resulted in approximately 18.2 m (60 ft) of rebound in the water level within the well at the start of sampling (**Figure 8**). Given that the screen length is only 6.1 m (20 ft) and that the pump was set approximately 0.6 m (2 ft) above the screen, this indicates that ground water obtained during sampling was derived from the formation with no component of casing storage. The total volume of water purged at the start of sampling was approximately 1117 L. The static water level in MW02 prior to purging was 80.5 m (264.2 ft) BTOC measured using the Well Sounder 2010 (April 2011). The initial pumping rate was approximately 18.9 L/min. The Eno Scientific well sounder was unable to measure the depth to water during most of the purging cycle perhaps due to a more rapid rate of decline in the water level in the casing. Sampling was initiated after approximately 1249 L of water were removed. The pump cavitated after approximately 1287 L were purged. The pump was subsequently stopped, allowed to cool, and restarted approximately 10 min later to complete the sampling.



**Figure 8.** Variation of water level as a function of time in MW01 during Phase IV well purging. The initial pumping rate was 24.2 L/min. After approximately 30 minutes of purging, the flow rate was decreased to 7.6 L/min. This reduced flow rate caused partial recovery of the water level and confirmation that formation water was being accessed.

An example of flow-cell readings through the purging of well MW02 is shown in **Figure 9**. The electrode readings show fairly rapid equilibration of pH and dissolved oxygen. Oxidation-reduction potential steadily decreased with the rate of change falling into the desired range (<2 mV per minute) by the end of purging. Specific conductance readings were typically variable, likely due to continuous off-gassing and bubble formation within the conductivity cell. After field measurements stabilized, ground water was collected into sample bottles as summarized in **Table B1**. Samples were collected for a wide range of inorganic, organic, and stable isotope analyses. A 500 mL sample was collected for field determinations of alkalinity, turbidity, ferrous iron, and dissolved sulfide. Alkalinity was determined onsite by incremental titration of ground water with sulfuric acid. Turbidity measurements were made with a portable meter (Hach 2100Q). Measurements were made for dissolved sulfide and ferrous iron using the methylene blue and 1,10-phenanthroline colorimetric methods, respectively (APHA 1998a,b). Samples collected for dissolved gases, volatile organic compounds, semi-volatile organic compounds, diesel-range organics, gasoline-range organics, glycols, low molecular weight acids, and $\delta^{13}C/\delta D$ of methane were not filtered. $\delta D$ is defined as

$$\delta D(\%o) = \left[\frac{(^2H/^1H)sample}{(^2H/^1H)standard} - 1\right] \times 1000$$

where the standard is the Vienna Standard Mean Ocean Water Standard (VSMOW). Samples collected for metals, anions, nutrients, dissolved organic carbon, dissolved inorganic carbon (DIC), $\delta^{13}C$ of dissolved inorganic carbon, and $\delta^{18}O/\delta D$ of water were filtered onsite using 0.45-micron pore-size, disposable-capsule filters. $\delta^{18}O$ is defined as

$$\delta^{18}O(\%o) = \left[\frac{(^{18}O/^{16}O)sample}{(^{18}O/^{16}O)standard} - 1\right] \times 1000$$

where the standard is the VSMOW.

DRAFT



**Figure 9.** Flow-cell readings as a function of time for specific conductance, dissolved oxygen, pH, and oxidation-reduction potential (well MW02, Phase IV sampling).

# DRAFT

Sample preservation and holding time criteria are listed in **Table B1**. Field quality control (QC) samples are summarized in **Table B2**. These included several types of blanks, duplicate samples, and field matrix-spike samples. All of these QC sample types were collected, preserved, and analyzed using identical methodologies as used for the water samples collected in the field (**Table B1**). Quality assurance/quality control (QA/QC) requirements for analysis of metals and major ions are summarized in **Table B3**. QA/QC requirements for analysis of dissolved gases, DIC/DOC, VOCs, low molecular weight acids and stable isotopes of water are summarized in **Table B4**. QA/QC requirements for analysis of semivolatile organic compounds (SVOCs), GRO, and DRO are summarized in **Table B5**. QA/QC requirements for analysis of glycols are summarized in **Table B6**. Results of Phase III and Phase IV blank samples are provided in **Tables B7** to **B12**. Detections observed in the blank samples were generally very low-level and generally much lower than concentrations measured in the deep monitoring wells. Some blank samples showed detections of acetone (1 µg/L), m,p-xylene (up to 0.7 µg/L), toluene (up to 0.5 µg/L), benzoic acid (3 µg/L), and tetraethylene glycol (3 µg/L). Concentrations of these analytes in MW01 and MW02 in Phase III and Phase IV sampling ranged from: 80 to 641 µg/L (acetone), non-detect to 750 µg/L (total xylenes), 0.6 to 617 µg/L (toluene), 209 to 457 µg/L (benzoic acid), and 7 to 27 µg/L (tetraethylene glycol). Detected concentrations of toluene (Phase III), xylene (Phase IV), and tetraethylene glycol (Phase IV) in MW01 are within about 2 times the detected levels of these chemicals in some of the applicable blank samples. Consequently, reported detections and concentrations of these chemicals in MW01 were used cautiously in this study. In one of the six blank samples collected for DRO, an elevated concentration of 135 µg/L or 6 times the reporting limit was observed (**Table B12**); all other DRO blank samples were non-detects (<20 µg/L). Concentrations of DRO in the deep monitoring wells ranged from 634 to 4050 µg/L.

Duplicate samples were collected in three locations during Phase III and Phase IV sampling activities. Results for the duplicate analyses are presented **Tables B13** and **B14**. Relative percent differences (RPDs) were generally less than 10% for most inorganic constituents indicating very good precision. RPD is defined as

$$RPD = \left[ \frac{x1 - x2}{(x1 + x2)/2} \right] x1000$$

where x1 = sample and x2 = sample duplicate. RPDs for methane, volatile organic compounds, and semi-volatile organic compounds were generally less than 25% (**Table B14**). The lower reproducibility for these compounds detetected in MW02 is likely due to difficulties in sampling and preserving water that is oversaturated in gas.

Major ions were quality checked by calculating ion balances. The AqQA (v.1.1.1) software package was used to evaluate cation/anion balance, which ranged from <0.1 to 17.2% with 90% of the calculated balances better than 5%.

Geochemical equilibria in ground water were evaluated with the Geochemist's Workbench package (version 8; Bethke 1996). Speciation and mineral equilibria calculations were made by entering the concentrations of major cations ($Na^+$, $K^+$, $Ca^{2+}$, $Mg^{2+}$), anions ($Cl^-$, $SO_4^{2-}$, $HCO_3^-$), pH, and temperature. For domestic well samples, bicarbonate concentrations were determined from alkalinity measurements. For the deep monitoring wells, because alkalinity included a significant contribution from hydroxide, concentrations of dissolved inorganic carbon were used for bicarbonate/carbonate input. Activity corrections were made using the Debye-Hückel equation. The LLNL (EQ3/6) thermodynamic database was selected for use in the calculations (Delany and Lundeen 1990). Model simulations were also conducted by tracing alkaline-addition titration paths. In order to do this, an additional entry was made to

**DRAFT**

the thermodynamic database describing the solubility of KOH (log $K$= 24.9; $KOH_{(s)} + H^+ = K^+_{(aq)} + H_2O_{(l)}$).

Audits of Data Quality (ADQs) were conducted by a contractor (independent of this investigation) or an EPA QA Manager for all analyses conducted outside EPA's Contract Laboratory Program (CLP) with the exception of data collected during Phase I, which is till in progress.  This included data from EPA's Region VIII laboratory in Golden, Colorado, EPA's Region III laboratory in Fort Mead, MD, EPA's Office of Research and Development Laboratory in Ada, Oklahoma, and Isotech Laboratories in Champaign, Illinois.  A technical systems audit of Isotech Laboratories included an on-site visit by the independent contractor and EPA QA Manager.  Two on-site field technical system audits were also conducted by the independent contractor and the EPA QA Manager to ensure compliance with the Category I (highest of four levels in EPA) Quality Assurance Project Plan established for this site for ground water and gas sample collection.

## Gas Sampling from Casing of Deep Monitoring Wells in Phase III and IV

Gas samples were collected from casing of deep monitoring wells by connecting a 12.7 mm NPT stainless-steel Swagelok quick-connect body and a Swagelok single-end shutoff stem to a 12.7 mm brass ball valve. The stem was connected to 6.35 mm internal diameter Tygon Masterflex tubing and a 0.5 liter Cali-5 Bond gas sampling bag equipped with a Leur-Fit Valve[TM] and a Leur-taper Quick-Mate[TM] connector.  A Masterflex E/S portable peristaltic pump was used to extract gas at 1 L/min.  Samples were collected after stabilization (± 1%) of $O_2$, $CO_2$, and $CH_4$ readings on a GEM-2000 Plus CES-LANDTEC portable gas analyzer.

## Domestic Well Sampling for Methane Using a Closed System in Phase IV

During the Phase IV sample event, water from domestic wells was screened using a Thermo-Scientific TVA-1000B portable FID/PID and a 10 L Plexiglas sparge cell **(Figure 10)**.  Samples from domestic wells were routed through a closed (no contact with the atmosphere to avoid offgassing) sample train and collected in 0.5 L Cali-5 Bond gas sample bags.  Ultrapure $N_2$ gas was introduced into the bags and placed on a rotary shaker for one hour prior to headspace analysis on site using a portable GC equipped with a thermal conductivity detector.  Portable FID readings provided an immediate indication of methane in well water prior to GC analysis.  Samples were also submitted to EPA's Office of Research and Development (ORD) laboratory in Ada, Oklahoma for analysis of dissolved gases.

## Review of Borehole Geophysical Logs

Borehole geophysical logs available on line from WOGCC were utilized to map lithology in the area of investigation.  Depending upon the specific well, various combinations of natural gamma, resistivity, self-potential, density, and neutron porosity logs were utilized.  Log resolution was sufficient to discern distinct layers of shale 1 m or greater in thickness but not sufficient to differentiate coarse-, medium-, and fine-grained sandstones nor sandstones containing various proportions of shale.  Descriptions of cuttings logged during installation of deep monitoring wells and domestic wells obtained from a local driller were used for near surface description.  Neither grain size nor proportions of shale in sandstone were differentiated in near surface sandstones to maintain consistency with descriptions from geophysical logs.  Lithology in the area of investigation is highly variable and difficult to correlate from borehole to borehole, even for boreholes in close proximity to one another consistent with other observations in the Wind River Formation (Osiensky 1984).  Sandstone and shale layers appeared thin and of limited lateral extent, again consistent with previous observations of lithology in the Wind River Formation (Single 1969, Flores and Keighin 1993).

**DRAFT**



**Figure 10.** Schematic of closed (no contact to atmosphere) sampling train for domestic wells.  Water flow from domestic well and into sparge cell was approximately 5 and 1 L/min respectively.  Excess water bled through valve used for sampling prior to sample collection.  Gas flow into sparge cell and portable FID/PID sparge cell was approximately 20 and 1 L/min.  Excess air was bled through splitter above sparge cell.

## Review of Cement Bond/Variable Density Logs

Cement bond/variable density (CBL/VDL) logs, available for less than half of production wells, were obtained online from WOGCC to evaluate well integrity.  Sporadic bonding is defined as an interval having an amplitude (mV) greater than $A_{80}$ (EPA 1994) where

$$A_{80} = 10^{0.2\log A_0 + 0.8\log A_{100}}$$

and $A_{80}$, $A_0$, and $A_{100}$ = amplitude at 80%, 0%, and 100% bond respectively.  $A_0$ typically corresponds to amplitude in free pipe whereas $A_{100}$ corresponds to the best-bonded interval on the CBL.  Examples of "no cement", "sporadic bonding", and "good bonding" are provided in **Appendix E**.

CBL/VDLs provide an average volumetric assessment of the cement in the casing-to-formation annular space and are considered low resolution tools compared to ultrasonic imaging tool logs which provide a high-resolution 360° scan of the condition of the casing-to-cement bond (Bybee 2007).  Acoustic imaging tools do not directly measure cement seal.  Communication of fluids between intervals has been observed to occur despite indication of "good to excellent" cement bond on acoustic logs (Boyd et al. 2006).  All CBL/VDLs available from WOGCC reflect pre-hydraulic fracturing conditions.

16

DRAFT

# 3.0
# Results and Discussion

## Ground Water and Soil Sample Results Near Three Pits

There are at least 33 pits previously used for storage/disposal of drilling wastes, produced water, and flowback fluids in the area of investigation. Discussions are ongoing with stakeholders to determine the location, delineate the boundaries, and extent (areal and vertical) of contamination associated with these pits. The operator has initiated remediation of selected pit areas. Concentrations of DRO, gasoline range organics (GRO), and total purgeable hydrocarbons (TPH) detected in soil samples adjacent to three pits investigated in Phase II were as high as 5010, 1760, and 6600 mg/kg, respectively (EPA 2010). Concentrations of GRO, DRO, and TPH in ground water samples from shallow (4.6 m bgs) monitoring wells were as high as 2.4, 39, and 3.8 mg/L, respectively (EPA 2010). A wide variety of organic compounds including benzene and m, p-xylene were detected at concentrations up to 390 and 150 µg/L, respectively (EPA 2010), indicating pits as a source of shallow ground water contamination in the area of investigation. EPA's maximum concentration level (MCL) for benzene is 5 µg/L.

## Inorganic Geochemistry

Inorganic geochemical results for ground water (all phases) are summarized in **Table A2a and Figure 11**. Major ion chemistry of ground water in the Pavillion area varies as a function of aquifer depth. Shallow ground waters (< 31 m bgs) collected from drinking water wells and stock wells are near-neutral (pH 7.7 ± 0.4, n = 19) (**Figure 12**) and display calcium-bicarbonate composition. With increasing depth, ground water becomes moderately alkaline (pH 9.0 ± 1.0, n = 55) (**Figure 12**), and with only one exception (MW02), is dominated by sodium and sulfate as the major cation/anion pair (**Figures 11** and **12**, **Table A2a**). This gradient in pH and water chemistry likely arises from the wide-scale surface application of irrigation water from the Wind River to support



**Figure 11.** Durov diagram showing ground water chemistry trends obtained in Phase I - IV sampling events and the composition of irrigation water.

**DRAFT**



**Figure 12.** Depth trends of chloride, pH, sulfate, and potassium (filled black squares = domestic wells, filled red circles = monitoring wells).

DRAFT

crop growth since irrigation water appears to represent an endmember composition (**Figure 11**). The chemical alteration from bicarbonate-type recharge water to sulfate-type ground water involves multiple water-rock interactions, including salt dissolution, carbonate mineralization, and exchange of divalent cations for sodium (Morris et al. 1959).  Total dissolved solids concentrations are <6000 mg/L in all ground water samples collected to depths up to 296 m (**Figure 11**).

Saturation indices of gypsum (CaSO$_4$·2H$_2$O) and calcite (CaCO$_3$), plotted against sulfate and calcium concentrations, are shown in **Figure 13**.  The trend for gypsum saturation suggests that sulfate concentrations in the aquifer are limited by the solubility of gypsum.  Ground water is also close to equilibrium with calcite which likely is an important control on pH and concentrations of calcium and

bicarbonate.  Some residents have described the development of particulates in ground water samples collected and stored in glass jars.  Precipitates that formed from PGDW05 ground water were analyzed by powder X-ray diffraction and found to be dominantly calcite.  Because calcite has retrograde solubility, precipitation of calcite is possibly triggered by warming calcite-saturated ground water to ambient conditions.

The geochemistry of ground water from the deep monitoring wells is distinctive from that in the domestic wells.  Chloride enrichment in monitoring well MW02 is 18 times the mean chloride concentration (25.6 mg/L) observed in ground water from domestic wells.  Chloride enrichment in this well is significant because regional anion trends tend to show decreasing Cl concentrations with depth.  The mean potassium concentration in domestic wells



**Figure 13.** Saturation indices for **(a)** gypsum versus sulfate concentration and **(b)** calcite versus calcium concentration. Saturation Index is equal to the logarithm of the ratio of the ion activity product to the mineral solubility product.  A Saturation Index of 0 corresponds to chemical equilibrium; values less than 0 and greater than 0 correspond to undersaturated and oversaturated conditions, respectively.

DRAFT

screened to 244 m bgs is 3 mg/L, with 99% of values <10 mg/L.  Potassium enrichment in MW01 and MW02 is between 8.2 and 18.3 times the mean value of domestic wells (**Table A2a**).  pH values in MW01 and MW02 are highly alkaline (11.2-12.0), above the pH range observed in domestic wells (6.9-10), and above the pH range previously reported for the Wind River Formation (Plafcan et al. 1995, Daddow 1996).  In the deep monitoring wells, up to 94% of the total alkalinity is contributed by hydroxide.  In addition, the monitoring wells show low calcium, sodium, and sulfate concentrations compared to the general trend observed in domestic well waters (**Figure 14**).

The high pH measured in the deep monitoring wells was unusual and unexpected.  Although ground water pH in these wells was >11, total alkalinity was not particularly high (<500 mg/kg), and as already noted up to 94% of the total alkalinity was present as hydroxide (see charge balance calculations, **Table A2b**).  Alkalinity contributed by carbonate/bicarbon-ate was less than the hydroxide component.  In fact, inorganic carbon concentrations were so low in MW02 as to prevent the measurement of $\delta^{13}C$ of dissolved inorganic carbon.  Presence of hydroxide alkalinity suggests strong base addition as the causative factor for elevated pH in the deep monitoring wells.  The possibility of cement/grout intrusion into the screened intervals was considered as a possibility for both monitoring wells, although precautions were taken to prevent downward migration of cement during well construction.  Cement intrusion typically leads to pH values between 10 and 11, lower than the pH values measured in the deep monitoring wells (Gibb et al. 1987).  Prolonged purging did not show decreasing pH trends (e.g., **Figure 9**) and water chemistry results indicate that ground water from the wells was highly undersaturated with respect to cement phases (e.g., portlandite), suggesting that cement was not the cause of elevated pH.

In order to gain additional insight, reaction path modeling was conducted to evaluate pH response to addition of strong base (potassium hydroxide, KOH).

Geochemical modeling was carried out by using ground water compositions for PGDW9, PGDW20, and PGDW32 (initial pH 7.3, 8.9, and 9.9, respectively).  Modeled titration results are shown in **Figure 15a**; pH is plotted versus the mass of KOH added per kg of solution.  Model titration results vary as a function of ground water composition.  Samples PGDW20 and PGDW32 have Na-$SO_4$-type compositions typical of deeper portions of the aquifer.  In both of these cases, attainment of pH values between 11.2 and 12.0 requires small quantities of KOH addition (<250 mg KOH per kg of solution).  Sample PGDW49 is elevated in $Ca^{2+}$ and $Mg^{2+}$, lower in pH, and typical of shallower ground water compositions.  In this case, significantly more KOH addition is required to attain pH values observed in the monitoring wells.  The first derivative of the titration curve, or buffer intensity, is shown in **Figure 15b**.  The buffer intensity indicates that ground water compositions like PGDW20 and PGDW32 inherently have little resistance to pH change up to about pH 12, at which point increased KOH additions are necessary to further increase pH.  PGDW49 shows a broad peak on the buffer intensity diagram (pH 10 to 11) which reflects precipitation reactions to form calcium carbonate and magnesium hydroxide, reactions that consume hydroxide and therefore limit pH increases, until divalent cations are completely consumed.  The model results clearly show that ground water typical of the Pavillion aquifer below 100 m depth (Na-$SO_4$-type composition) is especially vulnerable to the addition of strong base, with small KOH additions driving significant upward pH changes.

Paired values of $\delta^{18}O$ and $\delta^{2}H$ in ground water samples plot below the Global Meteoric Water Line (**Figure 16**; -16.6 to -12.4‰ $\delta^{18}O$ and -129.2 to -97.4‰ $\delta^{2}H$).  Shallow ground water samples generally tend to be depleted in $^{18}O$ and $^{2}H$ compared to deeper ground water samples and may be more reflective of local recharge.  Ground water isotope data from the deep monitoring wells (red circles, **Figure 16**) follow along the same $\delta^{18}O$ versus $\delta^{2}H$ trajectory established by the domestic well data, suggesting similar recharge and evolutional paths (e.g., Bartos et al. 2008).

**DRAFT**



**Figure 14.** Concentration trends versus specific conductivity. Note the monitoring wells show high pH and low sulfate, calcium, and sodium relative to the general trend observed in the domestic wells (filled black squares = domestic wells, filled red circles = monitoring wells).

DRAFT



**Figure 15. (a)** Results of KOH titration models plotted as pH versus grams of KOH added per kilogram of solution. Initial water compositions are from PGDW49, PGDW20, and PGDW32. Model accounts for reactions taking place in solution as KOH is added and equilibrated. pH range in deep monitoring wells shown for reference; **(b)** Buffer Intensity plot or first derivative of titration plot, pH versus change in concentration of base ($C_B$) per change in pH.



**Figure 16.** Hydrogen and oxygen isotope values (permil, Vienna Standard Mean Ocean Water, VSMOW) for ground water samples (black squares=domestic wells; red circles=deep monitoring wells) relative to the Global Meteoric Water Line from Craig (1961).

**DRAFT**

## Organic Geochemistry

Organic and inorganic geochemical impacts in deep ground water monitoring wells (Phase III and IV) are summarized in **Table 3**. The monitoring wells produce ground water near-saturated in methane at ambient pressure, with concentrations up to 19.0 mg/L. Gas exsolution was observed while sampling at both MW01 and MW02. A wide variety of organic chemicals was detected in the monitoring wells including: GRO, DRO, BTEX, trimethylbenzenes, phenols, naphthalenes, acetone, isopropanol, TBA, 2-butoxyethanol, 2-butanone, diethylene glycol, triethylene glycol, and tetraethylene glycol (**Figure 17; Table 3**). Concentrations of these chemicals range from µg/L to mg/L levels. Concentrations of benzene in MW02 exceed EPA's MCL in drinking by a factor of 49 times. Detections of organic chemicals are more numerous and exhibit higher concentrations in the deeper of the two monitoring wells (**Figure 17, Table 3**). This observation, along with trends in methane, potassium, chloride, and pH, suggest a deep source (>299 m bgs) of contamination. Natural breakdown products of organic contaminants like BTEX and glycols include acetate and benzoic acid; these breakdown products are more enriched in the shallower of the two monitoring wells, suggesting upward/lateral migration with natural degradation and accumulation of daughter products (Corseuil et al. 2011, Caldwell and Suflita 2000, Dwyer and Tiedje 1983). Other trace-level detections of semi-volatile organic compounds included: bis(2-ethylhexyl) phthalate (MW01 and MW02, Phase III and IV), bis(2-chloroethyl) ether, bis(2-ethylhexyl) adipate (MW01, Phase IV), butyl benzyl phthalate, and 4-methyl-2-pentanone (MW02, Phase IV).

Well completion reports obtained online from WOGCC and Material Safety and Data Sheets (MSDSs) obtained from the operator were reviewed to examine inorganic and organic compounds in additives used for hydraulic fracturing and similarity with detected elements and compounds in ground water. Well completion reports were limited to a subset of production wells and included dates of injection, injection depths, pressure, flow, and volume for slickwater and carbon dioxide foam fracture jobs. Some MSDSs list chemical formulation as proprietary (e.g., proprietary alcohols) or list a chemical family (e.g., blend of organic surfactants) rendering identification of constituents impossible. This review is summarized in **Table 4**. Inorganic additives are potential sources of elevated K, Cl, and OH in deep monitoring wells.

Detection of compounds associated with petroleum-based additives in ground water samples using analytical methods employed in this investigation would be manifested as GRO, DRO, BTEX, naphthalenes, and trimethylbenzenes observed in deep monitoring wells.

TBA was detected in MW02 during Phase 4 sampling at a concentration of 4470 µg/L. Two possible formation pathways for TBA are: 1) biodegradation of methyl *tert*-butyl ether (MTBE, synthetic chemical used as a fuel additive) under methanogenic conditions (e.g., Mormile et al. 1994, Bradley et al. 2001); and 2) breakdown of *tert*-butyl hydroperoxide (a gel breaker used in hydraulic fracturing; e.g., Hiatt et al. 1964). TBA biodegradation is generally slow compared to the degradation of MTBE; this suggests that TBA could be present and persist even after complete MTBE removal from ground water impacted by fuel releases (Wilson et al. 2005). MTBE was not detected in either of the deep monitoring wells. A second pathway of TBA production is from the decomposition of the gel breaker *tert*-butyl hydroperoxide. Hiatt et al. (1964) found that decomposition of *tert*-butyl hydroperoxide yielded a 10-fold molar quantity of TBA, oxygen, *di-tert*-butyl peroxide, and acetone. Acetone was detected in MW02 during Phase 4 sampling at a concentration of 641 µg/L. This breaker is used in hydraulic fracturing formulations; however, the MSDSs made available to EPA do not indicate whether *tert*-butyl hydroperoxide was used in the Pavillion gas field for well stimulation. Elevated concentrations of TBA are not expected in unimpacted aquifers and its presence in MW02 remains unresolved. Additional insight about the occurrence of TBA (and other organic compounds) might be obtained by conducting compound-specific isotope analyses.

**DRAFT**

**Table 3.** Geochemical impacts in deep ground-water monitoring wells

| Compound | MW01 Phase 3 10/6/2010 | MW02 Phase 3 10/6/2010 | MW01 Phase 4 4/20/2011 | MW02 Phase 4 4/19/2011 |
|---|---|---|---|---|
| pH | 11.9 | 12.0 | 11.2 | 11.8 |
| K, mg/L | 54.9 | 39.5 | 24.7 | 43.6 |
| Cl, mg/L | 23.3 | 466 | 23.1 | 457 |
| $CH_4$, mg/L | 16.0 | 19.0 | 17.9 | 18.8 |
| Benzene † | nd | 246 | nd | 139 |
| Toluene | 0.75 [d] | 617 | 0.56 | 336 |
| Ethylbenzene | nd | 67 | nd | 21.5 |
| Xylenes (total) | nd | 750 | 0.89 [d] | 362 |
| 1,2,4 Trimethylbenzene | nd | 69.2 | nd | 18.5 |
| 1,3,5 Trimethylbenzene | nd | 35.5 | nd | nd |
| Diesel Range Organics | 634 | 1440 | 924 | 4050 |
| Gasoline Range Organics | 389 | 3710 | 592 | 2800 |
| Phenol [a] | 11.1 | 56.1 | 20.9 | 64.9 |
| Naphthalene [b] | nd | 6.06 | nd | 6.10 |
| Isopropanol | ----- | ----- | 212 | 581 |
| Tert-Butyl Alcohol | ----- | ----- | nd | 4470 |
| 2-Butanone | ----- | ----- | nd | 120 |
| Diethylene Glycol | ----- | ----- | 226 | 1570 |
| Triethylene Glycol | ----- | ----- | 46 | 310 |
| Tetraethylene Glycol | ----- | ----- | 7.3 [c, d] | 27.2 |
| 2-Butoxyethanol * | ----- | ----- | nd | nd |
| 2-Butoxyethanol ** | nd | nd | 12.7 | nd |
| Acetone | ----- | ----- | 79.5 | 641 |
| Benzoic Acid | 212 | 244 | 457 | 209 |
| Acetate | ----- | ----- | 8050 | 4310 |
| Formate | ----- | ----- | 112 | 558 |
| Lactate | ----- | ----- | 69 | 213 |
| Propionate | ----- | ----- | 309 | 803 |

† All values in µg/L unless otherwise noted.
 ----- not analyzed.
nd - not detected.
[a] Includes phenol, 2,4-dimethylphenol, 2-methylphenol, 3&4 methylphenol.
[b] Includes naphthalene, 1-methylnaphthalene, and 2-methylnaphthalene.
[c] Value below quantitation limit of 10 µg/L.
[d] Chemical detected in a blank sample at a similar level
* 2-Butoxyethanol determined by HPLC-MS-MS.
** 2-Butoxyethanol determined by GC-MS.

DRAFT



**Figure 17.** Organic compounds detected in deep monitoring wells MW01 and MW02 during Phase III and IV sampling events. Horizontal bars show method reporting limits for the individual analytes.

**DRAFT**

**Table 4.** Association of inorganic and organic anomalies with compounds used for hydraulic fracturing

| Compound/ Compound Class | Information from MSDSs and Well Completion Reports |
|---|---|
| pH | KOH was used in a crosslinker (<5%) and in a solvent (85-100%). |
| K, Cl | The formulation of fracture fluid provided for foam jobs typically consisted of $CO_2$, 6% KCl, 10% methanol, and "clean" fluid and "additives." Potassium metaborate was used in crosslinkers (5-10%, 30-60%). KOH was used in a crosslinker (<5%) and in a solvent (85-100%). |
| Cl | Ammonium chloride was used in crosslinker (1-27%). |
| BTEX | Aromatic solvent (typically BTEX mixture) was used in a breaker (<75%). Diesel oil (mixture of saturated and aromatic hydrocarbons including naphthalenes and alkylbenzenes) was used in a guar polymer slurry/liquid gel concentrate (30-60%) and in a solvent (60-100%). Petroleum raffinates (mixture of paraffinic, cycloparaffinic, olefinic, and aromatic hydrocarbons) was used in a breaker (<30-60%). Heavy aromatic petroleum naptha (mixture of paraffinic, cycloparaffinic and aromatic hydrocarbons) was used in surfactants (5-10%, 10-30%, 30-60%) and in a solvent (10-50%). Toluene was used in a flow enhancer (3-7%). Xylenes were used in a flow enhancer (40-70%) and a breaker (confidential percentage). |
| Trimethylbenzenes | 1,2,4-trimethylbenzene was used in surfactants (0-1%). Diesel oil (mixture of saturated and aromatic hydrocarbons including naphthalenes and alkylbenzenes) was used in a guar polymer slurry/liquid gel concentrate (30-60%) and in a solvent (60-100%). Petroleum raffinates (mixture of paraffinic, cycloparaffinic, olefinic, and aromatic hydrocarbons) was used in a breaker (<30-60%). Heavy aromatic petroleum naptha (mixture of paraffinic, cycloparaffinic and aromatic hydrocarbons) was used in surfactants (5-10%, 10-30%, 30-60%) and in a solvent (10-50%). |
| DRO and GRO | Diesel oil (mixture of saturated and aromatic hydrocarbons including naphthalenes and alkylbenzenes) was used in a guar polymer slurry/liquid gel concentrate (30-60%) and in a solvent (60-100%). Petroleum raffinates (mixture of paraffinic, cycloparaffinic, olefinic, and aromatic hydrocarbons) was used in a breaker (<30-60%). Heavy aromatic petroleum naptha (mixture of paraffinic, cycloparaffinic and aromatic hydrocarbons) was used in surfactants (5-10%, 10-30%, 30-60%) and in a solvent (10-50%). |
| Naphthalene | Naphthalene was used in surfactants (0-1, 5-10%) and a breaker (confidential percentage). Hydrotreated light petroleum distillates (mixture of C10-C14 naphthenes, iso- and n-paraffins) were used in a guar polymer slurry/liquid gel concentrate (40-60%). Diesel oil (mixture of saturated and aromatic hydrocarbons including naphthalenes and alkylbenzenes) was used in a guar polymer slurry/liquid gel concentrate (30-60%) and in a solvent (60-100%). |
| Isopropanol | Isopropanol was used in a biocide (20-40%), in a surfactant (30-60%), in breakers (<1%, 10-30%), and in foaming agents (<3%, 1-5%, 10-30%). |
| Tert-Butyl Alcohol | No MSDS listing. Breakdown product of methyl *tert*-butyl ether and *tert*-butyl hydroperoxide - found in gel breakers. See discussion. |
| Glycols | Diethylene glycol was used in a foaming agent (5-10%) and in a solvent (0.1-5%). Triethylene glycol was used in a solvent (95-100%). |
| 2-Butoxyethanol | 2-butoxyethanol was used in a surfactant (10-30%), in foaming agents (<10%, <11%, <12%, 1-10%, 10-30%) and in solvents (15-40%, 60-100%). |
| Acetone | Breakdown product of *tert*-butyl hydroperoxide - found in gel breakers. See discussion. |
| Benzoic Acid, Acetate, Formate, Lactate, Propionate, 2-Butanone, Phenols | Natural breakdown products of organic contaminants (e.g., BTEX, glycols, etc.). |

DRAFT

Natural gas condensates are composed primarily of aliphatic hydrocarbons; however, condensates may contain low quantities of aromatic compounds, such as BTEX.  Gas from the Fort Union and lower Wind River Formations is generally dry ($C_1/C_1$-$C_5$ = 0.95 - 0.96 where methane = $C_1$, ethane = $C_2$, propane = $C_3$, butane = $C_4$, pentane = $C_5$) (Johnson and Rice 1993) and unlikely to yield liquid condensates at ground water pressure and temperature conditions.  In addition, a condensate origin for BTEX compounds in ground water is doubtful because dissolved gas compositions and concentrations are similar between the two deep monitoring wells and therefore would yield similar liquid condensates, yet the compositions and concentrations of organic compounds detected in these wells are quite different (**Figure 17**) further suggesting a deep source of BTEX in MW02.  The presence of synthetic compounds such as glycol ethers, along with enrichments in K, Cl, pH, and the assortment of other organic components is explained as the result of direct mixing of hydraulic fracturing fluids with ground water in the Pavillion gas field.

As noted previously, this investigation was prompted by homeowner complaints over perceived changes in water quality.  Domestic well results showed: the presence of DRO and GRO (in 23 of 28 samples), and trace levels of exotic organic compounds in some domestic wells including adamantanes, 2-butoxyethanol phosphate, phenols, naphthalene, and toluene (EPA 2009, EPA 2010).  Methane was detected in 10 of 28 samples at concentration levels below 0.8 mg/L. Foul odors associated with some domestic wells correlate with detections of GRO and DRO.  Anomalous trends in inorganic constituents observed in the deep monitoring wells (e.g., K, Cl, pH) were not revealed in domestic well waters.  In several instances, glycols were detected in domestic wells using gas chromatography with flame ionization detection (GC-FID; EPA Standard Method 8015).  However, glycol analysis using liquid chromatography with tandem mass spectroscopy (GC/MS/MS) failed to replicate these glycol detections, even though the method

reporting limit was over an order of magnitude lower, suggesting that Method 8015 is prone to false positive results (possibly due to interactions between the chromatographic column and organic compounds in sample water).  This result points to the need for continued and future improvements of analytical methods to detect and quantitate low levels of organic chemicals that may be associated with hydraulic fracturing fluids.  Although contamination was detected in some domestic wells proximal to the deep monitoring wells, underscoring potential future risk, the existing data at this time do not establish a definitive link between deep and shallow contamination of the aquifer.  An increased number of sampling points (monitoring wells) with vertical profiling in targeted locations are necessary to better define transport and fate characteristics of organic and inorganic contaminants in the ground water system and impact on domestic wells.

## Natural Gas Migration

A review of open-hole geophysical logs obtained from the WOGCC internet site indicates the presence of gas-filled porosity at three locations at 198, 208, and 252 m bgs between the years 1965 - 1973 suggesting the presence of natural gas in ground water at depths used for domestic water supply prior to extensive commercial development.  However, a review of 10 mud-gas logs recorded in the mid-1970s and early 1980s obtained on line from WOGCC, do not indicate gas shows within 300 m of the surface at any location.

Aqueous analysis of light hydrocarbons, gas and headspace analysis of light hydrocarbons, and isotopic data for dissolved, gas phase, and headspace analysis are summarized in **Tables A3a**, **A3b**, and **A3c** respectively (all investigative phases).  Elevated levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells (**Figure 18c**). Methane was not detected in shallow domestic wells (e.g., < 50 m) regardless of proximity to production wells (**Figure 18c**)  With the exception of two domestic wells where methane was

**DRAFT**



**Figure 18. (a)** Stable isotope ratios of carbon of methane versus ratio of methane ($C_1$) to ethane ($C_2$) and propane ($C_3$) in gas from production wells, monitoring wells, and domestic wells. Values of 100,000 are used to denote non detection of ethane and propane in samples. **(b)** Stable isotope ratios of carbon versus hydrogen of methane in gas from production wells (both literature and measured values), monitoring wells, and domestic wells. δD was not determined for PGDW32. Oxidation pathway (enrichment of $^{13}$C of remaining $CH_4$ with biodegradation) is illustrated. **(c)** Methane concentration in domestic (red circles and black squares) and monitoring wells (green squares) as a function of proximity to production wells and AMSL. Values of 1.0 were used for non-detection (detection limit 5 μg/L).

**DRAFT**

detected at less than 22 µg/L, methane was not detected in domestic wells with 2 or less production wells within 600 m (**Figure 18c**). All domestic wells with the exception of PGDW25 with 2 or less production wells within 600 m are located on the periphery of the gas field (**Figure 5**). PGDW25 is located within 1600 m of 15 gas production wells.

Of particular interest is the area encompassing MW01, PGDW30, and PGDW05 (**Figure 19**). Ground water is saturated with methane at MW01 which is screened at a depth (239 m bgs) typical of deeper domestic wells in the area. Methane was detected in PGDW30 at 808 µg/L at a depth of only 80 m, the highest level in any domestic well. A blowout occurred during drilling at a depth of only 159 m bgs in December 2005 adjacent to PGDW05. Natural gas exited the borehole for three days until the gas field operator was ordered to plug the borehole with a dense mud. The owner of PGDW05 was attempting at the time to replace this well due to taste, odor, and yield reduction he stated occurred after hydraulic fracturing at nearby production wells. A mud-gas log conducted on 11/16/1980 at Tribal Pavillion 14-2 (illustrated on **Figure 19** as 14-2) located only 300 m from the location of the uncontrolled release does not indicate a gas show (distinctive peaks on a gas chromatograph) within 300 m of the surface. The owner of PGDW05 complained that well yield decreased after hydraulic fracturing at nearby production wells. Records obtained from the Wyoming State Engineer's office dated January 1973 indicate a yield of 30 to 38 L/min with 1.2 meters of drawdown after 10 hours of pumping. During a sampling event in April 2005, PGDW05 became dry after pumping at a rate of 21.6 L/min for 14 minutes. The cause of reduced well yield requires further investigation.

Similarity of $\delta^{13}$C values for methane, ethane, propane, isobutane, and butane between gas production and monitoring wells and plots of $\delta^{13}$C-CH$_4$ versus $\delta$D -CH$_4$ (**Figure 18b**) and $\delta^{13}$C-CH$_4$ versus C$_1$/(C$_2$ + C$_3$) (**Figure 18a**) indicate that light hydrocarbons in casing and dissolved gas in deep monitoring wells are

similar to produced gas and have undergone little oxidation or biodegradation. These observations combined with radiocarbon analysis of CH$_4$ (< 0.2% percent modern carbon) obtained from gas in casing of both MW01 and MW02 indicate that methane in deep monitoring wells is of thermogenic origin. Gas from the Fort Union and lower Wind River Formations is isotopically heavy ($\delta^{13}$C-CH$_4$ from to -40.24 to -38.04‰) and as previously stated, dry (Johnson and Rice 1993, Johnson and Keighin 1998). Values of $\delta^{13}$C-CH$_4$ and $\delta$D -CH$_4$ more negative than -64‰ and -175‰, respectively, are indicative of microbial origin (Schoell 1980). The absence of ethane and propane in three of four domestic wells having sufficient methane to allow isotopic analysis and a shift of $\delta^{13}$C-CH$_4$ and $\delta$D-CH$_4$ values in a positive direction relative to produced gas suggests the presence of gas of thermogenic origin in domestic wells undergoing biodegradation and subsequent enrichment of $\delta^{13}$C and $\delta$D. This observation is consistent with a pattern of dispersion and degradation with upward migration observed for organic compounds. Values of $\delta^{13}$C-CH$_4$ more positive than -64‰ and C$_1$/(C$_2$+C$_3$) ratios above 1000 are often interpreted to indicate gas of mixed biogenic-thermogenic origin or gas of biogenic origin undergoing biodegradation (Whiticar 1999, Whiticar and Faber 1986) since neither ethane nor propane are biogenically generated in significant amounts. However, preferential loss of ethane and propane relative to methane in thermogenic gas produces a similar response (Valentine 2010, Kinnaman et al. 2007).

## Evaluation of Cement Bond/Variable Density Logs Along Transect

CBL/VDLs and lithology were examined along a transect (**Figure 19**) which included the deep monitoring wells and three domestic wells where elevated levels of methane were detected. At Pavillion Fee 34-03B, a CBL/VDL conducted on 10/22/2004 indicates no cement below surface casing until 802 m msl (**Figure 20**) and sporadic bonding to 604 m msl (not illustrated). The well completion

**DRAFT**



**Figure 19.** Map illustrating transect used to develop lithologic cross section and evaluation of CBL/VDLs.

report for this production well indicates that hydraulic fracturing was performed at 601 m msl on 11/9/2004. A cement squeeze was subsequently performed at 802 m msl on 4/1/2005 (no CBL/VDL after cement squeeze) with hydraulic fracturing at 689 m msl on 4/19/2005. At Pavillion Fee 34-03R, the CBL/VDL indicates no cement below surface casing until 968 m msl (**Figure 20**). At Tribal Pavillion 41-10 and 41-10B, CBL/VDLs indicate sporadic bonding over extensive intervals. A CBL/VDL conducted on 4/20/2005 at Tribal Pavillion 24-02 after a squeeze perforation at the base of the surface casing indicates poor bonding outside production casing below surface casing to the first perforation interval (**Figure 20**). At Tribal Pavillion 11-11B, a CBL/VDL indicates poor or sporadic bonding to 991 m bgs and no cement or cement bridging from 675 - 857 m msl. Thus, a review of well completion

reports and CBL/VDLs indicates instances of sporadic bonding directly above intervals of hydraulic fracturing. This review also indicates instances where cement outside production casing is lacking over an extensive interval providing a potential conduit for fluid migration to within 300 m of the surface. As graphically illustrated in **Figure 20**, production wells having no or sporadic cement outside production casing are located in proximity to deep monitoring wells where aqueous constituents consistent with hydraulic fracturing were detected and methane exsolved from solution during sampling and locations of domestic wells where elevated levels of methane were detected and where an uncontrolled release of natural gas occurred.



**Figure 20.** Lithologic cross-section along transect illustrating production wells (with evaluation of CBL/VDLs), domestic wells, and blowout location. Red arrows denote depths of hydraulic fracturing of unknown areal extent. Sandstone units are undifferentiated between fine, medium and coarse-grained units.

DRAFT

## Potential Migration Pathways

Further investigation is necessary to determine mechanisms of aqueous and gas phase transport in the area of investigation.  However, at least three mechanisms can be postulated at this time.  The first mechanism is aqueous and/or gas transport via boreholes due to insufficient or inadequate cement outside production casing.  Both aqueous (brine) and gas phase migration vertically up compromised wellbores have been simulated (Nordbotten et al. 2004, 2005a, 2005b) and indicate decreasing mass flux toward the surface with increasing number of permeable formations encountered along the way.  Thus, the severity of ground water contamination increases with depth.  Migration of gas via wellbores is well documented in the literature (e.g., Harrison 1983, Harrison 1985, Van Stempvoort et al. 2005, Taylor et al. 2000).  In Bainbridge, Ohio, an operator initiated hydraulic fracturing despite knowing that only 24 m of cement was present above the perforation interval (Bair et al. 2010, ODNR 2008).  Hydraulic fracturing fluid flowed to the surface via surface-production casing annulus which pressurized upon shut-in.  Gas subsequently migrated through natural fractures to domestic wells eventually causing an explosion at one home.  In northeastern Pennsylvania, two operators were fined for enhanced gas migration into domestic wells attributed to incomplete or inadequate cement outside production casing in wells used for hydraulic fracturing (PADEP 2009a, 2009b, 2010).

The second mechanism is fracture fluid excursion from thin discontinuous tight sandstone units into sandstone units of greater permeability.  This would be accompanied by physical displacement of gas-rich solutions in both tight and more permeable sandstone formations.  As illustrated in **Figure 20**, there is little lateral and vertical continuity to hydraulically fractured tight sandstones and no lithologic barrier (laterally continuous shale units) to upward vertical migration of aqueous constituents of hydraulic fracturing in the event of excursion from fractures.  A third mechanism is that the process of hydraulic

fracturing generates new fractures or enlarges existing ones above the target formation, increasing the connectivity of the fracture system.

In all three transport pathways, a general correlation (spatial relationships ultimately determined by fault and fracture systems in addition to lithology) would exist between proximity to gas production wells and concentration of aqueous and gas phase constituents in ground water.  For instance, Osborn et al. (2011) observed a correlation between methane concentration and proximity to hydraulically fractured gas production wells at locations above the Marcellus and Utica formations in Pennsylvania and New York.  Isotopic data and other measurements for methane in the drinking water were consistent with gas found in deep reservoirs such as the Marcellus and Utica shales at the active sites and matched gas geochemistry from shale-gas wells sampled nearby.  Also, in all three transport pathways, advective/dispersive transport would be accompanied by degradation causing a vertical chemical gradient as observed during sampling of MW01 and MW02.  Reduced mass flux to the near surface environment and subsequent degradation along vertical and lateral transport pathways would explain lack of detection in domestic wells of compounds observed in MW02.

**DRAFT**

# 4.0
# Conclusions

The objective of this investigation was to determine the presence of ground water contamination in the Wind River Formation above the Pavillion gas field and to the extent possible, identify the source of contamination. The combined use of shallow and deep monitoring wells allowed differentiation between shallow sources of contamination (pits) and deep sources of contamination (production wells). Additional investigation is necessary to determine the areal and vertical extent of shallow and deep ground water contamination.

Detection of high concentrations of benzene, xylenes, gasoline range organics, diesel range organics, and total purgeable hydrocarbons in ground water samples from shallow monitoring wells near pits indicates that pits are a source of shallow ground water contamination in the area of investigation. Pits were used for disposal of drilling cuttings, flowback, and produced water. There are at least 33 pits in the area of investigation. When considered separately, pits represent potential source terms for localized ground water plumes of unknown extent. When considered as whole they represent potential broader contamination of shallow ground water. A number of stock and domestic wells in the area of investigation are fairly shallow (e.g., < 30 m) representing potential receptor pathways. EPA is a member of a stakeholder group working with the operator to determine the areal and vertical extent of shallow ground water contamination caused by these pits. The operator of the site is currently engaged in investigating and remediating several pit areas.

Detection of contaminants in ground water from deep sources of contamination (production wells, hydraulic fracturing) was considerably more complex than detection of contaminants from pits necessitating a multiple lines of reasoning approach common to complex scientific investigations. In this approach, individual data sets and observations are integrated to formulate an explanation consistent with each data set and observation. While each individual data set or observation represents an important line of reasoning, taken as a whole, consistent data sets and observations provide compelling evidence to support an explanation of data. Using this approach, the explanation best fitting the data for the deep monitoring wells is that constituents associated with hydraulic fracturing have been released into the Wind River drinking water aquifer at depths above the current production zone.

Lines of reasoning to support this explanation consist of the following.

1.  High pH values

    pH values in MW01 and MW02 are highly alkaline (11.2-12.0), above the pH range observed in domestic wells (6.9-10), and above the pH range previously reported for the Wind River Formation with up to 94% of the total alkalinity contributed by hydroxide. The presence of hydroxide alkalinity suggests addition of base as the causative factor for elevated pH in the deep monitoring wells. Reaction path modeling indicates that sodium-sulfate composition ground water typical of deeper portions of the Wind River Formation provides little resistance to elevation of pH with small addition of potassium hydroxide.

    With the exception of soda ash, the pH of drilling additives in concentrated aqueous solution was well below that observed in the deep monitoring wells. Dense soda ash was added to the drilling mud which varied between pH 8 - 9.

    The possibility of cement/grout intrusion into the screened intervals was considered as a possibility for elevated pH in both monitoring

33

# DRAFT

wells. However, cement intrusion typically leads to pH values between 10 and 11 – below that observed in deep monitoring wells. Prolonged purging did not show decreasing pH trends. Water chemistry results indicate that ground water from the wells was highly undersaturated with respect to cement phases (e.g., portlandite).

Material Safety Data Sheets indicate that potassium hydroxide was used in a crosslinker (<5%) and in a solvent.

2.  Elevated potassium and chloride

The inorganic geochemistry of ground water from the deep monitoring wells is distinctive from that in the domestic wells and expected composition in the Wind River formation. Potassium concentration in MW02 (43.6 mg/L) and MW01 (54.9 mg/L) is between 14.5 and 18.3 times the mean value of levels observed in domestic wells (3 mg/L, 99% of values < 10 mg/L). Chloride enrichment in monitoring well MW02 (466 mg/L) is 18 times the mean chloride concentration (25.6 mg/L) observed in ground water from domestic wells. Chloride concentration in this well is significant because regional anion trends show decreasing chloride concentrations with depth.  In addition, the monitoring wells show low calcium, sodium, and sulfate concentrations compared to the general trend observed in domestic well waters.

Potassium levels in concentrated solutions of drilling additives were all less than 2 mg/L. One additive (Aqua Clear used during well development) contained 230 mg/L chloride in a concentrated solution. Information from well completion reports and Material Safety Data Sheets indicate that the formulation of fracture fluid provided for foam jobs typically consisted of 6% potassium chloride.

Potassium metaborate was used in crosslinkers (5-10%, 30-60%). Potassium hydroxide was used in a crosslinker (<5%) and in a solvent. Ammonium chloride was used in crosslinker (1-27%).

Alternative explanations for inorganic geochemical anomalies observed in deep monitoring wells have been provided and considered. These alternate explanations include contamination from drilling fluids and additives, well completion materials, and surface soil, with contamination from all these sources exacerbated by poor well development.  Contamination by drilling fluids and additives is inconsistent with analysis of concentrated solutions of bentonite and additives. Well construction materials (screen and sections of casing) consisted of stainless steel and were power-washed on site with detergent-free water prior to use.  Sections of tremie pipe used to inject cement above screened intervals were also power washed with detergent-free water prior to use. Stainless-steel screens and sections of casing and tremie pipe remained above ground level (did not touch soil) prior to use. Both deep monitoring wells were purposefully located away from the immediate vicinity of gas production wells, known locations of pits, and areas of domestic waste disposal (abandoned machinery) to minimize the potential of surface soil contamination. Conductor pipe installed over the first 30.5 m (100 ft) of drilling at both deep monitoring wells eliminated the possibility of surface soil entry into the borehole. Turbidity measurements in MW01 during sampling ranged from 7.5 and 7.9 Nephelometric Turbidity Units (NTUs). Turbidity measurements in MW02 during sampling ranged from 24.0 to 28.0 NTUs, slightly above the stated goal of 10.0 NTUs but nevertheless was clear water typical of domestic wells during sampling. A low

# DRAFT

recharge rate in MW02 necessitated a prolonged period of well development which was likely due in part to gas flow (reduced relative permeability to water) into the well during development.

3. Detection of synthetic organic compounds

Isopropanol was detected in MW01 and MW02 at 212 and 581 µg/L, respectively. Diethylene glycol was detected in MW01 and MW02 at 226 and 1570 µg/L, respectively. Triethylene glycol was detected in MW01 and MW02 at 46 and 310 µg/L, respectively. Another synthetic compound, tert-butyl alcohol, was detected in MW02 at a concentration of 4470 µg/L. Tert-butyl alcohol is a known breakdown product of methyl tert-butyl ether (a fuel additive) and tert-butyl hydroperoxide (a gel breaker used in hydraulic fracturing). EPA methods were utilized for analysis when applicable for compounds or classes of compounds. Detection of synthetic organic compounds in MW01 and MW02 was made in part through the use of non-commercially available modified EPA analytical methods. For instance, high performance liquid chromatography/mass spectrometry/mass spectrometry was utilized for analysis of diethylene, triethylene and tetraethylene glycols. Ethylene glycol, which was widely used for well stimulation, required additional method modification and was not analyzed during this investigation.

Isopropanol was detected in concentrated solutions of drilling additives at a maximum concentration of 87 µg/L, well below that detected in deep monitoring wells. Glycols were not detected in concentrated solutions of drilling additives.

Material Safety Data Sheets indicate that isopropanol was used in a biocide (20-40%), in

a surfactant (30-60%), in breakers (<1%, 10-30%), and in foaming agents (<3%, 1-5%, 10-30%). Diethylene glycol was used in a foaming agent (5-10%) and in a solvent (0.1-5%). Triethylene glycol was used in a solvent (95-100%). Material Safety Data Sheets do not indicate that tert-butyl hydroperoxide was used in the Pavillion gas field. The source of this compound remains unresolved. However, tert-butyl alcohol is not expected to occur naturally in ground water. Material Safety Data Sheets do not contain proprietary information and the chemical ingredients of many additives.

Alternative explanations provided to date and considered by EPA for detection of synthetic organic compounds in deep monitoring wells include arguments previously listed and addressed.

4. Detection of petroleum hydrocarbons

Benzene, toluene, ethylbenzene, and xylenes (BTEX) were detected in MW02 at concentrations of 246, 617, 67, and 750 µg/L respectively. Trimethylbenzenes were detected in MW02 at 105 µg/L. Gasoline range organics were detected in MW01 and MW02 at 592 and 3710 µg/L, respectively. Diesel range organics were detected in MW01 and MW02 at 924 and 4050 µg/L respectively. Naphthalene was detected in MW02 at 6 µg/L. EPA methods were utilized for analysis.

BTEX and trimethylbenzenes were not detected in concentrated solutions of drilling additives.

Material Safety Data Sheets indicate that aromatic solvent (typically BTEX mixture) was used in a breaker (<75%). Diesel oil (mixture of saturated and aromatic hydrocarbons including naphthalenes and alkylbenzenes) was used in a guar polymer slurry/liquid gel

**DRAFT**

concentrate (30-60%) and in a solvent (60-100%). Petroleum raffinates (a mixture of paraffinic, cycloparaffinic, olefinic, and aromatic hydrocarbons) were used in a breaker (<30-60%). Heavy aromatic petroleum naphtha (mixture of paraffinic, cycloparaffinic and aromatic hydrocarbons) was used in surfactants (5-10%, 10-30%, 30-60%) and in a solvent (10-50%). Toluene was used in a flow enhancer (3-7%). Xylenes were used in a flow enhancer (40-70%) and a breaker (confidential percentage). Gasoline range organics correspond to a hydrocarbon range of C6 – C10. It includes a variety of organic compounds ketones, ethers, mineral spirits, stoddard solvents, and naphthas. Detection of gasoline range organics does not infer the use of gasoline for hydraulic fracturing.

Alternative explanations provided to date and considered by EPA for detection of petroleum compounds in deep monitoring wells include arguments previously listed and addressed. An additional alternate explanation for detection of petroleum compounds includes use of lubricants on the drillstem and well casing, use of electrical tape on submersible pumps, and components of submersible pumps. Jet Lube Well Guard hydrocarbon free lubricant specifically designed for monitoring well installation was used for drillstem connections. No lubricants were used to attach sections of casing or sections of tremie pipe during cementation. Clamps, not electrical tape, were used to bind electrical wires for submersible pumps. Water collected for samples during recharge at MW01 and MW02 would have a short contact time with components of submersible pumps. For components of submersible pumps to be a causative factor of high concentrations of petroleum hydrocarbons observed in MW01 and MW02, components of submersible

pumps would have to contain high levels of water extractable petroleum compounds and consist of a matrix allowing rapid mass transfer, neither of which is plausible.

Another alternate explanation is that detection of petroleum hydrocarbons in ground water is expected above a natural gas field. Gas from Fort Union and Wind River Formations is dry and unlikely to yield liquid condensates at ground water pressure and temperature conditions. In addition, a condensate origin for petroleum hydrocarbons in ground water is doubtful because dissolved hydrocarbon gas compositions and concentrations are similar between the two deep monitoring wells and therefore would yield similar liquid condensates, yet the compositions and concentrations of organic compounds detected in these wells are quite different.

5.    Breakdown products of organic compounds

Detections of organic chemicals were more numerous and exhibited higher concentrations in the deeper of the two monitoring wells. Natural breakdown products of organic contaminants like BTEX and glycols include acetate and benzoic acid. These breakdown products are more enriched in the shallower of the two monitoring wells, suggesting upward/lateral migration with natural degradation and accumulation of daughter products.

Hydraulic gradients are currently undefined in the area of investigation. However, there are flowing stock wells (e.g., PGDW44 - one of the deepest domestic wells in the area of investigation at 229 m below ground surface) suggesting that upward gradients exist in the area of investigation. In the Agency's report on evaluation of impacts to USDWs by hydraulic fracturing of coalbed methane

36

# DRAFT

reservoirs (EPA, 2004), hypothetical conceptual models were presented on contaminant migration in a USDW during injection of fracturing fluids into a USDW.  In these conceptual models, highly concentrated contaminant plumes exist within the zone of injection with dispersed lower concentration areas vertically and laterally distant from injection points.  Data from deep monitoring wells suggests that this conceptual model may be appropriate at this site.

6.  <u>Sporadic bonding outside production casing directly above intervals of hydraulic fracturing</u>

It is possible that wellbore design and integrity issues were one causative factor in deep ground water contamination at this site (surface casing of production wells not extending below deepest domestic wells, little vertical separation between fractured zones and domestic wells, no cement or sporadic bonding outside production casing).

A review of well completion reports and cement bond/variable density logs in the area around MW01 and MW02 indicates instances of sporadic bonding outside production casing directly above intervals of hydraulic fracturing. For instance, at Pavillion Fee 34-03B, a cement bond/variable density log conducted on 10/22/2004 indicated no cement until 838 m (2750 ft) and sporadic bonding to 1036 m (3400 ft) below ground surface. The well completion report for this production well indicates that hydraulic fracturing was performed at 1039 m (3409 ft) below ground surface on 11/9/2004 prior to cement squeeze jobs at 823 m (2700 ft) and 256 m (840 ft) below ground surface in April 2005. At Tribal Pavillion 41-10 a cement bond/variable density log indicates sporadic bonding directly above the interval of hydraulic fracturing at 493 m (1618 ft) below ground surface.  A cement bond/variable density log conducted

on Tribal Pavillion 24-02 after a squeeze job at the base of the surface casing indicates sporadic bonding outside production casing below surface casing to the interval of hydraulic fracturing at 469 m (1538 ft) below ground surface. At Tribal Pavillion 11-11B, a cement bond/variable density log indicates sporadic bonding between 305 to 503 m (1000 to 1650 ft) below ground surface with hydraulic fracturing occurring at 463 m (1516 ft) below ground surface.

7.  <u>Hydraulic fracturing into thin discontinuous sandstone units</u>

There is little lateral and vertical continuity to hydraulically fractured tight sandstones and no lithologic barrier (laterally continuous shale units) to stop upward vertical migration of aqueous constituents of hydraulic fracturing in the event of excursion from fractures. Sandstone units are of variable grain size and permeability indicating a potentially tortuous path for upward migration.

In the event of excursion from sandstone units, vertical migration of fluids could also occur via nearby wellbores. For instance, at Pavillion Fee 34-03R, the cement bond/variable density log indicates no cement until 671 m (2200 ft) below ground surface. Hydraulic fracturing occurred above this depth at nearby production wells.

Although some natural migration of gas would be expected above a gas field such as Pavillion, data suggest that enhanced migration of gas has occurred to ground water at depths used for domestic water supply and to domestic wells.  Lines of reasoning to support this explanation consist of following.

1.  <u>Hydrocarbon and isotopic composition of gas</u>

The similarity of $\delta^{13}C$ values for methane, ethane, propane, isobutane, and butane

# DRAFT

between gas production and monitoring wells and plots of $\delta^{13}$C-CH$_4$ versus $\delta$D -CH$_4$ and $\delta^{13}$C-CH$_4$ versus methane/(ethane + propane) indicate that light hydrocarbons in casing and dissolved gas in deep monitoring wells are similar to produced gas and have undergone little oxidation or biodegradation indicative of advective transport. The absence of ethane and propane in three of four domestic wells having sufficient methane to allow isotopic analysis and a shift of $\delta^{13}$C-CH$_4$ and $\delta$D-CH$_4$ values in a positive direction relative to produced gas suggests the presence of gas of thermogenic origin in domestic wells undergoing biodegradation. This observation is consistent with a pattern of dispersion and degradation with upward migration observed for organic compounds.

2. Elevation of dissolved methane concentrations in proximity to production wells

   Levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells. With the exception of 2 domestic wells where methane was detected at less than 22 μg/L, methane was not detected in domestic wells with 2 or less production wells within 600 m.

3. Spatial anomaly near PGDW05

   Methane concentrations in ground water appear highest in the area encompassing MW01, PGDW30, and PGDW05. Ground water is saturated with methane at MW01 which is screened at a depth (239 m bgs) typical of deeper domestic wells in the area. Methane was detected in PGDW30 at 808 μg/L at a depth of only 80 m, the highest level in any domestic well. A blowout occurred during drilling at a depth of only 159 m bgs in December 2005 adjacent to PGDW05.

An alternative explanation of high methane concentrations in this area is that it is close to the top of the dome comprising the Pavillion gas field which may facilitate natural gas migration toward the surface. However, this geologic feature would also facilitate enhanced gas migration. Also, a mud-gas log conducted on 11/16/1980 (prior to intensive gas production well installation) at Tribal Pavillion 14-2 located only 300 m from the location of the uncontrolled release does not indicate a gas show (distinctive peaks on a gas chromatograph) within 300 m of the surface.

4. Shallow surface casing and lack of cement or sporadic bonding outside production casing

   With the exception of two production wells, surface casing of gas production wells do not extend below the maximum depth of domestic wells in the area of investigation. Shallow surface casing combined with lack of cement or sporadic bonding of cement outside production casing would facilitate migration of gas toward domestic wells.

   The discussion on migration of fluids associated with hydraulic fracturing is relevant for gas migration and is not repeated here for brevity. Of particular concern are wellbores having no or little cement over large vertical instances. For instance, at Pavillion Fee 34-03R, the cement bond/variable density log indicates no cement until 671 m (2200 ft) below ground surface. At Pavillion Fee 34-03B, a cement bond/variable density log conducted on 10/22/2004 indicated no cement until 838 m (2750 ft) below ground surface. Migration of gas via wellbores having no cement or poor cement bonding outside production casing is well documented in the literature.

   An alternative explanation of wellbore gas migration provided to EPA and considered is that domestic wells are poorly sealed and thus

**DRAFT**

constitute a potential gas migration pathway. However, lack of cement and sporadic bonding outside casing in production constitutes a major potential gas migration pathway to the depth of deep monitoring and domestic wells. It is possible that domestic wells could subsequently facilitate gas migration toward the surface.

5.   Citizens' complaints

Finally, citizens' complaints of taste and odor problems concurrent or after hydraulic fracturing are internally consistent. Citizens' complaints often serve as the first indication of subsurface contamination and cannot be dismissed without further detailed evaluation, particularly in the absence of routine ground water monitoring prior to and during gas production.

An alternate explanation provided and considered by EPA is that other residents in the Pavillion area have always had gas in their wells. Unfortunately, no baseline data exists to verify past levels of gas flux to the surface or domestic wells.

A lines of reasoning approach utilized at this site best supports an explanation that inorganic and organic constituents associated with hydraulic fracturing have contaminated ground water at and below the depth used for domestic water supply.  However, further investigation would be needed to determine if organic compounds associated with hydraulic fracturing have migrated to domestic wells in the area of investigation.  A lines of evidence approach also indicates that gas production activities have likely enhanced gas migration at and below depths used for domestic water supply and to domestic wells in the area of investigation.

Hydraulic fracturing in the Pavillion gas field occurred into zones of producible gas located within an Underground Source of Drinking Water (USDW).

Hydraulic fracturing for coal-bed methane recovery is often shallow and occurs directly into USDWs (EPA 2004).  TDS less than 10,000 mg/L in produced water is common throughout the Rocky Mountain portion of the United States (USGS 2011; Dahm et al. 2011). Ground water contamination with constituents such as those found at Pavillion is typically infeasible or too expensive to remediate or restore (GAO 1989). Collection of baseline data prior to hydraulic fracturing is necessary to reduce investigative costs and to verify or refute impacts to ground water.

Finally, this investigation supports recommendations made by the U.S. Department of Energy Panel (DOE 2011a, b) on the need for collection of baseline data, greater transparency on chemical composition of hydraulic fracturing fluids, and greater emphasis on well construction and integrity requirements and testing.  As stated by the panel, implementation of these recommendations would decrease the likelihood of impact to ground water and increase public confidence in the technology.

DRAFT

# 5.0

# References

American Public Health Association; American Water Works Association; Water Environment Federation (1998a). Method 3500-Fe B. Phenanthroline Method. In: Standard Methods for the Examination of Water and Waste Water, 20th Edition. Editors Clesceri, L.S., Greenberg, A.E., and Eaton, A.D.  Washington D.C.

American Public Health Association; American Water Works Association; Water Environment Federation (1998b). Method 4500-S2- D. Methylene Blue Method. In: Standard Methods for the Examination of Water and Waste Water, 20th Edition. Editors Clesceri, L.S., Greenberg, A.E., and Eaton, A.D.  Washington D.C.

Bair, S.E., Freeman, D.C., and Senko, J.M. (2010). Expert Panel Technical Report Subsurface Gas Invasion Bainbridge Township, Geauga County, Ohio, submitted to Ohio Department of Natural Resources Division of Mineral Resources Management, June 2010.

Bartos, T.T., Quinn, T.L., Hallberg, L.L., and Eddy-Miller, C.A. (2008).  Quality of shallow ground water in three areas of unsewered low-density development in Wyoming and Montana, 2001.  U. S. Geological Survey Scientific Investigations Report 2008-5012, 118 p.

Bethke, C. M. (1996). Geochemical Reaction Modeling. Oxford University Press, New York.

Boyd, D., Al-Kubti, S., Khedr, O., N. Khan, and K. Al-Nayadi, prepared for the 2006 SPE Abu Dhabi International Petroleum Exhibition and Conference, Abu Dhabi, UAE, 5–8 November.

Bradley, P.M., Chapelle, F.H., and Landmeyer, J.E. (2001).  Effect of redox conditions on MTBE biodegradation in surface water sediments. *Environmental Science and Technology*, v. 35, p. 4643-4647.

Bybee, K. (2007). Cement-bond-log interpretation reliability. *Journal of Petroleum Technology*, Feb. 2007, p. 64-66.

Caldwell, M.E. and Suflita, J.M. (2000).  Detection of phenol and benzoate as intermediates of anaerobic benzene biodegradation under different terminal electron-accepting conditions.  *Environmental Science and Technology*, v. 34, p. 1216-1220.

Corseuil, H.X., Monier, A.L., Fernandes, M., Schneider, M.R., Nunes, C.C. Rosario, M., and Alvarez, P.J.J. (2011).  BTEX plume dynamics following an ethanol blend release: Geochemical footprint and thermodynamic constraints on natural attenuation. *Environmental Science and Technology*, v. 45, p. 3422-3429.

Craig, H. (1961).  Isotopic variations in meteoric waters. *Science*, v. 133, p. 1702-1703.

Daddow, R.L. (1996). Water resources of the Wind River Indian Reservation, Wyoming. U.S. Geological Survey Water-Resources Investigation Report 95-4223, 121 p.

Dahm, K.G., Guerra, K.L., Xu, P., and Drewes, J.E. (2011). Composite geochemical database for coalbed methane produces water quality in the Rocky Mountain Region. *Environmental Science and Technology*, v. 45, p. 7655-7663.

Delany J.M. and Lundeen S.R. (1990). The LLNL thermochemical database. Lawrence Livermore National Laboratory Report, UCRL-21658.  Lawrence Livermore National Laboratory.

Dwyer, D.F. and Tiedje, J.M. (1983).  Degradation of ethylene glycol and polyethylene glycols by methanogenic consortia.  *Applied and Environmental Microbiology*, v. 46, p. 185-190.

Flores, R.M. and Keighin, C.W. (1993). Reservoir anisotropy and facies stratigraphic framework in the Paleocene Front Union Formation, western Wind River Basin, Wyoming, *in* W.R. Keefer, W.J. Metzger and L.H. Godwin, eds., Oil and Gas and Other Resources of the Wind River Basin, Wyoming: Wyoming Geological Association Special Symposium, 1993, p. 121–141.

DRAFT

Gibb, J.P. and Jennings, K.V.B. (1987). Forum: How drilling fluids and grouting materials affect the integrity of ground water samples from monitoring wells. *Ground Water Monitoring and Remediation*, v. 7, p. 33-42.

Harrison, S.S. (1983). Evaluating system for ground water contamination hazards due to gas-well drilling on the glaciated Appalachian Plateau. *Ground Water,* v. 21, 689-700.

Harrison, S.S. (1985). Contamination of aquifers by overpressuring the annulus of oil and gas wells. *Ground Water,* v. 23, 317-324.

Hiatt, R., Clipsham, J., and Visser, T. (1964). The induced decomposition of *tert*-butyl hydroperoxide. *Canadian Journal of Chemistry*, v. 42, p. 2754-2757.

Johnson, R.C. and Rice, D.D. (1993). Variations in composition and origins of gases from coal bed and conventional reservoirs, Wind River Basin, Wyoming, *in* W.R. Keefer, W.J. Metzger and L.H. Godwin, eds., Oil and Gas and Other Resources of the Wind River Basin, Wyoming: Wyoming Geological Association Special Symposium, 1993, p. 319-335.

Johnson, R.C. and Keighin, W.C. (1998). Origins of natural gases from upper Cretaceous reservoirs, Bighorn Basin, Wyoming and Montana, and comparison with gases from the Wind River Basin, Wyoming, In Forty-Ninth Guidebook, Wyoming Geological Association, p. 223- 249.

Keefer, W.R. and Johnson R.C. (1993). Stratigraphy and oil and gas resources in uppermost Cretaceous and Paleocene rocks, Wind River Reservation, Wyoming, *in* W.R. Keefer, W.J. Metzger and L.H. Godwin, eds., Oil and Gas and Other Resources of the Wind River Basin, Wyoming: Wyoming Geological Association Special Symposium, 1993, p. 71-86.

Johnson, R.C., Finn, T.M., Kirschbaum, M.A., Roberts, S.B., Roberts, L.N.R., Cook, T., and Taylor, D.J. (2007). The Cretaceous-Lower Tertiary Composite Total Petroleum System, Wind River Basin, Wyoming, Chapter 4 of Petroleum Systems and Geologic Assessment of Oil and Gas in the Wind River Basin Province, Wyoming. U.S. Geological Survey Digital Data Series DDS–69–J.

Kinnaman, F.S., Valentine, D.L., and Tyler, S.C. (2007). Carbon and hydrogen isotope fractionation associated with the aerobic microbial oxidation of methane, ethane, propane and butane. *Geochimica et Cosmochimica Acta*, v. 71, p. 271-283.

Mormille, M.R., Liu, S., and Suflita, J.M. (1994). Anaerobic biodegradation of gasoline oxygenates: Extrapolation of information to multiple sites and redox conditions. *Environmental Science and Technology*, v. 28, p. 1727-1732.

Morris, D.A., Hackett, O.M., Vanlier, K.E., Moulder, E.A., and Durum, W.H. (1959). Ground water resources of Riverton irrigation project area, Wyoming, Geological Survey Water-Supply Paper 1375, 205 p.

Mueller, C. (1989). Pavillion; Wyoming Geological Association, Wyoming Oil and Gas Fields Symposium, Bighorn and Wind River Basins, p. 356-358.

Nordbotten, J.M., Celia, M.A., and Bachu, S. (2004). Analytical solutions for leakage rates through abandoned wells. *Water Resources Research*, v. 40, W04204.

Nordbotten, J.M., Celia, M.A. and Bachu, S. (2005a). Injection and storage of $CO_2$ in deep saline aquifers: Analytical solution for $CO_2$ plume evolution during injection. *Transport Porous Media*, v. 58, p. 339-360.

Nordbotten, J.M., Celia, M.A., Bachu, S., and Dahle, H.K. (2005b). Semianalytical solution for $CO_2$ leakage through an abandoned well. *Environmental Science and Technology*, v. 39, p. 602-611.

Ohio Department of Natural Resources, Division of Mineral Resources Management, Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio September 1, (2008).

Osborn S.G., Vengosh, A., Warner, N.R., and Jackson, R.B. (2011). Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing. *Proceedings of the National Academy of Sciences*, v. 108, p. 8172-8176.

**DRAFT**

Osiensky, J.L., Winter, G.V., and Williams, R.E. (1984). Monitoring and mathematical modeling of contaminated ground water plumes in fluvial environments. *Ground Water*, v. 22, p. 298-306.

Pennsylvania Department of Environmental Protection (PADEP) Consent Order and Agreement Cabot Oil and Gas Corporation Dimock and Springville Townships Susquehanna County (2009).

Pennsylvania Department of Environmental Protection (PADEP) Modification to Consent Order and Agreement dated November 4, 2009 - April 15, 2010.

Pennsylvania Department of Environmental Protection (PADEP) Modification to Consent Order and Agreement dated November 4, 2009 - April 15, 2010.

Plafcan, M., Eddy-Miller, C.A., Ritz, G.F., and Holland, J.P.R. (1995). Water resources of Fremont County, Wyoming.  U.S. Geological Survey, Water-Resources Investigations Report 95-4095, 133 p.

Schoell, M. (1980). The hydrogen and carbon isotopic composition of methane from natural gases of various origins. *Geochimica et Cosmochimica Acta,* v. 44, p. 649-661.

U.S. Department of Energy. Secretary of Energy Advisory Board. Shale Gas Production Subcommittee. Ninety-Day Report – August 11, 2011.

U.S. Department of Energy. Secretary of Energy Advisory Board. Shale Gas Production Subcommittee. Second Ninety-Day Report – November 18, 2011.

Single, E.L. (1969). *in* Wyoming Geological Association 21st Field Conference Guidebook, p. 101-103.

Taylor, S.W., Sherwood Lollar, B., and Wassenaar, L.I. (2000). Bacteriogenic ethane in near-surface aquifers: Implications for leaking hydrocarbon well bores. *Environmental Science and Technology,* v. 34, p. 4727-4732.

U.S. Environmental Protection Agency (1987). Management of Wastes from Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal energy, EPA/530-SW-88-003, December, 1987. Available at

http://www.epa.gov/osw/nonhaz/industrial/special/oil/rtc1987.pdf

U.S. Environmental Protection Agency - Region VIII, Ground Water Section Guidance No. 34 - March 31, 1994.

U.S. Environmental Protection Agency (2004). Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs, Office of Water Office of Ground Water and Drinking Water (4606M), EPA 816-R-04-003, June 2004.

U.S. Environmental Protection Agency (2009). Site Inspection - Analytical Results Report, Pavillion Area Ground Water Investigation Site, August 8, 2009. available at http://www.epa.gov/region8/superfund/wy/pavillion/

U.S. Environmental Protection Agency (2010). Expanded Site Inspection - Analytical Results Report, Pavillion Area Ground Water Investigation Site, August 30, 2010. available at http://www.epa.gov/region8/superfund/wy/pavillion/

U.S. General Accounting Office (1989). Safeguards are not Preventing Contamination from Injected Oil and Gas Wastes, GAO/RCED-89-97, July 1989.

U.S. Geological Survey Produced Waters Database, Chemistry of Produced Water in the United States, http://energy.cr.usgs.gov/prov/prodwat/tds.htm. Site accessed November, 2011.

Valentine, D.L. et al. (2010). Propane respiration jump-starts microbial response to a deep oil spill. *Science*, v. 330, p. 208-211.

Van Stempvoort, D., Maathuis, H., Jaworski, E., Mayer, B., and Rich, K. (2005). Oxidation of fugitive methane in ground water linked to bacterial sulfate reduction, *Ground Water*, v. 43, p. 187-199.

Whiticar, M.J. (1999). Carbon and hydrogen isotope systematic of bacterial formation and oxidation of methane. *Chemical Geology,* v. 161, p. 291–314.

**DRAFT**

Whiticar, M.J. and Faber, E. (1986). Methane oxidation in sediment and water column environments-isotopic evidence. *Organic Geochemistry*, v. 10, p. 759-768.

Wilson, J.T., Kaiser, P.M., and Adair, C. (2005). Monitored natural attenuation of MTBE as a risk management option at leaking underground storage tank sites. EPA/600/R-04/1790.

Wyoming State Water Plan, Wyoming Water Development Office, Wind/Bighorn River Basin Plan, Jan. 14, 2003.
http://waterplan.state.wy.us/plan/bighorn/techmemos/grnddet.html

**DRAFT**

# Appendix A
## Summary of Analytical Results

A2

**DRAFT**

**Table A1.** Summary of subsurface sample locations, depth of sample collection, times (phases) of sampling, target analytes, laboratories utilized, and analytical methods

| Sample | Latitude | Longitude | Depth (m bgs) | Type | Media | Major anions and alkalinity phase(lab) | Metals phase(lab) | Alcohols and VOCs phase(lab) | Low molecular weight acids, glycols phase(lab) | SVOCs Pesticides PCBs, TICs phase(lab) | GRO, DRO, THE, TPH phase(lab) | Bacteria phase(lab) | Fixed gases, C1-C6+, δ13C and δD C1-C6 DOC DIC, δ13C DIC δ18O and δD water phase(lab) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PGPP01 (Tribal Pavillion 14-10) | 43.24578857 | -108.6356735 | | PG | gas/fluid | ----- | ----- | II(R8[2]) | ----- | II(R8[4]) | II(R8[4]) | ----- | II([1]) |
| PGPP02 | 43.2486496 | -108.6274796 | | PG | gas | ----- | ----- | ----- | ----- | ----- | ---- | ----- | II([1]) |
| PGPP04 (Tribal Pavillion 24-02) | 43.25984955 | -108.6116409 | | PG | gas/fluid | ----- | ----- | II(R8[4]) | ----- | II(R8[4]) | II(R8[4]) | ----- | II([1]) |
| PGPP05 (Tribal Pavillion 33-10) | 43.2486496 | -108.6274796 | | PG | gas/fluid | ----- | ----- | II(R8[2]) | ----- | II(R8[3]) | II(R8[4]) | ----- | II([1]) |
| PGPP06 (Tribal Pavillion 14-2) | 43.26016998 | -108.6165009 | | PG | gas/fluid | ----- | ----- | II(R8[2]) | ----- | II(R8[4]) | II(R8[4]) | ----- | II([1]) |
| MW01 | 43.25682 | -108.62185 | 233-239 | MW | gas/water | III(O[1]) IV(O[1]) | III(S[1]) IV(S[1]) | III(R8[4],S[2]) IV(R8[2],S[3]) | IV(S[4],R3) | II(R8[2]) IV(R8[3]) | III(R8[4]) IV(R8[4]) | ----- | III(I[2],I[3],O[2],S[3],S[4]) IV(I[3],I[4],O[2],S[3],S[4]) |
| MW02 | 43.25293 | -108.59468 | 293-299 | MW | gas/water | III(O[1]) IV(O[1]) | III(S[1]), IV(S[1]) | III(R8[4],S[2]) IV(R8[4],S[3]) | IV(S[4],R3) | II(R8[4]) IV(R8[3]) | III(R8[4]), IV(R8[4]) | ----- | II(I[2],I[3],O[2],S[3],S[4]) IV(I[3],I[4],O[2],S[3],S[4]) |
| PGMW01 (Pit 24-3#1) | 43.26122665 | -108.6316147 | 4.6 | PGM | water | II(R8[1]) | II(A4) | II(A,R8[2]) | ----- | II(A,R8[1]) | II(E[2],R8[4]) | II(E[1]) | II(R8[3]) |
| PGMW02 (Pit 14X-11#6) | 43.24616241 | -108.613205 | 4.6 | PGM | water | II(R8[1]) | II(A4) | II(A,R8[2]) | ----- | II(A,R8[1]) | II(E[2],R8[4]) | II(E[1]) | II(R8[3]) |
| PGMW03 (Pit 42X-11#4) | 43.25263977 | -108.6020584 | 4.6 | PGM | water | II(R8[1]) | II(A4) | II(A,R8[2]) | ----- | II(A,R8[1]) | II(E[3],R8[4]) | II(E[1]) | II(R8[3]) |
| PGSO01 (Pit 24-3) | 43.26117325 | -108.6316071 | < 5 | PGS | soil | ----- | ----- | ----- | ----- | II(R8[3]) | II(E[2],R8[4]) | ----- | ----- |
| PGSO02 (Pit 14X-11) | 43.24636841 | -108.6135254 | < 5 | PGS | soil | ----- | ----- | ----- | ----- | II(R8[3]) | II(E[2],R8[4]) | ----- | ----- |
| PGSO03 (Pit 42X-11) | 43.2527504 | -108.6022339 | < 5 | PGS | soil | ----- | ----- | ----- | ----- | II(R8[4]) | II(E[2],R8[4]) | ----- | ----- |
| PGDW01 | unknown | unknown | ----- | DW | water | I(R8[1]) | I(K) | I(L) | ----- | I(L,R8[3]) | ---- | ----- | ----- |
| PGDW02 | 43.21848912 | -108.5783117 | 15.2 | DW | water | I(R8[1]) | I(K) | I(L) | ----- | I(L,R8[3]) | ----- | ----- | ----- |
| PGDW03 | 43.22721318 | -108.6584107 | 152.4 | DW | water | I(R8[1]) II(R8[1]) | I(K), II(A4) | I(L) II(A,R8[4]) | ----- | I(L,R8[3]) II(A,R8[1]) | II(E[2],R8[4]) | II(E[1]) | II(I[1],R8[3]) |
| PGDW04 | 43.22790981 | -108.6542063 | 152.4 | DW | water | I(R8[1]) II(R8[1]) | I(K), II(A4) | I(L) II(A,R8[4]) | ----- | I(L,R8[1]), II(A,R8[1]) | I(E[2]) II(E[2],R8[4]) | I(E[1]) II(E[1]) | I(R8[3]) II(I,R8[3]) |
| PGDW05 | 43.25884666 | -108.6126481 | 64.0 | DW | water | I(R8), II(R8) IV(O[1]) | I(K) II(A4) IV(S[1]) | I(L) II(A,R8[2]) IV(R8[4],S[1]) | IV(S[4],R3) | I(L,R8[3]) II(A,R8[2]) IV(R8[3]) | I(E[2]) II(E[2],R8[4]) | I(E[1]) II(E[1]) | I(R8[3]) II(R8[4]) IV(I[2],O[4],O[3],S[4]) |

| Sample | Latitude | Longitude | Depth (m bgs) | Type | Media | Major anions and alkalinity phase(lab) | Metals phase(lab) | Alcohols and VOCs phase(lab) | Low molecular weight acids, glycols phase(lab) | SVOCs Pesticides PCBs, TICs phase(lab) | GRO, DRO, THF, TPH phase(lab) | Bacteria phase(lab) | Fixed gases, $C_1$-$C_{5+}$, $\delta^{13}C$ and $\delta D$ $C_1$-$C_4$ DOC DIC, $\delta^{13}C$ DIC $\delta^{18}O$ and $\delta D$ water |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PGDW06 | 43.27110813 | -108.5599211 | 115.8 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW07 | 43.24678442 | -108.6879085 | 154.2 | PGP | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | $I(R8^1)$ |
| PGDW08 | 43.24697265 | -108.6840567 | 157.0 | PGP | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW09 | 43.27211644 | -108.615144 | 9.1 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW10 | 43.23574855 | -108.6563896 | 227.1 | DW | water | $I(R8^1)$ $II(R8^1)$ | $I(K)$ $II(A4)$ | $I(L)$ $II(A,R8^2)$ | ----- | $I(L,R8^1)$ $II(A,R8^3)$ | $I(E^2)$ $II(E^2,R8^4)$ | $II(E^1)$ | $I(R8^1)$ $II(I^1,R8^1)$ |
| PGDW11 | 43.24312049 | -108.6228628 | 227.1 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW12 | 43.27628927 | -108.5661502 | 115.8 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW13 | 43.2444467 | -108.6772771 | ----- | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW14 | 43.25154027 | -108.6273311 | 57.9 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$, $IV(R8^2,S^4)$ | $IV(S^4,R3)$ | $I(L,R8^1)$ | ----- | ----- | $IV(O^4,S^5)$ |
| PGDW15 | 43.24312129 | -108.6671291 | 30.5 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW16 | 43.20381363 | -108.6405183 | 161.5 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW17 | 43.20416653 | -108.6368713 | 152.4 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | $I(R8^1)$ |
| PGDW18 | 43.22491388 | -108.569651 | 67.1 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW19 | 43.21382469 | -108.651274 | 19.8 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW20 | 43.25166961 | -108.5912756 | 140.2 | DW | water | $I(R8^1)$ $II(R8^1)$ $III(O^1)$ $IV(O^1)$ | $I(K)$, $II(A4)$ $III(S^4)$ $IV(S^4)$ | $I(K)$ $II(A,R8^2)$ $III(R8^2,S^4)$ $IV(R8^2,S^4)$ | $IV(S^4,R3)$ | $I(L,R8^1)$, $II(A,R8^3)$ $III(R8^4)$ $IV(R8^3)$ | $I(E^2)$ $II(E^2,R8^4)$ $III(R8^4)$ $IV(R8^4)$ | $I(E^1)$ $II(E^1)$ | $I(R8^1)$ $II(R8^1)$ $III(I^1,O^-,S^3,S^-)$ $IV(I^1,O^2,S^3,S^4)$ |
| PGDW21 | 43.25167095 | -108.5912762 | 140.2 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | $I(R8^1)$ |
| PGDW22 | 43.24452934 | -108.5981513 | ----- | DW | water | $I(R8^1)$ $II(R8^1)$ | $I(K)$ $II(A4)$ | $I(L)$ $II(A,R8^2)$ | ----- | $I(L,R8^1)$, $II(A,R8^3)$ | $I(E^1)$ $II(E^2,R8^4)$ | $I(E^1)$ $II(E^1)$ | $I(R8^1)$ $II(R8^1)$ |
| PGDW23 | 43.24866472 | -108.6225943 | 152.4 | DW | water | $I(R8^1)$ $II(R8^1)$ | $I(K)$ $II(A4)$ | $I(L)$, $II(A,R8^2)$, $IV(R8^2,S^4)$ | $IV(S^4,R3)$ | $I(L,R8^1)$ $II(A,R8^3)$ $IV(R8^4)$ | $I(E^2)$ $II(E^2,R8^4)$ | $I(E^1)$ $II(E^1)$ | $I(R8^1)$ $II(I^1,R8^2)$ $IV(S^4,S^5)$ |
| PGDW24 | 43.25877211 | -108.6015059 | 30.5 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW25 | 43.25558722 | -108.5694867 | 243.8 | DW | water | $I(R8^1)$ $II(R8^1)$ | $I(K)$, $II(A4)$ | $I(L)$, $II(A,R8^2)$ | ----- | $I(L,R8^3)$, $II(A,R8^3)$ | $II(E^2,R8^4)$ | $II(E^1)$ | $II(I^1,R8^2)$ |
| PGDW26 | 43.25512275 | -108.6132115 | 19.8 | DW | water | $I(R8^1)$, $IV(O^1)$ | $I(K)$ | $I(L)$, $IV(R8^2,S^4)$ | $IV(S^4,R3)$ | $I(L,R8^1)$ $IV(R8^4)$ | $IV(R8^4)$ | ----- | $I(R8^1)$ $IV(O^4,O^4,O^4,S^5)$ |
| PGDW28 | 43.23993143 | -108.6465688 | 25.9 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | ----- | ----- | ----- |
| PGDW29 | 43.21773909 | -108.6288449 | 121.9 | DW | water | $I(R8^1)$ | $I(K)$ | $I(L)$ | ----- | $I(L,R8^1)$ | $I(E^1)$ | ----- | $I(R8^1)$ |

DRAFT

A3

A4

DRAFT

| Sample | Latitude | Longitude | Depth (m bgs) | Type | Media | Major anions and alkalinity phase(lab) | Metals phase(lab) | Alcohols and VOCs phase(lab) | Low molecular weight acids, glycols phase(lab) | SVOCs Pesticides PCBs, TICs phase(lab) | GRO, DRO, THE, TPH phase(lab) | Bacteria phase(lab) | Fixed gases, $C_1$-$C_4$+, $\delta^{13}C$ and $\delta D$ $C_1$-$C_4$ DOC DIC, $\delta^{13}C$ DIC $\delta^{18}O$ and $\delta D$ water phase(lab) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PGDW30 | 43.25753218 | -108.6225755 | 79.2 | DW | water | I(R8¹) II(R8¹) III(O¹) IV(O¹) | I(K), II(A4) III (S¹) IV(S¹) | I(L) II(A,R8²) III(R8²,S²) IV(R8²,S²) | IV(S⁴,R3) | II(L,R8⁸), II(A,R8⁴) III(R8⁸) IV(R8⁷) | II(E²) III(R8⁴) IV(R8⁴) | II(E¹) | I(R8¹) II(R8⁸) III(I², O², S², S⁵) IV(I², O², S², S⁵) |
| PGDW31 | 43.27302485 | -108.6615302 | ------ | DW | water | I(R8¹) | I(K) | I(L) | ----- | I(L,R8¹) | ----- | ----- | ----- |
| PGDW32 | 43.24075256 | -108.5941561 | 205.7 | DW | water | I(R8¹) II(R8¹) IV(O¹) | I(K), II(A4), IV(S¹) | I(L)  II(A) IV(R8²,S⁴) | IV(S⁴,R3) | II(A,R8¹), II(A,R8⁴) IV(R8⁸) | II(E²,R8⁴) IV(R8¹) | II(E¹) | I(R8¹) II(R8⁸) IV(I²,O²,O⁴,S⁵) |
| PGDW33 | 43.23855522 | -108.5964146 | 9.1 | DW | water | I(R8¹) | I(K) | I(L) | ----- | I(L,R8¹) | ----- | ----- | ----- |
| PGDW34 | 43.23605297 | -108.6058086 | 30.5 | DW | water | I(R8¹) | I(K) | I(L) | ----- | I(L,R8¹) | ----- | ----- | ----- |
| PGDW35 | 43.23021564 | -108.6241763 | 88.4 | DW | water | I(R8¹) | I(K) | I(L) | ----- | I(L,R8¹) | ----- | ----- | I(R8¹) |
| PGDW36 | 43.25905726 | -108.5987059 | 30.5 | DW | water | I(R8¹) | I(K) | I(L) | ----- | I(L,R8⁸) | I(E²) | ----- | ----- |
| PGDW37 | 43.24016136 | -108.6585376 | 24.4 | DW | water | I(R8¹) | I(K) | I(L) | — | I(L,R8⁸) | ----- | ----- | ----- |
| PGDW38 | 43.2296203 | -108.572037 | 48.8 | DW | water | I(R8¹) | I(K) | I(L) | ----- | I(L,R8⁸) | I(E²) | ----- | I(R8¹) |
| PGDW39 | 43.23750687 | -108.5781708 | 6.1 | DW | water | I(L) II(R8¹) | I(L), II(A4) | I(L), II(A,R8⁴) | ----- | II(L,R8⁸), II(A,R8⁸) | ----- | II(E¹) | ----- |
| PGDW40 | 43.26156616 | -108.6198273 | 67.1 | DW | water | II(R8) | II(A4) | II(A,R8⁴) | ----- | II(A,R8⁴) | II(E²,R8⁴) | II(E¹) | II(I¹,R8¹) |
| PGDW41 | 43.262146 | -108.6378479 | 114.6 | DW | water | II(R8), IV(O¹) | II(A4) IV(S¹) | II(A,R8⁴) IV(R8²,S⁴) | IV(S⁴,R3) | II(A,R8⁸) IV(R8⁸) | II(E²,R8⁴), IV(R8⁴) | II(E¹) | II(I¹,R8¹) IV(I²,S²,S⁵) |
| PGDW42 | 43.25574493 | -108.647316 | 61.0 | DW | water | II(R8¹) | II(A4) | II(A,R8⁴) | ----- | II(A,R8⁸) | II(E²,R8⁴) | II(E¹) | II(I¹,R8¹) |
| PGDW43 | 43.25749207 | -108.64151 | ------ | DW | water | II(R8¹) | II(A4) | II(A,R8⁴) | ----- | II(A,R8⁸) | II(E²,R8⁴) | II(E¹) | II(I¹,R8¹) |
| PGDW44 | 43.25086975 | -108.6261292 | 228.6 | DW | water | II(R8) | II(A4) | II(A,R8¹), IV(R8²,S⁴) | IV(S⁴,R3) | II(A,R8⁴), IV(R8⁸) | II(E²,R8⁴) | II(E¹) | II(R8⁸) IV(I²,O³,S⁴) |
| PGDW45 | 43.25888062 | -108.6130142 | ------ | DW | water | II(R8), IV(O¹) | II(A4) IV(S¹) | II(A,R8⁸) IV(R8²,S⁴) | IV(S⁴,R3) | II(A,R8⁴) IV(R8⁸) | II(E⁴,R8⁴), IV(R8⁴) | II(E¹) | II(R8⁸) IV(I²,O²,O³,S⁵) |
| PGDW46 | 43.24651337 | -108.6157684 | 14.6 | DW | water | II(R8¹) | II(A4) | II(A,R8²) | ----- | II(A,R8¹) | II(E²,R8⁴) | II(E¹) | II(I¹,R8¹) |
| PGDW47 | 43.24520493 | -108.6319885 | 147.5 | DW | water | II(R8¹) | II(A4) | II(A,R8²) | ----- | II(A,R8⁸) | II(E²,R8⁴) | II(E¹) | II(I¹,R8¹) |
| PGDW48 | 43.2299881 | -108.6235733 | ------ | DW | water | II(R8¹) | II(A4) | II(A,R8¹) | ----- | II(A,R8⁸) | II(E²,R8⁴) | II(E¹) | II(R8¹) |
| PGDW49 | 43.25505829 | -108.6178741 | ------ | DW | water | II(R8¹) | II(A4) | II(A,R8²) IV(R8²,S⁴) | ----- | II(A,R8⁴) | II(E²,R8⁴) | II(E¹) | II(R8⁸) IV(I⁴,O³,S⁵) |
| PGPW01 | 43.24678802 | -108.6879349 | ~154 | PGP | water | II(R8¹) | II(A4) | II(A,R8⁴) | ----- | II(A,R8⁸) | II(E²,R8⁴) | II(E¹) | II(I¹,R8⁸) |
| PGPW02 | 43.24697113 | -108.6840515 | ~154 | PGP | water | II(R8¹) | II(A4) | II(A,R8⁴) | ----- | II(A,R8⁸) | II(E²,R8⁴) | II(E¹) | II(I¹,R8⁸) |
| LD-02 | 43.25167095 | -108.5912762 | 185.9 | DW | water | III(O¹) | III(S¹) | III(S²) | ----- | III(R8⁸) | ----- | ----- | III(I²,O², S³,S⁵) |

# DRAFT

**Laboratories, Analytes, and Methods**

A - ALS Laboratory Group, Salt Lake City, UT. VOCs, SVOCs, pesticides, TCBs, TICs determined using methods specified under the CLP.

A4 - A4 Scientific, The Woodlands, TX. TAL metals determined using methods specified under the CLP.

E[1] - Energy Laboratories Inc., Billings, MT. Heterotrophic plate counts, iron reducing bacteria, sulfur reducing bacteria.

E[2] - Energy Laboratories Inc., Billings, MT. GRO, DRO, THE, and TPH.

I[1] - Isotech Laboratories, Champaign, IL under contract by EnCana. Fixed gases and light hydrocarbons determined using ASTM D1945-03 in gas samples and headspace of aqueous samples. $\delta^{13}C$ and $\delta D$ for $C_1$ determined using gas stripping and IRMS in aqueous samples. $\delta^{13}C$ and $\delta D$ for $C_1$-$C_4$ determined using IRMS for gas samples.

I[2] - Isotech Laboratories, Champaign, IL. Fixed gases and light hydrocarbons determined using ASTM D1945-03 in headspace of aqueous samples. $\delta^{13}C$ and $\delta D$ for $C_1$ and $\delta^{13}C$ for $C_2$ and $C_3$ determined using gas stripping and IRMS in aqueous samples. $\delta^{13}C$ DIC using gas stripping and IRMS.

I[3] - Isotech Laboratories, Champaign, IL. Fixed gases and light hydrocarbons determined using ASTM D1945-03 in headspace of aqueous samples. $\delta^{13}C$ and $\delta D$ for $C_1$ , $\delta^{13}C$ for $C_2$ - $C_5$, and $\delta^{13}C$ for DIC gas stripping and IRMS in aqueous samples.

I[4] - Isotech Laboratories, Champaign, IL. Fixed gases and light hydrocarbons determined using ASTM D1945-03 in gas samples. $\delta^{13}C$ and $\delta D$ for $C_1$ - $C_3$ using IRMS in gas samples.

I[5] - Isotech Laboratories,  Champaign, IL. Fixed gases and light hydrocarbons determined using ASTM D1945-03 in gas samples. $\delta^{13}C$ and $\delta D$ for $C_1$ - $C_3$ using IRMS in gas samples. $^{14}C$ using AMS in gas samples.

K - KAP Laboratories, Vancouver, WA.  TAL metals determined under the CLP.

L - Liberty Analytical, Salt Lake City, UT. VOCs, SVOCs, PCBs, and TICs determined under the CLP.

O[1] - EPA, ORD, Ada, OK.  $SO_4$, Cl, F, and Br determined using RSKSOP 276v3 and EPA Method 6500.  $NO_3$ + $NO_2$ and $NH_4$ determined using RSKSOP 214v5 and EPA Method 350.1 and 353.2

O[2] - EPA, ORD, Ada, OK.  DIC and DOC determined using RSKSOP-330v0 and EPA Method 9060A.

O[3] - EPA, ORD, Ada, OK.  $C_1$ determined using RSKSOP 175v5 and Cali-5 gas sampling bags.

R3 - U.S. EPA Region 3 Laboratory, Fort Mead, MD. Diethylene glycol, triethylene glycol, tetraethylene glycol, and 2-butoxyethanol analysis by LC/MS/MS. This method is under development with no finalized SOP.  EPA Methods 8000C and 8321 were followed for method development and QA/QC limits where applicable.

R8[1] - U.S. EPA Region 8 Laboratory, Golden, CO (fluoride, chloride, nitrite-N, nitrate-N, orthophosphate-P, and sulfate determined using EPA Method 300.0 and EPA Region SOP 310.  Alkalinity determined using EPA Method 310.0).

R8[2] - U.S. EPA Region 8 Laboratory, Golden, CO. VOCs determined using EPA Method 8260B.

R8[3] - U.S. EPA Region 8 Laboratory, Golden, CO.  SVOCs determined using ORGM-515 r1.1 and EPA Method 8270D.

R8[4] - U.S. EPA Region 8 Laboratory, Golden, CO.  GRO determined using ORGM-506 r1.0 and EPA Method 8015D. DRO determined using ORGM-508 r1.0 and EPA Method 8015D.

R8[5] - U.S. EPA Region 8 Laboratory, Golden, CO. Dissolved $C_1$ in Phase I and dissolved $C_1$-$C_3$ in Phase II using EPA Method 524.2.

S[1] - Shaw Inc, Ada, OK in Phases III and IV. Metals and metals speciation determined using RSKSOP 213v4 and 257v2, or 332V0 and EPA Methods 200.7 and 6020.

S[2] - Shaw Inc, Ada, OK in Phases III and IV.  Aromatics and chlorinated hydrocarbons determined using method RSKSOP-259v1 and EPA Method 5021A plus 8260C.

S[3] - Shaw Inc, Ada, OK . Alcohols, aromatics, and chlorinated hydrocarbons determined using method RSKSOP-259v1.

S[4] - Shaw Inc, Ada, OK. Low molecular weight acids determined using RSKSOP-112v6.

S[5] - Shaw Inc, Ada, OK.  Dissolved gases $C_1$-$C_4$ determined using RSKSOP 194v4 and 175v5.

S[6] - Shaw Inc, Ada, OK.  Hydrogen and oxygen isotope ratios of water determined using RSKSOP-296v0.

# DRAFT

## Abbreviations

I () - Phase I(laboratory/method). Samples collected March, 2009
II() - Phase II(laboratory/method). Samples collected January, 2010
III() - Phase III(laboratory/method). Samples collected September and October 2010
IV() - Phase IV(laboratory/method). Samples collected April 2011.
PG - gas production well
MW - deep monitoring wells
PGM - shallow monitoring wells near pits
PGS - soil samples near pits
DW - domestic wells
PGP - municipal wells in the Town of Pavillion
IRMS - isotope-ratio mass spectrometry
AMS - accelerated mass spectrometry

VOCs - volatile organic compounds
SVOCs - semivolatile organic compounds
PCBs - polychlorinated biphenyls
TICs - tentatively identified compounds
DRO - diesel range organics
GRO - gasoline range organics
TEH - total extractable hydrocarbons
TPH - total purgeable hydrocarbons
DIC - dissolved inorganic carbon
TAL - target analyte list
CLP - U.S. EPA Contract Laboratory Program

$C_1$ (methane), $C_2$ (ethane), $C_3$ (propane), $iC_4$ (isobutane), $nC_4$ (normal butane), $iC_5$ (isopentane), $nC_5$ (normal pentane), $C_6^+$ (hexanes + other light hydrocarbons)

## Analytical Methods

ORGM-506 r1.0 - Region 8 Standard Operating Procedure.

ORGM-508 r1.0 - Region 8 Standard Operating Procedure.

ORGM-515 r1.1 - Region 8 Standard Operating Procedure.

RSKSOP-112v6 – Standard Operating Procedure for Quantitative Analysis of Low Molecular Weight Acids in Aqueous Samples by HPLC, 22 p.

RSKSOP-175v5 - Sample Preparation and Calculations for Dissolved Gas Analysis in Water Samples Using a GC Headspace Equilibration Technique, 16 p.

RSKSOP-194v4 - Gas Analysis by Micro Gas Chromatographs (Agilent MIcro 3000), 13 p.

RSKSOP-213v4 - Standard operating procedure for operation of Perkin Elmer Optima 3300 DV ICP-OES, 21 p.

RSKSOP-214v5 - Quality control procedures for general parameters analysis using Lachat Flow Injection analysis (FIA), 10 p.

RSKSOP-259v1 - Determination of volatile organic compounds (fuel oxygenates, aromatic and chlorinated hydrocarbons) in water using automated headspace gas chromatography/mass spectrometry  TEKMAR 7000 HS-Varian 2100T GC/MS system-ION trap detector, 28 p.

RSKSOP-257v2 - Standard operating procedure for elemental analysis by ICP-MS, 16 p.

RSKSOP-299v1 – Determination of Volatile Organic Compounds (Fuel Oxygenates, Aromatic and Chlorinated Hydrocarbons) in Water Using Automated Headspace Gas Chromatography/Mass Spectrometry (Agilent 6890/5973 Quadruple GC/MS System), 25 p.

RSKSOP-276v3 - Determination of major anions in aqueous samples using capillary ion electrophoresis with indirect UV detection and Empower 2 software, 11 p.

RSKSOP-296v0 - Determination of hydrogen and oxygen isotope ratios in water samples using high temperature conversion elemental analyzer (TC/EA), a continuous flow unit, and an isotope ratio mass spectrometer (IRMS), 8 p.

RSKSOP-297v1 – Metals Speciation Determination by LC/ICP-MS, 21 p.

RSKSOP-298v1 - Arsenic Speciation Determination by LC/ICP-MS with Anion Suppression and NaOH Mobile Phase, 21 p.

RSKSOP-313v1 - Determination of R-123 using the H25-IR Infrared Refrigerant Gas Leak Detector, 12 p.

RSKSOP-314v1 - Determination of Fixed Gases using the GEM2000 and GEM2000 Plus Gas Analyzers & Extraction Monitors, 13 p.

RSKSOP-320v1 - Determination of Organic and Inorganic Vapors Using the TVA-1000B Toxic Vapor Analyzer, 18 p.

RSKSOP-330v0 – Determination of Various Fractions of Carbon in Aqueous Samples Using the Shimadzu TOC-VCPH Analyzer, 16 p.

U.S. EPA Method 200.7 - Determination of Metals and Trace Elements in Water and Wastes by Inductively Coupled Plasma-Atomic Spectrometry, Rev. 5, Jan 2001.

U.S. EPA Method 300.0 - Determination of Inorganic Anions by Ion Chromatography, Rev. 2.1, Aug. 1993.
.
U.S. EPA method 310.1 - Alkalinity (Titrimetric, pH 4.5), Rev. 1978.

U.S. EPA Method 350.1 - Determination of Ammonia Nitrogen by Semi-Automated Colorimetry, Rev. 2, Aug. 1993.

# DRAFT

U.S. EPA Method 5021A - Volatile Organic Compounds in Various Sample Matrices Using Equilibrium Headspace Analysis, Rev. 1, June 2003.

U.S. EPA Method 6020 - Inductively Coupled Plasma-Mass Spectrometry, Rev. 1, Feb. 2007.

U.S. EPA Method 6500 - Dissolved Inorganic Anions in Aqueous Matrices by Capillary Electrophoresis, Rev. 0, Feb. 2007.

U.S. EPA Method 8260C - Volatile Organic Compounds by Gas Chromatography/Mass Spectrometry (GC/MS), Rev. 3, Aug. 2006.

U.S. EPA Method 8015B - Determination of Nonhalogenated Organics Using GC/FID, Rev. 2, Dec. 1996.

U.S. EPA Method 8015D - Nonhalogenated Organics Using GC/FID, Rev. 4, May 2003.

U.S. EPA Method 8270D - Determination of Semivolatile Organic Compounds by Gas Chromatography/Mass Spectrometry (GC/MS), Rev. 4, Feb. 2007.

U.S. EPA Method 8000C - Determinative Chromatographic Separations, Rev. 3, Mar. 2003.

U.S. EPA Method 8260C - Volatile Organic Compounds by Gas Chromatography/Mass Spectrometry (GC/MS), Rev. 3, Aug. 2006.

U.S. EPA Method 8270D - Semivolatile Organic Compounds by Gas Chromatography/Mass Spectrometry (GC/MS), Rev. 4, Feb. 2007.

U.S. EPA Method 9060A - Total Organic Carbon, Rev. 1, Nov. 2004.

**DRAFT**

| Table A2a. Geochemical results for Pavillion ground water | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sample ID | T (°C) | pH | SC (µS/cm) | Alkalinity (mg/kg) | Na (ppm) | K (ppm) | Ca (ppm) | Mg (ppm) | Cl (ppm) | SO$_4$ (ppm) | F (ppm) | NO$_3$ (N) (ppm) |
| PGDW01 | ------ | ------ | ------ | 234 | 808 | 6.2 | 398 | 93.6 | 34.3 | 1860 | 0.4 | 6.2 |
| PGDW02 | 13.4 | 8.11 | 551 | 108 | 86 | 1.8 | 34.8 | 5.3 | 2.6 | 175 | 0.7 | <0.5 |
| PGDW03 | 11.1 | 9.37 | 1333 | 40 | 272 | 0.4 | 16.3 | 0.3 | 25.1 | 549 | 0.9 | <0.5 |
| PGDW04 | 11.8 | 9.17 | 1370 | 29 | 270 | 0.4 | 18.0 | 0.1 | 21.6 | 551 | 0.9 | <0.5 |
| PGDW05 | 12.0 | 9.02 | 956 | 93 | 192 | 0.3 | 3.6 | 0.1 | 17 | 295 | 0.9 | <0.5 |
| PGDW06 | 13.8 | 10.20 | 1262 | 35 | 249 | 0.3 | 7.1 | <0.1 | 31 | 485 | 1.3 | <0.5 |
| PGDW07 | 12.4 | 8.85 | 1016 | 61 | 213 | 0.3 | 8.9 | 0.1 | 15.7 | 390 | 1.2 | <0.5 |
| PGDW08 | 12.4 | 8.57 | 1883 | 83 | 390 | 0.6 | 36.7 | 0.2 | 18.9 | 857 | 0.5 | <0.5 |
| PGDW09 | 12.4 | 8.35 | 1128 | 254 | 233 | 2.1 | 16.6 | 4.1 | 10.5 | 279 | 2.4 | 3.2 |
| PGDW10 | 12.2 | 8.95 | 948 | 147 | 204 | 0.4 | 6.1 | 0.1 | 8.0 | 293 | 0.9 | <0.5 |
| PGDW11 | 13.1 | 7.17 | 3400 | 312 | 423 | 5.5 | 363 | 80.9 | 15.3 | 1780 | 0.2 | 1.3 |
| PGDW12 | 12.4 | 10.04 | 1344 | 37 | 256 | 0.6 | 7.8 | 0.4 | 30.8 | 497 | 1.5 | <0.5 |
| PGDW13 | 10.9 | 6.89 | 1155 | 303 | 196 | 1.9 | 61.0 | 19.9 | 6.2 | 343 | 0.7 | 1.0 |
| PGDW14 | 10.8 | 7.85 | 2990 | 159 | 690 | 4.5 | 154 | 18.1 | 26.1 | 1820 | 0.4 | 0.7 |
| PGDW15 | 11.4 | 7.48 | 1728 | 277 | 269 | 1.5 | 72.2 | 10.2 | 9.9 | 520 | 0.6 | 1.8 |
| PGDW16 | 13.2 | 9.30 | 1011 | 145 | 188 | 0.3 | 6.4 | 0.1 | 13.4 | 258 | 0.8 | <0.5 |
| PGDW17 | 12.7 | 9.61 | 1490 | 21 | 278 | 0.4 | 21.2 | 0.5 | 49.5 | 583 | 2.0 | <0.5 |
| PGDW18 | 10.3 | 8.87 | 2002 | 21 | 509 | 0.8 | 84.5 | 0.3 | 27 | 1380 | 1.8 | 0.5 |
| PGDW19 | 11.8 | 7.75 | 707 | 291 | 194 | 1.4 | 29.0 | 3.2 | 6.9 | 196 | 0.9 | 2.6 |
| PGDW20 | 9.3 | 8.76 | 2005 | 70 | 520 | 1.0 | 79.3 | 9.3 | 34.5 | 1370 | 0.8 | <0.5 |
| PGDW22 | 8.3 | 6.93 | 6180 | 332 | 837 | 9.0 | 416 | 126 | 79.9 | 2720 | <0.2 | 43.6 |
| PGDW23 | 11.5 | 9.43 | 816 | 61 | 208 | 0.3 | 6.5 | 0.1 | 19.8 | 365 | 1.2 | <0.5 |
| PGDW24 | 9.7 | 7.65 | 4700 | 165 | 938 | 7.0 | 327 | 131 | 55.7 | 3200 | 0.6 | <0.5 |
| PGDW25 | 13.3 | 8.68 | 972 | 205 | 249 | 1.1 | 1.1 | 1.1 | 8.4 | 355 | 4.1 | <0.5 |
| PGDW26 | 9.2 | 7.13 | 2390 | 337 | 220 | 6.8 | 364 | 57.7 | 14.6 | 1240 | 0.7 | 1.5 |
| PGDW28 | 10.7 | 8.30 | 1170 | 258 | 239 | 2.2 | 40.6 | 12.9 | 16.7 | 298 | 0.5 | 3.7 |
| PGDW29 | 11.5 | 9.72 | 1442 | 52 | 298 | 0.4 | 19.7 | 0.5 | 52.3 | 596 | 0.9 | <0.5 |
| PGDW30 | 10.4 | 9.60 | 902 | 96 | 210 | 0.3 | 0.9 | 0.1 | 16.3 | 331 | 0.9 | <0.5 |
| PGDW31 | 9.0 | 8.60 | 2006 | 83 | 435 | 0.9 | 31.2 | 0.8 | 13.3 | 1030 | 0.4 | 0.5 |
| PGDW32 | 9.5 | 10.47 | 908 | 34 | 199 | 0.3 | 7.2 | <0.1 | 34.1 | 373 | 2.3 | <0.5 |
| PGDW33 | 3.7 | 7.77 | 1662 | 276 | 178 | 5.0 | 228 | 40.9 | 28 | 670 | 0.2 | 2.1 |
| PGDW34 | 8.3 | 7.87 | 4480 | 373 | 786 | 7.4 | 325 | 113 | 23 | 2690 | 0.5 | 3.5 |
| PGDW35 | 10.6 | 8.63 | 2810 | 84 | 587 | 1.1 | 148 | 1.1 | 24.1 | 1610 | 0.3 | 0.5 |
| PGDW36 | 9.8 | 7.62 | 649 | 232 | 42 | 2.6 | 89.5 | 28.9 | 3.2 | 195 | 1.0 | 1.2 |
| PGDW37 | 10.5 | 8.14 | 819 | 342 | 187 | 0.9 | 12.1 | 1.3 | 8.7 | 89.9 | 0.9 | 1.2 |
| PGDW38 | 9.5 | 8.68 | 2030 | 47 | 373 | 2.3 | 70.0 | 2.3 | 46.9 | 908 | 1.3 | 5.9 |
| PGDW39 | 6.7 | 7.79 | 6410 | 127 | 1110 | 5.3 | 389 | 147 | 52.9 | 3640 | 0.4 | 0.6 |
| PGDW40 | 11.5 | 9.06 | 1229 | 86 | 244 | 5.0 | 6.0 | 5.0 | 13.1 | 426 | ----- | <0.3 |
| PGDW41 | 7.2 | 7.63 | 4470 | 108 | 1030 | 2.7 | 270 | 57.5 | 31.4 | 2670 | 0.5 | <0.3 |
| PGDW42 | 12.1 | 9.18 | 888 | 89 | 181 | 5.0 | 5.1 | 5.0 | 13.2 | 311 | 1.0 | <0.3 |
| PGDW43 | 0.2 | 8.19 | 4410 | 113 | 911 | 5.0 | 208 | 13.7 | 38.4 | 2470 | 0.4 | <0.3 |
| PGDW44 | 9.4 | 8.13 | 4080 | 100 | 994 | 5.0 | 259 | 28.3 | 39.5 | 2880 | 0.3 | <0.3 |
| PGDW45 | 9.3 | 7.63 | 1103 | 379 | 59 | 2.6 | 138 | 31.2 | 14.5 | 213 | 1.9 | 0.3 |
| PGDW46 | 7.9 | 7.79 | 855 | 329 | 91 | 1.8 | 90.3 | 9.9 | 8.4 | 126 | 0.5 | 2.3 |
| PGDW47 | 8.2 | 9.52 | 970 | 44 | 183 | 5.0 | 6.9 | 5.0 | 21.6 | 330 | 1.5 | <0.3 |
| PGDW48 | 8.7 | 8.21 | 3550 | 90 | 725 | 5.0 | 147 | 4.4 | 24.1 | 1840 | 0.3 | <0.3 |
| PGDW49 | 7.8 | 7.66 | 5470 | 243 | 1210 | 11.4 | 486 | 153 | 64.3 | 3160 | 0.4 | 7.7 |
| PGDW03-0110 | 8.3 | 8.71 | 1390 | 28 | 251 | 5.0 | 16.3 | 5.0 | 20.7 | 570 | 0.8 | <0.3 |
| PGDW04-0110 | 8.3 | 9.07 | 1388 | 38 | 265 | 5.0 | 15.5 | 5.0 | 23.3 | 532 | 0.9 | <0.3 |
| PGDW05-0110 | 9.4 | 8.22 | 900 | 88 | 188 | 5.0 | 3.3 | 5.0 | 16.5 | 287 | 0.9 | <0.3 |
| PGDW10-0110 | 10.4 | 8.62 | 985 | 147 | 195 | 5.0 | 5.8 | 5.0 | 7.5 | 293 | 0.9 | <0.3 |
| PGDW20-0110 | 9.3 | 8.89 | 2690 | 68 | 550 | 5.0 | 71.7 | 8.1 | 32.6 | 1270 | 0.8 | <0.3 |
| PGDW22-0110 | 8.2 | 7.06 | 4230 | 337 | 908 | 5.8 | 397 | 130 | 74.6 | 2780 | ----- | 40.7 |
| PGDW23-0110 | 8.2 | 9.72 | 780 | 54 | 194 | 5.0 | 5.8 | 5.0 | 19.7 | 368 | 1.5 | <0.3 |
| PGDW25-0110 | 7.2 | 7.94 | 1511 | 295 | 269 | 5.0 | 70.1 | 9.6 | 9.5 | 441 | ----- | 1.7 |
| PGDW30-0110 | 9.2 | 9.39 | 967 | 94 | 195 | 5.0 | 4.1 | 5.0 | 15.5 | 333 | 0.9 | <0.3 |
| PGDW32-0110 | 8.3 | 9.87 | 1018 | 32 | 193 | 5.0 | 6.9 | 5.0 | 21.4 | 368 | 2.4 | <0.3 |

A8

## DRAFT

| Sample ID | T (°C) | pH | SC (µS/cm) | Alkalinity mg/kg | Na (ppm) | K (ppm) | Ca (ppm) | Mg (ppm) | Cl (ppm) | $SO_4$ (ppm) | F (ppm) | $NO_3$ (N) (ppm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW01 | 11.8 | 11.91 | 3265 | 430 | 334 | 54.9 | 15.6 | 0.05 | 23.3 | 398 | 1.6 | 0.15 |
| MW02 | 12.3 | 12.01 | 3812 | 456 | 420 | 39.5 | 73.3 | 0.03 | 466 | 12.1 | 1.0 | 0.38 |
| RD01 | 11.5 | 9.24 | 1068 | 78 | 208 | 0.2 | 4.3 | 0.10 | 15.2 | 357 | 1.0 | 0.23 |
| LD01 | 10.9 | 8.85 | 2940 | 54 | 562 | 1.1 | 71.9 | 8.1 | 33.0 | 1320 | 0.9 | 0.35 |
| PGDW05-0411 | 10.5 | 9.06 | 820 | 80 | 190 | 0.24 | 3.35 | 0.08 | 16.8 | 276 | 1.2 | ND |
| PGDW14-0411 | 8.5 | 7.73 | 3473 | 156 | 753 | 3.52 | 154 | 18.6 | 23.7 | 1760 | <0.05 | 0.36 |
| PGDW20-0411 | 8.3 | 8.59 | 2430 | 102 | 520 | 0.78 | 63 | 6.86 | 22.9 | 1150 | 1.3 | <0.03 |
| PGDW23-0411 | 11.0 | 9.07 | 959 | 72 | 208 | 0.31 | 6.7 | 0.17 | 19.9 | 365 | 1.6 | <0.03 |
| PGDW26-0411 | 8.3 | 6.95 | 2390 | 196 | 232 | 5.15 | 334 | 56 | 13.2 | 1180 | 1.0 | 1.37 |
| PGDW30-0411 | 10.4 | 8.92 | 938 | 82 | 210 | 0.29 | 4.5 | 0.09 | 16.1 | 327 | 1.1 | <0.03 |
| PGDW32-0411 | 11.1 | 9.30 | 885 | 46 | 198 | 0.09 | 7.2 | 0.03 | 18.8 | 361 | 2.0 | <0.03 |
| PGDW41-0411 | 8.2 | 7.05 | 4866 | 112 | 896 | 3.18 | 452 | 46.9 | 97.6 | 2640 | <0.05 | 17.5 |
| PGDW44-0411 | 10.0 | 8.17 | 4730 | 94 | 1060 | 2.09 | 259 | 19.2 | 32.1 | 2900 | <0.05 | <0.03 |
| PGDW45-0411 | 9.1 | 6.85 | 1085 | 364 | 61.6 | 2.81 | 159 | 34.5 | 18.4 | 251 | 1.7 | 0.64 |
| PGDW49-0411 | 10.4 | 7.34 | 5333 | 296 | 982 | 9.66 | 417 | 127 | 54.3 | 3200 | <0.05 | 8.75 |
| MW01-0411 | 11.2 | 11.24 | 2352 | 388 | 304 | 24.7 | 13.6 | 0.12 | 23.1 | 339 | 1.9 | <0.03 |
| MW02-0411 | 12.0 | 11.78 | 3099 | 482 | 448 | 43.6 | 60.5 | 0.03 | 457 | 63 | 1.5 | <0.03 |

----- not measured. SC – specific conductance. Alkalinity – mg/kg $CaCO_3$. Other cations detected include Al (0.05 to 0.74 ppm), Ba (0.01 to 0.21 ppm), Fe (<0.02 to 2.4 ppm), Mn (<0.01 to 0.23 ppm), $NH_4^+$ (0.4 to 4.6 ppm), and Sr (0.06 to 8.4 ppm). Sulfide was detected in LD01 (0.16 ppm, Phase III, same location as PGDW20), PGDW20 (0.12 ppm, Phase IV), and MW01 (1.1 ppm Phase III, 1.8 ppm Phase IV). Turbidity ranged from 1.7 to 29.7 in domestic wells (Phase III and IV). Turbidity in MW01 was 7.5 (Phase III) and 7.9 (Phase IV). Turbidity in MW02 was 28.8 (Phase III) and 24.0 (Phase IV). All turbidity values are in Nephelometric Turbidity Units (NTUs). Turbidity measurements in MW01 and MW02 could be impacted by gas exsolution.

**Table A2b.** Charge balance calculations for deep monitoring wells

| Well | Phase | Ca, meq | Mg, meq | Na, meq | K, meq | $SO_4$, meq | $CO_3$, meq | Cl, meq | F, meq | OH, meq | Σcat, meq | Σan, meq | Balance, % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | *cations* | | | | *anions* | | | | | | | |
| MW01 | III | 0.78 | 0.00 | 14.53 | 1.40 | 8.29 | 4.48 | 0.66 | 0.08 | 9.56 | 16.71 | 23.08 | 16.0 |
| MW02 | III | 3.66 | 0.00 | 18.27 | 1.01 | 0.25 | 3.40 | 13.14 | 0.05 | 12.04 | 22.94 | 28.89 | 11.5 |
| MW01 | IV | 0.68 | 0.01 | 13.22 | 0.63 | 7.06 | 2.12 | 0.65 | 0.10 | 1.97 | 14.54 | 11.90 | 10.0 |
| MW02 | IV | 3.02 | 0.00 | 19.49 | 1.12 | 1.30 | 0.23 | 12.89 | 0.08 | 7.01 | 23.62 | 21.52 | 4.7 |

Balance (%) = |(Σcat-Σan)/(Σcat+Σan)*100|. meq OH is calculated as $1000*[a_{OH^-}/\gamma_{OH^-}]$, where $a_{OH^-} = 10^{-(14-pH)}$ and $\gamma_{OH^-}$ = 0.85 to 0.88. meq $CO_3$ is estimated from measurements of Dissolved Inorganic Carbon (DIC) as 2*[DIC/12], where DIC is in mg/L.

**DRAFT**

| Table A3a. Summary of aqueous analysis of light hydrocarbons | | | | | | |
|---|---|---|---|---|---|---|
| Sample (matrix) | Phase | Date | $C_1$ (ug/l) | $C_2$ (ug/l) | $C_3$ (ug/l) | $C_4$ (ug/l) |
| MW01(w) | III | 10/6/2010 | 15950 | 2230 | 790 | 158 |
| MW01(w) | IV | 4/20/2011 | 17930 | 2950 | 1250 | 172 |
| MW02(w) | III | 10/6/2010 | 18990 | 3290 | 1820 | 355 |
| MW02(w) | IV | 4/19/2011 | 18820 | 2550 | 2260 | 276 |
| MW02(w)-dup | IV | 4/19/2011 | 22620 | 3120 | 2770 | 356 |
| PGMW01(w) | II | 01/21/10 | 474 | nd(10) | nd(15) | ------ |
| PGMW02(w) | II | 01/21/10 | 361 | 299 | 43.8 | ------ |
| PGMW03(w) | II | 01/21/10 | 528 | nd(10) | nd(15) | ------ |
| PGDW03(w) | II | 01/20/10 | nd(5.0) | nd(10) | nd(15) | ------ |
| PGDW04(w) | I | 03/03/09 | nd(5.0) | ------ | ------ | ------ |
| PGDW04(w) | II | 01/21/10 | nd(5.0) | nd(10) | nd(15) | ------ |
| PGDW05(w) | I | 03/03/09 | 16.6 | ------ | ------ | ------ |
| PGDW05(w) | II | 01/18/10 | 5.44 | nd(10) | nd(15) | ------ |
| PGDW05(w) | IV | 04/19/11 | 65* | discarded | nd(1.3) | nd(1.6) |
| PGDW07(w) | I | 03/03/09 | nd(5.0) | ------ | ----- | ----- |
| PGDW10(w) | I | 03/03/09 | nd(5.0) | ------ | ----- | ----- |
| PGDW10(w) | II | 01/18/10 | nd(5.0) | nd(10) | nd(15) | ------ |
| PGDW14(w) | IV | 04/20/11 | discarded | nd(1.3) | nd(1.4) | nd(1.7) |
| PGDW17(w) | I | 03/04/09 | 10.6 | ------ | ----- | ----- |
| PGDW20(w) | I | 03/04/09 | 137 | ------ | ----- | ----- |
| PGDW20 (w) | III | 10/06/10 | 189 | 24.3 | nd(0.22) | nd(0.21) |
| PGDW20(w)-dup | III | 10/06/10 | 168 | 17.4 | nd(0.22) | nd(0.21) |
| PGDW20(w) | IV | 04/18/11 | 137 | discarded | nd(1.43) | 2.93 |
| PGDW21(w) | I | 03/04/09 | 54.3 | ------ | ----- | ------ |
| PGDW22(w) | I | 03/04/09 | nd(5.0) | ------ | ----- | ------ |
| PGDW22(w) | II | 01/18/10 | nd(5.0) | nd(10) | nd(15) | ------ |
| PGDW23(w) | I | 03/04/09 | 146 | ------ | ----- | ------ |
| PGDW23(w) | II | 01/18/10 | 149 | nd(10) | nd(15) | ------ |
| PGDW23(w) | IV | 04/21/11 | 176 | nd(5.7) | nd(6.6) | nd(6.9) |
| PGDW25(w) | II | 01/19/10 | nd(5.0) | nd(10) | nd(15) | ------ |
| PGDW26(w) | I | 03/05/09 | nd(5.0) | ------ | ----- | ------ |
| PGDW26(w) | IV | 04/18/11 | nd(2.2)* | nd(1.4) | nd(1.5) | nd(1.8) |
| PGDW29(w) | I | 03/05/09 | nd(5.0) | ------ | ----- | ------ |
| PGDW30(w) | I | 03/05/09 | 558 | ------ | ----- | ------ |
| PGDW30(w) | II | 01/19/10 | 808 | nd(10) | nd(15) | ---- |
| PGDW30(w) | III | 10/05/10 | 762 | nd(0.19) | nd(0.23) | nd(0.21) |
| PGDW30(w) | IV | 04/18/11 | 644 | discarded | nd(1.5) | 4.6 |
| PGDW32(w) | I | 03/05/09 | 21.4 | ------ | ----- | ------ |

A10

**DRAFT**

| Sample (matrix) | Phase | Date | $C_1$ (ug/l) | $C_2$ (ug/l) | $C_3$ (ug/l) | $C_4$ (ug/l) |
|---|---|---|---|---|---|---|
| PGDW32(w) | II | 01/20/10 | 36.3 | nd(10.0) | nd(15.0) | ------ |
| PGDW32(w) | IV | 04/18/11 | nd(2.2)* | nd(1.2) | nd(1.3) | nd(1.5) |
| PGDW32(w)-dup | IV | 04/18/11 | discarded | discarded | nd(1.4) | discarded |
| PGDW35(w) | I | 03/05/09 | 21.6 | ------ | ----- | ------ |
| PGDW38(w) | I | 03/05/09 | nd(5.0) | ------ | ----- | ------ |
| PGDW39(w) | II | 01/19/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGDW40(w) | II | 01/22/10 | 98.9 | nd(10.0) | nd(15.0) | ------ |
| PGDW41(w) | II | 01/21/10 | nd(5.0) | nd(10.0) | nd(15.0) | ------ |
| PGDW41(w) | IV | 04/20/11 | 385 | 142 | nd(1.35) | discarded |
| PGDW42(w) | II | 01/19/10 | 60 | nd(10.0) | nd(15.0) | ------ |
| PGDW43(w) | II | 01/21/10 | nd(5.0) | nd(10.0) | nd(15.0) | ------ |
| PGDW44(w) | II | 01/18/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGDW44(w) | IV | 4/21/2011 | nd(2.2)* | nd(1.3) | nd(1.4) | nd(1.7) |
| PGDW45(w) | II | 01/18/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGDW45(w) | IV | 04/19/11 | nd(2.2)* | discarded | nd(1.3) | nd(1.6) |
| PGDW46(w) | II | 01/20/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGDW47(w) | II | 01/19/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGDW48(w) | II | 01/20/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGDW49(w) | II | 01/20/10 | nd(5.0) | nd(10.0) | nd(15.0) | ------ |
| PGDW49(w) | IV | 4/20/2011 | nd(2.2)* | discarded | nd(1.3) | nd(1.6) |
| LD02(w) | III | 10/20/2010 | 229 | 21 | nd(0.24) | nd(0.23) |
| PGPW01(w) | II | 01/20/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| PGPW02(w) | II | 01/20/10 | nd(5.0) | nd(10.0) | nd(15.0) | ----- |
| Travel Blank(w) | III | 10/6/2010 | 23.3 | nd(2.0) | nd(0.24) | nd(0.23) |
| Equipment Blank(w) | III | 10/6/2010 | 23.0 | nd(2.0) | nd(0.29) | nd(0.27) |
| Field Blank(w) | III | 10/6/2010 | 76.4 | nd(2.0) | nd(0.28) | nd(0.26) |
| Travel Blank(w) | IV | 4/14/2011 | 18.5 | 56.4 | nd(1.63) | nd(1.6) |
| Field Blank(w) | IV | 4/18/2011 | 45.0 | 67.9 | nd(1.36) | nd(1.66) |
| equipment blank(w) (on-site GC analysis) | IV | 4/18/2011 | nd(2.2) | ----- | ----- | ----- |
| equipment blank(w) (on-site GC analysis) | IV | 4/19/2011 | nd(2.2) | ----- | ----- | ----- |
| equipment blank(w) (on-site GC analysis) | IV | 4/20/2011 | nd(2.2) | ----- | ----- | ----- |
| equipment blank(w) (on-site GC analysis) | IV | 4/20/2011 | nd(2.2) | ----- | ------ | ----- |
| field blank(w) | IV | 4/21/2011 | nd(0.32) | nd(1.18) | nd(1.27) | nd(1.54) |

* Determined by on-site GC analysis in Phase IV.  Fixed laboratory analysis rejected in Phase IV if detection of methane and ethane less than 100 µg/L.
All values of methane in Phase III greater than 100 µg/L accepted.
Ultrapure nitrogen was used for equipment and travel blanks for on-site GC analysis.
nd() - not detected(detection limit)        ------ not analyzed

A11

**DRAFT**

| Sample (matrix) | Phase | Date | $C_1$ (%) | $C_2$ (%) | $C_2H_4$ (%) | $C_3$ (%) | $iC_4$ (%) | $nC_4$ (%) | $iC_5$ (%) | $nC_5$ (%) | $C_5+$ (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table A3b.** Summary of gas and headspace analysis of light hydrocarbons ||||||||||||
| Tribal Pavilion 14-6(g) (WR) | ---- | Johnson and Rice (1993) | 95.28 | 2.83 | ----- | 0.3 | 0.11 | 0.18 | 0.05 | 0.02 | ----- |
| Govt 21-5(g) (WR) | ---- | Johnson and Rice (1993) | 93.24 | 3.75 | ----- | 0.73 | 0.33 | 0.22 | 0.16 | 0.09 | ----- |
| Tribal Pavilion 41-09(g) (FU) | ---- | Johnson and Rice (1993) | 88.17 | 3.35 | ----- | 0.36 | 0.14 | 0.09 | nd | nd | ----- |
| Tribal Pavilion 14-11(g) (FU) | ---- | Johnson and Rice (1993) | 66.00 | 1.96 | ----- | 0.06 | 0.054 | 0.006 | 0.006 | 0.002 | ----- |
| Blankenship 4-8(g) (FU) | ---- | Johnson and Rice (1993) | 93.38 | 4.00 | ----- | 0.41 | 0.05 | 0.06 | 0.07 | 0.01 | ----- |
| Tribal Pavilion 14-10(g) (WR)(PGPP01) | II | 01/21/10 | 92.47 | 4.04 | 0.001 | 1.21 | 0.415 | 0.372 | 0.183 | 0.114 | 0.486 |
| Tribal Pavilion 43-10(g) (FU)(PGPP02) | II | 01/21/10 | 94.86 | 3.48 | 0.0001 | 0.356 | 0.143 | 0.0618 | 0.0501 | 0.0194 | 0.18 |
| Tribal Pavilion 24-2(g) (WR)(PGPP04) | II | 01/21/10 | 90.16 | 4.64 | 0.0017 | 1.46 | 0.581 | 0.512 | 0.335 | 0.211 | 1.39 |
| Tribal Pavilion 33-10(g) (FU)(PGPP05) | II | 01/21/10 | 94.68 | 3.64 | nd | 0.373 | 0.131 | 0.055 | 0.0427 | 0.014 | 0.107 |
| Tribal Pavilion 14-2(g) (FU)(PGPP06) | II | 01/21/10 | 93.23 | 3.93 | 0.0012 | 0.903 | 0.321 | 0.25 | 0.151 | 0.0905 | 0.506 |
| MW01(g) | III | 9/23/2010 | 84.22 | 3.43 | 0.0007 | 0.791 | 0.327 | 0.191 | 0.143 | 0.0632 | 0.111 |
| MW01(w) | III | 10/6/2010 | 35.11 | 2.02 | 0.0008 | 0.414 | 0.114 | 0.0871 | 0.0499 | 0.0241 | 0.0539 |
| MW01(g) | IV | 4/18/2011 | 89.43 | 3.92 | 0.0013 | 0.907 | 0.298 | 0.211 | 0.109 | 0.0574 | 0.0972 |
| MW01(g)-dup | IV | 4/18/2011 | 89.49 | 3.91 | 0.0013 | 0.902 | 0.295 | 0.206 | 0.103 | 0.0533 | 0.0804 |
| MW01(w) | IV | 4/20/2011 | 38.33 | 2.46 | 0.0016 | 0.504 | 0.113 | 0.101 | 0.0422 | 0.0229 | 0.0566 |
| MW02(g) | III | 9/24/2010 | 1.05 | 0.048 | nd | 0.022 | 0.0089 | 0.0053 | 0.0020 | 0.0008 | 0.0012 |
| MW02(g)-dup | III | 9/24/2010 | 1.04 | 0.048 | nd | 0.022 | 0.0089 | 0.0053 | 0.0020 | 0.0008 | 0.0009 |
| MW02(w) | III | 10/6/2010 | 28.03 | 2.16 | nd | 0.693 | 0.128 | 0.101 | 0.0185 | 0.0067 | 0.0174 |
| MW02(g) | IV | 4/18/2011 | 6.74 | 0.383 | nd | 0.142 | 0.0401 | 0.026 | 0.0070 | 0.0025 | 0.0034 |
| MW02(g)-dup | IV | 4/18/2011 | 7.41 | 0.422 | nd | 0.156 | 0.0439 | 0.0284 | 0.0077 | 0.0027 | 0.0035 |
| MW02(w) | IV | 4/19/2011 | 26.17 | 1.80 | nd | 0.765 | 0.259 | 0.147 | 0.0416 | 0.0141 | 0.0237 |
| MW02(w)-dup | IV | 4/19/2011 | 21.32 | 1.49 | nd | 0.623 | 0.204 | 0.118 | 0.0324 | 0.011 | 0.018 |
| PGMW01(w) | II | 01/21/10 | 2.47 | nd | nd | nd | 0.0054 | 0.005 | 0.0287 | 0.0092 | 0.537 |
| PGMW02(w) | II | 01/21/10 | 3.57 | 1.13 | nd | 0.103 | 0.402 | 0.0134 | 0.13 | 0.0003 | 0.398 |
| PGDW03(w) | II | 01/20/10 | 0.0122 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW04(w) | II | 01/21/10 | 0.0036 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW05(w) | IV | 04/19/11 | 0.0966 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW10(w) | II | 01/18/10 | 0.0266 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW14(w) | IV | 04/20/11 | 0.0005 | nd | nd | nd | nd | nd | nd | nd | nd |

**DRAFT**

| Sample (matrix) | Phase | Date | $C_1$ (%) | $C_2$ (%) | $C_2H_4$ (%) | $C_3$ (%) | $iC_4$ (%) | $nC_4$ (%) | $iC_5$ (%) | $nC_5$ (%) | $C_6$+ (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PGDW20 (w) | III | 10/06/10 | 0.191 | 0.007 | nd | 0.0006 | nd | nd | nd | nd | nd |
| PGDW20(w)-dup | III | 10/06/10 | 0.134 | 0.005 | nd | nd | nd | nd | nd | nd | nd |
| PGDW20(w) | IV | 04/18/11 | 0.221 | 0.007 | nd | 0.0007 | nd | nd | nd | nd | nd |
| PGDW22(w) | II | 01/18/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW23(w) | IV | 04/21/11 | 0.248 | nd | nd | nd | nd | 0.0015 | nd | nd | 0.0008 |
| PGDW25(w) | II | 01/19/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW26(w) | IV | 04/18/11 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW30(w) | II | 01/19/10 | 5.99 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW30(g) | III | 09/23/10 | 0.0123 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW30(w) | III | 10/05/10 | 1.19 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW30(w) | IV | 04/18/11 | 1.46 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW32(w) | II | 01/20/10 | 0.197 | nd | nd | nd | nd | nd | nd | nd | 0.0085 |
| PGDW32(w) | IV | 04/18/11 | 0.0752 | nd | nd | nd | nd | nd | nd | nd | 0.0019 |
| PGDW32(w)-dup | IV | 04/18/11 | 0.0522 | nd | nd | nd | nd | nd | nd | nd | 0.0013 |
| PGDW39(w) | II | 01/19/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW40(w) | II | 01/22/10 | 0.418 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW41(w) | II | 01/21/10 | 0.0091 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW41(w) | IV | 04/20/11 | 0.0005 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW42(w) | II | 01/19/10 | 0.291 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW43(w) | II | 01/21/10 | 0.0016 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW44(w) | IV | 4/21/11 | 0.0022 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW45(w) | II | 01/18/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW45(w) | IV | 04/19/11 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW46(w) | II | 01/20/10 | 0.0016 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW47(w) | II | 01/19/10 | 0.0428 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW47(w)-dup | II | 01/19/10 | 0.0365 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGDW49(w) | IV | 4/20/11 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| LD02(w) | III | 10/20/10 | 0.12 | 0.007 | nd | 0.001 | 0.0008 | 0.0007 | nd | 0.0005 | nd |
| PGPW01(w) | II | 01/20/10 | 0.0253 | nd | nd | nd | nd | nd | nd | nd | nd |
| PGPW02(w) | II | 01/20/10 | 0.0389 | nd | nd | nd | nd | nd | nd | nd | nd |
| field blank(w) | II | 01/21/10 | 0.0068 | nd | nd | nd | nd | nd | nd | nd | 0.0021 |
| field blank(w) | II | 01/22/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| travel blank(g) | III | 9/23/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| equipment blank(g) | III | 9/23/10 | 0.0029 | nd | nd | nd | nd | nd | nd | nd | nd |
| travel blank(g) | III | 9/24/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| equipment blank(g) | III | 9/24/10 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| travel blank(g) | IV | 4/18/11 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| equipment blank(g) | IV | 4/18/11 | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| equipment blank(g) | IV | 4/18/11 | nd | nd | nd | nd | nd | nd | nd | nd | nd |

WR - Wind River Formation          FU - Fort Union Formation          ----- not analyzed          nd () not detected

A13

A14

DRAFT

**Table A3c.** Summary of isotopic data for dissolved, gas phase, and headspace analysis

| Sample (matrix) | Phase | Date | $\delta^{13}C$-$C_1$ (‰) | $\delta D$-$C_1$ (‰) | $\delta^{13}C$-$C_2$ (‰) | $\delta D$-$C_2$ (‰) | $\delta^{13}C$-$C_3$ (‰) | $\delta D$-$C_3$ (‰) | $\delta^{13}C$-$iC_4$ (‰) | $\delta D$-$iC_4$ (‰) | $\delta^{13}C$-$nC_4$ (‰) | $\delta D$-$nC_4$ (‰) | $\delta^{13}C$-$iC_5$ (‰) | $\delta^{13}C$-$nC_5$ (‰) | $^{14}C_1$ (pMC) | $\delta^{13}C$ DIC (‰) | $\delta^{18}O$ $H_2O$ (‰) | $\delta D$ $H_2O$ (‰) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tribal Pavilion 14-6(g) (WR) | --- | Johnson and Rice (1993) | -39.24 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Govt 21-5(g) (WR) | --- | Johnson and Rice (1993) | -40.2 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 41-09(g) (FU) | --- | Johnson and Rice (1993) | -38.04 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 14-11(g) (FU) | --- | Johnson and Rice (1993) | -38.4 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Blankenship 4-8(g) (FU) | --- | Johnson and Rice (1993) | -38.08 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 14-10(g) (WR)(PGPP01) | II | 01/21/10 | -38.75 | -203.4 | -26.93 | -162.5 | -24.93 | -147.2 | -25.83 | -152.4 | -25.26 | -151.3 | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 43-10(g) (FU)(PGPP02) | II | 01/21/10 | -39.07 | -212.9 | -25.99 | -157.5 | -19.4 | ---- | ---- | ---- | -23.87 | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 24-2(g) (WR)(PGPP04) | II | 01/21/10 | -39.26 | -204.9 | -26.79 | -166.2 | -25.33 | -148.0 | -25.66 | -155.5 | -25.05 | -154 | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 33-10(g) (FU)(PGPP05) | II | 01/21/10 | -39.05 | -207.3 | -26.21 | -161.1 | -18.46 | -101.7 | -23.96 | ---- | -23.64 | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Tribal Pavilion 14-2(g) (FU)(PGPP06) | II | 01/21/10 | -39.28 | -215.3 | -26.42 | -162.3 | -24.01 | -145.2 | -25.33 | -150.1 | -24.87 | -152 | ---- | ---- | ---- | ---- | ---- | ---- |
| MW01(g) | III | 9/23/2010 | -39.44 | -209.1 | -26.63 | -165.0 | -23.76 | -143.7 | ---- | ---- | ---- | ---- | ---- | ---- | <0.2 | ---- | ---- | ---- |
| MW01(w) | III | 10/5/2010 | -38.89 | -191.3 | -26.55 | ---- | -23.85 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | -12.18 | -13.77 | -113.77 |
| MW01(g) | IV | 4/18/2011 | -39.25 | -211.2 | -26.67 | -166.8 | -23.74 | -146.1 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| MW01(g)-dup | IV | 4/18/2011 | -39.28 | -210.1 | -26.67 | -167.4 | -23.91 | -146.6 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| MW01(w) | IV | 4/20/2011 | -38.88 | -211.6 | -26.70 | ---- | -24.40 | ---- | -25.3 | ---- | -24.4 | ---- | -25.0 | -24.7 | ---- | -12.01 | -13.26 | -109.53 |
| MW02(g) | III | 9/24/2010 | -41.85 | -209.4 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | < 0.2 | ---- | ---- | ---- |
| MW02(g)-dup | III | 9/24/2010 | -41.72 | -209.2 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | < 0.2 | ---- | ---- | ---- |

| Sample (matrix) | Phase | Date | $\delta^{13}C\text{-}C_1$ (‰) | $\delta D\text{-}C_1$ (‰) | $\delta^{13}C\text{-}C_2$ (‰) | $\delta D\text{-}C_2$ (‰) | $\delta^{13}C\text{-}C_3$ (‰) | $\delta D\text{-}C_3$ (‰) | $\delta^{13}C\text{-}iC_4$ (‰) | $\delta D\text{-}iC_4$ (‰) | $\delta^{13}C\text{-}nC_4$ (‰) | $\delta D\text{-}nC_4$ (‰) | $\delta^{13}C\text{-}iC_5$ (‰) | $\delta^{13}C\text{-}nC_5$ (‰) | $^{14}C_1$ (pMC) | $\delta^{13}C$ DIC (‰) | $\delta^{18}O$ H$_2$O (‰) | $\delta D$ H$_2$O (‰) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MW02(w) | III | 10/6/2010 | -41.83 | -203.8 | -26.4 | ----- | -24.28 | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | Low DIC | -15.55 | -117.41 |
| MW02(g) | IV | 4/18/2011 | -41.05 | -208.9 | -26.10 | -170.5 | -24.05 | ----- | ------ | ------- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- |
| MW02(g)-dup | IV | 4/18/2011 | -41.01 | -210.8 | -26.09 | -171.4 | -24.06 | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- |
| MW02(w) | IV | 4/19/2011 | -41.30 | -210.7 | -26.25 | ----- | -24.29 | ----- | -25.3 | ----- | -24.3 | ----- | ----- | ----- | ----- | Low DIC | -14.24 | -113.42 |
| MW02(w)-dup | IV | 4/19/2011 | -41.37 | -208.2 | -26.28 | ------ | -24.28 | ----- | -25.3 | ------ | -24.5 | ----- | ----- | ----- | ----- | Low DIC | -14.27 | -113.46 |
| PGDW05(w) | IV | 04/19/11 | ------ | ----- | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -15.12 | -13.11 | -109.64 |
| PGDW14(w) | IV | 04/20/11 | ------ | ----- | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -11.94 | -15.79 | -126.04 |
| PGDW20 (w) | III | 10/06/10 | ------ | ----- | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -16.04 | -13.22 | -107.70 |
| PGDW20(w)-dup | III | 10/06/10 | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -15.91 | -13.18 | -107.38 |
| PGDW20(w) | IV | 04/18/11 | -33.1 | -175 | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -16.24 | -13.31 | -108.35 |
| PGDW23(w) | IV | 04/21/11 | | | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -13.29 | -12.40 | -97.35 |
| PGDW30(w) | II | 01/19/10 | -28.77 | -143.6 | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- | ----- |
| PGDW30(w) | III | 10/05/10 | -28.76 | -145.8 | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -12.18 | -13.02 | -109.78 |
| PGDW30(w) | IV | 04/18/11 | -27.8 | -133 | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -11.66 | -13.23 | -108.11 |
| PGDW32(w) | IV | 04/18/11 | -34.2 | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -11.32 | -13.33 | -108.10 |
| PGDW32(w)-dup | IV | 04/18/11 | -34.0 | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -10.84 | -13.28 | -108.24 |
| PGDW41(w) | IV | 04/20/11 | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -12.31 | -15.91 | -121.93 |
| PGDW44(w) | IV | 4/21/2011 | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -10.35 | -13.29 | -100.29 |
| PGDW45(w) | IV | 04/19/11 | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -14.18 | -16.59 | -128.18 |
| PGDW49(w) | IV | 4/20/2011 | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -11.05 | -15.57 | -122.19 |
| LD02(w) | III | 10/20/2010 | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- | ----- | ----- | ----- | ----- | ----- | -18.58 | -13.22 | -109.20 |

WR - Wind River Formation       FU - Fort Union Formation       ----- not analyzed       nd () - not detected

DRAFT

A15

**DRAFT**

**DRAFT**

# Appendix B

# Quality Assurance and Quality Control (QA/QC) for Analysis

**DRAFT**

**Table B1.** Sample collection containers, preservation, and holding times for ground-water samples for Phase III and IV

| Sample Type | Analysis Method (EPA Method) | Sample Bottles/# of bottles* | Preservation/ Storage | Holding Time(s) |
|---|---|---|---|---|
| Dissolved gases | RSKSOP-194v4 &-175v5 (No EPA Method) | 60 mL serum bottles/2 | No Headspace TSP[†], pH>10; refrigerate 4°C[††] | 14 days |
| Metals (filtered) | RSKSOP-213v4 &-257v3 (EPA Methods 200.7 and 6020) | 125 mL plastic bottle/1 | $HNO_3$, pH<2; room temperature | 6 months (Hg 28 days) |
| $SO_4$, Cl, F, Br | RSKSOP-276v3 (EPA Method 6500) | 30 mL plastic/1 | Refrigerate $\leq$4°C | 28 days |
| $NO_3 + NO_2$, $NH_4$ | RSKSOP-214v5 (EPA Method 350.1 and 353.2) | 30 mL plastic/1 | $H_2SO_4$, pH<2; refrigerate $\leq$4°C | 28 days |
| DIC | RSKSOP-102v5 or 330v0 (EPA Method 9060A) | 40 mL clear glass VOA vial/2 | refrigerate $\leq$4°C | 14 days |
| DOC | RSKSOP-102v5 or 330v0 (EPA Method 9060A) | 40 mL clear glass VOA vial/2 | $H_3PO_4$, pH<2; refrigerate $\leq$4°C | 28 days |
| VOCs | RSKSOP-299v1 or 259v1 (EPA Method 5021A plus 8260C) | 40 mL amber glass VOA vial/2 | No Headspace TSP[†], pH>10; refrigerate $\leq$4°C | 14 days |
| Low Molecular Weight Acids | RSKSOP-112V6 (No EPA Method) | 40 mL glass VOA vial/2 | TSP[†], pH>10; refrigerate $\leq$ 4°C | 30 days |
| O, H stable isotopes of water | RSKSOP-296v0 (No EPA Method) | 20 mL glass VOA vial/1 | Refrigerate at $\leq$ 4°C | Stable |
| $\delta^{13}$C DIC | Isotech: gas stripping and IRMS (No EPA Method) | 60 mL plastic bottle/1 | Refrigerate $\leq$4°C | No information |
| $\delta^{13}$C and $\delta$D of methane | Isotech: gas stripping and IRMS (No EPA Method) | 1 L plastic bottle/1 | Caplet of benzalkonium chloride; refrigerate $\leq$4°C | No information |
| SVOCs | ORGM-515 r1.1, EPA Method 8270D | 1L amber glass bottle/2 and for every 10 samples of ground water need 2 more bottles for one selected sample, or if <10 samples collected, collect 2 more bottles for one select sample | Refrigerate $\leq$4°C | 7 days until extraction, 30 days after extraction |
| DRO | ORGM-508 r1.0, EPA Method 8015D | 1L amber glass bottle/2 and for every 10 samples of ground water need 2 more bottles for one selected sample, or if <10 samples collected, collect 2 more bottles for one select sample | HCl, pH<2; refrigerate $\leq$4°C | 7 days until extraction, 40 days after extraction |
| GRO | ORGM-506 r1.0, EPA Method 8015D | 40 mL amber glass VOA vial/2 and for every 10 samples of ground water need 2 more bottles for one selected sample, or if <10 samples collected, collect 2 more bottles for one select sample | No headspace; HCl, pH<2; refrigerate $\leq$4°C | 14 days |
| Glycols | Region III method** (No EPA Method) | 40 mL amber glass VOA vial/2 | Refrigerate $\leq$4ºC | 14 days |

[†] Trisodium phosphate
[††] Above freezing point of water
*Spare bottles made available for laboratory QC samples and for replacement of compromised samples (broken bottle, QC failures, etc.).
**EPA Methods 8000C and 8321 were followed for method development and QA/AC limits were applicable.

**DRAFT**

| Table B2. Field QC samples for ground-water analysis | | | |
|---|---|---|---|
| **QC Sample** | **Purpose** | **Method** | **Frequency** |
| **Trip Blanks (VOCs and Dissolved Gases only)** | Assess contamination during transportation. | Fill bottles with reagent water and preserve, take to field and returned without opening. | One in an ice chest with VOA and dissolved gas samples. |
| **Equipment Blanks** | Assess contamination from field equipment, sampling procedures, decontamination procedures, sample container, preservative, and shipping. | Apply only to samples collected via equipment, such as filtered samples: Reagent water is filtered and collected into bottles and preserved same as filtered samples. | One per day of sampling with submersible pumps |
| **Field Duplicates** | Represent precision of field sampling, analysis, and site heterogeneity. | One or more samples collected immediately after original sample. | One in every 10 samples, or if <10 samples collected for a water type (ground or surface), collect a duplicate for one sample. |
| **Temperature Blanks** | Measure temperature of samples in the cooler. | Water sample that is transported in cooler to lab. | One per cooler. |
| **Field Blanks**\*\* | Assess contamination introduced from sample container with applicable preservative. | In the field, reagent water is collected into sample containers with preservatives. | One per day of sampling. |

\* Reporting limit or Quantitation Limit
\*\* Blank samples were not collected for isotope measurements, including O, H, C.

| Table B3. QA/QC requirements for analysis of metals and major ions | | | | | | |
|---|---|---|---|---|---|---|
| **Measurement** | **Analysis Method** | **Blanks (Frequency)** | **Calibration Checks (Frequency)** | **Second Source (Frequency)** | **Duplicates (Frequency)** | **Matrix Spikes (Frequency)** |
| Metals | RSKSOP-213v4 (EPA Methods 200.7 and 6020) | <QL for 80% of metals; (Beginning and end of each sample queue, 10-15 samples) | 90-110% of known value ( Beginning and end of each sample queue, 10-15 samples) | PE sample acceptance limits or 90-110% of known value (Immediately after first calibration check) | RPD<10 for 80% of metals; for results <5x QL, difference of <QL (Every 15 samples) | 90-110% Rec. for 80% of metals w/ no individual exceeding 50-150% Rec. (one per sample set, 10-15 samples) |
| Metals | RSKSOP-257v3 (EPA Methods 200.7 and 6020) | <QL for 80% of metals; none>10xMDL (Beginning and end of each sample queue, 10-15 samples) | 90-110% of known value ( Beginning and end of each sample queue, 10-15 samples) | PE sample acceptance limits or 90-110% of known value (Immediately after first calibration check) | RPD<10 for 80% of metals; for results <5xQL, difference of <QL (Every 15 samples) | 90-110% Rec. for 80% of metals w/ no individual exceeding 70-130% Rec. (one per sample set, 10-15 samples) |
| SO₄, Cl, F, Br | RSKSOP-2 (EPA Method 6500)76v3 | <MDL (Beginning and end of each sample queue) | 90-110% Rec. (Beginning, end, and every 10 samples) | PE sample acceptance limits (One per sample set) | RPD<10 (every 15 samples) | 80-120% Rec. (one per every 20 samples) |
| NO₃ + NO₂, NH₄ | RSKSOP-214v5 (EPA Method 350.1 and 353.2) | <½ lowest calib. std. (Beginning and end of each sample queue) | 90-110% Rec. (Beginning, end, and every 10 samples) | PE sample acceptance limits (One per sample set) | RPD<10 (every 10 samples) | 80-120% Rec. (one per every 20 samples) |

B3

**DRAFT**

**Table B4.** QA/QC requirements for analysis of dissolved gases, DIC/DOC, VOCs, low molecular weight acids and stable isotopes of water

| Measurement | Analysis Method | Blanks (Frequency) | Calibration Checks (Frequency) | Second Source (Frequency) | Duplicates (Frequency) | Matrix Spikes (Frequency) |
|---|---|---|---|---|---|---|
| **Dissolved gases** | RSKSOP-194v4 &-175v5[*] (No EPA Method) | ≤MDL (He/Ar blank, first and last in sample queue; water blank before samples) | 85-115% of known value (After helium/Ar blank at first of analysis queue, before helium/Ar blank at end of sample set, and every 15 samples) | 85-115% of known value (After first calibration check) | RPD≤20 (Every 15 samples) | NA |
| **DIC/DOC** | RSKSOP-102v5 (Phase III) or 330v0 (Phase IV) (EPA Method 9060A) | - 102v5: <½QL (after initial calib., every 10-15 samples, and at end) -330v0: < MDL (Beginning and end of sample set) | -102v5: 80-120% of known value (after initial calib., every 10-15 samples, and at end-330v0: 90-100% of known value (Beginning and end of sample set and every 10 samples) | -102v5: 80-120% of known value (Immediately after calibration) -330v0: PE sample reported acceptance limits. Others: 90-100% recovery (one per sample set) | -102v5: RPD≤10 (every 15 samples) -330v0: RPD≤10 (every 10 samples) | -102v5:80-120% Rec. (one per 20 or every set) -330v0:80-120% Rec. |
| **Volatile organic compounds (VOC)**[**] | RSKSOP-299v1 and -259v1 (EPA Method 5021A plus 8260C) | <MDL (Beginning and end of each sample set) | 80-120% Rec. (Beginning, end, and every 20 samples) | 80-120% of known value Once at beginning (and at end for -259v1) | -299v1 RPD<20 -259v1 RPD<25 (every 20 samples) | 70-130% Rec. (every 20 samples) |
| **Low Molecular Weight Acids** | RSKSOP-112v6 (No EPA Method) | <MDL (Beginning of a sample queue; every 10 samples; and end of sample queue) | 85-115% of the recovery (Prior to sample analysis; every 10 samples; end of sample queue) | 85-115% of recovery (Prior to sample analysis) | < 15 RPD (Every 20 samples through a sample queue) | 80-120 % recovery (Every 20 samples through a sample queue) |
| **O, H stable isotopes of water**[***] | RSKSOP-296v1 (No EPA Method) | NA | Difference of calibrated/true < 1‰ for $\delta^2$H & < 0.2‰ for $\delta^{18}$O (Beginning, end and every tenth sample) | Working stds calibrated against IAEAstds.[†] (Beginning, end, and every tenth sample) | Standard deviation ≤ 1‰ for $\delta^2$H and < 0.2‰ for $\delta^{18}$O (every sample) | NA |

[*]This table only provides a summary; SOPs should be consulted for greater detail.
[**]Surrogate compounds spiked at 100 ug/L: p-bromofluorobenzene and 1,2-dichlorobenzene-d4, 85-115% recovery.
[***]Additional checks:  internal reproducibility prior to each sample set, std devs ≤ 1‰ for $\delta^2$H and ≤ 1‰ for $\delta^{18}$O
[†]International Atomic Energy Agency (VSMOW, GISP, and SLAP)
Corrective actions are outlined in the SOPs.
MDL = Method Detection Limit
QL = Quantitation Limit
PE = Performance Evaluation

## DRAFT

| QC Type | Semivolatiles | DRO | GRO | Frequency |
|---|---|---|---|---|
| **Table B5.** QA/QC requirements for analysis of semi-volatiles, GRO, and DRO | | | | |
| **Method Blanks** | <RL Preparation or Method Blank, one with each set of extraction groups.  Calibration Blanks are also analyzed | <RL Preparation or Method Blank | <RL Preparation or Method Blank and IBL | At least one per sample set |
| **Surrogate Spikes** | Limits based upon DoD statistical study (rounded to 0 or 5) for the target compound analyses. | 60-140% of expected value | 70-130% of expected value | Every field and QC sample |
| **Internal Standards Verification** | Every sample, EICP area within -50% to +100% of last ICV or first CCV. | NA | NA | Every field and QC sample |
| **Initial multilevel calibration** | ICAL: minimum of 6 levels (0.25 -12.5 ug/L) , one is at the MRL (0.50 ug/L), prior to sample analysis (not daily) RSD≤20%, $r^2 \geq 0.990$ | ICAL: 10-500 ug/L RSD<=20% or $r^2$>=0.990 | ICAL: .25-12.5 ug/L for gasoline (different range for other compounds)<br><br>RSD<=20% or r2>=0.990 | As required (not daily if pass ICV) |
| **Initial and Continuing Calibration Checks** | 80-120% of expected value | 80-120% of expected value | 80-120% of expected value | At beginning of sample set, every tenth sample, and end of sample set |
| **Second Source Standards** | ICV1 70-130% of expected value | ICV1 80-120% of expected value | ICVs 80-120% of expected value | Each time calibration performed |
| **Laboratory Control Samples (LCS)** | Statistical Limits from DoD LCS Study (rounded to 0 or 5) or if SRM is used based on those certified limits | Use an SRM: Values of all analytes in the LCS should be within the limits determined by the supplier.<br><br>Otherwise 70-130% of expected value | Use and SRM: Values of all analytes in the LCS should be within the limits determined by the supplier.<br><br>Otherwise 70-130% of expected value | One per analytical batch or every 20 samples, whichever is greater |
| **Laboratory Control Samples (LCS)** | Statistical Limits from DoD LCS Study (rounded to 0 or 5) or if SRM is used based on those certified limits | Use an SRM: Values of all analytes in the LCS should be within the limits determined by the supplier.<br><br>Otherwise 70-130% of expected value | Use and SRM: Values of all analytes in the LCS should be within the limits determined by the supplier.<br><br>Otherwise 70-130% of expected value | One per analytical batch or every 20 samples, whichever is greater |
| **Matrix Spikes (MS)** | Same as LCS | Same as LCS | 70-130% of expected value | One per sample set or every 20 samples, whichever is more frequent |
| **MS/MSD** | % Recovery same as MS RPD ≤ 30 | % Recovery same as MS RPD ≤ 25 | % Recovery same as MS RPD ≤ 25 | One per sample set or every 20 samples, whichever is more frequent |
| **Reporting Limits\*** | 0.1 µg/L (generally)[1] for target compounds HF special compounds are higher | 20 µg/L[1] | 20 µg/L[2] | NA |

[1] Based on 1000 mL sample to 1 mL extract
[2] Based on a 5 mL purge

B5

**DRAFT**

| **Table B6.** QA/QC requirements for LC/MS/MS analysis of glycols | | |
|---|---|---|
| **QC Type** | **Performance Criteria** | **Frequency** |
| **Method Blanks** | <RL | One per every 20 samples |
| **Solvent Blanks** | <RL | One per every 10 samples |
| **Initial and Continuing Calibration Checks** | 80-120% of expected value | At beginning of sample set, after every tenth sample, and end of sample set |
| **Second Source Standards** | 80-120% of expected value | Each time calibration performed |
| **Laboratory Control Samples (LCS)** | 80-120% of expected value | One per analytical batch or every 20 samples, whichever is greater |
| **Matrix Spikes (MS)** | 70-130% of expected value | One per sample set or every 20 samples, whichever is more frequent |
| **MS/MSD** | RPD $\leq$ 25 | One per sample set or every 20 samples, whichever is more frequent |

RL = Reporting Limit
Corrective Actions:  If re-analysis was not possible (such as lack of sample volume), the data was qualified with a determination about the impact on the sample data.

**Table B7a.** ICP-OES blank results for Phase III and Phase IV sampling

| Label | Date | Al | Ag | B | Ba | Be | Ca | Co | Fe | K | Mg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L |
| Trip Blank | 10/6/2010 | nd | nd | nd | nd | nd | nd | BQL 0.001 | nd | nd | nd |
| EQ Blank | 10/7/2010 | nd | nd | nd | nd | nd | BQL 0.009 | nd | nd | nd | BQL 0.017 |
| Field Blank | 10/5/2010 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Trip Blank | 4/14/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Field Blank | 4/18/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Field Blank | 4/21/2011 | nd | nd | nd | nd | nd | nd | nd | nd | BQL 0.096 | nd |
| Equip Blank | 4/21/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| MDL | | 0.045 | 0.015 | 0.006 | 0.001 | 0.001 | 0.007 | 0.001 | 0.019 | 0.038 | 0.015 |
| QL | | 0.149 | 0.051 | 0.018 | 0.004 | 0.004 | 0.023 | 0.004 | 0.063 | 0.127 | 0.049 |
| Detections in samples | | 17/21 | 0/21 | 21/21 | 21/21 | 7/21 | 21/21 | 2/21 | 12/21 | 21/21 | 21/21 |
| Concentration min | | 0.054 | nd | 0.103 | 0.006 | 0.001 | 3.35 | 0.001 | 0.019 | 0.089 | 0.019 |
| Concentration max | | 0.736 | nd | 0.378 | 0.210 | 0.003 | 452 | 0.002 | 2.41 | 54.9 | 56.0 |

BQL – below quantitation level. Units are mg/L. nd – not detected. MDL – method detection level. QL – quantitation level. Detections in samples: the number of times the analyte was detected in Phase III and Phase IV sampling. Minimum and maximum sample concentration in Phase III /Phase IV sampling activities in mg/L.

**Table B7b.** ICP-OES blank results for Phase III and Phase IV sampling

| Label | Date | Mn | Mo | Na | Sb | Sr | Ti | Zn | Si | S | P |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L |
| Trip Blank | 10/6/2010 | nd | nd | nd | nd | nd | nd | BQL 0.077 | nd | nd | nd |
| EQ Blank | 10/7/2010 | BQL 0.001 | nd | nd | nd | nd | nd | BQL 0.017 | nd | 2.04 | nd |
| Field Blank | 10/5/2010 | nd | nd | nd | nd | nd | nd | BQL 0.011 | nd | 1.2 | nd |
| Trip Blank | 4/14/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | BQL 0.007 |
| Field Blank | 4/18/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | BQL 0.009 |
| Field Blank | 4/21/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Equip Blank | 4/21/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | BQL 0.011 |
| MDL | | 0.001 | 0.002 | 0.040 | 0.006 | 0.001 | 0.001 | 0.007 | 0.037 | 0.121 | 0.004 |
| QL | | 0.004 | 0.007 | 0.134 | 0.019 | 0.004 | 0.004 | 0.024 | 0.122 | 0.403 | 0.013 |
| Detections in samples | | 16/21 | 14/21 | 21/21 | 11/21 | 21/21 | 4/21 | 15/21 | 21/21 | 21/21 | 5/21 |
| Concentration min | | 0.001 | 0.006 | 61.6 | 0.007 | 0.058 | 0.001 | 0.009 | 2.93 | 6.76 | 0.008 |
| Concentration max | | 0.231 | 0.019 | 1060 | 0.033 | 8.44 | 0.004 | 0.201 | 10.2 | 1140 | 0.024 |

BQL – below quantitation level. Units are mg/L. nd – not detected. MDL – method detection level. QL – quantitation level. Detections in samples: the number of times the analyte was detected in Phase III and Phase IV sampling. Minimum and maximum sample concentration in Phase III /Phase IV sampling activities in mg/L.

DRAFT

B8

DRAFT

**Table B7c.** ICP-MS blank results for Phase III and Phase IV sampling

| Label | Date | As | Cd | Cr | Cu | Hg | Ni | Pb | Se | Tl | U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L |
| Trip Blank | 10/6/2010 | BQL 0.096 | nd | nd | 0.96 | 0.46 | nd | 0.981 | nd | 0.014 | ----- |
| EQ Blank | 10/7/2010 | 0.258 | nd | 0.086 | BQL 0.65 | nd | 0.34 | nd | nd | BQL 0.004 | ----- |
| Field Blank | 10/5/2010 | 0.263 | nd | BQL 0.018 | nd | nd | nd | nd | nd | 0.014 | ----- |
| Trip Blank | 4/14/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Field Blank | 4/18/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Field Blank | 4/21/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| Equip Blank | 4/21/2011 | nd | nd | nd | nd | nd | nd | nd | nd | nd | nd |
| MDL | | 0.052 | 0.020 | 0.008 | 0.287 | 0.019 | 0.048 | 0.043 | 0.044 | 0.004 | 0.002 |
| QL | | 0.173 | 0.067 | 0.124 | 0.957 | 0.064 | 0.160 | 0.143 | 0.147 | 0.013 | 0.007 |
| Detections in samples | | 18/21 | 3/21 | 19/21 | 19/21 | 5/21 | 19/21 | 11/21 | 21/21 | 5/21 | 15/15 |
| Concentration min | | 0.255 | 0.028 | 0.010 | 0.380 | 0.117 | 0.060 | 0.123 | 0.337 | 0.014 | 0.005 |
| Concentration max | | 4.96 | 0.089 | 18.9 | 0.614 | 9.62 | 2.37 | 16.4 | | 0.125 | 80.1 |

BQL – below quantitation level. Units are µg/L. ----- not measured. nd – not detected. MDL – method detection level. QL – quantitation level. Detections in samples: the number of times the analyte was detected in Phase III and Phase IV sampling. Minimum and maximum sample concentration in Phase III/Phase IV sampling activities in µg/L.

**Table B8.** Blank results for Capillary Electrophoresis, Lachat Flow Injection Analysis, Dissolved Inorganic Carbon (DIC) and Dissolved Organic Carbon analyses for Phase III and Phase IV sampling

| Label | Date | Cl | SO$_4$ | F | NO$_3$+NO$_2$ | NH$_4$ | DIC | DOC |
|---|---|---|---|---|---|---|---|---|
| | | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L | mg/L |
| Trip Blank | 10/6/2010 | nd | nd | nd | nd | nd | BQL 0.51 | BQL 0.06 |
| EQ Blank | 10/7/2010 | nd | nd | nd | nd | nd | BQL 0.17 | BQL 0.03 |
| Field Blank | 10/5/2010 | nd | nd | nd | nd | nd | BQL 0.08 | BQL 0.04 |
| Trip Blank | 4/14/2011 | nd | nd | nd | nd | nd | BQL 0.09 | BQL 0.29 |
| Field Blank | 4/18/2011 | nd | nd | nd | nd | nd | BQL 0.29 | BQL 0.24 |
| Field Blank | 4/21/2011 | nd | nd | nd | nd | nd | BQL 0.20 | BQL 0.17 |
| Equip Blank | 4/21/2011 | nd | nd | nd | nd | nd | BQL 0.18 | BQL 0.28 |
| MDL | | 0.136 | 0.103 | 0.056 | 0.005 | 0.014 | 0.103 | 0.103 |
| QL | | 1.00 | 1.00 | 0.200 | 0.100 | 0.100 | 0.500 | 0.500 |
| Detections in samples | | 21/21 | 21/21 | 17/21 | 11/21 | 16/21 | 21/21 | 21/21 |
| Concentration min | | 13.2 | 12.1 | 0.90 | 0.08 | 0.04 | 1.4 | 0.51 |
| Concentration max | | 466 | 3200 | 2.02 | 17.5 | 4.61 | 89.1 | 19.7 |

BQL – below quantitation level. Units are mg/L. nd – not detected. MDL – method detection level. QL – quantitation level. Detections in samples: the number of times the analyte was detected in Phase III and Phase IV sampling. Minimum and maximum sample concentration in Phase III /Phase IV sampling activities in mg/L.

# DRAFT

**Table B9.** Blank results for Volatile Organic Compounds (µg/L) in Phase III and Phase IV sampling (Region 8 laboratory, Golden, CO)

| | Trip Blank | EQ Blank | Field Blank | Trip Blank | Field Blank | Field Blank | RL |
|---|---|---|---|---|---|---|---|
| | 10/6/2010 | 10/7/2010 | 10/5/2010 | 4/14/2011 | 4/18/2011 | 4/21/2011 | |
| 1,1,1,2-Tetrachloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,1,1-Trichloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,1,2,2-Tetrachloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,1,2-Trichloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,1-Dichloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,1-Dichloroethene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,1-Dichloropropene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2,3-Trichlorobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2,3-Trichloropropane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2,4-Trichlorobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2,4-Trimethylbenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2-Dibromo-3-chloropropane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2-Dibromoethane (EDB) | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2-Dichlorobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2-Dichloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,2-Dichloropropane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,3,5-Trimethylbenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,3-Dichlorobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,3-Dichloropropane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,3-Dimethyl adamantane | nd | nd | nd | nd | nd | nd | 0.25 |
| 1,4-Dichlorobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| 2,2-Dichloropropane | nd | nd | nd | nd | nd | nd | 0.25 |
| 2-Butanone | ----- | ----- | ----- | nd | 0.64 | 0.82 | 0.50 |
| 2-Chlorotoluene | nd | nd | nd | nd | nd | nd | 0.25 |
| 4-Chlorotoluene | nd | nd | nd | nd | nd | nd | 0.25 |
| 4-Methyl-2-pentanone | ----- | ----- | ----- | nd | nd | nd | 0.25 |
| 2-Hexanone | ----- | ----- | ----- | nd | 0.29 | 0.41 | 0.25 |
| Acetone | ----- | ----- | ----- | nd | 1.03 | 1.38 | 1.00 |
| Acrylonitrile | nd | nd | nd | nd | nd | nd | 0.25 |
| Adamantane | nd | nd | nd | nd | nd | nd | 0.25 |
| Allyl chloride | nd | nd | nd | nd | nd | nd | 0.25 |
| Benzene | nd | nd | nd | nd | nd | nd | 0.03 |
| Bromobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| Bromochloromethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Bromodichloromethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Bromoform | nd | nd | nd | nd | nd | nd | 0.25 |
| Bromomethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Carbon disulfide | nd | nd | nd | nd | nd | nd | 0.25 |
| Carbon tetrachloride | nd | nd | nd | nd | nd | nd | 0.25 |
| Chlorobenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| Chlorodibromomethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Chloroethane | nd | 0.25 | nd | nd | nd | nd | 0.25 |
| Chloroform | nd | nd | nd | nd | nd | nd | 0.25 |
| Chloromethane | nd | nd | nd | 1.04 | nd | nd | 0.25 |
| cis-1,2-Dichloroethene | nd | nd | nd | nd | nd | nd | 0.25 |
| cis-1,3-Dichloropropene | nd | nd | nd | nd | nd | nd | 0.25 |
| Dibromomethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Dichlorodifluoromethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Ethyl Ether | nd | nd | nd | nd | nd | nd | 0.25 |
| Ethylbenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| Hexachlorobutadiene | nd | nd | nd | nd | nd | nd | 0.25 |
| Hexachloroethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Iodomethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Isopropylbenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| m,p-Xylene | nd | nd | nd | nd | 0.69 | 0.70 | 0.50 |
| Methacrylonitrile | nd | nd | nd | nd | 0.27 | nd | 0.25 |

# DRAFT

| | Trip Blank | EQ Blank | Field Blank | Trip Blank | Field Blank | Field Blank | RL |
|---|---|---|---|---|---|---|---|
| | 10/6/2010 | 10/7/2010 | 10/5/2010 | 4/14/2011 | 4/18/2011 | 4/21/2011 | |
| Methyl Acrylate | nd | nd | nd | nd | nd | nd | 0.25 |
| Methyl tert-Butyl Ether | nd | nd | nd | nd | nd | nd | 0.25 |
| Methylene chloride | nd | nd | nd | nd | nd | nd | 0.25 |
| Naphthalene | nd | nd | nd | nd | nd | nd | 0.25 |
| n-Butyl Benzene | nd | nd | nd | nd | nd | nd | 0.25 |
| n-Propyl Benzene | nd | nd | nd | nd | nd | nd | 0.25 |
| o-Xylene | nd | nd | nd | nd | nd | nd | 0.25 |
| p-Isopropyltoluene | nd | nd | nd | nd | nd | nd | 0.25 |
| sec-Butylbenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| Styrene | nd | nd | nd | nd | nd | nd | 0.25 |
| tert-Butylbenzene | nd | nd | nd | nd | nd | nd | 0.25 |
| Tetrachloroethene | nd | nd | nd | nd | nd | nd | 0.25 |
| Toluene | 0.54 | 0.16 | 0.16 | nd | nd | nd | 0.25 |
| trans-1,2-Dichloroethene | nd | nd | nd | nd | nd | nd | 0.25 |
| trans-1,3-Dichloropropene | nd | nd | nd | nd | nd | nd | 0.25 |
| Trichloroethene | nd | nd | nd | nd | nd | nd | 0.25 |
| Trichlorofluoromethane | nd | nd | nd | nd | nd | nd | 0.25 |
| Vinyl chloride | nd | nd | nd | nd | nd | nd | 0.25 |
| Xylenes (total) | nd | nd | nd | nd | nd | nd | 0.75 |

RL – Reporting Limit (µg/L).  nd – not detected. ----- not measured.

# DRAFT

**Table B10.**  Blank results for Volatile Organic Compounds (µg/L) in Phase IV sampling (ORD laboratory, Ada, OK)

| | Trip Blank | Field Blank | Field Blank | MDL | QL |
|---|---|---|---|---|---|
| | 4/14/2011 | 4/18/2011 | 4/21/2011 | | |
| Vinyl chloride | nd | nd | nd | 0.14 | 1.0 |
| 1,1-Dichloroethene | nd | nd | nd | 0.07 | 0.5 |
| Methylene Chloride | nd | nd | nd | 0.19 | 0.5 |
| trans-1,2-Dichloroethene | nd | nd | nd | 0.05 | 0.5 |
| cis-1,2-Dichloroethene | nd | nd | nd | 0.15 | 0.5 |
| Chloroform | nd | nd | nd | 0.07 | 0.5 |
| 1,1,1-Trichloroethane | nd | nd | nd | 0.03 | 0.5 |
| Carbon Tetrachloride | nd | nd | nd | 0.04 | 0.5 |
| 1,2-Dichloroethane | nd | nd | nd | 0.03 | 0.5 |
| Trichloroethene | nd | nd | nd | 0.07 | 0.5 |
| 1,1,2-Trichloroethane | nd | nd | nd | 0.03 | 0.5 |
| Tetrachloroethene | nd | nd | nd | 0.09 | 0.5 |
| Chlorobenzene | nd | nd | nd | 0.04 | 0.5 |
| 1,3-Dichlorobenzene | nd | nd | nd | 0.06 | 0.5 |
| 1,4-Dichlorobenzene | nd | nd | nd | 0.04 | 0.5 |
| 1,2-Dichlorobenzene | nd | nd | nd | 0.03 | 0.5 |
| Ethanol | nd | nd | nd | 0.11 | 1.0 |
| Isopropanol | nd | nd | nd | 24.7 | 100 |
| n-Propanol | nd | nd | nd | 11.4 | 100 |
| Isobutanol | nd | nd | nd | 13.5 | 100 |
| n-Butanol | nd | nd | nd | 15.6 | 100 |
| tert-Butyl Alcohol | nd | nd | nd | 15.5 | 100 |
| Methyl tert-Butyl Ether | nd | nd | nd | 1.72 | 5.0 |
| di-Isopropyl Ether | nd | nd | nd | 0.11 | 0.5 |
| Ethyl tert-Butyl Ether | nd | nd | nd | 0.11 | 0.5 |
| Benzene | nd | nd | nd | 0.03 | 0.5 |
| tert-Amyl Methyl Ether | nd | nd | nd | 0.06 | 0.5 |
| 2,5-Dimethylfuran | nd | nd | nd | 0.06 | 0.5 |
| Toluene | BQL 0.228 | nd | BQL 0.227 | 0.03 | 0.5 |
| 1,2-Dibromoethane | nd | nd | nd | 0.03 | 0.5 |
| Ethyl Benzene | nd | nd | nd | 0.09 | 1.0 |
| m+p Xylene | BQL 0.229 | nd | BQL 0.133 | 0.03 | 0.5 |
| o-Xylene | nd | nd | nd | 0.08 | 0.5 |
| 1,3,5-Trimethylbenzene | nd | nd | nd | 0.03 | 0.5 |
| 1,2,4-Trimethylbenzene | nd | nd | nd | 0.04 | 1.0 |
| 1,2,3-Trimethylbenzene | nd | nd | nd | 0.02 | 1.0 |
| Naphthalene | nd | nd | nd | 0.04 | 1.0 |

All results in µg/L.  MDL – method detection level.  QL – quantitation level.  nd – not detected.

# DRAFT

**Table B11.** Blank results for Semi-Volatile Organic Compounds (µg/L) in Phase III and Phase IV sampling (Region 8 laboratory, Golden, CO)

| | Trip Blank | EQ Blank | Field Blank | Trip Blank | Field Blank | Field Blank | RL |
|---|---|---|---|---|---|---|---|
| | 10/6/2010 | 10/7/2010 | 10/5/2010 | 4/14/2011 | 4/18/2011 | 4/21/2011 | |
| 1,2,4-Trichlorobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,2-Dichlorobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,2-Dinitrobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,3-Dichlorobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,3-Dinitrobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,4-Dichlorobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,4-Dinitrobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1-Methylnaphthalene | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,3,4,6-Tetrachlorophenol | nd | nd | nd | nd | nd | nd | 0.250 |
| 2,3,5,6-Tetrachlorophenol | nd | nd | nd | nd | nd | nd | 0.250 |
| 2,4,5-Trichlorophenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,4,6-Trichlorophenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,4-Dichlorophenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,4-Dimethylphenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,4-Dichlorophenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,4-Dimethylphenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2,4-Dinitrophenol | nd | nd | nd | nd | nd | nd | 1.00 |
| 2,4-Dinitrotoluene | nd | nd | nd | nd | nd | nd | 1.00 |
| 2,6-Dinitrotoluene | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Chloronaphthalene | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Chlorophenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Methylnaphthalene | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Methylphenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Nitroaniline | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Nitrophenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 3 & 4-Methylphenol | nd | nd | nd | nd | nd | nd | 0.200 |
| 3,3´-Dichlorobenzidine | nd | nd | nd | nd | nd | nd | 0.500 |
| 3-Nitroaniline | nd | nd | nd | nd | nd | nd | 0.100 |
| 4,6-Dinitro-2-methylphenol | nd | nd | nd | nd | nd | nd | 0.500 |
| 4-Bromophenyl phenyl ether | nd | nd | nd | nd | nd | nd | 0.100 |
| 4-Chloro-3-methylphenol | nd | nd | nd | nd | nd | nd | 0.100 |
| 4-Chloroaniline | nd | nd | nd | nd | nd | nd | 0.100 |
| 4-Chlorophenyl phenyl ether | nd | nd | nd | nd | nd | nd | 0.100 |
| 4-Nitroaniline | nd | nd | nd | nd | nd | nd | 0.500 |
| 4-Nitrophenol | nd | nd | nd | nd | nd | nd | 1.00 |
| Acenaphthene | nd | nd | nd | nd | nd | nd | 0.100 |
| Acenaphthylene | nd | nd | nd | nd | nd | nd | 0.100 |
| Aniline | nd | nd | nd | nd | nd | nd | 0.100 |
| Anthracene | nd | nd | nd | nd | nd | nd | 0.100 |
| Azobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| Benzo (a) anthracene | nd | nd | nd | nd | nd | nd | 0.100 |
| Benzo (a) pyrene | nd | nd | nd | nd | nd | nd | 0.100 |
| Benzo (g,h,i) perylene | nd | nd | nd | nd | nd | nd | 0.100 |
| Benzo (k) fluoranthene | nd | nd | nd | nd | nd | nd | 0.100 |
| Benzo(b)fluoranthene | nd | nd | nd | nd | nd | nd | 0.100 |
| Benzoic acid | 0.83 | 0.78 | nd | 3.00 | nd | nd | 0.500 |
| Benzyl alcohol | nd | 0.40 | 0.63 | nd | nd | nd | 0.500 |
| Bis(2-chloroethoxy)methane | nd | nd | nd | nd | nd | nd | 0.100 |
| Bis(2-chloroethyl)ether | nd | nd | nd | nd | nd | nd | 0.100 |
| Bis(2-chloroisopropyl)ether | nd | nd | nd | nd | nd | nd | 0.100 |
| Bis-(2-Ethylhexyl) Adipate | nd | nd | nd | nd | nd | nd | 0.100 |
| Bis(2-ethylhexyl)phthalate | nd | nd | nd | 5.44 | nd | nd | 0.500 |
| Butyl benzyl phthalate | nd | nd | nd | nd | nd | nd | 0.100 |
| Carbazole | nd | nd | nd | nd | nd | nd | 0.100 |
| Chrysene | nd | nd | nd | nd | nd | nd | 0.100 |
| Dibenz (a,h) anthracene | nd | nd | nd | nd | nd | nd | 0.100 |

**DRAFT**

| | Trip Blank | EQ Blank | Field Blank | Trip Blank | Field Blank | Field Blank | RL |
|---|---|---|---|---|---|---|---|
| | 10/6/2010 | 10/7/2010 | 10/5/2010 | 4/14/2011 | 4/18/2011 | 4/21/2011 | |
| Dibenzofuran | nd | nd | nd | nd | nd | nd | 0.100 |
| Diethyl phthalate | nd | nd | nd | nd | nd | nd | 0.100 |
| Dimethyl phthalate | nd | nd | nd | nd | nd | nd | 0.100 |
| Di-n-butyl phthalate | nd | nd | nd | nd | nd | nd | 0.100 |
| Di-n-octyl phthalate | nd | nd | nd | nd | nd | nd | 0.100 |
| Diphenylamine | nd | nd | nd | nd | nd | nd | 0.100 |
| Fluoranthene | nd | nd | nd | nd | nd | nd | 0.100 |
| Fluorene | nd | nd | nd | nd | nd | nd | 0.100 |
| Hexachlorobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| Hexachlorobutadiene | nd | nd | nd | nd | nd | nd | 0.100 |
| Hexachlorocyclopentadiene | nd | nd | nd | nd | nd | nd | 0.100 |
| Hexachloroethane | nd | nd | nd | nd | nd | nd | 0.100 |
| Indeno (1,2,3-cd) pyrene | nd | nd | nd | nd | nd | nd | 0.100 |
| Isophorone | nd | nd | nd | nd | nd | nd | 0.100 |
| Naphthalene | nd | nd | nd | nd | nd | nd | 0.100 |
| Nitrobenzene | nd | nd | nd | nd | nd | nd | 0.100 |
| N-Nitrosodi-n-propylamine | nd | nd | nd | nd | nd | nd | 0.100 |
| Pentachlorophenol | nd | nd | nd | nd | nd | nd | 0.500 |
| Phenanthrene | nd | nd | nd | nd | nd | nd | 0.100 |
| Phenol | nd | nd | nd | nd | nd | nd | 0.100 |
| Pyrene | nd | nd | nd | nd | nd | nd | 0.100 |
| Limonene | nd | nd | nd | nd | nd | nd | 0.100 |
| 1,3-Dimethyl adamantane | nd | nd | nd | nd | nd | nd | 0.100 |
| 2-Butoxyethanol | nd | nd | nd | nd | nd | nd | 0.100 |
| Adamantane | nd | 0.32 | nd | nd | nd | nd | 0.100 |
| Squalene | 0.36 | 0.49 | 0.23 | nd | nd | nd | 1.00 |
| Terpiniol | nd | nd | nd | nd | nd | nd | 0.100 |
| Tri(2-butoxyethyl) Phosphate | nd | 2.53 | nd | nd | nd | nd | 0.500 |

RL – Reporting Limit (µg/L).  nd – not detected. ----- not measured.

**Table B12.** Blank results for GRO and DRO analyses for Phase III and Phase IV sampling (Region 8 laboratory, Golden, CO) and blank results for glycol ethers in Phase IV sampling (Region 3 laboratory, Fort Meade, MD)

| | Trip Blank | EQ Blank | Field Blank | Trip Blank | Field Blank | Field Blank | RL |
|---|---|---|---|---|---|---|---|
| | 10/6/2010 | 10/7/2010 | 10/5/2010 | 4/14/2011 | 4/18/2011 | 4/21/2011 | |
| Gasoline Range Organics | nd | nd | nd | nd | 21.3 | nd | 20 |
| Diesel Range Organics | nd | nd | nd | nd | nd | 135 | 22 |
| 2-Butoxyethanol | ----- | ----- | ----- | nd | nd | nd | 10 |
| Diethylene Glycol | ----- | ----- | ----- | nd | nd | nd | 50 |
| Triethylene Glycol | ----- | ----- | ----- | nd | nd | nd | 10 |
| Tetraethylene Glycol | ----- | ----- | ----- | 3.6 | 3.1 | 3.4 | 10 |

RL – Reporting Limit (µg/L).  nd – not detected. ----- not measured.

B14

**Table B13.** Duplicate data for selected major ions, DOC, and DIC in ground water samples collected during Phase III and Phase IV sampling activities

| Sample | Date | Na | K | Ca | Mg | Ba | Sr | Si | Cl | SO4 | F | NO3 | DOC | DIC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ppm | ppm | ppm | ppm | ppm | ppm | ppm | ppm | ppm | ppm | ppm | ppm | ppm |
| LD01 | 10/6/2010 | 562 | 1.05 | 71.9 | 8.12 | 0.0096 | 1.08 | 5.82 | 33.0 | 1320 | 0.90 | 0.354 | 0.568 | 17.8 |
| LD01 dup | 10/6/2010 | 565 | 0.97 | 71.9 | 8.14 | 0.0096 | 1.08 | 5.81 | 32.9 | 1320 | 0.99 | 0.337 | 0.558 | 17.2 |
| RPD | | 0.53 | 7.92 | 0.00 | 0.25 | 0.00 | 0.00 | 0.17 | 0.30 | 0.00 | 9.52 | 4.92 | 1.78 | 3.48 |
| PGDW32 | 4/18/2011 | 198 | 0.09 | 7.19 | 0.028 | 0.010 | 0.090 | 6.74 | 18.8 | 361 | 1.95 | ND | 0.41 | 7.70 |
| PGDW32 dup | 4/18/2011 | 198 | 0.27 | 7.28 | 0.026 | 0.009 | 0.090 | 6.80 | 19.1 | 349 | 2.02 | ND | 0.37 | 7.73 |
| RPD | | 0.00 | 100 | 1.24 | 7.41 | 10.53 | 0.00 | 0.89 | 1.58 | 3.38 | 3.53 | NC | 10.26 | 0.39 |
| EPAMW02 | 4/19/2011 | 448 | 43.6 | 60.5 | 0.032 | 0.093 | 1.78 | 2.94 | 457 | 62.6 | 1.54 | ND | 19.7 | 1.40 |
| EPAMW02 dup | 4/19/2011 | 449 | 44.0 | 60.5 | 0.019 | 0.093 | 1.79 | 2.93 | 456 | 62.5 | 1.49 | ND | 19.7 | 1.39 |
| RPD | | 0.22 | 0.91 | 0.00 | 50.98 | 0.00 | 0.56 | 0.34 | 0.22 | 0.16 | 3.30 | NC | 0.00 | 0.72 |

RPD is the calculated relative percent difference: RPD = |[(sample1-sample2)/((sample1+sample2)/2)]*100|.  ND – not detected. ----- not measured.  NC – not calculated.

DRAFT

**Table B14.** Duplicate data for methane and selected dissolved organic compounds in ground water samples collected during Phase III and Phase IV sampling activities

| Sample | Date | Methane | Benzene | Toluene | m,p-Xylenes | Isopropyl alcohol | Tert-butyl alcohol | Phenol | Diethylene Glycol | Triethylene Glycol | Acetone |
|--------|------|---------|---------|---------|-------------|-------------------|--------------------|--------|--------------------|---------------------|---------|
| | | ppm | ppb | ppb | ppb | ppb | ppb | ppb | ppb | ppb | ppb |
| LD01 | 10/6/2010 | 0.189 | <0.25 | <0.25 | <0.25 | ----- | ----- | <0.1 | ----- | ----- | ----- |
| LD01 dup | 10/6/2010 | 0.168 | <0.25 | <0.25 | <0.25 | ----- | ----- | <0.1 | ----- | ----- | ----- |
| RPD | | 11.76 | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| PGDW32 | 4/18/2011 | 0.07 | <0.25 | <0.25 | <0.25 | <11.4 | <1.7 | <0.5 | <50 | <10 | <1.00 |
| PGDW32 dup | 4/18/2011 | 0.06 | <0.25 | <0.25 | <0.25 | <11.4 | <1.7 | <0.5 | <50 | <10 | <1.00 |
| RPD | | 15.38 | NC | NC | NC | NC | NC | NC | NC | NC | NC |
| EPAMW02 | 4/19/2011 | 18.82 | 139 | 336 | 280 | 581 | 4470 | 14.5 | 1570 | 314 | 641 |
| EPAMW02 dup | 4/19/2011 | 22.62 | 164 | 424 | 354 | 553 | 4580 | 29.2 | 1610 | 293 | 616 |
| RPD | | 18.34 | 16.50 | 23.16 | 23.34 | 4.94 | 2.43 | 67.28 | 2.52 | 6.92 | 3.98 |

RPD is the calculated relative percent difference: RPD = |[(sample1-sample2)/((sample1+sample2)/2)]*100|.  ND – not detected. ----- not measured.  NC – not calculated.

DRAFT

B15

**DRAFT**

**Table B15.** QA/QC requirements for analysis of $\delta^{13}C$ of DIC

| QC Type | Performance Criteria | Frequency |
|---|---|---|
| Mass Spec Calibration Check | Difference of calibrated/true $\leq 0.5‰$ | One at beginning of day, and one after sample is analyzed. |
| Mass Spec Zero Enrichment Check | 0 +/- 0.1 ‰ | Once a day |
| Lab Duplicates | $\leq 1‰$ | 1 per every 5 samples* |

Working standards were calibrated against IAEA (International Atomic Energy Agency) standard LSVEC and NBS-19; referenced to $\delta^{13}C$ of the PeeDee belemnite (NIST material).
*If < 5 samples were submitted, a duplicate was run regardless of total number.
Corrective Actions:   If re-analysis was not possible (such as lack of sample volume), the data was qualified with a determination about the impact on the sample data.

**Table B16.** QA/QC requirements for analysis for $\delta^{13}C$ and $\delta D$ of light hydrocarbons for aqueous and gas samples

| QC Type | Performance Criteria | Frequency |
|---|---|---|
| Mass Spec Calibration Check | Difference of calibrated/true $\leq 0.5‰$ for $\delta^{13}C$ and $\leq 3‰$ for $\delta D$ +/- 1 pMC for $^{14}C$ | One at beginning of day and after samples are analyzed for $\delta^{13}C$*; one at beginning of day and every tenth sample for $\delta D$** |
| Mass Spec Zero Enrichment Check | 0 +/- 0.1 ‰ for $\delta^{13}C$ and 0 +/- 1 ‰ for $\delta D$ | Once a day for $\delta^{13}C$ and every tenth sample for $\delta D$ |
| Lab Duplicates | $\leq 1‰$ for $\delta^{13}C$ and $\leq 3‰$ for $\delta D$ +/- 1 pMC for $^{14}C$ | 1 per every 10 samples for $\delta^{13}C$ and $\delta D$ *** |
| Preparation System Check/Reference Standards | $\leq 1‰$ for $\delta^{13}C$ and $\leq 3‰$ for $\delta D$ +/- 1 pMC | One per every 10 samples for $\delta^{13}C$ and $\delta D$ |

*Working standards calibrated against IAEA (International Atomic Energy Agency) standard LSVEC and NBS-19; referenced to $\delta^{13}C$ of the PeeDee belemnite (NIST material).
**Working standards calibrated against VSMOW, SLAP, and GISP; referenced to VSMOW.
***If < 10 samples were submitted, duplicate run regardless of total number.
Corrective Actions:   If re-analysis is not possible (such as lack of sample volume), the data will be qualified with a determination about the impact on the sample data.

**Table B17.** QA/QC requirements for analysis of fixed gases and light hydrocarbons for aqueous and gas samples

| Measurement | Analysis Method | Blanks (Frequency) | Calibration Checks (Frequency) | Second Source (Frequency) | Duplicates (Frequency) | Matrix Spikes (Frequency) |
|---|---|---|---|---|---|---|
| Ar, He, $H_2$, $O_2$, $N_2$, $CO_2$, $CH_4$, $C_2H_6$, $C_2H_4$, $C_3H_6$, $C_3H_8$, $iC_4H_{10}$, $nC_4H_{10}$, $iC_5H_{12}$, $nC_5H_{12}$, $C_6+$ | Modification of ASTM D1945-03 | None Detected (beginning every 10 samples, end of run) | 85-115% (beginning every 10 samples, end of run) | 85-115% (after each calibration) | RPD <15% (every 10 samples) | NA |

**DRAFT**

**Table B18.** Summary of quality control samples, purpose, method, and frequency to support gas analysis

| QC Sample | Purpose | Method | Frequency | Acceptance Criteria |
|---|---|---|---|---|
| Equipment Blanks | Ensure that construction materials in gas sample bags and the sample train are not a source of vapors or gases of concern | Fill sample bags with ultrapure $N_2$ gas via the sample train. | One sample per day | < Detection limit |
| Travel Blanks | Ensure that cross-contamination does not occur during sampling or transport to the laboratory | Fill sample bags with ultrapure $N_2$ gas and place in shipping container with other samples. | One sample per shipment | < Detection limit |
| Duplicates | Check precision of sampling method and analysis | Use a tee to collect two samples simultaneously. | One sample every 10 samples | RPD < 20% |

**Table B19.** Summary of analytes, instruments, calibration, and check standards for portable gas analyzers

| Analyte | Instrument (Detector) | Method | Range | Calibration | Check Standard | Accuracy |
|---|---|---|---|---|---|---|
| $O_2$ | GEM-2000 Plus CES-LANDTEC (EC Cell) | RSKSOP-314v1 | 0 - 21% | 4%, 10%, or 20.9% | 4% 10%, 20.9% | ±1.0% (0-5%) ±1.0% (5-21%) |
| $CH_4$ | GEM-2000 Plus CES-LANDTEC (IRGA) | RSKSOP-314v1 | 0 - 100% | 2.5% or 50% | 2.5%, 50% | ±0.3% (0-5%) ±1% (5-15%) ±3% (15-100%) |
| $CO_2$ | GEM-2000 Plus CES-LANDTEC (IRGA) | RSKSOP-314v1 | 0 - 100% | 5%, 20%, or 35% | 5%, 20%, 35% | ±0.3% (0-5%) ±1.0% (5-15%) ±3.0% (15-50%) |
| VOCs | Thermo Scientific TVA-1000B (FID) | RSKSOP-320v1 | 1.0 – 10,000 ppmv | 0.0, 10, 100, 1000, 9000 ppmv $CH_4$ | 10, 100, 1000, 9000 ppmv $CH_4$ | ±25% or ±2.5 ppmv, whichever is greater, from 1.0 to 10,000 ppmv. |
| VOCs | Thermo Scientific TVA-1000B (PID) | RSKSOP-320v1 | 0.5 – 500 ppmv | 0.0, 250, 475 ppmv | 250, 475 ppmv Isobutylene | ±25% or ±2.5 ppmv, whichever is greater, from 0.5 to 500 pomv. |

**Table B20.** QA/QC Requirements for portable gas analyzers

| Measurement | Analysis Method | Blanks** (Frequency) | Calibration Check Standards (Frequency) | Second Source Standards (Frequency) |
|---|---|---|---|---|
| $O_2$, $CO_2$, $CH_4$ | RSKSOP-314v1 | beginning & end of each sample event) | +/-1% of reading (beginning & end of each sample event) | +/-1% of reading (after each calibration, optional for this project) |
| Hydrocarbons | RSKSOP-320v1 | beginning & end of each sample event) | 90-110% of known value for FID and 80-120% for PID (after calibration, beginning & end of each sample event) | NA |

Corrective actions are detailed in the SOPs.
*Duplicate sample not appropriate for measurements from a sample train.
**Meter reading

**DRAFT**

**DRAFT**

# Appendix C

# Photographic Log of Deep Monitoring Well Construction

DRAFT



**Figure C1.** Photograph of drilling rig on platform with shakers for mud recirculation at MW02.



**Figure C2.** Photograph of blowout prevention (BOP) for annular space at base of drilling rig platform at MW02.



**Figure C3.** Photograph of blowout preventer for drillstem.

DRAFT



**Figure C4.** Photograph of bit and drillstem with bit for mud rotary drilling at MW02.

DRAFT



**Figure C5.** Photograph of water truck used to transport water to mix mud.



**Figure C6.** Photograph of Quik-Gel bentonite (Halliburton) used to create mud for drilling.



**Figure C7.** Photograph of mud additives EZ Mud Gold (Halliburton) and Dense Soda Ash.



**Figure C8.** Photograph of mud additive Penetrol (Halliburton).

C4

**DRAFT**



Figure C9. Photograph of flow of mud and cuttings from borehole at MW02.



Figure C10. Photograph of monitoring of mud and cuttings using a Thermo Scientific TVA-1000B FID/PID at MW02.

**DRAFT**



**Figure C11.** Photograph of pump used to transport mud and cuttings to shakers at MW02.



**Figure C12.** Photograph of flow of mud and cuttings to shakers at MW02.

**DRAFT**



**Figure C13.** Photograph of shakers separating mud from cuttings at MW02.

**DRAFT**



**Figure C14.** Photograph of cuttings transported to disposal bins at MW02.

**DRAFT**



**Figure C15.** Photograph of pumping of mud back to borehole at MW02.

**DRAFT**



Figure C16. Photograph of injection of mud to borehole at MW02.

C10

DRAFT



**Figure C17.** Photograph of collection of cuttings for lithologic characterization at MW02.



**Figure C18.** Photograph of removal of mud from cuttings at MW02.



**Figure C19.** Photograph of white coarse-grained sand targeted by local well drillers and media in which screens are set in for both deep monitoring wells.

**DRAFT**



**Figure C20.** Photograph of setting of stainless-steel pre-packed screen and sand basket into borehole at MW02.

**DRAFT**



Figure C21.  Photograph of securing sand basket and casing above screen.



Figure C22.  Photograph of placement of sand in sandbasket.

DRAFT



**Figure C23.** Photograph of well development at MW02.

**DRAFT**

# Appendix D

# Photographic Log of Ground Water Sampling

DRAFT



**Figure D1.** Photograph of flow from submersible pump through flowmeter at MW02.



**Figure D2.** Photograph of flow of water to purge water disposal tank at MW02.

DRAFT



**Figure D3.** Photograph (close-up) of flow of water into purge water disposal tank at MW02.



**Figure D4.** Photograph of water (foaming) flowing into YSI flow cell at MW02.

DRAFT



**Figure D5.** Photograph of sampling at MW02. The sample train was split prior to entry into purge water disposal container.



**Figure D6.** Photograph of field filtering samples for metals analysis at MW02.

**DRAFT**



**Figure D7.** Photograph of sample collection at PGDW14.



**Figure D8.** Photograph of cooler packed with samples for shipment.

**DRAFT**

**DRAFT**

# Appendix E
# Examples of Cement Bond/Variable
# Density Log Interpretation

**DRAFT**



**Figure E1**. Example of CBL/VDL indicating "no cement" at Pavillion Fee 34-03B.  The CBL/VDL indicates no cement 2750 feet below ground surface at the time of logging.

**DRAFT**



**Figure E2**. Example of "sporadic bonding" at Pavillion Fee 41-10 from 1000 to 1640 ft bgs.   Hydraulic fracturing occurred at 1618 feet below ground surface.  Arrow denotes interval of hydraulic fracturing.

**DRAFT**



**Figure E3a.** Example of "sporadic bonding" at Pavillion Fee 11-11B.  Hydraulic fracturing occurred at 1516 feet below ground surface.  Arrow denotes interval of hydraulic fracturing.  Depths on CBL/VDL difficult to read and inserted on left margin.

**DRAFT**



**Figure E3b.** Example of "sporadic bonding" Pavillion Fee 11-11B between 2350-3200 feet below ground suface.  Hydraulic fracturing occurred at 3165 feet below ground surface. Arrow denotes interval of hydraulic fracturing.  Depths on CBL/VDL difficult to read and inserted on left margin.

E5

**DRAFT**



**Figure E4**. Example of "Sporadic Bonding" at Tribal Pavillion 24-02.  Hydraulic fracturing occurred at 1538 feet bgs.  Arrow denotes interval of hydraulic fracturing.

DRAFT



**Figure E5**. Example of "Good Bonding" (from surface casing at 645 ft bgs to 820 ft bgs) followed by "Sporadic Bonding" (from 820 ft bgs 1310 ft bgs) to "Good Bonding" at 1310 to target depth at Pavillion Fee 41-10B.

**DRAFT**

**DRAFT**





United States
Environmental Protection
Agency

PRESORTED STANDARD
POSTAGE & FEES PAID
EPA
PERMIT NO. G-35

Office of Research and Development (8101R)
Washington, DC 20460

Official Business
Penalty for Private Use
$300

Department of Environmental Protection
Bureau of Oil and Gas Management
Stray Natural Gas Migration Associated with Oil and Gas Wells

Commercial oil production started in Pennsylvania in 1859 when Colonel Drake drilled the famous Drake well in Titusville. From there, petroleum production expanded further into the Venango, Southern and Bradford oil fields of Venango, Warren, McKean, Clarion, Butler and Armstrong Counties. Eventually, the oil belt extended to the southwest corner of the state in the Washington County area. During this 150-year span, hundreds of thousands of gas and oil wells have been drilled in Pennsylvania.

With the number of gas wells drilled in the Commonwealth since the inception of the industry, the potential exists for natural gas to migrate from the wellbore (via either improperly constructed or old, deteriorated wells) and adversely affect water supplies, as well as accumulate within or adjacent to structures such as residences and businesses. Collectively, this may represent a threat to public health, safety and welfare, and is a potential threat of a fire or explosion. The Department has documented such occurrences and these cases are provided in this document.

It should be noted that the Department also receives complaints of stray gas from other sources such as methane gas due to microbial processes or caused by burial of organic matter, landfills, mining activity, transmission or distribution pipeline, or natural causes. These cases are not included in this paper. The discussion in this paper is limited to gas migration cases associated with oil and natural gas wells (i.e. thermogenic in origin).

The gas migration cases are organized into several categories: new wells, operating or active wells, legacy or abandoned wells, and wells associated with underground storage of natural gas.

*New wells* involve that initial phase of an oil or gas well when the well is being drilled or re-drilled, completed and put into production. For most wells, well completion involves hydraulic fracturing either immediately after the well is drilled or at a later date.

*Operating or production wells* include wells that are actively producing. It also includes wells that the operator is not actively producing and that are not plugged.

*Legacy or abandoned well incidents* are associated with natural gas and oil wells drilled from 1859, when Colonel Drake drilled his first commercial well in Titusville, until the present and there is no responsibility operator for the well. The well may have been abandoned by the operator and not properly plugged or plugged according to the standards or practices that were in place at the time. Some of the wells were constructed under the Oil and Gas Act, which was passed in 1984 when new standards for casing, cementing and plugging wells were established. Many were not.

1

These cases typically involved gas migration from old wells that were abandoned without proper plugging procedures.  Often, these wells are associated with the old oil and gas fields surrounding the greater Pittsburgh area or the Bradford or Venango oil fields.

***Underground Storage of Natural Gas*** includes gas migration problems associated with operating gas storage fields.

# INVENTORY OF OIL AND GAS WELL STRAY GAS CASES

## NEW WELLS – STRAY GAS MIGRATION CASES

**McNett Township, Lycoming County - East Resources – NCRO – July 2009:** A natural gas leak from an East Resources Oriskany well was confirmed on July 27, 2009. Methane gas from the well impacted multiple private drinking water wells and two tributaries to Lycoming Creek, forced one resident to evacuate her home, and required the closure of access roads near the well. Company personnel took necessary measures to stop the gas leak at the well and stream and drinking water well conditions improved. The suspected cause of the leak is a casing failure of some sort.  East Resources continues to monitor homes and wells in the effected area (approximately 6000 foot + radius) where methane has been documented and reports to the Department weekly. Methane was evident in some wells and the subsurface.  One gas extraction system was installed at a residence.  The investigation is on-going.  The Northcentral Regional office expects to receive a report regarding the incident from East Resources in approximately 30 days.

**Dimock Migration, Dimock Twp., Susquehanna County - Cabot Oil and Gas – NCRO - 2009:**    The Department is actively monitoring domestic water supplies and investigating potential cause(s) of a significant gas migration that has been documented in several homes along Carter Road.  Free gas has been encountered in six domestic water supplies and dissolved has been found in several of the wells.  The operator has placed pilot water treatment systems on three water supplies.  Of particular note is that this area has not experienced previous drilling and recent gas drilling in the vicinity has targeted the Marcellus Shale.

**Hedgehog Lane, Foster Twp., McKean County – Schriener Oil and Gas – NWRO – April 2009:**  The Department is actively investigating the report of fugitive gas in domestic water well.  Prior to Departmental involvement, the company drilling gas wells in the area provided a new water well to an affected residence.  After stray gas was evident in the water well, apparently the concerned resident approached the company directly, a new water well was provided and the impacted well was plugged with bentonite.  Some time later, neighboring water well became impacted with stray gas and the resident contacted the Department.  During the investigation, four gas wells were discovered over-pressured.  Packers were placed in those over-pressured wells and the wells were brought into regulatory compliance.  At this time, a response in the affected water well has not been observed.  Complaints of water quality degradation and water diminutions are also under investigation in the area.

3

**Little Sandy Creek Migration, McCalmont Twp., Jefferson County – NWRO – April 2008:**  In April, 2008 the Department was informed of a large fugitive expression in Little Sandy Creek.  Subsequent investigation indicated the presence of combustible gas in the basement of a nearby residence.  It was determined that the gas was entering the structure through an un-sealed sump opening in the concrete floor of the basement. The sump was vented through the wall and the threat to the home was minimized. During the investigation the Department discovered that two recently drilled gas wells were over-pressured and were producing from different geologic strata.  Isotopic analysis indicated that a specific gas well was the probable source of the fugitive gas and measures were undertaken to reduce pressure on the casing seat.  After continued monitoring at the residence, it was determined that the amount of gas in the sump was decreasing.  The basement sump remains vented and the problem is dissipating.

**Kushequa Migration, Hamlin Twp., McKean County – NWRO – September 2007:** A stray gas migration caused a change in water quality and a minor explosion in a community water well.  Combustible gas was also encountered in a few private water wells within the village.  The Department investigated the stray gas occurrence in September of 2007 and through an investigation determined that a specific over-pressured gas well was the cause of the migration.  Pressure was released from the potentially responsible gas well and a positive change in the impacted water well was rapidly noted.  Additional production casing was placed in the suspect well to permanently resolve the problem.   The responsible party was recently issued a Consent Order and Civil Assessment which they plan to comply.  The Department issued a well plugging contract to plug 15 orphan wells adjacent to the water wells.

**Alexander Migration, Hickory, Washington County – SWRO**:  It appears the operator affected an old abandoned well when completing a new well in the area.  Stray gas occurs in the soils and contamination exists in private water supplies. DEP is evaluating several wells in the area. The investigation is ongoing.

**Five Mile Run A, Knox Twp., Jefferson County – NWRO – April 2009:**  The Department was made aware that on April 18, 2009 fugitive gas began escaping from a domestic water well.  During the investigation, the Department also encountered combustible gas in neighboring water well.  At this time evidence is being gathered and it is likely that the cause of the fugitive gas migration may be linked to a recently drilled neighboring gas well.  The Department is also investigating three reports of water quality problems that may be associated with the recent gas well drilling in the area.  The fugitive gas in the water well is a recent problem and at this time is not linked to the gas in Five Mile Run that is approximately 2,500 feet away.

**Five Mile Run, Knox Twp., Jefferson County – NWRO – 2008:**  Consistent gas streams have been identified at two locations within Five Mile Run.  Isotopic samples

were obtained in early 2008 and the analysis indicates that the gas is of thermogenic origin. It is unknown when the gas first appeared in the stream. At the time of sampling, only older historic wells (pre-1920's) were in the vicinity. Presently the area is experiencing an increase in drilling activity. The permitted boundary for the Galbraith Gas Storage Field (operated by National Fuel Gas) is located approximately 4000 feet to the closest stream expression of fugitive gas. The source of the gas at this time is unknown.

**Mix Run Migration, Gibson Twp., Cameron County – NWRO – Fall 2007:** In the fall of 2007, the Department continued the investigation of fugitive gas reported in the water well of a seasonal residence. The presence of gas in the water well is sporadic with no apparent trends in its occurrence noted. The area has experienced no recent drilling although historic records indicate Oriskany gas was produced in the vicinity. All wells that could be identified and field verified within one mile of the stray gas location are in regulatory compliance. The closest gas well was plugged and a gas well with potentially compromised casing (approximately 3000' away) was repaired. Gas was not present in the water well at the time of the last inspection in May, 2009.

**Ohl Complaint, Hebron Twp., Potter County – NWRO – June 2007:** The Department responded to a complaint of fugitive gas in a water well that serves a seasonal structure in June, 2007. Isotopic analysis indicated a possible similar thermogenic origin of the gas in the water well to a neighboring gas well. Initial efforts to vent the suspected gas well to atmosphere for an extended time failed to reduce the amount of gas in the neighboring water well. The new well owner placed a down-hole packer and additional production casing in the well. This action did not produce a reduction in the fugitive gas in the water well. The Department continues to investigate the complaint.

**Miller Gas Migration, Liberty Twp, McKean County – NWRO – January 2008:** Departmental personnel responded to a report of fugitive gas in a domestic water well that serves a seasonal residence in January, 2008. Investigation by Departmental field representatives discovered that two recently drilled gas well was over-pressured (exceeding the amount of allowable pressure on the casing seat). The operator Placed packers and additional production casing in the gas well, thereby eliminating pressure on the casing seat. The water well was aggressively pumped and over time the amount of combustible gas in the well bore decreased significantly. The gas well was brought back into production when the amount of gas was below the allowable amount.

**Head Drive Migration, Millcreek Twp., Erie County – NWRO – fall 2007.** In the fall of 2007, the Department initiated an investigation into the report of fugitive gas in the vicinity of several homes along Walnut Creek. The discovery of fugitive gas in the soil near the residences, forced the Erie County Health Dept. to evacuate the neighborhood. The residents were displaced for at least two months. Through the use of isotopic analysis and with a through investigation performed by the Department's field staff, it

was determined that the recently drilled neighboring gas wells were the cause of the migration.  Through a Consent Order with the Department, the responsible party plugged two defective gas wells and placed packers in the remaining gas wells.  The case is presently in private litigation.

**Hughes Migration**, **Hamlin Twp., McKean County – NWRO – June 2006:**  In June, 2006 the Department responded to two water quality/diminution complaints and determined that a change in water quality was evident.  Over-pressured conditions were noted at a recently drilled nearby gas well.  The gas well operator drilled new water wells for the impacted residences and gas was encountered during the drilling process.  Subsequently, when the operator placed additional production casing in the gas well, the Department noted a marked decrease in the amount of gas in the recently drilled water wells.  Over time the problem has diminished.

**Foote Rest Camp Ground Migration. Hamlin Twp., McKean County – NWRO – Late 1990s:**  In the late 1990's, the Department responded to a complaint of gas escaping from an abandoned gas well located in a wooded area near a private campground.  During the investigation, it was discovered that an extremely large amount of gas (estimated at more than 100 Mcf/day) was venting from the abandoned gas well.  The old well became activated when fracing was completed on a new gas well approximately 4000'away.  Installation of production casing placed in the new well prevented additional gas from migrating to the abandoned well and the problem was resolved.

## OPERATING WELLS STRAY GAS MIGRATION CASES

**Harper Migration, Jefferson County – SWRO and NWRO – March 2004**:  An operating gas well. House explosion resulted in three fatalities.  Origin/mechanism of migration: Operating gas well. Pressurization of the annulus on one or more operating gas well(s) was the mechanism of stray gas migration that caused the explosion.  Status: Final agreement pending. . Elements of DEP Compliance Order still outstanding.

**Dayton Investigation, Armstrong County – SWRO - March, 2008**:  Area-wide stray gas migration.  Evacuation of one residence. Newly drilled gas well was over-pressured and communicated with an abandoned gas well and other operating gas wells. Corrective action at the well resolved the problem.

Origin/mechanism of migration: Newly drilled gas well. Pressurization of surface casing resulted in migration. Frac communicated with abandoned gas well and other operating gas wells. Status: Resolved.

**Tin Town Road Migration, Monroe Twp., Clarion County – NWRO – July 2008:**
The Department became aware of fugitive gas migration that resulted in the fatality in
July of 2008.  Apparently, fugitive gas migrated from a very old gas well (drilled early
1900's) through the septic system and entered the bathroom of the residence.  It is
reported that the explosion resulted when the resident attempted to light a candle in the
room.  It is possible that gas migrated from the gas well through casing that over time had
become compromised.  The suspect gas well was vented to atmosphere and the problem
dissipated.  Presently, the well has been plugged by the operator and the case is in private
litigation.

.

**Toy Migration, Armstrong County – SWRO – October 2007**:  Explosion at a water
well enclosure. Well pump was destroyed and damage to enclosure.  No injuries. The
source was a nearby operating gas well. The water well has been properly vented and is
now back in service. The water well quality was affected during drilling and previously
restored by the operator of the gas well. The investigation is ongoing.

Origin/mechanism of migration is a newly drilled gas well. Pressurization of the annulus
on a recently drilled well was the mechanism of stray gas migration. Status: Investigation
is ongoing.

**Wilson Investigation, Armstrong County – SWRO - October, 2007:**  Explosion inside
residence. No injuries or significant damage. Stray gas impacted private water supply
well and entered home through conduit for waterline.  Origin/mechanism of migration
was a newly drilled gas well. Pressurization of the surface casing in newly drilled gas
well.  Status: Resolved

**Montgomery Migration, Hamlin Twp., McKean County – NWRO – July 2007:**  A
domestic water well became impacted by fugitive gas in July, 2007.  With Departmental
involvement, the operator of nearby gas wells initiated a program of pressure testing
suspect wells and it was determined that the casing failed on a specific well.  Apparently,
without a check valve in the production pipeline, the suspect well was feeding pipeline
gas into the gas well.  The gas migrated through the compromised well casing and into
the local aquifer.  The operator plugged the suspect well and problem was resolved.

**Alexander Investigation, Washington County – SWRO - September, 2006:**  Stray gas
migration impacting several private water supplies, and surface soils. Frac in recently
drilled well communicated with abandoned gas well and migrated to shallow
groundwater and surface soils.

7

Origin/mechanism of migration: Operating gas well. Frac communicated with abandoned gas well. Abandoned gas well is constructed with wooden surface casing. Investigation reveals frac at recently drilled well created pathway to abandoned well and further migration into the shallow groundwater system.  Status: Investigation is ongoing.

**703 Liberty Street Migration, Warren County – NWRO – January 2005**:  Gas migrating from an operating gas well resulted in an explosion in the boiler room of the house.  There were no injuries.  Two nearby wells provided house gas to the residence.  The problem well was identified and repaired.  The investigation lasted several months.

**Chestnut Street migration, Washington County – SWRO - May, 2003:**  An operating gas well resulted in fire and caused house explosions, with two injuries and an evacuation. Origin/mechanism of migration is an operating gas well had leak in casing. Status: Resolved. Gas well was repaired; outcome of the civil court case is unknown.

**Unknown name, Armstrong County – SWRO - ~ 1999**:  House explosion, resulting in destruction of residence and one fatality. Investigation is not well documented. Origin/mechanism of migration is an operating gas well. Pressurization of casing.  Status: Resolved

**Vtodian Investigation, Allegheny County – SWRO - January, 1992**:  House explosion, resulting in destruction of residence, one injury and an area-wide evacuation. Origin/mechanism of migration is an operating gas well. Pressurization of the casing was the mechanism of migration of stray gas that caused the explosion.  The well has been repaired.  Status: Resolved

## LEGACY OR ABANDONED WELL CASES

**Hulton Road Migration, Westmoreland County – SWRO - October 2009:**  This incident was first investigated in August of 2004**.**  The stray gas occurs in the soils on private property and in the right of way of Hulton Road.  Origin/mechanism of migration is an abandoned gas well. In 2009 the Department issued a contract to plug the suspected well and install venting..  Plugging the well did not alleviate the stray gas.  The Department let another contract for an additional $10,500 to vent the stay gas..

**128 Lilac Court Migration, Allegheny County – SWRO - June, 2009:**  The stray gas occurs in the soils in a suburban housing development. Currently, the gas is localized in an area in front of a single residence. Origin/mechanism of migration is an abandoned gas well, location and mechanism of migration unknown. Status: Investigation ongoing.

**226 Thompson Run Road Migration, Allegheny County – SWRO - May, 2009**: The stray gas occurs in the soils in the vicinity of a residence. The area has had historical stray gas incidents. Venting systems have been installed at several locations in the area. Origin/mechanism of migration: source of gas is an abandoned gas well.  Its location is unknown. DEP investigation is ongoing.

**Independent Valley News Migration, Allegheny County – SWRO - April, 2009:**  The stray gas occurs in the soils in front of a business. The gas is being vented with a temporary vent system.   Origin/mechanism of migration: source of stray gas is an abandoned gas well.  Its location is known. The well has been placed on the list for plugging/venting.  Status: DEP contractor to properly vent or plug suspect abandoned gas well.

**112 Buss Road Migration, Beaver County – SWRO - March, 2009:**  The stray gas occurs in the soils on private property.  Origin/mechanism of migration: source of gas is an abandoned gas well; its location is known.  Status: The leaking gas well is being evaluated for proper venting/plugging.

**2526 Wexford Bayne Road Migration, Allegheny County – SWRO - March, 2009:**  Stray gas in soils and inside home. Origin/mechanism of migration: abandoned gas well; its location is unknown. Natural gas service was terminated at a residence.  Status: Resolved. The owner installed a venting/alarm system at his own expense.

**Wendt Drive Migration, Allegheny County – SWRO - June, 2009:**  The stray gas occurs in the soils on private property.  Origin/mechanism of migration: source of gas is an abandoned gas well.  Its location is unknown. DEP investigation is ongoing.

**Charleroi Migration, Washington County – SWRO - March, 2009:**  Stray gas encountered in soils in close proximity to business. Origin/mechanism of migration is an abandoned gas well.  The operator of the well refused to accept responsibility for the problem and take corrective actions.  Gas was leaking from the well in the parking lot and was adjacent to the buildings slab foundation.  DEP issued a contract to plug the well and initially vented the well until work on plugging the well could begin. Plugging was recently completed. DEP will pursuing cost recovery from the operator.

9

**Tarentum Migration, Allegheny County – SWRO - March, 2005 to October 2009:** This incident was initially investigated in March, 2005. Thermogenic source from an unknown location resulted in natural gas service to be terminated by the gas utility 3 years ago at 220 W. 7th Avenue. The DEP plugged one abandoned well. This well plugging did not alleviate the stray gas in the 7th avenue area. There was another plugged well nearby, but did not show any signs of a problem. DEP is conducting follow-up work to the plugging contract to vent the area adjacent to the structure. Origin/mechanism of migration: abandoned gas well, location unknown (contracting is awarded and work is about to begin).

**Versailles Migration, Versailles, Allegheny County – SWRO – 2007 through 2008:** The natural gas migration problem in Versailles has been ongoing for many years. During the boom period from 1919 through 1921, over 175 wells were drilled in the Borough of Versailles which was part of the McKeesport Gas Field. Some wells produced little or no gas and were abandoned without casing or plugging the boreholes. Other wells produced for a few years and were also abandoned with out plugging the wells. During World War II, the call for scrap steel resulted in the removal of steel casings and wellheads. The abandoned wells were cover over or otherwise abandoned. Over the years many venting systems have been installed by the property owners, borough or by DEP. In 2007 and 2008, the Department let an emergency contract to rehabilitate a well on the Saraka property for to relieve the natural gas pressure in the area. The DOE's National Energy Technology Laboratory (NETL) conducted an extensive study of the area. The original budget for the study was about $1 million dollars. This case is ongoing.

**Buckner Migration, Washington County – SWRO - December, 2008**: The stray gas occurs in a private water supply well. Origin/mechanism of migration source of gas is an abandoned gas well. Its location is unknown. DEP is conducting an ongoing investigation. The water well has been properly vented. Stray gas was migrating into a residence. DEP discovered pathway into home. Gas appears to be migrating through an abandoned coal mine. Status Immediate danger resolved. Investigation as to specific source is ongoing.

**2228 Private Drive Migration, Fayette County – SWRO - October, 2008**: Stray gas in soils. Origin/mechanism of migration is an abandoned gas well. Its location is unknown. Status: Resolved. This case was resolved by venting gas away from the structure.

**630 Tara Court Migration, Ross Township, Allegheny County – SWRO - September 2008:** The source of gas is an abandoned gas well, probably located under the parking lot of the Ross Park Mall. Gas service was terminated at the house at 630 Tara Court in the adjacent subdivision. The Mall was contacted and they are to provide maps of the parking lot to help locate the abandoned wells. The stray gas problem at Tara Court was

resolved by installing a venting system until the abandoned wells under the parking lot can be located.  The case is ongoing.

**Pottle Migration, Allegheny County – SWRO - October, 2007:** Stray gas discovered in soils at location for new commercial building. Origin/mechanism of migration is an abandoned gas well. Its location is unknown. Status: Resolved. The owners of a commercial building installed a mitigation/alarm system at their expense to resolve the problem.

**1100 McCartney Avenue Migration, Allegheny County – SWRO - February, 2007:** Stray gas along front of commercial business. The source of gas is an abandoned gas well; its location is unknown. The owner of the commercial building installed a mitigation/alarm system at his expense. Natural Gas service restored.

**Sturgeon Migration, Allegheny County – SWRO - September, 2005:** Stray gas in close proximity to several residences. Natural gas service terminated. Origin/mechanism of migration is an abandoned gas well.  Its location is unknown. DEP installed a venting system to mitigate the gas migration problem at two residences.   Status: Resolved. Gas service restored and the occupants returned to their residence.  DEP investigated a well between the two properties; however, it was determined during preparations to plug the well that it was an old water well and not the source of gas.

**Childers Migration, Washington County – SWRO - June, 2005:**  Stray gas has impacted soils area wide on private property. The source of gas is an abandoned gas well; its location is known. A gas well was leaking at the surface. There is a dispute of ownership with the well. The Department suspects the integrity of the well may have been affected by deep mining as the stray gas occurrence coincides with documented mine subsidence in the area.

Origin/mechanism of migration: abandoned gas well. Suspected casing/cement failure possible caused by mine subsidence.   Status: Investigation Ongoing

**Mediate Migration, Westmoreland County – SWRO - November, 2003:**  The stray gas was impacting private residence. Origin/mechanism of migration: source of gas is an abandoned gas well; its location is unknown. Natural gas service to a structure was terminated. Status: DEP funded mitigation system installed. Structure is protected. Natural gas service restored.

**Tanoma Migration, Indiana County – SWRO - July, 2001:**  The stray gas occurs throughout the soils on private property. Origin/mechanism of migration: The origin of

11

the stray gas is likely coalbed/gas well mixture. The situation was resolved through venting. The specific sources have not identified.  Status: Resolved

**McDonald Sr. Care Home Migration, Washington County – SWRO - November 2002:**  Stray gas found inside a Senior Care home, resulted in temporary evacuation. Origin/mechanism of migration is an abandoned gas well.  Its location is unknown. The home was evacuated. The problem was resolved by installation of a mitigation system.

**Paiano Migration, Armstrong County, -SWRO - September, 2002:**  Stray gas inside private water supply well resulted explosion in well enclosure. No injuries. Well was properly vented. Origin/mechanism of migration is an abandoned gas well, location unknown.  Status: Resolved. Water well properly vented. Well not found.

**Bagdad Road Migration,** Waterford Twp., Erie County – NWRO – July 2008: The Department is in the process of investigating a complaint of fugitive gas in a domestic water well received in July of 2008.  All area gas wells are in regulatory compliance and isotopic analysis does not indicate a specific source of the stray thermogenic gas.

**Clarington Migration,** Barnett Twp., Clarion County - NWRO
The Department has been aware of a soil gas seep in a remote area since at least 1987. The source of the gas is unknown, no active gas wells are in the vicinity and a search of historical records failed to indicate any record of oil and gas drilling.  The site near Cherry Run has become a seasonal camping spot and the surface expression of the stray gas migration has been improved with stone fire-ring to serve as a campfire location.

**Groshek Migration, Keating Twp., McKean County – NWRO – 2008.**  In 2008 the Department responded to a complaint of stray gas in a domestic water supply.  The area of the complaint is in an old oil and gas field that was drilled near the turn of the 20th century.  Historic maps were used to attempt to locate nearby abandoned wells.  Without any new drilling activity vicinity, the Department plugged four abandoned wells.  These efforts of find and fix the cause of the migration have been unsuccessful.  A recently discovered gas well has been identified in the field and the well was placed on the department's plugging list.

**Leichtenberger Migration,** Howe Twp., Forest County - NWRO
In June 2005 stray gas was reported to have entered two springs that serve as domestic water supplies.  Located in an area that experienced a long history of oil and gas drilling activity, it was discovered that the migration began near the same time that two gas wells, located more that 3000' away, were fraced.  The new gas wells are in regulatory

compliance and additional measures were taken to prevent a gas migration.  The department has plugged three abandoned gas wells in the vicinity.  All efforts to identify the cause of the migration have been unsuccessful.


**Nicholls Migration, Rome Twp., Bradford County – NCRO – June 2007:**  Complaint received by the Department in June, 2007 of stray gas in a domestic water supply.  Isotopic analysis of the gas indicates that it is of thermogenic origin although it apparently does not match any production gas in nearby gas wells.


**Skinner Migration,** Columbus Twp., Warren County - NWRO
The Department responded to a complaint of stray gas in a domestic water well in June, 2005.  All wells within 6000' were inspected and found to be in regulatory compliance except two gas wells.  Those two wells were brought into compliance with the addition of production casing.  The water supply improved however small amounts of fugitive gas remain in the water well.  An abandoned well discovered by the department during the investigation remains on the State's plugging list.


**Wayland Road Gas Migration, East Mead Twp., Crawford County – NWRO – October 2008:**  The Department continues to investigate a fugitive gas migration expressed in a domestic water well first reported in October, 2008.  No difficulties were reported by the drilling company during construction of nearby gas wells, all gas wells are in regulatory compliance and it is difficult to determine when the problem became apparent.  Isotopic analysis indicates that the fugitive gas is thermogenic in origin although a match to a nearby gas well is not apparent.


**Hetrick Gas Migration, Redbank Twp., Clarion County – NWRO – Spring  2007:**  In the spring of 2007 the Department initiated an investigation into the conditions surrounding the report of fugitive gas in a domestic water well.  Isotopic analysis of the stray gas indicates a thermogenic origin potentially similar to neighboring gas wells.  A legally defensible case against a potentially responsible party could not be demonstrated and the Department eventually provided the resident with an alternative source of water.


**Julie Anne Lane, Summit Twp., Erie County – August 2008:**  In August of 2008 the Department responded to a report of fugitive gas near a private residence.  During the investigation a nearby "plugged" National Fuel Gas well was leaking a very small amount of gas.  Isotopic analysis of soil gas samples obtained by the DEP indicated that the gas was probably of microbial origin and fuel gas was restored to the residence.


**Mainesburg Migration, Sullivan Twp., Tioga County – NWRO – 2004:**  The Department became involved with this larger scale stray gas migration in 2004.  Elevated

levels of fugitive gas were identified in approximately 15 residences.  Through a joint action between the department and Township officials, and with funding through a Growing Greener Grant, treatment systems were placed on those affected water wells.  Three abandoned gas wells were plugged by the Department.

**McCommons Migration, Leidy Twp., Clinton County – NWRO – November 1998:**
In November 1998 the Department responded to a complaint of stray gas in three water supply wells.  Through the course of the investigation it was discovered that because one of the affected water wells was located in the basement of a church, combustible gas migrated from the well and into the indoor air of the structure, causing a significant risk of explosion.  Also discovered was that during a recent resurfacing project on Rt. 144, Penndot paved over an abandoned gas well.  The Department proceeded to remove the recent pavement and plug the abandoned well.  Two of the three impacted water wells returned to normal and a marked improvement in conditions were noted in the third water well.

**Mt. Jewett Municipal Well-field Migration, Hamlin Township, McKean County**:
Three water wells for the municipality of Mt. Jewett were temporarily affected by a stray gas occurrence in 2008.  The migration lasted approximately one week and went away for no apparent reason.  After the event, the department plugged a nearby abandoned gas well.

**Sara Coyne, City of Erie, Erie County – NWRO – April 2008**:  In April of 2008, the department responded to a complaint of gas bubbling in a large body of standing water in a campground near the entrance to Presque Isle State Park.  Soil gas samples obtained for isotopic analysis indicated that the composition of the gas is consistent with shallow shale gas of the area.  Excavation done by the property owner encountered an abandoned gas well approximately 6 feet below ground surface.  The gas well was subsequently plugged.

**Environmental Air Migration,** Pittsburgh, Allegheny County
The source of gas is an abandoned gas well; its location is unknown. Natural gas service was restored following installation of a mitigation system.

**Owens Migration,** Allegheny County
The source of gas is an abandoned gas well; its location is known. A site developer disturbed the well and was required to properly abandon the well.

**Marshall Avenue Migration,** Chartiers, Washington County

14

The source of gas is a possible coalbed/gas well mixture. The area has been properly vented. DEP suspects a gas well was leaking into a mine void.

**Elliot Migration,** Armstrong County
The source of gas is an abandoned gas well; its location is unknown. The case was resolved by properly venting a water well.

## UNDERGROUND STORAGE OF NATURAL GAS CASES

**Tioga Junction Migration, Tioga Twp., Tioga County – NWRO - 2008:**  In January 2001, the Department responded to a report of gas in the soil near two buildings.  Further investigation indicated the presence of a potentially widespread stray gas migration problem.  In 2008, Dominion Transmission and PPL Gas Utilities Corp. initiate a voluntary program to ensure safe source of drinking water for residences near Tioga Storage Field.  288 letters were sent of area homeowners requesting the opportunity to sample individual water supplies.   A large number of residents responded and the extent of the potential stray gas by sampling was delineated.  Water treatment systems were provided, at no cost to the homeowner, to those water supplies that were shown to have been impacted.  The companies and the Department remain in the investigation process.

**Sabinsville Migration, Borough of Sabinsville, Tioga County – NWRO – 2005 ongoing:**  The Department is aware of a fugitive gas migration in the water supplies for several residences in Sabinsville.  Initial sampling occurred in 2005 and elevated levels of methane/ethane were encountered.  The homes are located within the footprint for the Sabinsville Gas Storage Field that is operated by Dominion Transmission Inc.  Isotopic samples have been obtained from the affected water wells and gas wells within the storage field.  The cause of the migration has not been determined.



**Lease Road to English #1 Well**

# Report on the Investigation
# of the Natural Gas Invasion of Aquifers
# in Bainbridge Township
# of Geauga County, Ohio

September 1, 2008
Ohio Department of Natural Resources
Division of Mineral Resources Management



**English #1 Well**

# TABLE OF CONTENTS

Page

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Incident Response Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Investigation Methods. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Regional Geologic Setting and Oil and Gas Exploration . . . . . . . . . . . . . . . . . . . . . . . . .21

Hydro-Geologic Setting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Background Water Quality . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . .25

Cause of Aquifer Natural Gas Invasion and Explosion . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Alternative Explanations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

Correction Action and Remedial Cementing of the English No.1 Well  . . . . . . . . . . . . . . . .52

Risk Assessment/New Permit Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Water Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Next Steps and Recommendations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Summary of Public Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

References . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

## Appendices

Appendix 1 - Ohio Environmental Protection Agency Public Water Standards

Appendix 2 - Oil and Gas Well Permit Conditions

Appendix 3 - Public Communications

# EXECUTIVE SUMMARY

**Incident Response**

On Saturday, December 15, 2007, at 7:30 AM, the Geauga County Emergency Management Agency notified an Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) Inspector that there was an explosion at a house on 17975 English Drive in Bainbridge Township of Geauga County. Two residents in the house at the time of the explosion were not injured, but the house was significantly damaged. The DMRM responded immediately and three DMRM Inspectors were on location on Saturday morning.

The Bainbridge Township Fire Department and Dominion East Ohio personnel canvassed the surrounding neighborhoods to identify houses and water wells with detectable natural gas to ensure prompt evacuation of potentially at-risk residents. Early in the investigation, responders recognized that natural gas was entering homes via water wells. There were a number of possible avenues for natural gas to enter residences via ground water, including: 1) unvented water wells located in basements, 2) abandoned and unplugged water wells in basements, and 3) wells with indoor well pumps. The in-home water wells and abandoned wells were immediately identified as high risk. By the evening of December 15, 2007, 19 homes had been evacuated. Utilities were disconnected for safety reasons. Ohio Valley Energy Systems Corp. (OVESC), the owner of the recently completed English No. 1 oil and gas well, assumed responsibility to coordinate lodging and meal arrangements for all displaced residents.

DMRM Inspectors evaluated local oil and gas wells to identify potential source(s) of the problem. Based upon preliminary information regarding the extent of the natural gas incident, DMRM Inspectors were instructed to focus attention on surface-production casing annular pressures at all oil and gas wells within the investigation area. When DMRM Inspectors arrived at the English No. 1 well, representatives of OVESC and their consultant were already on location evaluating the well and discussing remedial cementing plans. OVESC management elected to take a pre-emptive approach and assume responsibility rather than waiting for completion of the DMRM investigation.

By the end of day one, the Bainbridge Fire Department had evacuated potentially at-risk residents, the DMRM had identified the likely cause of the problem, and OVESC had initiated corrective action.

During the weeks following the explosion, DMRM initiated a monitoring program to 1.) Identify water wells with detectable natural gas, 2.) Define the area where water samples would be collected, 3.) Monitor in-house gas concentrations for protection of public health and safety, and 4.) Measure the response of water wells to the corrective action at the English well. OVESC contractors disconnected 26 water wells, purged gas from domestic plumbing/heater systems, installed vents on six water wells, plugged abandoned in-house water wells, plumbed 26 houses to temporary water supplies, provided 49 in-house methane monitoring systems for homeowner installation, and began to provide bottled drinking water to 48 residences upon request. By December 24, 2007 (Day 9) all residents had been returned to their homes, except for the family whose house was damaged by the explosion.

**Public Safety**

Wall-mounted gas detection equipment provided continuous LEL monitoring at 49 residences.  These gas detectors are designed to monitor explosive gas levels in the ambient air within a home providing continuous digital readings. These systems are programmed to provide audible alarms at 10 percent of the Lower Explosive Limit (LEL) for natural gas, well below the explosive level. If an alarm were triggered, the DMRM advised residents to shut off running water, ventilate the house, and immediately call the Bainbridge Fire Department and the DMRM. The DMRM recommended the following actions in response to LEL measurements within a home.  These action levels do not apply to measurements at the wellhead or measurements at the water tap.

| % LEL Range | Action |
|---|---|
| 1 – 4 | No immediate action necessary |
| 5 – 9 | Increase ventilation, continue to monitor to see if the % LEL continues to rise |
| 10 – 19 | Shut off water; and monitor to see if % LEL continues to rise |
| 20+ | Keep water shut off; increase ventilation; evacuate the premises; call the Fire Department for an inspection (440) 543-9873; notify DMRM at (330) 896-0616 |

The DMRM also coordinated a monitoring program to collect in-house gas readings on a regular schedule. From the time the continuous monitoring systems were installed to September 1, 2008, the DMRM is not aware of a single incident where in-house gas concentrations triggered an alarm. The highest in home reading recorded during the first nine months was 0.8 percent of the LEL. At this level, the concentration of gas in the confined space would need to increase 125-fold in the presence of an ignition source to trigger an explosion. The highest concentration of dissolved methane found in 79 ground water samples was 1.04 mg/L.  At this concentration, the federal Office of Surface Mining recommends periodic monitoring, but no specific action.

**Cause of Natural Gas Invasion of Aquifers**

The primary oil and gas-bearing reservoir in eastern Ohio is the Silurian "Clinton" sandstone. The "Clinton" is a driller's term for a sequence of inter-bedded sandstones, siltstones and shales that range from 60 to 200 feet thick in eastern Ohio. Over 79,000 wells have been drilled to the "Clinton sandstone" in eastern Ohio since 1897. The Clinton is generally 3600 to 3900 feet below surface in Bainbridge Township. Since 1981, the DMRM had issued 131 permits to drill "Clinton" oil and gas wells in Bainbridge Township. All producing wells in Bainbridge Township have been completed in the "Clinton" sandstone.

The DMRM determined that accumulation and confinement of deep, high-pressure gas in the surface-production casing annulus of the English #1 well, between November 13 and December 15, 2007 resulted in over-pressurization of the annulus. This over-pressurized condition resulted in the invasion, or migration, of natural gas from the annulus of the well into natural fractures in the bedrock below the base of the cemented surface casing. This gas migrated

vertically through fractures into the overlying aquifers and discharged, or exited, the aquifers through local water wells.

Three different factors in the drilling and completion of the English #1 well are believed to be the primary contributing factors that led to the gas invasion of the shallow aquifers and subsequent explosion in the house on English Drive. The first contributing factor was inadequate cementing of the production casing prior to remedial cementing on December 15 2007. The second contributing factor was the decision to proceed with stimulating, or hydro-fracturing, the well without addressing the issue of the minimal cement behind the production casing. Hydro-fracturing is the process in which fluid is pumped into the oil and gas reservoir through perforations in the production casing t enhance fractures and improve the flow of gas and/or crude oil into the production casing. Finally, the third and most critical contributing factor leading to the incident was the 31 day period after the fracturing stimulation of the "Clinton" sandstone during which the annular space between the surface and production casings was mostly shut in. This confined the deep, high-pressure gas from "Newburg" and/or "Clinton" within this restricted space. Readings taken and reported by OVESC during this shut in period were consistently 320 psi or greater.

**Corrective Action**
The DMRM evaluated OVESC's remedial cement job at the English No 1 well by reviewing annular pressure measurementsand well construction records including four cement bond logs. Based upon this evaluation, the DMRM concluded that:
1. Inadequate primary cementing of the production casing has been remedied by the subsequent squeeze cementing operations;
2. The deep high-pressure gas zones that were the source of over-pressurization of the aquifers have been isolated and sealed from the well bore through the squeeze cementing procedures;
3. The confinement of annular gas, which caused the build up of pressure, has been eliminated.

Remedial cementing operations completed by OVESC in mid-December, 2007 have effectively isolated and sealed deep, high-pressure gas bearing zones. As a result, natural gas from deep formations can no longer migrate up the surface-production casing annulus of the English #1 Well and migrate into local aquifers. The "Clinton" sandstone and "Newburg" are effectively sealed behind cemented production casing.

Since 1984, when the DMRM established a ground water investigation program, this is the first documented incident where natural gas invaded ground water aquifers as a result of a deficient primary cement job on the production casing. During this same period of time, over 22,000 "Clinton" wells, and nearly 30,000 oil and gas wells have been completed in Ohio.

**Ground Water Impacts**
Ground water is the primary source of drinking water for 98 percent of the population of Geauga County. Approximately 78 percent of the population relies on ground water form domestic wells. In Bainbridge Township, water wells are developed in four aquifers, listed in descending stratigraphic order: 1) glacial sand and gravel deposits 2) sandstones of the

Pennsylvanian Pottsville Group, 3) shales and interbedded sandstones of the Mississippian Cuyahoga Formation, the underlying Mississippian Berea Sandstone.

The deepest water wells in the investigation area are developed in the Berea Sandstone – Bedford Shale sequence that is underlain by the Devonian Ohio Shale. The Ohio Shale is a known natural gas reservoir that is over 1800 feet thick in the vicinity of the investigation area. The occurrence of natural gas in ground water for wells developed in the Berea-Bedford sequence is common in Geauga County.

The DMRM compiled historic records representing "background" ground water quality in Geauga County to compare with water quality data for samples collected after the December 15 incident. Based upon a review of this data the DMRM determined that ground waters in the glacial, Cuyahoga Group and Berea Sandstone aquifers are commonly reducing. Ground water in Geauga County is typically hard and iron and manganese concentrations exceed Secondary Maximum Contaminant Levels (MCLs) in over half of all wells sampled. Secondary MCLs are based on aesthetic considerations such as taste or odor, and are not related to health. Ground water in Geauga County does not typically exceed Primary Maximum Contaminant Levels (MCLs) for VOCs, or secondary MCLs for chloride or Total Dissolved Solids except when anthropogenically affected. Primary MCLs are health based standards for public drinking water supplies. It is common for deep-water wells developed in the Berea- Bedford interval to emit natural gas.

Beginning in mid February 2008, the DMRM coordinated a major sampling initiative, collecting samples at 79 water wells in the investigation area. To evaluate the suitability of ground water for domestic purposes the DMRM compared water quality data to OEPA standards for public drinking water supplies. Ohio EPA has established both Primary and Secondary Maximum Contaminant Levels (MCLs) for public drinking water supplies. Primary MCLs are health-based limits and reflect the highest concentration that is allowable for a selected parameter in raw (untreated) water for a public water supply. Secondary MCL standards address aesthetic considerations such as taste, color and odor, rather than hazards to human health.

Ground water is considered "contaminated" when measured concentrations of induced chemical parameters of interest exceed "background" levels or ranges. Ground water is considered "polluted" when measured concentrations of induced chemical parameters of interest exceed "background" levels or ranges, and exceed maximum concentrations prescribed by regulation.

Based upon a review of the water quality data and other observations, the DMRM has determined that 22 domestic and one public water supply were contaminated by the natural gas charging event caused by the English No. 1 well. The DMRM has also determined that the data indicates that ground water has not been contaminated or polluted by brine, crude oil, or hydro-fracture fluids, which are commonly associated with the oil and gas drilling and well completion process. Furthermore, the data does not indicate that natural gas invasion of local aquifers alterated inorganic water quality, or caused pollution salts or metals.

There was only one exceedance of an OEPA PMCL.  This exceedance was not related to oilfield operations.  Iron and manganese concentrations exceeded OEPA SMCL for approximately 55 percent of the 79 wells sampled.  However, this is not unusual for clastic aquifers in Geauga County and could not be correlated with natural gas presence or concentration.

**New Permit Conditions**

On January 18, 2008, the DMRM announced implementation of new permit conditions through broad areas of northeastern Ohio.  The new conditions were designed to address the full-range of conditions that can create over-pressurized conditions in the surface-production casing annulus.  On January 29, 2008, the DMRM attended  meetings sponsored by the Ohio Oil and Gas Association to explain the new permit conditions to northeast Ohio oil and gas producers.  On February 6, 2008, the DMRM notified all permittees (33) in a seven-county area of northeastern Ohio, that the new conditions were being applied retroactively.

# INCIDENT RESPONSE SUMMARY

On Saturday, December 15, 2007, at 7:30 AM, the Geauga County Emergency Management Agency notified an Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) Inspector that there was an explosion at a house on 17975 English Drive in Bainbridge Township of Geauga County. Geauga County is in northeastern Ohio, southeast of Cleveland (figure 1). Figure 2 shows the location of the property with the natural gas explosion. Two residents in the house at the time of the explosion were not injured, but the house was significantly damaged. The DMRM Columbus office was notified at 9:45 AM on December 15 regarding the explosion at a house in Bainbridge Township. By 11:00 AM on December 15, three DMRM Inspectors were on location in Bainbridge Township. A fourth Mineral Resource Inspector provided remote support, relaying water well record information to on-site personnel through a web-search of the ODNR Division of Water database.

When the DMRM Inspectors arrived on location, three-man teams consisting of Bainbridge Township Fire Department and Dominion East Ohio personnel were canvassing the neighborhoods to identify houses and water wells with detectable natural gas to ensure prompt evacuation of potentially at-risk residents. Early in the investigation, responders recognized that natural gas was entering homes via water wells. There were a number of possible avenues for natural gas to enter residences via ground water, including: 1) unvented water wells located in basements, 2) abandoned and unplugged water wells in basements, and 3) wells with indoor well pumps. The in-home water wells and abandoned wells were immediately identified as high risk.

During the first day of the incident response, the location of gas measurement sites, and the natural gas concentration measurements were not recorded or were poorly documented. Therefore, it is not clear which residents were evacuated for potentially dangerous levels of methane within homes, versus residents evacuated due to detection of natural gas in outdoor water wells. However, the Bainbridge Fire Department responded decisively and ordered some of the displaced residents to evacuate. Other residents understandably elected to leave when their water or utilities were shut off. By the evening of December 15, 2007, 19 homes had been evacuated. Utilities were disconnected for safety reasons. Ohio Valley Energy Systems Corp. (OVESC) assumed responsibility to coordinate lodging and meal arrangements for all displaced residents. Figure 3 shows the location of the explosion and evacuated residences.

DMRM Inspectors evaluated local oil and gas wells to identify potential source(s) of the problem. The DMRM began evaluation of all oil and gas wells within one mile of the Bainbridge Fire Department public water supply well, the first water well where the increase in natural gas concentrations was noticed. Based upon preliminary information regarding the extent of the natural gas incident, DMRM Inspectors were instructed to focus attention on surface-production casing annular pressures at all oil and gas wells within the investigation area.

When DMRM Inspectors arrived on location at the English No. 1 well, representatives of Ohio Valley Energy Systems Corporation (OVESC) and their consultant were already on location evaluating the well and discussing corrective action plans. OVESC management elected to take a pre-emptive approach and assume responsibility rather than waiting for completion of the DMRM investigation.

When DMRM Inspectors arrived on location, OVESC was venting gas from the English No. 1 well surface-production casing annulus and preparing to conduct a cement "squeeze job" to seal natural gas in uncemented formations in the well-production casing annulus. The first squeeze job was completed on December 15, 2007. DMRM inspectors witnessed and documented the cement squeeze job.

By the end of day one, the Bainbridge Fire Department had evacuated potentially at-risk residents, the DMRM had identified the likely cause of the problem, and OVESC had initiated corrective action. OVESC elected to complete a second squeeze job on December 17, 2007.

The DMRM continued to evaluate other oil and gas wells and other potential sources of gas to ensure that all sources were identified. DMRM geologists were directed to compile area well records and begin assessment of other plausible explanations for the incident including:

1)  Presence of unplugged orphan wells;
2)  Improperly plugged oil and gas wells;
3)  Seismic event releasing natural gas from the Ohio Shale into the overlying aquifers;
4)  Annular over-pressurization at other oil and gas wells; and
5)  Natural occurrence.

DMRM Inspectors continued to monitor affected water wells and inspect area oil and gas wells. The DMRM required the Peninsula Group to plumb the open annulus of the Davis #1 well to their production tank as a preventive measure in case pressure communication with the nearby English No. 1 well caused flow of annular fluids to surface. While the annulus of the Davis #1 well did not flow, this proactive step effectively addressed any risk of brine or crude oil entering a tributary of the Chagrin River.

During the first week following the explosion, DMRM initiated a monitoring program to 1.) Identify water wells with detectable natural gas, 2.) Define the area where water samples would be collected, 3.) Monitor in-house gas concentrations for protection of public health and safety, and 4.) Measure the response of water wells to the corrective action at the English well. OVESC contractors disconnected water wells, purged gas from domestic plumbing/heater systems, installed vents on water wells, plumbed houses to temporary water supplies, installed in-house methane monitoring systems and began to provide bottled drinking water to residents upon request.

A total of 26 domestic water wells were disconnected between December 17 and 22, 2007 (Figure 4). OVESC installed 1500-gallon storage tanks as temporary water supplies at all homes where water wells had been disconnected. As of July 2008, 14 residents remain on temporary water storage systems provided by OVESC. OVESC installed vent systems on six water wells and sealed two unused in-home wells. OVESC began to deliver bottled water to affected residents, whose water had been shut off, on Saturday, December 15, 2007, the day the explosion was reported. As evacuated residents returned to their homes, OVESC provided bottled water to all residents who were now on temporary storage tank water systems. Over time, OVESC began to provide bottled water for concerned residents who continued to use their

wells for domestic purposes, but were concerned with the safety of their well water. Figure 5 shows the location of the 48 residents that received bottled water during some phase of the investigation.

Beginning on December 19, 2007 OVESC began to provide in-home gas detectors for area residents who had been evacuated by the Bainbridge Township Fire Department. They also provided gas detectors to area residents upon request. Gas detection systems were provided to a total of 49 residents (figure 6). These units are set to provide audible alarms if concentrations of gas exceed ten percent of the Lower Explosive Limit (LEL).

By Wednesday, December 19, 2007, only one home continued to test positive for the presence of non-explosive concentrations of natural gas (17938 English Drive). The Bainbridge Fire Department authorized re-occupation of all evacuated homes. Utility services were restored. Six families elected to remain out of their homes until Saturday, December 22, 2007. By December 24, 2007 (Day 9) all residents had been returned to their homes, except for the family whose house was damaged by the explosion.

Early in the investigation, the DMRM identified three water wells near the Scotland-English Drive intersection, that when pumped, emitted significant volumes of gas (figure7). DMRM geologists determined that pumping these wells could be useful to reduce the volume of gas in the aquifers and minimize gas migration with the permission of these home owners, these water wells were pumped periodically and ground water was discharged to surface.

The DMRM identified the holder of all active (undrilled) oil and gas well permits in Bainbridge Township and requested a voluntary delay in drilling activity until risk factors and causation had been established and protective permit conditions were finalized. The permittee agreed to temporarily suspend plans to drill.

On January 18, 2008, the DMRM announced implementation of new permit conditions through broad areas of northeastern Ohio. The new conditions were designed to address the full-range of conditions that can create over-pressurized conditions in the surface-production casing annulus. On January 29, 2008, the DMRM attended OOGA sponsored meetings to explain the new permit conditions to northeast Ohio oil and gas producers.

On January 29, 2008, the DMRM released a letter to local residents in the investigation area and the Bainbridge Township Trustees. The letter announced that:

1) DMRM had completed its preliminary investigation;
2) The English No. 1 Well had been identified as the likely source of natural gas in the local aquifers;
3) Alternative explanations had been evaluated and dismissed;
4) DMRM believed that the source of natural gas had been identified and eliminated, but would continue to evaluate area oil and gas wells;
5) DMRM was implementing new permit conditions that were designed to prevent similar events from occurring in Bainbridge Township, as well as broadly defined areas of northeastern Ohio.

The DMRM further committed to the following:

1) Continue monitoring for the presence of natural gas in local water wells and homes, until confident that the gas had effectively dissipated and no longer posed a threat to public health and safety.

2) Implement a comprehensive water quality-testing program to thoroughly evaluate whether there were indications of affectment by natural gas and/or contamination by oilfield brine, crude oil, and/or fluids used in the hydro-fracture operation at the English No. 1 well.

3) Continue to evaluate the effectiveness of remedial cementing to seal and isolate deep, high-pressure gas bearing zones in the annulus of the English well.

4) Complete a full report regarding the incident when all water quality monitoring and testing was finished.

5) Work with OVESC until all affected residents had been safely reconnected to properly disinfected domestic water supplies.

6) Refer reported health issues to the Ohio Department of Health for evaluation.

The DMRM cautioned that it could not predict how long it would take for gas to dissipate, and to complete monitoring of local domestic water wells. The DMRM has completed its investigation, consistent with the commitments listed above. The attached report reflects the final findings, conclusions, and recommendations of the DMRM.

# INVESTIGATION METHODS

## Emergency Response

On the morning of December 15, 2007, in response to an explosion inside a house at 17975 English Drive, representatives from Dominion East Ohio and the Bainbridge Township Fire Department formed teams to canvass the neighborhood.  The teams used portable gas detection equipment to measure gas concentrations inside homes and/or at water wells, and where gas was detected, advised residents to evacuate their homes.  The teams quickly assessed the possibility of additional explosions on English Drive, Scotland Drive, Kenston Lake Drive, Kingswood Drive, and segments of Bainbridge Road.  Certain homes had natural gas and electric services disconnected in an attempt to eliminate ignition sources.  This initial emergency survey was completed very quickly in order to protect residents.  At this time, the source of the explosive gas was unknown.  Time was critical and as a result, neither the specific location nor concentration of natural gas measurement were consistently documented.

By late morning, the likely source of the natural gas was identified and measures were initiated to terminate the continued flow of gas from the surface-production casing annulus of the English No. 1 well.  In the days immediately following this incident, the Bainbridge Fire Department continued to monitor homes and respond to calls.

## Oil and Gas Well Inspections

DMRM Inspectors queried the oil and gas well database (RBDMS) to identify oil and gas wells in the immediate area (Figure8).  DMRM Inspectors focused on five wells that were located within a one-mile radius of the explosion, as summarized in the following table.  Figure 7 shows the location of the oil and gas wells within one-mile of the property at 17975 English Drive.  Table 1 summarizes ownership, identification and completion date of the five wells.

### Table 1:  Oil and Gas Wells within a One-Mile Radius of the Explosion

| Owner | Lease Name | Permit No. | Completion Date |
|---|---|---|---|
| Range Resources, Inc. | Campane 1 | 480 | December 1984 |
| Range Resources, Inc. | Mayer-Campane | 482 | January 1985 |
| Summit Petroleum, Inc. | Weber 1 | 1811 | September 2005 |
| Transcontinental | Szumilak 1 | 1946 | October 2007 |
| Ohio Valley Energy | English 1 | 1983 | November 2007 |

On December 15, 2007, DMRM Inspectors contacted and met with oil and gas well owner representatives, including Transcontinental Oil and Gas, Inc., Range Resources, Inc. and Summit Petroleum. Representatives of OVESC were already on location at the recently drilled English no.1 well when DMRM Inspectors arrived. The English No.1 well had not been placed in production.  When DMRM Inspectors arrived on location, the surface-production casing annulus was open and venting gas. DMRM Inspectors and owner representatives of the other

four producing oil and gas wells examined the wellhead conditions to determine whether the valves on the surface – production casing annuli of these oil and gas wells were open or closed, and whether gas was venting from the annuli in significant volumes or apparent pressures. Inspectors reviewed well construction records, as well as compliance and production histories.

**Surface-Production Casing Annular Pressure Measurements– Fluid Level Measurement**

The DMRM reviewed well construction, completion, production and compliance records for each oil and gas well within the one-mile radius looking for possible problems that have the potential to cause high-pressure natural gas leaks.  High-pressure gas leaks may occur at the wellhead or in very rare instances, natural gas can escape through cemented production casing and enter into the annular space between the surface and production casing strings. If the annulus is confined (annular valve is closed and there is no pressure relief valve), and the gas pressure in the annulus exceeds the hydrostatic pressure outside the cemented surface casing, and there are permeable pathways at the surface casing-shoe, gas can migrate, into overlying aquifers.  This process is known as annular over-pressurization  (Harrison, S., 1983).

The DMRM continued to evaluate all five oil and gas wells within the one-mile radius as possible contributing sources of gas.  Several test methods were used to evaluate each well. Beginning on January 25, 2008, for approximately one week, the DMRM required each owner to shut in the surface- production casing annulus. All five oil and gas wells were fitted with pressure gauges to measure annular pressures. Properly functioning pressure relief valves were installed to prevent build up of excessive pressure during the brief monitoring period.  Pressure relief valves are designed to release gas when pressures reach specified relief points.  In this monitoring event, pressure relief valves were set at approximately 25 psi.  A 50 psi pressure relief valve was installed on the English No. 1 well.  It is common in northeastern Ohio for small volumes of low-pressure shale gas to accumulate in the un-cemented surface-production casing annulus. Shale gas pressure is typically less than 60 psi.  The DMRM was seeking to determine if gas migrating through the channelized cement in the surface-production casing annulus of the English No. 1 well after completion of remedial cementing operations on December 15 and 17, 2007, had pressures indicative of leakage from deep high pressure formations, or pressures indicative of shale gas. A DMRM Inspector monitored pressure readings.

As part of the evaluation of fluid pressures in the surface-production casing annuli, the DMRM also attempted to measure the annular fluid levels at Transcontinental Oil and Gas, Inc's. oil and gas well (Permit # 2-1946) using an Echo-meter .  The echo-meter is a precision instrument used for determining the depth of the fluid level in the oil and gas well surface casing/production casing annulus. The principal of echo-meter operation involves the generation of a pressure pulse from the wellhead attachment that is connected to the surface casing/production casing annulus valve. When the pressure is released from the echo-meter, a pulse travels down the annulus of the oil and gas well and is reflected back by collars on the production casing, fluids, and other obstructions.

A microphone in the echo-meter wellhead attachment converts the pressure pulses into electric pulses, which are amplified, filtered, and recorded on a strip of chart paper (Echo-meter Company, 1985). The chart paper then shows the number of casing collars to the liquid level and the depth is determined by multiplying the number of casing collars by their average length.

**English Well Construction/Completion Records Review**

In order to develop a more complete understanding of the English No. 1 well, the DMRM requested and reviewed records regarding well construction and completion of the English No.1 well. These included: the geolograph, daily drilling reports, invoices, job logs, employee field notes, and bond and temperature logs. Owner/operators are not required to submit these records by Ohio Oil and Gas Law. In addition DMRM staff interviewed oil and gas industry personnel who were on location during various phases of drilling and well completion operations.

**Natural Gas Monitoring**

DMRM field staff members are equipped with intrinsically safe explosive gas monitors. DMRM Inspectors are trained to use the portable gas meters in accordance with manufacturer instructions.  Each gas monitor is calibrated for methane, the most common chemical constituent of natural gas.  Field calibrations and checks are completed each time the instrument is activated. Methane concentrations were measured by the DMRM using a Biosystems PhD lite Multi Gas Detector. Ohio Valley Energy Systems Corporation and the Bainbridge Fire Department used a Sensit Gold meter.  All meters were calibrated per manufacturers' recommendations and standards.  The meters used by DMRM have sensors installed to measure oxygen and H2S concentrations, as well as the percent LEL.  The lowest reading that the PhD lite will register is an LEL of 1 percent or 500 ppm.

The monitoring program was established and has been maintained for the primary purposes of: 1.)  ensuring public safety while gases continue to exsolve from the ground water aquifers, 2.) delineating the area where ground water samples would be collected for laboratory analysis, and 3.) monitoring the effects of the remedial cementing of the English No. 1 well.  Gas readings are measured as a percent of the lower explosive limit (LEL).  The LEL is the lowest concentration of gas in air that can result in an explosion if an ignition source is present.  The LEL for methane is 5% by volume, or 50,000 parts per million (ppm).  When this concentration is reached, gas-monitoring equipment will display a 100% LEL value.

Table 2 compares LEL percentages to percent by volume and parts per million in the atmosphere.

**Table 2:  Example of Methane Gas Readings:**

| % LEL | % Volume | ppm (part per million) |
|---|---|---|
| 100 | 5 | 50,000 |
| 50 | 2.5 | 25,000 |
| 20 | 1 | 10,000 |
| 10 | .5 | 5,000 |
| 1 | .05 | 500 |
|  |  |  |

On December 29, 2007, DMRM, OVESC, and the Bainbridge Fire Department began a coordinated monitoring program. Gas was monitored at either the water well casing or a combination of the hot and cold water taps and the living space of each home in the investigation area. On February 24, 2008, the monitoring plan was expanded to 84 homes (figure 9). The 84 homes included homes with known gas readings and a buffer area that included of at least 3 homes beyond the last home with a water supply where natural gas had been detected. Over the ensuing weeks, the monitoring schedule was modified, eliminating homes with consistent zero methane readings. The monitoring frequency was also reduced for certain homes at home-owner request.

**Monitoring Locations**

When DMRM representatives visit a home, they typically pump the well to reduce hydrostatic pressure and monitor methane concentrations as the well is pumped. When a well is pumped and the height of the column of water declines, water pressure is reduced, and natural gas that was not apparent before, may be released. The DMRM approach was intended to increase the likelihood of obtaining a positive detection. After pumping the well, the DMRM collects LEL readings at the following potential gas emission locations when they are made available by the landowner:

a. Water Well Head: The LEL meter tip is inserted into the well casing or vent to record the highest reading. This measurement was taken to identify the presence of natural gas in a water well and to identify the area where indoor monitoring and sampling should occur. These readings are essentially a screening tool and are not intended to indicate the risk of an indoor explosion.

b. Cold Water Tap: At the kitchen sink, the cold water tap is opened after closing the drain the LEL meter tip is placed next to the faucet to obtain a reading. The tip is then moved inside the sink (without touching the water) to obtain and record the highest reading. Running tap water is intended to allow dissolved gas to exsolve (come out of solution as gas bubbles). By placing the tip of the gas detector at the surface of the water next to the running water, the potential to detect natural gas is maximized. This is essentially a screening process to determine whether gas should be monitored in the room.

c. Hot Water Tap: The LEL meter tip is placed next to the faucet at the kitchen sink. The hot water tap after closing the drain to obtain a reading. The tip is then moved inside the sink (without touching the water) to obtain and record the highest reading.

d. Inside the Home: The LEL meter is operating before entering the home. Air is monitored during the sampling of other locations. Any positive readings in the air of the home are recorded. For the purpose of protecting public safety the most important step in the monitoring process was measuring gas concentrations within the rooms where gas could be exsolving. During each home visit, the DMRM measured gas concentrations within the rooms as a percent of the LEL.

**Response to Natural Gas in a Home:**

The DMRM recommended the following actions in response to LEL measurements within a home (Table 3). These action levels do not apply to measurements at the wellhead or measurements at the water tap.

**Table 3:  Recommended Action Levels**

| % LEL Range | Action |
|---|---|
| 1 – 4 | No immediate action necessary |
| 5 – 9 | Increase ventilation, continue to monitor to see if the % LEL continues to rise |
| 10 – 19 | Shut off water; and monitor to see if % LEL continues to rise |
| 20+ | Keep water shut off;  increase ventilation; evacuate the premises; call the Fire Department for an inspection (440) 543-9873; notify DMRM at (330) 896-0616 |

**Continuous In-House Monitoring**

Continuous LEL monitoring is also accomplished with wall-mounted portable gas detection equipment. OVESC ultimately purchased and distributed 49 gas detectors to area residents.  These gas detectors are designed to monitor explosive gas levels in the ambient air within a home.  Alarms provide residents with continuous digital readings and are programmed to provide audible alarms at 10 percent of the LEL, well below the explosive level. If an alarm were triggered, the DMRM advised residents to shut off running water, ventilate the house, and immediately call the Bainbridge Fire Department and the DMRM.

**Water Well Logs**

Water well logs play a critical role in any ground water investigation. Although water well drilling reports are required by law, compliance is often poor. The DMRM compiled and reviewed all publicly available well logs within the investigation area. The DMRM began to compile and review water well logs on December 15, 2007.  DMRM Geologists and Inspectors conducted on-line and hard copy file searches for records maintained by the ODNR Division of Water, the Geauga County Health District, and the Ohio EPA.  These logs are particularly useful for evaluations of local geology and hydrology.  This information is combined with other geologic data to create geologic cross-sections.  It is sometimes possible to use this information to predict aquifer contaminant pathways.

Once all available records were compiled, the DMRM initiated site reconnaissance to match well logs with their associated parcel.  Home addresses and ownership were verified and correlated with historic water well logs.  DMRM staff also measured GPS coordinates of key water wells to determine spatial relationships used in the preparation of various maps and geologic cross-sections.

**Field Water Well Construction Evaluations**

The DMRM determined that many wells did not have available well logs. In the absence of water well log data, key wells are evaluated to gain geologic and hydrologic information.  The DMRM measured casing depths and total depth using Solinist Instruments. Homeowners were also interviewed to gain water well construction information for properties where water well logs could not be located.

**Water Level Measurements**

Water level measurements were collected and used in conjunction with water level data reported on well logs. These measurements are used to estimate hydraulic head to evaluate localized ground water flow directions. This information may also be used to estimate ground water contaminate flow directions. The data may also be used to correlate water well construction information with aquifer production zones.

**Down-Hole Video Camera Surveys**

The DMRM used a Marks Products Inc. Geovision Jr. M3 Color Downhole Video Camera at selected water wells. This downhole video camera is approximately two inches in diameter and is capable of being lowered into a well to a depth of 650 feet. The camera can be lowered into most water wells that are constructed using standard five-inch or greater well casings. This camera gives the DMRM the ability to observe down-hole wellbore and submersible pump conditions, geologic features, water flow, post pumping recharge and depths of natural gas entry into the wellbore.

**Water Well Sampling-Reconnaissance**

Water well sampling is routinely accomplished in several phases. The first phase is a reconnaissance round. DMRM staff use selected chemical parameters as possible indicators of inorganic oilfield waste contamination. Brine, which is predominantly sodium chloride, is the most common oilfield waste.

The DMRM collected a limited number of water samples from area water wells as a means to define an impact area. This limited sampling began on December 17, 2007. Sampling was expanded to include 11 homes between January 22 and 26, 2008. The DMRM selected water wells that were developed in different aquifers (figure 10).

**Water Well Sampling-Comprehensive**

A large-scale sampling event was scheduled and included an expanded parameter list. Seventy-nine water supplies were sampled between February 19 and March 25, 2008 (figure 11). The DMRM designed a comprehensive sampling and analysis plan to evaluate possible water chemistry changes related to the natural gas charging event. The sampling and analysis plan was designed to evaluate the presence and concentration of the following:

1. Dissolved natural gas constituents (methane, ethane, N-butane, and isobutane)
2. Volatile organic compounds (VOCs)
3. Inorganic parameters
4. Hydro-fracture fluid additives.
5. Physical parameters

Volatile organic compounds are water-soluble compounds that may be naturally occurring or man-made. Crude oil is a complex blend of hydrocarbons. The lightest, most water-soluble, and most mobile hydrocarbon components of crude oil are VOCs. While the DMRM had not seen any evidence suggesting that crude oil had entered ground water in the investigation area, a small volume of crude oil circulated to surface during the hydro-fracture operation at the English No. 1 well.

Furthermore, the black organic shales of the Ohio Shale Formation that underlie the Berea Sandstone aquifer are kerogen-rich and can contain crude oil. The DMRM tested ground water for VOCs to determine if natural gas migrating through fractures in the shale could have "transported" crude oil upward into the overlying aquifers.

The DMRM selected a set of inorganic parameters that would be useful in evaluating the presence of brine. The DMRM was interested in evaluating whether natural gas migrating through fractures in the Ohio Shale Formation could "transport" brackish, connate waters into the overlying aquifers resulting in increased salinity and hardness. The DMRM also selected inorganic parameters to evaluate whether natural gas migrating through the aquifer had altered ground water chemistry.

The DMRM also had ground water samples analyzed for select components of the hydro-fracture fluid used at the English No. 1 well. Information from material safety data sheets (MSDS) was reviewed for drilling and hydro-fracture operations.
Selected components include ethanol, ethylene glycol, and isopropyl alcohol.

**Pre- Site Meeting**
On February 19, 2008, the DMRM Regional Supervisor met with teams that had gathered to initiate the primary water-sampling event. Representatives from DMRM, Biosolutions LLC (hired by OVESC), Hull and Associates (representing OVESC), Coshocton Environmental Laboratory (representing the Law firm of Thraser, Dinsmore & Dolan), and the Geauga County General Health District were present. The DMRM lead a discussion regarding sampling methodologies, including pump times, collection methods, containers, and preservation. No objections were stated and all present agreed the methods, parameters, and practices being utilized were acceptable.

**Sample Collection**
OVESC contracted Biosolutions LLC to coordinate and collect ground water samples for 79 sites selected by DMRM. Water samples were collected before any filtration or treatment systems in order to analyze samples that are representative of the aquifer or aquifers. At each site, saturated wellbore volumes were calculated, and water wells were pumped to purge at least three borehole volumes prior to collection of a sample. Biosolutions LLC collected six types of grab samples at each of the 79 sites. The sample types included: filtered and preserved, non-filtered preserved, non-filtered and non-preserved, VOCs, frac fluid components, and dissolved gases. The Geauga County Health District collected the total coliform bacteria sample after the other grab samples were collected to avoid cross contamination by either bleach or alcohol used to disinfect the sampling port.

**Grab Samples**
Grab samples were collected sequentially and provided to Hull and Associates, BioSolutions, Inc., and DMRM. Coshocton Environmental Testing Laboratory personnel and Bill Wendell from the Geauga County Health District also participated in the sampling process.

**Sample Containers and Preservatives**

Following established sampling protocol, VOCs and dissolved gas samples were collected in 40-ml glass vials with a PTFE-lined septum and an open top screw cap. Containers were filled in such a manner that no air bubbles were present in the sample. VOC samples were preserved with sorbic and hydrochloric acid.

Inorganic anion samples were collected in one-liter cubitainers that were neither filtered nor preserved. Metal samples were collected in 250 ml. containers. One sample was non-filtered and preserved, the second was filtered using a 0.45-micron filter apparatus and a syringe, and preserved. Samples were preserved with nitric acid and placed on ice from the time of collection until receipt by the laboratory.

**Sample Documentation**

Sample collection, storage, and analysis descriptions were documented on the chain-of-custody forms. The original forms were sent to the laboratory with the samples and copies of the forms were kept by staff. A laboratory logbook is used to record all comments and observations associated with each water sample.

**Laboratory Analysis**

BioSolutions Inc. coordinated delivery of samples to the appropriate laboratory based on parameter group (Table 4). Samples were handled, stored, and shipped in accordance with applicable EPA guidelines. The following table lists the testing laboratories by parameter group. All laboratories are EPA certified for tested parameters. (There is no EPA certification for the dissolved gases.)

**Table 4:  Testing Laboratory by Parameter Group**

| Parameter Group | Testing Laboratory |
|---|---|
| Dissolved Gases | CWM, PA |
| VOCs | Brookside, New Knoxville, OH |
| Metals | Biosolutions, Chagrin Falls, OH |
| Inorganic Anion | Biosolutions, Chagrin Falls, OH |
| Frac Components | Test America, Dayton, OH |

Water samples were analyzed for VOCs (EPA method 524.2), metals (EPA methods 200.7 and/or Standard Methods SM312OB, SM3111B, SM3111D), inorganic anions (EPA methods 150.1, 300.0, and/or SM3111B, SM2320B, SM2450C, SM2340B, SM4110B, and SM4500-C1-D), frac fluids (SW8105M) and for the dissolved gases methane, ethane, N-Butane, and Isobutane (ATSM Method D1945 R&D).

**Water Quality Reports**

The DMRM received the final analytical reports for the major sampling event in late April 2008. As analytical results were received, the DMRM reviewed the reports for completeness and accuracy. The results were compiled, tabulated, categorized and compared to the Primary Maximum Contaminant Levels (PMCLs) Standards and the Secondary Maximum

Contaminant Levels (SMCLs) established by the USEPA Safe Drinking Water Act (SDWA). The majority of the chemical letters were prepared and sent to homeowners by May 2, 2008. Some chemical letters were sent after additional sampling was performed.  The remaining were sent to the homeowners by June 6, 2008.  The letters provided the homeowners with a summary of the test results including the parameters that exceeded the PMCL and/or the SMCL Standards.

**Background Water Quality Assessment**

In order to evaluate the possible changes in ground water quality in the Bainbridge Township investigation area, the DMRM conducted a literature search and reviewed Ohio EPA's ambient water quality data files for the public water supply wells in Geauga County. The DMRM used background data to establish baselines and ranges in the quality of ground water prior to the December 2007 incident. The DMRM field staff interviewed citizens within the investigation area regarding observed changes in water quality since December 2007, and their experience with their domestic water supplies prior to December 2007.  During the February-March sampling event, the DMRM selected six control sites to compare water quality results outside of the investigation area with ground water samples collected from wells within the DMRM defined investigation area.  Control points are selected because they lie outside of the impact area and/or have data that precedes oil and gas well development.

## REGIONAL GEOLOGIC SETTING AND OIL AND GAS EXPLORATION

Geauga County lies on the western edge of the Appalachian Basin in northeastern Ohio. Sedimentary rocks in eastern Ohio dip and thicken in an east-southeasterly direction toward the axis of the basin. The Appalachian basin contains significant oil and gas resources that have been explored and developed in a nine state area beginning over 150 years ago.

The sedimentary rocks in eastern Ohio are relatively un-deformed, and there are few significant faults or structural features superimposed on the strata as it dips into the basin. There is occasional seismic activity in the Geauga County area. Based upon a gravity survey, Baranowski (2002) infers the presence of a fault in Pre-Cambrian metamorphic and igneous rocks that trends north northeastward through western Geauga County. Based upon a structural contour map of the top of the Onondaga Limestone, there appears to be a local structural anomaly in Bainbridge Township indicating local folding or faulting. Geologic interpretation of open-hole wire line logs from an offset oil and gas well (permit 2-1946) also indicates fracturing in deeper formations including the Onondaga Limestone, Lockport Dolomite and "Packer Shell." Down-hole video camera pictures taken by the Division of Mineral Resources Management (DMRM) in nearby water wells show natural fracturing immediately above the Berea Sandstone in the Cuyahoga Formation

The primary oil and gas-bearing reservoir in eastern Ohio is the Silurian "Clinton" sandstone. The "Clinton" is a driller's term for a sequence of inter-bedded sandstones, siltstones and shales that range from 60 to 200 feet thick in eastern Ohio. Over 79,000 wells have been drilled to the "Clinton sandstone" in eastern Ohio since 1897.

In Geauga County, the "Clinton" sandstone is the primary commercial oil and gas-producing reservoir. Since 1981, 132 permits have been issued to drill Clinton gas wells in Bainbridge Township. Of these, 82 are producing, 25 were drilled, produced and have been plugged, and 22 were permitted but not drilled. Those permits have expired. The English #1 well has been drilled and is currently shut-in. The "Clinton" is generally 3600 to 3900 feet below surface in Bainbridge Township.

When drilling to the "Clinton" sandstone in Bainbridge Township, contractors first drill through unconsolidated glacial deposits that generally range from 10 to over 60 feet thick. Figure 12 is a general schematic showing typical construction of a "Clinton" well in northwestern Ohio. In areas where glacial deposits exceed 20 feet in thickness, operators typically install 10-3/4 inch diameter conductor pipe through the deposits in order to prevent collapse of unconsolidated sediments during the remainder of the drilling operation. Contractors then drill through a sequence of Pennsylvanian and Mississippian aged sandstones and shales, including in descending order the Sharon Conglomerate, Cuyahoga Formation, and the Berea Sandstone that provide fresh groundwater resources. The Berea Sandstone is the deepest underground source of potable water in the area. Water wells provide drinking water to homes and businesses either from individual private or public water wells, or local community water well fields.

Water well drillers and well owners have noted occasional shows of low-pressure naturally occurring natural gas in some of the Berea Sandstone water wells in Geauga County before December 2007.

The likely source of this nuisance gas is the Ohio Shale that underlies the Berea. Operators are required to set 8-5/8 inch surface casing at least 50 feet through the base of the Berea Sandstone and cement the casing to surface to seal and protect the freshwater aquifers prior to drilling deeper.

Below the Berea Sandstone, operators drill through the Devonian age Ohio Shale Formation. The Ohio Shale is a natural gas reservoir that is over 1800 feet thick in Bainbridge Township. According to Gray (1982), The Devonian shale in northeastern Ohio has been drilled for natural gas since the late 1800's on a noncommercial (domestic) basis. Published reports by the U.S.D.O.E. and the ODNR Division of Geological Survey indicate that geologic conditions in southwestern Geauga County (Bainbridge Township) are favorable for the accumulation of natural gas in the Ohio Shale. Gray (1982) lists southwestern Geauga County as an area favorable for gas production in the Cleveland Shale Member, the uppermost member of the Ohio Shale. Natural gas is most likely to occur where closely spaced natural fracture systems intersect within organic rich source beds (Janssens, 1976; Gray, 1982; Schwietering, 1979). While gas is not present in commercial quantities, it is commonly encountered and vented to atmosphere or flared during air rotary drilling operations in northeastern Ohio.

Below the Ohio Shale, is a sequence of Devonian and Silurian aged carbonate (limestone and dolomite) and evaporate (salt and anhydrite) deposits, known to drillers as the "Big Lime". The "Big Lime" is approximately 1600 feet thick in Bainbridge Township. Within the "Big Lime", there are two zones that are generally porous and permeable brine-bearing zones, but locally can contain natural gas. When natural gas is encountered in these zones it is generally in sub-commercial quantities. These zones are the Devonian Oriskany Sandstone and the Silurian "Newburg" dolomite. Local faulting or folding can influence the occurrence of gas in these zones. Gas from the "Newburg" often has a distinctive odor and can be sour (hydrogen sulfide bearing).

Below the "Big Lime", there is a relatively thin (approximately 100 feet thick) sequence of shales and limestones that overlie the "Clinton". This sequence includes the driller's "Packer shell", typically an impermeable limestone that constitutes part of "caprock", or confining unit over the "Clinton" sandstone. Once contractors drill through the "Clinton" and assess the properties of the reservoir, 4-1/2 inch diameter production pipe is run in the borehole and cement is circulated from total depth to 600-800 feet above the "Clinton" in accordance with standard industry practice. The "Clinton" sandstone is a tight, low permeability formation that must be stimulated through hydro-fracture to be commercially productive.

# HYDRO-GEOLOGIC SETTING

Geauga County is located in northeastern Ohio, and is within the Glaciated Appalachian Plateau Physiographic Province. Geauga County consists of gently to steeply rolling hills comprised of bedrock, generally covered by glacial deposits (Totten, 1988). Bainbridge Township is located in the southwest corner of Geauga County. Within Bainbridge Township, surface elevations range from 1260 feet above mean sea level (AMSL) along the ridge top east of McFarland's Corner, to a low of approximately 930 feet AMSL in the southwestern portion of the Township in the valley of McFarland Creek.

The investigation area is located south of Bainbridge Road and west of Chillicothe (State Route 306) Road. The investigation area includes some of the homes and water wells on Bainbridge, English, Kingswood, Kenston Lake, and Scotland Drives. The area is gently rolling with elevations ranging between 1000 and 1160 feet (figure13).

The glacial deposits in Bainbridge Township consist of thin deposits of till that are generally less than thirty feet thick in the upland areas (figure 14). While permeable sand and gravel deposits may occur within the glacial draft deposits, most water wells are developed in the underlying sandstones and shales. Glacial deposits thicken in the valleys. According to Totten (1988) there is a narrow sand and gravel kame deposit that extends southwestward from Kenston Lake. According to water well logs, the thickness of glacial deposits in the Kenston Lake valley may exceed 115 feet (figure 15). The kame and valley-fill deposits include sufficient deposits of sand and gravel for development of domestic water supplies. One water well driller recorded sand and gravel deposits as thick as 90 feet east of the intersection of Kingswood and Kenston Lake Drives. Water well logs indicate that glacial deposits thicken to the west along Scotland Drive and can be developed locally for domestic water supply.

The bedrock in Bainbridge Township consists of sandstones and conglomerates of the Pennsylvanian age Pottsville Group, and shale with inter-bedded siltstones and sandstones of the Mississippian age Cuyahoga Group (figure 15). In Bainbridge Township, water wells are developed in the Pottsville Group, the Cuyahoga Group, the underlying Berea Sandstone, as well as glacial sand and gravel deposits (figure 16). Rocks in Geauga County dip towards the south and southeast generally at 10 to 20 feet per mile. The bedrock formations that provide potable ground water in Geauga County are described as follows:

The Pottsville Group (Pennsylvanian): The Pottsville Group consists of sandstone with local channels of conglomerate and some shale that caps hilltops throughout the County. According to Walker (1978), the principle aquifer within the Pottsville Group is the Sharon Conglomerate. Walker (1978) reports that wells can produce sustained yields of as much as 50 gallons per minute. The Pottsville Group has a maximum thickness of 200 feet and is extensively developed as a ground water aquifer in Geauga County. Within the investigation area the sandstones of the Pottsville Group underlie Bainbridge Road east of Kenston Lake Drive, and portions of Chilocothe Road. There are several shallow mines where sandstone has been extracted form the Pottsville exposures within the investigation area north of Scotland Drive and west of English Drive.

In the early 1950's, many water wells were developed in the Pottsville Group aquifer along Bainbridge Road, northern English Drive, Kenston Lake and Kingswood Drive. As more homes were built, the high demand and usage of the Pottsville Group aquifer, forced local residents to have their water wells re-drilled to deeper aquifers. According to the regional potentiometric map (Jagucki, 2001), ground water flows to the southwest in the Pottsville Group (Sandstone) aquifer within the investigation area (figure 17).  This conclusion is supported by DMRM static water level measurements.

The Cuyahoga Formation- (Mississippian):  The Cuyahoga Formation consists predominantly of shale with interbedded layers of siltstone and sandstone and is the uppermost bedrock unit through most of the investigation area (figure 16).  Within the investigation area, many domestic water wells have been developed in the Cuyahoga Formation. The maximum thickness of the Cuyahoga Formation within the investigation area was 183 feet.  The Cuyahoga Formation aquifer is recharged by vertical flow from the overlying glacial and Pottsville Group aquifers.  Based upon static water level measurements, ground water flows in a southern-southwesterly direction in the investigation area.

The Berea Sandstone (Mississippian):  The Berea Sandstone is the lowermost formation in the Mississippian system.  It consists of sandstone and it is the deepest aquifer in Geauga County.  The Berea Sandstone has a maximum thickness of 80 feet in the investigation area.  Within the investigation area, the depth to the top of the Berea Sandstone ranged from 130 to 270 feet below ground surface.  According to Jagucki (2001) ground water flows in a west-southwestward direction in the Bainbridge Township area (figure 18).  There are sixteen water wells drilled in the Berea Sandstone in the investigation area.  Four of the sixteen wells were drilled through the entire Berea Sandstone aquifer into the underlying Devonian shale.  Most wells developed in the Berea Sandstone are not cased through the overlying Cuyahoga Group.

The Devonian Shale:  The Devonian aged Bedford Shale Formation underlies The Berea sandstone aquifer. Beneath the Bedford Shale, the Ohio Shale Formation consists predominantly of shale and is subdivided into a variety of members. The uppermost members are known as the Cleveland Shale.  The total thickness of the Ohio Shale is approximately 1800 feet in Geauga County.  The Ohio Shale is known to produce natural gas in areas of Geauga County including Bainbridge Township. While the Ohio Shale is not an aquifer in Bainbridge Township, water well drillers often drill through the Berea Sandstone into the underlying Devonian Shale to add storage capacity to domestic water wells.

# BACKGROUND GROUND WATER QUALITY

**Introduction**

Ground water is the primary source of drinking water for 98 percent of the population in Geauga County. Approximately 78 percent of the population relies on ground water from domestic wells, while approximately 20 percent of the population relies on publicly supplied ground water provided by utilities serving 25 or more people. Ground water is obtained from four aquifers, listed in descending stratigraphic order: 1) Glacial sand and gravel deposits of the Quaternary System, Pleistocene Series; 2) Pennsylvanian Pottsville Group; 3) Mississippian Cuyahoga Formation; and 4) the Mississippian Berea Sandstone. Within the investigation area, there is water wells developed in all four aquifers including many wells developed in multiple-aquifers.

The purpose of this section is to characterize the background hydro-chemistry of the various aquifers in Bainbridge Township, Geauga County prior to recent oilfield activities, and in particular, prior to December 2007, for comparison purposes. There is very little ground water quality data available for domestic water wells within the investigation area prior to the DMRM investigation. In order to evaluate the affect of the December 2007 natural gas charging incident, the DMRM compiled historic ground water quality data from Geauga County and the Bainbridge Township area to compare with post-incident ground water quality data. The DMRM conducted a literature search, compiled water quality data from Ohio EPA public water system files, compiled water quality data for water wells sampled as required by Urban Drilling regulations, and collected and analyzed ground water samples from selected control sites that are located outside of the investigation area.

Ground water is considered "contaminated" when measured concentrations of induced chemical parameters of interest exceed "background" levels or ranges. Ground water is considered "polluted" when measured concentrations of induced chemical parameters of interest exceed background levels, or ranges, but there are no specific maximum concentrations or action levels specified by regulation or enforceable guideline.

The primary source of information for this report is the USGS Water-Resources Investigations Report 01-4160, titled <u>Ground-Water Quality in Geauga County, Ohio – Review of Previous Studies, Status in 1999, and Comparison of 1986 and 1999 Data,</u> (Martha L. Jagucki and Robert A. Darner, 2001). The USGS collected and analyzed 31 samples from domestic and public water supply wells between June 7 and July 1, 1999, using standard field techniques. Three of the 31 water wells sampled by USGS are in Bainbridge Township and represent the Pottsville Group (GE-23), the Cuyahoga Group (GE-228) and the Berea Sandstone (GE-103). Figure 19 shows the location of sampled wells by aquifer in Geauga County.

All samples were analyzed for Volatile Organic Compounds (Voss), sulfide, dissolved organic carbon, major ions, trace elements, alkalinity, total coliform and Escherichia coli bacteria. Fourteen of the samples were also analyzed for tritium for the purpose of age-dating the ground water. All sampled wells were completed in a single stratigraphic unit so that the chemistry of ground water from the four aquifers could be compared.

The DMRM also reviewed ground water chemical data from public water supplies (PWS) obtained from the Ohio EPA's Northeast Ohio District (NEDO), Division of Drinking and Groundwater (Table 5). These include public water supply wells used by the Bainbridge Township Police Department, Settlers Park, and Montessori School well, Kinston Middle School, Kinston High School, Bainbridge Township Hall, Early Learning Center, the Lake Lucerne Community, and the Tangle wood Lake Community. The Tangle wood Community Water Company No. 9 well is a sampling site for Ohio's Ambient Ground Water Monitoring Program and has a substantial sampling history since 1974.

**Table 5:  Ohio EPA Public Water Supply Wells**

| Well Name | No. | Completion Date | Casing Depth (ft) | Total Depth (ft) | Uncased Interval |
|---|---|---|---|---|---|
| Bainbridge Twp. Police Dept. | - | 12/16/2002 | 138 | 280 | Cuyahoga-Berea Ss |
| Settlers Park | - | 10/21/1998 | 39 | 100 | Pottsville Gap. |
| Montessori School | | 3/6/1983 | 133 | 276 | Cuyahoga-Berea Ss |
| Kinston Middle School | | 5/25/1967 | 65 | 205 | Pottsville Gap. |
| Kinston High School | Old | 11/12/1974 | 91 | 205 | Pottsville Gap. |
| | 1 | 5/17/2004 | 100 | 201 | Pottsville Gap. |
| | 2 | 8/13/2004 | 100 | 203 | Pottsville Gap. |
| Bainbridge Twp. Hall | - | 10/27/1967 | 61 | 106 | Pottsville Gap. |
| Early Learning Center | - | 7/28/1998 | 105 | 145 | Cuyahoga Fm |
| Tangle wood Comm. | 1 | < 6/1995 | 40 | 50 | Undetermined |
| Tangle wood Comm. | 2 | < 1/1970 | 52 | 65 | Undetermined |
| Tangle wood Comm. | 3 | 7/5/1972 | 33 | 40 | Glacial Sand & Gravel |
| Tangle wood Comm. | 4 | 7/1994 | 27 | 36 | Undetermined |
| Tangle wood Comm. | 5 | 7/15/1974 | 33 | 36 | Glacial Sand & Gravel |
| Tangle wood Comm. | 8 | 7/20/1988 | 27 | 155 | Pottsville Ss |
| Tanglewood Comm. | 9 | 11/22/1995 | 43 | 159 | Pottsville Ss |
| Lake Lucerne Stat. 1 | 1 | 4/17/1989 | 41 | 190 | Cuyahoga Pottsville Fm Gp. |
| Lake Lucerne Stat. 1 | 15 | 3/20/2002 | 32 | 230 | Cuyahoga Pottsville Fm Gp. |
| Lake Lucerne Stat. 2 | 2 | 2/14/1956 | 41 | 85 | Pottsville Gp. |
| Lake Lucerne Stat. 2 | 18 | 12/19/2006 | 80 | 120 | Pottsville Gp. |
| Lake Lucerne Stat. 3 | 6 | | 50 | 230 | Cuyahoga Fm, Berea Ss |
| Lake Lucerne Stat. 3 | 11 | 7/29/1998 | 49 | 240 | Cuyahoga Fm, Berea Ss |
| Lake Lucerne Stat. 3 | 12 | 8/3/1998 | 54 | 240 | Cuyahoga Fm, Berea Ss |
| Lake Lucerne Stat. 3 | 13 | 5/11/1999 | 40 | 274 | Cuyahoga Fm, Berea Ss |
| Lake Lucerne Stat. 4 | 9 | 8/6/1971 | 53 | 208 | Cuyahoga Fm, Berea Ss |
| Lake Lucerne Stat. 4 | 16 | 11/26/2003 | 60 | 230 | Cuyahoga Fm, Berea Ss |
| Lake Lucerne Stat. 5 | 14 | 8/25/1999 | 51 | 230 | Cuyahoga Fm, Berea Ss |

ODNR-DMRM selected six (6) water wells to be sampled as control points in the investigation. These water wells were selected for the following reasons:

1. Availability of historical water quality data for these water wells prior to the December 2007 incident,
2. Includes one water well known to have natural gas in the ground water prior to the December 2007 incident, as reported by the owner,
3. Three wells had no documented or reported natural gas in the ground water prior to the December 2007 incident as documented in Ohio EPA's public water system files.
4. Three water wells represent the Berea Sandstone Aquifer including two wells cased
   a. partially through the Cuyahoga Shale,
5. Two wells represent the Cuyahoga Shale aquifer, and
6. One well represents the Pottsville Group

The six (6) control points water wells were drilled in three of the four aquifers documented in the investigation area. The water well depths, casing depth and aquifer are summarized in Table 6. These water wells represent the majority of the water wells in the investigation area. The water well information was obtained from the ODNR website and the owner for 7780 Bainbridge Road.

**Table 6:  Control Points Water Wells Utilized in the Investigation of the Area**

| Address Identification | Completion Date | Casing Depth (ft) | Total Depth (ft) | Uncased Interval |
|---|---|---|---|---|
| 8400 Bainbridge Rd (USGS GE-23) | December 1964 | 31 | 40 | PottsvilleGroup-Sharon sandstone |
| Bainbridge Twp. Hall 17870 Chillicothe Rd (State Route 306) | 10/27/1967 | 61 | 106 | Cuyahoga Fm. |
| Early Learning Center –17826 Chillicothe Rd (State Route 306) | 7/28/1998 | 105 | 145 | Cuyahoga Fm. |
| Montessori School- 17892 Chillicothe Rd (State Route 306) | 3/6/1983 | 133 | 276 | Cuyahoga Fm -Berea sandstone |
| 7780 Bainbridge Road | 1950's per the owner | unknown | 200+ (pump set at 200) | Cuyahoga Fm - Berea sandstone-Ohio Shale* |
| 17165 Abbey Rd- (USGS GE-122) | 8/2/1979 | 94 | 135 | Berea sandstone |

*Owner reported natural gas prior to December 17, 2007 incident.

The DMRM focused on parameters that are useful in evaluating chemical changes, if any, caused by oilfield drilling and well completion practices.  Background water quality data and water quality analyses obtained in 2008 through this investigation are compared to the primary and secondary public drinking-water concentration limits. Appendix 1 is a table listing all

OEPA Primary and Secondary Maximum Contaminant Limits associated with the tested parameters.

**Summary of Previous Ground Water Investigations in Bainbridge Township**

Since 1981, 107 oil and gas wells have been drilled and completed in Bainbridge Township without a known or reported ground water contamination incident.  Prior to December 2007, the DMRM had only received one Bainbridge area complaint alleging ground water contamination related to oil and gas exploration and production.  The DMRM determined that gas in the 280 feet deep water well, developed in the Berea Sandstone, was natural in origin and unrelated to oil and gas exploration or production activities.

During the 1980's the Ohio Environmental Protection Agency completed four ground-water contamination investigations involving public water supplies in Geauga County.  Three of the four contaminated sites are in Bainbridge Township.  Two sites were identified in December 1987, and are located in the northern Bainbridge Township near McFarland's Corner, approximately two miles north of the DMRM investigation area.  These two sites cover about 285 acres and are separated by a ground-water divide.  Since 1987, OEPA identified five separate plumes of contamination from industrial sources, including dry cleaning chemicals, affecting both the Sharon Member of the Pottsville Formation and the Berea Sandstone.  Three of the plumes contain trichloroethylene, one contains 1, 1, 1-trichloroethane (TCE) and tetrachloroethylene (also known as perchloroethylene, PCE), and one contains benzene and PCE contamination.  Benzene concentrations were found at approximately 10 times the USEPA maximum contaminant level (MCL), and PCE concentrations in one well was more than 200 times the MCL.

At a third site in the northwestern corner of Bainbridge Township, OEPA collected 51 ground-water samples from public water supplies and residential wells.  The analysis of these samples confirmed the presence of diethyl ether, dichloroethane (DCA), and other volatile organic compounds (VOCs) (Ohio Environmental Protection Agency, 1984).  In 1993, water lines were installed in the community to provide potable water to residents (Ohio Environmental Protection Agency, 1996b).  Based upon personal communications with OEPA, the DMRM has determined that these contamination events should not affect aquifers or wells sampled and tested during the DMRM 2008 investigation.

**Stratigraphic Variation in Water Quality in Geanga Connty**

In general, Jagucki (2001)  reported that most ground waters, regardless of aquifer, are dominated by the bicarbonate anion, with a variety of cation types ranging from calcium to mixed calcium-magnesium-sodium waters.  Four of 31 samples plotted on trilinear diagrams as chloride type water.  However, all four samples were considered affected by road salt and/or domestic sewage.

Most aquifers in Geauga County would be classified as iron or sulfate reducing with the exception of the Pottsville Group.  The shallow unconfined, fractured sandstones of the Pottsville Group typically have higher concentrations of dissolved oxygen and lower than average

concentrations of iron and manganese and low pH values, relative to groundwater in the Cuyahoga Formation, Berea Sandstone, or glacial aquifers.

According to Jagucki (2001) "No statistically significant differences in constituent concentrations between aquifer units were found for calcium, magnesium, sulfide, sulfate, chloride, bromide, silica, and manganese.  Variability of constituent concentrations in the Cuyahoga and Berea waters likely is caused by the varying degrees of stratigraphic confinement of these units.  For instance, in some places the full stratigraphic column is present, and recharging water must filter through all of these units before making its way to the lower bedrock aquifers."

**Glacial Deposits**

Jagucki (2001)  reported that "Waters of the glacial deposits generally are anoxic; dissolved oxygen concentrations were at or below the detection limit of 0.1 mg/L in seven of the eight samples collected from wells completed in the glacial deposits."

According to Jagucki (2001), Total coliform concentrations are highly variable in the glacial deposits, and include the highest concentration found (120 col/100 mL), as well as the greatest median concentration (6 col/100 mL).  Four of eight (50%) of domestic wells developed in the glacial aquifers had total coliform concentrations exceeding the Geauga County Health Districts standard of zero.  Chloride and TDS concentrations were well below US EPA Secondary Maximum Contaminant Levels (SMCLs).  Chloride concentrations ranged from 1.0 to 74.0 mg/L (mean: 22.1 mg/L) while TDS concentrations ranged from 203 – 420 mg/l (mean: 304.9 mg/L).

Mean concentrations for nearly all tested parameters were higher for Ohio EPA Public Water Supply wells. According to Ohio EPA Public Water Supply (PWS) records and Jagucki (2001), mean concentrations of iron and manganese exceeded US EPA Secondary MCLs.  The USGS reported concentrations of dissolved iron and manganese while OEPA reported concentrations of total iron and manganese.

Table 7 lists the range and mean concentrations for selected parameters for background water quality data compiled as part of this investigation.  The number of public water supply analyses used to calculate the mean concentration is included in parentheses.  N/A indicates no analytical data. The USGS reported concentrations of dissolved iron and manganese while OEPA reported concentrations of total iron and manganese.

**Table 7:  Ground Water Quality Summary (Selected Parameters)**
**Aquifer:  Glacial Sand and Gravel**

| Data Source | Jagucki 2001 | | OEPA-PWS | |
|---|---|---|---|---|
| Number of Samples | 8 | | 1 - 8 | |
| Parameter | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) |
| PH (S.U.) | 7.1 – 7.8 | 7.55 | 7.5 – 7.8 | (7) |
| Alkalinity | 150 – 270 | 200 | 189 – 241 | 203    (8) |
| Chloride | 1 – 74 | 22.1 | 6 – 57 | 25.6    (8) |
| Sulfate | 5.7 – 97 | 38.96 | 32 – 80 | 56.5    (8) |
| Calcium | 37 –97 | 58.5 | 62 – 97 | 80.4    (8) |
| Iron | < .01 – 1.9 | .765 | <0.1 – 3.16 | 1.43    (8) |
| Manganese | .015 - .20 | .104 | 0.08 – 0.8 | 0.22    (7) |
| Sodium | 3.4 – 120 | 29.71 | 5 – 63 | 17.5    (8) |
| Aluminum | N/A | N/A | N/A | N/A |
| Arsenic | N/A | N/A | N/A | N/A |
| Barium | N/A | N/A | <0.2 – 0.3 | <0.3    (1) |
| Total Dissolved Solids | 203 – 420 | 304.9 | 300 – 398 | 363.7   (6) |

**Pottsville Group**

In many areas of Geauga County, including the Bainbridge investigation area, the sandstones of the Pottsville Group are unconfined, ridge top aquifers overlain by relatively thin glacial till deposits.  In these settings, wells developed in the Pottsville; or partially cased through the Pottsville can be susceptible to pollutants introduced by surficial contamination sources.  Accordingly, Jagucki (2001) reported that "The Pottsville Group has the highest median concentration of dissolved oxygen (0.8 mg/L) and nitrate (0.3 mg/L as N) among the four stratigraphic units.  Of the six locations at which nitrate was detected in this study, five were in Pottsville Formation."  Total coliform concentrations exceeded the Geauga County Health District standard of zero at six of ten (60%) sampled wells.  Two wells had "unusually high total coliform concentrations."

In addition the USGS determined that "The median value of pH in the Pottsville waters was below (noncompliant) the SMCL range required by OEPA (1994) for drinking waters."  Based upon 15 field measurements at Tanglewood Water Company's #9 well, between May 1997 to October 2003 the mean pH was 6.73, below the OEPA's SMCL of 7.0 S.U.  The mean nitrate concentration was 3.61 mg/L.

Chloride and Total Dissolved Solids (TDS) concentrations reported by Jagucki (2001) were generally well below SMCL with the exception of well GE-23 south of the intersection SR 422 and Chillicothe Road in Bainbridge Township.  The chloride and TDS concentrations for well GE-23 were 240 and 820 mg/l, respectively, reflecting contamination by road salt.  For the other nine wells sampled, the chloride concentration ranged from 3.2 – 43.0 mg/l (mean: 12.6 mg/L), and TDS ranged from 220 – 321 mg/L (mean: 272.3 mg/L).  Based upon 15 samples collected from the Tanglewood Water Co. well #9, between May 1997 and October 2007, Ohio EPA's Ambient Ground Water Monitoring Network Data Summary indicates chloride concentrations ranged from 20.1 to 61.7 mg/L (mean: 41.82 mg/L).

The mean dissolved iron concentration reported by Jagucki (2001) was below US EPA's Secondary MCL. The mean total iron concentration for 15 samples from OEPA's Ambient Ground Water Monitoring Well (Tanglewood #9) was .113 mg/L, also below OEPA's Secondary MCL.  However, the mean total iron concentration for Ohio EPA's public water supply samples, exceeds the Secondary MCL (0.3 mg/L). The mean manganese concentration recorded by Jagucki (2001), the OEPA Public Water Supply wells, slightly exceeded the US EPA's Secondary MCL (0.05 mg/L).  Jagucki (2001) recorded concentrations of dissolved iron.  The Ohio EPA Ambient Ground Water Monitoring Program records total iron and manganese concentrations.  The mean manganese concentration for 15 samples from OEPA's Ambient Ground Water Monitoring Well (Tanglewood #9) was .012 mg/L, below OEPA's Secondary MCL.  The control well is anthropogenically contaminated and exceeds USEPA Secondary MCLs for chloride and TDS (250 and 500 mg/L respectively).  Table 8 lists the range and mean concentrations for selected parameters for background water quality data compiled as part of this investigation.

**Table 8:  Ground Water Quality Summary (Selected Parameters)**
**Aquifer:  Pottsville Group**

| Data Source | USGS Jagucki (2001) | | Ohio EPA PWS | | Ohio AGWMP | | Control Site | |
|---|---|---|---|---|---|---|---|---|
| Number of Samples | 10 | | 1 - 11 | | 15 | | 1 | |
| Parameter | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) |
| pH (S. U.) | 6.0 – 7.4 | 6.86 | 8.15 | 8.15 (1) | 6.22 – 6.73 | 7.04 | 7.1 | N/A |
| Alkalinity | 42 – 300 | 168.4 | 33 – 222 | 114.6 (8) | 70.5 – 157.0 | 99.55 | 251 | N/A |
| Chloride | 3.2 – 240 | 35.3 | 2 – 56 | 27.8 (10) | 20.1 – 61.7 | 41.82 | 702 | N/A |
| Sulfate | 31 – 70 | 47.3 | 12-61.9 | 38.8 (9) | 49.5 – 73.0 | 58.49 | 83 | N/A |
| Calcium | .06 – 140 | 63.16 | 26.8 – 74.1 | 50.7 (8) | 50.0 – 65.0 | 56.6 | 247 | N/A |
| Iron | < .01 - .64 | .15 | <0.02 – 5.1 | 1.3 (11) | .233 | .113 | 0.02 | N/A |
| Manganese | < .03 - .25 | .06 | <0.01 – 0.115 | 0.068 (11) | .01 - .026 | .012 | 0.02 | N/A |
| Sodium | 4 – 99 | 22.73 | 4.8 – 72 | 19.7 (10) | 8.0 – 21.0 | 18.13 | 264 | N/A |
| Aluminum | N/A | N/A | <0.2 | <0.2 (2) | <.2 | <.2 | <0.05 | N/A |
| Arsenic | N/A | N/A | <0.002 - .020 | .007 (12) | < .002 | < .002 | <0.02 | N/A |
| Barium | N/A | N/A | <.03 – 0.3 | 0.15 (12) | .052 - .083 | .073 | 0.5 | N/A |
| Total Dissolved Solids | 220 – 820 | 327.1 | 239 – 302 | 270.5 (2) | 272 - 330 | 294.5 | 1677 | N/A |

**Cuyahoga Formation**

Jagucki (2001) found that ground water from the shales and interbedded sandstones and siltstones of the Cuyahoga Formation were highly variable in water chemistry. Variability in water chemistry was attributed to the depth to the open interval of the well (casing base or screen depth), the hydraulic conductivity of the open interval and the permeability of overlying glacial deposits. According to Jagucki (2001) "Like the Pottsville waters, some Cuyahoga waters have a pH less than the lower limit of 7.0 required by OEPA (1994) for drinking water. The lowest pH found in any stratigraphic unit was in the Cuyahoga Group – a pH of 4.7 at well GE-341. Jagucki (2001) and Ohio EPA Public Water Supply water quality records indicate that median and mean iron and manganese concentrations in the Cuyahoga Formation both exceed the respective SMCLs." Jagucki (2001) recorded concentrations of dissolved iron and manganese while the Ohio EPA public water supply testing program records total iron concentrations.

Chloride and TDS concentrations were generally within US EPA SMCL. The chloride concentration for seven sample wells ranged from 2.0 to 150 mg/L (mean: 43.1 mg/L). The TDS concentration ranged from 213 – 507 mg/l (mean: 336.1 mg/l).

Table 9 lists the range and mean concentrations for selected parameters for background water quality data compiled as part of this investigation.

**Table 9:  Ground Water Quality Summary (Selected Parameters)**
**Aquifer:  Cuyahoga Formation**

| Data Source | USGS Jagucki (2001) | | Ohio EPA PWS | | Urban Drilling Background Samples | |
|---|---|---|---|---|---|---|
| Number of Samples | 7 | | 1 - 5 | | 3 | |
| Parameter | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) |
| pH (S.U.) | 4.7 – 7.4 | 6.83 | 5.7 – 7.4 | ?        (2) | 7.16 – 7.66 | 7.44 |
| Alkalinity | 4 – 360 | 169.1 | 17 – 191 | 118    (3) | N/A | N/A |
| Chloride | 2 – 150 | 43.1 | 9 – 165 | 93.7    (3) | 75 – 100 | 86 |
| Sulfate | 12 – 120 | 48.7 | 29-77 | 53        (3) | 35 – 50 | 41.7 |
| Calcium | 21 – 84 | 51.7 | 44.8 – 45 | 44.9    (2) | 63.41 – 76.91 | 67.8 |
| Iron | .028 – 2.1 | 1.11 | .11 – .92 | .45        (3) | ND – 0.35 | <0.35 |
| Manganese | .009 - .26 | 0.14 | .04 – .14 | .73        (3) | N/A | N/A |
| Sodium | 7.5 – 90 | 36.9 | 38.8 – 97 | 73.9    (3) | 21.98 – 58.02 | 35.9 |
| Aluminum | N/A | N/A | N/A | N/A | N/A | N/A |
| Arsenic | N/A | N/A | <.002 - .02 | .002    (5) | N/A | N/A |
| Barium | N/A | N/A | <0.1 – 0.2 | 0.15    (5) | .01 - .14 | .05 |
| Total Dissolved Solids | 194 – 507 | 336.1 | 353 | 353    (1) | 365 – 402 | 378 |

**Berea Sandstone**

The Berea Sandstone is the only one of the four aquifers that does not crop out in Geauga County. Throughout much of Geauga County the Berea Sandstone is a confined or leaky confined aquifer overlain by shales of the Cuyahoga Group. In the deeper drift-filled valleys of Geauga County (Chagrin River, and East Branch Chagrin River), the Berea Sandstone discharges to glacial deposits. According to Jagucki (2001), the Berea water wells (six) have the greatest average depth (182.7 feet).

Jagucki (2001) concluded that "Ground water within the Berea Sandstone can be distinguished from that of the other units on the basis of median constituent concentrations. Median concentrations of sodium, bicarbonate, alkalinity, ammonia, boron, and strontium in the Berea Sandstone are greater than those in the other three units and are significantly greater than those of the Pottsville Formation. The highest specific conductance and concentrations of hardness, calcium, magnesium, sulfate, and dissolved solids were found in ground-water samples from the Berea Sandstone. High concentrations of dissolved solids are consistent with the longer ground-water residence times in the Berea (70 to 4,800 years relative to residence times in the Pottsville Formation of 15 to 170 years, as estimated by Eberts and others (1990), which would allow for greater dissolution of aquifer minerals by ground water." For six sampled water wells, Jagucki (2001) determined that the concentration of chloride were generally low ranging from 1.2 to 52 mg/L (mean: 16.0 mg/L). The chloride concentration was highly variable for Ohio EPA public water supply wells (17 – 198 mg/L) and for the three control sites selected for this investigation (10 – 158 mg/L). The concentration of TDS range varied considerably for the various sets of background water quality data. Mean iron concentrations exceeded Ohio EPA's Secondary MCL for Jagucki (2001), Ohio EPA Public Water System samples and the control sites. Jagucki (2001) recorded concentrations of dissolved iron. The Ohio EPA Public Drinking Water Program records total iron concentrations.

Table 10 lists the range and mean concentrations for selected parameters for background water quality data compiled as part of this investigation.

**Table 10:  Ground Water Quality Summary (Selected Parameters)**
**Aquifer:  Berea Sandstone**

| Data Source | USGS Jagucki 2001 | | Ohio EPA Public Water System Records | | Urban Drilling Background Site | | Control Sites | |
|---|---|---|---|---|---|---|---|---|
| Number of Samples | 6 | | 4 - 15 | | 1 | | | |
| Parameter | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) | Range (mg/L) | Mean (mg/L) |
| pH (S.U.) | 7.2 – 8.7 | 7.6 | 7.3 – 8.9 | ?      (7) | 8.28 | - | 7.5 – 8.4 | 7.8 |
| Alkalinity | 250 – 330 | 283.3 | 120 – 422 | 248   (8) | N/A | - | 275 - 395 | 330 |
| Chloride | 1.2 – 52 | 16.0 | 17 – 198 | 84.5  (8) | 22 | - | 10 - 158 | 76 |
| Sulfate | 0.1 – 530 | 106.4 | <2-42 | 17.83 | 10 | - | <2 - 505 | 173 |
| Calcium | 1.8 – 160 | 60.3 | 0.56 – 65 | 27.7 (8) | 20.54 | - | 4.7 – 177 | 72 |
| Iron | .009 – 1.2 | 0.46 | .01 – 1.61 | 0.68 (9) | ND | - | .05 – 1.91 | .86 |
| Manganese | .002 - .174 | 0.07 | .01 - .21 | .046 (9) | N/A | - | ND – 0.08 | .03 |
| Sodium | 26 – 180 | 682 | 30 – 380 | 148.2 (8) | 78.60 | - | 58 – 284 | 148 |
| Aluminum | N/A | N/A | N/A | N/A | N/A | - | ND | ND |
| Arsenic | N/A | N/A | .002 - .024 | .007 (15) | N/A | - | ND | ND |
| Barium | N/A | N/A | <0.1 - .83 | 0.42 (9) | 0.04 | - | 0.1 – 0.2 | 0.16 |
| Total Dissolved Solids | 301 – 1100 | 475.7 | 360 – 722 | 466.8 (4) | 298 | - | 400 – 1073 | 713 |

**Occurrence of Natural Gas in Geauga County Ground Water**

Neither the USGS report (Jagucki, 2001), nor previous ground-water studies referenced by this report, have evaluated the presence or concentration of dissolved natural gas in Geauga County aquifers.  Jagucki (2001) reported that hydrogen sulfide was detected in 17 of 31 (55%) wells at a detection limit of 0.01 mg/L.  In eight of 31 wells (26%), owners claimed to have chronic odor issues with their well water related to the presence of hydrogen sulfide gas.

The deepest water wells in the investigation area are developed in the Berea Sandstone – Bedford Shale sequence that is underlain by the Devonian Ohio Shale.  The Ohio Shale is a known natural gas reservoir that is over 1800 feet thick in the vicinity of the investigation area. During the 1980s the potential for natural gas accumulation in the Ohio Shale was extensively evaluated through the U.S. Department of Energy's (U.S.D.O.E.) Eastern Gas Shales Project. The U.S.D.O.E. estimates that there are up to 900 trillion cubic feet of natural gas in the Ohio

Shale in the eastern United States. (Hoover, 1960; Janssens, 1976; Gray, 1982; Schwietering, 1979)

According to Gray (1982), The Devonian shales in northeastern and central Ohio have been drilled for natural gas since the late 1800's on a noncommercial (domestic) basis. "Typically, a Devonian shale gas well is a lowvolume, lowpressure, longpayout venture, which in the past has not been economically attractive to the petroleum industry. Portions of the Devonian shales and consist of dark-colored organic-rich marine shales which are believed to be the most important source of gas in the Devonian shale sequence."

Published reports by the U.S.D.O.E. and the ODNR Division of Geological Survey indicate that geologic conditions in southwestern Geauga County (Bainbridge Township) are favorable for the accumulation of natural gas in the Ohio Shale. Gray (1982) lists southwestern Geauga County as an area favorable for gas production in the Cleveland Shale Member, the uppermost member of the Ohio Shale. Natural gas is most likely to occur where closely spaced natural fracture systems intersect within organic rich source beds. (Janssens, 1976; Gray 1982; Schweitering, 1979)

There are two regions in Ohio that are known to have good potential for gas production from the Ohio Shale resulting from high fracture densities. One is a broad belt that runs parallel to the Lake Erie Shoreline (Jannsens, 1976; Gray 1982; Schweitering, 1979). Fractures extending to depths of approximately 900 feet are believed to be caused by glacial on and off-loading.

The DMRM has determined that fracture density in the investigation area is likely enhanced by local faulting /folding activity. The DMRM concluded that lost circulation and well completion issues at the English No. 1 well, are indicative of local faulting/folding. The presence of a local fault/fold is also evidenced by gas observed in the "Newburg" member of the Lockport Dolomite at both the English No. 1 well and the offset oil and gas well (permit no. 2-1946).

The occurrence of natural gas in ground water for wells developed in the Berea-Bedford sequence is common in Geauga County. This finding is based upon interviews with local residents, water well drillers, a review of records for the Bainbridge Police Dept. well and measurements from the control sample sites. In October 2004, the DMRM conducted an investigation of a complaint regarding natural gas in the Bainbridge Township Fire Department public water supply well. The DMRM concluded that the presence of gas was natural occurring and resulted from completion of the well in the Devonian Shale sequence underlying the Berea Sandstone. Three control wells selected for sampling during this investigation were developed in the Berea Sandstone. The owner of the well on Bainbridge Road stated that their well had natural gas for a number of years prior to the December 2007 incident. Ground water samples for two of the three control sites had measurable concentrations of dissolved methane (0.57 and 0.74 mg/L).

**Arsenic Metals in Geauga County Ground Water**

Arsenic is a common, naturally occurring element in the earths crust. OEPA has concluded that most arsenic found in Ohio's ground water is natural in origin. Jagucki (2001) did not analyze the 31 Geauga County ground water samples for arsenic. However, there are other sources of information relevant to arsenic concentrations in Geauga County ground water including four water wells sampled in 1978 and analyses of public water supplies.

In 1978, USGS analyzed four ground water samples for dissolved arsenic. Two wells developed in the Berea sandstone had dissolved arsenic concentrations ranging from 1.0 ug/l to below the detection limit (<1.0 ug/l). Two wells developed in the Pottsville Group had dissolved arsenic concentrations ranging from 4.0 ug/l to below detection limit.

While USGS did not test for arsenic in any wells developed in glacial aquifers, the USGS has concerns that reducing conditions documented in glacial aquifers appear to be favorable for dissolution of arsenic. Jagucki (2001) determined that seven of eight glacial wells sampled in 1999 had little or no oxygen and would be classified as iron or sulfate reducing ground waters. These conditions are similar to those evaluated by Thomas (2003) where elevated arsenic concentrations (greater than the OEPA PMCL of 10 mg/l) were found in 19 percent of ground water samples collected from water wells developed in glacial aquifers in Ohio.

OEPA has required several public water suppliers in Geauga County that produce waters from glacial deposits to install new treatment facilities to reduce arsenic levels. In January 2003, the first ground water sample from the Bainbridge Police Department water well, developed in the Berea Sandstone, had an arsenic concentration of 24 ug/l, well over the OEPA PMCL of 10 ug/L. The arsenic concentration from seven subsequent samples collected in June and July of 2003, ranged from 5 – 8 ug/l.

**Volatile Organic Compounds in Geauga County Ground Water**

Ohio EPA public water systems water quality records indicate VOCs have been detected at some concentration in 10 water wells between 1991 and 2005 (Table B). The VOCs detected were: Bromoform, Bromodichloromethane, Chloroform, Dibromochloromethane, Toluene, Chloroethane, Chloromethane, Dichlorodifluoromethane, Xylene, and Bromochloromethane.

TTHM was detected in seven public water supply wells at concentrations below the PMCL of 80 ug/l. Xylene was detected in one water well and toluene was detected in another well at concentrations below the PMCL standard established by the USEPA of 10,000 ug/l (10mg/l) and 1,000 ug/l (1.0 mg/l) respectively. Dichlorodifluoromethane was detected in two wells at concentrations ranging between 0.8 and 3.0 ug/l. Both water wells are developed in the Cuyahoga Shale and one is included in the sampling event as control point water well. Bromochloromethane was detected at one water well at concentration of 1.87 ug/l.

The background water quality data evaluated by ODNR show that VOCs were detected in the ground water even though they were not detected again in many samples after the initial detection (Table 11). TTHM and dichlorodifluoromethane were detected in two control point water wells.

### Table 11:  Summary of VOC Chemicals Detected in Public Water Supply Data (OHIO EPA)

| Parameter | MCL (Ug/L) | Kenston Early Learning Center | Montessori School | Lake Lucerne Outside Station #4 | Tanglewood Well #10 | Tanglewood Well #3 | Kenston HS New- Well #2 | Kenston Middle School | Lake Lucerne- Station #5, Outside well | 8353 Bainbridge Rd | Lake Lucerne- Station #1, Inside Well |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dibromochloromethane | 80 | | | | 2.62 (2004) | | | | | | |
| Bromodichloromethane | | | | | | | | | | 0.55 (2005) | |
| Chloroform (Trichloromethane) | | | 0.7 (1995) | | 0.73 (2004) | 1.8 (1992) | | | 1.2 (1991) | 1.98 (2005) | 0.9 (1991), 1.2 (1991) |
| Bromoform | | | | 1.4 (1991) | 0.82 (2004) | | | | | | 1.1 (1991) |
| Dichlorodifluoromethane | N/A | 2 (1991) | | | | | | 3. & 0.8 (1991) | | | |
| Bromochloromethane | N/A | | | | 1.87 (2004) | | | | | | |
| Chloromethane | N/A | | | | | | | | | | |
| Chloroethane | N/A | | | | | | | | | | |
| Dichloromethane (Methylene Chloride) | 5 | | | | | | | | | | |
| Total Xylene | 10,000 | | | | | 2 (1992) | | | | | |
| Toluene (Methylbenzene) | 1,000 | | | | | | 0.53 (2004) | | | | |

### Suitability of Ground Water for Drinking

There are no regulatory standards that apply to the chemical quality of ground water produced by domestic water wells in Ohio.  Jagucki (2001) compared water quality data from 31 domestic water wells to Ohio EPA standards that are only enforceable for public water supplies that serve 25 or more people.  Ohio EPA's public water standards are adopted from Maximum Contaminant Level (MCL) standards enacted by U.S. EPA for selected chemical parameters pursuant to the federal Safe Drinking Water Act.

Ohio EPA has established both Primary and Secondary MCLs for public drinking water supplies.  For the most part, the public drinking water standards that apply at the Federal level also apply at the State level.  Primary MCLs are health-based limits and reflect the highest concentration that is allowable for a selected parameter in raw (untreated) water for a public

water supply.  Secondary MCL standards address aesthetic considerations such as taste, color and odor, rather than hazards to human health.  Appendix 1 is a listing of Ohio EPA Primary and Secondary MCLs for public drinking water supplies.  It should be noted that untreated ground water may naturally have dissolved chemicals that exceed Primary or Secondary MCLs. One cannot assume that the exceedance of a MCLs indicates that ground water has been degraded or contaminated by a pollutant. During a ground water investigation, water sample results must be compared to the water quality data from selected control sampling sites, and pre-contamination event data in order to draw conclusions regarding degradation or contamination.

Jagucki (2001) also used the Geauga County General Health District's standard for total coliform bacteria in raw water (zero colonies per 100 ml of water) from newly constructed wells to assess suitability for drinking.

Jagucki (2001) evaluated the suitability of ground water in Geauga County for drinking purposes based upon standards for selected parameters.  According to Jagucki "Previous studies of ground-water quality in the county have consistently reported that manganese and iron concentrations in ground water in Geauga County often exceed the U.S. Environmental Protection Agency (USEPA) Secondary Maximum Contaminant Level (SMCL) (Eberts etal, 1990; Nicols, 1980).  Water from 16 of the 31 samples exceeded the Geauga County General Health District's standard of 0 colonies of total coliform bacteria per 100 milliliters of water. Aesthetically based SMCLs were exceeded in the indicated number of wells for pH (8), sulfate (1), dissolved solids (3), iron (19), and manganese (18).  Hydrogen sulfide was detected at or above the detection limit of 0.01 milligram per liter in 17 of the 31 water samples."  Table 12 summarizes findings reported by Jagucki (2001).

**Table 12:  Ground Water Quality Relative to Standards**

| Parameter | Standard | Source of Standard | Number of Wells Exceeding Standard | Percentage of Wells Exceeding Standard |
|---|---|---|---|---|
| Coliform Bacteria | 0 colonies per 100 mL | Geauga Co. General Health District | 16 | 51.6 |
| Nitrate | 10 mg/L | OEPA Primary MCL | 0 | 0 |
| Volatile Organic Compounds | | OEPA Primary MCL | | |
| • Benzene | 0.005 mg/L | | 0 | 0 |
| • Ethylbenzene | 0.7 mg/L | | 0 | 0 |
| • Toluene | 1.0 mg/L | | 0 | 0 |
| • Xylenes | | | 0 | 0 |
| pH | >7.0, <10.5 S.U. | OEPA Secondary MCL | 8 | 25.8 |
| Iron | 0.3 mg/L | OEPA Secondary MCL | 19 | 61.3 |
| Manganese | 0.05 mg/L | OEPA Secondary MCL | 18 | 58.1 |
| Sulfate | 250 mg/L | OEPA Secondary MCL | 1 | 3.2 |
| Chloride | 250 mg/L | OEPA Secondary MCL | 0 | 0 |
| Total Dissolved Solids | 500 mg/L | OEPA Secondary MCL | 3 | 9.7 |
| Hardness | 121 mg/L | OEPA Secondary MCL | 25 | 80.7 |

**Controls on Water Quality**

Jagucki (2001) concluded that significant variations in ground water chemistry could be attributed to the depth to top of the open sampling interval (base of water well casing or top of screened interval), differences in stratigraphic confinement, and anthropogenic effects.

The USGS (Jagucki, 2001) analyzed ground water samples for tritium to assess the age or residence time of ground water, as a means to evaluate susceptibility of ground water to contamination from surface sources. Jagucki (2001) states, "In terms of water quality, age of ground water is an indicator of susceptibility of an aquifer to human activities [anthropomorphic impacts] at or near land surface.  Ground water that recharged the aquifer after about 1950 is more susceptible to near-surface contamination than older waters because relatively little time has passed to allow for attenuation of contaminants in the subsurface, and because regulated

chemicals have been introduced into the environment in large quantities since the mid 1940's, following World War II . . . Dating of 14 ground water samples from Geauga County was done by use of tritium analyses . . .".  Tritium is the hydrogen isotope with an atomic weight of 3 is naturally occurring, but with concentrations that were dramatically increased following post WWII nuclear tests in the atmosphere which ended in 1964.

Ground-water samples with tritium concentrations less than the detection limit of 1.8 TU [tritium units] are considered to have reached the water table as recharge prior to 1953 or are mixtures of pre-1953 waters and recent recharge with a low tritium concentration.  Such waters are referred to as "old."  Conversely, waters with tritium concentrations greater than 1.8 TU are referred to as "young," having at least a component of post-1953 recharge.  (page21)

Jagucki (2001) determined that anthropogenic effects influenced ground water chemistry in Geauga County.  The USGS evaluated concentrations of a number of parameters including nitrate, coliform bacteria, VOCs and chloride to determine the influence of anthropogenic sources such as road salt, leaking septic systems, leaking underground storage tanks and oil and gas operations.  Jagucki (2001) reported the following:

**Nitrate**
Of the 31 samples from the USGS study, six (19.4%) had nitrate concentrations greater than 0.3 mg/L.  N. Baker and others (1989) consider nitrate concentrations from 0 to 0.3 mg/L to represent background concentrations in Ohio (that is, concentrations that largely are unaffected by human activity).  According to Baker and others (1989), concentrations of nitrate greater than 0.3 mg/L may represent anthropogenic effects.  All six nitrate detections were found at depths of less than 95 feet.  Sample depth in this context refers to distance, in feet, from land surface to the top of the screened or open interval in the well.  Five of the six wells in which nitrate was detected are completed in the Pottsville Formation.  Jagucki (2001) concluded that "leaking septic systems are the most likely source for nitrate in ground water at concentrations above background levels.  Most residents in the county rely on domestic septic systems to treat their wastewater.  Leaking septic systems, in addition to elevating nitrate concentrations, can cause elevated concentrations of total coliforms, E. coli, boron, sodium and chloride and other parameters in ground water."

**Total Coliform Bacteria**
Total coliform levels exceeding the Geauga County Health Districts standard were detected in 16 of the 31 samples (52%) supporting the idea of possible contamination from septic systems.  Five of the six samples with total coliform concentrations greater than 10 col/100 mL are from wells with depths less than 55 feet from land surface to the top of the open interval.  Water from these five wells all were categorized as "young" by tritium dating.

**Chloride-to-Bromide Ratios**
Salt can enter aquifers from a variety of sources including road salt for ice control, water softener discharge via septic systems, upconing of brackish connate ground water contained in fractures in the Ohio Shale, and improper containment or disposal of oil-field brines produced during exploration or production operations (Jenkins, 1987; Eberts and others, 1990, Lesney, 1992, MacDonald, 1987; Eberts and others, 1990).  According to Jagucki (2001) Geauga County

receives, on average, more than 100 inches of snowfall each year, so use of salt to keep the roads clear is a common practice.

The source(s) of chloride in ground water can be evaluated by comparing the weight ratios of chloride and bromide concentrations in a sample (Whittemore, 1988; Knuth and others, 1990; Davis and others, 1998). Chloride and bromide are useful indicators because they are; highly soluble, persistent (minimally affected by adsorption to sediment once dissolved in water), and non-reactive (not altered by oxidation-reduction reactions). The ratios of chloride to bromide for oilfield brine and dissolved salt differ significantly (Davis and others, 1998). As seawater evaporates, halite (NaCl) in the residual water becomes saturated and precipitates (crystallizes) first, leaving a residual brine[6] in which bromide has concentrated. Ground water with dissolved halite, applied as road salt, or discharged by water softeners, will have a high chloride-to-bromide (Cl:Br) ratio. Oilfield or connate brines, which can be found in deep aquifers, will be enriched in bromide relative to chloride and will have a much lower Cl:Br ratio (Davis and others, 1998).

Jagucki (2001) depicts simple binary mixing curves (figure 20) following methods described in Whittemore (1988), to show how the Cl:Br ratio of dilute ground water would change with the addition of increasing amounts of saturated halite solution, oilfield brine, and domestic sewage. These solutions, as well as the dilute, unaffected ground water, are referred to as "end-members" because they represent the starting and stopping points of the possible mixing process. Waters having Cl:Br ratios greater than 400 and plotting near or between the mixing lines are considered to have been affected by roadsalt application or salt leaking from septic systems. Davis and others (1998) reported that shallow ground water, unaffected or only minimally affected by dissolution of halite, generally has a Cl:Br ratio of 100 to 200. Jagucki (2001) states that it is difficult to make definitive statements regarding anthropogenic effects on ground waters that have Cl:Br ratios between 200 and 400. Ground waters within this range may be affected by multiple sources. The Cl:Br ratio for oilfield brine is generally in the range of 80 – 100. Based upon an evaluation of chloride: bromide ratios, Jagucki concluded that:

1. Mixing of potable ground water with oilfield brine was not a widespread problem in Geauga County. Only one water well (GE-165) had a chloride:bromide ratio consistent with oilfield brine. The chloride concentration of this water well was only 20 mg/L, far below the Secondary MCL (250 mg/L).
2. Salt was found to affect ground-water quality in a total of eight samples (26%) from wells completed in the glacial deposits, Pottsville Formation, and the Cuyahoga Group. Ratios of chloride to bromide for the samples indicate that they are mixtures of dilute ground water with either a halite (salt) solution, or a combination of domestic sewage and halite.
3. Chloride concentration in ground water is somewhat inversely related to distance of the well from the road.

**SUMMARY OF CONCLUSIONS**

1. Most waters, regardless of aquifer, are dominated by the bicarbonate anion.
2. It is common for deep water wells developed in the Berea-Bedford interval to emit natural gas.
3. Ground water in Geauga County is typically hard.
4. Iron and manganese concentrations exceed secondary MCLs in over half of all wells sampled.
5. Over half of all water wells sampled by the USGS, had coliform bacteria counts exceeding the Geauga County General Health District standard (zero colonies per 100 mL).
6. Ground water in Geauga County does not typically exceed primary MCLs for VOCs, or secondary MCLs for chloride or Total Dissolved Solids except when anthropogenically affected.
7. Ground waters in glacial Cuyahoga Group and Berea Sandstone aquifers are commonly reducing.

## CAUSE OF AQUIFER NATURAL GAS INVASION AND EXPLOSION

**Permitting and Drilling the English #1 Well**

On October 2, 2007, the DMRM issued a permit (API 34-055-2-1983-00-00) to Ohio Valley Energy Systems Corporation (OVESC) to drill the English #1 well in Lot 21, Tract 2, Bainbridge Township, Geauga County. The permitted target formations were the Ohio Shale through the "Clinton" (total depth: 3926 feet below ground surface). The permit was issued subject to urban area drilling conditions. OVESC was required to drill the English #1 well using a fluid circulating medium due to a gas show encountered in the "Newburg" section of the Lockport Dolomite, at a depth of approximately 3300 feet below surface, on a nearby offset well that was drilled the previous month (Permit 2-1946). Fluid drilling through known gas bearing zones can suppress gas flow into the well bore and will help control gas when drilling through those zones.  In addition, urban permit conditions require the driller to install a well control device or "blowout preventor". The device is pressure tested prior to drilling out from under surface casing. This equipment is designed to control and divert any high-pressure gas that may be encountered while drilling. On the English #1 well, OVESC complied with all well-control conditions required by the permit.

OVESC commenced drilling the English #1 well on October 18, 2007. In accordance with the permitted casing plan, 88 feet of new 32 lb/ft API standard 11 ¾ inch diameter steel conductor casing was set through the glacial drift into bedrock (Cuyahoga Group). To further protect groundwater resources, 253 feet of new 23 lb/ft API standard 8 5/8 inch diameter steel surface casing was set more than 50 feet through the Berea aquifer and cemented to surface. The well was conditioned prior to cementing, circulation was established and there were good cement returns to the surface. The cementing was witnessed and approved by Tom Hill, the DMRM oil and gas well inspector for Geauga County.

Following a 10 hour waiting period to allow the cement to set up, drilling proceeded without incident to a total depth of 3926 feet on October 26. Because the well was drilled on fluid, no shows of oil or gas were noted during the drilling; however the driller did report a slight odor of "sour gas" at total depth while mixing gel to condition the well bore. An attempt to run an open hole geophysical log was unsuccessful due to an obstruction in the well bore at 3658 feet that would not allow the logging tool to reach the bottom of the well. The OVESC consultant believed that the obstruction was caused by a filter cake in the well at 3658 feet, the depth of the "Packer Shell", a shaley dolomite that directly overlies the "Clinton" sand. Filter cake is a build up of drilling mud on the borehole wall and can be caused by an extremely porous and permeable zone where the mud accumulates adjacent to zones that are "thieving" fluids. The density component of the logging tool also did not work and the logging effort was abandoned.

OVESC then proceeded to set and cement production casing. New 10.5 lb/ft  API standard 4 ½ inch diameter steel production casing was run in the hole but could get no deeper than 3659 feet and had to be washed down to a depth of 3873 feet where the casing became differentially hung. Circulation of the borehole was established prior to cementing, but during the cementing operation, circulation was lost and the pump pressure increased to 1100 psi. Most of the remaining water on location was used to try to re-establish circulation and to complete the cement job.  Circulation of the borehole was not re-established but cementing of the

casing was accomplished. Due to the lost circulation during cementing, the OVESC consultant recommended that a cement bond log should be run to determine both the bond quality and the amount of cement outside the production casing.

## Completion of the English #1 Well

On November 1, Appalachian Well Surveys ran a cement bond log. The log indicated that the top of the cement was at 3640 feet, the depth of the "Packer Shell" (figure 21). Based upon the quantity of cement ordered by OVESC, the calculated fill up in the 4 ½ inch casing-borehole annulus should have been at least 700-800 feet above the "Clinton" and would have effectively sealed off the "Newburg" zone of the Lockport Dolomite, the formation where gas was released when drilling the offset well (Permit 2-1946). The "Newburg" in the English #1 is approximately 3350 feet deep. The level of cement in the English #1 well indicates that most of the cement went into the "Packer Shell" at about the same depth where bore hole problems were noted on October 26 with the logging tool and the production casing. The consultant for OVESC believes that these occurrences give evidence of natural fracturing of the "Packer Shell" in the English #1 well. Despite the fact that the cement behind casing was insufficient by standard industry practice, OVESC proceeded with the completion of the well. On November 5, the well was perforated by Appalachian Well Surveys in the "Clinton" section from 3720-3740 feet with 56 shots. Approximately 80 feet of cement covered the "Clinton" above the top perforation. Following perforation, Producers Service Corporation performed an acid breakdown of the "Clinton" in accordance with standard industry practice. The formation broke down at 1450 psi and 250 gallons of acid and 7500 gallons of fluid were displaced into the formation. Nothing out of the ordinary was noted during this acid job and OVESC decided to proceed with the pre-engineered, full hydraulic fracture stimulation treatment.

On November 13, 2007, Producers Service Corporation was scheduled to hydraulically fracture (frac) the well with 105,000 gallons of water and 600 sacks of proppant sand. After displacement of approximately 46,700 gallons of water and 290 sacks of proppant sand, circulation of fluid from the 8 5/8 inch annulus was observed indicating communication between the "Clinton" and the annular space between the 8 5/8 inch surface and 4 ½ inch production casings. At that point, the pump pressure and fluid displacement rate were reduced and another 4000 gallons of fresh water was pumped to flush and recover the sand that had been displaced. The frac operation was then discontinued and the pumps shut down. OVESC personnel estimated total of 20 barrels of fluid including one-to-three barrels of oil was circulated out of the annulus.

Over the next three days, the well was swabbed and most of the frac fluid that had been displaced into the well during the frac treatment was recovered. Pressure on the production casing appeared to be normal for a "Clinton" well and tubing was run in the well on the third day. At this point, the annulus was shut in while work proceeded to complete construction of the wellhead and tank battery in preparation for production.

## Post-Completion History of the English #1 Well

From November 17 to December 14, 2007 there was no reported construction activity at the English #1 well. OVESC recorded periodic pressure readings taken on the surface-production casing annulus.

On November 14th, the first day after the frac job, the recorded pressure was 90 psi. On the second day, the pressure increased to 180 psi. On the third day, the pressure increased and stabilized at 320 psi. Gas was periodically blown off to reduce the pressure, but the annulus was closed when company personnel were not on site over the next 31 days (figure 22).

Subsequent to the explosion, it was reported that on December 12 gas had been detected in the water well at the Bainbridge police station. This well is 280 feet deep, draws water from the Berea and is approximately 4700 feet to the northeast of the English #1 well.  During the investigation, the DMRM learned that on December 14, there were reports of natural gas perturbation, turbidity increases and artesian flow in the water wells of some of the homes on English Drive. The pressure on the annulus of the English #1 well was recorded at 360 psi. Early on the morning of December 15, methane gas entered the basement of a home at 17975 English Drive and ignited causing an explosion that seriously damaged the house. The two residents were at home but not injured.  Local fire officials, DMRM inspectors and OVESC personnel responded shortly after being alerted that there was a problem and began checking gas levels in surrounding homes and water wells.  By the end of December 15, residents of 19 homes had been evacuated.

**Remedial Action Taken in Response to Gas Invasion of the Aquifers**

On the morning of December 15, OVESC determined that the probable source of the gas in the annulus on the English #1 was from the "Newburg" member of the Lockport Dolomite. "Newburg" gas has a distinctive smell that was consistent with the odor noticed coming from the annulus. Remedial action called for cementing off the "Newburg" which would prevent the gas from entering the well bore. Water was pumped down the production casing to kill the "Clinton" gas and the tubing was removed from the well. The casing was then perforated from 3600-3602 feet with 9 shots and 800 sacks of cement were squeezed through these perforations to shut off the "Newburg" gas. Calculated fill up based on the volumetric amount of cement used should have returned the cement to surface. This did not occur but the job was successful in killing approximately "95-98%" of the gas in the annulus and the presence of "sour" smelling "Newburg" gas was no longer detected. DMRM oil and gas well inspectors witnessed this remedial phase. The annulus was not closed after this operation and the well was monitored by OVESC personnel.

On December 17, 2008, the annulus was still producing minor amounts of gas that was "not sour". A second Appalachian Well Surveys cement bond log was run indicating that the squeeze had filled the annulus with cement to 2656' significantly above the "Newburg" zone (figure 23). A temperature log was also run that indicated several possible gas zones in the Ohio Shale in the uncemented portion of the annulus.  To eliminate the remaining gas in the annulus, a second cement squeeze job was performed. The well was perforated with 9 shots from 2628-2630' and another 800 sacks of cement were squeezed through these perforations. This second squeeze cement job returned 41 barrels of cement to the surface.

On December 19, it was reported that there was a "very minor flow" of gas in the cemented surface-production casing annulus.  A third Appalachian Well Surveys bond log was

run. This log indicated there was possible gas channeling in the cement at 330' which could account for the continued presence of gas in the annulus (figure 24).

On March 3, 2008, following the recommendation of DMRM, OVESC had a Baker-Hughes Segmented Bond Log run in the well. This log showed what appears to be channeling in the cement from about 550 feet to surface. Below that level there appears to be good to excellent bond between the production casing and well bore. This would confirm that the deep high-pressure gas from the "Newburg" or other sources has been isolated from the surface-production casing annulus.

DMRM has determined that the gas still present in the annulus is near-surface low-pressure gas emanating from natural fractures in the Ohio Shale. In northeastern Ohio, it is common for small volumes of low-pressure shale gas to accumulate in the surface-production casing of oil and gas wells.

**Conclusions about the Cause of the Gas Invasion of the Aquifers**

The DMRM has determined that accumulation and confinement of deep, high-pressure gas in the surface-production casing annulus of the English #1 well, between November 13 and December 15, resulted in over-pressurization of the annulus. This over-pressurized condition resulted in invasion of natural gas from the annulus of the well into natural fractures in the bedrock below the base of the cemented surface casing. This gas migrated vertically through fractures into the overlying aquifers and discharged through local water wells. Three successive events in the drilling and completion of the English #1 well are believed to be the primary contributing factors that led to the gas invasion of the shallow aquifers and subsequent explosion in the house on English Drive.

The first contributing factor was inadequate cementing of the production casing prior to remedial cementing on December 15. The industry standard for cementing production casing calls for sufficient cement to fill the annulus between the well bore and the casing 600-800 feet above the "Clinton". At this height, the "Newburg" zone, which can be gas and/or brine bearing, is effectively sealed from the well bore and presents no further problem in completing the well. 175 sacks of Unitropic cement was ordered and run for the primary cement job for the English #1. Theoretically, this amount should have provided more than enough fill up to cover and seal the "Newburg" at 3350 feet. However, the bond log run on November 1 indicates the top of cement was only at 3640 feet, the level of the "Packer Shell" and approximately 300 feet below the "Newburg". It appears from the record that the "Packer Shell" in the English #1 well is naturally fractured to the extent that it "thieved" most of the cement that was pumped into the well. The result was that the borehole was exposed to high pressure gas from the "Newburg" and any other deep source of gas.

The second contributing factor was the decision to proceed with stimulating the well without addressing the issue of the minimal cement behind the production casing. Hydraulic fracture stimulation normally involves injecting fluids and sand into the oil and gas reservoir to enhance the flow of hydrocarbons to the well bore. When a well is properly constructed, the hydraulic fracture is confined between the permitted reservoir formation and the production casing. The abnormal circulation that was observed during the stimulation of the English #1 well

indicates that the frac communicated directly with the well bore and was not confined within the "Clinton" reservoir. This communication could also have provided a conduit for "Clinton" gas to enter the annulus of the well.

While the out-of-zone hydraulic fracturing operation may have provided an avenue for "Clinton" gas to migrate up the surface-production casing annulus, the DMRM has concluded that it is highly unlikely that fluids used in the hydraulic fracturing process, or flow back fluids escaped from the borehole or entered into local aquifers.

Based upon consideration of all records and available information, the DMRM has determined that the valves on the surface production casing annulus remained open before, during, and after the hydraulic fracturing operation in accordance with standard industry practice. Producers Services Corp. and OVESC appropriately terminated the hydraulic fracturing operation as soon as fluids circulated to surface. Producers Services immediately reduced the pump rate and pressure, completed the sand flush, and shut the fracturing operation down. According to eyewitness accounts and job records, fluid circulation rates responded to pump rates, and when the pump shut down, annular flow stopped as soon as hydraulic equilibrium was attained, as expected.

Finally, the third and most critical contributing factor leading to the incident was the 31 day period after the fracturing stimulation of the Clinton formation during which the annular space between the surface and production casings was mostly shut in. This confined the deep, high-pressure gas from "Newburg" and/or "Clinton" within this restricted space. Readings taken and reported by OVESC during this shut in period were consistently 320 psi or greater. Typically, shallow shale gas does not register more than 30-60 psi on the annulus and can be closed in or vented without problem. Pressures of the order that were observed would indicate a deeper source of the gas present in the annulus. This was not recognized by OVESC personnel who opened the valve to blow off the pressure but continued to close the annulus valve when not on site. As pressure on the annulus built up, the gas migrated laterally and vertically through natural fractures in the surrounding bedrock. This over-pressurized gas infiltrated the local aquifers, discharged through local water wells, allowing gas to enter some area homes in varying concentrations, and resulting in the explosion at one home.

# ALTERNATIVE EXPLANATIONS

**Introduction**

At approximately 7:30 AM, on December 15, 2007, a DMRM Inspector received a call from the Geauga County Emergency Management Agency (Geauga EMA). The Geauga EMA requesting assistance with the investigation of an explosion in a house located at 17975 English Drive. Three DMRM Inspectors met with Bainbridge Township Fire Chief Brian Phan, Assistant Chief Wayne Burge, and representatives from the Geauga EMA to discuss possible sources and extent of the natural gas problem.

DMRM staff began an immediate review of possible causes of the early morning explosion. Possible sources of explosive gases included 1) local oil and gas wells, 2) orphaned or plugged oil and gas wells, 3) the local natural gas distribution system, 4) explosive chemicals or gases on the premises, and 5) naturally occurring gases associated with shallow organic rich shale. While workers from Dominion East Ohio, the Bainbridge Fire Department, and DMRM continued to evaluate the extent and source of the explosive gas, other DMRM staff were researching files to better define possible sources of explosive gases.

**Sources of Explosive Gases**

In an emergency situation such as this, the evaluation of possible sources is time critical. The review focuses on the most likely source but must consider the possibility of multiple sources. While early on December 15, the DMRM considered the English No. 1 well to be the most likely source, other sources were evaluated as possible contributors. The following summaries are provided as a review of the explosive gas source reviews on December 15, 2007.

**Explosive Gases or Chemicals on the Premises**

Explosive materials on a location must be considered as a source of material leading to an explosion. Examples of such materials include propane tanks, gasoline, heating fuel oils, solvents, etc. These sources were ruled out very early as the teams monitoring for explosive gases reported highly variable but relatively widespread gas readings throughout the neighborhood.

The location of the initial gas readings was further evidence that these materials were not a likely source of the explosive material. Natural gas was being detected in multiple domestic water wells and in some cases in water supplies inside homes. Unfortunately, with the source of the explosive material not yet identified, and the potential for additional explosions unknown, the teams either did not record the readings or at best were inconsistent when data was recorded.

**Local Natural Gas Distribution System**

Representatives from Dominion East Ohio were present and assisted with the initial monitoring. Failures in this natural gas delivery system have the potential to lead to an explosion. The tubulars or piping is typically buried at least several feet deep. These systems do occasionally leak. Gas detectors are used to locate leaks by monitoring natural gas levels evolving from the soil. During winter months, especially if the ground is frozen, monitoring and isolating such a leak may prove more difficult. System leaks may also develop within a house.

With all these factors being considered, it was apparent fairly early on December 15 that multiple leaks or failures of the Dominion East Ohio system were not the likely source of the gases being detected.  There were no initial reports that leaks in the system were detected by the teams.  In addition, gas was being detected in some water wells and water supplies inside some homes.  Since natural gas is lighter than air, natural gas leaking from a distribution system would tend to rise toward the lands surface.  It is highly unlikely that natural gas from this type of delivery system would migrate downward into groundwater and eventually exsolve or discharge from domestic water wells.

**Shallow, Naturally Occurring Gases**

The shale bedrock that underlies the Berea Sandstone, the deepest underground source of drinking water in this area is organic rich and is known to contain hydrocarbons, in particular, natural gas.  Water well drillers encounter shows of natural gas while drilling some local water wells. This often happens in areas where oil and gas wells have not been drilled.  These natural gases are known to enter water wells, and occasionally enter buildings through foundations. Sudden discharges of shale gas are sometimes associated with earthquakes.

Based on a review of records from the ODNR Division of Geological Survey's seismic network, there were no recorded seismic events on or immediately before December 15 that could account for widespread detection of natural gas.  Although relatively small volumes of natural gas may be present in domestic water wells, the observed volumes of gas at some water wells on December 15, 2007 were highly unusual according to area residents.

**Abandoned or Orphaned Oil and Gas Wells**

Oil and gas wells are an obvious potential source of explosive gases.  As DMRM inspectors initiated an investigation of possible explosive gas sources, they focused on existing oil and gas wells within a one-mile radius of the initial incident. While these site reviews were being conducted, a database and map search was being completed for possible orphan or plugged well locations.  Plugged wells are evaluated because of the potential for leaks.  Orphan wells are wells that are abandoned, but have never been plugged, or were plugged using inadequate methods. DMRM has an orphan well plugging fund to properly plug and abandon such wells. The database search did not indicate plugged or orphan wells in the immediate area.  There are no records for oil and gas wells in Bainbridge Township prior to 1950.  Because of the relatively recent history of oil and gas exploration and production activities, the DMRM ruled out the possibility that orphaned wells caused or contributed to the problem.

**Producing Oil and Gas Wells**

Beginning on December 15, 2007, DMRM Inspectors began to inspect five oil and gas wells within one-mile of the home explosion to evaluate the pressure and volume of natural gas in the surface-production casing annuli. As a well is constructed, heavy steel casing is placed into the drilled hole and cemented in place.  Casings begin with a relatively large diameter and with depth, telescope to smaller and smaller diameters.  The open space between each casing is called an annulus.  Throughout much of Ohio, the annular space between the 8-5/8 inch diameter surface casing and the 4-1/2 inch diameter production casing contains small volumes of low pressure gas, generally less than 60 psi.  At low volumes and pressures, this gas is either safely confined within the annulus by the cemented surface casing or vents slowly to atmosphere if the

annular valve is open. If gas is present in the surface-production casing annulus at higher pressures and volumes this can be indicative of a well construction problem that could require corrective action such as remedial cementing.

When DMRM Inspectors arrived on location on December 15, 2007, the surface production casing valve on the English No. 1 well was open. DMRM inspectors observed little change in apparent pressure or rate of flow after approximately two hours of venting. Based upon personnel communications with OVESC personnel, it was determined that there was high-pressure gas (370 psi) in the annular space of the English No. 1 well, prior to venting and remedial cementing that OVESC initiated later that day.

During the week of December 17th, DMRM Inspectors worked with local operators, including Range Resources, Summit Petroleum and Transcontinental, to expose surface-production casing annular valves at the casing-heads, and remove bull-plugs, if necessary. DMRM Inspectors found that the surface-production casing annular valves were either open to atmosphere or held very little apparent pressure when opened. With the exception of the English No. 1 well there was little, if any, gas flow from the annuli.

In January 2008, the DMRM required operators, to install pressure gauges and pressure relief valves on surface-production casing annular valves for one week to further evaluate annular gas pressures DMRM Inspectors monitored annular pressures daily. The following table 13 lists the maximum annular pressure recorded for the five wells.

### Table 13:  Maximum Annular Pressure

| Owner | Lease Name | Permit No. | Annular Pressure (psi) |
|---|---|---|---|
| Range Resources, Inc. | Campane #1 | 480 | |
| Range Resources, Inc. | Mayer-Campane | 482 | |
| Summit Petroleum, Inc. | Weber #1 | 1811 | |
| Transcontinental | Szumilak #1 | 1946 | |
| Ohio Valley Energy | English #1 | 1983 | |

To further evaluate annular pressures and fluid levels, on January 11, 2008, the DMRM met with a representative of Transcontinental Oil and Gas, Inc. at the Szumilak #1 oil and gas well (Permit # 1946) to conduct an echometer test. The surface casing/production casing annulus was opened on the oil and gas well and there was no gas pressure detected.

The DMRM representatives attached the Echometer to the wellhead and shot three different echometer readings in an effort to determine the fluid level in the Szumilak #1 oil and gas well. The echometer wellhead attachment was pressured up to 250 pounds per square inch (psi) with carbon dioxide and the shots were released and recorded on the chart paper.  An evaluation of the echometer shots on the chart paper did not show a fluid level within the annulus

of the Szumilak # 1 oil and gas well. This means either there is no remaining fluid within the annular space of the oil and gas well or the fluid level is too deep to be detected by the echometer pulse.

Based upon annular pressure measurements, well inspections, and a review of well construction records, the DMRM determined that the wells owned by Range resources, Transcontinental, and Summit Petroleum did not cause or contribute natural gas to aquifers in the investigation area.

# CORRECTIVE ACTION AND REMEDIAL CEMENTING OF THE ENGLISH #1 WELL

**Remedial Cementing**

On December 15, 2007, in response to a natural gas explosion in one home and gas pressurization in the water wells of other nearby homes, OVESC initiated remedial cementing of the surface-production casing annulus to seal deep, high-pressure gas-bearing zones in the un-cemented portion of the well above the "Clinton Sandstone". The OVESC consultant concluded that the probable source of the gas in the annulus on the English #1 was from the "Newburg" member of the Lockport Dolomite. Sometimes described as "sour gas", gas from the "Newburg" has a distinctive odor consistent with the odor associated with the gas venting from the annulus. DMRM inspectors who were present also noted the distinctive odor of the gas. The purpose of the remedial cement job was to seal and isolate deep, high-pressure gas-bearing zones including the "Newburg" behind effectively cemented pipe. Water was pumped down the production casing to kill the "Clinton Sandstone" gas. The casing was then perforated at 3600-3602 feet below surface, and 800 sacks of 50/50 pozmix cement was squeezed through perforations to shut off the deep high-pressure gas. The volume of cement used was sufficient to fill the annulus to surface; however, return circulation was not achieved. According to the OVESC consultant who witnessed the remedial cement operation, the job was successful in reducing approximately "95-98%" of the gas in the annulus, and the "Newburg" gas odor was no longer present. DMRM inspectors who witnessed the squeeze job noted that the annular gas flow initially stopped but resumed approximately ten minutes later at a reduced flow rate.

On December 17, 2007, the OVESC consultant observed that the annulus was "still gassing at a substantially reduced flow" and the gas was "not sour". OVESC had Appalachian Well Surveys run another cement bond log indicating that the first squeeze filled the annulus to a height of 2,656 feet below surface. A temperature log was also run that indicated several possible gas zones in the Devonian Shale. OVESC made the decision to try to eliminate the remaining gas by performing a second squeeze. The production casing was perforated at a depth of 2628-2630 feet below surface and the second squeeze cement job using another 800 sacks of 50/50 pozmix returned 41 barrels of cement to the surface.

On December 19, 2007, the consultant for OVESC reported that there was a "very minor flow" of gas venting from the cemented surface-production casing annulus. Another Appalachian Well Surveys cement bond log was run and it was stated by the OVESC consultant that there was a "probable micro-annulus visible on the log from 330' to 198'".

The DMRM and OVESC continued to monitor the English #1 well surface-production casing annulus subsequent to the second remedial cementing operation. The DMRM determined that the existing Cement Bond Logs were inadequate to render a final determination regarding the quality and effectiveness of the remedial cementing measures. On March 3, 2008, per DMRM recommendation, OVESC hired Baker-Hughes to run a Segmented Cement Bond Log.

The advantage of a segmented bond log is that it provides a 360 degree evaluation of the cement bond between the pipe and the well bore whereas the standard cement bond logs previously run evaluate cement bond quality in one direction only and provide a basis for

approximating the depth to the top of the cement. Based upon a review by four DMRM geologists, the Segmented Cement Bond Log indicates good to excellent bond between the casing and well bore from 2360 feet to approximately 550 feet below surface. The Segmented Cement Bond Log confirms channeling in the cement from about 550 feet to surface. This Segmented Cement Bond Log also confirms that the deep high-pressure gas has been isolated from the well. DMRM geologists believe that the gas still present in the surface-production casing annulus is near-surface gas emanating from the shale, or a mixture of low-pressure shale gas mixed with remnant gas from the November-December 2007 charging event. When open, the annulus serves as an avenue for gas to vent to atmosphere. The cemented surface casing protects the local aquifers from gas migrating through the channelized cement in the annulus between the surface and production casing strings.

**Conclusions Regarding the Current Condition of the English No. 1 Well**

Based upon this evaluation, the DMRM concludes the following:

1. The well-construction issues that existed between completion of the English #1 Well in mid-November 2007 and December 15, 2007 that resulted in the over-pressurization of the un-cemented annulus and release of natural gas into local aquifers have been eliminated through the following corrective actions:

   - Inadequate primary cementing of the production casing has been remedied with the subsequent squeeze cementing operations;
   - The deep high-pressure gas zones that were the source of over-pressurization of the aquifers have been isolated and sealed from the well bore through the squeeze cementing procedures;
   - The confinement of annular gas, which caused the build up of pressure, has been eliminated.

2. Remedial cementing operations completed by OVESC in mid-December, 2007 have effectively isolated and sealed deep, high-pressure gas bearing zones. As a result, natural gas from deep formations can no longer migrate up the surface-production casing annulus of the English #1 Well and charge local aquifers.

3. The "Clinton Sandstone" and "Newburg" are effectively sealed behind cemented production casing.

4. Production of "Clinton Sandstone" gas through the cemented production casing does not pose a threat to local aquifers or public health and safety.

5. When the valve on the 8-4" annulus is open, low-pressure shallow gas from the shale sequence between 550 to 253 feet below surface (surface casing shoe) should continue to migrate to surface through channelized cement and vent to the atmosphere.

## RISK ASSESSMENT/NEW PERMIT CONDITIONS

Beginning on Monday, December 17th, 2007 the DMRM began to compile records to complete a risk analysis for the Bainbridge incident.  Based upon a review of records and personal communications with on-site personnel the DMRM determined that confinement of deep, high-pressure gas in the surface-production casing annulus of the English #1 well prior to December 15 resulted in over-pressurization of the annulus.  This over-pressurized condition resulted in invasion of natural gas from the annulus into fractures in the bedrock below the base of the cemented surface casing.  This gas migrated vertically through fractures into the overlying aquifers and continues to slowly discharge through water wells.

Three successive events in the drilling and completion of the English #1 well are believed to be the primary contributing factors that led to the gas invasion of the shallow aquifers and subsequent home explosion on English Drive.  These factors are as follows:

**1.  Inadequate primary cement job**
The first contributing factor was inadequate cementing of the production casing prior to remedial cementing on December 15.  The industry standard for cementing production casing calls for sufficient cement to fill the annulus between the well bore and the casing 600 – 800 feet above the "Clinton."  At this height, the "Newburg" zone, which can be gas and/or brine bearing, is effectively sealed from the well bore and presents no further problem in completing the well.  175 sacks of Unitropic cement was ordered and run for the primary cement job for the English #1.  Theoretically, this amount should have provided more than enough fill up to cover and seal the "Newburg" at 3350 feet.  However, the bond long run on November 1 indicates the top of cement was only at 3640 feet, the level of the "Packer Shell" and approximately 300 feet below the "Newburg."  It appears from the record that the "Packer Shell" in the English #1 well is naturally fractured to the extent that it "thieved" most of the cement that was pumped into the well.  The result was that the borehole was exposed to high-pressure gas from the "Newburg" and any other deep-seated sources of gas.

**2.  Well stimulation with deficient primary cement job**
The second contributing factor was the decision to proceed with stimulating the well without addressing the issue of the minimal cement behind the production casing.  Hydraulic fracture stimulation normally involves injecting fluids and sand into the oil and gas reservoir to enhance the flow of hydrocarbons to the well bore.  When a well is properly constructed, the hydraulic fracture is confined between the permitted reservoir formation and the production casing.  The abnormal circulation that was observed during the stimulation of the English #1 well indicates that the frac communicated directly with the well bore and was not confined within the "Clinton" reservoir.  The communication could  have provided a conduit for "Clinton" gas to enter the annulus of the well.  While the out-of-zone hydraulic fracturing operation may have provided an avenue for "Clinton" gas to migrate up the surface-production casing annulus prior to completion of the first squeeze job on December 15,2007, the DMRM has determined that that fluids used in the hydraulic fracturing process, did not enter into local aquifers. Components of hydro-fracture fluids were not detected in any of the 76 water wells tested as part of this investigation.

**3. Confinement of Deep, High-Pressure Gas in the Surface-Production Casing Annulus**

Finally, the third and most critical contributing factor leading to the incident was the 31-day period after the stimulation during which the annular space between the surface and production casings was mostly shut in. This confined the deep, high-pressure gas from "Newburg" and/or "Clinton" within this restricted space.

Readings taken during this time were consistently 320 psi or greater. Typically, shallow gas does not register more than 30 – 60 psi on the annulus and can be closed in or vented without problem. Pressures of the order that were observed would indicate a deeper source of the gas present in the annulus. OVESC personnel opened the valve to blow off the pressure but continued to close the annulus when not on site. As pressure on the annulus built up, the gas migrated laterally and vertically through natural fractures in the surrounding bedrock. The is over-pressurized gas infiltrated the local aquifers, discharged through local water wells, allowed gas to enter some area homes in varying concentrations, and resulted in the explosion at one home.

The DMRM recognizes that the other factors played a secondary role in the incident including:

1. Local structural geology – The DMRM has concluded the localized faulting/fracturing in this area of Bainbridge Township resulted in gas accumulations in the driller's "Big Lime," and created conditions that partially "thieved" the primary cement job. [Opritza, S. (1996) reports that local folding and faulting can influence the accumulation of gas in the Oriskany pinch out play.] *The Atlas of Major Appalachian Gas Plays* (1996) identifies eight, small structurally influenced gas plays in northeastern Ohio. Patchen (1996) confirms the strong structural control on the occurrence of gas fields in the "Newburg" Dolomite. While natural gas was not identified in the Oriskany Sandstone in the English No. 1 well, the DMRM based its new permit conditions on a broad range of scenarios, not just causation factors present at the Bainbridge incident.

   OVESC prepared a casing cementing plan that was consistent with industry best-management practices. The local faulting/ in Bainbridge Township resulted in the unusual permeability in the "Packer Shell" that partially thieved the primary cement job, leaving overlying gas-bearing zone(s) unsealed.

2. Fluid drilling requirements – Drilling on fluid effectively restricted release of gas to atmosphere during the drilling operation. It appears that OVESC was unaware of deep gas bearing zones that were unsealed as a result of the primary cement job during drilling operations and completion.

3. No geophysical log – As a result of filter cake build-up, OVESC could not lower the logging tools to total depth. In addition, the density tool was defective. Ohio oil and gas law does not require a geophysical log and OVESC elected to complete the well without the benefit of a logrecord. (Had OVESC resolved these issues and run a geophysical log suite, they may

have been alerted to the present of gas in the "Newburg" or other zones in the Onondaga Lime.

As a result of this risk analysis, the DMRM developed new permit conditions that were implemented on January 18, 2008.  On February 6, 2008, the DMRM notified all permittees (33) in a seven-county area of northeastern Ohio, that the new conditions were being applied retroactively.  A copy of the notice, permittee list and permit conditions are included in Appendix 2.  Northeastern Region Manager Rick Simmers attended Ohio Oil and Gas Association Region I & II meeting on January 29 to present the new permit conditions to Northeastern Ohio operators.

Table 14 illustrates how the conditions were designed to address the primary and secondary causation factors identified through the risk analysis.  These conditions provide redundant levels of protection.

### Table 14:  Permit Condition Requirements

| Risk Factor | Permit Condition # | Permit Condition Requirement |
|---|---|---|
| 1.  Inadequate primary cement job | 1, 2, 3, 5 | In addition to witnessing cementing operations for the conductor and surface casing to seal all underground Sources of Drinking Water, the owner must notify the DMRM inspector when the well has reached total depth so that an inspector can be present to witness the primary cement job on the 4 ½ inch diameter production casing and verify proper borehole conditioning and fluid/cement circulation. |
| 2.  Well stimulation with deficient primary cement job | 7 | The driller must record the depth of all lost circulation zones during drilling operations.  This information must be provided to the inspector prior to running production casing and cementing.  The owner must cement the production string, at least 100 feet above the top of the Lockport.  The borehole must be properly conditioned and circulation must be established prior to running production casing.  If there is a significant break in circulation during the primary cement job for the production casing (possible indication of lost circulation), the owner shall run a cement bond log to evaluate the top of cement and cement condition. |
| 3.  Confinement of high-pressure gas in the surface-production casing annulus | 4, 8, 9, 10 | The owner must record the depth of all natural gas bearing zones encountered during drilling  and provide that information to the inspector prior to cementing production casing.  .  After completion of cementing operations, the owner must /monitor annular pressure for five days after cementing production casing before stimulation.  Owner must inform inspector of monitored pressures, and any releases from the pressure relief valve.  If pressure exceeds the limit, the owner must complete remedial cementing operations.  At no time, will the surface-production casing annulus be shut in, except during an authorized pressure test.  The surface-production casing annulus must be vented or equipped with a properly functioning relief valve.  The surface-production casing annular valve must |

| | | be plumbed above grade for easy access. |
|---|---|---|
| 4.  Cement thief-zone related to localized  structure | 4 | The geolograph and well completion report must include notation regarding all thief zones. The driller must inform the inspector of all thief zones prior to cementing production casing. |
| 5.  Gas detection inhibited by fluid drilling requirements | 4, 6, 8, 9, 10 | The operation must include notation of all oil and gas bearing zones encountered during drilling on the geolograph.  The driller must inform the inspector prior to cementing production casing. Annular pressure monitoring is mandatory even if gas is not detected during drilling, or post-drilling operations.) |
| 6.  Gas detection inhibited by decision not to run logging tools | 6 | Geophysical logging is mandatory.  Even if gas is not detected during fluid drilling operations, the owners must log the production-borehole with a suite of logging tools capable of identifying gas bearing zones.  A copy of the log must be provided to the inspector prior to running production casing. |

# WATER QUALITY

Ground water samples were collected and analyzed for a range of parameters to evaluate potential impacts from oil and gas operations. For discussion, the parameters are grouped as represented in Table 15. The parameters include metals, non-metals and physical parameters, VOCs, frac related organic compounds and dissolved gases.

## Table 15: Water Quality Parameters

| METALS | VOCs | Isopropultoluene |
|---|---|---|
| Aluminum, Total | Bromodichloromethane | Methyl-tert-butyl-ether |
| Arsenic, Total | Bromoform | Naphthalene |
| Arsenic, Soluble | Chloroform | Nitrobenzene |
| Barium, Soluble –AA | Dibromochloromethane (chlorodibromomethane) | N-propyl Benzene |
| Barium, Total | | Styrene |
| Bromide | Benzene | 1,1,1,2-tetrachloroethane |
| Iron, Soluble | Bromobenzene | 1,1,2,2-tetrachloroethane |
| Iron, Total | N-Bromomethane | Toluene |
| Magnesium, Total as Mg | Bromochloromethane | 1,1,1-trichloroethane |
| Magnesium (Mg), Total as CaCO3 | Butylbenzene | Tetrachloroethene |
| | Sec-butylbenzene | 1,2,3-trichlorobenzene |
| Manganese, Total | Tert-butylbenzene | 1,2,4-trichlorobenzene |
| Potassium, Total | Carbon Tetrachloride | Trichloroethene |
| Sodium, Total | Chlorobenzene | 1,1,2-trichlorethane |
| Strontium | Chloroethane | Trichlorofluoromethane |
| NON-METALS and PHYSICAL PARAMETERS | Chloromethane | 1,2,3-trichloropropane |
| | 2-Chlorotoluene | 1,2,4-trimethyl-benzene |
| Laboratory Ph | Dibromomethane | 1,3,5-trimethylbenzene |
| Conductivity | 1,2-dichlorobenzene | Vinyl Chloride |
| Alkalinity, Bicarbonate | 1,3-dichlorobenzene | 1-chloro-2-methylbenzene |
| Alkalinity, Carbonate | 1,4-dichlorobenzene | 4-chlorotoluene |
| Alkalinity, Phenolphthalein | Dichlorodifluoromethane | |
| | 1,1-dichloroethane | HYDROFRACTURE RELATED ORGANIC COMPOUNDS |
| Alkalinity, Hydroxide | 1,2-dichloroethane | |
| Solids, Total Dissolved | 1,1-dichloroethene | |
| Acidity | Cis-1,2-dichloroethene | Ethanol |
| Solids, Total Suspended | Trans-1,2-dichloroethene | Ethylene Glycol |
| Total Solids | Dichloromethane | Isopropyl Alcohol |
| Chloride | 1,2-dichloropropane | BACTERIALS |
| Sulfate As SO4 | 1,3-dichloropropane | E. Coli |
| Calcium, Total as Ca | 2,2-dichloropropane | DISSOLVED GASES |
| Calcium, Total as CaCO3 | 1,1-dichloropropene | Methane |
| Hardness, Total (CaCO3) | 1,3-dichloropropene | Ethane |
| Nitrate | Ethyl Benzene | N-Butane |
| Nitrite | Hexachlorobutadiene | Isobutane |
| | 4-isopropyltoluene | |

This rather extensive list of parameters has been used as a whole to evaluate potential impacts to local ground water resources. In the pages that follow, certain parameters will be the topic of a specific review. Parameter reviews will focus on those parameters with specific Ohio EPA Primary Maximum Contaminant Levels (PMCL) or Secondary Maximum Contaminant Levels (SMCL) or parameters that may serve as potential indicators of oilfield impacts. Parameters that are not specifically reviewed were either not detected, did not exceed either PMCL or SMCL standards, or are common components of ground water, but have no affect on health or safety. However, these parameters are important in evaluating the overall water chemistry. Certain parameters may be used to evaluate the "type" or overall characteristics of ground water. Other parameters either singly or in combination, may be used to evaluate potential contaminant sources or pathways. Many of the parameters are used to evaluate the relative accuracy of the analytical laboratory results.

Water samples were collected in the investigation area on a number of dates. Some water supplies had multiple chemical analyses, although not necessarily the same complete list of parameters. Furthermore, as part of the comprehensive water-sampling event in late February and March 2008, grab samples were collected by DMRM, OVESC's contractor, and Coshocton Environmental Testing Laboratory representing the law firm of Thrasher, Dinsmore and Dolen. Most of the parameters analyzed in the two grab samples provide two sets of data for review. During the evaluation of this data, quality control checks were reviewed and outlier data points were scrutinized. For discussion and evaluation purposes, higher parameter values were used to establish parameter concentration ranges for comparison with Ohio EPA PMCL and SMCL standards. For the total chemistry of a given water supply, the higher (less conservative) parameter concentrations were reviewed, regardless of source (DMRM; OVESC). By selecting the higher of the two reported concentrations provided by the laboratories, the following discussion provides a worst-case scenario for evaluation of potential impacts.

It is not uncommon for Ohio EPA SMCL or PMCL standards to have an exceedence even without an outside contaminant source. Further, water chemistry is dynamic. Water samples collected from a given water supply on separate occasions are likely to have some variation in water chemistry. Many factors, such as aquifer recharge, well use, well construction, well maintenance history, the condition of the water well, and local variations in geology may affect the types and concentrations of materials in a water supply.

Background water quality information is also critical in the evaluation of any water supply. DMRM has conducted a thorough review of available background water data. This background data is very useful in evaluating trends. Most water supplies within the Bainbridge investigation area do not have water analyses predating local oil and gas activities. The DMRM evaluated water quality impacts by comparing water quality data for samples collected prior to December 2007, with water quality data for samples collected after the gas invasion event.

Control water sampling sites were selected to assist in this evaluation. These sites were selected for a number of reasons. Most control points had somewhat complete water analyses that predate certain oil and gas activity. All control points are also believed to be outside of the impacted area. Comparisons of past water analyses with current water analyses provides a relative review of chemistry changes over time. Control points also prove useful in establishing

certain baseline information.  Discussions and reviews are based on total versus dissolved parameter concentrations.  Ohio EPA MCL standards are based on total concentrations.

Natural gas is relatively common in ground water, but may be introduced from oil and gas operation or other sources.  Monitoring of water wells and other point sources for explosive gas concentrations, or LEL's, is another useful tool in the overall evaluation.  This too has limits.  Most water sources are not monitored for explosive gases, therefore natural gas background data for individual supplies are usually not available.  Field observations and measurements are sometimes the most effective tool in the final review.

The parameter groups selected for this investigation were chosen to answer the following questions:
1. Is there evidence that oilfield brine contaminated or polluted public or private water supplies within the investigation area?
2. Is there evidence that crude oil contaminated or polluted public or private water supplies within the investigation area?
3. Is there evidence that chemical associated with hydrofracture operations contaminated or polluted public or private water supplies within the investigation area?
4. Is there evidence that natural gas has affected public or private water supplies in the investigation area?
5. Are concentrations of dissolved natural gas in public or private water supplies sufficient to present an ongoing safety hazard or concern for residents within the investigation area?
6. Is there evidence that natural gas migrating through the aquifers has altered inorganic ground water quality causing contamination or pollution of public or private water supplies within the investigation area?

Ground water is considered "contaminated" when measured concentrations of induced chemical parameters of interest exceed "background" levels or ranges.  Ground water is considered "polluted" when measured concentrations of induced chemical parameters of interest exceed "background" levels or ranges and exceed health-based concentrations prescribed by regulation. Ground water is considered "affected" where measured concentrations of induced chemical parameters of interest exceed background levels, or range, but there are no specific maximum concentrations or action levels specified by regulation.

**Metals**

Most metals found in ground water are commonly referred as trace metals.  When present, trace metals generally occur at very low concentrations.  There are exceptions however.  Iron may be present in concentrations much greater than other trace metals.  Trace metal concentrations may vary as a result of anthropogenic actions or natural processes.  Sources of background metals data are discussed in the Section on Background Water Quality.
The Bainbridge investigation also included 79 sampling sites, six of which were used as control points.  This data is also referenced in the Section on Background Water Quality.  Evaluations and discussions of trace metals reference total metal values.

**Aluminum**

Aluminum is the most abundant metal in the earth's crust; therefore it is not unusual to detect this trace metal in a water supply. Domestic water samples are rarely tested for aluminum. Public water systems are also rarely tested for this parameter. The Secondary Maximum Contaminant level (SMCL) for Ohio public water supplies ranges from 0.05 to 0.2 mg/l (50 – 200 ug/l).

Ground water samples collected for this investigation had total aluminum values ranging from <0.005 to 3046 ug/L. Of the 79 water samples analyzed for total aluminum, 6 had concentrations exceeding the Ohio EPA SMCL (200 ug/L). The SMCL upper limit exceedences were evaluated. Elevated concentrations of total suspended solids (TSS) were present in all but one of the water samples exceeding the upper limit of the SMCL. Elevated TSS concentrations are often associated with elevated trace metal concentrations.

The abundance of aluminum in the earth's crust and the association of aluminum silicates with feldspars and other mineral groups that are mineral components of shale may account for elevated total aluminum concentrations in samples with elevated TSS values (Table 16). With adjustments for total aluminum values based on elevated TSS values, all but three samples are within the background range, upper limits.

**Table 16: Aluminum Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| 0.05 – 0.2 mg/L (50 – 200 ug/L) | <50 – 3046 ug/L Differs from pg 3 (2940) | Not previously analyzed in control sites | <200 ug/l – 220 ug/L |

One set of background samples in the area of investigation predates local oil and gas activity. Data was available for the water supply located at 17969 Kingswood Drive. Samples were collected on August 25, 1998 and February 15, 1999. Aluminum concentrations were reported at 114 ug/L and 65 ug/L, respectively. DMRM investigation grab samples collected from the same water supply on February 21, 2008, indicate aluminum concentrations ranged from 200 ug/L to 2940 ug/L. TSS values associated with this sample were somewhat elevated. It is likely that total aluminum concentrations were affected by elevated TSS, but the level of effects by TSS or other factors cannot be determined. One other set of background data was found for a water supply located at 17400 Haskins Road. This water supply was analyzed for aluminum on October 28, 1998 and again on October 16, 2003. In both sampling events, aluminum concentrations were reported as <200 ug/l.

Inadequate control and background data does not allow one to establish a baseline for total aluminum. Without some form of a baseline, it is not possible to accurately determine if aluminum values observed in this investigation reflect normal value ranges for local aquifers, or if these values have been influenced by local oil and gas activities.

**Arsenic**

Arsenic is a common element in the earth's crust.  It complexes to form both inorganic and organic compounds.  Ohio EPA has established a public drinking water standard of 0.010 mg/L (10 ug/L).  Primary Maximum Contaminant Level (PMCL) is a health-based standard.

Total arsenic was detected in 10 of the 79 samples collected.  Nine of the samples were well below the PMCL.  Concentrations in the nine samples ranged from 0.002 to 0.005 mg/l (2 – 5 ug/L).  One sample collected at 17839 English Drive had an arsenic concentration at the PMCL of 0.010 mg/L (10 ug/L).  This water supply also had total iron concentrations ranging from 103.5 mg/L to 235 mg/L in grab samples.  The extremely high iron concentrations are believed to be associated with turbid water conditions.  Although the water well was pumped for at least 20 minutes prior to sampling, the water sample was iron stained and turbid at the time of collection.  Dissolved methane and ethane concentrations were reported to be less than their respective method detection limits.   LEL monitoring data indicates natural gas was detected in one of four monitoring events.  The LEL values for this event indicate the highest measurement was detected at a concentration of 1.1% at a hot water tap.  The water supply was re-sampled on May 12, 2008.

The water system was pumped until the water ran clear, then a sample was collected.  Iron concentrations in the untreated water were reported at 11.8 mg/L.  Water collected after flowing through an in-home treatment system had an iron concentration of 0.062 mg/L.  Arsenic concentrations in the untreated follow-up sample were reported to be below method detection limits.  Analytical results from resampling of this water supply indicate the elevated total iron and total arsenic concentrations are associated with solid phase constituents in the original sample.  Research suggests the most important sources of arsenic in ground water are pyrite and iron oxides (Smeadley and Kinniburg, 2002).  Although arsenic does appear to be present in the aquifer matrix, it does not appear to be present in the ground water itself.

Table 17 includes background, control, and Bainbridge investigation area arsenic ranges:

**Table 17:  Arsenic Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| 10 ug/L | <0.002 – 10.0 ug/L | <2 ug/L where tested | <0.05 ug/L – 24 ug/L |

The limited background data suggests arsenic is not commonly found in ground water supplies, but when present it is typically below the OEPA PMCL.  On occasion, individual supplies may exceed standards.  Other than with public water supplies, arsenic is rarely tested.  A sample collected for this investigation on February 22, 2008, at 8353 Bainbridge Road, had a reported arsenic concentration of 3.0 ug/L.  This is a public water supply and was tested for arsenic from January, 2003 to present.  A sample collected on January 14, 2003 had a reported arsenic concentration of 24 ug/l.  The water supply was resampled on June 24, 2003.  The arsenic concentration was reported at 7.0 ug/L.  Six additional samples were collected between July 8, 2003 and July 18, 2003.  Arsenic concentrations ranged from 5 to 8 ug/L for those sampling events. From September 21, 2004 to January 10, 2007, four samples were collected with reported arsenic concentrations <2.0 ug/L in each event.  This public water supply well was

developed in the Berea Sandstone and was also known to have encountered natural gas. The presence of natural gas is episodic. Higher arsenic concentrations in this well may be associated with the presence of natural gas. It may also be argued that naturally reducing conditions within the aquifer were transformed into a mildly reducing environment shortly after this water well was drilled. With time, natural gasses originally encountered in this well dissipated. With the reduction in measurable gas, arsenic concentrations were reduced to less than the method detection limit. Public water supply samples collected at 17419 Snyder Road, 17425 Snyder Road, and 9500 Bainbridge Road in 1999 and 2004 indicate arsenic concentrations ranging from 4 to 6 ug/L. A sample collected from a public water supply at 17400 Haskins Road on October 16, 2003 had a reported arsenic concentration of 14.2 ug/L. Samples collected from three public water supply wells at Lake Lucerne in 1999 and 2003, had reported arsenic concentrations from 2 – 3 ug/L. One of the Lake Lucerne water supplies is known to have natural gas present.

The background data from public water supplies demonstrates the variability of arsenic concentrations in local ground water. It also demonstrates that the presence of arsenic is not directly correlated with the presence of natural gas. Although it is possible to release arsenic into ground water under strongly reducing conditions, it is unlikely arsenic has been released by methanogenic processes in these wells. Natural gas has not been reported in a majority of the background water supplies. Therefore some other mechanism is likely responsible for the presence of arsenic in local ground water supplies.

Evaluations of arsenic during this investigation were compared with background data. The relative percentage of water supplies containing arsenic were similar. Arsenic values obtained during this investigation have a reported range of concentrations that lie well within the range of concentrations for background data. Even with an outlier data correction for the background data, the concentration relationships are maintained. The data suggest that total arsenic is present in Geauga County ground water, but the presence of arsenic cannot be reliably predicted. With few exceptions, the concentrations of arsenic would be expected to be well below Ohio EPA PMCL's.

The presence or concentration of total arsenic cannot be predicted with reasonable certainty. Arsenic is a poor indicator of impacts from an oil and gas operation. Arsenic values obtained through investigation water sampling efforts do not by themselves indicate ground water supplies have been impacted by oilfield operations.

**Barium**
Barium is a naturally occurring trace metal. The mineral barite ($BaSO_4$) can be used as weighting agent in drilling muds. DMRM has verified that barium containing products were not used on the English No. 1 well location. Water tests required by Urban Drilling Regulations include this trace metal as a screening parameter. Barium was detected in most of the 79 water samples. Concentrations ranged from <100 ug/L to 2.5 mg/L. Ohio EPA has established a PMCL of 2.0 mg/L for barium. Table 18 includes background, control, and Bainbridge investigation water quality ranges for barium.

**Table 18:  Barium Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| (200 ug/L) | <50 ug/l – 2500 ug/L | <100 ug/L – 300 ug/L | <10 ug/L- 1400 ug/L |

One water sample collected at 17970 Kingswood Drive had a barium concentration that exceeded the Ohio EPA PMCL.  The highest DMRM analytical  results reflect a soluble barium concentration of 2431 ug/L.  BioSolutions reported a total barium concentration of 2500 ug/L.  Data from the two labs are consistent.  A comparison of the barium result with other data for this water supply indicates the value is accurate.  This Ohio EPA PMCL exceedence was compared with data from control and background information.  Background data for barium ranges from <10 ug/L to 1400 ug/L.  Control data for this investigation ranged from <100 ug/L to 300 ug/L.  A comparison of these data sets must take into consideration widely ranging method lower reporting limits.  Certain data had method reporting limits as low as 10 ug/l while other method reporting limits were as high as 300 ug/L.

Neither background or control data reflect Ohio EPA PMCL exceedences.  Although this water supply does exceed Ohio EPA PMCL standards, the value appears to be an exception in the investigation area and the area in general.  If this barium value is considered as an outlier value, barium concentrations for water supplies within the investigation area are below Ohio EPA PMCL's and are very similar to ranges for background data.

The elevated total barium concentration associated with the water supply at 17970 Kingswood Drive seems to be related to chemical composition of the aquifer.  Other water supplies in close proximity to this water supply have slightly elevated total barium concentrations.  Parameters that may be associated with oilfield brines are not elevated in concentration.  The dissolved methane concentration was 0.02 mg/L.  The highest LEL reading at the tap was 0.1%.  There is no apparent correlation between barium and natural gas concentrations.

Barium data would suggest there are localized variations in aquifer matrix chemistry that affect water chemistry.  This barium PMCL exceedence cannot be correlated to oilfield activities.

**Iron**

Iron is a very abundant metal in many ground water aquifers.  Iron may enter a water supply through a number of processes affecting minerals in sediments or rocks or components of the water system itself.  The specific form iron takes is affected by water chemistry and may vary with physical or chemical changes to the system.  Ohio EPA has established an SMCL of 0.3 mg/L for iron.

Iron values ranged widely in the Bainbridge sampling events.  Table 19 compares background, control, and Bainbridge investigation water quality ranges for iron.

**Table 19:  Iron Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| 300 ug/L | <20 – 234,500 ug/L | 40 – 1930 ug/L | <   - 5100 ug/L |

Approximately 55 percent of water samples analyzed for total iron exceeded the Ohio EPA SMCL.  This is about 6 percent less than the percentage of exceedences reported by Jagucki (2001).  Percentage values are comparable, but the range of values associated with this investigation far exceed the background data.  The highest total iron concentration was 234.5 mg/L.  This sample result was discussed in the review of the arsenic data.  Several other samples had total iron concentrations outside of the background range.

Water samples collected at 7916 Scotland Drive, 7989 and 8010 Bainbridge Road, 17860 English Drive, and 17926 Kingswood Drive had total iron concentrations of 830ug/L, 60.1 ug/L, 20.42 ug/L, 25.54 ug/L, and 11.8 ug/L respectively.  Total iron values for 3 of 5 samples are suspected to be elevated as indicated by elevated TSS concentrations.  Arsenic was not detected in any of the five samples, so resampling for data verification was not initiated.  As would be expected, concentrations of manganese are elevated in each water supply.

The sample collected at 17926 Kingswood Drive does differ from other water samples in several ways.  The sodium concentration is elevated to the point that the water is classified as sodium-calcium bicarbonate type water.  The other waters are classified as calcium-magnesium bicarbonate.  The pH of the other four supplies ranged from 6.1 – 6.4 S.U.  Although it is believed all four water supplies are developed in the shale aquifer, there appears to be a strong influence from the Sharon sandstone.  Historic surface mining of the Sharon sandstone, within or near the investigation area, may contribute to the overall oxic conditions.  Elevated sodium concentrations appear to be from anthropogenic sources.

Data suggests processes including road salting and water softener regeneration brines are contributing to an overall degradation of water quality.  These effects are most prominent along the lower portion of English Drive, much of Scotland Drive, the lower limits of Kingswood Drive near Kenston Lake Drive, and at sampling locations at or near Bainbridge Road.  A private pond on English Drive had elevated sodium and chloride concentrations at values very similar to ground water samples in the immediate area.

The total iron concentrations closely parallel background iron ranges.  At least six water supplies have total iron concentrations far exceeding Ohio EPA SMCL's and lie well outside of the background range.  These water supplies reflect elevated concentrations as a result of elevated TSS concentrations.  Further, oxidizing conditions appear to be influenced by historic surface mining operations.  High iron concentrations cannot be correlated with dissolved methane concentrations. The overall water analyses do not seem to indicate total iron concentrations have increased as a result of oil and gas activities.

**Manganese**

Like iron, manganese is fairly common in water supplies. Approximately 41 percent of the investigation area analytical results exceeded the Ohio EPA SMCL of 50 ug/l. Three of these water supplies had reported total manganese concentrations exceeding the background range upper limit. A sample collected at 17839 English Drive was discussed in the arsenic section. Samples collected at 7989 Bainbridge Road and 7916 Scotland Drive had total manganese concentrations of 2850 and 2305 ug/l, respectively.

Both these water supplies have elevated total manganese concentrations, but the waters are very different in composition. The water from 7989 Bainbridge Road is a sodium-chloride type water while the water from 7916 Scotland is a calcium-bicarbonate type. The former seems to be affected by salt from anthropogenic sources, most likely in the form of road salt or water softener regenerating brine.

The latter is unusual in that calcium is the dominant cation. Both supplies have low pH, elevated sulfate, and elevated iron. They are developed as predominantly shale wells. Pyrite and/or iron oxides are the likely source for these elevated values.

Table 20 compares background, control, and Bainbridge investigation area water quality ranges for manganese.

**Table 20: Manganese Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| 50 ug/L | <10 – 2850 ug/L | <10 – 92 ug/L | <10 – 1150 ug/L |

**Non Metals and Physical Parameters**

**Chloride**

Chloride concentrations in ground water may vary greatly. Chlorides are a natural component of many ground waters, but are often introduced through anthropogenic processes. Sources of chlorides may include certain minerals within sedimentary rocks, natural connate waters or brines, water softener regeneration brines, road salting, and brine produced by oil and gas explorations or production operations. Chlorides are a major constituent of oilfield brines and chloride containing fluids are routinely used or encountered during the drilling of oil and gas wells.

Chloride has an Ohio EPA SMCL of 250 mg/l. Table 21 compares chloride value ranges for the Bainbridge investigation area, control sites, and background locations.

**Table 21: Chloride Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| 250 mg/L | 2 – 532 mg/L | 10 – 158 ug/L | 1.2 – 240 mg/L |

Of the 79 samples collected for this investigation, two exceeded the Ohio EPA SMCL. Reported chloride exceedences were associated with water supplies at 17820 English Drive and 7989 Bainbridge Road. Chloride concentrations were 532 and 389 mg/l respectively. Bromide was detected in the water sample at 17820 English Drive.

The presence of bromide allows contaminant sources to be indicated using a binary mixing curve for the chloride to bromide (Cl:Br) ratios. Data was plotted on a 1999 Geauga County Binary Mixing Curve (Jagucki, 2001).

Plot information suggests this water supply is being affected by either domestic sewage and/or halite with possible influence from septic leachate and water softener regeneration brine. The likely source of elevated chloride in this water supply is from halite used for road de-icing.

When outlier values are removed from each set of data, the range of values for chloride are very similar. Background data ranges from 1.2 – 240 mg/l while investigation area data ranges from 2 – 235 mg/L.

Water samples collected at 7989 Bainbridge Road have chloride concentrations ranging from 360 – 389 mg/l. Bromide was not detected. This water supply has a low pH and very elevated iron and manganese. Sodium levels suggest sodium adsorption in clay particles. Dissolved methane and ethane were not detected. This water supply appears to be affected by road salt and is influenced by oxic conditions, possibly associated with historic mining of the Sharon sandstone. Both water supplies show evidence of anthropogenic effects. If these values are considered as outlier data, chloride values for the investigation lie within the range of values reported for background data.

Chloride values exceeding 100 mg/L were also reviewed even though the values are below the Ohio EPA SMCL standard. Eight water analyses exceeded this limit. Six of the water supplies are clustered on the south end of English Drive with one supply on Scotland Drive and one on Bainbridge Road. This grouping of homes includes some of the water supplies closest to the English No. 1 Well. Chloride: Bromide ratios for the Scotland Drive and Bainbridge Road samples plotted very close to the water sample collected from 17820 English Drive. The ratios do not indicate an oilfield impact, but do suggest an impact from road salt or water softener regeneration brines. OVESC collected ground water and surface water samples at 18019 English Drive prior to drilling of the English No. 1 Well. Water well grab samples were collected for this water supply on February 19, 2008. Parameter values for the pre and post drilling water well samples are generally comparable, except chloride values were increased according to reports from one laboratory, but essentially unchanged by reports from a second laboratory. The lower reported value is indicated as being more accurate based on ionic balances with limited parameter availability. With this assumption, no significant changes are observed between samples collected prior to the drilling of the English No. 1 Well and samples collected on February 19, 2008. Further, a comparison of the water samples collected from the pond and water well reflects common differences between surface and ground water.

A majority of ions analyzed have somewhat lower concentrations in the surface water. This is as would be expected. Surface waters generally have less contact time with minerals that may contribute to the overall chemistry of water. Sodium and potassium levels are slightly elevated relative to the ground water sample.

Sodium levels, and to some degree potassium levels, are often elevated in surface waters when anthropogenic processes contribute to soluble salt concentrations. In this case, if road salt or water softener regeneration brine have contributed to the overall concentrations of sodium and chloride, sodium concentrations would be elevated in the surface water because sodium adsorption on clays would be minimal due to surface area and residence time factors. Data suggest the concentrations of chloride on the south end of English Drive are elevated by road salt and/or water softener regeneration brines.

**Sulfate**

Sulfate compounds contain sulfur and oxygen. These compounds may be derived from certain minerals, including pyrite. When conditions are right, sulfur reducing bacteria may oxidize sulfate compounds. Oxygen is removed and hydrogen sulfide gas may be produced. Ohio EPA has established a SMCL of 250 mg/l for sulfates. A review of the analytical results shows the concentration of sulfates varies widely in this area. Table 22 compares ranges of sulfate concentrations with control and background samples.

**Table 22:  Sulfate Comparison Standards**

| Standard | Investigation Area Range | Control Range | Background Range |
|---|---|---|---|
| 250 mg/L | <2 – 61.8 mg/L | 11-90 mg/L | <2-80 mg/L |

Sulfate values are with a range that is expected for the area and aquifer types.

**Dissolved Gases**

Ground water commonly contains a variety of dissolved gases. Often times dissolved gases go unnoticed. The presence of natural gas in water is dependent on a number of factors. In the Bainbridge area, the Devonian shales that underlie the Berea Sandstone are known to bear natural gas.

Reports of natural gas are described in water well completion reports and are sometimes noted in drilling reports from oil and gas operations. Personal communications with area water well drillers provide further accounts of the widespread nature of shallow natural gas. The Background Water Quality section provides a discussion on the occurrence of natural gas in the Devonian Shale sequence of southwestern Geauga County.

Natural gas in ground water is a common enough problem in Geauga County. Prior to this incident, DMRM staff met with representatives of the Geauga County Health District to review water well drilling procedures necessary to avoid or control shallow natural gas. This meeting was in response to natural gas in water well complaints referred to DMRM by the health district. Certain of the complaints were in areas where no oil and gas wells had been drilled.

Improperly constructed water wells, like their larger oil and gas counterparts, may allow natural gas to migrate between aquifers.  Natural faulting, fracturing, and jointing of aquifers affect recharge, but may also provide migration pathways for contaminants migrating from the surface or upward from deeper sources.

Water wells developed in the  Berea Sandstone may produce water with dissolved gas present or natural gas may exsolve before pumping.  In the first case, gas may go unnoticed, or exsolve in the water system and be observed as sputtering, cloudy water, or as tiny bubbles on the side of a glass.  In the second case, gas may exsolve from the water before pumping and may be measurable in the water well or well vent itself.  In some cases both occur. As gas exsolves from water within the water well, or is released as a bubble from the aquifer, the gas rises to the surface.  Over time, air within the water well casing is pushed out of the well.  When an LEL measurement is taken, a range of readings up to 100% may occur.  Further, the readings will change with time.  If natural gas enters a water well quickly, the LEL value will likely remain high.  If natural gas enters the well slowly,  wind, water well pumping, and other actions will draw ambient air into the water well.  Lower LEL readings would be expected.

Even affects such as wind at the time of LEL measurements may affect the readings.  Variable readings are not uncommon.  Vary shallow natural gas has been encountered in many counties of Northeast Ohio for many years.

DMRM has had a number of shallow gas drilling conditions in place since at least 1985.  These drilling conditions require oil and gas operators to drill and construct wells in a manner necessary to avoid cross-contamination of fresh water aquifers.

The abundance of natural gas at various depths in Geauga County, and the commingling or cross-contamination of aquifers through natural or man-made pathways (i.e. water wells or oil and gas wells), has the potential to cause impacts on underground sources of drinking water.  Certain dissolved components of natural gas were evaluated in an attempt to define potential impacts to area water well.

These dissolved gases included methane, ethane, N-butane, and isobutene.  Natural gas generally contains these compounds plus a fairly complex array of other compounds.  Natural gas may be generated by thermogenic or microbial processes.  Gases generated by thermogenic processes often have a more complex composition.  Gases generated by microbial processes are often less complex and contain mostly simple hydrocarbons such as methane and ethane.

U.S. EPA has not established a Primary or Secondary Maximum Contaminant Standard for dissolved methane or other components of natural gas.  According to the Agency for Toxic Substances and Disease Registry (ASTDR) ingestion of water containing natural gas does not pose a direct health hazard.  However, using he water in the home can allow dissolved natural gas to exsolve, releasing natural gas into rooms where water is used.  If natural gas is dissolved in sufficient concentrations, and sufficient volumes of water are discharged there are potential safety issues.

The Federal Office of Surface Mining Reclamation and Enforcement (OSMRE) has developed a technical standard with specific action levels to address methane dissolved in ground water associated with active or abandoned coal mines. In 2001, the OSMRE published the conclusions of the Methane Work Group, in part to provide guidance to regulatory personnel that assess hazard potential while conducting investigations of citizens complaints involving dissolved methane in ground water (Eltshlager, Dieringer et. al, 2001). Table 23 includes the recommended action levies for methane in water.

**Table 23: Action Levels for Methane in Water**

| Dissolved Methane Concentration mg/l | Action |
|---|---|
| >28 mg/L | A dissolved methane concentration greater than 28 mg/L indicates that potentially explosive or flammable quantities of the gas are being liberated in the well and/or may be liberated in confined areas of the home. This concentration of methane should result in immediate ventilation of the wellhead to the atmosphere. Additionally, methane concentration in excess of 28 mg/L may require further mitigation and modifications to the water supply system. |
| >10 mg/L but <28 mg/L | When a dissolved methane concentration exceeds 10 mg/L, it should be viewed as a warning that gas is not only present but that the concentration may be increasing. Appropriate actions would be to warn the occupants. This warning should include information that the concentration of methane is above 10 mg/L, and that remediation may be prudent to reduce the methane concentration to less than 10 mg/L. Additionally, the warning should include a recommendation that ignition sources be removed from the immediate area. |
| <10 mg/L | Levels of methane less than 10 mg/L require no immediate action. Periodic monitoring should be performed to verify that the gas concentration has not changed. |

The highest dissolved methane concentration reported during this investigation was 1.04 mg/L. At this level, OSMRE recommends periodic monitoring to verify changes in gas concentration. The DMRM LEL monitoring program and the in-house gas detection systems have not identified significant changes in in-house gas concentrations throughout the eight-month monitoring period, to date. The highest indoor gas concentration reading in the investigation area was 0.8 % LEL. At this concentration, natural gas would have to increase over 125-fold to result in explosive conditions.

The water samples analyzed for dissolved gases did not indicate the presence of N-butane or isobutene. A total of 46 samples indicated the presence of dissolved methane. The highest recorded concentration of methane was 1.04 mg/l. Ethane was detected in a total of 12 samples, with a maximum reported value of 0.98 mg/l. Dissolved gases of this type are not commonly analyzed and monitoring for such gases rarely occurs. Background data for this area is not available, however reports of natural gas are included in Ohio EPA records for the Bainbridge Police Department water well and other public water supplies. In addition, the occurrence of natural gas in ground water for wells developed in the Berea-Bedford sequence is common in

Geauga County.  This finding is based upon interviews with local residents, water well drillers, and a review of records for the Bainbridge Police Department.  Control samples also indicate the presence of certain dissolved natural gases including methane and ethane.

The presence of dissolved methane and/or ethane alone may not be used as evidence of oil and gas effects.  The lack of background data for natural gases and the fact that natural gas is present in some shallow aquifers in Geauga County makes interpretation of analytical data very difficult.  Natural gas from the English No. 1 well has charged one or more aquifers in the investigation area.  Records and personnel communications demonstrate the presence of natural gas in certain public water supplies, at least one control site, and several domestic water wells within the investigation area prior to drilling of the English No. 1 well.  Shallow, naturally occurring gases present in these water supplies have not been characterized.  Based on water well construction information, it is likely the gases originate in the Devonian shales.  Gases from this formation are expected to be similar in composition to deeper gases.  Furthermore, migration of gases through bedrock and ground water aquifers tend to change the composition of the gases, much like water chemistry is subject to change.

Dissolved gas analyses must be  interpreted carefully and in conjunction with all other available data.  The presence of gas, including gases with more complex chemistry, cannot be used as a sole indicator of oil and gas activity impacts.

U.S. EPA has not established a Primary or Secondary Maximum Contaminant Standard for dissolved methane or other components of natural gas.  According to the Agency for Toxic Substances and Disease Registry (ASTDR) ingestion of water containing natural gas does not pose a direct health hazard.  However, using tap water in the home can allow dissolved natural gas to exsolve, releasing natural gas into rooms where water is used.  If natural gas is dissolved in sufficient concentrations, and sufficient volumes of water are discharged there are potential safety issues.

The Federal Office of Surface Mining Reclamation and Enforcement (OSMRE) has developed a technical support with specific action levels to address methane dissolved in ground water associated with active or abandoned coal mines.  In 2001, the OSMRE published the conclusions of the Methane Work Group, in part to provide guidance to regulatory personnel that assess hazard potential while conducting investigations of citizens complaints involving dissolved methane in ground water (Eltshlager, Dieringer, et. al 2001).

**Frac Related Organic Compounds**

As a comprehensive ground water sampling plan was being developed, drilling and frac related materials used on the English No. 1 Well were reviewed.  Certain  compounds that were present as additives in the water used to frac the English No. 1 well were identified and selected for analysis, including Ethanol, Ethylene glycol, and Isopropyl alcohol.  The relative volume of material used in frac jobs is very small.  These compounds are also quite common in non-oilfield applications.

he 

Ethylene glycol is a primary component of antifreeze, certain deicing agents, and brake fluids. Other industrial applications are also common. Ethanol, or ethyl alcohol and Isopropyl alcohol are distilled products commonly used as solvents or in association with surfactants. These chemicals also have domestic and commercial uses. The simple detection of one of these compounds does not indicate source.

Water analyses were completed for these compounds. The compounds were not detected in any water supply. The analytical results, combined with other screening parameter results indicate frac related fluids did not charge the aquifer.

**Primary Volatile Organic Compounds (VOCs)**

The USEPA and Ohio EPA analyze water samples for volatile organic compounds through a standardized VOC test. This VOC test is designed to screen for some 56 volatile organic chemicals. Twenty-one of the listed chemicals have USEPA PMCL's. The PMCL standards are included in Appendix1, entitled "Public Drinking Water Standards for Ohio, Revised September 26, 2005." Many of the chemicals on this list are manmade, and are not associated with oilfield activities. Certain VOC's, such as benzene, ethylbenzene, and toluene have many possible sources, including certain crude oils and oilfield brines. The VOC's that may be associated with oilfield brines or crude oil have varying degrees of solubility in water. This solubility may cause the dispersion and transport of these constituents at a faster rate than a free product such as crude oil. This allows such chemicals to be used to screen for oilfield contaminants earlier than screening for the principal contaminant alone. Although some VOC's may have multiple potential sources, others are fairly indicative of a source. Four chemicals included on the VOC list, Bromodichloromethane, Chloroform, Dibromochloromethane, and Bromoform, are known as Trihalomethanes (THHM). When detected in ground water, these compounds are commonly associated with the chlorination or bacterial disinfection of a water well. The PMCL for THHM as an aggregate concentration of the four chemicals is 80 ug/l (0.080 mg/l).

A total of seven VOC's were identified or tentatively identified in five of the seventy-nine water supplies tested. A water sample collected at 17926 Kingswood Drive tested positive for Dibromochloromethane, Bromodichloromethane, and Chloroform (Trichloromethane). These compounds belong to the group of chemicals commonly referred as THHM. The total concentration of the chemicals was reported at 7.94 ug/L. This is well below the Ohio EPA PMCL of 80 ug/L. One of the water well disinfection byproducts was also detected in a water sample collected at 17820 English Drive. Chloroform (Trichloromethane) was reported at a concentration of 11.88 ug/L. This water supply also contained Dichloromethane (Methylene Chloride) at a reported concentration of 1.04 ug/l. This chemical was detected at a concentration well below the Ohio EPA PMCL of 5 ug/L. Dichloromethane is likely present as a common laboratory contaminant. The THHM chemicals are commonly referenced as water well disinfection byproducts.

A water sample collected at 17968 Kingswood Drive had a reported concentration of Toluene of 1.12 ug/L. A second grab sample collected during this water-sampling event had a reported concentration below the method detection limit. The Ohio EPA PMCL for Toluene is 1000 ug/L. Although Toluene has many potential sources, such as glues or solvents for PVC

piping, it is associated with certain crude oil and oilfield brine. Even though the reported concentration was very low, an additional sample was collected on May 14, 2008. The laboratory test results indicate Toluene was below the method detection limit. Two of the three chemical analyses reported Toluene concentrations below the method detection limit. The third chemical analysis reported Toluene very close to the method detection limit. It is possible that Toluene was in this water supply at very low concentrations, but it is more likely the chemical was misidentified.

Chloromethane was detected in a water sample collected at 17990 English Drive. It was also reported in a water sample collected at 8353 Bainbridge Road. The reported concentrations were 9.36 and 6.68 ug/L, respectively. In both cases, the chemical was not detected by a second laboratory analyzing grab samples collected during the same sampling event. The reporting laboratory noted that the "Chloromethane result may be a false positive due to interference by an unknown compound that the mass spec is identifying as propylene oxide or methyl-propane." Similarly, Chloroethane was reported in the water sample from 8353 Bainbridge Road. One laboratory reported a concentration of 0.72 ug/L, while the second laboratory reported results below the method detection limit. The two water supplies were re-sampled on May 14, 2008. The laboratory had to raise the method detection limit for Chloromethane due to interferences. The laboratory report showed that none of the previously detected chemicals were detected in the May 14, 2008 samples. The analytical data would suggest the chemicals were misidentified due to lower range interferences.

The VOC data does not indicate volatile, soluble organic compounds associated with crude oil or oilfield brine have impacted local ground water aquifers.

**Conclusions**

Over the course of this investigation, many sources of data were reviewed before reaching a conclusion of impacts resulting from surface casing over-pressurization at the OVESC, English No. 1 Well. Initially, explosive gas meters were used to define an area of immediate impact for safety purposes. The initial explosive gas monitoring was continued and is referenced as LEL monitoring. Water samples were collected and analyzed for a range of parameters. Early samples were designed as reconnaissance measures in an attempt to define impacts and the aerial extent of the problem. This was followed by a comprehensive water-sampling event that included at least 79 water supplies. Nearly 10,000 lines of analytical data were collected and reviewed. The analytical data was used to evaluate oilfield impacts to the ground water system from natural gas, crude oil, deep formation brines, and hydraulic fracture related fluids.

As the various sources of data were gathered and reviewed, correlations between data were determined, where possible. Each set of data has certain value and certain limitations. The initial explosive gas monitoring established a baseline for safety, but is very limited in differentiating between naturally occurring gases and deeper, higher pressure gases that charged the aquifers. LEL monitoring is useful as a safety screening tool and may provide some information to differentiate natural gas sources. LEL data is also a somewhat effective tool for the evaluation of the effectiveness of water well pumping events to reduce hydrostatic pressures. The data has value in determining the potential migration of charged natural gas within the

aquifers. LEL data is also limited in that it does not distinguish gas sources and without controls data may appear variable or random. Pumping of individual water wells has the potential to affect aquifer properties, which in turn have the potential to affect LEL readings.

Water analyses are used to evaluate aquifer and individual water well chemistry. The water sample analytical results are compared to a variety of data sets including background and control-site analyses. The most useful comparison is a direct comparison of water well chemical data with historic chemical data from the same well. Unfortunately, for most private water supplies historic water samples do not exist. In the few instances were this data was found, the historic chemical analyses were very limited in scope. Background data is gathered from as many sources as possible in order to draw comparisons with data collected during the investigation. Background well or water characteristics have value. Field observations often times provide the most direct evidence of an impact. Even direct observations must be used carefully. An observed impact, such as turbid or cloudy water, may have a number of plausible explanations.

DMRM has made every effort to approach this investigation in a fair and unbiased manner. A comprehensive approach to identify all possible information and evaluate this information using proper scientific methods was maintained throughout the course of this investigation.

As a result of this comprehensive investigation and the data referenced in this report, DMRM has made the following determinations as official findings of fact.

- The OVESC, English No. 1 Well was originally constructed in such a manner as to allow the over-pressurization of the surface casing/production casing annulus. This over-pressurization ultimately caused local ground water aquifers to become charged with natural gas originating in deep hydrocarbon reservoirs.

- The DMRM has identified 23 water wells (22 private and one public supply) that were affected (disrupted) by gas invasion from the English No. 1 well. The magnitude and longevity of the affectment vary significantly. Natural gas affectment persists to this date in some of the wells and appears to have dissipated in others.

- The highest concentration of dissolved methane found in the 79 water wells was 1.04 mg/L. At this concentration OSMRE guidelines state that no immediate action is necessary; rather, periodic monitoring should be performed to verify that gas concentrations are not changing.

- The highest indoor LEL reading recorded during nine months of in-home monitoring was 0.8 percent of the LEL. At this level, the concentration of natural gas would need to increase 125-fold to result in an explosive atmosphere in a confined area.

- During the first nine-month monitoring period, there has not been a single incident in which the alarm of a wall-mounted natural gas detector has been triggered at any of the 49 monitored residences.  Wall mounted gas detection systems are programmed to trigger an alarm at 10 percent of the LEL.

- Based upon review of water quality data, the DMRM has determined that ground water has not been contaminated, polluted, or affected by oilfield brine.

- Based upon review of water quality data, the DMRM has determined that ground water has not been contaminated, polluted or affected by crude oil.

- Based upon review of water quality data, the DMRM has determined that ground water has not been contaminated, polluted or affected by hydro-fracture fluids.

- The DMRM has determined that there is inadequate evidence to conclude that natural gas migrating through the aquifers has altered inorganic ground water quality, or has resulted in contamination, pollution or affectment of public water supplies.

- Ground water for all water wells except one, met OEPA health-based PMCLs for public water supplies for all tested parameters.

Figure 25 shows the location of those properties determined by DMRM to have had some degree of affectment from natural gas originating at the OVESC, English No. 1 Well.  The impacted properties are also listed in Tables 24 and 25.

### Table 24:  Natural Gas Affected Water Supplies and/or Structures

| Address | Nature of Impact |
|---|---|
| 17938 English Drive | Structure/Water Supply/Water System |
| 17939 English Drive | Water Supply/Water System |
| 17955 English Drive | Water Supply/Water System |
| 17975 English Drive | Structure/Water Supply |
| 17990 English Drive | Water Supply/Water System |
| 17995 English Drive | Water Supply |
| 7987 Scotland Drive | Water Supply |
| 7969 Scotland Drive | Water Supply/Water System |
| 7915 Scotland Drive | Water Supply |
| 7859 Scotland Drive | Water Supply/Water System |
| 7868 Scotland Drive | Water Supply/Water System |
| 17969 Kingswood Drive | Water Supply/Water System |
| 17971 Kingswood Drive | Water Supply/Water System |

**Table 25:  Probable Natural Gas Affected Water Supplies and/or Structures**

| *Address* | Nature of Impact |
|---|---|
| 17954 English Drive | Water Supply |
| 7955 Scotland Drive | Water Supply |
| 7941 Scotland Drive | Water Supply |
| 7927 Scotland Drive | Water Supply |
| 7846 Scotland Drive | Water Supply |
| 17926 Kingswood Drive | Water Supply/Water System |
| 17927 Kingswood Drive | Water Supply/Water System |
| 17936 Kingswood Drive | Water Supply |
| 17937 Kingswood Drive | Water Supply |
| 8353 Bainbridge Road | Water Supply |

## NEXT STEPS AND RECOMMENDATIONS

DMRM will remain involved in monitoring the homes and aquifers associated with this investigation in Bainbridge Township until the affects of the natural gas charged aquifers are resolved.  The charged natural gas may be present at varying levels for some time.  Although the overall trend indicates the charged natural gas is dissipating, there may be lingering affects for a length of time that cannot be accurately estimated.

DMRM will modify the LEL monitoring plan based on LEL trends.  LEL monitoring locations will be selected in a manner that focuses on those water supplies that have higher LEL readings.  Homeowners will be contacted as monitoring locations and schedules are revised.

Additional water sampling will also be scheduled.  The DMRM will use water sample analytical data from our previous efforts to establish this follow-up water-sampling program.  Future sampling event(s) will focus on water supplies that were affected by the charged natural gas and will include water supplies developed in a variety of aquifers.  Sample parameter lists will be modified.

DMRM will assist all homeowners who wish to reconnect to existing water wells.  For all residents that wish to reconnect to their domestic water supplies, OVESC will contract the services of a licensed water well contractor who will clean, re-develop, and disinfect wells in accordance with requirements established by the Ohio Department of Health. For those homes with a continued affect, other options will be reviewed with homeowners on a case-by-case basis.  Options may include, but are not limited to one or more of the following:

- potential connection to a public water supply;
- installation of a natural gas removal system in an existing water well;
- modification of an existing water well;
- drilling of a new water well, if feasible;
- cleaning and disinfection of an existing water well, supply lines, and associated equipment;
- installation of in-line treatment equipment, if feasible.

Affected homeowners will be contacted by DMRM to review these and other options.

Should you have any questions or comments, please address them in writing, or by e-mail, to Marlene Hall with the DMRM's Uniontown Office.

Mail:  ODNR/DMRM
       3575 Forest Lake Drive, Suite 150
       Uniontown, Ohio  44685

E-Mail:  Marlene.Hall@dnr.state.oh.us

## SUMMARY OF PUBLIC COMMUNICATIONS

The Bainbridge investigation presented unique communication challenges primarily due to the number of residents within the "investigation area," the number of public records request, and the number and frequency of inquiries requiring written response.  While working to complete the investigation the DMRM endeavored to keep citizens and local officials informed in the following ways:

1) Personal communication during natural gas monitoring events;
2) Communication through local media;
3) Public meetings;
4) Distribution of FAQs;
5) Update letters;
6) News releases;
7) Report chapter releases;
8) Response to e-mails and citizen phone calls;
9) Response to public records requests;
10) Meetings with local government officials;
11) Distribution of the final report.

The following is a chronological summary of key communication efforts following the initial complaint received on Saturday, December 15, 2007.  Copies of key communications are included in Appendix 3.

| | |
|---|---|
| 12/15/2007 | DMRM field staff provided contact information to Emergency Responders with the Bainbridge Township Fire Department. |
| 12/17/2007 | Beginning the week of 12/17/2007, DMRM inspectors and geologists were in Bainbridge Township daily for weeks, then several days each week, often times on Sunday, to answer questions while monitoring gas concentrations. |
| 12/18/2007 | DMRM Deputy Chief Kell contacted the Bainbridge Township Trustees and provided contact information for Oil and Gas Program administrators responsible for coordinating the investigation.  (Deputy Chief Kell, Northeast Region Administrator Simmers) |
| 1/18/2008 | ODNR News Release<br>• Announced new protective permit conditions to prevent annular over-pressurization<br>• Stated that OVE's remedial cementing prevented further migration of gas into the local aquifer<br>• Announced ongoing efforts to purge water wells/aquifers |
| 1/29/2008 | Letter to local affected residents<br>• Announced completion of preliminary investigation<br>• English No. 1 well identified as the source |

- Stated DMRM's conclusion that source of natural gas had been eliminated
- Pledged continued monitoring to further evaluate success of corrective action (remedial cementing)
- Stated DMRM's belief that gas was diminishing
- Promised full report when water well testing was complete
- Provided <u>Water Sampling, Analysis and Monitoring Plan</u>
- Discussed methane in water wells and recommendation for venting/continuous monitoring

1/30/2008   DMRM meeting with Senator Grendell/Bainbridge Township Trustees
- Presented conclusions on causation
- Discussed new permit conditions
- Requested input on DMRM's role at the forthcoming public meeting scheduled for February 7th, 2008

2/7/2008   Bainbridge public meeting
- Presentations regarding cause (annular over-pressurization), corrective actions (remedial cementing), next steps in the investigation
- Presented the following summary regarding causation:: "In conclusion, the DMRM believes that periodic confinement of deep-formation gases in the surface-production annulus of the English well resulted in annularover pressurization and the escape of gas from the annulus into fractures in the surrounding bedrock. The DMRM has evaluated other oil and gas wells within one-mile of the incident and has <u>not</u> found evidence of other contributing sources to date. Since completion of remedial cementing operations at the English No. 1 well, measured concentrations of methane in local water wells have generally declined.
  <u>Contributing factors</u>:
  1. Inadequate identification of gas-occurrence in formations above the Clinton Sandstone
     a. Fluid drilling
     b. Surmise that drilling fluid mud cake adjacent to fractured zone prevented OVE's contractor from getting logging tools to total depth
     c. Log tool malfunction
     d. Decision to complete the well rather than wait on functional logging tools
  2. Fractured zones thieved the production casing cement resulting in far less fill up than planned.
  3. Deep formation (high pressure – 370 psi) gas was not constrained by the initial cement job, entered the well annulus, and created the over-pressurized conditions (several viable explanations)
  4. Annular gas was confined rather than vented or flared.
- Geauga County Health District officials answered questions regarding coliform bacteria
- Provided information regarding forthcoming sampling event

- Responded to citizen questions
- Provided DMRM contact names/numbers

2/15/2008   Water Sampling Flier
- Announced plans to implement extensive ground-water sampling program beginning on February 19, 2008
- Assured residents that lab reports would be free of charge
- DMRM geologists would be available to explain results
- Provided DMRM contact information (directed e-mail and phone inquiries to the DMRM Uniontown office)

2/29/2008   Letter from Deputy Chief Kell, including Coliform Bacteria FAQ
- Water sampling update
- Coliform Bacteria FAQ with references
- Provided contact names/numbers for State and local Health Dept. officials
- Again directed citizen questions to DMRM Uniontown office

3/14/2008   Letter from Deputy Chief Kell, including Natural Gas FAQ
- Includes explanation of monitoring methods
- Meaning of results
- Action levels
- Safe ventilation and safety recommendations
- Again, provided DMRM Uniontown office contact information and references

3/25/2008   Record of Natural Gas Monitoring
- Started use of new form to record gas monitoring results – left with resident after each monitoring event

4/1/2008   North Region Administrator Rick Simmers meeting with Bainbridge Township President Matthew Lynch
- Answered questions regarding investigation
- Offered to provide  regular update regarding investigation progress (via phone, e-mail, hard-copy, or through personal meeting)

4/7/2008   Letter from Chief Husted
- Directed Bainbridge officials to continue routing inquiries through the DMRM Uniontown office
- Directed public records requests through Administrative Assistant Marissa Priest
- Pledged the North Region Administrator Rick Simmers would provide a weekly update through Bainbridge Township Zoning Inspector Mike Joyce.

4/21/2008   Letter
- Announced continued general decline in gas concentrations
- Announced that Biosolutions had completed analyses

- Stated that DMRM would distribute lab reports ASAP after we receive copies
- Again provided DMRM Uniontown office contact information
- Corrected misinformation about our sampling program presented at most recent meeting of Township Trustees (we are testing for soluble components of crude oil)

4/25/2008   Letter from Deputy Chief Kell and Report on the Current Construction of the English No. 1 Well
- Dispelled rumors that the English well continues to charge local aquifers with gas
- Presents DMRM expert consensus position on current risks
- Announced no final decision on fate of the well
- Again provided DMRM Uniontown office contact information

5/1/2008   Release of Water Quality Reports (80+) with cover letter
- Provided DMRM Uniontown office contact information

5/13/2008   Release of Final Findings Regarding Causation
- Confirmed conclusions that confinement of natural gas in the surface-production casing annulus at the English no. 1 well was the cause of the problem

5/21/2008   Letter from Deputy Chief Kell to Bainbridge Township Trustees
- Addressed questions regarding possible future drilling operations in vicinity of the Tanglewood Community public water supply.
- Described extensive permit conditions imposed on potential drilling operations.
- Offered to address questions in writing.

6/9/2008   Public meeting with Bainbridge Township Trustees
- Informed residents regarding forthcoming resumption of oil and gas drilling operation(s) in Bainbridge Township
- Explained that proposed wells were not in the Source Water Protection Area of the Tanglewood Community Public Water System
- Explained purpose of permit conditions designed to protect fresh ground water resources
- Provided an update on the status of the investigation

8/2008   Letters to selected residents regarding water well disinfection, cleaning and water well reconnection process including FAQ prepared by ODH

9/1/08   Final Report Announcement
Web Posting of Report

# REFERENCES

Aller, Linda and Bellow, Karen, 1995, "Ground Water Pollution Potential of Geauga County, Ohio", Ohio Department of Natural Resources. Division of Water, Ground-Water Resources Section. Geodesy Inc. Report No. 12

Baker, B. B., Wallrabenstein, L. K., Richards, R. P., and Creamer, N. L., 1989, "Nitrate and pesticides in private wells of Ohio, a state atlas", Tiffin, Ohio, Water Quality Laboratory, Heidelberg College (Part 2. County summaries), p. 97-100

Baranoski, M. T., 2002, "Structure Contour Map on the Pre-Cambrian Unconformity Surface in Ohio and Related Basement Features", Ohio Department of Natural Resources, Division of Geological Survey

Budavari, Susan, Editor, 1989, "The Merck Index and Encyclopedia of Chemicals, Drugs, and Biologicals",  Merck & Co., Inc. Rahway, New Jersey, USA, Eleventh Edition

Davis, S. N., Whittemore, D. O., and Fabryka-Martin, J., 1998, "Uses of chloride/bromide ratios in studies of potable water", Ground Water, v. 36, no. 2, p. 338-350

Driscoll, Ph.D., Fletcher G., 1986, "Groundwater and Wells", Johnson Filtration Systems, Inc., St. Paul, Minnesota, Second Edition

Eberts, S. M., Bair, E. S., and de Roche, J. T., 1990, "Geohydrology, ground-water quality, and simulated ground-water flow", Geauga County, Ohio, U. S. Geological Survey, Water-Resources Investigation Report 90-4026, 117p.

Fetter, C. W., 1980, "Applied Hydrogeology", University of Wisconsin – Oshkosh. Charles E. Merrill Publishing Company, Columbus

Gray et al, 1982, "An Integrated Study of the Devonian-Age Black Shales in Eastern Ohio", USDOE/ET/12131-1399

Gray et al, 1982, "Evaluation of Devonian Shale Potential in Ohio", USDOE/METC-122

Hoover K., 1960, "Devonian and Mississippian Shale Sequence in Ohio",  IC #27, ODNR, Division of Geological Survey

Jagucki, Martha L. and Darner, Robert A., 2001, "Ground-Water Quality in Geauga County, Ohio – Review of Previous Studies, Status in 1999, and Comparison of 1986 and 1999 Data", U.S. Department of the Interior, U.S. Geological Survey. Water-Resources Investigation Report 01-4160

Janssens, A. and deWitt, W., 1976, "Potential Natural Gas Resources in the Devonian Shales in Ohio", Geo Note #3, ODNR, Division of Geological Survey

Jenkins, T. F., 1987, "The geology and groundwater resources of Chester Township", Geauga County, Ohio, Columbus, Ohio, AGW Consultants, Inc. 96 p.

Jones, A. L., and Sroka, B. N., 1997, "Effects of highway deicing chemicals on shallow unconsolidated aquifers in Ohio", interim report, 1988-1993, U. S. Geological Survey Water-Resources Investigations Report 97-4027, 139 p.

Knuth, M., Jackson, J. L., and Whittemore, D. O., 1990, "An integrated approach to identifying the salinity source contaminating a ground-water supply", Ground Water, v. 28, no. 2, p. 207-214

Nichols, V. E., 1980, "Ground-water levels and chemical quality in Geauga County, Ohio", 1978, U. S. Geological Survey Water-Resources Investigation Report 80-28, 17 p.

Ohio Environmental Protection Agency, 2008, Ohio Environmental Protection Agency data available on the World Wide Web at *www.epa.state.oh.us/ddagw*

Schwietering, J.F., 1979, "Devonian Shales of Ohio and Their Eastern and Southern Equivalents", USDOE/METC/CR-79/2

Slucher, E. R. and Larson, G. E., 2002, "Reconnaissance Bedrock Geology of the South Russell, Ohio, Quadrangle", Digital Map Series BG-R, Ohio Department of Natural Resources, Division of Geological Survey

Swinford, E. Mac; Schumacher, Gregory A.; Shrake, Douglas L.; Larson, Glenn E.; and Slucher, Ernie R., (Updated on November 22, 2000), "Descriptions of Geologic Map Units – A Compendium to Accompany Division of Geological Survey Open-File Bedrock-Geology Maps", Ohio Department of Natural Resources, Division of Geological Survey. Open File Report 98-1

Thomas, Mary Ann, 2007, "The Association of Arsenic with Redox Conditions, Depth, and Ground-Water Age in the Glacial Aquifer System of the Northern United States", U.S. Department of the Interior, U.S. Geological Survey. Scientific Investigation Report 2007-5036

Todd, David Keith, 1976, "Groundwater Hydrology", John Wiley and Sons, New York. 2nd Edition

Totten, S. M., 1988, "Glacial Geology of Geauga County, Ohio", Report of Investigation No. 140, Ohio Department of Natural Resources, Division of Geological Survey

Walker, Alfred C., 1978, "Ground-Water Resources of Geauga County", Ohio Department of Natural Resources, Division of Water, Ground-Water Resources Section

Walton, William C., 1970, "Groundwater Resource Evaluation", McGraw-Hill Book Company, New York

Weast, Ph.D., Robert C., 1971, "CRC Handbook of Chemistry and Physics, A Ready-Reference Book of Chemical and Physical Data", The Chemical Rubber Co., Cleveland, Ohio. 51st Edition

APPENDIX 1

# PUBLIC DRINKING WATER STANDARDS FOR OHIO
## Revision Date: September 26, 2005

| I. PRIMARY STANDARDS FOR OHIO PUBLIC WATER SUPPLIES  (Ohio Administrative Code; Chapter 3745-81) | |
|---|---|
| INORGANIC | Maximum Contaminant Level - MCL (mg/l) |
| Antimony | 0.006 |
| Arsenic | 0.010 (effective 1/1/06; 0.05 until 12/31/05) |
| Asbestos | 7 million fibers/liter (longer than 10 um) |
| Barium | 2 |
| Beryllium | 0.004 |
| Cadmium | 0.005 |
| Chromium | 0.1 |
| Cyanide | 0.2 |
| Fluoride | 4.0 |
| Mercury | 0.002 |
| Nitrate (as N) | 10 |
| Nitrate-Nitrite (as N) | 10 |
| Nitrite (as N) | 1 |
| Selenium | 0.05 |
| Thallium | 0.002 |
| PESTICIDES AND OTHER ORGANIC CHEMICALS (SOCs) | Maximum Contaminant Level - MCL (mg/l) |
| Alachlor | 0.002 |
| Aldicarb | 0.007 (proposed) |
| Aldicarb sulfone | 0.007 (proposed) |
| Aldicarb sulfoxide | 0.007 (proposed) |
| Atrazine | 0.003 |
| Benzo-a-pyrenes | 0.0002 |
| Carbofuran | 0.04 |
| Chlordane | 0.002 |
| 2,4-D | 0.07 |
| Dalapon | 0.2 |
| Di(2-ethylhexyl)adipate | 0.4 |
| Di(2-ethylhexyl)phthalate | 0.006 |
| Dibromochloropropane (DBCP) | 0.0002 |
| Dinoseb | 0.007 |
| Diquat | 0.02 |
| Endothall | 0.1 |
| Endrin | 0.002 |
| Ethylene dibromide (EDB) | 0.00005 |
| Glyphosate | 0.7 |
| Heptachlor | 0.0004 |
| Heptachlor epoxide | 0.0002 |
| Hexachlorobenzene | 0.001 |
| Hexachlorocyclopentadiene | 0.05 |
| Lindane | 0.0002 |
| Methoxychlor | 0.04 |
| Oxamyl (Vydate) | 0.2 |
| Pentachlorophenol | 0.001 |
| Picloram | 0.5 |
| Polychlorinated Biphenyls  (PCB's) | 0.0005 |
| Simazine | 0.004 |
| 2,3,7,8-TCDD (Dioxin) | $3 \times 10^{-8}$ |

APPENDIX 1

| 2,4,5-TP (Silvex) | 0.05 |
|---|---|
| Toxaphene | 0.003 |
| ORGANIC DISINFECTION BYPRODUCTS (DBPs) | Maximum Contaminant Level - MCL (mg/l) |
| Total Trihalomethanes (TTHMs):   The sum of the concentrations of Bromodichloromethane, Dibromochloromethane, Bromoform, and Chloroform | 0.080 |
| Five Haloacetic Acids (HAA5):   The sum of the concentrations of Monochloroacetic acid, Dichloroacetic acid, Trichloroacetic acid, Monobromoacetic acid, and Dibromoacetic acid | 0.060 |
| INORGANIC DISINFECTION BYPRODUCTS (DBPs) | Maximum Contaminant Level - MCL (mg/l) |
| Bromate | 0.010 |
| Chlorite | 1.0 |
| DISINFECTANT RESIDUALS (Distribution System) | Minimum Level Needed for Compliance (mg/l) Required for Free Chlorine or Combined Chlorine |
| Free Chlorine: Surface Water System | not less than 0.2 mg/l in more than 5% samples per month (not less than 0.2 mg/l for more than 4 consecutive hours) |
| Combined Chlorine: Surface Water System | not less than 1 mg/l in more than 5% samples per month (not less than 1 mg/l for more than 4 consecutive hours) |
| Free Chlorine: (Ohio Administrative Code; Chapter 3745-83) Ground Water System - Community and major Non-Community | at least 0.2 mg/l (unless exempted by the Director) |
| Combined Chlorine: (Ohio Administrative Code; Chapter 3745-83) Ground Water System - Community and major Non-Community | at least 1 mg/l (unless exempted by the Director) |
| DISINFECTANT RESIDUALS (Distribution System) | Maximum Residual Disinfectant Level- MRDL (mg/l) |
| Total Chlorine (as $Cl_2$) | 4.0 |
| Chlorine Dioxide (as $ClO_2$) | 0.8 |
| VOLATILE ORGANIC CHEMICALS (VOCs) | Maximum Contaminant Level - MCL (mg/l) |
| Benzene | 0.005 |
| Carbon tetrachloride | 0.005 |
| cis-1,2-Dichloroethylene | 0.07 |
| Dichloromethane | 0.005 |
| 1,1-Dichloroethylene | 0.007 |
| 1,2-Dichloroethane | 0.005 |
| 1,2-Dichloropropane | 0.005 |
| Ethylbenzene | 0.7 |
| Monochlorobenzene | 0.1 |
| o-Dichlorobenzene | 0.6 |
| para-Dichlorobenzene | 0.075 |
| Styrene | 0.1 |
| Tetrachloroethylene | 0.005 |
| Toluene | 1 |
| trans-1,2-Dichloroethylene | 0.1 |
| Trichloroethylene | 0.005 |
| 1,1,1-Trichloroethane | 0.2 |
| 1,2,4-Trichlorobenzene | 0.07 |
| 1,1,2-Trichloroethane | 0.005 |
| Vinyl Chloride | 0.002 |
| Xylenes (total) | 10 |

APPENDIX 1

| RADIOLOGICAL | Maximum Contaminant Level - MCL (pCi/l) |
|---|---|
| Beta particle and photon radioactivity | 4 mrem/yr* |
| Combined Radium-226 and Radium-228 | 5 |
| Gross Alpha particle activity (including Radium-226 but excluding Radon and Uranium) | 15 |
| Uranium | 30 ug/L |
| MICROBIOLOGY (Total Coliform) | COLIFORM RESULTS (compliance) |
| 1.  Public water supplies monitoring at least 40 samples per month | no more than 5% coliform positives per month |
| 2.  Public water supplies monitoring fewer than 40 samples per month | no more than 1 coliform positive per month |
|  | COLIFORM RESULTS (non-compliance) |
| 3.  Public water supplies with any positive repeat samples | Coliform violation |
| 4.  Public water supplies failing to monitor for repeat samples | Coliform violation |
| TURBIDITY (Finished Water) | Maximum Contaminant Level - MCL (NTU) |
| 1.  Conventional Filtration or Alternative Filtration Technology:     Combined population less than 10,000 | less than or equal to 0.5 NTU in at least 95% of samples per month and shall not exceed 5 NTU |
| 2.  Conventional Filtration or Alternative Filtration Technology:     Combined population equal to or greater than 10,000 | less than or equal to 0.3 NTU in at least 95% of samples per month and shall not exceed 1 NTU |
| 3.  Slow Sand Filtration | less than or equal to 1 NTU in at least 95% of samples per month and shall not exceed 5 NTU |
| Lead and Copper | Action Level |
| 1.  Lead | exceeded if lead greater than 0.015 mg/l is detected in more than 10% of tap samples in a compliance period |
| 2.  Copper | exceeded if copper greater than 1.3 mg/l is detected in more than 10% of tap samples in a compliance period |

| II.  SECONDARY STANDARDS FOR OHIO PUBLIC WATER SUPPLIES  (Ohio Administrative Code; Chapter 3745-82) | |
|---|---|
| PARAMETER | Secondary Maximum Contaminant Level  - SMCL |
| 1.  Aluminum | 0.05  to 0.2 mg/l |
| 2.  Chloride | 250 mg/l |
| 3.  Color | 15 color units |
| 4.  Corrosivity | non-corrosive |
| 5.  Fluoride | 2.0  mg/l |
| 6.  Iron | 0.3 mg/l |
| 7.  Manganese | 0.05 mg/l |
| 8.  Odor | 3 threshold odor number |
| 9.  pH | 7.0-10.5 |
| 10.  Silver | 0.1 mg/l |
| 11.  Sulfates | 250 mg/l |
| 12.  Total Dissolved Solids (TDS) | 500 mg/l |
| 13.  Zinc | 5 mg/l |
| 14.  Foaming Agents | 0.5  mg/l |

*Based on calculated levels for 168 possible contaminants

**ABBREVIATIONS:**
mg/L    - milligrams per liter (parts per million - ppm) = 1,000 ug/L
NTU     - nephelometric turbidity units
pCi/L   - picocurie per liter
ug/L    - micrograms per liter (parts per billion - ppb)
um      - micrometers

StandardsList.wpd

APPENDIX 2

# Special Permit Conditions

Wells drilled to the "Clinton sandstone" or deeper in areas of shallow surface casing requirements for these counties: – Ashtabula, Cuyahoga, Geauga, Lake, Lorain – Columbia and Eaton townships, Medina – Litchfield township, Summit – Macedonia, Northfield Center, Richfield, Sagamore Hills and Twinsburg townships.

1. Conductor casing must be landed to bedrock and cemented to surface. Circulation must be established and the hole must be properly conditioned, before the conductor casing is cemented. The division inspector or respective division regional office must receive ample notification before the cementing operation in order for the state to witness the condition of the well bore, placement of pipe and cementing operations.

2. The surface hole shall be drilled on freshwater or freshwater-based fluid only.

3. The 8-5/8" surface casing shall be set at least 50 feet below the deepest USDW and cemented to surface (see casing program on permit). Circulation must be established and the hole must be properly conditioned, before the surface casing is cemented. The division inspector or respective division regional office must receive ample notification before the cementing operation in order for the state to witness the condition of the well bore, placement of pipe and cementing operations.

4. The owner shall record all zones and depths where natural gas, oil and brine are encountered or circulation was lost during drilling operations. This information must be made available to the inspector prior to the production casing being cemented. This information must be forwarded to the inspector as a report, as notations on the geolograph or other format approved by the chief. Additionally, this information shall be recorded on the well completion record (Form 8).

5. The division inspector or respective division regional office must be notified when the well is drilled to total depth.

6. For vertical wells, the operator will run a geophysical log suite (minimum log suite: gamma ray, compensated density, neutron, and caliper) of the entire borehole, including the Berea Sandstone, to detect potential gas zones. A field copy of the log shall be made available to the division inspector prior to the act of running the production casing.

7. During the primary cementing operation for the production string the top of cement must be at least 100' above the top of the Lockport formation before perforating, acidizing or stimulating the well. Circulation must be established and the hole must be properly conditioned, before the production casing is cemented. If there is a significant break in circulation during the primary cementing

operations for the production casing, the operator shall run a Cement Bond Log (CBL), to verify the top of the cement job.

8. The annular pressure must be monitored for a period of five (5) days after the longstring casing is cemented.
   - If the pressure in the annulus does not exceed 70% of the hydrostatic pressure at the casing shoe of the surface casing string (determined by multiplying .303 times the depth of the casing shoe) after 5 days, work on the well can continue. Pressure should be recorded each day and then weekly thereafter until the well is placed into production. This data must be provided to the inspector before the well is completed. If the pressure relief valve is activated, the division must be immediately notified.
   - If the annular pressure exceeds 70% of the hydrostatic pressure at the casing shoe of the surface casing string, the owner must complete remedial cementing operations to the top of the "Big Lime" before completing the well.
   - **Under no circumstances should the annulus be shut in, except during a pressure test.**
   - The division inspector or respective division regional office must be notified a minimum of 24 hours prior to this cementing operation.

9. The 8-5/8" wellhead must be above grade or the annular space of the wellhead must be plumbed above grade and be readily accessible and unobstructed.

10. The operator shall maintain a gauge on the surface casing nipple to monitor gas pressure in the annulus. At no time shall gas be allowed to accumulate in the annulus at pressures exceeding 70% of the hydrostatic pressure at the casing shoe of the surface casing string. The surface casing nipple shall have a properly functioning relief valve, set to release gas, if pressure exceeds the allowable pressure. If venting cannot control the gas release, it may be flared according to the guidelines found in the OAC 1501:9-9-05 (B & C).

<u>1501:9-9-05 Producing operations.</u>
(B) All gas vented to the atmosphere must be flared, with the exception of gas released by a properly functioning relief device and gas released by controlled venting for testing, blowing down and cleaning out wells. Flares must be a minimum of one hundred (100) feet from the well, a minimum of one hundred (100) feet from oil production tanks and all other surface equipment, and one hundred (100) feet from existing inhabited structures and in a position so that any escaping oil or condensate cannot drain onto public roads or towards existing inhabited structures or other areas which could cause a safety hazard.

(C) Pits, pumps and flares must be safely fenced if within one hundred fifty (150) feet of an existing inhabited structure and if in the opinion of the Chief, such fence is necessary to protect life and limb.

APPENDIX 3

# NEW OIL AND GAS WELL DRILLING PERMIT CONDITIONS IMPLEMENTED FOR NORTHEAST OHIO
### New permit conditions aimed at preventing natural gas from leaking into local drinking water sources and presenting a hazard

COLUMBUS, OH – New permitting conditions designed to prevent the leakage of natural gas from oil and gas wells into freshwater aquifers are now in effect for a broad northeast Ohio area.

The permitting conditions will affect oil and natural gas drilling operations in all of Cuyahoga, Lake, Ashtabula and Geauga counties, as well as northern Summit and eastern Lorain and Medina counties. The rules apply to both urban and non-urban drilling permits.

The Ohio Department of Natural Resources (ODNR) Division of Mineral Resources Management formulated the new conditions in response to an incident in Bainbridge Township (Geauga County) in mid December. Twenty-six households were evacuated in the area after methane gas leaked from an oil and gas well into the structures via domestic water wells.

"While incidents like the one in Geauga County are very rare, given the potential gravity of the outcomes, it is necessary that we act to eliminate any chance of similar occurrences in the future," said John Husted, chief of the Division of Mineral Resources Management.

The new conditions apply to all wells permitted to the "Clinton sandstone" or to a deeper formation. These new conditions stress detection of natural gas in deposits above the permitted oil and gas reservoirs; seal deep sources of natural gas in the formations in which they occur or originate; monitor gas pressure in the space between surface and production casings (annulus); and prohibit the accumulation of unsafe gas pressure in the annulus of a well.

While Ohio Valley Energy responded quickly and appropriately to the situation in Bainbridge Township, ODNR is helping to assure drilling for oil and gas – even in urban areas – is a safe endeavor. The situation in Bainbridge Township was relieved when Ohio Valley Energy, under the supervision of ODNR inspectors, cemented the suspect well to prevent further migration of gas into the local aquifer.

ODNR continues to work with the company and the Bainbridge Fire Department to purge contaminated water wells. Once purged, ODNR geologists will work with Ohio Valley Energy and the Geauga County Health District to test, disinfect and reconnect the private water wells that were affected by the seepage.

-30-

*For Additional Information, Contact:*

APPENDIX 3

Jane Beathard, ODNR Media Relations
(614) 265-6860
-or-
Scott Kell, ODNR Mineral Resources Management
(614) 265-7058

REPORT ON THE BAINBRIDGE INVESTIGATION



APPENDIX 3

# Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR                                                                 SEAN D. LOGAN, DIRECTOR

*Scott R. Kell, Deputy Chief*
*Ohio Department of Natural Resources*
*Division of Mineral Resources Management*
*2045 Morse Road, Bldg. H-3*
*Columbus, OH  43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

January 29, 2008

Dear Bainbridge Township Resident:

The Bainbridge Township Trustees have invited representatives of the Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) to attend a public meeting on Thursday February 7th, beginning at 7:00 P.M. at the Bainbridge Township Meeting Hall. This meeting will be an opportunity to discuss the status of our investigation into the occurrence of natural gas in local aquifers and address your questions regarding the next steps in resolving your concerns.  Much has happened since December 15, 2007, the day DMRM first responded to local complaints regarding natural gas in water wells.  I can assure you that the DMRM takes this incident very seriously, and is directing resources to eliminate the source, prevent similar occurrences in the future, and restore your situation to normal.  The following is a brief summary of progress to date:

1. The DMRM has completed our preliminary investigation into the cause of the incident. We have effectively ruled out a number of possible causes. While the presence of natural gas is not uncommon in Geauga County ground water, the DMRM has determined that this incident is not a natural occurrence based on pressure and volume considerations. The DMRM has also ruled out natural occurrence triggered by seismic activity, improperly abandoned orphaned oil and gas wells, and improperly plugged oil and gas wells.  The DMRM has concluded that the English No. 1 well is the likely source of natural gas that entered the local aquifers.  The DMRM has evaluated other oil and gas wells in the area. To date, we have not found evidence suggesting that other oil and gas wells are contributing to the problem. However, the DMRM will continue to collect and evaluate evidence regarding the source of the natural gas until the investigation is complete. Final conclusions will be summarized in the report that will be drafted when the investigation has been completed.
2. Beginning on Saturday December 15, 2007, Ohio Valley Energy initiated corrective actions at the English No. 1 to effectively isolate natural gas in the surface-production casing annulus. The DMRM witnessed and documented corrective measures at the English No. 1 well.  The DMRM believes that the source of the natural gas has been eliminated. However, the DMRM continues to monitor the English No. 1 well to further evaluate the success of corrective measures.



APPENDIX 3

3. The DMRM continues to work with representatives of Ohio Valley Energy and the Bainbridge Township Fire Department to monitor natural gas emissions from local water wells.  While several water wells continue to de-gas, the DMRM has witnessed considerable progress and is confident that the presence of natural gas is diminishing since elimination of the source. Water wells are being re-connected to residences based on the findings of on-going monitoring efforts.

4. The DMRM is working with Ohio Valley Energy and the Geauga County Health District to test affected water wells. Attached is a copy of the water sampling and analysis plan that is currently being implemented. Sampling began on January 24, 2008.

5. On Friday, January 18th, the DMRM implemented new permit conditions designed to effectively prevent similar occurrences not only in Bainbridge Township, but also throughout broadly defined areas of northeastern Ohio.

The DMRM will complete a full report regarding the incident when all water quality monitoring and testing is finished. You will receive a copy of the report once it is finalized and approved. The DMRM looks forward to an opportunity to meet with you and discuss our findings with you face-to-face, and answer your questions at the meeting on February 7th.

Sincerely,

Scott R. Kell
Deputy Chief

SK:sh

CC:   Bainbridge Township Trustees
      Jeffrey S. Markley
      Christopher Horn
      Linda W. White
      Town Hall
      17826 Chillicothe Rd.
      Chagrin Falls OH 44023

1/25/2008

Water Sampling, Analysis, and Monitoring Plan

Introduction
        The Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) continues to evaluate water quality issues associated with the entry of natural gas into aquifers and water wells in Lots 19-21 of Tract 2 in Bainbridge Township of Geauga County. As part of this effort, the DMRM will continue to monitor water wells for the presence of natural gas until it is apparent that dissolved natural gas has effectively dissipated and is no longer evolving from local ground-water aquifers. The goal of our monitoring and sampling plan is to protect your health and safety as you reconnect to your private water supplies and resume use of your domestic system.
        The DMRM is also directing Ohio Valley Energy, Inc. to collect ground water samples to evaluate selected inorganic and organic parameter concentrations to ensure that private water supplies do not exceed primary maximum contaminant levels (PMCL) for public water supplies. You will be provided with copies of the laboratory analytical reports so that you can make an informed decision regarding resumed use of your private water supply well for drinking and cooking purposes.
        In addition, the Geauga County General Health District will be testing private water supplies for total coliform bacteria. If the bacteria test is positive, the sample will be analyzed for e-coli, or fecal bacteria. While bacterial testing and disinfection of your well is not related to the natural gas incident, it is an important step in safeguarding your health as you resume full use of your domestic water supply. You will receive copies of all laboratory reports pertaining to your private water system.
        Please be aware that the DMRM is not the State's primary health advisory agency. The scope of our water quality investigation, as defined by statute, is to determine if local oil and gas operations have diminished the quality of ground water produced by your domestic water well. Our water sampling and analysis efforts are focused on a selected set of parameters that are useful in determining whether constituents associated with oil and gas exploration and production activities are present in your well water at concentrations that are above normal. Such analyses are not intended to evaluate the presence of other potential industrial, agricultural or domestic contaminants. The DMRM cannot be aware of individual medical conditions, such as sodium intake restrictions, that could affect the healthfulness of consuming water. As always, we recommend that you discuss the results of our tests with your personal physician and the Geauga County Health District at (440) 279-1903 to make the best possible decision about resumed consumption of water from your well.

Methane Monitoring
        Methane is the primary constituent of natural gas. Methane is colorless and odorless. Well water that contains methane will, most commonly, contain fine bubbles and have a milky, cloudy appearance. Methane comes out of solution rapidly when the temperature rises above 42 degrees Fahrenheit and pressure decreases. When a well is pumped and the height of the column of water declines, hydrostatic pressure is reduced, and natural gas, otherwise not apparent, may be released. Other signs that a combustible gas may be present in ground water include popping or spurting of water at the tap or gurgling noises at the well casing. Natural gas is common in Geauga County water wells in low concentrations.

APPENDIX 3

According to the Agency for Toxic Substances and Disease Registry (ASTDR) ingestion of water containing natural gas does not pose a direct health hazard. However, using tap water in the home can allow dissolved gas to evolve and increase the level of gas in air within your home.

Methane is an explosive gas when mixed with air at concentrations ranging from 5 – 15 percent by volume. Five-percent, or 50,000 ppm, is the lower explosive limit (LEL) for methane. The primary danger is when the gas accumulates at combustible or explosive levels in confined spaces. Areas of concerns are basements, utility rooms and bathrooms where large quantities of water are used.

Several methods exist to test for combustible gases. DMRM Inspectors are equipped with portable instruments to measure the concentration of methane as a percent of the LEL.

When DMRM representatives visit your home, they will pump your well to reduce hydrostatic pressure and monitor methane concentrations at several locations directly at the emission points. Our measurements should yield conservative results, not necessarily reflecting general air quality in your house. The DMRM collects LEL readings at the following locations during each visit:

   a. <u>Water Well Head</u>: The LEL meter tip is inserted into the well casing to record the highest reading.

   b. <u>Cold Water Tap</u>: At the kitchen sink, open the cold water tap after closing the drain, and place the LEL meter tip next to the faucet and obtain a reading. Then move the tip closer inside the sink without touching the water to obtain a reading and record the highest reading.

   c. <u>Hot Water Tap</u>: At the kitchen sink, open the hot water tap after closing the drain, and place the LEL meter tip close to the faucet and obtain a reading. Then move the tip inside the sink without touching the water to obtain a reading and record the highest reading.

The DMRM, with your permission, is willing to continue monitoring your water well on a regular basis until you are comfortable that the gas has effectively dissipated. The DMRM cannot predict how long it will take for the dissolved gas in the aquifer to dissipate.

<u>Additional Recommendations</u>
1. Methane/combustible gas monitors can be installed in areas, such as basements or utility rooms, where large volumes of water are used and ventilation may be poor. The monitoring devices should have visual and audio alarms.
2. All affected water wells should have wellhead ventilation systems installed by a registered plumber/contractor, and approved by the Geauga County Health District.
3. Where possible, residents should ventilate enclosed areas where water is used such as basements, bathrooms, and laundry rooms.

<u>Volatile Organic Compounds</u>
Ohio Valley Energy, Inc. has contracted with Biosolutions of Chagrin Falls, Ohio, to collect samples and analyze for Volatile Organic Compounds (VOCs). VOCs are water-soluble compounds, which may be naturally occurring or man-made. While the DMRM has not seen indications of crude oil in ground water discharged from wells during this investigation, we are testing for those VOCs that may be associated with crude oil, as a precautionary measure. We regard this testing as an important step in confirming the quality and healthfulness of your water supply.

Biosolutions will follow standard protocols in collecting samples in 40-milliliter glass vials. Water samples will be collected before any filtration or treatment systems to provide worst-case scenario results. Before sample collection, well water will be flushed until the water

2

is considered representative of the ground water source that you are pumping from your well. The DMRM will collect split samples with Biosloutions on some of the water well samples to compare and evaluate the test results. The DMRM will require the samples to be submitted to an Ohio EPA certified laboratory for analysis using approved methods to ensure that the results are reliable.

Inorganic Parameter Samples

Ohio Valley Energy, Inc. has also contracted with Biosolutions to sample and analyze water samples for the following parameters:

| | |
|---|---|
| Total Dissolved Solids (TDS) | Iron (T & D) |
| Total Suspended Solids (TSS) | Aluminum (T) |
| Total Solids | Potassium (T) |
| Total Alkalinity as $CaCO_3$ (m-alk) | Manganese (T) |
| BiCarbonate Alkalinity ($HCO_3$) as $CaCO_3$ | Calcium (T) |
| Carbonate Alkalinity ($CO_3$) as $CaCO_3$ | Strontium (T) |
| Phenolphthalein Alkalinity as $CaCO_3$ | Barium (T & D) |
| Hydroxide Alkalinity (OH) as $CaCO_3$ | Sodium (T) |
| Hardness (Calcium & Magnesium) | PH |
| Specific Conductivity (uS/cm) corrected to 25 degrees C. | Sulfate |
| Chloride | Arsenic (T & D) |
| T = Total            D = Dissolved | |

The DMRM will collect split samples to compare and analyze analytical results. The DMRM will compare results from these tests with "background" water quality analyses from your area to determine if there are apparent changes in water quality. The DMRM is interested in determining whether gas migrating through the Ohio Shale Formation may "push" brackish, connate waters into the overlying aquifers resulting in increased salitivity and hardness, or whether the gas could alter the chemistry of local ground water.

APPENDIX 3



## Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR                                    SEAN D. LOGAN, DIRECTOR

**John F. Husted, Chief**
Ohio Department of Natural Resources
Department of Mineral Resources Management
2045 Morse Road Bldg. H-3
Columbus, OH 43229-6693
Phone (614) 265-6633 Fax: (614) 265-7998

February 15, 2008

Senator Grendell
Senate Building
Columbus, Ohio 43215

Bainbridge Township Trustees
8535 Tanglewood Sq. Unit C3.
P.O. Box 23707
Chagrin Falls, Ohio 44023

Subject: Bainbridge Natural Gas Accident

Dear Senator Grendell and Bainbridge Township Trustees:

This letter is being written as a follow-up to our February 7th Bainbridge Township Trustee public meeting. The Division of Mineral Resources Management is hand delivering the attached public notices to the residences associated with the December 15, 2007 natural gas explosion in Bainbridge Township.

I believe the public notice will ensure that all residence will know whom to contact if they have any problems or questions concerning the accident and the on-going investigation.

Thank you for your leadership and assistance in coordinating this very unfortunate event with the area residents.  Please contact Scott Kell or myself if you have any questions.

John F. Husted, Chief

Cc:    Director Logan
        Scott Kell, Deputy Chief
       Mike Shelton



APPENDIX 3

# Public Notice

Ohio Department of Natural Resources
Division of Mineral Resources Management
3575 Forest Lake Drive, Suite 150
Uniontown, Ohio 44685



February 15, 2008

- This notice is to ensure that residents in the area of the natural gas explosion on December 15, 2007 are made aware of the continued investigation plans that are being implemented by the Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM).
- On December 15, 2007, an explosion in Bainbridge Township severely damaged a home at 17975 English Drive. The DMRM has determined that the explosion was associated with natural gas from a nearby oil and gas well that had been drilled by Ohio Valley Energy.  Since December 15, 2007, natural gas has also been detected in homes and water supplies for other nearby residents.
- The DMRM has been investigating all aspects of this event since December 15, 2007.  Personnel have been in the area on a regular basis and have been in contact with local officials.
- The Division of Mineral Resources Management is in the process of developing informational brochures to help answer residents' questions and address concerns regarding this incident.

Should you have questions that need addressed in the interim, please contact Marlene Hall, with the DMRM's Uniontown Office.

Marlene Hall
Phone: (330) 896-0616
Email: Marlene.Hall@dnr.state.oh.us

**Please include a name, address and telephone number for all inquires.**

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

## Notice of Water Sampling Activities

- The Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) has identified an area in Bainbridge Township where additional water sampling and analysis will be offered. This area includes water wells where monitoring efforts have detected natural gas in water wells, and neighboring wells where no gas has been detected to date. Sampling will begin on Tuesday, February 19, 2008.

- The sampling area has been defined based on reconnaissance sampling, continued natural gas monitoring and information provided by area residents and the Bainbridge Fire Department.

- Your residence has been recommended for additional sampling and testing.

- As a result, Amanda Meitz of Biosolutions, LLC., an EPA certified laboratory, will call you to schedule a date and time when trained professionals from Biosolutions, LLC.can collect samples of your water.

- You are not obligated to have your well tested.

- If you agree to allow samples to be collected from your water well, you will receive all test results free of charge.

- DMRM personnel will be directing and participating in the sampling events. DMRM will collect water samples for quality control purposes at some sites.

- The DMRM will review sample test results for accuracy and will forward sample analysis reports.

- When you receive your test results, DMRM geologists will be available to help explain the meaning of test results.

- If you have any questions, please call DMRM geologist Ahmed Hawari at (330) 705-8070 or Ahmed.Hawari@dnr.state.oh.us

APPENDIX 3

*Division of Mineral Resources Management*
***Scott Kell, Deputy Chief***
*2045 Morse Road, Bldg. H-3*
*Columbus, OH  43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

February 28, 2008

Dear _____:

    During the past week, the Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) has worked with representatives of Biosolutions Inc. to begin collecting samples of ground water from water wells in your neighborhood.  As part of DMRM's ongoing investigation, Ohio Valley Energy has agreed to contract water sampling and analytical services through Biosolutions Inc., a consulting firm that manages an Ohio Environmental Protection Agency certified laboratory.  The area that DMRM identified for sampling includes water wells where natural gas has been detected in ground water, but also includes many wells where natural gas has not been detected to date.  We are working with Biosolutions Inc. to collect samples from a total of 86 wells, including four control sites as part of this effort.  The DMRM has included your water well in the sampling area.  If your water well has not already been sampled, you will be contacted by Biosolutions Inc. to schedule a mutually convenient time for their representatives to collect a water sample.  DMRM staff are present during sampling events to ensure that samples are collected in accordance with standard protocols.

    When Biosolutions completes the sampling and analysis process and the DMRM receives copies of the analytical reports, we will mail a copy to you.  The analytical report will be provided free of charge.

    The Geauga County General Health District (GCGHD) will also accompany Biosolutions and DMRM representatives during sampling events.  The GCGHD will be collecting samples to test for coliform bacteria. It is likely that you will receive a report regarding the coliform bacteria test before the other test results are available. During the public meeting on February 7, 2008, citizens asked many questions regarding the meaning of coliform bacteria tests and the healthfulness of using water if the presence of coliform bacteria is detected.  For your information, attached is a copy of a flier entitled Total & Fecal Coliform Bacteria, Answers to Frequently Asked Questions prepared by Ohio Bureau of Environmental Health.

February 28, 2008                      APPENDIX 3
Page 2

      If you have additional questions regarding coliform bacteria testing and analysis, please contact the GCGHD at (440) 279-1900, or the Ohio Bureau of Environmental Health at (614) 466-1390.  If you have questions regarding other aspects of the sampling and analysis program, please call Marlene Hall at the DMRM Uniontown office at (330) 896-0616. She will direct your questions to the appropriate representative of the DMRM.

Sincerely,


Scott Kell

SK/sh

c:  Rebecca Fugitt, Program Administrator, Ohio Dept. of Health
    Robert Weisdack, Health Commissioner, Geauga County
    Rick Simmers, Acting Deputy Chief, DMRM

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3



**Bureau of Environmental Health**

"To protect and improve the health of all Ohioans"

# Total & Fecal Coliform Bacteria
### Answers to Frequently Asked Health Question

## What is coliform?
Total coliform bacteria are a collection of relatively harmless microorganisms that live in large numbers in soils, plants and in intestines of warm-blooded (humans) and cold-blooded animals. Coliform aid in the digestion of food.

## Where do you find coliform?
There are 16 species of total coliform found in soils, plants and in animal and human waste. A subgroup of coliform, called fecal coliform bacteria, is different from the total coliform group because they can grow at higher temperatures and are found only in the fecal waste of warm-blooded animals. There are six species of fecal coliform bacteria found in animal and human waste. *E. coli* is one type of the six species of fecal coliform bacteria. A **rare** strain of *E. coli* that you may have seen in the news can cause potentially dangerous outbreaks and illness. This strain is called *E. coli* 0157.

## How do you come in contact with coliform?
Coliform are a family of bacteria common in soils, plants and animals. You can come in contact with these bacteria by eating or drinking (ingesting) soils on plants and in water sources such as ponds, lakes and rivers. Fecal coliform bacteria can be found in water contaminated by domestic sewage or other sources of human and animal waste.

## Can coliform harm your health?
Finding coliform or other bacteria in water does not necessarily always mean you will become ill. However, if these organisms are present, other disease-causing organisms may also be present. The presence of fecal contamination is a sign that a possible health risk exists for individuals exposed to this water. Health symptoms related to drinking or swallowing water contaminated with fecal coliform bacteria generally range from no ill effects to cramps and diarrhea (gastrointestinal distress). Sanitarians and those who test water look for total and fecal coliform bacteria to alert people to the possible dangers and suggest proper treatments to remove potentially harmful bacteria from the water.  The presence of any fecal coliform in drinking water is of immediate concern as many diseases can be spread through fecal transmission.

## How can you reduce coliform contamination?
Groundwater (underground drinking water) in a properly constructed well should be free of coliform bacteria. If coliform are found in a well, it generally means that surface water has somehow leaked into the drinking water. This could be caused by poor construction of a new well or because older wells may have developed holes in the well casing. Contamination can also occur if rain runoff or snowmelt makes its way into the well through cracks in rock outcroppings, gravelly soil or sandy soil or because of the lack of grout (sealing material) around the well casing.



Homeowners who use cisterns as a drinking water source should use treatment devices to filter and clean the water to remove coliform bacteria.

Improperly maintained treatment devices also can be sources of contamination. Home water filters and other water-treatment devices should be changed and maintained in accordance with manufacturer's recommendations.

## References:
Ohio Department of Health, Bureau of Environmental Health, Private Water Program, 2004.

Vermont Department of Health, Safe Water Resource Guide, A Fact Sheet on Coliform Bacteria in Water (electronic).

Kentucky Water Watch, Fecal Coliform Bacteria (electronic).

Created October 2004

The Ohio Department of Health is in cooperative agreement with the Agency for Toxic Substances and Disease Registry (ATSDR), Public Health Service, U.S. Department of Health and Human Services.

This document was created by the Ohio Department of Health, Bureau of Environmental Health, Health Assessment Section and supported in whole by funds from the Comprehensive Environmental Response, Compensation and Liability Act trust fund.

APPENDIX 3



| Bureau of Environmental Health | Total & Fecal Coliform Bacteria |
|---|---|
| "To protect and improve the health of all Ohioans" | Answers to Frequently Asked Health Question |

## What is coliform?
Total coliform bacteria are a collection of relatively harmless microorganisms that live in large numbers in soils, plants and in intestines of warm-blooded (humans) and cold-blooded animals. Coliform aid in the digestion of food.

## Where do you find coliform?
There are 16 species of total coliform found in soils, plants and in animal and human waste. A subgroup of coliform, called fecal coliform bacteria, is different from the total coliform group because they can grow at higher temperatures and are found only in the fecal waste of warm-blooded animals. There are six species of fecal coliform bacteria found in animal and human waste. *E. coli* is one type of the six species of fecal coliform bacteria. A **rare** strain of *E. coli* that you may have seen in the news can cause potentially dangerous outbreaks and illness. This strain is called *E. coli* 0157.

## How do you come in contact with coliform?
Coliform are a family of bacteria common in soils, plants and animals. You can come in contact with these bacteria by eating or drinking (ingesting) soils on plants and in water sources such as ponds, lakes and rivers. Fecal coliform bacteria can be found in water contaminated by domestic sewage or other sources of human and animal waste.

## Can coliform harm your health?
Finding coliform or other bacteria in water does not necessarily always mean you will become ill. However, if these organisms are present, other disease-causing organisms may also be present. The presence of fecal contamination is a sign that a possible health risk exists for individuals exposed to this water. Health symptoms related to drinking or swallowing water contaminated with fecal coliform bacteria generally range from no ill effects to cramps and diarrhea (gastrointestinal distress). Sanitarians and those who test water look for total and fecal coliform bacteria to alert people to the possible dangers and suggest proper treatments to remove potentially harmful bacteria from the water.  The presence of any fecal coliform in drinking water is of immediate concern as many diseases can be spread through fecal transmission.

## How can you reduce coliform contamination?
Groundwater (underground drinking water) in a properly constructed well should be free of coliform bacteria. If coliform are found in a well, it generally means that surface water has somehow leaked into the drinking water. This could be caused by poor construction of a new well or because older wells may have developed holes in the well casing. Contamination can also occur if rain runoff or snowmelt makes its way into the well through cracks in rock outcroppings, gravelly soil or sandy soil or because of the lack of grout (sealing material) around the well casing.



Homeowners who use cisterns as a drinking water source should use treatment devices to filter and clean the water to remove coliform bacteria.

Improperly maintained treatment devices also can be sources of contamination. Home water filters and other water-treatment devices should be changed and maintained in accordance with manufacturer's recommendations.

## References:
Ohio Department of Health, Bureau of Environmental Health, Private Water Program, 2004.

Vermont Department of Health, Safe Water Resource Guide, A Fact Sheet on Coliform Bacteria in Water (electronic).

Kentucky Water Watch, Fecal Coliform Bacteria (electronic).

Created October 2004

The Ohio Department of Health is in cooperative agreement with the Agency for Toxic Substances and Disease Registry (ATSDR), Public Health Service, U.S. Department of Health and Human Services.

This document was created by the Ohio Department of Health, Bureau of Environmental Health, Health Assessment Section and supported in whole by funds from the Comprehensive Environmental Response, Compensation and Liability Act trust fund.

APPENDIX 3

# Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR                                    SEAN D. LOGAN, DIRECTOR

*Division of Mineral Resources Management*
***Scott Kell, Deputy Chief***
*2045 Morse Road, Bldg. H-3*
*Columbus, OH  43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

March 14, 2008

Dear :

The Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) continues to monitor area water wells to determine if natural gas is present in ground water.  The DMRM has developed the attached Frequently Asked Question document in response to the questions we have received from local residents.

If you have additional questions, please contact Marlene Hall of the DMRM at (330) 896-0616. She will direct your question to the appropriate DMRM employee for response.

Sincerely,

Scott R. Kell
Deputy Chief

SRK/sh


REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

# Natural Gas
## Answers to Frequently Asked Questions

1. **What is natural gas and where does it come from?**
   Natural gas is a mixture of gaseous hydrocarbons that occur naturally in the earth.
   Methane is the primary constituent of natural gas.  Natural gas can originate from
   organic material buried in soil or glacial deposits, organic-rich rocks such as the
   Ohio Shale Formation, or may be trapped in oil and gas reservoirs deep beneath
   the surface of the earth.

2. **How do I know if I have natural gas in my ground water supply?**
   Methane is colorless and odorless.  Therefore, it is unlikely that you'll be able to
   detect the presence of natural gas through your sense of smell.  Signs that
   methane gas may be present in ground water include popping or spurting of water
   at the tap or gurgling noises at the well casing.  Bainbridge Township firefighters
   and Division of Mineral Resources Management (DMRM) staff are equipped with
   portable instruments that can detect the presence of natural gas.  The DMRM will
   inform you if detectable concentrations of natural gas are measured during our
   visit to your home.

3. **Why does DMRM pump my water well during the monitoring process?**
   When a well is pumped and the height of the column of water declines, water
   pressure is reduced, and natural gas, otherwise not apparent, may be released.

4. **If I have natural gas in my water supply, does it mean that it came from an
   oil and gas well?**
   Not necessarily.  Natural gas occurs naturally, and is common in water wells in
   Geauga County, specifically in water wells that are drilled to the Ohio shale, a
   gas-bearing formation that is below the deepest fresh-water aquifer, the Berea
   Sandstone.  The DMRM is conducting an investigation to determine which water
   wells have been affected by oil and gas operation(s).

5. **What are the health risks associated with drinking well water that contains
   natural gas?**
   According to the Agency for Toxic Substances and Disease Registry, ingestion of
   water containing natural gas does not pose a direct health threat.  Methane does
   not have any known toxic, poisonous, or cancer-causing properties.  There are no
   known adverse health affects associated with drinking or bathing with well water
   that contains methane.  However, if your well has been disconnected and then
   reconnected, because natural gas was detected in your water well, or you are
   receiving bottled water, the DMRM recommends that you not drink your well
   water until you receive the results of water quality tests, including coliform
   bacteria tests being completed by the Geauga County General Health District
   (GCGHD).  Prior to deciding to resume use of your well water for drinking
   purposes, the DMRM recommends that you consult with the GCGHD and/or your
   personal physician.

6. **What health or safety risks are associated with the use of well water that contains natural gas?**

Running tap water in your home can allow dissolved natural gas to exsolve (come out of solution as gas bubbles) and increase the level of natural gas in the air within your home. Natural gas cannot explode unless it reaches a concentration that is 100 percent of the Lower Explosive Limit (LEL) in the room, and has a source of ignition. The primary danger is when the natural gas accumulates at combustible or explosive levels in confined spaces. Areas of concerns are basements, utility rooms and bathrooms where large quantities of water are used.

7. **Under what circumstances would my water well be disconnected from my house?**

Any well that has a sufficient concentration of dissolved methane to exceed 10% LEL in a confined space (room), should be disconnected until the concentration of natural gas diminishes.

8. **How should I respond to the natural gas measurements provided by DMRM, or my house methane detector?**

When DMRM representatives visit your home, they will pump your well and measure methane concentrations at the well vent, and directly at the cold and hot water taps. This screening process tells us whether gas is present at detectable levels in the ground water being pumped from your water well at a specific time and day. These readings do not indicate whether gas is accumulating in a room at dangerous levels.

If a DMRM representative detects the presence of gas in the running water, he/she will then measure the concentration of methane in the room (basement, kitchen, garage, utility room, etc.). This reading will indicate whether the emission of gas from the running water is accumulating in the room at potentially dangerous levels.

The DMRM recommends the following actions in response to LEL measurements within rooms:

| % LEL Range | Action |
|---|---|
| 1 – 4 | No immediate action necessary |
| 5 – 9 | Increase ventilation, continue to monitor to see if the % LEL continues to rise |
| 10 – 19 | Shut off water; and monitor to see if % LEL continues to rise |
| 20+ | Keep water shut off. Increase ventilation; Evacuate the premises; Call the Fire Department for an inspection (440) 543-9873; Notify DMRM at (330) 896-0616 |

2

9. **What should I do if my natural gas alarm is triggered?**

   If you have a natural gas monitor it is generally set to provide an audible alarm when the concentration of methane extends ten percent of the LEL in the room. If you hear the alarm, shut off your running water, ventilate the room, and watch the digital reading on the monitor to see if the concentration diminishes. If the digital reading continues to increase beyond 20% LEL, the DMRM recommends that you evacuate the premises and notify the Fire Department and DMRM.

10. **If my water well has been disconnected, under what circumstances would it be re-connected?**

    When over the course of several weeks of monitoring, DMRM finds the following:
    - No observable or audible evidence of gas in your well; and,
    - Gas readings are less than ten percent of the LEL in your well vent; and
    - Gas readings are less than four percent at the running tap water;

    Once the above criteria are met, the DMRM considers it safe for you to reconnect your water supply.

11. **Once my water well has been reconnected, how can I be sure that I'm safe?**

    The best way to ensure your safety is to continue to operate the methane detection system(s) in rooms where you run large quantities of water, particularly hot water (basements, utility rooms, kitchens, or bathrooms).

12. **Will the natural gas eventually dissipate?**

    If your water well had natural gas in it before December 15, 2007, your well will likely continue to emit natural gas from time-to-time in the future. If the gas in your water well was caused by the local oil and gas well operation, the DMRM expects that the gas will eventually dissipate.

13. **Why has the natural gas problem lasted so long?**

    There are a variety of geologic factors that control the dissipation of gas. While DMRM has asked Ohio Valley Energy (OVE) to pump specific water wells to accelerate the process, the DMRM cannot predict how long it will take before gas completely dissipates.

14. **If symptoms of natural gas re-appear after my well has been reconnected, what should I do?**

    If signs of natural gas re-occur (e.g. the audible alarm on your natural gas monitoring system is triggered, spurting water, gurgling noises at the well casing, etc.) immediately notify the Bainbridge Fire Department at (440) 543-9873 and the DMRM at (330) 896-0616. The DMRM will immediately require OVE to disconnect your water well and re-install a storage tank as temporary water supply.

3

APPENDIX 3

**15. If natural gas is a persistent problem in my water well (unrelated to the December 15 incident), are there systems available to remove methane from ground water prior to pumping it into my house?**

If you have natural gas in your well water, the best course of action is to vent the well to allow gas to safely escape into open air. A water well professional could also advise you regarding methods to vent your pressure tank. If your water well is located indoors, your well should be equipped by a licensed professional with a sealed cap and a vent pipe that extends through the wall to the exterior of your house.

**16. Where can I find information on licensed water well professionals in this area?**

You can find a directory of licensed water well professionals listed by county at the Ohio Department of Health website: (http://www.odh.ohio.gov/odhPrograms/eh/water/water1.aspx)

**Additional Resources:**

For additional information on methane in ground water wells, we recommend the following sources:

US Geological Survey. 2006. *Methane in West Virginia Ground Water*. USGS Fact Sheet 2006-3011, 6 pp. http://pubs.water.usgs.gov/fs20063011

Keech, D. K. and M. S. Gaber. 1982. "Methane in Water Wells." *Water Well Journal* Feb. 1982:33-36. http://www.seagrant.umn.edu/groundwater/pdfs/Methane.pdf

To learn more about the proper maintenance of your private water well, consult this web site: http://www.sfr.cas.psu.edu/water

If you have additional questions, please call Marlene Hall, with the DMRM's Uniontown office at (330) 896-0616. She will refer your questions to the appropriate party.

4

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

Home Address: _____

# Record of Natural Gas Monitoring
## Ohio Department of Natural Resources
### Division of Mineral Resources Management

| Measurement Location | Maximum Measured Concentration (Percent of Lower Explosive Limit) |
|---|---|
| Water Well (Wellhead or Vent) | |
| Room: | |
|    Cold Water Tap | |
|    Hot Water Tap | |
| Room: | |
|    Cold Water Tap | |
|    Hot Water Tap | |
| Room: | |
| Room: | |

Date: ___/___/___     Time: _____     _____

(military)                                          Signature

    When DMRM representatives visit your home, they will use portable instruments to determine if natural gas can be detected at the well vent, and directly at the cold and hot water taps. This screening process tells us whether natural gas is present at detectable levels in the ground water being pumped from your water well at this specific time and day. These readings do not indicate whether natural gas is accumulating in a room.

    If a DMRM representative detects the presence of natural gas in the running water, he/she will then measure the concentration of natural gas in the room (basement, kitchen, garage, utility room, etc.). This reading will indicate whether the emission of natural gas from the running water is accumulating in the room at potentially dangerous levels. Natural gas cannot explode unless it reaches a concentration that is 100 percent of the Lower Explosive Limit (LEL) in the room, and has a source of ignition.

    The DMRM, with your permission, is willing to continue monitoring your water and water well on a regular basis until you are comfortable that the gas has effectively dissipated. The DMRM cannot predict how long it will take for the dissolved natural gas in the aquifer to dissipate. For additional information, please see our **Answers to Frequently Asked Questions about Natural Gas** flier.

    If you have additional questions, please call Marlene Hall, with the DMRM's Uniontown office at (330) 896-0616. She will refer your questions to the appropriate party.

APPENDIX 3

*John F. Husted, Chief*
*Ohio Department of Natural Resources*
*Division of Mineral Resources Management*
*2045 Morse Road, Bldg. H-3*
*Columbus, OH  43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

April 7, 2008

Bainbridge Township Trustees
17826 Chillicothe Rd.
Chagrin Falls OH 44023

Bainbridge Township Trustees:

In an effort to improve and better coordinate communications between the trustees and the Division of Mineral Resources Management (DMRM), I respectfully request your communications or requests be routed through DMRM North Region Supervisor Rick Simmers. Rick may be reached by telephone at 330.896.0616; by FAX at 330.896.1849; by e-mail at Rick.Simmers@dnr.state.oh.us; or by mail at ODNR, Division of Mineral Resources Management, 3575 Forest Lake Dr. Suite 150, Uniontown OH 44685-8116.  Official records requests will be coordinated through my assistant, Ms. Marissa Priest.  Rick will also work to provide weekly updates to the trustees through Zoning Inspector Michael Joyce.

Let me assure you, the protection of the citizens of Bainbridge Township is our highest priority.

Sincerely,

John Husted
Chief
Division of Mineral Resources Management

cc:  Scott Kell
     Rick Simmers
     Tom Hill
     Jay Cheslock
     Ahmed Hawari

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3



# Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR                                   SEAN D. LOGAN, DIRECTOR

*Division of Mineral Resources Management*
**Scott Kell, Deputy Chief**
*2045 Morse Road, Bldg. H-3*
*Columbus, OH  43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

April 21, 2008

Dear:

The Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) is continuing our regular monitoring of homes and water wells in your area to determine the presence of natural gas.

We want to take this opportunity to repeat our assurance that we will continue to monitor your water well and home on a regular basis until there is clear evidence that the natural gas has dissipated.  We also continue to monitor homes and wells in the periphery of our investigation area, although no natural gas has been detected in these areas. We consider this an indication that we have adequately defined the area where monitoring is appropriate.

The DMRM has witnessed considerable progress and is confident that the presence of natural gas is diminishing since remedial work was completed at Ohio Valley Energy's English No. 1 Well in December 2007.   As DMRM staff collects natural gas measurements in local homes, our gas detectors consistently indicate that natural gas is not detectable within confined areas (rooms) while water is running.  This is true even at homes, where we continue to detect the presence of natural gas in water well vents or at the hot or cold-water tap.  The consistent "zero" readings in your homes are very encouraging.  DMRM geologists and field staff have observed generally declining gas emissions (volume and pressure) from local water wells, even those wells that were significantly impacted in December 2007.  Recent down-hole camera surveys further support our conclusion that natural gas is dissipating throughout the investigation area.

When our staff are present at your home, we encourage you to accompany them as they collect data.  We also encourage you to view the digital read-out on our gas detectors as DMRM employees monitor and measure natural gas levels while they visit your home.  We welcome your questions, and will explain our findings throughout our monitoring session.  We have recently completed a form that our staff will leave with you after they have completed each monitoring session. This form serves as a record of our findings for each site visit.

It has recently been reported to us that some of you are not comfortable that employees of Ohio Valley Energy (OVE), including a contractor employed by Ohio Valley Energy, continue to monitor local water wells and homes for natural gas.  The contract employee in question is an off-duty assistant fire chief that fully understands the importance of collecting accurate



APPENDIX 3

measurements. The DMRM will weigh, but is not fully reliant on, the data collected by OVE or this contractor. DMRM employees also monitor the same locations on different schedules.

You are under no obligation to allow an employee of OVE, or DMRM for that matter, to enter your property or home. If you would prefer that monitoring cease by one or both parties, please contact our Uniontown office at the phone number listed below.

The DMRM has been informed that Biosolutions, Inc. has completed the reports for the samples collected from 80 water wells in the Bainbridge Township investigation area. The DMRM expects to receive the analytical reports soon. The DMRM's water quality laboratory has also completed analyses of samples that were collected as part of the recent sampling. As soon as the DMRM receives the reports from Biosolutions we will organize the reports by property owner and distribute them by mail. Each report will have a cover letter that will include a description of the reports for your water well, and will identify and explain any parameters that exceed Secondary or Primary Maximum Contaminant Levels established by the United States Environmental Protection Agency (US EPA) for public drinking water supplies pursuant to the Safe Drinking Water Act.

At a recent meeting of the Bainbridge Township Trustees it was stated that ODNR was not requiring OVE to test for the presence of crude oil in your water supplies. This is not correct. As stated in my January 29, 2008 letter and explained at the February 7, 2008 public meeting, we are testing for volatile organic compounds, water soluble compounds that are a component of crude oil, as a precautionary measure.

The DMRM appreciates your patience. We are finding consistent evidence that the gas is dissipating and that levels are generally dropping throughout the affected area..

Once again if you have any questions, please contact Marlene Hall at our Uniontown office at (330) 896-0616. Marlene will forward your questions to the appropriate DMRM staff.

Sincerely,

Scott R. Kell
Deputy Chief

SRK/sh

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

Dear _____:

Attached is the Division of Mineral Resources Management (DMRM) report regarding the current condition of the English No. 1 well. As stated in my January 29, 2008 letter, "The DMRM believes that the source of natural gas has been eliminated. However, the DMRM (will) continue to monitor the English No. 1 to further evaluate the success of corrective measures." As promised, the DMRM continued to evaluate the English well to ensure that it no longer presents a threat to public health and safety.

In March 2008, the DMRM required Ohio Valley Energy to complete additional evaluations of the English No. 1 well to ensure that it no longer presents a threat to public health and safety. Based upon our review of additional data, we've concluded that the English No. 1 well is not currently emitting gas into the local aquifers. The well construction conditions that existed in November and early December 2007, that caused natural gas contamination of local aquifers, have been effectively eliminated. The findings and conclusions in this report represent the consensus positions of DMRM geologists and administrators with significant experience in oil and gas operations and regulations.

Having eliminated the source of deep, high-pressure natural gas in the annulus of the English no. 1 well, the DMRM anticipates that concentrations of natural gas in local water wells will continue to diminish. The DMRM has not made any final decision regarding the fate of the English No.1 well.

The DMRM has received the water quality reports from Biosolutions, Inc. Within the next week you will be receiving a copy of the reports pertaining to your water well.

Again, if you have any questions regarding this report, please contact Marlene Hall at our Uniontown office at (330) 896-0616. She will refer your inquiry to the appropriate party.

Sincerely,

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

4/23/08

## Report on the Current Construction of the English #1 Well
## Geauga County, Bainbridge Township

Findings Regarding the Construction of the English #1 well

On October 18, 2007, in accordance with the State permitted casing plan, Ohio Valley Energy Systems Corporation (OVESC) set 88 feet of new 32 lb/ft American Petroleum Institute (API) standard 11 ¾ inch steel conductor casing through the glacial drift into bedrock. In compliance with the State permit, OVESC set 253 feet of new, 23 lb/ft, API standard 8-5/8 inch diameter steel surface casing was set more than 50 feet through the Berea Sandstone aquifer, the deepest source of potable ground water, and cemented to surface under supervision of the DMRM oil and gas well inspector assigned to Geauga County. The surface casing was cemented with 150 sacks of Class A cement with 3.0% calcium chloride and the inspector witnessed a return circulation of 12 barrels of cement. The cement stayed at surface and the job was approved by the inspector.

The average standard wait-on-cement time following cementing of surface casing is 8 hours. Following a 10 hour waiting period for the cement to set, drilling proceeded on fluid without incident to a total depth of 3926 feet on October 26, 2007. Fluid drilling was a permit requirement for the English well because the offset well, Permit 21946, encountered a significant show of high pressure gas in the "Newburg" section of the "Big Lime". Because the English #1 was drilled on fluid, no shows of oil or gas were noted during the drilling; however, the driller reported a slight odor of "sour gas" at total depth while mixing gel to condition the well bore.

After drilling to total depth, OVESC set 3873 feet of new 10.5 lb/ft API standard 4 ½ inch steel production casing. The production casing was cemented with 175 sacks of Unitropic cement. Circulation was of the borehole was established prior to cementing, but was lost during the cementing process. Calculated annular fill up for the amount of cement used to cement the 4 ½ inch production casing should have been at least 700-800 feet above the "Clinton sandstone", an industry standard best management practice. This would have been sufficient to seal off the "Newburg" zone of the Lockport Dolomite, which was a known gas bearing formation in the offset oil and gas well (Permit 21946).

A Cement Bond Log run by Appalachian Well Surveys on November 1, 2007 showed the top of the cement was at 3640 feet in the "Packer Shell", or approximately 25 feet above the top of the "Clinton sandstone", the permitted commercial oil and gas bearing formation. This amount of cement is considerably less than standard industry practice.

On November 5, 2007, OVESC perforated the production casing in the "Clinton sandstone" section from 3720-3740 feet with 56 shots. A total of 80 feet of cement covered the "Clinton" above the top perforation. Following perforation, an acid breakdown was performed on the "Clinton". The formation broke at 1450 psi followed by displacement of 250 gallons of acid and 7500 gallons of fluid.

On November 13, 2007, the well was hydraulically fractured with 50,700 gallons of fluid and 29,000 pounds of 20/40 sand.

On December 15, 2007, in response to a natural gas explosion in one home and gas pressurization in the water wells of other nearby homes, OVESC initiated remedial cementing of

the surface-production casing annulus to seal deep, high-pressure gas-bearing zones in the uncemented portion of the well above the "Clinton sandstone". The OVESC consultant concluded that the probable source of the gas in the annulus on the English #1 was from the "Newburg" member of the Lockport Dolomite. Sometimes described as "sour gas", gas from the "Newburg" has a distinctive odor consistent with the gas venting from the annulus. DMRM inspectors who were present also noted the distinctive odor of the gas. The purpose of the remedial cement job was to seal and isolate deep, high-pressure gas-bearing zones including the "Newburg" behind effectively cemented pipe. Water was pumped down the production casing to kill the "Clinton sandstone" gas. The casing was then perforated at 3600-3602 feet below surface, and 800 sacks of 50/50 pozmix cement was squeezed through perforations to shut off the deep high-pressure gas. The volume of cement used was sufficient to fill the annulus to surface; however, return circulation was not achieved. According to the OVESC consultant who witnessed the remedial cement operation, the job was successful in reducing approximately "95-98%" of the gas in the annulus, and the "Newburg" gas odor was no longer present. DMRM inspectors who witnessed the squeeze job noted that the annular gas flow initially stopped but resumed approximately ten minutes later at a reduced flow rate.

On December 17, 2007, the OVESC consultant observed that the annulus was "still gassing at a substantially reduced flow" and the gas was "not sour". OVESC had Appalachian Well Surveys run another cement bond log indicating that the first squeeze filled the annulus to a height of 2,656 feet below surface. A temperature log was also run that indicated several possible gas zones in the Devonian Shale. OVESC made the decision to try to eliminate the remaining gas by performing a second squeeze. The production casing was perforated at a depth of 2628-2630 feet below surface and the second squeeze cement job using another 800 sacks of 50/50 pozmix returned 41 barrels of cement to the surface.

On December 19, 2007, the consultant for OVESC reported that there was a "very minor flow" of gas venting from the cemented surface-production casing annulus. Another Appalachian Well Surveys cement bond log was run and it was stated by the OVESC consultant that there was a "probable micro-annulus visible on the log from 330' to 198'".

The DMRM and OVESC continued to monitor the English #1 well surface-production casing annulus subsequent to the second remedial cementing operation. The DMRM determined that the existing Cement Bond Logs were inadequate to render a final determination regarding the quality and effectiveness of the remedial cementing measures. On March 3, 2008, per DMRM recommendation, OVESC hired Baker-Hughes to run a Segmented Cement Bond Log. The advantage of a segmented bond log is that it provides a 360 degree evaluation of the cement bond between the pipe and the well bore whereas the standard cement bond logs previously run evaluate cement bond quality in one direction only and provide a basis for approximating the depth to the top of the cement. Based upon a review by four DMRM geologists, the Segmented Cement Bond Log indicates good to excellent bond between the casing and well bore from 2360 feet to approximately 550 feet below surface. The Segmented Cement Bond Log confirms channeling in the cement from about 550 feet to surface. This Segmented Cement bond Log also confirms that the deep high-pressure gas has been isolated from the well. DMRM geologists believe that the gas still present in the surface-production casing annulus is near-surface gas emanating from the shale, or a mixture of low-pressure shale gas mixed with remnant gas from the November-December 2007 charging event. When open, the annulus serves as an avenue for gas to vent to atmosphere. The cemented surface casing protects the local aquifers from gas

migrating through the channelized cement in the annulus between the surface and production casing strings.

## Conclusions Regarding the Current Condition of the English No. 1 Well:

Based upon this evaluation, the DMRM concludes the following:

1. The well-construction issues that existed between completion of the English #1 well in mid-November 2007 and December 15, 2007 that resulted in the over-pressurization of the un-cemented annulus and release of natural gas into local aquifers have been eliminated through the following corrective actions:
   - Inadequate primary cementing of the production casing has been remedied with the subsequent squeeze cementing operations;
   - The deep high-pressure gas zones that were the source of over-pressurization of the aquifers have been isolated and sealed from the well bore through the squeeze cementing procedures;
   - The confinement of annular gas which caused the build up of pressure has been eliminated.
2. Remedial cementing operations completed by OVESC in mid-December, 2007 have effectively isolated and sealed deep, high-pressure gas bearing zones. As a result, natural gas from deep formations can no longer migrate up the surface-production casing annulus of the English well and charge local aquifers.
3. The "Clinton sandstone" and "Newburg" are effectively sealed behind cemented production casing.
4. Production of "Clinton sandstone" gas through the cemented production casing does not pose a threat to local aquifers or public health and safety.
5. When the valve on the 8-4" annulus is open, low-pressure shallow gas from the shale should vent to the atmosphere.

APPENDIX 3

 # Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR                                        SEAN D. LOGAN, DIRECTOR

*Division of Mineral Resources Management*
*3575 Forest Lake Dr. Suite 150*
*Uniontown, OH  44685-8116*
*Phone: (330) 896-0616   Fax: (330) 896-1849*

May 2, 2008



Chagrin Falls OH 44023

Dear 

The Ohio Department of Natural Resources (ODNR), Division of Mineral Resources Management (DMRM) has received and compiled analytical results from the series of water sampling events over the past several months.  A copy of your laboratory data is attached.

In order to help you understand the laboratory data, we have included a glossary of terms.

The United States Environmental Protection Agency (USEPA) and the Ohio Environmental Protection Agency (OEPA) do not have water quality standards for domestic water supplies.  For your protection, ODNR – DMRM utilizes the USEPA Primary Maximum Contaminant Level (PMCL) and Secondary Maximum Contaminant Level (SMCL) that were established under authority of the Safe Drinking Water Act (SDWA) for public water supplies.  The PMCL standards have been established to define maximum contaminant levels for parameters that have known health effects.  SMCL standards have been established for parameters that do not affect health, but are established for aesthetic considerations such as taste, odor, and fixture staining.

Your water sample test results indicate dissolved gas in the form of methane is present at a concentration of 0.82 mg/l.  Methane may be present in water supplies as either a natural contaminant or as a contaminant introduced through oil and gas exploration activities.  There are no health standards for methane in water supplies.  The DMRM will continue to monitor your water supply for this dissolved gas.  All other test parameters are within USEPA primary and secondary drinking water standards.  The total coliform bacteria test result will be forwarded to you by the Geauga County General Health District.  If you have not received your bacteria test result, please contact Bill Wendell at (440) 279-1911.

If you would like to discuss your water sample results or schedule a meeting to review the data, please contact me at the Uniontown office at (330)-896-0616.

Sincerely,

*Ahmed Hawari*

Ahmed Hawari, Geologist
AH/mh



APPENDIX 3

**ODNR-DMRM--Cambridge Environmental Laboratory**          REPORT OF ANALYSIS

325 North 7th Street
Cambridge, Ohio   43725
(740) 439-5591;   (740) 439-3075-FAX

Laboratory ID#: 08012507
DMRM ID#: GEAU-ASH051
Field Sample ID#: ▓▓▓▓▓▓▓
Location: Geauga
Sample Date: 01/24/08
Sample Time: 13:56
Project Name: Bainbridge TWP
Analysis: DISSOLVED METALS
Date/Time Rec'd: 1/25/08 14:10
Received By: JMM

Uniontown
Ahmed S. Hawari
3575 Forest Lake Drive
Suite 150
Uniontown,OH 44685
(330)896-0616
(330)896-1849--FAX

| PARAMETER | RESULT | UNITS | METHOD | DATE OF ANALYSIS | ANALYST |
|---|---|---|---|---|---|
| Aluminum,Dissolved | <0.05 | mg/L | SM3120B | 02/06/08 | JMM |
| Barium,Dissolved | 0.148 | mg/L | SM3120B | 02/11/08 | JMM |
| Magnesium,Dissolved | 2.16 | mg/L | SM3120B | 02/06/08 | JMM |
| Calcium,Dissolved | 6.08 | mg/L | SM3120B | 02/06/08 | JMM |
| Iron,Dissolved | <0.05 | mg/L | SM3120B | 02/06/08 | JMM |
| Potassium,Dissolved | 1.53 | mg/L | SM3120B | 02/06/08 | JMM |
| Manganese,Dissolved | <0.03 | mg/L | SM3120B | 02/06/08 | JMM |
| Sodium,Dissolved | 143 | mg/L | SM3120B | 02/06/08 | JMM |
| Strontium,Dissolved | 0.092 | mg/L | SM3120B | 02/11/08 | JMM |
| Hardness,Dissolved | 24.1 | mg CaCO3/L | SM2340B | 02/11/08 | JMM |

Approved By: _____     Date: 3/4/08

REPORT ON THE BAINBRIDGE INVESTIGATION

LAB ID: 08012506
DMRM NUMBER: GEAU-ASH051
PROJECT NAME: Bainbridge TWP
LOCATION: Geauga
SAMPLE LOCATION: ███████████
GROUP: II
DATE SAMPLED: 1/24/2008
DATE RECEIVED: 1/25/2008

OHIO DEPARTMENT OF NATURAL RESOURCES
DIVISION OF MINERAL RESOURCES MANAGEMENT
CAMBRIDGE ENVIRONMENTAL LABORATORY
325 NORTH SEVENTH STREET
CAMBRIDGE, OH 43725

| PARAMETER | mg/L | epm | moles/L | SUSP. |
|---|---|---|---|---|
| pH | 8.17 | | | Ba, Total = 0.101 mg/L |
| Total Acidity as CaCO3 | 0 | pH>8.30 SU upon analysis. ⊗ | | |
| Total Alkalinity as CaCO3  (m-alk) | 276 | | | Sr, Total = 0.091 mg/L |
| Phenolphthalein Alkalinity as CaCO3 | 9.52 | | | |
| Carbonate (CO3) Alkalinity as CaCO3 | 19.04 | 0.3120656 | 0.000156 | Br, Total = <0.500 mg/L |
| BiCarbonate (HCO3) Alkalinity as CaCO3 | 256.96 | 4.2115744 | 0.004212 | |
| Hydroxide (OH) Alkalinity as CaCO3 | 0 | 0 | 0.000000 | |
| Specific Conductivity (uS/cm) | 655 | | | |
| Total Dissolved Solids (TDS) | 384 | | | |
| Total Suspended Solids (TSS) | 10 | | | |
| Total Solids (TS) | 394 | | | |
| Sulfate | 4.18 | 0.0870276 | 0.000044 | |
| Chloride | 42.5 | 1.198925 | 0.001199 | |
| Calcium, Total | 6.07 | 0.302893 | 0.000151 | |
| Magnesium, Total | 2.16 | 0.1777464 | 0.000089 | |
| Sodium, Total | 146 | 6.351 | 0.006351 | |
| Potassium, Total | 1.52 | 0.0388816 | 0.000039 | |
| Iron, Total | <0.05 | 0.00263228 | 0.000001 | |
| Ferrous Iron | 0 | 0 | 0.000000 | |
| Manganese, Total | <0.03 | 0.0001092 | 0.000000 | |
| Aluminum, Total | <0.05 | 0.0052264 | 0.000002 | |
| Hardness as CaCO3 | 24.1 | | | |
| (Hardness, S elements analyzed) | 663.57 | | | |

Approved By: _____          Date: 2/12/8

RECEIVE
FEB 19 2008
MINERAL RESOURCES M
UNIONTOWN FIELD OFFI

LAB ID: 08012506

| FIELD MEASUREMENTS | UNITS | | | UNITS |
|---|---|---|---|---|
| pH | | Flow (cfs) | | |
| eH | | Odor | | |
| Specific Conductivity | | Turbidity | | |
| Temperature | | Color | | |
| Alkalinity (mg/L as CaCO3) | | D.O. (mg/L) | | |
| H2S (mg/L) | | CO2 (mg/L) | | |

| | | | |
|---|---|---|---|
| Total Cations (EPM) | 6.87848888 | Total Anions(EPM) | 5.8095926 |
| % Ca | 4.403481714 | % HCO3 + CO3 | 77.86501243 |
| % Mg | 2.584090824 | % SO4 | 1.497998328 |
| % Na + K | 92.89658981 | % Cl | 20.63698924 |
| % Other | 0.115837652 | % Other | 0.00 |
| EPM Balance | 8.424412167 | % OH | 0 |
| | | Water Type | NaHCO3 |

| | |
|---|---|
| Measured TDS | 384 |
| Calculated TDS | 368.03 |
| Measured TDS/ Calculated TDS | 1.043393202 |

| | RATIO | | RATIO |
|---|---|---|---|
| | | H+ Conc. | 6.76083E-09 |
| measTDS/SC | 0.586259542 | calc TDS/SC | 0.561877863 |
| Ca/ HCO3 | 0.071919185 | K/ HCO3 | 0.009232082 |
| Mg/ SO4 | 0.516746411 | Mn/ Fe | 0.041484948 |
| Fe/ SO4 | 0.030246497 | Ca/ Mg | 1.704073894 |
| Al/ Ca | 0.017254938 | Na/ K | 163.3420435 |
| Al/ SO4 | 0.060054511 | Ca/ Cl | 0.252637154 |
| Na/ Cl | 3.435294118 | Ca/ SO4 | 3.480424601 |
| Na/ SO4 | 72.97684872 | Fe/ Cl | 0.002195533 |
| K/ SO4 | 0.446773208 | Mg/ Cl | 0.148254812 |
| Al/ Cl | 0.004359238 | K/ Cl | 0.032430386 |
| Mn/ Cl | 9.10816E-05 | Zn/ Fe | |
| Mn/ SO4 | 0.001254774 | Fe/ NO3 | |

| | SAR | | RSC | | ESP | |
|---|---|---|---|---|---|---|
| Carbonate Hardness | 24.1 | Non-Carbonate Hardness | | 0 | | |

APPENDIX 3



# Consumer Analytical Laboratory

Ohio Department of Agriculture
Consumer Analytical Laboratory
8995 East Main St.  Bldg 3
Reynoldsburg, OH  43068
Tel:  (614) 728-6230
Fax:  (614) 728-6322

## Customer Information

Customer:  ODNR/Mineral Resources Management
Address:  325 N. 7th St.
Cambridge, OH 43725

Invoice Id: 08IN036

## Sample Receipt Information

| | | | | |
|---|---|---|---|---|
| Sample number: | **0800778-02** | | Collection Site: | Kitchen Sink Faucet |
| Collection date: | 1/24/2008 | Collector: | Hawari, Ahmed | ▓▓▓▓▓ |
| Collection time: | 2:10:00 PM | Customer sample #: | 02 | |
| Date received: | 1/29/2008 | | | |
| Time received: | 10:25AM/DA | | | |

## Sample Information

Description:  Water, drinking        Identification:  Kitchen Sink Faucet
Comments:

| Test | Method | Result | Units | Analysis Date |
|---|---|---|---|---|
| 1,1,1,2-Tetrachloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,1,1-Trichloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,1,2,2-Tetrachloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,1,2-Trichloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,1-Dichloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,1-Dichloroethene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,1-Dichloropropene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2,3-Trichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2,3-Trichloropropane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2,4-Trichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2,4-Trimethylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2-Dichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2-Dichloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,2-Dichloropropane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,3,5-Trimethylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,3-Dichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |

REPORT ON THE BAINBRIDGE INVESTIGATION

x

APPENDIX 3



# Consumer Analytical Laboratory

Ohio Department of Agriculture
Consumer Analytical Laboratory
8995 East Main St.  Bldg 3
Reynoldsburg, OH   43068
Tel: (614) 728-6230
Fax: (614) 728-6322

## Customer Information

| | |
|---|---|
| Customer: | ODNR/Mineral Resources Management |
| Address: | 325 N. 7th St. |
| | Cambridge, OH 43725 |

Invoice Id: 08IN036

## Sample Receipt Information

| | | | | | |
|---|---|---|---|---|---|
| Sample number: | **0800778-02** | | | Collection Site: | Kitchen Sink Faucet |
| Collection date: | 1/24/2008 | Collector: | Hawari, Ahmed | | |
| Collection time: | 2:10:00 PM | Customer sample #: | 02 | | |
| Date received: | 1/29/2008 | | | | |
| Time received: | 10:25AM/DA | | | | |

## Sample Information

Description: Water, drinking          Identification: Kitchen Sink Faucet
Comments:

| Test | Method | Result | Units | Analysis Date |
|---|---|---|---|---|
| 1,3-Dichloropropane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,3-Dichloropropene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 1,4-Dichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 2,2-Dichloropropane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 2-Chlorotoluene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 4-Chlorotoluene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| 4-Isopropyltoluene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Benzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Bromobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Bromochloromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Bromodichloromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| *pH <2; residual chlorine negative* | | | | |
| Bromoform | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Bromomethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Carbon tetrachloride | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Chlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3



# Consumer Analytical Laboratory

Ohio Department of Agriculture
Consumer Analytical Laboratory
8995 East Main St.   Bldg 3
Reynoldsburg, OH   43068
Tel: (614) 728-6230
Fax: (614) 728-6322

## Customer Information

| | |
|---|---|
| Customer: | ODNR/Mineral Resources Management |
| Address: | 325 N. 7th St. |
| | Cambridge, OH 43725 |

Invoice Id: 08IN036

## Sample Receipt Information

Sample number: **0800778-02**
Collection date: 1/24/2008
Collection time: 2:10:00 PM

Collector: Hawari, Ahmed
Customer sample #: 02

Collection Site: Kitchen Sink Faucet

Date received: 1/29/2008
Time received: 10:25AM/DA

## Sample Information

Description: Water, drinking
Comments:

Identification: Kitchen Sink Faucet

| Test | Method | Result | Units | Analysis Date |
|---|---|---|---|---|
| Chloroethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Chloroform | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Chloromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| cis-1,2-Dichloroethylene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Dibromochloromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Dibromomethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Dichlorodifluoromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Dichloromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Ethylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Hexachlorobutadiene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Isopropylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Methyl-t-butyl Ether | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Naphthalene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| n-Butylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| n-Propylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| sec-Butylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |

REPORT ON THE BAINBRIDGE INVESTIGATION

# Consumer Analytical Laboratory

**Ohio Department of Agriculture**
**Consumer Analytical Laboratory**
**8995 East Main St. Bldg 3**
**Reynoldsburg, OH 43068**
**Tel: (614) 728-6230**
**Fax: (614) 728-6322**

## Customer Information

Customer: ODNR/Mineral Resources Management
Address: 325 N. 7th St.
Cambridge, OH 43725

Invoice Id: 08IN036

## Sample Receipt Information

Sample number: **0800778-02**
Collection date: 1/24/2008
Collection time: 2:10:00 PM

Collector: Hawari, Ahmed
Customer sample #: 02

Collection Site: Kitchen Sink Faucet
[redacted]

Date received: 1/29/2008
Time received: 10:25AM/DA

## Sample Information

Description: Water, drinking
Comments:

Identification: Kitchen Sink Faucet

| Test | Method | Result | Units | Analysis Date |
|---|---|---|---|---|
| Styrene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| tert-Butylbenzene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Tetrachloroethene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Toluene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| trans-1,2-Dichloroethylene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Trichloroethene | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Trichlorofluoromethane | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Vinyl chloride | EPA 524.2 | <0.5 | µg/L | 1/30/2008 |
| Xylenes (total) | EPA 524.2 | <1.5 | µg/L | 1/30/2008 |

Approved by: Consumer Analytical Laboratory

Signature and date: William Friz
Chemistry Supervisor

Approved Date: 2/4/2008
Print Date: 2/4/2008

APPENDIX 3

# BIOSOLUTIONS, LLC.

### Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

ODNR
Ahmed Hawari

Project:
Date Received: 1/24/2008
Date Complete: 2/7/2008
Date Reported: 2/13/2008

Sample Number: 14044-01
Client Sample ID: ████████
Description: After running hose in yard
Sample Point: Kitchen sink
Location: ████████

Date Sampled: 1/24/2008 1:56:00 PM
Sampled By: Amanda Meitz
Preservation: A,D<2 bottles

| Test | Method | Result | Units | Date | Analyst |
|------|--------|--------|-------|------|---------|
| **Gas Well Samples 2** | | | | | |
| Alkalinity, Total | SM 2320B | 263 | mg/L as CaCO3 | 1/25/2008 | JC |
| Alkalinity, Bicarbonate | SM 2320B | 263 | mg/L | 1/25/2008 | JC |
| Alkalinity, Carbonate | SM 2320B | <1 | mg/L | 1/25/2008 | JC |
| Alkalinity, P | SM 2320B | 0 | mg/L | 1/25/2008 | JC |
| Alkalinity, Hydroxide | SM 2320B | <1 | mg/L | 1/25/2008 | JC |
| pH (Lab) | EPA 150.1 | 8.2 | S.U. | 1/25/2008 | JC |
| Conductivity | SM 2510 | 617 | μMHO/cm | 1/25/2008 | JC |
| Solids, Total Dissolved (TDS) | SM 2540C | 329 | mg/L | 1/28/2008 | JC |
| Solids, Total Suspended Solids | SM 2540D | <1 | mg/L | 1/28/2008 | JC |
| Solids, Total | SM 2540B | 384 | mg/L | 1/28/2008 | JC |
| Chloride | EPA 300.0 | 42 | mg/L | 1/25/2008 | JC |
| Sulfate (SO4) | EPA 300.0 | <2 | mg/L | 1/25/2008 | JC |
| Calcium (Ca), Total as Ca | SM 3111B | 6.8 | mg/L | 1/25/2008 | MW |
| Calcium (Ca), Total as CaCO3 | SM 3111B | 17.0 | mg/L as CaCO3 | 1/25/2008 | MW |
| Magnesium (Mg), Total as Mg | SM 3111B | 2.2 | mg/L | 1/25/2008 | MW |
| Magnesium (Mg), Total as CaCO3 | SM 3111B | 9.1 | mg/L as CaCO3 | 1/25/2008 | MW |
| Hardness, Total | SM 2340B | 26.1 | mg/L as CaCO3 | 1/25/2008 | MW |
| Aluminium (Al), Total | SM 3111D | <100 | μg/L | 1/29/2008 | MW |
| Barium (Ba), Soluble -AA | SM 3111D | <100 | μg/L | 2/1/2008 | MW |
| Barium (Ba), Total | SM 3111D | <100 | μg/L | 2/1/2008 | MW |
| Iron (Fe), Soluble | SM 3111B | <20 | μg/L | 1/25/2008 | MW |
| Iron (Fe), Total as Fe | SM 3111B | 20 | μg/L | 1/25/2008 | MW |
| Manganese (Mn), Total | SM 3111B | <10 | μg/L | 1/25/2008 | MW |
| Potassium (K), Total as K | SM 3111B | 2 | mg/L | 1/25/2008 | MW |
| Sodium (Na), Total as Na | SM 3111B | 140 | mg/L | 1/25/2008 | MW |
| Strontium (Sr) | SM 3111B | 110 | μg/L | 1/28/2008 | MW |

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

# BIOSOLUTIONS, LLC.

Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

ODNR
Ahmed Hawari

Project:
Date Received:   1/24/2008
Date Complete:   2/7/2008
Date Reported:   2/13/2008

Sample Number:   14044-01
Client Sample ID:   ███████
Description:   After running hose in yard
Sample Point:   Kitchen sink
Location:   ███████

Date Sampled:   1/24/2008 1:56:00 PM
Sampled By:   Amanda Meitz
Preservation:   A,D<2 bottles

| Test | Method | Result | Units | Date | Analyst |
|------|--------|--------|-------|------|---------|
| **Gas Well Samples 2** | | | | | |
| Flow | | 5.1 | GPM | 1/24/2008 | AM |
| Flow Time | | 22 | Min | 1/24/2008 | AM |
| Volume Pumped | | 112 | Gal | 1/24/2008 | AM |
| Bore Volume | | See note | Gal | | AM |
| Sampling Fee | | Complete | | 1/24/2008 | AM |

Correlating well logs with property addresses was completed by ODNR representative. The well log associated with this property was not available when this report was issued, so the bore volume is not reported.
None of the labs listed on OEPA website is certified by OEPA for strontium. Strontium is not part of the drinking water lists of metals.
Smell of PVC glue was noted by ODNR representative when the plug from the PVC extension on the well was removed to do LEL.
Soluble metals sample was filtered in field prior to preservation.

**Approved By:** _____

Ohio EPA Certification #'s: I291 for Inorganics and 849 for Microbiological

APPENDIX 3

# BIOSOLUTIONS, LLC.

Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

ODNR
Ahmed Hawari

Project:
Date Received:   1/24/2008
Date Complete:   2/7/2008
Date Reported:   2/13/2008

Sample Number:   14044-02
Client Sample ID:   ███████████
Description:   After running hose in yard
Sample Point:   Kitchen sink
Location:   ███████████

Date Sampled:   1/24/2008 2:10:00 PM
Sampled By:   Amanda Meitz
Preservation:   VOC - 3 - 40 ml vials w/
ascorbic acid add HCl

| Test | Method | Result | Units | Date | Analyst |
|---|---|---|---|---|---|
| **VOC's (EPA 524.2) Drinking Water** | | | | | |
| Bromodichloromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Bromoform | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Chloroform | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Dibromochloromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Benzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Bromobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Bromochloromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Bromomethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| n-Butylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| sec-Butylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| tert-Butylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Carbon Tetrachloride | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Chlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Chloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Chloromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 2-Chlorotoluene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 4-Chlorotoluene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Dibromomethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,2-Dichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,3-Dichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,4-Dichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Dichlorodifluoromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1-Dichloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,2-Dichloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1-Dichloroethene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| cis-1,2-Dichloroethene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

APPENDIX 3

# BIOSOLUTIONS, LLC.

### Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

ODNR
Ahmed Hawari

Project:
Date Received:   1/24/2008
Date Complete:   2/7/2008
Date Reported:   2/13/2008

Sample Number:   14044-02
Client Sample ID:   ▓▓▓▓▓▓▓
Description:   After running hose in yard
Sample Point:   Kitchen sink
Location:   ▓▓▓▓▓▓▓

Date Sampled:   1/24/2008 2:10:00 PM
Sampled By:   Amanda Meitz
Preservation:   VOC - 3 - 40 ml vials w/
ascorbic acid add HCl

| Test | Method | Result | Units | Date | Analyst |
|------|--------|--------|-------|------|---------|
| **VOC's (EPA 524.2) Drinking Water** | | | | | |
| trans-1,2-Dichloroethene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Dichloromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,2-Dichloropropane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,3-Dichloropropane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 2,2-Dichloropropane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1-Dichloropropene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,3-Dichloropropene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Ethylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Hexachlorobutadiene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Isopropylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 4-Isopropyltoluene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Methyl-t-butyl ether | EPA 524.2 | <2 | µg/L | 1/31/2008 | 2979 |
| Naphthalene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Nitrobenzene | EPA 524.2 | <10 | µg/L | 1/31/2008 | 2979 |
| n-Propylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Styrene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1,1,2-Tetrachloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1,2,2-Tetrachloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Toluene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1,1-Trichloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Tetrachloroethene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,2,3-Trichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,2,4-Trichlorobenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Trichloroethene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,1,2-Trichloroethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Trichlorofluoromethane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

APPENDIX 3

# BIOSOLUTIONS, LLC.

### Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

ODNR
Ahmed Hawari

Project:
Date Received:   1/24/2008
Date Complete:   2/7/2008
Date Reported:   2/13/2008

Sample Number:   14044-02
Client Sample ID:   ▮▮▮▮▮▮▮▮
Description:   After running hose in yard
Sample Point:   Kitchen sink
Location:   ▮▮▮▮▮▮▮▮

Date Sampled:   1/24/2008 2:10:00 PM
Sampled By:   Amanda Meitz
Preservation:   VOC - 3 - 40 ml vials w/
ascorbic acid add HCl

| Test | Method | Result | Units | Date | Analyst |
|------|--------|--------|-------|------|---------|
| **VOC's (EPA 524.2) Drinking Water** | | | | | |
| 1,2,3-Trichloropropane | EPA 524.2 | <0.5 | μg/L | 1/31/2008 | 2979 |
| 1,2,4-Trimethylbenzene | EPA 524.2 | <0.5 | μg/L | 1/31/2008 | 2979 |
| 1,3,5-Trimethylbenzene | EPA 524.2 | <0.5 | μg/L | 1/31/2008 | 2979 |
| Vinyl Chloride | EPA 524.2 | <0.5 | μg/L | 1/31/2008 | 2979 |
| Xylenes, Total | EPA 524.2 | <0.5 | μg/L | 1/31/2008 | 2979 |

Approved By:   _____

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

# BIOSOLUTIONS, LLC.

Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

Hull & Associates
David Wazny

Project:
Date Received:   2/21/2008
Date Complete:   3/19/2008
Date Reported:   4/2/2008

Sample Number:   14175-14
Client Sample ID:   ▓▓▓▓▓▓▓▓
Description:
Sample Point:   Kitchen sink
Location:   ▓▓▓▓▓▓▓▓

Date Sampled:   2/21/2008 7:20:00 PM
Sampled By:   Amanda Meitz
Preservation:   A,D<2,filteredD,VOC,others

| Test | Method | Result | Units | Date | Analyst |
|------|--------|--------|-------|------|---------|
| **Arsenic (As), Soluble - GFAA** | | | | | |
| Arsenic (As), Soluble | EPA 200.9 | <2 | µg/L | 3/7/2008 | MW |
| ~~Arsenic (As), Total - GFAA~~ | | | | | |
| Arsenic (As),  Total | EPA 200.9 | <2 | µg/L | 3/7/2008 | MW |
| **Ethylene glycol, ethanol, isopropyl alcohol** | | | | | |
| Sampling Fee, Data Consolidation | | Entered | | 3/28/2008 | MW |
| Ethylene glycol | SW 8015m | <1.00 | mg/L | 3/4/2008 | JAU |
| Ethanol | SW 8015m | <1.00 | mg/L | 2/29/2008 | TWN |
| Isopropyl alcohol | SW 8015m | <1.00 | mg/L | 2/29/2008 | TWN |
| **Methane, ethane, butane** | | | | | |
| Sampling Fee, Data Consolidation | | Entered | | 3/19/2008 | MW |
| Methane | ASTM D1945 R&D | 0.82 | mg/L | 3/7/2008 | 257 |
| Ethane | ASTM D1945 R&D | <0.02 | mg/L | 3/7/2008 | 257 |
| Iso-Butane | ASTM D1945 R&D | <0.03 | mg/L | 3/7/2008 | 257 |
| N-Butane | ASTM D1945 R&D | <0.03 | mg/L | 3/7/2008 | 257 |
| **Nitrate/Nitrite** | | | | | |
| Nitrate (NO3) as N | EPA 300.0 | <0.10 | mg/L | 2/22/2008 | JC |
| Nitrite (NO2) as N | EPA 300.0 | <0.10 | mg/L | 2/22/2008 | JC |

Sample was filtered on site for soluble metals analysis, then preserved.
Calcite/carbonate system bypassed by ODNR representative.
Outsource testing: VOC's - Brookside Laboratory
Outsource testing: Methane, Ethane, Iso-Butane, N-Butane - CWM Environmental
Outsource testing: Ethylene Glycol, Ethanol, Isopropanol - Test America

Approved By:   _____

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3



# CWM Environmental
## 11931 State Route 85

### Kittanning, Pennsylvania 16201
### 724-543-3011

**Lab # 03-457**

## Lab Analysis Report

**Customer:** Biosolutions, LLC
**Site:** ███████████
**Monitoring Pt:** 14175-14
**Source Type:** N/A

**Collection Date:** 02/21/08  19:20
**Received Date:** 02/25/08  15:00
**Matrix:** Drinking Water
**Collection Method:** Grab

| 02080786 | Result | Method Detection Limit | Method | Analysis Date | Analyst |
|---|---|---|---|---|---|
| Methane | 0.82 mg/L | .01 mg/L | ASTM D1945 R&D | 3/7/08  13:40 | 02-257 |
| Ethane | <0.02 mg/L | .02 mg/L | ASTM D1945 R&D | 3/7/08  13:41 | 02-257 |
| ISO-Butane | ND | .03 mg/L | ASTM D1945 R&D | 3/7/08  13:42 | 02-257 |
| N-Butane | ND | .03 mg/L | ASTM D1945 R&D | 3/7/08  13:45 | 02-257 |

**Sample Comments:**
None

*Ryan C Shafer* (signature)

Ryan C Shafer, Technical Director

Analyte names in bold are listed under the laboratory's current NELAP scope of accreditation.

May 02 2008 12:10PM   BIOSOLUTIONS                4407082988          P.2
                                        APPENDIX 3

# BIOSOLUTIONS, LLC.

### Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 · CHAGRIN FALLS, OH · 44023 PHONE: 440-708-2999 · FAX: 440-708-2988

## Lab Analysis Report

Vorys, Sater, Seymour and Pease LLP
John K. Keller
52 E. Gay Street
Columbus, OH 43215

Project:
Date Received:   1/24/2008
Date Complete:   2/7/2008
Date Reported:   2/7/2008

Sample Number:   14044-02
Client Sample ID:   ▮▮▮▮▮▮
Description:   After running hose in yard
Sample Point:   Kitchen sink
Location:   ▮▮▮▮▮▮

Date Sampled:   1/24/2008 2:10:00 PM
Sampled By:   Amanda Meitz
Preservation:   VOC - 3 - 40 ml vials w/
ascorbic acid add HCl

| Test | Method | Result | Units | Date | Analyst |
|---|---|---|---|---|---|
| **VOC's (EPA 524.2) Drinking Water** | | | | | |
| 1,2,3-Trichloropropane | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,2,4-Trimethylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| 1,3,5-Trimethylbenzene | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Vinyl Chloride | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |
| Xylenes, Total | EPA 524.2 | <0.5 | µg/L | 1/31/2008 | 2979 |

Approved By:   _[signature]_

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

May 02 2008 12:10PM   BIOSOLUTIONS                       4407082988            P.1

APPENDIX 3

# BIOSOLUTIONS, LLC.

## Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

Vorys, Sater, Seymour and Pease LLP
John K. Keller
52 E. Gay Street
Columbus, OH 43215

Project:
Date Received:   1/24/2008
Date Complete:   2/7/2008
Date Reported:   2/7/2008

Sample Number:   14044-01
Client Sample ID:   ▇▇▇▇▇
Description:   After running hose in yard
Sample Point:   Kitchen sink
Location:   ▇▇▇▇▇

Date Sampled:   1/24/2008 1:56:00 PM
Sampled By:   Amanda Meitz
Preservation:   A,D<2 bottles

| Test | Method | Result | Units | Date | Analyst |
|------|--------|--------|-------|------|---------|
| **Gas Well Samples 2** | | | | | |
| Flow | | 5.1 | GPM | 1/24/2008 | AM |
| Flow Time | | 22 | Min | 1/24/2008 | AM |
| Volume Pumped | | 112 | Gal | 1/24/2008 | AM |
| Bore Volume | | See note | Gal | | AM |
| Sampling Fee | | Complete | | 1/24/2008 | AM |

Correlating well logs with property addresses was completed by ODNR representative. The well log associated
with this property was not available when this report was issued, so the bore volume is not reported.
None of the labs listed on OEPA website is certified by OEPA for strontium. Strontium is not part of the
drinking water lists of metals.
Smell of PVC glue was noted by ODNR representative when the plug from the PVC extension on the well was
removed to do LEL.
Soluble metals sample was filtered in field prior to preservation.

Approved By:

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

REPORT ON THE BAINBRIDGE INVESTIGATION

May 02 2008 1:46PM    BIOSOLUTIONS          4407082988           p.14
APPENDIX 3

# BIOSOLUTIONS, LLC.

### Cleaner water through applied chemistry and biology

10180 QUEENS WAY #6 • CHAGRIN FALLS, OH • 44023 PHONE: 440-708-2999 • FAX: 440-708-2988

## Lab Analysis Report

Vorys, Sater, Seymour and Pease LLP
John K. Keller
52 E. Gay Street
Columbus, OH 43215

Project:
Date Received: 2/21/2008
Date Complete: 3/19/2008
Date Reported: 3/28/2008

Sample Number:   14175-14
Client Sample ID:   ▮▮▮▮▮
Description:
Sample Point:   Kitchen sink
Location:   ▮▮▮▮▮

Date Sampled:   2/21/2008 7:20:00 PM
Sampled By:   Amanda Meitz
Preservation:   A,D<2,filteredD,VOC,others

| Test | Method | Result | Units | Date | Analyst |
|---|---|---|---|---|---|
| **Arsenic (As), Soluble - GFAA** | | | | | |
| Arsenic (As), Soluble | EPA 200.9 | <2 | µg/L | 3/7/2008 | MW |
| **Arsenic (As), Total - GFAA** | | | | | |
| Arsenic (As), Total | EPA 200.9 | <2 | µg/L | 3/7/2008 | MW |
| **Ethylene glycol, ethanol, isopropyl alcohol** | | | | | |
| Sampling Fee, Data Consolidation | | Entered | | 3/28/2008 | MW |
| Ethylene glycol | SW 8015m | <1.00 | mg/L | 3/4/2008 | JAU |
| Ethanol | SW 8015m | <1.00 | mg/L | 2/29/2008 | TWN |
| Isopropyl alcohol | SW 8015m | <1.00 | mg/L | 2/29/2008 | TWN |
| **Methane, ethane, butane** | | | | | |
| Sampling Fee, Data Consolidation | | Entered | | 3/19/2008 | MW |
| Methane | ASTM D1945 R&D | 0.82 | mg/L | 3/7/2008 | 257 |
| Ethane | ASTM D1945 R&D | <0.02 | mg/L | 3/7/2008 | 257 |
| Iso-Butane | ASTM D1945 R&D | <0.03 | mg/L | 3/7/2008 | 257 |
| N-Butane | ASTM D1945 R&D | <0.03 | mg/L | 3/7/2008 | 257 |
| **Nitrate/Nitrite** | | | | | |
| Nitrate (NO3) as N | EPA 300.0 | <0.10 | mg/L | 2/22/2008 | JC |
| Nitrite (NO2) as N | EPA 300.0 | <0.10 | mg/L | 2/22/2008 | JC |

Sample was filtered on site for soluble metals analysis, then preserved.
Calcite/carbonate system bypassed by ODNR representative.
Outsource testing: VOC's - Brookside Laboratory
Outsource testing: Methane, Ethane, Iso-Butane, N-Butane - CWM Environmental
Outsource testing: Ethylene Glycol, Ethanol, Isopropanol - Test America

Approved By: _____

Ohio EPA Certification #'s: 1291 for Inorganics and 849 for Microbiological

APPENDIX 3



# Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR                                                    SEAN D. LOGAN, DIRECTOR

*Division of Mineral Resources Management*
***Scott R. Kell, Deputy Chief***
*2045 Morse Road, Bldg. H-3*
*Columbus, OH  43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

May 13, 2008

Dear:

The Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) has completed its evaluation regarding the cause of gas infiltration into ground-water aquifers in areas of Bainbridge Township, Geauga County.  As with any ground water investigation, the DMRM evaluates evidence regarding source(s), migration pathways, and the pressure differential necessary to move contaminants from the source(s) to the affected water supplies. The DMRM has concluded that confinement of deep, high-pressure natural gas in the surface-production casing annulus of the Ohio Valley Energy Systems Corporation (OVESC) English No. 1 well caused over-pressurization. Over-pressurization occurs when pressure in an un-vented annulus exceeds the hydrostatic pressure of the freshwater aquifers. Once an annulus is over-pressurized, annular gas can infiltrate fractures in bedrock below the base of the cemented surface casing and migrate upward into the aquifers.  These findings and conclusions are consistent with preliminary findings summarized in the January 30, 2008 letter, and presented at the February 7, 2008 Bainbridge Township meeting.

Attached is a report summarizing the findings and conclusions of the DMRM investigation regarding causation, including an evaluation of contributing factors. In summary, the DMRM concluded that the primary cement job on the production casing was deficient. Furthermore, the DMRM concludes that OVESC erred in closing the wellhead valve rather than temporarily venting or flaring the annular gas, prior to completing remedial cementing operations.

As stated in our report released on April 23, 2008, the DMRM has concluded that the conditions that resulted in annular over-pressurization at the English Well have been corrected.  The well construction conditions that existed in November and early December 2007, that caused natural gas infiltration of local aquifers, have been effectively eliminated.

 All listed contributing factors have been effectively addressed through new permit conditions that the DMRM implemented beginning on January 18th, 2008.  DMRM inspectors have been enforcing the new requirements since January 2008, and there have not been any similar incidents.

APPENDIX 3

If you have any questions, please contact Marlene Hall of the DMRM Uniontown office at (330) 896-0616.  She will refer your inquiry to the appropriate party.

Sincerely,

Scott R. Kell, Deputy Chief

SRK/mh
Enc.

REPORT ON THE BAINBRIDGE INVESTIGATION

5/13/08

## Division of Mineral Resources Management Report
## Conclusions about the Causation of the Aquifer Gas Invasion and Home Explosion
## Bainbridge Township, Geauga County

### Local Geology

Geauga County lies on the western edge of the Appalachian Basin in northeastern Ohio. There is occasional seismic activity in the area. Based upon a gravity survey, Baranowski (2002) infers the presence of a fault in Pre-Cambrian metamorphic and igneous rocks that trends north northeastward through western Geauga County. Based upon a structural contour map of the top of the Onondaga Limestone, there appears to be a local structural anomaly in Bainbridge Township indicating folding or faulting. Geologic interpretation of open hole wireline logs from an offset oil and gas well (permit 2-1946) also indicates fracturing in deeper formations including the Onondaga Limestone, Lockport Dolomite and "Packer Shell". Down hole video camera pictures taken by the Division of Mineral Resources Management (DMRM) in nearby water wells show natural fracturing immediately above the Berea in the Cuyahoga Formation.

In Bainbridge Township, glacial sand and gravel deposits, the Sharon Conglomerate, Cuyahoga Formation, and the Berea provide groundwater resources. The Berea is the deepest underground source of potable water in the area. Water wells provide drinking water to homes and businesses either from individual private or public water wells, or local community water well fields. Water well drillers and well owners have noted occasional shows of low-pressure naturally occurring methane gas in some of the Berea water wells in Geauga County. The likely source of this nuisance gas is the Ohio Shale that underlies the Berea. Shale gas in water wells does not pose a health problem as long as wells are properly vented.
Knowledge of local geology, the subsurface sources of drinking water, and gas-bearing zones is essential in designing the casing plans that will protect ground water resources when issuing oil and gas drilling permits.

### Oil and gas activity in Bainbridge Township

Natural gas is the main hydrocarbon component produced in oil and gas wells in Geauga County with minor amounts of associated oil. Gas has been found in the Berea, Ohio Shale, Oriskany Sandstone, "Newburg" Dolomite and especially the "Clinton" sandstone, the primary commercial oil and gas producing reservoir in the county. Since 1981, 132 permits have been issued to drill Clinton gas wells in Bainbridge Township. Of these, 82 are producing, 25 were drilled, produced and have been plugged, and 22 were permitted but not drilled. Those permits have expired. The English #1 well has been drilled and is currently shut-in. There are also two valid outstanding permits that have not been drilled. One permit application is being processed at DMRM and is pending approval by the Division.

· 1

APPENDIX 3

## Permitting and Drilling the English #1 well

On October 2, 2007, a permit (API 34-055-2-1983-00-00) was issued to Ohio Valley Energy Systems Corporation (OVESC) to drill the English #1 well in Lot 21, Tract 2, Bainbridge Township, Geauga County. The permitted target formations were the Ohio Shale through the "Clinton". The permit was issued subject to urban area drilling conditions. OVESC was required to drill the English #1 well using a fluid circulating medium due to a gas show encountered in the "Newburg" section of the Lockport Dolomite on a nearby offset well that was drilled the previous month (Permit 2-1946). Fluid drilling through known gas bearing zones can suppress gas flow into the well bore and will help control gas when drilling through those zones.
In addition, urban permit conditions require the driller to install a well control device or "blowout preventor". The device is pressure tested prior to drilling out from under surface casing. This equipment is designed to control and divert any high-pressure gas that may be encountered while drilling. On the English #1 well, OVESC complied with all well-control conditions required by the permit.

OVESC commenced drilling the English #1 well on October 18, 2007. In accordance with the permitted casing plan, 88 feet of new 32 lb/ft API standard 11 ¾ inch diameter steel conductor casing was set through the glacial drift into bedrock. To further protect groundwater resources, 253 feet of new 23 lb/ft API standard 8 5/8 inch diameter steel surface casing was set more than 50 feet through the Berea aquifer and cemented to surface. The well was conditioned prior to cementing, circulation was established and there were good cement returns to the surface. The cementing was witnessed and approved by Tom Hill, the DMRM oil and gas well inspector for Geauga County.

Following a 10 hour waiting period to allow the cement to set up, drilling proceeded without incident to a total depth of 3926 feet on October 26. Because the well was drilled on fluid, no shows of oil or gas were noted during the drilling; however the driller did report a slight odor of "sour gas" at total depth while mixing gel to condition the well bore. An attempt to run an open hole geophysical log was unsuccessful due to an obstruction in the well bore at 3658 feet that would not allow the logging tool to reach the bottom of the well. The OVESC consultant believed that the obstruction was caused by a filter cake in the well at 3658 feet, the depth of the "Packer Shell", a shaley dolomite that overlies the "Clinton" sand. Filter cake is a build up of drilling mud on the borehole wall and can be caused by an extremely porous and permeable zone where the mud accumulates adjacent to zones that are "thieving" fluids. The density component of the logging tool also did not work and the logging effort was abandoned.

OVESC then proceeded to set and cement production casing. New 10.5 lb/ft API standard 4 ½ inch diameter steel production casing was run in the hole but could get no deeper than 3659 feet and had to be washed down to a depth of 3873 feet where the casing became differentially hung. Circulation of the borehole was established prior to cementing, but during the cementing operation, circulation was lost and the pump pressure increased to 1100 psi. Most of the remaining water on location was used to try to re-establish circulation and to complete the cement job. Circulation of the borehole was not re-established but cementing of the casing was accomplished. Due to the lost circulation during cementing, the OVESC consultant recommended that a cement bond log should be run to determine both the bond quality and the amount of cement outside the production casing.

2

REPORT ON THE BAINBRIDGE INVESTIGATION

## Completion of the English #1 well

On November 1, Appalachian Well Surveys ran a cement bond log. The log indicated that the top of the cement was at 3640 feet, the depth of the "Packer Shell". Based upon the quantity of cement ordered by OVESC, the calculated fill up in the 4 ½ inch casing-borehole annulus should have been at least 700-800 feet above the "Clinton" and would have effectively sealed off the "Newburg" zone of the Lockport Dolomite, the formation where gas was released when drilling the offset well (Permit 2-1946). The "Newburg" in the English #1 is approximately 3350 feet deep. The level of cement in the English #1 well indicates that most of the cement went into the "Packer Shell" at about the same depth where bore hole problems were noted on October 26 with the logging tool and the production casing. The consultant for OVESC believes that these occurrences give evidence of natural fracturing of the "Packer Shell" in the English #1 well. Despite the fact that the cement behind casing was insufficient by standard industry practice, OVESC proceeded with the completion of the well. On November 5, the well was perforated by Appalachian Well Surveys in the "Clinton" section from 3720-3740 feet with 56 shots. Approximately 80 feet of cement covered the "Clinton" above the top perforation. Following perforation, Producers Service Corporation performed an acid breakdown of the "Clinton" in accordance with standard industry practice. The formation broke down at 1450 psi and 250 gallons of acid and 7500 gallons of fluid were displaced into the formation. Nothing out of the ordinary was noted during this acid job and OVESC decided to proceed with a full hydraulic fracture stimulation treatment.

On November 13, Producers Service Corporation was scheduled to hydraulically fracture (frac) the well with 105,000 gallons of water and 600 sacks of sand. After displacement of approximately 46,700 gallons of water and 290 sacks of sand, circulation of fluid from the 8 5/8" annulus was observed indicating communication between the "Clinton" and the annular space between the surface and production casings.. At that point, the pump pressure and fluid displacement rate were reduced and another 4000 gallons of water was pumped to flush and recover the sand that had been displaced. The frac operation was then discontinued and the pumps shut down. OVESC personnel estimated total of 20 barrels of fluid including one-to-three barrels of oil was circulated out of the annulus.

Over the next three days, the well was swabbed and most of the fluid that had been displaced into the well during the frac treatment was recovered. Pressure on the production casing appeared to be normal for a "Clinton" well and tubing was run in the well on the third day. At this point, the annulus was shut in while work proceeded to complete the well for production.

## Post-Completion History of the English #1 well

From November 17 to December 14, 2007 there was no reported construction activity at the English #1 well. OVESC recorded periodic pressure readings taken on the surface-production casing annulus. On the first day after the frac job, the recorded pressure was 90 psi. On the second day, the pressure increased to 180 psi. On the third day, the pressure increased and stabilized at 320 psi. Gas was periodically blown off to reduce the pressure, but the annulus was closed when company personnel were not on site.

3

On December 14, there were reports of methane gas in the water wells of some of the homes on English Drive. The pressure on the annulus of the English #1 well was recorded at 360 psi. Early on the morning of December 15, methane gas entered the basement of a home at 17975 English Drive and ignited causing an explosion that seriously damaged the house. Local fire officials, DMRM inspectors and OVESC personnel responded shortly after being alerted that there was a problem and began checking gas levels in surrounding homes and water wells. A number of other homes in the area had abnormally high gas level readings and the Bainbridge Fire Department ordered evacuation of 26 homes.

Subsequent to the explosion, it was reported that on December 12 gas had been detected in the water well at the Bainbridge police station. This well is 280 feet deep, draws water from the Berea and is approximately 4700 feet to the northeast of the English #1 well.

## Remedial Action Taken in Response to Gas Invasion of the Aquifers

On the morning of December 15, OVESC determined that the probable source of the gas in the annulus on the English #1 was from the "Newburg" member of the Lockport Dolomite. "Newburg" gas has a distinctive smell that was consistent with the odor noticed coming from the annulus. Remedial action called for cementing off the "Newburg" which would prevent the gas from entering the well bore. Water was pumped down the production casing to kill the "Clinton" gas and the tubing was removed from the well. The casing was then perforated from 3600-3602 feet with 9 shots and 800 sacks of cement were squeezed through these perforations to shut off the "Newburg" gas. Calculated fill up based on the amount of cement used should have returned the cement to surface. This did not occur but the job was successful in killing approximately "95-98%" of the gas in the annulus and the presence of "sour" smelling "Newburg" gas was no longer detected. DMRM oil and gas well inspectors, Tom Hill and Bob Worstall, witnessed this remedial phase. The annulus was not closed after this operation and the well was to be monitored by OVESC personnel.

On December 17, 2008, the annulus was still producing minor amounts of gas that was "not sour". A second Appalachian Well Surveys cement bond log was run indicating that the squeeze had filled the annulus with cement to 2656' or well above the "Newburg" zone. A temperature log was also run that indicated several possible gas zones in the Ohio Shale.
To eliminate the remaining gas in the annulus, a second squeeze job was performed. The well was perforated with 9 shots from 2628-2630' and another 800 sacks of cement was squeezed through these perforations. This second squeeze cement job returned 41 barrels of cement to the surface.

On December 19, it was reported that there was a "very minor flow" of gas in the cemented surface-production casing annulus. Another Appalachian Well Surveys bond log was run. This log indicated there was possible gas channeling in the cement at 330' which could account for the continued presence of gas in the annulus.

4

APPENDIX 3

On March 3, 2008, following the recommendation of DMRM, OVESC had a Baker-Hughes Segmented Bond Log run in the well. This log showed what appears to be channeling in the cement from about 550 feet to surface. Below that level there appears to be good to excellent bond between the production casing and well bore. This would confirm that the deep high-pressure gas from the "Newburg" or other sources has been isolated from the surface-production casing annulus.

DMRM has determined that the gas still present in the annulus is near-surface low-pressure gas emanating from natural fractures in the Ohio Shale. In northeastern Ohio, it is common for small volumes of low-pressure shale gas to accumulate in the surface-production casing of oil and gas wells.

## Conclusions about the Cause of the Gas Invasion of the Aquifers

The DMRM has determined that confinement of deep, high-pressure gas in the surface-production casing annulus of the English #1 well, prior to December 15, resulted in over-pressurization of the annulus. This over-pressurized condition resulted in infiltration of natural gas from the annulus into fractures in the bedrock below the base of the cemented surface casing. This gas migrated vertically through fractures into the overlying aquifers and discharged through water wells. Three successive events in the drilling and completion of the English #1 well are believed to be the primary contributing factors that led to the gas invasion of the shallow aquifers and subsequent home explosion on English Drive.

The first contributing factor was inadequate cementing of the production casing prior to remedial cementing on December 15. The industry standard for cementing production casing calls for sufficient cement to fill the annulus between the well bore and the casing 600-800 feet above the "Clinton". At this height, the "Newburg" zone, which can be gas and/or brine bearing, is effectively sealed from the well bore and presents no further problem in completing the well. 175 sacks of Unitropic cement was ordered and run for the primary cement job for the English #1. Theoretically, this amount should have provided more than enough fill up to cover and seal the "Newburg" at 3350 feet. However, the bond log run on November 1 indicates the top of cement was only at 3640 feet, the level of the "Packer Shell" and approximately 300 feet below the "Newburg". It appears from the record that the "Packer Shell" in the English #1 well is naturally fractured to the extent that it "thieved" most of the cement that was pumped into the well. The result was that the borehole was exposed to high pressure gas from the "Newburg" and any other deep seated sources of gas.

The second contributing factor was the decision to proceed with stimulating the well without addressing the issue of the minimal cement behind the production casing. Hydraulic fracture stimulation normally involves injecting fluids and sand into the oil and gas reservoir to enhance the flow of hydrocarbons to the well bore. When a well is properly constructed, the hydraulic fracture is confined between the permitted reservoir formation and the production casing. The abnormal circulation that was observed during the stimulation of the English #1 well indicates that the frac communicated directly with the well bore and was not confined within the "Clinton" reservoir. This communication would also have provided a conduit for "Clinton" gas to enter the annulus of the well.

5

While the out-of-zone hydraulic fracturing operation may have provided an avenue for "Clinton" gas to migrate up the surface-production casing annulus, the DMRM has concluded that it is highly unlikely that fluids used in the hydraulic fracturing process, or flow back fluids escaped from the borehole or entered into local aquifers. Based upon consideration of all records and available information, the DMRM has determined that the valves on the surface production casing annulus remained open before, during, and after the hydraulic fracturing operation in accordance with standard industry practice. Producers Services and OVESC appropriately terminated the hydraulic fracturing operation as soon as fluids circulated to surface. Producers Services immediately reduced the pump rate and pressure, completed the sand flush, and shut the operation down. According to eyewitness accounts and job records, fluid circulation rates responded to pump rates, and when the pump shut down, annular flow stopped as soon as hydraulic equilibrium was attained.

Finally, the third and most critical contributing factor leading to the incident was the 31 day period after the stimulation during which the annular space between the surface and production casings was mostly shut in. This confined the deep, high-pressure gas from "Newburg" and/or "Clinton" within this restricted space. Readings taken during this time were consistently 320 psi or greater. Typically, shallow shale gas does not register more than 30-50 psi on the annulus and can be closed in or vented without problem. Pressures of the order that were observed would indicate a deeper source of the gas present in the annulus. This was not recognized and OVESC personnel opened the valve to blow off the pressure but continued to close the annulus when not on site. As pressure on the annulus built up, the gas migrated laterally and vertically through natural fractures in the surrounding bedrock. This over-pressurized gas infiltrated the local aquifers, discharged through local water wells, allowing gas to enter some area homes in varying concentrations, and resulting in the explosion at one home.

6

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3



# Ohio Department of Natural Resources

TED STRICKLAND, GOVERNOR            SEAN D. LOGAN, DIRECTOR

May 21, 2008

Bainbridge Township Trustees:

In response to requests by Senator Timothy Grendell and the Bainbridge Township Trustees, the Ohio Department of Natural Resources, Division of Mineral Resources Management (DMRM) has further evaluated three oil and gas well permits in Bainbridge Township. This evaluation was in response to your concern for protection of the community public water system that is managed by the Tanglewood Lake Water Company. As part of this review, the DMRM evaluated geologic maps and reports in the vicinity of the three proposed oil and gas well drilling locations, water well logs, Drinking Water Source Assessments prepared by the Ohio Environmental Protection agency (Ohio EPA) and ambient water quality data for the community public water systems in Bainbridge Township.

Ground water is obtained from four aquifers in Bainbridge Township. Listed in descending stratigraphic order, they are 1) Glacial sand and gravel deposits, 2) Sandstones of the Pottsville Group, 3) Inter-bedded layers of shale and sandstone of the Cuyahoga Group, and 4) the Berea Sandstone. The sandstones of the Pottsville Group are generally unconfined, ridge-top aquifers overlain by thin deposits of glacial till (poorly sorted deposits of clay, silt and sand with cobbles). In this setting, if the glacial till is thin or absent, water wells developed in the Pottsville sandstones can be susceptible to pollutants introduced by surface contamination sources. The Berea Sandstone is generally covered by layers of shale associated with the Cuyahoga Group that protect the aquifer from pollutants that may be discharged at surface.

The 1996 Amendments to the Safe Drinking Water Act establish a program for all states to assess the drinking water source for all public water systems, including the Tanglewood Lake Water Company community public water supply. The Ohio Environmental Protection Agency (Ohio EPA) administers Ohio's Source Water Assessment and Protection Program and provides assistance to help public water systems in their efforts to protect sources of drinking water. In 2002, Ohio EPA completed a Drinking Water Source Assessment for the Tanglewood Lake Water Company's community public water system. As part of this assessment, Ohio EPA used a ground water model to delineate the Source Water Protection Areas, the areas that supply ground water to their public water wells.

The Source Water Protection Area defined by Ohio EPA includes an "inner protection zone" and an "outer protection zone." The inner protection zone is the area that provides ground water to the public water wells within one year of pumping. Ohio EPA recommends more stringent protection measures within this area. The outer protection zone is the additional area that contributes ground water to wells when pumped for five years.

DNR-0001

ohiodnr.com

REPORT ON THE BAINBRIDGE INVESTIGATION

APPENDIX 3

May 21, 2008
Page 2

Based upon Ohio Environmental Protection Agency records, the Tanglewood Lake community public water system consists of eight water wells. Water well depths range from 40 to 159 feet below surface. These wells are developed primarily in the unconfined sandstone aquifers of the Pottsville Group. Ohio EPA delineated three source water protection areas that surround water well clusters that provide ground water for the Tanglewood Lake Community water system. All three source water protection areas are north of the McFarland Creek.

Currently, there are three oil and gas drilling permits in Bainbridge Township of Geauga County that have not expired. All three permits were issued to Summit Petroleum. All three proposed drilling locations are located south of the McFarland creek drainage divide. All three sites are located well outside the outer protection zones for the three source water protection areas. Therefore, surface operations at the proposed oil and gas drilling locations do not pose a threat to the Tanglewood Lake community water supply.

While the focus of your inquiry was the Tanglewood municipal water supply, the DMRM has determined that all three of Summit Petroleum's proposed locations are within the outer protective zone of the Source Water Protection Area for the Lake Lucerne community water supply. According to Ohio Environmental Protection Agency the Lake Lucerne community system draws water from Berea Sandstone, which lies 67 to 195 feet below surface within the Source Water Protection Area. The Berea Sandstone is generally overlain by low-permeability shales of varying thickness, which protect the aquifer from contaminants discharged at surface. According to Ohio EPA, "twenty-three types of potential sources of contamination" were identified within the Source Water Protection Area during a 2003 inventory, including gas stations, underground storage tanks, dry cleaners, chemical storage facilities and oil and gas wells. Based upon DMRM's review of reported water quality data, there is no indication that 14 oil and gas exploration and production operations within the outer protection zone have affected the Lake Lucerne community water supply.

Two of the three proposed oil and gas drilling sites are located in areas where the shallow Pottsville sandstone aquifer underlies thin deposits of glacial till. Even though these sandstones do not provide ground water for the Lake Lucerne community water supply, the DMRM is committed to protecting this source of ground water. In order to protect the shallow, unconfined sandstone aquifer at the proposed drilling locations, the DMRM has applied special permit conditions for the construction, maintenance and closure of drilling pits. The DMRM has applied these conditions in delineated sensitive areas for over twenty years without a single incident of private or public water supply contamination.

APPENDIX 3

May 21, 2008
Page 3

If Summit Petroleum proceeds to drill on any of the three locations, the operations would be subject to 1) site-specific urban-drilling permit conditions, 2) municipal water well-field construction and operation standards, and 3) the new well construction and monitoring standards implemented after the December 2007 Bainbridge incident. Collectively, these conditions provide substantial additional protections for ground water resources in this area. Based upon our review of area geology, the DMRM concludes that these permit conditions will effectively address all site-specific risks. Given the critical importance of protecting both private and public water supplies, the DMRM will assign high priority to inspection of critical phases of the drilling and well completion operations.

If you have any additional questions or concerns, please submit your questions or comments in writing.

Sincerely,

Scott R. Kell
Deputy Chief

SRK/sh

cc:  Timothy Grendell, Senator
     Cathryn Loucas, Deputy Director, ODNR
     Mike Shelton, Legislative Liason, ODNR
     John Husted, Chief, DMRM
     Rick Simmers, North Region Administrator, DMRM

  

## Geauga County, Bainbridge Twp. FAQ for Private Systems Procedures and Sample Results

**Why do I have to have my well cleaned?**
If your bacteria test came back positive for coliform bacteria then your well may need to be professionally cleaned and disinfected by a registered water system contractor. Coliforms are used as the indicator of cleanliness of your well and e-coli, a fecal type of coliform bacteria, is used to indicate the sanitary condition of your well. See ODH FACT sheet ----

**What is coliform?**
Total coliform bacteria are a collection of relatively harmless microorganisms that live in large numbers in soils, plants, and intestines of warm-blooded (humans) and cold-blooded animals.  Coliform also aid in the digestion of food.

**Where do you find coliform?**
There are 16 species of total coliform found in soils, plants, and in animal and human waste.  A subgroup of coliform, called <u>fecal</u> coliform bacteria, is different from the total coliform group because they can grow at higher temperatures and are found only in the fecal waste of warm-blooded animals.  There are six species of fecal coliform bacteria found in animal and human waste.  *E. coli* is one type of the six species of fecal coliform bacteria.  A **rare** strain of *E. coli* that you may have seen in the news can cause potentially dangerous outbreaks and illness.  This strain is called *E. coli* 0157.

**How do you come in contact with coliform?**
Coliform are a family of bacteria common in soils, plants and animals.  You can come in contact with these bacteria by eating or drinking (ingesting) soils on plants and in water sources such as ponds, lakes and rivers.  Fecal coliform bacteria can be found in water contaminated by domestic sewage, septic systems, or other sources of human and animal waste.

**Did the December 15, 2007 incident cause coliform bacteria to enter ground water aquifers?**
No, coliform bacteria do not come from natural gas wells. Most wells have some naturally occurring bacteria that don't usually cause health problems that form slime on the inside of the well. These bacteria are not coliforms. However, if the well is old and has a lot of bacteria buildup, and the well is disturbed, some of the slime bacteria can break off and give you a bad coliform bacteria result.

APPENDIX 3

**Why is my water well being tested for total and fecal coliform bacteria?**
For water wells, such as yours, that have been disconnected in response to the natural gas incident that began on December 15, 2007, the Geauga County General Health District (GCGHD) will sample and test your private water supply for coliform bacteria before approving full use, especially ingestion, of water from your well. Because your water supply system has been opened up and connected to different supplies, contamination from dirty surface water etc. may have had an opportunity to enter the water supply. Testing is an important step in safeguarding your health before you resume full use of your domestic water supply.

**If I have received a reporting indicating that my well water has tested positive for total coliform bacteria, what does this mean?**
A positive test simply means that coliform bacteria are present in your well water. Anytime the GCGHD identifies the presence of coliform bacteria, they are required to also test for specific types of coliform (fecal coliform) that may present health risks.

**Can coliform harm your health?**
Finding coliform or other bacteria in water does not necessarily always mean you will become ill. However, if these organisms are present, other disease-causing organisms may also be present. The presence of <u>fecal</u> contamination is a sign that a possible health risk exists for individuals exposed to this water. Health symptoms related to drinking or swallowing water contaminated with <u>fecal coliform</u> bacteria generally range from no ill effects to cramps and diarrhea (gastrointestinal distress). Sanitarians and those who test water look for <u>total</u> and <u>fecal</u> coliform bacteria to alert people to the possible dangers and suggest proper treatments to remove potentially harmful bacteria from the water. The presence of any <u>fecal coliform</u> in drinking water is of immediate concern as many diseases can be spread through <u>fecal</u> transmission.

Most wells have some naturally occurring bacteria that don't usually cause health problems that form slime on the inside of the well. These bacteria are not coliforms. However, if the well is old and has a lot of bacteria buildup, and the well is disturbed, some of the slime bacteria can break off and give you a bad coliform bacteria result.

Sometimes several positive coliform results might mean that your well is old and may have deteriorated and might be letting surface water run down the side of the casing. If disease causing bacteria are in the surface water (from septic systems or animal waste) then a susceptible person might get sick. The overall condition of your well casing is your responsibility.

**If my well water test indicates the presence of <u>total</u> coliform bacteria, but not <u>fecal</u> coliform, can I safely use the water for purposes such as bathing, washing my dishes, or washing my hands?**
*Yes and No.* The coliform test does not tell the degree of the contamination problem, only whether coliforms are in the water or not. Since coliforms are only indicators of potential health risk we will not say that the water is "safe" However the risk is probably

low since there are no fecal coliform indicators. The dishwashing process is usually enough to kill most microorganisms.

**If my well water test indicates the presence of both <u>total</u> <u>and</u> <u>fecal</u> coliform bacteria, what should I do?**
Fecal coliforms are a type of coliform that are associated with fecal contamination from humans or animals. The first step is to clean and disinfect your well. If additional samples indicate that bacteria are present the local health department may need to further investigate your well construction.

**What is the process for cleaning and disinfecting my water well?**
For those water wells, such as yours, that have been disconnected in response to the December 15, 2007 natural gas emergency, the ODNR, Division of Mineral Resources Management will require Ohio Valley Energy to hire a professional water well service company to clean and disinfect your well if your well tests positive for total or fecal coliform bacteria.  The procedure for cleaning and disinfecting your water well is described in the attached flier distributed by the Ohio Department of Health.

**I have heard that chlorinating my well will create chemicals called trihalomethanes (THMs) when the chlorine reacts with the natural gas. Will that be detrimental to my health?**
It is very important to reduce or eliminate of potentially dangerous bacteria by chlorination. However, all well water will have small amounts total trihalomethanes (TTHMs) after the well has been disinfected with chlorine. Chlorine combines with some naturally occurring organic chemicals to form THMs. THMs are actually very common chemicals found in public water supplies that are chlorinated. The US EPA Maximum Contaminant Level (MCL) for TTHMs is 80 ppm and is based on a lifetime exposure from drinking chlorinated water. For water from your well, the exposure to THMs will only be for a very short time after disinfection, until the chlorine treated water has been run out of the well. A small amount of TTHMs may remain in your water for a few weeks after the chlorine disinfection. If you are concerned, granular activated carbon (GAC) filters can be installed temporarily to remove or reduce the chlorine and the chlorine byproducts such as THMs. The GAC can be installed to treat the whole house or at the point of use (POU).

**When can I use my water?**
We recommend that you not use your water until the chemical and bacteria water results indicate that the water is safe to drink.

**Who should I contact if I have additional questions regarding coliform bacteria and the safe use of my water supply?**
-The Geauga County General Health District at (440) 279-1900
-The Ohio Department of Health, Bureau of Environmental Health at (614) 466-1390

APPENDIX 3



| | |
|---|---|
| **Ohio Department of Health**<br>Bureau of Environmental Health<br>Private Water Systems<br><br>"To protect and improve the health of all Ohioans" | **Contractor procedures for cleaning and disinfecting private water wells** |

It has been documented that all wells will have some degree of bacterial growth, sediment build-up, encrustation, scaling and deterioration.  While disinfection of wells is required as part of the construction and alteration process, the following cleaning and disinfecting procedures are to be performed when there is a problem with continual positive bacterial results, when a well that has not been in use for an extended period is being brought back into service, or when the integrity of the well has been compromised by flooding or physical damage to the well casing.  The following procedure is intended to supplement and act as an instructive guide to performing the superchlorination process cited in rule 3701-28-17 (C) of the Private Water Systems Rules, Chapter 3701-28 of the Ohio Administrative Code.

**The following private water well cleaning and disinfection procedures must be performed by a registered private water system contractor due to the equipment required and the chemicals used.**

# DISINFECTION OF EXISTING PRIVATE WATER SYSTEMS

### Step One:  Find the Well Log
Obtain the well log if it is available.  This information will be used to determine the total depth of the well, the type and length of casing, and the original static water level in the well.  The well log will also identify any unusual or unique well construction conditions the contractor should be aware of prior to beginning the disinfection process.  The well log can be obtained by contacting the Ohio Department of Natural Resources, Division of Water at (614) 265-6740 or through the website at
http://www.dnr.state.oh.us/water/maptechs/wellogs/app/ .

### Step Two: Pump the well
The water column in the private water system must be "moved" or circulated.  Movement of the water column will draw out formation fragments and other debris present in the aquifer or in the bottom of the well; some debris will be from the initial drilling process.  The water should run for several hours (24 hours if possible).  The water should be drained onto the ground, away from all septic system components within proximity of the private water system, or to a drainage way.  The water should not be discharged to a septic system, as it may cause the system to overload and possibly cause early septic system failure.

If a long period of pumping and circulation in not possible, the system should be pumped long enough to flush out the water well and replace the water column.

### Step Three: Physical cleaning
Previous disinfection procedures distributed by ODH and local health districts did not include a physical cleaning of the casing and borehole.  However, the physical cleaning of the well is a very important step in the cleaning process, as it removes bio-slimes, other microbial growths and deposited minerals from the casing and borehole walls.  Removing these growths will increase the chance of chlorine reaching all the bacteria and the surfaces in the casing and borehole when chlorination is performed.

All sections of the well casing and open borehole should be physically cleaned with a brush to scrub away all biological growth/slime formations and break up deposited minerals.  The brush should be vigorously moved up and down the casing several times to break up and remove slime and deposits.  The brush alone will not completely clean the casing, thus requiring a second process, swabbing.

APPENDIX 3



Well scrub brush

Swabbing the casing, not the bore hole, involves the brush being covered with a terry cloth fabric and the swab being pushed into the casing to remove all left over biological growth.  The swab must be pushed down to the bottom of the casing.  Swabbing should be done long enough to sufficiently clean the casing.  If the well includes a screen at the bottom, the size of the brush and swab will need to be reduced to eliminate the possibility of entrapment of the brush in the screen.  Care must be taken during this step to prevent damage to the casing, especially those constructed of PVC.




Swab around brush

### Step Four: Re-development
Once the physical cleaning is complete, all of the material removed from the casing and borehole walls must be removed from the well.  The well must then be re-developed.

Re-development may be accomplished by initial surging and agitation of the water in the well followed by pumping with a high capacity pump or through an air method that will sufficiently remove all of the debris present in the private water system.  The re-development should be done for an amount of time that is sufficient to minimize the turbidity in the water.

### Step Five : Determine the volume of chlorine to be used for disinfection.
The volume of chlorine solution depends on the total volume of the water stored in the private water system, which includes the well and all distribution lines.  The well log, in addition to on-site measuring, should be used to determine the water volume in the well.  On-site measurement of the static water level is necessary to determine the actual volume of water in the well.

Once the depth to the static water level is measured, the volume of water stored in the well can be calculated.  To calculate the total volume of water stored in the well, the total depth (found on the well log) must be subtracted by the static water level (measured on site); this will give you the total feet of water stored in the well (casing and borehole).  The volume is calculated by taking the total feet of water stored in the well and multiplying by the gallons per foot corresponding to the casing diameter.

The following table (Table 1) shows the volume per foot for different casing diameters.  This table can be found in the Ohio Administrative Code Rule 3701-28-17.

APPENDIX 3

*Example:*

*Total well depth is 120 feet; the static water level is 20 feet; and the well casing diameter is 6 inches.*

*The feet of water stored in the well equals: 120 – 20 = 100 (feet of water in the well).*

*From Table 1, a six inch well casing holds 1.5 gallons of water per foot.*

*100 feet of water in the well x 1.5 gallons per foot = 150 gallons (total volume of water in the well).*

| Table 1.  Volume of water in well | |
|---|---|
| Diameter of well (inches) | Gallons per foot of water |
| 3 | 0.37 |
| 4 | 0.65 |
| 5 | 1.0 |
| 6 | 1.5 |
| 8 | 2.6 |

In the past, when the well volume was not known, it was standard practice to use two gallons of 5.25% liquid bleach in a chlorine and vinegar solution.  With the new disinfection procedure, the total well volume must be calculated.  The measurements can be taken at the start of the physical cleaning of the well.

**Step Six: Mixing the chlorine solution and adding the chlorine solution.**
Simply pouring a bottle of chlorine bleach or dropping tablets into the well will not produce good disinfection results because the chlorine does not get evenly distributed in the casing and borehole, and can actually cause certain bacteria to generate more protective slime, thus preventing effective disinfection.  A disinfectant solution should be introduced during the development of the well.

Chlorine products to be used for disinfection should be sodium hypochlorite at 5% strength or greater.  Calcium hypochlorite products should not be used because they will contribute to additional calcium in the water and may cause clogging or the formation of sludge in the well.  Chlorine tablets, swimming pool disinfectants or other chemicals that are not approved for contact with drinking water are prohibited for use in water wells and may adversely interact with other chemicals.

Prior disinfection procedures allowed the chlorine solution to be "mixed" in the well, not on the surface in a tank.  This practice does not allow for even mixing of the chemicals with the water and severely limits the effectiveness of the disinfection process.

On the surface, mix the chlorine solution in a water container or tank large enough to hold the total water volume of the well (calculated in step 5). For proper disinfection a chlorine solution equal to three (3) times the total water volume of the well should be utilized.  For ease of transport, this volume may be split into two or at the most three parts.

For proper mixing and to optimize the disinfecting ability of the solution, the correct pH must be maintained. Fill the container/tank with water and then add an acid solution to lower the pH to approximately 3.5.  Use a mild acid, such as vinegar or one of the proprietary products available on the market to lower the pH of the disinfectant water.  **Do not use a highly concentrated form of acid to lower the pH of the disinfectant water.  Using one of the highly concentrated forms of acid such as hydrochloric acid (commercially available as muriatic acid) introduces the unwarranted risk of accidental exposure from spillage or inhalation.**  Any product used in the disinfection of a private water supply must comply with ANSI/NSF standard sixty (60).  Once at the preferred pH, add the chlorine solution, at a slow rate, to the water until the pH raises to approximately 6.0.  The solution must be stirred with either a plastic or wood rod to ensure proper mixture.

Once the chlorine solution has reached a pH of 6.0, inject the solution into the well through a tremie pipe.  The tremie pipe must be placed near the bottom of the well; this will ensure that the water is evenly distributed from the bottom and stirred enough for the chlorine to reach all the bacteria in the well.  Gravity feeding, through a tremie pipe, should be sufficient for the disinfection process.  Deeper or larger diameter wells may need the chlorine solution pumped under pressure down the tremie pipe.  **Note:** Pouring the solution in from the top will

not create sufficient turbulence for the chlorine solution to contact the bacteria at the bottom of the well and reach small areas and crevices in the borehole.

## Step Seven: Contact time

Once the chlorine solution has been introduced into the well, **all** the plumbing fixtures should be turned on, including the hot water faucets.  Be sure to run chlorinated water through all service lines including the washing machine, dishwasher, toilets and yard hydrants.  Turn all the faucets off at the first odor of chlorine.  Optimum contact time is 24 hours; the minimum contact time is 8 hours.  Once the chlorine solution has sufficient contact time in the system it must be flushed out.  Discharge the water from all faucets until the smell of chlorine has disappeared.  Do not discharge or drain the water into the sewage treatment system.  The water sample should be taken no sooner than 48 hours after the chlorine has been removed from the water system and plumbing.  The water sample must be taken by the local health department if it is associated with the permit process as required by OAC Rule 3701-28-03.  The water sample will be checked for the presence of chlorine by the local health district during the sample collection process.

## Positive test after the disinfection

The disinfection procedure does not guarantee the preferred results, but it will create the best environment for bacterial disinfection and help ensure the water is free of pathogenic (illness causing) bacteria.  If the disinfection process, as described in this fact sheet, is carried out and the water sample is still positive for total coliform, then additional investigative steps may be necessary.  A continuous disinfection unit may **NOT** be installed on a well until the investigation is concluded.  Also, continuous disinfection units shall **NOT** be installed on wells that have construction violations or are not approvable.  Further water testing (such as bacterial identification) or down-hole camera investigations may be performed to determine the type of bacteria in the well or possible causes or sources of contamination.

# NEW CONSTRUCTION DISINFECTION

The procedures outlined in this fact sheet should be followed for the disinfection of newly constructed wells.  If you know time will elapse between the completion of the drilling phase and the installation of the pitless adapter and the connection of the water supply to the residence, the addition of disinfectant to the well will protect against the growth of bacteria.  As a reminder, solid forms of calcium hypochlorite must be completely dissolved when used for disinfection.  Using liquid chlorine (sodium hypochlorite of at least 5% strength) will be a more efficient method of disinfecting newly constructed and existing wells.  The chlorine solution must be mixed in a tank at the surface and **NOT** in the well.  The pH of the solution must be stabilized as in the disinfection procedure for an existing well.  At least one total well volume of chlorine solution must be pumped to the bottom of the well.  The pumping will create turbulence and allow the even distribution of the chlorine solution to ensure disinfection of bacteria in the bottom of the well and throughout the borehole column.

**Note:**  Good drilling practice includes using potable water when mixing fluids and grouts and using clean drilling equipment before and during the drilling process to reduce the potential of contaminating the aquifer.

**Registered Private Water Systems Contractors:**
The cleaning and disinfection of private water wells must be performed by a registered private water systems contractor.  Contractors must register annually with the ODH.  For more information about how to become a registered private water system contractor, contact the ODH Private Water Systems at (614) 466-1390.

## Where can I get more information?
Residential Water and Sewage Program
Bureau of Environmental Health
Ohio Department of Health
246 North High Street
Columbus, Ohio 43266-0118
(614) 466-1390
Email:  BEH@odh.ohio.gov
Website:
www.odh.ohio.gov/odhPrograms/eh/water/water1.aspx

Revised: January, 2008

Contractor procedures for cleaning and disinfecting private water systems

REPORT ON THE BAINBRIDGE INVESTIGATION
Page 4 of 4

APPENDIX 3

*Division of Mineral Resources Management*
***Scott Kell, Deputy Chief***
*2045 Morse Road, Bldg. H-3*
*Columbus, OH 43229-6693*
*Phone: (614) 265-6633   Fax: (614) 265-7998*

July 24, 2008

Dear _____ :

The Ohio Department of Natural Resources, Division of Mineral Resources Management's (DMRM) final report and summary of our investigation is nearly completed and is undergoing review. The DMRM plans to release its findings and conclusions no later than September 1, 2008.

The DMRM was pleased that Ohio Valley Energy Systems Corp. announced their intention to extend public water lines to areas of Bainbridge Township that have been the focus of our investigation. While extension of public water lines could provide water supply options for local citizens, the DMRM is also working with experts in the Ohio Department of Health and the Ohio Environmental Protection Agency to address questions regarding the potability of local ground water supplies. The DMRM will be working cooperatively with local residents who are currently on temporary water supplies, but wish to return to use of their domestic water wells.

Effective August 6th, 2008 the DMRM will post information regarding the investigation, including the data from ongoing natural gas monitoring efforts on our own website. The information will be available athttp://www.dnr.state.oh.us/mineral
Again, if you have questions please refer them to Marlene Hall at our Uniontown office at (330) 896-0616 or via e-mail at marlene.hall@dnr.state.oh.us.

Sincerely,


Scott R. Kell
Deputy Chief

SRK/sh

c: John Husted, Chief
   Rick Simmers, North Region Administrator
   Marissa Priest, Administrative Assistant

REPORT ON THE BAINBRIDGE INVESTIGATION

Expert Panel Technical Report

## Subsurface Gas Invasion
## Bainbridge Township, Geauga County, Ohio

June 2010



written by

E. Scott Bair, Ohio State University
David C. Freeman, Marietta College
John M. Senko, University of Akron

submitted to

Ohio Department of Natural Resources
Division of Mineral Resources Management

This page intentionally left blank.

## Acknowledgements

The expert panel could not have completed its work without the expertise and assistance of other people.  We appreciate the technical field assistance of Tom Benko, Tom Tomastik, Tom Hill, and Rick Simmers (ODNR-DMRM), Dwight Williams (KU Consultants), and Mike Fletcher (Harper Well & Pump).  Coordination of all the field activities requested by the panel with homeowners and contractors was done by Rick Simmers, Tom Tomastik, and Tom Hill (ODNR-DMRM) in conjunction with Gina Miller and Barry Tancer (OVE). We are grateful for their efforts.

We appreciate the patience of the homeowners in Bainbridge and Chester townships who we inconvenienced during our field investigations.  We are especially grateful for the hospitality and kindness shown us by Lydia Komocki, Jack & Patsy Phipps, and James & Frances McGee, who served us cold drinks on hot days and hot drinks on cold days.

The format, appearance, and ease of downloading the report and its attachments from the DMRM website at www.ohiodnr.com/mineral are due to the expertise of Beth Wilson (ODNR-DMRM).  Lisa Van Doren (ODNR-DGS) produced the beautiful, poster-size maps used as attachments to the report.

## Preface

Our report is a comprehensive treatment of the disputed issues related to the subsurface migration of fugitive gas created by overpressurization of the annular space in the surface-production casing in the English $^{\#}1$ gas well.  We did not write the report for a technical audience in the manner of consultant-to-consultant or academic-to-academic.  We wrote the report in the style of a college textbook in a freshman science class.  It contains an abundance of figures and diagrams, lots of data tables, several appendices, and a few equations.  We progressively introduce concepts and then apply them to the Bainbridge investigation using local photographs and diagrams. Whenever possible the text and diagrams refer to street names and locations in Bainbridge Township.  Although the content becomes technical in a few sections, we present these materials using diagrams to display concepts, tables to present data, and graphs inserted with labels and arrows to convey our interpretations, which are presented in the text.  By writing the report in this manner, we hope to reach readers with as many different learning styles as we see in our freshman science classes.

We cite the professional literature throughout the report.  There are three equally important reasons for this.  The first is to explicitly reference the technical foundations of the concepts and methods we employ and to demonstrate they are among those established as standards in our disciplines.  The second is to provide readers with the information needed to locate and examine the original documents.  The third is to show that similar interpretations and conclusions have been reached by others who successfully submitted them for editorial evaluation, technical review, and publication in the professional scientific and engineering literature.  A complete reference to each citation is presented in the back of the report.  Like most reports, we lapse into ubiquitous use of uncommon acronyms and unusual notations.  The report contains a list of these on the next page.

S.B., D.F., J.S.

## Notations and Acronyms

bbls/d – barrels per day

cc – cubic centimeter
cm – centimeter

DGS – Division of Geological Survey, ODNR
DGES – Department of Geology and Environmental Science
DH – Department of Health
DMRM – Division of Mineral Resource Management, ODNR
d – day

E&A – Eckstein & Associates, Inc.
EDS – energy dispersive x-ray spectroscopy
ESEM – environmental scanning electron microscope

ft – feet

gal – gallon
gpm – gallons per minute

LEL – lower explosive level (methane)

m – meters
mD – millidarcies
mg/L – milligrams per liter
μg/L – micrograms per liter
ml – milliliter, 1 ml = 1 cc
Mcf – 1000 cubic feet
Mscf – 1000 standard cubic feet
MMcf – 1 million cubic feet
MMscf – 1 million standard cubic feet
MPN – most probable number

ODNR – Ohio Department of Natural Resources
OEPA – Ohio Environmental Protection Agency
OVE – Ohio Valley Energy Systems Corp.

ppb – parts per billion
ppm – parts per million
psi – pounds per square inch

SRB – Sulfate-reducing bacteria

TD&D – Thrasher, Dinsmore & Dolan

WRS – Wilcoxan rank sum
XRD – x-ray diffraction

yr – year

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**

**IN THE MATTER OF:**

| | | |
|---|---|---|
| Cabot Oil & Gas Corporation | : | The Clean Streams Law |
| Dimock and Springville Townships | : | Oil and Gas Act |
| Susquehanna County | : | |

## <u>CONSENT ORDER AND SETTLEMENT AGREEMENT</u>

This Consent Order and Settlement Agreement is entered into this 15th day of December

2010, by and between the Commonwealth of Pennsylvania, Department of Environmental Protection

("Department") and Cabot Oil & Gas Corporation ("Cabot").

### <u>Findings</u>

The Department has found and determined the following:

A.      The Department is the agency with the duty and authority to administer and enforce

The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§691.1-691.1001

("Clean Streams Law"); the Oil and Gas Act, Act of December 19, 1984, P.L. 1140, *as amended*, 58

P.S. §§601.101-601.605 ("Oil and Gas Act"); Section 1917-A of the Administrative Code of 1929,

Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§510-17 ("Administrative Code"); and the

rules and regulations promulgated thereunder ("Regulations").

B.      Cabot is a Delaware corporation registered to do business in Pennsylvania and is

engaged in various oil and gas exploration and production activities in Pennsylvania, including in

Dimock and Springville Townships, Susquehanna County.  Cabot maintains a mailing address at

5 Penn Center West, Suite 401, Pittsburgh, PA 15276.

C.      Cabot is the "owner" and "operator," as those terms are defined in Section 103 of the

Oil and Gas Act, 58 P.S. §601.103, of certain gas wells, or has received permit authorization from

the Department to drill wells, within an area defined as follows:  South of 41 degrees 45 minutes

latitude; East of -75 degrees 54 minutes 11 seconds longitude; North of 41 degrees 42 minutes 14 seconds latitude; and West of -75 degrees 50 minutes 48 seconds longitude in Dimock and Springville Townships, Susquehanna County, Pennsylvania ("Dimock/Carter Road Area," which is the same as the "Affected Area" in the Modified 2009 Agreement.). A map of the Dimock/Carter Road Area is attached as Exhibit A and incorporated herein.

  D. On November 4, 2009, the Department and Cabot executed a Consent Order and Agreement, which the Parties modified on April 15, 2010, and July 19, 2010 (collectively the "Modified 2009 Agreement"). This Consent Order and Settlement Agreement replaces the Modified 2009 Agreement.

  E. The gas wells that Cabot has plugged within the Dimock/Carter Road Area to date, the gas wells that Cabot has drilled and is producing within the Dimock/Carter Road Area, and the gas wells that Cabot has drilled but has not yet fraced within the Dimock/Carter Road Area (collectively "the Dimock/Carter Road Gas Wells") are identified on Exhibit B and incorporated herein.

  F. The Department has determined that eighteen (18) drinking water supplies that serve nineteen (19) homes within the Dimock/Carter Road Area have been affected from the drilling activities at the Dimock/Carter Road Gas Wells (collectively the "Water Supplies"). The owners of the nineteen (19) homes that are served by the Water Supplies are identified on Exhibit C and incorporated herein (collectively the "Property Owners").

  G. As of the date of this Consent Order and Settlement Agreement, Cabot has undertaken, among other things, the following actions:

    1. Plugged and abandoned three of the Dimock/Carter Road Gas Wells -- Baker 1, Gesford 3, and Gesford 9. To date, Cabot has not yet completed the restoration of the Gesford 3 and Gesford 9 Gas Well Sites;

2

2.   Reconditioned the Ely 4 Gas Well by squeezing the annular space, thereby eliminating the pressure that was present in a portion of the annular space between the 41/2 and 7 inch casings on the Gas Well, and conducted similar remedial actions at the Ratzel 2H Gas Well after September 14, 2010;

3.   Prepared and implemented a plan to check the integrity of the Dimock/Carter Road Gas Wells;

4.   Provided temporary, whole house water supplies to owners of residences within the Dimock/Carter Road Area, including to the Property Owners;

5.   Provided new vent stacks or extended existing vent stacks on Water Supplies; and

6.   Paid $570,000 to the Department in settlement of civil and monthly stipulated penalties.

H.   The Department has determined that Cabot has not: (1) permanently restored and/or replaced all of the Water Supplies by September 17, 2010; (2) completely eliminated the unpermitted discharge of natural gas into the waters of the Commonwealth from the Dimock/Carter Road Gas Wells by November 1, 2010; and (3) plugged or taken other remedial actions at certain of the Dimock/Carter Road Gas Wells by November 13, 2010.

I.   Regarding Department costs, from November 4, 2009, to the date of this Consent Order and Settlement Agreement, the Department has incurred costs for staff, lab analyses, and other Department expenses and costs relating to the Dimock/Carter Road Gas Wells, the Water Supplies, and the Modified 2009 Agreement.

J.   The Department has determined that the items identified in Paragraph H, above, constitute unlawful conduct by Cabot pursuant to Section 509 of the Oil and Gas Act, 58 P.S. §601.509, and Section 611 of the Clean Streams Law, 35 P.S. §691.611.

K.   Cabot disagrees with the substance of the Department's determinations in Findings F, H, and J.  However ,Cabot agrees to and shall fulfill all of the terms and obligations of this Consent

3

Order and Settlement Agreement. By entering into this Consent Order and Settlement Agreement, Cabot and the Department desire to fully and finally resolve the items identified in Paragraph L, below.

      L.      To avoid litigation, to resolve the items set forth above in Paragraphs F, H, and J, and as complete and final settlement of any known claims, demands, stipulated civil penalties, and/or sanctions of any type that the Department has made or could have made against Cabot to date relating to the items set forth in Paragraphs F, H, and J, above, relating to the Modified 2009 Agreement, the Dimock/Carter Road Area, and the Dimock/Carter Road Gas Wells, including for obligations under Section 208 of the Oil and Gas Act, 58 P.S. §601.208, and 25 Pa. Code §78.51, to pay for or restore and/or replace the Water Supplies, or to provide for ongoing operating or maintenance expense of such restoration or replacement, and to provide reimbursement for certain costs incurred by the Department to date, Cabot shall: perform the remediation activities to the Ely 2H and Ely 6H Gas Wells as set forth in Paragraph 5.c., below; pay $500,000; and shall complete the requirements below and as approved by the Department in accordance with this Consent Order and Settlement Agreement.

### Order

      After full and complete negotiation of all matters set forth in this Consent Order and Settlement Agreement, and upon mutual exchange of the covenants contained herein, the Parties desiring to avoid litigation and intending to be legally bound, it is hereby ORDERED by the Department and AGREED to by Cabot as follows:

      1.      *Authority*. This Consent Order and Settlement Agreement is an Order of the Department authorized and issued pursuant to Section 5 of the Clean Streams Law, 35 P.S. §691.5, Section 503 of the Oil and Gas Act, 58 P.S. §601.503, and Section 1917-A of the Administrative Code.

2.      ***Findings and Effect on Third Parties.***

      a.      This Consent Order and Settlement Agreement is a settlement between the Department and Cabot, and is a settlement only for the matters specifically addressed herein. This Consent Order and Settlement Agreement replaces the Modified 2009 Agreement.

      b.      Cabot disagrees with the substance of the Department's determinations in Findings F, H, and J. However, Cabot agrees to and shall fulfill all of the terms and obligations of this Consent Order and Settlement Agreement. Cabot agrees that the Findings in Paragraphs A-L, above, are true and correct and, in any matter or proceeding involving Cabot and the Department, Cabot shall not challenge the accuracy or validity of these Findings.

3.      ***Compliance, Permits Inside the Dimock/Carter Road Area, Cabot Agreement and Statements.***

      a.      Cabot hereby agrees that it shall take all actions necessary including, but not limited to, the requirements set forth in this Consent Order and Settlement Agreement, to comply with all applicable environmental laws and regulations, including all applicable provisions of the Clean Streams Law, Oil and Gas Act, and the Regulations.

      b.      Cabot hereby certifies that it has entered into this Consent Order and Settlement Agreement freely, under no coercion of any kind, and after consulting with Counsel. As identified herein, Cabot hereby agrees to comply with all of its obligations under this Consent Order and Settlement Agreement, and Cabot intends to be legally bound by this Consent Order and Settlement Agreement.

      c.      Cabot agrees that this Consent Order and Settlement Agreement is valid, is a binding obligation upon Cabot and is a final Order of the Department, and neither Cabot nor any authorized representative, agent, or attorney of Cabot or representing Cabot in any court or administrative forum shall state or argue otherwise for any purpose.

4.    *New Drilling And Hydro-fracturing Inside the Dimock/Carter Road Area*.

a.    After the date of this Consent Order and Settlement Agreement, for any of the seven (7) Dimock/Carter Road Gas Wells identified in Paragraph 3.c.2) of the Modified 2009 Agreement (A&M Hibbard 2H; A&M Hibbard 4; Ely 1H; Baker 3; Gesford 4R; Gesford 8H NW; and P. Kelly 1) that Cabot has drilled but not yet hydro-fractured, Cabot may begin hydro-fracturing any such Gas Well or Wells *only* upon receipt of written notice from the Department that Cabot has, as of the date Cabot proposes to frac said Gas Well or Wells, complied with all of its obligations as to said Gas Well or Wells under Paragraph 3.a., above, including obtaining all required permits or other authorizations from the Department, and under Paragraph 5.a, below.

b.    In all cases, Cabot shall not complete the drilling of any of Dimock/Carter Road Gas Wells, and shall not begin the drilling of any new Gas Wells within the Dimock/Carter Road Area until after April 15, 2011, at the earliest, and in accordance with all of the requirements of this Paragraph.

c.    Before the drilling permit expires for any of the Dimock/Carter Road Gas Wells, Cabot may submit a request to the Department to renew the drilling permit in accordance with 25 Pa. Code §78.17, and the Department will promptly process any such request in accordance with the applicable regulations.

d.    After April 15, 2011, Cabot may complete the drilling of any of the Dimock/Carter Road Gas Wells, and/or may begin the drilling of any new Gas Wells within the Dimock/Carter Road Area *only* upon receipt of written notice from the Department that, as to said Gas Well or Wells:

i.    Cabot is in compliance with all of its obligations under Paragraph 5, below;

6

ii. Cabot is, as of the date Cabot proposes to drill said Gas Well or Wells, in compliance with the applicable requirements of Paragraph 3.a., above, including obtaining all required permits or other authorizations from the Department; and

iii. Cabot is in compliance with all other obligations under this Consent Order and Settlement Agreement as of the date Cabot plans to drill said Gas Well or Well(s).

5. ***Compliance Obligations Of Cabot With Respect to the Dimock/Carter Road Area Gas Wells***. All compliance obligations of Cabot under this Consent Order and Settlement Agreement with respect to the Department's claims under the Modified 2009 Agreement, the Oil and Gas Act, and the Clean Streams Law, other than the claims in Paragraph 6, below, are satisfied subject to the Department providing Cabot written notice that Cabot has performed the following:

a. <u>Gas Well Pressure Testing</u>.

i. Within seven (7) days of the date of this Consent Order and Settlement Agreement, Cabot shall provide to the Department the hydrocarbon bearing intervals for each of the Dimock/Carter Road Gas Wells based on data collected by Cabot during the past drilling of each of Dimock/Carter Road Gas Wells;

ii. Within seven (7) days of the date of this Consent Order and Settlement Agreement, Cabot shall begin pressure testing of each accessible annuli on each of the Dimock/Carter Road Gas Wells. Cabot shall pressure test each annuli for forty-eight (48) consecutive hours, and shall provide the test results for each of the Dimock/Carter Road Gas Wells to the Department within five (5) days of completion of the pressure test on that Gas Well. At least twenty-four (24) hours before Cabot begins pressure testing in accordance with this Paragraph, Cabot shall provide the Department written notice of the Gas Well to be tested and the date and the approximate time that Cabot shall begin such pressure test;

iii. In all cases, Cabot shall have completed the 48-hour pressure test of the annuli on all of the Dimock/Carter Road Gas Wells, and shall provide the Department with the results of the pressure tests for all of the Dimock/Carter Road Gas Wells within sixty (60) days of the date of this Consent Order and Settlement Agreement; and

iv. If the pressure data required to be provided above indicates that the Gas Well in question is in compliance with Chapter 78 of the proposed regulations or such regulations that are finally enacted, then said Gas

7

Well shall, absent contradictory data reviewed by the Department, be considered to not be discharging natural gas into the aquifer.

b.    <u>Screening/Water Sampling</u>.  Cabot has received copies of the results of screenings for free combustible gas and of the laboratory analyses of all samples taken by the Department at the Water Supplies to date.  In addition to the screenings and sampling done by the Department, beginning upon execution of this Consent Order and Settlement Agreement, Cabot shall:

    i.    at least once every two weeks, screen the well head at each Water Supply for percentage of free combustible gas, and sample the well water at each Water Supply;

    ii.    for each water sample collected at a Water Supply, Cabot shall have the water sample analyzed in a Pennsylvania-licensed laboratory for dissolved methane, dissolved ethane, and dissolved propane;

    iii.    provide the Department a copy of the results of the screening for free combustible gas, and the laboratory analyses of each water sample within five  (5) days of Cabot's receipt of the analyses by its laboratory;

    iv.    Cabot shall continue to conduct the screening and sampling under Paragraph 5.b.i., above, once every two weeks at each Water Supply until the results of the screenings and sampling done by the Department in the past and by Cabot under Paragraph 5.b.i., above, show that either no combustible free gas is present at the wellhead for the Water Supply or that such levels of combustible free gas, if properly vented pursuant to applicable regulations and Department practice, do not pose a danger to persons or property *and* the concentration of dissolved methane is below 7 milligrams/liter ("mg/l"), or meets the standard then prescribed by applicable regulations.  However, Cabot may petition the Department, based on information obtained in accordance with this Paragraph for a determination that the concentration of methane in the Water Supply is at background levels for the aquifer that supplies that Water Supply. Cabot may further petition the Department for a determination that the concentration of combustible free gas at the wellhead is at levels that do not present a danger to persons or property if properly vented according to applicable regulations and Department practice;

    v.    for each Water Supply that meets the standards under Paragraph 5.b.iv, above, Cabot shall continue to screen each such Water Supply for free combustible gas and shall sample each such Water Supply at least

once per quarter, and shall have the water sample analyzed in a Pennsylvania-licensed laboratory for dissolved methane only. Cabot shall provide the Department a copy of the results of the screening for free combustible gas, and the laboratory analyses of each water sample within five (5) days of Cabot's receipt of the screening results and water sample analyses by its laboratory; and

vi.    unless the Department determines that the concentration of methane in the Water Supply is at background levels for the aquifer that supplies that Water Supply, Cabot shall continue such screenings and sampling under Paragraph 5b.v., above, for each quarter until the results of the screenings and sampling done by the Department in the past and by Cabot under this Paragraph 5 show that, for eight consecutive quarters, seventy-five percent of the water samples within each monitoring point over time contain 7 mg/l or less of dissolved methane (or meets the standard then prescribed by applicable regulations), and no individual water sample exceeds two times this standard.

c.    Beginning no more than 30 days from the date of this Consent Order and Settlement Agreement and continuing each day until 120 days from the date of this Consent Order and Settlement Agreement, Cabot shall complete any and all actions to the extent necessary, if any, to bring the Ely 2H Gas Well and Ely 6H Gas Well into compliance with the Oil and Gas Act, the Clean Streams Law, and the Regulations.

6.    *Settlement of Restoration/Replacement Obligation*. The claims by the Department regarding Cabot's obligations under Section 208 of the Oil and Gas Act, 58 P.S. §601.208, and 25 Pa. Code §78.51, including any obligation of Cabot to pay for or restore and/or replace the Water Supplies, or to provide for ongoing operating or maintenance expense shall be satisfied, as follows:

a.    <u>Escrow Fund</u>.

i.    Within thirty (30) days after the date of this Consent Order and Settlement Agreement, Cabot shall establish nineteen (19) Escrow Funds and each Escrow Fund shall hold an amount equal to, whichever is greater: $50,000; or two times the assessed value by the Susquehanna County Tax Assessor of the property(ies) owned by the Property Owners within the Dimock/Carter Road Area. Such assessed values for each property owned by the Property Owners are listed in chart attached as Exhibit D;

9

ii. Within ten (10) days after Cabot has established and funded the nineteen (19) Escrow Funds in accordance within Paragraph 6.a.i., above, Cabot shall notify each Property Owner, in writing, of the existence of the funds in the Escrow Fund for that Property Owner, the procedure by which the Property Owner can obtain his/her/their payment from the Escrow Fund;

iii. Cabot shall pay all fees and costs associated with each of the Escrow Funds.  The funds in the Escrow Funds shall be paid to Property Owners, their duly authorized attorney or representative or the heirs of the Property Owners in accordance with this Paragraph 6 and the Escrow Agreement attached hereto as Exhibit E.  Exhibit E shall be the model of the Escrow Agreement that Cabot shall use for each of the Escrow Funds established under Paragraph 6.a.i, above, and is incorporated herein; and

iv. If the Escrow Agent and Cabot have not received the executed and notarized Receipt provided for in the Escrow Agreement from the Property Owner on or prior to the 45th day after the date that the Property Owner has received written notice of the Escrow Fund in accordance with this Consent Order and Settlement Agreement, the Escrow Agent shall continue to hold the Escrow Fund until December 31, 2012.  During such time period the Escrow Agent shall deliver all proceeds from the Escrow Fund to the Property Owner if and only if the Escrow Agent receives unqualified and unconditional written instruction to do so from a duly authorized representative of the Department and from a duly authorized representative of Cabot.  If as of December 31, 2012, the Property Owner has not claimed and received the Escrow Fund, the Escrow Agent shall deliver all proceeds from the Escrow Fund to Cabot on January 2, 2013, together with all interest and/or earnings attributable to the Escrow Fund.

b. <u>Effect of Notification to Department</u>.  After the time has passed for the Escrow Fund to be funded in accordance with Paragraph 6.a.i., above, and upon completion of the restoration activities described below, the Department's claims regarding Cabot's obligations under Section 208 of the Oil and Gas Act, 58 P.S. §601.208, and 25 Pa. Code §78.51, to restore and/or replace a Water Supply that serves the property owned by a Property Owner shall be satisfied upon the Department's receipt of information from Cabot that verifies that: the nineteen (19) Escrow Funds have been established and fully funded in accordance with Paragraph 6.a.i, above; each of the Property Owners have received written notice from Cabot of the Escrow Fund and of the procedure

by which the Property Owner can obtain his/her/their payment from such Escrow Fund; *and* each of the Property Owners have received written notice from Cabot that it will install a whole house gas mitigation device at the property as provided for below.

        c.      For each Property Owner, Cabot shall continue to provide and maintain temporary potable water and, as applicable, shall continue to maintain gas mitigation devices that it had previously installed until Cabot receives written notice from the Department that it has complied with all of the requirements of Paragraph 6.a-6.b., above, for that Property Owner.

        d.      As long as Cabot provides temporary water to the Property Owners under Paragraph 6.c., above, from a water purveyor and/or water hauler, Cabot shall assure that the water purveyor/hauler has all licenses, permits, and/or other authorizations required under Pennsylvania law and Regulations, and that the Property Owners receive water in amounts sufficient to continually satisfy water usage needs until Cabot receives written notice from the Department that it has complied with all of the requirements of Paragraphs 6.a.-6.b., above, for that Property Owner.

        e.      As of the date of this Consent Order and Settlement Agreement, Cabot has purchased whole house gas mitigation devices for residential water supplies within the Dimock/Carter Road Area and it has drilled new drinking water wells to serve other residences within the Dimock/Carter Road Area. Within 30 days of the date of this Consent Order and Settlement Agreement, Cabot shall notify each Property Owner, in writing, that Cabot will install, at Cabot's sole expense, a whole house gas mitigation device at the Property Owner's residence.

        f.      If the Property Owner notifies Cabot, in writing, within sixty (60) days from the date that the Property Owner received the written notice in accordance with Paragraph 6.e, above, that he/she/they agree(s) to Cabot installing a whole house gas mitigation device at his/her/their residence, Cabot shall complete such action at the residence within ninety (90) days from the date that the Property Owner notified Cabot, in writing, of his/her/their agreement.

11

7.     ***Settlement of Claims for Stipulated Civil Penalties and Department Costs.***  Upon

signing this Consent Order and Settlement Agreement, Cabot shall pay $500,000 in complete and

final settlement of any known claims or demands of any type that Department has made or could

have made against Cabot relating to stipulated penalties under the Modified 2009 Agreement

through the date of this Consent Order and Settlement Agreement, and to provide reimbursement for

certain costs incurred by the Department to date.  The payment shall be made by corporate check or

the like made payable to "Commonwealth of Pennsylvania" and sent to the Department at the

address set forth in Paragraph 10, below.

8.     ***Reservation of Rights***.  The Department reserves the right to require additional

measures to achieve compliance with applicable law.  To date, the Department has not identified any

defective Dimock/Carter Road Gas Wells other than the Gesford No. 3, Gesford No. 9, Baker No. 1,

Ely No. 4, Ely 2H and Ely 6H Wells.  However, in the event the Department receives new data or

information concerning said Wells or any other Dimock/Carter Road Gas Wells, the Department

reserves the right to require additional measures to achieve compliance with applicable law,

including additional measures to take remedial actions to fix defective Dimock/Carter Road Gas

Wells, and to eliminate any unpermitted discharge of natural gas into the waters of the

Commonwealth from the Dimock/Carter Road Gas Wells.  Cabot reserves the right to challenge any

action which the Department may take to require those measures.

9.     ***Liability of Cabot***.  Cabot shall be liable for any violations of this Consent Order and

Settlement Agreement, including those caused by, contributed to, or allowed by its officers,

directors, agents, employees, contractors, successors, and assigns.

12

10.   ***Correspondence with and Notice to the Department.***  All correspondence with and notice to the Department concerning this Consent Order and Settlement Agreement shall be addressed to:

> Mr. Craig Lobins, Regional Manager
> Oil and Gas Management
> Department of Environmental Protection
> 230 Chestnut Street
> Meadville, PA  16335-3481
> Telephone:  814-332-6860
> Fax:  814-332-6121

11.   ***Correspondence with Cabot.***  All correspondence with Cabot concerning this Consent Order and Settlement Agreement shall be addressed to:

> Mr. Phil Stalnaker
> Cabot Oil & Gas Corporation
> 5 Penn Center West, Suite 401
> Pittsburgh, PA  15276
> Telephone:  412-249-3850
> Fax:  412-249-3855

Cabot shall notify the Department whenever there is a change in the contact person's name, title, or address.  Service of any document or notice by the Department under this Consent Order and Settlement Agreement may be made by mail to the above address.  However, service of any legal process by the Department for any purpose under this Consent Order and Settlement Agreement, including its enforcement, will be made by mailing a copy by certified mail, return receipt requested, to the above address.

12.   ***Decisions Under Consent Order and Settlement Agreement.***  Any decision which the Department makes under the provisions of this Consent Order and Agreement, including a notice that stipulated civil penalties are due, is intended to be neither a final action under 25 Pa. Code §1021.2, nor an adjudication under 2 Pa.C.S.A. §101.  Cabot hereby agrees that it shall not appeal to the Pennsylvania Environmental Hearing Board and/or shall not file any action of any kind with any Pennsylvania State or Federal Court of any decision by the Department on or arising from any matter

under this Consent Order and Settlement Agreement.  Any objection which Cabot may have to any

decision by the Department on or arising from any matter under this Consent Order and Settlement

Agreement will be preserved until the Department enforces this Consent Order and Settlement

Agreement.

      13.    ***Acknowledgment of No Obligation***.

          a.    In conjunction with Cabot, the Department will defend this Consent Order and

Settlement Agreement in any future appeal(s) brought by or on behalf of any Property Owner and/or

any other person or entity.

          b.    Except for any future appeal(s) of this Consent Order and Settlement

Agreement brought by or on behalf of any Property Owner and/or any other person or entity, Cabot

acknowledges that the Department has no obligation to defend it in any existing or future other

appeal, or in any litigation, lawsuit, demand, or claim for any issue, including damages, brought by

or on behalf of any Property Owner and/or any other person or entity for any matters arising from

the Dimock/Carter Road Gas Wells, the Water Supplies, any other Consent Order and Agreement,

this Consent Order and Settlement Agreement, and/or any and all other matters relating in any way

to Cabot and/or the Dimock/Carter Road Area.

      14.    ***Severability***.  The Paragraphs of this Consent Order and Settlement Agreement shall

be severable and should any part hereof be declared invalid or unenforceable, the remainder shall

continue in full force and effect between the Parties.

      15.    ***Entire Agreement***.  This Consent Order and Settlement Agreement shall constitute

the entire integrated agreement of the Parties as to the subject matter hereof.  No prior or

contemporaneous communications or prior drafts shall be relevant or admissible for purposes of

determining the meaning or intent of any provisions herein in any litigation or any other proceeding.

16.     *Attorneys' Fees*.

       a.     Except as stated herein, the Parties shall bear their respective attorney fees, expenses, and other costs in the prosecution or defense of this matter or any related matters, arising prior to execution of this Consent Order and Settlement Agreement.

       b.     Cabot shall pay the Department for any attorneys' fees or litigation cost awarded against the Department for the consolidated appeal docketed at EHB No. 2010-065 regarding the Modified 2009 Agreement, and/or any attorneys fees or litigation cost awarded against the Department for any appeal(s) filed in the future by any Property Owner and/or any other person or entity regarding this Consent Order and Settlement Agreement.

       c.     Payment to the Department under Paragraph 16.b., above, shall be on or before the 15th day of the succeeding month, and shall be made by corporate check or the like made payable to "Commonwealth of Pennsylvania" and sent to the Department at the address set forth in Paragraph 10, above.

17.     *Modifications*.  No changes, additions, modifications, or amendments of this Consent Order and Settlement Agreement shall be effective unless they are set out in writing and signed by the Parties.

18.     *Titles*.  A title used at the beginning of any Paragraph of this Consent Order and Settlement Agreement may be used to aid in the construction of that Paragraph, but shall not be treated as controlling.

19.     *Termination of Consent Order and Settlement Agreement*.  Cabot's obligations under this Consent Order and Settlement Agreement shall terminate when Cabot has complied with all of its obligations under this Consent Order and Settlement Agreement.

       IN WITNESS WHEREOF, the Parties have caused this Consent Order and Settlement Agreement to be executed by their duly authorized representative.  The undersigned representative

of Cabot certifies under penalty of law, as provided by 18 Pa.C.S.A. §4904, that he is authorized to

execute this Consent Order and Settlement Agreement on behalf of Cabot, that Cabot consents to the

entry of this Consent Order and Settlement Agreement as a final ORDER of the Department; and

that Cabot hereby knowingly waives its right to appeal this Consent Order and Settlement

Agreement and to challenge its content or validity, which rights may be available under Section 4 of

the Environmental Hearing Board Act, the Act of July 13, 1988, P.L. 530, No. 1988-94, 35 P.S.

§7514; the Administrative Agency Law, 2 Pa.C.S.A. §103(a) and Chapters 5A and 7A; or any other

provision of law.  Signature by Cabot's attorney certifies only that the Consent Order and Settlement

Agreement has been signed after consulting with counsel.


FOR CABOT OIL & GAS CORPORATION:    FOR THE COMMONWEALTH OF
                                    PENNSYLVANIA, DEPARTMENT OF
                                    ENVIRONMENTAL PROTECTION:


Dan O. Dinges                       S. Craig Lobins
Chief Executive Officer             Regional Manager
                                    Oil and Gas Management Program
                                    Northwest Region


Kevin Cunningham, General Counsel   Susan Shinkman, Chief Counsel


DoDuffy\Cabot\2010 CO&A\Final CO&A 121510 .doc


16

# EXECUTIVE SUMMARY

## ANALYSIS OF POTENTIAL IMPACTS OF FOUR EXPLORATORY NATURAL GAS WELLS TO WATER RESOURCES OF THE SOUTH FLANK OF THE GRAND MESA DELTA COUNTY, COLORADO

**March 2003**

Gunnison Energy Corporation (GEC) proposes to conduct an exploratory drilling project for natural gas at four locations named Dever Creek #1, Lone Pine #1, Spaulding Peak #1 and Steven's Gulch #1. All of these proposed wells are on private lands on the south flank of the Grand Mesa in Delta County, Colorado (Figure ES-1 and Table ES-1). The proposal is for exploration activities only, which will consist of drilling, completion, testing, and monitoring at the well sites, along with construction of new access roads and water use and disposal activities. This program will gather scientific information and data about the extent and distribution of natural gas resources and will perform tests on each of the wells to assess the economic viability of future production. The proposed drilling targets potential gas producing zones in the sandstones and coal seams of the Mesaverde Formation. The exploratory drilling program and associated monitoring program will also gather information and data on potential impacts to local water resources such as streams, springs, wells, wetlands, and other features.

The purpose of this report is to assess the potential impacts of the proposed exploratory natural gas wells on water resources, based on information that is currently available. This report relies on the hydrologic and geologic data compiled and interpreted in *Characterization and Assessment of Water Resources on the Southeastern Flank of the Grand Mesa, Delta, Gunnison, and Mesa Counties, Colorado* (Baseline Report) prepared by Wright Water Engineers, Inc. (WWE) in January 2003.

Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources
of the South Flank of the Grand Mesa, Delta County, Colorado

## Table ES-1

## Proposed Exploratory Natural Gas Well Descriptions

| Well Name | Location | Approximate Well Pad Dimensions (ft x ft) | Approximate Length of New Road Construction (ft) | Well Pad Ground Surface Elevation (ft) | Approximate Total Well Depth (ft below ground surface)[1] |
|---|---|---|---|---|---|
| Dever Creek #1 | SE ¼, NW ¼, Sec. 12, T13S, R93W | 225 x 150 (0.8 acre) | 1,000 (0.2 miles) | 9,051 | 2,940 |
| Lone Pine #1 | SE ¼, NW ¼, Sec. 25, T12S, R91W | 225 x 150 (0.8 acre) | 2,000 (0.4 miles) | 7,962 | 3,300 |
| Spaulding Peak #1 | SW ¼, NW ¼, Sec. 24, T12S, 94W | 225 x 150 (0.8 acre) | 2,500 (0.5 miles) | 8,601 | 3,750 |
| Stevens Gulch #1 | SE ¼, NE ¼, Sec. 1, T13S, R92W | 225 x 150 (0.8 acre) | 1,100 (0.2 miles) | 8,028 | 2,170 |

[1] Approximate depths that will be adjusted during drilling, based on actual geology.

All of the proposed exploration wells are located in remote areas with these characteristics: moderate to steep slopes; soil and surface conditions that produce low to moderate rates of infiltration; 21-30 inches per year of average precipitation; vegetation characterized by aspen, scrub oak, and/or grasses; and current surface uses focused on open space, grazing, and hunting. Various ephemeral and perennial streams, along with ponds, lakes, and wetlands, are located within one mile of each of the proposed wells. Baseline water chemistry data have been collected from multiple surface water sources in the vicinity of the proposed wells. Groundwater baseline data are also available. There are four Colorado State Engineer's Office (SEO)-permitted water wells within one-mile radius circles of the proposed wells. All of these wells draw water from the surficial unconsolidated (alluvial/colluvial) deposits.

The proposed exploratory wells could potentially impact local water resources due to: (1) construction activities (surface disturbances and features) and (2) gas production activities, including hydraulic stimulation and produced water management. Selected potential impacts and associated mitigation measures are discussed below.

The primary construction activities will include well pad and road construction to access the well sites. During construction, straw bales, silt fences, crimped mulch, check dams, erosion control "mats" and netting on steep slopes, terracing/benching, energy dissipation measures downstream from culverts, and other drainage and erosion control best management practices (BMPs) will be used. Multiple BMPs will be used to provide a conservative level of mitigation. These BMPs will be monitored after runoff events to assure they are properly functioning and protecting local water resources; necessary repairs and/or upgrades will be made promptly.

The four exploratory natural gas wells will range from about 2,170 to 3,750 feet (ft) in total depth. Hydraulic stimulation (also known as hydraulic fracturing, hydrofracing and hydrofracturing) will be used within the exploratory holes. Approximately 0.5 acre-feet (AF) of water will be trucked from the Oxbow Mining facilities (Oxbow Mining, L.L.C., owns various water rights) to the sites in order to drill and hydraulically stimulate each well. The space between the outside of the steel casing and inside of the drill hole (annulus) will be filled with cement (grout) from top to bottom, thus isolating gas production zones and minimizing potential impacts to groundwater.

Hydraulic fractures are created by pumping a thick, water-based, non-hazardous fluid into the formation. This technique results in increased flow of natural gas from the pore spaces within the rock (where it may be trapped) to the wellbore. GEC anticipates that the majority of the fracturing fluid will be recovered, with the remainder posing no residual hazard.

A common misconception with hydraulic stimulation is that the process cannot be effectively controlled and can result in large vertical and horizontal fracture networks. In fact, if properly planned and executed, hydraulic stimulation results in a well-defined and limited fracture network. GEC and its hydraulic stimulation consultant estimate that the maximum horizontal extent of the fracturing will be 500 ft in two directions from the well (1,000 ft total) in each of the four exploratory wells. The maximum hydraulic fracture height may extend upwards approximately 200 ft into the lower portion of the Barren Member of the Mesaverde Formation. These hydraulic fracture dimensions limit the potential for adverse impacts to surface and groundwater resources. Specifically, the SEO-permitted water wells that are within one mile of

the proposed exploratory wells withdraw shallow groundwater from unconsolidated alluvial/colluvial deposits. These deposits will not be impacted by the exploratory natural gas wells because these wells will be cased and cemented to a level below all water supply wells within one mile and will be hydraulically stimulated only in the Mesaverde Formation. The top of the projected hydrofracture zone will be far below the unconsolidated deposits. Just as shallow groundwater will not be affected by the exploratory wells, neither will surface water resources be impacted.

Another consideration regarding the large separation distances between the hydraulic fracture zone and the water wells is that when a fracture reaches deformable, soft rock, it will stop propagating. The Wasatch Formation, which overlies the Mesaverde Formation in the vicinity of the exploratory wells, is not conducive to fracture growth for this reason. This formation will provide additional protection for the shallow groundwater wells and surface water resources.

Shallow groundwater and surface water are further protected by the changes in internal stresses within the bedrock according to depth below the ground surface. In general, at depths shallower than approximately 1,000 feet below the ground surface, the least principal internal stresses are vertical. Therefore, hydrofractures, which form at right angles to the direction of least principal stress, become horizontal as they approach depths of less than 1,000 feet (USEPA 2002). Because of this, vertical hydrofractures would not penetrate upward to intercept groundwater sources less than approximately 1,000 feet in depth.

In a recent study, the U.S. Environmental Protection Agency (USEPA 2002) found that hydraulic stimulation of wells completed in coalbed formations does not pose a risk to underground sources of drinking water because of the characteristics of coalbed formations. In this study, the USEPA reviewed 11 United States coal basins containing an estimated 13,973 producing wells, including the Piceance basin with 50 wells. Although thousands of wells are hydraulically stimulated annually, the USEPA found no confirmed cases of drinking water well contamination or water loss as the result of hydraulic stimulation in any of the basins.

Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources
of the South Flank of the Grand Mesa, Delta County, Colorado

A summary of chemicals to be used at the proposed exploratory natural gas wells is provided in this report, including hazard level, concentrations, amounts left in the wellbore, and residual hazard. The only hazardous chemicals to be used at the exploratory well sites are diesel fuels for equipment and dilute hydrochloric acid. Handling and storage of these substances and all other chemicals at the sites will be in accordance with all state and federal regulations and guidelines.

Unlike many coalbed methane production areas (e.g., Powder River Basin in Wyoming, San Juan and Raton Basins in Southern Colorado), substantial evidence (see Baseline Report) indicates that the coal seams of the south flank of the Grand Mesa will be different, producing only small amounts of water. For example, as described in the Baseline Report, seven oil and gas wells in the study area produced an average of less than 1 gallon per minute (gpm) of water, which is less than the flow of a typical garden hose of 6-10 gpm (AWWA 1975). All produced waters will be temporarily stored in either tanks or the lined reserve pit on site, and periodically trucked to a licensed off-site disposal facility. Thus, there will be no adverse impacts to water resources from the discharges of produced water.

The potential for hydraulic stimulation to initiate fault movement has been researched and evaluated. None of the maximum projected hydraulic fracture lengths from the four wells will reach any mapped fault. Even if a fault were encountered, it is important to recognize the following information:

- When a hydraulic fracture intercepts a fault plane that is open or capable of transmitting water, the immediate marked drop in pressure signifies that the hydraulic stimulation fluid is being lost to a fault and the hydraulic stimulation operation would be halted.

- Some have postulated that hydraulic fracturing into a fault would affect wells and springs at great distances from the gas well or even cause earthquakes. Literature review and interviews with experts by the authors of this report failed to locate any evidence to support this concern.

- Although some groundwater injection projects have triggered fault movement (such as the U.S. Bureau of Reclamation salt brine injection program at Paradox Valley,

Colorado; waste injection during the 1960s at the Rocky Mountain Arsenal in Denver, Colorado; and the Rangely, Colorado oil field injection and testing program by the U.S. Geological Survey in the early 1970s), research indicates that these projects involved quantities of water that were orders of magnitude larger than the amount of water that will be used to hydraulically stimulate each of the four exploratory wells. Moreover, the durations of high pressure injections were long compared to the short (episodic) durations associated with hydraulically stimulating natural gas wells.

- Less than 0.5 AF of water will be used to hydraulically stimulate each well. This is an insignificant quantity of water relative to, for example, the Surface Creek fault, which is seven miles long and 10,000 ft high, with a surface area of about 8,500 acres (See Exhibit 4 of the Baseline Report for more information on fault dimensions).

- The question of whether or not hydraulic stimulation will induce earthquakes along existing faults was evaluated by considering the external stresses and rock material strengths on the fault surface. Stability against earthquakes along a fault in a continuous mass can be evaluated by comparing the material strengths that tend to maintain the mass in equilibrium to external forces, which tend to destabilize the mass and cause it to move. This analysis indicated that the probability of destabilization is insignificant.

Analysis of records from the Colorado Division of Minerals and Geology indicates that none of the four proposed exploratory wells will impact current coal mines. Future mining could easily avoid the wells, or the well casing could be cut and removed to facilitate mining.

The four proposed exploration wells will withdraw small quantities of water from the Mesaverde Formation. Recharge characteristics and hydrogeologic properties of the Mesaverde Formation were discussed extensively in the Baseline Report. There is no evidence to suggest a continuous hydraulic connection between the top of the water-rich Grand Mesa and the Mesaverde Formation, which lies thousands of feet below and is separated by the typically fine-grained (low to very low permeability) Uinta, Green River, and Wasatch Formations. There is no reliable evidence that substantiates that the potentiometric surface of the Mesaverde Formation beneath

the top of the Grand Mesa is elevated by thousands of feet above the formation itself, and there is much evidence to the contrary. Nevertheless, WWE has quantified the hydrologic significance of this hypothetical scenario. The associated calculations, which are included in this report, show that the hydrologic impacts are not significant, primarily due to the tightness (low permeability) of the Mesaverde Formation.

Review of data from the Colorado SEO indicates that there are decreed surface water rights downstream of the four proposed exploration wells. As described above, surface waters will not be affected by the exploratory wells; therefore, these water rights will not be impacted.

Reclamation practices will be designed, implemented, monitored, and maintained to assure that no long-term adverse impacts to water resources occur, in accordance with all applicable regulations and permit requirements.

GEC will collect monitoring data prior to, during, and after drilling operations for the four exploration wells. GEC has emphasized that exploration wells must be constructed to gather scientific data related to gas production, geology, hydrogeology, hydrology, and other subjects. Consequently, the scope of the water resources monitoring program proposed for the four exploration wells is broader than both that required by the Colorado Oil and Gas Conservation Commission and typical monitoring programs for other oil and gas producers in Colorado. Based on the experience and data gained from the exploration well monitoring program, a separate monitoring plan will eventually be prepared by GEC for the production wells, should they be shown to be feasible and approved for construction.

## SUMMARY

In summary, this study showed no significant impacts to water resources from drilling of four exploratory natural gas wells. Specifically:

- No adverse effects to local water wells are expected due to protective measures during drilling operations, the limited extent of hydraulic fractures, and the vertical separation distance between the water wells and the top of the hydraulic fracture zones.

Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources
of the South Flank of the Grand Mesa, Delta County, Colorado

- No impact to surface waters from hydraulic stimulation will occur because there will be no hydraulic connection between the fracture zone and the surface water.

- No impact to surface waters from produced water will occur. Produced water will be collected and transported to a licensed disposal facility. Potential impacts from stormwater runoff will be controlled by an array of best management practices (BMPs), which will be regularly and carefully monitored and maintained.

C:\PF\021-082\Impact Assessment\ExecutiveSummary3-31-03.doc



FIGURE ES-1

GENERAL LOCATION MAP

DATA / MAPPING SOURCE:
COLORADO CDSS
BASE CONSISTS OF
COLOR SHADED RELIEF
OF COLORADO

DATA / MAPPING SOURCE:
WRIGHT WATER ENGINEERS, INC.
2490 W 26TH AVE. 100A
DENVER, CO 80211
(303) 480-1700

# EXHIBIT 182

---

THE TRANSFORMATION OF THE ENERGY SECTOR

---

## 2. HYDRAULIC FRACTURING:

### In N.M., a sea of 'frack hits' may be tilting production

**Gayathri Vaidyanathan, E&E reporter**
*Published: Tuesday, March 18, 2014*

John Alexander, vice president at Dugan Production Corp., does not mind that other oil companies have fracked his company's oil wells at least 36 times. Each event flooded the well bores with nitrogen, which is commonly used in hydraulic fracturing in the San Juan Basin. Alexander called the floods an "inconvenience," nothing more.

That's because Dugan has a working interest in some of Encana (USA) Corp.'s wells, Alexander said.

But not all companies do. In New Mexico, more than 103 individual wells were affected by downhole communication incidents involving Encana, QEP Energy Co., WPX Energy Inc. and nine other drillers.

Downhole communication, or a frack hit, occurs during hydraulic fracturing, a process in which companies inject water, chemicals and sand into shale formations at high pressures to fracture shale rock and release oil and gas. Sometimes the fractures connect with existing wells nearby, and the injected fracking fluid can cross over more than half a mile and enter the adjacent well bore. In some cases, if a well is not shut in, it can cause a spill at the surface.

In the worst-case scenario, which has not yet been documented in the United States, the high pressures of fracking rupture the casing and allow drilling fluid to leak into groundwater (*EnergyWire*, Aug. 5, 2013).

The New Mexico Oil Conservation Division (OCD) said it was not aware of any incidents that have affected protectable groundwater. It has established a task force between regulatory agencies and the oil and gas industry to understand the situation, and began collecting information on the incidents in October 2013.

The records were provided to *EnergyWire* in response to a Freedom of Information Act request.

The incidents in New Mexico happened between 2007 and 2014, and in at least one case, there was a spill of fracking fluids at the surface (*EnergyWire*, Oct. 24, 2013).

In other cases, offset well operators found fracking fluid or drilling mud in their wells, which had to be cleared out. M&M Production, for instance, found drilling mud and production water in one of its wells after a nearby well operated by Logos Resources Inc. was being fracked.

Arguably, no company has been affected as much as Dugan Production, which reported 36 frack hits to the OCD. The company has conventional oil wells in the Gallup sandstone formation, many of which have been in operation for decades. They have mostly been affected by Encana, which has drilled and hydraulically fractured horizontal wells into the Mancos Shale formation, said Alexander.

The fracking fluid that Encana used is composed of nitrogen, water, sand and chemicals. The nitrogen keeps the solution foamy, like shaving cream, and reduces the amount of water used in the frack, Alexander said. Most companies use a mix of 70 percent nitrogen and 30 percent water in the San Juan Basin.

At times, when Encana fracked its wells, the nitrogen would show up half a mile away inside Dugan's vertical wells. The vertical wells are operated using pumpjacks, or nodding donkeys, that physically lift oil out of the ground. The presence of nitrogen in the wells interferes with the functioning of the pumpjacks. This is a minor inconvenience, Alexander said.

Alexander does not mind the frack hits because Dugan has an interest in some of Encana's wells. And Encana warns Dugan Production three weeks before each frack job so Dugan can shut in its well. Suspending production means that though fracking fluids may enter the well bore, they are unlikely to travel to the surface and cause a spill.

### Under pressure, production may rise

Sometimes, frack hits increase production in nearby conventional vertical wells, as has been documented by companies in New Mexico.

For instance, a conventional oil well owned by McElvain Energy Inc. of Farmington, N.M., that is close to an Encana well being fracked suddenly began producing much more oil. Prior to fracking in October 2012, the McElvain well had been producing 0.5 barrel per day (bpd) of oil and 25 thousand cubic feet (mcf) of natural gas. Encana finished fracking on Dec. 2, 2012. By February 2013, the McElvain well was producing 25 bpd of oil and 152 mcf of gas. The company noted that it could not be sure that frack hits were the cause of the increase in production, since it had not done the analysis.

Other companies also noticed an uptick in production from their conventional oil wells. One of Dugan Production's wells in September 2013 produced 347 barrels of oil and 129 mcf of gas. A month later, the well produced 1,500 barrels of oil and 9,533 mcf of gas. To put that in context, that is more oil than the well has produced on average since it was drilled in April 1996.

So where is the oil coming from?

Doug Hock at Encana thinks hydraulic fracturing is stimulating production at these nearby wells. The process of fracking causes an immense pressure buildup underground, which then looks for an exit. If there is an older well nearby, the pressure can push oil and gas into that older well.

"Once the well is opened up and the pressure relieved, there can be a temporary increase in production in the well as the built-up pressure releasing oil and gas from the reservoir," said Hock in an email.

Frack hits can also decrease production at certain wells, as was seen at a well owned by Elm Ridge Resources. Elm Ridge had been regularly shutting in the well since 2011 and building up pressures underground. The pressure buildup would improve production. But since a nearby well was hydraulically fractured in 2013, the well saw an influx of fracking fluid for two weeks, Elm Ridge wrote to the OCD. Since then, the well has not produced oil or gas.

## Will mineral owners lose out?

In nearby Colorado, Jim Hergenreder, a grain elevator owner, has leased 80 acres of minerals in the Niobrara Shale. Encana had drilled and hydraulically fractured Hergenreder's land in October 2013.

Hergenreder's neighbor already has a series of vertical wells 80 acres away. The distance between Hergenreder's wells and his neighbor's is a mere 400 feet at the narrowest point. That has made Hergenreder worry that fracking will improve production at his neighbor's well. The pressures could push oil from his portion of the reservoir into his neighbor's, costing him royalty, he said.

Jerry Simmons, executive director at the National Association of Royalty Owners, said there is no way to say for certain whether Hergenreder's concerns are warranted without more geological study.

Most of the wells that are frack hit get contaminated with fracking fluids in their well bore, which suggests material is moving between the two parcels of land. But whether oil is also moving -- and how much of it -- would be difficult to unravel without an in-depth study, said Simmons.

"Now, what does that mean for any fluid [oil] that were in the rock between those two well bores, I don't know," said Simmons. "It is probably a safe assumption that some of it moved with the fluids, right?"

It is the job of state regulatory agencies like the OCD or the Colorado Oil and Gas Conservation Commission (COGCC) to ensure that such situations do not play out and mineral owners do not lose out on royalties.

The OCD did not respond to *EnergyWire's* request for comment on the issue before deadline. The COGCC said Hergenreder's situation was unusual and other landowners have not complained.

"This is an unusual situation; we have not heard other complaints of this nature, at least not any time recently," wrote Todd Hartman, spokesman for COGCC, in an email.

Hergenreder said he has approached the COGCC to demand that his and his neighbor's land be unitized so all mineral owners share the royalty equally. The COGCC is examining the case. So far, his neighbor has not seen an increase in production increase at his wells, but Hergenreder is keeping a close watch.

"Everyone should be sharing in the money," he said.

---

Twitter: **@gayathriv** | Email: **gvaidyanathan@eenews.net**

**ENERGYWIRE HEADLINES — Tuesday, March 18, 2014**

## SPOTLIGHT

**1. BAKKEN SHALE:**
Faced with production declines, drillers cook up new recipes for growth

## TOP STORIES

**2. HYDRAULIC FRACTURING:**
In N.M., a sea of 'frack hits' may be tilting production

**3. ELECTRICITY:**
Stakes are high as Mo. utility clashes with its largest customer

**4. NATURAL GAS:**
DOE puts up $20M for methane hydrates research projects

## THIS MORNING'S STORIES

**5. TRANSPORT:**
N.Y. Dems call for speed on new crude-by-rail rules

**6. HYDRAULIC FRACTURING:**
No candles, please. API wishes fracking a happy birthday

**7. INTERNATIONAL:**
Navy SEALs storm rogue tanker as oil disruptions continue in Libya

**8. TECHNOLOGY:**
Exxon pushes ahead with oil shale that Chevron, Shell abandoned

**9. NORTH DAKOTA:**
First wave of new highway patrol troopers headed to oil patch

**10. POLITICS:**
Ill. county voting today on fracking recommendation

**11. OIL AND GAS:**
N.M. heavily dependent on drilling for tax revenues -- report

**12. HYDRAULIC FRACTURING:**
Bill that would undo caps on fracking waste at landfills heads to W.Va. governor

**13. EARTHQUAKES:**
Number of quakes quadruples in Ohio

*Advertisement*



Salon Power Saver
Click to Start Flash Plug-in

Delivering more with natural gas.

*The Premier Information Source for Professionals Who Track Environmental and Energy Policy.*

© 1996-2014 E&E Publishing, LLC  Privacy Policy  Site Map

# Fracking fluid blows out nearby well

Cleanup costs, competing technologies at issue

KASA | Tina Jensen

October 19, 2013

Read this article on the publishing site

COUNSELORS, N.M. (KRQE) - More than 200 barrels of fracking fluid, oil and water blew out of a traditional oil well on BLM land in the San Juan Basin in late September raising questions about who is responsible for the spill.

State regulators say the blowout on a Parko Oil well happened because of pressure from nearby fracking operations run by Encana Oil.

Fracking--short for horizontal fracturing--is a controversial practice that uses chemicals pumped under pressure to break up underground layers of shale to release oil and natural gas.

"The spill has been contained," said Jim Winchester, spokesperson for the New Mexico Energy, Minerals and Natural Resources Department, which houses the state regulator Oil Conservation Division. "Fluids from the spill were removed by a vacuum truck quickly after the release."

On Sept. 30, one of Encana's fractures reached Parko's neighboring vertical well. The pressure was too much for the older well to handle. "Our highest pressure is around 150 pounds," said Parko Oil pumper Johnny Aragon. "The pressure we were experiencing was in excess of 2,000 pounds, which is a lot more than what the wells are designed to hold."

Encana's operations were approximately 0.5 miles from the Parko well that had the blowout.

"An Encana well, undergoing stimulation operations, may have communicated with the well of a nearby operator," said Encana spokesperson Doug Hock. "That operator's well became over-pressurized resulting in the release of fluid from both the wellhead and a nearby tank."

"When Encana was made aware of the situation, it immediately ceased its own operations."

Well Spacing Concerns

The San Juan Basin is considered one of the largest natural gas reserves in the world. But with natural gas prices so low, many energy companies are making a play for oil.

1

"Many of the drilling rigs that are now operating in the San Juan Basin are exploring and drilling in parts of the basin that have the potential for oil and high levels of natural gas liquids as opposed to dry gas," said Wally Drangmeister of the New Mexico Oil and Gas Association.

New wells are springing up quickly.

Some fracking operations are installing wells as close as 800 feet from traditional vertical wells.

"I don't understand why the state or the BLM or anyone else is letting them get so close to other wells," said Floyd Parker, president of New Mexico-based Parker Oil. "Encana's encircling our field entirely."

New Mexico has no standard minimum spacing requirement between wells.
Some experts warn New Mexico could be facing huge problems ahead with the close proximity of highpressure fracking operations and aging wells.

"Other states have modified their rules to require, for example, that an operator intending to drill a horizontal well would have to identify all older wells within a certain distance from the route of the horizontal bore," said Bruce Baizel, energy program director for Earthworks.

But Drangmeister says he doesn't believe the proximity of the Encana and Parko wells caused the blowout.

"From my understanding of these very rare cases of well communication, the issue is one of local underground geology, not spacing or the age of wells," he said.

Environmental Questions

The Encana-Parko well hit resulted in soil contamination but no groundwater pollution, according to the state's Oil Conservation Division.

But there's a big risk when fracking fluid meets up with a traditional, aging well. Fracking fluid includes water and toxic chemicals. Some chemicals are disclosed, but in New Mexico the OCD doesn't require the reporting of "proprietary, trade secret or confidential business information."

Encana declined to give a full list of the chemicals involved with this spill, but said nitrogen is used in their operations.

2

Even Parker says aging wells are prone to cracks. If fracking operations hit one of those wells, it could have devastating consequences, he said.

"If you had a crack in your casing or something like that, their fluid may go into the water reserve," he said.

Baizel says it's a real possibility.

"The scientific research shows that all wellbores and their cement eventually degrade and leak; it's just a matter of time," he said. "We also know that older wells were subject to less stringent standards at the time they were drilled, so that also adds to the potential for leakage."

Drangmeister said he couldn't speculate on whether cracks in aging wells could pose a risk for groundwater contamination.

"I can say that a regulatory structure has always been in place in New Mexico for well construction and cementing," he said.

The Cost and Responsibility of Cleanup

The half-mile stream of chemicals and soil contamination from the blowout was left for Parko to cleanup.

"The release was on their well," Hock said. "They took charge of the cleanup and shut-in of their well."

So far, Parko Oil has had to pay for the cleanup, too.

Parko Oil president Floyd Parker estimates current damages at $100,000 and says this isn't the first time Encana's operations have impacted his own.

"They said they'd pay the bills," he said. "They haven't paid any of the bills, and they haven't paid anything on this mess either."

State oil regulators don't have the authority to say who should pay for these messes, so the companies have to work it out, or go to court.

KRQE News 13 asked Hock who must take responsibility for the cleanup and pay for it during an incident like this.

"I don't know the specifics of this," he said. "However, I can tell you that in this case, Parko took charge of the cleanup."

Hock says Encana voluntarily provided Parko with "advance notice of its intended stimulation activities."



WILL **NATURAL GAS** FUEL
AMERICA IN THE 21ST CENTURY?

BY J. DAVID HUGHES

MAY 2011

POST CARBON INSTITUTE

# ABOUT THE AUTHOR

J. David Hughes is a geoscientist who has studied the energy resources of Canada for nearly four decades, including 32 years with the Geological Survey of Canada as a scientist and research manager. He developed the National Coal Inventory to determine the availability and environmental constraints associated with Canada's coal resources. As team leader for unconventional gas on the Canadian Gas Potential Committee, he coordinated the recent publication of a comprehensive assessment of Canada's unconventional natural gas potential.

Over the past decade he has researched, published, and lectured widely on global energy and sustainability issues in North America and internationally. He is a board member of the Association for the Study of Peak Oil and Gas–Canada and is a Fellow of the Post Carbon Institute. He recently contributed to *Carbon Shift*, an anthology edited by Thomas Homer-Dixon on the twin issues of peak energy and climate change, and his work has been featured in *Canadian Business*, *Walrus,* and other magazines, as well as through the popular press, radio, television, and the Internet. He is currently president of a consultancy dedicated to research on energy and sustainability issues.

# ACKNOWLEDGMENTS

Thanks are due to Professor Andrew Miall of the University of Toronto and energy analysts Paul Sears and Michel Gelinas, who critically reviewed the final manuscript and offered many helpful suggestions. Asher Miller and Daniel Lerch of the Post Carbon Institute provided many additional comments and editorial assistance. Post Carbon Institute provided funding, which made this report possible.



Copyright © 2011 by Post Carbon Institute. All rights reserved.



Post Carbon Institute
Santa Rosa, California, USA
www.postcarbon.org

# ABSTRACT

Natural gas has increasingly been touted as a "bridge fuel" from high-carbon sources of energy like coal and oil to a renewable energy future. This is based on renewed optimism on the ability of horizontal drilling and hydraulic fracturing to access natural gas from previously inaccessible shale gas deposits. A review of the latest outlook (2011) of the U.S. Energy Information Administration (EIA) reveals that all eggs have been placed in the shale gas basket in terms of future growth in U.S. gas production. Without shale gas, U.S. domestic gas production is projected to fall by 20% through 2035.

Shale gas is characterized by high-cost, rapidly depleting wells that require high energy and water inputs. There is considerable controversy about the impacts of hydraulic fracturing on the contamination of surface water and groundwater, as well as the disposal of toxic drilling fluids produced from the wells. A moratorium has been placed on shale gas drilling in New York State. Other analyses place the marginal cost of shale gas production well above current gas prices, and above the EIA's price assumptions for most of the next quarter century. An analysis of the EIA's gas production forecast reveals that record levels of drilling will be required to achieve it, along with incumbent environmental impacts. Full-cycle greenhouse gas (GHG) emissions from shale gas may also be worse than previously understood, and possibly worse than coal.

Even assuming the EIA forecast for growth in shale gas production can be achieved, there is little scope for wholesale replacement of coal for electricity generation or oil for transportation in its outlook. Replacing coal would require a 64% increase of lower-48 gas production over and above 2009 levels, heavy vehicles a further 24% and light vehicles yet another 76%. This would also require a massive build out of new infrastructure, including pipelines, gas storage and refueling facilities, and so forth. This is a logistical, geological, environmental, and financial pipe dream.

Although a shift to natural gas is not a silver bullet, there are many other avenues that can yield lower GHG emissions and fuel requirements and thus improve energy security. More than half of the coal-fired electricity generation fleet is more than 42 years old. Many of these plants are inefficient and have few if any pollution controls. As much as 21% of coal-fired capacity will be retired under new U.S. Environmental Protection Agency (EPA) regulations set to take effect in 2015. Best-in-class technologies for both natural-gas- and coal-fired generation can reduce $CO_2$ emissions by 17% and 24%, respectively, and reduce other pollutants. Capturing waste heat from these plants for district and process heating can provide further increases in overall efficiency. The important role of natural gas for uses other than electricity generation in the industrial, commercial, and residential sectors, which constitute 70% of current natural gas consumption and for which there is no substitute at this time, must also be kept in mind. Natural gas vehicles are likely to increase in a niche role for high-mileage, short-haul applications.

Strategies for energy sustainability must focus on reducing energy demand and optimizing the use of the fuels that must be burnt. At the end of the day, hydrocarbons that aren't burnt produce no emissions. Capital- and energy-intensive "solutions" such as carbon capture and storage (CSS) are questionable at best and inconsistent with the whole notion of energy sustainability at worst.

# CONTENTS

**Foreword**................................................................................................... 3

**Introduction** .............................................................................................. 6

**The U.S. Energy System and Its Emissions** ................................................ 7
  Utility of Hydrocarbon Fuels for Different End Uses ............................... 9
    Oil....................................................................................................... 9
    Natural Gas ........................................................................................11
    Coal ...................................................................................................12
  Electricity Generation by Fuel ...............................................................13
  Carbon Dioxide Emissions ....................................................................15

**U.S. Natural Gas Production and Outlook** ...............................................17
  The Recent Past....................................................................................17
  Shale Gas............................................................................................. 21
    An Overview of Some of the Issues with Shale Gas............................ 22
  CO$_2$ Emissions from Shale Gas Production and LNG ........................... 26
  Outlook for U.S. Natural Gas Production ............................................... 28
  A Reality Check on the EIA U.S. Gas Production Projection.....................30

**Gas versus Coal for Electricity Generation** ............................................ 34
  Coal-Fired Electricity Generation: The Current Situation.........................42
  Natural-Gas-Fired Electricity Generation: The Current Situation.............45
  Natural-Gas- and Coal-Fired Electricity Generation: The Future ...........46
    Retire Inefficient Plants and Replace if Necessary with Best-in-Class..................... 47
    Implement Cogeneration—Production of Both Heat and Power ...............48
    Use Fuels that Must Be Burned in Their Highest-Value Applications........................48
    Carbon Capture and Storage—A Waste of Energy and Money? .................................49

**Gas versus Oil for Transportation** ..........................................................52

**Implications and Conclusions** ................................................................ 54



# FOREWORD

Post Carbon Institute undertook this report in order to examine three widespread assumptions about the role that natural gas can and should play in our energy future:

- Assumption #1: That, thanks to new techniques for hydraulic fracturing and horizontal drilling of shale, we have sufficient natural gas resources to supply the needs of our country for the next 100 years.

- Assumption #2: That the price of natural gas, which has historically been volatile, will remain consistently low for decades to come.

- Assumption #3: That natural gas is much cleaner and safer than other fossil fuels, from the standpoint of greenhouse gas emissions and public health.

Based on these assumptions, national energy officials at the Energy Information Administration (EIA) foresee a major expansion of natural gas in the coming decades. President Obama touted natural gas as a cornerstone of his Administration's "Blueprint for a Secure Energy Future"[1] and endorsed plans for converting a sizable portion of the vehicle fleet to run on natural gas.[2] Some environmental groups, rightly concerned about the greenhouse gas emissions of coal, have called for large-scale replacement of coal-fired power plants with those that burn natural gas, despite increasing concern over the environmental impacts of hydraulic fracturing.

As this report details, all of these assumptions and recommendations need to be re-thought. What emerges from the data is a very different assessment.

But if this report is right, then how could mainstream energy analysts have gotten so much so wrong? It is not our purpose to analyze in detail the social, political, and economic process whereby public relations became public policy. Nevertheless it is fairly easy to trace the convergence of interests among major players. First, the shale gas industry was motivated to hype production prospects in order to attract large amounts of needed investment capital; it did this by drilling the best sites first and extrapolating initial robust results to apply to more problematic prospective regions. The energy policy establishment, desperate to identify a new energy source to support future economic growth, accepted the industry's hype uncritically. This in turn led *The Wall Street Journal*, *Time Magazine*, *60 Minutes*, and many other media outlets to proclaim that shale gas would transform the energy world. Finally, several prominent environmental organizations, looking for a way to lobby for lower carbon emissions without calling for energy cutbacks, embraced shale gas as a necessary "bridge fuel" toward a renewable energy future. Each group saw in shale gas what it wanted and needed. The stuff seemed too good to be true—and indeed it was.

The biggest losers in this misguided rush to anoint shale gas as America's energy savior are members of the public, who need sound energy policy based on realistic expectations for future supply, as well as sound assessments of economic and environmental costs.

***Implications for the National Energy Conversation***

It is understandable that the shale gas industry would fudge supply and price forecasts in the interest of drumming up investment capital. However, the EIA is supposed to be an impartial purveyor of data and analysis. Yet that organization has historically been overly optimistic with regard to fossil fuel supplies and prices. During the past decade several non-profit energy groups, including Post Carbon Institute, warned that depletion of giant oilfields and declining oil discoveries would lead to a situation of higher petroleum prices and tight supplies beginning before 2010. Indeed, a leveling off of world crude

oil production and a simultaneous steep rise in oil prices during the past few years have arguably marked the most significant shift in the history of the petroleum industry—a shift whose consequences continue to ripple throughout the entire global economy. Yet EIA oil forecasts in the early years of the decade contained no hint of this impending and wholly foreseeable supply-price shift. In our view, the EIA is making similar mistakes in its too-rosy projections with regard to shale gas supplies and natural gas prices.



Signs at rally in opposition to hydraulic fracturing, Albany, New York.[3]

With mounting evidence of the environmental and human health risks of shale gas production, environmental groups are rightly questioning the "cleanliness" of shale gas. But if these groups focus their arguments only on the contamination of ground water supplies of shale gas *without at the same time questioning the economics of shale gas drilling*, they will have helped set up conditions for a political battle that could undermine their own influence and credibility. Political interests traditionally funded by the oil and gas industries will once again claim that environmentalism is the only thing standing between Americans and energy security. And if environmentalists are successful in enacting regulations to minimize the risks of water contamination *without clarity about the full lifecycle greenhouse gas emissions of natural gas*, they may inadvertently exacerbate the very crisis they are trying to address.

The stark reality we face is that humanity has embarked on the era of extreme energy, where there are no simple solutions. The inexpensive, high-yield fossil fuels that powered the industrial revolution and that helped make the U.S. the world's wealthiest and most powerful nation are dwindling, and all of them emit dangerous levels of greenhouse gases. While enormous amounts of natural gas, oil, and coal remain, the portions of those fuels that were cheapest and easiest to produce are now mostly gone, and producing remaining reserves will entail spiraling investment costs and environmental risks. Moreover, while alternative energy sources exist—including nuclear, wind, and solar—these come with their

own problems and trade-offs, and none is capable of replicating the economic benefits that fossil fuels delivered in decades past. There is no likely scenario in which the decades ahead will see energy as abundant or as cheap as it was in decades past.[4]

None of the major participants in our national energy discussion wants to utter that dismal truth. Yet continued appeals to wishful thinking merely squander opportunities to pre-adapt gracefully and painlessly to a lower-energy future.

### *The Unavoidable Solution: Energy Conservation*

It is past time for policy makers to get serious about the most important strategy we can and must adopt in order to succeed in this new era—energy conservation. Reducing demand for energy and using energy more efficiently are the cheapest and most effective ways of cutting carbon emissions, enhancing energy security, and providing a stable basis for economic planning.

Unfortunately, energy supply limits and demand reduction do not support robust economic growth. This is probably the main reason why policy makers and many energy analysts and environmentalists shy away from conveying the real dimensions of our predicament. However understandable this response may be from a political perspective, it is one that only compromises our prospects as a nation and a species. There is much we can do to ensure a secure social and natural environment in a lower-energy context, but we are unlikely to take the needed steps if we are laboring under fundamentally mistaken assumptions about the amounts of energy we can realistically access, and the costs of making that energy available.

> If environmentalists are successful in enacting regulations to minimize the risks of water contamination without clarity about the full lifecycle greenhouse gas emissions of natural gas, they may inadvertently exacerbate the very crisis they are trying to address.

Richard Heinberg
Senior Fellow-in-Residence
Post Carbon Institute

# INTRODUCTION

As recently as 2005, natural gas supply in North America was thought to be in terminal decline. Despite near record amounts of drilling, production had fallen from a 2001 peak, and hit a low when Hurricanes Katrina and Rita roared through the Gulf of Mexico in 2005. Gas prices soared to $13/mcf[5] in 2005 and soared again to similar levels in mid-2008 at about the time the price of oil hit an all-time record of $147 per barrel.

Then everything changed. The "Great Recession" struck in late 2008, reducing gas demand and collapsing prices. Meanwhile, production from unconventional gas plays, most prominently the Barnett Shale of east Texas, was rising rapidly and creating a glut. A new era of cheap, abundant natural gas was declared thanks to the latest hydraulic fracturing and horizontal drilling technologies, which unlocked previously uneconomic shale gas and tight sand reservoirs. The "Pickens Plan,"[6] put forward by Texas oil and gas entrepreneur T. Boone Pickens, suggested that a large part of the vehicle fleet (or at least the heavy-truck portion) could be repowered with natural gas, thereby enhancing U.S. energy security.



President Obama delivers a speech on energy at Pennsylvania State University.[1a]

Prominent shale gas driller Aubrey McClendon testified to Congress[7] in 2008 that U.S. gas production could grow by more than 60% in a decade, displacing oil imports. The Energy Information Administration (EIA), the forecasting arm of the U.S. Department of Energy, became ever more enamored with shale gas, suggesting it could provide 45% of an expanded supply by 2035.[8] And most recently, President Obama called for natural gas to be a cornerstone of U.S. energy security in his "Blueprint for a Secure Energy Future"[9]; the NAT GAS Act of 2011, which would provide incentives for the use of natural gas, was introduced in the House of Representatives on April 6, 2011. Spurred in part by such optimism about North America's renewed gas supply, several environmental groups are looking at natural gas as a "transition fuel" away from coal for electricity generation on the way to a low-carbon future based primarily on renewable sources. This thinking is based on a consideration of "burner-tip" carbon dioxide ($CO_2$) emissions (i.e., emissions strictly from burning the fuel), which are approximately half those of coal. There are many other environmental factors that must be considered, however, including full-cycle greenhouse gas (GHG) emissions, the impacts of gas drilling on groundwater, and the disposal of toxic drilling fluids, among other issues.

6

Are these projections of natural gas supply reliable? And what would be the environmental and other implications of increased reliance on natural gas? Following a brief review of the current U.S. energy system and its emissions, this report endeavors to answer the following questions:

1. How realistic are the current EIA projections for U.S. natural gas supply given that 45% of it is projected to come from shale gas by 2035? What level of effort would it take to achieve this production and what are the environmental implications of doing this?

2. Given that the current EIA projections do not assume a massive switch from coal to natural gas for electricity generation, how much would U.S. gas production have to increase to replace coal? Is this achievable? How much would $CO_2$ emissions be reduced if this could be done?

3. Given the current enthusiasm for switching transportation to natural gas to decrease oil imports and improve national energy security, what would it take in terms of increased gas supply over and above the EIA projections, which assume very little conversion to natural gas transport through 2035? Is this achievable? How much oil would be saved if this could be done?

4. Given the importance of addressing both carbon emissions and energy security, what are the implications of this analysis in terms of a rational energy strategy for the U.S. going forward?

# THE U.S. ENERGY SYSTEM AND ITS EMISSIONS

An understanding of energy supply and demand in the United States and the emissions produced by fuel and by sector is crucial for understanding the potential of various mitigation strategies in reducing carbon footprints and enhancing energy security. A good place to start is the EIA's *Annual Energy Outlook 2011*, which looks at existing consumption patterns and provides forecasts through 2035. While one can, and should, argue about the accuracy of these projections, which generally assume there will be *no* physical limits to hydrocarbon (i.e., fossil fuel) supplies through 2035, they serve as a starting point to understand the current energy system, and where we might go in a world without limits.

The current state of U.S. energy consumption by fuel source is illustrated in Figure 1. Hydrocarbons (oil, natural gas and coal) provided 84% of consumption in 2009 and the forecast in this scenario is for hydrocarbons to provide 82% of an expanded energy demand in 2035. Oil was the largest source of energy in 2009 at 39%, followed by natural gas at 24%, coal at 21%, and non-carbon-emitting energy sources—nuclear power, hydropower, biomass (largely wood), and renewables (wind, solar, geothermal)—at 16%. In 2009, renewable energy from wind, solar, and geothermal sources made up less than 1.4% of energy consumption. Of the non-hydropower, non-nuclear, carbon-neutral sources of energy, biomass made up the largest proportion, providing 2.65% in 2009.

7



**Figure 1.** U.S. energy consumption by source projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[1]

Figure 1 illustrates the sheer scale of U.S. dependence on fossil fuels and the difficulty of "getting off fossil fuels," which is the mantra of many organizations on environmental and national security grounds. We have succeeded—in what amounts to a blink of the eye in all of human history—in becoming nearly completely addicted to the dense, convenient stores of "fossilized sunshine" represented by hydrocarbons. Breaking that addiction, of course, will be no easy task.

The consumption of energy by end-use sector is shown in Figure 2. The transportation sector is the largest single consumer of energy, followed by the industrial, residential, and commercial sectors. Interestingly, energy losses in the generation and transmission of electricity constitute the second-largest use of energy in the United States. Only 32% of the energy used to generate electricity is actually delivered to end users. The remainder is lost due to the inefficiency of conversion from coal or natural gas and from losses along the transmission and delivery chain. Moving away from large, remote, centralized sources of electricity generation to local, smaller-scale, distributed sources of generation can serve to increase efficiency and minimize these energy losses, as well as make cogeneration of both heat and power more feasible.



**Figure 2.** U.S. energy consumption by end-use sector projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[12] Roughly 68% of the energy used to generate electricity is unavailable due to generation and transmission losses.

## Utility of Hydrocarbon Fuels for Different End Uses

In considering a wholesale transition from one fuel, such as coal or oil, to another, such as natural gas, it is imperative to understand the intrinsic natures of these fuels and their suitability for different end uses. These attributes for oil, natural gas, and coal are discussed below.

### Oil

Oil is currently the premier fuel for transportation, although it is also a very important feedstock for the petrochemical industry. The transportation sector consumed 72% of oil demand in 2009 and the industrial sector 22% (Figure 3). Only 6% of oil consumption was in the residential, commercial, and electricity sectors as they are served at much lower cost by natural gas and, in the case of the electricity sector, by coal. Oil accounted for more than 97% of the fuel used by the transportation sector in 2009, which amounted to 29% of total U.S. energy consumption.

9



**Figure 3.** U.S. oil consumption by end-use sector projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[13] Oil is the premier fuel for transportation but is also very important as a feedstock for the petrochemical industry.

A look at 2009 oil consumption by different end uses reveals that the American predilection for personal vehicles accounts for 62% of oil consumption in the transportation sector and 44% of all U.S. oil consumption (Figure 4). Personal vehicles also account for 19% of all U.S. $CO_2$ emissions. If heavy trucks and buses are included, motor vehicles account for 81% of oil consumption in the transportation sector, 58% of all U.S. oil consumption, and 26% of $CO_2$ emissions. More efficient rail and ship transport accounted for a mere 6.7% of oil consumption in the transportation sector, 4.8% of total U.S. oil consumption, and 2.4% of $CO_2$ emissions. Air travel accounted for 9.4% of oil consumption in the transportation sector, 6.7% of total oil consumption, and 3.3% of $CO_2$ emissions in 2009.



**Figure 4.** U.S. oil consumption in the transportation sector by end use projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[14] Motor vehicles comprise 81% of transportation sector oil use.

## Natural Gas

Natural gas is a very versatile fuel with major uses in all sectors except transportation, where it is mainly used in the pipeline transport of natural gas and to a very limited extent for compressed natural gas (CNG) vehicles (Figure 5). Natural gas is a primary feedstock in the petrochemical industry and underpins the production of nitrogen-based fertilizers, which are responsible for the "Green Revolution" that has improved crop yields by nearly 200% over the past 80 years. Industrial use of natural gas accounted for 32% of its consumption in 2009. Natural gas is also a very useful fuel for distributed use, as in residential and commercial heating applications, and in 2009 these sectors accounted for 21% and 14% of its use, respectively. Electricity generation accounted for a further 30% of U.S. natural gas consumption in 2009, mainly in "peaking" power plants. Peaking plants are used to meet peak electricity demand loads, as opposed to providing base load power, primarily because of fuel costs; however, some of the larger combined-cycle gas plants are used for base loads.

11



**Figure 5.** U.S. natural gas consumption by end-use sector projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[15] Gas is a highly versatile fuel for all sectors except transportation.

## Coal

Coal is the poor sister to oil and gas in terms of utility for a variety of uses. It is primarily suited as a source of heat in the electricity generation sector and as a source of coke in the production of steel in the metallurgical industry. In 2009, 93% of U.S. coal consumption was used for electricity generation, with practically all of the balance used in the industrial sector, primarily in the steel industry (Figure 6). Coal is unsuited for use in the other sectors without very costly transformations through coal-to-liquids or coal-to-gas technologies. Transforming coal to gas or to liquids involves large capital investments in infrastructure that are roughly equivalent in scale to those required for oil-sands production, and the transformation process entails large energy losses and GHG emissions. As a result, the conversion of coal to gas or liquids in North America is almost nonexistent, and is a very minor source of end-use energy worldwide.



**Figure 6.** U.S. coal consumption by end-use sector projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[16] Coal is primarily used for electricity generation and in the steel-making industrial sector.

## Electricity Generation by Fuel

Electricity generation is the largest use of energy in the United States. Electricity is an incredibly useful form of energy that powers the myriad gadgets, computers, and appliances that we use daily. It is also a major energy input in the industrial and commercial sectors. As mentioned above, its generation primarily by conversion of hydrocarbons to heat is also very inefficient. In 2009, 45% of U.S. electricity was generated by coal and 23% by natural gas (Figure 7). Non-GHG-emitting sources including nuclear, large hydro, biomass, wind, solar, and geothermal generated only 31% of U.S. electricity in 2009.



**Figure 7.** U.S. electricity generation by fuel projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[17]. Coal in this scenario is expected to be the major fuel source for electricity generation through 2035, growing in real terms but declining in terms of market share. Gas use will increase both in real terms and slightly in terms of market share.

Electricity generation is the primary use for renewable energy sources such as wind and solar; yet these sources, including geothermal energy, generated only 2.7% of U.S. electricity in 2009, with biomass generating a further 1%. Even if these renewable sources more than double through 2035, as projected by the EIA, they will still constitute only 8% of forecast U.S. electricity demand. Proponents of wind and solar and other renewable sources of generation will argue that this forecast is far too conservative. Perhaps it is, but the scale of the problem of replacing hydrocarbons in electricity generation is simply daunting. Moreover, renewables have well-known issues with intermittency and unpredictability, which compromise their ability to make up a major proportion of electricity supply, especially at current rates of consumption and necessary supply reliability.

## Carbon Dioxide Emissions

In any strategy to reduce carbon emissions it is important to understand where these emissions come from in the first place. The current sources of $CO_2$ emissions in the United States by fuel are illustrated in Figure 8. Oil is by far the largest source of emissions at 43%, followed by coal at 34% and natural gas at 23%. The EIA projection of $CO_2$ emissions in this figure is viewed as a doomsday scenario by a great many scientists, given the imperatives of reducing carbon emissions as outlined by the Intergovernmental Panel on Climate Change (IPCC)[18]. There are, however, potential supply constraints on the hydrocarbon inputs to this scenario that make it unlikely to happen. Even so, evidence mounts that anthropogenic greenhouse gas emissions are already altering the climate.



**Figure 8.** U.S. $CO_2$ emissions by fuel projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[19] This scenario assumes limited substitution of coal by natural gas through 2035.

Electricity generation is the largest source of $CO_2$ emissions in the U.S. at 40% (Figure 9). Non-electric use in the transportation sector is next at 34% followed by the industrial (16%), residential (6%), and commercial (4%) sectors. Substituting natural gas for coal in the electricity generation sector and substituting natural gas for oil in the transportation sector have been proposed as solutions for lowering carbon emissions and improving energy security; these proposals are addressed in the following sections.



**Figure 9.** U.S. $CO_2$ emissions by utilization sector projected through 2035. This is the EIA's reference case projection from its *Annual Energy Outlook 2011*.[20] All emissions from electricity use in the transportation, industrial, commercial, and residential sectors are ascribed to the electricity generation sector where they originate.

# U.S. NATURAL GAS PRODUCTION AND OUTLOOK



A natural gas transmission system.[21]

The advent of natural gas production from shale gas reservoirs in the past few years has led to a sharp increase in estimates of U.S. gas resources and sparked a wave of enthusiasm for natural gas as a "transition fuel" away from coal for electricity generation and away from oil for vehicular transport. EIA projections assume that U.S. shale gas production will nearly quadruple by 2035, when it is supposed to account for 45% of U.S. gas supply.[22] Other estimates for increases in shale gas production are even higher. Some of the most prominent voices promoting the benefits of natural gas are the natural gas producers' lobby, in the form of the organization America's Natural Gas Alliance (ANGA),[23] and major shale gas producers such as Chesapeake Energy Corporation.[24] How realistic are these claims, what are the limits to this enthusiasm, and what could be the environmental costs of realizing them? Let's have a look at the fundamentals of the U.S. natural gas industry.

## The Recent Past

U.S. natural gas production hit its all-time high of 21.73 trillion cubic feet (tcf) per year in 1973. Up until the late 1990s, the majority of U.S. gas production came from conventional reservoirs, which are pressurized pools of free-flowing gas trapped beneath impervious seals. Unconventional gas from coalbed methane became important in the early 1990s and was once heralded as a panacea to offset declines in conventional production, although now coalbed methane production is forecast to decline in the future (see Figure 16). Production from unconventional, very-low-permeability reservoirs in the form of tight gas sands and shale gas became significant in the late 1990s and especially over the past six years.

Natural gas production is a story about a race against depletion. Typically, the production from a new conventional gas well will decline by 25% to 40% in its first year, before tapering off to lower yearly declines as time goes by. The overall yearly decline rate of all U.S. gas wells has been estimated at 32% by EOG Resources.[25] This means that gas production would decline by a third each year, if no new wells were drilled. Sixty percent of U.S. gas production in 2006 came from wells drilled in the prior four years according to the EOG estimates. Chesapeake Energy has estimated that as of year-end 2007, nearly half of U.S. production came from wells drilled in the previous three years. So in order to keep overall gas supply from declining, drilling activity must be sustained.

Natural gas production is also a story about a rapidly increasing number of producing gas wells and a declining amount of gas produced from each. There are now more than half a million producing gas wells in the United States, nearly double the number in 1990 (Figure 10). Yet the gas production per well has declined by nearly 50% over this period. This is a manifestation of the law of diminishing returns, as a complex infrastructure nearly 100% larger than that in 1990 must be maintained today to achieve a 21% increase in natural gas production.



**Figure 10.** Number of U.S. producing natural gas wells versus the average productivity of each well from 1990 through 2010.[26] The number of wells for 2010 is estimated from the increase in the number of wells in 2009.

The law of diminishing returns is further illustrated in Figure 11, which plots the annual number of successful gas wells drilled versus gas production. When gas production peaked in 1973, about 7,000 gas wells were drilled annually. Throughout the 1990s gas drilling averaged about 10,000 wells yearly, which allowed some growth in production. Despite doubling this rate to more than 20,000 wells annually, gas production hit a post-

peak summit in 2001 and began to decline. In the run-up to the Great Recession, gas drilling more than tripled from 1990s levels to 33,000 wells per year in the 2006–2008 time frame before falling back below the 20,000 level. This burst of drilling served to grow production modestly to near the 1973 peak, albeit at more than four times the 1973 drilling rate. This "exploration treadmill" indicates the United States will need on the order of 30,000 or more successful gas wells per year to increase production going forward, which is triple the 1990s levels.



**Figure 11.** Annual number of successful U.S. natural gas wells versus total U.S. dry gas production 1990 through 2010.[27] Twelve-month centered moving average containing data through December, 2010.

The recent observed growth in U.S. gas production is a result of the unprecedented drilling boom of the 2006 to late-2008 period. Many of these wells are now being tied into production facilities. Of current drilling activity, some is motivated by requirements to retain leases and is likely otherwise uneconomic. It is unlikely that drilling will rebound to 2008 levels in a low-priced gas environment; hence production can be expected to start falling until prices and drilling activity recover. Thus the level of drilling activity that would be required to maintain and grow U.S. gas production in the future would be unprecedented in the history of U.S. gas production.

Another important aspect of natural gas supply is price and price volatility. Price determines the competitiveness of natural gas versus other fuels and energy sources. Figure 12 illustrates the price of U.S. natural gas over the past 16 years compared to European gas from Russia and the price of liquefied natural gas (LNG) in Asia.

19



**Figure 12.** Price of natural gas in the United States versus European gas (incl. Russia) and Asian LNG.[28] The wide spread between U.S. and European prices is a recent phenomenon developing only over the past three years.

The low U.S. natural gas prices observed since late 2008 are a recent phenomenon, yet it is assumed by proponents of natural gas for electricity generation and vehicle transport that prices will remain low for the foreseeable future. The high and volatile prices over most of the past decade have restricted the use of gas for electricity generation mainly to balancing peak loads. Comparatively little gas has historically been used for base load generation, although it is now being contemplated on a large scale. Notwithstanding the fact that the United States was a net importer of 12% of its gas consumption in 2009, the enthusiastic assumption in many quarters of ever-growing U.S. gas production has owners of several LNG import facilities planning to add LNG *export* capacity to take advantage of much higher gas prices outside of North America. The spread between North American gas prices and the rest of the world has, however, been relatively short-lived, and is unlikely to persist indefinitely into the future. This is obvious to economists like Jeff Rubin, who notes that "far from being the game-changer it's supposed to be, North American shale gas production isn't even sustainable at today's natual gas prices."[29]

The bottom line with natural gas is that it isn't so much a matter of the resources in the ground that count. What really counts are the flow rates at which these resources can be

produced. The flow rate will determine the ability of natural gas to contribute to future energy requirements, as well as to the social and environmental impacts of this production.

## Shale Gas

Shale gas has been declared a "game-changer," with the application of new technologies of horizontal drilling and multi-stage hydraulic fracturing. These technologies were first proven at scale in the Barnett Shale of east Texas, and demonstrated that gas locked in previously inaccessible very-low-permeability reservoirs could be recovered. Shale gas deposits throughout North America have since become candidates for the new drilling technology (Figure 13).

> **The bottom line with natural gas is that it isn't so much a matter of the resources in the ground that count. What really counts are the flow rates at which these resources can be produced.**



Figure 13. Shale gas plays in North America.[30]

In a 2011 report, the U.S. Potential Gas Committee (a non-profit organization made up of members of the natural gas industry) estimated total U.S. gas resources at 1739 tcf of probable, possible, and speculative resources (of which 687 tcf are shale gas) and a

further 159 tcf of coalbed methane, for a total of 1898 tcf.[31] Coupled with proven reserves of 272 tcf, this indicated a potential of 2170 tcf. It has been widely reported that the United States "has 100 years of gas" even though 2170 tcf, if it could actually be recovered, would last much less in actuality given the proposed ramp-up of shale gas production and the proposed increased use of gas for electricity generation and vehicle transport.

As mentioned earlier, the most important consideration for the outlook of natural gas is not the estimated volumes of potential resources and proven reserves in the ground, it is the rate at which they can be produced to meet present and future demand. Of the potential resources identified by the U.S. Potential Gas Committee, two-thirds are in conventional and unconventional tight sand and coalbed methane reservoirs, sources that are projected to decline in production going forward. Virtually all growth in gas supply in the current EIA reference case is projected to come from shale gas, which constitutes only a third of estimated U.S. gas resources.[32]

## An Overview of Some of the Issues with Shale Gas

Shale gas is a complex and hence high-cost source of natural gas fraught with environmental issues that are now becoming apparent. There have been many reviews of the potential of shale gas and the technical details of production, including primers by the U.S. Geological Survey[33] and Canada's National Energy Board.[34] The EIA has looked at the global aspects of shale gas,[35] and MIT has also published an assessment of the future of gas.[36] There have also been hundreds of articles published recently on the geology, economics, and environmental issues surrounding shale gas.

**PRODUCTION**

Shale is a very-low-permeability reservoir rock that must be fractured to allow conduits for gas to migrate to the production well bore. This is typically accomplished using multiple horizontal wells drilled from a common well pad (Figure 14), with multiple slickwater hydraulic fracture treatments in each (from as few as 5 to more than 20 fracture treatment stages per well). Because of the very low permeability of shale, minimum well spacing of 40 to 80 acres[37] or less is required—much closer than well spacing for conventional gas drilling, which is typically 160 acres or more.

22